# Title 8—Aliens and Nationality

\*     \*     \*     \*     \*     \*     \*

## CHAPTER 12.—IMMIGRATION AND NATIONALITY

### SUBCHAPTER I.—GENERAL PROVISIONS

Sec.
1101. Definitions.

\*     \*     \*     \*     \*     \*     \*

### SUBCHAPTER II.—IMMIGRATION

#### PART I.—SELECTION SYSTEM

\*     \*     \*     \*     \*     \*     \*

1152. Numerical limitations on individual foreign states.
    (a) Prohibition against preference or priority because of race, sex, nationality, place of birth, or place of residence.
    (b) Determination of individual foreign states by Secretary of State; charging immigrant to proper foreign state.
    (c) Immigrants born in colonies of foreign states.
    (d) Changes in territorial limits of foreign states.
    (e) Additional visas and conditional entries; availability and allocation.

\*     \*     \*     \*     \*     \*     \*

#### PART II.—ADMISSION QUALIFICATIONS FOR ALIENS; TRAVEL CONTROL OF CITIZENS AND ALIENS

\*     \*     \*     \*     \*     \*     \*

1184. Admission of nonimmigrants.
    (a) Regulations.
    (b) Presumption of status; written waiver.
    (c) Petition of importing employer.
    (d) Issuance of visa to fiancée or fiancé of citizen.

\*     \*     \*     \*     \*     \*     \*

#### PART V.—DEPORTATION; ADJUSTMENT OF STATUS

\*     \*     \*     \*     \*     \*     \*

1255. Adjustment of status of nonimmigrant to that of person admitted to permanent residence; record; natives of contiguous country or adjacent island.

\*     \*     \*     \*     \*     \*     \*

1258. Change of nonimmigrant classification.

\*     \*     \*     \*     \*     \*     \*

#### PART VIII.—GENERAL PENALTY PROVISIONS

\*     \*     \*     \*     \*     \*     \*

1324. Bringing in and harboring certain aliens; persons liable; authority to arrest.

\*     \*     \*     \*     \*     \*     \*

## SUBCHAPTER I.—GENERAL PROVISIONS

## § 1101. Definitions.

\*     \*     \*     \*     \*     \*     \*

AR2022_400935

(15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens—

\*    \*    \*    \*    \*    \*    \*

(H) an alien having a residence in a foreign country which he has no intention of abandoning (i) who is of distinguished merit and ability and who is coming temporarily to the United States to perform services of exceptional nature requiring such merit and ability, and who, in the case of a graduate of a medical school coming to the United States to perform services as a member of the medical profession, is coming pursuant to an invitation from a public or nonprofit private educational or research institution or agency in the United States to teach or conduct research, or both, at or for such institution or agency; or (ii) who is coming temporarily to the United States to perform temporary services or labor, *other than agricultural services described in section 216(h)(1)* if unemployed persons capable of performing such service or labor cannot be found in this country, but this clause shall not apply to graduates of medical schools coming to the United States to perform services as members of the medical profession; or (iii) who is coming temporarily to the United States as a trainee, other than to receive graduate medical education or training; and the alien spouse and minor children of any such alien specified in this paragraph if accompanying him or following to join him;

\*    \*    \*    \*    \*    \*    \*

(L) an alien who, immediately preceding the time of his application for admission into the United States, has been employed continuously for one year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive, or involves specialized knowledge, and the alien spouse and minor children of any such alien if accompanying him or following to join him; 【or】

(M)(i) an alien having a residence in a foreign country which he has no intention of abandoning who seeks to enter the United States temporarily and solely for the purpose of pursuing a full course of study at an established vocational or other recognized nonacademic institution (other than in a language training program) in the United States particularly designated by him and approved by the Attorney General, after consultation with the Secretary of Education, which institution shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant nonacademic student and if any such institution fails to make reports promptly the approval shall be withdrawn, and (ii) the alien spouse and minor children of any such alien if accompanying him or following to join him【.】;

*(N) an alien, having a residence in a foreign country which he has no intention of abandoning, who is coming temporarily*

AR2022_400936

71

to the United States under section 216 to perform agricultural services (as defined in section 216(h)(1)) of the temporary or seasonal nature; or

(O)(i) the parent of an alien accorded the status of special immigrant under paragraph (27)(I)(i), but only if and while the alien is a child, or

(ii) a child of such parent or of an alien accorded the status of a special immigrant under paragraph (27)(I) (ii), (iii), or (iv).

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(27) The term "special immigrant" means—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(G) an immigrant, and his accompanying spouse and children, who was an employee of the Panama Canal Company or Canal Zone Government on the effective date of the exchange of instruments of ratification of such Panama Canal Treaty of 1977 [April 1, 1979], who has performed faithful service for five years or more as such an employee, and whose personal safety, or the personal safety of whose spouse or children, as a direct result of such Treaty, is reasonably placed in danger because of the special nature of any of that employment; [or]

(H) an immigrant, and his accompanying spouse and children, who—

(i) has graduated from a medical school or has qualified to practice medicine in a foreign state,

(ii) was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date,

(iii) entered the United States as a nonimmigrant under subsection (a)(15)(H) or (a)(15)(J) of this section before January 10, 1978, and

(iv) has been continuously present in the United States in the practice or study of medicine since the date of such entry [.] ; or

(I)(i) an immigrant who is the unmarried son or daughter of an officer or employee, or of a former officer or employee, of an international organization described in paragraph (15)(G)(i), and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv) or paragraph (15)(O), has resided and been physically present in the United States for periods totaling at least one half of the seven years before the date of application for a visa or for adjustment of status to a status under this subparagraph and for a period or periods aggregating at least seven years between the ages of five and 21 years, and (II) applies for admission under this subparagraph no later than his twenty-fifth birthday or six months after the date this subparagraph is enacted, whichever is later;

(ii) an immigrant who is the surviving spouse of a deceased officer or employee of such an international organization, and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv) or paragraph (15)(O), has resided and been physically present in the United States for periods totaling at least one half of the seven years before the date of application

**AR2022_400937**

*for a visa or for adjustment of status to a status under this subparagraph and for a period or periods aggregating at least 15 years before the date of the death of such officer or employee, and (II) applies for admission under this subparagraph no later than six months after the date of such death or six months after the date this subparagraph is enacted, whichever is later;*

*(iii) an immigrant who is a retired officer or employee of such an international organization, and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv), has resided and been physically present in the United States for periods totaling at least one half of the seven years before the date of application for a visa or for adjustment of status to a status under this subparagraph and for a period or periods aggregating at least 15 years before the date of the officer or employee's retirement from any such international organization, and (II) applies for admission under this subparagraph before January 1, 1993, and no later than six months after the date of such retirement or six months after the date this subparagraph is enacted, whichever is later; or*

*(iv) an immigrant who is the spouse of a retired officer or employee accorded the status of special immigrant under clause (iii), accompanying or following to join such retired officer or employee as a member of his immediate family.*

\*        \*        \*        \*        \*        \*        \*

## SUBCHAPTER II.—IMMIGRATION

### Part I.—Selection System

\*        \*        \*        \*        \*        \*        \*

## § 1152. Numerical limitations on individual foreign states

\*        \*        \*        \*        \*        \*        \*

(c) Immigrants born in colonies of foreign states

Any immigrant born in a colony or other component or dependent area of a foreign state overseas from the foreign state, other than a special immigrant, as defined in section 1101(a)(27) of this title, or an immediate relative of a United States citizen, as defined in section 1151(b) of this title, shall be chargeable for the purpose of the limitation set forth in subsection (a) of this section, to the foreign state, and the number of immigrant visas available to each such colony or other component or dependent area shall not exceed 〖six hundred〗 *3,000* in any one fiscal year.

\*        \*        \*        \*        \*        \*        \*

(e) Additional visas and conditional entries; availability and allocation

Whenever the maximum number of visas have been made available under this section to natives of any single foreign state as defined in subsection (b) of this section or any dependent area as defined in subsection (c) of this section in any fiscal year, in the next following fiscal year a number of visas, not to exceed 20,000, in the case of a foreign state or 〖600〗 *3,000* in the case of a dependent area, shall be made available and allocated as follows:

(1) Visas shall first be made available, in a number not to exceed 20 per centum of the number specified in this subsection, to qualified immigrants who are the unmarried sons or daughters of citizens of the United States.

(2) Visas shall next be made available, in a number not to exceed 26 per centum of the number specified in this subsection, plus any visas not required for the classes specified in paragraph (1), to qualified immigrants who are the spouses, unmarried sons, or unmarried daughters of an alien lawfully admitted for permanent residence.

\*  \*  \*  \*  \*  \*  \*

PART II.—ADMISSION QUALIFICATIONS FOR ALIENS; TRAVEL CONTROL OF CITIZENS AND ALIENS

\*  \*  \*  \*  \*  \*  \*

## § 1184.  Admission of nonimmigrants

### (a) Regulations

The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe, including when he deems necessary the giving of a bond with sufficient surety in such sum and containing such conditions as the Attorney General shall prescribe, to insure that at the expiration of such time or upon failure to maintain the status under which he was admitted, or to maintain any status subsequently acquired under section 1258 of this title, such alien will depart from the United States. No alien admitted to Guam without a visa pursuant to section 1182(*l*) of this title may be authorized to enter or stay in the United States other than in Guam or to remain in Guam for a period exceeding fifteen days from date of admission to Guam. *No alien admitted to the United States without a visa pursuant to section 217 may be authorized to remain in the United States as a nonimmigrant visitor for a period exceeding 90 days from the date of admission.*

\*  \*  \*  \*  \*  \*  \*

### (c) Petition of importing employer

The question of importing any alien as a nonimmigrant under section 1101(a)(15) (H) 【or (L)】, *(L), or (N)* of this title in any specific case or specific cases shall be determined by the Attorney General, after consultation with appropriate agencies of the Government, upon petition of the importing employer. Such petition shall be made and approved before the visa is granted. The petition shall be in such form and contain such information as the Attorney General shall prescribe. The approval of such a petition shall not, of itself, be construed as establishing that the alien is a nonimmigrant. *For purposes of this subsection the term 'appropriate agencies of Government' means the Department of Labor and includes, with respect to nonimmigrants under section 101(a)(15)(N), the Department of Agriculture. The provisions of section 216 shall apply to the*

*question of importing any alien as a nonimmigrant under section 101(a)(15)(N).*

    \*      \*      \*      \*      \*      \*      \*

PART V.—DEPORTATION; ADJUSTMENT OF STATUS

    \*      \*      \*      \*      \*      \*      \*

**§ 1255.  Adjustment of status of nonimmigrant to that of person admitted for permanent residence; record; alien crewmen, aliens continuing or accepting unauthorized employment, and aliens admitted in transit without visa**

    \*      \*      \*      \*      \*      \*      \*

〔(c) The provisions of this section shall not be applicable to (1) an alien crewman; (2) an alien (other than an immediate relative as defined in section 1151(b) of this title or a special immigrant described in section 1101(a)(27)(H) of this title) who hereafter continues in or accepts unauthorized employment prior to filing an application for adjustment of status; or (3) any alien admitted in transit without visa under section 1182(d)(4)(C) of this title.〕

*c ALIENS FOR WHOM THIS SECTION DOES NOT APPLY.—Subsection (a) shall not apply to the following aliens:*

*(1) An alien crewman.*

*(2)(A) Except as provided in subparagraph (B), an alien who—*

    *(i) continues in or accepts unauthorized employment before the date of filing an application for adjustment of status,*

    *(ii) is not in legal immigration status on the date of filing the application for adjustment of status, or*

    *(iii) has failed to maintain continuously a legal status since the date of entry into the United States.*

*(B) Subparagraph (A) shall not apply to an alien who is—*

    *(i) an immediate relative, described in section 201(b), or*

    *(ii) a special immigrant described in section 101(a)(27)(H).*

*(3) An alien admitted in transit without a visa under section 212(d)(4)(C).*

*(4) An alien (other than an immediate relative specified in section 201(b)) who entered the Untied States classified as a nonimmigrant under section 101(a)(15)(N).*

*(5) An alien (other than an immediate relative specified in section 201(b)) who was admitted as a nonimmigrant visitor without a visa under section 212(l) or section 217.*

    \*      \*      \*      \*      \*      \*      \*

**§ 1258. Change of nonimmigrant classification**

The Attorney General may, under such conditions as he may prescribe, authorize a change from any nonimmigrant classification to any other nonimmigrant classification in the case of any alien lawfully admitted to the United States as a nonimmigrant who is continuing to maintain that status, except in the case of—

(1) an alien classified as a nonimmigrant under subparagraph (C), (D), [or (K)] *(K), or (N)* of section 1101(a)(15) of this title.

