*Prioritizing and Deferring Removal of Certain Unlawfully Present Aliens*

other programs Congress has implicitly endorsed, the program serves substantial and particularized humanitarian interests. Removing the parents of U.S. citizens and LPRs—that is, of children who have established permanent legal ties to the United States—would separate them from their nuclear families, potentially for many years, until they were able to secure visas through the path Congress has provided. During that time, both the parents and their U.S. citizen or LPR children would be deprived of both the economic support and the intangible benefits that families provide.

We recognize that the proposed program would likely differ in size from these prior deferred action programs. Although DHS has indicated that there is no reliable way to know how many eligible aliens would actually apply for or would be likely to receive deferred action following individualized consideration under the proposed program, it has informed us that approximately 4 million individuals could be eligible to apply. *See* Shahoulian E-mail. We have thus considered whether the size of the program alone sets it at odds with congressional policy or the Executive's duties under the Take Care Clause. In the absence of express statutory guidance, it is difficult to say exactly how the program's potential size bears on its permissibility as an exercise of executive enforcement discretion. But because the size of DHS's proposed program corresponds to the size of a population to which Congress has granted a prospective entitlement to lawful status without numerical restriction, it seems to us difficult to sustain an argument, based on numbers alone, that DHS's proposal to grant a limited form of administrative relief as a temporary interim measure exceeds its enforcement discretion under the INA. Furthermore, while the potential size of the program is large, it is nevertheless only a fraction of the approximately 11 million undocumented aliens who remain in the United States each year because DHS lacks the resources to remove them; and, as we have indicated, the program is limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. There is thus little practical danger that the program, simply by virtue of its size, will impede removals that would otherwise occur in its absence. And although we are aware of no prior exercises of deferred

---

modified in any way before such date." *Id.* § 301(g). INS's policies for qualifying Third Preference visa applicants and nurses eligible for H-1 nonimmigrant status likewise extended to aliens with prospective entitlements to lawful status. *See supra* p. 56.

AR2022_401292

action of the size contemplated here, INS's 1990 Family Fairness policy, which Congress later implicitly approved, made a comparable fraction of undocumented aliens—approximately four in ten—potentially eligible for discretionary extended voluntary departure relief. *Compare* CRS Immigration Report at 22 (estimating the Family Fairness policy extended to 1.5 million undocumented aliens), *with* Office of Policy and Planning, INS, *Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000* at 10 (2003) (estimating an undocumented alien population of 3.5 million in 1990); *see supra* notes 5, 15 (discussing extended voluntary departure and Congress's implicit approval of the Family Fairness policy). This suggests that DHS's proposed deferred action program is not, simply by virtue of its relative size, inconsistent with what Congress has previously considered a permissible exercise of enforcement discretion in the immigration context.

In light of these considerations, we believe the proposed expansion of deferred action to the parents of U.S. citizens and LPRs is lawful. It reflects considerations—responding to resource constraints and to particularized humanitarian concerns arising in the immigration context—that fall within DHS's expertise. It is consistent with congressional policy, since it focuses on a group—law-abiding parents of lawfully present children who have substantial ties to the community—that Congress itself has granted favorable treatment in the immigration process. The program provides for the exercise of case-by-case discretion, thereby avoiding creating a rule-like entitlement to immigration relief or abdicating DHS's enforcement responsibilities for a particular class of aliens. And, like several deferred action programs Congress has approved in the past, the proposed program provides interim relief that would prevent particularized harm that could otherwise befall both the beneficiaries of the program and their families. We accordingly conclude that the proposed program would constitute a permissible exercise of DHS's enforcement discretion under the INA.

## 2.

We now turn to the proposed deferred action program for the parents of DACA recipients. The relevant considerations are, to a certain extent, similar to those discussed above: Like the program for the parents of U.S.

AR2022_401293

*Prioritizing and Deferring Removal of Certain Unlawfully Present Aliens*

citizens and LPRs, the proposed program for parents of DACA recipients would respond to severe resource constraints that dramatically limit DHS's ability to remove aliens who are unlawfully present, and would be limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. And like the proposed program for LPRs and U.S. citizens, the proposed program for DACA parents would preserve a significant measure of case-by-case discretion not to award deferred action even if the general eligibility criteria are satisfied.

But the proposed program for parents of DACA recipients is unlike the proposed program for parents of U.S. citizens and LPRs in two critical respects. First, although DHS justifies the proposed program in large part based on considerations of family unity, the parents of DACA recipients are differently situated from the parents of U.S. citizens and LPRs under the family-related provisions of the immigration law. Many provisions of the INA reflect Congress's general concern with not separating individuals who are legally entitled to live in the United States from their immediate family members. *See, e.g.*, 8 U.S.C. § 1151(b)(2)(A)(i) (permitting citizens to petition for parents, spouses, and children); *id.* § 1229b(b)(1) (allowing cancellation of removal for relatives of citizens and LPRs). But the immigration laws do not express comparable concern for uniting persons who lack lawful status (or prospective lawful status) in the United States with their families. DACA recipients unquestionably lack lawful status in the United States. *See* DACA Toolkit at 8 ("Deferred action . . . does not provide you with a lawful status."). Although they may presumptively remain in the United States, at least for the duration of the grant of deferred action, that grant is both time-limited and contingent, revocable at any time in the agency's discretion. Extending deferred action to the parents of DACA recipients would therefore expand family-based immigration relief in a manner that deviates in important respects from the immigration system Congress has enacted and the policies that system embodies.

Second, as it has been described to us, the proposed deferred action program for the parents of DACA recipients would represent a significant departure from deferred action programs that Congress has implicitly approved in the past. Granting deferred action to the parents of DACA recipients would not operate as an interim measure for individuals to whom Congress has given a prospective entitlement to lawful status. Such

AR2022_401294

parents have no special prospect of obtaining visas, since Congress has not enabled them to self-petition—as it has for VAWA self-petitioners and individuals eligible for T or U visas—or enabled their undocumented children to petition for visas on their behalf. Nor would granting deferred action to parents of DACA recipients, at least in the absence of other factors, serve interests that are comparable to those that have prompted implementation of deferred action programs in the past. Family unity is, as we have discussed, a significant humanitarian concern that underlies many provisions of the INA. But a concern with furthering family unity alone would not justify the proposed program, because in the absence of any family member with lawful status in the United States, it would not explain why that concern should be satisfied by permitting family members to remain in the United States. The decision to grant deferred action to DACA parents thus seems to depend critically on the earlier decision to make deferred action available to their children. But we are aware of no precedent for using deferred action in this way, to respond to humanitarian needs rooted in earlier exercises of deferred action. The logic underlying such an expansion does not have a clear stopping point: It would appear to argue in favor of extending relief not only to parents of DACA recipients, but also to the close relatives of any alien granted deferred action through DACA or any other program, those relatives' close relatives, and perhaps the relatives (and relatives' relatives) of any alien granted any form of discretionary relief from removal by the Executive.

For these reasons, the proposed deferred action program for the parents of DACA recipients is meaningfully different from the proposed program for the parents of U.S. citizens and LPRs. It does not sound in Congress's concern for maintaining the integrity of families of individuals legally entitled to live in the United States. And unlike prior deferred action programs in which Congress has acquiesced, it would treat the Executive's prior decision to extend deferred action to one population as justifying the extension of deferred action to additional populations. DHS, of course, remains free to consider whether to grant deferred action to individual parents of DACA recipients on an ad hoc basis. But in the absence of clearer indications that the proposed class-based deferred action program for DACA parents would be consistent with the congressional policies and priorities embodied in the immigration laws, we conclude that it would not be permissible.

AR2022_401295

*Prioritizing and Deferring Removal of Certain Unlawfully Present Aliens*

### III.

In sum, for the reasons set forth above, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be legally permissible, but that the proposed deferred action program for parents of DACA recipients would not be permissible.

KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

81

# Findings from the National Agricultural Workers Survey (NAWS) 2017–2018:

A Demographic and Employment Profile of United States Farmworkers

Research Report No. 14

*Value of **thought**.*
*Value of **solution**.*



JBS INTERNATIONAL
A CELERIAN GROUP COMPANY

AR2022_401297

Material contained in this publication is in the public domain and may be reproduced, fully or partially, without permission of the Federal Government. Source credit is requested. Permission is required only to reproduce any copyrighted material contained herein.

This material will be made available to deaf and hard of hearing individuals upon request.
Voice phone: 1-202-219-6197
TTY FIRS: 1-800-877-8339

AR2022_401298

# Findings from the National Agricultural Workers Survey (NAWS) 2017–2018

## A Demographic and Employment Profile of United States Farmworkers

March 2021

This report was prepared for the U.S. Department of Labor, Employment and Training Administration, Office of Policy Development and Research by JBS International, Inc., under contract #GS-10F-0285K. Since contractors conducting research and evaluation projects under government sponsorship are encouraged to express their own judgment freely, this report does not necessarily represent official opinion or policy of the U.S. Department of Labor.

It was written by:

Izaac Ornelas, JBS International
Wenson Fung, JBS International
Susan Gabbard, JBS International
Daniel Carroll, U.S. Department of Labor

The authors are grateful to Jorge Nakamoto and Alberto Sandoval of JBS International for coordinating the field interviews on which the report is based, as well as to the interviewers and support staff of JBS International. The authors also thank the 2,586 U.S. crop workers who graciously participated in an interview during 2017–2018, and the agricultural employers who helped survey staff reach the workers.

AR2022_401299

## Table of Contents

EXECUTIVE SUMMARY ............................................................................................. i

INTRODUCTION ...................................................................................................... 1

   Topics Covered ..................................................................................................... 2

CHAPTER 1: Birthplace, Work Authorization, and Migrant Types ............................................ 3

   Summary of Findings: ............................................................................................ 3

   Place of Birth ...................................................................................................... 3

   Ethnicity and Race ................................................................................................ 4

   Foreign-born Workers' First Arrival to the United States ................................................... 5

   Work Authorization ............................................................................................... 6

   Migrant Farmworkers ............................................................................................. 7

CHAPTER 2: Demographics, Family Size, Children, and Household Structure ............................. 10

   Summary of Findings: ........................................................................................... 10

   Gender and Age .................................................................................................. 10

   Marital Status and Family Type ................................................................................ 11

   Children and Household Structure ............................................................................. 11

CHAPTER 3: Language, Education, and English Skills ..................................................... 13

   Summary of Findings: ........................................................................................... 13

   Primary Language ................................................................................................ 13

   English Language Skills ......................................................................................... 13

   Education ........................................................................................................... 15

   Adult Education ................................................................................................... 16

CHAPTER 4: Housing Characteristics and Distance to Work ............................................. 18

   Summary of Findings: ........................................................................................... 18

   Location of Housing and Payment Arrangement ............................................................. 18

   Type of Housing .................................................................................................. 20

   Household Crowding ............................................................................................. 21

   Distance to Work and Transportation ......................................................................... 22

CHAPTER 5: Employment Patterns and Farm Job Characteristics ....................................... 23

   Summary of Findings: ........................................................................................... 23

   Type of Employer and Job Recruitment ...................................................................... 23

   Primary Crops and Farm Job Tasks ........................................................................... 23

   Basis for Pay and Hours Worked .............................................................................. 24

AR2022_401300

Wages ................................................................................................................ 26

Monetary Bonuses ........................................................................................... 27

Worksite Availability of Water and Toilets ...................................................... 27

Pesticide Training ............................................................................................ 28

Insurance Benefits ........................................................................................... 28

CHAPTER 6: Employment Experience ................................................................ 30

Summary of Findings: ...................................................................................... 30

Number of U.S. Farm Employers in Previous 12 Months ................................ 30

Number of Years with Current Farm Employer ............................................... 30

Weeks and Days of Farm Work in Previous 12 Months ................................... 31

Years of U.S. Farm Work Experience .............................................................. 33

Other Work History .......................................................................................... 33

Plans to Remain in Farm Work ........................................................................ 35

CHAPTER 7: Non-Crop Work Activities During the Year ................................... 38

Summary of Findings: ...................................................................................... 38

Time Spent Not Employed or Abroad in Previous 12 Months .......................... 38

Non-Crop Work in Previous 12 Months ........................................................... 39

Reasons for Leaving Non-Crop Work in Previous Year ................................... 41

Periods of Unemployment During the Year ...................................................... 41

CHAPTER 8: Income, Assets, and Use of Assistance Programs ........................... 42

Summary of Findings: ...................................................................................... 42

Income .............................................................................................................. 42

Assets in the United States and Abroad ............................................................ 44

Use of Contribution- and Need-Based Programs ............................................. 45

CHAPTER 9: Health Care in the United States ..................................................... 46

Summary of Findings: ...................................................................................... 46

Health Insurance Coverage for Farmworkers and Family Members ................ 46

Health Care Utilization and Barriers to Health Care ....................................... 49

APPENDIX A: Methodology ................................................................................ 52

Overview .......................................................................................................... 52

Stratification .................................................................................................... 52

Sampling within Strata ..................................................................................... 52

APPENDIX B: Map of the NAWS Migrant Streams ............................................ 55

APPENDIX C: Index of Percentages and Means for Key Variables ..................... 56

AR2022_401301

Chapter 1 ........................................................................................................................... 56

Chapter 2 ........................................................................................................................... 58

Chapter 3 ........................................................................................................................... 60

Chapter 4 ........................................................................................................................... 62

Chapter 5 ........................................................................................................................... 66

Chapter 6 ........................................................................................................................... 69

Chapter 7 ........................................................................................................................... 73

Chapter 8 ........................................................................................................................... 75

Chapter 9 ........................................................................................................................... 79

APPENDIX D: Data on National Demographic and Employment Characteristics since 1989 ... 83

Table 1: Hired Crop Worker Demographics, National Estimates, Seven Time Periods* ........ 83

Table 2: Hired Crop Worker Employment Characteristics, National Estimates, Seven Time
Periods* ............................................................................................................................. 87

## Table of Figures

Figure 1.1: Place of Birth, 2017–2018 ................................................................... 4

Figure 1.2: Years Since First Arrival to the United States, 2017–2018 ......................................... 6

Figure 1.3: Distribution of Settled and Migrants, 2017–2018 .................................................... 8

Figure 1.4: Distribution of Migrant Types (As Percent of Migrants), 2017–2018 ...................... 8

Figure 1.5: Distribution of Migrant Types According to Their Migrant Travel Patterns (As Percent of Migrants), 2017–2018 .................................................. 9

Figure 2.1: Age Distribution of Farmworkers, 2017–2018 ....................................................... 10

Figure 2.2: Number of Minor Children in the Household of Farmworkers, 2017–2018 ............. 11

Figure 2.3: Percent of Farmworkers Unaccompanied by Nuclear Family, 2017–2018 .............. 12

Figure 3.2: Among Farmworkers Whose Primary Language Is Spanish, Self-Reported Spanish Speaking and Reading Ability, 2017–2018 ................................................. 15

Figure 3.3: Distribution of Highest Grade Completed by Farmworkers, 2017–2018 ................. 16

Figure 3.4: Percent of Farmworkers Who Attended Adult Education Classes, 2017–2018 ......... 17

Figure 3.5: Percent of Farmworkers Who Attended At Least One Adult Education Class in the United States, 2017–2018 ............................................... 17

Figure 4.1: Percent of Farmworkers Who Lived in Employer-Provided Housing, 2017–2018 ... 19

Figure 4.2: Housing Arrangement, 2017–2018 ....................................................................... 20

Figure 4.3: Type of Housing, 2017–2018 ............................................................................... 21

Figure 4.4: Type of Housing by Length of Time in the United States, 2017–2018 .................... 21

Figure 5.1: Primary Crop at Time of Interview, 2017–2018 ..................................................... 24

Figure 5.2: Primary Task at Time of Interview, 2017–2018 ...................................................... 24

Figure 5.3: Average Number of Hours Worked in Week Prior to Interview by Crop and Task at Time of Interview, 2017–2018 ............................................... 25

Figure 5.4: Average Number of Hours Worked in Week Prior to Interview by Farmworker Characteristic, 2017–2018 ................................................. 25

Figure 5.5: Average Hourly Wage by Farmworker Characteristic, 2017–2018 .......................... 27

Figure 5.6: Types of Cash Bonuses Farmworkers Received, 2017–2018 .................................. 27

Figure 6.1: Percentage Distribution of Number of Farm Work Employers in Previous 12 Months by Farmworker Characteristic, 2017–2018 .................................................... 30

Figure 6.2: Percentage Distribution of Number of Years with Current Farm Employer, 2017–2018 ................................................................ 31

Figure 6.3: Average Number of Weeks of Farm Work in Previous 12 Months, by Farmworker Characteristic, 2017–2018 ................................................. 32

Figure 6.4: Average Number of Days Worked Per Week at Current Farm Job and Average Number of Days of Farm Work in Previous 12 Months by Farmworker Characteristic, 2017–2018........................................................................................................................................... 32

Figure 6.5: Years U.S. Farm Work Experience, 2017–2018 ........................................................ 33

Figure 6.6: U.S. Non-Crop Work Experience, 2017–2018........................................................... 34

Figure 6.7: Last Time Parents Did Hired Farm Work in United States, 2017–2018.................... 35

Figure 6.8: Plans to Remain in Farm Work by Place of Birth and Work Authorization, 2017–2018........................................................................................................................................... 36

Figure 6.9: Plans to Remain in Farm Work by Migrant Status, Gender, and Educational Attainment, 2017–2018................................................................................................................. 36

Figure 6.10: Plans to Remain in Farm Work by Age Group, 2017–2018 .................................... 37

Figure 7.1: Average Number of Weeks Not Employed and Abroad in Previous 12 Months, 2017–2018........................................................................................................................................... 39

Figure 7.2: Percent of Farmworkers Who Held a Non-Crop Job the Previous Year, 2017–2018 40

Figure 7.3: Types of Non-Crop Jobs Held in Previous 12 Months, 2017–2018 ......................... 41

Figure 8.1: Percent of Farmworkers with Total Family Income Below Poverty Level by Family Size, 2017–2018............................................................................................................................ 43

Figure 8.2: Percent of Farmworkers with Total Family Income Below Poverty Level by Farmworker Characteristic, 2017–2018........................................................................................ 44

Figure 8.3: Assets in the United States, 2017–2018 ................................................................... 44

Figure 8.4: Percent of Farmworkers Who Reported That a Member of the Household Received Benefits from Contribution- or Needs-Based Programs in the Last Two Years, 2017–2018 ...... 45

Figure 9.1: Percent of Farmworkers with Health Insurance, 2017–2018 .................................... 47

Figure 9.2: Sources of Farmworkers' Health Insurance, 2017–2018............................................ 48

Figure 9.3: Sources of Farmworkers' Spouses' Health Insurance, 2017–2018 ........................... 48

Figure 9.4: Sources of Farmworkers' Children's Health Insurance, 2017–2018......................... 49

Figure 9.5: Visited a U.S. Health Care Provider in the Last Two Years by Health Insurance Status, 2017–2018......................................................................................................................... 49

# EXECUTIVE SUMMARY

This report is the fourteenth in a series of Department of Labor publications on the demographic and employment characteristics of hired agricultural workers in the United States (U.S.). It examines recent information on the demographics and employment characteristics of those who perform crop work. The report focuses on findings for the period covering fiscal years 2017 and 2018. These findings are based on data collected from face-to-face interviews with 2,586 crop farmworkers through the U.S. Department of Labor's National Agricultural Workers Survey (NAWS) between October 1, 2016 and September 30, 2018. The sample does not include crop workers with an H-2A visa.

### *Birthplace, Ethnicity, and Race*
Sixty-four percent of hired farmworkers interviewed in fiscal years 2017–2018 were born in Mexico, 32 percent were born in the United States or Puerto Rico, 3 percent were born in Central America, and the remainder originated from various other regions, including South America, the Caribbean, Asia, and the Pacific Islands. Seventy-seven percent of all farmworkers were Hispanic. Among U.S.-born workers, 30 percent were Hispanic. In terms of race, nearly one-third of crop workers self-identified as White (32%), and nearly two-thirds categorized their race with an "other" response (65%). Six percent of crop workers were identified as indigenous.

### *Work Authorization and Number of Years in the United States*
Work authorization describes farmworkers' current work authorization status, including U.S. citizen (by birth or naturalization), legal permanent resident (green card), other work authorized, and unauthorized. Almost two-thirds of all farmworkers in 2017–2018 were authorized to work in the United States (63%); 38 percent were U.S. citizens, 24 percent were legal permanent residents, and 2 percent[1] had work authorization through some other visa program. Among citizens, 85 percent were born in the United States, and 15 percent were naturalized citizens.

On average, foreign-born farmworkers interviewed in 2017–2018 first came to the United States 22 years before being interviewed. Most respondents had been in the United States at least 10 years (87%), with 70 percent arriving 15 years or more prior to their NAWS interview. One percent[2] of foreign-born farmworkers were in their first year in the United States. Eighty-seven percent of farmworkers were settled workers, and 13 percent were migrants.

### *Demographics and Family Composition*
Males comprised 69 percent of the hired crop labor force in 2017–2018. Farmworkers had an average age of 41. Thirty-six percent of workers were under the age of 35, 46 percent were ages 35 to 54, and 18 percent were age 55 or older.

---

[1] Estimates with relative standard errors (RSE) higher than 30 percent are identified throughout this report. The RSE is calculated by dividing the standard error of the estimate (mean or percentage) by the estimate itself. Estimates with RSEs greater than 30 percent but no more than 50 percent are published but should be used with caution. Estimates with RSEs greater than 50 percent are considered statistically unreliable and are suppressed. The estimate of percent of workers who had work authorization through some other visa program has a RSE of 31 percent to 50 percent and should be interpreted with caution.

[2] Estimate should be interpreted with caution because it has a relative standard error (RSE) of 31 to 50 percent.

AR2022_401305

Fifty-seven percent of farmworkers were married. The percentage of crop workers who were parents fell compared to previous years (55% in 2015–2016 compared to 50% now). At the time when they were interviewed, farmworker parents with minor children living with them had an average of two minor children. Among these parents, 68 percent had 1 or 2 minor children in their household, 21 percent had 3 minor children, and 11 percent had 4 or more minor children.

Thirty-eight percent of farmworkers were living apart from all nuclear family members at the time of their interview (i.e., were unaccompanied). Eighty-one percent of these unaccompanied workers were single without children, 12 percent were parents, and 6 percent had a spouse but no children.

### Language and Education

In 2017, 64 percent of farmworkers said that Spanish was the language in which they were most comfortable conversing, 33 percent said English was, and 3 percent[3] reported an indigenous language. In 2018, 65 percent said that Spanish was the language in which they were most comfortable conversing, 27 percent said English was, 6 percent said both Spanish and English,[4] 1 percent said more than one language,[5] and 1 percent reported an indigenous language.[6] In rating their English language skills, 23 percent of farmworkers reported that they could not speak English "at all," 41 percent said they could speak English "a little" or "somewhat," and 36 percent said they could speak English "well." In terms of their ability to read English, 33 percent of workers reported they could not read English "at all." 32 percent said they could read English "a little" or "somewhat," and 35 percent said that they could read English "well."

The average level of formal education completed by farmworkers was ninth grade. Two percent of workers reported that they had no formal schooling, and 35 percent reported that they completed the sixth or a lower grade. Eighteen percent of workers said they completed grade 7, 8, or 9, and 31 percent said they completed grade 10, 11, or 12. Twelve percent of workers reported completing some education beyond high school. Twenty-four percent of workers reported having taken at least one adult education class in the United States.

### Housing

Fifty percent of farmworkers interviewed in 2017–2018 reported that they lived in housing they rented from someone other than their employer, 35 percent of workers said they lived in a home owned by themselves or a family member, and 2 percent said they paid rent for housing provided by the government, a charity, or other organization. Fourteen percent of workers lived in employer-provided housing; 9 percent received it free of charge, and 3 percent paid rent either directly or via payroll deduction.

Fifty-eight percent of all farmworkers reported living in detached, single-family houses, 18 percent said they lived in mobile homes, 20 percent lived in apartments, and 4 percent[7] lived in various other types of housing including duplexes or triplexes, dormitories or barracks, and

---

[3] Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.
[4] Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.
[5] Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.
[6] Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.
[7] Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.

AR2022_401306

motels or hotels. Twenty-six percent of farmworkers lived in "crowded" dwellings, defined as housing units in which the number of persons per room was greater than one.

### Distance to Work and Transportation
When asked how far their current farm job was from their current residence, 11 percent of workers reported that they lived where they worked, 74 percent lived fewer than 25 miles from their current farm job, and 13 percent lived between 25 and 49 miles from work. Sixty-nine percent of workers drove a car to work, 10 percent rode with others, 7 percent walked or took public transportation, and 10 percent rode with a "raitero."[8]

### Job Characteristics and Employment History
In 2017–2018, 89 percent of farmworkers were employed directly by growers, and 11 percent were employed by farm labor contractors. At the time of interview, 20 percent of farmworkers were working in vegetable crops, 41 percent in fruit and nut crops, and 22 percent in horticulture. Another 13 percent were working in field crops, and 4 percent[9] were working in mixed crops. Twenty-three percent of farmworkers were performing pre-harvest tasks, 24 percent were harvesting crops, 19 percent were performing post-harvest activities, and 34 percent were performing technical production tasks.

In the 12 months prior to being interviewed, respondents spent an average of 35 weeks employed in farm work and performed an average of 198 days of farm work. Workers worked an average of 4 days per week for their current employer and reported an average of 45 work hours in the previous week. The majority of workers said that their basis for pay was an hourly wage (84%), and workers reported earning an average of $12.32 per hour. Fifty-five percent of farmworkers said that they were covered by Unemployment Insurance (UI) if they were to lose their current job, 85 percent said they would receive workers' compensation if they were injured at work or became ill as a result of their work, and 33 percent reported that their employer offered health insurance for injury or illness suffered while not on the job.

Eighty-one percent of workers reported having worked for only 1 farm employer in the previous 12 months, 12 percent worked for 2 employers, and 6 percent had 3 or more farm employers. At the time of interview, farmworkers had been employed by their current farm employer for an average of 8 years. The majority of farmworkers interviewed in 2017–2018 expected to continue doing farm work for more than 5 years or as long as possible (80%).

In the year prior to their NAWS interview, workers spent an average of 9 weeks living in the United States but not working and 2 weeks abroad. Thirty-one percent of farmworkers held at least one non-crop work job in the previous 12 months, and those who held a non-crop job worked an average of 25 weeks in non-crop production employment.

### Income and Assets
Farmworkers' mean and median personal income in the previous year was in the range of $20,000 to $24,999. Eleven percent of workers said their total personal income was less than $10,000, 24 percent said they had personal incomes of $10,000 to $19,999, 36 percent had personal incomes of $20,000 to $29,999, and 22 percent reported that their total personal income

---

[8] "Raitero," derived from "ride," is the Spanish word for a person who charges a fee for providing a ride to work.
[9] Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.

AR2022_401307

was $30,000 or more. Five percent of workers reported that they did not work at all during the prior calendar year.

Workers' mean and median total family income the previous year was in the range of $25,000 to $29,999. Four percent of workers reported no family income for the prior year, 22 percent said that their total family income in the prior year was less than $20,000, another 28 percent had a family income of $20,000 to $29,999, and 44 percent had a family income of $30,000 or more.[10] Twenty-one percent of farmworkers had family incomes below the poverty level.

Approximately three-quarters of farmworkers stated that they owned or were buying at least one asset in the United States (77%). The most common assets were a vehicle (reported by 74% of workers) or a home (reported by 40% of workers).

In 2017–2018, 18 percent of farmworkers reported that someone in their household received a benefit from at least one contribution-based program, including disability insurance, UI, or Social Security. Thirteen percent of households received payments from UI, 2 percent received Social Security payments, and 3 percent received payments from disability insurance. Fifty-four percent of farmworkers reported that they or someone in their household used at least one type of public assistance program in the previous two years. The most common programs utilized were Medicaid (43%), Supplemental Nutrition Assistance Program (SNAP, 15%), Special Supplemental Nutrition Program for Women, Infants, and Children (WIC, 11%), and public health clinics (17%).

### Health Care

Fifty-six percent of farmworkers interviewed in 2017–2018 reported that they had health insurance. Among them, 30 percent said their employer provided the insurance, 41 percent reported that they had insurance provided by the government, 10 percent said that they or their spouse paid for insurance themselves, 8 percent reported that they had insurance under their spouse's employer's plan, 7 percent reported that they were covered by a family member other than the spouse, such as a parent, and 7 percent reported that some other entity paid for their insurance.[11] Among workers with spouses, 66 percent said their spouse had health insurance. Among workers with minor children in the United States or Puerto Rico, 92 percent reported that all of their children had health insurance, 2 percent reported that some of their children had health insurance, and 5 percent reported that none of their children had health insurance.

Seventy-one percent of farmworkers used a health care provider in the United States sometime in the last two years. The last time they visited a health care provider, 44 percent of workers went to a private medical doctor's office or private clinic, 31 percent said they visited a community health center or migrant health clinic, 15 percent saw a dentist, 7 percent went to a hospital, and 2 percent went to some other health care provider.

Twenty-six percent of farmworkers paid for their last health care visit out of their own pockets, 24 percent said that they had Medicaid or Medicare, 15 percent reported that the cost was

---

[10] One percent of workers reported that they did not know their family income for the prior year.
[11] Percentages sum to more than 100 percent because respondents could select all that apply.

AR2022_401308

covered by health insurance provided by their employer, and 16 percent said the majority of the cost was covered by health insurance that they or their family had purchased themselves. An additional 11 percent of workers stated that they went to a public clinic that did not charge for the visit; 2 percent reported that they used some combination of sources to pay, they were covered by worker's compensation, or that they were billed for service but did not pay; and the remaining 6 percent provided a variety of other responses. The most common difficulty farmworkers said they faced when they needed to access health care was that health care visits were too expensive (reported by 23% of respondents).

AR2022_401309

# INTRODUCTION

The U.S. Department of Labor's National Agricultural Workers Survey (NAWS) is an employment-based, random-sample survey of U.S. crop workers that collects demographic, employment, and health data in face-to-face interviews. The survey began in Federal Fiscal Year 1989; since then, more than 68,000 interviews have been interviewed. The primary purposes of the NAWS are to monitor the terms and conditions of agricultural employment and assess the conditions of farmworkers. The survey also generates information for various Federal agencies that oversee farmworker programs.

The NAWS is a survey of hired workers employed in crop and crop-related work at the time of interview. To be interviewed, workers must be hired by an eligible establishment and working at an eligible task.  Eligible establishments are those classified in the North American Industrial Classification System (NAICS) as Crop Production (NAICS code 111) or as Support Activities for Crop Production (NAICS code 1151). NAICS 111 comprises establishments such as farms, orchards, groves, greenhouses, and nurseries primarily engaged in growing crops, plants, vines, or trees and their seeds. NAICS 1151 includes establishments primarily engaged in providing support activities for growing crops. Examples of support activities include supplying labor, aerial dusting or spraying, cotton ginning, cultivating services, farm management services, planting crops, and vineyard cultivation services.

Eligible tasks include work in all phases of crop production (pre-harvest, harvest, and post-harvest), as well as supervising workers, operating machinery, and packing crops. Workers who pack crops, however, are interviewed only if the packing facility at which they are employed is on or adjacent to the sampled crop producer, and the facility is owned by and primarily packs crops for that producer.

The NAWS sampling universe <u>does not include</u>:
- persons employed at eligible establishments who do not perform crop-related work, such as secretaries or mechanics, unless such workers also perform crop-related work; and
- crop workers with an H-2A visa (a temporary-employment visa for foreign agricultural workers). The Employment and Training Administration (Department of Labor) is currently assessing the feasibility of including H-2A crop workers in future survey waves.

The NAWS is unique for its broad coverage of the characteristics of hired crop workers and their dependents and its nearly year-round interviewing schedule. Data are collected throughout the year, over three cycles, to reflect the seasonality of agricultural production and employment. The NAWS differs from many Federal worker surveys in that: it is an establishment survey (workers are sampled at their workplaces); only currently employed persons are sampled; and data are collected through face-to-face interviews with farmworkers.

The NAWS sample includes both migrant and seasonal crop workers. The use of an employer-based sample rather than a household-based sample increases the likelihood that migrant workers will be interviewed in the NAWS. Multi-stage sampling is implemented to account for seasonal and regional fluctuations in the level of farm employment. To capture seasonal fluctuations in

1

the agricultural work force, the sampling year is divided into three interviewing cycles. For each cycle, there are six levels of selection:

- region;
- single counties or groupings of counties called farm labor areas (FLA), which constitute the primary sampling unit;
- county;
- ZIP Code region;
- employer; and
- respondent.

A full description of the survey's sampling design is available in the Statistical Methods of the National Agricultural Workers Survey (https://www.doleta.gov/naws/methodology/docs/NAWS_Statistical_Methods_AKA_Supporting _Statement_Part_B.pdf).

The NAWS has benefited from collaboration with multiple Federal agencies, which continue to share in the design of the questionnaire. Information provided through the NAWS informs the policies and programs of the many Federal government agencies that protect and provide services to migrant and seasonal farmworkers and their dependents.

## *Topics Covered*

This report presents information collected from face-to-face interviews with 2,586 crop workers interviewed between October 1, 2016, and September 30, 2018. It is organized into nine chapters, each beginning with a summary of the chapter's key findings. The report also contains four appendices: Appendix A describes the procedures used to select the sample, Appendix B displays a map of the NAWS migrant streams, Appendix C contains a table of the percentages and means of the principle variables presented in the report, and Appendix D contains tables of demographics and employment characteristic covering seven periods from 1989 to 2018.

Chapters 1 through 3 summarize the demographic characteristics of crop farmworkers, including place of birth, ethnicity and race, work authorization, gender, age, marital status, household size and structure, education, and language ability. Chapter 4 discusses farmworkers' housing, including the types of housing they live in, the location of their housing in relation to their jobs, and crowding conditions. Chapter 5 summarizes the characteristics of farm jobs, including crops and tasks, job recruitment, hours and wages, and benefits. Chapter 6 gives an overview of farmworkers' participation in U.S. agricultural employment and Chapter 7 discusses workers' participation in non-crop employment, including farm jobs in other types of agriculture and periods of unemployment. Chapter 8 presents information on farmworkers' income, assets, and use of assistance programs, and Chapter 9 summarizes health insurance coverage for farmworkers and their family members, health care utilization in the United States, and barriers to health care access.

AR2022_401311

## CHAPTER 1: Birthplace, Work Authorization, and Migrant Types

### *Summary of Findings:*

- About 6 in 10 hired farmworkers were born in Mexico (64%).
- Seventy-seven percent of all farmworkers were Hispanic. Among U.S.-born workers, 30 percent were Hispanic.
- Thirty-two percent of farmworkers self-identified as White, 3 percent as Black or African American,[12] and 65 percent of respondents did not select a category; instead, they described race with an open-ended "other" response.
- Six percent of farmworkers were identified as indigenous.
- Farmworkers in their first year in the United States comprised only 1 percent[13] of the hired crop labor force.
- Nearly two-thirds of all farmworkers had work authorization (63%).
- The majority of farmworkers were settled workers (87%). Thirteen percent were migrants.

### *Place of Birth*

More than 6 in 10 hired farmworkers interviewed in 2017–2018 were born in Mexico (64%), one-third were born in the United States or Puerto Rico, 3 percent were born in Central America, and a small portion (<1%[14]) originated from various other regions, including South America, the Caribbean, Asia, and the Pacific Islands (figure 1.1).

---

[12] Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.
[13] Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.
[14] Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.

AR2022_401312

**Figure 1.1: Place of Birth, 2017–2018**

### Two-thirds of farmworkers are from Mexico.



### Ethnicity and Race

Hispanic origin, as defined in the United States, can be viewed as the heritage, nationality group, lineage, or country of birth of the person or the person's parents or ancestors.[15] Foreign-born workers may more readily identify with a national origin rather than an abstract ethnicity concept such as Hispanic or Latino. Workers born in the United States or those who have been in the United States for several years might have a better understanding of the U.S-based ethnicity label system.

To capture Hispanic identity, farmworkers were asked to indicate which of a variety of categories best described them. Seventy-seven percent of workers identified themselves as members of a Hispanic group: 61 percent as Mexican, 11 percent as Mexican-American, and the remaining 5 percent as Chicano, Puerto Rican, or other Hispanic. Among U.S.-born workers, 30 percent self-identified as Hispanic: 18 percent as Mexican-American, 8 percent[16] as Mexican, and 4[17] percent as Puerto Rican, Chicano, or other Hispanic.

---

[15] Humes, K. R., Jones, N. A., and Ramirez, R. R. (2011). *Overview of Race and Hispanic Origin: 2010*. 2010 Census Briefs (p. 2).
[16] Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.
[17] Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.

AR2022_401313

Farmworker respondents were also asked to indicate the race with which they identify. Respondents had the opportunity to choose one or more race categories from the standard list required by the U.S. Office of Management and Budget. Thirty-two percent of all respondents in 2017–2018 self-identified as White, 3 percent as Black or African American,[18] and 65 percent of respondents gave an answer not on the standard list. Among them, 87 percent classified their race as Latino or Hispanic (including Latino, Hispanic, Hispano, Mexican, Mexicano, Mexican-American, and Chicano), 8 percent referenced their complexion (including Moreno and Café), 2 percent identified with an indigenous group, and 2 percent identified with their Central American origin (Guatemalan, Honduran, and Salvadoran). Fewer than 1 percent provided other responses (examples include American, Filipino, and Portuguese).

The categories used in the NAWS questions on ethnicity and race might not be intuitively understood by indigenous individuals who identify themselves as members of a specific community or language group rather than a more generic racial group, such as indigenous. Beginning in 2005, the NAWS began supplementing the question on primary language use with questions that ask about adult languages spoken as well as childhood language exposure.[19] The NAWS uses a combination of the responses to these questions and the question about race to identify farmworkers who are indigenous, and, in 2017–2018, 6 percent of NAWS respondents were identified as indigenous based on their race, language, and childhood language.

### *Foreign-born Workers' First Arrival to the United States*

While not a measure of continued residence, data on the month and year a foreign-born farmworker first entered the United States provides some information about migration history. For example, time in the United States since first arrival can serve as a measure of attachment to the farm workforce. However, a farmworker could have been in the U.S. for some time before joining the farm workforce.

On average, foreign-born farmworkers interviewed in 2017–2018 first came to the United States 22 years before being interviewed. The majority of respondents had been in the United States at least 10 years (87%), with more than half arriving at least 15 years prior to their NAWS interview (70%). Farmworkers who first arrived in the United States in the year predating their interview comprised 1 percent[20] of workers interviewed in 2017–2018 (figure 1.2).

---

[18] Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.

[19] Gabbard, S., Kissam, E., Glasnapp, J., Nakamoto, J., Saltz, R., Carroll, D. J., & Georges, A. (November, 2012). *Identifying Indigenous Mexicans and Central Americans in Surveys*. International Conference on Methods for Surveying and Enumerating Hard-to-Reach Populations (November, 2012) New Orleans, LA.

[20]   Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.

AR2022_401314

**Figure 1.2: Years Since First Arrival to the United States, 2017–2018**



Foreign-born respondents were asked to report where they lived (state/department/province) before coming to the United States. Among Mexico-born workers interviewed in 2017–2018, most came from the states of Michoacán (27%), Guanajuato (10%), Jalisco (10%), Oaxaca (10%), Baja California (6%), and Guerrero (5%). The greatest proportion of Mexico-born farmworkers originated from the Western Central region (49%), 28 percent came from Northern Mexico, and another 23 percent came from Southern Mexico.[21]

### *Work Authorization*

A series of related questions in the survey provides a picture of whether foreign-born respondents have work authorization. These questions address the foreign-born worker's existing status (citizen, legal permanent resident, border crossing-card holder, applicant for residency, temporary visa holder, or unauthorized) and, when applicable, the date and program under which the individual applied for work authorization. In addition, each foreign-born respondent is asked whether he or she has authorization to work in the United States. To be classified as work authorized, a worker must provide consistent answers that conform to visa regulations. For example, a worker who reports work authorization from a visa program that expired before he or she entered the country would be classified as unauthorized.

---

[21] The Western Central region of Mexico includes the states of Colima, Guanajuato, Jalisco, and Michoacán. The Northern region includes the states of Aguascalientes, Baja California, Chihuahua, Coahuila, Mexico City, Durango, Estado de Mexico, Hidalgo, Nayarit, Nuevo Leon, Queretaro, San Luis Potosi, Sinaloa, Sonora, Tamaulipas, and Zacatecas. The Southern region of Mexico includes the states of Campeche, Chiapas, Guerrero, Morelos, Oaxaca, Puebla, Quintana Roo, Tabasco, Tlaxcala, Veracruz, and Yucatan.

AR2022_401315

Sixty-three percent of the hired crop labor force had work authorization in 2017–2018, 38 percent of whom were U.S. citizens. Among the U.S. citizens, 85 percent were born in the United States, and 15 percent were naturalized citizens. The remainder of the work-authorized population consisted mainly of legal permanent residents (24%), and 2 percent[22] had work authorization through some other visa program.

### *Migrant Farmworkers*

The definition of "migrant" has varied across Federal government agencies and programs that provide services to migrant and seasonal farmworkers. The NAWS has defined a migrant as a person who reported jobs that were at least 75 miles apart or who reported moving more than 75 miles to obtain a farm job during a 12-month period.[23]

Interpreting migration patterns requires some caution. Since the analysis presented here covers only one year of farm employment data, these definitions describe movement during that particular year. The discussion below assumes that most of the workers making a move during the year were cyclical migrants. However, some portion of these workers might have been making a permanent move.

For the purpose of this report, migrant farmworkers were categorized according to their migrant travel patterns. Migration consisted of moving from a "home base," the location where the migrant spent the greatest amount of time during the year preceding his/her NAWS interview, to one or more destination locations where work was available. Shuttle migrants were workers who did not work on a U.S. farm at their home base, but who traveled 75 miles or more to do farm work in a single U.S. location, and worked only within a 75-mile radius of that location. Follow-the-crop migrants were workers who traveled to multiple U.S. farm locations for work. Follow-the-crop migrants might or might not have done U.S. farm work at their home base. This report further classifies migrants into domestic migrants (those who traveled solely within the United States in the 12 months preceding their interview to do farm work) or international migrants (those who crossed the U.S. border to do farm work).

Thirteen percent of farmworkers interviewed in 2017–2018 were migrants (see figure 1.3). Among them, nearly half were domestic migrants (24% domestic follow-the-crop and 23% domestic shuttle migrants), more than a third were international migrants (3% international follow-the-crop and 39% international shuttle migrants), and 11 percent were newcomers who had been in the U.S. less than a year (see figures 1.4 and 1.5).

---

[22] Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.
[23] Migrant programs often use a 24-month look-back period in their definitions of migrant. The NAWS collects data about travel to another city to do farm work during the 12 months preceding the NAWS interview and the 12 months prior to that. In 2017–2018, 16 percent of farmworkers reported that they traveled to another city to do farm work sometime during the previous 24 months.

AR2022_401316

**Figure 1.3: Distribution of Settled and Migrants, 2017–2018**



**Figure 1.4: Distribution of Migrant Types (As Percent of Migrants), 2017–2018**

**Nearly half of migrants were domestic.**



8

**Figure 1.5: Distribution of Migrant Types According to Their Migrant Travel Patterns (As Percent of Migrants), 2017–2018**

## Most international migrants
## were shuttle migrants.



AR2022_401318

# CHAPTER 2: Demographics, Family Size, Children, and Household Structure

***Summary of Findings:***

- Sixty-nine percent of farmworkers were men.
- Farmworkers' average age was 41, and median age was 40.
- Fifty-seven percent of farmworkers were married, and 50 percent had children.
- Thirty-eight percent of farmworkers were living apart from all nuclear family members at the time of their interview. Eighty-one percent of unaccompanied farmworkers were single workers without children, 12 percent were parents, and 6 percent had a spouse but no children.

***Gender and Age***

In 2017–2018, the U.S. crop labor force was predominantly male (69%) and had an average age of 41 and median age of 40. Just over one-third of crop workers were under the age of 35 (36%), and 18 percent were age 55 or older (figure 2.1).

**Figure 2.1: Age Distribution of Farmworkers, 2017–2018**



**A third of farmworkers were younger than 35.**

- 14-19 years old, 6%
- 20-24 years old, 8%
- 25-34 years old, 21%
- 35-44 years old, 23%
- 45-54 years old, 24%
- 55-64 years old, 14%
- 65 years or older, 4%

In 2017–2018, unauthorized workers were younger than authorized workers (an average of 39 and 42 years of age respectively) and newcomers to U.S. farm work (i.e., those arriving in the United States within the year prior to interview) were younger than experienced workers (an average of 28 and 41 years of age respectively). The average age of males and females was nearly the same – 41 and 40 years, respectively.

10

### Marital Status and Family Type

More than half of farmworkers interviewed in 2017–2018 were married (57%), and half were parents (50%). Among parents, 78 percent were married or living together, 14 percent were single, and 8 percent were separated, divorced, or widowed.

### Children and Household Structure

In 2017–2018, farmworker parents with minor children living in their household had an average of 2 minor children living with them at the time they were interviewed. Sixty-eight percent of these parents had 1 or 2 minor children living with them (32% and 36% respectively), 21 percent had 3 minor children, 9 percent had 4 minor children, and 2 percent had 5 or more minor children (figure 2.2).

**Figure 2.2: Number of Minor Children in the Household of Farmworkers, 2017–2018**



Of parents with children under the age of 18, 46 percent had children younger than age 6, 68 percent had children ages 6–13, and 43 percent had children ages 14–17. One percent[24] of parents resided with only some of their minor children, and 11 percent lived away from all of their minor children. Migrant parents were nearly four times more likely than settled parents to be living away from all their minor children (40% and 7% respectively).

---

[24] Estimate should be interpreted with caution because it has a RSE of 31 to 50 percent.

11

Chapter 2: Demographics, Family Size, and Children and Household Structure

"Unaccompanied" farmworkers, defined as those who were living apart from all nuclear family members (parents, siblings, spouse, and children) at the time of their interview, comprised 38 percent of the U.S. crop labor force in 2017–2018. Migrant workers were much more likely than settled workers to be unaccompanied (59% and 35% respectively) as were men when compared to women (43% and 27% respectively). See figure 2.3. Most of the unaccompanied were single workers without children (81%), 12 percent were parents, and 6 percent had a spouse but no children.

**Figure 2.3: Percent of Farmworkers Unaccompanied by Nuclear Family, 2017–2018**



Among farmworker parents in 2017–2018, nearly all mothers (98%) and almost 9 of 10 fathers (87%) were accompanied by at least some nuclear family members. Similarly, among married workers without children, 98 percent of women and 82 percent of the men were accompanied at the time of the interview.

12

# CHAPTER 3: Language, Education, and English Skills

## Summary of Findings:

- Approximately two-thirds of farmworkers reported that Spanish is their primary language (64%).
- Thirty-six percent of workers reported that they could speak English "well," and 23 percent said, "not at all." Thirty-five percent reported that they could read English "well" while 33 percent said, "not at all."
- The average level of formal education completed by farmworkers was ninth grade.
- Twenty-four percent of workers reported having taken at least one adult education class in the United States.

## Primary Language

Similar percentage of farmworkers said that Spanish, English, or both languages were their primary languages in 2017–2018. In 2017, approximately two-thirds of farmworkers said that Spanish was the language in which they are most comfortable conversing (64%), 33 percent said English was, and 3 percent reported an indigenous language.[25, 26] Among workers born in Mexico or Central America, nearly all reported that Spanish was their primary language (93%). Of the remainder, 2 percent said that English was their primary language, and 5 percent reported an indigenous language as the one in which they are most comfortable conversing.[27] In 2018, more than two-thirds of farmworkers said that Spanish was the language in which they are most comfortable conversing (65%), 27 percent said English was, 6 percent said both Spanish and English,[28] 1 percent said more than one language,[29] and 1 percent reported an indigenous language.[30] Among workers born in Mexico or Central America, nearly all reported that Spanish was their primary language (92%). Of the remainder, 2 percent said that English was their primary language,[31] and 4 percent said both Spanish and English.

## English Language Skills

Farmworkers were asked two questions about their English fluency: "How well do you speak English?" and "How well do you read English?" In 2017–2018, 23 percent of workers responded that they could not speak English "at all," 28 percent said they could speak English "a little," 13 percent said they could speak English "somewhat," and 36 percent said they could speak English "well." Regarding their ability to read English, 33 percent of the hired crop labor force reported they could not read English "at all," 21 percent said they could read English "a little," 11 percent said they could read English "somewhat," and 35 percent said they could read English "well" (figure 3.1).[32]

---

[25] Indigenous languages reported by farmworkers interviewed in 2017–2018 include Acateco, Amuzgo, Chatino, Chuj, Mam, Nahuatl, Popti, Purepecha/Tarasco, Tlapaneco, and Triqui.
[26] Estimates should be interpreted with caution because it has a RSE of 31 to 50 percent.
[27] Estimates should be interpreted with caution because it has a RSE of 31 to 50 percent.
[28] Estimates should be interpreted with caution because it has a RSE of 31 to 50 percent.
[29] Estimates should be interpreted with caution because it has a RSE of 31 to 50 percent.
[30] Estimates should be interpreted with caution because it has a RSE of 31 to 50 percent.
[31] Estimates should be interpreted with caution because it has a RSE of 31 to 50 percent
[32] Respondents' self-reports of language proficiency might be higher or lower than their actual proficiency.

AR2022_401322

**Figure 3.1: Farmworkers' Self-Reported English Speaking and Reading Ability, 2017–2018**



Farmworkers who reported having a primary language other than English were asked to indicate how well they could speak and read in that language. Among workers whose primary language was Spanish, nearly all reported they could speak Spanish "well" (97%). In describing their Spanish reading ability, 78 percent responded with "well," 16 percent replied with "somewhat," 5 percent said "a little," and 1 percent replied with "not at all" (figure 3.2).

14

**Figure 3.2: Among Farmworkers Whose Primary Language Is Spanish, Self-Reported Spanish Speaking and Reading Ability, 2017–2018**



### Education

In 2017–2018, farmworkers' average educational attainment was ninth grade. Two percent of workers reported that they had no formal schooling, and 35 percent reported that they completed the 6th grade or lower. Eighteen percent of workers said they completed grade 7, 8, or 9, and 31 percent said they completed grade 10, 11, or 12. Twelve percent of farmworkers reported completing some education beyond high school (figure 3.3).

**Figure 3.3: Distribution of Highest Grade Completed by Farmworkers, 2017–2018**



The highest grade completed varied by place of birth. On average, the highest grade completed by workers born in the United States was 12th, and the highest grade completed by workers born in Mexico or other countries was 7th. Approximately 8 in 10 U.S.-born farmworkers completed the 12th grade or higher (76%) as did 18 percent of Mexico-born workers and 23 percent of workers born in other countries.

### *Adult Education*

In 2017–2018, 24 percent of farmworkers reported having taken at least one adult education class in the United States sometime in their lives. The most common classes were English (13%), job training (30%), college or university classes (6%), and high school equivalency (GED) classes (4%). Small shares of workers (4%) reported taking other types of classes (figure 3.4).

16

**Figure 3.4: Percent of Farmworkers Who Attended Adult Education Classes, 2017–2018**

| Type of Class[a] | Percent of Farmworkers |
|---|---|
| Any adult education | 24% |
| Job training | 30% |
| English/ESL | 13% |
| College/University | 6% |
| GED, HS equivalency | 4% |
| Citizenship | 3%[b] |
| Other | 4% |

[a] Farmworkers may have attended multiple types of classes.
[b] Estimates should be interpreted with caution because it has a RSE of 31 to 50 percent.

Farmworkers with the most formal education were the most likely to attend U.S. adult education classes. The rate of attendance among those who had completed the 12th grade was almost twice as high as the rate of those who had not (34% and 18% respectively). Similarly, workers born in the United States were more likely than those born abroad to report having attended some type of adult education class (26% and 23% respectively), as were authorized workers when compared to unauthorized workers (26% and 21% respectively). See figure 3.5.

**Figure 3.5: Percent of Farmworkers Who Attended At Least One Adult Education Class in the United States, 2017–2018**



Higher-educated, U.S.-born, and authorized farmworkers were more likely to attend adult education.

At least 12th grade education, 34%
Less than 12th grade education, 18%
U.S.-born farmworkers, 26%
Foreign-born farmworkers, 23%
Authorized farmworkers, 26%
Unauthorized farmworkers, 21%

17

## CHAPTER 4: Housing Characteristics and Distance to Work

### *Summary of Findings:*

- Fourteen percent of farmworkers lived in a dwelling owned or administered by their current employer: 11 percent on the farm of the grower for whom they were working and 3 percent off the farm.
- Fifty-eight percent of workers lived in detached, single-family houses.
- One-quarter of farmworkers lived in a dwelling defined as "crowded" (26%).
- Seven in 10 workers lived fewer than 25 miles from their current farm job (74%), and 13 percent lived between 25 and 49 miles from work. Eleven percent of workers lived where they worked.
- Sixty-nine percent of workers drove a car to work, 10 percent rode with a "raitero,"[33] and 4 percent took a labor bus, truck, or van.

### *Location of Housing and Payment Arrangement*

Farmworkers provided information about their housing situation (arrangement, location, type, and occupancy) while working at their current farm job. Fourteen percent of farmworkers lived in employer-provided housing (i.e., property owned or administered by their current employer): 11 percent on the farm of the grower for whom they were working and 3 percent off the farm. The remaining 86 percent of workers lived in a property not owned or administered by their current employer.

Similar proportions of employer-provided housing (either on or off the employer's farm) were reported in the Eastern, Midwest, and Western migrant streams,[34] with 16 percent of Eastern farmworkers interviewed in 2017–2018 reporting that they lived in employer-provided housing, 13 percent[35] of workers in the Midwest migrant stream, and 13 percent in the Western migrant stream (figure 4.1).

---

[33] "Raitero," derived from "ride," is the Spanish word for a person who charges a fee for providing a ride to work.
[34] Migrant streams are one way of showing usual patterns of migration and the linkages between downstream and upstream states that many migrants travel in search of farm work. While these patterns are typical, some migrants may cross streams in their search for work. A map of the NAWS migrant streams can be found in Appendix B.
[35] Estimates should be interpreted with caution because it has a RSE of 31 to 50 percent.

18

**Figure 4.1: Percent of Farmworkers Who Lived in Employer-Provided Housing, 2017–2018**



a A map of the NAWS migrant streams can be found in Appendix B.

In addition to information about the location of their housing, farmworkers provided information about the payment arrangements for their housing. In 2017–2018, more than half of all farmworkers reported that they lived in housing they rented from someone other than their employer (50%), 35 percent of workers said they lived in a home owned by themselves or a family member, 2 percent said they paid rent for housing provided by the government, a charity, or other organization, and 14 percent of workers lived in employer-provided housing. Among those living in employer-provided housing, 9 percent received it free of charge, 3 percent paid rent either directly or via payroll deduction, and fewer than 1 percent[36] had other arrangements with their employers.

Migrant workers were more than 2 times as likely as settled workers to live in employer-provided housing free of charge (27% and 10% respectively) and far less likely than settled workers to live in a home they or a family member owned (22% and 37% respectively). See figure 4.2.

---

36  Estimate should be interpreted with caution because it has an RSE of 31 to 50 percent.

AR2022_401328

**Figure 4.2: Housing Arrangement, 2017–2018**



## Migrant farmworkers were more likely to live in employer-provided housing.

Farmworkers who reported that they paid for their housing were asked how much they paid at their current residence, including for their family if their family lived with them. Six percent reported that they paid less than 200 dollars per month, almost a quarter said they paid 200–399 dollars per month (21%), 27 percent paid 400–599 dollars per month, and 46 percent paid 600 dollars or more per month.

### *Type of Housing*

In 2017–2018, more than half of farmworkers reported living in detached, single-family houses (58%), 18 percent said they lived in mobile homes, and another 20 percent lived in apartments. The remaining 4 percent[37] lived in other types of housing.[38]

Migrant workers were less likely than settled workers to report living in detached, single-family homes (41% and 61% respectively) or mobile homes (16% and 18% respectively) and more likely than settled workers to live in apartments (30% and 18% respectively). Unauthorized workers were less likely than authorized workers to reside in single-family homes (44% and 67% respectively) and more likely to live in mobile homes (23% and 15% respectively) and apartments (28% and 15% respectively). See figure 4.3.

---

[37]  Estimate should be interpreted with caution because it has an RSE of 31 to 50 percent.
[38] Other types of housing in which farmworkers reported living included a duplex or triplex, dormitory or barracks, motel or hotel, or "other."

**Figure 4.3: Type of Housing, 2017–2018**

| Type of Housing | All Farmworkers | Migrant | Settled | Authorized | Unauthorized |
|---|---|---|---|---|---|
| **Single family home** | 58% | 41% | 61% | 67% | 44% |
| **Mobile home** | 18% | 16% | 18% | 15% | 23% |
| **Apartment** | 20% | 30% | 18% | 15% | 28% |
| **Other** | 4%[a] | 12%[a] | 2% | 3%[a] | 5%[a] |

[a] Estimate should be interpreted with caution because it has a RSE of 31 percent to 50 percent.

Among immigrant farmworkers, the proportion living in single-family homes increased with the number of years living in the United States. Among immigrants who first arrived in the United States fewer than 10 years ago, 45 percent lived in single-family homes compared to 47 percent of those that had been in the United States between 10 and 19 years and 55 percent of those who had been in the United States at least 20 years (see figure 4.4).

**Figure 4.4: Type of Housing by Length of Time in the United States, 2017–2018**

| Type of Housing | In United States Less than 10 Years | In United States 10-19 Years | In United States 20 Years or More |
|---|---|---|---|
| **Single family home** | 45% | 47% | 55% |
| **Mobile home** | 22% | 20% | 19% |
| **Apartment** | 26% | 30% | 21% |
| **Other** | 7%[a] | [b] | 5% |

[a] Estimate should be interpreted with caution because it has a RSE of 31 percent to 50 percent.
[b] Estimate is suppressed because it has a RSE greater than 50 percent.

In 2017–2018, farmworkers reported they had an average of six rooms in the dwellings they lived in: an average of three bedrooms, one or two bathrooms, one kitchen, and one "other" room. Nearly all workers said there was at least one bathroom in their living unit (>99%) and at least one kitchen (>99%).

### Household Crowding

The measure of crowding used for this report is based on the one-person-per-room definition of the U.S. Census Bureau, Census of Housing.[39] Persons-per-room was calculated by summing the number of rooms (excluding bathrooms, but including kitchens) that respondents said they had in their current living quarters, then dividing the number of persons that respondents said slept in those rooms by the total number of rooms. Dwellings in which the number of persons per room was greater than one were considered crowded.

In 2017–2018, 26 percent of farmworkers lived in crowded dwellings. Migrant workers lived in crowded dwellings with greater frequency than settled workers (41% compared to 24%), and

---

[39] U.S. Census Bureau, Housing and Household Economic Statistics Division. (2011, October 31). *Crowding (http://www.census.gov/hhes/www/housing/census/historic/crowding.html)*.

AR2022_401330

unauthorized workers were nearly twice as likely as authorized workers to live in crowded dwellings (39% and 19% respectively).

### *Distance to Work and Transportation*

When asked how far their current farm job was from their current residence, 11 percent of farmworkers in 2017–2018 reported that they lived where they worked, 33 percent said they lived within 9 miles of their job location, 41 percent lived between 10 and 24 miles from work, 13 percent lived between 25 and 49 miles from work, and 2 percent lived 50 or more miles from work.

Farmworkers used various modes of transportation to get to work. In 2017–2018, 69 percent of workers reported that they drove a car (74% of workers said they owned a car or truck, as discussed in chapter 8), and 7 percent said they walked or took public transit. Twenty-four percent of workers did not provide their own transportation but commuted via rides with others (10%), rides with a "raitero"[40] (10%), or rides on a labor bus, truck or van (4%).

Among workers who did not provide their own transportation, 3 percent[41] reported that it was mandatory or obligatory for them to use their current mode of transportation. Twenty-two percent of workers who did not provide their own transportation reported having to pay a fee for these rides to work, and 40 percent said they paid, but only for gas. Thirty-seven percent said they paid no fee for their rides with the "raitero," on the labor bus, or with others.

---

[40] "Raitero," derived from "ride," is the Spanish word for a person who charges a fee for providing a ride to work.
[41] Estimate should be interpreted with caution because it has an RSE of 31 to 50 percent.

AR2022_401331

## CHAPTER 5: Employment Patterns and Farm Job Characteristics

### Summary of Findings:

- Nearly 9 in 10 farmworkers were employed directly by growers (89%), and 11 percent were employed by farm labor contractors.
- At the time of interview, 41 percent of farmworkers were working in fruit and nut crops, 20 percent in vegetable crops, and 22 percent in horticulture. Thirteen percent were working in field crops, and 4 percent[42] were working in mixed crops.
- At the time of interview, 23 percent of farmworkers were performing pre-harvest tasks, 24 percent were harvesting crops, 19 percent were performing post-harvest activities, and 34 percent were performing technical production tasks.
- Most farmworkers reported that their basis for pay was an hourly wage (84%). Workers reported earning an average of $12.32 per hour at their current farm job.
- Fifty-five percent of farmworkers reported that they were covered by Unemployment Insurance (UI) if they were to lose their current job, 85 percent said they would receive workers' compensation if they were injured at work or became ill as a result of their work, and 33 percent reported that their employer offered health insurance for injury or illness suffered while not on the job.

### Type of Employer and Job Recruitment

Most farmworkers in 2017–2018 were employed directly by growers[43] (89%); farm labor contractors employed the remaining 11 percent. About 6 in 10 workers reported that they found their current job via references from friends or relatives (60%) and one-third got their job after applying for it on their own (30%). Seven percent of workers were recruited by a grower, foreman, or labor contractor, and the remaining 4 percent were referred to their job by an employment service, or welfare office, were hired under union-employer agreements, or found their job via some "other" means.

### Primary Crops and Farm Job Tasks

At the time they were interviewed in 2017–2018, 83 percent of farmworkers reported working in fruits, nuts, vegetables, and horticultural crops (41% in fruits and nuts, 20% in vegetables, and 22% in horticulture). Thirteen percent held jobs in field crops, and 4 percent worked in mixed crops or other crops. Workers employed by farm labor contractors were less likely than those employed directly by growers to work in vegetable crops (16%[44] compared to 21%) and more likely than directly-hired workers to work in fruit and nut crops (67% compared to 38%). Migrant farmworkers worked in vegetable crops with almost equal frequency as settled workers (19% and 21% respectively), but were less likely than settled workers to have jobs in horticultural crops (11% and 24% respectively). See figure 5.1.

---

[42]  Estimate should be interpreted with caution because it has an RSE of 31 to 50 percent.
[43]  Growers include owners of establishments (i.e., farms, orchards, greenhouses, and nurseries) that engage primarily in growing crops, plants, or trees, but can also include other types of crop producers, such as packers, shippers, or distributors.
[44]  Estimate should be interpreted with caution because it has an RSE of 31 to 50 percent.

23

AR2022_401332

**Figure 5.1: Primary Crop at Time of Interview, 2017–2018**

| Crop at Time of Interview | All Farmworkers | Employed by Grower | Employed by Farm Labor Contractor | Migrant Farmworkers | Settled Farmworkers |
|---|---|---|---|---|---|
| **Fruits and Nuts** | 41% | 38% | 67% | 54% | 39% |
| **Horticulture** | 22% | 25% | a | 11%[b] | 24% |
| **Vegetables** | 20% | 21% | 16%[b] | 19% | 21% |
| **Field Crops** | 13% | 15% | a | 7% | 14% |
| **Miscellaneous/ Multiple** | 4%[b] | 2% | a | 9% | 2% |

[a] Estimate is suppressed because it has a RSE greater than 50 percent.
[b] Estimate should be interpreted with caution because it has a RSE of 31 percent to 50 percent.

Over the course of a year and even in a single day, crop workers potentially perform a wide variety of tasks. In the NAWS, interviewers record the task the respondent was performing just prior to the interview. Among all crop workers interviewed in 2017–2018, 23 percent performed pre-harvest tasks such as hoeing, thinning, and transplanting; 24 percent harvested crops; 19 percent performed post-harvest activities such as field packing, sorting, and grading; and 34 percent of workers performed technical production tasks such as pruning, irrigating, and operating machinery. Workers employed by farm labor contractors and migrant workers were twice as likely as directly-hired workers and settled workers to perform harvest tasks (45% and 42% compared to 21%, respectively) while directly-hired and settled crop workers were nearly twice as likely as labor-contracted and migrant crop workers to perform post-harvest tasks (20% compared to 11% and 12%, respectively). Directly-hired workers and settled workers were also more likely than contracted workers and migrant workers to perform technical production tasks (35% compared to 27% and 29% respectively). See figure 5.2.

**Figure 5.2: Primary Task at Time of Interview, 2017–2018**

| Primary Task at Time of Interview | All Farmworkers | Employed by Grower | Employed by Farm Labor Contractor | Migrant Farmworkers | Settled Farmworkers |
|---|---|---|---|---|---|
| **Pre-harvest** | 23% | 24% | 18%[a] | 17% | 24% |
| **Harvest** | 24% | 21% | 45% | 42% | 21% |
| **Post-harvest** | 19% | 20% | 11%[a] | 12% | 20% |
| **Technical Production** | 34% | 35% | 27% | 29% | 35% |

[a] Estimate should be interpreted with caution because it has a RSE of 31 percent to 50 percent.

### Basis for Pay and Hours Worked

The majority of farmworkers in 2017–2018 reported that their basis for pay was an hourly wage (84%). Four percent of workers were paid a salary, 11 percent were paid exclusively by the piece.

24

Respondents worked an average of 45 hours in the previous week at their current farm job. Agricultural employers' labor needs vary by season, crop, and task, and workers are sometimes needed for longer than normal hours over short periods of time. The data reflect the fluctuating nature of labor use. For example, workers who were harvesting field crops at the time they were interviewed in 2017–2018 reported working an average of 54 hours in the previous week. Workers who performed pre-harvest tasks (such as thinning and transplanting) in horticulture, on the other hand, reported an average of 43 hours of work the previous week (figure 5.3). Workers who performed pre-harvest, harvest, and technical tasks related to field crops worked the highest number of hours the previous week; 48, 54, and 53 for pre-harvest, harvest, and technical tasks, respectively.

**Figure 5.3: Average Number of Hours Worked in Week Prior to Interview by Crop and Task at Time of Interview, 2017–2018**

| Crop | Pre-Harvest Tasks | Harvest Tasks | Post-Harvest Tasks | Technical Production Tasks |
|---|---|---|---|---|
| **Field Crops** | 48 | 54 | 47 | 53 |
| **Fruit and Nut Crops** | 43 | 44 | 48 | 47 |
| **Horticulture** | 43 | 47 | 43 | 41 |
| **Vegetable Crops** | 42 | 44 | 43 | 46 |
| **Miscellaneous/ Multiple** | 47 | 42 | 44 | 47 |

The average number of hours worked in the previous week also varied by workers' age, gender, U.S. farm work experience, and payment type. Respondents ages 14 to 17 reported the fewest hours (an average of 36), and workers ages 35 to 44 reported the most hours (an average of 47). Males reported working an average of 47 hours in the previous week, and females reported an average of 41 hours. Crop workers with fewer than 2 years of experience reported the fewest hours of work the previous week (an average of 37), while those with 21 to 30 years of experience reported the most hours (an average of 50). Farmworkers paid a salary reported the greatest number of hours the previous week (an average of 50). Workers paid by the piece averaged 45 hours, those paid by the hour averaged 45 hours, and those paid a combination of hourly wage and piece rate averaged 45 hours of work the previous week (figure 5.4).

**Figure 5.4: Average Number of Hours Worked in Week Prior to Interview by Farmworker Characteristic, 2017–2018**

| Farmworker Characteristic | Average Number of Hours Worked in Week Prior to Interview |
|---|---|
| **14-17 years old** | 36 |
| **18-21 years old** | 40 |
| **22-24 years old** | 45 |
| **25-34 years old** | 46 |
| **35-44 years old** | 47 |
| **45-50 years old** | 46 |

25

| Farmworker Characteristic | Average Number of Hours Worked in Week Prior to Interview |
|---|---|
| 51-54 years old | 45 |
| 55-64 years old | 45 |
| 65 or more years old | 38 |
| Male | 47 |
| Female | 41 |
| Less than 2 years of farm work experience | 37 |
| 2-4 years farm work experience | 43 |
| 5-10 years farm work experience | 45 |
| 11-20 years farm work experience | 46 |
| 21-30 years farm work experience | 50 |
| 31 or more years farm work experience | 46 |
| Paid by the hour | 45 |
| Paid by the piece | 45 |
| Paid combination hourly wage and piece rate | 45 |
| Paid salary or other | 50 |

### *Wages*

When asked how much they were earning per hour at their current farm job, farmworkers in 2017–2018 reported an average of $12.32.[45] Workers who were being paid by the hour earned an average hourly wage of $11.72, and those being paid by the piece earned an average of $15.76 per hour.

Hourly wages increased with respondents' number of years working for their current employer. Workers who had been with their current employer 1 to 2 years earned an average of $11.84 per hour, those working for their current employer 3 to 5 years earned an average of $11.83 per hour, and those working for their current employer 6 to 10 years earned an average of $12.54 per hour. Workers who had worked for their current employer 11 years or more earned the highest hourly wage, an average of $13.19 per hour.

Among the tasks respondents reported performing at the time they were interviewed, those who worked in harvest tasks earned the highest average hourly wage, $13.25. Pre-harvest workers earned an average of $11.63 per hour, post-harvest workers earned an average of $11.86 per hour, and those who worked in technical production tasks earned an average of $12.41 per hour (figure 5.5).

---

[45] Piece rate and combination wages were converted to an hourly wage, then averaged with the wages of workers who were paid by the hour.

AR2022_401335

**Figure 5.5: Average Hourly Wage by Farmworker Characteristic, 2017–2018**

| Farmworker Characteristic | Average Hourly Wage |
|---|---|
| **All farmworkers** | $12.32 |
| **Paid by the hour** | $11.72 |
| **Paid by the piece** | $15.76 |
| **Paid combination hourly wage and piece rate** | $15.17[a] |
| **Salary or Other** | $17.51 |
| **With current employer 1 to 2 years** | $11.84 |
| **With current employer 3 to 5 years** | $11.83 |
| **With current employer 6 to 10 years** | $12.54 |
| **With current employer 11 or more years** | $13.19 |
| **Performed pre-harvest tasks at time of interview** | $11.63 |
| **Performed harvest tasks at time of interview** | $13.25 |
| **Performed post-harvest tasks at time of interview** | $11.86 |
| **Performed technical production tasks at time of interview** | $12.41 |

[a] Less than one percent of farmworkers reported being paid a combination hourly wage and piece rate at their current farm job.

### *Monetary Bonuses*

In 2017–2018, 35 percent of farmworkers reported receiving a cash bonus from their current farm employer as part of their compensation package, 56 percent said they received no cash bonus, and 9 percent did not know. Workers who reported being paid a bonus were asked to identify all the types of bonuses they received. Fifty-five percent said they received a holiday bonus, 23 percent received an end-of-season bonus, 17 percent received an incentive award, and 6 percent received a bonus contingent upon grower profits (figure 5.6).

**Figure 5.6: Types of Cash Bonuses Farmworkers Received, 2017–2018**

| Type of Bonus Received[a] | Percent of Farmworkers |
|---|---|
| **Holiday bonus** | 55% |
| **End-of-season bonus** | 23% |
| **Incentive bonus** | 17% |
| **Bonus dependent on grower profit** | 6% |
| **Other type of bonus** | 3%[b] |

[a] Among workers who reported being paid a bonus. Multiple responses were allowed.
[b] Estimate should be interpreted with caution because it has a RSE of 31 percent to 50 percent.

### *Worksite Availability of Water and Toilets*

NAWS respondents were asked if their current farm employer provided the following items at the worksite every day: drinking water and cups, a toilet, and water for washing hands. Ninety percent of farmworkers in 2017–2018 reported that they were provided with drinking water and disposable cups every day, and 6 percent said they were provided water only. A notable share of

27

workers said that their employer provided no water and no cups (4%). Nearly all workers affirmed that they were provided a toilet every day (99%) and water for washing their hands (99%).

### Pesticide Training

The NAWS asks all respondents whether, at any time in the last 12 months, their current employer provided them with training or instruction in the safe use of pesticides. In 2017–2018, 68 percent of farmworkers reported that they did receive this type of training.

### Insurance Benefits

NAWS respondents were asked whether they were covered by UI if they were to lose their current job. Fifty-five percent of farmworkers interviewed in 2017–2018 said "yes," 41 percent said "no," and 4 percent did not know.[46] Workers with authorization to work in the United States were far more likely than unauthorized workers to report that they would be covered by UI (83% and 6% respectively). Of the 41 percent of respondents who reported that they would not be covered by UI, 92 percent were unauthorized and would not qualify for the benefit were it provided.

When asked whether they would receive workers' compensation if they were injured at work or got sick as a result of their work, approximately 8 in 10 farmworkers said "yes" (85%), 5 percent said "no," and 10 percent did not know.[47] Furthermore, when asked whether their employer provided health insurance or paid for medical treatment for injury or illness suffered while off the job (regardless of whether or not the worker accepted or used the insurance), 33 percent confirmed that their employer offered such a benefit, 59 percent said their employer did not, and 8 percent were unsure. Authorized workers were as likely as unauthorized workers to report that they were covered by workers' compensation insurance (86% and 85% respectively), and authorized workers were more likely than unauthorized workers to say that their employer offered health insurance for non-work-related injury or illness (37% and 25% respectively). See figure 5.7. A discussion of farmworkers' participation in health insurance coverage for themselves and their family members can be found in Chapter 9.

---

[46] UI coverage varies by state.  For agricultural labor in the majority of states, employers are required to pay UI taxes if they paid wages in cash of $20,000 or more for agricultural labor in any calendar quarter in the current or preceding calendar year, or who employed 10 or more workers on at least 1 day in each of 20 different weeks in the current or immediately preceding calendar year. U.S. Department of Labor, Employment and Training Administration. (2017). *Comparison of State Unemployment Insurance Laws (https://workforcesecurity.doleta.gov/unemploy/pdf/uilawcompar/2017/complete.pdf, p. 1-2)*.

[47] The rules for workers' compensation coverage for agricultural workers vary among states. In 14 states, Puerto Rico and the Virgin Islands, rules require employers to cover seasonal agricultural workers to the same extent as all other workers. In an additional 21 states, employers provide workers' compensation but coverage is limited to certain classifications of agricultural employers or workers such as the number of full-time workers employed. Fifteen states have optional coverage, allowing employers to elect to provide workers' compensation coverage to their employees, though the coverage is not required by law. In many of these states, workers' compensation is required for employers in other industries but optional for agriculture. *A Guide to Workers' Compensation for Clinicians Serving Agricultural Workers (http://www.farmworkerjustice.org/sites/default/files/Workers%20Comp%20Guide%20FINAL%20%281%29.pdf)*. Farmworker Justice and Migrant Clinicians Network (2015).

AR2022_401337

**Figure 5.7: Percent of Farmworkers Whose Employer Offers Health Insurance, 2017–2018**



# CHAPTER 6: Employment Experience

### Summary of Findings:

- Eighty-one percent of farmworkers worked for 1 farm employer in the previous 12 months. Crop workers had been employed with their current farm employer for an average of 8 years.
- Farmworkers worked an average of 35 weeks in the previous 12 months.
- Farmworkers worked an average of four days per week for their current employer and an average of 198 days in farm work in the previous 12 months.
- Farmworkers with a full year or more of farm work experience had an average of 19 years of U.S. farm work experience.
- Workers with more years of experience worked more days in the previous 12 months.
- Four-fifths of workers interviewed (80%) expected to continue doing farm work for at least 5 years.

### Number of U.S. Farm Employers in Previous 12 Months

Farmworkers in 2017–2018 worked for an average of 1 U.S. farm employer[48] in the 12 months prior to being interviewed. Eighty-one percent of workers reported having worked for only 1 farm employer, 12 percent worked for 2 employers, and 6 percent worked for 3 or more farm employers in the previous 12 months.

Unauthorized workers were more likely than authorized workers to have worked for more than 1 farm employer in the previous 12 months (28% compared to 14%), and migrant workers were more than twice as likely as settled workers to have had more than 1 farm employer in the previous 12 months (39% compared to 16%). See figure 6.1.

**Figure 6.1: Percentage Distribution of Number of Farm Work Employers in Previous 12 Months by Farmworker Characteristic, 2017–2018**

| Number of Farm Employers | All Farmworkers | Migrant | Settled | Authorized | Unauthorized |
|---|---|---|---|---|---|
| One | 81% | 61% | 84% | 86% | 73% |
| Two | 12% | 18% | 12% | 11% | 15% |
| Three or more | 6% | 21% | 4% | 3% | 13% |

### Number of Years with Current Farm Employer

In 2017–2018, farmworkers reported working for their current farm employer for an average of eight years.[49] About 5 in 10 stated that they had been with their current employer for fewer than 5 years (50%), and more than 2 in 10 said that they had been with their current farm employer for 11 years or more (26%). See figure 6.2.

---

[48] An employer can be either a farm owner or a farm labor contractor. While a worker employed by a farm labor contractor may work on more than one farm in a year, a single labor contractor is counted as one employer.
[49] Any employment for at least one day in the year qualifies as one year.

AR2022_401339

**Figure 6.2: Percentage Distribution of Number of Years with Current Farm Employer, 2017–2018**



Half of farmworkers had worked for their current farm employer for fewer than five years.

## Weeks and Days of Farm Work in Previous 12 Months

During the previous year, farmworkers spent an average of 35 weeks (67% of the year) employed in U.S. farm work, with farm work participation varying depending on workers' work authorization, migrant status, and place of birth. Authorized workers, migrant workers, and U.S.-born workers worked fewer weeks in farm work (averages of 32, 28, and 28 weeks respectively) than unauthorized workers, settled workers, and foreign-born workers (averages of 40, 36, and 38 weeks respectively). Youth farmworkers between the age of 14 and 17 were employed the fewest weeks in farm jobs, averaging 9 weeks of farm work in the previous 12 months, and workers aged 25 to 50 worked the most, averaging 37 weeks in the previous 12 months (figure 6.3).

31

**Figure 6.3: Average Number of Weeks of Farm Work in Previous 12 Months, by Farmworker Characteristic, 2017–2018**

| Farmworker Characteristic | Average Weeks of Farm Work in Previous 12 Months |
|---|---|
| All farmworkers | 35 |
| Migrant | 28 |
| Settled | 36 |
| Authorized | 32 |
| Unauthorized | 40 |
| U.S.-born | 28 |
| Foreign-born | 38 |
| 14-17 years old | 9 |
| 18-24 years old | 25 |
| 25-50 years old | 37 |
| Over 50 years old | 36 |

For their employer at the time of interview, farmworkers reported working an average of four days per week (see figure 6.4). Farmworkers' approximate number of workdays per year was calculated using information on each employer the respondent had in the 12-month retrospective work history. Total workdays is the sum over all the respondent's employers of the workdays for each employer, calculated from employment dates, number of days worked per week, and number of weeks worked per employer. Over the previous 12 months, respondents worked an average of 198 days in farm work, with averages varying depending upon workers' work authorization, migrant status, and place of birth. Unauthorized workers, settled workers, and foreign-born workers averaged a greater number of days than did their counterparts: Unauthorized workers worked an average of 233 days and authorized workers an average of 178 days; settled workers averaged 203 days while migrant workers averaged 167 days; foreign-born workers worked an average of 220 days and U.S.-born workers an average of 151 days (figure 6.4).

**Figure 6.4: Average Number of Days Worked Per Week at Current Farm Job and Average Number of Days of Farm Work in Previous 12 Months by Farmworker Characteristic, 2017–2018**

| Farmworker Characteristic | Average Days Worked Per Week Current Farm Job | Average Days of Farm Work in Previous 12 Months |
|---|---|---|
| All farmworkers | 4 | 198 |
| Migrant | 5 | 167 |
| Settled | 4 | 203 |
| Authorized | 4 | 178 |
| Unauthorized | 5 | 233 |
| U.S.-born | 4 | 151 |
| Foreign-born | 4 | 220 |

32

### *Years of U.S. Farm Work Experience*

Farmworkers with a full year or more of farm work experience had an average of 19 years of U.S. farm work experience. Thirty-two percent of farmworkers with a full year or more of farm work experience had worked 1 to 10 years in farm jobs, another 47 percent had worked 11 to 30 years in farm jobs, and 21 percent had worked more than 30 years in farm jobs (figure 6.5).

**Figure 6.5: Years U.S. Farm Work Experience, 2017–2018**



ᵃ Among workers with at least one year of U.S. farm work experience.

Large shares of crop workers with both few and many years of U.S. farm work experience were not authorized to work in the United States. Twenty-five percent of those with less than one year of experience were unauthorized as were 38 percent of those with 10 years or more of experience. Years of U.S. farm work experience and farm work days per year were positively correlated. Respondents who had between 1 and 5 years of farm work experience worked an average of 172 days in farm work in the previous 12 months, while those with 11 years or more of experience averaged 223 days of farm work.

### *Other Work History*

Farmworkers were asked to report the approximate number of years they had performed non-crop work in the United States. Fifty-four percent of farmworkers in 2017–2018 reported at least

AR2022_401342

1 year of non-crop work[50] (figure 6.6), and they had an average of 8 years of non-crop work experience.

**Figure 6.6: U.S. Non-Crop Work Experience, 2017–2018**



**More than half of farmworkers had performed non-crop work in the United States.**

No U.S. non-crop work experience, 46%

1 year U.S. non-crop work experience, 9%

2-10 years U.S. non-crop work experience, 32%

11+ years U.S. non-crop work experience, 12%

0%   10%   20%   30%   40%   50%   60%   70%   80%   90%   100%

Farmworkers were also asked to indicate the last time their parents did hired farm work in the United States. Fifty-one percent of workers said "never," 11 percent reported that their parents were doing U.S. farm work "now" or within the last year, 4 percent said their parents last did U.S. farm work 1 to 5 years ago, 4 percent said their parents last did U.S. farm work 6 to 10 years ago, and 29 percent reported that their parents last did U.S. farm work 11 or more years ago. U.S.-born farmworkers reported with much greater frequency than foreign-born farmworkers that their parents did hired farm work in the United States at some time (58% and 43% respectively). See figure 6.7.

---

[50] Any year in which 15 days of non-crop work were performed counts as one year of non-crop work.

AR2022_401343

**Figure 6.7: Last Time Parents Did Hired Farm Work in United States, 2017–2018**

| Last Time Parents Did U.S. Farm Work | All Farmworkers | U.S.-Born | Foreign-Born |
|---|---|---|---|
| Never | 51% | 41% | 56% |
| Now/within last year | 11% | 16% | 9% |
| 1 to 5 years ago | 4% | 3% | 4% |
| 6 to 10 years ago | 4% | 3% | 4% |
| More than 10 years ago | 29% | 36% | 26% |
| Don't know | <1%[a] | [b] | [b] |

[a] Estimates should be interpreted with caution because they have RSEs of 31 percent to 50 percent.
[b] Estimates are suppressed because number of responses is less than 4 or relative standard errors for the estimates are greater than 50%.

### *Plans to Remain in Farm Work*

When asked how long they expected to continue to do farm work, 80 percent of workers interviewed in 2017–2018 believed they would continue for more than 5 years, and most workers indicated that they would continue as long as they are able to do the work (78%). Five percent of respondents stated that they would continue working in agriculture for less than one year, 10 percent planned to remain in farm work for 1 to 3 years, 4 percent stated that they would continue in farm work for 4 to 5 years, and 1 percent provided an opened ended "other" response. See figure 6.8. Further breakdown of workers' plans to remain in farm work by place of birth, work authorization, migrant status, gender, educational attainment, and age are shown in figures 6.8–6.10). Workers who were not born in the U.S. or unauthorized were more likely to plan to work as long as they are able and less likely to plan to work for 1–3 years (figure 6.8). Settled workers and those who with educational attainment of 12th grade or less were more likely to plan to work for as long as they are able, while similar percentage of males and females reported they plan to work as long as they are able (figure 6.9). When looking at age group, younger workers are more likely to report that they plan to work for 1–3 years compared to older workers, and older workers are more likely to report that they plan to work for as long as they are able to compared to younger workers (figure 6.10).

35

**Figure 6.8: Plans to Remain in Farm Work by Place of Birth and Work Authorization, 2017–2018**

|  | All Farmworkers | U.S. Born | Foreign Born | Authorized | Unauthorized |
|---|---|---|---|---|---|
| Less than one year | 5% | 7% | 3% | 6% | 2%[a] |
| 1-3 years | 10% | 17% | 7% | 12% | 7% |
| 4-5 years | 4% | 6% | 3% | 4% | 4% |
| Over 5 years | 3% | 4%[a] | 2% | 3% | 3% |
| Over 5 years/as long as I am able | 78% | 65% | 84% | 74% | 83% |
| Other | 1% | 2%[a] | 1%[a] | 1%[a] | [b] |

[a] Estimates should be interpreted with caution because they have RSEs of 31 percent to 50 percent.
[b] Estimates are suppressed because number of responses is less than 4 or relative standard errors for the estimates are greater than 50%.

**Figure 6.9: Plans to Remain in Farm Work by Migrant Status, Gender, and Educational Attainment, 2017–2018**

|  | Settled | Migrant | Male | Female | 12th grade or less | Beyond 12th grade |
|---|---|---|---|---|---|---|
| Less than one year | 5% | 5%[a] | 4% | 5%[a] | 4% | 5% |
| 1-3 years | 9% | 19% | 11% | 10% | 8% | 14% |
| 4-5 years | 4% | 5% | 4% | 3% | 3% | 5% |
| Over 5 years | 3% | 2%[a] | 2% | 3%[a] | 2% | 4%[a] |
| Over 5 years/as long as I am able | 79% | 67% | 77% | 78% | 82% | 71% |
| Other | 1% | [b] | 1%[a] | [b] | 1%[a] | [b] |

[a] Estimates should be interpreted with caution because they have RSEs of 31 percent to 50 percent.
[b] Estimates are suppressed because number of responses is less than 4 or relative standard errors for the estimates are greater than 50%.

36

**Figure 6.10: Plans to Remain in Farm Work by Age Group, 2017–2018**

| Age groups | 14-17 | 18-24 | 25-50 | Over 50 |
|---|---|---|---|---|
| Less than one year | 34%[a] | 14% | 1%[a] | 5%[a] |
| 1-3 years | 44% | 30% | 6% | 8% |
| 4-5 years | [b] | 8%[a] | 3% | 3% |
| Over 5 years | 0% | [b] | 2% | 4%[a] |
| Over 5 years/as long as I am able | [b] | 44% | 86% | 80% |
| Other | [b] | [b] | 1%[a] | [b] |

[a] Estimates should be interpreted with caution because they have RSEs of 31 percent to 50 percent.
[b] Estimates are suppressed because number of responses is less than 4 or relative standard errors for the estimates are greater than 50%.

AR2022_401346

## CHAPTER 7: Non-Crop Work Activities During the Year

### Summary of Findings:

- During the previous year, farmworkers spent an average of 9 weeks living in the United States but not working and 2 weeks abroad.
- Thirty-one percent of farmworkers said they held at least one U.S. non-crop job during the previous year.
- The most common types of non-crop jobs held were non-crop agriculture jobs (41%) and mechanic, repair, or maintenance jobs (25%).
- About 7 in 10 farmworker respondents reported at least 1 period in the 12 months prior to their interview during which they did not work (70%), and these workers averaged 16 weeks without employment. Seventeen percent of these respondents said they received UI during at least one of their periods of unemployment.

### Time Spent Not Employed or Abroad in Previous 12 Months

During the previous year, farmworkers lived in the United States but did not work for approximately 9 weeks (17% of the year) on average and were abroad for an average of 2 weeks (4% of the year). Number of weeks of not working and time spent abroad varied depending on workers' work authorization, migrant status, and place of birth. Unauthorized, migrant, and foreign-born farmworkers spent, on average, fewer weeks in the United States not working (6, 7, and 8 weeks respectively) than authorized, settled, and U.S.-born farmworkers (11, 10, and 12 weeks respectively). Migrant workers spent more than 10 times as much time abroad during the previous year (11 weeks) than settled farmworkers (<1 week).

Youth farmworkers between the ages of 14 and 17 had the greatest number of weeks not working while in the United States: 40, or more than three-quarters of the year. Respondents ages 18 to 24 spent an average of 15 weeks not working and 3 weeks[51] abroad, and respondents ages 25 years and older averaged 7 to 8 weeks in the United States not working and 1 to 2 weeks abroad (figure 7.1).

---

[51]  Estimate should be interpreted with caution because it has an RSE of 31 to 50 percent.

AR2022_401347

**Figure 7.1: Average Number of Weeks Not Employed and Abroad in Previous 12 Months, 2017–2018**

| Farmworker Characteristic | Weeks in United States and Not Working | Weeks Abroad |
|---|---|---|
| All farmworkers | 9 | 2 |
| Migrant | 7 | 11 |
| Settled | 10 | <1 |
| Authorized | 11 | 2 |
| Unauthorized | 6 | 1 |
| U.S.-born | 12 | [b] |
| Foreign-born | 8 | 2 |
| 14-17 years old | 40 | 0 |
| 18-24 years old | 15 | 3[a] |
| 25-50 years old | 8 | 1 |
| Over 50 years old | 7 | 2 |

[a] Estimates should be interpreted with caution because they have RSEs of 31 percent to 50 percent.
[b] Estimate is suppressed because it has a RSE greater than 50 percent.

### *Non-Crop Work in Previous 12 Months*

Thirty-one percent of farmworkers reported at least one job during the previous year that was not in U.S. crop production. U.S.-born workers were nearly 3 times more likely than foreign-born workers to have had a non-crop job in the previous 12 months (54% compared to 20%), and authorized workers were twice as likely as unauthorized workers to have had a non-crop job (38% compared to 19%). See figure 7.2.

AR2022_401348

**Figure 7.2: Percent of Farmworkers Who Held a Non-Crop Job the Previous Year, 2017–2018**



The 31 percent of farmworkers who reported doing non-crop work during the previous year spent an average of 25 weeks in non-crop employment, and they held an average of 1 non-crop job. The most common types of non-crop jobs[52] were livestock, forestry and fisheries (41%), and mechanic, repair, or maintenance jobs (25%). Twelve percent did structural or extractive work,[53] 13 percent held a sales, service, or production job in the food industry, 8 percent held a sales, service, or manufacturing job in a non-food industry, 3 percent had a professional, technical, or managerial job, and 8 percent[54] held other types of jobs, including clerical, government service, health, arts and entertainment, and transportation (figure 7.3).

---

[52] Since the survey's inception, crop workers have been asked about jobs they've had outside of crop agriculture. Some non-crop jobs are farm jobs in other types of agriculture.

[53] Structural jobs, as coded in the NAWS, include working in construction.  Extractive jobs involve the removal of raw materials from the earth.  Examples of extractive processes include oil and gas extraction, mining, dredging and quarrying.  http://www.businessdictionary.com/definition/extractive-industry html

[54]  Estimate should be interpreted with caution because it has an RSE of 31 to 50 percent.

AR2022_401349

**Figure 7.3: Types of Non-Crop Jobs Held in Previous 12 Months, 2017–2018**

| Type of Non-Crop Job[a] | Percent of Workers Who Held At Least One Non-Crop Job |
|---|---|
| Non-Crop Agriculture | 41% |
| Mechanic/Repair/Maintenance | 25% |
| Food Industry -- Sales/Service/Production | 13% |
| Structural/Extractive Work | 12% |
| Non-food Industry-- Sales/Service/Manufacturing | 8% |
| Professional/Technical/Manager | 3% |
| Other | 8%[b] |

[a] Respondents may have reported multiple types of jobs.
[b] Estimate should be interpreted with caution because it has a RSE of 31 percent to 50 percent.

### Reasons for Leaving Non-Crop Work in Previous Year

Forty-four percent of workers who had non-crop employment during the previous year left at least one of their non-crop jobs. The NAWS sample includes only farmworkers actively employed in crop agriculture at the time of interview. However, some workers hold non-crop jobs and farm jobs simultaneously, and some perform non-crop work for their agricultural employers, thus changing jobs but not separating from the employer.

Whenever respondents reported separating from an employer, they were asked the reason why. Approximately 7 in 10 workers (66%) who left a non-crop employer during the previous year reported leaving for voluntary reasons ("family responsibilities," "school," "moved," "health reasons," "vacation," "retired," "quit," or "changed jobs"). More than one quarter of workers (28%) said that their exits from non-crop work were involuntary in nature ("lay off/end of season" or "fired").[55]

### Periods of Unemployment During the Year

About 7 in 10 farmworker respondents in 2017–2018 reported at least 1 period in the 12 months prior to their interview during which they did not work (70%), and these respondents averaged 16 weeks without employment. Each time a respondent reported a period of not working during the 12-month retrospective work history, the respondent was asked about receiving UI benefits during that time. Seventeen percent of these respondents said "yes," that they received UI benefits during at least one of their periods of unemployment.

---

[55] The remaining workers reported both voluntary and involuntary leaves from non-crop work, but this estimate is suppressed because it has a RSE greater than 50 percent.

AR2022_401350

## CHAPTER 8: Income, Assets, and Use of Assistance Programs

### Summary of Findings:

- Farmworkers' mean and median personal incomes the previous year were in the range of $20,000 to $24,999. Eleven percent of workers earned less than $10,000; 23 percent earned $30,000 or more.
- Farmworkers' mean and median total family incomes the previous year were in the range of $25,000 to $29,999. Twenty-two percent of farmworkers reported total family income of less than $20,000, another 28 percent said their family income was $20,000 to $29,999, and 44 percent had a family income of $30,000 or more.
- About one-fifth of farmworkers had family incomes below the poverty level (21%).
- Seventy-seven percent of farmworkers stated that they owned or were buying at least one asset in the United States. The most common assets listed were a vehicle (reported by 74% of workers) or a type of dwelling, such as a house, mobile home, condominium, or apartment (40% of workers).
- Eighteen percent of farmworkers reported that they or someone in their household received some form of benefit from a contribution-based program in the previous 2 years; 54 percent said someone in their household received some form of benefit from a needs-based program in the previous 2 years.

### Income

Farmworkers were asked to report their total personal income in the calendar year prior to the year in which they were interviewed. Rather than providing a specific sum, respondents answered the question by indicating a range in which their income fell. Farmworkers' mean and median personal incomes the previous year were in the range of $20,000 to $24,999. Five percent of farmworkers interviewed in 2017–2018 reported that they did not work at all during the prior calendar year, 11 percent said their total personal income was less than $10,000, 24 percent said they had personal incomes of $10,000 to $19,999, another 36 percent reported personal incomes of $20,000 to $29,999, and 23 percent reported that their total personal income was $30,000 or more. One percent of farmworkers said they were unsure of what their personal income was the previous year.

In addition to the question about personal income, workers were asked to report their total family income in the previous calendar year. For this question as well, respondents answered by indicating a range in which their income fell. Workers' mean and median total family incomes the previous year were in the range of $25,000 to $29,999. Four percent of farmworkers reported that they or their family had no earned income during the previous calendar year. Eight percent of workers said that their total family income the prior year was less than $10,000, 14 percent said their family income was $10,000 to $19,999, 28 percent had a family income of $20,000 to $29,999, and 44 percent had a family income of $30,000 or more. One percent of farmworkers reported that they did not know their family's total income the previous year.

AR2022_401351

To determine farmworkers' poverty status, a poverty threshold was calculated for each worker based on the worker's family size[56] and the U.S. Department of Health and Human Services' poverty guidelines[57] for the calendar year preceding the interview. The worker's family income was then compared to this poverty threshold.[58] Using this method, 21 percent of farmworkers in 2017–2018 were found to have family incomes below the poverty threshold.

Below-poverty income was more common among farmworkers with larger families (see figure 8.1). More than half of farmworkers with a family size of 6 or more had incomes below the poverty level (51%) compared to less than a quarter of farmworkers with a family size of 3 (18%) or 4 (22%). Farmworkers who are not living with their family (i.e., family size of one) also had elevated poverty rate (25%), compared to those with family sizes of 2–5. Likewise, migrant workers' family incomes fell below poverty at a much greater rate than settled workers' (31% compared to 20%), and unauthorized workers were more likely than authorized workers to have below-poverty household incomes (24% and 20% respectively). See figure 8.2.

**Figure 8.1: Percent of Farmworkers with Total Family Income Below Poverty Level by Family Size, 2017–2018**



**Larger families were more likely to have** family incomes below the federal poverty level.

- Family size of 1, 25%
- Family size of 2, 7%
- Family size of 3, 18%
- Family size of 4, 22%
- Family size of 5, 23%
- Family size of 6 or more, 51%

---

[56] Family size is defined as the number of family members who are living in the United States and who depend on the farmworker's income. Income was imputed for farmworkers with no income information.

[57] U.S. Department of Health and Human Services poverty guidelines (https://aspe.hhs.gov/prior-hhs-poverty-guidelines-and-federal-register-references).

[58] Workers' family income and poverty levels were based on their income in the United States, but were not adjusted for time in the United States. For additional information on the limitations of using traditional poverty statistics with migrant populations please see Pena's (2013) article on "Poverty Measurement for a Binational Population."

AR2022_401352

**Figure 8.2: Percent of Farmworkers with Total Family Income Below Poverty Level by Farmworker Characteristic, 2017–2018**



## Assets in the United States and Abroad

Respondents were asked about assets they own or are buying in the United States and, if foreign-born, in their home country. In 2017–2018, approximately three-quarters of all farmworkers stated that they owned or were buying at least one asset in the United States (77%). U.S.-born workers reported with about the same frequency that they owned or were buying an asset in the United States (78%) compared to foreign-born workers (77%). Among all workers, the most commonly held asset in the United States was a car or truck (74%) followed by a type of housing (40%). See figure 8.3. U.S.-born workers were more likely to own or be buying a type of housing in the United States (44%) than were foreign-born workers (38%).

**Figure 8.3: Assets in the United States, 2017–2018**

| Type of Asset in the United States | Percent of Farmworkers |
|---|---|
| Any asset | 77% |
| A car or truck | 74% |
| A type of housing (house, mobile home, condominium, apartment) | 40% |

Fifteen percent of foreign-born workers reported that they owned or were buying at least one asset abroad. The most frequently reported was a house (25%), followed by land (14%) and a car or truck (2%).

AR2022_401353

### *Use of Contribution- and Need-Based Programs*

In 2017–2018, farmworkers were asked whether they or anyone in their household received assistance from either contribution- or need-based programs in the two-year period preceding the interview. Contribution-based benefits include disability insurance, unemployment insurance, Social Security, and veteran's pay. Eighteen percent of the farmworkers reported that someone in their household received a benefit from at least one contribution-based program. Thirteen percent of farmworkers reported that they or a family member received payments from UI, 3 percent reported that they or a family member received payments from disability insurance, and 2 percent said that someone in their household received Social Security payments.

Need-based benefits include financial assistance through programs such as Temporary Assistance for Needy Families (TANF), general assistance or welfare, and publicly provided housing or medical and nutritional assistance such as Medicaid, Special Supplemental Nutrition Program for Women, Infants and Children (WIC), and Supplemental Nutrition Assistance Program (SNAP).[59] In 2017–2018, 54 percent of farmworkers reported that they or someone in their household used at least one type of need-based assistance in the previous two years.  The programs most commonly utilized were Medicaid (43%), public health clinics (17%), SNAP (15%), and WIC (11%). See figure 8.4.

**Figure 8.4: Percent of Farmworkers Who Reported That a Member of the Household Received Benefits from Contribution- or Needs-Based Programs in the Last Two Years, 2017–2018**

| Contribution- and Need-Based Programs Utilized | Percent of Farmworkers |
|---|---|
| **Any contribution-based program** | 18% |
| **UI** | 13% |
| **Disability** | 3% |
| **Social Security** | 2% |
| **Any need-based program** | 54% |
| **Medicaid** | 43% |
| **Public health clinic** | 17% |
| **SNAP** | 15% |
| **WIC** | 11% |
| **Welfare (general assistance) or TANF (Temporary Assistance for Needy Families)** | 2%[a] |

[a] Estimate should be interpreted with caution because it has a RSE of 31 percent to 50 percent.

[59] The Supplemental Nutrition Assistance Program or SNAP used to be named The Federal Food Stamps Program before it was changed in October, 2008.

AR2022_401354

# CHAPTER 9: Health Care in the United States

## *Summary of Findings:*

- Fifty-six percent of farmworkers reported that they had health insurance, 66 percent said their spouse had health insurance, and 94 percent reported that all (92%) or at least some (2%[60]) of their children had health insurance.
- Seventy-one percent of farmworkers used a health care provider in the United States sometime in the last two years.
- The last time they visited a health care provider, 44 percent went to a private medical doctor's office or private clinic, 33 percent said they visited a community health center or migrant health clinic, 15 percent saw a dentist, 7 percent went to a hospital, and 2 percent visited other providers such as a healer, chiropractor, or emergency room.
- Approximately a quarter of farmworkers paid for their last health care visit out of their own pockets (26%): 20 percent were uninsured so they had to pay the whole fee, and 5 percent had insurance so their out-of-pocket expense was likely a co-payment.
- The most common difficulty farmworkers reported facing when they needed health care was that health care visits were too expensive (23%).

## *Health Insurance Coverage for Farmworkers and Family Members*

There were several questions on the survey about health insurance. One question asked workers to indicate who in their family had health insurance in the United States. Fifty-six percent of workers responded that they, themselves, had health insurance. Authorized workers and settled workers were much more likely to report having health insurance (71% and 59% respectively) than unauthorized workers and migrant workers (31% and 40% respectively). See figure 9.1.

---

[60] Estimate should be interpreted with caution because it has an RSE of 31 to 50 percent.

46

**Figure 9.1: Percent of Farmworkers with Health Insurance, 2017–2018**



Farmworkers who reported having health insurance were asked to identify the source(s) that provided it (multiple sources could be reported). Forty-one percent reported that they had insurance provided by the government, 30 percent said their employer provided them with health insurance, 10 percent said that they or their spouse paid for insurance themselves, 8 percent reported that they had insurance under their spouse's employer's plan, another 7 percent reported that they were covered by their parents' or family's plan, and 7 percent indicated some other source[61] (figure 9.2).

---

[61] "Other" sources included the Affordable Care Act, private health insurance companies (e.g., Aetna, Blue Cross), charity, and retirement/pension plans.

**Figure 9.2: Sources of Farmworkers' Health Insurance, 2017–2018**

| Source of Farmworker's Health Insurance[a,b] | Percent of Farmworkers |
| --- | :---: |
| Farmworker's/Spouse's self-purchased plan | 10% |
| Farmworker's employer | 30% |
| Spouse's employer | 8% |
| Government program | 41% |
| Parent's/Family's plan | 7% |
| Other | 7% |

[a] Among the 56 percent of farmworkers who reported that they had health insurance.
[b] Farmworkers may have health insurance through more than one source.

Of the 59 percent of farmworkers who had a spouse, 66 percent reported that their spouse had health insurance. Among spouses with health insurance, 46 percent received the insurance through a government program, 9 percent were covered by a self-purchased plan, 26 percent were insured through the spouse's employer, 15 percent were covered by the farmworker's employer plan, and 5 percent indicated some other source (figure 9.3). Authorized workers reported that their spouses had health insurance at more than twice the frequency of unauthorized workers (83% and 38% respectively).

**Figure 9.3: Sources of Farmworkers' Spouses' Health Insurance, 2017–2018**

| Source of Spouse's Health Insurance[a,b] | Percent of Farmworkers |
| --- | :---: |
| Farmworker's/Spouse's self-purchased plan | 9% |
| Farmworker's employer | 15% |
| Spouse's employer | 26% |
| Government program | 46% |
| Other | 5% |

[a] Among the 59 percent of farmworkers who reported that their spouse had health insurance.
[b] Spouses may have health insurance through more than one source.

Among the 45 percent of farmworkers with minor children, a large majority reported that all of their children had health insurance (92%) while 2 percent[62] reported that only some of their children had health insurance. Most of these workers said their children's health insurance was provided by government programs (82%). Thirteen percent of the workers reported that their children were insured through their employer or their spouse's employer, and 4 percent said their children were covered by insurance that the worker and/or their spouse purchased on their own (figure 9.4). Nearly equal percentages of authorized and unauthorized workers reported that all or some of their children had health insurance (95% and 91% respectively).

---

[62] Estimate should be interpreted with caution because it has an RSE of 31 to 50 percent.

AR2022_401357

**Figure 9.4: Sources of Farmworkers' Children's Health Insurance, 2017–2018**

| Source of Children's Health Insurance[a,b] | Percent of Farmworkers |
|---|---|
| Farmworker's/Spouse's self-purchased plan | 4% |
| Farmworker's/Spouse's employer | 13% |
| Government program | 82% |
| Other | 2% |

[a] Among the 94 percent of farmworkers who reported that all or some of their children had health insurance.
[b] Children may have health insurance through more than one source.

### Health Care Utilization and Barriers to Health Care

In 2017–2018 farmworkers were asked whether, at any time in the 2 years prior to being interviewed, they had used any type of health care services from doctors, nurses, dentists, clinics, or hospitals in the United States. Seventy-one percent of farmworkers responded that they had. Workers who had health insurance reported more frequently that they utilized health care services (84%) than did workers who did not have health insurance (56%). See figure 9.5.

**Figure 9.5: Visited a U.S. Health Care Provider in the Last Two Years by Health Insurance Status, 2017–2018**



More than **two-thirds** of farmworkers visited a U.S. health care provider in the last two years.

All farmworkers, 71%

Insured, 84%

Uninsured, 56%

Farmworkers who reported seeking health care in the United States sometime in the last two years were asked what kind of health care provider they used the last time they saw one. Forty-four percent of workers who had a health care visit said that the last time they used a provider they went to a private medical doctor's office or private clinic. Thirty-one percent said they visited a community health center or migrant health clinic, 15 percent saw a dentist, and 7

percent went to a hospital. The remaining 2 percent of workers reportedly used another type of provider, including a healer or "curandero," an emergency room, a chiropractor, or a naturopath.

The type of health care provider visited depended on farmworkers' health insurance status. Insured workers were more likely than uninsured workers to visit a private provider (54% compared to 25%) and less likely to visit a community health center or migrant health clinic (25% of insured workers compared to 48% of uninsured workers). See figure 9.6.

**Figure 9.6: Type of U.S. Health Care Provider Visited by Health Insurance Status, 2017–2018**



*Note:* For the "Other" category, the estimates for insured and uninsured should be interpreted with caution because they have RSEs of 31 percent to 50 percent.

Farmworkers who reported seeking health care in the United States sometime in the last two years were also asked who paid most of the cost for their last health care visit. Twenty-six percent of workers responded that they paid out of their own pockets: 20 percent were uninsured, so they had to pay the fee in whole out of pocket; 5 percent had insurance, so their out-of-pocket

50

expense was likely a co-payment. Twenty-four percent said that they had Medicaid or Medicare, 16 percent said the majority of the cost was covered by health insurance that they or their family had purchased themselves, and 15 percent of workers reported that the cost was covered by health insurance provided by their employer. Eleven percent of the workers stated that they went to a pubic clinic that did not charge for the visit, and 2 percent reported that they used some combination of sources to pay, they were covered by worker's compensation, or that they were billed for service but did not pay. The remaining 6 percent provided a variety of other responses.[63]

Regardless of whether they reported having used a U.S. health care provider sometime in the last two years, farmworkers were asked to name the types of difficulties they faced when they needed to access health care in the United States. The most common response, provided by 23 percent of all farmworkers interviewed in 2017–2018, was that health care visits were too expensive or that they had no insurance to cover the costs. Nine percent of the workers were unable to name any specific barriers because they reported they had never needed health care in the United States.

---

[63] Farmworkers who responded with "other" when asked who paid the majority of the cost for their last health care visit specified their response in the following ways: low income program; insurance through a former employer, other employer, labor union, or pension plan; automobile insurance; coverage through the ACA; medical coupon; military insurance or the VA; and medical insurance with no specification about whether it was self-purchased or employer provided.

AR2022_401360

# APPENDIX A: Methodology

## *Overview*

The NAWS data come from a nationally representative, random sample of crop farmworkers. During 2017–2018, the NAWS used stratified, multi-stage sampling to account for seasonal and regional fluctuations in the level of farm employment. The stratification included three interviewing cycles per year and 12 geographic regions, resulting in 36 time-by-space strata. For each interviewing cycle, NAWS staff drew a random sample of locations for each of the 12 regions. Together, the 12 regions have a universe of 497 Farm Labor Areas (FLA). FLAs were single- or multi-county sampling units which form the survey's primary sampling units (PSUs). Counties were the secondary level sampling units, ZIP Code regions were the third, agricultural employers were the fourth, and workers were the fifth.

## *Stratification*

**Interviewing Cycles**

To account for the seasonality of the industry, interviews were conducted 3 times each year, in cycles lasting 4 months. The cycles started in February, June, and October. The number of interviews conducted in each cycle was proportional to the number of agricultural field workers employed at that time of the year. The USDA's National Agricultural Statistics Service (NASS) provided the Employment and Training Administration (ETA) with the agricultural employment figures for workers hired by agricultural producers, which came from the USDA's Agricultural Labor Survey (ALS). Figures for workers employed by farm labor contractors were obtained from the BLS Quarterly Census of Employment and Wages (QCEW).

**Regions**

Regional stratification entailed defining 12 distinct agricultural regions based on the USDA's 17 agricultural regions. At the start of the survey in 1988, the 17 regions were collapsed into 12 by combining those regions that were most similar based on statistical analysis of cropping patterns. In each cycle, all 12 agricultural regions were included in the sample. The number of interviews per region was proportional to the size of the seasonal farm labor force in that region at that time of the year, as determined by the NASS and the Bureau of Labor Statistics (BLS) using information obtained from the ALS and QCEW.

## *Sampling within Strata*

**Farm Labor Areas**

Each region was composed of several single- or multi-county sampling units called FLAs. There were 497 FLAs that form a universe from which sampling locations were selected. FLAs are aggregates of counties that have similar farm labor usage and are roughly similar in size. FLA size is more homogeneous within region than across regions.

The FLA size measure is an estimate of the amount of farm labor in the FLA during a cycle. In this case, the measure was based on the hired and contract labor expenses from the most recent Census of Agriculture (CoA) available at the time the sample was drawn. The CoA labor expenses were adjusted using seasonality estimates that identified the percentage of labor expenses that fell into each of the NAWS cycles, fall, spring and summer. The seasonality

52

estimates were based on monthly data from the QCEW and were constructed by aggregating the reported monthly employment for each month included in the corresponding NAWS cycle (e.g., June, July, August, and September for the summer cycle). The share of employment corresponding to each cycle became a FLA's seasonality estimate.

FLAs were selected in two stages. In the first stage, a roster of approximately 15 FLAs per cycle and region stratum was selected. In the second stage, all FLAs on each stratum roster were randomly sorted.

**Counties**
Selecting counties within FLAs was done using an iterative sampling procedure to ensure that an adequate number of counties was selected for each region. In most cases, interviews were completed in the first county within each FLA, and no additional counties were needed. However, because there was tremendous uncertainty about the number of workers in a county, additional counties were occasionally needed to complete the county allocation. Counties were selected one at a time, without replacement, using probabilities proportional to the size of each county's farm labor expenditures. Interviews began in the first selected county. If the work force within the county was depleted before all the allocated interviews in the FLA were completed, interviewing moved to the second randomly selected county on the list, and so forth, until all the allocated interviews were completed. In FLAs where farm work was sparse, interviewers might have had to travel to several counties to encounter sufficient workers to complete the FLA allocation.

**ZIP Code Regions**
Prior to generating lists of employers, sampled counties were divided into ZIP Code regions, which were smaller areas based on geographic proximity. A small county might be a single ZIP code region while a large county might have multiple regions. In a county with multiple ZIP Code regions, the regions were designed to be roughly equal in size.

When there were multiple ZIP Code regions in a county, the regions were randomly sorted to produce a list that determined the order in which the areas would be visited. Field staff contacted agricultural employers in the first ZIP Code region on the list and moved down the list, following the random order, until the interview allocation for the FLA was filled or the county's workforce was exhausted.

**Employers**
Within each selected ZIP Code region, interviewers received a list of randomly sorted agricultural employers. The list was compiled from marketing and administrative lists of employers in crop agriculture. An important component of the list was employer names in selected North American Industrial Classification Codes that the BLS provided directly to the contractor per the terms of an interagency agreement between the ETA and the BLS.

**Workers**
Once the randomly selected employer was located, the NAWS interviewer explained the purpose of the survey and obtained access to the work site to schedule interviews. If the employer was not familiar with his or her work force, the interviewer sought the name of the manager, personnel manager, farm labor contractor, or crew leader who could help construct a sampling frame of the

53

workers in the operation. Interviewers documented the number of workers employed on the day of worker selection to construct worker selection probabilities.

When the number of workers available for interview was greater than the number of interviews allocated, the selection of workers for interview followed specific sampling instructions designed by a sampling statistician to ensure selection of a random sample of workers at each selected employer. Only workers who were employed in agriculture at the time of the interview were included in the sample. Selected workers were usually interviewed at the worksite, either before or after work or during breaks. Respondents might have also been interviewed at another location if that was more convenient for them. Respondents received a 20-dollar honorarium for participating in the survey.

**Weighting**
The NAWS used a variety of weighting factors to construct weights for calculating unbiased population estimates.
- Sampling weights were calculated based on each sample member's probability of selection at the FLA, county, ZIP Code region, employer and worker level.
- Non-response factors were used to correct sampling weights for deviations from the sampling plan, such as discrepancies in the number of interviews planned and collected in specific locations.
- Post-sampling adjustment factors were used to adjust the weights given to each interview to compute unbiased population estimates from the sample data.

A full explanation of how the weights were calculated can be found in the *Statistical Methods of the National Agricultural Workers Survey* available at the U.S. Department of Labor, Employment and Training Administration's National Agricultural Workers Survey website (https://www.doleta.gov/naws/methodology/docs/NAWS_Statistical_Methods_AKA_Supporting_Statement_Part_B.pdf).

**Reliability of Estimates**
One measure of sampling error is the relative standard error (RSE), a measure of relative dispersion of the data. The RSE is calculated by dividing the standard error of the estimate (mean or percentage) by the estimate itself and reporting the result as a percentage. Higher RSE's indicate that the estimate of the mean might not represent the true mean of the distribution of responses.[64]

For the purpose of reporting data, the NAWS has adopted the following data suppression rules.
- Estimates with RSEs greater than 30 percent but no more than 50 percent are published but should be used with caution.
- Estimates with RSEs greater than 50 percent are considered statistically unreliable and are suppressed.

---

[64] Sommer, J. E., Green, R, and Korb, P (1998). *Structural and Financial Characteristics of U.S. Farms, 1995: 20th Annual Family Farm Report to Congress* (*https://www.ers.usda.gov/webdocs/publications/42178/32556_aib746_002.pdf?v=42487*). Agriculture Information Bulletin No. (AIB-746), 118 pp, December 1998 (p. 62).

AR2022_401363

## APPENDIX B: Map of the NAWS Migrant Streams



Legend

Eastern

Midwest

Western

* Source: U.S. Department of Labor, National Agricultural Workers Survey

55

AR2022_401364

## APPENDIX C: Index of Percentages and Means for Key Variables

The following tables list the names, descriptions, and categories of the key variables analyzed for this report, as well as the estimates (percentages or means) reported and the 95-percent confidence limits, standard errors, and relative standard errors (RSEs) of the estimates. Estimates with RSEs higher than 30 percent are identified throughout the tables. The RSE is calculated by dividing the standard error of the estimate by the estimate itself. Estimates with RSEs greater than 30 percent but no more than 50 percent are published but should be used with caution; these are identified with a superscript 'a.' Estimates based on fewer than 4 observations or with RSEs greater than 50 percent are considered statistically unreliable and are suppressed from the tables. Suppressed statistics are indicated with a superscript 'b.'

### Chapter 1

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| A07 | Country of birth | US or Puerto Rico | 665 | 32% | 2.7% | 27% | 37% | 8% |
| A07 | Country of birth | Mexico | 1,795 | 64% | 2.7% | 59% | 70% | 4% |
| A07 | Country of birth | Central America | 100 | 3% | 0.8% | 2% | 5% | 25% |
| A07 | Country of birth | Other (South America, Caribbean, South East Asia, Pacific Islands, Asia) | 26 | 1%[a] | 0.2% | 0% | 1% | 36% |
| HISP | Hispanic | Hispanic | 2,080 | 77% | 2.7% | 72% | 82% | 3% |
| B01 | Hispanic category | Mexican-American | 247 | 11% | 1.7% | 8% | 15% | 16% |
| B01 | Hispanic category | Mexican | 1,681 | 61% | 2.6% | 56% | 66% | 4% |
| B01 | Hispanic category | Chicano, Puerto Rican, or other Hispanic | 152 | 5% | 0.9% | 3% | 7% | 18% |
| B01 | Hispanic category | Not Hispanic or Latino | 501 | 23% | 2.7% | 18% | 28% | 12% |
| B02 | Race | White | 777 | 32% | 2.8% | 26% | 37% | 9% |
| B02 | Race | Black/African American | 69 | 3%[a] | 0.9% | 1% | 5% | 33% |
| B02 | Race | American Indian/Alaska Native | 5 | b | b | b | b | 80% |
| B02 | Race | Other | 1,731 | 65% | 3.0% | 59% | 71% | 5% |
| B02 | Race | Refused to answer | 2 | b | b | b | b | 75% |
| INDIGENOUS | Farmworker is indigenous | Farmworker is indigenous | 165 | 6% | 1.1% | 4% | 8% | 18% |

56

**Appendix C: Index of Percentages and Means for Key Variables**

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| USSTAY | Years in US | Average | 1,917 | 22 | 0.48 | 21 | 23 | 2% |
| USSTAY | Years in US | Less than 1 year (newcomer) | 11 | 1%[a] | 0.4% | 0% | 2% | 39% |
| USSTAY | Years in US | 1-4 years | 117 | 6% | 0.7% | 5% | 8% | 12% |
| USSTAY | Years in US | 5-9 years | 121 | 5% | 0.8% | 4% | 7% | 15% |
| USSTAY | Years in US | 10-14 years | 289 | 17% | 1.6% | 14% | 20% | 9% |
| USSTAY | Years in US | 15-19 years | 370 | 18% | 1.4% | 16% | 21% | 8% |
| USSTAY | Years in US | 20-29 years | 490 | 26% | 2.0% | 22% | 30% | 8% |
| USSTAY | Years in US | 30-39 years | 365 | 18% | 1.8% | 14% | 22% | 10% |
| USSTAY | Years in US | 40+ years | 154 | 8% | 1.2% | 6% | 10% | 15% |
| B18 (by A07) | State of birth (by country of birth) | Baja California (among country of birth is Mexico) | 127 | 6% | 1.2% | 3.8% | 8.5% | 19% |
| B18 (by A07) | State of birth (by country of birth) | Guanajuato (among country of birth is Mexico) | 243 | 10% | 1.1% | 8% | 12% | 11% |
| B18 (by A07) | State of birth (by country of birth) | Guerrero (among country of birth is Mexico) | 98 | 5% | 0.9% | 3% | 7% | 18% |
| B18 (by A07) | State of birth (by country of birth) | Jalisco (among country of birth is Mexico) | 160 | 10% | 1.5% | 7% | 13% | 15% |
| B18 (by A07) | State of birth (by country of birth) | Michoacán (among country of birth is Mexico) | 390 | 27% | 3.0% | 21% | 33% | 11% |
| B18 (by A07) | State of birth (by country of birth) | Oaxaca (among country of birth is Mexico) | 189 | 10% | 2.1% | 6% | 14% | 21% |
| CURRSTAT | Current work authorization | Citizen | 848 | 38% | 2.6% | 33% | 43% | 7% |
| CURRSTAT | Current work authorization | Legal permanent resident | 585 | 24% | 2.3% | 19% | 28% | 10% |
| CURRSTAT | Current work authorization | Other work authorized | 35 | 2% | 0.5% | <1% | 3% | 32% |
| CURRSTAT | Current work authorization | Unauthorized | 1,091 | 37% | 2.6% | 32% | 42% | 7% |
| MIGRANT | Migrant | Migrant | 316 | 13% | 1.6% | 10% | 17% | 12% |

AR2022_401366

## Chapter 2

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| GENDER | Gender | Male | 1,928 | 69% | 3.1% | 63% | 75% | 4% |
| GENDER | Gender | Female | 658 | 31% | 3.1% | 25% | 37% | 10% |
| AGE | Age | Average | 2,582 | 41 | 0.56 | 40 | 42 | 1% |
| AGE | Age | 14-19 | 85 | 6% | 0.9% | 4% | 8% | 15% |
| AGE | Age | 20-24 | 187 | 8% | 1.0% | 6% | 10% | 12% |
| AGE | Age | 25-34 | 618 | 21% | 1.4% | 19% | 24% | 7% |
| AGE | Age | 35-44 | 604 | 23% | 1.8% | 19% | 26% | 8% |
| AGE | Age | 45-54 | 595 | 24% | 1.6% | 21% | 27% | 7% |
| AGE | Age | 55-64 | 380 | 14% | 1.4% | 11% | 17% | 10% |
| AGE | Age | 65 and over | 112 | 4% | 0.7% | 3% | 5% | 17% |
| MARRIED, FWPARENT | Farmworker is married, Farmworker is a parent | Married, parent | 1,114 | 39% | 1.4% | 36% | 42% | 4% |
| MARRIED, FWPARENT | Farmworker is married, Farmworker is a parent | Married, no children | 490 | 18% | 1.4% | 15% | 21% | 8% |
| MARRIED, FWPARENT | Farmworker is married, Farmworker is a parent | Unmarried, parent | 264 | 11% | 1.0% | 9% | 13% | 9% |
| MARRIED, FWPARENT | Farmworker is married, Farmworker is a parent | Unmarried, no children | 716 | 32% | 1.9% | 28% | 35% | 6% |

**Appendix C: Index of Percentages and Means for Key Variables**

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| HKIDLT18 (by FWPARENT) | Number of children under age 18 in the household (by farmworker is a parent) | Average (among farmworker parents) | 1,121 | 2 | 0.05% | 2 | 2 | 2% |
| HKIDLT18 (by FWPARENT) | Number of children under age 18 in the household (by farmworker is a parent) | 1 child (among farmworker parents) | 367 | 32% | 2.8% | 27% | 38% | 9% |
| HKIDLT18 (by FWPARENT) | Number of children under age 18 in the household (by farmworker is a parent) | 2 children (among farmworker parents) | 379 | 36% | 2.7% | 30% | 41% | 8% |
| HKIDLT18 (by FWPARENT) | Number of children under age 18 in the household (by farmworker is a parent) | 3 children (among farmworker parents) | 246 | 21% | 1.7% | 17% | 24% | 8% |
| HKIDLT18 (by FWPARENT) | Number of children under age 18 in the household (by farmworker is a parent) | 4 children (among farmworker parents) | 101 | 9% | 1.4% | 6% | 12% | 16% |
| HKIDLT18 (by FWPARENT) | Number of children under age 18 in the household (by farmworker is a parent) | 5 or more children (among farmworker parents) | 28 | 2% | 0.6% | 1% | 4% | 26% |
| ACCOMP | Nuclear family lives in household | Unaccompanied | 901 | 38% | 2.1% | 34% | 42% | 5% |
| ACCOMP | Nuclear family lives in household | Accompanied | 1,685 | 62% | 2.1% | 58% | 66% | 3% |

AR2022_401368

Appendix C: Index of Percentages and Means for Key Variables

## Chapter 3

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| PRIMLANG | Adult primary language (2017) | English | 306 | 33% | 4.1% | 24% | 41% | 13% |
| PRIMLANG | Adult primary language (2017) | Spanish | 891 | 64% | 4.1% | 56% | 72% | 6% |
| PRIMLANG | Adult primary language (2017) | Indigenous | 32 | 3%[a] | 1.4% | 1% | 6% | 40% |
| PRIMLANG18 | Adult primary language (2018) | English | 300 | 27% | 3.9% | 19% | 34% | 19% |
| PRIMLANG18 | Adult primary language (2018) | Spanish | 939 | 65% | 3.2% | 59% | 72% | 59% |
| PRIMLANG18 | Adult primary language (2018) | Indigenous | 17 | 1%[a] | 0.6% | <1% | 2% | 0% |
| PRIMLANG18 | Adult primary language (2018) | Other | 8 | 0%[a] | 0.1% | <1% | 0% | 0% |
| PRIMLANG18 | Adult primary language (2018) | Bilingual Spanish/English | 51 | 6%[a] | 1.8% | 2% | 9% | 2% |
| PRIMLANG18 | Adult primary language (2018) | More than one language | 13 | 1%[a] | 0.4% | <1% | 2% | 0% |
| HIGHGRDE | Highest grade completed | Average | 2,585 | 9 | 0.17 | 8 | 9 | 2% |
| HIGHGRDE | Highest grade completed | No schooling | 87 | 2% | 0.5% | 1% | 3% | 20% |
| HIGHGRDE | Highest grade completed | K-6th grade | 985 | 35% | 1.7% | 32% | 39% | 5% |
| HIGHGRDE | Highest grade completed | 7th-9th grade | 522 | 18% | 1.4% | 16% | 21% | 8% |
| HIGHGRDE | Highest grade completed | 10th-12th grade | 718 | 31% | 1.8% | 28% | 35% | 6% |
| HIGHGRDE | Highest grade completed | 13 grades or more | 272 | 12% | 1.6% | 9% | 16% | 13% |
| ADULTED | Attended any adult education | No | 1,975 | 76% | 2.2% | 71% | 80% | 3% |
| ADULTED | Attended any adult education | Yes | 611 | 24% | 2.2% | 20% | 29% | 9% |
| B03ax | Attended English/ESL | Yes | 180 | 13% | 1.8% | 9% | 17% | 14% |
| B03bx | Attended citizenship classes | Yes | 43 | 3%[a] | 0.9% | 1% | 5% | 34% |
| B03dx | Attended job training | Yes | 387 | 30% | 3.6% | 23% | 37% | 12% |
| B03ex | Attended GED, high school equivalency | Yes | 31 | 4% | 0.9% | 2% | 6% | 27% |
| B03fx | Attended college/university | Yes | 66 | 6% | 1.3% | 3% | 8% | 21% |
| B03jx | Attended 'other' | Yes | 49 | 4% | 0.9% | 3% | 6% | 20% |

60

**Appendix C: Index of Percentages and Means for Key Variables**

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| B07 | Ability to speak English | Not at all | 651 | 23% | 1.6% | 19% | 26% | 7% |
| B07 | Ability to speak English | A little | 777 | 28% | 2.0% | 24% | 32% | 7% |
| B07 | Ability to speak English | Somewhat | 385 | 13% | 1.5% | 10% | 16% | 12% |
| B07 | Ability to speak English | Well | 761 | 36% | 2.7% | 31% | 42% | 7% |
| B08 | Ability to read English | Not at all | 954 | 33% | 2.0% | 29% | 37% | 6% |
| B08 | Ability to read English | A little | 622 | 21% | 1.6% | 18% | 25% | 8% |
| B08 | Ability to read English | Somewhat | 251 | 11% | 1.5% | 8% | 14% | 14% |
| B08 | Ability to read English | Well | 746 | 35% | 2.6% | 30% | 40% | 7% |
| B22b | Ability to speak Spanish | Somewhat | 31 | 3% | 0.8% | 0% | 6% | 27% |
| B22b | Ability to speak Spanish | Well | 858 | 97% | 0.8% | 94% | 100% | 1% |
| B23b | Ability to read Spanish | Not at all | 18 | 1% | 0.3% | 0% | 2% | 29% |
| B23b | Ability to read Spanish | A little | 58 | 5% | 1.0% | 2% | 8% | 19% |
| B23b | Ability to read Spanish | Somewhat | 126 | 16% | 1.6% | 11% | 21% | 10% |
| B23b | Ability to read Spanish | Well | 685 | 78% | 1.5% | 73% | 83% | 2% |

61

AR2022_401370

## Chapter 4

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| D35trend | Location of housing while at current farm job | Off farm, in property not owned by current employer | 2,101 | 86% | 1.9% | 82% | 89% | 2% |
| D35trend | Location of housing while at current farm job | Off farm, in property owned by current employer | 48 | 3% | 0.7% | 1% | 4% | 28% |
| D35trend | Location of housing while at current farm job | On farm of employer I currently work for | 364 | 11% | 1.6% | 8% | 14% | 14% |
| D35trend | Location of housing while at current farm job | Other | 29 | 1% | 0.2% | 0% | 1% | 28% |
| D33a | Payment arrangement for living quarters | EMPLOYER-PROVIDED: I pay for housing provided by my employer | 92 | 3% | 0.6% | 2% | 4% | 22% |
| D33a | Payment arrangement for living quarters | EMPLOYER-PROVIDED: I receive free housing from my employer | 304 | 9% | 1.5% | 6% | 12% | 17% |
| D33a | Payment arrangement for living quarters | EMPLOYER-PROVIDED: Other arrangement | 30 | 1%[a] | 0.4% | 0% | 2% | 32% |
| D33a | Payment arrangement for living quarters | I pay for housing provided by govt, charity, other organization | 43 | 2% | 0.5% | 1% | 3% | 28% |
| D33a | Payment arrangement for living quarters | I (or family member) own the house | 826 | 35% | 2.0% | 31% | 39% | 6% |
| D33a | Payment arrangement for living quarters | I rent from non-employer/non-relative | 1,278 | 50% | 2.4% | 45% | 55% | 5% |
| D33a | Payment arrangement for living quarters | Other | 10 | <1%[a] | 0.1% | <1% | <1% | 39% |

Appendix C: Index of Percentages and Means for Key Variables

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| D50MTCOD | How much paid for housing per month (coded) | Under $200 | 78 | 6% | 1.3% | 4% | 9% | 21% |
| D50MTCOD | How much paid for housing per month (coded) | $200-299 | 110 | 9% | 1.8% | 5% | 13% | 21% |
| D50MTCOD | How much paid for housing per month (coded) | $300-399 | 164 | 12% | 1.5% | 9% | 15% | 12% |
| D50MTCOD | How much paid for housing per month (coded) | $400-499 | 183 | 12% | 1.4% | 9% | 14% | 12% |
| D50MTCOD | How much paid for housing per month (coded) | $500-599 | 198 | 15% | 1.5% | 12% | 18% | 10% |
| D50MTCOD | How much paid for housing per month (coded) | $600 or more | 666 | 46% | 3.0% | 40% | 52% | 7% |
| D34trend | Type of housing | Single-family home | 1,370 | 58% | 2.1% | 54% | 63% | 4% |
| D34trend | Type of housing | Mobile home | 592 | 18% | 1.7% | 15% | 21% | 9% |
| D34trend | Type of housing | Apartment | 529 | 20% | 1.7% | 17% | 23% | 8% |
| D34trend | Type of housing | Other (includes duplex or triplex, dormitory or barracks, motel or hotel, and 'other') | 87 | 4%[a] | 1.1% | 1% | 6% | 32% |
| D54a | Number of bedrooms in current living quarters | Average | 2,585 | 3 | 0.04 | 3 | 3 | 1% |
| D54b | Number of bathrooms in current living quarters | Average | 2,584 | 2 | 0.03 | 1 | 2 | 2% |
| D54c | Number of kitchens in current living quarters | Average | 2,584 | 1 | 0.00 | 1 | 1 | 0% |
| D54f | Number of other rooms in current living quarters | Average | 2,583 | 1 | 0.05 | 1 | 1 | 5% |

63

Appendix C: Index of Percentages and Means for Key Variables

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| CROWDED1 | Household is crowded, based on US Census Bureau definition of a crowded household as one in which the number of persons per room exceeds one | Crowded | 715 | 26% | 1.7% | 23% | 30% | 6% |
| D37a | Distance of current farm job from current residence | I'm located at the job | 360 | 11% | 1.6% | 7% | 14% | 15% |
| D37a | Distance of current farm job from current residence | Within 9 miles | 893 | 33% | 2.1% | 29% | 37% | 6% |
| D37a | Distance of current farm job from current residence | 10-24 miles | 979 | 41% | 2.1% | 37% | 45% | 5% |
| D37a | Distance of current farm job from current residence | 25-49 miles | 305 | 13% | 1.5% | 10% | 16% | 11% |
| D37a | Distance of current farm job from current residence | 50+ miles | 45 | 2% | 0.5% | 1% | 3% | 27% |
| D37 | Mode of transportation to work | Drive car | 1,789 | 69% | 1.7% | 66% | 73% | 2% |
| D37 | Mode of transportation to work | Walk | 203 | 6% | 0.7% | 4% | 7% | 13% |
| D37 | Mode of transportation to work | Ride with others | 245 | 10% | 1.0% | 8% | 12% | 10% |
| D37 | Mode of transportation to work | Labor bus, truck, van | 83 | 4% | 0.9% | 2% | 6% | 25% |
| D37 | Mode of transportation to work | Raitero | 229 | 10% | 1.5% | 7% | 13% | 15% |
| D37 | Mode of transportation to work | Public transportation, other | 33 | 1%[a] | 0.4% | 1% | 2% | 30% |
| D38a | Transport is mandatory | Yes | 24 | 3%[a] | 1.0% | 1% | 5% | 31% |

64

Appendix C: Index of Percentages and Means for Key Variables

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| D38 | Pay a fee for rides to work | No | 194 | 37% | 4.0% | 29% | 45% | 11% |
| D38 | Pay a fee for rides to work | Yes, a fee | 154 | 22% | 2.0% | 18% | 26% | 9% |
| D38 | Pay a fee for rides to work | Yes, just for gas | 220 | 40% | 3.3% | 34% | 47% | 8% |

65

## Chapter 5

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| FLC | Employer is a farm labor contractor | Employer: Grower, nursery, packing house | 2,305 | 89% | 2.4% | 84% | 94% | 3% |
| FLC | Employer is a farm labor contractor | Employer: Farm labor contractor | 281 | 11% | 2.4% | 6% | 16% | 22% |
| D30 | How current job was obtained | Applied for the job on my own | 720 | 30% | 1.7% | 26% | 33% | 6% |
| D30 | How current job was obtained | Recruited by a grower/his foreman | 142 | 5% | 0.9% | 4% | 7% | 17% |
| D30 | How current job was obtained | Recruited by farm labor contractor/his foreman | 44 | 1% | 0.3% | 1% | 2% | 23% |
| D30 | How current job was obtained | Referred by the employment service, welfare office, labor union, other means | 62 | 4% | 1.0% | 2% | 6% | 28% |
| D30 | How current job was obtained | Referred by relative/friend/workmate | 1,615 | 60% | 1.8% | 56% | 64% | 3% |
| CROP | Primary crop at time of interview | Field crops | 356 | 13% | 2.0% | 9% | 17% | 16% |
| CROP | Primary crop at time of interview | Fruits and nuts | 1,028 | 41% | 3.6% | 34% | 48% | 9% |
| CROP | Primary crop at time of interview | Horticulture | 503 | 22% | 2.7% | 17% | 27% | 12% |
| CROP | Primary crop at time of interview | Vegetables | 579 | 20% | 2.4% | 16% | 25% | 12% |
| CROP | Primary crop at time of interview | Miscellaneous or multiple crops | 120 | 4%[a] | 1.4% | 1% | 6% | 39% |
| TASK | Primary task at time of interview | Pre-harvest | 651 | 23% | 2.2% | 19% | 28% | 9% |
| TASK | Primary task at time of interview | Harvest | 610 | 24% | 2.6% | 19% | 29% | 11% |
| TASK | Primary task at time of interview | Post-harvest | 429 | 19% | 2.6% | 14% | 24% | 14% |
| TASK | Primary task at time of interview | Technical | 895 | 34% | 2.7% | 28% | 39% | 8% |
| D04 | Number of hours worked the previous week at current farm job | Average | 2,541 | 45 | 0.7 | 44 | 46 | 2% |

AR2022_401375

**Appendix C: Index of Percentages and Means for Key Variables**

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| D11 | Basis of pay | By the hour | 2,223 | 84% | 2.5% | 79% | 89% | 3% |
| D11 | Basis of pay | By the piece | 200 | 11% | 2.6% | 6% | 16% | 23% |
| D11 | Basis of pay | Combination hourly wage and piece rate | 28 | b | b | b | b | 56% |
| D11 | Basis of pay | Salary or other | 131 | 4% | 0.6% | 2% | 5% | 17% |
| WAGET1 | Hourly wage for primary task | Average | 2,504 | $12.32 | 0.2 | 12 | 13 | 1% |
| D20 | In last 12 months, received money bonus from current employer | No | 638 | 56% | 3.3% | 49% | 62% | 6% |
| D20 | In last 12 months, received money bonus from current employer | Yes | 545 | 35% | 3.4% | 29% | 42% | 10% |
| D20 | In last 12 months, received money bonus from current employer | Don't know | 55 | 9% | 1.8% | 5% | 12% | 21% |
| D21ax | Holiday bonus | Yes | 320 | 55% | 3.6% | 47% | 62% | 7% |
| D21bx | Incentive bonus | Yes | 71 | 17% | 2.9% | 11% | 23% | 17% |
| D21cx | Dependent on grower profit | Yes | 37 | 6% | 1.2% | 4% | 9% | 19% |
| D21dx | End of season bonus | Yes | 124 | 23% | 3.1% | 17% | 29% | 14% |
| D21fx | Other bonus | Yes | 14 | 3%[a] | 1.4% | <1% | 6% | 43% |
| NS01 | Employer provides clean drinking water and disposable cups every day | No water, no cups | 90 | 4% | 0.8% | 2% | 5% | 24% |
| NS01 | Employer provides clean drinking water and disposable cups every day | Yes, water only | 172 | 6% | 0.9% | 4% | 8% | 15% |
| NS01 | Employer provides clean drinking water and disposable cups every day | Yes, water and disposable cups | 2,320 | 90% | 1.3% | 88% | 93% | 1% |
| NS04 | Employer provides a toilet every day | Yes | 2,562 | 99% | 0.3% | 99% | 100% | <1% |
| NS09 | Employer provides water to wash hands every day | Yes | 2,562 | 99% | 0.3% | 99% | 100% | <1% |
| NT02a | Current employer provided training in safe use of pesticides in last 12 months | Yes | 1,791 | 68% | 2.6% | 63% | 73% | 4% |

67

**Appendix C: Index of Percentages and Means for Key Variables**

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| D26 | Covered by Unemployment Insurance | No | 1,186 | 41% | 2.5% | 36% | 45% | 6% |
| D26 | Covered by Unemployment Insurance | Yes | 1,327 | 55% | 2.5% | 50% | 60% | 4% |
| D26 | Covered by Unemployment Insurance | Don't know | 68 | 4% | 0.8% | 3% | 6% | 18% |
| D23 | Receive workers' compensation if injured at work or get sick as a result of work | No | 128 | 5% | 0.9% | 3% | 6% | 21% |
| D23 | Receive workers' compensation if injured at work or get sick as a result of work | Yes | 2,217 | 85% | 1.8% | 82% | 89% | 2% |
| D23 | Receive workers' compensation if injured at work or get sick as a result of work | Don't know | 239 | 10% | 1.5% | 7% | 13% | 14% |
| D24 | Employer provides health insurance or pays for health care for injuries or illness while off the job | No | 1,696 | 59% | 2.8% | 54% | 65% | 5% |
| D24 | Employer provides health insurance or pays for health care for injuries or illness while off the job | Yes | 735 | 33% | 2.9% | 27% | 38% | 9% |
| D24 | Employer provides health insurance or pays for health care for injuries or illness while off the job | Don't know | 152 | 8% | 1.3% | 5% | 11% | 17% |

68

AR2022_401377

## Chapter 6

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| NUMFEMPL | Number of farm employers in previous 12 months | Average | 2,586 | 1 | 0.04 | 1 | 1 | 3% |
| NUMFEMPL | Number of farm employers in previous 12 months | 1 employer | 2,098 | 81% | 1.6% | 78% | 85% | 2% |
| NUMFEMPL | Number of farm employers in previous 12 months | 2 employers | 313 | 12% | 1.2% | 10% | 15% | 10% |
| NUMFEMPL | Number of farm employers in previous 12 months | 3 or more employers | 175 | 6% | 1.1% | 4% | 9% | 18% |
| D27 | Number of years with current employer | Average | 2,518 | 8 | 0.4 | 7 | 9 | 5% |
| D27 | Number of years with current employer | 1 year or less | 391 | 22% | 1.9% | 18% | 26% | 9% |
| D27 | Number of years with current employer | 2-4 years | 741 | 28% | 1.8% | 25% | 32% | 6% |
| D27 | Number of years with current employer | 5-10 years | 636 | 24% | 1.7% | 21% | 27% | 7% |
| D27 | Number of years with current employer | 11-20 years | 493 | 16% | 1.4% | 14% | 19% | 8% |
| D27 | Number of years with current employer | 21 or more years | 257 | 10% | 1.2% | 7% | 12% | 13% |
| FWWEEKS | Number of weeks of farm work the previous year | Average | 2,586 | 35 | 0.9 | 33 | 37 | 3% |
| C10 | Number of work days per week | Average | 2,583 | 4 | 0.1 | 4 | 4 | 3% |
| FWRDAYS | Number of farm work days the previous year | Average | 2,586 | 198 | 5.3 | 188 | 209 | 3% |

AR2022_401378

Appendix C: Index of Percentages and Means for Key Variables

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|----------|---------------------|-------------------|------------------------|-------------------------------|----------------|----------------------------|----------------------------|-------------------------|
| NUMYRSFW (by NEWFWKR) | Number of years since first did farm work (by new farmworker: less than 1 year, 1 year, more than 1 year) | Average (among one or more years of farm work) | 2,475 | 19 | 0.6 | 18 | 20 | 3% |
| NUMYRSFW (by NEWFWKR) | Number of years since first did farm work (by new farmworker: less than 1 year, 1 year, more than 1 year) | 1 year (among one or more years of farm work) | 105 | 5% | 0.7% | 3% | 6% | 16% |
| NUMYRSFW (by NEWFWKR) | Number of years since first did farm work (by new farmworker: less than 1 year, 1 year, more than 1 year) | 2-4 years (among one or more years of farm work) | 250 | 12% | 1.3% | 10% | 15% | 10% |
| NUMYRSFW (by NEWFWKR) | Number of years since first did farm work (by new farmworker: less than 1 year, 1 year, more than 1 year) | 5-10 years (among one or more years of farm work) | 382 | 15% | 1.1% | 13% | 17% | 7% |
| NUMYRSFW (by NEWFWKR) | Number of years since first did farm work (by new farmworker: less than 1 year, 1 year, more than 1 year) | 11-20 years (among one or more years of farm work) | 739 | 27% | 1.5% | 24% | 30% | 6% |
| NUMYRSFW (by NEWFWKR) | Number of years since first did farm work (by new farmworker: less than 1 year, 1 year, more than 1 year) | 21-30 years (among one or more years of farm work) | 469 | 20% | 1.6% | 17% | 23% | 8% |
| NUMYRSFW (by NEWFWKR) | Number of years since first did farm work (by new farmworker: less than 1 year, 1 year, more than 1 year) | 31 or more years (among one or more years of farm work) | 530 | 21% | 1.8% | 17% | 24% | 9% |

70

**Appendix C: Index of Percentages and Means for Key Variables**

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| B12 | Number of years of non-crop work in the US | None | 1,150 | 46% | 2.4% | 41% | 51% | 5% |
| B12 | Number of years of non-crop work in the US | 1 year | 253 | 9% | 1.0% | 7% | 11% | 10% |
| B12 | Number of years of non-crop work in the US | 2-10 years | 752 | 32% | 2.1% | 28% | 36% | 7% |
| B12 | Number of years of non-crop work in the US | 11 or more years | 260 | 12% | 1.5% | 9% | 15% | 12% |
| B12 | Number of years of non-crop work in the US | Average, among those with at least 1 year on non-crop work in the US | 1,265 | 8 | 0.7 | 7 | 9 | 8% |
| B13 | Last time parents did hired farm work in the US | Never | 1,323 | 51% | 1.9% | 48% | 55% | 4% |
| B13 | Last time parents did hired farm work in the US | Now/within the last year | 290 | 11% | 1.1% | 9% | 13% | 9% |
| B13 | Last time parents did hired farm work in the US | 1-5 years ago | 102 | 4% | 0.7% | 3% | 5% | 18% |
| B13 | Last time parents did hired farm work in the US | 6-10 years ago | 110 | 4% | 0.6% | 3% | 5% | 14% |
| B13 | Last time parents did hired farm work in the US | 11 or more years ago | 731 | 29% | 1.7% | 26% | 33% | 6% |
| B13 | Last time parents did hired farm work in the US | Don't know | 6 | 0%[a] | 0.1% | 0% | 0% | 48% |

71

Appendix C: Index of Percentages and Means for Key Variables

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| E02 | How long expect to continue doing farm work | Less than one year | 69 | 5% | 0.8% | 3% | 6% | 19% |
| E02 | How long expect to continue doing farm work | 1-3 years | 298 | 10% | 1.0% | 8% | 12% | 10% |
| E02 | How long expect to continue doing farm work | 4-5 years | 102 | 4% | 0.6% | 3% | 5% | 14% |
| E02 | How long expect to continue doing farm work | Over 5 years | 68 | 3% | 0.5% | 1% | 4% | 21% |
| E02 | How long expect to continue doing farm work | Over 5 years/as long as I am able | 1,988 | 78% | 1.5% | 75% | 81% | 2% |
| E02 | How long expect to continue doing farm work | Other | 23 | 1% | 0.3% | 0% | 2% | 29% |

72

AR2022_401381

## Chapter 7

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| NWWEEKS | Number of weeks living in the US but not working the previous year | Average | 2,586 | 9 | 0.9 | 7 | 11 | 10% |
| ABWEEKS | Number of weeks abroad the previous year | Average | 2,586 | 2 | 0.3 | 1 | 2 | 17% |
| NFWEEKS | Number of weeks of non-crop work the previous year | NFWEEKS>0 | 661 | 31% | 2.4% | 26% | 35% | 8% |
| NFWEEKS | Number of weeks of non-crop work the previous year | Average, among those with NFWEEKS>0 | 661 | 25 | 1.6 | 21 | 28 | 7% |
| NUMNFJOBS | Number of non-crop jobs the previous year | Average, among those with NFWEEKS>0 | 661 | 1 | 0.1 | 1 | 2 | 3% |
| HasNFLeave (by NFWEEKS) | Left at least one non-crop employer in the previous year (by number of weeks of non-crop work the previous year) | Left at least one non-crop employer in the previous year (among NFWEEKS>0) | 313 | 44% | 3.9% | 36% | 52% | 9% |
| NFleaves (by HasNFLeave) | Type of leave from non-crop work (by left at least one non-crop employer in the previous year) | All leaves from non-crop work were involuntary (among left at least one non-crop employer in the previous year) | 94 | 28% | 3.4% | 21% | 35% | 12% |
| NFleaves (by HasNFLeave) | Type of leave from non-crop work (by left at least one non-crop employer in the previous year) | All leaves from non-crop work were voluntary (among left at least one non-crop employer in the previous year) | 206 | 66% | 3.8% | 58% | 73% | 6% |
| NFleaves (by HasNFLeave) | Type of leave from non-crop work (by left at least one non-crop employer in the previous year) | Both voluntary and involuntary leaves from non-crop work (among left at least one non-crop employer in the previous year) | 13 | 6%[a] | 2.4% | 2% | 11% | 37% |
| HadNW | Had at least one period of not working in previous year | Yes | 1,784 | 70% | 2.0% | 66% | 74% | 1784 |

73

**Appendix C: Index of Percentages and Means for Key Variables**

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| WeeksNotWorking | Number of weeks not working in previous year | Average, among those who had at least one period of not working in previous year | 1,784 | 16 | 1.0 | 14 | 18 | 6% |
| RecvdUI | Received unemployment during at least one period of not working | Yes (among those who had at least one period of not working in previous year) | 265 | 17% | 3.3% | 10% | 23% | 19% |

74

## Chapter 8

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| G01 | Total personal income the previous year | Average | 2,433 | 11 ($20,000 to $24,999) | 0.1 | 10 ($17,500 to $19,999) | 11 ($20,000 to $24,999) | 1% |
| G01 | Total personal income the previous year | Median | 2,433 | 11 ($20,000 to $24,999) | 0.2 | 10 ($17,500 to $19,999) | 11 ($20,000 to $24,999) | 2% |
| G01 | Total personal income the previous year | Did not work at all the previous year | 66 | 5% | 0.9% | 3% | 7% | 17% |
| G01 | Total personal income the previous year | $500-$999 | 11 | 1% | 0.3% | 0% | 1% | 40% [a] |
| G01 | Total personal income the previous year | $1,000-$2,499 | 18 | 2% | 0.7% | 0% | 3% | 44% [a] |
| G01 | Total personal income the previous year | $2,500-$4,999 | 43 | 3% | 0.7% | 2% | 5% | 21% |
| G01 | Total personal income the previous year | $5,000-$7,499 | 47 | 3% | 0.7% | 2% | 5% | 21% |
| G01 | Total personal income the previous year | $7,500-$9,999 | 60 | 3% | 0.5% | 2% | 4% | 20% |
| G01 | Total personal income the previous year | $10,000-$12,499 | 78 | 3% | 0.6% | 2% | 4% | 18% |
| G01 | Total personal income the previous year | $12,500-$14,999 | 110 | 4% | 0.7% | 3% | 5% | 17% |
| G01 | Total personal income the previous year | $15,000-$17,499 | 170 | 7% | 1.1% | 5% | 10% | 15% |
| G01 | Total personal income the previous year | $17,500-$19,999 | 229 | 9% | 1.1% | 7% | 11% | 11% |
| G01 | Total personal income the previous year | $20,000-$24,999 | 531 | 20% | 1.8% | 16% | 24% | 9% |
| G01 | Total personal income the previous year | $25,000-$29,999 | 435 | 16% | 1.4% | 13% | 18% | 9% |
| G01 | Total personal income the previous year | $30,000-$34,999 | 310 | 10% | 1.0% | 8% | 12% | 10% |
| G01 | Total personal income the previous year | $35,000-$39,999 | 172 | 6% | 0.8% | 4% | 7% | 14% |
| G01 | Total personal income the previous year | Over $40,000 | 219 | 7% | 0.9% | 5% | 9% | 13% |

AR2022_401384

Appendix C: Index of Percentages and Means for Key Variables

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| G01 | Total personal income the previous year | Don't remember (don't know) | 48 | 1% | 0.3% | 0% | 2% | 29% |
| G01 | Total personal income the previous year | Refused to answer | 22 | 1% | 0.3% | 0% | 1% | 35%[a] |

76

**Appendix C: Index of Percentages and Means for Key Variables**

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| G03 | Family's total income the previous year | Average | 2,429 | 12 ($25,000 to $29,999) | 0.1 | 12 ($25,000 to $29,999) | 12 ($25,000 to $29,999) | 1% |
| G03 | Family's total income the previous year | Median | 2,429 | 12 ($25,000 to $29,999) | 0.1 | 12 ($25,000 to $29,999) | 12 ($25,000 to $29,999) | 1% |
| G03 | Family's total income the previous year | Did not work at all the previous year | 50 | 4% | 0.8% | 2% | 6% | 20% |
| G03 | Family's total income the previous year | $1,000-$2,499 | 20 | 1%ª | 0.4% | 0% | 2% | 37% |
| G03 | Family's total income the previous year | $2,500-$4,999 | 32 | 3% | 0.7% | 1% | 4% | 25% |
| G03 | Family's total income the previous year | $5,000-$7,499 | 33 | 3% | 0.6% | 1% | 4% | 23% |
| G03 | Family's total income the previous year | $7,500-$9,999 | 29 | 1% | 0.3% | 1% | 2% | 26% |
| G03 | Family's total income the previous year | $10,000-$12,499 | 46 | 2% | 0.4% | 1% | 3% | 21% |
| G03 | Family's total income the previous year | $12,500-$14,999 | 61 | 2% | 0.4% | 1% | 3% | 19% |
| G03 | Family's total income the previous year | $15,000-$17,499 | 114 | 5% | 0.8% | 3% | 7% | 16% |
| G03 | Family's total income the previous year | $17,500-$19,999 | 160 | 5% | 0.7% | 4% | 7% | 12% |
| G03 | Family's total income the previous year | $20,000-$24,999 | 349 | 14% | 1.5% | 11% | 17% | 11% |
| G03 | Family's total income the previous year | $25,000-$29,999 | 350 | 14% | 1.4% | 11% | 17% | 10% |
| G03 | Family's total income the previous year | $30,000-$34,999 | 290 | 12% | 1.0% | 10% | 14% | 9% |
| G03 | Family's total income the previous year | $35,000-$39,999 | 229 | 7% | 0.7% | 5% | 8% | 10% |
| G03 | Family's total income the previous year | Over $40,000 | 716 | 26% | 1.7% | 22% | 29% | 7% |
| G03 | Family's total income the previous year | Refused to answer | 27 | 1% | 0.3% | 0% | 1% | 32% |
| G03 | Family's total income the previous year | Don't remember (don't know) | 55 | 1% | 0.3% | 1% | 2% | 26% |

77

AR2022_401386

**Appendix C: Index of Percentages and Means for Key Variables**

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| FAMPOV | Family income below the poverty level | Below poverty level | 435 | 21% | 1.8% | 18% | 25% | 8% |
| ASSETUS | Assets in US | Any US asset | 2,029 | 77% | 1.9% | 74% | 81% | 2% |
| G06a | Type of US asset | Plot of land | 74 | 2% | 0.4% | 1% | 3% | 17% |
| G06d | Type of US asset | Car or truck | 1,924 | 74% | 1.9% | 70% | 78% | 3% |
| G06h | Type of US asset | A type of housing, such as a house, mobile home, condominium, or apartment | 638 | 40% | 2.5% | 35% | 45% | 6% |
| G04c | Type of contribution-based program household member utilized in the last 2 years | Disability insurance | 52 | 3% | 0.7% | 2% | 4% | 23% |
| G04d | Type of contribution-based program household member utilized in the last 2 years | Unemployment Insurance | 278 | 13% | 2.5% | 8% | 18% | 19% |
| G04e | Type of contribution-based program household member utilized in the last 2 years | Social Security | 60 | 2% | 0.5% | 1% | 4% | 22% |
| G04b | Type of need-based program household member utilized in the last 2 years | Supplemental Nutrition Assistance Program | 360 | 15% | 1.6% | 12% | 18% | 11% |
| G04i | Type of need-based program household member utilized in the last 2 years | Public health clinics | 417 | 17% | 2.2% | 12% | 21% | 13% |
| G04j | Type of need-based program household member utilized in the last 2 years | Medicaid | 1,122 | 43% | 2.3% | 39% | 48% | 5% |
| G04k | Type of need-based program household member utilized in the last 2 years | WIC | 274 | 11% | 1.2% | 9% | 14% | 10% |
| G04r | Type of need-based program household member utilized in the last 2 years | Welfare (general assistance) or Temporary Assistance for Needy Families (TANF) | 26 | 2%[a] | 0.7% | <1% | 3% | 37% |

78

## Chapter 9

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| A21a | Farmworker has health insurance | Yes | 1,303 | 56% | 2.2% | 52% | 61% | 4% |
| A23a1 | Who pays for farmworker's health insurance | Farmworker | 133 | 9% | 1.3% | 7% | 12% | 14% |
| A23a2 | Who pays for farmworker's health insurance | Farmworker's spouse | 10 | <1%[a] | 0.2% | <1% | 1% | 44% |
| A23a3 | Who pays for farmworker's health insurance | Farmworker's employer | 397 | 30% | 3.6% | 23% | 37% | 12% |
| A23a4 | Who pays for farmworker's health insurance | Farmworker's spouse's employer | 113 | 8% | 2.0% | 5% | 12% | 23% |
| A23a5 | Who pays for farmworker's health insurance | Government | 506 | 41% | 3.8% | 33% | 48% | 9% |
| A23a6 | Who pays for farmworker's health insurance | Other | 116 | 7% | 1.1% | 5% | 10% | 15% |
| A23a7 | Who pays for farmworker's health insurance | Farmworker's parents'/family's plan | 66 | 7% | 1.3% | 4% | 9% | 20% |
| A21b | Spouse has health insurance | Yes | 918 | 66% | 2.5% | 61% | 71% | 4% |
| A23b1 | Who pays for spouse's insurance | Farmworker | 64 | 7% | 1.5% | 4% | 10% | 21% |
| A23b2 | Who pays for spouse's insurance | Farmworker spouse | 17 | 2% | 0.5% | 1% | 3% | 26% |
| A23b3 | Who pays for spouse's insurance | Farmworker's employer | 139 | 15% | 2.5% | 10% | 20% | 16% |
| A23b4 | Who pays for spouse's insurance | Farmworker's spouse's employer | 230 | 26% | 3.2% | 20% | 33% | 12% |
| A23b5 | Who pays for spouse's insurance | Government | 421 | 46% | 3.8% | 39% | 54% | 8% |
| A23b6 | Who pays for spouse's insurance | Other | 62 | 5% | 0.9% | 3% | 7% | 18% |
| A21c2 | Children have health insurance | Yes, all have it | 1,058 | 92% | 1.5% | 89% | 95% | 2% |
| A21c2 | Children have health insurance | Yes, only some have it | 20 | 2%[a] | 0.9% | <1% | 4% | 40% |

AR2022_401388

**Appendix C: Index of Percentages and Means for Key Variables**

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| A23c1 | Who pays for children's insurance | Farmworker | 15 | 3%[a] | 1.3% | 1% | 6% | 38% |
| A23c2 | Who pays for children's insurance | Farmworker's spouse | 3 | b | b | b | b | 67% |
| A23c3 | Who pays for children's insurance | Farmworker's employer | 54 | 6% | 1.6% | 3% | 10% | 24% |
| A23c4 | Who pays for children's insurance | Farmworker's spouse's employer | 75 | 7% | 1.1% | 4% | 9% | 17% |
| A23c5 | Who pays for children's insurance | Government | 899 | 82% | 2.2% | 78% | 86% | 3% |
| A23c6 | Who pays for children's insurance | Other | 29 | 2% | 0.6% | <1% | 3% | 30% |
| NQ01x | Utilized health care service in last 2 years | Yes | 877 | 71% | 3.0% | 65% | 77% | 4% |
| NQ03bx | Type of health care provider at last visit | Community health center | 274 | 31% | 3.3% | 24% | 37% | 11% |
| NQ03bx | Type of health care provider at last visit | Private doctor's office/private clinic | 372 | 44% | 3.8% | 36% | 51% | 9% |
| NQ03bx | Type of health care provider at last visit | Hospital | 61 | 7% | 1.1% | 5% | 9% | 16% |
| NQ03bx | Type of health care provider at last visit | Healer/curandero, ER, chiropractor/naturopath, other | 28 | 2% | 0.6% | 1% | 3% | 29% |
| NQ03bx | Type of health care provider at last visit | Migrant health clinic | 9 | b | b | b | b | 52% |
| NQ03bx | Type of health care provider at last visit | Dentist | 130 | 15% | 2.1% | 11% | 19% | 14% |

80

Appendix C: Index of Percentages and Means for Key Variables

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| NQ05x | Who paid majority of cost of last health care visit | Paid the bill out of own pocket | 280 | 26% | 2.6% | 20% | 31% | 10% |
| NQ05x | Who paid majority of cost of last health care visit | Medicaid/Medicare | 158 | 24% | 2.6% | 18% | 29% | 11% |
| NQ05x | Who paid majority of cost of last health care visit | Public clinic/did not charge | 105 | 11% | 1.7% | 8% | 15% | 15% |
| NQ05x | Who paid majority of cost of last health care visit | Employer provided health plan | 121 | 15% | 2.7% | 10% | 21% | 18% |
| NQ05x | Who paid majority of cost of last health care visit | Self or family bought individual health plan | 125 | 16% | 3.1% | 10% | 22% | 20% |
| NQ05x | Who paid majority of cost of last health care visit | Other | 55 | 6% | 1.1% | 4% | 8% | 19% |
| NQ05x | Who paid majority of cost of last health care visit | Billed but did not pay, workers' compensation, or combination of sources | 30 | 2% | 0.6% | 1% | 4% | 23% |

81

**Appendix C: Index of Percentages and Means for Key Variables**

| Variable | Variable Description | Variable Level(s) | Number of Observations | Estimate (Percentage or Mean) | Standard Error | 95% Lower Confidence Limit | 95% Upper Confidence Limit | Relative Standard Error |
|---|---|---|---|---|---|---|---|---|
| NQ10ax | Main difficulties faced when needing to access health care in the US | No transportation, too far away | 7 | b | b | b | b | 51% |
| NQ10bx | Main difficulties faced when needing to access health care in the US | Don't know where services are available | 2 | b | b | b | b | 80% |
| NQ10ex | Main difficulties faced when needing to access health care in the US | They don't speak my language | 7 | <1%[a] | 0.1% | <1% | 1% | 38% |
| NQ10fx | Main difficulties faced when needing to access health care in the US | They don't treat me with respect | 7 | <1%[a] | 0.2% | <1% | <1% | 44% |
| NQ10gx | Main difficulties faced when needing to access health care in the US | They don't understand my problems | 10 | 1%[a] | 0.3% | <1% | 2% | 38% |
| NQ10hx | Main difficulties faced when needing to access health care in the US | I'll lose my job | 5 | <1%[a] | 0.1% | <1% | <1% | 41% |
| NQ10ix | Main difficulties faced when needing to access health care in the US | Too expensive/no insurance | 316 | 23% | 2.9% | 17% | 28% | 13% |
| MQ10jx | Main difficulties faced when needing to access health care in the US | Other | 13 | 1%[a] | 0.4% | <1% | 2% | 41% |
| NQ10lx | Main difficulties faced when needing to access health care in the US | I'm undocumented/no papers (that's why they don't treat me well) | 8 | b | b | b | b | 55% |
| NQ10mx | Main difficulties faced when needing to access health care in the US | I don't know, I've never needed it | 144 | 9% | 1.4% | 7% | 12% | 15% |

82

AR2022_401391

# APPENDIX D: Data on National Demographic and Employment Characteristics since 1989

*Table 1: Hired Crop Worker Demographics, National Estimates, Seven Time Periods\**

| Characteristic | Fiscal Years 1989–1991 | Fiscal Years 1998–2000 | Fiscal Years 2007–2009 | Fiscal Years 2010–2012 | Fiscal Years 2013–2014 | Fiscal Years 2015–2016 | Fiscal Years 2017–2018 |
|---|---|---|---|---|---|---|---|
| U.S.-born | 40% | 17% | 29% | 26% | 27% | 25% | 32% |
| Foreign-born | 60% | 83% | 71% | 74% | 73% | 75% | 68% |
| Authorized | 86% | 46% | 52% | 50% | 53% | 51% | 64% |
| Unauthorized | 14% | 54% | 48% | 50% | 47% | 49% | 36% |
| Place of birth: United States/Puerto Rico | 40% | 17% | 29% | 26% | 27% | 25% | 32% |
| Place of birth: Mexico | 54% | 79% | 68% | 67% | 68% | 69% | 64% |
| Place of birth: Central America | 2% | 2% | 3% | 6% | 4% | 6% | 3% |
| Place of birth: Other | 3% | 1% | 1% | 1% | 1% | 1% | 1%(a) |
| Current work authorization: U.S. citizen (by birth or naturalization) | 43% | 20% | 33% | 29% | 31% | 29% | 38% |
| Current work authorization: Legal permanent resident (green card) | 13% | 25% | 18% | 19% | 21% | 21% | 24% |
| Current work authorization: Other work authorized | 29% | 1% | 1% | 1% | 2% | 1% | 2% |
| Current work authorization: Unauthorized | 14% | 54% | 48% | 50% | 47% | 49% | 36% |
| Migrant type: Settled (did not migrate)[1] | 59% | 45% | 74% | 79% | 84% | 81% | 87% |
| Migrant type: Shuttle migrant[2] | 23% | 22% | 12% | 14% | 10% | 10% | 8% |
| Migrant type: Follow-the-crop migrant[3] | 14% | 10% | 5% | 6% | 4% | 6% | 4% |
| Migrant type: Foreign-born newcomer[4] | 4% | 22% | 9% | 2% | 2% | 4% | 2% |
| Male | 73% | 80% | 78% | 73% | 72% | 68% | 69% |
| Average age | 33 | 31 | 36 | 37 | 38 | 38 | 41 |

AR2022_401392

| Characteristic | Fiscal Years 1989-1991 | Fiscal Years 1998-2000 | Fiscal Years 2007-2009 | Fiscal Years 2010-2012 | Fiscal Years 2013-2014 | Fiscal Years 2015-2016 | Fiscal Years 2017-2018 |
|---|---|---|---|---|---|---|---|
| Age: 14-17 | 4% | 5% | 3% | 2% | 1% | 3% | 3% |
| Age: 18-19 | 8% | 9% | 6% | 4% | 4% | 4% | 3% |
| Age: 20-24 | 19% | 21% | 16% | 14% | 12% | 11% | 8% |
| Age: 25-34 | 32% | 31% | 26% | 27% | 27% | 26% | 21% |
| Age: 35-44 | 19% | 19% | 21% | 25% | 24% | 23% | 23% |
| Age: 45-54 | 10% | 9% | 18% | 17% | 18% | 19% | 24% |
| Age: 55-64 | 6% | 4% | 8% | 9% | 11% | 11% | 14% |
| Age: 65 or older | 1% | 1% | 2% | 2% | 3% | 4% | 4% |
| Age first worked in U.S. agriculture: Before age 14 | no data | 8% | 8% | 7% | 6% | 6% | 5% |
| Age first worked in U.S. agriculture: At age 14-18 | no data | 33% | 32% | 32% | 34% | 29% | 32% |
| Age first worked in U.S. agriculture: At age 19-21 | no data | 18% | 19% | 17% | 17% | 18% | 17% |
| Age first worked in U.S. agriculture: At age 22-24 | no data | 12% | 11% | 10% | 12% | 12% | 11% |
| Age first worked in U.S. agriculture: At age 25 or older | no data | 28% | 31% | 33% | 31% | 35% | 35% |
| Average highest grade completed in school | 8th | 7th | 8th | 8th | 8th | 8th | 9th |
| Highest grade completed: No schooling | 5% | 4% | 5% | 4% | 3% | 4% | 2% |
| Highest grade completed: 1st to 3rd | 13% | 14% | 11% | 12% | 10% | 11% | 9% |
| Highest grade completed: 4th to 7th | 30% | 41% | 32% | 30% | 28% | 28% | 27% |
| Highest grade completed: 8th to 11th | 26% | 27% | 24% | 23% | 26% | 26% | 24% |
| Highest grade completed: 12th (high school graduate) | 20% | 10% | 19% | 19% | 21% | 21% | 24% |
| Highest grade completed: 13 or more (college) | 6% | 4% | 9% | 12% | 11% | 10% | 12% |

AR2022_401393

Appendix D: Data on National Demographic and Employment Characteristics

| Characteristic | Fiscal Years 1989-1991 | Fiscal Years 1998-2000 | Fiscal Years 2007-2009 | Fiscal Years 2010-2012 | Fiscal Years 2013-2014 | Fiscal Years 2015-2016 | Fiscal Years 2017-2018 |
|---|---|---|---|---|---|---|---|
| English speaking ability (self-reported): Not at all | 35% | 48% | 35% | 30% | 27% | 30% | 23% |
| English speaking ability (self-reported): A little | 32% | 27% | 27% | 31% | 32% | 32% | 28% |
| English speaking ability (self-reported): Somewhat | 9% | 7% | 8% | 9% | 11% | 9% | 13% |
| English speaking ability (self-reported): Well | 23% | 18% | 30% | 30% | 31% | 29% | 36% |
| English reading ability (self-reported): Not at all | 38% | 59% | 45% | 40% | 38% | 41% | 33% |
| English reading ability (self-reported): A little | 18% | 21% | 20% | 24% | 23% | 24% | 21% |
| English reading ability (self-reported): Somewhat | 5% | 5% | 6% | 7% | 9% | 7% | 11% |
| English reading ability (self-reported): Well | 40% | 16% | 29% | 29% | 30% | 28% | 35% |
| Family composition: Married parent | 44% | 42% | 45% | 47% | 48% | 41% | 39% |
| Family composition: Married, no children | 14% | 10% | 14% | 12% | 15% | 15% | 18% |
| Family composition: Unmarried parent | 8% | 5% | 8% | 8% | 9% | 13% | 11% |
| Family composition: Single, no children | 34% | 43% | 33% | 32% | 27% | 30% | 32% |
| Median personal income range (all income sources) | $5,000-$7,499 | $7,500-$9,999 | $15,000-$17,499 | $12,500-$14,999 | $15,000-$17,499 | $17,500-$19,999 | $20,000-$24,999 |
| Average personal income range (all income sources) | $5,000-$7,499 | $7,500-$9,999 | $15,000-$17,499 | $15,000-$17,499 | $17,500-$19,999 | $17,500-$19,999 | $20,000-$24,999 |
| Median family income range (all income sources) | $7,500-$9,999 | $7,500-$9,999 | $17,500-$19,999 | $17,500-$19,999 | $20,000-$24,999 | $20,000-$24,999 | $25,000-$29,999 |
| Average family income range (all income sources) | $10,000-$12,499 | $10,000-$12,499 | $17,500-$19,999 | $17,500-$19,999 | $20,000-$24,999 | $20,000-$24,999 | $25,000-$29,999 |

85

AR2022_401394

**Appendix D: Data on National Demographic and Employment Characteristics**

| Characteristic | Fiscal Years 1989–1991 | Fiscal Years 1998–2000 | Fiscal Years 2007–2009 | Fiscal Years 2010–2012 | Fiscal Years 2013–2014 | Fiscal Years 2015–2016 | Fiscal Years 2017–2018 |
|---|---|---|---|---|---|---|---|
| Share of families with below poverty level income | no data | 55% | 33% | 31% | 30% | 33% | 22% |
| Share of families that received benefits from contribution-based programs[5] | 28% | 21% | 21% | 20% | 19% | 14% | 18% |
| Share of families that received benefits from need-based programs[6] | 20% | 22% | 31% | 46% | 50% | 55% | 54% |
| Ethnicity: Mexican-American | 10% | 5% | 6% | 7% | 9% | 9% | 11% |
| Ethnicity: Mexican | 53% | 81% | 65% | 65% | 65% | 65% | 61% |
| Ethnicity: Chicano | 1% | 1% | <1%[a] | <1% | <1% | 1% | 1%(a) |
| Ethnicity: Puerto Rican | 2% | 1% | 1%[a] | 1%[a] | 1%[a] | 1%[a] | (b) |
| Ethnicity: Other Hispanic | 4% | 2% | 4% | 7% | 5% | 8% | 4% |
| Ethnicity: Not Hispanic or Latino | 30% | 10% | 24% | 20% | 20% | 17% | 23% |
| Accompanied (respondent was living with at least one nuclear family member at the time of interview) | 60% | 37% | 52% | 57% | 61% | 60% | 62% |
| Among parents, share accompanied | 74% | 59% | 72% | 82% | 83% | 85% | 91% |

*Table 1 illustrates weighted data on farmworkers from the Employment and Training Administration's National Agricultural Workers Survey, Public Data, Fiscal Years (FY) 1989-2018.

a Estimates should be interpreted with caution because they have relative standard errors between 31 and 50 percent.

b Estimates are suppressed because they are based on fewer than four observations or have relative standard errors greater than 50 percent.

1 Settled crop workers are employed at locations that are within 75 miles of each other.

2 Shuttle migrants have a home base where they do not engage in farm work and have one farm work location that is more than 75 miles from the home base. They might hold multiple farm jobs at the farm work location, but those jobs are within 75 miles of each other.

3 Follow-the-crop migrants have at least two farm jobs that are separated by more than 75 miles.

4 Newcomers are foreign-born crop workers whose first arrival to the United States occurred within the year preceding the interview and whose migration patterns have not yet been established.

5 Contribution-based benefits include programs to which the recipient or their employer contributed such as disability insurance, Unemployment Insurance, or Social Security.

6 Need-based benefits include financial assistance through programs such as Temporary Assistance for Needy Families (TANF), general assistance or welfare, and publicly provided housing or medical and nutritional assistance such as Medicaid, Special Supplemental Nutrition Program for Women, Infants and Children (WIC), and Supplemental Nutrition Assistance Program (SNAP).

AR2022_401395

*Table 2: Hired Crop Worker Employment Characteristics, National Estimates, Seven Time Periods\**

| Characteristic | Fiscal Years 1989-1991 | Fiscal Years 1998-2000 | Fiscal Years 2007-2009 | Fiscal Years 2010-2012 | Fiscal Years 2013-2014 | Fiscal Years 2015-2016 | Fiscal Years 2017-2018 |
|---|---|---|---|---|---|---|---|
| Employment type at current farm job: Directly-hired | 84% | 73% | 88% | 88% | 85% | 80% | 89% |
| Employment type at current farm job: Labor-contracted | 16% | 27% | 12% | 12% | 15% | 20% | 11% |
| Average number of years of U.S. farm work experience | 10 | 8 | 13 | 12 | 14 | 14 | 16 |
| Years of U.S. farm work experience: 0-1 | 10% | 26% | 14% | 10% | 7% | 11% | 8% |
| Years of U.S. farm work experience: 2-4 | 25% | 24% | 18% | 17% | 14% | 17% | 15% |
| Years of U.S. farm work experience: 5-10 | 30% | 22% | 23% | 29% | 25% | 22% | 18% |
| Years of U.S. farm work experience: 11-20 | 22% | 18% | 23% | 25% | 28% | 24% | 27% |
| Years of U.S. farm work experience: 21 or more | 13% | 10% | 22% | 20% | 25% | 25% | 33% |
| Average number of years with current farm employer | 5 | 3 | 6 | 6 | 7 | 7 | 8 |
| Years with current farm employer: 0-1 | 37% | 44% | 27% | 25% | 23% | 26% | 22% |
| Years with current farm employer: 2-4 | 32% | 36% | 33% | 33% | 32% | 32% | 28% |
| Years with current farm employer: 5-10 | 19% | 14% | 23% | 25% | 24% | 22% | 24% |
| Years with current farm employer: 11-20 | 9% | 5% | 12% | 13% | 15% | 14% | 16% |
| Years with current farm employer: 21 or more | 3% | 1% | 5% | 4% | 6% | 6% | 10% |
| Average hourly earnings at current farm job | $5.15 | $6.52 | $9.14 | $9.38 | $10.20 | $10.60 | $12.32 |
| Paid below the minimum wage at current farm job | 8% | 6% | 2% | 4% | 2% | 3%[a] | (b) |

AR2022_401396

Appendix D: Data on National Demographic and Employment Characteristics

| Characteristic | Fiscal Years 1989-1991 | Fiscal Years 1998-2000 | Fiscal Years 2007-2009 | Fiscal Years 2010-2012 | Fiscal Years 2013-2014 | Fiscal Years 2015-2016 | Fiscal Years 2017-2018 |
|---|---|---|---|---|---|---|---|
| Average number of days worked on a farm last 12 months | 159 | 153 | 194 | 187 | 192 | 192 | 198 |
| Average number of weeks worked on a farm last 12 months | 28 | 27 | 35 | 34 | 35 | 33 | 35 |
| Average number of hours worked per week at current farm job | 40 | 41 | 45 | 44 | 44 | 45 | 45 |
| Number of hours worked per week at current farm job: 1-20 | 15% | 10% | 4% | 4% | 6% | 6% | 5% |
| Number of hours worked per week at current farm job: 21-40 | 43% | 43% | 36% | 42% | 42% | 36% | 37% |
| Number of hours worked per week at current farm job: 41-50 | 23% | 29% | 35% | 29% | 28% | 30% | 30% |
| Number of hours worked per week at current farm job: 51-60 | 10% | 11% | 17% | 19% | 17% | 21% | 21% |
| Number of hours worked per week at current farm job: More than 60 | 8% | 6% | 8% | 6% | 7% | 7% | 6% |
| Average number of days worked per week at current farm job | no data | 5 | 6 | 5 | 5 | 5 | 4 |
| Median number of days worked per week at current farm job | no data | 5 | 5 | 5 | 5 | 5 | 5 |
| Number of days worked per week at current farm job: 1-5 days | no data | 54% | 42% | 50% | 50% | 46% | 57% |
| Number of days worked per week at current farm job: 6-7 days | no data | 46% | 58% | 50% | 50% | 54% | 43% |

AR2022_401397

**Appendix D: Data on National Demographic and Employment Characteristics**

| Characteristic | Fiscal Years 1989-1991 | Fiscal Years 1998-2000 | Fiscal Years 2007-2009 | Fiscal Years 2010-2012 | Fiscal Years 2013-2014 | Fiscal Years 2015-2016 | Fiscal Years 2017-2018 |
|---|---|---|---|---|---|---|---|
| Average number of hours worked per day** | no data | 8 | 8 | 8 | 8 | 8 | |
| Number of hours worked per day: 1-6 | no data | 19% | 12% | 11% | 15% | 15% | 12% |
| Number of hours worked per day: 6.1-8 | no data | 44% | 43% | 50% | 46% | 40% | 46% |
| Number of hours worked per day: 8.1-10 | no data | 28% | 35% | 30% | 31% | 37% | 34% |
| Number of hours worked per day: 10.1-14** | no data | 8% | 10% | 9% | 9% | 8% | 8% |
| Average number of farm employers in the last 12 months | 2.14 | 1.57 | 1.29 | 1.29 | 1.34 | 1.32 | 1.29 |
| Number of farm employers in the last 12 months: 1 | 52% | 65% | 81% | 81% | 79% | 80% | 81% |
| Number of farm employers in the last 12 months: 2 | 21% | 21% | 13% | 13% | 13% | 13% | 12% |
| Number of farm employers in the last 12 months: 3 | 10% | 8% | 4% | 4% | 5% | 4% | 4% |
| Number of farm employers in the last 12 months: 4 | 6% | 3% | 2% | 1% | 2% | 1% | 1% |
| Number of farm employers in the last 12 months: 5 or more | 10% | 2% | 1% | 1%[a] | 1% | 1% | (b) |
| Primary crop at current farm job: Field | 12% | 16% | 16% | 17% | 13% | 10% | 13% |

89

AR2022_401398

**Appendix D: Data on National Demographic and Employment Characteristics**

| Characteristic | Fiscal Years 1989-1991 | Fiscal Years 1998-2000 | Fiscal Years 2007-2009 | Fiscal Years 2010-2012 | Fiscal Years 2013-2014 | Fiscal Years 2015-2016 | Fiscal Years 2017-2018 |
|---|---|---|---|---|---|---|---|
| Primary crop at current farm job: Fruit or nut | 28% | 37% | 35% | 34% | 41% | 32% | 41% |
| Primary crop at current farm job: Horticulture | 18% | 16% | 20% | 23% | 22% | 19% | 22% |
| Primary crop at current farm job: Vegetable | 35% | 25% | 23% | 24% | 21% | 37% | 20% |
| Primary crop at current farm job: Miscellaneous/multiple | 6% | 6% | 5% | 3% | 3% | 3% | 4%[a] |
| Primary task at current farm job: Pre-harvest | 20% | 20% | 27% | 34% | 26% | 30% | 23% |
| Primary task at current farm job: Harvest | 41% | 29% | 27% | 22% | 23% | 17% | 24% |
| Primary task at current farm job: Post-harvest | 13% | 10% | 18% | 17% | 18% | 25% | 19% |
| Primary task at current farm job: Technical (e.g., equipment operator) | 18% | 23% | 25% | 27% | 33% | 29% | 34% |
| Primary task at current farm job: Supervisor | 1% | (b) | <1% | (b) | (b) | (b) | (b) |
| Primary task at current farm job: Other | 7% | 18% | 3% | 0% | 0% | 0% | 0% |
| Current farm employer provides health insurance or pays for health care for a non-work-related injury or illness [D24]: No | no data | 79% | 72% | 70% | 78% | 71% | 59% |
| Current farm employer provides health insurance or pays for health care for a non-work-related injury or illness [D24]: Yes | no data | 7% | 18% | 19% | 14% | 18% | 33% |

90

Appendix D: Data on National Demographic and Employment Characteristics

| Characteristic | Fiscal Years 1989-1991 | Fiscal Years 1998-2000 | Fiscal Years 2007-2009 | Fiscal Years 2010-2012 | Fiscal Years 2013-2014 | Fiscal Years 2015-2016 | Fiscal Years 2017-2018 |
|---|---|---|---|---|---|---|---|
| Current farm employer provides health insurance or pays for health care for a non-work-related injury or illness [D24]: Don't know | no data | 14% | 11% | 11% | 9% | 11% | 8% |
| Current farm employer provides health insurance or pays for health care for a work-related injury or illness [D22]: No | 38% | 22% | 10% | 14% | 13% | 9% | 4% |
| Current farm employer provides health insurance or pays for health care for a work-related injury or illness [D22]: Yes | 46% | 64% | 74% | 69% | 70% | 76% | 89% |
| Current farm employer provides health insurance or pays for health care for a work-related injury or illness [D22]: Don't know | 16% | 14% | 16% | 17% | 18% | 14% | 8% |
| Workers' Compensation coverage at current farm job [D23]: No | 66% | 40% | 19% | 18% | 21% | 16% | 5% |
| Workers' Compensation coverage at current farm job [D23]: Yes | 24% | 38% | 60% | 60% | 51% | 62% | 85% |
| Workers' Compensation coverage at current farm job [D23]: Don't know | 9% | 22% | 21% | 22% | 28% | 22% | 10% |
| Unemployment Insurance coverage at current farm job: No | 38% | 55% | 49% | 53% | 50% | 52% | 41% |
| Unemployment Insurance coverage at current farm job: Yes | 51% | 37% | 48% | 44% | 46% | 43% | 55% |
| Unemployment Insurance coverage at current farm job: Don't know | 10% | 8% | 3% | 3% | 3% | 5% | 4% |

AR2022_401400

**Appendix D: Data on National Demographic and Employment Characteristics**

| Characteristic | Fiscal Years 1989-1991 | Fiscal Years 1998-2000 | Fiscal Years 2007-2009 | Fiscal Years 2010-2012 | Fiscal Years 2013-2014 | Fiscal Years 2015-2016 | Fiscal Years 2017-2018 |
|---|---|---|---|---|---|---|---|
| Mode of transportation to work: Drive a car | 46% | 34% | 56% | 55% | 59% | 58% | 69% |
| Mode of transportation to work: Walk | 7% | 8% | 8% | 8% | 7% | 7% | 6% |
| Mode of transportation to work: Public transportation (bus, train, etc.) | <1% | 1% | (b) | (b) | <1%[a] | <1%[a] | (b) |
| Mode of transportation to work: Labor bus, truck, van | 15% | 17% | 4% | 6% | 6% | 6%[a] | 4% |
| Mode of transportation to work: 'Raitero' | no data | no data | 18% | 21% | 13% | 15% | 10% |
| Mode of transportation to work: Ride with others (share ride) | 29% | 36% | 13% | 9% | 14% | 13% | 10% |
| Mode of transportation to work: Other | 4% | 4% | 1% | 1%[a] | 1%[a] | 1% | 1%[a] |
| Pay a fee for rides to work: No | 80% | 50% | 27% | 28% | 37% | 32% | 37% |
| Pay a fee for rides to work: Yes, a fee | 20% | 45% | 38% | 31% | 29% | 28% | 22% |
| Pay a fee for rides to work: Yes, just for gas | no data | 5% | 35% | 41% | 34% | 39% | 40% |

AR2022_401401

**Appendix D: Data on National Demographic and Employment Characteristics**

| Characteristic | Fiscal Years 1989-1991 | Fiscal Years 1998-2000 | Fiscal Years 2007-2009 | Fiscal Years 2010-2012 | Fiscal Years 2013-2014 | Fiscal Years 2015-2016 | Fiscal Years 2017-2018 |
|---|---|---|---|---|---|---|---|
| Share of farmworkers who have health insurance, taking into account all provider sources, including the respondent's employer, self-insurance, the government, the spouse's employer, etc. [A21a]: No | no data | 76% | 66% | 68% | 65% | 53% | 43% |
| Share of farmworkers who have health insurance, taking into account all provider sources, including the respondent's employer, self-insurance, the government, the spouse's employer, etc. [A21a]: Yes | no data | 24% | 33% | 31% | 35% | 47% | 56% |
| Share of farmworkers who have health insurance, taking into account all provider sources, including the respondent's employer, self-insurance, the government, the spouse's employer, etc. [A21a]: Don't know | no data | 1%[a] | 1% | 1%[a] | <1%[a] | 1%[a] | 1%[a] |
| Share who held a non-farm job in the last 12 months | 31% | 15% | 19% | 28% | 25% | 24% | 31% |
| Average number of non-farm work weeks last 12 months | 22 | 24 | 26 | 26 | 25 | 25 | 25 |

AR2022_401402

Appendix D: Data on National Demographic and Employment Characteristics

| Characteristic | Fiscal Years 1989-1991 | Fiscal Years 1998-2000 | Fiscal Years 2007-2009 | Fiscal Years 2010-2012 | Fiscal Years 2013-2014 | Fiscal Years 2015-2016 | Fiscal Years 2017-2018 |
|---|---|---|---|---|---|---|---|
| Plans to continue working in agriculture: Less than 1 year | 9% | 7% | 3% | 2% | 3% | 4% | 5% |
| Plans to continue working in agriculture: 1-3 years | 12% | 18% | 16% | 13% | 12% | 12% | 10% |
| Plans to continue working in agriculture: 4-5 years | 7% | 5% | 5% | 3% | 4% | 4% | 4% |
| Plans to continue working in agriculture: More than 5 years | 4% | 5% | 9% | 3% | 2% | 2% | 3% |
| Plans to continue working in agriculture: Over five years and as long as able to do the work | 65% | 56% | 64% | 76% | 76% | 74% | 78% |
| Plans to continue working in agriculture: Other | 4% | 9% | 4% | 3% | 2% | 3% | 1% |
| Could find a non-farm job within a month: No | 28% | 37% | 33% | 51% | 47% | 43% | 33% |
| Could find a non-farm job within a month: Yes | 51% | 39% | 44% | 32% | 36% | 45% | 58% |
| Could find a non-farm job within a month: Don't know | 20% | 24% | 23% | 17% | 17% | 12% | 10% |

*Table 2 illustrates weighted data on farmworkers from the Employment and Training Administration's National Agricultural Workers Survey, Public Data, Fiscal Years (FY) 1989-2018.
**Values greater than 14 for number of hours worked per day were set to missing.
a Estimates should be interpreted with caution because they have relative standard errors between 31 and 50 percent.
b Estimates are suppressed because they are based on fewer than four observations or have relative standard errors greater than 50 percent.

AR2022_401403

**U.S. Department of Labor**
Wage and Hour Division



U.S. Wage and Hour Division
(Revised July 2009)

# Fact Sheet #14: Coverage Under the Fair Labor Standards Act (FLSA)

This fact sheet provides general information concerning coverage under the FLSA.

The FLSA is the Federal law which sets minimum wage, overtime, recordkeeping, and youth employment standards.

The minimum wage for covered nonexempt workers is not less than $7.25 per hour effective July 24, 2009. With only some exceptions, overtime ("time and one-half") must be paid for work over forty hours a week. Child labor regulations prohibit persons younger than eighteen years old from working in certain jobs and additionally sets rules concerning the hours and times employees under sixteen years of age may work.

More than 143 million American workers are protected (or "covered") by the FLSA, which is enforced by the Wage and Hour Division of the U.S. Department of Labor.

There are two ways in which an employee can be covered by the law: "enterprise coverage" and "individual coverage."

**Enterprise Coverage**

Employees who work for certain businesses or organizations (or "enterprises") are covered by the FLSA. These enterprises, which must have at least two employees, are:

(1) those that have an annual dollar volume of sales or business done of at least $500,000

(2) hospitals, businesses providing medical or nursing care for residents, schools and preschools, and government agencies

**Individual Coverage**

Even when there is no enterprise coverage, employees are protected by the FLSA if their work regularly involves them in commerce between States ("interstate commerce"). The FLSA covers individual workers who are "engaged in commerce or in the production of goods for commerce."

Examples of employees who are involved in interstate commerce include those who: produce goods (such as a worker assembling components in a factory or a secretary typing letters in an office) that will be sent out of state, regularly make telephone calls to persons located in other States, handle records of interstate transactions, travel to other States on their jobs, and do janitorial work in buildings where goods are produced for shipment outside the State.

Also, domestic service workers (such as housekeepers, full-time babysitters, and cooks) are normally covered by the law.

AR2022_401404

**Where to Obtain Additional Information**

**For additional information, visit our Wage and Hour Division Website: http://www.wagehour.dol.gov and/or call our toll-free information and helpline, available 8 a.m. to 5 p.m. in your time zone, 1-866-4USWAGE (1-866-487-9243).**

This publication is for general information and is not to be considered in the same light as official statements of position contained in the regulations.

**U.S. Department of Labor**                                          **1-866-4-USWAGE**
Frances Perkins Building                                              TTY: 1-866-487-9243
200 Constitution Avenue, NW                                          **Contact Us**
Washington, DC 20210

 An offi ial w b it of th Unit d Stat  gov rnm nt

# POV Mileage Rates (Archived)

[Previous Airplane Reimbursement Rates](#)

[Previous Motorcycle Reimbursement Rates](#)

[Previous Automobile Reimbursement Rates](#)

[Previous Automobile Reimbursement Rates when Government-Owned Autos are Available](#)

The following are previous mileage reimbursement rates for airplanes:

## Previous airplane rates

| Effective Dates | Rate Per mile |
|---|---|
| January 1  2022 | $1 515 |
| January 1, 2021 | $1.26 |
| January 1  2020 | $1 27 |
| January 1, 2019 | $1.26 |
| January 1  2018 | $1 21 |
| January 1, 2017 | $1.15 |

[Th  following ar  pr  vious mil  ag  r  imburs  m  nt rat  s for motor  y l  s](#)

## Previous motorcycle rates

| Effective dates | Rate per mile |
|---|---|
| January 1  2022 | $0 565 |

## questions

Have travel policy questions?
Use our '[Have a Question?](#)'
site


Find COVID-19 Va
Near You

Visit Vaccines.gov

Or Call 1 800 232 023

AR2022_401406

| Effective dates | Rate per mile |
|---|---|
| January 1, 2021 | $0.54 |
| January 1, 2020 | $0.545 |
| January 1, 2019 | $0.55 |
| January 1, 2018 | $0.515 |
| January 1, 2017 | $0.505 |

The following are previous privately owned automobile rates:

## Previous automobile rates

| Effective Date | Rate per mile |
|---|---|
| January 1, 2022 | $0.585 |
| January 1, 2021 | $0.56 |
| January 1, 2020 | $0.575 |
| January 1, 2019 | $0.58 |
| January 1, 2018 | $0.545 |
| January 1, 2017 | $0.535 |

The following are Previous Automobile Reimbursement Rates when Government-Furnished Autos are Available:



| January 1, 2022 | $0.18 |
|---|---|
| January 1  2021 | $0 16 |
| January 1, 2020 | $0.17 |

**AR2022_401407**

| Effective Date | Rate per mile |
|---|---|
| January 1  2019 | $0 20 |
| January 1, 2018 | $0.18 |
| January 1  2017 | $0 17 |

QUESTIONS:

For all travel policy questions, e-mail travelpolicy@gsa.gov

s  Rev ewed  2022 06 2

**AR2022_401408**



**United States Government Accountability Office**

Report to Congressional Requesters

**January 2022**

# IMMIGRATION

# Information on Deferred Action for Childhood Arrivals



# GAO Highlights

Highlights of GAO-22-104734, a report to congressional requesters

January 2022

# IMMIGRATION

## Information on Deferred Action for Childhood Arrivals

## Why GAO Did This Study

In June 2012, DHS established the DACA initiative. Under DACA, DHS has the discretion to provide temporary protection from removal from the U.S. (or, deferred action) for certain noncitizens who came to the U.S. before age 16. DACA recipients are neither granted lawful immigration status nor put on a pathway to lawful status. Rather, they are considered to be lawfully present in the U.S. during the 2-year period of deferred action. USCIS has granted DACA to more than 800,000 noncitizens. In July 2021, a federal court ruled that USCIS may not approve first-time DACA requests but temporarily permitted USCIS to continue to approve renewals of previously approved requests.

GAO was asked to review the extent to which USCIS shares information on DACA requestors and recipients with immigration enforcement agencies. This report describes (1) the circumstances under which USCIS shares information on DACA requestors with immigration enforcement agencies and (2) how CBP and ICE have applied DHS's immigration enforcement priorities to DACA recipients and those who may have potentially qualified for DACA since 2012. GAO analyzed USCIS, CBP, and ICE policies and guidance; analyzed USCIS data on adjudication outcomes and the circumstances under which USCIS shared information on DACA requestors with ICE from June 2012 through June 2021; and interviewed relevant headquarters and field officials.

View GAO-22-104734. For more information, contact Rebecca Gambler at (202) 512-8777 or gamblerr@gao.gov.

## What GAO Found

In 2012, U.S. Citizenship and Immigration Services (USCIS) published guidance explaining that it would not proactively provide information from Deferred Action for Childhood Arrivals (DACA) requests to immigration enforcement agencies for the purpose of immigration enforcement, unless the DACA requestor met certain criteria. For example, USCIS may refer certain DACA cases to U.S. Immigration and Customs Enforcement (ICE) for a possible criminal investigation if the requestor represents a potential public safety risk based on the individual's criminal history or to identify fraudulent claims. USCIS has shared information with ICE for immigration enforcement purposes on a small number of DACA requestors and recipients who engaged in activities that disqualified them from DACA. Specifically, of the 106,000 DACA requests that USCIS denied, it referred fewer than 900 cases (less than 1 percent) to ICE (see fig.).

Outcomes for Deferred Action for Childhood Arrivals Requests and Approximate Number of Referrals to U.S. Immigration and Customs Enforcement, June 2012 through June 2021



3 million requests approved (800,000 initial, 2.2 million renewal)

167,000 pending     106,000 denied

Referrals to U.S. Immigration and Customs Enforcement : 900

Source: GAO analysis of U.S. Citizenship and Immigration Services information.  |  GAO-22-104734

Since 2012, U.S. Customs and Border Protection (CBP) and ICE enforcement practices related to DACA recipients and individuals who might qualify for DACA have generally aligned with the Department of Homeland Security's (DHS) immigration enforcement priorities. While DHS's immigration enforcement priorities have varied since 2012, the department has generally not considered DACA recipients to be immigration enforcement priorities unless they met specific criteria, such as having engaged in certain types of fraud or activities that posed a threat to national security or public safety. While DACA recipients are to be provided temporary protection from removal, individuals who might qualify to receive DACA but who have not yet submitted a request, or are awaiting approval, do not have such protection. However, CBP and ICE officials stated that they have generally extended prosecutorial discretion considerations to individuals who may have potentially qualified for DACA as long as they had not engaged in activities that would disqualify them from a favorable exercise of such discretion.

AILA Doc. No. 22011408. (Posted 1/14/22)     AR2022_401710

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 6 |
| | USCIS Rarely Shares Information on DACA Requestors with Immigration Enforcement Agencies | 14 |
| | DACA Recipients Have Not Been an Enforcement Priority, and CBP and ICE Practices for Those Potentially Qualified Have Aligned with DHS Priorities | 23 |
| | Agency Comments | 30 |
| Appendix I | GAO Contact and Staff Acknowledgments | 31 |

**Tables**

| | | |
|---|---|---|
| | Table 1: Adjudication Outcomes of Requests for Deferred Action for Childhood Arrivals (DACA), by Fiscal Year, June 2012 through June 2021 | 13 |
| | Table 2: Department of Homeland Security (DHS) Immigration Enforcement Priorities from March 2011 through September 2021 | 24 |

**Figures**

| | | |
|---|---|---|
| | Figure 1: Time Line of Key Deferred Action for Childhood Arrivals (DACA) Legal Challenges and Events | 9 |
| | Figure 2: Deferred Action for Childhood Arrivals (DACA) Request Adjudication Outcomes, June 2012 through June 2021 | 12 |
| | Figure 3: Outcomes for Deferred Action for Childhood Arrivals (DACA) Requests and Approximate Numbers of Enforcement Actions, June 2012 through June 2021 | 17 |
| | Figure 4: U.S. Citizenship and Immigration Services (USCIS) Referrals to U.S. Immigration and Customs Enforcement (ICE) Involving Deferred Action for Childhood Arrivals (DACA) Requests | 21 |

**Abbreviations**

| | |
|---|---|
| CBP | U.S. Customs and Border Protection |
| DACA | Deferred Action for Childhood Arrivals |
| DHS | Department of Homeland Security |
| FDNS | Fraud Detection and National Security Directorate |
| ICE | U.S. Immigration and Customs Enforcement |
| USCIS | U.S. Citizenship and Immigration Services |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

January 12, 2022

The Honorable Jerrold Nadler
Chairman
Committee on the Judiciary
House of Representatives

The Honorable Zoe Lofgren
Chair
Subcommittee on Immigration and Citizenship
Committee on the Judiciary
House of Representatives

In June 2012, the Department of Homeland Security (DHS) established the Deferred Action for Childhood Arrivals (DACA) initiative. Under DACA, DHS has the discretion to provide temporary protection from removal from the U.S. (or, deferred action) for noncitizens who came to the country as children.[1] DHS's U.S. Citizenship and Immigration Services (USCIS) adjudicates initial requests for deferred action, as well as renewals, both of which are valid for 2 years. DACA recipients are neither granted lawful immigration status nor put on a pathway to lawful immigration status. Rather, they are considered to be lawfully present in the U.S. during the period of deferred action.[2] Individuals who have been granted deferred action under DACA may also receive employment authorization for the period of deferred action, provided they can demonstrate "an economic necessity for employment."[3] USCIS has granted DACA to more than 800,000 noncitizens since 2012.

Following various federal court rulings related to DACA,[4] a January 20, 2021, presidential memorandum directed the Secretary of Homeland Security, in consultation with the Attorney General, to take all action

---

[1]Specifically, to qualify for DACA, children must have arrived in the U.S. before age 16.

[2]Certain categories of noncitizens who have not been granted lawful immigration status, including noncitizens currently granted deferred action, may be considered "lawfully present" for the purposes of applying for certain federal benefits. See 8 C.F.R. § 1.3(a)(vi).

[3]USCIS adjudicates employment authorization applications, which must be submitted as part of the DACA request. See 8 C.F.R. §§ 274a.12(c)(14); 274a.13.

[4]See, e.g., Dep't of Homeland Security v. Regents of the Univ. of Cal, 140 S. Ct. 1891 (2020); Batalla Vidal v. Wolf, No. 16-CV-04756 (E.D.N.Y. Dec. 4, 2020) (opinion).

AILA Doc. No. 22011408. (Posted 1/14/22)                    AR2022_401413

deemed appropriate, consistent with applicable law, to "preserve and fortify" DACA.[5] However, in July 2021, a federal court ruled that USCIS may no longer approve initial DACA requests, but temporarily permitted USCIS to continue to grant renewals of previously approved requests.[6]

USCIS's long-standing guidance states that USCIS may share information on DACA requestors with national security and law enforcement agencies if the requestor poses a risk to national security or public safety, or for assistance with the adjudication process. Members of Congress have raised concerns about U.S. Immigration and Customs Enforcement's (ICE) and U.S. Customs and Border Protection's (CBP) access to DACA requestors' personal information. In particular, such concerns include whether personal information could be used for enforcement purposes should DACA be terminated or DHS's immigration enforcement priorities change, given that DACA requestors and recipients do not have lawful status in the U.S.

You asked us to review the extent to which USCIS shares information on DACA requestors and recipients with immigration enforcement agencies and for what purpose. This report describes (1) the circumstances under which USCIS shares information on DACA requestors with immigration enforcement agencies and (2) how CBP and ICE have applied DHS's immigration enforcement priorities since 2012 to DACA recipients and those who may have potentially qualified for DACA.

To address our first objective, we analyzed USCIS documentation, including DACA request forms, policy memos, guidance documents, standard operating procedures, and training materials. These describe the information USCIS collects and uses to adjudicate DACA requests and may share with immigration enforcement agencies during the adjudication process. Further, we analyzed DHS-wide policies on information sharing, as well as CBP and ICE documentation describing

---

[5]On September 28, 2021, DHS published a notice of proposed rulemaking for DACA, to fortify immigration protections for DACA recipients, which included a 60-day period for public comment. 86 Fed. Reg. 53,736 (Sept. 28, 2021).

[6]Texas v. United States, No. 18-CV-00068 (S.D. Tex. July 16, 2021) (opinion). Among other motions, the government sought a stay of proceedings pending the completion of the proposed rulemaking for DACA, which was denied by the court on October 15, 2021. See Texas v. United States, No. 21-40680 (5th Cir. Oct. 4, 2021 and Oct. 15, 2021) (opposed motion of defendants-appellants to place appeal in abeyance pending completion of rulemaking); (court order). As of January 2022, this litigation was ongoing and on appeal to the Court of Appeals for the Fifth Circuit.

the nature of their respective access to USCIS databases containing information on DACA requestors and recipients.

In addition, we analyzed USCIS summary-level data from DACA's inception in June 2012 through June 2021—the most recent available data during the period of our review. Specifically, we analyzed USCIS data to determine adjudication outcomes, as well as the circumstances under which USCIS shared information on DACA requestors with immigration enforcement agencies, particularly ICE. To assess the reliability of these data, we reviewed them for reasonableness, accuracy, and consistency. We also interviewed USCIS officials responsible for maintaining the relevant data systems about the steps they took to ensure the quality and reliability of these data.[7] We determined these data were sufficiently reliable to describe the outcomes (e.g., approvals and denials) of initial DACA requests and renewals and the number of DACA-related cases USCIS referred to ICE due to national security, public safety, or fraud concerns.

Further, we interviewed headquarters officials from USCIS's Service Center Operations Directorate, which is responsible for overseeing DACA adjudications at four of USCIS's five service centers nationwide. We also interviewed USCIS officers at the Nebraska Service Center, including those from the center's background check unit.[8] We interviewed headquarters officials from USCIS's Fraud Detection and National Security Directorate, which is responsible for investigating potential immigration benefit fraud. We also interviewed officials from the ICE headquarters office that receives referrals from USCIS for potential investigation on suspected cases of fraud or national security and public safety concerns.

---

[7]DACA-related referrals to ICE are an estimate. According to USCIS officials, USCIS data systems track whether a referral to ICE has a DACA request form associated with it, even if the subject of the referral is not a DACA requestor. For example, USCIS may refer a case to ICE if an attorney has prepared fraudulent documents in support of multiple DACA requests. In such cases, even though the attorney is the subject of the referral, each of those DACA request forms would be associated with the referral to ICE, and ICE may have access to these requestors information.

[8]We selected the Nebraska Service Center because its officers have had responsibility for adjudicating both initial DACA requests and renewals. The other three service centers that have had responsibility for adjudicating DACA requests are in California, Texas, and Vermont.

To address our second objective, we analyzed agency documentation, including executive orders, DHS policy memos, CBP and ICE memorandums, and guidance documents on DHS's enforcement priorities. We analyzed CBP and ICE policies and guidance documents governing encounters with DACA requestors and recipients, including those who might qualify for deferred action. We also analyzed DHS and USCIS documentation on CBP's and ICE's access to and use of USCIS databases to verify the immigration status of noncitizens encountered at the border and interior checkpoints.[9] Such documentation included privacy impact assessments and user guides for each data system. We interviewed CBP and ICE headquarters officials to obtain their perspectives on agency policies and practices related to encounters with individuals who potentially qualified for, had requested, or had received DACA under various immigration enforcement priorities since DACA's inception in 2012. We also interviewed USCIS, CBP, and ICE headquarters officials to discuss CBP and ICE access to and use of USCIS databases containing information on DACA requestors and recipients.

In addition, we analyzed summary-level CBP and ICE data on DACA requestors, recipients, and potentially qualified individuals who were apprehended, detained, and subsequently released from custody. Specifically:

- Regarding ICE, we analyzed summary data from November 2014 to November 2019. In November 2014, ICE's Enforcement and Removal Operations began tracking in its case management system data on individuals whom ICE released from custody because they potentially qualified for, had requested, or had received DACA.[10] However, ICE

---

[9]U.S. Border Patrol (Border Patrol) deploys agents to immigration checkpoints that are generally located on highways 25 to 100 miles from the southwest border. At checkpoints, Border Patrol agents screen vehicles for noncitizens who were able to illegally cross the border undetected at or between U.S. ports of entry. Border Patrol checkpoints are located on major U.S. highways and secondary roads. This permits checkpoints to be far enough inland to detect and apprehend noncitizens in violation of U.S. immigration law, smugglers, and potential terrorists attempting to travel farther into the interior of the U.S. on ingress routes after evading detection or otherwise avoiding required inspection at the border. See GAO, *Border Patrol: Issues Related to Agency Deployment Strategy and Immigration Checkpoints*, GAO-18-50 (Washington, D.C.: Nov. 8, 2017).

[10]ICE's Enforcement and Removal Operations is responsible for managing all aspects of the immigration enforcement process, including identification and arrest, detention, removal. ICE's data field did not distinguish between DACA recipients and those who might qualify for DACA.

removed DACA from its system as a release reason in November 2019, according to ICE officials. To assess the reliability of these data, we interviewed agency officials responsible for maintaining these data about the steps they took to ensure their quality and reliability. We determined that these data were sufficiently reliable to describe the approximate number of ICE's DACA-related releases from November 2014 to November 2019.

- Regarding CBP, we analyzed summary-level U.S. Border Patrol (Border Patrol) data from June 2012 to October 2017.[11] We selected this period because officials told us that Border Patrol ceased tracking releases of potentially DACA-qualified individuals from its custody after this date, due to DACA's temporary rescission.[12] To assess the reliability of these data, we reviewed the data for obvious errors and interviewed agency officials responsible for maintaining these data about the steps they took to ensure their quality and reliability. According to Border Patrol's data, there was a significant increase in DACA-related releases over a 2-month period in one sector in Texas. Because Border Patrol officials could not determine whether this increase reflected actual releases or were data entry errors, we excluded this sector's data for these 2 months and report the number of DACA-related releases from June 2012 to October 2017 as a minimum.

We conducted this performance audit from January 2021 to January 2022 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[11]Within CBP, Border Patrol apprehends individuals at U.S. borders between ports of entry, and the Office of Field Operations encounters individuals who arrive at ports of entry. We included only Border Patrol data in our analysis because CBP's Office of Field Operations officials told us that CBP officers rarely encounter DACA recipients or requestors at U.S. ports of entry and that they do not collect or maintain data specific to DACA in its automated data system.

[12]In September 2017, DHS issued a memorandum rescinding DACA and directing USCIS to stop accepting initial DACA requests. This rescission of DACA was in place until June 2020.

# Background

## Deferred Action for Childhood Arrivals (DACA) Qualification Guidelines

To be considered for an initial grant of DACA, noncitizens must establish through documentation that they

- arrived in the U.S. before age 16;

- were age 30 or younger and had no legal immigration status on June 15, 2012;

- have continuously resided in the U.S. since June 15, 2007, up to the date of filing;[13]

- were physically present in the U.S. on June 15, 2012, and at the time of the DACA request;

- are in school, graduated from school, or have obtained a certificate of completion from high school, or have a discharge under honorable conditions from the military; and

- have not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors and do not otherwise pose a threat to national security or public safety.

To be considered for DACA renewal, recipients must establish through documentation that they

- did not depart the U.S. on or after August 15, 2012, without advance parole;[14]

- have continuously resided in the U.S. since receiving their approval for DACA; and

---

[13]According to the instructions for the DACA request form, any brief, casual, and innocent departures from the U.S. made on or after June 15, 2007, and before August 15, 2012, will not interrupt continuous residence if the absence was not the result of a removal order, the purpose of the absence was not contrary to law, and the duration of the absence was reasonable to accomplish the purpose for the absence.

[14]Advance parole allows an otherwise inadmissible noncitizen to enter the U.S. under certain safeguards and controls without applying for a visa. Generally, USCIS may grant advance parole to DACA recipients for employment, education, or humanitarian (medical, funerals, and visiting family) purposes. Travel outside the U.S. without first receiving advance parole automatically terminates deferred action under DACA.

- have not been convicted of a felony, significant misdemeanor, three or more misdemeanors, and do not otherwise pose a threat to national security or public safety.

According to USCIS officials, USCIS retains the discretion to determine whether deferred action is appropriate in any given case, even if these guidelines are met.

## Prosecutorial Discretion and Immigration Enforcement Priorities

USCIS defines deferred action as a type of prosecutorial discretion that allows an individual to remain in the U.S. for a set period, unless the deferred action is terminated.[15] Prosecutorial discretion is the longstanding authority of an agency to decide where to focus its resources and how to enforce the law against an individual. We have previously reported that, due to limited resources, DHS cannot respond to all immigration violations or remove all individuals who are determined to be in the U.S. without lawful immigration status.[16] Therefore, DHS has exercised prosecutorial discretion in the enforcement of the law. Current and prior administrations have developed various priorities for the enforcement of civil immigration laws, as well as for the exercise of prosecutorial discretion.[17]

## Time Line of DACA Legal Challenges and Key Events

Since the creation of DACA, legal challenges and evolving administration priorities have affected noncitizens' access to DACA. In June 2012, DHS issued a memorandum establishing DACA. In September 2017, DHS issued a memorandum rescinding DACA and directing USCIS to stop

---

[15]Such terminations may result, for example, if an individual no longer qualifies for deferred action or if the exercise of such prosecutorial discretion is no longer consistent with DHS's immigration enforcement priorities.

[16]GAO, *Immigration Enforcement: Arrests, Detentions, and Removals, and Issues Related to Selected Populations*, GAO-20-36 (Washington, D.C.: Dec. 5, 2019).

[17]Civil immigration enforcement actions include administrative arrests, detentions, and removals of noncitizens determined to be in the U.S. without lawful immigration status. In September 2021, DHS finalized the immigration enforcement priorities set forth in Executive Order 13993, *Revision of Civil Immigration Enforcement Policies and Priorities*, 86 Fed. Reg. 7051 (issued Jan. 20, 2021), effective November 29, 2021. The memorandums governing these priorities were partially enjoined in an August 2021 Texas federal district court order, although the implementation of this order was temporarily stayed by the same court. See Texas v. United States, No. 21-CV-00016 (S.D. Tex. Aug. 19, 2021) (memorandum opinion and order). The Fifth Circuit Court of Appeals then granted a partial stay of the district court order on September 15, 2021, keeping the majority of the memorandums in place. See Texas v. United States, No. 21-40618 (5th Cir. Sept. 15, 2021) (order). As of January 2022, litigation related to these memorandums is ongoing.

accepting initial requests, and providing a limited timeframe for accepting renewal requests.[18] This prompted legal challenges resulting in a series of California and New York federal district court rulings throughout 2018 requiring DHS to continue accepting DACA renewal requests, but not initial requests.[19] In June 2020, the Supreme Court held that the September 2017 rescission of DACA was invalid, thereby keeping DACA in place.[20]

In July 2020, DHS directed USCIS to reduce the period of deferred action and related employment authorization from 2 years to 1 year and not to grant advance parole, absent exceptional circumstances. In December 2020, following a New York federal district court ruling that directed DHS to take a number of actions, including posting a public notice that it would be accepting first-time requests for DACA, USCIS resumed accepting initial DACA requests and granting deferred action and related employment authorization for a period of 2 years.[21] In July 2021, following a Texas federal district court ruling, USCIS may accept but no longer approve initial DACA requests and may temporarily continue approving renewals of previously approved requests.[22] Most recently, in September 2021, DHS published a notice of proposed rulemaking for DACA, which

---

[18]The September 2017 memorandum stated that DHS would adjudicate on a case-by-case basis properly filed pending renewal requests accepted as of the date of the memorandum and from current beneficiaries whose benefits would expire between the date of the memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.

[19]See Regents of the Univ. of Cal. v. Dep't of Homeland Security, 279 F. Supp. 3d 1011 (N.D. Cal. Jan. 9, 2018); Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401 (E.D.N.Y. Feb. 8, 2018).

[20]Dep't of Homeland Security v. Regents of the Univ. of Cal, 140 S. Ct. 1891 (2020) (finding that the Department of Homeland Security violated the Administrative Procedure Act in rescinding DACA).

[21]Batalla Vidal v. Wolf, No. 16-CV-04756 (E.D.N.Y. Dec. 4, 2020) (opinion).

[22]Texas v. United States, No. 18-CV-00068 (S.D. Tex. July 16, 2021) (opinion). Among other motions, the government sought a stay of proceedings pending the completion of the proposed rulemaking for DACA, which was denied by the court on October 15, 2021. See Texas v. United States, No. 21-40680 (5th Cir. Oct. 4, 2021 and Oct. 15, 2021) (opposed motion of defendants-appellants to place appeal in abeyance pending completion of rulemaking); (court order). As of January 2022, this litigation was ongoing and on appeal to the Court of Appeals for the Fifth Circuit.

reinforces that DACA recipients should not be a priority for removal.[23] See figure 1 for a time line of key events related to DACA.

**Figure 1: Time Line of Key Deferred Action for Childhood Arrivals (DACA) Legal Challenges and Events**



Source: GAO analysis of White House and DHS policy memorandums.  |  GAO-22-104734

Note: In September 2021, DHS published a notice of proposed rulemaking for DACA, to fortify immigration protections for DACA recipients, which included a 60-day period for public comment. 86 Fed. Reg. 53,736 (Sept. 28, 2021).

[a]The September 2017 memorandum stated that DHS would adjudicate on a case-by-case basis properly filed pending renewal requests accepted as of the date of the memorandum and from current beneficiaries whose benefits would expire between the date of the memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.

[b]Dep't of Homeland Security v. Regents of the Univ. of Cal, 140 S. Ct. 1891 (2020).

[c]See also Batalla Vidal v. Wolf, No. 16-CV-04756 (E.D.N.Y. Dec. 4, 2020) (opinion).

[d]Texas v. United States, No. 18-CV-00068 (S.D. Tex. July 16, 2021) (opinion).

---

[23]86 Fed. Reg. 53,736 (Sept. 28, 2021). The notice of proposed rulemaking provides that, if finalized, the rule would include a number of provisions of the existing DACA policy and longstanding USCIS practice as well as make specific changes such as creating a DACA-specific regulatory provision regarding qualifying for employment authorization for DACA deferred action recipients. See 86 Fed. Reg. at 53,739-40.

## Agency Roles and Responsibilities

**USCIS.** USCIS service centers are responsible for adjudicating DACA requests. USCIS officers at the service centers adjudicate DACA requests by determining whether requestors meet established DACA guidelines. USCIS's Fraud Detection and National Security Directorate (FDNS) is responsible for researching and verifying information related to fraud concerns. Within USCIS's service centers, officers are to refer requests with fraud-related concerns to FDNS's Center Fraud Detection Operations (fraud detection units) for resolution. Also within the service centers, the Background Check Unit is responsible for reviewing and resolving any criminal, national security, or public safety concerns identified by comparing DACA requestors' information against law enforcement databases. USCIS is also generally responsible for issuing notices to appear for cases, including DACA requests, with substantiated findings of immigration fraud.[24]

**ICE.** ICE agents and officers are responsible for identifying, apprehending, detaining, litigating charges of removability against, and removing noncitizens who are in the U.S. in violation of U.S. immigration law. ICE's Homeland Security Investigations is responsible for conducting criminal investigations to prevent unauthorized noncitizens from obtaining fraudulent identity documents and immigration benefits. ICE's Enforcement and Removal Operations conducts civil immigration enforcement actions, which includes administrative arrests, detentions, and removals. In addition to arresting noncitizens for administrative violations of immigration law, it also conducts criminal arrests and assists with prosecutions related to such criminal activity. ICE is also responsible for issuing notices to appear, including those based on public safety and national security concerns related to DACA requestors and recipients. ICE officials stated they may encounter DACA recipients during routine immigration enforcement operations and that noncitizens who are already

---

[24]A notice to appear is a document issued to a noncitizen instructing them to appear before an immigration court on a certain date. DHS is to file the notice to appear with the immigration courts, thereby initiating removal proceedings against the noncitizen. See 8 C.F.R. §§ 208.30(f), 1239.1(a).

in ICE custody may sometimes self-identify as potentially qualified for DACA.[25]

**CBP.** Within CBP, Border Patrol is responsible for securing U.S. borders and apprehending individuals arriving at the border between U.S. ports of entry. Also within CBP, Office of Field Operations is responsible for inspecting travelers and cargo seeking to enter the U.S. through ports of entry and encounters individuals determined to be inadmissible to the country. Regarding DACA, for example, Border Patrol officials may encounter DACA recipients or individuals who may qualify for DACA at interior immigration checkpoints.

## DACA Adjudication Outcomes

Since 2012, USCIS has approved more than 3 million DACA requests and denied nearly 106,000 DACA requests, as shown in figure 2.[26] Of these, more than 800,000 were initial requests, and nearly 2.2 million were requests for renewal.

---

[25]According to USCIS guidance, individuals who believe they qualify for DACA, including those in removal proceedings, with a final removal order, or with a voluntary departure order (and not in immigration detention), may affirmatively request consideration of DACA from USCIS, subject to relevant court orders currently in effect. Individuals who are currently in immigration detention and believe they meet the guidelines may not request consideration of deferred action from USCIS but may identify themselves to their ICE case officer.

[26]A DACA request includes a DACA request form, an employment authorization form, and supporting evidence establishing that the requestor has met the guidelines. Upon receipt of a DACA request, USCIS determines whether DACA requests are complete, accepting complete requests for adjudication and rejecting incomplete requests. Since June 2012, USCIS has accepted for adjudication nearly all requests it received. Specifically, USCIS accepted 3.3 million of 3.5 million (93 percent) requests received through June 2021, including about 1 million initial and 2.5 million renewal requests. Approvals and denials do not total 100 percent, due to pending cases. As of June 2021, about 83,000 initial requests and 84,000 renewal requests were pending.

**Figure 2: Deferred Action for Childhood Arrivals (DACA) Request Adjudication Outcomes, June 2012 through June 2021**



3 million requests approved *(800,000 initial, 2.2 million renewal)*

167,000 pending        106,000 denied

Source: GAO analysis of U.S. Citizenship and Immigration Services (USCIS) information.  |  GAO-22-104734

Notes: Approving or denying a request refers to whether USCIS grants deferred action for the requestor. Pending requests are requests that have been accepted and are awaiting or undergoing adjudication by USCIS. As of June 2021, about 83,000 initial requests and 84,000 renewal requests were pending, according to USCIS data.

Numbers are rounded to the nearest thousand.

While USCIS has historically approved most DACA requests, multiple factors may result in USCIS denying a DACA request. For example, USCIS may deny a DACA request based on indications of criminality or fraud.[27] Criminal offenses associated with DACA denials include nonegregious criminality, such as driving-related offenses, immigration-related offenses, drug-related offenses, theft, and assault, among other offenses, according to a 2019 USCIS report.[28] Egregious public safety offenses include, among other offenses, murder, rape, and sexual abuse of a minor, according to USCIS guidance. USCIS may also deny a DACA request on the basis of administrative reasons, such as the abandonment of a request, multiple failures to appear for an appointment to collect biometric information, or failure to respond to a request for evidence or a notice of intent to deny a request, according to USCIS's standard

---

[27]According to USCIS's standard operating procedures, the decision whether to defer action in a particular case is individualized and discretionary, taking into account the nature and severity of the underlying criminal, national security, or public safety concerns. By their very nature, felonies, significant misdemeanors, a history of other misdemeanors, and activities compromising national security and public safety are particularly serious and carry considerable weight in the totality of the circumstances analysis. As a result, it would take an exceptional circumstance to overcome the underlying criminal, national security, and public safety grounds that would otherwise result in not considering an individual for DACA, which would be rare, according to USCIS's procedures.

[28]U.S. Citizenship and Immigration Services, *DACA Requestors with an IDENT Response* (Washington, D.C.: 2019).

operating procedures.[29] USCIS also may deny a request if it finds a requestor's response to a request for evidence, or notice of intent to deny, is not sufficient to establish that the requestor meets the guidelines for DACA. Table 1 shows the number of initial and renewal requests that USCIS approved and denied from June 2012 through June 2021.

**Table 1: Adjudication Outcomes of Requests for Deferred Action for Childhood Arrivals (DACA), by Fiscal Year, June 2012 through June 2021**

| Fiscal year | Initial requests approved | Renewal requests approved | Total requests approved | Initial requests denied | Renewal requests denied | Total requests denied[a] |
|---|---|---|---|---|---|---|
| June –Sept. 2012 | 1,684 | 0 | **1,684** | 0 | 0 | 0 |
| 2013 | 470,598 | 0 | **470,598** | 11,019 | 0 | **11,019** |
| 2014 | 135,921 | 22,234 | **158,155** | 21,068 | 3 | **21,071** |
| 2015 | 90,827 | 419,502 | **510,329** | 19,088 | 2,351 | **21,439** |
| 2016 | 52,992 | 145,821 | **198,813** | 11,526 | 3,026 | **14,552** |
| 2017 | 47,132 | 414,777 | **461,909** | 9,165 | 4,031 | **13,196** |
| 2018 | 24,381 | 294,960 | **319,341** | 8,248 | 4,287 | **12,535** |
| 2019 | 1,775 | 385,670 | **387,445** | 1,605 | 3,343 | **4,948** |
| 2020 | 1,792 | 292,916 | **294,708** | 716 | 3,285 | **4,001** |
| 2021 (through June) | 5,779 | 217,626 | **223,405** | 982 | 1,923 | **2,905** |
| **Total** | **832,881** | **2,193,506** | **3,026,387** | **83,417** | **22,249** | **105,666** |

Source: U.S. Citizenship and Immigration Services (USCIS). | GAO-22-104734

Note: Since USCIS began approving DACA requests in 2012 and approves DACA for 2 years, renewals did not begin until fiscal year 2014. According to USCIS data, from June 2012 through June 2021, about 176,000 approved DACA requests expired and were not renewed.

[a]USCIS data on denials includes the number of requests that were denied, terminated, or withdrawn. According to USCIS's standard operating procedures, a DACA request may be denied if the requestor does not establish that they qualify for DACA or if they have engaged in disqualifying

[29]After receiving a DACA request, USCIS schedules an appointment to collect the requestor's biometrics, such as fingerprints, a photograph, and a signature. According to USCIS's standard operating procedures, USCIS is not to deny a DACA request solely because the requestor failed to submit sufficient evidence with the request, unless there is sufficient evidence to support a denial. Instead, USCIS is to issue a request for evidence to obtain the information needed to adjudicate the request, or a notice of intent to deny, which provides the requestor an opportunity to rebut derogatory information obtained during a background check or to address reasons for not meeting the guidelines. According to USCIS officials, USCIS may waive biometrics collection under certain circumstances such as when a requestor is unable to attend an appointment in person. In such cases, if biometrics are available, USCIS may use biometrics that were previously collected, according to USCIS officials.

activity, such as having a felony criminal conviction. USCIS may also terminate an individual's previously approved DACA for disqualifying actions committed after the request was approved.

# USCIS Rarely Shares Information on DACA Requestors with Immigration Enforcement Agencies

## USCIS Uses Information from DACA Requestors and Law Enforcement Databases to Adjudicate Requests

USCIS uses information and documentation collected from DACA requestors, along with information contained in various law enforcement databases, to adjudicate requests. According to USCIS's standard operating procedures, DACA requestors are to establish by a preponderance of the evidence that they meet the criteria for deferred action.[30] Under this standard, requestors must demonstrate that it is more likely than not that they meet the qualification guidelines. Adjudication decisions are based on the sufficiency of the evidence provided. For example, to meet the evidence standard for the education criteria, requestors may provide documentation showing that they are currently in school; or have graduated or obtained a certificate of completion from a U.S. high school, college, or university. Further, to demonstrate that they were present in the U.S. on June 15, 2012, requestors may provide employment records (such as pay stubs or tax returns); receipts (such utility bills or rent receipts); school records (such as a transcript or report card); or medical records, according to the standard operating procedures.

In addition, USCIS officers conduct background and security checks against various law enforcement databases, including those owned by immigration enforcement agencies such as CBP and ICE, to determine whether requestors have criminal records that would disqualify them from

---

[30]The "preponderance of the evidence" is an evidentiary legal standard. It is the burden of proof in most civil trials, in which the jury is instructed to find for the party that, on the whole, has the stronger evidence, however slight the edge may be. See Black's Law Dictionary, 11th ed. (2019) (defining "preponderance of the evidence").

being qualified.[31] As part of the adjudication process, USCIS officers may contact law enforcement agencies such as ICE or CBP, for example, to resolve questions related to a DACA requestor who is a positive match to a record in a database. USCIS officials stated that, generally, when their agency contacts ICE or CBP regarding a record match to a DACA requestor, the individual is already known, and USCIS is not disclosing new information. For example, they said that USCIS officers may determine through the background and security check process that a record in a database indicates that a DACA requestor is potentially associated with a criminal gang. USCIS officers may need additional information about the record to adjudicate a DACA request, which ICE may be able to access and provide to the adjudicating officers. In such cases, USCIS officials stated that USCIS would provide ICE or CBP with sufficient biographical information on the DACA requestors to confirm the individuals' identity and obtain the information necessary to continue with adjudication.

In addition, a record in a law enforcement database may indicate that there is an open investigation involving a DACA requestor. In such cases, USCIS officials may reach out to an investigating agency, such as ICE, to ensure that an adjudicative decision on the DACA request would not negatively affect the ongoing investigation, according to USCIS officials. Specifically, USCIS adjudicators may seek information from the investigating agency to determine whether the information is likely to result in the arrest of a requestor or whether investigators have obtained additional derogatory information on the requestor.

## USCIS Has Shared Information with ICE on a Small Number of DACA Requestors for Enforcement Purposes

Since 2012, USCIS has shared information with ICE, for immigration enforcement purposes, on a small number of DACA requestors and recipients who engaged in activities that disqualified them from DACA. In 2012, USCIS published guidance stating that it would not provide information from DACA requests to CBP and ICE for the purpose of

---

[31]These law enforcement databases include CBP's TECS (not an acronym) and the Federal Bureau of Investigation's Integrated Automated Fingerprint Identification System. TECS is an automated enforcement and inspection lookout system maintained by CBP that combines information from multiple agencies and databases to compile data relating to national security risks, public safety issues, current or past targets of investigations, and other law enforcement concerns. The Integrated Automated Fingerprint Identification System provides a summary of an individual's administrative or criminal record within the U.S. For the purposes of this report, we focused on USCIS's coordination and information sharing with immigration enforcement agencies—namely, CBP and ICE.

immigration enforcement, unless the requestor met certain criteria.[32] For example, consistent with DHS's information-sharing policy, USCIS may refer a case to ICE if the requestor represents a potential public safety risk based on the individual's criminal history. The guidance also states that USCIS may share information with national security and law enforcement agencies, such as ICE, for purposes other than removal. This may include for assistance with adjudication, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a crime. However, under these circumstances, USCIS is not to provide information on family members of DACA requestors to ICE for enforcement purposes, according to the guidance.[33]

When USCIS officers encounter derogatory information about a requestor during the adjudication process, they may undertake various actions, depending on the nature of such information. In particular, consistent with USCIS guidance, officers may take action if the DACA request involves (1) confirmed or suspected fraud or (2) criminality that raises concerns that an individual may pose an egregious threat to public safety. In addition, if, after approval, USCIS subsequently determines that DACA recipients no longer meet the guidelines, USCIS may terminate their deferred action.[34] Since 2012, of the 106,000 DACA requests that USCIS

---

[32]Such criteria are outlined in U.S. Citizenship and Immigration Services, *Revised Guidance for the Referral of Cases and Issuance of Notices to Appear in Cases Involving Inadmissible and Removable Aliens* (Nov. 7, 2011). Further, according to DHS policy, information shall be shared within DHS whenever the requesting officer or employee has an authorized purpose for accessing the information for the performance of their duties, possesses the requisite security clearance, and assures adequate safeguarding and protection of the information. Therefore, according to the policy, DHS personnel must have timely access to all relevant information they need to successfully perform their duties while providing appropriate privacy, civil rights, and civil liberties protections.

[33]USCIS includes this information-sharing policy in the DACA request form instructions and in the DACA Frequently Asked Questions section on its website. See https://www.uscis.gov/humanitarian/consideration-of-deferred-action-for-childhood-arrivals-daca/frequently-asked-questions.

[34]Termination reasons may include USCIS determining that a requestor did not meet the qualification guidelines at the time DACA was granted.

denied, USCIS referred fewer than 900 cases (less than 1 percent) to ICE (see fig. 3).[35]

**Figure 3: Outcomes for Deferred Action for Childhood Arrivals (DACA) Requests and Approximate Numbers of Enforcement Actions, June 2012 through June 2021**



3 million requests approved *(800,000 initial, 2.2 million renewal)*

167,000 pending    106,000 denied[a]

Enforcement actions

DACA terminations : 4,661

Notices to appear[b] : 134

Referrals to U.S. Immigration and Customs Enforcement[c] : 900

Source: GAO analysis of USCIS information.   |   GAO-22-104734

Note: DACA-related referrals to U.S. Immigration and Customs Enforcement (ICE) are rounded to the nearest hundred. Other numbers are rounded to the nearest thousand.

[a]According to U.S. Citizenship and Immigration Services' (USCIS) standard operating procedures, requests involving issues of criminality that do not meet guidelines for DACA consideration will be denied. However, USCIS may approve cases where a requestor demonstrates through documentation that an exception is warranted.

[b]A notice to appear is a document issued to a noncitizen instructing them to appear before an immigration court on a certain date. DHS is to file the notice to appear with the immigration courts, thereby initiating removal proceedings against the noncitizen. See 8 C.F.R. §§ 208.30(f), 1239.1(a).

[c]DACA-related referrals to ICE are an estimate. According to USCIS officials, USCIS data systems track whether a referral to ICE has a DACA request form associated with it, even if the subject of the referral is not a DACA requestor. For example, USCIS may refer a case to ICE if an attorney has prepared fraudulent documents in support of multiple DACA requests. In such cases, even though the attorney is the subject of the referral, each of those DACA request forms would be associated with the referral to ICE, and ICE may have access to these requestors information.

**DACA requests involving fraud.** According to USCIS's standard operating procedures, when USCIS finds that an individual requestor committed fraud in connection with a DACA request, adjudicators are to deny the request and may issue the requestor a notice to appear before an immigration court.[36] Common document fraud includes altered or fraudulent documents, such as fraudulent educational credentials,

---

[35]DACA-related referrals to ICE are an estimate. According to USCIS officials, USCIS data systems track whether a referral to ICE has a DACA request form associated with it, even if the subject of the referral is not a DACA requestor. For example, USCIS may refer a case to ICE if an attorney has prepared fraudulent documents in support of multiple DACA requests. In such cases, even though the attorney is the subject of the referral, each of those DACA request forms would be associated with the referral to ICE, and ICE may have access to these requestors information.

[36]USCIS may determine that issuing a notice to appear is not appropriate if the requestor is already in removal proceedings or has already been removed from the U.S., according to USCIS officials.

according to USCIS officials. However, USCIS may also refer certain types of fraud cases to ICE's National Lead Development Center for a possible criminal investigation.[37] In particular, USCIS is to refer cases involving large-scale immigration fraud schemes, corruption involving government officials, or other aggravating circumstances.[38]

When USCIS refers a case to ICE for investigation due to fraud-related concerns, officers are to suspend other action on the DACA request, including adjudication decisions, for a period of at least 60 days while ICE determines how to proceed in response to the referral.[39] ICE may accept or decline USCIS's request for an investigation.[40] If ICE accepts and concludes its investigation with a finding of fraud and determines that the requestor is removable from the U.S., USCIS may initiate removal proceedings by issuing the requestor a notice to appear. If ICE declines a USCIS referral or does not provide a timely response to the referral, USCIS may continue adjudication on the DACA request, or FDNS may conduct further administrative investigation into the fraud concerns.

[37]According to USCIS and ICE officials, USCIS grants a small number of CBP and ICE agents and officers read-only access to its fraud case management system with a need to know this information, based on their daily responsibilities and to assist with fraud investigations. The Fraud Detection and National Security Database is USCIS's primary case management system to record requests and case determinations involving immigration benefit fraud, public safety, and national security concerns. According to USCIS officials, as of May 2021, 37 ICE officers have access to FDNS's database nationally. Three USCIS officers are embedded with ICE at the National Lead Development Center, according to ICE officials. Therefore, ICE personnel at the National Lead Development Center who need additional information about a USCIS referral to ICE typically direct requests to these embedded USCIS officers to obtain the needed information rather than directly accessing FDNS's database, according to USCIS officials. As of May 2021, no CBP personnel had access to this database because they did not have a need for this information, according to USCIS officials.

[38]Criteria for USCIS referring suspected fraud to ICE include a conspiracy or large-scale fraud scheme; corruption of a government employee; particularly egregious cases, such as those involving human trafficking; and cases that otherwise may meet USCIS referral guidelines, such as public safety or national security concerns.

[39]Typically, the National Lead Development Center receives referrals from USCIS and distributes them to ICE Special Agent-in-Charge local offices for further investigation. ICE's Homeland Security Investigations established the National Lead Development Center in August 2017 to streamline and standardize the lead referral process between USCIS and ICE. Prior to August 2017, ICE Benefit Fraud Units were co-located with USCIS's service centers.

[40]According to a 2020 memorandum of understanding between USCIS and ICE, ICE has 60 days to provide a response to a pending referral and 120 days to provide a response for an accepted referral. ICE may also request additional time in writing, if it needs more time to complete an investigation.

USCIS procedures indicate that when such an investigation results in a legally sustainable finding of fraud, USCIS is to deny the DACA request and may issue the requestor a notice to appear if ICE has not already done so.

According to USCIS data, denials due to fraud are not common and, in most cases, according to USCIS officials, denial of a DACA request does not result in USCIS issuing a notice to appear. USCIS issued 134 notices to appear related to DACA from June 2012 through June 2021, all of which USCIS data indicate were for confirmed findings of fraud.[41] Further, the vast majority of these 134 notices to appear were connected to a single, major fraud scheme in fiscal year 2018 associated with a fraudulent document preparer, according to USCIS officials.

**DACA requests involving public safety concerns.** According to USCIS guidance, when USCIS finds indications of criminality in connection with a DACA request, the case is categorized as either an egregious public safety case or a nonegregious public safety case, depending on the type of criminality.[42] For requests that raise egregious public safety concerns, USCIS officers are to refer the case to ICE's National Criminal Analysis and Targeting Center to determine the appropriate course of action.[43] USCIS officers are to suspend adjudication for 60 days but may proceed with adjudication sooner, if ICE provides notification of its action on the case. After ICE completes its review and determines whether to accept or decline the referral for additional investigation, USCIS is to continue adjudicating the DACA request. When appropriate, USCIS is to deny the request on the basis of confirmed criminality constituting an egregious

---

[41]In October 2021, USCIS officials told us that issuances of notices to appear by USCIS for fraud were on hold while USCIS works to align its policy for issuing notices to appear with updated DHS enforcement priorities. In September 2021, DHS issued updated immigration enforcement priorities, which took effect in November 2021.

[42]Examples of egregious public safety threats include murder, rape, sexual abuse of a minor, human or firearms trafficking, and violent crimes that carry a prison term of at least 1 year.

[43]ICE's National Criminal Analysis and Targeting Center, within Enforcement and Removal Operations, is responsible for analyzing data across law enforcement and immigration databases, developing lead and information referrals, and disseminating them to ICE field offices for follow-up enforcement action. ICE field offices use such information to locate and arrest noncitizens who pose a threat to public safety, including gang members, felons, and child predators. For certain public safety cases, including human right violators and known or suspected gang members, USCIS is to refer the case to ICE's National Lead Development Center instead of to Enforcement and Removal Operations.

public safety case, consistent with USCIS's standard operating procedures.[44]

For nonegregious public safety cases, USCIS's Background Check Unit evaluates the potentially disqualifying criminality to determine whether an exception was present that would enable the requestor to overcome the disqualifying factor. For example, where the requestor has been arrested for a potentially disqualifying criminal offense, but the court disposition is not yet available because the criminal proceedings are pending, USCIS officers may request additional information about the criminal proceedings, such as whether the charges were resolved. If the charges were resolved, USCIS officers are to evaluate the case based on the totality of the circumstances. If the charges were not resolved and are not expected to be resolved quickly, USCIS is to deny the request, according to USCIS officials. According to USCIS officials, USCIS does not refer nonegregious public safety cases to ICE that involve DACA requests.

Figure 4 outlines the DACA adjudication process and possible USCIS actions for cases involving public safety and fraud concerns.

---

[44]According to USCIS's standard operating procedures, requests involving issues of criminality that normally would not meet the guidelines for consideration of deferred action will be denied, unless the requestor is claiming that consideration is warranted due to exceptional circumstances and fully documents such claim. USCIS headquarters must review and concur with such an exception.

**Figure 4: U.S. Citizenship and Immigration Services (USCIS) Referrals to U.S. Immigration and Customs Enforcement (ICE) Involving Deferred Action for Childhood Arrivals (DACA) Requests**

Source: GAO analysis of USCIS documentation.  |  GAO-22-104734

[a]When USCIS refers a case to ICE for investigation due to fraud-related concerns, officers are to suspend action while ICE determines how to proceed. USCIS may continue with adjudication or conduct further investigation, if ICE declines the referral or does not provide a response within 60 days for a pending referral or 120 days for an accepted referral. ICE may also request additional time, if it needs more time to complete an investigation.

[b]If ICE declines a fraud-related referral from USCIS, USCIS may continue its administrative investigation to determine if a notice to appear is warranted. Generally, only DACA denials due to fraud result in USCIS issuing a notice to appear, according to USCIS officials.

[c]USCIS officers are to suspend adjudication for 60 days but may proceed with adjudication sooner, if ICE provides notification of its action on the case.

**DACA terminations.** USCIS may terminate DACA for recipients who no longer meet qualification guidelines, such as by traveling outside the U.S. without advance parole or engaging in disqualifying criminal activity, according to USCIS guidance.[45] Such activity may include terrorism; espionage; felony convictions; multiple misdemeanors; or a serious misdemeanor conviction, such as drug trafficking. For disqualifying criminal offenses or public safety concerns that arise after USCIS has granted DACA, USCIS is to refer the case to ICE. If ICE accepts the case and issues a notice to appear, USCIS is to terminate the recipient's DACA, which also results in the termination of their employment authorization.[46] If ICE does not accept the case, USCIS is to issue a notice of intent to terminate, which begins the termination process while giving the DACA recipient a chance to contest the termination.[47] Similarly, if it comes to USCIS's attention that a DACA recipient committed fraud in seeking DACA, USCIS is to issue a notice of intent to terminate. From June 2012 through June 2021, USCIS terminated nearly 4,700 DACA requests from individuals to whom it previously had granted deferred action.

Overall, referrals to ICE involving DACA requestors have been rare. In general, ICE officials explained that USCIS has referred a small number of cases to ICE because most do not meet ICE's acceptance criteria. Specifically, the officials said that ICE does not have the resources to investigate every referral and that its criteria for accepting referrals prioritize high-impact, complex, large-scale criminal cases, often involving large international or criminal organizations. ICE officials stated that ICE typically does not accept referrals involving a single person, unless there are aggravating factors. Such factors could include a person who poses an egregious public safety threat, such as a war criminal or a sex offender, or who has abused a position of public trust. USCIS and ICE

---

[45]Termination reasons may also include USCIS determining that a requestor did not meet the guidelines at the time DACA was granted.

[46]Issuance of a notice to appear by CBP also terminates an individual's deferred action.

[47]A February 2018 court ruling in *Inland Empire – Immigration Youth Collective v. Nielsen* certified a class of certain DACA recipients, who, after January 19, 2017, have had or will have their DACA grant and employment terminated without notice or an opportunity to respond, with certain exceptions. See Inland Empire v. Nielsen, No. 17-CV-2048 (C.D. Cal. Feb. 26, 2018). This decision further held that, for class members, USCIS cannot treat DACA and DACA-related work authorizations as automatically terminated based on notice to appear issuance and further cannot terminate either DACA or DACA-related work authorization without providing advance notice and an opportunity to respond, and a reasoned explanation.

officials explained that, due to their limited resources, they generally seek to resolve lower-level fraud cases with an administrative action, such as USCIS denying the DACA request. Of the approximately 900 referrals to ICE from June 2012 through June 2021, USCIS data indicate that about 820 involved public safety concerns, and about 80 involved fraud.

# DACA Recipients Have Not Been an Enforcement Priority, and CBP and ICE Practices for Those Potentially Qualified Have Aligned with DHS Priorities

## DHS Has Not Considered DACA Recipients to Be an Immigration Enforcement Priority

DHS has generally not considered DACA recipients to be immigration enforcement priorities unless they met certain criteria, such as having engaged in certain types of fraud or activities that posed a threat to national security or public safety, as previously discussed. The specific criteria that constitute DHS's immigration enforcement priorities have varied throughout the period DACA has been in effect (see table 2). From DACA's inception in 2012 to 2017, DHS policy prioritized immigration enforcement for suspected terrorists, national security threats, and individuals charged with or convicted of certain crimes for removal from the U.S. In 2017, Executive Order 13768 instructed DHS to ensure that U.S. immigration law was enforced against all removable individuals without exempting classes or categories. In accordance with this executive order and DHS implementing memorandums, although noncitizens with criminal histories were prioritized for enforcement action, the department was authorized to take action against any removable noncitizen encountered during operations. In January 2021, Executive Order 13993 revoked Executive Order 13768, and DHS issued interim civil immigration enforcement guidelines setting forth enforcement

priorities similar to those that were in effect from 2011 to 2017.[48] On September 30, 2021, DHS finalized its *Guidelines for the Enforcement of Civil Immigration Law*, which took effect on November 29, 2021.

**Table 2: Department of Homeland Security (DHS) Immigration Enforcement Priorities from March 2011 through September 2021**

| Date | Implementing program or order | Immigration enforcement priorities |
|---|---|---|
| Mar. 2, 2011– Jan. 5, 2015 | Civil Immigration Enforcement Priorities[a] | Civil Immigration Enforcement Priorities prioritized noncitizens for removal who posed a danger to national security or a risk to public safety over individuals who obstructed immigration controls. |
| | | • Priority one (highest priority) focused on noncitizens who pose a danger to national security or public safety, such as those who are engaged in, or suspected of, terrorism or convicted of violent crimes. |
| | | • Priority two consisted of recent unlawful entrants. |
| | | • Priority three (lowest priority) consisted of fugitive noncitizens, such as those who fail to follow an order to depart. |
| Jan. 5, 2015 – Feb. 20, 2017 | Priority Enforcement Program[b] | • Priority one (the highest priority) focused on threats to national security, border security, and public safety, directing DHS to prioritize the apprehension, detention, and removal of noncitizens who engaged in or were suspected of terrorism or espionage, or who otherwise posed a threat to national security; as well as noncitizens apprehended while attempting to unlawfully enter the United States, and noncitizens with certain serious criminal convictions (such as felonies). |
| | | • Priority two focused on misdemeanor crimes and new immigration violators, including noncitizens with three or more prior misdemeanor convictions (or a significant misdemeanor, such as domestic violence or drug trafficking) and those who were apprehended after unlawful entry or who have abused the visa or visa waiver programs. |
| | | • Priority three (the lowest priority) focused on other immigration violations that did not fall under the first two priorities. |

[48]See Executive Order 13993, *Revision of Civil Immigration Enforcement Policies and Priorities*, 86 Fed. Reg. 7051 (issued Jan. 20, 2021); and DHS, *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* (January 20, 2021). DHS characterized these enforcement guidelines as "interim" while it finalized its new enforcement priorities. The memorandums outlining these priorities were partially enjoined in an August 2021 Texas federal district court order, although the implementation of this order was temporarily stayed by the same court. See Texas v. United States, No. 21-CV-00016 (S.D. Tex. Aug. 19, 2021) (memorandum opinion and order). The Fifth Circuit Court of Appeals then granted a partial stay of the district court order on September 15, 2021, keeping the majority of the memorandums in place. See Texas v. United States, No. 21-40618 (5th Cir. Sept. 15, 2021). As of January 2022, litigation related to these memorandums is ongoing.

| Date | Implementing program or order | Immigration enforcement priorities |
|------|-------------------------------|-----------------------------------|
| Feb. 20, 2017 – Jan. 20, 2021 | Executive Order 13768c | Executive Order 13768 articulated broad enforcement priorities with equal consideration of potential enforcement for all classes and categories of removable individuals. It also terminated the Priority Enforcement Program and reinstated Secure Communities, allowing U.S. Immigration and Customs Enforcement to issue detainers for removable individuals charged with criminal offenses who had not yet been convicted and for individuals subject to a final order of removal whether or not they had a criminal history. |
| Issued Sept. 30, 2021 | Guidelines for the Enforcement of Civil Immigration Lawd | Guidelines for the Enforcement of Civil Immigration Law prioritizes noncitizens for removal who pose threats to national security, public safety, and border security—specifically<br><br>• threats to national security, such as noncitizens who have engaged in terrorism or espionage;<br><br>• threats to public safety, such as noncitizens involved in serious criminal conduct; and<br><br>• threats to border security, such as noncitizens apprehended at a border or port of entry while attempting to unlawfully enter the U.S. or apprehended in the U.S. after unlawfully entering after November 1, 2020. |

Source: DHS documentation. | GAO-22-104734

aU.S. Immigration and Customs Enforcement, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011).

bThe Secretary of Homeland Security established the Priority Enforcement Program in a November 2014 memorandum and it went into effect on January 5, 2015. See Department of Homeland Security, Secure Communities (Nov. 20, 2014).

cExecutive Order No. 13768, §§ 5, 7, 8, 9, 82 Fed. Reg. at 8800-8801 (issued Jan. 25, 2017). The Secretary of Homeland Security subsequently issued a memorandum establishing policy and providing guidance related to Executive Order 13768. See Department of Homeland Security, Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017).

dDepartment of Homeland Security, Guidelines for the Enforcement of Civil Immigration Law (Sept. 30, 2021). These guidelines took effect on November 29, 2021. Before issuing these immigration enforcement priorities, DHS issued similar interim civil immigration enforcement priorities on January 20, 2021 (see Department of Homeland Security, Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities (Jan. 20, 2021).

## CBP and ICE Enforcement Practices for DACA Recipients and Potentially Qualified Individuals Have Aligned with DHS Immigration Enforcement Priorities

Since 2012, CBP and ICE enforcement practices related to DACA recipients and individuals who might qualify for DACA have generally aligned with DHS's immigration enforcement priorities. Specifically, CBP and ICE issued policy memorandums implementing changes in their respective enforcement practices, which included guidance on how each component was to implement the priorities. Under each set of immigration enforcement priorities, agency guidance generally directed agents and officers to release DACA recipients they encountered, once they verified that the individual was approved for DACA. However, under this guidance, CBP and ICE retained the discretion to take an appropriate enforcement action against DACA recipients if there was derogatory

information or evidence of criminal activity that would make them an enforcement priority. For example, felony convictions or serious misdemeanors, such as drug trafficking or domestic violence, would likely result in a termination of DACA. CBP and ICE officials stated that they would likely release a DACA recipient whom they encountered in the case of a lower-priority offense, such as a traffic violation, if the individual did not present a threat to public safety, consistent with long-standing agency practice.

According to DHS officials, to verify whether an individual has DACA, CBP and ICE agents and officers may examine the recipients' documentation, such as their employment authorization documents, or they may access USCIS data systems to confirm the status of any requests the individual has filed.[49] These may include a pending DACA request awaiting adjudication, an approval or denial of the request, or a termination of a previously approved request. In particular, CBP and ICE agents and officers may obtain read-only access to a USCIS data system that aggregates an individual's immigration history from multiple immigration-related data systems, including USCIS's case management system for adjudicating DACA requests.[50]

While DACA recipients are to be provided temporary protection from removal, individuals who might qualify to receive DACA but who have not yet submitted a request or are awaiting approval do not have such protection. However, officials stated that they have generally extended prosecutorial discretion considerations to those who may have potentially qualified for DACA as long as they had not committed a removable

---

[49]To protect DACA requestors' personal information from unauthorized use, USCIS has implemented multiple safeguards on the access and use of this information. Specifically, CBP and ICE users must request access to USCIS systems. Such requests are reviewed by supervisors and must be renewed on a recurring basis. According to USCIS officials, each approved user is then granted a specific access level, based on their role and need to know specific information to perform their duties. Officials said that USCIS also monitors the activities of non-USCIS users of its data systems to determine when to revoke access for inactive users and to detect unauthorized use of the information.

[50]USCIS uses several data systems to store immigration-related information. The Person Centric Query System is a read-only data application that pulls information from multiple other systems—including the Computer Linked Application Information Management System and the Electronic Immigration Information System —to provide a single, consolidated history of a noncitizen's immigration interactions with the Department of Homeland Security. The Computer Linked Application Information Management System stores casework documentation for several types of immigration benefit requests. The Electronic Immigration Information System is a case management system used for processing benefit request forms and adjudicating immigration benefits, including DACA.

offense that would disqualify them from a favorable exercise of such discretion, in accordance with existing immigration enforcement priorities.

**CBP practices.** According to Border Patrol officials, agents encountering DACA recipients at interior immigration checkpoints who have not committed any criminal offenses are not to take them into custody or enter them into removal proceedings. However, consistent with policy, Border Patrol agents are to apprehend and refer to ICE for removal a DACA recipient who is allegedly involved in human smuggling or smuggling drugs through an immigration checkpoint, according to Border Patrol officials. CBP's Office of Field Operations officials stated that Office of Field Operations officers rarely encounter DACA recipients, and that such encounters may involve a DACA recipient attempting to reenter the U.S. at a port of entry without having obtained advance parole. For DACA recipients who have engaged in these types of disqualifying activities, Border Patrol agents and Office of Field Operations officers are to issue a notice to appear and transfer the individual to ICE custody, as appropriate.

From June 2012 through October 2017, according to Border Patrol officials, agents were to exercise prosecutorial discretion when encountering individuals who were potentially qualified for DACA by collecting information to determine whether apprehended individuals met USCIS's DACA qualification guidelines. Border Patrol officials said that in accordance with DHS immigration priorities and prosecutorial discretion policies, agents were directed to release individuals from custody who met the qualification guidelines and instruct them to contact USCIS to apply for DACA. During this period, Border Patrol data indicate that agents apprehended and subsequently released at least 800 individuals who might have potentially qualified for DACA, mostly along the southern border, as an exercise of prosecutorial discretion.[51]

After DHS temporarily rescinded DACA in September 2017, Border Patrol no longer extended prosecutorial discretion considerations to such individuals, according to Border Patrol officials. Rather, Border Patrol processed these individuals as a standard apprehension or arrest and issued them a notice to appear, as appropriate, thereby entering them

---

[51]According to Border Patrol's data, there was a significant increase in DACA-related releases over a 2-month period in one sector. Because Border Patrol officials could not determine whether this increase reflected actual releases or were data entry errors, we excluded this sector's data for these 2 months and report the number of DACA-related releases from June 2012 to October 2017 as a minimum.

into removal proceedings. Specifically, Border Patrol policy stated that individuals who may have previously qualified for DACA but did not have a DACA request on file with DHS as of September 6, 2017, should be processed according to normal procedures. Officials stated that CBP implemented this policy because USCIS was no longer accepting new DACA requests. However, agents were directed to continue releasing verified DACA recipients, per existing prosecutorial discretion policy.[52] In January 2021, DHS rescinded the policy, and in September 2021, it issued *Guidelines for the Enforcement of Civil Immigration Law*, which took effect in late November 2021, as previously noted.

**ICE practices.** According to ICE officials, beginning with DACA's inception in 2012, encounters with DACA recipients and individuals who may have potentially qualified for DACA were initially governed by a 2011 ICE memorandum on exercising prosecutorial discretion. This memorandum stated that when weighing whether an exercise of prosecutorial discretion may be warranted, ICE agents and officers were to consider all relevant factors, including the agency's civil immigration enforcement priorities; the individual's length of presence in the U.S.; and the circumstances of their arrival, particularly if the individual came to the U.S. as a young child. Moreover, although this memorandum predated DACA, it specifically instructed ICE officers and agents to consider exercising prosecutorial discretion for individuals who were present in the U.S. since childhood.[53] For example, ICE's Homeland Security Investigations agents who encountered DACA recipients with approved work authorization documents during worksite enforcement operations were not to take an enforcement action against the DACA recipient, according to ICE Homeland Security Investigations officials.[54] Likewise, ICE Enforcement and Removal Operations agents taking custody of individuals apprehended by Border Patrol were to release them upon verification of their approved DACA, according to officials. Consistent with policy, ICE officials stated that agents may arrest and initiate removal

---

[52]U.S. Customs and Border Protection, *Guidance on the Acting Secretary's Rescission of the Memorandum of June 15, 2012, Establishing DACA* (Sept. 6, 2017).

[53]U.S. Immigration and Customs Enforcement, *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* (June 17, 2011).

[54]ICE's Homeland Security Investigations conducts worksite enforcement operations, which include the criminal arrest of employers and the administrative arrest of unauthorized workers.

proceedings for any DACA recipients found to have committed removable offenses—such as drug trafficking—after being approved for DACA.

Since 2012, ICE agents have used a checklist to determine whether encountered individuals potentially met USCIS's DACA qualification guidelines, according to ICE officials. The checklist notes that anyone who might qualify for DACA should not be removed or issued a notice to appear. Officials stated that individuals who meet the qualification guidelines outlined in the checklist and who have not committed an offense that would disqualify them from a favorable exercise of prosecutorial discretion have generally been released from ICE custody and advised to contact USCIS for instructions about initiating a DACA request. From November 2014 through November 2019, ICE data indicate that ICE detained and subsequently released approximately 270 individuals who were either DACA recipients or who might have qualified for DACA.[55]

In 2017, Executive Order 13768 directed DHS to ensure that U.S. immigration law was enforced against all removal individuals without exempting classes or categories. In addition, the 2017 DHS and ICE memorandums that implemented this executive order stated that ICE was to revise or rescind any policies that conflicted with the executive order. However, the 2012 DACA memorandum was exempted from this effort and remained in effect, without modification. After DHS temporarily rescinded DACA in September 2017, ICE also temporarily suspended its practice of extending prosecutorial discretion considerations to individuals who may have potentially qualified for DACA, according to ICE officials. In addition, following the December 2020 reinstatement of DACA for initial requests,[56] ICE resumed its practice of extending prosecutorial discretion considerations to those who may have potentially qualified for DACA, as long as they had not committed a removable offense that would disqualify them from a favorable exercise of such discretion. Further, DHS's September 2021 *Guidelines for the Enforcement of Civil Immigration Law*, which took effect in late November 2021, set forth enforcement priorities similar to those that were in effect from 2011 to 2017.

---

[55]ICE's Enforcement and Removal Operations began tracking DACA releases in its system in November 2014. DACA was removed from this system as a release reason in 2019, according to ICE officials. ICE data do not distinguish between DACA recipients and those who might have qualified for DACA.

[56]See Batalla Vidal v. Wolf, No. 16-CV-04756 (E.D.N.Y. Dec. 4, 2020) (opinion).

## Agency Comments

We provided a draft of this report to DHS for review and comment. The department did not provide formal written comments, but did provide technical comments on the draft, which we incorporated as appropriate.

We are sending copies of this report to the appropriate congressional committees, the Secretary of Homeland Security, and other interested parties. In addition, the report is available at no charge on the GAO website at https://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-8777 or gamblerr@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix I.

Rebecca S. Gambler
Director, Homeland Security and Justice

# Appendix I: GAO Contact and Staff Acknowledgments

## GAO Contact

Rebecca Gambler, (202) 512-8777, gamblerr@gao.gov

## Staff Acknowledgments

In addition to the contact name above, Kathryn Bernet (Assistant Director), Carissa Bryant (Analyst-in-Charge), Benjamin Crossley, Michele Fejfar, Daniel Kuhn, Ben Nelson, Heidi Nielson, and Kevin Reeves made key contributions to this report.

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. |
| | Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. |
| | Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact FraudNet: Website: https://www.gao.gov/about/what-gao-does/fraudnet Automated answering system: (800) 424-5454 or (202) 512-7700 |
| Congressional Relations | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| Strategic Planning and External Liaison | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.



## Briefing Room

Your Weekly Address

**Speeches & Remarks**

Press Briefings

Statement_ & Relea_e_

White House Schedule

Presidential Actions

    Executive Orders

    Pre_idential Memoranda

    Proclamations

Legislation

    Pending Legislation

    Signed Legi_lation

    Vetoed Legislation

Nominations & Appointments

Disclosures

**The White House**

Office of the Press Secretary

For Immediate Release                                June 15, 2012

# Remarks by the President on Immigration

Rose Garden

2:09 P.M. EDT

AR2022_401445

7/11/22, 10:13 AM
Case 1:18-cv-00068   Document 610-3   Filed on 11/04/22 in TXSD   Page 155 of 310
Remarks by the President on Immigration | whitehouse.gov

THE PRESIDENT:  Good afternoon, everybody.  This morning, Secretary Napolitano announced new actions my administration will take to mend our nation's immigration policy, to make it more fair, more efficient, and more just -- specifically for certain young people sometimes called "Dreamers."

These are young people who study in our schools, they play in our neighborhoods, they're friends with our kids, they pledge allegiance to our flag.  They are Americans in their heart, in their minds, in every single way but one:  on paper.  They were brought to this country by their parents -- sometimes even as infants -- and often have no idea that they're undocumented until they apply for a job or a driver's license, or a college scholarship.

Put yourself in their shoes.  Imagine you've done everything right your entire life -- studied hard, worked hard, maybe even graduated at the top of your class -- only to suddenly face the threat of deportation to a country that you know nothing about, with a language that you may not even speak.

That's what gave rise to the DREAM Act.  It says that if your parents brought you here as a child, if you've been here for five years, and you're willing to go to college or serve in our military, you can one day earn your citizenship.  And I have said time and time and time again to Congress that, send me the DREAM Act, put it on my desk, and I will sign it right away.

Now, both parties wrote this legislation.  And a year and a half ago, Democrats passed the DREAM Act in the House, but Republicans walked away from it.  It got 55 votes in the Senate, but Republicans blocked it.  The bill hasn't really changed.  The need hasn't changed.  It's still the right thing to do.  The only thing that has changed, apparently, was the politics.

As I said in my speech on the economy yesterday, it makes no sense to expel talented young people, who, for all intents and purposes, are Americans -- they've been raised as Americans; understand themselves to be part of this country -- to expel these young people who want to staff our labs, or start new businesses, or defend our country simply because of the actions of their parents -- or because of the inaction of politicians.

In the absence of any immigration action from Congress to fix our broken immigration system, what we've tried to do is focus our immigration enforcement resources in the right places.  So we prioritized border security, putting more boots on the southern border than at any time in our history -- today, there are fewer illegal crossings than at any time in the past 40 years.  We focused and used discretion about whom to prosecute, focusing on criminals who endanger our communities rather than students who are earning their education.  And today, deportation of criminals is up 80 percent.  We've improved on that discretion carefully and thoughtfully.  Well, today, we're improving it again.

AR2022_401446

Case 1:18-cv-00068   Document 610-3   Filed on 11/04/22 in TXSD   Page 156 of 310

Effective immediately, the Department of Homeland Security is taking steps to lift the shadow of deportation from these young people.  Over the next few months, eligible individuals who do not present a risk to national security or public safety will be able to request temporary relief from deportation proceedings and apply for work authorization.

Now, let's be clear -- this is not amnesty, this is not immunity.  This is not a path to citizenship.  It's not a permanent fix.  This is a temporary stopgap measure that lets us focus our resources wisely while giving a degree of relief and hope to talented, driven, patriotic young people.  It is --

Q   (Inaudible.)

THE PRESIDENT:  -- the right thing to do.

Q   -- foreigners over American workers.

THE PRESIDENT:  Excuse me, sir.  It's not time for questions, sir.

Q   No, you have to take questions.

THE PRESIDENT:  Not while I'm speaking.

Precisely because this is temporary, Congress needs to act.  There is still time for Congress to pass the DREAM Act this year, because these kids deserve to plan their lives in more than two-year increments.  And we still need to pass comprehensive immigration reform that addresses our 21st century economic and security needs -- reform that gives our farmers and ranchers certainty about the workers that they'll have.  Reform that gives our science and technology sectors certainty that the young people who come here to earn their PhDs won't be forced to leave and start new businesses in other countries.  Reform that continues to improve our border security, and lives up to our heritage as a nation of laws and a nation of immigrants.

Just six years ago, the unlikely trio of John McCain, Ted Kennedy and President Bush came together to champion this kind of reform.  And I was proud to join 23 Republicans in voting for it.  So there's no reason that we can't come together and get this done.

And as long as I'm President, I will not give up on this issue, not only because it's the right thing to do for our economy -- and CEOs agree with me -- not just because it's the right thing to do for our security, but because it's the right thing to do, period.  And I believe that, eventually, enough Republicans in Congress will come around to that view as well.

And I believe that it's the right thing to do because I've been with groups of young people who work so hard and speak with so much heart about what's best in America, even though I knew some of them must have lived under the fear of deportation.  I know some have come

AR2022_401447

forward, at great risks to themselves and their futures, in hopes it would spur the rest of us to live up to our own most cherished values.  And I've seen the stories of Americans in schools and churches and communities across the country who stood up for them and rallied behind them, and pushed us to give them a better path and freedom from fear --because we are a better nation than one that expels innocent young kids.

And the answer to your question, sir -- and the next time I'd prefer you let me finish my statements before you ask that question -- is this is the right thing to do for the American people --

Q    (Inaudible.)

THE PRESIDENT:  I didn't ask for an argument.  I'm answering your question.

Q    I'd like to --

THE PRESIDENT:  It is the right thing to do --

Q    (Inaudible.)

THE PRESIDENT:  -- for the American people.  And here's why --

Q    -- unemployment --

THE PRESIDENT:  Here's the reason:  because these young people are going to make extraordinary contributions, and are already making contributions to our society.

I've got a young person who is serving in our military, protecting us and our freedom.  The notion that in some ways we would treat them as expendable makes no sense.  If there is a young person here who has grown up here and wants to contribute to this society, wants to maybe start a business that will create jobs for other folks who are looking for work, that's the right thing to do.  Giving certainty to our farmers and our ranchers; making sure that in addition to border security, we're creating a comprehensive framework for legal immigration -- these are all the right things to do.

We have always drawn strength from being a nation of immigrants, as well as a nation of laws, and that's going to continue.  And my hope is that Congress recognizes that and gets behind this effort.

All right.  Thank you very much.

Q    What about American workers who are unemployed while you import foreigners?

END
2:17 P.M. EDT

**AR2022_401448**



AR2022_401449

# NATIONAL

# CONTROL

**THE WHITE HOUSE**
**EXECUTIVE OFFICE OF THE**
**OFFICE OF NATIONAL DRUG**



AR2022_401450



# Table of Contents

Glossary ................................................................................................................ 1

To the Congress of the United States................................................................... 5

Preface from Dr. Gupta, Director ........................................................................ 6

Introduction: Saving Lives is Our North Star .................................................... 8

Prevention and Early Intervention ..................................................................... 17

Harm Reduction .................................................................................................. 30

Substance Use Disorder Treatment..................................................................... 45

Building a Recovery-Ready Nation ..................................................................... 60

Reduce the Supply of Illicit Substances through Domestic Collaboration................... 76

Reduce the Supply of Illicit Substances through International Engagement............... 85

Criminal Justice and Public Safety ..................................................................... 98

Data Systems and Research ................................................................................. 106

Appendix A—Developing a Data Plan................................................................ 123

Works Cited ......................................................................................................... 126



# Glossary

AAMC: American Association of Medical Colleges

ACEs: Adverse Childhood Experiences

ACF: Administration for Children and Families

ADAM: Arrestee Drug Abuse Monitoring

AML: Anti-Money Laundering

APG: Alternative Peer Group

ARTS: Addiction and Recovery Treatment Services

ASPE: Assistant Secretary on Planning and Evaluation

BIPOC: Black, Indigenous, and People of Color

BJA: Bureau of Justice Assistance

BOP: Federal Bureau of Prisons

BSA: Bank Secrecy Act

CADCA: Community Anti-Drug Coalitions of America

CBP: United States Customs and Border Protection

CCDB: Consolidated Counterdrug Database

CDC: Centers for Disease Control and Prevention

CDEWS: Community Drug Early Warning System

CICAD: Organization of American States Inter-American Drug Abuse Control Commission

CMS: Centers for Medicare & Medicaid Services

CoP: Community of Practice

CRP: Collegiate Recovery Program

DAWN: Drug Abuse Warning Network

DEA: Drug Enforcement Administration

DFC: Drug-Free Communities

DHS: United States Department of Homeland Security

DIO: Drug Intelligence Officer

DOD: United States Department of Defense

DOI: United States Department of the Interior

DOJ: United States Department of Justice

AR2022_401452


DOL: United States Department of Labor

DOS: Department of State

DOT: United States Department of Transportation

EBPRC: Evidence-Based Practices Resource Center

EBT: evidence-based treatment

ED: United States Department of Education

EDR: electronic death registration

EDWG: Equitable Data Working Group

EMCDDA: European Monitoring Centre of Drugs and Drug Addiction

EMS: Emergency Medical Services

EPA: United States Environmental Protection Agency

FDA: Food and Drug Administration

FTS: fentanyl test strips

HHS: United States Department of Health and Human Services

HIDTA: High Intensity Drug Trafficking Area

HRSA: Health Resources and Services Administration

HUD: U.S. Department of Housing & Urban Development

ICD: International Classification of Diseases

IHS: Indian Health Service

INCB: International Narcotics Control Board

INL: Bureau of International Narcotics and Law Enforcement Affairs

IRS: Internal Revenue Service

LGBTQ: lesbian, gay, bisexual, transgender, queer

ME/C: medical examiner or coroner

MEXK-54: Monitoring System of Illicit Crops in Mexico Program

MOUD: medications for opioid use disorder

N-SSATS: National Survey of Substance Abuse Treatment Services

NADCP: National Association of Drug Court Professionals

NADD: North America Drug Dialogue

NARR: National Alliance for Recovery Residences

NASADAD: National Association of Alcohol and Drug Abuse Directors


NCHS: National Center for Health Statistics

NDCI: National Drug Court Institute

NIAAA: National Institute on Alcohol Abuse and Alcoholism [1]

NIC: National Institute of Corrections

NIDA: National Institute on Drug Abuse[1]

NIH: National Institutes of Health

NIJ: National Institute of Justice

NIOSH: National Institute on Occupational Safety and Health

NPS: U.S. National Park Service

NRC: National Research Council

NREPP: National Registry of Evidence-based Programs and Practices

NRO: National Reconnaissance Office

NSDUH: National Survey on Drug Use and Health

NSS: National Seizure System

NTBI: National Prescription Drug Take Back Initiative

NHTSA: National Highway Traffic Safety Administration

OCDETF: Organized Crime Drug Enforcement Task Forces

ODMAP: Overdose Map Detection Program

OIG: Office of Inspector General

OJJDP: Office of Juvenile Justice and Delinquency Prevention

OJP: Office of Justice Programs

ONDCP: Office of National Drug Control Policy

ORS: Overdose Response Strategy

OTP: opioid treatment program

OUD: opioid use disorder

PHA: Public Health Analyst

PRC: People's Republic of China

PRSS: peer recovery support services

---

[1] The FY2023 Budget proposes to change the name of the National Institute on Alcohol Abuse and Alcoholism to the National Institute on Alcohol Effects and Alcohol-Associated Disorders, the name of the National Institute on Drug Abuse to the National Institute on Drugs and Addiction, and the name of the Substance Abuse and Mental Health Services Administration to the Substance use And Mental Health Services Administration.


PWUD: people who use drugs

RCC: recovery community center

RCO: recovery community organization

SAMHSA: Substance Abuse and Mental Health Services Administration[1]

SAPs: Student Assistance Programs

SAPT: Substance Abuse Prevention and Treatment

SBHCs: school-based health centers

SCM: specialized case management

SDOH: Social determinants of health

SSP: Syringe Services Program

SUD: Substance Use Disorder

TCO: Transnational Criminal Organization

TEDS: Treatment Episode Data Set

TTHY: Talk. They Hear You.

UCR: Uniform Crime Reporting/ Uniform Crime Reports

UNODC: United Nations Office of Drugs and Crime

USAID: United States Agency for International Development

USDA: United States Department of Agriculture

USFS: United States Forest Service

USFWS: United States Fish and Wildlife Service

USPIS: United States Postal Inspection Service

USSC: United States Sentencing Commission

VA: United States Department of Veterans Affairs

VHA: Veterans Health Administration

WBE: wastewater-based epidemiology

WONDER: Wide-ranging Online Data for Epidemiologic Research

YRBS: Youth Risk Behavior Survey



# To the Congress of the United States:

I am pleased to transmit the 2022 *National Drug Control Strategy*. This inaugural *Strategy* proposes bold, targeted, and consequential actions to bend the curve on overdose deaths in the immediate term and reduce drug use and its damaging consequences over the longer term. These actions are based on the best science, evidence, and data available.  Through them, we strive to usher in a new era of drug policy centered on individuals and communities.

This *Strategy* is the product of a rigorous process led by the Office of National Drug Control Policy in close collaboration with the 18 National Drug Control Agencies. In developing this *Strategy*, my Administration sought the input of more than 2,000 leaders and stakeholders including the entirety of the Congress; all 50 Governors; and advocates representing public safety, public health, community groups, local governments, and Tribal communities.

In my State of the Union Address, I identified addressing the opioid epidemic as part of a unity agenda for the Nation – something that could bring Americans together in service of a goal we all share. As this *Strategy* lays out, there is so much more we can do to expand access to evidence-based prevention, harm reduction, treatment, and recovery services, while also working to reduce the supply of harmful drugs in our communities.

I look forward to working with the Congress as well as State, local, and Tribal leaders as we implement this *Strategy*. Together, we can create safer and healthier communities for everyone.

President Joseph R. Biden

The White House



# Preface from Dr. Gupta, Director

The overdose epidemic affects all Americans, and in his first State of the Union, President Biden called on all Americans to work together to address it as part of a unity agenda for the Nation. As the President said, "Let's beat the opioid epidemic."

This call to action comes at a critical moment. For the first time in our Nation's history we have passed the tragic milestone of 100,000 deaths resulting from drug overdoses in a 12-month period. Since 1999, drug overdoses have killed approximately 1 million Americans. These are sons and daughters, parents and grandparents, neighbors and friends, and classmates and coworkers. This level of loss is heartbreaking and frankly, unacceptable. As we continue to lose an American life to drug overdose every five minutes around the clock, we find ourselves at an inflection point where we, as a Nation, must commit ourselves to doing what we know will help us triumph over this crisis.

As a practicing physician, I have seen firsthand the barriers that prevent people from obtaining the substance use treatment they need. As a researcher, I have observed the pervasive biases that have enabled ineffective drug policy approaches to be repeated over and over with the same results. And as a policymaker, I have encountered the roadblocks to progress in our legal and medical systems. This is part of the reason why I have seen too many succumb to their disease. Too often, stigma hinders Americans from seeking and receiving the help they need.

People with substance use disorder are in need of compassion and care. With the proper treatment and recovery support services, individuals go on to overcome addiction and lead successful lives.

Every family in America, regardless of their background or beliefs, has been impacted by addiction in some way. This is the reality we are facing today. The epidemic has taken a devastating toll on public health as well as the economy. Addiction prevents someone from reaching their full potential and contributing to their families and communities in a productive manner. Previous research has estimated that the economic costs of the epidemic are roughly $1 Trillion per year. If this trend continues, our national security and prosperity may be compromised considerably in the long-term.

Because the destruction caused by this epidemic in recent years is unrivaled, and the Biden-Harris Administration is determined to take unprecedented steps. There is a complex interplay between the availability of drugs in the United States and their use. Our *Strategy* will focus on two critical drivers of the overdose epidemic: untreated addiction and drug trafficking profits.

We are changing how we help people when it comes to drug use, by meeting them where they are with high-impact harm reduction services and removing barriers to effective treatment for addiction, while addressing the underlying factors that lead to substance use disorder head on. We are also striking drug trafficking organizations where it hurts them the most, in their wallets, by disrupting the operating capital they need to sustain their criminal enterprise. We need to apply both elements of this approach together, so we can disrupt the trafficking of drugs into the United States while allowing our historic investments in public health interventions to take hold. If it is easier to get illicit drugs in America than it is to get treatment, we will never bend the curve.

AR2022_401457



We can change this. We can make sure people get the help they need while also making our communities safer. President Biden's inaugural *National Drug Control Strategy* lays out our plans to achieve just that. It is based on the best science, evidence, and data available, and strives to usher in a new era of drug policy centered on individuals and communities.

As a Nation we must consider the legacy we are leaving behind for future generations. When it comes to drug policy, the Biden-Harris Administration is determined that our legacy will be healthier people and safer communities. This means building a better addiction infrastructure for preventing and treating substance use disorder, supporting recovery, and embracing evidence-based harm reduction strategies that keep people alive. This means building a better way of addressing addiction in the criminal justice system, reducing crime and making our communities safer while also making sure people get the help they need. And this means reducing the supply of illicit substances entering our communities. Every time one of our law enforcement professionals seizes illicit fentanyl, cocaine, or methamphetamine, they are helping to save lives and are cutting into the profits of the criminal organizations that fuel violence, breed corruption, and destabilize our partner nations, which makes our country and the world safer.

Our mandate from President Biden is clear: Reduce the number of drug overdose deaths, put quality public health services within reach for people with substance use disorder, and stop the drug trafficking organizations that seek profits by harming Americans. Working together, we can build healthy, safe and resilient communities where we have reduced the adverse experiences that can lead to substance use disorder, where public health services are available to everyone who needs them, and where the millions of Americans living in recovery have their health, their home, their community, and their purpose in life.

As President Biden said in his State of the Union, "If you're suffering from addiction, you should know you're not alone. I believe in recovery, and I celebrate the 23 million Americans in recovery… Now is our moment to meet and overcome the challenges of our time together. And we will." Our work cannot wait because every five minutes is a chance to save and transform a life.

Dr. Rahul Gupta
Director of National Drug Control Policy

AR2022_401458



# Introduction: Saving Lives is Our North Star

The drug overdose epidemic has taken a heartbreaking toll on Americans and their families. Provisionally, in the 12-months ending October 2021, an historic 105,752 persons are predicted to have died from a drug overdose; a 71-percent increase over this time period in 2016.[1] This was a greater rate of increase than for any other type of injury-related death in the United States.[2] Synthetic opioids, including illicit fentanyl, has been involved in 66-percent of these overdose deaths.

Saving lives is our North Star, and the 2022 *National Drug Control Strategy* calls for immediate actions that will save lives in the short term and outlines long-term solutions to reduce drug use and its associated harms, including overdose.

# The Biden-Harris Administration's Drug Policy Priorities for Year One

The passage and signature of the Substance Use-Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities (SUPPORT) Act in 2018 required the Office of National Drug Control Policy to produce a statement of drug policy priorities by April 1 of the first year of an Administration and an inaugural *National Drug Control Strategy* in the second year.

President Biden understood the urgency of the issue when he took office and the Biden-Harris Administration submitted its first-year drug policy priorities to Congress on April 1, 2021.

These seven priorities proposed specific and targeted actions to reduce overdoses and promote recovery, including expanding access to quality treatment, reducing an increasingly lethal supply of illicit substances, and enhancing harm reduction services that engage and build trust with people who use drugs, among others.

The seven Biden-Harris Administration drug policy priorities for the first year were:

1. Expanding access to evidence-based treatment, particularly medication for opioid use disorder.
2. Advancing racial equity in our approach to drug policy.
3. Enhancing evidence-based harm reduction efforts.
4. Supporting evidence-based prevention efforts to reduce youth substance use.
5. Reducing the supply of illicit substances.
6. Advancing recovery-ready workplaces and expanding the addiction workforce.
7. Expanding access to recovery support services.

ONDCP worked closely with agencies, Congress, and other partners in support of these priorities.

AR2022_401459



# Significant Actions Taken to Save Lives

The Biden-Harris Administration has taken several actions that support the first-year drug policy priorities:

- President Biden signed the American Rescue Plan into law, which invested nearly $4 billion in expanding access to vital mental health and substance use disorder services.

- The Department of Health and Human Services (HHS) released a new Overdose Prevention Strategy that supports substance use prevention by expanding research of new and improved prevention efforts, investing in community resources to help prevent harms related to substance use, increasing access to high-quality pain management to reduce preventable suffering, and promoting responsible prescription of medications to protect patient safety.

- The Administration made it easier for health care providers to prescribe buprenorphine to treat more patients with opioid use disorder; Thousands of providers signed up to do this within a few months.

- The Administration also announced rulemaking intentions to extend pandemic related treatment flexibilities to allow:

- people with opioid use disorder to begin buprenorphine treatment by telehealth, including through phone consultation; and

- patients receiving methadone to receive a higher amount of take-home e medication instead of visiting a clinic every day.

- The DEA revised regulations to allow treatment providers to operate mobile methadone vans, bringing treatment to rural, incarcerated, and underserved communities.

- President Biden announced two Executive Orders to counter transnational criminal organizations and illicit drug trafficking, first by formally establishing the U.S. Council on Transnational Organized Crime, and second, by modernizing and expanding the U.S. Government's ability to target drug trafficking organizations, their enablers, and financial facilitators through sanctions and other related actions.

These key actions represent a fraction of the total. For a comprehensive list, visit White House Releases List of Actions Taken by the Biden-Harris Administration Since January 2021 to Address Addiction and the Overdose Epidemic | The White House.

# The Administration's Inaugural *National Drug Control Strategy:* A Comprehensive Path Forward

The first-year policy priorities served as the basis for President Biden's inaugural *National Drug Control Strategy*, which builds upon the significant actions taken during the Administration's first year to reduce overdose deaths and improve the way this Nation approaches drug use and its harms.

Specifically, this *Strategy* seeks to build the foundation for the Nation's work to reduce drug overdose deaths by addressing both the demand and supply sides of drug policy. This includes


building a stronger substance use disorder treatment infrastructure and reducing the supply of illicit substances through targeted law enforcement actions and commercially disrupting criminal organizations by undermining the illicit finance networks that make drug trafficking both possible and profitable. Additional top priorities include expanding evidence-based harm reduction strategies to meet people where they are, preventing drug use from beginning, building a recovery-ready Nation, addressing drug policy challenges in criminal justice, and improving data systems and research that guide drug policy development.

This *Strategy* charts a comprehensive path forward beyond what past federal drug policies have attempted. The increased focus on improving racial equity, which has been a longstanding problem in drug policy affecting both public health and public safety, is long overdue. The new focus on evidence-based harm reduction addresses a historic gap in past U.S. drug policy. The renewed focus on collaboration across public health and public safety has implications for every community in the Nation.

Each chapter of this *Strategy* supports saving lives with specific principles and action items for Federal agencies and departments to lead:

## Prevention and Early Intervention

Adolescence is a critical risk period for substance use initiation and adverse outcomes related to substance use, particularly as drug use has been found to escalate between ages 12 and 19.[3] The goal of substance use prevention efforts is to prevent and/or delay the first use of substances. Research shows that early age of onset is an important predictor for the development of a substance use disorder later in life.[4,5] Further, research shows that prevention interventions can have positive long-term effects in reducing substance use.[6,7] Recognizing that preventing or delaying initiation of substance use can confer important health and social benefits, the Biden-Harris Administration is focused on addressing the social factors that put some youth at increased risk for substance use, preventing use before it starts, and avoiding the escalation of use during the most critical period for substance use initiation.

### Harm Reduction

Harm reduction is an approach that emphasizes working directly with people who use drugs to prevent overdose and infectious disease transmission, improve the physical, mental, and social wellbeing of those served, and offer flexible options for accessing substance use disorder treatment and other health care services. In other words, harm reduction is people-centered. It means helping people who use drugs access services they need to stay alive. It means building trust with them so that when they wish to seek help, they know where to turn.

> **Focus Area:** Expanding access to naloxone, an opioid overdose reversal medication, which could save tens of thousands of lives in a short period of time.

Specifically, the Biden-Harris Administration's focus on harm reduction includes naloxone, drug test strips, and syringe services programs. Syringe services programs are community-based programs that can provide a range of services, including links to substance use disorder treatment; access to and disposal of sterile syringes and injection equipment; and vaccination, testing, and links to care and treatment for infectious diseases. Syringe services programs can be a critical intervention to reduce overdose deaths and communicable disease. Access to these


proven, lifesaving interventions[8] should not depend on where someone lives and instead should be available to all who need them. The types of interventions proposed in this *Strategy* will save lives, improve health, and likely have a favorable economic benefit to society.

## Substance Use Disorder Treatment

According to the 2020 National Survey on Drug Use and Health (NSDUH), nearly all of the almost 20 million people living in the United States who need treatment are not currently receiving addiction treatment services.[9] People with SUD face prejudice, stigma, and discrimination, and this may especially be true for Black individuals seeking treatment.[10] Stigmatizing attitudes towards drug use and people who use drugs exist throughout our society, including in health care.[11] It is vital that the Nation reduces the barriers to substance use treatment so everyone who needs it can access it. Similarly, important is building a system of care that proactively seeks, diagnoses, and treats those who need it rather than waiting until they interact with the criminal justice system or experience an overdose. Treatment works and tens of millions of people in this country are in recovery.[12] However, additional work is necessary to meet the *Strategy*'s stated treatment goals of increasing access to quality treatment, reducing stigma, ensuring dedicated interventions for the most vulnerable, and building a trained addiction workforce.

> **Focus Area:**
> Expanding access to high-quality treatment, including medications for opioid use disorder (MOUD), to prevent overdoses and put recovery within reach.

## Building a Recovery-Ready Nation

The four major dimensions of recovery prioritized in the *Strategy* are home, health, purpose, and community.[13] Recovery is measured as a positive—by what it brings, including quality of life, a sense of self-efficacy and purpose, and improvements in social and emotional functioning and wellbeing. Americans follow diverse trajectories from SUD to recovery or remission. In 2020, an estimated 29.2 million Americans perceived ever having a substance use problem.[14] Of these, 21 million (72-percent) identified as in recovery or recovered from a substance use problem.[15] A 2017 study found that, among people who reported having resolved an alcohol or other drug program, the most common recovery supports included mutual aid groups (45-percent), treatment (28-percent), and emerging recovery support services (22-percent).[16] Reaching recovery is more important than the specific path taken to it.

The Administration will work to increase scientific understanding of recovery, foster adoption of more consistent certification and accreditation standards nationally, expand the peer recovery support services (PRSS) workforce and the organizational infrastructure that supports it, address stigma and misunderstanding, and eliminate barriers to safe and supportive housing, employment, and education for people in recovery.

## Domestic Supply Reduction

Law enforcement agencies at all levels—federal, state, local, Tribal, and territorial—work to combat domestic cultivated and synthetic drug production and trafficking with the goal of protecting Americans from a lethal drug supply contributing to record levels of fatal drug overdoses. However, traffickers continue to refine their methods and adopt new techniques of distributing drugs throughout our communities.



Responding effectively to the illicit production, trafficking, and distribution methods of domestic criminal organizations and Transnational Criminal Organizations (TCOs) is a significant challenge and remains a Biden-Harris Administration priority. Four principal lines of effort are necessary to improve domestic collaboration, reduce the supply of illicit substances, and decrease the harms caused by these substances in the United States and abroad:

- Improve information sharing and cooperation across all levels of government to strengthen the domestic response to drug trafficking;

- Deny and disrupt domestic production, trafficking, and distribution of illicit substances;

- Improve assessments of supply reduction initiative effectiveness and efficiency and allocate resources accordingly; and

- Protect individuals and the environment at home from criminal exploitation by those associated with drug production and trafficking.

## International Supply Reduction

The majority of illicit drugs consumed in the United States are produced abroad by TCOs and smuggled into the country. Large TCOs, wherever they are based, threaten the health and safety of our communities by exposing our citizens to illicitly manufactured substances. These include synthetic drugs, such as opioids like fentanyl and stimulants like methamphetamine, and cultivated drugs like heroin and cocaine. The plentiful supply and widespread availability of high potency illicit drugs fuel drug consumption across all sectors of American society.

> **Focus Area:** Disrupting illicit finance networks to commercially disrupt drug trafficking operations and prevent illicit substance from reaching communities in the United States.

Large and influential TCOs pose a threat to national security and effectively responding to their illicit manufacturing, trafficking and distribution methods is an Administration priority. Countering corruption and its deleterious impact, including its role in facilitating transnational crime, is a core national security interest of the U.S. government.

The U.S. must strengthen international partnerships and foster bilateral exchanges to collaboratively address drug-related problems as a shared responsibility. The increasingly dynamic and complex nature of the international illicit drug trade demands enhanced cooperation with international partners that reflects the reality of a globalized supply chain for illicit drugs and their precursor chemicals. In addition to confronting TCOs' illicit drug manufacturing and trafficking activities directly, the U.S. must also pursue the financial enablers of this illicit activity to deny TCOs their ill-gotten proceeds and to disrupt their ability to transfer working capital to fund their range of illicit activities including procuring precursor ingredients, trafficking, bribery, and corruption. A global approach is essential since traffickers exploit national boundaries to insulate their operations and limit the impact of any single nation's control efforts.[17]

## Criminal Justice and Public Safety

Americans with undiagnosed or untreated substance use disorders too often end up interacting with the justice system, creating severe consequences for individuals, their families and communities, society, and taxpayers. Further, attaching criminal penalties to substance use alone



has contributed to lost lives, hope and opportunity. Untreated substance use disorder is overrepresented in the prison population; A study published in 2010 estimated that 65-percent of persons incarcerated had an active SUD.[18] The impact begins at arrest and continues through incarceration and after release back into the community. Arrest and incarceration for crimes related to substance use and possession disproportionately affect *Black, Indigenous and People of Color (BIPOC)* communities. According to an analysis of National Registry data through mid-October of 2016, African Americans may be nearly five times as likely to go to prison for drug possession as Whites, and data on exoneration outcomes suggest innocent Black people are about 12 times more likely to be convicted of drug crimes than innocent White people.[19]

The arrest and incarceration of people who use drugs (PWUD) has not only led to significant harms in BIPOC communities, but it increases risks of overdose as well. Upon release, incarcerated individuals are at a meaningfully elevated risk to die from an overdose than the general population.[20,21] It is clear that the criminal justice system must play an important role in ensuring that people within its custody or supervision and upon reentry who use drugs do not overdose and instead have access to the continuum of services and support.

## Data and Research

The Biden-Harris Administration is committed to employing a multi-faceted and evidence-based approach to policy-making as directed in the Presidential Memorandum on scientific integrity and evidence-based policymaking.[22] This is particularly significant in the area of drug policy where the ultimate impact is typically measured in American lives. Timely and accurate data are essential to grasp the extent and evolving nature of the drug problem, guide policy, assess the effectiveness of our nation's efforts, and continually improve these efforts over time. Data systems and research to generate this information must be maintained, enhanced, and supplemented so drug control practitioners, researchers, and policy-makers are continually informed by the most up to date and accurate information, while also protecting privacy and confidentiality. Further, when well communicated, such data can help inform the American public as to the types of policies and programs most likely to successfully address substance use challenges in their own communities.

> **Focus Area:** Improving data collection, particularly for non-fatal overdoses, to obtain a full picture of overdoses in America and identify people who need substance use treatment.

Considering the costs of drug use to society, which have vastly increased due to the opioid epidemic over the past decade, our data systems lack the timeliness, scope and precision required for the most impactful national response. As we assess the data and research landscape to address the Administration's commitment to implementing evidence-based drug policy, we have much more work to do to close information and knowledge gaps. This chapter focuses on three themes: strengthening existing data systems, establishing new data systems and analytical methods to fill gaps, and enhancing the utility of drug data for policymakers, program developers and administrators, practitioners, and researchers. It concludes with recommendations for sustaining data systems and research to inform drug control policy.



# Specific Goals and Measuring Federal Performance

Accountability is critical to success. With a Federal Drug Control Budget of $40 billion, it is vital to the national interest that the *Strategy's* policies and plans are evaluated as they progress. To evaluate the effectiveness of the Nation's drug policy efforts, and assess the progress in implementing the *Strategy*, the Biden-Harris Administration established seven goals to be achieved by 2025. These goals, measured against a baseline of 2020, across the gamut of drug policy issues, including a general goal to reduce illicit substance use and enhance public health and safety, as well as other specific public health and supply reduction issues. Each of these long-range, comprehensive goals is accompanied by quantifiable and measurable objectives, with specific annual targets. Please refer to the *National Drug Control Strategy: Performance Review System (PRS) Report* for a detailed discussion of these goals, objectives and targets.

The following are the specific strategic goals and objectives for the Nation to reduce the demand for and availability of illicit drugs and their consequences:

1. **Illicit substance use is reduced in the United States.**

   o *Objective 1:* The number of drug overdose deaths is reduced by 13-percent by 2025.

   o *Objective 2:* The percentage of people meeting criteria for each of cocaine, opioid, and/or methamphetamine use disorders are reduced by 25-percent by 2025.

2. **Prevention efforts are increased in the United States.**

   o *Objective 1:* Past 30-day alcohol use among young people aged 12-17 is reduced by 10-percent by 2025.

   o *Objective 2:* Past 30-day use of any vaping among youth aged 12-17 is reduced by 15-percent by 2025.

3. **Harm Reduction efforts are increased in the United States.**

   o *Objective 1:* The number of counties with high overdose death rates which have at least one Syringe Service Program (SSP) is increased by 85-percent by 2025.

   o *Objective 2:* The percentage of SSPs that offer some type of drug safety checking support service, including, but not limited to Fentanyl Test Strips, is increased by 25-percent by 2025.

4. **Treatment efforts are increased in the United States.**

   o *Objective 1:* Treatment admissions for the populations most at risk of overdose death is increased by 100-percent by 2025.

   o *Objective 2:* The projected shortfall in the qualified workforce of behavioral health providers (including addiction professionals) funded by federal programs in the United States is reduced by 70-percent by 2025.

5. **Recovery efforts are increased in the United States.**

   o *Objective 1:* The number of states operating a recovery-ready workplace initiative is increased 75-percent by 2025.

AR2022_401465



- o *Objective 2:* The number of peer-led recovery community organizations is increased by 25-percent by 2025.

- o *Objective 3:* The number of recovery high schools is increased by 10-percent by 2025.

- o *Objective 4:* The number of collegiate recovery programs is increased by 25-percent by 2025.

- o *Objective 5:* The number of certified recovery residences is increased by 25-percent by 2025.

6. **Criminal Justice reform and public safety efforts in the United States include drug policy matters.**

- o *Objective 1:* Eighty percent of all treatment courts will be trained and will implement practices to increase equity by 2025.

- o *Objective 2:* The percentage of Federal Bureau of Prisons (BOP) inmates diagnosed with an opioid use disorder who are given access to medications for opioid use disorders (MOUD) is increased to 100-percent by 2025; the percentage of both state prison programs and local jail facilities offering MOUD is increased by 50-percent.

7. **The supply of illicit substances into the United States is reduced.**

- o *Objective 1:* The number of targets identified in counternarcotics Executive Orders and related asset freezes and seizures made by law enforcement is increased by 365-percent by 2025.

- o *Objective 2:* The number of defendants convicted in active OCDETF investigations that incorporate FinCEN/SAR data is increased by 14-percent by 2025.

- o *Objective 3:* The percentage of active priority OCDETF investigations linked to the Sinaloa or Jalisco New Generation (CJNG) cartels, or their enablers (such as illicit financiers) disrupted or dismantled is increased by 25-percent by 2025.

- o *Objective 4:* Potential production of cocaine is decreased by 10-percent, and heroin is decreased by 30-percent by 2025.

- o *Objective 5:* The number of incident reports for precursor chemicals sourced from China or India reported by North American countries increases by 125-percent by 2025.

## *Consultation for the National Drug Control Strategy*

The Office of National Drug Control Policy is statutorily required to consult with and solicit input for the *National Drug Control Strategy* from a variety of parties affected by federal drug policy, including federal agencies and departments charged with carrying out these policies, members of Congress and congressional committees, states, local, Tribal, and territorial governments, nongovernmental organizations and community activists, and foreign governments, among others.



The consultation process for the 2022 *National Drug Control Strategy* began in May 2021 and ONDCP received significant input from a wide range of interested parties. While the COVID-19 pandemic prevented in-person consultation in communities across the Nation as was done in years past, ONDCP held virtual meetings and received written input from the individual National Drug Control Program agencies while developing this *Strategy*. Following publication, ONDCP will lead the interagency process to implement this *Strategy*. Thank you to all partners who provided input for the Biden-Harris Administration's inaugural *Strategy,* and thank you for your commitment to addressing addiction and the overdose epidemic.

***

Addiction and the overdose epidemic are urgent issues facing the Nation. Our country has never seen substance use disorder cause such devastation, and the Biden-Harris Administration is determined to stop it. An overdose is a cry for help and for too many people that cry goes unanswered. With this *National Drug Control Strategy,* the Biden-Harris Administration is working to ensure these cries are not just heard but answered as well. This vision for the United States' drug policy is based on science, evidence, and the best data available. Saving lives is our North Star, and this *Strategy* supports this goal on every page.

# Prevention and Early Intervention

Adolescence is a critical risk period for substance use initiation and adverse outcomes related to substance use. Data from the National Survey on Drug Use and Health (NSDUH) show a rapid escalation of drug use associated with an increase in age, particularly among youth ages 12-19 (see Figure to left).[23] This trajectory speaks to the need to understand what drives youth drug use, identify current and emerging trends, and match programs and policies with local conditions so as to effectively reduce youth substance use.



Source: Substance Abuse and Mental Health Services Administration, *National Survey on Drug Use and Health 2019.* Unpublished Special Tabulation by the Center for Behavioral Health Statistics & Quality (June 2021).

There are simultaneous conditions that converge to create a particularly dangerous circumstance for adolescents – drug use increases during a period of time when the brain is especially vulnerable to damage from drug use.[24] During adolescence there is a significant reorganization of brain regions necessary for intellectual function, memory, emotional regulation, and decision-making.[25,26] Drug use often disrupts normal brain development and can result in long-lasting negative consequences, including reduced academic achievement and increased risk of depression, anxiety, suicide, and substance use disorder (SUD) later in life.[27,28,29,30,31] Adolescent drug use can also cause persistent changes in brain[32] structure and function.[33]

A range of factors influence mental, emotional, and behavioral development in children and adolescents.[34] These include societal, environmental, familial, and genetic dynamics. Social determinants of health (SDOH) play a critical role in overall health status[35] and substance use, including opioid use.[36] The Department of Health and Human Services (HHS) describes SDOH as the conditions in which people are born, grow, live, work and age, all of which affect a wide range of health risks and outcomes.[37] Prevention initiatives, couples with social needs interventions, can be impactful across the lifespan, including and in particular for the prenatal period and throughout adulthood.

More generally, social determinants include factors such as food and housing security, access to services and supports, income, lack of transporation, stable employment, education, and social inclusion. Studies suggest that roughly 30-percent to 55-percent of health outcomes are driven by SDOH,[38] and experiencing these social factors may increase levels of stress experienced which can elevate the risk of substance use.[39] Peers are often identified as an influence to youth substance use, but SDOH also contribute to youth substance use trends and negative health outcomes associated with substance use. Parental influence can deter youth use or unintentionally enable youth use. For example, strong parental monitoring, and communicating



clear expectations about risk and positive role modeling, can reduce use in youth. Conversely, parents can unintentionally enable underage alcohol use and/or youth drug use by not securing alcohol and prescription drugs.[40,41] Unstable housing is associated with higher rates of substance use among youth, while some families and caregivers who receive income supplements see a significant decrease in adolescent substance use.[42,43,44] Addressing SDOH is necessary to help improve health and reduce inequities in health outcomes—including in youth substance use, and this effort will require all sectors of Government and society to identify and improve factors that influence health outcomes.

Another factor to consider in understanding the origins of substance use among youth is the impact of adverse childhood experiences (ACEs), their connection to SDOH, and equity. ACEs are potentially traumatic events that occur during childhood and adolescence (between the ages of 0-17 years). Large scale population based studies have shown that individuals with more ACEs are likely to have health problems later in life. Types of ACEs include abuse and neglect, experiencing or witnessing violence, experiencing divorce of parents, a family member in jail, parental mental health or SUD, having a family member or caregiver attempt or die by suicide, and chronic poverty.[45,46,47] Recently, researchers have included experiences with racism, bullying, and community violence as traumatic experiences that can impact health and wellbeing.[48] While nearly 61 percent of adults surveyed report they experienced at least one type of ACE, women and most racial minority groups were more likely to have experienced four or more ACEs.

The link between ACEs and illicit substance use has been identified in a number of studies.[49,50] The more ACEs a child experiences, the more likely the child is to d develop a chronic disease, poor academic achievement, and/or illicit substance use.[51] Compared with people with no ACEs, individuals with more than five ACEs were seven to ten times more likely to report problems with illicit drug use.[52,53] It is possible to prevent youth exposure to ACEs, and to reduce the harms associated with ACEs among individuals who have already experienced them.[54] A coordinated effort to address SDOH will improve individual and population health, advance health equity, and decrease youth exposure to ACEs.

The goal of substance use prevention efforts is to prevent and/or delay the first use of substances. Research shows that early age of onset is an important predictor for the development of SUD later in life.[55,56] Research also indicates that the majority of individuals who have SUD started using substances before age 18 and are relatively more likely to have developed SUD by age 20.[57] The age of onset is therefore an important predictor for the development of SUD later in life.[58,59,60] Youth substance use is also often accompanied by other factors such as low academic attainment, health-related issues (including a mental health diagnosis and risky sexual behavior), involvement with the juvenile justice system, and overdoses. Youth who engaged in drug use are more likely to experience violence, are at greater risk for mental illness and suicidal ideation and/or suicide, and more likely to engage in risky sexual behavior such as not using a condom and having multiple partners.[61] These health behaviors put youth at risk for sexually transmitted infections like HIV, and unintended pregnancy. Youth

> **DFC & Youth Vaping**
>
> Approximately three quarters of Drug-Free Communities (DFC) Support Program coalitions are engaged in activities to address vaping. Of those coalitions, 94-percent reported addressing nicotine/tobacco and 84-percent reported addressing marijuana.


engaging in substance use and sexual behavior at an early age are also linked to poor test scores and lower educational attainment.[62,63]

Alcohol, marijuana, and tobacco are the substances most commonly used by adolescents.[64] In 2019, almost 14-percent of high school students reported binge drinking within the past month. Seven- percent reported past month prescription opioid misuse[65]—most often drugs that were not prescribed to them.[66] In 2020, one in five high school students surveyed reported past month e-cigarette use. From 2017 to 2019, the percentage of eighth graders who said they vaped nicotine in the past 12 months roughly doubled from 7.5-percent to 16.5-percent.[67] Among lifetime use measures from 2009 to 2019, marijuana use was reported by 36.8-percent of high school students surveyed, followed by misuse of prescription opioids (14.3-percent) and use of synthetic marijuana (7.3-percent). The prevalence of youth use of cocaine (3.9-percent), methamphetamine (2.1-percent), or heroin (1.8-percent) is much smaller and they are not commonly drugs of first use.

In 2020, there were 783 opioid overdose deaths in youth 5-18 years old and 1,022 overdose deaths involving all drugs in youth 5-18 years old.[68] Between 2016-2019, suspected overdoses involving all drugs increased by 2-percent for youth between the ages of 0-10 years and a 2.3-percent for youth between the ages of 11-14 years. Delaying age of initiation and addressing SUDs from a life stage perspective with assessment and treatment approaches incorporating co-occurring disorders are necessary to successfully impact overall health.[69] There is a strong relationship between ACEs and early initiation of youth substance use.[70] The estimated nonmedical use of prescription drugs increases by 62% for each additional ACE.[71,72]

Prevention interventions can have positive long-term effects in reducing substance use.[73,74] While alcohol remains the primary substance of abuse for youth, rates of use have decreased substantially over time. Successful youth substance use prevention works by targeting at least two areas of the childhood experience: reducing risk factors that increase the likelihood of substance use, and enhancing protective factors that prevent or decrease the impact of a negative experience.[75] Universal prevention focuses on an entire population (e.g., school or community) and are not

> **Universal Prevention Interventions and Positive Impacts Across Generations**
>
> A study looked at the impact on the offspring of children who received a universal prevention intervention. The original prevention intervention was implemented in public elementary schools serving high-crime areas in Seattle, Washington. The initial Raising Healthy Children intervention provided social and emotional training to some children while others did not receive the training. A recent analysis found that the intervention not only helped the children who received the initial social and emotional skills training, but their children benefited as well. These offspring had less substance use, fewer behavior issues, and better academic skills than the children whose parents had not received the training.
>
> The persistent impact of these positive effects of the universal prevention intervention speaks to the potential to prevent adverse childhood experiences and counter the impact and of negative social determinants of health.
>
> Reference: Hill K, Bailey J, Steeger C, et al. Outcomes of Childhood Preventive Intervention Across 2 Generations - A Nonrandomized Controlled Trial.



directed at a specific risk group.[76] There is evidence that universal prevention interventions provide sustained positive impacts on general health and behavioral outcomes years after the end of the intervention, including for youth in disadvantaged environments.[77,78,79,80] A recent analysis of the Raising Healthy Children intervention indicated positive outcomes including less substance use, fewer behavioral issues, and better academic skills into the third generation.[81]

Early childhood interventions that enhance protective factors, such as fostering self-control and successful coping strategies, and minimize risk factors can bring persistent benefits.[82,83] For example, a family history of substance use increases a child's risk for substance use but nurturing that child in an environment with clear messaging that substance use is potentially harmful, and helping the child spend time with peers who do not use substances can offset the original risk.[84,85] In addition, prevention interventions that are universal (e.g., target populations regardless of risk or use status) can reduce prescription drug misuse and have positive effects on other health risk behaviors, including misuse of prescription drugs to include opioid medications.[86,87] When interventions are appropriately matched to address identified problems, they can reduce substance use, reduce the impact of ACEs, and counter the potential impact of SDOH.[88,89,90]

Prevention is not only effective, it is also cost effective approach to prevent later SUD have been identified as an underutilized response to the opioid crisis.[91] The 2016 Surgeon General's Report on Alcohol, Drugs, and Health[92] also noted that prevention science demonstrates that effective prevention interventions exist, can markedly reduce substance use, and evidence-based programs and policies are underutilized. There are multiple examples of cost effective prevention programs. For example, the average effective school-based prevention program is estimated to save $18 per dollar invested.[93] There are also cost-benefit assessments of individual programs. Too Good for Drugs, a school-based prevention program for students in kindergarten through 12th grade, was designed to increase social competencies (e.g., develop protective factors) and diminish risk factors associated with alcohol, tobacco, and other drug use. It has a benefit-to-cost ratio of + $8.74 and it is estimated that there is a 94-percent chance that benefits will exceed costs.[94] Other effective and cost-effective programs include Botvin Life Skills[95] which has benefit-to-cost ratio of $13.49, and the Good Behavior Game with a benefit-to-cost ratio of $62.80.[96]

Implementing evidence-based policies, environmental strategies, and programs requires an understanding of a community's challenges and knowing which strategies will effectively address a community's specific challenges. There are three approaches that help communities identify their local substance use problems, identify the appropriate evidence-based interventions to address their unique local conditions, and assess the effectiveness of the intervention. These three approaches are Drug-Free Communities (DFC) Support Program, Promoting School University Community Partnerships to Enhance Resilience (PROSPER), and Communities that Care (CTC).[97,98,99,100,101] All three of these approaches have demonstrated the ability to reduce substance use among youth years after the initial intervention.

Prevention works best when there is an infrastructure to support it, for example, approaches used by DFC, CTC, PROSPER and the presence of community norms that create an environment that support youth and allows them to thrive. Interventions should cross stages of child development and levels of prevention (e.g., universal, selective, indicated). Addressing substance use should parallel approaches as seen in treating other health conditions such as cancer or heart disease. To effect lasting change there should be support for a wide range of efforts—from promoting a



healthier environment, healthier living patterns, to population screening, to identifying individuals at risk or with early/treatable disease, as well as those requiring more intensive treatment, recovery support, and rescue approaches.

Recognizing that preventing or delaying initiation of substance use can confer important health and social benefits, the Biden-Harris Administration is focused on addressing the social factors that put some youth at increased risk for substance use, preventing use before it starts, and avoiding the escalation of use during the most critical period for substance use initiation. The following principles identify specific prevention interventions that can effectively address youth substance use.

# Principle 1: Preventing Substance Use Among School-Aged Children is Effective

Delaying the age of initiation for substance use, providing skills for children that build resilience, and addressing co-occurring substance use and mental health disorders are necessary to successfully improve overall health and social outcomes for school-aged children.[102] Investments in research have identified effective strategies to strengthen the mental and emotional development of young people to prevent initial use. Ensuring that school-aged children have access to universal prevention programs designed to prevent use before it starts, prevention services that focus on children at higher risk for use or those that have started using drugs, and when necessary provide referral to treatment and recovery support is essential to support the health, well-being, and futures of the Nation's 74 million children.

A. **Provide technical assistance and guidance to help K-12 schools increase the reach of and access to substance use prevention supports and services.** *(Agencies Involved: DOJ/ OJP; ED; HHS/CDC, HRSA, NIH, SAMHSA)*

Schools are uniquely positioned to provide services that promote student health and optimal wellness as well as decrease barriers to learning. A number of school systems are already working to build systems that can help prevent youth initiation of substance use, identify children at risk for use or those who are already using, and, as needed, refer youth to appropriate interventions and/or treatment, and provide recovery support.

Providing technical assistance to schools on evidence-based approaches and programs can dramatically expand the number of children provided access to effective prevention efforts. One key approach is establishing school-based Student Assistance Programs (SAPs), which can play a key role in these efforts. SAPs are flexible in that they can support a range of efforts tailored to the unique demographics, socioeconomic challenges, and cultural context of the students they serve. SAPs can be structured to address the specific needs of a school. They can focus on ACEs, or children who live in poverty or who may be homeless. These programs also support the teachers and educational staff by providing access to trained professionals to address emotional and behavioral issues among the students. Federal agencies should increase efforts to provide technical assistance to schools on effective, comprehensive approaches to screen, prevent, intervene, and support recovery for substance use in school-based settings, including guidance on how to establish, expand, and continuously evaluate the success of SAPs in schools.

AR2022_401472



**B.   Provide technical assistance and guidance to organizations interested in establishing and expanding Student Assistance Programs to include evidence-based practices and available federal funding mechanisms.** *(Agencies Involved: ED; HHS/SAMHSA)*

Enlist federal agencies to provide technical expertise regarding effective comprehensive approaches to prevent use before it starts (universal prevention), prevent initiation of use among children with an elevated risk for use (selective prevention), prevent progression to SUD for children who have started to use drugs (indicated prevention), refer students to substance use treatment as deemed clinically appropriate, and provide support for recovery from substance use in school-based settings. Federal agencies should also be actively engaged in providing guidance on how federal funding can be used to support SAPs. These efforts should include expanding understanding of effective prevention programs and approaches for all school-aged children with a special emphasis on preventing initiation with universal prevention interventions. The assistance should also include information about federal funding mechanisms that can support SAPs, provide examples of effective programs, as well as, strategies for practical, ongoing assessments.

**C.   Expand research on effective screening approaches for school age children in health care settings and expand efforts to translate research findings into clinically and culturally appropriate tools.** *(Agencies Involved: DOJ/OJP; ED; HHS/CDC, CMS, HRSA, NIH, SAMHSA)*

To expand the use of clinically effective and culturally appropriate screening tools expanded research is needed. The American Academy of Pediatrics (AAP) notes that adolescents are at the highest risk compared to any other age group for experiencing health issues related to substance use, and that the potential benefits of identifying substance use and intervening to reduce or prevent use are substantial.[103] Results from a 2014 needs assessment conducted by the AAP indicated that only 23% of pediatricians used a validated screening tool, although 88% were screening for substance use. AAP also noted that by using clinical impressions alone there is a tendency to focus on late stage of signs of use and suggested that this is an area for practice improvement. AAP's Substance Use Screening and Implementation Guide reported that pediatric providers tend to underestimate the prevalence of adolescent substance use, so it is important for health care providers to discuss substance use with all patients.

A key area for expanded research focuses on screening for adolescents aged 12 to 17. The US Preventive Services Task Force (USPSTF) recommends screening for unhealthy drug use in adults 18 year or older. The data for the 12 to 17 age group is currently insufficient.[104] NIDA's and NIAAA's research on screening for substance use has been critical in identifying effective screening approaches for this age group.[105] NIDA and NIAAA are supporting a range of research studies focused on adolescents including looking at: addressing teen substance use during primary care visits, providing interventions for adolescents with substance use undergoing oral surgery, screening for stimulant use disorder in a primary care setting. It's important to note as well that screening can lead to treatment, but also screening can lead to more enhanced prevention services in school-based settings. Another area for additional research surrounds screening for ACEs and trauma. ACEs are known risk factors for health issues in a population but the accuracy of screening tools in predicting an individual's risk for health problems later in life is an area worthy of further research.[106,107]



Translating research findings into clinically effective and culturally appropriate tools is also important. Several federal agencies can play a key role in ensuring that the investment in research will help the Nation's youth. The Substance Abuse and Mental Health Services Administration (SAMHSA) through its knowledge, experience, and close relationships with State and local substance use organizations and governmental agencies is well placed to help in developing effective, appropriate screening tools. The Centers for Medicare & Medicaid Services (CMS), through its Early and Periodic Screening, Diagnostic and Treatment benefit, can ensure that children who qualify for the benefit receive effective and culturally appropriate screening for substance use.

The Health Resources and Services Administration (HRSA) currently supports 3,257 school-based health centers and can serve an important role in reaching children and adolescents who live in underserved communities.[108] The Department of Justice can ensure it provides effective and appropriate screening for substance use for youth in juvenile justice settings. The Centers for Disease Control and Prevention (CDC), working in collaboration with the NIH and other federal agencies, can draw on its experience in developing and disseminating guidance to K-12 schools on childhood diseases to help schools implement effective substance use screening that is appropriate for a school's population. The Department of Education (ED) also has an important role to play in ensuring close collaboration between substance use prevention efforts and Multi-tiered System of Supports (MTSS) programs.

Through these collective efforts there is great potential to reach millions of children in schools and in office-based health care settings.



> **Right Service, Right Time, for the Right Child:**
> **How a Washington State School District Provided**
> **Comprehensive Behavioral Health Services for Students**
>
> In 2012, the Capital Region Educational Service District 113 in Washington State faced a challenge with substance use and behavioral issues among high school students. Tenth grade current alcohol use rates for one identified district were at 36-percent, compared to the state average of 23-percent according to the state's Healthy Youth Survey. Additionally, problem behaviors and suspensions were at troubling levels, as were school attendance rates. These problems were compounded by a lack of access to clinically appropriate treatment and recovery support services for youth. To respond, the district established a Student Assistance Program (SAP) in 2013. Under the SAP model, a trained and credentialed behavioral health professional was brought onsite and the entire school staff was engaged to identify and help prevent substance use and address behavioral challenges among students. This made the entire team responsible for the behavioral health of the students. Under the SAP, the spectrum of services available to students was expanded and included: prevention services, behavioral health screening and early intervention of youth at high risk of substance use or mental health issues, referral and care management to substance use and/or mental health treatment and comprehensive recovery support services. The program also engaged parents/caregivers and the community.
>
> The SAP's comprehensive approach had overwhelmingly positive outcomes. From 2013 to 2018, the comprehensive approach adopted under the SAP was associated with a reduction in past 30-day alcohol use from a peak of 36% in 2012 to just 10% in 2018. Comparatively, statewide alcohol use rates only changed from 25% to 18% in that same time frame. But most compelling were the stories from the students themselves. The students described how an adult at the school saw they were struggling and referred them to someone who could figure out what was going on, understand their unique situation, and could figure out how to help them in their unique situation. The adoption of the SAP philosophy created a school environment where an individual focus on the needs of each student was possible.
>
> *Source: Data provided by Capital Region Educational Service District 113, Washington State.*

## Principle 2: Preventing Substance Use Among Young Adults Promotes Overall Health

Young adults experience a different set of risk factors specific to the developmental challenges of transitioning to adulthood.[109] Coping skills developed during early adolescence to reject substance use may no longer be effective during this transition to adulthood. These challenges set the stage for a critical time in which young adults are likely to initiate or increase substance use.

Among young adults between the ages of 18-25 years, the number of past year initiates of alcohol use doubled from 1.2 million people in 2002 to 2.4 million people in 2019. In addition, national survey data show higher prevalence rates of illicit drug use including marijuana, amphetamine, cocaine, hallucinogens, and MDMA, among young adults in comparison to youth


(ages 12-17 years) and adults (26 years and older). Further analysis shows significantly different rates of substance use among specific categories of young adults, including those with mental health conditions, LGBTQ youth, and collegiate vs non-collegiate young adults.

Prevention efforts addressing the needs of young adults must consider that young adults have their own unique patterns of substance use behaviors, an array of social determinants of these behaviors. This age cohort requires prevention services in multiple modalities and settings including colleges and universities, workplaces, vocational training programs, military services, homeless and runaway programs, correctional facilities (e.g., college health centers, primary care centers), and general health care settings.

A. **Encourage mental health and substance use and misuse screening for young adults in health care settings.** *(Agencies Involved: HHS/CMS, HRSA, SAMHSA)*

Providing information and technical assistance to health care providers, colleges and universities, employee assistance programs, and other providers that serve young adults can expand awareness and access to critical screening. The Affordable Care Act (ACA) required plans and issuers that offer dependent child coverage to make the coverage available until the adult child reaches the age of 26. In addition, ACA expanded coverage via expanded Medicaid and the ACA marketplaces for young adults unable to stay on their parents plan. This expands coverage for many young adults to access important screening, care, and referral to services. Given the high prevalence of SUD among young adults, as well as co-occurring mental illness, it is important for health professionals to: conduct regular screenings to identify substance use and misuse; assess mental health disorder(s); and refer individuals to clinically appropriate prevention and treatment interventions in a timely manner. HHS should assess its current support for behavioral health screening and explore opportunities to expand its efforts.

B. **Educate newly licensed drivers on the risks and harms of substance use.** *(Agencies Involved: DOT/NHTSA; HHS/CDC, SAMHSA)*

Age requirements for obtaining a driver's license differ from state to state. According to the Governors Highway Safety Association, most states grant full driver's licensure between the ages of 16-18 years. This graduated license process provides opportunities to disseminate information, tools, and resources to teens and young adults about the harms of substance use.[110] Partnerships between state Departments of Health and Motor Vehicle Agencies can ensure up to date information about the risks and harms of substance use are disseminated to applicants in preparation for licensure, as well as when full driver's licenses are issued. Federal agencies should encourage states to leverage Substance Abuse Prevention and Treatment Block Grant (SAPT) funds to partner with the Department of Motor Vehicles to reach a majority of young adults with information and messages to prevent substance use.

C. **Encourage evidence-based employer-based wellness programs.** *(Agencies Involved: HHS/ACF, CDC, SAMHSA; Labor; Treasury/IRS)*

According to the Department of Labor, a Drug-Free Workplace program consist of several core components: written policy; employee education; supervisor training; employee assistance program (EAP); and drug testing. Although drug testing receives significant attention in federal policy, employee education and assistance are equally important. Given the unique patterns of substance use among the young adult population,



tailoring efforts to address this group's substance use and mental health needs is especially important. Wellness programs offer tools to foster healthy nutrition, physical activity, stress management, lifestyle coaching, incentive programs, counseling, and a myriad of other services to address risk and resiliency factors among employees.[111] In addition to outlining employer's rules and expectations, a program focused on nurturing employee wellness can help increase productivity, morale, and overall safety of the workplace. The Society for Hunan Resource Management provides guidance to employers on developing wellness programs to promote overall wellness. SAMHSA also provides resources to assist employers in establishing Drug-Free Workplace programs. Federal agencies should encourage public and private sector employers to adopt federally-funded workplace wellness programs via on-line classes or expand wellness programs, especially making assertive efforts where young adults enter the workforce. SAMHSA's Wellness Initiative highlights several dimensions of a multifaceted approach to improving overall wellness that can be integrated into workplace programs.[112] Apprenticeship, fellowship, and college internship programs have particular opportunities to target young adults for information and services to prevent substance use and promote health and wellness.

**D. Raising awareness of substance use harms in the collegiate community.** *(Agencies Involved: ED; HHS/NIH, SAMHSA)*

Each year, millions of students begin their collegiate journey away from the routines and oversight of parents or caregivers. In addition to promoting policies to discourage underage drinking and tobacco use, many colleges and universities incorporate information about the dangers of substance use into student orientation. Several federal resources are available to assist colleges and universities in raising awareness among students. SAMHSA provides a resource guide to Substance Misuse Prevention for Young Adults with elements to guide initiatives to reach college-aged youth.[113] Resources to support adoption of evidence-based campus programs are available through the Higher Education Center for Alcohol and Drug Misuse Prevention and Recovery (HECAOD) and NIAAA's College Alcohol Intervention Matrix to help schools identify effective policies and programs.[114] Additionally, college health centers can integrate screening for mental health and/or substance use among college student populations and provide connections to community-based resources. HECAOD can also provide guidance on strategies for institutions of higher education to continually evaluate their programs over time, and to continually make refinements to achieve increasingly better outcomes. Federal partners should assess evidence-based programs and explore opportunities to expand reach among the collegiate community.

# Principle 3: Preventing Youth Substance Use Requires Community-Level Interventions

Public health strategies and interventions aimed at preventing and reducing youth substance use must also address the environmental conditions that can often facilitate and/or establish substance use as normative behavior. Grounded in public health research, the implementation of environmental prevention strategies that focus on the broader physical, social, cultural, and institutional factors that contribute to local substance use are effective in creating positive


behavior change. The section that follows highlights opportunities across the federal government to strengthen evidence-based efforts aimed at addressing a wide range of environmental and societal factors to create healthy, safe, and drug-free communities.

**A. Augment youth substance use prevention coalitions implementation of evidence-based prevention strategies across the country.** *(Agencies Involved: DOJ/OJP; HHS/CDC, SAMHSA)*

Community coalitions, such as those funded and trained by the Drug-Free Communities (DFC) Support Program, are well positioned to address local risk factors associated with youth substance use and strengthen protective factors. Community coalitions are best suited to establish and strengthen collaboration among various sectors of their communities to implement a comprehensive mix of evidence-based prevention strategies that will address their local needs. By supporting the development of local drug-free community coalitions and establishing collaboration among various sectors of a community, coalitions are capable of achieving long-term sustainable success in preventing local youth substance use. The flexibility and locally-driven nature of community coalitions allow a range of successful responses to local youth substance use issues. Federal agencies should highlight evidence-based youth substance use prevention programs and ensure federal funding opportunities require the implementation of evidence-based prevention strategies.

**B. Establish a community of practice (CoP) for evidence-based youth substance use prevention and adverse childhood experiences (ACEs).** *(Agencies Involved: HHS/CDC, SAMHSA)*

Communities of practice provide a collaborative framework for public health professionals to work together and gather input and perspectives from community partners in an effort to identify and leverage best practices and set standards. Through these evolving collaborative efforts and sharing of lessons learned in the community building process, the community of practice approach is being implemented in many public health areas as a model for how public health partners can be most effective together. As communities seek opportunities to implement data driven prevention strategies that focus on the broader physical, social, cultural and institutional factors that contribute to local substance use, a greater focus on ACEs provides youth within these communities' an environment that promotes their overall health and safety. Federal agencies should work towards the establishment of a CoP for evidence-based youth substance use prevention and adverse childhood experiences and identify specific goals to be accomplished.

**C. Expand "Talk. They Hear You" to address youth alcohol use and other drugs, including marijuana.** *(Agencies Involved: DOJ/OJP; DOT/ NHTSA; ED; HHS/ACF, CDC, FDA, NIH, SAMHSA)*

SAMHSA's "Talk. They Hear You." (TTHY) Underage Drinking Prevention National Media Campaign empowers parents and caregivers to talk with children early about alcohol and other drug use. High rates of youth alcohol use, shifting state laws regarding marijuana, and the nation's overdose epidemic are prevalent health concerns that directly affect America's parents and caregivers. Parents have a significant influence in their children's decision to experiment with alcohol, tobacco, and other drugs. The TTHY



campaign aims to accomplish the following: Increase parents' awareness of the prevalence and risk of underage drinking and substance use; equip parents with the knowledge, skills, and confidence to prevent underage drinking and substance use. The TTHY campaign involves a complex interplay of formative, process, and outcomes evaluation efforts. Evaluation findings to date suggest that SAMHSA has met many markers for early success, including strongly resonating with intended TTHY audiences. The growing body of evidence presented in the most recent Report to Congress on the Prevention and Reduction of Underage Drinking supports that key campaign messages serve as important cues to action that increase both the plans and actions of parents to talk with their children about underage drinking and other substance use. There is further evidence to suggest that TTHY increases parents' confidence not only in talking with their children about underage drinking and other substance use but also in the behavioral efficacy of their efforts. Federal partners should explore opportunities to expand the reach of the TTHY National Media Campaign among communities.

### Drug-Free Communities (DFC) Support Program:
### Local Problems, Local Solutions

The Drug-Free Communities (DFC) Support Program, created by the Drug-Free Communities Act of 1997, mobilizes communities to prevent youth substance use. Led by the Office of National Drug Control Policy (ONDCP) in partnership with the Centers for Disease Control and Prevention (CDC), the DFC Program provides grants to community coalitions to strengthen the infrastructure among local partners needed to reduce local youth substance use. Recognizing that local problems need local solutions, DFC coalitions engage multiple sectors of the community and employ a variety of environmental strategies to address local substance use problems. Through the National Coalition Institute (NCI) grant program, DFC and non-DFC funded community coalitions are trained to use the Strategic Prevention Framework (SPF) and the Seven Strategies for Community Change. These frameworks acknowledge that environmental contexts impact the risk of youth substance use.

An estimated 57 million (18-percent of the U.S. population) lived in communities served by DFC coalitions receiving funding in FY 2019. This included approximately 2.3 million middle school students ages 12 to 14 and 3.2 million high school students ages 15 to 18. As demonstrated by the National Cross Site Evaluation, DFC funded community coalitions are effective in reducing youth substance use. Across all DFC coalitions ever funded, past 30-day use of alcohol, tobacco, marijuana, and prescription drug misuse among middle schoolers declined by 25-percent, 34-percent, 13-percent, and 10-percent respectively from 2002 to 2020. High school past 30-day use of alcohol, tobacco, marijuana, and prescription drugs declined by 21-percent, 31-percent, 7-percent, and 28-percent respectively. All reductions in past 30-day prevalence of use for this sample were significant.

In addition to the substances listed above, almost all currently funded DFC coalitions have identified opioids—including prescription drugs, heroin, and synthetic opioids like fentanyl—as one of their top five substances of focus. Source: Drug-Free Communities Support Program National Cross-Site Evaluation, End-of-Year 2020 Report.

AR2022_401479



**D. Ensure guidance for the safe disposal of unused prescription medication is consistent across the interagency to support communities across the country.**
*(Agencies Involved: DOJ/DEA; EPA; HHS/CDC, FDA)*

Prescription drug misuse, the consumption of prescription medication inappropriately such as taking prescription medication not prescribed to you or taking prescription medication in a way other than prescribed, remains a significant problem for communities across the country. The 2020 National Survey on Drug Use and Health estimates that approximately 9.3 million people misused prescription pain relievers, 5.1 million people misused prescription stimulants, and 6.2 million people misused prescription tranquilizers or sedatives in 2020.[115] The availability of prescription medications found in the home and the misconception that because these medications are prescribed they are therefore safer than illicit substances, increase risk for youth substance use. The Drug Enforcement Administration's (DEA) National Prescription Drug Take-Back Initiative (NTBI) affords communities the opportunity to raise awareness about the dangers of having unused or expired prescription medications easily accessible to youth, and the need to safely secure drugs in the home. As a complement to DEA's NTBI, FDA's Remove the Risk campaign helps communities understand the important role they play in removing and properly disposing of unused prescription medications when a take back location is not immediately available. Consistent guidance around safe and environmentally responsible disposal methods to remove unused medications from the home is needed. This action is necessary to reduce availability and prevent misuse of these dangerous substances by youth and young adults.



# Harm Reduction

Harm reduction is an approach that emphasizes working directly with people who use drugs (PWUD) to prevent overdose and infectious disease transmission, improve the physical, mental, and social wellbeing of those served, and offer low-threshold options for accessing substance use disorder (SUD) treatment and other health care services. In the context of the nation's overdose epidemic, the Office of National Drug Control Policy (ONDCP) currently defines harm reduction as a public health approach designed to advance policies and programs for PWUD, based on the principles of Care/Support/Connect/Respect. For additional background on this, please see text box on Defining Harm Reduction Principles, page 32. A comprehensive harm reduction program consists of initiatives and measures aimed at mitigating the adverse public health and social consequences of drug use, which are an integral part of a continuum of care. The programs must be evidence-based and person-centered.

Policy and program changes are required to reach PWUD—central to this effort must be increased adoption of a harm reduction approach. As was highlighted by the bipartisan *Commission on Combating Synthetic Opioid Trafficking*, harm reduction programs not only offer protection from elevated risks posed by today's drug supply, but often serve as points of entry for long-term treatment.[116] Harm reduction programs build trust and engagement between outreach workers, including peers with lived experience, and PWUD. These individuals, including people experiencing unstable housing or homelessness, are at high risk of overdose and of contracting or transmitting infectious diseases, such as hepatitis B, hepatitis C or HIV, and can benefit from harm reduction services to improve their health, build linkages to physical and mental health services, and provide low-threshold, flexible opportunities to initiate substance use disorder treatment.

Not all of those who use drugs have SUD, which is a chronic medical disease that is driven by a host of biological and environmental factors. However, for many PWUD, whether they have been formally diagnosed with an SUD or not, regular substance use is difficult to stop, even when negative consequences mount. These individuals are often caught between substance use that both fuels and impedes their daily life and a health care system that lacks the engagement capacity to meet them where they are and fails to engage them in health and social services.

According to the 2020 National Survey on Drug Use and Health (NSDUH), the vast majority of the over 40 million living in the United States who need treatment for SUD are not currently receiving addiction treatment services.[117] This means that while some with SUD, as well as the larger group of PWUD, seek and receive care, there are far more who have not yet received the support they need. The reason why most of those with SUD have not received treatment is that they did not seek it. Harm reduction programs have the potential to proactively reach out to these individuals and offer them the level of care they are ready to accept. Many people with SUD also face stigma from public and health care professionals which may result in hesitation to seek treatment.[118] PWUD are at increased risk of fatal overdose, particularly from knowingly or unknowingly consuming substances containing illicitly manufactured fentanyl and its analogues. Early interventions are necessary to provide harm reduction services and offer treatment and health services to prevent loss of life.

Harm reduction programs enable PWUD to access services which reduce overdose risk and enhance health and safety. Trust developed between harm reduction outreach workers and PWUD often facilitates a range of potentially life-saving options including adequate supplies of

naloxone, sterile injection supplies such as syringes, and fentanyl test strips (FTS); linkage to evidence-based treatment, including medication for opioid use disorder (MOUD); screening for HIV and Hepatitis C infection; and access to health and social services that address social determinants.

Research shows harm reduction programs produce results. For example:

- People who use heroin and others who inject drugs who regularly utilize a syringe services program (SSP)—which provide sterile syringes and other health and social services—are five times more likely to initiate SUD treatment, compared with those who have never used an SSP.[119]

- SSPs can be effective platforms to motivate people with opioid use disorder (OUD) to enroll in substance use treatment and, over time, to reduce drug use and number of drug injections—according to a local study.[120]

- Expanded buprenorphine treatment and linkage to social services have been identified as major contributors to the success of a Philadelphia SSP.[121]

- SSPs have also been shown to substantially reduce HIV and Hepatitis C infection among people who inject drugs.[122]

- In addition to saving lives and improving health, harm reduction programs that include providing clean syringes and medications for OUD—are highly cost-effective, both when these services are provided separately and even more so when combined.[123]

- Using FTS and receiving a positive test result has been associated with changes in drug use behavior and perceptions of the risks of an overdose.[124]

- Analysis also indicates that distribution of naloxone to counter the effects of an opioid overdose not only saves lives but also produces a significant return on investment.[125]

We must continue to conduct research on the optimal ways to deliver, expand, and continuously improve the health of PWUD, especially through supporting and evaluating harm reduction programs. With an increase of public health resources being committed to support harm reduction programs, there is opportunity to evaluate current approaches and offer recommendations for improving services in collaboration with PWUD and the programs that support them. Harm reduction programs are vital, as they provide resources and connection to people who are at highest risk for overdose and poor health outcomes, including conditions often associated with injection drug use such as blood-borne diseases and heart conditions (such as endocarditis).[126] The types of interventions proposed in this chapter, such as SSPs, distribution of naloxone, FTS, and expanded opportunities to initiate low-threshold treatment with buprenorphine (e.g., without preconditions of any kind[127]) will save lives, improve health, and likely have a favorable economic benefit to society.



### ONDCP's Guiding Principles on Harm Reduction

Research and experience have shown how and why harm reduction approaches are effective. The following principles are integrated into harm reduction programs.

**1. Care.** Staff and peer outreach workers must support individuals in accessing the care they need and to overcome obstacles. This can include: naloxone and overdose prevention strategies and tools; sterile syringes and other injection equipment; medications for opioid use disorders and other SUD treatment; and physical health and mental health services. Entry into different types of low-threshold group support and mentoring relationships, including through peer workers, also must be supported.

**2. Support.** Ongoing support is often required after harm reduction or SUD treatment services are initiated. People who are in SUD treatment or have completed an episode of substance use disorder treatment may resume or continue to use substances. This can be addressed through ongoing support provided by harm reduction programs, or other evidence-based interventions. Substance use should not be a reason for punishment or to limit access to health or social services. PWUD accessing services through harm reduction organizations also need access to housing, nutritious food, education or training, and employment.

**3. Connection.** PWUD, especially those who inject drugs, those who are experiencing homelessness, or those who experience social marginalization, must have regular access to harm reduction services and the opportunity to connect with staff or volunteers—without preconditions. All PWUD in the United States deserve the opportunity to forge a personal connection with a caring non-judgmental individual as part of receiving health and social services. PWUD deserve support not just in reducing drug or alcohol use, but also in improving any aspect of their lives they want to work on.

**4. Respect.** PWUD are often in psychological or physical pain. They are generally aware of the negative consequences of their substance use on themselves and others, including family members. This knowledge can cause shame, despair, and embarrassment and create additional obstacles to treatment entry to someone who wishes to do so. Research finds that individuals who have a voice in when and how they will receive help, who establish their own harm reduction, treatment, or recovery goals, and who are treated with respect, dignity, and a recognition of their autonomy, are more receptive to receiving help and achieve better outcomes.

## Principle 1: Integrating Harm Reduction into the U.S. Substance Use Disorder System of Care Is Necessary to Save Lives and Increase Access to Treatment

It is vital that the entire SUD system of care meet people where they are and offer individuals the help that will save their lives, improve their health, and enable them to access a full menu of prevention, treatment and recovery support services on terms they will accept. Harm reduction



services are an essential part of the continuum of care for PWUD and should be linked to SUD treatment and to the larger health care system.

**A. Federal harm reduction efforts to support state and local partners.** *(Agencies Involved: AmeriCorps; DOD; DOJ/OJP; HHS/CDC, HRSA, SAMHSA; USDA; VA/VHA)*

To address SUDs and related problems effectively, health care systems, including those in correctional settings, need to be comprehensive and complementary, with all key components adequately funded. Because it helps prevent overdoses, provides opportunities for low-threshold treatment, and creates pathways into other health and social services, harm reduction is becoming a critical part of the system of care. However, it remains underfunded[128] and even where there have been some program increases, there are still too many individuals and regions of the country[129] that lack basic harm reduction services such as access to low-cost, accessible, life-saving naloxone and FTS. Federal funding must continue to support comprehensive community-based harm reduction efforts, just as they must fund traditional brick and mortar treatment centers and office-based treatment for OUD (discussed in Substance Use Disorder Treatment chapter), recovery support services (discussed in Building a Recovery-Ready Nation chapter), and prevention (discussed in Prevention and Early Intervention chapter). Public health systems, which are supported by federal behavioral health grants, should collaborate with harm reduction organizations. These organizations work directly with PWUD, helping to keep them alive and safe, building trust and connection, and creating access points to treatment and recovery services that otherwise would not exist. Congress took an important step when it appropriated dedicated federal harm reduction funding through the American Rescue Plan. These ARP funds, comprising $30 million, should complement existing funding streams that support harm reduction services. States should also consider opportunities for braiding together federal funds with existing ongoing initiatives to enhance the impact of harm reduction programs. Further, it is necessary to build and sustain community-based organizational and service capacity that will scale high quality comprehensive harm reduction efforts. Agencies should review, and as necessary, update their strategic planning documents, grant programs, and training and technical assistance efforts to ensure that harm reduction approaches are appropriately emphasized in all of their SUD and behavioral health work.

**B. Ensure that harm reduction organizations have a plentiful supply of naloxone.** *(Agencies Involved: HHS/CDC, CMS, FDA, HRSA, IHS, SAMHSA; ONDCP; VA/VHA)*

To fully address the rising overdose death rates, it is imperative that the supply and distribution of naloxone is robust and continuous, without interruption. Although naloxone formulations and prices vary, they are an extremely cost-effective life-saving intervention. Harm reduction organizations, working on the frontlines of the overdose epidemic, need a steady supply of naloxone to ensure continuity of service. Similarly, first responders and law enforcement officers need a robust supply of naloxone to save lives. One international study suggests the need for 20 times as many naloxone kits to be publicly distributed as annual opioid-related deaths per year.[130] The Department of Health and Human Services (HHS) should assess and provide recommendations on how to address bottlenecks and increase state and local availability of naloxone, especially as distributed by harm reduction organizations and also including other supply chain



concerns, such as pharmacies that do not carry naloxone or make it easily and discretely accessible to PWUD and their family and friends.

**C. Consider allowing coverage for harm reduction services.** *(Agencies Involved: DOD; HHS/CDC, CMS, HRSA, IHS, SAMHSA; ONDCP; VA/VHA)*

Public payers and private insurance companies could consider broadening coverage of harm reduction services. The Centers for Medicare & Medicaid Services (CMS) has approved Medicaid coverage for harm reduction services in New York State.[131] Although this effort is limited in scope, it demonstrates the potential to incorporate harm reduction as a public health approach at a state's option into the Medicaid program. Additional services could be considered for coverage. States may develop a comprehensive work plan for coverage opportunities for these critical services under Medicaid and Medicare, including steps to move this priority forward in the next year. Outcomes would surely be enhanced through consultation with harm reduction and public health providers and individuals with lived experience and their representatives to accommodate the unique challenges in developing a workable reimbursement/ billing approach. Covered services through harm reduction programs could incorporate direct services, care coordination, and managing transitions between different service providers. Critical services include: intake and comprehensive risk assessment; harm reduction counseling/ psychotherapy; client navigation; referrals; support groups; wellness services; peer training; opioid overdose prevention training; monitoring and follow-up; crisis intervention; reassessment; case closure; coordination activities; nutrition support; / wellness care; medication management; and supervisory oversight/ case-specific supervision. States may wish to consider services and supports to address social determinants of health, including housing, transportation, and job training as part of harm reduction. HHS could work to increase coverage of harm reduction related health care services, while protecting patient privacy. HHS should also make a special effort to bring these harm reduction services to Tribal and urban Indian communities.

**D. Comprehensively assess current evidence base on harm reduction strategies, and develop a plan for additional translational research.** *(Agencies Involved: DOJ; HHS/CDC, HRSA, NIH, SAMHSA; ONDCP; USDA; VA/VHA)*

There is a substantial evidence base[132] for the effectiveness and cost-effectiveness[133] of some harm reduction services, such as SSPs and naloxone distribution. Other strategies of engagement may be shown to be effective as research continues. Funders and service providers need access to more research about the harm reduction services that work well, and those that could be refined or adapted as they are delivered at the local level to meet the needs of specific communities. Research should include consultation with PWUD, as appropriate, in order to understand how to design programs that will best meet their needs and enhance their health. A focus must be on saving lives. Over the past five years there has been a significant expansion of naloxone distribution and utilization, nonetheless fatal overdoses have continued to increase. Research is needed to inform public health and public safety agencies how to best maximize the life-saving impact of naloxone through more robust and impactful individual and community distribution through pharmacies, health care providers, and community organizations of all kinds.

The National Institute on Drug Abuse (NIDA), in partnership with other federal partners, including the CDC, could convene a gathering of public health and harm reduction

AR2022_401485



researchers, practitioners, policy makers, and those with lived experience to chart out a "next generation" harm reduction research agenda that builds on the strong empirical foundation that exists for some interventions. This work can be aided by HRSA's Federal Office of Rural Health Policy. Critical to this effort will be concurrent work to identify and address barriers to research on harm reduction interventions, including statutory and regulatory impediments. The federal government should launch and study more harm reduction initiatives as a public health approach, and ensure that these efforts (and the evaluation of these efforts), which all involve working directly with people who currently use drugs, are not unreasonably impeded or constrained by laws, policies, or practices. The Department of Justice (DOJ) should continue to serve as an active partner in this type work by HHS and other federal partners in developing plans to ensure that this critically important research can go forward and legislative and other barriers to harm reduction research are addressed.

**E. Conduct a national harm reduction needs assessment.** *(Agencies Involved: DOD; DOJ/OJP; HHS/CDC, HRSA, SAMHSA; USDA/ORD; VA/VHA)*

There has never been a comprehensive national assessment of the country's unmet need for harm reduction services for PWUD. Harm reduction providers often struggle to meet the needs of the people they service due to resource limitations. Staff is generally underpaid and many programs rely heavily on volunteers. As programs scale up to meet the need, total staffing, as well as the capacity of the programs to provide a broader array of services, will have to grow as well. The challenge of adding to the harm reduction work force, with widespread demand for labor, can be mitigated by utilizing the millions of Americans with lived experience and providing them with training and mentoring. Data systems to support program delivery (as discussed below), while protecting patient privacy, are also under-resourced. Harm reduction initiatives provide an ideal platform both to initiate low-threshold treatment services, as well as to link people to treatment and recovery support service providers. SSPs, with additional resources, could potentially expand these efforts significantly and provide ongoing care coordination. Some states (e.g., New York,[134] Missouri,[135] and Washington[136]) have already established health hubs or other initiatives to provide harm reduction and low-threshold treatment services under one roof, a model ripe for studying and replicating. Organizations and agencies that provide peer support and health system navigation could be a part of this initiative. It will be critical to promote collaboration and avoid unnecessary duplication to the maximum extent possible. Federal agencies should assess the issue, conduct a national workforce study to provide an accurate picture of those now delivering harm reduction services, and project needs required to provide comprehensive high-quality harm reduction services wherever they are needed. This work should be completed in coordination with the National HIV/AIDS Strategy[137] and the National Viral Hepatitis Strategy.[138]

**F. Support harm reduction training and education for the treatment workforce.** *(Agencies Involved: AmeriCorps; HHS/CDC, HRSA, SAMHSA; USDA; VA/VHA)*

Current unmet needs for staffing harm reduction programs should primarily be addressed by recruiting and training new staff to serve as peer support workers and addiction counselors. In addition, many of those who work in existing treatment programs would benefit from short courses on harm reduction. In both cases, lived experience is an important asset in successfully doing this work. Because states currently certify peer



support workers under different systems an effort to develop a consistent approach and to allow for reciprocity agreement among states would provide increased flexibility and resilience to the workforce. HHS and ONDCP should engage on how to increase the availability and transferability of certification with state partners. A variety of training and academic programs can be updated, with the support of HHS, the Department of Agriculture (USDA), and VA, to more fully incorporate comprehensive harm reduction approaches into public health guidance or trainings they provide relating to PWUD. In addition, as the harm reduction work force grows, those trained in public health and traditional treatment methodology should receive short courses to supplement their pre-existing knowledge base. Many peer support workers are well-suited to work in harm reduction and can earn receive harm reduction and other relevant training as they continue to work as peers. Skepticism about harm reduction within the prevention, treatment field and recovery support services communities can be addressed through dissemination of science- and evidence-based practice and training materials, dialogue, site visits, and other appropriate mechanisms supported by HHS. All sectors of the SUD field would benefit from updated evidence-based knowledge regarding how and why harm reduction programs are reducing overdoses, addressing stigma, improving the health and safety of PWUD, and providing valuable new entry points to treatment. HHS operating divisions should integrate comprehensive harm reduction training into their work, in coordination with other federal partners, relevant NGOs, and technical assistance and training providers.

**G. Facilitate low barrier buprenorphine induction through harm reduction organizations.** *(Agencies Involved: HHS/CDC, HRSA, SAMHSA; VA/VHA)*

The emerging evidence suggests that harm reduction programs are well suited to initiate use of buprenorphine.[139,140] Because of the less formal setting of harm reduction programs, and the reality that some who initiate buprenorphine through an SSP may still be using drugs, specialized guidance should be developed by HHS. Buprenorphine was found to significantly reduces overdose risks in a local study[141] and improves health outcomes even if the patient is not fully abstinent.[142,143] Ideally, medication is supplemented by counseling and recovery support services. HHS and VA should consider

how to increase use of oral and extended-release injectable buprenorphine at harm reduction sites. Community-based harm reduction organizations are also well-suited to work with local public health departments, hospitals, emergency medical services (EMS), community health clinics, and law enforcement to follow up after non-fatal overdoses to initiate buprenorphine if individuals are not already engaged in an ongoing SUD treatment program. HHS agencies could incorporate clearer language on support for low-threshold buprenorphine induction in their notice of funding announcements for appropriate grant programs and work with harm reduction nongovernmental organizations, interested recovery community organizations, local public health departments and state drug and alcohol directors to increase the resources available for this important work, while tracking results with regard to overdose rates and retention in SUD treatment. Departments and agencies should work to incentivize research and clinical work around the field of harm reduction and substance use treatment in general. Federally funded provider and research supplemental reimbursement should be considered.



**The Promise and Challenge of Reimbursable Harm Reduction Services**

Harm reduction programs provide urgently needed health services and support to a vulnerable population and save money for governments by preventing disease transmission, lowering reliance on emergency room visits and hospitalization, and decreasing arrests, prosecutions, and incarcerations. Nonetheless, the nature of harm reduction work complicates standard reimbursement approaches and may require new mechanisms.

Building trust takes time and repeated contact. This is true both for individuals and within communities. Ways must be found to develop community-level partnerships, reimburse harm reduction organizations for this effort and to encourage program participants to accept care. In addition, some important interactions between PWUD and harm reduction staff can be very brief, while others can be quite lengthy.

Many SSPs may have never offered any health care services that could be billed to Medicaid. They can lack the infrastructure for Medicaid billing, comprehensive set of evidence-based harm reduction services or the sufficient volume of services/claims to build a self-supporting billing department or they may not operate a facility that is eligible for enrollment as a Medicaid provider. Part of making harm reduction programs sustainable is exploring reimbursement models that accommodate these challenges. Without this added support and infrastructure, it will be difficult for SSPs to develop into comprehensive, high-quality, sustainable services that promote PWUD health and safety. In addition, many harm reduction services are provided by peers, but those services provided by peers that Medicaid supports are reimbursed at lower rates.

Finally, the array of harm reduction billable services needs to be significantly expanded to benefit SSPs and their participants. Some services are not billable under Medicaid and CMS should explore changes and/or demonstrations to permit federal funds to support these services. An initial list of proposed services that could be considered for reimbursement is included in the Action Item on the next page. We note that although Medicaid support for SSPs and other harm reduction programs will be extremely important, these programs will also continue to require other federal, state, local, and private funds to fulfill their mission.

# Principle 2: Collaboration on Harm Reduction with Public Safety Agencies

Law enforcement can and should be an essential partner for harm reduction programs. For example, the North Carolina Harm Reduction Coalition, working with the Law Enforcement Assisted Diversion program (LEAD), has worked with police and sheriffs to redirect low-level offenders to community-based services, rather than incarceration.[144] Additional studies of LEAD supported initiatives find that these collaborations reduce criminal justice costs without negatively impacting public safety.[145] Critical to the success of pre-arrest diversion and deflection programs involving harm reduction programs is good communication and coordination between law enforcement agencies and program staff in order to identify appropriate cases for diversion and deflection based upon the fact-specific characteristics of each individual and situation.



**A. Conduct National-level dialogue on harm reduction with law enforcement associations.** *(Agencies Involved: DOJ/OJP; HHS; ONDCP)*

National law enforcement associations, as well as representatives of first responder organizations and state and local justice system officials, are critical partners for state and local communities in both increasing knowledge about harm reduction programs and policies and providing practical feedback about how to ensure harm reduction programs are collaborating effectively with law enforcement. Law enforcement agencies also have unique knowledge about drug markets that impact harm reduction work. This two-way dialogue is a critical element to ensure support for the further development of harm reduction initiatives to reduce overdoses and improve access to health services, while also ensuring that law enforcement officers can fulfill their public safety responsibilities. To a significant degree, the success of harm reduction programs depends on good working relationships with state and local law enforcement agencies. All Americans, whatever their background, deserve a fair opportunity to benefit from health services instead of punishment. Stigmatized populations and minority groups have often been denied access to compassionate alternatives to arrest and incarceration.[146,147,148] Voices from these communities need to be included in the development of initiatives that impact them. Dialogue at a national level between federal policy makers, law enforcement associations, and harm reduction organizations will help to strengthen positive relationships. These conversations at the national level should be designed to support and spur follow on harm reduction discussions with law enforcement and community groups at the state and local level since that is where so many critical public health and public safety decisions are made. ONDCP, in cooperation with the Office of Justice Programs (OJP), should convene a meeting about harm reduction with national law enforcement associations and advocacy groups and, based on the dialogue, produce a document for public release highlighting key principles to foster effective cooperation between law enforcement and harm reduction organizations that advance public health and public safety goals.

**B. Develop guidance on pre-arrest diversion and deflection to harm reduction programs.** *(Agencies Involved: DOJ/COPS, OJP; HHS/ASPE, CDC, HRSA, SAMHSA; ONDCP)*

State and local police departments and sheriff's offices are already critical partners with harm reduction organizations in many parts of the country. Officers often encounter individuals with SUD in their daily work, or in response to calls for assistance. When no arrest is made, officers are increasingly facilitating pre-arrest diversion or deflection into available programs when appropriate and without negatively impacting public safety. In order to produce the best outcome, referrals to service providers to the maximum extent possible should include a discussion between the individual and a clinician about what type of care is the best fit. The individual should have the opportunity to choose a harm reduction program. Often, the success of a harm reduction program in a community is directly related to the existing community partnerships, including those with local law enforcement officials. To foster this effort, law enforcement officers can help agencies identify best practices and appropriate criteria, in collaboration with public health and public safety agencies including DOJ and HHS, for referrals based upon a fact-specific



evaluation of the characteristics of the individual and situation without negatively impacting public safety.

**C. Support use of specialized case management for PWUD.** *(Agencies Involved: DOJ/OJP; HHS/CDC, HRSA, SAMHSA; ONDCP)*

Recognized by SAMHSA as one of the eight principles of community-based behavioral health services for justice-involved individuals,[149] specialized case management (SCM) incorporates treatment, social services, and social supports that address prior and current involvement with the criminal justice system and reduce the likelihood of recidivism, which enhances public safety. SCM promotes collaboration in the delivery of effective SUD, mental health, and medical treatment, as well as recovery support and social services. Comprehensive assessments identify individual needs, strengths, clinical diagnoses, and corresponding levels of care. This information serves as the foundation for an individualized care plan devised with each client. SCM, originally developed by Treatment Alternatives for Safe Communities (TASC)[150] nearly 50 years ago, is a critical element for pre-arrest alternatives to incarceration or deflection through harm reduction programs. The clinical focus, client engagement and navigation skills, and the safety net it provides help to keep individuals from falling between the cracks. It also provides a partner for police departments making the decision to avoid an arrest. Funding for case management is available through HHS grants, as well as through the Medicaid program. The potential return on investment for these monies may be substantial, since programs that reduce incarceration can produce significant savings for counties and cities. HHS and DOJ should work to ensure their current technical assistance and grant programs support SCM in harm reduction settings and consult with providers and harm reduction organizations to determine if new guidance or initiatives are required.

**D. Reduce fatal overdoses through data-driven efforts to get naloxone to where it is most urgently needed.** *(Agencies Involved: DOJ/OJP; HHS/CDC, HRSA, NIH, SAMHSA; ONDCP; VA/VHA)*

All PWUD need access to naloxone, since much of the drug supply (including stimulants such as methamphetamine and cocaine) now contain synthetic opioids. It is, however, especially urgent that a focused and comprehensive effort is made to get naloxone to those who are at the highest risk of a fatal overdose. This population includes those who: have previously had a non-fatal overdose; recently visited an emergency room for a drug related health problem; were just released from prison or jail and have a history of drug use; or have recently left a treatment program without completing the program. State and local public health and safety agencies must pool their available data and provide help to those that need better access to naloxone. These same data will reveal geographic areas with a pattern of overdoses where vulnerable populations may live. This knowledge can empower a much more efficient distribution of naloxone and can guide harm reduction programs' outreach. Federal departments, especially HHS and DOJ, should ensure their grant funds support these types of data-driven collaborations, as well as the collection and dissemination of best practices information. The experience of the Veterans Health Administration's Overdose Education and Naloxone Distribution Program[151] should inform this work. HHS should saturate geographic regions with high overdose rates with naloxone in order to experiment with dissemination models which ensure convenient, low cost, high volume access.



# Principle 3: Foster Changes in State Laws and Policies to Support Harm Reduction

 Harm reduction programs reduce overdoses,[152] improve the health of PWUD,[153,154] and, as referenced in the chapter introduction above, increase treatment entry. Federal, state, and local agencies must identify obstacles to expansion of harm reduction programs and address them. Grantees cannot use most annual Federal funding to purchase syringes. However, grantees may use funding from Section 2706 of the American Rescue Plan ($30 million) appropriated to support harm reduction programs, including to purchase syringes. Sterile syringes are a critical function of SSPs and purchasing the syringes can be costly, especially for small programs with few resources. Often the need for sterile syringes draws PWUD into initial contact with health workers, providing an opportunity for programs to connect PWUD with other services, including low-threshold SUD treatment with buprenorphine.

In addition to ensuring better access to harm reduction supplies and services, there are other changes required to ensure harm reduction programs have what they need to help their participants. At a time when much of the U.S. supply of illicit drugs, as well as black-market prescription medications, contain deadly synthetic opioids such as fentanyl, PWUD are at a high risk of overdose. In order to keep people safe, it is necessary for states to update drug paraphernalia laws to allow for distribution of FTS. Further, harm reduction programs are strengthened when they are empowered to connect those they serve to stable housing, services, and resources to address challenges related to the social determinants of health. Further, because data analytics both help inform harm reduction workers who is at highest risk of overdose and assist in program management, tailored knowledge management systems are needed to support harm reduction programs, while protecting participant privacy.

### A. Work with states to strengthen and expand Good Samaritan laws. *(Agencies Involved: DOJ/OJP; HHS/CDC, HRSA, NIH, SAMHSA; ONDCP)*

Research studies conducted prior to the COVID-19 pandemic suggest there is a pattern of lower rates of opioid-related overdose deaths among states that have enacted Good Samaritan laws.[155] These laws can increase the likelihood that individuals will call 911 to seek medical assistance when they see an overdose. However, not all of these laws are equal; they differ, for example, in which offenses they cover and the level of protection they offer. While some state laws provide full criminal immunity from arrest, charges, and prosecution for those who contact law enforcement to prevent a fatal overdose, others mandate criminal charges. In some places, without such explicit protections, health service providers who seek to disseminate sterile syringes and work closely with PWUD are unable to operate an SSP, or must operate in a very limited fashion in order to avoid criminal prosecution. In order to establish a science-based, public health approach to reducing overdose deaths and the transmission of disease via injection drug use, Good Samaritan laws should be expanded, promoted, and fully utilized to protect harm reduction program staff—working every day to save lives—from inappropriate entanglement with legal systems. ONDCP should work with DOJ and HHS to assess current state Good Samaritan laws, develop best practices and work to educate law enforcement and the public about the laws. Research from a local study indicate that even PWUD who do live a state with strong legal protections sometimes do not know that they will not be arrested[156] if they report an overdose. Thus, it is equally important for federal



agencies to provide technical assistance to states on development and implementation of strong laws, and to make sure PWUD know about how they are protected.

**B. Address obstacles to the expansion of drug checking, syringe services programs, and buprenorphine induction at harm reduction programs.** *(Agencies Involved: DOJ; HHS; ONDCP)*

Federal and/ or state restrictions on urgently needed supplies for harm reduction programs (including syringes, drug checking equipment and oral and injectable treatment medications) impair program effectiveness, impose unreasonable burdens on harm reduction programs, and limit their ability to serve a vital public health function. These harm reduction programs work with a population facing serious threats to their health and safety and can benefit from increased access to syringes or other equipment, such as mass spectrometers[157] that can detect potentially deadly fentanyl in drug supplies, puts lives at risk. The use of FTS is becoming increasingly common. For example, in Massachusetts and Maine, 21 police departments are participating in the One2One initiative which supports police officers and community partners in distributing FTS kits.[158] Many more people can be served and many more lives saved if restrictions are identified and eliminated. In addition to updating Good Samaritan laws (as highlighted above), federal agencies need to examine current drug-related laws, policies, and grant and research programs, to better integrate harm reduction. HHS should review its substance use programs department-wide to identify policies or practices that may impede SSPs and other harm reduction services and studies. ONDCP will work with federal partners to identify obstacles to the safe, legal, and efficient operation of harm reduction programs and develop proposals for consideration.

**C. Promote access to services and supports addressing social determinants of health for those receiving harm reduction services.** *(Agencies Involved: AmeriCorps; DOD; HHS/CDC, HRSA, NIH, SAMHSA; HUD; USDA; VA/VHA)*

Emerging evidence indicates that social determinants of health impact outcomes for PWUD.[159] This may be especially true for people experiencing unstable housing or homelessness and who have had repeated encounters with law enforcement. Access to nutritious food, showers, lockers, laundry, transportation, communications, social activities, employment and education are also valuable. Harm reduction outreach workers know the clients they work with, what their challenges are, and which services they could benefit from. Empowering harm reduction staff to connect people they serve to appropriate assistance helps to further build rapport between client and program staff, create opportunities for treatment initiation, and foster improved health outcomes. HHS should collect and disseminate emerging evidence on the intersection of harm reduction, social determinants of health and substance use outcomes, and identify promising public health practices. SAMHSA should collaborate with CDC to encourage grantees to address social determinants to improve the health and treatment engagement of PWUD, emphasizing the importance of consolidating an array of evidence-based practices and services to enable "one stop shopping." NIDA and CDC should support research in this area.

**D. Identify knowledge management tools and conduct implementation science research to foster efficient delivery of harm reduction services while protecting privacy.** *(Agencies Involved: DOJ; HHS/CDC, NIH; ONDCP)*



Harm reduction programs face significant challenges staying in touch with those they serve, delivering requested services and supplies, maintaining engagement, and following up. A variety of communications and data management tools should be available to harm reduction programs to facilitate sustained service delivery and to help build connectivity between program and participants, while allowing for the creation of privacy protected records, to ensure people do not 'fall through the cracks' due to staff turnover or changes in behavior patterns by PWUD. Analysis of emergency and social service utilization (e.g., contacts with hospitals, EMS, or law enforcement) may aid programs in identifying and proactively reaching out to those at high risk of overdose. As always with harm reduction programs, all services are voluntary and at the discretion of the person seeking services. However, it is critical to recognize that the person being served may be suffering from addiction, a chronic brain disorder. Therefore, proactively checking in on a person, expressing concern and encouraging them to drop by a mobile clinic, or offering naloxone and support services can save lives while still fully respecting the autonomy and agency of PWUD. New innovations in connecting to PWUD, through street outreach and distribution of supplies, developed during the pandemic should be made permanent. Federal agencies should develop and disseminate data management practice guidelines that help harm reduction staff provide services while protecting the privacy interests of patients. HHS, DOJ, and ONDCP should consult with data science experts in government, non-profits, and the private sector to identify the most effective tools and approaches to put them in the hands of those working in direct service to reduce overdoses and improve the health and safety of PWUD. This work should inform the publication of guidance documents, the provision of technical assistance and the updating of substance-related grant guidance by DOJ, HHS, and ONDCP to ensure such technological support is an allowable use for federal funds.

# Principle 4: Support Partnerships on Harm Reduction

Key partners in public health, other SUD system and drug policy stakeholders may have important questions, as well as insights and suggestions for harm reduction administrators and staff. ONDCP will seek to foster dialogue, surface key issues, and use what is learned to both enhance mutual understanding, improve communications strategies, and to identify additional opportunities to better meet the needs of Americans impacted by SUD.

A. **Consult with experts on harm reduction.** *(Agencies Involved: DOJ/OJP; DOS; HHS/CDC, HRSA, NIH, SAMHSA; ONDCP; VA/VHA)*

Given that the majority of people with SUD are not engaged in treatment, harm reduction is a valuable and under-utilized public health tool. It is critically important to identify ways to better integrate harm reduction services with other health initiatives, to continue research and data collection, and to further improve existing harm reduction initiatives. ONDCP, in collaboration with other agencies listed above will seek, through ad hoc meetings and exchanges, to learn from the experiences of federal, state, and local officials and harm reduction organizations to ensure we understand the state of harm reduction programs today around the country and the challenges they, and their partners in government face.

AR2022_401493


**B. Facilitate increased dialogue among prevention, treatment, public health, and harm reduction communities.** *(Agencies Involved: DOJ; HHS; ONDCP)*

Dialogue between groups and individuals with different perspectives can identify areas of common ground and potential options for improved collaboration. People with SUD often move back and forth between harm reduction programs and SUD programs. Dialogue between administrators from both groups can make this experience smoother for program participants, wherever they are provided. During the overdose epidemic, a range of health and social service providers, peer recovery support organizations, first responders, and hospitals launched innovative pilot programs. The last five years have seen the expansion of recovery community organizations and a variety of treatment providers engaging with PWUD at different stages of their SUD and recovery journeys.

At the same time, the connectivity between incarceration settings and behavioral health providers is growing. These experiences should inform the dialogue. ONDCP, HHS, and DOJ should organize discussions between harm reduction, treatment, and recovery groups and disseminate principles highlighting where common ground was identified.

**C. Encourage the coordinated use of federal grant funds for harm reduction.** *(Agencies Involved: DOJ/OJP; HHS/CDC, HRSA, SAMHSA; ONDCP)*

Many harm reduction services are eligible for federal funding through states. However, most states have, to date, dedicated only limited amounts of their prevention and treatment federal grant funds to SSPs and other harm reduction initiatives. There may be obstacles to such funding, such as record-keeping or other federal or state laws that impede distributing grant funds to harm reduction organizations. HHS and DOJ should identify and address federal barriers and issue guidance to improve comprehensive community-based harm reduction programs' access to federal grant funds, including for health screening and linkage to care not just for SUD treatment both for any identified health issue. Further, HHS and DOJ should review existing technical assistance and training programs to ensure that they have the expertise and capacity to serve those interested in expanding comprehensive harm reduction services, including both non-profit groups and state and local agencies. HHS should also assess how to better understand the share of federal grant funds that are dedicated to harm reduction.

> *"Abstinence isn't wrong, and it is a deeply desired goal for many drug users, but there are changes a person can accomplish whether they stop using or not. The hallmark of harm reduction models is a combination of respect for the customer, non-judgmental stances, compassion, empathy and practicality."*
>
> —Edith Springer[1]
>
> Springer E. No. 15 - Winter 2003, Harm Reduction Communication. Issuu. https://issuu.com/harmreduction/docs/hrc_2003_winter_editedtoc. Published January 1, 2003. Accessed September 2, 2021.

**D. Consult with international partners on harm reduction programs.** *(Agencies Involved: DOS; ONDCP; USAID)*

In addition to the important work and research conducted inside the United States, the international community has learned much about harm reduction initiatives over the past two decades or more. It is important to highlight that just as within the United States



there is a wide range of variation in defining what is described as harm reduction, this is also true internationally. Some countries have a strong public posture against harm reduction, yet may widely distribute naloxone. Although U.S. laws and traditions may differ from those of international partners, consultations with those partners and a review of the research literature associated with their efforts can inform the development of U.S. programs, including by identifying barriers to program expansion and fair and equitable access to services. The United States should learn what we can from the successes and challenges associated with developing and sustaining international harm reduction initiatives. The Department of State, ONDCP and HHS should collaborate on a consultation process to hear the views of international partners and share existing international resources as appropriate.

AR2022_401495



# Substance Use Disorder Treatment

According to the 2020 National Survey on Drug Use and Health (the National Survey),[2] 40.3 million people aged 12 or older had a past-year substance use disorder (SUD).[160] Among these, 70.3-percent (or 28.3 million people) had a past year alcohol use disorder, 45.7-percent (or 18.4 million people) had a past year illicit drug use disorder, and 16-percent (or 6.5 million people) had both an alcohol use disorder and an illicit drug use disorder.[161] This survey also shows that, in 2020, among the 41.1 million people who needed treatment only 2.7 million (6.5-percent) of received treatment received treatment at a specialty treatment facility in the past year.[162] This disparity in unmet needs of SUD is known as the "treatment gap."

Substantial federal funding in recent years has expanded and improved treatment services; however, access to diagnostic and treatment opportunities do not exist in the same manner that they do for other chronic illnesses (e.g., the rate of undiagnosed diabetes is about 39-percent).[163] Research shows that more than 95-percent of people identified in the 2020 National Survey as meeting criteria for SUD who did not seek treatment felt they did not need treatment.[164] Another 3-percent of those individuals thought they should get treatment but did not try to get it.[165]

SUDs including alcohol, prescription and illicit drug use disorders are medical conditions[166] that respond to evidence-based treatments (EBTs).[167,168,169] EBTs have scientific evidence supporting the effectiveness of the treatments, and may be pharmacotherapies, such as methadone (for opioid use disorder, or OUD) or naltrexone (used for both OUD and alcohol use disorder), or evidence-based therapies, such as contingency management. It is clear that if we were to appropriately screen, diagnose, and treat individuals with SUD similarly to chronic conditions we would be able to significantly reduce mortality and several aspects of morbidity associated with substance use. As such, the more people who are treated, the fewer lives will be lost. Treating more people who have SUD is one of the highest drug policy priorities.

Certain factors are associated with an elevated risk of overdose for people with cocaine, methamphetamine, other stimulant, or OUD (or a combination of these) such as experiencing homelessness,[170] injecting drugs,[171] having a prior history of non-fatal overdose,[172] using non-prescribed benzodiazepines,[173] and detoxification without follow-up medication treatment (in people who use opioids ).[174] Additionally, overdose is the highest risk factor for death among people leaving incarceration.[175,176] Geographic and other barriers to accessing services can confer vulnerability and even differ based on race.[177] Studies have shown racial disparity in naloxone prescribing and delivery is a health inequity that must be addressed.[178] Treatment for high-risk populations is especially important. Evidence-based treatments have been shown to reduce overdose risk and mortality.[179] However, people of color, pregnant people and individuals with children may find it difficult to access or complete treatment due to the barriers erected by some social determinants of health.[180,181,182] Pregnant and postpartum individuals experience additional barriers given the lack of integration between OB/Gyn care and SUD treatment. Some individuals live in treatment deserts without any treatment at all or with treatment too distant to be accessible via available or affordable transportation.[183] Finally, while the recent overdose epidemic began as a problem predominately in White people related to the oversupply of prescription opioids, overdose rates have begun climbing in people of color.[184,185]

---

[2] These numbers do not include people in institutional settings like prisons, jails, dormitories, or hospitals, and they also do not count individuals who are experiencing homelessness, leading to an undercount of people who may benefit from treatment



Neighborhoods with smaller White populations may have less access to certain treatments (e.g., buprenorphine).[186] Other underserved areas include rural counties, Tribal communities, and states that thus far have chosen not to expand Medicaid.[3]

EBTs can improve outcomes but are not as widely available as they need to be.[187] Research has shown that for OUDs, the U.S. Food and Drug Administration (FDA) approved medications most effectively reduce overdose mortality, increase abstinence, and improve quality of life.[188] Research with office-based buprenorphine has shown that adding additional behavioral therapy sometimes does not improve outcomes.[189,190] For OUDs related to prescription opioids, research reported that medicine managed by a prescriber can produce abstinence outcomes as good as medication plus a very robust psychosocial evidence-based treatment.[191] Recognizing the overall effectiveness of FDA approved MOUD, they should be accessible to any individual with an OUD regardless of the availability of, or their willingness to participate in, additional therapy except where that participation is mandated by regulation.

People with SUD often face prejudice, stigma, and discrimination, and this especially affects Black individuals.[192] Stigmatizing attitudes towards drug use and people who use drugs (PWUD) exist throughout our society, including in health care.[193] One study found that PWUD were discouraged from accessing medical care because they do not trust health care providers to maintain their privacy from law enforcement.[194] We must continue to ensure privacy protections for people in treatment while removing stigma in health care to enhance patient engagement in treatment.[195,196] Systems engineering and behavioral health research suggest that a focus on validation and elements of process improvement science are critical for engagement in treatment.[197,198,199]

Research shows that people with SUD are viewed more negatively than people with physical or other mental disorders.[200,201] When the subject of a vignette was referred to as a "substance abuser" rather than as a "person having a substance use disorder," even highly trained SUD and mental health clinicians were significantly more likely to assign blame and believe that an individual should be subjected to punitive (e.g., jail sentence) rather than therapeutic measures.[202] Blame is counterproductive because many factors other than individual decision-making impact whether a person tries a drug or develops SUD. Adverse Childhood Experiences (ACEs), like growing up in a home with a parent with SUD increases the risk for developing SUD.[203] To increase the number of people in treatment, societal attitudes towards people with SUD must change. The U.S Preventive Services Task force recently recommended screening adults for unhealthy substance use as a Grade B recommendation.[204] Members of the health, child welfare and justice systems should receive training to recognize SUD as a medical condition like diabetes or cancer. Practitioners and support staff should receive training to serve these individuals. Finally, attitudes more broadly about people in need of treatment can change but this likely only will happen if individuals feel safe to speak up.

Treatment is effective and an estimated 23 million people in this country are in recovery.[205] However, additional work is necessary to eliminate the unmet need for evidence-based SUD treatment. To meet the *Strategy*'s stated treatment goals, including increased access to quality treatment, reduced stigma, dedicated interventions for the most vulnerable, and a trained

---

3 The Patient Protection and Affordable Care Act (ACA, P.L. 111-148, as amended) extended Medicaid eligibility to all adults under age 65 with incomes below 133 percent of the federal poverty level. However, the June 2012 National Federation of Independent Business (NFIB) v. Sebelius Supreme Court decision effectively made the expansion optional for states.



workforce are necessary. In addition, novel approaches such as the use of technology[206] to facilitate entrance and retention in treatment must also be supported. Federal agencies must support efforts nationwide to identify people most at risk of overdose, expand access to evidence-based treatments, improve reimbursement models, and build the workforce and infrastructure needed so more people can enter long term recovery.

# Principle 1: Improve Treatment Engagement by Meeting People Where They Are

It is imperative to find ways to identify and engage people with SUD into treatment that will benefit them. Medical practitioners routinely screen for and treat other conditions that have few if any obvious symptoms (e.g., diabetes), and SUD should be no different. Primary care providers should be at the forefront of screening for SUD. To do that they must be equipped to routinely screen, assess, and treat SUD. Technological supports (such as screening reminders) can be of help as providers incorporate and deliver such services.

Engagement opportunities in locations where people who use drugs (PWUD) spend time is essential. Hospitals, syringe services programs (SSPs, discussed in detail in the previous chapter), infectious disease clinics, and health departments are all ideal locations to conduct screening and improve engagement rates. People with SUD encounter law enforcement in multiple settings. Programs that partner with law enforcement to divert and deflect appropriate individuals away from the justice system and into treatment and prevent incarceration without negatively impacting public safety are important.

Making treatments more accessible for people with different needs is essential to increasing treatment engagement. For example, housing for people with SUD who are experiencing homelessness, or providing childcare for children of a parent in treatment may decrease barriers to treatment participation and ultimately help more individuals enter recovery.[207,208] Transportation is also a significant barrier to treatment, particularly in rural areas, where treatment services may not exist and individuals must travel distances for treatment but lack public or reliable transportation.

The "Treatment Cascade" concept suggests that the more individuals are successfully diagnosed, entering treatment and receiving tailored evidence-based treatment, the more people who will enter long term recovery.[209] Unfortunately, as the figure below demonstrates, the U.S. has gaps in these rates and needs to radically increase them starting with the percentage diagnosed.

AR2022_401498

Figure: Hypothetical substance use disorders cascade of care for US population 12+, 2020. SUD = substance use disorders[210],[211]



Source: SAMHSA, 2021

**A. Implement a national case-finding initiative.** *(Agencies Involved: DOD; HHS/CMS, HRSA, SAMHSA; VA/VHA; ONDCP)*

A medical provider screening, assessing, and then recommending treatment to a patient especially coupled with feedback concerning the health effects and risks of ongoing use can raise awareness and motivation for change. All sectors should be involved including state, county and city health departments; clinics that offer testing for HIV/Hepatitis C and sexually transmitted diseases; crisis centers, emergency departments; and hospital trauma units. All patients who meet screening thresholds should have an assessment and efforts should be made to engage that patient in appropriate treatment. Agency principals should engage with national stakeholder organizations and establish this as a standard of practice, and all federal agencies that include providers who treat SUD should fully implement case-finding, assessment, and primary care feedback in their primary care patient population by 2024.

**B. Scale up primary care screening technology and computerized brief interventions to promote treatment entry.** *(Agencies Involved: DOD; DOJ/BOP; HHS/HRSA, IHS, NIH; VA/VHA)*

During the COVID-19 pandemic many of us have gotten used to being screened for symptoms by providers at the start of medical visits. Use of screening including tech-enabled screening tools and non-judgmental brief interventions like the National Institute on Drug Abuse's (NIDA) "Video Doctor"[212] program and other technology assisted motivational interviewing (TAMI) tools can help screen people with SUD and may motivate some to attend treatment. These approaches may reduce the need to train providers to do screening. Approaches like these should be widely deployed.[213]Providers should link those who screen positive to substance use disorder assessment and then treatment if they have substance use disorders.



**C. Support engagement through "low-threshold" or "low barrier to entry" settings.**
*(Agencies Involved: HHS/SAMHSA; DOD, VA/VHA)*

"Low-threshold" programs that make it relatively easy to get started or participate in treatment can include hospital clinics, telemedicine treatment initiation, mobile methadone programs or other programs which do not require people to "jump through hoops" to start in care. Although drug use has been historically grounds for dismissal from some treatment programs, providers are learning that flexibility can be offered to accommodate a person who might be willing to stop opioid use but not all other drugs. Education about other drug use and the need to take precautions when using benzodiazepines and buprenorphine, for example, may be an area that a provider negotiates with a patient because the benefits of being on buprenorphine outweigh the risks of co-use. Agencies should review their policies to allow greater flexibility and site treatment access where people already live or spend time such as in health care for the homeless programs or in SSPs.

# Principle 2: Improving Treatment Quality Including Payment Reform

Ample research shows that people with cocaine and methamphetamine use disorder respond to specific psychosocial and behavioral treatments.[214,215,216,217] Also, research shows that the Food and Drug Administration (FDA) approved MOUD save lives[218] and can outperform treatment without medication.[219,220] Thus, they should be accessible to any individuals with OUD regardless of whether that individual has access to, or chooses to participate in psychosocial or behavioral treatment unless the behavioral treatment is required by regulation.

A number of policy barriers prevent access to the most efficacious treatments for SUD. To vastly increase the percentage of people needing treatment who participate in evidence-based treatment in a given year, it is important to make evidence-based treatment as accessible and available as primary care. It is also essential that we prioritize utilizing treatment dollars efficiently by recognizing treatment dollars are limited, but the need is vast. Wherever possible, inexpensive oral methadone and sublingual buprenorphine should be the backbone of our treatment system for caring for people with opioid use disorder, and selected far more often because of their relative safety, efficacy, and low cost.

In addition, approaches such as motivational incentives, which utilize tangible rewards to reinforce positive behaviors such as abstinence from opioids and to motivate and sustain treatment adherence in patients who suffer from SUD, should be more widely available. These incentives are an integral part of protocol-driven and evidenced-based contingency management programs and can be offered through smartphone applications and smart debit card technology designed to provide comprehensive and personalized treatment for SUD (including, for opioid, stimulant, alcohol, and nicotine use disorders). These programs include tools that enable, for example, automated appointment reminders and attendance verification, automated medication reminders, drug, alcohol, and tobacco/nicotine testing, self-guided cognitive behavioral therapy, and recovery coaching.

In addition, prescription digital therapeutics are software-based disease treatments intended to prevent or treat a disease that are regulated by the US Food and Drug Administration. For



example, one prescription digital therapeutic authorized in 2018 delivers cognitive behavioral therapy for individuals receiving buprenorphine for opioid use disorder. [221] Further exploration of such digital therapeutics and other health technology in the form of digital screening, assessment and treatment could help increase services for a wide array of patients.

Payment reform is also essential. Insufficient insurance coverage, provider reimbursement rates that do not cover activities required to sustain a practice, and non-compliance with federal parity laws requiring certain insurance plans to provide comparable coverage of physical and behavioral health services all may impact access to treatment as well as whether people can succeed in treatment. Research shows lower overdose rates in Medicaid expansion states.[222] Although the Substance Abuse Prevention and Treatment Block Grants (Block Grant) as well as new money from Congress through the 21st Century Cures Act and State Opioid Response (SOR) provide for certain services in all States (Medicaid expansion and non-expansion), these sources of funding do not replace the more comprehensive access to care through Medicaid which would otherwise be offered if all States expanded coverage via opportunities offered through the Affordable Care Act. Reform is needed so that those treating groups most at risk receive funding, and so providers can make a business case for treating more of these patients and for accepting insurance.

A. **Provide technical assistance and support to Congress to remove outdated requirements that limit access to MOUD.** *(Agencies Involved: HHS/FDA, SAMHSA; DOJ/DEA; ONDCP)*

The Office of National Drug Control Policy (ONDCP) will work with interagency partners to provide technical assistance and support to Congress in order to eliminate the outdated requirements and overregulation that prevents widespread use of buprenorphine products for OUD treatment by licensed medical treatment providers.

B. **Explore linkages to training on controlled substance prescribing to DEA registration or another prescriber requirement.** *(Agencies Involved: DOJ/DEA; HHS/FDA, SAMHSA; ONDCP)*

ONDCP will work with interagency partners to explore linkages to training on the use of controlled substances for both pain and addiction treatment by exploring options to either (1) require minimum training as part of the Drug Enforcement Administration (DEA) registration or (2) create a requirement for training through the Opioid Analgesic Risk Evaluation Mitigation Strategy (REMS), pursuing a legislative solution if necessary.

C. **Explore reimbursement for evidence-based motivational incentives such as contingency management, and explore emerging evidence for digital screening, assessment, and treatment (digital therapeutics).** *(Agencies Involved: HHS/ASPE, CMS; VA/VHA, DOD)*

Coverage for the provision of motivational incentives could be considered within health plans. This will require considering billing codes and setting reimbursement parameters. Coverage should be explored for the incentives themselves, as well as for the provider costs for administering them and the digital tools that help enable the treatment (including FDA-cleared and evidence-based approaches). Revisions to existing payment bundles could be assessed by the Department of Health and Human Services (HHS) payers to include these programs alongside MOUD and psychotherapy, as patients with OUD and other SUDs may need concurrent treatment. If needed, HHS, VHA, and DOD


should request authority from Congress to cover the costs of motivational incentives and reimburse providers who work with patients using incentives and digital services for contingency management.

**D. Incentive-Based Treatment using section 1115 Medicaid Demonstration Authority.** *(Agencies Involved: HHS/ASPE, CMS, NIH, SAMHSA)*

States may apply to the Centers for Medicare & Medicaid Services (CMS) for Medicaid section 1115 demonstration programs to test innovative programs that may not otherwise be eligible for Medicaid reimbursement.

**E. Treatment Navigation and Entry Assistance.** *(Agencies Involved: HHS/CMS, NIH, SAMHSA; ONDCP)*

Parents, caregivers, and family members may not understand how to access care. To help individuals navigate options, providers and health care systems can be helpful in making referrals. However, these services are often not reimbursable under most plans. Requiring primary care providers to be responsible for ensuring patients access care without reimbursement to support care coordination and management can result in referrals to treatment that patients do not ultimately access without a navigator to hand a patient off to a treatment provider. For these reasons, insured patient's insurance plans should take a more active role in treatment access navigation, and monitor this coverage by virtue of their awareness of in- and out-of-network participation by providers in their plans. Federal agencies and external stakeholders, including state departments and national organizations, should engage with insurance companies to discuss the increased involvement of insurance case managers to help patients navigate treatment options and arrange for care. Reimbursement for patient navigation services should be researched.

**F. Review Medicare reimbursement rates.** *(Agencies Involved: DOJ/ DEA; HHS/CMS,)*

The level of reimbursement can affect providers' decision to furnish services to patients covered under Medicare.[223] At least one study of commercial claims databases shows that psychiatrists receive lower reimbursement relative to other medical specialists in network but higher reimbursement when out of network for patients with private insurance.[224] Moreover, people with SUD may have more medically complex conditions that require more time and resources to treat. Standard reimbursement models centered around a 15-minute office visit may be unlikely to adequately reflect the resources needed for treating patients with SUD, many of whom have comorbid conditions, and few resources. The federal government should evaluate the most effective strategies for addressing concerns regarding reimbursement rates in order to encourage maximum participation among SUD treatment providers in health plans.

**G. Make methadone more accessible for patients in federal health care systems.** *(Agencies Involved: DOJ/BOP; HHS/IHS; VA/VHA)*

Many federal treatment providers are ineligible to offer methadone to treat their patients with OUD because they do not work in federally regulated opioid treatment programs (OTPs). However, these systems should be able to offer the full complement of medication to treat OUD. Federal health service providers should not be hampered by regulations meant for the public and private sectors, especially when federal departments have direct control over the health care professionals they employ. The Administration


should explore changes to the Controlled Substances Act to permit federal health service practitioners to offer opioid treatment with all forms of MOUD outside the OTP system.

**H. Review and update withdrawal management programs and policies to be followed by treatment programs and services.** *(Agencies Involved: DOD; DOJ/DEA; HHS/CMS, IHS, SAMHSA; VA/VHA)*

Research shows that withdrawal management programs (formerly referred to as a "detoxification" programs for OUD) can actually raise the risk of overdose death because the patient participates in treatment only for a short period of time, loses opioid tolerance, and is not protected by medication in the event of relapse.[225] Withdrawal management should never be considered a complete episode of care. If patients do not desire to be on maintenance medication, withdrawal should be managed according to standards of care using medications to help wean patients from the drugs on which they are dependent, and the patient should be transitioned to appropriate additional treatment services. Withdrawal management service provider should arrange for additional care as needed including scheduling appointments, arranging transportation and other "warm handoff" type of logistics arrangements, as well as overdose education and naloxone access. Agencies should review and update their policies to include these services in an effort to decrease fatalities associated with withdrawal management programs.

**I. Review and revise regulations to support low-barrier buprenorphine programs.** *(Agencies Involved: HHS/SAMHSA)*

Low-barrier to entry buprenorphine programs are controversial in part because they involve letting patients start treatment without complete abstinence from other drugs.[226,227] To help mitigate this risk, the regulations and guidance to providers for buprenorphine treatment outside of Federal Opioid Treatment Programs should be revised to address needed risk mitigation like issuing naloxone, educating the patient about the dangers of benzodiazepines, and recommending monitoring to prevent overdose.



**Veteran Health Administration's Contingency Management "Incentives" Intervention**

Contingency management interventions use incentives in the form of tangible goods or services for completing certain treatment related activities or for maintaining abstinence. They are among the most effective treatments for stimulant use disorder but they are rarely used outside of research settings.[1,2] The Department of Veterans Affairs supports contingency management (CM) incentive interventions by offering incentives linked to drug negative urine samples which patients enrolled in treatment can then spend in the VA hospital canteen.[3] To be effective at engaging patients with anhedonia, a condition of disinterest similar to depression that can occur following stimulants cessation, contingency management interventions should offer incentives at values shown effective in research trials or risk failure.. Much developmental research has been conducted on ways to decrease the overall cost of incentives while maintaining the effects and new models like prize drawing protocols have been shown to be cost-effective.[4] The VA is the first organization to implement this evidence-based treatment on a wide-scale. Its experience can serve as a model for other health care systems interested in using incentives to treat stimulant use disorder, particularly its training and supervision.

Sources:
[1] Higgins ST, Kurti AN, Davis DR. Voucher-Based Contingency Management is Efficacious but Underutilized in Treating Addictions. Perspect Behav Sci. 2019;42(3):501-524. Published 2019 Jul 29. doi:10.1007/s40614-019-00216-z
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6768932/pdf/40614_2019_Article_216.pdf
[2] Rash CJ, DePhilippis D. Considerations for Implementing Contingency Management in Substance Abuse Treatment Clinics: The Veterans Affairs Initiative as a Model. Perspect Behav Sci. 2019;42(3):479-499. Published 2019 Jun 26. doi:10.1007/s40614-019-00204-3
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6768930/pdf/40614_2019_Article_204.pdf
[3] Petry NM, DePhilippis D, Rash CJ, Drapkin M, McKay JR. Nationwide dissemination of contingency management: the Veterans Administration initiative. Am J Addict. 2014;23(3):205-210. doi:10.1111/j.1521-0391.2014.12092.xhttps://www.ncbi.nlm.nih.gov/pmc/articles/PMC3986725/pdf/nihms507133.pdf
[4] Olmstead TA, Petry NM. The cost-effectiveness of prize-based and voucher-based contingency management in a population of cocaine- or opioid-dependent outpatients. Drug Alcohol Depend. 2009;102(1-3):108-115. doi:10.1016/j.drugalcdep.2009.02.005 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2679219/pdf/nihms99385.pdf

**J.  Review and update opioid treatment program regulations.** *(Agencies Involved: DOJ/DEA; HHS/SAMHSA)*

Existing federal regulations for opioid treatment with methadone pose barriers like requiring people under 18 to "fail first" on non-medication treatment before starting methadone.[228] They also do not require overdose prevention education, access to naloxone, or training on naloxone's use. ONDCP is currently supporting a review of these regulations by an independent organization. Once that is completed, and if warranted and approved by the interagency, Federal Opioid Treatment Program regulations should be updated to permit safer and better access to methadone treatment for OUD, and to require overdose prevention education and naloxone training. Regulators should consider allowing methadone dispensing from pharmacies as is done in the United Kingdom because of their greater accessibility in most communities relative to OTPs.



# Principle 3: Supporting At-Risk Populations

To substantially decrease overdose deaths and the burden from SUD, we must strategically address the barriers for treatment among those groups that are most at risk for overdose deaths and other negative consequences. One example is individuals who are incarcerated or reentering after incarceration- a disproportionate number of whom are Black, Indigenous or People of Color (BIPOC).[229] Although it would be ideal to treat people before or, where appropriate, as an alternative to arrest, bringing treatment "behind the walls" is an underutilized opportunity to treat people with SUD.

Certain populations could benefit from treatment but it may be close to impossible for them to participate without first having met their needs for shelter, childcare, or other health issues resulting from drug use like overdose or infections. We also must continue to maintain strong privacy protections for people with SUD as we reform treatment so people who need care will attend without fear of shame, nor social or legal repercussions. Research has shown that people avoided treatment over concerns that providers might turn them into law enforcement.[230, 231] Pregnant people[232] and parents may avoid seeking care and assistance out of fear of being reported to child welfare.[233]

A. **Utilize federal grant mechanisms to support people most in need of treatment to include reimbursing for wrap around services.** *(Agencies Involved: DOJ/OJP; HHS/CMS, NIH, SAMHSA; HUD; USDA)*

The Substance Abuse Prevention and Treatment Block Grant and other relatively new grant programs provide money to states to offer payment to certain non-profit treatment providers to care for the uninsured or under-insured, as well as to implement prevention services. But treatment needs often extend beyond simply provider reimbursement and should include support and reimburse for wrap around services. The Administration should examine ways existing grant mechanisms may be better utilized to best serve people most in need of treatment through the provision of safe, child-friendly housing or by widening access to cover care of people who are incarcerated. Use of federal grant dollars by for-profit treatment providers who have significant capacity to provide services also should be considered as a more widely utilized option. Changes should consider availability of state Medicaid dollars, opioid litigation settlement dollars, and the behavioral health infrastructure so economically vulnerable and people with stimulant, opioid, and cocaine use disorders always receive evidence-based treatment and wrap around social support services.

B. **Expand mobile units for MOUD including to prisons and jails.** *(Agencies Involved: DOJ/BOP, DEA, OJP; HHS/SAMHSA; VA/VHA; ONDCP)*

The DEA recently published a rule entitled "Registration Requirements for Narcotic Treatment Programs with Mobile Components"[234] that enables OTPs to deliver MOUD treatment to clients who are unable to access brick and mortar OTPs nearby. States and federal agencies that have not been able to start their own OTPs should be encouraged to invest in these units so they may offer treatment with MOUD to incarcerated individuals and people with limited transportation options. ONDCP should encourage states to consider whether state laws concerning mobile units hamper clinic's ability to use this service so they may determine if changes are needed in the state.



**C. Arrange for treatment funding for people who are incarcerated.** *(Agencies Involved: HHS/ASPE, CMS, SAMHSA; DOJ/BOP)*

Currently by law, states generally[4] may not spend federal Medicaid dollars on health care for individuals who are incarcerated, under the "inmate exclusion." The federal government could convene an interagency working group to identify the best way to provide SUD services for people in state prisons and jails, and then work to advance policies that address the lack of access for SUD services for incarcerated individuals.

**D. Expand evidence-based treatment in federal prison.** *(Agencies Involved: DOJ/BOP, DEA; ONDCP)*

The federal prison system needs to expand its treatment programming so evidence-based behavioral therapy and all medications to treat addiction are available to incarcerated persons who use drugs. Choice of treatment should be based on provider and patient agreement, and medication access should not be contingent on additional therapy participation (as medication alone may be lifesaving). The federal government should work to help coordinate treatment options so the Federal Bureau of Prisons (BOP) may offer all evidence-based treatments, including all MOUDs approved by the FDA. It also should work to support individuals in its custody so that they may participate meaningfully in treatment, which may include providing MOUD, individual psychotherapy or counseling appointments in lieu of group counseling, or implementing other measures to enhance their privacy and confidentiality.

**E. Pilot methadone programs in federal prisons to leverage telemedicine and bureau of prison pharmacists.** *(Agencies Involved: DOJ/BOP, DEA; HHS/NIH; ONDCP)*

The BOP is a unique treatment environment because patients reside in prisons, and much of the practice of medicine in these facilities involves dispensing chronically-needed medication to patients on the premises under close observation. The BOP permits pharmacists to perform duties that advanced practice nurses and physicians complete outside of federal prison. However, these pharmacists are not allowed to store and dispense methadone to treat addiction. The executive branch could explore options to allow BOP pharmacists to dispense methadone prescribed by BOP physicians using telemedicine visit induction as an exception to the Controlled Substances Act statute requiring dispensing in OTPs.

**F. Arrange for treatment for people leaving incarceration.** *(Agencies Involved: DOJ/BOP, OJP; HHS/ASPE, CMS, HRSA, SAMHSA; VA/VHA)*

The Department of Veterans Affairs (VA) allows reimbursement for transportation to treatment for eligible veterans enrolled in the VA health care system. However, few other health programs, systems, or insurers provide a similar benefit. Having treatment available and transportation to that treatment upon release from incarceration is a common-sense way to help prevent overdose deaths among people leaving incarceration.[235] Case management to connect people to treatment and transportation upon release should be an allowable cost for program services reimbursement.

---

[4] The exceptions are that Medicaid dollars are available for an inmate experiencing an inpatient stay of 24 hours or more at a health care facility. See https://www.medicaid.gov/sites/default/files/Federal-Policy-Guidance/Downloads/sho16007.pdf



# Principle 4: Build the Treatment Workforce and Infrastructure

Government estimates suggest the nation's behavioral health, including the SUD, workforce will continue to experience staffing shortages,[236] and we need to address future workforce needs for several behavioral health occupations.[237] Racial disparities in health care utilization may be partially explained by the lack of providers of similar race and ethnicity as the populations being served.[238] Hiring diverse practitioners who reflect the people and cultures they serve is an important workforce issue.[239] Research has shown that PWUD may avoid health systems, particularly people who inject drugs,[240] because they are often treated poorly. Fear of discrimination and stigmatization discourages people with SUD from seeking care and compromises the care they receive when they do seek it. Training all health professionals about SUD as a medical condition could improve the health care experience for PWUD, and integrating health services into organizations frequented by PWUD could increase use of health services by this population.[241,242] As depicted in the HHS map[243] below (Exhibit 1), the majority of counties in the United States are experiencing shortages of mental health professionals. The second HHS map[244] below (Exhibit 2) highlights areas with low or no access to buprenorphine treatment for OUD at doctors' offices.

**EXHIBIT 1**          **EXHIBIT 2**



SUD treatment providers in criminal justice settings are also severely lacking. According to the Bureaus of Justice Statistics, in 2019 the US federal and state prison population was 1,430,800[245] and local jails reported about 734,500 inmates at midyear 2019.[246] According to the National Center on Addiction and Substance Abuse, this is a population in which an estimated 65-percent has an active SUD, most of whom go untreated.[247]

A. **Expand Certified Community Behavioral Health Clinics (CCBHCs) and SUD services in Federally Qualified Health Centers (FQHCs).** *(Agencies Involved: HHS/ASPE, HRSA, SAMHSA)*

Multiple points of entry to treatment in communities are required to increase access to treatment services. States should explore establishing additional Certified Community Behavioral Health Clinics in places with greatest need to ensure local 24-hour access to SUD treatment services or linkage to services. Federal agencies should work with stakeholders to raise awareness and help improve uptake of these services, including access for law enforcement drop off and referral. Also, Federally Qualified Health Centers (FQHCs), a core provider of health services to underserved populations, should



work to provide the full spectrum of SUD services. Federal agencies should work with stakeholders to raise awareness and help improve uptake of these services.

**B.  Continue low-interest Federal loans for treatment program initiation in Rural Areas.** *(Agencies Involved: Treasury; USDA)*

Hospitals and treatment programs wishing to start or expand SUD treatment services programs in rural areas may need low-interest loans for brick and mortar expansion and program start-up funding. USDA Rural Development can provide support for infrastructure, equipment, and start-up costs for treatment services in rural areas through a variety of programs. Rural Development provides guaranteed loans through lenders to public bodies, non-profit organizations, federally recognized American Indian Tribes, and for-profit businesses in communities with populations of 50,000 or less through the Rural Development Community Facilities and Business and Industry Guaranteed Loan programs covered under the OneRD Guarantee Program. Direct loans and grants are available for government, non-profit, and tribal entities for projects in communities with populations of 20,000 or less through the Rural Development Community Facilities programs.

Other support for treatment services includes funding for equipment and startup costs for treatment and workforce development through the Distance Learning and Telemedicine Program in communities of 20,000 or less. Additionally, utilities can obtain zero interest loans from the Rural Economic Development Loan and Grant program to relend to local businesses to support projects that create and retain employment in rural areas with a population of 50,000 or less. Funding for hospitals and other types of care facilities are common uses of this program. Rural Development also administers the Delta Health Care Services Grant program that funds consortiums in the 252 counties and parishes in Alabama, Arkansas, Illinois, Kentucky, Louisiana, Mississippi, Missouri, and Tennessee in the Delta Region to develop healthcare services, health education programs, healthcare job training programs and the development and expansion of public health-related facilities. Additionally, the cooperative model provides a unique approach for healthcare and SUD treatment, and Rural Development provides both financial and technical assistance support for cooperative development. For example, the Rural Cooperative Development Grant Program offers grants to nonprofit corporations and institutions of higher education to operate Rural Cooperative Development Centers that serve communities with a population of 50,000 or less. The Socially Disadvantaged Group Grants Program also supports technical assistance to socially disadvantaged groups through cooperatives and Cooperative Development Centers serving rural communities of 50,000 or less.

With the variety of programs that can support treatment services and infrastructure, federal agencies should work with stakeholders to raise awareness and help increase use of these programs to support treatment services.

**C.  *Prioritize Efforts to Build Capacity in the behavioral health workforce.*** *(Agency Involved: HHS/CDC, HRSA, SAMHSA)*

The Department of Health and Human Services should prioritize efforts to advance capacity building in the behavioral health workforce to be responsive to the increasing mental health and SUD workforce needs through programs that provide scholarships,


loan reimbursement, and fellowships in the behavioral health professions to increase workforce capacity. This should include continued support of the Addiction Medicine Fellowship program. All workforce recruitment efforts should be designed to address equity, diversity inclusion and accessibility.

**D.  Develop addiction curriculum for medical, public health, and nursing schools.** *(Agencies Involved: HHS/HRSA, SAMHSA)*

The Substance Abuse and Mental Health Services Administration (SAMHSA) and HRSA—in collaboration with the American Association of Medical Colleges (AAMC), the Association of Schools and Programs of Public Health, and the American Nurses Association—should establish a core curriculum on SUD studies for all medical, public health, and nursing schools so that every student is educated on SUD and has basic knowledge of strategies to identify, assess, intervene, and treat addiction, as well as support recovery. This will build on work started by AAMC in 2019 working with medical schools to develop core curriculum to advance educational content related to pain and addiction. To the extent practicable, HRSA should consider including this core curriculum as a requirement for schools applying for fellowships and grants for licensed practitioners.

**E.  Train nurses, psychologists, pharmacists and social workers to care for people with substance use disorders.** *(Agencies Involved: HHS/HRSA, SAMHSA; ONDCP)*

The federal government should work with leadership of these disciplines to request that they set goals for tracking their workforce's engagement in SUD treatment and training for it. These professionals engage with people who have SUD regularly. With training, nurses, pharmacists and psychologists who prescribe may also be in position to offer quality treatment—including MOUD—as part of workforce expansion although new authorities would be needed for these prescriber categories.

**F.  Examine models for office-based buprenorphine treatment to address financial disincentives.** *(Agency Involved: HHS)*

Research suggests some office-based buprenorphine models do not reimburse providers enough to make a business case for delivering care.[248] Research reinforces that persistent provider workforce barriers to buprenorphine provision include insufficient training and education on opioid use disorder treatment, lack of institutional and clinician peer support, poor care coordination, provider stigma, inadequate reimbursement from private and public insurers, and regulatory hurdles to obtain the waiver needed to prescribe buprenorphine in non-addiction specialty treatment settings.[249] The Administration should examine this research and consider developing models that improve incentives to provide care.

**G.  Extend telemedicine flexibilities across state lines.** *(Agency Involved: DOJ/DEA; HHS)*

During the COVID-19 pandemic, the DEA temporarily waived the requirements that providers be licensed in the same state as a patient whom they serve via telemedicine. Now, many providers offer treatment via telemedicine to patients who live nearby but in another state. However, at the end of the pandemic, this may change. Federal agencies should work with Congress to establish a mechanism with appropriate safeguards for providers to engage in controlled substance prescribing across state lines by telemedicine,



and address licensing and payment obstacles across state lines for professionals and paraprofessionals through federal guidance/oversight/incentives to encourage states to allow interstate licensing reciprocity which would require collaboration with states.

**H. Pursue opportunities to advocate for global capacity to respond to substance use disorders and related health needs by prioritizing training of the global drug prevention, treatment and recovery workforce.** *(Agencies Involved: DOS; HHS; ONDCP)*

Executive branch agencies should advocate through multinational organizations for increasing global capacity to respond to SUD and related unmet health needs including by prioritizing training of the global workforce consisting of drug prevention, treatment and recovery professionals. Federal agencies will work with international partners to finalize the development of a universal accreditation system, and encourage adoption of the international standards on prevention and treatment.



# Building a Recovery-Ready Nation

In 2010, the Substance Abuse and Mental Health Services Administration (SAMHSA) convened diverse recovery stakeholders to develop the following consensus working definition of recovery from mental illness and SUD: "Recovery is a process of change through which individuals improve their health and wellness, live a self-directed life, and strive to reach their full potential." Participants identified four major dimensions of recovery: home; health; purpose; and community.[250] These dimensions can be viewed as the four corners of the foundation upon which a life in recovery is built.

Because recovery is a process, and not an event, it generally begins before substance use is stopped, continues after the cessation of use, can be sustained through a return to use, and may accommodate reduced levels of use when these permit improvements in health, wellness, and functioning. Recovery is measured as a positive—by what it brings, including improved quality of life, a sense of self-efficacy and purpose, and improvements in social and emotional functioning and wellbeing. It is distinct from both abstinence and remission, which are measured by the absence of symptoms.

> Recovery is a process of change through which individuals improve their health and wellness, live a self-directed life, and strive to reach their full potential.
>
> - SAMHSA, 2010

Recovery may be best understood as the process of building recovery capital, the internal and external resources upon which individuals can draw to pursue, achieve, sustain, and enhance a life in recovery.[251,252,253] Examples of internal recovery capital include knowledge, coping skills, resilience, hope, and perseverance. External recovery capital includes assets such as family, a supportive community of recovering peers, treatment, mutual aid meetings (e.g., A.A., N.A., SMART Recovery, Women for Sobriety), transportation, housing, employment, and income. Discrimination, inequitable access to resources and opportunities, and social determinants of health all intersect with recovery capital and should be considered concurrently.

Americans follow diverse trajectories from SUD to recovery or remission. In 2020, an estimated 29.2 million Americans aged 18 or older reported a lifetime alcohol or other drug (AOD) problem. Of these, 21.2 million (72 percent) identified as in recovery or recovered from a substance use problem. [254] A national study found that, among people who reported having resolved an alcohol or other drug program, 45 percent participated in mutual aid groups, 28-percent had received treatment, and 22-percent had received recovery support services (RSS), including from recovery community centers.[255] A smaller percentage of participants in this study (46-percent) described themselves as "in recovery." These data suggest that it is critical not only to expand access to treatment, but to understand the diverse characteristics, trajectories and needs of those whose journey from addiction to recovery or remission does not include treatment. We must understand these trajectories and their intersections with various systems in order to identify engagement and other intervention opportunities and develop strategies to increase the percentage of Americans with SUD who achieve recovery, to shorten the duration and severity of SUD, and to save lives.

RSS can be instrumental in engaging individuals with SUD and helping them navigate the early stages of recovery. Non-clinical services provided to individuals with or in recovery from SUD, RSS are distinct from treatment and can be more flexibly sequenced and delivered. These services are most commonly provided by individuals who have lived experience of addiction and



recovery. When that occurs, these services are referred to as peer recovery support services (PRSS).

While clinical services are based primarily on the specialty training and expertise of the practitioner, PRSS are anchored in experience of SUD and recovery that is supplemented by training. Peer specialists work in diverse settings where they engage, link, and otherwise serve both those in recovery and those with active SUD, including overdose survivors and others with SUD in emergency departments, those who can be reached through inpatient hospital and primary care settings, and through SSPs, street outreach programs, mobile clinics, drug court programs, and elsewhere.

> Peers play diverse roles across systems, sectors, and settings, providing a vital connective tissue linking diverse points on the intervention continuum.

While they can be valuable components of clinical, medical, or other teams, when working through peer-led organizations such as recovery community organizations (RCOs), peers are not limited to serving the patients of a specific treatment provider, can serve individuals who are not in and have not received treatment, and are not limited by the length of reimbursable treatment episodes. Peer workers employed by RCOs provide a bi-directional bridge between formal systems (e.g., SUD treatment, health care, child welfare, or criminal justice systems) and community-based resources such as family, mutual aid groups, housing, employment, faith groups, and the broader recovery community. Across systems, sectors, and settings, peers play varied roles, serving as vital connective tissue linking diverse points on the intervention continuum.

Recovery takes place at the family/caregiver and community levels as well as the individual level. A recovery-ready community recognizes the unique humanity and potential contributions of every person affected by addiction, not only those who are currently in or seeking recovery. Such communities embark on a community-wide healing and recovery process reducing the toll of substance use and helping more of their members achieve recovery and become productive, contributing citizens. By building recovery-ready communities, schools, and workplaces, and by fostering increased public health/ public safety partnerships, we will build a healthier, more equitable, and more resilient nation. This is a key goal of Biden-Harris Administration drug policy in both the supply and demand reduction arenas.

We are steadily learning more about recovery's dimensions and diverse trajectories, how recovery relates to remission and abstinence, what kinds of RSS may be effective, and whom they may most benefit. However, our scientific understanding in this domain is still emerging. Targeted, actionable research is needed to inform policy and resource allocation decisions in the recovery domain.

Available scientific evidence suggests that common forms of RSS can be beneficial. For example, positive outcomes are associated with receipt of services through recovery community centers (RCCs), local peer service hubs that can serve as drop-in centers for people in or seeking recovery, and through which recovery coaching and other services are available. RCCs can offer a range of services, including relapse prevention, housing and employment support, social and recreational activities, and other services.[256] One study found that receipt of services at an RCC is associated with greater recovery duration and improved psychological well-being and quality of life. The authors noted that RCCs played a unique role that differed from those of treatment and mutual aid groups: They facilitated recovery capital acquisition, "thereby enhancing



functioning and quality of life." This study found that RCCs served people facing multiple challenges; nearly half of RCC participants had a high school diploma or less, close to half had an annual household income of $10,000 or less, over 80-percent reported use of multiple substances, and close to half reported a lifetime psychiatric diagnosis. Notably, participants often remained engaged with the RCC for an extended period of time and over 35-percent of study participants had been receiving services at the RCC for over one year with some having remained engaged over multiple years. [257] Given the chronic nature of SUD, this extended engagement—which is typically not attainable in treatment—is invaluable.

Evidence of the effectiveness of recovery coaching is also emerging. One study found that parents with SUD who were involved in the child welfare system and who were randomly assigned to receive recovery coaching were significantly more likely to achieve and maintain reunification with their children than parents randomly assigned to usual services.[258] Other studies found that recovery coaches benefit those they serve by improving relationships with providers and social supports,[259] increasing treatment utilization[260] and retention,[261] and reducing relapse rates.[262,263] Additionally, compared to a control group receiving treatment as usual, pregnant and post-partum people receiving services from a peer counselor in a treatment program were found to more strongly recommend the program at which they received services than members of the control group. They described their peer counselors as empathic, identifying them as the most helpful aspect of their treatment. [264]

> "The CCAR philosophy is that 'our tent is big enough for everyone.' We don't really pay attention to what your illness is, your drug of choice, your recovery support, the medication you may be on (or not on), etc. 'You are in recovery if you say you are' and you are welcome. Our thriving all-recovery groups support this notion. As a result, we have become an incredibly diverse organization."
>
> —Phil Valentine
>
> Source: https://doi.org/10.1007/978-1-60327-960-4_14

RCOs operate many, but not all, RCCs. RCOs lead or coordinate recovery-focused policy advocacy activities and recovery-focused community education and outreach programs and often provide PRSS—typically through one or more RCCs. Serving a broad recovery community that includes not only people in or seeking recovery, but their families, friends and allies, RCOs may be local or statewide. They share an overarching mission: mobilizing people and resources to increase the prevalence and quality of long-term recovery from alcohol and other SUDs.[265]

Ideally, the peers who staff RCCs should have the knowledge and skills needed to help individuals find and follow pathways to recovery that may differ from theirs. Connecticut Communities for Addiction Recovery (CCAR) captured this inclusive vision in one oft-quoted statement: "You are in recovery if you say you are."[266,267] This reminds peer workers that there are many pathways to recovery and that their role is not to judge, exclude, or promote a specific pathway, but rather to help those they serve find and follow a pathway that works for them.

Research on Collegiate Recovery Programs (CRPs) is limited, but is growing as well. As of February 2022, the association representing CRPs had over 150 members throughout the United States and one member in the United Kingdom.[268] A survey of 29 CRPs found that annual

abstinence rates among participating students ranged from 75- to 100-percent, averaging 92-percent. Across these sites, most CRP members had not used substances for several years, while 5 percent reported past month alcohol or other drug use. This is a much lower rate than is found among age group peers in the first year following treatment.[269,270] CRP members also have been found to have higher grade-point averages than the student population as whole.[271] For example, students participating in the Texas Tech CRP had a consistently higher average GPA from 2002 through 2005 than the student body as a whole, averaging 3.181 over that period compared to the overall average of 2.926.[272]

> A survey of 29 CRPs found that annual abstinence rates among CRP students ranged from 75 to 100-percent and averaged 92-percent. Across these sites, 5-percent of students reported past year alcohol or other drug use, a much lower rate than is found among youth in the first year following treatment. CRP members also have higher retention and graduation rates and higher grades than the student population as whole.

Additionally, research suggests that CRPs may be an effective marketing tool for colleges and universities. For example, 34-percent of CRP participants responding to one survey indicated that they would not have been in college were it not for a CRP and 20-percent reported that they would not have enrolled at their institution if it had not offered a CRP.[273]

Racial and ethnic minority students appear to be underrepresented in CRPs. The survey of 29 CRPs cited above found that 91-percent of participants identified as White.[274] An earlier study involving one of the 29 CRPs observed that 95% of CRP members were non-Hispanic Whites while 81% of the larger student body were non-Hispanic Whites. The authors hypothesized that the disproportionately low representation of minorities may reflect lower rates of access to treatment and to four-year universities due to historic inequities.[275]

Nationally, there are over 40 recovery high schools (RHS) in operation across 21 states as of May 2021.[276] Most RHS have licensed counselors or other clinical staff and require students to participate in mutual aid groups. Recovery high schools are small, with enrollment ranging from six to 50 students.[277] Some RHS have dedicated facilities and others share space as part of public high schools.[278,279] One study found that RHS students tend to reflect the racial and ethnic composition of the communities in which they



Finch, AJ. *Recovery high schools growth chart: 1979-2021. Association of Recovery Schools. 2021. Retrieved at https://recoveryschools.org/rhs-growth-chart/*

are located and have more risk factors for substance use and relapse relative to youth completing treatment locally who did not enroll in a recovery high school. These students also had more risk



factors than a national sample of their peers exiting treatment. RHS students also had higher rates of mental illness than members of both the local and national comparison groups. Additionally, they tended to have greater substance use problem severity than members of the two control groups.[280] Another study found that RHS students were more likely than age-group controls who had received treatment but were not enrolled in a RHS to be abstinent from alcohol and drugs and more likely to graduate from high school than members of the control group. The authors estimated that increased graduation rates associated with RHS attendance resulted in mean net savings per student from $16,000 to $52,000, a benefit-to-cost ratio of 3.0 to 7.2.[281] One study noted that young people of color often did not have access to treatment before enrolling in an RHS[282] and another suggested the RHS model could be well suited to serving Hispanic communities as the schools can be customized to meet local needs, such as reducing stigma, which was cited as an important barrier to help-seeking among Hispanics.[283] While small, the number of RHSs has been climbing slowly over the past 30 years as shown in the chart, above.[284]

Like an RHS, an Alternative Peer Group (APG) combines clinical and peer recovery support. APGs adopt a family-centered model, offering a supportive community of recovering peers and a broader positive social environment. They combine these with counseling and case management services.[285] APGs differ from RHSs in that they are community- rather than school-based. APGs are also small in number but growing. There were 24 established APGs in 16 states in 2019. At that time, 20 more were in development.[286] APGs can become key components of integrated youth service networks, linking with adolescent SUD treatment programs, RHSs, and other youth-serving organizations. While APGs incorporate many practices and elements associated with positive outcomes, effectiveness research is currently lacking.

Recovery housing is the most widely available form of recovery support infrastructure in the United States. In 2020, it was estimated that there may be more than 17,500 recovery residences nationally.[287] Research on Oxford Houses—rented homes jointly operated by residents who share a lease and other costs—found that residents who stay for six months or more are less likely to return to substance use than those who remain a shorter period of time.[288] A study of recovery residences found that residents achieved significant improvements in alcohol and drug use, employment, psychiatric symptoms, and criminal justice system involvement.[289] Further, an experiment in which participants with OUD were randomly assigned to usual care, abstinence-contingent recovery housing, or a combination of reinforcement-based treatment and recovery housing found that abstinence-contingent recovery housing was associated with higher rates of abstinence and that the addition of intensive reinforcement-based treatment (RBT) further improved outcomes.[290] A subsequent study with a similar population yielded similar results.[291]

Sustainable financing for PRSS is indispensable. While time-limited discretionary grants have been instrumental in initiating, expanding, or enhancing peer services and RCOs, reliable long-term revenue streams are essential to developing a sustainable RSS infrastructure. The Administration's call for an expanded Substance Abuse Prevention and Treatment Block Grant (Block Grant) with a 10-percent RSS set-aside, included in the President's budget, represents an important step in this direction. In addition, Medicaid—can play a role in funding PRSS, including in the context of accountable care organizations, chronic care models, and alternative payment mechanisms focusing on outcomes or values-based purchasing, which can offer flexible options for covering the cost of this service. Medicare may also be able to play a role in reimbursing PRSS.



Virtually all of our efforts to address substance use and SUD—from primary prevention and harm reduction, to law enforcement, treatment, and recovery support—are impeded, to a greater or lesser degree, by still pervasive stigma. A phenomenon most acutely experienced by people with SUD and those in recovery, stigma is a cross-cutting concern that requires significant coordinated efforts to address. The stigma associated with substance use manifests in many ways and intersects with a range of factors, including race, gender, and socio-economic status. Social stigma is embodied in negative attitudes and beliefs about substance use and people with SUD and can be reflected in discriminatory policies and practices based on or influenced by those negative attitudes and beliefs. When embodied in policies and practices that limit the opportunities, access to resources, and wellbeing of stigmatized groups, social stigma is sometimes referred to as structural stigma.[292] Finally, people with SUD apply the negative attitudes and beliefs reflected in social stigma to themselves, resulting in a phenomenon known as self-stigma. As this occurs individuals may blame themselves for having SUD and/or may believe that their SUD is the result of inherent moral weakness on their part. This leads to shame and fear of social exclusion or other negative results if their condition is exposed. This can result in individuals avoiding treatment or other services.[293,294,295] The Administration's planned activities to address stigma are discussed throughout this chapter.

As part of its effort to build back better following the COVID-19 pandemic, the Administration will work to increase our scientific understanding of recovery, foster adoption of more consistent certification and accreditation standards for peer workers and the organizations that employ them nationally, expand the PRSS workforce and the organizational infrastructure that supports it, address stigma and misunderstanding, and eliminate barriers to safe and supportive housing, employment, and education for people in recovery. In all of these efforts, the Administration will continue to solicit input from and build partnerships with the recovery community and others directly impacted by substance use, keeping in mind the recovery community dictum, "Nothing about us without us."

## Principle 1: Expand the Science of Recovery.

*(Agencies Involved: DOJ/BOP, OJP; ED/IES; HHS/ASPE, AHRQ, CDC, CMS, HRSA, NIH, SAMHSA; HUD/OPDR; ONDCP; VA/VHA; DOD)*

Given the need to continually expand our scientific understanding of the recovery process, RSS, and the many factors that mediate outcomes, further targeted, actionable research is needed to guide policy and resource allocation decisions in the recovery domain. To prioritize and stage such translational research, ONDCP will partner with the National Institute on Drug Abuse (NIDA), and the National Institute on Alcohol Abuse and Alcoholism, the National Institute on Justice (NIJ), the National Institute on Corrections (NIC), and the Department of Health and Human Services (HHS) Assistant Secretary on Planning and Evaluation (ASPE) to convene a cross-agency workgroup to develop, prioritize, and coordinate the implementation of a federal recovery agenda. The findings and recommendations of this group will be transmitted to the drug data interagency workgroup, described in the Data Systems and Research chapter. In addition, they will be used to identify federal recovery research priorities and suggest specific existing or proposed funding streams that could support studies on prioritized topics.

**A. Establish a federal recovery research agenda to support the development of science-based policy in relation to recovery.** *(Agencies Involved: DOD/CDMRP;*



*DOL/ETA/DRE; DOJ/NIC, OJP; ED/IES; HHA/AHRQ, ASPE, CMS, CDC, NIH, SAMHSA; HUD/OPDR; OMB; ONDCP; VA/VHA)*

In partnership with key federal research agencies, ONDCP should convene the research and evaluation components of other drug control agencies to: (1) summarize the current scientific knowledge of the recovery process and RSS; (2) catalogue current federally-funded research and evaluation efforts germane to these topics, and; (3) identify key areas where additional research is needed to inform policy and resource allocation decisions. This interagency team should assess the extent to which current federal research and program evaluation portfolios address identified priorities and will recommend research to inform policy development and resource allocation decisions. To prepare for an initial convening of the *Recovery Research Workgroup*, ONDCP and NIDA should jointly coordinate the efforts of participating agencies as they: (1) catalogue current and recent federally-funded research with a SUD recovery nexus, and; (2) identify, list, and prioritize areas of research that will support the development of evidence-based policy and programs in the recovery domain. Subsequently, ONDCP and NIDA should: (1) summarize the findings of the group and provide specific recommendations regarding the prioritization and funding of relevant research and evaluation efforts by agency; and, (2) obtain interagency clearance of a document summarizing these recommendations and secure the commitment of agency leaders to implement the recommendations as feasible, given resource availability and broader research priorities.

**B. Establish targets and monitor progress.**

Following approval of the research priorities by Administration leadership, NIDA and ONDCP should coordinate a process through which participating agencies would identify: (1) prioritized research they would undertake with existing resources, and; (2) additional research they would undertake subject to the availability of resources. ONDCP, in partnership with participating agencies, should monitor progress toward meeting recovery research commitments and share progress through the interagency workgroup.

**C. Incorporate identified recovery research needs in the President's budget.**

To ensure that agencies have the resources needed to support priority recovery research, ONDCP, in consultation with NIDA and other participating agencies, will continue to recommend relevant research funding priorities and funding levels annually for the President's Budget through the Drug Control Budget.

# Principle 2: Make Recovery Possible for More Americans

People with SUD follow many pathways to recovery or remission and interact with diverse sectors, including law enforcement and other first responders, the criminal justice and child welfare systems, primary care, hospitals, harm reduction programs, housing and homeless services, and SUD treatment. It is critical not only that we understand the many trajectories to recovery, but that we adopt flexible, responsive approaches for helping people with SUD navigate the many challenges they encounter and both find and follow a pathway to recovery or remission that works for them. Our nation's emerging PRSS infrastructure, supported by a growing number of peer-led organizations, is essential to developing and implementing such



strategies. Therefore, sustainable financing for PRSS and for the organizations through which they are offered is critically important. Consistent standards are also needed to ensure quality and safety, to facilitate reimbursement from payers operating in multiple jurisdictions, and to permit reciprocity of credentials for peer recovery specialists.

Training and technical assistance, including through SAMHSA's National Peer-Run Training and Technical Assistance Center for Addiction Recovery Peer Support, are also indispensable to efforts to develop capacity and help states, organizations, and peer recovery support workers adopt more consistent standards nationally. Accessible and affordable training for individuals seeking to become peer specialists is essential to developing the peer workforce. More consistent standards for peer workers and for organizations through which PRSS are offered will also improve quality, create opportunities for reciprocity of credentials from one jurisdiction to another, and facilitate funding from public and private insurers with national or multi-state regional coverage areas.

When provided by an institution of higher education, training to become a peer specialist can be reimbursed under the Health Resources and Services Administration (HRSA) Substance Use Disorder Treatment and Recovery Loan Repayment Program. While this is a valuable resource that should be expanded, training provided by an institution of higher education may not be accessible or culturally appropriate to all those seeking to become a peer support worker. For many prospective peer workers, educational loans may be inaccessible, and, to them, higher education settings may seem far removed from the world in which they will operate and the experience they will bring to bear in their work. A broader array of training and technical assistance will be needed to develop the peer workforce.

A. **Expand PRSS capacity and foster the adoption of more consistent standards for the peer workforce, RCCs, RCOs, and similar peer-led organizations.** *(Agencies Involved: HHS/CMS, HRSA, IHS, SAMHSA; Labor/ETA, ODEP; VA/VHA)*

SAMHSA, with support from ONDCP, CMS, and HRSA, should convene key federal partners and external stakeholders with a role in developing peer workforce and RCO/RCC capacity and applicable credentialing and accreditation standards. Examples of external stakeholders germane to this effort include: the International Society of Substance Use Professionals (ISSUP); the International Certification and Reciprocity Consortium (IC&RC); the Association for Addiction Professionals (NAADAC) and its certification arm, the National Certification Commission for Addiction Professionals (NCC-AP); the Association of Recovery Community Organizations (ARCO); the Council on Accreditation of Peer Recovery Support Services (CAPRSS); the Global Centre for Credentialing and Certification (GCCC); and, the National Association of Alcohol and Drug Abuse Directors (NASADAD)

Through this process, SAMHSA should develop recommendations for: (1) expanding the capacity of the existing workforce and peer organizational infrastructure through training, technical assistance, and related efforts; and, (2) promoting the adoption of more consistent credentialing and accreditation standards and improving quality across states nationally, taking into consideration existing national peer certification and recovery support service provider organization accreditation standards. Recommendations could include support to states, RCCs, RCOs, and other entities through existing federally-funded training and technical assistance providers, such as the Addiction Technology Transfer Network, the technical assistance contracts for various federal discretionary



grant programs, and the National Peer-Run Training and Technical Assistance Center for Addiction Recovery Peer Support.

Upon approval of the plan, SAMHSA should spearhead efforts to implement recommendations, reporting periodically on progress. Capacity-building through training, technical assistance, and adoption of more consistent credentials and standards for peer workers, recovery community centers, and other entities providing PRSS could allow for expanded public and private insurance coverage, improved quality overall, and permit greater reciprocity of credentials across state lines to support increased workforce mobility in response to evolving needs.

**B. Foster the adoption of more consistent recovery housing standards.** *(Agencies Involved: DOJ/CRD, OJP; HHS/ASPE, HRSA, SAMHSA; HUD; ONDCP; USDA/RD)*

More consistent recovery housing standards across states would help prevent exploitation of residents and funders by unscrupulous operators, better ensure quality across states, and help consumers, addiction professionals, and payers identify quality recovery residences.

SAMHSA and the Department for Housing and Urban Development (HUD) should co-lead efforts to promote adoption of nationally recognized recovery residence standards, engaging stakeholders such as National Alliance for Recovery Residences (NARR), Oxford House, NASADAD, the National Conference of State Legislatures (NCSL), the National Governors' Association (NGA), the National Association of Counties (NACO), and the ONDCP Model State Drug Law contractor, Legislative Analysis and Public Policy Association (LAPPA), which convened a consultative process through which a Model State Recovery Residence Certification Act was developed in 2021.[296] Standards should ensure that people following all recovery pathways, including those receiving medications for opioid use disorder (MOUD), have access to quality recovery housing. Recovery housing does not replace Housing First resources which provide low-/no-barrier housing coupled with wrap around services. Ideally, recovery housing should be linked to Housing First resources, complementing them and permitting a bi-directional flow of residents between the two settings based on resident need and desires and the fit of residents within the respective housing contexts. Outside of federally-subsidized housing settings, the standards that govern recovery housing are set at the state level. Moreover, local zoning laws and building codes can facilitate, hinder, or prevent the establishment of recovery housing and may even represent violations of applicable federal civil rights laws such as the Americans with Disabilities Act, the Rehabilitation Act, and the Fair Housing Act. SAMHSA and HUD should work to support state and local governments and standards organizations in developing and implementing recovery housing standards that will ensure access to recovery housing to protect the rights of individuals in or seeking recovery from SUD. Additionally, SAMHSA and HUD should develop recommendations for policy, training and technical assistance. These recommendations should include guidance related to recovery housing through the HUD Continuum of Care and in the context of other federally-subsidized housing programs. Additionally, SAMHSA and HUD may elect to publish a guidance document developed in collaboration with these stakeholders.



C.   **Expand and sustain funding for recovery support services and recovery housing.**
*(Agencies Involved: AmeriCorps, HHS/CMS, HRSA, IHS, SAMHSA; HUD/CPD, OCPD; ONDCP; USDA/RD; VA/VHA)*

As discussed in the introduction to this chapter, multiple strategies will be needed to flexibly and sustainably finance PRSS. No single approach will work in every state, locality, or service system. SAMHSA and CMS, with support from VA, HRSA, IHS, and AmeriCorps, should review current federal, state, and local financing mechanisms for PRSS, and develop recommendations for these services. Additionally, they should work with states, tribes, local governments, and peer organizations to highlight and promote the adoption of effective PRSS financing solutions. As part of this process, CMS should update the guidance provided under State Medicaid Director Letter number 07-011, which provided guidance to states interested in coverage of PRSS under Medicaid. Additionally, it should explore the feasibility of supporting innovation in the reimbursement and utilization of PRSS under Medicaid.

A clearer definition of PRSS under Medicaid, information on promising reimbursement models under the program, and updated guidance to states on the supervision and reimbursement of PRSS could facilitate more consistency in approaches and could help support the use of Medicaid to reimburse PRSS. Additionally, with support from ONDCP, HRSA, IHS, the Department of Agriculture (USDA)/ Office of Rural Development (RD), AmeriCorps, and SAMHSA, and CMS should identify potential mechanisms for financing for PRSS and for peer-led organizations.

*a)*   **Financing for PRSS and Peer-led Organizations** *(HHS/CMS, HRSA, IHS, SAMHSA; HUD/CPD, OCPD; ONDCP; USDA/RD; VA/VHA)*

CMS and SAMHSA, with support from IHS, HRSA, and other federal agencies, should work with states, Tribes, local governments, and peer organizations to identify, highlight, and promote the adoption of effective financing solutions. As part of this process, CMS, with support from these agencies, should develop and disseminate guidance to state Medicaid programs, including in relation to organizational homes for peer recovery support specialists, their supervision, various models for sustainably funding this service under state plans. In addition, in partnership with SAMHSA, CMS should offer technical assistance to states seeking to initiate, expand, or change mechanisms for covering PRSS under Medicaid. SAMHSA, with support from CMS, HRSA, IHS, and other agencies, should provide guidance to states on a broader range of financing mechanisms, including the Block Grant and state and local funding, as well as mechanisms for braiding these funding streams with Medicaid. With support from ONDCP, HRSA, IHS, and USDA/RD, AmeriCorps, SAMHSA and CMS should identify and provide recommendations on potential mechanisms for financing for PRSS, including through peer-led organizations.

b)   **Financing for Recovery Housing.** *(HHS/ASPE, CMS, HRSA, IHS, SAMHSA; HUD/CPD, OCPD; ONDCP; USDA/RD; VA/VHA)*

Sustainable financing streams for recovery housing are also needed. Financing approaches will need to align with and complement self-pay funding models


under which residents seek and obtain employment and pay for their room and board, but may also need to accommodate models that serve individuals with greater levels of impairment who may require support for a longer period of time. Transitional payment approaches can cover the cost of recovery housing during an initial pre-employment period. Such approaches may need to have flexible provisions to account for limitations in employment opportunities in certain communities or the need for extended support among individuals with high levels of problem severity and complexity and low recovery capital. For more impaired individuals, the period of time during which such reimbursement is allowable may need to be extended.

The HUD Continuum of Care program represents another potential source of funding for recovery housing, provided regulatory and policy barriers to permanent housing associated with stays in recovery residences, which are typically classified as a form of transitional housing, can be resolved. Finally, the HUD Recovery Housing pilot program, authorized under the SUPPORT Act, helps those in recovery from SUD achieve stable housing through grants to states and the District of Columbia that provide assistance for individuals' recovery housing for up to two years.

HUD and HHS (both SAMHSA and CMS) should identify legal, regulatory, and policy barriers to increasing access to recovery housing and tenancy supports. They should consult with key stakeholders, including recovery housing associations, NASADAD, and the National Association of Medicaid Directors (NAMD).

**c) Financing of Recovery Support Services for Adolescents and Young Adults**

Services for adolescents and young adults in or seeking recovery are especially limited and require development as well as sustainable financing mechanisms. These include recovery high schools, alternative peer groups, and collegiate recovery programs. SAMHSA, the Department of Education (ED), and the Administration for Children and Families (ACF) should jointly develop and implement a plan for seeding the development of these critical services, including through grant funding and technical assistance, and should work with school districts, colleges and universities, and other stakeholders to develop and implement plans for sustaining these critical RSS. In developing this plan, they should consult with key stakeholders, including the Association of Recovery in Higher Education, the Association of Recovery Schools, and the Association of Alternative Peer Groups.

Competitive grants may offer an effective mechanism for seeding and developing these entities with a goal of securing sustainable funding from school districts, higher education institutions, state and local governments. Additionally, it may be possible to identify ongoing funding streams within current ED programs.



# Principle 3: Eliminate Barriers and Increase Opportunities

Developing and implementing evidence-based policies and programs to increase the number of Americans who can achieve and sustain recovery is essential to building a recovery-ready nation. However, in the absence of effective educational and stigma reduction efforts, policies and programs will not be not enough. As NIDA Director Nora Volkow has noted, "as a society, we still keep addiction in the shadows, regarding it as something shameful, reflecting lack of character, weakness of will, or even conscious wrongdoing, not a medical issue."[297]

Additionally, we must redouble our efforts to eliminate the myriad social, cultural, linguistic, legal, and regulatory barriers people in recovery confront as they attempt to rejoin and contribute to their communities, remembering that people with illicit drug use disorders confront the dual stigma of being both a "drug user" and as someone engaged in criminal activity by virtue of the fact that their SUD involves substances that are illegal to possess, purchase, or sell. To be effective in these undertakings, we must change how we think and talk about substance use and recovery, replacing the inconsistent, and often misleading and stigmatizing terminology we continue to use with neutral, science-based terminology.

A. **Ensure the adoption of consistent, neutral, science-based language regarding substance use and related topics across the federal supply and demand control functions.** *(Agencies Involved: DOD, DOL/ETA, ODEP; DOJ/DEA, OJP; DOS; HHS/CDC, CMS, FDA, HRSA, IHS, NIH, OASH, SAMHSA; ONDCP; VA/VHA).*

Research has shown that the terminology we use can affect our perceptions of people with or in recovery from SUD and our judgements about them. One notable study, touched upon briefly in the Substance Use Disorder Treatment chapter, demonstrated that even highly-trained mental health and substance use clinicians are susceptible to this influence. When randomly assigned to groups responding to case vignettes that were identical with the exception that one referred to the subject as a "person with a substance use disorder" while the other referred to him as a "substance abuser," those exposed to the second version were more likely to assign blame to the subject and to agree that punishment was appropriate.[298]

Similar studies conducted with other groups further demonstrate the power of language to subconsciously influence perceptions and judgments about people with SUD and those in or seeking recovery.[299,300,301,302] Among health professionals, negative attitudes toward people with SUD is widespread and is associated with routinized care, reduced empathy, and poor outcomes.[303] Internalized stigma is associated with reduced willingness to seek help for a behavioral health condition,[304] while social stigma (negative attitudes and beliefs about people with SUD) is associated with increased support for punitive polices, and reduced support for public health policies, such as expanding access to treatment.[305] An analysis of language used in U.S. news media found stigmatizing language and framing were not only highly prevalent, but had increased substantially from 2008 to 2018. The authors argued that development of non-stigmatizing language standards for journalism was a public health priority.[306] While experts agree that the opioid overdose epidemic is first and foremost a public health challenge, research has found that the issue is most often framed in news media as a public safety issue. Accordingly, law enforcement solutions related to the arrest and prosecution of individuals responsible for supplying illicit opioids were predominantly mentioned in the media.[307] Even within the



federal government, inconsistency in terminology and stigmatizing terms remain a pervasive problem. The federal government should therefore work across the public health and public safety sectors to ensure use of consistent, neutral, and science-based language and person-first framings.

Building on the January 9, 2017 memorandum from the ONDCP Director to the heads of departments and agencies entitled *Changing Federal Terminology Regarding Substance Use and Substance Use Disorder,* ONDCP, NIDA, SAMHSA, NIAAA, and the Department of Justice (DOJ)/ Office of Justice Programs (OJP) should co-convene a workgroup that will develop and publicly release a plan for adopting consistent, neutral, science-based language regarding substance use and SUD across the federal government. The plan should identify actions that will be undertaken immediately, such as development and adoption of a guide to support uniform terminology and framing in relation to substance use among Executive Branch agencies, and an audit of websites and frequently updated documents. It should also include actions the Executive Branch can take independently but that cannot be completed immediately, and actions that are beyond the purview of the Executive Branch and would require Congressional input such as changes in the terminology, definitions, and framing regarding substance use and SUD in statute (e.g., in the Controlled Substance Act and federal housing law) or changes to the names of agencies that currently include stigmatizing and potentially misleading terms, such as substance, drug, or alcohol "abuse". The workgroup should publicly release brief annual updates on progress toward accomplishing the objectives and broader goals outlined in the plan. This guidance should be shared with professional journals, media outlets, and other key communicators so as to provide best practices in use of substance use related terms.

**B. Expand, enhance, and improve the coordination of federal anti-stigma efforts related to SU/SUD.** *(Agencies Involved: DOD; DOL/ETA, ODEP; HHS/CMS, CDC, HRSA, IHS, NIH, OASH, SAMHSA; VA/VHA)*

The adoption of neutral, science-based terminology in relation to substance use and SUD is a critical and necessary first step. However, it alone will not adequately address widespread social stigma and its devastating impact. Effective stigma reduction campaigns targeting the general public, health professionals, law enforcement and other first responders, and policymakers must be developed and strategically deployed in partnership with state and local governments and the private sector.

CDC, with support from SAMHSA, NIH, and ONDCP should catalogue existing federal stigma reduction campaigns with a substance use nexus, summarize the scientific literature on stigma reduction in relation to substance use and SUD, identify key lessons that can be learned from the mental health, HIV/AIDS, and other stigma reduction literature, and develop recommendations for a coordinated federal stigma reduction strategy.



**C. Expand employment opportunities and promote Recovery-Ready Workplace policies.** *(Agencies Involved: Commerce; DOL/ETA, ODEP; EEOC; HHS/ASPE, CDC, SAMHSA; OPM; VA/VHA)*

Employment is a critically important part of the recovery journey for many and is also recognized as a key form of recovery capital.[308] Indeed, employment not only offers stabilizing supports to the individual and the larger community, but also reduces recidivism among people involved in the criminal justice system thereby enhancing public safety. However, a history of substance use or related criminal justice system involvement constitutes a significant barrier to meaningful employment for the individual. A crucial form of recovery capital, employment is associated with enhanced rehabilitative outcomes for the individual and public safety outcomes for the greater community. ONDCP should contribute to and coordinate with the Administration's existing interagency process to expand employment opportunities for formerly incarcerated persons so that it may share its expertise on how to support individuals in recovery. ONDCP should also continue to co-lead a working group focused on recovery-ready workplace policies, such as those detailed through CDC/National Institute for Occupational Safety and Health's (NIOSH) Workplace Supported Recovery initiative and New Hampshire's Recovery-Friendly Workplace initiative, which was launched with funding from the Department of Labor and has been adopted by a number of states. Participants in that working group include SAMHSA, the Departments of Commerce, the Department of Labor, NIOSH, and the VA. This existing interagency process works to develop and implement plans for establishing, expanding, and enhancing employment-related initiatives for people in recovery and people with active SUD, including through broader adoption of approaches such as the Individual Placement and Support (IPS) supported employment model. In addition, with support from the Office of Personnel Management (OPM), the Equal Opportunity Commission (EEOC), the Department of Commerce, the Chief Human Capital Officers Council (CHCOC), and selected other agencies, it will explore opportunities to promote the adoption of recovery-ready workplace policies within the federal government. ONDCP should also apply these insights to the Administration's interagency process on expanding employment opportunities for formerly incarcerated persons.

> To improve outcomes over the long-term, we must recommit to shifting the focus of drug policy from punishment and social exclusion to healing and community reintegration. That is how we will begin to turn the tide, building recovery-ready communities that can effectively respond to and heal from drug use, addiction, and overdose.

Recognizing that the majority of Americans with SUD are employed,[309] it is essential that more employers adopt recovery-ready workplace policies to prevent substance use in the workforce, encourage help seeking by employees with SUD, provide needed accommodations and workplace supports for those in treatment and recovery, and build recovery-supportive workplace cultures—all of which enhance public health and public safety.

**D. Reduce legal, regulatory, policy, and practice barriers to recovery.** *(Agencies Involved: DOL/ETA, ODEP; DOJ/DEA, OJP; HHS/ASPE, CMS, IHS, OASH, SAMHSA; HUD; VA/VHA)*



> In today's interconnected world, even criminal charges that are dropped and convictions that are vacated can leave an indelible electronic record. Beyond that, drug-related criminal convictions can carry unique, often lifelong penalties that go above and beyond one's sentence. Known as collateral consequences of conviction, these add-on restrictions or penalties are common in both state and federal law. Examples include bans on access to public housing or public assistance, ineligibility to vote or to serve on a jury, temporary or permanent ineligibility for federal student aid, ineligibility for employment in health care facilities or within a state government, or ineligibility to obtain a professional license—even in a field in which one had long practiced as a licensed professional. Additionally, a wide range of barriers associated with rules, policies, practices, and attitudes that do not meet the definition of collateral consequences of conviction can create substantial barriers to rejoining and fully contributing to the community.[5]

As noted in the Criminal Justice and Public Safety chapter, collateral consequences may serve a necessary public safety function when there is a nexus between the restriction and a harm to be prevented, such as barring convicted sex offenders from employment where they may have unsupervised interactions with children or other vulnerable individuals. However, as the United States Commission on Civil Rights has noted, when they do not serve a necessary public safety function and are not narrowly tailored, they undermine public safety by preventing successful community reintegration.[310] Specific actions to address collateral consequences of conviction are described in the criminal justice chapter.

SAMHSA, HUD, OJP, ED, DOL, and ONDCP will co-lead an interagency workgroup that would identify legal, regulatory, and policy barriers to treatment, housing, employment, health care, education, and public accommodations and develop and implement and action plans to address them. The workgroup would report annually to interagency partners on progress toward the objectives identified in its plan and shall develop recommendations, including, potential statutory changes.

---

[5] For example, *42 U.S. Code § 13661, Screening of applicants for federally assisted housing,* makes individuals determined to have manufactured, sold, distributed, used or possessed a controlled substance ineligible for public housing for a period of three years and prohibits admission of households to federally assisted housing or federally assisted housing programs if the housing agency or property owner has reasonable cause to believe that any member of the household's "illegal use (or pattern of illegal use) of a controlled substance, or abuse (or pattern of abuse) of alcohol, may interfere with the health, safety, or right to peaceful enjoyment of the premises by other residents." The statute does not require conviction in a court of law for such perceived offenses. *See* https://www.govinfo.gov/content/pkg/USCODE-2015-title42/pdf/USCODE-2015-title42-chap135-subchapV-sec13661.pdf.

## Building Recover   Ready Workplace

[REDACTED] committed to promoting the adoption of recovery-ready workplace policies, including in the federal government. A growing number of states is developing initiatives that encourage hiring of people in recovery and the adoption of recovery-



[REDACTED] help-seeking among workers, seek to prevent substance use in the workforce, and develop recovery-supportive policies and cultures to help employees achieve and sustain recovery. The states of New Hampshire and Indiana are among the pioneers in this domain. New Hampshire established the Recovery-Friendly Workplace initiative, which other states have replicated, and the Hoosier State launched Indiana Workforce Recovery. Additionally, the National Institute for Occupational Safety and Health (NIOSH), part of the CDC makes resources available to employers through its Workplace

[REDACTED]





Promoting productive workplaces through safety and health research



# Reduce the Supply of Illicit Substances through Domestic Collaboration

Law enforcement agencies at all levels—federal, state, local, Tribal, and territorial—work to combat domestic cultivated and synthetic drug production and trafficking with the goal of protecting Americans from a lethal drug supply contributing to record levels of fatal drug overdoses. However, traffickers continue to refine their methods and adopt new techniques distributing drugs throughout our communities. Responding effectively to the illicit production, trafficking, and distribution methods of domestic criminal organizations and Transnational Criminal Organizations (TCOs) is a significant challenge and remains a Biden-Harris Administration priority.

Substantial improvement in collaboration and cooperation between agencies at the federal level and among federal, state, local, Tribal, and territorial agencies is necessary in order to effectively confront the present domestic illicit drug trafficking landscape. The near continual year-on-year rise in American overdose deaths between 1999[311] and 2021[312] culminated in the unprecedented and somber milestone in April 2021 when the 12-month provisional overdose deaths exceeded 100,000[313] for the first time in our history. This is the clearest indicator yet that, while individual agency efforts to confront the TCOs responsible for bringing drugs into our communities may be laudable, collectively, the U.S. Government (USG) is dedicated to stemming the flow of illicit drugs or to impose costs sufficient to deter TCOs from trafficking illicit drugs into the United States and distributing them into our communities and could do more.

Additionally, considerable additional domestic effort is needed to improve our data collection and policy and program assessments so we are clear on what efforts are working, and which need to be improved or replaced with alternatives.

Four principal lines of effort are necessary to improve domestic collaboration, reduce the supply of illicit substances, and decrease the harms caused by these substances in the United States and abroad:

- Improve information sharing and cooperation across all levels of government to strengthen the domestic response to drug trafficking;

- Deny and disrupt domestic production, trafficking, and distribution of illicit substances;

- Improve assessments of supply reduction initiative effectiveness and efficiency and allocate resources accordingly; and

- Protect individuals and the environment at home from criminal exploitation by those associated with drug production and trafficking.

These domestic lines of effort are complemented by the activities outlined in the Southwest, Northern, and Caribbean Border Counternarcotics Strategies, and by the National Interdiction Command and Control Plan, which collectively serve as companions to the *National Drug Control Strategy*. The three border strategies provide strategy guidance linking international supply reduction efforts with domestic efforts.

AR2022_401527



# Principle 1: Improve information sharing and cooperation across all levels of government to strengthen the domestic response to drug trafficking.

Law enforcement capacity cannot be static in a dynamic drug threat environment. Improving information- and intelligence-sharing across the federal government and with state, territorial, local, and Tribal partners to target drug traffickers and their networks is essential to addressing the public health threat posed by TCOs. Successful seizures, or interdictions, of illicit drugs, illicit proceeds, and weapons, and the dismantling of TCOs require building the tools, relationships, and capacity to address a constantly evolving set of criminal networks that adapt their methods, change their tactics and techniques, and employ new technologies to avoid detection, interdiction, arrest, and prosecution.

A. **Leverage information-sharing structures to deepen a collective understanding of the drug trafficking and distribution environments and enhance investigations.**
*(Agencies Involved: DHS/CBP, ICE, USCG; DOJ/ATF, DEA, FBI, OCDETF; IC; Treasury/FINCEN, IRS, TFFC; DOD; USPIS)*

Agencies' structural and cultural impediments to sharing information hinder public safety and public health entities' ability to fully understand and respond to drug trafficking threats and substance use in our communities. Mitigating these impediments requires a fresh, open, and collaborative agency-agnostic approach. Public safety, public health, and regulatory agencies, the U.S. Intelligence Community (IC), and the national security community will coordinate development of policies and systems that provide the strategic drug intelligence elements necessary access to domestic public safety and aggregate public health information and appropriate national security information in a way that preserves the individual privacies and civil liberties of American citizens.

Robust strategic drug intelligence, synthesized by elements charged, resourced, and governed to provide federal, state, local, Tribal, territorial, and private/public sector agencies with meaningful information to shape proactive, coordinated, whole-of-government counternarcotics and counter-TCO planning and resourcing is a priority. Drug trafficking organizations exploit information gaps and seams among agencies and jurisdictions. For example, along the Southwest border, many agencies—including those at the federal level—are currently unable to share data captured by automated license plate readers that could provide information on drug traffickers moving into the United States, impeding our collective ability to conduct the intelligence-driven interdictions of illicit drugs. Additionally, perceived and actual obstacles to information sharing between the intelligence and law enforcement communities result in gaps exploitable by TCOs and inhibit the ability to develop and synthesize strategic intelligence on the global drug threat.

Consistent with the Constitution and statutes enshrining civil rights and civil liberties, the Office of the Director of National Intelligence (ODNI), Department of Homeland Security (DHS), and Department of Justice (DOJ) should prioritize coordinated efforts to eliminate real and perceived barriers to intelligence and information sharing between federal law enforcement and intelligence agencies. ODNI, DHS, and DOJ should ensure that federal law enforcement agencies have adequate resources to review law

AR2022_401528



enforcement reporting for foreign intelligence value and disseminate that intelligence to relevant agencies in a manner that protects law enforcement sensitivities. ODNI and individual intelligence agencies should proactively review foreign intelligence on drug and threat finance issues that may be relevant to or actionable by federal law enforcement agencies and ensure that information is appropriately downgraded in classification to permit passage to law enforcement partners.

Information fusion centers are crucial to bridging information gaps, but they are effective only if agencies commit to addressing the corresponding institutional and jurisdictional barriers that too often plague these efforts. Agencies challenged by information gaps should thoroughly examine systems and mechanisms across the interagency environment for solutions prior to embarking on individual agency initiatives, which tend to result in duplication and, ultimately, additional gaps and seams. Duplication of initiatives and activities across the interagency community inhibits the U.S. Government's ability to reduce overdose deaths. The Office of National Drug Control Policy (ONDCP) will prioritize funding recommendations for agencies demonstrating strategic effects through systematized sharing of information at enterprise levels.

Consideration should be given to leveraging the United States Council on Transnational Organized Crime (USCTOC), established on December 15, 2021 by Executive Order 14060 to improve the U.S. Government's ability to carry out strategic drug intelligence functions. Sustainable funding for strategic drug intelligence efforts is crucial.

**B. Improve information sharing, vertically and horizontally, between public safety and public health entities to improve health outcomes and build health equity.** *(Agencies Involved: DFC; DHS/ICE; DOJ/DEA, OCDETF, OJP; HHS/FDA, HHS; ONDCP)*

While there are several individual examples of initiatives that bring together public safety and public health, often in states or locally, government at all levels can do more. Public safety and public health agencies collect vast quantities of data, which they should share and integrate across both disciplines to inform whole-of-government responses to the problem.[6] This can and should be done if feasible while still protecting the privacy of individuals with all affected persons and maintaining trust and confidence in the health care system. The most effective public safety and public health collaboration and mechanisms are those that enable pursuit of the criminals trafficking illicit substances in our communities while enhancing the support structure for people who use drugs or have SUD.

Federal public safety and public health agencies within DOJ, DHS, and Department of Health and Human Services (HHS), and state governments should pursue common and interoperable information systems to enable more efficient synthesis and analysis of data at a national level. For example, standardized reporting criteria for drug-related deaths and contraband seizures, combined with mechanisms to integrate Tribal, local and state agencies, would provide a comprehensive, national picture of the effects of illicit drugs on our communities. This would enable tailored, meaningful responses, such as those

---

[6] An example of one such successful collaboration is DEA's NFLIS-TOX program. More information about the program can be found at, https://www.nflis.deadiversion.usdoj.gov/tox.xhtml

AR2022_401529



## HIDTA Overdose Response Strategy

*Public Health and Public Safety Collaboration Success*

The Overdose Response Strategy (ORS) is an unprecedented and unique collaboration between public health and public safety sectors, created to help local communities reduce overdoses by sharing timely data and innovative drug overdose prevention strategies.

The mission of the ORS is to help communities reduce fatal and nonfatal overdoses by developing and sharing information about heroin, fentanyl, methamphetamine, and other drugs across agencies and by offering evidence-based intervention strategies. The ORS is implemented by state teams made up of Drug Intelligence Officers (DIOs) and Public Health Analysts (PHAs) who swiftly exchange data, building the evidence for overdose prevention and response initiatives and allowing for earlier warnings and informed decision-making. DIOs working in the ORS track and relay information regarding sentinel arrests, seizures, and other incidents to law enforcement agencies at all levels of government. PHAs form a critical link across public health entities to share actionable information to identify and stop overdose events.

Annual ORS Cornerstone Projects leverage this network to gather new information about emerging trends or promising strategies. One such project focused on overdose prevention services in jails. PHAs and DIOs implemented surveys and interviews with justice professionals in 36 jails across 20 states to examine services in jails serving the counties most affected by the opioid overdose crisis. To increase the uptake of findings from this project, ORS teams worked directly with local partners on the development of jail-based overdose prevention programs to discuss best practices, helpful resources, and challenges. Teams also hosted webinars featuring how local champions from across the country built and implemented their own overdose prevention programs. This effort engaged more than 30 agencies and organizations about implementing or expanding local jail-based overdose prevention programs. These partners include sheriff's offices, harm reduction groups, state substance use authorities, and state criminal justice agencies. At least 12 local jails are currently working with ORS teams to build naloxone distribution into their overdose prevention programming.

achieved through the High Intensity Drug Trafficking Area's (HIDTA) Overdose Response Strategy.[314]

**C. Strengthen HIDTAs and other multi-jurisdictional task forces to disrupt and dismantle drug trafficking organizations.** *(Agencies Involved: DHS/CBP, ICE; DOJ/ATF, DEA, FBI, OCDETF; IC; DOD; Treasury/FINCEN, IRS, OFAC, TFFC; USCG; USPIS)*

Drug trafficking organizations rely on networks of facilitators such as money laundering organizations, complicit financial institutions, money service businesses (MSBs) and corrupt government officials to traffic illicit drugs into the United States, conceal and launder their illicit proceeds, purchase and distribute firearms, and move them across and out of the United States. Effectively countering this broad network of facilitators requires





an approach combining the expertise, perspectives, and authorities of federal, state, local, Tribal, and territorial agencies, as well as foreign partners.

Multi-jurisdictional task forces, such as the HIDTA task forces, bring together the resources, expertise, and authorities of federal, state, local, Tribal, and territorial agencies. These task forces mitigate jurisdictional challenges for law enforcement, such as investigations on Tribal lands and Tribal Trust lands that straddle international borders with Mexico and Canada, where criminal organizations exploit the gaps and seams between jurisdictions to ply their trade.

Agencies within DOJ, DHS and the U.S. Postal Inspection Service (USPIS) will prioritize participation in multi-agency task forces aligned against the manufacture and trafficking of illicit drugs; including the Organized Crime Drug Enforcement Task Forces (OCDETF) Strike Forces and Task Forces, DEA's Special Operations Division (SOD), and HSI Border Enforcement Security Task Forces (BESTs), to disrupt and dismantle the most dangerous transnational criminal organizations. Drug interdiction agencies at all levels should seek opportunities to participate in interagency task forces and information-sharing initiatives to maximize the impact of finite interdiction resources. National Drug Control Program Agencies must develop processes and mechanisms to enable intelligence-driven interdictions targeted against organizations of interest. It is crucial that task forces work with their assigned interdicting agencies to develop robust and effective mechanisms to exploit information gleaned from interdiction events in a timely manner in pursuit of criminal organizations. Further, developing national standards for information systems on which federal agencies rely, such as license plate readers, will

AR2022_401531



improve the efficiency of coordinated efforts within and between task forces and help enable intelligence-driven interdiction activities supporting investigations of criminal networks. Robust policy development and oversight will also be necessary to ensure that these systems are not misused and that individuals' privacy and civil liberties are protected. DOJ, DHS, and USPIS should collaborate with each other and with industry partners to identify and pursue systems suitable for common systems standards development.

## Principle 2: Deny and disrupt domestic production, trafficking, and distribution of illicit substances.

Drug traffickers exploit our highways, railways, airspace, and our mail and express consignment systems inside the United States to distribute illicit drugs across the nation and move illicit proceeds and other contraband, such as weapons. Criminal organizations beyond the border possess well-established distribution networks within the United States developed by partnering with or coopting local criminal organizations in order to expand distribution capacity and capability. The National Interdiction Command and Control Plan (NICCP) outlines the Administration's approach to interdiction beyond the borders, in the border regions, and inside the borders. The activities described in the NICCP should complement the actions below.

A. **Focus investigations on priority TCOs engaged in drug trafficking.** *(Agencies Involved: DOJ; DHS; USPIS)*

The Consolidated Priority Organizational Target (CPOT) and Regional Priority Organizational Target (RPOT) Lists, administered by OCDETF, represent the greatest transnational criminal threats to the United States. Departments and Agencies should evaluate how to use the full breadth of their authorities and capabilities to support enterprise investigations to disrupt and dismantle these priority organizations and their distribution networks within the United States. Agencies conducting interdictions should develop the capability to target interdictions against CPOTs and RPOTs and to assess the impacts of interdictions on CPOTs and RPOTs. All federal agencies should support targeted interdictions against CPOTs and RPOTS. The effectiveness of our limited interdiction, investigative, and prosecutorial resources should be evaluated and assessed through the lens of defeating these most deleterious organizations. ONDCP, in consultation with the interagency, will recommend funding priorities for initiatives that demonstrably disrupt and degrade CPOTs and RPOTs.

B. **Collaborate with the express consignment shipping industry and the U.S. Postal Service to deny drug traffickers success with those services.** *(Agencies involved: DHS/CBP; ICE; USPIS)*

Drug traffickers exploit the mail system and express consignment carriers to cheaply, efficiently, and reliably distribute illicit drugs, illicit cash, and other contraband across the nation. This includes delivering illicit drugs directly into the hands of those with SUDs. Addressing the use of the mail system and express consignment carriers by drug traffickers is therefore both a public safety and a public health imperative. Appropriate federal agency collaboration with express consignment carriers will enable analyses of large quantities of national data in order to develop and standardize algorithms for



identifying and interdicting suspect parcels while safeguarding individual privacy and proprietary carrier information.

# Principle 3: Improve assessments of supply reduction initiative effectiveness and efficiency and allocate resources accordingly.

Evaluating the efficiency and effectiveness of supply reduction efforts and policies will highlight what approaches are most impactful and enable a reprioritization of resources towards the most promising programs, policies, and innovations. We must collaboratively examine programs across our various international and domestic lines of effort, such as eradication of illicit coca and poppy plants, the raw materials for cocaine and heroin, respectively; initiatives to bolster interdiction capabilities in drug source and transit countries, whether the narcotics are moved by land, sea, or air; the results of programs designed to incentivize and strengthen licit economies within partner nations; measures to combat drug-related money laundering; and programs to combat drug sales on the internet. We must also use this process to assess new threats and future changes in the illicit drug market to ensure that programs and initiatives effectively and accurately combat the evolving threat.

A. **Strengthen assessments of supply reduction initiative outcomes against measurable goals.** *(Agencies Involved: DHS/CBP, ICE, USCG; DOD; DOJ/DEA, FBI, OCDETF; DOS; IC; Treasury/FINCEN, IRS, OFAC, TFFC)*

Supply reduction initiatives typically require substantial investments in personnel, funds, and material. Thorough and pragmatic assessment of the outcomes achieved by these initiatives is necessary to assess the extent to which investment of finite resources produces meaningful impacts. Intelligence Community and law enforcement information and analysis are vital to our understanding of the 'start-to-finish' drug production, movement, and international consumption processes, which is crucial to assessing effectiveness of supply reduction initiatives. The intelligence activities of the IC and federal law enforcement need to be well integrated with the work of select overseas Embassies, Combatant Commanders (especially US Indo-Pacific Command, US Northern Command and US Southern Command), state and local entities, HIDTAs, and other fusion centers. Federal agencies should further develop their capacity to critically assess the effectiveness of supply reduction initiatives and programs, in addition to monitoring activity performance. Resources should be prioritized for initiatives demonstrating strategic effects.

B. **Enhance supply reduction efficiency.** *(Agencies Involved: DHS/CBP, ICE, USCG; DOD; DOJ/DEA, FBI, OCDETF; DOS; IC; Treasury/FINCEN, IRS, OFAC, TFFC)*

We must ensure that we account for efficiency in our evaluation and selection of supply reduction efforts in addition to effectiveness, prioritizing demonstrably efficient efforts over others when effectiveness and outcomes are otherwise equal. This may require developing new metrics and tools for comparing supply reduction programs and activities or combining those that exist in different ways to provide a more complete picture of the return on investment in the continuum of supply reduction activities.



# Principle 4: Protect individuals and the environment at home from criminal exploitation by those associated with drug production and trafficking.

The abundant supply of illicit substances is costing too many American lives and causing far too much damage to vulnerable communities in the United States and around the world. Global drug trafficking sustains a vast domestic and international criminal ecosystem that enables corruption and destabilizes partner nations abroad. These illicit substances and corresponding criminality contribute to a crisis with considerable national security, public safety and public health implications in the United States, the western hemisphere, and beyond. Furthermore, we recognize the full scope of damaging activities related to illicit drug trafficking includes disproportionately detrimental effects on vulnerable and underrepresented populations at home and abroad and considerable harm to the environment.

**A. Address the criminal destruction of our protected natural resources due to domestic marijuana grows on public land.** *(Agencies Involved: DHS; DOD/NGB, NRO; DOI/BLM, NPS, USFWS; DOJ/DEA; EPA; USDA/USFS)*

Illegal outdoor marijuana cultivation on public and private lands causes substantial harm to the environment and threatens public safety.[315] To procure the water needed for the crops, illegal growers dam and divert rivers, streams, and creeks, and tap springs, altering the watershed and depriving the habitat and communities downstream of water. The use of fertilizers, herbicides, and pesticides by illegal marijuana growers is also a serious threat to wildlife, habitat, and humans encountering these toxic substances and can complicate eradication and reclamation and remediation efforts.[316]

Some of these substances are so toxic that they are banned or unavailable in the United States, but Homeland Security Investigations, the Environmental Protection Agency (EPA), and other federal and state agencies report they are smuggled into the country by trafficking organizations from abroad. Environmental analyses of lands within national parks and forests that had been used for marijuana grow operations show significant environmental degradation stemming from chemical pollution and poor waste management and that contaminants from these operations are poisoning native animal species, including several endangered species.[317]

To protect the environment and preserve our nation's public lands and forests, federal, state, local agencies must continue to act against the criminal destruction of our protected natural resources through eradication missions, investigations and prosecutions, and reclamation efforts. We must also improve our ability to identify grow sites under cultivation before the illegal growers can spray them with extremely toxic chemicals. This will enable law enforcement officers to avoid exposure to chemicals such as carbofuran, improve the efficiency of eradication efforts, and reduce the negative environmental impacts of illegal marijuana grows.

ONDCP and partner agencies will strongly encourage prosecutors to seek appropriate federal penalties for illegal marijuana grow operations on public lands, especially those involving firearms violations, environmental violations, export of prohibited toxicants, and endangerment of wildlife based upon the fact-specific characteristics of the offender and the offense. ONDCP will also continue to convene the Public Lands Drug Control



Committee (PLDCC), the only federal interagency group that coordinates programs to support marijuana eradication operations and investigations on public lands, as well as related intelligence and information sharing. Additionally, agencies must reduce the backlog of reclamation sites, including increasing reclamation of previous season grow sites.

We must leverage the full capabilities of the U.S. Government to reduce the supply of illicit substances. This requires fresh thinking, as well as the adoption of evidence-based approaches to improve our whole-of-government approach to drug trafficking, and its direct and indirect effects on communities at home and abroad. The complexity and diffusion of illicit drug supply chains, criminal drug trafficking organizations, and their networks of facilitators demands a renewed commitment by agencies to pool resources and work collaboratively to maximize the effects of our limited resources against drug manufacturing and trafficking organizations with nearly limitless resources. This includes taking greater risks by more openly sharing information across federal, state, local, Tribal, and territorial agencies and prioritizing resources for those agencies that do so. It also means prioritizing resources for programs that incentivize information sharing and that enhance collaboration vertically and horizontally across agencies as it is clear that the volume and pace of TCO activity far exceeds the pace presently achievable by individual public safety and public health mechanisms. The United States must set an example as a leader in world efforts to counter these criminal organizations and their facilitators and reduce the harms associated with illicit drugs.



# Reduce the Supply of Illicit Substances through International Engagement

National Security and law enforcement agencies at all levels—federal, state, local, Tribal, and territorial—work to combat drug trafficking with the goal of protecting Americans from a lethal drug supply contributing to record levels of fatal drug overdoses. However, traffickers continue to refine their methods and adopt new techniques for delivering illicit drugs to our communities. The majority of illicit drugs consumed in the United States are produced abroad by TCOs and smuggled into the country. Large TCOs, wherever they are based, threaten the health and safety of our communities by exposing our citizens to illicitly manufactured substances. These include synthetic drugs, such as fentanyl and methamphetamine, and cultivated drugs like heroin and cocaine. The plentiful supply and widespread availability of high potency illicit drugs fuel drug consumption across all sectors of American society. Large scale national drug markets, especially those containing synthetic opioids, lead to increased overdose deaths and drug use—impacting millions of American families. This drug use also contributes to significant economic costs for individuals and employers. Moreover, drug trafficking sustains vast domestic and international criminal enterprises that fund a range of illicit activities, enable corruption, undermine governance, and have a destabilizing effect on partner nations, as well as create opportunities for malign actors to gain footholds in fragile states and among vulnerable populations. The organization Global Financial Integrity estimated that, in 2014, the manufacture and trafficking of illicit drugs generated some $426-652 billion dollars for TCOs worldwide, more than a third of the total value of transnational organized crime.[318] Large and influential TCOs pose a threat to our national security and effectively responding to their illicit manufacturing, trafficking and distribution methods is an Administration priority.[7] Countering corruption and its deleterious impact, including its role in facilitating transnational crime, is a core national security interest of the U.S. government.

The U.S. must strengthen international partnerships and foster bilateral exchanges to collaboratively address drug-related problems as a shared responsibility. The increasingly dynamic and complex nature of the international illicit drug trade demands enhanced cooperation with international partners that reflects the reality of a globalized supply chain for illicit drugs and their precursor chemicals. In addition to confronting TCOs' illicit drug manufacturing and trafficking activities directly, the U.S. must also pursue the financial enablers of this illicit activity to deny TCOs their ill-gotten proceeds and to disrupt their ability to transfer working capital to fund their range of illicit activities including procuring precursor ingredients, trafficking, bribery, and corruption. A global approach is essential since traffickers exploit national boundaries to insulate their operations and limit the impact of any single nation's control efforts.[319] These international initiatives will also include a revitalized effort to leverage the significant capabilities of multilateral organizations and frameworks that are able to accomplish actions that no single government can achieve alone. This is true across all drug threats, but

---

[7] See E.O. on Establishing the United States Council on Transnational Organized Crime, https://www.whitehouse.gov/briefing-room/presidential-actions/2021/12/15/executive-order-on-establishing-the-united-states-council-on-transnational-organized-crime/ and Fact Sheet on Establishing the Fight Against Corruption as a Core U.S. National Security Interest, https://www.whitehouse.gov/briefing-room/statements-releases/2021/06/03/fact-sheet-establishing-the-fight-against-corruption-as-a-core-u-s-national-security-interest/



particularly for the challenge posed by the synthetic opioids supply chain that stretches around the globe.

Four principal lines of international effort are necessary to reduce the supply of illicit substances and decrease the harms caused by these substances in the United States and abroad:

- Strengthen foreign partnerships to address drug production and trafficking as a common and shared responsibility.

- Obstruct and disrupt financial activities of TCOs that manufacture illicit drugs and traffic them into the United States, including by countering corruption.

- Leverage the influence of multilateral organizations and other bilateral relationships to tackle shared challenges related to synthetic drugs.

- Protect individuals and the environment abroad from criminal exploitation by those associated with drug production and trafficking.

These lines of international effort are complemented by the activities outlined in the Southwest, Northern, and Caribbean Border Counternarcotics Strategies, and by the National Interdiction Command and Control Plan, which collectively serve as companions to the *National Drug Control Strategy*. This compendium of documents provides strategic guidance linking international efforts with domestic efforts to reduce the supply of illicit substances within our communities.

# Principle 1: Strengthen foreign partnerships to address drug production and trafficking as a common and shared responsibility.

Strengthening foreign partnerships is a crucial element in our efforts to reduce the supply of illicit substances in America's communities. Analyses indicates that criminal organizations in Mexico supply most of the cocaine (after sourcing it from Colombia), methamphetamine, heroin and illicitly manufactured fentanyl smuggled into the United States[320] and have increased their production of fentanyl and its analogues, using precursor chemicals sourced primarily from the PRC.[321] Additionally, over 90 percent of the cocaine seized and tested in the United States is produced in Colombia.[322]

TCOs remain the greatest criminal threat to the United States: they control lucrative smuggling corridors across the region to bring tons of illicit drugs across our borders every year.[323] Once in the United States, the drugs are delivered to consumer markets using vast transportation and distribution routes those criminal organizations oversee and control.[324] Consistent with the Administration's National Security Strategic Guidance, we will engage with key partners and collaborate on tangible and sustainable efforts to combat drug production and trafficking from all its global sources. We will expand our approach beyond capacity building by advancing economic opportunity for the most vulnerable within these countries, providing state presence and security that adheres to the rule of law and human rights, combatting transnational criminal networks, countering corruption, and reducing illicit drug production consistent with partner nation and United States law. We will prioritize Asian and Latin American countries with the most direct effect on drug trafficking and use in the United States and will draw upon long-



standing relationships with like-minded partners in Asia, the Western Hemisphere, and Europe, along with supporting the work of multilateral organizations, to address the changing dynamics and increasing sophistication of the global drug trade.

**A. Develop holistic approaches for engaging with Asian and Latin American countries with a direct effect on drug trafficking in the United States.** *(Agencies Involved: DHS; DOD; DOJ; DOS; HHS; IC/NSC; Treasury; USAID; USPIS)*

Within drug producing countries, there is a substantial correlation between areas lacking in development programs that reach the most vulnerable and impoverished citizens and the presence of TCOs.[325] The United States Agency for International Development (USAID) focuses on strengthening legal economies in rural, underdeveloped, and post-conflict areas via projects that focus on expanding land titling, increasing the competitiveness of licit goods, and establishing agricultural value chains through market analyses and development assistance. USAID also offers technical assistance to rural producers and organizations to improve the productivity of licit crops and increase rural smallholder sales. These efforts have helped local organizations become effective and reliable partners in the planning and implementation of sustainable socio-economic development initiatives and have helped provide former coca growers with a viable and licit income source.[326] The Department of State leads the United States government's efforts to reduce the production of drugs outside the United States by pursuing partnerships to disrupt the flow of drugs into the United States, and help mitigate the consequences of drug trafficking such as violence, criminality, corruption, and human exploitation in our global partner nations.

**B. Support Mexico's efforts to strengthen its counter-drug institutions and initiatives.** *(Agencies Involved: DHS/CBP, USCG, ICE; DOJ/ATF, DEA, FBI, OCDETF; DOD; DOS; TREASURY)*

Mexico is a primary source country for the cultivation, production, and shipment of heroin and illicit marijuana, as well as a key country in the production and movement of synthetic drugs and the movement of cocaine into the United States.[327] The Governments of the United States and Mexico have developed a common understanding of the negative economic, security, and public health impact of transnational criminal organizations in the production and trafficking of illicit substances. With Mexico, we must continue to expand cooperation to address common threats. Both governments agree that reducing the supply of illicit drugs is a shared responsibility.

Mexico is working to eradicate poppy fields more effectively, destroy clandestine laboratories, and interdict heroin and other illicit drugs before they reach the U.S. border. ONDCP will continue to use the Heroin/Fentanyl Working Group (HFWG) as a means to coordinate Embassy Mexico City and U.S. interagency efforts in Mexico. Despite challenges stemming from Mexico's 2020 national security law, the interagency will leverage our partnership with Mexican law enforcement officers, analysts, chemists, investigators, prosecutors, and military personnel to identify and safely dismantle clandestine drug laboratories and bring those responsible to justice.[328] In particular, we will work to establish an agreed United States-Mexico poppy eradication program, a shared eradication goal, and a joint strategy for intelligence-driven eradication in Mexico.



The Department of State, ONDCP, and other federal agencies have also been working with the Government of Mexico to address maritime port security, including through the NADD. Improving port security would curtail the diversion of imported of chemicals used to make illicit drugs, thus inhibiting synthetic drug production. Steps to improve port security include professionalizing security forces, reducing corruption and criminality at key ports, increasing awareness of the types of chemicals that authorities should seize, and improving insight into the evolving nature of the precursor environment.[329] Improving port security can also mitigate the movement of illicit weapons and proceeds, ultimately denying operational resources to the TCOs. Respecting the sovereignty of Mexico, we will continue to pursue efforts beyond capacity-building initiatives with Mexico to address shared responsibility to foster equitable regional development. The Bicentennial Framework modernizes U.S.-Mexico security cooperation to confront existing and new challenges, including the accelerating drug overdose deaths in the United States driven by illicit drugs and associated violence and criminality in Mexico. Through the Framework, the U.S. and Mexican interagencies will increase joint efforts to combat synthetic drugs and other illicit drug production, better understand and reduce drug demand in the United States and Mexico, increase interdiction of drugs, pursue TCO prosecutions and illicit finance, and reduce the number of illicit firearms crossing the U.S.-Mexico border, among other issues.

C. **Work with the PRC to strengthen control of the production, diversion, and transshipment of illicit synthetic drugs and their precursors.** *(Agencies Involved: DHS; DOD; DOJ; DOS; HHS; IC/NSC; Treasury; USAID; USPIS)*

A significant volume of non-fentanyl opioids and precursor chemicals used to produce fentanyl, fentanyl analogues, and other synthetic drugs originate in the People's Republic of China (PRC). This assessment is supported by seizure evidence, law enforcement investigations, internet sales information, and judicial actions in the United States, PRC, and Mexico.[330] Increased collaboration with the PRC on shared drug priorities can disrupt drug trafficking networks, along with the corrupt or compromised systems that support them, and reduce the availability of dangerous synthetic drugs in the United States. The United States will continue engagement with the PRC to reduce diversion of uncontrolled precursor chemicals to the illicit production and trafficking of synthetic drugs destined for markets in the United States, while also working with impacted third countries.

D. **Work with Colombia to reduce production and trafficking of cocaine while increasing alternative economic opportunities.** *(Agencies Involved: DOD; DOJ/DEA, OCDETF; DOS; IC/NSC; Treasury, USAID, USCG, WHA)*

Colombia remains a stalwart partner of the United States and one of our strongest and most reliable allies in the region. Recent data suggest that the current level of effort of manual eradication alone is insufficient to reverse the coca cultivation that provides the raw material for cocaine production in Colombia. In fact, both raw coca production and estimated total cocaine production in Colombia have more than tripled since 2012.[331] To reverse this upward trend, the U.S. government, in partnership with the Colombian government, will implement an integrated counterdrug plan that supports stability, prosperity, capacity-building, and a strong bilateral partnership. This whole of government effort will support and emphasize increases in environmentally-safe illicit



crop eradication, alternative development, interdiction, rural security, environmental protection, investigations and prosecutions, judicial support, and public health cooperation. Since coca fields differ in their level of productivity, this approach will be most successful if we focus in areas of high-yield coca cultivation. [332] Unfortunately, these areas generally have limited government services and lingering security concerns, and will require concerted effort over several years to reverse the continued rise in cocaine production. Consequently, U.S. government efforts must be closely tied to measurable outcomes, sustainable over the long term and designed to complement Colombia's national counterdrug strategy.

**E. Foster improved international drug control and alternative development in Peru.** *(Agencies Involved: DOD; DOJ/DEA, OCDETF; DOS; IC; Treasury; USAID; WHA)*

Peru, despite being the world's second largest producer of cocaine, is a steady partner in the fight against coca cultivation and illicit drug trafficking. [333] The Biden-Harris Administration will apply a comprehensive approach, working with the Government of Peru. Eradication remains a valuable tool in reducing coca cultivation in Peru, but the root causes of illicit crop cultivation must also be addressed. In addition to supporting eradication, U.S. efforts will focus on bringing security and state services, transportation infrastructure, and alternative livelihoods to the coca-growing regions of Peru, providing incentives for rural farmers to leave the often-dangerous work of coca cultivation in favor of safe and profitable licit livelihoods. Much of this work will be done through INL and USAID programming in the country, as well as continued support for Peru's National Commission for Development and Life without Drugs (DEVIDA).

**F. Strengthen Ecuador's drug control, law enforcement, and developmental initiatives.** *(Agencies Involved: DOD; DOJ/DEA, OCDETF; DOS; IC; Treasury; USAID; USCG; WHA)*

Ecuador, although not a cocaine producing country, constitutes one of the primary cocaine trafficking regions in South America. Cocaine is transported from Colombia and across Ecuador's porous borders to Ecuador's coast for illegal maritime smuggling. [334] In Ecuador, we will also seek to engage the Ecuadorian government and collaborate in developing a comprehensive counterdrug plan. This approach will focus on augmenting Ecuador's capacity and capability to surveil, monitor and interdict the illicit movement of drugs over land, air, and sea. It is the U.S. Government's goal to help Ecuador diminish illicit drug trafficking by increasing seizures in the Ecuadorian Economic Exclusion Zone (EEZ), [8] on the country's coasts and inland by 50-percent over the next three years.

**G. Intensify cooperation with India to preemptively address precursor chemical and illicit pharmaceutical diversion, production, and trafficking.** *(Agencies Involved: DHS; DOD; DOJ; DOS; HHS/FDA; IC/NSC; Treasury; USAID; USPIS)*

India represents a potential source for precursor chemicals used to make synthetic drugs. India is the leading generic drug manufacturer in the world. This commercial

---

[8] Exclusive Economic Zone (EEZ) as defined by United Nations Convention on the Law of the Sea (UNCLOS), Part V. https://www.un.org/depts/los/convention_agreements/texts/unclos/unclos_e.pdf. Based on United Nations Educational, Scientific and Cultural Organization UNESCO, the Ecuador EEZ covers approximately 1,150,000 squared km, which is approximately 200nm off the contiguous coast of Ecuador and the area surrounding the Galapagos (approximately 600nm off the coast). http://msp.ioc-unesco.org/world-applications/americas/ecuador/


infrastructure, and the combination of technical expertise and chemical source supplies in India, is exploited by drug traffickers to source synthetic drugs and precursor chemicals destined for markets in the United States and other regions globally.

The United States Government and the Government of India (GOI) understand the importance of counternarcotics engagement and regular consultation on narcotics matters. The creation of the Counternarcotics Working Group (CNWG) and the development of a bilateral framework demonstrates our shared commitment to strengthening meaningful partnership and engagement between our two nations.

This bilateral framework will allow the USG and the GOI to work together on curtailing the production of narcotics, reducing drug related crime, expanding the awareness of the dangers of illicit substance and its associated harms, and will build on the existing bilateral relationship between both countries.

**H. Support international partners as they address drug production and interdiction issues across the global drug market.** *(Agencies Involved: DHS; DOD; DOJ; DOS; IC)*

The global illicit drug market has resulted in an increasingly large number of countries that are not directly involved in drug trafficking into, and use in the United States, but which play substantial roles in the global flow of illicit drugs and precursor chemicals. The illicit drug industries in these nations, be it manufacturing or trafficking and transshipment, provide substantial illicit operating capital to TCOs that affect the United States directly and indirectly by their range of illegal activities, including bribery and corruption of government officials. We must be mindful of the transshipment roles played by Guatemala, Honduras, and El Salvador, forming the Northern Triangle, along with the destabilizing effects drug trafficking organizations have in these countries. [335] Similarly, Golden Triangle nations Thailand, Laos, and Burma and countries like Afghanistan serve as points of origin and transshipment for drugs including heroin, hashish, and methamphetamine bound for markets worldwide. It is also imperative that we maintain a vigilant eye on illicit narcotics flows throughout the Middle East, Africa, Europe, and Asia, as well as the possible emergence of new TCOs. For example, the new Afghan government's ultimate posture on illicit drug production and trafficking remains to be seen, which leave open the possibility that a permissive environment for TCOs will develop.

The United States must identify and engage like-minded nations as partners to confront illicit drug manufacturing and trafficking world-wide and deny TCOs safe havens from which to ply their trade. Bilateral agreements that enhance coordination and cooperation amongst law enforcement agencies of partner nations should be prioritized. Moreover, the United States should work with like-minded partners to amplify mutually held priorities in multilateral fora. Organizations such as The Interdiction Committee (TIC) should leverage the authorities and capabilities of its member agencies to enhance interdiction and capacity-building initiatives within transshipment nations for drugs bound for the United States. Support provided to international partners should be complemented by robust assessments of effectiveness and accountability for measurable outcomes. The United States will also work with multilateral organizations, such as the UNODC and the International Narcotics Control Board (INCB), to shed light on and respond to trafficking trends and enhance international cooperation.



# Principle 2: Obstruct and disrupt financial activities of transnational criminal organizations that manufacture illicit drugs and traffic them into the United States.

The ingenuity of drug traffickers is undeniable: from smuggling drugs across the southwest border on rail cars using well-engineered ventilated tunnels, to capitalizing on the massive volume of traffic flowing through the ports of entry in order to obscure contraband, to building semi-submersibles in the jungles of South America. However, the traffickers' ultimate goal is not getting drugs to market in the United States, but getting usable profits back to fund the illicit activities of the TCOs. The vast quantities of illicit drugs smuggled throughout the world generate enormous revenue, which must be moved and laundered so that traffickers can perpetuate the illicit enterprise. While bulk cash smuggling remains one of the predominant methods for moving illicit proceeds, trade-based money laundering (TBML) such as Black-Market Peso Exchanges, and mirror transfers via informal networks are also used. Additionally, TCOs are growing more comfortable with darknet markets and the use of virtual assets to launder funds, although the size and scope of drug proceeds generated on the darknet and laundered via virtual assets remain low in comparison to cash-based retail street sales.[336]

TCOs require funds to operate their illicit supply chains and exert their transnational corruptive influence. We must use and strengthen every available tool and seek new tools to uncover financial networks and obstruct and disrupt the illicit financial activities that fund TCOs that traffic illicit drugs into the United States.

A. **Enhance international partners' financial tools to target trafficking groups and deny them illicit drug proceeds.** *(Agencies Involved: DOJ/OCDETF; DOS, Treasury/ IRS, TFI)*

TCOs generate tens of billions of dollars in illicit proceeds through control of the drug trade that puts dangerous illicit drugs onto streets in the United States. While the revenue is generated from the sale of illicit drugs in the United States, illicit proceeds generated by wholesalers or larger transnational drug trafficking organizations must ultimately be moved and laundered out of the United States and back to the TCOs where they are used to fund the cycle of illicit activity and facilitate corruption and malign influence. We must work with our international partners to deny TCOs the illicit proceeds that fund their operations by enhancing anti-money laundering regulations and international standards. By working with vulnerable nations to enhance these regulations we can make it more challenging for TCOs, and the money laundering organizations that support them, to launder illicit proceeds and turn illicit drug revenue into operating capital. By denying TCOs the operating capital to purchase precursor chemicals we would impact the illicit drug trade far upstream of the street retail environment. As per Strategic Objective 5.8 of the U.S. Strategy on Countering Corruption, we must also consider the role of third-party enablers of illicit finance such as complicit lawyers and law firms, accountants, realtors/real estate firms, title insurers, art dealers, and other commercial enterprises and individuals that facilitate the illicit economy in source and transshipment countries.[9]

---

[9] "The U.S. Government will prioritize the development of a common understanding of corruption risks through joint analyses that outline corruption dynamics, networks, and nodes; consider enablers and drivers of corrupt behavior; examine the potential impact of providing foreign assistance (including security sector assistance); and



**B. Combat Transnational Criminal Organizations' financial structures and target their illicit proceeds.** *(Agencies Involved: DHS/CBP, ICE; DOJ/ATF, DEA, FBI, HIDTA, OCDETF; DOS; IC; DOD; Treasury/FINCEN, OFAC, TFFC, IRS)*

Street-level sales of illicit drugs are largely conducted with cash.[337] The manufacture, transport, and sale of illicit drugs involve multiple transactions that require the laundering of illicit finances across national, regional, and international boundaries via multiple methodologies.[338] These methodologies can include tax amnesties, casinos and gambling, transaction laundering, bank capture, shell companies and trusts, structuring, cash-intensive businesses, trade-based money laundering (TBML), commodity investment, round-tripping, cyber-laundering, and bulk cash smuggling (BCS). Tax amnesties, round-tripping, shell companies and trusts, and investments in commodities are often conducted in countries or regions with weak anti-money laundering regimes. TCOs take advantage of these weak jurisdictional controls and are able to move illicit finances with little scrutiny by law enforcement. BCS remains the primary illicit finance transfer of choice among TCOs, though due to the COVID-19 pandemic law enforcement personnel have witnessed an increase in TBML and an increased use of virtual currency and other digital assets to launder illicit funds. Reports from program implementation partners and law enforcement personnel that are part of DOS managed programs have shown a movement towards TBML and virtual currency transfers. TCOs have been stockpiling cash due to travel restrictions affecting their ability to move currency across international borders. TCOs use a variety of means to transfer value across international borders' including traditional BCS couriers, passenger vehicles, shipping containers, and high value gems, minerals, and metals shipped via mail or express consignment. Virtual currencies continue to grow in popularity with TCOs, but their use is still relatively nascent compared to BCS and other money laundering methods. Virtual currencies are mainly traded via private investors; yet, due to the relative ease in trading these currencies, TCOs often use this form of transaction as a mechanism to move money quickly and then shift it back to cash.[339]

The Bank Secrecy Act (BSA) underlies the federal government's role in working to inhibit TCOs and their financial structures.[340] The Anti-Money Laundering (AML) Act of 2020 is one of the most significant pieces of legislation enacted in recent years to thwart illicit financial actors.[341] In addition to the 2020 National Strategy to Combat Terrorism and other Illicit Financing,[342] the AML Act seeks to strengthen, modernize, and streamline the existing AML regime by promoting innovation, regulatory reform, and industry engagement through forums, such as the Bank Secrecy Act Advisory Group (BSAAG) and FinCEN Exchange. The 2021 U.S. Strategy to Counter Corruption incorporates a similar focus. Public-private partnerships are key tools in addressing the illicit finance threat. The Department of the Treasury should continue to engage with the private sector via public-private partnerships as they implement the AML Act.

**C. Enhance public-private partnership frameworks to more effectively combat the 21st Century Drug Market.** *(Agencies Involved: DHS/ICE; DOJ/DEA, DOS, HIDTA, OCDETF; Treasury/FINCEN)*

---

identify possible entry points or levers to shift the dynamics of corruption in order to incentivize reform." U.S. Strategy on Countering Corruption, Strategic Objective 5.4



Drug trafficking into the United States is a long and complex process involving manufacture, concealment, movement, purchase, and delivery that often starts and ends outside the United States with procurement of raw materials and the return of illicit proceeds, respectively. In 2019, FinCEN worked with ONDCP and 11 federal partners to release a series of advisories to crack down on international synthetic opioid trafficking and increase information sharing with the private sector to disrupt the synthetic opioid supply chain. These private-sector advisories allow domestic and foreign businesses to better protect themselves and their supply chains from inadvertently supporting drug trafficking, explain how fentanyl traffickers exploit their businesses and their supply chains to move and market deadly drugs, and foster deeper public-private collaboration to curb the production and sale of illicit fentanyl, fentanyl analogues, and other synthetic opioids.[343] Each advisory addresses one of four critical stages of illicit drugs trafficking:

- o **Manufacturing:** Aims to broaden the public and private sectors' awareness of various indicators of potential illicit fentanyl manufacturing and distribution;[344]

- o *Marketing:* Provides information for digital private sector partners about marketing and sale tactics of illicit fentanyl via social media, online forums, and e-commerce platforms;[345]

- o **Movement:** Identifies methods of intercepting illicit transportation of fentanyl and other illicit synthetic opioids; and [346]

- o **Money:** Focuses on financial institutions and their role in detecting and reporting illicit financial schemes aimed to disguise opioid trafficking activities.[347]

The DEA e-commerce outreach program is intended to reduce the availability of dangerous and often fatal counterfeit prescription drugs in the United States by educating retailers about the sale of pill presses and components used in the production of illicit and often deadly counterfeit pills.[348]

# Principle 3: Leverage the influence of multilateral organizations to tackle shared challenges from synthetic drugs.

The illicit drug trade is a global transnational problem that harms the citizens of source countries, transshipment countries, and consuming destination countries in varied and unique ways. All agencies and the international community need to continuously monitor and evaluate the effectiveness of efforts to combat drug trafficking and the direct and indirect effects of the illicit drug trade on communities at home and abroad.

A. **Utilize international fora to strengthen drug control cooperation and address international drug policy priorities, especially pressing threats related to the manufacturing and trafficking of synthetic drugs.** *(Agencies Involved: DHS/CBP; DOJ; DOS; DOD; HHS; ONDCP; USPIS)*

The rapidly shifting global drug market confirms the importance of working with international partners to respond to pressing drug issues. Bilateral efforts are effective in addressing more limited situations, but in recent years, the United States has increasingly turned to multilateral fora to help reduce the international manufacturing and trafficking


of dangerous synthetic drugs. These multilateral drug policy fora bring together a wider community of partners willing to work in concert to address global drug policy issues and improve the health and welfare of communities around the world. To support the objectives of the *National Drug Control Strategy,* harness the collective power of the global community, and promote effective outcomes, the Department of State should continue leveraging key international organizations to promote sharing of data on emerging trends, exchange best practices to address the broad range of issues associated with the illicit global drug market, and press for an enhanced focus on addressing the proliferation of synthetic drugs. In particular, the Department of State should use the Commission on Narcotic Drugs, the decision-making body for anti-drug efforts by the United Nations, to promote U.S. drug control priorities and hold our international partners accountable for their responsibility to help stem the flow of illicit synthetic drugs. The Department of State, with support from federal partners, should also accelerate efforts in these multilateral fora to place new psychoactive substances and uncontrolled or designer precursor chemicals under international control and urge the Expert Committee on Drug Dependence (ECDD) and the INCB to rapidly review priority substances and chemicals of concern for international control on a regular basis.

**B. Draw upon long-standing relationships with like-minded partners in Asia, the Western Hemisphere, and Europe to address the changing dynamics and increasing sophistication of the global drug trade, through regional multilateral fora.** *(Agencies Involved: DHS/CBP, ICE; DOJ/ATF, DEA, FBI; DOS; Treasury; USPIS)*

Regional multilateral fora provide important venues to advance U.S. policy priorities with likeminded partners in key regions such as Asia, the Western Hemisphere, and Europe and ensure effective implementation of international drug control conventions. This includes engagement through the NADD, OAS/CICAD, the U.S.-EU Political Dialogue on Drugs, and the Five Eyes.

During the June 2016 North American Leaders Summit (NALS), the heads of government from the United States, Mexico, and Canada agreed to establish the trilateral NADD to address current and emerging drug threats facing North America.[349] In 2021, members to NALS reaffirmed their commitment, pledging to continue the NADD and establish objectives defining a comprehensive approach to address the global illicit drug environment.[350] The annual meetings are held at the Assistant Secretary level, and throughout the year trilateral trainings, study tours, and information exchanges occur at the subject matter expert level. The NADD brings together law enforcement and health officials from all three countries to address the many facets of the transnational opioid overdose epidemic, illicit psychostimulant threats facing each country, and the broader drug crisis facing North America. Because of its composition and collaborative nature, the NADD has proven able to respond to the dynamics of the

> The U.S.-Canada Joint Action Plan on Opioids is a key mechanism to address the changing dynamics of the drug trade affecting both countries. Agreed to by the President and Prime Minister, the Action Plan was formally launched in Washington, D.C. January 31, 2020 and establishes a bilateral steering committee and three working groups focused on law enforcement, border security, and health.



illicit drug marketplace and produce results in a timely manner, and the leaders of all three countries have spoken about its value.

The US-EU Political Dialogue on Drugs is a bi-annual mechanism to coordinate and advance drug policy priorities, including in advance of multilateral meetings; share emerging issues of concern; and coordinate technical assistance to third countries. [351] Topics covered in 2021 included preparation for the 64th Commission on Narcotic Drugs, addressing new psychoactive substances and synthetic drugs, the impacts of the evolving situation in Afghanistan on drug trafficking, along with alternative development in Peru. The U.S. will continue to utilize this partnership to deepen cooperation and collaboration, especially related to the production and trafficking of synthetic drugs and precursor chemicals.

The Organization of American States anti-drug component (OAS/CICAD) works to address the hemisphere's drug problems by translating global treaty and policy frameworks for drug control into practical action at the regional level through mutual accountability frameworks, policy debates and dialogues, law enforcement information sharing, and technical assistance programs. As its primary benefactor, the United States supports CICAD to address the top drug supply threats and demand issues affecting the western hemisphere. The United States will continue to support CICAD efforts to reduce the trafficking of precursor chemicals, maritime drug trafficking, and the production and smuggling of drugs throughout the region. The United States will also continue to improve its assessments of returns on investments in these efforts.

> The abundant supply of illicit substances is costing too many American lives and causing far too much damage to vulnerable communities in the United States and around the world. Global drug trafficking sustains a vast domestic and international criminal ecosystem that enables corruption and destabilizes partner nations abroad.

Finally, our partners Australia, Canada, New Zealand, and the United Kingdom, colloquially named the "Five Eyes", are critical to worldwide law enforcement and intelligence sharing, and to our understanding of the drug threat globally. They face many of the same challenges as the United States, including international precursor shipments and the growing influence of Mexican drug trafficking organizations. Representatives of our Five Eye partners attend monthly classified meetings, hosted by ONDCP, with the full spectrum of interagency partners to share critical information, trends, and leads. Our Five Eye partners help facilitate law enforcement cooperation and information sharing. They also provide ships and aircraft to our interdiction missions in several critical locations around the globe. We will continue to expand these relationships to better understand drug trafficking not just in our countries, but around the world.

**C. Encourage international organizations to develop tools and offer capacity building to help countries address pressing threats related to the manufacturing and trafficking of illicit drugs, including emerging synthetic drugs.** *(Agencies involved: DHS/CBP; DEA; DOJ; DOS; Treasury; USPIS)*

International organizations offer opportunities to mobilize countries globally to share information about emerging trends, develop best practices, and strengthen capacity to



address the broad range of issues associated with the illicit global drug market. These efforts help countries around the world develop the skills and tools necessary to take measures independently and collectively to combat the illicit drug trade and improve global health and stability. Many organizations also offer tools that help monitor global trends, improve cross-border collaboration, and offer guidance and best practices to improve governments capacities to address drug challenges. For example, UNODC's Global SMART improves the capacity of targeted countries to generate, manage, and use information on illicit synthetic drugs through early warning advisories; the International Narcotics Control Board's Pre-Export Notification (PEN) Online tool helps track the global movement of chemicals used in the manufacture of substances of interest; the Precursor Incident Communication System (PICS) and International Operations on NPS Incident Communication System (IONICS) facilitate information sharing to support law enforcement investigations and collaboration; and the UN Toolkit on Synthetic Drugs offers countries a suite of programmatic and policy solutions to strengthen their national response to emerging threats. The United States should continue leveraging these and other tools offered by international and regional organizations to mobilize a global response to drug challenges.

## Principle 4: Protect individuals and the environment abroad from criminal exploitation by those associated with drug production and trafficking.

The cultivation and manufacture of illicit substances abroad produces tremendous collateral damage to the environment. However, the full scope of damaging activities carried out by TCOs engaged in drug trafficking also includes illicit crop cultivation and illegal mining which result in deforestation and pollution of watersheds and other sensitive habitats. Activities related to illegal drug production in the Western Hemisphere have disproportionately detrimental effects on vulnerable populations ill equipped to confront these activities on their own.

**A. Work with Western Hemisphere partners to address the criminal destruction of natural resources due to illicit drug production.** *(Agencies Involved: DOS; EPA; USAID)*

In Colombia, large areas of forest are clear cut to make room for coca cultivation and clandestine runways to support aerial trafficking operations. Deforestation leaves communities more vulnerable to erosion and landslides that displace populations. In Mexico, environmental pollution by the illicit synthetic drug trade is well documented; the high acidity of drug wastewater and harsh chemicals damage sensitive environments. The United States must engage with partner nations in the Western Hemisphere to prioritize the protection of their natural resources from environmentally damaging activities carried out by TCOs engaged in illicit drug manufacture and trafficking. Engagements must emphasize the range of approaches to address environmental destruction including investigations, prosecutions, and reclamation efforts.

The abundant supply of illicit substances is costing too many American lives and causing far too much damage to vulnerable communities in the United States and around the world. Global drug trafficking sustains a vast domestic and international criminal ecosystem that enables corruption



and destabilizes partner nations abroad. These illicit substances and corresponding criminality contribute to a crisis with considerable national security, public safety and public health implications in the United States, the western hemisphere, and beyond. We recognize the full scope of damaging activities related to illicit drug trafficking includes disproportionately detrimental effects on vulnerable and underrepresented populations at home and abroad, and our understanding of the illicit industry's negative environmental effects continues to grow.

We must leverage the full capabilities of the U.S. Government and our international partners to reduce the global supply of illicit substances to reduce the availability of these substances in the United States. The complexity and diffusion of illicit drug supply chains, criminal drug trafficking organizations, and their networks of facilitators demands a renewed commitment by agencies to identify opportunities to engaged with nations and organization world-wide to objectively characterize the issues and identify holistic solutions that increase the risk and cost of illicit activity and incentivize and enhance access to licit alternatives. This requires identifying shared responsibilities between nations and working with international partners to effectively counter transnational illicit supply chains. The United States will set an example as a leader in world efforts to counter these criminal organizations and their facilitators and reduce the harms associated with illicit drugs.

AR2022_401548



# Criminal Justice and Public Safety

Arrest and incarceration of persons with substance use disorder (SUD) has had severe consequences for individuals, their families and communities, society, and taxpayers. Further, attaching criminal penalties to substance use alone has contributed to lost lives, hope and opportunity. Untreated substance use disorder is overrepresented in the prison population. It is estimated that 65 percent of persons incarcerated have an active SUD.[352] The impact begins at arrest and continues through incarceration, after release, and during reentry to communities. Arrest and incarceration for crimes related to substance use and possession disproportionately impact *Black, Indigenous and People of Color (BIPOC) and other historically marginalized* communities. In fact, Black persons are nearly five times more likely to be incarcerated for drug possession than White persons.[353]

The arrest and incarceration of people for possession of drugs for personal use – and the high number of people arrested and incarcerated for other reasons while also experiencing substance use disorders - has not only led to significant harms in BIPOC and other historically marginalized communities, but it increases risks of overdose. Upon release, incarcerated individuals are at a meaningfully elevated risk to die from an overdose than the general population.[354,355] It is clear that the criminal justice system, while improving public safety, must also play an important role in ensuring that people within its custody or supervision and upon reentry who use drugs do not overdose and instead have access to the continuum of services and support. Ensuring meaningful rehabilitation and successful reentry advances public health and public safety goals.

We need to ensure that those with SUD who are involved with the juvenile and criminal justice systems receive the services and support they need while in jail or prison, under community supervision, upon release, and during reentry. Entities along the justice continuum system must screen people for SUD, offer appropriate treatment, and provide effective reentry services pre- and post-release. We also must develop comprehensive, cross-system collaborations and services to divert people interacting with the criminal justice system due to drug use alone from that system without negatively impacting public safety and to link them to appropriate services.

We must invest in programs that provide evidence-based treatment and support at all points in the criminal justice system. We must build upon the growing support for this evidence-based approach among the criminal justice system and law enforcement stakeholders to rapidly scale up these efforts nationwide.[356]

## Principle 1: Improve access to MOUD for incarcerated and reentry populations

Medication for opioid use disorder (MOUD) programs in criminal justice settings, when administered properly by trained professionals, dramatically reduce mortality post-release and increase the likelihood that an individual will stay in treatment, rejoin their communities successfully, and reduce their risk of recidivism—all of which enhance individual and community public health and public safety outcomes.[357,358] Research has shown that for incarcerated individuals with OUD, treatment with MOUD corresponded to a reduction in the risk of death by 85-percent for drug overdoses in the month following their release.[359] We also



know that people with OUD are up to 50-percent less likely to die when they are treated long term with methadone or buprenorphine.[360] We must work to make low-threshold access to MOUD throughout the criminal justice system the norm. Evidence has shown that these medications when administered properly are safe, highly effective, and save lives.[361] Low-threshold programs prioritize providing MOUD quickly and with minimal barriers to eligibility, which expands access to more vulnerable populations and reduces overdose risk. Screening individuals at intake and ensuring individuals on MOUD are, at a minimum, maintained on their medication is essential. However, complex medical assessment should not hinder rapid initiation of treatment. All three Food and Drug Administration (FDA) approved medications (methadone, buprenorphine, and naltrexone) should be made available with medically appropriate dosing.[362] Although behavioral interventions may also be beneficial for people with OUD, providers should not withhold medications from people with OUD when behavioral interventions are not available or when individuals decline them, but will accept MOUD. Evidence has shown that MOUD when administered properly by trained professionals decreases the risk of opioid-related overdose and death, decreases illicit opioid use, and likewise improves health outcomes. They are also more effective in reducing illicit opioid use and retaining individuals in treatment than behavioral interventions and treatments alone.[363]

Although MOUD when administered properly by trained professionals has a strong evidence-base and saves lives, as of August 2021, only about 12 percent (602 out of 5,000) of correctional facilities offer any form of MOUD.[364] Few facilities maintain treatment for individuals receiving MOUD at arrest and even fewer initiate MOUD for untreated individuals.[365] Regulations surrounding the provision of methadone and buprenorphine are one reason for limited MOUD programs.[366] However, The Practice Guidelines for the Administration of Buprenorphine for Treating Opioid Use Disorder, were issued in April 2021 to assist in increasing access to buprenorphine[367] and proposed federal regulations that will permit opioid treatment programs (OTPs) to provide methadone through mobile components means will also assist expanding access in correctional facilities where there are barriers to establishing an OTP behind the walls.

The criminal justice system is a critical touchpoint for people with SUD today. However, we envision a future where these individuals are diverted from the criminal justice system when appropriate and without negatively impacting public safety and do not lose access to the continuum of care.

A. **Expand access to MOUD in state and local correctional facilities and community corrections.** *(Agencies Involved: DOJ/OJP, BOP, NIC; HHS/ASPE, NIH)*

As noted previously, very few jails and prisons continue treatment with methadone or buprenorphine for those receiving these medications prior to incarceration, and even fewer initiate OUD treatment with these medications. Jurisdictions wanting to continue or initiate OUD treatment with medication may need to develop approaches that are customized for their facility and population. Courts and community corrections agencies also play a large role in determining the type of treatment available to individuals with SUD in the criminal justice system.[368] When appropriate, individuals should be allowed to continue MOUD while on pretrial release, probation, or parole, and court-ordered treatment should not ban or discourage the use of MOUD—nor should it mandate or encourage use of one medication over another. Requiring persons to change medications or discontinue MOUD as a condition of criminal justice supervision is associated with poor criminal justice and health outcomes, and a lower likelihood of participating in



substance use treatment or MOUD in the future.[369,370,371] Worse, because physiological tolerance to opioids declines during abstinence, persons required to withdraw involuntarily from methadone or buprenorphine face a substantially increased risk of overdose and death if they use opioids even once.[372,373] Best practices have been published by leading organizations including the Substance Abuse and Mental Health Services Administration (SAMHSA)[374] and the National Association of Drug Court Professionals (NADCP).[375,376] NADCP suggests that medication decisions, including the decision to reduce or discontinue a medication, should be made by patients in consultation with a legally authorized and competently trained medical practitioner. As such, nonmedically-trained criminal justice professionals should consider medication decisions relating to participants' psychosocial needs made by duly trained and credentialed clinicians and supervision officers in conjunction with the individual.[377,378] Additionally, fewer than one in 21 youth 17-years-old and younger have access to MOUD.[379] Juvenile justice detention centers must also ensure access to MOUD and defer to trained medical professionals regarding medical decisions, such as the need for and mode of SUD treatment.

It has been reported that some judges direct participants to specific treatment providers and express a preference for a particular medication.[380] However, deference should be given to the treatment recommendations of medical professionals when appropriate. Communication and coordination among jails, prisons, courts, and community corrections regarding treatment plans can help ensure continued access to MOUD throughout transitions within the correctional system and upon release. As mentioned previously, the recently issued guidelines around buprenorphine prescribing and proposed regulations for mobile methadone will alleviate some barriers to providing MOUD in criminal justice settings. Still, working groups and discussions with corrections officials should convene to facilitate peer-learning, including lessons learned implementing and funding MOUD in various criminal justice settings.

In coordination with ongoing work of the NIDA's Justice Community Innovation Network and the National Institute of Corrections (NIC), ONDCP will survey state and local corrections systems to learn more about the MOUD landscape to better inform policy. ONDCP will also convene with BOP, NIC, and NIDA correctional leadership to develop and disseminate best practices for fully adopting MOUD in correctional settings.

 Although roughly 2.3 million persons are incarcerated in prisons annually, roughly 8 to 10 million persons cycle through short-term incarceration in jails each year, many of whom are experiencing SUD and could benefit from access to MOUD administered properly by trained professionals.[381] ONDCP will leverage initiatives, such as OJP's Comprehensive Opioid, Stimulant, and Substance Abuse Program (COSSAP),[382] to expand the use of MOUD in jails. ONDCP also will work with OJP to prioritize MOUD in jails for grantee applications and awards.

**B. Expand funding for SUD treatment in the criminal justice system.** *(Agencies Involved: DOJ; HHS/ASPE, CMS, SAMHSA)*

Current federal Medicaid law generally prohibits federal Medicaid matching funds for otherwise reimbursable services for individuals when they are incarcerated, referred to as the Medicaid Inmate Exclusion Policy.[383] Section 5032 of the SUPPORT Act created demonstration opportunities for states to expand services to beneficiaries transitioning



from incarceration to the community, and states should work with CMS to incorporate SUD treatment best practices in their programs.

The Biden-Harris Administration is making significant investments in the SUD system with the potential to expand existing grant programs to provide services to incarcerated individuals, such as the Supplemental Substance Abuse Block Grant, State Opioid Response, and the Medication Assisted Treatment-Prescription Drug and Opioid Addiction grants.

Funding MOUD programs was a barrier found in a study of medical staff and wardens providing opioid agonist treatments in jails and prisons.[384] Many funding sources are not secure from year-to-year, leading to uncertainty about longer-term programming. ONDCP will explore sustainable opportunities to fund MOUD in jails, where the largest number of people with untreated SUD cycle in and out of the criminal justice system, and ensure its proper administration by trained professionals. Opioid litigation settlement proceeds will be among the potential funding sources ONDCP will recommend.

**C.  Simplify the regulation of methadone and buprenorphine to create the necessary flexibility for jails and prisons to offer MOUD.** *(Agencies Involved: DOJ/DEA; HHS/SAMHSA)*

Regulatory changes are needed to offer these services in jails and prisons in a safe and legal way. SAMHSA should continue its efforts to adopt a more flexible "take home" medication rules for people in jail or prison when appropriate, and make the COVID-19 pandemic emergency regulations permanent, including allowing for remote prescribing. While HHS released updated buprenorphine prescribing guidelines expanding access to treatment,[385] it is important to recognize that many jail providers serve both facility- and community-based populations, leading to issues when prescribers have a patient limit. ONDCP should work to resolve this issue. ONDCP should also work with DEA to clarify the application of the "72-hour rule" to providers in the criminal justice system and explore the possibility of increasing the time length that allows trained practitioners to administer MOUD properly in the criminal justice setting when appropriate. The 72-hour rule, or three-day rule, allows practitioners to administer methadone (or other Schedule II medication approved for the treatment of OUD) for a 72-hour period while arranging referral to treatment through an OTP.[386]

# Principle 2: Advance racial equity in investigation, arrest, and sentencing for drug related offenses

As noted previously, BIPOC and other historically marginalized communities have experienced harmful disparate impacts throughout all aspects of the criminal justice system, leading to the disruption of families and communities. President Biden has emphasized the need to eliminate racial and other inequities in the criminal justice system while improving public safety and has stated that people should not be incarcerated for substance use alone but offered treatment instead.[387,388]

**A.  Use data to identify racial inequities and to assist in driving policy changes.** *(Agencies Involved: DOJ/FBI, OJP)*



The Federal Bureau of Investigation (FBI) Uniform Crime Reporting (UCR) program data, and many other federal datasets, do not disaggregate data reporting for individuals of Latino heritage individuals by race.[389] Because they are not identified as a distinct ethnic group, disparities cannot be examined. The FBI should ensure that its criminal justice data captures racial and ethnic data for the broadest number of groups practicable. Although it is well-known that there are racial disparities in the criminal justice system, it is vital to follow the data to identify where disparities exist to evaluate and develop appropriate data-driven policy proposals.

**B. Engage prosecutors and judges to ensure equitable treatment for individuals involved in the criminal justice system. Expand training for staff in drug court programs to reduce the role of personal biases in screening out eligible nonviolent drug court program candidates.** *(Agencies Involved: DOJ/OJP, BOP)*

Evidence exists to suggest that standardized criminal justice policies that improve access to drug treatment may reduce some of the disparities between Black and White referrals to treatment.[390] Expanding training for staff in drug court programs will work towards creating a more standardized process for screening drug court candidates and prevent personal biases from impacting the decision-making process. A survey of 600 courts found that less than 4 percent of the arrestee population at risk of SUD entered treatment.[391] This is likely a reflection of the fact that many jurisdictions rely on the discretion of prosecutors, defense attorneys, and judges to make drug court referrals on a case-by-case basis. To create a more equitable process, we support the implementation of a universal, systematic screening process of arrestees which would work to prevent biases from impacting treatment referral decisions. Universal screening of persons entering he criminal justice should work to quickly process every defendant for eligibility and be integrated into regular case processing.[392]

**C. Allow courts to exercise sound judicial discretion and independence.** *(Agency Involved: DOJ)*

Mandatory minimum sentencing allows no room for courts to exercise sound judicial discretion and independence, and thus judges are required to impose punishments that they may not otherwise given the individualized facts and circumstances of each case. These sentences are commonly triggered by the weight of the drug, with the weight corresponding to specific sentences. If weight and monetary thresholds were raised, fewer individuals would be subjected to mandatory minimum sentences.[393] In 2009, Rhode Island eliminated mandatory minimum sentences and allowed courts to exercise judicial independence for nonviolent drug offenses. While the prison population decreased, its violent crime rate decreased as well.[394,395] These long and harsh sentences disproportionately affect poor people, BIPOC, and other historically marginalized groups.[396] In consultation and collaboration with DOJ, ONDCP will identify opportunities to amend federal statutes that impose mandatory minimum sentences for drug-related offenses—as warranted and where appropriate without negatively impacting public safety—allowing courts to exercise sound judicial discretion and independence based upon the mitigating and aggravating factors in each case.



# Principle 3: Promote Alternatives to Incarceration

Those committing drug-related offenses are serving longer sentences than before,[397] even as research shows that more time in prison does not reduce drug use or drug arrests.[398] While we support the work in states that are updating their criminal laws as they relate to substance use and possession, programs that divert non-violent individuals from the criminal justice system and juvenile justice system without negatively impacting public safety and offer them services to address their SUD must be supported when appropriate. Many of these programs can be found on the Annals of Research and Knowledge (ARK), an ONDCP-funded online, user-friendly database describing evidence-based and promising programs based on the risk level and needs of an individual at each stage of interaction with the criminal justice system.[399]

An example of a program in which alternatives to incarceration are promoted is occurring in Richmond County (Staten Island) in New York led by their District Attorney (DA) Michael McMahon. DA McMahon has witnessed the impact of addiction in his county and worked with the New York Police Department (NYPD) and the court system to create the Heroin Overdose Prevention & Education (HOPE) program where individuals who would be arrested for crimes related to their substance use are offered the opportunity to meaningfully engage in social and medical services (peer support, harm reduction, SUD treatment), prior to the processing of the arrest. If the individual does engage, their arrest is not processed. Since program inception, approximately 94-percent of the individuals who complete an assessment to participate in the program meaningfully engage in services and have their cases withdrawn and these participants are considerably less likely to be rearrested.[400]

A. **Work with federal, state, and local partners to support pre-arrest diversion programs for non-violent individuals when appropriate and without negatively impacting public safety.** *(Agencies Involved: DOJ/OJP, BOP; HHS/ASPE, SAMHSA)*

Diversion programs work to target the underlying problems that lead to crime and effective diversion programs can enhance long-term public safety and reduce recidivism while saving tax-payer dollars.[401,402] As previously discussed, law enforcement officers often encounter individuals with SUD in their daily work, or in response to calls for assistance. When no arrest is made, officers are increasingly facilitating pre-arrest diversion or deflection into available programs. Such pre-arrest diversion is a harm reduction approach. A number of states have worked to implement pre-booking jail diversion programs as a result of the opioid epidemic. Many jurisdictions describe the importance of shifting police culture towards community policing and community collaboration to quickly identify people who are high-risk and would particularly benefit

Another resource to assist drug courts to divert individuals to MOUD services is available in the NDCI MOUD Toolkit. This toolkit offers practical resources to help drug courts implement MOUD in accordance with scientific knowledge, drug court best practices, and emerging legal precedent. This tool kit includes three model memoranda of understanding, two letter templates, and an informational brochure for drug court participants and their loved ones. Additional information is available here: https://www.ndci.org/resource/training/medication-assisted-treatment/moud-toolkit


from diversion. [403] ONDCP will work to enhance their efforts and share the lessons learned and best practices. DOJ and HHS should also work to identify opportunities to expand funding for implementing, sustaining, and evaluating appropriate criteria for pre-arrest diversion programs that allow for a fact-specific evaluation of the characteristics of non-violent offenders and the offense and would not negatively impact public safety.

**B. Expand screening to divert non-violent individuals to the appropriate community-based services at the point of arrest, arraignment, and sentencing when appropriate and without negatively impacting public safety.** *(Agencies Involved: DOJ/BOP, OJP)*

The National Drug Court Institute (NDCI) identifies, trains, coaches, and connects drug court programs with addiction specialty physicians, physician assistants, and nurse practitioners. This allows expanded relationships with medical providers to assist in developing treatment protocols and individualized treatment plans. Early in 2022, NDCI, in partnership with the American Society of Addiction Medicine (ASAM), will also pilot a three-day virtual training series to train physicians, physician assistants, and nurses in the system. Agencies need to continue such efforts.

Federal grant-making agencies, such as HHS and DOJ, support drug court programs by including language in their awards ensuring participants cannot be compelled to cease use of MOUD when administered properly by trained professionals. Agencies must ensure that this language is maintained in current and future grant awards, and compliance with it should be monitored by the grant-making agencies.

**C. Assess impact on those with SUDs on Drug Delivery Resulting in Death Charge under state laws.** *(Agencies Involved: DOJ; HHS; ONDCP)*

Drug traffickers and violent drug dealers who sell drugs for profit deserve punishment for their crimes, especially when their products result in a fatal overdose. It is important that laws designed to punish drug traffickers harshly are not inadvertently applied to those with SUD who are not significant drug traffickers, but essentially are purchasing drugs with another user. Individual characteristics and the circumstances surrounding the commission of the offense matter in terms of determining the appropriate and proportional penalty. DOJ and HHS should assess how states are using these laws and provide recommendations to the Attorney General, Secretary of HHS and Director of ONDCP with regard to necessary changes.

# Principle 4: Improve reentry—Expand and remove barriers to support services

Individuals reentering the community benefit from support services to reintegrate them into society and connect them to stabilizing social services.[404] Individuals need assistance with gainful employment, housing and educational opportunities, and connection to benefits and health care coverage.[405] Individuals with SUD face additional challenges, from heightened risk of overdose post-release to connecting with community providers for treatment.[406,407,408] Planning for release and reentry is critical and should involve the individual and relevant community partners, and begin at intake and continue throughout the individual's incarceration.[409] Warm hand-offs to providers also increase the likelihood of engagement in



services and improves treatment outcomes, particularly when there is an established relationship with the provider.[410,411]

A. **Ensure evidence-based in reentry support, improving linkages to the community and reentry and recovery outcomes.** *(Agencies Involved: DOJ/BOP, OJP; DOL; HHS/ASPE, CMS, SAMHSA)*

Release and reentry are critical times for ensuring a safe and stable transition into the community and providing a linkage to treatment. Individuals should leave the facility with state-issued identification, Medicaid (if applicable), and other benefits. Individuals should also be provided with naloxone and naloxone training upon release. Individuals on MOUD should be provided with a bridge prescription or take-home medication, along with an appointment with a community provider and a warm handoff to the provider. Providing these linkages will improve outcomes and save lives. ONDCP should work with federal partners at DOJ and HHS to ensure that federal funding opportunities support and promote community reentry.

B. **Eliminate collateral consequences that do not serve to protect the public.** *(Agencies Involved: DOJ/BOP, OJP)*

Drug-related criminal convictions can carry unique lifelong penalties that go above and beyond one's sentence, including an indelible electronic record. Known as collateral consequences of conviction, these penalties are common in both state and federal law and can be lifelong. Examples include bans on access to public housing, public assistance, ineligibility to vote, serve on a jury, temporary or permanent ineligibility for federal student aid, ineligibility for employment in health care facilities or within a state government, or ineligibility to obtain a professional license—even in a field in which one had long practiced as a licensed professional.

Collateral consequences severely limit one's ability to have a successful reentry process and carry lifelong penalties. It is "no wonder, then, that approximately 60-percent of formerly incarcerated individuals remain unemployed one year after incarceration."[412] While collateral consequences are narrowly tailored and serve a necessary public function in some cases, such as by forbidding prohibiting employment of individuals convicted of Medicaid fraud at health care facilities receiving federal funding, in other cases, they serve principally to impede or prevent successful reintegration and recovery. Moreover, the United States Commission on Civil Rights has noted that the impact of collateral consequences of conviction extends beyond the individual to the family and community and that, while certain collateral consequences of conviction serve to safeguard the public, others are unrelated to the crime for which a person was convicted and do not serve a public safety purpose.[413]

Moreover, the Commission noted that both the public and the judiciary lack awareness of collateral consequences of conviction, undermining any hypothesized deterrent effect. Consequently, the Commission recommended that collateral consequences of conviction only be imposed when they serve to protect the public, noting that when such a function is absent such provisions actually undermine public safety by hindering successful community reintegration.[414] We must continue to advance such efforts.



# Data Systems and Research

The Biden-Harris Administration is committed to employing a multi-faceted and evidence-based approach to policy-making as directed in the Presidential Memorandum on scientific integrity and evidence-based policymaking. [415] This is particularly significant in the area of drug policy where the ultimate impact is typically measured in American lives. Timely and accurate data are essential to grasp the extent and evolving nature of the drug problem, guide policy, assess the effectiveness of our nation's efforts, and continually improve these efforts over time. Data systems and research to generate this information must be maintained, enhanced, and supplemented so drug control practitioners, researchers, and policy-makers are continually informed by the most up to date and accurate information, while also protecting privacy and confidentiality. Further, when well communicated, such data can help inform the American public as to the types of policies and programs most likely to successfully address substance use challenges in their own communities.

Development of effective drug policy requires timely and rigorous data covering the full range of trends and activities: consumption patterns and drug use consequences, such as drug morbidity and mortality; prevention, harm reduction, treatment, and recovery; drug production, transportation and distribution by drug trafficking organizations; economic consequences of substance use; eradication and interdiction operations, and related investigations and prosecutions, by law enforcement and national security organizations at home and abroad. Further, such data must be sufficiently robust to inform questions about health disparities in substance use and service delivery, as well as provide insights as to how to build health equity related to the alleviation of substance use challenges. This is a tremendous undertaking that requires data collection by diverse stakeholders, robust information systems and analytical capabilities to adapt as the situation evolves.

Curating a knowledge base of various policy and intervention tools is another important aspect of a science-centered modus. This too requires reliable data along with sound analytical techniques that ensures that policy and program decisions are grounded in science. By building an awareness of drug-related issues and creating a compendium of evidence-based solutions, policy makers and practitioners can select proven policies and interventions that are appropriate for contexts and populations to which they are applied.

Two decades ago, ONDCP commissioned the National Research Council (NRC) to review data sources and research needs to inform drug policy.[10] Some of the NRC report findings remain relevant today:

> *"Overall the committee finds that the existing drug use monitoring systems and programs of research are useful for some important purposes, yet they are strikingly inadequate to support the full range of policy decisions that the nation must make. The central problem is a woeful lack of investment in programs of data collection and empirical research…". [416]*

---

[10] At that time, ONDCP had a budget line item for policy research which enabled the commissioning of such a study. The policy research budget line was last authorized in FY 2011 for approximately $1.3 million.



Considering the costs of drug use to our society, which have vastly increased due to the opioid epidemic over the past decade, our data systems have not kept up and lack the timeliness, scope and precision required for the most impactful national response. As we assess the data and research landscape to address the Administration's commitment to implementing evidence-based drug policy, we have much more work to do to close information and knowledge gaps. This chapter focuses on three themes: strengthening existing data systems, establishing new data systems and analytical methods to fill gaps, and enhancing the utility of drug data for policymakers, program developers and administrators, practitioners, and researchers. It concludes with recommendations for sustaining data systems and research to inform drug control policy.

## Principle 1: Strengthen existing data systems

Data on drug use and its correlates typically consist of primary data collected through mechanisms such as the federally-funded periodic national surveys, administrative data that contain drug-relevant information collected by government agencies in the course of performing their respective missions; and synthesized data, where information from multiple sources are compiled and analyzed together to answer specific research or policy questions. These data form the foundation of what we know about trends, activities, and outcomes and how we know it. They also determine the limitations of our quantitative knowledge and understanding. Data also allow us to measure how patterns and consequences change over time. Hence, they are critical indicators of the extent to which policies may or may not be making progress on their goals. The *Strategy's Performance Review System (PRS) report*—with its own specific requirements— utilizes specific measures to track progress, and these are subject to the same challenges in data availability, quality, and timeliness as outlined in this chapter. In addition, there is a statutory requirement for a Data Plan,[11] the development of which is addressed separately (see Appendix A).

We envision a future where drug use behavior and its consequences, including overdoses, drug arrests, drug-related communicable diseases, drugged driving and workplace drug use, and the availability and use of prevention, treatment, harm reduction and recovery support services are tracked in real time or as near to real time as possible, while protecting individual liberty and privacy. Only in this way can we be able to continually inform an addiction management infrastructure that is transparent, accountable and responsive in making the important changes needed to save lives. During the COVID-19 pandemic several organizations demonstrated that with the proper policies and resources, national, and even global, data on the numbers and rates of infections, deaths, and vaccinations could be collected, analyzed, and shared in near real time while safeguarding personal information. The same approach can be applied to monitoring, reporting on, and addressing drug use and its consequences by implementing policies that improve the timeliness and completeness of data such as making drug overdose a reportable condition.

Additionally, we envision a future that more fully exploits the data we currently collect. In particular, the intelligence community and law enforcement at the federal, state and local levels collect volumes of data and, while these data are gathered for specific purposes, when combined they can illuminate criminal networks and support targeted interdictions and investigations to

---

[11] 21 U.S.C. § 1705(c)(1)(M), *National Drug Control Strategy*


disrupt and dismantle drug trafficking networks. Mechanisms for information sharing across the intelligence community and law enforcement is necessary along with resources devoted to aggregating and communicating these data in real time. When appropriate, actionable intelligence should also be shared with public health agencies. Together, these will help reduce the availability of illicit drugs and enable health care practitioners and public safety personnel to stay ahead of potential drug overdose outbreaks.

A. **Identify and address shortcomings in existing data systems.** *(Agencies Involved: DOT/NHTSA; HHS/ASPE, SAMHSA, NIH, CDC, FDA; DOJ/DEA, OJP; OMB/OIRA; OSTP)*

*Primary data* collected by federal surveys provide a window into the prevalence of drug use and associated behaviors, and lend themselves to extensive analysis to address specific policy questions, such as how many persons use specific drugs, how many need treatment, how similar or different are drug use patterns for racial or ethnic sub-groups, rural or urban populations, parolees and probationers, older adults, and other demographic sub-populations. The *National Survey on Drug Use and Health* (NSDUH) provides nationally representative data on much of this information on persons living in households.[417] The school-based *Monitoring the Future* study and, to a more limited extent, the *Youth Risk Behavior Survey*, measure prevalence among youth who are attending school.

Other surveys include the new *Drug Abuse Warning Network* (DAWN), reconstituted in 2018 and anticipated to yield its first full-year, nationally representative data on drug-involved admissions to U.S. emergency departments for calendar year 2020. Prisoner and jail inmate surveys are conducted by the Bureau of Justice Statistics, although less frequently, with the most recent prison inmate survey conducted in 2016.[418] Besides primary data from individual respondents, facilities also are surveyed. For example, the *National Survey of Substance Abuse Treatment Services* (N-SSATS) collects data from substance abuse treatment facilities in the United States on facility location, scope, and characteristics.

Many nationally representative household and school surveys lack coverage for populations at high risk of drug use that are outside the realm of their survey universe – such as youth who have quit school, people experiencing homelessness, sex workers, or arrestees. These subgroups are generally smaller, more hidden, and harder to access, and therefore would require more resources and novel approaches to data collection. One limitation of many drug surveys is that they rely on self-report without the resources to obtain additional corroborating information. Because behaviors associated with drug use are illicit, self-reporting can result in under-reporting of use. Ideally self-reporting should be complemented by corroborating data sources, such as measurements relying on biological samples, when these are feasible and can detect use during the period of time targeted by the survey (e.g., past year, past month, past week). Thus far, the prohibitive cost and logistical issues posed by collecting such specimens has limited their routine use. Maintaining existing primary data collection systems is a continuing endeavor in the face of limited or shrinking resources. The discontinuation of the Arrestee Drug Abuse Monitoring (ADAM) program and DAWN, followed by the recent resurrection of the latter are examples of the disruptions that can plague previously established data

AR2022_401559


collection systems. In the long run, it is necessary to retain and improve existing data resources by ensuring that they are adequately funded and appropriately staffed.

*Administrative data*, while not necessarily tailored to drug information needs, are utilized as indicators to inform and monitor drug policy. One example is the use of death certificate data; while such information is collected for many health-related purposes, death certificate data can provide insight into substance use related overdose deaths and patterns among such deaths. Such administrative data are repurposed to extract information on patterns and consequences pertaining to drugs. Many of our existing data sources originate from administrative records (see box below).

Administrative data are rich but tend to be narrowly focused on the collecting agency's mission and drug information is limited to their existing coding structures. For example, death certificate data use the *International Classification of Diseases* (ICD) standard developed by the World Health Organization to code all causes of death and includes a narrow range of codes specific to causes of death involving drugs. The need for more detail on specific drugs in death data will need to rely on additional information obtained from medical examiner or coroner (ME/C) reports. ME/C reports are a separate process

---

### Major Drug Data Sets Originating from Administrative Sources:

*Treatment Episode Data Set* (TEDS) from reporting by treatment facilities receiving public funds to their single State agency (SSA), compiled by SAMHSA into a national dataset to provide characteristics of admissions to and discharges from substance abuse treatment.

*Death certificate data* from States compiled and coded by the National Center for Health Statistics (NCHS), made available from Centers for Disease Control and Prevention's (CDC) Wide-ranging Online Data for Epidemiologic Research (WONDER) database for data on drug deaths and the involvement of specific drugs.

*Healthcare Cost and Utilization Project* (HCUP) from records of emergency department admissions and inpatient hospital stays from participating States compiled by the Agency for Healthcare Quality and Research (AHRQ) to provide data on drug overdoses and neonatal abstinence syndrome.

*National Forensic Laboratory Information System* (NFLIS) from reporting by local, State, and Federal forensic laboratories to the Drug Enforcement Agency on drugs identified in seizure samples.

*National Seizure System* (NSS) from reporting by law enforcement agencies to the El Paso Intelligence Center (EPIC) on drug seizures.

OCDETF Management Information Systems (MIS) from drug seizure activity reported by law enforcement agencies working OCDETF investigations, cases, and initiatives.

*Uniform Crime Reports* (UCR) from reporting by law enforcement agencies to the Federal Bureau of Investigation (FBI) on crime data.

*Consolidated Counterdrug Database* (CCDB) from U.S. agencies and foreign partners involved in transit zone cocaine interdiction and trafficking events to a curated interagency database on cocaine.

---



in death investigation, and improving their integration with death certificate information is currently undergoing development. In addition, technological solutions are also an option, for example, using computer code to review the literal text[419] in death certificates for specific mention of drugs like fentanyl or methamphetamine that do not have their own ICD codes. Additionally, the Treatment Episode Data Set (TEDS) collects data on specialty SUD treatment admissions, transfers, and discharges, including diagnoses, demographic information, and type of care received. These data are reported to states by publicly funded SUD treatment providers, compiled by states and, in turn, reported to the Substance Abuse and Mental Health Services Administration (SAMHSA).

In addition to the federally funded data sources noted above, there are underutilized or still developing data systems that need to be mined for drug content. For example, the *National Emergency Medical Services Information System* (NEMSIS)[420] can be harnessed for drug overdose data (see Inset box), and the *Fatality Analysis Reporting System* (FARS)[421] can provide data on drug involvement in fatal traffic crashes. The Centers for Disease Control and Prevention's (CDC) *Web-based Injury Statistics Query and Reporting System* (WISQARS)[422] contains fatal and non-fatal injury data. In addition, the *National Electronic Injury Surveillance System-Cooperative Adverse Drug Event Surveillance Project* (NEISS-CADES) by the Consumer Product Safety Commission and CDC, began to include the involvement of drugs or alcohol in its tracking of injuries and adverse drug events.[423] The *Overdose Map Detection Program* (ODMAP),[424] currently covering specific areas, can be used for tracking non-fatal overdoses in some local areas. This is similarly true for infectious disease data sets such as the National HIV Behavioral Surveillance (NHBS) collected by CDC which periodically assesses HIV-related information from persons who inject drugs.

---

### Emergency Medical Services Data in Near-Real Time

Nationwide emergency medical services (EMS) reporting, such as that aggregated and maintained by NHTSA's NEMSIS, have standardized patient care reporting across more than 11,000 EMS agencies in 49 US states, which represented 87-percent of all EMS activations nationally in 2020. EMS data have been used as a source of near real time drug environment surveillance information. Characteristics of 911 caller complaints, EMS providers' impressions, patients' primary symptoms, and receipt of naloxone correlate strongly with trends in drug overdose deaths. Data from EMS patient encounters are submitted electronically in near real time, allowing for rapid surveillance of trends that can be stratified by characteristics such as race/ethnicity, geography, urbanicity, and neighborhood poverty level. ONDCP has engaged with NHTSA to determine how EMS databases may be better utilized at state and national levels in an early warning capacity to give public health and law enforcement officials rapid and current information regarding changing overdose trends.

---

Some of these reporting systems are voluntary and rely upon the contributing partners for timely and accurate reporting. These then require statistical adjustments by the collecting agency for missing reports in order to yield data that are nationally representative. Some


data systems, such as Consolidated Counterdrug Database (CCDB) and National Seizure System (NSS), also have to deconflict reports where more than one enforcement agency is involved in the same interdiction event or seizure incident.

To strengthen these systems, a strong partnership with the States or other parties that collect and contribute data is essential. The federal government does not have the authority to make reporting mandatory for state, local, and Tribal governments, but can make reporting a necessary condition for organizations receiving High Intensity Drug Trafficking Area (HIDTA) or other federal funding. Increased use of in-kind incentives to improve data quality, such as training, hardware, and software solutions to augment limited local resources, can be harnessed to improve accuracy and timeliness of these data that are not under the full control of the federal agencies compiling them.

*Data synthesis to inform specific drug policy issues* relies upon data collections, both primary and administrative, and array more than one data source to develop more complete answers to policy questions in real time. Triangulating multiple data sources can mitigate some of the limitations found in any single data source. Aggregated data from multiple sources are not an issue, however, when individual records are linked between agencies, an equally important consideration is maintaining confidentiality and privacy.

The study commissioned by ONDCP, *What America's Users Spend on Illicit Drugs,* provides an example of an analytical product using multiple data sources.[425] Policy-relevant estimates of economic costs of drug use to society, or of chronic users, are needed and will require periodic use of multiple data sources and tailored analytical methods. Other less transparent data syntheses generate annual estimates of heroin or cocaine production[426] based on a combination of crop survey data, laboratory analyses, and other factors. While the methodologies for these are usually classified, the resulting estimates are released to the public.

At present, our ability to conduct analytical studies is largely constrained by data availability, limited staffing and access to new technology, and the absence of a dedicated budget line for drug policy research and efforts to fill drug data gaps. While the reconstitution of the Data IWG will help guide the policy focus of analytical studies by data scientists in the drug agencies, ONDCP will need to take the lead in research that cuts across agency boundaries. In order to do this, ONDCP needs to revitalize its research staff capabilities and obtain contract research resources so that the agency can perform these analyses directly, or design and supervise such studies when the research is contracted out.

**B. Work collaboratively with federal partners.** *(Agencies Involved: DOJ/BJS, DEA; DOT/NHTSA; HHS/CDC, FDA, NIH, SAMHSA; OMB/OIRA)*

In 2021, ONDCP re-established the Drug Data Interagency Working Group (Data IWG) to enhance collaboration in addressing drug policy data needs. The Data IWG meets approximately quarterly, or as needed, to update other drug agencies on planned, ongoing, or completed research and data collection efforts, and, at each meeting, to focus on a specific theme or topic area of policy research that needs attention and could benefit from interagency input. Specific topics to address include, among others, meeting statutory requirements for the NDCS, pursuing measures of equity in drug data,



measurement of polydrug use, developing a recovery research agenda, and acquiring data on underserved populations. The Drug Data IWG will complement ongoing ONDCP engagement with individual agencies at the leadership and staff levels.

**C. Complement federal data systems with state, local, Tribal, international, and commercial sources in real time or near real time.** *(Agencies Involved: DOS; HHS/CDC; OSTP; ONDCP; private sector, Tribal and local government)*

As noted earlier, many of the existing data systems already rely on reporting from States. Some States are more proactive than others in their data collection and reporting systems. In these instances, it is helpful for analytical studies to include additional data they may make available. For example, Florida, New Hampshire, and Virginia regularly update their drug mortality statistics and routinely include supplementary data from their medical examiners.

Limited data is available at the local and Tribal level, although there are some local data collection efforts. A rare example of comparable data collected at the local level are the school district-based Youth Risk Behavior Surveys (YRBS) conducted every other year in approximately two dozen participating school districts or counties and two Tribal areas sites in 2019.[427] These local efforts use the same standardized survey questionnaire modules that are applied to State and national samples, providing comparison points. The YRBS model can be applied to other data collection efforts, resources permitting.

Private sector data also complements federal data. Although commercial data are based on convenience samples, their coverage is typically very large and, because of this, they can provide useful insights into drug use trends. One example is workforce drug testing results from Quest Diagnostics.[428] These data have to be purchased, but they are often timelier than public data and may be collected with greater geographic granularity. Quest data, for example, are collected, monthly and can be disaggregated at the three-digit ZIP code level. Other commercial data sources (e.g., IQVIA, Symphony Health) can also provide data on dispensing patterns for opioid prescriptions with granular information on drug, strength, and quantities dispensed. These data can be used to provide insight into dispensing patterns throughout the US and can be used to calculate estimates of morphine milligram equivalents. Because these sources tend to be costly subscription services with data sharing restrictions, ONDCP obtains summarized dispensed prescription data from CDC and shares summarized Quest data with federal partners. This type of summary data sharing needs to be encouraged, particularly when government funds are used to purchase data from commercial sources.

Research engagement with the United Nations Office of Drugs and Crime (UNODC), the Organization of American States Inter-American Drug Abuse Control Commission (CICAD), and the European Monitoring Centre on Drugs and Drug Addiction (EMCDDA), as well as bilateral research agreements or collaborative efforts with specific countries also provide opportunities to expand or refine our own existing systems. Data exchange platforms managed by the International Narcotics Control Board (INCB) can identify emerging drug production trends and threats while supporting law enforcement investigations and customs operations. These collaborative efforts with international partners need to be re-invigorated, expanded and maintained.



Harnessing data relationships with local, Tribal, and state partners can be facilitated by Organizations that build relationships at the state and local levels, which can help facilitate data sharing. For example, the Community Anti-Drug Coalitions of America (CADCA)[429] represents over 5,000 community coalitions in the United States and in some 30 countries. While it is not a data collection organization, it has contacts at the community level that might be leveraged when local information is needed. Likewise, the National Association of State Alcohol and Drug Abuse Directors (NASADAD),[430] which represents Single State Substance Use Authorities, and whose mission is "to foster and support the development of effective alcohol and other drug abuse prevention and treatment programs throughout every state," could also facilitate collaboration and timely information exchange with States.

Along with frequent consultation with the research community through regular attendance at professional meetings and conferences, these strategies are critical for augmenting federal data systems to inform drug policy.

**D. Prioritize data and analytic efforts to support advancing equity for traditionally underserved populations.** *(Agencies Involved: DOT/NHTSA; HHS/CDC, HRSA, NIH, SAMHSA; DOJ/DEA, OJP)*

The Administration has identified advancing equity for underserved populations as a government-wide priority and has established the *Equitable Data Working Group* (EDWG)[431] of federal agencies to address data relevant issues. ONDCP participates in the EDWG to ensure that our drug-specific data collection and analysis efforts are aligned with efforts to advance equity. In the drug arena, we need to be able to identify drug use patterns and trends among specific subpopulations in addition to the major age, sex, and race categories. These data are in the very early stages of development. Additionally, we need to continue to monitor treatment admission data and drug-related arrests, convictions, sentences, and incarceration rates for marginalized groups to ensure equitable access to care and fair treatment under drug laws. Further, we need to monitor health outcomes to ensure that we go beyond identifying health disparities and actually implement policies and programs that achieve health equity.

Often, data cannot be disaggregated in ways that permit analysis of trends or outcomes among marginalized groups. For example, while research shows that sexual minorities are at greater risk for substance use, datasets that include gender identity and/or sexual orientation are limited. For example, 2015 was the first year NSDUH collected sexual orientation information, finding that 39-percent of persons aged 18 or older who identified as lesbian, gay or bisexual reported illicit drug use in the past year compared to 17-percent of those who did not identify as such.[432] YRBS also added questions on sexual orientation and found similar results.[433] The LGB group, however, combines heterogeneous smaller groups and may conceal different drug use patterns between lesbian, gay, or bisexual subgroups that may require different interventions. These initial findings demonstrate that there are clear differences that warrant further investigation.

Major ethnic group labels also can conceal diversity—for example, the large group name of "Hispanic" includes Cuban and Puerto Rican persons, and these communities have widely diverging drug use prevalence rates. Few studies of such subgroups have been conducted; one important study by NIDA[434] is now dated as it was last updated two


decades ago. As the need to examine subgroups with greater granularity grows, new data collection strategies and analytic approaches will need to be developed.

Other groups of interest include persons with disabilities, older adults, persons who live in rural areas, and persons adversely affected by persistent poverty or inequality. At the very least, we need to inventory already existing but underutilized data sources for information on underserved populations, and to routinely analyze drug data in more fine-grained categories when feasible. When such data are not available, federal data collection agencies need to expand demographic categories in existing surveys and administrative data collection tools so that comparable data can be collected on diverse populations. Finally, when surveys and administrative records do not furnish adequate information on some underserved subpopulations, alternative methods for developing this information should be used.

### E. Improve the timeliness of drug data. *(Agencies Involved: DOJ/DEA; DOT/NHTSA; HHS/CDC, NIH, SAMHSA)*

Timeliness of data is essential because drug use trends, production, and trafficking patterns can shift quickly in response to changes, such as the introduction of more powerful or less expensive products or new regulatory, interdiction, and law enforcement strategies and shifting financial incentives for traffickers. New drugs and new ways of combining them hit the streets, existing drugs fall in and out of favor, new markets pop up and others fade away. As traffickers seek to circumvent the system or subgroups of people who use drugs modify their behaviors, it is critical that policy makers are equipped with the most current data possible to ensure that policies remain relevant and resources are effectively deployed.

Existing federal drug data systems do not collect real-time data. Nationally representative surveys take time to administer and require post-collection data cleaning, weighting, analysis, and summary as well as clearance before publication. When state administrative data are compiled by the federal government, the task can only be completed after the slowest state has submitted data. Moreover, the overall quality of the data may be affected by inconsistencies in practices from state-to-state. Much remains to be done to improve timeliness and, in some cases, quality.

However, there has been some progress, as seen in national mortality data. A decade ago, the reporting lag for final mortality data was two to three years. To address this lag, CDC's National Center for Health Statistics began implementing electronic death registration (EDR) systems in the states some 20 years ago. In the long run, as the EDR systems matured, they became the primary driver of improved timeliness, reducing the reporting lag to about one year. While it is possible to further reduce the lag, factors at the state and local levels, such as limitations in resources available to conduct death investigations, are likely to confound this effort. Lessons learned from this example could be applied to similar data systems that rely on states or local governments to collect the underlying data to improve timeliness and quality.

Nationally representative drug data systems need to be supplemented with more timely and complementary data sources, such as the limited, but near real-time data available from sources such as Quest and IQVIA. Additionally, agencies should maximize cross-agency sharing of analytical products from commercial sources where possible. Finally,


as ODMAP coverage expands, it will provide near-real time information for an increasing number of local jurisdictions.

# Principle 2: Establish new data systems and analytical methods

To ensure data-driven policy, the Administration needs to identify gaps in the current data systems and identify and implement strategies for capturing needed data in a timely and cost-effective manner. This may involve adopting new data collection, analysis, and reporting methodologies. It is also critical that the government adopt cutting-edge analysis approaches utilizing multiple data sources to inform policy. As data collection improves, so too will computational requirements for analyzing it. While existing resources like the Department of Energy's supercomputing capabilities might be leveraged, assessments are needed to determine if current funding and staffing levels are sufficient to implement these new activities.

A. **Identify and recommend promising drug data sources and methods not currently employed.** *(Agencies Involved: DOJ/DEA; DOT/NHTSA; HHS/CDC, FDA, NIH, SAMHSA)*

In consultation with the Drug Data IWG and other data partners, ONDCP should re-invigorate a systematic and ongoing review of research for new developments and methods in drug surveillance. This should include federal agencies, professional organizations, international counterparts, and other public, nonprofit and private sector drug researchers and will require ongoing effort. Specifically, ONDCP recommends that overdoses be added to CDC's list of notifiable conditions, under the *National Notifiable Diseases Surveillance System* (NDSS) as a non-infectious disease.[435] COVID-19 was added last year, and a similar effort for drug overdose is needed. The use of electronic health records (EHR) and recent enhancements with Electronic Laboratory Reporting (ELR) that incorporate data improvements—such as faster electronic transmission, increased accuracy, more complete reports, and improved consistency—will enable near real time monitoring of drug overdoses.

B. **Utilize alternative, novel, and complementary data collection techniques.** *(Agencies Involved: DOJ/DEA, OJP; DOT/NHTSA; HHS/CDC, NIH, SAMHSA)*

There are a number of potential sources of drug data that are not utilized fully in the United States. Some of these are discussed in this section for illustrative purposes. While broad implementation of any of these would require resources, they have the potential to complement existing sources and bridge gaps in our knowledge.

One of these methods, pilot tested by ONDCP, is the re-testing of already collected biological samples for a broader array of drugs. The *Community Drug Early Warning System* (CDEWS) methodology, which is a rapid and low-cost system for identifying emerging drugs at the local level, has been used for studying people on probation and parole, youth involved in the juvenile justice system, individuals in treatment, and people served in emergency departments at about a dozen sites.[436] These re-tested specimens are not labeled with personally identifiable information (PII) and cannot be used to target specific individuals. CDEWS data reveal that these high-risk populations commonly used multiple drugs that would not be detected using a traditional toxicology panel. Although



the utility of this method has been established, large-scale implementation would require broader data collection and sustained support.

Wastewater-based epidemiology (WBE) is a non-invasive and cost-effective way of monitoring drug use trends in local areas. Utilized to monitor trends in a growing number of countries over the past 20 years, it has yet to be widely adopted in the U.S. More recently, public health applications of WBE have gained prominence because of its application in COVID-19 testing.[437] The National Science Foundation (NSF) began funding WBE through the *Coronavirus Aid, Relief, and Economic Security* (CARES) Act,[438] and has included wastewater testing to detect COVID-19 outbreaks early and projects to validate the technique for this purpose. The National Institutes of Health (NIH) and, specifically, NIDA, are funding a small number of WBE research grants for drug monitoring. The National Institute of Justice also recently funded a WBE research grant.[12] While in the initial stages, much more remains to be done to address major knowledge gaps in the United States. To expand application of this technique, we can learn from the international community, particularly the experience of the EMCDDA[439] and Sewage Analysis CORe group Europe (SCORE).[440]

For 'hard-to-reach' sub-populations such as people experiencing homelessness, street-level drug dealers, sex workers, and the chronically unemployed, rapid assessment ethnography and focus group interviews can be employed at the local level, and these methods can yield insights on respondents' attitudes and experiences which cannot be obtained from structured sample surveys. This type of qualitative data can inform the selection and development of group-appropriate quantitative research methods to produce generalizable results. Existing community connections with sub-populations should be leveraged to ensure socially disadvantaged groups are properly represented in our efforts to understand drug issues in these communities; such efforts are central to building health equity. Extending harm reduction, treatment, and recovery support services can help establish and reinforce these connections and enable a more comprehensive knowledge of how drugs impact all Americans. NIDA should research and develop methods of collecting data on high-risk and 'hard-to-reach' sub-populations to better inform policy making. The Washington, DC Metropolitan Area Drug Study (DC*MADS) series, an early NIDA effort to do this for a local jurisdiction,[441] examined household and non-household populations in the early 1990s. It included a *Homeless and Transient Population Study* and a study of drug use among women delivering livebirths in DC hospitals. We recommend that a similar effort be considered to inform policies that affect other high-risk sub-populations that are difficult to fully engage with conventional survey methods.

The Administration will also prioritize continued research on drug detection devices, including fentanyl test strips (FTS),[442] for identifying the presence of concealed substances in drug samples. These can be life-saving when deployed by people who use drugs. Using an artificial intelligence data mining interface, systematic monitoring of

---

[12] The Wastewater Epidemiology To Examine Stimulant Trends (weTEST) project will implement a wastewater-based epidemiology (WBE) approach for comprehensive, non-invasive monitoring of drug flows in communities in near real-time, effectively developing a novel drug surveillance strategy to identify specific stimulant drugs and their concentrations in samples taken from wastewater systems, and extrapolating to population-level use estimates. https://nij.ojp.gov/funding/awards/2020-r2-cx-0013



online drug fora like Bluelight, Reddit, and Erowid may shed light on the substances current drug users seek and purchase on the Internet. Other methods used internationally that may be useful in the U.S. include scraping the web or the darknet, analysis of used syringes, and indirect measures of drug use, de-identified data such as "patient questionnaires, patient self-reports, pill counts, rates of prescription refills, assessment of patient's clinical response, electronic medication monitors, measurement of physiologic markers".[443]

Geospatial analysis is not new, but is currently underutilized in relation to drug use data and drug policy. Such analyses can shed light on the relationships between drug use patterns, demographic attributes, and geographic location. For example, rural-urban differences provide a useful lens for examining patterns of substance use, morbidity and mortality along with the distribution and accessibility of treatment and other services,[444] such as harm reduction and peer recovery support services, relative to underserved populations.

**C. Develop methods for identifying emerging drug use trends in real time or near real time.** *(Agencies Involved: DOJ/DEA, OJP; DOT/NHTSA; HHS/CDC, NIH, SAMHSA; OSTP)*

New drugs and new patterns of use are, by definition, difficult to identify because one has to know what to look for. This is where studying individuals at high risk of drug use can give a warning of what new drugs are on the horizon. The rationale for the now-defunct ADAM was to study a high-risk population (male arrestees shortly after booking) with interviews (self-report) and a biological specimen (urine sample) to corroborate self-report. This was done at the local level because drug use patterns vary with geography and the logistics of data collection were better organized at the local level. At present, there is no system in place to collect these data from high-risk populations and we continue to have a blind spot in this area.

Along these lines, the *National Drug Early Warning System* (NDEWS), a system of 18 sentinel sites across the country designed to provide early warning is funded by NIDA. NDEWS was developed through the Community Epidemiology Work Group (CEWG). NDEWS assembles traditional surveillance data for local areas from treatment admissions, poison control reports, hospital and emergency department records, mortality data from medical examiners, and laboratory sampling of seized drugs. Another example is the NIJ-funded *NPS Discovery*, a research program that works in collaboration with law enforcement, public health, and public safety agencies to rapidly identify emerging drugs, also known as Novel Psychoactive Substances (NPS), associated with intoxications and adverse events. The information, trend reports, and resources consolidated here by *NPS Discovery* allow for the rapid dissemination of information to stakeholders and affected communities. Additional novel surveillance methods are planned, including machine learning to study online drug markets and social media content, drug checking, rapid street reporting, and, potentially, wastewater-based epidemiology.

**D. Develop methods to evaluate the impact of supply reduction efforts on public health and public safety outcomes.** *(Agencies Involved: DOJ/DEA; HHS/ASPE, CDC, NIH, SAMHSA; IC)*


New research and data sets are needed in order to draw definitive conclusions about the effects of the spectrum of supply reduction activities—such as eradication, interdiction, investigations, alternative development—on public health and public safety outcomes so that we can better understand the return on supply reduction investments and develop more outcome focused interventions. For example, existing data sets and analyses are inadequate to determine whether reductions in cultivation resulting from eradication, or changes in maritime and airborne interdiction in the transit zone are associated with changes in drug use prevalence of the number of drug overdoses in the United States. Research is required to better understand how drug production, transport, and distribution respond to interdiction and domestic enforcement activities, and to develop a formal model of the complex dynamics connecting supply reduction efforts to domestic drug prices and consumption.[445] Such a model will improve our ability to anticipate and assess the impact of supply reduction policy and resourcing decisions on public health and safety.

**E. Establish systems to collect and analyze data on subpopulations at high risk of drug use for which data is inadequate.** *(Agencies Involved: DOJ/DEA; HHS/CDC, NIH, SAMHSA)*

As noted earlier, there is a need to establish systems to collect and analyze data on subpopulations at high risk of drug use that are not adequately covered by existing data systems. This includes data on racial, ethnic, and other minority groups needed to address equity issues.

The data collection involving arrestees conducted under ADAM provides an example of such a targeted data collection effort, covering a subpopulation of male arrestees and providing a window into emerging drug use trends based on self-reported use corroborated with biological samples. Additionally, data could be disaggregated at the local level, and the results used in the synthetic estimation of broader drug indicators, such as drug consumption and estimations of the amount of money people who use drugs in America spend on illegal drugs.

Other populations at high risk of drug use that are outside the realm of survey samples include people experiencing homelessness, sex workers, and institutionalized populations. The rural population is also under-represented in many data systems. Reaching these groups requires labor-intensive and costly efforts. Nonetheless, without such efforts the U.S. is at significant risk of missing large pockets of problematic drug use within our population. The Data IWG can be harnessed to focus these activities for this type of research.

**F. Support data collection practices that enhance standardization, accuracy, timeliness and relevance to policy.** *(Agencies Involved: DOJ/DEA, OJP; DOT/NHTSA; HHS/CDC, NIH, SAMHSA; OSTP)*

Data and reporting standards are necessary to ensure the timeliness, accuracy and relevance of data utilized to develop drug policy. Existing data collection efforts, particularly at the State and local levels, can be strengthened by developing and improving guidance that standardizes the measurement of key variables that are ultimately necessary for describing and comparing drug behaviors and outcomes. Such standards can also enhance collection by non-governmental organizations. While such



standards do not currently exist in the drug arena, a growing effort, such as that embodied in the National Information Exchange Model (NIEM) [446] can inform this process of standardization and interoperability. Federal data collection agencies can promote such efforts in their ongoing work with their data partners. In addition, to facilitate geospatial analysis, U.S. *Federal Information Processing Standards* (FIPS) codes should be included in datasets except in cases where it may compromise privacy.

# Principle 3: Enhance the utility of drug data for practitioners, researchers, and policy-makers

Data must be accurate, timely and relevant to the decisions made by practitioners, researchers, and policymakers. Of course, data is only useful if it is accessible by those who need it. Expanded mechanisms for compiling, analyzing and sharing the outputs of drug-related research and data collection activities with potential users must be established, maintained, and improved to support a more comprehensive, multi-faceted, and evidence-based approach to drug control efforts. To the extent possible, data must be useful at the community level, although such granular data is rarely available at this time.

A. **Improve data accessibility.** *(Agencies Involved: DOJ/DEA, OJP; DOT/NHTSA; HHS/CDC, NIH, SAMHSA)*

While the information systems discussed above are useful for collecting and managing data, additional capabilities are required to make information easily accessible to diverse end users. In particular, two forms of accessible data are necessary: summary data in an online data dashboard, and public use data for analysis by data users.

a) *Summary data* can be made available in a searchable online data dashboard that consolidates drug-related data from multiple information systems along with data on other factors relevant to drug control (e.g. demographic, geospatial, socio-economic, supply, interdiction indicators). ONDCP's reauthorization language requires such a dashboard,[447] and it is currently in development. Upon implementation, the dashboard should be searchable, user-friendly, and transparent, not unlike some already in use elsewhere, such as the United Nations World Drug Report.[448] ONDCP is mandated to maintain and update the *Drug Control Data Dashboard* with data obtained from federal agencies and other authoritative sources.

b) *Public use data* need to be accessible for analysis by diverse stakeholders. Summary data published by reporting agencies are only the tip of the information iceberg. Many federal data systems track a plethora of variables that can be analyzed by researchers or others to address more specific policy questions. Some data systems generate readily accessible public use data that can be mined to explore a wide array of research questions, including, to a limited extent, questions on underserved populations.

For example, NSDUH public use data files typically become available around the same time that SAMHSA releases the annual summary findings. Similarly, NCHS makes record-level death certificate data available for further analysis through WONDER (Wide-ranging Online Data for Epidemiologic Research),


a menu-driven online system of the CDC that provides access to a wide array of public health information.

However, other data systems do not routinely make primary data available for analysis. Some provide restricted access (e.g., NSS, NFLIS), and others provide limited (e.g., N-SSATS) or no access beyond what is published in summary form. Not all data systems provide adequate documentation for analysts to utilize the data fully, and there is a need to improve access to primary data for analysts.

**B. Increase access to searchable compendia of evidence-based interventions.** *(Agencies Involved: DOJ/DEA; DOT/NHTSA; HHS/CDC, NIH, SAMHSA)*

In addition to data, states, local governments, provider organizations, and others need the knowledge and skills to identify and implement evidence-based interventions. The *Strategy*'s priority areas rely heavily on the adoption of evidence-based approaches for prevention, harm-reduction, treatment, recovery support, criminal justice reform, and interventions supporting drug policy.

Agencies have approached the task of disseminating evidence-based practices in various ways, from published reports to online resources or combinations of both. The CDC publication, *Overdose: What's working in the United States,* an overview of evidence-based strategies for preventing drug overdose[449] includes the scientific basis, how and why the strategy works, and examples of organizations that have put the practice to work. Similarly, SAMHSA's longstanding Treatment Improvement Protocol (TIP) series provides guidelines for implementing various evidence-based approaches.

Online resources continue to evolve, and SAMHSA is a case in point. In 2017, it discontinued its longstanding *National Registry of Evidence-based Programs and Practices* (NREPP), replacing it in 2018 with the *Evidence-Based Practices Resource Center* (EBPRC). NREPP compiled and updated effective, science-based behavioral health interventions, including for the prevention and treatment of SUD. Besides proven interventions that were independently audited, the registry also began to include programs to avoid because they had not been shown to work sufficiently.[450] Its successor, EBPRC was established with the same goals."[451] ONDCP will work with SAMHSA, NIDA, NIAAA, NIC, NIJ, CDC, and other federal agencies to further clarify the process for identification or external submission of practices for consideration, and the criteria for inclusion in the new resource.

Other agencies also have searchable databases. For example, the National Institute of Justice maintains the *Crime Solutions* website,[452] a topical repository that assists practitioners and policy makers in decision making and program implementation by providing information on justice-related programs and practices meeting standard evidentiary criteria of effectiveness. Inclusion and evaluation criteria are clearly described and included practices are reviewed by two experts using objective scoring criteria to rate the strength of the evidence supporting the practice.

Despite these and other federal resource repositories, the evidence base, in general, is not easy to access, and the quality of existing resources is uneven. Unintended consequences are not typically included in these assessments. Search filters often include sub-populations with specific needs (such as females or major racial groups), but do not



currently include other underserved populations such as ethnic or sexual minorities, or rural populations. Besides the need to expand the underlying research base to address equity issues, there is also a strong need to improve access to and the utility of evidence that already exists. This is true not only for databases collected specifically around substance use purposes, but also more general health and population data sets of relevance to substance use (such as databases of the medical literature which are not devoted solely to substance use issues but certainly contain key information about substance use; the challenge is how to withdraw that information from the more general data sets).

It is not necessary to have a single centralized government repository for evidence-based interventions. Moreover, the breadth of such a portal might limit its utility. ONDCP recommends that agencies curate their respective knowledge base materials or enter into selected interagency partnerships for this purpose. Agencies should provide clear criteria for determining what interventions or programs to include, identifying research supporting the evidence, describing the sub-populations to which practices apply, and indicating any known unintended consequences or potential complications. Such repositories should be searchable and should be continually updated.

C. **Expand datasets and data collection processes to permit greater disaggregation by subpopulations, including marginalized or underserved groups.** *(Agencies Involved: DOJ/DEA; DOT/NHTSA; HHS/CDC, NIH, SAMHSA)*

Prevalence, treatment access, outcome or other drug data can rarely be disaggregated by group other than by age, gender, races other than Black or White, and Hispanic ethnicity. For example, while NSDUH has released a series of slides focused on smaller subpopulations such as American Indians and Alaska Natives; Asians/Native Hawaiians and Other Pacific Islanders; veterans; and lesbian, gay, transgender, and bisexual adults, these standalone statistics are not routinely included in their published tables. As we proceed with this effort, we also need to routinely perform disclosure risk analysis as the sample sizes get smaller for minority subgroups to protect individual privacy.

An inventory of the subpopulations identified in existing surveys is necessary. In addition to racial or ethnic minorities, these should include sexual or religious minorities, rural residents, migrants, and other groups. While annual analysis may not be possible due to small numbers, aggregating data for multiple years for the subpopulation in question can still provide a picture that can inform policy. Multiple years of data will need to be aggregated to yield stable estimates, unless additional resources are expended to oversample such subpopulations. As an alternative, researchers may determine that certain purposive sampling strategies targeting minority populations can be adopted as a complement to the primary sampling mechanism.

D. **Expand law enforcement and intelligence community information sharing and strengthen information sharing framework across departments.** *(Agencies Involved: DHS/CBP, ICE, USCG; DOJ/ATF, DEA, FBI; OCDETF; DOD; ONDCP/HIDTA; IC; Treasury/FINCEN, IRS)*

Transnational criminal organizations (TCOs) are a complex and constantly evolving threat that requires a comprehensive and flexible approach. Multiple National Drug Control Program agencies and intelligence community entities collect useful data that can


be used to target, disrupt, dismantle, and degrade TCO operations and drug trafficking efforts. Additional resources should be devoted to aggregating these numerous datasets and information systems for timely analysis to thwart the threat of TCOs. While intelligence and law enforcement evidence is gathered with unique end goals in mind, both methods produce volumes of data that can illuminate criminal networks and support targeted interdictions and investigations to disrupt and dismantle TCOs, affiliates, and local street gangs involved in the illicit drug trade.

Current developments, including those in information technology and geospatial analysis, have permitted advances in some areas of drug research, but many challenges remain. In order to develop a robust and timely data system to support the *National Drug Control Strategy*, we recommend the following:

- Facilitate a regular periodic review of drug data needs and data access requirements *(Lead Agency: ONDCP through Data IWG)*

- Engage and motivate data partners, especially State and local collectors that contribute to national data compilations *(Agencies Involved: DOJ/DEA; DOT/NHTSA; HHS/CDC, NIH, SAMHSA)*

- Advance the analytical integration of multiple sources of data to mitigate weaknesses inherent in single data sources while maintaining privacy and confidentiality *(Agencies Involved: DOJ, DEA; DOT/NHTSA; HHS/CDC, NIH, SAMHSA; DOD; ONDCP)*

- Support the establishment of new data sources and analyses to fill data gaps (Agencies Involved: DOJ/DEA, OJP; DOD; HHS/CDC, NIH, SAMHSA)

- Accelerate and streamline access to data, findings, and evidence-based interventions *(Agencies Involved: DOD; DOJ/DEA; DOT/NHTSA; HHS/CDC, NIH, SAMHSA; ONDCP)*.

In addition to monitoring specific *Strategy* goals and objectives, it is necessary to pursue a sustained long-term effort to revitalize our drug data systems in order to measure progress in the *Strategy's* priority areas.



# Appendix A—Developing a Data Plan

The SUPPORT Act includes a statutory requirement for developing a "systematic plan for increasing data collection to enable real time surveillance of drug control threats, developing analysis and monitoring capabilities, and identifying and addressing policy questions related to the National Drug Control Strategy and Program."*

The Biden-Harris administration also has articulated seven drug policy priorities, specifically the following:

- Expanding access to evidence-based treatment
- Advancing racial equity in our approach to drug policy
- Enhancing evidence-based harm reduction efforts
- Supporting evidence-based prevention efforts to reduce youth substance use
- Reducing the supply of illicit substances
- Advancing recovery-ready workplaces and expanding the addiction workforce
- Expanding access to recovery support services.

These priority areas are folded into the 2022 *National Drug Control Strategy*. We envision a data plan to be developed that blends the statutory requirements and the Administration's priorities. The plan will be multi-faceted and informed by regular consultation with our interagency partners, and development will continue into next year.

## Background

The previous Administration published a Data Plan, appended to the 2020 NDCS, that was opaque in terms of how it was formulated and how it would be pursued. This Administration is in the process of reformulating such a data plan that is aligned with the current drug control priority areas and that undergoes a transparent process of development, with the involvement of subject matter experts in drug control agencies to formulate key policy questions pertaining to the *National Drug Control Strategy*. Such an interagency effort, led by ONDCP through the Drug Data Interagency Working Group (Data IWG), will recommend options, including resources required, for obtaining data in near-real-time to address such questions. Specific elements specified by statute are listed in the inset box below.

---

******* 21 U.S.C. § 1705(c)(1)(M), *National Drug Control Strategy*.


**Items to include in the Data Plan**

''(i) a list of policy-relevant questions for which the Director and each National Drug Control Program Agency intends to develop evidence to support the National Drug Control Program and Strategy;

''(ii) a list of data the Director and each National Drug Control Program Agency intends to collect, use, or acquire to facilitate the use of evidence in drug control policymaking and monitoring;

''(iii) a list of methods and analytical approaches that may be used to develop evidence to support the National Drug Control Program and Strategy and related policy;

''(iv) a list of any challenges to developing evidence to support policymaking, including any barriers to accessing, collecting, or using relevant data;

''(v) a description of the steps the Director and the head of each National Drug Control Program Agency will take to effectuate the plan; and

''(vi) any other relevant information as determined by the Director.

*Source: 21 U.S.C. § 1705(c)(1)(M), National Drug Control Strategy.*

# Process

The Data Plan development process began with the reconstitution of the Data IWG in December 2021 and is systematically proceeding with identifying policy questions, and then addressing such questions with relevant data.

Topical areas for potential policy questions to be developed with interagency input would likely include the following: drug overdose, treatment, resource tracking, drug supply reduction, illicit financing, and emerging drug threats.

We anticipate that as the iterative work proceeds, sub-committees of the Data IWG will be focusing on specific topical areas. For example, a sub-committee focusing on fatal and non-fatal overdoses could include agencies compiling data from forensic laboratories, emergency medical services, death certificates, hospital admissions, and visits to emergency departments. Similarly, a sub-committee focusing on drug supply issues could include the intelligence community, law enforcement and drug interdiction agencies, and forensic laboratories.

We also anticipate that the timing of the data plan development process will be coordinated with the budget cycle so that recommendations can be incorporated into the agency budget requests so we can obtain the resources needed to execute planned improvements or new activities.



A robust Data Plan can lead to real-time or near-real-time surveillance tools for monitoring drug-related causes and consequences in the public health, public safety, and drug supply arenas. In addition, data for tracking progress towards stated goals, as documented in the *Strategy's PRS report*,[13] can be improved in quality and timeliness.

## Outlook

A rigorous Data Plan is expected to take approximately one year to develop fully, with consideration of budget cycle timing. The plan's successful implementation will depend largely on the availability of resources, including staff and funding to improve existing data or to establish new sources or methods of utilizing data.

---

[13] The *PRS report* is a separate document that is part of the *National Drug Control Strategy* requirements.



# Works Cited

[1] NCHS, National Vital Statistics System. Estimates for 2020 are based on provisional data. Estimates for 2015-2019 are based on final data (available from: https://www.cdc.gov/nchs/nvss/mortality_public_use_data.htm).

[2] From 2016 to 2020, numbers of U.S. injury deaths by firearms increased by 17 percent, those by suicide increased by two percent, homicide by 27 percent, and those by motor vehicle crash increased by five percent. Injury death categories are not mutually exclusive. For example, 4,329 suicides in 2020 were by drug overdose. [Source: Centers for Disease Control and Prevention, National Center for Health Statistics, Multiple Cause of Death, 1999-2020 on CDC WONDER Online Database, released December 2021. Extracted by ONDCP on December 22, 2021.]

[3] Substance Abuse and Mental Health Services Administration, National Survey on Drug Use and Health 2019. Unpublished Special Tabulation by the Center for Behavioral Health Statistics & Quality (June 2021).

[4] Odgers C, Caspi A, Nagin D, et al. Is It Important to Prevent Early Exposure to Drugs and Alcohol Among Adolescents? Psychol Sci. Oct 2008; 19(10):1037–1044. Accessed July 23, 2021. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3664402/

[5] Newcomb M, Felix-Ortiz M. Multiple protective and risk factors for drug use and abuse: Cross-sectional and prospective findings. *Journal of Personality and Social Psychology, 1992; 63(2),* 280–296. Accessed July 23, 2021. https://doi.org/10.1037/0022-3514.63.2.280

[6] Preventing Drug Use Among Children and Adolescents. A Research-Based Guide for Parents, Educators, and Community Leaders. Second Edition. National Institute on Drug Abuse, National Institutes of Health, U.S. Department of Health and Human Services. NIH Publication No. 04-4212(A). Second Edition October 2003. Accessed July 23, 2021. https://www.drugabuse.gov/sites/default/files/preventingdruguse_2.pdf

[7] Principles of Substance Abuse Prevention for Early Childhood: A Research-Based Guide. National Institute on Drug Abuse, National Institutes of Health, U.S. Department of Health and Human Services. March 2016. Accessed July 23, 2021. https://www.drugabuse.gov/sites/default/files/early_childhood_prevention_march_2016.pdf

[8] Holly Hagan, James P McGough, Hanne Thiede, Sharon Hopkins, Jeffrey Duchin, E.Russell Alexander, Reduced injection frequency and increased entry and retention in drug treatment associated with needle-exchange participation in Seattle drug injectors, Journal of Substance Abuse Treatment, Volume 19, Issue 3, 2000, Pages 247-252, ISSN 0740-5472, https://doi.org/10.1016/S0740-5472(00)00104-5.

[9] SAMHSA. "2020 National Survey on Drug Use and Health." October 2021. Detailed Tables - Table 5.32A Classified as Needing Illicit Drug Use Treatment. https://www.samhsa.gov/data/sites/default/files/reports/rpt35323/NSDUHDetailedTabs2020/NSDUHDetailedTabs2020/NSDUHDetTabsSect5pe2020.htm

[10] Hall OT, Jordan A, Teater J, et al. Experiences of racial discrimination in the medical setting and associations with medical mistrust and expectations of care among black patients seeking addiction treatment [published online ahead of print, 2021 Jun 25]. J Subst Abuse Treat. 2021;108551. doi:10.1016/j.jsat.2021.108551

[11] van Boekel LC, Brouwers EPM, van Weeghel J, Garretsen HFL. Stigma among health professionals towards patients with substance use disorders and its consequences for healthcare delivery: Systematic review. *Drug and Alcohol Dependence.* 2013;131(1-2):23-35. doi:10.1016/j.drugalcdep.2013.02.018

[12] SAMHSA. "2020 National Survey on Drug Use and Health." October 2021. Detailed Tables - Table 6.36A Perceived Recovery from a Substance Use Problem. https://www.samhsa.gov/data/report/2020-nsduh-detailed-tables

[13] Substance Abuse and Mental Health Services Administration. SAMHSA's Working Definition of Recovery. 2010. Retrieved by ONDCP on May 24, 2021 at https://store.samhsa.gov/sites/default/files/d7/priv/pep12-recdef.pdf

[14] SAMHSA. "2020 National Survey on Drug Use and Health." October 2021. Detailed Tables - Table 6.35A Perceived Ever Having Had a Substance Use Problem.https://www.samhsa.gov/data/report/2020-nsduh-detailed-tables

[15] SAMHSA. "2020 National Survey on Drug Use and Health." October 2021. Detailed Tables - Table 6.36A Perceived Recovery from a Substance Use Problem. https://www.samhsa.gov/data/report/2020-nsduh-detailed-tables



[16] Kelly JF, Bergman B, Hoeppner BB, Vilsaint C, White WL. Prevalence and pathways of recovery from drug and alcohol problems in the United States population: Implications for practice, research, and policy. *Drug Alcohol Depend.* 2017;181:162-169.

[17] U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21: 2.

[18] Columbia University. National Center on Addiction and Substance Abuse. *Behind Bars II : Substance Abuse and America's Prison Population*. New York, NY: National Center on Addiction and Substance Abuse at Columbia University; 2010.

[19] Gross, S., R., Possley, M., & Stephens, K. (2017). *Race and Wrongful Convictions in the United States.* The National Registry of Exonerations, Newkirk Center for Science and Society. http://www.law.umich.edu/special/exoneration/Documents/Race_and_Wrongful_Convictions.pdf

[20] Binswanger IA, Stern MF, Deyo RA, et al. Release from prison — a high risk of death for former inmates. *The new england journal of medicine.* 2007;356(2):157-165. doi:10.1056/NEJMsa064115.

[21] Ranapurwala SI, Shanahan ME, Alexandridis AA, et al. Opioid overdose mortality among former north carolina inmates: 2000–2015. *American journal of public health.* 2018;108(9):1207-1213. doi:10.2105/AJPH.2018.304514

[22] The White House. Memorandum on Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking. January 27, 2021. Available at https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/memorandum-on-restoring-trust-in-government-through-scientific-integrity-and-evidence-based-policymaking/. Accessed on January 6, 2022.

[23] Substance Abuse and Mental Health Services Administration, National Survey on Drug Use and Health 2019. Unpublished Special Tabulation by the Center for Behavioral Health Statistics & Quality (June 2021).

[24] Compton W, Thomas Y, Stinson F, et al. Prevalence, Correlates, Disability, and Comorbidity of DSM-IV Drug Abuse and Dependence in the United States: Results From the National Epidemiologic Survey on Alcohol and Related Conditions. Archives of General Psychology, 2007 May;64(5):566-76. Accessed November 2021 https://pubmed ncbi.nlm.nih.gov/17485608/

[25] Huttenlocher PR, Dabholkar AS. Regional differences in synaptogenesis in human cerebral cortex. J Comp Neurol. 1997 Oct 20;387(2):167-78. doi: 10.1002/(sici)1096-9861(19971020)387:2<167::aid-cne1>3.0.co;2-z. PMID: 9336221.

[26] Petanjek Z, Judaš M, Šimic G, Rasin MR, Uylings HB, Rakic P, Kostovic I. Extraordinary neoteny of synaptic spines in the human prefrontal cortex. Proc Natl Acad Sci U S A. 2011 Aug 9;108(32):13281-6. doi: 10.1073/pnas.1105108108. Epub 2011 Jul 25. PMID: 21788513; PMCID: PMC3156171.

[27] Arria, A , Caldeira, K, Bugbee B, et al. The academic opportunity costs of substance use during college. College Park, MD: Center on Young Adult Health and Development. 2013. Accessed November 2021. www.cls.umd.edu/docs/AcadOppCosts.pdf

[28] Gobbi G, Tobias A, Zytynski T, et al., Association of Cannabis Use in Adolescence and Risk of Depression, Anxiety, and Suicidality in Young Adulthood: A Systematic Review and Meta-analysis, JAMA Psychiatry. 2019;1;76(4):426-434. Accessed November 2021. https://pubmed.ncbi.nlm.nih.gov/30758486/

[29] Tice, P, Lipari, R, and Van Horn, S. Substance use among 12th grade aged youths, by dropout status. The CBHSQ Report: August 15, 2017. Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration, Rockville, MD. Accessed November 2021. https://www.samhsa.gov/data/sites/default/files/report_3196/ShortReport-3196.html

[30] Grant BF, Dawson DA. Age of onset of drug use and its association with DSM-IV drug abuse and dependence: results from the National Longitudinal Alcohol Epidemiologic Survey. J Subst Abuse. 1998;10(2):163-73. doi: 10.1016/s0899-3289(99)80131-x. PMID: 9854701.

[31] Kessler RC, Aguilar-Gaxiola S, Berglund PA, Caraveo-Anduaga JJ, DeWit DJ, Greenfield SF, Kolody B, Olfson M, Vega WA. Patterns and predictors of treatment seeking after onset of a substance use disorder. Arch Gen Psychiatry. 2001 Nov;58(11):1065-71. doi: 10.1001/archpsyc.58.11.1065. PMID: 11695954.

[32] Salmanzadeh H, Ahmadi-Soleimani SM, Pachenari N, Azadi M, Halliwell RF, Rubino T, Azizi H. Adolescent drug exposure: A review of evidence for the development of persistent changes in brain function. Brain Res Bull. 2020 Mar;156:105-117. doi: 10.1016/j.brainresbull.2020.01.007. Epub 2020 Jan 8. PMID: 31926303.

[33] Monti P, Miranda R, Nixon K, et al. Adolescence: Booze, Brains, and Behavior. Alcohol Clin Exp Res, Vol 29, No 2, 2005: pp 207–220. Accessed November 2021. http://georgicounseling.com/wp-content/uploads/2009/07/Adolescence-booze-brains-behavior-2005.pdf

[34] National Academies of Sciences, Engineering, and Medicine. Fostering healthy mental, emotional, and Behavioral development in children and youth. The National Academies Press. 2019. doi:10.17226/25201



35 U.S. Department of Health and Human Services, Office of Disease Prevention and Health Promotion. Social Determinants of Health Workgroup. Healthy People 2030. Accessed July 2021. https://health.gov/healthypeople/about/workgroups/social-determinants-health-workgroup

36 Bohler R, Thomas C, Clark T, Horgan C. Addressing the Opioid Crisis through Social Determinants of Health: What Are Communities Doing? 2021. Opioid Policy Research Collaborative at Brandeis University.

37 U.S. Department of Health and Human Services, Centers for Disease Control and Prevention. About Social Determinants of Health (SDOH). Accessed July 23, 2021. https://www.cdc.gov/socialdeterminants/about.html.

38 Chung E, Siegel B, Garg A, et al. Screening for Social Determinants of Health Among Children and Families Living in Poverty: A Guide for Clinicians. Curr Probl Pediatr Adolesc Health Care. 2016; 46(5): 135–153. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6039226/. Accessed September 1, 2021.

39 Allen,J, et al. 4, Social determinants of mental health. International *Review of Psychiatry*, 2014; Vol. 26, pp. 392-407.

40 Rusby, J. C., Light, J. M., Crowley, R., & Westling, E. Influence of parent–youth relationship, parental monitoring, and parent substance use on adolescent substance use onset. Journal of Family Psychology, 2018;32(3), 310–320.

41 Monitoring the Future Study. Monitoring the Future is an annual drug use survey of eighth, 10th and 12th grade students conducted by researchers at the University of Michigan, Ann Arbor, and funded by the National Institute on Drug Abuse. https://www.drugabuse.gov/drug-topics/trends-statistics/monitoring-future.

42 Boardman JD, Finch BK, Ellison CG, Williams DR, Jackson JS. Neighborhood disadvantage, stress, and drug use among adults. J Health Soc Behav. 2001 Jun;42(2):151-65. PMID: 11467250.

43 Housing Instability and Concurrent Substance use and Mental Health Concerns: An Examination of Canadian Youth. Smith, T, et al. 3, 2017, J Can Acad Child Adolesc Psychiatry, Vol. 26, pp. 214-223.

44 Association of family income supplements in adolescence with development of psychiatric and substance use disorders in adulthood among an American Indian population. Costello, E J, et al. 19, 2010, JAMA, Vol. 303, pp. 1954-1960.

45 Centers for Disease Control and Prevention. Adverse Childhood Experiences Prevention Strategy. National Center for Injury Prevention and Control, Centers for Disease Control and Prevention. Accessed July 23, 2021. https://www.cdc.gov/injury/pdfs/priority/ACEs-Strategic-Plan_Final_508.pdf

46 Powell, T. M., & Davis, J. P. (2019). Addressing the social emotional needs of children in chronic poverty: A pilot of the Journey of Hope. *Children and Youth Services Review*, *98*, 319-327. https://doi.org/10.1016/j.childyouth.2018.11.010

47 Huang Y, Liu H, Masum M. Adverse Childhood Experiences and Physical and Mental Health of Adults: Assessing the Mediating Role of Cumulative Life Course Poverty. Am J Health Promot. 2021 Jun;35(5):637-647. doi: 10.1177/0890117120982407. Epub 2020 Dec 24. PMID: 33356410.

48 Kim, H. G., Kuendig, J., Prasad, K., & Sexter, A. (2020). Exposure to Racism and Other Adverse Childhood Experiences Among Perinatal Women with Moderate to Severe Mental Illness. Community mental health journal, 56(5), 867–874. https://doi.org/10.1007/s10597-020-00550-6

49 Felitti V, Anda R, Nordenberg D, et al. Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study. *American Journal of Preventive Medicine*. 1998; (1) 4: 245-258. Accessed July 23, 2021. https://www.ajpmonline.org/article/S0749-3797(98)00017-8/fulltext

50 Anda R, Dube S, Felitti V, et al. Childhood Abuse, Neglect, and Household Dysfunction and the Risk of Illicit Drug Use: The Adverse Childhood Experiences Study. *Pediatrics*. 2003;111;564. Accessed July 23, 2021. https://www.icmec.org/wp-content/uploads/2015/10/ACE-and-Illicit-Drug-Use-Pediatrics-2003.pdf

51 Centers for Disease Control and Prevention (2019). Preventing Adverse Childhood Experiences: Leveraging the Best Available Evidence. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.

52 Substance Abuse and Mental Health Services Administration. SAMHSA's Concept of Trauma and Guidance for a Trauma-Informed Approach. HHS Publication No. (SMA) 14-4884. Rockville, MD: Substance Abuse and Mental Health Services Administration, 2014. https://ncsacw.samhsa.gov/userfiles/files/SAMHSA_Trauma.pdf



53 Centers for Disease Control and Prevention (2019). Preventing Adverse Childhood Experiences: Leveraging the Best Available Evidence. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention. https://www.cdc.gov/violenceprevention/pdf/preventingACES.pdf

54 Centers for Disease Control and Prevention (2019). Preventing Adverse Childhood Experiences: Leveraging the best available evidence. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention. https://www.cdc.gov/violenceprevention/pdf/preventingACES-508.pdf

55 Odgers C, Caspi A, Nagin D, et al. Is It Important to Prevent Early Exposure to Drugs and Alcohol Among Adolescents? Psychol Sci. Oct 2008; 19(10):1037–1044. Accessed July 23, 2021. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3664402/

56 Newcomb M, Felix-Ortiz M. Multiple protective and risk factors for drug use and abuse: Cross-sectional and prospective findings. *Journal of Personality and Social Psychology, 1992; 63(2),* 280–296. Accessed July 23, 2021. https://doi.org/10.1037/0022-3514.63.2.280

57 Dennis M, Clark H, Huang, L. The need and opportunity to expand substance use disorder treatment in school-based settings. *Advances in School Mental Health Promotion.* 2014; 7:2, 75-87. Accessed July 22, 2019. http://dx.doi.org/10.1080/1754730X.2014.888221

58 Odgers C, Caspi A, Nagin D, et al. Is It Important to Prevent Early Exposure to Drugs and Alcohol Among Adolescents? Psychol Sci. Oct 2008; 19(10):1037–1044. Accessed July 23, 2021. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3664402/

59 Newcomb M, Felix-Ortiz M. Multiple protective and risk factors for drug use and abuse: Cross-sectional and prospective findings. Journal of Personality and Social Psychology, 1992; 63(2), 280–296. Accessed July 23, 2021. https://doi.org/10.1037/0022-3514.63.2.280

60 Grant BF, Dawson DA. Age of onset of drug use and its association with DSM-IV drug abuse and dependence: results from the National Longitudinal Alcohol Epidemiologic Survey. J Subst Abuse. 1998;10(2):163-73. doi: 10.1016/s0899-3289(99)80131-x. PMID: 9854701.

61 Clayton HB, Bohm MK, Lowry R, Ashley C, Ethier KA. Prescription opioid misuse associated with risk behaviors among adolescents. American Journal of Preventive Medicine, 2019;57(4), 533–539. https://doi.org/10.1016/j.amepre.2019.05.017

62 Carlson SA, Fulton JE, Lee SM, Maynard M, Drown DR, Kohl III HW, Dietz WH. Physical education and academic achievement in elementary school: data from the Early Childhood Longitudinal Study. American Journal of Public Health2008;98(4):721–727.

63 Rasberry CN, Tiu GF, Kann L, McManus T, Michael SL, Merlo CL, Lee SM, Bohm MK, Annor F, Ethier K. Health-related behaviors and academic achievement among high school students—United States, 2015. MMWR Morb Mortal Wkly Rep2917;66:922-927.

64 Monitoring the Future Study. Monitoring the Future is an annual drug use survey of eighth, 10th and12th grade students conducted by researchers at the University of Michigan, Ann Arbor, and funded by the National Institute on Drug Abuse. https://www.drugabuse.gov/drug-topics/trends-statistics/monitoring-future.

65 Jones C, Clayton H, Deputy N. et al. Prescription Opioid Misuse and Use of Alcohol and Other Substances Among High School Students — Youth Risk Behavior Survey, United States, 2019. Supplements / August 21, 2020 / 69(1);38–46. https://www.cdc.gov/mmwr/volumes/69/su/su6901a5.htm

66 Jones C, Clayton H, Deputy N. et al. Prescription Opioid Misuse and Use of Alcohol and Other Substances Among High School Students — Youth Risk Behavior Survey, United States, 2019. Supplements / August 21, 2020 / 69(1);38–46. https://www.cdc.gov/mmwr/volumes/69/su/su6901a5.htm

67 Wang TW, Neff LJ, Park-Lee E, Ren C, Cullen KA, King BA. E-cigarette Use Among Middle and High School Students — United States, 2020. Morbidity and Mortality Weekly Report 2020;69:1310–1312. DOI: http://dx.doi.org/10.15585/mmwr.mm6937e1.

68 Centers for Disease Control and Prevention (CDC), Wide-Ranging Online Data for Epidemiologic Research (WONDER). Data provided by CDC. February 2022.

69 Substance Use and Associated Health Conditions throughout the Lifespan. Public Health Rev. 2014; 35(2). Accessed July 23, 2021. https://web-beta.archive.org/web/20150206061220/http://www.publichealthreviews.eu/upload/pdf_files/14/00_Schulte_Hser.pdf

70 Dube SR, Felitti VJ, Dong M, Chapman DP, Giles WH, Anda RF. Childhood abuse, neglect, and household dysfunction and the risk of illicit drug use: the adverse childhood experiences study. Pediatrics. 2003 Mar;111(3):564-72. doi: 10.1542/peds.111.3.564. PMID: 12612237



[71] Rothman, E. F., Edwards, E. M., Heeren, T., & Hingson, R. W. (2008). Adverse childhood experiences predict earlier age of drinking onset: results from a representative US sample of current or former drinkers. Pediatrics 122(2), e298–e304.

[72] Forster, M., Gower, A. L., Borowsky, I. W., & McMorris, B. J. (2017). Associations between adverse childhood experiences, student-teacher relationships, and non-medical use of prescription medications among adolescents. Addictive Behaviors 68, 30–34. doi:10.1016/j.addbeh.2017.01.004

[73] Preventing Drug Use Among Children and Adolescents. A Research-Based Guide for Parents, Educators, and Community Leaders. Second Edition. National Institute on Drug Abuse, National Institutes of Health, U.S. Department of Health and Human Services. NIH Publication No. 04-4212(A). Second Edition October 2003. Accessed July 23, 2021. https://www.drugabuse.gov/sites/default/files/preventingdruguse_2.pdf

[74] Principles of Substance Abuse Prevention for Early Childhood: A Research-Based Guide. National Institute on Drug Abuse, National Institutes of Health, U.S. Department of Health and Human Services. March 2016. Accessed July 23, 2021. https://www.drugabuse.gov/sites/default/files/early_childhood_prevention_march_2016.pdf

[75] Hawkins J, Catalano R, Miller J. Risk and Protective Factors for Alcohol and Other Drug Problems in Adolescence and Early Adulthood: Implications for Substance Abuse Prevention. Psych. Bulletin. 1992: 112(1)64-105. PDF: Risk_and_Protective_Factors_for_Alcohol_20161117-21667-1i3ln4w-with-cover-page-v2.pdf (d1wqtxts1xzle7.cloudfront.net) Accessed September 1, 2021.

[76] There are 3 generally accepted categories of prevention: Universal prevention which focuses on an entire population (e.g., school or community) and is not directed at a specific risk group. Selective prevention interventions focus on those at higher-than-average risk for substance use. And indicated prevention intervention concentrate on those already using or engaged in other high-risk behaviors to prevent heavy or chronic use. Source: National Academies of Sciences, Engineering, and Medicine. Fostering healthy mental, emotional, and Behavioral development in children and youth. The National Academies Press. 2019. doi:10.17226/25201

[77] Hill K, Bailey J, Steeger C, et al. Outcomes of Childhood Preventive Intervention Across 2 Generations - A Nonrandomized Controlled Trial. AMA Pediatr. 2020;174(8):764-771. doi:10.1001/jamapediatrics.2020.1310 https://jamanetwork.com/journals/jamapediatrics/fullarticle/2766307?utm_campaign=articlePDF&utm_medium=articlePDFlink&utm_source=articlePDF&utm_content=jamapediatrics.2020.1310

[78] Olds D, Henderson CR Jr, Cole R, et al. Long-term effects of nurse home visitation on children's criminal and antisocial behavior: 15-year follow-up of a randomized controlled trial. JAMA. 1998;280 (14):1238-1244.doi:10.1001/jama.280.14.1238

[79] Kellam SG, Wang W, Mackenzie ACL, et al. The impact of the Good Behavior Game, a universal classroom-based preventive intervention in first and second grades, on high-risk sexual behaviors, and drug abuse and dependence disorders into young adulthood. Prev Sci. 2014;15(suppl 1):S6-S18. doi:10.1007/s11121-012-0296-z

[80] Reynolds AJ, Temple JA. Extended early childhood intervention and school achievement: age thirteen findings from the Chicago Longitudinal Study. Child Dev. 1998;69(1):231-246. doi:10.1111/j. 1467-8624.1998.tb06145.x https://srcd.onlinelibrary.wiley.com/doi/abs/10.1111/j.1467-8624.1998.tb06145.x?sid=nlm-percent3Apubmed

[81] Hill K, Bailey J, Steeger C, et al. Outcomes of Childhood Preventive Intervention Across 2 Generations - A Nonrandomized Controlled Trial. AMA Pediatr. 2020;174(8):764-771. doi:10.1001/jamapediatrics.2020.1310 https://jamanetwork.com/journals/jamapediatrics/fullarticle/2766307?utm_campaign=articlePDF&utm_medium=articlePDFlink&utm_source=articlePDF&utm_content=jamapediatrics.2020.1310

[82] Hawkins J, Oesterle S, Brown E., et al. Youth problem behaviors 8 years after implementing the Communities That Care prevention system. A community-randomized trial. JAMA Pediatrics. 2014; 168(2),122-129.

[83] Spoth R, Trudeau L, Redmond C, et al. PROSPER Partnership Delivery System: Effects on Adolescent Conduct Problem Behavior Outcomes Through 6.5 Years Past Baseline. J Adolescence. 2015; Dec; 45: 44–55. Accessed July 23, 2021. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4674368/

[84] Preventing Drug Use Among Children and Adolescents. A Research-Based Guide for Parents, Educators, and Community Leaders. Second Edition. National Institute on Drug Abuse, National Institutes of Health, U.S. Department of Health and Human Services. NIH Publication No. 04-4212(A). Second Edition October 2003. Accessed July 23, 2021. https://www.drugabuse.gov/sites/default/files/preventingdruguse_2.pdf



[85] Risk and protective factors for alcohol and other drug problems in adolescence and early adulthood: Implications for substance abuse prevention. By Hawkins, J. David,Catalano, Richard F.,Miller, Janet Y. Psychological Bulletin, Vol 112(1), Jul 1992, 64-105. https://psycnet.apa.org/buy/1992-40647-001

[86] Spoth R, Trudeau L, Shin C, et al. Longitudinal Effects of Universal Preventive Intervention on Prescription Drug Misuse: Three Randomized Controlled Trials with Late Adolescents and Young Adults. *American Journal of Public Health.* March 8, 2013. Accessed July 23, 2021. https://ajph.aphapublications.org/doi/abs/10.2105/AJPH.2012.301209?prevSearch=spoth&searchHistoryKey=

[87] *Compton W, Jones C, Baldwin GT*, et al. Targeting Youth to Prevent Later Substance Use Disorder: An Underutilized Response to the US Opioid Crisis. American Journal of Public Health. *2019*;109:2185-*S189*.

[88] A Guide to SAMHSA's Strategic Prevention Framework. Center for Substance Abuse Prevention, Substance Abuse and Mental Health Services Administration, U.S. Department of Health and Human Services. 2019. Accessed July 23, 2021 https://www.samhsa.gov/sites/default/files/20190620-samhsa-strategic-prevention-framework-guide.pdf

[89] Mullany, B., Barlow, A., Neault, N. et al. The Family Spirit Trial for American Indian Teen Mothers and Their Children: CBPR Rationale, Design, Methods and Baseline Characteristics. Prev Sci 13, 504–518 (2012). https://doi.org/10.1007/s11121-012-0277-2

[90] The nurse–family partnership: An evidence-based preventive intervention. David L. Olds. First published: 23 February 2006 https://doi.org/10.1002/imhj.20077

[91] Compton W, Jones C, Baldwin G, et al. Targeting Youth to Prevent Later Substance Use Disorder: An Underutilized Response to the US Opioid Crisis. Am J Public Health. 2019 Jun;109(S3):S185-S189. Accessed November 2021. https://pubmed.ncbi.nlm.nih.gov/31242006/

[92] U.S. Department of Health and Human Services (HHS), Office of the Surgeon General, Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs, and Health. Washington, DC: HHS, November 2016. Accessed November 2021. https://www.ncbi.nlm.nih.gov/books/NBK424857/pdf/Bookshelf_NBK424857.pdf

[93] Miller T, Hendrie D. Substance Abuse Prevention Dollars and Cents: A Cost-Benefit Analysis. 2008. DHHS Pub. No. (SMA) 07-4298. Rockville, MD: Center for Substance Abuse Prevention, Substance Abuse and Mental Health Services Administration. Accessed July 23, 2021. https://www.samhsa.gov/sites/default/files/cost-benefits-prevention.pdf

[94] Washington State Institute for Public Policy. Too Good for Drugs Program Cost-Benefit Analysis. Accessed July 27, 2021. http://www.wsipp.wa.gov/BenefitCost/Program/413

[95] Washington State Institute for Public Policy. Life Skills Training. Accessed November 2021. https://www.wsipp.wa.gov/BenefitCost/Program/37

[96] Washington State Institute for Public Policy. Good Behavior Game. Accessed November 2021. http://www.wsipp.wa.gov/BenefitCost/Program/82

[97] Spoth, Trudeau, Redmond, Shin, Greenberg, Feinberg, & Hyun (2015). PROSPER partnership delivery system: Effects on conduct problem behavior outcomes through 6.5 years past baseline. Journal of Adolescence, 45, 44-55. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4674368/

[98] Spoth, Redmond, Clair, Shin, Greenberg, & Feinberg (2011). Preventing substance misuse through community-university partnerships: Randomized controlled trial outcomes 4½ years past baseline. American Journal of Preventive Medicine, 40(4), 440-447. https://pubmed.ncbi.nlm.nih.gov/21406278/

[99] Hawkins, J. David, Oesterle, Sabrina, Brown, Eric C., Abbott, Robert D., & Catalano, Richard F. (2014). Youth problem behaviors 8 years after implementing the Communities That Care prevention system. A community-randomized trial. JAMA Pediatrics, 168(2), 122-129. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3946405/

[100] Spoth R, Redmond C, Shin C, Greenberg MT, Feinberg ME, Trudeau L. PROSPER delivery of universal preventive interventions with young adolescents: long-term effects on emerging adult substance misuse and associated risk behaviors. Psychol Med. 2017 Oct;47(13):2246-2259. doi: 10.1017/S0033291717000691. Epub 2017 Apr 12. PMID: 28399955; PMCID: PMC5963524.

[101] ICF (2021). Drug-Free Communities Support Program National Cross-Site Evaluation End-of-Year 2020 Report. Washington, DC: Office of National Drug Control Policy. https://www.whitehouse.gov/wp-content/uploads/2021/08/FINAL_DFC-Eval-Report_2021_march12_508.pdf

[102] Substance Use and Associated Health Conditions throughout the Lifespan. Public Health Rev. 2014; 35(2). Accessed July 23, 2021. https://web-



beta.archive.org/web/20150206061220/http://www.publichealthreviews.eu/upload/pdf_files/14/00_Schulte_Hser.pdf

[103] American Academy of Pediatrics Substance Use Screening and Implementation Guide. 2015. Accessed July 23, 2021. https://www.aap.org/en-us/Documents/substance_use_screening_implementation.pdf

[104] Screening for Unhealthy Drug Use: US Preventive Services Task Force Recommendation Statement. JAMA. 2020;323(22):2301-2309. doi:10.1001/jama.2020.8020 Accessed February 17, 2022.

[105] Patnode CD, Perdue LA, Rushkin M, et al. Screening for Unhealthy Drug Use in Primary Care in Adolescents and Adults, Including Pregnant Persons: Updated Systematic Review for the U.S. Preventive Services Task Force [Internet]. Rockville (MD): Agency for Healthcare Research and Quality (US); 2020 Jun. (Evidence Synthesis, No. 186.) Available from: https://www.ncbi.nlm.nih.gov/books/NBK558174/, Accessed February 17, 2022.

[106] Baldwin JR, Caspi A, Meehan AJ, Ambler A, Arseneault L, Fisher HL, Harrington H, Matthews T, Odgers CL, Poulton R, Ramrakha S, Moffitt TE, Danese A. Population vs Individual Prediction of Poor Health From Results of Adverse Childhood Experiences Screening. JAMA Pediatr. 2021 Apr 1;175(4):385-393. doi: 10.1001/jamapediatrics.2020.5602. PMID: 33492366; PMCID: PMC7835926.

[107] Anda RF, Porter LE, Brown DW. Inside the adverse childhood experience score: strengths, limitations, and misapplications. Am J Prev Med. 2020;59(2):293–295

[108] Love H, Schlitt J, Soleimanpour S, et al. Years of School-Based Health Care Growth And Expansion *Health Affairs* 2019;38, NO. 5 (2019): 755–764. Accessed July 23, 2021. https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.2018.05472

[109] Substance Abuse and Mental Health Services Administration (US); Office of the Surgeon General (US). Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs, and Health [Internet]. Washington (DC): US Department of Health and Human Services; 2016 Nov. Table 3.1, Risk Factors for Adolescent and Young Adult Substance Use. Available from: https://www.ncbi.nlm.nih.gov/books/NBK424850/table/ch3.t2/

[110] National Research Council (US), Institute of Medicine (US), and Transportation Research Board (US) Program Committee for a Workshop on Contributions from the Behavioral and Social Sciences in Reducing and Preventing Teen Motor Crashes. Preventing Teen Motor Crashes: Contributions from the Behavioral and Social Sciences: Workshop Report. Washington (DC): National Academies Press (US); 2007. 4, Strategies to Improve Safety. Available from: https://www.ncbi.nlm.nih.gov/books/NBK9669/

[111] Anderko, L., Roffenbender, J. S., Goetzel, R. Z., Howard, J., Millard, F., Wildenhaus, K., Desantis, C., & Novelli, W. (2012). Promoting prevention through the affordable care act: workplace wellness. *Preventing chronic disease*, 9, E175. https://doi.org/10.5888/pcd9.120092

[112] SAMHSA. 2016. Promoting Wellness: A Guide to Community Action. https://store.samhsa.gov/sites/default/files/d7/priv/sma16-4957.pdf

[113] Substance Abuse and Mental Health Services Administration: Substance Misuse Prevention for Young Adults. Publication No. PEP19-PL-Guide-1 Rockville, MD: National Mental Health and Substance Use Policy Laboratory. Substance Abuse and Mental Health Services Administration, 2019.

[114] Planning Alcohol Interventions Using NIAAA's College Aim Alcohol Intervention Matrix. NIH Publication No. 19-AA-8017. Updated December 2019.

[115] SAMHSA. 2021. 2020 NSDUH Detailed Tables (online). Available at https://www.samhsa.gov/data/report/2020-nsduh-detailed-tables, accessed on April 9, 2022. (Table 1.1A).

[116] Commission on Combating Synthetic Opioid Trafficking Final Report, February 2022. Accessed on April, 4 2022. https://www.rand.org/hsrd/hsoac/commission-combating-synthetic-opioid-trafficking.html

[117] Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Accessed from https://www.samhsa.gov/data/, accessed on March 29, 2022.

[118] Yang, Lawrence H et al. "Stigma and substance use disorders: an international phenomenon." Current opinion in psychiatry vol. 30,5 (2017): 378-388. doi:10.1097/YCO.0000000000000351.

[119] Holly Hagan, James P McGough, Hanne Thiede, Sharon Hopkins, Jeffrey Duchin, E.Russell Alexander, Reduced injection frequency and increased entry and retention in drug treatment associated with needle-exchange participation in Seattle drug injectors, Journal of Substance Abuse Treatment, Volume 19, Issue 3, 2000, Pages 247-252, ISSN 0740-5472, https://doi.org/10.1016/S0740-5472(00)00104-5.



120 Kidorf M, King VL, Neufeld K, Pierce J, Kolodner K, Brooner RK. Improving substance abuse treatment enrollment in community syringe exchangers. Addiction. 2009; 104:786–795.

121 Open Society Foundations. Harm Reduction at Work: A GUIDE FOR ORGANIZATIONS EMPLOYING PEOPLE WHO USE DRUGS. Retrieved from https://www.opensocietyfoundations. org/uploads/170e646d-bcc0-4370-96d7-7cf2822a1869/workharmreduction-20110314.pdf.

122 Abdul-Quader, A.S., Feelemyer, J., Modi, S. et al. Effectiveness of Structural-Level Needle/Syringe Programs to Reduce HCV and HIV Infection Among People Who Inject Drugs: A Systematic Review. AIDS Behav 17, 2878–2892 (2013). https://doi.org/10.1007/s10461-013-0593-y. Accessed 10/31/2021.

123 Cost-effectiveness of syringe service programs, medications for opioid use disorder, and combination programs in hepatitis C harm reduction among opioid injection drug users: a public payer perspective using a decision tree Stephen C Ijioma, PharmD, BA; Vasco M Pontinha, MPharm, MA; David A Holdford, PhD, MS, BSPharm; and Norman V Carroll, PhD, MS, BSPharm. Manag Care Spec Pharm. 2021;27(2):137-46. Accessed 10-31-21.

124 Nicholas C. Peiper, Sarah Duhart Clarke, Louise B. Vincent, Dan Ciccarone, Alex H. Kral, Jon E. Zibbell, Fentanyl test strips as an opioid overdose prevention strategy: Findings from a syringe services program in the Southeastern United States, International Journal of Drug Policy, Volume 63, 2019, Pages 122-128, ISSN 0955-3959, https://doi.org/10.1016/j.drugpo.2018.08.007. (https://www.sciencedirect.com/science/article/pii/S0955395918302135).

125 Mahip Acharya, Divyan Chopra, Corey J. Hayes, Benjamin Teeter, Bradley C. Martin, Cost-Effectiveness of Intranasal Naloxone Distribution to High-Risk Prescription Opioid Users, Value in Health, Volume 23, Issue 4, 2020, Pages 451-460, ISSN 1098-3015, https://doi.org/10.1016/j.jval.2019.12.002. (https://www.sciencedirect.com/science/article/pii/S1098301519352192)

126 Thakarar K, Rokas KE, Lucas FL, Powers S, Andrews E, et al. (2019) Mortality, morbidity, and cardiac surgery in Injection Drug Use (IDU)-associated versus non-IDU infective endocarditis: The need to expand substance use disorder treatment and harm reduction services. PLOS ONE 14(11): e0225460. https://doi.org/10.1371/journal.pone.0225460.

127 Aronowitz, Shoshana V., Behrends, Czarina Navos, Lowenstein, Margaret, Schackman, Bruce R., Weiner, Janet (2021). Lowering the Barriers to Medication Treatment for People with Opioid Use Disorder: Evidence for a Low- Threshold Approach, The Center for Health Economics of Treatment Interventions for Substance Use Disorder, HCV, and HIV (CHERISH). Accessed February 9, 2022.

128 Dita Broz, Neal Carnes, Johanna Chapin-Bardales, Don C. Des Jarlais, Senad Handanagic, Christopher M. Jones, R. Paul McClung, Alice K. Asher, Syringe Services Programs' Role in Ending the HIV Epidemic in the U.S.: Why We Cannot Do It Without Them, American Journal of Preventive Medicine, Volume 61, Issue 5, Supplement 1, 2021, Pages S118-S129, ISSN 0749-3797, https://doi.org/10.1016/j.amepre.2021.05.044. (https://www.sciencedirect.com/science/article/pii/S0749379721003895).

129 See SSP locations and regional gaps at: SEP Locations: NASEN Directory. Available at https://www.nasen.org/map/. Accessed on February 17, 2022.

130 Bird, Sheila M., Parmar, Mahesh K. B., and Strang, John (2015). Take-home naloxone to prevent fatalities from opiate-overdose: Protocol for Scotland's public health policy evaluation, and a new measure to assess impact. Informa Healthcare, Drugs Educ Prev Pol, 2015; 22(1): 66–76, Published by Taylor & Francis. DOI: 10.3109/09687637.2014.981509.

131 New York State Department of Health. Medicaid Harm Reduction Services Benefit. Available at https://www.health.ny.gov/diseases/aids/consumers/prevention/medicaid_harm_reduction.htm#:~:text=The %20federal%20Centers%20for%20Medicare%20and%20Medicaid%20Services,to%20offer%20reimburse ment%20for%20specific%20Harm%20Reduction%20Services Published 2018. Accessed September 2, 2021.

132 Javed, Z., Burk, K., Facente, S., Pegram, L., Ali, A. & Asher, A. (2020). Syringe Services Programs: A Technical Package of Effective Strategies and Approaches for Planning, Design, and Implementation. Atlanta, GA: US Department of Health and Human Services, National Center for HIV/AIDS, Viral Hepatitis, STD and TB Prevention, Centers for Disease, Control and Prevention; 2020. Retrieved from Syringe Services Programs Technical Package (cdc.gov).

133 David P. Wilson, Braedon Donald, Andrew J. Shattock, David Wilson, Nicole Fraser-Hurt, The cost-effectiveness of harm reduction, International Journal of Drug Policy, Volume 26, Supplement 1, 2015, Pages S5-S11, ISSN 0955-3959, https://doi.org/10.1016/j.drugpo.2014.11.007. (https://www.sciencedirect.com/science/article/pii/S0955395914003119). Accessed February 9, 2022.



134 New York State Department of Health. Drug User Health. health.ny.gov. Published 2021. Available at: https://www.health.ny.gov/diseases/aids/consumers/prevention/. Accessed on September 2, 2021.

135 Missouri Department of Health & Senior Services. MO Stays Safe - Safer Drug Use and Risk Reduction. health.mo.gov. Available at https://health.mo.gov/living/healthcondiseases/communicable/hivaids/saferdruguse.php. Accessed September 2, 2021.

136 Washington State Health Care Authority. Washington State Hub and Spoke Project. hca.wa.gov. Available at https://www.hca.wa.gov/about-hca/behavioral-health-recovery/washington-state-hub-and-spoke-project Accessed on September 2, 2021.

137 The White House. 2021. National HIV/AIDS Strategy for the United States 2022–2025. Washington, DC. Accessed February 9, 2022: National HIV/AIDS Strategy for the United States 2022–2025 (hivgov-prod-v3.s3.amazonaws.com).

116 U.S. Department of Health and Human Services. 2020. Viral Hepatitis National Strategic Plan for the United States: A Roadmap to Elimination (2021–2025). Washington, DC. Accessed on October 31, 2021: Viral Hepatitis National Strategic Plan for the United States: A Roadmap to Elimination (2021-2025) (hhs.gov).

139 Crowley, D., Delargy, I. A national model of remote care for assessing and providing opioid agonist treatment during the COVID-19 pandemic: a report. *Harm Reduct J* **17,** 49 (2020). https://doi.org/10.1186/s12954-020-00394-z.

140 Aronowitz, Shoshana V., Behrends, Czarina Navos, Lowenstein, Margaret, Schackman, Bruce R., Weiner, Janet (2021). Lowering the Barriers to Medication Treatment for People with Opioid Use Disorder: Evidence for a Low- Threshold Approach, The Center for Health Economics of Treatment Interventions for Substance Use Disorder, HCV, and HIV (CHERISH). Accessed February 9, 2022.

141 Burke, Mary A. and Sullivan, Riley and Carman, Katherine Grace and Wen, Hefei and Wharam, James and Yu, Hao, Who Gets Medication-assisted Treatment for Opioid Use Disorder, and Does It Reduce Overdose Risk? Evidence from the Rhode Island All-payer Claims Database (April 22, 2021). FRB of Boston Working Paper No. 21-3, Available at SSRN: https://ssrn.com/abstract=3832267.

142 Carrieri MP, Amass L, Lucas GM, Vlahov D, Wodak A, Woody GE. Buprenorphine use: the international experience. Clin Infect Dis. 2006 Dec 15;43 Suppl 4:S197-215. doi: 10.1086/508184. PMID: 17109307.

143 Substance Abuse and Mental Health Services Administration: Principles of Community-based Behavioral Health Services for Justice-involved Individuals: A Research-based Guide. HHS Publication No. SMA19-5097. Rockville, MD: Office of Policy, Planning, and Innovation. Substance Abuse and Mental Health Services.

144 LEAD - NC Harm Reduction Coalition (nchrc.org). Accessed on February 25, 2022.

145 Collins, S.E., Lonczak, H.S. & Clifasefi, S.L. Seattle's law enforcement assisted diversion (LEAD): program effects on criminal justice and legal system utilization and costs. J Exp Criminol 15, 201–211 (2019). https://doi.org/10.1007/s11292-019-09352-7.

146 Substance Abuse and Mental Health Services Administration: Principles of Community-based Behavioral Health Services for Justice-involved Individuals: A Research-based Guide. HHS Publication No. SMA19-5097. Rockville, MD: Office of Policy, Planning, and Innovation. Substance Abuse and Mental Health Services.

147 Mukku VK, Benson TG, Alam F, Richie WD, Bailey RK. Overview of substance use disorders and incarceration of african american males. Front Psychiatry. 2012 Nov 12;3:98. doi: 10.3389/fpsyt.2012.00098. PMID: 23162480; PMCID: PMC3495267.

148 Gross, S., R., Possley, M., & Stephens, K. (2017). *Race and Wrongful Convictions in the United States.* The National Registry of Exonerations, Newkirk Center for Science and Society. Available at http://www.law.umich.edu/special/exoneration/Documents/Race_and_Wrongful_Convictions.pdf. Accessed February 25, 2022.

149 Substance Abuse and Mental Health Services Administration: Principles of Community-based Behavioral Health Services for Justice-involved Individuals: A Research-based Guide. HHS Publication No. SMA19-5097. Rockville, MD: Office of Policy, Planning, and Innovation. Substance Abuse and Mental Health Services Administration, 2019.

150 TASC (Treatment Alternatives for Safe Communities). Specialized Case Management Model. https://www.tasc.org/TascBlog/images/documents/TASC-Clinical-Case-Mgt-Model.pdf. Published January 2019. Accessed September 2, 2021.

151 Elizabeth M. Oliva, Melissa L.D. Christopher, Daina Wells, Mark Bounthavong, Michael Harvey, Julianne Himstreet, Thomas Emmendorfer, Michael Valentino, Mariano Franchi, Francine Goodman, Jodie A. Trafton, Opioid overdose education and naloxone distribution: Development of the Veterans Health



Administration's national program, Journal of the American Pharmacists Association, Volume 57, Issue 2, Supplement, 2017, Pages S168-S179.e4, ISSN 1544-3191.

[152] Carroll JJ, Green TC, Noonan RK. Evidence-Based Strategies for Preventing Opioid Overdose: What's Working in the United States: An Introduction for Public Health, Law Enforcement, Local Organizations, and Others Striving to Serve Their Community. Available at https://www.cdc.gov/drugoverdose/pdf/pubs/2018-evidence-based-strategies.pdf. f. Accessed on September 2, 2021.

[153] Ashford RD, Curtis B, Brown AM. Peer-delivered harm reduction and recovery support services: Initial evaluation from a hybrid recovery community drop-in center and syringe exchange program. Harm Reduct J. 2018;15(1). doi:10.1186/s12954-018- 0258-2. Retrieved on September 2, 2021.

[154] David P. Wilson, Braedon Donald, Andrew J. Shattock, David Wilson, Nicole Fraser-Hurt, The cost-effectiveness of harm reduction, International Journal of Drug Policy, Volume 26, Supplement 1, 2015, Pages S5-S11, ISSN 0955-3959, https://doi.org/10.1016/j.drugpo.2014.11.007. (https://www.sciencedirect.com/science/article/pii/S0955395914003119).

[155] Chandler McClellan, Barrot H. Lambdin, Mir M. Ali, Ryan Mutter, Corey S. Davis, Eliza Wheeler, Michael Pemberton, Alex H. Kral, Opioid-overdose laws association with opioid use and overdose mortality, Addictive Behaviors, Volume 86, 2018, Pages 90-95, ISSN 0306-4603.

[156] Schneider KE, Park JN, Allen ST, Weir BW, Sherman SG. Knowledge of Good Samaritan Laws and Beliefs About Arrests Among Persons Who Inject Drugs a Year After Policy Change in Baltimore, Maryland. Public Health Rep. 2020 May/Jun;135(3):393-400. doi: 10.1177/0033354920915439. Epub 2020 Apr 7. PMID: 32264789; PMCID: PMC7238711.

[157] Bebinger M. Built for Counterterrorism, This High-Tech Machine Is Now Used To Detect Fentanyl. Kaiser Health News. https://khn.org/news/built-for-counterterrorism-this-high-tech-machine-is-now-used-to-detect-fentanyl/. Published December 4, 2019. Accessed September 2, 2021.

158 PERF Daily Critical Issues Report: PAARI Fentanyl test strip program and other strategies for reducing opioid overdoses. Available at https://paariusa.org/2021/03/19/perf-daily-critical-issues-report-paari-fentanyl-test-strip-program-and-other-strategies-for-reducing-opioid-overdoses/. Accessed on September 2, 2021.

[159] Sulley S, Ndanga M. Inpatient Opioid Use Disorder and Social Determinants of Health: A Nationwide Analysis of the National Inpatient Sample (2012-2014 and 2016-2017). *Cureus*. 2020;12(11):e11311. Published 2020 Nov 3. doi:10.7759/cureus.11311. Retrieved on September 2, 2021.

[160] Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data/.

[161] Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data/.

[162] Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data/.

[163] Xia PF, Pan XF, Li Y, et al. Trends in Diagnosed and Undiagnosed Diabetes Among Adults in the U.S., 2005-2016 [published online ahead of print, 2021 Jul 14]. *Diabetes Care*. 2021;dc211156. doi:10.2337/dc21-1156.

[164] Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data.

[165] Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health



Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data.

[166] American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Arlington, VA. American Psychiatric Association, 2013.

[167] Magill, Molly et al. "A meta-analysis of cognitive-behavioral therapy for alcohol or other drug use disorders: Treatment efficacy by contrast condition." Journal of consulting and clinical psychology vol. 87,12 (2019): 1093-1105. doi:10.1037/ccp0000447

[168] Maisel, Natalya C et al. "Meta-analysis of naltrexone and acamprosate for treating alcohol use disorders: when are these medications most helpful?." Addiction (Abingdon, England) vol. 108,2 (2013): 275-93. doi:10.1111/j.1360-0443.2012.04054.x

[169] Mattick, Richard P et al. "Buprenorphine maintenance versus placebo or methadone maintenance for opioid dependence." The Cochrane database of systematic reviews ,2 CD002207. 6 Feb. 2014, doi:10.1002/14651858.CD002207.pub4

[170] Bauer LK, Brody JK, Baggett TP. Characteristics of Homeless Adults Who Died of Drug Overdose: A Retrospective Record Review. J Health Care Poor Underserved. 2016;27(2):846-859. doi:10.1353/hpu.2016.0075

[171] Darke S, Hall W. Heroin overdose: research and evidence-based intervention. J Urban Health. 2003;80(2):189-200. doi:10.1093/jurban/jtg022
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3456279/pdf/11524_2006_Article_206.pdf

[172] Darke S, Hall W. Heroin overdose: research and evidence-based intervention. J Urban Health. 2003;80(2):189-200. doi:10.1093/jurban/jtg022
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3456279/pdf/11524_2006_Article_206.pdf

[173] Darke S, Hall W. Heroin overdose: research and evidence-based intervention. J Urban Health. 2003;80(2):189-200. doi:10.1093/jurban/jtg022
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3456279/pdf/11524_2006_Article_206.pdf

[174] Strang J, McCambridge J, Best D, et al. Loss of tolerance and overdose mortality after inpatient opiate detoxification: follow up study. BMJ. 2003;326(7396):959-960. doi:10.1136/bmj.326.7396.959

[175] Joudrey, P.J., Khan, M.R., Wang, E.A. et al. A conceptual model for understanding post-release opioid-related overdose risk. Addict Sci Clin Pract 14, 17 (2019). https://doi.org/10.1186/s13722-019-0145-5

[176] Au VYO, Rosic T, Sanger N, et al. Factors associated with opioid overdose during medication-assisted treatment: How can we identify individuals at risk?. Harm Reduct J. 2021;18(1):71. Published 2021 Jul 8. doi:10.1186/s12954-021-00521-4

[177] Forati AM, Ghose R, Mantsch JR. Examining Opioid Overdose Deaths across Communities Defined by Racial Composition: a Multiscale Geographically Weighted Regression Approach [published online ahead of print, 2021 Jul 6]. J Urban Health. 2021;1-12. doi:10.1007/s11524-021-00554-x

[178] Forati AM, Ghose R, Mantsch JR. Examining Opioid Overdose Deaths across Communities Defined by Racial Composition: a Multiscale Geographically Weighted Regression Approach [published online ahead of print, 2021 Jul 6]. J Urban Health. 2021;1-12. doi:10.1007/s11524-021-00554-x

[180] Saloner B, Cook BL. Blacks and Hispanics Are Less Likely Than Whites To Complete Addiction Treatment, Largely Due To Socioeconomic Factors. Health Affairs. 2013;32(1):135-145. doi:10.1377/hlthaff.2011.0983

[181] Phillippi JC, Schulte R, Bonnet K, et al. Reproductive-Age Women's Experience of Accessing Treatment for Opioid Use Disorder: "We Don't Do That Here" [published online ahead of print, 2021 May 17]. Womens Health Issues. 2021;S1049-3867(21)00033-5. doi:10.1016/j.whi.2021.03.010

[182] Boeri M, Lamonica AK, Turner JM, Parker A, Murphy G, Boccone C. Barriers and Motivators to Opioid Treatment Among Suburban Women Who Are Pregnant and Mothers in Caregiver Roles. Front Psychol. 2021;12:688429. Published 2021 Jul 1. doi:10.3389/fpsyg.2021.688429
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8280285/pdf/fpsyg-12-688429.pdf

[183] Hyder A, Lee J, Dundon A, Southerland LT, All D, Hammond G, et al. (2021) Opioid Treatment Deserts: Concept development and application in a US Midwestern urban county. PLoS ONE 16(5): e0250324. https://doi.org/ 10.1371/journal.pone.0250324

[184] Armoon B, SoleimanvandiAzar N, Rostami M, et al. Drug type and risk behaviors associated with non-fatal overdose among people who use drugs: a systematic review and meta-analysis [published online ahead of print, 2021 Jul 21]. J Addict Dis. 2021;1-12. doi:10.1080/10550887.2021.1950262



185 Lippold KM, Jones CM, Olsen EO, Giroir BP. Racial/Ethnic and Age Group Differences in Opioid and Synthetic Opioid–Involved Overdose Deaths Among Adults Aged ≥18 Years in Metropolitan Areas — United States, 2015–2017. MMWR Morb Mortal Wkly Rep 2019;68:967–973. DOI: http://dx.doi.org/10.15585/mmwr.mm6843a3external icon.

186 Goedel WC, Shapiro A, Cerdá M, Tsai JW, Hadland SE, Marshall BDL. Association of Racial/Ethnic Segregation With Treatment Capacity for Opioid Use Disorder in Counties in the United States. *JAMA Netw Open.* 2020;3(4):e203711. doi:10.1001/jamanetworkopen.2020.3711 https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2764663?resultClick=3

187 Haffajee RL, Lin LA, Bohnert ASB, Goldstick JE. Characteristics of US Counties With High Opioid Overdose Mortality and Low Capacity to Deliver Medications for Opioid Use Disorder. *JAMA Netw Open*. 2019;2(6):e196373. Published 2019 Jun 5. doi:10.1001/jamanetworkopen.2019.6373

188 National Academies of Sciences, Engineering, and Medicine. 2019. Medications for opioid use disorder save lives. Washington, DC: The National Academies Press. doi: https://doi.org/10.17226/25310

189 Moore BA, Fiellin DA, Cutter CJ, et al. Cognitive Behavioral Therapy Improves Treatment Outcomes for Prescription Opioid Users in Primary Care Buprenorphine Treatment. J Subst Abuse Treat. 2016;71:54-57. doi:10.1016/j.jsat.2016.08.016 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5119533/pdf/nihms-814533.pdf

190 Weiss RD, Potter JS, Fiellin DA, et al. Adjunctive counseling during brief and extended buprenorphine-naloxone treatment for prescription opioid dependence: a 2-phase randomized controlled trial. *Arch Gen Psychiatry*. 2011;68(12):1238-1246. doi:10.1001/archgenpsychiatry.2011.121 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3470422/pdf/nihms307513.pdf

191 Weiss RD, Potter JS, Fiellin DA, et al. Adjunctive counseling during brief and extended buprenorphine-naloxone treatment for prescription opioid dependence: a 2-phase randomized controlled trial. *Arch Gen Psychiatry*. 2011;68(12):1238-1246. doi:10.1001/archgenpsychiatry.2011.121

192 Hall OT, Jordan A, Teater J, et al. Experiences of racial discrimination in the medical setting and associations with medical mistrust and expectations of care among black patients seeking addiction treatment [published online ahead of print, 2021 Jun 25]. J Subst Abuse Treat. 2021;108551. doi:10.1016/j.jsat.2021.108551

193 van Boekel LC, Brouwers EPM, van Weeghel J, Garretsen HFL. Stigma among health professionals towards patients with substance use disorders and its consequences for healthcare delivery: Systematic review. *Drug and Alcohol Dependence*. 2013;131(1-2):23-35. doi:10.1016/j.drugalcdep.2013.02.018

194 Ellis K, Walters S, Friedman SR, et al. Breaching Trust: A Qualitative Study of Healthcare Experiences of People Who Use Drugs in a Rural Setting. *Front Sociol*. 2020;5:593925. Published 2020 Nov 10. doi:10.3389/fsoc.2020.593925

195 Howard KP, Altenburger EM, Cheavens JS. Validation predicting premature drop-out from treatment provided in training clinics. *Behav Cogn Psychother*. 2020;48(1):116-120. doi:10.1017/S1352465819000420

196 Hoffman KA, Green CA, Ford JH 2nd, Wisdom JP, Gustafson DH, McCarty D. Improving quality of care in substance abuse treatment using five key process improvement principles. J Behav Health Serv Res. 2012;39(3):234-244. doi:10.1007/s11414-011-9270-y

197 Howard KP, Altenburger EM, Cheavens JS. Validation predicting premature drop-out from treatment provided in training clinics. *Behav Cogn Psychother*. 2020;48(1):116-120. doi:10.1017/S1352465819000420

198 Hoffman KA, Green CA, Ford JH 2nd, Wisdom JP, Gustafson DH, McCarty D. Improving quality of care in substance abuse treatment using five key process improvement principles. J Behav Health Serv Res. 2012;39(3):234-244. doi:10.1007/s11414-011-9270-y

199 National Academy of Engineering (US) and Institute of Medicine (US) Committee on Engineering and the Health Care System; Reid PP, Compton WD, Grossman JH, et al., editors. Building a Better Delivery System: A New Engineering/Health Care Partnership. Washington (DC): National Academies Press (US); 2005. Crossing the Quality Chasm. Available from: https://www.ncbi.nlm.nih.gov/books/NBK22857/

200 Corrigan, P.W., Kuwabara, SA., O'Shaughnessy, J. (2009). *The public stigma of mental illness and druaddiction: findings from a stratified random sample.* Journal of Social Work. (9)(2): 139-147.

201 Barry, C.L., McGinty, E.E., Pescosolido, B.A., Goldman, H.H. (2014). *Stigma, discrimination, treatment, effectiveness, and policy: public views about drug addiction and mental illness.* Psychiatric Services. (65)(10): 1269-1272.

202 Kelly, J.F., Westerhoff, C.M. (2010). *Does it matter how we refer to individuals with substance-related conditions? A randomized study of two commonly used terms.* International Journal of Drug Policy. 21(3):202-7.



203 Choi NG, DiNitto DM, Marti CN, Choi BY. Association of adverse childhood experiences with lifetime mental and substance use disorders among men and women aged 50+ years. *Int Psychogeriatr*. 2017;29(3):359-372. doi:10.1017/S1041610216001800

204 US Preventive Services Task Force. Unhealthy Drug Use: Screening: Final Recommendation Statement. https://www.uspreventiveservicestaskforce.org/uspstf/recommendation/drug-use-illicit-screening. Accessed on April 18, 2022.

205 White House. State of the Union Address, March 1, 2022. https://www.whitehouse.gov/state-of-the-union-2022/. Accessed April 18, 2022.

206 Johnston DC, Mathews WD, Maus A, Gustafson DH. Using Smartphones to Improve Treatment Retention Among Impoverished Substance-Using Appalachian Women: A Naturalistic Study. *Subst Abuse*. 2019;13:1178221819861377. Published 2019 Jul 8. doi:10.1177/1178221819861377

207 Milby JB, Schumacher JE, McNamara C, et al. Initiating abstinence in cocaine abusing dually diagnosed homeless persons. *Drug Alcohol Depend*. 2000;60(1):55-67. doi:10.1016/s0376-8716(99)00139-8

208 Frazer Z, McConnell K, Jansson LM. Treatment for substance use disorders in pregnant women: Motivators and barriers. *Drug Alcohol Depend*. 2019;205:107652. doi:10.1016/j.drugalcdep.2019.107652

209 Socías ME, Volkow N, Wood E. Adopting the 'cascade of care' framework: an opportunity to close the implementation gap in addiction care?. Addiction. 2016;111(12):2079-2081. doi:10.1111/add.13479 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5321168/pdf/nihms-850611.pdf

210 Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data

211 Substance Abuse and Mental Health Services Administration. (2021). Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data

212 Gerbert B., Berg-Smith S., Mancuso M., Caspers N., McPhee S., Null D., Wofsy J. Using innovative video doctor technology in primary care to deliver brief smoking and alcohol intervention. *Health Promot. Pract.* 2003;4(3):249–261.

213 Shingleton R.M., Palfai T.P. Technology-delivered adaptations of motivational interviewing for health-related behaviors: a systematic review of the current research. *Patient Educ. Couns.* 2016;99(1):17–35.

214 Dugosh K., Abraham A, Seymour B, McLoyd K, Chalk M, Festinger D. A Systematic Review on the Use of Psychosocial Interventions in Conjunction With Medications for the Treatment of Opioid Addiction. Journal of Addiction Medicine. 2016;10(2):93-103. doi:10.1097/ADM.0000000000000193

215 Petry NM, Peirce JM, Stitzer ML, Blaine J, Roll JM, Cohen A, et al. Effect of prize-based incentives on outcomes in stimulant abusers in outpatient psychosocial treatment programs: A national drug abuse treatment clinical trials network study. *Arch Gen Psychiatry* 2005. ; 62:1148 -56.

216 Rawson R, Glasner S, Brecht ML, Farabee D. A randomized comparison of 4 vs. 16 weeks of psychosocial treatment for stimulant users. J Subst Abuse Treat. 2021;124:108274. doi:10.1016/j.jsat.2020.108274

217 Kiluk BD, Nich C, Buck MB, et al. Randomized Clinical Trial of Computerized and Clinician-Delivered CBT in Comparison With Standard Outpatient Treatment for Substance Use Disorders: Primary Within-Treatment and Follow-Up Outcomes. Am J Psychiatry. 2018;175(9):853-863. doi:10.1176/appi.ajp.2018.17090978 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6120780/pdf/nihms970623.pdf

218 Sordo, Barrio, Bravo, Indave, Degenhardt, Wiessing, Ferri, Pastor-Barriuso, Mortality Risk During and After Opioid Substitution Treatment: Systematic Review and Meta-analysis of Cohort Studies (Apr. 2017), available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5421454/

219 Weiss RD, Potter JS, Fiellin DA, et al. Adjunctive counseling during brief and extended buprenorphine-naloxone treatment for prescription opioid dependence: a 2-phase randomized controlled trial. Arch Gen Psychiatry. 2011;68(12):1238-1246. doi:10.1001/archgenpsychiatry.2011.121

220 Campbell ND, Lovell AM. The history of the development of buprenorphine as an addiction therapeutic. Ann N Y Acad Sci. 2012;1248:124-139. doi:10.1111/j.1749-6632.2011.06352.x

221 Luderer H, Chiodo L, Wilson A, Brezing C, Martinez S, Xiong X, Gerwien R, Imbert B, Deeg M, Maricich Y, Campbell A, Patient Engagement With a Game-Based Digital Therapeutic for the Treatment of Opioid Use Disorder: Protocol for a Randomized Controlled Open-Label, Decentralized Trial



JMIR Res Protoc 2022;11(1):e32759
doi: 10.2196/32759

[222] Kravitz-Wirtz N, Davis CS, Ponicki WR, et al. Association of Medicaid Expansion With Opioid Overdose Mortality in the United States. JAMA Netw Open. 2020;3(1):e1919066. doi:10.1001/jamanetworkopen.2019.19066 https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2758476

[223] United States Government Accountability Office, States' Changes to Payment Rates for Substance Use Disorder Services, https://www.gao.gov/assets/gao-20-260.pdf, accessed on March 3. 2022.

[224] Mark TL, Olesiuk W, Ali MM, Sherman LJ, Mutter R, Teich JL. Differential Reimbursement of Psychiatric Services by Psychiatrists and Other Medical Providers. Psychiatr Serv. 2018;69(3):281-285. doi:10.1176/appi.ps.201700271

[225] Strang J, McCambridge J, Best D, et al. Loss of tolerance and overdose mortality after inpatient opiate detoxification: follow up study. *BMJ.* 2003;326(7396):959-960. doi:10.1136/bmj.326.7396.959 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC153851/pdf/959.pdf

[226] Carter, J., Zevin, B. & Lum, P.J. Low barrier buprenorphine treatment for persons experiencing homelessness and injecting heroin in San Francisco. Addict Sci Clin Pract 14, 20 (2019). https://doi.org/10.1186/s13722-019-0149-1

[227] Strike, C., Millson, M., Hopkins, S., & Smith, C. (2013). What is low threshold methadone maintenance treatment?. The International journal on drug policy, 24(6), e51–e56. https://doi.org/10.1016/j.drugpo.2013.05.005

[228] (66 FR 4076) 01/17/2001 Opioid Drugs in Maintenance and Detoxification Treatment of Opiate Addiction Services. https://www.govinfo.gov/content/pkg/FR-2001-03-19/pdf/01-6745.pdf

[229] Motivans, M. (2021) Federal Justice Statistics 2017-2018. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. https://bjs.ojp.gov/content/pub/pdf/fjs1718.pdf

[230] Ellis K, Walters S, Friedman SR, et al. Breaching Trust: A Qualitative Study of Healthcare Experiences of People Who Use Drugs in a Rural Setting. *Front Sociol.* 2020;5:593925. Published 2020 Nov 10. doi:10.3389/fsoc.2020.593925

[231] Proulx D, Fantasia HC. The Lived Experience of Postpartum Women Attending Outpatient Substance Treatment for Opioid or Heroin Use. J Midwifery Womens Health. 2021;66(2):211-217. doi:10.1111/jmwh.13165

[232] Laura J. Faherty, MD, MPH, MS; Ashley M. Kranz, PhD; Joshua Russell-Fritch, MS; Stephen W. Patrick, MD, MPH, MS; Jonathan Cantor, PhD; Bradley D. Stein, MD, PhD, Association of Punitive and Reporting State Policies Related to Substance Use in Pregnancy With Rates of Neonatal Abstinence Syndrome, *JAMA Netw Open.* 2019;2(11):e1914078. doi:10.1001/jamanetworkopen.2019.14078. Accessed May 5, 2022

[233] Proulx D, Fantasia HC. The Lived Experience of Postpartum Women Attending Outpatient Substance Treatment for Opioid or Heroin Use. J Midwifery Womens Health. 2021;66(2):211-217. doi:10.1111/jmwh.13165

[234] 86 FR 3386. Final Rule. Registration Requirements for Narcotic Treatment Programs With Mobile Components. Available at https://www.govinfo.gov/content/pkg/FR-2021-06-28/pdf/2021-13519.pdf

[235] Sugarman OK, Bachhuber MA, Wennerstrom A, Bruno T, Springgate BF (2020) Interventions for incarcerated adults with opioid use disorder in the United States: A systematic review with a focus on social determinants of health. PLoS ONE 15(1): e0227968. https://doi.org/ 10.1371/journal.pone.0227968.

[236] U.S. Department of Health and Human Services, Health Resources and Services Administration, National Center for Health Workforce Analysis. State-Level Projections of Supply and Demand for Behavioral Health Occupations: 2016-2030, Rockville, Maryland, https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/data-research/state-level-estimates-report-2018.pdf , 2018, accessed May 25, 2021.

[237] U.S. Department of Health and Human Services, Health Resources and Services Administration. Behavioral health workforce projections, 2017-2030: HRSA health workforce factsheet. Rockville, MD. Accessed at https://bhw.hrsa.gov/sites/default/files/bureau-health-workforce/data-research/bh-workforce-projections-fact-sheet.pdf, 2020, accessed May 25, 2021.

[238] Ma, A., Sanchez, A., & Ma, M. The Impact of Patient-Provider Race/Ethnicity Concordance on Provider Visits: Updated Evidence from the Medical Expenditure Panel Survey. *Journal of racial and ethnic health disparities, 6(5), 1011–1020.* https://doi.org/10.1007/s40615-019-00602-y, 2019, accessed May 25, 2021.

[239] Ma, A., Sanchez, A., & Ma, M. The Impact of Patient-Provider Race/Ethnicity Concordance on Provider Visits: Updated Evidence from the Medical Expenditure Panel Survey. *Journal of racial and ethnic health disparities*, 6(5), 1011–1020. https://doi.org/10.1007/s40615-019-00602-y, 2019, accessed May 25, 2021.



240 Biancarelli, D. , et.al., Strategies used by people who inject drugs to avoid stigma in healthcare settings, 2019, *Drug Alcohol Depen*. 2019. https://www ncbi nlm nih.gov/pmc/articles/PMC6521691/pdf/nihms-1524548.pdf

241 Biancarelli, D. , et.al., Strategies used by people who inject drugs to avoid stigma in healthcare settings, 2019, *Drug Alcohol Depen*. 2019. https://www ncbi nlm nih.gov/pmc/articles/PMC6521691/pdf/nihms-1524548.pdf

242 Adams, J., Volkow, N. , Ethical imperatives to Overcome Stigma Against People with substance Use Disorders, *Journal of Ethics*, American Medical Association, 2020, https://journalofethics.ama-assn.org/article/ethical-imperatives-overcome-stigma-against-people-substance-use-disorders/2020-08

243 U.S. Department of Health and Human Services, Health Resources and Services Administration, Health Professional Shortage Areas for Mental Health map, HRSA provided directly May 27,2021.

244 U.S. Department of Health and Human Services, Office of Inspector General, Disparities Affect Access to Buprenorphine Services for Opioid Use Disorder, https://oig.hhs.gov/oei/reports/oei-12-17-00240.asp, accessed May 25, 2021.

245 Source: Bureau of Justice Statistics, National Prisoner Statistics, 1989-2019; and U.S. Census Bureau, post-censal resident population estimates for January 1 of the following calendar year

246 Source: Bureau of Justice Statistics, Annual Survey of Jails, 2006-2018; and Census of Jails, 2005 and 2019 https://www.bjs.gov/content/pub/pdf/ji19_sum.pdf

247 National Center on Addiction and Substance Abuse: Behind Bars II: Substance Abuse and America's Prison Population, 2010, https://issuu.com/nibbana/docs/5313_behind-bars-ii

248 Hodgkin D, Horgan C, Bart G. Financial sustainability of payment models for office-based opioid treatment in outpatient clinics. Addict Sci Clin Pract. 2021;16(1):45. Published 2021 Jul 5. doi:10.1186/s13722-021-00253-7

249 Haffajee RL, Bohnert ASD, Lagisetty PA. Policy Pathways to Address Provider Workforce Barriers to Buprenorphine Treatment, Am J Prev Med. 2018 Jun; 54(6 Suppl 3): S230–S242. doi: 10.1016/j.amepre.2017.12.022.

250 Substance Abuse and Mental Health Services Administration. SAMHSA's Working Definition of Recovery. 2010. Retrieved by ONDCP on May 24, 2021 at https://store.samhsa.gov/sites/default/files/d7/priv/pep12-recdef.pdf

251 Granfield R, Cloud W. Coming clean: overcoming addiction without treatment. New York University Press, New York. 1999.

252 Hennessy EA. Recovery capital: a systematic review of the literature. *Addiction Research & Theory*. 2017;25(5):349-360.

253 Sahker E, Ali S, Arndt S. Employment recovery capital in the treatment of substance use disorders: Six-month follow-up observations. *Drug and Alcohol Dependence*. 2019;205:107624.

254 Center for Behavioral Health Statistics and Quality. (2021). Results from the 2020 National Survey on Drug Use and Health: Detailed tables. Rockville, MD: Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data/, 2021:1062-63. (Tables 6.37A to 6.37B)

255 Kelly JF, Bergman B, Hoeppner BB, Vilsaint C, White WL. Prevalence and pathways of recovery from drug and alcohol problems in the United States population: Implications for practice, research, and policy. *Drug Alcohol Depend*. 2017;181:162-169.

256 Kelly JF, Stout RL, Jason LA, Fallah-Sohy N, Hoffman LA, Hoeppner BB. One-Stop Shopping for Recovery: An Investigation of Participant Characteristics and Benefits Derived From U.S. Recovery Community Centers. *Alcohol Clin Exp Res*. 2020;44(3):711-721.

257 Kelly JF, Stout RL, Jason LA, Fallah-Sohy N, Hoffman LA, Hoeppner BB. One-Stop Shopping for Recovery: An Investigation of Participant Characteristics and Benefits Derived From U.S. Recovery Community Centers. *Alcohol Clin Exp Res*. 2020;44(3):711-721.

258 Ryan JP, Victor BG, Moore A, Mowbray O, Perron BE. Recovery coaches and the stability of reunification for substance abusing families in child welfare. *Children and Youth Services Review*. 2016;70:357-363.

259 Andreas D, Ja DY, Wilson S. Peers Reach Out Supporting Peers to Embrace Recovery (PROSPER): A Center for Substance Abuse Treatment Recovery Community Services Program. *Alcoholism Treatment Quarterly*. 2010;28(3):326-338.

260 Deering KN, Kerr T, Tyndall MW, et al. A peer-led mobile outreach program and increased utilization of detoxification and residential drug treatment among female sex workers who use drugs in a Canadian setting. *Drug Alcohol Depend*. 2011;113(1):46-54.



261 Tracy K, Burton M, Nich C, Rounsaville BJ. Utilizing Peer Mentorship to Engage High Recidivism Substance-Abusing Patients in Treatment. *The American Journal of Drug and Alcohol Abuse.* 2011;37:525 - 531.

262 Boisvert RA, Martin LM, Grosek M, Clarie AJ. Effectiveness of a peer-support community in addiction recovery: participation as intervention. *Occupational therapy international.* 2008;15(4):205-220.

263 Reif S, Braude L, Lyman DR, et al. Peer recovery support for individuals with substance use disorders: assessing the evidence. *Psychiatric services (Washington, DC).* 2014;65(7):853-861.

264 Sanders LM, Trinh C, Sherman BR, Banks SM. Assessment of client satisfaction in a peer counseling substance abuse treatment program for pregnant and postpartum women. *Evaluation and Program Planning.* 1998;21(3):287-296.

265 Valentine P, White, W.L., Taylor, P. The Recovery Community Organization: Toward A Working Definition and Description. *Connecticut Community for Addiction Recovery.* 2007. Retrieved by ONDCP on June 28, 2021 at: https://facesandvoicesofrecovery.org/wp-content/uploads/2019/06/The-Recovery-Community-Organization-Toward-A-Working-Definition-and-Description.pdf

266 Valentine, P. Peer-Based Recovery Support Services Within a Recovery Community Organization: The CCAR Experience. In: Kelly J., White W. (eds) Addiction Recovery Management. Current Clinical Psychiatry. 2010. Humana Press, Totowa, NJ. https://doi.org/10.1007/978-1-60327-960-4_14

267 Best D. *Addiction Recovery: A movement for social change and personal growth in the UK.* Brighton, UK: Pavilion Publishing (Brighton) Ltd; 2012.

268 Association of Recovery in Higher Education (ARHE). *Collegiate recovery programs.* ARHE website. 2021. https://collegiaterecovery.org/crps-crcs

269 Laudet, A.; Harris, K.; Winters, K.; Moberg, P.; Kimball, T. Nationwide survey of collegiate recovery programs: Is there a single model?; Paper presented at the 75th Annual Meeting - College on Problems of Drug Dependence; San Diego, CA. 2013;

270 Laudet AB, Harris K, Kimball T, Winters KC, Moberg DP. Characteristics of students participating in collegiate recovery programs: a national survey. *Journal of substance abuse treatment.* 2015;51:38-46.

271 Laudet AB, Harris K, Kimball T, Winters KC, Moberg DP. In college and in recovery: Reasons for joining a Collegiate Recovery Program. *Journal of American college health: J of ACH.* 2016;64(3):238-246.

272 Harris KS, Baker AK, Kimball TG, Shumway ST. Achieving Systems-Based Sustained Recovery: A Comprehensive Model for Collegiate Recovery Communities. *Journal of Groups in Addiction & Recovery.* 2008;2(2-4):220-237.

273 Laudet AB, Harris K, Kimball T, Winters KC, Moberg DP. In college and in recovery: Reasons for joining a Collegiate Recovery Program. *Journal of American college health: J of ACH.* 2016;64(3):238-246.

274 Laudet AB, Harris K, Kimball T, Winters KC, Moberg DP. Characteristics of students participating in collegiate recovery programs: a national survey. *Journal of substance abuse treatment.* 2015;51:38-46.

275 Cleveland HH, Harris KS, Baker AK, Herbert R, Dean LR. Characteristics of a collegiate recovery community: maintaining recovery in an abstinence-hostile environment. *J Subst Abuse Treat.* 2007;33(1):13-23.

276 Association of Recovery in Higher Education. Find a school. ARS website. 2021: Retried by ONDCP on May 27. 2021 at: https://recoveryschools.org/find-a-school/

277 Finch AJ, Moberg DP, Krupp AL. Continuing Care in High Schools: A Descriptive Study of Recovery High School Programs. *J Child Adolesc Subst Abuse.* 2014;23(2):116-129.

278 Tanner-Smith EE, Finch AJ, Hennessy EA, Moberg DP. Who attends recovery high schools after substance use treatment? A descriptive analysis of school aged youth. *J Subst Abuse Treat.* 2018;89:20-27.

279 Moberg DP, Finch AJ. Recovery high schools: A descriptive study of school programs and students. *J Groups Addict Recover.* 2008;2:128-161.

280 Finch AJ, Moberg DP, Krupp AL. Continuing Care in High Schools: A Descriptive Study of Recovery High School Programs. *J Child Adolesc Subst Abuse.* 2014;23(2):116-129.

281 Weimer DL, Moberg P, French F, Tanner-Smith EE, Finch AJ. Net Benefits of Recovery High Schools: Higher Cost but Increased Sobriety and Educational Attainment. *The journal of mental health policy and economics.* 2019;22(3):109-120.

282 Oser R, Karakos HL, Hennessy EA. Disparities in Youth Access to Substance Abuse Treatment and Recovery Services: How One Recovery School Initiative is Helping Students "Change Tracks". *Journal of Groups in Addiction & Recovery.* 2016;11(4):267-281.

283 Glaude M, Torres LR. Hispanic Perspectives on Recovery High Schools: If We Build Them, Will They Come? *Journal of groups in addiction & recovery.* 2016;11(4):240-249.

284 Finch, A, Recovery High Schools Growth Chart: 1979-2021. Association of Recovery Schools. Retrieved by ONDCP on. August 18, 2021at https://recoveryschools.org/rhs-growth-chart/



[285] Nash A, Collier C. The Alternative Peer Group: A Developmentally Appropriate Recovery Support Model for Adolescents. *Journal of addictions nursing.* 2016;27(2):109-119.

[286] Smith NZ, Vasquez PJ, Emelogu NA, Hayes AE, Engebretson J, Nash AJ. The Good, the Bad, and Recovery: Adolescents Describe the Advantages and Disadvantages of Alternative Peer Groups. *Substance Abuse: Research and Treatment.* 2020;14:1178221820909354.

[287] Jason LA, Wiedbusch E, Bobak TJ, Taullahu D. Estimating the Number of Substance Use Disorder Recovery Homes in the United States. *Alcoholism treatment quarterly.* 2020;38(4):506-514.

[288] Jason LA, Davis MI, Ferrari JR. The need for substance abuse after-care: longitudinal analysis of Oxford House. *Addict Behav.* 2007;32(4):803-818.

[289] Polcin DL, Korcha RA, Bond J, Galloway G. Sober living houses for alcohol and drug dependence: 18-month outcomes. *Journal of substance abuse treatment.* 2010;38(4):356-365.

[290] Tuten M, DeFulio A, Jones HE, Stitzer M. Abstinence-contingent recovery housing and reinforcement-based treatment following opioid detoxification. *Addiction.* 2012;107(5):973-982.

[291] Tuten M, Shadur JM, Stitzer M, Jones HE. A Comparison of Reinforcement Based Treatment (RBT) versus RBT plus Recovery Housing (RBT(RH)). *J Subst Abuse Treat.* 2017;72:48-55.

[292] Hatzenbuehler ML. Structural stigma: Research evidence and implications for psychological science. *The American psychologist.* 2016;71(8):742-751.

[293] Browne T, Priester MA, Clone S, Iachini A, Dehart D, Hock R. Barriers and facilitators to substance use treatment in the rural south: a qualitative study. *J Rural Health.* 2016;32(1):92–101.

[294] Copeland J. A qualitative study of barriers to formal treatment among women who self-managed change in addictive behaviours. *J Subst Abuse Treat.* 1997;14(2):183–190.

[295] Cellucci T, Krogh J, Vik P. Help seeking for alcohol problems in a college population. *J Gen Psychol.* 2006;133(4):421–433.

[296] Legislative Analysis and Public Policy Association. Model Recovery Residence Certification Act. 2021: Retrieved by ONDCP on May 28, 2021 at https://legislativeanalysis.org/model-recovery-residence-certification-act/.

[297] Volkow N. To End the Drug Crisis, Bring Addiction Out of the Shadows. In AAMC News, November 8, 2021.

[298] Kelly JF, Westerhoff CM. Does it matter how we refer to individuals with substance-related conditions? A randomized study of two commonly used terms. *Int J Drug Policy.* 2010;21(3):202-207.

[299] Kelly JF, Dow SJ, Westerhoff C. Does Our Choice of Substance-Related Terms Influence Perceptions of Treatment Need? An Empirical Investigation with Two Commonly Used Terms. *Journal of Drug Issues.* 2010;40(4):805-818.

[300] Ashford RD, Brown AM, Curtis B. Substance use, recovery, and linguistics: The impact of word choice on explicit and implicit bias. *Drug Alcohol Depend.* 2018;189:131-138.

[301] Ashford RD, Brown AM, McDaniel J, Curtis B. Biased labels: An experimental study of language and stigma among individuals in recovery and health professionals. *Substance use & misuse.* 2019;54(8):1376-1384.

[302] Barry CL, McGinty EE, Pescosolido B, Goldman HH. Stigma, Discrimination, Treatment Effectiveness and Policy Support: Comparing Public Views about Drug Addiction with Mental Illness. *Psychiatric services (Washington, DC).* 2014;65(10):1269-1272.

[303] van Boekel LC, Brouwers EPM, van Weeghel J, Garretsen HFL. Stigma among health professionals towards patients with substance use disorders and its consequences for healthcare delivery: Systematic review. *Drug and Alcohol Dependence.* 2013;131(1):23-35.

[304] Benuto LT, Casas J, Gonzalez F, Newlands R. The Behavioral Model of Health: Education, Behavioral Health Factors, and Stigma as Predictors of Help-Seeking Attitudes. *Community Mental Health Journal.* 2020;56(7):1275-1283.

[305] Kennedy-Hendricks A, Barry CL, Gollust SE, Ensminger ME, Chisolm MS, McGinty EE. Social Stigma Toward Persons With Prescription Opioid Use Disorder: Associations With Public Support for Punitive and Public Health-Oriented Policies. *Psychiatric services (Washington, DC).* 2017;68(5):462-469.

[306] McGinty EE, Stone EM, Kennedy-Hendricks A, Barry CL. Stigmatizing language in news media coverage of the opioid epidemic: Implications for public health. *Preventive Medicine.* 2019;124:110-114.

[307] McGinty EE, Kennedy-Hendricks A, Baller J, Niederdeppe J, Gollust S, Barry CL. Criminal Activity or Treatable Health Condition? News Media Framing of Opioid Analgesic Abuse in the United States, 1998-2012. *Psychiatric services (Washington, DC).* 2016;67(4):405-411.

[308] Walton MT, Hall MT. The Effects of Employment Interventions on Addiction Treatment Outcomes: A Review of the Literature. *Journal of Social Work Practice in the Addictions.* 2016;16(4):358-384.

AR2022_401593



309 Substance Abuse and Mental Health Services Administration. Key substance use and mental health indicators in the United States: Results from the 2020 National Survey on Drug Use and Health (HHS Publication No. PEP21-07-01-003, NSDUH Series H-56). 2021. Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data/

310 U.S. Commission on Civil Rights. Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities. In. Washington, DC, 2019.

311 The International Classification of Diseases, Version 10 (ICD-10) was implemented in 1999 following conventions defined by the World Health Organization to replace Version 9 (ICD-9), in use since 1979.

312 Centers for Disease Control and Prevention, National Center for Health Statistics. Multiple Cause of Death, 1999-2019 on CDC WONDER Online Database, released December 2020. Extracted by ONDCP from http://wonder.cdc.gov/mcd-icd10.html on December 22, 2020.

313 Centers for Disease Control and Prevention, National Center for Health Statistics. Vital Statistics Rapid Release: Provisional Drug Overdose Death Counts. Available at https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm, Accessed on November 19, 2021.

314 National HIDTA Program Office. The Overdose Response Strategy Annual Report. 2019. Available at https://www.hidtaprogram.org/pdf/ors_report_2019.pdf. Accessed on August 23, 2021.

315 National Park Service, *Dangerous Marijuana Grow Site Discovered in Jail Canyon.;* 2021. Available at: https://www.nps.gov/deva/learn/news/dangerous-marijuana-grow-site-discovered-in-jail-canyon.htm. Accessed July 22, 2021.

316 Thorsen, Kim. Exploring the Problem of Domestic Marijuana Cultivation. Statement for the Record, U.S. Senate Caucus on International Narcotics Control. Available at https://www.doi.gov/ocl/hearings/112/MarijuanaCultivation_120711. Accessed August 23, 2021.

317 Thorsen, Kim. Exploring the Problem of Domestic Marijuana Cultivation. Statement for the Record, U.S. Senate Caucus on International Narcotics Control. Available at https://www.doi.gov/ocl/hearings/112/MarijuanaCultivation_120711. Accessed August 23, 2021.

318 May C. *Transnational Crime and the Developing World*. Global Financial Integrity, March 2017. Accessed August 19, 2021. https://secureservercdn.net/45.40.149.159/34n.8bd.myftpupload.com/wp-content/uploads/2017/03/Transnational_Crime-final.pdf?time=1629315967.

319 U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21: 2.

320320 U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21: 2.

321 U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21: 17.

322 Counternarcotics Center. 2019 Global Cocaine Trafficking (sanitized). 2019; 1911-23987: 8.

323 The White House. National Strategy to Combat Transnational Organized Crime. July 2011. Available at https://obamawhitehouse.archives.gov/sites/default/files/Strategy_to_Combat_Transnational_Organized_Crime_July_2011.pdf. Accessed on August 23, 2021.

324 U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21.

325 United Nations Office on Drugs and Crime. Alternative Development: A Global Thematic Evaluation Final Synthesis Report. 2005. Available at https://www.unodc.org/pdf/Alternative_Development_Evaluation_Dec-05.pdf. Accessed on August 23, 2021.

326 U.S. International Development Finance Corporation. United States – Colombia Growth Initiative Executive Summary: A Bilateral Investment Initiative to Advance Rural Development and Realize a Drug Free Colombia. Available at https://www.dfc.gov/sites/default/files/media/documents/USCGI%20Executive%20Summary.pdf. Accessed on August 31, 2021.

327 U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21.

328 Library of Congress. Mexico: Amendment Reforming National Security Law Approved. January 25, 2021. Available at Mexico: Amendment Reforming National Security Law Approved | Library of Congress (loc.gov). Accessed on August 13, 2021.



329 Adriana Ávila-Zúñiga-Nordfjeld, Dimitrios Dalaklis. CHAPTER 3 - Enhancing Maritime Security in Mexico: Privatization, Militarization, or a combination of both? Available from https://hal.archives-ouvertes.fr/hal-01792131/document. Accessed on August 22, 2021.

330 U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21.

331 The White House. UPDATED: ONDCP Releases Data on Coca Cultivation and Potential Cocaine Production in the Andean Region. July 16, 2021. Available at https://www.whitehouse.gov/ondcp/briefing-room/2021/07/16/ondcp-releases-data-on-coca-cultivation-and-potential-cocaine-production-in-the-andean-region/. Accessed on August 23, 2021.

332 United Nations Office on Drugs and Crime. Colombia Coca Cultivation Survey, 2020. https://www.unodc.org/documents/crop-monitoring/Colombia/Colombia_2020_Coca_Survey_FactSheet_ExSum.pdf. Accessed on August 25, 2021.

333 U.S. Department of State. 2020 International Narcotics Control Strategy Report. Volume 1. Drug and Chemical Control. March 2021: 33. Available at https://www.state.gov/wp-content/uploads/2021/02/International-Narcotics-Control-Strategy-Report-Volume-I-FINAL-1.pdf. Accessed August 23, 2021.

334 U.S. Department of State. 2020 International Narcotics Control Strategy Report. Volume 1. Drug and Chemical Control. March 2021: 130. Available at https://www.state.gov/wp-content/uploads/2021/02/International-Narcotics-Control-Strategy-Report-Volume-I-FINAL-1.pdf. Accessed August 23, 2021.

335 U.S. Department of State. 2020 International Narcotics Control Strategy Report. Volume 1. Drug and Chemical Control. March 2021. Available at https://www.state.gov/wp-content/uploads/2021/02/International-Narcotics-Control-Strategy-Report-Volume-I-FINAL-1.pdf. Accessed August 23, 2021.

336 U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21: 85.

337 U.S. Department of Justice Drug Enforcement Administration. 2020 National Drug Threat Assessment. March 2021; DEA-DCT-DIR-008-21: 121.

338 Finklea, Kristin. Illicit Drug Flows and Seizures in the United States: What Do We [Not] Know?. Congressional Research Service. July 3, 2019.

339 U.S. Department of the Treasury Financial Crimes Enforcement Network. *Advisory on Illicit Activity Involving Convertible Virtual Currency.* May 9, 2019; FIN-2019-A003. Available at https://www.fincen.gov/sites/default/files/advisory/2019-05-10/FinCEN%20Advisory%20CVC%20FINAL%20508.pdf. Accessed on August 24, 2021.

340 Department of Treasury, Bank Secrecy Act. https://www.fincen.gov/resources/fincens-mandate-congress.

341 Department of Treasury, Financial Crimes Enforcement Center. https://www.fincen.gov/anti-money-laundering-act-2020

342 Department of Treasury, Financial Crimes Enforcement Center. National Strategy to Combat Terrorism and other Illicit Financing. 2020; Available at https://home.treasury.gov/system/files/136/National-Strategy-to-Counter-Illicit-Financev2.pdf. Accessed on August 23, 2021.

343 The White House. 21st Century Drug Trafficking: Advisories on Fentanyl and Other Synthetic Opioids. August 21, 2019. Available at https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/08/White-House-Fentanyl-Advisories-Summary.pdf. Accessed on August 24, 2021.

344 The White House. Advisory to the Chemical Manufacturing Industry on Illicit Activity and Methods Related to the Manufacturing of Fentanyl and Synthetic Opioids. August 21, 2019. Available at https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/08/Fentanyl-Advisory-Manufacturing-Tab-A.pdf. Accessed on August 24, 2021.

345 The White House. Advisory to Digital Private Sector Platforms on Illicit Activity and Methods Related to the Marketing of Fentanyl and Synthetic Opioids. August 21, 2019. Available at https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/08/Fentanyl-Advisory-Marketing-Tab-B.pdf. Accessed on August 24, 2021.

346 The White House. Advisory to the Shipping Industry on the Illicit Movement Methods Related to the Trafficking of Fentanyl and Other Synthetic Opioids. August 21, 2019. Available at https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/08/Fentanyl-Advisory-Movement-Tab-C.pdf. Accessed on August 24, 2021.

347 The White House. Advisory to Financial Institutions on Illicit Financial Schemes and Methods Related to the Trafficking of Fentanyl and Other Synthetic Opioids. August 21, 2019. Available at



https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/08/Fentanyl-Advisory-Money-Tab-D.pdf. Accessed on August 24, 2021.

[348] U.S. Department of Justice. Drug Enforcement Administration. *DEA implements ecommerce outreach program to combat counterfeit drug production*. August 2020. Available at, https://www.dea.gov/press-releases/2020/08/04/dea-implements-ecommerce-outreach-program-combat-counterfeit-drug. . Accessed on August 20, 2021.

[349] The White House. United States Key Deliverables for the 2016 North American Leaders' Summit. June 29, 2016. Available at https://obamawhitehouse.archives.gov/the-press-office/2016/06/29/fact-sheet-united-states-key-deliverables-2016-north-american-leaders. Accessed on August 24, 2021.

[350] The White House. FACT SHEET: Key Deliverables for the 2021 North American Leaders' Summit. November 18, 2021. Available at https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/18/fact-sheet-key-deliverables-for-the-2021-north-american-leaders-summit/. Accessed on March 3, 2022.

[351] U.S. Department of State. Press Briefing on U.S.-EU political dialogue on drugs as well as U.S.-EU cooperation to address the opioid crises, cocaine trafficking. November 9, 2017. Available at https://2017-2021.state.gov/telephonic-press-briefing-with-james-a-walsh-das-for-international-narcotics-law-enforcement-affairs/index.html. Accessed on August 23, 2021.

[352] Columbia University. National Center on Addiction and Substance Abuse. *Behind Bars Ii : Substance Abuse and America's Prison Population*. New York, NY: National Center on Addiction and Substance Abuse at Columbia University; 2010.

[353] Nellis. A. *The Color of Justice: Racial and Ethnic Disparity in State Prisons*. The Sentencing Project, October 2021. https://www.sentencingproject.org/wp-content/uploads/2016/06/The-Color-of-Justice-Racial-and-Ethnic-Disparity-in-State-Prisons.pdf; accessed February 20, 2022.

[354] Binswanger IA, Stern MF, Deyo RA, et al. Release from prison — a high risk of death for former inmates. *The new england journal of medicine*. 2007;356(2):157-165. doi:10.1056/NEJMsa064115.

[355] Ranapurwala SI, Shanahan ME, Alexandridis AA, et al. Opioid overdose mortality among former north carolina inmates: 2000–2015. *American journal of public health*. 2018;108(9):1207-1213. doi:10.2105/AJPH.2018.304514

[356] Kubic, M. W., Pendergrass, T. (2017). Diversion programs are cheaper and more effective than incarceration. Prosecutors should embrace them. Retrieved from https://www.aclu.org/blog/smart-justice/diversion-programs-are-cheaper-and-more-effective-incarceration-prosecutors; and Ziedenberg, J, Schiraldi, V, & McVay, D., Treatment or Incarceration: National and State Findings on the Efficacy and Cost Savings of Drug Treatment Versus Imprisonment. Open Society Foundation and Justice Policy Institute. 2004. Treatment Versus Incarceration (opensocietyfoundations.org)

[357] Green, T. C., Clarke, J., Brinkley-Rubinstein, L., Marshall, B. D. L., Alexander-Scott, N., Boss, R., & Rich, J. D. (2018). Postincarceration Fatal Overdoses After Implementing Medications for Addiction Treatment in a Statewide Correctional System. *JAMA Psychiatry, 75*(4), 405-407. 10.1001/jamapsychiatry.2017.4614

[358] Marsden J, Stillwell G, Jones H, et al. Does exposure to opioid substitution treatment at prison release reduce the risk of death? a prospective, observational study in england. *The lancet*. 2016;388:11. doi:10.1016/S0140-6736(16)32247-4

[359] Marsden, J., Stillwell, G., Jones, H., Cooper, A., Eastwood, B., Farrell, M., Lowden, T., Maddalena, N., Metcalfe, C., Shaw, J., & Hickman, M. (2017). Does Exposure to Opioid Substitution Treatment in Prison Reduce the Risk of Death after Release? A National Prospective Observational Study in England. *Addiction (Abingdon, England), 112*(8), 1408-1418. 10.1111/add.13779 [doi]

[360] National Academies of Sciences, Engineering, and Medicine. (2019). *Medications for Opioid Use Disorder Save Lives.* (Consensus Study Report). Washington, DC: The National Academies Press. https://doi.org/10.17226/25310

[361] National Academies of Sciences, Engineering, and Medicine. (2019). *Medications for Opioid Use Disorder Save Lives.* (Consensus Study Report). Washington, DC: The National Academies Press. https://doi.org/10.17226/25310

[362] National Academies of Sciences, Engineering, and Medicine. (2019). *Medications for Opioid Use Disorder Save Lives.* (Consensus Study Report). Washington, DC: The National Academies Press. https://doi.org/10.17226/25310

[363] Wyse JJ, Morasco BJ, Dougherty J, et al. Adjunct interventions to standard medical management of buprenorphine in outpatient settings: a systematic review of the evidence. *Drug and alcohol dependence*. 2021. doi:10.1016/j.drugalcdep.2021.108923

[364] Jail and Prison Opioid Project. (2021). Explore the Data. Retrieved from http://dev.prisonopioidproject.org/



365 Wakeman SE, Rich JD. Addiction treatment within u.s. correctional facilities: bridging the gap between current practice and evidence-based care. *Journal of addictive diseases.* 2015;34(2-3):220-225. doi:10.1080/10550887.2015.1059217

366 Bandara, S., Kennedy-Hendricks, A., Merritt, S., Barry, C. L., & Saloner, B. (2021). Methadone and buprenorphine treatment in United States jails and prisons: lessons from early adopters. *Addiction (Abingdon, England)*, 10.1111/add.15565. Advance online publication. https://doi.org/10.1111/add.15565

367 Health and Human Services Department. (2021). *Practice Guidelines for the Administration of Buprenorphine for Treating Opioid Use Disorder.* Federal Registrar. Practice Guidelines for the Administration of Buprenorphine for Treating Opioid Use Disorder

368 Knight K, Farabee D, editors. *Treating Addicted Offenders: A Continuum of Effective Practices.* Kingston, NJ: Civic Research Institute; 2004; and Leukefeld CG, Tims F, Farabee D, editors. *Treatment of Drug Offenders: Policies and Issues.* New York, NY: Springer; 2002.

369 Maradiaga JA, Nahvi S, Cunningham CO, Sanchez J, Fox AD. "I Kicked the Hard Way. I Got Incarcerated." Withdrawal from Methadone During Incarceration and Subsequent Aversion to Medication Assisted Treatments. *J Subst Abuse Treat.* 2016;62:49-54. doi:10.1016/j.jsat.2015.11.004

370 National Institute on Drug Abuse. (2017). *Treating opioid addiction in criminal justice settings.* Bethesda, MD. https://d14rmgtrwzf5a.cloudfront net/sites/default/files/policybrief-cj.pdf

371 Rich, J. D., McKenzie, M., Larney, S., Wong, J. B., Tran, L., Clarke, J. et al. (2015). Methadone continuation versus forced withdrawal on incarceration in a combined US prison and jail: A randomised, openlabel trial. *The Lancet, 386,* 350-359.

372 Green, T. C., Clarke, J., Brinkley-Rubinstein, L., Marshall, B. D., Alexander-Scott, N., Boss, R. et al. (2018). Postincarceration fatal overdoses after implementing medications for addiction treatment in a statewide correctional system. *JAMA Psychiatry,* 75, 405-407. doi: 10.1001/jamapsychiatry.2017.4614

373 National Academies of Sciences, Engineering, and Medicine. (2019). *Medications for opioid use disorder save lives.* Washington, DC: National Academies Press. https://www.ncbi.nlm.nih.gov/books/NBK538936/

374 Substance Abuse & Mental Health Services Administration. (2019). *Use of medication-assisted treatment for opioid use disorder in criminal justice settings* (HHS Pub. No. PEP19-MATUSECJS). Rockville, MD. https://store.samhsa.gov/product/Use-of-Medication-Assisted-Treatment-for-Opioid-Use-Disorder-in-Criminal-Justice-Settings/PEP19-MATUSECJS

375 National Association of Drug Court Professionals. (2013). *Adult Drug Court Best Practice Standards* (Vol. I-Text Revision). Alexandria, VA.

376 National Association of Drug Court Professionals. (2015). *Adult Drug Court Best Practice Standards* (Vol. II-Text Revision). Alexandria, VA.

377 Nordstrom BR, Marlowe DB, National Drug Court Institute (U.S.). *Medication-Assisted Treatment for Opioid Use Disorders in Drug Courts : Ensuring the Safe, Effective, and Responsible Use of Addiction Medications for Drug Court Participants.* Alexandria, VA: National Drug Court Institute; 2016.

378 Legal Action Center. (2009). *Know your rights: Rights for individuals on medication-assisted treatment.* (Rep. No. SMA-09-4449). Rockville, MD: Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration

379 US Department of Justice. Coordinating Council on Juvenile Justice and Delinquency Prevention Meeting. https://juvenilecouncil.ojp.gov/sites/g/files/xyckuh301/files/media/document/march-14-2019-coordinating-council-meeting-summary.pdf. Accessed on April 18, 2022.

380 Kennedy-Hendricks, A., Bandara, S., Merritt, S., Barry, C. L., & Saloner, B. (2021). Structural and organizational factors shaping access to medication treatment for opioid use disorder in community supervision. *Drug and alcohol dependence*, *226*, 108881. Advance online publication. https://doi.org/10.1016/j.drugalcdep.2021.108881

381 Bureau of Justice Statistsics, U.S. Department of Justice. Jail Inmates in 2020 – Statistical Tables. Available at: https://bjs.ojp.gov/content/pub/pdf/ji20st.pdf.

382 Comprehensive Opioid, Stimulant, and Substance Abuse Program. (2021). The Building Bridges Initiative. Retrieved from https://bridges.cossapresources.org/

383 42 U.S.C. 1396d, §1905, Social Security Act. Note that there is a limited exception to this policy; Medicaid dollars are available for an inmate experiencing an inpatient stay of 24 hours or more. *See* https://www.medicaid.gov/sites/default/files/Federal-Policy-Guidance/Downloads/sho16007.pdf.

384 Bandara, S., Kennedy-Hendricks, A., Merritt, S., Barry, C. L., & Saloner, B. (2021). Methadone and buprenorphine treatment in United States jails and prisons: lessons from early adopters. *Addiction (Abingdon, England)*, 10.1111/add.15565. Advance online publication. https://doi.org/10.1111/add.15565



385 U.S. Department of Health & Human Services. (2021). HHS Releases New Buprenorphine Practice Guidelines,
   Expanding Access to Treatment for Opioid Use Disorder. Retrieved from
   https://www.hhs.gov/about/news/2021/04/27/hhs-releases-new-buprenorphine-practice-guidelines-
   expanding-access-to-treatment-for-opioid-use-disorder.html#:~:text=Practitioners-percent20who-
   percent20do-percent20not-percent20wish-percent20to-percent20practice-percent20under,drugs-percent2C-
   percent20covered-percent20under-percent20the-percent20CSA-percent2C-percent20such-percent20as-
   percent20buprenorphine.

386 U.S. Department of Justice, Drug Enforcement Administration. (2001). Emergency narcotic addiction treatment.
   Retrieved from https://www.deadiversion.usdoj.gov/pubs/advisories/emerg_treat.htm

387 The Biden-Harris Administration's Statement of Drug Policy Priorities for Year One. The White House.
   https://www.whitehouse.gov/wp-content/uploads/2021/03/BidenHarris-Statement-of-Drug-Policy-Priorities-
   April-1.pdf?fbclid=IwAR2TBk34U_XRqlqK_pAYnUd_9f7zY3IbCQI9KxI6S5eYeRJdFzl9B09hZ84.
   Published April 1, 2021. Accessed September 2, 2021.

388 The Biden Plan for Strengthening America's Commitment to Justice. Joe Biden's Criminal Justice Policy/Joe
   Biden. https://joebiden.com/justice/. Published July 23, 2019. Accessed September 2, 2021.

389 American Civil Liberties Union. (2020). *A Tale of Two Countries: Racially Targeted Arrests in the Era of
   Marijuana Reform.* American Civil Liberties Union.
   https://www.aclu.org/sites/default/files/field_document/tale_of_two_countries_racially_targeted_arrests_in
   _the_era_of_marijuana_reform_revised_7.1.20_0.pdf

390 Nicosia, N., Macdonald, J. M., & Arkes, J. (2013). Disparities in Criminal Court Referrals to Drug Treatment and
   Prison for Minority Men. *American Journal of Public Health, 103*(6), e77-e84.

391 Bhati AS, Roman J, Chalfin A, Justice Policy Center. *To Treat or Not to Treat : Evidence on the Prospects of
   Expanding Treatment to Drug-Involved Offenders*. Washington, D.C.: Urban Institute, Justice Policy
   Center; 2008. http://www.urban.org/UploadedPDF/411645_treatment_offenders.pdf. Accessed September
   2, 2021.

392 Arnold, A., Benally, P., Friedrich, M. (2020). Drug Courts in the Age of Sentencing Reform. Center for Court
   Innovation.

393 Criminal Justice Policy Foundation. (n.d.). Mandatory minimum and sentencing reform. Retrieved from
   https://www.cjpf.org/mandatory-minimums.

394 Eisen, L.B. (2015). Mandatory Minimum Sentences – Time to End Counterproductive Policy. Retrieved from
   https://www.brennancenter.org/our-work/analysis-opinion/mandatory-minimum-sentences-time-end-
   counterproductive-policy.

395 Report on the Rhode Island Department of Corrections' Population FY 1976 - FY 2016. State of Rhode Island
   and Providence Plantations - Planning & Research Unit.
   http://www.doc ri.gov/docs/RIDOC's%20Population%20FY1976%20-%20FY2016.pdf. Published June
   2017. Accessed September 2, 2021.

396 American Civil Liberties Union. (n.d.). Sentencing Reform. Retrieved from https://www.aclu.org/issues/smart-
   justice/sentencing-reform

397 The Pew Charitable Trusts, "Time Served: The High Cost, Low Return of Longer Prison Terms" (2012), 19,
   http://www.pewtrusts.org/~/media/assets/2012/06/06/time_served_report.pdf

398 The Pew Charitable Trusts. (2018). *More Imprisonment Does Not Reduce State Drug Problems.*
   https://www.pewtrusts.org/-
   /media/assets/2018/03/pspp_more_imprisonment_does_not_reduce_state_drug_problems.pdf

399 National Association Of Drug Court Professionals. (2021). Welcome To The ARK. Retrieved from
   https://ark nadcp.org/

400 Criminal Justice Knowledge Bank. (2018). Richmond County: HOPE Program. Retrieved from
   https://knowledgebank.criminaljustice.ny.gov/system/files/documents/2021/08/criminal-justice-knowledge-
   bank-program-profile_richmond-co-hope_082021.pdf

401 Kubic, M. W., Pendergrass, T. (2017). Diversion programs are cheaper and more effective than incarceration.
   Prosecutors should embrace them. Retrieved from https://www.aclu.org/blog/smart-justice/diversion-
   programs-are-cheaper-and-more-effective-incarceration-prosecutors

402 Zarkin, G. A., Cowell, A. J., Hicks, K. A., Mills, M. J., Belenko, S., Dunlap, L. J., & Keyes, V. (2015). Lifetime
   Benefits and Costs of Diverting Substance-Abusing Offenders From State Prison. *Crime & Delinquency*,
   *61*(6), 829–850. https://doi.org/10.1177/0011128712461904



[403] U.S. Department of Health and Human Services Assistant Secretary for Planning and Evaluation Office of Disability, Aging and Long-Term Care Policy. (2019). Approaches to Early Jail Diversion: Collaborations & Innovations. Retrieved from https://aspe.hhs.gov/system/files/pdf/262096/EarlyJail.pdf

[404] Duwe G. Evaluating the minnesota comprehensive offender reentry plan (mcorp): results from a randomized experiment. *Justice quarterly*. 2012;29(3):347-383. doi:10.1080/07418825.2011.555414

[405] Amy E. Hirsch et al., *Every Door Closed: Barriers Facing Parents with Criminal Records*, Center for Law and Social Policy and Community Legal Services, 2002

[406] Marlow E, White MC, Chesla CA. Barriers and facilitators: parolees' perceptions of community health care. J Correct Health Care. 2010 Jan;16(1):17-26. doi: 10.1177/1078345809348201. Epub 2009 Oct 26.

[407] Joudrey, Paul J. et al. "A Conceptual Model for Understanding Post-Release Opioid-Related Overdose Risk." Addiction Science and Clinical Practice. Vol. 14. Published April 15, 2019, https://ascpjournal.biomedcentral.com/articles/10.1186/s13722-019-0145-5.

[408] Merrall EL, Kariminia A, Binswanger IA, et al. Meta-analysis of drug-related deaths soon after release from prison. *Addiction*. 2010;105(9):1545-1554. doi:10.1111/j.1360-0443.2010.02990.x

[409] Substance Abuse and Mental Health Services Administration. (2021). *Intercept 4: ReEntry*. https://www.samhsa.gov/criminal-juvenile-justice/sim-overview/intercept-4

[410] Miller, Terry; Lauer, Aaron; Mihok, Briana; and Karlie Haywood. A Continuum of Care Approach; Western Pennsylvania's Response to the Opioid Epidemic. Pittsburgh, PA: University of Pittsburgh Institute of Politics, 2016, http://d-scholarship.pitt.edu/29950/1/IOPOpioidReport2016.pdf. P. 26

[411] Warm Hand-Offs in Pennsylvania. A Task Force and Advisory Committee Report. Joint State Government Commission. Retrieved at: http://www.jsg.legis.state.pa.us/resources/documents/ftp/publications/2020-12-29%20(2019HR216)WARM%20HAND-OFFS%20REPORT%2012.28.20.pdf. Published December 2020. Accessed September 2, 2021.

[412] Hubbard, William C. (2015) "Remarks on Collateral Consequences of Mass Incarceration," *Criminal Law Practitioner*: Vol. 2 : Iss. 2 , Article 3.

[413] U.S. Commission on Civil Rights. Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities. In. Washington, DC. 2019.

[414] U.S. Commission on Civil Rights. Collateral Consequences: The Crossroads of Punishment, Redemption, and the Effects on Communities. In. Washington, DC. 2019.

[415] The White House. Memorandum on Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking. January 27, 2021. Available at https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/memorandum-on-restoring-trust-in-government-through-scientific-integrity-and-evidence-based-policymaking/. Accessed on January 6, 2022.

[416] National Research Council. *Informing America's Policy on Illegal Drugs: What We Don't Know Keeps Hurting Us*. Washington, DC: The National Academies Press. 2001. (Page 2)

[417] In addition to official NSDUH reports, a detailed history of NSDUH and drug policy is available in Gfroerer,J. War Stories from the Drug Survey – How Culture, Politics, and Statistics Shaped the National Survey on Drug Use and Health. New York: Cambridge University Press. 2019.

[418] Maruschak LM, Bronson J, Alper M. Alcohol and Drug Use and Treatment Reported by Prisoners. Bureau of Justice Statistics. July 2021. Available at https://www.ojp.gov/library/publications/alcohol-and-drug-use-and-treatment-reported-prisoners-survey-prison-inmates. Accessed on July 13, 2021.

[419] Hedegaard H, Bastian BA, Trinidad JP, Spencer M, Warner M. Drugs Most Frequently Involved in Drug Overdose Deaths: United States, 2011-2016, National Vital Statistics Reports Vol. 67, No. 9 (December 12, 2018). Available at https://www.cdc.gov/nchs/data/nvsr/nvsr67/nvsr67_09-508.pdf . Accessed on December 13, 2018.

[420] National Highway Traffic Safety Administration. NEMSIS overview. Available at https://nemsis.org/. Accessed on April 18, 2022.

[421] National Highway Traffic Safety Administration. Fatality Analysis Reporting System. Available at https://www.nhtsa.gov/research-data/fatality-analysis-reporting-system-fars. Accessed on April 18, 2022.

[422] Centers for Disease Control and Prevention. WISQARS – Web-based Injury Statistics Query and Reporting System. Available at https://www.cdc.gov/injury/wisqars/index.html. Accessed on April 18, 2022.

[423] United State Consumer Product Safety Commission. National Electronic Injury Surveillance System. Available at https://www.cpsc.gov/Research--Statistics/NEISS-Injury-Data. Accessed on April 18, 2022.

[424] Washington/Baltimore High Intensity Drug Trafficking Area (HIDTA). ODMAP overview. Available athttps://www.hidta.org/odmap/. Accessed April 18, 2022.

[425] ONDCP. *The Economic Costs of Drug Abuse in the United States 1992-2002*. Washington, DC: 2004.



[426] ONDCP press release, UPDATED: ONDCP Releases Data on Coca Cultivation and Potential Cocaine Production in the Andean Region. July 16, 2021. Available at https://www.whitehouse.gov/ondcp/briefing-room/2021/07/16/ondcp-releases-data-on-coca-cultivation-and-potential-cocaine-production-in-the-andean-region/. Accessed on July 21, 2021.

[427] Centers for Disease Control and Prevention. Youth Risk Behavior Surveillance – United States, 2019. MMWR 69(SS-01) August 21, 2020. Available at https://www.cdc.gov/healthyyouth/data/yrbs/reports_factsheet_publications.htm#anchor_1596725978. Accessed on August 24, 2020.

[428] Quest Diagnostics. Marijuana Workforce Drug Test Positivity Continues Double-Digit Increases to Keep Overall Drug Positivity Rates at Historically High Levels, Finds Latest Quest Diagnostics Drug Testing Index Analysis. May 26, 2021. Available at https://www.questdiagnostics.com/dms/Documents/Employer-Solutions/DTI-2021/quest-drug-testing-index-press-release-2021/2021-quest-diagnostics-drug-testing-index-report-press-release.pdf. Accessed on May 27, 2021.

[429] Community Anti-Drug Coalitions of America (CADCA). Building Drug-Free Communities overview.  Available at https://www.cadca.org/. Accessed on April 18, 2022.

[430] National Association of State Alcohol and Drug Abuse Directors. Overview. Available at https://nasadad.org/. Accessed on April 18, 2022.

[431] Section 9 of the *Executive Order on Advancing Racial Equity and Support for Underserved Communities through the Federal Government*. Available at https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/. Accessed on July 22, 2021.

[432] Medley G, Lipari RN, Bose J. Sexual Orientation and Estimates of Adult Substance Use and Mental Health: Results from the 2015 National Survey on Drug Use and Health. NSDUH Data Review, SAMHSA. October 2016. Available at https://www.samhsa.gov/data/sites/default/files/NSDUH-SexualOrientation-2015/NSDUH-SexualOrientation-2015/NSDUH-SexualOrientation-2015.pdf. Accessed on May 31, 2021.

[433] Jones CM, Clayton HB, Deputy NP, Roehler DR, Ko JY, et al. Prescription Opioid Misuse and Use of Alcohol and Other Substances Among High School Students – Youth Risk Behavior Survey, United States, 2019. *MMWR* 69(1):38-46 August 21, 2020. Available at https://www.cdc.gov/healthyyouth/data/yrbs/pdf/2019/su6901-H.pdf. Accessed on June 2, 2021.

[434] National Institute on Drug Abuse. *Drug Use Among Racial/Ethnic Minorities* (Revised). U.S. Department of Health and Human Services, National Institutes of Health. 2003.

[435] Centers for Disease Control and Prevention. *National Notifiable Diseases Surveillance System.* https://www.cdc.gov/nndss/index.html. Accessed on November 30, 2021.

[436] University of Maryland Center for Substance Abuse Research. Community Drug Early Warning System. Available at https://cesar.umd.edu/landing/CDEWS. Accessed on May 31, 2021.

[437] A narrative account of where the United States is on wastewater-based epidemiology is found in: Weiss M. Sewage Has Stories to Tell. Why Won't U.S. listen? Smithsonian Magazine. April 26, 2021. (reprint from Undark). Available at https://www.smithsonianmag.com/science-nature/will-us-finally-embrace-sewage-analysis-improve-public-health-180977570/?utm_source=smithsoniandaily&utm_medium=email&utm_campaign=20210426-daily-responsive&spMailingID=44870393&spUserID=NzQwNDU1MzQzNzcS1&spJobID=1984111673&spReportId=MTk4NDExMTY3MwS2. Accessed on May 31, 2021.

[438] National Science Foundation. Covid-19 Response Funding Update. January 19, 2021. Available at https://www.nsf.gov/about/congress/funding-percent20updates/COVID_update_Jan19.pdf. Accessed on May 31, 2021.

[439] European Monitoring Centre for Drugs and Drug Addiction. Wastewater-based epidemiology and drugs topic page. Available at https://www.emcdda.europa.eu/topics/wastewater_en. Accessed on May 31, 2021.

[440] Sewage Analysis CORe group Europe (SCORE). https://score-cost.eu/. Accessed on May 31, 2021.

[441] A brief description of this series is available at https://www.childandfamilydataarchive.org/cfda/cfda/series/526. Accessed on August 16, 2021. https://www.childandfamilydataarchive.org/cfda/cfda/series/526. Accessed on August 16, 2021. https://www.childandfamilydataarchive.org/cfda/cfda/series/526. Accessed on August 16, 2021. https://www.childandfamilydataarchive.org/cfda/cfda/series/526. Accessed on August 16, 2021. https://www.childandfamilydataarchive.org/cfda/cfda/series/526. Accessed on August 16, 2021.

[442] Green, TC, Park JN, Gilbert M, McKenzie M, Struth E, et al. An assessment of the limits of detection, sensitivity, and specificity of three devices for public health-based drug checking of fentanyl in street-acquired



samples. *International Journal of Drug Policy* 77. 2020. Available at https://doi.org/10.1016/j.drugpo.2020.102661. Accessed on June 24, 2021.

443 Anghel LA, Farcas AM, Oprean RN. An overview of the common methods used to measure treatment adherence. *Med Pharm Rep.* 2019;92(2):117-122.

444 Caces MF, Delaney PJ, Cala MA. The impact of prescription pain reliever misuse and heroin use on morbidity and mortality by level of urbanicity: 2002-2004, *Contemporary Rural Social Work Journal* Volume 11, Number 1, Article 7. 2019.

445 National Research Council. *Informing America's Policy on Illegal Drugs: What We Don't Know Keeps Hurting Us*. Washington, DC: The National Academies Press. 2001. Available https://doi.org/10.17226/10021.

446 National Information Exchange Model. Available at https://www.niem.gov/. Accessed on January 5, 2022.

447 *The SUPPORT for Patients and Communities Act*, 21 U.S.C. 21 U.S. Code § 1705 -Development, submission, implementation, and assessment of National Drug Control Strategy, Section (f).

448 United Nations. *World Drug Report 2021*. Available online at https://wdr.unodc.org/wdr2021/index.html. Accessed on June 24, 2021.

449 Centers for Disease Control and Prevention (CDC). *Evidence-Based Strategies for Preventing Opioid Overdose: What's Working in the United States.* National Center for Injury Prevention and Control, CDC, U.S. Department of Health and Human Services. Available at https://www.cdc.gov/drugoverdose/pdf/pubs/2018-evidence-based-strategies.pdf, accessed on April 1, 2021.

450 The Washington Post. "Trump administration freezes database of addiction and mental health treatments." January 10, 2018. Available at https://www.washingtonpost.com/national/health-science/trump-administration-freezes-database-of-addiction-and-mental-health-programs/2018/01/10/ed421654-f577-11e7-beb6-c8d48830c54d_story.html, accessed on May 28, 2021.

451 SAMHSA. *Evidence-Based Practices Resource Center*. Available at https://www.samhsa.gov/resource-search/ebp, accessed on May 28, 2021.

452 National Institute of Justice. *Crime Solutions*. Available at https://crimesolutions.ojp.gov/. Accessed on May 12, 2021.