(2) an alien classified as a nonimmigrant under subparagraph (J) of section 1101(a)(15) of this title who came to the United States or acquired such classification in order to receive graduate medical education or training, [and]

(3) an alien (other than an alien described in paragraph (2)) classified as a nonimmigrant under subparagraph (J) of section 1101(a)(15) of this title who is subject to the two-year foreign residence requirement of section 1182(e) of this title and has not received a waiver thereof, unless such alien applies to have the alien's classification changed from classification under subparagraph (J) of section 1101(a)(15) of this title to a classification under subparagraph (A) or (G) of such section[.], *and*

*(4) an alien admitted as a nonimmigrant visitor without a visa under section 212(l) or section 217.*

*      *      *      *      *      *      *

PART VIII.—GENERAL PENALTY PROVISIONS

*      *      *      *      *      *      *

### § 1324. Bringing in and harboring certain aliens; persons liable; authority to arrest

[(a) Persons liable

[Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

[(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;

[(2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;

[(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; or

[(4) willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of—

any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any

violation of this subsection occurs: *Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.]

*(a) Criminal penalties*

    *(1) Any person who—*

        *(A) knowing or in reckless disregard of the fact that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;*

        *(B) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;*

        *(C) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation; or*

        *(D) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law,*

shall be fined, imprisoned not more than five years, or both, for each alien in respect to whom any violation of this subsection occurs. For the purpose of subparagraph (C) of this paragraph, employment (including the usual and normal practices incident to employment) by itself does not constitute harboring.

    *(2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each transaction constituting a violation of this subsection, regardless of the number of aliens involved—*

        *(A) be fined, or imprisoned not more than one year, or both; or*

        *(B) in the case of—*

            *(i) a second or subsequent offense,*

            *(ii) an offense done for the purpose of commercial advantage or private financial gain,*

            *(iii) an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry,*

            *(iv) an offense during which either the offender or the alien with the knowledge of the offender makes any false or misleading statement or engages in any act or conduct in-*

*tended to mislead any officer, agent, or employer of the United States,*
be fined, or imprisoned not more than five years, or both.

(b) Seizure and forfeiture of conveyances; exceptions; officers and authorized persons; disposition of forfeited conveyances; suits and actions

(1) Any conveyance, including any vessel, vehicle, or aircraft, which [is used] *has been or is being used* in the commission of a violation of subsection (a) of this section shall be [subject to seizure and] *seized and subject to* forfeiture, except that—

  *  *  *  *  *  *  *

(2) Any conveyance subject to seizure under this section may be seized without warrant if there is probable cause to believe the conveyance has been *or is being* used in a violation of subsection (a) of this section and circumstances exist where a warrant is not constitutionally required.

(3) All provisions of law relating to the seizure, summary and judicial forfeiture, and condemnation of property for the violation of the customs laws; the disposition of such property or the proceeds from the sale thereof; the remission or mitigation of such forfeitures; and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to seizures and forfeitures incurred, or alleged to have been incurred, under the provisions of this section, insofar as applicable and not inconsistent with the provisions hereof, except that duties imposed on customs officers or other persons regarding the seizure and forfeiture of [conveyances] *property* under the customs laws shall be performed with respect to seizures and forfeitures carried out under the provisions of this section by such officers or persons authorized for that purpose by the Attorney General.

(4) Whenever a conveyance is forfeited under this section the Attorney General may—

 (A) retain the conveyance for official use;

 (B) sell the conveyance, in which case the proceeds from any such sale shall be used to pay all proper expenses of the proceedings for forfeiture and sale including expenses of seizure, maintenance of custody, advertising, and court cost; [or]

 (C) require that the General Services Administration, *or the Federal Maritime Commission if appropriate under section 203(i) of the Federal Property and Administrative Services Act of 1949,* take custody of the conveyance and remove it for disposition in accordance with law[.]; *or*

 *(D) dispose of the conveyance in accordance with the terms and conditions of any petition of remission or mitigation of forfeiture granted by the Attorney General.*

(5) In all suits or actions brought for the forfeiture of any conveyance seized under this section, where the conveyance is claimed by any person, the burden of proof shall lie upon such claimant[: *Provided,* That], *except that* probable cause shall be first shown for the institution of such suit or action. In determining whether probable cause exists, any of the following shall be prima facie evidence that an alien involved in the alleged violation [was not lawfully

AR2022_400943

78

entitled to enter, or reside within, the United States.⟧ *had not received prior official authorization to come to, enter, or reside in the United States or that such alien had come to, entered, or remained in the United States in violation of law.*

(A) Records of any judicial or administrative proceeding in which that alien's status was an issue and in which it was determined that the alien ⟦was not lawfully entitled to, enter, or reside within, the United States.⟧ *had not received prior official authorization to come to enter, or reside in the United States or that such alien had come to, entered, or remained in the United States in violation of law.*

(B) Official records of the Service *or of the Department of State* showing that the alien was not lawfully entitled to enter, or reside within, the United States.

\*        \*        \*        \*        \*        \*        \*

# Title 18—Crimes and Criminal Procedure

## PART I—CRIMES

### CHAPTER 75—PASSPORTS AND VISAS

Sec.
1541. Issuance without authority.
1542. False statement in application and use of passport.
1543. Forgery or false use of passport.
1544. Misuse of passport.
1545. Safe conduct violation.
⟦1546. Fraud and misuse of visas, permits, and other entry documents.⟧
*1546. Fraud and misuse of visas, permits, and other documents.*

\*        \*        \*        \*        \*        \*        \*

## § 1546. ⟦Fraud and misuse of visas, permits, and other entry documents⟧ *Fraud and misuse of visas, permits, and other documents*

*(a)* Whoever knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, ⟦or other document required for entry into the United States,⟧ *border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or authorized employment in the United States,* or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, ⟦or document,⟧ *border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or authorized employment in the United States,* knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or ·to have been otherwise procured by fraud or unlawfully obtained; or

Whoever, except under direction of the Attorney General or the Commissioner of the Immigration and Naturalization Service, or other proper officer, knowingly possesses any blank permit, or engraves, sells, brings into the United States, or has in his control or

possession any plate in the likeness of a plate designed for the printing of permits, or makes any print, photograph, or impression in the likeness of any immigrant or nonimmigrant visa, permit or other document required for entry into the United States, or has in his possession a distinctive paper which has been adopted by the Attorney General or the Commissioner of the Immigration and Naturalization Service for the printing of such visas, permits, or documents; or

Whoever, when applying for an immigrant or nonimmigrant visa, permit, or other document required for entry into the United States, or for admission to the United States personates another, or falsely appears in the name of a deceased individual, or evades or attempts to evade the immigration laws by appearing under an assumed or fictitious name without disclosing his true identity, or sells or otherwise disposes of, or offers to sell or otherwise dispose of, or utters, such visa, permit, or other document, to any person not authorized by law to receive such document; or

Whoever knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement—

Shall be fined not more than $2,000 or imprisoned not more than five years, or both.

*(b) Whoever uses—*

*(1) an identification document, knowing (or having reason to know) that the document was not issued lawfully for the use of the possessor,*

*(2) an identification document knowing (or having reason to know) that the document is false, or*

*(3) a false attestation,*

*for the purpose of satisfying a requirement of section 274A(b) of the Immigration and Nationality Act, shall be fined, or imprisoned not more than two years, or both.*

*(c) This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a subdivision of a State, or of an intelligence agency of the United States, or any activity authorized under title V of the Organized Crime Control Act of 1970 (18 U.S.C. note prec. 3481).*

\*       \*       \*       \*,       \*       \*       \*

## Public Law 97–470 [H.R. 7102]; January 14, 1983

### Migrant and Seasonal Agricultural Worker Protection Act

#### TABLE OF CONTENTS

Sec. 1. Short title; table of contents.
Sec. 2. Purpose.
Sec. 3. Definitions.
Sec. 4. Application of Act.

## TITLE I—FARM LABOR CONTRACTORS

Sec. 101. Certificate of registration required.
Sec. 102. Issuance of certificate of registration.
Sec. 103. Registration determinations.
Sec. 104. Transfer or assignment; expiration; renewal.
Sec. 105. Notice of address change; amendment of certificate of registration.
【Sec. 106. Prohibition against employing illegal aliens.】

\*        \*        \*        \*        \*        \*        \*

## TITLE V—GENERAL PROVISIONS

### PART A—ENFORCEMENT PROVISIONS

Sec. 501. Criminal sanctions.
Sec. 502. Judicial enforcement.
Sec. 503. Administrative sanctions.
Sec. 504. Private right of action.
Sec. 505. Discrimination prohibited.
Sec. 506. Waiver of rights.

\*        \*        \*        \*        \*        \*        \*

## DEFINITIONS

SEC. 3. As used in this Act—

\*        \*        \*        \*        \*        \*        \*

(8)(A) Except as provided in subparagraph (B), the term "migrant agricultural worker" means an individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent place of residence.

(B) The term "migrant agricultural worker" does not include—

(i) any immediate family member of an agricultural employer or a farm labor contractor; or

(ii) any temporary nonimmigrant alien who is authorized to work in agricultural employment in the United States under sections 【101(a)(15)(H)(ii)】 *101(a)(15)(N)* and 214(c) of the Immigration and Nationality Act.

(9) The term "person" means any individual, partnership, association, joint stock company, trust, cooperative, or corporation.

(10)(A) Except as provided in subparagraph (B), the term "seasonal agricultural worker" means an individual who is employed in agricultural employment of a seasonal or other temporary nature and is not required to be absent overnight from his permanent place of residence—

(i) when employed on a farm or ranch performing field work related to planting, cultivating, or harvesting operations; or

(ii) when employed in canning, packing, ginning, seed conditioning or related research, or processing operations, and transported, or caused to be transported, to or from the place of employment by means of a day-haul operation.

(B) The term "seasonal agricultural worker" does not include—

(i) any migrant agricultural worker;

AR2022_400946

(ii) any immediate family member of an agricultural employer or a farm labor contractor; or

(iii) any temporary nonimmigrant alien who is authorized to work in agricultural employment in the United States under sections 〚101(a)(15)(H)(ii)〛 *101(a)(15)(N)* and 214(c) of the Immigration and Nationality Act.

\*          \*          \*          \*          \*          \*          \*

## TITLE I—FARM LABOR CONTRACTORS

\*          \*          \*          \*          \*          \*          \*

### REGISTRATION DETERMINATIONS

SEC. 103. (a) In accordance with regulations, the Secretary may refuse to issue or renew, or may suspend or revoke, a certificate of registration (including a certificate of registration as an employee of a farm labor contractor) if the applicant or holder—

(1) has knowingly made any misrepresentation in the application for such certificate;

(2) is not the real party in interest in the application or certificate of registration and the real party in interest is a person who has been refused issuance or renewal of a certificate, has had a certificate suspended or revoked, or does not qualify under this section for a certificate;

(3) has failed to comply with this Act or any regulation under this Act;

(4) has failed—

(A) to pay any court judgment obtained by the Secretary or any other person under this Act or any regulation under this Act or under the Farm Labor Contractor Registration Act of 1963 or any regulation under such Act, or

(B) to comply with any final order issued by the Secretary as a result of a violation of this Act or any regulation under this Act or a violation of the Farm Labor Contractor Registration Act of 1963 or any regulation under such Act; 〚or〛

(5) has been convicted within the preceding five years—

(A) of any crime under State or Federal law relating to gambling, or to the sale, distribution or possession of alcoholic beverages, in connection with or incident to any farm labor contracting activities; or

(B) of any felony under State or Federal law involving robbery, bribery, extortion, embezzlement, grand larceny, burglary, arson, violation of narcotics laws, murder, rape, assault with intent to kill, assault which inflicts grievous bodily injury, prostitution, peonage, or smuggling or harboring individuals who have entered the United States illegally 〚.〛*; or*

*(6) has been found to have violated paragraph (1) or (2) of section 274A(a) of the Immigration and Nationality Act.*

\*          \*          \*          \*          \*          \*          \*

⟦PROHIBITION AGAINST EMPLOYING ILLEGAL ALIENS⟧

⟦Sec. 106. (a) No farm labor contractor shall recruit, hire, employ, or use, with knowledge, the services of any individual who is an alien not lawfully admitted for permanent residence or who has not been authorized by the Attorney General to accept employment.

⟦(b) A farm labor contractor shall be considered to have complied with subsection (a) if the farm labor contractor demonstrates that the farm labor contractor relied in good faith on documentation prescribed by the Secretary, and the farm labor contractor had no reason to believe the individual was an alien referred to in subsection (a).⟧

\*         \*         \*         \*         \*         \*         \*

# TITLE V—GENERAL PROVISIONS

## PART A—ENFORCEMENT PROVISIONS

### CRIMINAL SANCTIONS

Sec. 501. (a) Any person who willfully and knowingly violates this Act or any regulation under this Act shall be fined not more than $1,000 or sentenced to prison for a term not to exceed one year, or both. Upon conviction for any subsequent violation of this Act or any regulation under this Act, the defendant shall be fined not more than $10,000 or sentenced to prison for a term not to exceed three years, or both.

(b) If a farm labor contractor who commits a violation of ⟦section 106⟧ *paragraph (1) or (2) of section 274A(a) of the Immigration and Nationality Act* has been refused issuance or renewal of, or has failed to obtain, a certificate of registration or is a farm labor contractor whose certificate has been suspended or revoked, the contractor shall, upon conviction, be fined not more than $10,000 or sentenced to prison for a term not to exceed three years, or both.

\*         \*         \*         \*         \*         \*         \*

## IMMIGRATION AND NATIONALITY ACT

### PUBLIC LAW 414

### June 27, 1952, c. 477, 66 Stat. 163

### TABLE OF CONTENTS

#### TITLE I—GENERAL

Sec.
101. Definitions.
102. Applicability of title II to certain nonimmigrants.
103. Powers and duties of the Attorney General and the Commissioner.
104. Powers and duties of the Secretary of State; Bureau of Security and Consular Affairs.
105. Liaison with internal security officers.

## TITLE II—IMMIGRATION

### CHAPTER 1—QUOTA SYSTEM

201. Numerical limitations; annual quota based upon national origin; minimum quotas.
202. Determination of quota to which an immigrant is chargeable.
203. Allocation of immigrant visas within quotas.
204. Procedure for granting immigrant status under section 101(a)(27)(F)(i) or 203(a)(1)(A).
205. Procedure for granting nonquota status or preference by reason of relationship.
206. Revocation of approval of petitions.
207. Unused quota immigrant visas.

### CHAPTER 2—QUALIFICATIONS FOR ADMISSION OF ALIENS; TRAVEL CONTROL OF CITIZENS AND ALIENS

211. Documentary requirements.
212. General classes of aliens ineligible to receive visas and excluded from admission.
213. Admission of aliens on giving bond or cash deposit.
214. Admission of nonimmigrants.
215. Travel control of aliens and citizens in time of war or national emergency.
*216. Admission of temporary agricultural workers.*
*217. Visa waiver pilot program for certain visitors.*

\*     \*     \*     \*     \*     \*     \*

### CHAPTER 8—GENERAL PENALTY PROVISIONS

271. Prevention of unauthorized landing of aliens.
272. Bringing in alien subject to disability or afflicted with disease.
273. Unlawful bringing of aliens into United States.
274. Bringing in and harboring certain aliens.
*274A. Unlawful employment of aliens.*

\*     \*     \*     \*     \*     \*     \*

### CHAPTER 9—MISCELLANEOUS

281. [Schedule of fees.] *Nonimmigrant visa fees and alien user fees.*

\*     \*     \*     \*     \*     \*     \*

## TITLE IV—MISCELLANEOUS

404. Authorization of appropriations.

\*     \*     \*     \*     \*     \*     \*

# CHAPTER 2—QUALIFICATIONS FOR ADMISSION OF ALIENS; TRAVEL CONTROL OF CITIZENS AND ALIENS

\*     \*     \*     \*     \*     \*     \*

### TRAVEL CONTROL OF ALIENS AND CITIZENS IN TIME OF WAR OR NATIONAL EMERGENCY

SEC. 215. (a) When the United States is at war or during the existence of any national emergency proclaimed by the President, or, as to aliens, whenever there exists a state of war between or among two or more states, and the President shall find that the interests of the United States require that restrictions and prohibitions in addition to those provided otherwise than by this section be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation there-

AR2022_400949

of, it shall, until otherwise ordered by the President or the Congress, be unlawful—

\* \* \* \* \* \* \*

(g) Passports, visas, reentry permits, and other documents required for entry under this Act may be considered as permits to enter for the purposes of this section.

### ADMISSION OF TEMPORARY AGRICULTURAL WORKERS

SEC. 216. (a) APPLICATION FOR LABOR CERTIFICATION.—

(1) REQUIREMENT.—*A petition to import an alien as a temporary agricultural worker (as defined in subsection (h)(3)) may not be approved by the Attorney General unless the petitioner has applied to the Secretary of Labor for a certification that—*

*(A) there are not sufficient eligible individuals who are able, willing, and qualified and who will be available at the time and place needed to perform the services involved in the petition, and*

*(B) the employment of the alien in such services will not adversely affect the wages and working conditions of eligible individuals in the United States similarly employed.*

(2) PAYMENT OF REQUIRED FEES.—*The Secretary of Labor may require by regulation, as a condition of applying for the certification, the payment of a fee to recover the reasonable costs of processing applications for certification.*

(b) CONDITIONS FOR DENIAL OF LABOR CERTIFICATION.—*The Secretary of Labor may not issue a certification under subsection (a) with respect to an employer if the conditions described in that subsection are not met or if any of the following conditions exist:*

(1) LABOR DISPUTE.—*There is a strike or lockout in the course of a labor dispute which, under the regulations, precludes such certification.*

(2) VIOLATION OF TERM OF PREVIOUS CERTIFICATION.—

*(A)* IN GENERAL.—*The employer at any time during the previous two-year period employed temporary agricultural workers and the Secretary of Labor has determined, after notice and opportunity for a hearing, that the employer at any time during that period—*

*(i) substantially violated an essential term or condition of the labor certification with respect to the employment of domestic or nonimmigrant workers, or*

*(ii) has not paid every penalty which has been assessed by the Secretary of Labor for a violation of a term or condition of such labor certification.*

*(B)* DISQUALIFICATION LIMITED TO ONE YEAR.—*No employer may be denied certification under subparagraph (A) for more than one year for any violation described in that subparagraph.*

(3) NOT PROVIDING FOR WORKERS' COMPENSATION.—*The employer has not provided the Secretary with satisfactory assurances that if the employment for which the certification is sought is not covered by State workers' compensation law, the employer will provide, at no cost to the worker, insurance covering injury and disease arising out of and in the course of the*

worker's employment which will provide benefits at least equal to those provided under the State workers' compensation law for comparable employment.

(c) RULES CONCERNING APPLICATIONS FOR LABOR CERTIFICATION.—The following rules shall apply in the case of the filing and consideration of an application for a labor certification for a temporary agricultural worker:

(1) DEADLINE FOR FILING APPLICATIONS.—The Secretary of Labor may not require that the application be filed more than 65 days before the first date the employer requires the services of the worker.

(2) NOTICE WITHIN 14 DAYS OF DEFICIENCIES.—

(A) NOTICE OF DEFICIENCIES.—The application shall be considered to have met the requirements of subsection (a)(1) (other than subparagraph (A) thereof) unless the Secretary of Labor, within 14 days of the date of filing the application, notifies the employer filing the application that the application does not meet the requirements.

(B) SUBMITTAL OF MODIFIED APPLICATION.—If the application does not meet the requirements, the notice shall include the reasons therefor and the Secretary shall permit the employer an opportunity for the prompt resubmission of a modified application.

(3) ISSUANCE OF CERTIFICATION.—

(A) IF CONDITIONS MET.—The Secretary of Labor shall make, not later than 20 days before the date such services are first required to be performed, the certification described in subsection (a)(1) if—

(i) the employer has complied with the requirements for certification (including the recruitment of eligible individuals as prescribed by regulation), and

(ii) the employer does not actually have, or has not been provided with referrals of, eligible individuals who have agreed to perform such services on the terms and conditions of a job offer which meet requirements of regulations.

(B) CONTINUED ACCEPTANCE OF APPLICANTS.—A labor certification under this section remains effective only if the employer continues to accept for employment, until the date the temporary agricultural workers depart for work with the employer, eligible individuals who apply or are referred to the employer.

(4) PROVIDING HOUSING ALLOWANCE.—In the employer's complying with terms and conditions of employment respecting the furnishing of housing, the employer shall be permitted, at the employer's option and instead of providing for suitable housing accommodations, to substitute payment of a reasonable housing allowance, but only if suitable housing is otherwise available in the proximate area of employment.

(d) ROLES OF AGRICULTURAL ASSOCIATIONS.—

(1) PERMITTING FILING BY AGRICULTURAL ASSOCIATIONS.—A petition to import an alien as a temporary agricultural worker, and an application for a labor certification with respect to such

AR2022_400951

*a worker, may be filed by an association representing agricultural producers which use agricultural services.*

*(2) TREATMENT OF ASSOCIATIONS ACTING AS EMPLOYERS.—If such an association is a joint or sole employer of temporary agricultural workers, the certifications granted under this section to the association may be used for the certified job opportunities of any of its producer members and such workers may be transferred among its member producers to perform agricultural services of a temporary or seasonal nature for which the certifications were granted.*

*(3) TREATMENT OF VIOLATIONS.—*

    *(A) MEMBER'S VIOLATION DOES NOT NECESSARILY DISQUALIFY ASSOCIATION OR OTHER MEMBERS.—If an individual producer member of such an association is determined to have committed an act that under subsection (b)(2) results in the denial of certifications with respect to the member, the denial shall apply only to that member and does not apply to the association or another producer member of the association unless the Secretary determines that the association or other member participated in, or had knowledge of and derived benefit from, the violation.*

    *(B) ASSOCIATION'S VIOLATION DOES NOT NECESSARILY DISQUALIFY MEMBERS.—If an association representing agricultural producers as a joint employer, or employer is determined to have committed an act that under subsection (b)(2) results in the denial of certification with respect to the association, the denial shall apply only to the association and does not apply to any individual producer member of the association unless the Secretary determines that the member participated in, or had knowledge of and derived benefit from, the violation.*

*(e) EXPEDITED ADMINISTRATIVE APPEALS OF CERTAIN DETERMINATIONS.—*

    *(1) DENIAL OF LABOR CERTIFICATION.—The Secretary of Labor shall provide for an expedited procedure for the review of a denial of certification under subsection (a)(1) or, at the applicant's request, for a de novo administrative hearing respecting the denial. In the case of a request for such a review or hearing with respect to denial of certification for temporary agricultural workers to perform agricultural services in the production of perishable commodities (as defined by the Secretary of Agriculture for purposes of this section), the Secretary of Labor shall provide that the review or hearing take place not later than 72 hours after the time the request is submitted.*

    *(2) REDETERMINATION WHERE UNQUALIFIED WORKERS REFERRED FOR EMPLOYMENT.—The Secretary of Labor shall expeditiously, but in no case later than 72 hours after the time a new determination is requested, make a new determination on the request for certification in the case of a temporary agricultural worker if the employer asserts that eligible individuals who have been referred are not able, willing, or qualified because of lawful employment-related reasons. If the employer asserts that an eligible individual who has been referred is not able, willing, or qualified, the burden of proof is on the employ-*

*er to establish that the individual referred is not able, willing, or qualified because of employment-related reasons.*

*(3) ATTORNEY GENERAL EXPEDITED REVIEW WHERE WORKERS NOT ACTUALLY AVAILABLE.—To the extent that—*

> *(A) a certification under subsection (a)(1) was denied solely because of the availability of eligible individuals to perform the agricultural services specified in the petition, and*

> *(B) eligible individuals who agree to perform the services for which the temporary agricultural workers are sought are not actually available at the time and place such services are required,*

*the Attorney General shall provide by regulation for an expedited review of the petition respecting the workers not later than 72 hours after the time the employer requests expedited review under this paragraph. To the extent that the Attorney General determines that the facts described in the previous sentence exist, the Attorney General may provide for approval of the petition (subject to the other conditions required for the approval of certification under subsection (a)(1)), notwithstanding the denial of the certification by the Secretary of Labor.*

*(4) EXPEDITED APPLICATION WHERE UNFORESEEN NEED FOR WORKERS.—*

> *(A) PERMITTING AMENDED APPLICATION OR ABBREVIATED RECRUITMENT PERIOD.—If the Secretary of Labor makes the determination described in subparagraph (C), the Secretary—*

>> *(i) shall permit the employer to amend or to make an application for certification under subsection (a)(1), and*

>> *(ii) may waive some or all of the 65-day recruitment period described in subsection (c)(1) as necessary to meet the critical need described in subparagraph (C)(i).*

> *(B) PROMPT REDETERMINATION.—In the case of an amended or new application under subparagraph (A)—*

>> *(i) USING BEST DATA.—The Secretary shall make the determination on the amendment or application based upon the best available labor market information.*

>> *(ii) DEADLINE FOR DETERMINATION.—Except as provided in clause (iii), the Secretary shall make the determination on the amendment or application not later than 20 days before the date on which the workers are needed.*

>> *(iii) DEADLINE FOR LATE AMENDMENTS AND APPLICATIONS.—If an amendment or application is made at any time later than 3 days before such date of need described in clause (ii), the Secretary shall make the determination on the amendment or application within 72 hours after the date the amendment or application is submitted.*

> *(C) DETERMINATION OF UNFORESEEN CIRCUMSTANCES.— The determination under subparagraph (A) is that—*

**AR2022_400953**

(i) in the case of an employer that has filed an application for a certification under subsection (a)(1), the employer—

(I) has a critical need for workers before the expiration of the 65-day period described in subsection (c)(1), or

(II) has a critical need for additional workers who had not been requested in the previous application;

(ii) in the case of an employer that had not previously filed such an application, the employer has a critical need for workers before the expiration of the 65-day period described in subsection (c)(1) and the employer made prompt application for certification under subsection (a)(1) when the employer's need for workers became known; and

(iii) based on the employer's past experience and on reasonable expectations, the need for such workers at the time required could not have been foreseen.

(5) PERMITTING PRESENTATION OF COUNTERVAILING EVIDENCE.—If the Secretary of Labor denies a certification under subsection (a)(1) or fails to act on the application, the Attorney General may permit the applicant to present countervailing evidence to the Attorney General that—

(A) there are not sufficient workers who are able, willing, and qualified and who will be available at the time and place needed to perform the services involved in the petition for which the certification is sought, and

(B) the employment policies of the Department of Labor have been observed.

(f) ENTRY AND TRANSFER OF TEMPORARY AGRICULTURAL WORKERS.—

(1) TIME LIMITATION.—An alien may not be admitted to the United States as a temporary agricultural worker for an aggregate period longer than the period (or periods) determined by regulations of the Attorney General. The regulations may provide for a period of admission of longer than one year in the case of agricultural services which the Secretary of Labor has recognized, for purposes of the admission of certain nonimmigrants under section 101(a)(15)(H)(ii), before the date of the enactment of this section.

(2) VIOLATORS DISQUALIFIED FOR 5 YEARS.—An alien may not be admitted to the United States as a temporary agricultural worker if the alien was admitted to the United States as such a worker within the previous five-year period and the alien during that period violated a term or condition of such previous admission.

(3) TRANSFER OF WORKERS AMONG EMPLOYERS PERMITTED.—Nothing in this section shall prohibit an employer which has a petition approved with respect to the importation of temporary agricultural workers from hiring such a worker who has completed a work contract entered into with another employer. The Attorney General shall provide for a procedure to allow temporary agricultural workers, who have completed a work contract

*under this section and who are not otherwise deportable, to remain in the United States for brief periods in which to seek and accept employment with employers who are authorized to employ the workers.*

*(g) MISCELLANEOUS PROVISIONS.—*

*(1) AUTHORITY OF SECRETARY OF LABOR.—The Secretary of Labor is authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under this section.*

*(2) APPROPRIATE DOCUMENTATION.—The Attorney General shall provide for such endorsement of entry and exit documents of temporary agricultural workers as may be necessary to carry out this section and to provide notice for purposes of section 274A.*

*(3) PREEMPTION.—The provisions of subsections (a) and (c) of section 214 and the provisions of this section preempt any State or local law regulating admissibility of nonimmigrant workers.*

*(4) TREATMENT FOR FICA, FUTA, AND SOCIAL SECURITY.—For the administration of the Federal Insurance Contributions Act, the Federal Unemployment Tax Act, and the Social Security Act, a temporary agricultural worker shall be considered to be an alien admitted to the United States to perform agricultural labor pursuant to sections 214(c) and 101(a)(15)(H)(ii) of this Act.*

*(h) DEFINITIONS.—For purposes of this section:*

*(1) AGRICULTURAL SERVICES.—The term "agricultural services" has the meaning given such term by the Secretary of Labor in regulations and includes—*

*(A) agricultural labor, defined in section 3121(g) of the Internal Revenue Code of 1954, and*

*(B) agriculture, as defined in section 3(f) of the Fair Labor Standards Act of 1938.*

*(2) ELIGIBLE INDIVIDUAL.—The term "eligible individual" means, with respect to employment, an individual who is not an unauthorized alien (as defined in section 274A(h)(2)) with respect to that employment.*

*(3) TEMPORARY AGRICULTURAL WORKER.—The term "temporary agricultural worker" means a nonimmigrant described in section 101(a)(15)(N).*

### VISA WAIVER PILOT PROGRAM FOR CERTAIN VISITORS

*SEC. 217. (a) ESTABLISHMENT OF PILOT PROGRAM.—The Attorney General and the Secretary of State are authorized to establish a pilot program (hereafter in this section referred to as the "pilot program") under which the requirement of paragraph (26)(B) of section 212(a) may be waived by the Attorney General and the Secretary of State, acting jointly and in accordance with this section, in the case of an alien who meets the following requirements:*

*(1) SEEKING ENTRY AS TOURIST FOR 90 DAYS OR LESS.—The alien is applying for admission during the pilot program period (as defined in subsection (e)) as a nonimmigrant visitor (de-*

AR2022_400955

scribed in section 101(a)(15)(B)) for a period not exceeding 90 days.

(2) NATIONAL OF PILOT PROGRAM COUNTRY.—The alien is a national of a country which—

    (A) extends (or agrees to extend) reciprocal privileges to citizens and nationals of the United States, and

    (B) is designated as a pilot program country under subsection (c).

(3) EXECUTES ENTRY CONTROL AND WAIVER FORMS.—The alien before the time of such admission—

    (A) completes such immigration form as the Attorney General shall establish under subsection (b)(3), and

    (B) executes a waiver of review and appeal described in subsection (b)(4).

(4) ROUND-TRIP TICKET.—The alien has a round-trip, nonrefundable, nontransferable, open-dated transportation ticket which—

    (A) is issued by a carrier which has entered into an agreement described in subsection (d), and

    (B) guarantees transport of the alien out of the United States at the end of the alien's visit.

(5) NOT A SAFETY THREAT.—The alien has been determined not to represent a threat to the welfare, health, safety, or security of the United States.

(6) NO PREVIOUS VIOLATION.—If the alien previously was admitted without a visa under this section, the alien must not have failed to comply with the conditions of any previous admission as such a nonimmigrant.

(b) CONDITIONS BEFORE PILOT PROGRAM CAN BE PUT INTO OPERATION.—

    (1) PRIOR NOTICE TO CONGRESS.—The pilot program may not be put into operation until the end of the 30-day period beginning on the date that the Attorney General submits to the Congress a certification that the screening and monitoring system described in paragraph (2) is operational and effective and that the form described in paragraph (3) has been produced.

    (2) AUTOMATED DATA ARRIVAL AND DEPARTURE SYSTEM.—The Attorney General in cooperation with the Secretary of State shall develop and establish an automated data arrival and departure control system to screen and monitor the arrival into and departure from the United States on nonimmigrant visitors receiving a visa waiver under the pilot program.

    (3) VISA WAIVER INFORMATION FORM.—The Attorney General shall develop a form for use under the pilot program. Such form shall be consistent and compatible with the control system developed under paragraph (2). Such form shall provide for, among other items—

        (A) a summary description of the conditions for excluding nonimmigrant visitors from the United States under section 212(a) and under the pilot program,

        (B) a description of the conditions of entry with a waiver under the pilot program, including the limitation of such entry to 90 days and the consequences of failure to abide by such conditions, and

*(C) questions for the alien to answer concerning any previous denial of the alien's application for a visa.*

(4) WAIVER OF RIGHTS.—*An alien may not be provided a waiver under the pilot program unless the alien has waived any right—*

*(A) to review or appeal under this Act of an immigration officer's determination as to the admissibility of the alien at the port of entry into the United States, or*

*(B) to contest, other than on the basis of an application for asylum, any action for deportation against the alien.*

(c) DESIGNATION OF PILOT PROGRAM COUNTRIES.—

(1) UP TO 8 COUNTRIES.—*The Attorney General and the Secretary of State acting jointly may designate up to eight countries as pilot program countries for purposes of the pilot program.*

(2) INITIAL QUALIFICATIONS.—*For the initial period described in paragraph (4), a country may not be designated as a pilot program country unless the following requirements are met:*

*(A)* LOW NONIMMIGRANT VISA REFUSAL RATE FOR PREVIOUS 2-YEAR PERIOD.—*The average number of refusals of nonimmigrant visitor visas for nationals of that country during the two previous full fiscal years was less than 2.0 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during those years.*

*(B)* LOW IMMIGRANT VISA REFUSAL RATE FOR EACH OF 2 PREVIOUS YEARS.—*The average number of refusals of nonimmigrant visitor visas for nationals of that country during either of such two previous full fiscal years was less than 2.5 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during that year.*

(3) CONTINUING AND SUBSEQUENT QUALIFICATIONS.—*For each fiscal year (within the pilot program period) after the initial period—*

*(A)* CONTINUING QUALIFICATION.—*In the case of a country which was a pilot program country in the previous fiscal year, a country may not be designated as a pilot program country unless the sum of—*

*(i) the total of the number of nationals of that country who were excluded from admission or withdrew their application for admission during such previous fiscal year as a nonimmigrant visitor, and*

*(ii) the total number of nationals of that country who were admitted as nonimmigrant visitors during such previous fiscal year and who violated the terms of such admission,*

*was less than 2 percent of the total number of nationals of that country who applied for admission as nonimmigrant visitors during such previous fiscal year.*

*(B)* NEW COUNTRIES.—*In the case of another country, the country may not be designated as a pilot program country unless the following requirements are met:*

*(i)* LOW NONIMMIGRANT VISA REFUSAL RATE IN PREVIOUS 2-YEAR PERIOD.—*The average number of refusals of*

*nonimmigrant visitor visas for nationals of that country during the two previous full fiscal years was less than 2 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during those years.*

*(ii) LOW NONIMMIGRANT VISA REFUSAL RATE IN EACH OF THE 2 PREVIOUS YEARS.—The average number of refusals of nonimmigrant visitor visas for nationals of that country during either of such two previous full fiscal years was less than 2.5 percent of the total number of nonimmigrant visitor visas for nationals of that country which were granted or refused during that year.*

*(4) INITIAL PERIOD.—For purposes of paragraphs (2) and (3), the term "initial period" means the period beginning at the end of the 30-day period described in subsection (b)(1) and ending on the last day of the first fiscal year which begins after such 30-day period.*

*(d) CARRIER AGREEMENTS.—*

*(1) IN GENERAL.—The agreement referred to in subsection (a)(4)(A) is an agreement between a carrier and the Attorney General under which the carrier agrees, in consideration of the waiver of the visa requirement with respect to a nonimmigrant visitor under the pilot program—*

*(A) to idemnify the United States against any costs for the transportation of the alien from the United States if the visitor is refused admission to the United States or remains in the United States unlawfully after the 90-day period described in subsection (a)(1)(A), and*

*(B) to submit daily to immigration officers any immigration forms received with respect to nonimmigrant visitors provided a waiver under the pilot program.*

*(2) TERMINATION OF AGREEMENTS.—The Attorney General may terminate an agreement under paragraph (1) with five days' notice to the carrier for the carrier's failure to meet the terms of such agreement.*

*(e) DEFINITION OF PILOT PROGRAM PERIOD.—For purposes of this section, the term "pilot program period" means the period beginning at the end of the 30-day period referred to in subsection (b)(1) and ending on the last day of the third fiscal year which begins after such 30-day period.*

\*     \*     \*     \*     \*     \*     \*

## CHAPTER 8—GENERAL PENALTY PROVISIONS

\*     \*     \*     \*     \*     \*     \*

BRINGING IN AND HARBORING CERTAIN ALIENS

SEC. 274. (a) \* \* \*

\*     \*     \*     \*     \*     \*     \*

*UNLAWFUL EMPLOYMENT OF ALIENS*

Sec. 274A. (a) Making Employment of Unauthorized Aliens Unlawful.—

(1) Hiring, recruiting, or referring.—It is unlawful for a person or other entity to hire, or to recruit or refer for a fee or other consideration, for employment in the United States an alien knowing the alien is an unauthorized alien (as defined in subsection (h)(2)) with respect to such employment.

(2) Continuing employment.—It is unlawful for a person or other entity, after hiring an alien for employment, to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment.

(3) Defenses.—

(A) Compliance with employment verification system.—A person or entity that establishes that it has complied in good faith with the requirements of subsection (b) with respect to the hiring, recruiting, or referral for employment of an alien in the United States has established an affirmative defense that the person or entity has not violated paragraph (1) with respect to such hiring, recruiting, or referral.

(B) Presumption for employers of 4 or more employees.—Except for purposes of subparagraph (2)(E) of subsection (d), if a person or entity is employing four or more employees and hires (or recruits or refers for a fee or other consideration) for employment in the United States an unauthorized alien, for purposes of paragraph (1) the person or entity shall be presumed to have known that the alien was an unauthorized alien unless the person or entity has complied with the requirements of subsection (b).

(C) Presumption for large recruiters or referrers.—If a person or entity recruits or refers for a fee or other consideration more than four individuals in any 12-month period and recuits or refers for a fee or other consideration for employment in the United States an unauthorized alien, for purposes of paragraph (1) the person or entity shall be considered to have known that the alien was an unauthorized alien unless the person or entity has complied with the requirements of subsection (b).

(D) Rebuttal of presumption.—The presumption established by subparagraph (B) or (C) may be rebutted through the presentation of clear and convincing evidence which contradicts the presumption.

(4) Violators subject to order.—A person or entity that violates paragraph (1) or (2) is subject to an order under subsection (d).

(b) Employment Verification System.—Except as provided in subsection (c), the requirements referred to in subsections (a)(3) and (d)(2)(C)(i) are, in the case of a person or other entity hiring, recruiting, or referring an individual for employment in the United States, the requirements specified in the following four paragraphs:

(1) Attestation after examination of documentation.—

AR2022_400959

(A) In general.—*The person or entity must attest, under penalty of perjury and on a form designated or established by the Attorney General by regulation, that it has verified that the individual is not an unauthorized alien by examining—*

(i) *a document described in subparagraph (B), or*

(ii) *a document described in subparagraph (C) and a document described in subparagraph (D).*

*A person or entity has complied with the requirement of this paragraph with respect to examination of a document if the document reasonably appears on its face to be genuine.*

(B) Documents establishing both employment authorization and identity.—*A document described in this subparagraph is an individual's—*

(i) *United States passport;*

(ii) *certificate of United States citizenship;*

(iii) *certificate of naturalization;*

(iv) *unexpired foreign passport, if the passport has an appropriate, unexpired endorsement of the Attorney General authorizing the individual's employment in the United States; or*

(v) *resident alien card or other alien registration card, if the card—*

(I) *contains a photograph of the individual or such other personal identifying information relating to the individual as the Attorney General finds, by regulation, sufficient for purposes of this subsection, and*

(II) *is evidence of authorization of employment in the United States.*

(C) Documents evidencing employment authorization.—*A document decribed in this subparagraph is an individual's—*

(i) *social security account number card (other than such a card which specifies on the face that the issuance of the card does not authorize employment in the United States);*

(ii) *certificate of birth in the United States or establishing United States nationality at birth, which certificate the Attorney General finds, by regulation, to be acceptable for purposes of this section; or*

(iii) *other documentation evidencing authorization of employment in the United States which the Attorney General finds, by regulation, to be acceptable for purposes of this section.*

(D) Documents establishing identity of individual.—*A document described in this subparagraph is an individual's—*

(i) *driver's license or similar document issued for the purpose of identification by a State, if it contains a photograph of the individual or such other personal identifying information relating to the individual as the Attorney General finds, by regulation, sufficient for purposes of this section; or*

(ii) in the case of individuals under 16 years of age or in a State which does not provide for issuance of an identification document (other than a driver's license) referred to in clause (i), documentation of personal identity of such other type as the Attorney General finds, by regulation, provides a reliable means of identification.

(2) INDIVIDUAL ATTESTATION OF EMPLOYMENT AUTHORIZATION.—The individual must attest, under penalty of perjury on the form designated or established for purposes of paragraph (1), that the individual is a citizen or national of the United States, an alien lawfully admitted for permanent residence, or an alien who is authorized under this Act or by the Attorney General to be hired, recruited, or referred for such employment.

(3) RETENTION OF VERIFICATION FORM.—After completion of such form in accordance with paragraphs (1) and (2), the person or entity must retain the form and make it available for inspection by officers of the Service or the Department of Labor during a period beginning on the date of the hiring, recruiting, or referral of the individual and ending—

(A) in the case of the recruiting or referral for a fee or other consideration (without hiring) of an individual, three years after the date of the recruiting or referral, and

(B) in the case of the hiring of an individual—

(i) three years after the date of such hiring, or

(ii) one year after the date the individual's employment is terminated.

whichever is later.

(4) UNIFORM VERIFICATION POLICY.—The person or entity must apply the requirements of the previous three paragraphs uniformly to all individuals hired (or recruited or referred for a fee or other consideration).

(5) COPYING OF DOCUMENTATION PERMITTED.—Notwithstanding any other provision of law, the person or entity may copy a document presented by an individual pursuant to this subsection and may retain the copy, but only (except as otherwise permitted under law) for the purpose of complying with the requirements of this subsection.

(6) LIMITATION ON USE OF ATTESTATION FORM.—A form designated or established by the Attorney General under this subsection and any information contained in or appended to such form, may not be used for purposes other than for enforcement of this Act and sections 1001, 1028, 1546, and 1621 of title 18, United States Code.

(c) EVALUATION AND CHANGES IN EMPLOYMENT VERIFICATION SYSTEM.—

(1) PRESIDENTIAL MONITORING AND IMPROVEMENTS IN SYSTEM.—

(A) MONITORING.—The President shall provide for the monitoring and evaluation of the degree to which the employment verification system established under subsection (b) provides a secure system to determine employment eligibility in the United States and shall examine the suitabil-

96

*ity of existing Federal and State identification systems for use for this purpose.*

*(B) IMPROVEMENTS TO ESTABLISH SECURE SYSTEM.—To the extent that the system established under subsection (b) is found not to be a secure system to determine employment eligibility in the United States, the President shall, subject to paragraph (3) and taking into account the results of any demonstration projects conducted under paragraph (4), implement such changes in (including additions to) the requirements of subsection (b) as may be necessary to establish a secure system to determine employment eligibility in the United States. Except as provided in subparagraph (C), such changes in the system may be implemented only if the changes conform to the requirements of paragraph (2).*

*(C) REQUIRING USE OF COUNTERFEIT-RESISTANT SOCIAL SECURITY CARDS.—The President may require, without regard to paragraph (2), that the only social security account number cards which may be presented in order to comply with subsection (b)(1)(C)(i) are such cards as are in a counterfeit-resistant form consistent with the second sentence of section 205(c)(2)(D) of the Social Security Act.*

*(2) RESTRICTIONS ON CHANGES IN SYSTEM.—Except as provided in paragraph (1)(C), any change the President proposes to implement under paragraph (1) in the verification system must be designed in a manner so the verification system, as so changed, meets the following requirements:*

*(A) RELIABLE DETERMINATION OF IDENTITY.—The system must be capable of reliably determining whether—*

*(i) a person with the identity claimed by an employee or prospective employee is eligible to work, and*

*(ii) the employee or prospective employee is claiming the identity of another individual.*

*(B) USING OF COUNTERFEIT-RESISTANT DOCUMENTS.—If the system requires that a document be presented to or examined by an employer, the document must be in a form which is resistant to counterfeiting and tampering.*

*(C) LIMITED USE OF SYSTEM.—Any personal information utilized by the system may not be made available to Government agencies, employers, and other persons except to the extent necessary to verify that an individual is not an unauthorized alien.*

*(D) PRIVACY OF INFORMATION.—The system must protect the privacy and security of personal information and identifiers utilized in the system.*

*(E) LIMITED DENIAL OF VERIFICATION.—A verification that an employee or prospective employee is eligible to be employed in the United States may not be withheld or revoked under the system for any reason other than that the employee or prospective employee is an unauthorized alien.*

*(F) LIMITED USE FOR LAW ENFORCEMENT PURPOSES.—The system may not be used for law enforcement purposes, other than for enforcement of this Act or sections 1001, 1028, 1546, and 1621 of title 18, United States Code.*

**AR2022_400962**

(G) RESTRICTION ON USE OF NEW DOCUMENTS.—If the system requires individuals to present a new card or other document (designed specifically for use for this purpose) at the time of hiring, recruitment, or referral, then such document may not be required to be presented for any purpose other than under this Act (or enforcement of sections 1001, 1028, 1546, and 1621 of title 18, United States Code) nor to be carried on one's person.

(3) NOTICE TO CONGRESS BEFORE IMPLEMENTING CHANGES.—

(A) IN GENERAL.—The President may not implement any change under paragraph (1) unless at least—

(i) 60 days, or

(ii) in the case of a major change described in sub-paragraph (D), two years,

before the date of implementation of the change, the President has prepared and transmitted to the Committee on the Judiciary of the House of Representatives and to the Committee on the Judiciary of the Senate a written report setting forth the proposed change. The President promptly shall cause to have printed in the Federal Register the substance of any major change (described in subparagraph (D)) proposed and reported to Congress.

(B) CONTENTS OF REPORT.—In any report under subparagraph (A) the President shall include recommendations for the establishment of civil and criminal sanctions for unauthorized use or disclosure of the information or identifiers contained in such system.

(C) CONGRESSIONAL REVIEW OF MAJOR CHANGES.—

(i) HEARINGS AND REVIEW.—The Committees on the Judiciary of the House of Representatives and of the Senate shall cause to have printed in the Congressional Record the substance of any major change described in subparagraph (D), shall hold hearings respecting the feasibility and desirability of implementing such a change, and, within the two year period before implementation, shall report to their respective Houses findings on whether or not such a change should be implemented.

(ii) CONGRESSIONAL ACTION.—No major change may be implemented unless the Congress specifically provides, in an appropriations or other Act, for funds for implementation of the change.

(D) MAJOR CHANGES REQUIRING TWO YEARS NOTICE AND CONGRESSIONAL REVIEW.—As used in this paragraph, the term "major change" means a change which would—

(i) require an individual to present a new card or other document (designed specifically for use for this purpose) at the time of hiring, recruitment, or referral, or

(ii) provide for a telephone verification system under which an employer, recruiter, or referrer must transmit to a Federal official information concerning the immigration status of prospective employees and the official

transmits to the person, and the person must record, a verification code;

but does not include a change in any card used for accounting purposes under the Social Security Act.

(4) DEMONSTRATION PROJECTS.—

(A) AUTHORITY.—The President may undertake demonstration projects (consistent with paragraph (2) of different changes in the requirements of subsection (b). No such project may extend over a period of longer than three years.

(B) REPORTS ON PROJECTS.—The President shall report to the Congress on the results of demonstration projects conducted under this paragraph.

(d) COMPLIANCE.—

(1) COMPLAINTS AND INVESTIGATIONS.—The Attorney General shall establish procedures—

(A) for individuals and entities to file written, signed complaints respecting potential violations of subsection (a),

(B) for the investigation of those complaints which, on their face, have a substantial probability of validity,

(C) for the investigation of such other violations of subsection (a) as the Attorney General determines to be appropriate, and

(D) for the designation in the Service of a unit which has, as its primary duty, the prosecution of cases of violations of subsection (a) under this subsection.

(2) ORDER FOR VIOLATIONS.—

(A) IN GENERAL.—If, after notice and opportunity to request a hearing respecting a violation of subsection (a), the immigration judge determines, upon the preponderance of the evidence received, that a person or entity named in the complaint has violated subsection (a), the judge shall state his findings of fact and issue and cause to be served on such person or entity an order.

(B) CIVIL PENALTY AS PART OF ORDER.—An order under subparagraph (A) shall require the person or entity to cease and desist from such violations and to pay a civil penalty in an amount of—

(i) not less than $100 and not more than $2,000 for each unauthorized alien with respect to whom a violation of subsection (a) occurred,

(ii) not less than $2,000 and not more than $5,000 for each such alien in the case of a person or entity previously subject to an order under this subsection, or

(iii) not less than $3,000 and not more than $10,000 for each such alien in the case of a person or entity which has engaged or is engaging in a pattern or practice of such violations.

(C) ADDITIONAL REMEDIES AS PART OF ORDER.—An order under subparagraph (A) may require the person or entity—

(i) to comply with the requirements of subsection (b) (or subsection (c) if applicable) with respect to individuals hired (or recruited or referred for employment for a fee or other consideration) during a period of up to three years, and

AR2022_400964

(ii) to take such other remedial action as is appropriate.

(D) DISMISSAL OF COMPLAINTS.—If upon the preponderance of the evidence taken, the judge is of the opinion that the person or entity named in the complaint has not violated subsection (a), the judge shall state his findings of fact and shall issue an order dismissing the complaint.

(E) CRIMINAL PENALTY.—Any person or entity which, after having been previously required to pay a civil penalty under subparagraph (B)(iii) for a pattern or practice of violations of subsection (a), again engages in such a pattern or practice shall be fined not more than $3,000 for each unauthorized alien with respect to whom a violation of subsection (a) occurred, imprisoned for not more than six months for the entire pattern or practice, or both, notwithstanding the provisions of any other Federal law relating to fine levels.

(3) AUTHORITY IN INVESTIGATIONS.—In conducting investigations and hearings under this subsection—

(A) immigration officers and immigration judges shall have reasonable access to examine evidence of any person or entity being investigated, and

(B) immigration judges, by subpoena, may compel the attendance of witnesses and the production of evidence at any designated place or hearing.

In case of contumacy or refusal to obey a subpoena lawfully issued under this paragraph and upon application of the Attorney General, an appropriate district court of the United States may issue an order requiring compliance with such subpoena and any failure to obey such order may be punished by such court as a contempt thereof.

(4) TREATMENT OF CERTAIN SUBDIVISIONS.—In applying this subsection in the case of a person or entity composed of distinct, physically separate subdivisions each of which provides separately for the hiring, recruiting, or referring for employment, without reference to the practices of, and not under the control of or common control with, another subdivision, each such subdivision shall be considered a separate person or entity.

(5) ADMINISTRATIVE APPELLATE REVIEW.—The Attorney General may provide for the administrative appellate review of the determination of an immigration judge under this subsection by an appropriate administrative appellate body.

(e) JUDICIAL REVIEW OF ORDERS.—Judicial review of orders under this subsection shall be exclusively under the procedures provided in chapter 158 of title 28, United States Code, except as follows:

(1) FILING DEADLINE.—Petitions for review may be filed not later than 45 days after the date of the final order.

(2) VENUE.—The venue of any petition for review under this subsection shall be in the judicial circuit in which the administrative proceedings before an immigration judge were conducted in whole or in part, or in the judicial circuit wherein is the residence of the petitioner, but not in more than one circuit.

(3) SERVICE.—In the case of review sought by an entity other than the Service, the action shall be brought against the Immi-

gration and Naturalization Service as respondent and service of the petition to review shall be made upon the Attorney General and upon the official of the Service in charge of the Service district in which the office of the clerk of the court is located.

(4) SUBSTANTIAL EVIDENCE.—The petition shall be determined solely upon the administrative record upon which the order is based and the immigration judge's findings of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive.

(5) TYPEWRITTEN BRIEFS.—It shall not be necessary to print the record or any part thereof, or the brief, and the court shall review the proceedings on a typewritten record and on typewritten briefs.

In any judicial review of an immigration judge's order under this subsection, the court may provide for such order of enforcement as may be appropriate. Section 279 shall not apply to causes arising under this section.

(f) ENFORCEMENT OF ORDERS.—If a person or entity fails to comply with a final order issued under subsection (d) against the person or entity, the Attorney General shall file a suit to seek compliance with the order in any appropriate district court of the United States. In any such suit, the validity and appropriateness of the final order imposing the assessment shall not be subject to review.

(g) MISCELLANEOUS PROVISIONS.—

(1) DOCUMENTATION.—In providing documentation or endorsement of authorization of aliens (other than aliens lawfully admitted for permanent residence) authorized to be employed in the United States, the Attorney General shall provide that any limitations with respect to the period or type of employment or employer shall be conspicuously stated on the documentation or endorsement.

(2) PREEMPTION.—The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee or other consideration for employment, unauthorized aliens.

(h) DEFINITIONS.—As used in this section—

(1) IMMIGRATION JUDGE.—The term "immigration judge" means an immigration officer specially designated to hear cases under this section.

(2) UNAUTHORIZED ALIEN.—The term "unauthorized alien" means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act or by the Attorney General.

*          *          *          *          *          *          *

## CHAPTER 9—MISCELLANEOUS

### 〖SCHEDULE OF FEES〗 *NONIMMIGRANT VISA FEES AND ALIEN USER FEES*

SEC. 281. 〖The following fees shall be charged:〗 *(a) NONIMMI-GRANT VISA FEES.*—

(1) For the furnishing and verification of each application for an immigrant visa (which shall include the furnishing and verification of the duplicate), $5;

(2) For the issuance of each immigrant visa, $20;

(3) For the issuance or each extension of a reentry permit, $10;

(4) For the filing of each application for adjustment of status under sections 245 and 248, for the creation of a record of admission for permanent residence under section 249, or for suspension of deportation, $25;

(5) For the issuance of each extension of stay to nonimmigrants, other than nonimmigrants described in section 101(a)(15)(F) and, upon a basis of reciprocity, the nonimmigrants described in section 101(a)(15)(A)(iii) or 101(a)(15)(G)(v), $10;

(6) For filing with the Attorney General each petition under sections 204(b), 205(b), and 214(c), $10; and

(7) For approval of each application for, including issuance of each certificate of, admission to practice as attorney or representative before the service, pursuant to such regulations as may be prescribed by the Attorney General, $25.

The fees for the furnishing and verification of applications for visas by nonimmigrants of each foreign country and for the issuance of visas to nonimmigrants of each foreign country shall be prescribed by the Secretary of State in amounts corresponding, as nearly as practicable, to the total of all similar visa, entry, residence, or other fees, taxes, or charges assessed or levied against nationals of the United States by the foreign countries of which such nonimmigrants are nationals or stateless residents: *Provided,* That nonimmigrant visas issued to aliens coming to the United States in transit to and from the headquarters district of the United Nations in accordance with the provisions of the Headquarters Agreement shall be gratis.

*(b) ALIEN USER FEES.—The Attorney General, in consultation with the Secretary of State, may impose fees on aliens with respect to their use of border facilities or services of the Service in such amounts as may reasonably reflect the portion of costs of maintenance and operation of such facilities and provision of such services attributable to aliens' use of such facilities and services.*

\*       \*       \*       \*       \*       \*       \*

## TITLE IV—MISCELLANEOUS

### 〖AUTHORIZATION OF APPROPRIATIONS〗

〖SEC. 404. There are authorized to be appropriated such sums as may be necessary to carry out the provisions of this Act.〗

### AUTHORIZATION OF APPROPRIATIONS

SEC. 404. (a) There are authorized to be appropriated to the Department of Justice for the Immigration and Naturalization Service—

(1) for fiscal year 1987, $840,000,000, and

(2) for fiscal year 1988, $830,000,000.

(b) AUTHORIZATIONS OF APPROPRIATIONS FOR SECRETARY OF LABOR.—(1) There are authorized to be appropriated to the Secretary of Labor for each fiscal year, beginning with fiscal year 1987, $10,000,000 for the purposes—

(A) of recruiting domestic workers for temporary services which might otherwise be performed by temporary agricultural workers described in section 216, and

(B) of monitoring terms and conditions under which such temporary agricultural workers (and domestic workers employed by the same employers) are employed in the United States.

(2) There are authorized to be appropriated for each fiscal year, beginning with fiscal year 1987, such sums as may be necessary for the purpose of enabling the Secretary of Labor to make determinations and certifications under section 216 and under section 212(a)(14).

(c) AUTHORIZATION OF APPROPRIATIONS FOR SECRETARY OF AGRICULTURE.—There are authorized to be appropriated for each fiscal year, beginning with fiscal year 1987, such sums as may be necessary for the purposes of enabling the Secretary of Agriculture to carry out the Secretary's duties and responsibilities under section 216.

(d) Nothing in this bill is intended to authorize funding for fiscal year 1986.

## MINORITY VIEWS OF MR. KENNEDY

I have voted against this bill in the Committee—as I did during the two previous Congresses—because I continue to have serious reservations about this legislation in its current form. During the Committee's consideration of the bill I offered a number of amendments to address these issues, and I intend to do so again when the bill reaches the Senate floor.

However, at the outset, I want to acknowledge once again my deep respect for the chairman of our subcommittee, Senator Simpson, and for his efforts to deal with the important issue of immigration reform. Although we have occasionally differed in our approach to this difficult and complex issue, I have always admired his sincerity and thoughtfulness since we served together 6 years ago as members of the Select Commission on Immigration and Refugee Policy. Since then there has been a great deal of debate on this issue, and on the recommendations of the Select Commission—often generating more heat than light—but throughout he has shown a willingness to hear all sides and consider all views.

This year's bill represents, in several respects, both a step forward, but also a step backward.

For example, I welcome the elimination of the drastic changes in the existing immigration preference system that was contained in last year's bill. I share the view that it is far better to deal with the reform of our current legal immigration system in a bill separate from one focused only on illegal migration, as the pending legislation is.

### LEGALIZATION PROGRAM

However, I believe the current bill has taken an unnecessary and regrettable step backwards in its retreat on authorizing a legalization program in concert with the enactment of employer sanctions and new enforcement strategies.

Twice the U.S. Senate has voted—by substantial margins—in support of a clear-cut and unequivocal legalization program. The House of Representatives has also voted for an even more generous amnesty. And last October the Conference Committee supported an equally generous and flexible legalization program. Why should we abandon these votes in support of such a humane program?

A legalization program was one of the fundamental recommendations of the Select Commission—unanimous, in fact—and was seen by all as an integral part of our reform and enforcement effort. In fact, it was seen as an essential corollary to the new enforcement provisions recommended by the Commission and embodied in the current bill. It still is.

AR2022_400969

## EMPLOYER SANCTIONS

A fundamental concern I have about this bill is that it must not become a vehicle for discriminatory actions against Hispanic Americans and other minority groups. Immigrants and undocumented aliens must not become scapegoats for the serious problems our country faces today. We must be extremely cautious to avoid legislative action that raises the level of intolerance and discrimination in our society. The employer sanctions provisions in this bill present this danger, and I regret that the Committee did not accept an amendment that addresses this issue.

I have in the past supported legal sanctions against employers who knowingly hire undocumented aliens. I have done so as a matter of principle; it is wrong that the sanctions under current law fall solely on the undocumented aliens, not on employers who may be exploiting them. The Government needs stronger enforcement tools to deal with the serious problem of employers who engage in a pattern and practice of hiring and exploiting undocumented aliens.

However, throughout the Select Commission's work as well as during the extensive hearings of the subcommittee over the past 4 years, two central objections were raised again and again:

(1) That the proposed employer sanctions might result in discrimination against certain American workers, especially Hispanics and Asians; and

(2) That employers would be unnecessarily burdened with paperwork in implementing the sanctions.

The history of immigration legislation in recent decades is that once an immigration law is enacted, Congress does not act again for many years. To assure that Congress will not ignore any discrimination that arises in the implementation of employer sanctions, I offered an amendment to provide the following safeguards:

(1) To insure that a fair and impartial study of the sanctions program is available to Congress, I felt the General Accounting Office should be explicitly required in the statute to undertake an independent study on their implementation.

(2) The employer sanctions should be "sunsetted" after 3 years, so that Congress will be obliged to face this issue of discrimination squarely, if it develops. If employer sanctions become a pretext for discrimination, then the authority for them should expire unless Congress enacts new legislations with additional protections. If no discrimination materializes, then under my amendment sanctions will be continued.

I regret the Committee did not accept this provision. If it is adopted, I believe minorities in our society will be given a pledge that, if a serious pattern of discrimination emerges, Congress will not ignore it. Given the significant changes proposed by this legislation, this is the minimum assurance we should be willing to provide.

## TEMPORARY FOREIGN WORKERS

One also must be alarmed over the weakening of the H-2, temporary foreign worker provisions contained in this bill. I continue to support the unanimous vote of the Select Commission in rejecting

the establishment of an expanded temporary foreign worker program. Adoption of the legalization program and implementation of the new immigration system will result in the legal admission of additional immigrants and an adjustment in the status of undocumented aliens already working here.

Until the impact of these changes is assessed, there is no valid justification for a large new temporary foreign worker program. Any such program would have serious consequences for American labor and American wages. We must reject calls for a new "bracero" program. We must be extremely cautious not to allow changes in the H–2 program to undermine labor standards or to depress wages. Employers seeking H–2 workers must be required to seek American workers first, and we should plan the elimination of this program in the future, not its expansion.

### INTERNATIONAL COOPERATION

Finally, although I am concerned over these specific provisions of this legislation, I remain even more concerned over the larger issue of the migration pressures our country will encounter in the decades ahead. I am concerned this legislation is moving forward in a kind of vacuum, and that we will be deluding ourselves if we think this legislation will really solve the many immigration problems our country—along with many others—faces today. At best this is a band-aid to a potential hemorrhage—a very tentative step in a long-term process.

Every day it becomes clearer that the complex migration problems, which are growing around the world, will require greater international action. Domestic laws and actions alone are no longer sufficient. Economic and developmental problems in neighboring countries—or even in countries far away—will have more impact upon migration to the United States than any combination of domestic laws or policies. And violence and conflict can produce a flow of people that only concerted international action can deal with.

There are no easy answers. But it is imperative that we understand that migration is an international issue, and not merely a domestic concern. It will require far greater international cooperation than we have undertaken to date—and that is why I supported in Committee Senator Simon's amendment forcing at least a brief review of these issues.

One of the most important recommendations of the 1981 Select Commission on Immigration and Refugee Policy was that the United States should become more actively involved in efforts to achieve international cooperation on world migration and refugee problems.

I continue to endorse the recommendation of the Commission that the United States should expand bilateral consultations to promote cooperation on migration issues in the Western Hemisphere—especially with our neighbors, Mexico, and Canada. These two nations deserve special consideration in our policies, and I commend Senator Simpson for his personal efforts to meet with the leaders of Mexico during the development of this legislation.

106

Once again, I must note that this bill is moving forward without adequate consultations by the executive branch with our neighbors. If we are to achieve genuine cooperation, we must consult in advance, before changes in our immigration policies are set.

Unilateral policies, like fences, do not always make good neighbors. During our consideration of this legislation we must give greater weight to this concern, and the administration must give greater evidence that it, too, is pursuing it.

## CONCLUSION

Although I continue to support efforts to achieve genuine immigration reform, I must oppose this legislation in its present form for all of the reasons I reviewed during the course of the Committee's markup of the bill. In its current form, it does not deserve the support of the Senate.

## MINORITY VIEWS OF MR. SIMON

As the newest member of the Subcommittee on Immigration and Refugee Policy, I have much to learn in this complex area. I have been pleased to work with the chairman of the subcommittee, Senator Simpson, and have been privileged to learn at least a little about this Nation's immigration problems because of the patience and consideration he has afforded me as a new member.

This is not the first time this Committee and the full Senate have considered similar measures. Senator Simpson's tireless attempts to responsibly correct this Nation's immigration problems have earned the respect of his colleagues on both sides of the aisle.

I have voiced concern during hearings and consultations about the following issues:

### LEGALIZATION

Legalization had been one of the fundamental components of most previous attempts to reform our immigration laws. Though some versions differed on application dates and procedural questions, it was clear that all legalization proposals were intended to be virtually concurrent with employer sanctions. This year's bill, however, moves away from this well-established precedent of concurrent employer sanctions and legalization. The Commissioner of the INS testified during hearings that his agency would be equipped to implement legalization concurrently with employer sanctions. Including a provision which would delay legalization for several million people and leave them in an exploitable and illegal status is not a desirable approach.

Lawrence Fuchs, former Executive Director of the Select Commission on Immigration and Refugee Policy, testified on June 17, 1985:

> . . . I became convinced that it (a delayed legalization program) is inherently a bad idea. Let us imagine a best case scenario. The bill passes and employer sanctions are instituted in January 1986 . . . Let us suppose that by January of 1988, a unanimous commission decides that the new enforcement measures are substantially effective, that the legalization program should begin in April 1988 and that for the next 12 months, a majority of the illegal aliens who have been in the U.S. more or less continuously since January 1, 1980 apply for temporary resident status, with the prospect of applying for immigrant status 30 months later. Under this best case, there would be a period of about two and one-half years between passage of the bill and the institution of the legalization program.

AR2022_400973

> During that time, long-time illegal aliens who intend to apply for legalization will be picked up by the INS, including some who are respected in their communities . . .
>
> The best case scenario is not a good one. And it does not take much imagination to portray a much less desirable scenario.

Under the bill as amended in the full Committee, an undocumented alien would have to reside in the United States continuously for 9 years to become eligible. This means that any absence from the United States, even for a family emergency, would disqualify a person.

The chairman has already spoken on many occasions about the exploitable underclass of undocumented aliens in this country today. It is evident that these are people who are productive members of society but who are unable, for example, to seek redress for crimes, who are fearful of reporting job-related abuse, and who have virtually nowhere to turn. They are forced to live a semiclandestine life. To eliminate this subclass within American society, we should be moving ahead with a concurrent legalization program. This bill falls short of that goal.

### TEMPORARY FOREIGN WORKERS

This year's provision creates a significantly expanded guestworker program with special consideration for growers of perishable crops.

Many members of this Committee remember a program which the United States maintained from 1946 to 1964. At its peak, the Bracero Program allowed nearly 500,000 Mexican guestworkers into this country to work primarily in agriculture.

In 1959, Secretary of Labor James Mitchell commissioned a report on the Bracero Program and found that the use of foreign workers had serious adverse effects on domestic agricultural workers.

> Studies of the Department of Labor have shown that wage rates paid to domestic workers by farmers who use Mexicans are generally lower than those paid by non-users for comparable work in the same area. This indicates that employers of foreign labor frequently do not make the same effort as other employers in competing for domestic farm workers. (Mexican Farm Labor Program Consultant's Report, Oct. 1959, US Department of Labor, James P. Mitchell, Secretary.)

The Bracero Program had other negative effects, as well. Abuse of guestworkers by employers was widespread and many were unable to effectively voice their complaints for fear of losing the opportunity to work the succeeding year.

The current bill would expand a foreign guestworker program to unpredictable levels. I supported Senator Kennedy's amendment to strike the H–2 provisions of the bill which would leave the law as it stands. According to the Department of Labor, over 90 percent of H–2 applications are approved. Moreover, the current H–2 program is available to an employer in any region of the country as long as

he or she can certify that: (a) unemployed workers cannot be found in this country, and (b) that foreign workers will not adversely affect the domestic wage rate. In expanding a guestworker program in the United States, we run the risk of repeating what we had in the Bracero Program.

## UNITED STATES-MEXICO RELATIONS

We will not be responsibly addressing this Nation's immigration problems by passing this bill or a dozen bills like it if none of them places attention on the importance of the economic condition of Mexico. I am pleased that my amendment to establish a 6-month Commission to look into this question was accepted.

There have been concerns raised that focusing the United States attention only on Mexico will prompt other countries to demand that they be given similar attention. There is no country which demonstrates the economic disparity between it and the United States as clearly as does Mexico. No other country shares a 2,000-mile border and which contributes to nearly 50 percent of this Nation's illegal immigration. Further, Mexico currently has a per capita income of $2,000 compared to $8,000 in the United States. Unemployment figures show an even greater gap.

The prospect of jobs will continue to draw people to this country unless some of these disparities can be corrected. The United States and Mexico must forge a much closer economic partnership, and all of us will benefit.

## DISCRIMINATION

Another area which concerns me is the issue of discrimination. The chairman has spent many years attempting to construct an acceptable form of employer sanctions keeping in mind the concerns of Hispanic residents of this country and business interests.

There have been some valid concerns raised by several ethnic and religious groups. The problem of discrimination resulting from employer sanctions against "foreign-looking" or "foreign-sounding" individuals is a reality which no Member of Congress should ignore.

We do not know exactly how much discrimination will increase against Hispanics, Asians, and other ethnic groups. Nor do we know how this bill will affect the nearly 12 million lawfully admitted permanent residents, refugees, and asylees in this country. The law is currently unclear as to what protection is and is not afforded to legal aliens. I felt the need to clarify these questions in an additional hearing. An additional hearing on these issues would have been of value to me and the subcommittee. I hope that the Senate will be able to have access to a clear record on these issues before the bill reaches the Senate floor.

110

CONCLUSION

Chairman Simpson has courageously fought for a responsible revision of our immigration laws. While I disagree with some of the provisions in the Committee bill, I agree that we need to take action to solve what has become a pressing national problem: illegal immigration. I would like to be able to vote for a bill which deals with this problem fairly and responsibly. I hope it can be amended on the floor so that I can support the final product.

○




**Congressional Research Service**
**The Library of Congress**

Washington, D.C.   20540

EXTENDED VOLUNTARY DEPARTURE
AND OTHER GRANTS OF BLANKET RELIEF FROM DEPORTATION

Sharon Stephan
Analyst in Social Legislation
Education and Public Welfare Division
February 23, 1985

AR2022_400977

ABSTRACT

Aliens in the U.S. may be provided relief from deportation by a variety of mechanisms.  This paper focuses on administratively-formulated discretionary relief from deportation, with particular emphasis on the blanket relief--such as extended voluntary departure--provided to all members of a national group. The paper covers issues relating to the administrative use of blanket relief from deportation and analyzes policy options relating to such grants of relief.

AR2022_400978

CONTENTS

ABSTRACT..................................................................... iii

BACKGROUND AND OVERVIEW.......................................................  1

FORMS OF ADMINISTRATIVE DISCRETIONARY RELIEF FROM DEPORTATION.............  3
  Stay of Deportation........................................................  3
  Deferred Departure or Deferred Action......................................  4
  Extended Voluntary Departure                                                5

ISSUES RELATING TO ADMINISTRATIVE RELIEF FROM DEPORTATION.................  8
  Definitional Issues........................................................ 10
  Alleged Inconsistencies in Grants of Relief................................ 14

POLICY PROPOSALS/OPTIONS................................................... 16
  Maintaining the Status Quo................................................. 16
  Requiring or Recommending Internal Changes................................. 18
  Legislative Mandate for Individual National Groups......................... 19
  Permanent Statutory Authority.............................................. 21

APPENDIX:  STATUTORY FORMS OF RELIEF FROM DEPORTATION..................... 23
  Mandated Relief............................................................ 23
  Discretionary Relief....................................................... 24

AR2022_400979

EXTENDED VOLUNTARY DEPARTURE
AND OTHER GRANTS OF BLANKET RELIEF FROM DEPORTATION

## BACKGROUND AND OVERVIEW

Under immigration law (8 USC 1101 et seq.), aliens who are in the U.S. in
an illegal status are subject to deportation following a determination of
deportability under statutorily-prescribed procedures.  Either permanent or
temporary relief from deportation is available to the aliens under certain
circumstances.  There are three basic forms of such relief:  relief mandated
by statute; relief allowed by statute; and discretionary relief formulated
administratively under the Attorney General's general authority for enforcing
immigration law. 1/  This paper focuses on administratively-formulated dis-
cretionary relief from deportation, with particular emphasis on the provision
of blanket relief for all members of a national group.  One such form of
blanket relief--extended voluntary departure (EVD)--has recently been the sub-
ject of debate and litigation.  Although statistics on the number of aliens
granted this form of relief are not available, the grants generally covered
all members of the national group involved who were present in the U.S. and
were made for periods of up to 12 years.  Thus, it is possible that hundreds
of thousands of aliens may have been eligible for this discretionary form of
relief from deportation.  Descriptions of the statutory forms of relief
from deportation--none of which is intended to provide blanket relief for
national groups--are in the Appendix.

---

1/  The 3-category distinction is adapted from Maurice A. Roberts, Relief
From Deportation: Discretion and Waivers, Interpreter Releases, Vol. 55, No.
19 (May 5, 1978).

AR2022_400980

CRS-2

The recent issues relating to the administrative use of blanket relief from deportation relate to confusion regarding the nature (including criteria) of blanket relief (such as EVD) made available for members of national groups; and alleged inconsistencies in the grants of such relief.

The major policy options regarding blanket relief from deportation range from continuing the current discretionary system to enacting legislation to provide statutory requirements for such grants.

The following paper describes the three major forms of administrative relief from deportation that are currently known to be available, including available statistics on the uses made of these forms of relief; discusses and analyzes the issues surrounding the use of blanket discretionary relief from deportation; and analyzes policy options relating to blanket grants of relief.

AR2022_400981

CRS-3

## FORMS OF ADMINISTRATIVE DISCRETIONARY RELIEF FROM DEPORTATION

In the past, Immigration and Naturalization Service (INS) has used a variety of discretionary procedures to allow aliens who have not been legally admitted to the U.S. to remain in this country either temporarily or permanently. The statutory authority cited by the agency for these discretionary procedures is generally that portion of immigration law that confers on the Attorney General the authority for general enforcement (8 USC 1103). Currently, three such discretionary procedures are relatively routinely used by INS to provide relief from deportation. One of the procedures—stay of deportation—is defined under INS regulations; another—deferred departure or deferred action—is described in INS operating instructions; and the third—extended voluntary departure—has not been formally defined and appears to be evolving. Although EVD is the only form of relief characterized by INS as specifically and solely for blanket relief for all members of a national group, it appears that the other forms of relief have also been used for this purpose. The discretionary procedures are generally developed and used to provide relief the Administration feels is appropriate but which would not be available under the statute. Blanket relief from deportation is not provided under statute. INS has little data on the uses made of these discretionary forms of relief from deportation. The following is a description of these three discretionary mechanisms:

### Stay of Deportation

Immigration regulations provide that aliens under a final administrative order of deportation may request a stay of deportation on a case-by-case basis (8 CFR 243.4). Under the regulations, the decision on the request is made by a INS district director, at his discretion, for such time and under such conditions

AR2022_400982

CRS-4

as he deems appropriate.  A denial of a stay is not appealable; but, the Board
of Immigration Appeals may also grant a stay in connection with a motion to
reopen or reconsider the deportation order.  According to immigration authorities,
Gordon and Rosenfield, a stay of deportation is generally for temporary (more
than one month) stays needed for various family, personal, health or business
reasons and is not for deportees who are using the time as a conscious dilatory
tactic.  2/  The regulations make no reference to using stay of deportation as
blanket relief for all members of a national group.  INS indicates that slight-
ly more than 1,000 persons a year received this form of relief between FY80-
FY84, but that no breakdown of these stays by nationality is available.  3/


Deferred Departure or Deferred Action

     Under INS operating instructions, INS district directors may, in their
discretion, decide to defer action in deportation cases.  This has also been
referred to as treating the cases as "nonpriority."  Regulations governing the
use of this procedure are not published, but the operating instructions provide
that a decision to defer action should consider the following factors, among
others:  the likelihood of ultimately removing the alien from the U.S.; the
presence of sympathetic factors; the likelihood that because of the sympathetic
factors, a large amount of adverse publicity would be generated resulting in a
disproportionate amount of service time being spent responding to the publicity;
and whether or not the alien is a member of a class of deportable aliens whose

---

2/  Gordon, Charles and Rosenfield, Harry N.  Immigration Law and Procedure.
New York, updated continuously.  Vol. 1A.  p. 5-173, 5-174.

     3/  Telephone conversation with Ms. Apgar, Detention and Deportation
Officer, Detention and Deportation Section, INS, Jan. 31, 1985.

     4/  INS Operations Instructions 103.1(a)(1)(ii)(May 6, 1981).

AR2022_400983

CRS-5

removal has been given high enforcement priority. 4/ According to Gordon and Rosenfield, deferred action may be decided at any stage of the deportation process (prior to instituting proceedings, terminating proceedings already underway, or after issue of an order of deportation). 5/ Gordon and Rosenfield also note that the deferral may be for any period of time--sometimes indefinitely. 6/ There is no reference in the INS instructions to extending deferred departure in blanket form to members of a national group. INS was unable to provide statistics on the number of deferred departures or deferred actions granted or on the nationals who received such grants. 7/

Extended Voluntary Departure

Extended Voluntary Departure (EVD) is not covered by INS regulations or operating instructions. There has been some question regarding what past EVD status entailed, but according to INS, the current policy is that the status is made available to national groups (not to individuals) "for reasons of State," different in each case, upon the recommendation of the Department of State (DOS). 8/ According to a July 1983 memo from Attorney General William French Smith, "it is inaccurate . . . to assume that there exists any specific criterion or criteria, such as the occurrence of violence or political instability, by which grants of 'extended voluntary departure' are determined . . . . Each determination is based on examination of a variety

---

5/ Gordon and Rosenfield, v. 1A, p. 5-49.

6/ Ibid., p. 5-175.

7/ Telephone conversation with Ms. Apgar, Detention and Deportation Officer, Detention and Deportation Section, INS. Jan. 31, 1985.

8/ Telephone conversation with Victor Rostow, Associate General Counsel, INS. April 16, 1984 and Jan. 31, 1985.

AR2022_400984