Journal of Housing Economics 35 (2017) 13–25

Contents lists available at ScienceDirect

# Journal of Housing Economics

journal homepage: www.elsevier.com/locate/jhec



# Immigration and housing: A spatial econometric analysis ☆

Abeba Mussa [a], Uwaoma G. Nwaogu [b,*], Susan Pozo [c]

[a] Department of Economics, Farmingdale State College, 2350 Broad Hollow Rd, Farmingdale, NY 11735, USA
[b] Economics, Accounting and Management Department, Central College, 812 University, Pella, IA 50219, USA
[c] Department of Economics, Western Michigan University, 1903 West Michigan Ave, Kalamazoo, MI 49008, USA



## ARTICLE INFO

*Article history:*
Received 1 July 2014
Revised 6 August 2016
Accepted 2 January 2017
Available online 3 January 2017

*JEL classification:*
F22
L85
R21

*Keywords:*
Immigration
Housing price
Housing rent
Spatial model
Spillover effect

## ABSTRACT

In this paper we examine the effect of immigration into the U.S. on the U.S. housing market, both in terms of rents and single family house prices. We model the housing market in a spatial econometrics context using the spatial Durbin model. This approach helps us exploit and capture both the direct and indirect effects of immigration inflows on the U.S. housing market. We find that an increase in immigration inflows into a particular MSA is associated with increases in rents and with house prices in that MSA while also seeming to drive up rents and prices in neighboring MSAs. The patterns observed in the rental and house price markets, along with the larger spillover effects, are consistent with native-flight from immigrant receiving areas.

© 2017 Elsevier Inc. All rights reserved.

## 1. Introduction

For the last three decades, the United States has experienced a surge of immigration. Foreign-born households now account for about 14% of all U.S. households (Trevelyan et al., 2013) and two thirds of projected U.S. population growth from 1995 to 2050 is expected to be due to immigrants and their offspring (National Research Council, 1997). Much of the analysis on the effects of immigration on the U.S. economy has focused on its impacts on wages and has found mixed results (e.g. Ottaviano and Peri, 2012; Borjas, 2003, Borjas and Katz, 2007). While labor market effects are of interest, understanding how immigration affects other facets of the economy is also important. We focus on an area we know relatively little about and provide a coherent framework for measuring how immigration influences housing markets in a spatial context. In particular, we focus on the spillover effect of immigration on house prices and housing rents.

We argue that immigration can be an important factor that drives house prices and rents, in particular, given immigrant's re-

cent and projected contributions to U.S. population growth. In principle, new immigrant demand for housing coupled with an upward-sloping housing supply in metropolitan areas (where immigrants tend to settle) would be expected to yield rising rents and prices (Saiz, 2007). However, we need to also consider the possibility that immigration is associated with decreasing prices and rents. There are a number of mechanisms by which this may take place. For example, if immigration is associated with driving down wages and income in a given area (Altonji and Card, 1991), it is conceivable that we observe an adverse shift in housing demand. This shift in the demand curve—a negative income effect—would likely depress housing values. An alternative mechanism that could result in downward pressure on housing values is if natives dislike residing in areas where immigrants tend to settle. This could lead to offsetting out-migration of natives in response to immigration. Depending on the relative magnitudes of the in-migration of immigrants and out-migration of natives, we might observe a decline in aggregate housing demand and in housing prices in immigrant settlement areas. The possibility that immigration into an area may result in additional population flows (e.g. out-migration of natives) points to the importance of accounting for geography and for possible spillover effects. In this paper we accomplish such by employing spatial econometric methods. We observe how inflows of new immigrants into an MSA influences the housing market, not only in that MSA, but also in the surrounding MSAs

---

☆ We are grateful to the suggestions of 2 referees and the editor for numerous suggestions for improving this paper.
* Corresponding author.
*E-mail addresses:* mussaa@farmingdale.edu (A. Mussa), nwaogug@central.edu (U.G. Nwaogu), susan.pozo@wmich.edu (S. Pozo).

http://dx.doi.org/10.1016/j.jhe.2017.01.002
1051-1377/© 2017 Elsevier Inc. All rights reserved.

AR2022_500001

A. Mussa et al. / Journal of Housing Economics 35 (2017) 13–25

A positive relationship between immigration and housing values in immigrant receiving areas has been estimated by a number of researchers. Using a general equilibrium model calibrated to U.S. conditions, Ottaviano and Peri (2007) conclude that immigrant inflows into the U.S. raise rents for natives. Using data on MSAs and an IV based approach that relies on historical levels of immigration into metropolitan areas, Saiz (2007) estimates that an immigration inflow equal to 1 percent of a city's population is associated with increases in average rents and housing values of about 1%. Qualitatively similar results have been reproduced in other countries as well. Akbari and Aydede (2012) examine the effect of immigration on house prices in Canada. Their result indicates that a 1 percentage point increase in the immigrant share of the population raises house prices in Canada, though, by only a fraction of a percent. They suggest that the relatively modest effect of immigration might be due to out-migration of local natives from the areas where new immigrants settle or to increased housing supply taking place in response to projected increases in immigration. More dramatic price findings are reported by Gonzalez and Ortega (2013) who conclude that immigration to Spain in the previous decade was responsible for a 52% increase in housing values. In addition they attribute 37% of new construction due to immigrants and argue that by contributing to the stock of construction workers, immigration also propelled an increase in housing supply experienced by Spain.

While it seems most reasonable to expect that immigration raises housing values, there are several arguments for expecting the converse, justifying the findings of a number of researchers who have found that immigration results in declining housing values instead. Accetturo et al. (2014) suggest that natives might perceive a deterioration in amenities (e.g. over-crowding) due to the inflow of immigrants, causing native-flight from immigrant-dense districts, thus slowing down native appreciation. Using district level data for a sample of 20 large Italian cities, they show that a 10% increase in immigrant stocks leads to a fall in housing prices of 2 percentage points in districts affected by the inflow in comparison with the rest of the city. Similarly, Sá (2015) finds negative effects of immigration on housing prices using UK data. She finds evidence that immigration generates a negative income effect on housing demand by driving out natives who are relatively high wage earners. Her results also show that the negative effect is mainly driven in local areas where immigrants have lower levels of education.

The timing of immigration (immigration vintage effects) may also influence relative housing values. For example, Akbari and Aydede (2012) note that immigrants tend to buy housing after a period of residency in their adopted homelands, while recent immigrants tend to rent. We might, therefore observe excess demand for rental housing units driving up rental prices when immigrants first move in. But over time, as immigrants move onto becoming homeowners, they may apply upward pressure on prices for single family homes. Hence the vintage of immigrants may affect different segments of the housing market in different ways. Using the Mariel boatlift natural experiment, Saiz (2003) concludes that this population influx raised rents and depressed home values in immigrant receiving areas. The Mariel immigrants tended to rent, possibly propelling natives to purchase housing in other areas. Using finer distinctions (census tracts instead of MSAs) Saiz and Wachter (2011) conclude that housing appreciation was slower in immigrant neighborhoods, with natives moving out in response to the in-migration of the newcomers.

The idea that natives may move out when immigrants move in and that home prices and rental rates may be differentiated by the timing of immigration, points to the importance of accounting for the geography of immigration. In addition, we note that immigrant settlement patterns tend to be clustered with clustering likely due to immigration networks. By reducing the costs of information gathering, immigrant networks help channel immigrant to specific areas. However, the impact of immigration network might not be limited to the cities or MSAs in which immigrants are living, but also the surrounding metropolitan areas. Immigrants in Chicago (New York City) are likely to be relatively well informed of opportunities for new immigrants in Gary, Indiana (Newark, New Jersey). On account of information networks or because new immigrants drive older residents out, immigration inflow and housing prices, in one MSA may be highly spatially correlated with the home prices and rents in neighboring MSAs. We, therefore argue that it is important to take into account spatial dependence across space (MSAs) in order to better understand the effects of immigration on the housing market. As such we believe it is important to apply spatial techniques when studying the interaction of immigrants with the housing market. In the following section we introduce spatial methods and review how they have been applied to housing markets.

## 2. Spatial methods and their application to housing markets

Spatial regression methods are useful for estimating economic relationship characterized by a data generating process with spatial dependence among observations. For example, we might expect that house prices in NYC are all relatively high, exhibiting positive spatial dependence. Similarly, the price of a house in Kalamazoo, is likely to be relatively similar to other house prices in Kalamazoo (and considerably less than NYC house prices). In this setting, spatial dependence (rather than spatial independence) better describes the relationship of one observation to another. There are a number of ways by which spatial dependence may manifest itself and a variety of econometric models have been proposed to account for differing data generating processes. Two popular models are the spatial error model (SEM) and the spatial autoregressive model (SAR). Each model contains only one type of spatial interaction effect (Elhorst, 2010). The SEM incorporates a spatial autoregressive process in the error term while the SAR contains a spatially lagged dependent variable as an additional explanatory variable.

A number of studies have explored the use of spatial methods in the context of housing markets. DeSilva et al. (2012) examine the impact of Blacks and Hispanics on house prices in a small urban housing market in the U.S. Using simple OLS they find that the presence of Blacks in a neighborhood is associated with lower house prices while Hispanic neighborhoods seem to enjoy house price premiums. However, when employing, instead, spatial methods (SEM and SAR) the effect of Blacks in a neighborhood, while still negative, is smaller and Hispanics do not appear to have a statistically significant impact on housing prices. Basu and Thibodeau (1998) model housing using the SAR model. In their view, housing prices are autocorrelated spatially because values of properties in a given neighborhood capitalize on shared location amenities. Location amenities such as the quality of the police department, assessment of the public schools, percent of the population with a college degree, distance to employment, availability of shopping or transportation may affect house prices more generally in the area. Using data from a region in Norway, Osland and Thorsen (2013) use the SDM to examine how travel time from the central business district and how labor market accessibility affect housing prices. Fernández-Avilés et al. (2012) examine the impact of air pollution on housing prices in Madrid, Spain. Employing SDM they corroborate other studies that fail to find a link between air pollution and housing prices.

Focusing on the negative externalities, Cohen and Coughlin (2008) note that houses located near noisy areas such as railway tracks and airports sell for lower prices. They use a spatial

AR2022_500002

A. Mussa et al./Journal of Housing Economics 35 (2017) 13–25

15

framework to examine the impact of airport-related noise on housing prices in the neighborhoods near Atlanta's Harsfield-Jackson International Airport. Based on a noise contour map, they categorized houses into two zones; in one, noise does not disrupt normal activities while in the other it does. Employing a general spatial econometrics model they show that houses located in vicinities where noise disrupts normal activities sold for 20.8% less than houses located where noise does not disrupt normal activities.

Presently, many spatial econometrics studies have shifted to a model with more than one spatial interaction called a spatial Durbin model (SDM). This model, introduced by LeSage and Pace (2009), nests both the SAR and the SEM models by including spatial lags of both the dependent variables and explanatory variables. In addition to being more flexible in accommodating different aspects of spatial dependence, the SDM is attractive for its ability to obtain direct, indirect and total marginal effects for the explanatory variables, providing us with a more complete understanding of the relationships we wish to explore. The SDM has only recently been employed in the context of housing markets.[1]

Given the importance of immigration networks and the spatial relationships we discussed earlier, we surmise that it might be worthwhile to explore the impact of immigration on housing markets using the SDM methodology. Given its flexibility in accounting for the two models of spatial dependence, and given its ability to uncover both direct and indirect (or spillover) effects, the SDM is well positioned to model the complexities that follow immigration flows and housing prices. Spatial econometrics, however, is not without its limitations. According to Gibbons and Overman (2012) while spatial econometrics provides a good description of spatial data, techniques for addressing causality in spatial models have not been well developed. For the question on hand—how does immigration impact house prices and rents—establishing causality is key.[2] Therefore, in addition to employing spatial techniques, we follow Saiz (2003, 2007) and Saiz and Wachter (2011) and first attempt to achieve identification by modeling the first difference of the log of rents and prices. We follow this specification with one that employs two stage instrumental variables with bootstrapping to obtain unbiased coefficient values with correct standard errors.

### 2.1. Marginal effects—spatial Durbin models

The spatial Durbin model can be specified as:

$$y = \alpha I_n + X\beta + \rho Wy + WX\emptyset + \varepsilon \tag{1}$$

where $I_n$ denotes the identity matrix and Wy captures spatial interdependence of the dependent variable in the model (see LeSage and Pace, 2009). The reduced form of the SDM model and implied data generating process can be written as:

$$y = (I_n - \rho W)^{-1}(\alpha I_n + X\beta + WX\emptyset)$$
$$+ (I_n - \rho W)^{-1}\varepsilon \text{ with } \varepsilon \sim N(0, \sigma^2 I_n) \tag{2}$$

The direct (feedback) effect estimate is captured by X$\beta$ while WX captures the indirect (spillover) effect estimate. The total effects of the explanatory variables are the sum of direct (feedback) and indirect effect (spillover) estimates. According to LeSage and

Pace (2009), the SDM model has several advantages over the SEM and SAR models. The model produces unbiased estimates even when the true data-generating process is simply a spatial lag or a spatial error process. Also, SDM does not impose any prior restrictions on the magnitude of spillover effects (Elhorst, 2014). In deriving the marginal effects of the explanatory variables in the SDM, Elhorst (2010) provides the following matrix of partial derivatives of the dependent variable in the different units with respect to the $k$th explanatory variable in the different units (e.g., $x_{ik}$ for $i = 1,...,N$) at time $t$:

$$\left[ \frac{\partial y}{\partial X_{1k}} \quad \cdots \quad \frac{\partial y}{\partial X_{Nk}} \right]_t = \begin{bmatrix} \frac{\partial y_1}{\partial x_{1k}} & \cdots & \frac{\partial y_1}{\partial x_{Nk}} \\ \vdots & \ddots & \vdots \\ \frac{\partial y_N}{\partial x_{1k}} & \cdots & \frac{\partial y_N}{\partial x_{Nk}} \end{bmatrix}$$

$$= (I_n W)^{-1} \begin{bmatrix} \beta_k & w_{12}\emptyset_k & \cdots & w_{1N}\emptyset_k \\ w_{21}\emptyset & \beta_k & & w_{2N}\emptyset_k \\ \vdots & & \ddots & \vdots \\ w_{N1}\emptyset_k & w_{N2}\emptyset_k & \cdots & \beta_k \end{bmatrix} \tag{3}$$

Three different marginal effects are obtained when estimating spatial models: direct (feedback) effects, indirect (spillover) effects, and total effects (LeSage and Pace, 2009). In the context of the housing model, the direct effect records the impact of a housing price determinant, (e.g. immigration into that particular MSA) on housing prices in that MSA. The indirect (spillover) effect, in contrast, measures the effect of the housing price determinant (e.g. immigration into a particular MSA) on housing prices in surrounding MSAs. LeSage and Pace (2009) point out that the average of the diagonal elements of the matrix on the right-hand of Eq. (3) is the direct effect while the indirect effect is given by either the average of the row or the average of the column (see Elhorst, 2010).

Given that the SDM nests both the SEM and the SAR models, Elhorst (2010) shows how one can obtain marginal effects for the SEM or SAR model by imposing restrictions on the matrix on the right-hand side of Eq. (3). In the case of the SEM, the matrix above reduces to a diagonal matrix with $\beta_k$ on the main diagonals. As a result, the direct effect of the $k$th explanatory variable for the spatial error model is $\beta_k$, while the indirect effect will be zero. For the spatial lag model, $\emptyset_k = 0$. Elhorst (2010) notes that even though all the off-diagonal terms of the right hand side matrix of Eq. (3) become zero, the marginal effects—direct and indirect effects—in the spatial lag model does not reduce to one single coefficient or zero as in the spatial error model.

### 3. Data and methodology

The availability of data at the MSA level determined both the dependent variable and the time period for this study. Our panel data consist of 275 MSAs for the rent equation and 282 for the home price equation over the 2002–2012 period. Our housing rent data are from the Department of Housing and Urban Development (HUD) Fair Market Rent Series (FMR). The FMR corresponds to the actual (nominal) dollar price of a vacant 0 bedroom to 4 bedroom rental unit at the 50% percentile (or median) of the MSA's distribution. It is calculated annually by HUD using data from the Census and American Housing Survey (AHS). Data on home prices are obtained from the Federal Housing Finance Agency (FHFA). Under FHFA, the Office of Federal Housing Enterprise Oversight (OFHEO) estimates and publishes quarterly home price indexes for single-family detached properties. The OFHEO use the data on conventional conforming mortgage transactions obtained from the Federal Home Loan Mortgage Corporation (Freddie Mac) and the Federal National Mortgage Association (Fannie Mae). These are converted

---

[1] See Fernández-Avilés et al. (2012) and Osland and Thorsen, 2013.

[2] According to Gibbons and Overman (2012), natural experiments, IV techniques and differencing are alternative measures for dealing with identification although each has drawbacks. The IV technique can be used effectively if applied carefully with attention to the identification of specific causal parameters. Alternatively, spatial differencing removes relevant omitted variables, eliminating time-invariant, area-specific factors that simultaneously affect immigration and the level of house prices and rents.

*A. Mussa et al. / Journal of Housing Economics 35 (2017) 13–25*

**Table 1**
Descriptive statistics.

| Rent equation | Observations | Mean | Std. Dev. | Min | Max |
|---|---|---|---|---|---|
| Housing rent | 3024 | 767.3 | 222.5 | 416.2 | 2049.6 |
| Immigration inflows | 3025 | 3313.5 | 13,536.9 | 11 | 224,444 |
| $Immigrant_t / Pop_{t-1}$ | 2750 | 0.002061 | 0.001911 | 0.000035 | 0.02267 |
| Income per capita (chained 2005 \$s) | 3005 | 36905.9 | 10191.1 | 15619 | 90,528 |
| Land per capita | 3025 | 0.00795 | 0.01156 | 0.00034 | 0.154655 |
| Murder (per 100,000) | 2687 | 4.72 | 3.36 | 0 | 28.2 |
| Burglary (per 100,000) | 2664 | 809.2 | 329.0 | 219.5 | 2179 |
| Population | 3025 | 808,391 | 1,763,195 | 67,371 | 19,837,753 |
| Permit | 2949 | 3612.2 | 7901.1 | 17 | 74,007 |
| Unemployment rate (%) | 3020 | 6.54 | 2.64 | 2.42 | 27.2 |
| Population density | 2731 | 2.28801 | 0.38930 | 0.8148 | 3.4296 |
| Price equation | | | | | |
| Housing price index | 3102 | 174.2 | 35.9 | 102.9 | 363.1 |
| Immigration inflows | 3102 | 3398.9 | 13476.1 | 11 | 224,444 |
| $Immigrant_t / Pop_{t-1}$ | 2821 | 0.002127 | 0.002398 | 0.00000479 | 0.02266 |
| Income per capita (chained 2005 \$s) | 3092 | 37,004.9 | 10,334.9 | 15,619 | 90,528 |
| Land per capita | 3102 | 0.00788 | 0.01145 | 0.00034 | 0.154655 |
| Murder (per 100,000) | 2749 | 4.70 | 3.34 | 0 | 28.2 |
| Burglary (per 100,000) | 2725 | 806.51 | 327.96 | 219.5 | 2179 |
| Population | 3099 | 821,412 | 1,757,445 | 67,371 | 19,837,753 |
| Permit | 3026 | 3652.5 | 7860.2 | 17 | 74,007 |
| Unemployment rate (%) | 3101 | 6.55 | 2.63 | 2.5 | 27.2 |
| Population density | 2731 | 2.28801 | 0.38930 | 0.8148 | 3.4296 |

to an index that measures the movement of single-family home prices.

The specific data source and some descriptive statistics for home prices, rents and the other variables incorporated into our price and rent equations are displayed in Table 1 and Appendix Table A. Our main right hand side variable of interest, immigration inflows as a share of the MSA's population, is derived with information from the Department of Homeland Security (DHS) on immigration and this is scaled by census estimates of population by MSA. DHS reports on the number of "immigrants admitted to the United States by MSA" specifically admission of foreign-born individuals as permanent residents into the United States for the year.[3] Average immigrant inflow for the housing sample is 3399, slightly higher than the average inflow in the rent sample, 3314. Nonetheless, the standard deviation is very high, pointing to the wide dispersion in immigration inflows by geography with some MSAs experience very large inflows while others receive very small inflows. Once scaled by MSA population we find that there continue to be large variations in the immigrant inflows across the United States with at least one MSA with immigration inflows as a share of the population reaching 2 and a quarter percent. While we might expect that immigration will have a positive impact on rents and house prices, alternative scenarios are also possible. If natives have a distaste for immigrant neighbors, we might instead see offsetting outmigration that, to the contrary, depresses housing values. Or if immigrants impact labor markets by depressing wages, housing values could instead fall due to a negative income effect.

We assume that housing rents and housing prices are also influenced by wealth, land per capita, crime rates, availability of jobs

and potential housing supply and therefore need to incorporate these controls in our estimation. Since wealth at the MSA level is difficult to obtain, we proxy for it using data on personal income per capita. These are obtained from the Bureau of Economic Analysis (BEA) Regional Information System (REIS). According to the BEA, this value is the income received by all persons from all sources. On average, income per capita in our sample is around \$37,000. Land per capita is defined as the MSA's land area in square miles divided by total population of the MSA. Land per capita is indicative of the availability of space and is postulated to have a negative impact on house prices and rents. We measure crime using burglary and murder rates. These were obtained from FBI uniform crime report and are expected to have negative impacts on both rent and house prices as these characteristics make the MSA a less desirable area in which to reside.

As we would anticipate, murder rates are much lower than burglary rates. Finally, unemployment and housing permit rates at the MSA level are obtained from the Bureau of Labor Statistics and the Census Bureau respectively. Increases in the unemployment rate are expected to reduce house prices and rents. On average the unemployment rate was about 6.5% over the time period in these MSAs. Housing permits are simply the number of new privately owned housing units authorized by each MSA. As more houses are built, all other things equal, rent and house prices are expected to decline.

Table 2 follows up on Table 1 and identifies the different MSAs associated with the highest and lowest values for the variables in the model. New York-Northern New Jersey-Long Island Consolidated Metropolitan Area (CMSA) has the highest immigration rate and population, but the lowest land per capita. Santa Fe, New Mexico and the New Orleans-Metairie-Kenner, Metropolitan Statistical Areas have the highest burglary and murder rates respectively. Residents of San Jose-Sunnyvale-Santa Clara, California pay the highest rents, while residents of Naples-Marco Island, Florida pay the steepest housing prices. Las Vegas-Paradise, Nevada has the lowest home prices and St. Joseph, MO-KS renters are charged the least. In El Paso, Texas and San Jose-Sunnyvale-Santa Clara, California unemployment rates are highest and income per capita lowest respectively among the MSAs.

---

[3] The timing of the admission of a foreign person as a permanent resident does not necessarily coincide with the actual date of entry into the U.S. The data, also, do not account for illegal immigrants or foreign-born individuals who stay in the U.S. temporarily such as tourists and students. Undocumented and temporary immigrants usually rent rather than buy houses. The exclusion of these immigrants would tend to cause us to overstate the effect of immigration on the rental market. The housing price market, however, is less likely to be directly affected by the inflow of illegal or temporary immigrants.

A. Mussa et al./Journal of Housing Economics 35 (2017) 13–25                                                                 17

**Table 2**
MSA with minimum and maximum values for each explanatory and dependent variable.

| Variable | MSA with maximum value | MSA with minimum value |
|---|---|---|
| Housing price index | Naples-Marco Island, FL | Las Vegas-Paradise, NV |
| Rent | San Jose-Sunnyvale-Santa Clara, CA | St. Joseph, MO-KS |
| Immigration rate | New York-Northern New Jersey-Long Island, NY-NJ-PA | Cheyenne, WY |
| Immigrant as a share of MSA population | Charlottesville, VA | Charleston-North Charleston, SC; Riverside-San Bernardino-Ontario, CA |
| Murder (per 100,000) | New Orleans-Metairie-Kenner, LA | Wausau, WI; Bangor, ME; Billings, MT; Fargo, ND-MN |
| Burglary (per 100,000) | Santa Fe, NM | Bismarck, ND |
| Population | New York-Northern New Jersey-Long Island, NY-NJ-PA | Casper, WY |
| Land per capita | Flagstaff, AZ | New York-Northern New Jersey-Long Island, NY-NJ-PA |
| Income per capita | San Jose-Sunnyvale-Santa Clara, CA | McAllen-Edinburg-Mission, TX |
| Permit | Atlanta-Sandy Springs-Marietta, GA | Wheeling, WV-OH |
| Unemployment | El Paso, TX | Fort Walton Beach-Crestview-Destin, FL |

### 3.1. Model

The study estimates the following SDM to obtain the marginal effects of rent and house price determinants.

$$\Delta \ln(H_{mt}) = \rho W \ln(H_{mt}) + \frac{Immigrants_{m\,t}}{Population_{m\,t-1}}.\delta_1 + X_{mt}\beta_1$$
$$+ W \frac{Immigrants_{m\,t}}{Population_{m\,t-1}}.\delta_2 + W X_{mt}\beta_2 + \Delta \mu_{mt} \quad (4)$$

The dependent variable is the annual change in the log of rent (house prices) in MSA $m$ at time $t$. Following the housing literature, we model the first difference of the log of prices and rent. By differencing the price (rent) variable and employing panel methods, we help control for time-invariant, area-specific factors that could simultaneously affect immigration and the level of house prices and rents, helping remove a potential source of endogeneity.[4] This is a conservative solution for achieving identification, given the state of spatial econometrics. GMM and 2SLS estimation are not easily applied in the context of a spatial Durbin model according to Pace et al. (2012) who note that the combination of correlated regressors and the SDM specification provides a challenging environment for instrumental variable techniques. In spite of these challenges, in a final specification, we employ a two-step instrumental variables procedure to more fully account for endogeneity and we follow up with corrected standard errors via bootstrapping.

The coefficient $\rho$, and associated with the spatial weight matrix, $W$, reflects inherent spatial interdependence in the data measuring the impact of rents (house prices) in a particular MSA on rents (house prices) in surrounding MSAs. The independent variable of interest is the annual inflow of immigrants into MSA m divided by the MSA's lagged population while the $X$ matrix includes all the other control variables. As noted in Saiz (2007), the parameter, $\delta_1$, associated with the immigrant population ratio, is interpreted as the percentage change in rents (house prices) corresponding to an annual inflow of immigrants equal to one percent of the city's population. In our case, $\delta_1$ and $\beta_1$ correspond to the direct effect estimates of immigration on house prices (rents) while $\delta_2$ and $\beta_2$ are the parameters for the indirect effect estimates of immigration on house prices (rents).

The spatial weight matrix, $W$, is a block diagonal matrix describing the arrangement of the spatial units (neighbors). The definition of neighbors used in the weights matrix is based on the idea of borders or adjacent areas. The weights matrix assigns weights to MSAs $m = i$ and $m = j$ based on the following criteria:

$$W_{ij} = \begin{cases} 1 & \text{if MSA } i \text{ and } j \text{ are in the same state or in states} \\ & \text{that share a border} \\ 0 & \text{otherwise} \end{cases}$$

The diagonal elements of the matrix are set to zero and row elements are standardized such that they sum to one.[5] For any year, $y \in [2002, 2012]$, $W$ is defined as

$$W = \begin{bmatrix} 0 & w_{ij}\cdots & w_{ik} \\ w_{ji} & 0 & w_{jk} \\ \vdots & \vdots & \vdots \\ w_{ki} & w_{kj}\cdots & 0 \end{bmatrix} \quad (5)$$

where $w_{ij}$ defines the functional form of the weights between any pair of host MSAs $i$ and $j$. We use maximum likelihood (MLE), the technique that has been adopted in spatial econometrics when estimating the SDM.[6]

## 4. Empirical results

Before discussing and comparing estimation results, we need to first determine the appropriate model specification that describes our data. In Section 2 of this paper, we noted that there are a variety of spatial models (SEM, SAR) but the incorporation of both into a single model (SDM) has not been commonly used to capture spatial dependence in housing studies. Elhorst (2010) provides guidelines for determining the appropriate model specification and we follow them. We employ the Lagrange Multiplier (LM) test to determine whether a non-spatial model (OLS), the spatial lag model or the spatial error model is appropriate. The LM test is based on the residuals of the OLS model.[7] If the non-spatial model is rejected in favor of the spatial lag model, the spatial error model, or in favor of both models, then the spatial model is the appropriate model to use. Table 3 presents the test results (LM classic and robust tests) for the different panel model specifications. Using the classic and robust LM tests, the hypothesis of no spatially autocorrelated error term and the hypothesis of no spatially lagged dependent variable were both rejected at the 1% significance levels (except for the rent equation with MSA and time period fixed effects, which was rejected at the 6% level). Overall these results suggest that a spatial model rather than a non-spatial model is the appropriate model to use.

We also test whether unobserved heterogeneities (spatial and time period fixed effects) are jointly significant by performing likelihood ratio (LR) tests. The test results for the hypothesis that the spatial fixed effects are not jointly significant cannot be rejected

---

[4] See Saiz (2007).

[5] The spatial weight matrix $W$ can also be column normalized. The interpretation for column and row normalized matrix is different. For row normalized weight matrix, the row gives the impact on a given unit by all other units. An element of a column normalized matrix gives the impact of a given unit on all other units.

[6] We use MATLAB code written by Paul Elhorst and James LaSage. See Elhorst's website, http://www.regroningen.nl/elhorst/software.shtml and LaSage's website www.spatial-econometrics.com/.

[7] See Matlab software for spatial panels by Elhorst (2010).

18
*A. Mussa et al. / Journal of Housing Economics 35 (2017) 13–25*

**Table 3**
Test results for choosing between spatial and non-spatial models.

| | ln rent | | | log house price | | |
|---|---|---|---|---|---|---|
| | MSA fixed effect | Time-period fixed effect | MSA and time-period fixed effect | MSA fixed effect | Time-period fixed effect | MSA and time-period fixed effect |
| LM spatial lag(classic) | 5304.443 | 156.404 | 138.530 | 5027.875 | 6882.494 | 6203.984 |
| | [0.000] | [0.000] | [0.000] | [0.000] | [0.000] | [0.000] |
| LM spatial error (classic) | 5330.378 | 146.788 | 130.442 | 8742.024 | 7616.052 | 7167.980 |
| | [0.000] | [0.000] | [0.002] | [0.000] | [0.000] | [0.000] |
| Robust LM SAR | 29.238 | 19.212 | 11.551 | 316.018 | 39.091 | 143.922 |
| | [0.000] | [0.013] | [0.001] | [0.000] | [0.000] | [0.000] |
| Robust LM SEM | 55.174 | 9.596 | 3.464 | 4030.167 | 772.650 | 1107.918 |
| | [0.000] | [0.002] | [0.063] | [0.000] | [0.000] | [0.000] |
| LR tests for the joint | | 246.713 | | | 258.831 | |
| Significance of spatial fixed effects | | [0.889] | | | [0.8353] | |
| LR tests for the joint | | 838.063 | | | 11545.834 | |
| Significance of time-period fixed effects | | [0.000] | | | [0.000] | |

*Notes*: Probability values are in square brackets; *significant at 10%; **significant at 5%; ***significant at 1%.

for both housing rent (246.7, $p > 0.01$) and house price (258.8, $p > 0.01$) estimations. To the contrary, the test results for the hypothesis that the time-period fixed effects are not jointly significant is rejected for both rent (838.1, $p < 0.01$) and house price (11545.8, $p < 0.01$) estimations. These test results seem to justify the extension of the model with only time period-fixed effects.

Since the OLS specification is rejected in favor of spatial models we proceed by estimating the SDM model. Recall that the SDM nests both the SEM and the SAR models. We determine whether or not the SDM can be simplified to one or the other (spatial lag or spatial error model) using a Wald test (Elhorst, 2010). Based on the Wald test as well as the LR test result shown at the bottom of column II of Tables 4 and 5, the spatial lag and the spatial error model were rejected in favor of the SDM. We therefore use the SDM model to describe rents and house prices.

The novelty of the SDM method is its ability to disaggregate the marginal (total) effects into direct and indirect effects as displayed in Tables 4 and 5. The first column of each specification records the direct effect – the impact of changes in determinants of rents or house prices in a particular MSA. The indirect or spillover effect, displayed in the second column of each specification, measures the impact of rent (or price) determinants in a particular MSA on rents (prices) in surrounding MSAs. The total effect is the sum of both direct and indirect effects.

*4.1. Rents*

Table 4 presents the results for the rent equation with specifications I and II displaying the SDM results prior to and after controlling for unobserved fixed heterogeneities. One might further question whether one should incorporate business cycle effects. The problem is that there are no known model specification tests that can attest to the appropriateness of their inclusion. We, nonetheless, report and discuss on a model incorporating business cycle effects as displayed in Appendix Tables B and C for the rent and house price models respectively.[8] Inspection of the business cycle estimates reveal that the main results are very similar to specifications I and II. Given, therefore, the inability to assess the appropriateness of Business Cycle specification, we simply report these results and note that they are very similar to the results obtained in specifications I and II—specifications we can formally evaluate.

The spatial coefficient, $\rho$, on ($W$*rent), displayed in the first row of Table 4, is highly significant in all specifications suggesting that our estimation strategy is appropriate. When rents in one MSA rise (fall), the rents in surrounding MSAs tend to rise (fall) as well. Turning now to the explanatory variables, the methodology splits the "total effect" into two—the "direct effect" and "indirect effect." Considering first, the direct effect in specification I, the results suggest that immigration is positively associated with housing rents at the MSA level. Specifically, the coefficient on immigration is interpreted as the percentage change in rents corresponding to an annual inflow of immigrants equal to 1% of the MSA's prior period's population. Before controlling for unobserved heterogeneities (Spatial Durbin Model I), our results suggest that rent in an MSA increased by 1.18% with an inflow of immigrants equal to 1% of the MSA's population. A similar result holds after we control for time-period fixed effects (specification II). Immigrant inflows equivalent to 1% of the MSA's population is associated with a 1.165% rise in rents. A similar result is found in the Business Cycle model displayed in Appendix Table B. These results are intuitive as they suggests that immigrant arrivals put pressure on rents as individuals need to secure places to live, positively affecting housing rents in those MSAs. Similar empirical results were obtained by Saiz (2003, 2007), and Susin (2001), who find that rents are higher in cities with increased immigration.

The indirect effect results across the different model specification (I and II and the Business Cycle model) indicate that immigrant arrivals into a particular MSA are associated with a positive spillover (indirect) effect on surrounding MSAs and the effect appears to be larger relative to the direct effect. Prior to controlling for unobserved heterogeneities, rent is found to increase by 12% with an immigration inflow of immigrants equal to 1% of the surrounding MSAs population. A more modest impact, roughly 8%, is observed when we control for time-period fixed effects as we do in model II while the business cycle model suggests a 7% rise.

Our result so far only tangentially account for endogeneity. The panel structure along with the transformed dependent variable (percent change in price/rent)) helps correct for endogeneity by sweeping away fixed unobservable variables that could be correlated with immigration and rents/home prices. However, an additional source of endogeneity could nonetheless still be present on account of reverse causality. It is logical that immigrants are driven by housing costs, for example, moving to areas that offer lower prices and rents. To further address endogeneity we use an

---

[8] In the regional business cycle specification displayed in the Appendix, we include regional effects, and the interaction of such regional effects with a dummy for the last 5 years in our sample. A quinquennial dummy separates the 2002–2007 boom period from the 2007–2012 bust period. In other words, we controlled for unobservable trends that varied across regions and in two distinct periods of time. The interaction term based on the four regions (Northeast, Midwest, West, and South), and the housing boom (2002–2007) and housing bust (2008–2012) periods are included and displayed in Appendix Tables B and C.

A. Mussa et al. / Journal of Housing Economics 35 (2017) 13–25

**Table 4**
Housing rent estimation.

Dependent variable $\Delta\ln(Rent_{mt})$

| | Spatial Durbin model I | | | Spatial Durbin fixed effects model II | | | SDM instrumental variables model III | | |
|---|---|---|---|---|---|---|---|---|---|
| | Direct effect | Indirect effect | Total effect | Direct effect | Indirect effect | Total effect | Direct effect | Indirect effect | Total effect |
| $\rho$ | 0.801*** | | | 0.412*** | | | 0.467*** | | |
| | (0.023) | | | (0.050) | | | (0.003) | | |
| Immigration $_i$/Pop $_{t-1}$ | 1.184** | 12.495* | 13.680* | 1.165** | 8.200*** | 9.364*** | 0.792*** | 1.612** | 2.404*** |
| | (0.546) | (7.216) | (7.308) | (0.536) | (2.907) | (2.897) | (0.072) | (0.777) | (0.728) |
| Murde $_{t-1}$ | 0.000 | 0.004 | 0.004 | 0.000 | 0.004* | 0.004* | 0.000*** | 0.002*** | 0.003*** |
| | (0.000) | (0.005) | (0.005) | (0.000) | (0.002) | (0.002) | (0.000) | (0.000) | (0.000) |
| ln Burglary $_{t-1}$ | 0.002 | 0.015 | 0.017 | 0.002 | -0.007 | -0.005 | -0.001*** | -0.005*** | -0.006*** |
| | (0.002) | (0.026) | (0.027) | (0.002) | (0.013) | (0.013) | (0.000) | (0.001) | (0.001) |
| Land per capita | -0.031 | -0.615 | -0.646 | -0.004 | -0.358 | -0.398 | -0.046** | -0.206*** | -0.252*** |
| | (0.083) | (0.978) | (0.992) | (0.081) | (0.358) | (0.356) | (0.002) | (0.001) | (0.010) |
| ln Income per capita | 0.003** | 0.002 | 0.004 | 0.003** | -0.001 | 0.001 | 0.001*** | -0.004*** | -0.003*** |
| | (0.001) | (0.011) | (0.011) | (0.001) | (0.008) | (0.009) | (0.000) | (0.001) | (0.001) |
| ln Permit | -0.003*** | -0.016 | -0.019 | -0.003*** | -0.010* | -0.013** | -0.002** | 0.003*** | 0.001 |
| | (0.001) | (0.012) | (0.012) | (0.001) | (0.006) | (0.006) | (0.000) | (0.001) | (0.001) |
| Unemployment $_{t-1}$ | 0.000 | -0.006* | -0.006* | 0.000 | -0.004** | -0.004** | -0.000*** | -0.000 | -0.001*** |
| | (0.001) | (0.003) | (0.003) | (0.001) | (0.002) | (0.002) | (0.000) | (0.000) | (0.000) |
| Observation | 2750 | | | 2750 | | | 2750 | | |
| Log-likelihood | 4715.537 | | | 4780.716 | | | 4831 | | |
| Time fixed effect | No | | | Yes | | | Yes | | |
| Wald test, spatial lag | | | | 14.681 [0.040] | | | 5.658 [0.580] | | |
| Wald test, spatial | | | | 16.476 [0.021] | | | 6.106 [0.5274] | | |
| LR test, spatial lag | | | | 14.792 [0.039] | | | 5.654 [0.5806] | | |
| LR test, spatial | | | | 16.644 [0.020] | | | 6.126 [0.5251] | | |

Notes: Standard errors are in parentheses. The probability values for the various tests are in square brackets. Probabilities smaller than 0.05 point to significance of Wald or LR test. The dependent variable is the annual change in the ln of rent in MSA m at time t.
* Significant at 10%.
** Significant at 5%.
*** Significant at 1%.

AR2022_500007

A. Mussa et al./Journal of Housing Economics 35 (2017) 13–25

AR2022_500008

**Table 5**
Housing price estimation.

Dependent Variable is $\Delta \log(Price_{mt})$

| | Spatial Durbin model I | | | Spatial Durbin FE model II | | | SDM instrumental variables model III | | |
|---|---|---|---|---|---|---|---|---|---|
| | Direct effect | Indirect effect | Total effect | Direct effect | Indirect effect | Total effect | Direct effect | Indirect effect | Total effect |
| $\rho$ | 0.906*** | | | 0.881*** | | | 0.877*** | | |
| | (0.012) | | | (0.015) | | | (0.003) | | |
| Immigrant$_t$/Pop$_{t-1}$ | -0.875*** | -24.470*** | -25.345*** | -0.700*** | -11.753* | -12.452** | 0.810*** | 9.594*** | 10.404*** |
| | (0.183) | (6.205) | (6.300) | (0.186) | (6.086) | (6.189) | (0.047) | (0.520) | (0.539) |
| Murder | 0.000 | 0.002 | 0.002 | 0.000 | 0.003 | 0.002 | 0.000*** | -0.001*** | -0.001*** |
| | (0.000) | (0.006) | (0.006) | (0.000) | (0.005) | (0.005) | (0.000) | (0.004) | (0.000) |
| log Burglary | -0.006*** | -0.173* | -0.180* | -0.006*** | -0.129** | -0.135** | -0.002*** | -0.046*** | -0.049*** |
| | (0.002) | (0.071) | (0.072) | (0.002) | (0.060) | (0.061) | (0.000) | (0.003) | (0.003) |
| Land per capita | 0.136*** | 0.480 | 0.617 | 0.128*** | 0.201 | 0.329 | 0.148*** | -0.265*** | -0.117*** |
| | (0.032) | (0.824) | (0.835) | (0.032) | (0.679) | (0.690) | (0.001) | (0.023) | (0.023) |
| log Income per Capita | 0.001 | 0.010 | 0.011 | 0.000 | -0.029 | -0.030 | -0.003*** | -0.151*** | -0.154*** |
| | (0.001) | (0.035) | (0.035) | (0.002) | (0.083) | (0.084) | (0.000) | (0.004) | (0.004) |
| log Permit | 0.004*** | 0.153*** | 0.157*** | 0.003*** | 0.104** | 0.107*** | 0.000 | 0.031*** | 0.031*** |
| | (0.000) | (0.024) | (0.024) | (0.001) | (0.031) | (0.032) | (0.000) | (0.001) | (0.001) |
| Unemployment | -0.001*** | 0.006* | 0.906 | -0.002*** | -0.003 | -0.005 | -0.002*** | -0.012*** | -0.014*** |
| | (0.0002) | (0.003) | (0.012) | (0.0002) | (0.003) | (0.004) | (0.000) | (0.000) | (0.000) |
| Observation | | 2820 | | | 2820 | | | 2820 | |
| Log-likelihood | | 7445.497 | | | 7433.129 | | 7447 | | |
| Time Fixed Effect | | No | | | Yes | | Yes | | |
| Wald test, spatial lag | | | | | 20.194 [0.005] | | | 17.23 [0.016] | |
| Wald test, spatial error | | | | | 20.214 [0.005] | | | 19.35 [0.007] | |
| LR test, spatial lag | | | | | 20.218 [0.005] | | | 17.11 [0.017] | |
| LR test, spatial error | | | | | 20.348 [0.005] | | | 18.93 [0.008] | |

Notes: Standard errors are in parentheses. The probability values for the various tests are in square brackets. Probabilities smaller than 0.05 point to significance of Wald or LR test. The dependent variable is the annual change in the log of housing prices in MSA $m$ at time $t$.

* Significant at 10%.
** Significant at 5%.
*** Significant at 1%.

instrumental variable approach that focuses on year to year changes in immigration inflows. As in Saiz (2007), we construct a "shift-share" prediction of the inflow of immigrants into each MSA. The prediction of immigration into MSA m at time t is based on the total number of new immigrants in the United States in year t ($immigrants_{US,t}$) multiplied by the share of all US immigrants residing in that specific MSA in 1990:

$$shift\ \widehat{share\_imm}_{mt} = \varphi_{m1990} \times immigrants_{USt} \qquad (6)$$

where $shift\ \widehat{share\_imm}_{mt}$ is the estimated number of new immigrants in metropolitan area m in year t and $\varphi_{m1990}$ is the share of all U.S. immigrants who resided in MSA m in 1990. The idea behind this variable is that immigration flows are propagated and influenced by networks. Immigrants are likely to flow to areas that already house large numbers of immigrants.

After constructing the "shift share" variable for each period and each MSA, we estimate the model with the "shift share" variable using a 2SLS procedure. However, since an appropriate estimator has not been worked out in the context of the Spatial Durbin Model, we manually employ 2SLS to obtain coefficient estimates and follow up by obtaining bootstrapped standard errors. In order to construct the immigration IV (first stage regression), we generated predictions for immigration to each MSA by estimating the following equation:

$$
\begin{aligned}
(\ln immigration\ inflow)_{mt} = &\ \alpha_0 + \alpha_1 \left( shift\ \widehat{share\_imm}_{mt} \right) \\
&+ \alpha_2 (Murder_{mt}) + \alpha_3 (lnBurglary_{mt}) \\
&+ \alpha_4 (Land\ per\ Capita_{mt}) + \alpha_5 (lnIncome\ per\ Capita_{mt}) \\
&+ \alpha_6 (lnPermit_{mt}) + \alpha_7 (unemployment_{mt}) \\
&+ time\ fixed\ effects + e_{mt}.
\end{aligned}
\qquad (7)
$$

Using the estimated coefficients from Eq. (7) along with actual values for all the explanatory variables, predicted ln(annual immigrant inflow)$_{mt}$ for all 275 MSAs in each time period is obtained. These values are transformed to immigrant$_t$/population$_{t-1}$ and incorporated into the spatial model for rent—part two of the 2-step procedure.

Appendix Table D displays the first stage coefficients along with the corrected (bootstrapped) standard errors for the first stage regression. The standard errors were obtained by generating 150 separate random samples without replacement of approximating 80% of the 275 MSAs we work with. The standard deviation of the resulting sampling distribution for each coefficient is the reported (bootstrapped) standard error in the first stage regression. Inspection of the first stage results suggest that the natural log of immigration in an MSA is positively related to the share of immigrants in that MSA in 1990, to per capita income, the issuance of building permits and to unemployment in the MSA. By contrast, murder rates, burglary activity and land area per capita are all negatively related to the natural log of immigration. All of the explanatory variables are statistically significant at conventional levels for the first step in the rent estimation.

The second step of our estimation requires that we incorporate the results of the first stage regression—predicted immigration inflows as a share of the population—into the SDM model and estimate it. The standard errors in the SDM model are also obtained via bootstrapping. That is, the SDM model (4) is estimated 150 times employing the predicted (immigrant$_t$/population$_{t-1}$) vector derived from each of the 150 iterations of (7). In this way we obtain sampling distributions for the coefficients in Eq. (4), the SDM model with which to compute appropriate standard errors.[9]

Inspection of the instrumented results, while a bit different in magnitude, are similar in "spirit" to the earlier model specifications with respect to the main explanatory variable of interest, immigration inflows. A one percent rise in immigration to an MSA is associated with a 0.8% rise in rents. The indirect effect is about doubled with a 1% increase in immigration to an MSA raising rents by 1.6% in surrounding areas. This result is somewhat more tempered than in the case of the non-instrumented models. The other explanatory variables in the IV SDM model are somewhat intuitive. With respect to the direct effects, burglary, land per capita, supply of housing (permits), and unemployment are associated with lower rents, while income is associated with higher rents. The positive coefficient on murder is not intuitive. Given that murder is a low probability event perhaps this is reflective of a "peso problem" in the case of housing markets with respect to some forms of crime.[10]

Overall, we have found that inflows of immigrants into a particular MSA are not only associated with increasing rents in that MSA, but also rents in surrounding MSAs. Also of note is that the size of the immigration coefficients is quite different in magnitude with the spillover (indirect) effects appearing to be much larger. These are interesting patterns that beg an explanation. Before further discussing these results in context, we examine the house price market to see whether similar patterns are observed.

### 4.2. House prices

The empirical results for the housing price equations are displayed in Table 5. Similar to rent, the spatial coefficient, $\rho$, on W*rent, is highly significant suggesting that house prices in one MSA are positively affected by prices in surrounding MSAs and corroborates the choice of a spatial model. Inspection of the main co-variate of interest (immigration as a share of the MSA's population) across models reveals that, unlike in the case for rents, the results of the non-IV and IV models do not coincide in spirit.[11] While immigration is associated with increases in prices in the IV model, they are associated with decreases in prices in the non-IV specification. The difference in results in the case of IV and non-IV specifications, underscores the need to account for endogeneity. The differential results may be the result of coefficient bias introduced on account of the use of an endogenous regressor in models I, II, and in the Business Cycle model. For this reason we center the remaining discussion on the instrumented results. According to specification III, immigration inflows have a direct effect elasticity of 0.8. This implies that housing prices in a particular MSA increase by about 0.8% following an inflow of immigrants equal to 1% of the MSA's population. This result is in keeping with rents which saw a similar increase. As in the rent model, the indirect or spillover effect is larger than the direct effect. But the magnitude of the difference is much larger. An increase in immigration inflows equivalent to 1% of an MSA's population increases house prices in

---

[9] While we obtain corrected standard errors for the coefficients in the IV-SDM model, we cannot assess the probability value for the Wald and LR tests. The prob-

ability values reported under specification III are not corrected and cannot properly interpret the fit of the model.

[10] The "peso problem" refers to the idea that low probability events might not be properly reflected in the price of an asset (Sill, 2000).

[11] A procedure, comparable to that used in the rent estimation, was used to obtain an instrument for immigration in the case of the house prices and subsequently estimate the spatial model for house prices. However given the slightly different availability of data for house price and rent series, (the house price series is available for 282 MSAs while the house rent series for 275 MSAs) the house price first stage estimation required a new set of 150 replications for immigration inflows in order to obtain appropriate standard errors. The far right two columns of Appendix Table D display the coefficient values along with the corrected standard errors. The coefficient values for price are similar in sign though with somewhat different values. As with the rent sample, all the coefficients are significant, with the exception of burglary, which does not seem to be associated with immigration flows in the house first stage regression.

22    A. Mussa et al./Journal of Housing Economics 35 (2017) 13–25

**Table 6**
Native, immigrant estimation—spatial model.

| | Dependent variable Δlog(natives_mt) | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Time fixed effect | | | Spatial and time fixed effect | | |
| | Direct effect | Indirect effect | Total effect | Direct effect | Indirect effect | Total effect |
| $\rho$ | 0.127* | | | 0.124* | | |
| | (0.066) | | | (0.066) | | |
| log Immigration $_{t-1}$ | −0.053*** | 0.075*** | 0.020* | −0.053*** | 0.081*** | 0.028* |
| | (0.005) | (0.018) | (0.018) | (0.005) | (0.017) | (0.018) |
| log Income per capita | 0.023 | 0.035 | 0.058 | 0.028 | 0.168 | 0.196** |
| | (0.028) | (0.102) | (0.013) | (0.028) | (0.100) | (0.096) |
| Murder | 0.000 | −0.003* | −0.002 | 0.000 | −0.002* | −0.001 |
| | (0.000) | (0.001) | (0.002) | (0.000) | (0.002) | (0.002) |
| log Burglary | −0.002 | 0.020 | 0.018 | −0.002 | 0.019 | 0.017 |
| | (0.006) | (0.021) | (0.019) | (0.006) | (0.028) | (0.029) |
| Unemployment $_{t-2}$ | −0.001* | 0.001 | −0.000 | −0.001* | 0.003* | −0.002 |
| | (0.001) | (0.002) | (0.002) | (0.001) | (0.002) | (0.001) |
| Population Density | −0.044*** | 0.064 | 0.021 | −0.043*** | 0.090* | 0.047 |
| | (0.007) | (0.047) | (0.780) | (0.007) | (0.049) | (0.049) |
| Observation | | 2730 | | | 2730 | |
| Log-likelihood | | 6343.92 | | | 6360.196 | |
| Wald test, spatial lag | | 63.377 [0.000] | | | 33.973 [0.000] | |
| Wald test, spatial | | 44.653 [0.000] | | | 27.127 [0.000] | |
| LR test, spatial lag | | 68.879 [0.000] | | | 37.969 [0.000] | |
| LR test, spatial | | 55.551 [0.000] | | | 34.392 [0.000] | |

*Notes*: Standard errors are in parentheses. The probability values for the various tests are in square brackets. Probabilities smaller than 0.05 point to significance of Wald or LR test.
* Significant at 10%.
** Significant at 5%.
*** Significant at 1%.

surrounding areas by close to 10%, quite a bit more in comparison to the rental market.

### 4.3. Explanation for larger indirect effect

The estimates are suggesting that the indirect effect of immigration on rents and house prices is much larger than the direct effect. There are a number of plausible explanations for the large spillover. A strong network effect may operate. When immigrants settle in a particular MSA, they may draw additional immigrant relatives and friends to settle in surrounding MSAs in order to be close by and as such may explain the larger indirect effect. An alternative mechanism that could be at play is that immigrants moving to one MSA "push out" older residents. Perhaps this is a manifestation of distrust of immigrant neighbors. Frey (1995), found that immigration plays an important role in the re-distribution patterns of the U.S. population by influencing internal migration which is selective on race and socio-economic status. Using 1990 Census data, Frey argues that natives, especially whites, move-out from high-immigration areas. Similarly, Borjas (2006) used census data from the 1960–2000 decennial censuses to examine the impact of immigration on internal migration behavior of native-born workers. His result shows that "for every ten immigrants who enter a particular MSA, between three and six natives will choose not to live in that locality."(p. 255).

Following Frey (1995) and Borjas (2006), we explore the "native out-migration" channel to see whether immigrants moving to one MSA displace or "push out" older residents. If so, we can argue that finding a larger indirect effect over the direct effect is consistent with a displacement explanation. The native out-migration channel is considered by estimating the following SDM equation:[12]

$$\Delta\log(Native_{mt}) = \rho W \ln(Native_{mt}) + \log Immig_{m\ t-1}.\delta_1 + X_{mt}\beta_1 + W \log Immig_{m\ t-1}.\delta_2 + WX_{mt}\beta_2 + \Delta\mu_{mt} \quad (8)$$

The dependent variable is the change in the log of native population in MSA m at time $t$, while the main independent variable is the log of immigrants. In addition to the immigration variable, we also controlled for GDP per capita, the unemployment rate, murder rates, burglary rates and population density. Population density is defined as the ratio of the number of people in MSA m divided by the land area of the MSA.

Table 6 provides the result of the native, immigrant estimation. In Specification I we controlled for MSA fixed effect while in specification II, we controlled for both MSA and time fixed effects. The negative direct effect in conjunction with the positive indirect effect is consistent with the notion that inflows of immigrants cause native-flight. While the negative direct effect indicates that inflow of immigrants in a particular MSA reduces the number of natives residing in that area the positive indirect effect shows an increase in the number of natives in surrounding MSAs. A 1% increase in immigration inflows is associated with a 0.05% fall in the growth rate of the native population. The indirect effect coefficient value is positive and a tad higher at 0.08. This implies that the same 1% rise in immigration inflows into an MSA is associated with a 0.08% increase in native population growth in the surrounding MSAs. If natives are moving from larger population areas to smaller population areas, the larger indirect effect is plausible. Native-flight might lie behind one of our main findings, a stronger indirect effect relative to direct effect estimate of immigration on rents and house prices.

## 5. Conclusions and discussion

Using data that span from 2002–2012, we find, as have others, that immigration inflows are associated with rising rents and prices. In our final specification, where we employ IV techniques

---

[12] Rather than estimating separate "native out-migration" equations for rent and house price samples, we estimate one equation by using all the MSAs that are in both rent and price equations. The MSA overlap is almost complete with only nine MSAs in the rent sample not included in the house price sample and two MSAs in house price sample that are not in housing rent sample. In total the equation we estimate contains 273 MSAs.

to account for potential endogeneity, we find that a rise in immigration inflows, equivalent to one percent of an MSA's population, is associated with an approximate eight-tenths of a percent rise in rents. More importantly, the SDM methodology that we employ shows, in addition, that the rent effects of immigrant inflows into one MSA spillover to neighboring MSAs. Immigrant inflows equivalent to one percentage point of an MSA's population are associated with a 1.6% increase in rents in surrounding MSAs. A similar pattern is found in house prices. The same increase in immigrant inflows appears to drive house prices up by 0.8%. However, in the case of house prices the spillover is much larger, leading to a 9.6% increase in home prices in the surrounding MSAs.

Furthermore, we find that immigrant inflow into an MSA seem to be driving natives out and into surrounding MSAs. Hence our findings are suggestive of increase in rents and prices in surrounding areas as being driven by native population movements in response to immigrant inflows. Immigration appears to induce native-flight, possibly explaining the pattern in rents and prices that we observe across geography.

We find it curious that while the direct effects of immigration on rents and house prices in an MSA are similar in magnitude, the spillover effects in the house price market are so much larger. A rise in immigration inflows, equivalent to one percentage point of an MSA's population, raises rents in neighboring MSAs by 1.8% while house prices rise by 9.6%. What might be driving the larger spillover effect in the house price market relative to the rental market? A number of reasons could explain the differential spillovers. One possibility is that the immigration inflows that lead to native flight result not only in natives moving into rental housing in neighboring MSAs, but also a good percentage of those switching into the house market from the rental market. Native flight might provide an opportune time for those leaving a rental unit in an immigrant receiving area to switch from being a renter to a homeowner. Those higher demand pressures in the housing market might explain the larger indirect impacts for house prices relative to rentals. Overall, these results point to complex dynamics in housing markets following immigration.

## Appendix

**Table B**
Spatial Durbin business cycle model for rent.

| | Dependent variable $\Delta\ln(Rent_{mt})$ | | |
| | Direct effect | Indirect effect | Total effect |
| --- | --- | --- | --- |
| $P$ | 0.412*** | | |
| | (0.052) | | |
| Immigrant $_t$ /Pop $_{t-1}$ | 1.108** | 7.261** | 8.369** |
| | (0.556) | (3.401) | (3.431) |
| Murder | 0.000 | 0.004 | 7.261** |
| | (0.000) | (0.003) | (3.401) |
| ln Burglary | 0.001 | −0.019 | 0.004 |
| | (0.002) | (0.018) | (0.003) |
| Land per capita | −0.048 | −0.336 | −0.019 |
| | (0.080) | (0.595) | (0.018) |
| ln Income per capita | 0.003*** | 0.007 | −0.336 |
| | (0.001) | (0.012) | (0.595) |
| ln Permit | −0.003*** | −0.014* | 0.007 |
| | (0.001) | (0.007) | (0.012) |
| Unemployment | 0.000 | −0.003 | −0.014* |
| | (0.001) | (0.003) | (0.007) |
| Northeast | 0.003 | −0.014 | −0.010 |
| | (0.010) | (0.019) | (0.017) |
| Midwest | 0.001 | 0.010 | −0.009 |
| | (0.007) | (0.014) | (0.014) |
| West | −0.001 | −0.003 | −0.004 |
| | (0.007) | (0.016) | (0.014) |
| Northeast*Bust | −0.002 | −0.002 | −0.004 |
| | (0.005) | (0.016) | (0.012) |
| Midwest *Bust | −0.012 | 0.004 | −0.008 |
| | (0.013) | (0.019) | (0.012) |
| West*Bust | 0.008 | 0.001 | 0.009 |
| | (0.012) | (0.016) | (0.010) |
| Observations | 2750 | | |
| Log-likelihood | 4786.735 | | |
| Time fixed effect | Yes | | |
| Wald test, spatial lag | 11.387 [0.578] | | |
| Wald test, spatial error | 12.635 [0.476] | | |
| LR test, spatial lag | 11.287 [0.587] | | |
| LR test, spatial error | 12.721 [0.470] | | |

*Notes:* Standard errors are in parentheses. The probability values for the various tests are in square brackets. Probabilities smaller than 0.05 point to significance of Wald or LR test. Bust is a dummy variable equaling 0 from 2003–2007 and 1 from 2008–2012.
* Significant at 10%.
** Significant at 5%.
*** Significant at 1%.

**Table A**
Variable definitions and data source.

| Variable | Description | Source |
| --- | --- | --- |
| Housing rent | Fair market rent corresponds to the price of a vacant 0 bedroom to 4 bedroom rental units | Department of Housing and Urban Development (HUD) http://www.huduser.org/portal/datasets/50per.html |
| House price index (HPI) | The HPI is a broad measure of the movement of single-family house prices | Federal Housing Finance Agency http://www.fhfa.gov/DataTools/Downloads/Pages/House-Price-Index-Datasets.aspx#qpo |
| Immigration | Number of immigrants admitted to the United States by MSA | Department of Homeland Security http://www.dhs.gov/yearbook-immigration-statistics |
| Personal income per capita | Personal income is the income received by all persons from all sources | Bureau of Economic Analysis (BEA) http://www.bea.gov/regional/ |
| Population | Population estimate by MSA | U.S. Census https://www.census.gov/popest/data/historical/2000s/vintage_2008/metro.html |
| Burglary rate | Rates are the number of reported burglary offenses per 100,000 population | FBI Uniform Crime Report http://www.fbi.gov/about-us/cjis/ucr/ucr-publications#Crime |
| Murder rate | Rates are the number of reported murder offenses per 100,000 population | FBI Uniform Crime Report http://www.fbi.gov/about-us/cjis/ucr/ucr-publications#Crime |
| Unemployment | Civilian unemployed as percent of total civilian labor force | Bureau of Labor Statistics http://www.bls.gov/lau/ |
| Housing permit | Number of new privately owned housing units authorized by each MSA | U.S. Census https://www.census.gov/construction/bps/historical_data/index.html |
| Land | Land area in square miles | U.S. Census http://www.census.gov/population/metro/data/pop_data.html |
| Land density | MSA's land area in square miles divided by total population of MSA | Constructed by the authors |
| Shift share to construct immigrant IV | (Foreign-born population in 1990 census in the MSA)/Total foreign born population in the U.S. in 1990 | Obtained from the 1990 U.S. Census 5% IPUMS sample: https://usa.ipums.org. Steven Ruggles et al. (2010) |

*A. Mussa et al. / Journal of Housing Economics 35 (2017) 13–25*

**Table C**
Spatial Durbin business cycle model for house price.

|  | Dependent variable $\Delta\log(Price_{mt})$ | | |
|---|---|---|---|
|  | Direct effect | Indirect effect | Total effect |
| $\rho$ | 0.874*** | | |
|  | (0.015) | | |
| Immigrant $_t$/Pop $_{t-1}$ | −0.787*** | −15.267** | −16.055*** |
|  | (0.192) | (5.940) | (6.054) |
| Murder | 0.000 | −0.001 | −0.001 |
|  | (0.000) | (0.004) | (0.005) |
| log Burglary | −0.004 | −0.056 | −0.060 |
|  | (0.003) | (0.079) | (0.081) |
| Land per capita | 0.137*** | 0.567 | 0.704 |
|  | (0.042) | (1.281) | (1.309) |
| log Income per capita | 0.001 | 0.002 | 0.003 |
|  | (0.002) | (0.091) | (0.093) |
| log Permit | 0.003*** | 0.098*** | 0.101*** |
|  | (0.001) | (0.032) | (0.032) |
| Unemployment | −0.001*** | 0.001 | −0.001 |
|  | (0.000) | (0.005) | (0.005) |
| Northeast | 0.006 | 0.036* | 0.041** |
|  | (0.004) | (0.018) | (0.017) |
| Midwest | 0.000 | 0.037 | 0.037 |
|  | (0.002) | (0.032) | (0.033) |
| West | 0.000 | 0.015 | 0.017 |
|  | (0.003) | (0.026) | (0.026) |
| Northeast*Bust | 0.004 | −0.061*** | −0.056*** |
|  | (0.005) | (0.021) | (0.021) |
| Midwest*Bust | −0.002 | −0.071*** | −0.073*** |
|  | (0.003) | (0.021) | (0.021) |
| West*Bust | 0.003 | −0.053*** | −0.050*** |
|  | (0.004) | (0.016) | (0.015) |
| Observations | 2820 | | |
| Log-likelihood | 7459.956 | | |
| Time fixed effect | Yes | | |
| Wald test, spatial lag | 36.004 [0.000] | | |
| Wald test, spatial error | 36.663 [0.000] | | |
| LR test, spatial lag | 35.815 [0.000] | | |
| LR test, spatial error | 37.497 [0.000] | | |

*Notes:* Standard errors are in parentheses. The probability values for the various tests are in square brackets. Probabilities smaller than 0.05 point to significance of Wald or LR test. Bust is a dummy variable equaling 0 from 2003–2007 and 1 from 2008–2012.
  \* Significant at 10%.
  \*\* Significant at 5%.
  \*\*\* Significant at 1%.

**Table D**
First stage regression for immigration inflows IV.

| Immigration IV for rent estimate | | | Immigration IV for price equation | | |
|---|---|---|---|---|---|
|  | Coefficient | Bootstrapped SE |  | Coefficient | Bootstrapped SE |
| ln(share1990) | 0.37*** | 0.027 | log(share1990) | 0.663*** | 0.016 |
| Murder | −0.015*** | 0.006 | murder | −0.005*** | 0.002 |
| ln(burglary) | −0.188*** | 0.070 | log(burglary) | −0.049 | 0.052 |
| Land per capita | −29.33*** | 4.163 | Land per capita | −7.97*** | 1.852 |
| ln(percapita Y) | 0.783*** | 0.050 | log(percapita Y) | 0.415*** | 0.030 |
| ln(permit) | 0.665*** | 0.025 | log(permit) | 0.372*** | 0.017 |
| unemployment | 0.111*** | 0.011 | unemployment | 0.010*** | 0.004 |
| Observations | 1812 | | | 2321 | |
| R-squared | 0.827 | | | 0.899 | |

*Notes:* Year effects incorporated but not shown. Coefficient values obtained from a first-stage regression with corrected standard errors derived from 150 replications. See text for details.

## References

Accetturo, A., Manaresi, F., Mocetti, S., Olivieri, E., 2014. Don't stand so close to me: the urban impact of immigration. Reg. Sci. Urban Econ. 45, 45–56.

Akbari, A.H., Aydede, Y., 2012. Effects of immigration on house prices in Canada. Appl. Econ. 44 (13), 1645–1658.

Altonji, J.G., Card, D., 1991. The effects of immigration on the labor market outcomes of less-skilled natives. In: Abowd, J.M., Freeman, R.B. (Eds.), Immigration, Trade and Labor. University of Chicago Press, pp. 201–234.

Basu, S., Thibodeau, T.G., 1998. Analysis of spatial autocorrelation in house prices. J. Real Estate Finance Econ. 17 (1), 61–85.

Borjas, G.J., 2003. The labor demand curve is downward sloping: reexamining the impact of immigration on the labor market. Q. J. Econ. 118 (4), 1335–1374.

Borjas, G.J., 2006. Native internal migration and the labor market impact of immigration. J. Human Resour. 41 (2), 221–258.

Borjas, G.J., Katz, L.F., 2007. The evolution of the Mexican-born workforce in the United States. In: Borjas, G. (Ed.), Mexican Immigration to the United States. National Bureau of Economic Research Conference Report, Cambridge, MA.

Cohen, J.P., Coughlin, C.C., 2008. Spatial hedonic models of airport noise, proximity and housing prices. J. Reg. Sci. 48 (5), 859–878.

DeSilva, S., Pham, A., Smith, M., 2012. Racial and ethnic price differentials in a small urban housing market. Housing Policy Debate 22 (2), 241–269.

AR2022_500012

*A. Mussa et al./Journal of Housing Economics 35 (2017) 13–25*                                       25

Elhorst, J.P., 2010. Matlab software for spatial panels. In: Paper presented at the IVth World Conference of the Spatial Econometrics Association (SEA). Chicago.

Elhorst, J.P., 2014. Spatial Econometrics: From Cross-Sectional Data to Spatial Panels. Springer, Berlin, New York, Dordrecht, London.

Fernández-Avilés, G., Minguez, R., Montero, J.-M., 2012. Geostatistical air pollution indexes in spatial hedonic models: the case of Madrid, Spain. J. Real Estate Res. 34 (2), 243–274.

Frey, W.H., 1995. Immigration and internal migration 'flight' from US metropolitan areas: toward a new demographic balkanisation. Urban Studies 32 (4–5), 733–757.

Gibbons, S., Overman, H.G., 2012. Mostly pointless spatial econometrics. J. *Reg. Sci.* 52 (2), 172–191.

Gonzalez, L., Ortega, F., 2013. Immigration and housing booms: evidence from Spain. J. Reg. Sci. 5 (1), 37–59.

LeSage, J.P., Pace, R.K., 2009. Introduction to Spatial Econometrics. CRC Press Taylor and Francis Group, Boca Raton, U.S.

National Research Council, 1997. The New Americans: Economic, Demographic and Fiscal Effects of Immigration. National Academy Press, Washington.

Osland, L., Thorsen, I., 2013. Spatial impacts, local labour market characteristics and housing prices. Urban Studies 50 (10), 2063–2083.

Ottaviano, G. I.P. and Peri, G. 2007. "The effects of immigration on U.S. wages and rents: a general equilibrium approach," CReAM *Discussion Paper* 13/07, Center for Research and Analysis of Migration.

Ottaviano, G.I.P., Peri, G., 2012. Rethinking the effects of immigration on wages. J. Eur. Econ. Assoc. 10 (1), 152–197.

Pace, R.K., LeSage, J.P., Zhu, S., 2012. Spatial dependence in regressors and its effect on performance of likelihood-based and instrumental variable estimators. In: Terrell, D., Millimet, D. (Eds.). In: 30th Anniversary Edition (Advances in Econometrics), 30. Emerald Group Publishing Limited, pp. 257–295.

Sill, K. 2000. "Understanding asset values: stock prices, exchange rates and the "peso problem." Business Review, Federal Reserve Bank of Philadephia, September/October 2000, pp. 3–13.

Ruggles, S., Alexander, J.T., Genadek, K., Goeken, R., Schroeder, M.B., Sobek, M., 2010. Integrated Public Use Microdata Series: Version 5.0. University of Minnesota, Minneapolis [Machine-readable database].

Sá, F., 2015. Immigration and house prices in the UK. Econ. J. 125 (587), 1393–1424.

Saiz, A., 2003. Room in the kitchen for the melting pot: immigration and rental prices. Rev. Econ. Stat. 85 (3), 502–521.

Saiz, A., 2007. Immigration and housing rents in American cities. J. Urban Econ. 61 (2), 345–371.

Saiz, A., Wachter, S., 2011. Immigration and the neighborhood. Am. Econ. J. Econ. Policy 3 (2), 169–188.

Susin, S. 2001. "The Impact of the Mariel Boatlift on the Miami Housing Market," Washington DC: U.S. Bureau of the Census.

Trevelyan, E.N., Acosta, Y.D., De La Cruz, P., 2013. Homeownership among the foreign-born population: 2011. Census Bureau. U.S. Department of Commerce.

AR2022_500013

# THE YALE LAW JOURNAL

ADAM B. COX & CRISTINA M. RODRÍGUEZ

## The President and Immigration Law Redux

**ABSTRACT.** In November 2014, President Obama announced his intention to dramatically reshape immigration law through administrative channels. Together with relief policies announced in 2012, his initiatives would shield nearly half the population of unauthorized immigrants from removal and enable them to work in the United States. These events have drawn renewed attention to the President's power to shape immigration law. They also have reignited a longstanding controversy about whether constitutional limits exist on a central source of executive authority: the power to enforce the law.

In using the Obama relief policies to explore these dynamics, we make two central claims. First, it is futile to try to constrain the enforcement power by tying it to a search for congressional enforcement priorities. Congress has no discernible priorities when it comes to a very wide swath of enforcement activity—a reality especially true for immigration law today. The immigration code has evolved over time into a highly reticulated statute through the work of numerous Congresses and political coalitions. The modern structure of immigration law also effectively delegates vast screening authority to the President. Interlocking historical, political, and legislative developments have opened a tremendous gap between the law on the books and the law on the ground. Under these conditions, there can be no meaningful search for congressionally preferred screening criteria. Far from reflecting a faithful-agent framework, then, immigration enforcement more closely resembles a two-principals model of policymaking—one in which the Executive can and should help construct the domain of regulation through its independent judgments about how and when to enforce the law.

Second, when exploring limits on the enforcement power, we should focus not on *who* benefits from enforcement discretion but on *how* the Executive institutionalizes its discretion. The Obama relief initiatives are innovative: they bind the exercise of prosecutorial discretion to a more rule-like decision-making process, constrain the judgments of line-level officials by subjecting them to centralized supervision, and render the exercise of enforcement discretion far more transparent to the public than is customary. These efforts to better organize the enforcement bureaucracy ultimately advance core rule-of-law values without undermining deterrence or legal compliance, as some critics have worried. Moreover, while our focus on discretion's institutionalization requires contextualized judgments that may rarely translate into clear doctrinal rules to govern the enforcement power, we believe it is generally unnecessary and unwise to use constitutional law to limit the President's authority over how to organize the enforcement bureaucracy.

AR2022_500014



**AUTHORS.** Adam B. Cox is the Robert A. Kindler Professor of Law, NYU School of Law. Cristina M. Rodríguez is the Leighton Homer Surbeck Professor of Law, Yale Law School. For their sharp insights and generous comments, many thanks to Muneer Ahmad, Rachel Barkow, Ming Hsu Chen, John Ferejohn, Jamal Greene, Rick Hills, Dan Ho, Lewis Kornhauser, Marty Lederman, Steve Legomsky, Ethan Leib, Daryl Levinson, Dave Martin, Nick Parrillo, Dave Pozen, Daphna Renan, Judith Resnik, Ricky Revesz, Shalev Roisman, Adam Samaha, Peter Schuck, David Sklansky, David Strauss, Peter Strauss, and participants in the faculty workshops at NYU, Berkeley, and Stanford Law Schools, the legal theory workshop at Columbia Law School, and the Law, Economics, and Politics Workshop at NYU. We are immensely grateful for the outstanding research support of Meg Braun, Olivia Gibbons, Kate Huddleston, Katie Kavanagh, Beezly Kiernan, Gabe Panek, and Susan Smelcer. Adam Cox thanks the Filomen D'Agostino and Max E. Greenberg Research Fund, and Cristina Rodríguez thanks the Oscar M. Ruebhausen Fund at Yale Law School, for generous support of their research.

AR2022_500015



**ARTICLE CONTENTS**

INTRODUCTION                                                                              107

I.   A BRIEF HISTORY OF PRESIDENTIAL IMMIGRATION LAW                                      113

    A.  From Delegation to Unilateralism                                                115
    B.  Policymaking Through (Under)Enforcement                                         124
    C.  The Rise of De Facto Delegation                                                 130
    D.  Centralizing Enforcement Within the Executive                                  135

II.  THE SUBSTANTIVE GROUNDS OF ENFORCEMENT DISCRETION                                    142

    A.  Congressional Priorities and Faithful Agents                                   146
    B.  The Limits of Congressional Intent                                              151
    C.  The Two-Principals Model of Immigration Policymaking                            159
        1.  Executive Construction of Enforcement Domains                    161
        2.  Against Faithful Agents                                          165

III. THE INSTITUTIONALIZATION OF ENFORCEMENT DISCRETION                                   174

    A.  Rules and Standards                                                             176
    B.  Supervision (Not Separation) of Powers                                          183
        1.  Institutional Design                                             184
        2.  Constitutionalized Decentralization                             195
    C.  Transparency and the Rule of Law                                                197
        1.  The Logic of Deterrence                                          198
        2.  Underenforcement and Ex Post Screening                           201
    D.  Benefits Versus Penalties                                                       205

IV.  WHITHER LIMITING PRINCIPLES?                                                         208

    A.  Current Constraining Principles                                                 210
    B.  Future Discipline                                                               214
        1.  Meta: The Process of Institutionalization                        215
        2.  Prosecutorial Discretion in a Second-Best Regulatory Environment 219

CONCLUSION                                                                                223

AR2022_500016

THE PRESIDENT AND IMMIGRATION LAW REDUX

## INTRODUCTION

On November 20, 2014, President Obama announced sweeping executive reforms of immigration law.[1] The centerpiece of his announcement was an initiative designed to provide a measure of security to millions of unauthorized immigrants. Under it, executive branch officials would exercise discretion to defer the deportation of unauthorized immigrants who have lived for years in the United States and have U.S. citizen (or green-card holding) children. Parents who received this "deferred action" also would be eligible to receive work permits. As many as 3.6 million noncitizens may be eligible for relief under the program—a number that jumps to more than five million when the program for parents is combined with an earlier-announced initiative for unauthorized immigrants who arrived in the United States as children.[2] Together, President Obama's efforts could protect nearly fifty percent of today's unauthorized immigrant population.[3]

The President's decision to defer the deportation of millions of immigrants sparked sharp debate among scholars and political figures about his authority to create such a large-scale relief program. The Administration provided an unusually meaty framework for the debate by releasing an opinion, prepared by the Office of Legal Counsel (OLC) in the Department of Justice, concluding that the initiative was well within the Administration's statutory and

---

[1]. *See* President Barack Obama, Remarks by the President in Address to the Nation on Immigration (Nov. 20, 2014), http://www.whitehouse.gov/the-press-office/2014/11/20/remarks-president-address-nation-immigration [http://perma.cc/LHK7-DZE4]. The President's address was accompanied by, and implemented through, a series of memoranda issued by U.S. Secretary of Homeland Security Jeh Johnson. *See Fixing Our Broken Immigration System Through Executive Action – Key Facts*, U.S. DEP'T OF HOMELAND SECURITY (Aug. 19, 2015), http://www.dhs.gov/immigration-action [http://perma.cc/U5K8-RE3R] (displaying the list of memos).

[2]. *See National and State Estimates of Populations Eligible for DACA and DAPA Programs, 2009-2013*, MIGRATION POL'Y INST. (2015), http://www.migrationpolicy.org/sites/default/files/datahub/DACA-DAPA-2013State%20Estimates-Spreadsheet-FINAL.xlsx [http://perma.cc/RE76-2TBJ].

[3]. For a detailed account of the President's initiatives, see *infra* notes 102-111 and accompanying text. In addition to the deferred action policies, the Department of Homeland Security (DHS) also announced a shift in enforcement priorities more generally. One study estimates that this shift, if "strictly implemented," coupled with the deferred action programs, could result in eighty-seven percent of unauthorized immigrants in the United States receiving some form of protection or relief from removal. Marc R. Rosenblum, *Understanding the Potential Impact of Executive Action on Immigration Enforcement*, MIGRATION POL'Y INST. 2 (July 2015), http://migrationpolicy.org/research/understanding-potential-impact-executive-action-immigration-enforcement [http://perma.cc/Y2YS-SRQ8].

AR2022_500017

THE YALE LAW JOURNAL                                      125:104   2015

constitutional authorities.[4] Critics disagreed with OLC's conclusion, decrying President Obama's actions as not just unwise but unconstitutional—the latest installment in the rise of an imperial presidency.[5] The debate quickly made its way to the federal courts, as nearly two dozen states challenged the relief programs in a lawsuit that, as of this writing, remains pending and has resulted in the temporary injunction of the President's initiatives.[6]

These events have drawn renewed attention to the President's power to shape the substance of immigration law through the exercise of his enforcement power. They have also reignited the longstanding controversy over whether any limits exist on this central source of executive authority. Both of these issues were at the heart of our previous work, *The President and Immigration Law*.[7] Published in these pages six years ago, that article provided a historical account of the distribution of immigration lawmaking authority between the President and Congress. Our core claim in that piece was that a series of twentieth-century developments—constitutional, historical, and institutional—had, as a functional matter, given the President tremendous power over the immigrant-screening system: power to determine which immigrants would be permitted to remain in the United States, and which would be forced to leave.[8] We labeled this constellation of developments "de facto delegation" and argued that it constituted one of the most important features of modern American immigration law.

---

4. *See infra* Part II.A.

5. *See infra* Parts II.B, III.B.

6. *See infra* notes 109, 117, 310-311 and accompanying text.

7. Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 YALE L.J. 458 (2009).

8. In *The President and Immigration Law*, we identified three models that have defined the nature of executive power in immigration law. Each of these models finds some foundation in Supreme Court case law, but because the Court's opinions generally have been concerned with defining federal power writ large, they abstract from the institutional details of the separation of powers. *See id.* at 460-83. We therefore turned to historical practice to understand interbranch relations in immigration law and found that the President has derived considerable policymaking authority from three sources: (1) inherent power; (2) express delegation; and (3) de facto delegation. *Id.* at 483-519. With the rise of the modern administrative state, the inherent authority model has receded into history. Yet it was not supplanted by a widespread practice of express congressional delegations as has been true in some other regulatory areas (though, to be sure, formal delegations in limited areas of immigration law have also given presidents avenues to advance their own policy objectives in a unilateral fashion). Instead, a more complex phenomenon that we labeled "de facto delegation" has enabled the President to set immigrant-screening policy through enforcement judgments. For elaboration on the meaning of de facto delegation, see *id.* at 510-19; and *infra* Part I.

AR2022_500018

THE PRESIDENT AND IMMIGRATION LAW REDUX

Developments since we last wrote, culminating in President Obama's recent announcement, have both confirmed our earlier account and raised important new questions. While our previous work was mostly descriptive and historical, intervening developments have sharpened the legal and theoretical separation of powers questions raised by our argument. Moreover, whereas in 2009 we chiefly addressed the allocation of power *between* the branches in immigration law, the passage of time has highlighted the importance of power allocations *within* the Executive Branch for understanding the on-the-ground practice of presidential immigration law. Thus, this Article seeks to move beyond our earlier arguments in two ways—by squarely confronting the legal and normative questions about the President's power over immigration policy, and by carefully unpacking the "unitary" Executive to develop better purchase on these questions and on our earlier descriptive account of the President and immigration law.

This Article makes two central claims about the relationship between enforcement discretion and the separation of powers, both in immigration law and more generally. The first concerns the *substantive limits* on enforcement discretion: what (if anything) constrains executive branch choices about which immigrants will be protected through the exercise of enforcement discretion? The second concerns the *institutionalization* of that discretion: what (if anything) constrains executive branch choices about how to institutionalize the exercise of enforcement discretion within the bureaucracy? While we address these questions by focusing on the Obama relief initiatives, the questions themselves implicate broader separation of powers debates and will remain pressing even if opponents of the President's relief initiatives emerge victorious in the pending federal litigation.[9]

With respect to our first argument, we show that efforts to constrain the President's enforcement authority with reference to "congressional enforcement priorities"—an approach taken by both defenders and critics of the President—are doomed to fail.[10] We recognize the appeal of this approach. By tying the exercise of enforcement discretion to inferences about congressional intent drawn directly from immigration statutes, the Administration can claim to be acting as Congress's faithful agent, following the principal's wishes rather than making policy unmoored from the dictates of

---

**9.**   We discuss our views as to the likely outcome of this litigation *infra* Parts II, IV and *infra* notes 119-120, 310 and accompanying text.

**10.**   For use by supporters, see Memorandum from the Office of Legal Counsel to the Sec'y of Homeland Sec. and the Counsel to the President 10 (Nov. 19, 2014), http://www.justice.gov /sites/default/files/olc/opinions/attachments/2014/11/20/2014-11-19-auth-prioritize-removal .pdf [http://perma.cc/85Y5-N94M] [hereinafter OLC Memorandum Op.]. For use by critics, see *infra* notes 152-157 and accompanying text.

AR2022_500019

immigration law's elaborate statutory scheme. On this account, Congress makes the tough value judgments, not the President. He or she simply extracts those underlying value judgments from the statute through sophisticated legal analysis. The approach also provides a seemingly clear limiting principle to prevent the enforcement power from devolving into dispensation of the law—something that supporters of large-scale administrative relief had failed to provide until OLC shifted the tenor of the debate.

The trouble is that this faithful-agent model obscures the role that enforcement discretion plays in our modern system of separated powers. Even outside the immigration context, it would be passing strange to argue that the myriad discretionary decisions made by law enforcement officials should always be motivated and constrained *solely* or even primarily by the value judgments those officials can trace to a code enacted by Congress. Moreover, this model is especially limited as an account of immigration law. Our historical account of separation of powers in this domain highlights the ubiquity of presidents exercising discretionary immigration authority in ways that cannot be characterized as consistent with clearly identifiable congressional priorities.[11] That history has combined with a series of other developments—most notably the growth of the deportation regime and the size of the unauthorized population—to create the de facto delegation model of immigration policymaking. The tremendous authority wielded by the President under that model to shape our immigrant screening policies renders talk of "congressional priorities" for enforcement inapposite. We do not think it possible to coherently identify a set of congressional priorities for immigration enforcement through a careful, lawyerly exercise of intertextual fidelity to the 300-page immigration code.[12]

Far from fitting into a faithful-agent framework, therefore, our modern system of presidentially driven, ex post immigration screening is better understood as embodying a "two-principals" model of immigration policymaking. One possible response to the emergence of this model would be to decry it as lawless. But that would be a mistake. We see significant value in a model of the enforcement power according to which executive priorities stand

---

[11]  *See* Cox & Rodríguez, *supra* note 7, at 483-528; *see also* Adam Cox & Cristina Rodríguez, *Executive Discretion and Congressional Priorities*, BALKINIZATION (Nov. 21, 2014, 2:05 PM), http://balkin.blogspot.com/2014/11/executive-discretion-and-congressional.html [http://perma.cc/5A78-NCY9]. In fact, many historical episodes reveal the President exercising immigration enforcement authority in ways contrary to the plausible preferences of Congress. *See* Cox & Rodríguez, *supra* note 7, at 483-528.

[12]  *See infra* Part I.C; *see also* Cox & Rodríguez, *supra* note 7, at 510-18 (describing three key aspects of immigration law that effectively delegate "tremendous policymaking power to the President").

THE PRESIDENT AND IMMIGRATION LAW REDUX

alongside congressional ones. As the history of immigration law has demonstrated, this model empowers the Executive to address the unanticipated costs and epistemic limits of ex ante congressional lawmaking, calibrate the policies enacted by Congress to changed circumstances, provoke constructive and innovative policy reforms in both branches, and guard against the perils of legislative stasis. Policymaking through enforcement may not advance these objectives all the time, and it could certainly be abused. But given the reality of de facto delegation and the benefits that flow from the President's current role, it would be a mistake to dismiss policymaking through enforcement as lawless.

While we reject substantive limits derived from congressional priorities, our second claim is that we can still meaningfully address the desirability or legality of particular regimes of enforcement discretion. As we explore in Part III, the better inquiry into the legality of President Obama's relief programs, and the use of the enforcement power more generally, asks whether the Executive should be constitutionally prohibited from *institutionalizing* enforcement discretion in particular ways. The most important aspects of the President's immigration initiatives have nothing to do with the substantive criteria for relief; the program's focus on children, families, long-term residence, and clean criminal records strongly resembles the approach contained in many earlier, much less controversial guidance documents intended to channel prosecutorial discretion.[13] Instead, the more important innovation was to make the exercise of discretion more rule-like, centralized, and transparent. These features have been the focus of prominent critics, who have argued that the President has wielded prosecutorial discretion in an impermissibly "categorical" way, rather than in a valid "individualized" fashion, or that he has extended substantive "legal benefits" to unauthorized immigrants, rather than mere forbearance.[14]

The institutional choices embodied in the President's initiatives thus raise issues far beyond immigration law: they concern broader debates about centralization, transparency, and bureaucratic justice. How one evaluates the choices embodied in the President's plans, therefore, cannot be divorced

---

13. *See infra* text accompanying notes 234-236.

14. *See, e.g.*, Robert J. Delahunty & John C. Yoo, *Dream On: The Obama Administration's Nonenforcement of Immigration Laws, the DREAM Act, and the Take Care Clause*, 91 TEX. L. REV. 781 (2013); Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 VAND. L. REV. 671 (2014); Peter Margulies, *President Obama's Immigration Plan: Rewriting the Law*, LAWFARE (Nov. 23, 2014, 4:15 PM), http://www.lawfareblog.com/2014/11/president-obamas -immigration-plan-rewriting-the-law [http://perma.cc/ND78-RDGL]; David A. Martin, *Concerns About a Troubling Presidential Precedent and OLC's Review of Its Validity*, BALKINIZATION (Nov. 25, 2014, 9:30 AM), http://www.balkin.blogspot.com/2014/11 /concerns-about-troubling-presidential.html [http://perma.cc/H4M8-B4MP].

AR2022_500021

THE YALE LAW JOURNAL                                          125:104   2015

entirely from one's views on some classic debates about the theoretical and legal underpinnings of the American administrative state. In that sense, the President's critics are correct that much more is at stake than the justice of deferring the removal of long-term residents of the United States.

At the same time, critics err in thinking that those debates can be resolved in this instance without a historically grounded understanding of the immigration separation of powers. The institutional account of immigration law that we have jointly developed over the course of the last several years ultimately helps explain exactly why the President's immigration initiatives are both lawful and desirable. They promote important rule-of-law values, such as transparency and accountability, as well as the age-old aim of treating like cases alike. And they do so without threatening to undermine another rule-of-law value—legal compliance—that some have claimed will be compromised by the President's initiatives.[15] Conjuring out of Article II ether a constitutional prohibition on the way the President has institutionalized discretion in his recent immigration initiatives would significantly undermine these values, and for essentially no benefit. Moreover, it would entrench the authority of low-level bureaucrats against alternative judgments about how best to arrange power within the bureaucracy—even judgments by the very Congress that created the bureaucracy.

Our complementary arguments—against the congressional priorities approach and in favor of a focus on discretion's institutionalization—ultimately show how the leading critiques of the President's relief initiatives go wrong.[16] Yet our two central claims are important not only (or even primarily) because they help us properly evaluate the legality of the most important presidential immigration initiative in several decades. They also address a set of shortcomings in modern separation of powers and administrative law theory. Principal-agent models borrowed from contract theory and positive political theory have been invaluable tools for analyzing the administrative state. But those models also have serious limitations. In this Article, we illuminate one crucial area of executive power where standard principal-agent models obscure much more than they illuminate. We also show that the project of fleshing out separation of powers theory, descriptively and normatively, must occur with much more institutional and domain-specific context than is typical in contemporary constitutional scholarship. Far from an argument for immigration exceptionalism, our analysis highlights how immigration is just like multiple other domains of regulation, in that each evolves according to particular legal, practical, and political dynamics. Though we may be able to

---

**15.** *See* Price, *supra* note 14.

**16.** *See infra* Part III.A and *infra* notes 152-157, 286-294 and accompanying text.

AR2022_500022

identify abstract goals that a system of separated powers should serve, how power has been and ought to be allocated among the branches to serve those goals will differ across time and setting.

This emphasis on context does not mean that the search for generalizable limiting principles or theories in separation of powers contexts is doomed. In fact, the arguments we make in Parts II and III together provide a framework, which we develop in Part IV, for thinking about limiting principles that can serve separation of powers values while accounting for institutional and historical context. Moreover, our defenses of presidential immigration law in general, and President Obama's immigration initiatives in particular, do not amount to a conclusion that current congressional-executive dynamics are optimal. We conclude in Part IV, therefore, by taking seriously the second-best nature of immigration law's current structure. We consider reforms—both modest and radical—that would promote and discipline the role that the President currently plays in American immigration law.

## I.  A BRIEF HISTORY OF PRESIDENTIAL IMMIGRATION LAW

Before we can evaluate the immigration enforcement initiatives announced by President Obama and understand the scope of the contemporary enforcement power, some history is in order. This Part situates the initiatives within a century-long story of administrative innovation that produced modern American immigration law. Only with this context can we make sense of the motivations for, and the legality of, the President's deportation relief programs.

We show that the Obama relief initiatives represent only the most recent examples of the executive policymaking that has been part and parcel of immigration history. The President has always been an immigration policymaker alongside and sometimes in competition with Congress. President Obama's recent actions simply reinforce the ways in which the content and scope of the President's regulatory authority have evolved in response to the actions of Congress, as well as underlying historical and social factors. That evolution has been complex, involving a combination of partisan politics, economic and demographic forces, social movement pressures, and institutional demands. This specificity of context, however, does not turn our account into a tyranny of particularism. The trajectory we trace provides important, generalizable lessons that, as we will show in Parts II and III, have direct implications for how we judge the legality and desirability of the

AR2022_500023

THE YALE LAW JOURNAL                                    125:104   2015

President's relief initiatives and the use of the enforcement power more generally.[17]

These lessons ultimately differ considerably from the ones that some supporters of the President's initiatives have drawn from pieces of the history we recount below. Some commentators have argued that the initiatives are lawful because they sufficiently resemble actions by previous administrations— in particular, the use of administrative relief by Presidents Reagan and Bush during the implementation of a legalization program enacted by Congress in 1986. We neither treat this history as quasi-legal precedent, nor rely on debatable notions of congressional acquiescence to executive branch practice to make claims about constitutional settlements between the branches. Instead, we use this history to provide a thorough account of the structure of modern

---

17.  In much of the debate over the 2014 policies, commentators have drawn a distinction between legal arguments and policy arguments. *See, e.g.*, Muzaffar Chishti et al., *As Implementation Nears, U.S. Deferred Action Programs Encounter Legal, Political Tests*, MIGRATION POL'Y INST. (Feb. 11, 2015), http://www.migrationpolicy.org/article /implementation-nears-us-deferred-action-programs-encounter-legal-political-tests [http:// perma.cc/7CQH-CNDZ] (analyzing separately political and legal opposition to the President's actions); *Understanding the Legal Challenges to Executive Action: Long on Politics, Short on Law*, AM. IMMIGR. COUNCIL (June 2, 2015), http:// www.immigrationpolicy.org/sites/default/files/docs/understanding_initial_legal_challenges _to_immigration_accountability_executive_actionlong_on_politics_short_on_law_final.pdf [http://perma.cc/5Z7B-3H2Y] (characterizing legal challenges to the 2014 policies as in fact predicated on policy arguments). Defenders of the President's actions have insisted that the legal authority for Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) is clear and that the only source of debate is whether it makes good policy sense to defer the removal of unauthorized immigrants. *See, e.g.*, *The Unconstitutionality of President Obama's Executive Actions on Immigration: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 83-84 (2015) (written testimony of Stephen H. Legomsky, Professor, Washington University School of Law) [hereinafter Legomsky, Written Testimony] ("While I appreciate that reasonable minds can and do differ about the *policy* decisions, I take this opportunity to respectfully share my opinion that the President's actions are well within his *legal* authority."); Hiroshi Motomura, *The President's Discretion, Immigration Enforcement, and the Rule of Law*, AM. IMMIGR. COUNCIL (Aug. 26, 2014), http://www.immigrationpolicy.org/perspectives /president%E2%80%99s-discretion-immigration-enforcement-and-rule-law [http://perma .cc/77F3-JVZV] ("[N]o matter how one might debate how the President should weigh these considerations, the fact remains that this is a policy debate."). But there is a third line of debate, legal in nature, that defenders of the policy sometimes obscure—whether the President's use of his prosecutorial discretion in the form of the 2014 initiatives reflects a desirable or healthy form of executive decision making. With this Article, we illuminate that terrain. It is possible to conclude that the President's actions are legal in the sense of being within his constitutional powers historically understood, but to also debate whether they embody a form of presidentialism that advances the objectives of the general separation of powers—a debate we take up throughout this Article. The answer to the latter question may be informed by whether deferring removal of millions of unauthorized immigrants is a good idea, but the two questions are not the same.

AR2022_500024

immigration law, identify the imperatives and temptations that attend the use of the enforcement power in light of that structure, and explain the motivations for present-day uses of that power.[18] Our history underscores what critics fail to understand about the nature of enforcement today, and in that sense it provides the context for a reality-based articulation of the scope of the enforcement power.

In this Part, we begin by summarizing our 2009 account of how the President historically has used the powers expressly delegated to him to advance his own policy agenda, resulting in what we term executive unilateralism. We then turn to the central source of power at issue in this Article—enforcement discretion. We demonstrate how the underenforcement of certain parts of the immigration code, as in many domains, has transformed the law enacted by Congress into regulation that reflects executive branch priorities. We then elaborate on the concept of de facto delegation introduced in our earlier work and explain its relevance to current controversies. In keeping with our focus on the internal organization of the Executive Branch, we close by documenting the trend in recent decades toward the Executive's centralization of its enforcement discretion. Taken together, these perspectives on executive power help make the descriptive case for the two-principals model defended in Part II and provide the institutional detail required to understand what precisely is at stake with the Obama relief initiatives.

## A. From Delegation to Unilateralism

In our 2009 work, we identified three models of executive authority that emerged over the course of the twentieth century: inherent presidential authority,[19] express delegation,[20] and de facto delegation.[21] Each model arose through institutional practice and amidst confusion in the courts about the constitutional role each branch was supposed to play in the exercise of the federal government's immigration power. By the late twentieth century, consonant with the dramatic expansion of the delegated administrative state,

---

**18.** *See, e.g.*, Mark Noferi, *When Reagan and GHW Bush Took Bold Executive Action on Immigration*, HILL (Oct. 2, 2014, 12:00 PM), http://thehill.com/blogs/congress -blog/foreign-policy/219463-when-reagan-and-ghw-bush-took-bold-executive-action-on [http://perma.cc/H5QF-ZQN2]; *see also* Lauren Gilbert, *Obama's Ruby Slippers: Enforcement Discretion in the Absence of Immigration Reform*, 116 W. VA. L. REV. 255 (2013).

**19.** Cox & Rodríguez, *supra* note 7, at 465-66.

**20.** *Id.* at 492.

**21.** *Id.* at 510.

115

the first tradition of inherent authority had receded.[22] But presidents looking to mold immigration law to advance their own objectives have rarely needed to resort to claims of inherent constitutional authority. Instead, they have used authorities expressly delegated to them by Congress, or taken advantage of their role in enforcing congressional schemes (the source of de facto delegation) to advance their own agendas.

Throughout the twentieth century, and up to the present, the President has used powers expressly delegated to him by Congress to advance his own immigration agenda. Importantly, these uses have often been innovative, accomplishing objectives Congress almost certainly did not intend and

---

**22.** *See id.* at 474. The most prominent (and likely only explicit) example of the President claiming inherent authority over immigration policy today is his use of Deferred Enforced Departure (DED) to defer the removal of certain noncitizens from the United States. *See* Memorandum from President Barack Obama to the Sec'y of Homeland Sec. (Sept. 26, 2014), http://www.whitehouse.gov/the-press-office/2014/09/26/presidential-memorandum -deferred-enforced-departure-liberians [http://perma.cc/3RCD-9P8Y] (extending President Bush's 2007 grant of deferred enforced departure to Liberians "[p]ursuant to [his] constitutional authority to conduct the foreign relations of the United States"); *Adjudicator's Field Manual, § 38.2: Deferred Enforced Departure*, U.S. CITIZENSHIP & IMMIGR. SERVICES, http://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-16606/0 -0-0-16764.html [http://perma.cc/JK68-927C]. Citing inherent Article II authorities, Presidents since at least George H.W. Bush have halted the removal of nationals to their countries of origins where doing so would have foreign policy implications. DED has been exercised in a very limited fashion, but the President's turn in these discrete cases to inherent foreign affairs powers as justification presents a puzzle. On the one hand, it may be that the existence of the Temporary Protected Status (TPS) statute, 8 U.S.C. § 1254a (2012), enacted in 1990 to enable the Executive to defer removal of nationals from states coping with environmental calamities or civil strife, requires the President to resort to extra-statutory sources to provide relief for groups who do not fall within the TPS criteria. But it is not altogether clear why the groups given relief pursuant to DED could not have their removal deferred under the theories of prosecutorial discretion advanced to support DAPA and DACA. In other words, why must DED even exist?

The answer is likely that the justifications or legal frameworks for various executive policies emerge in an ad hoc fashion and in response to the particular circumstances at issue in a given case. DED evolved out of another exercise of enforcement discretion—extended voluntary departure (EVD), *see infra* notes 42-48 and accompanying text—and served the very particular foreign affairs needs to which it has been put, namely protecting groups of noncitizens based on their nationality. At the time Presidents began invoking DED, the use of "ordinary" prosecutorial discretion in the form of deferred action does not appear to have been used in a categorical fashion, *see infra* note 38 and accompanying text (discussing other "categorical" uses of deferred action), and so deferred action might not have appeared as the obvious framework through which to grant relief to the groups given DED, leading Presidents to devise a form of enforcement discretion grounded in inherent presidential authorities, hence the link to foreign affairs. The collection of enforcement powers or programs—EVD, DED, deferred action—highlights how the content of the enforcement power develops historically and iteratively, as opposed to emanating from some sort of ex ante, coherent constitutional scheme of powers.

expanding or repurposing Congress's original design. Congress has at different moments resisted and accommodated these efforts, in some moments moving to limit the originally delegated power in an effort to rein in executive branch efforts, while at others creating new statutory frameworks to accomplish some of the Executive's objectives.

Perhaps the best twentieth-century example of this phenomenon is the President's use of the parole power. Contained within the original Immigration and Nationality Act (INA) of 1952, the parole power permits the President to exercise discretion and allow otherwise inadmissible noncitizens into the United States. [23] As we explained in 2009, beginning with President Eisenhower's admission of 15,000 Hungarians fleeing the communist crackdown in their country, the power served as "the central tool of American refugee policy," enabling the President to control refugee admissions for over twenty years.[24] Though Congress attempted to curtail the President's use of the power by enacting a refugee preference regime in 1965, presidents continued to wield the discretionary power that Congress intended only for "emergent, individual, and isolated situations" in order to admit large groups of noncitizens, including during refugee crises from Cuba, Haiti, and Vietnam.[25] A combination of settled expectations and political pressures eventually led Congress to make those temporary admissions permanent, underlining the President's agenda-setting power.[26]

With the Refugee Act of 1980, Congress directly responded to the executive-driven agenda in two ways. First, it added language to the parole provision requiring that the discretionary act serve compelling reasons in the public interest—an addition many in Congress (perhaps mistakenly) regarded

---

**23.** Today, the parole power is codified at 8 U.S.C. § 1182(d)(5) (2012) and permits the President to parole otherwise inadmissible noncitizens into the country "for urgent humanitarian reasons or significant public benefit."

**24.** Cox & Rodríguez, *supra* note 7, at 502.

**25.** *Id.* at 503.

**26.** *Id.* at 506. Episodes such as these help explain some of the Republican resistance to the President's recent uses of deferred action. Even though deferred action is styled as temporary, its opponents believe, with reason, that its extension will create settled expectations, which, when they exist on a large scale, may effectively tie the hands of future administrations and perhaps even require Congress eventually to recognize the temporary status as permanent. We discuss this phenomenon of entrenchment further *infra* notes 286-294 and accompanying text. In our view, we think it is far more likely that the Obama relief initiatives will tie the hands of future administrations rather than force Congress to adopt a legalization program. As a result, the initiatives do present a risk of further entrenching the unauthorized population, thus threatening the creation of a permanent underclass. That said, we could describe the state of affairs pre-DACA and DAPA the same way, suggesting that the President's relief initiatives make the best of a bad situation.

117

THE YALE LAW JOURNAL                                      125:104   2015

as a means of "bring[ing] the admission of refugees under greater Congressional and statutory control."[27] Second, and more importantly, it created a scheme for overseas refugee selection that expressly delegated power to the President to set the number of annual refugee admissions and to select the countries from which they would be accepted.[28] In 1990, Congress further systematized the process of admitting noncitizens fleeing disaster by creating the Temporary Protected Status (TPS) designation, which authorizes the President to permit categories of noncitizens to remain in the United States on a temporary basis, provided they meet statutory criteria defining the types of calamities Congress deemed worthy of response through protection.[29] The combination of these new provisions suggests that Congress sought to replace the nontransparent use of parole and other discretionary mechanisms with semi-supervised and controlled schemes of delegation that required the President to submit his recommendations to congressional committees and to consult with various agency heads in the process.[30]

As we will explain later, the substitution of delegated and visible authority for discretionary and opaque authority generally should be welcomed. But here, it is important to see how the President made these supposed new constraints on his authority his own. A common critique of the President's implementation of the refugee selection system in the 1980s and 1990s, for example, was that admissions during that period skewed toward nationals of

---

27.  Edward M. Kennedy, *Refugee Act of 1980*, 15 INT'L MIGRATION REV. 141, 146 (1981).

28.  Refugee Act of 1980, Pub. L. No. 96-212, § 201, 94 Stat. 102, 102-03.

29.  8 U.S.C. § 1254a (2012). TPS replaced the Executive's use of a discretionary mechanism, known as Extended Voluntary Departure (EVD), to provide relief from removal for persons fleeing certain kinds of disasters. *See* KATE M. MANUEL & MICHAEL JOHN GARCIA, CONG. RESEARCH SERV., R43782, EXECUTIVE DISCRETION AS TO IMMIGRATION: LEGAL OVERVIEW 6 (2014). For further discussion of EVD, see *infra* notes 42-46 and accompanying text. TPS filled a gap in the statutory protection of noncitizens fleeing calamities. The Refugee Act's asylum provisions, and pre-existing provisions authorizing the withholding of removal, applied only to those who met the definition of refugee, which required having a fear of persecution on account of one of several recognized grounds, including political opinion, race, and religion—the classic definition of refugee. The TPS statute provided a statutory mechanism for the Executive to protect persons fleeing disaster and civil strife. *See* Bill Frelick & Barbara Kohnen, *Filling the Gap: Temporary Protected Status*, 8 J. REFUGEE STUD. 339 (1995).

30.  Cox & Rodríguez, *supra* note 7, at 539. The statutory scheme requires the President's "appropriate consultation" with Cabinet members and members of congressional committees in determining that refugee admissions are justified and in setting admissions numbers. Immigration and Nationality Act § 207(a)(3)-(e), 8 U.S.C. § 1157(a)(3)-(e) (2012); *see also* Stephen H. Legomsky, *The Making of United States Refugee Policy: Separation of Powers in the Post-Cold War Era*, 70 WASH. L. REV. 675, 697 (1995) (characterizing section 1157(e) as requiring "personal discussion").

118

AR2022_500028

THE PRESIDENT AND IMMIGRATION LAW REDUX

then-Communist regimes, suggesting that the President used the system in order to advance his particularistic foreign policy goals rather than the more universal humanitarian objectives of the 1980 Act.[31] This critique simultaneously assumes that the two goals are mutually exclusive and that Congress had a clear purpose it thought should drive refugee selection.

Whether either of these claims has merit is beside the point for our purposes. Instead, what matters is that the President utilized his delegated authority to serve a decidedly executive agenda. The creation of the refugee selection process in 1980 and TPS authority in 1990 may have diminished the need for sweeping and categorical use of the parole power, as well as the political and legal flexibility of the President to rely on parole as he had in the past. But these effects have been more modest than one might suppose, and parole remains an important alternative route of admission for those who may not qualify for refugee status.[32] The authority also continues to serve as a basis for innovation. Most recently, the Obama Administration has invoked parole in place—itself an innovation on the parole power[33]—to provide relief for a large group of unauthorized immigrants already in the United States—relatives of members of the military. Though the application for and granting of parole continues to be framed as case-by-case, the memorandum announcing parole in place for military families clearly reflects an intent to provide relief to a favored category of unauthorized immigrants.[34]

This sort of creative unilateralism, which we identified in our 2009 article, has arisen in many other instances. A vivid example is the once obscure but now frequently invoked "family fairness" policies adopted by Presidents

---

31. *See* Legomsky, *supra* note 30, at 699–700.

32. *See In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador and Guatemala (Central American Minors—CAM)*, U.S. CITIZENSHIP & IMMIGR. SERVICES (Feb. 9, 2015), http://www.uscis.gov/humanitarian/refugees-asylum/refugees/country -refugeeparole-processing-minors-honduras-el-salvador-and-guatemala-central-american -minors-cam [http://perma.cc/782B-GPEK].

33. The parole provision of the INA authorizes parole for "any alien applying for admission." Immigration and Nationality Act § 212(d)(5), 8 U.S.C. § 1182(a)(5)(A) (2012). Section 235(a)(1) of the INA (8 U.S.C. § 1125(a)(1) (2012)), in turn, defines "applicant for admission" to include noncitizens present in the United States without having been admitted. Thus, while parole was available, prior to some 1996 changes to immigration law, only to noncitizens who had yet to enter the United States, the Executive has now interpreted its parole authority to extend to immigrants who have entered the country without having been admitted. *See, e.g.*, Memorandum from the U.S. Dep't of Justice Office of the Gen. Counsel to Immigration & Naturalization Serv. Officials (Aug. 21, 1998), *reprinted in* 76 INTERPRETER RELEASES 1050 app. (1999).

34. *See* Policy Memorandum from the U.S. Citizenship & Immigration Servs. (Nov. 15, 2013), http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2013/2013-1115_Parole _in_Place_Memo_.pdf [http://perma.cc/4VUN-K2TV].

119

Reagan and George H.W. Bush after Congress enacted a large-scale legalization program in 1986. The legalization program, part of the Immigration Reform and Control Act (IRCA), provided a path to legal status for millions of unauthorized migrants, but it did not extend to many of the spouses and children of those immigrants. Despite this, President Reagan's Immigration and Naturalization Service (INS) in 1987 elected to defer the removal of many of these family members[35]—a deferral President Bush continued, and then expanded in 1990 when legislation to legalize their status stalled in Congress.[36] Later that year, Congress enacted a statutory legalization for the group.[37]

These deferrals of removal can be cast in two very different lights. First, we might see them as nothing more than a form of transitional relief. On this account, Presidents Reagan and George H.W. Bush operated within a statutorily created legalization framework, but in the course of implementation

---

**35.** Memorandum from Gene McNary, Comm'r, Immigration & Naturalization Serv., to Reg'l Comm'rs (Feb. 2, 1990); *INS Reverses Family Fairness Policy*, 67 INTERPRETER RELEASES 153 (1990). The Reagan Administration deferred removal of minor children where all parents with whom the child was living had permanently legalized their status pursuant to IRCA. *INS Announces Limited Policy on Family Unity*, 64 INTERPRETER RELEASES 1191 (1987). The Administration also deferred removal of spouses on a case-by-case basis, where "compelling or humanitarian factors" existed. *Id.* When the Immigration and Nationalization Service (INS) continued the policy under President Bush in 1990, the agency amended the policy to include most spouses and unmarried minor children. *See INS Reverses Family Fairness Policy*, 67 INTERPRETER RELEASES 153, 153-54 (1990) (enumerating the prerequisites for spouses and children to benefit from the family fairness policy, including admissibility as immigrants and a maximum number of criminal convictions).

**36.** It is worth pausing for a moment in thinking about this episode to observe that the actions of Presidents Reagan and Bush arguably defy conventional understandings of how party dynamics affect immigration policy. We might not have expected Republican presidents to extend the reach of a legislative "amnesty." These Presidents' actions might be evidence of how the Republican Party in particular has evolved, as well as evidence of the way in which American presidents have often supported more open immigration policies than have their contemporaries in Congress. For a discussion of this pattern over time, see Adam B. Cox, *Enforcement Redundancy and the Future of Immigration Law*, 2012 SUP. CT. REV. 31. *See also* Cox & Rodríguez, *supra* note 7, at 484 (discussing presidents' repeated veto of literacy tests for immigrant screening adopted by Congress).

**37.** Immigration Act of 1990, Pub. L. No. 101-649, § 301, 104 Stat. 4978, 5029-39; *see also* JOYCE C. VIALET, CONG. RESEARCH SERV., 91-493 EPW, IMMIGRATION LEGISLATION—QUESTIONS AND ANSWERS 1 (1991) (explaining the deferral and work authorization provisions for spouses and unmarried children of legalized noncitizens in the Immigration Act of 1990's "Family Unity" section); Applicant Processing for Family Unity Benefits, 57 Fed. Reg. 6457, 6457-62 (Feb. 25, 1992) (interim rule implementing the Family Unity Program); *The Immigration Act of 1990 Analyzed: Part 2—Family-Sponsored Immigrants*, 67 INTERPRETER RELEASES 1393, 1397-99 (1990) (detailing the Family Unity Program's statutory provisions and legislative history).

AR2022_500030

THE PRESIDENT AND IMMIGRATION LAW REDUX

identified inequities (and perhaps oversights) in the design of IRCA's original program. They used their discretion to ameliorate those inequities—to prevent the removal of family members who eventually would be eligible for immigration status through their newly legalized spouses or parents. Once debate began in Congress over new legalization legislation that would reach family members left out of the initial legislation, thus obviating the need for those family members to petition through the ordinary immigration process, the actions of the Presidents truly became transitional amelioration pending congressional action. [38] If the statutory legalization scheme would soon encompass those family members, it would make little sense—as a matter of resource allocation or justice—to deport large numbers of them during the period of legal transition.[39] Far from being oppositional, the President's actions could be seen to exemplify cooperation between the Executive and Congress in the implementation of a large new initiative.

Of course, the family fairness regulations could also be seen as an act of executive defiance. On this account, Congress's intent as reflected in IRCA was to provide legal status to a precisely defined group of unauthorized

---

**38.** In this sense, the "family fairness" initiatives resemble decisions by President Clinton to defer the removal of victims of domestic abuse during debate over the reauthorization of the Violence Against Women Act (VAWA), which contained provisions that would have made them eligible for visas. They also resemble President George W. Bush's decision to defer the removal of student visa holders who temporarily lost their enrolled student status in the wake of Hurricane Katrina. *See* Memorandum from Paul W. Virtue, Acting Exec. Assoc. Comm'r, Immigration & Naturalization Serv., to Reg'l Dirs., Dist. Dirs., Officers-in-Charge & Serv. Ctr. Dirs. (May 6, 1997), http://www.asistahelp.org/documents/resources/Virtue_Memo_97pdf_53DC84D782445.pdf [http://perma.cc/RH5S-SWGE] (explaining the process for deferred action and work authorization during the debates over VAWA); Press Release, U.S. Citizenship & Immigration Servs., USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina (Nov. 25, 2005), http://www.uscis.gov/sites/default/files/files/pressrelease/F1Student_11_25_05_PR.pdf [http://perma.cc/H9PK-X5YG] (announcing the deferral of removal for F-1 visa holders whose enrollment was affected by Hurricane Katrina). The deferrals, while categorical, can also be characterized as transitional.

**39.** Because those legalized by the IRCA would become eligible to petition for the admission of their spouses and children through the already existing immigration system, deferring their removal would arguably have simply facilitated the inevitable operation of the law. The fight in Congress was about whether to allow spouses and children to "skip the line," or become permanent residents without having to wait for the green card queue to run its course. *See* S. COMM. ON THE JUDICIARY, IMMIGRATION REFORM AND CONTROL ACT OF 1985, S. REP. NO. 99-132, at 16 (1985) ("It is the intent of the Committee that the families of legalized aliens will obtain no special petitioning rights by virtue of the legalization. They will be required to 'wait in line' in the same manner as immediate family members of other new resident aliens."). In IRCA, Congress initially rejected that option, but in so doing it did not expressly or even impliedly preclude the President from deferring removal of that same group of noncitizens.

121

AR2022_500031

THE YALE LAW JOURNAL                                   125:104   2015

immigrants. And President Reagan's actions, in particular, amounted to a kind of executive rejection of the parameters of IRCA's legalization program and a unilateral decision to protect a group that the President, but not Congress, regarded as deserving. Perhaps these very actions forced the issue onto Congress's agenda and helped secure the statutory change adopted in 1990. Such unilateralism might have made Presidents Reagan and George H.W. Bush's judgments at the time more subject to question, but this characterization would also make so-called family fairness more of an on-point precedent for the Obama relief initiatives,[40] which emerged through the President's use of quintessentially executive authority, rather than in the implementation of a congressional legalization scheme.[41]

Whatever the appropriate characterization of family fairness, the episode embodies two of the characteristics of the separation of powers in immigration law that we have emphasized here and in other work. First, the particular tool Presidents Reagan and George H.W. Bush used to extend relief to the "ineligible spouses and children of legalized aliens"—extended voluntary departure (EVD)—was an innovation on enforcement discretion that emerged to address particular contingencies and grew in scope over time. The origins of, justifications for, and evolution of EVD are somewhat obscure and poorly understood. But it appears to have developed in an ad hoc fashion in the 1960s and 1970s, as a class-based form of relief from deportation. The Executive typically, though not exclusively, directed it at nationals of particular countries, often for humanitarian reasons or because conditions in the noncitizens' home countries were dangerous or chaotic.[42] Certain Cuban nationals permitted by President Eisenhower to remain in the United States in 1960, for example, benefitted from EVD.[43] And though it was most often used to address foreign

---

40. We think this claim of defiance would go too far, for the reasons expressed *supra* note 39.

41. As we discuss *infra* Part II, the Office of Legal Counsel in the Department of Justice found the President's decision to initiate DAPA lawful in part because it concluded that DAPA cohered with congressional priorities of family unity expressed in the Act. As we note there, however, this claim is not that Congress delegated authority to the President to initiate DACA and DAPA. Rather, it is a claim that, in the enforcement of the INA, the President's DACA and DAPA programs advance a congressional priority, which implies that for the exercise of enforcement discretion to be lawful, it must match up with some goals of Congress.

42. Certain class-based deferrals, characterized after the fact as examples of EVD, were not understood at the time to be exercises of EVD, underscoring the murkiness of the sources of discretionary decision making by the President in immigration law. SHARON STEPHAN, CONG. RESEARCH SERV., 85-599 EPW, EXTENDED VOLUNTARY DEPARTURE AND OTHER GRANTS OF BLANKET RELIEF FROM DEPORTATION 10 (1985).

43. *See* H.R. REP. NO. 89-1978, at 2 (1966) (observing that in September 1966, prior to the Cuban Adjustment Act, roughly 47,000 Cubans benefited from EVD).

AR2022_500032

policy-related exigencies, presidents came to use EVD to exert considerable authority over who could remain in the United States even when foreign policy was not at issue.[44]

The innovative nature of EVD extended to the legal justifications for the power: executive branch officials appear to have toggled between at least two different sources of legal authority to support its use. In 1985, officials in the Reagan Administration testified that EVD stemmed from the "Executive's constitutional authority in the areas of foreign and prosecutorial policy (supplemented by the general delegation of power over immigration in 8 U.S.C. § 1103(a))."[45] In 1987, however, officials claimed a more specific statutory source for the authority, contending that the power expressly delegated in the INA to grant voluntary departure (an alternative to formal removal whereby a noncitizen departs of his own volition) implied the power to grant EVD, or a temporary reprieve from removal.[46] Though the latter justification appears to have prevailed, probably because it points to a firmer statutory foundation than the former, it is clear that the legal authority for the practice emerged and evolved alongside (and not in advance of) the practice itself.

Second, the family fairness episode highlights the dynamic nature of the congressional-executive relationship. Executive actions like those taken by

---

44. *See Oversight of INS Policies and Legal Issues: Hearing Before the Subcomm. on Immigration, Citizenship, & Int'l Law of the H. Comm. on the Judiciary*, 95th Cong. 86-87 (1978) [hereinafter *Oversight Hearing*] (statement of David Crosland, General Counsel, Immigration and Naturalization Service) (describing the INS Operations Instructions in effect from 1956 to 1972 granting voluntary departure to certain highly skilled noncitizens, including foreign medical graduates); 93 CONG. REC. 13,844 (1973) (including INS associate commissioner stating that certain individuals from the Western Hemisphere with family-based visa preference would receive EVD); MANUEL & GARCIA, *supra* note 29, at 6 (listing EVD grants, at various times during the 1960s and 1970s, to those from, inter alia, Chile, Czechoslovakia, the Dominican Republic, Ethiopia, Hungary, Romania, Iran, Nicaragua, and Uganda).

45. *Extended Voluntary Departure Issues: Hearing on S. 337 Before the Subcomm. on Immigration & Refugee Policy of the S. Comm. on the Judiciary*, 99th Cong. 67 (1985) (statements of Elliott Abrams, Assistant Secretary of State, Bureau of Human Rights and Humanitarian Affairs, and Alan C. Nelson, Comm'r, Immigration and Naturalization Service).

46. The Reagan Administration cited statutory provisions that, after changes in the immigration laws' organization, are now codified at 8 U.S.C. § 1229c(a)(1) (2012), which provides that "[t]he Attorney General may permit an alien voluntarily to depart the United States at the alien's own expense." *See Temporary Safe Haven Act of 1987: Hearing Before the Subcomm. on Immigration, Refugees, & Int'l Law of the H. Comm. on the Judiciary*, 100th Cong. 163 (1987) [hereinafter *Temporary Safe Haven Act Hearing*] (statement of the Office of Legislative Affairs to questions posed by Rep. Romano L. Mazzoli). On this reading, the statute's lack of a specific required time period for the voluntary departure confers on the Attorney General the power to grant EVD to classes of individuals.

AR2022_500033

THE YALE LAW JOURNAL                    125:104    2015

Presidents Reagan and George H.W. Bush can powerfully shape the congressional agenda and the future path reform takes in the legislature. They can also, as the broader history of EVD highlights, prompt Congress to attempt to control executive discretion in order to advance Congress's own policy goals. In the 1980s, for example, House and Senate subcommittees called hearings to insist that the President exercise his EVD power to defer the removal of noncitizens from El Salvador.[47] The appropriations process was used for a similar purpose: appropriations bills for fiscal years 1982-1983 and 1984-1985 contained statements, admittedly nonbinding, that it was "the sense of the Congress" that Salvadorans should be granted EVD.[48] In other words, Congress sought to use *and* constrain novel forms of executive decision making to advance the congressional agenda, ultimately replacing the Executive's ad hoc discretionary tool with clear statutory authority to extend relief under circumstances specified by Congress.[49] These dynamics are by no means unique to immigration law, but they have been notable throughout its history.

### B. Policymaking Through (Under)Enforcement

A central feature of the examples of innovation discussed above is that they all emanated in some way from either express congressional delegation or the process of implementing a discrete congressional program over which Congress had given the Executive expansive implementation authority. These historical instances of executive policymaking therefore differ in significant respects from the Obama relief initiatives.[50] The latter were formulated

---

47. *See Temporary Suspension of Deportation for Nationals of Certain Countries: Hearing on H.R. 822 Before the Subcomm. on Immigration, Refugees, & Int'l Law of the H. Comm. on the Judiciary*, 99th Cong. 1 (1985); *Extended Voluntary Departure Issues: Hearing on S. 337 Before the Subcomm. on Immigration & Refugee Policy of the S. Comm. on the Judiciary*, 99th Cong. 1 (1985); *Extended Voluntary Departure for Salvadorans: Hearing on H.R. 4447 Before the Subcomm. on Rules of the H. of the H. Comm. on Rules*, 98th Cong. 1 (1984); *Temporary Suspension of Deportation of Certain Aliens: Hearing on H.R. 4447 Before the Subcomm. on Immigration, Refugees, & Int'l Law of the H. Comm. on the Judiciary*, 98th Cong. 1 (1984).

48. International Security and Development Cooperation Act of 1981, Pub. L. No. 97-113, § 731, 95 Stat. 1519, 1557 (codified at 8 U.S.C. § 1157 (2012)); Department of State Authorization Act, Fiscal Years 1984 and 1985, Pub. L. No. 98-164, § 1012, 97 Stat. 1017, 1062 (1983).

49. For a discussion of the TPS program that replaced EVD, see *supra* note 29 and accompanying text.

50. As noted above, supporters of the Administration have enthusiastically cited family fairness as precedent for the President's actions, both because the policy was based not on delegated authority but on the President's enforcement power, and because of the scale of relief it provided. *See* Noferi, *supra* note 18; *cf.* Legomsky, Written Testimony, *supra* note 17, at 83-84 (discussing the "family fairness" policies of Presidents Reagan and George H.W. Bush and their similarities to President Obama's policies). Though Congress considered and

124

pursuant to the President's determination as to how to go about enforcing the INA as a whole, not as the result of an express statutory delegation to defer the removal of certain categories of noncitizens or as part of the implementation of a larger program. To be sure, the INA expressly grants the Secretary of the Department of Homeland Security (DHS) broad authority to enforce the Code—a provision numerous defenders of the Administration have cited to support the Obama relief initiatives.[51] But this general authority to enforce the Code cannot reasonably be characterized as an express delegation of any particular form of authority; it is instead a recognition that the Executive will need to develop policies and protocols to accomplish all that the INA does expressly delegate.

The scope for executive policymaking in law enforcement contexts is vast, as commentators have emphasized with respect to numerous domains.[52] Immigration law is no exception to this basic fact of the American system of

---

rejected the inclusion of spouses and children in IRCA's legalization program, we still think it possible to regard Presidents Reagan and George H.W. Bush's enforcement actions as transitional, in the sense that the legalization program gave immigration status to its beneficiaries that in turn would have enabled them to petition for the admission of their spouses and children through already existing channels. DACA cannot be characterized in that fashion, because there is no clear existing route in the law for its beneficiaries to petition for lawful status. *See infra* note 105 and accompanying text. As for the beneficiaries of DAPA, while they may one day be able to adjust status, without DAPA, because of their relationships to U.S. citizens and lawful permanent residents (LPRs), in many cases that adjustment would be so far in the future as to stretch thin the meaning of transition. *See infra* notes 150-151 and accompanying text. More important, the political context of IRCA differs dramatically from the present one. We think it at least arguable that Congress's creation of a legalization program in 1986 licensed executive authority to engage in gap filling and other forms of ameliorative action throughout implementation. To be clear, *the absence* of such license in the current context does not make the Obama relief initiatives unlawful. It just makes them different from family fairness. Ultimately, however, we think these debates about the details of family fairness and its resemblance to DACA and DAPA amount to a red herring because they obscure the larger difficulties of using history as legal precedent.

**51.** *See* 6 U.S.C. § 202 (2012) ("The Secretary, acting through the Under Secretary for Border and Transportation Security, shall be responsible for the following . . . (5) Establishing national immigration enforcement policies and priorities."); 8 U.S.C. § 1103 (2012); Legomsky, Written Testimony, *supra* note 17, at 90 (citing "the additional broad authority conferred by 8 U.S.C. § 1103(a)"); OLC Memorandum Op., *supra* note 10, at 3-4.

**52.** For a discussion of the power of prosecutors and proposals for how to rein in that power through institutional design, see Rachel E. Barkow, *Institutional Design and the Policing of Prosecutors: Lessons from Administrative Law*, 61 STAN. L. REV. 869 (2009); and Rachel E. Barkow, *Prosecutorial Administration: Prosecutor Bias and the Department of Justice*, 99 VA. L. REV. 271 (2013). For an account of the President's use of the enforcement power to advance his objectives in civil contexts, see Kate Andrias, *The President's Enforcement Power*, 88 N.Y.U. L. REV. 1031, 1031 (2013), which argues that the President's enforcement authority has been extensive but also "ad hoc, crisis-driven, and frequently opaque."

AR2022_500035

separated powers. As is true in other arenas, the way the Executive exercises its enforcement discretion over time powerfully shapes the meaning and significance of the law. In enforcing the INA—a multi-faceted and complex code—the Executive must make numerous decisions, large and small, about how and when to wield its power.[53] In so doing, it must navigate the vagaries of ideologically diverse public and congressional opinion; observers will often criticize the same enforcement strategy as both feckless and draconian. In addition to addressing the basic question of how to allocate enforcement resources between the border and the interior,[54] the President and officials within DHS must determine the specific means for each sort of enforcement. At the border, should it rely on fencing and technology as deterrents,[55] or apprehensions and quick returns? In the interior, should its focus be on employers who hire unauthorized workers, on identifying and removing noncitizens who have committed crimes,[56] or on removing unauthorized noncitizens generally? Congress sometimes sets the stage for or constrains these choices through authorization and appropriations laws,[57] but in the main, the complexity and breadth of the tradeoffs required of the Executive transform him into a policymaker.

Historically, the President has exercised this power using a variety of legal tools. Prosecutorial discretion in the form of "deferred action"—the mechanism for the Obama relief initiatives—represents just one. We reserve analysis of that law enforcement tool until Part III and focus here instead on another crucial but oft-overlooked example of the President's use of the enforcement power to advance his agenda (arguably at the expense of Congress): underenforcement of the employer sanctions regime. The history of the Executive's weak (some might say irresponsible) implementation of this major congressional initiative illuminates how the President's constitutionally

---

53. These choices sometimes but do not always track partisan lines, for Republicans and Democrats alike have reasons to support both strong and lax enforcement. For a discussion of these dynamics with reference to the enforcement of a particular statutory framework—in this case, the employer sanctions provisions—see *infra* notes 58-77 and accompanying text.

54. Under the Obama Administration, there is some evidence that enforcement resources have been shifting toward the border. For example, the number of interior removals has been falling for several years. *See* Rosenblum, *supra* note 3, at 6.

55. For a discussion of Congress's grants of power to the Executive to build physical barriers at the border and a more general analysis of the utility of border enforcement as a screening mechanism, see Cox & Rodríguez, *supra* note 7, at 524-28.

56. For recent developments related to this sort of enforcement, see *infra* notes 96-98 and accompanying text.

57. For a discussion of the use of appropriations law, see *infra* notes 170-172 and accompanying text.

AR2022_500036

assigned role to execute the laws gives him power over the contours and significance of a statutory scheme.

Created in 1986 by Congress in tandem with IRCA's large-scale legalization program in 1986, the employer sanctions regime imposes both civil and criminal sanctions on employers who hire immigrants not authorized to work in the United States.[58] The theory behind employer sanctions was that penalizing employers who hired unauthorized workers would reduce the labor market incentive for illegal immigration. Congress also included employer sanctions to help justify legalization—as a promise that future legalizations would be unnecessary because IRCA would eliminate one of the primary reasons for illegal immigration.[59]

From its inception, however, the employer sanctions regime has been largely ineffectual.[60] Its weaknesses stem in part from the statute itself and the tradeoffs built into it. As the Supreme Court recognized in *Arizona v. United States*, IRCA reflects Congress's efforts to balance the desire to prevent the hiring of unauthorized immigrants with the concern that overzealous prosecution could give employers incentives to discriminate against potential workers on the basis of race or national origin.[61] But these legislative tradeoffs form only part of the story. The Executive itself has taken much of the bite out of this signature congressional enforcement initiative. Across administrations, different combinations of political desires and institutional concerns have led to varying degrees of underenforcement of the statute, leading lawmakers and scholarly commentators to doubt that IRCA has played a significant role in curbing unauthorized immigration to the United States.[62] This

---

58. Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 101, 100 Stat. 3359, 3360-72 (codified at 8 U.S.C § 1324a (2012)).

59. *See* Michael J. Wishnie, *Prohibiting the Employment of Unauthorized Immigrants: The Experiment Fails*, 2007 U. CHI. LEGAL F. 193, 200-04 (describing IRCA's employer sanctions as part of a one-time "grand bargain" among interest groups).

60. Data on the enforcement of employer sanctions is spotty and often relies on inconsistent methodologies. ANDORRA BRUNO, CONG. RESEARCH SERV., R40002, IMMIGRATION-RELATED WORKSITE ENFORCEMENT: PERFORMANCE MEASURES 4 (2015) (noting that assessments of worksite enforcement programs have been complicated by "data reporting problems, the existence of conflicting data," and the paucity of data before the creation of Immigration and Customs Enforcement (ICE)). But data pertaining to different discrete periods of IRCA enforcement are suggestive of underenforcement. *See, e.g.*, *id.* at 5 tbl.1 (showing low numbers of final orders and administrative fines relative to the number of employers from 1999-2012).

61. Arizona v. United States, 132 S. Ct. 2492, 2503-08 (2012).

62. *See Verification of Eligibility for Employment and Benefits: Hearing Before the Subcomm. on Immigration & Claims of the H. Comm. on the Judiciary*, 104th Cong. 8 (1995) (statement of Barbara Jordan, Chair, U.S. Commission on Immigration Reform) (arguing that IRCA's

underenforcement may reflect the Executive's desire to satisfy business or labor constituencies (to varying degrees depending on the party in office). It could also reflect the government's desire to target enforcement resources in the direction most saleable to the general public—toward safety risks and border enforcement—goals also reflected in Congress's expansion of the criminal law grounds for removal and appropriation of funds for border enforcement.[63]

Considered at a more granular level, it also becomes clear how each administration has calibrated its enforcement judgments under IRCA to address the particular mix of political and institutional pressures it has faced, managing the domain of enforcement according to its own policy preferences. Studies of the early years of implementation point to low levels of enforcement that declined over time, accompanied by the failure to develop strong incentives for compliance in immigrant-heavy industries.[64] One leading history of IRCA argues that the Reagan and George H.W. Bush Administrations' commitments to deregulation led to INS policy focused on educating businesses, rather than imposing penalties on them.[65]

Not much changed in later years. With one limited exception, the number of investigations, warnings, and fines directed at employers all declined steadily and dramatically from around 1990 into the 2000s.[66] A brief uptick in enforcement occurred during the mid-1990s,[67] following a Clinton Administration directive that called for "strengthening worksite enforcement and work authorization verification . . . to better protect American workers and

---

work authorization verification system failed to "[r]educ[e] the employment magnet"); S. REP. NO. 113-40, at 11 (2013) (criticizing IRCA's employer sanctions and legalization scheme for having "significant gaps"); H.R. REP. NO. 104-469, pt. 1, at 129 (1996) (faulting INS's enforcement of IRCA sanctions as "[t]epid"); Wishnie, *supra* note 59, at 209-11 (discussing the "decline in government enforcement" as part of an argument for repealing IRCA's employer sanctions).

63. *See generally* Doris Meissner et al., *Immigration Enforcement in the United States: The Rise of a Formidable Machinery*, MIGRATION POL'Y INST. 23-47, 92-116 (Jan. 2013), http://www.migrationpolicy.org/sites/default/files/publications/enforcementpillars.pdf [http://perma.cc/R38H-GQRE] (describing the implementation of IRCA and other immigration enforcement systems, including border enforcement and criminal justice system intersections).

64. *See* MICHAEL FIX & PAUL T. HILL, ENFORCING EMPLOYER SANCTIONS: CHALLENGES AND STRATEGIES 3 (1990) (describing concerns with the implementation of the employer sanctions); Peter Brownell, *The Declining Enforcement of Employer Sanctions*, MIGRATION POL'Y INST. (Sept. 1, 2005), http://www.migrationpolicy.org/article/declining-enforcement -employer-sanctions [http://perma.cc/WV33-3XL8].

65. DANIEL J. TICHENOR, DIVIDING LINES: THE POLITICS OF IMMIGRATION CONTROL IN AMERICA 262-63 (2002).

66. *See* Brownell, *supra* note 64.

67. *Id.* at fig.1.

AR2022_500038

businesses that do not hire illegal immigrants."[68] But this strengthening of enforcement dissipated within two years as the Clinton Administration shifted its efforts away from both sanctions and worksite raids and toward targeting the removal of noncitizens with criminal convictions.[69]

This trend toward targeting noncitizens who had committed crimes continued under the George W. Bush Administration, which seemed uninterested in employer sanctions and was focused on national security targets in the wake of the attacks of September 11, 2001. While we know that millions of unauthorized immigrants have long been employed by hundreds of thousands of employers,[70] for years during the Bush Administration, DHS fined fewer than one hundred employers for violating IRCA.[71] For several years, the number of both final orders issued and fines levied hovered close to zero,[72] suggesting the Administration was doing next to nothing to enforce the statute.[73] Even when the Administration increased scrutiny of workplaces near the end of President Bush's second term, the enforcement that resulted took the form of a series of high-profile worksite

68. Deterring Illegal Immigration: Memorandum for the Heads of Executive Departments and Agencies, 60 Fed. Reg. 7885, 7885-86 (Feb. 10, 1995). For a time in 1996, the Administration also launched a series of high-profile worksite raids. ALISON SISKIN ET AL., CONG. RESEARCH SERV., RL33351, IMMIGRATION ENFORCEMENT WITHIN THE UNITED STATES 37-38 (2006); *INS Steps Up Worksite Enforcement, Targets Eastern U.S.*, 73 INTERPRETER RELEASES 531 (1996). But by 1998, criticism from Congress, industry, and advocacy groups led the Administration to soften its enforcement strategy by curbing the abusive tactics critics had identified. *INS Distributes New Guidelines for Worksite Raids*, 75 INTERPRETER RELEASES 979 (1998). In December 1998, further responding to advocates' concerns over the implications of worksite enforcement for the protection of workers, the INS and the Department of Labor (DOL) entered into a memorandum of understanding, according to which DOL would cease referring suspected immigration law violators who complained about worksite violations to INS. *See Labor Department, INS Sign MOU on Labor Standards and Employer Sanctions*, 75 INTERPRETER RELEASES 1696 (1998).

69. The focus on noncitizens with criminal convictions was also facilitated by a series of legislative changes in the Illegal Immigrant and Immigration Reform Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009.

70. According to the Pew Hispanic Center, between 2000 and 2010, the estimated unauthorized labor force ranged from 5.5 million in 2000 to as high as 8.4 million in 2007. *See* Jeffrey S. Passel & D'Vera Cohn, *Unauthorized Immigrant Population: National and State Trends, 2010*, PEW RES. CTR. 17 (Feb. 1, 2011), http://www.pewhispanic.org/files/reports/133.pdf [http://perma.cc/ZDP3-YLJR].

71. *See* BRUNO, *supra* note 60, at 5 tbl.1.

72. *Id.*

73. Interestingly, even in this period we are not aware of anyone arguing that the lack of enforcement violated the statute or the Take Care Clause of the Constitution.

AR2022_500039

raids that led to the arrests of hundreds of workers. DHS issued only thirty administrative fines against employers.[74]

The Obama Administration disavowed high-profile raids in favor of employer audits, while continuing the focus on noncitizens who had committed criminal offenses.[75] The emphasis on audits led to increasing numbers of employer sanctions during President Obama's first term.[76] Yet even with the Obama Administration's increased attention to employer compliance, weak enforcement of IRCA has been a perennial feature of the immigration system. This underenforcement likely stems in part from Congress's ever-growing focus on border enforcement in the appropriations process[77]—an indirect means of de-prioritizing employer sanctions. But the Executive has been more directly responsible for deflating the 1986 statute. It has consistently chosen to focus its enforcement strategy elsewhere, rendering a signature congressional enforcement initiative largely irrelevant to immigration policy.

The complex enforcement history of IRCA reflects a crucial feature of the enforcement power we take up in more detail in Part II—that the President (through enforcement) and Congress (through appropriations and oversight) together continue to make policy and redefine the meaning of a statutory regime long after its enactment, as the regime unfolds in practice. This history also underscores how the President's enforcement judgments drive much of that development, constructing over time the domain of regulation. These enforcement judgments may take the scheme in practice far from the intentions of the enacting Congress, but such is the consequence of enforcement.[78]

## C.  The Rise of De Facto Delegation

In our 2009 article, we juxtaposed how presidents have used authorities expressly delegated to them, such as the parole power, with a phenomenon we termed *de facto delegation*. The concept relates to the sort of ordinary enforcement discretion that requires priority setting and judgment and can

---

**74.** *See* BRUNO, *supra* note 60, at 5-6.

**75.** *Id.* (showing how trends in arrests and administrative fines issued to employers moved in opposite directions as the Bush Administration gave way to the Obama Administration).

**76.** *See* Meissner et al., *supra* note 63, at 84 (citing Bruno, *supra* note 60).

**77.** *See, e.g.*, *id.* at 22 (noting that Customs and Border Patrol (CBP) receives more funding than all other immigration agencies combined, and that CBP's budget increased by eighty-five percent between fiscal years 2005 and 2012).

**78.** The Supreme Court has recognized as much, for reasons we explore in the immediately following section, Part I.C. *See infra* notes 88-90 and accompanying text.

THE PRESIDENT AND IMMIGRATION LAW REDUX

lead to the underenforcement we describe above. But the phenomenon is also more radical, amounting to a system of executive decision making about who may remain in the United States—a system that effectively substitutes for congressional judgment. Importantly, this delegation of de facto screening authority comes not from specific statutory enactments, but emerges instead from the modern structure of immigration law as a whole.

At bottom, de facto delegation is the result of a profound mismatch between the law on the books and reality on the ground, which has resulted from a series of legal, political, and demographic developments that have accelerated over the last four decades.[79] Three features of the immigration code produced by Congress helped establish the conditions for de facto delegation. First, the Code renders removable any noncitizen who enters the United States without authorization. This seemingly simple legal command has intersected with complex demographic and social trends—in particular, record levels of migration, both legal and illegal, over the last thirty years[80]—to produce an unauthorized population that reached over twelve million at its peak in 2007 and has remained above eleven million in recent years.[81] This is an arrestingly

---

**79.** A key consequence of this mismatch has been the emergence of a large gap between formal citizenship and a sociological account of membership—a distinction even courts have recognized when assessing whether and how unauthorized immigrants constitute subjects under the Constitution. *See* Cristina M. Rodríguez, *Immigration, Civil Rights & the Evolution of the People*, 142 DAEDALUS 228, 232-35 (2013). This sociological understanding of membership helps to explain the power of de facto delegation and executive branch policymaking, which arises from the fact that a perfect world is not a world of perfect compliance with current immigration law. *See infra* Part III.C.2.

**80.** These trends, in turn, have been the function of complex legal, economic, labor market, and social forces in the United States, Mexico, and elsewhere. *See, e.g.*, MARCELO SUÁREZ-OROZCO ET AL., THE NEW IMMIGRATION: A READER, at ix-x (2005) (noting that "[t]he current pattern of U.S. immigration" began "to intensify in 1965 and gained extraordinary momentum in the last two decades" and attributing this pattern to the combination of the postindustrial economy's "voracious appetite" for labor, the emphasis of the 1965 immigration reforms on family unity, social forces such as the ease of transportation and dissemination of information, and variables such as armed conflict and political repression).

**81.** *See* Jeffrey S. Passel et al., *Population Decline of Unauthorized Immigrants Stalls, May Have Reversed*, PEW RES. CTR. (Sept. 23, 2013), http://www.pewhispanic.org/2013/09/23 /population-decline-of-unauthorized-immigrants-stalls-may-have-reversed [http://perma .cc/Z8ZE-VEBB]. Demographers pinpoint the peak of illegal immigration to the United States to sometime in the early 2000s. The size of the unauthorized population present in the United States has remained relatively constant in recent years, even as net migration has approached near zero, as the result of factors such as the Great Recession, demographic shifts in Mexico, and U.S. enforcement policy at the border. *See* Jeffrey S. Passel et al., *Net Migration from Mexico Falls to Zero—and Perhaps Less*, PEW RES. CTR. (Apr. 23, 2012), http://www.pewhispanic.org/2012/04/23/net-migration-from-mexico-falls -to-zero-and-perhaps-less [http:// perma.cc/96PZ-ZLLV].

AR2022_500041

large number. It means that nearly half of all noncitizens currently living in the United States are formally deportable under the immigration code.[82]

Second, since the late 1980s, Congress has made increasing numbers of criminal offenses predicates for removal, sweeping even minor drug crimes into the Code and expanding the definition of so-called "aggravated felonies." That term of art initially only encompassed very serious crimes, such as murder and rape, but has come to encompass numerous minor offenses, including many misdemeanors.[83] This makes the pool of deportable noncitizens significantly larger, adding to those who are unauthorized many legal immigrants, including large numbers of lawful permanent residents. The size and complexity of the population thus eligible for removal, coupled with the fact that removal requires investigations, arrests, and charging decisions by immigration police and prosecutors, means that the Executive wields tremendous screening power—functional authority to make judgments about the types of noncitizens who should be permitted to remain in the United States.

Finally, the scope of the Executive's discretion at the enforcement stage has only been augmented by recent congressional decisions to constrain the authority of immigration judges to grant relief from removal at the end of deportation proceedings.[84] These restrictions on relief have often been conceptualized as limiting the role discretion plays in immigration enforcement. But far from eliminating executive discretion, these provisions have simply moved the power to provide relief to the arrest and charging phase, shifting the exercise of discretion from immigration judges to prosecutors and immigration police.[85]

Given the central role Congress has played in the rise of de facto delegation, we chose in 2009 to describe it as a cousin to ordinary delegation. But in using the term "delegation," we do not mean to suggest that Congress clearly intended at any moment in time to create a system of vast ex post executive screening. Instead, the concept describes a structural reality inherited from a series of choices over time—choices that have created a parallel executive

---

**82.** According to the 2010 Census, approximately 22,480,000 noncitizens reside in the United States. *See* Elizabeth M. Grieco et al., *The Foreign-Born Population in the United States: 2010*, U.S. CENSUS BUREAU 2 (May 2012), http://www.census.gov/prod/2012pubs/acs-19.pdf [http://perma.cc/SBG6-UT8T].

**83.** *See* 8 U.S.C. § 1101(a)(43) (2012) (defining "aggravated felony"). For an accounting of these trends and an explanation of how a once narrow definition has become a "colossus," see STEPHEN H. LEGOMSKY & CRISTINA M. RODRÍGUEZ, IMMIGRATION AND REFUGEE LAW AND POLICY 597-99 (6th ed. 2015).

**84.** Cox & Rodríguez, *supra* note 7, at 511-19.

**85.** *Id.*

AR2022_500042

screening regime through which the Executive exercises its own value judgments about the scope of our immigration policy.

Moreover, it would be a mistake to describe de facto delegation as the product solely of congressional choices. Enforcement judgments also have contributed to its rise during the era of mass migration, through the sorts of enforcement tradeoffs described in Part B. For instance, the Executive arguably has contributed to the scope of illegal immigration by declining to either prevent the entry of or remove in large numbers unauthorized immigrants who do not pose public safety or national security risks.[86] Even in a world of ever-increasing resources for immigration enforcement,[87] the gap between law on the books and on the ground has failed to close in any meaningful way, in part because of executive policy judgments. Seen in this light, Congress's decision to shower the enforcement bureaucracy with resources has served only to further increase the Executive's capacity to shape the pool of immigrants living in the United States.

Even the Supreme Court has embraced the central role the President plays in structuring the modern immigration screening system. In *Arizona v. United States*, the Court struck down most provisions of an Arizona law designed to augment federal immigration enforcement. While many of the provisions of the Arizona statute precisely tracked the INA—statutory text one might think embodied Congress's enforcement priorities—the Court rejected Arizona's attempt at redundant enforcement. Under the Court's theory of preemption, federal immigration law consists not only of the legislature's work, or the terms of the Code, but also of the enforcement choices the Executive makes. These choices elevate certain elements of the Code over others or reflect the Executive's desire to emphasize "human concerns" that the Executive has come to appreciate in the course of its enforcement but that might not be embedded

---

**86.** *See* Adam B. Cox & Eric A. Posner, *The Second-Order Structure of Immigration Law*, 59 STAN. L. REV. 809, 843-44 (2007) (arguing that the Executive may prefer a system of illegal immigration because it poses fewer constitutional obstacles to removal); Cristina M. Rodríguez, *The Citizenship Paradox in a Transnational Age*, 106 MICH. L. REV. 1111, 1123-24 (2008) (reviewing HIROSHI MOTOMURA, AMERICANS IN WAITING: THE LOST STORY OF IMMIGRATION AND CITIZENSHIP IN THE UNITED STATES (2006)) (arguing that citizens and lawmakers have tolerated illegal immigration because of its economic benefits). Whether any given administration has in fact tolerated illegal immigration may be in the eye of the beholder. For immigrants' rights activists, enforcement policy in recent years has seemed to mercilessly target large numbers of unauthorized immigrants with families and ties in the United States. For enforcement enthusiasts, the presence of millions of unauthorized immigrants suggests a lack of will on the Executive's part to remove.

**87.** *See generally* Meissner et al., *supra* note 63 (describing the build-up of federal immigration enforcement resources over the last several decades).

in the Code.[88] By conceptualizing immigration law in this way, the Court converted the ordinary exercise of prosecutorial discretion into binding federal law that preempted Arizona's immigration initiatives.[89] Thus, even though the state sanctions mirrored the federal statute, they were preempted because they conflicted with the way in which the Executive Branch had wielded its enforcement discretion. Whether we think federal enforcement priorities ought to have preemptive effect—a move that could be quite disruptive to federalism in the administrative state—the Court's move speaks powerfully to the independent role the Executive plays in the development of the very meaning of a statutory scheme.[90]

For our purposes here—dissecting and understanding the enforcement power—the signal feature of de facto delegation has been the priority setting it entails, which can result in profound and widespread policy effects. As we argued in 2009, "[T]he President's inability to set formal admissions and removal criteria has not precluded him from playing a major role in shaping screening policy."[91] This ex post form of screening authority has amplified the President's control over our immigration policy, despite the fact that (and paradoxically because) Congress has maintained a virtual monopoly over ex ante screening. Congress, perhaps unwittingly, has borne considerable responsibility for expanding the domain of enforcement in a way that has magnified executive policymaking power, by making the INA more and more complicated and rule-bound since its adoption in 1952. As we will argue in Part II, the fact that Congress may not have contemplated or intended these effects does not render the presidential actions producing them unlawful. Instead, the

---

88.  *See* Arizona v. United States, 132 S. Ct. 2492, 2499 (2012) ("Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation's international relations. . . . The foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return. The *dynamic* nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities." (emphasis added)).

89.  *See* Cox, *supra* note 36, at 54.

90.  Justice Kennedy's conception of federal law even seems to contemplate that the enacting Congress understands the Executive Branch will make crucial choices about the reach of a statute when it creates the enforcement scheme to begin with. *See Arizona*, 132 S. Ct. at 2499. As we explain below, however, our account does not turn on ascribing specific intent to the enacting Congress(es). *See infra* text accompanying notes 139-148.

91.  Cox & Rodríguez, *supra* note 7, at 511.

134

rise of de facto delegation underscores how regulatory domains evolve over time through the interplay of legislative acts and discretionary enforcement choices.

### D. Centralizing Enforcement Within the Executive

As we explained in 2009, there are reasons to be concerned about the increasingly outsized role enforcement policy has come to play in the formulation of immigration policy. The scale of de facto delegation, in particular, has given rise to a variety of good governance and rule-of-law concerns. As has been emphasized recently in debates about policing and criminal justice, enforcement judgments are often opaque and, for that reason, frequently resist accountability.[92] In addition, enforcement imperatives often empower low- and mid-level officials, especially as the size of the enforcement pool expands.[93] The diffusion of responsibility that results may make it more difficult to structure and control enforcement policy according to priorities established by executive branch leadership, let alone by Congress.

Presidential administrations are, of course, attentive to these concerns, if only because they implicate the territorial tussle between political leadership in Washington and agents in the field. Without control over the bureaucracy, it can be difficult, if not impossible, for a modern administration to implement its agenda. Accordingly, the modern history of presidential immigration law is as much a story about the organization of the Executive Branch, and dynamics among actors within it, as it is an account of the relationship between the Executive and Congress. Whereas in our 2009 article we focused exclusively on the latter, here we also seek to highlight how the former should factor into our account of the enforcement power and the separation of powers.

The Obama Administration, in particular, has responded to the demands engendered by de facto delegation with systemic and organizational changes, of which the 2014 relief policies represent only one example. The Administration's enforcement policy as a whole has become increasingly directed at regularizing and making more consistent the operation of the de facto, ex post screening system—a system executive leadership came to see as too random and overly subject to the views of low-level bureaucrats and state

---

92. *See* DAVID ALAN SKLANSKY, DEMOCRACY AND THE POLICE (2008); David Alan Sklansky, *Prosecutorial Discretion Through the Looking Glass*, BALKINIZATION (Nov. 23, 2014, 10:30 AM), http://balkin.blogspot.com/2014/11/prosecutorial-discretion-through.html [http://perma.cc/H8AD-Q9DV].

93. *See* Cox & Rodríguez, *supra* note 7, at 528-36.

135

and local officials.[94] The motivations for its various regularization efforts have been simultaneously institutional and political. As a Democratic administration, the politics of immigration required that it commit to enforcing the law, but also that it respond to enforcement's perceived excesses. And from DHS's institutional point of view, agents in the field (both federal and local) had become too powerful in dictating the direction of administration policy.

The Administration's centralizing and regularizing moves have been myriad, but three prior to the announcement of the first relief initiative in 2012 — Deferred Action for Childhood Arrivals (DACA) — stand out. First, the Administration's virtually unprecedented decision to file preemption lawsuits against Arizona and several other states, challenging state laws designed to buttress the federal enforcement regime, reflected a desire to retake federal control over the immigration debate and suppress state efforts to shape both immigration policy and politics.[95] Second, in 2011, DHS released the so-called Morton Memos, a pair of agency memoranda designed to regulate the use of prosecutorial discretion by line-level enforcement officials. These memos grew out of a long tradition of similar efforts in previous administrations to provide guidance to immigration enforcement officials.[96] But the Morton Memos

---

94. The role of state and local officials in driving federal immigration enforcement has been a subject of extended scholarly inquiry. Studies of the 287(g) Program, for example, have shown that the priorities of state and local officials involved in immigration enforcement often veer from those of federal officials, though federal agents in the field can also develop common cause with local officials, creating tension with officials in Washington. *See, e.g.*, Randy Capps et al., *Delegation and Divergence: A Study of 287(g) State and Local Immigration Enforcement*, MIGRATION POL'Y INST. (2011), http://migrationinformation.org /sites/default/files/publications/287g-divergence.pdf [http://perma.cc/EB3H-B98R]. In addition, because convictions under state law serve as predicates for removal, the federal government has been dependent on cooperation from state police to identify potentially removable noncitizens, and state and local arrests and prosecutions can determine who gets funneled into removal proceedings. *See* Ingrid V. Eagly, *Local Immigration Prosecution: A Study of Arizona Before SB 1070*, 58 UCLA L. REV. 1749 (2011) (showing how Arizona employed criminal anti-smuggling laws in ways that redefined and restructured the system of immigration enforcement); Hiroshi Motomura, *The Discretion That Matters: Federal Immigration Enforcement, State and Local Arrests, and the Civil-Criminal Line*, 58 UCLA L. REV. 1819 (2011) (arguing that state and local police have de facto power to set the immigration enforcement agenda through ordinary policing and that any policy that permits state and local police to act as gatekeepers can undermine federal authority).

95. For a discussion, see Cristina M. Rodríguez, *Negotiating Conflict Through Federalism: Institutional and Popular Perspectives*, 123 YALE L.J. 2094, 2104-05 (2014); and Cox, *supra* note 36.

96. *See, e.g.*, Memorandum from John Morton, Dir., Immigration and Customs Enf't (ICE), to Field Office Dirs., Special Agents in Charge & Chief Counsel 1 (June 17, 2011), http://www .ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf [http://perma

reached significantly beyond their predecessors by creating a tiered enforcement scheme. Accordingly, the immigration law world regarded them as more serious efforts to regularize discretion than past guidance documents. Finally, the Obama Administration's decision to make Secure Communities (launched during the waning days of the Bush Administration) the centerpiece of its enforcement strategy reflected a turn to technology to systematize enforcement against criminal offenders. Secure Communities promised to displace the unpredictable human element of formal and informal cooperation with local police.[97] Even though the President, as part of his November 2014 announcement, declared an end to the program and DHS replaced it with the Priority Enforcement Program, the core centralizing, data-sharing feature remains in place and likely reflects a permanent shift in the way DHS collects the information essential to its enforcement activities.[98]

With these moves as prelude, the motivations for the Obama relief initiatives come into sharper focus. Two of the centralizing moves succeeded, but one resulted in limited, if any, success and required recalibration. Federal lawsuits in Arizona and elsewhere successfully muted the state policymaking initiatives that had been accelerating prior to the litigation.[99]

---

.cc/V3FE-DTUG] [hereinafter Morton, Exercising Prosecutorial Discretion]; Memorandum from John Morton, Dir., ICE, to Field Office Dirs., Special Agents in Charge & Chief Counsel 1 (June 17, 2011), http://www.ice.gov/doclib/secure-communities/pdf/domestic -violence.pdf [http://perma.cc/XN2F-ZG33]; Memorandum from Julie L. Myers, Assistant Sec'y, ICE, to Field Office Dirs. & Special Agents in Charge 1 (Nov. 7, 2007), http://www.ice.gov/doclib/foia/prosecutorial-discretion/custody-pd.pdf [http://perma.cc /9XEQ-LLDJ]; Memorandum from Doris Meissner, Comm'r, Immigration and Naturalization Service, to Reg'l Dirs., Dist. Dirs., Chief Patrol Agents & Reg'l & Dist. Counsel 1 (Nov. 17, 2000), http://www.legalactioncenter.org/sites/default/files/docs/lac /Meissner-2000-memo.pdf [http://perma.cc/2DEH-8TLB].

97. *See* Adam B. Cox & Thomas J. Miles, *Policing Immigration*, 80 U. CHI. L. REV. 87 (2013); Rodríguez, *supra* note 95, at 2105 n.26 (describing Secure Communities as reflecting a desire to use "federalism's institutions while holding its actors at bay"). Under the program, the FBI shares with DHS the fingerprint and arrest data sent to it by state and local police. DHS then runs the data through its own database to determine if state and local police have identified a potentially removable noncitizen. ICE then determines whether to request that local officials hold the noncitizen until it can decide whether to take custody for removal purposes. *See* Cox & Miles, *supra*, at 93-96. The 2014 replacement of Secure Communities with the Priority Enforcement Program leaves the data-sharing function in place and simply changes what the Administration will do with the information it receives from the FBI and, by extension, state and local officials.

98. It should be noted that this centralization is relative. Because ICE depends on information held by local and state officials to do its job, it cannot avoid interacting with those bureaucracies.

99. *See, e.g.*, Arizona v. United States, 132 S. Ct. 2492 (2012). The Court struck down most of Arizona's attempt to augment federal immigration enforcement, though it left in place the most notorious provision of the statute, which requires law enforcement officials to inquire

AR2022_500047

Secure Communities took center stage and has come to account for the vast majority of removals from the interior of the country, superseding the more limited 287(g) Program, and systematizing long-standing informal cooperation between local and federal officials.[100] But for reasons we discuss in detail in Part III, the Morton Memos did not achieve their objectives, at least to the extent they were motivated by a genuine desire to significantly curb line-officer discretion to initiate the removal of unauthorized immigrants without criminal records. These institutional developments, in turn, coincided with a powerful social movement of unauthorized youth demanding recognition of their rightful place in the United States. The movement eventually made its way into the White House, while the larger campaign against deportations made a strong impression on powerful local officials in places such as California, Chicago, and New York City, who began to resist participation in federal enforcement.[101]

The combination of these institutional and social movement pressures, along with the imperatives of the 2012 election, created the context in which the White House announced DACA and then, a little more than a year later,

into immigration status in certain circumstances. *Id.* at 2510 ("At this stage . . . it would be inappropriate to assume § 2(B) will be construed in a way that creates a conflict with federal law."). It remains unclear the extent to which that provision has been used, for good or for ill, and much of the political momentum behind provisions of this sort appears to have subsided for now. *See* Cristina M. Rodríguez, *Toward Détente in Immigration Federalism*, 30 VA. J.L. & POL. (forthcoming 2015) (manuscript at 17 & n.49), http://ssrn.com/abstract=2624672 [http://perma.cc/AE2Q-3A3J].

100. *See* MARC R. ROSENBLUM & WILLIAM A. KANDEL, CONG. RESEARCH SERV., R42057, INTERIOR IMMIGRATION ENFORCEMENT: PROGRAMS TARGETING CRIMINAL ALIENS 25 tbl.6 (2012) (presenting interior enforcement actions by the program from fiscal year 2004 to fiscal year 2011).

101. *See* Rodríguez, *supra* note 95, at 2121; Rodríguez, *supra* note 99 (manuscript at 12-14). This resistance helped prompt the Administration's change in policy and demonstrated the power of the local in cooperative ventures. As Homeland Security Secretary Johnson wrote at the time of the program's discontinuation:

> The goal of Secure Communities was to more effectively identify and facilitate the removal of criminal aliens in the custody of state and local law enforcement agencies. But the reality is the program has attracted a great deal of criticism, is widely misunderstood, and is embroiled in litigation . . . . Governors, mayors, and state and local law enforcement officials around the country have increasingly refused to cooperate with the program . . . . The overarching goal of Secure Communities remains in my view a valid and important law enforcement objective, but a fresh start and a new program are necessary.

Memorandum from Jeh Charles Johnson, Sec'y, U.S. Dep't Homeland Sec., to Thomas S. Winkowski, Acting Dir., ICE, et al. 1 (Nov. 20, 2014), http://www.dhs.gov/sites/default/files/publications/14_1120_memo_secure_communities.pdf [http://perma.cc/UYG3-EWVK] [hereinafter Johnson, Secure Communities Memo].

THE PRESIDENT AND IMMIGRATION LAW REDUX

Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). The "Obama relief initiatives," as we call them, emerged in two phases. In June 2012, then-Secretary of Homeland Security, Janet Napolitano, announced what became known as DACA. [102] According to the DHS memorandum accompanying the announcement, noncitizens without legal status who met certain criteria were eligible to apply for a renewable two-year period of relief from removal, as well as for the authorization to work in the United States. [103] The central feature of DACA was that it covered blameless youth with longstanding presence in the United States, namely, unauthorized immigrants who had come to the United States before the age of sixteen and had resided continuously in the United States for at least five years. [104]

The Administration styled relief for that group as an exercise of prosecutorial discretion—a large-scale extension of the "deferred action" immigration authorities had utilized for decades as a case management and humanitarian relief tool. [105] To underscore that the initiative fell within the

---

[102]. Press Release, U.S. Dep't of Homeland Sec., Secretary Napolitano Announces Deferred Action Process for Young People Who Are Low Enforcement Priorities (June 15, 2012), http://www.dhs.gov/news/2012/06/15/secretary-napolitano-announces-deferred -action-process-young-people-who-are-low [http://perma.cc/83EK-N89S].

[103]. Memorandum from Janet Napolitano, Sec'y, U.S. Dep't Homeland Sec., to David V. Aguilar, Acting Comm'r, U.S. Customs & Border Prot., et al. (June 15, 2012) [hereinafter Napolitano, Prosecutorial Discretion Memo], http://www.dhs.gov/xlibrary/assets/s1 -exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf [http:// perma.cc/2HX6-G4H4].

[104]. *Id.* at 1. In addition, to receive relief under the 2012 version of DACA, an applicant must have been under the age of thirty-one as of June 15, 2012; not have been convicted of certain crimes; and, at the time of application, either be in school or have graduated from high school, have obtained a GED certification, or have been honorably discharged from the Coast Guard or Armed Forces. *Id.*

[105]. The decision to defer action, or delay or decline removal, functions like the criminal prosecutor's choice not to pursue a case. In the immigration setting, noncitizens whose prosecutions have been deferred have historically been eligible to apply for work permits pursuant to INS and now DHS regulation and are considered to be lawfully present for certain purposes, though deferred action does not confer on them a lawful immigration status. *See Frequently Asked Questions*, U.S. CITIZENSHIP & IMMIGR. SERVICES, http://www.uscis.gov/humanitarian/consideration-deferred-action -childhood-arrivals-process/frequently-asked-questions [http://perma.cc/4KVM-P4G5]. Though Congress has not affirmatively authorized the practice or weighed in on its scope and the Supreme Court has not directly addressed its permissibility, both had acknowledged deferred action as part of the system of immigration enforcement prior to the announcement of DACA. *See* 8 U.S.C. § 1154(a)(1)(D)(i)(IV) (2012) (characterizing certain petitioners for immigrant status subjected to familial abuse as "eligible for deferred action and work authorization"); *id.* § 1227(d)(2) (2012) (stating that the denial of a request for an administrative stay of removal is no bar to applying for "deferred action"); Reno v. Am.- Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999) (describing deferred action as

139

President's enforcement powers, the Administration emphasized that DACA would not confer a lawful status on its recipients, that the adjudicators of DACA petitions in United States Citizenship and Immigration Services (USCIS) retained discretion to deny applications of even those who satisfied the eligibility criteria, and that DHS retained the discretion to terminate the status at any time. By the end of 2014, approximately 638,897 noncitizens had been granted relief under DACA.[106]

In an address to the nation in November 2014, the President himself announced a second round of administrative actions designed to advance a variety of long-sought policy objectives.[107] The centerpiece again consisted of a large-scale deferred action initiative, this time for the unauthorized parents of U.S. citizens and lawful permanent residents. Pursuant to this program, known as DAPA,[108] eligible noncitizens who are not otherwise enforcement priorities for the government would be permitted to apply for the deferral of their removal, as well as work authorization, for three years.[109] Alongside this

INS's "regular practice . . . of exercising . . . discretion for humanitarian reasons or simply for its own convenience").

106. *See* U.S. Citizenship & Immigration Servs., *Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: 2012-2015 (December 31)*, U.S. DEP'T HOMELAND SECURITY (2015), http://www.uscis.gov/sites /default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Da ta/All%20Form%20Types/DACA/I821d_performancedata_fy2015_qtr1.pdf [http://perma.cc /RNW2-9WNJ] (listing total cumulative initial DACA grants from the program's start through December 31, 2014). In August 2014, after the initial two-year period of DACA expired, the Administration began processing applications for renewal of deferred action status. *Cf.* U.S. CITIZENSHIP & IMMIGR. SERVICES, *supra* note 105 (indicating the procedure for renewal of DACA). Roughly 148,171 cumulative renewals have been granted. U.S. Citizenship & Immigration Servs., *supra* (listing total cumulative renewal grants through December 31, 2014).

107. *See* Michael D. Shear, *Obama, Daring Congress, Acts To Overhaul Immigration*, N.Y. TIMES, Nov. 20, 2014, http://www.nytimes.com/2014/11/21/us/obama-immigration-speech.html [http://perma.cc/352G-VHR2]; Press Release, Office of the Press Sec'y, White House, Weekly Address: Immigration Accountability Executive Action (Nov. 22, 2014), http:// www.whitehouse.gov/the-press-office/2014/11/22/weekly-address-immigration-accountabili ty-executive-action [http://perma.cc/Q2B3-2RK4].

108. *See* Memorandum from Jeh Charles Johnson, Sec'y of Homeland Sec., to León Rodríguez, Dir., U.S. Citizenship & Immigration Servs., Thomas S. Winkowski, Acting Dir., U.S. Immigration & Customs Enf't, and R. Gil Kerlikowske, Comm'r of U.S. Customs & Border Prot. 4 (Nov. 20, 2014) [hereinafter Johnson, DACA and DAPA Memo], http://www .dhs.gov/sites/default/files/publications/14_1120_memo_deferred_action.pdf [http://perma .cc/Z7B9-K5MG]. The Administration originally called the program Deferred Action for Parental Accountability.

109. On February 16, 2015, a judge in the Southern District of Texas enjoined the implementation of DAPA, concluding that the Administration violated the Administrative Procedure Act (APA) by failing to initiate notice-and-comment rulemaking for what the

new deferred action initiative, the Administration proposed to tweak the existing DACA program, expanding eligibility and extending the relief period to three years.[110] Together with the announcement of DAPA, DHS Secretary Johnson also issued a memorandum identifying department-wide guidelines intended to govern removal and detention policies and budget requests more generally. The "Johnson Memo" reinforced the Department's longstanding emphasis on public safety, national security risks, and border enforcement. To implement these priorities, however, the memo superseded all previous enforcement guidance with a new three-tiered scheme for prioritizing enforcement efforts.[111]

These Obama relief policies are thus best understood as the most dramatic and politically salient examples of a larger effort to centralize the vast enforcement authority that modern de facto delegation has given to the Executive. This centralization has entailed experimenting with different means of ensuring that political leadership within the agencies, as well as the White House, exert greater control over the structure of the immigrant screening system in order to advance the policy objectives of leadership, as well as to promote consistency and predictability in enforcement. Some aspects of this centralization have elevated decision-making authority within the bureaucracy—moving it from lower-level to higher-level decision makers. Other aspects have drawn power into the bureaucracy that otherwise might lie outside it—as is true in efforts to reduce the role of state and local actors in shaping the enforcement system.

---

judge characterized as a legislative rule. *See* Texas v. United States, Civ. No. B-14-254, 2015 WL 648579, at *62 (S.D. Tex. Feb. 16, 2015). We discuss the APA question below. *See infra* notes 308-318 and accompanying text.

110. *See* Johnson, DACA and DAPA Memo, *supra* note 108, at 3. DACA initially made eligible only those childhood arrivals who were under the age of 31 at the time they applied for relief under DACA. *See* Napolitano, Prosecutorial Discretion Memo, *supra* note 103. This limit on one's age at the time of application was eliminated in the changes announced on November 20, 2014. *See* Johnson, DACA and DAPA Memo, *supra* note 108, at 3.

111. *See* Memorandum from Jeh Charles Johnson, Sec'y, U.S. Dep't Homeland Sec., to Thomas S. Winkowski, Acting Dir., U.S. Immigration & Customs Enf't, et al. 3-4 (Nov. 20, 2014) [hereinafter Johnson, Enforcement Priorities Memo], http://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf [http://perma.cc/EQ57-XP42] (prioritizing for enforcement purposes, in tier one, those posing "threats to national security, border security, and public safety," in tier two "misdemeanants and new immigration violators," and in tier three all other recent immigration violators). As part of this enforcement reform, the Administration also announced the reformulation of the Secure Communities Program. Though DHS would continue to rely on fingerprint data collected from state and local arrests, it would change DHS's enforcement policy from requesting that state and local police detain noncitizens for removal to, instead, requesting that police simply notify DHS that the release of potentially removable noncitizens from local custody was pending. *See* Johnson, Secure Communities Memo, *supra* note 101, at 1-3.

141

AR2022_500051

THE YALE LAW JOURNAL                                      125:104   2015

All recent administrations have reflected some centralizing tendencies, but the combination of politics and current events has made centralization efforts particularly pronounced in the Obama years. Of course, the fact that the Obama relief initiatives arose in response to these intertwined institutional and political forces does not tell us that those initiatives are lawful. Nor are they lawful simply because they fit comfortably within the tradition of executive branch policymaking that we have brought to the fore in this Part and in our 2009 work. Indeed, the propriety of any one of the forms of executive action highlighted in this Part could be debated, and the mere historical rootedness of the particular exercise of a power is not sufficient to endow it with constitutional status.[112]

The emergence of the relief initiatives as administration policy does, however, highlight the dynamic evolution of the content and reach of executive power. In particular, the initiatives embody recent efforts by the President and political leadership to reorganize this power. Their importance stems from what they reveal to us about the Executive Branch's internal operations and those operations' relationship to core constitutional and legal values, and not just their substantive outcomes. In Parts II and III, we turn from this historical account to critique and justification, to explain how such internal reorganization can promote transparency and accountability and thus serve the objectives of the separation of powers, even as it might deviate from congressional design and advance the Executive's own policy agenda.

## II. THE SUBSTANTIVE GROUNDS OF ENFORCEMENT DISCRETION

Everyone debating the Obama relief initiatives agrees on two basic points. First, all acknowledge that executive branch officials have some discretion to decide whether and when to initiate a prosecution in an individual case. This understanding represents the paradigm case of the Anglo-American concept of "prosecutorial discretion." Even those who insist most strongly on a constrained Executive accept this discretionary authority over charging decisions in both criminal and civil contexts.[113] Second, all participants agree

---

112. *See, e.g.*, Zachary Price, *Two Cheers for OLC's Opinion*, BALKINIZATION (Nov. 25, 2014, 1:30 PM), http://balkin.blogspot.com/2014/11/two-cheers-for-olcs-opinion.html [http://perma .cc/E7JV-EG53] (warning of the one-way ratchet of reliance on past executive branch practice to establish the legality of a present-day action and noting that "the constitutional architecture supports an important background norm that executive officials still must seek to effectuate statutory policies").

113. The existence of this authority does not mean, of course, that such discretion is never defeasible. A group of ICE agents challenged DACA on the ground that the INA stripped agency personnel of this discretion and now mandates the initiation of removal proceedings

AR2022_500052

that the President cannot decline to enforce altogether a law that is constitutional. Such an effort to "suspend" the law would amount to an abdication of his Article II obligation to "take Care that the Laws be faithfully executed."[114]

But how do we distinguish the constitutional exercise of prosecutorial discretion from an impermissible abdication of the President's duty to enforce the law? Putting aside purely formal arguments about the distinction between permissible "underenforcement"[115] and impermissible "suspension," which suffer from serious conceptual problems,[116] claims about how to draw this

---

against noncitizens who are inadmissible for having entered the United States without inspection. *See* Complaint, Crane v. Napolitano, 920 F. Supp. 2d 724 (N.D. Tex. 2013) (No. 3:12-CV-03247-O), 2012 WL 3629252 (arguing that Congress's use of the word "shall" in 8 U.S.C. § 1225(b)(2)(A) (2012), which states that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a [removal] proceeding," mandates the initiation of removal proceedings (emphasis omitted)). For a convincing demolition of this statutory claim about the INA, see David A. Martin, *A Defense of Immigration-Enforcement Discretion: The Legal and Policy Flaws in Kris Kobach's Latest Crusade*, 122 Yale L.J. Online (2012), http://www.yalelawjournal.org/forum/a-defense-of-immigration-enforcement-discretion-the-legal-and-policy-flaws-in-kris-kobachs-latest-crusade [http://perma.cc/TJP6-2Y4F]. For a discussion of the resolution of this case, see *infra* note 120. For a discussion of the tools available to Congress, see *infra* notes 299-301 and accompanying text.

114. U.S. Const. art. II, § 3. *But cf.* Eric Posner & Adrian Vermeule, The Executive Unbound 113-53 (2011) (arguing that the political need to maintain credibility and respond to public opinion, not legal norms or constitutional rules, constrains the Executive).

115. Extensive literature explores the pervasiveness of and reasons for underenforcement, as well as its potential costs. *See* Jonathan M. Barnett, *The Rational Underenforcement of Vice Laws*, 54 Rutgers L. Rev. 423, 426-27 (2002) (arguing that nonenforcement is a rational law enforcement strategy to deter marginal offenders without expending enormous resources on pursuing those who would offend regardless of the law); Alexandra Natapoff, *Underenforcement*, 75 Fordham L. Rev. 1715, 1745-48 (2006) (criticizing underenforcement by arguing that it arises when the group in need of enforcement is politically powerless); Gerald L. Neuman, *Anomalous Zones*, 48 Stan. L. Rev. 1197, 1201-06 (1996) (describing the reasons why zones arise in which law is not enforced as a matter of explicit policy); Matthew C. Stephenson, *Public Regulation of Private Enforcement: The Case for Expanding the Role of Administrative Agencies*, 91 Va. L. Rev. 93, 116-17 (2005) (linking underenforcement to the implementation of a larger administrative scheme and arguing that enforcement should be left to agencies rather than private causes of action to ensure that enforcement is governed by a unified strategy given that law cannot reasonably be enforced to its limits); Daniel T. Deacon, Note, *Deregulation Through Nonenforcement*, 85 N.Y.U. L. Rev. 795, 796-99 (2010) (identifying the phenomenon of deregulation through nonenforcement and arguing that it is undesirable because it lacks transparency and obstructs accountability).

116. A core conceptual challenge for formalistic approaches is the fact that enforcement decisions often require judgments about the appropriate relationships among myriad parts of a large statutory code. Immigration enforcement, for example, inevitably implicates tradeoffs across numerous INA provisions — between border and interior enforcement, between immigrants

143

distinction typically take one of two forms. The first searches for principles that limit the substantive criteria that can serve as a basis for prosecutorial discretion. The second focuses on the way the Executive institutionalizes the criteria—that is, on how the Executive structures its decision making to take account of substantive criteria it has defined as relevant.

Prior to President Obama's November 2014 announcement, few commentators had taken the first tack of focusing on whether the substantive grounds of relief in the President's potential programs were themselves unlawful.[117] But that changed when the Office of Legal Counsel (OLC) released a legal opinion to accompany the President's unveiling of DAPA. Before the President announced his new relief policies, the Secretary of DHS and the White House Counsel turned to OLC, proposing two deferred action programs and seeking advice as to whether they were lawful. OLC found one within the Executive's authority and the other not.[118] OLC's opinion honed in on the President's substantive priorities, asking whether the central criteria for relief—

---

who violate U.S. criminal laws and those who ignore provisions governing who may enter and work in the United States, between targeting immigrants themselves or third parties (like smugglers or employers) who affect the demand for migration, and so on. Whether one concludes that these choices lead to the unlawful suspension of "the law" depends on the level of generality at which one evaluates the Code. At a low level of generality—that is, with a focus on particular Code provisions—such tradeoffs can often resemble suspension, because *a part of the Code* (often a single provision) will end up being almost entirely unenforced. But if our frame of reference is the INA as a whole, these tradeoffs simply do not entail any failure to enforce the *Code as a whole*.

Recall, for example, our discussion in Part I of IRCA's employer sanctions regime. While we know that millions of unauthorized immigrants are employed by hundreds of thousands of employers, for years during the Bush Administration, DHS fined fewer than a hundred employers for violating IRCA. Whether one believes that those facts reflect a failure to enforce the law depends on the level of generality at which one defines "the law." And like these earlier IRCA enforcement decisions, the implementation of the Obama relief policies ultimately will mean that fewer enforcement resources will be directed to certain parts of the Code—the provisions making deportable those who entered without inspection or overstayed the terms of their lawful entry—while more enforcement resources will be directed at other elements of the Code, primarily those that make deportable noncitizens who have committed serious crimes or pose security risks.

117. In the wake of the President's announcement of DACA, a variety of commentators concluded his actions were unlawful, but they tended to focus their arguments on the institutional form of relief. Zachary Price provided the most detailed effort along these lines, arguing that "individualized" determinations are lawful but "categorical" ones are not. Price, *supra* note 14, at 675; *see also* Delahunty & Yoo, *supra* note 14, at 784-85 (acknowledging the President's authority to apply equitable concerns in individual cases but contending that such authority does not extend to general, categorical rules like DACA). We explain in Part III why the distinction between "categorical" and "case-by-case" enforcement discretion cannot bear the weight that Price's argument places on it.

118. For a discussion of the details, see *infra* notes 127-133, 150-157 and accompanying text.

being a parent of a U.S. citizen, for example—were lawful. The answer, according to OLC, could be found by asking whether providing relief to those singled out advanced "congressional priorities" embedded in the INA.

Though OLC developed its congressional priorities approach in response to a direct question about the lawfulness of DAPA, the opinion's analytic framework transcends the details of any one scheme of enforcement discretion. In our assessment of it, then, we aim simultaneously to address the particularities of DAPA (as well as DACA) in order to help resolve the debate currently raging about these specific programs, as well as to consider the viability of a congressional priorities framework for understanding any general limits on enforcement discretion, which can take numerous forms. In other words, even if DAPA were never implemented[119] and DACA were invalidated as the result of final federal court judgments[120]—outcomes we are skeptical will

---

**119.** At the time of this writing, DAPA remains enjoined. As we discuss in more detail in Part IV, a judge in the Southern District of Texas concluded that the Administration violated the Administrative Procedure Act by failing to subject DAPA—a legislative rule, in its view—to notice-and-comment rulemaking. In the spring and summer of 2015, the Fifth Circuit denied the United States's motion to stay the injunction and held oral arguments on the appeal of the preliminary injunction. In both settings, the Fifth Circuit telegraphed its extreme skepticism of the government's position, and it therefore seems likely that DAPA either will remain enjoined by the Fifth Circuit or be reviewed by the Supreme Court by 2016. *See infra* notes 310-312 and accompanying text. Even if the United States were to lose at each step of the way, it could cure the APA problem by initiating notice-and-comment rulemaking. Provided time remains in this Administration to go through these motions, DAPA is likely eventually to come into effect. To be sure, the analysis by the Texas district court and signals from the Fifth Circuit suggest underlying constitutional discomfort with DAPA. As we explain throughout this Article, we find the constitutional objections to DACA and DAPA to be both weak and ultimately inconsistent with the approach to enforcement discretion the Supreme Court has taken in cases such as *Arizona v. United States*.

**120.** Thus far, the United States has succeeded in defending DACA against attack, though neither the arguments animating those lawsuits nor the procedural developments in them is on all fours with the Texas litigation. In another lawsuit in the Fifth Circuit, a district judge in the Northern District of Texas found that ICE agents, but not the state of Mississippi, had standing to challenge DACA. *See* Crane v. Napolitano, 920 F. Supp. 2d 724, 736, 738, 746 (N.D. Tex. 2013) (holding that ICE agents could not claim a potential violation of their oaths of office as cognizable injury but could establish injury as the result of potential discipline they might face for not complying with DACA). The court ultimately dismissed the agents' lawsuit for lack of subject matter jurisdiction, however. *See* Crane v. Napolitano, No. 3:12-CV-03247-O, 2013 WL 8211660, at *2 (N.D. Tex. July 31, 2013) (concluding that the Civil Service Reform Act provides "comprehensive and exclusive procedures for settling work-related controversies between federal civil-service employees and the federal government"), *aff'd sub nom.* Crane v. Johnson, 783 F.3d 244 (5th Cir. 2015). In a lawsuit brought by Sheriff Joe Arpaio in the D.C. Circuit, a district court has denied a motion for a preliminary injunction against DACA and dismissed the case for lack of Article III standing. *See* Arpaio v. Obama, 27 F. Supp. 3d 185 (D.D.C. 2014) (noting that Arpaio has no authority to enforce the immigration laws and therefore is not injured by their underenforcement and

AR2022_500055

come to pass—evaluating the congressional priorities approach would remain an important task.

Putting aside one puzzling aspect of OLC's congressional priorities approach—that it elevates an ordinary argument about agency compliance with statutory obligations into a constitutional argument about the President's Article II obligations—the basic analytic framework of the "congressional priorities" approach seems straightforward.[121] But its seemingly straightforward quality turns out to be an illusion. As we explain in this Part, tying executive discretion to congressional priorities cannot provide a satisfying limiting principle within immigration law because, for the vast majority of enforcement choices that must be made, there are no coherent congressional priorities to be extracted from the Code. Any inquiry into congressional priorities is thus likely to be futile, which is why the dueling accounts of those priorities supplied by OLC and its critics are both unpersuasive. Moreover, in addition to providing little interpretive guidance, the congressional priorities approach perpetuates a "faithful-agent" model of law enforcement that is neither descriptively accurate nor normatively attractive. Executive branch policymaking through enforcement actually advances certain goals of our scheme of separated powers. When it comes to the exercise of the enforcement power, therefore, we should embrace what we refer to as the two-principals model of decision making that has emerged in practice.

## A. Congressional Priorities and Faithful Agents

Though we ultimately disagree with the OLC opinion's approach, the opinion reflects the best instincts of OLC: that significant and novel executive

---

concluding that his claim of injury stemming from the need to expend resources to address crime and other costs associated with DACA was speculative). The court also telegraphed its skepticism that Arpaio could succeed on the merits, observing that "the challenged deferred action programs continue a longstanding practice of enforcement discretion regarding the Nation's immigration laws" that has been "conferred by statute" and is therefore "consistent with, rather than contrary to, congressional policy." *Id.* at 209. The court also concluded that the policy preserved meaningful case-by-case review. *Id.* at 209-10. On appeal, the D.C. Circuit held that "Sheriff Arpaio has failed to allege an injury that is both fairly traceable to the deferred action policies and redressable by enjoining them, as our standing precedents require." Arpaio v. Obama, 797 F.3d 11, 14 (D.C. Cir. 2015).

[121]. In his work analyzing DACA, before the President's November 2014 announcement, Zachary Price offers a heuristic that resembles this OLC approach in the way that it ties the President's enforcement power to what Congress intends. He emphasizes that the Executive can engage in "priority setting" but not "policymaking." *See* Price, *supra* note 14, at 761. That said, the limiting principle he devises—the categorical versus individual distinction—does not attempt to excavate substantive priorities from the INA but instead devises a sort of structural device for evaluating enforcement discretion.

146

branch policies ought to be scrutinized and that such scrutiny is doubly important when the exercise of power is unlikely to be reviewed by courts and raises potential separation-of-powers concerns.[122] The independence of the Office's judgment is also reflected in an aspect of the opinion Administration detractors seem to overlook: its conclusion that one of the President's proposed initiatives was beyond his authority. Though OLC frequently advises the President that a proposed course of action would not be lawful,[123] such advice is rarely made public, making the release of the opinion itself a remarkable event. In taking on the task of crafting a principle to limit a highly malleable form of executive authority, OLC's actions highlight that law constrains the President's actions.

Two crucial legal conclusions structure the analysis in the OLC opinion. First, the opinion rejects the idea that "resource constraints" provide a meaningful principle for limiting enforcement discretion.[124] Many defenders of broad deportation relief had pressed that as a limiting principle. But OLC was right to reject it; as a limiting principle, it is virtually meaningless.[125] The

---

**122.** One of us (Cristina Rodríguez) was Deputy Assistant Attorney General in the Office of Legal Counsel from 2011-2013. The views expressed in this Article are the authors' alone and do not reflect the views of the Office or of the Department of Justice.

**123.** *See* Trevor M. Morrison, *Constitutional Alarmism*, 124 HARV. L. REV. 1688, 1718-19 (2011) (book review) (noting that thirty-two percent of OLC opinions between the beginning of the Carter Administration and the first year of the Obama Administration "went predominantly against the White House").

**124.** OLC grounds its discussion of the enforcement power and the President's duty under the Take Care Clause in principles articulated by the Supreme Court in *Heckler v. Chaney*, 470 U.S. 821 (1985), only one of which relates to agency judgments as to whether "agency resources are best spent on this violation or another" and "whether the agency has enough resources to undertake the action at all." OLC Memorandum Op., *supra* note 10, at 10 (citing *Heckler*, 470 U.S. at 831). In evaluating DAPA, in particular, OLC emphasizes that limited resources did not provide the only reason for DHS's actions. It noted, "DHS has explained that the program would also serve a particularized humanitarian interest in promoting family unity" and that this justification "appears consonant with congressional policy embodied in the INA." *Id.* at 26.

**125.** In the debate over the 2014 policies, defenders of the Administration position have repeatedly emphasized that the President does not have close to sufficient resources to remove all noncitizens who are removable, therefore making it necessary for him to prioritize those enforcement resources he does have. *See, e.g.*, Open Letter from Immigration Law Professors 6 (Nov. 25, 2014), http://pennstatelaw.psu.edu/sites /default/files/documents/pdfs/Immigrants/executive-action-law-prof-letter.pdf   [http:// perma.cc/N5QU-2GWG]. This argument is unexceptional. But prior to the OLC opinion, a number of supporters of the relief initiatives had argued further that resource constraints provided an appropriate measure and means of constraining executive discretion. The suggestion was that so long as the Executive Branch spent, in accordance with appropriations legislation, all the enforcement resources Congress had provided, the President had faithfully executed his duty to enforce the law. *See, e.g.*, *id.* (arguing that a

AR2022_500057

existence of resource constraints obviously provides a sufficient condition for the exercise of prosecutorial discretion. If the Executive lacks the resources to pursue every violator of the law, she must make choices about which ones not to pursue — that much is a truism. But resource constraints are not a necessary condition for the exercise of discretion: the paradigmatic historical justifications for prosecutorial discretion have little or nothing to do with resource constraints. And even were one to reject this history and conclude that resource limits should be considered necessary, the ubiquity of resource constraints would prevent this principle from providing any meaningful constraint on the exercise of executive authority. DHS has been showered with resources and operates with a budget larger than all other federal law enforcement agencies combined. Yet DHS could ignore broad swaths of the immigration code and still spend its appropriated dollars. After all, DHS currently spends its full appropriation every year and still manages to deport only a tiny fraction of the potentially removable noncitizens living in the United States.[126]

Instead of looking to financial constraints, OLC concluded that a limiting principle could be supplied by "congressional priorities" embedded in the

---

serious legal question would arise only if the Executive Branch "were to halt all immigration enforcement, or . . . refuse to substantially spend the resources appropriated by Congress" and noting that the Obama Administration has "fully utilized all the enforcement resources Congress has appropriated [and] enforced the immigration law at record levels through apprehensions, investigations, and detentions that have resulted in over two million removals"). Impoundment might violate Article II, and it would certainly violate statutory law, but nothing short of failure to spend appropriated resources would be unlawful. *Cf.* Legomsky, Written Testimony, *supra* note 17, at 10-11, 15 (listing express constraints imposed by Congress and constitutional rights limitations, as well as a general requirement of reasonableness, as limiting principles, but presenting resource constraints as the primary constitutional, structural limit on discretion, noting that "nothing in these new policies will prevent the President from continuing to enforce the immigration laws to the full extent that the resources Congress has given him will allow. As long as he does so, it is impossible to claim that his actions are tantamount to eliminating all limits.").

**126.** In 2013, for example, DHS removed almost 438,000 noncitizens. *See* John F. Simanski, *Annual Report: Immigration Enforcement Actions: 2013*, U.S. DEP'T HOMELAND SECURITY (Sept. 2014), http://www.dhs.gov/sites/default/files/publications/ois_enforcement_ar_2013 .pdf [http://perma.cc/9A7Z-XT44]. The unauthorized population alone remains at approximately eleven million, and the number of removals includes many lawfully present noncitizens who otherwise violated a term of the immigration laws. The fact that the Obama Administration has deported more noncitizens each year than any prior presidential administration in American history does not change the reality that it can remove only a small subset of those who are in fact removable. For a discussion of the relative removal rates across administrations, see Marc R. Rosenblum & Doris Meissner, *The Deportation Dilemma: Reconciling Tough and Humane Enforcement*, MIGRATION POL'Y INST. (Apr. 2014), http://www.migrationpolicy.org/research/deportation-dilemma-reconciling -tough-humane-enforcement [http://perma.cc/FS26-2RLB].

Code: these priorities, it concluded, constrain the *substantive criteria* that can lawfully serve as the basis for deportation relief.[127] In its opinion, OLC determined that, where the decision to grant relief tracked priorities the Office unearthed from the statute, such as keeping intact the families of citizens and lawful permanent residents, relief fell within the permissible zone of discretion.[128] But where OLC believed that the relief could not be tightly linked to priorities embodied in existing statutory provisions, it concluded that the Executive was without legal authority to act.[129] The opinion surveys numerous executive branch uses of deferred action and emphasizes that Congress was aware of them, seeming to use past practice as a form of precedent. But the opinion then turns to determine whether the President's new proposals building on that history are, in fact, "consonant with, rather than contrary to,"[130] priorities derived from the statute itself.[131] OLC ultimately determined that the decision in DAPA to provide relief to the parents of U.S. citizens and green card holders would promote congressionally articulated priorities, but that a proposed program to provide relief for the parents of DACA recipients would not.

To our knowledge, the notion that the exercise of enforcement discretion is lawful only if consistent with congressional priorities had not yet emerged as a claim in the debate at the time OLC issued its opinion. At that moment, we had not yet seen defended elsewhere the idea that executive priority setting ought to be informed by the Executive's own analysis of the enforcement obligations (and forms of relief) Congress thought most important. At the same time, the approach feels familiar. It aligns analysis of presidential enforcement authority with the way courts (and offices such as OLC) decide whether administrative agencies have lawfully exercised their delegated authority. This focus on consistency with congressional priorities in the context of administrative rulemaking reflects the dominant approach to administrative law, in which

---

**127.** OLC Memorandum Op., *supra* note 10, at 24 ("[A]ny expansion of deferred action to new classes of aliens must be carefully scrutinized to ensure that it reflects consideration within the agency's expertise, and that it does not seek to effectively rewrite the laws to match the Executive's policy preferences, but rather operates in a manner consonant with congressional policy expressed in the statute.").

**128.** *Id.* at 31.

**129.** *Id.* at 32-33.

**130.** *Id.* at 6.

**131.** *Id.* at 13-17, 24-25 ("[T]he proposed deferred action program would resemble in material respects the kinds of deferred action programs Congress has implicitly approved in the past, which provides some indication that the proposal is consonant not only with the interests reflected in immigration law as a general matter, but also with congressional understandings about the permissible uses of deferred action.").

AR2022_500059

THE YALE LAW JOURNAL                                125:104   2015

principal-agent models—both informal and formal—are used to conceptualize and evaluate the administrative state.[132] When we characterize Congress as the principal and the Executive as its agent, the obvious question becomes whether the agent is promoting his principal's goals or, instead, advancing his own. The turn to congressional priorities in the OLC Memorandum thus reflects a larger commitment to a delegation-centric model of congressional-executive relations—call it the faithful-agent model of prosecutorial discretion.

On the surface, the faithful-agent model might seem to have even stronger purchase in the enforcement context than in other administrative settings. In rulemaking, Congress has expressly delegated policymaking and thus interpretive authority to the Executive, but the duty to enforce is more akin to a straightforward obligation to follow the law on the books.[133] Congress passes laws, the Executive enforces them—or so the argument goes. Under this reasoning, the constitutional allocation of enforcement power to the Executive assumes that the President and the bureaucracy will enforce Congress's policies and priorities.

Of course, elucidating those priorities will likely involve a more freewheeling, inference-based inquiry than entailed by ordinary statutory interpretation, because Congress does not typically draft statutory enforcement priorities to accompany its substantive rules.[134] Priorities can be gleaned from any of a statute's provisions and not just the provisions being enforced or interpreted.[135] Any executive branch effort to limit its enforcement judgments

---

132. *See, e.g.,* Patrick Bolton & Mathias Dewatripont, Contract Theory (2005); David Epstein & Sharyn O'Halloran, Delegating Powers: A Transaction Cost Politics Approach to Policy Making under Separated Powers (1999); Mathew D. McCubbins et al., *Administrative Procedures as Instruments of Political Control*, 3 J.L. Econ. & Org. 243 (1987). For an overview of the historical development of these models in political contexts, see Sean Gailmard, *Accountability and Principal-Agent Models, in* The Oxford Handbook of Public Accountability (Mark Bovens et al. eds., 2014).

133. OLC's congressional priorities approach thus implicates debates about whether the administrative state merely implements or also interprets legislation. We do not purport to resolve or even address those debates here and observe only that the enforcement power at first glance is less consistent with a view that the Executive has broad interpretive authority than actions undertaken pursuant to express delegations.

134. In discrete instances, Congress has articulated general enforcement guidance, usually in appropriations legislation. For a discussion of the utility and force of such guidance, see *infra* notes 141-143 and accompanying text.

135. In its opinion, for example, OLC focuses not on the statutory provisions that would form the basis of removal for potential relief recipients under DAPA, i.e., the provisions that make unauthorized presence a ground of removal. Instead, it draws support for its conclusion that the INA embodies family unity from various provisions that grant relief from removal under specified circumstances that are unlikely to be applicable to those who would be eligible for DAPA. *See* OLC Memorandum Op., *supra* note 10, at 27-28. For a discussion of how this

150

AR2022_500060

based on its own understanding of the goals Congress sought to achieve with the statutory framework in question is thus likely to give the Executive Branch considerable interpretive authority.

But even with these caveats, it might remain appealing to ground enforcement judgments in an argument that they advance goals set by Congress. Under this view, enforcement judgments emanate from tough value choices made by Congress, not the President. The President simply extracts those judgments from the statute, using sophisticated legal analysis. Analytically, this approach preserves congressional supremacy in the lawmaking process. The strongest version of this model would treat the Executive as a functionary, though both OLC[136] and commentators[137] wedded to the principal-agent model recognize the reality that the Executive must exercise judgment when determining how to enforce the law. They simply seek to discipline that judgment in a way that ensures Congress, not the President, remains responsible for substantive policy.

### B. The Limits of Congressional Intent

The appeal of the congressional priorities approach is understandable. But we do not believe it provides an effective principle for limiting executive branch enforcement judgments in immigration law and many other domains. The congressional priorities approach fails because those priorities are a mirage.

Little meaningful congressional guidance exists about how to appropriately structure the ex post screening rules for immigration law. As we explained in Part I, the modern structure of immigration law effectively delegates vast screening authority to the President. The interlocking statutory and political developments we describe have opened up a tremendous gap between law on the books and on the ground. In a world where nearly *half* of all noncitizens living in the United States are formally deportable, there can be no meaningful search for the congressionally preferred screening criteria.[138] The keys to the immigrant screening system effectively belong to the Executive, which has the

---

differs from purposive forms of statutory interpretation, see *infra* note 148 and accompanying text.

**136.** OLC Memorandum Op., *supra* note 10, at 5.

**137.** *See* Price, *supra* note 14, at 677, 680, 696-97 (arguing for a framework of legislative supremacy and executive judgment and acknowledging that faithful agency does not require "robotic" interpretation but rather judgment and priority setting, rather than policymaking).

**138.** *See supra* text accompanying notes 80-83.

151

authority (and some might even say obligation) to define screening criteria.[139] As we described earlier, administrations have wielded this authority to reshape the screening system over time, a practice the Obama Administration has continued.[140]

In theory, of course, Congress could constrain de facto delegation by complementing its substantive statutory enactments with detailed enforcement instructions or prohibitions. In practice, Congress has rarely done this—in immigration law or any other regulatory arena. Occasionally Congress blandly obligates DHS to do something like "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime,"[141] or to fund a particular number of beds for immigrant detention (34,000, to be exact).[142] But loose language of prioritization does little to constrain the Executive's authority,[143] and even numerical prescriptions like the bed-space mandate only scratch the surface of the decisions the Executive must make when enforcing immigration law. Negative injunctions issued by Congress have the potential to be more powerful; prohibiting DHS from granting any immigrant deferred action, for example, would more seriously constrain the President's power to structure the immigrant screening system. But these sorts of prohibitions are also rare.

In this world, it will generally be futile to search for "congressional priorities" that legally constrain executive branch decisions about which immigrants, from within the vast pool of eleven million unlawfully here, may be deprioritized for deportation (not to mention congressional views as to *how*

---

**139.** For further discussion of this point, see *supra* Part I.C and *infra* notes 280-282 and accompanying text.

**140.** For examples of the guidance issued by various administrations to set these priorities, see *supra* note 111 and accompanying text. OLC acknowledges the need for administrations to prioritize, citing the observation in *Heckler v. Chaney* that decisions about whether to enforce the law require complex judgments that involve factors "peculiarly within [the agency's] expertise." OLC Memorandum Op., *supra* note 10, at 4 (citing Heckler v. Chaney, 470 U.S. 821, 831 (1985)). But in its search for a way to ensure that the Executive does not "rewrite" the law through enforcement, it requires that those judgments be "consonant with" congressional policy. *Id.* at 6.

**141.** *See* OLC Memorandum Op., *supra* note 10, at 10 (citing Department of Homeland Security Appropriations Act of 2014, Pub. L. No. 113-76, div. F, tit. II, 128 Stat. 5, 251).

**142.** *See, e.g.*, Department of Homeland Security Appropriations Act of 2013, Pub. L. No. 113-6, div. D, tit. II, 127 Stat. 342, 347 (providing that "funding made available under this heading shall maintain a level of not less than 34,000 detention beds"); *see also* H.R. REP. NO. 112-492, at 56 (2012) (directing "ICE to intensify its enforcement efforts and fully utilize these resources" rather than rely on alternatives to detention).

**143.** For example, directing the Administration to prioritize the removal of persons who have committed serious offenses provides no guidance with respect to how to address the millions of other noncitizens who are removable.

152

AR2022_500062

such deprioritization ought to be structured). And given the absence of such priorities, efforts to invoke them ultimately only obscure the reality that executive branch officials are making important value judgments about our immigrant-screening system.

Our argument should not be confused with the claim that presidential immigration law grows out of inherent Article II authority and exists independently from Congress. To the contrary: the argument is perfectly consistent with the claim that the President has no inherent constitutional authority over immigration policy.[144] In such a world, the Executive makes enforcement judgments *within* the domain Congress has created. Congress's statutory grounds of removal, for example, specify necessary conditions for the exercise of the enforcement power against a noncitizen, and the President cannot act outside the domain defined by those conditions. Thus, if DHS decided to start deporting immigrants who had failed to pay child support— not a ground of deportability under the INA—that decision would be unlawful.

Nor is our argument that the very idea of "congressional priorities" is incoherent in principle, or that such priorities can never be identified in practice. Ordinary interpretation often entails the search for Congress's specific intent or overarching legislative "plan."[145] The idea of legislative priorities (or purposes, or intent) is, in our view, crucial to the construction of any persuasive interpretive theory (though the fact that it has been embraced by so many conservative legal scholars arguing against DAPA's lawfulness is perhaps ironic).[146] When a court confronts the question of whether an immigrant's

---

[144]. Some historical examples of the President exercising inherent authority to regulate immigration do exist. As noted in Part I, for example, the President claims authority to grant Deferred Enforced Departure from Article II and his power to conduct foreign relations. *See also* Cox & Rodríguez, *supra* note 7, at 485-92 (highlighting how President Truman appeared to claim inherent executive authority in the management of the Bracero guest worker program). The reach of this inherent Article II authority is beyond the scope of this Article, as we are more concerned with the role the President plays within the domains Congress constructs. Additionally, the inherent authority model has always been marginal in the immigration sphere and has receded over time.

[145]. *See* King v. Burwell, 135 S. Ct. 2480, 2496 (2015) ("A fair reading of legislation demands a fair understanding of the legislative plan. . . . If at all possible, we must interpret the Act in a way that is consistent with [that plan].").

[146]. This is not, of course, to minimize the well-understood difficulties associated with the concept of legislative intent. For a classic treatment of the problem of collective intent, see Kenneth A. Shepsle, *Congress Is a "They," Not an "It": Legislative Intent as Oxymoron*, 12 INT'L. REV. L. & ECON. 239 (1992). For important work about the distinction between the enacting legislature and the current legislature, see William N. Eskridge, Jr., *Overriding Supreme Court Statutory Interpretation Decisions*, 101 YALE L.J. 331, 390-403 (1991); William N. Eskridge, Jr., *Reneging on History? Playing the Court/Congress/President Civil Rights Game*, 79

153

THE YALE LAW JOURNAL                                    125:104   2015

criminal conviction amounts to a ground of deportability under the Code, statutory interpretation arguments grounded in legislative intent will be perfectly plausible.[147]

But statutory interpretation questions of this sort typically have as their focus a discrete piece of statutory text. While interpreting that text might require placing it in the context of a larger code or in relation to other statutory provisions, the inquiry will typically be much more grounded in a discrete set of legislative materials than in inquiry into enforcement priorities.[148] Because, as we have noted, legislatures are not in the habit of writing enforcement instructions to accompany the substantive rules of a code, the congressional priorities approach will almost always be unmoored from any particular text and will require drawing inferences from a wide, amorphous range of statutory provisions and legislative materials. These materials are unlikely to contain much guidance. And the lack of guidance should come as no surprise, once we recognize that the pervasive failure of legislatures to write down enforcement instructions reflects the implicit delegation of those choices to the Executive.

That general challenge is only magnified in the specific context of modern American immigration law, where de facto delegation has given the Executive tremendous authority to manage the ex post screening rules by picking deportees from among a population of immigrants who are all obviously, and incontrovertibly, deportable. That is not to say, we reiterate, that the notion of congressional intent is conceptually incoherent. It is always possible to construct fanciful examples in which enforcement judgments would clearly contradict congressional purposes. Immigration law is no different in this respect. If the President announced that no enforcement resources would be directed toward immigrants with criminal convictions, and instead all resources would go toward deporting only long-term residents who were

---

CALIF. L. REV. 613 (1991); and William N. Eskridge, Jr., & Philip P. Frickey, *The Supreme Court, 1993 Term—Foreword: Law as Equilibrium*, 108 HARV. L. REV. 26 (1994).

147. Take, for example, the term of art "aggravated felony." Various consequences turn on whether a noncitizen has been convicted of a crime that falls into this category, but whether a federal or state offense constitutes an aggravated felony is far from straightforward. This has been the subject of numerous cases of statutory interpretation within the courts of appeals and at the Supreme Court. Resolving the interpretive questions at stake in those cases will for some interpreters involve inquiring into statutory purpose. For a discussion of the development of this statutory ground of removal, see LEGOMSKY & RODRÍGUEZ, *supra* note 83, at 598-99.

148. In this sense, the congressional priorities approach and our critique of it are also orthogonal to the analysis required of courts under the APA to determine whether agency action has been arbitrary or capricious, an abuse of discretion, or otherwise "not in accordance with law." *See* 5 U.S.C. § 706(2)(A) (2012) (directing courts to set aside agency action under certain circumstances).

AR2022_500064

married to Americans, we would not hesitate to conclude that such an enforcement decision is prohibited by the congressional priorities embedded in the Code, as well as appropriations law. But no President is likely to adopt such a policy. Thus, within extremely broad limits — limits that, we show below, easily sweep up programs like DACA and DAPA — the structure of modern immigration law simply leaves us with no discernable congressional enforcement priorities.

To see the failure of the congressional priorities approach in practice, we need look no further than OLC's efforts to extract such priorities from the INA in order to evaluate the two relief initiatives proposed by the Administration.[149] OLC ultimately determined that the INA's goal of promoting family unity justified DAPA, which provides relief to the parents of U.S. citizens and green card holders. It observed that the statute creates a path to lawful immigration status for immediate relatives of U.S. citizens without numerical limitation, and that "numerous provisions of the [INA] reflect a particular concern with uniting aliens with close relatives who have attained lawful immigration status in the United States."[150] But it rejected an initiative that would have provided relief from removal and work authorization for the unauthorized parents of the beneficiaries of the DACA program of 2012. The Office determined that such relief was beyond the President's authority because the INA did not reflect "comparable concern for uniting persons who lack lawful status (or prospective lawful status) in the United States with their families. Extending deferred action to the parents of DACA recipients would therefore expand family-based immigration relief in a manner that deviates in important respects from the

---

149. OLC in a sense recognizes this problem, noting: "These limits, however, are not clearly defined. The open-ended nature of the inquiry under the Take Care Clause — whether a particular exercise of discretion is 'faithful[]' to the law enacted by Congress — does not lend itself easily to the application of set formulas or bright-line rules." OLC Memorandum Op., *supra* note 10, at 5. But whereas we would abandon the effort to draw substantive limits, OLC does its best to find them.

150. *Id.* at 26. OLC also noted that, even though LPRs may not directly petition for the admission of their parents, the former could become citizens and then petition for family unity. *Id.* at 27. The opinion also cites the provision of the INA that authorizes the Attorney General to cancel the removal of certain aliens who have citizen or LPR relatives and to then adjust those aliens' status to permanent resident. *Id.* (citing 8 U.S.C. § 1229b(b)(1) (2012)). Importantly, OLC applied a sort of "lesser included" standard to evaluating the relationship of DAPA to the statute. It reasoned that, because the proposed deferred action program would provide temporary relief, it was "sharply limited in comparison to the benefits Congress has made available through statute" and therefore "would not operate to circumvent the limits Congress has placed on the availability of those benefits." *Id.*

THE YALE LAW JOURNAL                    125:104   2015

immigration system Congress has enacted and the policies that system embodies."[151]

In the wake of the opinion's release, critics of DAPA disagreed strongly with OLC's view about how to cash out the congressional priorities embedded in the INA.[152] The Code does not promote family unity in some abstract and general way, they argued. Instead, the Code sometimes makes immigration benefits available for family members and at other times conspicuously declines to do so.[153] In other words, Congress has clearly and specifically defined the limited circumstances in which it values family unity, and the circumstances of DAPA recipients are not among them. For decades the INA has prohibited children born in the United States from immediately sponsoring their parents' entry into the United States. A U.S.-born child must turn twenty-one before she can do so—a restriction that prevents the Fourteenth Amendment's birthright citizenship rule from enabling unauthorized immigrants to acquire status quickly by having children in the United States.[154] But U.S.-born children are precisely the group who, under DAPA, serve as the basis of relief

---

**151.** *Id.* at 32. Unlike U.S. citizen children (and lawful permanent resident children who might eventually become citizens), the unauthorized youth shielded from removal by DACA cannot under existing law file petitions for their parents to be admitted as lawful permanent residents. *Id.*

**152.** *See, e.g.*, Margulies, *supra* note 14 (characterizing DAPA as belonging in the third category of Justice Jackson's famous framework for evaluating executive authority, or the lowest ebb of executive authority in light of Congress's regulation, and concluding that the policy's "unilateral grant of these immigration benefits defies Congress's will"); Price, *supra* note 112 ("[T]he constitutional architecture supports an important background norm that executive officials still must seek to effectuate statutory policies."); *see also* Peter Margulies, *Taking Care of Immigration Law: Presidential Stewardship, Prosecutorial Discretion, and the Separation of Powers*, 94 B.U. L. REV. 105, 111 (2014) (evaluating DACA and concluding that it is inconsistent with Congress's will in passing the INA, where Congress "expressly provided only limited avenues for the exercise of discretion and impliedly offered room for additional discretion only on a case-by-case basis").

**153.** *See, e.g.*, Martin, *supra* note 14 (arguing that OLC's invocation of cancellation was "remarkably misleading" because Congress tightened the standards for cancellation in 1996 and made it available as relief only in cases in which removal would impose "exceptional and extremely unusual hardship" and because Congress capped the annual number of cancellations at 4,000, making relief far from immediate).

**154.** *See id.* ("Long-standing congressional policy, clearly fixed in statute, disallows immediate relative petitions for parents until the child reaches age twenty-one. A test looking to consonance with congressional policy . . . has to be more candid about all the elements of that policy."); Michael W. McConnell, *Why Obama's Immigration Order Was Blocked*, WALL STREET. J. (Feb. 17, 2015), http://www.wsj.com/articles/michael-mcconnell-why-obamas-immigration-order-was-blocked-1424219904 [http://perma.cc/KD5L-DN5N] (arguing that "DAPA dispensed with" the statutory requirements that "undocumented-immigrant parents of U.S. citizens . . . wait until the child turns 21, and then . . . leave the country for 10 years before applying for a change of immigration status on account of that child").

AR2022_500066

for their unauthorized parents. This shows, say Administration critics, that OLC got things exactly backwards.[155] To the extent the INA expresses priorities about when family unity should be the basis of immigration benefits, it has expressly rejected the priorities reflected in DAPA.

Similar arguments have also been made that DACA is inconsistent with the INA's priorities. DACA treats early childhood arrival in the United States as the touchstone criterion for relief from deportation. But the INA nowhere privileges young arrivals in its immigrant screening rules. Moreover, Congress has repeatedly rejected the so-called DREAM Act,[156] which would provide a path to legalization for many of the young migrants covered by DACA — further evidence, critics argue, that the Code cannot be read to reflect a congressional priority to provide protection to these young migrants.[157]

---

**155.** *See* Margulies, *supra* note 14 (arguing that the INA sends a "clear signal to foreign nationals: Entering the US without inspection and having kids is not a ticket to lawful residence or any of the benefits that lawful residence provides" and that "[t]he OLC memo misses this clear legislative signal").

**156.** *See* David M. Herszenhorn, *Senate Blocks Bill for Young Illegal Immigrants*, N.Y. TIMES (Dec. 18, 2010), http://www.nytimes.com/2010/12/19/us/politics/19immig.html [http://perma.cc /4894-S3N3]. The DREAM Act is a bill that has been introduced in Congress repeatedly that would give permanent resident status to unauthorized immigrants who were brought to the United States as children, completed two years of college or U.S. military service, and met other requirements. For an argument that DACA implements the DREAM Act through executive fiat, see Delahunty & Yoo, *supra* note 14, at 787-92.

**157.** Interestingly, the OLC opinion does not itself even make an argument that DACA is consistent with congressional priorities reflected in the INA. The opinion asked only that the Office formally evaluate the legality of DAPA and the proposed relief program for the parents of DACA recipients. In a footnote discussing the Office's earlier oral advice regarding DACA, however, the memorandum suggests that OLC might have had in mind a very different rationale for DACA itself. One possibility is that blamelessness — the fact that young migrants often bear no responsibility for their unauthorized status — implicates humanitarian and constitutional values that justify the exercise of discretion in DACA. Blamelessness connects to anti-inheritance principles reflected in the Fourteenth Amendment and other constitutional provisions. *See* Christopher L. Eisgruber, *Birthright Citizenship and the Constitution*, 72 N.Y.U. L. REV. 54, 76 (1997) (discussing the Constitution's rejection of titles of nobility); Cristina M. Rodríguez, *The Citizenship Clause, Original Meaning, and the Egalitarian Unity of the Fourteenth Amendment*, 11 U. PA. J. CONST. L. 1363, 1365 (2009) (articulating an anti-inheritance principle and arguing that the Citizenship Clause of the Fourteenth Amendment "represents our constitutional reset button" by placing "all people, regardless of ancestry, on equal terms at birth, with a legal status that cannot be denied them"). It also connects to conceptions of luck egalitarianism prominent in political philosophy. *See, e.g.*, Richard J. Arneson, *Luck Egalitarianism — a Primer*, *in* RESPONSIBILITY AND DISTRIBUTIVE JUSTICE 24 (Carl Knight & Zofia Stemplowska eds., 2011); Elizabeth S. Anderson, *What Is the Point of Equality?*, 109 ETHICS 287, 288 (1999) (criticizing luck egalitarian thought and arguing that the point of equality is to address oppression, not to "eliminate the impact of brute luck from human affairs"). Moreover, the idea of blamelessness played an important role in the famous immigration case *Plyler v. Doe*,

AR2022_500067

THE YALE LAW JOURNAL                                    125:104   2015

Who has the better argument? In our view, neither side persuades. OLC's critics are correct that there is no general policy in favor of family reunification that applies consistently throughout the Code. But critics are wrong too: the mere fact that U.S. citizen children cannot file green card petitions for their parents until age twenty-one does not tell us that the Code prohibits their parents from being provided with some lesser form of relief from deportation. DAPA simply defers a parent's deportation; it does not provide any lawful immigration status, let alone the right of permanent residency that comes with a green card. For the same reason, critics are mistaken in thinking that the Code's inclusion of specific, limited grounds for "relief" from removal—like those contained in the Code's "Cancellation of Removal" provision—undercuts DAPA's legality. The relief provided under the cancellation provision is, again, green card status, not deferred action. If all forms of relief from removal, including deferred action, really had to be limited to the enumerated grounds of "relief" in the Code, then nearly *every* grant of deferred action would be unlawful—not just the President's current policies—because DHS generally extends deferred action to noncitizens who are not eligible for more robust forms of relief like cancellation.[158]

If we attempt to abstract from any particular statutory provision to the claim that a web of provisions—really the whole Immigration Code read intratextually—dictates the result that either OLC or its critics are correct, we are left with an all-too-familiar level-of-generality game. At some high level of generality (i.e., does the INA prioritize families?) OLC's view looks more persuasive. At some lower level of generality (i.e., does the INA endorse deferred action for the out-of-status parents of U.S. citizens and lawful permanent residents?) it looks less persuasive. But we have no way to determine which level of generality to choose, given the way the INA evolved over time. The INA, initially adopted in 1952 and amended in significant fashion many times in the decades since, consists of a long series of legislative

---

457 U.S. 202 (1982), which struck down Texas laws restricting unauthorized children's access to the public schools. In concluding that the laws violated the Fourteenth Amendment, the Court emphasized the blamelessness of the unauthorized children for their immigration status. *Plyler*, 457 U.S. at 220-21; *cf.* Korematsu v. United States, 323 U.S. 214, 243 (1944) (Jackson, J., dissenting) ("Now, if any fundamental assumption underlies our system, it is that guilt is personal and not inheritable."). David Martin explains the legality of DACA in these terms, emphasizing that it "covers only a small percentage of removable aliens and . . . shields only those not culpable for the initial immigration law violation." Martin, *supra* note 14. Note that these justifications do not stem from congressional priorities.

**158.** OLC's rejection of deferred action for the parents of DACA recipients suffers from this same problem. *See, e.g.*, Steve Legomsky, *Why Can't Deferred Action Be Given to Parents of the Dreamers?*, BALKINIZATION (Nov. 25, 2014, 6:30 PM), http://balkin.blogspot.com/2014/11/why-cant-deferred-action-be-given-to.html [http://perma.cc/C272-23VF].

AR2022_500068

accretions. Each addition to the Code reflects a complicated mix of conflicting priorities either balanced against one another by a single Congress or across Congresses. The provisions for family-based immigration benefits have, for example, evolved in complex ways over more than a century.[159] There is little doubt that American immigration law makes family ties more important than do the immigration systems of many other nations.[160] But the devil is in the details: the general principle of family unity has been defined, qualified, and cabined in numerous ways, as have the general policy goals of augmenting the U.S. labor supply and providing protection for noncitizens fleeing disasters of various sorts, for that matter. A statute like the INA—one constructing a comprehensive regulatory scheme that has evolved in dynamic fashion over time and that embodies such a high level of complexity—will often not be amenable to many common intratextualist interpretive moves. The legislative "plan" of the INA is so full of internal contradictions and complexities as to be nearly impossible to characterize as pursuing concrete "priorities" at anything other than the highest level of generality.

This problem is not unique to immigration law. Today, it is common to many regulatory arenas, and looking for congressional priorities to constrain enforcement discretion will therefore pose a more difficult problem than those typically posed by statutory interpretation. When it comes to the INA, no individual relief provision points to Congress's intent to prohibit the adoption of a particular prioritization scheme for dealing with the eleven million removable noncitizens in the United States. Nor does the Code as a whole, read intratextually, do so. And at bottom the reason goes back to the general theory we laid out at the top of this Part: the rise of de facto delegation consolidated in the Executive the authority to make these sorts of judgments.

## C. The Two-Principals Model of Immigration Policymaking

At a general level, debates over the scope of executive power traffic in two competing frames of reference. The congressional priorities approach embodies a faithful-agent model according to which the Executive, when fulfilling its responsibilities through rulemaking, administration, or enforcement, should always ask itself: "What would Congress do?" The President's obligation is to

---

159. For a representative example exploring what is to be gained from family immigration, see Kerry Abrams, *What Makes the Family Special?*, 80 U. CHI. L. REV. 7 (2013). For a collection of sources discussing the U.S. immigration system's prioritization, as well as denigration, of family ties, see LEGOMSKY & RODRÍGUEZ, *supra* note 83, at 269 n.10.

160. *See* Adam B. Cox & Eric A. Posner, *Delegation in Immigration Law*, 79 U. CHI. L. REV. 1285, 1319-26 (2012) (discussing U.S. immigration law's focus on family-based immigration and its connection to ideas about immigrant integration as well as racial and ethnic exclusivity).

159

THE YALE LAW JOURNAL                                    125:104   2015

reflect as nearly as possible the policy Congress would adopt, were Congress itself making the regulatory or enforcement decision. Under this framework, the Executive exercises no policymaking autonomy and refrains from making contested value judgments, even as it exercises judgment and sets priorities.[161]

When it comes to understanding the enforcement power, we believe this framework is mistaken as a descriptive matter and unappealing as a normative matter. Instead, we offer a contrasting account—a two-principals model[162]—according to which the President possesses his own policymaking power. This model appears most clearly in the foreign affairs context and in debates over the extent of inherent authority the President possesses as Commander-in-Chief or as a function of Article II. It also characterizes theories of administration and statutory interpretation that capture the power of the modern Executive to displace Congress as a policymaker.[163] One of our core contributions in this Article is to elucidate how a version of the two-principals model also characterizes the enforcement domain, not as a matter of inherent presidential authority, but as a function of the imperatives of the President's obligations under the Take Care Clause, which emanate from but are not wholly controlled by Congress.

In this Part, we begin by reinforcing this two-principals claim descriptively. We then move to establish why the Executive serves rather than undermines certain core separation-of-powers values when acting as a kind of second principal in the exercise of the enforcement power. But first, we should say a few words about what we mean by two principals. We do not mean to suggest that the President and Congress are substitutes. Instead, we envision the Executive as a principal because, using the tools conferred by both the Constitution and the historical development of a particular regulatory arena, the President acts as a policymaking counterpart to Congress. He does so by playing a major and independent role in constructing the domain of enforcement over time, defining whom and under what circumstances the law will regulate. Moreover, to say that the Executive is a co-principal does not mean that the President himself is authorized or obligated to act as a pure unitary principal of the sort sometimes imagined in the separation-of-powers scholarship. Enforcement power can be lodged in a variety of institutional locations within the Executive Branch. Part III explores this explicitly, disaggregating the Executive and considering the possibility that the policymaking potential of the enforcement power may necessitate, or at least

---

**161.** *See* Price, *supra* note 14, at 677.

**162.** We thank Daryl Levinson for this formulation of our argument.

**163.** *See infra* notes 226-229 and accompanying text (discussing scholarly debates over presidential administration).

justify, some degree of high-level political control of or supervision over priority setting.[164] In the remainder of this Part, however, we bracket this institutional complexity and think about executive power in general terms.

### 1. Executive Construction of Enforcement Domains

The faithful-agent model cannot be squared with the reality of prosecutorial discretion in immigration and many other regulatory arenas. It is a descriptive impossibility. Outside the immigration context, for example, it would be strange to argue that the myriad discretionary decisions made by federal prosecutors and other law enforcement officials are (or should be) motivated only by a sense of the value judgments Congress made when enacting the criminal law. To the contrary, when a prosecutor makes a plea deal, she is much more likely to describe the choices embodied in the plea in terms of an all-things-considered pragmatic calculation that is guided by oversight within her office and, ultimately, by what justice requires. Her time would not be spent scouring the criminal code to unearth some latent congressional priorities that somehow compelled the particular plea deal.[165] Prosecutorial discretion has long entailed executive branch officials' legal authority (and responsibility) to make difficult value judgments about the exercise of the state's coercive authority.[166]

---

164. For further discussion of who should be understood as the principal within the Executive Branch, see *infra* notes 262-264 and accompanying text.

165. In his rejection of the independent counsel statute as a gross intrusion into the President's power to control prosecutors within the Executive Branch, Justice Scalia offers a vivid picture of the sort of judgments prosecutors routinely make — a picture that does not square with a congressional priorities model. He writes:

> Almost all investigative and prosecutorial decisions — including the ultimate decision whether, after a technical violation of the law has been found, prosecution is warranted — involve the balancing of innumerable legal and practical considerations. Indeed, even political considerations (in the nonpartisan sense) must be considered, as exemplified by the recent decision of an independent counsel to subpoena the former Ambassador of Canada, producing considerable tension in our relations with that country. Another preeminently political decision is whether getting a conviction in a particular case is worth the disclosure of national security information that would be necessary. . . . In sum, the balancing of various legal, practical, and political considerations, none of which is absolute, is the very essence of prosecutorial discretion.

Morrison v. Olson, 487 U.S. 654, 707-08 (1988) (Scalia, J., dissenting).

166. Some critics of the President's relief initiatives believe that decisions by line-level prosecutors are an inapposite comparison. Zachary Price, for example, argues that those decisions are different in kind because they are made on an individualized basis, while the decision to establish DACA or DAPA involves a "categorical" judgment by high-level agency

AR2022_500071

THE YALE LAW JOURNAL                                    125:104   2015

This dynamic of prosecutorial policymaking is perhaps even more vivid when we move from the retail level of the line prosecutor to the level of the agency head or the President himself. As we documented in detail in Part I, a simple principal-agent model does not accurately capture the history of immigration law and enforcement. While the nature and scope of executive power in immigration law has evolved over time in response to events and structural phenomena, as it has in other regulatory domains, an especially notable fact of immigration history is that the President has regularly acted as an independent policymaker, pursuing agendas that his corresponding Congresses may or may not have shared. In the first century of immigration law, Presidents used quintessentially executive powers—namely the negotiation of treaties—to advance their agendas, and they were able to do so because Congress had yet to occupy the field of immigration regulation with an elaborate code.[167] But even in the twentieth-century context of domesticated executive power, amidst the rise of immigration delegation, the President has played the independent policymaking role to at least as robust an effect, both in exercising delegated authorities and in large part through the exercise of the enforcement power in the context of de facto delegation.

Our account of IRCA, in Part I, presents a good example: the substantive legal regime that determines whether and how to regulate employers and their unauthorized workers has evolved over the last three decades through the application of the Executive's enforcement judgments. IRCA as a regulatory system in 2015 looks quite distinct from IRCA as a statute enacted in 1986. The combination of partisan politics and the institutional dynamics of enforcement itself (the assessment of its costs and the efficacy of different methods of enforcement, for example) have reconstructed the regulatory domain Congress created with its initial statutory enactment.

But as the evolution of IRCA highlights, the modern immigration system should not be understood to embody a simple static and uncontested shift of authority to the Executive. Nor is this joint federal lawmaking necessarily collaborative or harmonious. Rather, it consists of the branches responding to one another's regulatory choices. Presidential immigration law has precipitated a variety of responses from Congress, which has both ratified and resisted the

---

officials (or even by the President himself). *See* Price, *supra* note 14, at 674; *see also* Price, *supra* note 112. For reasons we explore in Part III, we do not believe this distinction between individual and categorical judgments can be sustained. And for reasons we explore in this Part, we believe there to be value in executive branch policymaking through enforcement.

**167.** *See* Cox & Rodríguez, *supra* note 7, at 469-71.

AR2022_500072

Executive's use of his authority.[168] On occasion Congress has responded with actual lawmaking, as in the case of refugee policy.[169] In other moments, Congress has wielded the power of the purse, using appropriations measures to shape executive branch conduct.[170]

In response to DAPA, in particular, House Republicans have sought to tie funding for the Department of Homeland Security to riders that would block implementation of the Obama relief initiatives; this is but the latest example of this phenomenon.[171] That they have not succeeded could either demonstrate the limited utility of appropriations threats, or that these Republicans were simply grandstanding, exerting a less formal form of control through politics. The congressional-executive dynamic often does not rise to the level of lawmaking. Congress's response to the President's use of his de facto delegated power frequently takes the form of political posturing, whether during election campaigns or in hearings called to bring attention to opposition among members of Congress.[172] But rather than think of these responses as reflecting

---

**168.** *See id.* at 502-05 (discussing congressional resistance to Presidents' uses of parole power); *id.* at 507-08 (discussing Congress's addition to the INA enabling adjustment of the status of Haitian and Cuban entrants in the aftermath of large-scale parole by President Carter).

**169.** *See id.* at 507-08. While the efforts to constrain the use of parole power might be the one (partial) exception, even these instances of responsive immigration legislation by Congress have not amounted to the sorts of congressionally imposed constraints sometimes seen in other regulatory arenas, where Congress responds to executive branch enforcement decisions by enacting statutory prohibitions, instructions, or deadlines.

**170.** *See supra* note 142 and accompanying text (discussing the detention bed mandate). In addition, the ever-increasing appropriation of funds for DHS generally reflects congressional efforts to shape enforcement. *See* Meissner et al., *supra* note 63, at 2, 9 (documenting two decades of "sizeable, sustained budget requests and appropriations made by the Executive Branch and Congress . . . under the leadership of both parties" and emphasizing that the U.S. government spends more on federal immigration enforcement than all other federal law enforcement agencies combined).

**171.** *See, e.g.,* Ashley Parker, *House and Senate Prepare Measures To Keep Homeland Security Funded,* N.Y. TIMES (Feb. 26, 2015), http://www.nytimes.com/2015/02/27/us/house-and -senate-near-differing-plans-to-avoid-homeland-security-shutdown.html [http://perma.cc /K8RS-BNTS].

**172.** *See, e.g., Unconstitutionality of Obama's Executive Actions on Immigration: Hearing Before the H. Comm. on the Judiciary,* 114th Cong. 1-3 (2015) (statement of Rep. Bob Goodlatte, Chairman, H. Comm. on the Judiciary) (introducing a hearing featuring testimony opposed to the President's executive actions and accusing the President of "one of the biggest constitutional power grabs ever" and "rewriting the laws when [he] can't convince Congress to change them"). At the same time, congressional complaints about the President's policymaking through enforcement have transcended partisan dynamics—though the charge of fecklessness may be less frequently lobbed at Republican Presidents (despite their examples of underenforcement) and more frequently aimed at Democrats (despite their zealous enforcement). Tellingly, however, Congress has never responded by acknowledging, much less addressing, the underlying "causes" of de facto delegation.

AR2022_500073

THE YALE LAW JOURNAL                                           125:104   2015

the petulance or dissatisfaction of a principal whose agent has gone astray, we should understand them as embodying the rivalry of two principals and the friction that can result when the center of policymaking gravity moves from one to the other.

This two principals understanding of executive power differs in important respects from other influential accounts of interbranch relations. As noted in Part I, we disclaim the position that the legality of the President's actions turns on whether precise historical precedents or analogs exist. In that sense, our argument diverges from and is more radical than the view, present in some scholarship as well as executive branch practice, that congressional acquiescence over time to a particular executive branch practice is what makes it lawful.[173] Instead, on our account, the President effectively acts as a principal within a regulatory space that has been constructed over time, even if Congress has not acquiesced. In immigration law, that space is breathtakingly broad in part because of the rise of de facto delegation. And within that space, the President shapes immigration law by continually revising and restructuring enforcement authority.[174]At the same time, our account is more restrained than the one contained in the historical gloss literature. That literature concludes that practices to which Congress has acquiesced at Time One become immune

---

173. The argument that historical executive branch practices qualify as constitutional precedents often entails the claim that those practices reflect a legal convention that should be accorded constitutional status. The "historical gloss" literature is founded on the idea that discrete exercises of presidential power, acquiesced in over time by Congress, become constitutional precedents that support the continued legality of that exercise of presidential power—even in the face of new resistance from Congress. *See* Curtis A. Bradley & Trevor W. Morrison, *Historical Gloss and the Separation of Powers*, 126 HARV. L. REV. 411 (2013) (exploring the significance of congressional acquiescence and arguing that it is necessary for a practice to achieve constitutional status but also exploring the limits and dangers of identifying or claiming acquiescence). For a discussion of the difficulties of using historical practice in this way, see Alison L. LaCroix, *Historical Gloss: A Primer*, 126 HARV. L. REV. F. 75 (2013), which criticizes Bradley and Morrison, in particular, for failing to account for the role of courts as "gloss producers."

174. Our model also differs from the claim made in scholarly and popular accounts that robust and independent presidential action can be justified during times of polarization, when Congress fails to fulfill its own constitutional responsibilities or obstructs policymaking. *See* David E. Pozen, *Self-Help and the Separation of Powers*, 124 YALE L.J. 2, 7-11 (2014); Cass R. Sunstein, Robert Walmsley Univ. Professor, Harvard Univ., Keynote Address at the University of Chicago Legal Forum: Partyism (Nov. 7, 2014), http://ssrn.com /abstract=2536684 [http://perma.cc/U9PT-THYT] (arguing that in the face of partyism— or deep prejudice against members of the opposing party—vast delegations and a receptivity to the *Chevron* principle offer good ways to ensure ongoing problem solving by government). While we would agree that a two-principals model could be especially useful in such circumstances, we also believe the model's value transcends polarized contexts, for reasons we explore *infra* Part II.C.2. In addition, defining what constitutes obstruction seems to us a fraught enterprise.

AR2022_500074

from congressional override—that is, constitutionally entrenched—at Time Two. In contrast, in our account, Congress can defeat presidential power at Time Two, producing a more fluid politics of congressional-executive relations over time.

This defeasibility does not mean Congress is, ultimately, the only "true" principal, or that our account can be reduced to the claim that presidential immigration law is nothing more than the product of agency "slack."[175] The idea that mere agency slack is all that is at stake is misleading for the same reason that the faithful-agent framework (from which the idea of slack is drawn) leads us astray. Conceptualizing the tremendous divergence between congressional statutes and executive branch outcomes that we document in Part I as the product of slack suggests that we should find ways to control that divergence. Slack is undesirable—something one always wishes to squeeze out of the principal-agent relationship, something that we are saddled with only because principals are incapable of perfectly monitoring their agents. The history of immigration law we tell, however, suggests that presidential policymaking is too pervasive and autonomous to fit this model. And as we explain in Part II.C.2 below, there is value in that relationship that would be quashed by an insistence that the goal of administrative law and design should be to tighten up slack. It is true that, as a matter of formal game theory, the President can be labeled principal only if his authority is indefeasibly by Congress. But we think that model obscures the interbranch dynamics that have existed in practice, and we believe our conceptions of those dynamics must take account of that practice.

### 2. Against Faithful Agents

If we have succeeded in our descriptive account of two principals, at least within the domain of immigration enforcement, the question then becomes what to think as a normative matter about the system we now have.[176] Our goal

---

175. Thank you to Dan Ho for pushing us to clarify this point.

176. As should be clear from everything we have said thus far, we do not believe this normative question can be collapsed into a formalistic inquiry into whether the President's exercise of the enforcement power ceases to be "executive" and becomes "legislative." To be sure, there is a long intellectual tradition, dating at least to Montesquieu and Locke, advancing the idea that certain forms of power belong to certain types of government actors. For a leading but somewhat forlorn defense of this view, see Jeremy Waldron, *Separation of Powers in Thought and Practice?*, 54 B.C. L. REV. 433, 438, 442, 467 (2013), which claims, "Even if the principle is dying a sclerotic death, even if it misconceives the character of modern political institutions, still it points to something that was once deemed valuable—namely, *articulated government through successive phases of governance each of which maintains its own integrity* . . . ." Modern administrative law has largely moved us past this formalistic idea of dividing power

AR2022_500075

is not to erect a theory of separated powers from the ground up, or to identify an "optimal" separation of powers. It can be hard to avoid abstract generalities when attempting to articulate the reasons for horizontal divisions of power. The Supreme Court's regular references to the prevention of tyranny or the protection of individual rights as the purposes of the separation of powers may ring true as far as they go,[177] but they are little more than platitudes when a genuine competition for power is at stake, in part because those power struggles do not themselves involve a clear battle between tyranny and freedom. We are deeply skeptical that a true first-principles inquiry can succeed, and a central conceit of our work is that any theory of power allocation must emerge from institutional and historical context.[178] That is not to say that we don't think current arrangements can be improved—a task we take on in Part IV. But if we reason from abstractions rather than from practice, we will lose sight of a number of benefits that flow from the two-principals model of

according to its type. *See, e.g.*, M. Elizabeth Magill, *Beyond Powers and Branches in Separation of Powers Laws*, 150 U. PA. L. REV. 603, 605-06 (2001) (turning attention away from constitutional separation of powers and toward consideration of how governmental power is shared by a "large and diverse set of government decision-makers"); *cf.* Memorandum from Walter Dellinger, Office of Legal Counsel, to the Gen. Counsels of the Fed. Gov't (May 7, 1996) (discussing cases such as Bowsher v. Synar, 478 U.S. 714 (1986), that identify congressional aggrandizement, or congressional efforts to formally exert executive powers), *reprinted in* 63 LAW & CONTEMP. PROBS. 514 (2000).

177. The "purpose" question is quite under-theorized in Supreme Court precedents. Much as it does in the federalism context, the Court gestures toward abstract values such as protecting liberty and preventing the rise of tyranny before it elaborates the particular power arrangements it believes the Constitution has erected to advance those values. However, the connection between the constitutional allocations and the values is typically assumed rather than analyzed. *See, e.g.*, Stern v. Marshall, 131 S. Ct. 2594, 2608-09 (2011); Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc., 501 U.S. 252, 273-74 (1991); Mistretta v. United States, 488 U.S. 361, 380-81 (1989) ("This Court consistently has given voice to, and has reaffirmed, that . . . that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty. Madison, in writing about the principle of separated powers, said: 'No political truth is certainly of greater intrinsic value or is stamped with the authority of more enlightened patrons of liberty.'" (citations omitted) (quoting THE FEDERALIST No. 47, at 324 (James Madison) (J. Cooke ed., 1961))); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (stating that the goal of separation of powers is to "diffuse[] power the better to secure liberty").

178. In rejecting the idea that there is some single, platonic separation-of-powers principle, we share much in common with John F. Manning, *Separation of Powers as Ordinary Interpretation*, 124 HARV. L. REV. 1939 (2011), which argues that there is no freestanding principle of the separation of powers. Of course, we differ a good deal as to the reasons for concluding that no such single principle exists, as well as on the implications that flow from its absence.

166

THE PRESIDENT AND IMMIGRATION LAW REDUX

immigration lawmaking that has emerged over time. Given the system we've inherited, it will be useful to understand its upsides.

In so doing, we focus on a second-order set of tradeoffs that the separation of powers entails: the classic struggle between the exercise of power to accomplish the ends of government and the overarching need to ensure that power is constrained, or exercised in a nonarbitrary fashion.[179] A central feature of this inquiry, for our purposes, is a debate about how best to ensure that the Executive acts in an accountable fashion, and then whether that accountability should be to apolitical norms of reasoned decision making or to popular and political conceptions of accountability.[180] In this sense, the inquiry sounds as much in administrative law as it does in constitutional law. In the balance of this Part, we explain why the two-principals model as applied to the enforcement power resonates with aspirations for constrained and accountable governmental power across the branches. We reserve for Part III a full discussion of the accountability tradeoffs embodied in the Obama relief initiatives. A key insight of our account of immigration enforcement is that independent priority setting by the Executive can, within the scheme of separated powers, actually facilitate the constrained use of power. Much separation-of-powers scholarship concerns itself with the rise of the imperial presidency, which prompts views that range from cheerful acceptance to

---

**179.** For a discussion of this dichotomy between power and constraint, see Jon D. Michaels, *An Enduring, Evolving Separation of Powers*, 115 COLUM. L. REV. 515 (2015). As Michaels describes the literature and the theory, he argues that the concept of checking powers is not just about constraining abuse; it is also about legitimating the exercise of power. *See id.* at 523. The Supreme Court's separation-of-powers jurisprudence is full of language linking both separation of powers and federalism to the related goal of diffusing power or preventing its concentration. *See, e.g.*, Dep't of Transp. v. Ass'n of Am. R.R., 135 S. Ct. 1225, 1244-45 (2015) (Thomas, J., concurring) (depicting the Framers as "concerned not just with the starting allocation" of power but also with power's ability to concentrate over time); *Youngstown*, 343 U.S. at 593-94 (Frankfurter, J., concurring) (describing the potential for "[t]he accretion of dangerous power" if separation of powers is not vigilantly guarded); *see also* Printz v. United States, 521 U.S. 898, 918-19 (1997) (stating that the Constitution established "dual sovereignty" in the national and state governments); Gregory v. Ashcroft, 501 U.S. 452, 458 (1991) (stating that the separation of powers was created with the purpose of "prevent[ing] the accumulation of excessive power in any one branch" and analogizing it to federalism).

**180.** *See* Gillian E. Metzger, *The Constitutional Duty To Supervise*, 124 YALE L.J. 1836, 1891-97 (2015) (distinguishing between political or electoral accountability and legal accountability, or the concept that "all exercises of governmental power be subject to constitutional limits that the political branches lack power to alter through ordinary legislation"); Michaels, *supra* note 179, at 540-57 (exploring the civil service as a counterweight to the political leadership of agencies and arguing that the former provides a form of constraint that helps ensure independent and apolitical decision making).

AR2022_500077

THE YALE LAW JOURNAL                                    125:104   2015

alarmism,[181] though whether to cheer or warn often depends on the sources of power the Executive purports to be using.[182] A crucial dynamic missing from this account, which revolves around the assumption that the Executive is the branch in need of constraint, emerges from our observation of how de facto delegation has operated in immigration law. Executive action and priority setting in the exercise of the enforcement power can serve to constrain power in a world of overbroad legislation. For example, the enforcement priorities articulated across administrations to emphasize the removal of security and safety risks constitute executive efforts to construct a more rational screening system within the overinclusive sweep of today's immigration code.[183]

Moreover, the act of actually enforcing the law—of confronting its real-world effects—can help point to limits or unintended consequences of the law as drafted.[184] Enforcement brings to life the consequences of legislation—one

**181.** *Compare* POSNER & VERMEULE, *supra* note 114 (arguing that in the modern administrative state, the Executive governs subject to weak or nonexistent legal constraints), *with* BRUCE ACKERMAN, THE DECLINE AND FALL OF THE AMERICAN REPUBLIC 6 (2010) (emphasizing the danger of a "runaway presidency").

**182.** *Compare* Delahunty & Yoo, *supra* note 14, at 784-85 (arguing that the President violated his responsibility under the Take Care Clause by initiating DACA), *with* JOHN YOO, THE POWERS OF WAR AND PEACE: THE CONSTITUTION AND FOREIGN AFFAIRS AFTER 9/11, at 106-09, 184-90 (2005) (locating robust presidential foreign affairs and war powers in Article II of the Constitution that overcome congressional efforts to limit them). *See generally* Eric A. Posner & Cass R. Sunstein, *Institutional Flip-Flops* (Univ. of Chi. Pub. Law & Legal Theory, Working Paper No. 501, 2015), http://ssrn.com/abstract=2553285 [http://perma.cc/U5JV-PHY4] (defining "flip-flops" as decisions by lawmakers, politicians, and others to change their approaches to federalism, the filibuster, recess appointments, executive privilege, and other structural arrangements to serve their ideological goals and attributing flip-flops to "merits bias" or a psychological phenomenon according to which short-term political commitments make the necessity of certain institutional arrangements seem self-evident).

**183.** This is not to say that the immigration enforcement bureaucracy has not been zealous in its mission. Immigrants' rights advocates would charge the Obama Administration, in particular, with overenforcement. But this charge often obscures the complexities of institutional context. The prioritization memos issued by various administrations may not have had as significant an impact as their political authors might have liked. As we explore in Part III, the Obama relief policies are themselves a recalibration of enforcement policy to capture that fact. Within the Executive Branch, the push and pull between political appointees and the civil service ensures that the exercise of the enforcement power will itself consist of mixed goals and imperfect results.

**184.** Another example of this dynamic can be found in the resistance by former executive branch officials from the first Bush and Clinton Administrations to the mandatory detention provision Congress added to the Code in 1996 for noncitizens in removal proceedings on the basis of having committed an aggravated felony or violation of certain other grounds of removal. When the American Civil Liberties Union took a due process challenge to this provision all the way to the Supreme Court in 2003, numerous former INS officials filed an amicus brief emphasizing how the provision constrained executive discretion to determine

AR2022_500078

concrete manifestation of the informational advantages of the presidency. We should want the Executive Branch to have the power to grapple with those consequences based on judgments forged through its own experience. Indeed, these informational benefits can often only be acquired in a dynamic context, in which executive branch officials have authority to make decisions *subsequent* to congressional policymaking. For the Executive to respond to the lived experience of the law by shifting priorities can help hold the legislature accountable, but also advance a policy debate by pointing a regulatory regime in better directions.

These epistemic benefits of executive action also bring with them increased policy responsiveness. While responsiveness is no unalloyed virtue, executive-branch initiative taking can perform a valuable constitutional function in immigration policy, particularly within a system that governs a polity marked by deep ideological differences and in a domain where a significant legislative reform occurs, at best, once a generation.[185] One way executive-driven priority setting has fostered responsiveness is by offering a counterpoint to the interest groups that dominated Congress, with the White House serving as an alternative site for organizing and advocacy for the immigrants' rights social movement. Whatever we think about the merits of their various positions, multiplying outlets for interest-group competition, and expression of popular preferences through policy, can promote the responsiveness of government.

To the extent that the concern about executive policymaking through enforcement stems from the desire for accountability, we do not think the Executive suffers from a democracy deficit as compared to Congress in any meaningful sense.[186] The mechanisms of democratic influence and accountability may differ from those that operate on the legislature, but they exist not only in the President's election mandate, but also in the

---

whether a noncitizen in removal proceedings could be released on bond in harmful and counterproductive ways. *See* Brief for T. Alexander Aleinikoff et al. as Amici Curiae Supporting Respondent at 4-14, Demore v. Kim, 538 U.S. 510 (2003) (No. 01-1491).

185. David Pozen calls for treating certain "remedial" measures taken by the Executive Branch as forms of norm-based self-help that advance separation-of-powers goals, rather than as self-aggrandizing, and he emphasizes the value of self-help during times of "agonistic" and "dysfunctional" government. *See* Pozen, *supra* note 174, at 7-11. For reasons explained *infra* notes 189-190 and accompanying text, we do not regard the two-principal dynamic as depending on polarized or dysfunctional government. Rather, we see it as vital under ordinary circumstances, too, when legislation is either difficult to achieve or when Congress has chosen inaction for other reasons.

186. *See infra* notes 226-229 and accompanying text (discussing the literature concerning presidential administration and the value and function of presidential control over agency policy, including by emphasizing the relative accountability of the President). *See generally* Andrias, *supra* note 52, at 1090-94 (highlighting the accountability of the President in defending his and his political appointees' control over enforcement judgments).

169

corresponding organization of interest groups that pressure the White House and the agencies, and in the modern media's insistence that the President explain and justify his actions and take his policy initiatives "on the road."[187] In fact, the Obama relief initiatives and the reformulation of Secure Communities offer prime examples of the Executive's responsiveness to popular dissent from administration enforcement policies and the underlying statutory framework that sets the stage for them. Relatedly, formal and informal interactions with Congress will themselves constrain the Executive. In the war-powers context, scholars have drawn attention to such potential. Stephen Griffin, for example, writes of a "cycle of accountability" that consists of interbranch interaction over time through which "mutual testing and deliberation results," such that the branches learn from their mistakes.[188]

---

**187.** The concept of "accountability" merits some unpacking, because it can come in the form of being answerable to the political process, or from the numerous internal constraints that operate within the Executive Branch and through the application of judicial review over agency action. For a nuanced discussion of forms of accountability, see Metzger, *supra* note 180, at 1886-97. Given the numerous internal constraints on the Executive Branch that exist, including competition among agencies in shared regulatory space, centralized White House review of agency action, the presence of lawyers across the branch assigned the function of ensuring executive action comports with the law, and institutions such as the Inspectors General, we reject the Posner and Vermeule formulation of the Executive as "unbound." *See* POSNER & VERMEULE, *supra* note 114 (describing the Executive's power as largely unconstrained by legal mechanisms); *see also* JACK GOLDSMITH, POWER AND CONSTRAINT: THE ACCOUNTABLE PRESIDENT AFTER 9/11, at 83-160 (2012) (discussing the interagency process, the Inspectors General, and the role of lawyers as forms of constraint). The ICE Agent's Union, and the lawsuit it has brought challenging DACA, represents one potential example of internal constraint, as do the different and generally enforcement-oriented preferences of the bureaucracy. *See* Rodríguez, *supra* note 95, at 2110 (discussing the role of institutional culture within agencies as part of a coherent picture of "federal" priorities and preferences). Whether there should be more and better internal constraints may be worth debating, and scholars such as Neal Katyal and Gillian Metzger have initiated important inquiries along these lines, but we would be wrong to think of the Executive as a necessarily and truly dangerous branch. *See, e.g.*, Neal Kumar Katyal, *Toward Internal Separation of Powers*, 116 YALE L.J. POCKET PART 106, 106-10 (2006) (arguing for the implementation of a separation-of-powers principle within the Executive Branch, given the scope of the President's power); Gillian E. Metzger, *The Interdependent Relationship Between Internal and External Separation of Powers*, 59 EMORY L.J. 423, 425 (2009) (calling for paying close attention to internal administrative design and analyzing which structures serve as the most effective checks on executive power).

**188.** STEPHEN M. GRIFFIN, LONG WARS AND THE CONSTITUTION 5 (2013). Importantly, Griffin argues that this cycle has not operated properly since 1945 and that scholars focused on whether Congress has authorized military action miss the deeper problem of the absence of codeliberation on the use of force. *Id.* at 8-9. The factors that account for this decline in deliberation are likely complex, but whereas the President has occupied the domain of foreign affairs, Congress remains his rival and counterpoint in the domestic setting.

AR2022_500080

THE PRESIDENT AND IMMIGRATION LAW REDUX

It may be that robust policymaking through enforcement creates disincentives for Congress to act. But while we could certainly characterize recent immigration history as embodying a failure of congressional will, we doubt that the causes of legislative stasis include executive initiative taking. Whatever the reasons for congressional inaction—whether they be dysfunction, paralysis, or simply the choice to not act—the President's decision to offer an affirmative, substantive vision can expand the policymaking domain in constructive and idea-generating ways. In this sense, the Executive acts as an engine in the policymaking process. This agenda-setting function may be particularly vital during times of polarization that produce legislative stasis,[189] such as the one we seem to be living through, but this function of executive policymaking is by no means limited to moments like ours.[190] Presidential immigration law can help mitigate one of the ordinary costs of our separation-of-powers regime—the reluctance or inability of government as a whole to act—thus furthering the interest of a healthy tradeoff between power and constraint.

Again, action in and of itself is not necessarily good. And whether executive action of the sort initiated by President Obama in his relief policies will actually prompt further policy deliberation is an empirical question. Executive action often amounts to a second-best alternative to legislation. Nowhere is that more true than in the immigration enforcement context, where prioritization cannot provide legal immigration status to those who receive deferred action under Obama's relief initiatives.[191] Thus, we should remain concerned with the possibility that executive policymaking will disable or displace Congress in some way—a point we take up in more detail in Part IV. But having a rival or complementary policymaker in the Executive can be good for the democratic and problem-solving features of government.

\*\*\*

Our dynamic understanding of the relationship between Congress and the Executive, and our conception of the domain of regulation as one that evolves over time through the exercise of the enforcement power, reflect what we believe to be an important moment in the intellectual history of separation-of-

---

189. For a similar argument in the federalism context, see Roderick M. Hills, Jr., *Against Preemption: How Federalism Can Improve the National Legislative Process*, 82 N.Y.U. L. REV. 1, 16-18 (2007).

190. In this sense, our claims about the value of two principals differ from some recent accounts of the separation of powers and politics. *See* Pozen, *supra* note 174; Sunstein, *supra* note 174.

191. *See infra* p. 215.

171

powers scholarship—both at the descriptive and the normative levels. The constitutional framework sets up institutional rivalries as forms of constraint on government power. But these constraints do not come exclusively from the formal powers the Constitution assigns each branch and the "checks" each one possesses over the other.[192] Our immigration history shows how constraints can also arise from the push and pull of politics and institutional design.[193] Unique to our account is the way in which we illuminate, through history, how constraints on government can arise when each branch acts as an institutional source of policymaking in the same domain.

This idea that the roles and powers of the political branches are defined through a complex historical process that cannot be easily captured through either formal models or deductive, judicial-style reasoning is far from limited to the immigration arena.[194] In fact, it appears even in settings where the

---

**192.** For a classic statement of three different forms of separation of powers that commentators often conflate, see Waldron, *supra* note 176, at 438-42, which distinguishes among separation of powers, checks and balances, and dispersal of power generally and argues that separation of powers is, above all, a matter of "articulated governance."

**193.** In Part III, we elaborate on this last point in particular and highlight how dynamics internal to the Executive Branch can serve as sources of constraint. This institutionally grounded conception of separation of powers serves as a counterpoint to an ascendant line of thinking that rejects the Madisonian theory of separation of powers and emphasizes instead that, to the extent constraints exist on the branches, they come from the "separation of parties," or divided government. *See* POSNER & VERMEULE, *supra* note 114, at 4 (rejecting altogether the notion that a legal concept of separation of powers does any work and arguing that constraints on the Executive come in the form of popular politics); Bradley & Morrison, *supra* note 173, at 438-47 (arguing that the Madisonian theory of checks and balances on which theories of congressional acquiescence to executive branch practice are based no longer accurately describes the relationship between the branches or captures the realities (and difficulties) of legislation); Daryl J. Levinson & Richard H. Pildes, *Separation of Parties, Not Powers*, 119 HARV. L. REV. 2311, 2330-47 (2006) (arguing that during times of cohesive and polarized politics, competition between the branches will vary widely and may disappear altogether if the branches are controlled by officials from the same party). These theories quite successfully dismantle the most abstract and starry-eyed versions of the Madisonian vision. But because their foil is a theory, they operate at a level of institutional abstraction that prevents them from appreciating some of the ways in which institutional constraints within government play a large role in the wielding of the enforcement power—dynamics our immigration history helps to bring to light. For an account of internal and external constraints on the Executive Branch that captures some of these institutional realities in the war powers and national security contexts, see generally GOLDSMITH, *supra* note 187.

**194.** Our thinking along these lines is ultimately part of a moment in the separation-of-powers scholarship that seeks to understand the nature of power by appreciating how it plays out in practice. Trevor Morrison and Curtis Bradley, for example, call for attention to the role that history plays in the construction of executive power and argue that historical practice can render a particular arrangement constitutional in status. *See* Bradley & Morrison, *supra* note 173; Aziz Z. Huq, *Removal as a Political Question*, 65 STAN. L. REV. 1, 45-52, 70-76 (2013)

Constitution clearly allocates overlapping power to Congress and the President, as in the war-powers context.[195] As we have emphasized, whether this sort of relationship between the branches proves productive really depends on context. Moreover, policymaking through enforcement judgments presents concerns that policymaking through rulemaking does not: the source of delegated authority is less clear, and it can be difficult to externally police the executive decision-making process — concerns we flagged back in 2009. In Part III, we take up this dilemma and explore how the Obama relief policies simultaneously harness the benefits of policymaking through enforcement, enhance accountability, and promote constrained government by making enforcement judgments more transparent. Even within our vision of executive policymaking through enforcement, we do believe there should be a limiting principle on executive action, in service of the basic value of constraining government power. We turn now to a more fruitful source of such a principle.

(arguing that the scope of the presidential removal power should be seen as a political question, in part because of the political-science scholarship suggesting that the removal power does not serve as a constraint on the bureaucracy, which renders judicial intervention in agency design counterproductive); Aziz Z. Huq, *The Negotiated Structural Constitution*, 114 COLUM. L. REV. 1595, 1620-31, 1683-86 (2014) (arguing that the branches negotiate their institutional interests with one another and that courts are not well placed to monitor these "intermural deals," which instead should be policed for bad outcomes by elected officials); Pozen, *supra* note 174, at 10 (criticizing the separation-of-powers scholarship that turns away from "legal modes of reasoning" and arguing that unwritten, quasi-legal norms shape and constrain interactions across the U.S. government, producing both "retaliation" as well as cooperation). Though we differ in our conclusions about the nature of executive power and the proper role of Congress and the courts in constraining it, all of these works share an understanding of interbranch relationships as constructed over time.

195. In an important recent work on presidential war powers, for example, Mariah Zeisberg develops a "relational" model of separation of powers and rejects the idea that the branches must adhere to "determinate textual meaning." MARIAH ZEISBERG, WAR POWERS: THE POLITICS OF CONSTITUTIONAL AUTHORITY 7-9, 18-19 (2013). She argues instead that we can evaluate the branches' work based on "how well they bring their special institutional capacities to bear on the problem of interpreting the Constitution's substantive standards about war." *Id.* at 18-19. She sees interbranch conflict as a potentially productive source of both deliberation over constitutional meaning and accountability for ultimate policies. *Id.* at 30-31. The focus on deliberation and accountability has much in common with Griffin's approach discussed *supra* note 188 and accompanying text. *See also* Stephen M. Griffin, *Zeisberg's Relational Conception of War Authority: Convergence and Divergence in Achieving a New Understanding of War Powers*, 95 B.U. L. REV. 1235, 1238 (2015) (noting the shared emphasis on "the nature and value of interbranch deliberation").

173

### III. THE INSTITUTIONALIZATION OF ENFORCEMENT DISCRETION

The faithful-agent model of congressional-executive relations we reject in Part II focuses on the *substantive* relationship between the choices or values reflected in the INA and those reflected in the President's enforcement of the statute. This approach, we have argued, leads us astray. But that does not mean we think all bets are off. In this Part, we turn from substance to process and argue that the inquiry into the legality of President Obama's relief programs and other similar exercises of the enforcement power should revolve around whether the Executive should be constitutionally prohibited from *institutionalizing* prosecutorial discretion in certain ways.[196] On this account, the concern is not *who* gets protected from deportation, but *how* they come to be protected.

Numerous critics of the Obama relief initiatives have focused on these process concerns and declared his actions unconstitutional because of the way they institutionalize the Executive's discretion. One prominent critique holds that the initiatives are unlawful because they provide "categorical" forms of relief, rather than resting on the exercise of "individualized" discretion.[197] A second claim emphasizes that the way the relief initiatives institutionalize discretion threatens to undermine the "rule of law," by which critics mean legal compliance.

This Part explains why these claims are misguided as a matter of both law and theory. As a theoretical matter, these claims about President Obama's relief initiatives are actually just retail-level examples of more general debates that have long raged in legal theory and administrative-law scholarship. We will show that these critiques all boil down to claims about one or more of three choices: the choices between (1) rules versus standards, (2) centralized versus decentralized control over prosecutorial discretion, and (3) secret versus public norms regarding the exercise of that discretion. The Obama relief initiatives' central "innovation" is to bind the exercise of prosecutorial discretion to more rule-like criteria, to centralize the supervision of discretion to a greater extent than is typical in enforcement contexts, and to make the exercise of discretion predictable and transparent. In other words, DACA and DAPA choose rules over standards, centralization over decentralization, and transparency over secrecy.

---

196. Whereas in this Part we focus on why the Obama Administration relief initiatives serve rather than undermine structural separation-of-powers values, in Part IV we consider what forms of institutionalizing discretion might present constitutional concerns, and we enumerate some of the external sources of constraint that exist.

197. *See, e.g.*, Price, *supra* note 14, at 674-75.

174

AR2022_500084

These choices ultimately advance the core rule-of-law values of consistency, transparency, and accountability: they ensure that similar cases are more likely to be treated alike, that the exercise of discretion is more predictable, and that enforcement outcomes align more closely with the policy preferences of the agency's political leadership and the President himself.[198] This does not mean, of course, that the choices embodied in DACA and DAPA are legally required, or even that they would in all contexts be legally permissible. At a high level of generality and abstracted from the details of the Obama relief initiatives, these choices are contestable. In many situations, good reasons exist to prefer standards to rules, decentralization to centralization, and secrecy to transparency; these choices involve tradeoffs between values at the very core of the American legal tradition. But for this very reason, it is impossible to make much progress in evaluating how those tradeoffs cash out without careful attention to institutional context. And once we understand the institutional realities against which the Obama Administration developed its relief initiatives, the choices embodied in DACA and DAPA become easy to defend.

Importantly, we ground our defense of the institutional choices reflected in the Obama relief initiatives by accepting the importance of identifying limiting principles on the enforcement power—principles that arise from constitutional structure, not just extralegal sources.[199] But we acknowledge that these limits must, given the structure of the modern administrative state, inevitably derive

---

198. Anil Kalhan similarly argues that DAPA helps the DHS ensure that "its personnel heed important rule-of-law values such as consistency, transparency, accountability, and nonarbitrariness." Anil Kalhan, *Deferred Action, Supervised Enforcement Discretion, and the Rule of Law Basis for Executive Action on Immigration*, 63 UCLA L. REV. DISCOURSE 58, 85 (2015). Though a deep analysis of what is meant by rule-of-law values is beyond the scope of this Article, we believe consistency rather than uniformity captures what we can realistically expect from complex enforcement efforts. For a discussion of the difference between uniformity and consistency, see Cristina M. Rodríguez, *Uniformity and Integrity in Immigration Law: Lessons from the Decisions of Justice (and Judge) Sotomayor*, 123 YALE L.J. F. 499 (2014), http://www.yalelawjournal.org/forum/uniformity-and-integrity-in-immigration-law [http://perma.cc/7NFN-U7CF]. In addition, we emphasize perceptions of fairness by the regulated public, rather than nonarbitrariness, because we are reluctant to describe the differentiated results of a decentralized, diffused decision-making process as necessarily arbitrary.

199. In view of the futility of substantive limits, another approach to understanding the enforcement power could be to reject the idea that any constitutional limits exist or can be reliably determined. We might adopt the perspective of Eric Posner and Adrian Vermeule and accept that the only real limits on executive power come from politics and public opinion. *See* POSNER & VERMEULE, *supra* note 114. As we suggest throughout this Article, we reject their descriptive account that legal rules and practices fail to constrain the modern Executive. And we share at least one assumption with the critics of the Obama relief initiatives—that the exercise of executive power ought to be disciplined as the result of legal and constitutional considerations.

175

THE YALE LAW JOURNAL 125:104 2015

from the contextual application of the broader objectives we identify in this Part and Part II. Critics have been blind to both that institutional context and to the realities of administrative governance. Their view that the institutional choices embodied in DACA and DAPA are unconstitutional (rather than just undesirable) embodies a radical theory that the Constitution sharply restricts the ways in which the Executive may organize itself.

## A. Rules and Standards

The Obama Administration's relief initiatives institutionalize discretion in an innovative way—just not in the way critics charge.[200] According to critics, DACA and DAPA are unconstitutional because they exercise discretion on a "categorical" rather than an "individualized" basis. The individualized exercise of discretion comports with the canonical form of prosecutorial authority, the argument goes. But the categorical exercise of discretion amounts to an unconstitutional act of executive "lawmaking."[201]

It might be tempting to dismiss this claim by pointing to the conceptual flaw in this dichotomy. Every exercise of prosecutorial discretion, including those authorized by the Obama relief initiatives, is "individualized" in the sense that individual persons seek or will be granted relief as individuals.[202] Given

---

[200] Some scholars have attempted to characterize DACA and DAPA as a run-of-the-mill action by the President, consistent with past practices. *See* Gilbert, *supra* note 18. As we explained in Part I, while we think the initiatives are consistent with the history of executive branch policymaking through the exercise of the enforcement power, many of the precedents typically cited for this claim were not of the same scale as DACA or DAPA, and those that were can be characterized as providing only transitional relief. We believe what the Administration has done is novel and simultaneously an improvement on the status quo and imperfect (for reasons we explain *infra* Part IV) but not constitutionally defective.

[201] *See, e.g.*, Price, *supra* note 14. In describing the appropriate use of the enforcement power, Price emphasizes that the Executive may engage in priority setting within the parameters of statutory policy but that it may not engage in policymaking. *Id.* at 677, 749 ("[E]xecutive officials should understand their task as a matter of priority setting within the parameters of statutory policy . . . ."). Our claim throughout this Article has been that the structure of immigration law transforms priority setting into policymaking, but that the raison d'être of the administrative state belies the idea that executive policymaking through enforcement (or rulemaking) is constitutionally worrisome.

[202] Leading defenders of the Administration's policy have emphasized that the memoranda detailing the policy and providing instructions to line-level adjudicators emphasize that they retain discretion to deny deferred action even to those who meet the eligibility criteria. *See* Legomsky, Written Testimony, *supra* note 17, at 71 (noting that the memoranda governing both DACA and DAPA "are filled with clear, careful, explicit, repeated commands to officers to make individualized, case-by-case discretionary judgments"). Even if it were not the case that adjudicators retained discretion beyond application of the eligibility criteria, the

176

THE PRESIDENT AND IMMIGRATION LAW REDUX

this, it is unclear what it even means to say that DACA and DAPA do not involve "individualized" determinations regarding the exercise of prosecutorial discretion. The fact that large numbers of noncitizens who meet the announced eligibility criteria will come forward to apply does not mean that each application will not be adjudicated on an individual basis. This sort of confused talk about individualized decision making is part of what plagued debates about profiling for years, and the history of that debate shows that there is little profit in trying to make this analytic distinction do much work as a matter of law or theory.[203]

But while the focus on "categorical" decision making is confused, we can recharacterize this argument to capture what seems to be at the heart of critics' concern. The core of their objection appears to be that the Obama relief initiatives have substituted rules for standards in the exercise of prosecutorial discretion. As a descriptive matter, this claim is essentially accurate. The initiatives innovate because they move from a system of suggestive enforcement guidelines to a much more rule-bound enforcement system. Previously, grants of "deferred action" were made on an ad hoc basis, guided by loose priorities laid out in a series of agency memos on the exercise of prosecutorial discretion. These memos specified dozens of factors relevant to relief determinations (many of which embodied vague standards), and said little about the appropriate relationship between the factors.

DACA and DAPA reshaped this decision-making process to make it much more rule-bound. (They also formalized the application process, a point we will take up in a moment.) First, DACA and DAPA reduced considerably the number of criteria relevant to eligibility for relief; rather than dozens of factors being relevant, the initiatives selected just a handful. Second, the initiatives replaced loose criteria with more objective ones. Under DAPA, for example, the two most important criteria the applicant must establish are that she has resided in the United States for at least five years, and that she has a child who is a U.S. citizen or green card holder.[204] Third, DACA and DAPA clearly specify the logical relationship among the listed criteria. Each criterion is a necessary condition, meaning that an immigrant must show that she satisfies all of the enumerated criteria in order to be eligible for the exercise of discretionary relief.

---

adjudications still would be individualized. The distinction between individual and categorical judgments ultimately amounts to a question of framing.

203. *See* FREDERICK SCHAUER, PROFILING, PROBABILITIES, AND STEREOTYPES (2006) (explaining the conceptual impossibility of "individualized" decision making, if an individualized decision is defined as one that does not permit the decision maker to make any group generalizations).

204. *See* Johnson, DACA and DAPA Memo, *supra* note 108, at 4.

AR2022_500087

Defenders of the relief initiatives have tried to resist the claim that DACA and DAPA have a rule-like structure. The Department of Justice has taken great pains to emphasize—both in the OLC opinion and in the Texas litigation over DAPA—that the relief programs authorize agency personnel to exercise discretion to deny relief to otherwise-eligible noncitizens. [205] But the preservation of formal discretion does not mean that DACA and DAPA are not more rule-like than the regime they would replace. The relevant question is whether, as a *causal matter* rather than as a formal one, discretion plays as large a role in deferred-action determinations under the new initiatives as under the old regime. The answer to that question is unequivocal: while discretion previously pervaded every aspect of each decision, it plays a very limited role under the new initiatives. Government-provided data for DACA show that almost no eligible applicants have been denied relief as a matter of discretion. From DACA's inception until the end of 2014, USCIS approved 638,897 applications and denied 38,597. [206] Most denied applications were rejected "based on a determination that the requestor failed to meet certain threshold criteria." [207] In other words, a full ninety-four percent of adjudications have resulted in grants. [208] And of the six percent that were rejections, most were based on the failure to satisfy DACA's eligibility criteria, not on the exercise of discretion to deny relief to an otherwise-eligible applicant. [209] Thus, the

---

**205.** *See* Defendant's Emergency Expedited Motion to Stay the Court's February 16, 2015 Order Pending Appeal and Supporting Memorandum at 10, Texas v. United States, No. 1:14-CV-254, renumbered No. B-14-254 (S.D. Tex. Feb. 23, 2015); OLC Memorandum Op., *supra* note 10, at 8-9. In describing DACA and DAPA as preferring rules over standards, we do not take a position on the question of whether DAPA constitutes a legislative rule for the purposes of the APA and as understood within the administrative law doctrine. We engage with that issue more fully in Part IV. Here, we make a legal-theory point by using "rules" as compared to "standards" to describe the structure of decision making. The desire to defend against the APA claims in the Texas lawsuit has detracted from candid discussion of what the Administration sought to accomplish with DACA and DAPA as a matter of executive branch organization.

**206.** *See* Declaration of Donald W. Neufeld ¶ 23, at 10, *Texas,* slip op. USCIS accepted 727,164 applications by this date, and 49,670 remained pending. *See id.*

**207.** *Id.*

**208.** *See id.*

**209.** *See id.* To be sure, these correlational statistics cannot, on their own, provide conclusive proof of causation. Because DACA applicants are self-selected, it is theoretically possible that the formal preservation of discretion plays a much larger role than these data suggest. If many potential applicants would be denied relief as a matter of discretion, and if these potential applicants can accurately predict the discretionary denial and therefore decline to apply whenever they anticipate that they will lose at the discretionary stage, then we would observe few discretionary denials, even though the presence of discretionary authority played a large role in the program. But while such a scenario is observationally equivalent to what we see in the grant-rate data, it is *not* equivalently plausible.

178

program appears to have operated, as intended, to ensure that certain types of immigration-law violators—those who satisfied the rule-like eligibility criteria—succeeded in their applications and therefore became protected from deportation.

These outcomes do not mean that the discretion left to USCIS officials is not in some sense "real." Out of the hundreds of thousands of DACA applications, there do appear to have been a small number in which adjudicators have denied relief to applicants who otherwise satisfied the eligibility criteria.[210] Thus, our claim is not that the formal preservation of discretion is somehow a sham. The formal discretion left to adjudicators may have been intended to preserve some of the case-by-case flexibility for truly exceptional cases; or perhaps it was mainly intended to insulate the new policies from certain kinds of (misguided) legal challenges.[211] But even if discretion remains relevant in rare cases, it is hard to resist the conclusion that the more rule-like components of the decision will be dispositive of ultimate relief decisions in the vast majority of cases.[212] This reality is, in fact, precisely

---

210. There is some dispute in the Texas litigation about exactly how many applications may have been denied as a matter of discretion. The district court concluded that "[n]o DACA application that has met the criteria has been denied based on an exercise of individualized discretion." *Texas*, slip op. at 109. This conclusion does not appear to be consistent with a declaration submitted on behalf of the United States as part of the litigation, which documents at least two instances in which DACA applicants who satisfied the threshold eligibility criteria were denied relief as a matter of discretion. *See* Neufeld, *supra* note 206, ¶ 18, at 8. As that declaration notes, however, "Until very recently, USCIS lacked any ability to automatically track and sort the reasons for DACA denials . . . ." *Id.* ¶ 24, at 10–11. For that reason, it appears to be impossible to know whether additional discretionary denials occurred beyond the two examples noted in the declaration.

211. *See infra* text accompanying notes 309–318 (discussing, and rejecting, the view that a more rule-bound regime of prosecutorial discretion might run afoul of the APA's "legislative rule" jurisprudence).

212. In many decision-making structures that mix rules and standards—including DACA and DAPA—the relative importance of different criteria cannot be determined as a matter of pure logical deduction. For example, it would have been fully consistent with the formal decision-making rules for DACA adjudicators to have denied relief, as a matter of discretion, to half of all otherwise-eligible applicants. And certainly other immigration relief programs, such as cancellation of removal (which also mixes rules and discretion), have much higher rates of discretionary denial.

It is interesting to note, however, that a pretty regular pattern does seem to emerge in legal decision-making contexts that combine a complex set of eligibility criteria with a back-end grant of discretionary authority: the rule-like stage seems to reduce the role discretion plays. *See, e.g.*, Adam B. Cox & Thomas J. Miles, *Judicial Ideology and the Transformation of Voting Rights Jurisprudence*, 75 U. CHI. L. REV. 1493 (2008) (testing empirically the constraining power of rules in one example of these sorts of mixed decision-making structures). Asylum determinations are a good illustration of this phenomenon. Adjudicators must determine whether an applicant meets the legal definition of refugee or

AR2022_500089

why the Administration replaced a wholly discretionary regime subject to suggestive guidance and ad hoc supervision with a rule-like application process in which discretion is limited to a backstopping role. As a practical matter, the structure of DACA and DAPA significantly constrains, if not functionally eliminates, the discretion of those adjudicating relief applications.

Critics are thus correct that the Obama initiatives replaced the old regime of discretion with a new regime bound by rules. Contrary to the critics, however, we do not believe this renders the programs unconstitutional. For these critics, the articulation of objective criteria and the overwhelming grant rates for DACA applicants who met the criteria render the program an unconstitutional act of executive "lawmaking." [213] Under this view, the distinction between rules and standards maps onto the constitutional division between "legislative" authority under Article I and "executive" authority under Article II; vague standards are less "legislative" than clear rules, and vice versa. But even for those who subscribe to formalistic accounts of the constitutional separation of powers, under which each branch exercises power of a particular type (and we are not among them), this argument makes little sense. Taken seriously, it would lead to the conclusion that Congress improperly exercises Article II "executive" authority when it enacts vague standards into law. The Sherman Antitrust Act would be unconstitutional, along with myriad other laws. [214] Such an argument would require a robust reinvigoration of the nondelegation doctrine. It also would require courts to conclude that administrative agencies improperly usurp Article I "legislative" authority

---

otherwise falls within any legal bars to asylum. But even if an applicant satisfies the criteria for asylum, an adjudicator still retains the discretion to deny an application for equitable reasons. In practice, the existence of the eligibility criteria has disciplined the inquiry and narrowed the authority of adjudicators; only a small percentage of asylum applicants who satisfy the eligibility criteria are denied asylum as a matter of discretion. *See, e.g.,* Gulla v. Gonzales, 498 F.3d 911, 916 (9th Cir. 2007) ("It is rare to find a case where an IJ finds a petitioner statutorily eligible for asylum and credible, yet exercises his discretion to deny relief."); 3 CHARLES GORDON ET AL., IMMIGRATION LAW AND PROCEDURE § 34.02(12)(d) (2011). And while there is some possibility that discretionary denials are suppressed because asylum law's malleable eligibility criteria make it easy for adjudicators to conduct legal analysis that comports with their preferred outcome, thereby obviating the need to deny applications on discretionary grounds, the DACA and DAPA criteria are not nearly so malleable.

213.  *See, e.g.,* Price, *supra* note 14, at 759-61. As noted above, this claim is sometimes cast as a formalist argument about the separation of powers: the idea is that the distinction between rules and standards maps onto the constitutional division between "legislative" authority under Article I and "executive" authority under Article II. *See supra* notes 176-178 and accompanying text.

214.  Magill, *supra* note 176, at 621.

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 91 of 990

THE PRESIDENT AND IMMIGRATION LAW REDUX

whenever they issue regulations that embody bright-line rules. So much for the modern administrative state.

More generally, American law rarely constitutionalizes the choice between rules and standards in public administration. Courts have in some cases constitutionally *required* reliance on rules—generally in cases where courts perceive a significant risk that discretionary decision making will serve as cover for discriminatory decision making. This idea runs through a number of First Amendment doctrines and helps explain the Warren Court's criminal procedure revolution.[215] In other circumstances, courts have constitutionally *prohibited* reliance on rules, generally where courts have concluded that adjudicatory discretion (and often a particular adjudicatory forum) must be preserved in order to secure the liberty or property interests of individuals protected by the Due Process Clause. The prohibition on categorical rules for pretrial detention in the criminal context offers a prominent example.[216] But these instances are clear exceptions to the general agnosticism of constitutional law on this question.

Even if the choice whether to structure decision making rigidly or flexibly rarely raises constitutional questions, it does implicate a question at the heart of twentieth-century administrative law and bureaucratic design: what is the best way to mete out mass justice, including in contexts like the one at issue here, in which millions of cases demand the attention of the Executive?[217] Attempts to answer that question generally must grapple with the foundational tradeoff between rules and standards: rules promote equal treatment across cases, but they necessarily define "like cases" in a more reductionist way than standards. Broad standards and "individualized discretion" can foster more fine-grained judgments about when justice or other equitable factors support relief.[218] But they necessarily achieve nuance at the expense of equal treatment across cases—

215. *See* GEOFFREY R. STONE ET AL., CONSTITUTIONAL LAW 809-12 (7th ed. 2013).

216. *See* United States v. Salerno, 481 U.S. 739 (1987). *But see* Demore v. Kim, 538 U.S. 510 (2003) (accepting the constitutionality of such categorical rules in at least some immigration detention contexts).

217. For an important early effort to work through this question, see generally JERRY L. MASHAW, BUREAUCRATIC JUSTICE: MANAGING SOCIAL SECURITY DISABILITY CLAIMS (1985).

218. On the tradeoffs between rules and standards, see, for example, FREDERICK SCHAUER, PLAYING BY THE RULES: A PHILOSOPHICAL EXAMINATION OF RULE-BASED DECISION-MAKING IN LAW AND IN LIFE (1991); Colin S. Diver, *The Optimal Precision of Administrative Rules*, 93 YALE L.J. 65 (1983); and Isaac Ehrlich & Richard A. Posner, *An Economic Analysis of Legal Rulemaking*, 3 J. LEGAL STUD. 257 (1974).

181

AR2022_500091

especially in a world where the same decision maker cannot decide all cases and power is diffused across a bureaucracy.[219]

There is no single answer to how best to strike these tradeoffs. In the context of mass administrative justice, however, the choice of whether to adopt rules or open-ended discretion is closely linked to the question of whether to centralize authority within the bureaucracy and exert significant supervisory authority over line-level executive officials. Within the Executive Branch, rules facilitate oversight and make it easier for high-level executive branch officials, many of whom are politically accountable, to prevent low-level agents from imposing their own views about when and how the law should be enforced.[220] But rather than eliminating discretion from the system, as critics charge, constraining low-level decision makers with rules simply relocates discretion to a point higher up in the bureaucracy. It is in this sense that discretion most truly remains within the system under the President's relief initiatives. That discretion simply belongs primarily to the Secretary of Homeland Security, Jeh Johnson, the officer to whom the INA formally delegates discretionary enforcement authority.[221] He retains the power to alter the criteria for relief in any way he sees fit, or even to cancel the relief programs.[222] And once we

---

219. Another conventional tradeoff between rules and standards is that rules are often more costly to specify ex ante and less costly to apply ex post. *See* Louis Kaplow, *Rules Versus Standards: An Economic Analysis*, 42 DUKE L.J. 557, 562-63 (1992). This tradeoff is also important to understanding why DACA and DAPA were likely structured the way they were, because they place the costly process of ex ante specification in the hands of high-level political officials rather than line-level bureaucrats.

220. *Cf.* Elizabeth Magill & Adrian Vermeule, *Allocating Power Within Agencies*, 120 YALE L.J. 1032, 1078 (2011) (noting the coordination costs of the diffusion of authority within the bureaucracy but suggesting the countervailing value of promoting independence by empowering the civil service).

221. *See* Immigration and Nationality Act § 103, 6 U.S.C. § 202 (2012) ("The Secretary, acting through the Under Secretary for Border and Transportation Security, shall be responsible for the following: . . . (5) Establishing national immigration enforcement policies and priorities."); 8 U.S.C. § 1103(a)(1) (2012) ("The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens . . . ."). There is some irony in the fact that critics are arguing that enforcement discretion cannot constitutionally be exercised by the statutory delegatee but instead must be exercised by a set of subordinate officials. We explore the radical nature of this claim about the structure of the administrative state below.

222. Though the President announced the DAPA initiative, Secretary Johnson issued the memoranda governing the program. *See supra* notes 108, 111 and accompanying text. The White House clearly was involved in the formulation of DAPA, as evidenced by the fact that the OLC opinion analyzing the program's legality was addressed both to the Secretary and to the White House Counsel. *See* OLC Memorandum Op., *supra* note 10, at 1. Though we speak in terms of the President's authority, therefore, the enforcement judgments we describe throughout the Article are clearly the product of collaboration within the Executive

AR2022_500092

acknowledge that the formal discretion left to line-level adjudicators to deny relief is of little practical importance, this transfer of discretion becomes all the more pronounced. We doubt Secretary Johnson (of his own volition or at the President's direction) will exercise his discretion to alter or terminate the program. But this doubt does not mean that Secretary Johnson actually lacks discretion; it simply means that we are confident about how he will exercise it.[223]

### B. Supervision (Not Separation) of Powers

The argument that "categorical rules" violate some requirement of "individualized discretion" really amounts to an argument that the supervision and centralization of discretion in immigration law are prohibited. The prohibition on centralization could be cast as a statutory directive, as a constitutional requirement, or as an imperative of good institutional design. So far as we are aware, no one has advanced the statutory argument—that Congress embedded in the immigration code a requirement that enforcement discretion be located exclusively in the hands of line-level enforcement personnel. This argument's absence is unsurprising, given that nearly all the statutory developments of the last several decades point in the other direction, promoting consolidation rather than diffusion within the Executive Branch of authority to make discretionary decisions about who should be deported.[224]

---

Branch, with the Secretary of Homeland Security and the leadership of DHS playing the key role in mediating presidential preferences and the management of the bureaucracy.

**223.** This confidence that Secretary Johnson will not reverse course leads some to believe that the relief is thereby more *durable* than ordinary decisions to defer prosecutions—a view that leads some to (wrongly) characterize the relief as a grant of "legal status." *See infra* notes 274-275 and accompanying text.

**224.** One particularly salient set of examples is the 1996 amendments to the INA that eliminated the authority that immigration judges had to grant relief from deportation. As we explained in 2009, these changes took place against a status quo in which the enforcement arm of the INS (now DHS) had considerable discretion about whom to place in proceedings in the first place. Rather than squeezing out discretion, the 1996 amendments simply consolidated discretion in the hands of enforcement officials by removing it from the hands of the somewhat-more-independent immigration judges. *See* Cox & Rodríguez, *supra* note 7, at 517-19. A similar story can be told about the slow death of a procedure, known as judicial recommendation against deportation (JRAD), which permitted an Article III judge to grant relief from deportation in the course of adjudicating a federal criminal case. *See* Padilla v. Kentucky, 559 U.S. 356, 361-64 (2010). Congress eliminated JRAD authority in 1990 and then further eliminated the Attorney General's discretionary authority to grant relief from deportation in 1996. *Id.* The elimination of JRAD took discretionary authority that was dispersed out to the federal judiciary and consolidated it in the hands of executive branch officials responsible for policing and prosecuting immigration violations.

AR2022_500093

THE YALE LAW JOURNAL                                    125:104   2015

Accordingly, we focus in this Part on the institutional and constitutional versions of the anticentralization claim. As a matter of institutional design, we show that the efforts in DACA and DAPA to centralize decision making have been significant administrative improvements on the practices of diffused prosecutorial discretion that preceded them. Second, we show that the notion that either the separation of powers generally, or the Take Care Clause in particular, constitutionalizes decentralization within the Executive Branch in the way imagined by critics of the relief programs is wildly implausible.[225]

### 1. Institutional Design

The long-term trend in American bureaucracy has been toward centralization—elevating decisions within agencies themselves, as well as above agencies into the Executive Office of the President. Political scientists and legal scholars from Terry Moe to Justice Elena Kagan have documented this trend,[226] and both unitary theorists on the right and advocates of presidential administration on the left have defended it.[227] Even recent developments in the

---

**225.** Some constitutional constraints surely exist on the organization and staffing of the bureaucracy, though none of the constraints clearly required by the Constitution, as described by judicial doctrine, apply to the sorts of choices we identify here. *See* Magill & Vermeule, *supra* note 220, at 1038-41 (discussing constitutional rules that constrain agency structure, such as the Constitution's Appointments Clause and the law governing removal, as well as the demands of procedural due process that require hearings or individualized processes in certain circumstances).

**226.** *See generally* WILLIAM G. HOWELL, POWER WITHOUT PERSUASION: THE POLITICS OF DIRECT PRESIDENTIAL ACTION (2003); ARTHUR M. SCHLESINGER JR., THE IMPERIAL PRESIDENCY (1973); Elena Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245 (2001); Terry Moe, *The Politicized Presidency*, *in* THE NEW DIRECTION IN AMERICAN POLITICS 235 (John E. Chubb & Paul E. Peterson eds., 1985); Terry M. Moe & William G. Howell, *Unilateral Action and Presidential Power: A Theory*, 29 PRESIDENTIAL STUD. Q. 850 (1999). It is important to note that centralization within an agency and centralization within the institution of the presidency are conceptually distinct phenomena, though they are causally related. With respect to the President's relief initiatives, both sorts of centralization are at work. Most of our discussion in this Part focuses on the way that those initiatives centralize discretionary decision making within the immigration bureaucracy. It is clear from the rollout of the initiatives, however, that the White House was intimately involved in overseeing the development of the initiatives.

**227.** *See, e.g.*, Andrias, *supra* note 52; Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power To Execute the Laws*, 104 YALE L.J. 541 (1994); Steven Croley, *White House Review of Agency Rulemaking: An Empirical Investigation*, 70 U. CHI. L. REV. 821 (2003); Kagan, *supra* note 226.

AR2022_500094

Supreme Court's administrative law canon have promoted and (implicitly) defended administrative centralization.[228]

Considered abstractly, of course, it would be difficult to identify a single, optimal level of centralization that applies across the bureaucracy to all (or even many) agencies and regulatory contexts. It is unsurprising, therefore, that a number of administrative law scholars have resisted Kagan's normative gloss on the centralization Moe describes.[229] In the critics' telling, centralization can diminish transparency, obscure lines of accountability, undermine expert decision making, and politicize agency action.

But our argument that the Obama relief initiatives promote the more disciplined and accountable use of executive power does not depend on taking a side in this general debate. If the last two decades of scholarship prove anything, it is that the appropriate level of centralization cannot be determined in the abstract; whether and how to centralize depend on how the relevant institutions operate in practice. Those who have argued that Obama's relief programs are unconstitutional have mostly elided this institutional detail. But it is precisely this detail in the immigration setting that offers us a unique policy experiment with which we can actually assess the centralizing tradeoffs made by Obama's relief initiatives. If we evaluate the initiatives in terms of what they replaced, we see how they promise to significantly improve the ex post screening system by regularizing it through the supervision of line officials.

Prior to DACA and DAPA, the Administration launched a prosecutorial discretion initiative that sought to preserve and guide line-level enforcement authority. The Obama Administration announced this initiative in June 2011 with the release of the so-called Morton Memos—directives that laid out the criteria the political leadership of Immigration and Customs Enforcement (ICE) and DHS wanted to govern the exercise of prosecutorial discretion by

---

**228.** *See* David J. Barron & Elena Kagan, *Chevron's Nondelegation Doctrine*, 2001 SUP. CT. REV. 201; Magill & Vermeule, *supra* note 220, at 1061-72. Recently, Gillian Metzger has reminded us that centralization and supervision are not just often desirable—sometimes these forms of oversight can be constitutionally mandatory. *See* Metzger, *supra* note 180, at 1903 (arguing that the Constitution imposes such a duty to ensure that the exercise of executive power is according to law, rather than arbitrary, as well as a duty to ensure that the Executive is politically accountable). The possibility that supervision can be constitutionally mandatory is commonplace in federal courts doctrine and scholarship, but it has far too often been overlooked in writing about administrative law.

**229.** *See* Lisa Schultz Bressman & Michael P. Vandenbergh, *Inside the Administrative State: A Critical Look at the Practice of Presidential Control*, 105 MICH. L. REV. 47, 59-62 (2006); Nina A. Mendelson, *Disclosing "Political" Oversight of Agency Decision Making*, 108 MICH. L. REV. 1127, 1130 (2010).

AR2022_500095

ICE employees.[230] The memos defined "prosecutorial discretion" broadly to encompass nearly every sort of enforcement decision made by ICE agents, including, crucially, the decision to initiate removal proceedings and the decision to grant deferred action.[231] As we noted in Part I, the memos were far from the first such documents; officials in both the Bush and Clinton Administrations issued guidance documents listing criteria intended to inform myriad discretionary enforcement judgments.[232] Yet both the content of the Morton Memos and the timing of their release, coinciding as they did with broader agency efforts designed to bring consistency to the system of screening noncitizens for deportability, led many advocates to see the memos as heralding a new era in which immigration discretion would be wielded on a more widespread and consistent basis.[233] This assumption may have been overly optimistic. The memos only articulated priorities; they did not indicate an intention *not* to remove low-priority targets, nor did they identify the means by which the priorities would inform the actual judgments of the line agents scattered across the country. By touting the memos, however, the Administration made a kind of political promise to shift the brunt of the enforcement system away from status violators and toward more serious offenders.

Many of the Morton Memos' factors for exercising prosecutorial discretion (and granting deferred action) bear a marked similarity to the deferred action criteria eventually embodied in the Obama relief initiatives. The factors included an immigrant's length of residence in the United States, as well as educational history, family ties, and criminal record (or lack thereof)—factors closely related to the eligibility criteria for both DACA and DAPA.[234] Having been a child when one migrated to the United States—the keystone criterion

---

230. *See* Morton, Exercising Prosecutorial Discretion, *supra* note 96.

231. *Id.* at 2-3.

232. *See supra* note 96 and accompanying text.

233. *See, e.g.*, Julia Preston, *U.S. Pledges To Raise Deportation Threshold*, N.Y. TIMES, June 17, 2011, http://www.nytimes.com/2011/06/18/us/18immig.html [http://perma.cc/42WW -Y2LT]. This view was held not only by media organizations and immigrants' rights advocates, but also by advocates of stricter immigration controls. *See The Morton Memos: Giving Illegal Aliens Administrative Amnesty*, FED'N FOR AM. IMMIGR. REFORM, http://www.fairus.org/morton-memos [http://perma.cc/6X8D-E7HZ].

234. *See* Morton, Exercising Prosecutorial Discretion, *supra* note 96, at 4 (referencing "the person's length of presence in the United States"; "the person's pursuit of education in the United States, with particular consideration given to those who have graduated from a U.S. high school or have successfully pursued or are pursuing a college or advanced degrees at a legitimate institution of higher education in the United States"; "whether the person has a U.S. citizen or permanent resident spouse, child, or parent"; and "the person's criminal history, including arrests, prior convictions, or outstanding arrest warrants").

AR2022_500096

THE PRESIDENT AND IMMIGRATION LAW REDUX

under DACA—was also deemed important under the Morton Memos.[235] Although the factors in the Morton Memos were less precise and more numerous, and although the logical relationship among them was not well defined, their resemblance to the DACA and DAPA priorities is unmistakable.[236]

Despite this resemblance, however, the Morton Memos did not have the immediate and obvious effects of DACA (and presumably of DAPA, once implemented), and perhaps for precisely that reason, they provoked much less public controversy than either of the Obama relief initiatives.[237] In the months following the memos' June 2011 release, there were few observable changes in the exercise of immigration prosecutorial discretion. According to widespread accounts, ICE continued to place immigrants who should have been among the lowest enforcement priorities in removal proceedings, routinely ignoring individual requests for deferred action.[238] Moreover, a large-scale review of

---

235. While the Morton Memos took pains to note that their list of factors was not exhaustive, they simultaneously emphasized that "there are certain classes of individuals that warrant particular care," including "minors" and "individuals present in the United States since childhood." *Id.* at 5; *see also id.* at 4 (highlighting "the circumstances of the person's arrival in the United States and the manner of his or her entry, particularly if the alien came to the United States as a young child").

236. This highlights another puzzling aspect of the arguments from congressional intent we criticized in Part II: the Morton Memos could have been subjected to pretty much the same wooden congressional-priorities critique that has been leveled against DACA and DAPA. Many of the Morton Memos' criteria are not clearly supported by the text of the INA, and some of them are in tension with discrete provisions of the Code. Yet many who criticize some or all of the President's proposals for relief express no doubts about the legality of the sorts of prioritization policies represented by the Morton Memos. *See, e.g.*, OLC Memorandum Op., *supra* note 10, at 7-11 (explaining how the prioritization policy announced by DHS (now known as the "Johnson Memo") fits comfortably within the President's enforcement discretion). Even the Texas district court that recently enjoined both DACA and DAPA took pains to emphasize its view that the agency has unreviewable discretion to prioritize its enforcement efforts and resources, essentially accepting the prioritization scheme set out in the memos Secretary Johnson issued to replace the Morton Memos. *See* Texas v. United States, No. 1:14-CV-254, renumbered No. B-14-254, slip op. at 68-70 (S.D. Tex. Jan. 30, 2015).

237. In a notable exception, a group of ICE officers in the Houston field office contested the new prosecutorial discretion policy, arguing that it created a "secretive review process." The national ICE union eventually passed a no-confidence motion citing ICE Director John Morton and Assistant Director Phyllis Coven. *See* Marjorie S. Zatz & Nancy Rodriguez, *The Limits of Discretion: Challenges and Dilemmas of Prosecutorial Discretion in Immigration Enforcement*, 39 LAW & SOC. INQUIRY 666, 677-78 (2014). Some members of Congress also, predictably, criticized the memos, *see* Rosenblum, *supra* note 3, at 5 n.13, though the concerns did not get widespread traction.

238. *See, e.g.*, Bill Ong Hing, *The Failure of Prosecutorial Discretion and the Deportation of Oscar Martinez*, 15 SCHOLAR 437 (2013); Julia Preston, *Deportations Under New U.S. Policy Are*

187

over 300,000 ongoing removal cases, implemented in conjunction with the memos' release in order to identify those cases in which prosecutorial discretion was warranted, resulted in a very small number of case closures.[239] And while the fraction of criminal deportees did go up somewhat through this period, that trend appears to be largely the product of changes to other enforcement initiatives, not the Morton Memos themselves.

Additional evidence of the Morton Memos' ineffectiveness can be seen in the operation of Secure Communities, another signature Obama enforcement initiative. That program, launched in the fall of 2008 by the Bush DHS, turned every local criminal arrest in the country into a point of immigration

---

*Inconsistent*, N.Y. TIMES, Nov. 12, 2011, http://www.nytimes.com/2011/11/13/us/politics /president-obamas-policy-on-deportation-is-unevenly-applied.html [http://perma.cc/EE24 -VQNJ]; *Holding DHS Accountable on Prosecutorial Discretion*, AM. IMMIGR. LAW. ASS'N & AM. IMMIGR. COUNCIL (Nov. 2011), http://www.aila.org/content/default.aspx?docid=37615 [http://perma.cc/2EWM-G9Y7].

**239.** *See ICE Prosecutorial Discretion Initiative: Latest Figures*, TRANSACTIONAL REC. ACCESS CLEARINGHOUSE 1 (Apr. 19, 2012), http://trac.syr.edu/immigration/reports/278 [http:// perma.cc/CYR2-AMS6] (stating that less than one percent of pending cases were closed by the end of September 2011); Julia Preston, *Deportations Continue Despite U.S. Review of Backlog*, N.Y. TIMES, June 6, 2012, http://www.nytimes.com/2012/06/07/us/politics /deportations-continue-despite-us-review-of-backlog.html [http://perma.cc/XU74-ZZT3] (stating that fewer than two percent were closed by June 6, 2012). The low rate of closure was exacerbated by delays in background checks, as well as by the fact that a fair number of respondents declined offers of administrative closure, presumably because they had pending claims for more permanent forms of relief. *See* Immigration Policy Ctr., *Prosecutorial Discretion: A Statistical Analysis*, AM. IMMIGR. COUNCIL (June 11, 2012), http://www.immigrationpolicy.org/just-facts/prosecutorial-discretion-statistical -analysis [http://perma.cc/XT9F-TSP5]. Even adjusting for these facts, the rates of eligibility remain remarkably low and declined as the program proceeded. *See* Ben Winograd, *ICE Numbers on Prosecutorial Discretion Keep Sliding Downward*, IMMIGR. IMPACT (July 30, 2012), http://immigrationimpact.com/2012/07/30/ice-numbers-on-prosecutorial -discretion-sliding-downward [http://perma.cc/7FCT-JMAB]. In a speech at the University of Georgia, former DHS Secretary Napolitano discussed the impetus for DACA and cited, among other factors, the difficulty of moving the bureaucracy in the direction the Administration desired through mechanisms such as the comprehensive review for administrative closure. *See* Janet Napolitano, President, Univ. of Cal., John A. Sibley Lecture at the University of Georgia School of Law: Anatomy of a Legal Decision 9 (Oct. 27, 2014), http://law.uga.edu/sites/default/files/President%20Napolitano%20Sibley %20Lecture%20UGA%20School%20of%20Law%2010.27.14.pdf [http://perma.cc/3X4M -2YR3] ("Bureaucratic momentum was not [on our side]. DHS was a new entity—a vast department that brought together many distinct agencies in the aftermath of 9-11. Our earlier call for a review of the backlogged cases in removal proceedings through the lens of our stated priorities helped a bit. But in the end, it did not have the desired impact. The Dreamers remained in limbo, ensnared within the sputtering debate over immigration reform.").

188

screening.[240] Universal screening at the point of arrest provides a tremendous amount of information to the federal government—information that can be used (and that the government has argued was designed to be used) to make decisions about removal both more consistent and more responsive to federal priorities. Under the program, federal officials, not local police, decided whether to place an immigrant identified through arrest data in removal proceedings.[241]

If the Morton Memos had actually significantly impacted the decisions made by agency personnel about whether to place a particular immigrant in removal proceedings, one would have expected to see that impact reflected in the pool of immigrants arrested by ICE under Secure Communities; those memos applied directly to arrest decisions made by ICE agents under Secure Communities. Yet no effect was apparent in the wake of the Morton Memos' release. Figure 1 shows the composition of that pool over time, broken down by the criminal history of those apprehended and placed in deportation proceedings following notification to DHS as part of Secure Communities.[242] Two aspects of the Figure stand out. First, a large percentage of people placed in proceedings under the program had no criminal history at all: nearly a third had no criminal conviction, despite the fact that the program was publicly touted as a means of targeting "criminal aliens."[243] Second, the composition of the arrestee pool did not change at all after the Morton Memos were released. The arrest decisions of line-level ICE agents under Secure Communities looks much the same before and after June 2011.[244] While the memos formally singled out noncitizens without prior convictions as lower priorities for

---

**240.** For an overview of the program, see Cox & Miles, *supra* note 97, at 93-98. The program involved data sharing between the FBI and DHS. *Id.* at 94. State and local police departments routinely route fingerprint data collected during arrests to the FBI. *Id.* Under Secure Communities, that data was forwarded to DHS and compared to a large database containing information on essentially every noncitizen encountered by the agency. *Id.* If the database returned a hit, ICE then determined whether the arrestee was potentially removable and, if so, whether to issue a request that police detain the person until ICE assumed custody. *Id.* at 95.

**241.** *See id.* at 131-35; *see also* Cox & Posner, *supra* note 160, at 1344-46 (explaining the advantages for the federal government over section 287 agreements).

**242.** Thomas J. Miles & Adam B. Cox, *Does Immigration Enforcement Reduce Crime? Evidence from "Secure Communities,"* 57 J.L. & ECON. 937, 956 fig.4 (2014).

**243.** *See* Johnson, Secure Communities Memo, *supra* note 101, at 1 ("The goal of Secure Communities was to more effectively identify and facilitate the removal of criminal aliens . . . .").

**244.** To be clear, there are some longer-term enforcement trends that bridge the release of the Morton Memos. The fraction of deportees with a criminal record had been rising since 2008, and this trend continued after the memos' release.

AR2022_500099

removal, the reality on the ground was that they were just as likely to be arrested by ICE after the memos' announcement.[245]

**Figure 1.**

CRIMINAL HISTORY OF NONCITIZENS ARRESTED BY ICE UNDER SECURE COMMUNITIES[246]



These data highlight the limitations of the Morton Memos' approach to producing meaningful changes in the exercise of immigration discretion.[247] In

---

**245.** It is certainly possible that, after a number of years, the Morton Memos would have been institutionalized in supervisory or disciplinary strategies so that they might ultimately have had *some* effects on enforcement. But as we explain below, we are very skeptical that any such strategies could have precipitated a shift that comes close to matching the effects of DACA and what would likely result from the implementation of DAPA—the *guarantee* that millions of unauthorized immigrants would be immune from removal for defined periods of time with the likelihood of indefinite continuation into the future.

**246.** L1 refers to noncitizens convicted of aggravated felonies, such as murder or rape, or two or more felonies. L2 refers to noncitizens convicted of any felony that is not an aggravated felony or three or more misdemeanors. L3 refers to noncitizens convicted of one or two misdemeanors. Noncriminal refers to noncitizens who have no criminal conviction but have civil violations of immigration law, such as overstaying a visa.

**247.** Another, perhaps more cynical, view of the Morton Memos is that they were motivated largely by politics, or the desire to curry favor with immigrant advocacy and Latino communities, rather than by a genuine desire to change the types of unauthorized migrants being deported from the United States. On this view, it should also be no surprise that the

AR2022_500100

retrospect, this limitation of a guidance-document-oriented approach should not be surprising. The memos embody an effort to shift the culture of enforcement at the agency through an articulation by leadership of best practices. But even if agency leadership sought to monitor compliance with the memos' priorities through vigilant supervision buttressed by the disciplining of officials who consistently failed to respect the memos' priorities, observable changes in enforcement practices would have taken considerable time to emerge. And, producing dramatic results of the sort achieved by DACA would have been elusive. The Morton Memos would have had to change the behavior of large numbers of ICE agents—the line-level enforcement personnel principally responsible for making decisions about whether to place an immigrant in removal proceedings.[248]

Many agents were extremely resistant to the memos' central goal, some quite vocally.[249] They work within a law enforcement agency that has an enforcement-oriented and results-driven institutional culture, not unlike the culture of the FBI and the DEA. It should not be surprising to find resistance within the ranks to the premise of the Morton Memos. Men and women who see their jobs as punishing lawbreakers could have felt as if they were being directed to ignore the transgressions of immigration violators.[250] This

---

Morton Memos had little effect. Regardless of their true aim (or whether it is even possible to characterize them as having a single aim), opponents of the Administration's deportation policies were able to use the Morton Memos' "failure" as a focal point for messaging and organizing that helped create the political conditions that gave rise to DACA in 2012. *See supra* text accompanying notes 101-102.

248. This question of whether and how to control line-level prosecutors, and even the U.S. Attorneys themselves, has been a perennial one in analyses of federal criminal law. *See, e.g.*, Kate Stith, *The Arc of the Pendulum: Judges, Prosecutors, and the Exercise of Discretion*, 117 YALE L.J. 1420, 1469-70 (2008) (analyzing a discretion memorandum issued by Attorney General John Ashcroft and concluding that it established no enforcement mechanism and left space for flexible application in its language, and that the lack of sufficient numbers of attorneys in Main Justice in the District of Columbia to monitor the thousands of local line attorneys in field offices thwarted the memorandum's centralizing goal); James Vorenberg, *Decent Restraint of Prosecutorial Power*, 94 HARV. L. REV. 1521, 1562-63 (1981) (arguing that guidelines to prosecutors need to be "specific enough to provide genuine guidance when applied to a particular set of facts").

249. *See, e.g.*, Press Release, ICE Union, ICE Agent's Union Speaks Out on Director's "Discretionary Memo"; Calls on the Public To Take Action (June 23, 2011), http://iceunion .org/download/286-287-press-release-pd-memo.pdf [http://perma.cc/6JNA-ZRCY].

250. This enforcement culture is, in part, the product of the culture within the INS, the legacy agency that was abolished in the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. And the law enforcement orientation within the INS was one reason advocates had long argued that the enforcement and services functions of the agency should be separated. The 2002 Act did so, locating enforcement functions within ICE and CBP while services functions were located within USCIS. *See* ALEINIKOFF ET AL., IMMIGRATION AND

THE YALE LAW JOURNAL                                    125:104   2015

discontent ultimately bubbled up through the employees' union,[251] and once DACA was announced, some members of the union filed suit against the Secretary of DHS, arguing that the policies required them to violate their legal duties to enforce immigration law.[252]

But even if the inability of the Morton Memos to significantly (and quickly) reshape the exercise of prosecutorial discretion comes as no surprise, it was quite consequential. The limitations of the approach bolstered forces—both inside and outside the agency—that sought to draw critical attention to the Administration's deportation policies generally. Many advocates initially regarded the memos as a strong *promise* of protection, and their disappointment with enforcement practices in the wake of the memos helped create the political conditions that ultimately persuaded the Administration of the need to centralize enforcement judgments in order to better insure protection of status violators.[253] One way of understanding the Obama relief initiatives, then, is as a determination that the Administration could no longer wait for the indirect guidance of the memos to take root and shift the culture of the agency. Political leadership thus turned to a more decisive and reliable approach to insulate mere status offenders from law enforcement.

For critics of the Obama relief initiative, this influence of politics on the formulation and timing of DACA underscores the argument that the President engaged in impermissible policymaking. We contend, however, that the inter-weaving of political and institutional incentives for administrative reorganization is to be expected generally and can often be constructive. The move to a more rule-bound and centralized regime provided the rule-of-law benefits associated with promoting consistency in official decision making,

---

CITIZENSHIP: PROCESS AND POLICY 242-48 (7th ed. 2013) (providing an overview of the functions of each DHS component).

**251.** *See* Zatz & Rodriguez, *supra* note 237, at 678.

**252.** *See* Crane v. Napolitano, No. 3:12-cv-03247-O, 2013 WL 8211660 (N.D. Tex. July 31, 2013) (dismissal for lack of subject matter jurisdiction), *aff'd sub nom.* Crane v. Johnson, 783 F.3d 244 (5th Cir. 2015). Though the suit specifically attacked the shape of DACA, the suit embodied an approach to enforcement discretion distinct from the one the Administration sought to advance even before DACA, thus undermining DHS leadership's attempts to channel that discretion through informal, standards-based guidelines.

**253.** *See* Ahilan Arulanantham, *The President's Relief Program as a Response to Insurrection*, BALKINIZATION (Nov. 25, 2014, 5:00 PM), http://balkin.blogspot.com/2014/11/the -presidents-relief-program-as.html [http://perma.cc/X925-LLHF]; *see also* Zatz & Rodriguez, *supra* note 237, at 679-81 (citing interviews with advocates who expressed concerns that the Morton Memos could not change institutional culture, that their implementation was slow and uneven, and that making the case for an exercise of discretion was particularly difficult for immigrants placed in mandatory detention).

192

amplifying political control and, most importantly, instituting accountability over the enforcement power.

On top of that, we are aware of no evidence that the pre-DACA regime of prosecutorial discretion guided by informal memoranda was serving the salutary function typically associated with discretion—promoting fine-grained judgments involving individual equities about when the initiation of removal proceedings was warranted. In the case of the Obama initiatives, then, the benefits of centralization and the rule-like inquiry it entailed came without the costs typically associated with a move away from discretion. The fact that the same initiatives advanced the political goals of the Administration, or may have been timed in response to political pressures, or the fact that the Administration could have been more patient with the Morton Memos' approach, are not reasons to declare them suspicious, much less unconstitutional. Instead, the evolution of the Morton Memos into the Obama relief initiatives underscores our claims in Part II about the potential value of a two-principals model of enforcement.

The trajectory of the Morton Memos also explains what we believe to be the most salient features of Obama's relief initiatives for the purposes of evaluating their legality. DACA made two interrelated institutional changes to the prior regime of discretion. In addition to the turn to rules that we discussed in the previous Part—a move that facilitated oversight of the bureaucracy and constrained lower-level decision makers—DACA changed the decision makers themselves. Not only did the Obama initiative locate the bulk of discretion in the hands of DHS leadership, it took the process of individual adjudication out of the hands of line-level ICE agents and the enforcement arm of the immigration bureaucracy and handed it over to personnel in USCIS, the arm of DHS responsible for conferring immigration benefits.[254]

This shift to USCIS might seem to have further fractured enforcement responsibilities across the bureaucracy, since ICE remains responsible for enforcement generally. In fact, however, it had the effect of further centralizing discretion. USCIS decided that all DACA applications would be processed in one of four major service centers, rather than dispersing them to eighty-seven field offices around the nation.[255] Moreover, the agency required that nearly every discretionary denial recommended by a service center be reviewed by decision makers at USCIS headquarters in northern Virginia.[256]

Even more important, the shift from ICE to USCIS amounted to DHS leadership, presumably in consultation with the White House, selecting the

---

254. *See* Napolitano, Prosecutorial Discretion Memo, *supra* note 103.

255. *See* Declaration of Donald W. Neufeld, *supra* note 206, at 5–9.

256. *See id.*

AR2022_500103

agency component more likely to share the views of the President and agency leadership and therefore more amenable to oversight in its administration of the program.[257] As the benefits-granting component of DHS, USCIS is more likely than ICE to be institutionally predisposed to viewing immigrants as claimants with potential entitlements; ICE is more likely to see them as lawbreakers. This change in decision makers, combined with the adoption of rules, thus facilitated the centralization of prosecutorial discretion decisions within DHS, making it possible to overcome the Department's seeming inability to supervise the exercise of discretion under the Morton Memos regime.

Seen through this lens, the President's relief initiatives form part of a broader trend in recent years toward the centralization and reorganization of immigration enforcement authority. We documented some of this movement in *The President and Immigration Law*, which showed how a series of statutory changes shifted discretionary authority that had previously been held by individual immigration judges within the Department of Justice to DHS.[258] Other data points in this trend include the rollout of Secure Communities, along with the scaling back of section 287(g) agreements that sometimes gave considerable discretionary immigration authority to local officials.[259] To be sure, the pattern of centralization has been complicated. It would be a mistake to suggest that significant authority over the shape of immigration law no longer exists outside executive leadership, or that such diffusion of authority could ever be extinguished, since immigration enforcement depends on public and private institutions beyond the federal bureaucracy.[260] Nonetheless, these

257. This story highlights the role of an agency's institutional culture in limiting the ability of high-level executive branch officials to quickly redirect the institution's priorities. At the same time, it shows the ways in which bureaucratic redundancy can diffuse the constraints that institutional culture might place on the pace of policy change. Because there were two agencies within DHS with the legal authority to make decisions on deferred action, the leadership within the Department could select the agency with an institutional culture more in line with the goals of the administrative initiative. *See* Jason Marisam, *The President's Agency Selection Powers*, 65 ADMIN. L. REV. 821 (2013); *cf.* Magill & Vermeule, *supra* note 220, at 1040 (arguing that where top officials have a closer relationship to the President, they are more likely to override others within the agency, suggesting that assignation of responsibility based on proximity of views to the President and political leadership can enable greater control of the bureaucracy by those delegated the power at issue).

258. *See* Cox & Rodríguez, *supra* note 7, at 517-19.

259. *See* Cox & Posner, *supra* note 160, at 1344-48; Rodríguez, *supra* note 99 (manuscript at 9-10).

260. *See generally* Cox & Posner, *supra* note 160 (describing the myriad ways in which federal immigration law expressly incorporates local conditions and judgments); Cristina M. Rodríguez, *The Significance of the Local in Immigration Regulation*, 106 MICH. L. REV. 567 (2008) (describing how state and local police and other bureaucracies play vital direct and

recent developments show that DACA and DAPA, far from being anomalous, reflect the latest significant moves in the ongoing reorganization and centralization of the immigration bureaucracy.

This series of recent institutional changes has helped constrain and control the use of the enforcement power in an immigration regime that today gives the Executive capacious authority. The Obama relief initiatives promise to do the same, if and when the Administration can fully implement them. The tradeoffs between rules and standards and centralization and diffusion may be intractable in the abstract, but in this context they point clearly in one direction.

### 2. Constitutionalized Decentralization

Our account of the institutional dynamics leading up to the Obama relief initiatives also has the benefit of highlighting a strange idea implicit in the conception of the separation of powers advanced by the President's critics. On the one hand, these critics complain about the failure of the Executive Branch to serve as Congress's faithful agent. They worry about the lack of sufficiently strong checks on principal-agent problems that arise *across* the branches. But they would address this problem by constitutionally prohibiting the President from attempting to ameliorate principal-agent problems *within* the Executive Branch, arguing that the President cannot take a centralizing step to ensure that the priorities reflected in immigration enforcement match his agenda, instead of being the product of tens of thousands of line-level agents within the immigration bureaucracy.[261]

Perhaps critics who make this claim believe that bureaucratic insulation from either politically appointed agency heads, or from the Executive Office of the President itself, actually furthers congressional control. The perennial argument in administrative law in favor of empowering the civil service sometimes takes this form, emphasizing that these employees are less likely than a political appointee or the President himself to ignore the wishes of Congress, or to be motivated by aggrandizement of the President and his

---

indirect roles in controlling immigration movement and facilitating immigrant integration); Rodríguez, *supra* note 95 (discussing the influence of local bureaucracies on federal decision making).

**261.** For various critiques of DACA and DAPA that can be understood in these terms, see sources cited *supra* note 14.

political party.[262] This idea also sometimes animates arguments for independent agencies.[263]

To the extent the arguments in favor of insulating low-level bureaucrats intend to promote Congress's substantive enforcement priorities, we are deeply skeptical of their purchase in this context. As we explained in Part II, the work of the Congresses that enacted the various provisions that have constructed the Executive's domain over immigration enforcement do not embody any coherent enforcement priorities. Insulating low-level bureaucrats from the President in this setting, therefore, will not facilitate their compliance with congressional priorities. It will simply enable them to freely pursue their own agendas.

More importantly, when theorists argue that insulating bureaucrats from the President may empower Congress, they do so primarily to defend the claim that the Constitution *permits* Congress to legislate such insulation by adopting new organizational structures for administrative entities, such as staggered-term commissions, or restrictions on the President's removal power.[264] Here, in sharp contrast, the constitutional critique of the President's relief initiatives amounts to a claim that the Constitution *requires* this sort of insulation—even if neither Congress nor the President prefers it. This claim amounts to radical constitutional theory. On this account, the Constitution imposes stringent dictates on the internal organization of the Executive Branch, precluding even the modest effort to discipline the exercise of prosecutorial discretion within an agency by subjecting its exercise to somewhat more rule-like criteria. Even if one thought that the idea of empowering low-level bureaucrats to resist supervision might be attractive in certain situations, constitutionalizing those views in a way that prohibits other organizational judgments by either Congress or the President would be a mistake.

In light of the foregoing analysis, the scope of our two-principals account in Part II comes into further relief. Our concept of the Executive as a second principal necessarily entails permitting politically accountable leadership to exert supervisory authority over line-level agents. But our account certainly does not require disabling line-level officials. After all, the informational advantages the Executive possesses—the learning that comes through

---

262. *See generally* Jonathan R. Macey, *Organizational Design and Political Control of Administrative Agencies*, 8 J.L. ECON. & ORG. 93 (1992); McCubbins et al., *supra* note 132.

263. *See generally* Jacob E. Gersen, *Designing Agencies*, *in* RESEARCH HANDBOOK ON PUBLIC CHOICE AND PUBLIC LAW 333, 333-57 (Daniel A. Farber & Anne Joseph O'Connell eds., 2010).

264. Such arguments are necessary because others, in particular those who subscribe to certain theories of the "unitary executive," believe that this sort of congressional interference is unconstitutional. The President, these scholars argue, is constitutionally entitled to supervise decision making within the Executive Branch. *See* sources cited *supra* note 227.

enforcement and that should inform ongoing policymaking—enter the system first and foremost through the work of line-level agents and bureaucrats and their operations in the regulatory field. The Executive's capacity to act as a second principal depends on diffusion in this sense—on the actual officials who produce regulatory reality and see the operation of the law in practice. But what the Obama relief initiatives seek to do is to channel and control the information flow from the field to the center, and our claim in this Part has been that such control should not be constitutionally prohibited (indeed, it might sometimes be constitutionally required). As in the criminal justice system, each individual immigration prosecutor or law enforcement official possesses small-scale policymaking power. When structured with the sorts of rule-of-law values we explore in this Part, the power that this gives to the Executive as a whole should be understood as both legitimate and productive.

### C. Transparency and the Rule of Law

As we noted at the outset of this Part, the Obama relief policies implicate a third tradeoff—between transparency and secrecy. One might worry that increased transparency pits two laudable rule-of-law values against each other. On the one hand, through their transparency about how enforcement judgments will be exercised, the initiatives secure greater consistency and predictability in the exercise of discretion, reducing the extent to which decisions about who will be deported appear arbitrary or random.[265] Curbing inconsistency and arbitrariness in the exercise of government power is commonly defended as a boon for the rule of law.[266] But clarity can come at a cost. Critics of the Obama initiatives worry that the very predictability of enforcement—or, more precisely, the predictability of who will be protected from enforcement—will undercut compliance with the INA and reduce the deterrent effect of the law, thereby threatening the rule of law.[267]

---

265. *See* HIROSHI MOTOMURA, IMMIGRATION OUTSIDE THE LAW 192 (2014); Cox & Rodríguez, *supra* note 7, at 536; Cristina M. Rodríguez, *Constraint Through Delegation: The Case of Executive Control over Immigration Policy*, 59 DUKE L.J. 1787, 1800-01 (2010); Shoba Sivaprasad Wadhia, *Sharing Secrets: Examining Deferred Action and Transparency in Immigration Law*, 10 U.N.H. L. REV. 1, 57 (2012).

266. *See* H.L.A. HART, THE CONCEPT OF LAW 155 (1961); Corey Brettschneider, *A Substantive Conception of the Rule of Law: Nonarbitrary Treatment and the Limits of Procedure*, *in* GETTING TO THE RULE OF LAW 52 (James E. Fleming ed., 2011); David A. Strauss, *Must Like Cases Be Treated Alike?* (Chi. Pub. Law & Legal Theory, Working Paper No. 24, 2002), http://www .law.uchicago.edu/files/files/24.strauss.like-cases.pdf [http://perma.cc/DPW3-VZA5].

267. *See* Martin, *supra* note 14; Price, *supra* note 14, at 755 n.360, 761 ("[K]eeping their priorities secret may preserve the deterrent effect of the statute on a public ignorant of actual executive enforcement practices.").

On this account, any effort to rationalize the exercise of prosecutorial discretion will necessitate a tragic choice between rule-of-law values: the value of making enforcement predictable on the one hand, and the value of legal compliance on the other.[268] This claim applies far more broadly than to the President's immigration actions: it amounts to an argument that *no* enforcement regime can simultaneously maximize both fairness and legal compliance. For the President's relief initiatives in particular, the argument suggests that critics would favor more emphasis on legal compliance, while supporters would be happy to trade reduced compliance for increased fairness.

This account poses an interesting dilemma, but we believe the choice to be illusory, not tragic, in our particular immigration setting. To make this case, we first show that this "tragic choice" logic rests on fuzzy thinking about deterrence. Second, and more important and controversial, we explain why concern about legal compliance rests on an incomplete understanding of modern American immigration law.

### 1. The Logic of Deterrence

There is an entirely mundane reason to doubt that DACA or DAPA will undermine the deterrent value of the law: both of the President's initiatives apply retrospectively. They grant relief only to past immigration violators, not to future ones. Because eligibility for DACA or DAPA requires at least five years' continuous residence in the country, the immigration violations of most eligible immigrants will have occurred more than five years ago, years before the President announced the policies. In fact, given estimates that the majority of the unauthorized population has been living in the United States for at least ten years,[269] DAPA relief may well end up helping mostly those whose immigration violations are more than a decade old.

The relief initiatives' retrospectivity makes the programs very different from conventional policies of prosecutorial discretion, which should reduce concern about their impact on law's deterrent value. Most prosecutorial discretion policies set out criteria that guide decisions about which *future*

---

**268.** The only way to avoid such a conflict would be to devise rule-like schemes that constrain enforcement discretion, but to somehow keep them from the public. Maintaining a gap between the system's operation and the public's beliefs about how it operates strikes us as extremely difficult. Even if it were possible, it is important to note that enforcement would then only be rational, not predictable. Thus the decisions of enforcement officials might still appear arbitrary to the public.

**269.** *See* Randy Capps & Marc R. Rosenblum, *Executive Action for Unauthorized Immigrants*, MIGRATION POL'Y INST. 3-4 (Sept. 2014), http://www.migrationpolicy.org/sites/default /files/publications/Executive-Action-Brief.pdf [http://perma.cc/GBA5-2ZRX].

THE PRESIDENT AND IMMIGRATION LAW REDUX

offenders will be prosecuted for certain legal violations. The Department of Justice's recent guidance about low-level marijuana offenses provides a run-of-the-mill example. The policy tells legal subjects—you and me—that a U.S. Attorney's office is extremely unlikely to prosecute us for possessing a few marijuana cigarettes. This announcement might well affect our decisions about whether to abide by the federal prohibition on marijuana possession laid out in 21 U.S.C. § 841. Indeed, the Department of Justice almost certainly wanted to shape people's decision making in this way, freeing states like Colorado and Washington to experiment with regimes that opted to decriminalize marijuana, regulating its distribution and use through noncriminal means.[270]

DAPA and DACA, by contrast, should not produce such a behavioral response. They are best conceptualized as exogenous legal shocks that will affect the size of the existing pool of unauthorized migrants without altering the legal regime that applies to future immigration violators (or to those who do not receive relief under the program). This feature enables the policies to drive a wedge between the values of deterrence and predictability; DHS can make enforcement more predictable without undermining future legal compliance. In fact, these programs might even improve future compliance with immigration law. With fewer resources devoted to identifying and deporting those who receive relief, DHS can redirect enforcement resources to increase the likelihood that future immigration law violators will be caught (thus increasing deterrence). DHS directives released alongside the relief policies in November 2014 reveal this strategy: DHS will devote more resources to the border, as well as to identifying those who become deportable by virtue of convictions for certain crimes.[271]

Critics who claim that DACA and DAPA will undermine the rule of law might resist this account of legal compliance in two ways. First, they might reject the notion that the programs grant relief for past immigration violations, arguing instead that immigration violations, by their very nature, constitute ongoing offenses. Every day an unauthorized migrant spends in the country amounts to a legal violation, and only by leaving the country can she put an end to her lawbreaking. Thus, the argument goes, even if DACA and DAPA do not affect the behavior of other migrants, they undermine legal compliance by the very migrants granted relief under the programs. Absent the programs,

---

**270.** *But cf.* Price, *supra* note 14, at 758 (arguing that DOJ's marijuana policy is permissible because it only announces a policy rather than guaranteeing immunity).

**271.** *See* Johnson, Enforcement Priorities Memo, *supra* note 111; Johnson, Secure Communities Memo, *supra* note 101; Memorandum from Jeh Charles Johnson, Sec'y, U.S. Dep't Homeland Sec., to U.S. Customs & Border Prot., et al. (Nov. 20, 2014), http://www.dhs.gov/sites/default/files/publications/14_1120_memo_southern_border_campaign_plan_0.pdf [http://perma.cc/5LDJ-UN8N].

199

THE YALE LAW JOURNAL                                     125:104   2015

some number of these migrants might self-deport to bring themselves into compliance with the law, but in the presence of the program no one granted relief will do so.

For a number of reasons, we reject this conceptualization of immigration violations. We need not delve into the complexity of what it means for conduct to constitute an ongoing legal violation, because the argument contains a more basic flaw: by focusing on the individuals eligible for relief, it ignores the effect the relief programs are likely to have on legal compliance more generally. DAPA might make compliance via self-deportation less likely for those eligible for relief, but it enhances the likelihood of compliance by those not eligible for relief by raising the risk that the latter will be deported. In other words, even on an account that treats immigration status violations as ongoing violations, neither DACA nor DAPA undermines the overall level of deterrence;[272] they simply shift the brunt of deterrence from one population to another.[273]

Second, critics might challenge the sharp analytic distinction we have made between retrospective and prospective relief. The distinction depends on the credibility of the government's commitment not to extend relief in the future to those who violate immigration law after DACA or DAPA's announcement. Commitment presents a perennial problem for amnesties and other forms of relief for past legal violations. If people begin to believe that similar relief will be granted again in the future, they might break the law in anticipation of a future grant of amnesty. If DACA grants relief to some immigrants who arrived as children, perhaps more children will attempt to enter the country in hopes of some future DACA-like program. Some commentators made precisely this claim last summer, when apprehensions of unaccompanied minors at the Texas border suddenly skyrocketed. And similar claims have been made about past immigration relief programs, most notably the legalization program that was a part of the 1986 Immigration Reform and Control Act (IRCA), which granted green cards to nearly 2.7 million unauthorized immigrants, more than half of the then-existing unauthorized population.[274]

---

272. Of course, the story may be more complicated, given the wealth of evidence that people do not respond to risk in the way predicted by expected utility theory. *See, e.g.*, DANIEL KAHNEMAN, THINKING, FAST AND SLOW (2011); Daniel Kahneman & Amos Tversky, *Prospect Theory: An Analysis of Decision Under Risk*, 47 ECONOMETRICA 263 (1979). But this evidence simply gives us more reason to doubt the simple story of legal compliance told by critics of the President's relief programs.

273. For immigrants' rights advocates, of course, this shift may still be troubling. Beyond the boundaries of DACA and DAPA lie many sympathetic cases of unauthorized noncitizens with deep ties to the United States who have long-ago, minor criminal convictions, or who have not been present for the requisite time to qualify for the relief initiatives.

274. *See* Nancy Rytina, *IRCA Legalization Effects: Lawful Permanent Residence and Naturalization Through 2001*, U.S. IMMIGR. & NATURALIZATION SERV. (Oct. 25, 2002), http://

AR2022_500110

Evidence from IRCA's legalization gives us reason to doubt strong claims that immigrants will make different migration decisions simply because of a slight increase in the highly uncertain prospect of some unspecified relief years down the road. Economists studying IRCA's effect on unauthorized migration found no evidence of an increase in the flow of migrants hoping for a future program.[275] Moreover, in the present political environment, it seems equally possible that DACA and DAPA will serve as anchors that lower, rather than raise, the probability of more expansive relief down the road. Prior to these programs, a legislative legalization program formed a central component of the immigration reform bills passed by the Senate in 2006 and 2013.[276] Most commentators think a legislative amnesty will eventually come to pass, in part because of the sheer magnitude of the unauthorized population. The open questions include when that legislative relief will ultimately come, and how far it will extend. It may be that the Obama relief initiatives will shape future legalization by limiting any program to those who have benefited from DACA and DAPA. But we think any such predictions would be foolish. What effect, if any, DACA and DAPA will have on future reform turns on political dynamics so complex that even those who are central players in the drama, right down to the congressional leadership and President Obama himself, seem to have little idea how it will play out. Given this extreme uncertainty, we think it implausible that DACA or DAPA's influence on the prospect of relief for future immigration violators will meaningfully affect the migration decisions of prospective migrants contemplating coming to America, either by encouraging or discouraging them.

### 2. Underenforcement and Ex Post Screening

The retrospective nature of DACA and DAPA make them special from the perspective of deterrence. But even if the compliance critique fails at the retail level, the turn to transparent, predictable, and rule-bound enforcement strategies could still raise compliance concerns, thus implicating the tragic choice between rule-of-law values. For this reason, it is important to explain why the choice between transparency and compliance is illusory in light of the structure of modern American immigration law—a structure other regulatory

---

www.dhs.gov/xlibrary/assets/statistics/publications/irca0114int.pdf [http://perma.cc/92X2 -R7ZV].

**275.** Pia M. Orrenius & Madeline Zavodny, *Do Amnesty Programs Reduce Undocumented Immigration? Evidence from IRCA*, 40 DEMOGRAPHY 437, 437-38 (2003).

**276.** *See* Border Security, Economic Opportunity, and Immigration Modernization Act, S. 744, 113th Cong. (as passed by Senate, June 27, 2013); Comprehensive Immigration Reform Act of 2006, S. 2611, 109th Cong. (as passed by Senate, May 25, 2006).

AR2022_500111

THE YALE LAW JOURNAL                                      125:104   2015

contexts may share and that in the immigration setting transcends the Obama relief initiatives.

The argument against transparency in the exercise of prosecutorial discretion conflates two very different types of enforcement settings. In one, the legal system makes clear that the desired level of some conduct is zero. In such a setting, there ideally would be perfect compliance with the legal prohibition. But compliance might fall short of that, and the government may lack the resources to punish every single violator. In that context, secrecy about enforcement strategy can be valuable, and transparency can threaten legal compliance. The threat to compliance will be most palpable when an offense can be committed in multiple ways, or in multiple places. In such situations, publicizing what law enforcement officials will be looking for, or where they will be looking, can make it easier for would-be violators to avoid having their legal violations detected. Secrecy about law enforcement tactics, even to the extent of randomizing those tactics, can often increase compliance, both by raising the risk of detection and by creating more uncertainty about the level of risk.[277] For these reasons, the IRS works hard to keep its audit algorithms secret, state highway patrols do not disclose the locations of speed traps, Customs and Border Patrol frequently moves the roving checkpoints it uses along the southern border, and the CIA and other intelligence agencies resist disclosure of their surveillance tactics.[278]

---

[277]. Risk can rise, rather than simply be redistributed across potential offenders, because strategic evasion is eliminated. *See* James Andreoni et al., *Tax Compliance*, 36 J. ECON. LITERATURE 818 (1998). *See generally* Gary S. Becker, *Crime and Punishment: An Economic Approach*, 76 J. POL. ECON. 169 (1968) (laying the foundation for strategic, rational action accounts of lawbreaking). For an overview of the large game-theoretic literature on these questions, see DECISION AND GAME THEORY FOR SECURITY (Radha Poovendran & Walid Saad eds., 2014).

[278]. This idea relates to a view in legal theory, dating back at least to Jeremy Bentham, that "[a] law confining itself to the creation of an offense, and a law commanding a punishment to be administered in case of the commission of such an offense, are two distinct laws." JEREMY BENTHAM, AN INTRODUCTION TO THE PRINCIPLES OF MORALS AND LEGISLATION 331 (Dover Classics 2007) (1789). On this view, legal obligations can motivate behavior even in the absence of a sanction, and hence it is possible to speak of a legal obligation and a legal remedy as "two distinct laws." Some deny this view, of course: rational choice theorists of a certain sort, for example, deny that obligations ever create an independent reason for action. But for those who do not deny this possibility, there can sometimes be value in keeping certain aspects of the official remedial regime hidden from public view—to the extent possible—to prevent gaps in the remedial regime from undermining the influence of some statutory rule on behavior. *See* Meir Dan-Cohen, *Decision Rules and Conduct Rules: On Acoustic Separation in Criminal Law*, 97 HARV. L. REV. 625 (1984); *see also* Daryl J. Levinson, *Rights Essentialism and Remedial Equilibration*, 99 COLUM. L. REV. 857 (1999) (developing a taxonomy of rights and remedies). Crucially, however, this idea turns on the notion that the "true" legal norm is not itself instantiated by the remedial regime.

202

But for reasons we already have explained in our development of the concept of de facto delegation, this account does not describe the immigration enforcement setting. In the world of de facto delegation, where exceptionally broad grounds of deportability and long-standing acceptance of high levels of unauthorized immigration have made half of all noncitizens living in the United States formally deportable,[279] a perfect world is not a world of perfect enforcement.[280] This is so not simply because the government has limited resources—the claim around which most defenses of the President's actions have turned.[281] Nor is it true only because the social costs of deporting all unauthorized migrants would be enormous (though they would be). Rather, it is because immigration law's formal prohibitions do not accurately reflect the structure of the immigrant screening system. The INA does not establish fully the contours of culpability under immigration law. Instead, our system of de facto delegation requires the Executive to assume responsibility for sorting "deserving" violators out from non-deserving ones—for making the sorts of policy judgments we defend in Part II.[282] The screening decisions of executive branch officials who decide which formally deportable noncitizens deserve deportation thus shape the true limits of the law.

In our view, the screening the law requires will be most fair if the Executive conducts screening universally and makes its rules transparent. Universality makes it possible to treat like cases alike, and transparency provides notice to immigrants about the actual structure of the screening system (as opposed to the formal structure of that system). We need not worry that transparency will undermine compliance with the formal screening rules of the INA, because the rules are not meant to be followed to the letter.[283] Instead, public behavior

---

**279.** *See* Grieco et al., *supra* note 82.

**280.** To be clear, our claim is not that an ideal world would still contain some illegal immigration. Instead, our claim is that, given the way the law is written and how it has intersected with social realities over time, we should not understand the existing immigration regime as one that demands full compliance and therefore enforcement efforts that seek to achieve full compliance.

**281.** *See, e.g.*, sources cited *supra* note 125.

**282.** *See* Cox, *supra* note 36.

**283.** As we explained in Part II, in making this claim about de facto delegation, we do not mean to suggest that Congress specifically intended to overdraw the law and assign the President the authority to screen. Instead, it is an observation about the evolution and expansion of a legal regime to cover such a broad swath of conduct that the Executive becomes obligated to do so. It is a claim about the social meaning and ex post acceptance of a system as it has evolved and been constructed by Congress and the Executive in tandem. As we also explained in Part II, the Supreme Court in *Arizona v. United States*, 132 S. Ct. 2492 (2012), openly acknowledged this conception of executive power by highlighting the central role that executive branch discretion plays in defining the actual content of immigration law. *See*

THE YALE LAW JOURNAL                                        125:104   2015

would track the screening system established by executive discretion, instead of the (overbroad) criteria articulated in the statute itself. The Obama relief initiatives aid this objective through transparency.

Other areas of the law share this structure whereby the legally desirable level of an action is not zero, and according to which overbroad laws have the effect of empowering public officials to screen for culpable violators from among a larger pool of formal violators.[284] Consider criminal law. Bill Stuntz has argued that it has just such a structure: legislators draw substantive rules of criminal liability to sweep in far more persons than are deserving of punishment, effectively delegating power to prosecutors and police to sift through the universe of violators, screening for those who are worthy of punishment.[285] In such a system, a rationalized, predictable, and transparent system of prosecutorial discretion promotes the equal treatment of similarly situated defendants without undermining compliance with the "true" criminal law norms that the system seeks to enforce. If we think that low-level marijuana possession by a person with no other criminal record should not be punished, then we should hope that judgment applies to all cases, not to a random subset of violators. And we would not worry that publicizing the policy would undermine legal compliance, because the very point of the exercise of discretion would be to communicate that possession under those circumstances does not deserve punishment.

We recognize, of course, that critics of the Obama relief initiatives, in Congress and in the commentariat, might dispute our account of the modern structure of immigration law—we view this claim as our most controversial and contestable one. The self-deportation strategy advanced by opponents of illegal immigration reflects a total compliance worldview leavened by the reality of limited enforcement resources. Measures that induce self-deportation

---

Cox, *supra* note 36, at 48-55 (discussing enforcement redundancy in the context of *Arizona*); Rodríguez, *supra* note 157 (discussing the ambiguous social meaning of unauthorized status and exploring the concept of sociological as opposed to legal membership); *supra* text accompanying notes 88-90.

**284.** The case that the formal rules embodied in the immigration code sweep in far more people than deserve deportation can be made in two ways: as an interpretive claim about the structure of modern immigration law, or as a purely normative claim. Our claim here is primarily interpretive, building on our historical account of the development of immigration law and the de facto delegation of screening authority to the Executive—a delegation which presumes that not all those in formal violation of the law should be deported. This is the sort of claim endorsed by the Supreme Court in *Arizona*. But our account also undoubtedly has important normative implications—about the questions of institutional design we are focused on in this Article, as well as about broader issues we have touched on in earlier work and continue to develop.

**285.** *See* WILLIAM J. STUNTZ, THE COLLAPSE OF AMERICAN CRIMINAL JUSTICE (2011); William J. Stuntz, *The Pathological Politics of Criminal Law*, 100 MICH. L. REV. 505, 506-09 (2001).

AR2022_500114

become necessary in a world of limited resources precisely in order to achieve the total compliance goals of the system. But the core of our argument here is that these critics operate with the wrong understanding of the nature of underenforcement in immigration law — one that ignores the actual history and practice of immigration law and puts them on the wrong side of the Supreme Court in *Arizona*. Supporters of DACA and DAPA have reinforced this confusion about underenforcement's significance; their persistent focus on resource constraints as both a necessary (and sufficient?) condition for the exercise of broad deportation discretion promotes the misconception that, in the absence of resource constraints, the Executive's duty would be to enforce against all violators (save perhaps for the occasional exercise of humanitarian discretion). Budget constraints are ubiquitous. But the structural delegation of screening authority present in immigration law — and some other areas like criminal law — is not.

### D. Benefits Versus Penalties

In choosing rules over standards, centralization over diffusion, and transparency over secrecy, the Obama relief initiatives highlight some key debates over how best to organize the modern bureaucracy. In their particular context, these choices not only make acceptable structural tradeoffs, they actually promote rule-of-law values and accountable and constrained executive power. Far from striking a blow on behalf of the imperial presidency, the relief initiatives represent responsible uses of the enforcement power, even as they advance the President's political agenda. Any unseemliness of the latter does not detract from the value of the former.

Of course, in offering this conceptual alternative to the faithful-agent framework we reject in Part II, the question becomes what sorts of efforts to structure the enforcement power *would* give rise to constitutional concerns. Can we imagine any limits on the way in which the Executive institutionalizes its discretion or makes the inevitable tradeoffs among rule-of-law values? We turn to these most difficult questions in Part IV below.

But before developing our account of limiting principles, we pause to address one last, frequently heard claim about the way in which DACA and DAPA institutionalize relief loosely related to our arguments in this Part. The claim is as follows: by choosing rule-like criteria for relief, by centralizing control over the application of those criteria, and by establishing a transparent application process, the Obama Administration has conferred on DACA and DAPA recipients a promise of nonenforcement that differs in kind from a mere guideline that de-prioritizes removal on the basis of certain characteristics. This claim — that there is an important substantive difference between the *form of relief* provided by these programs and ordinary prosecutorial discretion — rests

205

THE YALE LAW JOURNAL                                    125:104   2015

at the heart of the Texas district court's decision to enjoin DAPA and the expansion of DACA. In the words of the district court, the programs provide the benefit of "three years of immunity from [the] law."[286] At another point the decision describes the benefit as the conferral of "legal presence status."[287] In other words, the relief initiatives confer new legal benefits on recipients rather than simply declining to prosecute them.[288] Providing these legal benefits, in the critics' view, departs from any coherent understanding of prosecutorial discretion and exceeds the authority of executive branch officials.[289]

This argument appears to turn on the legal consequences for immigrants (or other regulatory subjects) of institutionalizing enforcement discretion in particular ways. Its subtext might also be that the relief policies' beneficiaries do not deserve an open and notorious relief from prosecution, even if they might escape prosecution as the result of case-by-case choices. To the extent this argument depends on the claim that DAPA and DACA recipients receive a legally binding promise that they will not be deported for three years,[290] the argument is mistaken. The Administration has made no such promise.[291] As a

---

286. Texas v. United States, No. B-14-254, 2015 WL 648579, at *44 (S.D. Tex. Feb. 16, 2015) (memorandum opinion and order granting preliminary injunction).

287. *Id.* at *2; *see also* McConnell, *supra* note 154 (arguing that the President has attempted to create "a new legal status for aliens unlawfully present under the terms of the Immigration Act" and emphasizing that the President's actions are not a "routine application of 'prosecutorial discretion'" but rather the conferral of benefits such as "work permits and welfare without statutory authority and notice-and-comment rule-making").

288. While we focus here on the purported benefit of legal status, critics also claim that the work permits that accompany a grant of relief amount to an unauthorized legal benefit. The difficulty with this argument is that federal regulations, adopted more than two decades ago through notice-and-comment rulemaking, authorized the Attorney General (now the Secretary of DHS) to grant work permits to noncitizens who receive deferred action. *See* 8 C.F.R. § 274.12 (2015). Bizarrely, this regulation is never cited by the Texas district court. For a lengthy explanation of this issue, see Legomsky, Written Testimony, *supra* note 17, at 16-18; OLC Memorandum Op., *supra* note 10, at 21-22.

289. Exactly how the "benefits" conferral exceeded the authority of those officials is unclear in the district court opinion. The court *held* only that the APA prohibited the provision of these benefits in the absence of notice-and-comment rulemaking. *See Texas*, 2015 WL 648579, at *56. But the court's *reasoning* appears to entail the much more consequential conclusion that the President violated Article II by conferring such benefits on immigrants under the guise of exercising prosecutorial discretion. *See id.* at *49 ("The DHS' job is to enforce the laws Congress passes and the President signs (or at least does not veto). It has broad discretion to utilize when it is enforcing a law. Nevertheless, no statute gives the DHS the discretion it is trying to exercise here.").

290. Price describes this as a prospective license to violate the law. *See* Price, *supra* note 14, at 704.

291. As an aside, it is also far from clear that the Constitution prohibits such promises. If Article II were understood to do so, it would require that we treat the ubiquitous practice of granting immunity to criminal defendants as either unconstitutional or unenforceable.

formal matter, the promise entailed by the relief initiatives is no more a legal entitlement than the promise that would have accompanied an "individualized" grant of deferred action in the years prior to DACA. While grants of deferred action have in the past often been made for multi-year terms, and sometimes for indefinite periods, these grants have never been understood as legal entitlements. As with any other instance of prosecutorial discretion, executive branch officials remain free to reverse course and charge a person previously granted deferred action. Of course, in practice, such reversals were rare historically, and we agree that Jeh Johnson almost certainly will not reverse course next month and order ICE agents to initiate removal proceedings against those who have been granted relief under DACA. As a matter of law, however, this reality does not convert a permissible nonenforcement decision into an impermissible grant of a legal benefit. If it did, grants of prosecutorial discretion by criminal prosecutors would be widely unlawful, as it is often clear in the case of such grants that criminal justice officials have no intention of pursuing changes in the future for the conduct at issue.

We could try to rescue the "benefits" critique by recasting it in a functional rather than formal light (though critics themselves have cast it in a formalist way). We could say that the core of the benefits claim is not that the deferred action granted amounts to a legal entitlement, but instead that, as a practical matter, DACA and DAPA provide relief that will be more *durable* than ordinary decisions to defer or forgo enforcement. This durability, critics might argue, applies not only within the current Administration, but also beyond it, as it would be very costly politically for a new President, regardless of party, to begin removing in significant numbers the beneficiaries of DACA and DAPA who will have developed strong reliance interests. On this account, the practical entrenchment likely to arise from the President's actions separates constitutional exercises of prosecutorial discretion from unconstitutional ones.

These programs may in fact be durable, but that would not distinguish DACA and DAPA from earlier exercises of immigration enforcement discretion. Whereas President Obama's initiatives promise only three years of relief, noncitizens granted deferred action in the past have in many cases been granted indefinite relief—relief that, in practice, often lasted for periods of more than three years and sometimes spanned more than one administration.[292] And, as a theoretical matter, it seems equally plausible that the institutionalization of relief in high-level agency decisions will ultimately

---

**292.** *See, e.g.*, SHOBA S. WADHIA, BEYOND DEPORTATION: THE ROLE OF PROSECUTORIAL DISCRETION IN IMMIGRATION CASES 59-63 (2015) (describing the use of open-ended grants of deferred action, some of which lasted for up to eight years, for U visa applicants). *See generally* MANUEL & GARCIA, *supra* note 29, at 17 (describing deferred action grants outside of DACA as "open-ended").

undermine the durability of relief over time. A single decision of a future administration could reverse the nonenforcement decisions with respect to millions of noncitizens.[293] Nothing of this sort would have been possible under the regime that preceded DACA and DAPA. The literature analyzing centralization appreciates this possibility, emphasizing the fact that agencies become more responsive and policies less entrenched—not the other way around—as decision making becomes centralized in high-level officials who are less subject to the slow-to-change culture of an institution.[294]

As a descriptive matter, therefore, we are skeptical of the claim that DACA and DAPA entrench nonenforcement promises to a greater degree than other forms of enforcement discretion. More importantly, we see no reason why the practical durability of the policy should be constitutionally relevant: there is no plausible constitutional theory of which we are aware under which a promise not to prosecute becomes unconstitutional whenever that promise might be politically durable.

## IV. WHITHER LIMITING PRINCIPLES?

As we showed in Part II, principles to limit the exercise of enforcement discretion based on *substantive* factors grounded in congressional priorities will be elusive across many statutory schemes, especially as those schemes become more reticulated over time. This reality underscores that the "parade of horribles" invoked by many critics of the Obama relief initiatives is not so much a series of hypotheticals about a dystopian post-DACA future as a simple description of the actual history of many regulatory arenas. Ronald Reagan dramatically scaled back environmental and antitrust enforcement. George W. Bush transformed the enforcement culture of the Environmental Protection Agency, altering threshold regulatory requirements for new source review under the Clean Air Act and abandoning investigations that had been commenced under the pre-existing legal regime.[295] His Administration also

---

293. *See, e.g.*, Marty Lederman, *Judge Hanen's—and Michael McConnell's—Mistakes About "Affirmative Action" in DAPA*, BALKINIZATION (Feb. 25, 2015, 2:46 PM), http://balkin.blogspot.com/2015/02/judge-hanens-and-michael-mcconnells.html [http://perma.cc/4332-JGKL]; Eric Posner, *Faithfully Executed*, SLATE (Feb. 19, 2015. 3:23 PM), http://www.slate.com/articles/news_and_politics/view_from_chicago/2015/02/obama_s_dapa_immigration_program_is_legal_judge_hanen_s_injunction_will.html [http://perma.cc/7RTM-NVVH].

294. *See, e.g.*, Kagan, *supra* note 226; Mathew Stephenson, *Optimal Political Control of the Bureaucracy*, 107 MICH. L. REV. 53 (2008).

295. *See* Deacon, *supra* note 115, at 811-16; Thomas O. McGarity, *When Strong Enforcement Works Better than Weak Regulation: The EPA/DOJ New Source Review Enforcement Initiative*, 72 MD.

AR2022_500118

nearly shuttered the Department of Justice office that pursues structural reform of police misconduct,[296] and the Voting Section of his Civil Rights Division did not file a single lawsuit alleging discrimination against minority voters for several consecutive years.[297] Indeed, Eric Holder came into office as Attorney General promising to restore the stature and power of the Division. The first chair of the Securities and Exchange Commission appointed by President Obama immediately ended a Bush Administration pilot program that required enforcement staff to seek permission from the Commission before negotiating a civil monetary penalty against a public company—a policy that had delayed the enforcement process.[298]

These shifts in enforcement policy, while perhaps dramatic, simply reflect the consequences of politics and presidential elections. Though it might be magnanimous and perhaps even judicious for the President to tread lightly when making enforcement judgments, in order to set good precedents for his or her successors who will have distinct ideological preferences, it may also be foolishly high-minded. Exercising the enforcement power necessitates making value judgments, particularly in circumstances where the laws being enforced either reflect a variety of compromises made by the enacting Congress or leave the Executive Branch with wide-ranging discretion in implementation. And as we explained in Part II, there are reasons to value rather than lament the scope

L. REV. 1204, 1257 (2013). In the first three years of the Bush Administration, the Department of Justice launched only three investigations against energy companies—down ninety percent from the last three years of the Clinton Administration. McGarity, *supra* at 1257.

296. *See* U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-10-75, U.S. DEPARTMENT OF JUSTICE: INFORMATION ON EMPLOYMENT LITIGATION, HOUSING AND CIVIL ENFORCEMENT, VOTING AND SPECIAL LITIGATION SECTIONS' ENFORCEMENT EFFORTS FROM FISCAL YEARS 2001 THROUGH 2007, at 22 (2009) (documenting that from 2001-2007, the Bush Administration initiated only three lawsuits against law enforcement agencies, all of which involved allegations of excessive force).

297. *See generally* OFFICE OF THE INSPECTOR GEN., U.S. DEP'T OF JUST., A REVIEW OF THE OPERATIONS OF THE VOTING SECTION OF THE CIVIL RIGHTS DIVISION 113 (2013) ("Our examination of the mix and volume of enforcement cases brought over the past ten years by the Voting Section revealed some changes in enforcement priorities over time, corresponding to changes in leadership."); Joseph D. Rich et al., *The Voting Section*, *in* THE EROSION OF RIGHTS: DECLINING CIVIL RIGHTS ENFORCEMENT UNDER THE BUSH ADMINISTRATION 32, 41 (William L. Taylor et al. eds., 2007).

298. *The SEC in Transition: A Mid-Year Review of SEC Enforcement in 2009*, GIBSON DUNN (2009), http://www.gibsondunn.com/publications/pages/SECinTransition -MidYearReview-SECEnforcement.aspx [http://perma.cc/UZ8R-AWJH]. Chair Mary Shapiro also approved a new procedure for rapidly approving formal orders of investigations and issued 188 formal orders from February to May 2009 and 167 injunctions against defendants from January to June 2009, as compared to 74 orders and 114 injunctions during the same periods in 2008. *Id.*

209

of judgment the enforcement power entails—reasons that parallel common defenses of Congress's delegation of vast rulemaking and, therefore, policymaking power.

Yet the inevitability and desirability of presidential priority setting does not mean that the President can exercise the enforcement power without constraint. In the absence of express and specific statutory direction as to how to prioritize enforcement, we would still want the Executive to abide by constitutional norms that expect the exercise of coercive power to be well supervised and accountable. But these norms will be difficult to translate into limiting principles based on substantive priorities. Instead, we should devise limiting principles that operate as forms of constraint on the way the Executive institutionalizes enforcement priorities. Understanding the choices at stake in the institutionalization of prosecutorial discretion, as we have presented them, can help us begin to identify when the form discretion takes might raise red flags as a matter of constitutional law or culture.

To say that such limiting principles can be identified is not to say that they will always be judicially manageable. Some might be easily embodied in doctrine, but others will be difficult to formulate into clear legal rules. For constitutional scholars who believe the very definition of a "limiting principle" is that it must be amenable to enforcement by an Article III judge, our view will be unsatisfying. But we believe that tangling up debates about the existence of limiting principles with longstanding disagreements about the extent to which constitutional norms must be judicially enforceable stymies genuine inquiry into how best to conform the enforcement power to conceptions of constrained and accountable government.

In what follows, we begin by identifying the sorts of limiting principles that might apply to the exercise of the enforcement power. But the inquiry into constraint need not end there. Even if broad use of the enforcement power according to executive judgment will almost always be constitutional, and even if it will be difficult to conclude that any given institutionalization of discretion crosses a constitutional line, we can still evaluate on the merits the Executive's decisions regarding how to structure its power, as well as any arrangement the political branches might have reached through the political process. In other words, it would be a mistake to limit the analysis of the enforcement power to the constitutional register. We therefore close by considering what might be deficient with the Obama relief initiatives and the state of affairs that produced them, as a matter of more general legal and political theory.

A.  *Current Constraining Principles*

Constraints on the President's authority to determine how to institutionalize discretion within the Executive Branch could arise from a

THE PRESIDENT AND IMMIGRATION LAW REDUX

number of sources, many of which have nothing to do with constitutional limiting principles. First, as we discussed in Parts II and III, Congress possesses a variety of tools to constrain discretion, though some will be easier to employ than others. Congress certainly could place constraints on the substance of discretionary choices. As we noted in Part II when describing how enforcement judgments help construct the regulatory domain, statutes themselves place limits on the bases of enforcement. The President could not, for example, declare as a ground of removal an offense Congress has not listed in the Code. Congress also could draft statutory prohibitions against certain exercises of discretion,[299] or use its appropriations power to shape enforcement choices, though we have discussed the limits of the latter[300] and are skeptical that the former approach would be a good one to adopt with frequency, given the affirmative value of executive policymaking through enforcement articulated in Part II.

Congress could also use institutional design and oversight in tandem to constrain discretion. It could limit the President's capacity to supervise officials' discretionary judgments; for example, Congress could require that particular low-level adjudicators, such as administrative law judges, make certain decisions without interference from agency leadership. The development of statutory protections for civil service employees reflects this sort of judgment and promotes the professionalization of government employment by insulating employees from the pressure of patronage politics.[301] Congress might also seek to diffuse power to make agencies more responsive to individual members of Congress and oversight committees through day-to-day, informal interactions. Strategies of this sort might be difficult to launch, given the fraught legislative process. But Congress could, at the very least, use hearings and appeals to the press to advance its point of view

---

**299.** We acknowledge the existence of a debate concerning whether Congress can direct the President's prosecutorial judgments. *See, e.g., In re* Aiken County, 725 F.3d 255, 266 n.11 (D.C. Cir. 2013) ("[T]he President may decline to follow a law that purports to *require* the Executive Branch to prosecute certain offenses or offenders. Such a law would interfere with the President's Article II prosecutorial discretion."). But while it seems clear that a congressional instruction to prosecute particular individuals would raise serious constitutional concerns, we would not read Article II as containing inherent authority to exercise discretion such that Congress could not extinguish that discretion—a power we think is included in its very power to legislate.

**300.** *See supra* notes 142-143 and accompanying text.

**301.** Jon Michaels, in fact, analogizes the civil service to the constraints imposed on government power by the judiciary in the Madisonian separation-of-powers framework and argues that modern trends toward privatization pose a worrying threat to this essential source of constraint of power. *See* Michaels, *supra* note 179, at 540-47.

211

AR2022_500121

in a way that might create political pressure on the Executive to change its behavior.[302]

But our primary interest here is not in the myriad political and institutional forces that constrain the President as a matter of fact. We focus instead on the ways in which the Constitution itself will sometimes directly constrain how executive officials institutionalize enforcement discretion.[303] Constraints can crop up along any of the three dimensions we identified in Part III. Take the choice between rules, standards, and unfettered discretion. Sometimes the Constitution requires government-by-rules; other times it prohibits their use. First Amendment doctrine, for example, sometimes requires that executive branch officials make decisions pursuant to rules clearly specified ex ante, in order to constrain discretionary judgments about decisions to issue permits and the like—judgments that present a high risk of impermissible discrimination.[304] In contrast, the Due Process Clause sometimes prohibits the use of highly structured decision-making rules, requiring that an adjudicator

---

**302.** *See* Barry R. Weingast & Mark J. Moran, *Bureaucratic Discretion or Congressional Control? Regulatory Policymaking by the Federal Trade Commission*, 91 J. POL. ECON. 765, 768-69, 793 (1983) (showing how members of Congress used hearings and the threat of sanctions in the late 1970s to induce changes in FTC policy); *see also* Kagan, *supra* note 226, at 2348-49 (arguing that presidential involvement in bureaucratic decision making stimulates congressional oversight); Daniel C. Richman, *Federal Criminal Law, Congressional Delegation, and Enforcement Discretion*, 46 UCLA L. REV. 757, 789-93 (1999) (arguing that congressional oversight hearings are particularly effective in cases of prosecutorial discretion, where the Executive would otherwise operate in secrecy).

**303.** One type of constraint on which we do not focus, but which is obviously very important, is constraint imposed by rights-regarding constitutional provisions like the First or Fourteenth Amendments. Even in a world where congressional priorities do not limit the substantive criteria on which the Executive bases enforcement, the Constitution does prohibit the use of some criteria. So, for example, the President could no more restrict grants of deferred action on the basis of race than could a federal prosecutor use race as a factor in charging decisions. *See* Legomsky, Written Testimony, *supra* note 17, at 15 ("[P]articular priorities can't . . . otherwise violate equal protection of other individual constitutional rights."). The Executive, of course, routinely makes discretionary judgments in the immigration arena based on nationality. Grants of temporary protected status and deferred enforced departure, for example, are made for groups of noncitizens based on their nationality, to provide protection for persons from countries beset by environmental disasters or civil strife or where the President's foreign policy would be undermined by their return. *See supra* notes 22, 29 and accompanying text (discussing TPS and DED). In the main, this line does not present a constitutional concern, even though correlations between race and nationality abound. But were the President to draw nationality classifications in a manner that suggested an underlying race-based motivation, we believe it would be appropriate for critics and even courts to decry the President's actions using the language of constitutionality.

**304.** *See* STONE ET AL., *supra* note 215.

AR2022_500122

retain discretion to take account of any evidence or arguments offered by an individual claimant.[305]

It could also be the case that particular choices between rules and standards result in impermissible tradeoffs among rule-of-law values. These limits will be hard to characterize as hard-and-fast constitutional requirements and may be more appropriately characterized as features of a theory of constitutionalism. But some criticisms aimed at particular institutional design choices might sound in constitutional concerns, even though a court would be unlikely to strike them down. If, for example, the President's initiative permitted any non-citizen to apply for relief but then left the judgment entirely to the whims of adjudicators, the loss of supervision resulting from this standards-based approach might, depending on the practice of the adjudicators, amount to a loss that cannot be offset by the benefits of individualized, fine-grained decision making. We could describe this tradeoff as a constitutionally irresponsible choice, even if it would be difficult to describe it as unconstitutional such that a court could strike it down.

We could similarly analyze the choice to centralize or diffuse power. Centralization designed to facilitate preferential treatment of the President's cronies could present a constitutionally problematic form of institutionalization. A centralization initiative designed to serve partisan goals might ordinarily be unexceptional, but it could present a source of constitutional concern in a context in which custom demands independence. The centralized and politicized hiring of immigration judges in the Ashcroft Department of Justice, for instance, contravened civil service regulations and customs surrounding the hiring of officials otherwise removable by the Attorney General.[306]

The tradeoff between transparency and secrecy could also be governed by principles or presumptions that would constrain presidential choices about how to institutionalize discretion. If the structure and integrity of a given enforcement domain depend on self-compliance by regulated parties, then the costs of transparency regarding enforcement priorities might be so high as to be deemed impermissible. In the tax arena, for example, the enforcement machinery depends heavily on the in terrorem effect of legal regulation; the system's goal is maximal compliance with the law, and so it is crucial for the IRS to keep its enforcement priorities hidden from view, in order to maintain public incentives for widespread compliance. If the IRS were to announce that

---

**305.** *See* Demore v. Kim, 538 U.S. 510 (2003); United States v. Salerno, 481 U.S. 739 (1987).

**306.** By contrast, Gillian Metzger, for example, argues that the failure to supervise the exercise of discretion can in some circumstances amount to unconstitutional abdication of presidential responsibilities. *See* Metzger, *supra* note 180, at 1874-86.

213

THE YALE LAW JOURNAL                                    125:104   2015

a portion of the Code simply would not be enforced because of the Service's scarce resources, legal compliance would be undermined for little benefit and for arguably questionable reasons (perhaps to curry favor with a tax-skeptical public).[307] In such a circumstance, the charge of "abdication" would have bite, because enforcement policy would reflect less an attempt to better structure the location of discretion than an effort to undermine the law itself.

Again, it bears emphasizing that these limits we imagine may not be judicially enforceable, and we have not conceptualized them as doctrinal principles. Defining and then mobilizing limits as doctrinal rules would require that we formulate a comprehensive theory of executive power that would inevitably be unmoored from constitutional text and have an ambiguous relationship to constitutional practice. As we emphasized throughout Part III, we are reluctant to constitutionalize the internal structures of the Executive Branch, given the complex tradeoffs among rule-of-law values that must be made when an administration seeks to organize and wield its power.

The difficulty of devising rules of constraint from a set of general principles does help explain the appeal of OLC's substantive approach, or of the prophylactic, bright-line framings of critics who have tried to draw the conceptual distinctions we reject between individual and categorical judgments, or between non-prosecution and the granting of benefits. But as we hope we have shown in Parts II and III, the lawyerly appeal of these frameworks cannot save them as descriptive or normative accounts of the scope of executive authority. The theoretical framework we have offered as an alternative may not result in clear lines around the enforcement power, but it does provide a vocabulary well suited to legal conversations about constitutional norms with which we (scholars, lawmakers, internal executive watchdogs) can assess the merits of executive branch practice.

### B. Future Discipline

The fact that the President acted lawfully and reasonably when announcing DACA and DAPA does not mean that our current institutional arrangements are ideal. The two-principals model of immigration policymaking is the one we have inherited, and we showed in Part II that important benefits flow from this model. But we do not maintain that the current regulatory structure is optimal, and current interbranch dynamics do present downsides. We therefore close by

---

**307.** As we explain in Part III, hypotheticals like this one presume that tax law aims for perfect compliance with the Tax Code.

AR2022_500124

considering various ways of improving the constitutional and theoretical grounding of the President's enforcement power over immigration law.[308]

### 1. Meta: The Process of Institutionalization

Let's start with the development of the Obama relief initiatives themselves. As we have argued, they represent transparency-enhancing and regularizing improvements on the status quo that preceded them—a world in which the Morton Memos and other guidance documents provided far too little information about how the Executive actually exercised its significant screening authority, and far too little supervision of line-level officials. Yet while the Obama initiatives themselves are transparent, the process that produced them was opaque. Mobilized interest groups may well have informed the ultimate shape of the initiatives, but there were no formal avenues for public input into the policymaking process. The policies were drafted and vetted only within the Executive Branch and its self-defined spheres of influence.

One means of addressing this flaw might be through the Administrative Procedure Act (APA). The notion that DACA and DAPA count as legislative rules subject to the APA's notice-and-comment requirement, rather than as general statements of policy, led the district court in Texas to declare that the Administration had violated the APA.[309] That decision remains pending before the Fifth Circuit as we write, though the court of appeals appears poised to affirm the district court, teeing up the APA issue, if not the underlying constitutional question, for the Supreme Court.[310] In denying the

---

**308.** In some sense, this inquiry resembles the debate in the foreign affairs domain over whether and how Congress should authorize the President to use force against a national security threat. Even if the President's authority is not in dispute (and it often is), reasons that reflect constitutional values still exist for him to seek authorization from Congress, and genuine debate can be had over how best to unleash but yet constrain the President's authority to use force. *See, e.g.*, Robert Chesney et al., *A Statutory Framework for Next-Generation Terrorist Threats*, HOOVER INST. (2013), http://media.hoover.org/sites/default/files/documents /Statutory-Framework-for-Next-Generation-Terrorist-Threats.pdf [http://perma.cc/F8MG -PE6M]; Ryan Goodman, *Obama's Forever War Starts Now*, FOREIGN POL'Y (Feb. 12, 2015), http://foreignpolicy.com/2015/02/12/obamas-forever-war-starts-now-aumf-isis -islamic-state [http://perma.cc/6KKG-PUFN].

**309.** For an elaboration of this holding, see *supra* notes 109, 119 and accompanying text. For skepticism by others of the district court's conclusion, see, for example, Cass R. Sunstein, *Texas Misjudges Obama on Immigration*, BLOOMBERG VIEW (Feb. 17, 2015, 12:56 PM), http://www.bloombergview.com/articles/2015-02-17/what-the-judge-got-wrong -about-obama-s-immigration-plan [http://perma.cc/M8E7-BBSR].

**310.** If the Fifth Circuit were to uphold the district court's injunction of the Obama relief initiatives, we believe there would be a strong case for Supreme Court review, given the fact that the court of appeals would have enjoined the nationwide implementation of an

AR2022_500125

government's request for a stay of the district court's injunction,[311] and during oral arguments on the merits,[312] two different Fifth Circuit panels (with overlapping membership) appeared skeptical of the federal government's case (though one judge subjected Texas's claims to withering criticism, as well).

As a matter of existing administrative law doctrine, we are skeptical of this outcome (though, to be frank, the case law attempting to sort legislative from nonlegislative rules is a mess).[313] But as a matter of principle, the claim that the

important federal program based on legal conclusions in a doctrinally muddy area. Though not creating an actual circuit split, the courts of appeals cases rejecting challenges to DACA on standing and jurisdictional grounds might also inform the Court's consideration of whether the sorts of issues implicated in DAPA require Court attention. For a discussion of those cases, see *supra* notes 119-120 and accompanying text. In a case challenging the State of Arizona's refusal to issue drivers' licenses to DACA recipients, the Ninth Circuit recently requested briefing on the constitutionality of DACA, since the State defends its policy in part on the claim that DACA was unlawful. This litigation therefore might also generate disagreement in the courts of appeals. *See* Order, Ariz. Dream Act Coal. v. Brewer, No. 15-15307 (9th Cir. July 17, 2015).

311. *See* Texas v. United States, 787 F.3d 733 (5th Cir. 2015). In denying the government's request for a stay of the district court's injunction pending appeal, the Fifth Circuit concluded that the United States had not shown that it was likely to succeed on the merits of its claims, including that Texas lacked standing, *id.* at 747-54, that the INA, and the fact that the policy constituted the exercise of prosecutorial discretion, precluded judicial review, *id.* at 757-61, and that DAPA did not constitute a legislative rule requiring notice-and-comment, *id.* at 762-67. The court found that the government had not made a strong showing that the district court erred in concluding that DAPA did not leave agency officials with genuine discretion. *Id.* at 765. In its assessment of whether judicial review was available, the panel's analysis suggests deep skepticism of the government's effort to characterize DAPA as the mere exercise of prosecutorial discretion. It even points to provisions in the INA that would suggest that the Secretary's discretion to provide relief based on humanitarian concerns is limited to specific cases, *id.* at 760, and observes that "[a]gainst that background, we would expect to find an explicit delegation of authority to implement DAPA—a program that makes 4.3 million otherwise removable aliens eligible for lawful presence, work authorization, and associated benefits—but no such provision exists," *id.*

312. *See* Michael D. Shear, *Appeals Panel Weighs Fate of Obama's Immigration Overhaul*, N.Y. TIMES, Apr. 27, 2015, http://www.nytimes.com/2015/04/18/us/obamas-immigration-overhaul-halted-by-judge-comes-before-appeals-court.html [http://perma.cc/S7LL-M7GA].

313. While the legislative rules doctrine is (in)famously incoherent, courts considering whether an agency action constitutes a legislative rule tend to focus on the following question: does the agency action create new legal obligations or benefits for the regulated party? *See, e.g.*, Nat'l Mining Ass'n v. McCarthy, 758 F.3d 243, 251-52 (D.C. Cir. 2014). As John Manning and others have noted, this question cannot be answered without some account of how one distinguishes the act of interpreting law from the act of making law and, ultimately, without an account of what constitutes law. *See, e.g.*, John F. Manning, *Nonlegislative Rules*, 72 GEO. WASH. L. REV. 893 (2004); *see generally* Manning, *supra* note 178. Formalist and functionalist approaches to these questions produce dramatically different results, and that is part of what accounts for the doctrinal confusion and indeterminacy. Despite this

THE PRESIDENT AND IMMIGRATION LAW REDUX

Obama relief policies would have benefited from more procedural formality, or transparent public input, should be taken seriously. The Administration's defenders have tried valiantly to frame the relief initiatives as entirely ordinary. But this framing obscures the innovative nature of DAPA and DACA that we described in Part III—a characteristic that, when combined with the scale of the programs, marks them as significant acts of policymaking by the Executive, much as the historical precedents the Administration cites were. DACA and DAPA may not confer formal legal status, but they enable millions of unauthorized immigrants to live and work free of the fear of removal, further entrenching their interests in remaining in the United States. The Obama relief initiatives thus significantly increase the political and humanitarian costs of removing this population at some future point.

Significant policymaking of this sort would have benefitted from public scrutiny and involvement. [314] Open debate could have informed the

---

confusion, however, the cases on which the Texas district court relied are clearly inapposite. In nearly all of those cases, an agency tasked with enforcing a vague statutory obligation—often one in which the statute required the regulated party to engage in "reasonable" behavior—cached out that obligation in a guidance document that created a precise, often numerical standard. *See, e.g.*, Nat. Res. Def. Council v. EPA, 643 F.3d 311 (D.C. Cir. 2011); Gen. Elec. Co. v. EPA, 290 F.3d 377 (D.C. Cir. 2002); Appalachian Power Co. v. EPA, 208 F.3d 1015 (D.C. Cir. 2000); Cmty. Nutrition Inst. v. Young, 818 F.2d 943 (D.C. Cir. 1987). In each case, the court concluded that the agency had created new legal obligations—mandatory rules of conduct—that were not themselves embodied in the statute. And for that reason the court held that the agency action must be treated as a legislative rule, regardless of how the agency itself had characterized it.

While these decisions do sometimes speak about whether the agency has "bound itself" to a course of conduct, the cases are not—contrary to the suggestion of the Texas district court—focused on the internal organization of the agency *independent* of the question of whether the agency has created new legal obligations. Under these cases, the fact that an agency directive "binds" low-level employees, by requiring them to comply with rules issued by their superiors, is not itself sufficient to render an agency action a legislative rule. Issuing rule-like commands to subordinates is consequential for the legislative rules calculus only insofar as those commands create or alter the legal obligations of the regulated parties.

If courts take that approach to DACA and DAPA, then there can be little doubt that they are not legislative rules. As we explained earlier, the President's relief initiatives do not create or alter the legal rights or obligations of immigrants. In contrast to the D.C. Circuit cases discussed above, they do not clarify or move some otherwise vague or shifting boundary between lawful and unlawful immigration status. That formal boundary is plain from the Immigration Code itself: all of the immigrants eligible for relief under the programs are currently in violation of immigration law, and they will remain in violation of immigration law even if they receive deferred action pursuant to one of those programs. Nothing in DACA or DAPA itself changes their legal status, and it has been well understood for a half century that the grant of deferred action itself does not confer any legal benefit.

**314.** *Cf.* Texas v. United States, No. 15-40238, slip op. at 29 (5th Cir. May 26, 2015) ("[W]e do not construe the broad grants of authority [in the INA and elsewhere] as assigning unreviewable decisions of vast economic and political significance to an agency.").

AR2022_500127

Administration's judgments on questions such as the relevant criteria, the scale of the program, and the range of "benefits" that should flow from the granting of relief, which may have improved the design of the program and certainly would have enhanced the legitimacy of the President's initiatives.[315] Such public deliberation also would have facilitated a central goal underlying the APA of increasing the accountability of the policymaking process while also bolstering public confidence in the measures ultimately adopted.

These potential benefits do not mean, however, that courts should overhaul existing legislative rules jurisprudence in order to force programs like DACA and DAPA to go through notice-and-comment rulemaking, as the litigants in the Fifth Circuit aim to do. The protracted multi-year nature of modern rulemaking would likely have made such a process unworkable from the Administration's point of view,[316] especially to the extent both DACA and DAPA were timed to maximize the political payoff of the announcements.[317] Perhaps interest group meetings in the White House were all that could reasonably have been expected by way of public input into an initiative of this sort. But that points to a more general dilemma posed by modern

---

**315.** For a sustained and compelling argument that the current legal debate over DAPA and DACA really dissolves into a debate about the legitimacy of the President's policies in substance, see Ming H. Chen, *Beyond Legality: The Legitimacy of Executive Action in Immigration Law*, 66 SYRACUSE L. REV. (forthcoming 2015-2016).

**316.** In July 2015, DHS issued an advanced notice of proposed rulemaking and invited comments on a decision to expand another program designed to stabilize the status of unauthorized immigrants. *See* Expansion of Provisional Unlawful Presence Waivers of Inadmissibility, 80 Fed. Reg. 43,338 (proposed July 22, 2015) (to be codified at 8 C.F.R. pts. 103 & 212). The original program permitted certain immediate relatives of U.S. citizens to apply for waivers from the ground of inadmissibility related to unauthorized presence from the United States, rather than continue to require that they travel abroad. This requirement, which was the previous practice, not only led to lengthy separations from families due to processing delays, but also meant those noncitizens ran the risk of being denied a waiver and then being barred from entering the United States for three or ten years in light of section 212(a)(9)(B)(i) of the INA. The 2015 proposed rule would substantially expand those eligible to apply for such waivers by opening the process to anyone eligible for a visa and thus substantially counters the disincentives created by the three and ten year bars in section 212(a)(9)(B)(i). The Administration's decision to invite comment on this proposal may provide some evidence as to how difficult and protracted a notice-and-comment period would be for DAPA, though we suspect even this proposal would spark far less controversy than the deferred action programs.

**317.** The Administration announced DACA in the summer before the 2012 presidential election, leading some commentators to conclude that the President's quest for re-election and a strong showing among Latino voters motivated the decision. *See* Julia Preston & John H. Cushman, *Obama To Permit Young Migrants to Remain in U.S.*, N.Y. TIMES, June 15, 2012, http://www.nytimes.com/2012/06/16/us/us-to-stop-deporting-some-illegal -immigrants.html [http://perma.cc/KF3E-R8R3] (quoting Senator Charles Grassley arguing that the President put "politics above responsible policies").

AR2022_500128

administrative law, where the choice too often is between a cumbersome notice-and-comment regime and minimal procedural formality.[318]

Faced with this choice, the incentives of executive branch officials have predictably produced more and more informality in the sphere of administrative action. In a way, it would have been shocking had the development of DACA and DAPA unfolded any differently. Nonetheless, the absence of manageable channels for public input highlights the basic failure of administrative law to address the central role that enforcement discretion plays in important regulatory arenas. Some form of public input into the development of enforcement priorities with more formality than private meetings convened by the Executive and less than notice-and-comment rulemaking would be a valuable contribution to regulatory spheres in which the enforcement power drives application of the law, as well as the politics and substantive policy of the area.

### 2. *Prosecutorial Discretion in a Second-Best Regulatory Environment*

Perhaps the most fundamental problem still in need of a solution stems from the facts on the ground that gave rise to DACA and DAPA in the first place. As we have chronicled here and in previous work, de facto delegation endows the President with asymmetrical screening power, giving him much more power at the back end of the system than the front. While exclusion and deportation are clearly substitute mechanisms for screening migrants, restricting most regulatory innovation to the ex post screening environment leaves us stuck in a second-best regulatory environment.

If the President is to have primary responsibility for the structure of the immigrant screening system, he should be able to determine the optimal mix of ex ante and ex post screening mechanisms. A better-designed system would prevent such a large pool of potentially removable noncitizens from arising in the first place, reducing the need for the coercive power of the state and therefore the sort of policymaking through enforcement that can tend toward the opaque and create the impression, if not the reality, of arbitrary decision making. In other words, the fact that policymaking through enforcement can play a desirable function within a scheme of separated powers does not mean that alternative forms of more transparent policymaking are not preferable.[319]

---

**318.** For a discussion of the law-like customs and practices that govern the administrative state outside the purview of the courts and APA-based policing, see Nestor M. Davidson & Ethan J. Leib, *Regleprudence—at OIRA and Beyond*, 103 GEO. L.J. (forthcoming 2015), http://ssrn.com/abstract=2442413 [http://perma.cc/8GCS-SKC8].

**319.** A related problem has been the proliferation of states of legal limbo created through executive action. As compensation for its lack of control over ex ante screening and to

We can imagine numerous ways to address this problem of an overly large enforcement realm. Eliminating or narrowing some of the grounds of removability and scaling up border enforcement represent two opposite ends of the political spectrum (and each addresses a different source of de facto delegation). We doubt that either will be especially effective, however, as a means of curbing the enforcement power. Whereas the former will have an effect primarily on the margins (at least as long as unauthorized presence remains a ground of removal), the latter offers a blunt instrument for reducing the deportable pool and only magnifies the unreviewed power of the Executive by focusing enforcement where law enforcement power is at its most robust and judicial review and due process norms are at their weakest. What is more, the pathologies of de facto delegation have not arisen solely from the legal structure of immigration law. As we emphasized earlier, the intersection of this legal structure with powerful social and demographic forces has produced the current state of affairs. For those whose answer to our dilemma of de facto delegation would be to use law to prevent the unauthorized pool from arising in the first place, we suggest that such thinking is likely wishful.

For all of these reasons, we have advocated in the past delegating greater ex ante screening authority to the Executive to enable the government to respond to demographic and labor market factors with sensitivity to their fluctuations, trading explicit delegation for de facto delegation.[320] Seen in light of our analysis in this Article of the role of the President as independent policymaker, this option should seem normatively attractive.[321] An ex ante process would make room for far more significant public input than an ex post enforcement regime—even one as transparent as DACA and DAPA. It also would channel executive power into less coercive forms than the operation of a law enforcement bureaucracy. We happen to be at a moment in time when net

---

address exigencies that have arisen but that the Code does not address, the Executive has created a variety of immigration non-statuses like deferred action that leave their recipients at the mercy of executive discretion. Compared to a world in which the Executive has not wielded such authority, this increasing complexity can seem like a positive development. But it is less than ideal. For a thorough articulation of these various executive-created statuses, see Geoffrey Heeren, *The Status of Nonstatus*, 64 AM. U. L. REV. 1115 (2015).

**320.** *See* Cox & Rodríguez, *supra* note 7, at 544; Rodríguez, *supra* note 265.

**321.** Of course, that presumes the Executive Branch does not prefer to have a pool of potentially removable and therefore vulnerable immigrants as a labor supply. But ferreting out and combating this tendency, we think, will be easier if the Executive Branch's responsibilities are more clearly defined and subject to public scrutiny at the ex ante stage than at the enforcement stage.

AR2022_500130

THE PRESIDENT AND IMMIGRATION LAW REDUX

illegal migration appears to have approached zero,[322] and so the need for such ex ante authority may be less pressing than it would have been a decade or two ago. But our very point is that the Executive should have substitute tools at its disposal to adapt to circumstances.

This call for delegation ultimately feeds into one final point. The President's powers over immigration policy remain limited as compared with those of Congress. The President has significant control over our shadow immigration system, but he cannot confer legal status directly on unauthorized immigrants; only Congress can do that through a legalization program. It has become commonplace for defenders of the President's actions to emphasize this point as a way of underscoring that the President's actions have remained within his domain.[323] Within our framework, however, this point highlights the centrality of Congress to addressing the policy issues raised by the persistence of a large, unauthorized population. In our view, however, Congress has been a poor participant in the debate. In 2013, the Senate passed an astoundingly comprehensive bill that would have launched a legalization program, but that bill has languished. Congress has contributed to the debate precipitated by the Obama relief initiatives largely through symbolic appropriations riders forbidding the President from implementing the initiatives, as well as threats to defund the Department of Homeland Security. These forms of debate serve primarily to escalate political conflict while offering no real hope for policy reform. Perhaps enough members of Congress prefer the pre-DACA state of affairs, such that we can read these symbolic gestures as reflective of a considered policy position. But even if one does not support a legalization program as a matter of policy, the rule-of-law concerns we have identified as emblematic of the pre-DACA world should be cause for legislative debate and action.

Some commentators seem to fear that the President's actions have compounded congressional policy passivity and partisan grandstanding—that DACA and DAPA have had the effect of disabling Congress, or at least pushing it into an oppositional posture rather than a lawmaking one.[324] We are skeptical

---

322. *See* Jeffrey S. Passel et al., *Net Migration from Mexico Falls to Zero—and Perhaps Less*, PEW RES. CTR. (Apr. 23, 2012), http://www.pewhispanic.org/2012/04/23/net-migration-from -mexico-falls-to-zero-and-perhaps-less [http://perma.cc/YB8W-4RBR].

323. *See, e.g.*, Wadhia, *supra* note 265.

324. This argument resembles claims by the likes of James Bradley Thayer about the impact of judicial supremacy on congressional action, *see* James Bradley Thayer, *The Origin and Scope of the American Doctrine of Constitutional Law*, *in* LEGAL ESSAYS 1, 32-33 (1908) ("[W]e introduced for the first time into the conduct of government through its great departments a judicial sanction . . . . It will only imperil the whole of it if it is sought to give [courts] more. They must not step into the shoes of the law-maker."), or the claim that robust judicial

AR2022_500131

of the claim that they have prevented Congress from acting, because it seems equally plausible that such actions could spur congressional action. Historically, politicians, advocates, and strategists have offered two different strategies for prompting Congress to fix the immigration laws. Some advocates argue that the President should publicly grant relief to millions (or even declare a moratorium on deportation) in order to highlight the broken nature of the system and prompt Congress to act. Others argue, instead, that the President should do his best to enforce the law to the hilt in order to expose the harshness and futility of the formal rules and thereby create political pressure for legislative change.[325] In other words, not even those who are enmeshed in the congressional-executive dynamic seem to agree on how presidential action will affect Congress's ability and willingness to legislate.

Moreover, there is an additional reason to be skeptical of the claim that executive action reduces the likelihood of congressional action. This worry typically arises in contexts where executive action can serve as a *substitute* for congressional action. If the Executive takes action on its own to regulate greenhouse gases, for example, some worry that its measures will reduce the pressure for Congress to take steps that will lead to the same outcome—the regulation of greenhouse gases. Or if courts engage in judicial review to evaluate the constitutionality of legislation, then Congress will stop worrying about constitutional questions when it drafts legislation. The crucial difference between these contexts and the present immigration context is that the actions of the Executive and Congress are emphatically not substitutes. President Obama did not legalize five million unauthorized migrants with his relief initiatives, and he lacks the authority to do so. Action by Congress will be

---

review absolves Congress of its obligations to conform its actions to the Constitution, *see* LOUIS FISHER, DEFENDING CONGRESS AND THE CONSTITUTION 1-2 (2011) (criticizing the "submissive attitude" taken by many congressmen towards their constitutional oath in light of judicial constitutional interpretation). In statutory interpretation, textualists similarly claim that a certain type of judicial interpretation—textualism as opposed to purposivism— will give Congress incentives to draft laws more responsibly and clearly, and by implication that purposivism promotes sloppy legislative work. *See, e.g.*, John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 COLUM. L. REV. 612, 647-48 (1996) ("[S]eparation of lawmaking from law-exposition . . . provid[es] legislators an incentive to enact rules that impose clear and definite limits upon governmental authority, rather than adopting vague and discretionary grants of power.").

325. For a collection of contexts in which actors use full compliance with the law to highlight what they see as failings in the formal rules, see DORIS KEARNS GOODWIN, THE BULLY PULPIT: THEODORE ROOSEVELT, WILLIAM HOWARD TAFT, AND THE GOLDEN AGE OF JOURNALISM 209–10 (2013) (discussing Roosevelt's strategy of using strict enforcement to generate support for legal change among elites); and Jessica Bulman-Pozen & David E. Pozen, *Uncivil Obedience*, 115 COLUM. L. REV. 809, 831-32 (2015) (describing "maximalist enforcement tactics that have been adopted by certain chief executives").

required to provide a lawful immigration status to most unauthorized migrants living in the United States. And given that only Congress can confer such status, it is hard to understand why the President's limited relief programs would somehow eliminate the pressure for future congressional action on immigration reform.

Recent history ultimately suggests that Congress would not have acted on immigration, even if President Obama had not pursued his relief initiatives. Generally speaking, the partisanship reflected in the debate over deferred action dominates the relationship between the branches, making it unlikely that continuation of the pre-DAPA and DACA status quo would have resulted in more meaningful cross-branch debate. But even so, when turning to executive branch policymaking as a viable alternative to congressional stasis, we should not lose sight of what can be lost when the Executive becomes the primary engine of policy—not just the open and transparent decision making more likely to come from a less disciplined but more multi-faceted congressional debate, but also the *collaboration* between Congress and the Executive that defines any legislative process.

To be clear, we do not mean to suggest that executive policymaking as a general matter is always a second best option to congressional action. We hope that our arguments in Part II, highlighting the dynamic, iterative conception of the separation of powers and the role the enforcement power plays in shaping a regulatory domain over time, shine through as reasons to appreciate executive policymaking within a proper and healthy distribution of powers. But we also believe that, when the President must take bold action to address threats to the rule of law within the domain of enforcement, a more fundamental recalibration of political branch responsibilities may be necessary.

## CONCLUSION

Presidential immigration law is ascendant. The dominant policymaking role long played by the President, combined with the twentieth-century rise of de facto delegation, destabilizes a simple principal-agent model as a way of understanding the separation of powers in immigration regulation. These developments have produced an immigration regime in which the President has significant *responsibility* for—not just power over—the rules for screening immigrants. The Executive Branch has actually helped construct the screening system over time as it has wielded its enforcement power and decided how to put the INA's statutory framework into effect—a process that has entailed considerable executive policymaking dynamically related to, but still separate from, congressional policy. The separation-of-powers framework that emerges from this history is thus far from static. De facto delegation has not entailed a simple transfer of power from one branch to another; as we have documented

223

here and in our 2009 work, the structure of modern immigration law has produced an iterative relationship between the branches in which Congress has played an important, if not dominant, role. Without both an awareness of and appreciation for these dynamics, the President's immigration enforcement power cannot be properly understood—let alone cabined.

The separation-of-powers framework we have uncovered is not just an institutional reality to be bemoaned. We believe there are reasons to accept, and even to endorse, presidential policymaking through enforcement, perhaps especially in the immigration context. Such acceptance does not mean that the President's (and the agencies') exercise of discretion should go entirely unchecked. But it does suggest that the constraint in most cases will not come from an inquiry into whether the substantive policy choices embodied in enforcement initiatives such as DACA and DAPA promote congressional priorities. In place of that sort of doomed Take Care Clause inquiry, enforcement policies should be evaluated for whether they make reasonable rule-of-law tradeoffs and thereby advance the general purposes of the constitutional separation of powers—constraining and rendering accountable government power.

Crucially, this rule-of-law inquiry requires that one attend as much to relationships of power *within* the branches as *across* them, as a growing body of scholarly work has come to appreciate with respect to the administrative state as a whole. Within this framework, we think it clear that the Obama relief initiatives are lawful. By using rules to centralize discretionary decision making, DACA and DAPA make visible the political and policy choices the Executive Branch has made while enhancing the consistency of the government's use of its coercive powers. Further, the initiatives tame the faceless prosecutor by imposing politically accountable constraints on the decisions of low-level officials. Critics have argued that the programs are dangerous because they permit the President to replace Congress's judgments with his own. In reality, however, the relief initiatives have enabled him to discipline the judgments of low-level enforcement officials, bringing order and discipline, along with his own substantive preferences, to an immigration enforcement regime in which the Executive has significant responsibility for the structure of screening. Advocates for the President's actions who tout the virtues of "individualized" prosecutorial discretion in this setting obscure the institutional reality of how that discretion has operated in immigration law, and they distract attention from the crucial benefits that flow from the way that DACA and DAPA actually centralize and *limit* discretionary judgments.

Presidential policymaking has always provoked political controversy, at least as much because of deep ideological disagreements over immigration policy as because of the perception it creates of an aggressive or boundless Executive. The fact that today's particular controversy over the Obama relief

224

THE PRESIDENT AND IMMIGRATION LAW REDUX

initiatives has vivid partisan overtones is not to say that limits on policymaking through enforcement do not exist, even when they do not appear visibly or clearly in the statutes that set the parameters for executive action. But those limits will be excruciatingly difficult to define without disabling legitimate and desirable executive action, given the inevitability of enforcement discretion and the values-based judgments that attend it. The bright-line rules critics have offered may have the appeal of ease of application, but they constrain executive power in ways that are neither constitutionally required nor necessarily consistent with the goal of keeping executive power in check. The separation of powers ultimately amounts to a messy political contest, and the search for clear, lawyerly lines to draw around the powers of the branches, we have come to believe, is misguided. Even if the current lawsuits succeed in scuttling the Obama initiatives, the imperatives of enforcement will not disappear, and any President will respond to those imperatives while pursuing his own objectives. We can only hope that he has the necessary freedom to structure the enforcement power in ways that serve the goals of accountability and constraint, and that he faces public and congressional pressure to do precisely that.

225

AR2022_500135

Case 1:18-cv-00068    Document 610-4    Filed on 11/04/22 in TXSD    Page 136 of 990
Three Reasons Why Immigrants Aren't Going to Take Your Job | Cato at Liberty Blog

APRIL 22, 2020 3:08PM

# Three Reasons Why Immigrants Aren't Going to Take Your Job

By **Alex Nowrasteh**

President Trump recently said that there were **two reasons** for virtually halting all immigration to the United States in response to COVID-19. The first was to prevent the spread of the disease domestically. **The second was to save American jobs for American citizens**. We've already **analyzed the first** claim, this post will look at whether reducing immigration further will help save jobs for Americans. The answer is no.

Unemployment is **spiking** during the **COVID-19 crisis**. Americans are reacting to the virus by changing their economic behavior by working at home where possible, **spending less time in dense public places**, and in numerous other ways that result in less economic activity – sometimes voluntarily and sometimes in response to government shelter in place orders. As a result, employment is falling. In this situation, many pundits are **arguing that further restricting immigration will preserve jobs for American citizens**. Further restrictions will have no such impact. **I've written much about the economic effects of immigration before**, but here are some big takeaway points related to the recent immigration ban:

First, immigrants come to the United States primarily because of economic opportunity. Even those coming today on green cards intended for family-reunification are primarily coming to reunite with family members who, at one point in the chain, came for economic reasons. If the benefits of coming to the United States are greater than the costs (psychological costs, cost of moving, opportunity cost, danger of migrating, etc.), then many people will do so.

The biggest benefit of coming to the United States is higher wages, which are higher here because immigrant workers have a greater marginal value product (MVP=the number of goods produced by a worker multiplied by the market price for those goods). That means that immigrants are more productive here than in their home countries, so they supply more goods and services that are sold at higher prices. The amazing thing about demand for labor is that it is entirely determined by the worker's MVP.

Economists Michael Clemens, Claudio Montenegro, and Lant Pritchett estimate the **place premium**, which is the estimated wage benefit of moving to the United States adjusting for the cost of living through a measurement called **purchasing power parity** (PPP). For example, they estimate that

AR2022_500136

Case 1:18-cv-00068    Document 610-4    Filed on 11/04/22 in TXSD    Page 137 of 990

a working age Mexican male with 9–12 years of education who was educated in his home country can expect a 2.6-fold increase in his wages. That's an enormous gain.

Immigration slows during a recession because the number of jobs decreases and, oftentimes, wages also adjust or their growth slows. Thus, the big benefit of immigrating to the United States evaporates for many immigrants during a recession. Immigration falls during recessions because immigrants benefit less from coming here, but natives benefit less too so the government also typically responds by **increasing immigration** enforcement. Less commonly, the government restricts legal immigration like **President Herbert Hoover** did in 1929 at the beginning of the Great Depression. The flow of illegal immigrants into the United States changes most dramatically during a recession as they're the most economically sensitive immigrants.

In response to COVID-19, the U.S. economy is in recession and unemployment is skyrocketing so the benefits of immigrating here are falling. Unlike other recessions, COVID-19 is also increasing the costs of immigrating. The virus is very widespread in the United States and many immigrants might be hesitant to risk their health to come here. Thus, the economic benefits of coming here are down due to the recession and the costs of doing so are up because of the virus. Immigration should fall on its own without changes in government policy.

Second, the impulse to close immigration to protect jobs for American citizens is known as the **lump of labor fallacy**, which is a fundamental misconception that there is a fixed amount of work in a society. Believers in this fallacy apply it to immigration by arguing that any job held by an immigrant could be held by an American citizen, but this just simply isn't true. The number of jobs available depend on myriad economic factors and is never stable.

The so-called displacement effect, which is the term for when immigrant workers push native-born American workers out of the labor market, **is rarely ever even observed in practice and always very small** when it is detected. Most economic research on the effects of immigration on employment find no statistically significant evidence that immigrants push natives out of jobs, even in **extreme cases** like the **Mariel boatlift** that increased Miami's labor force by 7 percent in 42 days. Immigrants and natives typically move to the same **economically growing areas of the country**, which we wouldn't see if immigrants were taking American's jobs.

Third, immigration **doesn't much affect the wages** of native-born Americans in the long run. Initially, more immigration might slightly lower wages. However, that decline in wages raises the relative price of capital, which are the tools that workers use to produce goods and services. As a result, the profits from capital increase and investors respond by producing more capital, which causes its price to fall. A consequence of more capital is that workers become more productive, which results in higher wages for them. The labor demand curve is almost perfectly elastic in the long-run. This economic effect, however, doesn't affect all workers equally.

AR2022_500137

Case 1:18-cv-00068    Document 610-4    Filed on 11/04/22 in TXSD    Page 188 of 990

A large increase in the supply of low-skilled workers could lower the relative wages of similarly-skilled workers even after the capital markets adjust, it's just that economy-wide wages should be about the same as they were prior to the immigration. The economic evidence is that the wages of native-born Americans slightly increase due to immigration after the capital markets adjust, with perhaps slightly lower wages for native-born American high school dropouts, but that the wages for immigrant workers fall the most. In other words, new immigrants only have a consistently negative impact on the wages of other immigrants but not on natives. That's because immigrants are most substitutable or competitive with other immigrant workers and are not really substitutable for many native-born American workers. Native-born American workers also react to immigration by making themselves less substitutable with immigrant workers by getting more education.

As the National Academy of Sciences noted: "When measured over a period of 10 years or more, the impact of immigration on the wages of native-born workers overall is very small. To the extent that negative impacts occur, they are most likely to be found for prior immigrants or native-born workers who have not completed high school—who are often the closest substitutes for immigrant workers with low skills."

Massive cuts in legal immigration don't raise wages either. The best research on this is by economists Michael Clemens, Ethan Lewis, and Hannah Postel who study the effectiveness of the U.S. government's 1964 termination of the Bracero program. That temporary farm worker program was cancelled to raise the wages of American farm workers by reducing the total size of the workforce. They found that ending lower-skilled migration for farm workers had little measurable effect on the labor market for Americans who worked in those occupations. Farmers didn't respond to the cancellation of Bracero by raising wages, but by using machines to harvest crops and altered the crops they planted to take account of the new dearth of workers. Instead of planting crops that required labor-intensive harvesting or care, they planted other crops that required many fewer workers. Farmers turned to machines like tomato pickers and changed methods for planting and harvesting other crops to take account of the newer wages they would have faced had they stuck with the Bracero-era farm techniques. Those new methods were more expensive, but cheaper than raising wages.

Fewer immigrants would come here anyway because there is less economic opportunity and more danger due to the virus. Those that come do not displace native-born American workers. Lastly, those who come slightly raise the wages of native-born American workers. Trump's "temporary ban" on legal immigration, like most of his previous temporary bans, will probably last longer than is necessary or won't be cancelled at all until there's a drastic change in the political situation. Regardless of that, protecting American jobs is not a good reason to close the borders.

[empty-para]

RELATED TAGS

AR2022_500138

7/7/22, 9:51 AM                    Three Reasons Why Immigrants Aren't Going to Take Your Job | Cato at Liberty Blog

**Immigration**



This work is licensed under a **Creative Commons Attribution-NonCommercial-ShareAlike 4.0 International License**.

**AR2022_500139**

**AMERICAN**
**IMMIGRATION**
**COUNCIL**

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

October 2014

## Executive Grants of Temporary Immigration Relief, 1956-Present

Much has been made of President Obama's Deferred Action for Childhood Arrivals (DACA) program, through which he deferred deportation for young adults brought to the U.S. as children. But as immigration legal scholar Hiroshi Motomura has noted, the president has broad executive authority to shape the enforcement and implementation of immigration laws, including exercising prosecutorial discretion to defer deportations and streamline certain adjudications.[1] In fact, a look at the history books reveals that President Obama's action follows a long line of presidents who relied on their executive branch authority to address immigration challenges.

A chart of these decisions [below] makes clear that presidents have ample legal authority—and abundant historical precedent—to exercise their discretion in immigration matters. Since at least 1956, every U.S. president has granted temporary immigration relief to one or more groups in need of assistance. This chart collects 39 examples, which span actions large and small, taken over many years, sometimes by multiple administrations.[2] Some presidents announced programs while legislation was pending. Other presidents responded to humanitarian crises. Still others made compelling choices to assist individuals in need when the law failed to address their needs or changes in circumstance.

Perhaps the most striking historical parallel to today's immigration challenges is the "Family Fairness" policy implemented by Presidents Ronald Reagan and George Bush, Sr. The story behind the fairness policy begins on November 6, 1986, when President Reagan signed the 1986 Immigration Reform and Control Act (IRCA), which gave up to 3 million unauthorized immigrants a path to legalization if they had been "continuously" present in the U.S. since January 1, 1982. But the new law excluded their spouses and children who didn't qualify and forced them to wait in line, creating "split-eligibility" families, as they were called. The U.S. Catholic bishops and immigration groups criticized President Reagan for separating families.

In 1987, Reagan's Immigration and Naturalization Service (INS) commissioner announced a blanket deferral of deportation (logistically similar to today's DACA program) for children under 18 who were living in a two-parent household with both parents legalizing, or with a single parent who was legalizing. Then, in July 1989, the Senate passed legislation to protect a bigger group—prohibiting deportation of all spouses and children of those who were legalizing under IRCA.

But the legislation stalled in the House, and in 1990 President Bush Sr. administratively implemented the Senate bill's provisions. His INS commissioner, saying "We can enforce the law humanely," expanded the blanket deferral to as many as 1.5 million spouses and children of immigrants who were legalizing, provided they met certain criteria. President Bush thus protected over 40 percent of the then-unauthorized population from deportation. The House then passed legislation, and President Bush signed it later that year.

AR2022_500140



COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

The Family Fairness program is only one example of the common characteristics of presidential decisions to act on immigration. Several decisions were large-scale actions potentially affecting hundreds of thousands or millions of immigrants. Some presidents focused on the necessity of keeping families together. And other presidents acknowledged the absurdity of trying to deport people for whom major legislation in Congress was pending. Some of these examples include:

- **Large-scale actions**: In addition to Family Fairness, other large-scale actions include paroles of up to 600,000 Cubans in the 1960s and over 300,000 Southeast Asians in the 1970s, President Carter's suspension of deportations for over 250,000 visa-holders, and President Reagan's deferral of deportations for up to 200,000 Nicaraguans.

- **Family-based actions:** Other actions to protect families include the suspended deportations of families of visa-holders (Carter), parole of foreign-born orphans (Eisenhower, Obama), deferred action to widows of U.S. citizens and their children (Obama), and parole-in-place to families of military members (Obama).

- **Actions while legislation was pending**: Other actions taken while legislation was pending include parole of Cuban asylum seekers fleeing Castro (Nixon, Kennedy, Johnson), deferred action to battered immigrants whom the Violence Against Women Act (VAWA) would protect (Clinton), parole of orphans (Eisenhower), and DACA (Obama).

## Endnotes

[1] Hiroshi Motomura, *The President's Discretion, Immigration Enforcement, and the Rule of Law* (Washington, DC: American Immigration Council, August 2014), http://immigrationpolicy.org/perspectives/president%E2%80%99s-discretion-immigration-enforcement-and-rule-law.

[2] This data is compiled from Marshall Fitz, *What the President Can Do on Immigration If Congress Fails to Act* (Washington, DC: Center for American Progress, July 2014), http://www.americanprogress.org/issues/immigration/report/2014/07/01/93042/what-the-president-can-do-on-immigration-if-congress-fails-to-act/; Andorra Bruno, Todd Garvey, Kate Manuel, and Ruth Ellen Wasem, *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (Washington, DC: Congressional Research Service, July 13, 2012), http://edsource.org//wp-content/uploads/Deferred-Action-Congressional-Research-Service-Report.pdf; Arthur C. Helton, "Immigration Parole Power: Toward Flexible Responses to Migration Emergencies," *Interpreter Releases* 71, no. 1637 (December 12, 1994); John W. Guendelsberger, "Family Fairness: A Status Report," *In Defense of the Alien* 15 (1992):45-57, http://www.jstor.org/stable/23143114; and other media reports, press releases, and articles, linked to here where publicly available.



**AMERICAN IMMIGRATION COUNCIL**

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

### Executive Grants of Temporary Immigration Relief, 1956-Present

| Year(s) | 1956 | 1956-58 | 1959-72 | 1962-65 | 1975-79 |
|---|---|---|---|---|---|
| **Relief Covered:** | 923 orphans were paroled into the custody of military families seeking to adopt them, pending Congressional legislation providing them permanent resident status | Parole of Hungarians who escaped after 1956 uprising against Soviets failed | Parole for Cuban asylum seekers fleeing Cuban revolution | Executive parole of Chinese who fled to Hong Kong in early 1962 | Executive parole of Indochinese from Vietnam, Cambodia, and Laos, in 10 authorizations or extensions from 1975-79 |
| **# Affected:** | 923 | 31,915 granted parole. | 621,403 received, vast majority granted parole | 15,100 paroled | 360,000 arrived in US, most under parole authorization |
| **President(s):** | Eisenhower | Eisenhower | Eisenhower, Kennedy, Johnson, Nixon | Kennedy, Johnson | Ford, Carter |
| **Other Notes:** | Press release, Oct. 26, 1956: "The Secretary of State and the Attorney General have just reported to me that this can be done." | | Legislation was pending during this time (i.e. the Cuban Adjustment Act of 1966). In FY 1972, a total of 17,109 Cuban asylum seekers were paroled into the U.S. via airlift | | Some also eligible under conditional entry, but since not enough entries statutorily available, most were paroled. Most of 130,000 refugees who were evacuated during 1975 U.S. withdrawal from Vietnam were paroled |

AR2022_500142



AMERICAN
IMMIGRATION
COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 1976 | 1977 | 1977-82 | 1977-1980 | 1978 |
|---|---|---|---|---|---|
| **Relief Covered:** | Extended Voluntary Departure (EVD) for Lebanese | AG temporarily suspended expulsion of "*Silva* letterholders," who were suing because the State Department incorrectly calculated a visa cap, while their litigation and legislation moved forward | Extended Voluntary Departure (EVD) for Ethiopians | Parole for Soviet refugees | Extended Voluntary Departure (EVD) for Ugandans |
| **# Affected:** | Unknown (although 14,000 fled Lebanon to US) | Ultimately 250,000 (500,000 including dependents) | 15,000+ | 50,000 + (9,000 in Jan. and Dec. 1977; 12,000 in June 1978; 36,000 in 1979) | Unknown |
| **President(s):** | Ford | Carter | Carter, Reagan | Carter | Carter |
| **Other Notes:** | Extended Voluntary Departure (EVD) is an administrative process by which designated nationals of a country were protected from deportation and provided work authorization. *See* 563 F. Supp. 157 (D.D.C. 1983) | | Reagan extended this policy in 1982, after Reps. Dixon (D-CA) and Kemp (R-NY) cosponsored resolution | From 1972-on, parole was used frequently for Soviet refugees when not enough conditional entries were statutorily available | |

AR2022_500143



AMERICAN
IMMIGRATION
COUNCIL

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 1979 | 1979 | 1980 | 1980 | 1981-1987 |
|---|---|---|---|---|---|
| **Relief Covered:** | Extend Voluntary Departure (EVD) for Nicaraguans | Extended Voluntary Departure (EVD) for Iranians | Extended Voluntary Departure (EVD) for Afghans | Parole of Cubans and Haitians during Mariel boatlift | Extended Voluntary Departure (EVD) for Poles |
| **# Affected:** | 3,600 | Unknown | Unknown | 123,000 paroled in US by 1981 | 7,000 (as of 1987) |
| **President(s):** | Carter | Carter | Carter | Carter | Reagan |
| **Other Notes:** | | In response to Iranian Revolution against Shah. | | | In response to Polish Communist government declaring martial law in 1981, after crackdown on Solidarity strikes. Initiated in 1981, extended in 1984 and 1987 |

AR2022_500144



**AMERICAN IMMIGRATION COUNCIL**

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 1987 | 1987 | 1989 | 1989 | 1990 |
|---|---|---|---|---|---|
| **Relief Covered:** | AG Meese directed INS not to deport Nicaraguans and to grant them work authorizations, if they demonstrated a "well-founded fear of persecution," even if denied asylum | Unauthorized children of some noncitizens who applied to legalize after 1986 immigration reform | Executive directive of deferred action for Chinese nationals following Tiananmen Square | Parole of Soviets and Indochinese, even though denied refugee status | Further executive order formalizing Deferred Enforced Departure (DED) for Chinese nationals following Tiananmen Square |
| **# Affected:** | Up to 200,000 | More than 100,000 families | 80,000 | 2,225 Indochinese in 1989; 5,000 Soviets as of 1989 | 80,000 |
| **President(s):** | Reagan | Reagan | Bush Sr. | Bush Sr. | Bush Sr. |
| **Other Notes:** | Legislation was pending. Ultimately, the Nicaraguan Adjustment and Central American Relief Act (NACARA) passed | Reagan's AG Meese also authorized INS to defer deportation proceedings for "compelling or humanitarian factors" | Visa overstays had to report to INS to benefit from deferred action and apply for work authorization. Bush: "I reemphasize my commitment… to never allow any action that would force the return of Chinese students if their lives or liberty are at risk." | | "Deferred Enforced Departure" is a stay of deportation, and often provision of work authorization, within the President's foreign relations power. Bush's executive order suspended deportations, provided work authorization for all Chinese nationals in the US as of 6/5/89, and waived a regulation to allow adjustment of status |

6



**AMERICAN IMMIGRATION COUNCIL**

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 1990 | 1991 | 1992 | 1994 | 1997 |
|---|---|---|---|---|---|
| **Relief Covered:** | Deferred deportation of unauthorized spouses _and children_ of individuals legalized under 1986 Immigration Reform and Control Act (IRCA) | President directed AG to grant deferred enforced departure (DED) to Persian Gulf evacuees who were airlifted to US after 1990 Kuwait invasion | Bush Administration granted DED to certain El Salvadorans, even though and because their statutory TPS grant expired | Parole of further Cubans into the US. | Deferred Enforced Departure (DED) for Haitians in the US since before 1995 |
| **# Affected:** | Up to 1.5 million | 2,227 | 190,000 | ~28,000 | 40,000 |
| **President(s):** | Bush Sr. | Bush Sr. | Bush Sr., Clinton | Clinton | Clinton |
| **Other Notes:** | Bush INS Commissioner issued blanket "Family Fairness" policy, and dropped "compelling or humanitarian factors" requirement in prior executive action. Legislation had passed the Senate, but not the House, providing similar relief | Criteria: Those who had US citizen relatives or harbored US citizens during the invasion. Allowed evacuees to apply for permanent residency.  A Kuwaiti doctor said, "I feel the President has finally put a happy ending on this tragic story." | President Clinton subsequently extended the DED grant until Dec. 31, 1994 | Included Cubans on the immigrant visa waiting list, unmarried sons and daughters of Cubans issued immigrant visas or granted refugee status, and family members who reside in the same household. Also paroled Cubans detained at Guantanamo and Panama | Legislation was pending to help these Haitians (Haitian Refugee Immigration Fairness Act of 1998 allowed these Haitians to obtain green card) |

AR2022_500146



**AMERICAN IMMIGRATION COUNCIL**

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 1997 | 1998 | 1999 | 2002 | 2005 |
|---|---|---|---|---|---|
| **Relief Covered:** | Deferred action to noncitizens who might gain relief through <u>Violence Against Women Act (VAWA)</u>, if it passed | Attorney General temporarily <u>suspended deportations</u> to El Salvador, Guatemala, Honduras, and Nicaragua, in response to Hurricane Mitch | <u>Deferred Enforced Departure (DED) for Liberians</u> for 1 year | Executive order of expedited naturalization for <u>green card holders who enlisted in military</u> | Deferred action for <u>foreign academic students</u> who were affected by Hurricane Katrina |
| **# Affected:** | Unknown | 150,000 | 10,000 | Unknown | Unknown |
| **President(s):** | Clinton | Clinton | Clinton | Bush | Bush |
| **Other Notes:** | VAWA legislation was pending. Criteria: Battered noncitizens with approved LPR self-petitions, and their derivative children | | | Order eliminated a three-year wait, let the soldiers seek citizenship immediately and applied to anyone on active duty as of Sept. 11, 2001. Included <u>Lance Cpl. José Gutiérrez</u>, a Guatemalan who received U.S. status through SIJ and died in Iraq | Bush also suspended employer verification rules. Congress was <u>considering legislation</u> at the time |

AR2022_500147



**AMERICAN IMMIGRATION COUNCIL**

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 2006 | 2007 | 2009 | 2009 | 2010 |
|---|---|---|---|---|---|
| **Relief Covered:** | Established <u>Cuban Medical Parole Program</u>, to allow Cuban doctors conscripted abroad to apply for parole at US embassies | Deferred Enforced Departure (DED) for Liberians in 2007, whose TPS had statutorily expired | <u>Extended Deferred Enforced Departure (DED)</u> for qualified Liberians | Extended deferred action to <u>widows and widowers of U.S. citizens</u>, and their unmarried children under 21 | Parole-in-place to spouses, parents, and children of <u>U.S. citizen military members</u> |
| **# Affected:** | <u>1,574</u>, as of Dec. 2010 | 3,600 | Unknown | Unknown | Unknown |
| **President(s):** | Bush | Bush | Obama | Obama | Obama |
| **Other Notes:** | Program <u>still in place</u> | | | | Granted on case-by-case basis. <u>First grant</u> of parole-in-place was under Bush Administration |

AR2022_500148



**AMERICAN IMMIGRATION COUNCIL**

COMMUNITY EDUCATION CENTER · IMMIGRATION POLICY CENTER · INTERNATIONAL EXCHANGE CENTER · LEGAL ACTION CENTER

| Year(s) | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| **Relief Covered:** | Parole to Haitian orphans who were in the process of being adopted by U.S. citizens | Extended Liberian DED through March 2013 | Deferred action for childhood arrivals (DACA) | Revised parole-in-place policy to spouses, parents, and children of U.S. citizen military members |
| **# Affected:** | Unknown | 3,600 | Up to 1.8 million | Unknown |
| **President(s):** | Obama | Obama | Obama | Obama |
| **Other Notes:** | Actions followed Haitian earthquake on January 12, 2010 | | Legislation was pending (i.e. the DREAM Act).  Provided for a two-year renewable reprieve from deportation, and work authorization, for those meeting certain criteria. USCIS took significant actions to process applications | Revised policy so that "ordinarily" granted |

AR2022_500149



**AMERICAN IMMIGRATION COUNCIL**

COMMUNITY EDUCATION CENTER • IMMIGRATION POLICY CENTER • INTERNATIONAL EXCHANGE CENTER • LEGAL ACTION CENTER

December 2014

### REAGAN-BUSH FAMILY FAIRNESS:
#### A Chronological History

From 1987 to 1990, Presidents Ronald Reagan and George Bush, Sr. used their executive authority to protect from deportation a group that Congress left out of its 1986 immigration reform legislation—the spouses and children of individuals who were in the process of legalizing. These "Family Fairness" actions were taken to avoid separating families in which one spouse or parent was eligible for legalization, but the other spouse or children living in the United States were not—and thus could be deported, even though they would one day be eligible for legal status when the spouse or parent legalized. Publicly available estimates at the time were that "Family Fairness" could cover as many as 1.5 million family members, which was approximately 40 percent of the then-unauthorized population.[1] After Reagan and Bush acted, Congress later protected the family members. This fact sheet provides a chronological history of the executive actions and legislative debate surrounding Family Fairness.

**November 6, 1986**:   President Reagan signs the Simpson-Mazzoli Immigration Reform and Control Act (IRCA).[2] The legislation makes certain immigrants eligible for temporary legal status and eventually green cards, primarily (1) those "continuously" present in the U.S. since January 1, 1982 (the general legalization provisions),[3] and (2) special agricultural workers (SAW).[4] At the time, roughly 3 million people are thought to be eligible to legalize, although that number will rise by 1990, due to an unexpectedly large number of SAW applicants, and litigation by several hundred thousand persons who claimed eligibility for the general legalization provisions.[5]

IRCA does not contain language regarding spouses and children who don't independently qualify for legalization. As a Senate Judiciary Committee report accompanying the legislation stated, "the families of legalized aliens will obtain no special petitioning right by virtue of the legalization. They will be required to 'wait in line'."[6]

When the Senate-passed bill moved to the House, IRCA's legalization provisions survived an amendment to strike them by seven votes.[7]

**1987**:   The plight of "split-eligibility" families immediately becomes a key issue post-IRCA.[8] For example, the National Conference of Catholic Bishops criticizes the separation of families, and urges Reagan's intervention."[9]

The Los Angeles Catholic archdiocese reports that up to 30 percent of the legalization applications it was assisting involved "split-eligibility" families.[10]

**October 7, 1987**: In an effort to address "split-eligibility" families, Sen. John Chafee (R-RI) offers an amendment to an unrelated bill that would give spouses and children excluded from IRCA a path to legalization.[11] The Senate defeats the amendment by a 55-45 vote.[12]

Among others, IRCA's lead Senate sponsor, Sen. Alan K. Simpson (R-WY), opposes Chafee's amendment as a "second amnesty" that "destroys the delicate balance of the recently passed immigration reform legislation." Citing the Senate Judiciary Committee's report, Simpson stated "[t]here is no question about what the legislative intent is or was."[13]

**October 21, 1987**: Two weeks later, Reagan's INS Commissioner Alan C. Nelson announces INS' "Family Fairness" executive action.[14] The INS' memo explains the "clear" Congressional intent in 1986 to exclude family members from the legalization program.[15] Nevertheless, the INS defers deportation for children living in a two-parent household with both parents legalizing, or living with a single parent who was legalizing. As to spouses, though, the INS directs that similar relief "generally not be granted"—only if "compelling or humanitarian factors" exist on top of marriage alone.[16]

**October 27, 1987**: The *Washington Post* editorial board, among other news outlets, applauds INS' policy. Citing IRCA's Congressional history and the recent Senate defeat of Chafee's amendment, the Post argues that "If Congress will not be moved, the INS should have a heart."[17]

**October 27, 1987**: Sen. Chafee and eight other Senators criticize INS' policy for not going far enough to cover spouses and ineligible children.[18]

**October 29, 1987**: The House Appropriations Committee reports a continuing resolution (CR) on appropriations to the House floor.[19] The CR includes an amendment by Rep. Edward Roybal (D-CA)—narrower than Chafee's, but broader than INS' Family Fairness policy—to block funding for deportation of ***both*** spouses and children of legalizing families.[20]

**December 3, 1987**: IRCA's lead House sponsor, Rep. Romano Mazzoli (D-KY), among others, criticizes Roybal's amendment during the House floor's CR debate because it "reverses the whole idea of the Immigration Reform and Control Act of 1986."[21] Rep. Hal Rogers (R-KY) also states, "[I]f my colleagues were concerned last year… about the amnesty portion of that bill, and it only carried by six votes… this continuing resolution violates completely the amnesty provisions delicately worked out last year."[22] Rep. Bill McCollum (R-FL) argues the amendment "means another 50 percent

2

or better expansion of the number of illegals who are immediately going to come into this country."[23] Nevertheless, the CR passes the House with Roybal's amendment included.

**December 22, 1987**:  The Senate appropriations bill does not include Roybal's amendment, and the amendment does not survive House-Senate conference negotiations.[24]

**August 23, 1988**:  House Judiciary Committee testimony details the still-large problem of "split-eligibility" families. Vanna Slaughter of Catholic Charities in Texas testifies that about one-third of Catholic Charities' applicants had ineligible family members.[25] Another witness testifies that Slaughter's numbers are "going to be the tip of the iceberg," since many applying have no lawyer and might not know family could qualify for Family Fairness.[26]

**January 20, 1989**:  President George H.W. Bush takes office.

**June 16, 1989**:  INS Commissioner Alan C. Nelson leaves office.

**July 13, 1989**:  The Senate passes immigration legislation.[27] The legislation includes an amendment by Sen. Chafee to protect both ineligible spouses and children from deportation—scaled back from his prior amendment that provided a path to legalization.[28]

Despite Chafee scaling back the amendment, Sen. Simpson repeats his objections based on the Congressional intent behind IRCA.[29] He states that Chafee's amendment "is not quite the same but yet it is," and calls it "a *de facto* second amnesty."[30]

However, Sen. Pete Wilson (R-CA) switches his vote and speaks for Chafee's amendment. Echoing the current debate, Wilson argues that "this country was built on certain values" like the "value of the family unit," and in any event, "we simply do not have the manpower" to enforce the law as written.[31] Chafee's amendment passes 61-38.[32]

Sen. Chafee's office publicly estimates that about 1.5 million family members would be affected, based on several recent immigration reports made available to senators.[33]

**August 1989**:  The INS releases its *Statistical Yearbook 1988*, which provides demographic information on the legalizing individuals whose family members are under debate.[34]

The *Yearbook* reports that INS had received nearly 3.1 million legalization applications.[35] Of those that had applied for legalization by 1988, about 41.5 percent of those seeking general legalization were married, with another 9.8 percent separated, divorced, widowed or unknown. Of those

AR2022_500152

applying for SAW legalization, 42.5 percent were married.[36] Combined, these categories indicate that a large pool of potential Family Fairness applicants exists (i.e. spouses and children of legalizing individuals, whom themselves are ineligible for IRCA).

**August 1989**: Additionally, a California study which surveyed a sample of the legalizing population finds that 68 percent of those applying for general legalization, and 43 percent of SAW applicants, were married. Only 30 percent of those applying for general legalization, and 63 percent of SAW applicants, reported no children living with them.[37]

**October 26, 1989**: New INS Commissioner Gene McNary is sworn into office.

**November 9, 1989**: The House Judiciary Committee's immigration subcommittee holds a hearing on Rep. Bruce Morrison's (D-CT) H.R. 3374, which includes a provision echoing Chafee's amendment to protect both ineligible spouses and children from deportation.[38]

The INS (among others) strongly opposes the provision as creating a "second legalization program contrary to the intent of Congress," and "outside the carefully crafted balance" of IRCA.[39] Other groups support the provision,[40] arguing that individuals are afraid to apply for Family Fairness because the INS would put applicants into deportation proceedings.[41]

The INS' counsel testifies it is "correct" that potentially eligible spouses and children constituted a "lot of people," although he didn't "have the numbers."[42] Now-former INS Commissioner Nelson states "the potential number is obviously enormous."[43] The Director of the Center for Immigration Studies also cites "immense demographic consequences," and that Chafee's provision "would grant de facto residence status to some 1.5 million."[44]

H.R. 3374 does not move forward.

**February 2, 1990**: President Bush's INS now expands Reagan's Family Fairness policy to all ineligible spouses ***and*** children under 18 of legalizing family members, provided they meet certain criteria.[45] The INS also provides them eligibility to apply for work authorization. INS Commissioner McNary noted that Bush's executive policy matched the Senate provisions,[46] even though the House had not yet acted.

The Commissioner also states, "We can enforce the law humanely… To split families encourages further violations of the law as they reunite."[47]

AR2022_500153

The *San Francisco Chronicle* reports that INS officials said the policy "is likely to benefit more than 100,000 people," while the *Washington Post* reports that it could "prevent the deportation of as many as 100,000 illegal aliens."[48] That said, an INS spokesman also said that the number of immigrants affected "may run to a million," and did not dispute large estimates from immigrant advocacy groups.[49] The unpredictability appears to depend on whether immigrants overcome their fear and apply.[50]

**February 6, 1990**:   The *Washington Post* editorial board, among others, applauds INS' expanded Family Fairness policy, calling it "sensible, humane and fair."[51] The Post notes it is "not an extension of amnesty, which would have required legislation," but calls it "in line with traditional policy to favor immigration that reunites families."

**February 6, 1990**:   Senator Chafee applauds Bush's Family Fairness action, which largely mirrored the Senator's own legislative proposal. He says, "Mr. President… the family unit is sacred," and "I am delighted, after four years of hard work, to see this principle triumph through the new Family Fairness guidelines."[52]

**February 8, 1990**:   An INS internal Decision Memorandum to Commissioner McNary states that Family Fairness "provides voluntary departure and employment authorization to potentially millions of individuals," and discusses processing options given the "large workload."[53]

An INS "Draft Processing Plan," also dated this day, states that "current estimates are that greater than one million IRCA-ineligible family members will file for" Family Fairness.[54] The plan calculates the financial resources required to process 1 million applications in 100 workdays.[55]

**February 12, 1990**:   The INS releases Family Fairness processing guidelines. The filing fee for a work authorization application is $35.[56]

**February 21, 1990**:   INS Commissioner McNary testifies before the House Judiciary Committee.[57] McNary states to Rep. Morrison that there are about 1.5 million ineligible family members covered by Family Fairness here in the United States. McNary also states that there are another 1.5 million ineligible family members of the legalizing population, presumably outside the United States.[58]

**February 26, 1990**:   A bulletin reports that the INS statistics office estimates that of the 3.1 million IRCA applicants at that point, 42 percent (1.3 million) were married.[59] The INS conceded that it lacked "reliable data" regarding children.[60] (Using current estimation tools, as many as 600,000 children of IRCA applicants may have been residing in the U.S in 1990).[61]

5

AR2022_500154

The INS also notes that over 740,000 legalization applications are pending or on appeal, and other class-action litigants are suing to legalize as well.[62] Their relatives cannot yet apply for Family Fairness protection.[63] However, once their legalization applications are approved, their family members will be eligible to apply.[64]

**March 5, 1990**:     The *New York Times* reports McNary's February 21 testimony that "as many as 1.5 million illegal aliens could be affected by the new policy."[65]

**March 19, 1990**:    Rep. Morrison introduces legislation which again includes a provision to defer deportations of the Family Fairness relatives.[66]

**September 1990**:    The INS updates its statistics on the legalizing population in its *Statistical Yearbook 1989*.[67] The INS reports that over 3 million have applied for legalization through general provisions or SAW.[68] Of those whom applied for general legalization, 41.2 percent are married, and 9.9 percent are separated, divorced, widowed, or unknown. Of those whom applied for SAW, 41.7 percent are married, and 4.6 percent are separated, divorced, widowed, or unknown.[69] The INS does not report data on children.

**October 27, 1990**:  The House and Senate conference agrees to a combined Immigration Act of 1990, which includes the provisions to defer deportation of the Family Fairness relatives (now called "Family Unity" provisions).[70]

**November 29, 1990**: President Bush signs the combined Immigration Act of 1990.[71] He salutes its "support for the family as the essential unit of society,"[72] and "respect for the family unit."[73] He also issues a signing statement, preserving the "authority of the executive branch to exercise prosecutorial discretion in suitable immigration cases."[74]

Congress' "Family Unity" provisions supersede the executive "Family Fairness" policy, as of Oct. 1, 1991.[75] Those Family Unity provisions are still in place today.[76]

The Immigration Act of 1990 also dramatically increases the number of visas available to spouses and minor children of those with lawful permanent resident status (i.e. a green card).[77]

**1990-1995**:         Although it is unclear how many spouses and children of the legalizing population ultimately apply for the "family fairness" or "family unity" provisions, large numbers likely apply directly for green cards that were made available under the Immigration Act of 1990. For example, the 1995 report of the State Department's Office of Visa Services estimated that spouses or children of those legalized under IRCA represented 80 percent of the 1.1 million applications by immediate relatives of lawful permanent residents, at that time (about 880,000 people).[78]

AR2022_500155

Family Fairness continued through Oct. 1, 1991. As of October 1, 1990, INS had received 46,821 applications.[79] Explanations for low application rates included fear and stringent documentary requirements.[80] As to Family Unity protection, it is unclear how many applied. About 140,000 individuals likely applied for a related "legalization dependent" visa, made available to the class of individuals eligible for Family Unity protection, and outside the normal visa caps.[81] One reason for relatively low rates of application for Family Fairness/Unity protection may be that many decided to apply directly for a green card, rather than making two applications.[82]

## Endnotes

[1] Jeffrey S. Passel, D'Vera Cohn, Jens Manuel Krogstad, and Ana Gonzalez-Barrera. "As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled" Washington, D.C.: Pew Research Center's Hispanic Trends Project (September 2014), http://www.pewhispanic.org/files/2014/09/2014-09-03_Unauthorized-Final.pdf.

[2] The Immigration Reform and Control Act of 1986 (IRCA), P. L. 99-603, at http://www.gpo.gov/fdsys/pkg/STATUTE-100/pdf/STATUTE-100-Pg3445.pdf.

[3] Ibid. Sec. 201, creating new Sec. 245A(a)(2)(A).

[4] Ibid. Sec. 302. IRCA also made legalization possible for certain Cubans and Haitians, *see* Sec. 202, and those whom had entered before 1972, by updating the registry date under INA § 249, *see* Sec. 203.

[5] Charles Kamasaki, *Doubling Down on a Grievous Error* (Dec. 4, 2014), p. 2, *available at* NCLR Blog, *Setting the Washington Post Straight on Executive Action* (Dec. 4, 2014), http://blog.nclr.org/2014/12/04/setting-washington-post-straight-executive-action/.

[6] S. Rep. No. 99-132, 99th Cong., 1 Sess. 343 (1985); *see also Angeles v. Ilchert,* 700 F. Supp. 1048, 1051 (N.D. Cal. 1988) (it is "clear" that "Congress did not intend to extend this legalization program to aliens who entered the United States after January 1, 1982—including the families of legalized aliens."), at http://www.leagle.com/decision/19881748700FSupp1048_11564.

[7] *See* H.Amdt 1291 to H.R. 3810, 99th Cong. (offered Oct. 9, 1986) (amendment, sponsored by Rep. Bill McCollum (R-FL), to strike provisions in the bill permitting aliens who entered this country illegally prior to 1982, and who are otherwise eligible for admission, to apply for temporary resident status. The amendment failed 192-199. Record Vote No. 455.

[8] 64 Interpreter Releases 1191 (Oct. 26, 1987) ("The family unity issue has been an area of serious concern"); Doris M. Meissner & Demetrious G. Papademetriou, *The Legalization Countdown: A Third-Quarter Assessment*, 36 (February 1988) (the family unity issue has become "the most polarized of the disagreements between the government and immigrant advocates"), at http://files.eric.ed.gov/fulltext/ED291836.pdf.

[9] Marita Hernandez, *Qualifying for Amnesty--a House Divided by Law*, Los Angeles Times (May 25, 1987), at http://articles.latimes.com/1987-05-25/news/mn-1459_1_family-unity/3.

[10] 64 Interpreter Releases 1191 (Oct. 26, 1987), citing "Family Unity Called Need of Immigrants," *San Diego Tribune,* August 8, 1987, at C4, col. 1. The diocese said it had analyzed over 6,000 applications.

[11] S. Amdt 894 to S. 1394, 100th Cong., at https://www.congress.gov/amendment/100th-congress/senate-amendment/894.

[12] Record Vote No. 311. https://www.congress.gov/amendment/100th-congress/senate-amendment/894/actions.

[13] 133 Cong. Rec. S13727 et. seq. (Oct. 7, 1987). *See also* ibid. (Sen. Chafee: "this bill passed the Senate 69 to 30.… Frankly, I do not think many of us realize that we are possibly breaking up families in giving this amnesty."); (Sen. Thurmond: "a decision was consciously made to require everyone to qualify individually for the amnesty program.… Simply because one member of the family qualifies does not mean you have to bring in all members of the family. It just does not make sense. That was never the intention of the bill.… Without this requirement I do not believe the amnesty program would have been passed in the first place."); (Sen. Simpson: "indeed the bill did pass

AR2022_500156

the Senate by a better margin than in the House. But the issue of legalization is what I was saying passed the House by only 7 votes.").

[14] 64 Interpreter Releases 1191 (Oct. 26, 1987).

[15] U.S. Immigration and Naturalization Service Commissioner Alan C. Nelson, *Legalization and Family Fairness – An Analysis* (Oct. 21, 1987), at http://www.prwatch.org/files/ins_family_fairness_memo_oct_21_1987.pdf. This contrasts the Washington Post's December 3, 2014 argument that President Bush's executive action "was in step with legislation recently and subsequently enacted by Congress." Washington Post, *President Obama's unilateral action on immigration has no precedent* (Dec. 3, 2014), at http://www.washingtonpost.com/opinions/president-obamas-unilateral-action-on-immigration-has-no-precedent/2014/12/03/3fd78650-79a3-11e4-9a27-6fdbc612bff8_story.html.

[16] Ibid. at pp. 4-5. This was true even for the parents of U.S.-citizen children. Ibid. at p. 5.

[17] Washington Post, *Amnesty Families*, p. A18 (Oct. 27, 1987) (op-ed), at http://pqasb.pqarchiver.com/washingtonpost/doc/306940299.html?FMT=FT.

[18] Senators Alan Cranston, John H. Chafee, Claiborne Pell, Robert T. Stafford, Barbara A. Mikulski, Daniel P. Moynihan, Spark M. Matsunaga, Albert Gore, Jr., and Brock Adams, *Letter to Alan C. Nelson, INS Commissioner* (Oct. 27, 1987), *reported at* 133 Cong. Rec. S15999 et. seq. (Nov. 6, 1987) (statement of Sen. Cranston).

[19] H.J. Res. 395, 100th Cong.

[20] H.J. Res. 395, 100th Cong., Sec. 110; *see also* 133 Cong. Rec. H11996 et. seq. (Dec. 21, 1987) (Rep. Roybal (D-CA) statements).

[21] 133 Cong. Rec. H10900-03, 100th Cong. (Dec. 3, 1987) (Rep. Mazzoli: "Many of you who were here in the 99th and now in the 100th Congresses remember my saying so often that the legalization section of the immigration bill was not meant to be an amnesty but was meant to be a case-by-case examination…. "[I]t goes too far…. [T]hose individuals could be felons. They could be criminals…. under the amendment of the gentleman from California now in the bill, they could not be deported.").

[22] Ibid.

[23] Ibid.

[24] P.L. 100-202 (Dec. 22, 1987); 133 Cong. Rec. H11996 et. seq. Notably, Sen. Orrin Hatch (R-UT) supported the Roybal amendment, in a Dec. 15, 1987 letter. Ibid.

[25] Vanna K. Slaughter, North Texas Immigration Coalition, Hearing, Committee on the Judiciary, House of Representatives, *Family Unification, Employer Sanctions and Anti-Discrimination under IRCA* (Aug. 23, 1988), p. 4, at http://www.loc.gov/law/find/hearings/pdf/00005124906.pdf. Slaughter had analyzed five thousand cases to date. Ibid. "Very few" would benefit from Reagan's policy alone. P. 33.

[26] Fernando Dubove, Assistant Director, Texas Project, National Immigration, Refugee, And Citizenship Forum, Hearing, Committee on the Judiciary, House of Representatives, *Family Unification, Employer Sanctions and Anti-Discrimination under IRCA* (Aug. 23, 1988), p. 92.

[27] S. 358, 101st Cong., 1st session. The legislation passed 81-17. See http://www.senate.gov/legislative/LIS/roll_call_lists/vote_menu_101_1.htm.

[28] Ibid., sec. 108. Sen. Chafee argued that this provision was narrower than his prior amendment. *See* 135 Cong. Rec. S7748 et. seq. (July 12, 1989) (Sen. Chafee: "This is a modest solution… I offered an amendment similar to this in 1987 that was defeated, 55 to 45. But it was different. It was broader than this. That amendment would have granted legal status to the spouses and children of the legalized aliens. There is a lot of difference between granting legal status and what my bill does…. My bill does not confer legal status on the spouse or children who benefit from this legislation. My bill only applies to spouses and minor unmarried children. It does not apply to the whole family of brothers and sisters and cousins and parents.")

[29] 135 Cong. Rec. S7748 et. seq. (July 12, 1989) (Sen. Simpson: "[I] oppose this amendment because to me it disturbs the delicate balance of the 1986 Immigration Reform and Control Act…. In the Judiciary Committee report we stated it very clearly.")

[30] Ibid. ("It does not grant this actual legal status, but, as I say, it grants the thing that is most primed…. I promised all my colleagues during the presentation of the immigration bill over the course of 6 to 8 years that legalization is and will be a one-time-only program.")

AR2022_500157

[31] Ibid. (Sen. Wilson: "[T]he law as it now stands has produced unintended hardship in my State and in many others…. [T]he time has come for us to say if this is to be regarded as such an expansion of amnesty, then so be it…. [L]et us not continue with a situation that is both unworkable, inhumane, and one that does not benefit the present citizens of the United States."); ibid. ("This is ridiculous in the sense that we are talking about setting a standard that cannot be enforced in any case. There is not the ability to enforce the law. The law should not be enforced as it is being proposed by the Senator from Wyoming… it is also… I reemphasize… an unworkable situation now. We simply do not have the manpower to expend but the threat of deportation remains.").

[32] S. Amdt. 244, Record Vote No. 107. *See* Helen Dewar, *Senate Votes Protection for Aliens' Kin*, Washington Post (July 13, 1989), at http://pqasb.pqarchiver.com/washingtonpost/doc/307193985.html.

[33] Josh Getlin, *Senate Acts to Protect Families in Amnesty Plan*, Los Angeles Times (July 13, 1989) (lead of story: "In an action that could affect more than 1.5 million illegal aliens…"), at http://articles.latimes.com/1989-07-13/news/mn-4478_1_family-members.

[34] 1988 Statistical Yearbook of the Immigration and Naturalization Service (August 1989), *available at* http://babel.hathitrust.org/cgi/pt?id=uc1.l0062135033;view=1up;seq=9.

[35] Ibid. at p. xxii (as of May 12, 1989, the INS had received applications from 1,768,089 legalization applicants and 1,301,804 Special Agricultural Worker (SAW) applicants). The *Yearbook* did not report numbers of Cuban-Haitian applicants, nor those whom had entered before 1972. Ibid.

[36] Ibid. at xxii-xxiii.

[37] Comprehensive Adult Student Assessment System, *Highlights: A Survey of Newly Legalized Persons in California* (August 1989), *included in* Hearing, Subcommittee on Immigration, Refugees, and International Law, House Judiciary Committee, *On H.R. 3374* (Nov. 9, 1989), at pp. 127-31.

[38] 101st Cong., H.R. 3374, IRCA Amendments of 1989, Sec. 205 (introduced Sept. 28, 1989), at https://www.congress.gov/bill/101st-congress/house-bill/3374. Sec 205 of Rep. Morrison's bill was broader, in that it applied to spouses and children in the United States as of January 1, 1989, rather than November 6, 1986.

[39] Statement of Paul W. Virtue, Acting General Counsel, U.S. Immigration and Naturalization Service, Hearing, Subcommittee on Immigration, Refugees, and International Law, House Judiciary Committee, *On H.R. 3374* (Nov. 9, 1989), at p. 25; *see also* Prepared Statement, at p. 37 (IRCA "was never intended to place all illegal aliens within a legal status"). Former INS Commissioner Alan C. Nelson testified similarly. Ibid. at p. 171 (Statement of Alan C. Nelson, Former Commissioner, U.S. Immigration and Naturalization Service, Member of the National Board of Advisors and Consultant to the Federation for American Immigration Reform).

[40] *See, e.g.*, Statement of Lavina Limon, Steering Committee Member, Coalition for Humane Immigrant Rights of Los Angeles (CHIRLA), at ibid., pp. 111-12 ("INS under pressure to respond created the family fairness policy, but in our experience it doesn't work.").

[41] Statement of Carolyn Waller, Director, Alien Rights Project, Washington Lawyers' Committee for Civil Rights Under Law (Nov. 9, 1989), at ibid., pp. 216-20.

[42] Ibid. at 48 (Rep. Morrison: "On this issue of minor children and spouses, you would agree that most of the individuals in this class are receiving indefinite voluntary departure?" A: "Although I don't have the numbers, I think that's correct." Rep. Morrison: "Very large numbers…. [I]t's a lot of people?" A: "My sense is that's correct.")

[43] Section 205 "codifies an extraordinary expansion of the amnesty granted by IRCA…. I am aware of no reliable estimate of how many people will be made eligible for amnesty by this section…." [But] "[s]ince over three million illegal aliens were granted legalization by IRCA, the potential number is obviously enormous." Testimony of Alan C. Nelson, Consultant to the Federation for American Immigration Reform, Member, National Board of Advisors, FAIR, and Former Commissioner of the U.S. Immigration and Naturalization Service, *On H.R. 3374* (Nov. 9, 1989), at *ibid.*, p. 179.

[44] Prepared Statement of David Simcox, Director, Center for Immigration Studies (Nov. 9, 1989), at *ibid.*, p. 209-10 ("[T]his proposal would be tantamount to a massive second stage amnesty…"). Simcox also criticized the administrative burden of adjudicating "millions of claims for such status." Ibid. at 210. Simcox argued that Section 205 of Rep. Morrison's bill was broader than Sen. Chafee's provision, and that a recent Center for Immigration Studies study estimated the number of unlegalized spouses and children of legalized aliens, including Special

AR2022_500158

Agricultural Workers, who would settle here if permitted to be 2.6 million. Ibid. at 209-10. CIS called this a "conservative" figure, since it did not include spouses and children acquired subsequent to legalization. Ibid.

[45] INS Commissioner Gene McNary, Memorandum, *Family Fairness: Guidelines for Voluntary Departure under 8 C.F.R. 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) (hereinafter "McNary Memo"). Bush's INS memo built upon Reagan's (see p. 1, referring to 1987 guidelines). The criteria were that the ineligible alien was otherwise admissible, had not been convicted of a felony or three misdemeanors, and had not assisted in persecution. Ibid.

[46] 67 Interpreter Releases 153, 154 (Feb. 5, 1990).

[47] Ibid.

[48] Tim Schreiner, *INS Reverses Policy That Split Alien Families*, San Francisco Chronicle (Feb. 3, 1990), at A1.

[49] Paul Anderson, *New Policy on Illegal Immigrants*, Philadelphia Inquirer (Feb. 3, 1990), at http://articles.philly.com/1990-02-03/news/25883655_1_illegal-immigrants-rick-swartz-american-immigration-reform. The article reported that McNary and his top INS aides "said they could not predict how many dependents would come forward." Ibid.

[50] Schreiner, *supra* note 48. For example, the San Francisco INS deputy district director stated, "I would not expect a big flood of people." He stated that his office had only granted 150 families permission to stay under the previous, narrower family fairness policy. Ibid. Meanwhile, immigrants' rights advocates said the number would increase significantly under the new policy, because districts had been granting Family Fairness only if the applicant was already in deportation proceedings. "People could not come in and apply for it," Charles Wheeler of the National Center for Immigrants' Rights said. "Now they can. This will take the fear out of it." Or, Kip Steinberg, an attorney with the National Lawyers Guild's National Immigration Project, said that many family members had not been applying "because once it was explained to them that they could be deported if they did not qualify, a lot of people were not willing to take the risk." Ibid.

[51] Washington Post, *Amnesty and Compassion* (Feb. 6, 1990), p. A24, at http://pqasb.pqarchiver.com/washingtonpost/doc/307234315.html.

[52] Cong. Record, 101st Cong., (Feb. 6., 1990), p. S929.

[53] Decision Memo to Gene McNary, Commissioner, "*The implementation of the Family Fairness Policy—Providing For Voluntary Departure under 8 CFR 242.5 and Employment Authorization under 8 CFR 274a.12 for the spouses and children of legalized aliens (section 245a and section 210)*" (February 8, 1990), cited in Cong. Record, 113th Cong., H8636 (Dec. 4, 2014), at https://www.congress.gov/crec/2014/12/04/CREC-2014-12-04-pt1-PgH8632.pdf.

[54] T. Andreotta, "Draft Processing Plan RPF Processing of Family Fairness Applications Utilizing Direct Mail Procedures" (Feb. 8, 1990), cited in Cong. Record, 113th Cong., H8635-36 (Dec. 4, 2014), at https://www.congress.gov/crec/2014/12/04/CREC-2014-12-04-pt1-PgH8632.pdf.

[55] Ibid.

[56] Michael T. Lempres, Executive Commissioner, U.S. INS, *Guidelines for Implementation: Family Fairness Policy for Ineligible Spouses and Children of Legalized Aliens* (Feb. 12, 1990), available at 67 Interpreter Releases 204, 230-33 (February 26, 1990).

[57] INS Commissioner Gene McNary, House Committee on the Judiciary, Hearing, *S. 358, H.R. 672, H.R. 2448, and H.R. 2646, Immigration Act of 1989* (Feb. 21, 1990), at

https://www.scribd.com/doc/248088098/Feb-21-1990-hearing-House-subcommittee-on-Immigration.

[58] *See* ibid., p. 49, 52, 56 (Mr. Morrison: "Mr. McNary, you used the number 1.5 million IRCA relatives who are undocumented but who are covered by your family fairness policy. Do I have that number right?" Mr. McNary: "Yes…. We think you are right as to the 1.5 million being here. There is an estimate of another 1.5 million that would come as a result of this change in definition [ED NOTE: through new legislation]… They are not here."] This echoes other estimates of 3 million ineligible relatives of the IRCA-legalized. *Binational Study: Migration Between Mexico and the United States* (1997), p. 10, at https://www.utexas.edu/lbj/uscir/binational/full-report.pdf.

The Washington Post called McNary's testimony a "misunderstanding," based on Commissioner McNary's comments to the paper 24 years later. Washington Post, *President Obama's unilateral action*, *supra* note 15. The Post does not explain the misunderstanding, however. Glenn Kessler, *Obama's claim that George H.W. Bush gave relief to '40 percent' of undocumented immigrants* (Nov. 24, 2014, subsequently revised), at http://www.washingtonpost.com/blogs/fact-checker/wp/2014/11/24/did-george-h-w-bush-really-shield-1-5-million-

AR2022_500159

illegal-immigrants-nope/. Kessler's "Fact Check" refers to the "different category of 1.5 million people," but does not explain that McNary's testimony referred to 1.5 million outside the United States. Ibid.

[59] 67 Interpreter Releases 204, 206 (February 26, 1990). Kamasaki estimates that about 840,000 spouses were likely ineligible. Kamasaki, *Doubling Down, supra* note 5, at p. 2.

[60] 67 Interpreter Releases 204, 206 (February 26, 1990). The bulletin reports that "No one knows how many people *will* apply for the family fairness program" (emphasis added), and that "[i]nformal estimates range from the thousands up to one million." Among the uncertainties are "how many will not apply because of the lack of confidentiality." The bulletin also reports that INS' current "'guesstimate' is that no more than 250,000 aliens will apply for" Family Fairness, without citation. Ibid.

[61] Kamasaki, *Doubling Down, supra* note 5, at p. 2, citing, e.g., Jeanne Batalova, Sarah Hooker, and Randy Capps, *DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action* (Migration Policy Institute: Washington DC, August 2014), at http://www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action. Kamasaki thus estimated that nearly 1.5 million immigrants likely were, in fact, ineligible to legalize but potentially eligible for Family Fairness at that time. Ibid.

Glenn Kessler's Washington Post "Fact Check" omitted children from its analysis, and erroneously argued that the 1.5 million estimate "is a rounded-up estimate of the number of illegal immigrants who were married." Kessler, *supra* note 58. The Post also argued that "no underlying data or methodology to justify the 1.5 million figure has been uncovered." Washington Post, *President Obama's unilateral action, supra* note 15.

[62] 67 Interpreter Releases 204, 205-06 (February 26, 1990). There were several hundred thousand class action litigants at the time. Kamasaki, *Doubling Down, supra* note 5, at p. 2.

[63] Ibid.

[64] Kessler's "Fact Check" erroneously argued that these relatives should be excluded from then-estimates of potential Family Fairness applicants at the time. Kessler, *supra* note 58.

[65] Marvine Howe, *New Policy Aids Families of Aliens*, N.Y. Times (Mar. 5, 1990), at http://www.nytimes.com/1990/03/05/nyregion/new-policy-aids-families-of-aliens.html.

[66] H.R. 4300, Family Unity and Employment Opportunity Immigration Act of 1990, Sec. 104 ("Prohibition of Deportation of Spouses and Children of Legalized Aliens"), 101st Cong., 2d session. As introduced, Sec. 104 applied to those in the United States as of Jan. 1, 1990. Sec. 104(a)(1).

[67] 1989 Statistical Yearbook of the Immigration and Naturalization Service (September 1990), *available at* http://babel.hathitrust.org/cgi/pt?id=uc1.l0055031603;view=1up;seq=15.

[68] Ibid. pp. xxiv-xxv (1,762,143 legalization applications

[69] Ibid.

[70] S. 358, sec. 301, "Family Unity," 101st Cong., 2d session. The final bill applied to those in the United States as of May 5, 1988. Sec. 301(a).

[71] P.L. 101-649, at http://www.justice.gov/eoir/IMMACT1990.pdf.

[72] President George H.W. Bush, *Statement on Signing the Immigration Act of 1990* (Nov. 29, 1990), at http://bush41library.tamu.edu/archives/public-papers/2514.

[73] President George H.W. Bush, *Remarks on Signing the Immigration Act of 1990* (Nov. 29, 1990), http://bush41library.tamu.edu/archives/public-papers/2513.

[74] President George H.W. Bush, *Statement on Signing the Immigration Act of 1990* (Nov. 29, 1990), at http://bush41library.tamu.edu/archives/public-papers/2514.

[75] Sec. 301(g). However, Congress stated that the delayed implementation "shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date." Ibid. President Obama's Office of Legal Counsel argued that this provision evidenced "Congress's implicit approval" of President Bush's executive action to defer deportations, and thus "some indication" of "congressional understandings about the permissible uses of deferred action." U.S. Department of Justice, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* (Nov. 19, 2014), pp. 29-30 & n. 15, available at

AR2022_500160

http://www.justice.gov/sites/default/files/olc/opinions/attachments/2014/11/20/2014-11-19-auth-prioritize-removal.pdf.

[76] United States Citizenship and Immigration Services, *Adjudicator's Field Manual - Redacted Public Version*, *Chapter 24.4, Family Unity Program* (Family Unity program under IMMACT 1990 Sec. 301 "supersedes the administrative Family Fairness Program"); 8 C.F.R. §§ 236.10-18.

[77] Immigration Act of 1990, Sec. 111.

[78] Kamasaki, *Doubling Down, supra* note 5, at 1 (reporting that 80 percent of the 1.1 million applicants for immediate relative visas were spouses and children of those legalized under IRCA, according to a 1995 U.S. State Department report).

[79] David Hancock, *Few immigrants use family aid program*, Miami Herald (Oct. 1, 1990), at 1B (noting that relatively few immigrants had applied for Family Fairness because of fear or documentary requirements).

[80] Ibid.

[81] Immigration Act of 1990, sec. 112 (creating a separate visa category for the spouses and children of the legalizing, and capping those visas at 55,000 per year for FY 1992 through FY 1994). *See The Immigration Act of 1990 and Legal Immigration*, (1994) at Table 4 (reporting 52,272 "legalization dependent" visas in FY 1992, 55,344 in FY 1993, and estimating 34,400 in FY 1994), at https://migration.ucdavis.edu/mn/cir/94report/immact.htm.

[82] Kamasaki, *Doubling Down, supra* note 5, at 1.

AR2022_500161

*Backgrounder*

# Central America's Turbulent Northern Triangle

The U.S. government continues to seek strategies for responding to the growing number of migrants fleeing poverty, violence, and other challenges in the Central American region.

**WRITTEN BY**
Amelia Cheatham *and* Diana Roy

**UPDATED**
*Last updated June 22, 2022 3:20 pm (EST)*

---

## Summary

More than two million people are estimated to have left El Salvador, Guatemala, and Honduras since 2014, many fleeing poverty, violence, and other hardships.

The region's governments have tried various development-centric, tough-on-crime interventions with little success.

U.S. administrations have sought to stem the Northern Triangle's exodus by reducing economic insecurity, violence, and irregular migration.

## Introduction

A rise in migrants coming from a region of Central America known as the Northern Triangle—comprised of El Salvador, Guatemala, and Honduras—has cast a spotlight on a long-suffering part of the world. Governments in the region have made some efforts to mitigate the poverty, violence, and corruption that are driving citizens away, but the problems remain widespread.

Recent U.S. administrations have varied in their responses to the Northern Triangle challenge, which have included changes to foreign aid and immigration policies. So far, the Joe Biden administration has named senior U.S. officials to liaise with Northern

AR2022_500162

Triangle governments, proposed a $4 billion plan to address migration's root causes in Central America, and issued a series of executive orders regarding U.S. immigration and asylum procedures.

## Who is leaving the Northern Triangle, and where are they going?

Migrants, including women and children, continue to flee the troubled region in large numbers. On average, an estimated 407,000 people [PDF] have left annually in recent years, though this number plummeted in 2020 due to border closures and restrictions amid the COVID-19 pandemic.

Why are People Fleeing the Northern Triangle?

But numbers have surged again as many Latin American governments lift border restrictions. Some migrants seek asylum or economic opportunities in other parts of Latin America or in Europe. However, most endure a treacherous journey north

AR2022_500163

7/7/22, 1:50 PM
Case 1:18-cv-00068    Document 610-4    Filed on 11/04/22 in TXSD    Page 164 of 990
Central America's Turbulent Northern Triangle | Council on Foreign Relations

through Mexico to the United States. Hondurans account for the largest share of Northern Triangle migrants intercepted by U.S. border authorities, closely followed by Guatemalans and then Salvadorans.

## Why have so many people fled the region?

Many interrelated factors are driving people from the Northern Triangle, including lack of economic opportunity, environmental challenges, and chronic violence.

The region is among the poorest in the Western Hemisphere. In 2020, all three countries ranked near the bottom for gross domestic product (GDP) per capita among Latin American and Caribbean states. Inequality and indigence have grown amid the pandemic. In July 2021, the Honduran government estimated that more than 73 percent of the country's population lived below the poverty line, with nearly 54 percent living in extreme poverty.

### Scraping By in the Northern Triangle

Gross domestic product (GDP) per capita in Latin American and Caribbean countries, 2020

Bahamas

Saint Kitts and Nevis

Uruguay

Trinidad and Tobago

Barbados

Antigua and Barbuda

Chile

Panama

Costa Rica

Cuba

Grenada

Saint Lucia

Argentina

Mexico

Saint Vincent and the Grenadines

Dominican Republic

Dominica

**AR2022_500164**



Guyana
Brazil
Peru
Ecuador
Colombia
Paraguay
Suriname
Jamaica
Guatemala
Belize
El Salvador
Bolivia
Honduras
Nicaragua
Haiti

$0K    $5K    $10K    $15K    $20K    $25K    $30K

*Source:* World Bank.

COUNCIL *on* FOREIGN RELATIONS

Environmental crises, including a destructive coffee rust and devastating back-to-back hurricanes in 2020, have fueled food insecurity and driven migration. Many households depend on remittances, or money sent home by relatives or friends living and working abroad. Though they dropped early in the pandemic, remittances to Latin America amounted to nearly $135 billion in 2021, a 24 percent increase from the previous year, according to the Inter-American Dialogue, a Washington-based think tank. Remittances to the Northern Triangle made up nearly a quarter of that. Historically, corruption and meager tax revenues [PDF], particularly in Guatemala, have crippled governments' ability to provide social services.

Many of the region's economic problems stem from deep-rooted violence. Decades of civil war and political instability [PDF] planted the seeds for the complex criminal ecosystem that plagues the region today, which includes transnational gangs such as Mara Salvatrucha (MS-13) and the Eighteenth Street Gang (M-18). Critics say that U.S. interventions during the Cold War helped destabilize the region. Homicide rates in the

AR2022_500165

Northern Triangle have been among the world's highest in recent decades. In 2019, Honduras saw its first rise in murders in seven years, though all three countries recorded declines in 2020 due to pandemic-related restrictions.



**Homicide Rates in the Northern Triangle and Surrounding Countries**
Homicides per 100,000 people in 2021

*Source:* InSight Crime.

Women in the region are also fleeing gender-based violence, which the pandemic has exacerbated. As of 2020, El Salvador and Honduras had some of Latin America's highest rates of femicide [PDF], or gender-based murders of women and girls.

AR2022_500166

Looking ahead, experts say that population growth and climate change, which is linked to an increasing number of extreme weather events, could put further strain on Northern Triangle economies, pushing more people to migrate.

## How have Northern Triangle governments attempted to address these problems?

Successive governments have tried various development-centric, tough-on-crime interventions to tackle the region's enduring problems, but they have yielded limited gains.

*Economic instability.* The region's most significant coordinated effort to reduce economic instability has been the U.S.-backed Plan of the Alliance for Prosperity (A4P). Aimed at addressing the drivers of irregular migration, A4P made commitments to increase production, strengthen institutions, expand opportunities, and improve public safety. But its outcomes are disputed and difficult to measure.

GDPs were rising across the Northern Triangle before the pandemic. However, monthslong COVID-19 restrictions paralyzed the vast informal sectors that keep regional economies afloat, fueling poverty and food insecurity. Northern Triangle countries borrowed heavily to roll out support programs, but institutional weaknesses impeded their delivery of aid and public services. The International Monetary Fund (IMF) estimates that they suffered economic contractions of between 1.5 percent and 8.6 percent in 2020.

*Corruption.* Endemic corruption has long been a drag on the region's economies. In 2006, Guatemala and the United Nations agreed to create the International Commission Against Impunity in Guatemala (CICIG), an independent investigatory body that helped convict more than four hundred people, including a sitting president, and contributed to a significant reduction in Guatemala's homicide rate.

In 2019, El Salvador announced its own anticorruption panel, which was backed by the Organization of American States (OAS), a regional bloc. Critics said the body—called the International Commission Against Impunity in El Salvador (CICIES)—had limited

AR2022_500167

power, questionable independence, and opaque inner workings, but it did help uncover mismanagement in pandemic-related government spending. Honduras also established an anticorruption committee with the OAS, known as the Mission to Support the Fight Against Corruption and Impunity in Honduras (MACCIH), and it fired 40 percent of its police as part of sweeping reforms beginning in 2016. However, security forces have continued to violate human rights [PDF] without consequence.

All three countries have backslid on their progress. After CICIG began investigating President Jimmy Morales, he allowed its mandate to expire in 2019, and Guatemalan judicial officials who promote the rule of law have faced retribution. The mandate for Honduras's anticorruption body was likewise left to expire in 2020, months before the country eased penalties for drug trafficking and certain corruption. Graft allegedly exists at the highest levels of the Honduran government: in April 2022, the government extradited former President Juan Orlando Hernandez to the United States to face drug- and weapons-trafficking charges.

Despite launching CICIES, Salvadoran President Nayib Bukele and his administration have similarly faced accusations of graft, and experts warn of rising authoritarianism under the highly popular leader. Since taking office in 2019, Bukele has threatened press freedom, stormed parliament with security forces, defied the Supreme Court, and consolidated power with the help of a ruling party–controlled legislature. In June 2021, his government announced the termination of its deal for CICIES with the OAS.

*Violence.* Beginning in the early 2000s, Northern Triangle governments implemented a series of controversial anti-crime policies that significantly expanded police powers and enacted harsher punishments for gang members.

Though popular [PDF], these policies in most cases failed to reduce crime and may have led to an increase in gang membership. Mass incarcerations increased the burden on already overcrowded prisons, many of which are effectively run by gangs. The U.S. State Department, human rights groups, and journalists have raised concerns about these policies, denouncing poor prison conditions and police violence against civilians.

AR2022_500168

In a change of tactic, Salvadoran President Mauricio Funes brokered a truce in 2012 between the MS-13 and M-18 gangs, which experts credited with halving the country's homicide rate. However, murders skyrocketed after the agreement fell apart in 2014, and the negotiations are faulted for giving the gangs political legitimacy. In 2016, a new tough-on-crime Salvadoran government designated gangs as "terrorist groups," and authorities arrested officials and others who helped arrange the truce. In 2020, Bukele's government was itself accused of negotiating with MS-13. Some experts suspect an undisclosed deal between authorities and gang members contributed to a plunge in homicides that year, though a sudden surge in killings in March 2022 renewed concerns over the Bukele administration's controversial strategy.

COVID-19 restrictions helped temporarily reduce homicides across the Northern Triangle and briefly curtailed revenue for criminal groups. However, experts say these groups quickly adapted to the health crisis, seizing on new opportunities to expand their power.

*Migration.* Regional governments have sought not only to address migration's drivers but also to physically halt migrants on the move. For example, Guatemalan authorities used force to break up a so-called caravan of migrants bound for the United States in January 2021. Guatemala's northern neighbor, Mexico, has sporadically worked to prevent migrants from crossing its southern border, including by deploying thousands of National Guard members to bolster border enforcement.

## What's been the U.S. approach to the Northern Triangle?

Over the past twenty years, the United States has tried to help Northern Triangle countries manage irregular migration flows by fighting economic insecurity and violence. However, critics say U.S. policies have been largely reactive, prompted by upturns in migration to the U.S.-Mexico border.

*Barack Obama administration.* President Obama and Congress isolated the Central America portion of the Merida Initiative, a U.S. assistance program benefiting the region and Mexico, and rebranded it as the Central America Regional Security Initiative (CARSI) [PDF]. Over the years, the U.S. government has budgeted more than $2 billion

AR2022_500169

Case 1:18-cv-00068    Document 610-4    Filed on 11/04/22 in TXSD    Page 170 of 990

in aid through CARSI to help the region's law enforcement, counternarcotics agencies, and justice systems. Midway through his second term, Obama recast the U.S. strategy [PDF] for Central America, forging what was intended to be a more holistic, interagency approach to complement A4P.

After a 2014 upswing in migration from the region, particularly by unaccompanied minors, the administration partnered with Northern Triangle governments on anti-smuggling operations and information campaigns intended to deter would-be migrants. It also cracked down on undocumented immigrants inside the United States. Court-mandated removals during Obama's administration outpaced those under President George W. Bush, totaling about three million. After Mexico, the Northern Triangle countries accounted for the largest shares of Obama-era removals.

*Donald Trump administration.* Trump kept Obama's framework for the region but prioritized stemming migration to the United States and ramping up border security. In 2018, the administration implemented a zero-tolerance policy [PDF] that sought to criminally prosecute all adults entering the United States illegally, which resulted in authorities controversially separating several thousand children from their parents. The administration also sparked criticism for deploying troops and diverting funds to secure the U.S.-Mexico border, as well as for negotiating deals with Mexico and the Northern Triangle governments to send asylum seekers back to countries they traveled through en route to the United States. Of the Northern Triangle governments, only Guatemala's began implementing the agreement, but it suspended the deal in 2020. Trump also sought to end temporary protected status, a program that allows migrants from crisis-stricken countries to live and work in the United States for a period of time, for Hondurans and Salvadorans.

In 2019, the Trump administration began withholding most aid to the Northern Triangle over the region's failure to curb migration; it reportedly reinstated the assistance [PDF] by the following year. However, annual funding for the Obama-era Central America strategy—most of which has gone to Northern Triangle countries—dropped by almost one-third during Trump's presidency.

AR2022_500170

Case 1:18-cv-00068     Document 610-4     Filed on 11/04/22 in TXSD     Page 171 of 990

Apprehensions of Northern Triangle migrants at the U.S. southern border plunged in the early months of the COVID-19 pandemic after soaring in fiscal year 2019. In March 2020, border authorities began expelling most migrants under Title 42, a pandemic-related public health order. Critics say the Trump administration used this and other measures to unnecessarily restrict immigration. Additionally, some observers allege that Trump overlooked governance issues in the Northern Triangle. Weeks before Trump left office, Congress passed legislation championed by Representative Eliot Engel (D-NY) that requires the United States to name and sanction corrupt or undemocratic officials in the region.

*Joe Biden administration.* The Biden administration has taken steps to roll back several Trump-era immigration policies related to the Northern Triangle. Notable among them are: canceling the asylum deals with El Salvador, Guatemala, and Honduras; raising the refugee cap to 125,000; reserving temporary visas for workers from the Northern Triangle; and reinstating an Obama-era program, which Trump discontinued in 2017, that allows eligible children from the region to join their parents already living in the United States. It has also launched a $4 billion plan [PDF] for Central America that seeks to mitigate the root causes of migration.

At the same time, the administration has sought to discourage irregular migration through messaging campaigns; called on Central American and Mexican officials to disrupt migrant flows; and continued to expel migrants—with the exceptions of unaccompanied children and some families and adults—under Title 42. Additionally, the administration has tried to end the controversial Migrant Protection Protocols, but legal setbacks have stalled those efforts.

In March 2021, the Biden administration named Ricardo Zuniga as special envoy for the Northern Triangle and designated Vice President Kamala Harris to lead regional diplomacy aimed at curbing migration to the U.S. southern border. Harris's involvement has so far focused on border enforcement, stimulating private-sector investment, and supporting civil society.

## Recommended Resources

AR2022_500171

This 2021 report [PDF] from the Center for Strategic and International Studies lays out the Northern Triangle's challenges and recommends priorities for Biden's strategy toward the region.

The International Crisis Group discusses how organized criminal groups in the Northern Triangle and Mexico have adapted amid the pandemic.

The Congressional Research Service analyzes the root causes of Central American migration [PDF] and the Biden administration's response.

This Backgrounder examines the debate over how to secure the southern U.S. border.

Former CFR Fellow Paul J. Angelo explains why Central American migrants are arriving at the U.S.-Mexico border.

Will Merrow created the graphics for this Backgrounder. Danielle Renwick and Rocio Cara Labrador contributed to this report.

**For media inquiries on this topic, please reach out to communications@cfr.org.**

AR2022_500172



*INTERNATIONAL* MIGRATION

International Organization for Migration (IOM)

doi: 10.1111/imig.12250

# DACA and the Surge in Unaccompanied Minors at the US-Mexico Border

Catalina Amuedo-Dorantes* and Thitima Puttitanun**

## ABSTRACT

Apprehensions of unaccompanied minors from Central American countries have been on the rise since 2008, but news reports particularly caught up with the increase after 2012. Some politicians posited that the 2012 *Deferred Action for Childhood Arrivals* (DACA) contributed to the surge by creating the expectation that children would be allowed to stay in the country. Immigration advocates, however, believe that the two are not related. Using data on apprehensions of unaccompanied minors by border patrol sector, nationality and year, we find that DACA did not significantly impact those apprehensions. Rather, the 2008 *Williams Wilberforce Trafficking Victims Protection Reauthorization Act*, along with violence in the originating countries and economic conditions in both the countries of origin and the United States, emerge as some of the key determinants of the recent surge in unaccompanied minors apprehended along the southwest US-Mexico border.

## INTRODUCTION

The number of unaccompanied alien children crossing the southern border of the United States has grown drastically since 2008, capturing congressional attention and leading to a number of hearings in the House (Rempdell, 2015). Figure 1 depicts the recent surge in apprehensions of unaccompanied alien children from Mexico, El Salvador, Guatemala, and Honduras. In addition to its growth, it has been noted that the composition of the flow of unaccompanied alien children changed over the time period under consideration. While the vast majority of these children used to come from Mexico, the surge in unaccompanied minors observed in recent years has been dominated by children originating from three other Central American countries: El Salvador, Guatemala, and Honduras.[1] A confluence of factors, including extreme violence, endemic poverty, increasingly sophisticated smuggling networks and the desire to reunite with family members in the United States, have fuelled this growth. Additionally, it has been argued that legislative changes, in particular, the 2008 *Williams Wilberforce Trafficking Victims Protection Reauthorization Act* (TVPRA) of President Bush era and the more recent *Deferred Action for Childhood Arrivals* (DACA) announced by President Obama on 15 June 2012, might have been used by smugglers to sway migrants with false promises that they will be able to stay in the United States once they get into the country (Hing, 2014; Rempdell, 2015). The TVPRA legislated that unaccompanied minors from non-contiguous countries needed to be released into the custody of family or sponsors while they await a deportation hearing in front of a judge, thus enabling children to stay in the United States for what became, in most instances, years. Under DACA, individuals approved for consideration of

---

\* San Diego State University.
\*\* Kasetsart University, Bangkok.

© 2016 The Authors
International Migration © 2016 IOM
*International Migration* Vol. 54 (4) 2016
ISSN 0020-7985

Published by John Wiley & Sons Ltd.



FIGURE 1
APPREHENSIONS OF UNACCOMPANIED MINORS OVER TIME



Source: U.S. Customs and Border Protection (CBP) via a Freedom of Information Act request.

deferred action were granted a renewable two-year reprieve from deportation proceedings and become eligible for work authorization in the United States. Because of the timing of DACA and the publicized surge in unaccompanied minors coming from Central America after 2012, Senator Sessions have called for a vote on DACA suspension.[2]

Yet, so far, we still lack a good understanding of the role that DACA or, for that matter, the TVPRA might have played, if any, on such inflows.

In this article, we explore the determinants behind the recent increase in inflows of unaccompanied alien children from Central America. In particular, given President Obama's second executive order expanding DACA programme, we pay special attention to the effect that DACA might have played on the surge of unaccompanied minors originating from Mexico, El Salvador, Guatemala and Honduras in recent years. Because one of the requirements of DACA involved being present in the United States, DACA might have encouraged undocumented immigration. Additionally, DACA could have stimulated inflows of unauthorized children if it somehow fostered beliefs that other deferred deportation concessions or even permanent amnesties would occur in the future.

Establishing the effect of DACA on the surge of unaccompanied minors is important for several reasons. First, the rapid increase has resulted in children often being held in overcrowded facilities with adult asylum seekers, thus increasing their difficulty in gaining access to proper legal and medical care (Binford, 2013; Stinchcomb and Hershberg, 2014; MPI, 2012). This led President Obama to declare the wave of unaccompanied minors an "urgent humanitarian situation", asking federal agencies to coordinate an emergency response to the situation. Yet an appropriate response requires a good understanding of the root causes for such flows, which we still lack.

Second, since President Obama's new executive order announced on 20 November 2014 extends the eligibility of DACA applicants and grants a *temporary* reprieve from deportation and work permits to parents of US-born or permanent resident children – an initiative currently placed on hold after Judge Hanen's decision to temporarily enjoin its implementation, an in-depth debate on the effect of the original reprieve from deportation offered by DACA will surely follow. Some have alleged that these *temporary* reprieves form deportation increase illegal border crossings. What

AR2022_500174

proof do we have? This analysis will provide some new evidence on the role of such policies in attracting the recent flows of unaccompanied minors.

Finally, there is a substantial number of unauthorized immigrants in the United States. While the stock of undocumented immigrants decreased during the 2008-2009 recession, it is still estimated at approximately 11.2 million (Krogstad and Passel, 2014). Aside from labour market displacement effects, concerns regarding the potential fiscal burdens they impose on state and local governments by increasing their expenditures on health and, in particular, education are one of the main reasons for which natives tend to oppose undocumented immigration (Smith and Edmonston, 1997; Hanson, 2012). Therefore, it is crucial to gain a better understanding of how current policies might be impacting the inflow of unaccompanied minors.

## BACKGROUND

Unaccompanied minors, legally referred to as "Unaccompanied Alien Children", are children under the age of 18 who enter the United States without lawful immigration status and do not have a parent or legal guardian with them to provide care and physical custody. According to a portion of the *William Wilberforce Trafficking Victims Protection Reauthorization Act* (henceforth: TVPRA) of 2008, with the exception of children coming from Mexico and Canada – countries with a border with the United States, unaccompanied minors have to be transferred to the custody of the Office of Refugee Resettlement (ORR) by the US Customs and Border Protection (CBP) within 72 hours. ORR is responsible for holding them "in the least restrictive setting that is in the best interest of the child" until the children can be released to a "suitable family member" in the United States.[3] Children then wait for a proper hearing. Given the increase in deportation hearings from recent years, waiting periods have been known to last for years and, during that time, the children are allowed to stay in the country (Resnick, 2014).

In sum, the 2008 law significantly changed the way in which unaccompanied minors were handled by the Department of Homeland Security (DHS), which had previously removed unaccompanied minors using expedited procedures. The new legislation was accompanied by a surge in the flow of unaccompanied minors from El Salvador, Guatemala and Honduras, worsening the bottleneck in the handling of unaccompanied minors' deportation. The confluence of all these factors led some to conclude that the 2008 TVPRA might have led the increase in inflows from those countries – a deduction supported by Figure 1.

At the same time, others have pointed fingers to President Obama's 2012 executive order offering a reprieve from deportation to unauthorized immigrant childhood arrivals that fulfilled a series of requirements (the *Deferred Action for Childhood Arrivals* or DACA). DACA's roots are closely tied to DREAM Act proposals, which preceded DACA by over a decade. However, the timing and political context in which DACA was announced cannot be overlooked.

DACA did not offer the more permanent immigration status embedded in DREAM Act proposals; rather, it provided qualified individuals with a two-year reprieve from deportation proceedings and the ability to obtain work authorization in the United States. At the expiration of the two-year period, program beneficiaries had to apply for a renewal of their DACA status, with renewals being issued in two-year increments. An individual eligible for DACA had to: (1) be under the age of 31 as of 15 June 2012; (2) have arrived in the United States before reaching his/her 16th birthday; (3) have continuously resided in the United States since 15 June 2007, up until the time of application (4) have been physically present in the United States on 15 June 2012, and at the time of making the request for deferred action with USCIS; (5) have entered without inspection prior to 15 June 2012, or had his lawful immigration status expired by that date; (6) be currently in school, have graduated from high school or obtained an equivalent degree, or have been honourably discharged

from the Coast Guard or Armed Forces of the United States; and (7) have no criminal records or pose a threat to national security or public safety.[4]

As noted above, since the surge in unaccompanied minors somewhat overlapped with the announcement of DACA, some politicians and critics have contended that DACA is primarily responsible for the surge in unaccompanied minors (Hing, 2014; Wolgin and Kelley, 2014; Wong, 2014). They have noted that these young migrants are heading north not just to flee deteriorating economic and security conditions in Central America, but also lured by rumours that they will be granted permission to stay legally and that such rumours originated from DACA.[5] In that vein, the Economist (2014) claimed that a memo from the US Customs and Border Patrol, based on interviews with 230 women and children apprehended in the Rio Grande Valley, concluded that they crossed mainly because they expected to be allowed to stay. Many responses, however, suggest that the surge started before DACA, as appears to be the case in Figure 1. Furthermore, none of the children crossing in or after 2012 would be eligible for DACA.[6] And, indeed, in an interview of over 400 children from Central America by the United Nations High Commissioner for Refugees (UNHCR) regional office for the United States and the Caribbean, only a handful of the children mentioned the rumours of preferential treatment for children or potential immigration reform as a reason for coming to the United States.[7]

Without a real understanding of the factors driving the inflows of unaccompanied minors from Central America, we will not be able to address the root causes of the problem. Therefore, the aim of this article is to explore in a more systematic manner the determinants of unaccompanied minors migration from Central America and Mexico, with a special focus on the role played by DACA, as opposed to other push-and-pull factors.

## BRIEF LITERATURE REVIEW

A number of authors have examined how policies granting permanent legal status via relatively broad amnesty programmes, such as the 1986 Immigration Reform and Control Act (IRCA), have impacted immigration flows.[8] The results from these studies are somewhat mixed. For instance, Bean et al. (1990), and Linder (2011) find that border apprehensions – a proxy for illegal immigration inflows – were significantly lower after IRCA. In contrast, Donato and Sisk (2015), Donato et al. (1992) and Woodrow and Passel (1990) do not. Trying to reconcile these contradictory findings, Orrenius and Zavodny (2003) look at various points in time surrounding the enactment of IRCA and find that apprehensions declined immediately after IRCA, but returned to normal levels soon after.

Studies on how *temporary* reprieves from deportation, such as DACA, affect illegal immigration inflows and, more specifically, child migration are virtually non-existent. Nonetheless, the literature has pointed out some factors they consider relevant in shaping child migration. For example, Bhabha (2008) suggests that, just as the migration of adults, child migration is motivated by traditional push and pull socio-economic factors, including poverty, employment and educational opportunities. Kandel et al. (2014) further add that, in addition to the aforementioned push and pull factors, actual and perceived US immigration policies play a role on child migration to the United States.

In addition, a number of commentary pieces and news reports that are descriptive in nature have zoomed in on unaccompanied minors in particular. For instance, Wong (2014) and Rosenblum and Ball (2016) suggest that violence in the sending countries is mostly responsible for the surge in flows during 2013 and 2014. Chishti and Hipsman (2014) and Hulse (2014) argue that, in addition to violence, child-friendly policies that date back to the TVPRA, have contributed to the upsurge in unaccompanied minors. By contrast, in a recent study Donato and Sisk (2015) argue that, while

violence and poverty underlie migration decisions, they do not predict child migration. Rather, child migration is strongly linked to parents' US experience and period of entry, even though their analysis does not explore the more recent role played by the two policies being discussed here.

In what follows, we formally examine the role that DACA, as opposed to the potential role of the TVPRA and other well-known determinants of immigration flows, might have played in explaining the recent surge in unaccompanied minors. Specifically, as suggested by the aforementioned literature on child migration, we allow for the flow of unaccompanied minors to be impacted by economic conditions back at home and in the host country.[9] In addition, we take into account rampant violence, which often targets young people,[10] as well as the role played by border enforcement and the availability of alternative legal entry methods, as captured by the number of Border Patrol agents in the sector where minors are being apprehended and the number of legal permanent residents admitted yearly, respectively. Most importantly, we account for the role that the passage of the TVPRA, which might have fed rumours that the US government was offering legal status documentation to Central American children, as well as DACA, might have played on the observed increase in apprehensions of unaccompanied children once we condition for all the aforementioned push and pull factors.

## DATA AND DESCRIPTIVE EVIDENCE

We make use of data on apprehensions of unaccompanied minors from Mexico, El Salvador, Guatemala, and Honduras obtained via a Freedom of Information Act request. The dataset spans from 2007 through 2013, the time period for which the US Customs and Border Protection (CBP) made the data available. Unfortunately, CBP does not offer any data from before 2007, which would enhance our ability to evaluate the TVPRA policy more thoroughly. However, it does allow us to address our main purpose, namely to evaluate the role played by DACA in attracting unaccompanied minors. Finally, we use apprehension figures broken down by border patrol sector. In this manner, we are able to address: (a) the lack of higher frequency (monthly or quarterly) data, as well as (b) the large variation in apprehensions across border patrol sectors on account of a number of factors, including their proximity to the railroad (nicknamed "The Beast") on which the children ride throughout Mexico, the availability of crossing networks and coyotes, or the overall degree of difficulty associated with crossing through a particular border point due to its terrain (e.g. mountain or desert) or fencing, to name a few. Indeed, as made evident by the graphs in Figure 2, apprehensions in some border patrol sectors, such as Big Bend, TX and Yuma, AZ, were in the hundreds, whereas apprehensions in Rio Grande Valley, TX were in the thousands, exceeding 20,000 in 2013.[11] Moreover, while some sectors, such as Rio Grande Valley, TX, experienced the largest increases in unaccompanied minor flows, sectors like Yuma, AZ or El Centro, CA, witnessed negligible changes over that time period. In fact, in some sectors (e.g. El Paso, TX), the numbers were declining.

As noted above, a few factors help to explain these differences, but two key elements include geography and border security. Geographically, south Texas is closer to Central America than west Texas, New Mexico, Arizona or California, allowing migrants to minimize the risks of an already treacherous journey. Furthermore, until August 2014, when the Mexican government started to curtail migrants' ability to ride the cargo trains, they were able to get to the border on top of rail cars. In addition to geography, border security is also likely to have also played an important role in the observed differences in unaccompanied minors' flows across border patrol sectors. Border patrolling aside, the Rio Grande Valley sector has the least border fencing within proximity to densely populated areas. This is, in part, due to its terrain – a flood-prone area that makes the building of fencing along its banks extremely costly. Less fencing and proximity to a densely populated area

© 2016 The Authors. International Migration © 2016 IOM**AR2022_500177**

FIGURE 2
APPREHENSIONS OF UNACCOMPANIED MINORS BY BORDER PATROL SECTOR



Source: US Customs and Border Protection (CBP) via a Freedom of Information Act request.

are factors that facilitate the crossing. In sum, for the aforementioned reasons it is essential to account for intrinsic border-patrol differences when modelling unaccompanied minors' apprehensions.

At this point, it is also worth noting that the number of apprehended youth is not the ideal measure of the number of unaccompanied minors who have successfully crossed into the United States or even of the number who have attempted to do so. However, given the generalized practice of turning themselves in to the border patrol agents upon crossing (e.g. American Immigration Council, 2014; Preston, 2014), these numbers are likely to be correlated to the number of illegal crossings by unaccompanied minors –possibly even more so that in the case of overall apprehensions of undocumented immigrants (Bean et al., 1990; Espenshade, 1995). As such, while one might have to be careful in assessing the exact impact of any determinant on those flows, the data can be helpful in identifying the direction of the impact that DACA, versus other factors, might be having on the recent flows of unaccompanied minors.

In addition, we gather information on a number of push and pull factors believed to be responsible for the observed increase in unaccompanied minor apprehensions – including economic and safety characteristics at home vs. in the host country. In particular, data on homicide counts and real GDP per capita of the sending countries is collected from the *United Nations Office on Drugs and Crime Database* and the *World Development Indicators Database*, respectively. Additionally, data on real US median weekly earnings and US unemployment rates are gathered from the Bureau of Labour Statistics website. Finally, as noted in section III, we also include figures on the total number of lawful permanent residents admitted from each country of origin and on the number of border patrol agents by sector along the southwest border of the United States and Mexico, which are collected from the *2007-2013 Yearbooks of Immigration Statistics* at the Department of Homeland Security website and from the US Customs and Border Protection website, correspondingly. A detailed description of the variables used in our analysis can be found in the data appendix.

Although our main purpose, owing to the availability of data, is on DACA, Table 1 displays the summary statistics for the variables used in the analysis before the 2008 TVPRA, after that law

TABLE 1

SUMMARY STATISTICS BY TIME PERIOD

| Variables | Overall (2007-2013) | Pre-TVPRA (2007) | Post-TVPRA & Pre-DACA(2008-2011) | Post-DACA (2012-2013) |
|---|---|---|---|---|
| UAC Apprehensions | 513.246 | 189.139 | 419.833 | 862.125 |
| | (1157.105) | (486.518) | (975.142) | (1583.349) |
| Homicide Count per | 0.09 | 0.054 | 0.094 | 0.098 |
| 100,000 at Origin | (0.076) | (0.022) | (0.077) | (0.086) |
| Real GDP per capita at | 3773.414 | 3772.709 | 3725.95 | 3868.695 |
| Origin | (2645.779) | (2683.923) | (2596.191) | (2758.058) |
| Real U.S. Median | 337.286 | 335 | 339.5 | 334 |
| Weekly Earnings | (4.104) | (0) | (4.168) | (1.007) |
| U.S. Unemployment | 7.669 | 4.617 | 8.41 | 7.713 |
| Rate | (1.74) | (0) | (1.532) | (0.365) |
| LPRs Admitted per | 47.771 | 48.83 | 49.373 | 44.037 |
| Country in 1,000s | (61.4) | (58.66) | (64.7) | (56.394) |
| BP Agents per Sector in | 18.888 | 14.774 | 19.107 | 20.507 |
| 100s | (9.446) | (7.584) | (8.998) | (10.615) |
| No. of Observations | 252 | 36 | 144 | 72 |

Note: UAC Apprehensions Data is by Border Patrol Sector and Fiscal Year.

and before the 2012 DACA, and after DACA. On average, apprehensions of unaccompanied minors were the lowest prior to the implementation of the TVPRA and DACA –averaging 189 across the various southwest border patrol sectors in 2007. Apprehensions doubled during the 2008-2011 period following the TVPRA law and prior to the announcement of DACA in 2012. Then, they doubled again during 2012 and 2013, coinciding with the implementation of DACA.

Also worth noting are the ongoing changes in other potentially responsible push and pull factors. For instance, homicide counts per 100,000 doubled from 2007 to 2008-2011 – a change that could be in part responsible for the large increase in unaccompanied minor apprehensions during that same period. However, the increase took place despite the simultaneous increase in US unemployment rates and the number of border patrol agents per sector along the southwest border, two factors that should have curtailed that surge in unaccompanied minors. Even more puzzling is the sharp rise in the unaccompanied minors during 2012 and 2013 notwithstanding the stability in most of the variables in Table 1 during that time period. What sustained the continued growth in the flow of unaccompanied minors?

In what follows, we thoroughly assess the role that DACA and TVPRA, along with traditional pull and push factors, might have played in explaining the observed changes in apprehensions of unaccompanied minors once we account for a wide range of unobserved fixed and time-varying country of origin and border patrol sector characteristics potentially responsible for the observed changes in flows.

## METHODOLOGY

Our main aim is to gauge the role that DACA, relative to that of prior legislative measures or sending/receiving country characteristics, might have played in the increase in crossings of unaccompanied minors. To that end, we regress the logarithm of unaccompanied minor apprehensions on two dummy variables indicative of the period during which DACA and the TVPRA laws were in place, along with a series of variables capturing the push-and-pull factors discussed earlier. Among the

© 2016 The Authors. International Migration © 2016 IOM**AR2022_500179**

former, we include homicide counts per 100,000 and real GDP per capita in the home country, as well as the number of border patrol agents per sector and year in the United States. Among the pull factors, we include the median real US weekly earnings and unemployment rates, in addition to the number of lawful permanent residents admitted from each of the countries. Our benchmark specification is as follows:

$$\log(UACS)_{bct} = \alpha_0 + \alpha_1 DACA_t + \alpha_2 TVPRA_t + \alpha_3 X_{bt} + Y_t\beta + Z_{ct}\gamma + \delta_b + \theta_c + trend + \delta_b*trend$$
$$+ \theta_c*trend + \varepsilon_{bct}$$

$$(1)$$

where subscript $b$ denotes border patrol sector, $c$ denotes home country of the unaccompanied minors, and $t$ denotes year of apprehension. Our dependent variable is the logarithm of unaccompanied minor apprehensions ($\log(UACS)_{bct}$) from each country per border patrol sector and year, a monotonic transformation that proves convenient in dealing with heteroscedasticity and in transforming a highly skewed variable into one that is more approximately normal. Our key regressors are given by $DACA_t$ and $TVPRA_t$, two dummy variables indicative of when DACA and the TVPRA were in effect. The vector $X_{bt}$ includes information on the number of border patrol agents per sector and year, whereas $Y_t$ accounts for median real weekly earnings and unemployment rates in the United States. (Median weekly earnings are in 1982-1984 constant dollars.) Vector $Z_{ct}$ includes homicide counts per 100,000 and real GDP per capita in the home country, along with data on the number of lawful permanent residents admitted to the United States from each of the four countries of origin. The latter could have influenced the migration of unaccompanied minors if they came to the United States to reunite with other family members with a legal status. Alternatively, if children had migrated illegally prior to the enactment of any of the two laws, an increase in the number of new lawful permanent residents enactment could lower the apprehensions of unaccompanied minors.

Equation (1) also includes a range of border patrol ($\delta_b$) and country of origin ($\theta_c$) fixed-effects to help explain flows of unaccompanied minors, such as proximity to railroad tracks crossing Mexico (e.g. the case of Rio Grande Valley sector), the difficulty associated with crossing through a mountainous or deserted terrain, or a history of high emigration to the United States (e.g. Mexico or El Salvador, owing to political turmoil in the 1980s). Importantly, because of the clear trend in apprehensions of unaccompanied minors exhibited in Figure 1, we include a time trend and also test for serial correlation.[12] One way to address first-order serial correlation is to perform the estimation in first differences. By doing so, however, we inevitably lose the 2007 data and the ability to assess the potential role of the TVPRA law on the flows of unaccompanied minors. Therefore, instead we use Baltagi-Wu's Generalized Least Square method to remove the AR(1) component.[13]

Finally, in addition to a time trend, equation (1) also incorporates border patrol- and country of origin-specific time trends (i.e. ($\delta_b * trend$) and ($\theta_c * trend$), respectively). These are included to address differences in the operability of border patrol sectors, sometimes related to the adoption of specific measures, as in the case of the progressive adoption of Operation Streamline by the various border patrol sectors from 2005 onwards.[14] At other times, differences in the flows of unaccompanied minors by border patrol sector are associated with the changing availability of crossing networks and coyotes through a particular border point. Similarly, countries of origin-specific time trends allow us to account for other time-varying characteristics in the home country, such as fertility rates or policy interventions.

We estimate various model specifications that progressively add the discussed pull and push factors to better gauge their role in shaping flows of unaccompanied minors. This is particularly important in the presence of potentially endogenous regressors, as would be the case with the number of border patrol agents per sector and year (in hundreds). By including it in a stepped manner,

AR2022_500180

110                                      *Amuedo-Dorantes and Puttitanun*

TABLE 2
DETERMINANTS OF UAC APPREHENSIONS

| Key Regressors | (1) Baseline | (2) Plus Fixed Effects and Time Trends | (3) Plus Receiving Country Characteristics | (4) Plus Legal Entries | (5) Plus Enforcement | (6) Plus Sending Country Characteristics | (7) Plus Interaction Term |
|---|---|---|---|---|---|---|---|
| **DACA** | **0.695*** (0.121) | **0.424** (0.174) | 0.177 (0.277) | 0.195 (0.271) | 0.192 (0.272) | 0.290 (0.274) | 0.249 (0.275) |
| **TVPRA** | **0.776*** (0.134) | **0.592*** (0.168) | **0.586*** (0.182) | **0.792*** (0.201) | **0.817*** (0.208) | **0.872*** (0.199) | **0.953*** (0.208) |
| Mexico*TVPRA | – | – | – | – | – | – | –1.213 (0.959) |
| Real U.S. Median Weekly Earnings | – | – | **0.098** (0.039) | **0.100*** (0.039) | **0.100** (0.039) | **0.080* (0.045) | **0.086* (0.045) |
| U.S. Unemployment Rate | – | – | –0.233* (0.039) | –0.266** (0.039) | –0.254* (0.039) | –0.323** (0.045) | –0.357** (0.045) |
| LPRs Admitted per Country in 1,000s | – | – | (0.136) | (0.135) –0.014** (0.135) | (0.137) –0.014** (0.006) | (0.152) –0.015** (0.006) | (0.154) 0.002 (0.015) |
| Border Patrol Agents per Sector in 100s | – | – | – | (0.006) | (0.006) –0.022 | (0.006) –0.026 | –0.032 |
| Homicides per 100,000 at Origin | – | – | – | – | (0.044) | (0.042) 5.856* | (0.042) 10.026** |
| Real GDP per Capita at Origin | – | – | – | – | – | (3.297) –0.002*** | (4.661) –0.002*** |
| BP Sector Fixed Effects | N | Y | Y | Y | Y | (0.001) Y | (0.001) Y |
| Country of Origin Fixed Effects | N | Y | Y | Y | Y | Y | Y |
| Time Trend | N | Y | Y | Y | Y | Y | Y |
| BP Sector-Time Trends | N | Y | Y | Y | Y | Y | Y |

© 2016 The Authors. International Migration © 2016 IOM **AR2022_500181**

*The Surge in Unaccompanied Minors at the US-Mexico Border*                    111

TABLE 2
(CONTINUED)

| Key Regressors | (1) Baseline | (2)Plus Fixed Effects and Time Trends | (3)Plus Receiving CountryCharacteristics | (4)Plus Legal Entries | (5)Plus Enforcement | (6)Plus Sending Country Characteristics | (7)Plus Interaction Term |
|---|---|---|---|---|---|---|---|
| Country of Origin-Time Trends | N | Y | Y | Y | Y | Y | Y |
| $R^2$ | 0.047 | 0.829 | 0.833 | 0.834 | 0.834 | 0.842 | 0.842 |
| Observations | 252 | 252 | 252 | 252 | 252 | 252 | 252 |

Notes: Standard Errors are in Parentheses and are Clustered at the (Country, Border Patrol Sector) Level. The Dependent Variable is the Logarithm of Unaccompanied Alien Children. ***, **, * Denote 1%, 5%, and 10% Levels of Significance, Respectively. Country-of-origin Dummies, Including one for Mexico, are Added to Specifications (2) through (7).

© 2016 The Authors. International Migration © 2016 IOM

we are able to gauge unexpected changes in the estimated impact of DACA potentially driven by its endogenous nature.

## RESULTS

Was DACA responsible, at least in part, for the unprecedented increase in the inflow of unaccompanied alien children in 2012 and 2013? Table 2 explores that question.[15] In the most parsimonious model specification, DACA appears to have augmented apprehensions of unaccompanied minors by as much as 70 per cent. A similar impact is also found for the 2008 TVPRA, which appears to have led to a 78 per cent increase in apprehensions of unaccompanied alien children. These two estimates, however, significantly decrease in magnitude when we include a range of border patrol sector and country of origin fixed effects, along with a time trend and border patrol and country of origin specific time trends. Specifically, the effect of DACA on the apprehensions of unaccompanied minors goes down from 70 per cent to 42 percent, whereas that of the TVPRA drops from 78 per cent to 59 per cent. In fact, as shown in specifications (3) through (7), the impact of DACA effectively becomes indistinguishable from zero when we control for the pull and push factors previously discussed in Table 1. Accounting for median weekly earnings and unemployment rates in the United States further reduces the estimated coefficient for DACA and eliminates its statistical significance. In contrast, the estimated impact of the TVPRA remains practically unchanged and only keeps on growing as we include the remaining controls: lawful entries, border patrol agents by sector and information on economic conditions and violence in the home country.

Our most complete specification (specification 7) adds an interaction term of the TVPRA with the Mexico country dummy. Because the TVPRA specifically targeted minors from countries other than Canada and Mexico, we would expect the 2008 law to have impacted the flow of unaccompanied minors from El Salvador, Guatemala and Honduras, but not the flow from neighbouring Mexico. As such, our expectation is that the estimated coefficients for the TVPRA and its interaction term with the Mexico country dummy would be jointly statistically different from zero and negative, revealing the comparatively larger impact of the 2008 law on the flow of unaccompanied minors from El Salvador, Guatemala and Honduras.

The estimates in specification 7 suggest that DACA does not appear to have a significant impact on the observed increase in unaccompanied alien children in 2012 and 2013. Rather, apprehensions of unaccompanied minors from El Salvador, Guatemala and Honduras have been on the rise since 2008.[16] They practically doubled since the passage of the aforementioned law by the US Congress, probably due to the fact that children from non-neighbouring countries were allowed to stay in the United States, often for years, while awaiting a hearing. In contrast, in relative terms, the TVPRA lowered by approximately 26 per cent apprehensions of unaccompanied minors originating from Mexico, who continued to be returned immediately to their home country following their apprehension via expedited removals.[17]

Other estimates in Table 2 have the expected signs. For instance, a one per cent increase in median weekly earnings in the United States, a highly unusual event given the compression of household incomes since the 1980s, would be associated with a 29 per cent increase in apprehensions of unaccompanied minors.[18] In contrast, a similar one per cent increase in unemployment rates would lower such apprehensions by 2.7 per cent. Additionally, conditions in the home countries also appear to play a significant role in shaping the flow of unaccompanied youth. In particular, a five per cent increase in the count of homicides per 100,000, the equivalent to an additional 445 homicides per year, on average, seems to raise apprehensions of unaccompanied alien children by 4.51 per cent. In contrast, better living conditions back home, as captured by a one per cent higher real

GDP per capita, a mere $37 increase per year, would reduce the aforementioned apprehensions by 7.5 per cent.

In sum, while DACA does not appear to have played a significant role in shaping the recent increases in apprehensions of unaccompanied alien children along the Mexico-U.S. border, the 2008 TVPRA does, along with economic conditions in the United States, plus economic conditions and violence in the originating countries.

## SUMMARY AND CONCLUSIONS

Apprehensions of unaccompanied minors from Mexico and Central American countries had been on the rise since 2008, but news reports particularly caught up with the increase after 2012. The surge in unaccompanied alien children crossing the southwest border brought new attention, most of it negative, to DACA. Some politicians have posited that DACA created the expectation that children would be allowed to stay in the country and, as a result, contributed to the surge. Immigration advocates, however, believe that the two are not related. With the President's executive order from November 20, 2014 expanding DACA and granting a temporary reprieve from deportation and work permits to parents of permanent residents or US born children, currently placed on hold after Judge Hanen's decision to enjoin its implementation temporarily, a careful analysis of the effect of these policy measures is much needed.

Using data on apprehensions of unaccompanied children by border patrol sector, nationality and year, we find that DACA has not had a significant impact on those apprehensions once we account for traditional pull and push factors and a range of unobserved country of origin and border patrol sector time-varying and fixed effects. Rather, the 2008 TVPRA, along with violence in the originating countries and economic conditions both in the origin countries and the United States, emerge as some of the key determinants of the recent surge in unaccompanied minors apprehended along the southwest US-Mexico border. While our findings are bounded by the accessibility of CBP data, a limitation that warrants further analyses were such data made available, we can conclude that the empirical evidence does not support the claim that DACA is responsible for the increase in the flow of unaccompanied alien children.

## ACKNOWLEDGEMENTS

We are grateful to Pia Orrenius and Madeline Zavodny for feedback on an earlier version, and to Nick Santos for assistance in acquiring the data.

## NOTES

1. See http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children for details.
2. See, for instance: http://trailblazersblog.dallasnews.com/2014/07/ted-cruz-pushes-to-undo-2012-deportation-ban-for-young-immigrants.html/
3. 8 USC § 1232. Only recently, in July 2014, H.R. 5079 was introduced to amend the TVPRA and allow for any unaccompanied alien child who is not considered a victim of trafficking or does not have a credible fear of persecution to be: (1) placed in removal proceedings, (2) eligible for voluntary departure at no cost to the child, and (3) provided with access to counsel. Currently, such expedited removal requirements apply only to unaccompanied children from countries that are contiguous to the United States.
4. For greater details, visit the section entitled: "Consideration of Deferred Action for Childhood Arrivals Process" at http://www.uscis.gov

AR2022_500184

5. See, for instance: http://trailblazersblog.dallasnews.com/2014/07/ted-cruz-pushes-to-undo-2012-deportation-ban-for-young-immigrants.html/

6. Nowrasteh (2014) and *LA Times* (2014).

7. http://themigrationist.net/2014/06/25/why-are-unaccompanied-children-fleeing-central-america-and-how-can-the-u-s-and-others-respond/

8. There is also a literature examining the role played by a much broader range of immigration policies, not just those granting legal status, on immigration flows from Latin America. For example, Massey and Pren (2012) suggest that the surge in illegal immigrants from Latin America since 1965 is an unintended consequence stemming from the Bracero Programme, the establishment of a cap on the number of permanent resident visas and stricter enforcement policies.

9. It is worth noting that, while young children may not be thinking about work and other economic aspects, such as wages, when they migrate, older youth – a group that encompasses most of the unaccompanied minors – might. Furthermore, even if they are not thinking about their immediate employment, young children might be swayed by better employment opportunities and overall economic conditions typically linked to better prospects for escaping poverty.

10. In a report for the Advocacy for Human Rights in the Americas, Meyer and Isacson (2015) note how, for example, homicides in El Salvador increased by 57 per cent in 2014 following the collapse of a 2012-2014 gang truce.

11. Because of the distinct magnitude of the flows, we use different scales for the y-axis in the figures in order to see the variation in the flows over time within each sector.

12. Wooldridge (2002)'s test for autocorrelation in panel-data models suggests that we have first-order autocorrelation in all of our specifications in Table 2 at the one per cent level of significance.

13. See details in http://www.stata.com/manuals13/xtxtregar.pdf.

14. We also experimented with including an indicator for Operation Streamline. The latter turned to be collinear with the border patrol specific time trends, which prove more relevant in explaining unaccompanied minor flows. Since our key findings were unaffected by the inclusion of that policy indicator, we opted for keeping the border patrol specific time trends instead. Results using the Operation Streamline indicator are available from the authors.

15. The Baltagi-Wu LBI-statistics in all specifications are around 2 indicating no autocorrelation. As a rough rule of thumb, values below 1 suggests positively autocorrelation, see Sarkisian (n.d.) and Engelhardt and Prskawetz (2009).

16. Our findings are robust to the exclusion of Mexicans from our sample. Results are available from the authors upon request.

17. The impact of the TVPRA on apprehensions of unaccompanied alien children from Mexico is computed as the sum of the estimated coefficients of the TVPRA and the interaction term between TVPRA and Mexico dummy, which are jointly significant at the one per cent level.

18. The marginal effect is computed as: (0.01*$337/week)*100*β, where $337 is the average value of real median weekly earnings in the U.S. as shown in Table 1. Other marginal effects are computed similarly.

## REFERENCES

American Immigration Council

2014    *Children in Danger: A Guide to the Humanitarian Crisis at the Border*. Special Report, July. Washington DC. Available at: http://www.immigrationpolicy.org/sites/default/files/docs/children_in_danger_a_guide_to_the_humanitarian_challenge_at_the_border_final.pdf (accessed 20 July 2015).

Bean, F.D., T.J. Espenshade, M.J. White, and R.F. Dymowski

1990    "Post-IRCA Changes in the Volume and Composition of Undocumented Migration to the United States", in F.D. Bean, B. Edmonston and J.S. Passel (Eds), *Undocumented Migration to the United States*, Santa Monica: RAND: 111–158

Bhabha, J.

2008    "Independent Children, Inconsistent Adults: International Child Migration and the Legal Framework. *UNICEF Discussion Papers*. IDP No. 2008-02.

Binford, W.

2013    "Giving Voice to Unaccompanied Children in Removal Proceedings", *Willamette Journal of International Law and Dispute Resolution*, 34: 34–55.

Chishti, M., and F. Hipsman
  2014    "Dramatic Surge in the Arrival of Unaccompanied Children Has Deep Roots and No Simple Solutions", *Migration Information Source*. Washington, DC: Migration Policy Institute. June 13. Online at: http://www.migrationpolicy.org/article/dramatic-surge-arrival-unaccompanied-children-has-deep-roots-and-no-simple-solutions

Donato, K.M., J. Durand, and D.S. Massey
  1992    "Stemming the Tide? Assessing the Deterrent Effects of the Immigration Reform and Control Act", *Demography*, 29: 139–157.

Donato, K.M., and B. Sisk
  2015    "Children's Migration to the United States from Mexico and Central America: Evidence from the Mexican and Latin American Migration Projects", *Journal on Migration and Human Security*, 3(1): 58–79.

Engelhardt, H., and A. Prskawetz
  2009    "A Pooled Time-Series Analysis on the Relation Between Fertility and Female Employment", *European Demographic Research Papers #0501*.

Espenshade, M.J.
  1995    "Using INS Border Apprehension Data to Measure the Flow of Undocumented Migrants Crossing the U.S.-Mexico Frontier", *International Migration Review*, 29(2): 545–465.

Hanson, G.
  2012    "Immigration and Economic Growth", *Cato Journal*, 32(1): 25–34. Available online at: http://www.cato.org/pubs/journal/cj32n1/cj32n1.html

Hanson, G., and A. Spilimbergo
  2001    "Political Economy, Sectoral Shocks, and Border Enforcement", *Canadian Journal of Economics*, 34(3): 612–638.

Hing, J.
  2014    "Three Myths of the Unaccompanied Minors Crisis, Debunked" ColorLines News for Action, Tuesday, July 1. Online at: http://colorlines.com/archives/2014/07/three_myths_of_the_unaccompanied_minors_crisis.html (accessed 24 November 2014).

Hulse, C.
  2014    "Immigrant Surge Rooted in Law to Curb Child Trafficking", *The New York Times*. Published July 7, 2014. (accessed 8 December 8 2014).

Kandel, W.A., A. Bruno, P.J. Meyer, C.R. Seelke, M. Taft-Morales, and R.E. Wasem
  2014    "Unaccompanied Alien Children: Potential Factors Contributing to Recent Immigration", Congressional Research Service, *CRS Report*, R43628.

Krogstad, Jens M., and Jeffrey S. Passel
  2014    "*5 facts about illegal immigration in the U.S.*" Pew Research Center, Washington DC. Available at: http://www.pewresearch.org/fact-tank/2014/11/18/5-facts-about-illegal-immigration-in-the-u-s/ (accessed 6 December 2014].

Linder, J.
  2011    "The Amnesty Effect: Evidence from the 1986 Immigration Reform and Control Act", *The Public Purpose*, Spring 2011: 13–31.

Los Angeles Times
  2014    "Republicans blame Obama policies for immigration crisis on border" Available at: www.latimes.com/nation/la-na-immigration-border-20140620-story.html

Massey, D.S., and K.A. Pren
  2012    "Unintended Consequences of US Immigration Policy: Explaining the Post-1965 Surge from Latin America", *Population and Development Review*, 38(1): 1–29.

Meyer, Maureen, and Adam Isacson
  2015    "On the Front Lines: Border Security, Migration, and Humanitarian Concerns in South Texas", New WOLA Report on the South Texas Border. Available at: www.wola.org/publications/south_texas_report (accessed 11 January 2016).

MPI/Migration Policy Institute
  2012    "Top 10 of 12: Issue #10: As Migration of Unaccompanied Minors Endures, and in Some Cases Rises, Government Seeks to Respond", Migration Information Source, December 2012. Available at: http://www.migrationinformation.org (accessed 15 September 2014).

© 2016 The Authors. International Migration © 2016 IOM

116                                  *Amuedo-Dorantes and Puttitanun*

Nowrasteh, Alex
  2014    "DACA Did Not Cause the Surge in Unaccompanied Children". Cato At Liberty, July 29, 2014.
          Available at: http://www.cato.org/blog/daca-did-not-cause-surge-unaccompanied-children (accessed
          4 December 2014).
Orrenius, P.M. and M. Zavodny
  2003    "Do Amnesty Programs Reduce Undocumented Immigration? Evidence from IRCA", *Demography*,
          40(3): 437–450.
Preston, J.
  2014    "Migrants Flow in South Texas, as Do Rumors" *The New York Times*. Published June 16, 2014.
          (accessed 1 December 2014).
Rempdell, S.
  2015    "Credible Fears, Unaccompanied Minors, and the Causes of the Southwestern Border Surge",
          *Chapman Law Review, forthcoming 2015*.
Resnick, B.
  2014    "Why We Don't Immediately Send the Border Kids Back", Available at: http://www.nationaljour-
          nal.com/domesticpolicy/why-we-don-t-immediately-send-the-border-kids-back-20140708. (accessed
          12 December 2014).
Rosenblum, M.R., and I. Ball
  2016    "Trends in Unaccompanied Child and Migration from Central America", *Migration Policy Institute*
          Fact Sheet, January 2016.
Sarkisian, N.
  n.d.    "SC706: Longitudinal Data Analysis", Available at: http://sarkisian.net/sc706/fixed.doc (accessed 4
          December 2014).
Smith, J. P., and B. Edmonston, eds.
  1997    *The New Americans*. Washington, DC: National Academy Press.
Stinchcomb, D., and E. Hershberg
  2014    "Unaccompanied Migrant Children from Central America: Context, Causes, and Responses", *Cen-
          ter for Latin American & Latino Studies Working Paper Series No. 7*.
*The Economist*
  2014    "Migration to the United States. Under-age and on the move. A wave of unaccompanied children
          swamps the debate over immigration" Available at: http://www.economist.com/news/briefing/
          21605886-wave-unaccompanied-children-swamps-debate-over-immigration-under-age-and-move.
Wolgin, Philip E., and Angela Maria Kelley
  2014    "5 Things You Need to Know About Unaccompanied Children", *American Progress*. Online at:
          https://www.americanprogress.org/issues/immigration/news/2014/06/18/92056/5-things-you-need-to-
          know-about-the-unaccompanied-minors-crisis/ (accessed 24 November 2014).
Wong, T.K.
  2014    "Statistical Analysis Shows that Violence, Not Deferred Action, Is Behind the Surge of Unaccom-
          panied Children Crossing the Border", *American Progress*. Online at: https://www.american-
          progress.org/issues/immigration/news/2014/07/08/93370/statistical-analysis-shows-that-violence-not-
          deferred-action-is-behind-the-surge-of-unaccompanied-children-crossing-the-border/ (accessed 24
          November 2014).
Woodrow, K.A., and J.S. Passel
  1990    "Post-IRCA Undocumented Immigration to the United States: An Assessment Based on the June
          1988 CPS. in F.D. Bean, B. Edmonston and J.S. Passel (Eds), *Undocumented Migration to the
          United States: IRCA and the Experience of the 1980s*, Washington, DC: Urban Institute Press: 33–
          75.
Wooldridge, Jeffrey
  2002    *Econometric Analysis of Cross Section and Panel Data*. Cambridge. MA: MIT Press.

AR2022_500187

DATA APPENDIX

TABLE A

VARIABLE NAMES, DEFINITIONS AND SOURCES

| Variable Name | Definition | Source |
|---|---|---|
| *Dependent Variable:* Unaccompanied Alien Children | Number of apprehensions of unaccompanied children by border patrol sector, nationality and year. We work with 9 border patrol sectors: Big Bend, TX; Del Rio, TX; El Centro, CA; El Paso, TX; Laredo, TX; Rio Grande Valley, TX; San Diego, CA; Tucson, AZ; Yuma, AZ; 4 countries of origin: Mexico, El Salvador, Guatemala, Honduras; and 7 years of data spanning from 2007 through 2013. | U.S. Customs and Border Protection (CBP) via a Freedom of Information Act request. |
| *Regressors:* DACA | Dummy variable equal to 1 after DACA was in effect. | U.S. Citizenship and Immigration Services Website:http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca |
| TVPRA | Dummy variable equal to 1 after TVPRA was in effect. | U.S. Department of State Website: http://www.state.gov/j/tip/laws/113178.htm |
| Mexico | Dummy variable equal to 1 when the unaccompanied alien children apprehended were from Mexico. | U.S. Customs and Border Protection (CBP) via a Freedom of Information Act request. |
| Real U.S. Median Weekly Earnings | U.S. median weekly earnings in 1982-1984 U.S. dollars. | Bureau of Labor Statistics Website: http://www.bls.gov/cps/cpswktabs.htm |
| U.S. Unemployment Rate | U.S. average unemployment rate. | Bureau of Labor Statistics Website: http://data.bls.gov/timeseries/LNS14000000 |
| LPRs Admitted per Country in 1000s | Total number of Lawful Permanent Residents (LPRs) admitted to the United States from each country in thousands. | 2007-2013 Yearbooks of Immigration Statistics at the Department of Homeland Security website: http://www.dhs.gov/yearbook-immigration-statistics |
| Border Patrol Agents per Sector in 100s | Total number of border patrol agents by border patrol sector in hundreds. | U.S. Customs and Border Protection website: http://www.cbp.gov/sites/default/files/documents/BP%20Staffing%20FY1992-FY2014_0.pdf |
| Homicide per 100,000 at Origin | Homicide rate per 100,000 in the country of origin. | United Nations Office on Drugs and Crime Database. |
| Real GDP per Capita at Origin | Real GDP per capita of the country of origin in 2005 U.S. dollars. | World Development Indicators Database. |

© 2016 The Authors. International Migration © 2016 IOM

**AR2022_500188**

Copyright of International Migration is the property of Wiley-Blackwell and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# Factors Associated With Medical School Graduates' Intention to Work With Underserved Populations: Policy Implications for Advancing Workforce Diversity

Andrea N. Garcia, MD, MS, Tony Kuo, MD, MSHS, Lisa Arangua, MPP, and Eliseo J. Pérez-Stable, MD

## Abstract

**Purpose**
Given projected U.S. physician shortages across all specialties that will likely impact underserved areas disproportionately, the authors sought to explore factors most correlated with medical school graduates' intention to work with underserved populations (IWUP).

**Method**
Data from the 2010–2012 Association of American Medical Colleges Medical School Graduation Questionnaire (n = 40,846) were analyzed. Variables (demographics, career preference, debt burden, intention to enter loan forgiveness programs) were examined using chi-square tests and logistic regression models.

**Results**
Respondents included 49.5% (20,228/40,846) women, 16.6% (6,771/40,837) underrepresented minorities (URMs), and 32.4% (13,034/37,342) with primary care intent. The median educational debt was $160,000. Respondents who were women (adjusted odds ratio [aOR] 1.59, 95% confidence interval [CI] 1.49, 1.70), URMs (aOR 2.50, 95% CI 2.30, 2.72), intended to enter loan forgiveness programs (aOR 2.44, 95% CI 2.26, 2.63), intended to practice primary care (aOR 1.65, 95% CI 1.54, 1.76), and intended to emphasize nonclinical careers (aOR 1.23, 95% CI 1.11, 1.37) had greater odds of reporting IWUP. Among those who chose specialties and careers with a nonclinical emphasis, and among those with greater burdens of educational and consumer debt, URMs were nearly twice as likely as other minorities and whites to report IWUP.

**Conclusions**
Findings suggest physician characteristics that may be associated with filling workforce gaps in underserved areas. Restructuring financial incentive programs to support physician leaders and specialists with characteristics associated with IWUP may complement similar policies in primary care and could have key impacts on health equity in underserved areas.

Downloaded from http://journals.lww.com/academicmedicine by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IlQrHD3i3D0OdRyi7TvSFl4Cf3VC1y0abggQZXdgwtfKZBYtws= on 05/12/2021

As more Americans enroll in health insurance plans under the Patient Protection and Affordable Care Act against the backdrop of a predicted physician shortage by 2030,[1] there is a call to action to recruit physicians to serve in Medically Underserved Areas and Health Professional Shortage Areas in the United States.[2,3] Although institutional, state, and national policies exist to increase the primary care workforce,[4–10] little effort has been focused on improving access to specialty and subspecialty care, which are

Please see the end of this article for information about the authors.

Correspondence should be addressed to Andrea N. Garcia, Division of Chronic Disease and Injury Prevention, Los Angeles County Department of Public Health, 3530 Wilshire Blvd., Suite 800, Los Angeles, CA 90010; telephone: (310) 794-2507; e-mail: agarcia@ph.lacounty.gov.

Written work prepared by employees of the Federal Government as part of their official duties is, under the U.S. Copyright Act, a "work of the United States Government" for which copyright protection under Title 17 of the United States Code is not available. As such, copyright does not extend to the contributions of employees of the Federal Government.

Acad Med. 2018;93:82–89.
First published online September 14, 2017
doi: 10.1097/ACM.0000000000001917

lacking in urban and rural underserved areas[11–15]—despite the roughly two-thirds majority of specialists among physicians in current practice nationwide.[16] Compounding this problem are the trends of fewer U.S. medical school graduates intending to pursue full-time clinical practice; more graduates choosing specialization; and more young physicians heading into alternative careers (e.g., academic appointments, research, government positions).[17–19] How these trends will affect medical school graduates' decisions to work with medically underserved populations remains largely uncharacterized.

Although it is well established that underrepresented minority (URM) physicians are more likely to practice in underserved areas compared with non-Hispanic white physicians,[20–22] little is known about URM physicians who decide to pursue non-primary-care career paths. One California study found that URM physicians who specialized were more likely to work in underserved areas than their white counterparts[23]; however, other factors mediating this workforce distribution were not fully examined. Independent of race/ethnicity, there

are conflicting studies on the impact of debt on career preferences[24–30]; in most cases, these studies have not addressed intention to work with underserved populations (IWUP). A systematic review published in 2009 found that financial incentive programs have placed large numbers of health professionals in underserved areas, but the authors were unable to conclude whether this was due to the incentive programs or self-selection by participants.[24]

Given the projected physician shortages that will likely impact underserved areas disproportionately, we sought to explore key factors that may affect medical school graduates' IWUP, including URM status, career preference (e.g., primary care or specialty care, clinical or nonclinical paths), debt burden, and intention to enter loan forgiveness programs after medical school graduation. We hypothesized that regardless of career preference and debt burden, URMs would be more likely to report IWUP and plan to take advantage of loan forgiveness programs when compared with other minorities and whites. Through our analysis of the Association of American Medical Colleges (AAMC)

2010–2012 Medical School Graduation Questionnaire (GQ) dataset, we sought to provide information that is relevant to the workforce and can help inform policies that support equitable distribution of physicians, including specialists and those in key leadership roles, in the most underserved areas across the United States.

## Method

### Data source and survey design

The GQ is an annual, nationally representative Internet-based survey administered by the AAMC to graduating students at U.S. MD-granting medical schools. The GQ contains questions relevant to our analysis, including items on debt burden upon graduation, career preferences, and race/ethnicity. Survey participation is voluntary and classified as confidential, and some medical schools provide incentives for participation. Our analysis focused on combined deidentified data from the 2010–2012 GQ surveys (n = 40,846 respondents). The study protocol was reviewed and deemed non-human-subjects research and exempted by the University of California, San Francisco Institutional Review Board.

### Outcome variable

IWUP was identified by a "yes" response to the item "Do you plan to locate your practice in an underserved area?" (n = 11,330) and/or to the question "Regardless of location, do you plan to care primarily for an underserved population?" (n = 6,712). Respondents with missing, unknown, or conflicting responses to these questions were cross-checked using responses to a third question: "If yes, what location do you plan to practice? Inner city, rural, other." Any response to this question—which was a follow-up to "Do you plan to locate your practice in an underserved area?"—was considered an affirmatory answer for IWUP. By this process, we identified a total of 13,034 respondents who indicated IWUP. Although the GQ questions have changed slightly throughout the years, prior studies have used this outcome measure, and we compared the consistency of results across other AAMC surveys including the Matriculating Student Questionnaire (MSQ), which uses the same IWUP questions.[31,32]

### Descriptive and independent variables

We analyzed demographic variables including gender and race/ethnicity. We defined URM status by combining the 2003 AAMC definition of URM with the 2004 AAMC definition of underrepresented in medicine[33]: African American, Mexican American, mainland Puerto Rican, American Indian or Alaska Native, Native Hawaiian or other Pacific Islander, Cuban, Commonwealth Puerto Rican, other Hispanic/Latino, Vietnamese, Filipino, and other Southeast Asian. Respondents who self-identified as URMs accounted for 16.6% (6,771/40,837) of the study sample. Non-URM and nonwhite respondents, hereon referred to as other minorities (18.9%; 7,710/40,837), included those who self-identified as other Asian, Chinese, Korean, Japanese, Indian/Pakistani, Asian Indian, and Pakistani. Respondents who self-identified as white and not Hispanic/Latino were categorized as white (64.5%; 26,356/40,837). Because respondents could choose multiple races, we classified those who chose a combination of URM, other minority, and/or white as the least populous group. For example, if a respondent chose African American, Chinese, and white, we classified that respondent as URM. We excluded cases where race and Hispanic/Latino ethnicity responses were both missing (n = 9). If the respondent chose white and Hispanic/Latino ethnicity, we classified the individual as URM. If race was missing but the respondent indicated he or she was not Hispanic/Latino, we classified the individual as white.

We grouped career preference into two dichotomous variables: specialty (primary care career or specialty career) and type of practice (clinical emphasis or nonclinical emphasis). *Primary care career* was defined as family medicine, general internal medicine, general pediatrics, and internal medicine/pediatrics. *Specialty career* was defined as any non-primary-care specialty (e.g., neurology, radiology, surgery). Respondents who answered "No" or "Undecided" to the question "Are you planning to become board certified in a specialty?" were excluded from the analysis (approximately 15% of the sample). We did not consider future intention of a fellowship after residency as indicating a specialty because one may still practice family medicine, for instance, after a fellowship.

*Nonclinical emphasis* was defined as indicating medical or health care administration without practice, a state or federal government agency, full-time basic science teaching or research, or nonuniversity research scientist, or as choosing "other" without specifying a scope of practice. *Clinical emphasis* included full- or part-time practice whether as academic faculty or in nonacademic, hospital, salaried, or solo practice. Respondents who answered "undecided" to the item "Indicate your career intention from the different activities listed below" were excluded from the analysis.

We grouped debt burden into two categorical variables: educational debt and consumer debt. *Educational debt* level was defined as any undergraduate loan debt plus medical school loan debt. *Consumer debt* level was based on the response to the question "Please enter in the total amount of noneducational, consumer debt that you are legally required to repay. Note: Do not include home mortgage debt." For simplicity, a three-tiered categorical variable was constructed for each type of debt and categorized based on median debt levels and obtaining even distributions. *Intention to enter loan forgiveness programs* was based on a "yes" response to the question "Do you plan to enter into a loan forgiveness program?"

*Dual advanced degree* was defined as any of the following combinations of degree programs completed upon graduation: MS–MD, MD–JD, MD–PhD, MD–other, MA–MD, MD–MBA, MD–MPH, MD–MPA, or MD–DDS.

### Statistical analysis

We estimated proportional differences in outcome of IWUP by gender, URM status, dual advanced degree, career preference (using two variables: specialty and type of practice), debt burden (using two variables: educational debt and consumer debt), and intention to enter loan forgiveness programs. Chi-square tests were used to test whether the differences in proportions were statistically significant. We ran multivariable logistic regression models to determine whether any of the independent (predictor) variables were independently associated with IWUP. In all models, IWUP was regressed on

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 192 of 990

gender, URM status, career preference, dual advanced degree, and debt burden. In Model 2, we examined the additional effects of intention to enter loan forgiveness programs. We constructed additional models (not shown) to test interaction terms: between URM status and educational debt level, and URM status and intention to enter loan forgiveness programs. Analyses were conducted using STATA version 12.1 (StataCorp, College Station, Texas).

## Results

Of the 2010–2012 GQ respondents (n = 40,846), 49.5% (20,228/40,846) were women, 16.6% (6,771/40,837) were URMs, and 32.4% (13,034/37,342) intended to practice primary care. The median educational debt owed was $160,000.

### Factors associated with IWUP

Table 1 presents the proportions of respondents who reported IWUP by demographic and other characteristics. By gender, 41.5% (7,699/18,561) of women compared with 28.4% (5,335/18,781) of men reported IWUP. By URM status, 54.8% (3,327/6,071) of URMs reported IWUP compared with 29.1% (2,006/6,889) of other minorities and 31.6% (7,698/24,376) of whites. IWUP was reported by 41.2% (4,179/10,142) of respondents who intended to enter a primary care career compared with 27.6% (5,832/21,151) of those who intended to pursue a specialty career. Of those who intended to pursue careers with a nonclinical emphasis, 39.1% (1,335/3,418) reported IWUP, whereas 35.4% (9,911/27,979) of those who planned to practice clinical medicine reported IWUP. There appeared to be a dose-response pattern for educational debt and IWUP, whereby a greater proportion of respondents with higher debt levels reported IWUP. Likewise, greater proportions of those with consumer debt levels ≥ $10,000 reported greater IWUP. Finally, of the respondents who reported intention to enter loan forgiveness programs, 53.9% (5,415/10,047) reported IWUP.

### Patterns in IWUP by URM status

Figure 1 depicts the proportions of respondents who reported IWUP by career preference and URM status. Across each career type, greater proportions of

## Table 1

**Intention to Work With Underserved Populations (IWUP) Among 2010–2012 AAMC Medical School Graduation Questionnaire Respondents (n = 40,846), by Demographic and Other Characteristics**

| Independent variable (n; N)[a] | IWUP reported,[b] n (%) | P value |
|---|---|---|
| **Gender (37,342; 40,846)** | | < .001 |
| Women | 7,699/18,561 (41.5) | |
| Men | 5,335/18,781 (28.4) | |
| **URM status (37,336; 40,837)** | | < .001 |
| URM[c] | 3,327/6,071 (54.8) | |
| Other minority[d] | 2,006/6,889 (29.1) | |
| White | 7,698/24,376 (31.6) | |
| **Degree type (37,342; 40,846)** | | < .001 |
| MD | 12,354/35,111 (35.2) | |
| Dual advanced degree (e.g., MD–PhD, MD–MPH) | 680/2,231 (30.5) | |
| **Specialty (31,293; 31,444)** | | |
| Primary care career[e] | 4,179/10,142 (41.2) | |
| Specialty career[f] | 5,832/21,151 (27.6) | |
| **Type of practice (31,397; 31,425)** | | < .001 |
| Clinical emphasis | 9,911/27,979 (35.4) | |
| Nonclinical emphasis | 1,335/3,418 (39.1) | |
| **Educational debt[g] (28,650; 28,679)** | | < .001 |
| ≤ $49,999 | 1,618/5,873 (27.6) | |
| $50,000–199,999 | 4,902/13,691 (35.8) | |
| ≥ $200,000 | 3,450/9,086 (38.0) | |
| **Consumer debt[h] (28,127; 28,165)** | | < .001 |
| ≤ $9,999 | 7,726/22,922 (33.7) | |
| $10,000–19,999 | 1,196/3,086 (38.8) | |
| ≥ $20,000 | 817/2,119 (38.6) | |
| **Intention to enter loan forgiveness programs (37,088; 37,132)** | 5,415/10,047 (53.9) | < .001 |

Abbreviations: AAMC indicates Association of American Medical Colleges; URM, underrepresented minority; MPH, master of public health.

[a]n = Number of respondents who answered both predictor and outcome variable questions; N = total number of respondents who answered the predictor variable question.

[b]IWUP was identified by a "yes" response to the item "Do you plan to locate your practice in an underserved area?" and/or to the question "Regardless of location, do you plan to care primarily for an underserved population?"

[c]URM was defined as self-identification as African American, Mexican American, mainland Puerto Rican, American Indian or Alaska Native, Native Hawaiian or other Pacific Islander, Cuban, Commonwealth Puerto Rican, other Hispanic/Latino, Vietnamese, Filipino, and other Southeast Asian.

[d]Other minority was defined as self-identification as other Asian, Chinese, Korean, Japanese, Indian/Pakistani, Asian Indian, and Pakistani.

[e]Primary care career was defined as family medicine, general internal medicine, general pediatrics, and internal medicine/pediatrics.

[f]Specialty career was defined as any non-primary-care specialty (e.g., neurology, radiology, surgery).

[g]Educational debt includes both undergraduate and medical school loan debt.

[h]Consumer debt does not include mortgage debt.

URMs reported IWUP compared with other minorities and whites. Nearly 63% (1,079/1,723) of URMs who chose primary care careers reported IWUP compared with 33.5% (642/1,916) of other minorities and 37.8% (2,457/6,501) of whites. Nearly twice the proportion of URMs who chose specialty careers reported IWUP (46.4%; 1,530/3,299) compared with other minorities

(22.8%; 859/3,764) and whites (24.4%; 3,442/14,086). Even among URMs who chose careers with a nonclinical emphasis, 56.8% (370/651) reported IWUP.

Among respondents who reported intention to enter loan forgiveness programs (data not shown), nearly half (49.3%; 4,974/10,095) indicated they would pursue Public Service Loan

AR2022_500192



**Figure 1** Percentage of respondents with intention to work with underserved populations (IWUP) by career preference and underrepresented minority (URM) status, 2010–2012 Association of American Medical Colleges Medical School Graduation Questionnaire (n = 40,846 medical school graduates). *$P < .001$ for within-group estimates.

Forgiveness (PSLF). Other programs indicated by respondents included the National Health Service Corps (NHSC; 10.7%; 1,080/10,095); the Indian Health Service (IHS, which is responsible for American Indian and Alaska Native health in the United States; 1.1%; 110/10,095); other hospital programs (e.g., sign-on bonus; 14%; 1,408/10,095); and state programs (12.9%; 1,306/10,095).

Figure 2 illustrates the effects of educational debt, consumer debt, and intention to enter loan forgiveness programs on IWUP by URM status. The graph suggests a dose–response pattern between increasing educational debt and IWUP, regardless of URM status. Even at the highest levels of educational debt (≥ $200,000) and of consumer debt (≥ $20,000), the proportion of URMs who reported IWUP was nearly twice that of other minorities and whites. Intention to enter loan forgiveness programs alone seemed to draw the highest proportion of respondents who reported IWUP: 70.2% (1,600/2,280) of URMs, 46.1% (624/1,355) of other minorities, and 49.8% (3,190/6,411) of whites. In a subanalysis (data not shown), a



**Figure 2** Percentage of respondents with intention to work with underserved populations (IWUP) by debt levels, intention to enter loan forgiveness programs, and underrepresented minority (URM) status, 2010–2012 Association of American Medical Colleges Medical School Graduation Questionnaire (n = 40,846 medical school graduates). *$P < .001$ for within-group estimates.

significantly greater proportion of URMs (86.1%; 4,222/4,901) had higher educational debt levels (debt ≥ $50,000) compared with other minorities (70.1%; 3,587/5,120) and whites (80.3; 14,987/18,654), $P < .001$. Similarly, a significantly greater proportion of URMs (10.7%; 516/4,840) had higher levels of consumer debt (≥ $20,000) compared with other minorities (3.5%; 171/4,900) and whites (7.8%; 1,433/18,421), $P < .001$.

**Predictors of IWUP: Multivariable models**

Table 2 presents two multivariable logistic regression models and corresponding adjusted odds ratios after controlling for different factors (independent variables) that may affect or predict IWUP. In both models, women, URM, primary care career, and nonclinical emphasis were strongly predictive of IWUP. Model 1 showed an association between increasing educational and consumer debt and IWUP. However, when intention to enter loan forgiveness programs was added into Model 2, the association between educational and consumer debt and IWUP disappeared. Having a dual advanced degree was predictive of not reporting IWUP in either model. In Model 2, women had 1.59 odds (95% confidence interval [CI] 1.49, 1.70) of reporting IWUP compared with men. URMs had 2.50 odds (95% CI 2.30, 2.72) of reporting IWUP compared with whites, even after controlling for debt burden, intention to enter loan forgiveness programs, gender, dual advanced degree, and career preference. These adjusted odds ratios comparing (1) women with men and (2) URMs with whites are somewhat similar to those reported in a prior study using 1996–2000 AAMC MSQ data that identified predictors of matriculating medical students' plans to practice in underserved areas upon graduation.[31] Respondents who indicated a preference for primary care careers had 1.65 odds (95% CI 1.54, 1.76) of reporting IWUP compared with those planning to go into specialty careers. Those who indicated a nonclinical emphasis to their careers had 1.23 odds (95% CI 1.11, 1.37) of reporting IWUP compared with those who indicated a clinical emphasis. Both models appeared to fit the data reasonably well given that the Hosmer–Lemeshow goodness-of-fit tests were not statistically significant.

When the models were stratified by intention to enter loan forgiveness programs, the associations between women, URM, primary care career, and IWUP were statistically significant (data not shown). Logistic regression models stratified by URM status yielded similar results. Logistic regression models were also run with only complete cases, and the results were essentially identical (data not shown). A chi-square test between intention to enter loan forgiveness programs and IWUP was statistically significant ($P < .001$). Null findings from the analyses included interaction terms between URM status and educational debt, and URM status and intention to enter loan forgiveness programs ($P$ values not statistically significant).

**Discussion**

To the best of our knowledge, this study using 2010–2012 AAMC GQ data is the first study to show that greater proportions of U.S. medical school graduates who were women, self-identified as URMs, intended to enter loan forgiveness programs after graduation, chose primary care careers, and preferred a nonclinical career path reported IWUP, compared with those who did not have these characteristics. There was no association between debt burden and IWUP after controlling for intention to enter loan forgiveness programs. This finding counters a common perception that a large debt burden is a primary reason for medical school graduates not to work with underserved populations.[34] Equally important, among those who chose specialty careers and careers with a nonclinical emphasis, URMs were nearly twice as likely as other minorities and whites to report IWUP. Among those with greater burden of educational and consumer debt, URMs were nearly twice as likely as other minorities and whites to report IWUP. This illuminates a disparity in educational and consumer debt by URM status—a disparity that is present despite URMs' intentions to fill critical workforce gaps.

Given the nature of most loan forgiveness programs that require service in underserved areas (e.g., PSLF, IHS, NHSC), the association between intention to enter loan forgiveness programs and IWUP was expected. However, our analysis provides

valuable insights into how to better identify physicians who will work with underserved populations, regardless of career choice. Our findings can inform future efforts in restructuring financial incentive programs that could potentially support specialists and physician leaders with personal characteristics associated with IWUP. Such restructuring is particularly important given the projected nationwide specialist physician shortages of 33,500 to 61,800 by 2030.[1] As an example, in a physician satisfaction survey within IHS, 86% of physicians indicated a moderate to urgent need for specialists in their service areas, and only 11% said they had ready access to specialists (0–7 days).[35] Our analysis suggests that restructuring loan repayment programs to target female and URM specialists who indicate IWUP could help mitigate specialist shortages in underserved areas. At the same time, targeting URMs could offer a structural intervention to help to alleviate their disproportionate levels of educational debt.

A large body of evidence supports the effectiveness of financial incentive programs, such as loan repayment, in the recruitment and retention of physicians. A systematic review showed that incentive programs, in general, are successful in retaining physicians: Participants may not stay at the site of their original placements after their service obligations are fulfilled, but they are more likely to work in underserved areas in the long term compared with nonparticipants.[24] An evaluation of the NHSC program (preferred by 10.7% of respondents in our study sample who intended to enter loan forgiveness programs) showed a 55% retention rate of clinicians in underserved areas 10 years after their service obligations were completed.[36] Even more popular is the PSLF program, which was preferred by 49.3% of the respondents in our study sample who indicated they intended to enter loan forgiveness programs. This program represents a means of alleviating debt for individuals employed at public or nonprofit institutions, regardless of profession or specialty, after they have made 120 qualifying loan repayments. However, citing the need to reduce inefficiencies and to focus on the needs of undergraduate borrowers, the fiscal year 2018 budget of the U.S.

Table 2

**Adjusted Odds Ratios for Intention to Work With Underserved Populations (IWUP)[a] Among 2010–2012 AAMC Medical School Graduation Questionnaire Respondents (n = 40,846), by Demographic and Other Characteristics**

| Independent variables | Model 1[b] aOR (95% CI) (n = 18,601)[c] | P value | Model 2[b] aOR (95% CI) (n = 18,575)[c] | P value |
|---|---|---|---|---|
| **Gender** | | | | |
| Women | 1.61 (1.51, 1.72) | < .001 | 1.59 (1.49, 1.70) | < .001 |
| Men | 1 | | 1 | |
| **URM status** | | | | |
| URM[d] | 2.62 (2.41, 2.85) | < .001 | 2.50 (2.30, 2.72) | < .001 |
| Other minority[e] | 0.94 (0.86, 1.03) | .16 | 0.95 (0.87, 1.04) | .32 |
| White | 1 | | 1 | |
| **Specialty** | | | | |
| Primary care career[f] | 1.81 (1.69, 1.93) | < .001 | 1.65 (1.54, 1.76) | < .001 |
| Specialty career[g] | 1 | | 1 | |
| **Type of practice** | | | | |
| Nonclinical emphasis | 1.27 (1.15, 1.41) | < .001 | 1.23 (1.11, 1.37) | < .001 |
| Clinical emphasis | 1 | | | |
| **Educational debt[h]** | | | | |
| ≤ $49,999 | 1 | | 1 | |
| $50,000–$199,999 | 1.33 (1.23, 1.46) | < .001 | 1.05 (0.96, 1.15) | .26 |
| ≥ $200,000 | 1.61 (1.47, 1.77) | < .001 | 1.1 (0.99, 1.21) | .07 |
| **Consumer debt[i]** | | | | |
| ≤ $9,999 | 1 | | 1 | |
| $10,000–$19,999 | 1.07 (0.96, 1.18) | .22 | 1.02 (0.91, 1.13) | .74 |
| ≥ $20,000 | 1.16 (1.02, 1.31) | < .05 | 1.12 (0.98, 1.27) | .09 |
| **Dual advanced degree (e.g., MD–PhD, MD–MPH)** | 0.83 (0.73, 0.95) | < .01 | 0.79 (0.69, 0.91) | < .001 |
| **Intention to enter loan forgiveness programs** | | | 2.44 (2.26, 2.63) | < .001 |

Abbreviations: AAMC indicates Association of American Medical Colleges; aOR, adjusted odds ratio; CI, confidence interval; URM, underrepresented minority; MPH, master of public health.
[a]IWUP was defined as a "yes" response to the item "Do you plan to locate your practice in an underserved area?" and/or to the question "Regardless of location, do you plan to care primarily for an underserved population?"
[b]Hosmer–Lemeshow test: Model 1 chi-square = 0.0626; Model 2 chi-square = 0.1145.
[c]The n in this column heading refers to sample size in this model.
[d]URM was defined as self-identification as African American, Mexican American, mainland Puerto Rican, American Indian or Alaska Native, Native Hawaiian or other Pacific Islander, Cuban, Commonwealth Puerto Rican, other Hispanic/Latino, Vietnamese, Filipino, and other Southeast Asian.
[e]Other minority was defined as self-identification as other Asian, Chinese, Korean, Japanese, Indian/Pakistani, Asian Indian, and Pakistani.
[f]Primary care career was defined as family medicine, general internal medicine, general pediatrics, and internal medicine/pediatrics.
[g]Specialty career was defined as any non-primary-care specialty (e.g., neurology, radiology, surgery).
[h]Educational debt includes both undergraduate and medical school loan debt.
[i]Consumer debt does not include mortgage debt.

government proposes eliminating the program altogether.[37] Indeed, another study suggested that targeting PSLF loan repayment for work performed in Medically Underserved Areas, or for specialties that meet underserved areas' societal needs, could be useful and more equitable in retaining physicians in these communities, as opposed to the broad criteria that PSLF currently applies.[38]

That 56.8% of URMs interested in nonclinical careers reported IWUP suggests that interventions such as diversifying the academic medicine pipeline could have a favorable impact on underserved populations. For example, in the United States there is a lack of diversity among academic medicine faculty (only 7.6% URM nationwide),[39] and among the highest ranks of academic medicine, less than 8% of all medical school deans are black or Latino.[40] URM faculty are usually disproportionately represented in institutional diversity efforts, and thus face promotion inequities as well as other forms of subtle inequities.[41] If the faculty pipeline is diversified with faculty who have personal characteristics associated with IWUP, these faculty may be able to contribute to a mission of excellence and inclusivity and to a social mission of reaching the most medically underserved populations by influencing the next generation of physicians.

Cultivating future physician leaders with IWUP represents an important innovation that could inform several key systems that deliver or impact health in the United States. Incentive programs provided through the IHS, the National Institutes of Health (for those interested in a research career), and the NHSC, for example, could consider incentivizing leadership development pathways for physicians working in research or governmental careers that align with organizational missions of achieving health equity for underserved populations.

Certainly, further research on policy innovation and program implementation is needed to help advance strategies that can increase and retain physicians in underserved areas.

**Limitations**

The AAMC GQ is a cross-sectional annual survey that includes items regarding IWUP in the United States. Respondents' eventual career choices and entry into loan forgiveness programs were not verified. The way in which URM was classified in the GQ may have led to an overestimation of the actual number of URMs in this study (e.g., if more than one race was reported). To mitigate this possibility, our analysis adjusted the URM category by excluding minority groups that were not underrepresented in medicine. Given that the AAMC GQ data came aggregated, we were unable to analyze responses by year or class. The estimates of specialty and type of career may have been underestimated given that respondents who chose "undecided" (approximately 15%) were excluded from the relevant analysis. Factors that affect IWUP are extensive, and this

study did not take into account other personal, institutional, or even practice characteristics outlined in the literature. Finally, lack of access to health care in rural and underserved areas is an international phenomenon that could be looked at more broadly for potential solutions.

That being said, our analysis examined three years of aggregated GQ data with a sample size and power sufficient for generating reliable estimates across multiple strata. Moreover, to address potential selection bias in those who voluntarily participated in the survey, we referenced trends in all graduates of U.S. MD-granting medical schools by gender and race/ethnicity for the same time period. Our gender and race/ethnicity distribution results in this study were identical to the gender and race/ethnicity distribution of all medical school graduates for the corresponding time frame (17% URM, 48% female).[42] Our analysis is also the first of its kind to examine career preference, URM status, debt burden, and intention to enter loan forgiveness programs, together in one model, to predict IWUP. Results from other studies examining the role of debt on career preference have generally been mixed.[24–30] Prior studies have not examined the role of loan forgiveness programs as a potential mediator or moderator.

## Conclusions

Our findings suggest physician characteristics associated with filling critical workforce gaps. Innovative strategies to restructure financial incentive programs and increase workforce diversity could enhance and complement similar programs in primary care. Cultivating key physician leaders in health equity, diversifying the academic medicine pipeline, and ensuring systems-based changes in underserved areas represent potentially sustainable upstream approaches for helping the U.S. health care system achieve greater equity in the quality and availability of care for all.

*Acknowledgments:* The authors thank the staff at the Association of American Medical Colleges for their technical support of the project, in particular, their assistance with the management of the Medical School Graduation Questionnaire dataset and approval of the manuscript.

*Funding/Support:* The project was supported in part by the Resource Centers for Minority Aging Research program at the National Institute on Aging (NIA). E.J. Pérez-Stable's time at the University of California, San Francisco was supported with funding from the National Institutes of Health (P30 AG15272). The NIA had no involvement in any aspect of the study design, data analysis, or interpretation of the results.

*Other disclosures:* None reported.

*Ethical approval:* The study protocol was reviewed and deemed non-human-subjects research and exempted by the University of California, San Francisco Institutional Review Board (October 2012).

*Disclaimer:* The findings and conclusions in this article are those of the authors and do not necessarily represent the views or the official position(s) of the National Institutes of Health or any of the sponsoring organizations and agencies of the U.S. government, the Los Angeles County Department of Public Health, the California Department of Public Health, the University of California San Francisco School of Medicine, or the Association of American Medical Colleges or any other agency or organization mentioned in the text.

*Previous presentations:* Association of American Indian Physicians Annual Meeting, August 2015, Tulalip, Washington.

**A.N. Garcia** is a fellow with the National Clinician Scholars Program at the University of California, Los Angeles. At the time of submission, the author was a general and preventive medicine resident, California Department of Public Health, Sacramento, California, assigned to the Division of Chronic Disease and Injury Prevention, Los Angeles County Department of Public Health, Los Angeles, California. The project was conceived while the author was a medical student at the University of California, San Francisco, San Francisco, California; ORCID: http://orcid.org/0000-0001-9284-3790.

**T. Kuo** is adjunct associate professor of epidemiology, UCLA Fielding School of Public Health, and health sciences associate professor of family medicine, David Geffen School of Medicine at UCLA, Los Angeles, California. The author also directs the Division of Chronic Disease and Injury Prevention and the Office of Senior Health, Los Angeles County Department of Public Health, Los Angeles, California; ORCID: http://orcid.org/0000-0002-4120-8559.

**L. Arangua** is a policy analyst, Division of Chronic Disease and Injury Prevention, Los Angeles County Department of Public Health, Los Angeles, California; ORCID: http://orcid.org/0000-0001-9105-3885.

**E.J. Pérez-Stable** is director, National Institute on Minority Health and Health Disparities, National Institutes of Health, Bethesda, Maryland. This project was conceived while the author was professor of medicine and chief, Division of General Internal Medicine, Department of Medicine, and director, Medical Effectiveness Research Center for Diverse Populations, University of California, San Francisco, San Francisco, California.

## References

1 IHS Markit. The Complexities of Physician Supply and Demand 2017 Update: Projections From 2015 to 2030. Washington, DC: Association of American Medical Colleges; 2017.

2 Institute of Medicine. Graduate Medical Education That Meets the Nation's Health Needs. Washington, DC: National Academies Press; 2014.

3 Freeman J, Ferrer RL, Greiner KA. Viewpoint: Developing a physician workforce for America's disadvantaged. Acad Med. 2007;82:133–138.

4 National Health Service Corps. NHSC loan repayment program. http://nhsc.hrsa.gov/loanrepayment/loanrepaymentprogram.html. Accessed June 29, 2017.

5 Indian Health Service. Loan repayment program. http://www.ihs.gov/loanrepayment/. Accessed June 29, 2017.

6 Davis K, Abrams M, Stremikis K. How the Affordable Care Act will strengthen the nation's primary care foundation. J Gen Intern Med. 2011;26:1201–1203.

7 Health Care and Education Reconciliation Act of 2010, 42 USC §1305. Public Law 111-152—Mar. 30, 2010. https://www.gpo.gov/fdsys/pkg/PLAW-111publ152/pdf/PLAW-111publ152.pdf. Accessed June 29, 2017.

8 Goodfellow A, Ulloa JG, Dowling PT, et al. Predictors of primary care physician practice location in underserved urban or rural areas in the United States: A systematic literature review. Acad Med. 2016;91:1313–1321.

9 Lipkin M, Zabar SR, Kalet AL, et al. Two decades of Title VII support of a primary care residency: Process and outcomes. Acad Med. 2008;83:1064–1070.

10 Pathman DE, Konrad TR, King TS, Taylor DH Jr, Koch GG. Outcomes of states' scholarship, loan repayment, and related programs for physicians. Med Care. 2004;42:560–568.

11 MacDowell M, Glasser M, Fitts M, Nielsen K, Hunsaker M. A national view of rural health workforce issues in the USA. Rural Remote Health. 2010;10:1531.

12 Williams TE Jr, Satiani B, Ellison EC. A comparison of future recruitment needs in urban and rural hospitals: The rural imperative. Surgery. 2011;150:617–625.

13 Stanley A, Cantor JC, Guarnaccia P. Holes in the safety net: A case study of access to prescription drugs and specialty care. J Urban Health. 2008;85:555–571.

14 Mayer ML. Disparities in geographic access to pediatric subspecialty care. Matern Child Health J. 2008;12:624–632.

15 Cook NL, Hicks LS, O'Malley AJ, Keegan T, Guadagnoli E, Landon BE. Access to specialty care and medical services in community health centers. Health Aff (Millwood). 2007;26:1459–1468.

16 Association of American Medical Colleges. 2016 Physician Specialty Data Report. Washington, DC: Association of American Medical Colleges; 2016. https://www.aamc.org/data/workforce/reports/457712/2016-specialty-databook.html. Accessed July 5, 2017.

17 Jeffe DB, Andriole DA, Hageman HL, Whelan AJ. The changing paradigm of contemporary U.S. allopathic medical school graduates' career paths: Analysis of the 1997–2004 national AAMC Graduation Questionnaire database. Acad Med. 2007;82:888–894.

18 Donini-Lenhoff FG, Hedrick HL. Growth of specialization in graduate medical education. JAMA. 2000;284:1284–1289.

19  Brotherton SE, Etzel SI. Graduate medical education, 2009–2010. JAMA. 2010;304:1255–1270.

20  Saha S, Guiton G, Wimmers PF, Wilkerson L. Student body racial and ethnic composition and diversity-related outcomes in US medical schools. JAMA. 2008;300:1135–1145.

21  Komaromy M, Grumbach K, Drake M, et al. The role of black and Hispanic physicians in providing health care for underserved populations. N Engl J Med. 1996;334:1305–1310.

22  Xierali IM, Castillo-Page L, Conrad S, Nivet MA. Analyzing physician workforce racial and ethnic composition associations: Geographic distribution (part II). AAMC Analysis in Brief. 2014;14(9). https://www.aamc.org/download/401814/data/aug2014aibpart2.pdf. Accessed July 3, 2017.

23  Walker KO, Moreno G, Grumbach K. The association among specialty, race, ethnicity, and practice location among California physicians in diverse specialties. J Natl Med Assoc. 2012;104:46–52.

24  Bärnighausen T, Bloom DE. Financial incentives for return of service in underserved areas: A systematic review. BMC Health Serv Res. 2009;9:86.

25  Dugger RA, El-Sayed AM, Messina C, Bronson R, Galea S. The health policy attitudes of American medical students: A pilot survey. PLoS One. 2015;10:e0140656.

26  McDonald FS, West CP, Popkave C, Kolars JC. Educational debt and reported career plans among internal medicine residents. Ann Intern Med. 2008;149:416–420.

27  Rosenblatt RA, Andrilla CH. The impact of U.S. medical students' debt on their choice of primary care careers: An analysis of data from the 2002 medical school graduation questionnaire. Acad Med. 2005;80:815–819.

28  Phillips JP, Petterson SM, Bazemore AW, Phillips RL. A retrospective analysis of the relationship between medical student debt and primary care practice in the United States. Ann Fam Med. 2014;12:542–549.

29  Phillips JP, Weismantel DP, Gold KJ, Schwenk TL. Medical student debt and primary care specialty intentions. Fam Med. 2010;42:616–622.

30  Phillips RL Jr, Dodoo MS, Petterson S, et al. Specialty and Geographic Distribution of the Physician Workforce: What Influences Medical Student and Resident Choices? Washington, DC: Robert Graham Center; 2009.

31  Andriole DA, Jeffe DB. Characteristics of medical school matriculants who participated in postbaccalaureate premedical programs. Acad Med. 2011;86:201–210.

32  Grbic D, Slapar F. Changes in medical students' intentions to serve the underserved: Matriculation to graduation. AAMC Analysis in Brief. 2010;9(8). https://www.aamc.org/download/137518/data/aib_vol9_no8.pdf. Accessed July 3, 2017.

33  Association of American Medical Colleges. Underrepresented in medicine definition. https://www.aamc.org/initiatives/urm/. Accessed June 29, 2017.

34  Odom Walker K, Ryan G, Ramey R, et al. Recruiting and retaining primary care physicians in urban underserved communities: The importance of having a mission to serve. Am J Public Health. 2010;100:2168–2175.

35  Indian Health Service. 2011 Survey of Physician Practice Patterns & Satisfaction: A Survey Examining the Practice Characteristics, Morale Levels, and Recruiting Needs of Indian Health Program Physicians. Rockville, MD: Indian Health Service; 2011.

36  National Health Service Corps. NHSC Clinician Retention: A Story of Dedication and Commitment. Washington, DC: U.S. Department of Health and Human Services, Health Resources and Services Administration; 2012.

37  Office of Management and Budget. Budget of the U.S. Government: A New Foundation for American Greatness: Fiscal Year 2018. Washington, DC: U.S. Government Printing Office; 2017. https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/budget/fy2018/budget.pdf. Accessed July 5, 2017.

38  Friedman AB, Grischkan JA, Dorsey ER, George BP. Forgiven but not relieved: US physician workforce consequences of changes to public service loan forgiveness. J Gen Intern Med. 2016;31:1237–1241.

39  Association of American Medical Colleges. Faculty roster. U.S. medical school faculty, 2014. Table 3: Rank and race/ethnicity. https://www.aamc.org/data/facultyroster/reports/420598/usmsf14.html. Accessed June 29, 2017.

40  Yu PT, Parsa PV, Hassanein O, Rogers SO, Chang DC. Minorities struggle to advance in academic medicine: A 12-y review of diversity at the highest levels of America's teaching institutions. J Surg Res. 2013;182:212–218.

41  Rodríguez JE, Campbell KM, Pololi LH. Addressing disparities in academic medicine: What of the minority tax? BMC Med Educ. 2015;15:6.

42  Association of American Medical Colleges. Table B-2: Total graduates by U.S. medical school, sex, and year. https://www.aamc.org/data/facts/enrollmentgraduate/148670/total-grads-by-school-gender.html. Accessed July 5, 2017.



# BREAKING MORE BARRIERS
## SURVEY REPORT

September 2019

Angela Chen, PhD
Mithi Del Rosario
Erick Leyva
Denisse Rojas Marquez
Sunny Nakae, PhD
Ingrid Vazquez
Anne Vo, PhD

AR2022_500198

## Table of Contents

**Acknowledgements**                                                            4

**Introduction & Survey Information**                                           5

**Executive Summary**                                                           7

**Policy Recommendations**                                                      9

**Demographics**                                                               10
    Age
    Gender Identity
    LGBTQ Identity
    Country of Birth
    Current State of Residence
    Race and Ethnicity
    Marital Status
    Parental Status
    Employment Status
    Educational Standing

**Journey**                                                                    15
    Age of Resettlement
    Method of Arrival
    Immigration and Residency Status

**Social and Financial Capital**                                               18
    Linguistic Capital
    Financial Capital
    Financial Expenditures
    Housing
    Household

**Education Status**                                                           21
    First-Generation High School or College Graduate
    College/University Enrollment or Completion

**Undergraduate Education Financing**                                          22
    Undergraduate Payment Method
    In-State Tuition Eligibility for Undergraduate College/University
    Debt from Undergraduate Degree

**AR2022_500199**

**Graduate Education**                                                    **24**
    Graduate Program
    Graduate School Payment Method
    In-State Graduate School Tuition Eligibility
    Current Graduate School Debt

**Access to Educational Resources and Support**                          **26**
    Access to Resources and Support
    Resources Available Across Institutions

**Career Interest**                                                      **27**

**References**                                                           **28**

**Contact Information**                                                  **29**

**AR2022_500200**

## Acknowledgments

The authors would like to thank the participants of the survey for their contributions that made this report possible. We are grateful for such strong communities of courageous and resilient individuals and families.  We hope this report breaks more barriers and opens more doors with policy makers, leaders, and elected officials. We dedicate this work to the bright futures of undocumented young individuals, their loved ones and families everywhere. Thank you to Paulani Cortez-Villas and James Blum for their assistance in editing the report.

We also thank the generous contributions of our donors and financial sponsors who make this work possible.

AR2022_500201

## Introduction & Survey Information

Undocumented students have traditionally faced substantial policy and financial barriers to pursuing higher education, especially in the health professions (e.g., medicine, nursing, dentistry). Policy changes, such as the federal Deferred Action for Childhood Arrivals (DACA) program in 2012, allowed an unprecedented number of undocumented students to apply and be accepted into health professions programs.[1,2] However, even with inclusive policies, undocumented students continue to face significant barriers in matriculating and completing health professions programs, such as the inability to receive federal financial aid. A better understanding of the characteristics and experiences of undocumented youth pursuing health and health science careers is needed to promote more inclusive policies and practices for these individuals. Though existing literature describes the barriers undocumented youth face in pursuing higher education[3,4] and characteristics of the undocumented youth population,[5] to date, there are no studies that have collected data on the demographics of the undocumented student population seeking entry to the health professions. This report contains survey data that was collected by Pre-Health Dreamers (PHD), a national organization that serves over 800 undocumented youth interested in and currently pursuing health and health science careers.

Specifically, the survey elucidates the demographics of undocumented students pursuing health and health-science careers, describes the barriers they face within educational settings (e.g. access to pre-health advisors and career advising, financial aid challenges, and peer support networks), provides insights to their lived experiences (e.g. key challenges they have faced due to their immigration status), and describes their career aspirations (e.g. which degree programs they are pursuing and if they wish to practice in underserved areas). The survey was designed to build on previous initiatives and be a collaborative project with continued input and guidance from PHD staff.

We hope this survey and the proceeding analyses of the collected information are helpful in shaping inclusive institutional policies, developing informed resources, and securing financial aid for these persons. We hope that this work will be impactful for other health professional and graduate schools staff, pre-health advisors and other educators, and local and state-wide advocates.

**Survey Methodology**

PHD conducted an online survey of 123 questions among members of to evaluate the needs of the PHD community. A snowball sampling methodology was used, due to the nature of informal networks and relationships within undocumented communities. Members of PHD were sent the survey via email and were asked to forward it to their networks and friends. Known allies and offices that serve undocumented students in high school and post-secondary education were also sent the survey to disseminate to potential respondents. The survey was also shared through email, Facebook, and Twitter. Data were collected and stored through the

5

SurveyMonkey website between the months of May and August 2016. This report consists of data that were collected by August 2016. A total of 223 survey responses were collected.

Data that were collected by PHD were stripped of any identifying information that survey respondents may have offered. The data were scrubbed to remove duplicate responses, false starts, and individuals indicating they were born in the U.S. This de-identified data was shared with the research team and subsequently analyzed for this report by Anne Vo and Denisse Rojas Marquez.

**Survey Design**

The survey that was distributed by PHD included open-ended response, multiple choice, and rating-scale format questions. Question topics included demographic information, immigration status, income and employment, education, access to education and financial assistance, and career interest.

**Protection of Survey Participants**

Staff at PHD downloaded survey data from the survey site and the data are now stored on a secure server. PHD staff removed all identifying data before sharing data files with the research team. Data were pre-screened for small cell sizes that could inadvertently reveal the identity of the respondent. Small cell threats were removed.

6

## Executive Summary

Four salient themes emerged from the data analysis for this report.

**Undocumented students are incredibly diverse.** Respondents' ages ranged from 17-42, with a mean age of 23.5. Almost 70% of survey respondents identified as female, with almost 30% identifying as male and slightly over 1% identifying as genderqueer. About 12% identified as LGBTQ. Respondents reported 30 different countries of birth including Albania, Bahrain, Jamaica, Iraq, Poland, Uzbekistan, Mexico, and Venezuela. The most common birth countries were Mexico, Peru, South Korea, and India. Immigration status also varied among respondents, which included DACA recipients (86%), undocumented people without DACA (8%), TPS recipients (1%), and one U-Visa recipient (0.5%). Four percent of respondents who were formerly undocumented are now US citizens or permanent residents. Respondents reported 26 different states of residence from all over the United States.

**Undocumented students are accessing education despite significant barriers** as evidenced by all of survey respondents who reported graduating from college or current enrollment in high school, community college, undergraduate universities, graduate schools, or post-baccalaureate programs. Almost 92% of survey respondents are currently enrolled or have graduated from a college or university. Almost 19% of respondents reported being enrolled in a graduate program (MD, DDS, PhD, Master's, etc).

**Undocumented students have important skill sets and experiences for the health professions.** Respondents reported speaking a collective 20 different languages with 98% speaking at least two languages fluently. Sixty-six percent of respondents were or will be first-generation high school graduates. Over two thirds of respondents are employed at least part time. Nearly all respondents (98%) expressed an interest in working in an underserved community.

**Undocumented students face barriers to navigating preparation pathways to health careers**, due to receiving inadequate mentorship or systemic support. Participants were asked to rate their experiences accessing preparation components or support for their pathways to health professions. Seventy-five percent of students indicated it was difficult or very difficult to access financial or academic scholarship support. Sixty-six percent of respondents reported barriers to accessing knowledgeable advising and over half of respondents found it challenging to find careers support.

7

AR2022_500204

## Policy Recommendations

This survey of undocumented students pursuing health careers provides a small snapshot of current barriers and opportunities. Based on analyses of these data, the authors submit the following recommendations for partners, collaborators, advocates, and allies to consider.

1. **Maintain and expand opportunities for undocumented students at public institutions of higher education.** States with policies that allow undocumented students to pay in-state tuition at colleges and universities based on their state residency showed higher rates of participation in higher education among the survey respondents. Further, colleges and universities where students were enrolled were a mixture of affordable public universities where tuition rates were within feasibility while working or with modest family support, and private institutions that likely offered financial aid packages that did not include federal dollars.

2. **Improve access to financial aid for undocumented students in health career fields. At each level of post-secondary education, the barriers for financial aid create gaps, delays, and time challenges for students and their families.** Though public universities, self-pay, and private scholarships have facilitated participation, at the graduate and professional school level, resources remain scarce.

3. **Acknowledge the breadth of diversity of undocumented students in the United States**. Our small sample size revealed marked diversity in immigration history, national origin, race, ethnicity, sexual identity, and family background. Often policy makers think of one racial or ethnic group in reference to undocumented communities. Our data show that this community is incredibly diverse. Programming and resource allocation should be informed by and adapted for the diversity of the undocumented student community.

4. **Address barriers to preparation for careers in health professions through mentorship, transparent processes, capacity building, and awareness.** Undocumented students faced challenges accessing internships, finding mentorship, and receiving guidance from knowledgeable allies. Volunteering had fewer respondents reporting difficulty with access, while career support, knowledgeable advising, employment opportunities, and internships had high response rates of being rated difficult or very difficult. It is important that undocumented students are able to acccess the opportunities they need to be competitive applicants.

AR2022_500205

## Demographics

### Age

Min: 17 years
Max: 42 years
Mean: 23.5 years
Mode: 23 years

n= 216



The majority of students (62.5%) ranged between 20 and 25 years of age. The most common age for was 23 years old (n=29), and the mean age of all respondents was 23.5 years old. The maximum and minimum ages were 42 and 17, respectively.

9

## Gender Identity

In the survey, 152 students identified as females (69.09%) and 65 identified as males (29.55%). Additionally, three participants identified as genderqueer.

| Gender Identity | Frequency | % |
|-----------------|-----------|---------|
| Female | 151 | 69.59% |
| Male | 63 | 29.03% |
| Genderqueer | 3 | 1.38% |
| **Total** | **217** | **100.00%** |

## LGBTQ Identity

A total of 25 students identified as LGBTQ (11.74%), and 188 did not (88.26%).

| LGBTQ Identity | Frequency | % |
|----------------|-----------|---------|
| No | 188 | 88.26% |
| Yes | 25 | 11.74% |
| **Total** | **213** | **100.00%** |

## Country of Birth

A total of 134 students (62.91%) were born in Mexico. The rest of the students reported their countries of birth were dispersed across a number of other countries, including Peru (10 individuals), South Korea (9 individuals), and India (7 individuals).



10

## Current State of Residence

A total of 112 respondents (51.38%) currently live in California. In addition, 23 individuals reside in Illinois (10.55%) and 15 reside in New York (6.88%). The remainder of the respondents were geographically dispersed (see map).

n = 218



11

## Race and Ethnicity

A total of 167 respondents (79.1%) identified their race/ethnicity as Hispanic/Latino. In addition, 32 respondents (15.2%) identified their race/ethnicity as Asian/Pacific Islander.

n=211



## Marital Status

Nearly all participants (91.67%) identified as single. Twelve people (5.56%) indicated they were married. Six participants were either divorced/separated, widowed, or selected "Other".

| Marital Status | Frequency | % |
|---|---|---|
| Single | 198 | 91.67% |
| Married | 12 | 5.56% |
| Other | 3 | 1.39% |
| Divorced/Separated | 2 | 0.93% |
| Widowed | 1 | 0.46% |
| **Total** | **216** | **100%** |

12

## Parental Status

A total of 213 respondents (96.82%) reported that they were not a parent/legal guardian. Seven individuals (3.18%) said that they were a parent/legal guardian.

| Parental Status | Frequency | % |
|---|---|---|
| No | 210 | 96.77% |
| Yes | 7 | 3.23% |
| **Total** | **217** | **100%** |

## Employment Status

A total of 67 respondents  (31.60%) reported they are full-time students who do not work, 60 respondents (28.30%) indicated they work part time, and 46 respondents (21.70%) reported they work full time. In total, half of the participants work at least part time.

| Employment status | Frequency | % |
|---|---|---|
| Student (not working) | 67 | 31.60% |
| Part-time (1-5 hours/wk) | 60 | 28.30% |
| Full-time (35+) | 46 | 21.70% |
| Other | 15 | 7.08% |
| Unemployed and looking for work | 11 | 5.19% |
| Student (and working part-time) | 11 | 5.19% |
| Temporarily laid-off | 1 | 0.47% |
| Unemployed and looking for work | 1 | 0.47% |
| **Total** | **212** | **100%** |

## Educational Standing

A total of 137 students (64.02%) were current students or graduates of a bachelor-granting institution. In addition, 39 (18.22%) were currently enrolled in or had completed a graduate program.

| Educational Standing | Frequency | % |
|---|---|---|
| University (Bachelor-granting institution) student or graduate | 137 | 64.02% |
| Graduate program student (e.g. dental, medical, Masters, Ph.D. program, etc.) or graduate | 39 | 18.22% |
| High School student or graduate | 15 | 7.01% |
| Community College student or graduate | 14 | 6.54% |
| Post-baccalaureate program student or graduate | 9 | 4.21% |
| **Total** | **214** | **100%** |

13

## Journey

### Age of Resettlement

The reported ages of resettlement, or when individuals first permanently moved to the U.S., were distributed fairly evenly. An overwhelming majority of respondents (73.8%) resettled before age nine. The mean age of resettlement was seven years.

n=214



### Method of Arrival

| Method of Arrival | Frequency | % |
|---|---|---|
| With a visa (e.g., student visa, tourist visa) | 104 | 48.83% |
| Without inspection | 95 | 43.66% |
| Other | 10 | 4.69% |
| Unaccompanied child | 6 | 2.82% |
| **Total** | **213** | **100%** |

A total of 104 respondents (48.83%) came to the United States with a visa. Another 95 respondents (43.66%) arrived without inspection. The remainder either indicated that they came as unaccompanied children, or they selected "Other", which included "Visa Waiver Program", "With Inspection", "Unknown", and "Border Crossing Card".

14

## Immigration Status

A total of 187 participants (86.18%) are DACA recipients. Seventeen participants (7.83%) indicated they are undocumented (without DACA or similar relief). Nine participants were formerly undocumented but are currently either a legal permanent resident or citizen.

| Immigration Status | Frequency | % |
|---|---|---|
| Deferred Action for Childhood Arrivals (DACA) Recipient | 187 | 86.18% |
| Undocumented (without DACA or similar relief) | 17 | 7.83% |
| Legal permanent resident (formerly undocumented) | 5 | 2.30% |
| Citizen (formerly undocumented) | 4 | 1.84% |
| Temporary Protected Status (TPS) Recipient | 3 | 1.38% |
| U Nonimmigrant Visa (U-Visa) holder | 1 | 0.46% |
| **Total** | **217** | **100%** |

## Respondents without DACA

Of the seventeen individuals who responded that they are undocumented (without DACA or similar relief), seven provided reasons why they do not have DACA. These answers included the following: *"I entered the U.S. after my 16th birthday," "I was not continuously present in the U.S. since June 15th, 2017," "I did not officially lose my status until a month after DACA was announced,"* and *"I was not present in the U.S. on June 15, 2012."* Notably, some survey respondents indicated that the cost of DACA renewal fees were prohibitively expensive.

## Residency Status

**Pursuing Legal Residence Status**: Twenty-four respondents (12.18%) indicated they are currently pursuing legal residence status and173 respondents (87.82%) are not pursuing legal residence status.

| Pursuing Legal Residence Status | Frequency | % |
|---|---|---|
| No | 173 | 87.37% |
| Yes | 25 | 12.63% |
| **Total** | **198** | **100%** |

15

**Estimated Length of Time to Receive Legal Permanent Residency:** Respondents who are pursuing legal status expect to wait an average of four years and seven months to receive their legal permanent residency. The range of expected waiting time was 6 months to 10 years (n=19).

**Approaches to establishing legal residence:** Among respondents who are currently adjusting their immigration statuses, the most common method of doing so is through family petitions (56%), followed by marriage sponsorships (24%), and U-Visas (8%).

n=25



APPROACHES TO ESTABLISHING LEGAL RESIDENCE

16

## Social and Financial Capital

### Linguistic Capital

An overwhelming majority (78.40%) of participants learned Spanish as a first language. In addition, 12 (5.63%) reported their first language was English, and seven (3.29%) learned Korean as their first language. Nearly all respondents (98.13%) are multilingual.

| Number of languages spoken | Frequency | % |
|---|---|---|
| 1 | 4 | 1.87 |
| 2 | 166 | 77.57% |
| 3 | 32 | 14.95 |
| 4 | 10 | 4.67% |
| 5 | 2 | 0.93% |
| **Total n** | **214** | **100%** |

### Financial Capital

**Income:** A total of 141 respondents (71.94%) reported an average annual household income under $39,999.

| Average Household Income | Frequency | % |
|---|---|---|
| $0 - $19,999 | 61 | 31.12% |
| $20,000 - $39,999 | 80 | 40.82% |
| $40,000 - $59,999 | 37 | 18.88% |
| $60,000 - $100,000 | 18 | 9.18% |
| **Total n** | **196** | **100%** |

**Individuals in the Household:**
The average number of people in a respondent's household was four (n=209). The average number of people in the household who are employed was two (n=204). Among respondents who work, the average number of hours worked per week is 28 (n=129).

17

**Housing Status:** A total of 115 respondents (54.25%) live with their parents while 91 respondents (42.92%) live independently. Six participants (2.36%) live with other family members (such as in-laws, grandparents, and siblings), and one participant (0.47%) indicated that they are undomiciled.

| Housing Status | Frequency | % |
|---|---|---|
| Live with parents | 115 | 54.25% |
| Live independently | 91 | 42.92% |
| Live with other family | 6 | 2.36% |
| Homeless | 1 | 0.47% |
| **Total** | **212** | **100%** |

**Supporting Family**: A total of 142 respondents (71.36%) reported they are only financially responsible for supporting themselves. Thirty (15.08%) support themselves and another person. Nineteen participants (9.55%) financially support themselves and two, three or four other individuals. Notably, seven participants (3.52%) said they are financially dependent on another person and do not support themselves and one person selected "other."

| # of People Supporting (including respondent) | Frequency | % |
|---|---|---|
| 0 or "Other" | 8 | 4.02% |
| 1 | 142 | 71.36% |
| 2 | 30 | 15.08% |
| 3 | 8 | 4.02% |
| 4 | 9 | 4.76% |
| 5 | 2 | 1.01% |
| **Total** | **199** | **100%** |

18

AR2022_500215

**Finances – Expenditures:**

A total of 120 respondents (57.14%) expressed having family financial obligations while 90 respondents (42.86%) reported not having family financial obligations. Of individuals with financial obligations, 59 are financially dependent (49.17%) and 61 are financially independent (50.83%).

| Financial Obligations | Frequency | % |
|---|---|---|
| Yes | 120 | 57.14% |
| No | 90 | 42.86% |
| **Total** | **215** | **100%** |

| Financial Status | Financial Obligations | |
|---|---|---|
| | No | Yes |
| Dependent | 62 | 59 |
| Independent | 28 | 61 |
| **Total** | 90 | 120 |

**Financial contributions to family and others**:
We asked how much money respondents contribute to their family's financial obligations per month (e.g. rent, bills, etc.). The most common response was $500 (n=81). The average of all responses was $714.20, the range of financial contributions was $60 - $6,800 (n=81).

19

## Education Status

### First-Generation High School or College Graduate

A total of 139 respondents (65.57%) are or will be the first in their family to graduate from high school. A total of 169 respondents (79.71%) are or will be the first in their family to graduate from college.

Further analysis below:

| | | First-Generation High School Graduate | |
|---|---|---|---|
| | | Yes | No |
| First-Generation | Yes | 139 | 30 |
| College Graduate | No | n/a | 43 |
| | **Total** | **139** | **73** |

- Participants responding "Yes" to both questions (top-left cell) indicated that their parents neither graduated from high school or college. They were both a first-generation high school and college graduate. There were 139 respondents in this category (65.57%).
- Participants occupying the top-right cell indicated that their parents graduated from high school, but not from college. They were a first-generation college graduate, but not a first-generation high school graduate. There were 30 respondents in this category (14.15%).
- Participants responding "No" to both questions (bottom-right cell) indicated that their parents graduated from both high school and college. A total of 43 respondents chose this category(20.28%).
- If any participant were to occupy the bottom-left cell, they would be indicating that their parents graduated from college, but not high school. This does not make sense, and is consequently labeled "n/a" (Not applicable).

Notably, 7 respondents indicated that their parents obtained their high school or college degree in their home country. This was not included as an option and thus these responses were coded as "no" for first-generation high school or college graduates, respectively.

### College/University Enrollment or Completion

A total of 188 respondents (92.16%) have started or completed college.

| Started or Completed College | Frequency | % |
|---|---|---|
| Yes | 188 | 92.16% |
| No | 16 | 7.84% |
| **Total** | **204** | **100%** |

## Undergraduate Education Financing

### Undergraduate Payment Method
n=173



METHODS USED TO PAY UNDERGRADUATE EDUCATION, BY PERCENTAGE

Respondents indicated that they paid for their undergraduate education using a myriad of financial resources. These findings only display the percentage of respondents who relied on each source of funding to cover the costs associated with their undergraduate degree. Each respondent could select multiple options. This graph does not reflect the amount of money received from each source. Family contribution accounted for the most common source of funding for respondents (20.53%). Other popular sources of funding included institutional merit scholarships, personal contributions, private scholarships, and financial/need-based scholarships.

21

## In-State Tuition Eligibility for Undergraduate College/University

A total of 129 respondents (70.88%) indicated they were eligible for in-state tuition. Another 32 respondents (17.58%) were not eligible. The rest of the respondents attended a private institution and were therefore not affected by in-state tuition policies.

| Eligibility for In-State Tuition | Frequency | % |
|---|---|---|
| Yes | 129 | 70.88% |
| No | 32 | 17.58% |
| N/A (I attend(ed) a private institution) | 21 | 11.41% |
| **Total** | **182** | **100%** |

## Debt from Undergraduate Degree

A total of 123 respondents (78.85%) have no debt from their undergraduate degree. The remaining 21.15% each owe under $40,000. The average debt was $1,839. The maximum amount reported was $40,000.

| Current Amount Owed | Frequency | % |
|---|---|---|
| None | 123 | 78.85% |
| $1-$999 | 3 | 1.94% |
| $1,000-$4,999 | 11 | 7.74% |
| $5,000-$9,999 | 8 | 4.52% |
| $10,000-$19,999 | 6 | 3.87% |
| $20,000-$40,000 | 5 | 3.23% |
| **Total** | **156** | **100%** |

AR2022_500219

## Graduate Education

### Graduate Program

Sixteen respondents (41.03%) are in medical school, and 14 (35.90%) are in graduate school at the master's level. These individuals accounted for the majority of responses from individuals who indicated they are attending graduate school.

| Graduate Program | Frequency | % |
|---|---|---|
| Medical School | 16 | 41.03% |
| Master's Program | 14 | 35.90% |
| Dental School | 3 | 7.69% |
| Not Specified | 2 | 5.13% |
| Doctoral program | 2 | 5.13% |
| PharmD | 1 | 2.56% |
| Medical Residency | 1 | 2.56% |
| **Total** | **39** | **100%** |

23

AR2022_500220

## Graduate School Payment Method

Respondents indicated that they paid or are paying for their graduate education using a variety of financial resources. These findings only display the percentage of respondents who relied on each source of funding to cover the costs associated with their graduate degree. Each respondent could select multiple options. This graph does not reflect the amount of money received from each source. The most common payment methods that respondents indicated they used to pay for graduate school are: institutional merit scholarships (17.44%), personal contribution (15.12%), private scholarship (15.12%), and institutional/need-based scholarship."

n= 34



METHODS USED TO PAY GRADUATE EDUCATION, BY PERCENTAGE

24

## In-State Graduate School Tuition Eligibility

Nineteen participants (52.78%) indicated that they were eligible for in-state tuition. Seven were not eligible (19.44%). The remaining participants who had attended or were attending graduate school attended private institutions and were therefore unaffected by in-state tuition policies.

| In-state Tuition Eligibility | Frequency | % |
|---|---|---|
| Yes | 19 | 52.78% |
| No | 7 | 19.44% |
| N/A (I attend(ed) a private institution) | 10 | 27.78% |
| **Total n** | **36** | **100.00%** |

## Current Graduate School Debt

5 respondents (26.32%) have zero debt from their graduate education. 2 respondents have an estimated $1-$19,999 of debt from their graduate education, and 2 students have an estimated $20,000-$39,999 of debt. The average debt owed towards graduate school is $29,136 (this number does not include actual debt upon completing graduate school). The maximum amount reported was $140,000.

| Money Currently Owed | Frequency | % |
|---|---|---|
| $0 | 5 | 26.32% |
| $1-$19,999 | 2 | 10.53% |
| $20,000-$39,999 | 2 | 10.53% |
| $40,000-$59,999 | 3 | 15.79% |
| $60,000-$79,999 | 4 | 21.05% |
| $80,000-$99,999 | 2 | 10.53% |
| $100,000-$200,000 | 1 | 5.26% |
| **Total** | **19** | **100%** |

25

AR2022_500222

# Access to Educational Resources and Support

## Access to Resources and Support

Participants were asked to rate their experiences accessing various academic resources over the course of their lifetime. Respondents reported that accessing financial resources was the most common challenge they faced, with 75.26% saying it was either "difficult" or "very difficult" to do so. In particular, accessing academic scholarships was challenging for respondents, with 74.09% saying it was either "difficult" or "very difficult."

Resources reported to be "easy" or "very easy" to access include volunteer opportunities (51.55%) and peer support (36.79%).

| Academic Resources | Very Easy | Easy | Neither easy nor difficult | Difficult | Very Difficult | n/a | Total |
|---|---|---|---|---|---|---|---|
| Internships | 6 | 18 | 32 | 68 | 49 | 18 | 191 |
| Scholarships | 0 | 8 | 38 | 76 | 67 | 4 | 193 |
| Volunteer opportunities | 39 | 61 | 50 | 31 | 12 | 1 | 194 |
| Mentorship | 13 | 40 | 50 | 55 | 22 | 13 | 193 |
| Peer Support | 17 | 54 | 51 | 45 | 22 | 4 | 193 |
| Financial Support | 1 | 8 | 38 | 64 | 82 | 1 | 194 |
| Employment Opportunities | 5 | 23 | 47 | 55 | 61 | 3 | 194 |
| Career Support | 3 | 23 | 51 | 58 | 55 | 3 | 193 |
| Knowledgeable advising | 5 | 26 | 33 | 61 | 66 | 2 | 193 |
| **Total** | 89 | 261 | 390 | 513 | 436 | 49 | 1736 |

26

## Career Interest

### Interest in Working in an Underserved Community

Two hundred (97.56%) respondents are planning on working in an underserved community. Five (2.44%) are not.

n=205



AR2022_500224

# References

1.      Balderas-Medina Anaya Y, del Rosario M, Doyle L, Hayes-Bautista DE. Undocumented Students pursuing medical education: The implications of deferred action for childhood arrivals (DACA). Acad. Med. 2014; 89(12):1599-602.

2.      Nakae S, Rojas Marquez D, Di Bartolo IM, Rodriguez R. Considerations for Residency Programs Regarding Accepting Undocumented Studnets Who are DACA Recipients. Acad Med. 2017;11: 1549-1554.

3.      Gonzalez RG. Lives in Limbo Undocumented and Coming of Age in America. N.P. Print 2016.

4.      Perez W. Americans By Heart Undocumented Latino Students and the Promise of Higher Education. Teachers College Press. 2012. New York, NY.

5.      Gonzalez RG, Terriquez V, Ruszczyk SP. Becoming DACAmented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA). Am. Behav. Sci. 2014;58:1852-1872.

28

## Contact Information

For any questions about the report, please contact: Denisse Rojas at denisse@phdreamers.org.
General inquiries about Pre-Health Dreamers (www.phdreamers.org) should be directed to Yadi
Ortiz at yadi@phdreamers.org.

29

**63 UCLA L. Rev. Discourse 58**

UCLA Law Review Discourse

2015

Anil Kalhan [a1]

Copyright © 2015 by UCLA Law Review; Anil Kalhan

# DEFERRED ACTION, SUPERVISED ENFORCEMENT DISCRETION, AND THE RULE OF LAW BASIS FOR EXECUTIVE ACTION ON IMMIGRATION

## ABSTRACT

In November 2014, the Obama administration announced the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) initiative, which built upon a program instituted two years earlier, the Deferred Action for Childhood Arrivals (DACA) initiative. As mechanisms to channel the government's scarce resources toward its enforcement priorities more efficiently and effectively, both DACA and DAPA permit certain individuals falling outside those priorities to seek "deferred action," which provides its recipients with time-limited, nonbinding, and revocable notification that officials have exercised prosecutorial discretion to deprioritize their removal. While deferred action thereby facilitates a highly tenuous form of quasi-legal recognition for its recipients, it does not provide legal immigration status. Accordingly, the two initiatives are not an equivalent substitute for legislative reform proposals that would create a pathway to durable legal status for a much larger number of individuals.

Nevertheless, critics have accused the Obama administration of imposing by decree precisely that which Congress has declined to authorize by statute: namely, legalization of noncitizens who lack lawful immigration status. In this Article, I critically examine those assertions and develop a rationale for the deferred action initiatives, anchored in rule of law values, that has received no meaningful attention in recent debates about DACA and DAPA. As the decision by U.S. District Judge Andrew S. Hanen enjoining those initiatives illustrates, legal discourse has mirrored and reinforced the same incorrect claims about deferred action that circulate in anti-immigration political discourse. Like the Obama administration's political critics, Judge Hanen repeatedly mischaracterizes the initiatives as providing "legal status" and, on that basis, flays the Obama administration for "total[ly] abdicat[ing]" immigration enforcement. These conclusions ultimately amount to what I describe elsewhere as "judicial truthiness," highlighting an erosion of the conventional lines between litigation, adjudication, and public discourse in politically salient cases more generally.

The flawed discourse surrounding DACA and DAPA underscores the need for a more careful assessment of the complex relationships between enforcement priorities, prosecutorial discretion, and the rule of law in an era of mass deportation. The blunt and distorted nature of that discourse, however, in turn has distorted the substantive analysis of those relationships. As the scale of the expansive and fragmented immigration enforcement regime has grown to such enormous levels--making the interrelated challenges of ensuring consistent execution of the law and fidelity to enforcement  **\*59**  priorities more formidable--the need for effective mechanisms to supervise the discretion exercised by rank-and-file officials has only grown more important. But even as it purports to respect the government's enforcement priorities, the logic of Judge Hanen's ruling would largely disable policymaking officials from implementing such mechanisms, requiring them instead to let the vagaries of the bureaucracy reign supreme. The decision therefore not only inhibits the agency's ability to establish enforcement priorities and manage its scarce resources, but also fails to acknowledge the importance of rule of law values such as consistency, transparency, accountability, and nonarbitrariness in the execution of the immigration laws.

## TABLE OF CONTENTS

Introduction ... 60

I. JUDICIAL TRUTHINESS ABOUT DEFERRED ACTION ... 66

A. The Tenuous "Nonstatus" of Deferred Action                                      66
B. The Mischaracterization of Deferred Action as "Legal Status"                    70
C. "Total Abdication" by the "Deporter-in-Chief"?                                   73
D. Sweeping Beyond "Benefits"                                                       75
II. POLITICAL COMMENTARY BY OTHER MEANS                                             78
III. SUPERVISED ENFORCEMENT DISCRETION AND THE RULE OF LAW IN INSTITUTIONAL        84
CONTEXT
A. Implementing Enforcement Priorities Through Supervised Discretion                85
B. The Core Inconsistency in *Texas v. United States*                              90
CONCLUSION                                                                         97

## *60 INTRODUCTION

On November 20, 2014, President Obama announced a package of administrative actions on immigration that the Department of Homeland Security (DHS) planned to take using its existing legal authority. [1] The most prominent of these measures built upon the government's use of prosecutorial discretion (also referred to as "enforcement discretion") to implement its enforcement priorities, which have long given precedence to removal of noncitizens deemed to present the greatest risks to national security, public safety, or border security. [2] To more efficiently and consistently channel the government's resources toward those priorities, DHS issued two administrative guidance documents. [3]

The first document refined and rearticulated the government's enforcement priorities themselves. [4] The second established eligibility criteria and processes for certain individuals falling outside those priorities to seek "deferred action," a longstanding mechanism by which immigration authorities exercise enforcement discretion. [5] Deferred action provides its recipients with nonbinding, revocable *61 notification that officials have deprioritized their removal. Under separate federal, state, or local legal authority, these individuals may then indirectly become eligible to seek certain benefits, such as employment authorization.

Two years earlier, DHS issued a similar guidance document announcing the Deferred Action for Childhood Arrivals (DACA) initiative, which set forth criteria for certain noncitizens who had unlawfully migrated to the United States as minors to seek deferred action. [6] The new DHS guidance documents expanded DACA to include a larger category of these individuals and announced a new initiative, Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), which established analogous criteria for certain undocumented parents of U.S. citizens and lawful permanent residents to seek deferred action. [7]

With as many as five million individuals potentially eligible for deferred action under DACA and DAPA, [8] immigrants' rights advocates welcomed the President's announcement. To be sure, none of these advocates regarded the deferred action initiatives as equivalent to comprehensive immigration reform, which would create a pathway to durable, legal immigration status for a much larger number of individuals. [9] Nevertheless, these advocates lauded the Obama administration for *62 taking a "good first step," which would afford a substantial subset of those individuals a provisional reprieve from removal while reform debates continue. [10]

But even before details of the DAPA program were announced, the Obama administration's political opponents charged that the steps being contemplated would reveal the President to be nothing less than an "American caudillo," a dark and tyrannical figure bent on engaging in "domestic Caesarism" by "eviscerat[ing] an entire statutory scheme." [11] Following the President's announcement, those attacks persisted. Critics accused the President of making a "brazen power grab" to impose "executive amnesty" and give "legal status" to "illegals." [12] As characterized by critics, the initiatives allow U.S. citizen and lawful permanent resident children of undocumented immigrants--a category of individuals often derided as "anchor babies"--to become "automatic human shields" for their "illegal parents." [13] One prominent Republican senator characterized the deferred action initiatives as tantamount to "printing up [and] counterfeiting immigration documents," while another raised the specter of "anarchy" and "violence" in response. [14] No matter the particular formulations of their attacks, all of these critics essentially accuse the President of having unlawfully imposed by decree precisely that which Congress *63 had declined to authorize by statute: legalization of noncitizens who lack lawful immigration status.

In political terms, these attacks--while legally unfounded, as I explain in this Article--are nevertheless unsurprising, given the toxic politics of immigration. More surprising, however, is the extent to which judicial discourse has closely mirrored the rhetoric and modes of argument that prevail in anti-immigration public discourse. Soon after the announcement, a group of Republican governors filed suit seeking to invalidate the deferred action initiatives. [15] The complaint--which inveighs against the President for "unilaterally suspend[ing] the immigration laws" by "executive fiat"--was filed in Brownsville, Texas, in order to steer its assignment to U.S. District Judge Andrew Hanen, who has for years garnered headlines as a strident critic of the Obama administration's immigration policies. [16]

Judicial opinions attacking the deferred action initiatives in similarly politicized terms have quickly followed. In mid-December 2014, U.S. District Judge Arthur Schwab, of the Western District of Pennsylvania, concluded that the President had unconstitutionally taken "unilateral legislative action" to permit undocumented immigrants to "become quasi-United States citizens." [17] In February 2015, Judge Hanen opined in *Texas v. United States* that the initiatives constituted "a new law" that grants undocumented immigrants "an award of legal status." [18] Echoing his earlier immigration-related commentaries, he blasted the Obama administration for its "total abdication and surrender of the Government's statutory responsibilities ... to enforce the immigration laws." [19] On that basis, Judge Hanen enjoined the new initiatives altogether. Several months later, in a lengthy opinion, a divided panel of the U.S. Court of Appeals for the Fifth Circuit denied **\*64** the government's motion to stay Judge Hanen's injunction pending appeal. [20] These decisions conflict with other judicial rulings that have declined to block the deferred action initiatives. [21]

In this Article, I examine a series of issues arising from this litigation, focusing in particular on Judge Hanen's decision in *Texas v. United States*. Drawing more from the political discourse surrounding the deferred action initiatives than from sound legal principles, the ruling highlights an erosion of the conventional lines between litigation, adjudication, and public discourse in politically salient cases and underscores the need for more careful attention to the legal basis for those initiatives. As programmatic mechanisms to ensure the consistent, transparent, and accountable exercise of prosecutorial discretion by agency officials, DACA and DAPA enable eligible noncitizens to obtain a tenuous form of quasi-legal recognition far short of legal immigration status under existing law or legislative reform proposals. However, Judge Hanen--like the Obama administration's political opponents-- elides these legal categories and distinctions, mischaracterizing the initiatives as "circumvent[ing] immigration laws" by providing "legal status." [22]

Like his earlier immigration-related commentaries, Judge Hanen's ruling is entirely continuous with the rhetoric and modes of argument that prevail in political discourse, and ultimately amounts to what I describe elsewhere as "judicial truthiness." [23] Indeed, at various points, the ruling appears directly influenced by that extrajudicial political discourse. While the Fifth Circuit's opinion declining to stay Judge Hanen's ruling is more measured in its tone, it reproduces the same basic substantive flaws. [24] As such, these decisions illustrate a broader tendency in litigation involving politically salient issues, in which groups engage the judicial process using politically oriented modes of argument--even when the gaps between that political rhetoric and the applicable legal principles are considerable-- **\*65** and judges respond in kind by discarding the norms of reasoned adjudication and judicial fact-finding in favor of the contemporary norms of political discourse. [25]

Those distortions of the judicial process, in turn, distorted Judge Hanen's substantive analysis in ways that have not been fully appreciated or analyzed. Contrary to what some observers have maintained, the decision cannot be understood as "narrowly" blocking certain "benefits" for undocumented immigrants while preserving the government's ability to establish enforcement priorities and exercise enforcement discretion. [26] Rather, at a more basic level, Judge Hanen's ruling effectively seeks to disable policymaking officials from taking meaningful steps either to implement those priorities or to promote rule of law values--including consistency, transparency, accountability, and nonarbitrariness--in the agency's execution of the immigration laws. While scholars have correctly observed that the decision's rhetoric and reasoning sweep much further than its formal holding, [27] this underlying, fundamental inconsistency in Judge Hanen's opinion-between purporting to respect the government's enforcement priorities and exercise of enforcement discretion, on the one hand, while simultaneously undermining its ability to execute those priorities in a manner that promotes rule of law values, on the other--has remained inadequately examined.

To examine the deferred action initiatives and the issues arising from these legal challenges, this Article proceeds in three Parts. In Part I, I explain how the deferred action initiatives operate and examine a series of basic factual and legal errors in

Judge Hanen's decision. Judge Hanen repeatedly mischaracterizes **\*66** DACA and DAPA not only as creating legal status, but as conferring a coherent, aggregated package of ancillary "benefits"--thereby mirroring and reinforcing precisely the same incorrect claims about the initiatives that circulate in political discourse. In Part II, I highlight the striking continuities between Judge Hanen's ruling in *Texas v. United States* and his provocative immigration-related commentaries in previous cases, which attacked the Obama administration's immigration policymaking officials for the manner in which they have established enforcement priorities, issued administrative guidance, implemented policies, and exercised prosecutorial discretion. These commentaries not only raise questions about the appearance of justice in *Texas v. United States*, but also, insofar as they involve analogous issues, provide a window into the confused manner in which Judge Hanen squarely challenges the government's enforcement priorities and exercises of prosecutorial discretion even as he purports to leave both undisturbed. In Part III, I examine that basic tension in the ruling, highlighting and developing a rationale for DACA and DAPA anchored in rule of law values, including consistency, transparency, accountability, and nonarbitrariness, which has received insufficient attention in discussions of the deferred action initiatives to date.

## I. JUDICIAL TRUTHINESS ABOUT DEFERRED ACTION

At the core of Judge Hanen's ruling is the incorrect assertion that DACA and DAPA create legal immigration status. That mistaken claim has proliferated widely in political discourse, and a variation on that same misunderstanding also has been reproduced by the Fifth Circuit in its opinion declining to stay Judge Hanen's ruling. [28] In this Part, I explain how the deferred action initiatives actually operate, highlighting the considerable gaps between the factual and legal realities of those initiatives and the manner in which Judge Hanen characterizes them in his opinion. While deferred action enables its recipients to obtain a tenuous and temporary form of quasi-legal recognition, it does not provide its recipients with any form of legal immigration status. As such, Judge Hanen's fusillade of attacks on the deferred action initiatives ultimately rest on a wholly incorrect factual and legal foundation.

### A. The Tenuous "Nonstatus" of Deferred Action

Both DACA and DAPA confer "deferred action," which for decades has been a principal mechanism--among numerous others--by which immigration **\*67** authorities have exercised prosecutorial discretion. [29] By itself, deferred action constitutes nonbinding, revocable notification that authorities have chosen not to seek the removal of a particular individual--and nothing more. The government's own longstanding regulations, for example, describe deferred action as simply an "act of administrative convenience to the government which gives some cases lower priority." [30]

The use of deferred action has been justified most frequently by the need for executive officials to prioritize enforcement actions, due to limited resources, and by the humanitarian equities that individual cases might present. [31] While deferred action has not been expressly authorized by Congress or expressly validated by the Supreme Court, both branches of government have long acknowledged this administrative practice as an established mechanism by which immigration authorities exercise prosecutorial discretion. The Supreme Court described and acknowledged the practice in 1999 in *Reno v. American-Arab Anti-Discrimination Committee*:

> At each stage [of the deportation process] the Executive has discretion to abandon the endeavor, and at the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as "deferred action") of exercising that discretion for humanitarian reasons or simply for its own convenience. [32]

Congress also has long acknowledged the agency's practice of conferring deferred action--for example, by expressly clarifying that particular categories of individuals should be permitted to seek deferred action. [33]

For years, observers have emphasized what the Court itself implicitly recognized in *American-Arab Anti-Discrimination Committee*: in formal terms, deferred action does not confer lawful immigration status. [34] Indeed, strictly speaking, **\*68** standing alone deferred action confers no benefits at all, but simply amounts to a memorialization and notification of the exercise of enforcement discretion. As Hiroshi Motomura has described, deferred action by itself is little more than the following: "If the

president can make a list to prioritize who should be deported first, then I think it's clear that he can give people at the bottom of that list a piece of paper saying you're at the bottom." [35]

To be sure, that piece of paper is by no means meaningless. However tenuous, individuals can derive a limited sense of reprieve and security from being informed that the agency has no present intention to take enforcement action against them. In addition, once individuals have been granted deferred action--whether under DACA, DAPA, or otherwise--they subsequently may become eligible, under other federal, state, and local legal authority, to indirectly receive certain ancillary benefits. Deferred action accordingly may be understood as facilitating a highly circumscribed form of quasi-legal recognition that, as Geoffrey Heeren describes, places noncitizens in a "paradoxical middle ground between legality and illegality." [36]  Access to that "middle ground"--which Heeren describes as "nonstatus," a form of immigration status purgatory--is a significant reason why potentially removable individuals seek deferred action in the first place, and one of the reasons why the Obama administration's deferred action initiatives make some critics uncomfortable. [37]

Importantly, however, the quasi-legal recognition that subsequently may arise from deferred action is inherently tenuous, and is a far cry from the full legal recognition extended to noncitizens with any form of legal immigration status. Deferred action provides no genuine immunity from removal, and despite longstanding efforts by immigrants' rights advocates to make deferred action more legally durable, nobody has any recognized right to seek deferred action. Any particular  **\*69**  grant of deferred action may be revoked at any time and for any reason without any recognized right to judicial or administrative review. [38]  More broadly, the President--or a future president--could curtail or eliminate DACA or DAPA altogether at any time and for any reason-- for example, due to increased funding for immigration enforcement or simply changed enforcement priorities. While it might currently seem that these initiatives, once implemented, would be politically difficult to rescind down the road, those future political calculations remain far from clear--and, in any event, are legally irrelevant.

Moreover, the structure of the quasi-legal recognition arising from deferred action is disaggregated and piecemeal--deriving not, as critics of the deferred action initiatives suggest, in any sort of coherent way from the guidance documents announcing DACA or DAPA or even from any particular grant of deferred action. Rather, that quasi-legal recognition arises from a constellation of entirely separate and dispersed sources of legal authority and administrative guidance that long predate DACA and DAPA, can vary significantly in different contexts, and often provide considerably more limited benefits than those afforded to individuals with legal immigration status. [39]  In all of these respects, the quasi-legal recognition that may arise from deferred action conceptually shares more continuities with the kind of quasi-legal recognition that invariably extends to *all* undocumented immigrants, in varying forms and degrees, than it does with the more complete legal recognition arising from any form of legal immigration status. After all, while undocumented immigrants are potentially removable, they have never been fully excluded from legal recognition and protection in the United States altogether. To the contrary, undocumented immigrants have a "dual legal identity," in which they are legally deemed "outsiders" for many purposes but simultaneously recognized by the law as "members" for other purposes. [40]  For undocumented immigrants who have been granted deferred action, that ambiguous and unstable legal subjectivity persists.

Unsurprisingly, therefore, neither proponents of legislative reform to legalize undocumented immigrants nor DACA- and DAPA-eligible individuals themselves regard deferred action as equivalent to legal status. [41]  Indeed, because  **\*70**  of the vulnerabilities that result from coming forward to seek deferred action, large numbers of DACA-eligible individuals have chosen not to apply. [42]  Applicants must submit biometric data and other personal information to permit authorities to establish their identity, conduct background checks, and determine their eligibility. Unsuccessful applicants risk being placed in removal proceedings--which operates as a powerful deterrent against individuals with marginal applications from applying in the first place. But given deferred action's tenuous nature, the vulnerabilities for successful applicants are also significant. If deferred action later were revoked or its renewal were denied, the data collected from applicants could make it much easier for the government to pursue their removal. Unlike more durable forms of discretionary relief from removal, therefore, deferred action has two distinct faces, for while it does confer a temporary (but revocable) reprieve from removal, it simultaneously operates as an ongoing mechanism of immigration surveillance and control and that can facilitate subsequent enforcement action. [43]

## B. The Mischaracterization of Deferred Action as "Legal Status"

Despite these realities about deferred action, Judge Hanen's ruling--echoing the inflamed politics surrounding immigration--is littered with assertions that the initiatives provide "an award of legal status" to millions of "illegal aliens." [44] Although "legal status" and "legal presence" have distinct legal meanings, Judge Hanen repeatedly conflates and uses the terms interchangeably. In a number of especially jumbled instances, he even mashes them up into what he calls "legal presence status," a made-up concept with no legal meaning at all. For example:

> • "The DHS has announced that the DAPA program *confers legal status* upon its recipients." [45]

> **\*71** • "[T]his case does not involve the wisdom, or the lack thereof, underlying the decision by [DHS] Secretary Jeh Johnson to award *legal presence status* to over four million illegal aliens." [46]

> • "[A]pproximately 636,000 [individuals] have applied for and received *legal presence status* through DACA." [47]

> • "DAPA makes *the illegal presence of millions of individuals legal*." [48]

> • "DAPA authorizes a new *status of 'legal presence'* along with numerous other benefits ...." [49]

> • "DHS knew ... that by giving the recipients *legal status*, it was triggering obligations on the states as well as the federal government." [50]

> • "DAPA turns its beneficiaries' *illegal status ... into a legal presence*." [51]

Judge Schwab's ruling rests on similar premises, asserting that the initiatives enable "undocumented immigrants [to] become quasi-United States citizens." [52]

These elisions amount to an extended rhetorical sleight of hand. Consider, for example, Judge Hanen's selective and out-of-context quotation from DHS's website, an apparent attempt to spring a "gotcha moment" on the government. According to Judge Hanen, DHS necessarily concedes that DACA confers "affirmative status" when it states:

> [Y]ou are considered to be lawfully present in the United States ... and are not precluded from establishing domicile in the United States. Apart from immigration laws, "lawful presence," "lawful status," and similar terms are used in various other federal and state laws. [53]

That discussion, however, concerns Section 212(a)(9)(B) of the Immigration and Nationality Act (INA), which imposes two waivable, time-limited bars on future admissibility for individuals who have been "unlawfully present" in the United States, depart the United States, and subsequently seek admission. [54] The statute deems individuals to be "unlawfully present" if they are present in **\*72** the United States "after the expiration of a period of stay authorized by the Attorney General"--a phrase that the statute leaves undefined--or present in the United States without being admitted or paroled. [55] But under both the terms of the statute itself and longstanding agency interpretations that well predate DACA and DAPA, unlawful *presence* does not

accrue for many individuals without lawful *status*, including deferred action recipients. [56] This nonaccrual of unlawful presence has no effect on either immigration status or potential removability, and does not eliminate any periods of unlawful presence that may have already accrued.

Accordingly, despite Judge Hanen's insinuation, the statement on the DHS website has no bearing on immigration status or removability. It only is relevant for the narrow purpose of future inadmissibility--and even there, the practical significance appears negligible. [57] Indeed, Judge Hanen's opinion is an extended exercise in missing the very point of the language he selectively quotes: "lawful status" and "lawful presence," as used in various legal contexts, do not always have the same legal meaning and are not necessarily equivalent to legal immigration status.

Tellingly, Judge Hanen declines to quote the language on the website immediately before the passage he cherry picks:

Q5: If my case is deferred, am I in lawful status for the period of deferral?

A5: No. Although action on your case has been deferred and you do not accrue unlawful presence (for admissibility purposes) during the period of deferred action, deferred action does not confer any lawful status. [58]

DHS emphasizes the same point repeatedly on the same web page. Judge Hanen, however, fails to acknowledge that fact, much less to engage its significance.

With no factual or legal basis, Judge Hanen's conclusion--that the initiatives create "legal status" and therefore involve "not just rewriting the laws [but] creating **\*73** them from scratch"--only makes sense in political terms. [59] Substantively, there is no daylight between this conclusion and political allegations that the initiatives constitute "executive amnesty" and give "illegals ... legal status." Indeed, Judge Hanen dignifies this rhetoric when he insists--in openly relativist terms that constitute truthiness in its purest form--that whether the initiatives constitute "a blanket amnesty program," as the administration's opponents falsely claim, "is obviously a matter of opinion." [60]

## C. "Total Abdication" by the "Deporter-in-Chief"?

A related set of conclusions--that the new initiatives "circumvent" immigration law and involve "total abdication and surrender of the Government's statutory responsibilities"--similarly draws more from political rhetoric than sound legal principles. [61] Echoing public discussions of legalization proposals that seek to provide undocumented immigrants with a "pathway to permanent residence," Judge Hanen charges that the deferred action initiatives "establish[] a pathway for non-compliance and completely abandon[] entire sections of this country's immigration law." [62] Insisting this claim "cannot be disputed," he repeats versions of the charge throughout his opinion, blasting the Obama administration for "not seek[ing] compliance with federal law in any form." [63] Some of the Obama administration's opponents routinely make the same kind of assertion when they accuse the President of acting like a king or an emperor, or engaging in "domestic Caesarism." [64] For example, Michael McConnell asserts that DAPA "dispense[ s] with" two statutory provisions: the "unlawful presence" admissibility bars, discussed above, and the requirement that U.S. citizens and permanent residents be at least twenty-one years old to sponsor their parents as immigrants. [65]

These assertions might carry some validity if DACA and DAPA purported to confer legal status. Because deferred action does no such thing, however, the initiatives "circumvent" and "dispense with" precisely nothing. DAPAeligible noncitizens remain potentially removable and subject to the future admissibility bars, and their children remain unable to sponsor their parents as **\*74** immigrants before age twenty-one. Moreover, the Obama administration can hardly be accused of "total abdication" of immigration enforcement with a straight face. In recent years, federal expenditures on immigration control have exceeded $18 billion per year, more than the expenditures on all other federal law enforcement programs combined. [66] The administration not

only has enforced the immigration laws to the maximum extent of these appropriated funds, but has removed more individuals than any other administration in U.S. history. By the end of President Obama's first term, the annual number of removals had exceeded 419,000 individuals--a level more than eighteen times higher than in 1985. [67] After five years in office, the Obama administration already had removed as many individuals as its predecessor had in its full eight years in office. [68]

Because of this record, immigrants' rights advocates have pointedly called President Obama the "deporter-in-chief." [69] While administration officials and the President himself have vigorously defended their record, [70] the nature of the mass deportation regime at the heart of that contention gives any suggestion that the Obama administration has "totally abdicated" immigration enforcement an odd, through-the-looking-glass quality. Judge Hanen does not make even a passing effort to reconcile his finding of "total abdication" with these facts demonstrating precisely the opposite.

Moreover, Judge Hanen's conclusion that states have standing because of this supposed "abdication" rests on a theory in significant tension with the Supreme Court's decision in *Arizona v. United States*. [71] According to Judge Hanen, the deferred action initiatives provide a "textbook example" of "a situation when the federal government asserts sole authority over a certain area of American life **\*75** and excludes any authority or regulation by a state; yet subsequently refuses to act in that area." [72] Echoing Justice Scalia's dissent in *Arizona*--which unsuccessfully maintained that states have a "sovereign prerogative" to regulate immigration--Judge Hanen criticizes the federal government for blocking states from "all but token participation" in immigration control and then "den[ying] the states any means to protect themselves" from unlawful migration, "even when the state seeks to enforce the very laws passed by Congress." [73] Oddly, he mischaracterizes the INA's enforcement provisions as having been "enacted to protect the states"--rather than as instruments of federal policy enacted to advance the national interest--"because, under our federal system, [the states] are forbidden from protecting themselves." [74]

All of this, in a word, is bizarre. Judge Hanen recognizes that *Arizona* effectively rejected his theory of state sovereignty over immigration-- lamenting, for example, that the Court left states "virtually powerless to protect themselves from the effects of illegal immigration." [75] But rather than treating *Arizona's* result as flowing from the supremacy of federal law, Judge Hanen paints a convoluted picture in which the immigration power has been improperly seized from the states--as if by force--and is now merely held in trust and exercised by federal authorities on behalf of the states as quasi-sovereign entities. That account is difficult to reconcile with *Arizona's* rejection of any nineteenth century-style state sovereignty over immigration. [76] Like Justice Scalia's *Arizona* dissent itself, however--which--Judge Richard Posner describes as "having the air of a campaign speech"-- Judge Hanen's account is entirely of a piece with the kinds of theories that circulate in anti-immigration political discourse. [77]

### D. Sweeping Beyond "Benefits"

Judge Hanen is not incorrect in observing that individuals granted deferred action can subsequently become eligible to seek certain ancillary benefits. But as **\*76** discussed above, those benefits are not equivalent to those available to individuals with legal status--and in any event, their availability is governed by separate legal authority and administrative guidance that long predate DACA and DAPA and that already have fully satisfied the requirements of the Administrative Procedure Act. Accordingly, like "unlawful presence" under INA § 212(a)(9)(B), eligibility for those benefits is conceptually separate from immigration status or the exercise of prosecutorial discretion. If Judge Hanen's ruling were correctly understood as confined to benefits, as some of its defenders maintain, then one would expect it to devote some attention to the actual legal authority governing whatever benefits troubled him. The opinion, however, devotes no attention to that authority at all.

Take, for example, employment authorization, which is not governed by DACA or DAPA, but by regulations promulgated decades ago using notice-and-comment rulemaking. [78] Since the 1960s, immigration officials have exercised authority to grant or deny employment authorization to various categories of noncitizens, including recipients of deferred action. Formal regulations issued using notice-and-comment rulemaking have governed these practices since 1981. [79] When Congress enacted the Immigration Reform and Control Act of 1986 (IRCA), which imposed sanctions on employers that hire noncitizens "unauthorized" to work in the United States, it legislated against the background of those practices and expressly confirmed this regulatory authority. [80] Under INA § 274A(h)(3), noncitizens are eligible to work in the United States if they are "alien[ s] lawfully admitted for permanent residence" or "authorized to be so employed by this Act *or by the Attorney General*." [81]

Notably, just before Congress enacted IRCA and President Reagan signed it into law, an organization advocating broader immigration restrictions petitioned the INS either to rescind those regulations or to modify them to include only those noncitizens expressly authorized by statute to work in the United States by statute. [82] The INS solicited public comments, and after IRCA became law the following year, it denied the petition. The agency emphasized IRCA's confirmation of its regulatory authority, concluding that INA § 274A(h)(3) should be interpreted as an express acknowledgment and endorsement of how **\*77** the agency had exercised authority to grant work authorization before IRCA's adoption. [83] Moreover, the contrary interpretation not only would render the phrase "or by the Attorney General" superfluous, but also would render meaningless several other provisions that expressly prohibit work authorization for certain noncitizens. When the agency issued regulations to implement IRCA, it accordingly preserved the existing provisions permitting deferred action recipients to apply for work authorization. [84]

Since then, immigration authorities have continued to grant employment authorization to deferred action recipients, but only, as before IRCA, upon a showing of "economic necessity to work." [85] Because that standard applies to individuals granted deferred action under DACA and DAPA--which is more restrictive than the standard for other noncitizens--there is no guarantee that indiindividuals granted deferred action under those initiatives will necessarily receive work authorization at all. Indeed, a recent analysis of over 17,000 applications for employment authorization that were submitted by individuals granted deferred action and processed between 2011 and 2013 found that, in applying that "economic necessity" standard, almost 23 percent of those applications had not been approved. [86]

While Congress has subsequently enacted major changes to the immigration laws-- including changes concerning employment authorization itself--at no point has it sought to curtail this regulatory authority to grant work authorization to deferred action recipients. In their complaint, the plaintiffs did not directly challenge these regulations, but instead incorrectly treated work authorization as flowing automatically from DACA and DAPA themselves. Eventually, the parties did joust over this legal authority in their briefs, albeit to a limited extent. [87] In Judge Hanen's ruling, however, this legal authority plays no role whatsoever. If the ruling genuinely had been narrowly crafted to questions about benefits, then Judge Hanen's lack of interest in the law governing those benefits makes little sense.

Moreover, if the ruling genuinely had been meant to preserve the exercise of prosecutorial discretion, then there would have been no reason for him to enjoin **\*78** the processes for conferring deferred action under the new initiatives--since deferred action *is* the exercise of prosecutorial discretion and nothing more. An injunction along those lines might have blocked the issuance of employment authorization documents while letting DHS proceed with its plans to accept and review applications for deferred action itself. While the number of DACA- and DAPA-eligible noncitizens willing to seek deferred action under those circumstances certainly would have been more limited, that kind of injunction would have been more consistent with a ruling limited to blocking benefits for undocumented immigrants. Instead, Judge Hanen's injunction bludgeoned the Obama administration's initiatives in their entirety, enjoining "any and all aspects or phases" of their implementation. [88]

Nor did Judge Hanen tailor his injunction to those states that had actually sued. Rather, the injunction blocked the initiatives nationwide--even though he only concluded that Texas had standing and might suffer harm if they were implemented. In making those findings, and assessing the balance of hardships to the parties and the public interest, Judge Hanen ignored countervailing evidence indicating that implementation of the initiatives would bring significant benefits. In fact, twelve states and the District of Columbia strongly argued to the court in an amicus brief not only that these benefits far outweighed the costs alleged by the plaintiffs, but that substantial harms would result in their states from blocking implementation. [89]

## II. POLITICAL COMMENTARY BY OTHER MEANS

Judge Hanen's ruling in *Texas v. United States* closely mirrors his impassioned but gratuitous commentaries in several cases attacking the Obama administration's immigration policies and its policymaking officials. In each instance, Judge Hanen discarded the conventional norms of adjudication and the adversarial process and exhibited an unusually high degree of personal interest, animosity, and emotional involvement in immigration-related questions far afield from the issues actually before the court. These surrounding facts and circumstances might **\*79** or might not rise to a level that would warrant his disqualification or reassignment on remand. But regardless of how that question ultimately might be answered, Judge Hanen's commentaries draw into sharper focus precisely where his factual findings and substantive legal conclusions ultimately fell short when reviewing the Obama administration's deferred action initiatives, given the continuities between the issues addressed in these opinions and some of the analogous questions arising in *Texas v. United States.*

In *United States v. Cabrera*, Judge Hanen lambasted U.S. Citizenship and Immigration Service officials--calling them "accessories after the fact" who had "purposefully hinder[ed] law enforcement officers from doing their job"-- for processing a valid request for a replacement green card by a lawful permanent resident who had pleaded guilty to a drug trafficking offense and been sentenced by Judge Hanen. [90] Judge Hanen recognized that his four-page attack was gratuitous, since the opinion solely concerned his disagreement with a guidance document that was neither before the court nor had any bearing on the case's disposition. Indeed, he deliberately waited until "the outcome of the case [was] no longer a pending question" before offering his comments-- which rendered his opinion entirely nonadjudicative. [91]

With *Cabrera*, however, Judge Hanen was just getting warmed up. In *United States v. Nava-Martinez*, he ripped into immigration officials for "participat [ ing] in ... a criminal conspiracy" with "evil individuals" who "are violating the border security of the United States." [92] In the case before him, Judge Hanen accepted the guilty plea of an individual who had been hired by an undocumented woman from El Salvador to smuggle her ten-year-old daughter into the United States. The focus of his anger was DHS's decision to release the daughter to her mother's custody and its exercise of prosecutorial discretion not to pursue criminal charges or removal proceedings against the mother. Once again, the opinion was nonadjudicative, since he self-consciously waited until after the defendant was sentenced before offering his commentary--and since neither the mother nor the daughter were even before the court in any capacity.

In both rhetoric and substance, Judge Hanen's ten-page commentary in *Nava-Martinez* closely foreshadowed his later opinion in *Texas v. United States*. Disapproving of how policymaking officials had implemented a settlement **\*80** agreement that was not before the court, he accused those officials of being more interested in "rewarding criminal conduct" than "enforcing the current laws": [93]

> This Court is quite concerned with the apparent policy ... of completing the criminal mission of individuals who are violating the border security of the United States ....

> The DHS, instead of enforcing our border security laws, actually assisted the criminal conspiracy in achieving its illegal goals ....

> The DHS has simply chosen not to enforce the United States' border security laws. [94]

He assailed these practices as the "shameful" result of "some policymaker" bent on "support[ing] the lawbreakers" and, without explaining the basis or relevance of his charges, accused them of "lower[ing] the morale of those law enforcement agents on the front line here on the border." [95] His bottom line was the same as it later would be in *Texas v. United States*: DHS "should cease telling the citizens of the United States that it is enforcing our border security laws because it is clearly not." [96]

Finally, only months before the deferred action initiatives were announced, Judge Hanen wrote a blistering, twenty-four-page opinion in *United States v. Ramirez* criticizing an immigration judge's decision to defer removal under the Convention Against Torture of an individual who Judge Hanen had previously sentenced for illegal reentry into the United States. [97] Again, Judge Hanen acknowledged that he lacked jurisdiction over the issue. Nevertheless, he raked the government over the coals for not implementing the immigration laws according to his own preferences. He asserted that granting humanitarian relief to Ramirez, and others, provided an "open invitation to the most dangerous villains of society"--thereby turning "Main Street America" into a "rogue's gallery"--and amounted to "the failure of the Government to enforce the laws of this country." [98] He offered his detailed views on the relationship between the government's implementation of laws governing asylum and other humanitarian relief from removal and criminal activity by drug cartels-- emphasizing that his armchair analysis was not based on the record, but on his "first-hand, in-the-trenches-knowledge of the border situation." [99]

**\*81**  By 2014, therefore, Judge Hanen had issued provocative and gratuitous commentaries in three separate immigration-related contexts in which he excoriated the Obama administration's policymaking officials for the manner in which they established enforcement priorities, issued administrative guidance, implemented policies, and exercised prosecutorial discretion. In each case, his unusually high personal interest, animosity, and emotional involvement in immigration-related issues were plain to see. He went to great lengths to comment on issues that concededly were neither before the court nor relevant to his decision making, and he acknowledged that his opinions were partially based on extrajudicial information outside the formal record.

Given this substantial body of injudicious commentary, reasonable observers could not have been surprised--and indeed, no observers in fact seemed surprised--when Judge Hanen approached *Texas v. United States* in a comparable manner. At the hearing on the plaintiffs' preliminary injunction motion, Judge Hanen underscored his unusually high interest and emotional investment in the Obama administration's immigration enforcement policies, invoking his court's location near the U.S.-Mexico border as relevant to his adjudication:

> I will say that talking not just to me, but to anyone in Brownsville about immigration is like talking to Noah about the flood, both in legal terms and in practical terms. So, I mean, we're the spearhead of the spear. If there's any tip to it, we're it.

> And by that, we've seen the upsides of--and downsides of strict enforcement of immigration laws. I mean, as a judge, I'm compelled to sentence people who are here illegally at times when I think all they are trying to make a better life for their family, and that's kind of a downside. We see the upside of it. We see--just last week we swore in over 100 new citizens. And we swear in thousands of new citizens a year here, and we get pleasure out of that.

> We see the upsides and downsides of what some people might describe as a lax enforcement policy. I mean, we--probably in the circumference of just several miles around this courthouse, we probably have thousands of illegal aliens that are living and doing nothing more than supporting their family and raising them and trying to make a better life for themselves, but we've also seen some of the crimes that are committed. I mean, just earlier this fall, we had a Border Patrol  **\*82**  agent shot and killed in Willacy County allegedly by illegal aliens. So, I mean, there are upsides and downsides about that, and we see that. [100]

Like his opinions in *Cabrera*, *Nava-Martinez*, and *Rodriguez*, these comments suggest a remarkable willingness to casually rely upon extrajudicial information, issues, and perspectives in the course of his adjudication. Judge Hanen's ultimate ruling in *Texas v. United States* also closely tracks those earlier opinions by asserting that DHS's policymaking officials--as opposed to its rank-and-file officers--have "totally abdicated" immigration enforcement.

Moreover, these continuities with his earlier opinions also draw attention to other ways in which Judge Hanen's adjudication greatly suffered in *Texas v. United States*. He treats several contested and complicated propositions about immigration policy as conclusively established without providing even cursory evidentiary support--asserting, for example, that the "constant influx of illegal immigrants ... is causing the States to experience severe law enforcement problems," [101] that "there can be no doubt that the failure of the federal government to secure the borders is costing the states ... millions of dollars in damages," [102] that it is "indisputable" that the states "are harmed to some extent by the Government's action and inaction in the area of immigration," [103] and that the government's "failure to secure the border has exacerbated illegal immigration into this country." [104] While Judge Hanen's confidence in his own "first-hand, in-the-trenchesknowledge of the border situation" [105] might have induced him to believe otherwise, none of those propositions are remotely as self-evident as he insists.

Like Judge Hanen's earlier immigration-related opinions, therefore, *Texas v. United States* reads more like a document written to intervene in political debates than a judicial opinion carefully analyzing legal issues arising from DACA and DAPA. He writes nonchalantly about "self-deportation" as if that were a noncontroversial, ordinary thing to discuss, and offers provocative commentary on a series of controversial but ultimately tangential immigration-related matters, including the

"flood" of unaccompanied minors, the "specter of terrorism," and the inability of the "powers that be in Washington" to enact immigration reform. **83** [106] To a striking extent, Judge Hanen engages those political debates in personal terms. He repeatedly emphasizes (and distorts) statements by President Obama about the initiatives, including offhand comments in response to informal questions, and treats them as if they had determinative legal significance--even as he acknowledges that the President himself "has not directly instituted any program at issue in this case" and largely disregards the administration's legal justifications for the initiatives, as opposed to its political motivations. [107]

Judge Hanen's subsequent conduct only reinforces this impression, exhibiting an "uncommon interest and degree of personal involvement" in the issues raised in the deferred action litigation. [108] His order denying the government's motion for a stay pending appeal doubles down on the incorrect assertions in his original opinion and adds the new, wildly untrue assertion--based on extrajudicial information from the Internet--that President Obama personally "has ordered that the laws requiring removal of illegal immigrants that conflict with the 2014 DHS Directive are not to be enforced, and that anyone who attempts to do so will be punished." [109] In referring imprecisely to a "2014 DHS Directive," Judge Hanen collapses two entirely separate administrative guidance documents--one delineating the government's enforcement priorities and one establishing eligibility criteria for individuals to seek deferred action under DACA and DAPA--into a single "directive," as if they were inextricably intertwined. [110] However, contrary to the insinuation by Judge Hanen, the comment in question by the President solely concerned implementation of the government's enforcement priorities--which, as discussed in Part III, Judge Hanen purports not to second guess. [111]

**84** Subsequently, Judge Hanen has reiterated those assertions, issuing a highly unusual, sua sponte "supplemental order" that highlights information that he evidently discovered in media reports--without any prompting by the parties--in an effort to bolster the reasoning in his original opinion, as if in response to arguments and criticisms of the opinion raised in appellate proceedings and the public sphere. [112] He also has fanned the flames on what seems best understood as a manufactured and contrived scandal, arising from a narrow misunderstanding among counsel in the litigation concerning the timing of the government's implementation of a limited modification to renewals of deferred action under DACA--to the point of angrily demanding the government's lawyer to answer, "I can trust what the president says? ... That's a yes or no question." [113]

All of this grandstanding makes for riveting political theater. As adjudication and legal analysis, however, it leaves much to be desired. A reasonable observer aware of all facts and circumstances surrounding the litigation might well conclude that this course of conduct has undermined the appearance of justice, by leaving an impression that Judge Hanen's decision making has been clouded and distorted by improper, extrajudicial concerns. [114] Even well short of that conclusion, however, Judge Hanen's unusual and provocative commentaries serve to highlight and place in sharper relief some of the specific faults in his adjudication of the analogous factual and legal issues in *Texas v. United States*.

**85** **III. SUPERVISED ENFORCEMENT DISCRETION AND THE RULE OF LAW IN INSTITUTIONAL CONTEXT**

All of these flaws in Judge Hanen's reasoning and approach to adjudication led him to falter in his substantive analysis of the complex issues arising from the government's establishment of enforcement priorities and prosecutorial discretion guidelines in an era of mass deportation--an era in which, as noted above, enforcement activities are now conducted on a massive scale by a broad array of separate agencies, entities, and officials. Ultimately the deferred action initiatives must be understood and evaluated in light of the specificities of that sprawling regime, not in abstract or decontextualized terms, and in this Part, I develop a rationale for the deferred action initiatives that is informed by those contextual specificities. [115] As frameworks to guide enforcement discretion within the immigration enforcement regime's expansive and fragmented decisionmaking context, DACA and DAPA grow out of an evolving series of efforts, spanning multiple presidential administrations, to minimize the extent to which that discretion is exercised in a manner that is arbitrary, inconsistent, or contrary to the agency's priorities and policies. [116] The initiatives not only seek to channel scarce enforcement resources toward agency priorities more efficiently and effectively than those previous efforts, but also seek to ensure that in executing the immigration laws, the agency and its personnel heed important rule of law values such as consistency, transparency, accountability, and nonarbitrariness. [117] While Judge Hanen purports to respect the government's authority to establish enforcement priorities and exercise enforcement discretion, his inattentiveness to the rule of law values promoted by DACA and DAPA causes him to simultaneously challenge those priorities and exercises of discretion more directly than it may initially appear.

## A. Implementing Enforcement Priorities Through Supervised Discretion

Leaving aside whether it even could permissibly or practically do so, Congress in fact has not tried to fully micromanage how immigration authorities set priorities and exercise prosecutorial discretion, or even for that matter to give fully **\*86** coherent or consistent general instructions about how those priorities should be established or how enforcement actions should be carried out. To the contrary--especially given the millions of noncitizens potentially subject to the immigration law's broad removability provisions, and congressional appropriations that permit enforcement action against only a small fraction of those individuals--Congress's instructions and guidance to immigration authorities, enacted at different moments in time for a variety of different purposes, are in some tension with each other. [118] The agency's establishment of enforcement priorities is congressionally authorized under broad, express delegations of authority to enforce the immigration laws and establish "national enforcement policies and priorities," but also under what Adam Cox and Cristina Rodríguez, applying William Stuntz's insights on the structure of criminal law, describe as "de facto delegation." [119] To a limited extent, those priorities are also congressionally directed in express terms, but only partially--for example, through various provisions instructing authorities to prioritize enforcement actions against noncitizens with criminal convictions, in part based on the severity of their offenses. [120]

The legal regime governing immigration therefore simultaneously authorizes, enables, and demands policymaking and supervisory officials in the executive branch to establish enforcement priorities and exercise enforcement discretion in a manner that necessitates tradeoffs among various goals and purposes. [121] Accordingly, **\*87** policymaking officials have long issued guidance documents communicating the agency's priorities and providing direction on how enforcement discretion should be exercised--at every stage of the removal process--to carry out those priorities and to promote other applicable principles, including rule of law values. [122] In 1999, twenty-eight members of Congress from both parties--seeking to ameliorate unjust results under the severe provisions of the 1996 immigration laws-- requested that Clinton administration officials provide stronger administrative guidance to encourage greater and more consistent use of prosecutorial discretion. [123] Drawing an analogy to the "detailed guidelines" governing enforcement discretion by U.S. Attorneys, their letter urged immigration authorities to issue similar guidelines for rank-and-file officials--"both to legitimate in their eyes the exercise of discretion and to ensure that their decisions to initiate or terminate removal proceedings are not made in an inconsistent manner." [124]

Following this bipartisan request, INS Commissioner Doris Meissner issued a policy statement summarizing the agency's priorities and discussing a nonexhaustive list of factors--including the individual's immigration status, length of residence in the United States, criminal history, humanitarian equities, and other considerations--to guide prosecutorial discretion. [125] While disclaiming any intent to "produce rigid uniformity among INS officers in all areas of the country at the expense of the fair administration of the law," she emphasized that stronger guidance was needed to "promot[e] consistency among the prosecutorial activities of different offices and between their activities and the INS' law enforcement **\*88** priorities." [126] To that end, she stressed that officials should exercise discretion "in a judicious manner at all stages of the enforcement process," and to do so "subject to their chains of command." [127]

Subsequent guidance documents have reiterated these principles. In 2005, ICE's principal legal advisor articulated criteria to guide prosecutorial discretion by agency attorneys, describing a number of different scenarios in which forgoing enforcement action would be deemed appropriate. [128] He highlighted the need to exercise discretion "uniformly throughout our offices and in all of our cases," noting that programmatic guidance was necessary because the scale and geographic extent of enforcement activities no longer made it practical for attorneys to make those decisions through routine, individualized consultation with officials initiating enforcement actions, as they had done in the past when the scale of the enforcement regime was smaller. [129] In 2007, ICE Director Julie Myers reiterated the applicability of the Meissner memo to custody decisions involving nursing mothers, emphasizing that those decisions should be overseen "through the programs' operational chain of command." [130]

Despite these efforts, enforcement patterns in the field remained inconsistent and diverged significantly from priorities and guidelines established by policymaking officials. Several factors have contributed to this divergence, including broad expansions in the categories of individuals potentially subject to removal proceedings, significant constrictions on eligibility for relief from removal, and tremendous growth in the resources available for enforcement activities. [131] The combination of these developments has caused massive expansions in both the scale of the enforcement regime and in the occasions for officials to

exercise enforcement discretion-- which in turn has greatly complicated the  **\*89**  agency's supervisory tasks of ensuring fidelity to its priorities, consistency in the exercise of discretion, and public confidence that the laws are being fairly executed and enforced. Those tasks have been further complicated by intense pressures on both individual enforcement officers and the agency more generally to measure performance based on numbers of removals--in some instances to the point of reportedly instituting enforcement quotas. [132]  Even without formal quotas, those pressures can frustrate the agency's priorities and guidelines by encouraging enforcement actions based on a numbers-driven sense of convenience or expedience, rather than judicious exercise of discretion in a manner that heeds those priorities and guidelines. [133]

While the Obama administration attempted to address this divergence by communicating the agency's priorities and guidelines more concretely, those initial efforts were widely regarded as unsuccessful. An enforcement priorities memorandum by ICE Director John Morton articulated the agency's priorities in terms of an elaborate hierarchy of categories and subcategories of potentially deportable noncitizens, rather than in more general terms. [134]  A subsequent memo built upon earlier guidelines for exercising prosecutorial discretion, setting forth more detailed criteria and drawing specific attention to factors warranting "particular care and consideration." [135]  These efforts, however, did not yield significant changes in enforcement patterns, which remained inconsistent and seemingly arbitrary, and continued to diverge from the agency's priorities and guidelines. [136]  Indeed, officials in the bureaucracy were not simply inconsistent in following these policy statements, but in some instances actively resisted them--to such an extent that one of the three ICE officers' unions, encouraged by opposition politicians in Congress, formally voted "no confidence" in ICE's leadership based on its  **\*90**  substantive disagreement with the policies established by those policymaking officials. [137]

The deferred action initiatives must be understood and analyzed in this context, as what one former ICE official describes as "a logical next step." [138]  The initiatives modify, refine, and clarify the hierarchy of enforcement priorities set forth in the Morton memos and establish new procedures for discretionary decisions to deviate from those priorities when appropriate. [139] But rather than exclusively delegating discretion to grant deferred action to front-line officers--and effectively giving them plenary authority to apply the detailed but open-ended criteria of earlier guidance documents--the initiatives establish a parallel framework that divides the exercise of prosecutorial discretion into two layers. The first layer involves an exercise of discretion by policymaking officials to establish a decision-making framework consisting of eligibility criteria, both qualifying and disqualifying, for noncitizens to be considered for deferred action. As the guidance documents for DACA and DAPA make clear, those eligibility criteria are intended to reflect and give effect to both the agency's priorities themselves, and incorporate many of its longstanding factors to guide the exercise of prosecutorial discretion. The second layer instructs rank-and-file officers to apply those criteria and to decide whether to grant deferred action on an individualized, case-by-case basis. Moreover, rather than leaving deferred action to be granted primarily when enforcement actions already have been initiated, the initiatives permit noncitizens to affirmatively apply for deferred action from DHS's immigration services agency, USCIS, before enforcement actions have been commenced--in order to eliminate the need for DHS's enforcement-oriented agencies, U.S. Customs and Border Patrol (CBP) and ICE, to expend resources on enforcement actions against those individuals. [140]

### *91 B. The Core Inconsistency in *Texas v. United States*

For Judge Hanen, this supervised, programmatic approach to enforcement discretion evidently does not constitute the legitimate exercise of discretion at all. That conclusion, however--offered only implicitly, without any rearcasoned explanation--fails to adequately grapple with both the actual facts concerning DACA and DAPA and the relationship between agency enforcement priorities and prosecutorial discretion when immigration enforcement takes place on a massive but fragmented scale. Ultimately, the ruling rests upon an inconsistency that Judge Hanen fails to acknowledge, much less resolve: while he purports to respect and leave undisturbed the executive branch's ability to establish enforcement priorities and exercise enforcement discretion, the entire thrust of his opinion directly challenges its ability to do precisely that.

First, in concluding that "discretion is virtually extinguished" under the two initiatives, Judge Hanen disregards the unambiguous terms of the guidance documents at issue, which unequivocally require not simply satisfaction of certain eligibility criteria, but also require officials to exercise individualized, case-by-case discretion before granting deferred action. Under the express terms of the policy statement announcing DAPA, for example, USCIS officials not only are directed to exercise prosecutorial discretion "on a case-by-case basis," but also are required to determine that the individual "presents no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate." [141]  But rather than focusing on those documents, Judge

Hanen focuses instead--again, in strikingly personal terms--on informal comments by President Obama and out-of-context statements from the DHS website, concluding on that basis that "if an applicant meets the DACA criteria, he or she *will* not be removed." [142] As in other parts of his opinion, Judge Hanen fails to explain why those political statements should be afforded determinative legal significance, especially in the face of guidance documents stating precisely the opposite. As the Fifth Circuit concluded, in upholding the dismissal of a previous lawsuit challenging DACA, the notion that officials are "always required to grant deferred action" under the initiatives is "erroneous." [143]

 **\*92** While Judge Hanen inferred from apparently high approval rates under DACA that no individualized, case-by-case discretion would take place under the new initiatives, that logically flawed inference flows from a cascade of basic errors. While acknowledging that the language of the guidance documents announcing the *new* initiatives expressly requires individualized, case-by-case disdiscretion, Judge Hanen concluded that language was "merely pretext" because the approval rates under *DACA* were especially high. [144] In reaching this conclusion, Judge Hanen made essentially no effort to account for potential differences in the characteristics of individuals eligible for DACA and DAPA arising from the differences in eligibility criteria under the two initiatives. Since applicants for deferred action under DAPA must satisfy different eligibility criteria than applicants for deferred action under DACA, it is by no means self-evident that approval rates under DAPA will necessarily be the same as under DACA--especially since individuals eligible for DACA, as individuals who "were brought to this country as children" without any "intent to violate the law," arguably might be more likely to have stronger positive equities simply by definition. [145]

But quite apart from this questionable premise in Judge Hanen's reasoning, his finding is wanting at an even more fundamental level. As in any number of other legal contexts, high approval rates cannot by themselves establish that discretion is not being exercised or that meaningful procedures do not exist, since there is no legitimate reason to assume that the universe of DACA applicants constitutes a random or representative sample of all potentially deportable noncitizens. [146] To the contrary, given the high costs of applying and the severe potential consequences if applications are denied or deferred action is later revoked, one should fully expect approval rates to be high--since noncitizens with marginal applications have exceedingly powerful incentives not to apply in the first place. [147]

In any event, as Stephen Legomsky has explained in detail, Judge Hanen's analysis also is riddled with more basic factual errors and mischaracterizations **\*93** about the agency's actual practices under DACA. [148] While Judge Hanen intimates that denials of deferred action applications for failure to satisfy the DACA and DAPA eligibility criteria do not involve any exercise of discretion, that conclusion misunderstands the nature of those eligibility criteria. For example, the policy statement announcing the new deferred action initiatives permits individuals to grant deferred action to individuals who do not fall within the agency's delineated enforcement priorities. [149] However, determining whether an individual falls within the agency's enforcement priorities itself involves individualized, case-by-case determinations, especially given the open-ended manner in which some of those priorities are defined. [150] The policy statement establishing the agency's enforcement priorities itself requires officials to consider a variety of factors, "in the totality of the circumstances," and makes clear that enforcement action may still be pursued against individuals who fall outside of the defined priorities if, in the judgment of an ICE field office director, "removing such an alien would serve an important federal interest." [151]

Second, Judge Hanen evidently believes that genuine prosecutorial discretion demands not only individualized decision making--which, as just discussed, DACA and DAPA in any event require--but also ad hoc and unguided decision making *exclusively* by rank-and-file ICE enforcement officers, without any meaningful supervision, direction, or participation by policymaking officials or the involvement of other rank-and-file officials, such as those within USCIS, with other immigration-related responsibilities. The basis for this position is left entirely unexplained. Strangely, given Judge Hanen's insistence that his ruling does not second-guess the agency's priorities, he concludes in sweeping terms that the initiatives are "not a necessary adjunct for the operation of the DHS or for effecting its stated priorities" at all-- based on the bare fact that noncitizens eligible for deferred action have not *yet* been deported: [152]

> [Non-enforcement] is what the DHS has been doing for these [DAPA] recipients for the last five years--whether that was because the DHS could not track down the millions of individuals they now deem eligible for deferred action, or because they were prioritizing removals according to limited resources, applying humanitarian considerations, **\*94** or just not removing these individuals for "administrative convenience." [153]

"[U]nburdened by the factual," this hopelessly confused line of reasoning cannot be reconciled with any plausible understanding of the institutional context from which the deferred action initiatives have actually emerged. [154] As attention to that context makes clear, the agency's protracted efforts to ensure fidelity to its priorities and consistent application of its prosecutorial discretion guidelines over the past five years have been fitful and largely unsuccessful over that period. While it certainly is true that noncitizens eligible to apply for DACA and DAPA have not been deported during that period--simply by definition--large numbers of similarly situated individuals have not been so fortunate, owing to the agency's inability to ensure that rank-and-file officers exercise discretion in a manner that complies with its priorities and guidelines and is sufficiently consistent.

Ultimately, Judge Hanen's ruling must be understood as resting on an assumption that policymaking officials should be restricted or even disabled altogether from establishing a programmatic framework to supervise the exercise of discretion throughout the enforcement regime. In fact, in his order denying the government's motion for a stay of his order pending appeal, he makes that assumption all but explicit. [155] That assumption is fully consistent with the remarkably high level of disdain he exhibits for immigration "policymaker[s]" in *Nava-Martinez* and his other immigration-related commentaries, in which he reams those officials for "thwart[ing]" and "negat [ing] the efforts" of "those that are actually doing the work of protecting Americans." [156] But it also is directly at odds with his own insistence that the agency's enforcement priorities are "not subject to judicial second-guessing." [157] After all, those priorities would have little meaning if policymaking officials were disabled altogether from implementing mechanisms to ensure they are actually carried out--particularly in the face of active resistance from rank-and-file officials or enforcement patterns that significantly diverge from the agency's priorities and guidelines.

 **\*95** Without question, the formalized and divided approach to enforcement discretion established by DACA and DAPA changes what the exercise of that discretion in fact looks like. Indeed, that is the very purpose of instituting that kind of approach in any form. When policymakers establish criteria to inform the exercise of discretion by rank-and-file officers, rather than affording them plenary authority to exercise that discretion without guidance or supervision, that necessarily constrains and narrows the scope of the discretion being exercised. In addition, assigning primary responsibility for deferred action decision making to the benefits-oriented USCIS--which DHS is entirely free to do--places those decisions in an agency with a different set of institutional responsibilities, incentives, practices, and cultural norms than the enforcement-oriented ICE, whose performance ultimately may be measured, in practice, more on the basis of the numbers of individuals apprehended, detained, and deported than on the basis of how it exercises prosecutorial discretion. [158]

However, to conclude from the reconfiguration of discretion that "discretion is virtually extinguished," as Judge Hanen does, is mistaken. While the extent to which enforcement discretion is tailored to every last particular fact and circumstance about the individuals seeking deferred action might well be narrower under this regime, the guidance documents announcing DACA and DAPA are crystal clear that deferred action must still be granted on an individualized, case-by-case basis. [159] The kinds of constraints that DACA and DAPA place on the individualized exercise of discretion by individual rank-and-file officers are inherent in any meaningful effort to establish enforcement priorities or to delineate guidelines and policies for how prosecutorial discretion should be exercised. Although it is possible to ignore the tradeoffs involved, one cannot wish them away. While flexibility and fine-grained attention to detailed facts and circumstances certainly may be diminished in a regime that constrains plenary, unguided, and unaccountable front-line discretion, those potential losses may be significantly outweighed by the corresponding gains in more rationally implementing the agency's enforcement priorities and promoting important rule of law values, including consistency, predictability, and the minimization of arbitrariness. **\*96** [160] A more coherent programmatic regime to enable policymaking officials to guide the exercise of enforcement discretion within the bureaucracy in more effective and efficient directions may achieve a more "acceptable balance" between those competing sets of values, and also may promote greater transparency and democratic accountability in the execution of the immigration laws. [161] While it might arguably be desirable, from a policy perspective, to institute that kind of regime using notice-and-comment rulemaking, as a formal legal matter DHS was not required to do so, since the policy statements announcing DACA and DAPA do not purport to be binding and still require individualized, case-by-case discretion before granting deferred action. [162]

Whether, and in what particular institutional forms, these kinds of programmatic mechanisms to guide the exercise of prosecutorial discretion may be justified to promote rule of law values and ensure consistency with the agency's enforcement priorities have been much less prominent questions in both political and legal discussions of DACA and DAPA than other relevant and important arguments concerning resource constraints and humanitarian concerns. [163] However, these rule of law

values are considerably more important than this limited attention might suggest. Indeed, given the prominent role in those discussions of arguments concerning the President's constitutional obligation to "take care that the laws be faithfully executed," the limited attention to rule of law values may be somewhat surprising. [164] Properly evaluating arrangements that seek to promote these values requires careful attention to the institutional specificities of immigration control. As the scale of the enforcement regime has grown to such enormous levels--making the interrelated challenges **97** of ensuring sufficiently uniform execution of the law and fidelity to enforcement priorities more formidable--the need for effective mechanisms to guide the discretion exercised in the field has only grown more important. [165] On Judge Hanen's largely fact-free, decontextualized, and politicized view, however, policymaking officials evidently must "abdicate" responsibility (as he might put it) to supervise those exercises of discretion and must instead let the vagaries of the bureaucracy reign supreme at the rule of law's expense.

**Conclusion**

Judge Hanen's 123-page ruling bursts at the seams with political rhetoric and "ideological dudgeon" that rivals anything one might hear at a congressional hearing. [166] Unfortunately, like his earlier immigration-related commentaries, it utilizes equally politicized modes of analysis and reasoning, casting aside the norms of judicial fact-finding, reasoned adjudication, and the adversarial process in a manner that distorts his substantive analysis. As David Martin has noted, "[i]t is the agency, not each individual enforcement officer, that has the responsibility to make ... decisions about resource allocation and overall policy," whether in the context of immigration control or any other law enforcement setting. [167] While that basic proposition seems unremarkable, Judge Hanen's analysis and approach to adjudication--along with his failure to properly engage the facts and laws at issue, his injudicious antagonism toward immigration policymaking officials, and his unusually high personal interest and involvement in immigration enforcement questions more generally--lead him to turn that basic proposition directly on its head. The net result is not simply an opinion that seeks to effectively disable the ability of policymaking officials to ensure fidelity to agency priorities or promote rule of law values in the execution of the immigration laws, but one that creates the appearance of a politicized quest for truthiness, rather than a judicious quest for truth.

**Footnotes**

[a1]   Associate Professor of Law, Drexel University Kline School of Law. Visiting Scholar, Center for the Study of Law and Society, School of Law, University of California, Berkeley. A.B., Brown University; M.P.P.M., Yale School of Management; J.D., Yale Law School. Many thanks to Tabatha Abu El-Haj, Ahilan Arulanantham, Jennifer Chacón, Mike Dorf, Ingrid Eagly, Jill Family, Annie Lai, Steve Legomsky, Nancy Leong, David Leopold, Dara Lind, Peter Margulies, Hiroshi Motomura, Cristina Rodríguez, Jayashri Srikantiah, and Shoba Sivaprasad Wadhia, and to workshop attendees at the University of California, Irvine School of Law, and Whittier Law School, for valuable exchanges on the issues in this Article and feedback on earlier drafts. I am also very thankful to Annie Banks, Dat Phan, Christian Vanderhooft, and the *UCLA Law Review Discourse* staff for their excellent editorial work.

[1]   President Barack Obama, Remarks in Address to the Nation on Immigration (Nov. 20, 2014), *available at* https://www.whitehouse.gov/the-press-office/2014/11/20/remarks-president-address-nation-immigration [https://perma.cc/47FB-2L44].

[2]   In this Article, I use the terms "prosecutorial discretion" and "enforcement discretion" interchangeably, since "prosecutorial discretion" in the immigration context is generally understood as applying "to a broad spectrum of discretionary enforcement decisions taken by a law enforcement agency" in addition to decisions "whether to bring charges against an individual." Memorandum from Bo Cooper, Gen. Counsel, Immigr. and Naturalization Serv., to the Deputy Commissioner, INS Exercise of Prosecutorial Discretion 2 (Oct. 4, 1999), *available at* http://www.legalactioncenter.org/sites/default/files/docs/lac/Bo-Cooper-memo.pdf [http://perma.cc/37DA-RLTB] [hereinafter Cooper, INS Exercise of Prosecutorial Discretion] (noting that the term "prosecutorial discretion" may be "something of a misnomer").

[3]   On the use of administrative guidance documents in the immigration context, see Jill E. Family, *Administrative Law Through the Lens of Immigration Law*, 64 ADMIN L. REV. 565 (2012); Jill E. Family, *Easing the Guidance Document Dilemma Agency by Agency: Immigration Law and Not Really Binding Rules*, 47 U. MICH. J.L. REFORM 1 (2013); *see also* William Funk, *A Primer on Nonlegislative Rules*, 53 ADMIN L. REV. 1321 (2001).

4   Memorandum from Jeh Charles Johnson, Sec'y of Homeland Sec., for Thomas S. Winkowski et al., Policies for the Apprehension, Detention and Removal of Undocumented Immigrants (Nov. 20, 2014), http://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf [http://perma.cc/EWE2-RGDU] [hereinafter Johnson, Enforcement Priorities Memorandum].

5   Memorandum from Jeh Charles Johnson, Sec'y of Homeland Sec., for Leon Rodriguez et al., Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children and With Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014), http://www.dhs.gov/sites/default/files/publications/14_1120_memo_deferred_action.pdf [http://perma.cc/9TKR-4FC2] [hereinafter Johnson, DAPA Memorandum].

6   Memorandum from Janet Napolitano, Sec'y of Homeland Security, for David V. Aguilar et al., Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children (June 15, 2012), http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf [http://perma.cc/2ST3-TM95] [hereinafter Napolitano, DACA Memorandum].

7   *See* Johnson, DAPA Memorandum, *supra* note 5. For the Obama administration's legal justifications for the deferred action initiatives, *see* Memorandum from Karl R. Thompson, Principal Deputy Assistant Att'y Gen., Office of Legal Counsel, U.S. Dep't of Justice, to the President, The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others (Nov. 19, 2014), http://www.justice.gov/sites/default/files/olc/opinions/attachments/2014/11/20/2014-11-19-auth-prioritize-removal.pdf [http://perma.cc/3DKH-FVHK] [hereinafter OLC Opinion].

8   Migration Pol'y Inst., *MPI: As Many as 3.7 Million Unauthorized Immigrants Could Get Relief from Deportation Under Anticipated New Deferred Action Program*, (Nov. 19, 2014), http://migrationpolicy.org/news/mpi-many-37-million-unauthorized-immigrants-could-get-relief-deportation-under-anticipated-new [http://perma.cc/5NFB-CPVW].

9   *See, e.g.*, Julia Preston, Migrants' Joy at New Rules Is Tempered, N.Y. Times, Nov. 22, 2014, at A1; Editorial, *At Long Last, Immigration Action*, N.Y. TIMES, Nov. 20, 2014, at A28 (emphasizing that "[o]nly Congress can create an immigration system that rescues workers and families from unjust laws and creates legal pathways to citizenship.").

10  Preston, *supra* note 9 (quoting Alejandro Caceres, Executive Director of the Austin Immigrant Rights Coalition); *see also* Editorial, *supra* note 9 (describing the limited "respite" from deportation afforded by the deferred action initiatives as "cause for relief and celebration").

11  Rich Lowry, *Barack Obama, American Caudillo*, POLITICO MAG. (Nov. 19, 2014), http://www.politico.com/magazine/story/2014/11/barack-obama-american-caudillo-113041.html [http://perma.cc/CS5S-KDXX]; Ross Douthat, *Obama's Impeachment Game*, N.Y. TIMES, Aug. 3, 2014, at SR9. Similar accusations were leveled after DACA was announced two years earlier. *See* Lauren Gilbert, *Obama's Ruby Slippers: Enforcement Discretion in the Absence of Immigration Reform*, 116 W. VA. L. REV. 255, 260 & nn.18-19 (2013).

12  Ashley Parker, *Boehner Says Obama's Immigration Action Damages Presidency*, N.Y. TIMES (Nov. 21, 2014), http://www.nytimes.com/2014/11/22/us/republicans-immigration-obama.html [http://perma.cc/S5QP-R7FE]; Ben S. Carson, *Obama Has Forgotten His Official Duty Is to Americans*, WASH. TIMES (Nov. 25, 2014), http://www.washingtontimes.com/news/2014/nov/25/ben-carson-obama-executive-orders-reward-illegal-i/ [http://perma.cc/CN3R-L29F].

13  Tony Lee, *Steve King: Obama Exec Action Turns 'Anchor Babies' Into 'Human Shields' for Illegal Parents*, BREITBART (Nov. 23, 2014), http://www.breitbart.com/big-government/2014/11/23/steve-king-obama-exec-action-turns-anchor-babies-into-human-shields-for-illegal-parents [http://perma.cc/4UVN-SMUN]; *see also* Eleanor Clift, *Get Ready to Start Hearing About 'Executive Amnesty for Anchor Babies'*, DAILY BEAST (Nov. 19, 2014, 5:45 AM), http://www.thedailybeast.com/articles/2014/11/19/get-ready-to-start-hearing-about-executive-amnesty-for-anchor-babies.html [http://perma.cc/X7LM-CVAC].

14  Reena Flores & DJ Judd, *Cruz Decries Obama's Immigration Actions as "Counterfeiting" Documents*, CBS NEWS (Feb. 18, 2015, 6:19 PM) http://www.cbsnews.com/news/cruz-obamas-immigration-actions-counterfeiting-documents/ [http://perma.cc/3X8G-BNXS]; Susan Page, *GOP Senator Warns of Violence After Immigration Order*, USA TODAY

(Nov. 20, 2014, 9:05 AM), http://www.usatoday.com/story/news/politics/2014/11/19/usa-today-capital-download-with-tomcoburn/19263969/ [http://perma.cc/4X2S-BKME].

15   David Montgomery & Julia Preston, *17 States Suing on Immigration*, N.Y. TIMES, Dec. 4, 2014, at A1.

16   Complaint for Declaratory and Injunctive Relief at ¶¶ 3, 21, 62, Texas v. United States, 2015 WL 648579 (S.D. Tex. Dec. 3, 2014) (No. B-14-254), ECF No. 1, *available at* http://klhn.co/Texas-v-US-SDTex-ECF-1 [http://perma.cc/2K3T-2M8Q]; *see* Alicia A. Caldwell, *Judge on Immigration Case Had Criticized US Policy*, ASSOCIATED PRESS (Dec. 9, 2014, 9:56 AM), http://bigstory.ap.org/article/135858ccf309405abcbe0589b001a7f2/judge-immigration-case-had-criticized-us-policy [http://perma.cc/AV4K-DNWZ]; AMERICA'S VOICE EDUC. FUND, A COORDINATED ATTACK: JUDGE HANEN AND THE NATIVIST LAWSUIT AGAINST DAPA AND DACA (2015), http://amvoice.3cdn.net/58627454a7fa8d720b_6hm6iigbo.pdf [http://perma.cc/8UBJ-EWN7].

17   United States v. Juarez-Escobar, 25 F. Supp. 3d 774, 787-88 (W.D. Pa. 2014); *see* Elise Foley & Ryan Grim, *Judge Who Ruled Against Obama Immigration Action Has Checkered Past*, HUFF. POST (Dec. 16, 2014, 4:26 PM), http://www.huffingtonpost.com/2014/12/16/judge-strikes-obamaimmig_n_6336162.html [http://perma.cc/JQX4-5UF2].

18   Texas v. United States (*Texas I*), No. B-14-254, 2015 WL 648579, at *44 n.67 (S.D. Tex. Feb. 16, 2015); Texas v. United States (*Texas II*), No. B-14-254, 2015 WL 1540022, at *8 (S.D. Tex. Apr. 7, 2015) (denying motion for stay pending appeal).

19   *Texas I*, 2015 WL 648579, at *29, *31.

20   Texas v. United States (*Texas IV*), No. 15-40238, 2015 WL 3386436 (5th Cir. May 26, 2015); *see* Anil Kalhan, *Executive Action on Immigration and the Judicial Artifice of "Lawful Presence"*, DORF ON LAW (June 3, 2015), http://www.dorfonlaw.org/2015/06/executive-action-on-immigrationand.html [http://perma.cc/97UJ-XQAU]. At this writing, the merits of the government's appeal remain pending before the Fifth Circuit.

21   *See* Crane v. Johnson, 783 F.3d 244 (5th Cir. 2015); Arpaio v. Obama, 27 F. Supp. 3d 185 (D.D.C. 2014), *appeal filed*, No. 145325 (D.C. Cir. Dec. 29, 2014); *see also* *Texas IV*, 2015 WL 3386436, at *16 (Higginson, J., dissenting).

22   *Texas IV*, 2015 WL 3386436, at *34, *48 & n.76.

23   Anil Kalhan, *Stop and Frisk, Judicial Independence, and the Ironies of Improper Appearances*, 27 GEO. J. LEGAL ETHICS 1043, 1117-20 (2014); *see also* Ben Zimmer, *Truthiness*, N.Y. TIMES, Oct. 17, 2010, at MM22.

24   *See* Kalhan, *supra* note 20.

25   *See, e.g.*, Jack M. Balkin, Bush v. Gore *and the Boundary Between Law and Politics*, 110 YALE L.J. 1407, 1444-47 (2001); *see also* Rick Hasen, *A Quick Reaction to the 7th Circuit Wisconsin Voter ID Decision: Horrendous*, ELECTION L. BLOG (Oct. 24, 2014, 2:45 PM), http://electionlawblog.org/?p=66413 [http://perma.cc/N3AE-ZNDS]; Simon Lazarus, *Hannitys on the Bench*, NEW REPUBLIC (Apr. 6, 2014), http://www.newrepublic.com/article/117279/conservative-judges-last-threat-obamacare [http://perma.cc/7TTC-DFRU]; Richard A. Posner, *Justice Scalia Is Upset About Illegal Immigration. But Where Is His Evidence?*, SLATE (June 27, 2012, 10:21 AM), http://www.slate.com/articles/news_and_politics/the_breakfast_table/features/2012/_supreme_court_year_in_review/supreme_court_year_in_review_justice_scalia_offers_no_evidence_to_back_up_his_claims_about_illegal_immigration_.html [http://perma.cc/FR4C-FB37].

26   Michael W. McConnell, *Why Obama's Immigration Order Was Blocked*, WALL ST. J., Feb. 18, 2015, at A15; *see* Anil Kalhan, *Is Judge Hanen's Smackdown of Executive Action on Immigration "Narrowly Crafted"?*, DORF ON LAW (Feb. 21, 2015), http://www.dorfonlaw.org/2015/02/is-judge-hanens-smackdown-of-executive.html [http://perma.cc/Y7YX-72HM].

27     *See, e.g.*, Eric Posner, *Faithfully Executed: Obama's New Immigration Program Is Perfectly Legal and Should Not Be Blocked*, SLATE (Feb. 19, 2015), http://www.slate.com/articles/news_and_politics/view_from_chicago/2015/02/obama_s_dapa_immigration_program_is_legal_judge_hanen_s_injunction_will.single.html [http://perma.cc/K7ZA-JQU4]; Peter M. Shane, *Judge Hanen's Misconceptions and the Legality of Deferred Action*, ACS BLOG (Mar. 16, 2015), http://www.acslaw.org/acsblog/judge-hanen's-misconceptions-and-the-legality-of-deferred-action [http://perma.cc/8J8N-T83T].

28     For a discussion of those flaws in the Fifth Circuit's opinion, see Kalhan, *supra* note 20.

29     *See generally* SHOBA SIVAPRASAD WADHIA, BEYOND DEPORTATION: THE ROLE OF PROSECUTORIAL DISCRETION IN IMMIGRATION CASES 14-32, 54-87 (2015).

30     8 C.F.R. § 274a.12(c)(14) (2014).

31     *See* Shoba Sivaprasad Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 CONN. PUB. INT. L.J. 243, 244-45 (2010); *see also* Sam Bernsen, Gen. Counsel, Immigr. and Naturalization Serv., Legal Opinion Regarding Service Exercise of Prosecutorial Discretion 1-2 (July 15, 1976) [hereinafter Bernsen, Legal Opinion on Prosecutorial Discretion].

32     Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 483-84 (1999); *see also* Arizona v. United States, 132 S. Ct. 2492, 2499 (2012) (describing the "broad discretion exercised by immigration officials" as a "principal feature" of the immigration enforcement regime).

33     8 U.S.C. §§ 1154(a)(1)(D)(i), 1227(d)(2) (2012).

34     *See* Letter from Scholars and Teachers of Immigration Law on the Obama Administration's Executive Actions on Immigration (Nov. 25, 2014), *available at* http://klhn.co/lawprofessors-2014-11-25 [http://perma.cc/EVJ7-XJNT]; Letter from Immigration Law Teachers and Scholars to the President of the United States Regarding Executive Authority to Protect Individuals or Groups From Deportation (Sep. 3, 2014), *available at* http://klhn.co/lawprofessors-2014-09-03 [http://perma.cc/NH9C-9FB3].

35     Brad Plumer, *Can Obama Legalize 11 Million Immigrants on His Own?*, WASH. POST (Aug. 22, 2013), http://www.washingtonpost.com/blogs/wonkblog/wp/2013/08/22/marco-rubio-say-sobama-could-legalize-11-million-immigrants-on-his-own-is-that-right/ [http://perma.cc/74XRCC7J].

36     Geoffrey Heeren, *The Status of Nonstatus*, 64 AM. U. L. REV. 1115, 1120 (2015); *see also* Cecilia Menjívar, *Liminal Legality: Salvadoran and Guatemalan Immigrants' Lives in the United States*, 111 AM. J. SOC. 999 (2006) (conceptualizing and describing "'in-between' status" or "liminal legality" that arises from the "gray area" between the legal categories of documented and undocumented immigration status); Jennifer Chacón, *Liminal Legality: Developments in Immigration Enforcement, Crime Control and Beyond*, 92 DENVER U. L. REV. (forthcoming 2015) (manuscript at 10-25) (applying "liminal legality" to analyze the ambiguous and unstable legal subjectivity arising from DACA and DAPA); *cf.* SUSAN BIBLER COUTIN, LEGALIZING MOVES: SALVADORAN IMMIGRANTS' STRUGGLE FOR U.S. RESIDENCY 27-47 (2003).

37     Heeren, *supra* note 36, at 1119.

38     *But see* WADHIA, *supra* note 29, at 150-51 (arguing that individuals denied deferred action should be able to obtain independent judicial or administrative review of those denials).

39     Kalhan, *supra* note 20; *see* Heeren, *supra* note 36, at 1165-74.

40     Linda S. Bosniak, *Exclusion and Membership: The Dual Identity of the Undocumented Worker Under United States Law*, 1988 WIS. L. REV. 955, 956 (1988); *see also* Gerald L. Neuman, *Aliens as Outlaws: Government Services, Proposition 187, and the Structure of Equal Protection Doctrine*, 42 UCLA L. REV. 1425 (1995); Menjívar, *supra* note 36.

41     Tina Griego, *Why Obama's Immigration Move Isn't Nearly Enough*, WASH. POST (Nov. 24, 2014), http://www.washingtonpost.com/news/storyline/wp/2014/11/24/why-obamas-immigration-move-isnt-nearly-enough [http://

perma.cc/UF29-79XW]; *see also* PETER SCHEY, CTR. FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW, THE OBAMA ADMINISTRATION'S MISSTEPS IN ISSUING AND DEFENDING THE DAPA/DACA PROGRAMS (2015), http://centerforhumanrights.org/PDFs/4-10-15%20Obama%C20Missteps%C20in%20DAPA-DACA%20Litigation.pdf [http://perma.cc/J3ZV-GRGN].

42  Jerry Markon & Sandhya Somashekhar, *Obama's 2012 DACA Move Offers a Window Into Pros and Cons of Executive Action*, WASH. POST (Nov. 30, 2014), http://www.washingtonpost.com/politics/obamas-2012-daca-move-offers-a-window-into-pros-and-cons-of-executiveaction/2014/11/30/88be7a36-7188-11e4-893f-86bd390a3340_story.html [http://perma.cc/48YHVFHW].

43  Anil Kalhan, *Immigration Surveillance*, 74 MD. L. REV. 1, 62-63 (2015).

44  *Texas I*, No. B-14-254, 2015 WL 648579, at *44 n.67 (S.D. Tex. Feb. 16, 2015).

45  *Id.* at *29 n.45 (emphasis added).

46  *Id.* at *2 (emphasis added).

47  *Id.* at *4 (emphasis added).

48  *Id.* at *39 (emphasis added).

49  *Id.* at *40 (emphasis added).

50  *Id.* at *48 n.76 (emphasis added).

51  *Id.* at *55 (emphasis added); *see also id.* at *1, *5, *14, *17, *21, *26, *28, *34, *44, *47-50, *56, *58, *62.

52  United States v. Juarez-Escobar, 25 F. Supp. 3d 774, 787 (W.D. Pa. 2014).

53  *Frequently Asked Questions*, U.S. CITIZENSHIP & IMMIGR. SERVS., http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last updated Oct. 23, 2014) [http://perma.cc/J5BT-9D5N] [hereinafter USCIS, *Frequently Asked Questions*], *quoted in Texas I*, 2015 WL 648579, at *48.

54  8 U.S.C. § 1182(a)(9)(B) (2012).

55  *Id.*

56  *Id.* § 1182(a)(9)(B)(iii)-(iv); *see* U.S. CITIZENSHIP & IMMIGR. SERVS., ADJUDICATOR'S FIELD MANUAL § 40.9, *available at* http://www.uscis.gov/iframe/ilink/docView/AFM/HTML/AFM/0-0-0-1.html [http://perma.cc/3CJ5-LAUE]; Memorandum from Donald Neufeld, Acting Assoc. Dir., U.S. Citizenship & Immigr. Servs., et al. to Field Leadership, Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act (May 6, 2009); Memorandum from Johnny Williams, Exec. Assoc. Comm'r, Immigr. & Naturalization Serv., for Regional Directors et al., Unlawful Presence (June 12, 2002).

57  Since the eligibility criteria for the new initiatives require continuous residence in the United States since January 1, 2010, most individuals eligible for deferred action under the new initiatives *already* have accrued sufficient unlawful presence to be subject to these prospective admissibility bars.

58  USCIS, *Frequently Asked Questions, supra* note 53.

59  *Texas I*, No. B-14-254, 2015 WL 648579 at *55 (S.D. Tex. Feb. 16, 2015).

60  *Id.* at *3.

61    *Id.* at *55.

62    *Id.* at *32, *34.

63    *Id.* at *28-29; *see, e.g., id.* at *13, *17, *21, *28-30, *32, *33, *34, *44 n.67.

64    Douthat, *supra* note 11.

65    McConnell, *supra* note 26. The language of "dispensation" itself is significant, implying a power to suspend legislation akin to that historically claimed by English monarchs or the papacy. *See* Robert J. Delahunty & John C. Yoo, *Dream On: The Obama Administration's Nonenforcement of Immigration Laws, the DREAM Act, and the Take Care Clause,* 91 TEX. L. REV. 781, 804-08, 842-48 (2012).

66    DORIS MEISSNER ET AL., MIGRATION POL'Y INST., IMMIGRATION ENFORCEMENT IN THE UNITED STATES: THE RISE OF A FORMIDABLE MACHINERY (2013), http://migrationpolicy.org/sites/default/files/publications/enforcementpillars.pdf [http://perma.cc/U7XC-X3FW].

67    *Id.*

68    *See* Dara Lind, *Obama Is Deporting More Immigrants Than Any President in History: Explained*, VOX (Apr. 9, 2014, 7:00 AM), http://www.vox.com/2014/4/9/5575006/2-million-immigrants-have-been-deported-under-obama [http://perma.cc/TX59-SX8E].

69    Reid J. Epstein, *National Council of La Raza Leader Calls Barack Obama 'Deporter-in-Chief'*, POLITICO (Mar. 4, 2014, 6:00 AM), http://www.politico.com/story/2014/03/national-council-of-la-raza-janet-murguia-barack-obama-deporter-in-chief-immigration-104217.html [http://perma.cc/DHN9-KM9N].

70    *See, e.g.*, Jorge Ramos & Brett LoGiurato, *Obama Defends His Record on Immigration*, FUSION (Dec. 9, 2014, 9:59 PM), http://fusion.net/video/32969/watch-obama-spars-with-jorge-ramos-on-immigration [http://perma.cc/UVE2-QLMA]; *see also* David A. Martin, *A Lawful Step for the Immigration System*, WASH. POST (June 24, 2012), http://www.washingtonpost.com/opinions/a-lawful-step-for-the-immigration-system/2012/06/24/gJQAgT0O0V_story.html [http://perma.cc/8LUW-JCTJ].

71    132 S. Ct. 2492 (2012).

72    *Texas I*, No. B-14-254, 2015 WL 648579, at *28, *34 (S.D. Tex. Feb. 16, 2015).

73    *Id.* at *17, *22-23; *Arizona*, 132 S. Ct. at 2514 (Scalia, J., dissenting).

74    *Texas I*, 2015 WL 648579 at *17. In a similarly odd manner, Judge Hanen characterizes the states as within the "zone of interests" that the INA seeks to protect and treats the INA's enforcement provisions as conferring "rights" on U.S. citizens that the states may enforce through a parens patriae lawsuit. *Id.* at *17, *19.

75    *Id.* at *29.

76    Kerry Abrams, *Plenary Power Preemption*, 99 VA. L. REV. 601, 633-34 (2013); David Martin, *Reading Arizona*, 98 VA. L. REV. IN BRIEF 41, 46-47 (2012).

77    Nina Totenberg, *Even Scalia's Dissenting Opinions Get Major Scrutiny*, NPR (July 16, 2012, 4:01 PM), http://www.npr.org/2012/07/16/156852889/even-scalia-s-dissenting-opinions-get-majorscrutiny [http://perma.cc/3TZ7-PX2E]; Posner, *supra* note 25.

78    8 C.F.R. § 274a.12(c)(14) (2014); Paul Wickham Schmidt, *Employment Authorization for Aliens: Part I*, 89 IMMIGR. BRIEFINGS 1 (May 1989).

79    Employment Authorization to Aliens in the United States, 46 Fed. Reg. 25,079 (May 5, 1981) (final rule); Employment Authorization, 45 Fed. Reg. 19,563 (Mar. 26, 1980) (modified proposed rule); Proposed Rules for Employment Authorization for Certain Aliens, 44 Fed. Reg. 43,480 (July 25, 1979).

80    Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359 (1986).

81    8 U.S.C. § 1324a(h)(3) (2012) (emphasis added).

82    Employment Authorization, 51 Fed. Reg. 39,385, 39,388-89 (Oct. 28, 1986).

83    Employment Authorization; Classes of Aliens Eligible, 52 Fed. Reg. 46,092-93 (Dec. 4, 1987).

84    Control of Employment of Aliens, 52 Fed. Reg. 16,216 (May 1, 1987).

85    8 C.F.R. § 274a.12(c)(14) (2014).

86    WADHIA, *supra* note 29, at 69-72.

87    *Compare* Defendants' Sur-Reply in Opposition to Motion for Preliminary Injunction at 35-38, Texas v. United States, 2015 WL 648579 (S.D. Tex. Jan. 30, 2015) (No. B-14-254), ECF No. 130, *available at* http://klhn.co/Texas-v-US-SDTex-ECF-130 [http://perma.cc/WMZ3-ZUFC], *with* Letter from Andrew S. Oldham, Counsel for Plaintiffs, to Judge Andrew S. Hanen at 2, Texas v. United States, 2015 WL 648579 (S.D. Tex. Feb. 2, 2015) (No. 14 Civ. 254), ECF No. 132, *available at* http://klhn.co/Texas-v-US-SDTex-ECF-132 [http://perma.cc/ZNX9-BGWX].

88    Order of Temporary Injunction at 1-2, Texas v. United States, No. B-14-254 (S.D. Tex. Feb. 16, 2015), ECF No. 144, *available at* http://klhn.co/Texas-v-US-SDTex-ECF-144 [http://perma.cc/KUY2-3692].

89    States' Motion for Leave to Participate as Amici Curiae and Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction, Texas v. United States, 2015 WL 648579 (S.D. Tex. Jan. 12, 2015) (No. B-14-254), ECF No. 81, *available at* http://klhn.co/Texas-v-US-SDTex-ECF-81 [http://perma.cc/V8AJ-EBB5]; *see also* Brief of Amici Curiae the Mayors of New York and Los Angeles, et al., Texas v. United States, 2015 WL 648579 (S.D. Tex. Jan. 27, 2015) (No. B-14-254), ECF No. 121, *available at* http://klhn.co/Texas-v-US-SDTex-ECF-121 [http://perma.cc/Y8JU-TKRN].

90    United States v. Cabrera, 711 F. Supp. 2d 736, 738-39 (S.D. Tex. 2010).

91    *Id.* at 737.

92    United States v. Nava-Martinez, No. B-13-441-1, 2013 WL 8844097, at *1 (S.D. Tex. Dec. 13, 2013).

93    *Id.* at *3.

94    *Id.* at *1-*2.

95    *Id.* at *5.

96    *Id.* at *3 n.6.

97    United States v. Ramirez, 38 F. Supp. 3d 818 (S.D. Tex. 2014).

98    *Id.* at 825, 832.

99    *Id.* at 827, 830 n.23.

100   Transcript of Preliminary Injunction Hearing at 3-4, Texas v. United States, No. B-14-254 (S.D. Tex. Jan. 15, 2015), *available at* http://klhn.co/Texas-v-US-SDTex-Transcript-2015-01-15 [http://perma.cc/LB7D-URXL].

101    *Texas I*, No. B-14-254, 2015 WL 648579, at *1 & n.3 (S.D. Tex. Feb. 16, 2015).

102    *Id.* at *22.

103    *Id.*

104    *Id.* at *23, *25.

105    United States v. Ramirez, 38 F. Supp. 3d 818, 827 (S.D. Tex. 2014).

106    *Texas I*, 2015 WL 648579, at *1, *4, *21 n.32, *26, *57. On the term "self-deportation" and recent controversies surrounding its use, see, for example, Anil Kalhan, *The Fourth Amendment and Privacy Implications of Interior Immigration Enforcement*, 41 U.C. DAVIS L. REV. 1137, 1165-66 (2008); Aaron Blake, *Priebus: Romney's Self-Deportation Comment Was "Horrific,"* WASH. POST (Aug. 16, 2013), http://www.washingtonpost.com/blogs/post-politics/wp/2013/08/16/priebus-romneys-self-deportation-comment-was-horrific [http://perma.cc/HP8D-6QJE].

107    *Texas I*, 2015 WL 648579 at *3. Indeed, even as he subjects those public, nonlegal statements to considerable scrutiny, Judge Hanen almost entirely ignores the detailed Office of Legal Counsel ("OLC") opinion elaborating the government's legal justifications. *Compare id.* at *3, *5 n.9, *8, *46, *47 n.74, *50 n.84, *54-55 (examining speeches, press releases, and other public statements by President Obama and DHS officials), *and Texas II*, No. B-14-254, 2015 WL 1540022, at *3-5 (S.D. Tex. Apr. 7, 2015) (same), *with Texas I*, 2015 WL 648579 at *50, *51 nn.85, 87 (citing OLC opinion, but only in passing).

108    United States v. Cooley, 1 F.3d 985, 995 (10th Cir. 1993); *In re* Boston's Children First, 244 F.3d 164, 169-70 (1st Cir. 2001).

109    *Texas II*, 2015 WL 1540022 at *3.

110    *Id.*

111    *Compare* Johnson, Enforcement Priorities Memorandum, *supra* note 4, *with* Johnson, DAPA Memorandum, *supra* note 5.

112    Supplemental Order, Texas v. United States, (*Texas III*), No. B-14-254 (S.D. Tex. May 8, 2015), ECF No. 248, *available at* http://klhn.co/Texas-v-US-SDTex-ECF-248 [http://perma.cc/G7XRRPDZ]; *see* Kalhan, *supra* note 23, at 1114-17 (discussing judicial ethics concerns arising from sua sponte issue creation). As in his order denying the government's stay motion, Judge Hanen's legally imprecise commentary failed to carefully distinguish between the policy statement setting forth the government's enforcement priorities and the policy statement establishing criteria for deferred action under DACA and DAPA, both of which were issued by DHS Secretary Jeh Johnson on the same day. *See* David Leopold, *Texas Judge Should Heed His Own Advice*, THE HILL (May 14, 2015, 12:00 PM), http://thehill.com/blogs/congress-blog/judicial/242003-texas-judge-should-heed-his-ownadvice [http://perma.cc/2785-Z6N4]; *see also supra* notes 109-111 and accompanying text.

113    Transcript of Motion Hearing at 21-22, Texas v. United States, No. B-14-254 (S.D. Tex. Mar. 19, 2015), *available at* http://klhn.co/Texas-v-US-SDTex-Transcript-2015-03-19 [http://perma.cc/HQH7-QU5S]; *see* AM. IMMIGR. LAWYERS ASS'N, JUDGE HANEN'S TROUBLING ACCUSATIONS OF UNETHICAL CONDUCT IN TEXAS V. UNITED STATES OF AMERICA (2015), http://www.aila.org/File/DownloadEmbeddedFile/64183; Juan A. Lozano, *Judge: Sanctions Possible in Obama Immigration Court Case*, ASSOCIATED PRESS (Mar. 19, 2015, 9:01 PM), http://bigstory.ap.org/article/5a419104dda64f3583cd3a6e98cbc6c25/hearing-set-allegations-immigration-lawsuit [http://perma.cc/TZ6N-5T9K].

114    *See* Johnson v. Sawyer, 120 F.3d 1307, 1333-37 (5th Cir. 1997); *see also In re* Daimler-Chrysler Corp., 294 F.3d 697, 700-01 (5th Cir. 2002).

115    *Cf.* Zephyr Teachout, *Facts in Exile: Corruption and Abstraction in* Citizens United v. Federal Election Commission, 42 LOY. U. CHI. L.J. 295 (2010).

116    Greg Sargent, *How Far Can Obama Go on Deportations?*, WASH. POST (Aug. 6, 2014), http:// www.washingtonpost.com/blogs/plum-line/wp/2014/08/06/how-far-can-obama-go-on-deportations [http://perma.cc/ L9AU-J4KG] (interview with former Immigration and Customs Enforcement official John Sandweg).

117    HIROSHI MOTOMURA, IMMIGRATION OUTSIDE THE LAW 204-05 (2014); Norman Abrams, *Internal Policy: Guiding the Exercise of Prosecutorial Discretion*, 19 UCLA L. REV. 1, 4-7 (1971).

118    Philip E. Wolgin, *What Would It Cost to Deport All 5 Million Beneficiaries of Executive Action on Immigration?*, CENTER FOR AM. PROGRESS (Feb. 23, 2015), https://www.americanprogress.org/issues/immigration/news/2015/02/23/106983/what-would-it-cost-to-deport-all-5-million-beneficiaries-of-executive-action-on-immigration [https://perma.cc/VNH4-HAWG]; *cf.* Chad DeVeaux, *The Fourth Zone of Presidential Power: Analyzing the Debt-Ceiling Standoffs Through the Prism of* Youngstown Steel, 47 CONN. L. REV. 397 (2014).

119    8 U.S.C. § 1103(a) (2012); 6 U.S.C. § 202(5) (2012); Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 YALE L.J. 458 (2009); William J. Stuntz, *The Pathological Politics of Criminal Law*, 100 MICH. L. REV. 505 (2001).

120    *E.g.*, Consolidated Appropriations Act 2014, Pub. L. 113-76, Div. F, title II, 128 Stat. 5, 251 (2014).

121    As Adam Cox and Cristina Rodríguez similarly observe, because it is "not possible to coherently identify a set of congressional priorities for immigration enforcement through a careful, lawyerly exercise of inter-textual fidelity to the 300-page immigration code," an attempt to tightly tether the exercise of enforcement discretion to congressional priorities "imposes an incoherent or impossible obligation in immigration law and many other enforcement contexts." Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law Redux*, 125 YALE L.J. (forthcoming 2015) (manuscript at 5, 29). In part for this reason, it is by no means clear that OLC was correct in concluding that it would be legally impermissible to include parents of individuals granted deferred action under DACA within the category of individuals eligible for deferred action under DAPA. OLC Opinion, *supra* note 7, at 31-33; *see* Letter from Shoba Sivaprasad Wadhia et al. to the President of the United States 1 (Nov. 3, 2014), *available at* http://klhn.co/ lawprofessors-2014-11-03 [http://perma.cc/ZM42-FGRR] (arguing that "there is no *legal* requirement that the executive branch limit deferred action or any other exercise of prosecutorial discretion to individuals whose dependents are lawfully present in the United States"); Cox & Rodriguez, *supra* (manuscript at 28-40).

122    Cooper, INS Exercise of Prosecutorial Discretion, *supra* note 2 (emphasizing need to "promot[e] public confidence in the fairness and consistency of the agency's enforcement action" and "maintain[] proper chains of command and accountability"); Sargent, *supra* note 116 (emphasizing that "[t]here is inconsistency when there is a lack of uniform guidance," and that "there are reasons to make issues like this public and to raise awareness and clarification").

123    Letter from Rep. Henry J. Hyde et al. to Janet Reno, Att'y Gen., and Doris Meissner, Comm'r, Immigr. & Naturalization Serv., Guidelines for Use of Prosecutorial Discretion in Removal Proceedings (Nov. 4, 1999), *available at* http:// www.ice.gov/doclib/foia/prosecutorial-discretion/991104congress-letter.pdf [http://perma.cc/6G98-GP6U] [hereinafter Hyde et al., Guidelines for Use of Prosecutorial Discretion in Removal Proceedings].

124    *Id.* at 2.

125    Memorandum from Doris Meissner, Comm'r, Immigr. & Naturalization Serv. to Regional Dirs. et al., Exercising Prosecutorial Discretion (Nov. 17, 2000), *available at* http://www.legalactioncenter.org/sites/default/files/docs/lac/ Meissner-2000-memo.pdf [http://perma.cc/HM6R6T4N] [hereinafter Meissner, Exercising Prosecutorial Discretion]; *see also* Letter from Robert Raben, Ass't Att'y Gen., U.S. Dep't of Justice, to Rep. Barney Frank (Jan. 19, 2000), *available at* http://www.ice.gov/doclib/foia/prosecutorial-discretion/000119frank.pdf [http://perma.cc/A6X5-U3RE] (discussing development of prosecutorial discretion guidelines).

126    Meissner, Exercising Prosecutorial Discretion, *supra* note 125, at 2, 10; *see also id.* at 10 (emphasizing the importance of "promot[ing] consistency in the application of the immigration laws").

127   *Id.* at 1, 5.

128   Memorandum from William J. Howard, Principal Legal Advisor, DHS, to All OPLA Chief Counsel, Prosecutorial Discretion (Oct. 24, 2005), *available at* http://niwaplibrary.wcl.american.edu/reference/additional-materials/immigration/enforcement-detention-and-criminaljustice/government-documents/22092975-ICE-Guidance-Memo-Prosecutorial-Discretion-William-J-Howard-10-24-05.pdf/at_download/file [http://perma.cc/FL4P-2PLG].

129   *Id.* at 3; *see also id.* at 1-2.

130   Memorandum from Julie Myers, Assistant Sec'y, DHS, to All Field Office Dirs. & All Special Agents in Charge, Prosecutorial and Custody Discretion (Nov. 7, 2007), *available at* http://www.ice.gov/doclib/foia/prosecutorial-discretion/custody-pd.pdf [http://perma.cc/2V2H-W2BK].

131   *See, e.g.*, Cox & Rodríguez, *supra* note 121. Analogous challenges arise in other areas of immigration control involving large-scale bureaucratic decision making, such as asylum adjudication and consular processing of visa applications. *See* Jaya Ramji-Nogales, Andrew I. Schoenholtz & Philip G. Schrag, *Refugee Roulette: Disparities in Asylum Adjudication*, 60 STAN. L. REV. 295 (2007); James A.R. Nafziger, *Review of Visa Denials by Consular Officers*, 66 WASH. L. REV. 1 (1991).

132   Brad Heath, *Immigration Tactics Aimed at Boosting Deportations*, USA TODAY, Feb. 17, 2013, at A1; Spencer S. Hsu & Andrew Becker, *Immigration Officials Set Quotas to Boost Deportation Numbers*, WASH. POST, Mar. 27, 2010, at A4.

133   Anil Kalhan, *Immigration Policing and Federalism Through the Lens of Technology, Surveillance, and Privacy*, 74 OHIO ST. L.J. 1105, 1119-20, 1154-55 (2013).

134   Memorandum from John Morton, Dir., U.S. Immigr. & Customs Enforecment, to all ICE Employees, Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens (June 30, 2010), *available at* http://www.ice.gov/doclib/news/releases/2010/civil-enforcement-priorities.pdf [http://perma.cc/2V2H-W2BK].

135   Memorandum from John Morton, Dir., U.S. Immigr. & Customs Enforecment, to All Field Office Dirs. et al., Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens (June 17, 2011), *available at* http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf [http://perma.cc/L6BJ-RE2W].

136   WADHIA, *supra* note 29, at 79-83, 102-04; Julia Preston, *Obama Policy On Deporting Used Unevenly*, N.Y. TIMES, Nov. 13, 2011, at A16.

137   Marjorie S. Zatz & Nancy Rodriguez, *The Limits of Discretion: Challenges and Dilemmas of Prosecutorial Discretion in Immigration Enforcement*, 39 LAW & SOC. INQUIRY 666, 677-79 (2014); Ahilan Arulanantham, *The President's Relief Program as a Response to Insurrection*, BALKINIZATION (Nov. 25, 2014), http://balkin.blogspot.com/2014/11/the-presidents-relief-program-as.html [http://perma.cc/LL2K-9WBP].

138   Sargent, *supra* note 116; *see also* Erin B. Corcoran, *Seek Justice, Not Just Deportation: How to Improve Prosecutorial Discretion in Immigration Law*, 48 LOY. L.A. L. REV. 119, 128-30 (2014).

139   Johnson, Enforcement Priorities Memorandum, *supra* note 4.

140   *See also* Meissner, Exercising Prosecutorial Discretion, supra note 125, at 6 ("As a general matter, it is better to exercise favorable discretion as early in the process as possible ... in order to conserve the [immigration agency's] resources and in recognition of the alien's interest in avoiding unnecessary legal proceedings."); Bernsen, Legal Opinion on Prosecutorial Discretion, *supra* note 31, at 7 ("Normally the appropriate time for the exercise of prosecutorial discretion is prior to the institution of [removal] proceedings.").

141   Johnson, DAPA Memorandum, *supra* note 5, at 4; *see also* Napolitano, DACA Memorandum, *supra* note 6, at 1-2 (requiring deferred action to be granted "on a case by case basis").

142   *Texas I*, No. B-14-254, 2015 WL 648579, at *5 n.9 (S.D. Tex. Feb. 16, 2015); *see id.* at *54-55, *74.

143     *Crane v. Johnson*, 783 F.3d 244, 254-55 (5th Cir. Apr. 7, 2015) (noting that the guidance document announcing DACA "makes it clear that the Agents shall exercise their discretion in deciding to grant deferred action, and this judgment should be exercised on a case-by-case basis"); *see Texas IV*, No. 15-40238, 2015 WL 3386436, at *21-25 (5th Cir. May 26, 2015) (Higginson, J., dissenting); *Arpaio v. Obama*, 27 F. Supp. 3d 185, 209-10 (D.D.C. 2014).

144     *Texas I*, 2015 WL 648579, at *55 & n.101.

145     *See Texas IV*, 2015 WL 3386436, at *24-25 (Higginson, J., dissenting).

146     George L. Priest & Benjamin Klein, *The Selection of Disputes for Litigation*, 13 J. LEGAL STUD. 1, 4 (1984); Conor Clarke, *Is the Foreign Intelligence Surveillance Court Really a Rubber Stamp? Ex Parte Proceedings and the FISC Win Rate*, 66 STAN. L. REV. ONLINE 125 (2014).

147     As Stephen Legomsky notes, "An undocumented individual with some additional misconduct in his or her background is unlikely to proactively approach the government [and submit detailed biographic and biometric information]--nor is that person likely to send the government $465--if he or she is unlikely to receive deferred action." *The Unconstitutionality of Obama's Executive Actions on Immigration, Hearing Before H. Comm. on the Judiciary*, 114th Cong., 1st Sess. (Feb. 25, 2015) (written statement of Stephen Legomsky) [hereinafter Legomsky Testimony].

148     *Id.* at 9-14; *see also Texas IV*, 2015 WL 3386436, at *21-25 (Higginson, J., dissenting).

149     Johnson, DAPA Memorandum, *supra* note 5, at 4.

150     *See* Legomsky Testimony, *supra* note 147, at 13 ("The fact that the discretion is exercised in applying the threshold criteria rather than separately after the threshold criteria have been met does not make the determination any less discretionary.").

151     Johnson, Enforcement Priorities Memorandum, *supra* note 4, at 5-6.

152     *Texas I*, No. 14-254, 2015 WL 648579, at *48 & n.75 (S.D. Tex. Feb. 16, 2015).

153     *Id.* at *44. In fact, Judge Hanen wastes no time in *directly* second-guessing those enforcement priorities, questioning DHS's exclusion of DAPA-eligible individuals from its third priority--even though that category is limited by its terms to noncitizens issued final removal orders on or after January 1, 2014. *Id.* at *35 n.49 ("DAPA recipients arguably fall under Priority 3, but the Secretary's DAPA Memorandum seems to indicate he thinks otherwise.").

154     Zimmer, *supra* note 23 (quoting Stephen Colbert).

155     *Texas II*, No. B-14-254, 2015 WL 1540022, at *3 (S.D. Tex. Apr. 7, 2015) (directly calling into question and challenging the executive branch's authority to establish and implement its enforcement priorities).

156     *United States v. Nava-Martinez*, No. B-13-441-1, 2013 WL 8844097, at *5 (S.D. Tex. Dec. 13, 2013).

157     *Texas I*, 2015 WL 648579, at *35.

158     In practice, as Adam Cox and Cristina Rodríguez observe, assigning primary responsibility to USCIS also has the effect of centralizing the exercise of enforcement discretion in a smaller and less dispersed set of actors, which may make the task of administrative supervision less complex. Cox & Rodriguez, *supra* note 121 (manuscript at 63-64).

159     Johnson, DAPA Memorandum, *supra* note 5, at 4; Napolitano, DACA Memorandum, *supra* note 6, at 1-2; *see Crane v. Johnson*, 783 F.3d 244, 254-55 (5th Cir. Apr. 7, 2015); *Texas IV*, 2015 WL 3386436, at *21-25 (5th Cir. May 26, 2015) (Higginson, J., dissenting); *Arpaio v. Obama*, 27 F. Supp. 3d 185, 209-10 (D.D.C. 2014).

160  *See* Abrams, *supra* note 117, at 3-4, 7-8 (describing a "competing tension between the need in prosecutorial decision-making for certainty, consistency, and an absence of arbitrariness, on the one hand, and the need for flexibility, sensitivity, and adaptability on the other").

161  *Id.* at 4; *see generally* Gillian E. Metzger, *The Constitutional Duty to Supervise*, 124 YALE L.J. 1836 (2015); Elena Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245 (2001); Kate Andrias, *The President's Enforcement Power*, 88 N.Y.U. L. REV. 1031 (2013).

162  *Texas IV*, No. 15-40238, 2015 WL 3386436, at \*16, \*21-25 (5th Cir. May 26, 2015) (Higginson, J., dissenting); Shane, *supra* note 27; *Reining in Amnesty: Texas v. United States and Its Implications, Hearing Before S. Comm. on the Judiciary, Subcomm. on Oversight, Agency Action, Federal Rights and Federal Courts*, 114th Cong., 1st Sess. (Mar. 19, 2015) (written statement of Jill Family); *see* WADHIA, *supra* note 29, at 85-87, 152-55 (arguing, from a policy perspective, that formal regulations governing deferred action would be desirable).

163  *See, e.g.*, Wadhia, *supra* note 31, at 244-45. For helpful but limited analysis of these rule of law values in the context of deferred action, see, for example, MOTOMURA, *supra* note 117, at 204-05; WADHIA, *supra* note 29, at 134-45; Metzger, *supra* note 161, at 1927-29; Saikrishna Bangalore Prakash, *The Statutory Nonenforcement Power*, 91 TEX. L. REV. 115, 116 (2012); Shane, *supra* note 27.

164  U.S. CONST. art. II, § 3.

165  *See* Hyde et al., Guidelines for Use of Prosecutorial Discretion in Removal Proceedings, *supra* note 123 (urging executive branch officials to develop stronger and more formalized administrative guidance to encourage greater and more consistent use of prosecutorial discretion).

166  Michael Dorf, *Is There a Silver Lining in Judge Hanen's Injunction Against the Obama Immigration Policy?*, DORF ON LAW (Feb. 17, 2015, 10:11 AM), http://www.dorfonlaw.org/2015/02/is-there-silver-lining-in-judge-hanens.html [http://perma.cc/6YSC-FYK9].

167  David A. Martin, *A Defense of Immigration-Enforcement Discretion: The Legal and Policy Flaws in Kris Kobach's Latest Crusade*, 122 YALE L.J. ONLINE 167, 183 (2012).

63 UCLALRD 58

---

**End of Document**                     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/23 in TXSD   Page 255 of 990

CNN

● **LIVE TV**

| ▲ **DOW** | +0.23% |
| ▲ **S&P 500** | +0.36% |
| ▲ **NASDAQ** | +0.35% |

**Fear & Greed Index**
What emotion is driving the market now? Click here to see today's reading

# Nearly half of American companies say they are short on skilled workers

By Anneken Tappe, CNN Business

Updated 12:01 AM ET, Mon October 25, 2021

**New York (CNN Business) —** America's worker shortage is alive and well, much to the misfortune of US companies that need staff to keep up with demand.

The National Association of Business Economics (NABE) found that nearly half — 47% — of respondents to its Business Conditions Survey reported a shortage of skilled workers in the third quarter. That's up from 32% reporting shortages in the second quarter of the year, which already was too high for comfort. And nobody thinks the labor shortages will just disappear as 2021 turns to 2022.

Labor shortages are now a hallmark of the recovering pandemic economy, most prevalently in the goods-producing sector, according to the NABE survey. Companies have a hard time attracting the workers they need to feed increased demand from consumers, while the risk of infections remains. Some people are also waiting for the right opportunity to come along before they return to the labor force, quit in order to take better positions or are kept home due to family and care responsibilities.

From the companies' point of view, 27% cited they had not received enough applications, while 20% reported the job seekers who apply don't have the right skills.

Meanwhile, the shortage of unskilled workers declined.

## Holding back the recovery

While retaining existing workers and attracting new ones is top of mind for businesses, their second major challenge centers on rising prices and supply chain chaos.

One-third of survey respondents called the increased price pressures the biggest downside risk to their operation. Perhaps more eye-opening: not a single business that took part in the survey had lowered prices in the third quarter and none expect to cut prices over the next three months, either.

Over the summer US inflation indicators soared. Consumer price inflation rose to a 13-year high in the summer months, while another price index tracking consumer spending — the PCE index — rose to a fresh 30-year high in August.

So far, higher prices haven't kept consumers from spending, but economists worry this could happen in the future. And that would be really bad news for the recovery.

Even though the NABE survey found that business conditions remained strong between July and September, survey respondents cut their expectations for the next four quarters ever so slightly.

**AR2022_500255**



7/6/22, 4:15 PM                    Nearly half of American companies say they are short on skilled workers: CNN



LIVE TV

grounds to celebrate, but in the recovery above average performance is needed to get back to normal.

Search CNN...

US

World

Politics

Business

Opinion

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Audio

Coupons

Weather

More



**FOLLOW CNN BUSINESS**

**AR2022_500256**



• LIVE TV   

Most stock quote data provided by BATS. Market indices are shown in real time, except for the DJIA, which is delayed by two minutes. All times are ET. Disclaimer. Morningstar: Copyright 2018 Morningstar, Inc. All Rights Reserved. Factset: FactSet Research Systems Inc.2018. All rights reserved. Chicago Mercantile Association: Certain market data is the property of Chicago Mercantile Exchange Inc. and its licensors. All rights reserved. Dow Jones: The Dow Jones branded indices are proprietary to and are calculated, distributed and marketed by DJI Opco, a subsidiary of S&P Dow Jones Indices LLC and have been licensed for use to S&P Opco, LLC and CNN. Standard & Poor's and S&P are registered trademarks of Standard & Poor's Financial Services LLC and Dow Jones is a registered trademark of Dow Jones Trademark Holdings LLC. All content of the Dow Jones branded indices Copyright S&P Dow Jones Indices LLC 2018 and/or its affiliates.

Terms of Use   Privacy Policy   Do Not Sell My Personal Information   AdChoices   About Us   CNN Store   Newsletters

Transcripts   License Footage   CNN Newsource   Sitemap

© 2022 Cable News Network.  A Warner Media Company.  All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

**AR2022_500257**







# Charting a New Regional Course of Action

## The Complex Motivations and Costs of Central American Migration

Ariel G. Ruiz Soto
Rossella Bottone
Jaret Waters
Sarah Williams
Ashley Louie
Yuehan Wang





AR2022_500258





# Charting a New Regional Course of Action

## The Complex Motivations and Costs of Central American Migration

Ariel G. Ruiz Soto
Rossella Bottone
Jaret Waters
Sarah Williams
Ashley Louie
Yuehan Wang

November 2021




AR2022_500259

# Contents

Executive Summary ................................................................................................... 1

1   Introduction ...................................................................................................... 5

2   Migration Intentions and Behaviors ................................................................. 9
    A.   In-Country Conditions ............................................................................... 9
    B.   Intentions to Migrate ............................................................................... 15
    C.   Migrant Profiles ....................................................................................... 22

3   The Economic Costs of Migration ................................................................... 28
    A.   Regular and Irregular Migration Pathways ............................................... 28
    B.   Estimating the Costs of Different Migration Pathways ............................. 30
    C.   Financial Preparations for Migration ........................................................ 32

4   The Economic Impacts of Migration ............................................................... 35

5   Conclusions .................................................................................................... 40

Appendices ........................................................................................................... 43

About the Authors ................................................................................................. 47

Acknowledgments ................................................................................................. 49

# Executive Summary

Influenced by an array of pull and push factors, the movement of Central Americans toward the United States has shaped the migration landscape in the region for decades. Yet, changes over the past five years in the volume and characteristics of those on the move have drawn an unprecedented level of attention from regional governments seeking to reduce irregular migration. The U.S. Border Patrol recorded approximately 1.8 million encounters of migrants from El Salvador, Guatemala, and Honduras at the U.S.-Mexico border between fiscal years 2017 and 2021, and in four of the last five fiscal years encounters of migrants from these three countries surpassed those involving Mexican migrants. Since 2018, the region has also witnessed larger and more frequent mass movements, including those composed of significant shares of families and unaccompanied children, primarily bound for the United States and motivated by a mix of employment opportunities, family reunification, and humanitarian protection needs.

At the same time, there has been renewed political interest in countries stretching from Panama to Canada in collaboratively addressing the unabating root causes of migration and displacement. This has led to the advancement of regional frameworks that seek to promote safe, orderly, and regular migration with the goal of benefiting migrants and origin and destination communities alike, while contributing to sustainable development and making migration an option but not the only resort to escape adverse conditions. If this interest can be leveraged and translated into action, governments in the region have a unique and timely opportunity to shift from an enforcement-centered strategy to a more multifaceted migration management system rooted in cooperation.

*Governments in the region have a unique and timely opportunity to shift from an enforcement-centered strategy to a more multifaceted migration management system rooted in cooperation.*

To inform strategic discussions about how best to address root causes and manage Central American migration, this report—a collaboration between the Migration Policy Institute (MPI), UN World Food Programme (WFP), and Civic Data Design Lab at the Massachusetts Institute of Technology (MIT)—explores the factors that drive people in El Salvador, Guatemala, and Honduras to consider and decide to migrate irregularly or regularly, as well as the costs and economic implications of migration for households and communities throughout the region.

The report's findings draw from a unique, face-to-face survey of nearly 5,000 households in 12 departments across these three countries, complemented by a nationally representative online survey with more than 6,000 individual responses, to understand these factors and the emerging needs of migrant and nonmigrant communities in countries of origin. Conducted in Spring 2021 during a dynamic period of economic instability and changing migration policies in response to the COVID-19 pandemic, these surveys capture a snapshot of migration decision-making processes in this period and make a compelling case for future research to document changes in migration desires and motivations.

AR2022_500261

Among the key findings of this study are:

1   **Central Americans' desire to migrate internationally is on the rise, but only a fraction of the surveyed population planned and prepared to do so.** Survey respondents in approximately four out of every ten households (43 percent) indicated in 2021 a desire to migrate permanently to another country within a year, compared to 8 percent in 2019. Still, less than one in ten households (6 percent) reported making plans to do so, and an even smaller 3 percent reported making concrete preparations. Notably, individuals experiencing food insecurity were more likely (23 percent) to make concrete preparations to migrate than those who were food secure (7 percent).

2   **Violence, insecurity, and natural disasters have been complex and longstanding triggers of migration, but economic factors were participants' primary motivation for desiring to emigrate.** Low wages, unemployment, and insufficient income to cover basic necessities directly affected people's livelihoods and contributed significantly to the desire to emigrate. At the same time, these conditions were the most-cited impediments preventing them for starting the migration journey.

3   **Family ties and positive perceptions of safety and belonging were key reasons why Central Americans decided not to migrate.** Households' top reason for not desiring to migrate was to avoid being separated from family in their country of origin. Other factors motivating people to stay were perceptions of safety in Guatemala and Honduras and a notable sense of belonging and rootedness *(arraigo)* in El Salvador.

4   **Households' likelihood to have had a member migrate within the last five years was similar across household income levels.** In contrast to prior studies, which have generally found that households with more resources are more likely to be able to migrate, respondents in this survey from households with the lowest income level were nearly as likely to report that a member had migrated as those from households with mid- to high income levels.

5   **Most but not all migrants relied on irregular channels to migrate, and one-third had returned voluntarily or involuntarily to their origin country.** In the households where survey respondents reported a member had migrated within the last five years, more than half (55 percent) of these migrants were said to have traveled irregularly and contracted a smuggler, nearly one-quarter (22 percent) traveled irregularly on their own or in a caravan, and about one-fifth (19 percent) used regular migration pathways. However, only 57 percent had reportedly reached and were residing in the destination country at the time of the survey, and 33 percent had returned either voluntarily or involuntarily to their origin country. The United States was cited as the intended destination for nine out of ten recent migrants.

6   **Although economic factors were the primary motivators for seeking to migrate, there were notable differences across departments in El Salvador, Guatemala, and Honduras.** The top three departments of origin of reported migrants were: Usulután, El Salvador (15 percent of households that reported a member migrating recently); Huehuetenango, Guatemala (12 percent); and Yoro, Honduras (12 percent). Notably, respondents in Usulután were more likely to report insecurity and

2

family reunification as migration factors than was the case in other departments. In terms of migration desires, climate events and family reunification were notable drivers in Cortés, Honduras, and in Cabañas, El Salvador, respectively, though economic factors ranked higher in both departments.

**7** **Reported costs to contract smugglers were not only significantly higher than the costs of using regular mechanisms but also comprised the majority of total annual migration costs.** Based on the amounts survey respondents reported their household members had spent on different types of migration, this analysis estimates that migrants from these three countries spent USD 2.2 billion annually on the costs involved in migrating regularly and irregularly to the United States over the past five years. Because of the significant costs associated with contracting a smuggler, an estimated USD 1.7 billion of this total was spent annually by migrants traveling irregularly with a smuggler.

**8** **The volume of migrant remittances varied by country yet represented an important means of survival across households.** Nearly three out of every ten households (29 percent) reported regularly receiving remittances from abroad. On average, Guatemalan households received a monthly amount of USD 350, while Honduran and Salvadoran households received USD 170 and USD 150, respectively. The surveyed households reported that remittances were a lifeline primarily used to meet subsistence costs and immediate expenses, rather than a means to contribute to savings or invest in personal or community projects, though such uses are often discussed by policymakers and researchers as potential catalysts of development.

Based on these findings, and building on emerging regional collaboration efforts, policymakers may wish to consider the following strategies to address the drivers of irregular migration and lay the foundation for a sustainable migration management system that promotes safe, orderly, and regular movement:

**1** **Expand national social protection programs and stimulate investments to increase economic opportunities, eradicate hunger, and alleviate poverty for at-risk populations in El Salvador, Guatemala, and Honduras.** Despite small differences across each country, households reported that the lack of economic prosperity and difficulty meeting basic needs had significant and far-reaching impacts on decisions to migrate. Social protection programs that address unemployment and offer work training are pivotal to reaching vulnerable populations who may consider emigrating. Additionally, taking steps to address these conditions should go hand in hand with supporting programs that build resilience and address violence, insecurity, and climate change, prioritizing and expanding those programs that also create economic opportunities.

**2** **Tailor ongoing economic development and investment initiatives to municipal-level conditions with robust monitoring and evaluation metrics.** Even as the survey's results overwhelmingly underscored the effect economic factors have on migration desires, they also pointed to small but notable differences across municipalities. Internal and external development efforts and investments to address the root causes of migration—for instance, agricultural programs to build resilience to climate events or anti-gang programming for youth—will be most effective if tailored to these local circumstances, based on information gathered through monitoring and evaluation mechanisms.

**AR2022_500263**

**3**  **Create incentives and opportunities for diasporas to invest in the development of local communities and to become agents of change in their countries of origin or ancestry.**
Remittances are a lifeline that mitigates local economic instability for Central American households—in effect, buffering against economic migration pressures. But to amplify the impact of remittances beyond individual households, governments and international organizations should consider diasporas as potential agents of economic development and governance. Creating incentives for members of a diaspora to invest in public works can magnify the reach of government efforts while simultaneously enriching transnational partnerships to improve governance, for example by matching diaspora donations with transparent and accountable commitments from national, departmental, and municipal governments.

**4**  **Incorporate programs and initiatives that underscore the positive conditions that give people the option to seek opportunities at home into broader migration management strategies.**
Governments and civil-society leaders alike can influence how migration is portrayed publicly by investing in programs that build family unity, highlight existing perceptions of safety, and foster a sense of belonging to local communities. Highlighting these positive aspects of local life and targeting efforts to groups most likely to migrate irregularly (e.g., households with members who migrated recently) can foster hope and bolster socioeconomic investments, such as entrepreneurial and infrastructure projects. To improve their chances of shaping migration decision-making, such initiatives must be paired with efforts to address the concrete drivers of irregular migration, with the aim of giving people the possibility to choose.

**5**  **Expand legal pathways for Central Americans interested in migrating to the United States and other destination countries to redirect migration from irregular to regular channels.**
Coordinated efforts to increase access to temporary employment visas, for example, could help meet the overwhelming demand for employment opportunities abroad. Shifting even a fraction of irregular migration to regular channels would decrease the estimated USD 1.7 billion that Central Americans spend annually on irregular migration with a smuggler and instead increase state revenues—for instance, through reasonable application fees—which can then be invested in initiatives to address other drivers of irregular migration.

Facing unabating push factors and limited access to regular migration channels, many Central Americans resort to irregular migration to improve their livelihoods in the United States. By implementing the aforementioned recommendations with concrete and measurable commitments, however, regional governments, UN agencies, civil-society organizations, and the private sector have a unique opportunity to establish a new approach to addressing irregular migration's root causes and to promote safe, orderly, and lawful movement. While reconfiguring U.S. immigration policies is fundamental to pursuing the aim of creating legal alternatives to irregular migration, the ultimate success of this approach will depend on efforts and initiatives led by the governments of El Salvador, Guatemala, and Honduras. The in-depth analyses of migration drivers and migrants' sociodemographic profiles in this report provide governments a blueprint to design tailored programs and initiatives for populations most likely to migrate irregularly, and to link these efforts to much-needed economic recovery measures. Charting this new regional course of action is undoubtedly a long-term strategy that must adapt to future changes, but one that even in the near term promises to encourage stronger local communities and ameliorate income inequality, hunger, and poverty as the key drivers of migration.

AR2022_500264

# 1    Introduction

Central American migration to the United States has shaped regional migration dynamics for decades,[1] but recent changes in the volume and characteristics of those on the move have drawn unprecedented attention from governments in the region and spurred renewed interest in cooperating to reduce irregular migration. Combined encounters of migrants from El Salvador, Guatemala, and Honduras at the U.S.-Mexico border reached approximately 1.8 million between fiscal years 2017 and 2021, and the number of encounters involving nationals of these countries surpassed the number involving Mexicans in four of the last five fiscal years.[2] The region has also experienced larger and more frequent mass migration events since 2018, including significant shares of families and unaccompanied minors, primarily bound for the United States and motivated by an array of push and pull factors—from the prospect of better employment opportunities than existed in their origin countries to a desire for family reunification and humanitarian protection needs.

Though no single factor drives migration on its own, economic stagnation in Central America has been a persistent feature and one that has worsened because of the COVID-19 pandemic. Each year, the number of young people entering the labor market surpasses the number of jobs available, and many who do not find jobs decide to migrate instead.[3] In 2020, the economic pressures were even more extreme, as GDP contracted by 2 percent in Guatemala, 8 percent in El Salvador, and 9 percent in Honduras.[4] That same year, projections from the UN Economic Commission for Latin America and the Caribbean suggested that more than half of Guatemalans and Hondurans and nearly 40 percent of Salvadorans lived in poverty.[5]

> *Though no single factor drives migration on its own, economic stagnation in Central America has been a persistent feature and one that has worsened because of the COVID-19 pandemic.*

The effects of poverty and the pandemic have also magnified levels of food insecurity in the region. According to the UN World Food Programme, the number of Guatemalans, Hondurans, and Salvadorans affected by moderate or severe food insecurity nearly quadrupled from 4.8 million in 2019 to 17.3 million by Fall 2020. Over the same period, the share of households in the three countries who reported an intention to migrate increased from 8 percent to 15 percent.[6]

---

1   As of 2020, 86 percent of the nearly 4 million Guatemalan, Honduran, and Salvadoran immigrants worldwide resided in the United States. Authors' calculations based on international migrant stock data from UN Department of Economic and Social Affairs, Population Division, "International Migrant Stock 2020: Destination and Origin," accessed August 17, 2021. According to U.S. Census Bureau data from 2019, 44 percent of Central American immigrants in the United States had entered the country before 2000. See Erin Babich and Jeanne Batalova, "Central American Immigrants in the United States," *Migration Information Source*, August 11, 2021.

2   Authors' calculations based on data from U.S. Customs and Border Protection (CBP), "Southwest Land Border Encounters," updated July 16, 2021.

3   Andrew Selee and Ariel G. Ruiz Soto, "The Real Migration Crisis Is in Central America: To Stem the Flow, the United States Needs to Invest in the Region," *Foreign Affairs*, April 13, 2021; UN Economic Commission for Latin America and the Caribbean (ECLAC), "Diagnóstico, áreas de oportuniad y recomendaciones de la CEPAL," updated May 20, 2019.

4   World Bank, "GDP Growth (Annual %) – Guatemala, Honduras, El Salvador," accessed August 17, 2021.

5   ECLAC, *Panorama Social de América Latina 2020* (Santiago, Chile: ECLAC, 2021).

6   UN World Food Programme (WFP), "Evaluación Remota de la Seguridad Alimentaria – Antes y Durante COVID 19: América Central" (fact sheet, September 2020).

**AR2022_500265**

Violence, crime, and corruption are also key drivers of migration. Though homicide rates appear to be falling, those in El Salvador and Honduras remain among the highest in the world, and parts of Guatemala are equally violent.[7] About one in five residents across these countries reports being the victim of a crime every year. And nearly one in ten Hondurans and Salvadorans report experiencing extortion annually, paying gangs and local criminal groups just so they can live in their homes or run small businesses.[8] Additionally, high-level governmental corruption as well as lower-level corruption amongst security actors and public officials can undermine people's faith in institutions and drive them to consider emigration.

Less present in regional policy dialogues compared to other factors, though equally important, are the worsening impacts of climate-related shocks, both in terms of slow-onset and sudden-onset hazards. El Salvador, Guatemala, and Honduras have borne the brunt of intense storms such as Hurricanes Eta and Iota in November 2020, and local agricultural markets were decimated in 2018 by one of the worst droughts in the last 40 years.[9] Such events result in reduced agricultural production and employment declines, and compounded by environments of high vulnerability, violence, unemployment, and limited access to social protection schemes, they overwhelm community resilience.[10]

At the same time, there is renewed political interest in the region that stretches from Panama to Canada in collaboratively addressing the root causes of migration and displacement. This has followed the advancement of international frameworks that seek to promote safe, orderly, and regular migration, with the goal of benefiting migrants and origin and destination communities alike, while contributing to sustainable development. A fundamental example is the Global Compact for Safe, Orderly, and Regular Migration, which was adopted at the UN General Assembly in December 2018. The compact underscores the importance of addressing the adverse drivers and structural factors that compel people to leave their countries of origin and calls for the establishment of pathways to safety for people affected by disasters, environmental degradation, and climate change—groups not covered in international refugee law. At a regional level, the Central American Integration System (SICA) adopted the Policy Proposal for Comprehensive Regional Migration in 2018 to ensure that intraregional migration is governed by the principles of human rights and security.

*There is renewed political interest in the region that stretches from Panama to Canada in collaboratively addressing the root causes of migration and displacement.*

---

7   Andrew Selee and Ariel G. Ruiz Soto, *Building a New Regional Migration System: Redefining U.S. Cooperation with Mexico and Central America* (Washington, DC: Migration Policy Institute, 2020).

8   Selee and Ruiz Soto, "The Real Migration Crisis is in Central America."

9   Inter-American Development Bank (IDB) and ECLAC, *Evaluación de los efectos e impactos de la tormenta tropical Eta y el huracán Iota en Honduras* (Washington, DC, and Santiago, Chile: IDB and ECLAC, 2021); United Nations, "Central America: Drought, Resulting Crop Losses Threaten Food Security of Two Million People, UN Warns," UN News, August 24, 2021.

10  Peter J. Meyer, "Central American Migration: Root Causes and U.S. Policy" (In Focus brief, Congressional Review Service, Washington, DC, October 27, 2021).

AR2022_500266

Governments in the region thus have a unique and timely opportunity to shift from an enforcement-centered strategy to a comprehensive migration management system by leveraging this renewed interest in cooperation. The Biden administration's July 2021 proposal to devise a "collaborative migration management strategy" in the region may be the most concrete and influential example of support for such efforts, but it is not the only one.[11] The governments of Mexico, El Salvador, Guatemala, and Honduras have called for the region to address migration based on a principle of co-responsibility.[12] Canada's immigration ministry has expressed interest in increasing its capacity to resettle more Central American refugees.[13] And Panama's foreign minister has requested regional cooperation and responsibility-sharing to address large-scale emigration from Nicaragua.[14] Moreover, responding to the large number of migrants moving through Central America in September and August 2021, many of them Haitian, the presidents of Panama, Costa Rica, and the Dominican Republic exhorted the region's governments to collaborate on comprehensive and immediate steps to improve migration management.[15]

To inform strategic policy discussions about the management of Central American migration, this report explores the factors that drive migration intentions and decisions in El Salvador, Guatemala, and Honduras, as well as the costs and other implications of migration for the region. It is the result of a collaboration between the Migration Policy Institute (MPI), the UN World Food Programme (WFP), and the Civic Data Design Lab at the Massachusetts Institute of Technology (MIT). The report draws its findings from unique, face-to-face interviews with a sample of approximately 5,000 households, complemented by a nationally representative sample of more than 6,000 individual responses to a web survey. Both surveys were conducted across the three countries as part of a joint initiative between WFP and international and civil-society partners[16] to better understand these factors and the emerging needs of migrant and nonmigrant communities in countries of origin (see Box 1).

The report starts by identifying the underlying and intersecting motivations that drive Central Americans to migrate, as reported by surveyed households. It also examines the factors that encourage household members to either migrate or stay within their country. The next section explores how people finance their migration attempts and the implications for individuals and governments by disaggregating the economic costs of regular and irregular migration pathways. The report concludes with a forward-looking set of policy recommendations to chart a new course of action that promotes safe, orderly, and regular migration from Central America.

---

11   The White House, "Fact Sheet: The Collaborative Migration Management Strategy," updated July 29, 2021.

12   Mexican Foreign Ministry, "Declaración Conjunta El Salvador, Guatemala, Honduras y los Estados Unidos Mexicanos" (press release, January 11, 2021).

13   Immigration, Refugees, and Citizenship Canada, "Canada Announces 3 New Initiatives to Welcome and Support More Refugees" (news repease, June 18, 2021); Ana Mehler Paperny, "Canada Could Take in Some Central American Migrants to Help U.S. – Minister," Reuters, June 9, 2021.

14   EFE, "Panamá pide una solución internacional conjunta a la situación de Nicaragua," swissinfo.ch, June 24, 2021.

15   AP News, "Panamá, C. Rica y Dominicana piden apoyo a EEUU para Haití," AP News, October, 21, 2021.

16   The broader WFP study conducted with international and civil-society partners explores trends and links between food security, climate variability, violence, and migration together with the impacts of migration dynamics. It focuses on the sociodemographic profiles of Central American migrants and their motivations and challenges to emigrate—including climate variability—and the impact of migration costs on regional governments and economies.

AR2022_500267

**BOX 1**
**Study Methodology**

Complemented by a thorough review of secondary data, this study relies primarily on household survey data collected by the UN World Food Programme (WFP) and international and civil-society partners. Between April and May 2021, the research team conducted interviews with nearly 5,000 households in 300 communities across the following 12 departments: Ahuachapán, Cabañas, San Salvador, and Usulután in El Salvador; Alta Verapaz, Chiquimula, Huehuetenango, and San Marcos in Guatemala; and Choluteca, Cortés, Francisco Morazán, and Yoro in Honduras (see map below). The survey asked respondents about their living conditions, intentions to migrate, and the sociodemographic characteristics of household members who had migrated, among other related questions. The study sample is representative of households at the department level, and the departments included in the survey were selected based on the reported number of migrants returning to each department, as a proxy for emigration rates, and food insecurity levels to capture households in diverse socioeconomic settings.



To expand understanding of the conditions that trigger migration and of individuals' migration experiences, WFP also conducted a web survey in the three Central American countries using a Random Domain Intercept Technology (RDIT). More than 6,000 survey responses were collected and met validation thresholds with a minimum of 90 observations in each of the 54 departments across the three countries, making this survey sample nationally representative. The authors tested and confirmed that findings regarding respondents' migration intentions from the web survey follow similar trends as those observed in the household survey. As such, this study relies on the household survey, with supplemental information from the web survey, to draw conclusions about the three countries at the national level. For more information on the methodology and assumptions used, see Appendices A and B.

AR2022_500268

# 2    Migration Intentions and Behaviors

The decision to migrate is complex and depends on an array of intersecting personal and social circumstances. To explore the conditions and factors that influence Central Americans' migration intentions, profiles, and behaviors, this section analyzes household survey responses across a series of key variables. The survey collected respondents' accounts of the migration intentions of the members of their household and whether household members migrated in the past five years—not necessarily the accounts of migrants themselves. Nonetheless, these responses provide insights that supplement other studies on migration from El Salvador, Guatemala, and Honduras and help paint a more comprehensive picture of the factors that play key roles in migrant decision-making and the profiles of the individuals who are most influenced by these factors.

## A.    In-Country Conditions

In assessing the conditions in each country, the vast majority—87 percent—of household respondents reported being satisfied with the area in which they were living. Even in Honduras, the country with the lowest satisfaction level, this figure was 81 percent. The highest satisfaction rates were reported in the departments of Cabañas, El Salvador (94 percent); San Marcos, Guatemala (94 percent); and Huehuetenango, Guatemala (93 percent).

However, satisfaction is a relative indicator that does not always capture the extent to which a group's needs are being met. Examining respondents' perceptions of their standard of living complicates this picture (see Figure 1). Only 13 percent of respondents reported that their standard of living was improving at the time of the survey, while 55 percent said it was staying the same and 31 percent reported a worsening of conditions. Honduras had the highest share of respondents who expressed a negative outlook on their standard of living (37 percent) and

*The vast majority—87 percent—of household respondents reported being satisfied with the area in which they were living.*

the lowest share with a positive outlook (9 percent). Interviewees in the Honduran department of Cortés reported the lowest levels of satisfaction of any department, with more than half stating that their standard of living was deteriorating. This may be explained in part by the fact that the department is home to the city of San Pedro Sula, the economic and agricultural hub of the country, which suffered extensive damage to factories and farms from Hurricanes Eta and Iota in November 2020 and has struggled to recover.[17]

---

17    María Verza, "Desperation Grows in Battered Honduras, Fueling Migration," AP News, February 11, 2021.

AR2022_500269

**FIGURE 1**

**Household Survey Respondents' Perceptions of Their Standard of Living, by Country of Residence, 2021**



Note: Percentages may not add up to 100 percent due to rounding.
Source: Authors' analysis of UN World Food Programme (WFP) household survey in El Salvador, Guatemala, and Honduras, 2021.

Respondents' evaluation of their economic conditions followed a similar distribution. More than half of respondents in all three countries reported feeling that economic conditions in their community were staying the same, while one-third said they were getting worse, and only 14 percent reported improvement (see Figure 2). Honduran respondents were the most likely to report deteriorating economic conditions (41 percent) and the least likely to report improvement (7 percent). Once again, more than half of all respondents in Cortés reported a worsening situation. On the other hand, although the share of Guatemalan respondents reporting improvements in economic conditions was just slightly higher that the three-country average (18 percent compared to 14 percent), the share was nearly double the average in the department of Huehuetenango, where approximately one in three respondents reporting perceived improvements.

**FIGURE 2**

**Household Survey Respondents' Perceptions of Economic Conditions in Their Area of Residence, by Country of Residence, 2021**



Note: Percentages may not add up to 100 percent due to rounding.
Source: Authors' analysis of UN World Food Programme (WFP) household survey in El Salvador, Guatemala, and Honduras, 2021.

AR2022_500270

The low income levels reported by survey respondents could partially explain these evaluations of economic conditions. The average level of per capita monthly expenditure among families interviewed was about USD 80, equivalent to about USD 300 per household per month. Using median expenditure as a proxy for household income, this indicates that half of all households were living on less than USD 60 per capita per month—or less than USD 2 per capita per day. In addition to the limited spending power reported among households, the fact that the median expenditure level was considerably lower than the mean points to the presence of income inequality among respondents.

The variance in expenditures reported by households indicates different income levels across the three countries (see Table 1). The average per capita monthly expenditure for households in Guatemala was USD 70, while this figure rose to USD 90 for households in El Salvador. In Guatemala, this translates into an average level of monthly household expenditure of USD 270, well below the country's basic food basket of USD 390 (the estimated cost of households' basic food expenses per month[18]). Additionally, in each of the three countries, the median expenditure fell considerably below the average level of expenditure, once again underscoring the spread in incomes among respondents.

TABLE 1

**Household Survey Respondents' Reported Monthly Expenditures (in USD), by Country of Residence, 2021**

| Country | | Total Per Capita Expenditure | Total Household Expenditure | Total Per Capita Food Expenditure |
|---------|--------|-----:|-----:|-----:|
| El Salvador | Mean | 90 | 330 | 30 |
| | Median | 70 | 260 | 30 |
| Guatemala | Mean | 70 | 270 | 30 |
| | Median | 50 | 200 | 20 |
| Honduras | Mean | 80 | 310 | 30 |
| | Median | 60 | 230 | 30 |
| Total | Mean | 80 | 300 | 30 |
| | Median | 60 | 230 | 20 |

Note: Household expenditure values were rounded to the nearest ten.
Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

Many households reported facing difficulties subsisting on their limited income (see Figure 3). Across the three countries, 36 percent reported being in a very critical situation or struggling on their current income, and 32 percent reported that their income was insufficient to cover food expenses in the past 30 days. Almost half said that they were "surviving" on their current income, and just 16 percent felt that they could live comfortably with their income. Similarly, 35 percent of respondents to the in-depth online survey reported that their income was insufficient to meet their basic needs.

Notably, despite Honduran respondents being the most likely to describe their standard of living and economic conditions as getting worse and the least likely to report improvements, respondents in El Salvador had a lower level of income satisfaction. Only 11 percent of Salvadoran respondents reported

---

18   The basic food basket (*canasta básica alimentaria* in Spanish) is a standard metric used to define the average amount of money required for a household to afford standard food items. See National Statistics Institute of Guatemala, *Canasta Básica Alimentaria (CBA) Y Ampliada (CA): Mayo de 2021* (Guatemala City: National Statistics Institute of Guatemala, 2021).

**AR2022_500271**

that they were living comfortably, and about 45 percent reported that they were struggling or in a very critical situation. Guatemalan respondents, by contrast, reported the highest levels of satisfaction with their household income levels. About one-fifth of Guatemalan respondents said they were living comfortably on their income, as did an even larger one in four respondents from the Guatemalan departments of Chiquimula and Huehuetenango.

FIGURE 3

**Household Survey Respondents' Perceptions of Their Household Income, by Country of Residence, 2021**



Note: Percentages may not add up to 100 percent due to rounding.
Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

Furthermore, food insecure households in all three countries reported lower expenditures than food secure households, pointing to significant household income disparities.[19] Food secure households spent an average of USD 364 per month, compared to USD 149 spent by food insecure households (see Figure 4). Most households, independent of their food security status, reported that at least half of their monthly expenditures were on food and water. But as households experienced greater levels of food insecurity, they reported less diverse expenditure patterns. This means that as households dedicated a greater share of their expenditures to food, they were less able to cover other basic needs. For instance, for households experiencing moderate and severe food insecurity, 63 percent of their monthly expenditures were on food and water, compared to 9 percent on transportation and 9 percent on housing.

---

19   WFP delineates four categories of food security: food secure, marginally food secure, moderately food insecure, and severely food insecure. Based on survey questions related to food consumption and survival strategies, this study defines food secure respondents as those who WFP would classify as food secure (able to meet essential food and non-food needs without engaging in atypical coping strategies) and marginally food secure (able to achieve adequate food consumption without engaging in irreversible coping strategies, though unable to meet some essential non-food needs). Being food insecure refers to respondents who WFP would classify as moderately food insecure (experiencing significant food consumption gaps or only marginally able to meet minimum food needs, only with irreversible coping strategies) or severely food insecure (experiencing extreme food consumption gaps or worse).

**AR2022_500272**

**FIGURE 4**

**Household Survey Respondents' Average Monthly Expenditure Patterns (in USD), by Food Security Category, 2021**



| Food Security Classification | Country | Monthly Expenditure on Basic Needs per Household | | Monthly Expenditure per Capita |
|---|---|---|---|---|
| | | **Food & Water** | **Housing** | |
| **Food Secure**<br>CARI score 1 | El Salvador | $130 | $76 | $105 |
| | Guatemala | $113 | $51 | $87 |
| | Honduras | $146 | $76 | $108 |
| | **Average** | **$129** | **$67** | **$100** |
| **Marginally Food Secure**<br>CARI score 2 | El Salvador | $124 | $46 | $83 |
| | Guatemala | $106 | $33 | $58 |
| | Honduras | $122 | $37 | $64 |
| | **Average** | **$118** | **$39** | **$68** |
| **Moderately Food Insecure**<br>CARI score 3 | El Salvador | $110 | $41 | $68 |
| | Guatemala | $94 | $18 | $39 |
| | Honduras | $96 | $14 | $37 |
| | **Average** | **$98** | **$22** | **$46** |
| **Severely Food Insecure**<br>CARI score 4 | El Salvador | $55 | $8 | $19 |
| | Guatemala | $111 | $2 | $28 |
| | Honduras | $81 | $5 | $36 |
| | **Average** | **$91** | **$4** | **$30** |

Notes: The CARI score is an index used to classify households based on their food security status. The score is based on four indicators measuring the different dimensions of food security: food consumption score, coping strategy index, livelihood coping strategy, and food expenditure share. Percentages may not add up to 100 percent due to rounding.

Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

AR2022_500273

While depressed wages are likely at the root of respondents' bleak outlook on economic conditions, other factors also contribute to low perceptions of living standards. For instance, violence disrupts and threatens the well-being of residents in the region. When asked about how violence in their communities has changed over the past year, 46 percent of respondents reported that violence had either increased or stayed the same. Meanwhile, 16 percent reported a decrease in violence in the year prior to data collection, and 33 percent reported that there was not any violence or crime where they lived. These figures varied by country of origin; for example, 26 percent of Honduran respondents reported an increase in violence in the past year, compared to 10 percent of Guatemalans and 9 percent of Salvadorans.

The frequency and intensity of natural disasters prior to data collection likely also contributed to respondents' reports of precarious living conditions. Forty percent of respondents said they had been affected by some type of natural threat in the three-year period prior to data collection. About 20 percent of Honduran respondents and 19 percent of Salvadoran respondents reported having been affected by hurricanes, and more than 10 percent of Guatemalan respondents reported being affected by droughts.

Low income levels, hunger, insecurity, and climatic events are deeply intertwined. For instance, violence has been shown to negatively affect local economies, as it reduces residents' likelihood to save,[20] dims the prospects for upward mobility,[21] and depresses earnings for self-employed individuals.[22] The reverse is also true. Research has shown that economics can affect violence, such as when a lack of employment opportunities increases participation in organized crime.[23] Similarly, natural disasters not only cause direct economic impacts but also generate indirect macroeconomic losses, especially among low-income countries and less-diversified economies.[24]

*Low income levels, hunger, insecurity, and climatic events are deeply intertwined.*

In fact, the results of the household survey presented evidence of the relationship between these factors and respondents' economic outlook and livelihood perceptions. Among respondents who reported that economic conditions in their area of residence were getting worse, 48 percent reported experiencing some type of natural disaster or threat in the three years prior to data collection, while a smaller 36 percent of those who reported improvement in economic conditions had experienced a natural disaster or threat. These figures were nearly identical for respondents' perceptions of their standard of living: Of those who reported a deterioration in their standard of living, 50 percent had experienced a natural disaster or threat in the past three years, while 34 percent of those who reported improvement in their standard of living said the same.

---

20  Maarten J. Voors et al., "Violent Conflict and Behavior: A Field Experiment in Burundi," *American Economic Review* 102, no. 2 (2012): 941–64.

21  Andrés Moya and Michael Carter, "Violence and the Formation of Hopelessness and Pessimistic Prospects of Upward Mobility in Colombia" (working paper 20463, National Bureau of Economic Research, Cambridge, MA, February 2018).

22  Andrea Velásquez, "The Economic Burden of Crime: Evidence from Mexico," *The Journal of Human Resources* (2019).

23  Clare Ribando Seelke, *Gangs in Central America* (Washington, DC: Congressional Research Service, 2016).

24  W. J. Wouter Botzen, Olivier Deschenes, and Mark Sanders, "The Economic Impacts of Natural Disasters: A Review of Models and Empirical Studies," *Review of Environmental Economics and Policy* 13, No. 2 (2019): 167–88.

AR2022_500274

Similarly, respondents who reported worsening economic conditions and standard of living also reported increases in violence over the past year at higher rates. While 22 percent of those who said that economic conditions were getting worse where they were living reported an increase in violence, a smaller 10 percent of those who reporting economic improvement reported increasing violence. Once again, the figures are almost the same when looking at the relationship between violence and standard of living (20 percent versus 11 percent).

Combined, these results illustrate the connections between natural disasters, violence, and survey respondents' perceived economic conditions and standards of living. Recognizing the complexity of these relationships is critical to understanding how respondents describe the local conditions that influence their migration decision-making.

## B.    *Intentions to Migrate*

To better understand the connection between these conditions and migration behaviors, the household survey asked respondents about their intentions to migrate. The survey was designed based on a methodology developed for the Gallup World Poll, which used a tiered set of three indicators to measure migration intentions.[25] First, respondents were asked if they would like to permanently move to another country if they had the chance. Then, those who responded affirmatively were asked if they were planning to permanently move to another country in the 12 months subsequent to data collection. Finally, those who indicated that they were planning to move were asked if they had made any concrete preparations to permanently move to another country.

*Measuring intentions across these three indicators—desire, plans, and preparations—provides insight into the relationship between the drivers of migration and actual movement.*

Measuring intentions across these three indicators—desire, plans, and preparations—provides insight into the relationship between the drivers of migration and actual movement, as well as the disparity between wanting to move and actually having the capability to do so. At the same time, this measurement of migration intentions and plans may not fully capture the experiences of individuals who, despite not having previous plans to move, are displaced or forced to migrate on short notice by unexpected natural disasters or threats of violence.

---

25   Neli Esipova, Julie Ray, and Anita Pugliese, *Gallup World Poll: The Many Faces of Global Migration* (Geneva: International Organization for Migration, 2011).

AR2022_500275

## BOX 2
## Internal Migration in El Salvador, Guatemala, and Honduras

In many cases, individuals do not need to leave a country to improve their standard of living or escape unfavorable conditions; instead, they may opt to move to another part of their country of residence. Rather than being two entirely separate phenomena, internal and international migration exist in a complex relationship with one another. While in some cases decisions to migrate internally or internationally are independent, in others, internal migration serves as a precursor to international migration, and or vice versa (research has shown that the labor shortages produced by international emigration can stimulate internal migration within migrant origin countries, for instance). Drawing linkages between the two forms of migration is critical to further understanding this complex relationship.

Survey respondents in this study were asked a series of questions about their intentions to migrate internally and recent internal migration. Respondents' intentions to migrate internally followed largely similar patterns to their intentions to migrate internationally, with some key differences. Only 24 percent of those surveyed would migrate internally if they had the chance, in comparison to 43 percent who would move to another country, indicating that internal migration is less appealing to many than international migration. The desire to move internally was higher in Honduras (28 percent) and El Salvador (30 percent) than Guatemala (14 percent).

Like trends observed for international migration, however, few respondents reported that they were actively planning or had prepared to migrate internally within 12 months of the survey. In fact, 3 percent of all those surveyed said they had begun planning, and only 1 percent of the sample reporting making concrete preparations. The reasons household respondents gave for wanting to relocate domestically were predominantly economic, with 85 percent citing reasons such as unemployment, the need for a better job or working conditions, or lack of money for food and basic necessities.

About 9 percent of respondents reported that a household member had migrated or attempted to migrate to another part of the country within the past five years. Of the nearly 700 households that reported members migrating to another part of the country, the majority (52 percent) were from Honduras, followed by El Salvador (29 percent). These internal migrants were primarily young adults, with more than half between the ages of 18 and 34. And, once again reinforcing the findings of this report regarding international migration, economic factors influenced much of this internal mobility; 71 percent of migrants chose to move for reasons related to employment or income. Furthermore, households reported that 64 percent of these recent internal migrants had moved to an urban area, compared to just 25 percent who moved to rural areas, reflecting a pattern of urbanization across each of the three countries. From 2010 to 2020, the share of the population living in urban areas increased 12 percent in El Salvador and Honduras, and 8 percent in Guatemala (8 percent).

Notes: The population reported to have migrated internally over the last five years included 6 percent who moved multiple times and to both urban and rural areas. For the remaining 6 percent of internal migrants, household respondents did not know or did not answer whether the destination was rural or urban.

Sources: For data on the urban share of the population in each country, see World Bank, "Urban Population (% of Total Population)," accessed October 5, 2021. For more information on the relationship between internal and international migration, see Russell King, Ronald Skeldon, and Julie Vullnetari, "Internal and International Migration: Bridging the Theoretical Divide" (working paper 52, Sussex Centre for Migration Research, University of Sussex, Brighton, UK, December 2008); Ronald Skeldon, "Interlinkages Between Internal and International Migration and Development in the Asian Region," *Population Space and Place* 12, no. 1 (2006): 15–30.

AR2022_500276

Despite a large share of respondents reporting the desire to migrate internationally (43 percent), there was a considerable drop-off in the share of people reporting having concretely planned or prepared to emigrate within 12 months of being interviewed (see Figure 5). Of individuals who expressed this desire, only 15 percent reported having made plans to move abroad—a share that represents 6 percent of the total sample. Among respondents making plans, about half had made concrete preparations, equivalent to just 3 percent of the total sample. Interestingly, respondents to the online survey indicated even higher levels of intentions to migrate internationally but a similar drop in the share who had made plans and preparations: 70 percent of all respondents reported a desire to migrate internationally, 31 percent of these respondents reported having plans to do so in the next 12 months (22 percent of the total sample), and 45 percent of those with plans reported having made concrete preparations to move (10 percent of the total sample).

FIGURE 5

**Share of Household Survey Respondents Reporting Intentions to Migrate Internationally, 2021**



Note: Percentages may not add up to the total due to rounding.
Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

Across different sociodemographic characteristics, respondents generally reported similar migration intentions. For example, 45 percent of men and 42 percent of women surveyed expressed the desire to migrate abroad. The proportions of men and women making plans or preparations to move were also similar. However, some demographic patterns stood out. For instance, intentions varied more across age groups: While 55 percent of respondents under the age of 35 expressed the desire to migrate internationally, only 32 percent of those age 45 or older expressed this same desire.

Additionally, intentions to migrate were higher among households with a recent history of migration. Of the respondents who reported that at least one member of the household had migrated or attempted to migrate in the five years prior to data collection, 55 percent expressed the desire to move to another country (see Figure 6). In contrast, 39 percent of respondents who reported no recent household migration expressed the desire to permanently move abroad. This could be due to the positive relationship between having established transnational social networks and intentions to migrate.[26] It may also reflect an interest in migrating again among recent migrants who were unsuccessful in reaching their destination or who returned to their country of origin.

---

26   Esipova, Ray, and Pugliese, *Gallup World Poll*.

AR2022_500277

FIGURE 6

**Share of Household Survey Respondents with Intentions to Migrate Internationally, by Household History of Recent Migration, 2021**



Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

In the web survey, intentions to migrate internationally also varied by the level of hunger reported by respondents.[27] Although the desire to migrate consistently stood around 70 percent for respondents independent of their level of hunger, respondents with higher levels of hunger reported planning and preparing to migrate at higher levels (see Figure 7). Across the three countries, 37 percent of all respondents experiencing severe hunger reported having plans to migrate compared to 18 percent of those who experienced little to no hunger. Furthermore, 23 percent of all respondents experiencing severe hunger reported having prepared to migrate compared to 7 percent of those experiencing little to no hunger.

Respondents in the household survey who indicated the desire to permanently move abroad were also asked to select up to 15 different possible reasons for wishing to do so. The vast majority (92 percent) cited economic reasons related to their livelihoods as being key motivating factors, including: the need to search for a better job, salary, or working conditions; unemployment; lack of money for food and other basic necessities; and the desire to send remittances. Moreover, those who referenced a lack of money for food or other basic necessities reported average per capita monthly expenditures of just USD 50. Although economic factors are well-documented drivers of migration from the region, the extent to which they were cited by this survey's respondents is unique. For instance, a 2019 survey from Creative Associates International found that 60 percent of respondents living in El Salvador, Guatemala, and Honduras cited

---

27   For the online survey, hunger categories were developed using the Household Hunger Scale (HHS), an indicator of hunger used in studies of food insecure areas. It allows for comparison across a wide variety of countries, situations, and contexts. For more information, see Food and Nutrition Technical Assistance III Project (FANTA), "Household Hunger Scale (HHS): Indicator Definition and Measurement Guide," accessed August 16, 2021. Though they are comparable instruments, the HHS used in the online survey is calculated differently than the CARI score used in the household survey. For reference, severe hunger under the HHS is comparable to a CARI score of 4 (severe food insecurity).

**AR2022_500278**

economic factors as their primary reason to potentially leave.[28] Respondents in that survey, however, were asked to select just one motivating factor while the present study allowed respondents to select multiple factors; therefore, the share of people citing economic factors may have been higher if they were allowed to cite multiple motivations.

FIGURE 7

**Online Survey Respondents' Intentions to Migrate Internationally, by Level of Hunger, 2021**



Source: Authors' analysis of WFP online survey in El Salvador, Guatemala, and Honduras, 2021.

The impact of the COVID-19 pandemic and subsequent economic recessions throughout the region also partially explain these results. For example, WFP's remote monitoring of the three countries found that the proportion of households employing severe consumption-based coping strategies (such as reducing the size or number of meals consumed by adults) nearly doubled in Guatemala after the onset of the pandemic. This proportion surpassed half of all households in Honduras. Additionally, an overwhelming majority of households across all three countries reported income losses or unemployment during the pandemic.[29]

Other factors, such as violence (including insecurity and domestic violence), family reunification, and climate and environmental change (including land use changes, direct impact of natural disasters, or degradation of means of subsistence due to natural threats) were markedly less common, each being referenced as a reason to potentially emigrate by only about 5 percent of survey respondents. In the 2019 Creative Associates study, crime and violence were cited at much higher levels, with 38 percent of Salvadoran respondents reporting this as their primary reason to leave. However, respondents cited family reunification as their reason for migrating at similar rates in the present survey (6 percent) and the Creative Associates survey (3 percent).[30]

---

28   Creative Associates International, *Saliendo Adelante: Why Migrants Risk It All* (Washington, DC: Creative Associates International, 2019).

29   The WFP CATI survey interviewed 20,700 households: 6,645 households between December 2019 and February 2020 before the onset of the COVID-19 pandemic and 14,055 households between May and August 2020, during the pandemic. While the data collected are representative at the department level, the results included in this report are based on results representative at national level to compare before and after the start of the pandemic in the three countries.

30   Creative Associates International, *Saliendo Adelante*.

AR2022_500279

As discussed in Section 2.A., the complex relationship between economic factors, violence, and natural disasters makes it difficult to isolate a single cause of migrants' decision-making behavior. It is possible that migrants who cite economic factors may also be indirectly affected by violence or natural disasters, given these phenomena overlap and interact with local economies, jobs, and wages. In the case of an agricultural worker whose earnings decreased due to diminished crop yields resulting from climate change, or a subsistence farmer forced into the informal labor market by a natural disaster, for instance, the subsequent economic struggles may have greater salience than their underlying environmental or climatic causes. Moreover, violence and natural disasters may prompt immediate displacement with less advanced planning and preparation, leading them to be underrepresented in the survey.

FIGURE 8

**Household Survey Respondents' Reasons for Wanting to Migrate Internationally, by Country of Residence, 2021**



Notes: Only respondents who expressed a desire to migrate internationally were asked to cite factors influencing this desire. Therefore, percentages represent shares of respondents who reported a desire to migrate, not of the total surveyed population. This survey question allowed for multiple responses, meaning the sum of percentages can exceed 100 percent. The "economics" category includes looking for a better job, salary, or working conditions; unemployment; lack of money to buy food; lack of money to cover other basic needs (including health, education, housing, clothing, and utilities); and desire to send remittances. The "insecurity and violence" category includes insecurity and domestic violence. The "family reunification" category includes only family reunification. The "climate and environment" category includes deterioration of livelihoods due to natural hazards (including floods, droughts, volcanic eruption, hurricanes, and plagues); the direct impact of a natural hazard; and the loss of land due to land use changes. The "other" category includes wanting to move to study; for cultural reasons or custom; for health-related reasons (including treatments, surgeries, medical consultations, or medicines); for tourism; the "other" option in the survey; and those participants who did not respond to this question about motivating factors or who reported not knowing.
Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

Nonetheless, the rate at which the present survey's respondents cited these motivating factors was relatively consistent across each of the three countries, but with some notable differences. For example, 45 percent of Guatemalans attributed their desire to migrate to a lack of money for food or basic necessities, while a smaller 32 percent of Salvadorans cited this same reason. As described in Section 2.A., respondents in Guatemala reported the lowest levels of per capita monthly expenditure (see Table 1). In addition, Salvadoran respondents cited both insecurity (7 percent) and family reunification (8 percent) at slightly

AR2022_500280

higher rates than respondents from the other two countries, though these rates still fall well below traditionally observed levels. In a 2020 study conducted by the UN Development Programme (UNDP) and U.S. Agency for International Development (USAID), 82 percent of respondents from El Salvador who were considering migrating abroad cited insecurity and 39 percent cited family reunification as their reasons for leaving. The proportion of Salvadoran respondents who cited economic factors (84 percent), however, was nearly the same as in the present study.[31]

Certain noneconomic factors took on a more pronounced role at the departmental level. For instance, the highest proportion of respondents citing environmental and climate-related issues as a factor behind their desire to migrate (13 percent) was in Cortés, Honduras, a coastal area that experienced considerable damage by Hurricanes Eta and Iota. Additionally, 11 percent of respondents in San Salvador, El Salvador, reported violence as a reason for desiring to migrate, and 13 percent of respondents in Cabañas, El Salvador, who wanted to move abroad referenced family reunification.

*Certain noneconomic factors took on a more pronounced role at the departmental level.*

In order to better understand why respondents' desires to migrate did not always translate into more concrete actions, the survey asked those who said they had not made plans to move about their reasons. For many, the key factors were once again economic. Across the three countries, 59 percent of these respondents reported not making plans because they did not have enough money to pay for the trip. Other commonly cited reasons included pandemic-related immigration restrictions (17 percent), fear of the spread of COVID-19 (16 percent), not having enough money to cover the cost of living in the destination country (16 percent), the dangers of the journey (16 percent), and not having documentation to travel (15 percent).

In El Salvador, respondents' reasons for not migrating stand out in several ways. Of those Salvadoran respondents who expressed the desire to migrate internationally but had not made plans to make the journey in the next 12 months, only 11 percent respondents referenced pandemic-related mobility restrictions and fear of the spread of COVID-19 as a reason *not* to make migration plans, in comparison to 35 percent of respondents from Guatemala and 40 percent from Honduras. This may stem from the disparity in the pace of the vaccine rollout in the three countries. While the share of the total population that had received at least one dose of a COVID-19 vaccine jumped from 2 percent to 18 percent in El Salvador during the period of data collection, this figure only grew from 1 percent to 3 percent in Guatemala and 1 percent to 2 percent in Honduras.[32] Another notable difference was that Salvadoran respondents cited the inability to cover the cost of living in the destination country as a reason for not planning to migrate, despite wishing to do so, at a higher level (23 percent) than Guatemalans (12 percent) and Hondurans (9 percent).

Critically, not everyone in this region wants to migrate, and the decision to stay is not necessarily indicative of the inability to migrate. Of respondents who reported not having any desire to migrate internationally, 66 percent reported wishing to remain in their home countries because they did not want to separate their

---

31   UN Development Programme (UNDP) and U.S. Agency for International Development (USAID), *Movilidad humana, desarrollo y seguridad ciudadana en los países del norte de Centroamérica* (New York and Washington, DC: UNDP and USAID, 2020).

32   University of Oxford, Our World in Data, "Coronavirus (COVID-19) Vaccinations," updated July 26, 2021.

AR2022_500281

family—the most commonly cited response. This proportion was slightly lower for El Salvador (59 percent) in comparison to Guatemala (66 percent) and Honduras (71 percent), possibly due to the fact that an estimated one in four Salvadorans already lives in another country.[33]

Other common reasons cited by respondents who did not want to permanently emigrate included the safety of their place of residence (41 percent) and a sense of belonging (*arraigo*) to their communities or country (23 percent). In El Salvador, a smaller 32 percent of these respondents referenced the safety of their area as a reason to stay, in comparison to 44 percent of those in Guatemala and 43 percent in Honduras. Notably, the most common factor referenced by Salvadorans was their sense of rootedness or belonging to their community or country; more than half cited this as a reason to stay, in comparison to just 10 percent of Guatemalans and 13 percent of Hondurans.

## C.   *Migrant Profiles*

While data related to migration intentions provide a snapshot of respondents' needs, desires, and capabilities at the time of the survey, questions that asked respondents about members of their household who had migrated recently—whether through regular or irregular channels—offer more insight on actual migration behaviors and patterns over the past several years. In total, 24 percent of the nearly 5,000 respondents in the household survey reported that at least one household member had migrated or attempted to migrate within the five years prior to the survey, thus providing information on about 1,600 reported migrants (see Table 2).

The numbers of recent migrants described by households in each of the three countries were similar. As a result, about one-third of the total recent migrants reported come from each country. The largest shares of reported recent migrants came from the departments of Usulután, El Salvador (15 percent); Huehuetenango, Guatemala (12 percent); and Yoro, Honduras (12 percent). Most reported recent migrants were men (69 percent), and more than half were ages 18 to 34 (55 percent).

TABLE 2
**Demographics of Recent Migrants Reported by Household Survey Respondents, 2021**

| | Count | Percent of All Households Surveyed |
|---|---|---|
| **Total Number of Households Surveyed** | **4,998** | **100%** |
| Number of Households Reporting Recent Migration | 1,186 | 24% |
| Number of Recent Migrants Reported per Household | | |
| 0 | 3,812 | 76% |
| 1 | 882 | 18% |
| 2 | 217 | 4% |
| 3+ | 87 | 2% |

---

33   USAID, "Country Development Cooperation Strategy: El Salvador," updated April 30, 2021.

**AR2022_500282**

TABLE 2 (cont.)

**Demographics of Recent Migrants Reported by Household Survey Respondents, 2021**

| | Count | Percent of Recent Migrants Reported |
|---|---|---|
| **Total Number of Recent Migrants Reported** | **1,624** | **100%** |
| **Age** | | |
| 0–17 | 205 | 13% |
| 18–34 | 901 | 55% |
| 35–44 | 310 | 19% |
| 45+ | 208 | 13% |
| **Sex** | | |
| Female* | 502 | 31% |
| **Origin Country and Department** | | |
| El Salvador | 515 | 32% |
| Ahuachapán | 79 | 5% |
| Cabañas | 119 | 7% |
| San Salvador | 78 | 5% |
| Usulután | 239 | 15% |
| Guatemala | 524 | 32% |
| Alta Verapaz | 106 | 7% |
| Chiquimula | 111 | 7% |
| Huehuetenango | 193 | 12% |
| San Marcos | 114 | 7% |
| Honduras | 585 | 36% |
| Choluteca | 98 | 6% |
| Cortés | 118 | 7% |
| Francisco Morazán | 170 | 10% |
| Yoro | 199 | 12% |
| **Destination Country** | | |
| United States | 1,453 | 89% |
| Mexico | 31 | 2% |
| Spain | 72 | 4% |
| Other** | 68 | 4% |

\* Eight respondents preferred not to specify the sex of the household member who had migrated, meaning the remaining 1,114 migrants were reported to have been men.

\*\* Other countries cited included: Belize, Canada, Cayman Islands, Costa Rica, El Salvador, Germany, Guatemala, Honduras, Italy, Japan, Nicaragua, Panama, Italy, Honduras, Sweden, and the United Kingdom. This category also includes six migrants who did not have a reported destination country.

Notes: Recent migration refers to households that reported that at least one member had migrated or attempted to migrate in the five years prior to the study. Percentages may not add up to 100 percent due to rounding.

Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

AR2022_500283

**FIGURE 9**

**Intended Destination of Recent Migrants Reported by Household Survey Respondents, by Country of Residence, 2021**



Guatemala
- 96% United States
- 3% Mexico
- 1% Other *

Honduras
- 82% United States
- 11% Spain
- 2% Mexico
- 5% Other *

El Salvador
- 94% United States
- 6% Other *

* In each chart, destination countries that did not receive at least 2 percent of survey responses were consolidated under the "other" category. These countries include: Belize, Canada, Cayman Islands, Costa Rica, El Salvador, Germany, Guatemala, Honduras, Italy, Japan, Mexico (for El Salvador), Nicaragua, Panama, Spain (for Guatemala and El Salvador),  Sweden, and the United Kingdom.
Note: Recent migrants are those household members who were said to have migrated within the five years prior to the survey.
Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

**FIGURE 10**

**Outcomes of the Reported Migration Journeys Attempted by Members of Surveyed Households, 2021**



Note: "Migrants" in this figure refers to the share of household members who were reported to have migrated or attempted to migrate in the five years prior to the survey.
Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

AR2022_500284

Of the household members who were reported to have migrated or attempted to migrate in the five years prior to the survey, the majority (89 percent) intended to migrate to the United States. However, these recent migrants' intended destinations varied across the three countries in which the survey was conducted (see Figure 9). A notable share of those from Hondurans (11 percent), for instance, were reported to have migrated to Spain. When asked about the outcomes of these journeys, 57 percent of recent migrants were reported to have had a successful journey and to be residing in their destination country at the time of data collection (see Figure 10). Meanwhile, 33 percent were reported to have returned to their origin countries, either voluntarily or involuntarily, and about 5 percent were reported to still be in transit at the time of the survey. Tragically, family members reported that 1 percent of migrants either died or disappeared while attempting to migrate.

The households that reported at least one member migrating recently span the socioeconomic spectrum, indicating that their overall interest or ability to migrate was not necessarily dependent on household income (see Figure 11). Disaggregating these households based on their monthly per capita income into six groups shows their propensity to migrate was not markedly different.[34]

FIGURE 11

**Proportion of Households with a Reported Recent Migrant, by Monthly Household Income (in USD) per Capita at the Time of the Survey, 2021**



Note: Recent migrants are those household members who were said to have migrated within the five years prior to the survey.
Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

---

34   The six household income groups were derived by normalizing the overall distribution of household monthly income per capita with a logarithmic transformation. The income per capita data were then split into six bins of equal width. All income per capita figures are in U.S. dollar values.

AR2022_500285

There are, of course, limitations to the conclusions that can be drawn from such insights. Because "recent migration" refers to movement in the five-year period prior to data collection, the household income reported in the survey could be different than what it was when the migration occurred. Indeed, among households reporting recent migration, 68 percent reported that their income decreased or was totally wiped out by the pandemic, suggesting it may have been higher at the time of migration, while 27 percent reported that their income stayed the same or increased. Remittances received from migrants could have also altered households' income from the time of migration to the period of study. Finally, the data refer to all individuals who attempted to migrate, and not specifically those who were successful in making it to their destination country.

Nonetheless, in a period of dynamic migration policy changes in the region and significant new economic pressures due to the pandemic, these findings show that individuals from households with the lowest levels of income found ways to migrate (as will be discussed in Section 3) at similar rates to those from middle- and high-income households. This is particularly notable given the ways in which migration is constrained by capital. As discussed in Section 2.A., more than half of respondents who wanted to migrate were not planning to do so because of the cost. In addition, higher income levels facilitate migration through access to education and international social networks. Indeed, research has documented a positive relationship between individual-level economic factors and emigration.[35] And from a macro perspective, research suggests that emigration increases as a country's GDP per capita increases up to a certain point, often referred to as the "migration hump."[36]

The reasons survey respondents gave for their household members having left the country in recent years, like the factors cited as influencing future migration intentions, were predominantly economic. Across the three countries, 85 percent of the recent migrants in the sample were reported to have been motivated by economic factors affecting their livelihoods, whereas factors such as insecurity and family reunification were each cited by 8 percent of migrants. However, the predominance of livelihood-related considerations does not necessarily mean that other conditions (such as violence and climatic or environmental problems) did not play a role. As noted above, these issues exist in complex, interdependent relationships that produce different migration outcomes. A growing body of research has documented the positive correlation between homicide rates and Central American migration, and the influence of climate events—for example, that decreases in precipitation are associated with increases in Honduran migration, further compounded by high homicides rates.[37] Additionally, due to the nature of the household survey, entire families or households that migrated (and either successfully made it to their destination country or were in transit at the time of data collection) were not represented in these results; conditions that can cause displacement of entire households, such as violence and natural disasters, are thus likely underrepresented.

---

35   Michael A. Clemens, "Violence, Development, and Migration Waves: Evidence from Central American Child Migrant Apprehensions" (working paper 459, Center for Global Development, Washington, DC, July 2017); Samuel Bazzi, "Wealth Heterogeneity and the Income Elasticity of Migration," *American Economic Journal: Applied Economics* 9, no. 2 (2017): 219–55.

36   Michael A. Clemens and Hannah M. Postel, "Deterring Emigration with Foreign Aid: An Overview of Evidence from Low-Income Countries" (policy paper 119, Center for Global Development, Washington, DC, February 2018).

37   Betilde Muñoz-Pogossian and Diego Chaves-González, *Environmental Explanations of Central American Migration: Challenges and Policy Recommendations* (Miami: Florida International University, Steven J. Green School of International and Public Affairs, 2021), 39; Sarah Bermeo and David Leblang, "Climate, Violence, and Honduran Migration to the United States," Brookings Institution, April 1, 2021.

AR2022_500286

When analyzing the demographic profiles of reported migrants, age was the characteristic linked to the most notable differences in migrants' motivations. While 93 percent of recent migrants between the ages of 18 and 34 were reported to have left for economic reasons, this proportion dropped to 77 percent for migrants 45 years old or older. The role reunifying with family played in migration decisions also varied by age: 17 percent of reported migrants who were 45 years old or older were said to have migrated for family reunification compared to just 5 percent of migrants between the ages of 18 and 34.

FIGURE 12

**Factors Reported to Have Motivated Members of Surveyed Households to Migrate Recently, by Country of Origin, 2021**



Notes: Recent migrants are those household members who were said to have migrated within the five years prior to the survey. Percentages represent the share of recent migrants reported by surveyed households who were said to have left due to each factor. This survey question allowed for multiple responses, meaning the sum of percentages can exceed 100 percent. The "economics" category includes looking for a better job, salary, or working conditions; unemployment; lack of money to buy food; lack of money to cover other basic needs (including health, education, housing, clothing, and utilities); and desire to send remittances. The "insecurity and violence" category includes insecurity and domestic violence. The "family reunification" category just includes family reunification. The "climate and environment" category includes deterioration of livelihoods due to natural hazards (including floods, droughts, volcanic eruption, hurricanes, and plagues); the direct impact of a natural hazard; and the loss of land due to land use changes. The "other" category includes wanting to move to study; for cultural reasons or custom; for health-related reasons (including treatments, surgeries, medical consultations, or medicines); for tourism; the "other" option in the survey; and those respondents who did not respond to this question about motivating factors or who reported not knowing.
Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

Important differences across countries of origin also underscore the mixed nature of migration from the region. Among those who were reported to have migrated or attempted to migrate from El Salvador, 16 percent were said to have been motivated by family reunification and 18 percent by insecurity, compared to just 5 percent and 1 percent, respectively, of those from Guatemala (see Figure 12). The relatively low proportions of respondents across all the countries who cited these reasons are notable, given a 2018 IDB survey[38] of recently arrived Guatemalan, Honduran, and Salvadoran migrants living in the United States found that 43 percent cited family reunification and 41 percent cited insecurity as drivers of migration. In

---

38   Emmanuel Abuelafia, Giselle Del Carmen, and Marta Ruiz-Arranz, *In the Footprints of Migrants: Perspectives and Experiences of Migrants from El Salvador, Guatemala and Honduras in the United States* (New York: IDB, 2019).

**AR2022_500287**

the present household survey, respondents from El Salvador were less likely to report that economic factors played a role in household members' migration than respondents in Guatemala and Honduras (75 percent versus 91 percent and 89 percent, respectively).[39]

Finally, there were some noteworthy differences in responses from different departments within each of the countries. In Usulután, El Salvador, for instance, respondents were more likely to report insecurity and family reunification as factors that motivated members of their households to migrate than was the case in other departments, although the majority of these recent migrants were also said to have moved due to lack of economic opportunity. This example is notable because, despite respondents living in this department expressing the highest level of income dissatisfaction, other factors evidently also played a key role in migrants' decision-making.

# 3   The Economic Costs of Migration

As much as migration often represents an investment to mitigate economic precarity and improve personal livelihoods over the long term, the costs involved in migration can be significant for individuals and households over the short term. This section presents estimates of some of these costs and analyzes the means migrants rely on to fund their international migration attempts. The authors calculated these estimates using a combination of survey responses to questions about the types of migration household members engaged in and the associated costs as well as secondary data on Central American population trends. While these cost estimates may not reflect the full set of expenses migrants incur, they are approximations that provide a baseline for further research and a useful starting point when seeking to understand the impacts of these costs.

## A.   Regular and Irregular Migration Pathways

Respondents who reported members of their households migrating within the last five years described these journeys as taking place in one of three primary forms: regular channels using temporary tourist and employment visas; irregular channels with the assistance of a smuggler; and irregular channels on one's own or with a caravan.[40] Temporary and permanent regular migration channels are limited and not widely available to Central Americans, though they provide safety and orderly transit to

*Temporary and permanent regular migration channels are limited and not widely available to Central Americans.*

---

39   These proportions are consistent with previous studies. In a 2017 survey of migrants in El Salvador, the International Organization for Migration (IOM) found that 74 percent of respondents cited work, 16 percent cited safety, and 9 percent cited family reunification as reasons to migrate. In a 2016 survey, IOM found that 91 percent of Guatemalans left their country for economic reasons. See IOM, *Encuesta national de migración y remesas: El Salvador 2017* (San José, Costa Rica: IOM, 2017), 13; IOM, *Encuesta sobre migración internacional de personas guatemaltecas y remesas 2016* (San José, Costa Rica: IOM, 2016), 42.

40   Respondents were asked about the primary, not the only, means of transportation used to migrate, and therefore some respondents may have used a combination of these channels to migrate. Under regular migration channels, the authors coded only survey responses indicating the use of work, tourist, or student visas; passports that enable the holder to travel to the destination country without needing a visa; other national identity documents that facilitate travel to other countries that are part of the Central American Agreement for Free Mobility, or CA-4 (El Salvador, Guatemala, Honduras, and Nicaragua); as well as responses indicating refugee resettlement or asylum requests. Authors coded any combination of responses indicating the use of smugglers as irregular migration with a smuggler, and responses that involved smugglers but also use of other unauthorized means of travel, including caravans, as irregular migration on one's own or with caravan.

AR2022_500288

destination countries. Meanwhile, irregular migration channels expose migrants—especially vulnerable groups—to great potential personal risk at the hands of smugglers and treacherous conditions.[41] Since 2018, migrants travelling irregularly from Central America have organized caravans more frequently to provide protection and pool resources during the journey, especially along the most dangerous segments of migration routes. Beyond its precarious and hazardous nature, irregular migration often results in apprehension, expulsion to a third country, and repatriation for Central American migrants, and many who still wish to reach their intended destination must make multiple attempts.[42]

FIGURE 13

**Regular and Irregular Migration Channels Reportedly Used by Recent Migrant Members of Survey Respondents' Households, by Country of Origin, 2021**



Notes: Recent migrants are those household members who were said to have migrated within the five years prior to the survey. Figure excludes individuals whose responses were coded as "don't know" or "preferred not to answer," and therefore these percentages may not add up to 100 percent.
Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

---

41   Jeff Hallock, Ariel G. Ruiz Soto, and Michael Fix, "In Search of Safety, Growing Numbers of Women Flee Central America," *Migration Information Source,* May 30, 2018.

42   As evidence of the number of attempts it takes to enter the United States via the U.S.-Mexico border without authorization, CBP data show that the share of migrants encountered at the border who have been apprehended within the last year is increasing from an average of 14 percent between 2014 and 2019 to 27 percent in July 2021. This is due in part to the recent implementation of migrant expulsions by U.S. authorities to Mexico, after which it is easier for migrants to make additional attempts, but it is also likely due to changes in smuggler tactics that offer migrants "packages" for one price covering multiple attempts if they are apprehended and returned to Central America. See CBP, "CBP Releases July 2021 Operational Update," updated August 12, 2021; Victoria A. Greenfield et al., *Human Smuggling and Associated Revenues: What Do or Can We Know About Routes from Central America to the United States?* (Arlington, VA: Homeland Security Operational Analysis Center, 2019).

AR2022_500289

Household survey respondents reported that most recent migrants relied on irregular channels to make their journey: 55 percent of them contracted smugglers and an additional 22 percent migrated without authorization on their own or with a caravan (see Figure 13). Among the migrants using a smuggler, it took two attempts on average to make it to their destination country. Still, nearly one in every five recent migrants (19 percent) were described as traveling through regular migration channels, including with temporary tourist and employment visas.

The channels these migrants used to move internationally varied considerably across nationalities. Guatemalan migrants were the most likely to rely on smugglers to migrate (78 percent), followed by Salvadorans (64 percent). Honduran migrants were the least likely to contract smugglers (25 percent); instead, higher shares reportedly migrated through regular channels (27 percent) or irregularly but on their own or with a caravan (41 percent). In fact, Hondurans were three times as likely as Salvadorans or Guatemalans to travel on their own or in a caravan.[43] After traveling irregularly with a smuggler, Salvadorans' next most common mode of travel was said to be migration through regular channels (20 percent of recent migrants).

## B.    *Estimating the Costs of Different Migration Pathways*

The costs survey respondents reported for their household members' migration—including transportation, food, and intermediaries—varied significantly across the three principal migration pathways. Migrants using regular channels reportedly spent USD 4,500 on average and those migrating irregularly on their own or with a caravan spent USD 2,900. The average cost of migrating irregularly with a smuggler was USD 7,500, more than double the cost of using legal pathways or migrating irregularly on one's own or in a caravan. Although migrating irregularly without smuggler assistance was the most affordable option, it presents serious safety concerns, particularly for vulnerable migrants.

Based on these average costs and estimates of the number of people who migrated from El Salvador, Guatemala, and Honduras over the last five years,[44] the authors calculated estimates of the total amounts these migrants paid in their attempts to migrate using regular and irregular channels to the United States, given it was the destination for 89 percent of reported migrants. An estimated average of 189,000 Guatemalans, 116,000 Hondurans, and 73,000 Salvadorans attempted to migrate to the United States each

---

43    Within this category of irregular migration, most Honduran migrants traveled on their own; only a small share traveled in a caravan. Still, previous surveys have found that Honduran migrants have made up the majority of Central American migrants traveling in caravans since 2019. See IOM, "Encuesta: Monitoreo de Flujos Suchiate, Chiapas, México" (fact sheet, January 2019).

44    The aggregate annual cost to migrate to the United States from El Salvador, Guatemala, and Honduras over the last five years was estimated using survey data and 2021 population estimates. Secondary population estimates were used to estimate the number of households in the region, which was then multiplied by the number of people per household who were reported in the survey to have migrated or tried to migrate internationally in the five years prior to the survey. This calculation was used to approximate the average annual number of migrants for the last five years. This estimate was then multiplied by the percentage of migrants reported to have used regular or irregular pathways (with and without a smuggler) and the average costs associated with each channel. National population projections for 2021 were referenced from the following sources: Guatemalan National Institute of Statistics, "Estimaciones y proyecciones de la población a largo plazo. 1950-2050" (dataset, 2019); Honduran National Institute of Statistics, "Proyecciones 2014 – 2030," accessed July 2021; Salvadoran National Directorate of Statistics and Census, Salvadoran Ministry of Economics, UN Population Fund, and ECLAC, "Estimaciones y proyecciones de población municipal 2005 -2025" (dataset, 2014).

AR2022_500290

year in the last five years.[45] This resulted in an estimated annual cost of USD 1.2 billion for Guatemalan migrants, USD 520 million for Honduran migrants, and USD 450 million for Salvadoran migrants (see Figure 14). In total, migrants traveling through regular and irregular channels spent an estimated USD 2.2 billion annually seeking to migrate to the United States, approximately one-tenth as much as total remittances sent to the three countries in 2020.[46]

FIGURE 14

**Estimated Annual Cost of Regular and Irregular Migration to the United States for All Migrants from Guatemala, El Salvador, and Honduras (in USD), 2021**



Note: Percentages may not add up to 100 percent due to rounding.
Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

Of the USD 2.2 billion migrants from these three Central American countries are estimated to have spent annually seeking to reach the United States, regular migration accounted for 11 percent of the total costs and irregular migration for the remaining 89 percent. Because irregular migrants traveling without a smuggler represented a smaller share of migration from the region and the expenses associated with this mode of travel were reportedly lower, the total estimated annual cost of this type of irregular migration was significantly lower (USD 230 million) than that of irregular migration with a smuggler (USD 1.7 billion).[47] Among the population of migrants who hired a smuggler, Guatemalans are estimated to have spent an annual average of USD 1.1 billion total, Salvadorans to have spent about USD 350 million, and Hondurans to have spent USD 260 million. These estimated costs of migrating irregularly with a smuggler represent a

---

45   These figures are only for migrants whose destination was the United States. In total, the authors estimate that 195,000 Guatemalans, 136,000 Hondurans, and 75,000 Salvadorans migrated annually to the United States *and* other countries.

46   Migrant remittances to El Salvador, Guatemala, and Honduras in 2020 amounted to USD 22.9 billion. For individual country totals, see World Bank, "Personal Remittances, Received (Current US$) – El Salvador, Guatemala, Honduras," accessed July 24, 2021.

47   Estimates by UN Office on Drugs and Crime (UNDOC) suggest that smuggler costs worldwide were between USD 5.5 billion and 7 billion in 2016. See UNDOC, *Global Study on Smuggling of Migrants 2018* (Vienna: UNDOC, 2018).

AR2022_500291

notable share of these three countries' GDP in 2020: 1.4 percent in both El Salvador and Guatemala, and 1.1 percent in Honduras.[48]

In addition to highlighting the high costs of smuggler-facilitated irregular migration for migrants, these estimates underscore the economic inefficiency that results from the mismatch between the scale of Central Americans' desire to migrate and the much more limited opportunities they have to do so regularly. This entails both the limited temporary visas available for Central American migrants and the lack of support infrastructure to connect potential migrants to the legal avenues that do exist. These limited migratory options, coupled with the migration pressures described in earlier sections, lead to spending on irregular migration which is siphoned to clandestine markets and away from regulated markets.

## C.  *Financial Preparations for Migration*

Because migration costs can be such a high financial burden, migrants often receive assistance from family and friends, use personal savings, and/or obtain bank or personal loans to afford the journey. Survey respondents reported that 41 percent of recent migrants from their households financed their trip with support from relatives and friends, including 22 percent who received personal loans from loved ones abroad. An additional 19 percent paid for migration costs using their own savings and 18 percent used loans from financial institutions.[49]

How migrants financed their travel varied according to the pathway they used, likely due to the large cost differences between these channels and to the different financing sources available to them. For example, looking at the most expensive pathway—irregular migration with a smuggler—55 percent of migrants reportedly relied primarily on support from family and friends (in country and abroad), 28 percent acquired bank loans, and 9 percent used their own savings or assets

*Migrants often receive assistance from family and friends, use personal savings, and/or obtain bank or personal loans to afford the journey.*

(see Figure 15). Among migrants who traveled using regular channels, the largest share (44 percent) also relied on friends and family, but a sizable share (30 percent) used their own means. Irregular migrants who traveled on their own or in a caravan, in contrast, were the most likely (43 percent) to use their own savings or assets to pay for migration costs, likely due at least in part to the fact that it was the cheapest option.

Migrants' reliance on assistance from family and friends and on bank loans is not surprising, given that economic conditions across the three countries make it nearly impossible for migrant households to save enough earnings to finance regular or irregular migration on their own.[50] And while incurring significant

---

48  In 2020, GDP in El Salvador, Guatemala, and Honduras was USD 24.6 billion, USD 77.6 billion, and USD 23.8 billion, respectively. See World Bank, "GDP (Current US$) – El Salvador, Guatemala, Honduras," accessed July 24, 2021.

49  Methods for financing migration trips are not mutually exclusive; some respondents gave more than one response for how trips were financed.

50  Assuming individuals are able to save 15 percent of their monthly minimum wage, it would take 40 years for one individual alone to afford the cost of regular migration and up to 90 years to afford the cost of irregular migration using a smuggler. This approximation is based on the minimum wage estimates in El Salvador (USD 203–304), Guatemala (Quetzal 2,832–3075), and Honduras (Lempiras 6,763–12,358). External minimum wage are from: AFP, "Nayib Bukele plantea incrementar un 20% al salario mínimo en El Salvador desde agosto," *El Universo*, July 1, 2021; Government of Guatemala, "Salario mínimo 2021," accessed July 2021; Government of Honduras, "Tabla de Salario Mínimo, Vigente a Partir del 1 de Enero del Año 2020," accessed July 2021.

AR2022_500292

debt to finance migration is daunting, the prospect of earning wages three to eight times higher in the United States than in El Salvador, Guatemala, and Honduras can make this trade-off appealing.[51]

FIGURE 15

**Financial Preparation Methods Used by Recent Migrant Members of Survey Respondents' Households, by Migration Channel, 2021**



Note: Recent migrants are those household members who were said to have migrated within the five years prior to the survey.
Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

Nonetheless, for migrants who make it successfully to the United States, paying back loans or debt can be a challenge. Depending on their job occupation, it could take between 11 and 19 months for Central Americans to pay the full expenses of migrating irregularly with a smuggler and between 5 and 8 months to pay the expenses associated with regular migration (see Figure 16). For migrants who do not make it to the United States or who are repatriated to their countries of origin, paying back loans and expenses presents an even greater challenge. As such, migration costs and debt can exacerbate difficult economic conditions and increase food insecurity as households use limited resources to cover these expenses.[52]

---

51  For example, the wages for working in construction and agriculture in the United States range from the federal minimum of USD 7.50 per hour up to USD 14.00 per hour in some states. By comparison, depending on industry of employment, the minimum hourly wage ranges in each country are: USD 0.90–1.30 in El Salvador; USD 1.40–1.50 in Guatemala; and USD 1.20–2.20 in Honduras. See Andrew Soergel and Sara Clarke, "24 U.S. States Will See a Minimum Wage Increase in 2021," U.S. News, August 2, 2021; AFP, "Nayib Bukele plantea incrementar un 20% al salario mínimo"; Guatemalan Ministry of Labor and Social Welfare, "Salario mínimo 2021"; Chamber of Commerce and Industry of Tegucigalpa, "Nuevo salario mínimo 2021," accessed August 17, 2021.

52  WFP, *At the Root of Exodus: Food Security, Conflict and International Migration* (Rome: WFP, 2017).

AR2022_500293

**FIGURE 16**

**Estimated Number of Months of U.S. Employment Required to Pay Migration Debt (in USD), by Migration Channel, 2021**





Notes: Authors' calculations of the number of months it would take for migrants to pay back migration debt assume migrants could allocate up to 33 percent of their monthly income for these payments, which is the average share of income U.S. households spend on housing. For this proxy, the authors assume that most migrants are likely to initially reside with friends or family and, thus, would incur no housing expenses or only a fraction of the expenses of living independently. Estimates of migrants' monthly income are based on wages in common U.S. sectors employing Central American migrant workers: approximately USD 680 in agriculture, USD 520 in construction, and otherwise USD 390 in minimum wage work.

Sources: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021; U.S. Department of Labor, Bureau of Labor Statistics, "Consumer Expenditures, 2019," updated September 9, 2020; California Department of Industrial Relations Labor Enforcement Task Force, "Protect Your Business-Prevent Penalties" (fact sheet, 2020); Annette Bernhardt, Siobhán McGrath, and James DeFilippis, *Unregulated Work in the Global City: Employment and Labor Law Violations* (New York: Brennan Center for Justice, 2007); U.S. Department of Labor, "State Minimum Wage Laws," updated August 1, 2021.

AR2022_500294

# 4   The Economic Impacts of Migration

Emigration from El Salvador, Guatemala, and Honduras has intended and unintended economic impacts not only for migrants and their households in origin communities, but also for communities in their destination country, as well as macroeconomic effects in the regional labor market. At the macro level, high emigration levels from Central America can result in significant losses for labor markets in countries of origin. Survey respondents reported that 89 percent of migrants from their households were between 14 and 60 years old (i.e., working age), and 76 percent were part of the labor force.[53] Furthermore, 92 percent of those in the labor force were employed prior to migrating, and the remaining 8 percent were unemployed but seeking employment. Based on these survey results, the authors estimate that about 1 percent of the three countries' local labor force migrated each year for the past five years.[54]

More than in any other occupation, emigration from this region has represented a key loss in agricultural productivity, considering the large share of recent migrants reported to have been previously employed in this sector. In fact, 37 percent of recent migrants from Guatemala and 32 percent of those from El Salvador reportedly worked in agriculture prior to migrating (see Figure 17). In Honduras, a smaller share (12 percent) of migrants were employed in agriculture, and higher shares were employed in informal work (24 percent) and salaried jobs (22 percent).

Survey results indicate that once in their destination countries, more than half of Guatemalan, Honduran, and Salvadoran migrants were working in similar occupations as in their origin countries, be it at higher wages. Yet, occupational shifts do appear to occur, with a notable increase in employment in informal work and salaried positions, but a decrease

*Once in their destination countries, more than half of Guatemalan, Honduran, and Salvadoran migrants were working in similar occupations as in their origin countries, be it at higher wages.*

in agricultural work (see Figure 18). This suggests that finding stable full-time employment in the formal market is a challenge for migrants in their destination countries.

---

53   As defined by the World Bank, labor force includes "people who are currently employed and people who are unemployed but seeking work as well as first-time job-seekers." See World Bank, "Labor Force, Total – Guatemala, El Salvador, Honduras," accessed August 18, 2021.

54   Of the 405,000 people the authors estimate attempted to migrate annually to the United States and to other countries, 76 percent were of working age and actively participated in their origin countries' labor force prior to migrating. About 57 percent of those who attempted to migrate reportedly made it to their countries of destination. Authors thereby estimate that approximately 176,000 working-age migrants successfully made it to their destination. This population accounts for slightly more than 1 percent of the 13 million people that make up the combined labor force of El Salvador, Guatemala, and Honduras. See World Bank, "Labor Force, Total – Guatemala, El Salvador, Honduras."

**AR2022_500295**

**FIGURE 17**

**Occupations of Recent Migrant Members of Survey Respondents' Households Prior to Migrating, by Country of Origin, 2021**



Notes: Recent migrants are those household members who were said to have migrated within the five years prior to the survey. Figure excludes recent migrants who were said to be retired prior to migrating or for whom the question was not applicable, as well as those survey respondents who did not respond. Percentages may not add up to 100 percent due to rounding.
Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

At the same time, migration responds not only to push but also to pull factors in destination countries, whereby migrants seek a higher standard of living while also productively meeting local labor demands and contributing to destination communities. In the case of the United States, Central American immigrants participate in the U.S. labor force at a higher rate than both the overall immigrant population and the U.S.-born population. As of 2019, Salvadorans and Guatemalans had among the highest labor force participation rates of all Central American immigrants, at 74 percent each, compared to 72 percent for Central Americans overall, 67 percent for all immigrants, and 62 percent for the U.S. born.[55] Nearly one-third of Central Americans were employed in service occupations, and agriculture is another sector that benefits from Central American immigrants' contributions to the U.S. economy. Moreover, foreign-born workers composed 73 percent of all U.S. hired crop labor workers in U.S. fiscal year 2016, and about half of all hired crop workers were unauthorized immigrants.[56] Mexico is the overwhelming source of migrant workers on U.S. farms, but Central Americans accounted for 6 percent of U.S. hired crop migrant workers between fiscal years 2015 and 2016.[57]

55   Babich and Batalova, "Central American Immigrants in the United States."
56   U.S. Department of Agriculture, Economic Research Service, "Farm Labor," updated August 18, 2021.
57   U.S. Department of Labor, "Table 1: Hired Crop Workers Demographic Characteristics, National Estimates, Seven Time Periods," accessed November 3, 2021.

AR2022_500296

**FIGURE 18**
**Occupational Changes of Recent Migrant Members of Survey Respondents' Households, 2021**



Notes: Recent migrants are those household members who were said to have migrated within the five years prior to the survey. Figure excludes recent migrants who were said to be retired prior to migrating or for whom the question was not applicable, as well as those survey respondents who did not respond. Percentages may not add up to 100 percent due to rounding.
Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

As immigrants find employment in their destination country, remittances to El Salvador, Guatemala, and Honduras represent a fundamental pillar of economic well-being for countries and communities of origin. Nearly three out of every ten surveyed households reported receiving remittances from abroad, mostly in money transfers but some also in gifts and goods. On average, surveyed households had been regularly receiving remittances for six years, although some had received remittances for as many as 30 years (see Figure 19). These remittances were typically sent by adult children to parents in Central America, followed by brothers sending money to their siblings, a reflection of the fact that most of these migrants were working-age men.

The amount of money received by surveyed households varied across countries of origin. Guatemalan households on average received USD 350 in remittances monthly, compared to USD 170 and USD 150 for Honduran and Salvadoran households, respectively. These amounts were roughly equivalent to 170 percent of household monthly expenditures in Guatemala, 70 percent in Honduras, and 62 percent in El Salvador. And despite the economic downturn during the COVID-19 pandemic, migrant remittances to Central America increased in 2020, reaching approximately USD 11.6 billion in Guatemala,

*Despite the economic downturn during the COVID-19 pandemic, migrant remittances to Central America increased in 2020.*

**AR2022_500297**

USD 5.9 billion in El Salvador, and USD 5.5 billion in Honduras. In fact, migrant remittances in 2020 accounted for 15 percent of GDP in Guatemala, 24 percent in El Salvador, and 23 percent in Honduras.[58]

FIGURE 19

**Surveyed Households Receiving Remittances from Abroad, 2021**



Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

Even with increasing migrant remittances, however, surveyed households reported that they used remittances primarily as a means to meet immediate needs and subsistence costs. The most commonly cited uses of remittances were to pay for food (86 percent), health expenses (40 percent), and utility bills (30 percent). In sharp contrast, only about 5 percent of households indicated they used remittances to invest in savings, pay off debts, or purchase agricultural inputs.

Looking at remittance-receiving households across food security levels further demonstrates the dependence on remittances to cover basic needs. More than half of surveyed households, regardless of their level of food security, said they used remittances to buy food and pay for housing costs (see Figure 20). And households that were less food secure were more likely to spend remittances on food costs. Notably, households with severe food insecurity did not report receiving remittances, making them significantly less resilient to economic instability.

---

58   World Bank, "Resilience COVID-19 Crisis through a Migration Lens" (Migration and Development Brief No. 34, World Bank Group, Washington, DC, May 2021); World Bank, "Personal Remittances, Received (% of GDP) – El Salvador, Guatemala, Honduras," accessed July 27, 2021.

AR2022_500298

**FIGURE 20**

**Household Spending of Remittances Reported by Survey Respondents, by Level of Food Security and Type of Expenditure, 2021**



'Notes: Recent migrants are those household members who were said to have migrated within the five years prior to the survey. Percentages may not add up to 100 percent due to rounding.
Source: Authors' analysis of WFP household survey in El Salvador, Guatemala, and Honduras, 2021.

Migrant remittances therefore represent a fundamental lifeline for households, enabling them to afford their basic needs and without which their living conditions would be more precarious. At the national level, remittances contribute to consumer spending and to maintaining economic stability, but these findings suggest that remittances alone are not enough to support short-term development or upward social mobility, given the small share that goes to social investment or entrepreneurial projects, which are often cited as potential catalysts of development.[59]

59   Central American Bank for Economic Integration, *Remittances in Central America: The Role of CABEI* (Tegucigalpa: Central American Bank for Economic Integration, 2021); Flore Gubert, "Migration, Remittances and Development: Insights from the Migration and Development Conference," *Revue d'économie du développement* 25, no. 3-4 (2017): 29–44; Organization for Economic Cooperation and Development (OECD), "International Migrant Remittances and their Role in Development," in *International Migration Outlook 2006* (Paris: OECD Publishing, 2006), 139–61.

**AR2022_500299**

# 5   Conclusions

To date, unilateral and bilateral attempts to address increasing Central American migration have been characterized by their reactive nature, limited reach, and narrow focus on reducing irregular movement. Policy responses prioritizing control and enforcement may temporarily reduce irregular migration, but they have failed to build durable solutions to manage regional migration and promote safe, orderly, and regular movement. As a result, the persistent root causes of migration—a combination of income inequality, poverty and hunger, violence and insecurity, and the effects of climate events—continue to drive Central Americans without accessible legal alternatives to make the dangerous journey toward the United States through irregular channels.

Irregular migration is a risky gamble for Central Americans seeking to increase their income and prosperity over the long term, given its substantial upfront financial costs and the uncertainty of success. It also carries economic losses for the region more broadly. At the macro level, the economic conditions that trigger migration and the legal framework that regulates it result in a loss of human capital from origin-country labor forces and an outflow of personal and external investments that are spent on migration costs but might otherwise help promote development.

*Policy responses prioritizing control and enforcement may temporarily reduce irregular migration, but they have failed to build durable solutions to manage regional migration and promote safe, orderly, and regular movement.*

Destination countries benefit from the added labor supply for in-demand occupations, but the monetary costs of irregular migration are siphoned to smugglers and unregulated, untaxed markets, which take away from potential public benefits and investments.[60] While migrants' remittances are a significant source of economic support in countries of origin, without dedicated channels to promote development projects, they are insufficient to improve the very conditions that motivate people to migrate.

Yet, an opportunity to address these root causes, rethink migration policies, and thereby lay the foundation for a sustainable migration management system appears to be opening, with growing consensus around the importance of regional cooperation. The long-term objective underlying such consensus is ensuring that migrating becomes an option for Central Americans, not the only recourse to escape extreme poverty, hunger, and limited opportunities at home.

Charting this new regional course of action must start with understanding the key drivers of migration and its costs. From the overwhelming effect of economic conditions on migration desires to the reasons people decide to stay and the costs of irregular migration, this report's findings point to the following potential opportunities for collaboration:

**1   Expanding national social protection programs and stimulating investments to increase economic opportunities, eradicate hunger, and alleviate poverty for at-risk populations in El Salvador, Guatemala, and Honduras.** Despite small differences across each country, households

---

60   Greenfield et al., "Human Smuggling and Associated Revenues"; UN Office on Drugs and Crime (UNODC), *Smuggling of Migrants: A Global Review and Annotated Bibliography of Recent Publications* (Vienna: UNODC, 2011).

**AR2022_500300**

reported that the lack of economic prosperity and difficulty meeting basic needs had significant and far-reaching impacts on decisions to migrate. Social protection programs that address unemployment and offer work training are pivotal to reaching vulnerable populations who may considering emigrating. Additionally, taking steps to address these conditions should go hand-in-hand with supporting programs that build resilience and address violence, insecurity, and climate change, prioritizing and expanding those programs that also create economic opportunities.

**2** **Tailoring ongoing economic development and investment initiatives to municipal-level conditions with robust monitoring and evaluation metrics.** Even as the survey's results overwhelmingly underscored the effect economic factors have on migration desires, they also pointed to small but notable differences across municipalities. Internal and external development efforts and investments to address the root causes of migration—for instance, agricultural programs to build resilience to climate events or anti-gang programming for youth—will be most effective if tailored to these local circumstances, based on information gathered through monitoring and evaluation mechanisms.

**3** **Creating incentives and opportunities for diasporas to invest in the development of local communities and to become agents of change in their countries of origin or ancestry.** Remittances are a lifeline that mitigates local economic instability for Central American households— in effect, buffering against economic migration pressures. But to amplify the impact of remittances beyond individual households, governments and international organizations should consider diasporas as potential agents of economic development and governance. Creating incentives for members of a diaspora to invest in public works can magnify the reach of government efforts while simultaneously enriching transnational partnerships to improve governance, for example, by matching diaspora donations with transparent and accountable commitments from the national, departmental, and municipal governments.

**4** **Incorporating programs and initiatives that underscore the positive conditions that give people the option to seek opportunities at home into broader migration management strategies.** Governments and civil-society leaders alike can influence how migration is portrayed publicly by investing in programs that build family unity, highlight existing perceptions of safety, and foster a sense of belonging to local communities. Highlighting these positive aspects of local life and targeting efforts to groups most likely to migrate irregularly (e.g., households with members who migrated recently) can foster hope and bolster socioeconomic investments, such as entrepreneurial and infrastructure projects. To improve their chances of shaping migration decision-making, such initiatives must be paired with efforts to address the concrete drivers of irregular migration, with the aim of giving people the possibility to choose.

**5** **Expanding legal pathways for Central Americans interested in migrating to the United States and other destination countries to redirect migration from irregular to regular channels.** Coordinated efforts to increase access to temporary employment visas, for example, could help meet the overwhelming demand for employment opportunities abroad. Shifting even a fraction of irregular migration to regular channels would decrease the estimated USD 1.7 billion that Central Americans

AR2022_500301

spend annually on irregular migration with a smuggler and instead increase state revenues—for instance, through reasonable application fees—which can then be invested in initiatives to address other drivers of irregular migration.

Implementing these recommendations will contribute to efforts to eradicate hunger, alleviate poverty, and craft a new approach to the management of Central American migration. These efforts require collaboration across and within regional governments, as well as coordination with UN agencies, civil-society organizations, and the private sector. And while reconfiguring existing U.S. immigration policies is fundamental to several of these objectives, the success of the broader strategy will depend on efforts and initiatives led by the governments of El Salvador, Guatemala, and Honduras. The findings of this study regarding the drivers of migration and migrants' sociodemographic profiles provide governments an opportunity to design tailored programs and initiatives for populations most likely to migrate irregularly, linking these efforts to economic recovery measures. Additional research will also be needed to craft regional responses, given the complex and dynamic nature of migration in the region. This includes a closer look at how drivers of migration may change as the pandemic eases, and at the interactions between economic factors and violence, insecurity, and climate change. Addressing the root causes of migration from Central America is a long-term strategy, but by alleviating poverty and implementing a regional migration management strategy, governments can shape this movement in the near term and promote migration that is safe, orderly, and lawful.

---

*Addressing the root causes of migration from Central America is a long-term strategy, but by alleviating poverty and implementing a regional migration management strategy, governments can shape this movement in the near term and promote migration that is safe, orderly, and lawful.*

AR2022_500302

# Appendices

## *Appendix A. Household Survey Methodology*

Designed by the UN World Food Programme (WFP) and following Comprehensive Food Security and Vulnerability Analysis guidelines,[61] the face-to-face, household survey used in this report asked respondents in El Salvador, Guatemala, and Honduras about their living conditions, intentions to migrate, and the sociodemographic characteristics of household members who had migrated, among other related questions. The survey was administered in person by trained enumerators between April 20 and May 15, 2021, and captured valid responses from 4,998 households (see Table A–1 for sample distribution and selected demographics).

The survey is based on a two-step stratified cluster sampling design with two analytical strata: households reporting having at least one household member who had migrated within the five years prior to data collection, and households reporting having no members who migrated during the same period. To approximate representativeness at the departmental level, WFP calculated a required sample minimum of 1,500 households with 90 percent confidence, 5 percent precision, and 1.5 design effect. The main parameter used to calculate the sample size was the percentage of people directly receiving remittances in the country, as a proxy for migration. The proportion of people directly receiving remittances was derived from national migration and remittances surveys conducted in the three countries between 2016 and 2018; the results were 17 percent for El Salvador, 9 percent for Guatemala, and 17 percent for Honduras.

Though the initial intent was to survey a larger set of departments, WFP administered the survey instrument in 12 departments—four in each of the three Central American countries—due to mobility and health restrictions resulting from the ongoing COVID-19 pandemic. These departments were selected based on the reported number of migrants returning to municipalities in each department, as a proxy for emigration rates, and food insecurity levels (as measured by their most recent Integrated Food Security Phase Classification, including CARI indicators) to capture households in diverse socioeconomic settings.[62] Municipal-level figures for returnees were kindly provided by the International Organization for Migration. The selected departments of study were: Ahuachapán, Cabañas, San Salvador, and Usulután in El Salvador; Alta Verapaz, Chiquimula, Huehuetenango, and San Marcos in Guatemala; and Choluteca, Cortés, Francisco Morazán, and Yoro in Honduras.

In each department, 25 communities were randomly selected using land scan data, and once in the communities, enumerators were trained to randomly select households using a systematic approach based on a randomly selected number. Enumerators conducted at least 15 interviews per site and visited a total of 100 communities in each country. From design to execution, administrators conducted the survey seeking to capture as robust a cross-section of each country as possible (i.e., rural and urban settings, areas of low and high out migration, and those with low and high food security).

---

61   WFP, "Comprehensive Food Security & Vulnerability Analysis (CFSVA) Guidelines - First Edition, 2009," updated January 30, 2009.
62   Integrated Food Security Phase Classification, "IPC Analysis Portal," accessed September 30, 2021.

**AR2022_500303**

**TABLE A–1**

**Selected Demographics of Respondents in the Household Survey, 2021**

|  | Sample Count | Percent of Total |
|---|---|---|
| **Total Number of Individuals Interviewed** | **4,998** | **100%** |
| **Age** | | |
| 0–17 | 29 | 1% |
| 18–34 | 1,583 | 32% |
| 35–44 | 1,028 | 21% |
| 45+ | 2,358 | 47% |
| **Sex** | | |
| Female* | 3,675 | 74% |
| **Origin Country and Department** | | |
| El Salvador | 1,703 | 34% |
| Ahuachapán | 526 | 11% |
| Cabañas | 313 | 6% |
| San Salvador | 353 | 7% |
| Usulután | 511 | 10% |
| Guatemala | 1,730 | 35% |
| Alta Verapaz | 405 | 8% |
| Chiquimula | 392 | 8% |
| Huehuetenango | 437 | 9% |
| San Marcos | 496 | 10% |
| Honduras | 1,565 | 31% |
| Choluteca | 386 | 8% |
| Cortés | 408 | 8% |
| Francisco Morazán | 385 | 8% |
| Yoro | 386 | 8% |

* One respondent preferred not to specify their sex, meaning the remaining 1,322 respondents (26 percent of the sample) identified as men. Percentages may not add up to 100 percent due to rounding.

## Limitations

Despite best efforts to capture a fully representative sample of household respondents, WFP was not able to administer the survey questionnaire beyond the 12 selected departments because of COVID-19-related mobility restrictions. As a result, findings from this household survey are representative at the departmental level, not nationally, despite its large and randomized sample in departments known to have high emigration rates. To draw conclusions about migration intentions and costs at the national level, however, the authors cross-referenced and confirmed the findings of the household survey with those of a separate, nationally representative, online survey with certain assumptions as described in Appendix B.

AR2022_500304

In addition, this survey relies on household members' responses by design and not on those of migrants themselves. The enumerators were instructed to only collect information related to direct family members who were part of the household before their migration and who are still members, if remotely (e.g., spouse, parent, or brother or sister if still in the paternal house). Findings about migrants' characteristics, experiences, and costs thus capture household members' perception and memory of events. This limitation is inherent to studying populations in transit, and these personal accounts nonetheless represent significant contributions to understanding migration dynamics and policy impacts.

## Appendix B. Web Survey Methodology

In June 2021, WFP conducted a survey of individual web users in El Salvador, Guatemala, and Honduras using Random Domain Intercept Technology (RDIT),[63] with the objective of expanding public understanding of changes in migration drivers and of individuals' migration experiences. A total of 6,064 survey responses were collected and filtered to exclude non-human responses to meet validation thresholds. The sample included a minimum of 90 observations in each of the 54 departments across the three countries, making survey findings nationally representative (see Table A–2 for sample distribution).

RDIT administers short, opinion assessments to large samples of randomized online users by redirecting them to questionaries when they input a broken or misdirected URL. In this case, individual web users in El Salvador, Guatemala, and Honduras who searched or reached broken websites were redirected and invited to anonymously participate in a survey about their intentions to migrate, past migration history, experience of food security, and living conditions. Participants could access the survey across devices (e.g., desktops, laptops, tablets, and cell phones), and the survey was conducted in participants' native language, primarily in Spanish.

The authors tested and confirmed that findings regarding respondents' migration intentions from the web survey follow similar trends as those observed in the household survey. The authors also confirmed demographic characteristics across samples are similar. As such, this study relies on the household survey, with supplemental information from the web survey, to draw certain conclusions about the three countries at the national level, including population inputs to calculate migration costs.

TABLE A–2

**Web Survey Sample Distribution by Country of Origin**

| Country of Origin | Valid Number of Surveys |
|---|---|
| El Salvador | 1,253 |
| Guatemala | 2,957 |
| Honduras | 1,854 |
| **Total** | **6,064** |

---

63   Real-time Interactive World-Wide Intelligence (RIWI) Technology, "Random Domain Intercept Technology," accessed September 30, 2021.

**AR2022_500305**

## Limitations

An important limitation of this online survey is that it excludes by default populations that do not have internet access. Estimates suggest that the share of the population with access to the internet varies across Central America: 65 percent of Guatemalans were estimated to have internet access in 2020, followed by 59 percent of Salvadorans, and 42 percent of Hondurans.[64] This means that significant shares of these populations may not be equally represented under this survey instrument. At the same time, reports suggest that migrant populations are increasingly using social media and the internet to communicate and learn about migration opportunities and to make plans.[65] Therefore, it is unclear the extent to which (would-be) migrants were included versus excluded from this survey compared to other groups.

In addition to populations with limited internet access, other groups may have been excluded from participating in the survey. Central Americans who do not know how to read are another important demographic that may not be equally represented in survey results. Additionally, WFP generally collects information on the age and education level of respondents, which has shown that people above age 45 are generally less likely to answer randomized web surveys. Estimates of internet access also indicate that women are less likely to have access to the internet than men worldwide, and therefore they may be less able to respond to web surveys.[66] To account for age and gender discrepancies, WFP weighted these factors against the normal population distribution when analyzing survey results.

---

64  DataReportal, "Digital 2020: Guatemala," accessed November 2, 2021; DataReportal, "Digital 2020: El Salvador," accessed November 2, 2021; DataReportal, "Digital 2020: Honduras," accessed November 2, 2021.

65  This has prompted the U.S. government to monitor these channels more closely and enhance its messaging against irregular migration through these platforms. See Ailsa Chang, Amy Isackson, and Miguel Macias, "How Social Media Has Changed Migration to the United States," National Public Radio, October 14, 2021; Julia Ainsley, "Biden Admin to Build Intelligence-Gathering Cell to Track Groups of Migrants Headed North," NBC News, October 18, 2021; Ted Hesson, "U.S. to Push More 'Aggressive' Messaging Effort to Deter Migrants," Reuters, March 18, 2021.

66  International Telecommunication Union (ITU), *Measuring Digital Development: Facts and Figures 2020* (Geneva: ITU Publications, 2020).

AR2022_500306

# About the Authors



**ARIEL G. RUIZ SOTO**    @ruizags

Ariel G. Ruiz Soto is a Policy Analyst at the Migration Policy Institute (MPI), where he works with the U.S. Immigration Policy Program and the Latin America Initiative. His research examines the interaction of migration policies in the region that stretches from Panama to Canada, as well as their intended and unintended consequences for foreign- and native-born populations. He also analyzes demographic trends across the region and methodological approaches to estimate the unauthorized immigrant population in the United States.

Mr. Ruiz Soto holds a master's degree from the University of Chicago's School of Social Service Administration with an emphasis on immigration policy and service provision, and a bachelor's degree in sociology from Whitman College.

---



**ROSSELLA BOTTONE**

Rossella Bottone is a Vulnerability Analysis Advisor for the United Nations World Food Programme (WFP). Currently based in the Panama regional office, she has more than 15 years of experience in the humanitarian sector and is an expert in emergency food security assessments, vulnerability surveys, and data analysis in support of early warning and emergency preparedness. She has worked in the Democratic Republic of the Congo, Guatemala, Haiti, Italy, Nepal, and Senegal, and has conducted needs assessments for WFP in more than 20 countries in Latin America and Africa.

Ms. Bottone holds a master's degree in international cooperation from the University of Pavia in Italy and is pursuing a master's in humanitarian action from SOAS, University of London.

---



**JARET WATERS**    @jaretwaters

Jaret Waters interned with MPI's Latin America Initiative, where he supported research on Central America and Mexico. His research interests include border management, migration governance, and Indigenous migration throughout Latin America, with a specific focus on Brazil's migration regime. Previously, he interned at the U.S. Embassy in Brazil, the Latin America Working Group, and the Universidade do Sul de Santa Catarina in Brazil.

Mr. Waters holds bachelor's degrees in economics and Spanish from The Ohio State University.

AR2022_500307



**SARAH WILLIAMS**      @datasew

Sarah Williams is an Associate Professor of Technology and Urban Planning at the Massachusetts Institute of Technology (MIT), where she is also Director of the Civic Data Design Lab and the Leventhal Center for Advanced Urbanism. Ms. Williams combines her training in computation and design to create communication strategies that expose urban policy issues to broad audiences and create civic change. She calls the process Data Action, which is also the name of her 2020 book published by MIT Press. Williams is co-founder and developer of Envelope.city, a web-based software product that visualizes and allows users to modify zoning in New York City.

Before coming to MIT, Ms. Williams was Co-Director of the Spatial Information Design Lab at Columbia University's Graduate School of Architecture, Planning, and Preservation. Her design work has been widely exhibited, including work in the Guggenheim, the Museum of Modern Art, Venice Biennale, and the Cooper Hewitt Museum.

---



**ASHLEY LOUIE**      @_ashsicle

Ashley Louie is a Research Associate at MIT's Civic Data Design Lab, where she works at the intersection of design, data visualization, and interactive web development. With a passion for engaging people and serving communities, she has developed a multi-scalar approach to systems and spaces in the public realm. She analyzes data, designs visual graphics, and creates a narrative to advocate for public good.

Ms. Louie holds a master's degree in architecture and urban design from Columbia University's Graduate School of Architecture, Planning, and Preservation, where she was awarded the Visualization Award; and a bachelor's degree in architecture from the University of Southern California.

---



**YUEHAN WANG**

Yuehan Wang is a Research Affiliate at MIT's Civic Data Design Lab and focuses on data analysis. As a recent MIT graduate, she has a background in urban design and social science. At MIT, she developed a passion for exploring technology and data's role in urban intervention and expanded her skillset to data analysis and visualization.

Ms. Wang holds master's degrees in city planning and in real estate development from MIT and a bachelor of engineering degree in urban planning from Sichuan University, China.

AR2022_500308

# Acknowledgments

This report was made possible by support and coordination from the United Nations World Food Programme (WFP), the Inter-American Development Bank (IDB), and the Organization of American States (OAS).

The WFP Regional Bureau for Latin America and the Caribbean coordinated the study and implemented both the household survey and the remote data collection in El Salvador, Guatemala, and Honduras. Many WFP colleagues supported the study in a variety of functions, particularly Annette Castillo, Johanna Costanza, Carlos Martinez, Adriana Moreno, Luis Penutt, Hector Roca, Claudia Saenz, Francesco Stompanato, and Andrea Vega, who led the survey deployment; Angie Lee, who helped with the planning and secondary data review; and Krishna Krishnamurthy, who conducted the climate variability analysis.

The authors are also grateful for the planning support and implementation of data collection provided by teams from the Information Systems Program for Resilience in Food and Nutrition Security at the Central American Integration System (PROGRESAN-SICA), Oxfam, Action against Hunger, and WeWorld-GVC. Likewise, the authors recognize the invaluable contributions of the local and national authorities across El Salvador, Guatemala, and Honduras, which made it possible to reach 300 communities. And most importantly in this effort, the authors are immensely grateful for the participation of the nearly 5,000 families who welcomed the survey implementors and shared insights about their households' migration experiences. This study could not have been possible without them.

For their creative design and visualization of a number of the figures in this report, as well as for their creation of a related website to showcase the data presented here (http://migration.mit.edu/), the authors thank the Civic Data Design Lab at the Massachusetts Institute of Technology, including Octavie Berendschot, Luis Alberto Meouchi Velez, Zoe Kuhlken, Victor Chau, and Carlos Centeno.

Finally, the authors express their gratitude to Migration Policy Institute (MPI) colleagues Andrew Selee and Diego Chaves-Gonzaléz for reviewing earlier versions of this report; Lauren Shaw for editing it; and Michelle Mittelstadt and Julia Yanoff for strategic outreach.

MPI is an independent, nonpartisan policy research organization that adheres to the highest standard of rigor and integrity in its work. All analysis, recommendations, and policy ideas advanced by MPI are solely determined by its researchers.

© 2021 World Food Programme, Migration Policy Institute, and Civic Data Design Lab at Massachusetts Institute of Technology. All Rights Reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means (electronic, mechanical, photocopying, recording, or otherwise) without prior permission from the World Food Programme, the Migration Policy Institute, or the Civic Data Design Lab at Massachusetts Institute of Technology.

This document has been subject to an editorial review. A full text pdf of this report can be downloaded at: www.migrationpolicy.org.

Design: Sara Staedicke, MPI
Layout: Yoseph Hamid, MPI
Cover Photo: World Food Programme/Julian Frank

Suggested citation: Ruiz Soto, Ariel G., Rossella Bottone, Jaret Waters, Sarah Williams, Ashley Louie, and Yuehan Wang. 2021. *Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration.* Rome, Washington, DC, and Cambridge, MA: World Food Programme, Migration Policy Institute, and Civic Data Design Lab at Massachusetts Institute of Technology.

AR2022_500309

AR2022_500310

**Articles**

# Health consequences of the US Deferred Action for Childhood Arrivals (DACA) immigration programme: a quasi-experimental study



*Atheendar S Venkataramani, Sachin J Shah, Rourke O'Brien, Ichiro Kawachi, Alexander C Tsai*

## Summary

**Background** The effects of changes in immigration policy on health outcomes among undocumented immigrants are not well known. We aimed to examine the physical and mental health effects of the Deferred Action for Childhood Arrivals (DACA) programme, a 2012 US immigration policy that provided renewable work permits and freedom from deportation for a large number of undocumented immigrants.

**Methods** We did a retrospective, quasi-experimental study using nationally representative, repeated cross-sectional data from the US National Health Interview Survey (NHIS) for the period January, 2008, to December, 2015. We included non-citizen, Hispanic adults aged 19–50 years in our analyses. We used a difference-in-differences strategy to compare changes in health outcomes among individuals who met key DACA eligibility criteria (based on age at immigration and at the time of policy implementation) before and after programme implementation versus changes in outcomes for individuals who did not meet these criteria. We additionally restricted the sample to individuals who had lived in the USA for at least 5 years and had completed high school or its equivalent, in order to hold fixed two other DACA eligibility criteria. Our primary outcomes were self-reported overall health (measured on a 5 point Likert scale) and psychological distress (Kessler 6 [K6] scale), the latter was administered to a random subset of NHIS respondents.

**Findings** Our final sample contained 14973 respondents for the self-reported health outcome and 5035 respondents for the K6 outcome. Of these individuals, 3972 in the self-reported health analysis and 1138 in the K6 analysis met the DACA eligibility criteria. Compared with people ineligible for DACA, the introduction of DACA was associated with no significant change among DACA-eligible individuals in terms of self-reported overall health ($b=0.056$, 95% CI −0.024 to 0.14, p=0.17) or the likelihood of reporting poor or fair health (adjusted odds ratio [aOR] 0.98, 95% CI 0.66–1.44, p=0.91). However, DACA-eligible individuals experienced a reduction in K6 score compared with DACA-ineligible individuals (adjusted incident risk ratio 0.78, 95% CI 0.56–0.95, p=0.020) and were less likely to meet screening criteria for moderate or worse psychological distress (aOR 0.62, 95% CI 0.41–0.93, p=0.022).

**Interpretation** Economic opportunities and protection from deportation for undocumented immigrants, as offered by DACA, could confer large mental health benefits to such individuals. Health consequences should be considered by researchers and policy makers in evaluations of the broader welfare effects of immigration policy.

**Funding** None.

**Copyright** © The Author(s). Published by Elsevier Ltd. This is an Open Access article under the CC BY license.

## Introduction

Undocumented migration has become an important public policy issue worldwide. From a public health perspective, it is well recognised that the estimated 11 million undocumented immigrants in the USA[1] and 8 million in Europe[2] are at risk of poor health outcomes.[3–6] In particular, the results of studies from both the USA and European settings suggest that immigration policies that raise the risk of deportation or place limits on legal rights and access to social services might raise the risk of poor mental health outcomes, such as depression and anxiety, and curtail access to health care more generally.[7–15]

In recent years, the USA has witnessed substantial changes in policies towards undocumented immigrants. In June, 2012, the US Government initiated the Deferred Action for Childhood Arrivals (DACA) programme, which provided temporary work permits and freedom from deportation to individuals who met specific eligibility criteria (panel).[16] Although the programme has not been a pathway to citizenship, the work permits are renewable, ostensibly staving off the risk of deportation. Since its inception, the programme has enrolled more than 720000 of an estimated 1.9 million eligible individuals.[17]

In addition to any microeconomic and macroeconomic benefits, DACA could improve the health of beneficiaries in several ways. First, research has shown increases in employment and income after DACA implementation,[18,19] both of which are well known social determinants of health.[20] Second, expanded economic opportunities might raise future aspirations and thereby increase

*Lancet Public Health* 2017; 2: e175–81

Published Online March 14, 2017 http://dx.doi.org/10.1016/ S2468-2667(17)30047-6

This online publication has been corrected. The corrected version first appeared at thelancet.com/public-health on April 6, 2017

See **Comment** page e160

Division of General Internal Medicine, Massachusetts General Hospital and Harvard Medical School, Boston, MA, USA (A S Venkataramani MD, S J Shah MD); La Follette School of Public Affairs, University of Wisconsin-Madison, Madison, WI, USA (R O'Brien PhD); Department of Social and Behavioral Sciences, Harvard T H Chan School of Public Health, Boston, MA, USA (Prof I Kawachi PhD); and Chester M Pierce, MD Division of Global Psychiatry, Massachusetts General Hospital and Harvard Medical School, Boston, MA, USA (A C Tsai MD)

Correspondence to: Dr Atheendar S Venkataramani, Division of General Internal Medicine, Massachusetts General Hospital and Harvard Medical School, Boston, MA 02114, USA avenkataramani@partners.org

**AR2022_500311**

**Research in context**

**Evidence before this study**
We searched PubMed, Google Scholar, and EconLit with the terms ("undocumented immigrants" OR "illegal immigrant" OR "undocumented migrant") AND ("health" OR "mental health" OR "depression") AND ("immigration policy" OR "deportation" OR "DACA") OR ("Deferred Action for Childhood Arrivals"). We did not apply any restrictions by language or date, and the latest search was done on Feb 7, 2017. We found two summative reviews and several commentary and research articles examining the association between immigration policy and health outcomes in the USA, Europe, and Australia. Most studies were descriptive in nature and used both qualitative and quantitative methods to show links between immigration policy and mental health outcomes, health-care access, or both. No studies used quasi-experimental methods to assess causality between changes in immigration policy and health. Although we found two studies investigating the economic effects of the US Deferred Action for Childhood Arrival (DACA) programme, we did not find any study examining its effects on health.

**Added value of this study**
We used a large, nationally representative survey of non-citizen, Hispanic adults living in the USA to investigate the effects of the DACA programme on self-reported overall health and psychological distress. We found that DACA eligibility was associated with large, clinically meaningful reductions in symptoms of psychological distress. We found no effects on self-reported overall health, although this finding was anticipated given the overall youth of the DACA-eligible population. Our findings contribute to the public health literature by showing for the first time robust, quasi-experimental evidence of the effect of immigration policy towards undocumented immigrants on their mental health.

**Implications of all the available evidence**
Our findings add to a growing evidence base showing strong links between immigration policy choices and health outcomes. These results might be informative for clinicians providing health care to undocumented immigrants, public health officials, and policy makers. Our findings are relevant to ongoing debates around immigration policy in the USA and Europe and suggest that mental health outcomes should be taken into account when considering policy alternatives.

perceived returns on health investments, both of which can in turn affect health outcomes.[21] Third, eliminating the risk of deportation and providing access to employment opportunities could raise hope and reduce psychosocial stress, which might directly improve mental health and indirectly affect physical health by leading to improved health behaviours.[22,23]

Despite these strong theoretical links, the health consequences of the DACA programme have not yet been explored. More generally, studies linking policies targeting undocumented migrants to health outcomes are generally descriptive, with the underlying causality less clear.[7-15] This broader question has gained significance in recent months, as fundamental changes in US immigration policy are being debated.[24,25]

In this study we aimed to examine the consequences of the US DACA programme on self-reported overall and mental health among undocumented immigrants of Hispanic origin (who represent the majority of DACA-eligible individuals). We used a quasi-experimental research strategy based on the timing of programme implementation, as well as eligibility rules, to estimate causal relationships.

## Methods

### Data

We used data from the US National Health Interview Survey (NHIS), an annual, nationally representative, repeated cross-sectional sample survey that tracks health outcomes, behaviours, and access to care in the US civilian, non-institutionalised population.[26] We used surveys for the period January, 2008, to December, 2015. We restricted our sample to adults (aged 19–50 years) who reported Hispanic ethnicity because nearly 90% of DACA beneficiaries were born in central America or South America.[27] Following evidence from the economics literature,[18] we prespecified that we would exclude individuals with less than a high school education and recently arrived immigrants to minimise confounding from well established differential trends in socioeconomic outcomes.[28,29] These sample restrictions hold fixed two key DACA eligibility criteria (panel): completion of high school or its equivalent and residence in the USA for at least 5 years.

### Exposures and outcomes

Our exposure measure was DACA eligibility based on two key criteria: age at immigration and age at the time of the policy change. We estimated age at immigration by subtracting years living in the USA from the participant's current stated age; individuals aged 16 years or younger at the time of immigration were defined as meeting this DACA eligibility criterion. Because the public-use files from the NHIS provide a binned value for years living in the USA (<1 year, 1–4 years, 5–9 years, 10–14 years, and ≥15 years), our estimates of age at immigration were not exact and are therefore subject to classic measurement error. We used the exact date of birth to assess whether the individual met the other DACA eligibility criterion of

AR2022_500312

being age 31 years or younger at the time of the policy announcement.

Our primary outcomes were self-reported overall health (measured on a 5 point Likert scale, where a score of 1 represents poor health, 2 represents fair health, 3 represents good health, 4 represents very good health, and 5 represents excellent health) and symptoms of non-specific psychologic distress as represented by the summed score from the Kessler 6 (K6) scale (symptoms of feeling nervous, hopeless, depressed, restless, depressed, that everything was an effort, and worthless over the past 30 days assessed by six questions that are coded by frequency, with 0 representing none of the time, 1 representing a little of the time, 2 representing some of the time, 3 representing most of the time, and 4 representing all of the time; the summed score can thus range from 0 to 24).[30,31] The K6 was administered only to a randomly selected one-third sample of NHIS respondents. The K6 has been shown to have high reliability, validity, and internal consistency in identifying of the symptoms serious mental illness as denoted by the DSM-IV.[30] We also used these variables to specify binary outcomes denoting self-reported classifications of poor or fair health (vs good, very good, or excellent health) and presence of moderate or worse psychological distress (K6 score ≥5).[31]

### Statistical analyses

We used the difference-in-differences[32] method to estimate the health consequences of DACA. Specifically, we estimated versions of the following regression models:

$$H_{it} = g(\beta_0 + \beta_1 \times Eligible_i \times DACA_t + \beta_2 \times Eligible_i + \beta_3 \times DACA_t + \beta \times X_{i(t)} + \varepsilon_{it})$$

where the subscript i references the individual and t the year–month of the survey. $Eligible_i$ is a binary indicator denoting whether the individual met DACA eligibility criteria (1 if DACA-eligible, 0 otherwise), and $DACA_t$ is a binary indicator for survey timing (1 if surveyed after DACA implementation in June, 2012, and 0 otherwise). $H_{it}$ is the health outcome of interest and the function $g(\cdot)$ refers to a least squares, Poisson, or logistic link function. The vector $X_{i(t)}$ consists of key covariates, consisting of participant age in years at the time of the policy change, estimated age at immigration, census region of residence, gender, and year–month of interview. We adjusted for the complex survey design of the NHIS—which included use of sample weights (along with SEs robust to heteroscedasticity where appropriate)—in all analyses to recover nationally representative estimates.[33] This step is particularly important given the reported (potentially non-random) decline in participation in the NHIS and other US sample surveys,[34] which the weights are designed to take into account.

The difference-in-differences estimate (both in linear and non-linear models[35]) is denoted by the coefficient

**Panel: Deferred Action for Childhood Arrivals (DACA) eligibility criteria**

- No lawful status and physically present in USA as of June, 2012
- Under age 31 years as of June 15, 2012
- Arrived in USA prior to 16th birthday
- Continuous residence in USA since June 15, 2007
- Currently in school; have graduated or obtained certificate of completion from high school; have obtained general education development certificate; or honourably discharged veteran of Armed Forces
- Have not been convicted of a felony, significant misdemeanour (or more than two other misdemeanours), and/or otherwise do not pose threat to public safety or security

Source: Citizenship and Immigration Services, US Department of Homeland Security (2017).

on the product term ($\beta_1$). This estimate can be interpreted as the effect of the policy on DACA-eligible individuals before versus after the policy change, compared with the effect on DACA-ineligible individuals. We estimated least-squares regression models for self-reported health, and Poisson regression models for the count outcome (K6), both with heteroscedasticity-corrected standard errors. For the binary outcomes (poor or fair self-reported overall health and moderate or worse psychological distress), we estimated logistic regression models. We hypothesised larger estimates on mental health outcomes in view of findings from previous descriptive studies on migration,[7–9,36] quasi-experimental studies on the health benefits of social policies,[37,38] and the relative youth of our study population (who would otherwise be expected to be in good physical health).

Importantly, the NHIS did not elicit undocumented immigrant status from survey respondents. This is a long-standing feature of publicly available, large-scale US databases that are used to examine undocumented immigration.[18,29] Among self-reported non-citizens, 60% of individuals are estimated to be undocumented.[18] Thus, our effect estimates will be smaller than the intention-to-treat effect. Additionally, data for other DACA eligibility criteria—criminal offenses and recent honourable discharge from the military—were also not available in the NHIS (because crimes and mis-demeanours are not directly queried and honourable discharges were not queried after 2010). This data limitation is also likely to lead to attenuated estimates, as individuals with these histories might be inaccurately assigned to the treatment and control group.

We did four sensitivity analyses. First, because the Great Recession (2007–09) could have had differential effects on DACA-eligible versus DACA-ineligible individuals, we restricted our sample to participants

AR2022_500313

|  | Eligible for DACA | | Not eligible for DACA | |
|---|---|---|---|---|
|  | Pre-DACA | Post-DACA | Pre-DACA | Post-DACA |
| Number of respondents |  |  |  |  |
|   Self-reported overall health outcomes | 2188 | 1784 | 6331 | 4670 |
|   Mental health outcomes | 598 | 540 | 2217 | 1680 |
| Self-reported overall health (Likert scale score 1–5) | 3·99 (0·91) | 4·00 (0·94) | 3·83 (0·98) | 3·81 (0·98) |
| Fair or poor health | 95 (4%) | 101 (6%) | 523 (8%) | 408 (9%) |
| K6 score (0–24) | 3·06 (4·49) | 2·66 (4·3) | 2·72 (4·57) | 2·70 (4·38) |
| Moderate or worse psychological (K6 score ≥5) | 168 (28%) | 133 (25%) | 554 (25%) | 423 (25%) |
| Gender, female | 1116 (51%) | 906 (51%) | 3270 (52%) | 2428 (52%) |
| Age (years) | 23·0 (3·32) | 25·39 (4·02) | 36·9 (6·73) | 38·27 (6·71) |
| Age at immigration (years) | 9·6 (4·19) | 10·6 (3·81) | 24·2 (6·48) | 24·9 (6·01) |
| Census region |  |  |  |  |
|   Northeast | 240 (11%) | 168 (9%) | 884 (14%) | 536 (11%) |
|   North central or midwest | 161 (7%) | 199 (11%) | 536 (8%) | 430 (9%) |
|   South | 728 (38%) | 587 (33%) | 2216 (35%) | 1750 (33%) |
|   West | 1059 (42%) | 830 (47%) | 2695 (43%) | 1954 (48%) |

Data are mean (SD) or n (%) unless specified otherwise. All data are from the NHIS, 2008–15. The sample is restricted to non-citizen, Hispanic men and women aged 18–50 years who have lived in the USA for at least 5 years and who have completed at least a high school education or above. Eligible for DACA refers to individuals who were 31 years or younger as of June, 2012, and had immigrated to the USA at age 16 years or before. Pre-DACA denotes respondents interviewed before June, 2012, and post-DACA those interviewed thereafter. The K6 instrument was administered to a random subset of NHIS respondents. Descriptive statistics were weighted by NHIS sampling weights. DACA=Deferred Action for Childhood Arrivals. K6=Kessler 6 scale. NHIS=National Health Interview Survey.

*Table 1:* Descriptive statistics of study population

See Online for appendix

interviewed in 2010 and thereafter. Second, we further restricted the sample to individuals younger than 40 years. This would help to account for differential time trends in the health of middle-aged immigrants, which might be distinct from younger DACA-eligible individuals, and therefore bias the difference-in-differences estimates. Finally, as a pre-specified falsification test,[39] we estimated our models for adults who had completed less than a high school education (and were not currently in school at the time of the survey): because these individuals were not DACA-eligible, we expected to observe no effect of the policy on their health outcomes. Fourth, we re-estimated all models without sampling weights; differences in coefficient estimates in weighted versus unweighted models might reflect errors in model specification, incorporation of the survey sampling process, or both.[40]

We did all analyses with Stata version 14. This study relied solely on public-use data so no ethical approval was sought for the study procedures.

### Role of the funding source

There was no funding source for this study. The corresponding author had full access to all the data in the study and had final responsibility for the decision to submit for publication.

### Results

During the study period, 783 026 people were interviewed, and 14 973 people met our inclusion criteria (appendix). For the outcome of self-reported overall health, our total sample consisted of 14 973 survey respondents, of whom 3972 were eligible for DACA. For the K6 psychological distress outcomes, our total sample contained 5035 respondents, 1138 of whom were eligible for DACA. Before the start of DACA, DACA-eligible respondents reported slightly better overall health than did ineligible respondents, but had higher K6 scores and rates of moderate psychological distress (table 1). Mean K6 scores and the likelihood of meeting screening criteria for moderate or worse psychological distress declined among DACA-eligible respondents in the survey years after policy implementation. However, similar declines did not occur for DACA-ineligible individuals. For both groups, mean self-reported overall health did not change, although we noted small increases in the likelihood of reporting poor or fair health in both groups. As expected on the basis of eligibility criteria, eligible respondents were younger and had immigrated to the USA earlier in their lives than did ineligible respondents. The sex and residential composition of the eligible and ineligible respondent samples were similar.

Difference-in-differences estimates (table 2) did not show significant changes in self-reported overall health before and after programme implementation for eligible versus ineligible respondents (adjusted $b$=0·056, 95% CI –0·024 to 0·14, p=0·17). However, our estimates showed significant reductions in K6 scores among DACA-eligible versus DACA-ineligible respondents (adjusted incident risk ratio 0·78, 95% CI 0·56–0·95, p=0·020). The binary outcomes showed similar patterns, with no significant differences estimated for the odds of reporting poor or fair health (adjusted odds ratio [aOR] 0·98, 95% CI 0·66–1·44, p=0·91), but a significant decline in the odds of reporting moderate or worse psychological distress before and after programme implementation for eligible versus ineligible respondents (aOR 0·62, 95% CI 0·41–0·93, p=0·022).

Sensitivity analyses (table 3) showed similar coefficient estimates when we restricted estimation to individuals in the same age range interviewed between 2010 and 2015 and when we further restricted the sample to individuals younger than 40 years. Consistent with programme eligibility criteria, we found no evidence that DACA improved outcomes for DACA-ineligible people (ie, individuals with less than a high school education). We found mostly similar results in analyses without sampling weights (appendix), suggesting that the specification of our model and handling of the complex survey design was appropriate.

### Discussion

In this quasi-experimental study of Hispanic adults in the USA, we found that exposure to the DACA programme

| | Self-reported health (Likert scale score 1–5) | Poor or fair health | K6 score (0–24) | Moderate or worse psychological distress (K6 score ≥5) |
|---|---|---|---|---|
| Regression method (estimate) | Least squares (*b*) | Logistic (adjusted OR) | Poisson (adjusted IRR) | Logistic (adjusted OR) |
| Differences-in-differences estimate (95% CI) | 0·056 (–0·024 to 0·14) | 0·98 (0·66 to 1·44) | 0·78 (0·56 to 0·95) | 0·62 (0·41 to 0·93) |
| p value | 0·17 | 0·91 | 0·020 | 0·022 |
| Number | 14 973 | 14 973 | 5035 | 5035 |

Differences-in-differences estimates of the effects of the DACA programme on health outcomes. Estimator and interpretation of coefficient is provided in the column header. For the ordinary least-squares (self-reported health) and Poisson (K6 score) models, we calculated 95% CIs with heteroscedasticity-corrected SEs. The estimates shown reflect coefficients on the interaction between binary indicators that denote meeting the eligibility criteria of the DACA programme on mental health (16 years or younger) and age at policy implementation (31 years or younger) and being surveyed after programme implementation (June, 2012). All models include the main effects for meeting DACA eligibility thresholds, interview year-month fixed effects (which subsume the main effects of being surveyed after DACA implementation), and adjust for respondent age (at the time of policy), gender, fixed-effects for years living in the USA, and fixed effects census region of residence. All models use National Health Interview Survey sampling weights. K6=Kessler 6 scale. IRR=incident risk ratio. OR=odds ratio. DACA=Deferred Action for Childhood Arrivals.

*Table 2:* **Difference-in-differences estimates**

| | Self-reported health (Likert scale score 1–5) | Poor or fair health | K6 score (0–24) | Moderate or worse psychological distress (K6 score ≥5) |
|---|---|---|---|---|
| **Restricted to 2010–15** | | | | |
| Regression method (estimate) | Least squares (*b*) | Logistic (adjusted OR) | Poisson (adjusted IRR) | Logistic (adjusted OR) |
| Differences-in-differences estimate (95% CI) | 0·017 (–0·072 to 0·11) | 1·00 (0·65 to 1·54) | 0·69 (0·52 to 0·92) | 0·56 (0·36 to 0·87) |
| p value | 0·71 | 0·99 | 0·010 | 0·011 |
| Number | 11 672 | 11 672 | 4008 | 4008 |
| **Restricted to 2010–15 and younger than 40 years** | | | | |
| Regression method (estimate) | Least squares (*b*) | Logistic (adjusted OR) | Poisson (adjusted IRR) | Logistic (adjusted OR) |
| Differences-in-differences estimate (95% CI) | –0·013 (–0·11 to 0·08) | 1·16 (0·73 to 1·83) | 0·76 (0·56 to 1·02) | 0·61 (0·38 to 0·99) |
| p value | 0·78 | 0·53 | 0·073 | 0·044 |
| Number | 8715 | 8715 | 2963 | 2963 |
| **Restricted to less than high-school education (falsification test)** | | | | |
| Regression method (estimate) | Least squares (*b*) | Logistic (adjusted OR) | Poisson (adjusted IRR) | Logistic (adjusted OR) |
| Differences-in-differences estimate (95% CI) | 0·043 (–0·06 to 0·14) | 0·72 (0·49 to 1·06) | 1·07 (0·76 to 1·49) | 1·38 (0·89 to 2·15) |
| p value | 0·40 | 0·11 | 0·67 | 0·15 |
| Number | 16 552 | 16 552 | 5696 | 5696 |

Models are identical to those presented in table 2, except the sample is restricted as denoted. K6=Kessler 6 scale. IRR=incident risk ratio. OR=odds ratio.

*Table 3:* **Sensitivity analyses**

led to meaningful reductions in symptoms of psychological distress among DACA-eligible individuals. The effects on mental health were large and clinically significant, with the DACA programme significantly reducing the odds of individuals reporting moderate or worse psychological distress. We did not find any improvements in self-reported overall health, which was consistent with the fact that the population was relatively young (mean age <40 years in all groups) and therefore generally in good physical health.

Our findings advance the existing public health literature by providing the first quasi-experimental evidence of a link between immigration policies that target undocumented immigrants and their health outcomes. The findings of large effects on mental health are consistent with results from observational studies showing rising symptoms of anxiety and depression with policies that raise the risk of deportation.[7–15] These findings could be of considerable importance in the current policy environment, with the USA broadening the legal infrastructure and human resources base needed to deport undocumented immigrants and restrict the entry of new migrants.[24,41] Additionally—as of the time of writing—the future of the DACA programme itself seems to be in doubt.[42]

In addition to informing the public health community about the health impacts of immigration policy, our findings add to a growing evidence base on the mental health consequences of social policies more generally.[37,38] Our findings also show the importance of economic opportunities for health outcomes. In particular, the use of quasi-experimental methods builds on and greatly

**AR2022_500315**

e179

advances findings from observational studies linking measures of area-level economic opportunity to various health outcomes.[21,43–45]

Several limitations are inherent to the data available and the study design. First, despite the quasi-experimental research strategy, unobserved bias from time-varying factors that differentially affect immigrants who are eligible or ineligible for DACA cannot be definitively excluded. The potential for such confounders might be exacerbated by the fact that the NHIS data represent repeated cross sections rather than a panel. Moreover, well described downward trends exist in sample survey participation in the USA.[14] We supported the robustness of our findings by showing that estimates remained similar when we applied tighter restrictions to the estimation sample. We also did a falsification test, the results of which showed the absence of an association among individuals who met all other eligibility criteria except for high school completion.

Second, differences in mean ages among DACA-eligible and DACA-ineligible respondents, which are inevitable because age is part of the eligibility criteria, might also generate bias in our results. To address these differences, we included individual age-specific fixed effects to flexibly control for non-linear age effects. We also estimated our models with a narrower age band, which produced mostly similar estimates.

Third, the NHIS did not specifically identify undocumented immigrants, exact age at immigration, or individuals who met two other DACA eligibility criteria (absence of criminal history and honourable discharge from the military). However, each of these data limitations would bias our estimates toward the null, either by deflating estimates of the intention-to-treat effect, introducing classic measurement error, or inaccurately assigning respondents to eligible and ineligible groups. Finally, well known differences exist between US states in the implementation and acceptance of DACA,[17,46] which might have modified programme effects on health outcomes. Unfortunately, we cannot examine this possibility in the NHIS because the public-use data do not include state identifiers.

In conclusion, we found that the DACA programme had important, positive effects on mental health outcomes. These benefits have so far been underappreciated and, in conjunction with the reported positive economic benefits,[18] can help to guide ongoing policy debates[47] around the overall benefit of the DACA programme and its future in US immigration policy, as well as around the design of policies towards undocumented migrants in Europe.

**Contributors**
ASV, SJS, and ACT conceived the study. ASV obtained the publicly available NHIS data, did the statistical analysis, and wrote the first draft of the manuscript. SJS, ROB, IK, and ACT suggested improvements to the statistical analysis and contributed important revisions to the manuscript. All authors approved the final submission of the manuscript.

**Declaration of interests**
We declare no competing interests.

**Acknowledgments**
No specific funding was received for this study. We report salary support from the National Institutes of Health (NIH Mentored Patient-Oriented Research Career Development Award, K23MH106362 to ASV; NIH Patient-Oriented Research Career Development Award, K23MH096620 to ACT).

**References**
1    Passel JS, Cohn DV. Overall number of U.S. unauthorized immigrants holds steady since 2009. Washington, DC: Pew Research Center, 2016.
2    The Lancet. Access to health care for undocumented migrants in Europe. *Lancet* 2008; **370:** 2070.
3    Castañeda H, Holmes SM, Madrigal DS, De Trindad Young M-E, Beyeler N, Quesada J. Immigration as a social determinant of health. *Annu Rev Public Health* 2015; **36:** 375–92.
4    Sanggaran J-P, Haire B, Zion D. The health care consequences of australian immigration policies. *PLoS Med* 2016; **13:** e1001960.
5    Devi S. US health and immigration systems failing migrants. *Lancet* 2009; **373:** 448–49.
6    Rechel B, Mladovsky P, Ingleby D, Mackenbach JP, McKee M. Migration and health in an increasingly diverse Europe. *Lancet* 2013; **381:** 1235–45.
7    Hacker K, Chu J, Leung C, et al. The impact of immigration and customs enforcement on immigrant health: perceptions of immigrants in Everett, Massachusetts, USA. *Soc Sci Med* 2011; **73:** 586–94.
8    Steel Z, Momartin S, Silove D, Coello M, Aroche J, Tay KW. Two year psychosocial and mental health outcomes for refugees subjected to restrictive or supportive immigration policies. *Soc Sci Med* 2011; **72:** 1149–56.
9    Hacker K, Chu J, Arsenault L, Marlin RP. Provider's perspectives on the impact of Immigration and Customs Enforcement (ICE) activity on immigrant health. *J Health Care Poor Underserved* 2013; **23:** 651–65.
10   Sommers BD. Stuck between health and immigration reform—care for undocumented immigrants. *N Engl J Med* 2013; **369:** 593–95.
11   Cimas M, Gullon P, Aguilera E, Meyer S, Manuel Freire J, Perez-Gomez B. Healthcare coverage for undocumented migrants in Spain: Regional differences after Royal Decree Law 16/2012. *Health Policy* 2016; **120:** 384–95.
12   Giannoni M, Franzini L, Masiero G. Migrant integration policies and health inequalities in Europe. *BMC Public Health* 2016; **16:** 463.
13   Hatzenbuehler ML, Prins SJ, Flake M, et al. Immigration policies and mental health morbidity among Latinos: a state-level analysis. *Soc Sci Med* 2017; **174:** 169–78.
14   Ikram UZ, Malmusi D, Juel K, Rey G, Kunst AE. Association between integration policies and immigrant mortality: an explorative study across three European countries. *PLoS One* 2015; **10:** e0129916.
15   Malmusi D. Immigrants' health and helath inequality by type of intergration policies in Europe countries. *Eur J Public Health* 2014; **25:** 293–99.
16   US Citizenship and Immigration Services. Consideration of Deferred Action for Childhood Arrivals (DACA). 2017. https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca (accessed Feb 7, 2017).
17   Hispman F, Gómez-Aguiñaga B, Capps R. DACA at four: participation in the deferred action program and its impacts on recipients. Washington, DC: Migration Policy Institute, 2016.
18   Pope NG. The effects of DACAmentation: the impact of Deferred Action for Childhood Arrivals on unauthorized immigrants. *J Public Econ* 2016; **143:** 98–114.
19   Amuedo-Dorantes C, Antman F. Can authorization reduce poverty among undocumented immigrants? Evidence from the Deferred Action for Childhood Arrivals Program. *Econ Lett* 2016; **147:** 1–4.
20   Marmot M, Wilkinson RG, eds. Social determinants of health, 2nd edn. New York: Oxford University Press, 2006.
21   Venkataramani AS, Brigell R, O'Brien R, Chatterjee P, Kawachi I, Tsai AC. Economic opportunity, health behaviours, and health outcomes in the USA: a population-based cross-sectional study. *Lancet Public Health* 2016; **1:** e18-e25.
22   Scioli A, Chamberlain CM, Samor CM, et al. A prospective study of hope, optimism, and health. *Psychol Rep* 1997; **81:** 723–33.

**AR2022_500316**

23   Snyder CR, Irving LM, Anderson JR. Hope and health.
In: Snyder CR, Forsyth DR, eds. Handbook of social and clinical
psychology: the health perspective, vol 162. Elmsford: Pergamon
Press, 1991.

24   Davis JH. Trump orders Mexican border wall to be built and plans
to block Syrian refugees. *The New York Times* (New York),
Jan 26, 2017: A1.

25   Shear MD, Cooper H. Trump bars refugees and citizens of 7 Muslim
countries. *The New York Times* (New York), Jan 28, 2017: A1.

26   Minnesota Population Center and State Health Access Data
Assistance Center. Integrated health interview series: version 6.21.
Minneapolis: University of Minnesota, 2016.

27   Batalova J, Hooker S, Capps R, Bachmeier JD. DACA at the two year
mark: a national and state profile of youth eligible and applying for
deferred action. Washington, DC: Migration Policy Institute, 2014.

28   Ross M, Svajlenka NP. Employment and disconnection among teens
and young adults: the role of place, race, and education.
Washington, DC: Brookings Institution, 2016.

29   Pew Research Center. Modern immigration wave brings 59 million
to U.S., driving population growth and change through 2065.
Washington, DC: Pew Research Center, 2015.

30   Kessler RC, Green JG, Gruber MJ, et al. Screening for serious
mental illness in the general population with the K6 screening scale:
results from the WHO World Mental Health (WMH) survey
initiative. *Int J Methods Psychiatr Res* 2010; **19** (suppl 1): 4–22.

31   Prochaska J, Sung H, Max W, Shi Y, Ong M. Validity study of the K6
scale as a measure of moderate mental distress based on mental
health treatment need and utilization. *Int J Methods Psychiatric Res*
2012; **21**: 88–97.

32   Dimick JB, Ryan AM. Methods for evaluating changes in health care
policy: the differences-in-differences approach. *JAMA* 2014;
**312**: 2401–02.

33   Bieler GS, Brown GG, Williams RL, Brogan DJ.
Estimating model-adjusted risks, risk differences, and risk rations
from complex survey data. *Am J Epidemiol* 2010; **171**: 618–23.

34   Hill JM. Survey response rate trends. *Survey News*. November 2014.
Washinton, DC: US Census Bureau, 2014.

35   Karaca-Mandic P, Norton EC, Dowd B. Interaction terms in
nonlinear models. *Health Sev Res* 2012; **47**: 255–74.

36   Lindert J, Ehrenstein O, Priebe S, Mielck A, Brahler E.
Depression and anxiety in labor migrants and refugees—a
systematic review and meta-analysis. *Soc Sci Med* 2009; **69**: 246–57.

37   Reeves A, Clair A, McKee M, Stuckler D. Reductions in the
United Kingdom's Government Housing Benefit and symptoms of
depression in low-income household. *Am J Epidemiol* 2016;
**184**: 421–29.

38   Reeves A, McKee M, Mackenbach JP, Whitehead M, Stuckler D.
Introduction of a national minimum wage reduced depressive
symptoms in low-wage workers: a quasi-natural experiment in
the UK. *Health Econ* 2016: published online April 4.
DOI:10.1002/hec.3336.

39   Prasad V, Jena AB. Prespecified falsification end points: can they
validate true observational associations? *JAMA* 2013; **309**: 241–42.

40   Solon G, Haider SJ, Wooldridge JM. What are we weighting for?
*J Hum Resour* 2015; **50**: 301–16.

41   Hartmann M. What President Trump's executive orders could
actually do. *New York Magazine* (New York), Feb 1, 2017.

42   Whitely J. "My life is made here": undocumented students fear fate
under Trump. Feb 2, 2017. http://www.cbsnews.com/news/
undocumented-students-daca-immigrants-fears-under-trump/
(accessed Feb 8, 2017).

43   O'Brien R, Venkataramani AS, Tsai AC. Economic opportunity
and mortality among US middle aged whites. *Epidemiology* 2017;
**28**: e12–e13.

44   Venkataramani AS, Chatterjee P, Kawachi I, Tsai AC.
Economic opportunity, health behaviors, and mortality in
the United States. *Am J Public Health* 2016; **106**: 478–84.

45   Katikireddi SV. Economic opportunity: a determinant of health?
*Lancet Public Health* 2016; **1**: e4-e5.

46   Cebulko K, Silver A. Navigating DACA in hospitable and hostile
states: State responses and access to membership in the wake of
Deferred Action for Childhood Arrivals. *Am Behav Sci* 2016;
**60**: 1553–74.

47   Goldman F. What Trump's presidency will mean for the dreamers.
*New Yorker* (New York), November 19, 2016.



Case 1:18-cv-00068 Document 610-4 Filed on 11/04/22 in TXSD Page 318 of 990



# ALBANY LAW SCHOOL

Search   Menu

# Government Law Center

# Immigrants and Public Benefits: What Must States and Localities Provide?

Download PDF

*by Ava Ayers\**

Immigration law is often thought of as a federal issue, and indeed the federal government has exclusive power over who enters the country and on what terms they can remain.  But the day-to-day life of noncitizens is regulated both by the federal government and by its state and local counterparts.

One of the many controversies related to immigration is over immigrants' access to public benefits.  In 1996, the Welfare Reform Act dramatically limited lawful immigrants' access to public benefits, causing almost a million noncitizens to lose access to benefits.[1]  But the controversy has continued from that time to today.  Recent proposals by the Trump administration would significantly increase the number of noncitizens (and their children) who become deportable because they use public benefits.[2]

Meanwhile, few people understand exactly what benefits noncitizens can receive.  This Explainer gives an overview of the laws governing *state and local governments*' provision of public benefits to noncitizens.  By "public benefits," we mean not only traditional public benefits like welfare and housing assistance, but all of the affirmative goods that governments offer to the citizens, from professional licenses to Medicaid to education assistance to government contracts and grants.

The Constitution requires states and localities to treat noncitizens just like citizens (with a few exceptions, discussed below).  But federal statutes sometimes require states to treat the two groups differently.  So state and local governments have to navigate a tricky path between the rock of Equal Protection and the hard place of federal preemption.

**AR2022_500318**

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 319 of 990

This Explainer first discusses the requirements of Equal Protection, and then explains how federal statutes sometimes limit the benefits states and localities can give to noncitizens.

# When Equal Protection Requires Benefits

In general, the *federal* government is allowed to treat citizens and noncitizens differently.[3]  But when the law or policy in question comes from the government of a *state or locality*, noncitizens have a constitutional right to be treated like citizens.[4]

Under a long line of Supreme Court cases, states and localities that distinguish between citizens and noncitizens are subject to "strict scrutiny," meaning that in order to comply with the Constitution, the law or policy that treats noncitizens differently must "further[] a compelling state interest by the least restrictive means practically available."[5]  This is the same level of scrutiny that applies to racially discriminatory laws.

Hardly any state law or policy can survive strict scrutiny; in practice, strict scrutiny means the law is virtually certain to be struck down.

So the Constitution treats state discrimination against noncitizens with the same suspicion reserved for racial discrimination.  But in the case of noncitizens, there are some important exceptions—cases in which states are allowed to treat noncitizens differently.

## DIFFERENTIAL TREATMENT OF NONCITIZENS IN PUBLIC EMPLOYMENT

One important exception to the rule that states and localities cannot treat noncitizens differently is known as the "political function" doctrine.  Under this doctrine, state governments are free to limit certain kinds of public employment to citizens, including jobs like public-school teachers and police offers.[6]  The Supreme Court has not applied this exception to local governments, but it seems likely it would extend to them.

## DIFFERENTIAL TREATMENT OF THE UNLAWFULLY PRESENT

A second exception is for noncitizens who are unlawfully present. While the Supreme Court has never explicitly held that state and localities can deny benefits and services to undocumented people, courts have interpreted this to be an implication of the Court's decision in *Plyler v. Doe*.[7]  (This Explainer uses the word "undocumented" and the phrase "unlawfully present" interchangeably.)

Importantly, there are difficult questions about exactly who counts as unlawfully present for these purposes.  Clearly within the category are people who cross the border without permission.  Then there are people who enter the country lawfully but overstay their visas. (Each year, roughly two-thirds of newly unlawfully present noncitizens have overstayed their visas.)[8]

There are other noncitizens who, although lawfully present, commit a crime that makes them deportable, and it is far from clear how this group would be regarded under the Equal Protection Clause.  Still other noncitizens are temporarily without lawful status, but have a right to remain in the country and are simply

AR2022_500319

Case 1:18-cv-00068 Document 610-4 Filed on 11/04/22 in TXSD Page 320 of 990

waiting for their paperwork to be processed. (For example, someone whose fiancé is a U.S. citizen might be between statuses while they wait for their green card to be issued.) It is not clear which of these groups might be denied state or local benefits without triggering strict scrutiny.

# DIFFERENTIAL TREATMENT OF NONCITIZENS IN TEMPORARY STATUS

A third possible exception to the rule against treating noncitizens differently should be approached with great caution.  According to some courts, "rational basis" scrutiny—a very forgiving standard of review—applies to state laws that distinguish between citizens and those noncitizens in temporary status.[9]  In other words, states may deny benefits and services to people in temporary status (e.g., people with student visas, temporary work visas, and similar statuses), even though they must not discriminate against noncitizens with permanent status (i.e., green-card holders).

This exception for temporarily present noncitizens has been adopted by two federal appellate courts. But it has been rejected by the Second Circuit, which covers New York, Vermont and Connecticut.[10]  This creates a "circuit split" that will likely be resolved by the U.S. Supreme Court at some point in the future.

The exception for temporarily present noncitizens has also been rejected in the strongest terms by the New York Court of Appeals in *Aliessa v. Novello*, 96 N.Y.2d 418 (2001).  The Court applied strict scrutiny to state laws that apply differential treatment to lawfully present noncitizens—not just those with green cards, but also temporarily present noncitizens, and even "aliens of whom the INS is aware, but has no plans to deport."[11]

This latter category—noncitizens who are deportable, but whose deportations are being stayed as a matter of federal prosecutorial discretion—is the most temporary and tenuous of all immigration statuses.  If New York law applies strict scrutiny to these noncitizens, then the only group that can be treated differently from citizens in New York is noncitizens who have no explicit or implicit authorization to remain in the country.

The holding of *Aliessa* was based not only on the U.S. Constitution but also on the New York State Constitution.[12]  This means that even if the Supreme Court were to allow state discrimination against temporarily present noncitizens temporary visitors, the New York ruling would stand.

*Aliessa* also held that differential treatment of noncitizens is unconstitutional under a separate provision of the state constitution:  article XVII, § 1, which provides:

"The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine."

The court held that this provision forbids the state from imposing an "eligibility condition having nothing to do with need."[13] Interestingly, no subsequent case has analyzed whether the same constitutional prohibition would forbid denying essential benefits to undocumented people.  But it is reasonable to expect

AR2022_500320

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 321 of 990

a judicial challenge to any state or local policies that deny benefits to undocumented people, because a requirement that denies benefits on grounds of undocumented status would be an "eligibility condition having nothing to do with need."

In sum, the basic rule governing noncitizens' benefits is that state and local governments in New York cannot treat noncitizens differently from citizens unless the noncitizens are unlawfully present, or unless the political-function exception applies.

There is, in effect, one final exception to the requirement of equal treatment for noncitizens—an exception so complex it will be analyzed in the three separate sections that form the rest of this Explainer.  Congress can, and does, create laws that *require* states to treat noncitizens differently, or that purport to give states *discretion* to treat them differently.  And, on occasion, Congress requires equal treatment.  All of these provisions give rise to constitutional questions that have yet to be definitively resolved.

## *When Congress Prohibits Benefits*

Although the Equal Protection Clause generally requires that state and local governments treat noncitizens equally, several federal statutes demand differential treatment of noncitizens.

## SECTION 1621:  NONCITIZENS IN CERTAIN MARGINAL STATUSES ARE GENERALLY INELIGIBLE FOR SUBFEDERAL BENEFITS

The most important statute restricting state and local rights to offer benefits and services to noncitizens is 8 U.S.C. § 1621.  This statute limits state and local governments' right to provide a wide variety of government benefits, contracts, and licenses, including:

any grant, contract, loan, professional license, or commercial license provided by an agency of a State or local government or by appropriated funds.[14]

The statute also applies to "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit."[15]

Noncitizens cannot receive any of these benefits or licenses unless their immigration status is specifically listed in § 1621(a).[16]  (There are exceptions for some emergency health-care benefits.[17])

Who is barred from benefits by § 1621?  Undocumented people are not among the groups listed as eligible, so they are ineligible for all of the enumerated benefits.  Section 1621 also denies benefits to people who are *not* unlawfully present, including people in the following classifications:

- Temporary Protected Status.[18]

- Deferred Action for Childhood Arrivals (DACA).[19]

AR2022_500321

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 332 of 990

- Forms of "deferred action" other than DACA. (Although DACA is the highest-profile form of deferred action, deferred action has been granted since the 1970s, when it was referred to as "nonpriority" status.)[20]

- Deferred Enforced Departure.[21]

- Citizens of nations party to the Compact of Free Association Agreements (Palau, Micronesia, and the Marshall Islands).[22]

The upshot of § 1621 is that states can offer to noncitizens with green cards, student visas, or other listed statuses all of the benefits listed in § 1621, including things like welfare, Medicaid, professional licenses, government contracts, or unemployment benefits.  But states cannot offer these benefits to noncitizens in Temporary Protected Status, DACA beneficiaries, or undocumented people.

However, there is an important exception under which states can choose to provide benefits to any of the ineligible groups. Under § 1621(d), states can override the ineligibility, and provide benefits, "through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility."

Several states have exercised this prerogative.  For example, California and Florida passed statutes to make DACA recipients eligible for admission to the bar.[23]

Section 1621 seems to allow states to override the ineligibility only if the state *legislature* acts.  But courts in New York State have held that the judicial branch, too, can exercise that authority.  The theory these courts adopted is that states have a sovereign right to decide which branch of their government makes any given decision.  Thus, although § 1621(d) seems to require a decision by the state legislature, states are free to delegate that decision to another part of their government.[24]

Other cases in New York and elsewhere have followed the precedent set by *Vargas*.[25] And the New York State Education Department, acting on the same theory, issued regulations admitting noncitizens to professional licensure, invoking the authority embraced by *Vargas*.[26]

Another important feature of § 1621 is that it does not require state or localities to verify immigration status before offering any of the listed benefits.  Another section, 8 U.S.C. § 1624, authorizes states to confirm eligibility, but does not require it.[27] Thus, while states and localities are in theory barred from offering listed benefits to undocumented people, they are free to ask no questions about immigration status when people apply.

# HIGHER-EDUCATION BENEFITS

There is one more situation in which states are forbidden to offer benefits to non-citizens:  States cannot offer higher-education benefits to undocumented people unless those benefits are also available to citizens. [28]

Currently, the District of Columbia and twenty states (including New York) allow undocumented students to pay in-state tuition.[29]  Three states (Alabama, Georgia, and South Carolina) bar undocumented students from enrolling in some or all higher-educational institutions.[30]  Many state legislatures have pending bills

AR2022_500322

Case 1:18-cv-00068 Document 610-4 Filed on 11/04/22 in TXSD Page 323 of 990

that would expand or limit in-state tuition for undocumented students.[31]

# When Congress Gives States a Choice

As we've seen, Congress sometimes tries to prohibit states from offering benefits to noncitizens. There are other statutes in which Congress purports to give states a choice.

## SECTION 1622: FOR MOST NONCITIZENS, CONGRESS PURPORTS TO GIVE STATES DISCRETION OVER WHICH BENEFITS TO OFFER

What about the noncitizens who *are* eligible for state and local benefits under § 1621? This group includes "nonimmigrants" (temporary visa-holders, like people with student visas, work visas, tourist visas, or other short-term visas); certain "parolees" (a very tenuous status that has nothing to do with criminal parole); and "qualified aliens" (a group that includes green-card holders, asylees and refugees, and others).[32] In short, it includes many of the most common immigration statuses.

Noncitizens in this large group are covered by 8 U.S.C. § 1622, which says that states are "authorized to determine the eligibility for any State public benefits" of anyone with these benefits.[33]

Some courts have interpreted this to mean that the federal government has given states the freedom to decide whether to grant benefits to people in this group.[34]

But other courts, including the New York Court of Appeals, have found that whenever states have a choice, the Equal Protection Clause applies—and requires equal treatment of noncitizens.[35] Congress may want states to have discretion, but, in the words of the Supreme Court, "Congress does not have the power to authorize the individual States to violate the Equal Protection Clause."[36]

## CASH ASSISTANCE

Congress attempted the same strategy for general cash public assistance. 8 U.S.C. § 1624 provides that states and localities are "authorized to prohibit or otherwise limit or restrict the eligibility of aliens or classes of aliens for programs of general cash public assistance," as long as the state scheme is not more restrictive than the parallel federal benefits scheme. The same questions arise: does Congress have the power to authorize behavior by states that would otherwise violate immigrants' right to equal protection?

# When Congress Requires Benefits

## SECTION 1622(B) REQUIRES BENEFITS FOR PERMANENT RESIDENTS, REFUGEES, AND ASYLEES AFTER A CERTAIN AMOUNT OF TIME

AR2022_500323

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 324 of 990

As discussed above, Congress generally wanted states to have the discretion to choose whether to offer benefits to most lawfully present noncitizens.  But, as always, there's an important exception.

Under § 1622(b), states are *required* to offer public benefits to legal permanent residents ("LPRs," i.e., green-card holders), asylees, and refugees after specified periods of time.  For refugees, it's five years after entry into the U.S.; for asylees, 5 years after the grant of asylum; and for green-card holders, it's 40 quarters of work.[37]

State are also required to offer benefits to noncitizens in active military service, veterans, and their children. [38]

## DOES CONGRESS HAVE THE POWER TO REQUIRE BENEFITS?

Congress's attempts to require that states offer certain benefits, create a complicated constitutional issue. First, does Congress have the constitutional power to impose such a requirement?  And, second, if Congress has no power to impose such a requirement, does equal protection require states to offer benefits anyway?

In general, Congress cannot "commandeer" the states—that is, force them to implement a federal regulatory program.  Congress has no power to commandeer states' executive officials or legislative processes.[39] "[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions."[40]

This principle might seem to prevent Congress from requiring states to give any particular benefits to noncitizens.  But Congress has traditionally been given great deference in the realm of immigration policy. And even if Congress can't constitutionally require benefits, there remains the Equal Protection Clause, which will require benefits in most situations.  The difficult question, again, will be what happens when Congress requires, by statute, the provision of benefits in an area where the Equal Protection Clause would not require them.

In New York State, equal protection clearly requires the provision of benefits for lawfully present aliens; nationally, the issue remains to be definitively resolved.

## Conclusion

States and localities have a complicated set of questions to navigate when they make decisions about noncitizens and benefits and services.  Sometimes the Equal Protection Clause requires the provision of benefits; sometimes Congress purports to require their denial.

In other areas, federal statutes appear to give states a choice, or to require the provision of benefits, which creates complicated constitutional questions.  States, localities, and courts are likely to continue to struggle with these issues for years to come.

## Resources

AR2022_500324

This explainer deals with state and local benefits. For background on the *federal* public benefits available to noncitizens, see Congressional Research Service, "Noncitizen Eligibility for Federal Public Assistance," available at https://www.everycrsreport.com/reports/RL33809.html

A useful guide to the various immigration statuses from the American Immigration Council is available here: https://www.americanimmigrationcouncil.org/research/how-united-states-immigration-system-works-fact-sheet

Another useful guide, from the Immigrant Defense Project, is online here: https://www.immigrantdefenseproject.org/wp-content/uploads/IDP-Immigration-Status-101-Guide-FINAL1.pdf

For a very useful guide to state policies on public benefits for noncitizens, see the Pew Charitable Trust's "Mapping Public Benefits for Immigrants in the States" (2014): http://www.pewtrusts.org/~/media/assets/2014/09/mappingpublicbenefitsforimmigrantsinthestatesfinal.pd

The New York State Department of Health has a guide explaining which immigration statuses it considers eligible for Medicaid benefits: https://www.health.ny.gov/health_care/medicaid/publications/docs/gis/08ma009att.pdf

The federal government has issued a guide for state or local agencies trying to interpret immigration documents. It's part of the "SAVE" (Systematic Alien Verification for Entitlements) system, a resource for agencies that administer benefits: https://save.uscis.gov/web/media/resourcesContents/SAVEGuideCommonlyusedImmigrationDocs.pdf

For information about the limitations of the SAVE system, see: https://www.americanimmigrationcouncil.org/research/systematic-alien-verification-entitlements-save-program-fact-sheet

# *Endnotes*

\* Ava Ayers is Director of the Government Law Center and an assistant professor at Albany Law School. Research assistance by Olivia Fleming, Brendan Nashelsky, and Michele Monforte.

[1] On the Welfare Reform Act, see https://www.migrationpolicy.org/article/immigrants-and-welfare-use

[2] On the proposals to make noncitizens deportable for using public benefits, see https://www.vox.com/2018/2/8/16993172/trump-regulation-immigrants-benefits-public-charge.

[3] The federal power to offer different benefits to citizens and noncitizens was affirmed in *Mathews v. Diaz*, 426 U.S. 67 (1976).

[4] States' obligation to treat citizens and noncitizens equally was established in *Graham v. Richardson*, 403 U.S. 365 (1971).

[5] This definition of strict scrutiny is from *Bernal v. Fainter*, 467 U.S. 216, 227 (1984).

**AR2022_500325**

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 326 of 990

[6] Cases on the political-function exception to strict scrutiny for state laws excluding immigrants include *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982) (upholding citizenship requirement for probation officers); *Ambach v. Norwick*, 441 U.S. 68 (1979) (upholding citizenship requirement for public-school teachers); *Foley v. Connelie*, 435 U.S. 291 (1978) (upholding citizenship requirement for police officers); and *Sugarman v. Dougall*, 413 U.S. 634 (1973) (striking down a citizenship requirement for civil-service positions because it was not sufficiently related to sovereign functions of government).

[7] The Supreme Court appeared to suggest that rational-basis scrutiny applies to state laws that excluded undocumented people in *Plyler v. Doe*, 457 U.S. 202 (1982), although the holding of that case was that states must provide an education to undocumented schoolchildren. *See Dandamudi v. Tisch*, 686 F.3d 66, 74 (2d Cir. 2012) (interpreting *Plyler* to allow differential treatment of unauthorized immigrants). Full disclosure: the author of this Explainer wrote the brief and presented the oral argument to the Second Circuit in *Dandamudi*.

[8] For statistics on the number of unauthorized immigrants who overstay their visas, see the Center for Migration Studies, http://cmsny.org/publications/jmhs-visa-overstays-border-wall/.

[9] For decisions applying rational-basis scrutiny to noncitizens with temporary visa, see *League of United Latin Am. Citizens (LULAC) v. Bredesen*, 500 F.3d 523, 531–34, 536–37 (6th Cir. 2007); *LeClerc v. Webb*, 419 F.3d 405, 415 (5th Cir. 2005), *reh'g en banc denied*, 444 F.3d 428 (2006).

[10] The Second Circuit rejected an argument that states can deny benefits to temporarily present noncitizens in *Dandamudi v. Tisch*, 686 F.3d 66, 74 (2d Cir. 2012).

[11] For the New York Court of Appeals's explanation of exactly who receives strict scrutiny, see *Aliessa v. Novello*, 96 N.Y.2d 418 (2001), holding that the state law in question violates the "Equal Protection Clauses of the United States and New York State Constitutions insofar as it denies State Medicaid to otherwise eligible PRUCOLs and lawfully admitted permanent residents based on their status as aliens," *id.* at 436, and then compare its definition of "PRUCOL" in footnote 2.

[12] *Aliessa* makes clear that its holding is based on the New York State Equal Protection Clause. *See* 96 N.Y.2d at 436.

[13] For discussion of the right to aid and care of the needy as applied to immigrants, see *Aliessa*, 96 N.Y.2d at 429.

[14] 8 U.S.C. § 1621(c)(1)(A).

[15] *Id.* § 1621(c)(1)(B).

[16] The enumerated statuses eligible for benefits under § 1621 are "a qualified alien (as defined in section 431 [8 USCS § 1641])"; "a nonimmigrant under the Immigration and Nationality Act" and "an alien who is paroled into the United States under section 212(d)(5) of such Act [8 USCS § 1182(d)(5)] for less than one year." By using the term "qualified alien," which is defined in USC 1641, section 1621(a) confers eligibility on several sub-categories of aliens: legal permanent residents; asylees and refugees; aliens whose deportation is withheld under 8 U.S.C. § 1251(b)(3) [see 8 CFR § 208.16]; aliens granted "conditional entry" under 8 USC §

AR2022_500326

Case 1:18-cv-00068 Document 610-4 Filed on 11/04/22 in TXSD Page 327 of 990

1153(a)(7) before 1980; and aliens who are "Cuban and Haitian entrants" under 8 USC § 1522 (note); and certain battered aliens. Also eligible are aliens whose deportation is withheld under § 243(h) of the Immigration and Nationality Act, but this is a small category, because this form of relief has been unavailable since 1997.

[17]*Id.* § 1621(b).

[18]  On Temporary Protected Status, see  http://www.uscis.gov/humanitarian/temporary-protected-status-deferred-enforced-departure/temporary-protected-status.

[19] On DACA, see http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca

[20]*See* Leon Wildes, The Nonpriority Program of the Immigration and Naturalization Service Goes Public: The Litigative Use of the Freedom of Information Act, 14 SAN DIEGO L. REV. 42 (1976-77); for a more recent history, see Shoba Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 Conn. Pub. Int. L. J. 244 (2010).

[21]http://www.uscis.gov/humanitarian/temporary-protected-status-deferred-enforced-departure/deferred-enforced-departure

[22] See info on the Compact of Free Association Agreements here: http://www.uscis.gov/sites/default/files/files/pressrelease/Micronesia_MarshallIslFS.pdf

[23] For statutes making DACA recipients eligible for bar admission, see H.R. 755, § 454.021, 2014 Leg., Reg. Sess. (Fla. 2014); and *In re Garcia*, 58 Cal. 4th 440 (2014). *Seealso* Wendi Adelson, *Lawfully Present Lawyers*, 18 Chap. L. Rev. 387, 399 (2015).

[24] Note: the theory adopted in *Vargas* (that state sovereignty prevents Congress from dictating the use of state legislatures for decisions about immigrants' benefits) was presented to the Second Department in an amicus brief that was signed by the author of this Explainer. For an elaboration of the theory and its implications for other areas of law, see Andrew B. Ayers, *Federalism and the Right to Decide Who Decides*, Villanova L. Rev. (forthcoming 2018).

[25] Courts have followed *Vargas* by admitting DACA recipients to the bar in New York's Third Department, Pennsylvania, and New Jersey. *See* Matter of Anonymous, 152 A.D.3d 1046 (3d Dep't 2017); *See* ACLU Pennsylvania, "Pennsylvania Admits DACA Recipient to the Bar,"; *see also* Memorandum of Law in Support of Application of Parthiv Patel (Letter to Pa. Bd. of Law Examiners, Feb. 21, 2017), available at https://www.aclupa.org/en/cases/bar-admission-undocumented-law-school-graduates; See ACLU, DACA Recipient Sworn In As Lawyer By NJ AG (Jan. 24, 2018), https://www.aclu.org/news/daca-recipient-sworn-lawyer-nj-ag.

[26] For New York regulations admitting teachers to licensure under the *Vargas* authority, see 8 N.Y.C.R.R. § 80-1.3 (for teacher licensure, "pursuant to 8 USC § 1621(d), no otherwise qualified alien shall be precluded from obtaining a professional license under this Title if any individual is not unlawfully present in the United States, including but not limited to applicants granted deferred Action for Childhood Arrivals relief or similar

AR2022_500327

relief from deportation8 NYCRR § 80-1.3"); 8 N.Y.C.R.R. § 59.4 (same language applied to other professions); 2016-10 N.Y. St. Reg. 19 (Mar. 9, 2016; Volume 38, Issue 10) (proposed regulation); 2016-22 N.Y. St. Reg. 23, 25 (final rule and response to comments) ("While the *Vargas* decision is based on an intrusion on the role of the judiciary over bar admissions in violation of the Supremacy Clause, we believe that the Court's reasoning applies equally to the adoption of regulations having the force and effect of law by an administrative agency that is part of the executive branch of New York government, another one of the three coequal branches of government under the New York Constitution."). http://www.nysed.gov/news/2016/board-regents-permanently-adopts-regulations-allow-daca-recipients-apply-teacher. For more on the process leading to these changes, see Janet M. Calvo, *Professional Licensing and Teacher Certification for Non-Citizens: Federalism, Equal Protection and a State's Socioeconomic Interests*, Col. J. Race & Law (forthcoming).

[27] 8 U.S.C. § 1625.

[28] 8 U.S.C. § 1623.

[29] On in-state tuition for undocumented students, see the National Immigration Law Center's table at https://www.nilc.org/issues/education/eduaccesstoolkit/eduaccesstoolkit2/#maps. See also the National Conference of State Legislatures' excellent overview at http://www.ncsl.org/research/education/undocumented-student-tuition-overview.aspx.

[30] For states that bar enrollment to undocumented students, see the National Immigration Law Center's table at https://www.nilc.org/issues/education/eduaccesstoolkit/eduaccesstoolkit2/#maps.

[31] On pending bills that would expand or limit in-state tuition for undocumented students, see this overview by National Association of Student Personnel Administrators (NASPA): https://www.naspa.org/rpi/posts/in-state-tuition-for-undocumented-students-2017-state-level-analysis.

[32] 8 U.S.C. § 1621(a); for the definition of "qualified alien," see 8 U.S.C. § 1641.

[33] 8 U.S.C. § 1622(a).

[34] See, e.g., *Korab v. Fink*, 797 F.3d 572, 582 (9th Cir. 2014).

[35] The New York Court of Appeals applied strict scrutiny to a denial of benefits in spite of § 1622's grant of discretion in *Aliessa*, discussed above. Note, however, that *this* interpretation could in theory be overruled by the U.S. Supreme Court, even though the state court has held that the state Equal Protection Clause requires treating noncitizens equally. Valid federal statutes preempt state constitutional provisions. If the Supreme Court were to hold that Congress has the power to promulgate a statute that gives states the discretion to treat immigrants differently, that statute would preempt the state constitution. Thus, the Court could effectively nullify *Aliessa* by revisiting its statement that "Congress does not have the power to authorize the individual States to violate the Equal Protection Clause." *Graham v. Richardson*, 403 U.S. 365, 382 (1971)

[36] *Graham v. Richardson*, 403 U.S. 365, 382 (1971) ("Although the Federal Government admittedly has broad constitutional power to determine what aliens shall be admitted to the United States, the period they may remain, and the terms and conditions of their naturalization, Congress does not have the power to authorize

AR2022_500328

Case 1:18-cv-00068 Document 610-4 Filed on 11/04/22 in TXSD Page 329 of 990

the individual States to violate the Equal Protection Clause.").

[37] On benefits for green-card holders, refugees, and asylees after specified periods of time, see 8 U.S.C. § 1622(b).

[38] On benefits for servicemembers, veterans, and their children, see 8 U.S.C. § 1622(b)(3).

[39] On commandeering, see *Printz v. United States*, 521 U.S. 898, 933 (1997) (executive officials); *New York v. United States*, 505 U.S. 144, 161-66 (1992) (legislative processes).

[40] *New York*, 505 U.S. at 162.

80 New Scotland Avenue

Albany, NY 12208-3494

PHONE: 518-445-2311

*Better Opportunities. Bigger Impact.*

**SCHAFFER LAW LIBRARY**

**CALENDAR**

**EMPLOYMENT**

**VISIT US**

**COMMUNITY IMPACT**

**ADMISSIONS & APPLICATIONS**

**PROGRAMS & CENTERS**

**STUDENT EXPERIENCE & SUPPORT**

COPYRIGHT 2020

PRIVACY POLICY

   

**AR2022_500330**

# BROOKINGS

Brookings Now

## The reality of DACA, the Deferred Action for Childhood Arrivals program

Brennan Hoban Friday, September 22, 2017

**Editor's Note:**

*On Friday, September 22, Brookings held an event on immigration policy in Trump's America. Elaine Kamarck, founding director of the Center for Effective Public Management, introduced a panel that included Senior Fellow John Hudak (moderator); Janet Napolitano, former Homeland Security secretary; Doris Meissner, former commissioner of U.S. Immigration and Naturalization; and Carlos Guevara, senior policy advisor, UnidosUS.*

*Panelists did address DACA, among other issues. Full video is available here.*

On September 5, President Trump announced his intention to end the Deferred Action for Childhood Arrivals (DACA) program and called on Congress to pass a replacement. Since then, rumors have emerged that President Trump and congressional Democratic leaders reached an agreement that would prevent the termination of DACA protections and the possible deportation of its 800,000 beneficiaries.

## What is DACA ?

DACA, which was passed as part of the Obama administration's immigration policy in June 2012, allowed some individuals who entered the country illegally as minors to receive a renewable two-year period of deferred action from deportation and be eligible for a work permit.

## Repealing DACA would cost the U.S.

Brookings Senior Fellows John Hudak and Elaine Kamarck highlight the human and economic costs of repealing DACA, and address how politically unfavorable the decision would be. Hudak and Kamarck explain that the United States would lose the $2 billion a year in tax revenue that these people (sometimes known as Dreamers after the DREAM Act

AR2022_500331

legislation that would give DACA beneficiaries a path to legal residency), pay if DACA recipients are deported. On top of that, the scholars calculate that the cost of deporting these young adults would cost nearly $10 billion.

Likewise, repealing DACA would have a human cost as well. Brookings Rubenstein Fellow Andre Perry discusses how the repeal of DACA could lead to the expulsion of hundreds of thousands of young people who are acculturated to U.S. society. These young people must have come to the U.S. when they were under 16. The average Dreamer arrived in the United States before the age of six. Perry explains that DACA is "like a jobs program" and does not grant Dreamers citizenship or immunity from being deported. He argues that the decision to repeal DACA "does not address the issue of a broken immigration system."

In addition, Perry takes issue with the timing of President Trump's announcement, which he made as Texas was beginning to recover from Hurricane Harvey. Perry explains that when Harvey devastated the Houston Metropolitan area, over 500,000 undocumented residents were also affected. Perry insists that Trump's statement undermined the sense of community that had grown in Houston, as Houstonians, "regardless of race and citizenship status, are rolling up their sleeves to rescue those trapped in their homes, deliver supplies, house and feed the displaced, as well as provide medical services."

## Two-thirds of Trump supporters want Dreamers to stay in the U.S.

Using survey and polling data, Brookings Senior Fellow William Galston highlights the 60 percent of self-identified Trump supporters who want Dreamers to be allowed to stay in the United States. Galston explains that considering whether or not to allow Dreamers to stay is separate from the discussion on cancelling the program altogether, a distinction that could potentially lead Congress to pass legislation that replaces and effectively ends DACA but allows Dreamers to remain in the country legally and permanently.

## In the absence of DACA, states can step up to provide higher education

Brookings Fellow Elizabeth Mann and Research Analyst Diana Quintero discuss how DACA can increase accessibility to higher education for undocumented students. Mann explains that 21 states have already either enacted laws that allow undocumented students to pay

**AR2022_500332**

in-state tuition or have university systems that offer in-state tuition to undocumented students. If DACA is repealed, states without these laws in place (particularly states with Democratic governors and legislatures) could adopt similar laws to increase college affordability for this vulnerable population.



DACA recipients as a percent of 18-24 years old per state

Source: The National Conference of State Legislatures (2015), Student Affairs Administrators in Higher Education (2017), and US Immigration Services (2017)

Note: The U.S. Immigration Service does not publish data on the age of DACA recipients by state of residence. People ages 16-35 are currently eligible for DACA (including first-time applications and renewals). In 2013, 83 percent of DACA recipients were between the ages of 16 and 24. Because of our interest in DACA students with respect to higher education, this map illustrates the number of DACA recipients per state as a percentage of that state's traditional college-age population (18-24 year olds).

For more, check out additional Brookings research on immigration.

AR2022_500333

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/258163322

# The Children Left Behind: The Impact of Parental Deportation on Mental Health

**Article** *in* Journal of Child and Family Studies · February 2013

DOI: 10.1007/s10826-013-9848-5

CITATIONS
12

READS
1,337

3 authors, including:

Brian Allen
Penn State Hershey Medical Center and Penn State College of Medicine

**31** PUBLICATIONS   **362** CITATIONS

SEE PROFILE

Some of the authors of this publication are also working on these related projects:

Late adoptees and developmental trajectories View project

Assessment and treatment of children with problematic sexual behavior View project

All content following this page was uploaded by Brian Allen on 04 April 2015.

The user has requested enhancement of the downloaded file.

J Child Fam Stud (2015) 24:386–392
DOI 10.1007/s10826-013-9848-5

ORIGINAL PAPER

# The Children Left Behind: The Impact of Parental Deportation on Mental Health

Brian Allen · Erica M. Cisneros · Alexandra Tellez

Published online: 16 October 2013
© Springer Science+Business Media New York 2013

**Abstract**   The current report describes the results of the first known study examining the impact of parental deportation on the mental health of children using psychometrically reliable and valid assessment instruments. Participants reported on the current internalizing and externalizing problems of children under their care using the Spanish language version of the Child Behavior Checklist and completed a trauma history and demographic questionnaire that asked specifically about parental deportation status. Children with a deported parent ($n = 23$) were significantly more likely to display externalizing and internalizing problems than children whose parents were not deported or in the process of deportation ($n = 52$). Associated demographic characteristics and trauma history were controlled in these analyses. The results are discussed in the context of evolving immigration policy in the United States.

**Keywords**   Child mental health · Deportation · Spanish language · Cultural issues · Parenting

## Introduction

Immigration policy in the United States remains a contentious issue at the forefront of political and social discussions. Oftentimes this debate centers on how best to respond when the individual at risk for deportation is the parent of a child with legal status to remain in the U.S. Deportation of the individual may necessitate the child's separation from the parent; allowing the individual to stay in the U.S. grants an exception to immigration policy that many suggest may encourage other undocumented immigrants to attempt to give birth to children in the U.S. (e.g., North 2011).

In 2011, nearly 400,000 individuals were deported from the United States (Immigration and Customs Enforcement 2011). Baum et al. (2010) estimate that over 100,000 children, the vast majority of whom were American citizens, had a parent deported between 1997 and 2007. Other estimates suggest the number of children with a deported parent in recent years may be much higher (Wessler 2011).

Observations in the clinical literature that children experience significant distress when separated from their parents can be traced to before World War II (Hoffman 1934) and clinicians have provided significant theoretical treatises on the topic (e.g., Bowlby 1973). Attachment research demonstrates the critical role that parent–child relationships play in the development of social skills (Belskey and Fearon 2002), emotion regulation (Contreras et al. 2000) and self-concept (Goodvin et al. 2008). Not surprisingly, research examining other types of parental separation, incarcerated parents (Murray et al. 2012) or parents deployed for military service (Lester et al. 2010) for instance, have concluded that children are at increased risk for emotional and behavioral problems.

Although immigration policy and the appropriateness of deportation is a prominent political issue, empirical examination of the impact of parental deportation is rare. The studies that do exist tend to point to the same conclusion: parental deportation causes increased emotional

B. Allen (✉)
Center for Safe and Healthy Families, Primary Children's Medical Center, 675 East 500 South, Suite 300, Salt Lake City, UT 84102, USA
e-mail: brian.allen@imail.org

E. M. Cisneros · A. Tellez
Department of Psychology, Sam Houston State University, Huntsville, TX, USA

 Springer

and behavioral distress among children, including sleep problems, depression, anxiety, and poorer grades (Baum et al. 2010; Brabeck and Xu 2010; Dreby 2012). Although informative, these studies are limited by the fact that they typically utilize unvalidated interview or study-specific survey methods, opening the validity of the results to questions about the method of data collection and the structure of the interview or survey. In addition, these studies do not typically examine the impact of other negative or traumatic events that may be prevalent in the lives of these children while their family is attempting to live outside of governmental awareness.

Absent from the current literature is an empirical examination of the impact of parental deportation on children using standardized, psychometrically defensible measures that recognizes the potential contribution of other untoward events on mental health outcomes. The current paper provides such an analysis. Based on related findings and theoretical propositions, the primary hypothesis for the current study is that children who currently are separated from a parent as a result of deportation will demonstrate more significant externalizing (e.g., aggression, conduct problems) and internalizing (e.g., anxiety, depression) problems than children with parents of legal status.

## Method

### Participants

Participants were individuals in the state of Texas attending free legal consultations focused on immigration issues offered by a nonprofit organization. These sessions provided overview information about the immigration system and policy in the United States, followed by one-on-one consultations with lawyers specializing in immigration law. Individuals attended to seek legal assistance for themselves, family members, and/or friends. Estimates were that approximately 100 individuals attended each of the 8 sessions attended by researchers for the purposes of data collection.

Although it is estimated that over 800 individuals attended the sessions in which participation in the study was offered, caregiver reports for only 95 children were included in the current analysis. Of the children for whom data were obtained, 54.7 % were male, the mean age was approximately 9 years, and 87 % of the children were born in the United States. Seventy-nine percent (79 %) of those providing the information were mothers of the children. The majority of children had at least one parent whose country of origin was Mexico; however, other countries of origin included Guatemala, El Salvador, Colombia, and Nicaragua, among others. Complete demographics of the

sample are provided in Table 1. It should be observed that the skepticism and refusal of a large portion of caregivers introduces a source of sampling bias whose effect cannot be estimated.

### Procedure

Prior to the commencement of each immigration consultation session an announcement was made by research personnel describing the study as an examination of the impact of documented and undocumented immigration on children. The announcement was made in Spanish as practically all of the attendees were from Spanish-speaking countries and spoke Spanish as their first language. Participants were told that volunteers were required to currently be caring for children between the ages of 6 and 12, regardless of the immigration status of the child's parent(s), and be able to read in Spanish. Those who wished to volunteer were instructed to approach the researchers set up at a table in the room as they waited their turn for the individual legal consultations. Numerous potential participant caregivers approached the researchers to ascertain how the data might be used. Despite assurances that the data were collected anonymously, the requirement of signing the consent form was often sufficient grounds to decline participation. Many potential participants appeared concerned regarding who would have access to their individual forms and if they could be used to identify them or against them in any potential legal proceedings. Because of the nature of the data collection process, it was not possible to collect data on the demographic characteristics of those who declined participation after showing initial interest or those individuals who did not approach the researchers. Data for this project were collected between August and December of 2011.

Participants volunteering for the study were asked to read the informed consent form and a Spanish-speaking individual involved with the project ensured that they understood all pieces before proceeding. While reviewing the informed consent form, the research staff conducted an informal assessment to screen out individuals who appeared to have difficulty reading the Spanish language. No participants were removed from participation due to reading ability. Participants signed the informed consent forms, which were then placed in a separate folder to insure that the names of individuals were separated from the data they provided, so as to assure anonymity of their responses. After informed consent was obtained, participants were provided with an envelope that included all of the measures included in the current study. Once participants completed the forms they were asked to return all materials to the original envelope and deposit the envelope in a box. Spanish-speaking members of the research team were

⌂ Springer

**Table 1** Demographic and descriptive statistics

| Variable | Control (n = 52) | Parent fighting deportation (n = 20) | Parent deported (n = 23) |
|---|---|---|---|
| Sex | | | |
| Male: n | 29 | 10 | 13 |
| Female: n | 23 | 10 | 10 |
| Age | | | |
| M (SD) | 8.4 (2.0) | 9.8 (1.9) | 9.3 (1.7) |
| Family income | | | |
| <$30,000 (n) | 43 | 18 | 17 |
| More than $30,000 (n) | 9 | 1 | 3 |
| Not reported | 0 | 1 | 3 |
| Parents' marital status | | | |
| Married (n) | 18 | 14 | 6 |
| Never married (n) | 16 | 5 | 7 |
| Other (n) | 17 | 1 | 10 |
| Not reported | 1 | 0 | 0 |
| Child's nation of birth | | | |
| United States (n) | 45 | 17 | 21 |
| Other (n) | 7 | 3 | 2 |
| Mother's nation of birth | | | |
| Mexico (n) | 33 | 15 | 13 |
| Other (n) | 18 | 5 | 9 |
| Not reported (n) | 1 | 0 | 1 |
| Father's nation of birth | | | |
| Mexico (n) | 30 | 15 | 15 |
| Other (n) | 22 | 5 | 8 |
| Parent fighting or deported[a] | | | |
| Mother (n) | N/A | 9 | 5 |
| Father (n) | N/A | 22 | 16 |
| Both (n) | N/A | 5 | 2 |
| Child witness parental arrest | | | |
| Yes (n) | N/A | 2 | 3 |
| No (n) | N/A | 16 | 19 |
| Not reported | N/A | 2 | 1 |
| Trauma history | | | |
| Yes (n) | 25 | 8 | 8 |
| No (n) | 27 | 12 | 15 |
| Reporter's relationship to child | | | |
| Mother (n) | 46 | 14 | 15 |
| Father (n) | 6 | 6 | 2 |
| Other (n) | 0 | 0 | 6 |
| Child Behavior Checklist[b] | | | |
| Internalizing | | | |
| M (SD; 95 % CI) | 52.6 (14.0; 48.7–56.5) | 57.2 (13.3; 50.9–63.4) | 61.0 (15.8; 54.2–67.9) |

**Table 1** continued

| Variable | Control (n = 52) | Parent fighting deportation (n = 20) | Parent deported (n = 23) |
|---|---|---|---|
| Externalizing | | | |
| M (SD; 95 % CI) | 49.7 (12.1; 46.3–53.1) | 48.5 (11.6; 43.0–53.9) | 58.1 (14.5; 51.8–64.4) |

*PTS* posttraumatic stress

[a] A number of children had a parent deported and the other parent fighting deportation. These children are included in both columns in this category

[b] Child Behavior Checklist scores are reported in T-scores ($M = 50$, $SD = 10$)

available to help explain individual items to the participants, but the forms were not administered in an interview format. Debriefing information, including a list of mental health resources that were sensitive to the needs of undocumented immigrants, was provided to participants after completing the forms. This project was approved by a university Institutional Review Board.

Measures

*Demographic Form*

A demographic form was completed by all caregivers that asked specifically about the deportation history of each biological parent. Participants were required to identify whether each parent was currently deported, fighting a deportation order through legal proceedings, or neither. In addition, participants were asked to identify the child's country of birth, the country of birth of each parent, and other details related to immigration and deportation history, as well as standard demographic questions pertaining to socioeconomic status, marital status, sex, and other demographic variables. The demographic form was composed in English and translated into Spanish by a native Spanish-speaking individual. Back-translation of this instrument was completed by a separate native Spanish-speaking individual and discrepancies were discussed and resolved to yield the final instrument.

*Child Behavior Checklist (CBCL; Achenbach and Rescorla 2001)*

The CBCL is a broad-band measure of child emotional and behavioral problems. The parent-rating form used in this

AR2022_500337

study has 113 items and asks the parent or primary caregiver to rate the frequency with which their child experiences a variety of symptoms on a 3-point Likert-type scale (0 = not true; 1 = somewhat or sometimes true; 2 = very true or often true). The current study utilized the Externalizing (e.g., aggression, conduct problems) and Internalizing (e.g., depression, anxiety) composite scores. To account for possible language barriers among the participants, the Spanish version of the CBCL was used. The CBCL is one of the most widely-used measures of childhood emotional and behavioral problems and is considered one of the most used internationalized instruments (Albores-Gallo et al. 2007). Initial internal reliability (Cronbach alpha) studies of the Spanish-version yielded estimates between .89 and .94 for the internalizing and externalizing scales among a group of Puerto Rican children (Rubio-Stipec 1990). A more recent study reported similar reliability findings (Cronbach alpha coefficients between .90 and .97) among a group of Mexican children (Albores-Gallo et al. 2007). In addition, the Spanish version of the CBCL demonstrated sufficient validity with the samples in these studies.

### UCLA PTSD Reaction Index (UCLA-PTSD-RI) Trauma History Checklist (Steinberg et al. 2004)

The UCLA-PTSD-RI is a caregiver-report measure of posttraumatic stress in children and adolescents. The first part of the instrument is a trauma history checklist that asks caregivers to identify whether the child has experienced each of 13 types of traumatic events in a yes/no format. The UCLA-PTSD-RI was selected for this study because of the availability of a Spanish language version of the measure. Although the UCLA-PTSD-RI includes a scale measuring posttraumatic stress, caregivers only complete these items if they identified a history of traumatic events. As such, only the trauma history checklist was used in this study to assess the experience of traumatic events not directly related to parental deportation, and participants were coded as either having experienced or not having experienced traumatic events.

### Analysis Plan

The method of the current project yielded 3 separate and exclusive groups of children: Parent Deported (either parent is currently deported from the U.S., $n = 23$), Parent Fighting Deportation (either parent is currently fighting deportation from the U.S., but neither parent is currently deported, $n = 20$), and Control (neither parent is currently deported or fighting deportation from the U.S., $n = 52$). The nature of these groups allows for examination of the impact of parental deportation, as well as the impact of stress incurred as a result of a parent fighting possible deportation through legal proceedings. Two hierarchical regression analyses were performed; one analysis for externalizing problems and one analysis for internalizing problems. Demographic variables (e.g., sex, family income, trauma history) identified as possibly related to the outcome variables during initial analyses were entered in the first step of each hierarchical regression analysis. In the second step, the three deportation groups were entered as dummy-coded variables, with the control group serving as the referential group (Dummy 1: "parent fighting deportation" group, Dummy 2: "parent deported" group).

### Results

#### Demographic Analyses

Initial analyses were completed to determine the potential impact of demographic variables on mental health outcomes. Analyses of demographic differences between the groups found no significant differences for sex ($\chi^2 = .23$, ns), family income ($\chi^2 = 1.66$, ns), child's nation of birth ($\chi^2 = .46$, ns), mother's nation of birth ($\chi^2 = 1.21$, ns), father's nation of birth ($\chi^2 = 1.92$, ns) or experience of traumatic events ($\chi^2 = 1.25$, ns). However, a significant difference was observed for age [$F$ (2, 92) = 4.4, $p = .015$], with post hoc LSD analyses showing that the control group was significantly younger than the "parent fighting deportation" group ($p = .008$). In addition, significant results were obtained for the marital status variable ($\chi^2 = 11.82$, $p = .019$), with the Parent Deported group showing a greater likelihood of parental divorce, separation, and/or widowing than the other two groups. The demographic compositions of the individual groups are presented in Table 1.

Although the three groups appear fairly similar on most demographic variables, the relatively small sample sizes of the "parent deported" and "parent fighting deportation" groups may result in minor differences in group demographic compositions prompting significant differences in mental health outcomes. As such, the relationships between demographic variables and mental health outcomes were examined and any demographic variable found to significantly relate to the internalizing or externalizing problems is controlled in later analyses examining the impact of parental deportation status.

First, sex differences were observed for both of the mental health outcomes: internalizing problems [$t(93) = 2.33$, $p = .022$] and externalizing problems [$t(93) = 2.47$, $p = .015$]. In each instance boys received more elevated scores than girls. Second, age was only significantly correlated with internalizing problems ($r = .23$, $p = .028$). Lastly, the experience of traumatic events was related to

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 338 of 990

Springer



**Table 2** Regression analyses examining mental health outcomes

| Variable | Internalizing problems | Externalizing problems |
|---|---|---|
| Step 1: (standardized $\beta$) | | |
| Sex | −.24* | −.25* |
| Age | .24* | – |
| Trauma history | .26** | – |
| Model $R^2$ | .19 | .06 |
| Model $F$ | 7.05*** | 6.08* |
| Step 2: (standardized $\beta$) | | |
| D1: parent fighting deportation | .11 | −.03 |
| D2: parent deported | .25* | .28** |
| Model $R^2$ | .24 | .14 |
| Model $F$ | 5.66*** | 5.05** |
| $\Delta R^2$ | .05 | .08 |
| $\Delta F$ | 3.09* | 4.31** |

* $p < .05$; ** $p < .01$; *** $p < .001$

internalizing problems only $[t(93) = -3.08, \ p = .003]$. Other demographic variables were not related to mental health outcomes.

Regression Analyses

The first hierarchical regression analysis examined the impact of parental deportation status on internalizing problems. The first step of the analysis found that sex, age, and trauma history accounted for 19 % of the variance (see Table 2). The addition of parental deportation status in the second step accounted for an additional 5 % of variance, a statistically significant improvement over the first model $(\Delta F = 3.09, \ p = .05)$. Children in the "parent deported" group displayed significantly higher levels of internalizing symptoms than children in the control group ($\beta = .25$, $t = 2.47$, $p = .015$).

The second hierarchical regression analysis examined externalizing problems. Sex was the only demographic variable entered in the first step (see Table 2). The addition of parental deportation status significantly increased the amount of variance accounted for, from 6 % in the first step to 14 % in the second step ($\Delta F = 4.31$, $p = .016$). As before, having a parent deported emerged as the most influential factor ($\beta = .28$, $t = 2.72$, $p = .008$).

**Discussion**

The issue of parental deportation will likely remain a heatedly debated topic. The current study can inform that debate by providing data describing the relationship of parental deportation and child emotional and behavioral concerns as measured by a standardized, objective, and psychometrically defensible assessment measure. The hypotheses of the current study were supported: children with a deported parent were more likely to demonstrate elevated levels of internalizing and externalizing problems than children without a deported parent. Especially relevant is that these analyses controlled for the impact of associated demographic variables and trauma history.

Although unfortunate, the results of the current study are not altogether surprising. Indeed, prior studies have suggested that parental deportation exerts a detrimental impact on the emotional and behavioral functioning of children (Baum et al. 2010; Brabeck and Xu 2010; Dreby 2012). Placed within the larger developmental context, the importance of a supportive primary caregiver for the adaptive development of social and emotional capabilities is well established (Sroufe et al. 2005; Thompson et al. 2006). Removing that caregiver from the child may result in aberrant development, increased stress as a result of losing a primary social support, and concern about the well-being of the parent.

Although the current study cannot make specific public policy recommendations, it should raise awareness of the potential impact of parental deportation on social and public health systems. From a prevention perspective, it appears imperative that attempts are made to preserve the parent–child relationship during instances when undocumented immigrants are identified by governmental agencies. In situations when the relationship is not preserved as a result of deportation, the remaining children may face a multitude of barriers in accessing medical and mental health care (Henderson and Baily 2013). For instance, Hispanic youth, including immigrants, utilize mental health services at significantly lower rates than other populations (Kataoka et al. 2002) and the causes appear complex (Bridges et al. 2010). However, untreated child mental health problems may persist or exacerbate and eventually burden residential treatment facilities, psychiatric hospitals, and the criminal justice system. A comprehensive public health policy that addresses identifiable barriers to accessing evidence-based treatment services for the children of deported parents should be a priority.

It is important to recognize the limitations of the current study. Most notable is the relatively small sample size. The "parent deported" group had only 23 children, while the "parent fighting deportation group" had only 20 children. It is interesting to note that the effect sizes were of such magnitude that even with the small sample sizes, statistical significance was achieved. However, studies with larger sample sizes would yield greater confidence in generalizing these findings. There also is an obvious selection bias in the sample. As mentioned previously, a large number of


**AR2022_500339**

potential participants declined participation, some after showing initial interest. It is possible that a specific qualitative difference exists between those who chose to participate and those who did not, and that this difference may impact the obtained results. In addition, the cross-sectional nature of this study prevents implying causal pathways. Lastly, it was not possible to obtain child self-report measures, and it might be expected that the children would provide differing results than their caregivers (Canavera et al. 2009; Hartley et al. 2011).

As discussed throughout this report, numerous difficulties were encountered; foremost among these factors were the significant distrust of researchers by potential participants and the near uniform refusal of the caregivers to allow access to the children of interest. Recent deportation suspensions by the federal government may offer an opportunity to address some of these concerns. However, given the often temporary nature of political policy shifts, the window available for researchers to take advantage of this occasion may be limited. Future research should attempt to remedy the shortcomings of the current study and do so within the current political atmosphere.

Despite the limitations of the current study, the data obtained suggests potentially significant emotional and behavioral consequences to the child when a parent is deported and the child stays in the country. There are an estimated 5.5 million children in the United States with undocumented parents, and 75 % of these children are natural born U.S. citizens (Chaudry et al. 2010). These numbers suggest that millions of children in the United States are at risk for experiencing the impact of parental deportation, and the current study suggests that children of deported parents are at increased risk for a multitude of emotional and behavioral problems. It is vital that U.S. immigration policy provides a coherent and effective approach for attending to the emotional and behavioral needs of children whose parents are undocumented immigrants.

## References

Achenbach, T. M., & Rescorla, L. A. (2001). *Manual for the ASEBA school-age forms and profiles*. Burlington, VT: University of Vermont, Research Center for Children, Youth, and Families.

Albores-Gallo, L. L., Lara-Muñoz, C. C., Esperón-Vargas, C. C., Zetina, J., Soriano, A., & Colin, G. (2007). Validez y fiabilidad del CBCL/6-18. Incluye las escalas del DSM. (Spanish). *Actas Españolas De Psiquiatria, 35*, 393–399.

Baum, J., Jones, R., & Barry, C. (2010). In the child's best interest? The consequences of losing a lawful immigrant parent to deportation. Retrieved from the University of California Davis Law School website: http://www.law.ucdavis.edu/news/images/childsbestinterest.pdf.

Belskey, J., & Fearon, R. M. (2002). Early attachment security, subsequent maternal sensitivity, and later child development: Does continuity in development depend upon continuity of caregiving? *Attachment and Human Development, 4*, 361–387.

Bowlby, J. (1973). *Separation: Anxiety and anger*. New York: Basic Books.

Brabeck, K., & Xu, Q. (2010). The impact of detention and deportation on Latino immigrant children and families: A quantitative exploration. *Hispanic Journal of Behavioral Sciences, 32*, 341–361.

Bridges, A. J., de Arellano, M. A., Rheingold, A. A., Danielson, C. K., & Silcott, L. (2010). Trauma exposure, mental health, and service utilization rates among immigrant and United States-born Hispanic youth: Results from the Hispanic family study. *Psychological Trauma: Theory, Research, Practice, and Policy, 2*, 40–48.

Canavera, K. E., Wilkins, K. C., Pincus, D. B., & Ehrenreich-May, J. T. (2009). Parent-child agreement in the assessment of obsessive-compulsive disorder. *Journal of Clinical Child and Adolescent Psychology, 38*, 909–915.

Chaudry, A., Capps, R., Pedroza, J. M., Castañeda, R. M., Santos, R., & Scott, M. M. (2010). *Facing our future: Children in the aftermath of immigration enforcement*. The Urban Institute. Retrieved from http://www.urban.org/uploadedpdf/412020_FacingOurFuture_final.pdf.

Contreras, J. M., Kerns, K. A., Weimer, B. L., Gentzler, A. L., & Tomich, P. L. (2000). Emotion regulation as a mediator of associations between mother-child attachment and peer relationships in middle childhood. *Journal of Family Psychology, 14*, 111–124.

Dreby, J. (2012). The burden of deportation on children in Mexican immigrant families. *Journal of Marriage and Family, 74*, 829–845.

Goodvin, R., Meyer, S., Thompson, R. A., & Hayes, R. (2008). Self-understanding in early childhood: Associations with child attachment security and maternal negative affect. *Attachment and Human Development, 10*, 433–450.

Hartley, A. G., Zakriski, A. L., & Wright, J. C. (2011). Probing the depths of informant discrepancies: Contextual influences on divergence and convergence. *Journal of Clinical Child and Adolescent Psychology, 40*, 54–66.

Henderson, S. W., & Baily, C. D. R. (2013). Parental deportation, families, and mental health. *Journal of the American Academy of Child and Adolescent Psychiatry, 52*, 451–453.

Hoffman, H. F. (1934). A study of fifty state hospital children. *Proceedings of the American Association on Mental Deficiency, 39*, 273–282.

Kataoka, S. H., Zhang, L., & Wells, K. B. (2002). Unmet need for mental health care among U.S. children: Variation by ethnicity and insurance status. *American Journal of Psychiatry, 159*, 1548–1555.

Lester, P., Peterson, K., Reeves, J., Knauss, L., Glover, D., Mogil, C., et al. (2010). The long war and parental combat deployment: Effects on military children and at-home spouses. *Journal of the American Academy of Child and Adolescent Psychiatry, 49*, 310–320.

Murray, J., Farrington, D. P., & Sekol, I. (2012). Children's antisocial behavior, mental health, drug use, and educational performance after parental incarceration: A systematic review and meta-analysis. *Psychological Bulletin, 138*, 175–210.

North, D. (2011). Just how does an anchor baby anchor the illegal alien parent? [Web log post]. Retrieved from http://www.cis.org/north/anchor-baby-mechanisms.

Rubio-Stipec, M. (1990). The internal consistency and concurrent validity of a Spanish translation of the child behavior checklist. *Journal of Abnormal Child Psychology, 18*, 393–406.

AR2022_500340

Sroufe, L. A., Egeland, B., Carlson, E. A., & Collins, W. A. (2005). *The development of the person: The Minnesota study of risk and adaptation from birth to adulthood*. New York: Guilford.

Steinberg, A. M., Brymer, M. J., Decker, K. B., & Pynoos, R. S. (2004). The University of California at Los Angeles PTSD stress reaction index. *Current Psychiatry Reports, 6*, 96–100.

Thompson, R. A., Flood, M. F., & Goodvin, R. (2006). Social support and developmental psychopathology. In D. Cicchetti & D.

Cohen (Eds.), *Developmental psychopathology* (2nd ed.): *Vol. III. Risk, disorder, and adaptation*. New York: Wiley.

US Department of Homeland Security, Immigration and Customs Enforcement. (2011). Retrieved from http://www.ice.gov/news/releases/1110/111018washingtondc.htm.

Wessler, S. F. (2011). U.S. deports 46 K parents with citizen kids in just six months. Retrieved from http://colorlines.com/archives/2011/11/shocking_data_on_parents_deported_with_citizen_children.html.

 Springer

**AR2022_500341**

View publication stats

J Popul Econ (2017) 30:339–373
DOI 10.1007/s00148-016-0606-z



ORIGINAL PAPER

# Schooling and labor market effects of temporary authorization: evidence from DACA

Catalina Amuedo-Dorantes[1] · Francisca Antman[2]

Received: 30 November 2015 / Accepted: 21 July 2016 / Published online: 4 August 2016
© Springer-Verlag Berlin Heidelberg 2016

**Abstract** This paper explores the labor market and schooling effects of the Deferred Action for Childhood Arrivals (DACA) initiative, which provides work authorization to eligible immigrants along with a temporary reprieve from deportation. The analysis relies on a difference-in-differences approach which exploits the discontinuity in program rules to compare eligible individuals to ineligible, likely undocumented immigrants before and after the program went into effect. To address potential endogeneity concerns, we focus on youths that likely met DACA's schooling requirement when the program was announced. We find that DACA reduced the probability of school enrollment of eligible higher-educated individuals, as well as some evidence that it increased the employment likelihood of men, in particular. Together, these findings suggest that a lack of authorization may lead individuals to enroll in school when working is not a viable option. Thus, once employment restrictions are relaxed and the opportunity costs of higher education rise, eligible individuals may reduce investments in schooling.

**Keywords** Undocumented immigrants · Work authorization

**JEL classification** J15 · J61 · J2 · J3

*Responsible editor*: Klaus F. Zimmermann

✉ Francisca Antman
  Francisca.Antman@colorado.edu

  Catalina Amuedo-Dorantes
  camuedod@mail.sdsu.edu

[1] Department of Economics, San Diego State University, 5500 Campanile Dr., San Diego, CA 92182, USA

[2] Department of Economics, University of Colorado Boulder, 256 UCB, Boulder, CO 80309, USA

## 1 Introduction

Immigration reform is again the subject of heated debate in the American political system, media, and public at large. One of the most contentious issues is whether immigration reform should include a path to citizenship for unauthorized immigrants already in the USA—a population estimated to be about 11.7 million in 2012 (Passel et al. 2013). Within this debate, special attention has been paid to whether a path to legalization should be offered to unauthorized immigrants who came to the USA as children. Advocates of these youths have pushed forward variants of the *Development, Relief, and Education for Alien Minors* (DREAM) *Act* over the past decade. As immigration reform and DREAM Act legislation stalled at the national level, on 15 June 2012, President Barack Obama announced that his administration would practice prosecutorial discretion for individuals meeting a set of criteria very similar to those proposed in the most recent version of the DREAM Act (Preston and Cushman Jr 2012).[1] Under this program, individuals approved for consideration of deferred action are granted a renewable 2-year reprieve from deportation proceedings and become eligible for work authorization in the USA.

In this paper, we exploit the implementation of DACA to revisit a topic of great concern in the immigration debate—the extent to which work authorization can affect the schooling and labor market outcomes of undocumented workers.[2] In principle, the expected impact of DACA on these outcomes is uncertain. One might expect that eligible individuals will be more likely to be employed given that the work authorization relaxes the employment constraints faced by undocumented migrants. However, most of these individuals might have already been working informally, in which case, the work authorization granted by DACA might have little impact on their employment likelihood.[3] The anticipated effect of DACA on schooling is similarly difficult to pin down. Proponents of DREAM Act legislation have often argued that authorization incentivizes previously undocumented youths to invest more in schooling since it allows them to more fully reap the rewards of education (National Immigration Law 2005; Immigration Policy 2012). Nevertheless, undocumented youths are likely to heavily discount future earnings and may only view schooling as a second-best alternative to working given the less stringent legal requirements to register in school. Thus, DACA could represent an increase in the opportunity cost of schooling for eligible individuals and, consequently, lead to a drop in schooling investments by individuals who already meet DACA's educational eligibility requirements.[4] Additionally, uncertainty about the continuity of the program under future administrations may

---

[1] DACA eligibility rules are outlined in Sect. 2 below.

[2] Given the policy significance of DACA, interested parties have begun surveying DACA applicants to measure its impacts. Notably, Gonzales and Bautista-Chavez (2014) report that almost 60 percent of survey respondents found a new job, even though most were already at work prior to DACA. School enrollment effects are not reported. Nonetheless, lack of information on the selection of survey participants and on survey non-response rates make it difficult to compare their findings with those reported here.

[3] It may be seen in other labor market outcomes, however, such as wages and type of occupation. We also explore these outcomes below.

[4] This is analogous to the explanation offered in Charles et al. (2013), who suggest that housing booms resulted in an increase in the opportunity cost of college and thus an observed drop in enrollments at community colleges. Similar effects of local labor market conditions on educational attainment are found in Evans and Kim (2008) and Black et al. (2005).



**AR2022_500343**

have curbed its overall impacts. These ambiguities underscore the importance of examining the empirical questions we look at herein.

DACA provides a special opportunity to make these assessments because the recovery of the causal effect of work authorization on schooling and labor market outcomes is generally plagued with self-selection and endogeneity concerns. Put simply, those individuals who choose to pursue and ultimately obtain work authorization are likely to be different from those that do not in unobservable ways, which are also correlated with their labor market performance. Thus, a naïve comparison of the labor market outcomes of individuals that have obtained work authorization and of individuals who have not will generally fail to reveal a causal impact.

We avoid these problems by adopting a quasi-experimental approach that relies on an intent-to-treat strategy and compares individuals who were eligible for the DACA program to other likely undocumented immigrants who were not eligible before and after the policy went into effect. To bolster the case that our estimates are driven by plausibly exogenous variation and simplify the interpretation, we also present results which exploit the discontinuity in a single eligibility rule. While information on legal status is not observable to us, we begin with a sample of foreign-born non-citizens and, subsequently, perform robustness checks focusing on populations more likely to be undocumented, such as Hispanic and Mexican non-citizens. To get around the endogeneity of schooling choice inherent in the DACA-eligibility rules, we also focus on youths that would likely have met DACA's schooling eligibility requirement at the time the program was announced. According to Batalova et al. (2013), an estimated 76 % of DACA-eligible youth have earned a high school diploma or its equivalent, making this a sensible restriction. Furthermore, to alleviate any remaining concerns regarding the likely unauthorized immigration status of non-DACA-eligible individuals in our control group, we also perform robustness checks that restrict the analysis to foreign-born non-citizens with more than 5 years of US residency—typically the maximum duration of student visas.

Our paper is similar in spirit to the study by Gathmann and Keller (2013), who examine the returns to citizenship in Germany by evaluating the impact of a change in program rules that affected eligibility for citizenship. More broadly, this research is also closely related to the wider discussion about the goals of immigration policy in developed nations and how labor market outcomes vary with migrants' legal status (see, for example, Constant and Zimmermann 2005a, b). In this case, however, we explore the returns to obtaining a 2-year reprieve from deportation and work authorization relative to the counterfactual of remaining unauthorized—a more relevant policy concern in the USA today owing to its large population of undocumented immigrants. In this sense, our study also shares much in common with the literature examining the impact of legalization under the 1986 Immigration Reform and Control Act (IRCA) on immigrants' labor market outcomes (see, for example, Rivera-Batiz 1999; Kossoudji and Cobb-Clark 2002; Amuedo-Dorantes et al. 2007). Of course, one important distinction between IRCA and DACA is that the latter favored relatively young and educated immigrants. Thus, one might expect the schooling impacts of legalization which were under-studied after IRCA to be of greater interest under DACA. Given the uncertainty surrounding the continuity of DACA, as well as the millions of undocumented immigrants that have arrived in the two and a half decades between the two reforms, one may also question whether similar impacts should be expected.

We find that, despite the short time period that has elapsed since the enactment of DACA, the policy has already had a significant impact on eligible individuals. In particular, we find evidence that the program reduced the probability of school enrollment of eligible higher-educated individuals and that it increased the likelihood of employment among eligible men. Together, these results suggest that undocumented individuals may over-invest in education in the absence of legal work permits, so that when a program such as DACA is implemented, employment outcomes may improve while school enrollments fall. This is consistent with an increased opportunity cost of college education for eligible individuals once DACA went into effect.

The paper is organized as follows. Section 2 describes the DACA program in greater detail, focusing on its enactment, eligibility requirements, as well as on its application and approval rates. Section 3 describes the data and presents summary statistics on the sample used in the analysis, while Sect. 4 outlines our empirical strategy, and Sect. 5 presents our findings on the impact that DACA is having on the schooling and labor market outcomes of eligible undocumented youth. We also present the results of a separate identification strategy where we exploit only the age at arrival eligibility criterion to simplify the results and interpretation. We find that the impact of DACA on eligible individuals is similar regardless of the empirical approach, thus suggesting that our main results are driven by exogenous variation. In Sect. 6, we perform a series of robustness checks to (a) confirm the lack of pre-existing trends prior to the implementation of DACA, (b) ensure that we are likely dealing with undocumented immigrants and DACA applicants by focusing our attention to individuals with characteristics of actual DACA applicants (such as their state of residency, ethnicity and time in the USA), and, lastly, (c) experiment with different assumptions regarding the effective date of treatment. Finally, Sect. 7 summarizes our main findings and concludes the paper.

## 2 Background

As mentioned above, DACA's roots are closely tied to DREAM Act proposals, which preceded DACA by over a decade. Nevertheless, the timing and political context in which DACA was announced cannot be overlooked. Its origins lie in the lead up to the presidential election in late 2012, which resulted in a battle for Latino votes in the face of a potential alternative to the DREAM act presented by Mr. Obama's challengers (Wallsten 2012). All this contributed to a political environment in which DACA was announced suddenly and implemented swiftly. For purposes of evaluating the impact of DACA, this suggests that there were relatively little anticipation effects leading up to the program's announcement.

Although DACA does not offer the more permanent immigration status embedded in DREAM Act proposals, it does provide qualified individuals with a 2-year reprieve from deportation proceedings and the ability to obtain work authorization in the USA. At the expiration of the 2-year period, program beneficiaries can apply for a renewal of their DACA status, with renewals issued in 2-year increments. Eligibility rules under DACA also closely mirror those suggested in variants of DREAM Act legislation. Namely, US Citizenship and Immigration Services (USCIS) stipulates that an individual eligible for DACA must (1) be under the age of 31 as of 15 June 2012; (2) have



**AR2022_500345**

arrived in the USA before reaching his 16th birthday; (3) have continuously resided in the USA since 15 June 2007, up until the time of application; (4) have been physically present in the USA on 15 June 2012 and at the time of making the request for deferred action with USCIS; (5) have entered without inspection prior to 15 June 2012 or had his lawful immigration status expired by that date; (6) be currently in school, have graduated from high school or obtained an equivalent degree, or have been honorably discharged from the Coast Guard or Armed Forces of the USA; and (7) have no criminal records or pose a threat to national security or public safety.[5] For purposes of the analysis, we focus on those eligibility criteria observable to researchers given the data available—namely, age as of 2012, age at arrival in the USA, arrival prior to June 2007, and educational attainment/enrollment. These are also likely to be the most relevant determinants of eligibility from a practical point of view.

A final note that is critical for the analysis concerns the date of implementation of the DACA program, which defines the dividing line between the pre- and post-DACA periods. Although USCIS began to accept DACA applications on 15 August 2012, relatively few cases were actually approved until October 2012 (Passel and Lopez 2012; Batalova et al. 2013). Figure 1 shows the number of approved DACA cases in the year after applications were first accepted in August 2012. As highlighted in the figure, only 1687 cases were approved in September 2012, whereas in excess of 28,000 were approved each month thereafter (Department of Homeland Security, U.S. Citizenship and Immigration Services 2013). Hence, except in some robustness checks, we define the Post-DACA period as October 2012 onwards.

## 3 Data and descriptive statistics

### 3.1 Sample considerations

To evaluate how DACA is impacting the schooling, employment, and wages of eligible youth, we use individual micro-level data from the monthly Current Population Survey (CPS) spanning from January 2000 through March 2014. The CPS provides detailed information on the labor force status, hourly wages, educational attainment, race/ethnicity, and other basic demographics, such as the decade of arrival for those born outside the USA. With regard to information on current schooling investments, the CPS is more limited. Over the time period being examined, the CPS asks only if individuals between the ages of 16 and 24 were enrolled in high school, college, or university at the time of the survey. Respondents who answer *yes* were then asked whether they enrolled full or part time.

As our focus is on the impact of DACA on schooling investments and labor market outcomes of eligible youth, we limit the sample to working-age individuals who were asked about schooling in the CPS—namely 16- to 24-year olds. Furthermore, since one of DACA's eligibility requirements has to do explicitly with schooling, we must also ensure that our estimate of the impact of DACA is not confounded by any selection into schooling. With that aim, we further restrict our sample to individuals 18 to 24 years

---

[5] For greater details, visit the section entitled: "Consideration of deferred action for childhood arrivals process" at http://www.uscis.gov.



**Fig. 1** Number of DACA applications approved over time. Source: USCIS, data available at http://www.
uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20
Data/All%20Form%20Types/DACA/daca-13-8-15.pdf

old who likely met the DACA schooling eligibility requirement as of its announcement. Since we do not have information on the year in which respondents earned their high school degree or GED, we assume the vast majority did so by age 18. Focusing on 18- to 24-year olds ensures that the schooling and employment-related impacts of DACA we observe are not driven by individuals' decision to pursue schooling in order to qualify for deferred deportation itself and the potential endogeneity issues which that implies.[6] Additionally, it encompasses the broadest group of DACA applicants, who are on average 20 years old (Wong et al. 2013).

One useful feature of the CPS is that it contains information on the type of occupation in which respondents are employed. We make use of these data by grouping occupations into high- and low-skill occupations.[7] This classification will enable us to test whether DACA permitted eligible individuals to move into higher-skill occupations—where verification of legal status and higher compensation may be more likely. On the other hand, DACA may have reduced eligible individuals' tendencies to get a high-skilled job if they rushed into getting a job and placed their plans for a post-secondary education on hold.

---

[6] Our results are substantially similar if we use a slightly older age cutoff and restrict the sample to individuals ages 20 to 24 with a high school or GED degree. Nevertheless, we present the results for the larger group of 18- to 24-year olds with a high school degree or GED to preserve sample size.

[7] For example, we place "computer and mathematical sciences occupations" in the high-skill category and "food preparation and serving related occupations" in the low-skill category. The full classification of occupations into high and low skill can be found in Appendix 1.



### 3.2 Capturing undocumented immigrants and DACA applicants

One important limitation of the CPS is that it lacks sensitive information on individuals' legal status. Consequently, it is reasonable to question whether the ineligibles in our sample consist of an undocumented control group, especially given that the undocumented are traditionally less educated than the sample we work with. As such, some may be concerned that the control group may be made up of individuals who immigrated with the purpose of getting an educational degree in the USA, as is the case with F1 and J1 visa holders. [8]

To address this concern, in a series of robustness checks, we further restrict our attention to a group of immigrants previously shown to be a good representation of the most likely unauthorized. In that regard, Passel and Cohn (2009, 2010) show that almost three quarters of unauthorized immigrants are Hispanics, with Mexican-origin individuals comprising the majority of the population of unauthorized immigrants (almost 60 %). Therefore, we also perform the analysis for Hispanic non-citizens and, subsequently Mexican non-citizens.

An additional concern when assessing the impact of DACA using the CPS is that we do not observe actual participation in the program. Thus, some may question whether the DACA-eligible treatment group we identify is actually representative of DACA applicants. Note, however, that our treatment group not only fulfills a collection of DACA-eligibility requirements but also displays demographic characteristics that align with the ones reported of DACA applicants. The latter include having arrived in the USA at an early age, holding at least a high school degree, and having long US residencies.

Still, in Sect. 6, we experiment with restricting our attention to non-citizens residing in states with large populations of DACA applicants,[9] as well as focusing on Hispanic and Mexican non-citizens—a particularly useful trait as the vast majority of DACA applicants are Hispanic and close to three quarters of them were born in Mexico (Singer and Svajlenka 2013). Note that, while all these restrictions bring our sample in line with those individuals who applied for DACA, they also increase the likelihood that both eligible and ineligible individuals in our sample are undocumented immigrants. As such, restricting our sample to individuals with DACA-applicant characteristics will not only narrow the control group to a group that is more likely to be undocumented, but also narrow the treatment group to a group that were actually granted authorization under DACA.

Finally, some may be concerned with using the October 2012 cutoff date, as it was neither the DACA announcement date nor its implementation date. To address this concern, we also experiment with using the DACA announcement date of June 2012,

---

[8] Foreign students with F1 and J1 visas are allowed to stay in the USA for the duration of the academic program they are admitted to, which is typically listed in the arrival-departure Form I-94 (now automated). If no specific date is listed in the I-94 Form, their admission stamp will indicate: duration of status ("D/S"), and they will be allowed to stay in the USA as long as they are pursuing a full course of study (12 units for undergraduates/8 units for graduates per semester) and making normal progress toward completing their academic program. The I-20 for F1 students and the DS-156 for J1 students tell exactly how long the academic program will take.

[9] These states are California, Texas, New York, Illinois, Florida, North Carolina, Arizona, Georgia, and New Jersey.

as well as the DACA implementation date of August 2012 (at which time applications were first received), as the onset of treatment. As both of these alternative treatment dates come before the October 2012 treatment date we use in most of the analysis, results observed under these alternative dates support the interpretation that the announcement and implementation of DACA resulted in changes in behavior consistent with the anticipation of the work authorization that would later be granted.

### 3.3 Descriptive statistics

Table 1 displays some of the characteristics of the likely unauthorized group under analysis: foreign-born non-citizens ages 18 to 24 with a high school or GED degree that was likely earned prior to the announcement of DACA. It splits the sample by eligibility status before and after DACA, allowing us to compare the samples of eligible and ineligibles before DACA went into effect. As can be seen in Table 1, there are differences across these so-called treatment and control groups. Nevertheless, they are tied to the characteristics shaping eligibility in the first place. For instance, prior to DACA, eligible individuals were slightly

**Table 1** Descriptive statistics by eligibility status pre- and post-DACA (sample: all non-citizen 18–24 years of age with a high school diploma or GED)

|  | Pre-DACA period | | | | Post-DACA period | | | |
|  | Non-eligible group | | Eligible group | | Non-eligible group | | Eligible group | |
|  | Mean | S.D. | Mean | S.D. | Mean | S.D. | Mean | S.D. |
|---|---|---|---|---|---|---|---|---|
| Eligible | 0.000 | 0.000 | 1.000 | 0.000 | 0.000 | 0.000 | 1.000 | 0.000 |
| Age at arrival | 17.423 | 4.449 | 8.616 | 4.600 | 19.913 | 2.265 | 7.594 | 4.213 |
| Years in the USA | 4.568 | 4.419 | 12.134 | 4.748 | 2.093 | 1.859 | 13.626 | 4.266 |
| Male | 0.516 | 0.500 | 0.504 | 0.500 | 0.490 | 0.500 | 0.490 | 0.500 |
| White | 0.403 | 0.491 | 0.685 | 0.465 | 0.406 | 0.492 | 0.789 | 0.408 |
| Black | 0.064 | 0.246 | 0.081 | 0.273 | 0.124 | 0.330 | 0.080 | 0.271 |
| Age | 21.991 | 1.734 | 20.743 | 1.844 | 22.007 | 1.679 | 21.214 | 1.921 |
| Married | 0.250 | 0.433 | 0.152 | 0.359 | 0.193 | 0.395 | 0.152 | 0.359 |
| Number of children | 0.213 | 0.569 | 0.187 | 0.524 | 0.154 | 0.498 | 0.207 | 0.576 |
| High school | 0.495 | 0.500 | 0.517 | 0.500 | 0.308 | 0.462 | 0.528 | 0.500 |
| More than high school | 0.505 | 0.500 | 0.483 | 0.500 | 0.692 | 0.462 | 0.472 | 0.500 |
| Any state immigration enforcement | 0.120 | 0.325 | 0.188 | 0.391 | 0.269 | 0.444 | 0.321 | 0.467 |
| In-state tuition policy state | 0.248 | 0.432 | 0.465 | 0.499 | 0.531 | 0.500 | 0.550 | 0.498 |
| State unemployment rate | 5.528 | 1.889 | 6.754 | 2.533 | 6.598 | 1.416 | 6.808 | 1.458 |
| Observations | 6672 | 3893 | 461 | 527 | | | | |

younger (20.7 versus 22 years of age), had spent significantly more years in the USA (12 versus 4.6 years), and had arrived to the country at a much younger age (8.6 years of age versus 17.4 years of age) than their non-eligible counterparts. Because of the aforementioned differences in the eligibility criteria, it also makes sense that the two groups would differ with regards to their likelihood of being married and the number of children they might have. However, differences in other demographic characteristics, such as race and gender, as well as in the characteristics of the states where they reside, are smaller. Still, the analysis will explicitly account for all these characteristics and for unobserved heterogeneity through state fixed effects and state-specific time trends. In addition, we perform a number of robustness checks using restricted samples that are much more alike in terms of some of the more distinct dimensions, such as age, age at arrival, and the corresponding time in the USA.

Table 2 further informs about pre-existing differences in our outcomes of interest between the samples of eligible and ineligibles. Moreover, it reports preliminary difference-in-differences estimates by comparing outcome variables for eligible and ineligible individuals before and after DACA's implementation without controlling for any variables. There is a marked decline in the school enrollment and full-time school enrollment of eligible youths of about 8 percentage points from the pre- to post-DACA periods that is statistically significant at the 1 % level. At the same time, school enrollment and full-time school enrollment is rising at sizable levels for the non-eligible comparison group by around 20 percentage points over this period, resulting in a difference-in-difference estimate of a decline in schooling and a decline in full-time schooling of about 28 percentage points. We also observe a rise in 3.1 percentage points in the likelihood of employment for the eligible group; however, it is not statistically significant. Nevertheless, compared with the striking 18.3 percentage point decline in the employment rate of non-eligible youths over the same period, the difference-in-difference estimate is a rise in 21.5 percentage points that is statistically significant at the 1 % level. Thus, it seems that DACA effectively protects eligible youths from the employment decline seen for the non-eligible comparison group. The difference-in-difference estimates for the remaining outcomes (weekly work hours, wages, and high-skill occupation) are not statistically significant. At any rate, given the differences between eligible and non-eligible youths in Table 1, it remains to be seen whether the relatively strong results on schooling and employment seen in these summary statistics will survive once we account for their demographic characteristics and for state-level variation. The regression analysis presented below explores this question.

## 4 Methodology

Our main aim is to learn about how DACA is changing the schooling investments and labor market outcomes of eligible undocumented youth relative to those of similarly

348                                                                                                    C. Amuedo-Dorantes, F. Antman

**Table 2** Difference in differences (sample: all non-citizen 18–24 years of age with a high school diploma or GED)

| | Eligible youth | | | Non-eligible youth | | | DD (DT-DC) |
|---|---|---|---|---|---|---|---|
| | Pre-DACA | Post-DACA | DT | Pre-DACA | Post-DACA | DC | |
| Enrolled in school | 0.420 *(0.494)* | 0.342 *(0.475)* | −0.079*** **(0.023)** | 0.331 *(0.471)* | 0.527 *(0.500)* | 0.196*** **(0.023)** | −0.275*** **(0.032)** |
| | 3893 | 527 | 4420 | 6672 | 461 | 7133 | 11,553 |
| Full-time student | 0.347 *(0.476)* | 0.266 *(0.442)* | −0.081*** **(0.022)** | 0.273 *(0.445)* | 0.477 *(0.500)* | 0.205*** **(0.022)** | −0.285** **(0.031)** |
| | 3893 | 527 | 4420 | 6672 | 461 | 7133 | 11,553 |
| Employed | 0.574 *(0.495)* | 0.605 *(0.489)* | 0.031 **(0.023)** | 0.615 *(0.487)* | 0.432 *(0.496)* | −0.183*** **(0.023)** | 0.215*** **(0.033)** |
| | 3893 | 527 | 4420 | 6672 | 461 | 7133 | 11,553 |
| Weekly work hours | 34.576 *(10.978)* | 34.238 *(11.707)* | −0.338 **(0.706)** | 36.611 *(10.815)* | 34.674 *(12.492)* | −1.937** **(0.858)** | 1.599 **(1.112)** |
| | 1911 | 282 | 2193 | 2743 | 172 | 2915 | 5108 |
| Log real hourly wages | 2.311 *(0.383)* | 2.259 *(0.348)* | −0.052** **(0.024)** | 2.366 *(0.478)* | 2.296 *(0.389)* | −0.070 **(0.037)** | 0.018 **(0.044)** |
| | 1911 | 282 | 2193 | 2743 | 172 | 2915 | 5108 |
| High-skill occupation | 0.122 *(0.328)* | 0.113 *(0.318)* | −0.009 **(0.021)** | 0.183 *(0.387)* | 0.209 *(0.408)* | 0.026 **(0.031)** | −0.035 **(0.037)** |
| | 1911 | 282 | 2193 | 2743 | 172 | 2915 | 5108 |

Notes: Standard deviations are set in italics, and standard errors are set in bold. All regressions include a constant term. The number of observations is listed on the second row corresponding to each outcome

$*p < 0.1$; $**p < 0.05$; $***p < 0.01$

AR2022_500351

undocumented youth who prove ineligible for deferred deportation. With that aim in mind, we estimate the following benchmark regression:

$$
\begin{aligned}
Y_{ist} = {} & \alpha + \beta_1 (\text{DACA}_t \times \text{eligible}_{ist}) + \beta_2 \text{eligible}_{ist} + \beta_3 \text{HSplus}_{ist} \\
& + \beta_4 \text{YearsinUS}_{ist} + \sum_j \beta_{5,j} \text{Age}_{ijst} + X_{ist}\gamma + Z_{st}\lambda + \mu_s + \delta_t \\
& + \theta_s t + \varepsilon_{ist}
\end{aligned}
\tag{1}
$$

The dependent variable $Y_{ist}$ stands for the observed schooling or labor market outcome for individual $i$ in state $s$ in period $t$. Outcomes considered include whether the individual is currently enrolled in school, enrolled full-time, currently working, working in a high-skill occupation, and the log of real hourly wages as well as the usual weekly hours of work for those employed. $\text{DACA}_t$ is a dummy variable equal to 1 after October 2012 –when the first large wave of individuals received official notification that their cases had been approved. The variable $\text{eligible}_{ist}$ indicates whether the individual meets all eligibility requirements observable to researchers: (1) being under the age of 31 in June 2012, (2) having entered the USA before his or her 16th birthday, and (3) having arrived prior to June 2007.

Note that since all individuals in the sample have at least earned a high school degree or GED by the time of DACA's announcement, all individuals will have met the education/enrollment requirement, i.e., being currently enrolled in school, having completed high school or having earned a GED. This restriction limits the potential for individuals to select into treatment after the program was announced, ensuring that our estimates are in fact driven by DACA treatment as opposed to self-selection. It also establishes eligibility as of the date the program was announced, avoiding the phasing into eligible status. Finally, by focusing on foreign-born, non-citizens between the ages of 18 and 24 years old, we can compare individuals with the set of DACA-eligibility criteria to other likely undocumented immigrants who do not display these characteristics, before and after the policy went into effect. Further sample restrictions to Mexican immigrants in the robustness checks will bolster the case for this assessment.

To ensure that the returns to eligibility are not driven by any one of the eligibility criteria alone, we also control for having more than a high school degree ($\text{HSplus}_{ist}$), years in the USA ($\text{YearsinUS}_{ist}$), and include $j$ dummy variables controlling for the respondent's age ($\text{Age}_{ijst}$). Note that the inclusion of the latter two variables together will effectively control for the age at arrival eligibility criterion. Other individual-level covariates in $X_{ist}$ include the number of own children under the age of 18, as well as dummy variables for the respondent's gender, race, and marital status. In addition, to bolster the case that our estimates are driven by exogenous variation, we present results from a simplified identification strategy where eligibility is determined solely by small differences in one eligibility criterion.

Other controls in Eq. (1) include the state unemployment rate and several indicators of state immigration policy that vary over time ($Z_{st}$), such as an indicator for whether the state implemented any type of E-Verify mandate, omnibus immigration law or 287(g) agreement, as well as a separate indicator for whether the state granted in-state tuition for undocumented immigrants. Finally, the model incorporates a battery of state fixed effects ($\mu_s$), month-year fixed effects ($\delta_t$), and state-specific linear time trends ($\theta_s t$)

to address any other policies and economic conditions changing at the state level.[10] Standard errors are clustered at the state level.

The parameter of interest to us is $\beta_1$, the coefficient on the interaction term between $DACA_t$ and eligible$_{ist}$. It reveals the changes in the schooling, employment, and wages earned by DACA-eligible individuals after the DACA program went into effect, relative to the changes experienced by likely undocumented, DACA-ineligible individuals over the same time period. This difference-in-differences estimate will inform on the returns to the 2-year reprieve and work authorization granted by DACA. As is true for all difference-in-differences estimators, this strategy assumes that the treatment (DACA-eligible) and control (undocumented DACA-ineligible) groups would have maintained parallel trends in the absence of treatment (DACA). While this assumption is ultimately untestable, we provide support for this assumption by testing for pre-existing trends between treatment and control groups to ensure that the deviations we observe did not occur prior to the implementation of DACA.

## 5 The impact of DACA on schooling and employment outcomes

### 5.1 Main results

To assess the impact that DACA has had on the schooling and labor market outcomes of eligible undocumented youth, we estimate Eq. (1). As noted earlier, our sample is composed of foreign-born, non-citizens between the ages of 18 and 24 years old with at least a high school degree or GED.[11] In Sect. 6, we also present results for Mexican-born non-citizens and Hispanic non-citizens, as the latter groups are more likely to be unauthorized.

Table 3 presents the results of estimating Eq. (1) on the full sample of foreign-born non-citizens. Focusing first on the impact of DACA on the probability of being enrolled in school, we find that the policy generated significant effects. Specifically, the program reduced the probability of school enrollment by 11.7 percentage points or by approximately 28 % relative to the overall average. Similarly, the likelihood of being enrolled in school full time decreased by 11.5 percentage points or 33 % relative to the overall average. At the same time, DACA was associated with an increase in the employment likelihood of 9.5 percentage points or 17 % relative to the overall average.[12] The fact that all three estimates are of similar magnitude suggests that eligible youths are

---

[10] Note that the inclusion of month-year fixed effects implies the main level effect of DACA ($DACA_t$) drops out of the equation due to multicollinearity.

[11] While we limit the sample to a more educated group for reasons noted above, some may nevertheless be interested in results for the full sample without the restriction on education, particularly given that undocumented immigrants are likely to be less educated. Thus, we present results of estimating Eq. (1) on the full sample without the schooling restriction in Appendix 2. Note that an additional control for schooling level is added since the sample includes both higher- and less-educated individuals. As can be seen from Appendix 2, results are substantially similar to those in Tables 3 and 4.

[12] This finding is in line with those from prior studies examining the impact of legalization under the 1986 Immigration Reform and Control Act (IRCA) on labor market outcomes concluding that the latter improved undocumented workers' employment prospects, reduced their workplace vulnerabilities, or increased their job mobility and working conditions (Rivera-Batiz 1999; Kossoudji and Cobb-Clark 2002; Amuedo-Dorantes et al. 2007).

                                                                              **AR2022_500353**

dropping out of full-time schooling in order to take advantage of employment opportunities once permission to work is granted under DACA. It should also be noted that the 2-year reprieve from deportation and work authorization does not appear to have significantly affected working hours, wages or the type of occupation held by eligible individuals.

Some may be concerned that these estimates look especially large given that they are intent-to-treat (ITT) estimates and participation in the program is not directly observed. To address this concern, we compare the number of first-time DACA applications received by USCIS through our treatment year of 2014 to the population believed to be immediately eligible for DACA, as estimated by the Pew Research Center. Dividing the approximately 700,000 initial applications received in 2012–2014 (Department of Homeland Security, U.S. Citizenship and Immigration Services 2015) by the 950,000 youths estimated to be immediately eligible for DACA (Passel and Lopez 2012), yields a take-up rate of about 74 %. Scaling our estimates from Table 3, by this take-up rate yields treatment-on-the-treated (TOT) estimates that are not much higher than the ITT estimates—namely: 15.8, 15.5, and 12.8 percentage points for the schooling enrollment, full-time schooling enrollment, and employment outcomes, respectively. The relatively high take-up rate should also assuage concerns that eligible individuals were not availing themselves of the program and of the legitimacy of the empirical approach in that context.

### 5.2 Focusing on the age at arrival eligibility criterion

As the constructed measure of DACA eligibility is composed of a collection of characteristics, it is useful to simplify the analysis and thus confirm that the impact of DACA estimated herein is driven by plausibly exogenous variation. To do this, we further exploit the discontinuity in one exogenous requirement determining eligibility for DACA—namely the immigrant's age at arrival in the USA. [13] We do this by estimating Eq. (1) on the sample of individuals who arrived between the ages of 13 and 18 years old who met all other DACA eligibility criteria. The sample restrictions imply that we have a treatment group consisting of individuals who arrived at ages 13 to 15, and a control group of respondents who arrived between 16 and 18 years of age.

Results of this analysis can be found in Table 4. Despite working with a significantly smaller sample, we continue to find that DACA appears to have reduced schooling investments, although the positive impact on the likelihood of being at work is no longer statistically different from zero. Point estimates are also somewhat larger than those found using the larger sample. This is to be expected given that we have restricted our attention to those who narrowly received benefits and those who were just denied thus making the comparison between treatment and control groups all the more striking.

---

[13] We are unable to exploit the discontinuity in age at the time of DACA's announcement (eligibility requirement number 1 above) because the survey only asks schooling questions of respondents between the ages of 16 and 24.

**Table 3** Results for highly skilled (HS+) non-citizens 18–24 years of age (sample meeting the educational attainment criterion only)

| Key regressors | Likelihood of being enrolled in school | Likelihood of being enrolled in school full-time | Likelihood of being employed | Usual weekly hours of work | Log real hourly wages | Likelihood of working in a high-skill occupation |
|---|---|---|---|---|---|---|
| DACA × eligible | −0.117*** (0.030) | −0.115*** (0.027) | 0.095*** (0.035) | −0.536 (0.995) | −0.018 (0.054) | −0.029 (0.051) |
| Eligible | 0.028** (0.013) | 0.037*** (0.011) | −0.015 (0.014) | −0.676* (0.509) | 0.026* (0.015) | 0.015 (0.018) |
| Observations | 11,553 | 11,553 | 11,553 | 5108 | 5108 | 5108 |
| R-squared | 0.295 | 0.272 | 0.117 | 0.173 | 0.140 | 0.191 |

Other covariates include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state fixed effects, month-year fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

*$p < 0.1$; **$p < 0.05$; ***$p < 0.01$

AR2022_500355

Table 4 Results for highly skilled (HS+) non-citizens 18–24 years of age (sample meeting the education, arrival date, and age-eligibility criteria but limited to treated sample, 13–15 years old at arrival and control sample: 16–18 years old at arrival)

| Key regressors | Likelihood of being enrolled in school | Likelihood of being enrolled in school full-time | Likelihood of being employed | Usual weekly hours of work | Log real hourly wages | Likelihood of working in a high-skill occupation |
|---|---|---|---|---|---|---|
| DACA × eligible | −0.231** (0.109) | −0.239** (0.097) | 0.125 (0.187) | 7.520 (5.273) | 0.128 (0.173) | 0.072 (0.116) |
| Eligible | 0.004 (0.054) | 0.010 (0.059) | −0.019 (0.069) | 0.389 (1.390) | 0.096 (0.061) | 0.051 (0.062) |
| Observations | 1739 | 1739 | 1739 | 1019 | 1019 | 1019 |
| R-squared | 0.410 | 0.389 | 0.227 | 0.378 | 0.327 | 0.333 |

Other covariates include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state fixed effects, month-year fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

**p < 0.05

**Table 5** Robustness check for pre-trends (sample: highly skilled non-citizens 18–24 years of age; using leads)

| Key regressors | Likelihood of being enrolled in school | Likelihood of being enrolled in school full-time | Likelihood of being employed | Usual weekly hours of work | Log real hourly wages | Likelihood of working in a high-skill occupation |
|---|---|---|---|---|---|---|
| DACA × eligible | −0.122*** (0.030) | −0.123*** (0.029) | 0.105*** (0.039) | −0.730 (0.953) | −0.019 (0.051) | −0.017 (0.051) |
| Placebo 2011 × eligible | −0.039 (0.039) | −0.041 (0.042) | 0.047 (0.047) | −0.171 (1.227) | 0.014 (0.041) | 0.046 (0.051) |
| Placebo 2010 × eligible | −0.004 (0.027) | −0.027 (0.029) | 0.052 (0.037) | −1.885* (1.033) | −0.030 (0.066) | 0.042 (0.026) |
| Placebo 2009 × eligible | −0.016 (0.032) | −0.003 (0.034) | 0.013 (0.048) | −0.081 (1.728) | 0.016 (0.056) | 0.050 (0.038) |
| Eligible | 0.032** (0.013) | 0.042*** (0.012) | −0.023 (0.015) | −0.509 (0.572) | 0.026* (0.015) | 0.005 (0.017) |
| Observations | 11,553 | 11,553 | 11,553 | 5108 | 5108 | 5108 |
| $R$-squared | 0.295 | 0.273 | 0.117 | 0.174 | 0.140 | 0.191 |

Each of these placebo indicators equals 1 from October of the stated year through the following September to match the timing of the DACA indicator. Other covariates include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state fixed effects, month-year fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

*$p < 0.1$; **$p < 0.05$; ***$p < 0.01$

**Table 6** Robustness check for pre-trends (sample: highly skilled non-citizens 18–24 years of age; shorter window around treatment)

| Key regressors | Likelihood of being enrolled in school | Likelihood of being enrolled in school full-time | Likelihood of being employed | Usual weekly hours of work | Log real hourly wages | Likelihood of working in a high-skill occupation |
|---|---|---|---|---|---|---|
| DACA × eligible | −0.105*** (0.032) | −0.117*** (0.029) | 0.100*** (0.030) | −0.275 (0.945) | −0.002 (0.055) | −0.041 (0.052) |
| Eligible | −0.003 (0.017) | 0.011 (0.017) | 0.014 (0.018) | −0.259 (0.668) | 0.028 (0.022) | 0.020 (0.020) |
| Observations | 7021 | 7021 | 7021 | 3632 | 3632 | 3632 |
| R-squared | 0.308 | 0.290 | 0.134 | 0.190 | 0.134 | 0.180 |

Other covariates include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state fixed effects, month-year fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

\*\*\*p < 0.01

Springer

356                                                                                                          C. Amuedo-Dorantes, F. Antman

**Table 7** Robustness check for pre-trends (sample: highly skilled non-citizens 18–24 years of age; falsification test using pre-period sample)

| Key regressors | Likelihood of being enrolled in school | Likelihood of being enrolled in school full-time | Likelihood of being employed | Usual weekly hours of work | Log real hourly wages | Likelihood of working in a high-skill occupation |
|---|---|---|---|---|---|---|
| Placebo DACA × eligible | −0.007 (0.020) | −0.024 (0.024) | 0.042 (0.031) | −1.107 (1.028) | −0.009 (0.041) | 0.031 (0.020) |
| Eligible | 0.000 (0.017) | 0.022 (0.016) | −0.002 (0.020) | −0.412 (0.779) | 0.013 (0.024) | −0.001 (0.020) |
| Observations | 5538 | 5538 | 5538 | 2951 | 2951 | 2951 |
| $R$-squared | 0.309 | 0.283 | 0.136 | 0.176 | 0.126 | 0.186 |

The placebo here equals 1 from October of 2009 to December 2011. Other covariates include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state fixed effects, month-year fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

AR2022_500359



**Fig. 2** School enrollment outcome. Notes: Graph shows coefficient estimates and confidence intervals from regression of indicator for being enrolled in school on the interactions between eligibility status and vector of year dummies where sample is restricted to cover October 2004 to March 2014. To coincide with the implementation timing of DACA, year is defined to begin in October of stated year and run through September of following year. Note that the inclusion of all interaction terms absorbs the main effect of eligibility status, which is thus omitted from the specification. Other covariates in the regression (not shown) include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state-fixed effects, month-year-fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

## 6 Robustness checks

### 6.1 Support for the parallel trends assumption

As noted above, the main threat to our empirical approach is whether there existed differential trends in the schooling and labor market outcomes of eligible and ineligible youths prior to DACA that may be falsely attributed to the policy. To investigate whether that is the case, we construct indicators for each of the 3 years prior to DACA, interact them with the indicator for DACA eligibility, and include these interaction terms in regression (1).[14] If there were pre-existing trends that could account for the DACA effect observed here, we would expect these placebo interaction terms to produce statistically significant coefficients in the same direction of the DACA impact discussed above. The results of this test are documented in Table 5.

The main findings regarding the impact of DACA on the schooling and employment outcomes of non-citizens prevail, with no statistically significant placebo interaction terms. It is also reassuring that the DACA point estimates are similar to the ones noted in the main results, despite the inclusion of the

---

[14] Each of these placebo indicators runs from October of the year of interest through the following September to match the timing of the DACA indicator discussed in Sect. 2.



**Fig. 3** Full-time student outcome. Notes: Graph shows coefficient estimates and confidence intervals from regression of indicator for being enrolled in school full-time on the interactions between eligibility status and vector of year dummies where sample is restricted to cover October 2004 to March 2014. To coincide with the implementation timing of DACA, year is defined to begin in October of stated year and run through September of following year. Note that the inclusion of all interaction terms absorbs the main effect of eligibility status, which is thus omitted from the specification. Other covariates in the regression (not shown) include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state-fixed effects, month-year-fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

placebo interaction terms leading up to the true DACA period. Thus, we can be reasonably confident that the schooling and employment effects discussed above can be attributed to changes that occurred in the DACA period and not to pre-existing trends.

To offer further reassurance that the results are not driven by a long trend prior to DACA's implementation, we further restrict our sample to a shorter window around DACA's implementation, ranging from January 2005 through the end of our sample in March 2014. Table 6 reports the results for this time period. Consistent with the parallel trends assumption, we find that the long pre-period is not driving our results, as point estimates and significance levels survive this restriction on the data. Finally, in Table 7, we perform a falsification test in which we further cut the sample in Table 6 to a pre-period sample extending from 2005 through 2011 and falsely designate the DACA period as starting in 2009.[15] We find that there is no statistically significant impact of the pseudo-DACA indicator interacted with the eligibility indicator. This is consistent with no pre-existing trend between eligible and ineligibles driving the results.

---

[15] As in Table 5, to mirror the timing of DACA, the new placebo indicator runs from October of the year of interest (October 2009) and, in this case, spans to the end of 2011.



Additional support for the parallel trends assumption, as well as justification for the interpretation that the DACA policy is driving the schooling and employment results, is offered in Figs. 2, 3, and 4. The graphs display the coefficient estimates and the respective 90 % confidence intervals from a regression model similar to the one in Eq. (1). The sole exception is that the DACA × eligibility term has been replaced by interaction terms between the eligibility indicator and a vector of year dummies. The latter are defined to begin in October of the stated year and run through September of the following year to mirror the timing of DACA. Again, we focus on a shorter window around treatment: October 2004 through the end of our sample.

As can be seen in Figs. 2, 3, and 4, the confidence intervals on the coefficient estimates corresponding to the eligibility indicator interacted with those years prior to DACA's implementation almost always include zero. Only the confidence intervals corresponding to the interaction between eligibility status and the years after DACA's implementation (Eligible_2012 and Eligible_2013) lie consistently below zero (in the case of school enrollment and full-time schooling) or above zero (in the case of employment). This pattern supports the notion that (a) there was no systematic trend in employment and schooling differences between eligible and non-eligible groups prior to DACA's implementation and (b) the drop in schooling and rise in employment observed above, are strongly consistent with the timing of DACA.



**Fig. 4** Employment outcome. Notes: Graph shows coefficient estimates and confidence intervals from regression of indicator for being employed on the interactions between eligibility status and vector of year dummies where sample is restricted to cover October 2004 to March 2014. To coincide with the implementation timing of DACA, year is defined to begin in October of stated year and run through September of following year. Note that the inclusion of all interaction terms absorbs the main effect of eligibility status, which is thus omitted from the specification. Other covariates in the regression (not shown) include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state-fixed effects, month-year-fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

### 6.2 Capturing undocumented immigrants and DACA applicants

As recognized above, one limitation of the data is that it does not allow us to observe whether individuals are undocumented nor whether they have actually been granted a DACA reprieve and work authorization. While our sample already displays many of the traits characteristic of DACA applicants—including being close to 20 years old on average and having a high school degree (Batalova et al. 2013; Singer and Svajlenka 2013; Wong et al. 2013), one way we can address the aforementioned concern is by further restricting our sample to a group of immigrants with some of the known traits of DACA applicants and undocumented immigrants. Since the vast majority of DACA applications were ultimately approved, this also increases the likelihood that our estimates not only measure DACA eligibility, but actual DACA take-up.

Thus, in Table 8, we start by narrowing the main sample of highly skilled non-citizens to those residing in one of the top nine states with the most DACA applicants. Note that this also happens to be a group of states with large populations of undocumented immigrants (Passel and Cohn 2009). Furthermore, the average age at arrival and US residency for this sub-sample are, respectively, 14 and 7—in line with the young ages at arrival and long US residencies of DACA applicants (Singer and Svajlenka 2013). Once again, we observe how DACA was accompanied by a decline in the likelihood of being enrolled at school and being enrolled full-time of approximately 11 and 9 percentage points, respectively. And, while the estimated impact of DACA on the employment likelihood lies just below the threshold for statistical significance, its magnitude (about 9 percentage points) is similar to the one in Table 3.

As an alternative robustness check that we are capturing both likely unauthorized migrants as well as DACA applicants, we next focus our attention on Hispanic non-citizens—a group more likely to capture unauthorized immigrants and DACA applicants (Passel and Cohn 2009, 2010; Singer and Svajlenka 2013). These results, displayed in Table 9, continue to show a statistically significant decrease in the likelihood of school enrollment. However, the observed decline in employment probability is no longer statistically significant at conventional levels. Still, the magnitudes of the estimates remain similar to those in Table 3.

Table 10 goes further to restrict our sample of Hispanic non-citizens to those with five or more years of US residency to address any remaining concerns regarding our control group and whether it includes foreign students. Despite the significantly smaller sample sizes, the results in Table 10 continue to show evidence of a drop in the likelihood of school enrollment and full-time school enrollment, although the impact of DACA on the employment likelihood is not statistically significant in these smaller samples.

Lastly, we experiment with restricting our sample to just Mexican non-citizens—an ethnic immigrant group that is the most likely to be unauthorized and accounts for the vast majority of DACA applicants (Passel and Cohn 2009, 2010; Singer and Svajlenka 2013). On average, this group arrived in the USA when they were 12 years old and have resided in the



**Table 8** Robustness check to DACA treatment—likely characteristics of DACA applicants (sample: highly skilled non-citizens 18–24 years of age; residents of CA, TX, NY, IL, FL, NC, AZ, GA, and NJ)

| Key regressors | Likelihood of being enrolled in school | Likelihood of being enrolled in school full-time | Likelihood of being employed | Usual weekly hours of work | Log real hourly wages | Likelihood of working in a high-skill occupation |
|---|---|---|---|---|---|---|
| DACA × eligible | −0.107** (0.044) | −0.094** (0.036) | 0.086 (0.050) | −1.083 (1.317) | 0.076 (0.050) | 0.039 (0.044) |
| Eligible | 0.037** (0.013) | 0.053*** (0.009) | −0.010 (0.018) | −0.231 (0.660) | 0.014 (0.017) | −0.006 (0.017) |
| Observations | 6568 | 6568 | 6568 | 2796 | 2796 | 2796 |
| R-squared | 0.290 | 0.267 | 0.135 | 0.199 | 0.138 | 0.197 |

Other covariates include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state fixed effects, month-year fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

**$p < 0.05$; ***$p < 0.01$

 Springer

**Table 9** Robustness check to DACA treatment—likely characteristics of DACA applicants (sample: highly skilled non-citizens 18–24 years of age; Hispanics)

| Key regressors | Likelihood of being enrolled in school | Likelihood of being enrolled in school full-time | Likelihood of being employed | Usual weekly hours of work | Log real hourly wages | Likelihood of working in a high-skill occupation |
|---|---|---|---|---|---|---|
| DACA × eligible | −0.120*** (0.044) | −0.108*** (0.040) | 0.070 (0.057) | −0.237 (2.070) | 0.026 (0.068) | −0.018 (0.039) |
| Eligible | 0.028 (0.019) | 0.033** (0.015) | −0.016 (0.022) | −0.048 (0.489) | 0.012 (0.017) | −0.002 (0.015) |
| Observations | 5787 | 5787 | 5787 | 2837 | 2837 | 2837 |
| $R$-squared | 0.275 | 0.242 | 0.164 | 0.216 | 0.172 | 0.162 |

Other covariates include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state fixed effects, month-year fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

$**p < 0.05$; $***p < 0.01$

AR2022_500365

**Table 10** Robustness check to DACA treatment—likely characteristics of DACA applicants (sample: highly skilled non-citizens 18–24 years of age; Hispanics with 5+ years in the USA)

| Key regressors | Likelihood of being enrolled in school | Likelihood of being enrolled in school full-time | Likelihood of being employed | Usual weekly hours of work | Log real hourly wages | Likelihood of working in a high-skill occupation |
|---|---|---|---|---|---|---|
| DACA × eligible | −0.158* (0.094) | −0.209** (0.097) | 0.154 (0.108) | −0.818 (3.958) | 0.069 (0.106) | −0.017 (0.091) |
| Eligible | −0.032** (0.015) | −0.011 (0.014) | 0.013 (0.026) | 1.502** (0.669) | 0.020 (0.018) | −0.009 (0.017) |
| Observations | 3940 | 3940 | 3940 | 1969 | 1969 | 1969 |
| R-squared | 0.320 | 0.278 | 0.175 | 0.265 | 0.221 | 0.177 |

Other covariates include: gender; race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state fixed effects, month-year fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

*$p < 0.1$; **$p < 0.05$

364                                                                                                              C. Amuedo-Dorantes, F. Antman

**Table 11** Robustness check to DACA treatment—likely characteristics of DACA applicants (sample: highly skilled non-citizens 18–24 years of age: Mexicans)

| Key regressors | Likelihood of being enrolled in school | Likelihood of being enrolled in school full-time | Likelihood of being employed | Usual weekly hours of work | Log real hourly wages | Likelihood of working in a high-skill occupation |
|---|---|---|---|---|---|---|
| DACA × eligible | -0.072 (0.051) | -0.104* (0.056) | 0.011 (0.069) | -4.126 (3.639) | 0.012 (0.072) | -0.004 (0.059) |
| Eligible | 0.001 (0.024) | 0.028* (0.016) | -0.006 (0.029) | 0.854 (0.688) | 0.007 (0.021) | -0.010 (0.017) |
| Observations | 3112 | 3112 | 3112 | 1768 | 1768 | 1768 |
| R-squared | 0.307 | 0.260 | 0.224 | 0.276 | 0.210 | 0.188 |

Other covariates include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state fixed effects, month-year fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

*$p < 0.1$

USA more than 9 years. As shown in Table 11, we observe a drop in the likelihood of being enrolled in school full time (−10.4 percentage points) that is statistically significant at the 10 % level; but possibly due, in part, to the significantly smaller sample, we find no statistically significant impacts on the remaining labor market outcomes.

## 6.3 Robustness to treatment assignment date

As noted earlier, the CPS does not contain information on DACA participation or when DACA approval was received. Assigning a later date may bias our estimates if some DACA eligibles were actually treated before we assume them to be. To address that concern, we test the sensitivity of our results to choosing two slightly earlier treatment dates—one corresponding to the announcement of DACA in June 2012, and the other corresponding to the official implementation of DACA in August 2012. These are not falsification tests, as it is reasonable to expect that some eligible individuals could have reasonably changed their behavior in anticipation of treatment. Rather, we wish to gauge if our estimates of the impact of DACA are in a reasonable range based on slightly different treatment assignment dates.

Table 12 presents the results using the earliest treatment assignment month possible—which is, June 2012, the month in which DACA was announced. While this was earlier than any DACA-eligible individuals would have been granted DACA authorization, we might observe some impacts if individuals anticipated a conferral of benefits and behaved accordingly. Likewise, schools and employers may have anticipated a change in the treatment of undocumented immigrants and altered their behavior as well. The results in that panel are consistent with our interpretation, as we observe significant reductions in the likelihood of being enrolled in school and being enrolled full time similar in magnitude to those found in Table 3. Similarly, we continue to find evidence of a statistically significant increase in the likelihood of employment.

Likewise, Table 13 presents the results using a treatment assignment date of August 2012—the month in which DACA applications were first accepted. Results using this alternative date are very close to those in Table 12, and the main results in Table 3. Overall, the estimates in Tables 12 and 13 suggest that anticipation of benefits under DACA were an important factor in the estimated responses captured in Table 3.

## 6.4 Heterogeneous effects by gender

Finally, we decompose the main sample by gender to take into account the fact that employment patterns of male and female immigrants, in particular, are somewhat different and thus may display different responses to policy interventions. The results on the sub-sample of men are presented in Table 14, while those for women can be found in Table 15. We find evidence that, after October 2012, DACA-eligible men experienced a reduction in their school enrollment and full-time enrollment likelihood, at the same time they

366                                                                                                              C. Amuedo-Dorantes, F. Antman

**Table 12** Robustness check to policy timing—experimenting with alternative DACA treatment dates (sample: highly skilled non-citizens 18–24 years of age; using enactment date)

| Key regressors | Likelihood of being enrolled in school | Likelihood of being enrolled in school full-time | Likelihood of being employed | Usual weekly hours of work | Log real hourly wages | Likelihood of working in a high-skill occupation |
|---|---|---|---|---|---|---|
| DACA × eligible | $-0.105^{***}$ (0.035) | $-0.096^{***}$ (0.033) | $0.122^{***}$ (0.042) | $-0.491$ (1.134) | $-0.033$ (0.055) | $-0.027$ (0.053) |
| Eligible | $0.030^{**}$ (0.013) | $0.040^{***}$ (0.012) | $-0.018$ (0.014) | $-0.792$ (0.522) | $0.026^{*}$ (0.015) | $0.015$ (0.018) |
| Observations | 11,167 | 11,167 | 11,167 | 4938 | 4938 | 4938 |
| R-squared | 0.293 | 0.270 | 0.117 | 0.169 | 0.140 | 0.192 |

Other covariates include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state fixed effects, month-year fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

$^{*}p < 0.1$; $^{**}p < 0.05$; $^{***}p < 0.01$

**AR2022_500369**

**Table 13** Robustness check to policy timing—experimenting with alternative DACA treatment dates (sample: highly skilled non-citizens 18–24 years of age; using implementation date)

| Key regressors | Likelihood of being enrolled in school | Likelihood of being enrolled in school full-time | Likelihood of being employed | Usual weekly hours of work | Log real hourly wages | Likelihood of working in a high-skill occupation |
|---|---|---|---|---|---|---|
| DACA × eligible | −0.106*** (0.026) | −0.107*** (0.024) | 0.103*** (0.032) | −0.396 (0.965) | 0.000 (0.050) | −0.005 (0.045) |
| Eligible | 0.028** (0.013) | 0.038*** (0.012) | −0.017 (0.014) | −0.682 (0.521) | 0.025 (0.015) | 0.013 (0.018) |
| Observations | 11,553 | 11,553 | 11,553 | 5108 | 5108 | 5108 |
| R-squared | 0.295 | 0.272 | 0.117 | 0.173 | 0.140 | 0.191 |

Other covariates include: gender; race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state fixed effects, month-year fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

**p < 0.05; ***p < 0.01

**Table 14** Results for highly skilled non-citizens 18–24 years of age by gender (men)

| Key regressors | Likelihood of being enrolled in school | Likelihood of being enrolled in school full-time | Likelihood of being employed | Usual weekly hours of work | Log real hourly wages | Likelihood of working in a high-skill occupation |
|---|---|---|---|---|---|---|
| DACA × eligible | −0.095** (0.041) | −0.077** (0.035) | 0.100** (0.037) | 0.004 (1.776) | −0.019 (0.062) | −0.026 (0.053) |
| Eligible | 0.024 (0.021) | 0.025 (0.017) | −0.014 (0.017) | −0.192 (0.794) | 0.025 (0.027) | 0.042** (0.021) |
| Observations | 5891 | 5891 | 5891 | 2899 | 2899 | 2899 |
| R-squared | 0.319 | 0.296 | 0.170 | 0.206 | 0.171 | 0.272 |

Other covariates include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state fixed effects, month-year fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

**p < 0.05

**Table 15** Results for highly skilled non-citizens 18–24 years of age by gender (women)

| Key regressors | Likelihood of being enrolled in school | Likelihood of being enrolled in school full-time | Likelihood of being employed | Usual weekly hours of work | Log real hourly wages | Likelihood of working in a high-skill occupation |
|---|---|---|---|---|---|---|
| DACA × eligible | −0.119** (0.059) | −0.143*** (0.048) | 0.075 (0.050) | −1.034 (1.634) | 0.014 (0.064) | 0.002 (0.074) |
| Eligible | 0.029* (0.015) | 0.048*** (0.018) | −0.018 (0.023) | −1.164 (0.791) | 0.016 (0.019) | −0.043 (0.026) |
| Observations | 5662 | 5662 | 5662 | 2209 | 2209 | 2209 |
| R-squared | 0.313 | 0.291 | 0.121 | 0.222 | 0.182 | 0.221 |

Other covariates include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state fixed effects, month-year fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

*$p < 0.1$; **$p < 0.05$; ***$p < 0.01$

Springer

increased their employment likelihood. All three of the latter estimates
(−0.095, −0.077, and 0.100, respectively) are close in magnitude to the
estimates for the overall sample. While women appear to experience similar
impacts based on their point estimates, only the effects on the likelihood
of being enrolled in school and full-time school enrollment (−0.119 and −0.143,
respectively) are statistically significant at conventional levels. Therefore, it
seems that the main impact of DACA has been to reduce enrollment in higher
education for eligible individuals, regardless of their gender. It also seems that
DACA raised the employment likelihood of men, not women. However, we
cannot rule out that the point estimates for men and women are statistically
different. Finally, the 2-year reprieve from deportation and work authorization
does not yet appear to have significantly affected working hours or the wages
earned by either men or women.

## 7 Summary and conclusions

President Barack Obama announced the DACA initiative on 15 June 2012.
The initiative, which first began to approve a significant number of cases in
October 2012, was intended to provide eligible youth with a 2-year reprieve
from deportation and work authorization to allow them to come out of the
shadows and enjoy better educational and labor market outcomes. In this
paper, we rely on data from the Current Population Survey to gauge the
impact that DACA has had on the schooling, employment and wages of
eligible youth.

Despite some expectations that DACA would result in increased motiva-
tion to pursue higher education, we find that DACA significantly reduced
the likelihood of school enrollment and full-time school enrollment of
eligible youths who had already earned the schooling credentials required
for DACA. In addition, there is some evidence of an improvement in the
likelihood of employment among DACA-eligible males, suggesting that the
potential labor market returns to authorization today might outweigh any
additional returns to higher education to be felt further down the road. This
behavior is consistent with an increased opportunity cost of college educa-
tion for DACA-eligible individuals once DACA went into effect.

In sum, our results suggest that a lack of authorization inhibits undocu-
mented individuals from efficient use of their time, which in this case
manifests itself by an over-investment in schooling. Thus, once employment
restrictions are relaxed, as with the implementation of DACA, eligible
individuals may actually reduce their investments in schooling. It is worth
noting, however, that our focus has been on the immediate, short-run im-
pacts of DACA on schooling and labor market outcomes. Its long-run
outcomes may differ. For instance, if large-scale immigration legalization
efforts are realized, general equilibrium effects may ultimately reduce the
opportunity costs of schooling and mitigate the drop in school enrollment
observed here. Therefore, further analyses examining long-term impacts of
the policy are warranted.



**AR2022_500373**

**Acknowledgments** We thank Kelly Bedard, Sarah Bohn, Brian Cadena, Seema Jayachandran, Terra McKinnish, Anita Alves Pena, Audrey Singer, Stephen J. Trejo, Klaus Zimmermann, three anonymous referees, seminar participants at the IZA Annual Migration Meeting, University of Southern California and *Colegio de la Frontera*, along with session participants at the annual meetings of the American Economic Association, Population Association of America and Western Economic Association International. Any errors are our own.

**Compliance with ethical standards**

**Conflict of interest**   The authors declare that they have no conflict of interest.

## Appendix 1

**Table 16**  High- and low-skill occupations

High-skill occupations

1. "Management occupations"

2. "Business and financial operations occupations"

3. "Computer and mathematical science occupations"

4. "Architecture and engineering occupations"

5. "Life, physical, and social science occupations"

6. "Community and social service occupations"

7. "Legal occupations"

8. "Education, training, and library occupations"

9. "Arts, design, entertainment, sports, and media"

10. "Healthcare practitioner and technical occupations"

Low-skill occupations

11. "Healthcare support occupations"

12. "Protective service occupations"

13. "Food preparation and serving related occupations"

14. "Building and grounds cleaning and maintenance"

15. "Personal care and service occupations"

16. "Sales and related occupations"

17. "Office and administrative support occupations"

18. "Farming, fishing, and forestry occupations"

19. "Construction and extraction occupations"

20. "Installation, maintenance, and repair occupations"

21. "Production occupations"

22. "Transportation and material moving occupations"

23. "Armed Forces"

## Appendix 2

**Table 17**  Results for non-citizens 18–24 years of age of all educational attainments (sample: non-citizen men and women)

| Key regressors | Likelihood of being enrolled in school | Likelihood of being enrolled in school full-time | Likelihood of being employed | Usual weekly hours of work | Log real hourly wages | Likelihood of working in a high-skill occupation |
|---|---|---|---|---|---|---|
| DACA × eligible | −0.117*** | −0.115*** | 0.068*** | 0.218 | −0.014 | −0.013 |
| | (0.029) | (0.026) | (0.025) | (0.693) | (0.036) | (0.030) |
| Eligible | 0.212*** | 0.189*** | −0.059*** | −1.941*** | −0.016 | −0.009 |
| | (0.010) | (0.010) | (0.011) | (0.348) | (0.014) | (0.012) |
| Observations | 19,177 | 19,177 | 19,177 | 8063 | 8063 | 8063 |
| R-squared | 0.339 | 0.313 | 0.153 | 0.162 | 0.125 | 0.202 |

Other covariates include: gender, race (white and black), marital status, indicators for age, years in the USA, number of children, educational attainment (HS and more than HS), an indicator for whether the individual resides in a state with any of the following immigration enforcement measures: E-Verify mandate, omnibus immigration law, or a 287(g) agreement, a separate indicator for residing in a state granting in-state tuition for undocumented immigrants, and state-level unemployment rates. Additionally, all specifications include state fixed effects, month-year fixed effects, and state-specific linear time trends. Standard errors are clustered at the state level

$*p < 0.1; **p < 0.05; ***p < 0.01$

## References

Amuedo-Dorantes C, Bansak C, Raphael S (2007) Gender differences in the labor market: impact of IRCA's amnesty provisions. Am Econ Rev 97(2):412–416

Batalova J, Hooker S, Capps R (2013) Deferred action for childhood arrivals at the one-year mark, issue brief, no. 8, august. Migration Policy Institute, Washington DC

Black DA, McKinnish TG, Sanders SG (2005) Tight labor markets and the demand for educational attainment: evidence from the coal boom and bust. Ind Labor Relat Rev 59(1):3–16

Charles KK, Hurst E, Notowidigdo MJ (2013) Housing booms, labor market outcomes, and educational attainment. Unpublished manuscript. University of Chicago, Booth School of Business

Constant A, Zimmermann KF (2005a) Immigrant performance and selective immigration policy: a European perspective. Natl Instit Econ Rev 194(1):94–105

Constant A, Zimmermann KF (2005b) Legal status at entry, economic performance, and self-employment proclivity: a bi-national study of immigrants. IZA Discussion Paper No. 1910

Department of Homeland Security, U.S. Citizenship and Immigration Services (2013) Deferred action for childhood arrivals. Data for August 2012–30 June 2013. Available at: www.uscis.gov/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca-13-7-12.pdf

Department of Homeland Security, U.S. Citizenship and Immigration Services (2015) Biometrics capture systems, CIS consolidated operational repository (CISCOR)

Evans WN, Kim W-Y (2008) The impact of local labor market conditions on the demand for educational attainment: evidence from Indian casinos. Unpublished manuscript, University of Notre Dame

Gathmann C, Keller N (2013) Benefits of citizenship? evidence from Germany's new immigration policy. Unpublished manuscript, University of Heidelberg

Gonzales RG, Bautista-Chavez AM (2014) Two years and counting: assessing the growing power of DACA. American Immigration Council Report

Immigration Policy Center (2012) Creating opportunity: the economic benefits of granting deferred action to unauthorized immigrants brought to the United States as Children, Washington, DC: June 22



Kossoudji SA, Cobb-Clark DA (2002) Coming out of the shadows: learning about legal status and wages from the legalized population. J Labor Econ 20(3):598–628

National Immigration Law Center (2005) The economic benefits of the DREAM act and the student adjustment act, Washington, DC: February

Passel JS, Cohn D (2009) A portrait of unauthorized immigrants in the United States. Pew Hispanic Center, Washington, DC

Passel J, Cohn DV (2010) U.S. unauthorized immigration flows are down sharply since mid-decade. Pew Hispanic Center, Washington, DC

Passel J, Lopez MH (2012) Up to 1.7 million unauthorized immigrant youth may benefit from new deportation rules. Pew Hispanic Center, Washington, DC

Passel JS, Cohn D, Gonzalez-Barrera A (2013) Population decline of unauthorized immigrants stalls, may have reversed. Pew Research Center, Washington, DC

Preston J, Cushman Jr. JH (2012) Obama to permit young migrants to remain in U.S. The New York Times. Published June 15, 2012. Accessed September 24, 2013

Rivera-Batiz F (1999) Undocumented workers in the labor market: an analysis of the earnings of legal and illegal Mexican immigrants in the United States. J Popul Econ 12(1):91–116

Singer A, Svajlenka NP (2013) Immigration facts: deferred action for childhood arrivals (DACA). Brookings Institution. 14 August 2013. Available at: http://www.brookings.edu/research/reports/2013/08/14-daca-immigration-singer

Wallsten P (2012) Marco Rubio's DREAM act alternative a challenge for Obama on illegal immigration. The Washington Post. Published 25 April2012. Accessed 26 September 2013

Wong TK, García AS, Abrajano M, FitzGerald D, Ramakrishnan K, Le S (2013) Undocumented no more: a nationwide analysis of deferred action for childhood arrivals, or DACA. Center for American Progress, Washington, DC



doi: 10.1111/imig.12250

# DACA and the Surge in Unaccompanied Minors at the US-Mexico Border

Catalina Amuedo-Dorantes* and Thitima Puttitanun**

## ABSTRACT

Apprehensions of unaccompanied minors from Central American countries have been on the rise since 2008, but news reports particularly caught up with the increase after 2012. Some politicians posited that the 2012 *Deferred Action for Childhood Arrivals* (DACA) contributed to the surge by creating the expectation that children would be allowed to stay in the country. Immigration advocates, however, believe that the two are not related. Using data on apprehensions of unaccompanied minors by border patrol sector, nationality and year, we find that DACA did not significantly impact those apprehensions. Rather, the 2008 *Williams Wilberforce Trafficking Victims Protection Reauthorization Act*, along with violence in the originating countries and economic conditions in both the countries of origin and the United States, emerge as some of the key determinants of the recent surge in unaccompanied minors apprehended along the southwest US-Mexico border.

## INTRODUCTION

The number of unaccompanied alien children crossing the southern border of the United States has grown drastically since 2008, capturing congressional attention and leading to a number of hearings in the House (Rempdell, 2015). Figure 1 depicts the recent surge in apprehensions of unaccompanied alien children from Mexico, El Salvador, Guatemala, and Honduras. In addition to its growth, it has been noted that the composition of the flow of unaccompanied alien children changed over the time period under consideration. While the vast majority of these children used to come from Mexico, the surge in unaccompanied minors observed in recent years has been dominated by children originating from three other Central American countries: El Salvador, Guatemala, and Honduras.[1] A confluence of factors, including extreme violence, endemic poverty, increasingly sophisticated smuggling networks and the desire to reunite with family members in the United States, have fuelled this growth. Additionally, it has been argued that legislative changes, in particular, the 2008 *Williams Wilberforce Trafficking Victims Protection Reauthorization Act* (TVPRA) of President Bush era and the more recent *Deferred Action for Childhood Arrivals* (DACA) announced by President Obama on 15 June 2012, might have been used by smugglers to sway migrants with false promises that they will be able to stay in the United States once they get into the country (Hing, 2014; Rempdell, 2015). The TVPRA legislated that unaccompanied minors from non-contiguous countries needed to be released into the custody of family or sponsors while they await a deportation hearing in front of a judge, thus enabling children to stay in the United States for what became, in most instances, years. Under DACA, individuals approved for consideration of

---

* San Diego State University.
** Kasetsart University, Bangkok.

© 2016 The Authors
International Migration © 2016 IOM
*International Migration* Vol. 54 (4) 2016
ISSN 0020-7985                                             Published by John Wiley & Sons Ltd.

AR2022_500377

FIGURE 1
APPREHENSIONS OF UNACCOMPANIED MINORS OVER TIME



Source: U.S. Customs and Border Protection (CBP) via a Freedom of Information Act request.

deferred action were granted a renewable two-year reprieve from deportation proceedings and become eligible for work authorization in the United States. Because of the timing of DACA and the publicized surge in unaccompanied minors coming from Central America after 2012, Senator Sessions have called for a vote on DACA suspension.[2]

Yet, so far, we still lack a good understanding of the role that DACA or, for that matter, the TVPRA might have played, if any, on such inflows.

In this article, we explore the determinants behind the recent increase in inflows of unaccompanied alien children from Central America. In particular, given President Obama's second executive order expanding DACA programme, we pay special attention to the effect that DACA might have played on the surge of unaccompanied minors originating from Mexico, El Salvador, Guatemala and Honduras in recent years. Because one of the requirements of DACA involved being present in the United States, DACA might have encouraged undocumented immigration. Additionally, DACA could have stimulated inflows of unauthorized children if it somehow fostered beliefs that other deferred deportation concessions or even permanent amnesties would occur in the future.

Establishing the effect of DACA on the surge of unaccompanied minors is important for several reasons. First, the rapid increase has resulted in children often being held in overcrowded facilities with adult asylum seekers, thus increasing their difficulty in gaining access to proper legal and medical care (Binford, 2013; Stinchcomb and Hershberg, 2014; MPI, 2012). This led President Obama to declare the wave of unaccompanied minors an "urgent humanitarian situation", asking federal agencies to coordinate an emergency response to the situation. Yet an appropriate response requires a good understanding of the root causes for such flows, which we still lack.

Second, since President Obama's new executive order announced on 20 November 2014 extends the eligibility of DACA applicants and grants a *temporary* reprieve from deportation and work permits to parents of US-born or permanent resident children – an initiative currently placed on hold after Judge Hanen's decision to temporarily enjoin its implementation, an in-depth debate on the effect of the original reprieve from deportation offered by DACA will surely follow. Some have alleged that these *temporary* reprieves form deportation increase illegal border crossings. What

AR2022_500378

proof do we have? This analysis will provide some new evidence on the role of such policies in attracting the recent flows of unaccompanied minors.

Finally, there is a substantial number of unauthorized immigrants in the United States. While the stock of undocumented immigrants decreased during the 2008-2009 recession, it is still estimated at approximately 11.2 million (Krogstad and Passel, 2014). Aside from labour market displacement effects, concerns regarding the potential fiscal burdens they impose on state and local governments by increasing their expenditures on health and, in particular, education are one of the main reasons for which natives tend to oppose undocumented immigration (Smith and Edmonston, 1997; Hanson, 2012). Therefore, it is crucial to gain a better understanding of how current policies might be impacting the inflow of unaccompanied minors.

## BACKGROUND

Unaccompanied minors, legally referred to as "Unaccompanied Alien Children", are children under the age of 18 who enter the United States without lawful immigration status and do not have a parent or legal guardian with them to provide care and physical custody. According to a portion of the *William Wilberforce Trafficking Victims Protection Reauthorization Act* (henceforth: TVPRA) of 2008, with the exception of children coming from Mexico and Canada – countries with a border with the United States, unaccompanied minors have to be transferred to the custody of the Office of Refugee Resettlement (ORR) by the US Customs and Border Protection (CBP) within 72 hours. ORR is responsible for holding them "in the least restrictive setting that is in the best interest of the child" until the children can be released to a "suitable family member" in the United States.[3] Children then wait for a proper hearing. Given the increase in deportation hearings from recent years, waiting periods have been known to last for years and, during that time, the children are allowed to stay in the country (Resnick, 2014).

In sum, the 2008 law significantly changed the way in which unaccompanied minors were handled by the Department of Homeland Security (DHS), which had previously removed unaccompanied minors using expedited procedures. The new legislation was accompanied by a surge in the flow of unaccompanied minors from El Salvador, Guatemala and Honduras, worsening the bottleneck in the handling of unaccompanied minors' deportation. The confluence of all these factors led some to conclude that the 2008 TVPRA might have led the increase in inflows from those countries – a deduction supported by Figure 1.

At the same time, others have pointed fingers to President Obama's 2012 executive order offering a reprieve from deportation to unauthorized immigrant childhood arrivals that fulfilled a series of requirements (the *Deferred Action for Childhood Arrivals* or DACA). DACA's roots are closely tied to DREAM Act proposals, which preceded DACA by over a decade. However, the timing and political context in which DACA was announced cannot be overlooked.

DACA did not offer the more permanent immigration status embedded in DREAM Act proposals; rather, it provided qualified individuals with a two-year reprieve from deportation proceedings and the ability to obtain work authorization in the United States. At the expiration of the two-year period, program beneficiaries had to apply for a renewal of their DACA status, with renewals being issued in two-year increments. An individual eligible for DACA had to: (1) be under the age of 31 as of 15 June 2012; (2) have arrived in the United States before reaching his/her 16th birthday; (3) have continuously resided in the United States since 15 June 2007, up until the time of application (4) have been physically present in the United States on 15 June 2012, and at the time of making the request for deferred action with USCIS; (5) have entered without inspection prior to 15 June 2012, or had his lawful immigration status expired by that date; (6) be currently in school, have graduated from high school or obtained an equivalent degree, or have been honourably discharged

from the Coast Guard or Armed Forces of the United States; and (7) have no criminal records or pose a threat to national security or public safety.[4]

As noted above, since the surge in unaccompanied minors somewhat overlapped with the announcement of DACA, some politicians and critics have contended that DACA is primarily responsible for the surge in unaccompanied minors (Hing, 2014; Wolgin and Kelley, 2014; Wong, 2014). They have noted that these young migrants are heading north not just to flee deteriorating economic and security conditions in Central America, but also lured by rumours that they will be granted permission to stay legally and that such rumours originated from DACA.[5] In that vein, the Economist (2014) claimed that a memo from the US Customs and Border Patrol, based on interviews with 230 women and children apprehended in the Rio Grande Valley, concluded that they crossed mainly because they expected to be allowed to stay. Many responses, however, suggest that the surge started before DACA, as appears to be the case in Figure 1. Furthermore, none of the children crossing in or after 2012 would be eligible for DACA.[6] And, indeed, in an interview of over 400 children from Central America by the United Nations High Commissioner for Refugees (UNHCR) regional office for the United States and the Caribbean, only a handful of the children mentioned the rumours of preferential treatment for children or potential immigration reform as a reason for coming to the United States.[7]

Without a real understanding of the factors driving the inflows of unaccompanied minors from Central America, we will not be able to address the root causes of the problem. Therefore, the aim of this article is to explore in a more systematic manner the determinants of unaccompanied minors migration from Central America and Mexico, with a special focus on the role played by DACA, as opposed to other push-and-pull factors.

## BRIEF LITERATURE REVIEW

A number of authors have examined how policies granting permanent legal status via relatively broad amnesty programmes, such as the 1986 Immigration Reform and Control Act (IRCA), have impacted immigration flows.[8] The results from these studies are somewhat mixed. For instance, Bean et al. (1990), and Linder (2011) find that border apprehensions – a proxy for illegal immigration inflows – were significantly lower after IRCA. In contrast, Donato and Sisk (2015), Donato et al. (1992) and Woodrow and Passel (1990) do not. Trying to reconcile these contradictory findings, Orrenius and Zavodny (2003) look at various points in time surrounding the enactment of IRCA and find that apprehensions declined immediately after IRCA, but returned to normal levels soon after.

Studies on how *temporary* reprieves from deportation, such as DACA, affect illegal immigration inflows and, more specifically, child migration are virtually non-existent. Nonetheless, the literature has pointed out some factors they consider relevant in shaping child migration. For example, Bhabha (2008) suggests that, just as the migration of adults, child migration is motivated by traditional push and pull socio-economic factors, including poverty, employment and educational opportunities. Kandel et al. (2014) further add that, in addition to the aforementioned push and pull factors, actual and perceived US immigration policies play a role on child migration to the United States.

In addition, a number of commentary pieces and news reports that are descriptive in nature have zoomed in on unaccompanied minors in particular. For instance, Wong (2014) and Rosenblum and Ball (2016) suggest that violence in the sending countries is mostly responsible for the surge in flows during 2013 and 2014. Chishti and Hipsman (2014) and Hulse (2014) argue that, in addition to violence, child-friendly policies that date back to the TVPRA, have contributed to the upsurge in unaccompanied minors. By contrast, in a recent study Donato and Sisk (2015) argue that, while

© 2016 The Authors. International Migration © 2016 IOM

violence and poverty underlie migration decisions, they do not predict child migration. Rather, child migration is strongly linked to parents' US experience and period of entry, even though their analysis does not explore the more recent role played by the two policies being discussed here.

In what follows, we formally examine the role that DACA, as opposed to the potential role of the TVPRA and other well-known determinants of immigration flows, might have played in explaining the recent surge in unaccompanied minors. Specifically, as suggested by the aforementioned literature on child migration, we allow for the flow of unaccompanied minors to be impacted by economic conditions back at home and in the host country.[9] In addition, we take into account rampant violence, which often targets young people,[10] as well as the role played by border enforcement and the availability of alternative legal entry methods, as captured by the number of Border Patrol agents in the sector where minors are being apprehended and the number of legal permanent residents admitted yearly, respectively. Most importantly, we account for the role that the passage of the TVPRA, which might have fed rumours that the US government was offering legal status documentation to Central American children, as well as DACA, might have played on the observed increase in apprehensions of unaccompanied children once we condition for all the aforementioned push and pull factors.

## DATA AND DESCRIPTIVE EVIDENCE

We make use of data on apprehensions of unaccompanied minors from Mexico, El Salvador, Guatemala, and Honduras obtained via a Freedom of Information Act request. The dataset spans from 2007 through 2013, the time period for which the US Customs and Border Protection (CBP) made the data available. Unfortunately, CBP does not offer any data from before 2007, which would enhance our ability to evaluate the TVPRA policy more thoroughly. However, it does allow us to address our main purpose, namely to evaluate the role played by DACA in attracting unaccompanied minors. Finally, we use apprehension figures broken down by border patrol sector. In this manner, we are able to address: (a) the lack of higher frequency (monthly or quarterly) data, as well as (b) the large variation in apprehensions across border patrol sectors on account of a number of factors, including their proximity to the railroad (nicknamed "The Beast") on which the children ride throughout Mexico, the availability of crossing networks and coyotes, or the overall degree of difficulty associated with crossing through a particular border point due to its terrain (e.g. mountain or desert) or fencing, to name a few. Indeed, as made evident by the graphs in Figure 2, apprehensions in some border patrol sectors, such as Big Bend, TX and Yuma, AZ, were in the hundreds, whereas apprehensions in Rio Grande Valley, TX were in the thousands, exceeding 20,000 in 2013.[11] Moreover, while some sectors, such as Rio Grande Valley, TX, experienced the largest increases in unaccompanied minor flows, sectors like Yuma, AZ or El Centro, CA, witnessed negligible changes over that time period. In fact, in some sectors (e.g. El Paso, TX), the numbers were declining.

As noted above, a few factors help to explain these differences, but two key elements include geography and border security. Geographically, south Texas is closer to Central America than west Texas, New Mexico, Arizona or California, allowing migrants to minimize the risks of an already treacherous journey. Furthermore, until August 2014, when the Mexican government started to curtail migrants' ability to ride the cargo trains, they were able to get to the border on top of rail cars. In addition to geography, border security is also likely to have also played an important role in the observed differences in unaccompanied minors' flows across border patrol sectors. Border patrolling aside, the Rio Grande Valley sector has the least border fencing within proximity to densely populated areas. This is, in part, due to its terrain – a flood-prone area that makes the building of fencing along its banks extremely costly. Less fencing and proximity to a densely populated area

© 2016 The Authors. International Migration © 2016 IOM



FIGURE 2
APPREHENSIONS OF UNACCOMPANIED MINORS BY BORDER PATROL SECTOR



Source: US Customs and Border Protection (CBP) via a Freedom of Information Act request.

are factors that facilitate the crossing. In sum, for the aforementioned reasons it is essential to account for intrinsic border-patrol differences when modelling unaccompanied minors' apprehensions.

At this point, it is also worth noting that the number of apprehended youth is not the ideal measure of the number of unaccompanied minors who have successfully crossed into the United States or even of the number who have attempted to do so. However, given the generalized practice of turning themselves in to the border patrol agents upon crossing (e.g. American Immigration Council, 2014; Preston, 2014), these numbers are likely to be correlated to the number of illegal crossings by unaccompanied minors –possibly even more so that in the case of overall apprehensions of undocumented immigrants (Bean et al., 1990; Espenshade, 1995). As such, while one might have to be careful in assessing the exact impact of any determinant on those flows, the data can be helpful in identifying the direction of the impact that DACA, versus other factors, might be having on the recent flows of unaccompanied minors.

In addition, we gather information on a number of push and pull factors believed to be responsible for the observed increase in unaccompanied minor apprehensions – including economic and safety characteristics at home vs. in the host country. In particular, data on homicide counts and real GDP per capita of the sending countries is collected from the *United Nations Office on Drugs and Crime Database* and the *World Development Indicators Database*, respectively. Additionally, data on real US median weekly earnings and US unemployment rates are gathered from the Bureau of Labour Statistics website. Finally, as noted in section III, we also include figures on the total number of lawful permanent residents admitted from each country of origin and on the number of border patrol agents by sector along the southwest border of the United States and Mexico, which are collected from the *2007-2013 Yearbooks of Immigration Statistics* at the Department of Homeland Security website and from the US Customs and Border Protection website, correspondingly. A detailed description of the variables used in our analysis can be found in the data appendix.

Although our main purpose, owing to the availability of data, is on DACA, Table 1 displays the summary statistics for the variables used in the analysis before the 2008 TVPRA, after that law

© 2016 The Authors. International Migration © 2016 IOM

TABLE 1

SUMMARY STATISTICS BY TIME PERIOD

| Variables | Overall (2007-2013) | Pre-TVPRA (2007) | Post-TVPRA & Pre-DACA(2008-2011) | Post-DACA (2012-2013) |
|---|---|---|---|---|
| UAC Apprehensions | 513.246 | 189.139 | 419.833 | 862.125 |
| | (1157.105) | (486.518) | (975.142) | (1583.349) |
| Homicide Count per | 0.09 | 0.054 | 0.094 | 0.098 |
| 100,000 at Origin | (0.076) | (0.022) | (0.077) | (0.086) |
| Real GDP per capita at | 3773.414 | 3772.709 | 3725.95 | 3868.695 |
| Origin | (2645.779) | (2683.923) | (2596.191) | (2758.058) |
| Real U.S. Median | 337.286 | 335 | 339.5 | 334 |
| Weekly Earnings | (4.104) | (0) | (4.168) | (1.007) |
| U.S. Unemployment | 7.669 | 4.617 | 8.41 | 7.713 |
| Rate | (1.74) | (0) | (1.532) | (0.365) |
| LPRs Admitted per | 47.771 | 48.83 | 49.373 | 44.037 |
| Country in 1,000s | (61.4) | (58.66) | (64.7) | (56.394) |
| BP Agents per Sector in | 18.888 | 14.774 | 19.107 | 20.507 |
| 100s | (9.446) | (7.584) | (8.998) | (10.615) |
| No. of Observations | 252 | 36 | 144 | 72 |

Note: UAC Apprehensions Data is by Border Patrol Sector and Fiscal Year.

and before the 2012 DACA, and after DACA. On average, apprehensions of unaccompanied minors were the lowest prior to the implementation of the TVPRA and DACA –averaging 189 across the various southwest border patrol sectors in 2007. Apprehensions doubled during the 2008-2011 period following the TVPRA law and prior to the announcement of DACA in 2012. Then, they doubled again during 2012 and 2013, coinciding with the implementation of DACA.

Also worth noting are the ongoing changes in other potentially responsible push and pull factors. For instance, homicide counts per 100,000 doubled from 2007 to 2008-2011 – a change that could be in part responsible for the large increase in unaccompanied minor apprehensions during that same period. However, the increase took place despite the simultaneous increase in US unemployment rates and the number of border patrol agents per sector along the southwest border, two factors that should have curtailed that surge in unaccompanied minors. Even more puzzling is the sharp rise in the unaccompanied minors during 2012 and 2013 notwithstanding the stability in most of the variables in Table 1 during that time period. What sustained the continued growth in the flow of unaccompanied minors?

In what follows, we thoroughly assess the role that DACA and TVPRA, along with traditional pull and push factors, might have played in explaining the observed changes in apprehensions of unaccompanied minors once we account for a wide range of unobserved fixed and time-varying country of origin and border patrol sector characteristics potentially responsible for the observed changes in flows.

## METHODOLOGY

Our main aim is to gauge the role that DACA, relative to that of prior legislative measures or sending/receiving country characteristics, might have played in the increase in crossings of unaccompanied minors. To that end, we regress the logarithm of unaccompanied minor apprehensions on two dummy variables indicative of the period during which DACA and the TVPRA laws were in place, along with a series of variables capturing the push-and-pull factors discussed earlier. Among the

former, we include homicide counts per 100,000 and real GDP per capita in the home country, as well as the number of border patrol agents per sector and year in the United States. Among the pull factors, we include the median real US weekly earnings and unemployment rates, in addition to the number of lawful permanent residents admitted from each of the countries. Our benchmark specification is as follows:

$$
\begin{aligned}
\log(UACS)_{bct} = {} & \alpha_0 + \alpha_1 DACA_t + \alpha_2 TVPRA_t + \alpha_3 X_{bt} + Y_t\beta + Z_{ct}\gamma + \delta_b + \theta_c + trend + \delta_b * trend \\
& + \theta_c * trend + \varepsilon_{bct}
\end{aligned}
$$

$$(1)$$

where subscript $b$ denotes border patrol sector, $c$ denotes home country of the unaccompanied minors, and $t$ denotes year of apprehension. Our dependent variable is the logarithm of unaccompanied minor apprehensions ($\log(UACS)_{bct}$) from each country per border patrol sector and year, a monotonic transformation that proves convenient in dealing with heteroscedasticity and in transforming a highly skewed variable into one that is more approximately normal. Our key regressors are given by $DACA_t$ and $TVPRA_t$, two dummy variables indicative of when DACA and the TVPRA were in effect. The vector $X_{bt}$ includes information on the number of border patrol agents per sector and year, whereas $Y_t$ accounts for median real weekly earnings and unemployment rates in the United States. (Median weekly earnings are in 1982-1984 constant dollars.) Vector $Z_{ct}$ includes homicide counts per 100,000 and real GDP per capita in the home country, along with data on the number of lawful permanent residents admitted to the United States from each of the four countries of origin. The latter could have influenced the migration of unaccompanied minors if they came to the United States to reunite with other family members with a legal status. Alternatively, if children had migrated illegally prior to the enactment of any of the two laws, an increase in the number of new lawful permanent residents should lower the apprehensions of unaccompanied minors.

Equation (1) also includes a range of border patrol ($\delta_b$) and country of origin ($\theta_c$) fixed-effects to help explain flows of unaccompanied minors, such as proximity to railroad tracks crossing Mexico (e.g. the case of Rio Grande Valley sector), the difficulty associated with crossing through a mountainous or deserted terrain, or a history of high emigration to the United States (e.g. Mexico or El Salvador, owing to political turmoil in the 1980s). Importantly, because of the clear trend in apprehensions of unaccompanied minors exhibited in Figure 1, we include a time trend and also test for serial correlation.[12] One way to address first-order serial correlation is to perform the estimation in first differences. By doing so, however, we inevitably lose the 2007 data and the ability to assess the potential role of the TVPRA law on the flows of unaccompanied minors. Therefore, instead we use Baltagi-Wu's Generalized Least Square method to remove the AR(1) component.[13]

Finally, in addition to a time trend, equation (1) also incorporates border patrol- and country of origin-specific time trends (i.e. ($\delta_b * trend$) and ($\theta_c * trend$), respectively). These are included to address differences in the operability of border patrol sectors, sometimes related to the adoption of specific measures, as in the case of the progressive adoption of Operation Streamline by the various border patrol sectors from 2005 onwards.[14] At other times, differences in the flows of unaccompanied minors by border patrol sector are associated with the changing availability of crossing networks and coyotes through a particular border point. Similarly, countries of origin-specific time trends allow us to account for other time-varying characteristics in the home country, such as fertility rates or policy interventions.

We estimate various model specifications that progressively add the discussed pull and push factors to better gauge their role in shaping flows of unaccompanied minors. This is particularly important in the presence of potentially endogenous regressors, as would be the case with the number of border patrol agents per sector and year (in hundreds). By including it in a stepped manner,

TABLE 2

DETERMINANTS OF UAC APPREHENSIONS

| Key Regressors | (1) Baseline | (2) Plus Fixed Effects and Time Trends | (3) Plus Receiving Country Characteristics | (4) Plus Legal Entries | (5) Plus Enforcement | (6) Plus Sending Country Characteristics | (7) Plus Interaction Term |
|---|---|---|---|---|---|---|---|
| **DACA** | **0.695*** (0.121) | **0.424** (0.174) | 0.177 (0.277) | 0.195 (0.271) | 0.192 (0.272) | 0.290 (0.274) | 0.249 (0.275) |
| **TVPRA** | **0.776*** (0.134) | **0.592*** (0.168) | **0.586*** (0.182) | **0.792*** (0.201) | **0.817*** (0.208) | **0.872*** (0.199) | **0.953*** (0.208) |
| Mexico*TVPRA | – | – | – | – | – | – | –1.213 (0.959) |
| Real U.S. Median Weekly Earnings | – | – | **0.098** (0.039) | **0.100*** (0.039) | **0.100** (0.039) | **0.080* (0.045) | **0.086* (0.045) |
| U.S. Unemployment Rate | – | – | –0.233* (0.136) | –0.266** (0.135) | –0.254* (0.137) | –0.323*** (0.152) | –0.357** (0.154) |
| LPRs Admitted per Country in 1,000s | – | – | – | –0.014** (0.006) | –0.014** (0.006) | –0.015** (0.006) | 0.002 (0.015) |
| Border Patrol Agents per Sector in 100s | – | – | – | – | –0.022 (0.044) | –0.026 (0.042) | –0.032 (0.042) |
| Homicides per 100,000 at Origin | – | – | – | – | – | 5.856* (3.297) | 10.026** (4.661) |
| Real GDP per Capita at Origin | – | – | – | – | – | –0.002*** (0.001) | –0.002*** (0.001) |
| BP Sector Fixed Effects | N | Y | Y | Y | Y | Y | Y |
| Country of Origin Fixed Effects | N | Y | Y | Y | Y | Y | Y |
| Time Trend | N | Y | Y | Y | Y | Y | Y |
| BP Sector-Time Trends | N | Y | Y | Y | Y | Y | Y |

© 2016 The Authors. International Migration © 2016 IOM

AR2022_500385

*The Surge in Unaccompanied Minors at the US-Mexico Border*                    111

TABLE 2
(CONTINUED)

| Key Regressors | (1) Baseline | (2) Plus Fixed Effects and Time Trends | (3) Plus Receiving Country Characteristics | (4) Plus Legal Entries | (5) Plus Enforcement | (6) Plus Sending Country Characteristics | (7) Plus Interaction Term |
|---|---|---|---|---|---|---|---|
| Country of Origin-Time Trends | N | Y | Y | Y | Y | Y | Y |
| $R^2$ | 0.047 | 0.829 | 0.833 | 0.834 | 0.834 | 0.842 | 0.842 |
| Observations | 252 | 252 | 252 | 252 | 252 | 252 | 252 |

Notes: Standard Errors are in Parentheses and are Clustered at the (Country, Border Patrol Sector) Level. The Dependent Variable is the Logarithm of Unaccompanied Alien Children. ***, **, * Denote 1%, 5%, and 10% Levels of Significance, Respectively. Country-of-origin Dummies, Including one for Mexico, are Added to Specifications (2) through (7).

© 2016 The Authors. International Migration © 2016 IOM

we are able to gauge unexpected changes in the estimated impact of DACA potentially driven by its endogenous nature.

## RESULTS

Was DACA responsible, at least in part, for the unprecedented increase in the inflow of unaccompanied alien children in 2012 and 2013? Table 2 explores that question.[15] In the most parsimonious model specification, DACA appears to have augmented apprehensions of unaccompanied minors by as much as 70 per cent. A similar impact is also found for the 2008 TVPRA, which appears to have led to a 78 per cent increase in apprehensions of unaccompanied alien children. These two estimates, however, significantly decrease in magnitude when we include a range of border patrol sector and country of origin fixed effects, along with a time trend and border patrol and country of origin specific time trends. Specifically, the effect of DACA on the apprehensions of unaccompanied minors goes down from 70 percent to 42 percent, whereas that of the TVPRA drops from 78 per cent to 59 per cent. In fact, as shown in specifications (3) through (7), the impact of DACA effectively becomes indistinguishable from zero when we control for the pull and push factors previously discussed in Table 1. Accounting for median weekly earnings and unemployment rates in the United States further reduces the estimated coefficient for DACA and eliminates its statistical significance. In contrast, the estimated impact of the TVPRA remains practically unchanged and only keeps on growing as we include the remaining controls: lawful entries, border patrol agents by sector and information on economic conditions and violence in the home country.

Our most complete specification (specification 7) adds an interaction term of the TVPRA with the Mexico country dummy. Because the TVPRA specifically targeted minors from countries other than Canada and Mexico, we would expect the 2008 law to have impacted the flow of unaccompanied minors from El Salvador, Guatemala and Honduras, but not the flow from neighbouring Mexico. As such, our expectation is that the estimated coefficients for the TVPRA and its interaction term with the Mexico country dummy would be jointly statistically different from zero and negative, revealing the comparatively larger impact of the 2008 law on the flow of unaccompanied minors from El Salvador, Guatemala and Honduras.

The estimates in specification 7 suggest that DACA does not appear to have a significant impact on the observed increase in unaccompanied alien children in 2012 and 2013. Rather, apprehensions of unaccompanied minors from El Salvador, Guatemala and Honduras have been on the rise since 2008.[16] They practically doubled since the passage of the aforementioned law by the US Congress, probably due to the fact that children from non-neighbouring countries were allowed to stay in the United States, often for years, while awaiting a hearing. In contrast, in relative terms, the TVPRA lowered by approximately 26 per cent apprehensions of unaccompanied minors originating from Mexico, who continued to be returned immediately to their home country following their apprehension via expedited removals.[17]

Other estimates in Table 2 have the expected signs. For instance, a one per cent increase in median weekly earnings in the United States, a highly unusual event given the compression of household incomes since the 1980s, would be associated with a 29 per cent increase in apprehensions of unaccompanied minors.[18] In contrast, a similar one per cent increase in unemployment rates would lower such apprehensions by 2.7 per cent. Additionally, conditions in the home countries also appear to play a significant role in shaping the flow of unaccompanied youth. In particular, a five per cent increase in the count of homicides per 100,000, the equivalent to an additional 445 homicides per year, on average, seems to raise apprehensions of unaccompanied alien children by 4.51 per cent. In contrast, better living conditions back home, as captured by a one per cent higher real

AR2022_500387

GDP per capita, a mere \$37 increase per year, would reduce the aforementioned apprehensions by 7.5 per cent.

In sum, while DACA does not appear to have played a significant role in shaping the recent increases in apprehensions of unaccompanied alien children along the Mexico-U.S. border, the 2008 TVPRA does, along with economic conditions in the United States, plus economic conditions and violence in the originating countries.

## SUMMARY AND CONCLUSIONS

Apprehensions of unaccompanied minors from Mexico and Central American countries had been on the rise since 2008, but news reports particularly caught up with the increase after 2012. The surge in unaccompanied alien children crossing the southwest border brought new attention, most of it negative, to DACA. Some politicians have posited that DACA created the expectation that children would be allowed to stay in the country and, as a result, contributed to the surge. Immigration advocates, however, believe that the two are not related. With the President's executive order from November 20, 2014 expanding DACA and granting a temporary reprieve from deportation and work permits to parents of permanent residents or US born children, currently placed on hold after Judge Hanen's decision to enjoin its implementation temporarily, a careful analysis of the effect of these policy measures is much needed.

Using data on apprehensions of unaccompanied children by border patrol sector, nationality and year, we find that DACA has not had a significant impact on those apprehensions once we account for traditional pull and push factors and a range of unobserved country of origin and border patrol sector time-varying and fixed effects. Rather, the 2008 TVPRA, along with violence in the originating countries and economic conditions both in the origin countries and the United States, emerge as some of the key determinants of the recent surge in unaccompanied minors apprehended along the southwest US-Mexico border. While our findings are bounded by the accessibility of CBP data, a limitation that warrants further analyses were such data made available, we can conclude that the empirical evidence does not support the claim that DACA is responsible for the increase in the flow of unaccompanied alien children.

## ACKNOWLEDGEMENTS

We are grateful to Pia Orrenius and Madeline Zavodny for feedback on an earlier version, and to Nick Santos for assistance in acquiring the data.

## NOTES

1. See http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children for details.
2. See, for instance: http://trailblazersblog.dallasnews.com/2014/07/ted-cruz-pushes-to-undo-2012-deportation-ban-for-young-immigrants.html/
3. 8 USC § 1232. Only recently, in July 2014, H.R. 5079 was introduced to amend the TVPRA and allow for any unaccompanied alien child who is not considered a victim of trafficking or does not have a credible fear of persecution to be: (1) placed in removal proceedings, (2) eligible for voluntary departure at no cost to the child, and (3) provided with access to counsel. Currently, such expedited removal requirements apply only to unaccompanied children from countries that are contiguous to the United States.
4. For greater details, visit the section entitled: "Consideration of Deferred Action for Childhood Arrivals Process" at http://www.uscis.gov

© 2016 The Authors. International Migration © 2016 IOM

5. See, for instance: http://trailblazersblog.dallasnews.com/2014/07/ted-cruz-pushes-to-undo-2012-deportation-ban-for-young-immigrants.html/

6. Nowrasteh (2014) and *LA Times* (2014).

7. http://themigrationist.net/2014/06/25/why-are-unaccompanied-children-fleeing-central-america-and-how-can-the-u-s-and-others-respond/

8. There is also a literature examining the role played by a much broader range of immigration policies, not just those granting legal status, on immigration flows from Latin America. For example, Massey and Pren (2012) suggest that the surge in illegal immigrants from Latin America since 1965 is an unintended consequence stemming from the Bracero Programme, the establishment of a cap on the number of permanent resident visas and stricter enforcement policies.

9. It is worth noting that, while young children may not be thinking about work and other economic aspects, such as wages, when they migrate, older youth – a group that encompasses most of the unaccompanied minors – might. Furthermore, even if they are not thinking about their immediate employment, young children might be swayed by better employment opportunities and overall economic conditions typically linked to better prospects for escaping poverty.

10. In a report for the Advocacy for Human Rights in the Americas, Meyer and Isacson (2015) note how, for example, homicides in El Salvador increased by 57 per cent in 2014 following the collapse of a 2012-2014 gang truce.

11. Because of the distinct magnitude of the flows, we use different scales for the y-axis in the figures in order to see the variation in the flows over time within each sector.

12. Wooldridge (2002)'s test for autocorrelation in panel-data models suggests that we have first-order autocorrelation in all of our specifications in Table 2 at the one per cent level of significance.

13. See details in http://www.stata.com/manuals13/xtxtregar.pdf.

14. We also experimented with including an indicator for Operation Streamline. The latter turned to be collinear with the border patrol specific time trends, which prove more relevant in explaining unaccompanied minor flows. Since our key findings were unaffected by the inclusion of that policy indicator, we opted for keeping the border patrol specific time trends instead. Results using the Operation Streamline indicator are available from the authors.

15. The Baltagi-Wu LBI-statistics in all specifications are around 2 indicating no autocorrelation. As a rough rule of thumb, values below 1 suggests positively autocorrelated, see Sarkisian (n.d.) and Engelhardt and Prskawetz (2009).

16. Our findings are robust to the exclusion of Mexicans from our sample. Results are available from the authors upon request.

17. The impact of the TVPRA on apprehensions of unaccompanied alien children from Mexico is computed as the sum of the estimated coefficients of the TVPRA and the interaction term between TVPRA and Mexico dummy, which are jointly significant at the one per cent level.

18. The marginal effect is computed as: (0.01*$337/week)*100*β, where $337 is the average value of real median weekly earnings in the U.S. as shown in Table 1. Other marginal effects are computed similarly.

# REFERENCES

American Immigration Council
2014     *Children in Danger: A Guide to the Humanitarian Crisis at the Border*. Special Report, July. Washington DC. Available at: http://www.immigrationpolicy.org/sites/default/files/docs/children_in_danger_a_guide_to_the_humanitarian_challenge_at_the_border_final.pdf (accessed 20 July 2015).

Bean, F.D., T.J. Espenshade, M.J. White, and R.F. Dymowski
1990     "Post-IRCA Changes in the Volume and Composition of Undocumented Migration to the United States", in F.D. Bean, B. Edmonston and J.S. Passel (Eds), *Undocumented Migration to the United States*, Santa Monica: RAND: 111–158

Bhabha, J.
2008     "Independent Children, Inconsistent Adults: International Child Migration and the Legal Framework. *UNICEF Discussion Papers*. IDP No. 2008-02.

Binford, W.
2013     "Giving Voice to Unaccompanied Children in Removal Proceedings", *Willamette Journal of International Law and Dispute Resolution*, 34: 34–55.

**AR2022_500389**

Chishti, M., and F. Hipsman
    2014      "Dramatic Surge in the Arrival of Unaccompanied Children Has Deep Roots and No Simple Solu-
             tions", *Migration Information Source*. Washington, DC: Migration Policy Institute. June 13. Online
             at:  http://www.migrationpolicy.org/article/dramatic-surge-arrival-unaccompanied-children-has-deep-
             roots-and-no-simple-solutions
Donato, K.M., J. Durand, and D.S. Massey
    1992      "Stemming the Tide? Assessing the Deterrent Effects of the Immigration Reform and Control Act",
             *Demography*, 29: 139–157.
Donato, K.M., and B. Sisk
    2015      "Children's Migration to the United States from Mexico and Central America: Evidence from the
             Mexican and Latin American Migration Projects", *Journal on Migration and Human Security*, 3(1):
             58–79.
Engelhardt, H., and A. Prskawetz
    2009      "A Pooled Time-Series Analysis on the Relation Between Fertility and Female Employment",
             *European Demographic Research Papers #0501*.
Espenshade, M.J.
    1995      "Using INS Border Apprehension Data to Measure the Flow of Undocumented Migrants Crossing
             the U.S.-Mexico Frontier", *International Migration Review*, 29(2): 545–465.
Hanson, G.
    2012      "Immigration and Economic Growth", *Cato Journal*, 32(1): 25–34. Available online at: http://
             www.cato.org/pubs/journal/cj32n1/cj32n1.html
Hanson, G., and A. Spilimbergo
    2001      "Political Economy, Sectoral Shocks, and Border Enforcement", *Canadian Journal of Economics*,
             34(3): 612–638.
Hing, J.
    2014      "Three Myths of the Unaccompanied Minors Crisis, Debunked" ColorLines News for Action, Tues-
             day, July 1. Online at: http://colorlines.com/archives/2014/07/three_myths_of_the_unaccompa-
             nied_minors_crisis.html (accessed 24 November 2014).
Hulse, C.
    2014      "Immigrant Surge Rooted in Law to Curb Child Trafficking", *The New York Times*. Published July
             7, 2014. (accessed 8 December 8 2014).
Kandel, W.A., A. Bruno, P.J. Meyer, C.R. Seelke, M. Taft-Morales, and R.E. Wasem
    2014      "Unaccompanied Alien Children: Potential Factors Contributing to Recent Immigration", Congres-
             sional Research Service, *CRS Report*, R43628.
Krogstad, Jens M., and Jeffrey S. Passel
    2014      "*5 facts about illegal immigration in the U.S.*" Pew Research Center, Washington DC.
             Available at: http://www.pewresearch.org/fact-tank/2014/11/18/5-facts-about-illegal-immigration-in-
             the-u-s/ (accessed 6 December 2014].
Linder, J.
    2011      "The Amnesty Effect: Evidence from the 1986 Immigration Reform and Control Act", *The Public
             Purpose*, Spring 2011: 13–31.
Los Angeles Times
    2014      "Republicans blame Obama policies for immigration crisis on border" Available at: www.latimes.-
             com/nation/la-na-immigration-border-20140620-story.html
Massey, D.S., and K.A. Pren
    2012      "Unintended Consequences of US Immigration Policy: Explaining the Post-1965 Surge from Latin
             America", *Population and Development Review*, 38(1): 1–29.
Meyer, Maureen, and Adam Isacson
    2015      "On the Front Lines: Border Security, Migration, and Humanitarian Concerns in South Texas",
             New WOLA Report on the South Texas Border. Available at: www.wola.org/publications/south_-
             texas_report (accessed 11 January 2016).
MPI/Migration Policy Institute
    2012      "Top 10 of 12: Issue #10: As Migration of Unaccompanied Minors Endures, and in Some Cases
             Rises, Government Seeks to Respond", Migration Information Source, December 2012. Available
             at: http://www.migrationinformation.org (accessed 15 September 2014).

© 2016 The Authors. International Migration © 2016 IOM

*Amuedo-Dorantes and Puttitanun*

Nowrasteh, Alex
  2014    "DACA Did Not Cause the Surge in Unaccompanied Children". Cato At Liberty, July 29, 2014.
          Available at: http://www.cato.org/blog/daca-did-not-cause-surge-unaccompanied-children (accessed
          4 December 2014).
Orrenius, P.M. and M. Zavodny
  2003    "Do Amnesty Programs Reduce Undocumented Immigration? Evidence from IRCA", *Demography*,
          40(3): 437–450.
Preston, J.
  2014    "Migrants Flow in South Texas, as Do Rumors" *The New York Times*. Published June 16, 2014.
          (accessed 1 December 2014).
Rempdell, S.
  2015    "Credible Fears, Unaccompanied Minors, and the Causes of the Southwestern Border Surge",
          *Chapman Law Review, forthcoming 2015*.
Resnick, B.
  2014    "Why We Don't Immediately Send the Border Kids Back", Available at: http://www.nationaljour-
          nal.com/domesticpolicy/why-we-don-t-immediately-send-the-border-kids-back-20140708.   (accessed
          12 December 2014).
Rosenblum, M.R., and I. Ball
  2016    "Trends in Unaccompanied Child and Migration from Central America", *Migration Policy Institute*
          Fact Sheet, January 2016.
Sarkisian, N.
  n.d.    "SC706: Longitudinal Data Analysis", Available at: http://sarkisian.net/sc706/fixed.doc (accessed 4
          December 2014).
Smith, J. P., and B. Edmonston, eds.
  1997    *The New Americans*. Washington, DC: National Academy Press.
Stinchcomb, D., and E. Hershberg
  2014    "Unaccompanied Migrant Children from Central America: Context, Causes, and Responses", *Cen-
          ter for Latin American & Latino Studies Working Paper Series No. 7*.
*The Economist*
  2014    "Migration to the United States. Under-age and on the move. A wave of unaccompanied children
          swamps the debate over immigration" Available at: http://www.economist.com/news/briefing/
          21605886-wave-unaccompanied-children-swamps-debate-over-immigration-under-age-and-move.
Wolgin, Philip E., and Angela Maria Kelley
  2014    "5 Things You Need to Know About Unaccompanied Children", *American Progress*. Online at:
          https://www.americanprogress.org/issues/immigration/news/2014/06/18/92056/5-things-you-need-to-
          know-about-the-unaccompanied-minors-crisis/ (accessed 24 November 2014).
Wong, T.K.
  2014    "Statistical Analysis Shows that Violence, Not Deferred Action, Is Behind the Surge of Unaccom-
          panied Children Crossing the Border", *American Progress*. Online at: https://www.american-
          progress.org/issues/immigration/news/2014/07/08/93370/statistical-analysis-shows-that-violence-not-
          deferred-action-is-behind-the-surge-of-unaccompanied-children-crossing-the-border/   (accessed   24
          November 2014).
Woodrow, K.A., and J.S. Passel
  1990    "Post-IRCA Undocumented Immigration to the United States: An Assessment Based on the June
          1988 CPS. in F.D. Bean, B. Edmonston and J.S. Passel (Eds), *Undocumented Migration to the
          United States: IRCA and the Experience of the 1980s*, Washington, DC: Urban Institute Press: 33–
          75.
Wooldridge, Jeffrey
  2002    *Econometric Analysis of Cross Section and Panel Data*. Cambridge. MA: MIT Press.

AR2022_500391

DATA APPENDIX

TABLE A

VARIABLE NAMES, DEFINITIONS AND SOURCES

| Variable Name | Definition | Source |
|---|---|---|
| *Dependent Variable:* Unaccompanied Alien Children | Number of apprehensions of unaccompanied children by border patrol sector, nationality and year. We work with 9 border patrol sectors: Big Bend, TX; Del Rio, TX; El Centro, CA; El Paso, TX; Laredo, TX; Rio Grande Valley, TX; San Diego, CA; Tucson, AZ; Yuma, AZ; 4 countries of origin: Mexico, El Salvador, Guatemala, Honduras; and 7 years of data spanning from 2007 through 2013. | U.S. Customs and Border Protection (CBP) via a Freedom of Information Act request. |
| *Regressors:* DACA | Dummy variable equal to 1 after DACA was in effect. | U.S. Citizenship and Immigration Services Website:http://www.uscis.gov/ humanitarian/consideration-deferred-action-childhood-arrivals-daca |
| TVPRA | Dummy variable equal to 1 after TVPRA was in effect. | U.S. Department of State Website: http://www.state.gov/j/tip/laws/ 113178.htm |
| Mexico | Dummy variable equal to 1 when the unaccompanied alien children apprehended were from Mexico. | U.S. Customs and Border Protection (CBP) via a Freedom of Information Act request. |
| Real U.S. Median Weekly Earnings | U.S. median weekly earnings in 1982-1984 U.S. dollars. | Bureau of Labor Statistics Website: http://www.bls.gov/cps/cpswktabs.htm |
| U.S. Unemployment Rate | U.S. average unemployment rate. | Bureau of Labor Statistics Website: http://data.bls.gov/timeseries/ LNS14000000 |
| LPRs Admitted per Country in 1000s | Total number of Lawful Permanent Residents (LPRs) admitted to the United States from each country in thousands. | 2007-2013 Yearbooks of Immigration Statistics at the Department of Homeland Security website: http://www.dhs. gov/yearbook-immigration-statistics |
| Border Patrol Agents per Sector in 100s | Total number of border patrol agents by border patrol sector in hundreds. | U.S. Customs and Border Protection website: http://www.cbp.gov/sites/default/files/documents/BP%20Staffing% 20FY1992-FY2014_0.pdf |
| Homicide per 100,000 at Origin | Homicide rate per 100,000 in the country of origin. | United Nations Office on Drugs and Crime Database. |
| Real GDP per Capita at Origin | Real GDP per capita of the country of origin in 2005 U.S. dollars. | World Development Indicators Database. |

© 2016 The Authors. International Migration © 2016 IOM

Copyright of International Migration is the property of Wiley-Blackwell and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

BLOG

# The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants

SEPTEMBER 17, 2021 • ARTICLES

By Chair Cecilia Rouse, Lisa Barrow, Kevin Rinz, and Evan Soltas

The United States is often described as a nation of immigrants. With the exception of Native Americans, the vast majority of Americans are immigrants or the descendants of immigrants or enslaved people. This diversity has been celebrated for its contributions to American culture through cuisine, language, and the arts, among many other influences.

Immigrants also make an important contribution to the U.S. economy. Most directly, immigration increases potential economic output by increasing the size of the labor force. Immigrants also contribute to increasing productivity. Economists Gaetano Basso and Giovanni Peri find that immigrants are more mobile than natives in response to local economic conditions, perhaps because they have fewer long-standing familial and community ties, helping labor markets to function more efficiently. Economists Jennifer Hunt and Marjolaine Gauthier-Loiselle have also shown that immigrants boost innovation, a key factor in generating improvements in living standards. Specifically, they find that a 1 percentage point increase in the population share of immigrant college graduates increases patents per capita by 9 percent to 18 percent.

While most immigrants residing in the United States are legally authorized to live and work here, the Department of Homeland Security (DHS) estimates the population of unauthorized immigrants to be roughly 11.4 million as of 2018. This estimate and those used by researchers include beneficiaries of Deferred Action for Childhood Arrivals (DACA) and Temporary Protected Status (TPS), even though both groups have legal authorization to live and work in the United States on a temporary basis.[1] This diverse population also includes other individuals who either entered without passing through immigration (unauthorized entry), or legally came to the United States on a temporary basis and then overstayed their visa.[2] Most of these individuals may not legally work or receive safety-net benefits—or only can under substantial restrictions.

AR2022_500394

This blog discusses the economics of legalizing unauthorized immigrants. Some critics claim that legalizing unauthorized immigrants, as proposed by the Build Back Better framework, could be costly because they would become eligible for additional social insurance benefits such as Medicaid. However, granting permanent legal status would also likely raise tax revenues, increase productivity, and have additional benefits for the children of these immigrants, generating substantial economic value for the country.

**Permanent legal status is likely to increase the effective labor supply of unauthorized immigrants.**

About 73 percent of unauthorized-immigrant adults ages 18 to 65 were employed in any given year from 2014 to 2019, roughly equal to the employment rates of non-citizen legal residents and U.S. citizens.[3] Permanent legal status would likely allow these workers to be more productive, generating gains that could be realized through a variety of channels.

Critically, permanent legal status would allow these currently unauthorized immigrants to pursue and accept jobs for which their skills are well-suited, rather than being restricted to particular sectors of the economy, such as agriculture, construction, and leisure and hospitality, where employers often do not insist on legal status and where wages are lower on average. For example, around one-half of workers in the U.S. dairy industry—which in 2018 paid between $11 and $13 an hour for general labor—are immigrants, most of whom are thought to be unauthorized.[4] Without legal status, unauthorized immigrants have limited opportunities for job mobility, a key channel by which other workers find better, more productive employment matches over their careers.

Comparisons between the earnings of authorized and unauthorized immigrants suggest that limited job opportunities cause talent to be misallocated, reducing productivity. Unauthorized-immigrant workers have been estimated to earn about 40 percent less per hour than native-born workers and about 35 percent less per hour than legal immigrants. A large part of these gaps can be explained by differences in average skills as measured by educational attainment; however, after adjusting for these and other demographic differences, this research continues to find a significant "wage penalty" for unauthorized workers ranging from 4 percent to 24 percent of their hourly wage. Further, we estimate that there is no wage penalty for unauthorized-immigrant workers relative to similar legal immigrants within the same occupation and industry, which suggests the penalty arises from being confined to low-paying jobs.[5]

In addition to employment opportunities, evidence from prior legalizations in the United States and in other countries suggests that legalization also encourages immigrants to improve their language skills, induces them to complete additional education and training, and

AR2022_500395

improves their health outcomes, all of which make them more productive members of society. For example, evidence from Germany finds    that faster access to citizenship led immigrant women to improve their language skills in addition to increasing their labor force attachment. In a study of U.S. teenagers born to the same immigrant families—but whose legal status varies due to the countries in which they were born—the unauthorized-immigrant teenagers were about 2.6 percentage points    less likely to be enrolled in school. In addition, evidence from the Immigration Reform and Control Act of 1986 (IRCA   ) and DACA    shows these reforms increased schooling for previously-unauthorized immigrants. Finally, a recent economic study    also suggests that DACA-recipients experienced improved physical and mental health, which contributes to increased productivity.

In a market economy, employees' productivity influences their pay. As a result, productivity improvements—through better job matches, investments in skills, and increases in physical and mental health—should be reflected in increased wages among the legalized immigrants. Indeed, the research evidence supports this hypothesis. For example, research finds that the wages of DACA-eligible Dreamers rose 4 to 5 percent    by 2016 relative to those not eligible. [6] Another study concludes    that the DACA-related gains in earnings for unauthorized workers were largest among the lowest paid workers. These results signify that even though these unauthorized immigrants may currently be working in the United States, providing them with legal permanent status would increase their effective labor supply, that is, the work their greater productivity enables them to do. Importantly, this increase in productivity is foundational for improving U.S. economic growth.

Given that providing legal status to unauthorized immigrants would increase their effective labor supply, critics of legalization argue there could be adverse labor market consequences for native and other immigrant workers. While there is not a large economics literature on the labor market effects of legalization on other workers, in a well-cited National Academies report    on the economic and fiscal impact of immigration, a distinguished group of experts concludes that in the longer run, the effect of immigration on wages overall is very small.[7]

**AR2022_500396**

9/17/21, 10:56 AM                The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants | The White House

Case 1:18-cv-00068 Document 610-4 Filed on 11/04/22 in TXSD Page 397 of 990



**Figure 1: Age Distribution of Citizens and Unauthorized Immigrants**

*Share of population (percent)*

Source: U.S. Current Population Survey (ASEC 2014-2019), CEA Analysis.

**Permanent legal status would likely have implications for costs and revenues for the Federal government.**

While granting permanent legal status to unauthorized immigrants would likely boost economic growth, some are concerned about the price tag, given that an increased number of legal immigrants could enroll in, and raise costs of, social benefit programs. However, some of this increased cost would likely be offset by higher tax contributions.[8]

Consider first the potential increase in costs to the Federal government associated with receipt of social benefits. Legal status may make undocumented immigrants more comfortable using Federal benefits for which they are already eligible, such as emergency health services under Medicaid and the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC). In addition, newly-legalized immigrants could take up social benefits for which they were previously ineligible due to their unauthorized status. Based on benefit use among demographically-similar, non-citizen legal immigrants, this increase in take-up could be significant. For example, many of these immigrants could become fully eligible for Medicaid.[9] Finally, granting legal status could also increase benefit take-up among citizen or authorized-immigrant relatives of undocumented immigrants; several studies find that the threat of an undocumented relative being deported discouraged benefit take-up by citizen members of the same household, even though those citizens are eligible for benefits and cannot be deported.

AR2022_500397

However, much of the direct fiscal cost of these public benefits is likely to be repaid due to increased tax contributions from the immigrants, and, in the long run, by positive fiscal contributions from their children. Anyone working in the United States is supposed to be paying taxes; however, Federal income tax compliance rates for unauthorized immigrants are unknown. Several government agencies and nongovernmental organizations estimate rates between 50 and 75 percent. By comparison, tax compliance rates on ordinary wage income are close to 100 percent for the U.S. population as a whole, according to the U.S. Treasury Department.

Shifts from the informal to the formal sector that are expected to result from legal status would likely increase tax compliance rates. Indeed, after the passage of IRCA, researchers found that income tax compliance rates of previously-unauthorized immigrants in California became comparable to other residents. Combined with the wage gains, gross tax revenues would increase. Moreover, undocumented immigrants are disproportionately of prime-working age (see Figure 1) and relatively younger than prime-age U.S. citizens. Therefore, they are likely to have many working years during which they will be paying these higher payroll and income taxes if they are legalized.

Finally, many children of unauthorized immigrants grow up in households below the Federal poverty level because their parents cannot secure higher-paying work due to their immigration status. Growing up poor can be harmful for child development, and providing public health insurance and nutrition assistance has been shown to improve the health of immigrant children. In general, the direct fiscal cost of public assistance for low-income children is thought to be substantially or fully offset in the long run. The costs are offset by increases in tax revenues and reductions in spending on government programs when these children grow up to become higher-earning adults than they would have had they not received assistance.[10]

## Conclusion

Immigrants have made innumerable contributions to American business and society. However, current law confines millions of them to a life in the shadows, without the rights to be fully economically engaged or have access to foundational social protections. Such treatment inflicts harms on unauthorized immigrants themselves and their families—many of which include U.S. citizens and non-citizen legal residents—as well as to the broader economy.

Though some argue that increased take-up of social programs would generate a substantial fiscal cost to the government, the productivity of the newly-legalized would likely increase, which would benefit all in the United States by expanding economic output. Further, the

AR2022_500398

ensuing increase in wages and compliance with tax requirements would increase their contributions to public sector finances, and their children would benefit as well. Allowing currently unauthorized workers to engage fully in the labor force would not only benefit the immigrants and their families, but society as a whole.

[1] DHS estimates of the unauthorized immigrant population are calculated as the residual from subtracting the legally-resident, foreign-born population from the total foreign-born population. Dreamers (individuals born between 1981 and 2012 brought to the United States as children) who applied to and were accepted into the DACA program can legally work and reside in the United States, but only for two years, at which point they must apply to renew their status; the Supreme Court ruled in June 2020 that the Trump Administration could not end the program, but the U.S. District Court in Southern Texas ruled in July 2021 that the program is not lawful. While those currently in the DACA program are still protected and can reapply, new applicants are not accepted, and the case is making its way through the Federal courts. TPS is granted only until resolution of the conditions in a recipient's country of origin that make it difficult or unsafe to return.

[2] Unauthorized immigrants do not include people who have been granted asylum or refugee status or nonimmigrant residents, such as students and temporary workers, who have been granted permission to study or work in the United States for a limited period of time and for a specific purpose.

[3] CEA analysis of Current Population Survey microdata from 2014 to 2019.

[4] The average hourly wage in the United States in 2020 was about $27 an hour.

[5] Based on CEA analysis of Current Population Survey microdata from 2014 to 2019.

[6] Evidence from the wage impacts of naturalization in the United States and other countries; smaller extensions of work authorization to particular groups of unauthorized immigrants, such as those aided by the Chinese Student Protection Act of 1992; and reforms that have restricted employment options for unauthorized workers, also suggest that granting legal status would improve labor market outcomes of unauthorized workers.

[7] See also David Card's Richard T. Ely Lecture to the American Economic Association in which he argues that immigrants have had at most small impacts on wage inequality among natives.

**AR2022_500399**

[8] We note that the fiscal impacts of providing legal permanent status to existing unauthorized immigrants likely differ from prior analyses of the fiscal impacts of immigration generally, as unauthorized immigrants are already in the country, and many currently work, pay taxes, and receive some forms of government benefits. This existing relationship with the government makes it necessary to estimate how their rates of tax compliance and take-up of benefits would change if they gained legal status. Such calculations are not straightforward and require important assumptions, some with scarce relevant data and evidence that could inform them.

[9] Unauthorized immigrants who entered the United States after August 22, 1996—the date Federal welfare reforms were signed into law—would generally be eligible only after a waiting period of five years of legal residence for several benefits, including non-emergency health services under Medicaid and the Supplemental Nutrition Assistance Program (SNAP).

[10] At present the Congressional Budget Office (CBO) does not account for any long-run fiscal return to public benefit programs, suggesting that current approaches to "scoring" the fiscal impacts of legal status are likely to overstate their true fiscal cost.



Policy Areas ⌄    Texas Legislature < Https://Everytexan.Org/Our-Work/Current-Projects/Texas-Legislature/>    Blog < Https://Everytexan.Org/Our-Blog/>

Contact < Https://Everytexan.Org/About/Contact-Us/>    News & Media < Https://Everytexan.Org/News-Media/>    En Español < Https://Everytexan.Org/En-Espanol/>

✉ < https://everytexan.org/get-involved/get-updates/>    🐦 < https://twitter.com/EveryTxn>    f < https://www.facebook.com/everytexan/>

▶ < https://www.youtube.com/channel/UC1g65J6tvBMnqWxs4C97WyQ>    ◎ < https://www.instagram.com/every_texan>

♥ Donate < https://everytexan.org/get-involved/donate/>

**EVERY TEXAN**
Formerly Center for Public Policy Priorities
< https://everytexan.org/>

Our Work ⌄    About ⌄    Get Involved ⌄    Data Center ⌄    Search



Keeping Schools Whole Through Crisis



KEEPING SCHOOLS WHOLE
COVID-19

CHANDRA KRING VILLANUEVA    FEBRUARY 22, 2021

Education < https://everytexan.org/policy_area/education/> , K-12 Public Education < https://everytexan.org/policy_area/k-12-public-education/>

### Texas Schools at Risk of Significant Funding Cuts due to Pandemic-Related Attendance Loss

As the spread of COVID-19 became a global pandemic, disrupting every facet of our daily lives, Texas schools pivoted without warning or additional funding to continue the promise of public education. In the early days of the crisis, schools organized food distribution systems to ensure low-income students did not miss the school meals their families rely on. While districts worked to establish remote learning platforms, teachers printed and distributed lessons to their students to keep them on track and engaged. It is a year into this pandemic and the commitment our schools have shown to enrolling and engaging students and their families has not waned. Our school districts conduct home visits, use data to identify eligible Pre-K students, and partner with non-profits to ensure students are enrolled and address barriers to remote participation.

Still attendance is lagging as families struggle to navigate working from home while parenting, insufficient devices and connectivity, and losses in income, health, and family members due to COVID. Because public education funding in Texas is based on attendance, our schools are at risk of losing over a billion dollars in funding this budget cycle if the Legislature does not act.

### Holding School District Funding Harmless from COVID

Our schools need stability and COVID-specific supports to weather the remainder of the pandemic. To provide stability to school districts across the state, at a minimum, the Legislature should hold districts harmless from the effects COVID has on attendance by using historic growth projections to fund schools in the coming budget. If the Legislature used the historic rate of growth for average daily attendance, the House and Senate budget proposals would have included funding for an additional 155,679 students in 2023.





*Source: Every Texan analysis of Texas Education Agency and Legislative Budget Board data*

Without this "hold harmless" funding districts will be forced to lay off teachers and will have fewer resources to engage in family outreach or address the loss of instruction time many students have experienced.

With the vaccine rollout, COVID's grip on our communities will eventually loosen and young Texans will be returning to our schools. The decisions made today will determine the quality of the schools to which our children return. Without hold harmless funding, our schools will be scrambling to re-hire teachers as attendance grows and stabilizes. Forcing our schools to go through an artificial contraction due to short-term attendance loss will have long-term impacts on the programs and services schools provide students such as bilingual and special education.

## Funding Every Student

Holding school districts harmless is the bare minimum the Legislature should do to ensure our schools have the resources they need to serve all students. Attendance-based funding disadvantages districts with high concentrations of low-income students and students with chronic health issues. Using funding to incentivize attendance is based on the unfounded assumption that absenteeism is mostly voluntary, and the primary cause is truancy. While 46 states use a foundation school program similar to that used in Texas, only seven states use attendance for funding (CA, ID, IL, KY, MS, MO, TX).

School districts plan and budget based on the number of students enrolled. Every student must be assigned a campus, classrooms, teachers, and desk space. The school must be prepared to educate every child every school day, even when a child is absent for the day. Schools do not save money when children are absent. In fact, chronic absenteeism brings additional costs such as remediation for students and administrative time for teachers and districts.

Attendance taking has become an overburdensome administrative task for teachers and districts during the pandemic. Lack of conformity across districts on how and when attendance is taken, coupled with students struggling to connect at the right times, has led to unreliable attendance data.



*Source: Every Texan analysis of Texas Education Agency and Legislative Budget Board data*

In 2020 of the nearly 5.5 million students enrolled, 434,350 or 8% of students were not reflected in average daily attendance for funding purposes. Because low-income students and those with chronic health issues drive higher absenteeism, using attendance for funding penalizes schools based on the types of students they serve. Districts with rates of low-income and other hard teach populations are being denied the resources needed to overcome the obstacles their students arrive with—including the issues that lead to chronic absenteeism.

The Legislature should adopt enrollment-based funding to improve equity, increase stability, decrease administrative burdens, and fund every student in Texas public schools.

## Texans Value Public Education

When the pandemic struck Texas, our schools were first responders. With no blueprint to follow, Texas public schools developed online platforms, retrained teachers, distributed devices, and expanded internet access throughout communities. The role our schools have played during this pandemic is recognized and appreciated by Texans across the state.

In a recent poll by **Raise Your Hand Texas < https://www.raiseyourhandtexas.org/2021poll/#key-findings>**, 56% of Texans give their community school an A or B rating. That's up from 48% in 2020. Of the Texans polled 44% said they are more appreciative of their public schools because of their response to the pandemic. Most importantly, "more than 8 in 10 Texans are concerned that cuts in funding would impact the quality of public education."

Texas schools are at risk of losing a large amount of funding this session due to pandemic-related drops in attendance. Forcing schools to layoff teachers and reduce programs and services for students at a time when needs are greatest will hurt the long-term recovery of the state. The current budgets proposed in the House and Senate would force an artificial contraction of our schools, right before Texans begin returning to work and students return to the classroom. The Legislature is offering the bare minimum while ignoring the desires of Texans to keep our schools whole throughout this crisis.



AR2022_500402

   

## Policy Areas

| Budget and Taxes | ⌄ |

go »

## Archives

| Select Month | ⌄ |



# Stay Connected

First Name*

Last Name*

Email Address*

We will never share your email address.  Ever.

Sign Up



EVERY TEXAN < https://everytexan.org/>
Formerly Center for Public Policy Priorities

**Support Us**

We believe Texas can be the best state in the United States, and your support of our public policy work is an indispensable part of getting there.

›  **Get Involved**

›  **Donate**

**About**

Our Staff < https://everytexan.org/about/staff/>

Board of Directors < https://everytexan.org/about/board-of-directors/>

Contact Us < https://everytexan.org/about/contact-us/>

< https://everytexan.org/>     Our Work ⌄     About ⌄     Get Involved ⌄     Data Center ⌄     

center/kids-count/>

**AR2022_500403**

3/4

At the Texas Legislature <
https://everytexan.org/our-work/current-
projects/texas-legislature/>

Testimony <
https://everytexan.org/testimony/>

Data Center < https://everytexan.org/data-
center/>

**Stay Informed**

News & Media <
https://everytexan.org/news-media/>

Upcoming Events <
https://everytexan.org/get-
involved/events/>

Our Blog < https://everytexan.org/our-
blog/>

   

Every Texan is a nonpartisan nonprofit under federal tax guidelines.

© 2020 Every Texan. All rights reserved. Registered in U.S. Patent and Trademark Office.

Privacy Policy < Https://Everytexan.Org/Privacy-Policy/>  |  Sitemap < Https://Everytexan.Org/Sitemap/>  |  Website Design By HMG Creative < Https://Www.Hmgcreative.Com>

AR2022_500404

# THE YALE LAW JOURNAL

CHARLES W. TYLER & E. DONALD ELLIOTT

## Administrative Severability Clauses

**ABSTRACT.** Severability clauses can help administrative agencies minimize the damage caused by judicial review and can make the regulatory environment more efficient, participatory, and predictable. Yet agencies rarely include these clauses in their rules because courts tend to treat administrative rules with severability clauses the same as those without. Courts have treated administrative severability clauses in this way largely because they have mistakenly analogized them to severability clauses contained in statutes. While Congress routinely includes severability clauses in statutes that are drafted in distinct iterations, by different committees with legislative staff who often lack the time and expertise to consider the clauses' potential ramifications, administrative agencies use these clauses with more care. This Article proposes a Chevron-style deference framework for administrative severability clauses. Under this framework, after a reviewing court has set aside a challenged regulatory provision, the court should defer to a promulgating agency's opinion on severability as expressed through a severability clause, unless the remainder of the rule itself would suffer from legal defects resulting from the court's invalidation of the challenged provisions. This framework would better promote the overarching goals of administrative law than do current judicial doctrine and agency practice.

**AUTHORS.** Charles W. Tyler is a law clerk to the Honorable Goodwin Liu, Associate Justice, Supreme Court of California; Yale Law School, J.D. 2013. E. Donald Elliott is Adjunct Professor of Law, Yale Law School, and Senior of Counsel, Covington & Burling LLP. For their suggestions and encouragement, we thank Ali Deich, Arthur Ewenczyk, Heather Gerken, Abbe Gluck, Daniel Hemel, Chris Hu, Rob Katz, Daniel Markovits, Jerry Mashaw, Tracey Meares, Ben Moskowitz, Janice Ong, Nick Parrillo, Judith Resnik, Stan Richards, Rebecca Schonberg, Travis Silva, Andrew Tutt, and Ke Wu. The views set forth in this Article are the personal views of the authors alone and do not necessarily reflect the views of the institutions with which they are affiliated or their clients.

AR2022_500405



**ARTICLE CONTENTS**

INTRODUCTION                                                                2288

I.  SEVERABILITY IN ADMINISTRATIVE LAW                                      2294

    A. The Severability Decision                                           2294

        1. The Severability of Statutes                                    2294
        2. The Severability of Administrative Rules                        2296

    B. The Who-Decides Question                                            2297

        1. Agency Intent                                                   2298
        2. Workability of the Remainder                                    2299
            a. Expertise                                                   2299
            b. Accountability                                              2301
            c. Rule of Law                                                 2306
            d. Efficiency                                                  2309

II. THE STRANGE DEARTH OF ADMINISTRATIVE SEVERABILITY CLAUSES              2312

    A. De Novo Review by the Courts                                        2312
    B. Neglect in the Agencies                                             2318

III. DEFERENCE TO ADMINISTRATIVE SEVERABILITY CLAUSES                      2324

    A. Disassociating Statutory and Administrative Severability Clauses    2324

        1. Attention Paid to Severability Clauses                          2326
        2. Time Pressure                                                   2327
        3. Centralization                                                  2329

    B. A *Chevron*-Style Framework for Severability Clauses               2331

        1. Step One: Address Legal Defects                                 2334
            a. Identifying Defects                                         2335
            b. Remedying Defects                                           2338
        2. Step Two: Defer to the Agency                                   2341
        3. Step Zero: The Limits of the Deference Framework                2344

CONCLUSION                                                                  2348

APPENDIX: ADMINISTRATIVE SEVERABILITY CLAUSES BY AGENCY                     2349

AR2022_500406

THE YALE LAW JOURNAL                                    124:2286   2015

## INTRODUCTION

> *"Judicial review controls administrative action in the same way that tornadoes control the rice crop in Arkansas: they appear unpredictably, wreak havoc, and then depart."*
> — Jerry Mashaw[1]

This Article explores a topic overlooked in legal scholarship: severability clauses in administrative regulations. "Administrative severability clauses," as we call them, are provisions of administrative rules that clarify whether an agency intends for a rule to remain in effect if a court were to invalidate a portion of the rule.[2] A recent example, to which we return at several points in the Article, helps to illustrate the function and potential importance of these clauses.

The Environmental Protection Agency (EPA) recently published a proposed rule, commonly referred to as the "Clean Power Plan."[3] Political analysts have dubbed it the "centerpiece" of the Obama Administration's strategy on climate change.[4] The Clean Power Plan aspires to reduce greenhouse gas emissions by thirty percent below 2005 levels before 2030 by requiring states to

---

1.  This is a paraphrase of a remark often ascribed to Jerry Mashaw. The remark always connects natural disasters with vegetation. Sometimes it is about tornadoes controlling rice crops, sometimes forest fires controlling the underbrush, but the point is always the same: judicial review is "both stochastic and destructive." Email from Jerry Mashaw, Sterling Professor of Law, Yale Law Sch., to Charles Tyler, J.D. 2013, Yale Law Sch. (Dec. 24, 2014, 08:08 EST) (on file with author); *see also* JERRY L. MASHAW & DAVID L. HARFST, THE STRUGGLE FOR AUTO SAFETY 10-14 (1990); Jerry L. Mashaw, *Improving the Environment of Agency Rulemaking: An Essay on Management, Games, and Accountability*, 57 LAW & CONTEMP. PROBS. 185, 200-04 (1994).

2.  When we refer to administrative "rules" in this Article, we mean legislative rules, usually adopted through notice and comment. Although a severability clause is usually contained in the regulatory text, some agencies indicate that a rule is severable in the rule's statement of basis and purpose. *See, e.g.*, Applications for FDA Approval To Market a New Drug: Patent Submission and Listing Requirements, 68 Fed. Reg. 36,676, 36,695-96 (June 18, 2003) (to be codified at 21 C.F.R. pt. 314). Where possible, we have counted these remarks as severability clauses because they have many of the same benefits as severability clauses included in a rule's text.

3.  *See* Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 79 Fed. Reg. 34,830, 34,832 (proposed June 18, 2014) (to be codified at 40 C.F.R. pt. 60) [hereinafter Carbon Pollution Emission Guidelines].

4.  Editorial, *The EPA's Emissions Plan Should Be Just the Beginning*, WASH. POST, June 2, 2014, http://www.washingtonpost.com/opinions/the-epas-emissions-plan-should-be-just-the-be ginning/2014/06/02/640cd838-ea9a-11e3-9f5c-9075d5508f0a_story.html [http://perma.cc /ND94-6933].

AR2022_500407

meet certain carbon pollution emissions goals.[5] To set those goals, the EPA has identified four measures, which the proposed rule terms "building blocks" and which the agency has determined together make up the "best system of emission reduction."[6] The building blocks are: (1) making existing coal plants more efficient; (2) using existing gas plants more effectively; (3) increasing reliance on renewable and nuclear energy sources; and (4) improving end-use energy efficiency.[7] Like many environmental regulations, the Clean Power Plan is an example of cooperative federalism. While states are free to formulate their own plans for reducing greenhouse gas emissions, they must implement plans that will at least match the emissions reductions that the EPA has determined could be achieved by implementing the four building blocks.

Since the EPA's emissions goals are derived from the building blocks, regulated entities opposed to the Clean Power Plan—and there are many—are likely to challenge the building blocks in court. The agency may therefore be concerned that a court will vacate the entire Clean Power Plan if a court finds that just one of the building blocks is invalid. Likely in order to manage this risk, the EPA inserted a severability clause into the proposed rule's text. The clause provides that if a court invalidates one or more of the building blocks, the remainder of the rule should stay in effect, and the states' adjusted emissions targets should be based on the remainder of the building blocks.[8]

The Clean Power Plan's severability clause will become relevant in litigation if a discontent stakeholder challenges the rule and the reviewing court sets one or more of the building blocks aside. The court will then have to make what we call the "severability decision"; it will have to choose between invalidating only the challenged provision, invalidating the challenged provision and several other provisions, or invalidating the entire rule.

In the absence of the severability clause, the severability decision requires a reviewing court to apply a fairly well-established doctrinal framework. But

---

5.   Carbon Pollution Emission Guidelines, *supra* note 3, at 34,832.

6.   *Id.* at 34,836.

7.   *Id.*

8.   The severability clause reads:

   We consider our proposed findings of the BSER [Best System of Emission Reduction] with respect to the various building blocks to be severable, such that in the event a court were to invalidate our finding with respect to any particular building block, we would find that the BSER consists of the remaining building blocks. The state goals that would result from any combination of the building blocks can be computed from data included in the Goal Computation TSD [Technical Support Document] and its appendices using the methodology described in the preamble and that TSD.

   *Id.* at 34,892.

when a rule contains a severability clause, such as the one contained in the Clean Power Plan, it raises an important question that courts and commentators have largely overlooked. *Who* should decide whether an invalidated provision of a rule is severable? We call this the "who-decides question." The who-decides question implicates the level of deference that a reviewing court should give to a promulgating agency's opinion on the severability of a rule expressed in a severability clause.

Once raised, the who-decides question involves some of the most basic issues in administrative law — issues about the allocation of decision-making authority in the federal government. When an agency has expressed its view on severability, should a court defer to the agency, as it would when an agency reasonably interprets an ambiguous statute pursuant to a congressional delegation of lawmaking authority?[9] If a rule is within an agency's bailiwick because it was promulgated pursuant to a statutory delegation of authority, does the severability of the rule also fall within its bailiwick, or is the severability decision intrinsically within the judicial power? Does a severability clause constitute an interpretation of the agency's own rule, qualifying it for *Seminole Rock* deference (that is, deference accorded to an agency's interpretation of its own regulations)?[10] If courts should give some measure of deference to an agency's opinion on severability, how much? Do some of the agency's statements on severability, but not others, deserve deference?

The visibility of the Clean Power Plan's severability clause notwithstanding, these questions remain mostly under-theorized. Until the last two decades, only three articles had been devoted to severability doctrine in either statutes or rules.[11] And courts have analyzed the doctrine in little more depth. Former Chief Judge of the Ninth Circuit John Clifford Wallace once lamented that "[t]he test for severability has been stated often but rarely explained."[12] To be sure, theoretical analysis of the severability of *statutes* has become more robust in recent years. The severability doctrine has figured prominently in recent de-

---

**9.** *See* Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843-44 (1984); *see also* United States v. Mead Corp., 533 U.S. 218 (2001).

**10.** *See* Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945); *see also* Auer v. Robbins, 519 U.S. 452, 461 (1997) (holding that the agency's interpretation is controlling unless it is "plainly erroneous or inconsistent with the regulation") (internal quotation marks omitted).

**11.** *See* Mark L. Movsesian, *Severability in Statutes and Contracts*, 30 GA. L. REV. 41 (1995); John Copeland Nagle, *Severability*, 72 N.C. L. REV. 203 (1993); Robert L. Stern, *Separability and Separability Clauses in the Supreme Court*, 51 HARV. L. REV. 76 (1937).

**12.** Nagle, *supra* note 11, at 205 (quoting Bd. of Natural Res. v. Brown, 992 F.2d 937, 947 (9th Cir. 1993)).

AR2022_500409

bates in both Congress[13] and the Supreme Court,[14] and scholars have responded with full articles on the subject.[15] But the analysis of *administrative* severability doctrine continues to lag behind. There have been no law review articles addressing severability in administrative law, and we have found only one secondary source even mentioning the difference between the severability analyses in the statutory and administrative contexts.[16]

The dearth of scholarship is probably due, in part, to the answer that the agencies and the courts currently give to the who-decides question. Agencies tend to include severability clauses in their rules infrequently and sporadically. Even when an agency does include a severability clause in a rule, the current doctrine suggests that a reviewing court should not defer to it. Thus, the current judicial doctrine and agency practice regarding administrative severability represents one possible allocation of decision-making authority: namely, courts make the severability decision de novo without regard to the existence of a severability clause. As a result, these relatively insignificant clauses have not received much attention from commentators.

This Article maintains that current judicial doctrine and agency practice regarding severability are misguided. We think that courts should defer to administrative severability clauses and that agencies should more frequently include them in their rules. We propose a deference framework for

---

**13.** In a widely covered dispute, Congress debated the inclusion of either a severability clause or a nonseverability clause in the Bipartisan Campaign Reform Act of 2002. *See Excerpts From Senate Debate on Donations: Skirmishing and Predictions*, N.Y. TIMES, Mar. 30, 2001, http://www.nytimes.com/2001/03/30/us/excerpts-from-senate-debate-on-donations-skirmishing-and-predictions.html [http://perma.cc/AA47-RVQC].

**14.** The Court has addressed the severability doctrine in several recent cases, including: *Executive Benefits Insurance Agency v. Arkison*, 134 S. Ct. 2165, 2173 (2014); *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012); *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010); and *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320 (2006).

**15.** *See* Tom Campbell, *Severability of Statutes*, 62 HASTINGS L.J. 1495 (2011); Michael C. Dorf, *Fallback Law*, 107 COLUM. L. REV. 303 (2007); Tobias A. Dorsey, Remarks, *Sense and Severability*, 46 U. RICH. L. REV. 877 (2012); Fred Kameny, *Are Inseverability Clauses Constitutional?*, 68 ALB. L. REV. 997 (2005); Kenneth A. Klukowski, *Severability Doctrine: How Much of a Statute Should Federal Courts Invalidate?*, 16 TEX. REV. L. & POL. 1 (2011); Michael D. Shumsky, *Severability, Inseverability, and the Rule of Law*, 41 HARV. J. ON LEGIS. 227 (2004); Kevin C. Walsh, *Partial Unconstitutionality*, 85 N.Y.U. L. REV. 738 (2010); Rachel J. Ezzell, Note, *Statutory Interdependence in Severability Analysis*, 111 MICH. L. REV. 1481 (2013); C. Vered Jona, Note, *Cleaning Up for Congress: Why Courts Should Reject the Presumption of Severability in the Face of Intentionally Unconstitutional Legislation*, 76 GEO. WASH. L. REV. 698 (2008); Jenna L. Kamiat, Comment, *PPACA and the Individual Mandate: A Healthy Approach to Severability*, 80 FORDHAM L. REV. 2237 (2012).

**16.** *See* Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 DUKE L.J. 291, 330 (2003).

AR2022_500410

administrative severability clauses, similar to the *Chevron* and *Seminole Rock* frameworks, under which both courts and agencies would play a role in the severability decision.

This Article proceeds in three Parts. Part I explains the severability decision and the who-decides question in more detail. In Part I.A, we discuss the current severability doctrine. As we explain, the doctrinal test for severability consists of two questions: (1) whether the promulgating agency would have intended for the remainder of a regulation to stay in effect; and (2) whether the remainder of the regulation is workable.

In Part I.B, we consider which institution—the reviewing court or the promulgating agency—is best suited to answer each of these questions. We conclude that when a promulgating agency has expressed an opinion on severability through a severability clause, it has offered an answer to the intent and workability questions. Because the promulgating agency is better equipped than a court to assess both its own intent on severability and the workability of a regulatory remainder, the agency's answers to those questions deserve deference. This preliminary discussion will serve as helpful background for our thesis that the current doctrine and practice on severability clauses misallocates decision-making authority and for our proposal of a deference framework for administrative severability clauses.

Part II describes the current judicial doctrine and agency practice on administrative severability clauses and shows that the doctrine and practice do not follow the allocation of decision-making authority suggested in Part I. In Part II.A, we explain that federal courts for decades have declined to take severability clauses in statutes at face value. We then explain that the doctrinal treatment of statutory severability clauses has been applied to administrative severability clauses because courts have reflexively analogized the two.

In Part II.B, we explain that agencies do not generally include severability clauses in their rules. Instead, agencies usually offer their opinions on severability only when required to do so in litigation. Our research suggests that agencies behave in this way because promulgating severability clauses through notice-and-comment procedures often entails significant ex ante and ex post costs that courts do not reward through greater deference. In light of the discussion in Part I, we conclude that judicial doctrine and agency practice regarding severability are misguided. Courts should develop a framework for deferring to administrative severability clauses that would create greater incentives for agencies to include severability clauses in their rules.

Part III outlines our proposed deference framework for administrative severability clauses. In Part III.A, we debunk the primary doctrinal obstacle to such a framework. We argue that it is a mistake to evaluate *administrative* severability clauses through the same prism used to evaluate *statutory* severability clauses. Congress and the agencies have different institutional capacities and

2292

incentives. In Congress, severability clauses are often thrown in to far-reaching statutes that are drafted in several iterations, by several committees with legislative staff members who often lack the time and expertise to consider the clauses' potential ramifications adequately. By contrast, administrative agencies are more unified organizations that operate in a narrower regulatory space and have staff with greater expertise; agencies can therefore devote more resources to considering the potential consequences of a severability clause. As a result, administrative severability clauses are a more useful guide to the severability decision than statutory severability clauses. The analogy between statutory and administrative severability clauses is thus misplaced.

In Part III.B, we articulate a framework that courts can use to evaluate whether to sever an invalid provision from a rule containing a severability clause. When a court invalidates a provision of an administrative rule containing a severability clause, the court should first determine whether the remainder of the rule contains residual legal defects. For example, the court should determine whether the remainder of the rule is unconstitutional, ultra vires, arbitrary and capricious, or otherwise unlawful. If possible, the court should remove those residual legal defects by setting aside additional provisions of the rule. The court, however, should defer to the agency's severability decision if it determines that the remainder does not contain inextricable, residual legal defects. We also argue that courts should give *Chevron*-style deference only to administrative severability *clauses*, rather than informal agency opinions on severability. We acknowledge that agencies should be provided with some incentive to opine on severability before litigation commences because informal agency opinions on severability will often be better than no opinion at all. To encourage agencies to clarify their positions on severability, even if not through notice-and-comment procedures, we propose that courts give *Skidmore* deference to informal agency actions, such as litigation briefs, that opine on severability.[17]

The use of severability clauses in regulations is a fairly nascent experiment in administrative law. While the case law on these devices is problematic, it is not so entrenched that it could not easily be changed by a panel of the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) or the U.S. Supreme Court. This Article shows that deference to severability clauses in rules would have significant benefits for complex and ambitious regulatory schemes like the EPA's Clean Power Plan. Since the EPA is scheduled to promulgate the final rule implementing the Plan in the summer of 2015, now is an auspicious time for the courts to reconsider their approach to administrative severability clauses.

---

17. Skidmore v. Swift & Co., 323 U.S. 134 (1944).

THE YALE LAW JOURNAL                                        124:2286   2015

## I. SEVERABILITY IN ADMINISTRATIVE LAW

### A. The Severability Decision

Questions of severability arise after a discontented stakeholder challenges a provision of a statute or regulation and the reviewing court invalidates the challenged provision as unconstitutional, ultra vires, arbitrary and capricious, supported by insubstantial evidence, or otherwise unlawful. Having invalidated the challenged provision, the reviewing court's scrutiny turns to what we call the statutory or regulatory "remainder" — the part of the statute or rule that would remain absent the invalid provision. Assessing the remainder gives rise to the severability decision — the remedial choice between invalidating the challenged provision alone, the challenged provision and some of the remainder, or the entire statute or rule.

Courts and commentators have spent a good amount of time and energy theorizing the severability decision. The Supreme Court has developed a fairly useful test for making that decision. That test was first developed as the Court considered the severability of congressional statutes. But, as we shall see, the Supreme Court and the D.C. Circuit have repurposed the test for use in determining the severability of administrative regulations.

#### 1. The Severability of Statutes

The leading case laying out the Court's modern severability doctrine is *Alaska Airlines, Inc. v. Brock*.[18] In that case, several airlines challenged the employee protection program provisions of the Airline Deregulation Act.[19] Following the Court's landmark decision in *Chadha*,[20] which held legislative veto provisions unconstitutional, the Court held that the Deregulation Act's legislative veto provision was unconstitutional and that the challenged provision was severable from the statutory remainder.[21] Writing for the Court, Justice Blackmun explained: "Unless [1] it is evident that the Legislature would not have enacted those provisions which are within its power, independently of

---

18. 480 U.S. 678, 684 (1987). *Alaska Airlines* synthesized tests developed in earlier cases. *See* Regan v. Time, Inc., 468 U.S. 641, 653 (1984); INS v. Chadha, 462 U.S. 919, 931-32 (1983); Buckley v. Valeo, 424 U.S. 1, 108 (1976); United States v. Jackson, 390 U.S. 570, 585 (1968); Champlin Ref. Co. v. Corp. Comm'n of Oklahoma, 286 U.S. 210, 234 (1932).

19. *Alaska Airlines*, 480 U.S. at 680.

20. *Chadha*, 462 U.S. 919. For criticism of the *Chadha* opinion, *see* E. Donald Elliott, INS v. Chadha*: The Administrative Constitution, the Constitution, and the Legislative Veto*, 1983 SUP. CT. REV. 125.

21. *Alaska Airlines*, 480 U.S. at 683.

AR2022_500413

that which is not, the invalid part may be dropped if [2] what is left is fully operative as a law."[22] *Alaska Airlines* holds that courts should ask two questions when considering how to remedy invalid statutory provisions.[23]

First, would Congress have enacted the remainder without the unlawful provision? Call this the "intent question." To answer this question, the reviewing court investigates Congress's intent at the time it *enacted* the relevant statute. Ideally, the reviewing court would find evidence of Congress's *actual* intent—that is, evidence that Congress considered the possibility that the challenged provision would be struck down and intended the remainder of the statute to stay in effect (or not) under those circumstances. Evidence of actual intent, however, is often unavailable. In the absence of such evidence, courts look for evidence of *putative* intent—that is, evidence of what Congress would have wanted had it thought about the possibility that the challenged provision would be struck down. So the intent question often requires a counterfactual inquiry. It requires the reviewing court to recreate the bargain between stakeholders that led to the statute's final text to determine what the lawmakers likely would have wanted had they known that the reviewing court would strike down the challenged provision.[24]

The second question that courts are required to ask is whether the statutory remainder is "fully operative as a law." In other words, is the remainder *workable?* Call this the "workability question." To answer this question, the court must determine whether the statute is "capable of functioning independently" of the challenged provision.[25] Often courts answering this question will consider the interdependence of the relevant statute's provisions. If the reviewing court answers either question in the negative, it will strike down the entire statute.

---

22. *Id*. at 684 (quoting Buckley v. Valeo, 424 U.S. 1, 108 (1976) (per curiam) (internal quotation marks omitted)).

23. The Court's recent cases dealing with severability have followed the *Alaska Airlines* test. *See, e.g.*, Exec. Benefits Ins. Agency v. Arkison, 134 S. Ct. 2165, 2173 (2014); Free Enterprise Fund v. Public Co. Accounting Oversight Bd., 561 U.S. 477, 509 (2010).

24. *See, e.g.*, *Alaska Airlines*, 480 U.S. at 697 (stating that the legislative veto was not essential to the legislative bargain over the Airline Deregulation Act); City of New Haven v. United States, 809 F.2d 900, 907 (D.C. Cir. 1987); Atkins v. United States, 556 F.2d 1028, 1086 (Ct. Cl. 1977).

25. *Alaska Airlines*, 480 U.S. at 684 ("Congress could not have intended a constitutionally flawed provision to be severed from the remainder of the statute if the balance of the legislation is incapable of functioning independently.").

AR2022_500414

THE YALE LAW JOURNAL                                    124:2286   2015

2. *The Severability of Administrative Rules*

The Court's test for the severability of administrative regulations repurposes the *Alaska Airlines* statutory severability test. The first Supreme Court case to assess the severability of administrative regulations was *K-Mart Corp. v. Cartier*, where the Court considered whether a subsection of a Customs Service regulation violated the Tariff Act of 1930.[26] The Tariff Act prohibited the importation of foreign merchandise bearing a trademark owned by a United States' citizen (or a corporation organized within the United States) without the owner's written consent. The Customs Service regulation permitted foreign manufacturers to import trademarked goods into the United States if they had received the U.S. trademark owner's authorization to *use* its trademark, but not necessarily its authorization to *import* goods bearing the trademark into the United States.[27] The Court held that the regulation violated the Tariff Act.[28] Writing for the majority, Justice Kennedy reasoned that the invalid subsection of the Customs Service regulation was severable from the remainder because invalidating the subsection would "not impair the function of the statute as a whole" and because "there is no indication that the regulation would not have been passed but for its inclusion."[29] Although Justice Kennedy's analysis did not cite any cases, he applied the same test for the severability of statutes that the Court had articulated in *Alaska Airlines* just one year earlier.

Since the *K-Mart* decision, courts have applied the same test to determine the severability of administrative provisions and the severability of statutory provisions.[30] For example, in *Davis County Solid Waste Management v. EPA*, the

---

**26.** 486 U.S. 281, 286-93 (discussing 46 Stat. 741 (codified as amended at 19 U.S.C. § 1526 (2012))).

**27.** *Id.* at 290 (discussing 19 C.F.R. § 133.21(c)(3) (1987)).

**28.** *Id.* at 291.

**29.** *Id.* at 294.

**30.** For cases where the D.C. Circuit and the U.S. District Court in that Circuit have cited *K-Mart* on the severability decision, see Fin. Planning Ass'n v. SEC, 482 F.3d 481, 493 (D.C. Cir. 2007); MD/DC/DE Broadcasters Ass'n v. FCC, 236 F.3d 13, 22 (D.C. Cir. 2001); Virginia v. EPA, 116 F.3d 499, 501 (D.C. Cir. 1997); Davis Cnty. Solid Waste Mgmt. v. EPA (*Davis County II*), 108 F.3d 1454, 1460 (D.C. Cir. 1997); Alliance for Cmty. Media v. FCC, 10 F.3d 812, 830 (D.C. Cir. 1993), *reh'g en banc granted, judgment vacated* 15 F.3d 186 (D.C. Cir. 1994); and Akiachak Native Cmty. v. Jewell, 995 F. Supp. 2d 1, 5-6 (D.D.C. 2013). The D.C. Circuit has decided several recent cases addressing the severability of administrative regulations on the intent prong alone, without resorting to the workability prong. *See, e.g.*, North Carolina v. EPA, 531 F.3d 896, 929 (D.C. Cir. 2008); New Jersey v. EPA, 517 F.3d 574, 584 (D.C. Cir. 2008); Nat'l Treasury Emps. Union v. Chertoff, 452 F.3d 839, 867 (D.C. Cir. 2006). The D.C. Circuit has given no indication, however, that severability no longer depends on the second prong.

AR2022_500415

D.C. Circuit reconsidered the issue of whether an invalid provision of an EPA rule could be severed from the remainder of the rule.[31] As in the case of statutes, the court held that severability depends on: (1) whether there is any "'indication that the regulation would not have been passed but for [the] inclusion' of the [invalid] standards" and (2) whether severance would "'impair the function of [the remainder of the rule].'"[32] Here again, severability was made to depend on the intent and workability questions.

### B.  The Who-Decides Question

The current severability doctrine may be useful for making the severability decision when an agency has not included a severability clause in its rule. But courts and commentators have generally not considered which institution should make that decision when an agency has included a severability clause in a rule. This is the who-decides question.

Perhaps the simple answer to the who-decides question is that the reviewing court *must* decide. After all, the severability decision concerns a remedial issue in litigation. Courts are the "tornadoes," in Mashaw's analogy, and *they* must determine what is left in their wake.[33] But this simplistic answer overlooks the ways in which a severability clause could affect a reviewing court's severability analysis.

When an agency includes a severability clause in a rule, it states whether it would promulgate the rule without certain portions. More specifically, a severability clause can be seen as the agency's affirmative answer to the two component questions of the severability test: the agency (1) *intends* for the remainder to stay in effect; and (2) believes that the remainder is *workable*. In light of the agency's opinion on severability, the question becomes whether a reviewing court should defer to that opinion or substitute its own judgment for that of the agency.

In this way, when an agency has included a severability clause in a rule, the who-decides question raises questions familiar from scholarly discussions of the *Chevron* doctrine. Just as we need a doctrine for determining whether a reviewing court should defer to an agency's interpretation of a federal statute, so too we need a doctrine for determining whether a reviewing court should defer to an agency's opinion on severability expressed through a severability clause. We now consider whether a reviewing court should defer to a promulgating agency's answer to the intent and workability questions.

---

**31.**  *Davis County II*, 108 F.3d at 1455.

**32.**  *Id.* at 1460 (quoting *K-Mart*, 486 U.S. at 294).

**33.**  *See supra* note 1 and accompanying text.

2297

### 1. Agency Intent

The first question for the reviewing court to consider is whether the promulgating agency would have wanted the remainder to stay in effect had it contemplated that a court would invalidate the challenged provision.[34] On its face, an administrative severability clause is the agency's affirmative answer to that question.[35] A typical administrative severability clause, for example, reads as follows: "The provisions of this part are separate and severable from one another. If any provision is stayed or determined to be invalid, *it is the Commission's intention* that the remaining provisions shall continue in effect."[36]

The case for judicial deference on the intent question is straightforward. The regulatory text is strong evidence of the agency's intent.[37] When an administrative rule contains a severability clause, it is odd for a court to conduct an independent inquiry into whether the agency intended for the remainder to stay in effect. To do so amounts to a search for the agency's *putative* intent when the rule already contains a statement of the agency's *actual* intent.

Moreover, when a court searches for putative intent under these circumstances, it likely lacks a coherent objective. Recall that the inquiry into an agency's putative intent attempts to recreate the bargain between stakeholders that gave rise to the regulation. But the court must suppose that the severability clause, as part of the regulatory text, is *itself* part of the regulatory bargain.[38] It

---

**34.** *Davis County II*, 108 F.3d at 1459 (quoting North Carolina v. FERC, 730 F.2d 790, 795-96 (D.C. Cir. 1984)) ("Whether an administrative agency's order or regulation is severable . . . depends on the issuing agency's intent.").

**35.** *Cf.* David H. Gans, *Severability as Judicial Lawmaking*, 76 GEO. WASH. L. REV. 639, 649 n.51 (2008) (suggesting that severability clauses "settle, once and for all, the question of legislative intent"). For similar reasons, some commentators have argued for a plain meaning rule for statutory severability clauses. *See* Movsesian, *supra* note 11, at 73-82; Nagle, *supra* note 11, at 234-46; Shumsky, *supra* note 15, at 245-67.

**36.** FTC Children's Online Privacy Protection Rule, 16 C.F.R. § 312.13 (2014) (emphasis added); *see also* 70 Fed. Reg. 25,654, 25,656 (May 13, 2005) (codified at 36 C.F.R. § 294.18) ("The Department wishes to make *its intent* clear that should all or any part of this regulation be set aside, the Department does not intend that the prior rule be reinstated, in whole or in part.") (emphasis added); Applications for FDA Approval To Market a New Drug: Patent Submission and Listing Requirements and Application of 30-Month Stays on Approval of Abbreviated New Drug Applications Certifying that a Patent Claiming a Drug Is Invalid or Will Not Be Infringed, 68 Fed. Reg. 36,695-96 (2003) (codified at 21 C.F.R. § 314).

**37.** *See generally* John F. Manning, *The New Purposivism*, 2011 SUP. CT. REV. 113 (describing the modern "textually structured approach to purposivism"); Kevin M. Stack, *Interpreting Regulations*, 111 MICH. L. REV. 355 (2012).

**38.** Indeed, some severability clauses recognize the importance of a regulatory provision while providing that the provision is nonetheless severable from the remainder. For example, in one rule's statement of basis and purpose, the FCC commented:

2298

is therefore questionable whether the court could properly find that the regulatory bargain implies that the challenged provision is inseverable. Consequently, we think there is a compelling case for judicial deference to the plain meaning of a severability clause with respect to the promulgating agency's intent.

### 2. *Workability of the Remainder*

The second question for the reviewing court to consider is whether the remainder is workable. Unlike the intent question, severability clauses do not always address this aspect of the severability decision expressly. Still, it is fair to read a severability clause as providing the agency's opinion on workability because workability is such a prominent consideration—perhaps the *most* prominent consideration—in the severability decision. Therefore, like the intent question, courts should give deference to the agency's opinion on workability when it is expressed in a severability clause. Below, we provide four reasons that the regulatory environment would benefit if courts gave deference to the agency's answer to the workability question, expressed through an administrative severability clause.

### a. *Expertise*

Agencies are often better equipped than courts to determine whether a regulatory remainder is workable because they have greater subject-matter expertise. Agency expertise has several sources. First, agencies are highly specialized. Federal agencies are differentiated by subject matter, and each agency's staff spends most of its time and resources addressing issues related to the agency's particular substantive domain. As a result, the staff becomes more knowledge-

---

We remind stations and MVPDs that they must always utilize their audio passthrough equipment so that it does not harm the RP-compliant programming they receive and transmit to their viewers. We note that this safe harbor is an *important but severable* element of our compliance and enforcement scheme. We are establishing it to simplify our enforcement process for the benefit of stations and MVPDs, but it is not so fundamental to the scheme as a whole that the CALM Act regulations adopted in the item would be unenforceable in its absence. If the safe harbor is declared invalid or unenforceable for any reason, it is our intent that the remaining CALM Act regulations shall remain in full force and effect.

Implementation of the Commercial Advertisement Loudness Mitigation (CALM) Act, 77 Fed. Reg. 40,276, 40,285 n.132 (July 9, 2012) (codified at 47 C.F.R. §§ 73, 76) (emphasis added).

AR2022_500418

THE YALE LAW JOURNAL                                    124:2286   2015

able about the policies and methods that work in that domain.[39] Second, agency personnel usually include staff members who have advanced training in fields such as economic analysis and the scientific disciplines. The EPA's staff, for example, includes scientists and economists tasked with evaluating the EPA's regulatory and enforcement efforts. Similarly, the Securities and Exchange Commission employs economists and lawyers with advanced training in economics to determine the best rules for detecting and preventing securities fraud.[40] Finally, executive-branch agencies are subject to review by the Office of Information and Regulatory Affairs (OIRA), whose staff of economists and other experts requires agencies to justify major rulemakings through cost-benefit analysis.[41] "[J]udges," by contrast, "are not expert in the field."[42] They are generalists who decide cases across various subject matters. Judges also have relatively limited resources and staff who rarely have highly advanced training in economics and related disciplines. Finally, courts have limited investigative powers and must decide each case based on the facts that are presented by the parties.

An agency's superior subject-matter expertise typically means that the agency is better able than courts to make informed policy judgments. This is one reason why, under *Chevron*, a reviewing court will defer to an agency's reasonable interpretation of an ambiguous statute that the agency is charged with implementing. Similarly, agencies are better equipped to determine whether a regulatory remainder is workable because, in many instances, this inquiry requires a deep understanding of the subject matter of the regulation itself.

Consider, for example, the Clean Power Plan. As explained above, the Plan sets carbon pollution emissions goals for the states by identifying four "building blocks," which the agency has determined together make up the "best system of emission reduction."[43] The Plan's severability clause provides that if a court sets aside any of the building blocks, then the remainder of the Plan

---

**39.** William N. Eskridge, Jr., *Expanding* Chevron*'s Domain: A Comparative Institutional Analysis of the Relative Competence of Courts and Agencies To Interpret Statutes*, 2013 WIS. L. REV. 411, 421.

**40.** *Id.* at 422.

**41.** *Id.* at 422; Nicholas Bagley & Richard L. Revesz, *Centralized Oversight of the Regulatory State*, 106 COLUM. L. REV. 1260, 1268-70 (2006); Steven Croley, *White House Review of Agency Rulemaking: An Empirical Investigation*, 70 U. CHI. L. REV. 821, 821-30 (2003); Thomas O. McGarity, *A Cost-Benefit State*, 50 ADMIN. L. REV. 7, 40-48 (1998); Cass R. Sunstein, *The Office of Information and Regulatory Affairs: Myths and Realities*, 126 HARV. L. REV. 1838, 1844-54 (2013).

**42.** Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 865-66 (1984).

**43.** Carbon Pollution Emissions Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 79 Fed. Reg. 34,830, 34,835 (June 18, 2014) (to be codified at 40 C.F.R. pt. 60).

AR2022_500419

should stay in effect.[44] If a federal court invalidates one of the building blocks, the court must determine whether the remainder of the regulation is workable in the absence of the invalid provision. This inquiry inherently involves determining whether the remaining building blocks could sensibly be thought to constitute the "best system of emission reduction."[45] Put plainly, this is a question that the EPA—the agency with experience implementing the Clean Air Act—is best equipped to answer.[46]

The Clean Power Plan is not unique in this respect. Many regulatory schemes are very technical and complex, and they often involve highly interdependent provisions.[47] In fact, every indication is that regulatory schemes are becoming more complex each year.[48] Further, as we explain below, agencies rarely use severability clauses. Thus, when an agency *does* include a severability clause in a rule, it may indicate that the rule is especially technical and complex and that the agency fears that a court may incorrectly associate complexity with the rule's supposed inability to function absent a challenged provision.

In light of the highly technical and complex nature of modern regulation and the agency practice of only rarely including severability clauses in rules, generalist judges should defer to an expert agency that has offered its opinion through an administrative severability clause on the workability of a regulatory remainder. A court should not substitute its policy judgment for the agency's.[49] Instead, courts should defer to the expert agency's opinion on whether the remainder is workable.

### b. Accountability

Deference to the agency's answer to the workability question as expressed in a severability clause also makes the regulatory scheme more accountable to

---

**44.** *Id.* at 34,892.

**45.** For a suggestion that the effect of certain "building blocks" might be "negative" without the others, see Anthony Paul, Dallas Burtraw, Karen Palmer & Sophie Pan, The Future of the U.S. Power Sector: Implications of the Clean Power Plan, Presentation at the NYU Institute for Policy Integrity Forum (Oct. 28, 2014).

**46.** *See* Train v. Natural Res. Def. Council, Inc., 421 U.S. 60 (1975).

**47.** Matthew C. Stephenson & Miri Pogoriler, Seminole Rock*'s Domain*, 79 GEO. WASH. L. REV. 1449, 1456 (2011).

**48.** Thomas W. Merrill & Kristin E. Hickman, Chevron*'s Domain*, 89 GEO. L.J. 833, 861-62 (2001).

**49.** *See* Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); Citizens To Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); *cf.* Gans, *supra* note 35, at 643 (arguing that statutory severability often "enmesh[es] the judiciary in policy choices that are better left to the legislative branch").

AR2022_500420

the public. To understand the significance of democratic accountability in this context, one must realize that the severability decision imposes upon the public a regulatory scheme not approved in its exact form by the agency. It has long been a fundamental principle of administrative law that a reviewing court may not affirm an agency decision on a ground different from that adopted by the agency to justify its action.[50] This principle, generally called the *Chenery* doctrine, reflects the fact that Congress has given the authority to make rules to the expert agency and not to the court. When the court affirms on a ground not adopted by the agency, it invades the proper province of the agency by substituting its judgment for the agency's. Severability raises similar issues. When a court upholds a portion of an administrative rule but sets aside others, the court leaves in place a regulatory scheme different from the scheme promulgated by the agency. And if the reviewing court sets aside the remainder, it creates a regulatory scheme (or perhaps *de*regulatory scheme) that the agency purposefully rejected by promulgating the rule.

These considerations do not lead us to the conclusion, which at least one scholar has reached, that severing a challenged provision of a rule constitutes unconstitutional judicial lawmaking.[51] Rather, they underscore the importance of allocating the workability question to the institution with the greater democratic pedigree. The workability question implicates compromises among constituents' interests—compromises that led to the creation of various regulatory objectives ultimately memorialized in the final rule. More direct lines of accountability to constituents provide agencies with a better understanding of these compromises and therefore with a better understanding of whether a regulatory remainder will adequately serve those regulatory objectives.[52]

---

50.  *See* SEC v. Chenery Corp. (*Chenery II*), 332 U.S. 194 (1947); SEC v. Chenery Corp. (*Chenery I*), 318 U.S. 80 (1943). As often happens in the law, the rationale for *Chenery I* was better explained when the Court reflected on its earlier decision in *Chenery II* than in the original decision itself.

51.  In the context of statutes, Tom Campbell has argued that severance violates the Constitution's bicameralism-and-presentment requirements. In Campbell's view, just as the President and Congress cannot exercise line-item or one-house vetoes, so too the courts cannot leave in place laws that have not gone through Article I, Section 7's requirements for lawmaking. *See* Campbell, *supra* note 15, at 1503; *see also* Lars Noah, *The Executive Line Item Veto and the Judicial Power To Sever: What's the Difference?*, 56 WASH. & LEE L. REV. 235, 236-41 (1999) (mentioning this argument, but not asserting it); Laurence H. Tribe, *The Legislative Veto Decision: A Law by Any Other Name?*, 21 HARV. J. ON LEGIS. 1, 22 (1984) (same). *But see* Dorsey, *supra* note 15, at 885-89 (showing that this view would undermine many provisions of the U.S. Code). We presume that Campbell would hold a similar view about administrative rules.

52.  *Cf.* Stephenson & Pogoriler, *supra* note 47, at 1456-57 (discussing the supposed accountability benefits of *Seminole Rock* deference); John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 COLUM. L. REV. 612, 629 (1996)

AR2022_500421

Many scholars of administrative law have argued that agencies have more direct lines of accountability to the public than the courts.[53] Agency procedural requirements for rulemaking are one line of accountability. When an agency disseminates a proposed rule, including one containing a severability clause, it must provide a "[g]eneral notice of proposed rule making"[54] and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."[55]

These procedural mechanisms for maintaining accountability between the public and the agencies can be significant to an agency's decision to promulgate a severability clause because the severability of regulatory provisions is often sufficiently important to induce stakeholders to comment formally. For example, in a comment on a proposed Fish and Wildlife Service (FWS) Rule, the Alaska Oil and Gas Association (AOGA) wrote:

> Regardless of the form of the final rule, AOGA urges FWS to make a finding of severability. A severability finding would determine that the provisions of this rule, and the various applications of the rule, are distinct and severable from one another. . . . A severability finding would ensure that if any provision or application of the 4(d) rule is stayed or invalidated, such a stay or invalidation will not affect other provisions or applications to other persons or circumstances.[56]

When the public does participate, agencies are required to respond to the public's comments in a reasoned fashion.[57] Moreover, an agency's final rule

---

(same); Richard J. Pierce, Jr., *Democratizing the Administrative State*, 48 WM. & MARY L. REV. 559, 569-70 (2006) (same). For a discussion of how deference to administrative severability clauses is similar to *Seminole Rock* deference, see *infra* notes 176-184 and accompanying text.

53. *See, e.g.*, Stephen Breyer, *Judicial Review of Questions of Law and Policy*, 38 ADMIN. L. REV. 363 (1986); Elena Kagan, *Presidential Administration*, 114 HARV. L. REV. 2245, 2373-74 (2001); Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 DUKE L.J. 511; Cass R. Sunstein, *Law and Administration After* Chevron, 90 COLUM. L. REV. 2071, 2086-87 (1990).

54. 5 U.S.C. § 553(b) (2012).

55. *Id.* § 553(c); *see also* Richard J. Pierce, Jr., *Seven Ways To Deossify Agency Rulemaking*, 47 ADMIN. L. REV. 59, 59 (1995) ("[R]ulemaking enhances fairness by allowing all potentially affected members of the public to participate in the decisionmaking process that determines rules that apply to their conduct[.]").

56. Letter from Marilyn Crockett, Exec. Dir., Alaska Oil & Gas Ass'n, to U.S. Fish & Wildlife Service 12 (July 14, 2008), http://www.regulations.gov/#!documentDetail;D=FWS-R7-ES -2008-0027-0083 [http://perma.cc/D633-NH6D].

57. We note, however, that agencies have discretion to decide how to address comments. *See* Ctr. for Auto Safety v. Peck, 751 F.2d 1336, 1355 n.15 (D.C. Cir. 1985) ("An agency need not address every conceivable issue or alternative no matter how remote or insignificant.");

AR2022_500422

must be a "logical outgrowth" of the agency's proposed rule,[58] and the agency must address relevant and significant comments raised during the rulemaking in its statement of basis and purpose.[59] These notice-and-comment requirements serve to "reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies."[60] Notice-and-comment requirements thus give the public an opportunity to exercise accountability over an agency's decision to promulgate a severability clause.

Courts are less responsive to the wishes of the President and Congress than federal administrative agencies.[61] The federal courts are subject to a variety of controls by the democratic branches, including control over the federal courts' budget and jurisdiction. But at the level of individual judges, the political branches have no official influence over the decisions of courts in particular cases.[62] Of course, the President with the advice and consent of the Senate appoints individual judges. But once confirmed, federal judges enjoy lifetime appointments and undiminished pay, and they can be removed by the political branches only through the Constitution's onerous impeachment procedures. Indeed, part of the attraction of placing some decisions in the hands of federal judges is that they enjoy a great degree of removal from the whims and impulses of the political branches and of public opinion.

To be sure, one should not overestimate the democratic responsiveness of administrative agencies to the popular will. Unlike agency heads, career agency staff members are not subject to the political pressures imposed by Congress or the President.[63] Many statutes also provide exemptions to participation-enhancing notice-and-comment procedures. The Administrative Procedure Act (APA), which controls agency procedures when a more specific organic act

---

Reyblatt v. Nuclear Regulatory Comm'n, 105 F.3d 715, 722 (D.C. Cir. 1997) ("An agency need not address every comment, but it must respond in a reasoned manner to those that raise significant problems.").

58. *See* Int'l Union, United Mine Workers v. Mine Safety & Health Admin., 626 F.3d 84, 94-95 (D.C. Cir. 2010).

59. *See* PPL Wallingford Energy LLC v. FERC, 419 F.3d 1194, 1198 (D.C. Cir. 2005).

60. Batterton v. Marshall, 648 F.2d 694, 703 (D.C. Cir. 1980); *see also* HENRY S. RICHARDSON, DEMOCRATIC AUTONOMY: PUBLIC REASONING ABOUT THE ENDS OF POLICY 219-20, 251 (2002) (asserting that notice-and-comment rulemaking is the most democratic form of administrative rulemaking).

61. For an account of how agencies can undermine accountability to the President, see generally Jennifer Nou, *Agency Self-Insulation Under Presidential Review*, 126 HARV. L. REV. 1755 (2013).

62. *See generally* John A. Ferejohn & Larry D. Kramer, *Independent Judges, Dependent Judiciary: Institutionalizing Judicial Restraint*, 77 N.Y.U. L. REV. 962 (2002).

63. David J. Barron & Elena Kagan, Chevron*'s Nondelegation Doctrine*, 2001 SUP. CT. REV. 201, 242-43.

does not, exempts an agency from undertaking notice and comment for rules regulating certain subject matters, such as foreign affairs, national security, and internal personnel matters.[64] There are also exemptions if the rule is an interpretive rule or policy statement, or when the agency has good cause not to follow notice-and-comment requirements.[65] Further, even when agencies do follow notice-and-comment procedures, these procedures are often more a means for ensuring favorable judicial review than they are a means of facilitating genuine public participation.[66]

But even if we cannot be uniformly sanguine about the power of formal procedural requirements to ensure genuine accountability and participation, we still maintain that agencies are also more responsive than the courts to representatives in the legislative and executive branches.[67] The heads of executive-branch agencies are appointed and removable by the President. The heads of so-called "independent" agencies are also appointed by the President (though they can usually be removed only for cause), and the budgets of such agencies are prepared by the Office of Management and Budget.[68]

Agencies are also subject to oversight by Congress. They are subject to the budgetary control of congressional committees, and their heads frequently testify before Congress. As a result of these formal and other informal mechanisms of oversight, William Eskridge and Lauren Baer have argued that "agencies usually have institutionally superior access to the original expectations of the legislators . . . . [and] also have better knowledge than courts about current

---

64. *See* 5 U.S.C. §§ 552-556 (2012).

65. *Id.*

66. *See* Barron & Kagan, *supra* note 63, at 231-32; E. Donald Elliott, *Re-Inventing Rulemaking*, 41 DUKE L.J. 1490, 1490 (1992); Jody Freeman, *Collaborative Governance in the Administrative State*, 45 UCLA L. REV. 1, 12 (1997). *But see* Mariano-Florentino Cuéllar, *Rethinking Regulatory Democracy*, 57 ADMIN. L. REV. 411, 463 (2005) ("Even though agencies have both the incentive and the opportunity to anticipate political reactions to their regulations, the notice and comment process is not treated as a charade. Agencies in these case studies often respond to comments by making substantive changes in their regulations. Their lawyers grapple with concerns raised by the commenters. At the same time, they change the proposed laws in response to feedback from interested parties.").

67. *See* Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 865-66 (1984); Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part); Matthew D. Adler, *Judicial Restraint in the Administrative State: Beyond the Countermajoritarian Difficulty*, 145 U. PA. L. REV. 759, 875-76 (1997); Jerry L. Mashaw, *Prodelegation: Why Administrators Should Make Political Decisions*, 1 J.L. ECON. & ORG. 81, 95-99 (1985).

68. *See* Neal Devins, *Political Will and the Unitary Executive: What Makes an Independent Agency Independent?*, 15 CARDOZO L. REV. 273, 287-92 (1993) (discussing how the Department of Justice has affected legal decision making by the EEOC).

AR2022_500424

congressional expectations."[69] Further, some theorists posit that procedural requirements on regulation, such as notice-and-comment procedures, are means for Congress to intervene more easily when an agency is not adequately addressing the concerns of powerful constituencies.[70]

In short, the public and representatives in the executive and legislative branches maintain comparatively robust controls for holding agencies accountable in relation to the courts. Thus, when an agency opines on the workability of a regulatory remainder, it is in a better position than a court to know how the remainder will affect citizens and other entities.

### c. Rule of Law

When a reviewing court defers to an administrative severability clause, it also promotes two important aspects of the rule of law: predictability and stability.[71]

Predictability benefits both agencies and regulated entities by encouraging efficient investment.[72] When regulated entities evaluate which resources to invest in complying with the law most efficiently, an important consideration, especially for sophisticated actors, is how courts will treat recently promulgated administrative rules. If certain provisions of a rule are unlikely to survive judicial review, then entities may make different investment choices from the choices they would make if the provisions were likely to survive.

Similarly, greater predictability in the law allows agencies to determine how to use rulemaking resources most efficiently. Without severability, the probability that a court will set aside any particular provision is partly a function of the probability that a court will set aside any *other* provision in the same rule. Thus, the assessment of how best to regulate (for an agency) or how best to comply with the law (for regulated entities) is to some extent a function of how likely a court is to find potentially unlawful provisions severable. An agency's regulatory choices, for example, will depend on the probability it assigns to the possibility that a court will set aside certain provisions. If an agency is fairly

---

**69.** William N. Eskridge, Jr. & Lauren E. Baer, *The Continuum of Deference: Supreme Court Treatment of Agency Statutory Interpretations from* Chevron *to* Hamdan, 96 GEO. L.J. 1083, 1176-77 (2008) (citations omitted); Eskridge, *supra* note 39, at 425-26.

**70.** Mathew D. McCubbins et al., *The Political Origins of the Administrative Procedure Act*, 15 J.L. ECON. & ORG. 180 (1999).

**71.** *See* JOHN FINNIS, NATURAL LAW AND NATURAL RIGHTS 270-76 (1980); LON L. FULLER, THE MORALITY OF LAW 37-52 (1969); JOSEPH RAZ, THE AUTHORITY OF LAW: ESSAYS ON LAW AND MORALITY 210-31 (2d ed. 2009).

**72.** Thomas W. Merrill, *The* Mead *Doctrine: Rules and Standards, Meta-Rules and Meta-Standards*, 54 ADMIN. L. REV. 807, 822-23 (2002).

AR2022_500425

certain that a court will defer to a severability clause, however, it may choose to promulgate a set of controversial regulations as a single rule rather than dispersing the regulations across several rules.

By adhering to a deference framework for administrative severability clauses, courts would mitigate some of the uncertainty in this probabilistic assessment. This point follows from the timing in which a severability clause appears in the interbranch dialogue. While a reviewing court can determine the workability of a regulatory remainder only after invalidating a challenged provision in *litigation*, an agency can use a severability clause to answer the workability question at the time the final rule is *promulgated*. So if federal courts deferred to severability clauses, the workability question would be one less element of possible uncertainty in the law.

Judicial deference to administrative severability clauses also promotes greater stability in regulatory schemes. A "remand-and-repromulgation cycle," as we call it, occurs when a regulation passes back and forth between an agency and the courts. If an agency could reliably influence how a reviewing court would make the severability decision by including a severability clause in a rule, then it could reduce the number of times it must re-promulgate a regulatory remainder that a court has erroneously invalidated.[73]

Reducing these cycles would save agencies and regulated entities costs caused by legal flux.[74] Agencies would save scarce resources in two ways. Ex ante, an agency's drafting costs will be reduced because, assured in the knowledge that a severability clause will prevent the vacatur of an entire rulemaking, the agency will not have to engage in as rigorous of an assessment of the likelihood that each provision of a rule will be struck down. In this way, judicial deference to administrative severability clauses would partially offset some of the drawbacks associated with agency ossification.[75] Ex post, agencies

---

73. *Id.* at 823.

74. *See* Levin, *supra* note 16, at 300; Emily Hammond Meazell, *Deference and Dialogue in Administrative Law*, 111 COLUM. L. REV. 1722, 1723 (2011); Daniel B. Rodriguez, *Of Gift Horses and Great Expectations: Remands Without Vacatur in Administrative Law*, 36 ARIZ. ST. L.J. 599, 623 (2004). To be clear, we do not propose that courts consider these costs in individual cases because doing so would potentially violate the APA. *See* MD/DC/DE Broadcasters Ass'n v. FCC (*MD/DC/DE Broadcasters II*), 253 F.3d 732, 736 (D.C. Cir. 2001) (noting that the APA does not permit courts to consider the agency's costs in curing an invalid rule). However, courts should consider these costs when crafting judicial presumptions and rules of deference.

75. *See, e.g.*, Thomas O. McGarity, *Some Thoughts on "Deossifying" the Rulemaking Process*, 41 DUKE L.J. 1385, 1385 (1992) [hereinafter McGarity, *Some Thoughts*]; Thomas O. McGarity, *The Courts and the Ossification of Rulemaking: A Response to Professor Seidenfeld*, 75 TEX. L. REV. 525, 528-36 (1997) [hereinafter McGarity, *The Courts*]; Mark Seidenfeld, *Demystifying*

AR2022_500426

will save costs associated with re-promulgating rules already put through notice and comment.[76] These costs are significant. One study, which one of the authors and Peter Schuck conducted in 1989, concluded that post-remand proceedings at the agency level took an average of seventeen months to complete.[77]

True, to receive deference on its answer to the workability question, the agency must draft a severability clause and take it through notice and comment. This process involves non-negligible costs, especially when the regulatory scheme is highly technical or complex. The agency may also incur costs associated with litigation over the meaning and scope of the severability clause.[78] But on average these costs pale in comparison to the average costs of redrafting a rule and taking it back through notice and comment.

Reducing the incidence of remand-and-repromulgation cycles would also save costs for regulated entities. A regulated entity, relying on an unchallenged portion of a rule and caught in such a cycle, must first adapt to the agency's rule, readapt to a regulatory vacuum after vacatur, and adapt for a third time to the original rule's valid provisions after the agency re-promulgates those provisions.[79] But if a court's deference to an administrative severability clause prevented the court from erroneously invalidating the remainder, then the regulated entity would only need to adjust once.

Despite an administrative severability clause, there may be times when the remainder may turn out to be unworkable. This might occur, for example, when the agency does not correctly foresee what part of the rule might be struck down or how the regulatory remainder might function in the absence of the invalid portion. In these circumstances, a court's deference to the severability clause may entail additional costs for regulated entities. In particular, regulated entities relying on an unchallenged portion of a rule will have to change their behavior when the agency first promulgates the rule and also when the agency changes the rule after deciding that the remainder is unworkable. How-

---

*Deossification: Rethinking Recent Proposals To Modify Judicial Review of Notice and Comment Rulemaking*, 75 TEX. L. REV. 483, 489-90 (1997).

76.   *See* National Forest System Land Management Planning, 77 Fed. Reg. 21,162, 21,244 (Apr. 9, 2012) (to be codified at 36 C.F.R. pt. 219) ("The Department retained the [severability] provision in the final rule, because rulemaking is an extensive Departmental and public undertaking, and the entire rule should not be dismissed if a court finds only a portion of the rule is inappropriate.").

77.   *See* Peter H. Schuck & E. Donald Elliott, *To the* Chevron *Station: An Empirical Study of Federal Administrative Law*, 1990 DUKE L.J. 984, 1050.

78.   *Cf.* Adrian Vermeule, *Introduction:* Mead *in the Trenches*, 71 GEO. WASH. L. REV. 347, 350 (2003) (making a similar point about litigation over *Chevron*'s domain); Merrill, *supra* note 72, at 825 (same).

79.   *See* Gans, *supra* note 35, at 653-54; Meazell, *supra* note 74, at 1723-24.

2308

ever, these occasions are likely to be rare for two reasons. First, the agency's expertise with respect to the workability question suggests that when the agency includes a severability clause, the remainder of the statute will be workable. Second, if agencies (and commenters) know that their judgments about severability are likely to carry dispositive weight with the courts in the future, they can be expected to devote more time and attention to these issues. This will lead to more accurate projections of workability. Together, these considerations suggest that the aggregate costs of correcting for ill-conceived severability clauses are still likely outweighed by the cost-savings of preventing remand-and-repromulgation cycles.

Bearing in mind that courts currently do not defer to administrative severability clauses, one might also argue that there is a certain irony in advocating for *change* in the law as a way of making the law more stable.[80] As the Supreme Court has explained in a different context, "[w]hat is of paramount importance is that Congress be able to legislate against a background of clear interpretive rules, so that it may know the effect of the language it adopts."[81] One might then think that courts should not change their treatment of administrative severability clauses because lawyers in the agencies should have a stable background against which to draft administrative rules.

If, however, an agency could reliably predict whether a court will defer to a severability clause, then the agency could reliably predict "the effect of the language it adopts."[82] While changing the doctrine would disrupt the judicial background against which agencies currently regulate, the change would ultimately give the agencies more control over the consequences of their rules. We therefore advocate a change in the *secondary rules* of administrative law to make the *primary rules* more stable.[83]

### d. Efficiency

Finally, if agency regulatory (or, for that matter, deregulatory) actions are generally socially beneficial, then judicial deference to the agency's answer to

---

80. *See* Nagle, *supra* note 11, at 245-46. *See generally* John F. Manning, *Continuity and the Legislative Design*, 79 NOTRE DAME L. REV. 1863, 1864-65 (2004).

81. Finley v. United States, 490 U.S. 545, 556 (1989).

82. *Id.*; *see also* Nagle, *supra* note 11, at 245-46 (providing several justifications for changing the test for severability).

83. *See* H.L.A. HART, THE CONCEPT OF LAW 80-81 (2d ed. 1994) (explaining the distinction between primary and secondary rules).

AR2022_500428

THE YALE LAW JOURNAL                                    124:2286   2015

the workability question promotes the development of efficient rules.[84] When a court erroneously invalidates an entire rule that the agency would not itself rescind, society bears the costs associated with a "regulatory gap" (or, in the case of deregulation, a "regulatory glut") between invalidation and re-promulgation of the regulatory remainder. Moreover, this gap or glut may prove indefinitely long because agencies are sometimes able to promulgate a rule that they cannot, for political or fiscal reasons, later re-promulgate.[85] For example, the interstate air pollution rules were upheld by the Supreme Court in *EPA v. EME Homer City Generation, L.P.*[86] after almost a twenty-year delay stretching back over three presidential administrations to the 1998 NOx SIP call.

Another potential efficiency gain, which is more controversial, derives from the fact that judicial deference to administrative severability clauses promotes dynamic agency interpretations of statutes.[87] If courts would generally defer to administrative severability clauses, then a promulgating agency, knowing that a reviewing court is unlikely to vacate the entire rule, can more freely promulgate regulatory provisions that interpret statutes in new ways. As a consequence, the agency can more dynamically interpret statutes with rules containing a severability clause than rules without.[88] The Clean Power Plan provides a good example of this phenomenon. Some experts doubt that a final rule based on the Clean Power Plan would be a valid exercise of the agency's delegated authority under the Clean Air Act.[89] The EPA is aware of these criticisms, and one aspect of its strategy for dealing with them was to include the severability

---

**84.** *See* Levin, *supra* note 16, at 298-99; Meazell, *supra* note 74, at 1725. We recognize that those who hold a view according to which the proper role of the administrative state is rather limited may disagree with the assumption in this sentence.

**85.** *See* McGarity, *Some Thoughts*, *supra* note 75, at 1401.

**86.** 134 S. Ct. 1584 (2014).

**87.** *See* WILLIAM N. ESKRIDGE, JR., DYNAMIC STATUTORY INTERPRETATION ch. 2 (1994) (explaining the inevitability of dynamic statutory interpretation).

**88.** A theoretical and empirical literature suggests that a similar adjustment in agency behavior occurred after the Court first announced the *Chevron* framework. *See* Linda Cohen & Matthew Spitzer, *Solving the* Chevron *Puzzle*, 57 LAW & CONTEMP. PROBS. 65, 67-68 (1994) (predicting that remand rates would equilibrate as agencies became more aggressive in their statutory interpretations); Schuck & Elliott, *supra* note 77, at 1043 (explaining that *Chevron* caused agencies to begin changing the grounds on which they based their decisions); Matthew C. Stephenson, *The Strategic Substitution Effect: Textual Plausibility, Procedural Formality, and Judicial Review of Agency Statutory Interpretations*, 120 HARV. L. REV. 528, 558 (2006).

**89.** *See, e.g.*, Brian H. Potts & David R. Zappo, *EPA's Clean Power Play: Who Needs Congress?*, 27 ELECTRICITY J. 26 (2014); Laurence H. Tribe, Op-Ed, *The Clean Power Plan Is Unconstitutional*, WALL ST. J., Dec. 29, 2014, http://www.wsj.com/articles/laurence-tribe-the-epas-clean-power-plan-is-unconstitutional-1419293203 [http://perma.cc/L8TA-3485].

clause, hoping that a reviewing court will defer to that clause if the court sets aside one or more of the four building blocks.

One potential rejoinder to the efficiency argument is that severability clauses make controversial rules more likely to be partially set aside, either because (1) expressing a position on the severability of a particular provision puts a target on the tenuous provision; or (2) courts are more willing to invalidate regulatory provisions when they need not invalidate the entire rule. On this view, even someone who thinks that agency actions generally conduce to the social good may thus conclude that an agency should not include a severability clause in a rule that is likely to be litigated because doing so makes a regulatory provision more likely to be set aside.

With respect to the first concern, we doubt that agency opinions on severability *actually* make legally suspect provisions of administrative rules significantly more likely to be challenged. Elite law firms scrutinize every rule that affects concentrated interests, either on the instructions of their existing clients or in the hope of attracting new ones. We doubt that there are many potentially problematic provisions that would be noticed only if the agency included a severability clause.

With respect to the second concern—that courts are more willing to set aside provisions contained in rules with a severability clause—we have two observations. First, the argument assumes that courts should leave in place a socially beneficial yet *unlawful* provision. One might disfavor unlawful regulatory provisions on principle, however, even if they are in fact socially beneficial. Second, even assuming that unlawful yet socially beneficial regulations are desirable, one must weigh the costs of relinquishing those regulations against the costs of erroneous vacatur of entire rules. Although it is impossible to quantify these social costs, we think the latter, even if less frequent, are likely to be greater in the aggregate.

* * *

To summarize the argument thus far, the severability decision involves two questions: (1) would the agency have intended the regulatory remainder to stay in effect in the absence of the challenged provision?; and (2) is the remainder lawful? We have argued that a promulgating agency, rather than a reviewing court, is best positioned to answer these questions. As the next Part explains, however, this is not the modern doctrine on administrative severability clauses.

AR2022_500430

THE YALE LAW JOURNAL                                      124:2286   2015

In fact, the D.C. Circuit has stated that severability clauses will rarely be dispositive of the severability decision.[90]

## II. THE STRANGE DEARTH OF ADMINISTRATIVE SEVERABILITY CLAUSES

The previous Part argued for a particular allocation of decision-making authority on severability in administrative law: courts should defer to agency-promulgated severability clauses. For that division of labor to materialize, however, agencies must promulgate rules containing severability clauses, and courts must develop a framework for deferring to them.

In this Part, we turn our sights to judicial doctrine and administrative practice and show that neither condition obtains. In Part II.A, we focus on the courts. Federal judicial doctrine on administrative severability clauses is largely a re-application of the doctrine on *statutory* severability clauses to the administrative context. We briefly survey the doctrine on statutory severability clauses, explaining that it does not require courts to defer to severability clauses. We then show that this doctrine has been transmogrified into a doctrine of administrative law. In Part II.B, we show that administrative agencies rarely incorporate severability clauses into their rules. We posit that agencies usually do not consider including severability clauses in their rules because they do not receive a deference pay-off when they do. We conclude, therefore, that if courts want to capture the potential benefits of administrative severability clauses discussed in Part I, then they need to develop a framework for evaluating administrative severability clauses that would give these clauses some appreciable measure of deference.

### A.  *De Novo Review by the Courts*

Just as courts have applied the same test to determine the severability of both statutes and administrative rules,[91] they have applied the same framework for evaluating the effect of severability *clauses*. This section therefore begins with a brief overview of the development of judicial doctrine on statutory severability clauses.[92]

---

**90.**  *See* Cmty. for Creative Non-Violence v. Turner, 893 F.2d 1387, 1394 (D.C. Cir. 1990) (quoting United States v. Jackson, 390 U.S. 570, 585 n.27 (1968)).

**91.**  *See supra* Part I.A.

**92.**  The historical discussion that follows owes much to outstanding earlier treatments in Klukowski, *supra* note 15, at 10-23; Nagle, *supra* note 11, at 210-18; and Shumsky, *supra* note 15, at 232-40.

According to John Nagle, severability clauses began to appear in state and federal statutes in the late nineteenth century and had become common by 1910.[93] Before the appearance of severability clauses, the federal courts had long presumed that partially unconstitutional statutes were severable, unless the provisions of the statutory remainder were so intertwined with the challenged provisions as to make the remainder unworkable.[94]

The U.S. Supreme Court first addressed the emerging phenomenon of statutory severability clauses in the 1914 *Ohio Tax Cases*.[95] There, the Court accepted the statute's severability clause at face value. The Court, in leaving the remainder in place, assumed that the severability clause meant that the legislature intended for the statutory remainder to stay in effect.[96]

In the subsequent two decades, the Court moved further and further away from the literalist approach to severability clauses. In *Hill v. Wallace*, decided in 1922, the Court maintained that a severability clause expresses the legislature's intent for the remainder of a statute to stay in effect[97] but declined to defer to the clause's plain meaning.[98] The Court for the first time noted a basis on which a reviewing court might second-guess the plain meaning of a severability clause: to wit, the interconnectedness of the statute's provisions might demonstrate that the legislature would have intended for the court to strike the entire statute down, notwithstanding the severability clause.[99] And in *Dorchy v. Kansas*, decided in 1924, the Court for the first time advised that a severability clause "provides a rule of construction which may sometimes aid in determining [legislative] intent. But it is an aid merely; not an inexorable command."[100]

In 1928, the Court announced an even greater departure from a literal construction of severability clauses. In *Williams v. Standard Oil Co.*, the Court confirmed that interconnectedness was a basis for doubting a severability clause's ostensible meaning and also added a second basis: a court could disregard a severability clause if there were "considerations which make evident" that "the

**93.** Nagle, *supra* note 11, at 222.

**94.** *See* Allen v. Louisiana, 103 U.S. 80, 84 (1880) (citing Warren v. Mayor & Alderman of Charlestown, 68 Mass. (2 Gray) 84 (1854)).

**95.** 232 U.S. 576 (1914).

**96.** *Id.* at 594.

**97.** Hill v. Wallace, 259 U.S. 44, 71 (1922) (noting that the severability clause "furnishes assurance to courts that they may properly sustain separate sections or provisions of a partly invalid act without hesitation or doubt as to whether they would have been adopted, even if the legislature had been advised of the invalidity of part").

**98.** *Id.* at 70.

**99.** *Id.*

**100.** Dorchy v. Kansas, 264 U.S. 286, 290 (1924).

AR2022_500432

legislature would not have been satisfied with what remains [after a court strikes down the challenged provision].”[101] More significantly, the Court reversed the presumption in favor of severability for statutes that do not contain a severability clause. The Court held that a severability clause creates a presumption of severability, but the absence of such a clause creates a presumption “that the legislature intends an act to be effective as an entirety.”[102]

The early twentieth-century doctrine on severability clauses began to crystallize in *Carter v. Carter Coal Co.*[103] According to *Carter Coal*, statutes are presumed inseverable.[104] A severability clause creates a presumption of severability, but that presumption can “be overcome by considerations which establish ‘the clear probability that . . . the Legislature would not have been satisfied with [the remainder].’”[105] Legislative intent determines whether “the provisions of a statute are so interwoven that[,] one being held invalid[,] the others must fall.”[106] Robert Stern offered the following synopsis of the law at the time: “Separability clauses are thus now significant only because of their absence. Like articles of clothing, if they are present little attention is paid to them, but if they are absent they may be missed.”[107]

*Carter Coal*’s view of the significance of severability clauses largely persists, except that the Court no longer presumes that a statute is inseverable when a statute does not contain a severability clause. The leading modern case on statutory severability is *Alaska Airlines*. According to that widely cited case:

> [W]hen Congress has explicitly provided for severance by including a severability clause in the statute[,] . . . the inclusion of such a clause creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision. . . . [But] Congress’ silence is just that—silence—and does not raise a presumption against severability.[108]

*Alaska Airlines* thus acknowledged that severability clauses create a presumption of severability, but it confirmed that statutes without a severability clause

---

**101.** 278 U.S. 235, 242 (1928).

**102.** *Id.* at 241.

**103.** 298 U.S. 238 (1936).

**104.** *Id.* at 312.

**105.** *Id.* at 312 (quoting *Williams*, 278 U.S. 242).

**106.** *Id.* at 313.

**107.** Stern, *supra* note 11, at 122.

**108.** Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 686 (1987).

AR2022_500433

are not presumed inseverable.[109] As noted earlier, *Alaska Airlines* also retained the two bases for finding a statute containing a severability clause nonetheless inseverable: "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law."[110]

The Court has not clarified the strength of the presumption in favor of severability created by a severability clause, but the case law suggests that the presumption is rather weak. The Court has repeatedly said that "a severability clause is an 'aid merely; not an inexorable command'"[111] and that "whatever relevance such an explicit clause might have in creating a presumption of severability, . . . the ultimate determination of severability will rarely turn on the presence or absence of such a clause."[112]

The behavior of subsequent courts has borne out these observations. In several cases involving the severability decision, lower courts have ignored the existence of a severability clause.[113] And in *Buckley v. Valeo*, the Court held the remainder of the Federal Election Campaign Act to be severable from its unconstitutional provisions without citing the Act's severability clause.[114] Even when courts do not totally ignore a severability clause, the common trope is for

---

109. In *Regan v. Time, Inc.*, 468 U.S. 641, 652-53 (1984), the plurality held that a presumption of severability exists even in the absence of a severability clause. But a majority of the Court has not adopted that holding. Scholars nonetheless disagree about whether the current Court presumes the severability of statutes not containing severability clauses. *See* Jona, *supra* note 15, at 704-05; Gillian E. Metzger, *Facial Challenges and Federalism*, 105 COLUM. L. REV. 873, 884 (2005); Shumsky, *supra* note 15, at 243. *Compare* Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2668 (2012) (Scalia, J., dissenting) ("[W]hile the Court has sometimes applied at least a modest presumption in favor of . . . severability, it has not always done so." (citation and internal quotation marks omitted)); Klukowski, *supra* note 15, at 7-8 ("[C]ontrary to what some scholars argue—without a severability clause there is . . . a presumption [in favor of severability] only in the lower courts, not the Supreme Court."); *and* Nagle, *supra* note 11, at 220-21, *with* Dorf, *supra* note 15, at 313 ("[A]ll the states and the federal government have a general default principle authorizing courts to sever invalid provisions and applications from valid ones.").

110. *Id.* at 684 (quoting Buckley v. Valeo, 424 U.S. 1, 108 (1976) (per curiam)).

111. Reno v. Am. Civil Liberties Union, 521 U.S. 844, 884 n.49 (1997) (quoting Dorchy v. Kan., 264 U.S. 286, 290 (1924)).

112. United States v. Jackson, 390 U.S. 570, 585 n.27 (1968); *see also* INS v. Chadha, 462 U.S. 919, 1014 (1983) (Rehnquist, J., dissenting).

113. Eubanks v. Wilkinson, 937 F.2d 1118, 1128-29 (6th Cir. 1991) (discussing severability without noting the severability clause); Ragsdale v. Turnock, 841 F.2d 1358, 1377 (7th Cir. 1988) (Coffey, J., dissenting) (criticizing the majority for "completely disregard[ing] the statute's severability clauses as if they didn't exist").

114. 424 U.S. at 108-09.

AR2022_500434

a federal court opinion dealing with statutory severability issues to begin with a rhetorical nod in the direction of a severability clause but then to analyze the severability decision as if the clause did not exist.

Several of the Court's recent decisions illustrate this treatment of severability clauses. In *National Federation of Independent Businesses v. Sebelius* (*NFIB*), both the majority opinion and Justice Ginsburg's separate opinion stated that the Court would follow Congress's explicit instruction that the Medicaid expansion be severed from the rest of the Act.[115] However, the majority opinion then proceeded to determine — as if it were a totally separate inquiry — "what Congress would have intended in light of the Court's constitutional holding."[116]

Consider also the Court's decision last Term in *Executive Benefits Insurance Agency v. Arkison*.[117] In an earlier case, *Stern v. Marshall*, the Supreme Court considered the constitutionality of a particular provision of the Bankruptcy Code. Under section 157, bankruptcy courts may proceed to final judgment on certain "core" claims[118] and may offer proposed findings of fact and conclusions of law on certain "non-core" claims.[119] In *Stern*, the Court held that bankruptcy courts lack constitutional authority to enter final judgment on state-law counterclaims labeled as "core" under section 157(b).[120] In *Arkison*, the Court considered whether *Stern* created a "gap" in the statute. According to the "gap" theory, bankruptcy courts lack *constitutional* authority to enter final judgment on certain core claims under *Stern* and lack *statutory* authority to make proposed findings of fact and conclusions of law as to those claims under section 157.[121] The Court noted that the statute contains a severability clause and held that the clause "closes the so-called 'gap.'"[122] However, as in *NFIB*, the Court then proceeded to analyze severability under the *Alaska Airlines* test as if the severability clause did not exist.[123] The Court's reasoning in *NFIB* and *Arkison*

---

**115.** 132 S. Ct. 2566, 2607 (2012) ("We then follow Congress's explicit textual instruction to leave unaffected 'the remainder of the chapter, and the application of [the challenged] provision to other persons or circumstances.'"); *id.* at 2642 (Ginsburg, J., concurring in part, concurring in the judgment in part, and dissenting in part) ("In view of the Chief Justice's disposition, I agree with him that the Medicaid Act's severability clause determines the appropriate remedy.").

**116.** *Id.* at 2607 (quoting United States v. Booker, 543 U.S. 220, 246 (2005)).

**117.** 134 S. Ct. 2165 (2014).

**118.** 28 U.S.C. § 157(b) (2012).

**119.** *Id.* at § 157(c).

**120.** 131 S. Ct. 2594 (2011).

**121.** *Arkison*, 134 S. Ct. at 2172-73.

**122.** *Id.* at 2173.

**123.** *Id.*

AR2022_500435

shows that the presumption in favor of severability is weak. Indeed, if the Court took severability clauses at anything like face value, then those clauses would not so quickly be set to one side. Much of what Robert Stern said in 1937 continues to be true today: "if [severability clauses] are present[,] little attention is paid to them."[124]

We do not intend to criticize the courts' treatment of statutory severability clauses. Indeed, in Part III, we suggest that considerations of institutional competence may justify this treatment (though a full consideration of that issue is outside the scope of this Article). Rather, the point has been to set the stage for our discussion of administrative severability clauses. Earlier in the Article, we observed that the federal courts have, without much reflection, treated the severability of administrative regulations as not relevantly different from the severability of statutes. We noted that the Supreme Court's first and most substantial discussion of severability in administrative law contained no citations but simply repurposed the *Alaska Airlines* test for use in cases involving the severability of regulations.[125] Similarly, after an extensive discussion of the statutory severability doctrine in *Alliance for Community Media v. FCC*, a panel of the D.C. Circuit wrote: "The [severability] analysis differs little in the context of invalidating provisions of regulations promulgated by an agency."[126] Courts have thus assumed that the severability of statutes and of administrative regulations raise virtually identical considerations.

Unlike the case law on statutory severability clauses, the case law on administrative severability clauses is rather scarce. As the next section illustrates, the scarcity is due primarily to the fact that administrative agencies rarely include severability clauses in their rules. The cases that do exist, however, suggest that the federal courts also view administrative severability clauses as raising identical considerations to statutory severability clauses. Like severability clauses in statutes, administrative severability clauses create a "presumption" of severability.[127] And as in the case of statutes, this presumption is largely unimportant under current jurisprudence. Indeed, borrowing from the Supreme Court's cases on statutory severability clauses, the D.C. Circuit in reviewing a Transit Authority regulation has stated that the "determination of severability

---

**124.** Stern, *supra* note 11, at 122.

**125.** *See supra* Part I.A.

**126.** Alliance for Cmty. Media v. FCC, 10 F.3d 812, 830 (D.C. Cir. 1993), *reh'g en banc granted, opinion vacated*, 15 F.3d 186 (D.C. Cir. 1994), *on reh'g*, 56 F.3d 105 (D.C. Cir. 1995), *aff'd in part, rev'd in part sub nom.* Denver Area Educ. Telecomm. Consortium, Inc. v. FCC, 518 U.S. 727 (1996).

**127.** High Country Conservation Advocates v. U.S. Forest Serv., No. 13-CV-01723-RBJ, 2014 WL 4470427, at *4 (D. Colo. Sept. 11, 2014) ("I conclude that the severability clause creates a presumption that the North Fork Exception is severable . . . .").

AR2022_500436

will rarely turn on the presence or absence of [a severability clause]."[128] We conclude that the doctrine on administrative severability clauses, like the doctrine on statutory severability clauses, requires a reviewing court to recognize only a weak presumption in favor of severability and does not require the court to defer to an administrative severability clause.

The analysis in Part I suggested that regulatory schemes would benefit if courts deferred to administrative severability clauses. Accordingly, we think a reviewing court should adopt more than a weak presumption in favor of severability when the agency has chosen to include a severability clause in its rule. As we explain in the next section, the federal courts' treatment of administrative severability clauses has likely created a feedback loop between judicial doctrine and agency practice. Under the doctrine, courts do not defer to severability clauses, and this leads agencies to not promulgate these clauses — a consequence that in turn stunts the development of administrative severability doctrine.

## B. Neglect in the Agencies

This Article began by inspecting the severability clause in the EPA's ambitious Clean Power Plan. Such clauses are rare. We have identified twenty-one agencies that included a severability clause in at least one of their rules between 2000 and 2014.[129] Among these agencies, the Federal Trade Commission

---

128. Cmty. for Creative Non-Violence v. Turner, 893 F.2d 1387, 1394 (D.C. Cir. 1990) (quoting United States v. Jackson, 390 U.S. 570, 585 n.27 (1968)); *see also* New York SMSA Ltd. P'ship v. Town of Clarkstown, 603 F. Supp. 2d 715, 734 (S.D.N.Y. 2009), *aff'd* 612 F.3d 97 (2d Cir. 2010) (internal quotation marks omitted) ("[T]he presence of [a severability] clause is not dispositive.").

129. They include: Bureau of Consumer Financial Protection, Bureau of Land Management, Chemical Safety and Hazard Investigation Board, Commodity Futures Trading Commission, Department of Health and Human Services, Department of Homeland Security, Department of Housing and Urban Development, Department of Justice, Employment and Training Administration, Environmental Protection Agency, Federal Communications Commission, Federal Railroad Administration, Federal Trade Commission, Forest Service, National Indian Gaming Commission, National Labor Relations Board, National Oceanic and Atmospheric Administration, National Park Service, Nuclear Regulatory Commission, Occupational Safety and Health Administration, and the Postal Service. To compile this list, we searched the Federal Register on Bloomberg Law for final rules containing either the word "severability" or the word "severable," and then checked the results manually to eliminate erroneous hits. Depending on how one counts agencies, one could conduct the same exercise and arrive at numbers slightly different from those described in the main text. For example, we decided to count the Food and Drug Administration, the Office of Population Affairs, and the Office of the Secretary of the Department of Health and Human Services as falling under HHS's umbrella. One could also reasonably count these as three separate agencies. Doing so would add two agencies to our total of agencies using severability clauses

2318

(FTC) generated the highest volume of severability clauses. From 2000 to 2014, the FTC promulgated 206 rules, thirteen (6.3%) of which contained a severability clause. After the FTC, the next most active users of severability clauses from 2000 to 2014 were the EPA (with seven final rules containing a severability clause), followed by the Federal Communications Commission and the Forest Service (each with five) and the Federal Railroad Administration (with four). All other agencies have included severability clauses in their rules in three or fewer instances from 2000 to 2014.[130] The normative significance of our data—for example, whether they support the claim that agencies include severability clauses in their rules *too* infrequently—is of course debatable. However, we think it is fair to conclude from the data that agencies infrequently include severability clauses in their rules.

Instead of including severability clauses in final rules, agencies tend to clarify their positions on severability only when required to do so in litigation—that is, they formulate a position on severability only *after* they become concerned that particular provisions of their rules are in jeopardy.[131] In conversation, supervising lawyers at several agencies indicated that severability was not a priority during notice and comment; rather, agency personnel assumed that they would consider severability only when it became an imminent issue in litigation. An informal survey of several former EPA General Counsels, including one of the co-authors, indicated that the topic of including a severability clause rarely came up, and when it did, agency general counsel staffs were often reluctant to imply that there was even a possibility that portions of their rule might be set aside. This attitude, while understandable, is myopic.

Waiting until litigation to opine on severability can have significant drawbacks. While severability clauses must be promulgated according to statute-prescribed procedural formalities—most commonly, notice-and-comment procedures—positions developed in litigation do not require such procedures. In-

and would reduce the concentration of severability clauses in a single agency's rules. Our basic point that agencies rarely include severability clauses is not affected by how one individuates related agencies.

130. See *infra* Appendix for more detail.

131. Nat'l Ass'n of Mfrs. v. NLRB, 717 F.3d 947, 963 (D.C. Cir. 2013) (asking for reconsideration of severability in petition for rehearing); MD/DC/DE Broadcasters Ass'n v. FCC, 253 F.3d 732 (D.C. Cir. 2001) (same); Virginia v. EPA, 116 F.3d 499, 500-01 (D.C. Cir. 1997) (same); Davis Cnty. Solid Waste Mgmt. v. EPA (*Davis County II*), 108 F.3d 1454, 1455 (D.C. Cir. 1997) (same); Davis Cnty. Solid Waste Mgmt. v. EPA, 101 F.3d 1395, 1411 (D.C. Cir. 1996) (*Davis County I*) (opining on severability at oral argument); Akiachak Native Cmty. v. Jewell, 995 F. Supp. 2d 1, 6 (D.D.C. 2013) (articulating an agency's position on severability in a legal brief); Principal and Response Brief of Appellees/Cross-Appellants at 59-64, *Nat'l Ass'n of Mfrs.*, 717 F.3d 947 (No. 12-5068 & 12-5138) (discussing the NLRB's severability argument).

AR2022_500438

deed, trial and appellate briefs are typically confidential until the time they are filed, and they are often reviewed only by a handful of agency lawyers. As a consequence of these procedural differences, severability arguments raised in litigation do not benefit regulatory regimes along the dimensions discussed in Part I—expertise, accountability, the rule of law, and efficiency—at least not to the same extent as severability clauses.

Severability opinions expressed through briefs are less likely to reflect the agency's subject-matter expertise. Agency staff with advanced training in scientific and economic analysis, for example, will often review legislative rules, but not review legal briefs. The benefits of review by agency staff became particularly evident in *Davis County I* and *II*. In *Davis County I*, operators of several existing municipal solid waste (MSW) combustor units challenged EPA's 1995 MSW combustion standards. The court held that the 1995 standards, as applied to small MSW combustors, exceeded EPA's statutory authority under section 129 of the Clean Air Act.[132] On the advice of the EPA's counsel at oral argument, the court vacated the entire rule rather than severing the ultra vires provision.[133] In *Davis County II*, however, the EPA petitioned for rehearing on the severability issue, conceding that the agency's counsel had not fully grasped the workability of the regulatory provisions that would remain after the court's ruling.[134] The Court of Appeals reinstated the standards except as applied to small MSW combustors and cement kilns.[135] This was a close call for the agency and presumably for communities that are affected by pollution from MSW combustors. Had the agency's position on severability been expressed through a severability clause, rather than through a lawyer at oral argument, the agency's administrative expertise could have been brought more directly to bear on the severability question confronting the court.

An administrative severability clause is also a more accountable and participatory way for an agency to express its opinion on severability than a litigation brief. As noted, to include a severability clause in a legislative rule pursuant to the APA, an agency must provide a "[g]eneral notice of proposed rulemaking,"[136] give "interested persons an opportunity to participate in the rule making" by submitting comments,[137] and address significant comments in its statement of basis and purpose.[138] By contrast, for reasons of legal strategy, po-

---

132. *Davis County I*, 101 F.3d at 1397.

133. *Id.* at 1411.

134. *Davis County II*, 108 F.3d at 1460.

135. *Id.*

136. 5 U.S.C. § 553(b) (2012).

137. 5 U.S.C. § 553(c).

138. *See* PPL Wallingford Energy LLC v. FERC, 419 F.3d 1194, 1198 (D.C. Cir. 2005).

AR2022_500439

sitions developed in litigation almost never involve participation by the public; at most, a few litigants aligned with the agency may be consulted.

Severability clauses can also make regulatory schemes more predictable and stable than positions on severability developed in litigation, due to the greater prospectivity and formality of severability clauses. A severability clause in a rule will always be promulgated far in advance of a legal brief opining on severability. Therefore, a rule with a severability clause creates reliance interests that adjust for the possibility that some of the rule's provisions may be invalidated and severed from the rest. By contrast, an agency develops a position on severability in litigation only after regulated entities have begun to plan their affairs around a rule's substantive provisions. Similarly, procedural requirements for promulgating severability clauses make regulatory schemes more stable at the margins because these requirements must be satisfied in order to *rescind* these clauses once they are in effect.[139] Consequently, one expects fewer changes in an agency's position on severability when the change is announced through a severability clause rather than in a legal brief.

In light of the potential drawbacks of waiting until litigation to develop a position on severability, why do agencies choose to wait rather than include a severability clause in the text of a rule? While more research needs to be done on this question,[140] one way to approach it is to compare an agency's decision whether to include a severability clause in a rule with the choice between interpreting a federal statute using a legislative rule or using an informal agency action.

Under *Chevron*, an agency interpreting a federal statute can choose either to pay now or pay later.[141] The agency can "purchase" *Chevron* deference for its

---

139. *See* Nat'l Family Planning & Reproductive Health Assoc. v. Sullivan, 979 F.2d 227 (D.C. Cir. 1992) (holding that a reversal of a prior agency action requires at least the extent of procedural formality initially used in adopting the action).

140. We think it would be worthwhile to survey agencies' legislative counsels to determine why agencies choose to include or not to include a severability clause in a rule. This research would be a piece of the larger project of investigating the process of regulating "from the inside," similar to recent work that has begun to shed light on the process of legislative drafting in Congress. *See* Lisa Schultz Bressman & Abbe R. Gluck, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation and the Canons: Part II*, 66 STAN. L. REV. 725 (2014) [hereinafter Bressman & Gluck, *Part II*]; Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I*, 65 STAN. L. REV. 901 (2013) [hereinafter Gluck & Bressman, *Part I*]; Victoria F. Nourse & Jane S. Schacter, *The Politics of Legislative Drafting: A Congressional Case Study*, 77 N.Y.U. L. REV. 575 (2002). A recent article by Christopher Walker takes the first step in this larger project. *See* Christopher J. Walker, *Inside Agency Interpretation*, 67 STAN. L. REV. 999 (2015).

141. *See* Lisa Schultz Bressman, *Beyond Accountability: Arbitrariness and Legitimacy in the Administrative State*, 78 N.Y.U. L. REV. 461, 539 (2003); Elliott, *supra* note 66, at 1491; Merrill, *supra*

AR2022_500440

THE YALE LAW JOURNAL                                    124:2286   2015

interpretation by investing agency resources in costly notice-and-comment procedures. If the agency does so, then its reward is less judicial scrutiny. Alternatively, the agency can choose not to invest in formal procedures. But if it does so, the agency might later have to "purchase" judicial approval through stronger interpretive arguments evaluated under the less deferential *Skidmore* framework.

The courts' doctrine on administrative severability clauses, however, does not share *Chevron/Skidmore*'s incentive structure. Promulgating a severability clause through notice-and-comment procedures can be costly. It may entail significant ex ante costs associated with investigating and reflecting on the various regimes that might result from an enforceable severability clause. Furthermore, the agency may believe that a severability clause entails higher expected ex post costs. For example, an agency may be concerned that a severability clause will make weaknesses in its regulatory program easier to detect. Or an agency may think that a severability clause will weaken its position in litigation, either because a court may wonder why the agency included a severability clause if the agency believed that the regulatory program was lawful[142] or because the court may feel it easier to partially invalidate a rule that contains a severability clause.[143]

Under current judicial doctrine, the agency receives little payoff for incurring these ex ante and ex post costs. As explained in the previous section, courts tend not to give substantial deference to severability clauses, preferring instead to conduct the same severability analysis that they would perform in the absence of a severability clause. This lack of deference may often be the de-

---

note 72, at 822; Merrill & Hickman, *supra* note 48, at 887; Stephenson, *supra* note 88, at 547-48; Cass R. Sunstein, Chevron *Step Zero*, 92 VA. L. REV. 187, 225-26 (2006).

142. Applications for FDA Approval To Market a New Drug: Patent Submission and Listing Requirements and Application of 30-Month Stays on Approval of Abbreviated New Drug Applications Certifying that a Patent Claiming a Drug Is Invalid or Will Not Be Infringed, 21 C.F.R. § 314 (2014) ("From the comments we have received to the proposed rule, we believe there is a possibility that we will be challenged on various portions of the final rule. *We expect we will prevail in any such challenge, as the final rule and each of its provisions is legally sound.* If, however, a court should conclude that any one or more provisions of the final rule is invalid, we wish to emphasize our intent that the remaining provisions of the final rule be permitted to take effect." (emphasis added)).

143. *Cf. The Supreme Court Decision in* INS v. Chadha *and Its Implications for Congressional Oversight and Agency Rulemaking: Hearings Before the Subcomm. on Admin. Law & Governmental Relations of the H. Comm. on the Judiciary*, 98th Cong. 275 (1983) (statement of Rep. John Joseph Moakley) ("[Including severability clauses in legislation] has not been an intelligent policy [because those clauses] are a dangerously open invitation to the courts to assume th[e] legislative function."); Kameny, *supra* note 15, at 1001 (arguing that some inseverability clauses serve "an in terrorem function, as the legislature attempts to guard against judicial review altogether by making the price of invalidation too great").

AR2022_500441

cisive factor for an agency considering whether to include a severability clause in a rule. For example, the National Indian Gaming Commission responded to a comment requesting that it include a severability clause in one of its rules as follows:

> The Commission . . . addressed [the suggestion that the Commission include a severability clause in its rule] in the previous preamble, stating that severability clauses are not conclusive of an agency's intent and that "the ultimate determination of severability will rarely turn on the presence or absence of such a clause."[144]

Thus, an agency considering whether to include a severability clause in a rule may conclude that the potential benefits are not worth the candle. The absence of a deference framework specifically for administrative severability clauses is a critical feature of a vicious cycle in which courts do not defer to severability clauses, so agencies do not include them, so courts have no occasion to reconsider whether they should defer to them.

Our aim here is not to suggest that agencies should include a severability clause in every rule. Even if rulemaking were costless, including a severability clause in a rule would not be advisable under some circumstances. First, severability is not advisable when the rule's efficacy depends on the interconnectedness of its provisions.[145] Second, a severability clause might prove to be misguided if the agency does not know whether it would want a court to sever a challenged provision.[146] Third, there may be some provisions that are severable and others that are not, and it may be difficult to predict which combinations should result in severability. Finally, although a regulatory remainder left standing may be preferable to the court's invalidation of the entire rule, the

---

144. 25 C.F.R. § 543 (2014) (citing Canterbury Liquors v. Sullivan, 999 F. Supp. 144 (D. Mass. 1994)).

145. *See* 50 C.F.R. § 17 (2014) ("We recognize that severability clauses are frequently used in legislation but have decided that such a clause would not be useful in the current rule. The rule is organized in a manner that reflects the connection among the different paragraphs while also indicating the distinctiveness of the different provisions. We would expect a court to take the distinctiveness of the various provisions into consideration during any judicial review of the rule.").

146. Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities: Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, 62 Fed. Reg. 12,274, 12,281 (1997) (codified at 18 C.F.R. § 35) ("The Commission will not, at this time, make any determination whether or not [certain regulatory provisions] are severable . . . . Circumstances at the time of any court order would dictate how we should proceed and we would consider all such circumstances, and the entirety of our policy decisions, before determining how to respond to a court decision.").

AR2022_500442

benefits of that regulatory remainder will not always outweigh the drafting costs of promulgating a severability clause.

Our point here is that the current doctrine on administrative severability clauses does not give agencies adequate incentives to include these clauses in their rules even though these clauses can often benefit regulatory schemes more than agency positions on severability developed in litigation. As we have explained, even if courts adopt our proposal by developing a deference framework for administrative severability clauses, an agency will sometimes have good reasons for not including a severability clause in a rule. However, a framework for severability clauses would ensure that agencies will be compensated for their upfront investment in drafting severability clauses and would thereby expand an agency's options for creating the best regulatory scheme with its scarce resources.

## III. DEFERENCE TO ADMINISTRATIVE SEVERABILITY CLAUSES

This Part proposes a deference framework for severability clauses. Before introducing that framework, we first debunk the primary argument against judicial deference to administrative severability clauses—namely, that severability clauses are not the best evidence of the agency's intent regarding severability. We then explain the framework that courts should follow when reviewing an administrative severability clause.

### A.  Disassociating Statutory and Administrative Severability Clauses

Part I demonstrated that regulatory schemes containing severability clauses would benefit in several important ways if courts deferred to an agency's opinion on the intent and workability questions expressed in a severability clause. Part II, however, showed that courts tend not to defer to severability clauses. Rather, courts typically give a rhetorical nod to the existence of a severability clause but then conduct their own de novo review of agency intent and workability. This doctrinal treatment of administrative severability clauses is symptomatic of the federal courts' tendency to treat severability analysis in administrative law as substantially the same as severability analysis for statutes. The key, then, to understanding why courts hardly defer to administrative severability clauses is to understand their treatment of *statutory* severability clauses.

Severability clauses ordinarily state in plain terms that Congress intends for a court to sever an unconstitutional provision from a statute's remainder. Federal courts typically regard clear statutory text as strong evidence of Congress's

intent.[147] Why then do courts look past the plain text of a severability clause to analyze severability de novo? The accepted explanation is that statutory severability clauses are boilerplate provisions.[148] We have not seen this argument systematically developed, but it might proceed in the following way: severability clauses are not reliable evidence of Congress's intent because they are generally added to statutes without much (or any) consideration by members of Congress or their staffs. Therefore, a reviewing court is justified in looking past a severability clause because Congress was likely much more concerned with the statute's substantive provisions than with the severability clause.

We hear the ring of truth in the claim that Congress is institutionally ill-equipped to have an informed view of the workability of severability clauses. In particular, several features of the legislative process in Congress (which we describe below) justify a court's scrutiny of a statutory severability clause's apparent meaning. If the rulemaking process within the administrative agencies shared these features, then the parallel treatment of statutory and administrative severability clauses might be justified. However, in several important ways, the rulemaking process is substantially different from the process of drafting statutes. Indeed, the reasons for thinking that Congress *lacks* capacity and incentive to consider the severability of statutes are, interestingly, reasons to

---

**147.** *See, e.g.*, NFIB v. Sebelius, 132 S. Ct. 2566, 2583 (2012) ("[T]he best evidence of Congress's intent is the statutory text."); Chamber of Commerce v. Whiting, 131 S. Ct. 1968, 1977 (2011) ("When a federal law contains an express preemption clause, we focus on the plain wording of the clause" because it is "the best evidence of Congress' preemptive intent."); West Virginia Univ. Hosp., Inc. v. Casey, 499 U.S. 83, 98 (1991) ("The best evidence of [Congress's] purpose is the statutory text adopted by both Houses of Congress and submitted to the President.").

**148.** *See* Trainor v. Hernandez, 431 U.S. 434, 463 (1977) (Stevens, J., dissenting) (mentioning "a legitimate severability clause, or some other equally innocuous provision"); Lindenberg v. First Fed. Sav. & Loan Ass'n, 90 F.R.D. 255, 258 (N.D. Ga. 1981) (describing a severability clause as "merely boilerplate"); H.R. REP. NO. 988-91, at 49 (1970) (describing a severability clause as "the usual separability provision in legislation"); 140 CONG. REC. H3117 (daily ed. May 5, 1994) (statement of Rep. Slaughter) (arguing that floor debate on the inclusion of a severability clause was unnecessary); 134 CONG. REC. 12,280 (1988) (statement of Rep. Frank) (describing a severability clause as "just boilerplate severability"); 2 SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 44.08 (5th ed. 1992); 2 NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 44.8, at 585 (6th ed. 2001); Israel E. Friedman, *Inseverability Clauses in Statutes*, 64 U. CHI. L. REV. 903, 903 (1997) ("In part because severability clauses have become boilerplate, these clauses have had little effect on courts making severability determinations."); Kameny, *supra* note 15, at 1005; Max Radin, *A Short Way with Statutes*, 56 HARV. L. REV. 388, 419 (1942) ("Are we really to imagine that the legislature had, as it says it has, weighed each paragraph literally and come to the conclusion that it would have enacted that paragraph if all the rest of the statute were invalid? That contradicts the ordinary experience of which every citizen takes notice."); Stern, *supra* note 11, at 122; Tribe, *supra* note 51, at 22 (mentioning "a boilerplate severability clause (of the sort most laws contain)").

AR2022_500444

THE YALE LAW JOURNAL                                124:2286   2015

think that agencies *have* such capacity and incentive. We consider three such reasons below.

### 1. Attention Paid to Severability Clauses

Some commentators have argued that members of Congress and their staff do not pay much attention to severability clauses. Instead, legislative counsel throw them "unthinkingly . . . into a statute without considering whether [they] really want[] each provision of [their] handiwork to stand independently."[149] Because Congress uses severability clauses so "indiscriminately," a reviewing court could reasonably conclude that, if taken literally, severability clauses would "cover situations which they were never intended to reach."[150]

The process by which administrative agencies decide to include severability clauses in rules, however, is vastly different from this supposed congressional process. Agencies do not just throw severability clauses into their regulations. As we explained in Part II.B, even the most active user of severability clauses — the FTC — has included a severability clause in only 6.3% of its rules from 2000 to 2014.[151] Moreover, unlike Congress, agencies may not include severability clauses in their rules unthinkingly because the APA's rulemaking procedures require agencies to respond to public input about their rules. To be sure, congressional committees do hold regular hearings on proposed legislation that would in theory permit the public to provide input about severability clauses. Administrative agencies, however, are *required* to respond in a rational way to public comments; otherwise, their rules can be set aside as arbitrary and capricious.[152] Moreover, our research suggests that agencies tend to respond with care to comments suggesting the inclusion or removal of severability clauses. For example, in response to one set of comments, the Fish and Wildlife Service explained: "We recognize that severability clauses are frequently used in legislation but have decided that such a clause would not be useful in the current rule."[153] Similarly, in the statement of basis and purpose for one of its rules, the National Indian Gaming Commission wrote:

---

[149]. Nagle, *supra* note 11, at 239.

[150]. Stern, *supra* note 11, at 124.

[151]. *See supra* notes 129-130 and accompanying text.

[152]. *See* Reyblatt v. Nuclear Regulatory Comm'n, 105 F.3d 715, 722 (D.C. Cir. 1997) ("An agency need not address every comment, but it must respond in a reasoned manner to those that raise significant problems.").

[153]. Special Rule for the Polar Bear, 73 Fed. Reg. 76,249, 76,267 (Dec. 16, 2008) (to be codified at 50 C.F.R. pt. 17).

AR2022_500445

> [S]ome commenters advocated for the inclusion of a severability clause
> . . . . [T]he Commission declines to include a severability clause in this
> regulation because it believes that the regulations are not so intertwined
> that striking one provision would necessarily always require invalida-
> tion of the entire part, and the lack of a severability clause will not com-
> pel a court's finding on the issue.[154]

In short, there is no evidence that administrative agencies throw severability
clauses unreflectively into their rules.

### 2. Time Pressure

Even if members of Congress and their staffs were inclined to reflect on the
manifold potential ramifications of a statutory severability clause, they often
lack the time to do so. Congressional staffs work under tremendous time pres-
sure, making it less likely that they will have had the opportunity to consider
the implications of a complex, probabilistic, and procedural instrument like a
severability clause.[155] Nourse and Schacter's study of legislative drafting in
Congress indirectly supports this hypothesis by finding that:

> Several staff members complained about the dangers of drafting bills
> on the floor, as this increased the risks of the process becoming "ugly,"
> haphazard, and driven by political imperative. Staffers expressed con-
> cern about last-minute drafting without a lot of public scrutiny. Specif-
> ic fears included provisions being "slipped in," people losing track of
> whether one provision squares with another, or a provision being add-
> ed to satisfy the needs of a senator in trouble for re-election.[156]

Similarly, in Gluck and Bressman's more recent study of congressional legisla-
tive staff, respondents reported that time pressures often made it impossible to
comply with their goal of making the usage of terms consistent across a stat-
ute.[157] Neither Nourse and Schacter nor Gluck and Bressman surveyed staffers
on their use of severability clauses, but we suspect that time pressures also in-

---

**154.** Minimum Internal Control Standards for National Indian Gaming Commission, 77 Fed.
Reg. 58,708, 58,709 (Sept. 21, 2012) (to be codified at 25 C.F.R. pt. 543).

**155.** *Cf.* Cuéllar, *supra* note 66, at 420 n.31 (noting that Congress's ability to control administra-
tive agencies "is almost certainly shaped by the legislature's scarce resources and their com-
peting uses. Legislators must vote on foreign policy, campaign among their constituencies,
evaluate tax law changes, and supervise staff. . . . [T]hey must develop techniques for de-
ploying scarce attention and resources.").

**156.** Nourse & Schacter, *supra* note 140, at 592-93 (footnote omitted).

**157.** *See* Gluck & Bressman, *Part I, supra* note 140, at 936.

AR2022_500446

hibit staffers from meaningfully considering these clauses' potential ramifications.

It is true that agencies labor under their own time pressures.[158] Congress can impose deadlines on agency action,[159] the public can petition agencies to initiate rulemaking,[160] and, like Congress, agencies are not immune from the pressures of election cycles. Still, various statutory and executive controls require agencies to take care in promulgating rules. As noted, the APA, certain agency organic acts, and various other statutes impose procedural requirements on rulemaking that require deliberation and reasoned responses to comments by a promulgating agency. Review by OIRA typically requires agencies to justify major proposed rulemakings on the basis of sophisticated economic analysis. These various procedural mechanisms require an agency to be careful about each aspect of a proposed rule.[161] Indeed, much of the literature on agency ossification maintains that many of these controls on agency action require agencies to use scarce resources inefficiently in order to explain their reasons for promulgating rules.[162] We think it is fair to conclude that agencies promulgate rules in a more deliberate and deliberative way than Congress enacts statutes, which in part suggests that there should be less concern about deference to administrative severability clauses than about deference to statutory severability clauses.

---

**158.** *See generally* Cass R. Sunstein & Adrian Vermeule, *The Law of "Not Now": When Agencies Defer Decisions*, 103 U. PA. L. REV. 157 (2014); Jacob E. Gersen & Anne Joseph O'Connell, *Deadlines in Administrative Law*, 156 U. PA. L. REV. 923 (2008).

**159.** *See, e.g., In re* Bluewater Network, 234 F.3d 1305, 1316 (D.C. Cir. 2000) (compelling agency rulemaking in light of "a clear statutory mandate, a deadline nine-years ignored, and an agency that had admitted its continuing recalcitrance").

**160.** *See* Mass. v. EPA, 549 U.S. 497, 527 (2007).

**161.** Studies suggest that the average time between several agencies' notices of proposed rulemaking and the promulgation of their final rules is somewhere between one-and-a-half and five years — far longer than the time between election cycles that Congress has to pass major legislation. *See* Stephen M. Johnson, *Ossification's Demise? An Empirical Analysis of EPA Rulemaking from 2001-2005*, 38 ENVTL. L. 767, 770 (2008) (finding that, between 2001 and 2005, the EPA took an average of between 1.5 and 2 years to finalize a rule after publishing it); Cornelius M. Kerwin & Scott R. Furlong, *Time and Rulemaking: An Empirical Test of Theory*, 2 J. PUB. ADMIN. RES. & THEORY 113, 134 (1992) (finding that the EPA took an average time of 1,108 days to promulgate a rule); McGarity, *Some Thoughts, supra* note 75, at 1388 (noting that "OSHA health standards rarely take less than five years to promulgate").

**162.** Freeman, *supra* note 66, at 9; William S. Jordan, III, *Ossification Revisited: Does Arbitrary and Capricious Review Significantly Interfere with Agency Ability To Achieve Regulatory Goals Through Informal Rulemaking?*, 94 NW. U. L. REV. 393 (2000); Pierce, *supra* note 54; Seidenfeld, *supra* note 75, at 514; Mark Seidenfeld, *Hard Look Review in a World of Techno-Bureaucratic Decisionmaking: A Reply to Professor McGarity*, 75 TEX. L. REV. 559 (1997); Paul R. Verkuil, Comment, *Rulemaking Ossification — A Modest Proposal*, 47 ADMIN. L. REV. 453 (1995).

AR2022_500447

### 3. Centralization

The Nourse-Schacter and Gluck-Bressman surveys have shed light on the variability, complexity, and polycentricity of statutory drafting in Congress. Statutes are regularly the result of many legislative bargains and are drafted by multiple committees over multiple iterations. In their study of staffers on the Senate Judiciary Committee, for example, Nourse and Schacter found broad consensus on the proposition that "[t]he [legislative] drafting process . . . is better understood as *multiple* drafting processes, varying along many axes,"[163] reinforcing the aphorism that Congress is a "they," not an "it."[164] Nourse and Schacter continue:

> [R]esponsibility for drafting a bill often is diffused among many people and groups, chief among them staffers from different offices, Legislative Counsel drafters, and lobbyists. This dispersal of responsibility makes it problematic for a court to try to isolate any single moment, actor, or event that decisively conferred meaning on a contested provision.[165]

Moreover, respondents in Gluck and Bressman's study emphasized that committees often operate as drafting "islands," unconnected from the business of the other committees.[166]

The messy reality of the statutory drafting process has several implications for the plausibility of ascribing to Congress a specific intention to draft and pass workable severability clauses. First, the committee drafting model creates incentives for individual members to include severability clauses in statutes; members want to ensure that the portions of bills *they* have drafted will remain in effect even if portions drafted by members of *other* committees eventually fail. The larger and more complex a bill, the more likely it contains an unconstitutional provision, and thus the stronger the incentive to include a severability clause. The practice of legislating by means of omnibus bills strengthens incentives to include severability clauses, but not always in situations in which they would be advisable. Second, the isolation of congressional committees suggests that blanket severability clauses may be inserted into portions of bills drafted by one committee that were not intended to apply to other portions of the bill. This suggests that a statutory severability clause, drafted and passed by

---

**163.** Nourse & Schacter, *supra* note 140, at 583.

**164.** *See* Kenneth A. Shepsle, *Congress Is a "They," Not an "It": Legislative Intent as Oxymoron*, 12 INT'L REV. L. & ECON. 239, 239 (1992).

**165.** Nourse & Schacter, *supra* note 140, at 618.

**166.** Gluck & Bressman, *Part I*, *supra* note 140, at 936.

AR2022_500448

a committee without reference to other parts of the bill, does not provide an informed opinion on the larger body's intent or on the workability of the statutory remainder. Third, traditional forms of democratic accountability likely do not chasten the temptation to include a far-reaching severability clause in a statute merely to protect a limited set of provisions. In Congress, responsibility for a severability clause gone wrong would be diffused across all members, diminishing any particular member's concerns that she will be held unaccountable for inserting an ill-advised severability clause into a statute. This point also suggests that these clauses do not contain an informed opinion on the statutory remainder's workability. In short, Congress arguably has too many cooks in the kitchen for a severability clause meaningfully to reflect the legislative will.

Not so for the administrative agencies. Instead of multiple committees working in multiple drafting stages, agencies draft rules in a more concerted fashion.[167] There is no such thing as a "Christmas tree" rule.[168] Rules are typically drafted by a single team of drafters, representing different offices, whose draft work product is reviewed multiple times — at least in general terms, if not word by word — by agency general counsels and often by the agency head or her deputies. Agency proposed rules are also subject to OIRA review, which puts them through a rigorous economic analysis. Furthermore, the temptation to include a severability clause in a rule in the hope of preserving important substantive provisions is reduced by the fact that responsibility for an unworkable regulatory remainder will fall squarely upon the agency (or, more realistically, the agency head). Thus, administrative severability clauses are more likely than statutory severability clauses to reflect the actual intent of their drafters.

Regardless of the merits of arguments discrediting statutory severability clauses, the case for not deferring to administrative severability clauses is based on an inapt analogy between the agencies and Congress. Having made the case that courts should defer to administrative severability clauses in Part I.B and having debunked the analogy between legislative and administrative severability clauses in this section, we next lay out a deference framework for administrative severability clauses.

---

167. The distinction between the drafting methods used in Congress and those used in agencies might not be as stark in the context of negotiated rulemaking (so-called "neg reg"). However, even in the case of negotiated rulemaking, agencies are less likely than Congress to endorse a severability clause that covers aspects of a rule or statute that it was not meant to cover.

168. *Cf.* Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2675 (Scalia, J., dissenting) (discussing "Christmas tree" bills).

AR2022_500449

### B. A Chevron-*Style Framework for Severability Clauses*

We propose a two-step deference framework for administrative severability clauses, similar in some respects to *Chevron* deference. The *Chevron* framework addresses how a federal court should treat an agency's interpretation of a federal statute that it administers. The framework proceeds in two steps. At Step One, the court asks whether "the intent of Congress is clear" after employing traditional canons of statutory construction; if so, "that is the end of the matter . . . the court . . . must give effect to the unambiguously expressed intent of Congress."[169] Step One launches a purely legal inquiry. Employing interpretive techniques in which they are skilled, courts ask whether the agency has stepped beyond the boundaries of its statutory authority. If, after employing these techniques, a reviewing court determines that the statute is silent or ambiguous on the relevant issue, then the court proceeds to Step Two. At Step Two, the court again undertakes a purely legal inquiry and asks whether the agency's interpretation is "based on a permissible construction of the statute."[170] If so, then the court defers to the agency's interpretation because "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."[171]

*Chevron* acknowledges that within a certain "zone of reasonableness"[172] statutory interpretation is closer to creating policy than it is to discerning legal norms, and that it is better to allow the more expert and accountable agency to create policy. As the Supreme Court explained in 2005:

> In *Chevron*, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps, the Court explained, *involves difficult policy choices that agencies are better equipped to make than courts*. If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.[173]

---

**169.** Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).

**170.** *Id*. at 843.

**171.** *Id*. at 844.

**172.** RICHARD A. POSNER, HOW JUDGES THINK 86-87 (2008) (explaining the meaning of the phrase "zone of reasonableness").

**173.** Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005) (emphasis added).

AR2022_500450

Thus, both courts and agencies have roles to play under *Chevron* — roles delimited by their institutional capacities. Using traditional interpretation methods, courts police the clear statutory boundaries, while agencies, employing their own expertise, may create reasonable policies within those boundaries.

The deference framework for administrative severability clauses that we propose is similar. At Step One, a reviewing court should determine whether the regulatory remainder is *lawful*. Michael Dorf has called this the "taint problem" for severability analysis because the remainder of a statute or rule may be "tainted" by residual legal defects when a court invalidates a certain provision.[174] This inquiry is analytically prior to the two questions of the *Alaska Airlines* severability test.

If the remainder is lawful, then at Step Two a court should determine what the severability clause requires and defer to it. Like *Chevron* Step Two, the courts' review at this stage should be highly deferential because, as we explained in Part I.B, agencies are better than courts at determining when a regulatory remainder will be workable.[175] Like *Chevron*, our deference framework assigns to the courts and agencies roles delimited by each institution's capacities.

The deference framework we propose would break the vicious cycle in which courts, rather than agencies, make the severability decision. By giving agencies deference at Step Two, it would (1) allow agencies to answer the intent and workability questions and (2) provide agencies with incentives to include severability clauses in more rules when appropriate.

Before expounding further upon the mechanics of our proposed deference framework, we should note that administrative law already has the conceptual resources to implement the framework. Under the *Seminole Rock* doctrine,[176] which predates *Chevron* by nearly forty years, federal courts give what is essen-

---

174. Dorf, *supra* note 15, at 307, 310.

175. With one potential exception, the Supreme Court has never invalidated an agency's construction of a statute at *Chevron* Step Two. *See* Lisa Schultz Bressman, Schechter Poultry *at the Millennium: A Delegation Doctrine for the Administrative State*, 109 YALE L.J. 1399, 1399-1400 & n.5 (2000) (citing AT&T Corp. v. Iowa Utilities Bd., 119 S. Ct. 721, 734-36 (1999), as a potential exception). Lower federal courts have behaved similarly, though, as expected, there have been more decisions decided against the agency at Step Two than there have been in the Supreme Court. *See* Orin S. Kerr, *Shedding Light on* Chevron: *An Empirical Study of the* Chevron *Doctrine in the U.S. Courts of Appeals*, 15 YALE J. ON REG. 1, 30-31 (1998) (noting that, in the years 1995 and 1996, U.S. courts of appeals upheld agency interpretations at Step Two in one hundred cases and rejected them in twelve).

176. *See* Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945) ("[T]he ultimate criterion [in interpreting a regulation] is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."); *see also* Auer v. Robbins, 519 U.S. 452, 461 (1997) (providing the modern formulation of the doctrine).

AR2022_500451

tially *Chevron* deference to an agency's interpretation of its own rules.[177] Like *Chevron*, the contemporary statement of the *Seminole Rock* doctrine involves a two-step analysis. First, a reviewing court asks whether the agency's interpretation steps outside the boundaries established by the agency's original rule — that is, whether the agency's interpretation is "inconsistent" with the regulation.[178] If not, the court asks whether the agency's interpretation is "plainly erroneous."[179]

Two rationales support the doctrine. First, an originalist rationale[180] posits that agencies, as the drafters of administrative rules, have special insight into their intent when promulgating those rules.[181] Second, a functionalist rationale emphasizes the agencies' specialized expertise in administering their "'complex and highly technical regulatory program[s].'"[182]

*Seminole Rock* is related to severability because questions of severability are fundamentally questions of interpretation.[183] Just as archetypal questions of statutory interpretation oblige the court to examine the legislative authorities (for example, text, structure, and legislative history) to determine the legislature's intent, so too does severability analysis oblige the court to examine the regulation in search of the agency's intent. If severability is fundamentally a question of interpretation, then an agency's opinion on the severability of its rule is an interpretation of that rule deserving *Seminole Rock* deference. Small wonder, then, that the rationales underlying the *Seminole Rock* doctrine dovetail with the two questions of the *Alaska Airlines* test. The "touchstone" of severability analysis is the lawmakers' intent. And since agencies have special insight into their intent when enacting administrative rules, they are best

---

**177.** *See* Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. 1326, 1339 (2013) (Scalia, J., concurring in part and dissenting in part).

**178.** *Auer*, 519 U.S. at 461 (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989)).

**179.** *Id.*

**180.** *See* Stephenson & Pogoriler, *supra* note 47, at 1454.

**181.** *See* Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 152 (1991); Bruh v. Bessemer Venture Partners III, 464 F.3d 202, 208 (2d Cir. 2006); Manning, *supra* note 52, at 630-31; Stephenson & Pogoriler, *supra* note 47, at 1454.

**182.** Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991)); *see also* Amerada Hess Pipeline Corp. v. FERC, 117 F.3d 596, 604 (D.C. Cir. 1997) (according deference "because the Commission has greater technical expertise in this field than does the Court"); Stephenson & Pogoriler, *supra* note 47, at 1456.

**183.** *See* Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 STAN. L. REV. 235, 289 (1994); Edward A. Hartnett, *Modest Hope for a Modest Roberts Court: Deference, Facial Challenges, and the Comparative Competence of Courts*, 59 SMU L. REV. 1735, 1752 (2006); Metzger, *supra* note 109, at 928; Nagle, *supra* note 11, at 232-33; Stern, *supra* note 11, at 115.

THE YALE LAW JOURNAL                    124:2286   2015

equipped to opine on that intent. Further, severability analysis requires a determination of whether the remainder of a regulation is workable. Since agencies have special expertise in the "complex and highly technical regulatory program[s]" they administer, they are best equipped to opine on the workability of regulatory remainders.[184] Thus, although neither the Supreme Court nor the D.C. Circuit have applied the *Seminole Rock* doctrine to administrative severability clauses, accommodating the deference framework we propose would not require a seismic shift in the current doctrine. We now discuss each step of our proposed deference framework in more detail.

### 1. Step One: Address Legal Defects

At Severability Step One, a reviewing court must determine whether the regulatory remainder is lawful or "tainted" by residual legal defects.[185] The *Alaska Airlines* severability test does not require this inquiry, largely because the *Alaska Airlines* test *assumes* that the reviewing court will not leave in place a remainder that is unlawful. In any case, a reviewing court has a duty to determine whether the regulatory remainder is lawful.

The proper scope of a court's review for residual legal defects will inherently be somewhat open-ended. On one hand, a court may not leave in place legal defects that are apparent from its review of the provision challenged in litigation. On the other hand, the duty to determine the existence of residual defects does not require the court to comb the entire rule in search of problems. Indeed, such a requirement would, in some cases, be far too onerous for a court to perform and would arguably violate the Constitution's case-or-controversy jurisdictional requirement by giving a court license to rule on the legality of any aspect of a rule, even if not challenged by the parties.[186] Thus, a reviewing court is obliged to determine whether the remainder contains residual legal defects that are substantially related to the challenged provision. We now explain how a court should undertake that task.

---

**184.** It may seem awkward to think of clauses contained in rules as *interpretations of* those same rules. But upon reflection, there is nothing mysterious about parts of a text explaining how to interpret other parts of a text. The definitions at the beginning of almost every federal statute, for example, do just that. *See* Nicholas Quinn Rosenkranz, *Federal Rules of Statutory Interpretation*, 115 HARV. L. REV. 2085, 2104 (2002). Of course, interpretive clauses will themselves require interpretation, but this form of regress is entirely benign; nothing sets it apart from any other piece of ordinary language. Any interpretation of ordinary language will itself require an interpretation, which will in turn require an interpretation, and so on. *See* Larry Alexander & Frederick Schauer, *On Extrajudicial Constitutional Interpretation*, 110 HARV. L. REV. 1359, 1369-70 (1997).

**185.** Dorf, *supra* note 15, at 310-26.

**186.** U.S. CONST. art III, § 2.

AR2022_500453

### a.  Identifying Defects

A reviewing court considering whether to leave a regulatory remainder in place must determine whether the remainder suffers from any of several types of legal defects, including whether the remainder is unconstitutional, ultra vires, or arbitrary and capricious.[187]

First, a regulatory remainder may be unconstitutional. Suppose the Department of Homeland Security promulgates a rule containing a severability clause and two substantive provisions: first, the rule bans all "First Amendment activities" in domestic commercial airports, and second, the rule contains a fallback provision stating that, "In the event that a court sets this rule aside, all expressive activities that, consistent with the First Amendment, can be banned in an airport, shall be banned."[188] If a plaintiff challenges the first provision in court, the remainder clearly would contain a residual constitutional defect. While the reviewing court would set the first provision aside as unconstitutionally overbroad,[189] the remainder would be unconstitutionally vague.[190]

Second, a regulatory remainder may also be ultra vires, even if the original rule was not. Suppose a federal statute directs the Federal Reserve Board to promulgate two types of regulations.[191] First, the Board must establish procedures to be used in an administrative hearing to determine whether a particular financial institution that does not fall under the statutory definition of a "bank" nevertheless offers many of the services that banks offer (banking services). Second, after those procedures are established, the Board must promulgate regulations to monitor and control the activities of institutions found to offer banking services to ensure that consumers are adequately protected. Now suppose the Board promulgates a rule that establishes both the procedures to be used in hearings and the substantive regulations governing institutions that offer banking services. Finally, suppose the hearing procedures are unconstitutional. In this example, if a plaintiff successfully challenges the hearing procedures,

---

187.  We considered whether a court's ground for invalidating a regulatory provision should affect the degree of deference that the court gives to a severability clause, but we concluded that it should not. Regulatory provisions are either valid or invalid. If they are valid, they remain valid irrespective of the type of legal defect from which juxtaposed regulatory provisions might suffer.

188.  This illustration is based on an example offered by Dorf, *supra* note 15, at 312. Dorf's example itself is based on *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569, 570-71 (1987).

189.  *Jews for Jesus*, 482 U.S. at 570-71.

190.  Dorf, *supra* note 15, at 312.

191.  The following example is loosely based on *Board of Governors of the Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361 (1986).

2335

the regulatory remainder would suffer from a residual ultra vires defect because the statute directs the Board to promulgate substantive regulations only *after* promulgating procedures to be used in hearings.

Finally, the regulatory remainder might be legally defective because it is arbitrary and capricious. This defect is most common when a reviewing court renders the remainder inconsistent with the rule's statement of basis and purpose.[192] To illustrate, consider the D.C. Circuit's decision in *MD/DC/DE Broadcasters Association II*.[193] In *MD/DC/DE Broadcasters I*, the court considered the constitutionality of an FCC rule regarding the equal employment opportunity policies of broadcasters.[194] To ensure that minority and women candidates knew about available job opportunities with broadcast stations, the FCC rule required broadcasters that sought licenses from the FCC to make "a good faith effort to disseminate widely any information about job openings."[195] To "afford[] broadcasters flexibility in designing their EEO programs," the rule allowed broadcasters to select one of two options for accomplishing that goal.[196] Under Option A, licensees had to "undertake four approved recruitment initiatives in each two-year period."[197] The FCC did not require licensees who selected Option A to report the race and gender of job applicants.[198] Under Option B, licensees could design their own outreach programs but had to report the race and gender of each job applicant and how the applicant was referred to the station.[199] The D.C. Circuit held that Option B required race-based discrimination and was accordingly subject to strict scrutiny.[200] The court then held that Option B was unconstitutional because it was not narrowly tailored to any ostensibly compelling interest that the Commission might

---

**192.** For the purpose of determining whether a rule is arbitrary and capricious, courts are obliged to consider an agency's reasoning only at the time the agency made its decision. *See* SEC v. Chenery Corp. (*Chenery I*), 318 U.S. 80, 87-88 (1943).

**193.** MD/DC/DE Broadcasters Ass'n v. FCC (*MD/DC/DE Broadcasters II*), 253 F.3d 732 (D.C. Cir. 2001).

**194.** MD/DC/DE Broadcasters Ass'n v. FCC (*MD/DC/DE Broadcasters I*), 236 F.3d 13, 16 (D.C. Cir. 2001).

**195.** *Id.* at 17 (citing Review of the Commission's Broadcast Equal Employment Opportunity Rules and Policies, 15 FCC Rec. 2329, 2364 (2000)).

**196.** *Id.*

**197.** *Id.*

**198.** *Id.* (citing 47 C.F.R. § 73.2080(d) (2014)).

**199.** *Id.*

**200.** *Id.* at 20-21.

AR2022_500455

have had.[201] Finally, the court found that the unconstitutional provision was inseverable from the remainder of the rule and set aside the entire rule.[202]

In its petition for rehearing in *MD/DC/DE Broadcasters Association II*, the FCC asked the court to reinstate the remainder of its rule.[203] Writing for the court, Judge Douglas Ginsburg observed that the FCC had two goals in promulgating the rule, but that Options A and B would *each* achieve only *one* of those goals.[204] As the court observed, the FCC's statement of basis and purpose stated "that Option A could satisfy the goal of achieving broad outreach" and "that Option B was added in order to afford broadcasters flexibility."[205] The court accordingly concluded that severing the invalid part of the rule "would leave in force a rule that, in view of the Commission's own stated goals, would be arbitrary and capricious"[206] because the remainder would achieve only *one* of the stated goals. The majority plainly thought they had confronted a taint problem. After setting aside the unconstitutional part of the FCC's rule, the rule's remainder became, in the majority's view, arbitrary and capricious. Thus, the court set aside the entire rule.

In dissent, Judge David Tatel criticized the majority for not deferring to the agency's litigation position. He maintained that the court should defer to the agency's opinion on severability because the agency had the statutory authority to promulgate Option A and expressed its position in the briefs that Option B was severable.[207] Regardless of whether the regulatory remainder was arbitrary and capricious under the case's facts, we agree with the majority's endorsement of the following principle: a court may not leave in place a regulatory remainder that is inadequately supported by the original rule's statement of basis and purpose.[208] While courts should defer to an agency's opinion whether a rule's remainder will be workable (a claim we defended in Part I), courts should not defer to the agency's position on whether the rule's statement of basis and purpose adequately supports the remainder. An agency's statement of basis and

**201.** *Id.* at 21–22.

**202.** *Id.* at 22–23.

**203.** MD/DC/DE Broadcasters Ass'n v. FCC (*MD/DC/DE Broadcasters II*), 253 F.3d 732, 736 (D.C. Cir. 2001).

**204.** *Id.*

**205.** *Id.* at 735.

**206.** *Id.* at 736.

**207.** *Id.* at 739–41. On this point, the dissent may have had the better argument. The majority observed that in promulgating the rule, the Commission had two goals: broad outreach and flexibility. *See id.* at 735. But as the dissent noted, the remainder of the rule—that is, Option A—*itself* gave the broadcasters a great deal of flexibility because the broadcasters could choose between thirteen different programs under Option A. *See id.* at 741.

**208.** *See* 5 U.S.C. § 706(2)(A) (2012).

2337

THE YALE LAW JOURNAL                                    124:2286   2015

purpose need not persuade the reviewing court that the regulatory remainder is a good idea; indeed, from the court's perspective the remainder may seem like a disaster. However, for the court to satisfy its obligations under the APA, it must be persuaded that the regulatory remainder has adequate *support in* the agency's statement of basis and purpose—that is, that the agency has provided *reasons* for the regulatory provisions that remain.

Residual arbitrary and capricious review accommodates the sensible idea that the larger the portion of an administrative rule that a court invalidates, the less willing a court should be to enforce the remainder. Generally speaking, for example, the larger the portion of a rule that a court invalidates, the more likely that the remainder will also be set aside because it is more likely to be arbitrary and capricious under the rule's statement of basis and purpose. We do not advocate that courts use the extent of invalidation as a *factor* when determining whether to sever invalid provisions of rules, but the extent of invalidation may be helpful in *predicting* what a court will do with a regulatory remainder.

### b. Remedying Defects

When a reviewing court identifies residual legal defects in a rule containing a severability clause, it should first determine whether it could invalidate the remaining infirmities without causing additional taint problems. If invalidating additional provisions would remove the residual defects, then the court should generally use its equitable discretion to invalidate those additional provisions and uphold the remainder.

But if the court cannot eventually rid the remainder of taint problems, then the remedy should depend on the *type* of legal defect tainting the remainder. Consider the three types of legal defects discussed above. Neither courts nor agencies can fix rules that are ultra vires or constitutional. In our hypothetical example of the Federal Reserve Board's banking regulations, neither the reviewing court nor the Board can change the fact that the remainder of the Board's rule is ultra vires in the absence of pre-established administrative procedures for determining whether a financial institution offers banking services. The same is true for constitutional violations. Thus, if a rule inextricably violates an agency's congressional mandate or the Constitution, the court should invalidate the entire rule.

By contrast, courts should often use the remand-without-vacatur remedy when a court finds a regulatory remainder to be arbitrary or capricious. Ordinarily, courts "set aside" unlawful agency actions by vacating them, which nul-

2338

lifies the action and requires the agency to initiate new procedures.[209] Courts sometimes, however, remand the rule without vacating it,[210] which leaves a rule in force while the agency works to cure its defects.[211] Remand without vacatur eliminates some of the costs of the remand-and-repromulgation cycle because regulated entities do not have to adjust to a regulatory vacuum during the time that the agency works to fix its original rule's defects. Of course, if the agency does not eventually revise a remanded rule to the court's satisfaction, then the court will vacate the rule in its entirety. But while the rule is on remand, regulated entities must still comply with the regulatory remainder.[212]

Remand without vacatur will often be the appropriate remedy for a rule containing a severability clause whose remainder is arbitrary or capricious. Courts have typically used remand without vacatur in two sets of circumstances: where the court determines (1) that the agency can likely cure a rule's defects and (2) that vacatur would have disruptive consequences for a regulatory regime.[213] With respect to the first circumstance, the promulgating agency can

---

**209.** *See* Checkosky v. SEC, 23 F.3d 452, 465 (D.C. Cir. 1994) (Silberman, J., concurring) ("[Vacatur] requir[es] the agency to initiate another rulemaking proceeding if it would seek to confront the problem anew." (citation omitted)).

**210.** *See* Stephanie J. Tatham, *The Unusual Remedy of Remand Without Vacatur*, ADMIN. CONF. U.S. 54-58 (Jan. 3, 2014), http://www.acus.gov/sites/default/files/documents /Remand%20Without%20Vacatur%20Final%20Report.pdf   [http://perma.cc/Y778-TY99] (collecting seventy-three cases employing remand without vacatur between 1972 and 2013).

**211.** Remand without vacatur is somewhat controversial in the D.C. Circuit. The Circuit seemed firmly to approve the practice in *Checkosky*, 23 F.3d at 465, but members of the court continue to claim that it is illegal. *See, e.g.*, Milk Train, Inc. v. Veneman, 310 F.3d 747, 758 (D.C. Cir. 2002) (Sentelle, J., dissenting) ("Although I greatly respect the majority's attempt to save a well-intended relief program from possibly inefficient further proceedings, I do not think we can lawfully do so."); *Checkosky*, 23 F.3d at 490-91 (Randolph, J., dissenting) (arguing that remand without vacatur is prohibited by § 706(2)(A) of the APA, which provides that a reviewing court "shall" set aside unlawful agency action). *See generally* Levin, *supra* note 16, at 361 (arguing that remand without vacatur strikes a balance between agency discretion and judicial activism); Daniel B. Rodriguez, *Of Gift Horses and Great Expectations: Remands Without Vacatur in Administrative Law*, 36 ARIZ. ST. L.J. 599, 601 (2004) (arguing that courts should use remand without vacatur only sparingly because the remedy encourages courts to exercise sweeping review of agency actions). The Administrative Conference of the United States has approved remand without vacatur as a legitimate remedy under 5 U.S.C. § 706(2), and has recommended that courts consider the remedy as an alternative to vacatur. *See Administrative Conference Recommendation 2013-6: Remand Without Vacatur*, ADMIN. CONF. U.S. (Dec. 5, 2013), http://www.acus.gov/sites/default/files/documents /Remand%20Without%20Vacatur%20_%20Final%20Recommendation.pdf [https://perma .cc/7BBM-MDBF].

**212.** Tatham, *supra* note 210, at 1.

**213.** *See* Allied-Signal, Inc. v. Nuclear Regulatory Comm'n, 988 F.2d 146, 151-52 (D.C. Cir. 1993); Levin, *supra* note 16, at 380.

2339

AR2022_500458

THE YALE LAW JOURNAL                                124:2286   2015

usually fix a regulatory remainder containing a severability clause that a court finds arbitrary and capricious by providing additional reasons for the remainder in the rule's statement of basis and purpose. With respect to the second circumstance, because agencies do not frequently include severability clauses in their rules, when an agency does so, this provides strong circumstantial evidence that the agency believes that vacatur would have disruptive consequences for its regulatory scheme.

One D.C. Circuit opinion has already suggested this approach to severability. In *Alliance for Community Media*, a panel of the D.C. Circuit held that FCC regulations authorizing cable providers to ban indecent material on cable access channels violated the First Amendment.[214] Consequently, the court had to determine whether to sever the unconstitutional provisions of the FCC's rule from the regulatory remainder. The court observed that, were it to sever the invalid provisions, it would leave in place a regulatory scheme under which indecent material could be regulated only on cable channels for unaffiliated commercial programmers but not on cable channels set aside for public, educational, or governmental use.[215] The FCC, however, had not provided a justification for this seemingly odd distinction between cable access channels. Accordingly, the court was concerned that leaving this scheme in place would be arbitrary and capricious. Rather than invalidate the entire rule, the court remanded it without vacatur.[216] The court explained:

> [W]here an agency is involved, a court need not strike down a regulation to effect a reconsideration by the issuing body. Thus, a court will issue a remand to the issuing agency if there is "substantial doubt" as to whether the agency intended its regulation to be severable. Such a remand is often in the best interest of justice in that it allows the agency to reconsider the residue of its original regulation and keeps judges out of the business of administrators.[217]

However, *Alliance for Community Media* was later vacated,[218] and no subsequent cases have followed its approach of ordering remand without vacatur in these circumstances. We agree, however, with *Alliance*'s approach.

---

214.  Alliance for Cmty. Media v. FCC, 10 F.3d 812, 829 (D.C. Cir. 1993).

215.  *Id.*

216.  *Id.* at 831.

217.  *Alliance for Cmty. Media*, 10 F.3d at 830 (citation omitted).

218.  *See* Alliance for Cmty. Media v. FCC, 15 F.3d 186 (D.C. Cir. 1994) (granting rehearing en banc and vacating 10 F.3d 812); Alliance for Cmty. Media v. FCC, 56 F.3d 105 (D.C. Cir. 1995) (determining en banc that the FCC regulations were constitutional and thus did not require remand or vacatur).

AR2022_500459

The foregoing discussion explains how courts should proceed at Severability Step One. A court should determine (1) whether invalidating a portion of a rule creates residual legal defects for the regulatory remainder that are substantially related to the challenged provision and (2) whether these defects can be removed. If the defects are inextricable, then the appropriate remedy will depend on the nature of the defect. When the defect is constitutional or ultra vires in nature, the court should set aside the entire rule. But when an inextricable defect renders the rule arbitrary and capricious, the court should generally remand the rule without vacating it. If, on the other hand, the regulatory remainder does not contain inextricable legal defects, the reviewing court should proceed to Severability Step Two, to which we now turn.

### 2. Step Two: Defer to the Agency

Part I.B showed that if courts deferred to administrative severability clauses, then regulatory schemes would promote expertise, accountability, the rule of law, and efficiency. In light of these potential benefits, we maintain that a court's review at Severability Step Two should be highly deferential and relatively straightforward: determine what the severability clause requires and follow it.

This thesis requires a defense, of course. The fact that agency decision making on severability is typically better than judicial decision making does not necessarily entail that a reviewing court should always defer to an administrative severability clause. A reviewing court's severability decision might be more prudent in *some* cases if it could draw upon an agency's technical expertise. But not *every* severability decision will be highly technical. Similarly, the promulgation of some administrative severability clauses may not have involved participation by the public and may not have engendered any great reliance interests. This might lead some to conclude that the deference framework we propose is over-inclusive. One might argue that the fact that agencies are often superior decision makers about severability supports a deference framework more akin to the *Skidmore* regime, according to which the degree of deference that a severability clause receives should vary with a rule's technical complexity; the extent to which the agency's expertise and democratic accountability informed its adoption of the severability clause; and the extent to which the public has relied on the severability clause.[219]

---

[219]. *Cf.* Stephenson & Pogoriler, *supra* note 47, at 1458 (making a similar point about the domain of *Seminole Rock* deference).

AR2022_500460

We must therefore defend our choice of a more rule-like framework over a standard-like framework.[220] An extensive literature addresses the considerations that should lead one to favor (or not favor) a rule over a standard.[221] The primary drawback of rules is that they are usually over- or under-inclusive with respect to the rulemaker's underlying policy goals.[222] A rule-like framework may therefore lead a court to defer to an administrative severability clause that does not confer the benefits of administrative severability clauses discussed in Part I.B.

We believe, however, that rules have benefits that outweigh their drawbacks (vis-à-vis standards) in the case of deference to administrative severability clauses. First, a rule-like framework would better confine the discretion of lower courts, helping courts higher in the judicial hierarchy overcome principal-agent problems.[223] A standard-like framework may influence lower courts to defer to administrative severability clauses not when those clauses, say, reflect the agency's administrative expertise, but when the court approves of the regulatory scheme that would result from the rule's remainder. Adopting a rule-like framework would help to curb this shirking tendency.

---

**220.** Kathleen Sullivan explains the choice between rules and standards:

> A legal directive is "rule"-like when it binds a decisionmaker to respond in a determinate way to the presence of delimited triggering facts. . . . A rule captures the background principle or policy in a form that from then on operates independently. . . . [T]he rule's force as a rule is that decisionmakers follow it, even when direct application of the background principle or policy to the facts would produce a different result. . . . A legal directive is "standard"-like when it tends to collapse decisionmaking back into the direct application of the background principle or policy to a fact situation. Standards . . . giv[e] the decisionmaker more discretion than do rules. Standards allow the decisionmaker to take into account all relevant factors or the totality of the circumstances.

Kathleen M. Sullivan, *The Supreme Court, 1991 Term—Foreword: The Justices of Rules and Standards*, 106 HARV. L. REV. 22, 58-59 (1992).

**221.** *See, e.g.*, FREDERICK SCHAUER, PLAYING BY THE RULES: A PHILOSOPHICAL EXAMINATION OF RULE-BASED DECISION-MAKING IN LAW AND IN LIFE 135-67 (1991); Isaac Ehrlich & Richard A. Posner, *An Economic Analysis of Legal Rulemaking*, 3 J. LEGAL STUD. 257 (1994); Louis Kaplow, *Rules Versus Standards: An Economic Analysis*, 42 DUKE L.J. 557 (1992); Russell B. Korobkin, *Behavioral Analysis and Legal Form: Rules vs. Standards Revisited*, 79 OR. L. REV. 23 (2000).

**222.** *See* MARK KELMAN, A GUIDE TO CRITICAL LEGAL STUDIES 40-41 (1987); SCHAUER, *supra* note 221, at 31-34; Korobkin, *supra* note 221, at 36-37; Merrill, *supra* note 72, at 826; Sullivan, *supra* note 220, at 58.

**223.** *See* Korobkin, *supra* note 221, at 38-39; Merrill, *supra* note 72, at 820-21; Vermeule, *supra* note 78, at 355.

ADMINISTRATIVE SEVERABILITY CLAUSES

Second, a rule-like framework would be more predictable and thus would encourage the development of investment-backed expectations.[224] As discussed in Part I.B.3, predictability in the law has a number of cost-saving advantages for agencies and regulated entities alike. Because agencies can better predict the effect of a severability clause, they can choose how to use their rulemaking resources most efficiently. If an agency is relatively certain that a court will defer to a severability clause, for example, it may choose to promulgate a set of substantive regulations as a single rule rather than divide the regulations across several rules. The agency might also devote fewer agency resources to explaining how the agency's administrative expertise informs the adoption of the severability clause. Similarly, regulated entities would be better positioned to organize their affairs around a regulatory scheme because they could more easily predict what the law would be if a challenged provision were eventually set aside.[225] Finally, both agencies and regulated entities can save costs associated with the additional expense of litigating the application of a standard as opposed to the application of a rule.[226]

We also doubt that the over-inclusiveness problem is very severe in the case of a rule-like deference framework for severability clauses. As we explained in Part III.A, agencies tend not to include severability clauses in their rules lightly. When they do include a severability clause, they do so only after deliberation. Moreover, the cost of including a severability clause in a rule, as opposed to opining on severability in litigation, suggests that agencies will include these clauses prudently when they elect to bear these comparatively higher costs.

If one accepts our defense of *Chevron*-style deference to administrative severability clauses, one might then ask why our proposal is even *more* deferential than *Chevron*. At *Chevron* Step Two, courts defer only to reasonable agency interpretations of ambiguous federal statutes. Why then do we not propose that courts defer only to reasonable administrative severability clauses?

Deference only to putatively reasonable administrative severability clauses, however, would invite courts to determine for themselves whether a regulatory remainder is workable, thereby defeating the very purpose of the deference framework. At *Chevron* Step Two, the question of reasonableness is a question of legal meaning — that is, whether the agency has adopted a permissible construction of the statutory text (interpreted in light of the traditional tools of

---

224. *See* SCHAUER, *supra* note 221, at 137-45; Merrill, *supra* note 72, at 822-23; Carol M. Rose, *Crystals and Mud in Property Law*, 40 STAN. L. REV. 577, 590-92 (1988); Vermeule, *supra* note 78, at 356.

225. *See supra* note 72 and accompanying text.

226. *See* SCHAUER, *supra* note 221, at 145-49; Merrill, *supra* note 72, at 825; Vermeule, *supra* note 78, at 356.

2343

statutory construction). *That* question of reasonableness is still one within the institutional competence of the courts and does not require the reviewing court to evaluate the validity of the agency's underlying reasons for adopting its construction. By contrast, the question of reasonableness at Severability Step Two would require the reviewing court to determine whether it is permissible for the agency to maintain that the regulatory remainder is workable. *This* reasonableness question would inherently take the reviewing court outside of its institutional competence and collapse into an evaluation of the substantive regulatory merits of the agency's decision.

Furthermore, concerns about the unreasonableness of a severability clause are mostly allayed by our proposed residual arbitrary and capricious review, which we outlined in the previous section. If the regulatory remainder lacks a legal defect, such as being ultra vires or inconsistent with the agency's statement of basis and purpose, then the severability clause will likely not be unreasonable. Accordingly, the deference framework we propose can afford to be even more deferential than *Chevron* at Step Two without allowing unreasonable severability clauses to escape scrutiny.

### 3. Step Zero: The Limits of the Deference Framework

An agency may express its opinion on severability through agency actions other than including a severability clause in a rule. As we noted in Part II.B, ordinary agency practice is to opine on severability in trial and appellate briefs. An agency could also opine on severability by issuing any of a variety of informal agency documents, including interpretative rules and guidance manuals, which do not require notice and comment.[227] We should therefore defend an underlying assumption of this Article—the assumption that the "domain"[228] of a deference framework for severability should be limited to severability clauses. Put differently, we assume that courts should not give *Chevron*-style deference to other forms of agency action in which an agency might opine on severability.

Several Supreme Court cases might suggest that our deference regime should cast a wider net. The Supreme Court has addressed another "domain" question in the context of determining what agency actions should receive *Chevron* deference.[229] In the leading case, *United States v. Mead Corp.*, the Court

---

227. 5 U.S.C. § 553(b)(A) (2012).

228. *See generally* Merrill & Hickman, *supra* note 48.

229. *See* Barnhart v. Walton, 535 U.S. 212 (2002); United States v. Mead Corp., 533 U.S. 218 (2001) (holding that some agency statutory interpretations—particularly those contained in interpretive rules, informal orders, or other pronouncements issued without extensive procedures—are presumptively not entitled to *Chevron* deference); Christensen v. Harris Cnty.,

considered whether tariff classification rulings by the Customs Service were entitled to *Chevron* deference.[230] The Court held that the tariff classification rulings at issue should not receive *Chevron* deference because they were not promulgated in the exercise of delegated authority to make rules with the force of law. The Court stated that notice-and-comment rulemaking (and formal adjudication) would presumptively receive *Chevron* deference but that other agency actions might also qualify for deference when "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was *promulgated in the exercise of that authority.*"[231] Thus, *Mead* expressly declined sharply to delimit *Chevron*'s domain to legislative rules.[232]

The Supreme Court's *Seminole Rock* doctrine requires deference to an even larger set of agency actions. *Auer* itself, for example, involved an agency interpretation expressed in an amicus brief.[233] In *MD/DC/DE Broadcasters II*, three judges on the D.C. Circuit suggested that *Seminole Rock/Auer* deference should apply to agency opinions on severability expressed in litigation. In that case, Judge David Tatel dissented from the D.C. Circuit's denial of rehearing en banc, in an opinion joined by then-Chief Judge Harry Edwards and Judge Judith Rogers. The FCC petitioned for rehearing, requesting that the court reinstate the remainder of a rule. Judge Tatel argued that the agency's opinion on the severability of its rule was an interpretation of the rule warranting *Seminole Rock* deference.[234] Thus, if judicial deference to an agency's opinion on severability follows as a direct application of the *Seminole Rock* doctrine — that is, if courts should defer to administrative severability clauses *pursuant to Seminole Rock* — then perhaps the domain of our proposed deference framework should not be limited to severability clauses.

Although we agree that administrative severability clauses warrant deference under the *Seminole Rock* doctrine, we do not think that courts should give *Chevron*-style deference to agency opinions on severability other than severability clauses.[235] In large part, our view is based on misgivings we share with sev-

---

529 U.S. 576, 587 (2000) (holding that agencies' interpretations of statutes contained in opinion letters, policy statements, agency manuals, and enforcement guidelines are not entitled to *Chevron* deference).

230.  *Mead*, 533 U.S. at 221.

231.  *Id.* at 226-27 (emphasis added).

232.  Merrill, *supra* note 72, at 819-20.

233.  *See* Auer v. Robbins, 519 U.S. 452, 461 (1997).

234.  MD/DC/DE Broadcasters Ass'n v. FCC (*MD/DC/DE Broadcasters II*), 253 F.3d 732, 740 (2001) (citing Trinity Broad. of Fla., Inc. v. FCC, 211 F.3d 618, 625 (D.C. Cir. 2000)).

235.  Several scholars have expressed a similar view in the context of determining *Chevron*'s domain. *See* Robert A. Anthony, *Interpretive Rules, Policy Statements, Guidance Manuals and the*

2345

eral Justices on the Supreme Court about *Seminole Rock* itself.[236] Recently, several Justices have criticized the *Seminole Rock* doctrine's tendency to encourage agencies to issue vague rules through notice-and-comment rulemaking and then clarify those rules through less formal, deliberative, and participatory procedures.[237] Some Justices worry that the *Seminole Rock* doctrine creates incentives that ultimately undermine the accountability, transparency, and predictability of administrative rulemaking.[238]

There are similar concerns about incentives related to informal agency opinions on severability. Part II.B noted that the current severability doctrine does not create adequate incentives for agencies to promulgate severability clauses through notice-and-comment procedures. So giving the same *Chevron*-style deference to agency opinions on severability expressed through informal agency actions would seem to undermine an agency's incentive to use more formal procedures.[239]

*Chevron*-style deference for informal agency opinions on severability would also generate uncertainty. A reviewing court cannot, as a practical matter, give *Chevron*-style deference to *every* agency informal opinion on severability because agency officials may express inconsistent opinions. Accordingly, a deference framework that would give *Chevron*-style deference to some informal

---

*Like—Should Federal Agencies Use Them To Bind the Public?*, 41 DUKE L.J. 1311 (1992); Robert A. Anthony, *Which Agency Interpretations Should Bind Citizens and the Courts?*, 7 YALE J. ON REG. 1 (1990); Lisa Schultz Bressman, *How* Mead *Has Muddled Judicial Review of Agency Action*, 58 VAND. L. REV. 1443 (2005); Eskridge, *supra* note 39, at 428; Merrill, *supra* note 72, at 831; Merrill & Hickman, *supra* note 48, at 835.

236. Several current Justices have expressed doubts about the *Seminole Rock* doctrine. *See* Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. 1326, 1339 (2013) (Scalia, J., concurring in part and dissenting in part); Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2168 (2012) (majority opinion by Justice Alito, in which Chief Justice Roberts and Justices Scalia, Kennedy, and Thomas joined); Talk Am., Inc. v. Mich. Bell Tel. Co., 131 S. Ct. 2254, 2266 (2011) (Scalia, J., concurring); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 525 (1994) (Thomas, J., dissenting) (joined by Justice Ginsburg) (citing Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 696 (1991)). In light of these criticisms, Court observers have wondered whether "a reconsideration of *Auer* is in the offing." Jonathan H. Adler, Auer *Deference Still Up for Grabs?*, VOLOKH CONSPIRACY (June 18, 2012, 11:36 AM), http://www.volokh.com/2012/06/18/auer-deference-still-up-for-grabs [http://perma.cc/J9-ULS6].

237. *See* Decker, 133 S. Ct. at 1341 (Scalia, J., concurring in part and dissenting in part) ("*Auer* deference encourages agencies to be vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures." (internal quotation marks omitted)).

238. *Id.*

239. *Cf.* Robert A. Anthony, *The Supreme Court and the APA: Sometimes They Just Don't Get It*, 10 ADMIN. L.J. AM. U. 1, 12 (1996) (noting that deference "generates incentives to be vague in framing regulations, with the plan of . . . creat[ing] the intended new law without observance of notice and comment procedures"); Manning, *supra* note 52, at 647-60.

AR2022_500465

agency actions would have to apply a meta-standard for determining which agency actions warrant deference.[240] Such a meta-standard, however, would likely produce inefficient litigation over the proper application of the standard in individual cases. *Chevron*-style deference for agency opinions on severability should therefore be reserved for severability clauses.

Reserving *Chevron*-style deference for severability clauses does not mean, however, that a reviewing court should give *no* deference to an agency's opinion on severability expressed in an informal agency action. We think informal agency opinions on severability should receive *Skidmore* deference.[241] When notice-and-comment procedures are prohibitively time- and resource-consuming, informal agency opinions on severability can generate some of a severability clause's benefits. For example, even if a court does not defer to an agency's informal opinion on severability and strikes down a rule entirely, an informal opinion on severability could promote predictability because it could indicate how the agency is likely to proceed in the future. Suppose, for example, that an agency promulgates provisions *A* and *B* as part of regulation *R* and states in an informal agency opinion that provisions *A* and *B* are severable. Assume further that a court later rules that provision *A* is unlawful and inseverable from provision *B*. In this case, though the agency's opinion was ineffective at preventing a court from striking down the rule, the opinion would still give regulated entities some evidence that the agency is likely, in the future, to re-promulgate provision *B* even in the absence of provision *A*.

Furthermore, since agencies do not use severability clauses frequently,[242] agencies will likely clarify the severability of current regulations, if at all, through informal agency actions. Although we prefer that agencies opine on severability using severability clauses, amending existing rules that would benefit from an agency opinion on severability may be too cumbersome or costly.[243] In these circumstances, we think an agency should be given incentives to opine on the severability of its rules, even if the agency does not express its opinion through a formal amendment to a rule. Accordingly, we think *Skidmore* deference is appropriate to encourage an agency to clarify its position on severability rather than remain silent.

---

240. For more on meta-standards, see generally Merrill, *supra* note 72.

241. For a thorough analysis of the *Skidmore* doctrine, see Jim Rossi, *Respecting Deference: Conceptualizing* Skidmore *Within the Architecture of* Chevron, 42 WM. & MARY L. REV. 1105, 1112-28 (2001).

242. *See supra* Part II.B.

243. *Cf.* Hoctor v. U.S. Dep't of Agric., 82 F.3d 165, 170 (7th Cir. 1996) ("[U]nless a statute or regulation is of crystalline transparency, the agency . . . cannot avoid interpreting it, and . . . would be stymied in its enforcement duties if every time it brought a case . . . it had to pause for a bout, possibly lasting several years, of notice and comment rulemaking.").

AR2022_500466

THE YALE LAW JOURNAL                                   124:2286   2015

Under this approach, the various tiers of deference would appropriately match the diligence the agency used in expressing its opinion on severability. A reviewing court would reward an agency for an informal opinion on severability with deference tailored to the degree of care and expertise that the agency employed in adopting that opinion. Further, if an agency chose to invest even greater resources by promulgating a severability clause through the rigors of notice and comment, then a reviewing court would give additional deference in recognition of the greater rulemaking benefits that those procedures entail.

## CONCLUSION

The current doctrine and agency practice on administrative severability clauses is unfortunate. Administrative severability clauses allow agencies to express their expert and popularly informed opinion on the severability of their rules. And if courts routinely deferred to those opinions, they would promote expertise, accountability, the rule of law, and efficiency in regulatory schemes.

However, the federal courts have implicitly analogized administrative severability clauses to severability clauses contained in statutes. Based on this analogy, federal courts have developed a doctrine in which the severability decision "will rarely turn on the presence or absence of . . . a[n] [administrative severability] clause."[244] As a consequence, agencies have diminished incentives to promulgate their opinions on severability by means of notice-and-comment procedures. And the actual frequency with which agencies include severability clauses in their rules reflects these diminished incentives. Agencies have been content to leave the severability decision to the courts.

Current doctrine and agency practice suggest that courts need a deference framework for administrative severability clauses. Under this framework, courts should police the boundaries of the agency's lawmaking authority by ensuring that regulatory remainders are lawful. But when a regulatory remainder is lawful, a reviewing court should follow the opinion an agency expressed in a severability clause.

---

**244.** Cmty. for Creative Non-Violence v. Turner, 893 F. 2d 1387 (D.C. Cir. 1990) (citation omitted) (internal quotation marks omitted).

AR2022_500467

ADMINISTRATIVE SEVERABILITY CLAUSES

## APPENDIX: ADMINISTRATIVE SEVERABILITY CLAUSES BY AGENCY

| Agency | Number of Rules with a Severability Clause | Total Number of Rules (as of October 30, 2014) | Percentage of Total Rules with a Severability Clause |
|---|---|---|---|
| Bureau of Consumer Financial Protection[245] | 3 | 95 | 3.2% |
| Bureau of Land Management[246] | 1 | 88 | 1.1% |
| Chemical Safety and Hazard Investigation Board[247] | 1 | 10[248] | 10% |
| Commodity Futures Trading Commission[249] | 3 | 243 | 1.2% |
| Department of Health and Human Services[250] | 3 | 2,866 | <1% |

**245.** (1) Mortgage Acts and Practices—Advertising (Regulation N), 12 C.F.R. § 1014.7 (2015); Mortgage Assistance Relief Services (Regulation O), 12 C.F.R § 1015.11 (2015);

(2) Real Estate Settlement Procedures Act (Regulation X), 12 C.F.R. § 1024.22 (2015); Real Estate Settlement Procedures Act (Regulation X), 76 Fed. Reg. 78,978, 78,998 (Dec. 20, 2011) (codified at 12 C.F.R. pt. 1024);

(3) Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 12 C.F.R. § 1024.22 (2015); Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10,695, 10,718 (Feb. 14, 2013) (codified at 12 C.F.R. pt. 1024).

**246.** Rights-of-Way, Principles and Procedures; Rights-of-Way Under the Federal Land Policy and Management Act and the Mineral Leasing Act, 43 C.F.R. § 2801.8 (2015).

**247.** Rules Implementing the Government in the Sunshine Act, 40 C.F.R. § 1603.14 (2014).

**248.** We determined this figure by searching *Bloomberg Law* for final rules that contain the phrase "Chemical Safety and Hazard Investigation Board." We then manually filtered the rules and identified ten hits.

**249.** (1) Real-Time Public Reporting of Swap Transaction Data, 17 C.F.R. § 43.1 (2014);

(2) Commodity Pool Operators and Commodity Trading Advisors, 17 C.F.R. § 4.17 (2014);

(3) Position Limits for Futures and Swaps, 17 C.F.R. § 151.13 (2014).

**250.** (1) Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 42 C.F.R. pt. 59 (2014);

(2) Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. pts. 160, 164 (2014);

(3) Applications for FDA Approval To Market a New Drug: Patent Submission and Listing Requirements and Application of 30-Month Stays on Approval of Abbreviated New Drug Applications Certifying that a Patent Claiming a Drug Is Invalid or Will Not Be Infringed, 21 C.F.R. pt. 314 (2014).

AR2022_500468

THE YALE LAW JOURNAL                                      124:2286   2015

| | | | |
|---|---|---|---|
| Department of Homeland Security[251] | 2 | 7,212 | <1% |
| Department of Housing and Urban Development[252] | 1 | 397 | <1% |
| Department of Justice[253] | 2 | 607 | <1% |
| Employment and Training Administration[254] | 1 | 73 | 1.4% |
| Environmental Protection Agency[255] | 8 | 8,070 | <1% |
| Federal Communications Commission[256] | 5 | 2,952 | <1% |

251. (1) Standards for Living Organisms in Ships' Ballast Waste Discharged in U.S. Waters, 33 C.F.R. pt. 151, 46 C.F.R. pt. 162 (2014).

(2) Chemical Facility Anti-Terrorism Standards, 6 C.F.R. pt. 27 (2014).

252. (1) Real Estate Settlement Procedures Act, 24 C.F.R. § 3500.22 (2014).

253. (1) International Terrorism Victim Expense Reimbursement Program, 28 C.F.R. § 94.11 (2014);

(2) Public Safety Officers' Death, Disability, and Educational Assistance Benefit Claims, 28 C.F.R. § 32.4 (2014);

(3) Public Safety Officers' Death, Disability, and Educational Assistance Benefit Claims, 28 C.F.R. § 32.4.

254. (1) Temporary Agricultural Employment of H-2A Aliens in the Unites States; Modernizing the Labor Certification Process and Enforcement, 20 C.F.R. pt. 655.

255. (1) National Emissions Standards for Hazardous Air Pollutants from Secondary Lead Smelting, 40 C.F.R. pt. 63 (2014);

(2) Determination of Attainment of the 1-Hour Ozone National Ambient Air Quality Standards in the Sacramento Metro Nonattainment Area in California, 40 C.F.R. pt. 52 (2014);

(3) Nonattainment New Source Review (NSR), 40 C.F.R. pt. 51 (2014); Expansion of RCRA Comparable Fuel Exclusion, 40 C.F.R. pt. 261 (2014);

(4) Administrative Stay of Clean Air Interstate Rule for Minnesota; Administrative Stay of Federal Implementation Plan To Reduce Interstate Transport of Fine Particulate Matter and Ozone for Minnesota, 40 C.F.R. pts. 51, 52 (2014);

(5) Consolidated Federal Air Rule (CAR): Synthetic Organic Chemical Manufacturing Industry, 40 C.F.R. pts. 60, 61, 63, 65 (2014);

(6) Public Health and Environmental Radiation Protection Standards for Yucca Mountain, NV, 40 C.F.R. pt. 197 (2014);

(7) Regulation of Fuels and Fuel Additives: Modifications to Reformulated Gasoline Covered Area Provisions, 40 C.F.R. pt. 80 (2014).

256. (1) Rates for Interstate Inmate Calling Services, 47 C.F.R. pt. 64 (2014);

(2) Closed Captioning of Internet Protocol-Delivered Video Programming: Implementation of the Twenty-First Century Communications and Video Accessibility Act of 2010, 47 C.F.R. pts. 15, 79 (2014);

AR2022_500469

ADMINISTRATIVE SEVERABILITY CLAUSES

| | | | |
|---|---|---|---|
| Federal Railroad Administration[257] | 4 | 176 | 2.3% |
| Federal Trade Commission[258] | 13 | 206 | 6.3% |
| Forest Service[259] | 5 | 159 | 3.1% |

(3) Implementation of the Commercial Advertisement Loudness Mitigation (CALM) Act, 47 C.F.R. pts. 73, 76 (2014);

(4) 2006 Quadrennial Regulatory Review — Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, 47 C.F.R. pt. 73 (2014);

(5) Broadcast Ownership Rules, Cross-Ownership of Broadcast Stations and Newspapers, Multiple Ownership of Radio Broadcast Stations in Local Markets, and Definitions of Radio Markets, 47 C.F.R. pt. 73 (2014).

**257.** (1) Use of Locomotive Horns at Highway-Rail Grade Crossings, 49 C.F.R. § 222.3(b) (2014);

(2) Positive Train Control Systems, 49 C.F.R. § 236.1 (2014);

(3) Use of Locomotive Horns at Highway-Rail Grade Crossing, 49 C.F.R. §§ 222.3;

(4) Use of Locomotive Horns at Highway-Rail Grade Crossing, 49 C.F.R. §§ 222.3.

**258.** (1) Business Opportunity Rule, 16 C.F.R. § 437.10 (2014);

(2) Children's Online Privacy Protection Rule, 16 C.F.R. § 312.12 (2014);

(3) Disclosure Requirements and Prohibitions Concerning Franchising,16 C.F.R. § 436.11 (2014);

(4) CAN-SPAM Rule, 16 C.F.R. § 316.6 (2014);

(5) Prohibitions of Energy Market Manipulation Rule, 16 C.F.R. § 317.5 (2014);

(6) Telemarketing Sales Rule, 16 C.F.R. § 310.9 (2014);

(7) Mortgage Assistance Relief Services, 16 C.F.R. pt. 322 (2014);

(8) Mortgage Acts and Practices—Advertising, 16 C.F.R. § 321.7 (2014).

(9) Telemarketing Sales Rule, 16 C.F.R. § 310.8 (2014).

(10) CAN-SPAM Rule, 16 C.F.R. § 316.6;

(11) Amendment of Rules Under the FACT Act, 16 C.F.R. § 604.1 (2014);

(12) Contact Lens Rule, 16 C.F.R. § 315.10 (2014);

(13) Definitions and Implementation Under the CAN-SPAM Act, 16 C.F.R. § 316.6 (2014).

**259.** (1) National Forest System Land Management Planning, 36 C.F.R. § 219.18 (2015); National Forest System Land Management Planning, 77 Fed. Reg. 21,162, 21,244, 21,270 (Apr. 9, 2012) (codified at 36 C.F.R. pt. 219);

(2) National Forest System Land Management Planning, 73 Fed. Reg. 21,468, 21,502, 21,512 (Apr. 21, 2008) (codified at 36 C.F.R. pt. 219);

(3) Special Areas, 36 C.F.R. § 294.18 (2015); Special Areas; Roadless Area Conservation, 66 Fed. Reg. 3,244, 3,260 (Jan. 12, 2001) (codified at 36 C.F.R. pt. 294);

(4) National Forest System Land Management Planning, 70 Fed. Reg. 1023, 1052, 1060 (Jan. 5, 2005) (codified at 36 C.F.R. pt. 219);

AR2022_500470

THE YALE LAW JOURNAL                                    124:2286   2015

| | | | |
|---|---|---|---|
| National Indian Gaming Commission[260] | 1 | 41 | 2.4% |
| National Labor Relations Board[261] | 1 | 22 | 4.5% |
| National Oceanic and Atmospheric Administration[262] | 1 | 4,346 | <1% |
| National Park Service[263] | 1 | 75 | 1.3% |
| Nuclear Regulatory Commission[264] | 1 | 439 | <1% |
| Occupational Safety and Health Administration[265] | 1 | 148 | <1% |
| Postal Service[266] | 1 | 394 | <1% |

(5) Special Areas; State Petitions for Inventoried Roadless Area Management, 70 Fed. Reg. 25,654, 25,655, 25,662 (May 13, 2005) (codified at 36 C.F.R. pt. 294).

**260.** Technical Standards for Electronic, Computer, or Other Technologic Aids Used in the Play of Class II Games, 25 C.F.R. § 547.5 (2014).

**261.** Representation−Case Procedures, 29 C.F.R. pts. 101, 102 (2014).

**262.** (1) Magnuson-Stevens Fishery Conservation and Management Act Provisions; Fisheries of the Northeastern United States; Northeast Region Standardized Bycatch Reporting Methodology Omnibus Amendment, 50 C.F.R. pt. 648 (2014).

**263.** Concession Contracts, 36 C.F.R. § 51.103 (2014).

**264.** Disposal of High-Level Radioactive Wastes in a Proposed Geologic Repository at Yucca Mountain, NV, 10 C.F.R. § 63.343 (2014).

**265.** Cranes and Derricks in Construction, 29 C.F.R. § 1926.1442 (2015).

**266.** The Board of Governors of the U.S. Postal Service Bylaws of the Board of Governors, 39 C.F.R. § 2.6 (2015).

AR2022_500471

# Convention on the Rights of the Child

**Adopted and opened for signature, ratification and accession by General Assembly resolution 44/25 of 20 November 1989**

**entry into force 2 September 1990, in accordance with article 49**

**Preamble**

The States Parties to the present Convention,

Considering that, in accordance with the principles proclaimed in the Charter of the United Nations, recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world,

Bearing in mind that the peoples of the United Nations have, in the Charter, reaffirmed their faith in fundamental human rights and in the dignity and worth of the human person, and have determined to promote social progress and better standards of life in larger freedom,

Recognizing that the United Nations has, in the Universal Declaration of Human Rights and in the International Covenants on Human Rights, proclaimed and agreed that everyone is entitled to all the rights and freedoms set forth therein, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status,

Recalling that, in the Universal Declaration of Human Rights, the United Nations has proclaimed that childhood is entitled to special care and assistance,

Convinced that the family, as the fundamental group of society and the natural environment for the growth and well-being of all its members and particularly children, should be afforded the necessary protection and assistance so that it can fully assume its responsibilities within the community,

Recognizing that the child, for the full and harmonious development of his or her personality, should grow up in a family environment, in an atmosphere of happiness, love and understanding,

Considering that the child should be fully prepared to live an individual life in society, and brought up in the spirit of the ideals proclaimed in the Charter of the United Nations, and in particular in the spirit of peace, dignity, tolerance, freedom, equality and solidarity,

Bearing in mind that the need to extend particular care to the child has been stated in the Geneva Declaration of the Rights of the Child of 1924 and in the Declaration of the Rights of the Child adopted by the General Assembly on 20 November 1959 and recognized in the Universal Declaration of Human Rights, in the International Covenant on Civil and Political Rights (in particular in articles 23 and 24), in the International Covenant on Economic, Social and Cultural Rights (in particular in article 10) and in the statutes and relevant instruments of specialized agencies and international organizations concerned with the welfare of children,

Bearing in mind that, as indicated in the Declaration of the Rights of the Child, "the child, by reason of his physical and mental immaturity, needs special safeguards and care, including appropriate legal protection, before as well as after birth",

Recalling the provisions of the Declaration on Social and Legal Principles relating to the Protection and Welfare of Children, with Special Reference to Foster Placement and Adoption Nationally and Internationally; the United Nations Standard Minimum Rules for the Administration of Juvenile Justice (The Beijing Rules) ; and the Declaration on the Protection of Women and Children in Emergency and Armed Conflict, Recognizing that, in all countries in the world, there are children living in exceptionally difficult conditions, and that such children need special consideration,

Taking due account of the importance of the traditions and cultural values of each people for the protection and harmonious development of the child, Recognizing the importance of international co-operation for improving the living conditions of children in every country, in particular in the developing countries,

Have agreed as follows:

## PART I

### Article 1

For the purposes of the present Convention, a child means every human being below the age of eighteen years unless under the law applicable to the child, majority is attained earlier.

### Article 2

1. States Parties shall respect and ensure the rights set forth in the present Convention to each child within their jurisdiction without discrimination of any kind, irrespective of the child's or his or her parent's or legal guardian's race, colour, sex, language, religion, political or other opinion, national, ethnic or social origin, property, disability, birth or other status.

2. States Parties shall take all appropriate measures to ensure that the child is protected against all forms of discrimination or punishment on the basis of the status, activities, expressed opinions, or beliefs of the child's parents, legal guardians, or family members.

### Article 3

1. In all actions concerning children, whether undertaken by public or private social welfare institutions, courts of law, administrative authorities or legislative bodies, the best interests of the child shall be a primary consideration.

2. States Parties undertake to ensure the child such protection and care as is necessary for his or her well-being, taking into account the rights and duties of his or her parents, legal guardians, or other individuals legally responsible for him or her, and, to this end, shall take all appropriate legislative and administrative measures.

3. States Parties shall ensure that the institutions, services and facilities responsible for the care or protection of children shall conform with the standards established by competent authorities, particularly in the areas of safety, health, in the number and suitability of their staff, as well as competent supervision.

### Article 4

States Parties shall undertake all appropriate legislative, administrative, and other measures for the implementation of the rights recognized in the present Convention. With regard to economic, social and cultural rights, States Parties shall undertake such measures to the maximum extent of their available resources and, where needed, within the framework of international co-operation.

### Article 5

States Parties shall respect the responsibilities, rights and duties of parents or, where applicable, the members of the extended family or community as provided for by local custom, legal guardians or other persons legally responsible for the child, to provide, in a manner consistent with the evolving capacities of the child, appropriate direction and guidance in the exercise by the child of the rights recognized in the present Convention.

### Article 6

1. States Parties recognize that every child has the inherent right to life. 2. States Parties shall ensure to the maximum extent possible the survival and development of the child.

**Article 7**

1. The child shall be registered immediately after birth and shall have the right from birth to a name, the right to acquire a nationality and. as far as possible, the right to know and be cared for by his or her parents.

2. States Parties shall ensure the implementation of these rights in accordance with their national law and their obligations under the relevant international instruments in this field, in particular where the child would otherwise be stateless.

**Article 8**

1. States Parties undertake to respect the right of the child to preserve his or her identity, including nationality, name and family relations as recognized by law without unlawful interference.

2. Where a child is illegally deprived of some or all of the elements of his or her identity, States Parties shall provide appropriate assistance and protection, with a view to re-establishing speedily his or her identity.

**Article 9**

1. States Parties shall ensure that a child shall not be separated from his or her parents against their will, except when competent authorities subject to judicial review determine, in accordance with applicable law and procedures, that such separation is necessary for the best interests of the child. Such determination may be necessary in a particular case such as one involving abuse or neglect of the child by the parents, or one where the parents are living separately and a decision must be made as to the child's place of residence.

2. In any proceedings pursuant to paragraph 1 of the present article, all interested parties shall be given an opportunity to participate in the proceedings and make their views known.

3. States Parties shall respect the right of the child who is separated from one or both parents to maintain personal relations and direct contact with both parents on a regular basis, except if it is contrary to the child's best interests.

4. Where such separation results from any action initiated by a State Party, such as the detention, imprisonment, exile, deportation or death (including death arising from any cause while the person is in the custody of the State) of one or both parents or of the child, that State Party shall, upon request, provide the parents, the child or, if appropriate, another member of the family with the essential information concerning the whereabouts of the absent member(s) of the family unless the provision of the information would be detrimental to the well-being of the child. States Parties shall further ensure that the submission of such a request shall of itself entail no adverse consequences for the person(s) concerned.

**Article 10**

1. In accordance with the obligation of States Parties under article 9, paragraph 1, applications by a child or his or her parents to enter or leave a State Party for the purpose of family reunification shall be dealt with by States Parties in a positive, humane and expeditious manner. States Parties shall further ensure that the submission of such a request shall entail no adverse consequences for the applicants and for the members of their family.

2. A child whose parents reside in different States shall have the right to maintain on a regular basis, save in exceptional circumstances personal relations and direct contacts with both parents. Towards that end and in accordance with the obligation of States Parties under article 9, paragraph 1, States Parties shall respect the right of the child and his or her parents to leave any country, including their

**AR2022_500474**

own, and to enter their own country. The right to leave any country shall be subject only to such restrictions as are prescribed by law and which are necessary to protect the national security, public order (ordre public), public health or morals or the rights and freedoms of others and are consistent with the other rights recognized in the present Convention.

**Article 11**

1. States Parties shall take measures to combat the illicit transfer and non-return of children abroad.

2. To this end, States Parties shall promote the conclusion of bilateral or multilateral agreements or accession to existing agreements.

**Article 12**

1. States Parties shall assure to the child who is capable of forming his or her own views the right to express those views freely in all matters affecting the child, the views of the child being given due weight in accordance with the age and maturity of the child.

2. For this purpose, the child shall in particular be provided the opportunity to be heard in any judicial and administrative proceedings affecting the child, either directly, or through a representative or an appropriate body, in a manner consistent with the procedural rules of national law.

**Article 13**

1. The child shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of the child's choice.

2. The exercise of this right may be subject to certain restrictions, but these shall only be such as are provided by law and are necessary:

(a) For respect of the rights or reputations of others; or

(b) For the protection of national security or of public order (ordre public), or of public health or morals.

**Article 14**

1. States Parties shall respect the right of the child to freedom of thought, conscience and religion.

2. States Parties shall respect the rights and duties of the parents and, when applicable, legal guardians, to provide direction to the child in the exercise of his or her right in a manner consistent with the evolving capacities of the child.

3. Freedom to manifest one's religion or beliefs may be subject only to such limitations as are prescribed by law and are necessary to protect public safety, order, health or morals, or the fundamental rights and freedoms of others.

**Article 15**

1. States Parties recognize the rights of the child to freedom of association and to freedom of peaceful assembly.

2. No restrictions may be placed on the exercise of these rights other than those imposed in conformity with the law and which are necessary in a democratic society in the interests of national security or public safety, public order (ordre public), the protection of public health or morals or the protection of the rights and freedoms of others.

**Article 16**

AR2022_500475

1. No child shall be subjected to arbitrary or unlawful interference with his or her privacy, family, home or correspondence, nor to unlawful attacks on his or her honour and reputation.

2. The child has the right to the protection of the law against such interference or attacks.

**Article 17**

States Parties recognize the important function performed by the mass media and shall ensure that the child has access to information and material from a diversity of national and international sources, especially those aimed at the promotion of his or her social, spiritual and moral well-being and physical and mental health.

To this end, States Parties shall:

(a) Encourage the mass media to disseminate information and material of social and cultural benefit to the child and in accordance with the spirit of article 29;

(b) Encourage international co-operation in the production, exchange and dissemination of such information and material from a diversity of cultural, national and international sources;

(c) Encourage the production and dissemination of children's books;

(d) Encourage the mass media to have particular regard to the linguistic needs of the child who belongs to a minority group or who is indigenous;

(e) Encourage the development of appropriate guidelines for the protection of the child from information and material injurious to his or her well-being, bearing in mind the provisions of articles 13 and 18.

**Article 18**

1. States Parties shall use their best efforts to ensure recognition of the principle that both parents have common responsibilities for the upbringing and development of the child. Parents or, as the case may be, legal guardians, have the primary responsibility for the upbringing and development of the child. The best interests of the child will be their basic concern.

2. For the purpose of guaranteeing and promoting the rights set forth in the present Convention, States Parties shall render appropriate assistance to parents and legal guardians in the performance of their child-rearing responsibilities and shall ensure the development of institutions, facilities and services for the care of children.

3. States Parties shall take all appropriate measures to ensure that children of working parents have the right to benefit from child-care services and facilities for which they are eligible.

**Article 19**

1. States Parties shall take all appropriate legislative, administrative, social and educational measures to protect the child from all forms of physical or mental violence, injury or abuse, neglect or negligent treatment, maltreatment or exploitation, including sexual abuse, while in the care of parent(s), legal guardian(s) or any other person who has the care of the child.

2. Such protective measures should, as appropriate, include effective procedures for the establishment of social programmes to provide necessary support for the child and for those who have the care of the child, as well as for other forms of prevention and for identification, reporting, referral, investigation, treatment and follow-up of instances of child maltreatment described heretofore, and, as appropriate, for judicial involvement.

**Article 20**

1. A child temporarily or permanently deprived of his or her family environment, or in whose own best interests cannot be allowed to remain in that environment, shall be entitled to special protection and assistance provided by the State.

2. States Parties shall in accordance with their national laws ensure alternative care for such a child.

3. Such care could include, inter alia, foster placement, kafalah of Islamic law, adoption or if necessary placement in suitable institutions for the care of children. When considering solutions, due regard shall be paid to the desirability of continuity in a child's upbringing and to the child's ethnic, religious, cultural and linguistic background.

**Article 21**

States Parties that recognize and/or permit the system of adoption shall ensure that the best interests of the child shall be the paramount consideration and they shall:

(a) Ensure that the adoption of a child is authorized only by competent authorities who determine, in accordance with applicable law and procedures and on the basis of all pertinent and reliable information, that the adoption is permissible in view of the child's status concerning parents, relatives and legal guardians and that, if required, the persons concerned have given their informed consent to the adoption on the basis of such counselling as may be necessary;

(b) Recognize that inter-country adoption may be considered as an alternative means of child's care, if the child cannot be placed in a foster or an adoptive family or cannot in any suitable manner be cared for in the child's country of origin;

(c) Ensure that the child concerned by inter-country adoption enjoys safeguards and standards equivalent to those existing in the case of national adoption;

(d) Take all appropriate measures to ensure that, in inter-country adoption, the placement does not result in improper financial gain for those involved in it;

(e) Promote, where appropriate, the objectives of the present article by concluding bilateral or multilateral arrangements or agreements, and endeavour, within this framework, to ensure that the placement of the child in another country is carried out by competent authorities or organs.

**Article 22**

1. States Parties shall take appropriate measures to ensure that a child who is seeking refugee status or who is considered a refugee in accordance with applicable international or domestic law and procedures shall, whether unaccompanied or accompanied by his or her parents or by any other person, receive appropriate protection and humanitarian assistance in the enjoyment of applicable rights set forth in the present Convention and in other international human rights or humanitarian instruments to which the said States are Parties.

2. For this purpose, States Parties shall provide, as they consider appropriate, co-operation in any efforts by the United Nations and other competent intergovernmental organizations or non-governmental organizations co-operating with the United Nations to protect and assist such a child and to trace the parents or other members of the family of any refugee child in order to obtain information necessary for reunification with his or her family. In cases where no parents or other members of the family can be found, the child shall be accorded the same protection as any other child permanently or temporarily deprived of his or her family environment for any reason , as set forth in the present Convention.

**Article 23**

1. States Parties recognize that a mentally or physically disabled child should enjoy a full and decent life, in conditions which ensure dignity, promote self-reliance and facilitate the child's active participation in the community.

2. States Parties recognize the right of the disabled child to special care and shall encourage and ensure the extension, subject to available resources, to the eligible child and those responsible for his or her care, of assistance for which application is made and which is appropriate to the child's condition and to the circumstances of the parents or others caring for the child.

3. Recognizing the special needs of a disabled child, assistance extended in accordance with paragraph 2 of the present article shall be provided free of charge, whenever possible, taking into account the financial resources of the parents or others caring for the child, and shall be designed to ensure that the disabled child has effective access to and receives education, training, health care services, rehabilitation services, preparation for employment and recreation opportunities in a manner conducive to the child's achieving the fullest possible social integration and individual development, including his or her cultural and spiritual development

4. States Parties shall promote, in the spirit of international cooperation, the exchange of appropriate information in the field of preventive health care and of medical, psychological and functional treatment of disabled children, including dissemination of and access to information concerning methods of rehabilitation, education and vocational services, with the aim of enabling States Parties to improve their capabilities and skills and to widen their experience in these areas. In this regard, particular account shall be taken of the needs of developing countries.

## Article 24

1. States Parties recognize the right of the child to the enjoyment of the highest attainable standard of health and to facilities for the treatment of illness and rehabilitation of health. States Parties shall strive to ensure that no child is deprived of his or her right of access to such health care services.

2. States Parties shall pursue full implementation of this right and, in particular, shall take appropriate measures:

(a) To diminish infant and child mortality;

(b) To ensure the provision of necessary medical assistance and health care to all children with emphasis on the development of primary health care;

(c) To combat disease and malnutrition, including within the framework of primary health care, through, inter alia, the application of readily available technology and through the provision of adequate nutritious foods and clean drinking-water, taking into consideration the dangers and risks of environmental pollution;

(d) To ensure appropriate pre-natal and post-natal health care for mothers;

(e) To ensure that all segments of society, in particular parents and children, are informed, have access to education and are supported in the use of basic knowledge of child health and nutrition, the advantages of breastfeeding, hygiene and environmental sanitation and the prevention of accidents;

(f) To develop preventive health care, guidance for parents and family planning education and services.

3. States Parties shall take all effective and appropriate measures with a view to abolishing traditional practices prejudicial to the health of children.

4. States Parties undertake to promote and encourage international co-operation with a view to achieving progressively the full realization of the right recognized in the present article. In this regard, particular account shall be taken of the needs of developing countries.

**Article 25**

States Parties recognize the right of a child who has been placed by the competent authorities for the purposes of care, protection or treatment of his or her physical or mental health, to a periodic review of the treatment provided to the child and all other circumstances relevant to his or her placement.

**Article 26**

1. States Parties shall recognize for every child the right to benefit from social security, including social insurance, and shall take the necessary measures to achieve the full realization of this right in accordance with their national law.

2. The benefits should, where appropriate, be granted, taking into account the resources and the circumstances of the child and persons having responsibility for the maintenance of the child, as well as any other consideration relevant to an application for benefits made by or on behalf of the child.

**Article 27**

1. States Parties recognize the right of every child to a standard of living adequate for the child's physical, mental, spiritual, moral and social development.

2. The parent(s) or others responsible for the child have the primary responsibility to secure, within their abilities and financial capacities, the conditions of living necessary for the child's development.

3. States Parties, in accordance with national conditions and within their means, shall take appropriate measures to assist parents and others responsible for the child to implement this right and shall in case of need provide material assistance and support programmes, particularly with regard to nutrition, clothing and housing.

4. States Parties shall take all appropriate measures to secure the recovery of maintenance for the child from the parents or other persons having financial responsibility for the child, both within the State Party and from abroad. In particular, where the person having financial responsibility for the child lives in a State different from that of the child, States Parties shall promote the accession to international agreements or the conclusion of such agreements, as well as the making of other appropriate arrangements.

**Article 28**

1. States Parties recognize the right of the child to education, and with a view to achieving this right progressively and on the basis of equal opportunity, they shall, in particular:

(a) Make primary education compulsory and available free to all;

(b) Encourage the development of different forms of secondary education, including general and vocational education, make them available and accessible to every child, and take appropriate measures such as the introduction of free education and offering financial assistance in case of need;

(c) Make higher education accessible to all on the basis of capacity by every appropriate means;

(d) Make educational and vocational information and guidance available and accessible to all children;

(e) Take measures to encourage regular attendance at schools and the reduction of drop-out rates.

2. States Parties shall take all appropriate measures to ensure that school discipline is administered in a manner consistent with the child's human dignity and in conformity with the present Convention.

3. States Parties shall promote and encourage international cooperation in matters relating to education, in particular with a view to contributing to the elimination of ignorance and illiteracy

throughout the world and facilitating access to scientific and technical knowledge and modern teaching methods. In this regard, particular account shall be taken of the needs of developing countries.

**Article 29**

1. States Parties agree that the education of the child shall be directed to:

(a) The development of the child's personality, talents and mental and physical abilities to their fullest potential;

(b) The development of respect for human rights and fundamental freedoms, and for the principles enshrined in the Charter of the United Nations;

(c) The development of respect for the child's parents, his or her own cultural identity, language and values, for the national values of the country in which the child is living, the country from which he or she may originate, and for civilizations different from his or her own;

(d) The preparation of the child for responsible life in a free society, in the spirit of understanding, peace, tolerance, equality of sexes, and friendship among all peoples, ethnic, national and religious groups and persons of indigenous origin;

(e) The development of respect for the natural environment.

2. No part of the present article or article 28 shall be construed so as to interfere with the liberty of individuals and bodies to establish and direct educational institutions, subject always to the observance of the principle set forth in paragraph 1 of the present article and to the requirements that the education given in such institutions shall conform to such minimum standards as may be laid down by the State.

**Article 30**

In those States in which ethnic, religious or linguistic minorities or persons of indigenous origin exist, a child belonging to such a minority or who is indigenous shall not be denied the right, in community with other members of his or her group, to enjoy his or her own culture, to profess and practise his or her own religion, or to use his or her own language.

**Article 31**

1. States Parties recognize the right of the child to rest and leisure, to engage in play and recreational activities appropriate to the age of the child and to participate freely in cultural life and the arts.

2. States Parties shall respect and promote the right of the child to participate fully in cultural and artistic life and shall encourage the provision of appropriate and equal opportunities for cultural, artistic, recreational and leisure activity.

**Article 32**

1. States Parties recognize the right of the child to be protected from economic exploitation and from performing any work that is likely to be hazardous or to interfere with the child's education, or to be harmful to the child's health or physical, mental, spiritual, moral or social development.

2. States Parties shall take legislative, administrative, social and educational measures to ensure the implementation of the present article. To this end, and having regard to the relevant provisions of other international instruments, States Parties shall in particular:

(a) Provide for a minimum age or minimum ages for admission to employment;

(b) Provide for appropriate regulation of the hours and conditions of employment;

**AR2022_500480**

(c) Provide for appropriate penalties or other sanctions to ensure the effective enforcement of the present article.

**Article 33**

States Parties shall take all appropriate measures, including legislative, administrative, social and educational measures, to protect children from the illicit use of narcotic drugs and psychotropic substances as defined in the relevant international treaties, and to prevent the use of children in the illicit production and trafficking of such substances.

**Article 34**

States Parties undertake to protect the child from all forms of sexual exploitation and sexual abuse. For these purposes, States Parties shall in particular take all appropriate national, bilateral and multilateral measures to prevent:

(a) The inducement or coercion of a child to engage in any unlawful sexual activity;

(b) The exploitative use of children in prostitution or other unlawful sexual practices;

(c) The exploitative use of children in pornographic performances and materials.

**Article 35**

States Parties shall take all appropriate national, bilateral and multilateral measures to prevent the abduction of, the sale of or traffic in children for any purpose or in any form.

**Article 36**

States Parties shall protect the child against all other forms of exploitation prejudicial to any aspects of the child's welfare.

**Article 37**

States Parties shall ensure that:

(a) No child shall be subjected to torture or other cruel, inhuman or degrading treatment or punishment. Neither capital punishment nor life imprisonment without possibility of release shall be imposed for offences committed by persons below eighteen years of age;

(b) No child shall be deprived of his or her liberty unlawfully or arbitrarily. The arrest, detention or imprisonment of a child shall be in conformity with the law and shall be used only as a measure of last resort and for the shortest appropriate period of time;

(c) Every child deprived of liberty shall be treated with humanity and respect for the inherent dignity of the human person, and in a manner which takes into account the needs of persons of his or her age. In particular, every child deprived of liberty shall be separated from adults unless it is considered in the child's best interest not to do so and shall have the right to maintain contact with his or her family through correspondence and visits, save in exceptional circumstances;

(d) Every child deprived of his or her liberty shall have the right to prompt access to legal and other appropriate assistance, as well as the right to challenge the legality of the deprivation of his or her liberty before a court or other competent, independent and impartial authority, and to a prompt decision on any such action.

**Article 38**

1. States Parties undertake to respect and to ensure respect for rules of international humanitarian law applicable to them in armed conflicts which are relevant to the child.

2. States Parties shall take all feasible measures to ensure that persons who have not attained the age of fifteen years do not take a direct part in hostilities.

3. States Parties shall refrain from recruiting any person who has not attained the age of fifteen years into their armed forces. In recruiting among those persons who have attained the age of fifteen years but who have not attained the age of eighteen years, States Parties shall endeavour to give priority to those who are oldest.

4. In accordance with their obligations under international humanitarian law to protect the civilian population in armed conflicts, States Parties shall take all feasible measures to ensure protection and care of children who are affected by an armed conflict.

**Article 39**

States Parties shall take all appropriate measures to promote physical and psychological recovery and social reintegration of a child victim of: any form of neglect, exploitation, or abuse; torture or any other form of cruel, inhuman or degrading treatment or punishment; or armed conflicts. Such recovery and reintegration shall take place in an environment which fosters the health, self-respect and dignity of the child.

**Article 40**

1. States Parties recognize the right of every child alleged as, accused of, or recognized as having infringed the penal law to be treated in a manner consistent with the promotion of the child's sense of dignity and worth, which reinforces the child's respect for the human rights and fundamental freedoms of others and which takes into account the child's age and the desirability of promoting the child's reintegration and the child's assuming a constructive role in society.

2. To this end, and having regard to the relevant provisions of international instruments, States Parties shall, in particular, ensure that:

(a) No child shall be alleged as, be accused of, or recognized as having infringed the penal law by reason of acts or omissions that were not prohibited by national or international law at the time they were committed;

(b) Every child alleged as or accused of having infringed the penal law has at least the following guarantees:

(i) To be presumed innocent until proven guilty according to law;

(ii) To be informed promptly and directly of the charges against him or her, and, if appropriate, through his or her parents or legal guardians, and to have legal or other appropriate assistance in the preparation and presentation of his or her defence;

(iii) To have the matter determined without delay by a competent, independent and impartial authority or judicial body in a fair hearing according to law, in the presence of legal or other appropriate assistance and, unless it is considered not to be in the best interest of the child, in particular, taking into account his or her age or situation, his or her parents or legal guardians;

(iv) Not to be compelled to give testimony or to confess guilt; to examine or have examined adverse witnesses and to obtain the participation and examination of witnesses on his or her behalf under conditions of equality;

(v) If considered to have infringed the penal law, to have this decision and any measures imposed in consequence thereof reviewed by a higher competent, independent and impartial authority or judicial body according to law;

AR2022_500482

(vi) To have the free assistance of an interpreter if the child cannot understand or speak the language used;

(vii) To have his or her privacy fully respected at all stages of the proceedings.

3. States Parties shall seek to promote the establishment of laws, procedures, authorities and institutions specifically applicable to children alleged as, accused of, or recognized as having infringed the penal law, and, in particular:

(a) The establishment of a minimum age below which children shall be presumed not to have the capacity to infringe the penal law;

(b) Whenever appropriate and desirable, measures for dealing with such children without resorting to judicial proceedings, providing that human rights and legal safeguards are fully respected. 4. A variety of dispositions, such as care, guidance and supervision orders; counselling; probation; foster care; education and vocational training programmes and other alternatives to institutional care shall be available to ensure that children are dealt with in a manner appropriate to their well-being and proportionate both to their circumstances and the offence.

**Article 41**

Nothing in the present Convention shall affect any provisions which are more conducive to the realization of the rights of the child and which may be contained in:

(a) The law of a State party; or

(b) International law in force for that State.

**PART II**

**Article 42**

States Parties undertake to make the principles and provisions of the Convention widely known, by appropriate and active means, to adults and children alike.

**Article 43**

1. For the purpose of examining the progress made by States Parties in achieving the realization of the obligations undertaken in the present Convention, there shall be established a Committee on the Rights of the Child, which shall carry out the functions hereinafter provided.

2. The Committee shall consist of ten experts of high moral standing and recognized competence in the field covered by this Convention. The members of the Committee shall be elected by States Parties from among their nationals and shall serve in their personal capacity, consideration being given to equitable geographical distribution, as well as to the principal legal systems.

3. The members of the Committee shall be elected by secret ballot from a list of persons nominated by States Parties. Each State Party may nominate one person from among its own nationals.

4. The initial election to the Committee shall be held no later than six months after the date of the entry into force of the present Convention and thereafter every second year. At least four months before the date of each election, the Secretary-General of the United Nations shall address a letter to States Parties inviting them to submit their nominations within two months. The Secretary-General shall subsequently prepare a list in alphabetical order of all persons thus nominated, indicating States Parties which have nominated them, and shall submit it to the States Parties to the present Convention.

5. The elections shall be held at meetings of States Parties convened by the Secretary-General at United Nations Headquarters. At those meetings, for which two thirds of States Parties shall constitute

a quorum, the persons elected to the Committee shall be those who obtain the largest number of votes and an absolute majority of the votes of the representatives of States Parties present and voting.

6. The members of the Committee shall be elected for a term of four years. They shall be eligible for re-election if renominated. The term of five of the members elected at the first election shall expire at the end of two years; immediately after the first election, the names of these five members shall be chosen by lot by the Chairman of the meeting.

7. If a member of the Committee dies or resigns or declares that for any other cause he or she can no longer perform the duties of the Committee, the State Party which nominated the member shall appoint another expert from among its nationals to serve for the remainder of the term, subject to the approval of the Committee.

8. The Committee shall establish its own rules of procedure.

9. The Committee shall elect its officers for a period of two years.

10. The meetings of the Committee shall normally be held at United Nations Headquarters or at any other convenient place as determined by the Committee. The Committee shall normally meet annually. The duration of the meetings of the Committee shall be determined, and reviewed, if necessary, by a meeting of the States Parties to the present Convention, subject to the approval of the General Assembly.

11. The Secretary-General of the United Nations shall provide the necessary staff and facilities for the effective performance of the functions of the Committee under the present Convention.

12. With the approval of the General Assembly, the members of the Committee established under the present Convention shall receive emoluments from United Nations resources on such terms and conditions as the Assembly may decide.

**Article 44**

1. States Parties undertake to submit to the Committee, through the Secretary-General of the United Nations, reports on the measures they have adopted which give effect to the rights recognized herein and on the progress made on the enjoyment of those rights

(a) Within two years of the entry into force of the Convention for the State Party concerned;

(b) Thereafter every five years.

2. Reports made under the present article shall indicate factors and difficulties, if any, affecting the degree of fulfilment of the obligations under the present Convention. Reports shall also contain sufficient information to provide the Committee with a comprehensive understanding of the implementation of the Convention in the country concerned.

3. A State Party which has submitted a comprehensive initial report to the Committee need not, in its subsequent reports submitted in accordance with paragraph 1 (b) of the present article, repeat basic information previously provided.

4. The Committee may request from States Parties further information relevant to the implementation of the Convention.

5. The Committee shall submit to the General Assembly, through the Economic and Social Council, every two years, reports on its activities.

6. States Parties shall make their reports widely available to the public in their own countries.

**Article 45**

In order to foster the effective implementation of the Convention and to encourage international co-operation in the field covered by the Convention:

(a) The specialized agencies, the United Nations Children's Fund, and other United Nations organs shall be entitled to be represented at the consideration of the implementation of such provisions of the present Convention as fall within the scope of their mandate. The Committee may invite the specialized agencies, the United Nations Children's Fund and other competent bodies as it may consider appropriate to provide expert advice on the implementation of the Convention in areas falling within the scope of their respective mandates. The Committee may invite the specialized agencies, the United Nations Children's Fund, and other United Nations organs to submit reports on the implementation of the Convention in areas falling within the scope of their activities;

(b) The Committee shall transmit, as it may consider appropriate, to the specialized agencies, the United Nations Children's Fund and other competent bodies, any reports from States Parties that contain a request, or indicate a need, for technical advice or assistance, along with the Committee's observations and suggestions, if any, on these requests or indications;

(c) The Committee may recommend to the General Assembly to request the Secretary-General to undertake on its behalf studies on specific issues relating to the rights of the child;

(d) The Committee may make suggestions and general recommendations based on information received pursuant to articles 44 and 45 of the present Convention. Such suggestions and general recommendations shall be transmitted to any State Party concerned and reported to the General Assembly, together with comments, if any, from States Parties.

## PART III

### Article 46

The present Convention shall be open for signature by all States.

### Article 47

The present Convention is subject to ratification. Instruments of ratification shall be deposited with the Secretary-General of the United Nations.

### Article 48

The present Convention shall remain open for accession by any State. The instruments of accession shall be deposited with the Secretary-General of the United Nations.

### Article 49

1. The present Convention shall enter into force on the thirtieth day following the date of deposit with the Secretary-General of the United Nations of the twentieth instrument of ratification or accession.

2. For each State ratifying or acceding to the Convention after the deposit of the twentieth instrument of ratification or accession, the Convention shall enter into force on the thirtieth day after the deposit by such State of its instrument of ratification or accession.

### Article 50

1. Any State Party may propose an amendment and file it with the Secretary-General of the United Nations. The Secretary-General shall thereupon communicate the proposed amendment to States Parties, with a request that they indicate whether they favour a conference of States Parties for the purpose of considering and voting upon the proposals. In the event that, within four months from the date of such communication, at least one third of the States Parties favour such a conference, the Secretary-General shall convene the conference under the auspices of the United Nations. Any

amendment adopted by a majority of States Parties present and voting at the conference shall be submitted to the General Assembly for approval.

2. An amendment adopted in accordance with paragraph 1 of the present article shall enter into force when it has been approved by the General Assembly of the United Nations and accepted by a two-thirds majority of States Parties.

3. When an amendment enters into force, it shall be binding on those States Parties which have accepted it, other States Parties still being bound by the provisions of the present Convention and any earlier amendments which they have accepted.

**Article 51**

1. The Secretary-General of the United Nations shall receive and circulate to all States the text of reservations made by States at the time of ratification or accession.

2. A reservation incompatible with the object and purpose of the present Convention shall not be permitted.

3. Reservations may be withdrawn at any time by notification to that effect addressed to the Secretary-General of the United Nations, who shall then inform all States. Such notification shall take effect on the date on which it is received by the Secretary-General

**Article 52**

A State Party may denounce the present Convention by written notification to the Secretary-General of the United Nations. Denunciation becomes effective one year after the date of receipt of the notification by the Secretary-General.

**Article 53**

The Secretary-General of the United Nations is designated as the depositary of the present Convention.

**Article 54**

The original of the present Convention, of which the Arabic, Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited with the Secretary-General of the United Nations. IN WITNESS THEREOF the undersigned plenipotentiaries, being duly authorized thereto by their respective governments, have signed the present Convention.

# THE YALE LAW JOURNAL ONLINE

DAVID A. MARTIN

# A Defense of Immigration-Enforcement Discretion: The Legal and Policy Flaws in Kris Kobach's Latest Crusade

*This Essay disputes the legal claims set forth in a recent lawsuit that seeks to invalidate a policy of the Department of Homeland Security. The policy gives protection against deportation to unauthorized immigrants who came to the country as children, and the Department defends it as an exercise of prosecutorial discretion. The plaintiffs claim that no such discretion exists, because the Immigration and Nationality Act, as amended in 1996, requires that virtually all aliens who entered without inspection be detained and placed in removal proceedings whenever encountered by immigration agents. Closely examining the statutory language and drawing on the author's own extensive involvement as General Counsel of the Immigration and Naturalization Service in the 1996 consideration of legislative amendments and administrative implementation, this Essay makes the case that the plaintiffs' argument misunderstands both Congress's intent and consistent agency practice before and after those amendments.*

On August 23, 2012, ten Immigration and Customs Enforcement (ICE) officers sued in federal court to block the Obama Administration's program to grant deferred action to longtime U.S. residents who came here illegally as children.[1] Under that program, eligible persons will be shielded from deportation for two years (potentially renewable) and will generally receive work authorization. The covered individuals are sometimes called "DREAMers,"

---

1.  Complaint, Crane v. Napolitano, No. 3:12-cv-03247-O (N.D. Tex. Aug. 23, 2012). The plaintiffs filed an amended complaint on Oct. 10, 2012, primarily to add the State of Mississippi, through its governor, Phil Bryant, as an additional plaintiff. Amended Complaint, Crane v. Napolitano, No. 3:12-cv-03247-O (N.D. Tex. Oct. 10, 2012), http://big.assets.huffingtonpost.com/ICElawsuit.pdf. The substantive arguments remained unchanged.

AR2022_500487

THE YALE LAW JOURNAL ONLINE                                    122:167    2012

because most would have been given lawful immigration status by the DREAM Act, a bipartisan bill that at times has garnered majority support in both houses of Congress, but has never been enacted.[2] The officers claim that the program, officially known as Deferred Action for Childhood Arrivals (DACA), violates immigration statutes and transgresses our constitutional separation of powers. The Department of Homeland Security justifies DACA as a systematic and thoughtful way of exercising prosecutorial discretion. Under the program, the Department exercises its discretion by forgoing enforcement, after careful screening, against young unauthorized immigrants not considered culpable for their unauthorized entry or presence.[3]

Lead counsel for the officers in this case, *Crane v. Napolitano*, is Kris Kobach, who was a prime mover behind the recent wave of state and local legislation designed to crack down on illegal migration.[4] Kobach is also the elected Secretary of State of Kansas, although he is representing the plaintiffs here in his private capacity and, one assumes, his spare time. Evidently, since

---

**2.** The initial Development, Relief, and Education for Alien Minors (DREAM) Act was introduced in 2001, S. 1291, 107th Cong. (2001), and reintroduced, with variations, in succeeding congresses. The House passed a version of the DREAM Act in the 2010 lame-duck session, but the bill failed in the Senate when a cloture motion received only 55 votes (with 41 opposed). David M. Herszenhorn, *Senate Blocks Bill for Young Illegal Immigrants*, N.Y. TIMES, Dec. 18, 2010, http://www.nytimes.com/2010/12/19/us/politics/19immig.html.

   The criteria for deferred action under the Obama Administration's policy, however, diverge slightly from the DREAM Act. More significantly, the benefits of the executive action are more ephemeral than the full legal status that legislation could provide. Describing the policy in a *Time* essay, President Obama specifically noted that difference and called on Congress to enact the DREAM Act during its 2012 session. Barack Obama, *Exclusive: A Nation of Laws and a Nation of Immigrants*, TIME, June 17, 2012, http://ideas.time.com/2012/06/17/a-nation-of-laws-and-a-nation-of-immigrants.

**3.** *See* Memorandum from Janet Napolitano, U.S. Sec'y of Homeland Sec., to David V. Aguilar, Acting Comm'r, U.S. Customs & Border Prot., et al., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf. For a thorough review of the history of deferred action in the immigration field, see Shoba Sivaprasad Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 CONN. PUB. INT. L.J. 243, 246-65 (2010). To be eligible for DACA, applicants must have taken up residence in the United States before their sixteenth birthday, and on or before June 15, 2007—five years before the program was announced—and must not have reached their thirty-first birthday as of June 15, 2012. Other requirements, particularly with regard to schooling and criminal record, also apply. *See Consideration of Deferred Action for Childhood Arrivals Process*, U.S. CITIZENSHIP & IMMIGR. SERVS., http://www.uscis.gov/childhoodarrivals (last updated Sept. 14, 2012).

**4.** *See* John Hanna, *Kan. Lawyer Is Architect of Many Immigration Laws*, SAN DIEGO UNION-TRIB., May 10, 2010, http://www.utsandiego.com/news/2010/may/10/kan-lawyer-is-architect-of-many-immigration-laws.

AR2022_500488

A DEFENSE OF IMMIGRATION-ENFORCEMENT DISCRETION

the Supreme Court squelched most of those crackdown provisions in its June ruling in *Arizona v. United States*,[5] he feels the itch to find a new stage on which to complain about federal immigration policy.

Policy objections to the new program are fair game, of course, but as a lawsuit this is a very strange beast, and its full and disturbing implications have not been widely noted. In essence, the plaintiff officers say they are empowered to make their own choices about which immigration violators to arrest, no matter what their bosses may say about enforcement priorities. Their position represents both unwise policy and deeply flawed legal analysis.

The suit relies primarily on a superficially attractive and syllogistically neat statutory theory that Kobach first trumpeted in TV appearances and op-eds shortly after DACA was announced in June.[6] Under Kobach's theory, virtually every time an ICE agent encounters unauthorized aliens, he or she has a duty under federal law—with which no supervisor can interfere—to place the aliens into formal removal proceedings. The same argument has also been picked up by congressional opponents of DACA.[7] But the argument's central reasoning is legally erroneous. The theory takes out of context a provision Congress enacted in 1996, marries it with a misunderstanding of two provisions that have been in place for decades, and ignores the actual practice under those provisions.

I present this Essay primarily as a work of statutory interpretation. But it also draws on close personal knowledge of the legislative project that led to major statutory amendments in 1996,[8] including the legal provisions on which Kobach relies. From summer 1995 to early 1998, I was on leave from my law-faculty position, where my main specialty has been immigration law, to serve as General Counsel of the Immigration and Naturalization Service. In that capacity, I was involved in hundreds of discussions within the executive branch and on Capitol Hill regarding the immigration-reform legislation—initially as it was being shaped and later as it was being implemented. The *Crane* lawsuit

---

5.  132 S. Ct. 2492 (2012).

6.  *See* Kris W. Kobach, *The 'DREAM' Order Isn't Legal*, N.Y. POST, June 21, 2012, http://www.nypost.com/p/news/opinion/opedcolumnists/the_dream_order_isn_legal _4WAYaqJueaEK6MS0onMJCO. The complaint also presents other legal theories, but I focus here on this statutory argument, which is the centerpiece of Kobach's public attack on DACA and of the lawsuit, as presented in the complaint's first cause of action.

7.  *See, e.g.*, Letter from Congressman Lou Barletta to House Judiciary Comm. and Homeland Sec. Comm. (June 26, 2012), http://www.fairus.org/DocServer/Rep_Barletta_Investigation _Letter_6-26-12.pdf.

8.  *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, tit. IV, 110 Stat. 1214, 1258-81 (1996); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546 (1996). The changes on which the lawsuit relies were enacted in the Illegal Immigration Reform and Immigrant Responsibility Act.

AR2022_500489

refashions history and distorts what Congress and the executive branch intended in 1996. This Essay gives a richer account of why Congress adopted the key provisions than may be apparent from the traditional legislative history of committee reports and floor colloquies.

Part I addresses the core statutory argument that the officers' lawsuit presents. Part II goes on to reflect on the wider implications for sound and accountable law enforcement if the plaintiffs were to prevail.

## I. THE STATUTORY ARGUMENT

### A. The Syllogism

Here is the legal syllogism, as spelled out in the complaint. The argument relies on three provisions of section 235 of the Immigration and Nationality Act (INA),[9] a section that governs inspections of people who have not been admitted to the United States. The first of those provisions, section 235(a)(1), was wholly new in 1996, and the other two are slightly revised versions of earlier provisions that have been in the INA since it was enacted in 1952. Specifically, the complaint contends:

> [Section 235(a)(1) of the INA] requires that "an alien present in the United States who has not been admitted . . . shall be deemed for purposes of this chapter an applicant for admission." This designation triggers [section 235(a)(3)], which requires that all applicants for admission "shall be inspected by immigration officers." This in turn triggers [section 235(b)(2)(A),] which mandates that "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a [removal] proceeding [in immigration court]."[10]

The complaint then concludes that "federal law clearly requires Plaintiffs to place [aliens covered by these provisions] into removal proceedings."[11] Kobach's op-ed is even more sweeping, asserting that Congress "inserted [these] interlocking provisions into the law that *require deportation* when

---

**9.**   8 U.S.C. § 1225 (2006). The complaint cites only the United States Code. In the text of this Essay, however, I refer to the relevant statutory provisions by their section numbers in the INA. In citations, I cite the United States Code as well as, where relevant, the INA.

**10.**   Amended Complaint, *supra* note 1, ¶ 68.

**11.**   *Id.* ¶ 69.

Executive Branch officials become aware of illegal aliens."[12] He goes on: "[T]he 'prosecutorial discretion' that Obama claims he is ordering ICE agents to exercise no longer exists, because Congress eliminated it in 1996."[13] In other words, in Kobach's view, Congress left no room for prosecutorial discretion, at least not before an unadmitted person has been charged, detained, and haled into immigration court.

### B. Legal Flaws

#### 1. Entrants Without Inspection vs. Overstays

Kobach's statutory argument presents several serious problems. First, he acts as though it applies to all "illegal aliens." (This is particularly true of the op-ed, but any nuances qualifying the legal argument in the complaint are at best subtly buried.) By its very terms, however, section 235(a)(1) applies only to "an alien present in the United States who has not been admitted"—that is, someone who entered clandestinely away from the port of entry where inspection and admission take place.[14] These entrants without inspection (EWIs, in immigration-speak) probably constitute the stereotypical "illegal alien" in the public mind, but by commonly accepted estimates they make up only fifty to sixty-seven percent of the unlawfully present population.[15] The rest entered through normal nonimmigrant channels (primarily on a student, tourist, or business visa), were admitted after inspection at the border, and then overstayed or otherwise violated the conditions of their temporary admission. Therefore, up to fifty percent of the unauthorized immigrants encountered by ICE agents would fall outside Kobach's sweeping claim about the repeal of prosecutorial discretion, and there is no reason to think that different percentages would apply to DACA applicants.

#### 2. How Congress Changed the Treatment of EWIs in 1996

But let us set aside this rather significant qualification on Kobach's claim (perhaps it was only a made-for-media shorthand) that prosecutorial discretion no longer exists, and henceforth focus only on EWIs. Even as applied to them,

---

**12.** Kobach, *supra* note 6.

**13.** *Id.*

**14.** 8 U.S.C. § 1225(a)(1).

**15.** *Modes of Entry for the Unauthorized Migrant Population*, PEW HISP. CENTER 3 (May 22, 2006), http://pewhispanic.org/files/factsheets/19.pdf.

171

the argument, for all its lockstep "triggering," is unsound. The complaint implicitly argues that there can be no reason for Congress to have specified, in INA section 235(a)(1), that every alien found in the country without having been admitted shall be deemed to be an applicant for admission, other than to trigger the other paragraphs and thus mandate that EWIs be inspected and then detained for removal proceedings. This argument deeply misunderstands a fundamental architectural change that Congress was making in 1996 to the structure of immigration law, and the role that section 235(a)(1) plays in that change. Moreover, the ultimate explanation of that paragraph of the law actually leads in the opposite direction from where Kobach wants the court to go, because it reflects a congressional wish to expand, not contract, the options open to the immigration-enforcement agency as it chooses when and whether to file charges.

To fully understand Congress's handiwork, we must plunge deeply into the history of some immigration technicalities. Before 1996, and tracing back for at least a hundred years, immigration enforcement was marked by a key dividing line between exclusion and deportation—between blocking unqualified persons from entry and removing them after they had entered.[16] The laws contained separate statutory sections setting forth grounds for exclusion and a somewhat shorter and more focused list of grounds for deportation. The statute also provided different procedures for exclusion and deportation, most importantly regarding the burden of proof. To avoid exclusion, the alien applicant for admission bore the burden of proof. In deportation proceedings, however, the burden fell on the government to show that one of the deportation grounds applied. Although the procedural and substantive differences were never great in practical effect and had narrowed over time, the overall provisions remained somewhat more favorable for deportable aliens than for excludable aliens.

Crucially, whether a person would be in exclusion or in deportation turned on whether he or she had *entered* U.S. territory. Thus applicants who did what they were supposed to—presented their documents at a port of entry—would be in the less favorable position of an excludable alien if their admissibility were questioned. But someone who sneaked across the border and thereby accomplished an entry would be subject to the more advantageous deportation

---

**16.**   *See, e.g.*, Leng May Ma v. Barber, 357 U.S. 185, 187 (1958).

grounds and deportation procedures.[17] This ironic privileging of EWIs had drawn adverse comment in several court cases and in academic commentary.[18]

Changing that framework to end the more favorable treatment of EWIs drew wide support within Congress and the executive branch as immigration reform legislation moved forward in 1995 and 1996.[19] As enacted, the new legislation made several changes toward this end. Primarily, it amended the prefatory language in the section setting forth deportation grounds (which, after 1996, have generally been called "deportability grounds"). The repealed language stated that deportation grounds apply to aliens "in the United States."[20] The new language declared the grounds applicable to aliens "in and admitted to the United States."[21] Further, the preexisting *deportation* ground for entering without inspection was repealed.[22] Instead, EWIs would be covered by a brand new *inadmissibility* ground (the new terminology after 1996, which replaced "exclusion ground"), which renders inadmissible persons "present in the United States without being admitted or paroled."[23] Finally, Congress changed a key paragraph of the definitions section of the INA,[24] so that, instead of defining "entry," the statute would define "admission" or "admitted."[25] In short, the key factor in determining which substantive provisions apply and which procedures govern is now admission, not entry. Because they were never "admitted," EWIs are now, once charged, treated

---

**17.** *See* THOMAS ALEXANDER ALEINIKOFF, DAVID A. MARTIN & HIROSHI MOTOMURA, IMMIGRATION: PROCESS AND POLICY 474-510 (3d ed. 1995).

**18.** *See id.* at 402.

**19.** *See, e.g., Immigration in the National Interest Act of 1995: Hearing on H.R. 1915 Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary,* 104th Cong. 24 (1995) (statement of T. Alexander Aleinikoff, Executive Associate Comm'r for Programs, United States Immigration and Naturalization Service); *see also* Matter of Quilantan, 25 I. & N. Dec. 285, 291 (B.I.A. 2010) (stating that the 1996 amendments were intended "to eliminate that aspect of the 'entry doctrine' that permitted aliens who had entered without inspection to have greater procedural and substantive rights in deportation proceedings than those who had presented themselves for inspection at a port of entry and had been placed in exclusion proceedings"). In this footnote, and as well as on page 174 and in footnote 52, I depart from standard citation style for the names of administrative adjudications and instead follow the terminology used by the Board of Immigration Appeals (BIA) and by many immigration scholars and practitioners.

**20.** 8 U.S.C. § 1251(a) (1994) (codifying the former section 241(a) of the INA).

**21.** 8 U.S.C. § 1227(a) (2006) (codifying section 237(a) of the INA).

**22.** 8 U.S.C. § 1251(a)(1)(B) (1994) (codifying the former section 241(a)(1)(B) of the INA).

**23.** 8 U.S.C. § 1182(a)(6)(A)(i) (2006) (codifying section 212(a)(6)(A)(i) of the INA).

**24.** 8 U.S.C. § 1101(a)(13) (2006) (codifying section 101(a)(13) of the INA).

**25.** *Compare* 8 U.S.C. § 1101(a)(13) (1994), *with* 8 U.S.C. § 1101(a)(13) (2006).

AR2022_500493

essentially the same as persons identified as inadmissible (formerly "excludable") at a port of entry.[26]

### 3. Badalamenti *and the Statutory Designation of EWIs as Applicants for Admission*

The statutory changes just described were the primary engines of the effort to end any favorable treatment of EWIs, and they might well have been enough to secure the basic architectural change that the political branches wanted: making EWIs inadmissible rather than deportable. But there was one more complication that the immigration agencies feared might hamper efficient enforcement against EWIs once that change took effect, and that complication was the real reason that Congress enacted section 235(a)(1). The complication derived from a 1988 decision by the Board of Immigration Appeals (BIA), *Matter of Badalamenti*,[27] which had very limited significance when handed down, but which might have had much wider application after the 1996 amendments.

Exclusion grounds, the BIA noted in *Badalamenti*, apply to "applicants for admission."[28] In the pre-1996 world, this linkage rarely presented any issue at all. The litigated cases[29] almost always involved someone ruled excludable at a port of entry. By the very nature of the process of arrival and port inspection, a person challenging exclusion was clearly seeking admission. The picture becomes a bit more complex, however, because exclusion grounds could also be applied to some persons outside the port-of-entry context: parolees. In immigration law, a parolee is a person who has received official permission to come into U.S. territory for a stated period (which might sometimes extend for years, or even decades). From the beginning, parole as a legal concept did not amount to admission, and a parolee was deemed not to have accomplished an

---

26. There are still a few respects in which the statute and its implementing regulations differentiate between "arriving aliens" who present themselves at the port of entry for inspection and other removable aliens—a category that includes EWIs. *See, e.g.*, 8 U.S.C. §§ 1182(a)(9)(A), 1225(b)(1)(A)(i), (iii) (2006) (codifying sections 212(a)(9)(A), 235(b)(1)(A)(i), and 235(b)(1)(A)(iii) of the INA); 8 C.F.R. §§ 1.2, 235.3(c), 1003.19(h)(2)(i)(B) (2012). But because EWIs are now subject to the INA inadmissibility grounds and most of the inadmissibility procedures, the differences are limited compared to the disparities under pre-1996 law, and they are not material to the issues presented in the *Crane* litigation.

27. 19 I. & N. Dec. 623 (B.I.A. 1988).

28. *Id.* at 626.

29. The exclusion grounds were—and now the inadmissibility grounds are—also regularly applied by U.S. consular officers deciding whether to issue a visa, but such decisions are generally not subject to administrative or judicial review.

174

entry.[30] Under a legal fiction, a parolee remained constructively at the border and would be treated as an applicant for admission once again (thus subject to the exclusion grounds and procedures) whenever the parole ended. This also rarely presented an issue, however, because parolees generally wanted to stay. When parole termination was litigated, the controversy almost always centered on the propriety of the termination or the substantive interpretation of an exclusion ground.

Vito Badalamenti's case was different. An Italian citizen, he had been extradited to the United States from Spain in 1984 as one of nineteen defendants charged in a massive indictment meant to break up the so-called Pizza Connection drug-smuggling ring run by his father, Gaetano Badalamenti. In order to stand trial, he had been paroled into the United States. This move had been a standard practice for decades: parole is necessary if extradited defendants are to proceed beyond the port of entry to the jail and then the courthouse, because they would almost always be barred from admission owing to the evidence of their criminal activity. After a seventeen-month Pizza Connection trial, seventeen defendants were convicted, but Vito Badalamenti was acquitted. The local INS office told him he had a week to make arrangements to leave the United States at his own expense. When he missed the deadline, he was taken into INS custody and charged under the applicable exclusion grounds.[31]

Badalamenti did not dispute the possible substantive relevance of the stated grounds. He argued instead that he was not an applicant for admission and thus not subject to any exclusion grounds at all. Clearly he had not desired to come to the United States, and he would be happy to leave now, but he had been unable to secure travel plans in the time allowed.[32] (He did not want to return to Italy, his country of nationality, because he probably faced prosecution there, and initial arrangements with Paraguay fell through.)[33]

---

**30.** For a general account of the concept of parole and its application, see ALEINIKOFF ET AL., *supra* note 17, at 379-84. Parole is provided for in section 212(d)(5) of the INA. 8 U.S.C. § 1182(d)(5) (2006).

**31.** 19 I. & N. Dec. at 624-25; Ralph Blumenthal, *Acquitted in 'Pizza Connection' Trial, Man Remains in Prison*, N.Y. TIMES, July 28, 1988, http://www.nytimes.com/1988/07/28/nyregion /acquitted-in-pizza-connection-trial-man-remains-in-prison.html; Arnold H. Lubasch, *17 Found Guilty in 'Pizza' Trial of a Drug Ring*, N.Y. TIMES, Mar. 3, 1987, http://www.nytimes.com /1987/03/03/nyregion/17-found-guilty-in-pizza-trial-of-a-drug-ring.html.

**32.** 19 I. & N. Dec. at 625.

**33.** *Id.*; Blumenthal, *supra* note 31; *see also* Badalamenti v. Moyer, No. 87-c-8503, 1988 WL 9125, at *1 (N.D. Ill. Feb. 4, 1988) (describing—in the course of rejecting Badalamenti's habeas corpus petition, filed before the BIA ruling in the case—Badalamenti's allegations about the

AR2022_500495

THE YALE LAW JOURNAL ONLINE                                    122:167   2012

The BIA agreed with his basic argument. It stated that, "once the purpose of parole has been served and parole has been terminated, the alien must be given a reasonable opportunity to depart unless there is evidence that he is an applicant for admission."[34] At some point, the BIA stated, a parolee who fails to depart will become subject to exclusion and to treatment as an applicant for admission, but first he must be given a "fair and reasonable opportunity to depart."[35] The case was remanded to the immigration judge for a hearing on whether Badalamenti had had such an opportunity, including what efforts he had made to secure departure and whether the government had impeded his efforts.[36] If the opportunity to depart fell short of these standards, the judge should terminate the exclusion proceedings as premature.

As the immigration-reform legislation was under consideration in 1995, INS and the Department of Justice grew concerned that *Badalamenti* might apply to EWIs upon their apprehension. That is, now that EWIs could be removed only under an inadmissibility ground, they might claim upon apprehension that they really did not want to apply for admission and that they would happily depart on their own if given a week or two to do so. Under *Badalamenti*, INS feared that the BIA might allow application of the inadmissibility provisions only to a person for whom INS could present direct "evidence that he is an applicant for admission"[37]—at least until the person had a reasonable opportunity to depart on his own. In the meantime, lacking authority to charge, much less detain, the person, officers faced the prospect that many EWIs could easily abscond. Congressional staffers who were crafting the new system understood the concern and wanted to make certain to avoid this outcome.[38]

---

Italian government's interest in prosecuting him and the circumstances of his thwarted flight to Paraguay).

34.  19 I. & N. Dec. at 626.

35.  *Id.* at 627.

36.  *Id.*

37.  *Id.* at 626.

38.  I emphasize that the concern arose from an abundance of caution, rather than from any slam-dunk argument that an EWI had to be treated like an acquitted extraditee (for whom the claim of no desire to apply for admission is far more plausible). Nonetheless, early drafts of the legislation did not squarely foreclose the *Badalamenti* argument, and one could easily envision a defense lawyer pressing it in the future. Further, the concept of "seeking admission" does still appear in some locations in the post-1996 law (e.g., section 235(b)(2)(A), one of the provisions Kobach highlights). INS and the Department of Justice prudently wanted Congress to take direct steps to eliminate any misunderstanding and foreclose one litigation issue. Perhaps because this additional safeguard provision was added at the staff level early in the drafting process and without real controversy, the

A DEFENSE OF IMMIGRATION-ENFORCEMENT DISCRETION

Congress reacted by stating in section 235(a)(1) that any "alien present in the United States who has not been admitted" shall be deemed, as a matter of law, to be an applicant for admission.[39] Accordingly, once the reformed system took effect, INS could immediately charge an EWI, whatever his declared subjective intent, without first giving him a couple of weeks to leave. The congressional purpose was to *broaden* the discretion of the enforcement agency to choose when to charge an EWI. This new provision gave INS the *option* to charge EWIs with inadmissibility upon discovery when it otherwise might not have been able to file immediate charges at all because of *Badalamenti*. To my knowledge, no one at the time even came close to suggesting that this provision *required* the agency to file charges whenever it encountered an EWI. Kris Kobach has it backward.

### 4. The Other Provisions of Section 235 of the Immigration and Nationality Act

Even if section 235(a)(1) were read as Kobach argues, it still precludes prosecutorial discretion only if the remaining two paragraphs themselves leave no room for discretion. Those two provisions call, first, for inspection of applicants for admission and, second, for detention leading up to removal proceedings in cases of doubt about admissibility. But versions of these two provisions have been in the immigration laws at least since the current Immigration and Nationality Act was adopted in 1952,[40] and the longstanding practice of immigration agencies, at the ports of entry where these provisions classically applied, reveals substantial exercises of discretion, without an inexorable march into detention and then immigration court.

First, consider the well-established practice of withdrawal of an application for admission. For many years before 1996, and continuing thereafter, immigration inspectors have annually allowed tens of thousands of applicants for admission in the ports of entry to withdraw their applications, without charging or detaining them or placing them in removal proceedings. Withdrawal permission commonly reflects a judgment by the officer that the

---

reasons for adding what is now section 235(a)(1) have not been expressly stated, so far as I am aware, in the formal legislative history. (I took up my INS position in August 1995 after this change had already been made to the leading draft bills. But I had many conversations about section 235(a)(1) and its derivation from *Badalamenti* in succeeding months, while working with executive-branch and congressional staff on further necessary refinements in the provisions that would operationalize the shift of EWIs from deportable to inadmissible.)

**39.** 8 U.S.C. § 1225(a)(1) (2006).

**40.** Before 1996, the relevant provisions were the first two sentences of section 235(a) of the INA, which became the current section 235(a)(3), and the first sentence of section 235(b), which became the current section 235(b)(2)(A). *See* 8 U.S.C. § 1225(a), (b) (1994).

AR2022_500497

individual presented a document with a merely technical flaw or otherwise had made an honest mistake.[41] Withdrawal allows the person to go home right away, fix the problem (perhaps by getting a new visa), and return without the automatic disqualifications that attach if a judge issues a formal removal order.[42] This practice unmistakably amounts to prosecutorial discretion, routinely exercised for persons who came before an immigration officer for examination and were not "clearly and beyond a doubt entitled" to land.

If Kobach's argument about the current, only slightly changed language, is correct, then from 1952 to 1996 the withdrawal practice was illegal. Under the Kobach interpretation, all that an examining officer could do upon finding a flaw in the application for admission would be to detain, charge, and bind the person over to immigration court. Congress never thought this withdrawal practice illegitimate or deemed it a violation of the "shall" commands in the governing statute. Indeed, in 1996 Congress gave explicit statutory blessing to this practice of permitting withdrawals, in the discretion of the officer, instead of detaining for removal.[43]

Perhaps more closely relevant to assessing the legality of DACA are several varieties of immigration parole. Parole, like withdrawal, originated as a purely administrative innovation. It permits a person's physical presence in the United States even when she could not legally be granted formal admission. The practice was well established by the time parole gained explicit statutory sanction in the original 1952 Immigration and Nationality Act. Consistent with

---

41.  *See* Stanley Mailman & Stephen Yale-Loehr, *Withdrawing the Application for Admission*, N.Y. L.J., June 23, 1997, at 1, http://www.ssbb.com/index.php/publications/entry/22 (describing the background of the withdrawal practice). Once a person presents himself or herself for admission at a port of entry, withdrawal is not at the individual's discretion; it requires the officer's approval. But approval is far from rare. When Congress began consideration of the 1996 amendments to the INA, withdrawals, which at that time had no explicit statutory basis, but were instead an "administrative invention" justified under the general INS authority to administer the immigration laws, were running above 900,000 per year. *Id.* (reporting 961,444 withdrawals in 1994, "a typical year," as compared to 17,419 exclusion cases decided that year by immigration judges). In 2005, the most recent year for which withdrawal statistics have been officially reported, the Department of Homeland Security counted 316,898 withdrawals. Mary Dougherty, Denise Wilson & Amy Wu, *Annual Report—Immigration Enforcement Actions: 2005*, DEP'T OF HOMELAND SECURITY 4 (Nov. 2006), http://www.dhs.gov/xlibrary/assets/statistics/yearbook/2005/Enforcement_AR_05.pdf.

42.  *See* 8 U.S.C. § 1182(a)(9)(A)(i) (2006) (codifying section 212(a)(9)(A)(i) of the INA) (generally rendering inadmissible for five years a person who had been ordered removed in a proceeding initiated upon her or his arrival).

43.  8 U.S.C. § 1225(a)(4) (2006) (codifying section 235(a)(4) of the INA).

AR2022_500498

the earlier treatment, Congress expressly provided that parole "shall not be regarded as an admission of the alien."[44]

Because that same 1952 Act contained the predecessor provisions to the current section 235(a)(3) and (b)(2)(A), Kobach's interpretation of those two paragraphs must indicate that parole could take place only after the potential parolee–almost by definition a person "not clearly and beyond a doubt entitled" to admission–had been detained and placed in proceedings in immigration court. To be sure, a respectable percentage of paroles do conform to the Kobach model, because parole is often used to release from immigration custody an ostensibly inadmissible applicant for admission, pending completion of his removal proceedings. Under this type of parole, the person is released from actual physical custody, often after posting bond, based on a judgment that he is neither dangerous nor a flight risk.[45]

But parole has also been used in hundreds of thousands of cases each year to allow arriving aliens at the port of entry to establish physical presence in the United States, without detention and without the initiation of immigration-court proceedings, even though these persons appear to be inadmissible. Humanitarian parole, granted so that an inadmissible person may receive urgent medical care, for instance, or may be united with a dying relative, furnishes one important example.[46] A far more common situation involves advance parole–approved by U.S. Citizenship and Immigration Services

---

44. Immigration and Nationality Act, Pub. L. No. 82-414, § 212(d)(5), 66 Stat. 163, 188 (1952) (codified as amended at 8 U.S.C. § 1182(d)(5) (2006)).

45. *See* 8 C.F.R. §§ 235.3(c), 236.1(c)(8), (11), 1003.19(h) (2012) (governing release from custody pending an immigration-court hearing); Leng May Ma v. Barber, 357 U.S. 185, 188-90 (1958) (describing the history of parole and its use to avoid "needless confinement").

46. In recent years, U.S. Citizenship and Immigration Services (USCIS) has granted roughly three hundred to four hundred humanitarian paroles annually. *See* U.S. Gov't Accountability Office, GAO 08-208, Immigration Benefits: Internal Controls for Adjudicating Humanitarian Parole Cases Are Generally Effective, but Some Can Be Strengthened 11 (2008), http://www.gao.gov/new.items/d08282.pdf. Immigration inspectors at the port of entry may also grant humanitarian and special public-interest parole without advance USCIS processing. U.S. Customs & Border Prot., Inspector's Field Manual, § 16.1(c), http://www.visaserveblog.com/tp-090109080449/post-120221102209 /U.S.CustomsandBorderProtection%28CBP%29Inspector%27sFieldManual.pdf (last visited Dec. 6, 2012) (redacted version).

Another significant example can be found in the regulations governing "parole for deferred inspection," a practice under which an alien is allowed to travel freely to his U.S. destination, where he will be further inspected by Department of Homeland Security officers. This practice is used primarily in circumstances where the officer at the port of entry "has reason to believe that the alien can overcome a finding of inadmissibility" by, inter alia, posting a bond or presenting additional evidence. 8 C.F.R. § 235.2(b) (2012).

179

(USCIS) upon the application of an alien currently in the United States (and ordinarily awaiting the processing of a benefit) but otherwise unable to reenter in the same status or on the initial nonimmigrant visa if he or she undertakes temporary travel. In fiscal year 2011, USCIS granted more than 245,000 freestanding applications for advance parole and more than 500,000 more applications as part of the adjustment of status process.[47] People who receive these types of parole, with few exceptions, are permitted to proceed at liberty onto U.S. territory, after minimal additional processing at the port of entry. Agency practice before 1996 in the ports of entry thus included a history of thousands of paroles allowed without detention, charge, or appearance in immigration court, and that pattern continued smoothly after the 1996 amendments.[48] I am aware of no evidence that Congress either intended a change or has objected to the continuing use of parole in this manner.[49]

47. DATA ANALYSIS & REPORTING BRANCH, U.S. CITIZENSHIP & IMMIGRATION SERVS., SERVICE-WIDE RECEIPTS AND APPROVALS FOR ALL FORM TYPES, FISCAL YEAR 2011, http://www.uscis.gov/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/allformtypes_performancedata_fy11.pdf. Advance parole is primarily granted to persons in the United States awaiting adjustment of status who need to travel before they receive their green card through the adjustment process. By 2007, applications for advance parole had become so common on the part of adjustment applicants that USCIS decided to require all adjustment applicants to complete the advance parole application and pay one consolidated fee that covers both adjustment processing and advance parole processing (plus interim employment authorization). *See* Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule, 27 Fed. Reg. 29,851, 29,861-62 (May 3, 2007) (codified at 8 C.F.R. pt. 103) (final rule); *see also* Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule, 72 Fed. Reg. 4888, 4894 (Jan. 26, 2007) (proposed rule). Of course, only a fraction of adjustment applicants actually travel during the relevant period and return to the port of entry using advance parole.

48. Advance approval of parole does not guarantee actual parole at the port of entry. *See* U.S. CUSTOMS & BORDER PROT., *supra* note 46, § 16.1(b). If the inspecting officer detects a problem with the case, he may instead place the person into removal proceedings or permit withdrawal of the application for admission, accompanied by prompt return to the country the person left.

49. Some court decisions, most of them relying on *Succar v. Ashcroft*, 394 F.3d 8 (1st Cir. 2005), have read section 235(b)(2)(A) of the INA as giving the immigration officer "no choice but to place the alien in removal proceedings." *Id.* at 27; *see, e.g.*, Bona v. Gonzales, 425 F.3d 663, 669-70 (9th Cir. 2005); Zheng v. Gonzales, 422 F.3d 98, 117 (3d Cir. 2005). But in these cases, which involved aliens at the ports of entry, not EWIs, the courts were focusing not on inspection and charging procedures, but on the validity of a separate regulation that precluded certain arriving aliens in removal proceedings from applying for adjustment of status. This rigid reading of section 235(b)(2)(A) of the INA by the courts was one small part of a complicated statutory interpretation that led the courts to conclude that the regulation was invalid. These pronouncements on section 235(b)(2)(A) are probably dicta because the holdings rest on the regulation's inconsistency with the underlying statute

AR2022_500500

If Kobach's statutory argument in *Crane v. Napolitano* prevails, it must follow that these convenient and salutary uses of parole at the ports of entry are illegal. The deleterious effects (and utter impracticality) of such a change can be illustrated by focusing on one particular use of parole explicitly recognized in the *Inspector's Field Manual*: for an "[e]mergency worker responding to a natural disaster."[50] In earlier years, parole came to be used for such persons because, in disaster situations, time is too short for full visa processing in nonimmigrant categories that include work authorization. Under Kobach's theory, a European search-and-rescue team or a squad of Canadian electric-power technicians would be allowed to proceed to their duty stations in the aftermath of an earthquake or hurricane only after the insult of detention and the filing of formal immigration charges. That is surely not what Congress intended.

### 5. Prosecutorial Discretion and the Word "Shall"

Finally, the entire statutory argument in *Crane v. Napolitano* depends on reading the word "shall" as a categorical mandate wherever it appears, negating any exercise of judgment—at least at any level above the frontline officer. But

---

governing adjustment of status, section 245 of the INA. 8 U.S.C. § 1255 (2006). (*Cruz-Miguel v. Holder*, 650 F.3d 189, 197 (2d Cir. 2011), did involve EWI petitioners, and it also contains dictum addressing application of section 235(b)(2)(A) of the INA to EWIs, but the court ultimately affirmed a BIA ruling that the petitioners were ineligible for adjustment of status.) In any event, these courts' statements on the mandatory nature of section 235(b)(2)(A) were not based on a fully informed exploration of the actual administrative practice under that section and its predecessors. In particular, the court in *Zheng* was clearly incorrect when it stated that "[p]arole is a form of relief from immigration *detention*[;] it is not a form of relief from *removal proceedings*." 422 F.3d at 117. As described in the text above, hundreds of thousands of parolees have been allowed to come into the United States without being placed into proceedings. *See* THOMAS ALEXANDER ALEINIKOFF, DAVID A. MARTIN, HIROSHI MOTOMURA & MARYELLEN FULLERTON, IMMIGRATION AND CITIZENSHIP: PROCESS AND POLICY 521 (7th ed. 2012) (stating that parole "can thus be used for a wide variety of purposes, either before or after an administrative finding of inadmissibility").

In contrast, the Supreme Court gave a more nuanced and careful signal about the meaning of section 235(b)(2)(A) when it began its 2005 opinion in *Clark v. Martinez* with these words:

> An alien arriving in the United States must be inspected by an immigration official and, unless he is found 'clearly and beyond a doubt entitled to be admitted,' *must generally* undergo removal proceedings to determine admissibility. Meanwhile the alien *may* be detained, subject to the Secretary's discretionary authority to parole him into the country.

543 U.S. 371, 373 (2005) (emphasis added) (citations omitted).

**50.** U.S. CUSTOMS & BORDER PROT., *supra* note 46, § 16.1(c)(2)(A).

AR2022_500501

enforcement statutes, notably in the criminal field, commonly employ that word, and yet discretion survives. For example, a typical petty-larceny statute reads: "Whoever steals . . . the property of another . . . *shall* be guilty of larceny, and . . . if the value of the property stolen . . . does not exceed two hundred and fifty dollars, *shall* be punished by imprisonment in jail for not more than one year or by a fine of not more than three hundred dollars."[51] No one considers that such a law absolutely requires police to investigate or prosecutors to charge every time they have even minimal evidence of such a theft. To be sure, officers are unlikely to ignore someone shoplifting groceries right in front of them. But, even in such a case, the officer or district attorney could properly drop the case before charges are filed—based on a judgment that the criminal docket is already overloaded with more serious cases, for example, or that the defendant acted to feed a famished child. The statute's ostensibly directive language would not render such a decision ultra vires. In this vein, the BIA ruled recently that "shall," in a different paragraph of section 235, "does not carry its ordinary meaning, namely, that an act is mandatory. It is common for the term 'shall' to mean 'may' when it relates to decisions made by the Executive Branch of the Government on whether to charge an individual and on what charge or charges to bring."[52]

In that decision, the BIA relied on classic prosecutorial-discretion decisions by the Supreme Court in the criminal-justice field, including *United States v. Armstrong*.[53] In *Armstrong*, the Court rejected the defendant's selective-prosecution argument with these words: "A selective-prosecution claim asks a court to exercise judicial power over a 'special province' of the Executive[, which traces to] . . . the President's . . . constitutional responsibility to 'take Care that the Laws be faithfully executed.'"[54] *Armstrong* relied in part on *Heckler v. Chaney*, a landmark decision that generally precludes judicial review under the Administrative Procedure Act of "agency decisions to refuse enforcement."[55] *Heckler* summarized the reasons for the "general unsuitability" of judicial review in this context:

> [A]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation

---

51. MASS. GEN. LAWS ANN., ch. 266, § 30(1) (West 2008) (emphasis added).

52. Matter of E-R-M- & L-R-M-, 25 I. & N. Dec. 520, 522 (B.I.A. 2011). The provision at issue was section 235(b)(1)(A)(i) of the INA.

53. 517 U.S. 456 (1996).

54. *Id.* at 464 (citing U.S. CONST. art. II, § 3).

55. 470 U.S. 821, 831 (1985).

> has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all. An agency generally cannot act against each technical violation of the statute it is charged with enforcing. The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.[56]

It is the agency, not each individual enforcement officer, that has the responsibility to make these decisions about resource allocation and overall policy.

The normal selective-prosecution claim, of course, is filed by the accused, alleging that she was improperly singled out. But the ICE officers' suit also amounts to a selective-prosecution suit, although it comes from the opposite angle. The officers assert that their supervisors require them to be selective, when the statute's "shalls" do not permit selectivity. But as long as the same constitutionally based discretion that the executive branch possesses in the criminal realm also applies to immigration enforcement—as the BIA and the Supreme Court have indicated[57]—then discretion continues, and it belongs not personally to line officers, but to the President and his delegates who head the relevant agency.

## II. A BROADER PERSPECTIVE

Now that we have taken a deep dive into the technicalities, let us regain some altitude and think about the kind of enforcement regime we would have if Kobach's argument prevails. Supervisors could not tell front-line officers how to focus their enforcement efforts, ostensibly because Congress has said directly to the line officer: you must pick up every EWI you ever encounter and place them all in proceedings. An officer assigned to an interagency task force charged with investigating and then prosecuting or deporting major foreign

---

56.  *Id.* at 831-32.

57.  Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 489-92 (1999); *E-R-M- & L-R-M-*, 25 I. & N. Dec. at 522. *American-Arab Anti-Discrimination Committee* applied *Armstrong* in the immigration field, rejecting judicial review of a selective-enforcement challenge to deportation charges. As in the other settings, however, the Court said it was not necessarily foreclosing the possibility of review in a case presenting evidence of "outrageous" discrimination. *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 491.

AR2022_500503

drug dealers would have to break off from pursuit of the organization's leaders if he came across EWIs in the course of his investigation. An officer assigned to a fugitive-operations team—which concentrates on locating and removing persons who ignored a final order of removal issued after a full hearing—would have to divert her attention and use whatever time might be required to arrest and charge all EWIs encountered at the site where she expected to find the fugitive. It is even possible that an officer ordered to interview foreigners booked into a local jail after arrests for common crime could escape discipline for failing to show up if he could demonstrate that he spent the whole morning instead arresting and charging EWIs he happened to encounter on his way to the jail.

Equally important, Kobach's relentless mandate to arrest EWIs would apply even when detention space is full, even when local immigration-court dockets are overwhelmed. Any effort by supervisors and managers to prioritize based on judgments about the relative threat posed by various individuals, by reference to humanitarian concerns, or even just to accommodate the real world of limited enforcement resources, would be illegitimate.

This portrait of the anarchic enforcement regime that might result if the suit is successful is not fanciful. In fact, the complaint reveals that one of the plaintiffs has apparently already tried to act in this fashion. According to a section of the complaint titled "Harm" (evidently included to help establish that the officer plaintiffs have standing), plaintiff James Doebler was told that he had to stop issuing charging documents "to certain illegal aliens" who were not within the guidelines. His supervisors then moved to impose a three-day suspension when he still went ahead and arrested someone who was a low priority.[58]

In any other law enforcement environment, this discipline would be unremarkable. Picture a mayor and police chief directing officers to join a new concerted operation to arrest drug dealers. But one of the officers decides instead to spend his day arresting unlicensed sidewalk hucksters whom he sees along the streets. A police officer who insists on arresting just the people he chooses, defying the chain of command that runs up to electorally accountable officials, is rightly regarded as a rogue agent—a troubling thing in a democracy. The officer is entitled to disagree with the policy, but not to defy it. Those who do not like the policy can work to elect a different mayor. In the meantime, enforcement officers have to follow orders.

No sensible law enforcement agency operates the way Kobach advocates. If Congress meant in 1996 to remove all enforcement discretion, particularly in view of the President's constitutionally based authority over enforcement, one

---

**58.**   Amended Complaint, *supra* note 1, ¶ 50.

184

would expect a far more explicit statement than the complicated three-step triggering on which Kobach relies. Moreover, one would have to wonder why Congress would pick out EWIs, most of whom are diligent hard workers, and elevate them above criminals or national security threats for an absolute requirement to file charges. (The Administration, it should be noted, has firmly anchored DACA in ongoing policy changes meant to focus most immigration-enforcement resources on criminals, recent border crossers, and serious violators of the immigration laws.)[59] Nothing in the legislative history supports Kobach's counterintuitive reading. Indeed, twenty-eight members of Congress wrote to the Attorney General in 1999, indicating that prosecutorial discretion survived the 1996 legislation and urging that it be used more systematically to reduce hardship and promote fairness. The signers included several Republicans normally seen as hard-liners on immigration, including Representative Lamar Smith of Texas, the current Chairman of the House Judiciary Committee, and Representative F. James Sensenbrenner, Jr., of Wisconsin, the previous Republican chair of that committee.[60]

Kobach's relentless push for blanket and indiscriminate enforcement, here and in the state legislation he helped draft and defend, contributes mightily to the bitter polarization on this issue—although he shares that blame with a few advocates on the other side whose maximalist opposition to enforcement initiatives gives little practical respect to immigration restrictions enacted in law. Those of us who hope someday to see a viable regime that restores credibility to our immigration laws lament stances such as Kobach's. Enforcement without a sense of proportion—or even of sensible administration

---

59.   *See* Obama, *supra* note 2; Memorandum from John Morton, Dir., U.S. Immigration & Customs Enforcement, to All Field Office Dirs., Special Agents in Charge, and Chief Counsel, Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens (June 17, 2011), http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial -discretion-memo.pdf; Memorandum from John Morton, Dir., U.S. Immigration & Customs Enforcement, to All ICE Employees, Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens (Mar. 2, 2011), http://www.ice.gov /doclib/news/releases/2011/110302washingtondc.pdf. For a further discussion of the link between declining removals of low-priority cases and increased removals of criminals, see David A. Martin, *A Lawful Step for the Immigration System*, WASH. POST, June 24, 2012, http://www.washingtonpost.com/opinions/a-lawful-step-for-the-immigration-system/2012/06 /24/gJQAgToOoV_story.html, which notes that overall ICE removals have remained at approximately 400,000 per year under Obama even as noncriminal removals decreased.

60.   Letter from 28 Members of Cong. to Att'y Gen. Janet Reno & Doris Meissner, Comm'r, Immigration & Naturalization Serv. (Nov. 4, 1999), *reprinted in* 76 INTERPRETER RELEASES 1720 app. 1 (1999).

AR2022_500505

in the real world of limited resources—will fail at restoring the rule of law in this fractious and troubled realm.

In *Arizona v. United States*, the Supreme Court emphasized the federal government's "broad discretion" in immigration enforcement, a discretion that is grounded in the President's constitutional powers and also "embraces immediate human concerns."[61] The *Crane* challenge to DACA is technically deficient for the many reasons canvassed here. But it deserves rejection primarily because of its blindness to this larger principle, so recently reaffirmed.

*David A. Martin is the Warner-Booker Distinguished Professor of International Law and Joel B. Piassick Research Professor of Law at the University of Virginia School of Law. The author served as General Counsel of the Immigration and Naturalization Service from 1995 through 1997 and returned to government service as Principal Deputy General Counsel of the Department of Homeland Security from 2009 through 2010. The views presented here are the author's and should not be taken as the views of the Department of Homeland Security or any other government agency. Thanks go to Andrew Schoenholtz, Nicholas Perry, Paul Virtue, and Michael Wishnie for helpful comments on an earlier draft, and to Jennifer Bryer for excellent research assistance.*

Preferred Citation: David A. Martin, *A Defense of Immigration-Enforcement Discretion: The Legal and Policy Flaws in Kris Kobach's Latest Crusade*, 122 YALE L.J. ONLINE 167 (2012), http://yalelawjournal.org/2012/12/20/martin.html.

---

**61.** Arizona v. United States, 132 S. Ct. 2492, 2499 (2012). These early sections of the majority opinion seem to have been designed to counter the intemperate separate opinion of Justice Scalia, *id.* at 2511, 2520-22 (Scalia, J., concurring in part and dissenting in part), who went out of his way to thunder against the June 15 DACA policy, then only two weeks old (and obviously not discussed in the record before the Court). *See* David A. Martin, *Reading* Arizona, 98 VA. L. REV. IN BRIEF 41, 45-46 (2012), http://www.virginialawreview.org/inbrief/2012/04/14/Martin_Web.pdf.

186



**NISKANEN CENTER**

February 9, 2015

# Examining the UAC-DACA Link
New Data Show Child Migrant Crisis Began Before DACA

BY DAVID BIER

**EXECUTIVE SUMMARY**

Since 2012, Deferred Action for Childhood Arrivals (DACA) has granted relief from deportation to illegal immigrants who, before June 2007, entered the United States as children. This month, the administration will begin to accept applications from anyone who arrived as a child before 2010. While this policy is understandably attacked as executive overreach, some critics further claim that it motivated a rush of migrant children to the Southwest border.

Newly available data—analyzed in this study for the first time—show that the massive increase in unaccompanied alien children (UACs) began before DACA was even announced in June 2012. Without knowledge of the program, the children who came to the border in early 2012 could not have been motivated by DACA. In fact, fewer UACs entered illegally in the 3 months after DACA than the 3 months before it.

In fact, fewer children entered the United States illegally in 2014 than in 2004, indicating that illegal child migration is not a recent phenomenon. While the percentage of illegal entries by children has increased, this is mainly because entry for adults has become much more difficult due to greater border security and the absence of legal avenues for admission. Congress should respond to the expansion of DACA by enacting its own reforms without fear that those reforms will launch a rush to the border.

**AR2022_500507**

**DACA'S IMPLEMENTATION AND REACTION**

Under DACA, the Department of Homeland Security (DHS) formally defers for 2 years the deportation of illegal aliens who were under the age of 31 on June 15, 2012, had no lawful status on that date, and who entered the United States prior to June 15, 2007 as a child under the age of 16.[1] DHS began to accept applications in August 2012 and has since approved over 700,000 applications.[2] In November 2014, the president announced DHS would expand DACA to accept applications from anyone who arrived in the United States as a child prior to January 2010.[3]

Almost immediately critics argued that DACA was encouraging illegal immigration and enticing young children to come to the border.[4] In August 2014, the House passed a bill to end DACA mainly based on the argument that it motivated young immigration.[5] In his press release on the bill, House Judiciary Chairman Bob Goodlatte said, "Since the implementation of DACA, the number of unaccompanied alien minors seeking to enter the U.S. illegally has risen dramatically."[6]

**UNACCOMPANIED ALIEN CHILDREN**

This DACA-UAC narrative initially appeared to be plausible based on the annual numbers of apprehensions of unaccompanied children. Fiscal year 2012, which began in October 2011, did see a 53 percent increase in the number of apprehensions over 2012. Recently, however, Customs and Border Protection released the monthly data on UAC apprehensions from 2012.[7] These numbers clearly confirm that the surge started well before the June announcement.



**Chart 1**: Monthly UAC Apprehensions, FY 2012

AR2022_500508

As Chart 2 shows, October through May of FY 2012 saw a more than 50 percent increase over the same period in FY 2011.[8]

### Chart 2: UAC Apprehensions in FY 2011 vs. FY 2012, pre-DACA



In the months leading up to the president's DACA announcement, Border Patrol officials and humanitarian groups expressed alarm about the number of children fleeing Central American countries, mainly from Honduras, El Salvador, and Guatemala. By early June 2012, Mexican authorities were catching twice as many Central Americans illegally traveling through Mexico as in 2011.[9] So many children were apprehended during the early part of FY 2012 that Lackland Air Force Base in San Antonio was used to house the children, and Texas Governor Rick Perry wrote a letter to the president in May to demand the federal government step up its efforts to control the flow.[10]

These events could still be blamed on DACA if prospective child migrants anticipated such an announcement. Leaked memos in 2010 showed that the administration was planning for DACA should comprehensive immigration reform fail,[11] but by 2012, the idea was not on the media's radar. The preparation for DACA's implementation was so closely guarded that many high-level DHS officials were surprised by the announcement.[12] Moreover, the president had, for years, claimed that he needed Congress to act to slow deportations.[13] Rumblings about DACA could not have motivated minors who came to the border in early 2012.

The monthly apprehension figures do not reveal a response by Central American children to DACA's announcement either. Border Patrol actually caught 25 percent fewer UACs in the 3 months after the president's decision than in the 3 months before it.[14] Virtually the same numbers were apprehended in the 6 months before the month of DACA's announcement as the 6 months after it (Chart 3).

### Chart 3: UAC Apprehensions 6 Months Before and After DACA



As seen in Chart 4, the number of apprehensions actually dropped in June 2012, and it would be another 8 months after DACA was announced before apprehensions exceeded those in May 2012.

AR2022_500509



**Chart 4**: Monthly UAC Apprehensions, FY 2011 - 2013

While it is true that UAC apprehensions increased in the year following DACA's implementation, they also increased in the prior year. DACA did little, if anything, to affect the upward trend of child migration in the year after its implementation. The annual rate of increase in UACs apprehended remained almost constant from 2012 through 2013, as seen in Chart 5.



**Chart 5**: Annual Growth in UAC Apprehensions

Another sign that DACA did not cause the increased border crossings can be seen in the number of DACA applications relative to the number of UACs, as displayed in Chart 6. The new monthly figures reveal a negative correlation between the number of DACA applications and the number of UAC apprehensions.[15]

AR2022_500510



**Chart 6**: Monthly UAC Apprehensions vs. New DACA Applications

DACA did not cause the child migrant crisis. In fact, although the U.S. Border Patrol appears to have only recorded the number of UACs since 2008, the overall number of apprehended children—unaccompanied and accompanied—is currently lower than it was a decade ago.[16] As Chart 7 shows, annual juvenile apprehensions have simply returned to pre-recession levels.[17] In other words, the child migrant crisis is not unique to this presidency.

**Chart 7**: Annual Juvenile Apprehensions

**Chart 8**: Non-Mexicans as a Share of All Apprehensions

Nearly all UAC apprehensions resulted from increased migration of children from Central America. As seen in Chart 8, this change reflects the general trend toward migration from non-Mexican countries, not American policies toward child migrants. Even though migration flows of Mexican illegal aliens reversed beginning in 2008, the number of Central Americans in the United States illegally actually rose 24 percent from 2008 to 2012.[18] At the same time, non-Mexican border crossers rose from 5 percent of the total a decade ago to a majority for the first time last year.[19]

AR2022_500511

The main reason why this wave of children has received more attention than the prior wave is that Mexican children are immediately removed and handed over to Mexican authorities. By contrast, Central American children are handed over to Health and Human Services, which must then attempt to place the child with a guardian pending an immigration court hearing, all of which can be a very lengthy and expensive process.

**EXPLANATIONS FOR THE RECENT UAC WAVE**

Four explanations for the increases in illegal entry by Central American children present themselves. First, economic conditions in the United States have improved, and child apprehensions over the last decade and a half appear to roughly track economic growth, as seen in Chart 9. Economic conditions could affect immigration decisions not only if the child is pursuing a job, but also if the family in the U.S. is more financially secure and can more easily afford to transport their children across the border and care for them once they arrive.[20]



**Chart 9**: Juvenile Apprehensions and US GDP Growth

The second explanation for the recent increase is the escalating violence in Central America. From 2007 to 2012 (the most recent year for which data is available), the homicide rate in Central America rose from about 15 homicides per 100,000 to over 26.[21] The higher homicide rates are driven primarily by three countries: El Salvador, Honduras, and Guatemala, countries with some of the highest murder rates in the world.[22]

These countries were also the source countries for 75 percent of all UACs in 2014, and 98.3 percent of the increase in UACs since 2009.[23] As one researcher noted, Honduras was more dangerous for civilians in 2012 than Iraq in 2007.[24] In interviews with the United Nations in 2014, nearly half of all children apprehended at the border said that violence was a factor in their decision to immigrate.[25]

AR2022_500512



**Chart 10**: North American Murder Rates



**Chart 11**: Children as a Share of All Apprehensions

The final two likely explanations have to do with the shift in the overall composition of illegal immigration away from adult laborers toward children and family units. Not only are more children migrating as percentage of all illegal entries, the children are also, on average, younger. The number of children under the age of 12 increased from 9 percent to 16 percent from 2013 to 2014.[26] It is likely that this activity is a response to two U.S. policies – the increased intensity of border enforcement and the differential legal treatment of children and family units.

As the intensity of border enforcement has increased,[27] the price of border crossing has also increased, as Chart 12 shows.[28] Smuggling costs from Central America are even higher than those from Mexico, averaging about $7,500 per crossing.[29] Higher prices discourage illegal entries by adult migrants at the margin. Adult laborers tend to respond to increased enforcement not by refusing to come at all, but by extending their illegal stay in the United States, as seen in Chart 13.[30]



**Chart 12**: Smuggling Costs vs. Border Agents



**Chart 13**: Probability of Return Home within 1 Year of Entry vs. Border Agents

AR2022_500513

Rather than cycling back and forth across the border almost annually as they did in the 1980s, immigrants remained illegally for increasingly longer periods, particularly since 2001. These extended stays encourage illegal immigrants to send for children left behind in their home country. These laborers likely leave their children initially to find employment and save enough to send for their children, a process termed "stage migration."[31] Chart 14 shows how the increase in illegal residents from El Salvador, Guatemala, and Honduras in 2010 was followed 2 years later by large increases in UAC apprehensions from those countries.[32]



**Chart 14**: Illegal Immigrants from El Salvador, Guatemala, and Honduras

Anecdotal reports from Central America support the view that human smugglers are actively recruiting children.[33] Smugglers appear to have responded to the lower demand from would-be adult migrants by informing juveniles and their parents that even if Border Patrol apprehended the children, they would be guaranteed access to the United States. This sales pitch has the benefit of actually being true, but not because of DACA.

The Trafficking Victims Protection Reauthorization Act of 2008 codified procedures created in the 1990s under which Mexican children were removed without a court hearing unless they told Border Patrol that they feared persecution or were trafficked. Mexican authorities take custody of almost all Mexican children, often in less than 48 hours,[34] but all Central American UACs are granted a removal hearing before an immigration judge and are released to a guardian in the U.S.—a fact now well known in Central America.[35]

Hearings are often delayed for several years due to an increasingly long backlog of removal cases.[36] In a May 2014 survey conducted by Border Patrol agents, 95 percent of child migrants expected that they would receive a "permiso" or a free pass to enter, which they identified as the Notice to Appear in court for a removal hearing before an immigration judge.[37] In other words, smugglers began to use the dysfunctional hearing process as a tool to encourage children to journey from Central America to the United States.

AR2022_500514

**CONCLUSION**

As President Obama proceeds with his plan to expand administrative relief to more individuals under DACA, Congress should focus on the legality of that decision, not on its potential consequences for border security. The overwhelming weight of evidence reveals that DACA was not a factor in the recent influx of children.[38]

The Obama administration blamed the crisis on the Trafficking Victims Protection Reauthorization Act and human smugglers who use the law to their advantage.[39] While those factors did contribute to the problem, the administration's narrative overlooks the reality that human smugglers only changed strategy after entry for adults became much more difficult. Adults remained in the United States rather than moving back and forth from their home countries. Smugglers discovered that the only group for whom entry could be assured was children.

The president is correct that the removal process needs greater efficiency, but that alone will not address the underlying causes of illegal child migration. In order to prevent future crises, Congress should create worker visas that allow adult migrant workers to circulate legally between their home countries and the United States for employment. This would greatly reduce the incentive to pay thousands of dollars to smuggle their children across the border. Remittances and work experience in the United States would also increase the standard of living of workers in Central America, which would encourage many migrant workers to return home voluntarily after working in the United States.

AR2022_500515

**APPENDIX : TABLES**

**Table 1**: Annual UAC Apprehensions

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|------|------|------|------|------|------|------|
| 8,041 | 19,668 | 18,634 | 15,949 | 24,403 | 38,759 | 68,541 |

**Table 2**: Monthly UAC Apprehensions

|  | FY 2011 | FY 2012 | FY 2013 | FY 2014 |
|--|---------|---------|---------|---------|
| **October** | 1,097 | 1,465 | 2,333 | 4,181 |
| **November** | 1,092 | 1,446 | 2,392 | 4,344 |
| **December** | 1,011 | 1,259 | 2,218 | 4,327 |
| **January** | 1,073 | 1,635 | 2,260 | 3,706 |
| **February** | 1,310 | 2,077 | 2,986 | 4,845 |
| **March** | 1,956 | 2,755 | 4,120 | 7,176 |
| **April** | 1,718 | 2,703 | 4,206 | 7,701 |
| **May** | 1,435 | 2,541 | 3,985 | 10,578 |
| **June** | 1,313 | 2,071 | 3,384 | 10,620 |
| **July** | 1,253 | 2,118 | 3,607 | 5,499 |
| **August** | 1,360 | 2,289 | 3,718 | 3,138 |
| **September** | 1,331 | 2,044 | 3,550 | 2,426 |

**AR2022_500516**

**Table 3**: Monthly Initial DACA Applications

|  | FY 2012 | FY 2013 | FY 2014 |
|---|---|---|---|
| October | - | 112,660 | 12,250 |
| November | - | 71,114 | 12,250 |
| December | - | 44,815 | 12,250 |
| January | - | 31,034 | 11,730 |
| February | - | 30,255 | 11,730 |
| March | - | 29,688 | 11,730 |
| April | - | 25,972 | 14,218 |
| May | - | 22,215 | 14,218 |
| June | - | 17,485 | 14,218 |
| July | - | 15,986 | 8,998 |
| August | 48,051 | 13,960 | 8,998 |
| September | 104,371 | 14,403 | 8,998 |

**Table 4**: Annual Total Juvenile Apprehensions

| 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|
| 97,954 | 86,433 | 86,606 | 109,285 | 114,222 | 101,778 | 77,778 |
|  |  |  |  |  |  |  |

| 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| 59,578 | 40,461 | 31,291 | 23,089 | 31,029 | 47,397 | 107,613 |

AR2022_500517

## CITATIONS

1 United States Citizenship and Immigration Services, "Consideration of Deferred Action for Childhood Arrivals (DACA)," last updated January 29, 2014, accessed: January 21, 2015.
http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca

2 United State States Citizenship and Immigration Services, "Data Set: Deferred Action for Childhood Arrivals," November 21, 2014. http://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-deferred-action-childhood-arrivals

3 Department of Homeland Security, "Fixing Our Broken Immigration System Through Executive Action - Key Facts," last updated: January 5, 2015, accessed: January 29, 2015. http://www.dhs.gov/immigration-action

4 FAIR Legislative Update, "Number of Illegal Alien Minors Crossing Border Alone Continues to Grow," Federation for American Immigration Reform, July 9, 2012. http://www.fairus.org/legislative-updates/fair-legislative-update-july-9-2012

5 Congress.gov, "H.R. 5272," accessed January 29, 2015. https://www.congress.gov/bill/113th-congress/house-bill/5272

6 Office of Congressman Bob Goodlatte, "Goodlatte Applauds Passage of Bill to Stop President Obama's Unilateral Immigration Actions," Press Release, August 1, 2014. http://goodlatte.house.gov/press_releases/578

7 Customs and Border Protection, "U.S. Border Patrol Total Monthly UAC Apprehensions by Month, by Sector (FY 2010 - FY 2014)," accessed January 30, 2015.
http://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20UACs%20by%20Sector%2C%20FY10.-FY14.pdf

8 Ibid.

9 Women's Refugee Commission, "Forced from Home: The Lost Boys and Girls of Central America," June 2012, p. 13. http://womensrefugeecommission.org/forced-from-home-press-kit

10 Sean Collins Walsh, "Perry Blasts Obama Over Rise in Illegal Immigrant Children Entering U.S. on their own," Dallas News, May 7, 2012. http://www.dallasnews.com/news/politics/headlines/20120507-perry-blasts-obama-over-rise-in-illegal-immigrant-children-entering-u.s.-on-their-own.ece

11 Jason Ryan; Matthew Jaffe; and Devin Dwyer, "Obama 'Scheming' on Immigrant Amnesty? Memo Draws Republican Fire," ABC News, July 30, 2010. http://abcnews.go.com/Politics/immigration-memo-republicans-accuse-obama-administration-scheming-amnesty/story?id=11288210

12 Phone interview by author with a high-ranking Department of Homeland Security official.

13 Jan Ting, "Obama's Own Words Refute His Stand on Immigration Authority," New York Times, November 18, 2014.  http://www.nytimes.com/roomfordebate/2014/11/18/constitutional-limits-of-presidential-action-on-immigration-12/obamas-own-words-refute-his-stand-on-immigration-authority

14 Customs and Border Protection, "U.S. Border Patrol Total Monthly UAC Apprehensions by Month, by Sector (FY 2010 - FY 2014)," accessed January 30, 2015.
http://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20UACs%20by%20Sector%2C%20FY10.-FY14.pdf

15 USCIS, "Data Set: Deferred Action for Childhood Arrivals," November 21, 2014. http://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-deferred-action-childhood-arrivals

Customs and Border Protection, "U.S. Border Patrol Total Monthly UAC Apprehensions by Month, by Sector (FY 2010 - FY 2014)," accessed January 30, 2015.
http://www.cbp.gov/sites/default/files/documents/BP%20Total%20Monthly%20UACs%20by%20Sector%2C%20FY10.-FY14.pdf

16 2014: United States Border Patrol, "Sector Profile – Fiscal Year 2014," accessed January 29, 2015.

http://www.cbp.gov/sites/default/files/documents/USBP%20Stats%20FY2014%20sector%20profile.pdf

AR2022_500518

2001-2013: Matt Graham, "Child Migration by the Numbers," Bipartisan Policy Center, June 30, 2014, p. 10. http://bipartisanpolicy.org/library/child-migration-numbers/

[17] 2008: Customs and Border Protection, "Unaccompanied Children (Age 0-17) Apprehensions Fiscal Year 2008 through Fiscal Year 2012," http://www.rcusa.org/uploads/pdfs/appr_uac.pdf

2009-2014: Department of Homeland Security, "Southwest Border Unaccompanied Alien Children," accessed: January 30, 2014. http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children

[18] Bryan Baker; Nancy Rytina, "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012," Department of Homeland Security, accessed: January 29, 2014. http://www.dhs.gov/sites/default/files/publications/ois_ill_pe_2012_2.pdf

[19] U.S. Border Patrol, "Total Illegal Alien Apprehensions By Fiscal Year," 2014. http://www.cbp.gov/sites/default/files/documents/BP%20Total%20Apps%2C%20Mexico%2C%20OTM%20FY2000-FY2014_0.pdf

[20] 2014: Bureau of Economic Analysis, "National Income and Product Accounts Gross Domestic Product: Fourth Quarter and Annual 2014," U.S. Department of Commerce, January 30, 2014.

http://www.bea.gov/newsreleases/national/gdp/gdpnewsrelease.htm

2001-2013: Bureau of Economic Analysis, "Percent Change from Preceding Period in Real Gross Domestic Product: Table 1.1.1," 2013. http://www.bea.gov/iTable/iTable.cfm?ReqID=9&step=1#reqid=9&step=1&isuri=1

[21] Graph of data from: United Nations Office on Drugs and Crime, "Global Study on Homicide 2013: Figure 1.16," UNODC, 2013, p. 34. http://www.unodc.org/documents/gsh/pdfs/2014_GLOBAL_HOMICIDE_BOOK_web.pdf

[22] ibid.

[23] Department of Homeland Security, "Southwest Border Unaccompanied Alien Children," accessed: January 30, 2014. http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children

[24] CAP Immigration Team, "Violence is Causing Children to Flee Central America," Center for American Progress, August 12, 2014. https://www.americanprogress.org/issues/immigration/news/2014/08/12/95556/violence-is-causing-children-to-flee-central-america-2/

[25] United Nations High Counsel on Refugees, "Children on the Run," July 9, 2014, p. 23. http://www.unhcrwashington.org/sites/default/files/1_UAC_Children%20on%20the%20Run_Full%20Report.pdf

[26] Jens Manuel Krogstad, Ana Gonzalez-Barrera, and Mark Hugo Lopez, "Children 12 and under are fastest growing group of unaccompanied minors at U.S. border," Pew Research Center, July 22, 2014. http://www.pewresearch.org/fact-tank/2014/07/22/children-12-and-under-are-fastest-growing-group-of-unaccompanied-minors-at-u-s-border/

[27] U.S. Border Patrol, "Border Patrol Agent Staffing by Fiscal Year," September 20, 2014. http://www.cbp.gov/sites/default/files/documents/BP%20Staffing%20FY1992-FY2014_0.pdf

[28] Bryan Roberts, Gordon Hanson, Derekh Cornwell, and Scott Borger, "An Analysis of Migrant Smuggling Costs along the Southwest Border," Department of Homeland Security, November 2010. https://www.dhs.gov/xlibrary/assets/statistics/publications/ois-smuggling-wp.pdf

Graph of smuggling costs from: Catherine Rampell, "Economix Blog: Why Are Mexican Smugglers' Fees Still Rising?" *New York Times*, May 18, 2009.

http://economix.blogs.nytimes.com/2009/05/18/the-rise-in-mexican-smugglers-fees/

[29] Julia Preston, "Snakes and Thorny Brush, and Children at the Border Alone," June 25, 2014. http://www.nytimes.com/2014/06/26/us/snakes-and-thorny-brush-and-children-at-the-border-alone.html?_r=1

$7,000 from Guatemala in 2011: Associated Press, "The Mexican Police Find 513 US-Bound Migrants in Two Trucks," Fox News May 18, 2011.  http://www.foxnews.com/world/2011/05/18/mexican-police-find-513-bound-migrants-trucks/

[30] Graph of return rates from: Douglas Massey, "Chain Reaction: The Causes and Consequences of America's War on Immigrants," Julian Simon Lecture Series, No. VIII, 2011.
http://www.iza.org/conference_files/amm2011/massey_d1244.pdf

[31] Alex Nowrasteh, "Family Reunification and Other Explanations for the Border Surge of Unaccompanied Children," Cato at Liberty, June 25, 2014.

http://www.cato.org/blog/family-reunification-other-explanations-border-surge-unaccompanied-children

[32] Department of Homeland Security, "Southwest Border Unaccompanied Alien Children," accessed: January 30, 2014. http://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children

[33] Anastasia Moloney, "Is a human smuggling "marketing strategy" behind exodus of child migrants to the US?" Thomas Reuters Foundation, July 19, 2014. http://www.trust.org/item/20140718155508-gucfy/

[34] United Nations High Counsel on Refugees, "Children on the Run," July 9, 2014, p. 23.
http://www.unhcrwashington.org/sites/default/files/1_UAC_Children%20on%20the%20Run_Full%20Report.pdf

[35] Local newspapers have reported on the treatment of UACs extensively in Central America. See, for example: Sergio Morales, "Familias reciben a hijos migrantes," Prensa Libre, July 16, 2014.
http://www.prensalibre.com/noticias/migrantes/Familias-reciben-hijos-migrantes_0_1175882414.html

[36] Devlin Barrett, "U.S. Delays Thousands of Immigration Hearings by Nearly 5 Years," Wall Street Journal, January 28, 2015.   http://www.wsj.com/articles/justice-department-delays-some-immigration-hearings-by-5-years-1422461407

[37] Document from: Dara Lind, "Almost half of Americans want to deport migrant kids," Vox, July 16, 2014
http://www.vox.com/2014/7/16/5909723/americans-always-want-action-on-immigration-right-now-that-means

Scanned copy of survey document: https://drive.google.com/file/d/0B0kkOiAWUCUGclJUdTFlMmZEUzA/edit

[38] The child migrant crisis is also not a symptom of lax enforcement generally under the Obama administration. In FY 2009, which covered the last four months of the Bush administration and the first 8 months of the Obama administration, the number of UACs actually doubled despite the largest number of interior removals in history. FY 2009 also occurred before President Obama's earliest attempts at prioritization of removal.  Most importantly, this theory does not explain the unusual rise in children specifically. Interior deportations: Alex Nowrasteh, "Is Obama Still the Deporter-In-Chief?" Cato at Liberty, May 5, 2014. http://www.cato.org/blog/obama-still-deporter-chief

[39] Carl Hulse, "Immigrant Surge Rooted in Law to Curb Child Trafficking," New York Times, July 7, 2014.
http://www.nytimes.com/2014/07/08/us/immigrant-surge-rooted-in-law-to-curb-child-trafficking.html

AR2022_500520

The Wayback Machine - https://web.archive.org/web/20201225224949/https://www.cato.org/blog/daca-definitely-did-not-cause-child-mig...

 RSS



# CATO AT LIBERTY

January 9, 2017 12:28PM

## DACA Definitely Did Not Cause the Child Migrant Crisis

By David J. Bier

Senators Dick Durbin and Lindsey Graham have introduced **a bill** to extend the Deferred Action for Childhood Arrivals (DACA) program, which since 2012 has provided work permits and lawful presence to 800,000 young immigrants brought illegally to the United States as children. One difficulty for the bill is that the GOP House passed a bill to end DACA in 2014, arguing that DACA caused a surge of young children to come to the border starting in 2012 and reaching its peak in 2014.

At the time, my colleague Alex Nowrasteh **published** an article arguing against this thesis. First, he noted that DACA specifically prohibited recent arrivals from applying for the benefits. DACA applicants **had** to be under the age of 31, have arrived in the United States before they were the age of 16, and have continuously resided in the United States since June 15, 2007. Second, Nowrasteh explained that the surge began well before DACA was unexpectedly announced on June 15, 2012. He wrote:

> From October 2011 through March 2012, there was a **93 percent** increase in UAC arrivals over the same period in Fiscal Year 2011.  Texas Governor Rick Perry **warned** President Obama about the rapid increase in UAC at the border in early May 2012 – more than a full month before DACA was announced.  In **early June** 2012, Mexico was detaining twice as many Central American children as in 2011.  The surge in unaccompanied children (UAC) began before DACA was announced.

As the bill was being debated on the House floor, Rep. Zoe Lofgren, the ranking member of the House Subcommittee on Immigration and Border Security, proceeded to **introduce** Nowrasteh's article into the record as evidence against the underlying reason for the bill. Unfortunately, Border Patrol had not yet released their monthly UAC arrival figures for 2012, so Nowrasteh's report had to rely on comments from border agents and local officials about the increases in arrivals rather than the raw Border Patrol data. The anti-DACA bill passed on a party-line vote.

**UAC crisis began before DACA was announced**

Now, however, the Border Patrol has made available the monthly numbers for 2012. These figures vindicate the Cato argument from 2014, showing unequivocally that all of the increase in children coming to the border in 2012 began before the DACA announcement in mid-June. Figure 1 shows the trend in UAC arrivals for 2011 and 2012. From December 2011 to April 2012, the number of UACs more than doubled from 1,259 to 2,703. Thereafter, the numbers fell and did not recover their peak again until 2013.

*Figure 1: Unaccompanied Alien Children (UACs) Arriving in 2011 and 2012 by Month*



AR2022_500521

*Source: Customs and Border Protection (CBP)*

It is true that more than six months after DACA in 2013, the monthly UAC numbers finally rose above the pre-DACA level. But when seen in the broader context, the largest growth occurred much later, shooting up in early 2014. Moreover, as Figure 2 shows, UAC arrivals have fluctuated month-to-month and year-to-year totally without regard to the number of new DACA applications. To the extent that there is a relationship, it is the other way—almost all DACA approvals occurred at a time of relatively low UAC arrivals.

*Figure 2: Unaccompanied Alien Children (UACs) Arrivals and Deferred Action for Childhood Arrivals (DACA) Approvals*



*Sources:* **USCIS, CBP**

Annual UAC figures confirm this impression. The percentage growth in UAC arrivals was the largest in 2009, and while it rose in 2012, the rate of growth remained similar in 2013 and 2014. In 2015, UAC arrivals plunged before rising again in 2016. The first two months of 2017 have seen a remarkable growth over the numbers in those same months in 2016.

*Table: UAC Arrivals and UAC Growth Rates*

|  | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| UACs | 8,041 | 19,668 | 18,634 | 16,056 | 24,481 |
| UAC growth |  | 145% | -5% | -14% | 52% |

|  | 2013 | 2014 | 2015 | 2016 | 2017* |
|---|---|---|---|---|---|
| UACs | 38,833 | 68,631 | 39,970 | 59,692 | 14,128* |
| UAC growth | 59% | 77% | -42% | 49% | 134%** |

*\*Based on the first two months of the fiscal year, \*\*Compared to the first two months of FY 2016*
*Source: CBP, CBP*

**DACA expansion announcement led to no increase in UACs**

It would be nice to be able to conduct an experiment to see if announcements of deferring the deportations of minors result in more children coming to the border. While it is impossible to conduct an experiment of this kind perfectly, President Obama provided the next best option in 2014. In November 2014, he **announced** that he would expand DACA to include anyone of any age—not just those under 31—who arrived before 2010 and would grant three-year work authorizations to recipients.

Figure 3 provides the monthly UAC arrivals for fiscal years 2014 and 2015 and notes when the expanded DACA announcement occurred. It is true that the numbers rose slightly over the course of the year, but the peak month saw half as many arrivals as the peak in 2014. Just as DACA did not cause a crisis, the expanded DACA program announcement did not cause one, and it

AR2022_500522

provides more evidence against the theory that allowing DACA recipients to stay is a significant influence on the children coming to the border.

*Figure 3: UAC Arrivals in Fiscal Years 2014 and 2015*



*Source: See table above*

Expanded DACA's implementation was prevented due to **a preliminary injunction** issued by a federal judge on February 16, 2015. But three months had already passed since the announcement with no increase in UAC arrivals. Moreover, advocates were hopeful that the injunction would be quickly overturned, and the program implemented that year. In any case, the basis for the purported link between UAC and DACA is that the UACs mistakenly believe that they will be eligible for these programs, not that they actually will be, so it is not clear why the judge's order would have had any more of an impact on these confused children than President Obama's specific criteria making them ineligible.

**Child migrants are not a recent phenomenon**

Perhaps the most important argument against the idea that the child migrant crisis was caused by the actions of the Obama administration is that a similar crisis occurred during the Bush administration as well. Unfortunately, CBP has not made available its UAC numbers prior to 2008, but before the recession, its statistics show that huge numbers of children were coming to the border. The New York *Times* ran **an article** about the issue as far back as 2003, noting that Border Patrol was struggling to handle the flow of children. It appears that juvenile arrivals are simply returning to their pre-recession trend.

*Figure 4: UAC Arrivals and all Juvenile Arrivals from Fiscal Year 2001 to 2016*



*Source: **CBP, DHS***

Another reason to believe that the UAC crisis is not related to confusion around DACA is that the recent surge in children is concentrated among non-Mexican arrivals. All of the increase in UAC arrivals is from Central American children. But this surge in UACs has been paralleled by an even larger, in absolute terms, increase among non-UACs—the vast majority of whom are adults who would be ineligible for DACA. Since 2009, the number of overall Mexican apprehensions has steadily dropped year after year, falling over 50 percent over that time, and UAC apprehensions have dropped by a third. These facts point to causes of the surge that are specifically impacting Central America, not Mexico, and all Central Americans, not just children.

AR2022_500523

*Figure 5: Apprehensions of Non-Mexicans by Border Patrol*



*Source: See Figure 4*

Moreover, the surge was not simply driven by non-Mexican countries generally—which could lead to the conclusion that perhaps something unique is happening in Mexico—but rather was driven entirely from three countries—Guatemala, Honduras, and El Salvador, known collectively as the Northern Triangle. As Figure 6 shows, the rise in child migration is a phenomenon that solely impacted these three countries. This makes it extremely unlikely that the cause of the crisis is a general confusion about DACA among children outside of the country.

*Figure 6: UAC Arrivals by Country of Origin*



*Source: See Figure 4, Figure 1*

DACA was not a contributor to the child migrant crisis, so it should not be used as a justification to end the program. If DACA was an example of executive overreach, Congress should replace it with a permanent program that recognizes that America is home for the vast majority of these young immigrants.

Topics:  International Economics, Development & Immigration

**RELATED CONTENT**

No Evidence Migrant Families Are Aiding Drug Smuggling

Obama Tripled Migrant Processing at Legal Ports—Trump Halved It

Democratic Debate Ignores Illegal Immigration's Cause: No Visas

Senate GOP Bill Doesn't Extend DACA. It Guts It

AR2022_500524

This work is licensed under a Creative Commons Attribution-NonCommercial-ShareAlike 4.0 International License.

AR2022_500525

OCTOBER 23, 2017 3:20PM

# Huge Fiscal Benefits of Including Legal Immigrant Dreamers in the DREAM Act

By **David J. Bier**

While Congress is rightly concerned about providing a pathway to citizenship for immigrant Dreamers without legal status, thousands of legal immigrants who are in the same position are being left behind. This decision to exclude legal immigrant Dreamers is not just inequitable. It is costly.

H-1B high-skilled foreign workers can bring their spouses and minor children with them to the United States on H-4 visas. The H-4 is a temporary visa that is valid for as long as the H-1B is. Once the child turns 21, however, the H-4 is canceled. Most employers also sponsor their H-1B employees for permanent residency (a "green card"), and their *minor* children can receive green cards with them. But again, if their children turn 21 while they are waiting, the law boots them from the line.

In a functioning immigration system, these situations would happen rarely, if ever. But because Congress **has failed to update** the limits on permanent residency since 1990 and because it **discriminates against immigrants** from populous countries, H-1B workers from India have to **wait at least several decades** for green cards. During this time, their children grow up as Americans, but then **"age out,"** losing both their H-4 status and their place in the green card line on their 21st birthday.

These kids are in almost the exact same position as those in the DACA program right now. Their parents brought them to the United States as young children; they grew up here; they have a temporary status now, but they will lose it if Congress fails to change the law. Yet the DREAM Act and other legislative solutions for immigrant Dreamers expressly and inexplicably exclude these *legal* immigrants. It is not hyperbole to say that **the DREAM Act requires applicants to violate the law to qualify**.

Why? Legal immigrant Dreamers would certainly qualify under the bill's other requirements. Virtually all graduate U.S. high schools and enroll in U.S. colleges, and virtually none have criminal records that would disqualify them. Children of H-1Bs are some of the highest achieving children in American society today. In fact, **75 percent of the 2016 finalists** for the Intel Science Talent Search—the leading science competition for U.S. high schoolers—had parents who were at one time on an H-1B visa.

**AR2022_500526**

7/12/22, 11:32 AM
Case 1:18-cv-00068 Document 610-4 Filed on 11/04/22 in TXSD Page 527 of 990
Huge Fiscal Benefits to Including Legal Immigrant Dreamers in the DREAM Act | Cato at Liberty Blog

This talent is a gigantic economic asset to the United States. According to the **National Academy of Science's 2016 report (NAS) on the fiscal effects of immigration**, immigrants who enter as children and who have at least one college graduate parent—as all H-1B workers do—create a massive fiscal surplus. The NAS estimates that each H-4 child would have a 75-year net fiscal present value of between $143,000 and $316,000 to all levels of the U.S. government—federal, state, and local. Averaging NAS's estimates from Table 8–14 for kids with college grad parents or parents with advanced degrees yields an estimated $252,000 net present value for each legal immigrant Dreamer.

Net present value estimates apply a discount rate to future costs and benefits on the (correct) theory that money today is more valuable than the same amount of money received three decades from now. One way to understand the net present value concept is to envision each one of these kids cutting a check to the government for $252,000 when they arrive in the country that would then be invested at 3 percent per year for the next 75 years.

The DREAM Act **is already** a big fiscal boost to the United States, but including the legal immigrant Dreamers would increase its fiscal benefits. The government doesn't produce estimates of the number of children with H-4 status or how many are waiting in the backlog for green cards who could potentially qualify. However, DHS **did estimate** that 125,000 spouses of H-1Bs on H-4 visas had resided in the United States for at least 6 years as of 2015. Conservatively estimating that each married couple brought an average of one child with them, that's a population of 125,000 kids. $252,000 multiplied by 125,000 kids is $31.4 billion in net fiscal benefits.

This number is likely low because it only counts H-4s. There are some, albeit fewer, legal immigrant Dreamers on the whole range of alphabet soup visas (E, O, J, L, P, etc.). All of these kids are children of skilled professionals in the United States, so their impacts are probably similar. The country likely will receive some of these benefits whether legal immigrants are included in the DREAM Act or not, as some kids will find a way to stay on their own, but to fully realize all of them, Congress needs to provide them with permanent residency.

The United States gains nothing from kicking legal immigrant Dreamers out or forcing them to maneuver America's **impossible immigration system** to find other temporary statuses to stay in the country that is their home. And here's the thing: the sponsors of the DREAM Act or any other proposal don't need to *add* legal immigrant Dreamers or do anything *special* for them. They just need to not exclude them or go out of their way to treat them worse than other immigrants, as they have right now. All they need to do is **strike the requirement that DREAM Act applicants break the law**. Few changes so simple could benefit the United States so much.

**AR2022_500527**



This work is licensed under a **Creative Commons Attribution-NonCommercial-ShareAlike 4.0 International License**.

**AR2022_500528**

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 529 of 990

SELF EXPLANATORY

# Biden's immigration plan must reform DACA to cover Dreamers whose parents are here legally

The programs protecting immigrants brought here as children require a breach of immigration law. If you've always been legal, you don't qualify for help.



—  The current DACA program is welcome, but protection for Dreamers must include those of us who meet every criterion except that we be here illegally.   Mandel Ngan / AFP - Getty Images file

Dec. 4, 2020, 4:32 AM EST

**By Dip Patel, founder of ImproveTheDream.org**

As an inpatient hospital pharmacist, I am part of a health care team providing lifesaving treatments to Covid-19 patients. It's hard work, but I love being a part of easing patients' suffering

AR2022_500529

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 530 of 990

and restoring their health. I am honored to be an essential health care worker in this country at this time.

---

*I'm one of an estimated 200,000-plus "documented Dreamers" – a little-known group of young immigrants who live here legally but at age 21 must "self-deport."*

And yet, unless the new Biden administration and Congress take action, my ability to do this work could be short-lived. I'm one of an estimated 200,000-plus "documented Dreamers," a little-known group of young immigrants who live here legally but at age 21 must "self-deport" – that is, leave the country on our own to prevent violating immigration law, unless we find temporary ways to stay.

Much like the Dreamers who have been at the center of the debate over Deferred Action for Childhood Arrivals, documented Dreamers like me were brought to the U.S. by our parents when we were children. We grew up in the American school system, and many of us know no other home.

We are different from undocumented Dreamers, however, in that our parents have maintained legal status in the country, typically as small-business owners or highly skilled workers. Their visas either don't provide pathways to citizenship or have long waits for green cards, without which they can't confer ongoing status to their children.

**Related**



OPINION

Why I stand with Dreamers, the brave men and women who help make America great

AR2022_500530

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 531 of 990

And so, if our parents haven't managed to secure permanent residence by the time we turn 21, we must self-deport even though they are allowed to stay. In contrast, DACA recipients qualify for work authorization and may remain in the U.S. so long as they apply for two-year extensions. In addition, if the proposed American Dream and Promise Act passed by the House last year becomes law, DACA recipients and others who grew up in the United States as children in an undocumented status will get a clear pathway to citizenship.

Nonsensically, these programs protecting immigrants brought here as children all require some breach of immigration laws, whether that's arriving undocumented or overstaying a visa. That means those of us who grew up here legally are ineligible because our parents followed the rules and maintained their legal status.



— Dip Patel at St. Louis College of Pharmacy in 2016.   Dip Patel

This is why I founded ImproveTheDream.org, an organization that advocates for an inclusive Dreamer solution. The DACA program is welcome, and it needs to be made permanent, but future proposals for Dreamers must include those of us who meet every criterion except the absurd "requirement" of being here without legal status. America courted our parents because it

AR2022_500531

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 532 of 990

wanted their skills and economic contributions. In doing so, this country helped raise us, educating us in American schools and steeping us in American culture.

Though I was born in India, my family and I are Canadian citizens who moved to the U.S. on an E-2 treaty investor visa over 15 years ago. I was still in elementary school when we settled in southern Illinois to open a convenience store in which we employed American workers and became invested in our community.

### Related



OPINION

We want to hear what you THINK. Please submit a letter to the editor.

I grew up as American as my neighbors, participating in school clubs and playing baseball, soccer and tennis. Upon turning 21, I had to give up my E-2 status, however, and switch to an international student visa. After graduating with a doctor of pharmacy degree, I started working at a suburban Chicago hospital under the Optional Practical Training program, which thankfully gives one year of work authorization to international students.

When that ended this summer, I was fortunate to find a way to stay for three years based on my Canadian citizenship, a provision that is renewable for certain occupations. But a gap in employment or an employer unwilling to support my temporary status could force me to leave the country I have called home for 15 years.

### Recommended



OPINION

The GOP's silence on Kinzinger's death threats might as well be encouragement

OPINION

Lindsey Graham's response to his Georgia subpoena is frankly disturbing

AR2022_500532

Case 1:18-cv-00068    Document 610-4    Filed on 11/04/22 in TXSD    Page 533 of 990



No matter how long I eventually live and work here, because of obstacles under current immigration law, I have no clear path to citizenship. I will always have to find temporary status and, unless I marry a U.S. citizen, will face deportation if I fail to secure it.

Moreover, documented Dreamers without the advantages of Canadian citizenship – which is most of them – often fail to find authorization to stay and must self-deport.

**Related**



OPINION

Adopted by U.S. parents and still vulnerable to deportation

This system isn't only stressful and cruel; it's also bad for the economy. The Cato Institute estimates the net economic cost of losing documented Dreamers, almost all of whom have been educated in taxpayer-funded schools, to be over $30 billion. The documented Dreamers I represent fill critical gaps in health care, technology, agriculture and service industries that are struggling to grow because they can't find workers, even during the recession.

Throughout his campaign, Joe Biden promised to reinstate DACA and create a pathway for citizenship for 2 million Dreamers. Now that he is president-elect, I urge his administration and Congress to ensure that these policies include documented Dreamers like me. All children, undocumented or documented, who grew up in the U.S. should have a clear path to citizenship.

## Subscribe to the THINK newsletter

ReTHINK the news cycle with timely op-eds, in-depth analyses and personal essays delivered weekly to your inbox.

AR2022_500533



Enter your email

SIGN UP

THIS SITE IS PROTECTED BY RECAPTCHA PRIVACY POLICY | TERMS OF SERVICE

### Dip Patel

Dip Patel is a hospital pharmacist in Illinois and the founder of ImproveTheDream.org.

ABOUT

DO NOT SELL MY PERSONAL INFORMATION

CONTACT

CA NOTICE

HELP

TERMS OF SERVICE

CAREERS

NBC NEWS SITEMAP

AD CHOICES

ADVERTISE

PRIVACY POLICY

© 2022 NBC UNIVERSAL

NEWS          MSNBC          TODAY

AR2022_500534

20131029P NYCBAR 161

City Bar Center for Continuing Legal Education
New York City Bar
October 29, 2013

Immigration Remedies Available Now: Are You Prepared?
Parole

APPENDIX 23-4 TEXT OF COMMISSIONER'S MEMORANDUM FOR ELIGIBILITY
FOR PERMANENT RESIDENCE UNCER THE CUBAN ADJUSTMENT ACT DESPITE
HAVING ARRIVED AT A PLACE OTHER THAN A DESIGNATED PORT OF ENTRY.

Copyright (c) 2013 New York City Bar Association

**TEXT OF COMMISSIONER'S MEMORANDUM ON ELIGIBILITY FOR PERMANENT RESIDENCE UNDER
THE CUBAN ADJUSTMENT ACT DESPITE HAVING ARRIVED AT A PLACE OTHER THAN A DESIGNATED
PORT OF ENTRY**

Apr 19, 1999

MEMORANDUM FOR ALL REGIONAL DIRECTORS

    ALL DISTRICT DIRECTORS

    ALL CHIEF PATROL AGENTS

    ALL OFFICERS IN CHARGE

FROM: Doris Meissner /s/ Doris Meissner

Commissioner

SUBJECT: Eligibility for permanent residence under the Cuban Adjustment Act despite having arrived at a place other than a designated port of entry

This memorandum sets forth Immigration and Naturalization Service (Service) policy concerning the effect of an alien's having arrived in the United States at a place other than a designated port of entry on the alien's eligibility for adjustment of status under the Cuban Adjustment Act of 1966 (CAA), 8 U.S.C. § 1255, note. This issue arises because many CAA applicants, in fact, arrive in the United States in an irregular manner. Section 1 of the CAA, however, requires that they must be "admissible." CAA §1, 8 U.S.C. § 1255, note. If the inadmissibility ground that is based on an alien's having arrived at a place other than a port of entry, Immigration and Nationality Act (INA) § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), applies to CAA applicants, then many aliens who were formerly eligible for adjustment of status will no longer be eligible.

The policy of the Service is that the inadmissibility ground that is based on an alien's having arrived at a place other than a port of entry *does not* apply to CAA applicants. All Service officers adjudicating CAA applications will do so in accordance with this policy. So long as the applicant meets all other CAA eligibility requirements, it is contrary to this policy to find the alien ineligible for CAA adjustment on the basis of the alien's having arrived in the United States at a place other than a designated port of entry.

The Service will incorporate this policy into Service regulations as promptly as possible. The policy is, however, effective immediately. Service officers are not to await the publication of the intended rule before deciding CAA applications in accordance with this policy.

This policy is based on the rationale of the decision in *Matter of Mesa,* 12 I & N Dec. 432 (INS 1967). In *Matter of Mesa,* the Service held that the admissibility requirement of § 1 of the CAA must be construed generously, in order to give full effect to the purpose of the CAA. The decision noted that Congress was fully aware that many, and perhaps most, Cuban nationals were dependent on some forms of public assistance. Yet the purpose of the CAA would have been defeated, if the public charge ground of inadmissibility applied to these applicants. The Service concluded, therefore, that the public charge ground does not apply to CAA applicants. *Id.*

I have concluded that the same reasoning applies to inadmissibility for having arrived at a place other than a designated port of entry. Aliens arriving in this manner have been eligible for CAA adjustment for many years. Congress recently reaffirmed the availability of this adjustment provision, by enacting that the CAA is to continue in force until there is a democratic government in Cuba. Illegal Immigration Reform and Immigrant Responsibility Act of 1966 (IIRIRA), Pub. L. No. 104-208, Division C, § 60 6(a), 110 Stat. 3009-546, 3009-695. Section 212(a)(6)(A)(i) of the INA was designed to complement the new legal doctrine, enacted as part of IIRIRA, under which aliens who come into the United States without inspection are inadmissible, rather than deportable, aliens. *Compare* INA §§ 212(a)(6)(A)(i) and 235(a)(1), 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1225(a)(1) *with* 8 U.S.C. § 1241(a)(1)(B) (1994). Nothing in the legislative history of these changes suggests that Congress also intended to make aliens who arrive in the United States away from ports of entry ineligible for CAA adjustment.

This policy does not relieve the applicant of the obligation to meet all other eligibility requirements. In particular, CAA adjustment is available only to applicants who have been "inspected and admitted or paroled into the United States." CAA §1, 8 U.S.C. § 1255, note. The authority to parole an applicant for admission, of course, is set forth in § 212(d)(5) of the INA, 8 U.S.C. § 1182(d)(5), with § 236 of the INA, 8 U.S.C. § 1226, providing additional authority concerning the conditions the Service may place on the alien's parole. An alien who is present without inspection, therefore, would not be eligible for CAA adjustment unless the alien first surrendered himself or herself into Service custody and the Service released the alien from custody pending a final determination of his or her admissibility.

Service officers will not deny parole to an alien whose parole would be consistent with Service parole regulations and policy, solely in order to preclude CAA eligibility. Nor does this policy require the parole of any alien whose parole would not be consistent with Service parole regulations and policy, merely because paroling the alien would open the path to CAA adjustment. In the absence of a disqualifying criminal record or other factors that would bar CAA adjustment, however, the on-going difficulty in actually removing aliens to Cuba and the availability of CAA adjustment should ordinarily weigh heavily in favor of a grant of parole. The Service may properly consider the avoidance of detention costs with respect to an alien whose actual removal is unlikely as a factor in determining, as a matter of discretion, that parole would yield a "significant public benefit." INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A). In similar fashion, the Service may properly consider the availability of CAA adjustment as a factor in determining, as a matter of discretion, that an "urgent humanitarian reason" justifies a grant of parole. *Id*. If the Service paroles the alien, he or she will be eligible to apply for employment authorization. 8 C.F.R. § 274a.12(c) (12).

The Service is also aware that, because of the CAA eligibility requirements, the parole will be for at least one year, so that the alien will be a "qualified alien" for purposes of eligibility for Federal means-tested public benefits. 8 U.S.C. § 1641 (b)(4). The alien will also be a "Cuban-Haitian entrant" for purposes of the Refugee Education Assistance Act of 1980, as amended. 8 C.F.R. § 212.5(g). Service officers will not consider these two factors as "adverse factors" in determining whether to grant or deny parole.

Finally, the Office of the General Counsel has advised the Service concerning the relationship between parole under § 212(d) (5) and "release" under § 236. Memorandum from Paul W. Virtue to Executive Associate Commissioners for Policy and Planning and for Field Operations, and to Regional, District and Sector Counsels (August 21, 1998). In a case involving an applicant for admission, the General Counsel concluded that:

... release under § 236 of the Act and 8 C.F.R. § 236.1 (d)(1) should not be seen as a separate form of relief from custody. Any release of an applicant for admission from custody, without resolution of his or her admissibility, is a parole. (Citations omitted.) In the case of an applicant for admission who is not an "arriving alien," therefore, § 212(d)(5)(A) and § 236 should be seen as complementary, rather than as alternative release mechanisms.

*Id*. at 3. For this reason, if the Service releases from custody an alien who is an applicant for admission because the alien is present in the United States without having been admitted, the alien has been paroled. This conclusion applies even if the Service officer who authorized the release thought there was a legal distinction between paroling an applicant for admission and releasing an applicant for admission under § 236. When the Service releases from custody an alien who is an applicant for admission because he or she is present without inspection, the Form I-94 should bear that standard annotation that shows that the alien has been paroled under § 212(d)(5)(A). [FN1]

[FN1]. It may be the case that the Service has released an alien who is an applicant for admission because he or she is present without inspection, without providing the alien with a parole Form I-94. In this case, the Service will issue a parole Form I-94 upon the alien's asking for one, and satisfying the Service that the alien is the alien who was released. The Service will then update the Service records concerning the alien to reflect the fact that the alien has been paroled.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

*American Economic Journal: Economic Policy 2020, 12(1): 293–324*
*https://doi.org/10.1257/pol.20180352*

# Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA[†]

By Elira Kuka, Na'ama Shenhav, and Kevin Shih*

*This paper studies human capital responses to the availability of the Deferred Action for Childhood Arrivals (DACA) program, which provides temporary work authorization and deferral from deportation for undocumented, high-school-educated youth. We use a sample of young adults that migrated to the United States as children to implement a difference-in-difference design that compares noncitizen immigrants ("eligible") to citizen immigrants ("ineligible") over time. We find that DACA significantly increased high school attendance and high school graduation rates, reducing the citizen-noncitizen gap in graduation by 40 percent. We also find positive, though imprecise, impacts on college attendance. (JEL H52, I21, I26, J13, J15, J24)*

The canonical model of human capital predicts that individuals respond to returns to education, as with any investment (Becker 1964). However, even as the earnings gap between college- and non-college-educated workers widens, the high school and college completion rates of many communities remain low (Bailey and Dynarski 2011, Murnane 2013). Undocumented youth, who account for 1.5 percent of the population of US minors, stand out in particular in this regard, with between 15 and 40 percent of young adults not having completed high school.[1] Survey responses of this population suggest that the absence of legal status may inhibit investments in education (Wong et al. 2016), but also at play may be liquidity constraints, a high opportunity cost of schooling, or misperceptions of the returns to education. In this paper, we examine how the availability and design of legalization policies impact youth investments in human capital.

* Kuka: Department of Economics, George Washington University, 2115 G Street NW, Monroe Hall, Office 301, Washington, DC 20052 (email: ekuka@gwu.edu); Shenhav: Department of Economics, Dartmouth College, 6106 Rockefeller Center, Hanover, NH 03755 (email: naama.shenhav@dartmouth.edu); Shih: Department of Economics, Queens College, City University of New York, Powdermaker Hall 300, 65-30 Kissena Boulevard, Flushing, NY 11367 (email: kshih@qc.cuny.edu). Matthew Notowidigdo was coeditor for this article. We would like to thank Anna Aizer, Catalina Amuedo-Dorantes, Elizabeth Cascio, Aimee Chin, Chloe East, Hilary Hoynes, Chris Karbownik, Melissa Kearney, Ethan Lewis, Dan Millimet, Francesc Ortega, Marianne Page, Bruce Sacerdote, Diane Schanzenbach, and Doug Staiger, as well as seminar participants at Northwestern MPES, the University of Connecticut, OK State University, the US Census Bureau, and conference participants at the Barcelona GSE Summer Forum Migration meeting, Northeast Economics of Education Conference, UC Davis Alumni Conference, WEAI Conference, SEA Conference, SOLE Annual Meeting, and AEA Annual Meeting for helpful suggestions and feedback. We are also grateful to Marcella Alsan for her feedback and for generously sharing data on Secure Communities activation dates with us.
† Go to https://doi.org/10.1257/pol.20180352 to visit the article page for additional materials and author disclosure statement(s) or to comment in the online discussion forum.

[1] Estimates of completed education vary due to different methods of identifying undocumented youth. A range of estimates is provided in Erisman and Looney (2007) and Passel (2003).

AR2022_500538

We take advantage of an ongoing policy "experiment" in the United States, the institution of the Deferred Action for Childhood Arrivals program (DACA), which granted temporary legal status for undocumented youth. Enacted in August 2012, DACA extended temporary relief from deportation and work authorization—two years, initially, subject to renewal—to undocumented youth who were in school or had completed high school, and met other criteria based on age and year of arrival. DACA thus generates a discrete increase in the benefits associated with completing high school, and could also affect incentives for higher education. We discuss the range of direct and indirect benefits of participation in detail in Section I. Despite this, previous studies of DACA's impact on schooling have ignored its effect on high school attainment.

The responses of undocumented youth to immigration policy is of interest for several reasons. First, given the large migrant and refugee populations in the United States and Europe, and the intense policy debates on immigration reform, fully understanding the effects of DACA can assist in evaluating the benefits and costs of future immigration policies. Second, the fact that undocumented children have persistently low rates of high school graduation is worthy of attention in itself, as high school dropouts fare worse along multiple measures of health, family life, and economic success. Since this likely reflects, in part, uncertainty over employment and lower wage returns to education, policies that target these returns could improve a constellation of behaviors (Borjas 2017). Finally, similar to other under-resourced populations, they face several disincentives to acquire human capital, such as lack of information about college applications, uncertainty over the costs and returns to schooling, and reduced access to credit markets (Amuedo-Dorantes and Bansak 2006, Osili and Paulson 2007). Understanding the role of expected benefits of schooling for this population may inform the education choices of other low-income youth.

We navigate several empirical challenges to identify the causal response to DACA. First, there are no available data over this period that contain information on legal status and education for a large sample of youth. As a result, we follow the literature and in our preferred specification rely on the absence of US citizenship combined with Hispanic ethnicity as a second-best measure of undocumented status (Amuedo-Dorantes and Antman 2016, Kaushal 2006, Pope 2016). Second, while ineligible undocumented youth might ex ante be a sensible comparison group, we show that the early age of arrival (before 16) and year of arrival (before 2007) requirements for DACA make eligible youth significantly more predisposed to stay in school relative to ineligibale undocumented youth. Instead, we use foreign-born citizens with identical age and year of arrival profiles as our comparison group. Third, we limit our attention to individuals who arrived by age ten to address mechanical changes in sample composition that are tied to the year of arrival criteria for eligibility.

Hence, our difference-in-difference framework primarily compares Hispanic immigrant noncitizen child arrivals (treated) to immigrant citizen child arrivals (comparison) over time using the 2005 to 2015 American Community Surveys (ACS). This empirical design is similar in spirit to other recent policy evaluations that identify treatment effects by utilizing counterfactuals that vary along demographic traits, such as income, nationality, age, and/or year of arrival

**AR2022_500539**

(Jackson, Johnson, and Persico 2016; Kleven et al. 2014; Marie and Zölitz 2017). The data provide strong support for the identifying assumptions. We show that the average school attendance and high school completion of the treated and comparison groups tracked each other closely for seven years prior to DACA, and that there is an apparent closing of the gap in these outcomes after 2012. We then demonstrate that a large set of observable characteristics do not predict a differential improvement in schooling of the eligible population after DACA. As a result, our findings are largely insensitive to using alternative comparison groups or specifications, including propensity score methods.

We find that DACA had a significant impact on adolescents' educational investments. Our preferred estimates for Hispanics show that DACA led to a 2.2 percentage point (pp) increase in the school attendance of 14- to 18-year-olds, a 2.5 percent increase, which narrowed the gap in attendance between citizens and noncitizens in this age range in our sample by 55 percent. This rise in school attendance arguably includes many students who were on the margin of high school completion. We find that DACA increased high school completion of 19- to 22-year-olds by 5.9 pp, a 7.5 percent increase. Our results imply that more than 49,000 additional Hispanic youth obtained a high school diploma because of DACA, and that the gap in high school graduation between citizen and noncitizen youth in our sample closed by 40 percent. Effects are smaller, though still positive, for individuals further from the typical high school enrollment age.

We find less precise evidence of impacts on post-secondary schooling, which was not required for DACA. Estimates from our main specification show that attainment of some college for 19- to 22-year-old Hispanics increased by 1.3 pp, but this effect is imprecisely estimated and varies across alternative specifications. We interpret these results as suggestive, but not definitive, evidence of increases in college going.

As a secondary identification strategy, we use administrative data from California and leverage variation in the geographic concentration of eligible youth across counties. We analyze the impact of DACA on Hispanic high school enrollment and performance on the California High School Exit Exam (CAHSEE), a mandatory test required for graduation. We find a 4 pp increase in high school enrollment and a 2 pp increase in the number of CAHSEE test takers, which corroborates well the ACS results on attendance. We also find increases in the pass rate among twelfth-grade Hispanic students approaching their final opportunity to graduate, which indicates that DACA also induced greater schooling effort.

How large is the effect of DACA? Unpacking our results, we find that DACA had twice the impact on high school graduation of men (7.7 pp) as for women (3.5 pp). To interpret these magnitudes, we scale these impacts by the expected lifetime benefits of DACA, which we calculate with a simple model of lifetime expected earnings. This combines estimates of the reduction in the sex-specific average risk of deportation, skill-specific earnings in the United States and abroad, and the difference between legal and nonlegal earnings in the United States. We obtain elasticities of high school graduation to expected lifetime earnings around 0.05 for both men and women, which implies that the differential DACA response by gender was proportional to the expected benefits of the program. Further, we calculate that the semi-elasticity of high school graduation is 0.25. This is roughly 60 percent of the

semi-elasticity in Abramitzky and Lavy (2014), who study an increase in the return to schooling in Israeli kibbutzim. This suggests that DACA-eligible youth may be less sensitive to future returns, although these results could also be rationalized by misperceptions of the returns from DACA.

Our findings speak to central questions in education and immigration policy. First, we provide compelling evidence that a large share of the gap in the high school graduation of noncitizen youth and their citizen peers is attributable to the uncertain and limited returns to schooling. Previous papers show that *reductions* in the labor market incentives to stay in school, commonly induced through improvements in the low-skilled labor market, increase the likelihood of dropping out of high school and reduce college enrollment (Atkin 2016; Black, McKinnish, and Sanders 2005; Cascio and Narayan 2017; Charles, Hurst, and Notowidigdo 2018; Shah and Steinberg 2017). However, responses to *increases* in future wage returns would not necessarily mirror these effects, since obtaining a degree, unlike dropping out, requires individuals to put forth effort, patience, and be sufficiently forward looking (Oreopoulos and Salvanes 2011). Prior work finds evidence for this behavior by exploiting novel, though often context- or skill-specific, interventions such as foreign firm entry, communal income sharing, or experimental information treatments (Abramitzky and Lavy 2014, Jensen 2010, Oster and Steinberg 2013, Wiswall and Zafar 2014).[2] We move these findings to a more general national policy setting and produce direct policy implications for raising the human capital of a large population of youth.

We also provide novel evidence of the response to a *conditional* and potentially *temporary* amnesty, whereas the majority of the literature focuses on *unconditional* amnesties. Among this literature, Cortes (2013) is the only study, that we are aware of, that examines the effects of an unconditional amnesty (Immigration Reform and Control Act of 1986 (IRCA)) on education,[3] and finds that college attendance substantially increases with amnesty. However, since that study does not account for changes in the sample age or age of immigration, the conclusions of that study are difficult to interpret.

We also contribute to a growing literature on the impacts of DACA, which finds that DACA improves health among children and adults (Giuntalla and Lonsky 2018, Hainmueller et al. 2017), reduces teenage pregnancy (Kuka, Shenhav, and Shih 2019), and improves adult labor market outcomes (Amuedo-Dorantes and Antman 2017, Pope 2016). Closer to this paper, Pope (2016), Amuedo-Dorantes and Antman (2017), and Hsin and Ortega (2017) analyze impacts on school attendance, focusing on older populations that have already completed high school and therefore are already eligible for the program. We build on this prior work in several respects.

---

[2]Changing the cost of college, and hence the returns, through financial aid has also been found to increase post-secondary attainment; but there has been little evidence that aid enters into longer term planning, such as by affecting the high school graduation decision (Deming and Dynarski 2009).

[3]The IRCA provided legal status to undocumented immigrants that entered the United States before 1982 and met other criteria. In a similar vein, Liscow and Woolston (2017) and Felfe, Rainer, and Saurer (2016) analyze the impact of citizenship on childhood and teenage schooling. However, the effect of citizenship may be quite different than a temporary or permanent amnesty, and the mixed-citizen families in Liscow and Woolston (2017) are not necessarily representative of all undocumented youth.

**AR2022_500541**

First, we study impacts on high school graduation, asking whether youth at an earlier stage of schooling are more responsive to DACA, perhaps because they want to *become* eligible. We provide a careful and transparent analysis of school attendance and high school completion that yields new insights about the comparability of schooling outcomes between citizens and noncitizens in this population. Second, in our analysis of higher education, we do not control for high school graduation, contrary to all prior studies of DACA on schooling. Consistent with selection bias, we show in sensitivity analyses that controlling for this covariate meaningfully reduces the estimate on school attendance for this sample.[4] Third, we provide a two-pronged approach to analyzing schooling impacts, utilizing both individual-level survey data and county-level administrative records from California. The similarity of our estimates across these disparate sources helps reinforce our conclusions. These new findings inform the current debate on immigration policy, which has until now ignored the role for a path to legalization in producing an educated immigrant workforce.

The paper continues as follows. We provide further detail regarding the institutional details of DACA in Section I. In Section II we examine the incentives of DACA and generate empirical predictions for schooling decisions. We discuss our data and empirical strategies in Sections III and IV. Section V presents results on schooling attendance, high school graduation, and college. Section VI provides evidence on exit exam performance. We discuss mechanisms and calculate implied schooling elasticities in Section VII, and conclude in Section VIII.

## I. Institutional Background and Take-Up of DACA

Prior to DACA, there were multiple attempts to create a unifying federal policy for undocumented youth (Olivas 2004). The Development, Relief and Education for Alien Minors (DREAM) Act, put forth in 2001, was the most prominent of these efforts, proposing a pathway to legalization for undocumented childhood immigrants conditional on meeting minimum education requirements. Momentum for the DREAM Act dissipated in 2010, however, after opposing political parties failed to come to a resolution. This legislative inaction led to the enactment of DACA by executive memorandum in June 2012, with the first applications being accepted in August 2012.

DACA provides two types of benefits to recipients. First, deportation is deferred, allowing beneficiaries to reside legally in the United States. Since there are no available estimates of the deportation risk for undocumented youth, we try to approximate the size of this benefit using tabulations of removals for the population between ages 18 and 39 by sex in 2012 from the Department of Homeland Security (Simanski and Sapp 2013). On average, the annual deportation risk is 5 percent, however, there is significant variation in the risk across sex, as men account for almost 90 percent of all deportations. This implies that the deportation risk is closer to 1.5 percent for women and 7.3 percent for men, taking differences in the size of the respective

---

[4]For a more detailed discussion of this analysis as well as of these earlier works, see online Appendix F.

populations into account.[5] It is worth noting that for both men and women, the perceived risk of deportation may be much higher than the actual risk, as recent surveys found that 59 percent of foreign-born Hispanics are somewhat or significantly concerned about the risk of deportation (Lopez et al. 2013).

Second, recipients may obtain an Employment Authorization Document (EAD), which grants recipients work authorization. An EAD also allows individuals to apply for a social security number, which opens the possibility of obtaining a state identification card or driver's license (in many states) and can reduce frictions in applying for a credit card, bank account, or loan.

Application requests are initially granted for two years, but recipients may request an extension through a renewal process. During our sample period, roughly 93 percent of recipients applied for renewal after the initial two-year period (Hipsman, Gómez-Aguiñaga, and Capps 2016). The prevalence of renewals could reflect an expectation among recipients that the program would persist beyond two years (Nevarez 2015). Efforts to expand the reach of DACA, though never passed, could have further added to expectations of the program's longevity.[6]

DACA applicants must meet a suite of immigration, education, and criminal requirements and pay a \$465 fee for approval. The first set of requirements are based on age and date of arrival in the United States. We use these criteria to determine treatment status in our empirical analysis: (i) under 31 by June 15, 2012, (ii) entered the United States before age 16, (iii) continuous residence in the United States since June 15, 2007, and present at the time of application. Applicants must also be at least 15 years old, though we do not use this restriction in our analysis since young teenagers may age into eligibility. Second, applicants are not eligible if they have been convicted of a serious crime. Third, applicants must currently be in school, have graduated high school, or obtained a general education development (GED) certificate.[7] We do not use this last criterion to determine treatment, as schooling is the potential outcome of the program that we focus on.

US Citizenship and Immigration Services (USCIS) began accepting applications for DACA on August 15, 2012, which was met by an immediate surge in applications. Figure 1, panel A displays total initial applications and initial approvals by quarter from implementation through 2016. USCIS received nearly 150,000 applications in the fourth quarter of 2012 and 525,000 applications within one year—roughly 30 percent of the estimated eligible population of 1.7 million (Passel and Lopez 2012). The rate of applications slowed beginning in 2013; USCIS received a total of 901,000 applications by the end of 2016. On September 5, 2017, President

---

[5] Tabulations on deportations from 2011 would be ideal, but only more aggregate statistics were available for that year. The overall annual deportation risk is calculated as 341,448 removals divided by the Pew Center estimated population of 6.6 million (56 percent of 11.9 million undocumented immigrants) (Passel 2005, Passel and Cohn 2009). Deportation rates by gender are calculated as the rate of 18 to 39 removals (81.4 percent) times the share of male (female) deportations, 89.3 percent (10.7 percent), times of 304,851 alien removals—a total of 304,851 (36,527) deportations—divided by an estimated population of 4.1 million (2.5 million), 35 percent (21 percent) of 11.9 million unauthorized immigrants.

[6] President Obama announced an expanded DACA program in 2014 that would have extended eligibility to youth that arrived in the United States by January 1, 2010; however, that version was never enacted.

[7] Applicants may substitute veteran status for this requirement, though in practice this seems to be rare, as a survey of DACA recipients revealed 100 percent had at least a high school diploma (2.9 percent did not respond to the question) (Wong et al. 2016).





FIGURE 1. DACA APPLICATIONS—YEARS 2011–2016

*Notes:* Panel A shows first-time DACA application counts and the number approved in each quarter through 2016. Panel B shows first-time DACA application counts across states as of the fourth quarter of 2016. Data come from publicly available records from United States Citizenship and Immigration Services. See https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals.

Trump ordered an end to DACA, leading to an immediate halt in the acceptance of new applications and renewals. However, ongoing court challenges have resulted in a continuation of renewals.

The geographic distribution of DACA applications reflects the concentration of undocumented populations in a handful of states. Figure 1, panel B displays cumulative initial DACA applications through 2016 by state. California and Texas account

**AR2022_500544**

for over 237,000 and 138,000 DACA applications, respectively. Illinois, New York, and Florida each account for roughly 40,000. These five states alone constitute 52 percent of the total number of applications. Moreover, the majority of applicants are from Latin America, with 600,000 applications from Mexico alone, with El Salvador, Guatemala, and Honduras as the next highest applicant countries. Outside of Latin America, the largest sources of applicants are from Asia (South Korea and the Philippines) and the Caribbean (Jamaica and the Dominican Republic), although each of these countries contributed less than 5,000 total applications.[8]

## II. DACA Incentives for Education

To motivate our empirical analysis, we use a simple human capital investment framework to examine how DACA might impact school attendance, high school completion, and college attendance of undocumented youth. For brevity, we present the basic intuition here and include further details in online Appendix Section C.

We consider the schooling decision of an undocumented young adult in his final year of high school prior to DACA. If he leaves school, he will work full time and obtain an annual wage corresponding to his current legal status and schooling level. Given that he is undocumented, he will earn a lower wage relative to a worker with legal status that has the same skill level because of an unauthorized "wage penalty."[9] If he remains in school, he foregoes current earnings but will earn a higher wage with every year of additional schooling completed. Since undocumented youth are in the United States illegally, he may be deported to his country of origin at any time. If he is deported, he may either work in his country of origin or attempt a return to the United States.[10] We assume that the probability of successful return is low for simplicity.[11]

Given these options, he chooses the level of education—dropout, high school graduate, or some college—that maximizes his lifetime expected earnings. For each level of education, lifetime earnings are given by the discounted sum of the US wages earned over the expected years in the United States after completing his schooling and the discounted earnings in his country of origin earned over the remainder of his working years. His optimal education choice will therefore depend on the wage for each schooling level in the United States and in his country of origin, and how many years he expects to remain in the United States. It is worth highlighting that the expected duration in the United States depends on his estimation of unobserved risks of deportation and successful reentry, which may be imperfect. For example, survey evidence in Section I showed that youth may overestimate deportation risk. This would lead to biased perceptions of the expected years in each country and

---

[8] Qualitative evidence suggests that DACA application rates among Asians were low due to significant stigma associated with undocumented status, distrust toward authorities and the uncertain nature of the program, and lack of information about DACA through ethnic media (Singer, Svajlenka, and Wilson 2015).

[9] Works on this topic, including Borjas (2017), Kossoudji and Cobb-Clark (2002), and Rivera-Batiz (1999), find that legalization raises wages between 6 to 14 percent.

[10] Similar models that examine human capital decisions under uncertainty include Altonji (1993); Altonji, Blom, and Meghir (2012); and Jayachandran and Lleras-Muney (2009).

[11] Bazzi et al. (2019) provides a nice summary on the risk of apprehension, with estimates of the probability of apprehension conditional on attempted return ranging from 40 to 60 percent. We assume that the unconditional probability is likely to be much smaller, since not all migrants will attempt return.

**AR2022_500545**

cause education choices at baseline to differ from decisions taken under correct information.

By granting work authorization and reducing the risk of deportation, DACA raises the expected wage earned in the United States, from the nonlegal to the legal wage, and increases the expected number of years in the United States. Since eligibility depends on having a high school diploma, this generates a discrete jump in the earnings function when one attains a high school degree. The size of this jump increases proportionally to the reduction in the deportation risk net of the probability of successful return—which extends the number of years one expects to spend in the United States—and to the wage gain from remaining in the United States without legal status, instead of returning to one's country of origin.[12] It also increases with the unauthorized wage penalty among high-school-educated workers, since this determines the size of the increase in wages when one obtains legal work authorization through DACA. Assuming that the opportunity cost of high school (i.e., the dropout wage) and the probability of return is unchanged, this generates a clear prediction that high school completion will increase after DACA.

In addition, DACA increases expected college earnings, but since the opportunity cost of college also rises, as discussed above, the effect on the *return* to college and college attendance is ambiguous. All else equal, the lifetime return to a college education will increase after DACA if the unauthorized wage penalty for college-educated workers is larger than for high-school-educated workers, which has been documented in cross-sectional data (Borjas 2017, Rivera-Batiz 1999). It could also increase if the return to college in the United States is higher than in the country of origin, since DACA ensures that more years will be spent in the United States reaping those returns. Empirically, returns to college are roughly 50 percent higher *on average* in typical countries of origin for DACA youth (e.g., Mexico);[13] however, the returns to experience for college-educated workers are twice as high in the United States (Lagakos et al. 2018). Thus, over the life cycle, college-educated workers may still reap higher returns in the United States. If these conditions are satisfied, DACA should encourage college attendance.

While we have thus far focused on the benefits of DACA that arise through expected wages, we acknowledge there are likely significant nonpecuniary benefits of DACA. For example, undocumented youth may have an incentive to finish high school just to avoid deportation if they have a preference for remaining in the United States (Vargas 2012).

### III. Data

We use data from the Integrated Public Use Microdata Series (IPUMS) ACS (Ruggles et al. 2018) for the period 2005 through 2015 to examine the education decisions of eligible and non-eligible individuals. We use year of immigration and

---

[12] Since youth also now have short-term certainty over deportation risk, this also reduces the possibility of "mistakes" based on short-term misestimation of the deportation risk, which could increase individual and social welfare (see, e.g., Finkelstein and Notowidigdo (2018) and Bernheim and Taubinsky (2018)).

[13] We calculate the ratio of the return to college in countries of origin and the return to college in the United States by taking the ratio of column 5 and column 6 from table 5 of Clemens, Montenegro, and Pritchett (2016).

citizenship status, together with current age, to determine eligibility for DACA.[14] Since age of arrival and year of birth are not reported in the survey, we assign age of arrival as the difference between year of arrival and the survey year minus current age.

Our main analysis focuses on a sample of immigrant youth ages 14 to 22 that arrived to the United States by age 10 and by 2007. We focus on individuals born outside of the 50 US states to avoid the strong cultural, institutional, and structural divisions between natives and immigrants (Borjas 1985, 2017, LaLonde and Topel 1992). We justify the age of immigration criteria in Section IV. We conduct our analyses on various subgroups of youth, reflecting the distinct ages at which different decisions are taken. We use a sample of teens between the ages of 14 to 18 to examine high school attendance, and a sample of young adults between the ages of 19 and 22 to examine post-secondary school attendance and high school completion.

Importantly, the ACS collects information on all households living in the United States, irrespective of their citizenship or legal status. Pope (2016) details that the sampling procedure for the ACS draws from the universe of addresses, and is therefore likely to be representative of the unauthorized immigrant population. Moreover, the Census Bureau also takes several steps to encourage responses to the ACS (Liscow and Woolston 2017). The Census Bureau is not permitted to share personal information with other government agencies and communicates this confidentiality policy in the survey. Particularly relevant for our context, the Census also performs outreach to Hispanic organizations, and makes the survey available in Spanish.

As a secondary source of schooling outcomes, we turn to administrative data from California. California has the largest undocumented population among all states and accounts for nearly 30 percent of DACA recipients. We obtain county-level administrative data on Hispanic high school enrollment from the California Department of Education (CA DOE) and county-level Hispanic performance on the California High School Exit Examination (CAHSEE), including average test scores, the number of test takers, and the number of students passing the exam by test subject. CAHSEE data is available starting in academic year 2005–2006, hereafter 2005, when the CAHSEE was launched, through 2014, after which the CAHSEE was suspended. Enrollment data are available for the entire period, from 2005 to 2015.

We provide further detail on the sample construction and variable definitions in both these data sources in the online data Appendix.

## IV. Empirical Strategy Using Individual Eligibility

Our empirical strategy identifies DACA-ineligible immigrant youth whose education decisions follow similar patterns to eligible youth prior to DACA, and uses

---

[14] Year of immigration comes from the response to the question, "When did this person come to live in the United States?" Redstone and Massey (2004) shows that the ambiguity in the wording of this question leads to various interpretations in reporting that may cause us to misassign treatment in some cases. We assume that this misinterpretation is not discontinuous after 2012.

**AR2022_500547**

a difference-in-difference strategy to measure the impacts of the policy. We use the estimating equation,

$$(1) \qquad Y_{igast} \;=\; \alpha_0 + \alpha_1 Eligible_g + \alpha_2 \big( Eligible_g \times Post_t \big)$$

$$+ \beta X_{ig} + \gamma_{st} + \gamma_{rt} + \gamma_{at} + \epsilon_{igast},$$

where $Y_{igast}$ is the outcome for an individual $i$, who has eligibility status $g$ (eligible or not eligible), and is currently age $a$ and living in state $s$ in year $t$. The term $Eligible_g$ is a function of whether an individual is (i) not a citizen and (ii) meets DACA's age and year of arrival requirements. We impose the latter criteria by restricting our sample to immigrant youth who arrived by 2007 and by age 10. This also corrects for a mechanical shift in sample composition whereby moving forward in survey time reduces the maximum age of arrival of eligible youth, which could have an independent effect on our estimates (Bleakley and Chin 2010).[15] As a result, $Eligible_g$ is simply an indicator for being a noncitizen. The variable $Post_t$ is an indicator that equals 1 beginning in the year 2012.

We account for fixed individual characteristics by including a vector of controls, $X_{ig}$, that include dummies for sex, year of immigration, birth region,[16] as well as age of immigration-by-eligibility and age-by-eligibility fixed effects. We include state-by-year ($\gamma_{st}$) and race-by-year fixed effects ($\gamma_{rt}$) to absorb state- and race-specific shocks, and age-by-year dummies ($\gamma_{at}$) to account for cohort effects. We use sampling weights in all regressions.

The interaction between *Eligible* and *Post*, captured by $\alpha_2$, provides the average effect of DACA after 2012. If individuals are unable to adjust education decisions immediately, this estimate will provide an attenuated estimate of the policy effect. Therefore, our preferred specification replaces $Post_t$ with indicators for each year to estimate dynamic treatment effects. This event study approach also allows us to visualize any difference between the eligible and ineligible groups before and after the policy went into effect as a test of the identification assumption.

We obtain standard errors for our estimates using two methods. First, we cluster our standard errors at the state level, as is commonly done for difference-in-differences with a federal policy (e.g., Hoynes, Miller, and Simon 2015), which we report in all tables. Second, we obtain $p$-values using permutation tests that compare our estimates of the effect of DACA to estimates of placebo policies, following Conley and Taber (2010) and Agarwal et al. (2015). Since our main analysis covers four "treated" years, we assign a placebo DACA policy to four randomly chosen years drawn without replacement, allowing the remaining seven years to serve as the pre-period. We then estimate the effect of the placebo DACA policy. We construct $p$-values by comparing our estimate to the distribution of estimates from 1,000 placebo DACA simulations.

---

[15] Without this adjustment, the sample of eligible 18-year-olds in 2011 would include those that arrived by age 14, but in 2015 would only include those that arrived by age 10.

[16] We assign countries of birth into five groups: Mexico, Central and South America, United Kingdom and Europe, Asia, and rest of the world.

**AR2022_500548**

## A. *Intent-to-Treat* (*ITT*) *Interpretation*

Our measure of eligibility is measured with noise, as noncitizens include green card holders and temporary visa holders. This causes our estimated effects of DACA eligibility to be a "scaled-down" estimate of the true ITT effect due to the possible inclusion of individuals who are not undocumented. Drawing on a number of sources summarized in online Appendix B, we calculate that 55 percent of all US noncitizens and 45 percent of noncitizens ages 18–24 are *legal* residents. As a result, our difference-in-difference estimates for the whole sample are likely to underestimate the true effect of DACA by 45 percent.

To get closer to the true ITT effect, we separately analyze groups that have a higher share of undocumented individuals among those that we assign eligibility. We first analyze treatment effects among Hispanics. Our best estimates suggest that Hispanics comprise 78 percent of undocumented immigrants and that 72 percent of all Hispanic noncitizens are undocumented. Given our estimates for all noncitizens above, this is likely to be a lower bound on the share undocumented among noncitizen Hispanic youth.

Second, we analyze individuals from countries that have a DACA take-up rate above 30 percent ("high take-up"), which have a high share of undocumented due to overlap with the Hispanic subgroup but may have greater familiarity with DACA.[17] While there is substantial overlap between our Hispanic and high take-up samples, these two groups are not identical. Among foreign-born Hispanics ages 14 to 22, 86 percent of respondents come from high take-up countries, and among individuals born in high take-up countries, 93 percent are Hispanic.

Our baseline estimates are also "local" in the sense that they omit any effect on undocumented teens who immigrated after age 10, who account for roughly 40 percent of 14- to 18-year-old noncitizens in the ACS. We find slightly larger treatment effects when we include individuals who arrived between the ages of 11 and 16 (see Section VC).

## B. *Baseline Sample Characteristics*

Online Appendix Table A.1 provides descriptive statistics of the Hispanic eligible and comparison groups at baseline, from 2005 to 2011. Roughly 24 percent of the comparison group was born in US territories, primarily Puerto Rico, 19 percent was born abroad to American parents, and 57 percent gained citizenship through naturalization. Relative to the treatment group, high-school-aged youths in the comparison group are more likely to have health insurance coverage, English fluency, and parental college, and are less likely to be in poverty—but are also more likely to have a single mother and similarly likely to have had a recent birth. As a sensitivity

[17] These countries are El Salvador, Mexico, Uruguay, Honduras, Bolivia, Brazil, Peru, Ecuador, Jamaica, Guatemala, Venezuela, Dominican Republic, and Colombia. Statistics are based on the Migration Policy Institute's (MPI) estimates of the DACA-eligible population and application rates by country, available at http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles (accessed 8/16/2017).

exercise, we use propensity score methods to generate balance in demographics across our treated and comparison groups (see Section VC.)

Note that while other ineligibale immigrants could in theory serve as a comparison group, namely noncitizens who do not meet the age and/or year of arrival criteria, online Appendix Figure A.1 shows that the common trends assumption does not hold for these groups. This reinforces our intuition that the age and year of arrival of immigrants strongly influence school attendance and that the comparison group should match these characteristics of the eligible population.

## C. *Evidence on Identifying Assumptions*

Our identification relies on the assumption that in the absence of DACA, citizen child arrivals would have exhibited similar trends to noncitizen child arrivals. We examine the plausibility of this assumption in two ways. First, we ask whether the gap in *predicted* schooling, based on observable characteristics, was constant around the timing of DACA. To obtain predicted schooling outcomes, we generate fitted values for the entire sample period from a regression of schooling outcomes on a large number of demographic characteristics from 2005 to 2011.[18] Online Appendix Figure A.2 presents event study estimates of equation (1) for predicted school attendance and high school completion. In favor of our strategy, the coefficients are generally insignificant and show no upward trend in predicted schooling. Hence, any change in education outcomes of noncitizens relative to citizens post DACA must come from a change in *behavior*, not compositional changes.

Second, we examine observed trends in schooling of our treatment and comparison groups. Panel A of Figure 2 shows that the school attendance trajectories of these two groups tracked each other closely from 2005 to 2011, with a constant gap of roughly 4 percentage points over this period. Strikingly, after 2012, the difference narrows by half, as attendance of the eligible group increases by over 2 percentage points. Panel B shows a similar, unexpected closure of the gap in high school completion in 2012. These patterns provide support for common trends as well as suggestive evidence of a DACA treatment effect on education decisions. Further, the few examples where the trends appear to deviate in the raw means seem to be explained by small changes in observable characteristics that we control for in our regressions.[19]

We also require there to be no other simultaneous policies targeting undocumented youth. DACA was the only such national policy implemented during our sample period; we examine the role of local-level policies in Section VC.

---

[18]These include (i) indicators for age, race, sex, age and year of immigration; citizenship status; birthplace; language; state; and metropolitan status and (ii) health insurance coverage, presence of mother and father in the household, parental college attendance, family size, number of siblings, household poverty status, and the presence of a food stamp recipient in the household. The results are similar, and more precise, if we only use the first set of variables, which are less likely to be outcomes of DACA.

[19]For example, the rise in noncitizen high school graduation between 2010 and 2011 is mirrored in our prediction of high school completion in online Appendix Figure A.2.

**AR2022_500550**



FIGURE 2. AVERAGE SCHOOL ATTENDANCE AND HIGH SCHOOL COMPLETION, HISPANICS

*Notes:* This figure shows the average school attendance and high school completion rates for Hispanic immigrants ages 14–18 and 19–22 for eligible youth (noncitizens) and ineligible youth (citizens). The vertical dashed line demarcates the implementation of DACA.

*Source:* 2005–2015 ACS. Sample is composed of foreign-born Hispanics who immigrated by age 10 and by 2007.

## V. ACS Results

### A. *School Attendance*

We first examine whether DACA led to increased school attendance. Figure 3 presents event studies for school attendance of adolescents ages 14 to 18. Estimates for the whole sample appear in panel A, while those for Hispanics and the high take-up sample appear in panels B and C. The figures show that there was not a preexisting trend between our eligible and comparison groups prior to 2012. After

**AR2022_500551**



FIGURE 3. EFFECT OF DACA ON SCHOOL ATTENDANCE, AGES 14–18

*Notes:* This figure shows the coefficients and 95 percent confidence intervals from event study regressions that esti-mate interactions between year and eligibility indicators, where the outcome is an indicator for being in school, and year 2011 is the omitted category. The dashed vertical line indicates the enactment of DACA. Eligible individuals are defined as noncitizen immigrants, and the comparison group is comprised of citizen immigrants. All regressions control for the following fixed effects: sex, year of immigration, birth region, age of immigration by eligibility, age by eligibility, state-by-year, race-by-year, and age-by-year (see equation (1)). Standard errors are clustered by state, and regressions are weighted by the survey sampling weights. High take-up includes individuals born in countries that have a DACA-eligible take-up rate above 30 percent—see text for details.

*Source:* 2005–2015 ACS. Sample is composed of foreign-born Hispanics between the ages of 14 and 18 who immi-grated by age 10 and by 2007.

the enactment of DACA in 2012, eligible youth experience an immediate and per-sistent increase in school attendance.

The difference-in-difference results appear in panel A of Table 1. In line with the event studies, we find that DACA led to statistically significant increases in school attendance of 14–18-year-olds, with a 1.2, 2.2, and 2.9 pp increase among all immi-grants, Hispanics, and the high take-up sample, respectively, which is equivalent to a 1.3 to 3.3 percent increase. To give a sense of the magnitude of this effect, the point estimates for Hispanics are slightly higher than the within-sibling impact of citizenship status on school attendance (Liscow and Woolston 2017). Panel B shows the effect of DACA among college-aged individuals, ages 19 to 22, with event study figures in online Appendix Figure A.3. We find positive, statistically insignificant point estimates for this age category.

**AR2022_500552**

Table 1—Effect of DACA on School Attendance

|  | All | Hispanic | High take-up |
|---|---|---|---|
| *Panel A. Age 14–18* |  |  |  |
| Eligible × Post | 0.012 | 0.022 | 0.029 |
|  | (0.005) | (0.008) | (0.008) |
| Mean $Y$ | 0.921 | 0.891 | 0.889 |
| Individuals | 114,453 | 54,015 | 48,359 |
| *Panel B. Age 19–22* |  |  |  |
| Eligible × Post | 0.019 | 0.020 | 0.005 |
|  | (0.012) | (0.014) | (0.012) |
| Mean $Y$ | 0.547 | 0.405 | 0.401 |
| Individuals | 82,077 | 38,704 | 34,768 |

*Notes:* This table shows the difference-in-difference estimates of the impact of DACA on the school attendance of eligible youth. Eligible individuals are defined as noncitizen immigrants, and the comparison group is comprised of citizen immigrants. High take-up includes individuals born in countries that have a DACA-eligible take-up rate above 30 percent—see text for details. The outcome is current school attendance, and post is an indicator for 2012 or after. All regressions control for the following fixed effects: sex, year of immigration, birth region, age of immigration-by-eligibility, age-by-eligibility, state-by-year, race-by-year, and age-by-year (see equation (1)). Standard errors, shown in parentheses, are clustered by state, and regressions are weighted by the survey sampling weights.

*Source:* 2005–2015 ACS. Sample is composed of foreign-born individuals ages 14–18 (panel A) or 19 to 22 (panel B) who immigrated by age 10 and by 2007.

## B. *High School Completion and College Attendance*

Next, we investigate whether increases in school going resulted in a higher rate of high school completion, defined as having earned either a high school diploma or GED.[20] We hypothesize that DACA will have the largest impact on youth that had not yet or just recently dropped out of school by DACA enactment (ages 19 to 22) but also examine impacts on 23 to 30-year-olds, all of whom would have likely left high school before DACA.

The results, presented in the first three columns of Table 2, show that DACA increased high school completion for all age categories. Panel A shows completion rates of 19-year-olds increased by 4.6 pp overall, with larger effects for Hispanics and the high take-up sample who experienced increases of 6.5 and 8.5 pp, respectively. This represents a sizable increase, both in absolute terms and relative to other interventions, particularly given the low 75 percent completion among Hispanics.

Panel B of Table 2 shows the impact for 19- to 22-year-olds is somewhat smaller, ranging from 3.8 to 6.4 pp, though more precisely estimated due to the larger sample size. The effect for 23 to 30-year-olds is quite a bit more muted. We find a marginally significant 1.5 pp effect among Hispanics, and a similarly sized but statistically insignificant effect for the high take-up sample. This is perhaps not surprising since this group is likely to have work or family commitments that would pose a barrier to returning to school.

---

[20] We would like to be able to separately estimate the effect on diploma and GED, but the ACS only provides information on the type of high school degree for the subsample of individuals that completed exactly high school.

TABLE 2—EFFECT OF DACA ON HIGH SCHOOL COMPLETION AND COLLEGE ENROLLMENT

| | High school completion | | | Some college | | |
|---|---|---|---|---|---|---|
| | All | Hispanic | High take-up | All | Hispanic | High take-up |
| *Panel A. Age 19* | | | | | | |
| Eligible × Post | 0.046 | 0.065 | 0.085 | 0.003 | 0.034 | 0.057 |
| | (0.016) | (0.026) | (0.027) | (0.025) | (0.029) | (0.028) |
| Mean Y | 0.824 | 0.747 | 0.741 | 0.468 | 0.350 | 0.343 |
| Individuals | 22,153 | 10,252 | 9,173 | 22,153 | 10,252 | 9,173 |
| | | | | | | |
| *Panel B. Age 19–22* | | | | | | |
| Eligible × Post | 0.038 | 0.059 | 0.064 | 0.017 | 0.013 | 0.011 |
| | (0.007) | (0.010) | (0.011) | (0.009) | (0.010) | (0.011) |
| Mean Y | 0.858 | 0.781 | 0.775 | 0.544 | 0.407 | 0.399 |
| Individuals | 82,077 | 38,704 | 34,768 | 82,077 | 38,704 | 34,768 |
| | | | | | | |
| *Panel C. Age 23–30* | | | | | | |
| Eligible × Post | 0.013 | 0.015 | 0.013 | 0.008 | −0.001 | −0.000 |
| | (0.005) | (0.008) | (0.008) | (0.009) | (0.010) | (0.010) |
| Mean Y | 0.862 | 0.767 | 0.761 | 0.613 | 0.443 | 0.435 |
| Individuals | 133,576 | 61,210 | 54,110 | 133,576 | 61,210 | 54,110 |

*Notes:* This table shows the difference-in-difference estimates of the impact of DACA on the high school completion and the attainment of some college of eligible youth. The outcomes are high school completion (GED or diploma) in columns 1–3 and completion of some college (more than 12 years of completed education) in columns 4–6, and post is an indicator for 2012 or after. See the notes of Table 1 for the definition of eligibility, high take-up, control variables, clustering, and sample weights.

*Source:* 2005–2015 American Community Survey. Sample is composed of foreign-born individuals ages 19 (panel A) or 19–22 (panel B) or 23–30 (panel C) who immigrated by age 10 and by 2007.

The event studies in Figure 4 allow us to examine the timing of the effects for the 19 to 22 sample. Mirroring the increase in school attendance, we see that the increase in high school completion began in the year following the DACA announcement, and that the gap in completion rates was steady prior to the policy.[21] There is also a slight upward trend in the point estimates over time, although the point estimates are noisy, and we cannot reject a constant effect.

To put our findings into perspective, multiplying the 830,700 eligible Hispanics age 19–22 represented in the ACS by our estimated 5.9 pp increase in high school graduation implies that DACA led to over 49,000 additional high school graduates. As a result, the 15 pp gap in high school completion between Hispanic noncitizen youth and their citizen immigrant peers in our sample, which is roughly the same when we adjust for observable characteristics, narrowed by 40 percent.

Finally, in the last three columns of Table 2 and online Appendix Figure A.4 we analyze impacts on college going, which we define as having attended any post-secondary schooling. In general, we find positive but imprecise effects on the

---

[21] To examine the plausibility of an effect on high school graduation in 2012, which had at most six months that were treated by DACA, we estimate the likelihood of obtaining a diploma between July and December. Using the National Longitudinal Study of Youth 1997 (NLSY97), we find that one quarter of students that complete high school in five years obtain a diploma between August and December (see online Appendix D). Further, this could be a lower bound on the scope for completing in the first semester, if those who do not return to complete a degree are only deficient one semester of work.

**AR2022_500554**







FIGURE 4. EFFECT OF DACA ON HIGH SCHOOL COMPLETION, AGES 19–22

*Notes:* This figure shows the coefficients and 95 percent confidence intervals from event study regressions that estimate interactions between year and eligibility indicators, where the outcome is an indicator for being in school between the ages of 19 and 22, and year 2011 is the omitted category. The dashed vertical line indicates the enactment of DACA. See the notes accompanying Figure 3 for definition of eligibility, control variables, clustering, sample weights, and high take-up.

*Source:* 2005–2015 ACS. Sample is composed of foreign-born Hispanics between the ages of 19 and 22 who immigrated by age 10 and by 2007.

order of 1 to 3 pp for young adults ages 19 to 22. Even so, we are still able to rule out declines in college attendance larger than 2.2 pp for Hispanics. This lower bound is more positive than the upper bound of effects in Amuedo-Dorantes and Antman (2017) and Hsin and Ortega (2017), and similar to the mean effect in Pope (2016).[22] An exception to this is that we find a statistically significant 5.7 pp increase in college going for 19-year-olds in the high take-up sample, a 17 percent effect. This could reflect true heterogeneity in the treatment effect on college but may also have occurred in this subsample by chance.

A limitation of these results is that they do not allow for differential linear trends in college going between citizens and noncitizens, which may be important in part due to recent changes in tuition policies for undocumented students (Mendoza and Shaikh 2019). If we account for differential trends by eligibility, we find a significant 3 to 7 pp increase in college attendance (see Section VC for details).[23]

---

[22] We provide an in-depth comparison of the estimates across these studies in online Appendix Section F.

[23] In results not reported, we test whether the impact on college is tied to the cost of tuition by allowing for differential effects in states where undocumented individuals are eligible for in-state tuition. Intuitively, we find that

Overall, we view this as suggestive, though not definitive, evidence of increases in college, particularly with respect to the prior trend in undocumented attendance. Importantly, the fact that we find a consistent pattern across specifications should positively update and perhaps widen the confidence interval of college impacts from earlier studies.

### C. *Robustness*

These results indicate that DACA had a significant impact on youth schooling decisions. We now perform sensitivity exercises to test alternative explanations for these findings and specifications for the analysis.

First, we examine whether our conclusions change when we calculate $p$-values using the permutation tests described in Section IV. Figure 5 shows the histogram of placebo estimates for Hispanic school attendance for ages 14 to 18 (panel A) and high school graduation for ages 19–22 (panel B), along with a vertical line representing our difference-in-difference estimate. The permutation tests yield $p$-values less than 0.01 for both outcomes, which suggests that our clustered standard errors for high school completion may in fact be too conservative.

Second, we test the sensitivity of our main findings to alternative sample selection criteria and refinements. The first column of Table 3 reprints our baseline results for school attendance, high school completion, and college attendance. In the following columns, we re-estimate results using alternative age-of-arrival restrictions, keeping only those that arrived by age 6 (column 2) or age 16 (column 3). We then expand the comparison group by sequentially adding in noncitizens and citizens who arrived in the United States after turning 16 (column 4), individuals who arrived after 2007 (column 5), and US-born individuals (column 6). The magnitude of our estimate is sometimes attenuated across these columns, but the precision and pattern of effects are very similar. In the last column we recode our eligibility indicator to exclude noncitizens that live in households with veterans or report positive social security or welfare receipt (Liscow and Woolston 2017). The estimated effects remain similar to our baseline effects.

Third, we account for potential differential linear pre-trends in the outcome by eligibility status in two different ways. Our less preferred approach is to control for the interaction between eligibility and year in equation (1). Instead, we favor a "two-step" approach in which we (i) regress each outcome and covariate on the interaction between eligibility and year using pre-period data, and obtain residuals; and then (ii) estimate equation (1) on the de-trended data, adjusting standard errors to account for the parameters in (i) (Goodman-Bacon 2016). We favor this approach because in the presence of dynamic treatment effects, directly controlling for linear trends can bias estimates (Borusyak and Jaravel 2017, Lee and Solon 2011, Wolfers 2006), and for transparency. Online Appendix Table A.2 shows our qualitative results are unchanged when we perform these adjustments, though we find larger and more precise effects on college going when using the "two-step" approach.

---

the impacts on college are between 3 and 6 points higher in states with in-state tuition, but these differences are not statistically significant.



Figure 5. Permutation Tests of School Attendance and High School Completion, Hispanics

*Notes:* This figure shows results from permutation tests where we compare our estimated effect of DACA for the Hispanic sample to placebo estimates from 1,000 samples where we randomly assign four years as "treated" and the remaining seven years as the pre-period. We plot the distribution of placebo estimates, with our estimated effect represented by the vertical red line. See the notes of Figure 3 for definition of eligibility, control variables, clustering, and sample weights. The implied *p*-values are less than 0.01 for both panels.

*Source:* 2005–2015 ACS. Sample is composed of foreign-born Hispanics ages 14–18 (panel A) or 19–22 (panel B) who immigrated by age 10 and by 2007.

Table 3—Effect of DACA on Main Outcomes, Hispanics: Alternative Sample Restrictions

|  | Baseline | Arrived by | | No restriction on | | Add Natives | Refine Eligibility |
|---|---|---|---|---|---|---|---|
|  |  | Age 6 | Age 16 | Age arrival | Year arrival |  |  |
| *Panel A. School attendance, ages 14–18* | | | | | | | |
| Eligible × Post | 0.022 | 0.018 | 0.018 | 0.017 | 0.025 | 0.025 | 0.025 |
|  | (0.008) | (0.009) | (0.007) | (0.007) | (0.007) | (0.006) | (0.008) |
| Mean *Y* | 0.891 | 0.899 | 0.850 | 0.840 | 0.834 | 0.912 | 0.892 |
| Individuals | 54,015 | 37,393 | 66,981 | 68,048 | 77,474 | 409,095 | 50,219 |
| *Panel B. High school completion, ages 19–22* | | | | | | | |
| Eligible × Post | 0.059 | 0.050 | 0.037 | 0.029 | 0.034 | 0.031 | 0.059 |
|  | (0.010) | (0.015) | (0.008) | (0.008) | (0.010) | (0.010) | (0.012) |
| Mean *Y* | 0.781 | 0.796 | 0.698 | 0.651 | 0.641 | 0.777 | 0.789 |
| Individuals | 38,704 | 25,393 | 61,550 | 76,235 | 87,132 | 291,278 | 35,920 |
| *Panel C. College enrollment, ages 19–22* | | | | | | | |
| Eligible × Post | 0.013 | 0.001 | −0.005 | −0.008 | −0.005 | 0.007 | 0.012 |
|  | (0.010) | (0.016) | (0.010) | (0.010) | (0.011) | (0.008) | (0.009) |
| Mean *Y* | 0.407 | 0.425 | 0.337 | 0.298 | 0.293 | 0.436 | 0.415 |
| Individuals | 38,704 | 25,393 | 61,550 | 76,235 | 87,132 | 291,278 | 35,920 |

*Notes:* This table shows difference-in-difference estimates of the impact of DACA on schooling decisions of eligible youth, with different restrictions. Column 1 contains baseline results from Tables 1 and 2. Columns 2 and 3 adjust the sample to include only individuals who arrived by age 6 (more restrictive) and by 16 (more expansive), respectively. Column 4 adds to the comparison group foreign-born individuals who arrived after age 16, column 5 adds foreign-born individuals who arrived after 2007, and column 6 adds individuals born in the United States. Column 7 refines the baseline specification, restricting eligibility to individuals that do not live in a household that receives government benefits or that has a veteran in it. The dependent variable is shown in the panel heading, and post is an indicator for 2012 or after. See the notes of Table 1 for the definition of eligibility, high take-up, control variables, clustering, and sample weights.

*Source:* 2005–2015 ACS. Sample composed of Hispanics ages 14–18 or ages 19–22.

Fourth, we consider other policies affecting undocumented immigrants during this period. While DACA was the only national-level policy, there were several local-level programs that were active, most notably Secure Communities, 287(g) agreements, and the Criminal Alien Program. These policies focused on detainment or deportation of undocumented criminals, which could have altered schooling decisions. Among these programs, Secure Communities stands out as a primary threat to identification as it experienced large expansions that coincided with DACA and influenced take-up of public assistance (e.g., Alsan and Yang 2019).[24] To address this potential confound, we control for the county-by-year rollout of Secure Communities using data from Alsan and Yang (2019), shown in online Appendix Figure A.5. Our estimates are unaffected by this control.

Fifth, since our analysis relies on survey data, one could be concerned that DACA might lead to changes in participation in the ACS, which could bias our estimated effects. Recall, however, that online Appendix Figure A.2 showed that we cannot predict our findings based on a large number of characteristics of survey participants. Hence, this explanation seems less plausible.

Finally, we also present propensity score re-weighted estimates as an additional method of controlling for omitted variable bias. This addresses potential concerns that the imbalance in background characteristics between eligible and ineligibale youth influences our results. We predict the likelihood of being eligible for each subsample and age group using a probit regression with a large number of individual and household covariates, described in the online Appendix. We then re-estimate our regressions using inverse-propensity score weighting. Online Appendix Table A.3 shows that the effects are the same as when we do not use this re-weighting.

## VI.  Schooling Evidence from California

Thus far, we have shown that DACA increased individual reports of high school attendance and completion. We use administrative data from California to extend these results in two ways. First, we examine whether DACA led to growth in high school attendance using official school reports, which addresses potential concerns about strategic reporting of school attendance. Second, we use data on the CAHSEE, a mandatory exam for graduation, to assess whether test performance changed alongside increases in attendance. The CAHSEE consists of two subject exams in mathematics and english language arts (ELA), and students must pass both in order to graduate. All students take the exam for the first time in tenth grade, and those who do not pass may take the exam again in eleventh and twelfth grades.

---

[24] Since 287(g) agreements took place before DACA (Watson 2013) that policy is less likely to contaminate our effects, and we find no evidence of significant responses in our pre-trend analysis. Furthermore, Dee and Murphy (2018) finds that 287(g) actually reduced high school enrollment, which implies that contamination from this program is likely to imply that our estimates are conservative. The Criminal Alien Program (CAP) also saw expansions many years prior to DACA. Recent changes dedicated additional funding to CAP circa 2014, after DACA was already implemented (Cantor, Noferi, and Martinez 2015). Nonetheless, we see treatment effects immediately after the implementation of DACA and before CAP funding in 2014.

### A. *Empirical Strategy Using Geographic Eligibility*

Since administrative schooling data from California are available at the county level, we adapt our empirical strategy to exploit variation in the *concentration* of eligible youth across counties.[25] In particular, we compare the outcomes of Hispanic youth in counties that have a high share of eligible Hispanics relative to counties with a low share of eligible Hispanics, before and after DACA.[26]

We use the estimating equation

$$(2) \qquad Y_{ct} = \alpha + \beta HiShareElig_c \times Post_t + \gamma_c + \gamma_t + \theta U_{ct} + \epsilon_{ct},$$

where $Y_{ct}$ is a school performance measure for county $c$ in year $t$ and $HiShareElig_c$ is an indicator for having an above-median average share of eligible individuals among the Hispanic population ages 14 to 18 during the pre-DACA period between 2005 and 2011. We will refer to these as "high-undocumented" counties, and below-median-share counties as "low-undocumented" counties. We include county fixed effects, $\gamma_c$, to control for fixed differences in school quality and county composition, year fixed effects, $\gamma_t$, to control for statewide trends and changes in other state or federal policies, and county unemployment rates, $U_{ct}$, to account for differences in local economic conditions, especially during the Great Recession, that may influence schooling decisions. As before, we replace $Post_t$ with year indicators to estimate treatment effects over time. Standard errors are clustered at the county level.

### B. *California Schooling Results*

We first analyze impacts on high school enrollment. We complement our main results by examining two different measures of attendance, high school enrollment and the number of CAHSEE test takers. To account for differences in population sizes across counties, we standardize all attendance measures by the average population of Hispanics ages 14–18 between 2005 and 2011. This serves two purposes: (i) it allows us to validate our earlier results using administrative data and slightly different identifying assumptions, and (ii) it allows us to establish a "first stage" on schooling attendance in this data before examining test scores.

Figure 6 presents the event study estimates for high school enrollment in panel A and the number of math and ELA test takers in panels B and C, respectively. Prior to 2012, the gap between high-undocumented counties and low-undocumented counties was relatively constant. All three figures show a clear rise in attendance in high-undocumented counties after DACA. The difference-in-difference estimates for these outcomes, included in online Appendix Table A.4 and in the notes below the figure, indicate that high-undocumented counties experienced a marginally

---

[25] This approach is similar to Cascio and Lewis (2018), who also utilize variation in the geographic concentration of unauthorized immigrants in the absence of individual-level information on legal status.

[26] Since we construct this treatment variable using the ACS, our analysis focuses on the 34 of California's 58 counties that are identified in the ACS that account for over 88 percent of total K–12 enrollment during the 2005–2015 period.

**AR2022_500559**



FIGURE 6. EFFECT OF DACA ON HIGH SCHOOL ATTENDANCE, CALIFORNIA

*Notes:* This figure shows event study regressions that separately estimate interactions between year and an indicator for being a county with an above-median share of DACA-eligible Hispanics, where year 2011 is the omitted category. The outcomes are the share of youth that (i) are enrolled in high school (panel A), (ii) sat for the math CAHSEE (panel B), or (iii) sat for the ELA CAHSEE (panel C). The denominator for the shares is the average number of Hispanics aged 14 to 18 in the county between 2005–2011. Regressions include county fixed effects, year fixed effects, and a control for the county unemployment rate (see equation (2)). Regressions are weighted by the average number of Hispanics aged 14 to 18 in the county in the 2005–2011 ACS, and standard errors are clustered by county. The difference-in-difference estimate is 0.042 ($p = 0.108$) for enrollment, 0.024 ($p < 0.01$) for math test takers, and 0.013 ($p < 0.10$) for ELA test takers.

*Source:* Enrollment data for academic years 2005/06 to 2015/16 and CAHSEE data for 2005/06 to 2015/16, provided by the California Department of Education

significant 4.2 pp increase in high school enrollment and a significant 1.3 to 2.4 pp increase in ELA and math CAHSEE test takers, respectively.[27] Despite the different data source and identification, these estimates also show positive impacts on school attendance.[28]

Next, we analyze whether students put forth greater effort on exams. Online Appendix Table A.5 presents the effects on test performance for tenth, eleventh, and twelfth graders. Among first-time test takers in the tenth grade, DACA led to

---

[27] The *p*-value is 0.108 for high school enrollment; $p < 0.01$ for math test takers, and $p < 0.10$ for ELA test-takers.

[28] In online Appendix B, we calculate that the scaling factor to convert these estimates to ITT is between 9.7 and 16.3, which implies an order of magnitude larger enrollment effect relative to our ACS estimates. We speculate that this may be an overestimate of the ITT if noncitizens are underreported in high undocumented counties, although large effects are plausible if native Hispanics experienced spillover effects from the policy.

statistically significant decreases in performance on both the math and ELA exams. This decline should be interpreted in light of the increases in attendance, and hence the number of test takers. Marginal undocumented students—those induced by DACA to stay in school—are likely to be less prepared on average for the exam and lower scoring. Importantly, however, the magnitudes are quite small. The share of test takers passing each exam falls by 1 to 2 percentage points off of a baseline pass rate of 74 percent for both math and ELA. At the same time test scores decline by 1.6–3 points from average scores of around 370 in math and ELA.

Among repeat test takers in eleventh and twelfth grades, we find mixed results. The effect on eleventh grade performance is statistically insignificant, but average performance appears to rise for twelfth grade students. Pass rates for the ELA exam increase by a statistically significant 1.7 percentage points, which translates to a modest 7 percent of the mean. This suggests that undocumented students facing their final attempt to graduate and qualify for DACA may have increased effort, particularly with respect to English language.

## VII. Discussion

Having focused on the average reduced-form effects on different education choices, we now separately consider the importance of deferral from deportation as an incentive for schooling. We then use our difference-in-difference estimates to construct a range of elasticities of schooling to changes in returns based on lifetime earnings and compare these to similar estimates in the literature.

### A. *The Role of Deportation Risk*

We begin by analyzing differential schooling responses across men and women, recalling that the national deportation risk for men is over four times higher than the risk for women. Table 4, which focuses on 19–22-year-olds, shows that the effects for high school completion are more than twice as large for young men as for young women, and that these differences across sexes are statistically significant at the 10 percent level. We find no significant difference between men and women in college attendance. These results are consistent with youth responding to the differential national patterns in deportation risk across gender. Further, in the online Appendix, we rule out differences in opportunity costs as an alternative explanation.[29]

As a second test of the role of deportation risk, we ask whether schooling responses are correlated with *local* deportation risk, which we measure using the deportation rate in one's state of residence. We take a nonparametric approach, estimating difference-in-difference coefficients by state, and then plotting the coefficients, ranked in ascending order of state's deportation rate (see online Appendix E for data details). Online Appendix Figure E.2 shows no systematic relationship between the state deportation risk and the DACA-induced increase in schooling. For instance, we

---

[29] In particular, online Appendix Table A.6 shows that men substituted toward schooling from work and idleness, while women entirely substituted from idleness, perhaps due to a lower incidence of teenage births (Kuka, Shenhav, and Shih 2019). This suggests that men likely had a higher opportunity cost of schooling than women.

TABLE 4—EFFECT OF DACA ON HIGH SCHOOL COMPLETION AND COLLEGE ENROLLMENT, AGES 19–22: BY SEX

| | High school completion | | | Some college | | |
|---|---|---|---|---|---|---|
| | All | Female | Male | All | Female | Male |
| *Panel A. Hispanic* | | | | | | |
| *Eligible × Post* | 0.059 | 0.035 | 0.077 | 0.013 | 0.009 | 0.015 |
| | (0.010) | (0.014) | (0.016) | (0.010) | (0.017) | (0.018) |
| Mean $Y$ | 0.781 | 0.812 | 0.754 | 0.407 | 0.456 | 0.363 |
| $p$-value male = female | | | 0.07 | | | 0.84 |
| Individuals | 38,704 | 18,501 | 20,203 | 38,704 | 18,501 | 20,203 |
| *Panel B. High take-up* | | | | | | |
| *Eligible × Post* | 0.064 | 0.040 | 0.084 | 0.011 | 0.004 | 0.014 |
| | (0.011) | (0.013) | (0.019) | (0.011) | (0.013) | (0.018) |
| Mean $Y$ | 0.775 | 0.806 | 0.747 | 0.399 | 0.446 | 0.357 |
| $p$-value male = female | | | 0.09 | | | 0.66 |
| Individuals | 34,768 | 16,574 | 18,194 | 34,768 | 16,574 | 18,194 |

*Notes:* This table shows the difference-in-difference estimates of the impact of DACA on the high school completion and attainment of some college of eligible youth ages 19–22. The outcomes are high school completion (GED or diploma) in columns 1–3 and completion of some college (more than 12 years of completed education) in columns 4–6, and post is an indicator for 2012 or after. See the notes of Table 1 for the definition of eligibility, high take-up, control variables, clustering, and sample weights.

*Source:* 2005–2015 ACS. Sample is composed of foreign-born individuals ages 19–22 who immigrated by age 10 and by 2007.

find similar-sized effects on teenage schooling in Arizona and New Jersey despite the fact that we estimate the deportation risk to be over 12 times higher in Arizona.[30] We come to the same conclusion when we allow the effect of DACA to vary linearly with the state-level deportation risk.

One interpretation of these results is that youth do not value reductions in deportation risk. Considering the magnitude of the schooling response, this seems unlikely. Our calculations of the increase in lifetime earnings resulting from DACA, which we discuss in more detail below, reveal that the expected earnings benefits from lower deportation risk account for 37–50 percent of the total benefits of DACA. Therefore, removing this benefit would imply doubling the schooling responses for each dollar of earnings benefits. We cannot rule out this possibility, but it seems less plausible. Our preferred interpretation is that youth react to *perceived* deportation risk, which is likely to be different than actual measured risk. For example, youth in low-deportation-rate states may overestimate the likelihood of deportation, consistent with the survey evidence in Section I, or youth in high-deportation states may overestimate the probability of return to the United States conditional on deportation. These misperceptions could rationalize the similar schooling responses across states.

---

[30] Further, in results not reported, we find that states with a higher deportation risk do not have a lower "legal premium," which could offset the response to deportation risk.

## B. *From Reduced Form Effects to Schooling Elasticities*

We now convert our difference-in-difference estimates to the ITT effects of DACA and use these estimates to obtain a range of elasticities of schooling to lifetime earnings.

First, to recover the ITT effect of DACA we rescale our treatment effects to account for the fact that the eligible group includes legal immigrants. Given that our best estimates indicate that roughly 72 percent of noncitizen Hispanics are undocumented, we rescale our treatment effects by a factor of 1.39 to recover the ITT effects. Since the share undocumented tends to be higher for youth, we take this as a lower bound of the share of noncitizen youths that are undocumented, and hence our ITT effects are an upper bound.[31]

Second, we calculate the percent change in expected returns to schooling from DACA by taking the difference in expected lifetime earnings before and after DACA. This can be written as a function of (i) the expected years working in the United States and Mexico pre- and post-DACA, and (ii) home country, undocumented US, and documented US wages for each education level (see online Appendix C for more detail). We do not attempt to monetize the nonpecuniary benefits of DACA, such that our wage estimates are thus a lower bound of the total benefits of DACA, which makes the estimated elasticity an upper bound on the sensitivity of schooling to total schooling returns.

We draw on a variety of sources to estimate these inputs, summarized in detail in online Appendix Table C.1. To calculate the expected duration of years working in the United States, we subtract the cumulative probability of deportation from the total number of working years. In our preferred estimate, we calculate this deportation risk for each age and sex prior to DACA using the number of removals from the United States in 2012 (Simanski and Sapp 2013) divided by the estimated population of undocumented immigrants. We conservatively assume for most calculations that the probability of deportation only declines to 0.5 pp during DACA receipt, and for simplicity assume that the perceived probability of return is zero.

We also consider three time horizons over which eligible individuals may have expected DACA benefits to last: four years, six years, or permanent. Although there is no data on these expectations, we surmise that four years may be the minimum expectation, given that the Obama administration was reelected for a four year term soon after the passage of DACA.

We assign the US wages for each legal status (citizens, noncitizens) and education level as the average wages of foreign-born adults that meet the sample immigration requirements in the 2009–2011 ACS. Since the vast majority of the DACA-eligible population was born in Mexico, we proxy the wage in the country of origin as the average wage in Mexico by education and sex calculated from the IPUMS 2010 Mexico Census (Ruggles et al. 1790–2018).

Column 1 of Table 5 shows the elasticity of high school completion under each of these scenarios using the rescaled (ITT) schooling estimates for Hispanics.

---

[31] In contrast, since only 55 percent of eligible teens in the whole sample are likely to be unauthorized, the ITT effect is roughly 80 percent larger than the difference-in-difference estimates for the whole sample.

**AR2022_500563**

TABLE 5—IMPLIED ELASTICITY OF HIGH SCHOOL GRADUATION TO WAGES

| | Actual deportation risk | Perceived deportation risk | |
|---|---|---|---|
| | Age-based | 0% | 30% |
| *Panel A. Four Years expected duration* | | | |
| Elasticity—All | 0.086 | 0.174 | 0.079 |
| Elasticity—Males | 0.080 | 0.141 | 0.085 |
| Elasticity—Females | 0.129 | 0.171 | 0.052 |
| | | | |
| *Panel B. Six Years expected duration* | | | |
| Elasticity—All | 0.054 | 0.109 | 0.052 |
| Elasticity—Males | 0.050 | 0.089 | 0.056 |
| Elasticity—Females | 0.082 | 0.108 | 0.034 |
| | | | |
| *Panel C. Permanent expected duration* | | | |
| Elasticity—All | 0.019 | 0.027 | 0.014 |
| Elasticity—Males | 0.017 | 0.022 | 0.016 |
| Elasticity—Females | 0.024 | 0.027 | 0.009 |

*Notes:* Estimates of the elasticity of high school for all males, and female DACA-eligible youth, under various expectations of the duration of DACA (four years, six years, and permanent) and the deportation risk. Elasticity calculated using (i) the implied ITT effects of DACA for Hispanics (see Section VII) and (ii) estimates of the wage benefits of DACA using inputs from online Appendix Table C.1 together with the framework for expected wages in Section C.

Intuitively, the elasticity is larger when we assume shorter expected durations of DACA, since the benefits of DACA accrue over a shorter period. Our preferred elasticities rely on six years of duration, the actual duration of DACA. Under these assumptions, the elasticity of high school completion is between 0.05 and 0.08. Men and women exhibit similar responsiveness, indicating that the varying magnitudes of the difference-in-difference estimates are proportional to the respective changes in expected high-school-educated lifetime earnings.[32]

The remaining two columns show the sensitivity of our elasticity calculations to misperceptions in the deportation risk. In column 2 we assume the perceived risk to always be zero, and hence that the only earnings benefit from DACA comes from the higher wages afforded by legal status. Since the increase in the return to high school is much lower under this assumption, our average elasticity estimate doubles to 0.109. In column 3 we assume a 30 percent deportation rate, the highest from our state deportation rate calculations. These elasticities are similar to the baseline estimates.[33]

Is the size of our DACA responses comparable to prior work? The most similar estimates to ours come from Abramitzky and Lavy (2011, 2014), who study the high school completion response to a change in the wage returns to schooling in Israeli kibbutzim. Abramitzky and Lavy (2011) argues that the near-zero initial return to schooling in the kibbutz makes a *semi-elasticity* of high school graduation to the return for a year of schooling understanding the magnitude, and calculates this to

---

[32] See online Appendix Table C.3 for the equivalent college enrollment elasticities.
[33] The elasticity for 30 percent deportation risk is typically lower than for the age-varying deportation risk, consistent with higher benefits. Occasionally the 30 percent elasticity is higher, reflecting a higher return to high school at baseline (which reduces the percent increase in the return).

**AR2022_500564**

be 0.43.[34] When we calculate the semi-elasticity to the return to high school completion from our estimates, we find an average of 0.25, roughly 60 percent of the response in Israel.[35] Hence, a 10 pp increase in the return to high school graduation leads to a 2.5 percent increase in high school completion.

Taking these estimates at face value suggests that the response to DACA among undocumented youth may be smaller than among Israeli teens. One potential reason for this is that the perceived wage differences between Mexico, US legal, and US undocumented individuals could be smaller than the ones we calculate, which would cause us to underestimate the semi-elasticity. Second, undocumented youth may expected to return to the United States if deported, or have lower expectations about the probability of deportation, which would also make the perceived benefit lower than our calculation. Finally, undocumented youth may be less responsive than Israelis because they face other barriers to schooling, such as liquidity constraints, norms about working or helping out at home, or early childbearing, to name a few reasons.

Finally, we note that our analysis has focused on the undocumented population living in the United States, holding constant migration decisions, as DACA explicitly required an established presence in the United States. However, in the long run, DACA's benefits might encourage new immigration if potential migrants expect the United States to continue to pass DACA-like policies. This point, as well as any general equilibrium responses to DACA, are left for future investigation.

### VIII. Conclusion

In this paper, we quantify the education response of undocumented youth to a large shock in the returns to education. We obtain variation in the returns to education from the enactment of DACA, which provided temporary deferral from deportation and work authorization to this population. Using a difference-in-difference design, we show that DACA altered the education decisions of undocumented youth.

The policy increased school attendance by 2.2 pp and high school graduation rates by 6 pp, an effect that was more pronounced among Hispanic men. These effects imply that DACA reduced the citizen-noncitizen gap in school attendance by 55 percent, and the gap in high school completion by 40 percent. We find some increases along the college margin as well, but cannot reject a null effect in our main specification. Auxiliary analyses show that DACA also induced greater effort in school, as we find increases in the pass rates of a mandatory exam for graduation among twelfth graders.

These results have significant policy implications. First, they show that a substantial part of the gap in educational attainment between noncitizen and citizen youth is due to the low benefits of schooling associated with lack of legal status. Hence, policies that increase the real or perceived economic opportunities of disadvantaged youth may lead to a more educated workforce. Second, immigration policy

---

[34] This is likely to be an upper bound on the elasticity to the change in the return to high school.
[35] See online Appendix Table C.3 for the semi-elasticity estimates.

is currently at the center of the public debate, with many fearing that undocumented immigrants may bring undesirable attributes to communities, such as low levels of education. Our findings suggest that immigration policies that include incentives for education and reduce uncertainty over employment can lead to improvements in each of these areas of concern.

## REFERENCES

**Abramitzky, Ran, and Victor Lavy.** 2011. "How Responsive Is Investment in Schooling to Changes in Redistribution Policies and in Returns?" NBER Working Paper 17093.

**Abramitzky, Ran, and Victor Lavy.** 2014. "How Responsive Is Investment in Schooling to Changes in Redistributive Policies and in Returns?" *Econometrica* 82 (4): 1241–72.

**Acosta, Yesenia D., Luke J. Larsen, and Elizabeth M. Grieco.** 2014. *Noncitizens under Age 35: 2010–2012*. Washington, DC: United States Census Bureau.

**Agarwal, Sumit, Souphala Chomsisengphet, Neale Mahoney, and Johannes Stroebel.** 2015. "Regulating Consumer Financial Products: Evidence from Credit Cards." *Quarterly Journal of Economics* 130 (1): 111–64.

**Alsan, Marcella, and Crystal Yang.** 2019. "Fear and the Safety Net: Evidence from Secure Communities." NBER Working Paper 24731.

**Altonji, Joseph G.** 1993. "The Demand for and Return to Education When Education Outcomes Are Uncertain." *Journal of Labor Economics* 11 (1, Pt. 1): 48–83.

**Altonji, Joseph G., Erica Blom, and Costas Meghir.** 2012. "Heterogeneity in Human Capital Investments: High School Curriculum, College Major, and Careers." *Annual Review of Economics* 4: 185–223.

**Amuedo-Dorantes, Catalina, and Francisca Antman.** 2016. "Can Authorization Reduce Poverty among Undocumented Immigrants? Evidence from the Deferred Action for Childhood Arrivals Program." *Economics Letters* 147: 1–4.

**Amuedo-Dorantes, Catalina, and Francisca Antman.** 2017. "Schooling and Labor Market Effects of Temporary Authorization: Evidence from DACA." *Journal of Population Economics* 30 (1): 339–73.

**Amuedo-Dorantes, Catalina, and Cynthia Bansak.** 2006. "Money Transfers among Banked and Unbanked Mexican Immigrants." *Southern Economic Journal* 73 (2): 374–401.

**Atkin, David.** 2016. "Endogenous Skill Acquisition and Export Manufacturing in Mexico." *American Economic Review* 106 (8): 2046–85.

**Bailey, Martha J., and Susan M. Dynarski.** 2011. "Inequality in Postsecondary Education." In *Whither Opportunity? Rising Inequality, Schools, and Children's Life Chances*, edited by Greg J. Duncan and Richard J. Murnane, 117–32. New York: Russell Sage Foundation.

**Baker, Bryan, and Nancy Rytina.** 2013. *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012*. Washington, DC: Department of Homeland Security Office of Immigration Statistics.

**Bazzi, Samuel, Sarah Burns, Gordon Hanson, Bryan Roberts, and John Whitley.** 2019. "Deterring Illegal Entry: Migrant Sanctions and Recidivism in Border Apprehensions." NBER Working Paper 25100.

**Becker, Gary S.** 1964. *Human Capital: A Theoretical and Empirical Analysis, with Special Reference to Education*. Chicago: University of Chicago Press.

**Bernheim, B. Douglas, and Dmitry Taubinsky.** 2018. "Behavioral Public Economics." In *Handbook of Behavioral Economics - Foundations and Applications 1*, Vol. 1, edited by B. Douglas Bernheim, Stefano DellaVigna, and David Laibson, 381–516. North-Holland: Elsevier.

**Black, Dan A., Terra G. McKinnish, and Seth G. Sanders.** 2005. "Tight Labor Markets and the Demand for Education: Evidence from the Coal Boom and Bust." *ILR Review* 59 (1): 3–16.

**Bleakley, Hoyt, and Aimee Chin.** 2010. "Age at Arrival, English Proficiency, and Social Assimilation among US Immigrants." *American Economic Journal: Applied Economics* 2 (1): 165–92.

**Borjas, George J.** 1985. "Assimilation, Changes in Cohort Quality, and the Earnings of Immigrants." *Journal of Labor Economics* 3 (4): 463–89.

**Borjas, George J.** 2017. "The Earnings of Undocumented Immigrants." NBER Working Paper 23236.

**Borusyak, Kirill, and Xavier Jaravel.** 2017. "Revisiting Event Study Designs." https://scholar.harvard.edu/files/borusyak/files/event_studies_may8_website.pdf.

**Cantor, Guillermo, Mark Noferi, and Daniel Martínez.** 2015. *Enforcement Overdrive: A Comprehensive Assessment of ICE's Criminal Alien Program*. Washington, DC: American Immigration Council.

**AR2022_500566**

**Cascio, Elizabeth U., and Ethan G. Lewis.** 2018. "Distributing the Green (Cards): Permanent Residency and Personal Income Taxes after the Immigration Reform and Control Act of 1986." NBER Working Paper 24872.

**Cascio, Elizabeth U., and Ayushi Narayan.** 2017. "Who Needs a Fracking Education? The Educational Response to Biased Technological Change." https://www.dartmouth.edu/~eucascio/cascio&narayan_fracking_latest.pdf.

**Charles, Kerwin Kofi, Erik Hurst, and Matthew J. Notowidigdo.** 2018. "Housing Booms and Busts, Labor Market Opportunities, and College Attendance." *American Economic Review* 108 (10): 2947–94.

**Clemens, Michael A., Claudio Montenegro, and Lant Pritchett.** 2016. "Bounding the Price Equivalent of Migration Barriers." IZA Discussion Paper 9789.

**Conley, Timothy G., and Christopher R. Taber.** 2010. "Inference with 'Difference in Differences' with a Small Number of Policy Changes." *Review of Economics and Statistics* 93 (1): 113–25.

**Cortes, Kalena E.** 2013. "Achieving the DREAM: The Effect of IRCA on Immigrant Youth Postsecondary Educational Access." *American Economic Review* 103 (3): 428–32.

**Dee, Thomas, and Mark Murphy.** 2018. "Vanished Classmates: The Effects of Local Immigration Enforcement on Student Enrollment." NBER Working Paper 25080.

**Deming, David, and Susan Dynarski.** 2009. "Into College, Out of Poverty? Policies to Increase the Postsecondary Attainment of the Poor." NBER Working Paper 15387.

**Erisman, Wendy, and Shannon Looney.** 2007. *Opening the Door to the American Dream: Increasing Higher Education Access and Success for Immigrants*. Washington, DC: Institute for Higher Education Policy.

**Felfe, Christina, Helmut Rainer, and Judith Saurer.** 2016. "Why Birthright Citizenship Matters for Immigrant Children: Impacts on Parental Educational Choice." CESifo Working Paper 6037.

**Finkelstein, Amy, and Matthew J. Notowidigdo.** 2018. "Take-Up and Targeting: Experimental Evidence from SNAP." NBER Working Paper 24652.

**Flores, Antonio.** 2017. *How the U.S. Hispanic Population Is Changing*. Washington, DC: Pew Research Center.

**Giuntalla, Osea, and Jakub Lonsky.** 2018. "The Effects of DACA on Health Insurance, Access to Care, and Health Outcomes." IZA Discussion Paper 11469.

**Goodman-Bacon, Andrew.** 2016. "The Long-Run Effects of Childhood Insurance Coverage: Medicaid Implementation, Adult Health, and Labor Market Outcomes." NBER Working Paper 22899.

**Hainmueller, Jens, Duncan Lawrence, Linna Martén, Bernard Black, Lucila Figueroa, Michael Hotard, Tomás R. Jiménez, et al.** 2017. "Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health." *Science* 357 (6355): 1041–44.

**Hill, Laura E., and Hans P. Johnson.** 2011. *Unauthorized Immigrants in California: Estimates for Counties*. San Francisco: Public Policy Institute of California.

**Hipsman, Faye, Bárbara Gómez-Aguiñaga, and Randy Capps.** 2016. *DACA at Four: Participation in the Deferred Action Program and Impacts on Recipients*. Washington, DC: Migration Policy Institute.

**Hoynes, Hilary, Doug Miller, and David Simon.** 2015. "Income, the Earned Income Tax Credit, and Infant Health." *American Economic Journal: Economic Policy* 7 (1): 172–211.

**Hsin, Amy, and Francesc Ortega.** 2017. "The Effects of Deferred Action for Childhood Arrivals on the Educational Outcomes of Undocumented Students." IZA Discussion Paper 11078.

**Jackson, C. Kirabo, Rucker C. Johnson, and Claudia Persico.** 2016. "The Effects of School Spending on Educational and Economic Outcomes: Evidence from School Finance Reforms." *Quarterly Journal of Economics* 131 (1): 157–218.

**Jayachandran, Seema, and Adriana Lleras-Muney.** 2009. "Life Expectancy and Human Capital Investments: Evidence from Maternal Mortality Declines." *Quarterly Journal of Economics* 124 (1): 349–97.

**Jensen, Robert.** 2010. "The (Perceived) Returns to Education and the Demand for Schooling." *Quarterly Journal of Economics* 125 (2): 515–48.

**Kaushal, Neeraj.** 2006. "Amnesty Programs and the Labor Market Outcomes of Undocumented Workers." *Journal of Human Resources* 41 (3): 631–47.

**Kleven, Henrik Jacobsen, Camille Landais, Emmanuel Saez, and Esben Schultz.** 2014. "Migration and Wage Effects of Taxing Top Earners: Evidence from the Foreigners' Tax Scheme in Denmark." *Quarterly Journal of Economics* 129 (1): 333–78.

**Kossoudji, Sherrie A., and Deborah A. Cobb-Clark.** 2002. "Coming Out of the Shadows: Learning about Legal Status and Wages from the Legalized Population." *Journal of Labor Economics* 20 (3): 598–628.

**AR2022_500567**

**Kuka, Elira, Na'ama Shenhav, and Kevin Shih.** 2019. "A Reason to Wait: The Effect of Legal Status on Teen Pregnancy." *AEA Papers and Proceedings* 109: 213–17.

**Lagakos, David, Benjamin Moll, Tommaso Porzio, Nancy Qian, and Todd Schoellman.**
2018. "Life Cycle Wage Growth across Countries." *Journal of Political Economy* 126 (2): 797–849.

**LaLonde, Robert J., and Robert H. Topel.** 1992. "The Assimilation of Immigrants in the U.S. Labor Market." In *Immigration and the Work Force: Economic Consequences for the United States and Source Areas*, edited by George J. Borjas and Richard B. Freeman, 67–92. Chicago: University of Chicago Press.

**Lee, Jin Young, and Gary Solon.** 2011. "The Fragility of Estimated Effects of Unilateral Divorce Laws on Divorce Rates." *B.E. Journal of Economic Analysis and Policy* 11 (1).

**Liscow, Zachary, and William Gui Woolston.** 2017. "Does Legal Status Affect Educational Attainment in Immigrant Families?" https://www.ntanet.org/wp-content/uploads/proceedings/2017/NTA2017-362.pdf.

**Lopez, Mark Hugo, Jeffrey Passel, and Molly Rohal.** 2015. "Chapter 5: U.S. Foreign-Born Population Trends." In *Modern Immigration Wave Brings 59 Million to U.S., Driving Population Growth and Change through 2065: Views of Immigration's Impact on U.S. Society Mixed*. Washington, DC: Pew Research Center.

**Lopez, Mark Hugo, Paul Taylor, Cary Funk, and Ana Gonzalez-Barrera.** 2013. *On Immigration Policy, Deportation Relief Seen as More Important Than Citizenship: A Survey of Hispanics and Asian Americans*. Washington, DC: Pew Research Center.

**Marie, Olivier, and Ulf Zölitz.** 2017. "'High' Achievers? Cannabis Access and Academic Performance." *Review of Economic Studies* 84 (3): 1210–37.

**Mendoza, Gilberto Soria, and Noor Shaikh.** 2019. *Tuition Benefits for Immigrants*. Washington, DC: National Conference of State Legislatures.

**Murnane, Richard J.** 2013. "U.S. High School Graduation Rates: Patterns and Explanations."
*Journal of Economic Literature* 51 (2): 370–422.

**Nevarez, Griselda.** 2015. "American Dream: After Qualifying for DACA, Young Immigrants Buy Homes." *NBC News*, December 7. https://www.nbcnews.com/news/latino/american-dream-after-qualifying-daca-young-immigrants-buy-homes-n475666.

**Olivas, Michael A.** 2004. "IIRIRA, the Dream Act, and Undocumented College Student Residency." *Immigrant and Nationality Law Review* 25: 323–52.

**Oreopoulos, Philip, and Kjell G. Salvanes.** 2011. "Priceless: The Nonpecuniary Benefits of Schooling." *Journal of Economic Perspectives* 25 (1): 159–84.

**Osili, Una Okonkwo, and Anna L. Paulson.** 2007. "Immigrants Access to Financial Services and Asset Accumulation." https://economics.yale.edu/sites/default/files/files/Workshops-Seminars/Labor-Public/osili-paulson-071105.pdf.

**Oster, Emily, and Bryce Millett Steinberg.** 2013. "Do IT Service Centers Promote School Enrollment? Evidence from India." *Journal of Development Economics* 104: 123–35.

**Passel, Jeffrey S.** 2003. *Further Demographic Information Relating to the DREAM Act*. Washington, DC: The Urban Institute.

**Passel, Jeffrey S.** 2005. *Estimates of the Size and Characteristics of the Undocumented Population*. Washington, DC: Pew Research Center.

**Passel, Jeffrey S., and D'Vera Cohn.** 2009. *A Portrait of Unauthorized Immigrants in the United States*. Washington, DC: Pew Hispanic Center.

**Passel, Jeffrey S., and D'Vera Cohn.** 2014. "Chapter 2: Birthplaces of U.S. Unauthorized Immigrants." In *Unauthorized Immigrant Totals Rise in 7 States, Fall in 14*. Washington, DC: Pew Research Center.

**Passel, Jeffrey S., and Mark Hugo Lopez.** 2012. *Up to 1.7 Million Unauthorized Immigrant Youth May Benefit from New Deportation Rules*. Washington, DC: Pew Research Center.

**Pope, Nolan G.** 2016. "The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants." *Journal of Public Economics* 143: 98–114.

**Redstone, Ilana, and Douglas S. Massey.** 2004. "Coming to Stay: An Analysis of the US Census Question on Immigrants' Year of Arrival." *Demography* 41 (4): 721–38.

**Rivera-Batiz, Francisco L.** 1999. "Undocumented Workers in the Labor Market: An Analysis of the Earnings of Legal and Illegal Mexican Immigrants in the United States." *Journal of Population Economics* 12 (1): 91–116.

**Ruggles, Steven, Katie Genadek, Ronald Goeken, Josiah Grover, and Matthew Sobek.** 1790–2018. "Integrated Public Use Microdata Series: Version 7.0 [dataset]." IPUMS USA. https://ipums.org/projects/ipums-usa/d010.v7.0 (accessed April 18, 2018).

**AR2022_500568**

**Shah, Manisha, and Bryce Millett Steinberg.** 2017. "Drought of Opportunities: Contemporaneous and Long-Term Impacts of Rainfall Shocks on Human Capital." *Journal of Political Economy* 125 (2): 527–61.

**Simanski, John F., and Lesley M. Sapp.** 2013. *Immigration Enforcement Actions: 2012*. Washington, DC: Department of Homeland Security.

**Singer, Audrey, Nicole Prchal Svajlenka, and Jill H. Wilson.** 2015. *Local Insights from DACA for Implementing Future Programs for Unauthorized Immigrants*. Washington, DC: Brookings Metropolitan Policy Program.

**Vargas, Jose Antonio.** 2012. "How Obama's New Policy Affects Undocumented Youth—and Me." *Time*, June 18. http://ideas.time.com/2012/06/18/how-obamas-new-policy-affects-undocumented-youth-and-me/.

**Watson, Tara.** 2013. "Enforcement and Immigrant Location Choice." NBER Working Paper 19626.

**Wiswall, Matthew, and Basit Zafar.** 2014. "Determinants of College Major Choice: Identification Using an Information Experiment." *Review of Economic Studies* 82 (2): 791–824.

**Wolfers, Justin.** 2006. "Did Unilateral Divorce Laws Raise Divorce Rates? A Reconciliation and New Results." *American Economic Review* 96 (5): 1802–20.

**Wong, Tom K., Greisa Martinez Rosas, Adrian Reyna, Ignacia Rodriguez, Patrick O'Shea, Tom Jawetz, and Philip E. Wolgin.** 2016. *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*. Washington, DC: Center for American Progress.

**AR2022_500569**

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/284402061

# The Spillover Consequences of an Enforcement–First U.S. Immigration Regime

**Article** *in* American Behavioral Scientist · November 2014

DOI: 10.1177/0002764214537264

CITATIONS
52

READS
226

3 authors:



Elizabeth Aranda
University of South Florida
**30** PUBLICATIONS   **536** CITATIONS

SEE PROFILE

Cecilia Menjívar
University of California, Los Angeles
**160** PUBLICATIONS   **6,151** CITATIONS

SEE PROFILE

Katharine Donato
Vanderbilt University
**65** PUBLICATIONS   **3,294** CITATIONS

SEE PROFILE

**Some of the authors of this publication are also working on these related projects:**

Violence in the lives of women in Guatemala View project

New Immigrant Destinations View project

All content following this page was uploaded by Elizabeth Aranda on 16 January 2016.

The user has requested enhancement of the downloaded file.

**AR2022_500570**

*Introduction*

# The Spillover Consequences of an Enforcement-First U.S. Immigration Regime

American Behavioral Scientist
2014, Vol. 58(13) 1687–1695
© 2014 SAGE Publications
Reprints and permissions:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0002764214537264
abs.sagepub.com



# Elizabeth Aranda[1], Cecilia Menjívar[2], and Katharine M. Donato[3]

## Abstract

In our introduction to this special issue, we describe how the immigration enforcement-first regime has consequences that extend beyond the supposed target population of undocumented immigrants and spill over to other groups, including legal permanent residents, U.S.-born Latinos/as, and other U.S.-born residents. The papers in this special issue address whether and how spillover effects exist and the form that they take. Often they include social, psychological, and in some cases, physical harm, and together they illustrate that directly or indirectly, U.S. policy's emphasis on interior and external border enforcement affects all of us.

## Keywords

U.S. immigration reform, enforcement effects, Latinos

The beginning of 2013 promised to be a good one for immigrants. Many in Congress expressed their intentions of reforming the U.S. immigration system, and strong support for reform came from the White House. Many hoped that the 1st year of president Barack Obama's second term would address concerns in the Latino population, a constituency that significantly contributed to his reelection, about the broken immigration system. Moreover, the media buzzed around the potential for reform, particularly when the Senate passed an immigration bill in June of that year. Immigrants clamored for reform, and in particular, DREAMers, the term often used to talk about the undocumented children of immigrants, fervently declared that any immigration bill should

[1]University of South Florida, Tampa, FL, USA
[2]Arizona State University, Tempe, AZ, USA
[3]Vanderbilt University, Nashville, TN, USA

**Corresponding Author:**
Elizabeth Aranda, University of South Florida, 4202 E. Fowler Ave, CPR 107, Tampa, FL 33620, USA.
Email: earanda@usf.edu

**AR2022_500571**

Downloaded from abs.sagepub.com at UNIV OF SOUTH FLORIDA on June 1, 2015

legalize not just immigrant youth but their parents too. The underlying sentiment was that the immigrant population had suffered greatly from deportations, reaching up to 400,000 a year during the Obama administration, and that the resulting separation of families had caused much social suffering. The time seemed to be ripe for change.

Like attempts to reform the immigration system in the past, a sticking point was whether and, if so, how to regularize the statuses of the 11.7 million undocumented immigrants in the country (of which three fourths are Latinos), according to Pew Research Center estimates (Lopez & Gonzalez-Barrera, 2013). Avoiding anything resembling amnesty or the provision of a path to citizenship (even if long and bumpy, such as the 10 years in provisional status that immigrants would have to wait to be able to apply for legal permanent residence and then another 5 years to apply for citizenship through naturalization proposed in the Senate bill), concerns in the House of Representatives centered on prioritizing border security. And similar to prior attempts at reform, congressional gridlock affecting budget proposals, the debt ceiling, and debates about military intervention in other countries drowned out the voices clamoring for immigration reform. By the end of 2013, any remaining hopes for meaningful reform of the immigration system had died down.

## Consequences of No Reform

The consequences of inaction on reform are varied, widespread, and grave. Having such a large population on the sidelines and in the shadows of U.S. society limits employment opportunities, puts a ceiling on the educational prospects of immigrant children, and relegates this group to a marginalized status at the bottom of the U.S. social-racial hierarchy (Aranda, Hughes, & Sabogal, 2014; Donato & Massey, 1993; Massey, 2008; Menjívar, 2006; Menjívar & Kanstroom, 2014; Yoshikawa, 2011). This legislative inaction translates into the infringement of the most basic social, economic, and human rights for out-of-status immigrants today but also to unsurmountable obstacles for their future integration (Massey, 2013). Thus, the impasse we see today has significant consequences for immigrants, their families, and communities.

Yet the costs related to the neglect of immigration reform go well beyond limiting immigrants' opportunities to get ahead in life. Since the early 1990s, U.S. government policies and programs have emphasized enforcement by implementing, among other things, a strategy of "consequence enforcement" for those arrested by the Border Patrol (Meissner, Kerwin, Chishti, & Bergeron, 2013, p. 4). The consequences are massive and include expelling immigrants in the form of deportation; excluding them through detention in a burgeoning system of immigrant prisons, and at the very least, threatening them with the prospects of deportation, family separation, and financial insecurity—keeping immigrants in a constant state of vulnerability (De Genova, 2002). The collateral damage of these enforcement-first immigration practices has ripple effects not only for immigrants and their kin but also for neighborhoods, communities, and populations throughout the United States (Donato & Armenta, 2011) and beyond (Menjívar, in press). These ripple effects will persist and immigrants will remain in states of insecurity until Congress revamps federal admission and policy

**AR2022_500572**

Downloaded from abs.sagepub.com at UNIV OF SOUTH FLORIDA on June 1, 2015

practices that have placed so many immigrants in vulnerable legal categories. Some immigrants find themselves worrying about the chances of their own removal from the United States and/or the expulsion of their loved ones from their homes and new country. And whereas some studies seem to indicate that immigrants relocate to other regions of the United States after localities implement strict enforcement programs (Watson, 2013), other research (Ellis, Wright, & Townley, 2014) finds that, following trends in the U.S. population in general, immigrants in the past two decades have become less migratory.

Mounting scholarly evidence points to the pressing need for comprehensive immigration reform, and the articles in this special issue contribute to this body of research. However, it is important to note that immigration reform has to be done carefully and thoughtfully, informed by what the research in this area shows. For instance, studies show that reform that privileges border enforcement over legalization is ineffective (Cornelius & Salehyan, 2007; Massey, 2013) and may prove detrimental in the long run because it can create dangerous conditions at the border that are harmful to immigrants and communities (Dunn, 1996; Eschbach, Hagan, & Rodriguez, 2003; Heyman, 2008, 2012; Spener, 2009). At the same time, legalization proposals must also be based on research as well as on a tradition of inclusion, not exclusion, of immigrants to ensure effectiveness in the long run. For instance, the proposal passed in the U.S. Senate in 2013 would require applicants to remain in registered provisional immigration status for 6 years, after which they can renew for another 6, and only after remaining in this provisional status for at least 10 years will they be able to seek legal permanent residence (provided they maintain a record clean of felonies or misdemeanors, maintain a job, and pay fees along the way). Although appearing to provide a path to legalization, this proposal would actually move thousands of immigrants into temporary statuses, or "liminal legality" (Menjívar, 2006) for at least a decade. Thus, immigration reform, while indisputably necessary and urgent, must be informed by research evidence and not by largely unfounded arguments about an insecure border.

The articles in this special issue examine the spillover effects of this restrictive immigration enforcement-first regime and identify the many ways in which increases in the criminalization of immigrants (see Dowling & Inda, 2013), and the threat of deportation and surveillance, negatively affect Latinos/as all over the country, reaching beyond the supposed target population of undocumented immigrants to those documented, including legal permanent residents, U.S.-born Latinos/as, and other U.S.-born residents. Such spillover effects include social, psychological, and in some cases, physical harm. Thus, directly or indirectly, U.S. policy's emphasis on interior and external border enforcement affects all of us.

## Spillover Effects and Enforcement's Collateral Damage

This special issue delves into the spillover effects and the damage left in the wake of ramped-up enforcement. It examines the contours of this spillover and what this looks like "on the ground," in the daily lives of immigrants; it also examines those populations that are most affected, and interrogates how the collateral damage is supported

**AR2022_500573**

Downloaded from abs.sagepub.com at UNIV OF SOUTH FLORIDA on June 1, 2015

and maintained by the current immigration regime. These underlying themes reveal a paradox. As the United States attempts to reassure its citizenry that the nation's borders are secure, and as leaders propagate the misleading notion that enforcement and harsh immigration policies are what strengthen national security, the cruel irony is that border policing and interior enforcement policies have created nightmares for immigrants, their families, and communities, including U.S.-born Latino/a citizens. Even native non-Latino/nonimmigrants are affected, as they respond to media constructions of immigrants as criminals by mobilizing and creating anti-immigrant groups (Chavez, 2008; Kil, Menjívar, & Doty 2009; Rodriguez, 1997). So, too, have documented Latino immigrants been affected; their employment outcomes now more closely resemble those of undocumented immigrants than in the past (Donato & Sisk, 2013). But the immigrants whom the policies target have felt the effects directly and for a long period of time. In a recently published book about immigrant life in a multiethnic metropolis that has so often served as a testing ground for Immigration and Customs Enforcement policies and programs—Miami, Florida—an immigrant from Colombia, Gabriel, aptly articulates the terror that has spread through his community as the result of this immigration regime: "Since 9/11 there has been persecution towards immigrants. They [the government] have utilized terrorism to justify the persecution of immigrants. They have confused the word *immigrant* with the word *terrorist*" (Aranda et al., 2014, p. 90).

The aggressive enforcement regime has resulted in the suffering of an entire group of individuals and legal violence in immigrant communities across the United States (Menjívar & Abrego, 2012). In spite of the mantra that U.S. immigration policies prioritize family reunification, the state has become a source of terror for children who fear their parents will be deported, immigrant parents who fear they will be taken from their children, and spouses who fear separation from their families (Dreby, 2010; Menjívar & Abrego, 2012). Such states of human insecurity are doing the opposite of what the family reunification provisions in the Hart-Cellar Act of 1965 intended. Instead of strengthening them, families are being separated and have become fearful and insecure in routines of everyday life.

In this issue, we present findings from studies that examine the consequences of enforcement policies at various scales of analyses. Menjívar (this issue, p. 1805) shows how enforcement at the various levels of government reinforces the effects of each, so that states do not substitute for federal enforcement but instead exacerbate the effects of federal policies. The range of papers we include speaks to the effects of enforcement on individuals' lives and opportunities; they investigate the likelihood of perceiving discrimination (see Ebert & Ovink, this issue, p. 1784), the vulnerabilities and psychological distress found in Latino/a families (those with and without authorized status; see Szkupinski Quiroga, Medina, & Glick, this issue, p. 1723), the social consequences related to interethnic and intraethnic relations in new and long-established immigrant destinations (see Flores, this issue, p. 1743; Vega, this issue, p. 1764), and the chances of being pulled over, detained, and arrested for driving without a license (see Donato & Rodriguez, this issue, p. 1696). At a broader level of analysis, one common denominator in these papers is the heterogeneity of sources and consequences of mass immigrant

**AR2022_500574**

Downloaded from abs.sagepub.com at UNIV OF SOUTH FLORIDA on June 1, 2015

enforcement (see Menjívar, this issue). This heterogeneity is found in the various levels of government involved in immigrant policing, the geographic scale in which enforcement tactics are employed, and the diversity of those who are the objects of surveillance. What is remarkable about the heterogeneity is the strikingly similar consequences that are observed for immigrant Latino/a populations. Menjívar (this issue) picks up on the effects of this multilayered system on all spheres of immigrants' lives and discusses how contemporary enforcement practices may affect the future incorporation of immigrants.

## The Immigration Regime and Heterogeneity of Sources, Tactics, and Subjects

### Levels of Government

The papers in this issue elaborate on patterns of enforcement at various levels of government—from municipalities (see Flores, this issue) to counties (see Ebert & Ovink, this issue) and states (see Szkupinski Quiroga et al., this issue)—and how these interact with policies at the federal level (see Donato & Rodriguez, this issue), particularly in cases where restrictive local ordinances exacerbate state and federal anti-immigrant legislation. For example, Donato and Rodriguez show how the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) and the Antiterrorism and Effective Death Penalty Act (AEDPA) laid the groundwork for state- and local-level enforcement efforts to thrive. The former established the foundation for 287(g) agreements between counties and the federal government to check the immigration status of those arrested by local police, and the latter, almost overnight, made it impossible for immigrants to have the right to due process. Specifically, the AEDPA eliminated judicial review of deportation decisions and lowered the offense threshold for the mandatory detention of immigrants, so that all offenders—even if they do not pose a flight risk—are detained and unable to obtain bond. These pieces of federal legislation ramped up in the aftermath of September 11, 2001, when immigrants were scapegoated for what many perceived and hailed as a failure to control U.S. borders; subsequently, the U.S. government increased spending on enforcement mandates and programs to an unparalleled degree (Meissner et al., 2013), even though the scholarly literature has shown that the enterprise of border control has been a "game of smoke and mirrors" dating back decades (Massey, Durand, & Malone, 2002).

It is in this context that, beginning in 2005, new forms of internal border control have become prevalent (Leerkes, Bachmeier, & Leach, 2013). With more immigrants in new immigrant gateways in the United States resulting, among other things, from growth in the internal mobility of immigrants (Cadena & Kovak, 2013), many localities began taking "matters into their own hands" and passed legislation aimed at barring immigrants from employment, housing, and social services, among other rights. And even though not all state-level laws and ordinances are the same, as in some regions there are inclusionary state-level laws passed (see below), many have focused on disrupting life for immigrants and creating conditions so hostile that

**AR2022_500575**

Downloaded from abs.sagepub.com at UNIV OF SOUTH FLORIDA on June 1, 2015

immigrants will "self-deport." As the articles in this issue demonstrate, the re-uptake of interior enforcement is expansive and cuts across all levels of government so that no realm of immigrant social life is left untouched.

## Geographic Scales of Enforcement

Relatedly, we see heterogeneity of enforcement measures at various geographic scales. While these are tied to the practices of different scales of government, Walker and Leitner (2011) show that it is not simply the large concentrations of immigrants in localities but rather the dramatic growth in the presence of immigrant Latinos/as in certain areas that hastened to drive increases in state-level immigrant policies. These policies have tended to be restrictive, in contrast to those passed in localities with a long-term presence of Latino immigrants. Yet, with an increase of new immigrants in long-established Latino communities, Arizona has spearheaded some of the most draconian enforcement measures to date (see Szkupinski Quiroga et al., this issue) as well as new destinations, such as Hazleton, Pennsylvania (see Flores, this issue), and Davidson County, Tennessee (see Donato & Rodriguez, this issue), where negative enforcement policies and ordinances have also increased (Leerkes et al., 2013; Wilson, Singer, & DeRenzis, 2010). Not surprisingly, Walker and Leitner (2011) find that the pace of growth is the best predictor of the *kind* of local immigration policies that are passed. Moreover, places with highly educated populations and higher unemployment have lower likelihoods of passing exclusionary policies; in contrast, Republican areas with high proportions of owner-occupied housing tend to produce more exclusionary policies (Ramakrishnan & Wong, 2010). These findings translate into interesting geographic patterns in which municipalities in the South and outlying suburbs are places where a White conception of the nation thrives; thus immigrant policies in these areas are designed to exclude, expulse, and segregate Latino populations (Walker & Leitner, 2011).

## Widespread Spillover Effects

With the heterogeneity of policies, geography, and a pattern of exclusionary measures meant to keep Latino immigrants out and deter communities of color from expanding (see Møller, 2014), the spillover effects affect a wide swath of the population. The collateral damage of exclusionary ordinances do not discriminate when it comes to immigrant generation (see Ebert & Ovink, this issue), national origins (see Flores, this issue), nativity (see Donato & Rodriguez, this issue; Vega, this issue), and documented status (see Szkupinski Quiroga et al., this issue). Anti-immigrant sentiment affects the stability of all communities, as we see in Flores's (this issue) piece—because it is not just Latinos/as who lead lives marred by insecurity but their xenophobic neighbors— as long-established communities become unstable and White flight ensues out of immigrant-expanding areas.

As a whole, the articles in this issue tell the story of how interior enforcement is disrupting lives, families, and communities, all in the name of national security, as a

**AR2022_500576**

Downloaded from abs.sagepub.com at UNIV OF SOUTH FLORIDA on June 1, 2015

result of exclusionary ordinances designed to slow the demographic shifts engulfing locales at various scales. In the absence of any meaningful immigration reform, we are likely to see further spillover effects as the cohort of undocumented immigrants lives on into future generations.

## Authors' Note

This special issue of American Behavioral Scientist is the first of two that include articles based on research presented at the conference, "Latinos in Old and New Destinations: Multi-disciplinary Approaches to Assessing the Impact of Legal Reforms" sponsored by the University of South Florida on November 8, 2013 in St. Petersburg, FL.

## Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

## Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

## References

Aranda, E., Hughes, S., & Sabogal, E. (2014). *Making a life in multiethnic Miami: Immigration and the rise of the global city*. Boulder, CO: Lynne Rienner Press.

Cadena, B. C., & Kovak, B. K. (2013). "Immigrants equilibrate local labor markets: evidence from the great recession." Paper 19272, National Bureau of Economic Research, Washington D.C.

Chavez, R. L. (2008). Spectacle in the desert: The Minuteman Project on the US-Mexico border. In D. Pratten & A. Sen (Eds.), *Global vigilantes* (pp. 25-46). New York, NY: Columbia University Press.

Cornelius, W. A., & Salehyan, I. (2007). Does border enforcement deter unauthorized immigration? The case of Mexican migration to the United States of America. *Regulation & Governance 1*(2), 139-153.

De Genova, N. (2002). Migrant "illegality" and deportability in everyday life. *Annual Review of Anthropology*, *31*, 419-447.

Donato, K. M., & Armenta, A. (2011). What do we know about unauthorized migration. *Annual Review of Sociology*, *37*, 529-543.

Donato, K. M., & Massey, D. (1993). Effect of the Immigration Reform and Control Act on the wages of Mexican migrants. *Social Science Quarterly*, *74*(3), 523-541.

Donato, K. M., & Sisk, B. (2013). Shifts in the employment outcomes among Mexican migrants to the United States, 1976-2009. *Research in Social Stratification and Mobility*, *30*(1), 63-77.

Dowling, J. A., & Inda, J. X. (2013). *Governing immigration through crime: A reader*. Stanford, CA: Stanford University Press.

Dreby, J. (2010). The burden of deportation on children in Mexican immigrant families. *Journal of Marriage and the Family*, *74*(4), 829-45.

**AR2022_500577**

Downloaded from abs.sagepub.com at UNIV OF SOUTH FLORIDA on June 1, 2015

Dunn, T. J. (1996). *The militarization of the U.S.-Mexico border, 1978-1992*. Austin, TX: CMAS Border & Migration Series and University of Texas Press.

Ellis, M., Wright, R. A., & Townley, M. (2014). The Great Recession and the allure of new immigrant destinations in the United States. *International Migration Review*, *48*(1), 3-33.

Eschbach, K., Hagan, J., & Rodriguez, N. (2003). Deaths during undocumented migration: Trends and policy implications in the new era of Homeland Security. In *In defense of the alien* (Vol. 26, pp. 37-52). New York, NY: Center for Migration Studies.

Heyman, J. M. (2008). Constructing a virtual wall: Race and citizenship in U.S.-Mexico border policing. *Journal of the Southwest*, *50*(3), 305-334.

Heyman, J. M. (2012). Political economy and social justice in the US-Mexico border region. In M. Lusk, K. Staudt, & E. Moya (Eds.), *Social justice in the U.S.-Mexico border region* (pp. 41-59). Dordrecht, Netherlands: Springer Verlag.

Kil, S., Menjívar, C., & Doty, R. (2009). Securing borders: Patriotism, vigilantism and the brutalization of the US American public. In W. F. McDonald (Ed.), *Immigration, crime, and justice* (pp. 297-312). Bingley, UK: Emerald/JAI Press.

Leerkes, A., Bachmeier, J. D., & Leach, M. A. (2013). When the border is "everywhere": State-level variation in migration control and changing settlement patterns of the unauthorized immigrant population in the united states. *International Migration Review*, *47*(4), 910-943.

Lopez, M. H., & Gonzalez-Barrera, A. (2013). *On immigration policy, deportation relief seen as more important than citizenship*. Pew Research Hispanic Trends report. Retrieved from http://www.pewhispanic.org/2013/12/19/on-immigration-policy-deportation-relief-seen-as-more-important-than-citizenship/

Massey, D. S. (2008). *Categorically unequal: The American stratification system*. New York, NY: Russell Sage Foundation.

Massey, D. S. (2013). America's immigration policy fiasco: Learning from past mistakes. *Daedalus*, *142*(3), 5-15. doi:10.1162/DAED_a_00215.

Massey, D., Durand, J., & Malone, N. (2002). *Beyond smoke and mirrors: Mexican immigration in an era of economic integration*. New York, NY: Russell Sage Foundation.

Meissner, D., Kerwin, D. M., Chishti, M., & Bergeron, C. (2013). *Immigration enforcement in the United States: The rise of a formidable machinery*. Washington, DC: Migration Policy Institute. Retrieved from http://www.migrationpolicy.org/pubs/enforcementpillars.pdf

Menjívar, C. (2006). Liminal legality: Salvadoran and Guatemalan immigrants' lives in the United States. *American Journal of Sociology*, *111*(4), 999-1037.

Menjívar, C. (in press). Laws beyond borders: Externalizing and internalizing borders in an era of securitization. *Annual Review of Law and Social Science*, *11*.

Menjívar, C., & Abrego, L. J. (2012). Legal violence: Immigration law and the lives of Central American immigrants. *American Journal of Sociology*, *117*(5), 1380-1421.

Menjívar, C., & Kanstroom, D. (Eds.). (2014). *Constructing immigrant "illegality": Critiques, experiences and responses*. New York, NY: Cambridge University Press.

Møller, P. (2014). Restoring law and (racial) order to the old dominion: White dreams and new federalism in anti-immigrant legislation. *Cultural Studies*. Advance online publication. doi: 10.1080/09502386.2014.886487

Ramakrishnan, S. K., & Wong, T. (2010). Partisanship, not Spanish: Explaining municipal ordinances affecting undocumented immigrants. In M. Varsanyi (Ed.), *Taking local control: Immigration policy activism in U.S. cities and states* (pp. 73-92). Stanford, CA: Stanford University Press.

Downloaded from abs.sagepub.com at UNIV OF SOUTH FLORIDA on June 1, 2015

**AR2022_500578**

Rodriguez, N. (1997). Social construction of the U.S.-Mexico border. In J. F. Perea (Ed.), *Immigrants out! The new nativism and the anti-immigrant impulse in the United States* (pp. 223-243). New York: New York University Press.

Spener, D. (2009). *Clandestine crossings: Migrants and coyotes on the Texas-Mexico border*. Ithaca, NY: Cornell University Press.

Walker, K. E., & Leitner, H. (2011). The variegated landscape of local immigration policies in the United States. *Urban Geography*, *32*(2), 156-178.

Watson, T. (2013). *Enforcement and immigrant location choice* (NBER Working Paper No. 19626). Cambridge, MA: National Bureau of Economic Research. Retrieved from http://www.nber.org/papers/w19626

Wilson, J. H., Singer, A., & DeRenzis, B. (2010). Growing pains: Local response to recent immigrant settlement in suburban Washington, DC. In M. Varsanyi (Ed.), *Taking local control: Immigration policy activism in U.S. cities and states* (pp. 193-216). Stanford, CA: Stanford University Press.

Yoshikawa, H. (2011). *Immigrants raising citizens: Undocumented parents and their young children*. New York, NY: Russell Sage Foundation.

## Author Biographies

**Elizabeth Aranda** is Associate Professor and Chair of the Department of Sociology at the University of South Florida. She has written about the lived experiences of immigrants, particularly their emotional wellbeing. Her recent book, with Sallie Hughes and Elena Sabogal, is *Making a Life in Multiethnic Miami: Immigration and the Rise of a Global City*, 2014, Lynne Rienner Publishers.

**Katharine M. Donato** is Professor and Chair of the Department of Sociology at Vanderbilt University. From 2010 until 2013, she also served as Editor of the American Sociological Review. She is the author of more than 50 articles and two co-edited volumes. She is currently finishing a book manuscript on gender and international migration, with Donna Gabaccia.

**Cecilia Menjívar** is Cowden Distinghished Professor in the T. Denny School of Social and Family Dynamics at Arizona State University. She has written extensively on the effects of immigration laws on various aspects of immigrants' lives. Her most recent book, co-edited with Daniel Kanstroom, is *Constructing Immigrant "Illegality": Critiques, Experiences, and Responses*, 2014, Cambridge University Press.

**AR2022_500579**

Downloaded from abs.sagepub.com at UNIV OF SOUTH FLORIDA on June 1, 2015

View publication stats

*Social Problems*, 2021, 68, 675–695
doi: 10.1093/socpro/spaa016
Advance Access Publication Date: 1 May 2020
Article



Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

# Transition into Liminal Legality: DACA's Mixed Impacts on Education and Employment among Young Adult Immigrants in California

## Erin R. Hamilton, Caitlin Patler, and Robin Savinar

University of California, Davis

### ABSTRACT

The Deferred Action for Childhood Arrivals (DACA) program, implemented by executive order in 2012, granted a subset of undocumented youth temporary relief from deportation, work authorization, and other benefits. While theories of immigrant integration predict that legalization will enable immigrant socioeconomic mobility, past research on DACA's effects on education and employment have reached mixed conclusions, possibly reflecting the limitations of different methodological approaches to the question. Using multiple data sources and mixed methods, we analyzed both whether and how DACA impacted education and employment among undocumented immigrants in California. Our difference-in-differences analysis of the 2007–2017 waves of the California Health Interview Study employs a more precise definition of the DACA-eligible population than previous studies, yet we also find mixed effects. Our analysis of surveys and in-depth interviews collected with DACA recipients in California provides context for this finding. DACA enabled college for some, but discouraged it for others. DACA recipients perceived substantial occupational mobility, but this was not reflected in movement out of the secondary labor market for many. Our findings suggest that without access to permanent legal status, DACA recipients will experience liminal legality with limited and contingent impacts on socioeconomic integration.

**KEYWORDS**: immigrants; DACA; legal status; employment; education.

This work was supported by the National Science Foundation (Award 1822787); the American Sociological Association Spivack Community Action Research Award; the National Academy of Education/Spencer Postdoctoral Fellowship; the Sociological Initiatives Foundation; the University of California Center for New Racial Studies; the University of California Institute for Social Sciences; the University of California Institute for Mexico and the United States; the UCLA Institute of American Cultures and the Chicano Studies Research Center; the UCLA Institute for Research on Labor and Employment; the UC Davis Academic Senate Faculty Research Grant; and the UC Davis Center for Regional Change. We thank Kelsey Meagher, the staff at the UCLA Center for Health Policy Research Data Access Center for their generous assistance with the analysis of the California Health Interview Survey, and Ninez Ponce for her support of the project. We thank current and former members of Dream Team Los Angeles for their contributions to the DACA Study. Please direct correspondence to Erin Hamilton at the Department of Sociology, University of California, Davis, 1283 Social Sciences & Humanities, One Shields Avenue, Davis, CA 95616; telephone (530) 754-0786; email: erhamilton@ucdavis.edu.

© The Author(s) 2020. Published by Oxford University Press on behalf of the Society for the Study of Social Problems.
All rights reserved. For permissions, please e-mail: journals.permissions@oup.com.

*Interviewer:* How has DACA changed things for you?
*Respondent:* So definitely, you know, I would say in very small ways [life after DACA] has changed. But at the same time, those small things are big things, because before we did not have anything. And just something is a lot. But at the same time, this something is very little. So, why not [comprehensive] immigration reform, right?

President Obama created the Deferred Action for Childhood Arrivals (DACA) program in 2012, following two decades of growth in apprehensions, detentions, and deportations of immigrants, and in response to years of activism by undocumented immigrants asking for more permanent inclusion in the United States. DACA granted temporary reprieve from deportation, work authorization, and other benefits under existing laws to a subset of undocumented immigrant youth who arrived to the United States as children. By September 2018, U.S. Citizenship and Immigration Services had approved over 900,000 initial DACA applications, representing 70% of the 1.3 million people estimated to be eligible for the program (Migration Policy Institute 2017; USCIS 2018). The 2016 presidential election ushered in an increasingly hostile political terrain for immigrants in the United States, and, in September 2017, President Trump announced plans for DACA's termination, which was under review by the Supreme Court as of February 2020. Whether the program will be terminated, maintained, or replaced is presently unknown.

In this article, we address whether and how DACA has changed employment and educational outcomes for immigrants who participate in the program. Theories of immigrant integration argue that legal status is a key determinant of immigrant incorporation and predict, therefore, that legalization will enable economic integration (Bean, Brown, and Bachmeier 2015; Portes and Zhou 1993). Yet it is unclear whether and to what extent DACA, as a temporary legal status targeted at young, 1.5-generation immigrants, will impact economic mobility. DACA may be better described as liminal legality, a status "in between" documented and undocumented, with uncertain and contingent impacts on economic integration (Cebulko 2014; Menjívar 2006; Roth 2018).

The existing research on DACA's impacts on education and employment reaches inconsistent conclusions, which may reflect the limitations of different approaches to the question. Studies using large, secondary data sets with proxies for DACA eligibility find that DACA increased labor force participation and employment but had little or no impact on hours worked, full-time work, wages, and occupation, and had negative impacts on schooling (Amuedo-Dorantes and Antman 2016; Hsin and Ortega 2018; Pope 2016). However, these studies may under-estimate DACA's impact because they imprecisely identify DACA eligibility, grouping eligible, undocumented immigrants with ineligible, undocumented immigrants (Hsin and Ortega 2018) or with documented immigrants (Amuedo-Dorantes and Antman 2016; Pope 2016). Studies using primary, non-representative data with direct measurement of DACA receipt reach more positive conclusions—that DACA facilitated both post-secondary schooling and occupational mobility (Gonzales et al. 2018; Gonzales, Terriquez, and Ruszczyk 2014; Patler and Cabrera 2015; Wong 2016, 2017). However, these studies use subjective indicators of change and may over-estimate DACA's impact by sampling among more privileged – largely activist, college-going – youth. It is also possible that both accounts are true and that DACA's impacts are mixed and vary across different groups of recipients.

We contribute to this debate by examining *both whether and how* DACA affected the employment and educational outcomes of young adult immigrants in California, which is home to more than a quarter of DACA recipients (USCIS 2018). We utilize two sources of complementary data from California in order to overcome some of the limitations of previous research. First, we use survey data from 2007–2017 waves of the California Health Interview Study (CHIS) to estimate the average effect of DACA on educational and employment outcomes. A key advantage of the CHIS data is that they allow us to more precisely identify the DACA-eligible population than has been possible in previous research using large, secondary data sources. We then zero in on the mechanisms through which DACA affected work and school outcomes by drawing on original data from the DACA Study,

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

which includes surveys and in-depth interviews with DACA recipients in California. The DACA Study represents an improvement over other primary data sources by sampling more broadly within the undocumented, DACA-eligible population.

Understanding how DACA has impacted recipients is fundamental to generating policy solutions to a critical and perennial social problem: inequality based on legal status. Undocumented status undermines immigrant wellbeing through a variety of mechanisms, including the denial of rights, exclusion from formal institutions, and the threat of detention and deportation (Waters and Pineau 2016). To be sure, undocumented status is linked to higher rates of poverty, lower rates of education, and increased incidence of mental health problems (Bean et al. 2011; Berk and Schur 2001; Dreby 2015; Gonzales, Suárez-Orozco, and Dedios-Sanguineti 2013; Hall and Greenman 2015; Hall, Greenman, and Farkas 2010). Therefore, assessing the impacts of policies that broaden the rights of undocumented immigrants is fundamental to new policy efforts to mitigate social inequality. This is especially crucial in the current political climate, as the future of nearly one million young immigrants hangs in limbo.

## BACKGROUND

A large body of sociological theory and research views immigration policy as a key determinant of immigrant integration (Bean et al. 2015; Menjivar 2006; Portes and Zhou 1993; Waters and Pineau 2016). The "membership exclusion" approach provides the most direct account of how immigration policy—and legal status in particular—affects immigrant integration (Bean et al. 2015). According to this view, immigration laws create undocumented status, which hinders immigrants' integration and mobility by denying rights, putting individuals at risk of detention and deportation, excluding immigrants from social services and institutions, provoking discrimination and stigma, and generating substantial uncertainty. Numerous studies show that undocumented immigrants and their children have worse self-rated health, poorer developmental and educational outcomes, lower earnings, and higher rates of poverty than documented immigrants and their children (Bean et al. 2011; Berk and Schur 2001; Dreby 2015; Gonzales et al. 2013; Hall and Greenman 2015; Hall, Greenman, and Farkas 2010; Patler 2018).

Membership exclusion predicts that legalization will be "a life-course turning point, the attainment of which may mark the weakening, if not the end, of the inhibiting mechanisms of unauthorized status" (Bean et al. 2015:14). The experience of immigrants who gained legal status following Congress's last major immigration reform, the 1986 Immigration Reform and Control Act (IRCA), supports this hypothesis. Studies of IRCA's impacts find evidence consistent with the membership exclusion approach, including increases in the labor force participation, employment, wages, occupational mobility, post-secondary school enrollment, and English language ability among the more than three million immigrants who adjusted status under the law (Amuedo-Dorantes, Bansak, and Raphael 2007; Cortes 2013; Kossoudji and Cobb-Clark 2000; Pan 2012; Rivera-Batiz 1999). Using a different approach to the question, Bean, Brown, and Bachmeier (2015) also found support for the theory, namely that children whose parents legalized their status completed as many years of schooling as children whose parents were always legal, whereas children whose parents were always undocumented showed a major schooling deficit.

While membership exclusion theory predicts legalization will lead to socioeconomic mobility, DACA may be different. Unlike the permanent adjustment of status available under IRCA, DACA status is temporary, and the program's future is uncertain. Recipients in the DACA program receive a two-year deferral from deportation and work authorization that has to be renewed; furthermore, the program may be able to be terminated by the president, if the president's power to do so is upheld by the Supreme Court. Thus, DACA may be more akin to other non-permanent statuses such as Temporary Protective Status (TPS), a program created to grant some groups of immigrants fleeing crises in their home countries protection from deportation and access to work authorization on a

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

short-term basis. Cecilia Menjívar (2006:1000, 1008) defined the legal status of recipients in the TPS program as "liminal legality," "a gray area between [documented and undocumented]," "a status characterized by its ambiguity, as it is neither an undocumented status nor a documented one, but may have the characteristics of both." Insofar as it is an improvement over *il*legality, liminal legality may be empowering in the short term, but experienced over longer durations, liminal legality can be dysfunctional in multiple ways, most importantly because its inherent uncertainty undermines the ability to plan and make investments in the future (Menjívar 2006, 2008). Cebulko (2014) and Roth (2018) have argued that DACA should be conceived as liminal legality, as the immigrant youth they interviewed in Boston and South Carolina described some hardships associated with an incremental and uncertain gain in legal inclusion.

If DACA is a form of liminal legality, we may expect the program's impacts on socioeconomic status to be less positive than the impact of legalization with a route to citizenship. In this instance, the uncertainty and temporariness of the DACA program may alter the choices recipients make regarding school and work. However, how these choices change is not clear. Several hypotheses are possible. First, because the work authorization granted through the DACA program allows recipients to search openly on the labor market, some recipients may seek employment rather than remain unemployed, or they may find better-paid or better-fitting jobs than they would without DACA. On the other hand, some DACA recipients may accept a less-than-ideal job if they worry that searching for an ideal job will waste the limited time allotted under their temporary work permits. Third, given the short-term nature of the program, some recipients may prioritize work over schooling in order to take advantage of the opportunity to work, thereby undermining longer-term occupational mobility. Alternatively, because DACA increases the possible labor market returns on schooling, some DACA recipients may seek a post-secondary degree. DACA may also facilitate post-secondary schooling by helping students pay for tuition through work.

Prior studies using secondary data to observe the outcomes of potential DACA recipients largely support the hypothesis that DACA led recipients to prioritize short-term work opportunities over longer-term investments in occupational mobility such as post-secondary schooling. Two studies analyzing DACA's impact on employment outcomes in national data found that DACA increased labor force participation and employment but had little or no impact on hours worked, on full-time work, wages, occupation, or school enrollment (Amuedo-Dorantes and Antman 2017; Pope 2016). A third study, of students in a large, public university system, found that DACA led to increases in drop-outs at four-year colleges and decreases in full-time enrollment at two-year colleges, findings the authors interpreted to mean that college students who received DACA adjusted their school enrollment in order to prioritize the opportunity to work (Hsin and Ortega 2018).

Prior studies using primary data reach more positive conclusions. Findings from a 2013 online survey and follow-up interviews of DACA recipients recruited from undocumented immigrants' rights organizations suggest that DACA led to short-term improvements in occupational outcomes, with 59% of respondents reporting that they obtained a new job following DACA and 49% reporting that their earnings increased (Gonzales et al. 2014). In-depth interviews generated a similar conclusion: the program facilitated the college-bound trajectories of young recipients and enabled older recipients to return to school, or, as the authors put it, "revive previously abandoned aims" (Gonzales et al. 2018:7). Another online survey of DACA recipients, also recruited through immigrants' rights organizations, found even more positive results, namely that 91 percent of respondents in 2017 were currently employed, 69 percent of respondents reported obtaining a job with better pay after receiving DACA, 54 percent reported finding a job that better fit their education and career goals, and that hourly earnings increased by 69 percent (Wong 2016, 2017).

We build on this mixed body of literature using two complementary data sources from California. First, we use a similar design as prior studies of secondary data—a difference-in-differences analysis—to estimate the average impact of DACA on educational and employment outcomes, but the data we use (the CHIS) allow for a more accurate definition of the DACA-eligible population. We

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

then compare this group to both documented immigrants who meet the DACA eligibility criteria and to likely undocumented immigrants who do not, allowing us to achieve a more precise estimate of DACA's "intent-to-treat" effect than prior studies using secondary data. We are thereby better able to address whether prior, less positive conclusions emerging from research using secondary data sources and proxies for DACA eligibility under-estimate DACA's impacts.

Our second contribution is to clarify the mechanisms through which DACA affects employment and educational outcomes by analyzing original survey and in-depth interview data collected from DACA recipients in California in the DACA Study. The DACA Study includes surveys and in-depth interviews with DACA recipients and similarly aged non-recipients (i.e., those who remained undocumented) in California. The main advantages of our primary data collection are that DACA eligibility and receipt are directly observed (asked of respondents). We recruited from DACA information sessions held shortly after the program was announced, and the DACA Study provides a more diverse sample of DACA recipients than prior primary data collection efforts. We use these data to explore why and for whom DACA enables or discourages post-secondary schooling, as well as to understand occupational mobility in the context of DACA. Our combined analysis of the CHIS and the DACA Study provides strong support for the liminal legality perspective of DACA: the program's impacts are highly contingent as a result of the program's temporariness and uncertainty.

## DATA AND METHODS
Our study draws on two sources of data from California. We describe these sources and the corresponding methods of analysis of each in turn.

### California Health Interview Survey
We use data from the 2007–2017 waves of the California Health Interview Survey (CHIS), a population-based telephone survey of California's residential, non-institutionalized population collected biannually from 2001–2011 and annually thereafter by UCLA's Center for Health Policy Research (CHPR) in collaboration with the California Department of Public Health and the Department of Health Care Services. The CHIS uses a dual-frame, multi-stage sampling design that draws from landline and cell phone numbers across the state. One adult (age 18 and older) was randomly selected within each household. We restricted our analysis to the 2,585 Latino-origin immigrants who were under 31, at least 18 years old, and were observed in the 2007, 2009, 2011, 2012, 2013, 2014, 2015, 2016, and 2017 waves.[1] In other analyses, we restricted to Mexican-born immigrants, who make up 84 percent of Latino immigrants in the sample. We cannot separately analyze Asian immigrants or immigrants of other origins due to small sample sizes. We used survey weights to adjust for the complex sample design. Missing values were imputed by the CHPR Data Access Center.

The key advantage of the CHIS data over other repeated cross-sectional data sets is the CHIS's more detailed module on legal status among immigrants. The CHIS asks all foreign-born respondents if they are a citizen, and then, among noncitizens, asks if the respondent is a legal permanent resident with a green card (i.e., LPR). In contrast, prior studies have used data that do not differentiate among noncitizen immigrants by LPR status (Amuedo-Dorantes and Antman 2016; Pope 2016). As a result, the DACA-eligible group in prior studies includes LPRs and temporary visa holders, who make up a

---

1   The use of repeated cross-sectional data means that we do not observe changes in educational and employment outcomes among the same individuals over time; rather, we observe population-level changes. This means that we cannot see whether a person who was previously unemployed became employed after DACA; what we observe is whether the overall employment rate among DACA-eligible individuals changes over time. Longitudinal data, such as that used by Hsin and Ortega (2018), allow for within-individual changes to be observed. The use of repeated cross-sectional data introduces the possibility of sampling or response error that could be correlated with the DID design (e.g., increased response rates of DACA eligible following DACA), but it avoids challenges specific to longitudinal data, such as selective attrition (e.g., increased drop-out of undocumented ineligible students following DACA).

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

substantial portion of noncitizens (e.g., an estimated 40 percent of noncitizens under age 35 are LPRs; Acosta, Larsen, and Grieco 2014; Rytina 2013). In the CHIS data, the DACA-eligible group excludes LPRs but may include temporary visa holders, who are estimated to make up a much smaller portion of noncitizens—only 7 percent of Latino noncitizen, non-LPRs in California (Vargas Bustamante et al. 2012). Studies using these data sources will underestimate DACA's impact by virtue of including immigrants who are ineligible for the program in the eligible group, but the error will be smaller using the CHIS than using national data.

We use the CHIS data to estimate difference-in-difference (DID) models, which compare the impacts of a "treatment" on a "treatment group" compared to a "control group" before and after the treatment is introduced (Morgan and Winship 2014). The DID estimates the change in outcomes that is attributable to the treatment net of the over-time changes experienced by all groups and net of time-constant differences between treatment and control groups. Equation 1 shows the basic DID regression equation.

$$Y = \beta_0 + \beta_1 Treat + \ \beta_2 post + \ \beta_3 (Treat \cdot post) + \beta_4 (covariates) + \varepsilon \qquad \text{(Equation 1)}$$

In Equation 1, $\beta_1$ is the difference in Y between the treatment and the control groups in the pre-period, $\beta_2$ is the change in Y from the pre- to the post- period for the control group, and $\beta_3$ is the unique difference in Y that emerges in the post-period for the treatment group, or the treatment effect. The treatment effect is also net of controls represented in the equation by $\beta_4$. In our case, the treatment is the DACA program, the treatment group is the DACA eligible, and the date when DACA permits began to be issued (October 1, 2012) demarks the before and after periods.

DACA eligibility was limited to undocumented immigrants who were 15 years old in 2012 or later, were under 31 in 2012, arrived prior to 2007, arrived at age 15 or younger, have a high school diploma, or were enrolled in school or have military service, and have no criminal record. In the CHIS data, we identify the DACA-eligible as noncitizen, non-LPRs meeting the age, age at arrival, and year of arrival criteria of the DACA program.

The choice of control group(s) is not *a priori* clear, and existing studies make different choices.[2] In an ideal DID design, the treatment and control group should be as similar as possible, except for the treatment. We used two control groups that differ in how they are similar to the DACA eligible. As mentioned previously, we limited the entire sample to those who are eligible for the program based on age; this ensures that all groups age similarly over the time period analyzed. The first control group is likely undocumented immigrants who are ineligible for DACA (hereafter referred to as "undocumented ineligible"); that is, noncitizen, non-LPRs who arrived after 2007 or arrived at age 16 or older. The second control group is documented immigrants who meet the DACA criteria for age and year of arrival; that is, LPRs or naturalized citizens who immigrated prior to age 16 before 2007.[3]

We analyzed current employment status and educational attainment. For employment outcomes, we began with an analysis of labor force participation (in the labor force, versus not). Then, among those in the labor force, we analyzed current employment (employed or looking for work, versus not). Then among those who are working, we analyzed full-time (usually works >=35 hours per week) versus part-time, and logged hourly earnings. We also examined educational attainment using the respondent's highest level of education. We first analyzed high school or GED completion. Then,

---

2  Amuedo-Dorantes and Antman (2016) and Pope (2016) restricted to similarly aged noncitizens and identified eligibility by age and year of arrival. Pope (2016) additionally restricted to similarly aged immigrants and identified eligibility by citizenship. Hsin and Ortega (2018) analyzed incoming cohorts of freshmen at a major public university system and compared undocumented to documented immigrants.

3  For the DID analysis to be accurate, the treatment and control groups should follow parallel trends absent the treatment. This can be empirically assessed by examining the pre-policy outcome trend lines of the treatment and comparison groups. To do so, we estimated the interactions between each pre-period year and each comparison group. Significant interactions indicate a differential pre-trend. The results are presented in Appendix Table 1 and indicate that there are not clear pre-trends.

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

**Table 1.** Summary Characteristics of DACA Study Survey and Interview Respondents

|  | *Survey Respondents* | *Interview Respondents* |
| --- | --- | --- |
| Female (%) | 58 | 64 |
| Age (mean years) | 23 | 24 |
| Latino (%) | 97 | 100 |
| Mexican (%) | 90 | 95 |
| Married (%) | 12 | 10 |
| Has DACA (%) | 90 | 82 |
| Sample | 502 | 62 |

*Source:* DACA Study

among those with a high school diploma or GED, we analyzed post-secondary educational attainment. All models control for age in years, gender, married versus not, and year of migration. We used linear probability models for all outcomes.

*The DACA Study*

In addition to the DID analysis of the CHIS data, we also analyzed survey and in-depth interview data from the DACA Study, which were collected in 2014–15 and include 502 telephone surveys with potential DACA applicants and 62 in-depth interviews with a subset of survey recipients. Respondents were drawn from a pool of individuals who attended at least one of six workshops in Los Angeles County between 2012–2014.[4] The DACA Study is unique in that it does not primarily sample activists or university students. Indeed, in the DACA Study, only 27 percent of respondents were affiliated with immigrant rights organizations, and only 16 percent had a college degree. The survey was conducted using Computer-Assisted Telephone Interviewing (CATI) software. The mean length of the survey was 32 minutes. All respondents received a $15 gift card and know-your-rights information to thank them for participating.

We conducted in-depth interviews with 62 survey participants approximately one year after the telephone surveys. Interviewees were selected from the telephone survey sample via quota sampling to include male- and female-identifying individuals of diverse ages. Interviewees include individuals with and without DACA, with and without a post-secondary education, who are involved and not involved in community organizations, and who are of Mexican and other origins. Interviews took place in person or on the phone and lasted between 45 minutes to over two hours. Respondents received a $20 gift card to thank them for their time. Table 1 shows the demographic characteristics and DACA status of the survey and interview samples.

In-depth interviews were transcribed and analyzed using Dedoose software. We coded the data into broad categories related to work and school and then recoded inductively based on emerging themes. To ensure inter-coder reliability, we completed a three-step process. First, each member of our research team coded the same interview. We then used Dedoose's inter-coder reliability check feature to score the codes across interviewers and make any necessary corrections. Finally, to continue to ensure inter-coder reliability, each interview was coded by at least two research team members and discussed at a weekly team meeting.

We also used the DACA Study survey data to provide more detailed information about the occupational status of DACA recipients. We analyzed their responses to the question "What is your occupation at your main job? In other words, what do you do there?" We coded seven occupation

---

4   Workshops were held at schools, libraries, and convention centers and were co-hosted by civil rights and labor organizations, as well as the Los Angeles Unified School District and the Los Angeles Mayor's Office. The workshops were advertised widely in English- and Spanish-language media. See Patler and Cabrera (2015) for more information on the DACA Study.

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

682 • *Hamilton, Patler, and Savinar*

**Table 2.** Summary Characteristics of Mexican And Latino DACA-Eligible, Undocumented-Ineligible, and Documented Immigrants Ages 18–30 In California

| | Mexican | | | Latino | | |
|---|---|---|---|---|---|---|
| | DACA Eligible | Undoc. Ineligible | Documented | DACA Eligible | Undoc. Ineligible | Documented |
| Age (mean) | 23.2 | 26.1* | 24.1* | 23.1 | 25.9* | 24.2* |
| Age at migration (mean) | 8.3 | 19.3* | 6.7* | 8.7 | 19.6* | 6.7* |
| Year immigrated (mean) | 1998 | 2006* | 1995* | 1998 | 2006* | 1995* |
| Educational attainment (%)* | | | | | | |
| <HS/GED | 31.1 | 59.7* | 15.8* | 30.4 | 60.3* | 14.8* |
| HS/GED | 47.5 | 29.3* | 34.8* | 46.4 | 27.9* | 32.3* |
| Some post-secondary or higher | 21.4 | 11.0* | 49.4* | 23.2 | 11.8* | 52.9* |
| In the labor force (%) | 80.1 | 72.0* | 87.2* | 81.8 | 75.5 | 85.9 |
| Employed (% of in the labor force) | 80.1 | 91.5* | 86.0 | 78.9 | 90.3* | 84.5 |
| Employed full- time (% of employed) | 59.6 | 73.2* | 68.7 | 60.5 | 74.8* | 66.0 |
| Hourly earnings (mean) | 14.3 | 12.5 | 16.2 | 14.3 | 11.5* | 16.1 |
| Male (%) | 47.5 | 48.2 | 51.0 | 48.1 | 52.5 | 49.2 |
| Married (%) | 18.9 | 35.0* | 21.3 | 19.4 | 29.0* | 21.0 |
| Born in Mexico (%) | 100 | 100 | 100 | 86.8 | 72.2* | 78.5* |
| Observations | 431 | 752 | 949 | 476 | 961 | 1,148 |

*Source*: 2007–2017 California Health Interview Survey
*Note:* DACA eligible are undocumented respondents who arrived before 2007 at the age of 15 or younger. Undocumented ineligible are undocumented respondents who arrived after 2007 OR at age 16 or older. Documented respondents are LPRs or naturalized citizens who would be eligible for DACA based on year of arrival (before 2007) and age (15 or younger).
*Significant (p<.05) difference from DACA eligible.

groups: low-skilled workers, clerical workers, para-professionals, skilled laborers and technicians, professionals, and self-employed.[5]

**RESULTS**

*Average Effects of DACA on Education and Employment*

As Table 2 shows, the average DACA-eligible immigrant in the CHIS sample is 23 years old and migrated at age 8 in 1998. Undocumented-ineligible immigrants are older (26 years old on average), and they migrated at older ages in later years. Documented immigrants are more similar to the DACA-eligible group on these characteristics: they migrated on average at age 6 in 1995. The three groups differ in their educational and employment profiles. DACA-eligible immigrants fall between the other two groups on education. Undocumented-ineligible immigrants are the least likely to have

5   *Low skilled workers* are workers in any industry whose position requires minimal skills or training. This category includes cashiers, cooks, and servers in the food industry; gardeners, cleaners, and caretakers in individual homes; sales associates and cashiers in retail; laborers in agriculture or construction; and shipping and warehouse workers. *Clerical workers* are workers whose positions require basic training in computers and/or database management; this category includes mostly administrative assistants and billing assistants. *Para-professionals* are workers who assist or train under professionals, or otherwise perform work related to professional work, but who are not themselves licensed to do professional work. This category includes medical, dental, and nursing assistants; research assistants; library aids, tutors, and teaching assistants; and interns. *Management* includes workers in any industry who manage others; in the DACA Study, most managers are in the food and retail industries. *Skilled laborers and technicians* are workers mostly in utilities and construction whose job requires substantial training and expertise and who are licensed. This category includes electricians, contractors, and mechanics. *Professionals* are workers whose job requires a high level of skill and specialized training and who are frequently licensed. This category includes engineers, teachers, nurses, and accountants. *Self-employed* includes musicians, photographers, and independent contractors whose work was not specified in more detail.

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

**AR2022_500587**

**Table 3.** Difference-in-difference Estimates from Sequential Linear Probability Models of DACA's Impact on Educational Outcomes among Mexican and Latino Immigrants in California

| | (1) High school degree or GED | | (2) Post-secondary, among those with HS/GED | |
|---|---|---|---|---|
| | *Coeff.* | *SE* | *Coeff.* | *SE* |
| **Mexican** | | | | |
| *Ref. Undoc. Inelig.* | | | | |
| DACA Eligible | −0.01 | 0.08 | 0.21 | 0.12 |
| Post-period | 0.10 | 0.07 | −0.14 | 0.09 |
| DACA eligible*Post | 0.18* | 0.09 | 0.14 | 0.12 |
| Observations | 1,179 | | 612 | |
| *Ref. Documented* | | | | |
| DACA Eligible | −0.27*** | 0.05 | −0.23** | 0.07 |
| Post-period | 0.06 | 0.04 | 0.07 | 0.06 |
| DACA eligible*Post | 0.23** | 0.07 | 0.02 | 0.09 |
| Observations | 1,380 | | 1,113 | |
| **Latino** | | | | |
| *Ref. Undoc. Inelig.* | | | | |
| DACA Eligible | 0.02 | 0.08 | 0.23* | 0.11 |
| Post-period | 0.10 | 0.06 | −0.19* | 0.08 |
| DACA eligible*Post | 0.17* | 0.08 | 0.14 | 0.10 |
| Observations | 1,430 | | 735 | |
| *Ref. Documented* | | | | |
| DACA Eligible | −0.25*** | 0.05 | −0.24*** | 0.06 |
| Post-period | 0.08 | 0.04 | 0.04 | 0.05 |
| DACA eligible*Post | 0.19** | 0.07 | 0.03 | 0.09 |
| Observations | 1,624 | | 1,323 | |

*Source:* 2007-2017 California Health Interview Survey
***p<0.001, **p<0.01, *p<0.05
*Note:* the sample is limited to foreign-born respondents 18–30 years old. The model controls for age, gender, married status, and year of migration.

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

finished high school, while documented immigrants are the most likely to have gone to post-secondary school. DACA-eligible immigrants are least likely to be in the labor force and least likely to be employed among those in the labor force, while undocumented-ineligible immigrants are most likely to be in the labor force and most likely to be employed among those in the labor force. However, undocumented-ineligible immigrants earn the lowest hourly wages.

Table 3 shows the results of the difference-in-differences analysis of the impact of DACA on education from sequential linear probability models of (1) high school or GED completion and (2) any post-secondary education among those with a high school degree or GED. The key finding—the interaction term between DACA eligibility and the post-period—is highlighted in gray. The results show that DACA led to significant increases in high school completion. In contrast, there was no significant effect of DACA on post-secondary education.[6] The results are similar for Mexican and Latino immigrants.

6  The close coinciding of the creation of DACA in 2012 and the passage of the CA DREAM Act in 2011, which granted undocumented students who attended three years of school in California access to state-funded financial aid for college, may confound



**Figure 1.** Predicted Probability of Educational Outcomes by DACA Group and Pre- and Post-DACA Period, among Latino Immigrants in California

*Note:* HS/GED is high school diploma or GED completion; PS ED is any post-secondary education, among those with a HS/GED. Pre-DACA is 1/1/2007–9/30/2012 and Post-DACA is 10/1/2012–12/31/2017.

Figure 1 shows the predicted probability of high school/GED completion and post-secondary educational attainment (among those with a high school degree), comparing each immigrant group in the pre- and post-DACA periods. The figure shows a significant increase in the probability of high school completion—from .54 to .80 from the pre- to the post-period—for the DACA eligible, a substantially larger change than for the two other groups. While the predicted probability of obtaining some post-secondary education also increased across the periods for the DACA eligible, from .31 to .35, this change was not statistically different from the change observed for the other two groups, meaning that DACA did not have a discernable, average impact on post-secondary schooling in California.

Table 4 shows the results of the difference-in-differences analysis of the impact of DACA on employment from sequential linear probability models of (1) labor force participation, (2) employment among those in the labor force, (3) full-time employment among those employed, and (4) logged hourly earnings among those employed. The results show that DACA led to significant increases in labor force participation but decreases in full-time employment. DACA had no significant effect on employment among those in the labor force or on wages among those employed.

These results are illustrated in Figure 2. The figure shows that the predicted probability of labor force participation rose 9 points, from .76 to .85, from the pre- to the post-DACA period for DACA eligible immigrants, compared to no change for undocumented ineligible immigrant and a slight decline among documented immigrants. The predicted probability of employment rose similarly for all three groups, meaning that DACA did not have a uniquely positive impact on employment. And perhaps surprisingly, the predicted probability of full-time employment declined for DACA eligible immigrants, from .68 in the pre-period to .55 in the post-period, while it rose for the other two groups. We discuss these findings in light of our qualitative results, which we turn to next.

*Understanding Education after DACA*

In spite of the better identification of DACA-eligible immigrants in the CHIS than in previous studies of large datasets, the DID analysis showed no impact of DACA on post-secondary schooling. While we have greater confidence that this null result does not arise from the misidentification of the DACA-eligible population in survey data, the survey data cannot explain why the null result arises. Does DACA truly have no effect on post-secondary education? Or does it have mixed effects, raising the likelihood of post-secondary schooling for some, but lowering it for others, producing a null effect on average?

our analysis of DACA's impact on education in California. If the CA DREAM Act raised the likelihood of college-going among the DACA eligible but not the control groups in our analysis, then our estimate will be upwardly biased. If that's the case, then the true average effect of DACA on post-secondary schooling is more negative than what we find.

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

**Table 4.** Difference-in-difference Estimates from Sequential Linear Probability Models of DACA's Impact on Employment Outcomes among Mexican and Latino Immigrants in California

| | (1) In the labor force | | (2) Employed, among those in the labor force | | (3) Works full time, among those employed | | (4) Logged hourly earnings, among those employed | |
|---|---|---|---|---|---|---|---|---|
| | *Coeff.* | *SE* | *Coeff.* | *SE* | *Coeff.* | *SE* | *Coeff.* | *SE* |
| **Mexican** | | | | | | | | |
| *Ref. Undoc. Inelig.* | | | | | | | | |
| DACA Eligible | −0.04 | 0.05 | −0.19* | 0.09 | 0.07 | 0.08 | 0.03 | 0.14 |
| Post-period | 0.05 | 0.05 | 0.11** | 0.04 | 0.10 | 0.07 | 0.26* | 0.12 |
| DACA eligible*Post | 0.05 | 0.07 | −0.02 | 0.09 | −0.27** | 0.10 | 0.10 | 0.17 |
| Observations | 1,179 | | 834 | | 719 | | 714 | |
| *Ref. Documented* | | | | | | | | |
| DACA Eligible | −0.12** | 0.04 | −0.03 | 0.09 | 0.11 | 0.06 | 0.16 | 0.08 |
| Post-period | −0.01 | 0.05 | 0.10 | 0.06 | 0.09 | 0.05 | 0.05 | 0.09 |
| DACA eligible*Post | 0.12* | 0.05 | −0.03 | 0.11 | −0.27** | 0.09 | 0.33* | 0.14 |
| Observations | 1,380 | | 1,110 | | 948 | | 941 | |
| **Latino** | | | | | | | | |
| *Ref. Undoc. Inelig.* | | | | | | | | |
| DACA Eligible | −0.00 | 0.05 | −0.18* | 0.08 | 0.02 | 0.08 | 0.09 | 0.14 |
| Post-period | 0.07 | 0.06 | 0.14*** | 0.04 | 0.06 | 0.06 | 0.31* | 0.12 |
| DACA eligible*Post | 0.07 | 0.06 | −0.08 | 0.08 | −0.19* | 0.09 | 0.09 | 0.16 |
| Observations | 1,430 | | 1,041 | | 896 | | 891 | |
| *Ref. Documented* | | | | | | | | |
| DACA Eligible | −0.10** | 0.04 | 0.01 | 0.08 | 0.10 | 0.06 | −0.13 | 0.09 |
| Post-period | −0.02 | 0.03 | 0.14* | 0.05 | 0.07 | 0.05 | 0.08 | 0.10 |
| DACA eligible*Post | 0.13* | 0.05 | −0.10 | 0.10 | −0.21* | 0.08 | 0.30 | 0.15 |
| Observations | 1,624 | | 1,313 | | 1,114 | | 1,107 | |

*Source:* 2007–2017 California Health Interview Survey
***p<0.001, **p<0.01, *p<0.05
*Note:* the sample is limited to foreign-born respondents 18–30 years old. The model controls for age, gender, married status, and year of migration.



**Figure 2.** Predicted Probability of Current Employment Status by DACA Group and Pre- and Post-DACA Period, among Latino Immigrants in California

*Note:* ILF is in the labor force; EMP is employed, among those within the labor force; and FTE is full-time employment, among those employed. Pre-DACA is 1/1/2007–9/30/2012 and Post-DACA is 10/1/2012–12/31/2017.

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

AR2022_500590

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

Our analysis of interview data from the DACA Study provides strong evidence of the latter. We identified four patterns of DACA's effects on education in the interview data. For one group, DACA made college possible. For a second, college-going group, DACA made college easier. For a third group, DACA led recipients to prioritize work over school. Finally, a fourth group described college as out of reach or no longer an option by the time DACA was created. For the first and third groups, DACA had a direct effect on schooling: it either encouraged it (by making it possible) or discouraged it (by leading recipients to prioritize work). For the second and fourth groups, DACA had small or no effects on college-going because those respondents' post-secondary pathways were already in place by the time that DACA was created. We describe each group in turn.

Respondents in the first group described how DACA made college possible, both materially and symbolically. Some mentioned that college would have been too expensive without the possibility of working at the same time; DACA therefore helped make college financially possible for them. Others described how DACA changed the way they thought about the future. For example, Joshua said that he was able to "imagine myself moving forward in a professional career where two years ago I didn't think that it was possible."[7]

For many, the sense that DACA opened doors reflected the perception that, prior to DACA, schooling would not pay off on the job market. Stephanie said, "When I was going to high school I didn't know what I was going to do with my life, because I didn't know if I was even gonna be able to work here [in the United States] . . . so what was the point of going to college?" Marlena further described her thought process: "I go to school right, I'm able to finish, get my BA, get a Masters, but I don't have a social [security number], I can't apply to jobs. So I have all this knowledge, and all this experience, and all these things, but I can't apply because I don't have I don't have a social security." For individuals like Marlena, because DACA provided a work permit, the returns to schooling could be materialized, making college seem like a reasonable investment.

Other respondents were already on a trajectory that included college; these students were, therefore, in a different, "DACA made college easier" trajectory. Students in this group reflected that they would have likely completed college even without DACA. Janet said this explicitly:

> I don't think it affected me, having or not having DACA, because I was still gonna do it [go to college]. Like, there's not . . . there's not another option. How're you gonna live if you don't have an education? Like, I don't wanna be like . . . breaking [my back] at my current job for the rest of my life.

Many other college-bound high schoolers and students already in college described how DACA made college-going easier by reducing financial and other stressors. College students discussed being able to get a job to pay for books, tuition, housing, and other costs related to college. Jonathan described the change as follows:

> Before [DACA], I just have to be worried about whether or not I was gonna get money to pay for my classes, and then to get my books, and then maybe for transportation, and then for food. . . . And now I know that at the very least, I have a job. And financially, I can have a peace of mind that if there's anything that I need, I can get [it] . . . I don't have to be thinking too much about whether or not I will be able to fund my education.

Vanessa commented that the financial security that DACA provided allowed her to focus on school in way that she couldn't before:

---

7   Pseudonyms are used for all respondents.

> [DACA] has helped me a lot. The fact that I can work better jobs that pay better, that are more flexible with hours, has helped me a lot because I have more time to study, more time to put into school, versus before I had to work a lot more to be able to just make it through.

Students like Jonathan and Vanessa were already on the college trajectory and DACA improved their college experiences by lessening financial burdens and stress.

For the third group of respondents, financial constraints led them to prioritize work rather than go to college, and they continued to do so after acquiring DACA. Some respondents mentioned having to help family members, like Jared, who said he did not continue his schooling after high school because he had to "help around the house to bring money."

Others worked to save up money to eventually go to school, but had not made the transition yet. For instance, Eunice said that she took a year off to "get a job so I can save up money for college since it is a lot of money." Others postponed schooling to work because they found that going to school and work at the same time was not possible because their work schedules were too hectic, or because they could not or did not want to cut back on hours to make time for school. For instance, TJ wanted to go to college, but DACA had made his job as a sound engineer for a band much more lucrative because he could now travel with the band. He said that going to college "interests me a lot. But right now with work it is really complicated. What I want is to go to school full time, but with my work, I can't do it. But it does interest me."

A final group of respondents felt that they might have made a different decision if DACA had been available when they were just out of high school; for these respondents, college no longer seemed to be an option. Darlene expressed that she wanted to go to college right out of high school, but when DACA was created 10 years later, she no longer felt that college was an option. As she put it:

> At first [after getting DACA], I couldn't even believe that I was actually working in an office after years of manual labor type jobs . . . for me it was 10 years . . . it's like a tug-of-war to see who you're morphing to be. Because you wanna cling [to] that 18-year-old who wanted to go to college, but you're also the adult who's kinda at war with how old you are and how much you can get done in that amount of time while still trying to enjoy your life. So it gets a little more complicated the longer you had to wait. Um, but for people who just graduated high school and are able to qualify for DACA, my god, I'm so happy for them. Because they get to enjoy their actual age and they get the opportunity to reach that potential early on.

Like Darlene, many respondents commented that working created a barrier to returning to school. For instance, Sylvia worked after high school in order to pay for college, but after working for years felt that returning to school would be too difficult and would cost too much in lost wages.

> *Interviewer:* Did you ever take time off from school for any reason?
> *Sylvia:* Yes, for lack of funds.
> *Interviewer:* Okay. Did having DACA help with that?
> *Sylvia:* Not really, no, because already I had a lot of time out of school after high school. . . . I was working full-time. To go back would mean cutting back from full-time, and to go back, to start over at the beginning, having been out of school for more than ten years—that would be too difficult.

For these recipients, DACA came too late to enable college-going.

### Understanding Employment after DACA

Undoubtedly, access to a work permit was the single most important material benefit of the DACA program; this was repeated by nearly every respondent in our in-depth interviews. Maria's response

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

**Table 5.** Worker and Work Characteristics by Occupation among DACA Recipients in
California, 2013–2014 (N=378)

| Occupational Category | Sample dist. (col %) | Ave. age | Currently enrolled in school (row %) | HS/GED highest degree (row %) | College degree or higher (row %) | Works part-time (row %) | Med. Wage |
|---|---|---|---|---|---|---|---|
| Low-skilled worker | 44.3 | 23 | 72.6 | 64.7 | 3.7 | 54.8 | 9.00 |
| Clerical worker | 14.9 | 24 | 45.3 | 54.7 | 20.8 | 41.1 | 10.80 |
| Para-professional | 14.1 | 24 | 58.0 | 40.0 | 28.0 | 50.9 | 10.90 |
| Management | 6.9 | 25 | 58.3 | 79.2 | 8.3 | 30.8 | 11.30 |
| Skilled worker | 7.2 | 25 | 37.5 | 62.5 | 16.7 | 11.1 | 13.00 |
| Professional | 11.5 | 26 | 35.0 | 20.0 | 50.0 | 9.3 | 14.20 |
| Self-employed | 1.1 | 26 | 50.0 | 25.0 | 75.0 | 50.0 | 15.00 |
| All | 100 | 24 | 57.4 | 54.4 | 17.8 | 42.1 | 10.00 |

*Source*: DACA Study
*Note*: The sample is limited to respondents working for pay at the time of the survey.

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

to a question asking what the single biggest change was after DACA is a simple example: "The biggest thing was just like being able to work . . . that was probably the biggest thing." With only a few exceptions, such as a respondent who was ineligible for a federally-funded research position limited to U.S. citizens, respondents perceived that the work permit improved their labor market outlook.

At the same time, our analysis of the CHIS data showed that, on average, DACA did not lead to increases in employment or wages and actually led to declines in full-time employment. Other studies have found that DACA had no effect on occupational prestige (Amuedo-Dorantes and Antman 2016). Nevertheless, our interviews show that DACA nearly universally and unconditionally improved the labor market outlook of DACA recipients. We turn to two distinct sources of data from the DACA Study to explain this result. First, we analyze the occupations of telephone survey respondents to describe the types of jobs that DACA recipients held in the two-to-three years following the passage of the program; next we turn to the in-depth interview data to describe what occupational mobility looks like for DACA recipients.

Table 5 shows the occupational breakdown of the 84 percent of DACA recipients (*n*=378) who reported that they were working for pay at the time of the DACA Study telephone survey in 2014–2015, as well as the average age, educational attainment and enrollment, part-time employment, and median wages by occupation. Three important conclusions can be drawn from the table. First, in 2014–2015, DACA recipients in the DACA Study mostly worked in low-skilled positions; the largest category, low-skilled workers, comprises 44.3 percent of DACA workers in the data. Fewer than one in five respondents (18.7 percent) worked in professional or skilled labor positions. Second, at the time of the survey, many DACA workers (42 percent) worked part-time and earned low wages. The median wage among DACA workers was $10 an hour, and even professional workers earned a low median hourly wage, of $14.20. Third, these work characteristics reflect the characteristics of the DACA population: DACA recipients were young (on average 24 years old in 2014); the majority (57.4 percent) was enrolled in school; and fewer than one in five (17.8 percent) had completed a college degree. Three quarters of respondents in lower-paid, less skilled occupations were enrolled in school, suggesting they may have mobility out of those occupations once/if they finish.

With this profile in mind, we turn back to the interview data to understand what occupational mobility looks like for a population of young adult immigrants, most who have yet to complete their schooling. To focus our discussion, we highlight the work experiences of four DACA recipients, one from each of the trajectories we discussed previously. These four examples characterize the overall conclusion emerging from the conversations we had with DACA recipients about work: that the DACA work permit improved their labor market outlook. These improvements reflected DACA

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

recipients' ability to seek out and choose better work, not measured by wages or hours worked (in many cases), but by fit with their interests, skills, and sense of the status of the work.

Monica is an example of a DACA recipient who perceived that DACA made college possible. At the time of our interview, Monica was a full-time student at a community college who was able to pay for her education as a result of state financial aid and earnings from her job as a cashier at a souvenir store in Los Angeles. She was 15 when DACA passed, which was, as she put it, "really emotional. I felt relieved. . . I was gonna get out of high school. . . so *it gave me like the whole world*, like I'm gonna find a job. And then like I was gonna be able to have like the chance to get an education" (emphasis added). DACA made college possible for Monica because it made it financially feasible and because it meant that she could eventually translate her education into higher earnings on the labor market. In the meantime, Monica was happy with her job as a cashier. Although she would have preferred a higher wage—she earned $9.50 an hour—the job was a clear improvement over the kinds of jobs she would have access to without DACA. As she put it, without DACA, "I'd be working cleaning houses right now. I mean, I did it for like a month." In fact, she held several less-desirable jobs prior to DACA, and in the longest-lasting one, she assisted her father at the liquor store where he worked, doing odd jobs including managing inventory. At the end of her time at the liquor store, she earned $11 an hour, so her take-home earnings were higher than what she was earning at the souvenir store at the time of the interview. However, for Monica, the fact that she doesn't have to lift heavy boxes is a symbol of mobility. She said, "they weighed like 100 pounds. . . I was like, 'what is this? Rocks inside here?'" For Monica, no longer doing manual work—lifting boxes or cleaning houses—and instead working in the front of the shop as a cashier was an unequivocal upgrade in her work life, in spite of lower wages. Monica hopes that mobility out of low-skilled work is on the horizon when she finishes college.

Vanessa, a 22-year-old college student, was enrolled full-time at community college and working part-time for minimum wage at Taco Bell when DACA passed. Vanessa is an example of someone for whom DACA made college easier; she was quoted earlier in the article saying that working better-paying jobs with more flexible hours accommodated her school life. The work permit also enabled her to find work that better fit her skills, interests, and sense of self. At Taco Bell, she was "very unhappy. . . because people have all these misconceptions. . . like you're a low life, like you don't go to school." She said that people would say that "this is why you go to school, so that you don't end up" at Taco Bell, when in fact she worked at Taco Bell in order to pay her way through school. After receiving DACA, she transferred to a state university, left Taco Bell, and began work at two part-time jobs. She worked 4 hours a day during the week at an after-school program earning $11/hour; on weekends she worked another 8 hours a day for $15/hour, planning and holding events for a small marketing company. Although neither position was her "dream job," and she would have preferred higher pay, DACA improved her employment outlook because she was able to escape the stigmatized, fast-food industry and find work that better matched her skills.

Miguel is an example of someone who chose work over college because he felt he could not miss the opportunity to work full-time for higher wages. He went to one year of community college but dropped out in order to work and support his family. The uncertainty and temporariness of the program meant that Miguel prioritized the short-term ability to work:

> You don't know what's going to happen. You don't know what president or what laws are gonna change to the point where it will affect you. Jobwise, you can't think long-term because you don't know if you're always gonna have the job permit. Short-term, for me at least, I have to see myself as with small deadlines . . . I just feel like I have three years to work. I have to make something happen now.

From Miguel's perspective, DACA facilitated clear upward mobility. When DACA was announced, he was working at the same fast food restaurant where his undocumented mother worked. With the

work permit, he was able to move out of the food industry into marketing, insurance, and sales. As he put it, DACA completely changed his life because he was able "to hold a legal job. A legitimate job. I was able to apply anywhere and it just opened up so many doors." Currently he works full-time in marketing for a medical office, where he earns $14 an hour plus commission, which he feels is "an OK pay." Although he likes his job, he eventually wants to be a business owner.

David is an example of someone for whom DACA had little impact on post-secondary schooling because college was out of reach by the time DACA was created. He had already graduated from high school when DACA passed and had no plans to go to college, although he may one day go back to vocational school to train to be a mechanic. David speculated that if he had had legal status, he might have considered college if he had been tracked into different classes in high school. Prior to DACA, David worked at a fast food chain, and following DACA he worked part-time as a server in a restaurant. The rest of the time he dedicated to his own landscaping business. Although David remains in low-skilled work after obtaining DACA, the legal status of his work is important to him. As he put it, "I was able to go to court and make [my landscaping business] legal. . . make it more like a company," and he is able to pay taxes on his earnings at the restaurant. David perceives moving his work above the table as an improvement to his work life, and he perceives greater opportunity in a legal business.

Monica, Vanessa, Miguel, and David reveal what occupational mobility looks like among DACA recipients. In each case, like nearly all respondents in our interview data, they described the various advantages of the DACA work permit: the ability to search openly on the labor market, find a better-paying or better-fitting job, work "above the table," gain access to benefits, perceive opportunities for upward mobility, and feel empowered at the workplace to demand raises or make complaints. Miguel is an example of someone who turned the work permit into a short-term improvement in wages and occupational status. But not everyone accessed higher-paying or more prestigious jobs; in some cases, like Vanessa's, the fact that their work was a better fit was more important than better pay, and in other cases, like David's and Monica's, pay and prestige didn't improve, but there were qualitative improvements to the work. In some cases, like Monica's, it is simply too soon to see whether the investment in post-secondary schooling will pay off on the labor market, which of course depends in large part on whether the DACA program, or another program enabling legal work, exists once they earn their degree.

## CONCLUSION

DACA was the first major expansion of immigrant rights since 1986. However, unlike the Immigration Reform and Control Act, DACA did not provide a path to citizenship. It was, in the words of President Obama when he announced the program, a "temporary, stopgap measure that . . . gives a degree of relief and hope to talented, driven, patriotic young people" (Obama 2012). In this article we investigated whether and how DACA impacted the educational attainment and employment outcomes of DACA recipients in California in the five years following the program's creation. The findings from our analysis of representative survey data on young Latino immigrants and original survey and in-depth interviews with DACA recipients in California resonate with President Obama's words: while the program did indeed give a degree of relief and hope to young people, the temporary, stopgap nature of the program limited the extent to which recipients could make meaningful, long-term investments in education and in occupational mobility. In theoretical terms, our findings support the liminal legality perspective. We conclude that the temporariness and uncertainty of the DACA program has undermined the potential impacts of this expansion of immigrant rights (see also Cebulko 2014; Roth 2018).

Our analysis helps explain why previous studies have not found consistent impacts of the program on recipients' work and school outcomes. Like previous studies, we also found mixed effects of DACA on employment and education, including a strong, positive effect on high school graduation

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

and labor force participation, but no consistent effect on post-secondary schooling, employment, or wages, and a negative effect on full-time employment. Because we were able to more closely identify the DACA-eligible population in the CHIS than prior studies using national data, we can conclude that the inclusion of ineligible individuals in the policy treatment group is likely not why prior studies have found small, weak, or mixed effects. While smaller samples in our data may increase the risk of a Type 2 error – of a false negative – our results are generally consistent with studies using much larger samples.

Furthermore, our qualitative data provide substantial rationale for the mechanisms behind the mixed findings. Our analysis of original surveys and in-depth interviews with DACA recipients in California shows that the program had diverse, often counter-balancing impacts on the socioeconomic trajectories of recipients. While DACA made college possible and easier for some, the college plans—either to attend or not—were already set by a lifetime of inequality for many others. For a fourth group, DACA appears to have discouraged college attendance, as recipients prioritized the opportunity to work rather than attend college. This heterogeneity in post-secondary education outcomes may imply that the program's impacts vary along a measurable characteristic, like age or background socioeconomic status.[8] However, we did not find strong evidence of this in the DACA Study. Some college-bound DACA recipients came from extremely disadvantaged backgrounds, while some who eschewed college altogether did not. Rather, college plans established earlier in life – formed through parents' expectations and supports, interactions and relationships with teachers and other mentors, and school-based resources—may have mattered more in determining these distinct patterns. Future research can help explain these pathways.

Our interviews also help explain our finding in the CHIS that DACA did not affect employment or wages and led to declines in full-time employment. Many recipients took lower-paying jobs or jobs with fewer hours in order to work in positions that they felt were an improvement over their previous positions by virtue of being "above the table," better-fitting with their interests, and providing some avenue for future mobility. An implication of these findings is that standard survey measures of occupational mobility—employment, wages, hours worked, and occupational prestige—will not capture the experience of mobility for young people who immigrated as children, many of whom have yet to complete their schooling. Rather, occupational mobility is more of a subjective, "felt" experience for DACA recipients, reflecting the benefits of being able to search openly on the labor market and the legitimacy that comes from legal work. This is similar to the results from other studies that document subjective feelings of inclusion that come from access to legal documents such as work permits or drivers licenses (Cebulko and Silver 2016; Roth 2018). These subjective experiences could account for the positive responses to online surveys of individuals recruited through immigrants' rights organizations regarding whether their work lives improved after DACA.

Underlying the diversity of DACA recipients' experiences is something they all shared: the insecurity of the program's temporariness and uncertainty. Respondents who felt DACA had opened up endless possibilities expressed worry about renewing their status. Respondents who described crying with relief when they received their DACA permits in the mail also described the fear they felt in anticipation of the 2016 presidential election. Nearly every single respondent said that it was difficult to plan for the future because they could not be sure what the future would hold for them in terms of their legal status. As Menjívar's (2006) theory of liminal legality instructs us, insofar as it is an improvement over *il*legality, liminal legality is enabling in the short-run, but experienced indefinitely, it can undermine wellbeing in myriad ways. Our data suggest that, like TPS, DACA is a liminal legality, and the inherent uncertainty of liminal legality limits the ability of DACA recipients to plan and invest in their futures. In addition to its uncertainty and temporariness, other aspects of the DACA program limit its positive impacts, including that for some undocumented youth, it arrived too late in life

---

8   There were no measures of background socioeconomic status, such as parents' education, for adults in the CHIS, and we did not have sufficient statistical power to estimate variation in impacts by age.

to impact schooling. For others, the need to support family who remain undocumented means that work takes priority over schooling.

Our findings are specific to the state of California, which is one of the most welcoming immigrant-receiving states—at least in the period we studied between 2007–2017 and as measured by legislative actions to provide services and benefits to undocumented immigrant residents of the state (De Trinidad Young and Wallace 2019; Rodríguez, Young, and Wallace 2015). California allows undocumented students who attended three years of high school in California to pay in-state tuition at public colleges, gives undocumented students access to state-funded financial aid to attend college, allows undocumented children and adolescents to enroll in state-funded health insurance plans, allows undocumented residents to obtain driver's licenses, and forbids state law enforcement agents from using state resources for federal immigration enforcement efforts. It is possible that employment and educational attainment outcomes would be different in other states. Indeed, Cebulko and Silver (2016) have argued that state law interacts with federal law to inform the experiences of DACA recipients. They found that immigrant youth were more optimistic about their futures in the more welcoming context of Massachusetts than in the hostile immigration climate of North Carolina. Roth (2017) found that many DACA recipients in South Carolina, which forbids undocumented immigrants from enrolling in state colleges but allows DACA recipients to do so, were unable to achieve their college-going dreams because the state climate affected their interactions with and the information they obtained from high school counselors. Our results—in a relatively welcoming state climate—were mixed, and would likely be different in other states or in the national average. Future research should continue to examine and compare across different local policy climates.

In spite of state variation in DACA experiences, whether and to what degree DACA has long-term impacts on socioeconomic mobility depends more basically on whether the DACA is terminated, maintained, or replaced. The respondent whose quote introduced this article stated the problem of liminal legality well: "In very small ways, [life after DACA] has changed. But at the same time those small things are big things because before we did not have anything. And just something is a lot. But at the same time this something is very little. Why not [comprehensive] immigration reform, right?" Replacing DACA with a permanent program including a route to citizenship is the "big thing" that DACA recipients need in order to invest in and realize their potential.

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

AR2022_500597

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

APPENDIX

Table A1. Pre-trend Analysis of Education and Employment Outcomes

| | High school degree or GED | | Post-secondary, among those with HS/GEG | | In the labor force | | Employed, among those in the labor force | | Works full time, among those employed | | Logged hourly earnings, among those employed | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Coeff. | SE | Coeff. | SE | Coeff. | SE | Coeff. | SE | Coeff. | SE | Coeff. | SE |
| **Mexican** | | | | | | | | | | | | |
| Doc. x 2007–08 | −0.04 | (0.12) | 0.01 | (0.14) | −0.04 | (0.09) | −0.10 | (0.27) | −0.17 | (0.15) | −0.04 | (0.25) |
| Doc. x 2011–6/14/12 | −0.22 | (0.12) | −0.25 | (0.15) | −0.03 | (0.09) | −0.17 | (0.26) | −0.15 | (0.14) | −0.21 | (0.22) |
| Undoc. Inelig. x 2007–08 | 0.00 | (0.16) | −0.00 | (0.14) | −0.05 | (0.11) | −0.19 | (0.21) | 0.10 | (0.15) | −0.14 | (0.26) |
| Undoc. Inelig. x 2011–6/14/12 | −0.10 | (0.16) | −0.14 | (0.17) | 0.02 | (0.11) | −0.43* | (0.21) | 0.04 | (0.15) | −0.08 | (0.23) |
| **Latino** | | | | | | | | | | | | |
| Doc. x 2007–08 | −0.09 | (0.12) | 0.03 | (0.15) | −0.10 | (0.09) | −0.06 | (0.25) | −0.06 | (0.16) | −0.05 | (0.23) |
| Doc. x 2011–6/14/12 | −0.19 | (0.12) | −0.15 | (0.15) | −0.02 | (0.08) | −0.19 | (0.24) | −0.17 | (0.14) | −0.29 | (0.21) |
| Undoc. Inelig. x 2007–08 | −0.06 | (0.15) | −0.04 | (0.15) | −0.13 | (0.10) | −0.18 | (0.20) | 0.18 | (0.15) | −0.15 | (0.23) |
| Undoc. Inelig. x 2011–6/14/12 | −0.11 | (0.15) | −0.12 | (0.16) | −0.01 | (0.10) | −0.38 | (0.20) | 0.01 | (0.15) | −0.33 | (0.24) |

*Source:* 2007–2017 California Health Interview Survey

***p<0.001, **p<0.01, *p<0.05

*Notes:* DACA-eligible 2009–10 is the omitted interaction term. The sample is limited to foreign-born respondents 18–30 years old. The models control for age, gender, married status, and year of migration.

**AR2022_500598**

## REFERENCES

Acosta, Yesenia D., Luke J. Larsen, and Elizabeth M. Grieco. 2014. *Noncitizens under Age* 35: 2010–2012. Washington, DC: U.S. Census Bureau.

Amuedo-Dorantes, Catalina, and Francisca Antman. 2016. "Can Authorization Reduce Poverty among Undocumented Immigrants? Evidence from the Deferred Action for Childhood Arrivals Program." *Economics Letters* 147:1–4.

Amuedo-Dorantes, Catalina, and Francisca Antman. 2017. "Schooling and Labor Market Effects of Temporary Authorization: Evidence from DACA." *Journal of Population Economics* 30(1):339–73.

Amuedo-Dorantes, Catalina, Cynthia Bansak, and Steven Raphael. 2007. "Gender Differences in the Labor Market: Impact of IRCA's Amnesty Provisions." *American Economic Review* 97(2):412–16.

Bean, Frank D., Susan K. Brown, and James D. Bachmeier. 2015. *Parents without Papers: The Progress and Pitfalls of Mexican American Integration*. New York: Russell Sage Foundation.

Bean, Frank D., Mark A. Leach, Susan K. Brown, James D. Bachmeier, and John R. Hipp. 2011. "The Educational Legacy of Unauthorized Migration: Comparisons across U.S.-Immigrant Groups in How Parents' Status Affects Their Offspring." *International Migration Review* 45(2):348–85.

Berk, Marc L., and Claudia L. Schur. 2001. "The Effect of Fear on Access to Care among Undocumented Latino Immigrants." *Journal of Immigrant Health* 3(3):151–56.

Cebulko, Kara. 2014. "Documented, Undocumented, and Liminally Legal: Legal Status during the Transition to Adulthood for 1.5-Generation Brazilian Immigrants." *The Sociological Quarterly* 55(1):143–67.

Cebulko, Kara, and Alexis Silver. 2016. "Navigating DACA in Hospitable and Hostile States: State Responses and Access to Membership in the Wake of Deferred Action for Childhood Arrivals." *American Behavioral Scientist* 60(13):1553–74.

Cortes, Kalena E. 2013. "Achieving the DREAM: The Effect of IRCA on Immigrant Youth Postsecondary Educational Access." *American Economic Review* 103(3):428–32.

De Trinidad Young, Maria-Elena, and Steven P. Wallace. 2019. "Included, But Deportable: A New Public Health Approach to Policies That Criminalize and Integrate Immigrants." *American Journal of Public Health* 109(9):1171–76.

Dreby, Joanna. 2015. *Everyday Illegal: When Policies Undermine Immigrant Families*. Berkeley, CA: University of California Press.

Gonzales, Roberto G., Basia Ellis, Sarah A. Rendón-García, and Kristina Brant. 2018. "(Un)Authorized Transitions: Illegality, DACA, and the Life Course." *Research in Human Development* 15(3–4):1–15.

Gonzales, Roberto G., Carola Suárez-Orozco, and Maria Cecilia Dedios-Sanguineti. 2013. "No Place to Belong." *American Behavioral Scientist* 57(8):1174–99.

Gonzales, Roberto G., Veronica Terriquez, and Stephen P. Ruszczyk. 2014. "Becoming DACAmented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)." *American Behavioral Scientist* 58(14):1852–72.

Hall, Matthew, and Emily Greenman. 2015. "The Occupational Cost of Being Illegal in the United States: Legal Status, Job Hazards, and Compensating Differentials." *International Migration Review* 49(2):406–42.

Hall, Matthew, Emily Greenman, and George Farkas. 2010. "Legal Status and Wage Disparities for Mexican Immigrants." *Social Forces* 89(2):491–513.

Hsin, Amy, and Francesc Ortega. 2018. "The Effects of Deferred Action for Childhood Arrivals on the Educational Outcomes of Undocumented Students." *Demography* 55(4):1487–1506.

Kossoudji, Sherrie A., and Deborah A. Cobb-Clark. 2000. "IRCA's Impact on the Occupational Concentration and Mobility of Newly-Legalized Mexican Men." *Journal of Population Economics* 13:81–98.

Menjívar, Cecilia. 2006. "Liminal Legality: Salvadoran and Guatemalan Immigrants' Lives in the United States." *American Journal of Sociology* 111(4):999–1037.

Menjívar, Cecilia. 2008. "Educational Hopes, Documented Dreams: Guatemalan and Salvadoran Immigrants' Legality and Educational Prospects." *The ANNALS of the American Academy of Political and Social Science* 620(1):177–93.

Migration Policy Institute. 2017. *A Profile of Current DACA Recipients by Education, Industry, and Occupation*. Washington, DC: MPI.

Morgan, Stephen L., and Christopher Winship. 2014. *Counterfactuals and Causal Inference: Methods and Principles for Social Research*. New York: Cambridge University Press.

Obama, Barack. 2012. "Remarks by the President on Immigration." June 15. White House Rose Garden. https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration.

Pan, Ying. 2012. "The Impact of Legal Status on Immigrants' Earnings and Human Capital: Evidence from the IRCA 1986." *Journal of Labor Research* 33(2):119–42.

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

Patler, Caitlin. 2018. "Citizen Advantage, Undocumented Disadvantage, or Both? The Comparative Educational Outcomes of Second and 1.5-Generation Latino Young Adults." *International Migration Review* 52(4):1080–1110.

Patler, Caitlin, and Jorge Cabrera. 2015. *From Undocumented to DACAmented: Impacts of the Deferred Action for Childhood Arrivals (DACA) Program*. UCLA Institute for Research on Labor and Employment. https://escholarship.org/uc/item/3060d4z3.

Pope, Nolan G. 2016. "The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants." *Journal of Public Economics* 143:98–114.

Portes, Alejandro, and Min Zhou. 1993. "The New Second Generation: Segmented Assimilation and Its Variants." *Annals of the American Academy of Political and Social Science* 530:74–96.

Rivera-Batiz, Francisco L. 1999. "Undocumented Workers in the Labor Market: An Analysis of the Earnings of Legal and Illegal Mexican Immigrants in the United States." *Journal of Population Economics* 12:91–116.

Rodríguez, Michael A., Maria-Elena Young, and Steven P. Wallace. 2015. *Creating Conditions to Support Healthy People: State Policies That Affect the Health of Undocumented Immigrants and Their Families*. San Francisco, CA: UC Global Health Institute.

Roth, Benjamin J. 2017. "When College Is Illegal: Undocumented Latino/a Youth and Mobilizing Social Support for Educational Attainment in South Carolina." *Journal of the Society for Social Work and Research* 8(4):539–61.

Roth, Benjamin J. 2018. "The Double Bind of DACA: Exploring the Legal Violence of Liminal Status for Undocumented Youth." *Ethnic and Racial Studies* 1–18.

Rytina, Nancy. 2013. *Estimates of the Legal Permanent Resident Population in 2012*. Department of Homeland Security, Office of Immigration Statistics. https://www.dhs.gov/sites/default/files/publications/LPR%20Population%20Estimates%20January%202013.pdf.

U.S. Citizenship and Immigration Services. 2018. *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status Fiscal Year 2012-2018*. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performance_data_fy2018_qtr3_plus_july.pdf.

Vargas Bustamante, Arturo, Hai Fang, Jeremiah Garza, Olivia Carter-Pokras, Steven P. Wallace, John A. Rizzo, and Alexander N. Ortega. 2012. "Variations in Healthcare Access and Utilization among Mexican Immigrants: The Role of Documentation Status." *Journal of Immigrant and Minority Health* 14(1):146–55.

Waters, Mary C., and Marisa G. Pineau. 2016. *The Integration of Immigrants into American Society*. Washington, DC: The National Academies Press.

Wong, Tom K. 2016. *Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey*. https://www.americanprogress.org/issues/immigration/news/2016/10/18/146290/new-study-of-daca-beneficiaries-shows-positive-economic-and-educational-outcomes/.

Wong, Tom K. 2017. *Results from Tom K. Wong et al., 2017 National DACA Study*. https://cdn.americanprogress.org/content/uploads/2017/11/02125251/2017_DACA_study_economic_report_updated.pdf.

Downloaded from https://academic.oup.com/socpro/article/68/3/675/5827865 by University of Michigan user on 06 July 2022

# THE IMMIGRANT RIGHT TO WORK

GEOFFREY HEEREN*

*Federal and state policies that make immigrant work putatively illegal are in tension with a constitutional right to work that is deeply rooted in United States history and jurisprudence. The Department of Homeland Security ("DHS") regulates immigrant work through a system of employment authorization and sanctions on employers who hire unauthorized immigrant workers. This system has become such a central feature of immigration law that few recognize it is a relatively recent innovation. While the United States has always regulated its domestic labor market by modulating immigration, regulation of work as a mechanism of immigration enforcement has only existed since the 1980s. In order for that system to come into being, a radical shift needed to occur: immigrants' right to work had to be forgotten.*

*From the late nineteenth through the early twentieth centuries, courts accepted that immigrants had a right to work based on substantive due process and natural law. This article contends that there are strong constitutional reasons to return to that principle, which has lapsed but has never been overruled. The right of immigrants to work is "objectively, deeply rooted this Nation's history and tradition," which is sufficient to trigger a rigorous form of substantive due process review. No statute has ever been passed that revokes immigrants' right to work; the laws that exist today do not ban unauthorized immigrants from working but instead utilize employer sanctions to relegate them to various forms of contingent work. In these positions, immigrant workers are denied the bundle of rights and protections that go along with the traditional employment relationship. They face exploitation, lower wages, unsafe conditions, and retaliatory discharge or reporting to DHS.*

*This system of subordination arose during the late 1970s after a dramatic curtailment in legal Western Hemisphere immigration virtually assured a constant campaign of deportation against millions of predominately Latin American unauthorized immigrants. Policymakers discouraged unauthorized immigrant employment as a strategy to reduce the wave of illegal*

* Associate Professor, Valparaiso University School of Law. I would like to thank Rosalie Berger Levinson, David Herzig, Marty Lederman, Jennifer J. Lee, Stephen Legomsky, Peter Markowitz, Jason Parkin, Barry Sullivan, Mary Szto, D.A. Jeremy Telman, Bernard Trujillo, and the participants at work-in-progress sessions at the Emerging Immigration Scholars' Conference, the AALS Clinical Conference, the Seventh Annual Constitutional Law Colloquium at Loyola University, Chicago, and faculty workshops at Arkansas, South Carolina, and Valparaiso. © 2017, Geoffrey Heeren.

AR2022_500601

*immigration they had created—a goal that has so far not been met. This history shows that the ineffective policies of the present day raise significant constitutional concerns, and it is time to reconsider them. One way to do so is by taking a second look at the right to work that was well established during an earlier era of United States history.*

## I. INTRODUCTION

For much of United States history, immigrants had a right to work.[1] Nineteenth and early twentieth century courts viewed work as a natural right, and a central aspect of the liberty and property protected by the Fourteenth Amendment Due Process clause.[2] When states tried to keep out or drive out immigrants by restricting their job opportunities through licensing, permitting, or zoning laws, federal courts routinely struck down these efforts.[3] It was not until the late 1970s that the Immigration and Naturalization Service ("INS") began to limit immigrants' right to work by developing a comprehensive system for authorizing immigrant employment.[4] Congress followed up with the Immigration Reform and Control Act ("IRCA") of 1986, which for the first time imposed sanctions on employers who hired unauthorized immigrant workers.[5] This was a paradigm shift: while immigration was once a means for regulating the supply of labor in the country, employment regulation since the 1980s has become a mechanism of immigration enforcement.[6]

However, neither IRCA nor any other federal statute has ever prohibited unauthorized immigrants from working, as long as they do not use false documents to do so.[7] When an unauthorized immigrant worker works for an employer, it is the employer who violates the law by hiring an unauthorized immigrant, not the worker.

Unauthorized immigrant workers continue to work despite employer sanctions, not only because it is lawful, but also because they have to in order to feed themselves and their families.[8] Work is one of the most basic human

---

1. *See infra* Part I.
2. *See, e.g.,* Allgeyer v. Louisiana, 165 U.S. 578, 589 (1897).
3. *See infra* Part II.
4. *See infra* Part II.
5. Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, §§ 115, 274A, 100 Stat. 3359, 3360, 3384 (making employment of unauthorized immigrants unlawful and increasing enforcement of existing immigration laws).
6. *See* Juliet Stumpf & Bruce Friedman, *Advancing Civil Rights Through Immigration Law: One Step Forward, Two Steps Back?,* 6 N.Y.U. J. LEGIS. & PUB. POL'Y 131, 137 (2002) (noting that IRCA "effectively makes employers parties to enforcement of the immigration laws affecting the labor market.").
7. Kati L. Griffith, *U.S. Migrant Worker Law: The Interstices of Immigration Law and Labor and Employment Law,* 31 COMP. LAB. L. & POL'Y J. 125, 140 (2009) [hereinafter Griffith, *Migrant Worker Law*] ("IRCA [the Immigration Reform and Control Act of 1986] did not explicitly make it illegal for an undocumented employee to simply seek or accept employment in the United States.").
8. *See* Jeffrey S. Passel & D'Vera Cohn, *Share of Unauthorized Immigrant Workers in Production, Construction Jobs Falls Since 2007,* PEW RESEARCH CENTER 5 (2015), http://www.pewhispanic.org/2

activities and the source of not only physical sustenance, but also societal respect and emotional fulfillment.[9] Courts once agreed that immigrants had a constitutional right to work, based on natural law principles set out in fundamental constitutive documents of the United States, like the Declaration of Independence.[10] In sharp contrast, unauthorized immigrant work today is putatively illegal—discouraged (but not actually banned) through a work permit system and employer sanctions.[11]

The putative illegality of unauthorized work puts unauthorized workers in a uniquely poor bargaining position in the economy. Employers who know of their workers' unauthorized status can use that knowledge as leverage to blackmail them into accepting conditions that do not comply with federal and state employment laws.[12] Many large and well-established employers, of course, do not wish the exposure that comes with openly hiring unauthorized workers. Yet they can still secure the economic benefit of hiring unauthorized immigrant workers by participating in the "fissured workplace": a growing network of non-traditional work relationships, such as independent contracting, subcontracting, and franchising.[13] According to one estimate, about 13% of the labor force is composed of independent contractors: workers who theoretically control the terms and conditions of their work.[14] If self-employed workers, agency temps, on-call workers, and contract company workers are added in, the number rises to nearly a quarter of the United States workforce.[15]

Companies or individuals do not for the most part face sanctions under IRCA if they hire unauthorized immigrant workers who are independent contractors.[16] The independent contractor exception opens a vast swath of

---

015/03/26/share-of-unauthorized-immigrant-workers-in-production-construction-jobs-falls-since-20 07/ (the number of unauthorized immigrants in the United States labor force has ranged from 8.1 million to 8.3 million since 2007).

9. *See* STUDS TERKEL, WORKING: PEOPLE TALK ABOUT WHAT THEY DO ALL DAY AND HOW THEY FEEL ABOUT WHAT THEY DO xiii (1974).

10. *See infra* Part I.

11. *See infra* Part III.

12. *See* Stephen Lee, *Monitoring Immigration Enforcement*, 53 ARIZ. L. REV. 1089, 1091 (2011) ("growing evidence suggests that unauthorized workers are more likely than their authorized counterparts to experience labor violations."); Michael J. Wishnie, *Prohibiting the Employment of Unauthorized Immigrants: The Experiment Fails*, 2007 U. CHI. LEGAL F. 193 (2007). For a discussion of the workplace rights that arguably do apply to unauthorized migrants, see Keith Cunningham-Parmeter, *Redefining the Rights of Undocumented Workers*, 58 Am. U. L. Rev. 1361, 1367-71 (2009); D. Carolina Núñez, *Fractured Membership: Deconstructing Territoriality to Secure Rights and Remedies for the Undocumented Worker*, 2010 Wis. L. Rev. 817, 849-60 (2010).

13. DAVID WEIL, THE FISSURED WORKPLACE: WHY WORK BECAME SO BAD FOR SO MANY AND WHAT CAN BE DONE TO IMPROVE IT 11-13 (2014).

14. GOVERNMENT ACCOUNTABILITY OFFICE, CONTINGENT WORKFORCE: SIZE, CHARACTERISTICS, EARNINGS, AND BENEFITS, LETTER TO THE HONORABLE PATTY MURRAY, RANKING MEMBER, COMMITTEE ON HEALTH, EDUCATION, LABOR, AND PENSIONS, UNITED STATES SENATE 16 (APRIL 20, 2015).

15. *Id.* at 15-16.

16. Independent contractors are excluded from the definition of "employee" under IRCA and persons or entities therefore have no obligation to check the citizenship status or employment authorization of independent contractors. 8 C.F.R. § 274a.1(f). However, a person or entity who knowingly contracts with an unauthorized worker knowing that he or she is unauthorized can be

occupations for unauthorized immigrant workers; landscapers, general contractors, barbers, and home health care workers are all examples of occupations commonly structured as independent contractors. With the spread of the fissured workplace, large employers can subcontract out corporate functions to entities that might be more willing to directly hire unauthorized workers, or to hire independent contractors who are unauthorized to work.

In addition to the independent contractor exception, there are two other significant gaps in IRCA. The employment of one's self does not violate IRCA, and many unauthorized workers are self-employed entrepreneurs.[17] Last, persons can hire irregular domestic workers, such as housecleaners or part-time nannies, without violating IRCA.[18]

What all these positions have in common is that they do not come with the bundle of rights that typically accompanies a formal employment relationship: minimum wage and overtime, Social Security and other retirement benefits, unemployment insurance, workers' compensation, collective bargaining rights, and the protection of federal antidiscrimination laws.[19] Thus, the primary impact of employer sanctions is not to ban unauthorized workers from working, but to relegate them to contingent positions where they do not receive the rights and protections that traditional employees take for granted.

Therefore, unauthorized immigrant workers are literally subordinate in the workplace; IRCA does not bar them from working, just from accessing the rights that other workers have. They typically receive less pay than authorized workers do in exchange for largely manual labor jobs that come with a risk of poisoning by pesticides and industrial chemicals, debilitating workplace accidents, retaliatory discharge, and other labor law violations.[20] All

---

subject to liability under IRCA even if the worker is an independent contractor. 8 U.S. Code § 1324a(a)(4); 8 C.F.R. § 274a.5. Thus, an individual or entity might face sanctions if the individual or entity has independent knowledge that an independent contractor is not authorized to work.

17. *See* Cindy Carcamo, *Immigrants Lacking Papers Work Legally—As Their Own Bosses*, L.A. TIMES, Sept. 14, 2013; Michael Mastman, *Undocumented Entrepreneurs: Are Business Owners "Employees" Under the Immigration Laws?*, 12 N.Y.U. J. LEGIS. & PUB. POL'Y 225, 252 (2008) (analyzing IRCA's employer sanctions provisions and determining that they do not prevent unauthorized immigrants from owning businesses). One study using data from the 1990 Census and the Legalized Population Survey (LPS) found that the rate of self-employment among undocumented male (female) immigrants was 4.6 percent (3.6 percent) in 1989 and 8.3 percent (5.1 percent) in 1992 after legalization through the Immigration Reform and Control Act. Robert W. Fairlie & Christopher Woodruff, *Mexican Entrepreneurship: A Comparison of Self-Employment in Mexico and the United States*, *in* GEORGE J. BORJAS, MEXICAN IMMIGRATION TO THE UNITED STATES 154 (2007). If this rate of self-employment among undocumented immigrants has remained constant, about 450,000 of the estimated eleven million undocumented immigrants would be self-employed.

18. 8 C.F.R. § 274a.1(h) (excluding "domestic service in a private home that is sporadic, irregular, or intermittent" from the definition of employment under IRCA).

19. WEIL, *supra* note 13, at 17-18. For a discussion concerning whether undocumented immigrants who are not working as independent contractors receive these protections, see Cunningham-Parmenter and Núñez, *supra* note 12.

20. *See* ANNETTE BERNHARDT, ET AL., BROKEN LAWS, UNPROTECTED WORKERS: VIOLATIONS OF EMPLOYMENT AND LABOR LAWS IN AMERICA'S CITIES (2008) (finding high incidence of labor law violations for unauthorized immigrant workers), http://www.nelp.org/content/uploads/2015/03/Broken LawsReport2009.pdf?nocdn=1; FARMWORKER JUSTICE, EXPOSED AND IGNORED: HOW PESTICIDES ARE ENDANGERING OUR NATION'S FARMWORKERS (2013) (documenting the health impact of pesticide

the while, deportation hangs over their heads as a cudgel for unscrupulous employers to use against them—a stick that would not exist if employers were not required by law to inquire into immigration status.[21]

Certain aspects of this situation could be remedied if courts recognized what once was a truism: immigrants have a right to work. Given the historical protection of the immigrant right to work, it seems to satisfy the *Washington v. Glucksberg* standard for assessing whether a right is fundamental enough to deserve protection under the Fourteenth Amendment as a matter of substantive due process: whether it is "objectively, deeply rooted in United States history."[22]

Admittedly, recognizing an immigrant right to work would be in tension with courts' longstanding reluctance to apply heightened review to economic legislation since the rejection of this approach in *Lochner v. New York*.[23] Expansion of judicial protection for economic rights could be a Pandora's box, possibly resulting in the invalidation of modern labor law. However, there are principled ways to expand select economic rights without holding all progressive economic legislation unconstitutional.[24] One possible limiting principle comes from the Court's recent decision in *Obergefell v. Hodges*.[25] In that case, the Court found the history of subordination against LGBT persons supported the invocation of a substantive due process right to marry, even though LGBT persons had not historically enjoyed protection of that right.[26] Much like same-sex couples, immigrants have also experienced subordination; the workplace subordination of unauthorized immigrant workers is part and parcel of a larger history of discrimination, violence, and exploitation of immigrants in the United States. Thus, it is possible to legally distinguish between the workplace rights of subordinated immigrants and those of, for example, an employee who does not wish to pay union fees. Accordingly, there is a sound basis for treating them differently.[27]

---

exposure to farmworkers), http://www.farmworkerjustice.org/sites/default/files/aExposed%20and%20Ignored%20by%20Farmworker%20Justice%20singles%20compressed.pdf; Passel & Cohn, *supra* note 11, at 8-9 (unauthorized immigrants hold jobs in agriculture, service, and construction at a disproportionately high rate); Jayesh M. Rathod, *Beyond the "Chilling Effect": Immigrant Worker Behavior and the Regulation of Occupational Safety & Health*, 14 EMP. RTS. & EMP. POL'Y J. 267, 275–76 (2010) (noting a rise in workplace accidents among the foreign-born population in the United States).

21. *See* Wishnie, *supra* note 12, at 215.

22. Washington v. Glucksberg, 521 U.S. 702, 703 (1997).

23. For a discussion of Lochner v. New York , 198 U.S. 45 (1905), and its demise, *see* Richard E. Levy, *Escaping Lochner's Shadow: Toward A Coherent Jurisprudence of Economic Rights*, 73 N.C. L. Rev. 329, 344 (1995).

24. As an example of one such argument, see *id.* at 413-42.

25. Obergefell v. Hodges, 135 S. Ct. 2584 (2015).

26. *See* Laurence H. Tribe, *Equal Dignity: Speaking its Name*, 129 HARV. L. REV. F. 16 (2015); Kenji Yoshino, *A New Birth of Freedom?: Obergefell v. Hodges*, 129 HARV. L. REV. 147, 148 (2015).

27. For a discussion of the role that the anti-subordination principle has played in legal analysis, see Ruth Colker, *Anti-Subordination Above All: Sex, Race, and Equal Protection*, 61 N.Y.U. L. REV. 1003, 1048 (1986); Cass R. Sunstein, *The Anticaste Principle*, 92 MICH. L. REV. 2410, 2428-33 (1994).

There are four parts to this argument. Part One provides a historical overview of immigrants' jurisprudential right to work and the relative absence of federal regulation of immigrant labor during the same time period. This history shows that immigrants' right to work is deeply rooted in United States history. Part Two describes how federal regulation of immigrant labor began to take place as courts simultaneously shifted away from recognizing immigrants' constitutional right to work. This shift accelerated in the 1970s as policymakers dramatically curtailed legal Western Hemisphere immigration and became concerned about the increase in illegal immigration that occurred as a result.[28] Believing that jobs were a magnet for illegal immigration, Congress restricted immigrant employment and made work authorization central to the overall immigration enforcement strategy.[29] Part Three contends that laws that evolved out of this era concerning noncitizens' work made unauthorized work only *putatively* illegal and subordinated unauthorized immigrant workers without significantly reducing illegal immigration. Finally, Part Four argues that immigrants' right to work ought to be revived because it is deeply rooted in United States history and because immigrant workers have experienced subordination.

This article argues that noncitizens have a right to work whether they have a formal immigration status or not. That does not mean the right to work can never be restricted. The exact contours of the right to work and the standard for evaluating restrictions on it are beyond the scope of this article. Nevertheless, if a constitutional right to work does exist for immigrants, then two significant conclusions follow. First, a President may expand immigrant work authorization without specific congressional approval. Second, government actions that significantly burden the immigrant right to work—like provisions criminalizing unauthorized work or taking work authorization away from classes of noncitizens who currently have it—should trigger judicial review.

## II. THE ORIGINS OF IMMIGRANTS' RIGHT TO WORK

Immigration has always been closely connected to labor in this country.[30] Throughout United States history, immigration controls have operated as a means to meet labor needs during times of economic prosperity or to protect jobs held by American citizens during times of economic malaise.[31] It is only in the last few decades that another system has arisen, under which labor regulation has come to serve as a means of immigration enforcement.

---

28. *See infra* Part II.
29. *Id.*
30. E.P. HUTCHINSON, LEGISLATIVE HISTORY OF AMERICAN IMMIGRATION POLICY 1789–1965 492 (1981).
31. JUAN F. PEREA, ET AL., RACE AND RACES: CASES AND RESOURCES FOR A DIVERSE AMERICA (Thomson/West 3d ed. 2007).

Previously, the federal government did not regulate immigrant work. When states did, courts struck down their efforts as a violation of immigrant rights.

A.  *The Absence of Federal Regulation of Immigrant Work Prior to the 1940s*

In the nineteenth century, the Industrial Revolution created a seemingly endless need for labor. The United States met this need in part through policies encouraging immigration. Early federal immigration laws, such as the Contract Labor Law of 1864, were intended to increase, rather than reduce, immigration.[32] The Burlingame Treaty of 1868 encouraged Chinese immigration in particular—a key source of labor to build the infrastructure necessary for an expanding nation.[33] However, states like California reacted with hostility to the entry of large numbers of Chinese immigrants.[34] Organized labor objected to the use of contract immigrant laborers to break strikes and depress wages.[35]

As a result, Congress passed a series of laws that, for the first time, restricted immigration. The Page Act of 1875 prohibited immigration of Asian forced laborers and prostitutes.[36] The Chinese Exclusion Act of 1882 prohibited all Chinese immigration.[37] The 1885 Contract Labor Law banned American employers from entering into labor contracts with individuals prior to their immigration to the United States, and forbade ship captains from transporting immigrants under labor contracts.[38] There were, however, a variety of exceptions to the new Contract Labor Law, such as for "foreigners temporarily residing in the United States, skilled workmen for any new industry not established in the United States and artists, lecturers, and servants."[39] In 1903, Congress banned advertising intended to encourage immigration of noncitizen laborers.[40]

This early round of immigration regulation may have been a response to declining wages for unskilled labor.[41] It aimed to fortify wages by restricting the supply of new laborers. Immigration and labor were so strongly linked in the views of policymakers that, shortly after the Department of Commerce and Labor was formed in 1903, the Bureau of Immigration was transferred

32. An Act to Encourage Immigration, 13 Stat. 385 (1864).
33. *See* Tim Wu, *Treaties' Domains*, 93 VA. L. REV. 571, 616 (2007).
34. *Id.*
35. ANDREW GYORY, CLOSING THE GATE: RACE, POLITICS, AND THE CHINESE EXCLUSION ACT 246 (1998).
36. The Page Act of 1875, 18 Stat. 477, 477–78 (1875).
37. Chinese Exclusion Act of 1882, ch. 126, 22 Stat. 58, 58–59 (1882).
38. Contract Labor Law of 1885, ch. 164, 23 Stat. 332 (1885).
39. H. Rep. No. 1365, at 1662 (1952).
40. Act of March 3, 1903, ch. 1012, 32 Stat. 1213 (1903).
41. Ashley S. Timmer & Jeffrey G. Williams, *Immigration Policy Prior to the 1930s: Labor Markets, Policy Interactions, and Globalization Backlash*, 24 POPULATION & DEV. REV., 739, 759 (1998).

AR2022_500607

from the Treasury Department to the newly created department.[42] When Commerce and Labor broke off into separate departments, immigration remained with the Department of Labor.[43]

Though immigration restrictions ostensibly protected the domestic labor market, they often reflected the nation's racial biases. For example, the 1907 Immigration Act gave the president authority "to refuse immigration to certain persons when he was satisfied that such immigration was detrimental to labor conditions here."[44] In response to continuing public opposition to Asian immigration, President Theodore Roosevelt used this authority in 1907 to exclude Japanese and Korean laborers entering the United States from Mexico, Canada, or Hawaii.[45] Because immigration laws functioned as a means for regulating the labor supply in the United States, immigrants who were already in the United States faced no federal regulation of their right to work.

In 1924, Congress passed the first truly comprehensive immigration law, the Johnson-Reed Immigration Act.[46] The law did not restrict the right of immigrants to work; even students, under the Act's regulations, had a right to work to support themselves.[47] The Johnson-Reed Act regulated immigration through a series of national origin quotas that were intentionally designed to maintain a predominately white, Western European immigrant pool.[48] Asian immigration was barred entirely.[49] However, the quotas did not apply to the Western Hemisphere, largely because policymakers believed that Mexican migrant workers were essential to meeting the country's labor needs and that Mexican migrants would not remain or the flow of Mexican immigration could easily be controlled.[50]

While quotas did not apply to the Western Hemisphere, immigration authorities used their discretionary powers to prevent Mexican nationals from obtaining immigrant visas to reside permanently in the United States.[51] Many Mexicans therefore chose to enter as nonimmigrants, but eventually lost lawful status after overstaying their visas.[52] This unlawful status made it easier to deport them when the labor market changed during the Great Depression.[53] In the early 1930s, for example, over 400,000 Mexican nationals and United States citizens of Mexican descent were deported or

---

42. Act of February 14, 1903, ch. 552 (1903).
43. An Act to Create a Department of Labor, Pub. L. No. 426-62 (1913).
44. H. Rep. No. 1365 at 1669 (1952).
45. *Id.*
46. Immigration Act of 1924, Pub. L. No. 139, ch. 190, 43 Stat. 153 (1924).
47. 8 C.F.R. § 10.1 (1938).
48. MAE M. NGAI, IMPOSSIBLE SUBJECTS: ILLEGAL ALIENS AND THE MAKING OF MODERN AMERICA 21-37 (2003) [hereinafter NGAI, IMPOSSIBLE SUBJECTS].
49. *Id.* at 37.
50. *Id.* at 50.
51. *Id.* at 55.
52. *Id.* at 70.
53. *Id.* at 129–35.

repatriated under the aegis of Secretary of Labor William Doak, who "believed that deportation enforcement was a good way to create jobs for unemployed Americans during the Depression."[54] During this period of minimal due process protection for immigrants, immigration enforcement was another way that government officials sought to regulate the domestic labor market. Able to engage in massive deportation round-ups with apparently minimal judicial oversight, there was little need for policymakers to try to limit the right of immigrants in the United States to work.

## B. *Early Right to Work Jurisprudence*

In the absence of federal statutory limitations on immigrant labor, states sometimes tried to step in to regulate immigrant work. The federal courts and some state courts generally struck down these efforts. In doing so, they relied on a constitutional right to work that was often grounded in the Due Process Clause of the Fourteenth Amendment.

Initially, the Supreme Court rejected the position that the Due Process Clause protected a right to work in the *Slaughterhouse Cases*.[55] However, Justices Field and Bradley strongly dissented from this position, and their view soon prevailed.[56] In a series of decisions throughout the late nineteenth and early twentieth centuries, the Supreme Court recognized that the Fourteenth Amendment Due Process Clause protected a right to work.[57] The Court often used the language of natural law to infer a right to work from the Due Process Clause, which protected against state deprivations of "life, liberty, or property."[58] For example, in *Allgeyer v. Louisiana*, the Court stated that the protection of "liberty" in the Due Process Clause embraced:

> . . . [T]he right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation; and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned.[59]

---

54. *Id.* at 71–75; DANIEL KANSTROOM, DEPORTATION NATION: OUTSIDERS IN AMERICAN HISTORY 215 (2010).

55. *See* Butchers' Union Slaughterhouse Co. v. Crescent City Live-Stock Landing Co., 111 U. S. 746, 759 (1884) (rejecting various constitutional challenges to the grant of a monopoly to a slaughterhouse company, including one based in substantive due process).

56. *See id.* at 762 (Bradley, J., concurring) ("the right to follow any of the common occupations of life is an inalienable right").

57. *See* Allgeyer v. Louisiana, 165 U.S. 578, 589 (1897); Powell v. Pennsylvania, 127 U. S. 678, 684 (1888) ("enjoyment upon terms of equality with all others in similar circumstances of the privilege of pursuing an ordinary calling or trade, and of acquiring, holding, and selling property, is an essential part of his rights of liberty and property, as guaranteed by the fourteenth amendment").

58. U.S. CONST., amend. XIV, § 1.

59. *Allgeyer*, 165 U.S. at 589.

AR2022_500609

*Allgeyer* is now considered the beginning of the 1897-1937 "*Lochner* era," named after *Lochner v. New York*, which invalidated state legislation limiting weekly work hours.[60] The Court's tendency during that era to strike down progressive legislation as violating a substantive due process right to contract has come to be viewed as a form of dubious judicial activism.[61] However, as further discussed in Part IV, revisionist scholarship has considerably qualified that critique.[62]

Although *Allgeyer* spoke of the right of "citizens" to labor, noncitizens were among the earliest beneficiaries of the Court's right to work. *Lochner* itself addressed a New York law that may have been drafted to disadvantage immigrant bakers who were willing to work longer hours.[63] In fact, courts began to invalidate legislation limiting immigrants' right to work about twenty years before the official start of the *Lochner* era.[64] The Supreme Court's seminal immigrant right to work case, *Yick Wo v. Hopkins*, came ten years before *Allgeyer*.[65] This has led some commentators to label *Yick Wo* as a *Lochner* precursor.[66] However, *Yick Wo* did not exist in a vacuum; it was part of a sizeable body of contemporary case law concerning immigrants' right to work that both preceded and post-dated the official *Lochner* era.[67]

Nineteenth and early twentieth century cases relied on various textual sources for these decisions, but they all took as a given that immigrants generally had a "right to work."[68] Commentators from the time period also

---

60. Matthew J. Lindsay, *In Search of "Laissez-Faire Constitutionalism,"* 123 HARV. L. REV. F. 55, 56 (2010).

61. *Id.*

62. *See infra* Part IV.B.

63. David Bernstein, *The Supreme Court and "Civil Rights," 1886–1908*, 100 YALE L.J. 725, 734–36 (1990).

64. Baker v. Portland, 5 Sawy. 566 (1879).

65. In Yick Wo v. Hopkins, 118 U.S. 356 (1886), the Court struck down a San Francisco ordinance regulating laundries that had a disparate impact on Chinese-owned businesses.

66. Gabriel J. Chin, *Unexplainable on Grounds of Race: Doubts About Yick Wo*, 2008 U. ILL. L. REV. 1359, 1364, 1373 (2008); Thomas Wuil Joo, *New "Conspiracy Theory" of the Fourteenth Amendment: Nineteenth Century Chinese Civil Rights Cases and the Development of Substantive Due Process Jurisprudence*, 29 U.S.F. L. REV. 353, 356 (1995).

67. *See* Torao Takahashi v. Fish and Game Comm'n, 334 U.S. 410, 422 (1948); Truax v. Raich, 239 U.S. 33, 35, 41 (1915); Yick Wo, 118 U.S. at 357–59, 369–70 (1886); Fraser v. McConway & Torley Co., 82 F. 257 (C.C.D. Pa. 1897); In re Yot Sang, 75 F. 983 (1896); *In re* Ah Chong, 2 Fed. 733 (1880); Baker v. Portland, 5 Sawy. 566 (C.C.D. Or. 1879); *In re* Quong Woo, 13 F. 229 (C.C.D. Cal. 1882); *Ex parte* Case, 116 P. 1037-38 (Idaho 1911); State v. Montgomery, 47 A. 165 (Me. 1900); Templar v. Bd. of Exam'rs, 90 N.W. 1058 (Mich 1902); George v. Portland, 235 P. 681 (Or. 1925); Carvallo v. Cooper, 239 N.Y.S. 436 (1930).

68. *See* Takahashi v. Fish and Game Comm'n, 334 U.S. 410, 422 (1948) (California statute barring issuance of commercial fishing licenses to persons ineligible for citizenship under federal law violated equal protection); Asakura v. Seattle, 265 U.S. 332 (1924) (statute denying pawnbrokers' licenses to aliens violated treaty with Japan); Truax v. Raich, 239 U.S. 33, 35, 41 (1915) (using natural rights language and locating the right of noncitizens to work in the Fourteenth Amendment); Yick Wo, 118 U.S. at 357–59, 369–70 (1886) (discussing natural rights in the context of striking down a law regulating laundry businesses in San Francisco because unequal enforcement of the law violated equal protection); Fraser, 82 F. At 259 (C.C.D. Pa.1897) (Pennsylvania tax of male noncitizens over twenty-one of three cents per day for each day employed was evidently "intended to hinder the employment of foreign-born unnaturalized male persons over twenty-one years of age"

agreed that immigrants had a right to work, arguing at times for an even more robust version of the right than courts entertained.[69] Courts found exceptions for jobs involving public works,[70] public resources,[71] or the "police power,"[72] but, all in all, it is remarkable how far they went extending immigrants a right to work. Even when that right was based on Constitutional equal protection theories or international treaties, there was often an emphasis on substantive due process and the language of natural law.[73] Sometimes the right of immigrants to work seemed linked in the analysis of courts to the right of

---

and was therefore prohibited by [Fourteenth Amendment]."); *In re* Tie Loy (The Stockton Laundry Case), 26 F. 611, 613–15 (C.C.D. Cal. 1886) (city ordinance prohibiting the opening of laundries violates the Privileges or Immunities Clause of the Fourteenth Amendment, as well as due process and equal protection); ; *In re* Quong Woo, 13 F. 229 (C.C.D. Cal. 1882) (using natural law language to hold that a San Francisco ordinance requiring consent of Board of Supervisors to operate a laundry violated treaty with China); *In re* Ah Chong, 2 F. 733 (C.C.D. Ca. 1880) (striking down a CA law that denied fishing rights to all who were ineligible to become electors, meaning Chinese persons, as a violation of Equal Protection and the Treaty with China); *In re* Tiburcio Parrot, 1 F. 481, 510 (C.C.D. Ca. 1880) (Sawyer, J., concurring) ("to deprive a man of the right to select and follow any lawful occupation—that is, to labor, or contract to labor, if he so desires and can find employment—is to deprive him of both liberty and property, within the meaning of the [F]ourteenth [A]mendment and the act of congress."); Baker v. Portland, 5 Sawy. 566 (C.C.D. Or. 1879) (Oregon statute barring holders of contracts for public work within the state from employing Chinese persons violated Treaty with China); *Ex parte Case*, 116 P. 1037, 1038 (Idaho 1911) (Idaho statute prohibiting employment of noncitizens violated equal protection and right to contract); Chicago v. Hulbert, 68 N.E. 786 (Ill. 1903) (state law requiring bidders for state public work contracts to work personnel only eight hours per day and use only citizen labor violated the right to contract); State v. Montgomery, 47 A. 165, 169 (Me. 1900) (state legislation barring aliens from obtaining hawker's or peddler's licenses denied equal protection, broadly defined to embrace the right of all persons to pursue business and property on an even footing); Templar v. Bd. of Exam'rs, 90 N.W. 1058 (Mich. 1902) (ordinance denying barbers' licenses to noncitizens violated Fourteenth Amendment).; *Ex parte* Sing Lee, 31 P. 245, 246 (Cal. 1892) (ordinance requiring a permit to open a laundry violated "the inalienable right of such person to engage in a lawful occupation," and "the right of the owner of property to devote it to a lawful purpose").

69. NORMAN ALEXANDER, RIGHTS OF ALIENS UNDER THE FEDERAL CONSTITUTION (1931); WILLIAM MARION GIBSON, ALIENS AND THE LAW: SOME LEGAL ASPECTS OF THE NATIONAL TREATMENT OF ALIENS IN THE UNITED STATES (1940); Note, *Constitutionality of Legislative Discrimination Against the Alien in His Right to Work*, 83 U. PA. L. REV. 74 (1934–35).

70. Early cases sometimes found that states had authority to deny various sorts of occupational licenses to noncitizens as an exercise of their "police power," based on the dubious theory that noncitizens were less likely to uphold the public order in certain supposedly sensitive types of work. *See* Clarke v. Deckebach, 274 U.S. 392 (1927) (upholding Cincinnati ordinance denying licenses to operate pool rooms to aliens); Anton v. Van Winkle, 297 F. 340 (D. Or. 1924) (same); Commonwealth v. Hana, 81 N.E. 149 (Mass. 1907) (upholding ban of issuance of hawkers' licenses to noncitizens); Trageser v. Gray, 20 A. 905 (Md. 1890) (upholding ban on issuing retail liquor licenses to noncitizens).

71. Other cases upheld discrimination in employment in public works on the theory that when a state acted as employer it was as free to discriminate against noncitizens as a private employer at that time would have been. *See* Crane v. New York, 239 U.S. 195 (1915); Heim v. McCall, 239 U.S. 175 (1915); Lee v. City of Lynn, 111 N.E. 700 (Mass. 1916); People v. I.M. Ludington's Sons, Inc., 131 N.Y.S. 550 (Orleans Cty. Ct. 1911).

72. Another line of cases held that state resources were collective property, owned by state citizens, meaning that the state could deny noncitizens licenses related to the use of public resources, such as fishing licenses. *See McC*ready v. Virginia, 94 U.S. 391 (1876) (oyster fishing); Tokai Maru, 190 F. 450 (9th Cir. 1911) (commercial fishing); People v. Naglee, 1 Cal. 232 (1850) (gold mines); *Ex parte* Gilletti, 70 So. 446 (Fla. 1915) (commercial oyster fishing); State v. Kofines, 80 A. 432 (R.I. 1911) (fishing licenses).

73. *See infra* note 84.

businesses to exploit them,[74] but most of the decisions redounded to immigrants' benefit during an era of government-supported xenophobia, discrimination, and anti-immigrant violence.[75]

Though the *Lochner* era ended around 1937, the Court has continued to strike down state efforts to regulate labor by lawful immigrants (except for jobs with a "governmental function," i.e. those related to self-government and the democratic process).[76] However, decisions in immigrant work cases have moved away from the language of natural rights, due process, and the right to contract, and have coalesced around a theory that state efforts to deny employment to lawful immigrants implicate equal protection and fail to satisfy the requirements of strict scrutiny unless they fall within the "governmental function" exception.[77] This remains an undisputed point of law today, although the current Court may be inclined to strike down state regulation of immigrant employment on preemption grounds rather than equal protection.[78]

Two characteristics distinguished the earlier cases from the current equal protection jurisprudence concerning alienage-based restrictions. First, the current case law seems almost entirely limited to discrimination against immigrants with lawful status, typically lawful permanent residency. The earlier line of cases, however, recognized a right to work even for immigrants who were the closest thing the nineteenth and early twentieth century had to unpopular "illegal aliens": Chinese nationals. There was no such thing as a "lawful permanent resident" until 1952,[79] and most immigrants of the time were recognized as being on a potential pathway to citizenship, except Asian immigrants, who were ineligible for naturalization.[80] In addition, Chinese nationals were excluded from admission to the United States in 1882 (and in 1924, all Asian immigrants were excluded).[81] Those who could prove they had resided in the United States prior to a certain date and who could meet the

---

74. For example, in *Glover v. People*, 66 N.E. 820 (Ill. 1903), the court upheld a taxpayer suit challenging a state law requiring bidders for state public work contracts to work personnel only eight hours per day and use only citizen labor. In upholding the challenge, the court found, essentially, that it was public policy to get the work done as cheaply as possible. *Id.* at 822.

75. Bernstein, *Chinese Laundry Cases, infra* note 244, at 217–69 (1999).

76. *See* Cabell v. Chavez-Salido, 454 U.S. 432 (1982) (upholding a citizenship requirement for probation officers); Ambach v. Norwick, 441 U.S. 68, 73–75 (1979) (rejecting an equal protection challenge to New York's refusal to employ elementary and secondary school teachers who are eligible for citizenship but who refuse to seek naturalization); Foley v. Connelie, 435 U.S. 291 (1978) (upholding a New York requirement that police officers be citizens).

77. *See* Bernal v. Fainter, 467 U.S. 216, 219-27 (1984); Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 601-02 (1976); *In re* Griffiths, 413 U.S. 717, 722 (1973); Sugarman v. Dougall, 413 U.S. 634, 643 (1973); Gebin v. Mineta, 231 F.Supp. 2d 971, 976 (C.D. Cal. 2002); Szeto v. Louisiana State Bd. of Dentistry, 508 F.Supp. 268, 272 (E.D. La. 1981); Younus v. Shabat, 336 F.Supp. 1137, 1139 (N.D. Ill. 1971) *aff'd,* (7th Cir. Jan. 3, 1973); Sundram v. City of Niagara Falls, 357 N.Y.S.2d 943 (N.Y. Sup. Ct. 1973), *aff'd,* 44 A.D.2d 906 (1974).

78. *See, e.g.,* Arizona v. United States, 132 S. Ct. 2492, 2505 (2012) (striking down Arizona's effort to make unauthorized work a criminal offense as being preempted by federal immigration law).

79. 8 U.S.C. § 1101(a)(20) (1952).

80. *See* HIROSHI MOTOMURA, AMERICANS IN WAITING: THE LOST STORY OF IMMIGRATION AND CITIZENSHIP IN THE UNITED STATES 115–25 (2006).

81. KANSTROOM, *supra* note 54, at 109–21; NGAI, IMPOSSIBLE SUBJECTS, *supra* note 48, at 37–50.

onerous registration requirements of the Geary Act of 1892 could in theory remain; all others were subject to summary deportation.[82] Yet even as the legislation of the period spelled out the deportability of most Chinese nationals, it implicitly recognized their employability—referring explicitly to them in the statutory text as "Chinese laborers."[83]

The second characteristic distinguishing the early right-to-work cases from the more recent line of cases is an understanding of work as a substantive due process or a natural right.[84] Contemporary cases view discrimination as the problem meriting judicial intervention, but earlier cases saw the right to work as a universal aspect of liberty or autonomy. For example, in *In re Quong Woo*, Supreme Court Justice Stephen Field, sitting as a circuit judge, held that the right to pursue an occupation free from unreasonable government regulation was a liberty interest protected by the Due Process Clause.[85] Even when striking down state legislation as a violation of equal protection, courts used due process-like language to do so, defining equal protection as embracing a right of all persons to pursue business and property on equal terms.[86] Although ostensibly based on equal protection, *Yick Wo v. Hopkins* relied on substantive due process and natural rights language to strike down San Francisco's licensing provisions for laundries, which had a disparate impact on Chinese persons:

> For the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself.[87]

---

82. Fong Yue Ting v. United States, 149 U.S. 698, 728 (1893).

83. Geary Act, ch. 60, § 6, 27 Stat. 25, 25 (1892) ("any Chinese laborer, within the limits of the United States, who shall neglect, fail, or refuse to comply with the provisions of this act, or who, after one year from the passage hereof, shall be found within the jurisdiction of the United States without such certificate of residence, shall be deemed and adjudged to be unlawfully within the United States, and may be arrested, by any United States customs official, collector of internal revenue or his deputies, United States marshal or his deputies, and taken before a United States judge, whose duty it shall be to order that he be deported from the United States . . . .").

84. *See, e.g.*, Anton v. Van Winkle, 297 Fed. 340 (1924) ("Plaintiff, [a non-citizen] along with citizens of the United States, has the right to work and so employ himself as to gain a livelihood. Primarily, he has the same right and privilege as citizens under similar conditions to engage in useful gainful employment and occupations, unless they pertain to the regulation or distribution of the public domain, or to the common property or resources of the people of the State . . . or pertain to public works or benefits to be received from public moneys.").

85. *See In re* Quong Woo, 13 F. 229, 233 (Field, Circuit Justice, C.C.D. Cal. 1882).

86. *See, e.g.*, State v. Montgomery, 47 A. 165, 169 (Me. 1900) (a licensing requirement for a noncitizen to engage in peddling "absolutely denies him the privilege of an occupation open to citizens, which is more than a discrimination in burdens. It does not permit the alien within our jurisdiction to pursue a business occupation and to acquire and enjoy property on equal terms with the citizen.") According to Professor Gabriel Chin, late nineteenth century courts held that all due process violations concerning work and property were automatically equal protection violations "because others were allowed to pursue their occupations and retain their property." Chin, *supra* note 66, at 1364, 1375.

87. Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886).

The right that emerged from these cases cannot be entirely dismissed as a species of deference to business interests. Taken in its entirety, this jurisprudence offered the outlines of an individual right based in notions of autonomy and individual liberty, which was especially protective of immigrants in part because they were the subjects of societal discrimination.[88]

### III. The End of Immigrants' Right to Work

After the Court repudiated *Lochner* in *West Coast Hotel* in 1937,[89] courts eventually stopped using the sweeping language contained in earlier right-to-work cases. Instead, courts assessed immigrant work cases using preemption analysis or the growing body of modern equal protection law, which was doctrinally skewed to defer to the federal government in cases of federal discrimination against noncitizens.[90] At the same time, the Immigration and Naturalization Service ("INS") began incrementally regulating immigrant labor.[91] However, the first comprehensive employment authorization regulations was not proposed until the late 1970s, after Congress had extended the country quotas to the Western Hemisphere, virtually assuring the presence of a massive population of unauthorized Mexican immigrants in the country.[92] In response to this self-created immigration crisis, policymakers chose the Sisyphean task of restricting immigrant work rather than fixing the irrationally low immigration quota for Mexico. In a relatively short timeframe, immigrant work shifted from a national asset to presumptively illegal, and work authorization became an element of the overall immigration enforcement strategy. The imposition of employer sanctions with passage of the Immigration Reform and Control Act ("IRCA") of 1986 and the development of E-Verify in the 1990s-2000s fortified this sea change.[93]

### A. *The 1940s-1960s: Incremental Agency Regulation*

The first significant federal restriction on noncitizens' legal right to work came with the "Bracero" program.[94] The program began in 1942 with the negotiation of an agreement between the executive branch and Mexico to import a large, temporary workforce of Mexican laborers into the United

---

88. *See* MICHAEL J. PHILLIPS, THE *LOCHNER* COURT, MYTH AND REALITY: SUBSTANTIVE DUE PROCESS FROM THE 1890S TO THE 1930S (2001) (early *Lochner* Court decisions laid foundation for constitutional right to privacy).

89. Cass R. Sunstein, Lochner's *Legacy*, 87 COLUM. L. REV. 873, 876 (1987) (stating that the downfall of Lochner is associated with the decision of *West Coast Hotel v. Parrish*, 300 U.S. 379 (1937)).

90. *See supra* notes 77-78.

91. *See infra* Part II.A.

92. *Id.*

93. Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359.

94. For a general discussion of the Bracero Program, see KITTY CALAVITA, INSIDE THE STATE: THE BRACERO PROGRAM, IMMIGRATION, AND THE I.N.S. (1992).

States.[95] The Bracero program was widely criticized for leading to violations of the Braceros' workplace rights, and was both preceded and followed by massive deportation campaigns that specifically targeted Mexican nationals.[96]

In general, the Bracero program followed the preexisting pattern of immigration regulation as a means of controlling the domestic labor supply. Braceros were imported to meet labor needs, and the number of Braceros could be increased or decreased depending on economic interests. However, there was one significant difference between Braceros and earlier immigrants who had entered to meet the country's labor needs. The five million temporary workers who were imported into the United States over the twenty-two years of the Bracero program were contractually bound to their employers and therefore restricted from pursuing other employment.[97] This limitation on the mobility of immigrant workers represented one of the first instances of federal regulation of immigrants' right to work.

In 1947, the INS also promulgated regulations barring students from working without a showing of financial necessity and special permission from the INS District Director.[98] The following year, it promulgated regulations similarly barring visitors from working without permission.[99]

In 1952, Congress passed the Immigration and Nationality Act (INA), which included various new "nonimmigrant" visa categories for noncitizens coming to the United States for a temporary period of time to engage in a specific activity.[100] Among these were a new H visa for temporary guest workers, which, like the Bracero program, limited the visa holders to working for particular employers.[101] In addition, the 1952 Act revised the contract laborer ground of exclusion, which, since 1885, had prohibited the admission of contract laborers but allowed the importation of "skilled labor," provided that it could not be obtained in the United States.[102] According to the House Report accompanying the bill, the Contract Labor provision was being replaced in order to better protect American labor with a new, more robust provision.[103] In particular, the new provision excluded:

---

95. *See* Juan Carlos Linares, *Hired Hands Needed: The Impact of Globalization and Human Rights Law on Migrant Workers in the United States*, 34 DENV. J. INT'L L. & POL'Y 321, 330 (2006).

96. *Id.* at 331; NGAI, *supra* note 48 at 71–75; KANSTROOM, *supra* note 54 at 215.

97. *See* Linares, *supra* note 95 at 330–31.

98. INS Rule for Nonquota Immigrant Students, 12 Fed. Reg. 5355, 5357 (Aug. 7, 1947) (to be codified at 8 C.F.R. pt. 125).

99. INS Rule for Aliens Coming to the United States as Visitors, 13 Fed. Reg. 2643, 2644 (Feb. 26, 1948) (to be codified at 8 C.F.R. pt. 119).

100. *See* Immigration and Nationality Act, Pub. L. No 82-414, 66 Stat. 163, § 101(a)(15) (1952) (defining "immigrant" as "every alien except an alien who is within . . . [various enumerated] classes of nonimmigrant aliens").

101. *See* Griffith, *Migrant Worker Law*, *supra* note 7, at 131–38.

102. *See, e.g.*, 8 U.S.C. § 136(h) (1946) (allowing for the importation of skilled labor upon application to the Attorney General and after a hearing on the question of whether labor "of like kind unemployed cannot be found in this country").

103. H.R. REP. NO. 82-1365, at 50-51 (1952).

AR2022_500615

Aliens seeking to enter the United States for the purpose of performing skilled or unskilled labor, if the Secretary of Labor has determined and certified to the Secretary of State and to the Attorney General that (A) sufficient workers in the United States who are able, willing, and qualified are available at the time (of application for a visa and for admission to the United States) and place (to which the alien is destined) to perform such skilled or unskilled labor, or (B) the employment of such aliens will adversely affect the wages and working conditions of the workers in the United States similarly employed.[104]

However, the provision only applied to two categories: (1) immigrants who were subject to annual per-country quotas who were not part of several priority categories, such as those with extraordinary ability or close family relationships to citizens and Lawful Permanent Residents ("LPRs"); or (2) certain specified classes of immigrants who were exempt from annual quotas, including, most relevantly, nationals of the Western Hemisphere "other than parents, spouses, or children of the United States citizens or LPRs."[105] Moreover, the provision included a potential waiver, by which the Attorney General could waive application of the provision if the Attorney General determined that their services were "needed urgently in the United States because of the high education technical training, specialized experience, or exceptional ability of such immigrants" and it would "be substantially beneficial prospectively to the national economy, cultural interest, or welfare of the United States" to admit them.[106]

The most significant result of this provision was that Western Hemisphere nationals (including Mexican citizens) could be barred under the 1952 INA from entering the United States to work if the Secretary of Labor certified that there was not a need for their labor, unless they had an immediate family member who was a United States citizen or LPR.[107] Thus, the 1952 INA, like earlier immigration reforms, continued to regulate the supply of domestic labor through immigration; immigrant laborers could be excluded in order to protect the domestic labor market. Yet the 1952 Act did nothing to prevent immigrants from working once they were inside the United States.

The 1952 INA, however, also authorized the Attorney General to promulgate regulations as necessary to implement the INA.[108] The INS afterward

---

104. 8 U.S.C. § 1182(a)(14) (1952).

105. 8 U.S.C. § 212(a)(14) (1952); 8 U.S.C. § 203(a)(4) (1952); 8 U.S.C. § 101(a)(27)(C), (D), and (E) (1952).

106. 8 U.S.C. § 212(a)(14)(1952). *See also* 8 C.F.R. § 212(a)(1952) (setting out procedures for seeking the waiver).

107. If a noncitizen entered for a bona fide purpose other than to work and then later began working, the INS did not take enforcement action against the noncitizen. *See* Sam Bernsen, *Leave to Labor*, 52 INTERP. REL. 291, 299 (1975).

108. Immigration and Nationality Act, Pub. L. No. 414, 66 Stat. 163, §§ 101(a)(15) and 103 (1952) (§ 101 defines new nonimmigrant categories and § 103 authorizes the AG to promulgate regulations as necessary to implement the Act).

used this authority to promulgate regulations that restricted employment for any nonimmigrant that was "inconsistent with and not essential to the status under which he is in the United States unless such activity has first been authorized by the district director or the officer in charge having administrative jurisdiction over the alien's place of temporary residence in the United States."[109]

The new regulation on nonimmigrant work expanded upon the INS's earlier regulation of work by tourists and students, and solidified the legal authority for doing so by relying on the INA provision authorizing the Attorney General to promulgate regulations to implement the INA.[110] The new regulations did not square well with the Court's earlier immigrant right-to-work jurisprudence. However, the regulations were not legally challenged, perhaps because they were rarely enforced and, when they were, the temporary visa holders to whom they applied lacked the resources or ability to contest them. In addition, the 1950s were a period of low immigration and reduced societal support for immigrants.[111] Finally, the end of the *Lochner* era also ushered in a growing legal consensus in favor of an empowered administrative state.[112]

By the late 1950s, the INS had begun to deport a modest number of nonimmigrants who had worked without permission.[113] It distributed a form to entering nonimmigrants stating that they could not work without permission, but the INS did not have a formal process for granting work permits.[114] In the absence of any official work permit, the INS marked some noncitizens' I-94 Arrival/Departure Records with a statement that the noncitizens were eligible to seek employment.[115]

The INS developed more policies concerning nonimmigrant employment over the course of the 1960s and 1970s. For example, it took the position that noncitizens with student visas were not banned by statute from working, but

---

109. 8 C.F.R. § 214.2(c) (1952).

110. Another authority for at least regulating the work of tourists and temporary business visitors was the new definition of those categories contained in the INA, which specified that they did not include "an alien . . . coming for the purpose of study or of performing skilled or unskilled labor. . . ." 8 U.S.C. § 1101(a)(15)(B) (1952).

111. Douglas S. Massey, *The New Immigration and Ethnicity in the United States*, 21 POP. & DEV. REV. 631, 635 (1995).

112. *See* Robert L. Rabin, *Federal Regulation in Historical Perspective*, 38 STAN. L. REV. 1189, 1266-67 (1986).

113. *See* IMMIGRATION AND NATURALIZATION SERV., U.S. DEP'T OF JUSTICE, ANNUAL REPORT OF THE COMMISSIONER OF IMMIGRATION AND NATURALIZATION 7 (1959) (reporting that 39,016 nonimmigrants violated the terms of their admission—most "by engaging in unauthorized employment or . . . remaining beyond the period of authorized stay"); Matter of S-, 8 I. & N. Dec. 574, 575 (B.I.A. 1960).

114. In 1960, the INS informed entering nonimmigrants that they could not work using Form I-358. Matter of S-, 8 I. & N. Dec. 574, 575 (B.I.A. 1960).

115. *See* IMMIGRATION AND NATURALIZATION SERV., U.S. DEP'T OF JUSTICE, ANNUAL REPORT OF THE COMMISSIONER OF IMMIGRATION AND NATURALIZATION 7 (1959) (reporting that 39,016 nonimmigrants violated the terms of their admission—most "by engaging in unauthorized employment or . . . remaining beyond the period of authorized stay"); Matter of S-, 8 I. & N. Dec. 574, 575 (B.I.A. 1960).

restricted student work based on labor market conditions.[116] It allowed on-campus work without restrictions, and from the 1950s through 1974 allowed off-campus summer work on an annual basis after consulting with the Labor Department.[117] After 1974, it allowed off-campus work only on a case-by-case basis following a showing of economic necessity or a need for practical training.[118] Furthermore, INS District Directors varied considerably in how they handled students' applications for work permission during this time period.[119]

In addition to nonimmigrants and immigrants (green card holders), there were a number of other categories of noncitizens during this time period, such as unauthorized immigrants and those paroled into the country as the contemporary equivalent of refugees.[120] These noncitizens certainly worked, and there was no legal authority making it illegal for them to do so.[121] Although unauthorized immigrants could be deported for entering without inspection, working without permission did not create any additional penalty for them.[122] Moreover, the INS gave I-94s stamped to show work authorization to some undocumented immigrants in the 1970s, such as those who were waiting for their applications or petitions for lawful status to be granted.[123]

In 1965, Congress substantially amended the INA.[124] The most significant change was to eliminate the former system of national origin quotas that had been intentionally designed in 1924 to maintain a predominately white, Western European immigrant pool.[125] In place of the national origin quotas, Congress created new quotas of 20,000 visas per country per year that were the same for every country in the Eastern Hemisphere.[126] For the Western Hemisphere, Congress imposed a cap of 120,000 visas to be divided by demand.[127]

One other significant change that Congress made in 1965 was to tighten the grounds for excluding noncitizens seeking admission to perform labor. Its 1952 act had allowed the exclusion of noncitizens seeking admission to perform work if the Secretary of Labor certified that there were sufficient workers in the United States to perform the job at issue or that the

---

116. Bernsen, *supra* note 107, at 292–94.
117. *Id.* at 292–93.
118. *Id.* at 293–94.
119. *Id.* at 300.
120. The Refugee Act was not passed until 1980, but the United States paroled in thousands of persons for humanitarian reasons from the 1950s up until 1980. HIROSHI MOTOMURA, IMMIGRATION OUTSIDE THE LAW 25 (2014).
121. *See* Wishnie, *supra* note 12, at 198–99 (explaining that prior to IRCA's passage, there were no criminal penalties for employers who hired unauthorized workers and no additional penalties for unauthorized workers who worked).
122. 8 U.S.C. § 1251 (1958).
123. Bernsen, *supra* note 107, at 294–95.
124. The Immigration and Nationality Act of 1965, Pub. L. 89-236, 79 Stat. 911 (1965).
125. NGAI, *supra* note 48, at 227.
126. *Id.* at 258.
127. *Id.*

employment of the noncitizen would adversely affect wages or working conditions in the United States.[128] The amended provision allowed admission only if the Secretary of Labor certified that there were *not* sufficient laborers in the United States to perform the work at issue or that the employment of the noncitizen would *not* adversely affect wages or working conditions.[129] Thus, the 1965 amendments, like earlier reforms, focused on using immigration laws to control the domestic labor supply. They did not contain any limitations on immigrants' ability to work once in the country.

## B. *The 1970s-1990s: The Illusion of a Comprehensive System*

Although Congress and the Agency tinkered around the edges of immigrant work regulations from the 1940s through the 1960s, there was no comprehensive system until the late 1970s. The creation of such a system coincided with Congress' and the public's growing obsession with the phenomenon of so-called "illegal aliens." As Professor Mae Ngai has persuasively shown, the legal and cultural category of "illegal alien" as it currently exists was partly created by public policies during this time period that dramatically curtailed legal Mexican immigration.[130]

In 1964, Congress repealed the Bracero program, which had been admitting about 200,000 Mexican Braceros per year.[131] Although the H2A guest worker visa program remained, the number of H2A workers was never sufficient to meet the labor needs of the United States economy.[132] Exacerbating the sudden disjuncture between the needs of the labor market and the amount of legal Mexican immigration, in 1968 Congress, imposed a numerical quota for the first time on Western Hemisphere immigration.[133] The total number of Western Hemisphere immigrants permitted was 120,000—considerably less than the annual number of Mexican Braceros entering just a few years earlier.[134] In 1976, Congress further restricted Mexican immigration by imposing an annual quota of 20,000 on each Western Hemisphere country, including Mexico.[135]

The United States economy, however, had not substantially reduced its need for labor. As a result, illegal immigration from Mexico surged. The number of deportations of undocumented Mexicans increased by forty percent in 1968 (the year the 120,000 quota for the Western Hemisphere was implemented) to 151,000.[136] In 1976, the year the 20,000 country quota for

---

128. *See* Pesikoff v. Sec'y of Labor, 501 F.2d 757, 761 (D.C. Cir. 1974).
129. *Id.*
130. NGAI, IMPOSSIBLE SUBJECTS, *supra* note 48, at 261.
131. Linares, *supra* note 95, at 333.
132. For a discussion of the H visa and other temporary work visa programs, *see* Griffith, *Migrant Worker Law*, *supra* note 7, at 130–38.
133. NGAI, IMPOSSIBLE SUBJECTS, *supra* note 48, at 258.
134. *Id.*
135. *Id.* at 261.
136. *Id.*

Mexico was implemented, the INS expelled 781,000 Mexicans from the United States.[137] Meanwhile, the total number of apprehensions for all other nationals in the world combined remained below 100,000 per year.[138]

One obvious policy solution to this problem would have been to revise the immigration quota for Mexico and other countries with historically high emigration to the United States so that they better reflected the country's need for foreign labor. Instead, a consensus view emerged among policymakers that illegal immigration should be combatted by restricting unauthorized migrants' access to work.[139] Bills were unsuccessfully introduced throughout the 1970s to penalize employers who hired unauthorized immigrant workers.[140] This legislation incorrectly presumed that there was a comprehensive system in place for limiting or authorizing immigrant work.[141] For example, in 1971, the Nixon administration introduced legislation prohibiting the employment of noncitizens "who are illegally in the United States or are in an immigration status in which such employment is not authorized."[142] The bill did not pass,[143] but if it had, it would have left the agency scrambling to develop a more comprehensive employment authorization system.

In 1972, Congress amended the Social Security Act to require certain measures concerning social security numbers for noncitizens.[144] It was driven by a concern that unauthorized immigrants were seeking to obtain social security numbers, which was lawful at the time.[145] In 1974, the Social Security Administration ("SSA") promulgated new regulations implementing the recent amendments to the Social Security Act.[146] Under the new regulations, the SSA was authorized to issue numbers to citizens, LPRs, or persons "under other authority of law permitting them to engage in employment in the United States."[147] Again, policymakers wrongly assumed that there already existed some legal framework comprehensively addressing employment authorization for noncitizens.

---

137. *Id.*

138. *Id.*

139. *See, e.g.*, Final Report of the Select Commission on Immigration and Refugee Policy: Joint Hearings, Open. Statement of Hon. Alan K. Simpson, Chairman, Subcommittee on Immigration and Refugee Policy 8 (1981) (identifying the United States labor market as the primary pull factor for illegal immigration and calling for "sanctions against employers who hire and exploit illegal aliens, plus some new method to verify work authorization.").

140. Wishnie, *supra* note 12, at 199–202.

141. *See* DeCanas v. Bica, 424 U.S. 351, 360–61 (1976) (noting, in striking down California's effort to criminally punish employers who hired undocumented workers, that the INA did not concern itself with regulating the hiring of immigrant workers).

142. H.R. 2328 § 26 (1971).

143. JEFFREY TOGMAN, THE RAMPARTS OF NATIONS: INSTITUTIONS AND IMMIGRATION POLICIES IN FRANCE AND THE UNITED STATES, 52-53 (2002).

144. Social Security Amendments of 1972, Pub. L. No. 92-603, 64 Stat. 518, § 137 (1972).

145. *See* Sen. Rep. No. 92-1230, Social Security Amendments Act of 1972, Report of the Committee on Finance, United States Senate, to Accompany H.R. 1, 92nd Cong. 2d Session, Sept. 26, 1972, 160.

146. 20 C.F.R. § 422.104 (1974).

147. *Id.* Those not authorized to work could be issued cards "only for a non-work purpose."

Also in 1974 Congress passed the Farm Labor Contractor Registration Amendments Act, which prohibited farm labor contractors from facilitating the hiring of any noncitizen "not lawfully admitted for permanent residence, or who has not been authorized by the Attorney General to accept employment."[148] Two years later, Congress not only imposed the 20,000 quota on Mexican immigration, but also barred noncitizens who "continue[d] in or accept[ed] unauthorized employment" from obtaining lawful permanent residence in the United States.[149] Yet Congress did not specify in the Immigration and Nationality Act Amendments of 1976 who could legally work in the United States, nor had the INS yet done so through regulations.

In response to the 1976 Act, and in an environment of rapidly escalating immigration enforcement against Mexican nationals, the Agency began to try to systematically regulate noncitizen employment. It published notice of a draft regulation concerning work authorization, stating that Congress had recognized its authority to do so by banning noncitizens who were unauthorized to work from adjusting status.[150] The proposed regulation was relatively simple; it authorized noncitizens to file an employment authorization application in three circumstances: if the noncitizen (1) held valid nonimmigrant status and was otherwise authorized by the regulations to seek work; (2) had "a prima facie claim of entitlement to a benefit—which, if granted, would make him eligible to remain permanently or indefinitely in the United States"; or (3) had "been granted permission to remain in the United States for an indefinite or extended period of time by the Immigration and Naturalization Service."[151]

After President Reagan took office in 1980, the INS issued another proposed regulation, eschewing the simple approach in the earlier regulation for a cumbersome list of categories of noncitizens eligible to work.[152] With some modifications, the regulation was finalized in 1981.[153] After forty years of incrementally chipping away at the immigrant right to work, the INS now explicitly repudiated it in the new regulatory language. In the new regulation's preamble, the INS stated that "[e]mployment in the United States is not an inherent right" but, rather, "a matter of administrative discretion . . . ."[154]

---

148. 5 Farm Labor Contractor Registration Amendments Act, Pub. L. No. 93-518 § 11, 88 Stat. 1652, 1655 (1974).

149. Immigration and Nationality Act Amendments of 1976, Pub. L. No. 94-571 § 6, 90 Stat. 2703, 2706 (codified as amended at 8 U.S.C. § 1255(c)); 44 Fed. Reg. 43,480 (Jul. 25, 1979).

150. INS, Proposed Rules for Employment Authorization for Certain Aliens, 44 Fed. Reg. 43,480 (July 25, 1979) (Reserved 8 CFR Part 109).

151. *Id.*

152. INS, Employment Authorization, 45 Fed. Reg. 19,563 (Mar. 26, 1980) (Reserved 8 CFR 109).

153. Employment Authorization to Aliens in the United States, 46 Fed. Reg. 25,079, 25,080–81 (May 5, 1981) (codified at 8 C.F.R. pt. 109) (distinguishing classes of aliens who receive work authorization as a condition of their admission from others who must apply for work authorization separately).

154. *Id.* at 25,080.

There was no statutory authority for this language, which was directly contrary to the holding of the earlier right-to-work cases, like *Yick Wo*. As statutory authority for the regulation, the INS cited only the general provision of the INA authorizing the Attorney General to engage in rulemaking "as he deems necessary for carrying out his authority under the provisions of this chapter."[155]

Still, the new work permission regulation authorized a grant of work permission even for many noncitizens who lacked formal legal status, but whose presence in the United States was allowed as a matter of administrative discretion.[156] Moreover, the regulation said nothing about what would happen to noncitizens who did work without permission, or to employers who hired them.[157]

The same year that the INS published this employment authorization regulation, Congress's Select Commission on Immigration and Refugee Policy released a report summarizing its multi-year study of immigration.[158] The report focused heavily on the issue of illegal immigration.[159] It recommended a multi-prong strategy to combat illegal immigration, including increased enforcement, employer sanctions, a legalization program for unauthorized migrants in the United States, and a temporary guest worker program.[160]

Congress eventually acted on these recommendations when it passed the Immigration Reform and Control Act ("IRCA"), in 1986.[161] "IRCA contained a new provision specifying that an 'unauthorized alien' for purposes of work was a noncitizen who is neither an LPR nor 'authorized to be . . . employed by this chapter or by the Attorney General.'"[162] The provision thus ratified the INS's pre-existing practice of administratively deciding which categories of noncitizens could lawfully work.[163] In this regulatory Möbius strip, a noncitizen authorized to work was essentially anyone whom the INS said was authorized to work.

---

155. 8 U.S.C. § 1103(a) (1982).

156. *See* 8 C.F.R. § 109.1(b)(4)–(6) (1982) (allowing work authorization for noncitizens with "voluntary departure," "deferred action," and "parole").

157. *See* Sure-Tan, Inc. v. N.L.R.B., 467 U.S. 883, 893 (1984).

158. U.S. Immigration Policy and the National Interest: The Final Report and Recommendations of the Select Comm'n on Immigration and Refugee Policy with Supplemental Views by Commissioners, 97th Cong, 1st Sess. (Mar 1, 1981) ("Select Commission Report").

159. *Id.* at 35.

160. *Id.* at 11-13.

161. *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, §§ 115, 274A, 100 Stat. 3359, 3360, 3384 (making employment of unauthorized immigrants unlawful and increasing enforcement of existing immigration laws).

162. 8 U.S.C. § 1324a(1324(a)(h)(3) (1988).

163. *See* Employment Authorization; Classes of Aliens Eligible, 52 Fed. Reg. 46,092, 46,093 (Dec. 4, 1987) (to be codified 8 C.F.R. pt. 109) (rejecting a petition asking the INS to rescind its employment authorization regulation and rejecting an argument that "the phrase 'authorized to be so employed by this Act or the Attorney General' does not recognize the Attorney General's authority to grant work authorization except to those aliens who have already been granted specific authorization by the Act").

IRCA also included new employer sanctions provisions. Until IRCA, it had not been illegal for employers to hire immigrants without work authorization; Congress had issued the so-called "Texas Proviso" to clarify that hiring an undocumented immigrant did not violate the federal harboring statute.[164] Under IRCA, prospective employees were required to complete a "Form I-9, Employment Eligibility Verification," attesting to their work eligibility.[165] Employers were required to verify eligibility by consulting certain documents, and certifying that the documents reasonably appeared to be genuine and to relate to the individual.[166]

The purpose of the new employer sanctions provision was twofold: to reduce illegal immigration and to protect the domestic labor market from competition by unauthorized migrants.[167] However, enforcement of employer sanctions was spotty and seemed to grow even weaker over the course of the first couple decades after IRCA's passage.[168] Rather than reducing illegal immigration, the number of unauthorized migrants in the United States tripled after IRCA.[169]

Moreover, instead of protecting United States citizen-workers from unfair competition, this legislation merely "granted to employers an enormous, coercive power over their noncitizen workers and over low-wage U.S. workers who compete with them."[170] The IRCA sanctions have been an insufficient deterrent for many employers who have an economic incentive to hire unauthorized workers due to the their inability to demand higher wages or better workplace conditions without risking deportation. This incentive has been enhanced by the Supreme Court's finding that unauthorized workers could not recover backpay for employers' labor law violations,[171] which further limited unauthorized workers' recourse against employers' unfair labor practices.[172]

Despite the failure of IRCA to achieve its twin purposes, policymakers did not abandon the course Congress had embarked on with IRCA. Instead, Congress doubled down by attempting to develop better methods for employers to verify employment eligibility. In 1996, Congress ordered the INS to conduct three pilot programs to determine the best method of verifying an employee's employment authorization.[173] One of these programs was the "Basic Pilot Program," under which voluntarily participating employers

---

164. 8 U.S.C. § 1324(a)(4) (1982).

165. Griffith, *Migrant Worker Law*, *supra* note 7 at 139.

166. *Id.*

167. Wishnie, *supra* note 12, at 202.

168. *Id.* at 209 (noting a decline in IRCA enforcement throughout the 1990s, and through 2005).

169. *Id.* at 206.

170. *Id.* at 205.

171. Hoffman Plastic Compounds, Inc. v NLRB, 535 U.S. 137 (2002).

172. Wishnie, *supra* note 12, at 213–14.

173. The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996, Pub. L. No. 104–208, Div. C, 110 Stat. 3009-546 (amended 1996).

AR2022_500623

called the SSA to check information from a form that the employee is required to fill out concerning her immigration status, called an "I-9 form," against SSA records.[174] Once the SSA information was confirmed by phone, the employer entered I-9 data into a computer program that was sent to the INS by modem.[175]

Eighteen years later, the program has outlasted its generic name, bureaucratic implementation, and opposition from both industry and civil liberty organizations. It is now called "E-Verify" and boasts over 600,000 participating employers.[176] Proposed immigration reforms frequently include mandatory participation in the program for all employers, so something like E-Verify could come to dominate the future of immigrant labor. This would mark a 180-degree turn from the *Yick Wo* era. Contradicting the Supreme Court's earlier recognition that work is a fundamental right, E-Verify heralds a future of technocratic policing of work in service of a Sisyphean project of immigration enforcement.

## IV. THE PUTATIVE ILLEGALITY OF UNAUTHORIZED IMMIGRANT WORK

Immigration laws today primarily address the issue of immigrant labor through statutory provisions that aim to limit the admission of immigrant workers in order to protect the jobs or wages of domestic workers.[177] Compared to this system for regulating the *admission* of noncitizen workers, the laws that address the ability of noncitizens *already residing* in the United States to work are sparse and equivocal.[178] On the whole, they do not prohibit unauthorized work, but restrict it by limiting unauthorized workers' access to jobs and labor rights.[179] As a result, most people assume that unauthorized work is illegal—not because it is, but because unauthorized workers are treated as if they had done something illegal.[180] The putative illegality of

---

174. For a copy of the form, *see Employment Eligibility Verification, USCIS*, https://www.uscis.gov/i-9 (last visited Apr 9, 2017).

175. *United States Citizenship and Immigration Services, E-Verify: History and Milestones, USCIS,* http://www.uscis.gov/e-verify/about-program/history-and-milestones (last visited Apr 9, 2017).

176. *Id.* For a discussion of E-Verify, *see* Juliet P. Stumpf, *Getting to Work: Why Nobody Cares About E-Verify (and Why They Should)*, 2 U.C. IRVINE L. REV. 381, 382 (2012).

177. *See* 8 U.S.C. §§ 1101(a)(15)(H)(i)(b) (allowing for the admission of temporary workers engaged in specialty occupations); 1101(a)(15)(I) (admission of journalists); 1101(a)(15)(J) (exchange visitors, including workers); 1101(a)(15)(L) (executive transferees); 1101(a)(15)(O) (aliens of extraordinary ability); 1101(a)(15)(P) (artists and entertainers); 1101(a)(15)(R) (religious workers); 1182(a)(5) (describing the "labor certification" process), 1182(n)(2)(G) (authorization investigations of employers in violation of the H visa requirements); 1188 (labor certification process for the admission of H-2A agricultural workers).

178. *See infra* Part III.B.

179. *Id.*

180. For a discussion of the criminalization of immigrants, see Mae M. Ngai, *The Strange Career of the Illegal Alien: Immigration Restriction and Deportation Policy in the United States, 1921-1965*, 21 LAW & HIST. REV. 69, 7 (2003).

AR2022_500624

immigrant work has allowed a system that was designed to regulate employers to become a means for exploiting immigrant workers.

### A.   Immigration Regulation to Control the Labor Market

United States immigration law sets out the grounds for admitting noncitizens into the United States.[181] There are a variety of temporary visa categories, including several that are specifically for temporary workers.[182] Some of these categories are subject to a "labor certification" process.[183]

The antecedents to this process date to 1885, when the United States barred the admission of "contract labor" and only allowed the importation of immigrant laborers if there were not enough native workers to fill the job.[184] The 1952 and 1965 amendments to this law establish the essential structure of the current labor certification process.[185] According to this system, employers may not petition for the admission of most skilled and unskilled workers unless the Department of Labor has certified that there are not enough workers in the United States to do the work and that their admission will not adversely affect the wages of American workers.[186] The labor certification process serves a longstanding goal of United States immigration policy: assuring the existence of sufficient workers to meet economic needs while also protecting the jobs of domestic workers.[187]

### B.   Immigration Law Creates Some Qualified Penalties for Unauthorized Work but Does Not Explicitly Prohibit It

The above system for deciding who gets into the United States in the first place must be distinguished from the question of what rights noncitizens have who are present in the country. When it comes to work, the INA defines an "unauthorized alien" as "(A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General."[188] The second half of the above definition is implemented through regulations enumerating the categories of noncitizens authorized to work or to seek work permission.[189] However, neither the statute nor

---

181. 8 U.S.C. §§ 1101(a)(15) (setting out various visa categories); 1182 (setting out categories of inadmissible noncitizens).

182. See supra note 177.

183. 8 U.S.C. § 1182(a)(5).

184. Contract Labor Law of 1885, ch. 164, 23 Stat. 332 (amended 1887).

185. For the text of these provisions and a discussion of them, see Pesikoff v. Sec'y of Labor, 501 F.2d 757, 761 (D.C. Cir. 1974).

186. 8 U.S.C. § 1182(a)(5). The labor certification process applies to second preference (Professionals Holding Advanced Degrees and Persons of Exceptional Ability) and third preference (Skilled Workers, Professionals, and Unskilled Workers) categories of employment-based admissions, meaning that priority workers, "special immigrants" and immigrant investors are exempt. For the labor certification requirements, see 20 C.F.R. § 656.24.

187. See Digilab, Inc. v. Sec'y of Labor, 495 F.2d 323 (1st Cir. 1974).

188. 8 U.S.C. § 1324a(h)(3) (1952).

189. 8 C.F.R. § 274a.12 (2017).

regulations set out a clear penalty for "unauthorized aliens" who work.[190]

In the instances where the INA addresses immigrant work, it does so in a qualified manner. First, the INA is explicit that nonimmigrant "B visas" for tourism or business are unavailable to persons "coming for the purpose of . . . performing skilled or unskilled labor" and these visa holders can be deported for working.[191] However, Department of Homeland Security ("DHS") regulations do actually authorize B visa holders to work in some situations.[192]

Second, noncitizens who work without authorization may in some situations be ineligible for other benefits under the INA.[193] For asylum seekers, unauthorized work is considered tantamount to "unlawful presence" and can lead to a bar on future admission to the United States, although this bar only becomes effective if the asylum seeker loses or abandons her asylum application, leaves, and later attempts to return.[194]

Perhaps the most significant immigration complication arising from unauthorized work is that noncitizens who work without authorization are ineligible for adjustment of status—a process for obtaining a green card from within the United States.[195] However, there is an exception to this principle for "immediate relatives" (spouses, parents, and children) of United States citizens and certain "special immigrants."[196] Moreover, this penalty for unauthorized work is often beside the point, because noncitizens who entered without inspection are already ineligible for adjustment of status and generally must return to their country of origin to "consular process" in order to obtain a green card.[197]

Thus, the legally mandated penalties specifically for unauthorized work are limited. Unauthorized workers who are unlawfully present in the United States do face a significant immigration consequence as a result of that unlawful presence: they can be deported. However, that consequence is collateral to working, not because of it.

## C.  *State Policies Limiting Immigrant Work*

Although unauthorized work is not per se illegal as a matter of federal law, some states have created an environment hostile to immigrant work. Many

---

190. *Id.*

191. *See* 8 U.S.C. §§ 1101(a)(15)(B); 1227(a)(1)(C)(i).

192. *See* 8 C.F.R. § 274a.12(c)(17) (authorizing work for B visa holders who are domestic servants of certain nonimmigrants or US citizens with a permanent home in another country, and for certain employees of foreign airlines).

193. *See* U.S.C. § 112(a)(9)(B)(iii)(II) (treating work as unlawful presence for asylum seekers); U.S.C. § 1255(c) (making noncitizens who work without authorization ineligible in many cases for adjustment of status).

194. 8 U.S.C. § 1182(a)(9)(B)(iii)(II) (2012).

195. 8 U.S.C. § 1255(c) (2012).

196. *Id.*

197. 8 U.S.C. § 1255(a) (2012) (providing for adjustment of status for an "alien who was inspected and admitted or paroled into the United States.").

states have licensing standards that restrict noncitizens' ability to pursue certain occupations.[198] About half the states in the country sued the Obama administration over its effort to authorize the work of some immigrants who otherwise lacked legal immigration status.[199] As set out in Part II, the phenomenon of states attempting to limit immigrant work has a long tradition. In the late nineteenth and early twentieth centuries, courts mostly struck down those laws as violating a substantive immigrant right to work.[200] Later, courts became more likely to invalidate them as violating equal protection; today, preemption is often the analysis of choice.[201] For example, Arizona and Alabama have attempted in recent years to make unauthorized work a criminal offense, but courts have found that such efforts are pre-empted by IRCA.[202]

### D.  Unauthorized Workers Are Relegated to Precarious Work

In the end, the most serious impediments to immigrant work come from laws that limit unauthorized immigrant workers' employment opportunities rather than prohibiting them.[203] IRCA employer sanctions provisions and E-Verify are the most notable of these. E-Verify continues to gain steam and although participation is voluntary at the federal level, a number of states have mandated its use by at least some employers.[204]

Employers who do not participate in E-Verify must still confirm that a worker is not an "unauthorized alien" by checking certain documents before hiring the employee, such as a Social Security Card.[205] Unless noncitizens use a false Social Security Card or other false documents to obtain work, they do not face a penalty under IRCA if an employer hires them.[206] Nonetheless, it is the unauthorized worker who often bears the brunt of the violation.

---

198. For a discussion of state occupational licensing requirements on noncitizens, *see* Michael A. Olivas, *How Did We Get Here? Undocumented and DACAmented Lawyers and Occupational Licensing*, 52 VALPARAISO L. REV. (2017, forthcoming).

199. Texas v. United States, 809 F.3d 134, 179–86 (5th Cir. 2015), *aff'd*, 579 U.S. ___ (2016).

200. *See* note 84, *supra*.

201. *See* note 78, *supra*. Preemption is a doctrine based on the Supremacy Clause to the United States Constitution, providing that state regulation of a subject can be preempted when there is a conflicting federal statute or a comprehensive regulatory scheme. *See* Arizona v. United States, 132 S. Ct. 2492, 2500 (2012).

202. *See* Arizona, 132 S. Ct. at 2505 (finding a provision making it unlawful for an unauthorized migrant to knowingly apply for or perform work in Arizona to be preempted by federal law); United States v. Alabama, 691 F.3d 1269, 1283 (11th Cir. 2012) (same).

203. Once in removal proceedings, unauthorized employment can be banned as a condition of release on bond. *See* I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc., 502 U.S. 183, 194 (1991) (rejecting facial statutory challenge to INS regulation allowing for a ban on acceptance of unauthorized employment as a condition of bond).

204. *See* Kati L. Griffith, *Discovering "Immployment" Law: The Constitutionality of Subfederal Immigration Regulation at Work*, 29 YALE L. & POL'Y REV. 389, 390. (2011).

205. *See* note 176, *supra*.

206. 8 U.S.C. § 1324c(a), (f).

AR2022_500627

Employers who violate IRCA face civil fines as low as $100.[207] By contrast, an unauthorized migrant risks deportation and possibly permanent separation from her family, home, and life in the United States—not because he or she worked but because he or she drew attention to his or her unauthorized presence by working. These disparate stakes contribute to the putative illegality of unauthorized immigrant work. Because unauthorized immigrants bear the steeper penalty, they are perceived as the more culpable party—as the ones who have "stolen" the jobs of citizens.[208]

Noncitizens who are unauthorized to work cannot legally obtain a Social Security Card that satisfies IRCA requirements for an employer to hire them.[209] However, it is possible to work and pay taxes without a Social Security Number.[210] Thus, unauthorized workers can be self-employed, and many are.[211] In addition, employers can hire "sporadic, irregular, or intermittent" domestic workers without checking their immigration status.[212] Most significantly, employers need not check the immigration status of independent contractors they retain to perform work for them.[213]

These categories of contingent work comprise a large, and growing share of the overall United States economy.[214] In many sectors of the economy, such as landscaping and construction, it is common to characterize (or mischaracterize) workers as independent contractors. This means that employers need not check immigration status, pay minimum wage, overtime, social security, Medicaid, or unemployment insurance taxes.[215] Independent contractors are unable to access the protections of most labor and employment law, such as the Fair Labor Standards Act, National Labor Relations Act, Occupational Safety and Health Act, Family Medical Leave Act, or Title VII.[216] Such incentives to hire independent contractors lead to the fissuring of the workplace and the degradation of employment security for all

207. Huyen Pham, *The Private Enforcement of Immigration Laws*, 96 GEO. L.J. 777, 789 (2008). An employer who engages in a pattern and practice of violations can be subject to the criminal penalty of six months' incarceration. 8 U.S.C. § 1324a(f)(1).

208. Daniel Morales, *In Democracy's Shadow: Fences, Raids, and the Production of Migrant Illegality*, 5 STAN. J. C.R. & C.L. 23, 65 (2009) ("Apart from reiterating the established link between Mexicans and the criminal, employer sanctions also turned the workplace (which had formerly been the location where immigrants, through sweat and toil 'earned' their social right to remain present in the United States) into the locus of criminal endeavor and fraud. Work went from a marker of belonging to a species of theft.").

209. 42 U.S.C. 405(c)(2)(B)(i)(I) (2012).

210. Most persons have a Social Security number in order to report their taxes, because the Internal Revenue Service requires that employers obtain an identification number from employees, which is typically a Social Security Number . However, federal law allows employers to use Taxpayer Identification Numbers ("TIN") if employees are ineligible for a Social Security number. *See* 26 U.S.C. § 6109 (2012); 26 CFR 301.6109–1(a). Because unauthorized migrants can obtain TIN numbers, they technically do not need a Social Security Number to legally work.

211. *See* Mastman, *supra* note 17 at 257.

212. 8 C.F.R. § 274a.1(h) (2009).

213. 8 C.F.R. § 274a.1(f) (2009).

214. *See supra* note 13-15.

215. *See* WEIL, *supra* note 13 at 17-18.

216. *Id.*

employees in the affected industries.[217]

Thus, the primary impact of IRCA employer sanctions is not to make it illegal for immigrants without work authorization to work, but to limit unauthorized workers' employment opportunities and access to legal protections and benefits. They are restricted to self-employment, independent contractor status, or the underground economy, where they earn less money, are less likely to have work-provided benefits, and are more likely to live in poverty.[218]

In 2002 the Supreme Court announced, "Under the IRCA regime, it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies."[219] Yet, unauthorized immigrant workers can legally be self-employed or work as irregular domestic workers or independent contractors. A 2016 challenge filed by many states to a federal expansion of work authorization, United States v. Texas, similarly reveals that this point is rarely understood. No party in that case pointed out that unauthorized migrants could legally work without being granted work authorization through the controversial new federal program.[220] The Court, states, and federal government all seem to believe that there is a comprehensive statutory scheme in place to prohibit and punish employment by unauthorized immigrant workers, rather than just a set of measures to discourage employers from hiring them.

Perhaps part of the reason why there is no comprehensive statutory scheme for regulating immigrant work is that at one time this country encouraged and protected all immigrant work.[221] The current system is a messy palimpsest written over that earlier history. It is time to reconsider this system, which has disrupted the labor market, caused hardship on immigrant families, and led to arbitrary immigration enforcement without solving the underlying problem of illegal immigration.[222] The policy arguments for doing so have been ably made by other commentators.[223] Thus, the following section looks instead at constitutional arguments for restoring the once widely accepted right of immigrants to work to support themselves and their families.

## V. RESUSCITATING IMMIGRANTS' RIGHT TO WORK?

In a country that accepts E-Verify, it may seem quixotic to attempt to resurrect the right to work for noncitizens. The view that that the ability to

---

217. *Id.*
218. Government Accountability Office, *supra* note 15 at 5-6.
219. Hoffman Plastic Compounds, Inc. v. N.L.R.B., 535 U.S. 137, 148 (2002).
220. *See* Brief for the Petitioners, United States v. Texas, (March 1, 2016) (No. 15-674); Brief for the Respondents, United States v. Texas, (March 2, 2016) (No. 15-674); Reply Brief of Petitioners, United States v. Texas, (April 11, 2016) (No. 15-674).
221. *See* Part I, *supra.*
222. *See* Wishnie, *supra* note 12.
223. *See id.*; Griffith, *Migrant Worker Law, supra* note 7, at 140; Stephen Lee, *Private Immigration Screening in the Workplace,* 61 STAN. L. REV. 1103, 1119 (2009); Pham, *supra* note 207.

work is a privilege to be granted by Congress or the Executive has become thoroughly entrenched. Yet the hegemony of this principle does not mean that it is legitimate or wise. We have seen that the current system arose largely through incremental regulation and became entrenched in the wake of 1970s reforms that virtually assured a perpetual campaign of deportation against Latin American migrants. With IRCA, Congress finally lent its stamp of approval to a system of work authorization it believed to be comprehensive, but which in fact was far from it.

The current views concerning immigrant work are myopic. Looking back, the right of immigrants to work is "objectively, deeply rooted in this Nation's history and tradition."[224] As a result, restrictions of the right should trigger robust review under the Due Process Clause.[225] The precise standard of review is beyond the scope of this Article, as is an analysis of the complete ramifications of resuscitating immigrants' right to work. The point here is to discuss whether the right still exists.

The constitutional argument for a right to work faces formidable hurdles, such as the post-*West Coast Hotel* reluctance of the Court to apply more than cursory review to economic regulation and the extraordinary deference the Court grants Congress and the executive branch in immigration matters.[226] Yet once these problematic doctrines are overcome, there are strong theoretical reasons for restoring the constitutional right to work. This discussion aims to renew debate on this neglected topic.

## A.  *Interpretative Methodology*

There are a host of schools of constitutional interpretation. Some commentators and judges advocate a "Living Constitution" that changes with the times.[227] Others urge an "originalist" approach that looks either to the intentions of the founders or the public understanding of the text at the time of ratification.[228] As a general matter, originalists are suspicious of substantive due process.[229] Yet the search for historicity that is the hallmark of originalism has had an impact on the Court's substantive due process jurisprudence. In *Washington v. Glucksberg*, the Court articulated a test for expanding the rights protected by substantive due process that examines

---

224. Washington v. Glucksberg, 521 U.S. 702, 703 (1997).

225. There is also a right to work under the Privileges and Immunities Clause of Article IV, § 2 of the Constitution. *See* Jonathan Varat, *State "Citizenship" and Interstate Equality*, 48 U. Chi. L. Rev. 487, 491 (1981). However, that clause is limited to citizens and only protects against state discrimination. *See* United Building & Construction Trades Council v. Mayor & Council of Camden, 465 U.S. 208, 216 (1984).

226. *See* Part IV.B and C, *infra*.

227. *See, e.g.*, DAVID A. STRAUSS, THE LIVING CONSTITUTION (2010).

228. D.A. Jeremy Telman, *Originalism: A Thing Worth Doing*, 42 OHIO N. L. REV. 529 (2016); Randy E. Barnett, *Scalia's Infidelity: A Critique of "Faint-Hearted" Originalism*, 75 U. CIN. L. REV. 7, 9 (2006).

229. *See, e.g.*, AKHIL REED AMAR, AMERICA'S UNWRITTEN CONSTITUTION 389 (2012).

AR2022_500630

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 631 of 990

whether the right is "objectively, deeply rooted in this Nation's history and tradition."[230]

In its most recent substantive due process decision, *Obergefell v. Hodges*, the Court continued its reliance on historical inquiry, citing de Toqueville and nineteenth century case law for the proposition that marriage is a fundamental right.[231] However, it also cautioned that "[t]he generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning."[232] As a result, *Obergefell* rejected the second element of the *Glucksberg* test—that there be "a 'careful description' of the asserted fundamental liberty interest."[233] The justices thus did not require that a right to *same-sex* marriage be deeply rooted in United States history and tradition, only that marriage itself be a fundamental right.[234] In considering whether that right could be used to strike down restrictions on same-sex marriage, they focused on considerations that had previously been confined to equal protection cases. Because LGBT persons had suffered historical discrimination, a majority concluded that there could be no deeply rooted right to same-sex marriage.[235] The Court thus blended an examination of the historical pedigree of the right to marriage with a focus on whether LGBT persons had experienced disrespect and subordination that prevented them from accessing that right.[236]

Consistent with *Glucksberg* and *Obergefell*, this Part inspects whether an immigrant right to work is deeply rooted in United States tradition and whether noncitizens have experienced subordination. It draws upon the substantial historical support for the right to work for immigrants set out in Part II, and the reasons for its lapse, including animus against immigrants, which are set out in Part III. Thus, the two aspects of the *Glucksberg/ Obergefell* analysis—historicity and subordination—support renewal of immigrants' right to work.

As a preliminary matter, two theoretical obstacles to this analysis must be addressed: Lochnerism and the Plenary Power doctrine. Lochnerism refers to the judicial consensus that arose in the wake of *Lochner* that any form of strong judicial review of economic regulation amounts to judicial activism. The Plenary Power doctrine refers to the judicial doctrine that federal regulation of immigration should be given great deference. Although the two

---

230. Washington v. Glucksberg, 521 U.S. 702, 703 (1997).
231. Obergefell v. Hodges, 135 S. Ct. 2584, 2601 (2015).
232. *Id.* at 2598.
233. *Id.* at 2602.
234. *Id.*
235. *Id.* at 2602–05.
236. *Id.* at 2604.

AR2022_500631

together seem to present an insurmountable barrier to immigrants' right to work, each gives way under closer scrutiny.

## B.  *Lochnerism*

Since *West Coast Hotel*, the Court has applied such a deferential form of rational basis review to economic regulations that it has only rarely struck down any legislation in the economic arena as a violation of due process.[237] This reluctance stems largely from the widespread view that the era's decisions amounted to judicial activism—an invention of economic rights that were not in the Constitution, in order to support "an economic theory which a large part of the country does not entertain."[238] According to both the traditional and progressive views of *Lochner*, Supreme Court Justices "steeped in laissez-faire economic theory" struck down "legislation that threatened to burden corporations or disturb the existing economic hierarchy."[239]

There are several reasons why the charge of Lochnerism should not undermine an argument for a right to work. First, recent scholarship has questioned the traditional critique of *Lochner*.[240] Revisionists have "traced the main strands of Lochner-era police powers jurisprudence back to the Jacksonian aversion to 'class' legislation, to the anti-slavery movement's adulation of individual economic liberty as a constitutive element of human freedom, and to the nation's traditional social contract vision of political membership."[241] One strand of *Lochner* revisionism holds that the Court was engaged in a sincere, if at times anachronistic, effort to uphold core constitutional values.[242] It is likely no coincidence that the Court's search for historicity frequently served the nation's increasingly voracious appetite for labor—and often in a way that privileged capitalist interests over workers. Yet the right to work, with its Lockean pedigree,[243] was authentically tied to the country's intellectual tradition.[244]

---

237. Levy, *supra* note 23.

238. *Lochner*, 198 U.S. at 75 (Holmes, J. dissenting). *See generally* Gary D. Rowe, Lochner *Revisionism Revisited*, 24 LAW & SOC. INQUIRY 221, 223 (1999).

239. Lindsay, *supra* note 61 at 56.

240. Paul Kens, Lochner v. New York, *Tradition or Change in Constitutional Law*, 1 N.Y.U. J.L. & LIBERTY 404 (2005).

241. Lindsay, *supra* note 61, at 56.

242. David E. Bernstein, Lochner *Era Revisionism, Revised:* Lochner *and the Origins of Fundamental Rights Constitutionalism*, 92 GEO. L.J. 1, 12 (2003) (the Lochner Court "had a generally historicist outlook, seeking to discover the content of fundamental rights through an understanding of which rights had created and advanced liberty among the Anglo-American people.").

243. JOHN LOCKE, THE SECOND TREATISE ON CIVIL GOVERNMENT.

244. David E. Bernstein, Lochner, *Parity, and the Chinese Laundry Cases*, 41 WM. & MARY L. REV. 211, 282–83 (1999) [hereinafter Bernstein, *Chinese Laundry Cases*] ("Lochnerian judges relied on two long-standing American intellectual traditions that heavily influenced American conceptions of liberty and the proper role of government in the post-bellum era: the tradition that valued 'natural rights' and 'free labor,' and the tradition that opposed 'class legislation'—legislation that benefits politically powerful interest groups at the expense of other citizens."); William E. Forbath, *The Ambiguities of Free Labor: Labor and the Law in the Gilded Age*, 1985 WIS. L. REV. 767, 799 (1985).

Thus, revisionist scholarship suggests that the Court's doctrinal aversion to applying substantive due process analysis in the economic arena is not based on a coherent set of principles.[245] If the Court were to apply substantive due process to laws that severely restrict work, the floodgates would not burst open. In fact, the Court has been willing to enforce substantive due process in recent years—both in the economic and private domains. One area in which the Court has struck down economic regulation as violating substantive due process is when it comes to excessive punitive damages awards.[246] The Court has also continued to regularly apply substantive due process analysis in analogous areas outside economic regulation, such as restrictions on the fundamental right of marriage.[247]

Both marriage and work involve a "personal choice [that] . . . is inherent in the concept of individual autonomy."[248] Other than the choice of a life partner, the choice of how to work is one of the most basic and personal decisions in life. The fact that work is economic activity does not seem to be a sufficient basis to distinguish it from the Court's recognition of other analogous rights, like marriage, as fundamental for due process purposes.

Modern courts seem concerned that if they recognize economic rights as being fundamental as a matter of substantive due process, it will reopen a Pandora's box with no logical stopping point. However, there are principles that could allow a court to strike down some restrictions on immigrant work without logically requiring the invalidation of all labor law. The Court's recent *Obergefell* decision provides a framework for doing so.

In *Obergefell*, the Court blended equal protection and due process review, and looked to the historical subordination of LGBT persons as a basis for recognizing a substantive due process right to gay marriage even in the absence of any historical tradition of respecting such a right.[249] As Professor Kenji Yoshino points out, this "analysis of substantive due process inflected with equality concerns . . . constrains as well as expands the field of possible liberties."[250] In other words, a linkage between equality principles and substantive due process can act as a check on Lochnerism. Unlike workers who may not wish to pay union dues or fees, immigrants have been subject to a history of subordination both inside and outside the workforce. A denial of their right to work does not just represent a minor economic hardship; it typically results in greatly diminished or eviscerated employment options

---

245. Levy, *supra* note 23 at 331.

246. *See* Philip Morris U.S.A. v. Williams, 549 U.S. 346 (2007) (striking down a punitive damages limit as in violation of the Due Process Clause); State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003) (same); BMW of North Am., Inc. v. Gore, 517 U.S. 599 (1996) (same).

247. Obergefell v. Hodges, 135 S. Ct. 2584, 2604 (2015); Loving v. Virginia, 388 U.S. 1, 12 (1967).

248. Obergefell, 135 S. Ct. at 2599.

249. *Id.*

250. Yoshino, *supra* note 26 at 175.

AR2022_500633

and furthers immigrant subordination.[251]

Another reason to reject the charge of Lochnerism in this context is international law. Justice Kennedy has been particularly willing to consult international law in order to confirm "the centrality of those same rights within our own heritage of freedom."[252] International law has historically provided support for a right to work: Justice Field, for example, quoted the 1776 edict of Louis XVI giving freedom to trades and professions to buttress a finding that the right to work is rooted in natural law.[253] Many of the early immigrant right-to-work cases relied on treaties between the United States and China and Japan.[254]

International law today continues to support a right to work, even if that right is not robustly enforced in practice.[255] The International Covenant on Civil and Political Rights ("ICCPR") includes a right to life, which impliedly comes with a right to seek out the basic necessities of life, meaning, for most persons, work.[256] The Universal Declaration of Human Rights ("UDHR"), which is a fundamental constitutive document of the United Nations, sets out "a right to work."[257] The International Covenant on Economic, Social and Cultural Rights ("ICESR"), which the United States has signed but not ratified, also contains a right to work.[258] The right to work set out in these provisions has been interpreted to mean a right to a job, not to nondiscriminatory access to work. However, the UDHR and ICESR also provide that all persons must be afforded equal protection with respect to their right to work.[259]

These international authorities have generally been met with ambivalence in the United States, because they could imply increased government interference with the labor market.[260] Internationally, the right to work is often not enforced, but that does not mean that it does not exist, or that it will not eventually be vindicated over time.[261] There is widespread recognition in international law that nondiscriminatory access to employment is a human right.[262] This global consensus concerning the right to work shows that the

---

251. *See* Part IV.D, *infra.*

252. Roper v. Simmons, 543 U.S. 551, 578 (2005).

253. Butchers' Union Slaughterhouse Co. v. Crescent City Live-Stock Landing Co., 111 U. S. 746, 757 (1884) (Field, J., concurring).

254. Tim Wu, *Treaties' Domains*, 93 VA. L. REV. 571, 618 (2007).

255. *See generally* Philip Harvey, *Human Rights and Economic Policy Discourse: Taking Economic and Social Rights Seriously*, 33 COLUM. HUM. RTS. L. REV. 363, 371 (2002).

256. International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171, Art. 6.

257. Universal Declaration of Human Rights, G.A. Res. 217, U.N. GAOR, 3d Sess., art. 23, U.N. Doc. A/810 (Dec. 10, 1948).

258. International Covenant on Economic, Social and Cultural Rights, *adopted* Dec. 16, 1966, G.A. Res. 2200A (XXI), U.N. GAOR, 21st Sess., Supp. No. 16 at 49, art. 6, U.N. Doc. A/6316 (1966), 993 U.N.T.S. 3, reprinted in 6 I.L.M. (1967) (*entered into force* Jan. 3, 1976).

259. Harvey, *supra* note 255 at 380.

260. *Id.* at 383-84.

261. *Id.* at 382.

262. *Id.*

core critique of Lochner—that judges struck down legislation based mostly on their personal views of political economy—does not hold in this context. Thus, international law, revisionist scholarship, and recent substantive due process jurisprudence all refute the argument that an immigrant right to work is mere Lochnerism.

## C.  *The Plenary Power Doctrine*

The Court has frequently adhered to a "plenary power" doctrine under which it exercises extraordinary deference towards congressional or executive decisions over "immigration law," or decisions concerning the admission or deportation of noncitizens.[263] This doctrine first arose in 1889 in *Chae Chan Ping*, or the *Chinese Exclusion* case, in which the Supreme Court affirmed Congress's shameful exclusion of Chinese immigration into the United States.[264] The primary justification for the doctrine is the greater competence of the political branches over questions of foreign affairs,[265] and it has been limited, for the most part, to cases involving federal decisions about whom to admit or deport.[266] In cases, on the other hand, involving the rights of noncitizens in the United States, the Court has generally not applied the plenary power doctrine.[267] This is especially true in cases involving *state* discrimination against noncitizens, particularly lawful residents, which have even sometimes triggered strict scrutiny equal protection review.[268] When the *federal government* discriminates with respect to different types of noncitizens, the Court has been much more likely to apply the plenary power doctrine. It has even done so in at least one major case, *Mathews v. Diaz*, which involved the allocation of benefits rather than decisions about admission and deportation.[269]

Therefore, a court is more likely to apply the plenary power doctrine to federal discrimination concerning the right to work rather than state restrictions on the right. Moreover, whether the plenary power doctrine should insulate federal work restrictions from review depends on whether those rules are construed as "immigration law" or pertaining to the "more general law of aliens' rights and obligations."[270] In other words, if work restrictions are connected closely enough to decisions concerning admission and depor-

---

263.  For a discussion of the plenary power doctrine and its scope, see Adam B. Cox, *Citizenship, Standing, and Immigration Law*, 92 CAL. L. REV. 373, 379 (2004); Hiroshi Motomura, *Immigration Law After A Century of Plenary Power: Phantom Constitutional Norms and Statutory Interpretation*, 100 YALE L.J. 545, 547 (1990); Stephen H. Legomsky, *Immigration Law and the Principle of Plenary Congressional Power*, 1984 SUP. CT. REV. 255, 256 (1984).

264.  Chae Chan Ping v. United States, 130 U.S. 581, 606 (1889).

265.  *Id.*

266.  *See* LINDA BOSNIAK, THE CITIZEN AND THE ALIEN 54 (2006).

267.  *Id.*

268.  *See, e.g.*, Graham v. Richardson, 403 U.S. 365 (1971).

269.  Matthews, 426 U.S. at 81 (1976) (applying rational basis review to evaluate federal discrimination concerning the award of Medicare benefits to different categories of noncitizens).

270.  Legomsky, *supra* note 263 at 256.

AR2022_500635

tation, they are likely to fall under the plenary power doctrine. If they are viewed as imposing on civil rights that transcend the limited context of immigration decisions, they should fall outside the scope of plenary power.

Given the increasingly close connection between employment regulation and immigration enforcement, an argument could be made for the application of the plenary power doctrine in the area of employment regulation. The argument would be that limitations on immigrants' right to work in the United States are necessary to deter unauthorized immigration. In addition, enlisting employers in checking work authorization aids the federal government in deporting unauthorized immigrants. Limitation of immigrants' right to work may not be, strictly speaking, in the area of admissions and deportation, but it does have a close connection to admissions and removal.

One of the strongest reasons to reject such an argument is that the Supreme Court did not apply the plenary power doctrine to cases involving immigrant work during the era when it invented the doctrine. Justice Field was the author of the *Chinese Exclusion* case, in which he used remarkably racist language to affirm federal plenary power to exclude Chinese individuals.[271] Yet, he repeatedly affirmed in other cases that immigrants—even Chinese ones—had a right to work.[272]

Moreover, applying the plenary power doctrine in this context would be an unwarranted extension of it. Accepting the historical right of immigrants to work in the United States does not restrict the authority of the federal government to limit admissions in order to regulate the labor market. Immigrant rights doctrine traditionally distinguishes between "alienage" cases involving the rights of noncitizens present in the United States, where plenary power is at its weakest, and "immigration cases" involving admissions and removal decisions, where the plenary power doctrine is at its peak.[273] There is no question that Congress has plenary power to require noncitizens seeking to enter the country in order to work to comply with the labor certification process described in Part IV. However, the current use of employment authorization restrictions as a tool of immigration enforcement is a distinct and more novel development, which conflicts with a long history of accepting the right of all persons already present in the United States to earn a livelihood.[274]

Ultimately, the primary rationale for the plenary power doctrine—the greater competence of the political branches over foreign affairs—does not

---

271. *See* Chae Chan Ping, 130 U.S. at 595 ("It seemed impossible for them to assimilate with our people, or to make any change in their habits or modes of living. As they grew in numbers each year the people of the coast saw, or believed they saw, in the facility of immigration, and in the crowded millions of China, where population presses upon the means of subsistence, great danger that at no distant day that portion of our country would be overrun by them, unless prompt action was taken to restrict their immigration.").

272. *See* In re Quong Woo, 13 F. 229 (Field, Circuit Justice, C.C.D. Cal. 1882).

273. Legomsky, *supra* note 263.

274. *See* Part I, *supra*.

apply to questions about who can work in the United States. The plenary power doctrine should not limit judicial review of restrictions on immigrant work.

## D.  *Historicity and Subordination*

In *Washington v. Glucksberg*, the Court articulated a two-part test for assessing whether a right is protected by substantive due process. First, the test examines whether the right is "objectively, 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'"[275] Second, it requires "a 'careful description' of the asserted fundamental liberty interest," meaning that there must be a history of recognizing the specific right at issue, not some more general form of it.[276] However, the Court appeared to move away from the second requirement in *Obergefell* as it found a right to gay marriage based on historical recognition of a general right to marriage, not a specific right to gay marriage.[277]

There is ample support for finding a right to work that is deeply rooted in this nation's history and tradition and "implicit in the concept of ordered liberty." This support can be found in the nation's intellectual, cultural, and legal history. The founders drew much of their political theory from the work of John Locke.[278] In particular, much of the Declaration of Independence was based upon Locke's Treatise on Government.[279] In the Second Treatise on Government, Locke defended a natural right to property and defined property by reference to labor.[280] Work, according to Locke, is the basis for property, and the justification for protecting a right to property.[281]

American intellectual history has also been heavily influenced by the work of Adam Smith, and the founders in particular may have been influenced his views.[282] James Madison, for example, was persuaded by Adam Smith's

---

275.  Washington v. Glucksberg, 521 U.S. 702, 721 (1997) (quoting Moore v. East Cleveland, 431 U.S. 494, 502 (1977) (plurality opinion) and Palko v. Connecticut, 302 U.S. 319, 325 (1937)).

276.  *Id.* (quoting Reno v. Flores, 507 U.S. 292, 302 (1993).

277.  Obergefell, 135 S. Ct. at 2599.

278.  *See* DONALD S. LUTZ, THE ORIGINS OF AMERICAN CONSTITUTIONALISM 143 (LSU Press) (1988).

279.  Letter from Thomas Jefferson to James Madison (August 30, 1823), 15 THOMAS JEFFERSON, THE WRITINGS OF THOMAS JEFFERSON 462 (Andrew A. Lipscomb et al. eds., The Thomas Jefferson Memorial Association 1904).

280.  JOHN LOCKE, SECOND TREATISE OF GOVERNMENT, ch. 5, § 27 (C.B. Macpherson ed., Hackett Publishing Inc. 1980) (1690).

281.  For an argument that the Constitution should be interpreted as consistent with the Declaration of Independence, see Harry V. Jaffa, *What Were the "Original Intentions" of the Framers of the Constitution of the United States?*, 10 SEATTLE U. L. REV. 351, 365–66 (1987) (arguing that the right to property "is the antecedent natural right grounded in natural equality that every person possesses in himself. This right is a fortiori—a right of each person to possess the fruit of his labor.").

282.  Samuel Fleischacker, *Adam Smith's Reception among the American Founders, 1776–1790*, 59 WM. & MARY Q. 897, 905 (2002) ("There is good evidence that Jefferson, Hamilton, Wilson, Adams, Webster, Morris, and the two James Madisons were some of his Smith's earliest readers and among the first to take him seriously in their own political lives.").

view of labor as being the foundation for all property.[283] Like Locke, Smith believed in a close connection between labor, property, and liberty:

> The property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands; and to hinder him from employing this strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property. It is a manifest encroachment upon the just liberty both of the workman and of those who might be disposed to employ him. As it hinders the one from working at what he thinks proper, so it hinders the others from employing whom they think proper.[284]

This view was also highly influential with the nineteenth century jurists who upheld the right to work for immigrants—Justice Field quoted the above passage in his dissent in the 1884 *Slaughterhouse Case*.[285]

The centrality of the right to work in American culture has been recognized by commentators from Benjamin Franklin to Max Weber.[286] In the United States, work seems to carry a unique moral and social force.[287] Those who do not work are viewed as immoral—lazy and shiftless—or as dependent, lacking in autonomy.[288] Jefferson and Madison believed that one's character was influenced by the type of work one did, and that democracy depended on the responsible judgment of economically independent yeoman farmers.[289] There is perhaps no other aspect of human activity that is more "deeply rooted in this Nation's history and tradition" than work.[290]

Throughout most of United States history, it has been assumed that immigrants would be workers, and the value of their work to the growth and success of the country has been widely recognized, even by those with nativist or racist views.[291] As detailed in Part I, United States courts recognized a constitutional and natural law right to work for immigrants from

---

283. *Id.* at 906.

284. ADAM SMITH, AN INQUIRY INTO THE NATURE AND CAUSES OF THE WEALTH OF NATIONS, b. 1, ch. 10, part 2 (London: Methuen, 1904), http://oll.libertyfund.org/titles/237#Smith_0206-01_516.

285. Butchers' Union Slaughterhouse Co. v. Crescent City Live-Stock Landing Co., 111 U. S. 746, 757 (1884).

286. MAX WEBER, THE PROTESTANT ETHIC AND THE SPIRIT OF CAPITALISM 13-19 (Routledge 2001) (discussing Benjamin Franklin and the view of work as a moral "calling").

287. *See* TERKEL, *supra* note 9.

288. MICHAEL B. KATZ, IN THE SHADOW OF THE POORHOUSE: A SOCIAL HISTORY OF WELFARE IN AMERICA 17-19 (New York: Basic Books 10th ed. 1996).

289. *See* JAMES MADISON, JAMES MADISON: WRITINGS 512 (Jack N. Rakove ed. 1999).

290. *Glucksberg*, 521 U.S. at 721.

291. *See* Leticia M. Saucedo, *Mexicans, Immigrants, Cultural Narratives, and National Origin*, 44 ARIZ. ST. L.J. 305, 316 (2012) (describing historical preferences of many employers for Mexican laborers). *See also* Chae Chan Ping v. United States, 130 U.S. 581, 594 (1889) ("These [Chinese] laborers readily secured employment, and, as domestic servants, and in various kinds of outdoor work, proved to be exceedingly useful.").

the 1870s through the early twentieth century.[292] Since then, federal courts have continued to strike down state restrictions on immigrant labor as a violation of the Equal Protection Clause—showing a persistent regard for immigrant work, although without recognizing a right to such.[293]

There is also a strong moral and philosophical argument that an immigrant right to work is implicit in the concept of ordered liberty. As discussed above, the liberal political theory on which the United States was founded clearly upheld a universal right to work. The principle philosophical counterpoint to liberalism comes from communitarianism.[294] A communitarian critique of an immigrant right to work might be that work is a privilege of formal membership in the United States, not a universal right. Relegating the right to members, this argument posits, is necessary to preserve the integrity of the community by discouraging illegal immigration. That argument relies on an empirical assumption that has proven false—that illegal immigration will be discouraged by limiting access to work.[295] In addition, Part IV clarifies that unauthorized immigrants are able to legally work, but in jobs where their access to legal protections are limited, such as independent contractor positions or self-employment. Communitarians recognize that denying rights to non-members undermines community by encouraging exploitation that harms the community as a whole.[296] One of the foremost communitarian thinkers, Michael Walzer, argues for rigid border control but liberal rights recognition in the interior, and recognizes that the subordination of noncitizens is a form of tyranny.[297]

There is therefore a very strong argument that immigrants' right to work meets all elements of the *Washington v. Glucksberg* test. It is deeply rooted in United States history, implicit in the concept of ordered liberty, and also "carefully described" in the sense that American history not only reflects a general right to work, but that immigrants themselves have been the beneficiaries of that right. It is only in relatively recent history that the paradigm concerning immigrant work has shifted. The conception of immigrant work as putatively illegal and linked to immigration enforcement coincided with the decision of policymakers in the 1960s and 1970s to dramatically curtail legal Western Hemisphere immigration by initiating a massive campaign of deportation against Latin American nationals in the United States and a

---

292. Part I.B, *supra.*

293. *See* MICHAEL J. SANDEL, Introduction to LIBERALISM AND ITS CRITICS 1, 5 (Michael J. Sandel ed., 1984).

294. *Id.*

295. Kitty Calavita, *Employer Sanctions Violations: Toward a Dialectical Model of White-Collar Crime*, 24 LAW & SOC'Y REV. 1041, 1046–55, 1057, 1060 (1990); Hiroshi Motomura, *Immigration Outside the Law*, 108 COLUM. L. REV. 2037, 2051 (2008) [hereinafter Motomura, *Outside the Law*]; Pham, *supra* note 207, at 803–10.

296. Linda S. Bosniak, *Exclusion and Membership: The Dual Identity of the Undocumented Worker Under United States Law*, 1988 Wis. L. Rev. 955, 1004 (1988).

297. MICHAEL WALZER, SPHERES OF JUSTICE: A DEFENSE OF PLURALISM AND EQUALITY 62 (New York: Basic Books 1983).

AR2022_500639

conflation in the popular imagination of so-called "illegal aliens" with Mexican nationals.[298]

This recent history offers a strong reason for the Supreme Court to invoke an immigrant right to work. According to Professor Cass Sunstein:

> From its inception, the Due Process Clause has been interpreted largely (though not exclusively) to protect traditional practices against short-run departures. The clause has therefore been associated with a particular conception of judicial review, one that sees the courts as safeguards against novel developments brought about by temporary majorities who are insufficiently sensitive to the claims of history.[299]

The current hostility to immigrant work is a recent phenomenon and the traditional view of substantive due process should protect against it. Yet, labor and employment laws in general are a "recent phenomenon" when viewed against the full scope of United States history.[300] The concern then is that a substantive due process right to work might be used to undermine labor and employment laws in general, not just those that limit immigrant work. This is where the *Obergefell* focus on anti-subordination as a constraining principle for substantive due process is relevant.[301]

In *Obergefell*, Justice Kennedy looked to whether LGBT persons had experienced subordination that explained their exclusion from the right of marriage. Like LGBT persons, immigrants—especially Asian and Latino ones—have experienced subordination in countless ways throughout American history: restrictions on immigrants' rights and privileges, selective enforcement of criminal laws against them, mass internment, draconian deportation campaigns, hostile public rhetoric, and attacks on their physical safety.[302] The Supreme Court has even recognized that "Aliens as a class are a prime example of a 'discrete and insular' minority" requiring special judicial protection, because majoritarian politics cannot be relied upon to do so.[303]

The subordination of unauthorized immigrants has often been effectuated by policies that limit their rights while simultaneously encouraging or at least tolerating their availability as low-cost labor. Justice Brennan described this

---

298. Kevin R. Johnson, *"Aliens" and the U.S. Immigration Laws: The Social and Legal Construction of Nonpersons*, 28 U. MIAMI INTER-AM. L. REV. 263, 282 (1997).

299. Cass R. Sunstein, *Sexual Orientation and the Constitution: A Note on the Relationship Between Due Process and Equal Protection*, 55 U. CHI. L. REV. 1161, 1163 (1988).

300. *See* Stephen F. Befort, *Labor and Employment Law at the Millenium: A Historical Review and Critical Assessment*, 43 B.C. L. Rev. 351, 354 (2002).

301. *See* Yoshino, *supra* note 26 at 175.

302. *See* Bill Ong Hing, *Vigilante Racism: The De-Americanization of Immigrant America*, 7 MICH. J. RACE & L. 441, 450–54 (2002); *See also* Kevin R. Johnson, *Fear of an "Alien Nation": Race, Immigration, and Immigrants*, 7 STAN. L. & POL'Y REV. 111 (1996).

303. Graham v. Richardson, 403 U.S. 365, 372 (1971).

AR2022_500640

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 641 of 990

reality in *Plyler v. Doe*, in which the Court struck down Texas's effort to deny public education to undocumented immigrant children:

> This situation raises the specter of a permanent caste of undocumented resident aliens, encouraged by some to remain here as a source of cheap labor, but nevertheless denied the benefits that our society makes available to citizens and lawful residents. The existence of such an underclass presents most difficult problems for a Nation that prides itself on adherence to principles of equality under law.[304]

As a general matter, there can be little doubt that immigrants—especially unauthorized ones—have experienced subordination.[305] This is particularly true in the workplace, where they are forced to work in the underground economy or be independent contractors or self-employed.[306] They accept exploitative conditions and risk deportation for just trying to feed themselves and their families.

Given the historical foundations for an immigrant right to work and the subordination that noncitizens have experienced, they should have a right to work regardless of whether they have a formal immigration status. That is not to say that every restriction on immigrant work will violate the right. There is a fundamental right to marriage, but the right to marry is not infringed by every burden on it; for example, the government can impose a special tax on married couples without violating the right itself.[307] In deciding whether there has been a violation of a right, the Court considers "[t]he directness and substantiality of the interference,"[308] meaning that a court may well conclude that some reasonable restrictions on immigrant work do not infringe upon the right. Even when rights are infringed, courts may allow the violation to occur if there is a sufficiently important state interest in doing so and the restriction is carefully tailored.[309]

The extent to which the right to work can be abridged as a constitutional matter and the policy rationales for regulating immigrant work are beyond

---

304. Plyer v. Doe, 457 U.S. 202, 218–19 (1982).

305. Anthony O'Rourke, *Substantive Due Process for Noncitizens: Lessons from* Obergefell, 114 MICH. L. REV. FIRST IMPRESSIONS 9, 17 (2015).

306. Part IV.D, *supra*.

307. *See, e.g.,* Druker v. C.I.R., 697 F.2d 46, 50 (2d Cir. 1982).

308. Zablocki v. Redhail, 434 U.S. 374, 387 n.12 (1978).

309. *See* Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. REV. 1267, 1283–97 (2007) (describing the evolution of "strict scrutiny" in various contexts, including substantive due process). For an argument that a lesser standard of review applied to rights violations at the time of the *Lochner* Court, which was focused on analysis of the government's "police power," *see* Victoria F. Nourse, *A Tale of Two Lochners: The Untold History of Substantive Due Process and the Idea of Fundamental Rights*, 97 CAL. L. REV. 751, 752 (2009). Generally, if a right is "deeply rooted in this Nation's history and tradition," the Court considers it to be fundamental and applies strict scrutiny, although that standard is of relatively recent origin and could be modified going forward. *See* Fallon, 54 UCLA L. REV. at 1281-85. The question of what level of judicial scrutiny is appropriate for addressing violations of the immigrant right to work is an important one, but is beyond the scope of this article.

AR2022_500641

the scope of this Article. However, even without addressing these doctrinal questions, it is possible to draw two basic conclusions that follow from the existence of a right to work.

First, if there is a right to work, that means that the starting point for any conversation about immigrants working should not be whether Congress has specifically authorized it, but whether Congress has prohibited it. There should be no impediment, for example, to the president offering work authorization to unauthorized immigrants without specific congressional approval, as President Obama attempted with his Deferred Action for Parental Accountability ("DAPA") program.[310]

Second, direct and substantial interference with the right to work ought to trigger some level of judicial review. The criminalization of unauthorized work, for example, would seem to be such a direct and substantial interference. When Arizona and Alabama attempted to criminalize unauthorized work, their laws were struck down as being preempted by federal law.[311] However, if Congress were to criminalize unauthorized work, the preemption doctrine would not apply, and one of the few constitutional checks on such an action might be the constitutional right to work. Similarly, if Congress were to attempt to withdraw work authorization from a category of noncitizens that currently has it, like asylees and refugees, a constitutional right-to-work claim also might be one of the only bases for legally challenging such action.

## VI. CONCLUSION

Immigrants' right to work is not officially dead, just dying. No court has ever overruled *Yick Wo*, and no statute has been passed saying "unauthorized aliens" cannot work. But any reasonable bystander looking at the condition of immigrants' right to work would say that it needs resuscitation. So many statutory and regulatory impediments to immigrant work have been created that it has come to be putatively illegal. Moreover, no court has enforced a substantive due process right to work since the *Lochner* era.

Restrictions on immigrant work may ultimately serve a symbolic function more than they advance any legitimate policy goal.[312] To some citizens who have lost economic status in the global economy, they may reflect a commitment to preserving American jobs for American citizens. Yet, in practice, they diminish workplace protections and civil liberties for citizens

---

310. *See* DEPT. OF HOMELAND SECURITY, EXERCISING PROSECUTORIAL DISCRETION WITH RESPECT TO INDIVIDUALS WHO CAME TO THE UNITED STATES AS CHILDREN AND WITH RESPECT TO CERTAIN INDIVIDUALS WHO ARE THE PARENTS OF U.S. CITIZENS OR PERMANENT RESIDENTS (2014). The Fifth Circuit upheld an injunction against the DAPA program and it never went into effect. Texas v. United States, 809 F.3d 134, 187–88 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271, 2272 (2016).

311. *See Arizona* and *Alabama*, supra note 202.

312. *See* Pham, *supra* note 207, at 817.

just as they subordinate unauthorized immigrant workers.[313]

The early immigrant right-to-work cases recognized a basic principle that is strangely missing from today's debate about unauthorized immigration: all humans have a right to work to support themselves.[314] This principle is not only codified in international law, but is also deeply rooted in United States history and in foundational documents like the Declaration of Independence.[315] The movement away from the never-overruled constitutional jurisprudence of immigrants' right to work was a radical shift that seems inevitable only because it occurred under the radar, mostly without congressional action, over years of bureaucratic half-measures.[316]

The anti-subordination logic of *Obergefell* offers a principled way to recognize immigrants' right to work without also resurrecting all the problems associated with *Lochner*. In order to assert a right to work, a claimant would need to be a member of a subordinated class. Employers would not generally have standing to enforce a right to work for their employees, and workers could not raise claims to defend exploitative work conditions that exacerbate rather than remedy subordination in the face of government health and safety regulations.

Restrictions that directly and substantially interfere with immigrant work would trigger judicial review. Moreover, the recognition of an immigrant right to work would shift the discussion in cases involving work authorization from whether Congress has specifically authorized work, to whether it has prohibited it. Thus, there should be no constitutional problem with the president authorizing a large class of unauthorized migrants to work, as President Obama attempted to do with his DAPA program.

Not all presidents want to broaden work authorization, so it is equally possible that in the future the federal government will act to restrict noncitizens' ability to work. In these cases, the right to work might provide the most potent, if not only, form of challenge. Immigrant rights advocates have successfully challenged state legislation as being preempted by federal law or as violating equal protection.[317] But preemption provides no check on federal limitations on immigrant work, and the Supreme Court has sometimes applied only rational basis review to federal action, despite the fact that the Court mostly applies strict scrutiny to state discrimination.[318]

---

313. *See* Wishnie, *supra* note 12; Griffith, *Migrant Worker Law, supra* note 7, at 140; Lee, *Private Immigration Screening, supra* note 223.
314. *See* Part II.B, *supra*.
315. *See* Part II.B, *supra*.
316. *See* Part III.A, *supra*.
317. *See Arizona* and *Alabama,* supra note 202.
318. *Compare* Mathews v. Diaz, 426 U.S. 67, 83 (1976) (rational basis review of federal discrimination concerning the allocation of Medicaid benefits), *with* Graham v. Richardson, 403 U.S. 365, 372 (1971) (applying strict scrutiny to Arizona's durational residency requirement for noncitizen receipt of welfare benefits).

Both the proper standard of review and policy arguments for or against particular types of regulation are beyond the scope of the article. There are no doubt good economic arguments for preventing some immigrants from working, as well as arguments that society would be better off with no regulation.[319] Assessing those arguments requires rigorous empirical study. But, at a minimum, if Congress wishes to prohibit immigrant work it should have a legitimate reason for doing so. Anti-immigrant sentiment alone ought not to suffice. A constitutional right with a lengthy pedigree should not be abridged based on prejudice or unexamined assumptions.

---

319. *See, e.g.,* Pia Orrenius & Madeline Zavodny, *Does Immigration Affect Wages? A Look at Occupation-Level Evidence*, 14 LABOUR ECON. 757 (2007) (finding that an increase in foreign-born workers tends to lower the wages of natives in blue collar occupations but does not have a statistically significant impact on the wages of natives in skilled occupations).

**Valparaiso University**
**ValpoScholar**

Law Faculty Publications                    Law Faculty Presentations and Publications

5-2015

# The Status of Nonstatus

Geoffrey Heeren
*Valparaiso University*, geoffrey.heeren@valpo.edu

Follow this and additional works at: http://scholar.valpo.edu/law_fac_pubs

 Part of the Immigration Law Commons

### Recommended Citation

Geoffrey Heeren, The Status of Nonstatus, 64 Am. U. L. Rev. 1115 (2015).

This Article is brought to you for free and open access by the Law Faculty Presentations and Publications at ValpoScholar. It has been accepted for inclusion in Law Faculty Publications by an authorized administrator of ValpoScholar. For more information, please contact a ValpoScholar staff member at scholar@valpo.edu.

# ARTICLES

# THE STATUS OF NONSTATUS

GEOFFREY HEEREN[*]

Millions of unauthorized immigrants in the United States have no legal immigration status and live in constant fear of deportation.  There are millions more who do have some sort of status, like lawful permanent residency, asylum, or a nonimmigrant visa.  In between is the netherworld of nonstatus.  Here live noncitizens who possess government documentation but few rights.  They have no pathway to lawful permanent residence or citizenship and cannot receive most public benefits.  If nonstatus is denied or revoked by a prosecutor or bureaucrat, there is no right to a hearing or an appeal.  If the Executive Branch discriminates in how it allocates nonstatus, there may not be a legal right to challenge it.

The Obama Administration's Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parental Accountability (DAPA) programs are the most recent and largest categories of nonstatus, but there are many others:  parole, administrative closure, supervision, Deferred Enforced Departure (DED), and stays of removal, to name just a few.  What these categories have in common is that they are discretionary, unreviewable, weakly described by positive law, and officially temporary, although individuals often live for years or even lifetimes in the purgatory of nonstatus.  They occupy a paradoxical middle ground between legality and illegality, loosely tethered to this country by humanitarian concern or prosecutorial discretion.  Those with nonstatus have fewer rights and

* Associate Professor, *Valparaiso University Law School.*  I am grateful to Ingrid Eagly, Shoba Sivaprasad Wadhia, Juliet Stumpf, Peter Margulies, Alina Das, Stuart Ford, Nadia Nasser-Ghodsi and participants at a Valparaiso University Law School faculty workshop and at the 2014 Immigration Law Professors Workshop at the University of California at Irvine School of Law for their helpful comments and conversations as well as to the editors of the *American University Law Review* for their excellent edits.

AR2022_500646

*remedies than those with immigration status. At the same time, they must register, disclose biographic data, be fingerprinted, and regularly update their address. Yet nonstatus is not just a government surveillance program: it is the only way for many individuals to claim some measure of dignity and legitimacy from a society that places a strong stigma on unauthorized immigrants.*

*This Article will provide the first description of immigration nonstatus and its impact on the individuals who have it. It will describe the growth of nonstatus over time and the acceleration of that growth following late-1990s immigration reforms that restricted the means to acquire immigration status. The Article will contend that nonstatus is growing in part because it offers a means to authorize the presence of undocumented immigrants without offering them rights and benefits that have become controversial for immigrants with full status.*

## TABLE OF CONTENTS

Introduction ....................................................................................... 1117
I. Definitions ............................................................................. 1122
    A. Status ............................................................................. 1122
    B. No Status ....................................................................... 1126
    C. Nonstatus ...................................................................... 1129
II. The Development of Nonstatus ........................................... 1133
    A. Parole ............................................................................ 1134
    B. Voluntary Departure, Extended Voluntary Departure,
       and Deferred Enforced Departure ............................... 1136
    C. Family Unity and Temporary Protected Status ............. 1139
    D. Withholding and Deferral of Removal ......................... 1142
    E. ICE Supervision and Stays of Removal ......................... 1146
    F. Deferred Action, Part I ................................................. 1149
       1. Deferred action in the wake of the
          non-priority program ..........................................1150
       2. VAWA deferred action .............................................. 1152
       3. Deferred action and U Visas.................................... 1154
       4. Deferred action after Hurricane Katrina................. 1156
       5. Deferred action for widows and widowers............... 1156
       6. Deferred action for military family members.......... 1157
    G. Administrative Closure.................................................. 1157
    H. Deferred Action, Part II ............................................... 1160
       1. Deferred Action for Childhood Arrivals.................. 1161
       2. Deferred Action for Parental Accountability........... 1163
III. The Impact of Nonstatus..................................................... 1165
    A. Benefits ......................................................................... 1165
    B. The Future .................................................................... 1174
Conclusion ........................................................................................ 1179

## INTRODUCTION

Sergio and his brother were taking trash to the dump in their Honduran town when they saw a local police officer grab a woman by the hair and shoot her in the head.[1]   When the officer and his accomplices saw Sergio and his brother watching, they tried to shoot them too.   Sergio and his brother went into hiding, but the police found and killed Sergio's brother a month later.   Sergio fled immediately after identifying his brother's mangled body, washed up on a trash and sewage soaked riverbank.   He left his daughter behind with her mother, crossed deserts, and exhausted his financial resources to come to the United States.

Once in the United States, Sergio applied for asylum.   During the years he waited for his final hearing, he struggled to obtain corroboration from his friends and family of what he had seen.   His two law clinic representatives worked countless hours to find evidence.   They retained a psychologist to evaluate Sergio for post-traumatic stress disorder, hired an expert on police corruption in Honduras to testify, had voluminous documents translated from Spanish to English, found supporting articles and reports, and presented all of this evidence in a lengthy memorandum of law.

The work took its toll on Sergio.   It was painful for him to recall the shooting and his brother's death in excruciating detail as he needed to in order for his representatives to draft an affidavit and prepare him to testify.   The hours Sergio spent describing what he saw gave him nightmares.   He and his representatives sacrificed much to get to the day of the final asylum hearing.   When that day came, they approached it with confidence that they had done everything they could to get ready.

Before they entered the courtroom, the lawyer for the U.S. Department of Homeland Security (DHS) approached them.[2]   "I have

---

1.  The facts of Sergio's case come from an asylum claim handled by the Valparaiso University Law School's Immigration Clinic.   Although the client has agreed to a recitation of certain facts from his case, his name has been changed to protect his confidentiality.

2.  In 2002, Congress passed the Homeland Security Act, which abolished the Immigration and Naturalization Service and created the new Department of Homeland Security (DHS), along with its various sub-agencies, including Immigration and Customs Enforcement (ICE), the primary enforcer of immigration law, and U.S. Citizenship and Immigration Services (USCIS), the primary adjudicator of immigration applications.   This Article will refer to INS when describing pre-2002 events, and to DHS or its various subagencies for events occurring after 2002.

a one-time deal," she offered.[3]  "The respondent has U.S.-citizen children and has been here for three years, so he meets our office's criteria for prosecutorial discretion."[4]  She went on to explain that her office had been instructed to assess its docket for cases that could be "administratively closed."[5]  Sergio's representatives had ten minutes to explain the offer to Sergio.  If he refused the deal, DHS would not renew the offer if he lost his asylum case.  Therefore, he would be deported.

The representatives explained DHS's offer to Sergio as well as they could in the short time they had.  The removal case would not go away:  it would just be taken off of the court's docket.  Sergio could probably renew his work permit every year because of his asylum application's pending status.  But, as long as the case was administratively closed, he would not receive asylum.  He could not petition for his daughter in Honduras to join him in the United States, meaning he would probably never see her again.  If DHS's prosecutorial discretion priorities changed in the future, perhaps as a result of the election of a different U.S. President, DHS might renew its effort to deport Sergio.

Sergio rejected the offer.  He wanted to bring his daughter to the United States where she would be safe, and without asylum, he would have no clear way to do so.[6]  The decision ended up being a good one for him:  he went on to eventually win his asylum case.

However, an increasing number of people subject to removal proceedings are agreeing to the type of deal that Sergio rejected.  The Obama Administration's 2011 prosecutorial discretion initiative has resulted in about 29,000 removal cases being administratively closed.[7]  The program was originally intended as a means to drop cases against noncitizens with close family, educational, or other ties in the United States to spend the DHS's limited resources on individuals who pose a serious threat to public safety or national

---

3.  Summary of Hearing, Valparaiso University Law School Immigration Clinic Case No. 14-0000051, March 20, 2014.

4.  *Id.*

5.  *Id.*

6.  *Id.*

7.  *See Once Intended to Reduce Immigration Court Backlog, Prosecutorial Discretion Closures Continue Unabated*, TRANSACTIONAL RECS. ACCESS CLEARINGHOUSE (Jan. 15, 2014), http://trac.syr.edu/immigration/reports/339 [hereinafter TRAC] (reporting that prosecutorial discretion is used to administratively close Immigration Court cases in an effort to reduce court backlog).

security.[8]   However, Sergio's case and other anecdotal evidence suggest that many administratively closed cases involve individuals who could have qualified for a more secure immigration status, such as asylum.[9]   To avoid the risk of deportation, these applicants take administrative closure, which forces them into an immigration purgatory that might allow work but not a pathway to legal permanent residency or citizenship.   They lack the ability to naturalize and the rights to vote and to participate in civil society that go with it, the privilege to seek government benefits like social security retirement enjoyed by lawful permanent residents (LPRs), and even the ability to freely travel afforded temporary visa holders. As far as the government is concerned, their presence in the United States is by virtue of prosecutorial discretion only, and they lack any actual "lawful status."

These tens of thousands of individuals may not be "in status," but they are not at risk of deportation either.   They are in an in-between state, a limbo that this Article will call "nonstatus."   The first goal of this Article is to define nonstatus.   This Article will strive to offer a clear definition, description, and taxonomy of this newly identified category.   It will define nonstatus as possessing three principal attributes.   First, nonstatus is officially temporary and does not offer a pathway to citizenship.   Second, nonstatus is tentative:   its holders have few rights—substantive or procedural—and as a result, they live in a state of perpetual uncertainty.   Relatedly, the positive law that circumscribes nonstatus is often hazy:   there are few statutes that describe how to obtain it.

There are a host of immigration categories that meet all or most of the elements of this definition:   deferred action, deferred enforced departure (DED), extended voluntary departure (EVD), temporary protected status (TPS), withholding of removal, deferral of removal,

---

8.   *See* Memorandum from John Morton, Dir., U.S. Immigration & Customs Enforcement, to All Field Office Dirs., All Special Agents in Charge, All Chief Counsel 1, 4 (June 17, 2011) [hereinafter June 2011 Morton Memo], *available at* http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf (describing factors to be considered for when exercising prosecutorial discretion).

9.   The author surveyed other clinical professors of immigration law concerning this issue and received several responses stating that DHS commonly offers prosecutorial discretion in cases where noncitizens are eligible for other relief.   One New York-based clinician noted that DHS commonly offers prosecutorial discretion in strong asylum cases.   *See* iclinic@list.msu.edu Listserv Exchange (Apr. 1, 2014–Apr. 3, 2014) (on file with author).

and stays of removal.[10]  The many names for nonstatus all emphasize its transitory nature, but people can and do live for years or even lifetimes in the United States within these categories without the rights afforded to lawful residents.  These individuals occupy a paradoxical middle ground between legality and illegality, loosely tethered to this country by humanitarian concern or prosecutorial discretion.

The United States has offered nonstatus since at least the 1920s and has categorically doled it out to thousands of persons at a time since the 1950s.[11]  But, in recent years, the United States has expanded the number of persons placed in nonstatus.[12]  Beginning in the late 1990s, the nonstatus of "deferred action" began to evolve from an esoteric benefit offered on a very limited case-by-case basis to a means for granting lawful presence and work permits to thousands of undocumented immigrants at a time.[13]  The government has recently released more and more deported persons with "orders of supervision" allowing them to stay in the United States, resulting in a population that now numbers well over 600,000 individuals.[14]  This increase in nonstatus culminated with the Obama Administration's controversial DACA and DAPA programs that could benefit as many as four million immigrants if they survive litigation challenges and congressional hostility.[15]

---

10. *See* 8 C.F.R. § 241.6 (2014) (setting out the requirements for an administrative stay of removal); Shoba Sivaprasad Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 CONN. PUB. INT. L.J. 243, 264–65 (2010) (explaining the development of and distinctions between Deferred Enforced Departure (DED), Extended Voluntary Departure (EVD), and Temporary Protected Status).

11. *See infra* Part II.

12. *See infra* Part II.

13. *See infra* Part II.F.

14. The author filed a Freedom of Information Act Request with ICE on April 1, 2014 for data from 2002 to the present "about the number and types of cases in which ICE has granted removable non-citizens some form of relief, broadly construed, from removal."  Letter from Geoffrey Heeren, Assistant Professor, Valparaiso Univ. Law Sch., to U.S. Immigration & Customs Enforcement (Apr. 1, 2014) (on file with author).  In response, ICE disclosed statistics concerning persons released on orders of supervision, stays of removal, extended voluntary departure, and deferred action from Fiscal Year (FY) 2010 through FY 2014.  The data reveals that there were 613,578 individuals under ICE supervision in FY 2014.  Enforcement & Removal Office LESA Statistical Tracking Unit, FOIA 14-15328 Relief from Removal (response to Freedom of Information Act Request filed by Geoffrey Heeren) [hereinafter ICE FOIA Response] (on file with author).

15. David Nakamura, *Obama Acts on Immigration, Announcing Decision to Defer Deportations of 4 Million*, WASH. POST (Nov. 20, 2014), http://www.washingtonpost.com/ politics/obama-acts-on-immigration-announcing-decision-to-defer-deportations-of-4-million/2014/11/20/9a5c3856-70f6-11e4-8808-afaa1e3a33ef_story.html.  As of this

There are several reasons for the growth of nonstatus.  Many unauthorized immigrants have strong moral claims to full status but are cut off from it by legal standards that have become increasingly strict since the late-1990s immigration reforms.[16]   There is a bipartisan consensus that the immigration system is "broken," but Congress has repeatedly failed in its efforts to reform immigration law,[17] leaving even unauthorized immigrants with very sympathetic claims ineligible for status.  One reason why reform is so difficult is that the provision of rights and benefits to immigrants is controversial.[18]  Thus, nonstatus, which comes with few real rights and benefits, offers a way to authorize the presence of undocumented immigrants without undertaking the politically hazardous task of incorporating them into the mainstream of American rights and privileges.

Part I of this Article develops definitions for status, the lack of status, and nonstatus and suggests that the three make up a fluid continuum.  Part II provides a more complete portrait of nonstatus, including the types of nonstatus and numbers of individuals with it and the different actors and interest groups involved in nonstatus: bureaucrats, politicians, judges, and private corporations.  Part III discusses the meaning of nonstatus for those who have it and society at large.  Without stating definite conclusions, this Article offers a warning.  If nonstatus is limbo, it cannot last forever, and the pathway the United States takes from it will, to a large extent, determine whether the United States is an egalitarian society.

---

writing, DAPA is subject to a federal court injunction that has prevented it from going forward.  *See generally* Texas v. United States, No. B-14-254, 2015 WL 648579 (S.D. Tex. Feb. 16, 2015), *appeal filed*, No. 15-40238 (5th Cir. Feb. 23, 2015).

16.  *See* Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 YALE L.J. 458, 517 (2009) ("In recent years, Congress has made the system of deportation more categorical, eliminating many avenues of relief from removal that in earlier periods were available to noncitizens who engaged in deportable conduct.").

17.  RUTH ELLEN WASEM, CONG. RESEARCH SERV., R42980, BRIEF HISTORY OF COMPREHENSIVE IMMIGRATION REFORM EFFORTS IN THE 109TH AND 110TH CONGRESSES TO INFORM POLICY DISCUSSIONS IN THE 113TH CONGRESS 1 (2013), *available at* http://fas.org/sgp/crs/homesec/R42980.pdf; Jaime Fuller, *Americans Are Ready for Immigration Reform.  They Are Just Not Ready Enough*, WASH. POST (July 14, 2014), http://www.washingtonpost.com/blogs/the-fix/wp/2014/07/14/americans-are-ready-for-immigration-reform-they-are-just-not-ready-enough.

18.  *See infra* Part III.A.

## I.  DEFINITIONS

*Ceci n'est pas une pipe.*

- René Magritte[19]

According to U.S. Citizenship and Immigration Services (USCIS), a grant of deferred action means that a person is not unlawfully present but does not mean that the person has lawful status.[20] Indeed, USCIS insists that deferred action is not an "immigration status" at all.[21]  A status that is neither lawful nor unlawful and that is not even a status at all may make some sense to attorneys who have been deeply immersed in the illogic of immigration law.[22]  However, to everyone else, it may sound like a riddle.  This Part will address USCIS's unintentional riddle head-on:  what is it that is not status and not no status?

### A.  Status

To answer this riddle, one must first know what immigration status is.  In English, the word means both a rank or classification and a high rank.[23]  If one has status, in other words, one enjoys a high standing.  In immigration law, status means that, too.  Short of citizenship, the best status is "lawful permanent resident," a category

---

19.  From the painting by René Magritte, *La trahison des images* (The Treachery of Images) (depicting a pipe).

20.  *Consideration of Deferred Action for Childhood Arrivals Process: Frequently Asked Questions*, U.S. CITIZENSHIP & IMMIGR. SERVS., http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last updated Oct. 23, 2014) [hereinafter DACA FAQ].

21.  Adjustment of Status; Certain Nationals of the People's Republic of China, 62 Fed. Reg. 63,249, 63,253 (Nov. 28, 1997) (codified at 8 C.F.R. pt. 245) ("Deferred action recognizes that the Service has limited enforcement resources and that every attempt should be made administratively to use these resources in a manner which will achieve the greatest impact under the immigration laws.  Deferred action does not confer any immigration status on an alien, nor is it in any way a reflection of an alien's lawful immigration status. . . .  Since deferred action is not an immigration status, no alien has the right to deferred action.  It is used solely for the administrative convenience of, and in the discretion of, the Service and confers no protection or benefit on an alien.  Deferred action does not preclude the Service from commencing removal proceedings at any time against an alien.").

22.  There is a distinction in immigration law between "unlawful presence" and "unlawful status."  The former is a term of art that is relevant to the ground of inadmissibility for individuals who have accrued 180 days or more of unlawful presence.  *See* 8 U.S.C. § 1182(a)(9)(B) (2012) (defining the term unlawful presence and stating that those individuals are inadmissible).

23.  *Status*, AM. HERITAGE DICTIONARY, https://www.ahdictionary.com/word/search.html?q=status (last visited May 11, 2015).

AR2022_500653

first codified into law in 1952.[24]  LPRs can legally work, travel into and out of the United States, access various government benefits, and eventually become citizens.[25]  For those who do not wish to apply for citizenship, the status does not expire.[26]  Courts have held that LPRs are also entitled to Fifth Amendment and other constitutional protections.[27]

However, status does not end with LPRs.  There is a headache-inducing excess of immigration categories.  Just below LPRs on the immigration hierarchy, one might place refugees and asylees, who have established that they have a "well-founded fear" of future persecution in their country of origin.[28]  Refugees and asylees are entitled to work, to receive a variety of public benefits, and to "adjust status" after a year to become LPRs.[29]  In 2012, there were about 20,790,000 LPRs, refugees, and asylees in the United States.[30]

Another large immigration category consists of temporary "nonimmigrant" visas for tourists, businesspersons, students, temporary workers, athletes, and many others.[31]  In 2012 there were about 1,870,000 nonimmigrants in the United States.[32]  Most nonimmigrants remain for short periods and have few rights, putting them close to the bottom of the hierarchy of immigration statuses.[33]

---

24.  8 U.S.C. § 1101(a)(20) (1952) ("The term 'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed.").

25.  David A. Martin, *Graduated Application of Constitutional Protections for Aliens: The Real Meaning of* Zadvydas v. Davis, 2001 SUP. CT. REV. 47, 93–94 (2002).

26.  8 U.S.C. § 1101(a)(20) (2012).

27.  *See* Landon v. Plasencia, 459 U.S. 21, 33, 35 (1982) (instructing courts to grant LPRs procedures that satisfy the minimum requirements of due process upon reentering the U.S.); Kwong Hai Chew v. Colding, 344 U.S. 590, 596 (1953) (noting that LPRs who are physically present in the United States may not be deprived of life, liberty, or property without due process of law).

28.  *See generally* DEBORAH E. ANKER, LAW OF ASYLUM IN THE UNITED STATES 6–7 (2014) (internal quotation marks omitted) (providing the UN Convention Relating to the Status of Refugees definition of "refugee").

29.  8 C.F.R. §§ 209.1–209.2 (2014).

30.  BRYAN BAKER & NANCY RYTINA, U.S. DEP'T OF HOMELAND SEC., ESTIMATES OF THE UNAUTHORIZED IMMIGRANT POPULATION RESIDING IN THE UNITED STATES: JANUARY 2012 4 tbl.2 (2013), *available at* http://www.dhs.gov/sites/default/files/publications/ois_ill_pe_2012_2.pdf.

31.  *See generally* 2 CHARLES GORDON ET AL., IMMIGRATION LAW AND PROCEDURE § 12.01[1] (2014).

32.  BAKER & RYTINA, *supra* note 30, at 4 tbl.2.

33.  2 GORDON ET AL., *supra* note 31, § 12.01[1] (explaining that individuals with nonimmigrant visas are permitted to remain in the United States for the duration of

For example, the government famously revoked the nonimmigrant visas of all Iranian Americans in the United States after the Iran Hostage crisis in 1980.[34]

Status is malleable.  It is possible to enter the United States with a status—for example, a nonimmigrant visa—and to overstay its period of authorized stay, meaning that one would begin with status but become unauthorized.[35]  It is also possible to enter the United States without inspection,[36] meaning that one would be an unauthorized immigrant upon entering the country.  Yet, that person might later obtain status through one of various routes.  Even an unauthorized immigrant who has been ordered deported can sometimes obtain status through one of these processes.[37]

The means to acquire immigration status can be opaque and sometimes even seemingly arbitrary.  There are innumerable bureaucratic and ministerial requirements, a host of niggling distinctions, and often ridiculously long wait times.  For example, one of the most common routes by which immigrants obtain LPR status is through a relationship to a U.S.-citizen family member.  The U.S.-citizen family member can file a petition to have her familial relationship legally recognized by DHS.[38]  Once the relationship is recognized, the noncitizen must wait for a visa to become available.[39]  After the visa becomes available, she can file a lengthy and burdensome application for it.[40]

---

an authorized stay and to engage in activities that are compatible with their nonimmigrant statuses).

34.  PUB. AFFAIRS ALLIANCE OF IRANIAN AMS., IRANIAN AMERICANS: IMMIGRATION AND ASSIMILATION 6 (2014), *available at* http://www.paaia.org/CMS/Data/Sites/1/pdfs/iranian-americans—immigration-and-assimilation.pdf.

35.  *See infra* Part I.B (explaining how individuals become unauthorized).

36.  *See* 8 U.S.C. § 1182(a)(6)(A) (2012) (stating that noncitizens present in the United States without having been inspected are inadmissible); 8 C.F.R. § 235.1 (2014) (setting out procedures for inspection of applicants for admission to the United States).

37.  *See In re* Velarde-Pacheco, 23 I. & N. Dec. 253, 256 (BIA 2002) (holding that a properly filed motion to reopen a removal case may be granted to allow a noncitizen to apply for adjustment of status in certain situations).

38.  *See* 8 U.S.C. §§ 1151(b)(2)(A)(i), 1154(a)(1)(A)(i).

39.  *See Visa Bulletin: Immigrant Numbers for September 2014*, U.S. DEP'T STATE 1 (Aug. 12, 2014), http://travel.state.gov/content/dam/visas/Bulletins/visabulletin_september2014.pdf (explaining that visas are allocated in chronological order of priority date and that certain categories are oversubscribed because not all demand can be met).

40.  *See* 8 U.S.C. § 1255(a); *I-485, Application to Register Permanent Residence or Adjust Status*, U.S. CITIZENSHIP & IMMIGR. SERVS., http://www.uscis.gov/i-485 (last visited May 11, 2015).

The average wait for a visa ranges from a couple months to a couple decades, depending on the nature of the relationship and the family member's country of origin.  Long wait times are common because visas are allocated based on a formula that allots the same number of visas to every country in the world, regardless of how many people want to come to the United States from that country.[41]  The result is lengthy wait times—often decades long—for individuals from certain countries.[42]  The longest wait times are reserved for those countries that have the most nationals looking to immigrate to the United States, such as Mexico.[43]

While the beneficiaries of these visa petitions are waiting for their visas to become current, do they have status?  In a way, they do because they can obtain work permission if they are in the United States.  Yet, there is no official name for the status they enjoy.[44]  Prior to obtaining a green card, many will have to leave the United States to return to their home countries, where they may face additional legal hurdles and wait times.[45]  Many will eventually have their applications denied because they will be found inadmissible on the basis of criminal convictions, financial instability, health issues, or past immigration violations, further clarifying that whatever status they thought they had was at best a chimera.[46]  Professor David Martin has described this group of long-suffering applicants, which numbers in the hundreds of thousands, as having a kind of "twilight status."[47]

---

41.  "[N]o more than seven percent of the worldwide allotments for visas or adjustments to permanent residence may be made available during any fiscal year to the natives of a single foreign state."  3 GORDON ET AL., *supra* note 31, § 31.02[3][a].

42.  *See, e.g., Visa Bulletin:  Immigrant Numbers for September 2014, supra* note 39 (showing wait times of up to twenty-three years).

43.  *See id.* (indicating that individuals seeking F4 visas from the Philippines wait up to twenty-three years for their visas).

44.  *See* David A. Martin, *Twilight Statuses:  A Closer Examination of the Unauthorized Population*, 2 MIGRATION POL'Y INST. 1, 4–5 (2005), *available at* http://www.migrationpolicy.org/research/twilight-statuses-closer-examination-unauthorized-population.

45.  Marisa S. Cianciarulo, *Seventeen Years Since the Sunset:  The Expiration of 245(i) and Its Effect on U.S. Citizens Married to Undocumented Immigrants*, 18 CHAP. L. REV. 451, 452 (2015).

46.  *Id.* at 456; Martin, *supra* note 44, at 3.

47.  *See* Martin, *supra* note 44, at 2.  Professor Martin's term, "twilight status," poetically captures the liminal status of the 1–1.5 million persons whom he estimated "have current or incipient claims to legal status in the United States because they are either relatives of lawful permanent residents or have been granted temporary protected status."  *Id.*  It is important to note that this population differs from the

AR2022_500656

### B. No Status

Presented with a Sisyphean process for legally immigrating, many immigrants enter the United States without inspection. Others enter legally but overstay their visas. These two groups comprise the approximately 11.5 million noncitizens in the United States without status who are often described as "illegal," "undocumented," or "unauthorized" noncitizens.[48]

The number of unauthorized immigrants in the United States today may be at an all-time high, yet there have always been more unauthorized immigrants in the United States than the government has the resources to deport. Indeed, for much of the twentieth century, the United States tolerated or even welcomed unauthorized immigrants, depending on the economic needs of the moment.[49] Many unauthorized immigrants live for years in the United States, building homes and families here. They do so because the government's inability and seeming unwillingness to deport all deportable individuals means that the question of whether any given immigrant will be removed is indeterminate.

More precisely, the deportation of unauthorized immigrants is a matter of discretion. As Professor Hiroshi Motomura has noted, "[w]hether they are ultimately deported depends on countless decisions by government officials who exercise discretion, always aware of political and economic pressures, and often in ways that can be inconsistent, unpredictable, and sometimes, discriminatory."[50] It is worth highlighting this last point about the sometimes arbitrary or even discriminatory quality of immigration enforcement. For unauthorized immigrants who live in a state of constant uncertainty, it is this uneven aspect of enforcement that must seem most disturbing.

---

nonstatus holders that this Article discusses who are more permanently in limbo due to the lack of any legal claim to lawful status.

48. BAKER & RYTINA, *supra* note 30, at 4 tbl.2 (estimating that there are 11,430,000 undocumented individuals in the United States). For a discussion of the use of the modifiers "illegal," "undocumented," and "unauthorized" with respect to immigrants, see Hiroshi Motomura, *The Rights of Others: Legal Claims and Immigration Outside the Law*, 59 DUKE L.J. 1723, 1786 n.2 (2010).

49. *E.g.*, MAE NGAE, IMPOSSIBLE SUBJECTS: ILLEGAL ALIENS AND THE MAKING OF MODERN AMERICA 265–66 (2004) (noting that throughout its history, the United States has welcomed illegal immigrants for a variety of reasons, including to meet demand for low wage workers and for work in domestic services and housing construction).

50. HIROSHI MOTOMURA, IMMIGRATION OUTSIDE THE LAW 22 (2014).

There are countless examples of arbitrary or discriminatory enforcement involving the internment, detention, or deportation of individuals based on their political leanings, religion, or country of origin.[51]  The "Red Scare," Japanese Internment during World War II, the Iranian Hostage crisis, and the post-September 11 era all involved dubious crackdowns on particular immigrant groups. Consider a recent example.   After September 11, 2001, the government instituted a massive "special registration" program for male noncitizens over the age of sixteen who had entered the United States on nonimmigrant visas from twenty-five countries, all of which were predominately Muslim countries except for North Korea.[52]  In other words, the scope of the registration program encompassed a substantial part of the Muslim noncitizen population in the United States.   After one year of special registration under this National Security Entry/Exit Registration System (NSEERS), 83,519 individuals were registered domestically, 13,789 registrants were placed in removal proceedings, and 2,870 were detained in immigration custody.[53]

It appears that most of those who were placed in removal proceedings were charged with minor immigration offenses.[54]  The government only claimed that it found eleven individuals with

---

51.  *See* DANIEL KANSTROOM, DEPORTATION NATION:  OUTSIDERS IN AMERICAN HISTORY 8–10 (2007) (suggesting that the Bush Administration's post-September 11 deportation policy impacted many individuals who were not "terrorists"); David Cole, *Enemy Aliens*, 54 STAN. L. REV. 953, 989–1000 (2002) (discussing Japanese interment, the Palmer Raids, and efforts to deport noncitizens for their support of Palestinian liberation).

52.  *See* Rajah v. Mukasey, 544 F.3d 427, 433–34, 448 (2d Cir. 2008) (holding that an NSEERS registrant who alleged the removal proceedings against him were tainted by NSEERS regulatory violations was not entitled to relief because he was not in the country legally, he did not qualify for any lawful status, and the regulatory violations were harmless).   DHS terminated the NSEERS program in 2011.   Removing Designated Countries from the National Security Entry-Exit Registration System (NSEERS), 76 Fed. Reg. 23,830, 23,831 (Apr. 28, 2011).

53.  *See* DEP'T OF HOMELAND SEC., FACT SHEET:  CHANGES TO NATIONAL SECURITY ENTRY/EXIT REGISTRATION SYSTEM (NSEERS) 4 (2003) (on file with author).

54.  Muzaffar Chishti & Claire Bergeron, *DHS Announces End to Controversial Post-9/11 Immigrant Registration and Tracking Program*, MIGRATION POL'Y INST. (May 17, 2011), http://www.migrationpolicy.org/article/dhs-announces-end-controversial-post-911-immigrant-registration-and-tracking-program.     The majority of NSEERS apprehensions involved individuals who were detained simply because they did not have lawful immigration status.  *See* PETER MARGULIES ET AL., NATIONAL SECURITY LAW: PRINCIPLES & POLICY 33 (forthcoming 2015).

connections to terrorism as a result of the program,[55] and there is reason to suppose that those connections were attenuated.[56]   One might draw this inference from the slipshod way the government often used terrorism allegations to justify detention of Muslim noncitizens in the years following September 11.   During that period, the government commonly placed Muslim noncitizens in removal proceedings based on weak misrepresentation charges for failing to disclose tenuous ties to Islamic charitable organizations.[57]   The government also detained Muslim noncitizens based on flimsy terrorism charges, relying on the excessively overbroad language of the terrorism definition in the INA.[58]

Widely criticized as discriminatory, NSEERS was nonetheless upheld as a rational exercise of the government's plenary power over alien exclusion and national security matters.[59]   The available data lends support to the argument that the government used NSEERS and its other deportation powers after September 11 to try to deport every male Muslim noncitizen with a colorable immigration violation, including almost one out of every five individuals who registered through NSEERS.

By contrast, the government declined to exercise its deportation powers against many other types of noncitizens during the same period.   For example, in 2007, President Bush decided to grant DED to Liberian nationals who had been living in the United States with tenuous legal status since that country's brutal civil war in the late-1980s and the 1990s.[60]   As a result of the DED designation, Liberians

---

55.   Rachel L. Swarns, *Special Registration for Arab Immigrants Will Reportedly Stop*, N.Y. TIMES, Nov. 22, 2003, at A16 (reporting that the program ended amidst concerns from civil liberties groups and government officials that the program was not effective).

56.   *E.g.*, Kevin R. Johnson & Bernard Trujillo, *Immigration Reform, National Security After September 11, and the Future of North American Integration*, 91 MINN. L. REV. 1369, 1383–84 (2007) (asserting that the Bush Administration's discontinuation of the program suggests that it never resulted in any significant leads in the war on terror).

57.   *Id.* at 1384.

58.   *See* CTR. FOR HUMAN RIGHTS & GLOBAL JUSTICE ET AL., UNDER THE RADAR: MUSLIMS DEPORTED, DETAINED, AND DENIED ON UNSUBSTANTIATED TERRORISM ALLEGATIONS 3, 5–6 (2011), *available at* http://aaldef.org/UndertheRadar.pdf (noting that NSEERS and other similar programs have produced "wide-scale racial profiling").

59.   *See* Rajah v. Mukasey, 544 F.3d 427, 439 (2d Cir. 2008) ("We therefore join every circuit that has considered the issue in concluding that the Program does not violate Equal Protection guarantees.").

60.   *See* Automatic Extension of Employment Authorization and Related Documentation for Liberians Provided Deferred Enforced Departure, 72 Fed. Reg.

could remain in the United States and legally work, even though they did not technically have any immigration status.[61]   The government passed over many other unauthorized groups and individuals during the same time period, leading some to contend that the government was engaged in a program of selective prosecution against noncitizen Muslim males.[62]

### C.   Nonstatus

If the government exercises its discretion and does not deport an unauthorized immigrant, what is that individual's status?   The government would likely answer that such individuals have no status or at least that they do not have lawful status.   Consider the Liberians granted DED in 2007.   According to USCIS, DED "is not considered an immigration 'status.'"[63]   However, individuals with DED can obtain a federal work permit that they can use as an ID card.   Obviously, then, they are not "undocumented" nor "unauthorized" or "illegal" because the government has recognized their presence and authorized them to remain in the country.

If DED is somewhere between status and no status, then it is the answer to our riddle:  that which is not status and not no status.   In other words, DED is "nonstatus."   One way to illustrate the attributes of nonstatus is by considering those of DED.   First, DED is temporary:

---

53,596, 53,596 (Sept. 19, 2007) (extending automatically Employment Authorization Documents for Liberians for eighteen months).

61.  *Id.*  Many Liberian nationals have lived in the United States with TPS since the 1990s, when Liberia was engaged in a bloody civil war.   LISA SEGHETTI ET AL., CONG. RESEARCH SERV., RS20844, TEMPORARY PROTECTED STATUS:   CURRENT IMMIGRATION POLICY AND ISSUES 6–7 (2015), *available at* http://fas.org/sgp/crs/ homesec/RS20844.pdf.   In 2007, the Bush Administration ended TPS for the Liberians who had lived in the United States since the war but decided to instead offer them DED.   *Id.*  On November 21, 2014, DHS redesignated Liberia for TPS until May 20, 2015 because of the Ebola outbreak in Liberia.   Press Release, Dep't of Homeland Sec., DHS Announces Temporary Protected Status Designations for Liberia, Guinea, and Sierra Leone (Nov. 20, 2014) [hereinafter Press Release, DHS DED], *available at* http://www.uscis.gov/news/dhs-announces-temporary-protected-status-designations-liberia-guinea-and-sierra-leone.

62.  *See* Rashad Hussain, Note, *Preventing the New Internment:  A Security-Sensitive Standard for Equal Protection Claims in the Post-9/11 Era*, 13 TEX. J. C.L. & C.R. 117, 147–48 (2007) (noting that the program seemed to target individuals of South Asian, Arab, or Muslim descent; that the policies never resulted in any terrorism-related arrests; and that the practice violated the government's own position on profiling).

63.  U.S. CITIZENSHIP & IMMIGRATION SERVS., AFFIRMATIVE ASYLUM PROCEDURES MANUAL 39 (2013) [hereinafter AFFIRMATIVE ASYLUM MANUAL], *available at* http://www.uscis.gov/sites/default/files/files/nativedocuments/Asylum_Procedures _Manual_2013.pdf.

it has been periodically renewed for Liberians since 2007 and was most recently authorized for Liberians for a twenty-four month period beginning on October 1, 2014.[64]   The most recent announcement came just four days before the last round of DED was set to expire.[65]  Individuals with DED live in a state of perpetual uncertainty.  Thus, the first aspect of nonstatus is that it is officially temporary, although in practice some types of nonstatus can last for a long time.

Second, DED comes with few substantive or procedural rights. Substantively, its holders cannot vote,[66] receive public benefits,[67] obtain driver's licenses in some states,[68] and are probably unprotected from some employment discrimination.[69]  Procedurally, there is not even any application process for DED status, let alone a formal hearing.[70]  DED does not prevent DHS from obtaining a removal order:  it only means that DHS will generally not enforce a removal order, although the limited guidance available on DED states that there are "exceptions" to nonenforcement of the removal order, including for persons "who have committed certain crimes, persons who are persecutors, and persons who have previously been deported, excluded or removed."[71]  However, there does not seem to be any right to appeal a denial or revocation based on this vague

---

64.  Press Release, White House, Presidential Memorandum—Deferred Enforced Departure for Liberians (Sept. 26, 2014) [hereinafter Press Release, White House], *available at* http://www.whitehouse.gov/the-press-office/2014/09/26/presidential-memorandum-deferred-enforced-departure-liberians.

65.  *See id.*  On November 21, 2014, DHS also designated Liberia for TPS until May 20, 2015 as a result of the Ebola outbreak in that county.  *See* Press Release, DHS DED, *supra* note 61 (citing the Ebola outbreak in West Africa as the reason for granting eighteen months TPS for eligible nationals of Liberia, Guinea, and Sierra Leone).

66.  *See* U.S. CONST. amend. XV, § 1 (establishing a right to vote for citizens).

67.  *See* 8 U.S.C. §§ 1611, 1613 (2012) (limiting receipt of most public benefits to "qualified aliens"); *id.* § 1641(b) (defining "qualified alien" so as to exclude persons with DED).

68.  *See infra* note 286.  Federal law requires "lawful status" for purposes of getting a driver's license and does not list DED as a lawful status.  *See* 6 C.F.R. § 37.1, 37.3 (2014).

69.  All individuals in the United States are protected by the prohibition against race and national origin discrimination in employment contained in Title VII of the Civil Rights Act, but they are not protected from discrimination based on immigration status.  *See* 8 U.S.C. § 1324b(a)(1)–(3) (prohibiting discrimination based on citizenship status for "[p]rotected individual[s]" and defining "[p]rotected individual" to exclude persons with non-status); 42 U.S.C. § 2000e–2(a)(1) (prohibiting employers from discriminating, inter alia, based on national origin or race).

70.  AFFIRMATIVE ASYLUM MANUAL, *supra* note 63, at 39.

71.  *Id.*

AR2022_500661

standard,[72] and if the presidential administration in power discriminates as to how it allocates DED, there may not be a legal right to challenge it.[73]   Therefore, the second characteristic of nonstatus, is that it is tentative:  its holders have few rights and it is easily revocable.

Third, the legal contours of DED are ambiguous.  DHS apparently relies on 8 U.S.C. § 1229a for legal support for this program, which is the provision of law conferring general immigration enforcement authority on the Attorney General (and the DHS Secretary), or 8 U.S.C. § 1229c, which gives DOJ and DHS authority to grant "voluntary departure."[74]   The provision neither explicitly mentions nor explains the requirements for DED.  Typically, the President designates DED via fiat through an executive order or presidential memorandum.[75]    Immigrants granted DED may apply for employment authorization, but that permission is the result of a regulation not a statute, making it subject to a greater possibility of change.[76]  Thus, another characteristic of nonstatus is that the legal authority for it is tenuous and sometimes even secret.   Whatever

---

72.  *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 482 (1999) (explaining that 8 U.S.C. § 1252(g) allows judicial review of some of the Attorney General's actions but not his decision to refuse reconsideration of an order); *see also* Heckler v. Chaney, 470 U.S. 821, 837 (1985) (declining to review the U.S. Food and Drug Administration's (FDA) decision not to respond to a prison inmate's request that the FDA take enforcement action to prevent the use of drugs used to administer the death penalty); Hotel & Rest. Emps. Union, Local 25 v. Smith, 846 F.2d 1499, 1519–20 (D.C. Cir. 1988) (en banc) (per curiam) (refusing review of an agency decision declining to extend voluntary departure to Salvadorans).

73.  *See Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 472–73, 492 (declining to review a claim that individuals were being targeted for deportation based on their affiliation with a politically unpopular group).

74.  8 U.S.C. § 1229c(a)(2)(A), (b)(1) (allowing the Attorney General to permit aliens to voluntarily leave the United States at their own expense as opposed to being subjected to removal proceedings as long as the alien leaves within 120 days, has been in the United States at least one year, has been an individual of good moral character for five years, has not committed a criminal offense invoking deportation proceedings, and has the means and intent to depart).  *See generally* SEGHETTI ET AL., *supra* note 61, at 2–3.

75.  *See* AFFIRMATIVE ASYLUM MANUAL, *supra* note 63, at 39 (explaining that because DED is not a statutory provision, the President can exercise his discretion to invoke it and can issue it on a country-by-country basis for serious issues in a country such as ongoing civil strife, environment disaster, or other extraordinary conditions).

76.  8 C.F.R. § 274a.1(a) (2014).  The U.S. Code defines an "unauthorized alien" ineligible to work as an alien who is not a LPR or otherwise granted permission by the Attorney General, seemingly conveying broad authority on the Executive Branch to decide who should get work permission.  *See* 8 U.S.C. § 1324a(h)(3).

statute authorizes nonstatus will rarely provide a detailed framework; DHS will fill in requirements, if at all, using regulations or more commonly with non-binding policy guidance or memoranda.

As mentioned above, individuals from DED-designated countries can obtain work permits. To do so, DED recipients have to complete an "I-765 application" containing basic biographic data, such as an individual's address, telephone number, and time and manner of entry.[77] After submitting the application with a fee and photographs, DED recipients receive a notice for an appointment at an Application Support Center, where they are fingerprinted.[78] The work permit DED recipients receive is valid for a limited time, and if they want to continue working, they must submit renewal applications containing updated information.[79] Another characteristic of nonstatus, therefore, is that it offers the government a method of surveillance over the unauthorized population. One could argue that nonstatus is essentially a registration program.

Nonstatus is temporary, tenuous, and tentative. It comes at the price of registration and government surveillance. Yet, the ability to legally work, to get a driver's license (for many types of nonstatus), to live without constant fear of deportation, and to simply have one's presence recognized as legitimate is of enormous value to many people who would otherwise suffer a much more shadowy existence. Indeed, "coming out of the shadows" is how immigrant advocates and Dreamers often characterize obtaining nonstatus. It is a way to claim some measure of dignity in a society that stigmatizes those without status as "illegals." In many cases, it is a brave act, too, because it sometimes involves substantial risk. Although this Article catalogues the dangers and inadequacies of nonstatus, it is important to recognize that the individuals who have it deserve the respect that they have risked so much to achieve.

Nonstatus should persuasively debunk the unenlightened notion that immigration is binary: legal immigrants and illegal immigrants. Rather, immigration law affords a continuum of rights and privileges, and where one falls on this spectrum depends on many factors other than manner of entry. The next Part will describe

---

77. DEP'T OF HOMELAND SEC., I-765, APPLICATION FOR EMPLOYMENT AUTHORIZATION (Aug. 6, 2014), *available at* http://www.uscis.gov/sites/default/files/files/form/i-765.pdf.

78. DEP'T OF HOMELAND SEC., INSTRUCTIONS FOR I-765, APPLICATION FOR EMPLOYMENT AUTHORIZATION 9 (Aug. 6, 2014), *available at* http://www.uscis.gov/sites/default/files/files/form/i-765instr.pdf.

79. DACA FAQ, *supra* note 20.

AR2022_500663

those who fall in the nebulous middle of this spectrum. It will also trace the origins of modern-day nonstatus from the 1920s up to the contemporary DACA program.

## II.   THE DEVELOPMENT OF NONSTATUS

*Everybody's got something to hide except for me and my monkey.*

- John Lennon[80]

In 1971, John Lennon and Yoko Ono came to the United States to fight for custody of Yoko Ono's daughter, Kyoko, by a prior marriage.[81] After Yoko Ono won the custody battle, her ex-husband absconded with Kyoko.[82] To try to find her, the couple overstayed their visas.[83] The Immigration and Naturalization Service (INS) wasted little time in commencing expulsion proceedings against the controversial Lennon and Ono.[84] Ostensibly, INS filed proceedings against Lennon because of his British cannabis conviction, although there is evidence that he was really targeted because of his political views.[85]

To defend themselves, Lennon and Ono hired an intrepid immigration lawyer named Leon Wildes.[86] Wildes pursued a sophisticated litigation strategy, including an effort to have Lennon selected for a program called "nonpriority status."[87] There was just one problem: there was no proof that non-priority status existed. The Operations Instruction containing information about it "was buried in the *Blue Sheets*, the INS internal regulations [that were]

---

80. THE BEATLES, *Everybody's Got Something to Hide Except for Me and My Monkey, on* THE BEATLES (Apple Records 1968).

81. Leon Wildes, *Not Just Any Immigration Case*, CARDOZO L. REV. ALUMNI REV. (1998), http://www.cardozo.yu.edu/life/spring1998/john.lennon [hereinafter Wildes, *Not Just Any Immigration Case*].

82. *Id.*

83. Leon Wildes, *The Nonpriority Program of the Immigration and Naturalization Service Goes Public: The Litigative Use of the Freedom of Information Act*, 14 SAN DIEGO L. REV. 42, 44 (1977) [hereinafter Wildes, *Nonpriority Program*].

84. *Id.* at 44–45.

85. *See generally* Wildes, *Not Just Any Immigration Case*, *supra* note 81 (indicating that Lennon was being selectively prosecuted by the Nixon Administration for political purposes on the ground that he was a "threat to the U.S. government and the reelection campaign of Richard Nixon because of [his] affiliations with members of the Radical Left").

86. *Id.* (reporting that Wildes was comfortable pursuing a political strategy to persuade the government to approve Lennon and Yoko's petitions to stay in the United States).

87. *Id.* at 53 (explaining that non-priority status was granted when there were humanitarian factors to consider after a deportation proceeding had begun).

never made available to the public."[88]   According to Wildes, "[t]he situation was a classic example of a secret law."[89]

John Lennon spent five years fighting his deportation and eventually obtained a green card.[90]  Along the way, Wildes filed four separate federal lawsuits, Lennon recorded three albums, and Lennon and Ono announced at a press conference that they had founded the state of "Nutopia," "a state with no borders, no laws, no exclusionary proceedings, no deportation proceedings, and no immigration lawyers!"[91]

They also uncovered the existence of the non-priority program. Their Freedom of Information Act (FOIA) lawsuit confirmed that the rumored program existed and that the INS had granted non-priority status to a total of 1,843 individuals until 1974—mostly "the elderly, the young, the mentally incompetent, the infirm, and those who would be separated from their families."[92]  In his effort to prevent Lennon's deportation, Wildes had uncovered a program for granting nonstatus on a case-by-case basis to individuals with no other legal defense to deportation.  This program was one of many antecedents to the Obama Administration's massive new deferred action programs.  The following subparts will consider the others.

### A.   Parole

DACA has offered mass relief to hundreds of thousands of individuals, but the non-priority status program was designed to provide relief on a case-by-case basis to discrete individuals with sympathetic cases.  There are, however, several older agency practices that sometimes mirror DACA and DAPA in that they have been categorically applied to large groups of individuals.  One of the most flexible practices—used at times both for entire categories of persons and for individuals—is parole.

INS has used parole since at least the 1920s.[93]  INS appears to have originally invented parole out of whole cloth, but it gained a statutory

---

88.   Wildes, *Nonpriority Program*, *supra* note 83, at 43.

89.   *Id.*

90.   Wildes, *Not Just Any Immigration Case*, *supra* note 81.

91.   *Id.*

92.   *See* Wildes, *Nonpriority Program*, *supra* note 83, at 53 (explaining that non-priority status was granted through a formal, internal procedure initiated by an INS District Director and conducted without input from the alien himself, although an attorney could request non-priority status on behalf of his client).

93.   *See, e.g., In re R-*, 3 I. & N. Dec. 45, 46 (BIA 1947) ("[T]he power to parole has been used to permit inadmissible aliens to adjust their immigration status where they

footing in 1952.[94]  The government does not consider parole to be an immigration "status," and parolees have few rights.[95]  Courts have long accepted an "entry fiction" under which parolees are treated as though they have remained at the U.S. border even after they have lived in the country for years, acquired homes, and established families in the United States.[96]

Originally, the government used parole on a case-by-case basis to allow individuals into the United States who had either failed to meet the legal requirements for entry or who had been denied legal entry and the corresponding set of rights because of INS discretion.[97] However, beginning in 1956, the government began to use parole for mass admissions of refugees.  That year, the government paroled in about 30,000 Hungarians fleeing the Soviet Union's crackdown on the anti-communist revolution in Hungary.[98]  Over the following years, the government regularly used parole to allow refugees into the United States.[99]  One of the largest examples was during the Mariel Cuban boatlift, when the United States paroled in approximately 123,000 Cubans who had come based on President Carter's statement that the United States would welcome them "with an open heart and open arms."[100]  Ultimately, most obtained green cards under the Cuban Adjustment Act, but those who were deemed ineligible for adjustment due to criminal convictions or for other

---

entered without or with improper documents, to defend criminal prosecutions, to testify in criminal cases for the Government, to report for induction into the Armed Forces, to apply for registry and to apply for naturalization . . . [and] where the inadmissible alien has no right of appeal.").

94.  5 GORDON ET AL., *supra* note 31, § 62.01[1] (citing Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 212(d)(5), 66 Stat. 163, 188 (1952)).

95.  Leng May Ma v. Barber, 357 U.S. 185, 190 (1958) ("The parole of aliens seeking admission . . . was never intended to affect an alien's status . . . ."); *In re Castellon*, 17 I. & N. Dec. 616, 620 (BIA 1981) (noting that the scope of the Board of Immigration Appeals' review over a Cuban parolee's case was limited because applicants for admission do not enjoy the same constitutional rights that are afforded to aliens who have entered the United States).

96.  *See* Kaplan v. Tod, 267 U.S. 228, 229–31 (1925) (holding that a minor child had never entered the United States within the meaning of the law despite her nine-year stay in the custody of an immigrant aid organization and her father).

97.  5 GORDON ET AL., *supra* note 31, § 62.01 & n.3.

98.  MOTOMURA, *supra* note 50, at 25.

99.  3 GORDON ET AL., *supra* note 31, § 33.03[3].

100.  Mark D. Kemple, Note, *Legal Fictions Mask Human Suffering:  The Detention of the Mariel Cubans Constitutional, Statutory, International Law, and Human Considerations*, 62 S. CAL. L. REV. 1733, 1735–36 (1989) (internal quotation marks omitted).

reasons were subjected to prolonged detention.[101]  Many continue to live in the United States with parole or an even less secure form of nonstatus called supervision, which will be discussed in Part II.[102]

Parole has most of the attributes of nonstatus:  it is a legal limbo that is officially not status at all, is entirely discretionary and comes with few rights, originally had no statutory basis, and remains legally nebulous although it now is mentioned in the INA.[103]  For many years, INS granted parole en mass to deal with humanitarian crises abroad or to advance the United States's foreign policy interests, but in 1996, Congress amended the INA to allow parole "only on a case by case basis . . . ."[104]  As a result, the government has needed to find other ways to offer nonstatus to large groups of individuals.

### B.   Voluntary Departure, Extended Voluntary Departure, and Deferred Enforced Departure

Part I discussed deferred enforced departure, which has most recently been offered to Liberians in the United States.  The first Bush Administration invented DED in the late 1980s, but for nearly thirty years the INS had been granting a similar benefit with the equally contradictory name, extended voluntary departure.  The name alludes to a long-standing provision in the INA allowing immigration judges (IJs) or officers to grant "voluntary departure"[105] to deportable or excludable noncitizens in lieu of removal.[106]  Although this provision seemed to contemplate short-term deportation reprieves and case-by-case adjudication, in 1960, the INS

---

101.  *Id.* at 1736; *see* Clark v. Martinez, 543 U.S. 371, 375, 377 (2005) (explaining that 8 U.S.C. § 1231(a)(6) provides that aliens who have been ordered for removal may remain in custody after the ninety-day removal period if the immigration judge found the alien inadmissible by reason of his prior criminal convictions, prior specific criminal offenses, lack of sufficient documentation, posing as a threat to national security, or if he has been determined by the Secretary of Homeland Security to be a risk to the community, unlikely to comply with the order, or a flight risk).

102.  *See infra* Part II.E.

103.  *See* 8 U.S.C. § 1182(d)(5)(A) (2012) (permitting the Attorney General broad discretion in granting parole on a case-by-case basis for humanitarian reasons but requiring aliens to return to custody once the purpose of parole has elapsed).

104.  Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 602(a), 110 Stat. 3009, 3009-689 (internal quotation marks omitted).

105.  8 U.S.C. § 1229c(b)(1)(A)–(D) (setting out the legal requirements for a noncitizen to obtain voluntary departure in lieu of an order of removal at the conclusion of removal proceedings).

106.  *See* 8 U.S.C. § 1252(b) (1964).  In contrast to the earlier provision, the current one allows only for a maximum period of 120 days to voluntarily depart. 8 U.S.C. § 1229c(a)(2)(A) (2012).

began to use it to justify extended grants of nonstatus to all noncitizens from particular countries such as those in a state of strife, or countries that implicated United States foreign policy interests, like Cuba.[107]   As authority for EVD, the agency pointed to the voluntary departure provision or the more general INA section giving the Attorney General discretion to enforce immigration law as she or he sees fit.[108]

EVD procedures were as vague as the statutory authority. Essentially, the Department of State would request that the Attorney General suspend deportation for a particular nationality.[109] Afterward, the INS would instruct field offices "not to enforce deportation and removal requirements for persons of a particular nationality group who arrived in the United States before a specified date."[110]   Individuals who had "committed certain crimes" were not protected.[111]   There was no requirement that EVD recipients register, but they were required to apply for employment authorization.[112]

---

107.   The INS granted EVD to Cubans on November 29, 1960 and terminated it on November 2, 1966 when the Cuban Adjustment Act was passed.  *See* H.R. Rep. No. 100-627, at 6 (1988).  From 1968–1977, the INS granted Czechoslovakians EVD in one-year increments.  *Id.*  Laotians, Vietnamese, and Cambodians received EVD for two years between 1975 and 1977, when Indochinese relief legislation providing for their adjustment of status was passed.  *Id.*  The INS gave EVD to Ethiopians from July 12, 1977 until August 26, 1981, and EVD is still in effect for those who arrived before July 1, 1980.  *Id.*  From June 8, 1978 to September 30, 1986, the INS granted Ugandan nationals EVD.  *Id.*  Afghans have been allowed to remain in the United States since the 1980s.  *Id.*  Nicaraguans were given voluntary departure for fifteen months after the fall of the Somoza government.  *Id.*  Polish nationals who entered the United States prior to July 22, 1984 were given EVD through December 31, 1987. *Id.*; *see* Lynda J. Oswald, Note, *Extended Voluntary Departure:  Limiting the Attorney General's Discretion in Immigration Matters*, 85 MICH. L. REV. 152, 158–59 n.40 (1986) (providing a chart of EVD grants up to 1986).

108.   *See* Hotel & Rest. Emps. Union, Local 25 v. Smith, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (finding that EVD falls under the Attorney General's broad mandate in 8 U.S.C. § 1103(a) to enforce immigration laws); *see also* H.R. REP. NO. 100-627, at 7 (1988) (describing this "safe haven" for persons of certain nationalities experiencing unexpected crisis in their country).  The Voluntary Departure provision was amended by IIRIRA to limit voluntary departure to 120 days, thereafter making that provision arguably unavailable as legal authority for EVD.  *See* 8 U.S.C. § 1229c(a)(2)(A).

109.   H.R. Rep. No. 100-627, at 7.

110.   *Id.*

111.   *Id.*

112.   *Id.*

The Reagan Administration disfavored EVD and believed that it was unnecessary in light of the passage of the Refugee Act in 1980.[113] Thus, after 1980, grants of EVD became less frequent, despite the fact that violent civil wars were disrupting Central America.[114] Advocates and members of Congress criticized the Reagan Administration throughout the 1980s for failing to provide EVD to Salvadorans fleeing that country's brutal twelve-year civil war.[115]

The first Bush Administration was apparently more sympathetic to Chinese nationals after the Tiananmen Square crackdown than the Reagan Administration had been to Salvadorans.[116] Afterward, it granted temporary protection to Chinese students in the United States.[117] Perhaps because of the Administration's prior opposition to EVD, it came up with a new name, "deferral of enforced departure," for a status that in every other way resembled EVD.[118] DED has now mostly replaced EVD, although ICE continues to grant something it calls EVD to a small number of individuals each year.[119]

Not long afterward, the first Bush Administration granted a similar benefit to tens of thousands of undocumented spouses and children of formerly undocumented individuals who had been granted legalization through the Immigration Reform and Control Act (IRCA) of 1986.[120] The new program, known as Family Fairness, required that applicants meet certain residency and other requirements, and, in exchange, they received one year of "voluntary

---

113. *See* Suzanne Seltzer, Note, *Temporary Protected Status: A Good Foundation for Building*, 6 GEO. IMMIGR. L.J. 773, 786 (1992) (reporting that the Reagan Administration disfavored the "blanket relief" that EVD provides because the Refugee Act of 1980 established asylum for those at risk of persecution in their country of origin).

114. *Id.*

115. Oswald, *supra* note 107, at 153 & n.8, 161–62 & n.49.

116. John D. Griffin, Comment, *The Chinese Student Protection Act and "Enhanced Consideration" for PRC Nationals: Legitimizing Foreign Policy While Averting False Positives in Asylum Law*, 66 U. COLO. L. REV. 1105, 1105–06 (1995).

117. *Id.* at 1106.

118. *More on Deferred Departure of PRC Nationals,* 66 INTERPRETER RELEASES 676 (June 26, 1989).

119. ICE granted EVD to 4,121 persons in FY 2010, 3,730 persons in FY 2011, 3,398 persons in FY 2012, 3,014 individuals in FY 2013, and 2,806 individuals in FY 2014. ICE FOIA Response, *supra* note 14.

120. *See* Pub. L. No. 99-603, § 312(b), 100 Stat. 3359, 3435; Memorandum from Gene McNary, Comm'r, Immigration & Naturalization Serv., to Reg'l Comm'rs 2 (Feb. 2, 1990) [hereinafter McNary Memorandum], *available at* http://cdn.factcheck.org/UploadedFiles/2014/11/McNary-memo.pdf.

AR2022_500669

departure" and a work permit.[121]   The program replaced a more
nebulous policy that had first been outlined in 1987 as a way to deal
with situations in which only one member of a family had been
granted legalization, raising the possibility that families could be torn
apart by deportation.[122]

Newspapers at the time reported dramatically different accounts
concerning the number of individuals who would benefit from the
change.[123]   It seems that about 50,000 individuals were probably
granted voluntary departure under the program before the Family
Unity program, later enacted by Congress, superseded it.[124]

### C.   Family Unity and Temporary Protected Status

The Immigration Act of 1990 created two legislative forms of
nonstatus to replace EVD/DVD and Family Fairness.   Initially,
Congress created the new "Family Unity" program to accomplish the
same objective as the Family Fairness program:[125]  to provide relief to
the undocumented spouse or child of a person granted relief under
IRCA.   In time, INS promulgated regulations and created an

---

121.   *See* McNary Memorandum, *supra* note 120.

122.   *Id.*  The earlier policy only allowed automatic voluntary departure for minor
children living with newly legalized parents.  *Id.*  Ineligible spouses of legalized
individuals had to show "compelling or humanitarian factors beyond the marriage
itself to warrant voluntary departure."  *See INS Reverses Family Fairness Policy*, 67
INTERPRETER RELEASES 153 (Feb. 16, 1990) (internal quotation marks omitted).

123.   *Compare New Measure Opens the Door a Bit Wider to Aliens*, N.Y. TIMES, Feb. 3,
1990, at 28 (reporting that thousands of illegal aliens who were the spouses or the
children of legalized aliens would be allowed to stay in the United States as a result of
this policy change), *with* Marvine Howe, *New Policy Aids Families of Aliens*, N.Y. TIMES,
Mar. 5, 1990, at B3 (stating that as many as 1.5 million illegal immigrants benefitted
from the Family Fairness policy, which allows close family members of legalized
immigrants to remain in the country under certain conditions).

124.   Immigration Act of 1990, Pub. L. No. 101-649, § 301, 104 Stat. 4978, 5029
(codified as amended at 8 U.S.C. § 1255a (2012)) (creating the "Family Unity"
program, which offers certain family members of individuals who are granted
legalization work authorization and a temporary stay of deportation proceedings).
According to a newspaper account published about a month before passage of the
Immigration Act of 1990, "[i]n the eight months since McNary announced the family
fairness program, INS received more than 250,000 inquiries about the program—but
only 46,821 applications have been received nationwide."  David Hancock, *Few
Immigrants Use Family Unity Program*, MIAMI HERALD, Oct. 1, 1990, at 1B.

125.   Immigration Act of 1990 § 301; *see* 8 C.F.R. § 236.15 (1998) (stating that
children of legalized aliens residing in the United States may be granted voluntary
departure for two years and any alien granted benefits under the program is eligible
for employment if he has applied for authorization through the I-765 form).

application form for Family Unity benefits.[126]   While the form remains available today, it is unlikely that many individuals apply for what is now one of the more esoteric benefits in immigration law because most eligible individuals have probably already adjusted status, been deported, or have left the United States.

Subsequently, congressional disappointment with the Reagan Administration's failure to protect Salvadorans led to the creation of temporary protected status, which Congress specifically mandated be offered to Salvadorans.[127]   After complying with the law and initially granting TPS to Salvadorans, the Bush Administration allowed TPS to lapse and instead granted them DED.[128]

In subsequent years, Salvadorans have commonly received TPS, as have representatives of sixteen other nationalities.[129]   Some countries, like El Salvador and Liberia, have shifted between TPS and DED designations.   TPS is similar to the EVD and DED programs after which it was modeled, but is a bit more formal.   First, there is a specific standard for TPS set out in the statute.   DHS may designate the nationals of any foreign state as temporarily protected if it finds that the foreign state is experiencing civil strife, environmental disaster, or other extraordinary conditions and that requiring individuals to return to that foreign state would pose a serious threat to their safety.[130]   After designation, there is a formal application process for TPS—another distinction between TPS and EVD/DED.[131]

---

126.  8 C.F.R. § 236.15.   *See generally* U.S. DEP'T OF HOMELAND SEC., I-817 APPLICATION FOR FAMILY UNITY BENEFITS (June 26, 2013), http://www.uscis.gov/sites/default/files/files/form/i-817.pdf (constituting the application form, which seeks information about an applicant's family member(s)).

127.  Immigration Act of 1990 §§ 302(b)–303.

128.  SEGHETTI ET AL., *supra* note 61, at 4.

129.  Salvadorans received TPS on and off throughout the provision's history, including from 1990–1992, in 1998, in 2000, and from 2001–2015.  *Id.* at 3–4, 7; *see Temporary Protected Status*, U.S. CITIZENSHIP & IMMIGRATION SERVS., http://www.uscis.gov/humanitarian/temporary-protected-status-deferred-enforced-departure/temporary-protected-status#Countries (last updated Jan. 7, 2015).  USCIS also currently grants TPS to Haitians, Hondurans, Nicaraguans, Somalians, Sudanese, South Sudanese, Syrians, and Liberians, Guineans, and Sierra Leoneans since 2011, 1999, 2001, 2012, 2013, 2014, 2015, and 2014, respectively.  *Id.*  Past countries include "Kuwait from March 1991 to March 1992; Rwanda from June 1995 to December 1997; Lebanon from March 1991 to March 1993; the Kosovo Province of Serbia from June 1998 to December 2000; Bosnia-Herzegovina from August 1992 to February 2001; Angola from March 29, 2000, to March 29, 2003; and Burundi from November 4, 1997, to May 2, 2009."  SEGHETTI ET AL., *supra* note 61, at 3.

130.  8 U.S.C. § 1254a(b)(1)(A)–(C) (2012).

131.  U.S. CITIZENSHIP & IMMIGR. SERVS., FORM I-821, APPLICATION FOR TEMPORARY PROTECTED STATUS (Feb. 2014), *available at* http://www.uscis.gov/i-821.

AR2022_500671

Applicants must meet various requirements, including that they timely register for TPS and that they have continuously resided in the United States since the designation date for their country.[132]  Unlike DED and EVD, there are explicit and well-defined bars to TPS for individuals with particular types of convictions or other problematic immigration issues.[133]

Like EVD, DED, and other forms of nonstatus, TPS is temporary and tenuous since the protection periods range from six to eighteen months, and DHS can decide afterward not to renew it.[134] Moreover, the TPS statute does not create any pathway to LPR status or citizenship.[135]  In fact, DHS has always taken the position that TPS does not constitute an "admission" for immigration purposes, meaning that TPS holders cannot easily adjust status even if they acquire some other route for doing so, such as by marrying an LPR or U.S. citizen.[136]

TPS meets most of the characteristics for nonstatus, although it is a close call.  It is ostensibly temporary, but many Salvadorans now have held TPS for thirteen years.  It is tenuous and easy for the government to revoke or substitute for a less secure nonstatus, like DED.  TPS holders have few rights besides the right to work. However, unlike other forms of nonstatus, TPS's contours are quite well described in a statute.

TPS is one of the more populous categories of nonstatus.  In 2015, the Congressional Research Service identified a total of 320,300 TPS grants to nationals of El Salvador, Haiti, Honduras, Nicaragua, Somalia, Southern Sudan, and Sudan.[137]  Since then, Syria, Liberia, Guinea, and Sierra Leone have been designated for TPS, allowing thousands more to receive the benefit.

---

132.  8 U.S.C. § 1254a(c)(1)(A)(i)–(iv).

133.  *Id.* § 1254a(c)(2)(B)(ii).

134.  *Id.* § 1254a(b)(3)(B)–(C).

135.  *Id.* § 1254a(f)(1).

136.  *See* Serrano v. U.S. Att'y Gen., 655 F.3d 1260, 1266 (11th Cir. 2011) (per curiam) (deferring to DHS's position that TPS is not an "admission").  The U.S. Court of Appeals for the Sixth Circuit recently rejected DHS's position, so some TPS holders now have a pathway to a more secure status.  Flores v. U.S. Citizenship & Immigration Servs., 718 F.3d 548, 554 (6th Cir. 2013) (noting that the plain language of 8 U.S.C. § 1182, which lists classes of aliens ineligible for visas or admissions, makes no mention of TPS beneficiaries being categorically barred from visa or admission entry and that Congress intended TPS beneficiaries to be part of a protected class due to extraordinary circumstances).

137.  SEGHETTI ET AL., *supra* note 61, at 3.  The most populous group was the Salvadorans, with 204,000 TPS grants.  *Id.*

### D.   Withholding and Deferral of Removal

In 1980, Congress passed the Refugee Act, which created a process for noncitizens who fear persecution based on certain protected grounds to seek refuge in the United States.[138]   The new asylum provisions in the INA set out a comprehensive legal standard and process for asylum, involving administrative interviews, immigration court hearings, and judicial review.[139]   Asylum is full status, allowing for LPR status after a year and offering a long-term pathway to citizenship.[140]   With passage of the Refugee Act, the United States could be said to be in substantial compliance with the international Refugee Convention and Protocol, to which the United States acceded in 1967.[141]

During the twenty-nine years between the United States's accession to the Refugee Protocol and the passage of the Refugee Act, its compliance with the Protocol was more ad hoc.   As discussed above, the United States admitted many refugees through parole and EVD. The INA also contained a provision that tracked one of the central principles of the Refugee Convention—*non-refoulement*—which prohibits a signatory from returning a refugee to a country "where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."[142]   Since 1951, the INA contained a similar such provision called "Withholding of Deportation."[143]

In sharp contrast to the asylum provision, the withholding statute provides little guidance on the legal standard or process for granting relief, or what benefits come with it.[144]   Yet over the past decades, the

---

138.   United States Refugee Act of 1980, Pub. L. No 96-212, § 201, 94 Stat. 102, 102.

139.   8 U.S.C. § 1158(a)(3), -(d)(5)(A)(1).

140.   *Id.* § 1159(b) (allowing for the adjustment of status of refugees and asylees present in the United States for a year).

141.   Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267–68.

142.   Convention Relating to the Status of Refugees, art. 33, July 28, 1951, 189 U.N.T.S. 137, 176.

143.   8 U.S.C. § 1253(h) (1952) (current version at 8 U.S.C. § 1231(b)(3)(A) (2012)).   The provision is now entitled "Restriction on Removal" and is known colloquially as "withholding of removal."   8 U.S.C. § 1231(b)(3)(A) (2012).

144.   The original provision read as follows:   "The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason."   8 U.S.C. § 1253(h) (1952).   It now reads:   "[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that

AR2022_500673

INS and the courts have filled in the gaps with a fairly comprehensive framework of regulations and case law.[145]   Although the law for withholding may have started out vague, it is now relatively clear, meaning that it fails at least one of the criteria for nonstatus.

However, it mostly meets the other characteristics: it is temporary and tentative.   Originally, the provision authorized the Attorney General to grant withholding in her or his discretion, "for such period of time as he [the Attorney General] deems necessary."   Now the provision is phrased in mandatory terms and requires a grant if the noncitizen can prove to an IJ that she meets the legal standard. However, DHS can reopen proceedings to try to terminate withholding of removal anytime conditions in the noncitizen's country have improved or if new information shows that the noncitizen does not meet the eligibility requirements for withholding.[146]

Withholding of removal under the INA is also tentative because it comes without many rights.   Like other forms of nonstatus, withholding grantees can work, but they cannot travel, seek LPR status or citizenship, petition for family members to obtain immigration status, or apply for most public benefits.[147]   Thus, withholding of removal under the INA is like nonstatus, although it fails to satisfy one part of the definition in that the method for obtaining it is clear.

In addition to withholding of removal under the INA, there is another benefit under U.S. law that is similar to asylum but comes without the status and rights that accompany asylum.   In 1984, the United Nations adopted the Convention Against Torture (CAT), and CAT entered into force in the United States in 1994.[148]   Among other things, CAT prohibits signatories from sending individuals to countries where they are likely to be tortured.[149]

---

country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3) (2012).

145.   *See* 3 GORDON ET AL., *supra* note 31, § 34.03[2] (explaining the development of procedures for adjudicating withholding of removal cases).

146.   8 C.F.R. § 1208.24(f) (2014).

147.   DAVID A. MARTIN ET AL., FORCED MIGRATION:  LAW AND POLICY 92 (2d ed. 2007).

148.   United Nations Convention Against Torture and Other Cruel, Inhuman, and Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 113 [hereinafter Convention Against Torture]; *see In re* H-M-V-, 22 I. & N. Dec. 256, 257 (BIA 1998) (dismissing a defendant's motion for appeal after he was found to be deportable for committing a felony because the Board rejected the argument that his deportation violated Article 3 of the CAT, which prohibits the return of an individual to a country when there are substantial grounds to believe he would be subject to torture).

149.   Convention Against Torture, *supra* note 148, at 114.

In 1998, Congress incorporated CAT into U.S. law through the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA).[150] FARRA required the Department of Justice (DOJ) to promulgate regulations that, to the maximum extent possible, exclude from protection those noncitizens who are ineligible for withholding of removal under the INA because they are security risks, are subject to the persecutor bar, or have been convicted of particularly serious crimes.[151]   DOJ promulgated regulations in 1999.[152]   Its way of complying with Congress's exclusionary mandate was to set up a process by which an individual can be granted either CAT "withholding of removal" or CAT "deferral of removal."[153]

Under the regulations, individuals are excluded from CAT withholding of removal for essentially the same reasons that they are from excluded from withholding of removal under the INA.[154]   In contrast, CAT deferral of removal is available to everyone, regardless of whether an applicant would be inadmissible for past criminal or terrorist activity.[155]   However, life is not easy for a CAT deferral of removal grantee.   DHS has historically taken the position that such individuals can be held in detention indefinitely while it pursues efforts to deport them to another country or while it seeks "diplomatic assurances" from the individual's country of origin that it will not torture the person.[156]   As a matter of constitutional due process, the government must eventually release CAT grantees if there is no reasonably foreseeable possibility of deportation, but most CAT deferral of removal grantees sit in detention for at least three to six months before they are released.[157]   When ICE does not release a person within that time frame, his or her only remedy is to file a

---

150.  Pub. L. No. 105-277, § 2242(b), 112 Stat. 2681-761, 2681-822 (codified as amended at 8 U.S.C. § 1231 (2012)).

151.  *Id.* § 2242(c).

152.  Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8678 (Feb. 19, 1999) (codified at 8 C.F.R. pts. 3, 103, 208, 235, 238, 240, 241, 253, 507).

153.  8 C.F.R. § 208.16 (2014) (explaining CAT withholding of removal); *id.* § 208.17 (explaining CAT deferral of removal).

154.  *Id.* § 208.16(d)(2).

155.  *Id.* § 208.17(a).

156.  *See* Hussain v. Mukasey, 510 F.3d 739, 741–42 (7th Cir. 2007) (noting that the U.S. government could utilize diplomatic channels to purportedly confirm that a Pakistani national who met the INA's extremely broad terrorism provision would not be tortured if he were deported to Pakistan).

157.  *Id.* at 742; 8 C.F.R. § 241.4(b)(4)(C)(1) (providing for custody reviews after the conclusion of a 90-day removal period and again within three months thereafter).

AR2022_500675

complex and time-consuming habeas petition—a project for which most detainees lack the resources.[158]

Like withholding of removal under the INA, CAT deferral and withholding meet some of the characteristics of nonstatus. Although FARRA provides a statutory basis for CAT, the framework for CAT adjudication is set out in the regulations. Those regulations offer a fairly robust framework for IJs to assess CAT claims.[159] However, there is no question that CAT is tentative and ostensibly temporary. In fact, DHS is more aggressive about enforcing the supposedly temporary quality of CAT than it is for INA withholding. Specifically, DHS is more likely to hold CAT grantees in detention for longer periods while it tries to find other places to send individuals with CAT or while it pursues efforts to obtain diplomatic assurances from the individual's country of origin that it will not in fact torture the CAT grantee. DHS stubbornly goes through the motions of searching for an alternative country of removal in almost every CAT case. Such individuals are typically released under an ICE "order of supervision," an overlapping form of nonstatus that will be addressed in the next subpart.

There are thousands of individuals living in the United States today with the nonstatus of withholding or deferral of removal. From 2000 to 2014, DOJ and DHS granted CAT deferral of removal to approximately 1,736 individuals and CAT withholding to approximately 6,305 individuals.[160] Statistics for INA withholding for 2000–2001 are missing or unreliable, but over the twelve-year period from 2002–2014, DOJ granted INA withholding of removal to approximately 22,929 individuals.[161]

---

158. *E.g.*, Reid v. Donelan, 991 F. Supp. 2d 275, 281 (D. Mass. 2014).

159. *See* 8 C.F.R. §§ 208.16-18.

160. These numbers were compiled by adding yearly statistics from the U.S. DEP'T OF JUSTICE, EXEC. OFFICE FOR IMMIGRATION REVIEW, STATISTICAL YEAR BOOK for the years 2002–2014. *Statistical Yearbooks*, U.S. DEP'T JUST., http://www.justice.gov/eoir/statspub/syb2000main.htm (last updated Mar. 2015).

161. *See id.* EOIR often reports several years' worth of withholding statistics in the same table, and it often appears to revise prior years' statistics in subsequent yearbooks. Therefore, statistics were taken from the most recent yearbook that stated data for that year. 2002 data came from the 2006 yearbook. 2003 data came from the 2007 yearbook. 2004 data came from the 2008 yearbook. Years 2005–2009 were all supplied by the 2009 Yearbook. 2010-2014 data was taken from the 2014 Yearbook. Data for 2000 was not reported in any yearbook. Data for 2001, reported in the 2005 yearbook, was disregarded as unreliable because the 2056 reported grants seemed unusually high, and the statistics reported for subsequent years in that yearbook were radically higher than the numbers reported in following years' yearbooks for those years.

*Table 1:  Grants of Withholding, CAT Withholding, and CAT Deferral for the Years 2002–2014*

| Year | Withholding | CAT Withholding | CAT Deferral |
|------|-------------|-----------------|--------------|
| 2000 |             | 316             | 213          |
| 2001 |             | 443             | 101          |
| 2002 | 902         | 483             | 75           |
| 2003 | 1357        | 427             | 63           |
| 2004 | 1764        | 430             | 105          |
| 2005 | 2106        | 388             | 70           |
| 2006 | 2569        | 405             | 173          |
| 2007 | 2550        | 449             | 92           |
| 2008 | 2019        | 378             | 123          |
| 2009 | 1959        | 394             | 110          |
| 2010 | 1496        | 395             | 94           |
| 2011 | 1673        | 493             | 136          |
| 2012 | 1553        | 514             | 129          |
| 2013 | 1518        | 375             | 131          |
| 2014 | 1463        | 415             | 121          |
| TOTAL | 22,929     | 6305            | 1736         |

## E.  ICE Supervision and Stays of Removal

ICE has ninety days to remove a person with a removal order,[162] and if it fails to do so within this time frame it is supposed to undertake a "post-order custody review" to decide whether removal in the near future is likely or if the person should continue to be detained as a security risk.[163]   Many individuals end up being released at this stage with an ICE "order of supervision."[164]  A person with an order of supervision must periodically report to ICE, has no pathway to LPR status or citizenship, and cannot travel but might be allowed to work.[165]

ICE also gives orders of supervision to deportable individuals it apprehends who are subject to a variety of forms of summary

---

162.  8 U.S.C. § 1231(a)(1) (2012).

163.  8 C.F.R. § 241.4(h).

164.  Anil Kalhan, *Rethinking Immigration Detention*, 110 COLUM. L. REV. SIDEBAR 42, 45 (2010); Mark Noferi, *Cascading Constitutional Deprivation:  The Right to Appointed Counsel for Mandatorily Detained Immigrants Pending Removal Proceedings*, 18 MICH. J. RACE & L. 63, 129 n.108 (2012).

165.  *See* 8 C.F.R. § 274a.12(c)(18) (providing that employment authorization is awarded at the discretion of the district director); U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, FORM I-220B, ORDER OF SUPERVISION (2012) [hereinafter ICE, FORM I-220B] (on file with author) (restricting travel and requiring regular reporting to the ICE office).

AR2022_500677

removal, including persons subject to expedited removal or reinstatement of prior removal orders.[166]  Sometimes ICE will also decide to "stay the removal" of a person with a removal order in response to either a formal request for a stay filed by an attorney[167] or as an exercise of its own discretion.  In fiscal year 2013, it granted stays of removal to 10,584 individuals; in 2014 it granted stays of removal to 13,611 individuals.[168]  ICE typically gives these individuals orders of supervision too, sometimes in conjunction with a decision to stay the removal for a particular period of time or indefinitely.[169]

An order of supervision is a multiple page document that spells out certain conditions of release and restrictions on the liberty of the supervisee.   These conditions include prohibiting travel outside the jurisdiction of the local ICE office without permission, requiring that the individual appear for medical or psychiatric examinations at the request of ICE, and testifying under oath concerning any subject ICE wishes.[170]  The document typically also contains a schedule for check-ins with the local ICE office.[171]  Initially, the check-ins might be every few months, but over time ICE might revise the check-in schedule so that the individual needs to report in only once or twice a year.[172]  Check-ins are sometimes pro forma, but there is always the possibility that a person will be re-detained by ICE at the check-in.[173]  Some

---

166.  *See* Memorandum from Victor X. Cerda, Acting Dir., U.S. Immigration & Customs Enforcement, to Field Office Dirs. 1–2 (Nov. 12, 2004) [hereinafter Cerda Memorandum] (reiterating that field offices should continue to release individuals who qualify for orders of supervision and comply with the policy guidelines outlined in the memorandum); Shoba Sivaprasad Wadhia, *The Rise of Speed Deportation and the Role of Discretion*, 5 COLUM. J. RACE & L. 1, 6–9, 24 (2014) (describing various procedural mechanisms for "speed deportation" and noting that ICE has prosecutorial discretion to issue supervision orders in lieu of enforcing an order of removal).

167.  U.S. CUSTOMS & IMMIGR. ENFORCEMENT, APPLICATION FOR A STAY OF DEPORTATION OR REMOVAL (Dec. 2010), *available at* http://www.ice.gov/sites/default/files/documents/Document/2014/ice_form_i_246.pdf.

168.  ICE FOIA Response, *supra* note 14.

169.  *See* 8 U.S.C. 1231(a)(3) (2012) (noting that supervision regulations are prescribed by the Attorney General).

170.  ICE, FORM I-220B, *supra* note 165.

171.  *Id.*

172.  *See* Cerda Memorandum, *supra* note 166, at 1–2 (providing supervision reporting guidelines but acknowledging that alternative requirements may be established based upon the needs of specific circumstances).

173.  *See* Nguyen v. B.I. Inc., 435 F. Supp. 2d 1109, 1114 (D. Or. 2006) ("ICE . . . can return aliens to detention or seek criminal penalties against aliens who violate their orders of supervision."); 8 C.F.R. § 241.4(b)(4) (2014) (providing authority for

individuals released on an order of supervision are also required to wear an electronic bracelet that allows ICE to constantly monitor the person's whereabouts.[174]   The devices cannot be removed, which makes simple things like getting dressed and showering difficult.

Supervision is essentially a kind of indefinite immigration probation involving surveillance, paternalistic hectoring, and the constant threat of deportation.   There is a statutory basis for supervision, but it is awarded at the sole discretion of ICE officers, and supervision determinations are not appealable.[175]   It is officially temporary but can last indefinitely.   Individuals with supervision can seek work permission if they can prove that they need it, but their travel even inside the United States is restricted, and if they leave the country, they will probably never be able to come back.[176]

As reflected in the graph below, every year, ICE appears to grant supervision to more and more individuals.   In fiscal year 2010, ICE granted supervision orders to 47,078 individuals; in 2014 it granted supervision to 81,085 individuals.[177]   The growth of ICE supervision is consistent with the growth of other types of nonstatus throughout this same time period.   At present, ICE reports that there are 613,578 individuals with ICE orders of supervision, making supervision one of the largest and fastest growing forms of nonstatus.[178]

---

DHS to re-detain a person if it determines that changed conditions have created a reasonably foreseeable possibility of deportation).

174.   ICE, FORM I-220B, *supra* note 165.

175.   The statutory basis for supervision is section 241 of the Immigration and Nationality Act, which requires DHS to promulgate regulations for the supervision of noncitizens ordered removed whom DHS has been unable to remove within a ninety-day removal period. *See* 8 U.S.C. § 1231(a)(3) (2012).

176.   DHS's regulations allow for a work permit to be granted to a person on supervision. *See* 8 C.F.R. § 274a(12)(c)(18).   Travel under an order of supervision is typically explicitly restricted by the terms of the order. ICE, FORM I-220B, *supra* note 165.

177.   ICE FOIA Response, *supra* note 14.

178.   *Id.*

AR2022_500679

*Figure 1: ICE Supervision Grants 2010–2014*



## F.   Deferred Action, Part I

In 2014, deferred action has gone from an obscure nonstatus to the center of the national debate as a result of President Obama's controversial immigration executive actions that expanded access to DACA and created DAPA.   Some scholars have contended that President Obama's creation of a categorical process for conferring deferred action on thousands of persons has no precedent.[179]  In fact, deferred action has been offered on *both* a case-by-case and categorical basis over the past few decades.   This subpart describes the many types of deferred action and the gradual evolution of this form of nonstatus from an esoteric benefit offered on a case-by-case basis to a categorical one offered on a large scale to thousands of

---

179.  *See* Peter Margulies, *Taking Care of Immigration Law:   Presidential Stewardship, Prosecutorial Discretion, and the Separation of Powers*, 94 B.U. L. REV. 105, 119 (2014); *see also* Peter Margulies, *The Boundaries of Executive Discretion: Deferred Action, Unlawful Presence, and Immigration Law* 18, 26 (Roger Williams Univ. Sch. of Law, Paper No. 156, 2015), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2559836&download=yes (indicating that "Congress has never authorized or acquiesced in a blanket award of benefits to foreign nationals with no prospect for obtaining legal status in a reasonable time," contending that deferred action has until now been limited to the Family Fairness program, which was ancillary to a statutory benefit, and to "a relatively small number of hardship cases"). This section of the Article disputes this contention by documenting the increase in categorical grants of deferred action beginning in the late 1990s.

eligible individuals.  Viewed in this context, DACA and DAPA are not radical departures but, rather, the culmination of a growing trend.

### 1.   Deferred action in the wake of the non-priority program

As a result of John Lennon's FOIA battle, the INS released its previously secret Operating Instructions concerning non-priority status, which it retitled "deferred action."[180]   The Operating Instructions reveals non-priority status and deferred action to have been an early example of nonstatus.  First, deferred action was a temporary deferral of deportation, subject to periodic internal review.[181]  Second, it came without a clear package of rights; the only evidence of the status was a notification from INS to the beneficiary "that no action will be taken by the [agency] to disturb his immigration status, or that his departure from the United States has been deferred indefinitely, whichever is appropriate."[182]  Third, there was no statutory authority for deferred action other than the absence of anything in the INA prohibiting it.[183]

The INS then and DHS now have considered deferred action to be an unreviewable exercise of its prosecutorial discretion.[184]  However, the immigration agency's discretion was not unfettered:  the Operating Instructions set out a list of factors that the agency was required to consider in deciding whether or not to grant deferred action, and there were multiple levels of internal review.[185]  Initially, the U.S. courts of appeals split on whether federal courts could review deferred action decisions.[186]  In response to the circuit split,

---

180.  See Wildes, Nonpriority Program, supra note 83, at 43–46 (detailing John Lennon's Freedom of Information Act battle); see also Leon Wildes, The Operations Instructions of the Immigration Service:  Internal Guides or Binding Rules?, 17 SAN DIEGO L. REV. 99, 102–06 (1979) [hereinafter Wildes, Operations Instructions] (discussing federal courts of appeals' use of the non-priority Operations Instruction during the 1970s).

181.  Wildes, Nonpriority Program, supra note 83, at 50 n.32.

182.  Id.

183.  Id. at 49.

184.  See Memorandum from Janet Napolitano, Sec'y of Homeland Sec., to David V. Aguilar, Acting Comm'r, U.S. Customs & Border Prot., Alejandro Mayorkas, Dir., U.S. Citizenship & Immigration Servs., John Morton, Dir., U.S. Immigration & Customs Enforcement 1, 3 (June 15, 2012) [hereinafter Napolitano Memorandum], available at http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf (stating the deferred action policy is an exercise of prosecutorial discretion and, therefore, unreviewable).

185.  Wildes, Nonpriority Program, supra note 83, at 50 n.32.

186.  Compare Nichols v. INS, 590 F.2d 802, 808 (9th Cir. 1979) (holding "that the decision of an INS District Director upon an application for non-priority status will stand unless it so departs from an established pattern of treatment of others similarly

the INS amended its Operating Instructions to clarify that deferred action was "in no way an entitlement."[187]

In 1996, Congress undertook a major reform of the immigration laws, two principal aspects of which were to restrict the ability of IJs to grant discretionary relief from removal and the ability of federal courts to review agency decisions.[188]  Not long afterward, the INS rescinded the Operating Instructions for deferred action as part of a "housekeeping" effort.[189]  However, around the same time, INS Commissioner Doris Meissner issued a memo on prosecutorial discretion that reaffirmed the existence of deferred action as well as the INS's general authority to prioritize deporting some noncitizens over others.[190]

Thus, advocates continued to seek deferred action for their clients.[191]  Given Congress's elimination of most judicial relief from removal in 1996,[192] prosecutorial discretion would seem to have become an even more important advocacy tool and perhaps also a safety valve for an agency overburdened by its enforcement obligations.  Professors Adam Cox and Christina Rodríguez have

---

situated without reason, as to be arbitrary and capricious, and an abuse of discretion"), *with* Soon Bok Yoon v. INS, 538 F.2d 1211, 1213 (5th Cir. 1976) (per curiam) (finding that deferred action decisions are within the sole discretion of the INS).

187.  Leon Wildes, *The Deferred Action Program of the Bureau of Citizenship and Immigration Services: A Possible Remedy for Impossible Immigration Cases*, 41 SAN DIEGO L. REV. 819, 822 (2004) [hereinafter Wildes, *Deferred Action Program*].

188.  *See* Stephen H. Legomsky, *Fear and Loathing in Congress and the Courts: Immigration and Judicial Review*, 78 TEX. L. REV. 1615, 1624 (2000) (explaining that the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, eliminated jurisdiction to review removal orders "predicated on criminal convictions," "discretionary remedies in compassionate circumstances," and removal orders entered pursuant to an "expedited removal process" (internal quotation marks omitted)); Nancy Morawetz, *Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms*, 113 HARV. L. REV. 1936, 1952 (2000) (describing how the 1996 statute prohibited IJs from taking family integrity into consideration when a child adopted from Thailand was deported after turning eighteen because the family had not filed the proper paperwork).

189.  Wadhia, *supra* note 10, at 251 (internal quotation marks omitted).

190.  *See* Memorandum from Doris Meissner, Comm'r, Immigration & Naturalization Serv., to Reg'l Dirs., Dist. Dirs., Chief Patrol Agents, Reg'l & Dist. Counsel 2–6, 12 (Nov. 17, 2000) [hereinafter Meissner Memorandum] (explaining that investigations focused on identifying high priority aliens are preferable to investigations that identify a broader variety of removable aliens).

191.  *Id.* at 12.

192.  *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546; Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214.

argued that the 1996 immigration reforms acted to increase the government's discretion over removal by shifting discretion from judges to ICE officers whose charging decisions were unreviewable.[193] To date, however, commentators have assumed that this authority was exercised during the period after the 1996 reforms on a case-by-case basis.[194]   A closer look reveals that in the years following the 1996 reforms, the INS began to expand its use of deferred action to offer it to entire categories of individuals.  Like the other types of nonstatus discussed above, deferred action became a vehicle for massive grants of relief to entire categories of unauthorized immigrants.[195]

### 2.   *VAWA deferred action*

The first categorical application of deferred action was for certain abused spouses and children of LPRs and U.S. citizens.  In 1994, Congress passed the Violence Against Women Act (VAWA), which included a new immigration benefit.[196]   As described in Part I, a petition filed by a U.S.-citizen family member, such as a spouse, provides one means to obtain LPR status in the United States. Congress found that many abusive spouses were using this power to control their unauthorized partner.[197]  Thus, VAWA created a process for abused spouses and children to file "self petitions."[198]   If the petition met certain requirements, including a showing that the

---

193.  *See* Cox & Rodríguez, *supra* note 16, at 517–19 (arguing that the Executive Branch's authority has increased because discretionary relief is no longer guided by the INA's statutory framework and instead is consolidated in the hands of agency officials responsible for charging decisions).

194.  *See id.* at 517 ("[T]he Executive still has de facto delegated authority to grant relief from removal on a case-by-case basis [using prosecutorial discretion]."); *see also* Margulies, *supra* note 179, at 119 ("Immigration authorities have historically decided on deferred action 'on a case-by-case basis.'" (quoting Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 n.8 (1999))).

195.  In addition to the growth of categorical deferred action described in this subpart, ICE continues to also grant deferred action on a case-by-case basis to many individuals each year.  In FY 2013, ICE granted deferred action to 6,392 individuals; in FY 2014, it granted deferred action to 9,705 individuals.  ICE FOIA Response, *supra* note 14.

196.  Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796.

197.  *See* H.R. REP. NO. 103-395, at 26 (1993) (suggesting that battered spouses are unlikely to report to authorities that they have been abused because they fear being deported).

198.  8 U.S.C. § 1154(a)(1)(A)(iii)–(v) (2012).

petitioner had suffered "battery or extreme cruelty," it would be approved, thus allowing the petitioner to then seek LPR status.[199]

After passage of VAWA, the INS had to work through a number of implementation issues. One important issue was what to do with VAWA self-petitioners during the interim period between approval of their petitions and when they adjusted status to obtain green cards. The abused spouses and children of U.S. citizens could adjust status immediately after the approval of their self-petitions because they were classified as "immediate relatives," a category that is not subject to annual caps on the number of visas.[200] However, those individuals filing petitions based on their relationship to an LPR were subject to the annual caps.[201] As discussed in Part I, there are lengthy wait times for most immigration categories depending on the nature of the relationship and the applicant's country of origin. This means that many VAWA petitioners would have to wait years before they could adjust status. The INS had to decide what to do with all these individuals with approved petitions. What was their status? Could they work?

Initially, the INS suggested that VAWA self-petitioners seek either voluntary departure or deferred action on a case-by-case basis and then seek work permission based on their receipt of those benefits.[202] However, by the end of 1999, the INS began to grant deferred action routinely to all VAWA self-petitioners residing in the United States with approved petitions who had not yet adjusted status and who were not in removal proceedings.[203] The INS acknowledged in its memorandum setting out this procedure that many VAWA self-petitioners were likely to remain in deferred action for ten years or longer while they waited for a visa to become available.[204]

---

199. To be approved, a VAWA petition must document the existence of a relationship to a U.S. citizen or LPR, that the petitioner has resided in the United States with her spouse or parent, that she has suffered "battery or extreme cruelty" by her spouse or parent, and that she has good moral character. *Id.* §§ 1154(a)(1)(A)(iii)–(vi), -(B)(ii)–(iii). For petitioners seeking classification based on marriage, the petition must also establish that the marriage was entered into in good faith. *See id.*

200. *Id.* § 1151(b)(2)(A)(i).

201. *Id.* § 1151(c).

202. Petition to Classify Alien as Immediate Relative of a United States Citizen or as a Preference Immigrant; Self-Petitioning for Certain Battered or Abused Spouses and Children, 61 Fed. Reg. 13,061, 13,071–02 (Mar. 26, 1996) (codified at 8 C.F.R. pts. 103, 204–205, 216).

203. Memorandum from Michael D. Cronin, Acting Assoc. Comm'r, Office of Programs, U.S. Dep't of Justice, to All Reg'l Dirs. 2 (Dec. 22, 1998).

204. *Id.* at 4.

At first, the INS would not extend deferred action for more than twenty-seven months beyond the date in which a visa became available.[205]  However, the INS soon realized that many VAWA self-petitioners were ineligible to adjust status because of past immigration infractions or other issues.[206]  As a result, the INS eliminated the cap, allowing VAWA self-petitioners to remain in deferred action indefinitely.[207]

From 2000 to 2011, the INS and its successor, USCIS, approved over 67,000 VAWA self-petitions, likely granting deferred action to most of them.[208]  It is difficult to say exactly how many of these self-petitioners have remained in deferred action instead of adjusting status, but it is likely that a relatively substantial number of them remained in deferred action given the strictness of certain provisions enacted as part of the 1996 immigration reforms.  For example, one provision permanently bars individuals from being admitted to the United States as LPRs if they accrued one year or more of unlawful presence in the United States, left the United States, and later reentered the country.[209]  As a result of this and other restrictions, many VAWA self-petitioners will remain indefinitely in the nonstatus of deferred action.

### 3.  Deferred action and U Visas

During the same period, USCIS also granted deferred action to thousands of immigrants who are victims of crimes.  In 2000, Congress created the U visa, a visa for immigrant victims of certain

---

205.  *See* Memorandum from Michael D. Cronin, Acting Exec. Assoc. Comm'r, Office of Programs, U.S. Dep't of Justice, to Vt. Serv. Ctr. 1 (Sep. 8, 2000).  The twenty-seven month cap was for self-petitioners "for whom a visa number was immediately available."  *Id.*  There was a cap of twenty-four months after the date on which a visa became available for all other self-petitioners.  *Id.*

206.  *Id.*

207.  *Id.*

208.  WILLIAM A. KANDEL, CONG. RESEARCH SERV., R42477, IMMIGRATION PROVISIONS OF THE VIOLENCE AGAINST WOMEN ACT (VAWA) 4–5 tbl.1 (2012), *available at* http://fas.org/sgp/crs/misc/R42477.pdf.

209.  8 U.S.C. § 1182(a)(9)(C) (2012).  There are many other strict grounds of inadmissibility that prevent VAWA self-petitioners and others from adjusting status.  One provision, 8 U.S.C. § 1182(a)(6)(C)(ii), makes persons inadmissible who have made false claims to citizenship, which is common for those who have provided false documentation in order to work.  *Id.* §1182(a)(6)(C)(ii).  Another common provision makes any person inadmissible "who at any time knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States . . . ."  *Id.* § 1182(a)(6)(E).  This applies on its face to persons who have helped family members to illegally enter the United States.

crimes who are assisting or who have assisted law enforcement investigations.[210]   For some reason, it took the INS and DHS an unusually long time—seven years—to promulgate regulations to implement the new U visa provision.[211]   During the interim, the immigration agency granted deferred action to 7,500 U visa applicants.[212]   Although most of the applicants were likely ultimately granted U visas, the interim grants are another example of the growth of categorical deferred action.[213]

   Recently, USCIS has again begun granting deferred action to large numbers of U visa applicants.   The number of annual U visa applicants now vastly exceeds the 10,000 U visas allotted by statute for each year.[214]   After reaching the annual cap, USCIS now conditionally grants a U visa to eligible applicants and grants them deferred action in the interim, later substituting a U visa for the deferred action once more visas become available.[215]

---

210.   *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1513, 114 Stat. 1464, 1533–34 (codified as amended at 8 U.S.C. § 1101(a)) (creating a new nonimmigrant visa classification to encourage law enforcement "to better serve immigrant crime victims and to prosecute crimes committed against aliens").

211.   *See generally* Jessica Farb, *The U Visa Unveiled: Immigrant Crime Victims Freed from Limbo*, 15 HUM. RTS. BRIEF 26, 26–27 (2007) (examining how the seven-year delay and failure to promulgate proper regulations forced immigrant advocates to turn to litigation to expose problems and create pressure for a solution).

212.   *See* Memorandum from William R. Yates, Assoc. Dir. of Operations, U.S. Citizenship & Immigrations Servs., to Dir., Vt. Serv. Ctr. 1–2 (Oct. 8, 2003) (outlining interim relief for U nonimmigrant status by centralizing the process at the Vermont Service Center where requests receive case-by-case scrutiny to determine if deferred action is appropriate); Farb, *supra* note 211, at 27 (providing an overview of the confusion to families, advocates, and law enforcement resulting from the deferred applications).

213.   In 2008, Congress amended the deportation grounds of the INA to state that U visa applicants with a final removal order can seek a stay of removal. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110–457, § 204, 122 Stat. 5044.   It also clarified that "[t]he denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for a stay of removal, deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws of the United States." *Id.*   This reference to "deferred action" could signal congressional acquiescence to the Executive Branch's practice of granting the benefit.

214.   ASISTA, U CAP UPDATE FROM USCIS & ADDITIONAL UPDATES FROM VSC STAKEHOLDER TELECONFERENCE 1 (Dec. 11, 2013) (on file with author).

215.   *Id.*

### 4. Deferred action after Hurricane Katrina

In 2005, Hurricane Katrina caused many academic institutions to shut down, making it impossible for foreign students to meet a primary condition of their visas—namely, that they be actively engaged in study. As a result, USCIS granted deferred action to about 5,500 foreign students.[216]

### 5. Deferred action for widows and widowers

The next group to receive deferred action was spouses of deceased U.S. citizens who had been married for less than two years before the death of their spouses. USCIS had interpreted the INA to require it to deny spousal visa petitions filed by U.S. citizens who had been married for less than two years and who died before USCIS could adjudicate their petitions.[217] Several U.S. courts of appeals split over whether USCIS's interpretation was correct, meaning that surviving spouses were treated differently in different parts of the country.[218] In 2009, USCIS attempted to ameliorate the problem by offering deferred action to surviving spouses living in the circuits where they could not adjust status.[219] However, the benefit was short-lived because Congress amended the INA at the end of 2009 to eliminate the requirement that the surviving spouse of a U.S. citizen be married for two years prior to the death of the U.S. citizen in order to self-petition for LPR status.[220]

---

216. Shoba Sivaprasad Wadhia, *In Defense of DACA, Deferred Action, and the Dream Act*, 91 TEX. L. REV. SEE ALSO 59, 67 (2013).

217. *See* Lockhart v. Napolitano, 573 F.3d 251, 255, 263 (6th Cir. 2009) (finding that a surviving alien-spouse whose citizen-spouse filed a Form I-130 prior to his or her death qualifies as a 'spouse' under the ''immediate relative'' provision of the INA).

218. *Compare* Robinson v. Napolitano, 554 F.3d 358, 367 (3d Cir. 2009) (upholding USCIS's interpretation that a surviving alien spouse who was not married to his or her deceased citizen-spouse for two years does not qualify as an immediate relative under the INA), *with Lockhart*, 573 F.3d at 255 (rejecting USCIS's interpretation and finding that Congress intended for an alien widow to qualify as an immediate relative even though the widow's citizen spouse died within two years of the marriage), Taing v. Napolitano, 567 F.3d 19, 23 (1st Cir. 2009) (same), *and* Freeman v. Gonzales, 444 F.3d 1031, 1039 (9th Cir. 2006) (same).

219. Press Release, U.S. Dep't of Homeland Sec., DHS Establishes Interim Relief for Widows of U.S. Citizens (June 9, 2009), *available at* https://www.dhs.gov/news/2009/06/09/dhs-establishes-interim-relief-widows-us-citizens.

220. Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 568(c), 123 Stat 2142, 2186 (2009).

### 6.   Deferred action for military family members

In 2010, DHS announced a deferred action program that would apply to military families.  DHS Secretary Janet Napolitano responded to an inquiry from U.S. Representative Zoe Lofgren about "the immigration needs of soldiers and their families" by noting that "a new DHS policy" promoted the use of "several discretionary authorities," including deferred action, "to minimize periods of family separation" for "immigrants who are the spouses, parents and children of military members."[221]  As a result, immigrants who lacked status but were related to a military member could reap the benefits of deferred action.

### G.   Administrative Closure

In June 2011, ICE Director John Morton issued a memo reiterating the agency's intention to focus its prosecutorial resources on high priority cases.[222]  Commonly known as the Morton Memo, the memo established various ways ICE could exercise prosecutorial discretion, such as by not filing a case, agreeing to close a case, conceding to relief, or not pursuing an appeal.[223]  The memo emphasized that ICE would exercise its discretion to not pursue removal cases against lower priority cases, such as those involving veterans, long-time LPRs, minors and the elderly, individuals present in the United States since childhood, pregnant or nursing women, crime victims, the mentally ill, and individuals with serious health conditions.[224]  Furthermore, the memo set out a series of factors for ICE officials to consider in deciding whether or not to favorably exercise prosecutorial discretion.[225]

Not long afterward, the Obama Administration announced that it would be "reviewing the current deportation caseload to clear out low-priority cases on a case-by-case basis and make more room to deport people who have been convicted of crimes or pose a security

---

221.   Letter from Janet Napolitano, Sec'y, Dep't. of Homeland Sec., to Zoe Lofgren, Representative, U.S. House of Representatives (Aug. 30, 2010) (on file with author).

222.   *See* June 2011 Morton Memo, *supra* note 8, at 4–5. The June 2011 Morton memo built on the Meissner Memorandum, *supra* note 190, at 6, as well as a series of other memos the agency issued over the years.  June 2011 Morton Memo, *supra* note 8, at 1.

223.   June 2011 Morton Memo, *supra* note 8, at 2–3.

224.   *Id.* at 5.

225.   *Id.* at 4.

risk."[226]  Over the following months, immigration court hearings were rescheduled to make time for ICE trial attorneys to review their entire dockets for cases that met ICE's guidelines for case closure.[227] Although the initial docket review has concluded, attorneys who have clients with sympathetic cases continue to make a "PD request" to the local office of the ICE Chief Counsel.[228]

As a result of the Morton Memo, about 29,000 removal cases have been administratively closed.[229]  However, there seem to be wide disparities in the rates at which different offices are closing cases.  For example, nearly one-third of the cases closed in the Seattle Immigration Court were closed due to ICE recommending closure as an exercise of its prosecutorial discretion, while only 1.7 percent of the cases closed in Houston were closed due to prosecutorial discretion.[230]

When a case is administratively closed, it is removed from the court's calendar but not from its docket.[231]  It remains indefinitely pending in inactive status.[232]  As a result, noncitizens with administratively closed cases technically remain in removal proceedings, although as long as the case is closed, there is no possibility that they will be removed.  Many of these individuals will have filed applications for relief from removal, and these applications will remain pending, too, without ever being adjudicated.[233]  Because some applications come with a right to seek work permission while the application is pending, many individuals

---

226.  Cecilia Muñoz, *Immigration Update:  Maximizing Public Safety and Better Focusing Resources*, WHITE HOUSE BLOG (Aug. 18, 2011, 2:00 PM), http://www.whitehouse.gov/blog/2011/08/18/immigration-update-maximizing-public-safety-and-better-focusing-resources.

227.  AM. IMMIGRATION LAWYERS ASS'N COL., IMPLEMENTATION OF THE PROSECUTORIAL DISCRETION REVIEW PILOT PROGRAM IN DENVER, COLORADO 6–7 (2011), *available at* http://www.aila.org/infonet/co-chapter-practice-advisory-implement-pd-denver.

228.  *Id.* at 4–5.

229.  TRAC, *supra* note 7, at tbl.2.

230.  *Id.*

231.  *See In re* Avetisyan, 25 I. & N. Dec. 688, 692, 695 (BIA 2012) (discussing how administrative closure is a tool to temporarily remove a case from an IJ's active calendar or from the Board's docket and acknowledging that administrative closures are not final orders because the appeal may be reinstated by the Board or recalendared by DHS).

232.  *See* Vahora v. Holder, 626 F.3d 907, 915 (7th Cir. 2010) (comparing administrative closures to indefinite continuances).

233.  *Questions and Answers:  USCIS-American Immigration Lawyers Association (AILA) Meeting*, U.S. CITIZENSHIP & IMMIGR. SERVS. 11 (Oct. 9, 2012) [hereinafter Questions and Answers:  USCIS-AILA], *available at* http://www.uscis.gov/sites/default/files/USCIS/Outreach/Notes%20from%20Previous%20Engagements/2012/October%202012/AILA-Liaison-Committee-meetingQA.pdf.

AR2022_500689

with administratively closed cases can seek work permission as long as they pay a fee and file an application to renew their work permit annually.[234]  However, it would be risky and unwise in most cases for a person with an administratively closed removal case to travel outside of the United States.[235]

Some individuals with administratively closed removal cases may have had status going into proceedings.  For example, sometimes LPRs are put in proceedings based on criminal convictions.  When LPRs' cases are administratively closed, they remain, essentially, LPRs and can access most of the rights that LPRs enjoy.[236]  However, many individuals with administratively closed proceedings have no status before proceedings begin.  In these cases, their status is converted to

---

234.  Applications such as those for asylum, lawful permanent residency, and cancellation of removal come with a contingent right to seek work permission while the case is being adjudicated.  *See* 8 C.F.R. § 274a(c)(8)–(10) (2014).  USCIS does not always grant these applications:  it considers itself to have discretion to deny them.  *See Questions and Answers: USCIS-AILA, supra* note 233, at 11.

235.  Travel outside of the United States will not deprive the Immigration Court of jurisdiction over the administratively closed but technically still pending removal proceeding.  *See In re* Sanchez-Herbert, 26 I. & N. Dec. 43, 44 (BIA 2012).  Thus, to the extent that a person with an administratively closed case is relying on the technical pendency of some application for relief in the removal case as a basis for seeking work permission, travel should not impact the person's eligibility for work permission.  Moreover, because removal proceedings are already pending, a traveler with an administratively closed case arguably should not be subject to expedited removal procedures that might otherwise cause her to be removed summarily at the border upon her return without access to a court hearing.  *Compare* 8 U.S.C. § 1225 (2012) (expedited removal), *with* 8 U.S.C. § 1229a (removal before an IJ).  However, it is difficult to predict precisely how DHS would deal with such a case.  It might take the position that it can deny reentry, and it is extraordinarily difficult to challenge DHS's actions at the border.  *See* Gerald L. Neuman, *Discretionary Deportation*, 20 GEO. IMMIGR. L.J. 611, 635 (2006).  Alternatively, DHS might allow reentry but use the new entry as a basis to reopen the closed removal proceeding.  Persons with administratively closed cases who had a pending application for adjustment of status might be able to obtain some sense of security about traveling by filing an application for advance parole, but it is difficult, again, to predict how DHS would deal with an application filed by a person who is technically in removal proceedings.  *See* U.S. CITIZENSHIP & IMMIGRATION SERVS., FORM I-131, INSTRUCTIONS FOR APPLICATION FOR TRAVEL DOCUMENT 1 (2013), *available at* http://www.uscis.gov/ sites/default/files/files/form/i-131instr.pdf (noting that Advance Parole is available to persons with a pending application for adjustment of status).

236.  USCIS might also be suspicious of petitions filed by LPRs in removal proceedings for their family members to obtain green cards. In addition, the status of LPRs with administratively closed proceedings is less secure than other LPRs, since their proceedings could be recalendared and they could be deported at that time. It would be risky for an LPR with an administratively closed removal proceeding to travel outside the United States.  *See supra* note 235 and accompanying text.

nonstatus. They might be able to work, but they have few other rights. Their nonstatus is not due to the operation of a statute but is purely a function of prosecutorial discretion. Should ICE's priorities change, their cases can be recalendared and they might be deported.

As the description of Sergio's case in the Introduction demonstrates, it is now common for ICE attorneys to begin merits hearings by offering prosecutorial discretion in cases where the applicant has a claim for status. Prosecutorial discretion seems to be partly morphing into a kind of plea bargaining process—a means for government attorneys to leverage noncitizens into agreeing to give up their right to a more secure benefit, like asylum.[237] Sergio ended up winning his asylum case. However, many noncitizens or their lawyers are more risk-averse than he was, and, as a result, there are a growing number of individuals with nonstatus who might have become asylees, LPRs, and eventually, citizens.

## H. Deferred Action, Part II

Between 2000 and 2010, the INS and USCIS expanded deferred action from a case-by-case means of benefiting a small number of unauthorized immigrants with sympathetic cases to a benefit awarded categorically to groups of unauthorized immigrants: VAWA self-petitioners, U visa applicants, foreign students impacted by Hurricane Katrina, widows and widowers of U.S. citizens, and unauthorized immigrant family members of military servicemen. The numbers of grantees may have remained relatively modest, but they were almost certainly in the thousands. For example, nearly 67,000 VAWA self-petitioners received deferred action during this time period.[238] Although most of them might have ultimately adjusted status, a substantial number will likely always remain in deferred action because of stringent grounds of inadmissibility that disproportionately impact that demographic.[239] The next subpart will

---

237. *See supra* note 9 (discussing the author's e-mail survey of other clinical professors of immigration clinics concerning this issue).

238. *See* KANDEL, *supra* note 208.

239. This analysis shows that past statistics concerning deferred action grants during this time period are radically inaccurate. In 2004, Leon Wildes summarized Freedom of Information Act data he had obtained from USCIS for "records of all cases where deferred action status has been granted." Wildes, *Deferred Action Program, supra* note 187, at 825–27. In response, he received records of 499 deferred action grants from two of the three USCIS offices—a figure that obviously cannot be correct in light of the thousands of VAWA and U visa deferred action grants made up to 2004. *Id.* In 2010, Professor Shoba Wadhia obtained data from USCIS on deferred action requests from 2003 through 2010, which purported to show an even more

show that after 2010, the number of deferred action grants began to grow even more rapidly.

### 1. Deferred Action for Childhood Arrivals

Congress has repeatedly tried and failed to undertake reform on behalf of Dreamers—undocumented youths who came to the United States as children.[240]  Although a broad bipartisan coalition agrees that these youth are not to blame for being without status and are in fact important to the future of this country, Congress has not been able to pass the DREAM Act, the piece of legislation after which they are named.[241]  Frustrated by congressional inertia, these courageous youth mobilized to convince the Obama Administration to unilaterally order a deportation reprieve for them.[242]   In June 2012, the Administration implemented a new program for the "Dreamers," with the far less inspiring name, Deferred Action for Childhood Arrivals (DACA).[243]

The new program was designed to track the DREAM Act. Accordingly, DACA contains a series of requirements related to the applicant's age, residence, physical presence, immigration status, schooling, and criminal record.[244]   USCIS created an application

---

woefully inaccurate figure:  forty-eight deferred action grants.  Shoba Sivaprasad Wadhia, *Sharing Secrets:  Examining Deferred Action and Transparency in Immigration Law*, 10 U.N.H. L. REV. 1, 42 (2012).  As Professor Wadhia observed in her article, USCIS's failure to provide coherent statistics reveals that its implementation of the program lacks transparency.  *Id.* at 48–49.

240.  The term "Dreamer" comes from the Development, Relief, and Education for Alien Minors Act first introduced in the Senate on August 1, 2001 by Senators Richard Durbin and Orrin Hatch.  S. 1291, 107th Cong. (2001).  Members of both houses of Congress have reintroduced the bill several times, but Congress has never passed it.  *See generally* S. 2205, 110th Cong. (2007); H.R. 1275, 110th Cong. (2007); S. 774, 110th Cong. (2007); H.R. 5131, 109th Cong. (2006); S. 2075, 109th Cong. (2005); S. 1545, 108th Cong. (2003); H.R. 1684, 108th Cong. (2003).

241.  *See* sources cited *supra* note 240.

242.  *See* Julia Preston & John H. Cushman, Jr., *Obama to Permit Young Migrants to Remain in U.S.*, N.Y. TIMES (June 15, 2012), http://www.nytimes.com/2012/06/16/us/us-to-stop-deporting-some-illegal-immigrants.html.

243.  *See* Napolitano Memorandum, *supra* note 184, at 1 (describing DACA).

244.  *See* DACA FAQ, *supra* note 20.  Essentially, USCIS requires that a DACA applicant show that she age was under the age of thirty-one as of June 15, 2012, that she arrived in the United States before her sixteenth birthday, and that she has maintained a current and continuous residence in the United States since June 15, 2007.  *Id.*  Further, USCIS requires that a DACA applicant make her request for consideration of deferred action by demonstrating that she entered the country without inspection or that her immigration status expired before June 15, 2012.  *Id.*  A DACA applicant must also show that she is either in school or has graduated from

form, filing fee, and set of pro se materials to help applicants.[245]  By September 2014, USCIS had granted 632,855 DACA applications[246]— an explosion of nonstatus that has unleashed a fierce debate concerning executive power.[247]

------------------

high school (or obtained a General Education Development certificate) or that she is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.  *Id.*  Finally, she must not have been convicted of a felony, significant misdemeanor, or three or more misdemeanors and she must not otherwise pose a threat to national security or public safety.  *Id.*

245.  *See id.* (providing an in-depth explanations of eligibility requirements, outlining the DACA application guidelines, and providing a link to the DACA application itself).  *See generally* U.S. CITIZENSHIP & IMMIGRATION SERVS., FORM I-821D, CONSIDERATION FOR DEFERRED ACTION OF CHILDHOOD ARRIVALS (2014), *available at* http://www.uscis.gov/sites/default/files/files/form/i-821d.pdf (constituting the DACA application form).

246.  *Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: 2012–2014*, U.S. CITIZENSHIP & IMMIGR. SERVS., http://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_fy2014_qtr4.pdf (last visited May 11, 2015).

247.  *See* Robert J. Delahunty & John C. Yoo, *Dream On:  The Obama Administration's Nonenforcement of Immigration Laws, the DREAM Act, and the Take Care Clause*, 91 TEX. L. REV. 781, 856–57 (2013) (arguing that there is no general presidential nonenforcement power because the Constitution's Take Care Clause imposes a duty on the President to enforce all constitutionally valid acts of Congress in all situations); Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 VAND. L. REV. 671, 768–69 (2014) (arguing that the President's nonenforcement authority does not extend to prospective licensing of prohibited conduct or to policy-based nonenforcement of federal laws for entire categories of offenders unless Congress affirmatively expands Executive discretion).  For a response to Delahunty and Yoo, see Wadhia, *supra* note 216, at 60, 70–71 (attacking Delhaunty and Yoo's Take Care Clause arguments on the following three grounds:  (1) the Obama Administration has faithfully and forcefully executed the immigration laws, (2) prosecutorial discretion actions do not undercut statutory law because such actions have been pursued by other U.S. presidents and a part of the immigration system for at least three decades, and (3) the act of equating DACA's limbo status to the secure status offered by the DREAM Act is an unfair and inaccurate comparison).  For a critique of the prosecutorial discretion rationale for DACA but defense of it on other grounds, see Margulies, *supra* note 194, at 122–26 (contending that before DACA, deferred action was only offered on a case-by-case basis and the lack of precedent for categorical deferred action means that the use of prosecutorial discretion as a rationale runs afoul of Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952), where the U.S. Supreme Court held that the U.S. President could not seize private property absent express authorization from Congress or an authority enumerated under Article II of the Constitution).  This Article's discussion of VAWA deferred action and other types of categorical deferred conflicts with this analysis.

AR2022_500693

2. *Deferred Action for Parental Accountability*

On November 20, 2014, President Obama announced a series of new administrative immigration initiatives.[248]   Through DHS, the President expanded DACA to include more individuals and increased the duration of DACA work permits to three years instead of two.[249] The initiatives also created a new nonstatus for the parents of LPRs and U.S. citizens entitled DAPA.[250]   An estimated four million immigrants may qualify for nonstatus under the changes, dramatically raising the stakes in the constitutional debate over executive power.[251]

Anticipating legal conflict, DOJ took the unusual step of releasing its internal memo concluding that the government has authority for the new programs.   DOJ concluded that the President had prosecutorial discretion to defer some deportations given his limited resources and the vast population of unauthorized immigrants.[252] DOJ also found that the President had prosecutorial discretion to defer removal of the parents of LPRs and U.S. citizens but not the parents of DACA recipients.[253]   DOJ thus suggested that deferring deportation for the parents of citizens and LPRs was consistent with past executive actions and compatible with other preferential treatment given to these groups by immigration law.[254]   By contrast,

---

248. *See generally* Memorandum from Jeh Charles Johnson, Sec'y, Dep't of Homeland Sec., to León Rodriguez, Dir., U.S. Citizenship & Immigration Servs., Thomas S. Winkowski, Acting Dir., U.S. Immigration & Customs Enforcement, R. Gil Kerlikowske, Comm'r, U.S. Customs & Border Prot. 1–5 (Nov. 20, 2014), *available at* http://www.dhs.gov/sites/default/files/publications/14_1120_memo_deferred_action.pdf (discussing the use of deferred action for individuals who came to the United States as children and the parents of U.S. citizens or permanent residents).

249. *See id.* at 3–4 (outlining the policy changes to expand DACA, including removing the then-existing age cap, extending DACA's employment authorization to three-year increments, and expanding the eligibility cut-off date from 2007–2010).

250. *See id.* at 4 (stating that to be eligible for prosecutorial discretion under DAPA, individuals must (1) have a child that is a citizen or LPR, (2) have continuously resided in the United States since January 1, 2010, (3) be physically present in the United States on the date of the memorandum as well as when applying for deferred action, (4) have no lawful status, and (5) not be an enforcement priority as of the date of the memorandum).

251. *See* Nakamura, *supra* note 15. (noting that some opponents have warned that Obama's action could trigger confrontation with Congress).

252. *See* Memorandum from Karl R. Thompson, Principal Deputy Assistant Att'y Gen., Office of Legal Counsel, to the Sec'y of Homeland Sec. 9 (Nov. 19, 2014) [hereinafter Thompson Memorandum], *available at* http://www.justice.gov/sites/default/files/olc/opinions/attachments/2014/11/20/2014-11-19-auth-prioritize-removal.pdf.

253.   *Id.* at 33.

254.   *Id.* at 31.

DOJ found no similar treatment in immigration law toward the undocumented parents of DACA recipients.[255]

The reaction to DAPA was immediate and highly polarized. In Washington, D.C., immigrants rallied at the White House to thank the President.[256]   Not long afterward, the U.S. House of Representatives passed a resolution to halt the executive actions.[257] Twenty-two states, four governors, and the Attorney General of Michigan sued DHS to enjoin DAPA, arguing that it violated the Administrative Procedure Act and the President's constitutional duty to "take care" to enforce the law.[258]   On February 16, 2015, the U.S. District Court for the Southern District of Texas granted the plaintiffs' motion for injunctive relief, effectively putting DAPA and the expansion of DACA on hold until the litigation winds its way through the appeals process.[259]

This debate over the limits of executive power will continue to play out in the courts, Congress, academia and the media in the months and years ahead.[260]   Missing in this debate is the impact of nonstatus on the affected individuals.   Part III addresses this question.

---

255.  *See id.* at 32–33 (reasoning that immigration laws are more concerned with uniting individuals who are legally entitled to live in the United States than they are with uniting individuals who lack lawful status).

256.  Pamela Constable & Julie Zauzmer, *Illegal Immigrants to Rally at White House, Thank Obama for Deportation Reprieve*, WASH. POST (Nov. 21, 2014), http://www.washingtonpost.com/local/illegal-immigrants-to-rally-at-white-house-thank-obama-for-deportation-reprieve/2014/11/21/145ccea0-71a0-11e4-893f-86bd390a3340_story.html.

257.  *See* Jeremy W. Peters & Ashley Parker, *On War and Immigration, Obama Faces Tests of Authority from Congress*, N.Y. TIMES, Dec. 4, 2014 at A21 (noting that the vote for the resolution was largely symbolic).

258.  *See* Complaint at 25–27, Texas v. United States, No. 1:14-CV-254 (S.D. Tex. Dec. 3, 2014) (reasoning that because Congress has already addressed when the parent of a U.S. citizen may change their status, DAPA represents a departure from the President's duty to faithfully execute the laws and stands in contradiction to the laws enacted by Congress).   The Take Care Clause prevents the President from discarding laws he disfavors by requiring the President to faithfully execute the laws in place.   U.S. CONST. art. II, § 3 ("[H]e shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.").   The complaint originally included only fourteen plaintiffs; additional plaintiffs joined the suit after its filing.   *See* Texas v. United States, No. 1:14-CV-254, 2015 WL 648579, at *1 n.1 (S.D. Tex. Feb. 16, 2015), *appeal filed*, No. 15-40238 (5th Cir. Feb. 23, 2015).

259.  *Texas*, 2015 WL 648579, at *62.

260.  For a sampling of the different views concerning President Obama's immigration executive actions, compare Delahunty & Yoo, *supra* note 247, at 856 (arguing that the Take Care Clause mandates, with limited exceptions, that the President enforces congressional enactments and that DACA constitutes a violation of this requirement), with Cox & Rodriguez, *supra* note 193, at 483–519 (noting

### III.  THE IMPACT OF NONSTATUS

> Venerable Gon'yô asked Jôshû, "How is it when a person does not
> have a single thing?"  Jôshû said, "Throw it away."  Gon'yô said, "I
> say I don't have a single thing.  What could I ever throw away?"
> Jôshû said, "If so, carry it around with you."

>                                             - Hongzhi Zhengjue[261]

Nonstatus challenges us with a paradox:  nonstatus is neither status
nor its absence, and those who have it are neither lawfully nor
unlawfully present.  As we saw in Part II, it is a growing enigma.
Hundreds of thousands of individuals with no status are now being
offered nonstatus through mass prosecutorial discretion programs
like DACA, and millions more may soon receive nonstatus through
DAPA.[262]  Some who would have previously won status in immigration
court hearings are now taking nonstatus through a quasi-plea
bargaining process in order to avoid the risk of deportation.
Nonstatus is bleeding into the margins of status and no status and
occupying a greater percentage of the immigrant population.  The
growth of this category raises important questions:  why is nonstatus
growing, and what does the future hold for individuals in nonstatus?

#### A.  Benefits

Congressional and public opposition to granting immigrants social
and economic benefits is one reason for the expansion of the
nonstatus category over time.  One of the most virulent political
narratives relates to the "welfare magnet"—the notion that this or
that group of individuals will move to a particular jurisdiction to
collect welfare benefits.[263]  In the 1990s, the Gingrich Congress

---

doctrinal confusion concerning whether the Executive or Congress possess inherent
authority over immigration and noting various examples in practice of the Executive
exercising inherent authority over immigration), and Price, *supra* note 247, at 674–75
(asserting that notwithstanding the Take Care Clause, the President may decline to
enforce civil and criminal prohibitions in particular cases but not with respect to
entire categories of persons).

261.  GERRY SHISHIN WICK, THE BOOK OF EQUANIMITY:  ILLUMINATING CLASSIC ZEN
KOANS 178 (2005) (quoting Case 57: Gon'yô's One "Thing").

262.  *See* David Nakamura, *Obama Readies Executive Action on Immigration*, WASH.
POST   (Aug.   2,   2014),   http://www.washingtonpost.com/politics/obama-readies-
executive-action-to-legalize-millions-of-undocumented-
immigrants/2014/08/01/222ae2e8-18f8-11e4-85b6-c1451e622637_story.html
(reporting that in framing DACA, legislators sought to define a broader category of
immigrants that could receive similar benefits as the 2012 Dreamers).

263.  *See, e.g.*, Elizabeth Shogren & Melissa Healy, *Gingrich Backs Wilson on Illegal
Immigrant Costs*, L.A. TIMES (Feb. 9, 1995), http://articles.latimes.com/1995-02-

passed reforms that dramatically restricted the receipt of welfare benefits for immigrants, based in part on the misguided belief that noncitizens collect welfare benefits at a disproportionately high rate.[264]   One reason it is so difficult to pass immigration reform today is no doubt the continued prevalence of the notion that individuals who are legalized as a result of reform will drain coffers by collecting public benefits.[265]   Immigrant rights—particularly those closely associated with citizenship, such as voting—are embattled, too.  Nonstatus comes with far fewer benefits, rights, and privileges than status, although even these benefits can be controversial.  This Part offers a sketch of the limited benefits that come with nonstatus and contends that nonstatus is growing in part because it offers a means to authorize the presence of undocumented immigrants without providing them the panoply of benefits and rights that go with full status.

Until 1996, individuals with nonstatus were eligible for some public benefits under the theory that they were "persons residing under color of law" (PRUCOL).[266]   Individuals with nonstatus like deferred action and EVD were considered PRUCOL because the INS was aware of their presence and was not actively pursuing their deportation.[267]   However, in 1996, the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) banned noncitizens from receiving most federal public benefits unless they could show that they met a narrow definition of "qualified alien" and

---

09/news/mn-30042_1_illegal-immigrants (quoting U.S. Representative David Cook, who sought to justify Congress's move to restrict benefits to immigrants when he said that "[w]e don't want to be a welfare magnet for the world").

264.  Bill Ong Hing, *Don't Give Me Your Tired, Your Poor:  Conflicted Immigrant Stories and Welfare Reform*, 33 HARV. C.R.-C.L. L. REV. 159, 167–68, 170 (1998) (describing the unsupported rhetoric and mistaken economic analysis concerning immigrant welfare use).

265.  For a rebuttal of the dubious notion that immigrants move to the United States to collect benefits or that they receive welfare benefits at a disproportionately high rate, see *id.* at 170–78.

266.  *See* Holley v. Lavine, 553 F.2d 845, 847, 851 (2d Cir. 1977) (interpreting a provision of the Social Security Act and its implementing regulation authorizing payments to an alien "permanently residing in the United States under color of law" to include a noncitizen whom the INS had decided not to deport for humanitarian reasons (internal quotation marks omitted)).

267.  *See, e.g., id.* at 849–51 (holding that where a "responsible official" of the INS, aware that an individual was unlawfully residing in the United States, chooses not to institute deportation proceedings for humanitarian reasons, that individual can be said to be living "under the color of law" (internal quotation marks omitted)).

had held that status for five years.[268]  Individuals with nonstatus were excluded, with the exception of those with withholding of removal and grants of parole for more than one year.[269]

Today, those with nonstatus largely remain ineligible for public benefits like food stamps, cash assistance, public housing, social security benefits such as Supplemental Security Income and Social Security Disability Insurance, and federally guaranteed student loans, despite the fact that they typically pay taxes to support this social welfare system.[270]  There are some notable exceptions to the fact that those with nonstatus are ineligible for public benefits.  Nonetheless, even with these exceptions, access to benefits is restricted.  For example, individuals are eligible for Medicare if they are at least sixty-five years old and eligible for social security retirement benefits.[271]  To be eligible for social security retirement benefits, a person must be "lawfully present."[272]  A regulation defines "lawfully present" for retirement benefits and includes noncitizens with a variety of forms of nonstatus, including deferred action.[273]  However, the regulation's definition of lawfully present omits some important forms of

---

268.  *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, §§ 401, 403, 110 Stat. 2105, 2261, 2265 (codified as amended at 8 U.S.C. §§ 1611, 1613 (2012)) (making exceptions for emergency medical assistance, emergency disaster relief, public health assistance, programs for community development assistance, and programs or services specified by the Attorney General that deliver community services necessary for protection of life and safety).

269.  See 8 U.S.C. § 1641(b) (defining "qualified alien" to include LPRs, asylees, refugees, persons paroled for a period of at least one year, persons granted withholding of removal, persons granted conditional entry, and Cuban and Haitian entrants).

270.  *See* TANYA BRODER & JONATHAN BLAZER, NAT'L IMMIGRATION LAW CTR., OVERVIEW OF IMMIGRANT ELIGIBILITY FOR FEDERAL PROGRAMS 2–3 & n.11 (2011), *available at* http://www.nilc.org/overview-immeligfedprograms.html (observing that the welfare reform does not clarify what specific programs are covered under the term "federal public benefit" but rather defines federal public benefit as "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit").

271.  *See* 8 U.S.C. § 1611(b)(3) (excepting "lawfully present" individuals from the general prohibition of federal benefits for aliens); 42 U.S.C. § 1395c (stating that the title protects hospital and health services for those who are sixty-five years of age and over).

272.  Congress exempted retirement benefits under Social Security from the list of federal public benefits for which a noncitizen must be a "qualified alien" and wait five years for eligibility pursuant to PRWORA. *See* 8 U.S.C. § 1611(b)(2).  Instead the SSA only requires that aliens be "lawfully present." *Id.*; *see* 42 U.S.C. § 402(y) (affirming that an alien may not collect any benefit during any month in which he or she is not lawfully present in the United States).

273.  8 C.F.R. § 1.3(a)(3)–(4) (2014).

nonstatus, such as individuals granted work permits pursuant to ICE supervision.[274]   Individuals whose cases have been administratively closed as a result of ICE prosecutorial discretion will likely not qualify for social security retirement benefits unless they can show that they have a pending asylum, withholding of removal, CAT, or adjustment of status application.[275]   Therefore, under the current system, hundreds of thousands of individuals with administratively closed cases and ICE supervision orders will spend the rest of their lives paying into a social security system without ever seeing any benefits for themselves.

   It is striking how inconsistent the public benefit eligibility rules are. For example, there is a difference between the categories of nonstatus holders ineligible for medical benefits under the Affordable Care Act (ACA) and those who qualify for retirement benefits and Medicare.   Like the Social Security Act, the ACA considers people who are "lawfully present" in the United States to be eligible for care under the legislation.[276]   However, its regulations have a distinct definition of "lawfully present."   As is the case in the Social Security Act, individuals with deferred action are eligible for

---

274.   *Id.* § 1.3(a)(1)–(4) (limiting the category of "lawfully present" aliens to individuals who are "qualified alien[s]" and have been inspected and admitted to the United States, paroled into the United States, or permitted to remain in the United States for humanitarian or other policy reasons or who applied for asylum or withholding of removal); 45 C.F.R. § 152.2(4)(iii) (2013) (defining as lawfully present aliens granted work permission pursuant to 8 C.F.R. § 274a.12(c)(18) for persons released on an order of supervision).

275.   *See* 8 C.F.R. §§ 1.3(a)(3)(vii)–(a)(5) (limiting "lawfully present" for the purposes of applying for Social Security as a qualified alien, an alien who has been inspected and admitted to the United States, an alien who has been paroled into the United States, or an alien who has been permitted to stay in the United States for certain delineated humanitarian or policy purposes (internal quotation marks omitted)).

276.   *See* 42 U.S.C. § 18032(f)(3) (stating that individuals who are not citizens, nationals, or lawfully present aliens may not be covered under a qualified health plan).  The Department of Health and Human Services (HHS) has not included the Affordable Care Act (ACA) in the definition of either "federal public benefit" or "federal means-tested public benefit" in the only notices that it has published on the issue, which predate the ACA but appear to constitute the agency's final say on the matter.   *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PROWRA); Interpretation of "Federal Means-Tested Public Benefit", 62 Fed. Reg. 45,256, 45,256 (Aug. 26, 1997) (defining "federal means-tested public benefits to be "only mandatory spending programs of the Federal Government" where eligibility is determined by income or resources); Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PROWRA); Interpretation of "Federal Public Benefit", 63 Fed. Reg. 41,658, 41,658 (Aug. 4, 1998) (providing a list of federal public benefits, including Medicaid and Medicare).  As a result, the ACA is not subject to the restrictions on alien access to benefits contained in the PRWORA.

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 700 of 990

ACA benefits.[277]   However, individuals with DACA are explicitly excluded, and the Obama administration has announced that it will also bar DAPA recipients from receiving benefits under the ACA.[278] Some states have stepped in to bridge the gap and cover DACA recipients and possibly individuals with DAPA, creating an inconsistent patchwork of medical benefits across the country.[279]  In some states, nonstatus holders can only obtain emergency medical care; in others, some individuals with nonstatus are eligible for some state-funded medical care.[280]

Other privileges of nonstatus holders also vary from state to state. For example, at least some nonstatus holders may be eligible under federal law for unemployment benefits because they are considered "lawfully present."[281]   However, states typically administer these programs, and some have banned DACA recipients from obtaining benefits.[282]  Likewise, some states offer in-state tuition to holders of some types of nonstatus, but others do not.[283]   Nonstatus holders'

---

277. *See* 45 C.F.R. § 152.2 (defining "lawfully present" to include "qualified aliens" and a wide range of other types of status and non-status, including deferred action); *id.* § 155.20 (defining "lawfully present" for purposes of the ACA by referencing 45 C.F.R. § 152.2, the pre-existing condition insurance plan regulations); *see also* 26 C.F.R. § 1.36B-1(g) (2014) (defining "lawfully present" by reference to 45 C.F.R. § 155.20).

278. *See* 45 C.F.R. § 152.2(8) (2013) (excluding DACA from the ACA); Michael D. Shear & Robert Pear, *Obama's Immigration Plan Could Shield Four Million*, N.Y. TIMES, Nov. 20, 2014, at A1 (reporting that the Administration will promulgate regulations to exclude DACA holders from the ACA).

279. Cindy Y. Rodriguez & Jaqueline Hurtado, *States Work Around Obamacare to Help Undocumented Immigrants*, CNN, http://www.cnn.com/2014/04/09/us/obamacare-undocumented-immigrants (last updated Apr. 9, 2014, 1:30 PM) (noting that California, Washington, Massachusetts, Minnesota, New York, and Washington, D.C. offer health insurance to persons granted deferred status).

280. *See* TANYA BRODER, NAT'L IMMIGR. LAW CTR, TABLE: MEDICAL ASSISTANCE PROGRAMS FOR IMMIGRANTS IN VARIOUS STATES 1–5 (2014), *available at* http://www.nilc.org/document.html?id=159 (discussing the availability of different medical assistance programs in thirty-seven states and the District of Columbia).

281. *See* 26 U.S.C. § 3304(a)(14)(A) (allowing payment to an alien provided she was "lawfully present for purposes of performing such services, or was permanently residing in the United States under color of law at the time such services were performed . . .").

282. *See, e.g.*, Daniel Gonzalez, *Governor Cautions 'Dreamers'*, USA TODAY (Aug. 16, 2012), http://usatoday30.usatoday.com/USCP/PNI/Front%20Page/2012-08-16-pni0816met-deferred-first-dayPNIBrd_ST_U.htm (discussing Governor Jan Brewer's efforts to resist implementation of DACA in Arizona, such as by denying unemployment benefits to DACA recipients).

283. *See* Raquel Aldana, *On Rights, Federal Citizenship, and the "Alien"*, 46 WASHBURN L.J. 263, 278–81 (2007) (describing federal and state laws concerning in-state tuition for undocumented students); Michael A. Olivas, *Dreams Deferred: Deferred Action,*

AR2022_500700

eligibility for professional memberships like law and medicine will also vary depending on the state.[284]

For many years, there was no question that those with nonstatus could apply for driver's licenses.  However, the REAL ID Act of 2005 requires states to deny driver's licenses to individuals who do not meet certain immigration requirements.[285]   Most individuals with deferred action and TPS can obtain driver's licenses because the federal REAL ID Act specifically lists deferred action and TPS as lawful immigration statuses.  However, the Act does not authorize states to provide a driver's license to individuals with any other type of nonstatus, and several states have even tried to deny driver's licenses to individuals with deferred action.[286]

When it comes to many constitutional rights, nonstatus holders must contend with case law that has historically privileged LPRs over immigrants with lesser statuses.[287]   With respect to some types of

---

*Prosecutorial Discretion, and the Vexing Case(s) of Dream Act Students*, 21 WM. & MARY BILL RTS. J. 463, 464–67 (2012) (emphasizing that while some states, such as Rhode Island, have sought to incorporate undocumented students into the community by extending resident tuition, other states, such as New Jersey, have denied financial assistance to U.S. citizens with undocumented parents).

284.   California has passed legislation that allows persons to be admitted to the bar regardless of their immigration status.  Jennifer Medina, *Allowed to Join the Bar, but Not to Take a Job*, N.Y. TIMES (Jan. 2, 2014), http://www.nytimes.com/2014/01/03/us/immigrant-in-us-illegally-may-practice-law-california-court-rules.html?_r=0.        Florida allows DACA recipients to take the bar.  Jan Pudlow, *Governor Signs Undocumented Attorney Bill*, FLA. BAR NEWS (June 1, 2014), http://www.floridabar.org/DIVCOM/JN/JNNews01.nsf/RSSFeed/52B54E465C469EE785257CDD0044AFD4. It is unclear whether individuals with nonstatus can practice law in any other states.

285.   REAL ID Act of 2005, Pub. L. No. 109-13, § 202(c)(2), 119 Stat. 302, 312–13; *see* 6 C.F.R. § 37.3 (2014) (defining a REAL ID driver's license to be an identification card certified to be in compliance with the requirements of the REAL ID Act).

286.   *See* Ariz. Dream Act Coal. v. Brewer, 945 F. Supp. 2d 1049, 1052, 1079 (D. Ariz. 2013), *rev'd*, 757 F.3d 1053 (9th Cir. 2014) (finding that Arizona's efforts to deny driver's licenses to persons with DACA violated equal protection); Saldana v. Lahm, No. 4:13CV3108, 2013 WL 5658233, at *1, *7 (D. Neb. Oct. 11, 2013) (granting in part the defendant's motion to dismiss a challenge to Nebraska's refusal to grant a driver's license to a DACA grantee); 6 C.F.R. § 37.3 (defining "lawful status" for the purpose of the REAL ID Act).

287.   For a discussion of the rights of unauthorized immigrants relative to lawful permanent residents and citizens, see David A. Martin, *supra* note 25, at 92–101 (ranking the hierarchy of immigrants in order of decreasing community membership as (1) citizens, (2) lawful permanent resident, (3) admitted nonimmigrant, (4) entrant without inspection, (5) parolee, and (6) applicant at the border); Maryam Kamali Miyamoto, *The First Amendment After* Reno v. American-Arab Anti-Discrimination Committee*: A Different Bill of Rights for Aliens?*, 35 HARV. C.R.-C.L. L. REV. 183, 193–95 (2000) (asserting that because deportation is not classified

nonstatus, like parole, the U.S. Supreme Court has bought into an "entry fiction" that has treated individuals as though they are outside the United States and are therefore afforded less due process even when they have been in the country for years.[288]

Individuals with nonstatus have few immigration law privileges and many burdens.  Some cannot travel at all without being considered to have "self-deported"; others can travel with "advance parole," but advance parole is difficult to obtain.[289]  Many forms of non-status, like DACA and DAPA, must be regularly renewed and at considerable cost.[290]  In addition to paying hundreds of dollars every few years to renew their work permission, nonstatus holders must also regularly update their address and appear at application support centers to be photographed and fingerprinted.[291]   Nonstatus holders cannot

---

as a "punishment," the government has removed immigrants based on their political beliefs and associations); Hiroshi Motomura, *Immigration Outside the Law*, 108 COLUM. L. REV. 2037, 2075–76 (2008) (suggesting that despite a Supreme Court holding that supported the right of unauthorized immigrant children to attend elementary and secondary school, states' ability to restrict immigrant access to colleges and universities results in exclusion from the community); Hiroshi Motomura, *The Rights of Others: Legal Claims and Immigration Outside the Law*, 59 DUKE L.J. 1723, 1727 (2010) (examining efforts by states to address the arrival of undocumented immigrants, the workplace protections afforded to undocumented immigrants, the extent of Fourth Amendment protections for undocumented immigrants, and undocumented immigrants' right to effective counsel in court); Allison Brownell Tirres, *Property Outliers: Noncitizens, Property Rights and State Power*, 27 GEO. IMMIGR. L.J. 77, 90–91 (2012) (demonstrating that when property is held by noncitizens, constitutional precepts only partially exist, and therefore states may use land laws to subordinate and exclude noncitizens).

288. Linda S. Bosniak, *Exclusion and Membership:  The Dual Identity of the Undocumented Worker Under United States Law*, 1988 WIS. L. REV. 955, 970 (1988) (reporting that some courts have asserted that excludable aliens are unprotected because by definition these aliens are "outside the United States" (though in fact they can be physically present in the United States) and constitutional protections only extend to the limits of the United States's territory).

289. *See, e.g.*, DACA FAQ, *supra* note 20 (explaining that DACA recipients must receive advance parole to travel and will only be granted advance parole if their travel is for humanitarian, educational, or employment purposes).

290. The current application fee for DACA is $465.  *See I-821D, Consideration of Deferred Action for Childhood Arrivals*, U.S. CITIZENSHIP & IMMIGR. SERVS., http://www.uscis.gov/i-821d (last visited May 11, 2015).

291. DEP'T OF HOMELAND SEC., INSTRUCTIONS FOR I-765, APPLICATION FOR EMPLOYMENT AUTHORIZATION 8 (Aug. 6, 2014), *available at* http://www.uscis.gov/sites/default/files/files/form/i-765instr.pdf. (explaining that the application filing fee is $380, that there is an additional $85 fee for "biometrics," and that applicants might be required to appear for an interview and the collection of biometric data).

petition for family members to obtain legal status in the United States.[292]  No form of nonstatus comes with a pathway to citizenship.

The one immigration benefit that does typically come with nonstatus is work permission, although often it is not automatic.[293]  Individuals with nonstatus have been offered work permits since May 1981, when the INS published its first ever regulation governing employment authorization.[294]  By 1981, the government had concluded that "[e]mployment in the United States is not an inherent right" but, rather, "a matter of administrative discretion . . . ."[295]  This philosophy marked a shift from the early twentieth century, when the Supreme Court held that the "right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure."[296]

Perhaps because work was once seen as a right, not a privilege, the INA had never addressed the issue of work permission for noncitizens.[297]  Therefore, the INS had to strain to find statutory authority for its new regulation.  It cited section 103 of the INA, a provision that set out the powers of the Attorney General, including the power to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter."[298]

---

292.  3 GORDON ET AL., *supra* note 31, § 31.03 ("Those who seek to immigrate as an 'immediate relative' or on the basis of a family-sponsored preference require approval of a petition by the U.S. citizen or lawful-resident sponsor filed with the DHS agency having jurisdiction over the petitioner's residence.").

293.  *See, e.g.*, 8 C.F.R. § 274a.12(c)(14) (2014) (allowing work permission for a person granted deferred action if she can show economic necessity).

294.  Employment Authorization to Aliens in the United States, 46 Fed. Reg. 25,079, 25,080–81 (May 5, 1981) (codified at 8 C.F.R. pt. 109) (distinguishing classes of aliens who receive work authorization as a condition of their admission from others which must apply for work authorization separately).

295.  *Id.* at 25,080.

296.  *See* Truax v. Raich, 239 U.S. 33, 35, 41 (1915) (discussing the validity of an Arizona statute requiring employers to employ no less than eighty percent "qualified electors or native-born citizens of the United States" (internal quotation marks omitted)); *see also* Yick Wo v. Hopkins, 118 U.S. 356, 357–59, 369–70 (1886) (discussing natural rights in the context of striking down a law regulating laundry businesses in San Francisco because unequal enforcement of the law violated equal protection).

297.  *See* Michael J. Wishnie, *Prohibiting the Employment of Unauthorized Immigrants: The Experiment Fails*, 2007 U. CHI. LEGAL F. 193, 198–99 (2007) (explaining that prior to the IRCA's passage, there were no criminal penalties for employers who hired undocumented workers and no additional penalties for undocumented workers who worked).

298.  8 U.S.C. § 1103(a) (1982).

The new work permission regulation was relatively expansive and authorized a grant of work permission for two types of nonstatus: voluntary departure (presumably including EVD) and deferred action.[299]  In November 1981, the INS added a work authorization category for individuals granted parole.[300]  Although the regulation specified who could be granted authority to work, it said nothing about what would happen to individuals who worked without permission.  In practice, there was no real regulation of unauthorized work until Congress passed IRCA in 1986.[301]  IRCA contained a new provision defining an "unauthorized alien" not entitled to work in the United States as a noncitizen who is neither an LPR nor "authorized to be . . . employed by this chapter or by the Attorney General."[302]  The provision thus acknowledged the Attorney General's (and INS's) pre-existing practice of administratively deciding which categories of aliens could lawfully work.[303]

Despite the fact that non-status holders have previously been permitted to work in the United States, the provision of work permission to DACA and DAPA grantees has been one of the most controversial features of the new programs.[304]  At one time, nonstatus holders could work without special permission and obtain driver's licenses and apply for the same public benefits as citizens.  However, now, privileges and benefits of these types vary depending on arcane eligibility rules and the politics of individual states.  The one relatively durable and consistent benefit granted to most nonstatus holders seems to be work permission—a privilege that was once a right in American society.

---

299.  8 C.F.R. § 109.1(b)(5)–(6) (1982).

300.  *Id.* § 109.1(b)(4).

301.  *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, §§ 115, 274A, 100 Stat. 3359, 3360, 3384 (making employment of unauthorized immigrants unlawful and increasing enforcement of existing immigration laws).

302.  8 U.S.C. § 1324a(h)(3) (1988).

303.  *See* Employment Authorization; Classes of Aliens Eligible, 52 Fed. Reg. 46,092, 46,093 (Dec. 4, 1987) (to be codified 8 C.F.R. pt. 109) (rejecting a petition asking the INS to rescind its employment authorization regulation and rejecting an argument that "the phrase 'authorized to be so employed by this Act or the Attorney General' does not recognize the Attorney General's authority to grant work authorization except to those aliens who have already been granted specific authorization by the Act").

304.  *See* The Repeal Executive Amnesty Act of 2015, H.R. 191, 114th Cong. § 104 (2015) (proposing to eliminate the Attorney General's discretion to grant employment authorization to persons otherwise not entitled to work under the INA).

AR2022_500704

As nonstatus expands, it seems, the privileges of non-status holders narrow. When nonstatus was an arcane benefit available to only thousands of individuals, it flew far enough below the political radar that individuals with it could collect many benefits without risking public ire. But once it exploded, the rights and benefits of nonstatus holders burst, too. The Obama Administration's exclusion of DACA and DAPA from the ACA offers a portrait of what nonstatus will look like in the future, as politicians working to expand the boundaries of nonstatus need to water down its benefits in order to address the welfare magnet narrative.

### B.   The Future

It is likely that legal challenges to DACA and DAPA will ultimately fail because prosecutorial discretion decisions are usually isolated from judicial review and the challengers lack much evidence of real injury.[305] However, the greater danger to nonstatus comes not from the courts but from the political branches. Nonstatus can be eliminated based on the shifting whims of the Executive Branch or by a Congress displeased with perceived executive overreaching.[306]

Nonstatus is rarely cabined by statutory language, notice and comment rulemaking, or judicial oversight. It is usually an exercise of sole executive prerogative and, therefore, can theoretically be undone as easily as it can be wrought. To repeal a statute, there must be hearings, majority votes in both houses of Congress, and a presidential signature.[307] To amend a regulation, an agency must publish notice and solicit and consider comments—sometimes hundreds of thousands of them.[308] Both congressional and executive

---

305. *See* Heckler v. Chaney, 470 U.S. 821, 831 (1985) (recognizing that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion"); Delahunty & Yoo, *supra* note 247, at 786, 796 (arguing that the President's duty to faithfully execute the laws conflicts with the widely held understanding that executive power "includes the discretion to decline enforcement of federal laws at any time, place, or case").

306. *E.g.*, The Repeal Executive Amnesty Act of 2015, H.R. 191, 114th Cong. §§ 401–402 (2015) (restricting the definition of "lawfully present in the United States," thus reducing who is eligible for certain benefits (internal quotation marks omitted)).

307. *See* U.S. CONST. art. I, § 7 (announcing that for a bill to become law, it must pass both the House of Representatives and the Senate and receive the President's signature).

308. *See, e.g.*, Preserving the Open Internet, 76 Fed. Reg. 59,192, 59,192 (Sept. 23, 2011) (to be codified at 47 C.F.R. pts. 0, 8) (noting that before adopting new Internet protections, the Federal Communications Commission (FCC) undertook a public inquiry and received over 100,000 comments); Elise Hu, *A Fascinating Look*

actions are subject to judicial review. By contrast, when an administration changes its prosecutorial priorities, it need not make even so much as an announcement and the changed priorities are likely insulated from judicial oversight.

Thus, over the years various nonstatus programs have come and gone. INS made up EVD, the Reagan Administration nearly abandoned it, and then the first Bush Administration resurrected it with a new name, DED. Every year or two, the individuals with DED and its statutory cousin, TPS, wait anxiously to learn whether their status will be extended for another period. The existence of their status is year-to-year—dependent on political whims.

In some ways, the executive creation of nonstatus does not resemble an act of lawmaking so much as it does a massive government registration program. In order to obtain work permits, individuals with nonstatus voluntarily disclose their whereabouts, work and family histories, and other biographic data. They are fingerprinted, photographed, and annually tracked. This is all the information that ICE would need to deport hundreds of thousands of individuals if its prosecutorial priorities ever shift again in the future. Mass deportation of nonstatus holders is unlikely because it would probably be too expensive and controversial. However, it is important to acknowledge the possibility that at least some nonstatus holders might be deported.

The fact that nonstatus can be eliminated does not mean that it will be, but its changeability will have an impact on the lives of individuals with nonstatus either way. Consider Liberians with DED: the most recent renewal of Liberian DED occurred just four days before it was set to expire.[309] Imagine how difficult it must have been for these individuals to plan for the future without knowing whether their presence in the United States would continue to be authorized or not.

Critics argue that DACA is more like lawmaking than prosecutorial discretion. But, one central feature of the law is that it provides stability.[310] For better or worse, established rules allow individuals to

---

*Inside Those 1.1 Million Open-Internet Comments*, NAT'L PUB. RADIO (Aug. 12, 2014, 1:24 PM), http://www.npr.org/blogs/alltechconsidered/2014/08/12/339710293/a-fascinating-look-inside-those-1-1-million-open-internet-comments (reporting that the response to new Internet protections was so immense that the FCC's server crashed and the deadline for receiving public comments had to be extended).

309. *See* Press Release, White House, *supra* note 64 (extending deferral employment authorization for an additional twenty-four months).

310. *See* H. L. A. HART, THE CONCEPT OF LAW 2–3 (1961) (observing that while there may be many different opinions on what exactly law is, there is a general

govern their lives.  Nonstatus does not provide this certainty. Although programs like DACA resemble lawmaking in many ways, a chief difference is that these programs are more ephemeral.

Another feature of the law is that it allows similarly situated individuals to be treated equally.  But, the implementation of nonstatus has often been arbitrary or even discriminatory.  For years, the INS offered EVD to Cubans but refused in the 1980s to grant it to Salvadorans whose lives were in great risk.[311]  When ICE first began its 2011 review of pending cases for administrative closure, it did not consider same-sex relationships to be a positive factor weighing in favor of prosecutorial discretion to the same extent as opposite-sex relationships.  It was not until a year later that the agency released a memo clarifying that it would not discriminate against same-sex partners.[312]  Moreover, there are vast disparities in general in the operation of the prosecutorial discretion program.  It appears that some ICE Chief Counsel offices have exercised their prosecutorial discretion to administratively close cases much more than others.[313]

It is difficult to challenge these sorts of arbitrary or discriminatory decisions concerning nonstatus because they are so discretionary and because there is no real process for doing so.  Professor Shoba Sivaprasad Wadhia has urged that prosecutorial discretion programs should be subject to APA review.[314]  This would be an improvement for those lucky or ambitious enough to find lawyers able to mount

---

understanding that laws create a system in each country and that these legal systems are generally similar in structure).

311.  *See supra* notes 115, 127, 129 and accompanying text (observing that the failure of the Reagan Administration to extend EVD to Salvadorans resulted in Salvadorans receiving TPS or DED instead).

312.  *See* Memorandum from Gary Mead, Exec. Assoc. Dir., U.S. Immigr. & Customs Enforcement, et al., to All Field Office Dirs., All Chief Counsel, All Special Agents in Charge 1 (Oct. 5, 2012) (clarifying that long-term same-sex relationships are considered "family relationships" when the individuals are in monogamous relationships, intend to stay in those relationships, and maintain common residences and financial assets).

313.  *See* TRAC, *supra* note 7 (finding that as of January 2014, prosecutorial discretion was used more frequently than in 2012 but less frequently than in 2013).

314.  *See* Shoba Sivaprasad Wadhia, *The Immigration Prosecutor and the Judge: Examining the Role of the Judiciary in Prosecutorial Discretion Decisions*, 16 HARV. LATINO L. REV. 39, 47 (2013) (reasoning that prosecutorial directives give judges considerable guidance in reviewing decisions and that courts favor interpretations of statutes allowing judicial review of agency action).

AR2022_500707

such challenges, but it would also represent a doctrinal sea change and is, therefore, probably not very likely in the short term.[315]

Furthermore, the potential benefits that come with nonstatus are also sometimes apportioned in a discriminatory or at least seemingly arbitrary way.  For example, individuals with deferred action are generally eligible for medical coverage under the ACA, but DACA (and soon DAPA) recipients are excluded.[316]  This type of discrimination is infectious because of the questionable "welfare magnet" notion that individuals will illegally migrate to the United States in the hope that they will be able to collect public benefits.[317]  To address the argument that immigrants will be a drain on American society, policymakers will likely continuously water down the limited rights, privileges, and benefits that come with nonstatus.  Courts will probably not protect nonstatus holders from such discrimination despite the fact that they are exactly the type of discrete and insular minority that benefit from heightened equal protection review in other contexts.[318]  The Supreme Court often strikes down discrimination concerning immigrant benefits at the state level, but it has been unwilling to uphold equal protection challenges filed to challenge federal discrimination, no matter how irrational it may be.[319]

Nonstatus offers few rights and many risks.  Why would anyone accept such a tenuous, tentative, and temporary benefit?  In some cases, such as instances where removal proceedings have been administratively closed, accepting nonstatus is a rational calculation made to avoid possible deportation.  However, many people, like DACA applicants, have affirmatively applied for nonstatus.  For those individuals, the act of seeking nonstatus is one of tremendous courage.

---

315.  *See* Hotel & Rest. Emps. Union, Local 25 v. Att'y Gen., 804 F.2d 1256, 1271 (1986) (holding that the APA does not authorize judicial review of the Attorney General's decision not to grant EVD), *vacated*, 808 F.2d 847 (D.C. Cir. 1987).

316.  *See* 45 C.F.R. § 152.2(8) (2013) (excluding DACA from the ACA).

317.  *See supra* notes 262–64 and accompanying text.

318.  For a discussion of the argument that the Equal Protection Clause should be used to protect "discrete and insular minorities" who are left vulnerable in a democracy, see JOHN HART ELY, DEMOCRACY AND DISTRUST:  A THEORY OF JUDICIAL REVIEW 75–76 (1980) (analyzing United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4 (1938)).

319.  *Compare* Plyler v. Doe, 457 U.S. 202, 228–30 (1982) (striking down a state statute that prevented the use of state funding for the education of undocumented immigrant children), *with* Mathews v. Diaz, 426 U.S. 67, 84 (1976) (concluding that the judiciary does not have broad power to review decisions made by Congress and the President with respect to immigration).

While individual courage is admirable, collective courage is formidable.  In order to obtain DACA, thousands of youths and their families mobilized and lobbied the Obama Administration.  They created a political movement, as a result of which some of the most marginalized individuals in this society have achieved work permission, a chance at a higher education, and the ability to open bank accounts and legally drive.  These are transformational rights for unauthorized immigrants.  Thus, there is another way to see nonstatus—not as a massive government registration and surveillance program, but as a civil rights movement.

Through political mobilization, nonstatus may morph into something better for at least some of those who have it.  The examples of past nonstatus leading to status include EVD for Cubans, which eventually led to congressional passage of the Cuban Adjustment Act; EVD for Southeast Asians, which led to similar legislation for Indochinese adjustment of status; DED for Chinese students after Tiananmen Square, which was soon supplanted by the Chinese Student Protection Act; and the Family Fairness program, which was replaced by Family Unity.[320]   The most secure form of nonstatus—TPS—came about after years of unsuccessful lobbying for Salvadorans to be granted EVD.[321]  Thus, there is reason behind the Dreamers' faith that they might someday get something better.  Nonstatus can sometimes be a way station en route to status.

On the other hand, nonstatus could calcify.  The ability of millions of undocumented individuals to obtain nonstatus might reduce the pressure to pass actual immigration reform.  Business interests that have historically lobbied for reform might be appeased by the existence of a large new lawful work force.[322]  The tenuous nature of nonstatus might prevent its holders from pushing too hard for something better for fear of losing what they have.  Even if nonstatus becomes status for the most politically popular groups, like those with DACA, less visible and less politically connected groups will likely be left out.

---

320.  *Designations of Temporary Protected Status and Fraud in Prior Amnesty Programs: Hearing Before the Subcomm. on Immigration & Claims of the H. Comm. on the Judiciary*, 106th Cong. 27–31 (1999) (statement of Mark Krikorian, Executive Director, Center for Immigration Studies).

321.  *See supra* notes 127–29 and accompanying text.

322.  *See* Ngae, *supra* note 49, at 93–95 (explaining that business interests that benefited from the existence of a low-wage work force helped perpetuate the immigration policies that led to the existence of large numbers of undocumented immigrants in the United States).

The dangers of this situation need to be recognized.  Those with nonstatus will contribute to the country's tax revenue without receiving their fair share of benefits, such as health care, and for some, social security retirement.  They will be more likely to suffer discrimination and less likely to be protected by the courts.  On the other hand, DHS will grow from nonstatus, gaining more and more officers to process millions of work permit renewal requests.[323] DHS has even claimed that it might be able to shift some of the fees from DAPA to fund ICE's and CBP's enforcement efforts—growing those agencies, too.[324]

Although the immigration enforcement agencies may be nourished by nonstatus, nonstatus may guarantee that the United States will never solve its problem of unauthorized immigration.  The Executive Branch justifies most of its nonstatus programs as an exercise of prosecutorial discretion in the face of an unauthorized population that is larger than what the government is capable of deporting.  In order for it to keep granting nonstatus, therefore, the government must always be faced with a massive undocumented population.[325]  Those undocumented immigrants who do not qualify for nonstatus will likely be subject to a new regime of hyper-enforcement with ever-larger levels of resources directed against them.

## CONCLUSION

The Executive Branch has offered nonstatus at least since the 1920s, when the INS granted parole to excludable individuals with sympathetic cases.  By the 1950s, the Executive Branch was granting nonstatus to tens of thousands of individuals at a time as a type of de facto refugee admissions program.  Even after the 1980 passage

---

323. *See Joint Written Statement of Joseph Moore, Senior Financial Official, U.S. Citizenship and Immigration Services, Donald Neufeld, Associate Director, Service Center Operations, U.S. Citizenship and Immigration Services, Daniel Renaud, Associate Director, Field Operations, U.S. Citizenship and Immigration Services*, SENATE JUDICIARY COMMITTEE (Mar. 3, 2015), http://www.judiciary.senate.gov/imo/media/doc/Moore-Renaud-Neufeld%20Testimony.pdf (explaining that USCIS is funded through the fees it collects on applications and that it hires staff based on its projection of its adjudication workload).

324. "DHS has explained that, if anything, the proposed deferred action program might increase ICE's and CBP's efficiency by in effect using USCIS's fee-funded resources to enable those enforcement divisions to more easily identify non-priority aliens and focus their resources on pursuing aliens who are strong candidates for removal." Thompson Memorandum, *supra* note 252, at 26.

325. *See id.* at 31 (noting that DACA recipients constitute only a small percentage of the total undocumented population).

of the Refugee Act created the formal statuses of refugee and asylee, Presidents Reagan, Bush, and Clinton continued offering the nonstatus of EVD and DED to large numbers of individuals from countries in strife and to countries that implicated U.S. foreign policy interests.

Throughout the same period, the INS also granted the nonstatus of "deferred action" on a case-by-case basis to deportable individuals with sympathetic cases.  After the 1996 restrictionist immigration reforms made more individuals deportable or inadmissible than ever before and eliminated many forms of immigration relief, INS and then DHS gradually expanded deferred action programs. Beginning with VAWA self-petitioners in the late 1990s, the Executive Branch continued to ramp up deferred action, categorically granting it to thousands of individuals.  At the same time, it also issued more and more supervision orders every year, netting a population of well over 600,000 persons subject to this form of indefinite immigration probation.[326]

This expansion of nonstatus largely went uncontested until the Obama Administration inaugurated the DACA program, which drew considerable publicity and further polarized immigrant advocates and immigration restrictionists.  President Obama has since expanded nonstatus even further, offering to grant it to the parents of LPRs and U.S. citizens.  There is a fierce debate as to whether or not this move is legal.

The legal debate over nonstatus could be avoided by legislative immigration reform to create a pathway to residency and citizenship for some portion of the unauthorized immigrant population. However, such a measure would still be controversial precisely because it would grant status instead of nonstatus.  During the 2013 congressional debate over immigration reform, the most contentious subject was whether unauthorized immigrants should be granted a pathway to citizenship.[327]  Even when the pathway was lengthened to

---

326. ICE FOIA Response, *supra* note 14.
327. *See* Sean Sullivan, *Rand Paul and Why the 'Pathway to Citizenship' Question is So Delicate for the GOP*, WASH. POST (Mar. 19, 2013), http://www.washingtonpost.com/blogs/the-fix/wp/2013/03/19/rand-paul-and-why-the-pathway-to-citizenship-question-is-so-delicate-for-the-gop (internal quotation marks omitted) (pointing out the potential political and election ramifications members of Congress—particularly members of the Republican party—faced with respect to immigration reform).

more than a decade and strewn with obstacles, Congress still could not agree on such a measure.[328]

It is perhaps natural that citizenship is so contested because, according to one view, it is no less than the "right to have rights."[329] The embattled state of immigrant rights and benefits is perhaps part of the reason why nonstatus has become the default answer to the immigration policy debate.  Nonstatus comes with minimal rights and benefits, although even those have provoked an outcry.

Therefore, nonstatus will probably continue to grow—an expanding limbo that reflects the United States polity's deep ambivalence for immigrants and immigration law.  It is unfortunate that thus far, the nation has been unable to find a more satisfying answer to the policy and moral dilemmas posed by its large unauthorized immigrant population.  Persons with nonstatus often work, pay taxes, and add to the social fabric of the United States.  In some cases, such as that of the Dreamers, they have demonstrated tremendous courage and won the respect of a wide bipartisan coalition.  Hopefully, in the future they will also receive the benefits that they have earned through their contributions.

---

328.   Jaime Fuller, *Americans Are Ready for Immigration Reform.  They Are Just Not Ready Enough*, WASH. POST (July 14, 2014), http://www.washingtonpost.com/blogs/the-fix/wp/2014/07/14/americans-are-ready-for-immigration-reform-they-are-just-not-ready-enough.

329.   Perez v. Brownell, 356 U.S. 44, 64 (1958).

# Work and Employment for DACA Recipients

**Geoffrey Heeren**[†]

Introduction ........................................................................................ 46
I.  The Agency's Authority to Regulate Immigrant Employment ..... 48
      A. The Tradition of Work as a Natural Right .............................. 50
      B. The Historical Origins of Regulating Immigrant
         Employment ........................................................................ 52
II. The Myth of a Policy to Comprehensively Regulate Immigrant
    Work ............................................................................................. 53
Conclusion .......................................................................................... 57

## Introduction

Deferred Action for Childhood Arrivals (DACA) has brought job opportunities and a brighter future to somewhere around 700,000 undocumented immigrant youth.[1] Yet some contend that the employment authorization conferred upon DACA recipients renders the program illegal, because it converts it from a mere program of prosecutorial discretion into an *ultra vires* benefit.[2] This essay sets aside the host of other legal issues raised by DACA and focuses on the narrow question of whether the federal government exceeds its statutory authority when it confers employment authorization on DACA recipients.[3] There is a short answer to this question that is based on the unambiguous text of the Immigration and Nationality Act (INA), which is an emphatic no. The relevant statute defines an "unauthorized alien" for employment purposes to exclude anyone designated as authorized for employment by the agency; the agency has long designated deferred action as a category authorized

---

[†] Associate Professor, University of Idaho College of Law. Thanks to the editors of the Yale Journal on Regulation for their thoughtful editing and insightful comments on this essay.

1. Andorra Bruno, Cong. Rsch. Serv., R46764, Deferred Action for Childhood Arrivals (DACA): By the Numbers 9 (2021). For a discussion of the benefits of DACA to the recipients themselves, see Shoba Sivaprasad Wadhia, *Demystifying Employment Authorization and Prosecutorial Discretion in Immigration Cases*, 6 Colum. J. Race & L. 1, 18–20 (2016).

2. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1911–12 (2020) (describing the rationale of Acting DHS Secretary Elaine Duke in rescinding DACA).

3. The essay does not address the question of whether the agency's grant of "lawful presence" causes the program to violate the Administrative Procedure Act. For a discussion of this question, compare Michael Kagan, *DAPA's Unlawful Presence Problem*, Yale J. on Reg: Notice & Comment (Feb. 6, 2016), https://www.yalejreg.com/nc/dapa-s-unlawful-presence-problem-by-michael-kagan, with Anil Kalhan, *DAPA, "Lawful Presence," and the Illusion of a Problem*, Yale J. on Reg: Notice & Comment (Feb. 12, 2016), https://www.yalejreg.com/nc/dapa-lawful-presence-and-the-illusion-of-a-problem-by-anil-kalhan.

AR2022_500713

Work and Employment for DACA Recipients

for employment, and DACA is a species of deferred action.[4] Yet some courts have found this answer unsatisfying, referring to the provision as a "mousehole" that pales beside the vast social and economic questions at stake in making large numbers of undocumented immigrants eligible for employment.[5] Federal courts in Texas have enjoined DACA and a related program called Deferred Action for Parental Accountability (DAPA) based on their inference that a purpose of the INA is to parsimoniously guard employment authorization as part of a broader scheme to enforce immigration law and protect jobs for native workers.[6]

Recently, the government issued a notice of proposed rulemaking that would explicitly codify employment authorization for DACA recipients.[7] However, DACA applicants would no longer be required under the proposed rule to seek employment authorization in conjunction with their DACA applications.[8] In addition, the government contends that each core facet of DACA is severable from the others, and that it can continue running the program on a piecemeal basis if a court enjoins any one of those aspects, such as employment authorization.[9] Thus, at the same time that the government would codify the various aspects of DACA to put them on a more secure legal footing, it would also try to de-tether them so that DACA would survive if dissected by injunction.

This new approach makes it all the more important to address the legality of employment authorization, which is vital to DACA recipients' livelihoods and futures. This essay argues that courts are wrong to ignore the easy textual answer to the employment authorization question, and goes on to explain that the relevant text makes sense in light of the broader historical context, including a libertarian tradition for immigrant work and heavy economic dependence on it for much of United States history. The purposivist reasoning of the courts hostile to employment authorization for DACA recipients is out of step with the mainstream textualist approach to statutory interpretation. Moreover, the protectionist purpose inferred by these courts from the INA is in tension with the broader history of work by non-citizens inside the United States.

---

4.    8 U.S.C. § 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14) (2021).

5.    *See Texas v. United States* ["*Texas I*"], 809 F.3d 134, 183 (5th Cir. 2015), *as revised* (Nov. 25, 2015); *Texas v. United States* ["*Texas II*"], No. 1:18-CV-00068, 2021 WL 3025857, at *24 n.37 (S.D. Tex. July 16, 2021) (quoting *Texas I*, 809 F.3d at 183 n.186).

6.    *Texas I*, 809 F.3d at 180–81; *Texas II*, 2021 WL 3025857 at *29–31.

7.    Department of Homeland Security, United States Citizenship and Immigration Services, Deferred Action for Childhood Arrivals, Notice of Proposed Rulemaking, 86 Fed. Reg. 53,736, 53,756–60, 53,770, 53,772, 53,773 (Sept. 28, 2021) (creating a specific regulatory provision allowing DACA recipients to seek employment authorization, specifying that employment authorization will automatically terminate upon termination of a grant of DACA, eliminating the previous requirement that DACA applicants seek employment authorization, and including a severability section stating that DACA will stand if any of its three major components, including employment authorization, are held to be illegal).

8.    *Id.* at 53815.

9.    *Id.* at 53816.

AR2022_500714

Yale Journal on Regulation Bulletin                    Vol. 39:46 2021

## I. The Agency's Authority to Regulate Immigrant Employment

President Obama created DACA in 2013 as an exercise of prosecutorial discretion after a decade of congressional near misses at passing some version of the DREAM Act, which would have created a pathway to citizenship for those brought to the United States at a young age.[10] DACA is a deportation forbearance policy for persons who might well qualify for status if the DREAM Act eventually passes, and who comprise a highly sympathetic group regardless of whether legislation ultimately passes. According to the government, DACA is not an immigration status; it is "deferred action," or a decision, in other words, to defer removal.[11] However, it also has come with employment authorization and persons with DACA are considered lawfully present for certain collateral purposes.[12]

The Supreme Court has yet to address the questions of whether DACA is legal or whether offering employment authorization to DACA recipients contributes to its possible illegality. In its 2020 decision, *Department of Homeland Security v. Regents of the University of California*, the Supreme Court found that the Trump Administration's rescission of DACA violated the Administrative Procedure Act (APA) because it failed to segregate the issues of granting a deportation forbearance from the benefits associated with DACA, like a grant of lawful presence and employment authorization.[13] In essence, the majority assumed for the sake of argument that a prior Fifth Circuit analysis was correct that grants of employment authorization and lawful presence convert a prosecutorial-discretion program into a benefit program that is "'manifestly contrary' to the INA."[14] Assuming that to be the case, the Court held that the government should have considered eliminating lawful presence and employment authorization while keeping the deportation

---

10. *See generally* Ming H. Chen, *Beyond Legality: The Legitimacy of Executive Action in Immigration Law*, 66 SYRACUSE L. REV. 87, 94–96 (2016).

11. *Id.*

12. Wadhia, *supra* note 1 at 6–7.

13. *Regents*, 140 S. Ct. at 1912.

14. *See id.* at 1911–12; *Texas I*, 809 F.3d at 182. The Supreme Court noted that in rescinding DACA, the Acting Secretary of DHS was bound by the Attorney General's conclusion that the program was unlawful because "[t]he same statutory provision that establishes the Secretary of Homeland Security's authority to administer and enforce immigration laws limits that authority, specifying that, with respect to 'all questions of law,' the determinations of the Attorney General 'shall be controlling.'" *Regents*, 140 S. Ct. at 1910 (citing 8 U.S.C. § 1103(a)(1)). The Attorney General had stated that DACA was unlawful for the same reasons that the Fifth Circuit had found DAPA unlawful. *Id.* at 1911. Since the respondents in *Regents* had not addressed how 8 U.S.C. § 1103(a)(1) impacted the reviewability of the Attorney General's legal conclusions concerning DACA, the court did not review those conclusions, but instead essentially took them as a given, and proceeded to consider whether the rescission nonetheless violated the APA because the agency had overlooked important considerations. *Id.* at 1910-15.

AR2022_500715

Work and Employment for DACA Recipients

forbearance aspect of the program.[15] The government violated the APA by failing to consider this and other ways to address DACA, particularly given the enormous reliance interests at stake.

Despite *Regents* and the support of the Biden Administration, today DACA just clings to existence. Judge Hanen of the Southern District of Texas enjoined the program in July 2021 but stayed his decision in part while the government appeals and simultaneously works on a draft regulation.[16] Judge Hanen first held that the government violated the APA by failing to go through a notice and comment rulemaking process—a defect that he acknowledged may be cured by an imminent proposal for a DACA regulation.[17] However, in addition to this procedural APA violation, Judge Hanen ruled in the states' favor on a substantive APA claim that DACA is in fundamental tension with central principles set out in the INA.[18] One of these, according to Judge Hanen, is that "[t]he INA provides a comprehensive statutory scheme for the allocation of work authorization."[19]

This is incorrect. First, a regulation has been in place since 1981 authorizing employment for deferred action recipients, and DACA is a type of deferred action.[20] This regulation predated Congress saying anything significant about immigrant employment, which it did not do until 1986 when it passed the Immigration Reform and Control Act (IRCA).[21] Second, with IRCA, Congress granted authority to the agency to offer employment authorization to whomever it wants, ratifying the agency's preexisting practice of granting it to persons with deferred action. According to the INA as amended by IRCA, an "unauthorized alien" for purposes of employment is a noncitizen who is neither a Lawful Permanent Resident nor "authorized to be . . . employed by this chapter *or by the Attorney General*."[22] In other words, Congress explicitly granted authority to the Attorney General to give employment authorization to categories of persons unmentioned in the statute. After passage of the Homeland Security Act of 2002, this function was transferred to United States Citizenship and Immigration Services (USCIS), the component of the

---

15.    *Regents*, 140 S. Ct. at 1912.

16.    *Texas II*, 2021 WL 3025857 at *42.

17.    *Id.* at *23.

18.    *Id.* at *24–32.

19.    *Id.* at *29.

20.    *See* Employment Authorization to Aliens in the United States, 46 Fed. Reg. 25,079, at 25,081 (May 5, 1981) (codified at 8 C.F.R. pt. 109). Today the regulation allowing for employment authorization for persons with deferred action is 8 C.F.R. § 274a.12(c)(14) (2021) ("An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, [may be able to obtain work authorization upon application] if the alien establishes an economic necessity for employment.")

21.    Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, §§ 115, 274A, 100 Stat. 3359, 3360, 3384.

22.    8 U.S.C. § 1324a(h)(3) (emphasis added); *see generally* Wadhia, *supra* note 1, at 5.

49

Department of Homeland Security (DHS) that has inherited authority over employment authorization.[23]

It may seem hard to understand at first glance why Congress would draft an exception that seemingly swallowed its other rules about immigrant employment, but that is exactly what the statute says. Under the plain wording of the statute, USCIS can grant employment authorization to new categories of individuals, or even dole it out to individual undocumented immigrants on a case-by-case basis. Although this reading may be jarring to those with a certain view of immigration enforcement, the broader historical context offers clarity.

### A. The Tradition of Work as a Natural Right

The regulation of immigrant employment with IRCA in 1986 is a relatively recent development in the history of immigrant work in the United States. In order to understand why it came as late as it did, it is first necessary to address a crucial semantic distinction. The INA regulates the "employment" of non-citizens, and USCIS grants an "employment authorization document" to persons who qualify for one under the agency's regulations and policies.[24] "Employ" means to hire a person and "employment" is central to the modern capitalist system, with its focus on the corporation and economies of scale. "Work," in contrast, has a broader and more basic meaning—one that hearkens back to the nation's individualistic, agricultural, and entrepreneurial roots.[25] Historically, people in this country have long worked for themselves, on farms or in small businesses. The founders were steeped in the philosophies of John

---

23.     Prior to enactment of the Homeland Security Act, the Attorney General delegated most powers to the Commissioner of the Immigration and Naturalization Service. 8 C.F.R. § 2.1 (2001). The Homeland Security Act transferred the Commissioner's power to adjudication immigration applications, like applications for employment authorization documents, to the Bureau of Citizenship and Immigration Services, which has since been renamed as United States Citizenship and Immigration Services (USCIS). *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 451(b), 116 Stat 2135 (2002).

24.     *See* 8 U.S.C. § 1324a (unlawful employment of aliens); 8 C.F.R. § 274a.12 (Classes of aliens authorized to accept employment); *Form I-765, Application for Employment Authorization*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/i-765 [https://perma.cc/4979-MB57].

25.     The relevant meaning of "employ" is "(1) to use or engage the services of (2): to provide with a job that pays wages or a salary." *Merriam Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/employ. "Work" has a long and nuanced definition. It can be used as a noun, verb, or adjective. As an intransitive verb, one definition of "work" is "a: to perform work or fulfill duties regularly for wages or salary // works in publishing b: to perform or carry through a task requiring sustained effort or continuous repeated operations // worked all day over a hot stove c: to exert oneself physically or mentally especially in sustained effort for a purpose or under compulsion or necessity." *Merriam Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/work. As a noun, "work" can mean "1: activity in which one exerts strength or faculties to do or perform something: a: activity that a person engages in regularly to earn a livelihood // people looking for work b: a specific task, duty, function, or assignment often being a part or phase of some larger activity c: sustained physical or mental effort to overcome obstacles and achieve an objective or result." *Id.*

AR2022_500717

Work and Employment for DACA Recipients

Locke and Adam Smith, who considered labor the foundation for property rights, central to individual liberty.[26] Their vision of a new Republic was built on the Lockean premise that individuals have a right to work in order to feed themselves and their families.[27] This philosophy informed a well-established jurisprudence concerning an immigrant "right to work" that both pre- and post-dated the Lochner era.[28] During a period dating from the late nineteenth to mid-twentieth century, courts regularly struck down state legislation restricting non-citizens' ability to work based on various theories that were loosely connected by language concerning universal natural rights.[29]

During this period when courts were striking down state regulations on immigrant work, the federal government had the ability to bar the entry of foreign "contract labor" if there were enough native workers to fill the job.[30] Beginning in the late nineteenth century, the United States regulated the admission of immigrants to protect the labor market. However, once non-citizens arrived in the United States, their ability to work was entitled to constitutional protection. This constitutional distinction between the treatment of non-citizens seeking admission and those already present was consistent with a broader trend that continues to this day. Courts regularly defer to the federal government's regulation of the admission of non-citizens while more closely scrutinizing state infringements on the constitutional rights of non-citizens once they are present.[31]

Part of the reason that the regulation of immigrant employment came as late as it did was that the regulation was built on a libertarian tradition of protecting the right to work of immigrant workers, at least once they had arrived here. This ideological foundation for immigrant work was fed by and in turn nourished the nation's massive economic dependence on immigrant labor.[32] Populist pressures occasionally resulted in reform, such as the Contract Labor Law of 1885, but up until the late twentieth century, these reforms impacted only the criteria for admission, and left in place an essentially laissez-faire right of undocumented immigrants to work within the interior.[33]

---

26. *See* Geoffrey Heeren, *The Immigrant Right to Work*, 31 GEO. IMMIG. L.J. 243, 279–80 (2017).

27. For example, Jefferson's vision of Democracy was deeply tied to the notion of independent "yeoman farmers" who cared about the country because they cared about their own land and the work they had done to improve it. *See* Lisi Krall, *Thomas Jefferson's Agrarian Vision and the Changing Nature of Property*, 36 J. ECON. ISSUES 131, 131–32 (2002).

28. Heeren, *supra* note 26, at 252.

29. *Id.*

30. Contract Labor Law of 1885, ch. 164, 23 Stat. 332 (amended 1887).

31. *See* Stephen H. Legomsky, *Immigration Law and the Principle of Plenary Congressional Power*, 1984 SUP. CT. REV. 255, 255–56.

32. Kitty Calavita, *The Contradictions of Immigration Lawmaking: The Immigration Reform and Control Act of 1986*, 11 LAW & POL'Y 18, 19–21 (1989).

33. *Id.* at 21.

AR2022_500718

### B.  The Historical Origins of Regulating Immigrant Employment

After the Lochner era ended, courts stopped using natural rights language to protect an immigrant right to work.[34] At the same time, Congress and the agency began toying with some regulation of non-citizens' employment. The INA, enacted in 1951, built upon the preexisting practice of preventing the admission of noncitizens to work in positions that could be filled by domestic workers.[35] However, it did nothing to prevent non-citizens from working who were present in the United States without lawful status, and employers who hired such workers faced no penalty. The INA made it illegal to "harbor transport, or conceal illegal entrants," but an amendment named the "Texas Proviso" after the Texas growers to whom it was a concession excluded employment from the category of harboring, and was "interpreted by the INS as a virtual *carte blanche* for the employment of undocumented workers."[36] After passage of the INA, the Immigration and Naturalization Service (INS) did promulgate regulations restricting employment for some temporary visa holders, or "nonimmigrants," if they lacked permission.[37] Yet the INS did not appear to have a formal process for adjudicating employment authorization until 1981 when it issued the first employment authorization regulation—the one that recognized authority for employment authorization for persons with deferred action.[38]

Statutory authorization for this regulatory practice of restricting employment authorization did not clearly exist until 1986, when Congress enacted IRCA. When Congress did act, it ratified the agency's regulatory definition of employment authorization rather than creating a new one. This left the agency with sweeping authority over the issue, meaning that Judge Hanen's conclusion that the INA comprehensively regulates "work authorization" is incorrect. Rather, the INA gives the agency authority to regulate employment authorization via its regulations and even less formal practices.

For example, beginning in 1999, the INS began to grant deferred action on a categorical basis to petitioners for lawful permanent residency under the Violence Against Women Act while they waited for visas to become available.[39] The agency has likely granted deferred action to tens of thousands of such persons, and some of them have remained indefinitely in the limbo of deferred action due to strict limitations on adjusting status.[40]

---

34.    Heeren, *supra* note 26, at 256.

35.    8 U.S.C. § 1182(a)(14) (1952).

36.    Calavita, *supra* note 32, at 21.

37.    8 C.F.R. § 214.2(c) (1952).

38.    Employment Authorization to Aliens in the United States, 46 Fed. Reg. 25,079, 25,080–81 (May 5, 1981) (codified at 8 C.F.R. pt. 109).

39.    Geoffrey Heeren, *The Status of Nonstatus*, 64 AM. U. L. REV. 1115, 1152–54 (2015).

40.    *Id.* at 1154.

Work and Employment for DACA Recipients

In 2000, the agency began granting deferred action to applicants for a special visa for crime victims called the U visa until visas were available for them.[41] Due to an annual cap of 10,000 U visa grants, and yearly applications that vastly exceed that amount, the agency has recently been granting deferred action and employment authorization to thousands of U visa applicants each year.[42]

DACA therefore is only the latest example in a long history of employment authorization being granted to large categories of deferred action recipients. The agency has had a regulation authorizing this practice since 1981 and Congress ratified the agency's authority to do so in 1986 with the passage of IRCA. As a result, the agency did not violate the INA when it elected to grant employment authorization to DACA recipients. Nor was it required to undertake rulemaking for this aspect of the program, as a regulation already existed authorizing employment authorization for those with deferred action. However, the agency has now proposed adding a regulatory provision explicitly allowing DACA recipients to seek employment authorization.[43] For all the above reasons, the proposed regulation's conferral of employment authorization on DACA recipients is lawful.

## II.      The Myth of a Policy to Comprehensively Regulate Immigrant Work

Judge Hanen also relied on the policies he discerned behind IRCA and the INA to comprehensively prohibit the "employment of illegal aliens" as a means to deter illegal immigration.[44] The Fifth Circuit relied on similar logic when it struck down "Deferred Action for Parental Accountability," another Obama Administration initiative to grant deferred action to some undocumented parents of United States citizens and lawful permanent residents. According to the Fifth Circuit, "[t]he INA's careful employment-authorization scheme 'protect[s] against the displacement of workers in the United States,' and a 'primary purpose in restricting immigration is to preserve jobs for American workers.'"[45] The Fifth Circuit contended that the mere increase in the number of persons with employment authorization would undermine "Congress's stated goal of closely guarding access to work authorization and preserving jobs for those lawfully in the country."[46]

---

41.    *Id.* at 1154–55.
42.    *Id.* at 1155.
43.    Deferred Action for Childhood Arrivals, 86 Fed. Reg. 53,736, 53,740.
44.    *Texas II*, 2021 WL 3025857 at *29.
45.    *Texas I*, 809 F.3d at 181–82.
46.    *Id.*

53

As Professors Adam Cox and Cristina Rodríguez have noted, it is a dubious enterprise to try to infer any overarching policy goal from the INA, which represents a series of accretions by different congresses with conflicting priorities.[47] Immigration law is, as Professor Kitty Calavita says, a "patchwork fashioned out of mutually contradictory pieces," two of the foremost of which are "the political demand for restrictions side-by-side with the economic reality of the need for immigrant labor."[48] These competing demands have resulted in a Janus-faced policy concerning immigrant work. On one side, the admission of foreign labor is regulated and employers must check immigration status for employees; on the other exists a vast shadowy economy in which unauthorized work is legal and employer sanctions do not operate. This regime allows for the perpetuation of a symbolically attractive myth that unauthorized work is illegal while still serving the needs of the many economic sectors in which undocumented workers form a large share of the workforce.

It is true that IRCA sought to address illegal immigration partly by barring the employment of "unauthorized alien" workers. Yet, IRCA sought to achieve this end by regulating employers, not workers, and the agency has defined employment relatively narrowly. Under applicable regulations, employers are required to check employment authorization for "employees" but are not required to do so for "intermittent" domestic workers and "independent contractors" "who carry on independent business, contract to do a piece of work according to their own means and methods, and are subject to control only as to results."[49] These carve-outs for independent contractors and domestic workers mirror the Texas Proviso in that they offer a significant escape valve from employer sanctions. Add to this that employer sanctions have often not been strictly enforced, and the result is a large accommodation for individuals and entities to hire undocumented workers.

IRCA also continued the INA's approach of not significantly penalizing non-citizens who seek or secure unauthorized employment, provided they do not use false documents to do so.[50] While the INA has some penalties for unauthorized employment, they are limited and

47.   Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law Redux*, 125 YALE L.J. 104, 151–59 (2015).

48.   Calavita, *supra* note 32, at 40.

49.   *See* 8 C.F.R. § 274a.1(f), (h), and (j). The INS's proposed regulations exempted "casual employment" as a domestic worker and working as an independent contractor. Immigration and Naturalization Service, Control of Employment of Aliens, 52 Fed. Reg. 8762, 8764 (1987). A definition of "independent contractor" was added to the final regulations at the behest of twenty-five businesses that commented on the regulations. Immigration and Naturalization Service, Control of Employment of Aliens, 52 Fed. Reg. 16,216-01, 16,219 (1987). Although persons and companies need not check employment authorization for independent contractors, they can be subject to liability under IRCA for hiring an independent contractor that they know is unauthorized to work. 8 U.S.C. § 1324a(a)(4).

50.   *See Arizona v. United States*, 567 U.S. 387, 404–06 (2012).

54

Work and Employment for DACA Recipients

qualified by exceptions.[51] Moreover, those provisions that address the issue refer to unauthorized "employment" and not to "work."[52] There is no provision of the INA that clearly prohibits a non-citizen without employment authorization from working as an independent contractor, from owning and operating their own business, or from farming their own land.[53]

This point may strike many as jarring because it runs up against the myth that unauthorized work is illegal.[54] Contributing to this myth are the myriad ways in which undocumented immigrants are mistreated in the workforce and the overarching paradigm of illegality popularly attributed to them.[55] Jobs have also become a flashpoint in an economy in which many American citizens are struggling—a theme that President Trump exploited in his campaigns.[56] The myth of illegal unauthorized work serves a powerful symbolic purpose in a political milieu given to regular bouts of nativism. Yet the fact remains: no statute clearly makes unauthorized work illegal, and no court has ever dispositively held as much.[57] Given the ability of undocumented immigrants to legally work as independent contractors or through self-employment, the Fifth Circuit's inference of a Congressional purpose to absolutely ban them from being employed is a major stretch.

Not only is Judge Hanen's inference about the INA's purpose not borne out by history, but it is also dubious on its own terms. It is perverse to expect that denying employment authorization to DACA recipients will protect American workers or jobs or do anything to prevent future illegal immigration.[58] First, it is important to recognize that DACA recipients are

51.    Heeren, *supra* note 26, at 267–68.

52.    *See* 8 U.S.C. § 1182(a)(9)(B)(iii)(II) (treating employment without authorization as tantamount to unlawful presence for asylum applicants); 8 U.S.C. § 1255(c) (barring a person from adjusting status who "continues in or accepts unauthorized employment prior to filing an application for adjustment of status").

53.    Michael Mastman, *Undocumented Entrepreneurs: Are Business Owners "Employees" Under the Immigration Laws?*, 12 N.Y.U. J. LEGIS. & PUB. POL'Y 225, 252 (2008); Heeren, *supra* note 26, at 266–68. *But see* In re Garcia, 58 Cal. 4th 440, 462, 315 P.3d 117, 131 (2014) (noting that the Department of Justice took the position that a non-citizen without employment authorization could not practice law as an independent contractor).

54.    Heeren, *supra* note 26, at 266; *see also* Leticia M. Saucedo, *Employment Authorization, Alienage Discrimination and Executive Authority*, 38 BERKELEY J. EMP. & LAB. L. 183, 199 (2017) ("By providing employment authorization to a large number of undocumented immigrants, the Obama administration challenged the assumption that undocumented immigration status precluded access to all rights and benefits, even in the workplace.").

55.    *Id.*

56.    *See* Leticia M. Saucedo, *Employment Authorization and Immigration Status: The Janus-Faced Immigrant Worker*, 43 Ohio N.U. L. Rev. 471, 479 (2017).

57.    *See Arizona*, 567 U.S. at 404–06 (holding that a state provision making it illegal for an "unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor" was preempted by federal law, which does not criminally punish unauthorized work).

58.    Professor Shoba Sivaprasad Wadhia has broadly canvased policy rationales for granting employment authorization to DACA recipients. *See* Wadhia, *supra* note 1, at 18–23. The government's notice of proposed rulemaking concerning DACA addresses the labor market

AR2022_500722

Yale Journal on Regulation Bulletin                    Vol. 39:46 2021

already heavily employed and deeply enmeshed in the United States economy.[59] During the eight years they have had employment authorization, there has been little evidence that their employment has hurt authorized workers. To the extent that they out-competed citizens and authorized workers for jobs, it is hard to make a moral argument that this is wrong, since DACA recipients by and large have lived their lives in this country and are as much a product of and contributors to it as citizens and other authorized workers.

To take away the employment authorization that DACA recipients have held for years would surely leave many employers in the lurch and cause damage to the American economy.[60] It would also, as the government notes in its proposed DACA rulemaking, "produce a great deal of human suffering" to DACA holders themselves.[61] Would doing so open up jobs for citizens? It is possible. But it is beyond naïve to believe that it will do much to prevent illegal immigration. The idea that jealously guarding employment authorization will prevent illegal immigration and preserve jobs for citizen workers ignores realities that seem unlikely to change anytime soon. In certain sectors of the economy, such as construction, housekeeping, agricultural work, and landscaping, undocumented workers already comprise more than a fifth of all workers.[62] Unless Congress enacts radical change, working in one of these jobs would probably always be an option for an unauthorized worker. Alternatively, DACA recipients, who are often highly educated, could work in professional jobs that sometimes involve an independent contractor arrangement, arguably including the solo practice of law.[63]

Yet what all these positions have in common is that they come without the benefits that go with a formal employment relationship, including minimum wage, overtime, and unemployment insurance, as well as the protections of employment and labor laws like the Fair Labor Standards

---

impacts of the new DACA rule based on available economic studies that on the whole show "little evidence that immigration significantly affects the overall employment levels of native-born workers" and a "very small" impact of immigration on the wages of native workers, with the largest impact falling on prior immigrants and high school dropouts. 86 Fed. Reg. 53736, 53801 (quoting National Academies of Sciences, Engineering, and Medicine, The Economic and Fiscal Consequences of Immigration (2017), https://www.nap.edu/catalog/23550/the-economic-and-fiscal-consequences-of-immigration).

59.      Bill Ong Hing, *Beyond Daca-Defying Employer Sanctions Through Civil Disobedience*, 52 U.C. DAVIS L. REV. 299, 302–03 (2018).

60.      *Id.* at 302.

61.      Deferred Action for Childhood Arrivals, 86 Fed. Reg. at 53,736, 53,811.

62.      Nicole Prchal Svajlenka, *Protecting Undocumented Workers on the Pandemic's Front Lines*, CENTER FOR AMERICAN PROGRESS tbl. 2 (Dec. 2, 2020, 9:04 AM), https://www.americanprogress.org/issues/immigration/reports/2020/12/02/493307/protecting-undocumented-workers-pandemics-front-lines [https://perma.cc/MRC5-5ABR].

63.      *See In re Garcia*, 58 Cal. 4th 440, 462, 315 P.3d 117, 131 (2014) (noting a disagreement between the briefs filed by the Committee and Petitioner and the amicus brief filed by the Department of Justice on the question of whether an undocumented immigrant without employment authorization "could lawfully practice law in this country as an 'independent contractor,' for example, as a sole practitioner.")

56

Work and Employment for DACA Recipients

Act, National Labor Relations Act, Occupational Safety and Health Act, Family Medical Leave Act, and Title VII of the Civil Rights Act.[64] Denying employment authorization to DACA recipients will not prevent them from legally working; it will instead prevent them from being formally employed, and one of the main consequences of this is to deny them access to workplace protections and benefits enjoyed by other American workers.[65] Given that DACA recipients have commonly spent much of their lives in the United States, they deserve these protections. Moreover, assuring broad access to them inures to the benefit of all American workers, since it prevents a "race to the bottom" as employers seek to farm out work to independent contractors.[66]

### Conclusion

The text of the INA and its longstanding regulations authorize the government to grant employment authorization to deferred action recipients. Yet the Fifth Circuit in *Texas I* and the District Court in *Texas II* divined proof of the opposite in their visions of immigration policy. The history described in this essay is presented to refute these courts' view of policies surrounding immigrant work. However, under a textualist interpretation, the simple language of the statute should dispositively clarify that the provision of employment authorization to those with deferred action is not contrary to the INA, and thus does not support a substantive APA claim against DACA. That leaves, then, the question of whether the grant of lawful presence for certain collateral purposes flies so far in the face of the INA as to render the program unlawful—a topic beyond the scope of this essay. Other scholars have debated the unlawful presence question, and the government's notice of proposed rulemaking for DACA addresses it at length.[67] The government also takes the position that if any one of the three principal aspects of the program—deportation forbearance, employment authorization, and lawful presence—are held to be unlawful, the remaining aspects are severable.[68] This means that a court could find the provision of lawful presence to be contrary to the INA yet uphold the deportation forbearance and employment authorization aspects of the program.

With Congress deadlocked on immigration reform, the stakes for DACA recipients and the country as a whole are profound. DACA recipients have a legal right to work in many ways in the United States even

64.  Heeren, *supra* note 26, at 269–71.

65.  *Id.*

66.  *See* Michael J. Wishnie, *Prohibiting the Employment of Unauthorized Immigrants: The Experiment Fails*, 2007 U. Chi. Legal F. 193, 214 (2007); Saucedo, *supra* note 56, at 480.

67.  *See* Kagan, *supra* note 3; Deferred Action for Childhood Arrivals, 86 Fed. Reg. 53,736, 53,760–62.

68.  Deferred Action for Childhood Arrivals, 86 Fed. Reg. at 53,772

Yale Journal on Regulation Bulletin                    Vol. 39:46 2021

without employment authorization. Yet without employment authorization, they will be confined to precarious work without access to protections and benefits that their classmates and colleagues enjoy. Cutting DACA recipients off from formal employment and the protections and benefits that go with it will do little or nothing to prevent illegal immigration or serve any other policy goals that can purportedly be inferred from the contradictory INA. There is little justification for enacting this sort of caste system, and it would likely seem antithetical to the founders who believed in a natural right to work to feed oneself and support one's family. This same conception of individual autonomy and personal responsibility should resonate with many conservative thinkers today, and offers a counterweight to the policy justifications cited by some courts for finding employment authorization for deferred action recipients unlawful. Yet at the end of the day, the plain text of the statute itself should validate the hard work that DACA recipients have been doing for themselves and the country.

58

Labour Economics 61 (2019) 101757



| Contents lists available at ScienceDirect |
| --- |
| **Labour Economics** |
| journal homepage: www.elsevier.com/locate/labeco |



# The wage penalty to undocumented immigration ☆



George J. Borjas [a],[*], Hugh Cassidy [b]

[a] Harvard University, United States
[b] Kansas State University, United States

## A B S T R A C T

This paper examines the determinants of the wage penalty experienced by undocumented workers, defined as the wage gap between observationally equivalent legal and undocumented immigrants. Using recently developed methods that impute undocumented status for foreign-born persons sampled in microdata surveys, the study documents a number of empirical findings. Although the unadjusted gap in the log hourly wage between the average undocumented and legal immigrant is very large (over 35%), almost all of this gap disappears once the calculation adjusts for differences in observable socioeconomic characteristics. The wage penalty to undocumented immigration for men was only about 4% in 2016. Nevertheless, there is sizable variation in the wage penalty over the life cycle, across demographic groups, across different legal environments, and across labor markets. The flat age-earnings profiles of undocumented immigrants, created partly by slower occupational mobility, implies a sizable increase in the wage penalty over the life cycle; the wage penalty falls when legal restrictions on the employment of undocumented immigrants are relaxed (as with DACA) and rises when restrictions are tightened (as with E-Verify); and the wage penalty responds to increases in the number of undocumented workers in the labor market, with the wage penalty being higher in those states with larger undocumented populations.

## 1. Introduction

The Department of Homeland Security (DHS) estimates that 12.1 million undocumented persons resided in the United States in January 2014 (Baker, 2017). In the past decade, Congress considered (but failed to enact) a number of proposals that would regularize the status of the undocumented population and provide a "path to citizenship." Given the large size of this population, any future change in its immigration status is bound to have significant effects on the labor market and the broader economy. But any evaluation that attempts to predict the economic impact of regularization immediately runs into a major roadblock: We know little about the economic status of the 12 million undocumented persons already living in the United States.

The study of the socioeconomic status of the undocumented is obviously hampered by the fact that no widely available microdata survey reports whether a particular foreign-born person is undocumented or not. In recent years, however, there has been progress in developing methods that attempt to impute the undocumented status of foreign-born persons at the individual level, such as the imputation algorithm for the Current Population Surveys (CPS) developed at the Pew Research Center or Warren's (2014) analogous exercise using the American Community Survey (ACS). These attempts build on the framework first proposed by Warren and Passel (1987) that attempts to estimate the size of the undocumented population. The Passel-Warren methodology, in fact, underlies the "official" estimates of this population as reported by DHS.

The Pew researchers essentially built an algorithm that considers various aspects of a person's demographic background to add a variable to a CPS microdata file indicating if a foreign-born person is "likely authorized" or "likely unauthorized" (Passel and Cohn, 2014). After being granted access to some of the Pew data files, Borjas (2017) used a variant of this algorithm to create an undocumented status identifier in all the post-1994 Current Population Surveys, and used these data to analyze the differences in labor supply behavior among undocumented immigrants, legal immigrants, and natives. The differences in work propensities were striking. Undocumented men had much larger labor force participation and employment rates than other groups in the population; the gap widened substantially over the past two decades; and the labor supply elasticity of undocumented men was close to zero, suggesting that their labor supply is very inelastic. In contrast, undocumented women had much lower participation and employment rates than other groups in the population.

This paper applies the algorithm to the American Community Survey (ACS) to measure the size and examine the determinants of the wage penalty to undocumented immigration.[1] Undocumented immigrants are likely to earn less than equally qualified legal immigrants simply because the undocumented have many fewer options in the labor market.

---

[1] The ACS data was downloaded from the Integrated Public Use Microdata Series (IPUMS) website. See Ruggles et al. (2018).

---

☆ Parts of this paper subsume research that appeared in separate unpublished working papers by Borjas (2016) and Cassidy (2017). We are particularly grateful to Mark Lopez and Jeffrey Passel of the Pew Research Center for their generosity in sharing data files. We have also benefited from the comments and reactions of Joan Llull, Joakim Ruist, and two referees.
* Corresponding author.
    E-mail address: gborjas@harvard.edu (G.J. Borjas).

https://doi.org/10.1016/j.labeco.2019.101757
Received 10 September 2018; Received in revised form 11 August 2019; Accepted 12 August 2019
Available online 14 August 2019
0927-5371/© 2019 Elsevier B.V. All rights reserved.

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

Not all jobs are available to undocumented immigrants, and the possibility of detection (and eventual deportation) may lead to exploitation of the undocumented by unscrupulous employers. Our analysis of the ACS data yields a number of potentially important findings:

(1) Although the unadjusted gap in the log hourly wage between undocumented workers and legal immigrants is large (around 35% for both men and women), much of the gap disappears after adjusting for differences in observable socioeconomic characteristics between the two groups. Two variables, educational attainment and English language proficiency, account for nearly half of the observed wage gap between the groups.

(2) The wage penalty to undocumented immigration declined between 2008 and 2016. In 2008, the wage penalty stood between 4 and 6% for both men and women. By 2016, the wage penalty had declined for both groups. Although it is difficult to ascertain why the *average* wage penalty in the national labor market has shrunk, the decline in the wage penalty coincides with the timing of actions by the Obama administration which led to a less restrictive approach to undocumented immigration. In fact, our evidence indicates that the wage penalty to specific groups of immigrants, such as those targeted by the Deferred Action for Childhood Arrivals (DACA) executive action, declined significantly after the relaxation of restrictions.

(3) The finding that the *average* wage penalty is relatively low hides a lot of variation in the penalty among different types of undocumented workers, and among undocumented workers employed in different labor markets. Not surprisingly, the (cross-section) age-earnings profile of undocumented workers lies far below that of legal immigrants (and, of course, of native workers). More strikingly, the age-earnings profile of undocumented workers is almost perfectly flat during much of the prime working years, As a result, the wage penalty for undocumented workers rises significantly over the life cycle.

(4) The evidence indicates that observationally equivalent undocumented workers and legal immigrants are not perfect substitutes. As a result, the wage penalty responds to increases in the relative size of the undocumented population. In particular, the wage penalty is larger in states with relatively larger undocumented populations: A 1 percentage point increase in the fraction of the state's workforce that is undocumented increases the wage penalty for men by about 1 percent. In addition, the wage penalty responds to the enactment of state-level legislation that restricts the employment of undocumented workers, with tighter restrictions leading to significantly larger wage penalties.

This diverse set of findings provides a foundation upon which any eventual analysis of the impact of alternative regularization proposals can be based. It is important to acknowledge at the outset, however, that the robustness of the evidence presented below depends on the validity of the procedure used to impute undocumented status at the micro level.

## 2. Imputing undocumented status in microdata files

Warren and Passel (1987) introduced the "residual" methodology used by the DHS to calculate the size of the undocumented population. The first step involves estimating how many legal immigrants should reside in the United States at a point in time. Over the years, immigration officials have tracked the number of legal immigrants admitted to the country (i.e., the number of "green cards" granted each year). Other immigration records allow us to determine how many foreign-born persons live in the United States temporarily (e.g., foreign students, business visitors, diplomats, etc.). These data enable us to apply mortality tables to the cumulative count of green cards and predict how many foreign-born persons should be legally residing in the United States at a point in time.

At the same time, many government surveys, such as the decadal census, enumerate the U.S. population and specifically ask where each person was born. These surveys provide estimates of how many foreign-born people are actually living in the country. In rough terms, the difference between the number of foreign-born persons who are actually living in the United States and the number of legal immigrants who should be living in the United States is the Warren–Passel (and now "official" DHS) estimate of the number of undocumented persons.[2]

Jeffrey Passel has continued to work on the enumeration and identification of undocumented immigrants over the past two decades. As a result of these efforts, Passel (and colleagues at the Pew Research Center) developed a comparable methodology that attempts to identify the undocumented immigrants at the *individual level* in survey data. This important extension of the Warren–Passel methodology relies on the same residual approach that was initially used to calculate the size of the undocumented population.

Passel and Cohn (2014) describe the methodology used to add an undocumented status identifier to the Annual Social and Economic Supplement (ASEC) files of the CPS. In rough terms, the algorithm identifies the foreign-born persons in the sample who are likely to be legal, and then classifies the residual group as likely to be undocumented. In closely related work, Warren (2014) used logical edits and other adjustments to impute the legal status of foreign-born persons in the ACS. After being granted access to the 2012–2013 CPS files created by Passel and Cohn (2014), Borjas (2017) "reverse-engineered" the approach and applied the algorithm to all available CPS files to examine the labor supply of undocumented immigrants. The residual method classifies a foreign-born person as a legal immigrant if any of the following conditions hold:

(a) that person arrived before 1980;

(b) that person is a citizen;

(c) that person receives Social Security benefits, SSI, Medicaid, Medicare, or Military Insurance;

(d) that person is a veteran, or is currently in the Armed Forces;

(e) that person works in the government sector;

(f) that person resides in public housing or receives rental subsidies, or that person is a spouse of someone who resides in public housing or receives rental subsidies;

(g) that person was born in Cuba (as practically all Cuban immigrants were granted refugee status);

(h) that person's occupation requires some form of licensing (such as physicians, registered nurses, air traffic controllers, and lawyers);

(i) that person's spouse is a legal immigrant or citizen.[3]

We use this algorithm to create a comparable undocumented status identifier in the American Community Survey (ACS) data beginning in 2008.[4] The only difference in the algorithms applied to the CPS and ACS data arises because the ACS does not identify whether a particular household is living in public housing or receiving subsidized rents, and thus we omit condition f from the imputation procedure for the ACS. As Fig. 1 shows, the predicted fraction of undocumented immigrants in the population at any particular age is roughly the same regardless of whether we use the Pew files in our possession (the 2012–2013 cross-sections) or the comparable ACS files, although the ACS tends to slightly overpredict the relative number of undocumented persons at younger

---

[2]  Note that government surveys, including the decadal census, miss many people. Some of the people missed are undocumented immigrants who wish to avoid detection. To calculate an estimate of the size of the undocumented population, the Warren–Passel methodology requires an assumption about the undercount rate. The DHS assumes that the undercount for undocumented persons is 10% (Baker, 2017, p. 7).

[3]  Condition i implies that a person who does not satisfy any condition between a and h, but whose spouse satisfies at least one of these conditions, would be considered legal by virtue of their spouse's legal status.

[4]  Prior to 2008, the ACS also does not report information on Medicare or Medicaid receipt, so that the classification of undocumented status in the pre-2008 ACS requires further assumptions.

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757



**Fig. 1.** Percent of population that is undocumented, by age. (Pooled 2012–2013 CPS-ASEC files, pooled 2011–2012 ACS). Notes: The figure calculates the percent of the population (at a particular age) that is foreign-born and is classified as undocumented using either the "likely unauthorized" status indicator created by Jeffrey Passel and colleagues at the Pew Research Center or my reconstruction of the undocumented status indicator in the ACS (see text for details).

**Table 1**
Comparison of summary statistics for male workers, 2012–2013.

|  | Natives | Legal No correction. | H1B correction. | Undocumented No correction. | H1B correction. |
|---|---|---|---|---|---|
| A. Pew |  |  |  |  |  |
| Percent of pop. | 80.9 | 12.4 | 12.6 | 6.6 | 6.5 |
| Average age | 41.9 | 42.7 | 42.6 | 37.4 | 37.5 |
| Education: |  |  |  |  |  |
| High school dropouts | 5.4 | 20.1 | 19.9 | 44.7 | 45.6 |
| High school graduates | 31.2 | 23.5 | 23.3 | 29.4 | 30.0 |
| Some college | 29.3 | 17.7 | 17.5 | 10.1 | 10.3 |
| College graduates | 23.4 | 21.3 | 21.5 | 9.1 | 8.6 |
| Postcollege | 10.8 | 17.3 | 17.8 | 6.6 | 5.5 |
| State of residence: |  |  |  |  |  |
| California | 9.1 | 26.1 | 26.1 | 22.5 | 22.5 |
| New York | 5.4 | 11.1 | 11.0 | 6.7 | 6.8 |
| Texas | 8.1 | 10.0 | 9.9 | 14.8 | 14.9 |
| Log wage gap | 0.000 | –0.070 | –0.062 | –0.438 | –0.460 |
| Sample size | 66,632 | 15,794 | 15,936 | 7016 | 6874 |
| B. ACS |  |  |  |  |  |
| Percent of pop. | 81.5 | 11.3 | 11.6 | 7.2 | 6.9 |
| Average age | 42.0 | 43.6 | 43.5 | 36.8 | 37.0 |
| Education: |  |  |  |  |  |
| High school dropouts | 5.6 | 19.2 | 19.0 | 42.6 | 44.5 |
| High school graduates | 31.8 | 25.7 | 25.4 | 28.9 | 30.1 |
| Some college | 31.7 | 20.4 | 20.3 | 10.7 | 11.2 |
| College graduates | 21.0 | 19.2 | 19.3 | 9.4 | 7.9 |
| Postcollege | 10.0 | 15.5 | 16.0 | 8.4 | 6.3 |
| Speaks English | – | 58.4 | 58.5 | 29.5 | 27.4 |
| State of residence: |  |  |  |  |  |
| California | 8.9 | 25.8 | 25.8 | 23.6 | 23.7 |
| New York | 5.4 | 11.0 | 11.0 | 8.2 | 8.4 |
| Texas | 7.7 | 9.9 | 9.9 | 13.5 | 13.7 |
| Log wage gap | 0.000 | –0.040 | –0.025 | –0.398 | –0.439 |
| Sample size | 980,270 | 121,699 | 124,433 | 60,889 | 58,155 |

Notes: The statistics are calculated in the sample of men aged 21–64 who are not enrolled in school, are not self-employed, and report positive wage and salary income, weeks worked, and usual hours worked weekly.

ages. The figure also shows that the life cycle trend in the fraction of persons who are imputed to be undocumented in the ACS closely tracks the fraction predicted in the original Pew CPS files.

To further document that our application of the algorithm to the ACS leads to very similar results as those implied by the Pew CPS files, Table 1 reports summary statistics for the samples of male working natives, legal immigrants, and undocumented persons in both the Pew CPS

and the ACS 2012–2013 cross-sections. The corresponding results for women are reported in Appendix Table A1. The sample is restricted to persons aged 21–64 who are not enrolled in school, and who report positive wage and salary income in the previous calendar year, positive weeks worked, and positive usual hours worked weekly.

As illustrated in Table 1, the Pew residual method suggests that a strikingly large number of undocumented workers have high levels of

AR2022_500728

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

educational attainment. For example, 17.8% of the undocumented male population in the ACS have at least a college degree. Although this surprising result has not been explored in any of the previous studies that impute an undocumented status indicator in micro data, we suspect that the typical imputation algorithm misclassifies many highly educated immigrant workers. Specifically, the algorithms do not "filter out" the large sample of high-skill immigrants who are in the United States temporarily under the auspices of the "high tech" H-1B program. In fact, Albert (2019) reports that the algorithm (and the Pew methodology it is based on), while very accurate for low-skilled immigrants, mistakenly classified around 25% of college educated immigrants as undocumented. This inaccuracy suggests that accounting for the legal status of H-1B immigrants may be appropriate.

In this paper, we refine the Pew algorithm by adding an additional filter to the list above, further classifying a person as a legal immigrant if he or she is likely to be an H-1B visa-holder. Specifically, we assume that a foreign-born person is likely to be in the country with an H-1B visa if: (1) the immigrant works in an occupation that commonly employs H-1B visa holders (such as computer programmer)[5]; (2) the immigrant has resided in the United States for six years or fewer (i.e., the maximum length of time an H-1B visa is valid); and (3) the immigrant is at least a college graduate. As Table 1 shows, the application of the H-1B filter reduces the fraction of undocumented immigrant men with at least a college degree from 17.8 to 14.2%. Note, however, that both the original Pew files and our imputation in the ACS still produce a relatively large number of undocumented workers with high levels of educational attainment. We use the H-1B filter throughout the empirical analysis reported in this paper.[6]

There is a lot of similarity in the socioeconomic characteristics of the three demographic groups across the two data extracts. Among men, for example, the fraction of the population that is undocumented is 6.5% in the Pew CPS and 6.9% in the ACS. The average age of undocumented immigrants is the same in the two files (about 37 years). And 45.2 of undocumented men in the Pew files are high school dropouts, as compared to 44.0% in the ACS files.

We also calculated the hourly wage rate for each worker in the sample (defined as wage and salary income divided by the product of weeks worked in the past year and usual hours worked weekly). Table 1 also shows that the log wage gap between undocumented workers and natives is similar across the data sets. The wage disadvantage of undocumented men is −0.398 log points in the Pew CPS and −0.414 log points in the ACS data (equivalent to about a 33% wage gap between the two groups). The comparable statistics reported in Table A1 for undocumented women imply that an equally large wage disadvantage (of about −0.385 log points in the ACS).

The validity of the evidence presented below hinges on the accuracy of the undocumented status indicator in the original Pew algorithm. In the absence of administrative data on the characteristics of the undocumented population, it is not possible to quantify the direction and magnitude of any potential bias. We can, however, compare key socioe-conomic characteristics in our sample with comparable data in samples of undocumented immigrants created by other researchers using different methods. For instance, the Center for Migration Studies (CMS) has also developed an analogous method of imputing legal status in the ACS (Warren, 2014).[7] The CMS method uses individual characteristics (including birthplace, occupation, or the receipt of public benefits) to classify some immigrants as likely legal. The CMS also makes further adjustments by country of origin and incorporates a correction for the undercount of undocumented persons (our methodology does *not* perform any reweighting).[8] Table 2, adapted from Warren (2014, Table 2), compares the total predicted size of the undocumented population as well as its geographic distribution using alternative methods, and adds results from our own imputation in the ACS. It is evident that the geographic distribution of undocumented immigrants in our imputed ACS data is broadly consistent with the distribution predicted by the four alternative methodologies summarized in the Warren study. It seems, therefore, that our approach closely duplicates the undocumented population examined in other studies.

## 3. Estimating the wage penalty

We calculate the wage penalty to undocumented status by estimating the following Mincerian wage regression in the sample of working immigrants:

$$\log w_i = \beta h_i + \beta_L L_i + \varepsilon_i, \tag{1}$$

where $w_i$ is the hourly wage rate of worker $i$; $h_i$ is a vector of socioeconomic characteristics that affect earnings; and $L_i$ is a dummy variable that equals one if the worker is a legal immigrant. The coefficient $\beta_L$ measures the wage penalty, with a positive value indicating the earnings advantage enjoyed by legal immigrants over observationally equivalent undocumented workers.

It is also possible to calculate the wage penalty by instead performing an Oaxaca–Blinder decomposition that yields the predicted wage disadvantage of the average undocumented immigrant arising from differential treatment in the labor market (i.e., allows the coefficient vector $\beta$, the returns to socioeconomic charactersitics, to vary by legal status). One alternative definition of the wage penalty would calculate by how much the earnings of the average undocumented immigrant increased if he or she were "treated" just like an observationally equivalent legal immigrant in the labor market.

It is unlikely, however, that observationally equivalent legal immigrants and undocumented immigrants are perfect substitutes in production (and the empirical evidence reported below shows that they are not). Even putting aside the possibility the two groups might have different unobservable skill sets, legal restrictions prevent employers from viewing one type of immigrant as a clone of the other type.[9] As a result, the relative number of undocumented immigrants in a particular labor market actually affects the structure of wages (and hence the

---

[5]  The list of occupations assumed to commonly employ H-1B visa holders are computer and information system managers; computer and mathematical occupations; architecture and engineering occupations; and postsecondary teachers. These occupations account for over 80% of all H-1B petitions filed in 2017 (U.S. Citizenship and Immigration Services, 2018a).

[6]  Our H-1B filter identifies 598,000 foreign-born persons as H-1B visa holders, which is in the ballpark of what one would expect to be the steady-state number of that population (i.e., the visa is capped at 85,000 visas per year, and the visa lasts 6 years). It may be that H-1B visa holders stay in the country beyond the sixth year while waiting to adjust their status because of country-specific quotas on the number of green cards available. An alternative filter might define H-1B status only by education and occupation. However, the predicted number of H-1B visa holders if one ignores the 6-year limitation is 2.1 million, which seems far too large to be consistent with the number that is expected to reside in the country.

[7]  See also Van Hook et al. (2015), which evaluates various methods of imputing the legal status of immigrants using Monte Carlo simulations.

[8]  Specifically, the CMS algorithm assigns each immigrant a likely legal status based on individual characteristics, in a manner similar to our approach. Two additional steps are then performed: (1) likely undocumented are randomly sampled at a rate that varies by country of origin; and (2) undercounting of undocumented immigrants is accounted for by re-weighting the microdata, depending on year of arrival.

[9]  Cotton (1988, p.238) makes a related point in the context of measuring racial wage discrimination. In his discussion of whether to use the black or the white regression coefficients to measure discrimination he writes: "…each comparison abstracts from the central reality of wage and other forms of discrimination: not only is the group discriminated against undervalued, but the preferred group is overvalued, and the undervaluation of the one subsidizes the overvaluation of the other. Thus, the white and black wage structures are both functions of discrimination and we would not expect either to prevail in the absence of discrimination."

**AR2022_500729**

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

**Table 2**
Geographic distribution of the undocumented population in 2010, using alternative methodologies.

|  | Borjas–Cassidy | CMS | Warren and Warren | DHS | Pew Research Center |
|---|---|---|---|---|---|
| US Total (thousands) | 12,256 | 11,725 | 11,725 | 11,570 | 11,400 |
| Distribution by state (%): |  |  |  |  |  |
| California | 23.6 | 24.9 | 25.0 | 25.2 | 21.9 |
| Texas | 13.7 | 14.7 | 13.7 | 15.4 | 14.5 |
| New York | 7.9 | 7.8 | 6.0 | 6.0 | 7.0 |
| Florida | 7.3 | 6.7 | 8.5 | 6.3 | 7.9 |
| Illinois | 4.8 | 5.1 | 5.0 | 4.8 | 4.4 |
| New Jersey | 4.3 | 4.1 | 3.5 | 3.8 | 4.4 |
| Georgia | 3.4 | 3.4 | 3.4 | 3.7 | n/a |
| North Carolina | 2.8 | 2.9 | 3.2 | 3.4 | n/a |
| Arizona | 2.4 | 2.6 | 2.9 | 3.0 | n/a |
| Washington | 2.0 | 2.0 | 2.2 | 2.2 | n/a |
| Other states and DC | 27.7 | 25.9 | 26.6 | 26.3 | n/a |

Notes: The first column shows the geographic distribution of the undocumented by state in 2010 applying our methodology across the whole population. The remaining columns show the distribution using alternative methodologies, with data derived from Table 2 in Warren (2014).

coefficient vector $\beta$) for both groups.[10] Any large-scale legalization initiative would then influence the wage-setting decisions by employers and change the $\beta$ vectors for both legal and undocumented workers. Running a Mincerian wage regression on the pooled sample of legal and undocumented immigrants, where the vector $\beta$ gives the returns to socioeconomic characteristics for the average worker, bypasses this problem.[11]

To document that our application of the Pew residual method to the ACS does not alter the nature of the empirical evidence, we initially focus on the 2012–2013 period. As noted earlier, we have access to the pooled 2012–2013 CPS files created by the Pew Research Center, which allows us to compare the estimates of the wage penalty in those years to those obtained in the ACS. After we establish the similarity between the estimates, we can then expand the analysis to other periods and other samples in the much larger ACS data files.[12] To simplify the presentation, we pool the two cross-sections and treat them as a single data set.

Table 3 reports the wage penalty results. For the Pew data, we only report a single specification where the vector $h$ includes age, state of residence, years since migration, educational attainment, and country of birth.[13] For the ACS regression, we add a vector of fixed effects that characterizes the worker's English language proficiency, a variable that is not available in the CPS but which is likely an important component of an immigrant's human capital stock. In fact, there are sizable differences between the English language skills of undocumented and legal immigrants, with legal immigrants being far more proficient. The ACS data indicate that 16.3% of undocumented immigrants reported not speaking

English at all, as compared to only 4.1% of legal immigrants. Similarly, 59.4% of legal immigrants reported they spoke either only English or English "very well," as compared to only 28.9% of undocumented immigrants.

The top three rows of Table 3 show the overall "raw" difference in log wages between legal and undocumented immigrants, the wage gap that is explained by the control variables, and the unexplained portion, which is our estimate of the wage penalty.

There are several interesting findings in the table. First, the Pew CPS and ACS data generate very similar estimates of the raw wage gap between legal and undocumented immigrants, as well as of the adjusted wage penalty. Among men, for example, the raw wage gap is approximately 39.8% in the Pew CPS and 41.3% in the ACS. Adjusting for age, state of residence, years since migration, educational attainment, and country of birth implies an estimated wage penalty of 6.0% in the Pew CPS and of 8.6% in the ACS. Among women, the estimated wage penalty is 4.6% in the CPS and 6.3% in the ACS. In short, our application of the residual methodology to the ACS data yields similar estimates of the wage penalty as those obtained in the Pew CPS files.

It turns out, however, that these estimates of the wage penalty are "too big," as adding English language proficiency fixed effects to the regression model further reduces the wage penalty in the ACS, from 8.6 to 6.1% for men and from 6.3 to 4.2% for women. In short, after controlling for an extensive set of observable individual characteristics, we find there is a positive and significant wage penalty to undocumented immigration, but it is numerically small—on the order of 4–6%.[14]

This striking finding raises a number of interesting questions. For example, which differences in observable characteristics play a larger role in generating the observed wage gap between legal immigrants and undocumented workers? In other words, while introducing the full set of characteristics dramatically lowers the estimate of the wage penalty $\beta_L$, how much does each set of covariates contribute to the reduction?

Gelbach (2016) presents a methodology that allows us to decompose the contribution of each set of covariates (e.g., education) to the change in the estimated wage penalty. The advantage of this approach over the more common procedure of sequentially adding each set of covariates

---

[10] Ortega, Edwards, and Hsin (2018) simulate the impact of DACA on the wage structure of both legal and undocumented workers who do not change status. Because of the small number of DACA recipients relative to the immigrant population, the effects are minimal.

[11] The estimate of the wage penalty given by the regression in Eq. (1) is numerically identical to that implied by the Oaxaca-Blinder decomposition method if the reference coefficients for the socioeconomic characteristics are estimated on the pooled sample of legal and undocumented immigrants.

[12] Because the CPS reports earnings in the previous calendar year, the analysis uses the comparable 2011 and 2012 cross-sections of the ACS.

[13] Age is included as a vector of fixed effects indicating a worker's age 5-year bands (20–24, 25-29, and so on); state of residence is included as a vector of 51 fixed effects; years since migration is included as a fourth-order polynomial; educational attainment is included as a vector of fixed effects indicating if the worker has less than 12 years of schooling, 12 years, 13–15 years, 16 years, or more than 16 years; and country of birth is included as a vector of fixed effects using all the information in the CPS or ACS data. The vector of fixed effects indicating English proficiency uses all the information contained in the English language variable in the ACS.

[14] Ortega and Hsin (2018) use the ACS data from 2010–2012 which contains legal status based on the CMS methodology. The authors find that, due to occupational barriers, lacking legal status reduces undocumented immigrants' productivity by 12%. They also find wage gaps (see Table 4 of their paper) between legal and undocumented immigrants that are larger than those reported in our paper, though their imputation methodology does not correct for potential H-1B immigrants. Hotchkiss and Quispe-Agnoli (2013), who identify undocumented workers using state administrative data, also find that the large difference in wages between legal and undocumented immigrants is mostly attributable to differences in observed characteristics.

G.J. Borjas and H. Cassidy

*Labour Economics 61 (2019) 101757*

**Table 3**
Wage penalty to undocumented status in the 2012–2013 cross-section.

| | Men Pew | ACS (1) | (2) | Women Pew | ACS (1) | (2) |
|---|---|---|---|---|---|---|
| Difference | 0.398 | 0.413 | 0.413 | 0.358 | 0.385 | 0.385 |
| | (0.009) | (0.003) | (0.011) | (0.004) | (0.003) | (0.004) |
| Explained | 0.338 | 0.327 | 0.352 | 0.311 | 0.322 | 0.343 |
| | (0.005) | (0.003) | (0.003) | (0.009) | (0.003) | (0.003) |
| Unexplained | 0.060 | 0.086 | 0.061 | 0.046 | 0.063 | 0.042 |
| | (0.009) | (0.003) | (0.003) | (0.011) | (0.004) | (0.004) |
| Fraction explained by: | | | | | | |
| Age | 0.011 | 0.021 | 0.035 | −0.002 | 0.005 | 0.016 |
| | (0.002) | (0.001) | (0.001) | (0.002) | (0.001) | (0.001) |
| State of residence | 0.002 | 0.003 | 0.004 | 0.007 | 0.009 | 0.009 |
| | (0.002) | (0.001) | (0.001) | (0.002) | (0.001) | (0.001) |
| YSM | 0.053 | 0.080 | 0.057 | 0.061 | 0.090 | 0.066 |
| | (0.003) | (0.002) | (0.002) | (0.004) | (0.002) | (0.002) |
| Education | 0.195 | 0.168 | 0.144 | 0.171 | 0.160 | 0.136 |
| | (0.005) | (0.002) | (0.002) | (0.006) | (0.002) | (0.002) |
| Birthplace | 0.078 | 0.056 | 0.042 | 0.075 | 0.059 | 0.048 |
| | (0.005) | (0.002) | (0.002) | (0.006) | (0.002) | (0.002) |
| English | – | – | 0.071 | – | – | 0.067 |
| | – | – | (0.001) | – | – | (0.002) |

Notes: Standard errors are reported in parentheses. The dependent variable gives a worker's log hourly wage rate. The statistics reported in the table are the results from a Mincerian wage regression that includes controls for survey year, age, educational attainment, state of residence, years-since-migration, and birthplace, while ACS columns (2) add English language proficiency. The rows labeled "Difference", "Explained", and "Unexplained" indicate the raw wage gap between legal and undocumented immigrants, the amount of that gap that is explained by the covariates, and the amount that remains unexplained, respectively. Each covariate row under "Fraction explained by:" indicate the fraction of the explained portion of the wage gap explained by that set of covariates (Gelbach, 2016). The years-since-migration variable is introduced as a fourth order polynomial; the age, education, state of residence, birthplace, and English language proficiency variables are introduced as vectors of fixed effects.

and simply documenting the change in the coefficient is that the Gelbach methodology accounts for the correlations among sets of covariates. In the presence of such correlations, the order in which each set of covariates is added impacts the interpretation of the results, whereas the Gelbach decomposition is independent of any sequential introduction of sets of covariates.[15]

The bottom panel of Table 3 reports the part of the wage gap "explained" by each of the covariate groups in our regression model. For example, differences between the two groups in the values of the covariate group "age" (which stands for a vector of nine age fixed effects) leads to a 3.5 percentage point wage gap for men, while the covariate group "state of residence" generates only a 0.4 percentage point wage gap. It is evident that the covariate groups that "matter," in terms of explaining a large part of the observed wage gap, are years since migration (with undocumented immigrants having been in the United States for a shorter period), educational attainment, and English proficiency. For men, these three sets of variables together generate a 27.2% wage gap, about two-thirds of what is actually observed; and differences in educational attainment alone generate a 14.4% wage gap, about a third of what is actually observed. Similar results are obtained for women.[16]

Having established the similarity between the Pew CPS and the ACS results, we can now extend the analysis to other ACS cross sections and subgroups of the population. We first explore how the wage penalty evolved over the past decade. Specifically, we conduct our decomposition exercise separately in each of the ACS cross-sections between 2008

and 2016, using the full model specification that includes English language proficiency. The top panel of Fig. 2 illustrates the trend in the wage penalty for the entire male workforce, as well as for low-skill (i.e., at most a high school education) and high-skill (i.e., at least some college) workers.[17] The bottom panel of the figure duplicates the analysis for the female workforce.[18]

It turns out that the wage penalty for undocumented men was relatively stable at about 5–6% through 2013, at which time it began a noticeable, and statistically significant, decline. In 2013, for example, the wage penalty for the average male worker was 6.7 percentage points (with a standard error of 0.6), but it declined to 4.1 percentage points by 2016 (with a standard error of 0.6).

The figure also illustrates the analogous trends in the wage penalty for low- and high-skill workers. Both groups exhibit the post-2013 decline in the wage penalty, with the decline being steeper for high skill undocumented workers. The wage penalty for low-skill workers stood at 8.3% in 2013, before beginning its decline and ending up at 6.6% in 2016. In contrast, the wage penalty for high-skill workers was 6.1% in 2013, but by 2016 had declined to 2.7%. As the descriptive statistics reported in Table 1 show, there are a surprisingly large number of high-skill workers in the undocumented population. Both the Pew CPS and the ACS suggest that about 14% of undocumented men have at least a college diploma (even after applying the filter for H-1B status), and that an additional about 11% have some college education. The debate over undocumented immigration in the United States has focused on its

---

[15] We use the Stata package "b1x2" to perform the decomposition.

[16] Adding occupation controls to the decomposition further lowers the wage penalty to 2.7% for men and to near zero for women in the ACS, and occupation explains 15.3 and 17.7 percentage points of the wage gap between legal and undocumented immigrants for men and women, respectively.

[17] The standard error of the wage penalty in any given year is about 0.006 for men and 0.008 for women.

[18] The wage penalty for low- or high-skill workers is calculated by estimating the regression model separately in the samples of low- or high-skill workers.

AR2022_500731

G.J. Borjas and H. Cassidy *Labour Economics 61 (2019) 101757*

**A. Men**



**Fig. 2.** Trend in the wage penalty for undocumented workers. Notes: Figures show the log hourly wage penalty between legal and undocumented immigrants calculated with Mincerian wage regressions estimated separately in each cross-section that include controls for age, educational attainment, state of residence, years-since-migration, birthplace, and English language proficiency. The wage penalty values shown are the coefficients on legal status. "Low-skill" and "high-skill" include workers who are high school graduates or less and workers with more than a high school degree, respectively. All results calculated from the ACS.

**B. Women**



impact on the low-skill labor market, and the presence and labor market impact of high-skill undocumented immigrants has been ignored.

The bottom panel of Fig. 2 illustrates the analogous trends in the wage penalty estimated in the sample of women. As with men, the key finding is that there has been a long-term decline in the average wage penalty to undocumented women, with the decline beginning a bit earlier (around 2010). In 2010, the wage penalty for women stood at over 5%. By 2016, it had fallen to about 2%. The decline in the female wage penalty was also steeper for high-skill women. As noted earlier, however, undocumented women have very low employment rates, so that it is difficult to disentangle the impact of self-selection biases in the labor supply decision from secular trends in the wage penalty.[19]

It is of interest to compare our estimate of the wage penalty obtained from adding an undocumented identifier to the ACS to existing estimates of how much legalization raises the wage of undocumented workers. Almost all existing estimates of this wage penalty come from studies that examine what happened to the earnings of the persons who received amnesty in 1986 as part of the Immigration Reform and Control Act (IRCA). Nearly 3 million undocumented immigrants received amnesty at the time, and contemporaneous surveys tracked those immigrants as they received their legal working papers (Kossoudji and Cobb-Clark, 2002; and Kaushal. 2006). Their wage rose by at most 6% between 1989 and 1992. The estimates of the wage penalty implied by the ACS around 2008 (the earliest year available where the ACS provides the requisite information required to identify undocumented status), are very similar (around 4–6%). In short, the existing estimates of the wage penalty (based on measuring the wage impact of the IRCA amnesty) closely resemble the penalty implied by the wage data in the early years of our ACS cross-sections.[20]

It is difficult to identify precisely which factor drove the decline in the wage penalty in the national labor market after 2013.[21] A number

---

[19] We also estimated the wage penalty and its trend using the alternative approach of holding constant the demographic composition of the immigrant population, and then using those fixed characteristics to compute the average wage for legal and undocumented immigrants in each ACS cross-section. Specifically, we calculated (by gender) the distribution of immigrants across demographic cells using the pooled 2008-2016 ACS (where the cells are defined in terms of education, English language proficiency, age, years-since-migration, and state of residence). We then use those shares to get a weighted average of the log wage for legal and undocumented immigrants each year. This approach also reveals a decline of 3→+5 percentage points in the wage penalty starting around 2012 or 2013.

[20] Rivera-Batiz (1999, p. 106) looks specifically at Mexican undocumented immigrants using the 1990 Census. His results are similar to those reported in this paper, and he concludes that: "The most important characteristics in explaining the wage gap are: schooling, English proficiency, and recency of immigration."

[21] One stumbling block is that the composition of the undocumented population has changed in unknown ways during this period. The estimated number of undocumented immigrants (as reported by the DHS) rose between 2000 and 2006, and held relatively steady through 2016. The constant number of un-

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757



**Fig. 3.** Trend in the wage penalty for undocumented workers in specific cohorts.

Notes: Figures show the log hourly wage penalty between legal and undocumented immigrants calculated with Mincerian wage regressions estimated separately in each cross-section that include controls for age, educational attainment, state of residence, years-since-migration, birthplace, and English language proficiency. The wage penalty values shown are the coefficients on legal status. "Low-skill" and "high-skill" include workers who are high school graduates or less and workers with more than a high school degree, respectively. All results calculated from the ACS.

of sensitivity exercises can be conducted, however, that help to further identify the groups that experienced a substantial decline in the wage penalty and that may suggest a potential source for the decline. For example, we can examine what happened to the entry wage disadvantage of *new* undocumented immigrants over the past decade. We define a recent immigrant as someone who arrived in the 3-year period prior to the ACS cross-section, and we define an "older" immigrant as someone who has been in the United States more than 10 years. Because of the small number of "new" immigrants (only about 5% of legal immigrants and 12% of undocumented immigrants are recent arrivals), we pool the sample of male and female workers to calculate the wage penalty.[22] Fig. 3 illustrate the wage trends for the new and the earlier immigrants.

It is evident that the wage penalty associated with undocumented status for the newly arrived immigrants shrank substantially in the post-2011 period. The wage penalty to new immigrants fell from 10.7% in 2011 to 5.0% (with a standard error of 1.5) by 2016. In contrast, the trend in the wage penalty accruing to undocumented immigrants who have been in the United States more than 10 years was more stable, with the wage penalty declining by only about 2 percentage points (from about 6% in 2013 to 4% in 2016).

One plausible explanation for the decline in the wage penalty for the newly arrived immigrants is that there was a favorable shift in the legal environment regarding undocumented immigration during the years of the Obama administration. It seems plausible to argue that the shift would particularly benefit newly arrived immigrants, as they better represent the "marginal" worker in the labor market that will most quickly be affected by the implied changes in the legal environment. Unfortunately, the time-series giving the trend in the national wage penalty do not provide sufficient information that would help identify the impact of such *economy-wide* changes in the labor market for undocumented workers. There is evidence, however, suggesting that changes in the legal environment at the federal level *do* affect the national wage penalty

(and we will show below that corresponding changes in the local legal environment also influence the wage penalty in the local labor market).

On June 15, 2012, President Barack Obama issued an executive action that grants undocumented immigrants who entered the United States as children a temporary reprieve from the threat of deportation as long as some eligibility requirements were met. The undocumented persons who qualify for the Deferred Action for Childhood Arrivals (DACA) program are immigrants who entered the United States under the age of 16, were at most 31 years old at the time the executive action was taken, and had at least a high school (or equivalent) education. The executive action permits these immigrants to work as if they were legal immigrants. In other words, the DACA program potentially represents a substantial change in labor market opportunities for the eligible undocumented workers in the national labor market, and it would be important to determine if it led to a reduction in the wage penalty for the affected workers.

We can use the ACS data to determine if the wage penalty for the DACA-eligible population fell towards the end of our sample period.[23] Because of the relatively small sample of undocumented immigrants who can potentially benefit from DACA, we use a simpler strategy to estimate how the wage penalty responded to the executive action. In particular, we pool the sample of all immigrants (legal and undocumented) who satisfy the *demographic* requirements for DACA eligibility: the immigrant must have migrated to the United States before the age of 16, be at most 31 years old in 2012, and have at least a high school education. In the 2012 ACS, 30.1% of the workers in this sample were undocumented and would qualify for the benefits provided by DACA.

We estimate a regression in this sample of persons relating the worker's log hourly wage rate on a variable indicating if the worker was a legal immigrant, holding constant the set of demographic characteristics used throughout this section (i.e., age, sex, educational attainment, English language proficiency, state of residence, and country of birth). The coefficient of the legal status indicator, of course, measures the wage penalty. To isolate the impact of the DACA executive action on the wage penalty just before and after the 2012 announcement, we restrict the analysis to the 2010–2016 ACS cross-sections. We then interact the legal status indicator with variables indicating if the observation

---

documented persons does *not* imply that the flow of undocumented immigrants stopped altogether in 2006. Some of the undocumented persons present in the United States in 2006 may have left the country and many may have been able to adjust their immigration status and obtain a green card. These "exits" were then replaced by a similarly sized flow of new undocumented immigrants. We lack the requisite information to precisely measure how much of the decline in the wage penalty can be accounted for by changes in the sample composition of the relevant populations over the past decade.

[22] Note that although the pooling of male and female workers helps alleviate the small sample issue, it also introduces a problem. Nearly half of the undocumented women do not work so that wage trends in this sample are likely influenced by sample selection.

[23] Pope (2016) also uses the ACS to test the impact of DACA and finds that it increased the labor force participation and reduced the unemployment of eligible unauthorized immigrants, though only raised income for unauthorized immigrants in the bottom of the income distribution. Amuedo-Dorantes and Antman (2017) find that DACA reduced the probability of school attendance, consistent with a lack of legal work status leading to a substitution away from work and towards schooling.

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

**Table 4**
The impact of DACA on the wage penalty.

| | Schooling > 12 | | Schooling = 12, not enrolled | |
| | Excludes enrolled (1) | Includes enrolled (2) | DACA eligible (3) | Not DACA eligible, but age <31 as of 2012 (4) |
|---|---|---|---|---|
| Legal status indicator | 0.064 | 0.069 | 0.068 | 0.039 |
| | (0.008) | (0.007) | (0.011) | (0.012) |
| Legal status indicator interacted with: | | | | |
| 2010–2011 | –0.013 | –0.011 | –0.004 | 0.030 |
| | (0.011) | (0.010) | (0.016) | (0.017) |
| 2012–2013 | – | – | – | – |
| 2014 | –0.023 | –0.022 | –0.016 | 0.022 |
| | (0.012) | (0.011) | (0.017) | (0.018) |
| 2015 | –0.017 | –0.023 | –0.023 | 0.024 |
| | (0.013) | (0.011) | (0.017) | (0.018) |
| 2016 | –0.038 | –0.045 | –0.045 | 0.028 |
| | (0.012) | (0.011) | (0.017) | (0.017) |
| Includes school enrollment indicator | No | Yes | No | No |
| Number of observations | 89,759 | 119,231 | 34,433 | 32,982 |

Notes: Standard errors are reported in parentheses. The sample in columns (1) and (2) consists of working immigrants who meet the demographic qualifications for DACA: aged 31 or less in 2012, have at least a high school education, and who migrated to the United States when they were 16 years old or younger. The sample in column (3) adds the further restriction that the immigrants have exactly 12 years of schooling. The sample in column (4) consists of workers who do not meet the demographic qualifications for DACA, but were 31 years old or younger in 2012. The regression includes vectors of fixed effects for age, gender, educational attainment, English language proficiency, state of residence, and birthplace.

is drawn from a particular cross-section, allowing us to document the trend in the wage penalty. Table 4 presents the relevant coefficients.

Before proceeding to discuss the coefficients, it is worth noting that it took a while for the DACA program to go into effect. Only 1687 applications had been approved by the end of the 2012 calendar year, and many more (472,378) were approved during the 2013 calendar year (U.S. Citizenship and Immigration Services, 2014). Much of the initial implementation of the program, therefore, took place over the 2012–2013 period, and we use this period as the baseline for our analysis.

The first column of Table 4 shows that the wage penalty in the demographic sample potentially affected by DACA stood at 6.4% during this baseline period. However, note that the wage penalty began to decline after 2014. By 2017, it had dropped by 3.8 percentage points.

The DACA executive action obviously encourages further education for the affected undocumented immigrants (as one needs at least a high school diploma to qualify for the benefits that DACA imparts).[24] Our empirical study of the wage penalty has been restricted to workers not enrolled in school. In the DACA context, however, this restriction might generate results that miss some of the potential impact of the executive action. The second column of the table replicates the analysis using the larger sample of DACA-eligible immigrants, which includes those who are enrolled in school (but report earnings). The regression suggests that the measured decline in the wage penalty in the post-DACA period is slightly larger, about 4.5 percentage points.

Note that the regression analysis reported in Table 3 is, in an important sense, "tracking" a particular cohort of immigrants (those who satisfy the demographic restrictions in DACA, whether legal or not) across ACS cross-sections. For example, the average age of a worker in our sample is 25.2 in 2010 and 28.5 in 2016. As a result, there may be life cycle effects on the wage penalty that contaminate the secular trend, and we might be mistakenly attributing any life cycle effects to DACA.

A simple way of showing that DACA does indeed seem to have an impact is to further refine the sample to workers not enrolled in school who have exactly 12 years of schooling, leading to a much more focused "tracking" of a particular set of workers.[25] In 2012, 64.5% of the

sample of DACA-eligible undocumented workers had exactly 12 years of schooling. Column (3) of the table re-estimates the regression in this subsample of the DACA-eligible population and shows that the wage penalty in the baseline period 2012–2013 was 6.8% and had declined by 4.5 percentage points by 2016.

We can document that this decline in the wage penalty is not reflecting a life cycle effect by simply showing what happened to the penalty in a comparable population that is *not* DACA-eligible. In particular, column 4 estimates the regression using the sample of immigrants who are not DACA-eligible, but who had high school diplomas and were at most 31 years old in 2012.[26] It is evident that the wage penalty in this comparable, but not eligible, sample did not decline over time. If anything, the wage penalty was *rising* somewhat over the life cycle in this "counterfactual" sample (a trend consistent with the life cycle effects documented in the next section). In sum, the evidence in Table 4 suggests that the DACA executive action significantly improved the labor market conditions facing the affected undocumented workers and reduced the wage penalty by at least 4 or 5 percentage points.[27]

## 4. The wage penalty over the life cycle

The last section documented the differences in the wage penalty across different groups of undocumented workers, and the differential trends in the penalty experienced by the different groups. It turns out that the wage penalty will also vary for a given worker along the life cycle.

We begin our analysis of the life cycle variation in the wage penalty by illustrating the differences in the (cross-sectional) age-earnings profiles of natives, legal immigrants, and undocumented immigrants, shown in Fig. 4.[28] The age-earnings profiles of undocumented workers lie far below those of the other two groups *and* are relatively flat. At the age of

___

[24] Hsin and Ortega (2018) find that DACA, which is effectively a work permit program, serves to incentivize work over schooling, and the effect of DACA on university and community college attendance depends on how accommodating schools are of working students.

[25] The sample restriction avoids the sample composition problem created by the fact that some of the workers who do not appear in the early years of the

___

sample because they enrolled in school eventually show up in the labor force in the later cross-sections as college graduates.

[26] By construction, the only difference between the two samples is that workers in the DACA-eligible sample migrated before age 16, while non-eligible undocumented workers migrated after age 16.

[27] Ortega et al. (2018) report that DACA recipients experienced a wage increase of around 12%, although they find no evidence that undocumented immigrants with a college degree experienced a wage increase.

[28] The analysis reported in this section pools the 2008–2016 cross-sections of the ACS.

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

**A. Men**



Fig. 4. Age-earnings profiles of workers.
Notes: The age-earnings profiles report the average log hourly wage of workers in each of the nativity groups at each age.

**B. Women**



25, for example, the hourly wage of undocumented men in the ACS is 0.24 log points below that of natives and 0.27 log points below that of legal immigrants. By age 45, the wage gap between natives and undocumented immigrants rose to 0.47 log points, while the wage gap between legal and undocumented immigrants rose to 0.37 log points. The bottom panel of Fig. 3 shows similar life cycle effects for women.

It is important to emphasize that it is difficult to interpret the cross-section age-earnings profiles of both legal, and particularly, undocumented workers as measuring some type of wage evolution over the life cycle. It is well known (Borjas, 1985) that cross-section age-earnings profiles of immigrants are affected by both assimilation effects, the wage growth that occurs as a particular immigrant gets older, and by cohort effects, the differences in earnings potential across waves of immigrants that entered the United States at different times. The wage evolution of the undocumented sample is also affected by the fact that some of the undocumented will be able to "filter themselves" out and obtain green cards as they age, joining the legal sample, and by the fact that changes in the legal infrastructure regulating undocumented immigration (such as non-enforcement of existing laws or enactment of new penalties) might affect the flow of undocumented workers in and out of the country over time.

An important factor in understanding the evolution of earnings over the life cycle, particularly for undocumented versus legal immigrants, may be occupational attainment. A lack of legal immigration status

likely acts as a barrier in the occupational mobility of undocumented immigrants as some occupations may be more difficult (or nearly impossible to attain) in the absence of legal status. To understand the importance of occupations in explaining the life cycle pattern of wages, we use a task-based approach to occupational attainment. Each occupation is assigned a vector of task requirements that summarize what is required to perform that job. The task requirements for each occupation are derived from the U.S. Department of Labor's O*NET, with details of the procedure used to assign the task requirements discussed in Appendix A.

To simplify the presentation, we focus on only two tasks that efficiently summarize the difference in the types of jobs held by legal and undocumented immigrants: cognitive and non-cognitive tasks. An occupation that has a high level of cognitive task requirement might involve, for example, high levels of mathematical and deductive reasoning. In our data, the occupations with the highest cognitive task requirements are actuaries and physicists and astronomers. In contrast, occupations that require high levels of non-cognitive tasks typically involved physical strength and stamina, and the two occupations with the highest levels of non-cognitive task requirements are millwrights and dancers.

Fig. 5 shows the age-task requirement profiles (analogous to the age-earnings profiles in Fig. 4) for our cognitive and non-cognitive occupational task requirement measures. These figures mirror the age-earnings profiles. The cognitive task, which is strongly and positively associated

AR2022_500735

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

## A. Cognitive



## B. Non-cognitive



**Fig. 5.** Age-task requirement profiles of workers.
Notes: The age-task requirement profiles report the average cognitive and non-cognitive task requirements of workers in each of the nativity groups at each age.

with wages, starts lower for undocumented immigrants than for natives or legal immigrants, rises more slowly with age, and actually begins to decline quite early in the life cycle. In contrast, the non-cognitive task shows the opposite pattern, falling more slowly for undocumented immigrants than the other groups, flattening out for men after about age 35, and actually starting to rise early in the life cycle for women. Note that the divergence between legal and undocumented immigrants in the occupational task requirements occurs between the ages of 21 and 35. More generally, Fig. 5 demonstrates the striking difference in the jobs the two groups perform, how this difference widens prior to age 35, and how the substantial gap then persists over the lifecycle.[29]

The "raw" age-earnings profiles illustrated in Fig. 4 do not adjust for differences in other worker characteristics such as educational at-

tainment and English language proficiency, but they do suggest that the wage penalty to undocumented immigration is not constant over the life cycle, while Fig. 5 suggests that differences in occupational mobility (particularly at younger ages) may be an important factor in explaining both the overall wage penalty as well as in understanding the evolution of the wage penalty over the life cycle. To study the variation in the wage penalty over the life cycle, we estimate a Mincerian log wage regression that allows us to measure the difference in the slope of the age-earnings profile between legal and undocumented immigrants. In particular, consider the following regression model estimated in the pooled 2006–2016 ACS sample (separately for men and women):

$$\log \; w_{it} = \beta h_i + \theta_t + A_i + \pi_A \left( L_i \times A_i \right) + \varepsilon_{it}, \tag{3}$$

where $w_{it}$ gives the wage of worker $i$ in year $t$; $h_i$ is a vector of the worker's socioeconomic characteristics (i.e., education, years since migration, English proficiency, state of residence, and country of birth); $\theta t$ is a vector of calendar year fixed effects; $At$ is a vector of age fixed effects, with each value of age having its own fixed effect; and these age fixed effects are interacted with $L_i$, a variable indicating if worker $i$ is a legal immigrant. The coefficient vector $\pi_A$ measures the wage penalty at a particular age.

---

[29] The most common occupation among low-skilled men is truck driver for legal immigrants but construction laborer for undocumented immigrants, which is consistent with truck drivers often requiring an occupational license and these licenses being more difficult to undocumented immigrants to acquire. See Cassidy and Dacass (2019) for a more thorough discussion of occupational licensing and immigrants.

G.J. Borjas and H. Cassidy

*Labour Economics 61 (2019) 101757*

## A. Men



## B. Women



**Fig. 6.** Wage penalty for undocumented workers over the life-cycle.

Notes: Figures show the wage penalty between legal and undocumented immigrants in log hourly wage at different points in the life cycle calculated with a Mincerian wage regression that includes controls for survey year, educational attainment, state of residence, years-since-migration, birthplace, and English language proficiency. The wage penalty values shown are the coefficients on legal status interacted with age. The line "occupation" adds occupation controls to the baseline specification. All results calculated from the ACS.

Fig. 6 illustrates the "baseline" life cycle trend in the measured wage penalty. Consistent with Figs. 4 and 5, we find that the wage penalty increases steadily over the life cycle until approximately ages 45–50, when it plateaus for men and begins to decline slightly for women. Note that the measured wage penalty is negative for the youngest undocumented workers. Given the unadjusted age-earnings profiles illustrated in Fig. 4, the finding of a negative wage penalty at younger ages is not surprising. After all, the average wage of undocumented immigrants is basically equal to that of legal immigrants for workers in their 20s. At the same time, however, the undocumented population has far less education and is much less English proficient, generating a negative wage penalty. The relatively superior economic performance of young undocumented workers seems like an empirical finding that deserves much further study.

We explore the role of occupational mobility in generating the life cycle trend in the wage penalty by adding a vector of occupation fixed effects to the log wage regression in Eq. (3). Fig. 6 shows that the introduction of the occupation fixed effects noticeably reduces the growth in the wage penalty between ages 21 and 35, particularly for men. For example, the baseline wage penalty for men grows by 19.4 percentage points (from −12.9−+6.5%) through age 35, while the wage penalty that adjusts for the widening gap in occupational attainment grows by only 15.5 percentage points (from −12.4−+3.1). The evidence, therefore, suggests that occupational mobility (or, more specifically, the lack thereof) is a determinant of the life cycle trend in the wage penalty.

## 5. The wage penalty across states

The analysis reported in the previous sections suggests that the *average* wage penalty to undocumented immigration was quantitatively small for both undocumented men and women by 2016. As we have seen, however, this conclusion does not necessarily imply that there was little wage penalty throughout the U.S. labor market. We have documented important differences in the wage penalty as a worker ages, between new immigrants and older immigrants, and over time as relaxed restrictions on undocumented immigration affected some groups of workers. This section continues the analysis of the dispersion in the wage penalty by exploiting the fact that the relative number of undocumented immigrants varies substantially across states. According to the official DHS statistics (Baker, 2017), 56% of undocumented immigrants in January 2104 lived in only 5 states (California with 24%; Texas with 16%; Florida with 6%; and New York and Illinois, each with 5%).

Further, the labor market environment facing undocumented immigrants in the past decade changed differently across states, due perhaps to geographic differences in the impact of the Great Recession (and subsequent recovery) or to state-specific legislation that made it more difficult for undocumented immigrants to work in particular regions (more on this below). These differences may account for some of the observed changes in the relative number of undocumented immigrants choosing to settle in some states over time. For example, the official DHS statistics (Baker, 2017) reveal a sizable decline between 2007 and 2014 in the number of undocumented immigrants in Arizona (from 530,000 to

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

**Table 5**
Interstate variation in undocumented immigration and the wage penalty for men.

| State | Number of undocumented workers (1000s) | | Undocumented share of workforce (%) | | Wage penalty | |
|---|---|---|---|---|---|---|
| | 2008 | 2016 | 2008 | 2016 | 2008 | 2016 |
| Arizona | 251.0 | 140.1 | 8.6 | 4.8 | −0.039 | 0.011 |
| California | 1940.1 | 1491.9 | 11.3 | 8.3 | 0.080 | 0.061 |
| Colorado | 138.6 | 124.6 | 5.4 | 4.5 | 0.120 | −0.012 |
| Florida | 558.3 | 519.2 | 6.7 | 5.8 | 0.035 | 0.039 |
| Georgia | 280.5 | 260.1 | 6.1 | 5.6 | 0.072 | 0.053 |
| Illinois | 400.8 | 332.3 | 6.5 | 5.5 | 0.045 | 0.049 |
| Maryland | 150.0 | 165.9 | 5.3 | 5.6 | 0.045 | 0.062 |
| Massachusetts | 140.2 | 103.2 | 4.3 | 3.1 | −0.036 | −0.020 |
| Nevada | 139.6 | 119.7 | 11.0 | 8.9 | −0.032 | 0.010 |
| New Jersey | 339.5 | 324.5 | 8.0 | 7.7 | 0.079 | 0.086 |
| New York | 676.9 | 562.0 | 7.3 | 6.1 | 0.051 | 0.058 |
| North Carolina | 215.0 | 202.9 | 4.9 | 4.5 | 0.066 | 0.048 |
| Pennsylvania | 102.7 | 103.7 | 1.7 | 1.8 | −0.002 | −0.001 |
| Texas | 997.3 | 1084.1 | 8.8 | 8.6 | 0.015 | 0.065 |
| Virginia | 173.3 | 182.5 | 4.4 | 4.5 | 0.086 | 0.066 |
| Washington | 149.0 | 164.9 | 4.6 | 4.8 | −0.022 | 0.070 |

Notes: The 16 states listed in this table had the largest number of undocumented workers (at least 100,000) in 2008. The undocumented share is the fraction of undocumented workers in the state's workforce. The wage penalty values are for male immigrants.

270,000), a stable undocumented population in New York (at 640,000), and a slight increase in the number of undocumented persons in North Carolina (from 380,000 to 400,000).

The potential interstate differences in the labor market conditions facing undocumented immigrants suggest a novel use of the ACS data. Specifically, we can estimate the wage penalty to undocumented immigration in each state/year cell and then determine whether this variation responds to factors that describe the local labor market, including the relative number of undocumented immigrants, aggregate economic conditions in the state, and state-specific legislative changes that made it more difficult for employers to hire undocumented workers.[30]

To calculate the wage penalty for each state-year cell, we again estimate a Mincerian earnings function using the pooled ACS data over the entire sample period 2008–2016:

$$\log\ w_{ist} = \beta h_i + \theta_{rt} + \pi_{rt}(L_i \times \theta_{rt}) + \varepsilon_{irt}, \quad (4)$$

where $w_{ist}$ gives the wage of worker $i$ residing in state $r$ in year $t$; $h_i$ is a vector of the worker's socioeconomic characteristics (which now also includes a vector of age fixed effects in 5-year bands); $\theta_{rt}$ is a vector of state-year interaction fixed effects; and these fixed effects are interacted with $L_i$, the variable indicating if worker $i$ is a legal immigrant. The coefficient $\pi_{rt}$ measures the wage penalty in state $r$ at time $t$.

We first illustrate the sizable interstate variation in both the number of undocumented workers and the measured wage penalty for male immigrants in the 2008 and 2016 ACS cross-sections. Table 5 reports the number of undocumented workers (aged 21–64) in the 16 states that employed at least 100,000 undocumented workers in 2008. The table also reports the share of undocumented workers as a fraction of the state's total workforce.

It is evident that the number of undocumented workers fell significantly in some states, while rising in others. For example, the number of undocumented workers fell by over 40% in Arizona (from 251.0 thousand to 140.1 thousand), while rising by nearly 10% in Texas (from 997.3 thousand to 1084.1 thousand).

The table also shows sizable differences in both the level and the trends in the undocumented share. The fraction of the state's workforce composed of undocumented workers fell from 8.6 to 4.8% in Arizona and from 11.3 to 8.3% in California. In contrast, it declined slightly in Texas from 8.8 to 8.6 % and rose slightly from 4.6 to 4.8 in Washington.

Of the 16 states listed, only Washington, Pennsylvania, and Maryland experienced an increase in the *share* of their workforce that is undocumented, and those increases were modest.

Although the average wage penalty in the national labor market hovered between 4 and 6% throughout much of the period, there was much greater interstate variation in the penalty. Table 5 also reports the estimated wage penalty for men for each of the states in 2008 and 2016. The wage penalty rose by 5 percentage points in Arizona (from −3.9% to 1.1%), by 0.7 percentage point in New Jersey (from 7.9 to 8.6%), and fell by 1.9 percentage points in California (from 8.0 to 6.1%). Fig. 7 illustrates the dispersion in the size of the wage penalty for men across the 16 states with the largest number of undocumented workers. Note that most of the penalties estimated for each state-year cell are positive, i.e., legal immigrants have higher wages that otherwise similar undocumented immigrants.

We exploit this variation to determine if there are systematic factors that explain the differences in the wage penalty that undocumented immigrants face in different geographic labor markets at different times. Specifically, we estimate second-stage regressions that relate the wage penalty in a state-year cell to variables that describe local labor market conditions facing the undocumented.[31] We consider three specific variables that might determine the size of the wage penalty: (1) the relative number of undocumented immigrants in the local labor market; (2) the presence of state-level legislation that restricts the employment of undocumented immigrants; and (3) the impact of the Great Recession on local labor market conditions. This second-stage regression is estimated using the entire sample of 459 state-year observations (9 annual observations for each of the 51 "states," which includes the District of Columbia). The regression also includes vectors of state fixed effects and year fixed effects. The regression is weighted by the number of observations used to calculate the dependent variable (i.e., the wage penalty in the state-year cell), and the standard errors are clustered at the state level.[32]

The top panel of Table 6 presents the relevant OLS coefficients of the regression model. Consider initially the regressions estimated using the sample of male workers. As column 1 shows, there is a positive

---

[30] Related work by Massey and Gentsch (2014), using Mexican Migration Project data and state-year undocumented population estimates from Warren and Warren (2013), find that the percent of a state in a given year is negatively related to the wage of undocumented Mexican immigrants.

[31] Note that we are using the state as the geographic definition of the local labor market. It might be preferable to look at smaller geographic units, such as metropolitan areas or commuting zones, but the sample size of undocumented immigrants would fall substantially in many of these smaller geographic units.

[32] More precisely, the weight is given by $(nL \times nU)/(nL + nU)$, where $nL$ and $nU$ give the number of observations in the state-year cell for legal immigrants and undocumented workers, respectively.

AR2022_500738

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757



**Fig. 7.** Distribution of wage penalty for men in states with largest number of undocumented workers, 2008–2016.
Notes: The wage penalty is calculated at the state-year cell and is regression coefficient of state-year interacted with legal immigrant status in a Mincerian wage regression that includes controls for survey year, age, educational attainment, state of residence, years-since-migration, birthplace, and English language proficiency.

**Table 6**
Determinants of variation in wage penalty across states, 2008–2016.

|  | All men (1) | All men (2) | Low-skill men (3) | High-skill Men (4) | Women (5) |
|---|---|---|---|---|---|
| OLS estimates |  |  |  |  |  |
| Undocumented share | 0.009 | 0.011 | 0.012 | 0.017 | 0.015 |
|  | (0.003) | (0.004) | (0.005) | (0.006) | (0.004) |
| E-Verify | – | 0.045 | 0.038 | 0.048 | −0.015 |
|  |  | (0.014) | (0.027) | (0.042) | (0.011) |
| Unemployment rate | – | −0.003 | −0.002 | −0.001 | −0.002 |
|  |  | (0.005) | (0.005) | (0.007) | (0.005) |
| IV estimates |  |  |  |  |  |
| Undocumented share | 0.009 | 0.011 | 0.013 | 0.019 | −0.002 |
|  | (0.003) | (0.006) | (0.006) | (0.009) | (0.011) |
| E-Verify | – | 0.045 | 0.037 | 0.047 | −0.003 |
|  |  | (0.013) | (0.025) | (0.039) | (0.014) |
| Unemployment rate | – | −0.003 | −0.003 | −0.002 | 0.004 |
|  |  | (0.005) | (0.005) | (0.008) | (0.007) |

Notes: Standard errors in parentheses clustered at the state level. The undocumented share gives the percent of the state's total workforce that is composed of undocumented workers. The E-Verify variable is set to unity if employers in a given state/year cell were required to use E-Verify in their new hiring. The "low-skill" regressions are estimated using the sample of immigrants who have at most a high school education; and the "high skill" regressions are estimated in the sample of immigrants who have more than a high school education. Columns (1), (2), and (4), have 459 observations, column (3) has 456 observations, and column (5) has 458 observations.

and statistically significant relationship between the wage penalty and the fraction of the state's workforce that is undocumented. Moreover, the impact is quantitatively sizable: An increase of 1 percentage point in the undocumented share raises the wages penalty by about 0.9 percentage points.[33]

It is worth noting that the positive relationship between the wage penalty and the relative size of the undocumented workforce suggests that legal and undocumented immigrants are not perfect substitutes in production. If the two groups were perfect substitutes, the relative wage of undocumented immigrants would not depend on their relative number. In fact, if we assume that the wage data was generated in labor markets where profit-maximizing competitive firms faced the technology implied by a nested CES aggregate production function, we can use our data to estimate the elasticity of substitution between the two groups. It is well known that the elasticity of substitution is given by the reciprocal

of the coefficient of a regression of the log wage ratio between any two labor inputs on the log quantity ratio of those two inputs. The estimated regression for men is:

$$\pi_{rt} = \theta_r + \theta_t - 0.059 \log \frac{E_{Lrt}}{E_{Urt}}, \qquad (5)$$

where $\theta r$ and $\theta t$ denote vectors of state and time fixed effects; and $Ejrt$ gives the number of workers of type $j$ in state $r$ at time $t$. The implied elasticity of substitution between the two groups is 17.0. For women, the coefficient on the log ratio of legal to undocumented immigrants is −0.087 (with a standard error of 0.029), which yields an implied elasticity of 11.5. Note that the coefficient is statistically significant for both men and women, so that we can reject the hypothesis that legal and undocumented immigrants are perfect substitutes. In short, there are factors—perhaps due to unobservable differences in the skill set of the two groups, or because the two groups face different labor market constraints—which imply that the labor market does not view the two groups as interchangeable. As a result, an important insight from this type of empirical analysis is that the relative size of the undocumented

---

[33] Massey and Gentsch (2014) also find that a one percentage point increase in the share of a state that is undocumented lowers the wages of undocumented Mexican immigrants by one percentage point.

G.J. Borjas and H. Cassidy                                                                                                              Labour Economics 61 (2019) 101757

population is itself a major determinant of the wage penalty. A larger undocumented population generates a substantially larger wage penalty.

Of course, the OLS correlation between the wage penalty and the undocumented share is contaminated by the potentially endogenous settlement of both undocumented and legal immigrants in some states and not in others. We address the endogeneity problem by using a variant of the generic shift-share instrument that has become popular in the immigration literature (although see Jaeger et al., 2018, for a critical appraisal). Specifically, we use the pooled Current Population Surveys between 1995 and 2000 to obtain the baseline interstate distribution of both legal and undocumented immigrants from a particular country of origin, where the CPS surveys use the residual method described in section II of the paper to impute an undocumented immigration status variable for each observation.[34]

Let $scr$ be the share of the undocumented population from country $c$ living in state $r$ in the pooled CPS. Suppose that the ACS survey in cross-section year $t$ reveals the presence of $Uc(t)$ undocumented immigrant workers from that country. We then predict the number of undocumented immigrants from country $c$ residing in state $r$ in year $t$ to be the product ($scr \times Uc(t)$). We conduct a similar calculation for legal immigrants. By adding up this predicted number across all countries of birth, we can then obtain the number of undocumented and legal immigrants that would be predicted to be in state $r$ in cross-section $t$, or $\hat{U}_r(t)$ and $\hat{L}_r(t)$. The instrument for the undocumented immigrant share variable is then given by:

$$S = \frac{\hat{U}_r(t)}{\hat{U}_r(t) + \hat{L}_r(t) + N_r(t)},  \qquad (4)$$

where $Nr(t)$ gives the size of the native workforce in state $r$ in year $t$.

The first-stage regression shows that there is indeed there is a significant positive correlation between the actual undocumented immigrant share in the state and the predicted share. The relevant coefficient of the first stage is 0.916, with a standard error of 0.188. The bottom panel of Table 6 shows that the IV coefficient of the share is again positive and statistically significant. In fact, the magnitude of the coefficient is nearly identical to that obtained using OLS. A one percentage point increase in the undocumented share again increases the size of the wage penalty by about 0.9 percentage points.

The second column of the table adds two additional regressors to the model that attempt to explain the interstate variation in the wage penalty—a variable that measures state-specific legislative measures to restrict undocumented employment and the state's unemployment rate (as reported by the BLS).

During the period under analysis, the federal inaction on resolving the status of undocumented workers led some states to take state-specific actions that made it more difficult for employers to employ the undocumented. The best known of these attempts was the 2010 legislation in Arizona that, among many things, "[required] law enforcement officers to determine immigration status during any lawful stop; [created] state crimes and penalties for failure to carry federally-issued alien registration documents; [made] it unlawful for an unauthorized alien to knowingly apply for or perform work in Arizona; and [permitted] an officer to make a warrantless arrest if the officer has probable cause to believe the person has committed any public offense that makes the person removable from the United States" (National Conference of State Legislatures, 2012a).[35]

One common provision in the restrictive state-level statutes was the requirement that employers use E-Verify to authenticate the legal status of new hires. As the Department of Homeland Security describes it: "E-Verify is a web-based system that allows enrolled employers to confirm the eligibility of their employees to work in the United States. E-Verify employers verify the identity and employment eligibility of newly hired employees by electronically matching information provided by employees on the Form I-9, Employment Eligibility Verification, against records available to the Social Security Administration (SSA) and the Department of Homeland Security (DHS)."[36] During the period under analysis, four states enacted legislation mandating that all private employers in those states use E-Verify system to confirm the employment eligibility of new hires: Arizona beginning in 2008, Alabama in 2012, Mississippi in 2011, and South Carolina in 2010.[37]

We introduced a variable into our regression model indicating if an E-Verify provision was in effect in a particular state at time $t$. Table 6 shows that the legislation mandating the use of E-Verify had a significant positive impact on the wage penalty to undocumented immigration, raising the wage penalty by 4.5 percentage points (in both the OLS and IV regressions). Not surprisingly, legal restrictions that make it harder for employers to hire undocumented immigrants (and make legal and undocumented immigrants less substitutable) increases the wage penalty. It is important to note, however, that our evidence exploits the enactment of the E-Verify system in only a very small number of states, so that it would not be prudent to generalize from this exercise to a prediction of what would happen to the wage penalty if the system were adopted nationwide.

Our results showing an impact of the E-Verify program on the wage penalty are generally consistent with related evidence reported in other studies, although these studies typically examine the link between E-Verify and the economic outcomes of Hispanic (mainly Mexican) immigrants (Bohn et al., 2015; Orrenius and Zavodny, 2015, 2016; and Orrenius et al., 2018). In rough terms, these studies find that the adoption of the E-Verify system reduces the hourly wage of undocumented Mexican men; leads to an outflow of undocumented immigrants from the states that adopt the system; and reduces the employment propensities of Hispanic workers.[38]

The second column of the table also includes the BLS unemployment rate in the state-year cell. Surprisingly, the impact of the local unemployment rate on the wage penalty is near zero, both statistically and numerically. It seems that changes in local labor market conditions arising from the business cycle affect aggregate wages, and likely affect immigrant wages, but do not seem to affect the relative wage of undocumented workers.

Column 5 of the table replicates the analysis using the sample of female workers. The results are far less stable, although they still show a significant positive relation between the wage penalty and the relative size of the undocumented population (but only in the OLS specification). As noted earlier, the analysis of wage trends in the female undocumented sample is problematic, as undocumented women have a very low labor force participation rate, so that selection biases likely play a significant role in determining both the interstate variation in the wage penalty and the trend in that penalty within a particular state. Borjas (2017, Table 1) reports that the employment rate in the 2012–2013 CPS

---

[34] Ideally, the instrument would employ the geographic settlement of legal and undocumented immigrants many years prior to the sample period of 2008–2016. The longer lag would reduce the probability that serial correlation in economic conditions at the state level invalidate the instrument. Unfortunately, there are no large-scale micro surveys that can be used to impute the legal status of a foreign-born person prior to the 1994 CPS.

[35] Some of the provisions in this legislation were later ruled to be unconstitutional by the U.S. Supreme Court.

[36] U.S. Citizenship and Immigration Services (2018b).

[37] NumbersUSA (2016); see also National Council of State Legislatures (2012b). A few other states passed versions of the E-Verify requirement, but these states typically exempted many employers (such as small firms) and had a phase-in period before the requirement was fully operational.

[38] We defined the states that use an E-Verify system using a strict definition of the regulation, specifically isolating the states and time periods where E-Verify applied to all workers. The Orrenius–Zavodny–Gutierrez studies use a less strict definition, classifying some states as having an E-Verify system even though many employers are exempt from the legislation or there is a phasing-in period when the regulation was not enforced.

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

is 84.7% for legal immigrant men and 88.1% for undocumented men. In contrast, the employment rate is 64.4% for legal immigrant women and only 56.7% for undocumented women. The selection biases in wage regressions are likely to be substantial when nearly half the sample self-selects out of the workforce.

Finally, Table 6 also reports regressions estimated separately for low-skill (defined as persons with at most a high school education) and high-skill (those with more than a high school education) male immigrants. These regressions tend to reinforce the finding that the wage penalty is larger in states that have a relatively larger undocumented population, and that restrictions on the employment of undocumented immigrants tend to raise the wage penalty.

## 6. Summary

The past decade has witnessed a series of attempts to create some type of "path to citizenship" for the over 12 million undocumented immigrants now residing in the United States. This paper uses newly developed algorithms that impute undocumented status for each person in microdata files, including the Current Population Surveys and the American Community Surveys, to examine the determinants of what is perhaps the key indicator of their economic well-being, their earnings in the U.S. labor market.

The analysis yields a number of new insights into the determination of earnings for the large undocumented population:

(1) The age-earnings profiles of undocumented workers lies far below that of legal immigrants and of native workers. Moreover, the age-earnings profile of undocumented workers is almost perfectly flat during the prime working years.

(2) The unadjusted gap in the log hourly wage between legal immigrants and undocumented workers is large (around 35% for

both men and women). Much of this gap disappears once the calculation adjusts for differences in observable socioeconomic characteristics, including age, education, state of residence, country of birth, and English language proficiency. As a result, the wage penalty—the wage disadvantage suffered by undocumented workers relative to statistically comparable legal immigrants—hovered around 6% until about 2013 for men and 4% for women, at which point it began a noticeable decline. Between 2013 and 2016, the wage penalty to both male and female undocumented workers had shrunk to about only 2–4%.

(3) There are important differences in the level and trend in the wage penalty over the life cycle and across labor markets. The wage penalty rises over the life cycle partly because undocumented immigrants do not experience the same extent of occupational mobility as legal immigrants; and the wage penalty is larger in states with a larger undocumented population and in states that have enacted state-specific legislation that restricts the employment of undocumented immigrants.

It is important to emphasize that the analysis reported in this paper represents a first step in any evaluation of the proposals being discussed to regularize the status of undocumented workers. Much more information about the economic well-being of the undocumented population needs to be documented and examined before a full evaluation can be made. Similarly, it is crucial to continue to assess the validity of the statistical methods that are used to impute a person's undocumented status in microdata surveys.

## Appendix A. Deriving occupational task requirements

In this appendix, we briefly describe the procedure used to assign cognitive and non-cognitive task requirements to each occ1990 occupation code in the ACS.

**Table A1**
Comparison of summary statistics for workers, 2012–2013, Women.

| | Natives | Legal | | Undocumented | |
| | | No correction | H1B correction. | No correction. | H1B correction |
|---|---|---|---|---|---|
| A. Pew | | | | | |
| Percent of pop. | 84.6 | 11.4 | 11.5 | 4.0 | 4.0 |
| Average age | 42.5 | 43.5 | 43.5 | 39.1 | 39.2 |
| Education: | | | | | |
|   High school dropouts | 3.8 | 14.2 | 14.2 | 38.2 | 38.6 |
|   High school graduates | 25.4 | 24.2 | 24.1 | 28.0 | 28.4 |
|   Some college | 32.3 | 20.7 | 20.7 | 14.4 | 14.6 |
|   College graduates | 25.1 | 26.0 | 26.1 | 12.4 | 12.1 |
|   Postcollege | 13.3 | 14.9 | 15.1 | 7.0 | 6.3 |
| State of residence: | | | | | |
|   California | 8.9 | 26.2 | 26.2 | 21.1 | 21.0 |
|   New York | 5.5 | 11.6 | 11.6 | 7.7 | 7.7 |
|   Texas | 7.7 | 8.1 | 8.1 | 14.1 | 14.2 |
| Log wage gap | 0.000 | −0.048 | −0.045 | −0.391 | −0.403 |
| Sample size | 64,173 | 11,864 | 11,924 | 4553 | 4493 |
| B. ACS | | | | | |
| Percent of pop. | 84.6 | 11.4 | 11.6 | 3.9 | 3.8 |
| Average age | 42.7 | 43.9 | 43.8 | 38.3 | 38.5 |
| Education: | | | | | |
|   High school dropouts | 3.7 | 15.1 | 14.9 | 36.2 | 37.2 |
|   High school graduates | 25.8 | 24.3 | 24.1 | 29.5 | 30.4 |
|   Some college | 34.5 | 23.4 | 23.2 | 14.2 | 14.6 |
|   College graduates | 23.2 | 23.2 | 23.3 | 12.0 | 11.1 |
|   Postcollege | 12.7 | 14.1 | 14.5 | 8.0 | 6.7 |
| Speaks English | – | 60.2 | 60.3 | 32.9 | 31.7 |
| State of residence: | | | | | |
|   California | 8.7 | 25.5 | 25.4 | 24.0 | 24.1 |
|   New York | 5.7 | 12.5 | 12.5 | 8.7 | 8.8 |
|   Texas | 7.6 | 8.5 | 8.5 | 12.0 | 12.1 |
| Log wage gap | 0.000 | −0.024 | −0.019 | −0.381 | −0.404 |
| Sample size | 933,459 | 114,975 | 115,854 | 31,398 | 30,519 |

Notes: The statistics are calculated in the sample of women aged 21–64 who are not enrolled in school, are not self-employed, and report positive wage and salary income, weeks worked, and usual hours worked weekly.

G.J. Borjas and H. Cassidy

Labour Economics 61 (2019) 101757

Each occupation in the O*NET (version 17.0) contains a vector of job characteristics, e.g., number facility. Using the ACS variable *occsoc*, we merge these O*NET job characteristics with the ACS for years 2010–2016, which are the years in the ACS where the *occsoc* code most closely matches the SOC codes used in the O*NET. Each individual in the ACS with a valid *occsoc* code between ages 21–64 is assigned a vector of O*NET job characteristics. Since we will use the *occ1990* occupation code to merge the task requirements with the other ACS samples, we average across the O*NET job characteristics within each *occ1990* occupation code.

We follow the approach of Yamaguchi (2012) and Imai et al. (2018) and perform an *a priori* grouping of some of these job characteristics into our two groups: cognitive and non-cognitive. The cognitive characteristics follow the analytical category used in Imai et al. (2018), and contains: Deductive Reasoning, Inductive Reasoning, Information Ordering, Category Flexibility, Mathematical Reasoning, Number Facility, Analytical Thinking, Making Decisions and Solving Problems, and Mathematics. The non-cognitive characteristics follow the physical strength category from Imai et al. (2018), and include: Static Strength, Dynamic Strength, Trunk Strength, Stamina, Performing General Physical Activities, and Handling Moving Objects.

To reduce the job characteristics in the cognitive and non-cognitive groups to a single task measure each, we perform principal component analysis separately for each group of characteristics and extract the first component, which yields our cognitive and non-cognitive task requirements. We then rescaled each task requirement to have a mean of zero and a standard deviation of one in the 2010–2016 ACS sample. This entire procedure is performed separately for men and women, whose task measures may differ depending on how the *occsoc* codes map into the *occ1990* codes.

At the end of this procedure, we have, for each *occ1990* code (and separately for men and women), a two-dimensional vector of cognitive and non-cognitive occupational task requirements. We then merge these task requirements for all of our ACS sample years (2008–2016).

## References

Amuedo-Dorantes, C., Antman, F., 2017. Schooling and labor market effects of temporary authorization: evidence from daca. J. Popul. Econ. 31 (1), 339–373.

Albert, C., 2019. The Labor Market Impact of Immigration: Job Creation vs. Job Competition. CEMFI Working Paper.

Baker, B., 2017. Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2014. Department of Homeland Security, Office of Immigration Statistics, Washington, DC.

Bohn, S., Lofstrom, M., Raphael, S., 2015. Do E-Verify mandates improve labor market outcomes of low-skilled native and legal immigrant workers? South. Econ. J. 81 (4), 960–979.

Borjas, G.J., 1985. Assimilation, changes in cohort quality, and the earnings of immigrants. J. Labor Econ. 3 (4), 463–489.

Borjas, G.J., 2016. The Earnings of Undocumented Immigrants. NBER Working Paper No. 23236.

Borjas, G.J., 2017. The labour supply of undocumented immigrants. Labour Econ. 46, 1–13.

Cassidy, H., 2017. Kansas State University Working Paper.

Cassidy, H., Dacass, T., 2019. Kansas State University Working Paper.

Cotton, J., 1988. On the decomposition of wage differentials. Rev. Econ. Stat. 70 (2), 236–243.

Gelbach, J.B., 2016. When do covariates matter? And which ones, and how much? J. Labor Econ. 34 (2), 509–543.

Hotchkiss, J.L., Quispe-Agnoli, M., 2013. The expected impact of state immigration legislation on labor market outcomes. J. Policy Anal. Manag. 32 (1), 34–59.

Hsin, A., Ortega, F., 2018. The effects of deferred action for childhood arrivals on the educational outcomes of undocumented students. Demography 55 (4), 1487–1506.

Imai, S., D. Stacey, and C. Warman (2018): "From engineer to taxi driver? Language proficiency and the occupational skills of immigrants," Working Paper.

Jaeger, D.A., Ruist, J., Stuhler, J., 2018. Shift-Share Instruments and the Impact of Immigration. National Bureau of Economic Research NBER Working Paper No. 24285.

Kossoudji, S.A., Cobb-Clark, D.A., 2002. Coming out of the shadows: learning about legal status and wages from the legalized population. J. Labor Econ. 20 (3), 598–628.

Kaushal, N., 2006. Amnesty programs and the labor market outcomes of undocumented workers. J. Hum. Resour. 16 (3), 631–647.

Massey, D.D., Gentsch, K., 2014. Undocumented migration to the United States and the wages of Mexican immigrants. Int. Migr. Rev. 48 (2), 482–499.

National Conference of State Legislatures. 2012a. "State omnibus immigration legislation and legal challenges," August 27. Website: http://www.ncsl.org/research/immigration/omnibus-immigration-legislation.aspx.

National Conference of State Legislatures. 2012b. "E-Verify," August 27. Website: http://www.ncsl.org/research/immigration/everify-faq.aspx.

NumbersUSA. 2016. "Map of states with E-verify laws," December 18. Website: https://www.numbersusa.com/resource-article/everify-state-map.

Orrenius, P.M., Zavodny, M., 2015. The impact of E-Verify mandates on labor market outcomes. South. Econ. J. 81 (4), 947–959.

Orrenius, P.M., Zavodny, M., 2016. Do state work eligibility verification laws reduce unauthorized immigration? IZA J. Migr. 5 (5), 1–17.

Orrenius, P.M., Zavodny, M., Gutierrez, E., 2018. Do state employment eligibility verification laws affect job turnover? Contemp. Econ. Policy 36 (2), 394–409.

Ortega, F., Hsin, A., 2018. IZA Discussion Paper No. 11680.

Ortega, F., Edwards, R., Hsin, A., 2018. IZA Discussion Paper No. 11281.

Passel, J.S., Cohn, D'V., 2014. Unauthorized Immigrant Totals Rise in 7 States, Fall in 14 States: Decline in Those From Mexico Fuels Most State Decreases. Pew Research Center, Washington, DC.

Pope, N.G., 2016. The effects of DACAmentation: the impact of deferred action for childhood arrivals on unauthorized immigrants. J. Public Econ. 143, 98–114.

Rivera-Batiz, F.L., 1999. Undocumented workers in the labor market: an analysis of the earnings of legal and illegal Mexican immigrants in the United States. J. Popul. Econ. 12 (1), 91–116.

Ruggles, S., Flood, S., Goeken, R., Grover, J., Meyer, E., Pacas, J., Sobek, M., .

U.S. Citizenship and Immigration Services. 2014. "Deferred action for childhood arrivals (DACA) report (Aug. 15, 2012–Dec. 31, 2013)," Washington, DC. https://www.uscis.gov/sites/default/files/USCIS/Resources/ReportsandStudies/ImmigrationFormsData/AllFormTypes/DACA/DACA-06-02-14.pdf.

U.S. Citizenship and Immigration Services. 2018a. "Characteristics of H-1B specialty occupation workers," Washington, DC. https://www.uscis.gov/sites/default/files/reports-studies/Characteristics-of-Specialty-Occupation-Workers-H-1B-Fiscal-Year-2017.pdf.

U.S. Citizenship and Immigration Services. 2018b. "About E-Verify," Washington, DC. https://www.uscis.gov/e-verify.

Van Hook, J., James, D, Donna Coffman, B., Harel, O., 2015. Can we spin straw into gold? An evaluation of immigrant legal status imputation approaches. Demography 52 (1), 329–354.

Warren, R., 2014. Democratizing data about unauthorized residents in the United States: estimates and public-use data, 2010 to 2013. J. Migr. Hum. Secur. 2 (4), 305–328.

Warren, R., Warren, J.R., 2013. Unauthorized immigration to the United States: annual estimates and components of change, by state, 1990 to 2010. Int. Migr. Rev. 47 (2), 296–329.

Warren, R., Passel, J.S., 1987. A count of the uncountable: estimates of undocumented aliens counted in the 1980 United States census. Demography 24 (3), 375–393.

Yamaguchi, S., 2012. Tasks and heterogeneous human capital. J. Labor Econ. 30 (1), 1–53.



# 4 myths about how immigrants affect the U.S. economy

Making Sen$e  Nov 2, 2018 6:48 PM EDT

President Donald Trump has been stoking fears about immigrants in the days leading up to the midterm elections. He's tweeted anti-immigrant ads and threatened to revoke birthright citizenship, something lawmakers on both sides of the aisle have said would be unconstitutional, as he campaigns to drive up Republican turnout.

In a Thursday speech, Trump, a vocal critic of illegal immigration long before he reached the White House, claimed it costs the U.S. **billions of dollars each year**.

"Illegal immigration hurts Americans workers, burdens American taxpayers and undermines public safety, and places enormous strains on local schools, hospitals and communities in general, taking precious resources away from the poorest Americans who need them most," Trump said.

While Trump's rhetoric has lately focused on unauthorized immigrants, his policies have targeted legal immigration as well. Under his administration, refugee **admissions in 2017** dropped to their lowest since at least 2002. Trump signed an executive order **tightening restrictions on HB1 visas** for skilled immigrants. He has pushed for **a merit-based immigration system**, and his administration has proposed **cutting public benefits** to legal immigrants.

Trump's characterization of immigrants, as people who drain public resources, however, is not backed by the data. Unauthorized immigrants aren't usually eligible for federal benefits, for instance, and multiple studies have found that immigrants help the economy grow.

**READ MORE: Trump retweets false claim on immigrant aid**

Here are some of the most widespread myths about how immigrants affect the U.S. economy, and the research that refutes them.

**Myth #1: Immigrants take more from the U.S. government than they contribute**

**Fact: Immigrants contribute more in tax revenue than they take in government benefits**

A **2017 report** from the National Academies of Sciences, Engineering, and Medicine found immigration "has an overall positive impact on the long-run economic growth in the U.S."

How that breaks down is important.

First-generation immigrants cost the government more than native-born Americans, according to the report — about $1,600 per person annually. But second generation immigrants are "among the strongest fiscal and economic contributors in the U.S.," the report found. They contribute about $1,700 per person per year. All other native-born Americans, including third generation immigrants, contribute $1,300 per year on average.

It is difficult to determine the exact cost or contribution of unauthorized immigrants because they are harder to survey, but the study suggests they likely have a more positive effect than their legal counterparts because they are, on average, younger and do not qualify for public benefits.

AR2022_500743

Case 1:18-cv-00068    Document 610-4    Filed on 11/04/22 in TXSD    Page 744 of 990



After being detained and released by law enforcement, undocumented immigrants from Central America wait for assistance in a Catholic Charities relief center in McAllen, Texas. Photo by Loren Elliott/Reuters.

It's also important to note that less-educated immigrants tend to work more than people with the same level of education born in the U.S. About half of all U.S.-born Americans with no high school diploma work, compared to about 70 percent of immigrants with the same education level, Giovanni Peri, an economics professor at the University of California, Davis, said in **a recent interview with PBS NewsHour.**

**WATCH:Proposed immigration policy penalizes legal residents for use of public benefits**

In general, more people working means more taxes — and that's true overall with undocumented immigrants as well. Undocumented immigrants pay an estimated **$11.6 billion a year** in taxes, according to the Institute on Taxation & Economic Policy.

Immigrants are also less likely to take public benefits than the native-born population for two reasons.

First, to receive most public benefits under the social safety net, immigrants must be lawful permanent residents for at least five years.

There are approximately 9 million immigrants that fit that definition in the U.S. Of those, many would not qualify for welfare or other programs because their incomes are too high.

"While it is really important to ensure that immigrants and their children have access to the safety net, there are already a lot of eligibility barriers in place," said Hamutal Bernstein, a senior research associate at the Urban Institute.
Many immigrants are hesitant to take public benefits even if they are eligible, Peri said.

"There is a little bit of a stigma in applying for welfare because they have come here to work, to support their families," Peri said.

Immigrants can be a financial burden to state and local governments through the cost of sending their children to public school — something Trump mentioned Thursday.

But Trump's claim ignored a critical point. Educating those children has economic benefits later down the road when they get better-paying jobs and, in turn, pay higher taxes.

**Myth #2: Immigrants take American jobs**

**Fact: Immigrants workers often take jobs that boost other parts of the economy**

Immigrants make up **17 percent** of the U.S. labor force, according to the U.S. Bureau of Labor Statistics, but few experts believe they're taking jobs from Americans, as Trump claims.

"Most economists agree that in spite of being a very big part of the labor force, immigrants have not come at the cost either of American jobs, nor of American wages," Peri, the UC Davis professor, said.

The reason is that immigrants often have jobs that Americans tend not to take. So instead of competing with Americans' for work, immigrants tend to complement American workers.

On a farm, for example, owners, managers and salespeople are often born in America. Immigrants tend to work as field hands. Neither group could do their job without the other.

Immigrants who work as child care providers give Americans, specifically women, more opportunity to join the labor force. And immigrants are playing an increasingly critical role in taking care of the elderly as baby boomers retire. Census data shows that

AR2022_500744

Wendy Estrada, a 30-year-old Honduran immigrant training to become a certified nursing assistant listens to Center at Park West resident Maria Ruvalcaba sing. Immigrants make up a large share of health care aides in the U.S. Photo by Barbara Davidson/Los Angeles Times via Getty Images

immigrants accounted for **24 percent** of nursing, psychiatric and home care aides in 2015.

**WATCH: What happened when this struggling city opened its arms to refugees**

**A study** from the bipartisan research organization New American Economy found immigrants were 15 percent more likely to work unusual hours than similar U.S.-born workers. They are also more likely to be employed in dangerous jobs, according to data from the American Community Survey and Bureau of Statistics.

In addition, the **latest jobs report** shows the U.S. economy performing strongly enough that it can absorb large numbers of workers, including immigrants.

Immigrants fill those roles in part because they are on average less educated than native-born Americans. About 26 percent have **less than a high school degree**, compared to 5 percent of native-born workers, according to the Urban Institute. But one in three immigrant workers have a college or advanced degree, a rate on par with Americans born here. Unauthorized immigrants tend to have slightly lower education levels; about **13 percent have college degrees**.

**Myth #3: The U.S. economy does not need immigrants**

**Fact: Immigrants are key to offsetting a falling birth rate**

The U.S. birth rate is **1.8 births per woman**, down from 3.65 in 1960, according to the World Bank. Demographers consider 2.1 births per woman as the rate needed to replace the existing population.

According to the Pew Research Center, if not for immigrants, the **U.S. workforce would be shrinking**. That would create a host of problems for the federal government.

Social Security, which is paid for by current workers, would be in even more serious budgetary trouble than it already is. Economic growth would also likely stagnate or even contract, **as it has in Japan**, a country where the population is shrinking and does not attract many immigrants.

Automation can buttress economic growth for a while, but investment in new technology only goes so far, said Betsey Stevenson, an associate professor of economics at the University of Michigan.

Plus, immigrants increase demand for goods and services, which further boosts economic growth, she added.

**Myth #4: It would be better for the economy if immigrants' children were not citizens**

**Fact: Children with citizenship are more productive workers**

At his rally Thursday night in Columbia, Missouri, Trump criticized the 14th Amendment, which was ratified after the Civil War and guaranteed citizenship to "all persons born or naturalized in the United States," including people who were formerly enslaved.

Trump said the idea was "a crazy, lunatic policy" supported by Democrats that today allows "hundreds of thousands of children born to illegal immigrants" to become citizens each year.

Research shows that repealing birthright citizenship could have significant negative consequences for the U.S. economy because children who are citizens have more economic opportunity and rely less on government assistance.

**AR2022_500745**



An undocumented immigrant father from Honduras and his infant daughter are released from detention with other families at a bus depot in McAllen, Texas. A study of immigration in Germany found children given citizenship at birth had better health outcomes. Photo by Loren Elliott/Reuters

A **Migration Policy Institute analysis** estimates the number of unauthorized immigrants would increase from 11 million to 16 million by 2050 if birthright citizenship were repealed.

"Over the course of decades, you'd end up with a growing population that is cut off from the rest of society because they live in fear of deportation and they can't get jobs," said Randy Capps, the director of research for U.S. programs at the Migration Policy Institute.

Take, for example, the population of so-called "Dreamers" who were brought to the U.S. illegally as children. One study estimated the U.S. is **losing out on $15 billion** in economic potential from that group because they often face problems getting into college and getting a job.

An **experiment in Germany**, which does not have birthright citizenship, also showed that when children of immigrants were given citizenship at birth, those children experienced better health outcomes and had fewer children of their own.

*By —* **Gretchen Frazee**

Gretchen Frazee is a Senior Coordinating Broadcast Producer for the PBS NewsHour.

🐦 **@gretchenfrazee**

## Why this author says it's 'highly probable' Russian

# interference swung the 2016 election

Nation Nov 01

AR2022_500747

# California



This state page integrates student data, economic contributions, state policies, effective practices, and other resources to learn about and better support the state's undocumented, other immigrant, and international students in higher education.

We classify California as a **Comprehensive Access** state in terms of inclusive in-state tuition and state financial aid policies for undocumented students. The Portal tracks state policies for undocumented students on in-state tuition, state financial aid, professional and occupational licensure, and driver licenses.

State Data       State Policies       Narratives       Effective Practices and State Resources       Top

# State Data

Higher education in the U.S. benefits from the participation of immigrant and international students. First and second-generation individuals comprise 28% of all students enrolled in higher education, a growing figure that underscores the importance of immigrant-origin students in the classroom and our workforce.

| | |
|---|---|
| **All Students in Higher Education in California** | **2,712,000** |

*Note: First-generation immigrants were born abroad and immigrated to the U.S. Second-generation immigrants are U.S.-born individuals with at least one immigrant parent. First-generation immigrants include undocumented immigrants. First-generation immigrants do not include international students on a visa.*

**AR2022_500748**

**Methodology**

**Source: President's Alliance**

**Source: MPI**

| | |
|---|---|
| First-Generation Immigrant Students | 338,000 |
| Second-Generation Immigrant Students | 1,014,000 |
| International Students | 132,758 |

*Note: First-generation immigrants were born abroad and immigrated to the U.S. Second-generation immigrants are U.S.-born individuals with at least one immigrant parent. First-generation immigrants include undocumented immigrants. First-generation immigrants do not include international students on a visa.*

The U.S. is home to more than 427,000 undocumented students enrolled in higher education. In their pursuit of higher education, undocumented students actively ready themselves to fill critical skill shortages and become better positioned to support their families, communities, and the U.S. economy.

**Source: NAE**

**Source: Presidents' Alliance**

| | |
|---|---|
| **Undocumented Students in Higher Education** | **94,030** |
| DACA-Eligible Students in Higher Education | 49,704 |
| Non-DACA Eligible Students in Higher Education | 44,326 |
| Undocumented Students Graduating High School Each Year | 27,000 |

*Note: Undocumented students are a sub-group of first-generation students.*

International students comprise only 5

**132,758**

**AR2022_500749**

percent of all students in higher
education, but provide significant
economic, academic and cultural
contributions that enrich learning,
enrollment and funding opportunities for
American students.

**Source: Open Doors State Sheet**

**Source: NAFSA**

| **International Students in Higher Education** | |
|---|---|
| Economic Contributions of International Students in the State | $4.8 billion |
| Jobs Supported by International Students in the State | 51,378 |
| Optional Practical Training (OPT) Participants | 44,536 |

*Note: Optional Practical Training participants are a subgroup of international students.*

Immigrant residents, including
undocumented immigrants and DACA-
eligible residents, play an important role
in the state's economy, contributing
spending power and paying federal,
state, and local taxes.

**Source: NAE**

| **All Immigrant Residents in California** | **10,555,425** |
|---|---|
| **Immigrant Share of Total Population** | **26.7%** |
| Undocumented Immigrants in State | 2,010,993 |
| DACA-Eligible Residents in State | 253,818 |
| Spending Power of DACA-Eligible Residents | $5.062 billion |

*Note: DACA-eligible residents are a sub-group of undocumented immigrant residents.*

**AR2022_500750**

| DACA-Eligible Residents Federal Tax Contributions | $905.4 million |
|---|---|
| DACA-Eligible Residents State and Local Tax Contributions | $626.6 million |

*Note: DACA-eligible residents are a sub-group of undocumented immigrant residents.*

---

Higher education helps prepare all students, including immigrant and international students, to fill critical career and skills needs.

**Source: NAE**

**State Immigrant Workers Fill Critical Skills Needs**

| Share of STEM Workers Who Are First-Generation Immigrants | 39.1% |
|---|---|
| Share of Nurses Who Are First-Generation Immigrants | 35.8% |
| Share of Health Aides Who Are First-Generation Immigrants | 45.5% |
| DACA recipients in STEM or Health Professions | 8,579 |

*Note: First-generation immigrants were born abroad and immigrated to the U.S.*

| | |
|---|---|
| DACA recipients in Education (K-12, Higher Education, Education Industry) | 9,211 |
| First-Generation Immigrant Faculty and Staff in Colleges, Universities and Professional Schools | 134,644 |

*Note: First-generation immigrants were born abroad and immigrated to the U.S.*

You can find additional state data, including by congressional district, in the following resources by immigrant population (NAE) and international students (NAFSA).

**Source: NAE**        **Source: NAFSA**

# State Policies

## Evaluating Access for Undocumented Students

State policies in four key areas – in state tuition, state financial aid, professional and occupational licensure, and driver licenses – play an important role in expanding access to higher education and workforce development for undocumented students.

*In-State Tuition & State*        *Professional & Occupational*        *Driver Licenses &*

AR2022_500752

*Financial Aid*
## Access and Affordability

**Comprehensive Access:**
Policies provide statewide access to in-state tuition and some state financial aid or scholarships for the state's resident DACA recipients and undocumented students.

*Licensure*
## Workforce Entry & Eligibility

**Comprehensive Access:**
Policies allow individuals to obtain occupational licensure in all professions regardless of their immigration status, provided that they meet all other requirements.

*Identification*
## Mobility

**Accessible:**
Policies provide the state's undocumented residents with access to driver licenses and/or state identification regardless of their immigration status, but these are not REAL ID compliant.

---

# Enacted Policies

California provides eligible undocumented residents, including DACA recipients, with access to in-state tuition, state financial aid, professional and occupational licensure, and driver licenses and state identification.



### In-State Tuition

California Assembly Bill (A.B.) 540, signed into law on October 12, 2001, allows eligible undocumented students living in California to access in-state tuition. California Assembly Bill (A.B.) 2000, signed into law on September 27, 2014, and Senate Bill (S.B.) 68, signed into law on October 5, 2017, expand the scope of eligibility for in-state tuition. Students must meet certain requirements to access in-state tuition, including:

1. Attend a California high school, adult school, or community college for at least three years or the equivalent; or

2. Graduate from a California high school, attain an equivalent GED, or fulfill minimum transfer requirements from a community college to a UC or CSU campus;

3. File an affidavit, the California Nonresident Exemption Request, stating that they meet the requirements for in-state tuition and will obtain legal status as soon as they are eligible.

Please click here for more detailed information on eligibility requirements.

California A.B. 2000 expands eligibility for in-state tuition to students who graduate early from a California high school before completing the three-year high school requirement, usually through participation in an accelerated learning program. AB 2000 allows students to access in-state tuition if they completed the equivalent of three or more years of high school coursework and attended a California elementary or secondary schools for a total of three or more years.

S.B. 68 expands in-state tuition to students who complete three or more years of attendance or the equivalent in credits while enrolled in a California high school, adult school, community college, or a combination of those schools.

California Assembly Bill (A.B. 343), signed into law on October 5, 2017, provides certain individuals admitted to the United States as refugees or who have a Special Immigrant Visa (SIV) with access to in-state tuition.



## State Financial Aid

California provides eligible undocumented students, including DACA recipients, with access to state financial aid, scholarships, and educational loans. California Assembly Bill (A.B.) 131, signed into law in October 2011, provides undocumented students with access to state-based financial aid. California Assembly Bill (A.B.) 130, signed into law in July 2011, allows undocumented students living in California to access non-state funded scholarships. Both laws are known as the California Dream Act.

California Senate Bill (S.B.) 1210, the California DREAM Loan Program, signed into law in September 2014, establishes an educational loan program for eligible undocumented students.

Please click here for more detailed information on eligibility requirements.

**Detailed Information on Eligibility Requirements**



## Professional & Occupational Licensure

California allows individuals to obtain professional and occupational licensure regardless of their immigration status.

California Senate Bill (S.B.) 1159, signed into law in September 2014, allows individuals who complete the necessary training and other state licensing requirements to obtain professional licenses, independent of their immigration status. Applicants without a Social Security Number (SSN) can provide an Individual Tax Identification Number (ITIN) when seeking a professional license.

California Assembly Bill (A.B.) 595, signed into law in August 2019, allows a student enrolled in a community college class pursuant to an apprenticeship training program or an internship training program who does not have an SSN to use an ITIN for purposes of any background check required by the class or program.

## Additional Policies

California Senate Bill (S.B.) 695, signed into law in September 2018, prohibits licensing boards from requiring an individual to disclose their citizenship or immigration status for the purpose of obtaining professional licensure. The bill requires the Commission on Teacher Credentialing to authorize the use of ITINs in lieu of SSNs for the purpose of credentialing. The bill also requires the Department of Public Health to accept ITINs for certification applications. California Assembly Bill (A.B.) 2184, signed into law in September 2018, requires local governments to accept a California driver's license or identification number, an ITIN, or municipal identification number in lieu of a SSN for the issuance of a business license.

California Senate Bill (S.B.) 788, signed into law in October 2017, allows the Insurance Commissioner to accept ITINs in lieu of SSNs from licensure applicants.



AR2022_500755

## Driver Licenses

Undocumented immigrants living in California are eligible to obtain a driver license. Assembly Bill (A.B.) 60, signed into law on October 3, 2013, permits all eligible undocumented residents to obtain a driver license or state identification card.

DACA recipients in California are also allowed to obtain a driver license or state identification card.

**Source: NILC**

# Narratives

The following narratives highlight stories of immigrant, refugee, and international students, alumni, and scholars, including in their own words or as shared publicly.

*Narrative*

### Student Narratives: Presidents' Alliance Dream Summer Fellows

A conversation with two Dream Summer Fellows who have joined the Presidents' Alliance since 2019. Through our partnership, we have hosted fellows who have done outstanding work within our organization and centered the voices of those directly impacted by immigration.

# Effective Practices and State Resources

Spotlight on effective practices and policy, research, or community-based state resources.

*Research*

## Undocumented Students in Higher Education (Updated March 2021)

More than 427,000 undocumented students in the U.S. are enrolled in higher education, including 181,000 DACA-eligible individuals.

*Effective Practice*

## California Based Resources for Undocumented Students

Resources cover a variety of topics related to the state of California, including state tuition and financial aid.

*Effective Practice*

## Undocumented Graduate and Professional Students Handbook

A handbook for undocumented graduate and professional students.

© 2022 Higher Ed Immigration Portal. All rights reserved.

Site by: Web Solutions

AR2022_500757

28 May 2012

The President
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

re: Executive authority to grant administrative relief
for DREAM Act beneficiaries

Dear Mr. President,

 We write as law professors whose teaching and scholarship focus on matters of U.S. immigration and citizenship law. This letter addresses an issue that may arise as agencies and officials within the Executive Branch consider various administrative options in cases involving potential beneficiaries of the Development, Relief, and Education for Alien Minors (DREAM) Act.

 In assessing the options that may be available to the Executive Branch, the threshold question is whether there is executive authority to grant administrative relief. This is the question addressed in this letter. Though your Administration has considered various forms of prosecutorial discretion for individual DREAM-eligible applicants, this letter highlights the administrative authority that is available to potential DREAM Act beneficiaries as a group. We offer no views on the policy dimensions of a decision to exercise or to not exercise this authority. We write only to explain that there is clear executive authority for several forms of administrative relief for DREAM Act beneficiaries: deferred action, parole–in–place, and deferred enforced departure.

 ***Deferred action*** is a long–standing form of administrative relief, originally known as "nonpriority enforcement status."[1] It is one of many forms of prosecutorial discretion available to the Executive Branch. A grant of deferred action can have any of several effects, depending on the timing of the grant. It can prevent an individual from being placed in removal proceedings, suspend any proceedings that have commenced, or stay the enforcement of any existing removal order.[2] It also makes the recipient eligible to apply

---

[1] *See generally* T.A. Aleinikoff, David A. Martin, Hiroshi Motomura, and Maryellen Fullerton, *Immigration and Citizenship: Process and Policy* 780 (7th ed. 2012); Shoba Sivaprasad Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 Conn. Pub. Int. L.J. 243, 248-65 (2010).

[2] Practitioners have reported that, in recent months, some DHS officials have taken the position that deferred action is available only to individuals who are in removal proceedings. At the same time, these officials maintain that once a removal case has been administratively closed, deferred action is no longer available. This position is inconsistent with DHS's prior practice. *See* Citizenship and Immigration Services

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 2

for employment authorization.[3] General authority for deferred action exists under
Immigration and Nationality Act (INA) § 103(a), 8 U.S.C. § 1103(a), which grants the
Secretary of Homeland Security the authority to enforce the immigration laws. Though no
statutes or regulations delineate deferred action in specific terms, the U.S. Supreme Court
has made clear that decisions to initiate or terminate enforcement proceedings fall squarely
within the authority of the Executive.[4] In the immigration context, the Executive Branch
has exercised its general enforcement authority to grant deferred action since at least 1971.
Federal courts have acknowledged the existence of this executive power at least as far back
as the mid–1970s.[5] More recently, this Administration granted deferred action in June
2009 to widows and children of U.S. citizens while legislation to grant them statutory
relief was under consideration.[6]

    *Parole–in–place* refers to a form of parole granted by the Executive Branch under
the authority of INA § 212(d)(5), 8 U.S.C. § 1182(d)(5). Under this provision, the Attorney
General "may . . . in his discretion parole into the United States temporarily under such
conditions as he may prescribe only on a case–by–case basis for urgent humanitarian
reasons or significant public benefit any alien applying for admission to the United
States."[7] Parole permits a noncitizen to remain lawfully in the United States, although
parole does not constitute an "admission" under the INA. Individuals who have been
paroled are eligible for work authorization.[8] Under this express authority, previous
Presidents have granted parole to noncitizens who did not qualify for admission under
existing immigration law. For example, President Jimmy Carter exercised parole authority

---

Ombudsman, *Deferred Action:  Recommendations to Improve Transparency and Consistency in the USCIS
Process*, July 11, 2011, at 3-4; Citizenship and Immigration Services, *Fact Sheet: USCIS Provides Interim
Deferred Action Relief for Surviving Spouses*, Aug. 31, 2009.  It is also inconsistent with case law and with
DHS's own regulations.  As the Supreme Court has explained, through deferred action: "[T]he INS may
decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation. . . .
*A case may be selected for deferred action treatment at any stage of the administrative process.*" *Reno v.
American-Arab Anti-Discrimination Committee,* 525 U.S. 471, 483-84 (1999) (quoting 6 C. Gordon, S.
Mailman, & S. Yale-Loehr, Immigration Law and Procedure §72.03[2][h] (1998)) (quotation marks
removed) (emphasis added); *see also* 8 C.F.R. § 274a.12(c)(14) (describing deferred action as "an act of
administrative convenience to the government which gives some cases lower priority").

    [3] *See* 8 C.F.R. § 274a.12(c)(14).

    [4] *See, e.g., Heckler v. Chaney,* 470 U.S. 821, 831 (1985).

    [5] *See, e.g., Soon Bok Yoon v. INS,* 538 F.2d 1211, 1213 (5th Cir. 1976); *Vergel v. INS,* 536 F.2d 755,
757-58 (8th Cir. 1976); *David v. INS,* 548 F.2d 219, 223 & n.5 (8th Cir. 1977); *Nicholas v. INS,* 590 F.2d
802, 806-08 (9th Cir. 1979), *superseded by rule on other grounds,* as stated in *Romeiro de Silva v. Smith,* 773
F.2d 1021, 1024 (9th Cir. 1985).

    [6] *See* DHS Establishes Interim Relief for Widows of U.S. Citizens, June 9, 2009, *available at*
http://www.dhs.gov/ynews/releases/pr_1244578412501.shtm.

    [7] Although the INA gives the parole authority to the Attorney General, the statutes creating DHS in
2003 essentially transferred the parole–granting authority to DHS.

    [8] 8 C.F.R. § 274a.12(c)(11).

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 3

to allow Cubans into the United States in 1980.[9] President Bill Clinton did the same in
1994.[10] More recently, this Administration granted parole in January 2010 to Haitian
orphans who were in the process of being adopted by U.S. citizens.[11] In May 2010, this
Administration adopted the current practice of granting parole to spouses, parents, and
children of U.S. citizens serving in the military.[12] Though the text of the statute calls for
case–by–case discretion, both historical and current practice make clear that such
discretionary judgments may be based on group circumstances.[13] And, as the Supreme
Court has made plain, the Administration's use of group circumstances as a basis for
decision–making would be entitled to deference.[14]

 **Deferred enforced departure**, often referred to as DED, is a form of prosecutorial
discretion that is closely related to deferred action. Almost every Administration since
President Dwight D. Eisenhower has granted DED or the analogous "Extended Voluntary
Departure" to at least one group of noncitizens.[15] As with deferred action, executive
authority to grant deferred enforced departure and extended voluntary departure exists
under the general authority to enforce the immigration laws as set out in INA § 103(a), 8
U.S.C. § 1103(a).[16] Though Temporary Protected Status (TPS) in INA § 244, 8 U.S.C.
§ 1254a, has largely superseded the use of DED in practice, DHS's statutory authority for
granting DED on bases other than nationality remains intact, and the President retains his
inherent authority with respect to DED. Most recently, this Administration granted DED to
Liberians in March 2009.[17] Though DED has been used in response to disturbed conditions
in specific countries, there is nothing in the statutory authority for DED that limits its use
to such situations. Recipients of DED are eligible to apply for work authorization.[18]

---

  [9] *See* T.A. Aleinikoff, David A. Martin, Hiroshi Motomura, and Maryellen Fullerton*, Immigration and Citizenship: Process and Policy* 520 (7th ed. 2012).

  [10] *See id.*

  [11] *See* Secretary Napolitano Announces Humanitarian Parole Policy for Certain Haitian Orphans, January 18, 2010, *available at* http://www.dhs.gov/ynews/releases/pr_1263861907258.shtm

  [12] *See* Julia Preston, *Immigration Policy Aims to Help Military Families*, N.Y. Times, August 1, 2010, at A15.

  [13] For a discussion of the historical use of the parole power, *see, e.g.,* Arthur C. Helton, *Immigration Parole Power: Toward Flexible Responses to Migration Emergencies*, 71 Interpreter Releases 1637 (Dec. 12, 1994). For examples of more recent categorical grants of parole, *see supra* notes 11 and 12.

  [14] *See generally Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984).

  [15] *See* Ari Weitzhandler, Comment, *Temporary Protected Status: The Congressional Response to the Plight of Salvadoran Aliens*, 64 U. Colo. L. Rev. 249, 256 & nn. 41–43 (1993).

  [16] *Hotel and Restaurant Employees Union, Local 25 v. Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (en banc) (opinion of Mikva, J.), *affirming by an equally divided court* 594 F. Supp. 502 (D.D.C. 1984); *see also American Baptist Churches in the U.S.A. v. Meese*, 712 F. Supp. 756, 768 (N.D. Cal. 1989).

  [17] *See* Deferred Enforced Departure of Liberians, March 23, 2009, *available at* http://www.whitehouse.gov/the-press-office/presidential-memorandum-regarding-deferred-enforced-departure-liberians

  [18] 8 C.F.R. § 274a.12(c)(14).

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 4


These three forms of administrative relief differ in their requirements and consequences. In this letter, we do not reach these questions of specific application. Our purpose in writing is more limited and straightforward: to explain that the Executive Branch has the authority to grant these three forms of administrative relief to some significant number of DREAM Act beneficiaries, and that it has done so both historically and recently in similar situations.

Respectfully yours,

Hiroshi Motomura
Susan Westerberg Prager Professor of Law
UCLA School of Law*

David Abraham
Professor of Law
University of Miami School of Law

Muneer I. Ahmad
Clinical Professor of Law
Yale Law School

Raquel Aldana
Professor of Law
University of the Pacific
McGeorge School of Law

Deborah Anker
Clinical Professor of Law
Director, Harvard Immigration and Refugee
    Clinical Program
Harvard Law School

Angela M. Banks
Associate Professor
William & Mary School of Law

---

\* All institutional affiliations indicated for identification purposes only.

*Signatures continued**

Melynda H. Barnhart
Associate Professor
New York Law School

Linda Bosniak
Professor of Law
Rutgers University School of Law-
    Camden

Richard Boswell
Professor of Law
University of California, Hastings
    College of the Law

Allison Brownell Tirres
Assistant Professor
DePaul University College of Law

Kristina M. Campbell
Assistant Professor of Law
Director, Immigration and Human Rights
    Clinic
University of the District of Columbia
David A. Clarke School of Law

Stacy Caplow
Professor of Law
Brooklyn Law School

Ming Hsu Chen
Associate Professor
University of Colorado Law School

Gabriel J. Chin
Professor of Law
University of California, Davis School of
    Law

Michael J. Churgin
Raybourne Thompson Centennial
    Professor in Law
The University of Texas at Austin

Marisa S. Cianciarulo
Associate Professor of Law
Director, Bette & Wylie Aitken Family
    Violence Clinic
Chapman University

Adam B. Cox
Professor of Law
New York University School of Law

Keith Cunningham-Parmeter
Associate Professor of Law
Willamette University College of Law

Alina Das
Assistant Professor of Clinical Law
New York University School of Law

Johanna K.P. Dennis
Associate Professor of Law
Southern University Law Center

Ingrid V. Eagly
Acting Professor of Law
UCLA School of Law

Jill E. Family
Associate Professor of Law
Widener University School of Law

Niels W. Frenzen
Clinical Professor of Law
Gould School of Law
University of Southern California

Maryellen Fullerton
Professor of Law
Brooklyn Law School

---

[*] All institutional affiliations indicated for
identification purposes only.

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 6

*Signatures continued\**

César Cuauhtémoc García Hernández
Assistant Professor
Capital University Law School

Lauren Gilbert
Professor of Law
St. Thomas University School of Law

Denise Gilman
Clinical Professor
Co-Director, Immigration Clinic
University of Texas School of Law

Jennifer Gordon
Professor of Law
Fordham University School of Law

Pratheepan Gulasekaram
Assistant Professor of Law
Santa Clara University

Anjum Gupta
Assistant Professor of Law
Director, Immigrant Rights Clinic
Rutgers School of Law - Newark

Jonathan Hafetz
Associate Professor of Law
Seton Hall University School of Law

Barbara Hines
Clinical Professor of Law
Co-Director, Immigration Clinic
University of Texas School of Law

Geoffrey A. Hoffman
Clinical Associate Professor and
Director, University of Houston
    Immigration Clinic
University of Houston Law Center

Alan Hyde
Distinguished Professor and Sidney
    Reitman Scholar
Rutgers University School of Law

Kate Jastram
Lecturer in Residence
Senior Fellow, Miller Institute for Global
    Challenges and the Law
University of California, Berkeley School
    of Law

Michael Kagan
Associate Professor
William S. Boyd School of Law
University of Nevada, Las Vegas

Daniel Kanstroom
Professor of Law and
Director, International Human Rights
    Program
Boston College Law School

Kathleen Kim
Professor of Law
Loyola Law School, Los Angeles

David C. Koelsch
Associate Professor and
Director, Immigration Law Clinic
University of Detroit Mercy School of
    Law

Sylvia R. Lazos
Justice Myron Leavitt Professor
William S. Boyd School of Law
University of Nevada, Las Vegas

Stephen Lee
Assistant Professor of Law
University of California, Irvine

---

\* All institutional affiliations indicated for
  identification purposes only.

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 7

*Signatures continued\**

Jennifer Lee Koh
Assistant Professor of Law
Western State University College of Law

Beth Lyon
Professor of Law
Villanova University School of Law

Lynn Marcus
Professor of the Practice
Co-Director, Immigration Law Clinic
University of Arizona Rogers College of
    Law

Peter L. Markowitz
Associate Clinical Professor of Law
Benjamin N. Cardozo School of Law

Fatma E. Marouf
Associate Professor of Law
Co-Director of the Immigration Clinic
William S. Boyd School of Law
University of Nevada, Las Vegas

Elizabeth McCormick
Associate Clinical Professor of Law
University of Tulsa College of Law

Karla McKanders
Associate Professor of Law
University of Tennessee, College of Law

Michelle McKinley
Associate Professor
University of Oregon School of Law

M. Isabel Medina
Ferris Family Distinguished Professor of
    Law
Loyola University New Orleans College
    of Law

Jennifer Moore
Regents Professor of Law
University of New Mexico School of
    Law

Daniel Morales
Assistant Professor
DePaul University College of Law

Nancy Morawetz
Professor of Clinical Law
New York University School of Law

Karen Musalo
Clinical Professor of Law &
Director, Center for Gender & Refugee
    Studies
University of California, Hastings
    College of the Law

Noah Benjamin Novogrodsky
Associate Professor of Law
University of Wyoming College of Law

Mariela Olivares
Assistant Professor of Law
Howard University School of Law

Michael A. Olivas
William B. Bates Distinguished Chair in
    Law
University of Houston Law Center

Sarah H. Paoletti
Practice Associate Professor
Director, Transnational Legal Clinic
University of Pennsylvania School of
    Law

---

\* All institutional affiliations indicated for
identification purposes only.

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 8

*Signatures continued\**

Huyen Pham
Professor of Law
Texas Wesleyan University School of
Law

Polly J. Price
Professor of Law
Emory University School of Law

Nina Rabin
Associate Clinical Professor of Law
Director, Bacon Immigration Law and
Policy Program
James E. Rogers College of Law,
University of Arizona

Jaya Ramji-Nogales
Associate Professor of Law
Temple University, Beasley School of
Law

Jayesh Rathod
Assistant Professor of Law
American University Washington
College of Law

Maritza Reyes
Assistant Professor of Law
Florida A&M University College of Law

Ediberto Roman
Professor of Law &
Director of Citizenship and Immigration
Initiatives
Florida International University

Victor C. Romero
Maureen B. Cavanaugh Distinguished
Faculty Scholar & Professor of Law
The Pennsylvania State University,
Dickinson School of Law

Rachel E. Rosenbloom
Assistant Professor
Northeastern University School of Law

Kevin Ruser
M.S. Hevelone Professor of Law
Director of Clinical Programs
University of Nebraska-Lincoln College
of Law

Leticia M. Saucedo
Professor of Law
University of California, Davis School of
Law

Michael Scaperlanda
Edwards Family Chair in Law
University of Oklahoma College of Law

Irene Scharf
Professor of Law
University of Massachusetts School of
Law – Dartmouth

Andrew I. Schoenholtz
Visiting Professor of Law
Georgetown University Law Center

Philip G. Schrag
Delaney Family Professor of Public
Interest Law
Georgetown University Law Center

Rachel Settlage
Assistant Professor
Wayne State Law School

---

\* All institutional affiliations indicated for
identification purposes only.

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 9

*Signatures continued**

Ragini Shah
Associate Clinical Professor of Law
Suffolk University Law School

Rebecca Sharpless
Associate Clinical Professor
University of Miami School of Law

Dan R. Smulian
Associate Professor of Clinical Law
Safe Harbor Project
BLS Legal Services Corporation
Brooklyn Law School

Gemma Solimene
Clinical Associate Professor of Law
Fordham University School of Law

Jayashri Srikantiah
Professor of Law &
Director, Immigrants' Rights Clinic
Stanford Law School

Juliet P. Stumpf
Professor of Law
Lewis & Clark Law School

Maureen A. Sweeney
Clinical Instructor
Immigration Clinic
University of Maryland Francis King
   Carey School of Law

Margaret Taylor
Professor of Law
Wake Forest University School of Law

David B. Thronson
Professor of Law
Michigan State University College of
   Law

Enid Trucios-Haynes
Professor of Law &
University Faculty Grievance Officer
Brandeis School of Law
University of Louisville

Diane Uchimiya
Professor of Law
Director of the Justice and Immigration
   Clinic
University of LaVerne College of Law

Katherine L. Vaughns
Professor of Law
University of Maryland Francis King
   Carey School of Law

Prof. Sheila I Vélez Martínez
Immigration Law Clinic
University of Pittsburgh School of Law

Leti Volpp
Professor
University of California, Berkeley
   School of Law

Shoba Sivaprasad Wadhia, Esq.
Clinical Professor and
Director, Center for Immigrants' Rights
The Pennsylvania State University
The Dickinson School of Law

David P. Weber
Associate Professor of Law
Creighton Law School

Jonathan Weinberg
Professor of Law
Wayne State University

---

* All institutional affiliations indicated for
   identification purposes only.

re: Executive authority to grant administrative relief for DREAM Act beneficiaries
page 10

*Signatures continued**

Deborah M. Weissman
Reef C. Ivey II Distinguished Professor
    of Law
University of North Carolina School of
    Law

Virgil Wiebe
Professor of Law
University of St. Thomas School of Law
    (Minneapolis)

Michael Wishnie
William O. Douglas Clinical Professor of
    Law and
Director of the Jerome N. Frank Legal
    Services Organization
Yale Law School

Elizabeth L. Young
Associate Professor of Law
University of Arkansas School of Law –
    Fayetteville

---

* All institutional affiliations indicated for
  identification purposes only.





## CATO AT LIBERTY

**JANUARY 18, 2017** 3:00PM

# The Economic and Fiscal Impact of Repealing DACA

By **Ike Brannon** and Logan Albright

 SHARE

### Executive Summary

Donald Trump has proposed eliminating or severely modifying the Deferred Action for Childhood Arrivals (DACA) program. Many Americans believe that the presence of unauthorized immigrants is harmful to the economy and would like to see steps taken to reduce their presence. However, a repeal or roll-back of DACA would harm the economy and cost the U.S. government a significant amount of lost tax revenue. We estimate that the fiscal cost of immediately deporting the approximately 750,000 people currently in the DACA program would be over $60 billion to the federal government along with a $280 billion reduction in economic growth over the next decade.

We arrived at our estimates by comparing and adjusting the characteristics of DACA recipients to similarly well-educated immigrants admitted through the H-1B visa program, a cohort that not only resembles the population of DACA recipients but whose own economic impact has been well-studied. We use the estimated budgetary and economic impact of H-1B visa workers and adjust it to reflect the age and earnings differences between the two groups to calculate our figures.

### Background

President Obama created the DACA program in 2012 via executive action. DACA's objective was to allow American residents who entered the country illegally as children to receive temporary protection from deportation, work permits, and an incentive to invest in their own human capital. The program only applies to those who have lived in the United States for five years or longer and do not have a criminal record. Essentially, these are people who never

AR2022_500768

knowingly broke any law and have been productive and peaceful members of society since their arrival. The logic of the Obama Administration in creating DACA is that it makes little sense to expend time and resources trying to track down, arrest, and deport these people when they have not committed any crime save for being unwittingly brought across the border by others.

There is much legitimate debate in the United States over the role that immigration—both legal and illegal—plays in the economy, and what should be done about border security. Inseparable from this problem is the question of what to do with the undocumented immigrants already in the country, a sizeable population that is estimated to number 11 to 12 million.[1]

President-Elect Donald Trump has taken an absolutist position on the issue, vowing not only to build a wall with the intent of greatly reducing illegal entry from the Mexican border, but also to unilaterally nullify President Obama's executive actions dealing with immigration, including the action which spawned DACA.

As with any sudden and dramatic shift in any policy, there are bound to be costs associated with implementation, as well as after-effects of the policy, not all of which are immediately intuitive. It is the goal of this paper to examine the costs that the wholesale repeal of DACA would impose on the American economy, both in terms of enforcement as well as the sudden loss of a large number of residents and their contributions to the domestic economy.

## Who Are the DACA Recipients?

Although there have been many previous studies on the costs and benefits of immigration as a whole (we recently authored a review of such studies), it is important to note that we cannot simply assume that DACA recipients constitute a representative sample of the immigrant population. In addition to the aforementioned screening for criminal activity, workers in the DACA program tend to be younger, better educated, and more highly paid than the typical immigrant. To extrapolate from the studies on immigration in general, therefore, would significantly underestimate the opportunity cost to the economy of deporting the approximately 750,000 program participants, due to their higher level of productivity.

We instead looked for another group that might more closely resemble the demographic characteristics of those in the DACA program whose economic and budgetary impacts on the economy is well established: the recipients of H-1B visas, which are issued to skilled workers

AR2022_500769

who are invited into the country to fulfill specific economic needs. This coincidence is useful.

The average DACA recipient is 22 years old, employed, and earns about $17 an hour. The majority are still students and 17 percent are pursuing an advanced degree.[2] By contrast, most recipients of H-1B visas are between 25 and 34 and hold either a Bachelor's Degree or a Master's Degree. In short, they appear to be a close reflection of what DACA recipients will look like a few years from now as they complete their educations.[3]

While the comparison is not perfect, as no such comparison can be, calculating costs under the assumption that DACA recipients are more like H-1B Visa holders than the general population of unauthorized immigrants will, we believe, yield a more accurate result. And given that we know the demographic and educational differences between the two groups we take those differences into account when estimating the fiscal and economic costs of repealing DACA.

**Economic Costs**

As of June 2016, U.S. Citizenship and Immigration Services has received 844,931 applications for the DACA program. Of these, 741,546 were accepted, with the rest either denied or pending approval.[4] It should be noted that the applicants to DACA are asked to pay the administrative fees for background checks and processing, so the administrative costs of implementing the program itself are minimal. While the Obama Administration had announced its intention to expand the program last year, this is unlikely to occur under the Trump Administration, so we will accept these numbers as representative of the affected population.

Little research has been done on the effects of DACA itself, which is why we have chosen to extrapolate the program's economic impact from the research done on holders of H-1B visas, who are demographically similar to workers in the DACA program, as well as from the numerous studies on the economic effects of undocumented immigration generally.

One study on DACA itself was conducted by Nolan G. Pope and published in the *Journal of Public Economics* in 2016. Nolan found that DACA moved between 50,000 and 75,000 immigrants into employment from either outside the formal labor force or unemployment, and increased the average income of immigrants in the bottom of the income distribution.[5] This is a positive labor market outcome for a number of reasons: working and earning a higher level of income in the formal sector means that the DACA workers pay more taxes, both through payroll, income, and sales as a result of greater consumption associated with higher

AR2022_500770

incomes. The Organization of Economic Co-operation and Development (OECD) cited employment as "the most important factor that weighs on migrants' net fiscal contributions," so it is clear that any increase in immigrant employment will tend to result in a positive fiscal impact.[6]

A 2014 survey found that 59 percent of DACA recipients reported getting their first job, 45 percent received a pay increase, 49 percent opened their first bank account, and 33 percent got their first credit card due to their participating in DACA.[7] All of these factors contribute positively to the economy. But while the survey also noted that recipients would be eligible for higher levels of education, Pope's research completed two years later found no correlation between DACA participation and education, although it is possible that simply not enough time has passed to observe an effect.

Turning more generally to the cost-benefit analysis of unauthorized immigration as a whole, the evidence suggests that the mere presence of undocumented workers, especially non-criminals like those covered under DACA, is not nearly as detrimental to the economy as most people suppose, and may actually be a net benefit. Legalizing unauthorized immigrants and allowing them to participate in society as legal workers dramatically reduces government enforcement costs and generates broader economic benefits.[8] **Quantifying the Net Costs**

Quantifying the costs of any action on immigration presents enormous difficulties, due to the complexity and number of variables involved.

Alex Nowrasteh, a scholar at the Cato Institute, points out that while the economic impact of immigration is large and positive, the fiscal impact tends to be minimal. Nowrasteh also stresses the need to take into account the long-term effects of immigration, meaning the contributions of immigrants' children and grandchildren, which tend to be more positive than those of first generation immigrants.[9]

There are unquantifiable benefits from DACA as well, such as providing increased access to private health insurance, driver's licenses, and auto insurance, all of which generate spillover benefits to the rest of society. This analysis also leaves out the effects of simply having more productive minds in the country capable of producing innovations and increasing labor productivity. The data show that immigrants start their own businesses and file patents at greater rates than native-born Americans.[10]

The fiscal costs of DACA recipients are also minimal and comparable to the fiscal costs of H-

AR2022_500771

1B workers.[11] Under current law, DACA recipients are ineligible for means-tested welfare benefits provided by the federal government or funded through federal matching grants to the states.[12]  Although states can extend welfare benefits to DACA recipients if they choose to, few have done so. DACA recipients, like everybody else in the United States, are eligible for emergency Medicaid. Thus, DACA does not boost government welfare expenditures above the level consumed by unauthorized immigrants.

To reiterate, we need to isolate DACA recipients—who tend to be more educated, younger, and less prone to criminal activity—from the general population of unauthorized immigrants to derive an accurate estimate of DACA's impact. To do this, we begin by comparing them to the holders of H-1B visas, the work permits issued for high-skilled labor. The main difference between the two groups is age, with H-1B visa holders being on average 3 to 12 years older. With this age gap also comes the concomitant difference in education and earnings, which we can adjust for in our calculations.

Thomas Church, a senior fellow at the Hoover Institution, estimates that expanding the H-1B visa program over a ten year period would increase GDP by $456 billion and tax revenues by $113 billion, assuming that 660,000 new H-1B immigrants would arrive over the decade.[13] Church obtains his results by taking the mean wages for H-1B immigrants, assuming an average wage growth of 3 percent per year, and applying the appropriate tax rates.

Church also incorporates income accrued to capital from these workers, using the relatively stable historical averages calculated by the Congressional Budget Office. Multiple studies have been conducted on the impact of immigration on native wages, and the results have been both positive and negative, albeit small in either direction. There is also some evidence that the presence of immigrant workers can increase purchasing power by reducing consumer prices. Given these conflicting and minor findings, Church has not included wage or purchasing power effects in his calculations, and we have done the same.

We take Church's estimate as our baseline and begin by adjusting it to reflect the 741,546 participants in the DACA program—which is a bit more than his H-1B expansion called for—producing an estimated GDP gain of $512 billion and a budgetary impact of $127 billion.

However, since the average wages of DACA participants are lower than H-1B immigrants, we corrected these values to reflect the relative youth and inexperience of DACA immigrants. DACA participants earn an average of $34,000 annually and H-1B participants an average of $72,000 annually, a ratio of 47 percent. Applying this ratio to the economic and fiscal costs

AR2022_500772

above yields an economic impact of $215 billion and a fiscal impact of $60 billion.

We feel this is a conservative estimate due to the fact that many DACA immigrants are young and still acquiring education credentials that will boost wages later.  DACA immigrants are less like H-1B immigrants at half the salary, and more like younger H-1B workers. Additionally, the higher tax brackets associated with higher incomes would increase DACA immigrants' fiscal contributions at a greater rate than the increase in salary. In other words, doubling the wages of DACA participants would more than double their contributions to state and federal budgets. Thus, a life-cycle comparison of the wages of the two groups would produce a narrower difference.

For comparison, an influential study by the National Research Council[14] examined the present value fiscal impact of immigration in the United States, with an emphasis on long-term impact. The study points out that immigrants become more productive over time as they learn new skills and become more fluent in English. The authors concluded that the average immigrant will have a net long-term impact on state, local and federal budgets of $80,000, which includes tax payments as well as the impact of the children of immigrants, who tend to be less costly—and higher-earning—than their parents. Multiplying this estimate by the number of DACA recipients produces an estimated fiscal impact of $59.3 billion, nearly identical to the $60 billion fiscal impact we derived from the Hoover study.

We also need to add the actual cost of deportation for current DACA recipients to the fiscal and economic estimates. For this we borrow from a study from the Center for American Progress that estimates the marginal deportation costs at just over $10,000 per removal.[15] The total deportation cost would then be $7.5 billion.

Summing these numbers produces a total cost estimate of immediately eliminating the DACA program and deporting its participants of $283 billion over 10 years. In other words, the United States economy would be poorer by more than a quarter of a trillion dollars if President Trump were to make good on his threat to repeal it.

There are other variables that potentially impact both the costs and benefits of immigrant workers, and the further into the future we attempt to project such costs and benefits the more difficult accurate estimates become. For example, our calculation used only the current number of DACA recipients, but it is estimated that there could be another one million eligible residents who have not yet applied for, or received, membership in the program.[16] We do not make any forecast regarding whether this cohort would eventually take advantage of the

**AR2022_500773**

program and instead assume none of them would do so.

Likewise, assuming immediate deportation instead of a temporary reversion to undocumented status changes the calculus as well, considering the costs that result from people trying to live outside the law. This would need to be taken into account.

Alex Nowrasteh of Cato suggested that it is probably more realistic to assume that upon a repeal of DACA the newly unauthorized immigrants would predominantly remain in the United States and pursue employment illegally, at wages 10 percent to 20 percent less than they earned legally. If we combined that with a similar reduction in employment levels then the resulting economic impact would be a bit less—in the range of $60-$100 billion—but still significant.[17]

Regardless of the response, it is clear that there is a significant fiscal and economic cost to the immediate repeal of DACA, one borne by all of the nation's residents and not just by those whose lives would be upended by such a move. This suggests that it would make more sense to focus immigration enforcement efforts elsewhere—if indeed the aim is to protect American national sovereignty, as well as the life, liberty, and private property of Americans.

**Small Gains, Big Costs**

There are valid reasons to be concerned about unauthorized immigration in the United States. The DACA program, however, screens out anyone with a criminal past as part of its core eligibility requirements. DACA participants are not eligible for means-tested welfare benefits or Obamacare subsidies.

Since DACA applicants pay their own processing fees, the program itself does not have an administrative cost, and so the only costs we need to evaluate are those that stem from having these people in the country in the first place. We submit that any such costs are far outweighed by the benefits that come from immigrants who are able to work openly and legally, pay taxes, support entitlement programs, create jobs, innovate, and sire children who will one day do the same.

The deportation of DACA participants would cost the American economy billions of dollars, as well as billions of tax dollars foregone, while doing little to address the true concerns that Americans may have about unauthorized immigrants.

AR2022_500774

div[1] Jeffrey S. Passel and D'Vera Cohn, "Unauthorized Immigrant Population Stable for Half a Decade," (Washington: Pew Research Center, September 21, 2016), http://www.pewresearch.org/fact-tank/2016/09/21/unauthorized-immigrant-population-stable-for-half-a-decade/.

div[2] Tom K. Wong, "Results of Tom K. Wong, National Immigration Law Center, and Center for American Progress National Survey," (Washington: National Immigration Law Center and Center for American Progress, June 2015), https://cdn.americanprogress.org/wp-content/uploads/2015/07/DACA-Wong_NILC_CAP-Codebook-PDF.pdf.

div[3] "Characteristics of H-1B Specialty Occupation Workers," Fiscal Year 2014 Annual Report to Congress (Washington: U.S. Citizenship and Immigration Services, February 26, 2015), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/H-1B/h-1B-characteristics-report-14.pdf.

div[4] "Number of I-821D, Consideration of Arrivals by Fiscal Year, Quarter, Intake, Biometrics, and Case Status: 2012–2016," (Washington: U.S. Citizenship and Immigration Services, June 30, 2016), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and…;

div[5] Nolan G. Pope, "The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants," *Journal of Public Economics* 143 (2016): 98-114.

div[6] Organization for Economic Cooperation and Development, "International Migration Outlook," (Paris: OECD, 2013), p. 161.

div[7] Robert G. Gonzales and Angie M. Bautista-Chavez, "Two Years and Counting: Assessing the Growing Power of DACA," American Immigration Council Special Report (Washington: American Immigration Council, June 14, 2014), https://www.americanimmigrationcouncil.org/research/two-years-and-counting-assessing-growing-power-daca.

div[8] Ike Brannon and Logan Albright, "Immigration's Impact on the Texas Economy," Texas Public Policy Foundation (Austin: TPPF, March 2016), http://www.texaspolicy.com/library/doclib/Immigration-s-Impact-on-the-Texas-Economy.pdf.

**AR2022_500775**

div[9] Alex Nowrasteh, "The Fiscal Impact of Immigration," Cato Institute Working Paper (Washington: Cato Institute, July 23, 2014), https://object.cato.org/sites/cato.org/files/pubs/pdf/working-paper-21-fix.pdf.

div[10] American Immigration Council, "Value Added: Immigrants Create Jobs and Businesses, Boost Wages of Native-Born Workers," American Immigration Council Factsheet (Washington: AIC, January 2, 2012), https://www.americanimmigrationcouncil.org/research/value-added-immigrants-create-jobs-and-businesses-boost-wages-native-born-workers.

div[11] Ruth Ellen Wasem, "Noncitizen Eligibility for Federal Public Assistance: Policy Overview and Trends," Congressional Research Service (Washington: CRS, September 27, 2012).

div[12] "Frequently Asked Questions: The Obama Administration's DAPA and Expanded DACA Programs," National Immigration Law Center (Washington: NILC, March 2, 2015), https://www.nilc.org/issues/immigration-reform-and-executive-actions/dapa-and-expanded-daca-programs/.

div[13] Thomas V. Church, "Estimating the Economic and Budgetary Effects of New H-1B Visas in the Senate Gang of Eight's Proposed Immigration Bill," Hoover Institution (Stanford: Hoover, May 7, 2013), http://www.hoover.org/sites/default/files/uploads/aafs/2013/05/Estimating-the-Economic-and-Budgetary-Effects-of-H-1B-Reform-In-S.744.pdf.

div[14] James P. Smith and Barry Edmonston, editors, "The New Americans: Economics, Demographic, and Fiscal Effects of Immigration," National Academies Press (Washington: NAP, 1997), p. 346.

div[15] https://www.americanprogress.org/issues/immigration/news/2015/02/23/106...;

div[16] Philip E. Wolgin, "What Would it Cost to Deport All 5 Million Beneficiaries of Executive Action on Immigration?" Center for American Progress (Washington: CAP, February 23, 2015), https://www.americanprogress.org/issues/immigration/news/2015/02/23/106983/what-would-it-cost-to-deport-all-5-million-beneficiaries-of-executive-action-on-immigration/.

div[17] Alex Nowrasteh, "Heritage Immigration Study Fatally Flawed," Cato at Liberty, April 4, 2013, https://www.cato.org/blog/heritage-immigration-study-fatally-flawed.

---

RELATED TAGS

**AR2022_500776**

# Email Signup

Sign up to have blog posts delivered straight to your inbox!

Subscribe

### TOPICS

- Banking and Finance
- Constitutional Law
- Criminal Justice
- Defense and Foreign Policy
- Education
- Free Speech and Civil Liberties
- Global Freedom
- Government and Politics
- Health Care
- Immigration
- Monetary Policy
- Poverty and Social Welfare
- Regulation
- Tax and Budget Policy
- Technology and Privacy
- Trade Policy

### ARCHIVES

- April 2021
- March 2021
- February 2021
- January 2021
- December 2020
- November 2020
- October 2020

**AR2022_500777**

• Show More

# Stay Connected to Cato

Sign up for the newsletter to receive periodic updates on Cato research, events, and publications.

Your Email Address

**Subscribe**

**View All Newsletters**

**ABOUT**

Annual Reports

Leadership

Jobs

Student Programs

Media Information

Store

Contact

**PODCASTS**

**EXPERTS**

Policy Scholars

Adjunct Scholars

Fellows

**EVENTS**

Upcoming

Past

Event FAQs

Sphere Summit

**PUBLICATIONS**

Books

*Cato Journal*

*Regulation*

*Cato Policy Report*

*Cato Supreme Court Review*

*Cato's Letter*

*Human Freedom Index*

*Economic Freedom of the World*

*Cato Handbook for Policymakers*

**BLOG**

**DONATE**

Sponsorship Benefits

Ways to Give

Planned Giving



AR2022_500778



1000 Massachusetts Ave, NW,
Washington, DC 20001-5403

(202) 842-0200

**CONTACT US**

**PRIVACY**

ALSO FROM CATO INSTITUTE:

LIBERTARIANISM.ORG

HUMANPROGRESS.ORG

DOWNSIZINGGOVERNMENT.ORG

AR2022_500779

# Estimating the Economic Impact of the 2021 Dream Act

Ike Brannon

Senior Fellow, Jack Kemp Foundation


M. Kevin McGee

Professor Emeritus, UW Oshkosh

June 6, 2021


## Abstract

In 2012 President Obama established Deferred Action for Childhood Arrivals, or DACA, providing legal protection for foreign nationals who arrived in the U.S. as children. In 2017 President Trump took steps to end DACA, only to be rebuffed by the courts. In 2021 President Biden reinstated DACA.

DACA protects only those who arrived as children under the age of 16 before June 2007. That leaves millions of other foreign nationals who arrived in the U.S. with their families, either as 16- or 17-year-olds before June 2007, or under the age of 18 in the subsequent nine years, without recourse to obtain employment or various other legal protections themselves. Recently proposed legislation – The 2021 Dream Act, co-sponsored by Senators Lindsey Graham and Richard Durbin – would make DACA's protections permanent, while extending those protections to up to 500,000 other minors.

We estimate the economic and budgetary impact of the passage of the bill. Our analysis suggests that it would lock in the current gains from DACA, which include nearly $57 billion of additional federal tax revenue in the 2022-2031 budget window, and $92 billion in additional income for this population. By extending DACA's protections, it would also generate nearly $20 billion of additional federal tax revenue in the 2022-2031 budget window, while boosting the income of those who gain this protection by approximately $26 billion. The total impact it would have on U.S. economic activity would be well above this increased income.

Because of the young age of most of these potential Dreamers, most of their increased earnings from obtaining legal status would accrue outside the budget window, which means that incremental revenues from passing the 2021 Dream Act would grow sharply in subsequent years.

AR2022_500780

Electronic copy available at: https://ssrn.com/abstract=3861371

How the United States handles foreign nationals who arrive in the U.S. as minors has been a matter of contentious debate for some time, as have all other efforts to change our immigration laws in the last two decades. While the United States did have several amnesties in the late 20th century for foreign nationals who had come to the U.S. illegally and had been living here for some time, replicating such an act is at present politically untenable.

In 2012 President Obama issued an executive order establishing the Deferred Action for Childhood Arrivals, or DACA. It created a path to attain legal status for minors who had arrived in the U.S. with their parents, provided they obtained a high school degree or GED and had not been convicted of a felony or serious misdemeanor. The action proved to be controversial, and most Republicans strenuously objected. In 2017 President Trump took steps to end DACA, only to be rebuffed by the courts. On his first day in office President Biden reinstated DACA.

However, DACA only applies to foreign nationals who arrived in the U.S. as children under the age of 16 before June 2007. It leaves those who came to the U.S. as 16 or 17 year olds before 2007 or as minors after 2007 without any legal recourse. The Biden Administration has indicated it would support expanding the program to cover these additional populations.

There is a modicum of support in the GOP – and overwhelming support in the Democratic party – to provide some sort of accommodation for these young people that would allow them to legally obtain employment. Legislation has been introduced in both the House and the Senate that would achieve that.

In March 2021 the House of Representatives passed legislation that would provide nearly three million U.S. residents who arrived as minors after 2007 a pathway to legal status.[1] Senators Richard Durban and Lindsey Graham introduced a companion bill – The Dream Act of 2021 – that would extend legal protections to a smaller cohort of

---

[1] https://www.congress.gov/bill/117th-congress/house-bill/6/actions.  The MPI (2021) estimates up to 2,885,000 beneficiaries.

2

Electronic copy available at: https://ssrn.com/abstract=3861371

post-2007 arrivals.[2]

One argument given for either scaling down DACA protections in the Senate bill, or for opposing such legalization efforts altogether, is the claim that extending legal protections to this group will serve to increase government outlays and add to the government's budget deficit at a time when the federal debt is at an unprecedented level. However, our previous research has demonstrated that the original DACA protections serve to reduce the government deficit. Allowing the pre-2007 DACA population to obtain legal employment increased its members' predilection to complete high school and obtain post-secondary education, which helped them obtain more productive and remunerative jobs, which in turn meant they paid more taxes.

The counterfactual was not, we argued, that this cohort would return to their countries of birth – there is no evidence such a thing would occur regardless of our country's willingness to spend resources to track down and deport illegal immigrants – but that they would remain in the country, do low-skilled jobs emblematic of off-the-books employment, and pay minimal taxes. We aver that this reality also applies to the subsequent potential DACA recipients as well.

In this paper we estimate this legislation's potential impact on three populations, using the same methodology as in our previous research. The first affected group are the original DACA recipients, whose legal status was put in jeopardy under President Trump. This legislation would give them a path to permanent legal status, eliminating the risk that their current legal status would be similarly jeopardized any time in the future. To estimate the economic impact of the legislation on this population, we compare the economic implications of permanent legal status to what a DACA recipient would consider a worst case scenario: that the President elected in Nov. 2024 would eliminate DACA permanently in Jan. 2025.

The second affected group are the children who arrived in the U.S. under the age

---

[2]https://www.congress.gov/bill/117th-congress/senate-bill/264

AR2022_500782

Electronic copy available at: https://ssrn.com/abstract=3861371

of 16 between June 2007 and June 2016, who we term the "Recent Young Arrivals." These young people do not currently have legal status; this legislation, by providing these young people with the same protection that the current DACA population enjoys, would give them the same enhanced incentives to pursue an education and increase their lifetime earnings, productivity, and thence tax liabilities.

The third affected group are the young people who arrived as 16 or 17 year olds, either before June 2007 or between June 2007 and June 2016. The original DACA did not cover these immigrants; the proposed legislation would enhance the employability of those in this population who have graduated from high school, in turn enhancing their earnings, productivity, and the taxes they will pay.[3]

Section 1 describes the methodology we have used in our research to derive our estimates of economic impact. Section 2 reports those estimated impacts for each of the three populations. Section 3 presents some concluding remarks.

# 1   Our Methodology

This section describes how we estimate the economic gains that accrue from allowing children who have entered the U.S. without a necessary visa and have graduated from high school to legally obtain gainful employment in the United States. Our estimate accounts for the fact that this legal status increases these young peoples' incentives to pursue a college education or some other form of post-secondary education, increasing their labor skills, their ability to contribute to national productivity, and their tax payments.

We begin with the Migration Policy Institute's (MPI) estimate of the size of the affected population, and stratify that population into a series of school year cohorts. We then estimate the educational attainment of each cohort and the resulting income they

---

[3]Our study focuses on the 1,941,000 young immigrants most likely to qualify and benefit from the legislation: 1,345,000 DACAs, 324,000 Recent Arrivals, and 272,000 Slightly Old Dreamers.

AR2022_500783

Electronic copy available at: https://ssrn.com/abstract=3861371

would earn given that education, under the assumption that they have been given legal residential status. We then compare that to a counterfactual, our estimate of that cohort's educational attainment and income if they have no path towards documentation but remain in the U.S.

This is an exercise we have done previously (Brannon and McGee, The Cost of Closing DACA, 2020; Brannon and McGee, Estimating the Economic Impacts of DACA, 2019; Albright, Brannon and McGee, A New Estimate of the Cost of Reversing DACA, 2018). Our methodology has evolved over these earlier studies; here we largely follow that of our most recent paper.

## 1.1   Estimating the Impact of Legal Status on Education

Our estimates of educational attainment, both with and without legal status, are based on data on Hispanic educational attainment. Admittedly not all of the DACA population are Hispanic, but the overwhelming majority are: according to the U.S. Citizenship and Immigration Services (2017), 93.8% of the DACA population are Hispanic. Hence our use of data on Hispanic educational attainment is at least reasonably appropriate. However, these measures of the Hispanic population's educational attainment typically do not distinguish between those with legal status and those without. Therefore, these measures will tend to underestimate the educational level of the population with legal status. As a result, our paper tends to underestimate the true economic impacts that legal status confers.

We use the Hispanic dropout rates from the Census Departments CPS Historical Time Series Tables on School Enrollment, 2012-2019 to project that each cohort would have a 5.56% annual dropout rate during their last three years of high school, or an 84.2% high school graduation rate, provided they have legal status. However, in the absence of establishing legal status, we project the reduced returns to education will result in significantly lower graduation rates. Based on the research of Jeffrey Passel

AR2022_500784

Electronic copy available at: https://ssrn.com/abstract=3861371

and DVera Cohn (2009), Zachary Liscow and William Woolston (2018), and Elira Kuka, Naama Shenhav, and Kevin Shih (2018), we estimate that the high school dropout rate would rise to 8.7% for each of the last three years of high school. That would reduce the graduation rate to 76.1%.[4]

We use data from the U. S. Department of Education, National Center for Education Statistics (NCES) *Digest for Education Statistics* (table 302.20) to project that 67.1% of the high school graduates with legal status will enroll in college.[5] However, based on the research of Neeraj Kaushal (2008), Kalena Cortes (2013), and Tom Wong et al. (2016, 2017, 2018), we estimate that only 40% of those high school graduates lacking legal status would enroll in college.

For all college enrollees, we project a college graduation rate of 44.8%. We base this on a comparison of Hispanic college enrollments (NCES table 302.20) to subsequent Hispanic Bachelor's degrees (NCES table 322.20); see Brannon and McGee (2019). We apply this graduation rate to all college enrollees, regardless of legal status; if, as seems likely, those without legal status are less likely to graduate, then our estimates will underestimate the economic impacts of legal status.[6]

Together, these estimates imply that if a cohort of 14-year-olds were given legal status, over 25% of them would eventually earn college degrees. However, without legal status that percentage would be cut nearly in half. Table 1 summarizes these estimates for a cohort of 10,000 14-year-olds.

## 1.2   Estimating the Impact of Legal Status on Income

To estimate the aggregate earnings of those potentially impacted by DACA, we use our estimates of educational attainment to break each age cohort into four distinct cat-

---

[4]For a more detailed discussion of how we arrived at this and all subsequent estimated parameter values, see our 2019 paper.

[5]This is the average of the percent college enrollments for Hispanics reported in table 302.20 from 2011 through 2016. The corresponding measure for whites is 68.6%.

[6]Following the procedure outlined in our 2019 paper, we estimate that 30% of these college enrollees will leave after one year, 14% will leave after two years, and 11.2% will depart after three years, with the remaining 44.8% earning college degrees (Brannon and McGee 2019, Table 3). As in that earlier paper, we assume that half of these college graduates will finish their degrees after four years, three eighths after five years, and the remaining one eighth after 6 years.

6

Electronic copy available at: https://ssrn.com/abstract=3861371

Table 1: Estimated Education, by Legal Status

| Group | Legal status | No legal status |
|---|---|---|
| HS entrants | 10,000 | 10,000 |
| HS degrees | 8,423 | 7,610 |
| College enrollment | 5,652 | 3,044 |
| HS dropouts | 1,577 | 2,390 |
| HS degree only | 2,771 | 4,566 |
| Some College | 3,120 | 1,680 |
| College degrees | 2,532 | 1,364 |

egories: those who fail to complete high school, high school graduates, high school graduates with some post-college education, and college graduates.

For those with legal status, we use the average employment rates from 2012 to 2019 for 25-to-34 year olds from the NCES Digest for Education Statistics (table 501.50) – 57.64% for high school dropouts, 70.75% for high school graduates, 76.92% or those with some college education, and 85.40% for college graduates – to estimate the number of workforce entrants each year for each age cohort.[7]

For those lacking legal status, we base our employment estimates on research by the economist Nolan Pope (2016), who found that its absence causes the employment rates at each level of education to decline by six percentage points. As a result, we project that 51.64% of high school dropouts, 64.75% of high school graduates, 70.92% of those with some college education, and 79.40% of college graduates will be employed after completing their education. Table 2 shows our projected eventual flows of workforce entrants based on legal status, for an initial cohort of 10,000 high school entrants.

We then project the subsequent lifetime earnings profiles for each of these four education levels in inflation-adjusted 2021 dollars. The NCES Digest for Education Statis-

---

[7]Through most of this paper we will ignore the stream of high school dropouts, who would not qualify for legal status under DACA or any of the bills currently under consideration.

7

Electronic copy available at: https://ssrn.com/abstract=3861371

Table 2: Estimated Workforce, by Legal Status

| Group | Legal status | Pct Wkfc | No legal status | Pct Wkfc |
|---|---|---|---|---|
| HS entrants | 10,000 | | 10,000 | |
| HS dropouts | 909 | 57.64% | 1,234 | 51.64% |
| HS degree only | 1,960 | 70.75% | 2,956 | 64.75% |
| Some College | 2,400 | 76.92% | 1,191 | 70.92% |
| College degrees | 2,162 | 85.40% | 1,083 | 79.40% |

tics (table 502.30) reports that from 2012 to 2019, the median income of full-time year-round Hispanic workers 25 to 34 years old with only high school degrees averaged $33,174 a year in 2021 dollars. Robert Thornton, J.D. Rogers and Michael Brookshire (1997, Table 4) found that real earnings for workers with high school degrees only rise by about 1% a year until about age 40. Consistent with their analysis, we estimate that workers with legal status and just a high school diploma will initially earn $29,900 at age 19, which will then rise 1% in real terms per year, attaining the median of $33,193 a year at about age 29 and a half.

Similarly, we use Christopher Tamborini, ChangHwan Kim and Arthur Sakamoto's (2015, Tables 2 and 3) analysis of Hispanics with some college education to estimate that with legal status, these workers will initially earn $32,600, subsequently increasing 1.53% annually. That implies that a worker who enters the workforce at age 21 would earn $37,092 at age 29.5. This almost exactly corresponds to the $37,090 average of the 2012-19 median incomes for Hispanics with some college education or an associate degree as reported in the NCES, table 502.30 (2021 dollars).

For college graduates with legal status, we again reference the research by Thornton et al. and project that their real earnings will initially grow by four percent a year initially, taper to 3% after ten years and two percent after 20 years. A starting salary of $39,200 would result in an income of $49,720 at age 29.5, which almost exactly matches the $49,740 average for the 2012-19 median incomes of Hispanic college graduates in

8

Electronic copy available at: https://ssrn.com/abstract=3861371

the NCES table 502.30, when converted to 2021 dollars.[8]

To estimate the lifetime earnings profiles of workers without legal status, we use the findings of Francisco Rivera-Batiz (1999), Sherrie Kossoudji and Deborah Cobb-Clark (2002), Roberto Gonzales, Veronica Terriquez and Stephen Ruszczyk (2014), and George Borjas (2017, Table 3), as well as the research by Tom Wong and his colleagues. Based on Wong et al. (2017, 2018) we project that these who drop out of high school will earn $23,100 a year in inflation-adjusted 2021 dollars, and that their income will remain constant in real terms.

This empirical research suggests that the lack of legal status reduces the education wage premium by nearly half, which we feel is conservative: the ability of a college-educated worker to find a job that uses his training is extremely limited without being able to legally obtain a job.

We project that the high school graduates will start at only $26,500 a year, increasing by 0.55% annually; that those with some college education will start at only $28,400, increasing by 0.84% a year; and college graduates will start at only $32,700, increasing initially by 2.2% a year, tapering to 1.65% annual growth after ten years and 1.1% annual growth after twenty years (all starting incomes in 2021 dollars). Table 3 displays these incomes.

Table 3: Estimated Starting Incomes, by Legal Status

| Group | Legal status | No legal status |
|---|---|---|
| HS dropouts | – | $23,100 |
| HS degree only | $29,900 | $26,500 |
| Some College | $32,600 | $28,400 |
| College degrees | $39,200 | $32,700 |

In addition to estimating the impact that legal status would have on the income of

[8]The NCES estimates do not distinguish between Hispanics with and without legal status. Therefore, their estimated median incomes are almost certainly below the medians for Hispanics with legal status. Also, while the NCES tables report median incomes, we are essentially using these as average incomes. For both of these reasons, our estimates of the economic impacts of legal status are biased downward.

9

**AR2022_500788**

Electronic copy available at: https://ssrn.com/abstract=3861371

its recipients, we estimate how it would change their tax liabilities as well. A policy that boosts income will boost income tax revenue for the government as well. To estimate that boost in income tax liabilities, we use the 2021 tax brackets for single individuals. We assume that they take the standard deduction, that FICA taxes remain at 15.3% of income (including both the employers and employees share), and that inflation grows at two percent per annum for the next decade. Per CBO convention we do not discount the income or tax revenues of future years.

Changing the legal status of a cohort will impact federal tax revenues in two ways. First, workers who cannot obtain legal employment will invariably end up working in occupations that require less skill and expertise, which means that they will have lower incomes – and pay less taxes as a result.

Second, since these workers will not have legal work authorization – and will therefore be driven to "underground" employment – the federal government will be less successful in collecting those taxes owed. According to the Social Securitys Office of the Chief Actuary (Goss et al. 2013), only about 44% of undocumented workers paid Social Security taxes in 2010. We apply this compliance rate to both Federal income taxes and FICA taxes to estimate the Federal tax revenues that would be collected from workers without legal status.

## 2   The Economic Impacts of a Path to Citizenship

### 2.1   A Path to Citizenship for DACAs

The DACA population – those who potentially qualified for DACA when it was established in 2012, who arrived prior to June 15, 2007, and were under the age of 16 when they arrived – are already able to hold legal status, provided they earned a high school degree and have not committed a felony or serious misdemeanor. The political machinations of the last four years showed that their continued legal status is not at all cer-

Electronic copy available at: https://ssrn.com/abstract=3861371

tain.

Providing those who currently qualify for DACA with a path to citizenship would make that legal status permanent. To estimate the economic impact of such legislation, we compare the economic implications of permanent legal status to what a DACA recipient would consider a worst case scenario: that the President elected in Nov. 2024 might eliminate DACA permanently in Jan. 2025.

The Migration Policy Institute estimates that there are 1,339,000 DACA-eligibles who have either earned high school degrees or who are currently 15 and older and in high school, and an additional 6,000 who are 14 years old and in high school. Since these numbers are only slightly smaller than the numbers we used for this population in our 2019 study, we used essentially the same stratification by school year cohort used in that study, adjusted to match MPI's current estimates.

The youngest of these DACAs will be completing their high school education by June 2025, so a loss of legal status a few months before then would not affect high school graduation rates. However, it would affect the college enrollment of a portion of this population, their likelihood of employment, and their earnings and tax liabilities. In this section we estimate the sizes of these impacts.

Table 4 presents the aggregate projected income and Federal tax payment streams for the current-DACA-eligible population, with and without legal status beginning in 2025 (all numbers in current dollars). Over the 2022-2031 budget window, we estimate that guaranteeing their legal status would result in this cohort earning about $92 billion worth of additional income over the 2022-2031 budget window, and would generate an additional $57 billion in Federal tax revenue.

As the table shows, the benefits of granting legal status to this population increase steadily over time. Higher education results in a steeper lifetime earnings profile, and to greater continued gains in productivity over one's entire work career. Permanent legal status for the DACA population would ensure that their ongoing lifetime productivity

Electronic copy available at: https://ssrn.com/abstract=3861371

Table 4: Estimated Income and Taxes, with and without Legal Status, for DACAs ($B)

| Year | Legal Status | | | Without Legal Status | | | Economic Gain | | |
|---|---|---|---|---|---|---|---|---|---|
| | Income | Inc Tax | FICA Tax | Income | Inc Tax | FICA Tax | Income | Inc Tax | FICA Tax |
| 2025 | $43.12 | $3.37 | $6.60 | $32.55 | $0.93 | $2.19 | $10.58 | $2.44 | $4.41 |
| 2026 | $45.26 | $3.59 | $6.93 | $33.88 | $0.97 | $2.28 | $11.38 | $2.61 | $4.64 |
| 2027 | $47.34 | $3.80 | $7.24 | $35.12 | $1.01 | $2.36 | $12.22 | $2.79 | $4.88 |
| 2028 | $49.40 | $4.02 | $7.56 | $36.30 | $1.05 | $2.44 | $13.10 | $2.97 | $5.12 |
| 2029 | $51.47 | $4.26 | $7.88 | $37.47 | $1.09 | $2.52 | $14.00 | $3.17 | $5.35 |
| 2030 | $53.55 | $4.51 | $8.19 | $38.63 | $1.14 | $2.60 | $14.92 | $3.37 | $5.59 |
| 2031 | $55.66 | $4.77 | $8.52 | $39.81 | $1.18 | $2.68 | $15.85 | $3.59 | $5.84 |
| 2032 | $57.82 | $5.04 | $8.85 | $41.01 | $1.22 | $2.76 | $16.81 | $3.82 | $6.09 |
| 2033 | $59.95 | $5.31 | $9.17 | $42.25 | $1.27 | $2.84 | $17.71 | $4.04 | $6.33 |
| Total | $463.59 | $38.66 | $70.93 | $337.02 | $9.87 | $22.69 | $126.57 | $28.79 | $48.24 |

gains will not be dissipated within the underground economy.

We believe that the estimated income and productivity gains from legal status are likely underestimated, for three reasons. First, a significant portion of the compensation of high-skilled workers comes in the form of health insurance and other employer-provided benefits, which are not estimated here. Second, the employer's share of social security taxes is also interpreted by economists as employee income that has been taxed away indirectly, but which helps fund the employee's future retirement income. That is also not included in our income calculation. And thirdly, worker productivity may equal but often exceeds the worker's compensation; thus, that compensation only represents a floor on the worker's productive contribution to society.

Table 5: 2022-31 Gain from Legal Status for DACAs ($B)

| Income | Inc Tax | FICA Tax |
|---|---|---|
| $92.05 | $20.94 | $35.83 |

12

AR2022_500791

Electronic copy available at: https://ssrn.com/abstract=3861371

## 2.2   A Path to Citizenship for More Recent Arrivals

More recent young arrivals – young people who entered the U.S. before their 16th birthday, but after June 15, 2007 – are currently ineligible for DACA. Extending an opportunity for permanent legal status to this population would give these young people the same incentive to pursue an education that DACA provided their earlier-arriving counterparts and would provide the group a similar boost in their lifetime income. The immigration legislation that's been passed by the House and proposed in the Senate makes provisions to do precisely that.

The Migration Policy Institute estimates that there are 399,000 young people who came to the US before their 16th birthday between June 2007 and June 2016. MPI estimates that 117,000 of these young people are currently 15 or older and are either currently in high school or already have high school degrees; another 207,000 are under age 15; the remainder have dropped out of school. To assess the economic impact of granting these young people a path to permanent legal status, we apply the same methodology to this population as we did to the DACA population, but assume that none of those who have dropped out of school would become eligible.

As before, we stratify the population into school year cohorts; the youngest members of this population begin first grade this autumn and would not graduate from high school until 2033. We then model two scenarios: in the first, the students remain without legal status and their high school graduation rates, college enrollment rates, employments rates, incomes, and tax payments all reflect this absence of legal status.

In the alternative scenario, we assume that a DACA-like legal status becomes available to those who meet the age and education requirements, beginning in mid-2021. Thereafter, high school graduation rates, college enrollment rates, employments rates, incomes, and tax payments all respond to this new legal status. As with their older DACA counterparts, we aggregate their projected nominal income and Federal tax payment streams, as shown in Table 6.

AR2022_500792

Electronic copy available at: https://ssrn.com/abstract=3861371

Table 6: Estimated Income and Taxes, with and without Legal Status,
for Recent Young Arrivals ($B)

| | Legal Status | | | Without Legal Status | | | Economic Gain | | |
|------|--------|---------|----------|--------|---------|----------|--------|---------|----------|
| Year | Income | Inc Tax | FICA Tax | Income | Inc Tax | FICA Tax | Income | Inc Tax | FICA Tax |
| 2021 | $1.20 | $0.08 | $0.18 | $1.02 | $0.03 | $0.07 | $0.18 | $0.05 | $0.12 |
| 2022 | $1.53 | $0.10 | $0.23 | $1.34 | $0.03 | $0.09 | $0.18 | $0.07 | $0.14 |
| 2023 | $1.90 | $0.13 | $0.29 | $1.71 | $0.04 | $0.12 | $0.20 | $0.08 | $0.17 |
| 2024 | $2.34 | $0.15 | $0.35 | $2.11 | $0.05 | $0.14 | $0.23 | $0.10 | $0.21 |
| 2025 | $2.86 | $0.19 | $0.42 | $2.76 | $0.07 | $0.19 | $0.10 | $0.12 | $0.24 |
| 2026 | $3.47 | $0.23 | $0.51 | $3.40 | $0.09 | $0.23 | $0.07 | $0.15 | $0.28 |
| 2027 | $4.15 | $0.27 | $0.61 | $4.04 | $0.09 | $0.27 | $0.10 | $0.17 | $0.34 |
| 2028 | $4.88 | $0.30 | $0.72 | $4.67 | $0.10 | $0.31 | $0.21 | $0.21 | $0.40 |
| 2029 | $5.47 | $0.34 | $0.80 | $5.20 | $0.10 | $0.35 | $0.27 | $0.24 | $0.45 |
| 2030 | $6.11 | $0.37 | $0.90 | $5.72 | $0.10 | $0.39 | $0.39 | $0.27 | $0.51 |
| 2031 | $6.80 | $0.40 | $1.00 | $6.22 | $0.11 | $0.42 | $0.58 | $0.29 | $0.58 |
| 2032 | $7.26 | $0.43 | $1.06 | $6.54 | $0.11 | $0.44 | $0.72 | $0.32 | $0.62 |
| 2033 | $7.53 | $0.45 | $1.10 | $6.72 | $0.12 | $0.45 | $0.81 | $0.34 | $0.65 |
| Total | $55.50 | $3.46 | $8.18 | $51.44 | $1.05 | $3.46 | $4.06 | $2.41 | $4.72 |

We find that over the proceeding thirteen years, providing legal status to these young recent arrivals would generate an additional $4 billion worth of income and productivity from this population, and would generate an extra $7 billion in Federal tax revenue. A substantial fraction of the tax revenue gain would be due to greater tax compliance. We display our estimates in Table 6.

If we limit our total to the 2022-2031 ten year window, legal status would result in an extra $2.3 billion worth of income and productivity from this population, and an extra $5 billion in Federal tax revenue.

Table 7: 2022-31 Gain from Legal Status for Recent Young Arrivals ($B)

| Income | Inc Tax | FICA Tax |
|--------|---------|----------|
| $2.34 | $1.70 | $3.33 |

While these gains might appear small, that is largely because they only include the

14

Electronic copy available at: https://ssrn.com/abstract=3861371

earliest part of this population's lifetime. Roughly half of this cohort are still in grade school and won't enter the labor market until after the ten year budget window has closed, so the benefits to providing them with legal status would not be reflected in a ten-year budget window,.

In addition, with legal status, the older portion of this group will be more inclined to (rationally) choose to pursue more education; their inability to currently obtain legal employment reduces the opportunity cost of attending school, so many will choose to finish high school and pursue post-secondary training and education if at all possible. This will reduce the number of (low-skill) workforce entrants in the first several years, reducing the measured benefits of legal status over the first several years.

What's more, the (increasing) returns to education are comparatively small in the early stages of a career, when a student trades off four or more years of earnings and experience for education and a starting wage that may be only slightly above his peers who entered the labor market years earlier. As we pointed out above for the current DACA population, the biggest payoffs to education, and to the legal status that makes education more attractive and more useful, occur further in one's work career, which for this population will occur well after the ten year budget window has closed.

To provide a more comprehensive perspective of the potential gains from extending DACA protection to this younger population, we looked beyond the standard ten year budget window. Figure 1 plots this population's estimated increased income from 2021 to 2039, when the last members of this population are likely to enter the workforce.

It shows that each year's increase in annual income is small and relatively stable for the first seven years, before beginning to grow steadily: we estimate that the additional income from the legislation would not exceed $1 billion until 2035. Thus, granting legal status to this population can best be viewed as an investment that will yield only small returns initially, but higher, steadily increasing returns over the long run.

AR2022_500794

Electronic copy available at: https://ssrn.com/abstract=3861371



Figure 1: Recent Young Arrivals' Yearly Increased Income from Legal Status

## 2.3   A Path to Citizenship for Slightly Old Dreamers

The original rules for DACA limited eligibility to young people who had arrived in the U.S. prior to their 16th birthday. In this subsection we estimate the benefits of extending those same protections, and a pathway to permanent legal status, to young people who had arrived in the U.S. after their 16th birthday but prior to their 18th birthday.

An estimated 174,000 such young people arrived prior to June 15, 2007 and meet the educational requirements of DACA, and an additional 98,000 such young people who arrived after June 15, 2007 but before June 2016 likewise meet those educational requirements.[9] All of them would have completed their high school education by now (2021), and nearly all would have completed any post-secondary education by now as well. Thus, our estimate of the educational impacts of legal status for this population are small.[10]

However, granting these two populations legal status would increase their ability to

---

[9]The MPI also estimated an additional 209,000 and 90,000 entrants, respectively, who do not currently meet the education requirements. We assume throughout this paper that the prospect of legal status has no effect on these high school dropouts. More likely, some (presumably small) share of them will attain GEDs or otherwise meet the qualification requirements, if presented with the opportunity. If so, the economic benefits of providing these populations with a path to citizenship will be greater than our estimates.

[10]However, the initial creation of DACA in 2012 appears to have generated a surge in college enrollments among DACA enrollees who had not gone to college immediately after high school. Since the population of "Slightly Old Dreamers" who arrived after 2007 is now mostly in its mid-to-late 20s, it would not be unreasonable to expect a similar surge in college enrollments, if legal status became available to them. Since our model does not include any such college enrollment surge, we almost certainly underestimate the economic benefits of providing this population with a path to legal status.

16

Electronic copy available at: https://ssrn.com/abstract=3861371

Table 8: Estimated Income and Taxes, with and without Legal Status,
for Older Dreamers ($B)

| Year | Legal Status | | | Without Legal Status | | | Economic Gain | | |
|------|--------|---------|----------|--------|---------|----------|--------|---------|----------|
|      | Income | Inc Tax | FICA Tax | Income | Inc Tax | FICA Tax | Income | Inc Tax | FICA Tax |
| 2021 | $7.34 | $0.54 | $1.12 | $5.65 | $0.16 | $0.38 | $1.69 | $0.38 | $0.74 |
| 2022 | $7.66 | $0.57 | $1.17 | $5.86 | $0.16 | $0.39 | $1.80 | $0.40 | $0.78 |
| 2023 | $7.97 | $0.60 | $1.22 | $6.05 | $0.17 | $0.41 | $1.92 | $0.43 | $0.81 |
| 2024 | $8.28 | $0.63 | $1.27 | $6.23 | $0.18 | $0.42 | $2.05 | $0.45 | $0.85 |
| 2025 | $8.59 | $0.66 | $1.31 | $6.42 | $0.18 | $0.43 | $2.17 | $0.48 | $0.88 |
| 2026 | $8.91 | $0.70 | $1.36 | $6.61 | $0.19 | $0.44 | $2.30 | $0.51 | $0.92 |
| 2027 | $9.24 | $0.74 | $1.41 | $6.80 | $0.20 | $0.46 | $2.44 | $0.54 | $0.96 |
| 2028 | $9.59 | $0.78 | $1.47 | $7.00 | $0.20 | $0.47 | $2.59 | $0.57 | $1.00 |
| 2029 | $9.94 | $0.82 | $1.52 | $7.20 | $0.21 | $0.48 | $2.74 | $0.61 | $1.04 |
| 2030 | $10.30 | $0.86 | $1.58 | $7.41 | $0.22 | $0.50 | $2.89 | $0.65 | $1.08 |
| 2031 | $10.68 | $0.91 | $1.63 | $7.63 | $0.23 | $0.51 | $3.05 | $0.68 | $1.12 |
| 2032 | $11.06 | $0.96 | $1.69 | $7.84 | $0.23 | $0.53 | $3.22 | $0.72 | $1.16 |
| 2033 | $11.42 | $1.00 | $1.75 | $8.07 | $0.24 | $0.54 | $3.35 | $0.76 | $1.20 |
| Total | $120.99 | $9.75 | $18.51 | $88.77 | $2.56 | $5.98 | $32.22 | $7.19 | $12.54 |

obtain jobs at which they would be more productive, increasing their income and tax obligations. Table 8 presents our aggregate projected income and Federal tax payment streams for the combined population of 16 and 17-year-old arrivals, with and without legal status. Over the thirteen years shown, legal status increases this group's productivity and earnings by $32 billion, and increases Federal tax collections by nearly $20 billion. Over the 2022-2031 budget window, providing them with legal status would result in an extra $24 billion worth of income and productivity from this combined population, and an extra $15 billion in Federal tax revenue.

Table 9: 2022-31 Gain from Legal Status for Older Dreamers ($B)

| Income | Inc Tax | FICA Tax |
|--------|---------|----------|
| $23.97 | $5.33 | $9.42 |

17

Electronic copy available at: https://ssrn.com/abstract=3861371

# 3   Conclusion

Before the Covid-19 pandemic, the national unemployment rate in the U.S. was just 3.5 percent, and many states and localities were grappling with serious labor shortages that imposed significant constraints on their economies. With the U.S. economy poised to attain its pre-pandemic level of economic activity as early as this summer, states and localities are seeing evidence of labor shortages once again.

Given the lower birth rates in the last two decades, and with the tail end of the baby boom generation quickly approaching retirement age, labor shortages may soon be endemic across the country once again. This problem is likely to be especially acute away from large urban areas, where attracting skilled labor can be particularly difficult, since Americans are increasingly reluctant to relocate for employment purposes. The lack of skilled employees threatens to limit growth in small towns and rural communities, compounding regional economic inequality across the country.

The Dream Act and its various iterations represent a viable way to alleviate this constraint by taking a cohort of hundreds of thousands of young men and women who would otherwise be consigned to low-wage and menial jobs – where they would depress the wages of domestic-born low-skilled workers – and move most of them into skilled, managerial or technical occupations. Given that foreign-born workers have a much greater predilection to move in pursuit of gainful employment, the Dream Act could prove to be very beneficial to non-urban economies.

Many opponents of immigration often object to their influx as economically threatening to a large cohort of U.S. workers who would compete for jobs with them. However, this facile notion of a static economy accounts for neither the vast diversity of the domestic job market nor the remarkable dynamism of the U.S. economy, which created over 22 million jobs in the decade preceding the pandemic. Such robust growth may be impossible in the next decade unless we take steps to create a larger, more skilled

18

Electronic copy available at: https://ssrn.com/abstract=3861371

workforce. What's more, we have shown that this would increase federal, state and local tax revenues, reducing government budget exigencies.

Failing to provide a path to obtain legal, gainful employment to a new cohort of foreign-born youths who arrived in the country with their families will not create jobs or boost wages for U.S. citizens: in fact, the evidence suggests that it would both result in fewer jobs for U.S. born workers, and cost taxpayers billions of dollars.

## References

[1] Albright, Logan, Ike Brannon, and M. Kevin McGee, 2018. "A New Estimate of the Cost of Reversing DACA." https://www.cato.org/sites/cato.org/files/pubs/pdf/working-paper-49.pdf

[2] Borjas, George J., 2017. "The Earnings of Undocumented Immigrants," NBER Working Paper 23236. Available at: http://www.nber.org/papers/w23236.

[3] Brannon, Ike and Logan Albright, "Immigration's Impact on the Texas Economy," *Texas Public Policy Institute*, March 2016.

[4] Brannon, Ike and M. Kevin McGee, "Estimating the Economic Impacts of DACA," 2019. Available at SSRN: https://ssrn.com/abstract=3420511 or http://dx.doi.org/10.2139/ssrn.3420511

[5] Brannon, Ike and M. Kevin McGee, "The Costs of Closing DACA Initial Enrollments," 2020. Available at SSRN: https://ssrn.com/abstract=3717861 or http://dx.doi.org/10.2139/ssrn.3717861

[6] Chiswick, Barry, 2011. "Immigration: High-skilled vs Low-skilled Labor," IZA: Institute for the Study of Labor, Policy Paper 28.

AR2022_500798

Electronic copy available at: https://ssrn.com/abstract=3861371

[7] Cortes, Kalena E. 2013. "Achieving the DREAM: The Effect of IRCA on Immigrant Youth Postsecondary Educational Access." *American Economic Review*, 103(3): 428-432.

[8] Gonzales, Roberto G. , Veronica Terriquez and Stephen P. Ruszczyk, 2014. "Becoming DACAmented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)," *American Behavioral Scientist* :1-21.

[9] Goss, Stephen, Alice Wade, J. Patrick Skirvin, et al, 2013. "Effects of Unauthorized Immigration on the Actuarial Status of the Social Security Trust Funds," Social Security Administration, Actuarial Note, 151. Available at: https://www.ssa.gov/oact/NOTES/pdf_notes/note151.pdf.

[10] Hudak, John and Elaine Kamarck, 2017. "The Mind-boggling Cost of DACA Repeal." Washington DC: The Brookings Institute. Available at: https://www.brookings.edu/blog/fixgov/2017/09/07/the-mind-boggling-cost-of-daca-repeal/

[11] Kaushal, Neeraj. 2008. "In-State Tuition for the Undocumented: Education Effects on Mexican Young Adults." *Journal of Policy Analysis and Management* 27(4): 771-92.

[12] Kiley, Michael T, 1999. "The Supply of Skilled Labor and Skills-biased Technological Progress," *Economics Journal*.

[13] Kossoudji, Sherrie A, and Deborah A Cobb-Clark, 2002. "Coming out of the shadows: Learning about legal status and wages from the legalized population." *Journal of Labor Economics*, 20(3): 598-628.

[14] Kuka, Elira, Na'ama Shenhav, and Kevin Shih. 2020. "Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA" *American Economic Journal: Economic Policy 2020*, 12(1): 293324.

AR2022_500799

Electronic copy available at: https://ssrn.com/abstract=3861371

[15] Liscow, Zachary and William Gui Woolston, 2018. "Does Legal Status Matter for Educational Choices? Evidence from Immigrant Teenagers" *American Law and Economics Review* 20: 318-381.

[16] Migration Policy Institute, 2018. "National and State Estimates of Immigrant Populations Eligible for the Deferred Action for Childhood Arrivals (DACA) Program, 2018." Available at: https://www.migrationpolicy.org/sites/default/files/datahub/State-County-DACA-Estimates of DACA-Eligible Population_2018.xlsx.

[17] Migration Policy Institute, 2021. "Back on the Table: U.S. Legalization and the Unauthorized Immigrant Groups that Could Factor in the Debate" Available at: https://www.migrationpolicy.org/sites/default/files/publications/mpi-rethinking-legalization-2021_final.pdf.

[18] Passel, Jeffrey and D'Vera Cohn. 2009. "A Portrait of Unauthorized Immigrants in the United States," Washington, DC: Pew Hispanic Center Report.

[19] Peri, Giovanni, Kevin Shih, Chad Sparber, and Angie Marek-Zeitlin, 2014a. "Closing Economic Windows: How H-1B Visa Denials Cost U.S.-born Tech Workers Jobs and Wages during the Great Recession," *The Partnership for a New American Economy,*.

[20] Peri, Giovanni, Kevin Shih, and Chad Sparber, 2014b. "Foreign Scientists and Engineers and Economic Growth," *Cato Papers on Public Policy* 3: 107-184.

[21] Pope, Nolan G., 2016. "The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants," *Journal of Public Economics* 143: 98-114.

[22] Rivera-Batiz, Francisco L. 1999. "Undocumented workers in the labor market: An analysis of the earnings of legal and illegal Mexican immigrants in the United States." *Journal of Population Economics* 12(1): 91-116.

AR2022_500800

Electronic copy available at: https://ssrn.com/abstract=3861371

[23] Tamborini, Christopher R., ChangHwan Kim and Arthur Sakamoto, 2015."Education and Lifetime Earnings in the United States," *Demography* 52: 1383-1407.

[24] Thornton, Robert, James Rogers and Michael Brookshire, 1997. "On the Interpretation of Age-Earnings Profiles," *Journal of Labor Research* 18(2): 351-365.

[25] U.S. Census Bureau, "Table H-8. Median Household Income by State: 1984 to 2017." Available at: https://www2.census.gov/programs-surveys/cps/tables/time-series/historical-income-households/h08.xls.

[26] U.S. Census Bureau, "Annual Estimates of the Resident Population by Sex, Single Year of Age, Race Alone or in Combination, and Hispanic Origin for the United States: April 1, 2010 to July 1, 2017." Available at: https://www.census.gov/newsroom/press-kits/2018/estimates-characteristics.html.

[27] U.S. Census Bureau, "CPS Historical Time Series Tables on School Enrollment." Available at: https://www.census.gov/data/tables/time-series/demo/school-enrollment/ cps-historical-time-series.html, Table A-4.

[28] U.S. Census Bureau, "Educational Attainment in the United States: 2017." Available at: https://www.census.gov/data/tables/2017/demo/education-attainment/cps-detailed-tables.html.

[29] U.S. Census Bureau Annual Survey of State and Local Government Finances, 1977-2017 (compiled by the Urban Institute via State and Local Finance Data: Exploring the Census of Governments; accessed 08-Sep-2020 02:41), https://state-local-finance-data.taxpolicycenter.org.

[30] U.S. Citizenship and Immigration Services, 2019."Approximate Active DACA Recipients: As of December 31, 2019." Available at: https://www.uscis.gov/sites/default/files/document/data/DACA_Population_Receipts_since_Injunction_Dec_31_2019.pdf.

AR2022_500801

Electronic copy available at: https://ssrn.com/abstract=3861371

[31] U. S. Department of Education, Institute of Education Sciences, National Center for Education Statistics, *Digest for Education Statistics*. https://nces.ed.gov/programs/ digest/.

[32] Wolla, Scott, 2014. "The Economics of Immigration," The Federal Reserve Bank of St. Louis.

[33] Wong, Tom K., Greisa Martinez Rosas, Adrian Reyna, Ignacia Rodriguez, Patrick OShea, Tom Jawetz, and Philip E. Wolgin, 2016, *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*, Washington D.C.: Center for American Progress. Available at: https://www.americanprogress.org/issues/immigration/news/ 2016/10/18/146290/new-study-of-daca-beneficiaries-shows-positive-economic-and-educational-outcomes/.

[34] Wong, Tom K., Greisa Martinez Rosas, Adam Luna, Henry Manning, Adrian Reyna, Patrick OShea, Tom Jawetz, and Philip E. Wolgin, 2017, *DACA Recipients Economic and Educational Gains Continue to Grow*, Washington D.C.: Center for American Progress. Available at: https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/ daca-recipients-economic-educational-gains-continue-grow/.

[35] Wong, Tom K., Sanaa Abrar, Tom Jawetz, Ignacia Rodriguez Kmec, Patrick O'Shea, Greisa Martinez Rosas, and Philip E. Wolgin, 2018, *Amid Legal and Political Uncertainty, DACA Remains More Important Than Ever*, Washington D.C.: Center for American Progress. Available at: https://www.americanprogress.org/issues/immigration/news/2018/08/15/454731/ amid-legal-political-uncertainty-daca-remains-important-ever/.

AR2022_500802

Electronic copy available at: https://ssrn.com/abstract=3861371

# Estimating the Economic Impacts of DACA

Ike Brannon

Senior Fellow, Jack Kemp Foundation


M. Kevin McGee

Professor Emeritus, UW Oshkosh

July 5, 2019


## Abstract

This paper estimates the economic impacts of DACA, on the educational attainment, earnings and federal tax payments of the DACA population, on state and local tax revenues, on the broader American workforce, and on the U.S. economy as a whole. We construct two models of the DACA population and its economic behaviors, the first assuming DACA is made permanent, and the second assuming DACA is terminated at the end of 2019.

We find that eliminating DACA is lose-lose-lose. The DACA population would lose about $120 billion in income, the federal government would lose roughly $72 billion in tax revenue, and states and local governments would lose about $15 billion in tax revenue over the 2020-29 decade.

Those losses would come without any offsetting gains. Eliminating DACA would be, in effect, throwing away some of our nation's human capital resources, dramatically reducing the returns to education for the DACA population, and channeling them into jobs where legal status is ignored, and that do not allow them to take full advantage of their human capital.

This failure to employ all of our human capital would hurt low-to-moderate income workers. Eliminating DACA would merely increase the competition for the kinds of jobs that tend to have an excess supply of workers, while reducing the supply of employable skilled workers in the areas where we have the most acute labor shortages. Overall, we find that eliminating DACA would benefit virtually no one while hurting pretty much everyone.

AR2022_500803

Electronic copy available at: https://ssrn.com/abstract=3420511

The Deferred Action for Childhood Arrivals (DACA) was first established in 2012 via an executive order of President Barack Obama. DACA protects from deportation individuals who were transported to the United States as children and who have since proven themselves to be productive members of society, both by maintaining strong educational attainment and not engaging in any criminal activities. From 2012 to 2017 roughly 800,000 people claimed DACA status. While this population could prior to DACA attend most colleges despite their lack of a legal status, the program gave them temporary work permits and access to Social Security numbers, which allowed them to work as well.

During his presidential campaign, Donald Trump promised to rescind DACA. Following up on that promise, in September 2017 Attorney General Jeff Sessions announced that the program was, in fact, being suspended, with DACA recipients given six months grace to get their affairs in order. Four months later, the U.S. District Court of the Northern District of California ruled that the reversal of DACA was unconstitutional, and ordered the government to continue to accept DACA renewals until further notice. A similar injunction was issued by the U.S. District Court of the Eastern District of New York in February 2018. In November 2018, the Ninth Circuit Court of Appeals affirmed the Northern District of California injunction. In May 2019, the Fourth Circuit Court of Appeals vacated the DACA rescission as "arbitrary and capricious." As we write, DACA renewals are currently being accepted and processed, but new applications are not being accepted, and the U.S. Supreme Court has agreed to hear the administration's appeal of the Ninth Circuit Court's decision in the fall.

In July 2017, Sens. Graham, Durbin, Flake, and Schumer introduced the DREAM Act of 2017, S. 1615. The Act would have granted permanent residential status to most DACA recipients. In its analysis of the Act, the Congressional Budget Office (CBO) estimated that the Act would cost the government approximately $24 billion in lost tax revenue over the following decade. It provided a similar $26 billion estimate for the DREAM Act of 2019, H.R 2820. CBO's rationale was that immigrants without work

Electronic copy available at: https://ssrn.com/abstract=3420511

permits pay certain taxes, most notably payroll taxes, typically by procuring another person's Social Security number, but cannot claim benefits.  By granting them legal status these workers would become eligible for various benefit programs and Social Security benefits without paying much more in federal income taxes.

This paper explores the issue of DACA's economic impacts on the educational attainment, earnings and federal tax payments of the DACA population, state and local tax revenues, the broader American workforce, and the U.S. economy as a whole.  We find that the biggest impact of ending DACA would be to dramatically reduce the returns to education for the DACA population, channeling them into jobs where legal status is ignored, and that do not allow them to take full advantage of their human capital.

Eliminating DACA would be, in effect, throwing away some of our nation's capital resources.  We estimated that its elimination would cost the DACA population about $120 billion in reduced income, with a somewhat greater total loss of economic output that would be even greater. We also estimated that its elimination would cost the federal government roughly $72 billion in lost tax revenue over the 2020-29 decade, consisting of $26 billion in foregone income taxes and $46 billion in foregone payroll taxes.  State and local governments would lose another $15 billion during that decade.

Those losses would come without any offsetting gains.  Human capital and physical capital are complements, so the failure to employ all of our human capital would hurt the suppliers of physical capital, low-to-moderate income workers.  Eliminating DACA would merely increase the competition for the kinds of jobs that tend to have an excess supply of workers, while reducing the supply of employable skilled workers in the areas where we have the most acute labor shortages.  Overall, we find that eliminating DACA is lose-lose-lose, benefiting virtually no one while hurting pretty much everyone.

To more accurately estimate DACA's impacts we construct two models of the DACA population and its economic behaviors.  The first model estimates their behavior should DACA be made permanent.  Under that scenario, the DACA population can be expected

AR2022_500805

Electronic copy available at: https://ssrn.com/abstract=3420511

to behave very much like the rest of the legal-status Hispanic population, with similar high school and college completion rates, along with similar post-graduation earnings.[1] Our first model estimates their educational attainment, earnings profiles, and tax payments using the corresponding estimates for the Hispanic population as a whole.[2]

The second model estimates their behavior assuming DACA is terminated at the end of 2019. Under that scenario, the DACA population can be expected to behave very much like the rest of the undocumented Hispanic population, albeit with the higher levels of education that much of this population would have attained prior to its termination. We assume that the roughly 30% of the DACA population that had not yet completed its education by that point would revert to undocumented education rates, and the employment and earnings of the DACA population reflect their lack of legal status following DACA's termination.[3]

## 1   Economic Outcomes if DACA Is Made Permanent

Estimating the economic production and tax revenues that DACA enrollees are likely to generate over the next decade, should DACA be made permanent, involves three steps. First, we need to generate a profile of the DACA-eligible population over time, as its members move from high school either directly into the workforce, or through post-secondary education into the workforce. That profile needs to include estimates of both high school and college drop out rates consistent with the patterns observed in the data.

Second, we need to estimate age-earnings profiles for three groups of DACA-eligible individuals: those projected to have only high school degrees, those projected to have some college or other post-secondary education but no Bachelor's degree, and those

---

[1] According to the U.S. Citizenship and Immigration Services (2017), 93.8% of the DACA population are Hispanic.

[2] Since many measures of the Hispanic population do not distinguish between those with legal status and those without, our estimates of the DACA population's economic outcomes in this model are probably biased downward. If so, our paper will understate the true economic impacts of DACA.

[3] A third potential scenario would be to model the DACA population as being deported to their countries of origin. Under this scenario, the U.S. government would not only fail to gain any revenues at all from current DACA recipients, but would also have to locate and deport 800,000 individuals, a task that would cost over ten billion dollars if it were feasible, either from a practical or political perspective. See Hudak and Kamarck (2017).

4

Electronic copy available at: https://ssrn.com/abstract=3420511

projected to complete college. Finally, we need to estimate the taxes that these incomes would generate.

## 1.1   DACA population profile

To understand the economic impact of reversing DACA it helps to understand what distinguishes DACA recipients from other cohorts of legal and illegal immigrants. To be eligible to apply for DACA, immigrants had to be younger than 31 on June 15, 2012, must have come to the U.S. when they were younger than 16, and must have lived in the U.S. since 2007. Since the DACA population grew up in the United States, they more closely resemble native-born Americans and second-generation immigrants more than first-generation immigrants. Having experienced the American school system and a peer group comprised mainly of Americans, the difficulties presented by language barriers, culture shock, and other obstacles to assimilation have dissipated, thus affording DACA recipients more opportunities for economic success than immigrants as a whole.

Table 1: MPI DACA-eligible Population Estimates

| Year | | |
|------|------|------|
| 2014 | Enrolled in Secondary School | 365,000 |
| | Completed High School, not in Higher Ed. | 396,000 |
| | Enrolled in Higher Education | 241,000 |
| | Completed Some College | 134,000 |
| | Completed a B.A. or B.S. | 57,000 |
| | Total | 1,193,000 |
| 2016 | Enrolled in or completed Secondary School | 1,300,000 |
| | Under Age 15 | 228,000 |
| | Total | 1,528,000 |

Moreover, DACA recipients must necessarily be free from criminal activity, as well as have the ability to enroll and remain in some sort of post-secondary education in order

5

Electronic copy available at: https://ssrn.com/abstract=3420511

to qualify for the program. They are, therefore, a cohort that has largely performed well in school and remained out of trouble.

To generate a reasonable age profile for these immigrants, we began with the Migration Policy Institute's (MPI) 2014 estimates of educational attainment and school enrollment for the DACA-eligible population, and their 2016 estimates of the DACA-eligible population.[4]  They estimated a 2014 DACA-eligible population of 1.19 million, roughly equally divided between those still in high school, those in or having some college education, and those who had completed high school but had no post-secondary education (Table 1). They also estimated a 2016 DACA-eligible (in high school or high school degree) population of 1.3 million, with an additional 228,000 children below the age of 15 that could eventually become DACA-eligible.[5]

Using these estimates, we generated a time profile of DACA-eligible high school enrollment that gradually tapered from 98,000 freshmen starting high school in 2012 to 8,000 freshmen starting high school in 2023 (Table 2). This pattern fits the constraints of (a) the MPI's estimate of roughly 365,000 high school students in 2014, (b) the MPI's estimate of roughly 228,000 children below the age of 15 in 2016, and (c) the DACA-eligibility requirement that the person be foreign born, but a U. S. resident prior to 2007.

We then used the Hispanic dropout rates from the Census Department's CPS Historical Time Series Tables on School Enrollment to generate a profile of high school graduates from this population.  The assumed dropout rate after 2017 of 5.6% is the average of the observed rates from 2012 to 2017. These dropout rates are for students in grades 10 to 12, so we applied them only to students in those three grades.[6]

Our DACA-eligible age profile suggests that by September 2019, the number of DACA-eligibles with high school degrees or better will have risen to 1.3 million, with

---

[4]Capps, Fix, Zong (2017).

[5]They also estimated that in 2016, there were another 398,000 potential eligibles who did not have the required high school diploma, but could meet that requirement with adult education. Throughout our study, we make the conservative assumption that no poentially-DACA-eligible high school dropouts acquire a high school equivalent degree. Thus, our economic impact estimates likely underestimate the true impact.

[6]A 5.6% dropout rate over three years implies an 84% graduation rate, which aligns with the 84% post-2012 graduation rate estimated by Kuka et al (2018).

Electronic copy available at: https://ssrn.com/abstract=3420511

an additional 209,000 enrolled in high school and 80,000 enrolled in elementary school.

Table 2: DACA-eligible Age Profile

| Year | dropout rate | begin HS-9 | HS-10 | HS-11 | HS-12 | HS total | HS grads |
|------|-------------|-----------|-------|-------|-------|----------|----------|
| pre-2012 | | | | | | | 580,356 |
| 2012 | 5.09% | 98,000 | 97,858 | 93,000 | 88,000 | 376,858 | 82,500 |
| 2013 | 5.26% | 96,000 | 98,000 | 92,710 | 88,107 | 374,817 | 83,370 |
| 2014 | 7.19% | 92,000 | 96,000 | 90,955 | 86,045 | 365,000 | 81,773 |
| 2015 | 5.69% | 84,000 | 92,000 | 90,533 | 85,776 | 352,309 | 81,145 |
| 2016 | 4.30% | 72,000 | 84,000 | 88,048 | 86,644 | 330,692 | 82,091 |
| 2017 | 6.08% | 60,000 | 72,000 | 78,892 | 82,694 | 293,587 | 81,376 |
| 2018 | 5.60% | 48,000 | 60,000 | 67,966 | 74,473 | 250,439 | 78,062 |
| 2019 | 5.60% | 40,000 | 48,000 | 56,638 | 64,159 | 208,797 | 70,301 |
| 2020 | 5.60% | 32,000 | 40,000 | 45,311 | 53,465 | 170,777 | 60,564 |
| 2021 | 5.60% | 24,000 | 32,000 | 37,759 | 42,772 | 136,531 | 50,470 |
| 2022 | 5.60% | 16,000 | 24,000 | 30,207 | 35,643 | 105,851 | 40,376 |
| 2023 | 5.60% | 8,000 | 16,000 | 22,655 | 28,515 | 75,170 | 33,647 |
| 2024 | 5.60% | 0 | 8,000 | 15,103 | 21,386 | 44,490 | 26,917 |
| 2025 | 5.60% | 0 | 0 | 7,552 | 14,258 | 21,809 | 20,188 |
| 2026 | 5.60% | 0 | 0 | 0 | 7,129 | 7,129 | 13,459 |
| 2027 | 5.60% | 0 | 0 | 0 | 0 | 0 | 6,729 |

Note: The numbers progress diagonally: 98,000 freshmen in 2012 become 98,000 sopho-mores in 2013, 90,955 juniors in 2014, 85,776 seniors in 2015, and 82,091 graduates in 2016.

## 1.2   DACA college graduates

Estimating the number of DACA-eligibles with high school degrees who would proceed into post-secondary education was straightforward. The U. S. Department of Education, National Center for Education Statistics (NCES) *Digest for Education Statistics* (table 302.20) reports the percentage of recent high school completers enrolled in college, by race and ethnicity. From 2011 to 2016 the 3-year moving average for Hispanic high school completers enrolled in college has ranged from 64.7% and 70.6%; it averaged 67.1% over that 6-year period. Therefore we assumed that 67.1% of DACA-eligibles with high school degrees would enroll in college.

7

Electronic copy available at: https://ssrn.com/abstract=3420511

Estimating the number of DACA-eligibles who complete college with a Bachelor's degree is more complicated. The NCES *Digest for Education Statistics* (table 326.10) reports the graduation rates for first-time, full-time bachelor's degree-seeking students from the 4-year postsecondary institutions they started at. For Hispanics, this graduation rate has steadily risen from 45.5% after 6 years for the 1996 starting cohort to 55.0% for the 2011 starting cohort. However, this measure may understate the true graduation rate, as it omits students who graduated from a different 4-year institution after transferring. It may also overstate the true graduation rate, since it omits students who began their postsecondary career at a 2-year institution, which have significantly lower first-year retention rates.[7] And over half of all Hispanics begin their postsecondary careers at a 2-year institution, a far higher percentage than any other ethnic group.[8]

Table 3: Estimated Hispanic College Graduation Rates

| Year | 18 year-olds | HS grads | % Coll. | Coll. Enroll | Year | Coll. Grds. | Grad. Rate |
|------|-------------|----------|---------|--------------|------|-------------|------------|
| 2010 | 950,102 | 799,257 | 59.7% | 477,120 | 2015 | 218,098 | 45.7% |
| 2011 | 954,441 | 802,907 | 66.6% | 534,663 | 2016 | 235,190 | 44.0% |
| 2012 | 949,696 | 798,915 | 70.3% | 561,591 | 2017 | 252,166 | 44.9% |

To overcome this hurdle, we began with the total numbers of Hispanic 18-year-olds reported annually by the U.S. Census Department's *Annual Estimates*, shown in the second column of Table 3. We reduce these population estimates to high school graduate estimates in the third column, using the 5.60% annual attrition rate used in Table 2. We then convert these graduate estimates to college enrollment estimates in the fourth column, using the annual 3-year moving averages for Hispanic high school completers enrolled in college from the NCES *Digest for Education Statistics* (table 302.20). We obtained the number of Hispanic Bachelor's degrees earned for the 2014-15, 2015-16, and 2016-17 academic years from the NCES *Digest for Education Statistics* (table 302.20).

---

[7] First-year retention rates are from the NCES *Digest for Education Statistics* (table 326.30). However, the differences in retention may just reflect a much higher likelihood to transfer to a different (probably 4-year) institution after one year at a 2-year college.

[8] NCES *Digest for Education Statistics* (table 306.40)

8

Electronic copy available at: https://ssrn.com/abstract=3420511

We then compared total Bachelor's degrees to estimated enrollees from 5 years earlier to derive estimated graduation rates, which average 44.8% over the three years.

Table 4 shows our initial estimates of post-secondary educational enrollment for the DACA-eligible population. The first column reports the estimated high school graduations from Table 2. The next two columns divide these graduates into the 67.1% who pursue further education and the 32.9% who move directly into the workforce.

Table 4: DACA Post-secondary Education

| Year | HS grads | HS only | College | Coll Enr | Some Coll | BA/BS |
|------|----------|---------|---------|----------|-----------|-------|
| 2012 | 82,500 | 27,142 | 55,358 | 55,358 | 0 | 0 |
| 2013 | 83,370 | 27,429 | 55,941 | 94,692 | 16,607 | 0 |
| 2014 | 81,773 | 26,903 | 54,870 | 125,030 | 41,139 | 0 |
| 2015 | 81,145 | 26,697 | 54,448 | 148,985 | 71,632 | 0 |
| 2016 | 82,091 | 27,008 | 55,083 | 161,387 | 101,913 | 12,401 |
| 2017 | 81,376 | 26,773 | 54,603 | 163,865 | 132,206 | 34,233 |
| 2018 | 78,062 | 25,682 | 52,380 | 161,265 | 162,397 | 59,022 |
| 2019 | 70,301 | 23,129 | 47,172 | 154,363 | 191,924 | 83,570 |
| 2020 | 60,565 | 19,926 | 40,639 | 142,842 | 219,525 | 108,130 |
| 2021 | 50,471 | 16,605 | 33,866 | 127,511 | 244,188 | 132,664 |
| 2022 | 40,377 | 13,284 | 27,093 | 109,481 | 265,320 | 156,655 |
| 2023 | 33,647 | 11,070 | 22,577 | 92,213 | 282,741 | 179,080 |
| 2024 | 26,918 | 8,856 | 18,062 | 75,955 | 297,100 | 199,041 |
| 2025 | 20,188 | 6,642 | 13,546 | 60,832 | 308,714 | 216,096 |
| 2026 | 13,459 | 4,428 | 9,031 | 46,707 | 317,836 | 230,131 |
| 2027 | 6,729 | 2,214 | 4,515 | 33,088 | 324,464 | 241,637 |
| 2028 | | | | 19,598 | 328,600 | 250,993 |
| 2029 | | | | 10,622 | 330,244 | 258,327 |
| 2030 | | | | 4,805 | 330,750 | 263,638 |
| 2031 | | | | 1,518 | 330,750 | 266,926 |
| 2032 | | | | 253 | 330,750 | 268,191 |
| 2033 | | | | | 330,750 | 268,444 |

The last three columns describe the aggregate DACA-eligible college population. To achieve the estimated 44.8% graduation rate, we assume that 30% of all college en-

9

Electronic copy available at: https://ssrn.com/abstract=3420511

rollees leave after one year, either because they completed some certification program or because they dropped out; that 20% of all remaining enrollees leave after their second year; that another 20% of all remaining enrollees leave after their third year; and that all the remaining enrollees graduate, half after four years, another three-eights after five years, and the remaining one-eighth after six years.[9]

Table 5: Adjusted DACA Post-secondary Education

| Year | HS grads | HS only | College | Backlog | Coll Enr | Some Coll | BA/BS |
|------|----------|---------|---------|---------|----------|-----------|-------|
| Pre-2012 | 580,356 | 314,526 | 265,830 | | 59,760 | 16,940 | 30,120 |
| 2012 | 82,500 | 27,142 | 55,358 | 90,000 | 185,118 | 27,981 | 39,080 |
| 2013 | 83,370 | 27,429 | 55,941 | 60,000 | 243,452 | 76,628 | 48,040 |
| 2014 | 81,773 | 26,903 | 54,870 | 9,010 | 241,000 | 134,000 | 57,000 |
| 2015 | 81,145 | 26,697 | 54,448 | | 234,812 | 185,676 | 65,960 |
| 2016 | 82,091 | 27,008 | 55,083 | | 214,593 | 223,938 | 103,001 |
| 2017 | 81,376 | 26,773 | 54,603 | | 186,381 | 255,241 | 154,513 |
| 2018 | 78,062 | 25,682 | 52,380 | | 166,643 | 285,432 | 196,440 |
| 2019 | 70,301 | 23,129 | 47,172 | | 154,867 | 314,959 | 225,862 |
| 2020 | 60,565 | 19,926 | 40,639 | | 142,842 | 342,560 | 250,926 |
| 2021 | 50,471 | 16,605 | 33,866 | | 127,511 | 367,223 | 275,460 |
| 2022 | 40,377 | 13,284 | 27,093 | | 109,481 | 388,355 | 299,451 |
| 2023 | 33,647 | 11,070 | 22,577 | | 92,213 | 405,776 | 321,876 |
| 2024 | 26,918 | 8,856 | 18,062 | | 75,955 | 420,135 | 341,837 |
| 2025 | 20,188 | 6,642 | 13,546 | | 60,832 | 431,749 | 358,892 |
| 2026 | 13,459 | 4,428 | 9,031 | | 46,707 | 440,871 | 372,927 |
| 2027 | 6,729 | 2,214 | 4,515 | | 33,088 | 447,499 | 384,433 |
| 2028 | | | | | 19,598 | 451,635 | 393,824 |
| 2029 | | | | | 10,622 | 453,279 | 401,123 |
| 2030 | | | | | 4,805 | 453,785 | 406,434 |
| 2031 | | | | | 1,518 | 453,785 | 409,722 |
| 2032 | | | | | 253 | 453,785 | 410,987 |
| 2033 | | | | | 0 | 453,785 | 411,240 |

Table 4's estimates fall well short of the MPI's 2014 DACA-eligible college enrollment and college completion numbers, reported in Table 1. The MPI estimated that in 2014, 241,000 DACA-eligibles were enrolled in higher education, 134,000 had com-

[9]Multiplying 70% x 80% x 80% gives a 44.8% graduation rate.

10

Electronic copy available at: https://ssrn.com/abstract=3420511

pleted some college, and 57,000 had completed a B.A. or B.S. Our model shows only 125,030 enrollees in 2014, 41,139 DACA-eligibles with some college, and no bachelor's degrees. Clearly, two things must have occurred. First, some small percentage of this population had been enrolling in post-secondary education before DACA was created, despite their lack of legal status. Second, some fraction of this population that had graduated from high school prior to 2012 had chosen to enroll in post-secondary education shortly after DACA gave them at least temporary legal status.

To capture these effects, we added estimated values for pre-DACA enrollments and backlog first-time enrollments in 2012 and 2013 to the model. We chose the numbers to bring our totals up to the MPI estimates while remaining consistent with our estimated attrition rates. The results are in Table 5. Our estimates imply that by now, not quite half of the DACA-eligibles who had graduated from high school prior to DACA will have enrolled in post-secondary education, significantly lower than the 67.1% rate observed in the overall Hispanic population.[10] Our estimates also imply that by 2033, 27.91% of the DACA-eligible population will have college degrees. This falls short of the Census department's 2017 estimate that by the age of 34, 36.4% of all Hispanics who graduate from high school have earned college degrees, suggesting that our methodology may be overly conservative.[11]

Our estimates in Table 5 allow us to project three streams of workforce entrants from the DACA-eligible population: those with high school degrees only, those with some college, and those with Bachelor's Degrees.[12] To account for the facts that not all high school graduates are in the labor force, and not all labor force participants are employed, we reduced all three entry streams to reflect the average 2011 through 2018 employment rates for each level of educational attainment.[13] The resulting projections, in Table 6,

---

[10]The 265,830 pre-2012 high school graduates who are projected to have enrolled in college include the 106,820 who were enrolled or had some degree of college completion in 2011, plus the 159,010 "backlog" enrollees in 2012-14.

[11]Our calculation, based on U.S. Census Bureau, "Educational Attainment in the United States: 2017," Table 1.

[12]Although it is extremely likely that some share of those earning Bachelor's Degrees will continue on into Graduate School, we did not attempt to incorporate that into our model.

[13]NCES *Digest for Education Statistics* (table 501.50)

Electronic copy available at: https://ssrn.com/abstract=3420511

allow us to subsequently project the economic impacts of DACA in the next subsection.

Table 6: DACA Workforce Entry

| % Empl | HS only 69.94% | Some Coll 75.96% | BA/BS 84.89% |
|---|---|---|---|
| Pre-2012 | 219,979 | 12,868 | 25,569 |
| 2012 | 18,983 | 8,386 | 7,606 |
| 2013 | 19,184 | 36,952 | 7,606 |
| 2014 | 18,816 | 43,580 | 7,606 |
| 2015 | 18,672 | 39,253 | 7,606 |
| 2016 | 18,889 | 29,064 | 31,444 |
| 2017 | 18,725 | 23,778 | 43,729 |
| 2018 | 17,962 | 22,933 | 35,592 |
| 2019 | 16,176 | 22,429 | 24,976 |
| 2020 | 13,936 | 20,966 | 21,277 |
| 2021 | 11,614 | 18,734 | 20,827 |
| 2022 | 9,291 | 16,052 | 20,366 |
| 2023 | 7,742 | 13,233 | 19,037 |
| 2024 | 6,194 | 10,907 | 16,945 |
| 2025 | 4,645 | 8,822 | 14,478 |
| 2026 | 3,097 | 6,929 | 11,914 |
| 2027 | 1,548 | 5,035 | 9,767 |
| 2028 | 0 | 3,142 | 7,942 |
| 2029 | 0 | 1,249 | 6,226 |
| 2030 | 0 | 384 | 4,509 |
| 2031 | 0 | 0 | 2,791 |
| 2032 | 0 | 0 | 1,074 |
| 2033 | 0 | 0 | 215 |
| Totals | 425,453 | 344,696 | 349,102 |

## 1.3   DACA age-earnings profiles

Earnings change with age, and the rate at which earnings rise with age differ systematically by educational attainment. To reasonably estimate the effects of DACA on the future earnings of the DACA-eligible population, we need to take the various age-earnings profiles into account.

AR2022_500814

Electronic copy available at: https://ssrn.com/abstract=3420511

We began by estimating an age-earnings profile for DACA-eligibles with no schooling beyond high school. Median annual earnings for Hispanics age 25 to 34 years old with only high school degrees averaged $30,354 a year from 2010 through 2017.[14] According to Thornton et al. (1997, Table 4), real earnings for workers with high school degrees only rise by about 1% a year until about age 40, and remain flat thereafter. To match this pattern, we assumed that this cohort would initially earn about $27,300 (in 2017 dollars) at age 19, when we assume these individuals enter the workforce, attain the median of $30,354 a year at age 29 and one half, and top off at about $33,700 at age 40 (Table 7).

For Hispanics age 25 to 34 years old with some college but no degree, median earnings averaged $33,499 a year from 2010 through 2017; for those with associate's degrees, median earnings averaged $35,761 a year.[15] According to Tamborini et al. (2015, Tables 2 and 3), median earnings for these workers are 5.6% higher for men and 11.3% higher for women at ages 20-29; at ages 30-39 earnings are 11.9% higher for men and 16.7% higher for women than their high-school-only counterparts. Since we have no estimate of the breakdown between those with some-college-but-no-degree and those with associate's degrees within the DACA-eligible population, nor of the gender breakdown among those who entered post-secondary education but did not earn a Bachelor's degree, we keep our age-earnings profile reasonably consistent with all of these values. It starts at $29,700 at age 21, rising by 1.53% a year thereafter. The resulting earnings at age 24 are 8.2% higher than those with high school degrees only, at age 29 are about $33,500, and at age 34 are 14% higher than those with high school degrees only – all generally fitting the given values (Table 7).

To estimate the earnings of the DACA college graduates, we obtained data from dreamers.us, an organization that provides scholarship money for DACA students to help cover the cost of college. Just under 3,000 students received financial assistance from dreamers.us. For these individuals, we have data on their current college, expected

---

[14]NCES *Digest for Education Statistics* (table 502.30).
[15]NCES *Digest for Education Statistics* (table 502.30).

Electronic copy available at: https://ssrn.com/abstract=3420511

Table 7: DACA Age-Earnings Profiles and Taxes, by Education

| Age | HS only | | Some Coll | | BA/BS | |
|---|---|---|---|---|---|---|
| | Income | Taxes | Income | Taxes | Income | Taxes |
| 19 | $27,343 | $1,647 | | | | |
| 20 | $27,616 | $1,680 | | | | |
| 21 | $27,892 | $1,713 | $29,700 | $1,930 | | |
| 22 | $28,171 | $1,747 | $30,154 | $1,984 | | |
| 23 | $28,453 | $1,780 | $30,615 | $2,040 | $41,487 | $3,344 |
| 24 | $28,738 | $1,815 | $31,083 | $2,096 | $43,146 | $3,544 |
| 25 | $29,025 | $1,849 | $31,559 | $2,153 | $44,829 | $3,745 |
| 26 | $29,315 | $1,884 | $32,042 | $2,211 | $46,533 | $3,950 |
| 27 | $29,608 | $1,919 | $32,532 | $2,270 | $48,255 | $4,157 |
| 28 | $29,904 | $1,954 | $33,030 | $2,330 | $49,992 | $4,365 |
| 29 | $30,203 | $1,990 | $33,535 | $2,390 | $51,742 | $4,679 |
| 30 | $30,505 | $2,027 | $34,048 | $2,452 | $53,501 | $5,066 |
| 31 | $30,810 | $2,063 | $34,569 | $2,514 | $55,267 | $5,455 |
| 32 | $31,118 | $2,100 | $35,098 | $2,578 | $57,036 | $5,844 |
| 33 | $31,429 | $2,137 | $35,635 | $2,642 | $58,804 | $6,233 |
| 34 | $31,743 | $2,175 | $36,180 | $2,708 | $60,568 | $6,621 |
| 35 | $32,060 | $2,213 | $36,734 | $2,774 | $62,324 | $7,007 |
| 36 | $32,381 | $2,252 | $37,296 | $2,842 | $64,069 | $7,391 |
| 37 | $32,705 | $2,291 | $37,867 | $2,910 | $65,799 | $7,772 |
| 38 | $33,032 | $2,330 | $38,446 | $2,980 | $67,510 | $8,148 |
| 39 | $33,362 | $2,369 | $39,034 | $3,050 | $69,198 | $8,520 |
| 40 | $33,696 | $2,410 | $39,631 | $3,122 | $70,859 | $8,885 |
| 41 | $33,696 | $2,410 | $40,237 | $3,194 | $72,489 | $9,244 |
| 42 | $33,696 | $2,410 | $40,853 | $3,268 | $74,084 | $9,594 |
| 43 | $33,696 | $2,410 | $41,478 | $3,343 | $75,640 | $9,937 |
| 44 | $33,696 | $2,410 | $42,113 | $3,420 | $77,153 | $10,270 |
| 45 | $33,696 | $2,410 | $42,757 | $3,497 | $78,619 | $10,592 |

graduation date, their choice of major, previous post-secondary education (a substantial proportion have already earned an associates degree), and their city and state of residence. We have no data on college performance.

We paired the educational data with income data we obtained from the fintech company payscale.com, which has an estimated starting salary for college students based on degree, school, and major using reported salary data. Our data set had 2,563 usable

14

Electronic copy available at: https://ssrn.com/abstract=3420511

observations, with a median expected starting salary of $59,875.[16] This is probably too high an estimate, as it is well above the $46,443 median annual earnings for 25 to 34 year old Hispanics with a Bachelor's degree, or even the $50,858 median annual earnings for all 25 to 34 year olds a Bachelor's degree, as reported in the NCES *Digest for Education Statistics* (table 502.30; average of 2010 to 2017, in 2017 dollars). However, our data set shows that the DACA college students attend universities in states with a median household income 5.28% higher than in the country as a whole, suggesting that a 2017 median salary of $53,500 at age 30 would be a reasonable estimate.

Table 8: Aggregate DACA Income and Taxes, by Education ($B)

| Year | HS only | | Some Coll | | BA/BS | |
|------|---------|-------|-----------|-------|--------|-------|
| | Income | Taxes | Income | Taxes | Income | Taxes |
| 2019 | $10.905 | $0.696 | $6.901 | $0.467 | $9.135 | $0.792 |
| 2020 | $11.631 | $0.747 | $7.839 | $0.534 | $10.578 | $0.931 |
| 2021 | $12.319 | $0.797 | $8.779 | $0.602 | $12.096 | $1.080 |
| 2022 | $12.966 | $0.845 | $9.694 | $0.670 | $13.690 | $1.242 |
| 2023 | $13.591 | $0.891 | $10.565 | $0.736 | $15.322 | $1.417 |
| 2024 | $14.192 | $0.937 | $11.384 | $0.799 | $16.954 | $1.604 |
| 2025 | $14.767 | $0.982 | $12.162 | $0.860 | $18.563 | $1.798 |
| 2026 | $15.312 | $1.026 | $12.902 | $0.920 | $20.134 | $1.997 |
| 2027 | $15.825 | $1.068 | $13.607 | $0.979 | $21.680 | $2.163 |
| 2028 | $16.303 | $1.109 | $14.274 | $1.036 | $23.206 | $2.339 |
| 2029 | $16.795 | $1.151 | $14.898 | $1.091 | $24.712 | $2.526 |
| 2030 | $17.302 | $1.195 | $15.429 | $1.141 | $26.190 | $2.722 |
| 2031 | $17.825 | $1.240 | $15.978 | $1.192 | $27.631 | $2.927 |
| 2032 | $18.363 | $1.286 | $16.547 | $1.246 | $28.968 | $3.142 |
| 2033 | $18.818 | $1.323 | $17.136 | $1.302 | $30.341 | $3.363 |

To generate an age-earnings profile for college graduates, we assumed those salaries, per Thornton et al. (1997), would initially grow at a 4% real annual rate, gradually tapering to a 3% real annual rate after 10 years, and a 2% real annual rate after another decade. That gave us an average starting salary of $41,487.

For all three of these groups, we assigned the age-profile starting salaries to all em-

---

[16]The mean was virtually the same, $59,640.

Electronic copy available at: https://ssrn.com/abstract=3420511

ployed DACA-participating individuals at the beginning of their work careers, with their real incomes rising with age.  In reality, some individuals will earn more than those median earnings, and others less.  The progressivity of the tax code implies that our revenue estimates for these workers will understate the true revenue impacts, although probably not by much, since most of these individuals will remain in a relatively low tax bracket for the next decade, regardless of how much their income varies from the median.

Table 9: Aggregate DACA Income and Taxes ($B)

| Year | Income | Inc. Taxes | FICA Taxes |
|------|--------|-----------|-----------|
| 2019 | $26.941 | $1.955 | $4.122 |
| 2020 | $30.048 | $2.212 | $4.597 |
| 2021 | $33.194 | $2.479 | $5.079 |
| 2022 | $36.350 | $2.757 | $5.562 |
| 2023 | $39.478 | $3.044 | $6.040 |
| 2024 | $42.530 | $3.340 | $6.507 |
| 2025 | $45.492 | $3.640 | $6.960 |
| 2026 | $48.348 | $3.943 | $7.397 |
| 2027 | $51.112 | $4.210 | $7.820 |
| 2028 | $53.783 | $4.484 | $8.229 |
| 2029 | $56.405 | $4.768 | $8.630 |
| 2030 | $58.921 | $5.058 | $9.015 |
| 2031 | $61.434 | $5.359 | $9.399 |
| 2032 | $63.878 | $5.674 | $9.773 |
| 2033 | $66.295 | $5.988 | $10.143 |
| 2020-29 | $436.740 | $34.877 | $66.821 |
| 2021-30 | $465.613 | $37.723 | $71.239 |

Their estimated income taxes were based on the tax rates adopted in December 2017 for single individuals.  FICA taxes are 15.3% of income, which includes both the employer's and employee's share. For years after 2018, nominal income and tax payments were inflated using an annual 2% inflation rate. Per CBO custom we do not discount the income or tax revenues of future years.

Table 8 reports the annual estimated aggregate nominal income and income tax payments of the three DACA-eligible education groups for the years 2019-2033, in billions of

16

Electronic copy available at: https://ssrn.com/abstract=3420511

dollars. Table 9 aggregates these income and income tax estimates by year, and reports the corresponding FICA taxes. Overall, we estimate that if DACA were continued, for the decade 2020-2029 the DACA-eligible population would have an aggregate income of $437 billion, pay $35 billion in income taxes, and generate $67 billion in FICA taxes.

As we will show below, those numbers are all substantially greater than our estimated income and tax payments for the DACA-eligible population, if DACA is eliminated.

## 2   Economic Outcomes if DACA Ends

The elimination of DACA would profoundly affect this population. The 440,000 DACA-eligibles who are still in school would have a reduced incentive to continue their education, since DACA's elimination would severely restrict their future employment opportunities. And many of the 1.06 million DACA-eligibles currently in the workforce would be forced to leave their current employment, migrating to the typically less rewarding and less productive jobs that can be done without legal employment status.

To estimate the economic impacts of eliminating DACA, we estimate the effect that would have on educational outcomes, earnings, and labor force participation. Those estimates in turn provide us with estimated aggregate income and tax payments for the DACA-eligible population, which can be compared to the corresponding estimates from a continued DACA in the previous section.

### 2.1   Educational attainment without DACA

To estimate how educational outcomes in the DACA population would change if DACA ended, we begin by estimating how its creation affected those outcomes. The clearest impact has been on high school graduation, since its effect is unambiguous. DACA provides benefits, both pecuniary (principally greater post-graduation employment opportunities) and non-pecuniary (primarily a temporary reduction in deportation risk) only

17

Electronic copy available at: https://ssrn.com/abstract=3420511

if high school graduation is attained. Three studies have explored how legal status affects high school graduation, all concluding that DACA has increased the high school graduation rate significantly in the DACA population.

In an analysis that pre-dated DACA, Passel and Cohn (2009) estimated a high school completion rate of only 72% among undocumented immigrants who arrived in the United States before the age of 14 years, 10% lower than native-born Americans. Similarly, using (2000 to 2011) pre-DACA data on teenagers aged 13 to 17, Liscow and Woolston (2018) found that undocumented siblings of Mexican heritage were roughly twice as likely to not be enrolled in school as their U.S.-born siblings. Since Passel and Cohn reported a better than 2-to-1 ratio of U.S.-born to foreign-born children in undocumented immigrant families, and the overall Hispanic dropout rate averaged 5.8% over that 12 year period, Liscow and Woolston's "double likelihood" estimate suggests annual dropout rates of 4.3% and 8.8%, and high school graduation rates of 88% and 76%, among Hispanic U.S.-born versus foreign-born children.

Using data than spanned the creation of DACA, Kuka et al (2018) compared the educational attainment of potentially DACA-eligible Hispanics to that of foreign-born citizens with the same age and year of arrival profiles. They found that DACA increased high school completion of 19 to 22 year olds by 5.9 percentage points, to about an 84% graduation rate. Merging these three studies suggests that the high school graduation rate with legal status is the 84% we used in our estimate of the economic outcomes under DACA, and without legal status would be roughly 76%.[17]

However, DACA's effect on college enrollment is not unambiguous. It increases the benefits of higher education by opening up future employment opportunities that would not be accessible without legal status. But it also raises the opportunity cost of higher education, by increasing the current income that must be foregone in pursuing that higher education. We would expect that the former effect would predominate if DACA recipients

---

[17]This would imply an annual dropout rate of 8.7% for each of the last three years of high school.

18

Electronic copy available at: https://ssrn.com/abstract=3420511

perceive DACA as being likely to provide permanent legal status, but that the latter effect would predominate if DACA recipients saw the program as only a temporary opportunity to work legally.

It is therefore not surprising that the evidence on DACA's effect on college enrollment is mixed. Hsin and Ortega (2018) estimated the effects of DACA on DACA-eligibles who were already enrolled in college when DACA was first announced. They note that the DACA college-enrolled population was already positively selected compared to immigrants with legal status, with higher average high school GPAs and lower pre-DACA dropout rates, indicating that the lack of legal status had deterred college enrollment. They found that DACA increased the college dropout rate by 7.3 percentage points among students at four-year colleges, while decreasing the full-time enrollment rate at community colleges by 5.5 percentage points. Their results suggest that not quite one-tenth of already-enrolled DACA recipients reacted as if the program would be only temporary. Of course, since they were only studying DACA-eligibles already enrolled in college, they could not possibly have found any enrollment increase.

Pope (2016) compared DACA participants who barely met the qualifications (by being just below the age of 16 when they entered the country, or just below the age of 30 when DACA was announced) to their peers who barely missed qualifying for DACA, and found DACA had no effect on education. And Kuka et al (2018), using data comparing potentially DACA-eligible Hispanics to foreign-born citizens, found that DACA increased college attendance by only around 3 percentage points. However, we suspect that this result may be strongly affected by the significant differences in family educational backgrounds between DACA-eligible Hispanics and foreign-born citizens.

In strong contrast to these results, Kaushal (2008) reported that for the 1997-2005 period only about 29% of the young noncitizen adults of Mexican origin age 23-28 with high school degrees had any college attendance, as compared to 43% of young noncit-

Electronic copy available at: https://ssrn.com/abstract=3420511

izen non-Mexican Latinos and 75% of young noncitizen non-Latinos.[18] According to the U.S. Citizenship and Immigration Services (2017), 79.4% of the DACA population are of Mexican origin, and another 14.4% are of other Latin American origin.  Applying these 1997-2005 college attendance rates to the immediately pre-DACA period suggests that about only 38% of DACA-eligibles who graduated from high school prior to 2012 would have attended college before DACA, well shy of the 67.1% of Hispanic high school completers enrolled in college reported by the NCES *Digest for Education Statistics* (table 302.20).

Cortes (2013) reaches similar conclusions by comparing the educational attainment of young immigrants legalized by the 1986 Immigration Reform and Control Act (IRCA) to other undocumented immigrant youth.  She found that legal status in 2000 increased college enrollment in that population by 15 percentage points, at a time when overall Hispanic college enrollment was only around 50%.  Similarly, Wong et al (2016, 2017, 2018) found, in a series of on-line surveys of DACA recipients, that 64% of the respondents reported having "pursued educational opportunities that I previously could not," principally, post-secondary education.

Recall that, to make sense of the MPI's 2014 DACA-eligible college enrollment and college completion numbers, as reported in Table 1, we had to incorporate into Table 6 estimated values for pre-DACA college enrollments and for backlog first-time enrollments in 2012 and 2013.  Our numbers suggest that prior to DACA, only about 18% of the future-DACA-eligible high school graduates enrolled in college, but that the aggregate college enrollment among these pre-2012 high school graduates jumped to 45% by 2014. We then used the NCES *Digest for Education Statistics'* estimated 67.1% college enrollment rate for Hispanic high school completers for the high school cohorts who graduated after DACA was established.[19]

---

[18]These differences are probably due to the fact that many non-Mexican undocumented immigrants arrived in the U.S. on student visas, and subsequently overstayed those visas.

[19]In a report on a 2013 survey of DACA participants, a year after DACA began, Gonzales, Terriquez and Ruszczyk (2014) found that 22% had already obtained a bachelor's degree, another 69% either had or were attending a 4-year or community college. Our simulation numbers are generally in line with their findings.

Electronic copy available at: https://ssrn.com/abstract=3420511

Overall, we believe that it is reasonable to estimate that if DACA ended, the college enrollment rate would drop back down to only about 40% of high school completers.[20]

Table 10 reflects these changes, and recalculates the numbers from Table 6 beginning in 2020. The annual high school dropout rate has risen to 8.7%, only 40% of high school completers enroll in college, and the college dropout rates for those who were enrolled when DACA expired has risen to 40% after one year and 30% after the second and third year, reflecting the likelihood that many DACA-eligibles who enrolled in college under the promise of DACA would become discouraged by its elimination. As we did in Table 6, we applied employment rates to each level of educational attainment from the NCES *Digest for Education Statistics* (table 501.50), adding the corresponding employment rate for those with less than high school completion. We further adjusted those employment rates to reflect the lower likelihood of employment when a worker is undocumented, which we will address more fully in the the next subsection.[21]

Table 10 shows 52 more high-school-only DACA-eligible workforce entrants, 45,466 fewer workforce entrants with some college, and 63,966 fewer college graduates in the workforce than in Table 6. There are also 9,575 additional high school dropouts from this population in the workforce. These changes primarily reflect the impacts of eliminating DACA on employment rather than on education. The estimated changes in educational attainment are in fact relatively moderate, primarily because we estimate that 71% of the Table 6's population had completed its education and entered the workforce before DACA's termination.[22]

---

Amuedo-Dorantes and Antman (2016) found that DACA decreased education among DACA-eligibles relative to DACA-ineligible undocumented immigrants. However, their small DACA-eligible sample sizes and the high level of post-secondary education in their DACA-eligible group prior to DACA lead us to discount their results.

[20] Our overall results are not very sensitive to this estimate, since in our model about 83% of the DACA population has already completed high school by the time DACA is assumed to end.

[21] The high school dropouts reported in the table are our estimated net increase in dropouts due to the elimination of DACA. Undocumented immigrants who would already have dropped out had DACA continued would be unaffected by the policy change.

[22] Technically, the elimination of DACA, modeled as occurring at the end of 2019, would not affect workforce entry prior to 2020. However, it would reduce the employment of those earlier workforce cohorts thereafter. Reducing the workforce entry numbers for the years before 2020 simplifies the calculation of the economic affects after DACA is eliminated.

AR2022_500823

Electronic copy available at: https://ssrn.com/abstract=3420511

Table 10: No-DACA Workforce Entry

|  | HS dropout | HS only | Some Coll | BA/BS |
|---|---|---|---|---|
| % Empl (DACA) | 57.18% | 69.94% | 75.96% | 84.89% |
| % Empl (No DACA) | 51.18% | 63.94% | 69.96% | 78.89% |
| Pre-2012 | 0 | 201,108 | 11,852 | 23,762 |
| 2012 | 0 | 17,355 | 7,724 | 7,069 |
| 2013 | 0 | 17,538 | 34,033 | 7,069 |
| 2014 | 0 | 17,202 | 40,137 | 7,069 |
| 2015 | 0 | 17,070 | 36,153 | 7,069 |
| 2016 | 0 | 17,269 | 26,767 | 29,222 |
| 2017 | 0 | 17,119 | 21,900 | 40,638 |
| 2018 | 0 | 16,421 | 21,122 | 33,076 |
| 2019 | 0 | 14,789 | 20,656 | 23,211 |
| 2020 | 2,676 | 22,472 | 27,313 | 19,773 |
| 2021 | 2,056 | 18,112 | 16,244 | 18,149 |
| 2022 | 1,606 | 14,014 | 10,416 | 15,853 |
| 2023 | 1,278 | 11,679 | 6,753 | 12,896 |
| 2024 | 950 | 9,343 | 5,466 | 10,016 |
| 2025 | 622 | 7,007 | 4,382 | 7,812 |
| 2026 | 294 | 4,671 | 3,442 | 6,120 |
| 2027 | 93 | 2,336 | 2,500 | 4,924 |
| 2028 | 0 | 0 | 1,560 | 3,981 |
| 2029 | 0 | 0 | 619 | 3,121 |
| 2030 | 0 | 0 | 191 | 2,260 |
| 2031 | 0 | 0 | 0 | 1,399 |
| 2032 | 0 | 0 | 0 | 539 |
| 2033 | 0 | 0 | 0 | 108 |
| Totals | 9,575 | 425,505 | 299,230 | 285,136 |

## 2.2  Employment without DACA

There are two reasons to expect that the termination of DACA would reduce, but not eliminate, employment in the DACA population. The first, already captured in the previous section, is the reduced educational attainment. As the NCES *Digest for Education Statistics* (table 501.50) reports, employment rates are higher, the higher the level of education, so less educational attainment means fewer employed workers. That effect

22

Electronic copy available at: https://ssrn.com/abstract=3420511

is already reflected into the numbers in Table 10.

Secondly, the loss of legal status will itself prove a hindrance to obtaining employment. Pope (2016), comparing the labor market outcomes of DACA participants to their peers who barely missed qualifying for DACA, found that DACA increased labor force participation and decreased unemployment among DACA participants, increasing the likelihood than an individual was employed by between 4.8 and 7.7 percentage points. Since Pope found no effect of DACA on education in his study, this employment effect must be independent of the effects of education.

In Table 10, the employment rates have all been reduced by 6 percentage points to reflect Pope's estimates. However, when the employment rate is only 69.94%, a 6 percentage point decline in employment reduces the employment rate to 63.94%, which is a nearly 9% reduction.[23]

## 2.3   Earnings without DACA

It would be surprising if legal status did not impact the financial rewards to employment. Being able to work legally opens up a wide array of job opportunities that would otherwise be unavailable to the worker, almost certainly leading to an increase in earnings.

Two studies of the effects of the Immigration Reform and Control Act (IRCA) of 1986 on the earnings of previously undocumented Mexican immigrants found exactly that. Rivera-Batiz (1999) compared the earnings of undocumented Mexican immigrants surveyed in 1987-8 with their earnings in 1992, after gaining legal status through IRCA. The majority of his sample were poorly educated, with nine or fewer years of education. He found, after accounting for changes in education, language proficiency, employment sector, and employment experience that had occurred during the intervening period, that legal status increased men's earnings by about 8% and women's earnings by nearly 13%.

---

[23]$0.6394/0.6994 = 91.4\%$.

Electronic copy available at: https://ssrn.com/abstract=3420511

Kossoudji and Cobb-Clark (2002) compared the same population of Mexican immigrant men who gained legal status under IRCA with a sample of (primarily U.S.-born) Latino man who entered the job market at about the same time. Similar to Rivera-Batiz, they concluded that prior to IRCA, the lack of legal status had reduced the men's earnings by 14% to 22%. They also found that prior to gaining legal status, there was only a small, statistically insignificant wage premium for education among the Mexican immigrants, which increased dramatically after legal status was obtained.

Pope (2016) looked at the effects of DACA on earnings, and found that DACA increased incomes in the bottom half of those working by 5% to 20%, but had little effect on those in the top of income distribution. This latter result is surprising, since Borjas (2017, Table 3) estimated than the returns to education for undocumented workers were only slightly more than half those of native-born workers.[24] He also found that the overall wage penalty to undocumented immigrants who had been in the U.S. for over a decade declined from around 12% prior to 2007 to around 8% in 2011-14.

Two sets of surveys report earnings gains for DACA recipients. Gonzales, Terriquez and Ruszczyk (2014) surveyed 2,381 DACA recipients in 2013, shortly after the program was implemented. 59% of those surveyed reported having obtained a new job, and 45% reported increased job earnings. Both positive outcomes were significantly more likely for those who had earned college degrees. Wong et al (2016, 2017, 2018), in three surveys with a total of 5,421 DACA respondents, reported that 64% of those surveyed reported having obtained a better paying job, 51% reported having obtained a job that better fit their education, and 68% reported increased job earnings. Their average earnings rose 65% for the full sample, and 88% for those 25 and older in the 2017 or 2018 surveys.

Since the acquisition of legal status clearly raised DACA recipients' incomes, the loss of that status would reduce those incomes. We model the impact of ending DACA as

---

[24]His education coefficients (in regressions of log income on various demographic measures) for native-born Americans averaged 0.118; they averaged 0.064 for undocumented immigrants.

AR2022_500826

Electronic copy available at: https://ssrn.com/abstract=3420511

reducing the earnings of all the DACA-eligibles of the previous section, but especially of those with the highest education. We began by assuming that otherwise-DACA-eligibles who dropped out of high school earn $21,800 a year in 2017 dollars, with only an inflationary increase over time; that is, with no increasing age-earnings profile. The $21,800 roughly equals the $20,000 that DACA respondents reported earning on average prior to DACA in Wong's 2017 and 2018 surveys, adjusted for inflation. It also represents a 15% wage penalty relative to the median income for all Hispanics with less than a high school education, $25,520 a year in 2017 dollars.[25]

In Table 11 we have adjusted downward the age-earnings profiles from Table 7, relative to that $21,800 figure. For those with high school degrees or some college, our without-DACA incomes are 55% of the difference between the with-DACA incomes and the $21,800 base.[26] For those with college degrees, without-DACA incomes are 40% of the difference between the with-DACA incomes and the $21,800 base. This reflects the fact that many of the highest paying jobs open to college graduates with legal status – such as Chemical Engineer or Systems Analyst – would be totally inaccessible once that status is removed. These adjustments capture Borjas' (2017) estimate that lack of legal status cuts the returns to education roughly in half, and are consistent with Kossoudji and Cobb-Clark's (2002) finding that legal status dramatically increased the education wage premium.

## 2.4   Income and Taxes without DACA

Combining the adjusted age-earnings profiles in Table 11 with the streams of workforce entrants in Table 10 gives income streams and aggregate income tax payments for each of the four education levels, which we present in Table 12. Note that the 2019 numbers are identical to those in Table 8, since we are modeling the policy change as occurring

---

[25]NCES *Digest for Education Statistics* (table 502.30)

[26]Thus, a 25 year-old with some college who would have earned $31,559 under DACA would now earn {$21,800 +0.55($31,559-$21,800)} = $27,167.

Electronic copy available at: https://ssrn.com/abstract=3420511

Table 11: No-DACA Age-Earnings Profiles, by Education

| Age | HS dropout | HS only | Some Coll | BA/BS |
|-----|-----------|---------|-----------|-------|
| 19 | $21,800 | $24,849 | | |
| 20 | $21,800 | $24,999 | | |
| 21 | $21,800 | $25,151 | $26,145 | |
| 22 | $21,800 | $25,304 | $26,395 | |
| 23 | $21,800 | $25,459 | $26,648 | $29,675 |
| 24 | $21,800 | $25,616 | $26,906 | $30,338 |
| 25 | $21,800 | $25,774 | $27,167 | $31,012 |
| 26 | $21,800 | $25,933 | $27,433 | $31,693 |
| 27 | $21,800 | $26,094 | $27,703 | $32,382 |
| 28 | $21,800 | $26,257 | $27,977 | $33,077 |
| 29 | $21,800 | $26,422 | $28,254 | $33,777 |
| 30 | $21,800 | $26,588 | $28,536 | $34,480 |
| 31 | $21,800 | $26,756 | $28,823 | $35,187 |
| 32 | $21,800 | $26,925 | $29,114 | $35,894 |
| 33 | $21,800 | $27,096 | $29,409 | $36,602 |
| 34 | $21,800 | $27,269 | $29,709 | $37,307 |
| 35 | $21,800 | $27,443 | $30,014 | $38,010 |
| 36 | $21,800 | $27,620 | $30,323 | $38,708 |
| 37 | $21,800 | $27,798 | $30,637 | $39,400 |
| 38 | $21,800 | $27,978 | $30,955 | $40,084 |
| 39 | $21,800 | $28,159 | $31,279 | $40,759 |
| 40 | $21,800 | $28,343 | $31,607 | $41,424 |
| 41 | $21,800 | $28,343 | $31,940 | $42,076 |
| 42 | $21,800 | $28,343 | $32,279 | $42,714 |
| 43 | $21,800 | $28,343 | $32,623 | $43,336 |
| 44 | $21,800 | $28,343 | $32,972 | $43,941 |
| 45 | $21,800 | $28,343 | $33,326 | $44,528 |

at the end of 2019.

We again aggregate these income and income tax estimates by year and report the corresponding FICA taxes in Table 13. The results suggest that if DACA were terminated, for the decade 2020-2029 the formerly DACA-eligible population would have an aggregate income of only $316 billion, pay only $20 billion in income taxes, and generate only $48 billion in FICA taxes.

26

Electronic copy available at: https://ssrn.com/abstract=3420511

Table 12: No-DACA Aggregate Income and Taxes, by Education ($B)

| Year | HS dropout | | HS only | | Some Coll | | BA/BS | |
|------|--------|-------|--------|-------|--------|-------|--------|-------|
| | Income | Taxes | Income | Taxes | Income | Taxes | Income | Taxes |
| 2019 | | | $10.905 | $0.696 | $6.901 | $0.467 | $9.135 | $0.792 |
| 2020 | $0.061 | $0.003 | $9.658 | $0.550 | $7.024 | $0.379 | $6.626 | $0.459 |
| 2021 | $0.109 | $0.005 | $10.390 | $0.594 | $7.685 | $0.439 | $7.475 | $0.522 |
| 2022 | $0.150 | $0.007 | $11.041 | $0.634 | $8.210 | $0.483 | $8.295 | $0.585 |
| 2023 | $0.183 | $0.008 | $11.652 | $0.673 | $8.652 | $0.520 | $9.061 | $0.646 |
| 2024 | $0.210 | $0.009 | $12.221 | $0.709 | $9.074 | $0.552 | $9.769 | $0.703 |
| 2025 | $0.230 | $0.010 | $12.744 | $0.744 | $9.479 | $0.584 | $10.435 | $0.759 |
| 2026 | $0.242 | $0.011 | $13.216 | $0.776 | $9.871 | $0.615 | $11.071 | $0.814 |
| 2027 | $0.249 | $0.011 | $13.635 | $0.805 | $10.248 | $0.645 | $11.691 | $0.857 |
| 2028 | $0.254 | $0.011 | $13.996 | $0.832 | $10.608 | $0.676 | $12.301 | $0.902 |
| 2029 | $0.260 | $0.012 | $14.367 | $0.860 | $10.930 | $0.705 | $12.902 | $0.947 |
| 2030 | $0.265 | $0.012 | $14.748 | $0.888 | $11.262 | $0.733 | $13.492 | $0.995 |
| 2031 | $0.270 | $0.012 | $15.139 | $0.917 | $11.605 | $0.762 | $14.067 | $1.043 |
| 2032 | $0.275 | $0.012 | $15.541 | $0.948 | $11.959 | $0.792 | $14.604 | $1.093 |
| 2033 | $0.281 | $0.013 | $15.904 | $0.973 | $12.325 | $0.823 | $15.154 | $1.144 |

However, those numbers assume that this population would, despite the loss of legal status, fully comply with the tax laws and pay all of their required tax liabilities.  A far more reasonable assumption would be that a considerable fraction of these taxes would go unpaid.  Social Security's Office of Chief Actuary (Goss el al 2013) has estimated that only about 44% of undocumented workers paid Social Security taxes in 2010.[27] Since we cannot imagine why an underground worker who is not paying Social Security taxes would then pay income taxes, we apply this 44% compliance rate to both sets of taxes.  Under this assumption, the formerly DACA-eligible population would again have an aggregate 2020-2029 income of $316 billion, but pay just $9 billion in income taxes, and generate just $21 billion in FICA taxes.

---

[27] They estimated that there were about 7 million unauthorized workers that year, of whom 3.9 million were identified as working in the underground economy, and thus not paying taxes, with the remaining 3.1 million unauthorized workers tax compliant.

27

Electronic copy available at: https://ssrn.com/abstract=3420511

Table 13: No-DACA Aggregate Income and Taxes ($B)

| Year | Income | Inc. Taxes | FICA Taxes |
|------|--------|------------|------------|
| 2019 | $26.941 | $1.955 | $4.122 |
| 2020 | $23.369 | $1.391 | $3.575 |
| 2021 | $25.659 | $1.560 | $3.926 |
| 2022 | $27.696 | $1.709 | $4.237 |
| 2023 | $29.548 | $1.847 | $4.521 |
| 2024 | $31.274 | $1.973 | $4.785 |
| 2025 | $32.888 | $2.097 | $5.032 |
| 2026 | $34.400 | $2.216 | $5.263 |
| 2027 | $35.823 | $2.318 | $5.481 |
| 2028 | $37.159 | $2.421 | $5.685 |
| 2029 | $38.459 | $2.524 | $5.884 |
| 2030 | $39.767 | $2.628 | $6.084 |
| 2031 | $41.081 | $2.734 | $6.285 |
| 2032 | $42.379 | $2.845 | $6.484 |
| 2033 | $43.664 | $2.953 | $6.681 |
| Assuming Full Tax Compliance | | | |
| 2019-28 | $304.757 | $19.487 | $46.627 |
| 2020-29 | $316.275 | $20.056 | $48.389 |
| 2021-30 | $332.673 | $21.293 | $50.898 |
| Assuming 44% Tax Compliance after 2019 | | | |
| 2019-28 | $304.757 | $9.669 | $22.824 |
| 2020-29 | $316.275 | $8.825 | $21.291 |
| 2021-30 | $332.673 | $9.369 | $22.395 |

## 3   Consequences of Ending DACA

As the previous two sections show, ending DACA would have significant economic consequences, summarized in Table 14. The DACA population would face a 28% decline in earnings, primarily through a loss in the return to education. Ending DACA would be, in effect, a 50% tax on their return to investment in human capital, an investment made in good faith when the promise of legal status was held out to them. Ending DACA would also result in a roughly $72 billion loss in tax revenue to the federal government over the 2020-29 decade.

Ending DACA would also affect state and local government tax revenues, the earnings

28

Electronic copy available at: https://ssrn.com/abstract=3420511

Table 14: Consequences of Ending DACA ($B)

| 2020-29 | Income | Inc. Taxes | FICA Taxes |
|---|---|---|---|
| Under DACA | $436.740 | $34.877 | $66.821 |
| DACA Terminated | $316.275 | $8.825 | $21.291 |
| Difference | $120.465 | $26.052 | $45.530 |
| % Difference | 27.58% | 74.70% | 68.14% |

of American citizens, and the U.S. economy as a whole. We address each of those changes in the subsections below.

## 3.1   The Impact on State and Local Governments

Ending DACA would reduce state and local government tax revenues by reducing the incomes and resulting consumer spending that those governments tax. To estimate those revenue affects, we calculated each state's share of the total DACA population, based on the Migration Policy Institute (2018) estimated distribution.[28] These shares were then weighted by states' 2017 median household incomes to estimate the share of total DACA income to attribute to each state.

State and local tax revenues as a percent of state personal income were downloaded from the Urban Institute-Brookings Institution Tax Policy Center. Our estimated changes in property tax revenue and in sales and gross receipts tax revenue for each state are the products of our estimated change in DACA income times the state's weighted income share, multiplied by that tax's revenue as a percent of state personal income. We calculate estimated changes in income tax revenue similarly, but assume that only 44% of the DACA population's income would be reported if DACA were eliminated.

Table 15 reports these tax revenue losses for the 10 states with the largest income shares and for the nation as a whole, in million of dollars. Overall, the 50 states, Washington D.C., and their local tax jurisdictions would lose about $15 billion during the 2020-

---

[28]The MPI's estimates include 40 states, covering 98.9% of the DACA-eligible population.

Electronic copy available at: https://ssrn.com/abstract=3420511

Table 15: 2020-29 State/Local Tax Revenue Cost of Ending DACA ($M)

| State | Share | Inc Loss | Prop Tax | Sales Tax | Inc Tax | Tax Loss |
|---|---|---|---|---|---|---|
| California | 33.57% | $40,442 | $1,096 | $1,290 | $3,567 | $5,953 |
| Texas | 13.55% | $16,320 | $623 | $712 | | $1,335 |
| New York | 5.90% | $7,113 | $325 | $255 | $845 | $1,425 |
| Illinois | 4.82% | $5,811 | $235 | $208 | $294 | $737 |
| New Jersey | 4.69% | $5,649 | $285 | $136 | $335 | $756 |
| Florida | 4.55% | $5,479 | $150 | $209 | | $359 |
| Georgia | 3.09% | $3,719 | $101 | $112 | $218 | $431 |
| North Carolina | 2.52% | $3,034 | $69 | $101 | $208 | $378 |
| Arizona | 2.34% | $2,824 | $74 | $120 | $98 | $292 |
| Washington | 2.17% | $2,619 | $68 | $147 | | $215 |
| Total | 98.9% | $119,139 | $3,751 | $4,138 | $7,168 | $15,057 |

29 decade.

## 3.2   The Impact on American Workers

One of the ironies of the proposal to end DACA is that it would convert a population with a substantial fraction of high-skilled workers into a population of at best moderate-to-low skilled workers. A high-school-only DACA-eligible worker currently employed in retail sales would face a comparatively small loss in income if he lost that job when his DACA work authorization ended, since there are undoubtedly many small retailers willing to hire him to do the same job, albeit off the books at a somewhat lower wage. But a DACA-eligible worker with a degree in structural engineering would be unlikely to find an employer willing to hire her without work authorization, forcing her to compete in that same market for retail jobs.

The economics literature shows that skilled immigrant workers have a beneficial impact on the employment of both skilled and unskilled American citizens. One reason for this is that skilled immigrants have a relatively small substitution effect on skilled domestic workers, because those skilled immigrants are relatively mobile and go where there

30

Electronic copy available at: https://ssrn.com/abstract=3420511

are many available jobs. In contrast, the U.S. labor force is less flexible: geographic mobility has gradually diminished in the U.S. since the 1950s, and has fallen by 10% in just the last few years.[29] The chief reason for this trend is the rise in two-income households, which increases the cost of moving for one spouse's job.

Skilled immigrants also have a positive impact on domestic employment because they create what economists call a "scale effect": skilled immigrants boost overall economic activity, creating more opportunities and jobs for both skilled and unskilled domestic workers. This scale effect outweighs their small substitution effect for skilled domestic workers. For example, Peri et. al. (2014a) showed that reducing the number of skilled foreign workers coming to a community significantly reduced the wages of college-educated U.S.-born workers in those communities who work with computers.[30]

Skilled immigrants have an unambiguously positive effect on unskilled U.S. born workers. Skilled workers and unskilled workers are, in general, complementary, just as skilled workers and capital are complementary – that is, an increase in the quantity of one increases the demand and price for the other (Chiswick 2011). Hence, an increase in the supply of skilled immigrants increases the amount of capital in the economy and – along with it – the demand for unskilled workers. This results in higher wage and employment levels for unskilled workers, even without the scale effect (Kiley 1999).

Highly-skilled immigrants are also more likely to create new businesses than U.S. citizens with similar skills and education. Immigrants in the U.S. are 30% more likely to start a new business than a native worker, and 25% of all startups in Silicon Valley have been founded by immigrants (Wolla 2014).

In addition, highly-skilled, well-educated workers, both foreign-born and domestic, have high employment levels, are less likely to avail themselves of public services such as food stamps or welfare, and are more likely to be in occupations that are hard to fill. As a result, they boost U.S. tax revenues while having little impact on government

---

[29] Feintzeig and Weber (2018).
[30] See also Peri, Shih, and Sparber (2014b).

31

Electronic copy available at: https://ssrn.com/abstract=3420511

spending.[31]

Ending DACA would reduce the supply of high skilled workers while increasing the supply of low skilled workers in the economy.[32] The increased competition for low-skilled jobs would hurt low skilled domestic workers; the DACA population's loss of income would create a negative scale effect, reducing the demand for high and low skill workers alike.

Thus, any belief that ending DACA would be a boon for low skilled American workers is therefore sadly out on line with the facts.

## 4  Conclusion

DACA provides legal status, and legal work authorization, to over a million young people who came to this country as children, and who, except for their currently tenuous legal status, mostly identify as Americans. As the Congressional Budget Office (CBO) implicitly and we believe correctly assumed when they scored S. 1615, these young people are highly likely to remain in the U.S., and in the U.S. workforce, regardless of whether DACA is discontinued. The primary impact of ending DACA would therefore be to channel them into jobs where legal status is ignored, and therefore for the most part into jobs that do not allow them to take full advantage of their human capital.

Eliminating DACA would be, in effect, throwing away some of our nation's capital resources. We estimated that its elimination would cost the DACA population about $120 billion in reduced income (Table 14). But workers rarely capture all of their productivity in wage income, so the total loss of economic output would be even greater. As a result, the losses in tax revenue at both the federal and state/local level will likely exceed our

---

[31] For a literature review on this topic see Brannon and Albright (2016).

[32] The Congressional Budget Office (CBO) score for S. 1615 effectively assumed that DACA merely switches the DACA population from underground to legal status, without having any effect on their income. While we find this latter assumption implausible, we would note that they do *not* assume that DACA has any significant impact on these workers' willingness to be employed. Hence the CBO's scoring of S. 1615 implicitly agrees with our assessment that ending DACA would not remove a large number of low-skilled workers from the workforce.

AR2022_500834

Electronic copy available at: https://ssrn.com/abstract=3420511

estimates in the previous sections.

Since human capital and physical capital are complements, the failure to employ all of our human capital would hurt the suppliers of physical capital, low-to-moderate income workers. Opponents of DACA, displaying a tragic lack of understanding of how the economy works, argue that its elimination would "open up jobs for Americans." But as section 3.2 showed, its elimination would merely increase the competition for the kinds of jobs that tend to have an excess supply of workers, while reducing the supply of employable skilled workers in the areas where we have the most acute labor shortages. Overall, we find that eliminating DACA would be a lose-lose-lose economic policy, hurting these young immigrants, federal, state, and local government treasuries, the aggregate economy, and the incomes of low-to-moderate income workers.

AR2022_500835

Electronic copy available at: https://ssrn.com/abstract=3420511

# References

[1] Amuedo-Dorantes, Catalina, and Francisca Antman, 2017. "Schooling and labor market effects of temporary authorization: Evidence from DACA," *Journal of Population Economics* 30: 339-373.

[2] Borjas, George J., 2017. " The Earnings of Undocumented Immigrants," NBER Working Paper 23236. Available at: http://www.nber.org/papers/w23236.

[3] Brannon, Ike and Logan Albright, "Immigration's Impact on the Texas Economy," *Texas Public Policy Institute*, March 2016.

[4] Capps, Randy, Michael Fix, and Jie Zong, 2017. "The Education and Work Profiles of the DACA Population," Washington, DC: Migration Policy Institute.

[5] Chiswick, Barry, 2011. "Immigration: High-skilled vs Low-skilled Labor," IZA: Institute for the Study of Labor, Policy Paper 28.

[6] Cortes, Kalena E. 2013. "Achieving the DREAM: The Effect of IRCA on Immigrant Youth Postsecondary Educational Access." *American Economic Review*, 103(3): 428-432.

[7] Feintzeig, Lauren and Lauren Weber, "Fewer Americans Uproot Themselves for a New Job," *The Wall Street Journal*, 20 August 2018.

[8] Gonzales, Roberto G. , Veronica Terriquez and Stephen P. Ruszczyk, 2014. "Becoming DACAmented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)," *American Behavioral Scientist* :1-21.

[9] Goss, Stephen, Alice Wade, J. Patrick Skirvin, et al, 2013. "Effects of Unauthorized Immigration on the Actuarial Status of the Social Security Trust Funds," Social Security Administration, Actuarial Note, 151. Available at: https://www.ssa.gov/oact/NOTES/pdf_notes/note151.pdf.

AR2022_500836

Electronic copy available at: https://ssrn.com/abstract=3420511

[10] Hsin, Amy and Francesc Ortega, 2018. "The Effects of Deferred Action for Childhood Arrivals on the Educational Outcomes of Undocumented Students," *Demography* 55: 1487-1506.

[11] Hudak, John and Elaine Kamarck, 2017. "The Mind-boggling Cost of DACA Repeal." Washington DC: The Brookings Institute. Available at: https://www.brookings.edu/blog/fixgov/2017/09/07/the-mind-boggling-cost-of-daca-repeal/

[12] Kaushal, Neeraj. 2008. "In-State Tuition for the Undocumented: Education Effects on Mexican Young Adults." *Journal of Policy Analysis and Management* 27(4): 771-92.

[13] Kiley, Michael T, 1999. "The Supply of Skilled Labor and Skills-biased Technological Progress," *Economics Journal*.

[14] Kossoudji, Sherrie A, and Deborah A Cobb-Clark, 2002. "Coming out of the shadows: Learning about legal status and wages from the legalized population." *Journal of Labor Economics*, 20(3): 598-628.

[15] Kuka, Elira, Na'ama Shenhav, and Kevin Shih. 2018. "Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA," NBER Working Paper, 24315.

[16] Liscow, Zachary and William Gui Woolston, 2018. "Does Legal Status Matter for Educational Choices? Evidence from Immigrant Teenagers" *American Law and Economics Review* 20: 318-381.

[17] Migration Policy Institute, 2018. "National and State Estimates of Immigrant Populations Eligible for the Deferred Action for Childhood Arrivals (DACA) Program, 2018." Available at: https://www.migrationpolicy.org/sites/default/files/datahub/State-County-DACA-Estimates of DACA-Eligible Population_2018.xlsx.

AR2022_500837

Electronic copy available at: https://ssrn.com/abstract=3420511

[18] Passel, Jeffrey and D'Vera Cohn. 2009. "A Portrait of Unauthorized Immigrants in the United States," Washington, DC: Pew Hispanic Center Report.

[19] Peri, Giovanni, Kevin Shih, Chad Sparber, and Angie Marek-Zeitlin, 2014a. "Closing Economic Windows: How H-1B Visa Denials Cost U.S.-born Tech Workers Jobs and Wages during the Great Recession," *The Partnership for a New American Economy,*.

[20] Peri, Giovanni, Kevin Shih, and Chad Sparber, 2014b. "Foreign Scientists and Engineers and Economic Growth," *Cato Papers on Public Policy* 3: 107-184.

[21] Pope, Nolan G., 2016. "The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants," *Journal of Public Economics* 143: 98-114.

[22] Rivera-Batiz, Francisco L. 1999. "Undocumented workers in the labor market: An analysis of the earnings of legal and illegal Mexican immigrants in the United States." *Journal of Population Economics* 12(1): 91-116.

[23] Tamborini, Christopher R., ChangHwan Kim and Arthur Sakamoto, 2015."Education and Lifetime Earnings in the United States," *Demography* 52: 1383-1407.

[24] Thornton, Robert, James Rogers and Michael Brookshire, 1997. "On the Interpretation of Age-Earnings Profiles," *Journal of Labor Research* 18(2): 351-365.

[25] U.S. Census Bureau, "Table H-8. Median Household Income by State: 1984 to 2017." Available at: https://www2.census.gov/programs-surveys/cps/tables/time-series/historical-income-households/h08.xls.

[26] U.S. Census Bureau, "Annual Estimates of the Resident Population by Sex, Single Year of Age, Race Alone or in Combination, and Hispanic Origin for the United States:  April 1, 2010 to July 1, 2017." Available at: https://www.census.gov/newsroom/press-kits/2018/estimates-characteristics.html.

AR2022_500838

Electronic copy available at: https://ssrn.com/abstract=3420511

[27] U.S. Census Bureau, "CPS Historical Time Series Tables on School Enrollment." Available at: https://www.census.gov/data/tables/time-series/demo/school-enrollment/ cps-historical-time-series.html, Table A-4.

[28] U.S. Census Bureau, "Educational Attainment in the United States: 2017." Available at: https://www.census.gov/data/tables/2017/demo/education-attainment/cps-detailed-tables.html.

[29] U.S. Citizenship and Immigration Services, 2017."Approximate Active DACA Recipients:  Country of Birth." Available at: https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports and Studies/Immigration Forms Data/All FormTypes/DACA/daca_population_data.pdf

[30] U. S. Department of Education, Institute of Education Sciences, National Center for Education Statistics, *Digest for Education Statistics*. https://nces.ed.gov/programs/digest/.

[31] The Urban Institute-Brookings Institution Tax Policy Center, State & Local Government Finance Data Query System. Available at: http://www.taxpolicycenter.org/slf-dqs/pages.cfm.

[32] Wolla, Scott, 2014. "The Economics of Immigration," The Federal Reserve Bank of St. Louis.

[33] Wong, Tom K., Greisa Martinez Rosas, Adrian Reyna, Ignacia Rodriguez, Patrick OShea, Tom Jawetz, and Philip E. Wolgin, 2016, *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*, Washington D.C.:  Center for American Progress. Available at: https://www.americanprogress.org/issues/immigration/news/2016/10/18/146290/new-study-of-daca-beneficiaries-shows-positive-economic-and-educational-outcomes/.

AR2022_500839

Electronic copy available at: https://ssrn.com/abstract=3420511

[34] Wong, Tom K., Greisa Martinez Rosas, Adam Luna, Henry Manning, Adrian Reyna, Patrick OShea, Tom Jawetz, and Philip E. Wolgin, 2017, *DACA Recipients Economic and Educational Gains Continue to Grow*, Washington D.C.: Center for American Progress. Available at: https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[35] Wong, Tom K., Sanaa Abrar, Tom Jawetz, Ignacia Rodriguez Kmec, Patrick O'Shea, Greisa Martinez Rosas, and Philip E. Wolgin, 2018, *Amid Legal and Political Uncertainty, DACA Remains More Important Than Ever*, Washington D.C.: Center for American Progress. Available at: https://www.americanprogress.org/issues/immigration/news/2018/08/15/454731/amid-legal-political-uncertainty-daca-remains-important-ever/.

AR2022_500840

Electronic copy available at: https://ssrn.com/abstract=3420511



Interpreter Releases
January 14, 2000

**\*93** INS FIELD MANUAL PROJECT TO EVENTUALLY REPLACE **OPERATIONS INSTRUCTIONS**

Copyright (c) 2000 West Group

The INS is producing a series of field manuals that will eventually replace the Service's **Operations Instructions** (OIs), which have provided guidance to INS employees and immigration practitioners for many years. According to INS officials, the field manual project, which will result in at least four new manuals, will take many years to complete.

The new field manuals are to be a combination of policy and procedure and will be more detailed than the OIs, many parts of which are now outdated. While, like the OIs, the field manuals will be primarily designed to provide guidance to INS officers and adjudicators, they may, if made public, also be useful for immigration practitioners. It is still unclear, however, whether or to what extent the public will have access to the manuals.

So far, the INS has completed most of one field manual, relating to inspections.

The Operations Instructions. Most immigration practitioners are familiar with the INS OIs, having used them for guidance when the contents of the statute or regulations were not enough. Many OIs read like the regulations at Title 8 of the Code of Federal Regulations, but significantly, were promulgated and updated without going through the Administrative Procedure Act (APA) rulemaking process. [FN50] In fact, the INS has always treated the OIs more as internal operating procedures for its officers, to assist the officers by providing additional interpretation of particular policies. [FN51] The Service often promulgated an OI after encountering a particular situation repeatedly, [FN52] much as it now does when it issues a field policy memorandum.

As some scholars have noted, the exact function and status of the OIs have sometimes been the subject of controversy. [FN53] For many years, the OIs were kept strictly within the INS and were not released to the public. Beginning in 1972, however, in part in response to requests under the Freedom of Information Act (FOIA), the INS made almost all of the OIs public, with the exception of material relating to classified or confidential policies and procedures. [FN54]

The few federal courts that have considered the status of **\*94** the OIs have held that they generally do not have the force of law. At least three times in the 1980s, for example, the Fifth Circuit stated that the OIs are only internal guidelines for INS personnel that neither confer substantive rights nor establish procedures upon which a petitioner for immigration benefits may rely. *Fano v. O'Neill*, 806 F.2d 1262 (5th Cir. 1987); *Dong Sik Kwon v. INS*, 646 F.2d 909 (5th Cir. 1981) [FN55]; *Ponce-Gonzalez v. INS*, 775 F.2d 1342 (5th Cir. 1985). [FN56]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

At times, however, some courts have taken a slightly different view of the OIs. In *Nicholas v. INS*, 590 F.2d 802, 807 (9th Cir. 1979), the court held that while OIs typically do not create substantive rights because they are nothing more than intra-agency guidelines, a 1978 version of one particular OI "clearly and directly affects substantive rights" because "its effect can be final and permanent, with the same force as that of a Congressional statute." While not addressing the issue directly, a more recent decision, *Abboud v. INS*, 140 F.3d 843 (9th Cir. 1998), also suggested that some OIs may create substantive rights.

The OIs have been a way of informing INS field offices about the specifics of handling various types of immigration cases. They, along with policy memoranda and various how-to handbooks, served this purpose for many years. They also were helpful to attorneys and other practitioners, who have used the OIs to help find out what INS policies and procedures are for various areas.

The Field Manual Project. The INS stopped updating the OIs long ago. A few years ago the Service began focusing on its "Field Manual Project," established in 1995, as a way of eventually replacing the OIs. The Project has been in almost continuous operation since then, except for a brief hiatus while the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) was being implemented. The Service envisions the field manuals that will be produced by the Project as combining the information that has been contained in the OIs with policy memoranda and handbook procedures, to produce manuals that are a blend of both policy and procedure.

The INS has been "canceling" (rescinding) various portions of the OIs since the information in those portions was rewritten for field manual purposes, and has been posting "**transmittal memos**" removing specific portions of the OIs on its website. [FN57] For example, currently on the website are March 1998 and **June 1997 transmittal memos** removing numerous parts of the OIs. According to INS officials, about 30 percent of the OIs have already been canceled. The Service has not canceled an OI until it was certain that the procedures therein are covered by a new portion of the field manual, officials said.

The INS is planning four field manuals, covering the following areas: inspections, adjudications, detention and deportation, and investigations. The last manual is designed for INS special agents. In addition, it is possible that a field manual for the Border Patrol will be prepared. The field manuals for inspections and investigations are being prepared mainly by senior INS officials, including Lawrence J. Weinig, who heads the Field Manual Project, and Michael Shaul. They will be joined by one additional staffer each for the investigations field manual and for the detention and deportation field manual.

It will take many years for the INS to complete all of the field manuals. Not only will new field manuals be created in coming years, but all of the completed ones will need constant updating as law and policy changes. That process is sure to take even longer if Congress enacts another big immigration overhaul, such as the IIRIRA.

**\*95** According to Mr. Weinig, the Inspectors' Field Manual (IFM) is almost complete. The only section that still needs to be finished is one relating to bond procedures, to take into account all of the changes in this area made by the IIRIRA.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Currently, the IFM is only available to INS field offices on CD-ROM, Mr. Weinig said. The INS envisions updating the IFM three times per year.

One interesting process involves how updates to the IFM are being communicated to the field. According to Mr. Weinig, the Field Manual Project is trying to convince INS components to communicate policy and procedural changes in the form of updates to the IFM, not through random memos to the field. Some offices have complied with this, but others have not, largely because it differs from the process INS offices have used for many years. The IFM updates are sent in electronic form to field offices; the more important updates are also sent out on paper. They are often also posted on internal INS bulletin boards.

The Field Manual Project involves a huge amount of effort and detail. A look at the IFM illustrates this. The IFM, which is several thousand pages long, contains 20 chapters. Chapters one through four contain general introductory material, including such items as INS structure and the chain of command. Chapters 11 to 18 are policies and procedures for applicants for inspection. These chapters discuss the particular policies for inspections of U.S. citizens, lawful permanent residents, nonimmigrants, and others. Chapter 17 discusses inadmissible aliens, including the expedited removal system created by the IIRIRA. Chapters 21 to 28 discuss special policies and procedures, including preinspection; primary and secondary inspection at land, air and sea ports of entry; and special programs such as the INSPASS program. One section is devoted to departure procedures, in particular how they relate to abducted children. The rest of the IFM's chapters discuss special tools and miscellaneous items, such as automated lookout systems, multiagency support, vehicle seizures, management, and statistical reporting.

The Adjudications Field Manual (AFM), on which the Field Manual Project is now focusing most of its energies, is an even more ambitious undertaking. According to Mr. Weinig, when it is completed, the AFM will be two to three times the size of the IFM. The first few chapters of the manual will constitute general adjudications policies and procedures. These will include evidence issues (chapter 11), attorneys (chapter 12), decisionmaking (chapter 13), research (chapter 14), and interviewing (chapter 15). After that will follow chapters on adjudications specific to the various classes of immigrants and nonimmigrants; travel documents, including advance parole; bonds and fines; nationality and naturalization; and management. Overall, the AFM is expected to contain more than 75 chapters.

The detail and scope of the field manuals are expected to be extremely useful to INS employees. They could also be very helpful to attorneys and others who have dealings with the Service. It is still uncertain, however, whether those outside the agency will have access to the field manuals, or to what degree. There is an ongoing debate within the INS on whether to release the IFM and the other field manuals to the public. Currently, the only way for the public to obtain portions of the field manuals is through Freedom of Information Act requests. [FN58]

Some believe that public dissemination would be beneficial to the INS for two principal reasons. First, it would enable attorneys, scholars and others to provide feedback on specific INS policies, and that feedback could be useful in refining policies and procedures, much as is now done in the formal rulemaking process for INS regulations. Second, distribution of field manuals could serve an important "public relations" function for the INS. Giving the public access to particular INS procedures contained in the manuals may help promote increased openness between the INS and those individuals and organizations that work closely with it. A good example of this is the decision by the INS to release a portion of Chapter 17 of the IFM almost three years ago. The release discussed the IIRIRA's expedited

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

removal program, and it provided much-needed guidance to practitioners and advocates at a critical time, when expedited removal was just beginning to be implemented. [FN59] The INS was praised at the time for releasing the Chapter 17 portion. [FN60]

> The Service may see fit to release other portions of the IFM and other field manuals in coming months.

[FN50]. See generally Aleinikoff, Martin and Motomura, Immigration and Citizenship: Policy and Process, 248 (West Group 1998).

[FN51]. See General Counsel Opinion 94-22, "Delegation of Authority: Warrants of Deportation (May 9, 1994) (the INS Commissioner promulgated **Operations Instructions** to supplement the regulations).

[FN52]. *International Union of Bricklayers and Allied Craftsmen v. Meese*, 761 F.2d 798 (D.C. Cir. 1985).

[FN53]. Aleinikoff, Martin, and Motomura, Immigration and Citizenship: Policy and Process, 248 (West Group 1998).

[FN54]. Id.

[FN55]. The court in *Dong Sik Kwon* apparently found the language of both the OIs and regulations less than clear, at least as they existed in 1981. The court noted:

> In its brief the INS states "the public, of course, has a right to obtain guidance from the regulations for its dealings with the Service." We devoutly hope the INS and those who draft the regulations and **Operations Instructions** under which it **operates** will take this statement to heart. Whatever guidance the regulations furnish to those cognoscenti familiar with INS procedures, this court, despite many years of legal experience, finds that they yield up meaning only grudgingly and that morsels of comprehension must be pried from mollusks of jargon. There is nothing esoteric about the subject matter. The regulations concern simple matters of great concern to human beings, most of them of limited education. They should be so written as to be comprehensible by intelligent laymen and unspecialized lawyers without the aid of both lexicon and inner-circle guide.

[FN56]. The court in *Ponce-Gonzalez* thus held that the alleged failure of the INS to conduct sua sponte an investigation of a petitioner's situation afforded no legal basis for concluding that the failure of an Immigration Judge to accord the petitioner relief constituted a "gross miscarriage of justice," citing *Dong Sik Kwon v. INS*, 646 F.2d 909 (5th Cir. 1981); *Pasquini v. Morris*, 700 F.2d 658, 662 (11th Cir. 1983); and *Velasco-Gutierrez v. Crosland*, 732 F.2d 792, 794-98 (10th Cir. 1984).

[FN57]. The INS's website is located at *http://www.ins.usdoj.gov*. For the OIs that have been removed, look under "Laws, Regulations and Guides," and then under "**Operations Instructions**."

[FN58]. Classified or confidential portions of the field manuals are not subject to FOIA distribution.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

77 No. 3 INTERREL 93                                                                    Page 5
77 No. 3 Interpreter Releases 93

[FN59]. See 74 Interpreter Releases 633 (Apr. 21, **1997**). See also 75 Interpreter Releases 122 (Jan. 26, 1998).

[FN60]. Chapter 17 of the IFM was cited repeatedly by the court that issued a decision in a lawsuit challenging the expedited removal regulations. *American Immigration Lawyers Association v. Reno*, 18 F. Supp. 2d 38 (D.D.C. 1998), discussed in 75 Interpreter Releases 1403 (Oct. 9, 1998).

77 No. 3 Interpreter Releases 93

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Can We Spin Straw Into Gold? An Evaluation of Immigrant Legal Status Imputation Approaches

Author(s): Jennifer Van Hook, James D. Bachmeier, Donna L. Coffman and Ofer Harel

Source: *Demography*, February 2015, Vol. 52, No. 1 (February 2015), pp. 329-354

Published by: Springer on behalf of the Population Association of America

Stable URL: https://www.jstor.org/stable/43697562

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Population Association of America* and *Springer* are collaborating with JSTOR to digitize, preserve and extend access to *Demography*

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

**AR2022_500846**

Demography (2015) 52:329–354
DOI 10.1007/s13524-014-0358-x

# Can We Spin Straw Into Gold? An Evaluation of Immigrant Legal Status Imputation Approaches

**Jennifer Van Hook · James D. Bachmeier · Donna L. Coffman · Ofer Harel**

Published online: 16 December 2014
© Population Association of America 2014

**Abstract**  Researchers have developed logical, demographic, and statistical strategies for imputing immigrants' legal status, but these methods have never been empirically assessed. We used Monte Carlo simulations to test whether, and under what conditions, legal status imputation approaches yield unbiased estimates of the association of unauthorized status with health insurance coverage. We tested five methods under a range of missing data scenarios. Logical and demographic imputation methods yielded biased estimates across all missing data scenarios. Statistical imputation approaches yielded unbiased estimates only when unauthorized status was jointly observed with insurance coverage; when this condition was not met, these methods overestimated insurance coverage for unauthorized relative to legal immigrants. We next showed how bias can be reduced by incorporating prior information about unauthorized immigrants. Finally, we demonstrated the utility of the best-performing statistical method for increasing power. We used it to produce state/regional estimates of insurance coverage among unauthorized immigrants in the Current Population Survey, a data source that contains no direct measures of immigrants' legal status. We conclude that commonly employed legal status imputation approaches are likely to produce biased estimates, but data and statistical methods exist that could substantially reduce these biases.

**Keywords**  Legal status · Unauthorized · Immigration · Imputation · Simulation

J. Van Hook (✉)
The Population Research Institute, The Pennsylvania State University, 601B Oswald Tower, University Park, PA 16802, USA
e-mail: jxv21@psu.edu

J. D. Bachmeier
Department of Sociology, Temple University, Philadelphia, PA, USA

D. L. Coffman
The Methodology Center, The Pennsylvania State University, University Park, PA, USA

O. Harel
Department of Statistics, University of Connecticut, Storrs, CT, USA


Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500847

"Interest in immigrants' socioeconomic characteristics from scientists, poli-cy-makers, and the public has run ahead of the availability of the data to address these interests. The most serious omission from data sets is information on legal status. . . ."

—Clark and King (2008:295)

The capacity for immigration scholars to produce research results of major social and policy significance remains hampered by a lack of population and survey data allowing the identification of immigrants' legal status. Large-scale, nationally representative surveys that are most commonly used to study the foreign-born population—such as the American Community Survey (ACS)—distinguish between naturalized citizens and noncitizens, but they do not inquire about the legal status of the latter. Surveys that have included such measures are limited by the fact they are typically relatively small, regionally targeted, and/or focused on a particular subpopulation of immigrants (Bachmeier et al. 2014). As a result, important questions—such as the extent to which unauthorized status threatens the well-being of immigrant families, the role undocumented immigrants play in the labor market, and their economic and fiscal impacts—remain largely unaddressed (Clark and King 2008; Clark et al. 2009; Massey and Bartley 2005).

Faced with these data limitations, researchers have developed logical, demographic, and statistically based strategies for imputing the legal status of immigrants in the aforementioned nationally representative surveys (e.g., Batalova et al. 2014; Heer and Passel 1987; Marcelli 2004; Marcelli and Heer 1997, 1998; Passel and Cohn 2009; State Health Access Data Assistance Center 2013). At present, such methods are the only means through which much-needed avenues of research on legal status can be opened. However, the conditions under which these methods yield unbiased estimates of the characteristics of the unauthorized foreign-born population have never been tested.

We address this question using Monte Carlo simulations based on the Survey of Income and Program Participation (SIPP), an underutilized source of information on the foreign-born population and the only nationally representative survey with questions about immigrants' legal status. We provide empirical tests of whether, and under what conditions, it is possible to impute legal status on the basis of commonly available socioeconomic and demographic survey items: to spin straw into gold, so to speak. We first review existing legal status imputation methods, including a recently developed method that employs multiple imputation using pooled survey samples. We subsequently present simulation results that compare the various approaches with respect to the degree that they yield unbiased estimates of the association of unauthorized status with insurance coverage, an important predictor of access to health care, and thus a potential source of cumulative disadvantage (e.g., Bustamante et al. 2012; Javier et al. 2010; Ku 2009; Sommers 2013; Stevens et al. 2010). Although insurance coverage serves primarily as an example used to test the various imputation methods, our analyses do provide new estimates of the level and geographic distribution of coverage among unauthorized immigrants.

The results show that it is not possible to spin straw into gold. All the approaches that we tested produced biased estimates. Some methods failed in all circumstances,

 Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500848

and others failed only when the "joint observation" condition was not met, meaning that the imputation method was not informed by the association of unauthorized status with the dependent variable. Nevertheless, we also show that these methods could be improved if external ("prior") information about legal status were available. Additionally, in an example using the Current Population Survey (CPS), we demonstrate the utility of the best-performing method for increasing statistical power when the joint observation condition is met.

## Background: Methods for Measuring Immigrants' Legal Status

Several panels of the SIPP (1996, 2001, 2004, and 2008) asked foreign-born respondents their immigration status when they entered the United States and whether they had since adjusted their status (U.S. Census Bureau 2013). Assessments of the quality of the legal status data from the SIPP further reveal that they are likely to produce an accurate portrayal of the unauthorized population. Despite moderately high levels of missing data, the demographic characteristics of the unauthorized immigrants in the SIPP closely match residual estimates produced by the Department of Homeland Security (DHS) and the Pew Hispanic Center (Pew) (Bachmeier et al. 2014).

However, the SIPP is not appropriate for all research questions involving unauthorized migration. Its sample is too small for some types of analyses (e.g., state-level). Additionally, although the SIPP includes detailed information about income, poverty, and public assistance receipt, it provides much less information about health, education, and fertility, all of which are highly significant topics. Other surveys collect data on legal status, but none are nationally representative. They are limited to a specific metropolitan area (e.g., Los Angeles Family and Neighborhood Study, Los Angeles County Mexican Immigrant Residency Status Survey, Los Angeles County Household Survey), state (e.g., California Health Interview Survey), occupational group (e.g., National Agricultural Workers Survey), immigrants who legalized (e.g., Legalized Population Survey, New Immigrant Survey), or immigrants who returned to Mexico (e.g., Mexican Migration Project).

To compensate for the scarcity of survey data on legal status, several researchers have developed creative ways to impute legal status in surveys lacking such measures. In the most basic terms, imputation methods involve assigning legal status to immigrants in a survey sample lacking measures of legal status on the basis of information provided by outside knowledge about the characteristics of legal immigrants or independent data sources, such as a survey with direct measures of legal status. Most of these methods do not account for uncertainty but rather treat imputed values as if they were true.

The most widely publicized imputation-based results are those produced by Passel and published by the Pew Hispanic Center. Originally developed by Passel and Clark and published by the Urban Institute (Passel and Clark 1998), this method imputes legal status for foreign-born respondents of the CPS in order to produce detailed descriptive profiles of the unauthorized population, such as poverty rates, unemployment rates, educational attainment, and occupational composition (e.g., Passel 2006; Passel and Cohn 2009).

The method on which Pew Hispanic Center estimates are based combines a variety of techniques—logical imputation, statistical imputation, and weighting adjustments—

🖉 Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500849

to assign legal status. Because it attempts to match legal status assignments with external information about immigration policy and residual (demographic) estimates of the unauthorized population, we classify it as a "demographic accounting method." This method first identifies those who are very likely to be legally resident on the basis of indicators of legality, such as U.S. citizens, veterans, and those in occupations that make it nearly impossible for them to be unauthorized.[1] The remaining noncitizens are the pool of potentially unauthorized immigrants: a group that contains a mixture of legal noncitizens and unauthorized immigrants. To further distinguish the unauthorized from legal noncitizens, the method assigns legal status to the remaining noncitizens based on an estimated probability of being unauthorized, which is calculated from the occupational distribution by age, sex, and state of residence of unauthorized immigrants in the Legalized Population Survey (LPS). The LPS is a 1989 survey of those who applied for legalization under the main provisions of the 1986 Immigration Reform and Control Act (IRCA). After additional data editing to ensure that the status assignments correspond with U.S. immigration law for families, the sampling weights of respondents are adjusted to match control totals, derived from residual estimates (e.g., Passel 2006) of the number of unauthorized immigrants by state and national origin.

Demographic accounting estimates, particularly those produced by Pew/Passel, are based on the meticulous application of demographic methods and have come to be trusted and widely cited outside of academia. However, the method has never been evaluated. The specific details of the Pew/Passel method are not publicly available, thus making it difficult for other researchers to replicate the method. Beyond the lack of transparency, its reliance on LPS data raises concern largely because the LPS was collected more than two decades ago, and it represents only the unauthorized who applied for legalization under the nonagricultural worker provisions of IRCA. The LPS thus excludes those who qualified for the other major legalization program under IRCA (the Special Agricultural Workers program), and it overrepresents Mexicans and those who arrived in the United States before 1982, and who were then concentrated in the American Southwest to a far greater degree than is true today (Durand et al. 2005).

Others have used survey-based statistical imputation to assign unauthorized status (Caponi and Plesca 2014; Capps et al. 2013; Heer and Passel 1987; Marcelli and Heer 1997, 1998). Statistical imputations use the associations between a set of predictors and unauthorized status from a survey that includes questions about immigrants' legal status (the donor sample) to assign legal status to foreign-born respondents in surveys lacking such measures (the target sample). Statistical imputations have employed both single and multiple imputation approaches as the basis for prediction. Heer and Passel (1987) were among the first to use a single-imputation approach. In subsequent developments, Marcelli and Heer (1997) estimated a logistic regression model predicting unauthorized status as a function of duration of U.S. residence, educational attainment, age, and sex in the 1994 Los Angeles County Household Survey (the donor sample). They then used this model to estimate the predicted probability of being unauthorized among immigrants in the Los Angeles County 1990 Census (the target

---

[1] Indicators of legality include U.S. citizenship, migration from countries and periods that correspond with known patterns of refugee flows, being newly arrived with characteristics that would qualify for certain visa categories, working in occupations or industries that require legal status; receipt of public assistance or social services, and having moved to the United States before 1982 (thus qualifying for IRCA legalization).

 Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500850

sample). Finally, they used the predicted probabilities in subsequent analyses that estimated the relationship between unauthorized status and labor force and welfare outcomes (Marcelli and Heer 1997, 1998).

In contrast to the single-imputation method, researchers have begun to employ cross-survey multiple imputation to impute variables that are completely missing in one data set but observed in another (Rässler 2004; Rendall et al. 2013; Resche-Rigon et al. 2013; Schenker et al. 2010). Multiple-imputation approaches are preferred because they account for the uncertainty in imputed data (Little and Rubin 2002). This approach has recently been used to impute legal status. To produce a profile of health insurance coverage and other social and economic characteristics among the unauthorized, Capps et al. (2013) pooled the SIPP (the donor sample) with the ACS (the target sample), and multiply imputed unauthorized status for all foreign-born observations in the ACS. A Minnesota policy analysis group (State Health Access Data Assistance Center 2013) used a similar approach in examining immigrants' access to health insurance coverage.

As long as a suitable donor sample is available (such as the SIPP), statistical imputation methods can be readily replicated, unlike the detailed algorithms involved in logical and demographic accounting methods. However, the bias and precision of the resulting estimates remain unclear. Importantly, Rendall and his colleagues (2013) argued that the success of the cross-survey multiple-imputation method depends on two conditions. First, the target and donor samples must be drawn from the same universe. In other words, the population-level associations producing the donor sample should be statistically identical in the target sample. Second, to avoid identification problems, every pair of variables must be jointly observed in one data set or the other to enable the estimation of the covariance for all pairs. Taking an example developed by Rässler (2004), say we have two data sets. Variables X and Z are observed in the first, Z and Y are observed in the second, and X and Y are never jointly observed. If the correlation between Z and X is .9, and that between Z and Y is .8, then the estimated correlation between X and Y is mathematically bounded between 0.4585 and 0.9815—a wide range. Without additional information, no value in this range is a better estimate than another. Additionally, Rodgers (1984) showed that only very high correlations approaching 1.0 will narrow the range considerably.

When applied to legal status imputations, the joint observation requirement effectively limits the analytic variables to those that are jointly observed with legal status. For example, if an analyst were interested in estimating the effects of unauthorized status on insurance coverage, and if legal status were completely missing in the target sample, then insurance coverage *must be* observed in both the donor and target samples. If insurance coverage were completely missing in the donor data, then legal status and insurance coverage would never be jointly observed. If both the same universe and joint observation conditions must always be met, this would cast doubt on methods that violate them, including most imputation methods employed in past research.

Here, we evaluate the prevailing approaches to imputing legal status. We do not attempt to replicate and evaluate specific imputation methods, such as the precise methodology from which Pew Hispanic Center estimates are derived, largely because such methods change over time as researchers refine their methodologies and data inputs—and, as noted, they can be difficult to replicate. Rather, we evaluate and

<span style="float:right">⬦ Springer</span>

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500851

compare five general approaches (explained in the Imputation Methods section). We tested multiple variations of each of these methods in preliminary analyses, but due to space constraints, we present the results for only the best-performing variants.

We conducted Monte Carlo simulations that evaluate whether, and under what conditions, estimates of the association between imputed unauthorized status and insurance coverage are unbiased. By varying the imputation method, the simulations identify the optimal method. We alter the missing data patterns in the simulation data to assess the performance of the methods when the joint observation condition is not met. We further assessed how much the methods would improve if prior information about immigrants' legal status were available beyond that already included in most demographic surveys, whether through administrative record linkages, new survey questions, or information from an auxiliary survey.

Throughout, we assessed the robustness of the results across different dependent variables by varying, in simulated data, the magnitude of the association between unauthorized status and health insurance coverage. Imputation methods may perform well when the association between unauthorized status and the dependent variable is consistent with socioeconomic and demographic characteristics (e.g., the unauthorized have lower levels of insurance coverage than legal immigrants, which is consistent with their lower levels of education and income). However, imputation methods may be less able to detect "surprises," such as when unauthorized immigrants exhibit unique or exceptional outcomes.

## Methodology

### Data

We used the SIPP as a basis for generating data and establishing true population values for the simulations. The SIPP is a longitudinal survey of the U.S. noninstitutionalized population conducted by the U.S. Census Bureau (2013). Every few years, the SIPP draws a new panel of households (i.e., 1996, 2001, 2004, and 2008). All individuals in these households are then followed up every four months for three to four years. Panel respondents in each wave are asked a set of core questions primarily about labor force activity, income, and program participation. In addition, respondents are administered wave-specific topical modules. In all panels from 1996–2008, including the 2004 panel on which we rely for our simulations, the second wave of data collection includes a series of questions about migration, which includes questions about country of birth, year of arrival, citizenship, and visa status. Although SIPP is longitudinal, each wave can be weighted with cross-sectional weights to represent the current U.S. population. The final SIPP sample from which our simulated data were generated was restricted to 8,898 foreign-born respondents age 16 and older who were interviewed in Wave 2 of the 2004 panel. Children as well as persons born abroad to U.S. citizen parents were excluded.

### Measures

The weighted means for all analytic variables from the SIPP are shown in Table 1 for the total foreign-born sample in the SIPP as well as separately by three legal status



This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

**AR2022_500852**

Case 1:18-cv-00068    Document 610-4    Filed on 11/04/22 in TXSD    Page 853 of 990

**Table 1**  Sample descriptive statistics (weighted means) for all analytic variables, 2004 SIPP

| Variables | All Foreign-born | Probably Legal | Ambiguous Status | Unauthorized |
|---|---|---|---|---|
| **Legal Status** | | | | |
| Probably legal | 0.511 | 1.000 | 0.000 | 0.000 |
| Ambiguous status | 0.248 | 0.000 | 1.000 | 0.000 |
| Unauthorized | 0.241 | 0.000 | 0.000 | 1.000 |
| **Dependent Variables** | | | | |
| Insurance 1: Observed | 0.684 | 0.848 | 0.586 | 0.435 |
| Insurance 2: Ambiguous have low coverage | 0.644 | 0.848 | 0.425 | 0.435 |
| Insurance 3: Ambiguous have high coverage | 0.725 | 0.848 | 0.751 | 0.435 |
| **Controls** | | | | |
| Income-to-poverty ratio (logged) | 0.627 | 0.845 | 0.568 | 0.225 |
| Years of education | 11.745 | 12.573 | 11.333 | 10.414 |
| Mexican-born | 0.346 | 0.214 | 0.448 | 0.519 |
| Years of U.S. residence | 17.273 | 23.764 | 12.551 | 8.364 |
| Age | 42.959 | 48.845 | 37.863 | 35.718 |
| Sex (male = 1) | 0.498 | 0.465 | 0.519 | 0.547 |
| Number of functional limitations | 0.571 | 0.839 | 0.279 | 0.303 |
| Self-rated health (fair/poor = 1) | 0.122 | 0.167 | 0.078 | 0.072 |
| *N* | 8,898 | 4,633 | 2,201 | 2,064 |

*Notes:* Data and sample are from the 2004 Survey of Income and Program Participation, Topical Module 2. The sample is restricted to foreign-born persons age 16 and older.

designations—"probably legal," "ambiguous," and "unauthorized"—the definitions for which are provided in the Imputation Methods section. Further description of the two simulated insurance coverage variables—insurance 2 and 3—is also provided later herein.

*Unauthorized Legal Status*

The key independent variable used in our analyses is a dichotomous indicator of unauthorized legal status (=1 if unauthorized). The SIPP asked questions about immigrants' legal status at the second interview. Foreign-born respondents were asked whether they were citizens, and all noncitizens were asked about their status upon arrival. Immigrants could select one of six arrival statuses: three types of legal permanent resident (LPR) status; and three non–LPR statuses, including refugee/asylee status, legal nonimmigrants (e.g., student or tourist visas), and "other." Finally, noncitizen, non-LPR arrivals were asked whether they have adjusted to LPR status since first immigrating. Following others (Greenman and Hall 2013; Hall et al. 2010), we infer that the group of persons arriving with "other" status and who have not adjusted to LPR status overwhelmingly consists of unauthorized immigrants. To address data handling challenges presented both by relatively high rates of missing

 Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms                    AR2022_500853

data on immigration-related items in the SIPP and by the suppression by the Census Bureau of detailed visa status categories in the arrival status item in the public-use data, we have employed similar methods reported in previous research (Bachmeier et al. 2014; Greenman and Hall 2013; Hall et al. 2010).

*Insurance Coverage*

The dependent variable, "insurance 1," is a dichotomous indicator of insurance coverage (employer, other private, Medicaid, and other public = 1).

*Controls*

All models of insurance coverage included the following controls: income-to-poverty ratio (logged), educational attainment (years), Mexican place of birth, years of U.S. residence, age, sex, number of functional limitations, and self-rated health (fair/poor vs. better health).

Simulations

We conducted Monte Carlo simulations to evaluate the bias of the estimate of the association of imputed unauthorized status with the outcome (health insurance coverage) under different scenarios. For the simulation exercises, we assumed that the true association (i.e., the expected population value) of unauthorized status with insurance coverage is the association observed in the SIPP. Bias is the difference between the true and estimated association. The validity of the SIPP-based measure of legal status (or how close the SIPP-based measure comes to reality) is also an important question, but we set it aside here because it is not central to our question concerning bias and because we have already addressed it in another article (Bachmeier et al. 2014).

Each simulation involved three steps. First, we drew 10,000 cases with replacement from a self-weighted version of the 2004 SIPP (i.e., expanded in proportion to sampling weights). Second, we randomly divided the sample in half, with the first half representing the donor sample, and the second half representing the target sample. This randomization ensured that the donor and target samples are drawn from the same universe. We coded unauthorized status to missing in the target sample, and for some simulations, we coded the dependent variable and/or a key independent variable (the income-to-poverty ratio) to missing in the donor sample. Both samples included a common set of control variables. The data structure of the donor and target samples is illustrated in Table 2. Third, we imputed unauthorized status in the target sample using one of five imputation methods, and then estimated a multivariate model predicting insurance coverage as a function of imputed unauthorized status and controls on cases in the target sample.

For each simulation, we repeated all three steps 500 times to estimate the coefficient and standard error for imputed unauthorized status (i.e., the average of the coefficient and standard error across the 500 replications). We estimated bias as the average difference between the estimated coefficient and the expected population value; we estimated relative bias as bias divided by the expected value. The level of acceptable bias varies by application. As a rule of thumb, we favor methods that produce estimates

 Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500854

**Table 2** Data structure used for simulations, by missing data pattern

| Missing Data Pattern (joint observation with unauthorized status) | Unauthorized Status | DV (insurance coverage) | IV (income-to-poverty ratio) | Controls | | | |
|---|---|---|---|---|---|---|---|
| | | | | $X_1$ | $X_2$ | . . . | $X_7$ |
| DV and IV Jointly Observed | | | | | | | |
| Donor ($N \approx 5,000$) | X | X | X | X | X | . . . | X |
| Target ($N \approx 5,000$) | . | X | X | X | X | . . . | X |
| DV Jointly Observed; IV Never Jointly Observed | | | | | | | |
| Donor ($N \approx 5,000$) | X | X | . | X | X | . . . | X |
| Target ($N \approx 5,000$) | . | X | X | X | X | . . . | X |
| DV Never Jointly Observed; IV Jointly Observed | | | | | | | |
| Donor ($N \approx 5,000$) | X | . | X | X | X | . . . | X |
| Target ($N \approx 5,000$) | . | X | X | X | X | . . . | X |
| DV and IV Never Jointly Observed | | | | | | | |
| Donor ($N \approx 5,000$) | X | . | . | X | X | . . . | X |
| Target ($N \approx 5,000$) | . | X | X | X | X | . . . | X |

*Notes:* X = completely observed; . = completely missing; DV = dependent variable; IV = independent variable.

with lower bias and relative bias, and we describe estimates as "unbiased" if they fall within 10 % of the expected value (i.e., relative bias falls in the range of −.10 to .10).

*Imputation Methods*

As summarized in Table 3, we varied the imputation methodology to evaluate the comparative performance of a set of approaches under a range of conditions.

The logical-imputation method is similar to the first part of the Pew/Passel method. We tested it separately from the demographic accounting method because it is sometimes used to proxy legal status in policy analyses (e.g., Bohn et al. 2014; Bozick and Miller 2014; Flores 2010; Kaushal 2006; Potochnick 2014). It codes as legal those in the target data who have characteristics that make it very unlikely they are unauthorized (i.e., those who are "probably legal"), and all others as unauthorized. In our simulations, the "probably legal" included U.S. citizens and others with indicators of legality, such as employment by the U.S. government, a history of military service, or receipt of Social Security income; we used similar indicators of legality as the Passel/Pew method (see footnote 1 for a complete list). These indicators are measured in most major demographic and health surveys (e.g., ACS, CPS, NHIS). As already shown in Table 1, roughly one-half (51 %) of all foreign-born in the SIPP can be logically imputed as legal by these criteria. Among the remaining unclassified foreign-born respondents, one-half are actually unauthorized (24 % of all foreign-born), and the rest are neither unauthorized nor have characteristics that signify legality and therefore have "ambiguous" status.

<span style="float:right">&#x2469; Springer</span>

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms


AR2022_500855

**Table 3** Description of imputation methods

| Method | | Description |
|---|---|---|
| 1 | Logical | In target data, those appearing to be "probably legal" are coded as legal and the remaining as unauthorized. |
| 2 | Demographic Accounting | In target data, those appearing to be "probably legal" are coded as legal. Among remaining, single-imputation method used to assign targeted percentage as unauthorized. The rest are coded as legal. |
| 3 | Single Imputation | In target data, unauthorized = 1 if random draw from uniform distribution < predicted probability of being unauthorized; unauthorized = 0 otherwise; predicted probability is generated from a prediction equation estimated on the donor sample. |
| 4 | Cross-Survey Multiple Imputation (CSMI) | Pool donor and target data. Impute legal status using multiple imputation (multivariate imputation by chained equations). |
| 5 | Logical Cross-Survey Multiple Imputation (Logical-CSMI) | Pool donor and target data. Predicted probability of being unauthorized is coded as 0 for those who are "probably legal," and this variable is included in the imputation model (multivariate imputation by chained equations). |

The demographic accounting method has similarities to the full Pew/Passel method in that it combines elements of the logical- and single-imputation methods, and its estimates are forced to match target values of the percentage of unauthorized immigrants. Those classified as "probably legal" in the target sample were coded as legal (51 %). Among the remaining foreign-born, the single-imputation method was employed to assign unauthorized status. To do this, we estimated a logistic regression model predicting unauthorized status as a function of several regressors[2] in the donor data source. Importantly, the dependent variable (insurance coverage) was included in the prediction model in simulations in which the dependent variable was jointly observed with unauthorized status. The estimated coefficients were then applied to immigrants in the target data to derive for each person a predicted probability of being unauthorized. Each individual's predicted probability was compared with a random draw from a uniform distribution: if the predicted probability was greater than the random draw, the individual was assigned unauthorized status. This assignment process continued until a targeted percentage (24 %, or about one-half of the non–probably legal, as observed in the SIPP) was coded as unauthorized.[3]

The single-imputation method is similar to the approach taken by Heer and Marcelli (Marcelli 2004; Marcelli and Heer 1997, 1998), and more recently by Caponi and Plesca (2014). A logistic regression model predicting unauthorized status was estimated on the donor data, using the same predictors as for the demographic accounting method. In the target data, foreign-born persons were coded as unauthorized if a

---

[2] Regressors include insurance coverage, all the controls described earlier, and several additional variables: marital status, spouse's citizenship, occupational status, English proficiency, parental status, household size, homeownership, employment status, occupation, state of residence, and selected squared and interaction terms.

[3] We tested variations where we altered which half of the non–probably legal were coded as unauthorized: those most likely to be unauthorized, the most disadvantaged, and a random half. None performed better than the demographic accounting method described here.

 Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500856

random draw from a uniform distribution was less then their predicted probability of being unauthorized, and all others were coded as legal. Unlike the demographic accounting method, no attempt was made to first code people as "probably legal," and the percentage assigned as unauthorized was derived from the percentage unauthorized in the donor data, not from a predetermined target.

The cross-survey multiple-imputation (CSMI) method is similar to the approach taken by Capps et al. (2013). It pools the donor and target samples and treats the absence of an unauthorized status indicator in the latter as a missing data problem to be addressed by multiple-imputation techniques. Specifically, missing values in the target data were imputed using multiple chained equations (StataCorp 2013). Following common practice (Rubin 1987), 10 data sets were created, and results were summarized using the *mi* routines available in Stata version 12 or higher. We used the same predictors as in the single-imputation method to inform the imputations.

Finally, the logical cross-survey multiple-imputation (logical-CSMI) method combines elements of three methods. We tested this approach because we wondered whether the multiple-imputation method could be improved if it were informed by outside (i.e., logical) information about legal status. As with the CSMI method, the donor and target samples were pooled, and missing data were imputed with multiple chained equation techniques. In addition to the predictors used by the other methods, the imputation model was informed by the respondents' classification as "probably legal" and predicted probability of being unauthorized (based on a single prediction model). Specifically, the predicted probability was coded to 0 for those who are "probably legal" and was then included as a predictor in the imputation model.[4] Like the single-imputation and CSMI methods, the percentage assigned as unauthorized was derived from the donor data, not a predetermined target.

*Joint Observation of the Dependent and Independent Variables With Unauthorized Status*

We assessed whether bias depends on whether (1) the dependent variable, (2) an important independent variable (income-to-poverty ratio), and (3) both the dependent and independent variables are jointly observed with unauthorized status. In simulations in which these variables are treated as jointly observed, they are observed along with unauthorized status in the donor data set, as shown in Table 2. In simulations in which they are never jointly observed, we recoded them to missing in the donor sample prior to carrying out the imputation.

*Strength of Association Between Unauthorized Status and Insurance Coverage*

Robust imputation methods should produce unbiased estimates of the association of unauthorized status regardless of how surprising the result is. To assess the robustness of the methods, we created two variants of insurance coverage, one with weak

---

[4] We also tried (1) coding unauthorized status to 0 for those who are "probably legal" before multiply imputing, (2) including "probably legal" and the predicted probability separately in the imputation model, and (3) coding the "probably legal" as legal and those with very high probabilities of being unauthorized (>.8) as unauthorized prior to multiple imputation. None of these variations outperformed the logical-CSMI method.

 Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500857

("insurance 2") and another with strong ("insurance 3") associations with unauthorized status; we used these along with the original measure of insurance coverage as dependent variables in our models. We created the variants by recoding insurance coverage among those with ambiguous legal status (i.e., legal noncitizens in the donor sample that do not have characteristics of the "probably legal" population). As observed in the SIPP, insurance coverage is lowest for unauthorized immigrants, higher among those with "ambiguous" status, and highest among those who are "probably legal." To weaken the association, we randomly reduced coverage among "ambiguous" immigrants, thus reducing the insurance gap between the unauthorized and all legal immigrants (see Table 1). To strengthen the association, we randomly increased coverage among "ambiguous" immigrants, thus increasing the gap.

## Results

As noted earlier, the associations observed in the SIPP represent the expected population values. The first row of Table 4 reports ordinary least squares (OLS) coefficients from the model estimated on the SIPP data. Because insurance coverage is treated continuously, the interpretation of coefficients is that of a linear probability model. In the case of "insurance 1" (observed), the coefficient for unauthorized status is –0.152, indicating that insurance coverage is about 15 percentage points lower among the unauthorized than the authorized after accounting for the control variables. As designed, unauthorized status is more weakly associated with "insurance 2" ($\beta = -0.058$) and more strongly associated with "insurance 3" ($\beta = -0.236$).

The simulations presented in Table 4 assess the imputation methods under optimal circumstances: that is, when all variables are jointly observed with unauthorized status. For this scenario, both the logical and demographic accounting methods produce biased estimates for two of the three dependent variables. The logical-imputation method completely fails to pick up variations in the association between unauthorized status and the dependent variables, estimating the strongest association where the expected association is weakest ("insurance 2"; relative bias = 3.259), and the weakest association where the expected association is strongest ("insurance 3"; relative bias = –0.743). The demographic accounting method does not perform much better. For example, the bias in the model predicting "insurance 2" is –0.10 (relative bias = 1.757).

In contrast, the single-imputation, CSMI, and logical-CSMI methods yield virtually unbiased estimates for all three dependent variables, with bias never exceeding ±5.5 % of the expected value. The two methods using multiple imputation (CSMI and logical-CSMI) yield larger standard errors than the single-imputation method because single imputation treats imputed values as true and therefore underestimates the true variance (Little and Rubin 2002).

We next evaluate the effects of violating the joint observation assumption. As shown in Table 5, the logical and demographic accounting methods are less sensitive to the missing data pattern than the other methods because they do not rely heavily (and the logical imputation does not at all rely) on the missing variables to impute legal status. Nevertheless, both methods produce coefficients with large biases across all missing data scenarios for at least two of the three dependent variables.

 Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

**AR2022_500858**

**Table 4** Simulated coefficients of unauthorized status in models predicting insurance coverage by imputation method ($N$ = 10,000; 500 repetitions; DV and IV jointly observed)

| Imputation Method | Insurance 1 (observed) | | | Insurance 2 (weak association) | | | | Insurance 3 (strong association) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | β | SE | Bias | Relative Bias | β | SE | Bias | Relative Bias | β | SE | Bias | Relative Bias |
| Expected Value | −0.151 | | | | −0.057 | | | | −0.237 | | | |
| 1 Logical | −0.164 | 0.014 | −0.013 | 0.086 | −0.245 | 0.014 | −0.187 | 3.259 | −0.061 | 0.013 | 0.176 | −0.743 |
| 2 Demographic Accounting | −0.225 | 0.015 | −0.073 | 0.485 | −0.158 | 0.016 | −0.101 | 1.757 | −0.256 | 0.015 | −0.019 | 0.079 |
| 3 Single Imputation | −0.153 | 0.015 | −0.002 | 0.014 | −0.060 | 0.015 | −0.003 | 0.045 | −0.238 | 0.014 | −0.001 | 0.005 |
| 4 CSMI | −0.149 | 0.027 | 0.002 | −0.016 | −0.057 | 0.027 | 0.001 | −0.015 | −0.233 | 0.026 | 0.004 | −0.016 |
| 5 Logical-CSMI | −0.150 | 0.025 | 0.002 | −0.012 | −0.061 | 0.025 | −0.003 | 0.055 | −0.231 | 0.024 | 0.006 | −0.025 |

*Notes*: Coefficients are estimated on the target sample only ($N$ ≈ 5,000). Bias = estimate − expected value; Relative Bias = bias/expected value; CSMI = cross-survey multiple imputation.

$\underline{\textcircled{2}}$ Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500859

**Table 5** Simulated coefficients of unauthorized status in models predicting insurance coverage by imputation method and missing data pattern ($N = 10,000$; 500 repetitions)

| Method | Missing Data Pattern (joint observation with unauthorized status) | Insurance 1 (observed) | | | | Insurance 2 (weak association) | | | | Insurance 3 (strong association) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | β | SE | Bias | Relative Bias | β | SE | Bias | Relative Bias | β | SE | Bias | Relative Bias |
| Expected Value | | -0.151 | | | | -0.057 | | | | -0.237 | | | |
| 1) Logical | DV and IV jointly observed | -0.164 | 0.014 | -0.013 | 0.086 | -0.245 | 0.014 | -0.187 | 3.259 | -0.061 | 0.013 | 0.176 | -0.743 |
| | DV jointly observed, IV never jointly observed | -0.164 | 0.014 | -0.013 | 0.086 | -0.245 | 0.014 | -0.187 | 3.259 | -0.061 | 0.013 | 0.176 | -0.743 |
| | DV never jointly observed, IV jointly observed | -0.164 | 0.014 | -0.013 | 0.086 | -0.245 | 0.014 | -0.187 | 3.259 | -0.061 | 0.013 | 0.176 | -0.743 |
| | DV and IV never jointly observed | -0.164 | 0.014 | -0.013 | 0.086 | -0.245 | 0.014 | -0.187 | 3.259 | -0.061 | 0.013 | 0.176 | -0.743 |
| 2) Demographic Accounting | DV and IV jointly observed | -0.225 | 0.015 | -0.073 | 0.485 | -0.158 | 0.016 | -0.101 | 1.757 | -0.256 | 0.015 | -0.019 | 0.079 |
| | DV jointly observed, IV never jointly observed | -0.231 | 0.015 | -0.080 | 0.526 | -0.170 | 0.016 | -0.113 | 1.963 | -0.257 | 0.015 | -0.020 | 0.085 |
| | DV never jointly observed, IV jointly observed | -0.176 | 0.015 | -0.024 | 0.161 | -0.184 | 0.016 | -0.127 | 2.205 | -0.145 | 0.015 | 0.092 | -0.389 |
| | DV and IV never jointly observed | -0.175 | 0.015 | -0.023 | 0.155 | -0.180 | 0.016 | -0.123 | 2.143 | -0.141 | 0.015 | 0.096 | -0.405 |
| 3) Single Imputation | DV and IV jointly observed | -0.153 | 0.015 | -0.002 | 0.014 | -0.060 | 0.015 | -0.003 | 0.045 | -0.238 | 0.014 | -0.001 | 0.005 |

 Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500860

**Table 5** (continued)

| Method | Missing Data Pattern (joint observation with unauthorized status) | Insurance 1 (observed) | | | | Insurance 2 (weak association) | | | | Insurance 3 (strong association) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | β | SE | Bias | Relative Bias | β | SE | Bias | Relative Bias | β | SE | Bias | Relative Bias |
| | DV jointly observed, IV never jointly observed | -0.157 | 0.015 | -0.006 | 0.039 | -0.068 | 0.015 | -0.010 | 0.179 | -0.240 | 0.014 | -0.003 | 0.011 |
| | DV never jointly observed, IV jointly observed | -0.097 | 0.015 | 0.054 | -0.357 | -0.082 | 0.015 | -0.025 | 0.435 | -0.098 | 0.014 | 0.139 | -0.588 |
| | DV and IV never jointly observed | -0.096 | 0.015 | 0.056 | -0.368 | -0.081 | 0.015 | -0.023 | 0.407 | -0.093 | 0.014 | 0.144 | -0.606 |
| 4) CSMI | DV and IV jointly observed | -0.149 | 0.027 | 0.002 | -0.016 | -0.057 | 0.027 | 0.001 | -0.015 | -0.233 | 0.026 | 0.004 | -0.016 |
| | DV jointly observed, IV never jointly observed | -0.151 | 0.042 | 0.000 | 0.000 | -0.049 | 0.043 | 0.008 | -0.142 | -0.242 | 0.039 | -0.005 | 0.021 |
| | DV never jointly observed, IV jointly observed | -0.125 | 0.102 | 0.026 | -0.172 | -0.105 | 0.099 | -0.047 | 0.827 | -0.125 | 0.102 | 0.112 | -0.473 |
| | DV and IV never jointly observed | -0.107 | 0.132 | 0.044 | -0.294 | -0.082 | 0.127 | -0.024 | 0.426 | -0.106 | 0.135 | 0.131 | -0.553 |
| 5) Logical-CSMI | DV and IV jointly observed | -0.150 | 0.025 | 0.002 | -0.012 | -0.061 | 0.025 | -0.003 | 0.055 | -0.231 | 0.024 | 0.006 | -0.025 |
| | DV jointly observed, IV never jointly observed | -0.153 | 0.035 | -0.001 | 0.007 | -0.052 | 0.038 | 0.006 | -0.097 | -0.240 | 0.031 | -0.003 | 0.013 |

🖄 Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

**AR2022_500861**

**Table 5** (continued)

| Method | Missing Data Pattern (joint observation with unauthorized status) | Insurance 1 (observed) | | | | Insurance 2 (weak association) | | | | Insurance 3 (strong association) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | β | SE | Bias | Relative Bias | β | SE | Bias | Relative Bias | β | SE | Bias | Relative Bias |
| | DV never jointly observed, IV jointly observed | -0.073 | 0.119 | 0.078 | -0.515 | -0.066 | 0.116 | -0.008 | 0.146 | -0.055 | 0.113 | 0.182 | -0.767 |
| | DV and IV never jointly observed | -0.040 | 0.133 | 0.111 | -0.735 | -0.023 | 0.129 | 0.034 | -0.591 | -0.034 | 0.127 | 0.203 | -0.856 |

*Notes:* Coefficients are estimated on the target sample only ($N \approx 5{,}000$). Bias = estimate − expected value; Relative Bias = bias/expected value; CSMI = cross-survey multiple imputation.

Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

**AR2022_500862**

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 863 of 990

In contrast, the single-imputation, CSMI, and logical-CSMI methods are sensitive to the missing data pattern. For these methods, the estimates are virtually unbiased when the dependent variable is jointly observed with unauthorized status (either "DV and IV jointly observed" or "DV jointly observed, IV never jointly observed"). Even when a key independent variable (income-to-poverty ratio) is missing from the donor data, bias remains somewhat low and less than ±20 % of the expected value. Supplementary analyses suggest that this holds only when the imputation model is "inclusive" (i.e., containing "everything but the kitchen sink"). When the imputation model is parsimonious and includes only the variables used in the model of insurance coverage, the estimates are more biased (results available upon request), which is consistent with Collins et al. (2001). Finally, when the dependent variable is not jointly observed with unauthorized status in the donor data (either "DV never jointly observed, IV jointly observed" or "DV and IV never jointly observed"), bias is much greater than for the other missing data scenarios—in one case, exceeding 80 % of the expected value. For "insurance 1" and "insurance 3" (for which the expected coefficient is large and negative), the coefficients overestimate health coverage for unauthorized immigrants relative to legal immigrants.

Using Prior Information to Improve Imputations

The results thus far show that when the joint observation requirement is met, the statistical imputation approaches, particularly those employing multiple imputation, yield unbiased estimates, at least in the particular scenarios we tested. However, when the joint observation requirement is not met, none of the methods produce unbiased estimates across all three outcomes, including the logical-CSMI method and all its variants (see footnote 4). This led us to explore whether the incorporation of prior information into the imputation methods would improve the estimates even when the joint observation condition is not met.

We first considered the methods that rely on logical imputation: the logical, demographic accounting, and logical-CSMI methods. Our data permit us to logically impute about one-half (51 %) of the foreign-born as "probably legal," but we wondered how much bias would be reduced if a higher percentage were logically imputed (i.e., if additional information enabled us to identify more legal immigrants). Logically imputing a higher percentage would be possible because additional indicators of legality from administrative record linkages are available in restricted data sets (e.g., possession of a valid Social Security number), and new survey questions could be added to surveys. To explore this question, we reran the simulations while randomly increasing the percentage of those with ambiguous status that are classified as "probably legal" to 50 %, 75 %, and 90 % (meaning that the non–"probably legal" group was composed of 66 %, 80 %, and 90 % unauthorized, respectively). We confined our tests to the most problematic scenario in which the dependent variable is never jointly observed with unauthorized status. As shown in Table 6, bias decreases substantially across all methods and dependent variables as the percentage logically imputed increases. Nevertheless, even when as many as 90 % of those with ambiguous status are logically imputed as "probably legal," relative bias remains moderately high for "insurance 2," reaching 46.2 % of the expected value in the case of the demographic accounting imputation method, although the absolute bias is low (–0.028).

<span style="float:right">🖄 Springer</span>

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500863

Table 6 Simulated coefficients of unauthorized status in models predicting insurance coverage, by imputation method and percentage classified as "probably legal," ($N = 10,000$; 500 repetitions; DV never jointly observed, IV jointly observed)

| Percentage of Those With Ambiguous Status Classified as "Probably Legal" | Insurance 1 (observed) | | | | Insurance 2 (weak association) | | | | Insurance 3 (strong association) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | β | SE | Bias | Relative Bias | β | SE | Bias | Relative Bias | β | SE | Bias | Relative Bias |
| Expected Value | -0.151 | | | | -0.057 | | | | -0.237 | | | |
| Logical Imputation | | | | | | | | | | | | |
| 0 % | -0.164 | 0.014 | -0.013 | 0.086 | -0.245 | 0.014 | -0.187 | 3.259 | -0.061 | 0.013 | 0.176 | -0.743 |
| 50 % | -0.143 | 0.014 | 0.009 | -0.056 | -0.140 | 0.014 | -0.083 | 1.439 | -0.128 | 0.013 | 0.109 | -0.459 |
| 75 % | -0.142 | 0.014 | 0.009 | -0.059 | -0.100 | 0.014 | -0.042 | 0.739 | -0.173 | 0.013 | 0.065 | -0.272 |
| 90 % | -0.147 | 0.014 | 0.005 | -0.030 | -0.075 | 0.015 | -0.017 | 0.304 | -0.208 | 0.014 | 0.029 | -0.122 |
| Demographic Accounting | | | | | | | | | | | | |
| 0 % | -0.176 | 0.015 | -0.024 | 0.161 | -0.184 | 0.016 | -0.127 | 2.205 | -0.145 | 0.015 | 0.092 | -0.389 |
| 50 % | -0.168 | 0.015 | -0.016 | 0.107 | -0.138 | 0.015 | -0.081 | 1.410 | -0.178 | 0.015 | 0.059 | -0.249 |
| 75 % | -0.164 | 0.015 | -0.012 | 0.080 | -0.109 | 0.016 | -0.051 | 0.893 | -0.204 | 0.015 | 0.033 | -0.139 |
| 90 % | -0.162 | 0.015 | -0.011 | 0.069 | -0.085 | 0.016 | -0.028 | 0.480 | -0.227 | 0.015 | 0.010 | -0.043 |
| Logical-CSMI | | | | | | | | | | | | |
| 0 % | -0.073 | 0.119 | 0.078 | -0.515 | -0.066 | 0.116 | -0.008 | 0.146 | -0.055 | 0.113 | 0.182 | -0.767 |
| 50 % | -0.116 | 0.094 | 0.036 | -0.237 | -0.125 | 0.093 | -0.067 | 1.170 | -0.094 | 0.096 | 0.143 | -0.603 |
| 75 % | -0.140 | 0.059 | 0.011 | -0.072 | -0.110 | 0.059 | -0.053 | 0.919 | -0.172 | 0.063 | 0.065 | -0.275 |
| 90 % | -0.149 | 0.030 | 0.002 | -0.015 | -0.075 | 0.031 | -0.018 | 0.307 | -0.223 | 0.029 | 0.014 | -0.061 |

Notes: Coefficients are estimated on the target sample only ($N \approx 5,000$). Bias = estimate − expected value; Relative Bias = bias/expected value; CSMI = cross-survey multiple imputation.

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

�microphone Springer

AR2022_500864

This approach offers a potential solution to analysts who are unable to meet the joint observation requirement. However, most demographic and health data do not typically include enough indicators of legality to classify such a high proportion as "probably legal." Additionally, federal statistical agencies appear to have become more, not less, restrictive in their willingness to release sensitive data and administrative record linkages, especially concerning immigrants and their statuses. We therefore explored yet another option available to researchers when the joint observation condition is not initially met. Following Rässler (2004), the CSMI method is likely to yield less-biased estimates if an auxiliary data set with jointly observed measures of unauthorized status and the dependent variable were pooled with the donor and target data sets. Typically, an auxiliary data set is one that contains the necessary variables but may not be drawn from the same universe as the target sample. To illustrate, one might pool the SIPP with a national health survey to estimate the association of legal status with chronic health conditions. Because legal status is measured only in the SIPP and chronic health conditions are measured only in the health survey, the two are never jointly observed. However, one could add an auxiliary data set that includes both unauthorized status and chronic health conditions, such as the California Health Interview Survey (2013), to satisfy the joint observation requirement.

To evaluate this approach, we pooled target and donor data (wherein unauthorized status and the dependent variable are never jointly observed) with a third equal-sized data set containing both variables. In practice, it would be difficult to locate an auxiliary data set that is drawn from the same universe as the other two data sets, so we assessed how the results differ when all three data sets are drawn from the same universe (the SIPP) versus when the auxiliary data set is drawn from a different universe (specifically, from Californians in the SIPP). The results, shown in Table 7, indicate that bias is reduced to nearly 0 when all three data sets are drawn from the same universe. Bias is somewhat higher (but still quite low) when the same-universe assumption is violated. It is likely that the level of bias depends on a variety of factors, such as the number of variables common to the three data sets, the relative sample sizes of three data sets, and how different their universes are. Given space constraints, identifying and evaluating the impact of these factors extends beyond the scope of this article.

Using the Cross-Survey Multiple Imputation Method to Increase Statistical Power

In this last section, we demonstrate how the CSMI method could be used with currently available public-use data to increase statistical power when the joint observation requirement is met. We selected CSMI over other methods because it yielded less-biased estimates than the logical and demographic accounting methods and is easier to implement than the equally well-performing logical-CSMI method. Although CSMI generally should not be used to examine outcomes that are unobserved in the donor data (i.e., without prior information), it can be used to increase sample size and power, which is extremely valuable for producing estimates by detailed characteristics, such as state of residence, country of birth, or year of entry cohort.

🖄 Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500865

**Table 7** Simulated coefficients of unauthorized status in models predicting insurance coverage estimated by CSMI method with and without an auxiliary data set ($N = 15,000$; 500 repetitions; DV never jointly observed, IV jointly observed)

| Method | Insurance 1 (observed) | | | | Insurance 2 (weak association) | | | | Insurance 3 (strong association) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | β | SE | Bias | Relative Bias | β | SE | Bias | Relative Bias | β | SE | Bias | Relative Bias |
| Expected Value | -0.151 | | | | -0.057 | | | | -0.237 | | | |
| Cross-Survey Multiple Imputation (CSMI) | | | | | | | | | | | | |
| Without auxiliary data set | -0.125 | 0.102 | 0.026 | -0.172 | -0.105 | 0.099 | -0.047 | 0.827 | -0.125 | 0.102 | 0.112 | -0.473 |
| With auxiliary data set | | | | | | | | | | | | |
| Auxiliary data set has same universe as target and donor data (United States) | -0.153 | 0.027 | -0.001 | 0.008 | -0.060 | 0.027 | -0.003 | 0.051 | -0.236 | 0.026 | 0.001 | -0.004 |
| Auxiliary data set has different universe (California) | -0.171 | 0.027 | -0.019 | 0.128 | -0.048 | 0.027 | 0.009 | -0.161 | -0.237 | 0.027 | 0.000 | 0.001 |

*Notes*: Coefficients are estimated on the target sample only ($N \approx 5,000$). Bias = estimate − expected value; Relative Bias = bias/expected value; CSMI = cross-survey multiple imputation.


Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

**AR2022_500866**

To demonstrate, we applied the CSMI method to actual data, using the 2004 SIPP data as the donor sample and the 2004 March CPS as the target sample. The CPS is conducted throughout the year by the U.S. Census Bureau on approximately 60,000 civilian U.S. housing units; thus, the sample is very large and has the capacity to produce estimates for many states, something that is not feasible with the smaller SIPP sample. The CPS lacks a measure of legal status, but includes many of the same variables as the SIPP (including all the predictors and the dependent variable in our example), which we coded identically as the SIPP variables. Thus, the joint observation condition can be met. Additionally, the CPS relies on nearly the same sampling frame as the SIPP. As with the analytical SIPP sample, our final CPS sample was restricted to foreign-born adults age 16 and older, excluding those born abroad of U.S.-born parents ($N = 21{,}214$). A comparative profile of the SIPP and CPS foreign-born samples on standard socioeconomic and demographic variables provides support for the same universe assumption. On nearly every dimension of comparison, the samples are virtually identically distributed (available upon request).

To implement the multiple-imputation method, we pooled the SIPP and CPS, multiply imputed unauthorized status for cases in the CPS on the basis of a large set of predictors (including insurance coverage), and estimated the percentage of unauthorized with insurance coverage by state/region in the CPS data. To demonstrate the sensitivity of the estimates to the specification of the imputation model, we first excluded the dependent variable—insurance coverage—from the predictors in the imputation model (i.e., treating it as if it were never jointly observed). In a second analysis, we included it. Finally, in the third, we estimated the imputation model separately by state/region (i.e., essentially a fully interactive model), thus allowing for interactions between state/region and all other predictors.

Results are reported in Table 8. In the first set of columns, means and standard errors are reported for states and regions in the SIPP in which there are at least 250 observations. For example, as observed in the SIPP, approximately 42 % of unauthorized immigrants in California had health insurance coverage in 2004. The second column reports the corresponding percentage estimated in the CPS when unauthorized status has been imputed without health insurance coverage being included in the model. Despite greater precision signified by lower standard errors, these estimates are significantly different from the SIPP-based estimates in approximately one-half (8 of 14) of the state/regions and tend to overestimate coverage among unauthorized immigrants. For example, the estimate for California derived from the CPS when insurance was not included in the imputation model is fully 10 percentage points higher than that estimated by the SIPP.

Health insurance coverage is allowed to be jointly observed in the final two columns of Table 8. Estimates in the third set of columns include state/region as a variable in the imputation model, and estimates in the fourth set of columns are derived from a model estimated separately within the 14 states/regions. In these two columns, estimates of insurance coverage among the unauthorized are much more in line with the SIPP-based estimates compared with the scenario in which coverage is never jointly observed with unauthorized status. Just 1 of the 14 states/regions has estimates that are significantly different from the SIPP-based estimates both when state/region is included as a variable and when separate models are estimated within states/regions; and in both instances, the magnitude of the difference is smaller compared with the scenario in which coverage is never jointly observed.

🖄 Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

**AR2022_500867**

**Table 8** Proportion of unauthorized immigrants with insurance coverage estimated by CSMI method, by state/region and imputation model specification

| State/Region | 2004 SIPP | | Pooled 2004 SIPP and CPS | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Insurance Never Jointly Observed | | Insurance Jointly Observed | | | |
| | | | State/Region in Imputation Model | | State/Region in Imputation Model | | Imputed Separately by State/Region | |
| | Mean | SE | Mean | SE | Mean | SE | Mean | SE |
| California | 0.416 | 0.023 | 0.524 | 0.010*** | 0.442 | 0.009 | 0.434 | 0.011 |
| Florida | 0.462 | 0.038 | 0.555 | 0.010* | 0.449 | 0.008 | 0.468 | 0.011 |
| Illinois | 0.560 | 0.068 | 0.553 | 0.015 | 0.502 | 0.019 | 0.568 | 0.023 |
| New Jersey | 0.427 | 0.050 | 0.567 | 0.015** | 0.463 | 0.017 | 0.458 | 0.020 |
| New York | 0.513 | 0.041 | 0.590 | 0.010 | 0.503 | 0.009 | 0.478 | 0.020 |
| Texas | 0.357 | 0.035 | 0.360 | 0.015 | 0.324 | 0.010 | 0.338 | 0.010 |
| Other Pacific/Southwest (AZ, HI, NV, NM) | 0.334 | 0.037 | 0.546 | 0.015*** | 0.407 | 0.016 | 0.412 | 0.016* |
| Northwest (CO, ID, MT, OR, UT, WA, WY) | 0.456 | 0.039 | 0.473 | 0.012 | 0.400 | 0.009 | 0.420 | 0.029 |
| Midwest (IN, IA, KS, MN, NE, ND, OK, SD) | 0.533 | 0.045 | 0.564 | 0.008 | 0.543 | 0.014 | 0.550 | 0.020 |
| Great Lakes Region (MI, OH, WI) | 0.692 | 0.062 | 0.553 | 0.018* | 0.556 | 0.029* | 0.589 | 0.022 |
| Northeast (CT, ME, MA, NH, PA, RI, VT) | 0.518 | 0.043 | 0.671 | 0.008*** | 0.540 | 0.011 | 0.497 | 0.021 |
| Mid-Atlantic (DE, DC, MD, VA) | 0.583 | 0.054 | 0.556 | 0.017 | 0.476 | 0.024 | 0.521 | 0.030 |
| Southeast (GA, NC, SC, WV) | 0.259 | 0.035 | 0.406 | 0.014*** | 0.324 | 0.012 | 0.312 | 0.013 |
| Deep South (AL, AK, KY, LA, MS, MO, TN) | 0.453 | 0.062 | 0.627 | 0.016** | 0.492 | 0.023 | 0.552 | 0.035 |

*Notes*: The sample is pooled. $N = 30,112$; SIPP $N = 8,898$; CPS $N = 21,214$; SIPP includes at least 250 foreign-born per state/region; CSMI = cross-survey multiple imputation.

Significance tests are based on the SE of the difference between the estimate from the 2004 SIPP and the pooled SIPP-CPS: $SE_{diff} = \sqrt{\left(SE_{SIPP}^2 + SE_{pooled}^2\right)}$.

$*p < .05$; $**p < .01$; $***p < .001$

Ⓓ Springer

This content downloaded from
141.211.fff:ffff:ffff:ffff on Thu, 01 Jan 1976 12:34:56 UTC
All use subject to https://about.jstor.org/terms

**AR2022_500868**

## Conclusions

Research on immigration, immigrant incorporation, and immigration policy has been stymied by inadequate data on legal status. To compensate for the lack of individual-level indicators of legal status, researchers have tried to impute legal status in order to examine the socioeconomic and demographic characteristics of unauthorized immigrants. Although imputation-based results appear to be widely accepted (especially in policy settings), the degree to which such methods produce biased estimates have not been empirically tested. In this article, we used Monte Carlo simulations to evaluate a variety of imputation approaches under a range of conditions.

Our simulations revealed significant limitations in all the methods we tested. The logical and demographic accounting approaches produced biased estimates even under the most favorable scenarios regarding missing data. They were especially poor at detecting surprising results, such as unusually low or high insurance coverage among unauthorized relative to legal immigrants. The statistical imputation methods (single-imputation, CSMI, and logical-CSMI) produced unbiased estimates when unauthorized status was jointly observed with the dependent variable. However, when this condition was not met, these methods tended to overestimate coverage among the unauthorized.

These biases arose when the imputation method failed to incorporate information about the association of unauthorized status with the dependent variable. To understand how problematic this is, consider the surprising but well-established finding that Hispanics have lower mortality than non-Hispanic whites despite their lower socioeconomic status (SES) (Markides and Eschbach 2005). If we knew only that low SES is associated with higher mortality and that Hispanics have lower SES, we would erroneously conclude that Hispanics have higher mortality. Direct observation of the association between Hispanic origin and mortality (i.e., joint observation) is necessary to detect the truth. The critical nature of the joint observation requirement means that legal status imputation is not appropriate for analyses of outcomes that are not measured alongside legal status in the donor data set.

However, our simulations also showed that external data about legal status (i.e., prior information) could be used to reduce bias, even when joint observation does not occur. As the percentage of those classified as "probably legal" increased, bias in the estimates produced by the logical-imputation, demographic accounting, and logical-CSMI imputation methods decreased substantially. Similarly, CSMI estimates were improved by incorporating information about the association between unauthorized status and the dependent variable from an auxiliary data set, even when it was drawn from a different universe (California) than the other two data sets.

What do the results imply about prior research? Unfortunately, most legal status imputation methods violate the joint observation assumption and are therefore likely to produce estimates that are biased to an unknown degree. To our knowledge, no existing applications of the logical and single-imputation methods use information about the dependent variable to inform the imputation. Although the demographic accounting approach used by Pew/Passel is harder to evaluate, it also appears to violate the joint observation assumption because it imputes legal status on the basis of only a few predictors in the LPS survey (occupational distribution by age, sex, and state of residence), yet examines imputed legal status across a wide variety of outcomes.

🖄 Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500869

Beyond this, prior approaches have clearly violated the same-universe requirement. For example, Marcelli and Heer (1997, 1998) used a local Los Angeles–based sample to impute unauthorized status for respondents in a sample that is representative of a larger geographic area; and Pew/Passel used an older sample (the LPS) to impute unauthorized status decades later. Similarly, Caponi and Plesca (2014) used data from the New Immigrant Survey (NIS) (Jasso et al. 2000), a nationally representative sample of legal permanent residents (LPRs) admitted to the United States in the early 2000s, to impute the legal status of all immigrants in the ACS. Although our tests involving the usage of an auxiliary data set suggest that the same-universe condition is less critical than the joint observation condition, we caution that more research is necessary to assess the conditions under which the same-universe assumption can be relaxed.

What do the results mean for future research on legal status? All the imputation methods we tested were limited in one way or another, suggesting that rather than continuing to try to spin gold from straw, the research community should increase efforts to improve data on immigrants. The most inexpensive and timely way to accomplish this would be to permit administrative record linkages to be used to logically impute legal status. Such data linkages already exist, but as we note earlier, U.S. federal statistical agencies have been reluctant to permit researchers to use these linkages to proxy legal status. A more expensive, but perhaps more ethically acceptable, route would be to add questions about legal status in surveys. Recent evaluations of the quality of information gathered from survey questions on legal status are promising, and suggest that the addition of such items to questionnaires are unlikely to compromise survey response rates (Bachmeier et al. 2014).

Absent better data, the CSMI method has promise, as long as the joint observation condition is met. As demonstrated in our CPS example, this method has the potential to increase statistical power, thus enabling analyses for detailed subgroups and geographies. Although the joint observation condition appears to constrain the applicability of the CSMI method, the SIPP nevertheless includes a very rich set of outcomes in many topical modules. To the extent that the SIPP can be pooled with larger data sets with common variables, there are numerous opportunities to expand research on the unauthorized population. Of course, the SIPP is not perfect. It appears to undercount unauthorized immigrants, and handling its data on legal status can be challenging. When using the SIPP in research on legal status, we recommend following the methods outlined in Bachmeier et al. (2014). Additionally, when implementing the CSMI method, it is important that donor and target data sample from the same universe, although as noted earlier, our tests suggest that this restriction could be less important than the joint observation requirement. We refer readers to Rendall et al. (2013) for guidance on how to test for violations of this assumption. Finally, it is important that analysts employ best practices for multiple imputation, such as specifying the correct functional form, including all analytically important variables, and appropriately accounting for clustered observations in the imputation model (Allison 2002; Rubin 1987).

Research on immigration to the United States remains plagued by the lack of data available to researchers, precisely at a time when public policy discussions are most in need of input by social scientists. Even more problematic is the fact that the limited existing knowledge that we have about the characteristics of the unauthorized population has been derived from imputation approaches that the simulation exercises


Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

reported here have shown to yield biased estimates. Nevertheless, the simulation exercises have also demonstrated that social scientists have at their disposal reliable data and statistical methods for imputing legal status in large-scale surveys lacking such measures, insofar as important conditions are met. Although these conditions might appear to limit the utility of the CSMI method, it can nevertheless be employed to substantially expand the body of literature on the incorporation of the unauthorized population beyond the limited number of studies that currently comprise it.

**Acknowledgments** This research was supported by grants from the National Institutes of Health (RC2 HD064497, P01 HD062498, K01MH087219, and 2R24HD041025). We thank Michelle Frisco, Molly Martin, Nancy Landale, Claire Altman, Susana Sanchez, and the anonymous reviewers for helpful comments. The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Institutes of Health.

# References

Allison, P. D. (2002). *Missing data*. Thousand Oaks, CA: Sage.

Bachmeier, J. D., Van Hook, J., & Bean, F. D. (2014). Can we measure immigrants' legal status? Lessons from two U.S. surveys. *International Migration Review, 48*, 538–566.

Batalova, J., Hooker, S., & Capps, R. (2014). *DACA at the two-year mark: A national and state profile of youth eligible and applying for deferred action*. Washington, DC: Migration Policy Institute.

Bohn, S., Lofstrom, M., & Raphael, S. (2014). Did the 2007 Legal Arizona Workers Act reduce the state's unauthorized immigrant population? *Review of Economics and Statistics, 96*, 258–269.

Bozick, R., & Miller, T. (2014). In-state college tuition policies for undocumented immigrants: Implications for high school enrollment among non-citizen Mexican youth. *Population Research and Policy Review, 33*, 13–30.

Bustamante, A. V., Fang, H., Garza, J., Carter-Pokras, O., Wallace, S. P., Rizzo, J. A., & Ortega, A. N. (2012). Variations in healthcare access and utilization among Mexican immigrants: The role of documentation status. *Journal of Immigrant and Minority Health, 14*, 146–155.

California Health Interview Survey. (2013). *CHIS 2013–2014 sample design*. Los Angeles, CA: UCLA Center for Health Policy Research.

Caponi, V., & Plesca, M. (2014). Empirical characteristics of legal and illegal immigrants in the USA. *Journal of Population Economics, 27*, 923–960.

Capps, R., Bachmeier, J. D., Fix, M., & Van Hook, J. (2013). *A demographic, socioeconomic, and health coverage profile of unauthorized immigrants in the United States*. Washington, DC: Migration Policy Institute.

Clark, R. L., Glick, J. E., & Bures, R. M. (2009). Immigrant families over the life course: Research directions and needs. *Journal of Family Issues, 30*, 852–872.

Clark, R. L., & King, R. B. (2008). Social and economic aspects of immigration. *Annals of the New York Academy of Sciences, 1136*, 289–297.

Collins, L. M., Schafer, J. L., & Kam, C.-M. (2001). A comparison of inclusive and restrictive strategies in modern missing data procedures. *Psychological Methods, 6*, 330–351.

Durand, J., Massey, D. S., & Capoferro, C. (2005). The new geography of Mexican immigration. In V. Zuniga & R. Hernandez-Leon (Eds.), *New destinations: Mexican immigration in the United States* (pp. 1–22). New York, NY: Russell Sage Foundation.

Flores, S. M. (2010). State dream acts: The effect of in-state resident tuition policies and undocumented Latino students. *Review of Higher Education, 33*, 239–283.

Greenman, E., & Hall, M. (2013). Legal status and educational transitions for Mexican and Central American immigrant youth. *Social Forces, 91*, 1475–1498.

Hall, M., Greenman, E., & Farkas, G. (2010). Legal status and wage disparities for Mexican immigrants. *Social Forces, 89*, 491–513.

Heer, D. M., & Passel, J. S. (1987). Comparison of two methods for estimating the number of undocumented Mexican adults in Los Angeles County. *International Migration Review, 21*, 1446–1473.

Jasso, G., Massey, D. S., Rosenzweig, M. R., & Smith, J. P. (2000). The New Immigrant Survey Pilot (NIS-P): Overview and new findings about U.S. legal immigrants at admission. *Demography, 37*, 127–138.


🙋 Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500871

Javier, J. R., Huffman, L. C., Mendoza, F. S., & Wise, P. H. (2010). Children with special health care needs: How immigrant status is related to health care access, health care utilization, and health status. *Maternal and Child Health Journal, 14,* 567–579.

Kaushal, N. (2006). Amnesty programs and the labor market outcomes of undocumented workers. *Journal of Human Resources, 41,* 631–647.

Ku, L. (2009). Health insurance coverage and medical expenditures of immigrants and native-born citizens in the United States. *American Journal of Public Health, 99,* 1322–1328.

Little, R. J. A., & Rubin, D. B. (2002). *Statistical analyses with missing data* (2nd ed.). New York, NY: John Wiley and Sons.

Marcelli, E. A. (2004). Unauthorized Mexican immigration, day labour and other lower-wage informal employment in California. *Regional Studies, 38,* 1–13.

Marcelli, E. A., & Heer, D. (1997). Unauthorized Mexican workers in the 1990 Los Angeles County labour force. *International Migration, 35,* 59–83.

Marcelli, E. A., & Heer, D. (1998). Unauthorized Mexican immigration and welfare: A comparative statistical analysis. *Sociological Perspectives, 41,* 279–302.

Markides, K. S., & Eschbach, K. (2005). Aging, migration, and mortality: Current status of research on the Hispanic paradox. *Journals of Gerontology: Series B, 60*(Special Issue 2), S68–S75.

Massey, D. S., & Bartley, K. (2005). The changing legal status distribution of immigrants: A caution. *International Migration Review, 39,* 469–482.

Passel, J. S. (2006). *The size and characteristics of the unauthorized migrant population in the U.S.* Washington, DC: Pew Hispanic Center.

Passel, J. S., & Clark, R. L. (1998). *Immigrants in New York: Their legal status, incomes, and taxes.* Washington, DC: Urban Institute.

Passel, J. S., & Cohn, D. V. (2009). *A portrait of unauthorized immigrants in the United States.* Washington, DC: Pew Hispanic Center.

Potochnick, S. (2014). How states can reduce the dropout rate for undocumented youth: The effects of in-state resident tuition policies. *Social Science Research, 45,* 18–32.

Rässler, S. (2004). Data fusion: Identification problems, validity, and multiple imputation. *Austrian Journal of Statistics, 33*(1–2), 153–171.

Rendall, M. S., Ghosh-Dastidar, B., Weden, M. M., Baker, E. H., & Nazarov, Z. (2013). Multiple imputation for combined-survey estimation with incomplete regressors in one but not both surveys. *Sociological Methods & Research, 42,* 483–530.

Resche-Rigon, M., White, I. R., Bartlett, J. W., Peters, S. A. E., & Thompson, S. G. (2013). Multiple imputation for handling systematically missing confounders in meta-analysis of individual participant data. *Statistics in Medicine, 32,* 4890–4905.

Rodgers, W. L. (1984). An evaluation of statistical matching. *Journal of Business and Economic Statistics, 2,* 91–102.

Rubin, D. B. (1987). *Multiple imputation for nonresponse in surveys.* New York, NY: John Wiley and Sons.

Schenker, N., Raghunathan, T. E., & Bondarenko, I. (2010). Improving on analyses of self-reported data in a large-scale health survey by using information from an examination-based survey. *Statistics in Medicine, 29,* 533–545.

Sommers, B. D. (2013). Stuck between health and immigration reform—Care for undocumented immigrants. *New England Journal of Medicine, 369,* 593–597.

StataCorp. (2013). *Stata statistical software: Release 13.* College Station, TX: StataCorp LP.

State Health Access Data Assistance Center. (2013). *State estimates of the low-income uninsured not eligible for the ACA Medicaid expansion* (Issue Brief No. 35). Minneapolis, MN: University of Minnesota.

Stevens, G. D., West-Wright, C. N., & Tsai, K.-Y. (2010). Health insurance and access to care for families with young children in California, 2001–2005: Differences by immigration status. *Journal of Immigrant and Minority Health, 12,* 273–281.

U.S. Census Bureau. (2013). *Survey of income and program participation.* Washington, DC: U.S. Census Bureau.


Springer

This content downloaded from
141.211.4.224 on Thu, 14 Jul 2022 15:19:25 UTC
All use subject to https://about.jstor.org/terms

AR2022_500872



# Back on the Table

## U.S. Legalization and the Unauthorized Immigrant Groups that Could Factor in the Debate

Jessica Bolter
Muzaffar Chishti
Doris Meissner



AR2022_500873

U.S. IMMIGRATION POLICY PROGRAM

# Back on the Table

## U.S. Legalization and the Unauthorized Immigrant Groups that Could Factor in the Debate

Jessica Bolter

Muzaffar Chishti

Doris Meissner

Migration Policy Institute

February 2021

AR2022_500874

# Contents

Executive Summary ........................................................................................... 1

1   Introduction ................................................................................................ 3

2   The Unauthorized Immigrant Population: A Profile ................................. 5
    Unauthorized Immigrant Subgroups ........................................................... 7

3   Policy Options: Legislative Reform and Executive Action .................... 18
    A.   Legislative Solutions .......................................................................... 18
    B.   Executive Action ................................................................................. 26

4   Conclusion ................................................................................................ 29

About the Authors ............................................................................................ 30

Acknowledgments ........................................................................................... 31

# Executive Summary

Sixty percent of the estimated 11 million unauthorized immigrants in the United States have lived in the country for a decade or more, and are thus deeply embedded in its workforce, economy, and communities. Just one-fifth of the unauthorized immigrant population has been in the United States for less than five years. Even if the U.S. government intended to deport everyone without legal status, it would require major resources and result in large-scale dislocations. Yet attempts to legalize the unauthorized immigrant population have been largely unsuccessful for at least two decades, thwarting any prospects for broader reform of a U.S. immigration system that urgently requires updating. Amid this stasis, Congress has mounted new obstacles that make it more difficult for those who would otherwise have been eligible to legalize to do so.

*Attempts to legalize the unauthorized immigrant population have been largely unsuccessful for at least two decades, thwarting any prospects for broader reform of a U.S. immigration system that urgently requires updating.*

The Biden administration has unveiled a framework for a pathway to citizenship for unauthorized immigrants, urging Congress to take up legalization. This report provides an analysis of the composition and characteristics of the unauthorized immigrant population in the United States today. It draws upon a unique Migration Policy Institute (MPI) methodology that allows the assignment of legal status in U.S. Census Bureau data. It also takes stock of the legalization options that exist, particularly amid growing calls to recognize the role immigrants, including the unauthorized, have played in providing essential services during the COVID-19 pandemic and their outsized vulnerability to the disease.

> **BOX 1**
> **Definition of Legalization**
>
> In this report, the term "legalization" refers to the process by which qualifying noncitizens lacking lawful immigration status, including those in quasi-legal statuses such as Deferred Action for Childhood Arrivals (DACA), can access some form of legal status that gives them protection from removal and the ability to work lawfully.

Within the overall unauthorized immigrant population, some subgroups with particularly strong equities stand out:

- ▶ **Recipients of Deferred Action for Childhood Arrivals (DACA), and DREAMers more broadly.** A legalization program for DACA holders could offer more enduring protections to up to 1.7 million individuals potentially eligible for DACA by December 2021. Such a legalization program could also broaden eligibility criteria. Depending on how the requirements are drawn, MPI estimates between 1.9 million and 2.9 million unauthorized immigrants brought to the United States as minors could be eligible.

- ▶ **Recipients of Temporary Protected Status (TPS).** Of the 320,000 people with TPS as of September 2020, 80 percent have held the status for at least ten years.

AR2022_500876

► **Essential workers.** Between 1.1 million and 5.6 million unauthorized immigrants could be considered "essential" workers, depending on how the occupations considered essential are defined. This category has emerged in the public conversation as a result of the COVID-19 outbreak.

► **Farmworkers.** Close to half of the estimated 2.4 million agricultural workers not on temporary visas were unauthorized immigrants, according to data from the 2015-16 National Agricultural Workers Survey, the most recent available from the U.S. Department of Labor. They provide essential food supply services that have become especially vital for the country's residents during the pandemic.

► **Family- and employer-sponsored immigrants.** MPI estimates 1.4 million unauthorized immigrants have a U.S.-citizen or permanent resident spouse, and at least 1.7 million others are most likely to have employer sponsors. Both groups would be able to attain permanent resident status (also known as getting a green card) if not for impediments imposed by Congress in 1996.

► **Parents of U.S. citizens and permanent residents.** As of 2021, MPI estimates there were 3.4 million unauthorized immigrants who live with U.S.- citizen or permanent resident children and have been in the country for at least five years.

The overlap among these subgroups is not measurable and is likely extensive—e.g., unauthorized immigrants with a U.S.-citizen spouse may have DACA and also perform essential work—so it would not be accurate to add them together to estimate the total number of unauthorized immigrants who fall into one or more of these subgroups.

There are several ways to approach legalization for these subgroups or for the broader unauthorized immigrant population. Legislation is clearly the most durable mechanism to establish legalization. Congress could provide a broad path to legal status and eventually citizenship. One example of this is the legalization framework that President Joe Biden sent to Congress upon his inauguration, which would make anyone in the country illegally as of January 1, 2021 eligible to apply.

Given the political difficulties inherent in achieving broad legalizations, policymakers could tackle the challenge piecemeal, creating pathways to legal status for one or more of the above subgroups. Elements of U.S. immigration law that have fallen into disuse, such as the registry provision (which allows unauthorized immigrants who have been in the country for an extended period and meet other requirements to get green cards), could be revived. Elements that have served as barriers to legalization could be revisited, including the narrowed options for cancellation of removal and the three- and ten-year unlawful presence bars, which have effectively prevented otherwise eligible unauthorized immigrants from attaining lawful permanent residence.

> *Given the political difficulties inherent in achieving broad legalizations, policymakers could tackle the challenge piecemeal.*

Alternatively, short of a pathway to citizenship, legislation could create a limited, renewable legal status that provides more protections and certainty than measures created through administrative action, such as DACA and TPS, which provide only nondurable relief from deportation and work authorization.

If legislation fails, executive action could provide legal protections—albeit less durable—to unauthorized immigrants who might otherwise be subject to deportation. The executive branch has several tools it can use to offer these protections, including grants of deferred action, parole-in-place, Deferred Enforced Departure (DED), and TPS.

**BOX 2**
**About the Rethinking U.S. Immigration Policy Project**

This report is part of a multiyear Migration Policy Institute (MPI) project, Rethinking U.S. Immigration Policy. At a time when U.S. immigration realities are changing rapidly, this initiative is generating a big-picture, evidence-driven vision of the role immigration can and should play in America's future. It is providing research, analysis, and policy ideas and proposals—both administrative and legislative—that reflect these new realities and needs for immigration to better align with U.S. national interests.

To learn more about the project and read other reports and policy briefs generated by the Rethinking U.S. Immigration Policy initiative, see bit.ly/RethinkingImmigration.

Addressing the status of the unauthorized population in some fashion remains foundational to establishing a workable U.S. immigration system in the coming years. While legalization can be broad or limited, both in terms of the populations it covers and the scope of relief it offers, providing permanent legal protections to them serves not only their interests but national interests as well.

# 1    Introduction

The issue of legalization for unauthorized immigrants in the United States has paralyzed the progress of immigration reform legislation for the last 20 years. Should any unauthorized immigrants be eligible for legal status at all? Who should be legalized? Under what conditions? How quickly? These questions and the political reactions that they trigger have repeatedly brought lawmakers to an impasse. Those on the right, generally averse to legalization, see it as rewarding lawbreakers and inviting more illegal immigration, while those on the left have broadly called for a path to citizenship for millions as an equitable outcome for people who are contributing to the life of the nation.

The term legalization means different things to different people. In this report, it refers to the process by which qualifying unauthorized immigrants, including those in quasi-legal statuses such as Temporary Protected Status (TPS) or Deferred Action for Childhood Arrivals (DACA),[1] can access some form of legal status that gives them protections from removal and the ability to work lawfully.[2]

---

1    The Deferred Action for Childhood Arrivals (DACA) program is open to unauthorized immigrants who were 15 or younger when they entered the United States; were 30 or younger on June 15, 2012; have lived in the United States since June 15, 2007; have clean criminal records; and are in school, have a high school degree or equivalent, or are veterans. See U.S. Citizenship and Immigration Services (USCIS), "Consideration of Deferred Action for Childhood Arrivals (DACA)," updated January 21, 2021.

2    For more on quasi-legal statuses, also known as liminal status or liminal legality, see Cecilia Menjívar, "Liminal Legality: Salvadoran and Guatemalan Immigrants' Lives in the United States," *American Journal of Sociology* 111, no. 4 (2006): 999-1037.

There has been a growing public consensus in favor of some form of legalization. According to a June 2020 Pew Research Center poll, 75 percent of the U.S. public, including 89 percent of Democrats and 57 percent of Republicans, agreed that unauthorized immigrants who meet certain requirements should be able to stay legally. [3] However, what this support means to different people—including whether these immigrants should receive a temporary renewable status or a permanent status with a path to citizenship, and how liberal or restrictive the eligibility requirements should be—varies greatly. Further, those who oppose increased immigration in general tend to have more intense feelings on the issue than do those who generally favor it.[4]



**75%**

of the public favors allowing unauthorized immigrants to get legal status

That includes:

**89%** of Democrats
**57%** of Republicans

The rise in the unauthorized population in the United States is a product both of immigration policies that do not align with U.S. labor market realities and of a political stalemate that prevents any significant legislative reform. Throughout the 1980s, 1990s, and 2000s, the availability of jobs in the United States and limited economic opportunities in Mexico led many more Mexicans to make their way across the U.S.-Mexico border than U.S. visa quotas permitted. These push-and-pull factors led to a 249 percent growth in the unauthorized immigrant population between 1990 and 2007, rising from 3.5 million to 12.3 million, despite increasing levels of resources devoted to border enforcement.[5] Since then, the size of the unauthorized population has decreased from its 2007 peak to 11.0 million in 2018, mostly due to reduced economic opportunities in the United States and increased opportunities and declining demographic pressures in Mexico.[6]

Fulfilling his campaign pledge to send Congress a bill during his first 100 days, President Biden on January 20 unveiled a legislative framework that would offer a pathway to citizenship for the unauthorized population.[7] While presidential leadership is key, it is Congress that will make or break such a proposal. In the event of a continuing impasse on Capitol Hill, after failed attempts at immigration reform in 2006, 2007, and 2013, executive actions offer an alternative channel for providing relief, albeit more limited and less durable.

---

3   Jens Manuel Krogstad, "Americans Broadly Support Legal Status for Immigrants Brought to the U.S. Illegally as Children," Pew Research Center Fact Tank blog, June 17, 2020.

4   Conservatives in this survey were both more opposed to immigration and described as "more sensitive" to issues relating to immigration than other societal groups. This means they think about immigration more often and have stronger emotions about it. Questions in this survey were not asked about legalization specifically. See Stephen Hawkins, Daniel Yudkin, Míriam Juan-Torres, and Tim Dixon, *Hidden Tribes: A Study of America's Polarized Landscape* (New York: More in Common, 2018), 62.

5   Pew Research Center, "Unauthorized Immigrant Population Trends for States, Birth Countries and Regions," Pew Research Center, June 12, 2019.

6   Randy Capps, Julia Gelatt, Ariel G. Ruiz Soto, and Jennifer Van Hook, *Unauthorized Immigrants in the United States: Stable Numbers, Changing Origins* (Washington, DC: Migration Policy Institute, 2020), 1.

7   Biden-Harris Transition, "Fact Sheet: President Biden Sends Immigration Bill to Congress as Part of His Commitment to Modernize Our Immigration System" (press release, January 20, 2021).

AR2022_500879

The profile of the unauthorized immigrant population, particularly those crossing over the U.S.-Mexico border, is changing.[8] The flow arriving at the border today is dominated by mixed migration from Central America, i.e. migrants seeking protection, alongside others in search of economic opportunity, as well as those migrating for a combination of these reasons.[9] Thus, to achieve more effective migration management and reduce illegality, policies aimed at legalizing the unauthorized population should be paired with a more comprehensive response to humanitarian arrivals and a better alignment of legal immigration channels with U.S. labor market needs.[10]

When considering legalization policy options, it is also important to note that there is historical precedent for policymakers to cover narrower subgroups, rather than grant the fullest possible protections by covering the entire unauthorized population. Indeed, the United States has carried out smaller-scale legalizations throughout the past century, which have ultimately provided legal status to more people with much less political resistance than that engendered by contentious large-scale programs.[11]

*The United States has carried out smaller-scale legalizations throughout the past century.*

The purpose of this report is to provide an analysis of the numbers and characteristics of the various subsets of the unauthorized population—including new insights that have emerged during the COVID-19 crisis— and to re-examine the range and scope of options available to policymakers as the country re-engages in the legalization debate.[12]

# 2   The Unauthorized Immigrant Population: A Profile

The unauthorized population, including those with temporary protections such as DACA and TPS, has been estimated to number between 10.5 million and 12 million.[13] The several reliable estimates of this population have slight variances that are explained by the different methodologies they employ. The Migration Policy Institute (MPI) estimated that as of 2018, the unauthorized population numbered 11.0 million. The Center

---

8   People who entered the country legally but overstayed their visas made up an estimated 44 percent of the unauthorized immigrant population as of 2015. See Robert Warren, "DHS Overestimates Visa Overstays for 2016; Overstay Population Growth Near Zero During the Year," *Journal on Migration and Human Security* 5, no. 4 (2017): 768-79.

9   Randy Capps, Doris Meissner, Ariel G. Ruiz Soto, Jessica Bolter, and Sarah Pierce, *From Control to Crisis: Changing Trends and Policies Reshaping U.S.-Mexico Border Enforcement* (Washington, DC: Migration Policy Institute, 2019), 22.

10   For more on creating temporary labor migration pathways for migrants from Central America, see Andrew Selee and Ariel G. Ruiz Soto, *Building a New Regional Migration System: Redefining U.S. Cooperation with Mexico and Central America* (Washington, DC: Migration Policy Institute, 2020).

11   Donald Kerwin, *More than IRCA: US Legalization Programs and the Current Policy Debate* (Washington, DC: Migration Policy Institute, 2010).

12   It is not within the scope of this report to debate the pros and cons of legalization. For more on this topic, see, for example, Cynthia Bansak, "Legalizing Undocumented Immigrants," IZA World of Labor, March 2016.

13   Capps, Gelatt, Ruiz Soto, and Van Hook, *Unauthorized Immigrants in the United States*, 4.

AR2022_500880

for Migration Studies of New York estimated it at 10.6 million.[14] The Pew Research Center estimates that as of 2017, there were 10.5 million unauthorized immigrants.[15] And finally, the U.S. Department of Homeland Security (DHS) put the number at 12.0 million in 2015.[16] MPI finds the majority of unauthorized immigrants are from Mexico (51 percent), Central America (17 percent), and Asia (14 percent).[17]

Both MPI and the Pew Research Center estimate that the unauthorized population peaked in 2007, fell during the recession of 2008-09, and has remained relatively steady thereafter.[18] Much of this decrease owes to a change in Mexican migration flows, with net migration to the United States from Mexico decreasing since the Great Recession: fewer Mexicans came to the United States illegally, partly due to reduced U.S. job opportunities, increased border enforcement, and an aging population, while more left the United States, during a time of rising interior enforcement and job loss.[19] Even with the increase in illegal immigration from Central America across the U.S.-Mexico border in 2018,[20] all available data suggest the decline in the Mexican unauthorized immigrant population has offset that growth.[21]

Based on its unique methodology to assign legal status within data from the U.S. Census Bureau's American Community Survey (ACS) and thus study key characteristics of the unauthorized immigrant population,[22] MPI estimates:

▶ 60 percent have lived in the United States for ten years or more

▶ 57 percent of those who are at least 5 years old speak only English, or speak it well or very well

▶ 66 percent of those age 16 or older are employed (5 percent are unemployed and 30 percent are not in the labor force)

▶ 29 percent are homeowners

▶ 35 percent of those who are at least 15 years old live with at least one minor U.S.-citizen child

▶ 22 percent of those age 15 or older are married to a U.S. citizen or lawful permanent resident (LPR).[23]

---

14  Migration Policy Institute (MPI) Migration Data Hub, "Profile of the Unauthorized Population: United States," accessed January 12, 2021; Center for Migration Studies of New York (CMS), "State-Level Unauthorized Population and Eligible-to-Naturalize Estimates," accessed January 12, 2021.

15  Jeffrey S. Passel and D'Vera Cohn, "Mexicans Decline to Less Than Half the U.S. Unauthorized Immigrant Population for the First Time," Pew Research Center, June 12, 2019.

16  Bryan Baker, Estimates of the Illegal Alien Population Residing in the United States: January 2015 (Washington, DC: Department of Homeland Security, 2018).

17  Capps, Gelatt, Ruiz Soto, and Van Hook, Unauthorized Immigrants in the United States, 6.

18  MPI's estimates show a decline from 2008-11 and then slow growth since then. The Pew Research Center estimates show an ongoing slow decline since 2008. See Capps, Gelatt, Ruiz Soto, and Van Hook, Unauthorized Immigrants in the United States, 4.

19  Ana Gonzalez-Barrera, "More Mexicans Leaving Than Coming to the U.S.," Pew Research Center, November 19, 2015.

20  Capps, Meissner, Ruiz Soto, Bolter, and Pierce, From Control to Crisis.

21  From 2007 to 2017, the Mexican unauthorized immigrant population declined by 2 million. See Passel and Cohn, "Mexicans Decline to Less than Half the U.S. Unauthorized Immigrant Population." From 2010 to 2018, the Mexican unauthorized population declined by 2.6 million. See Robert Warren, "Reverse Migration to Mexico Led to US Undocumented Population Decline: 2010 to 2018," Journal on Migration and Human Security 8, no. 1 (2020): 32-41.

22  MPI, "MPI Methodology for Assigning Legal Status to Noncitizen Respondents in U.S. Census Bureau Survey Data," accessed January 18, 2021.

23  All data from MPI Data Hub, "Profile of the Unauthorized Population: United States."

**AR2022_500881**

This profile suggests that large segments of the overall unauthorized population are deeply embedded in communities and labor markets, and are living in family structures often composed of people with different legal statuses. Most recently, the response to COVID-19 has demonstrated the critical role immigrants, including those without legal status, are playing as essential workers in keeping the country running in the face of the pandemic.[24] Thus, removal of otherwise law-abiding unauthorized immigrants would cause dislocation and have strong collateral consequences—separating spouses and parents from children, removing wage earners from families, and depriving communities of leaders and business owners.

*Large segments of the overall unauthorized population are deeply embedded in communities and labor markets, and are living in family structures often composed of people with different legal statuses.*

Within the broad unauthorized population, there are a variety of subgroups, many of which have been created by varying targeted immigration policy actions over the course of many years.

## Unauthorized Immigrant Subgroups

The smaller groupings among the unauthorized population are not mutually exclusive—there may be considerable overlap—but each is identifiable and possesses distinct characteristics and equities. Indeed, Biden's legalization proposal would address most of these subgroups, including DACA recipients, TPS holders, farmworkers, and those with willing family or employer sponsors and who have been blocked from receiving green cards despite being eligible. Essential workers, even if not specifically included in the initial Biden proposal, are also the subject of proposed legislation.[25] Table 1 presents estimates of the size of each of these populations, explored in further detail below.

---

24   See, for example, Julia Gelatt, *Immigrant Workers: Vital to the U.S. COVID-19 Response, Disproportionately Vulnerable* (Washington, DC: MPI, 2020 revised).

25   Laura Barrón-López and Sabrina Rodriguez, "Democrats Ready Immigration Push for Biden's Early Days," Politico, January 15, 2021.

AR2022_500882

U.S. LEGALIZATION AND THE UNAUTHORIZED IMMIGRANT GROUPS THAT COULD FACTOR IN THE DEBATE

**TABLE 1**

**Subgroups of the Unauthorized Immigrant Population**

| Unauthorized Population Subgroup | Estimated Size (year of estimate) |
| --- | --- |
| DACA-eligibles and DREAMers (those who arrived as minors) | 1.7 million to 2.9 million (2021) (the range depends on definitions of years of U.S. residence, age at entry, and maximum age) |
| Temporary Protected Status (TPS) holders | 320,000 (2020) |
| Essential workers | 1.1 million to 5.6 million (2018) (the range depends on the definition of occupations considered essential) |
| Essential workers with DACA | 72,000 to 361,000 (2020) |
| Farmworkers | 1.2 million (2016) |
| Spouses of U.S. citizens and permanent residents | 1.4 million (2018) |
| Parents living with U.S.-citizen and permanent resident children | 3.4 million (2021) |
| Recipients of repeated discretionary relief | 69,000 to 109,000 (2020) (the range depends on how many people have received discretionary status grants for multiple years) |
| Unauthorized immigrants with possible employer sponsors | At least 1.7 million (2018) |

Note: Estimate of spouses of U.S. citizens and permanent residents includes all spouses of legal permanent residents (LPRs) plus those spouses of U.S. citizens who are estimated to have entered without inspection (versus overstaying a visa). Spouses of U.S. citizens who entered with a visa and overstayed could adjust under current law without triggering a ten-year bar on re-entry to the United States. Sources: Estimates for the Deferred Action for Childhood Arrivals (DACA) and DREAMer cohort and parents living with U.S.-citizen or permanent resident children cohort: Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the 2014-18 American Community Survey (ACS) pooled and the 2008 Survey of Income and Program Participation (SIPP), drawing on an MPI methodology developed in consultation with James Bachmeier of Temple University and Jennifer Van Hook of The Pennsylvania State University, Population Research Institute. Estimates for the Temporary Protected Status (TPS) cohort: MPI calculation of TPS population based on Jill H. Wilson, *Temporary Protected Status: Overview and Current Issues* (Washington, DC: Congressional Research Service, 2018), 5; U.S. Citizenship and Immigration Services (USCIS), "Extension of the Designation of Somalia for Temporary Protected Status," *Federal Register* 85, no. 48 (March 11, 2020): 14229-35; USCIS, "Extension of the Designation of South Sudan for Temporary Protected Status," *Federal Register* 85, no. 212 (November 2, 2020): 69344-51; USCIS, "Extension of the Designation of Syria for Temporary Protected Status," *Federal Register* 84, no. 184 (September 23, 2019): 49751-57; USCIS, "Extension of the Designation of Yemen for Temporary Protected Status," *Federal Register* 85, no. 41 (March 2, 2020): 12313-19. Estimates for the essential worker cohorts: MPI analysis of U.S. Census Bureau data from the pooled 2014–18 ACS and the 2008 SIPP, weighted to 2018 unauthorized immigrant population estimates provided by Jennifer Van Hook of The Pennsylvania State University; Philip Martin and J. Edward Taylor, *Ripe with Change: Evolving Farm Labor Markets in the United States, Mexico, and Central America* (Washington, DC: MPI, 2013), 4. Estimates for the farmworker cohort: Trish Hernandez and Susan Gabbard, *Findings from the National Agricultural Workers Survey (NAWS) 2015-2016: A Demographic and Employment Profile of United States Farmworkers* (N.p.: JBS International, 2018), 52; U.S. Department of Labor, Employment and Training Administration, "Data Limitations," accessed January 12, 2021. Estimates of unauthorized immigrants who entered without inspection were done by MPI using visa overstay rates by country from Robert Warren and Donald Kerwin, 2017, "The 2,000 Mile Wall in Search of a Purpose: Since 2007 Visa Overstays Have Outnumbered Undocumented Border Crossers by a Half Million," *Journal on Migration and Human Security* 5 (1): 124-36. Estimates for recipients of repeated discretionary relief, MPI estimates based on Transactional Records Access Clearinghouse (TRAC), "The Life and Death of Administrative Closure," updated September 10, 2020; USCIS, "Form I-765 Application for Employment Authorization: All Receipts, Approvals, Denials Grouped by Eligibility Category and Filing Type," accessed January 26, 2021.

**AR2022_500883**

## DACA and DREAMer Populations

A path to permanent residence for those covered by DACA and for other DREAMers who entered the United States as children may be the most widely discussed potential legalization program in recent years. MPI estimates up to 1.7 million young people in the United States could be eligible for DACA under its original criteria, in effect as of January 2021;[26] this includes the 641,000 active DACA holders as of September 2020.[27] By mid-2021, all those eligible for DACA will have lived in the United States for at least 13 years. There is broad bipartisan support for providing them permanent residence, though there are different ways of defining this population. Several bills have been introduced in recent years that would provide a pathway to permanent residence for different segments of the DACA-eligible population.[28]

*MPI estimates up to 1.7 million young people in the United States could be eligible for DACA under its original criteria.*

Several versions of the DREAM Act and similar legislative proposals introduced since 2001 have broader eligibility criteria beyond those covered by DACA.[29] Some policymakers have considered eliminating or adjusting age limits to expand the eligible pool. If the requirement under DACA that migrants be under age 16 when they entered the country in 2007 were adjusted in a legalization bill to include those under age 18, an additional 382,000 individuals could become eligible, for a total of 2.1 million. Adjusting the maximum age could also expand the eligible population, as could revisions to cutoff dates and other changes. If the requirement that they be under age 31 as of June 15, 2012 were removed, an additional 208,000 individuals could become eligible, for a total of 1.9 million (see Table 2).

Legislation for DREAMers could also extend eligibility for legal status to those who entered the United States as children after June 15, 2007 (the current cutoff date for DACA eligibility). If a legalization program were to cover those who met the original DACA criteria but moved the cutoff date for entering the country up to 2016, an additional 399,000 individuals could become eligible, for a total of 2.1 million. Changing the cutoff date for entry would expand coverage to young people who entered the country more recently but face the same challenges as the DREAMers who came before them. Other updates to the DACA criteria could make more than 1.1 million additional people eligible for such a legalization program (see Table 2).

---

26  MPI Migration Data Hub, "Estimates of DACA-Eligible Population at U.S. and State Levels," accessed January 20, 2021. This 1.7 million estimate includes 1.3 million people who meet all criteria to apply for the DACA program, whether they have or not; a further 384,000 who meet all criteria but for education; and 14,000 children under age 15 who could age into eligibility provided they remain in school.

27  USCIS, "Approximate Active DACA Recipients: As of September 30, 2020," accessed February 2, 2021.

28  Sarah Pierce, "A Path to Citizenship for 1.8 Million DREAMERs? Despite Talk, No Proposal Would Do So," MPI commentary, February 2018.

29  See, for example, Jeanne Batalova, Ariel G. Ruiz Soto, Sarah Pierce, and Randy Capps, *Differing DREAMs: Estimating the Unauthorized Populations That Could Benefit under Different Legalization Bills* (Washington, DC: MPI, 2017).

AR2022_500884

**TABLE 2**

**Unauthorized Immigrants Eligible under Updated or Expanded DACA Criteria by December 2021**

| Changes to DACA Criteria | Immediately Eligible | Eligible but for Education | Eligible in the Future | Total Eligible |
|---|---|---|---|---|
| No changes | 1,339,000 | 384,000 | 6,000 | 1,729,000 |
| Remove age cap (set at under age 31 as of June 15, 2012) | 1,443,000 | 489,000 | 6,000 | 1,937,000 |
| Raise age at entry to 17 or younger | 1,513,000 | 593,000 | 6,000 | 2,111,000 |
| Move date of entry from current date of June 15, 2007 to 2016 | 1,456,000 | 460,000 | 213,000 | 2,128,000 |
| Move date of entry to 2016 and remove age cap | 1,495,000 | 507,000 | 213,000 | 2,216,000 |
| Remove the age cap, and raise the age at entry to 17 or younger | 1,689,000 | 815,000 | 6,000 | 2,509,000 |
| Move date of entry to 2016 and raise age at entry to 17 or younger | 1,728,000 | 759,000 | 213,000 | 2,700,000 |
| Move date of entry to 2016, remove age cap, and raise age at entry to 17 or younger | 1,804,000 | 868,000 | 213,000 | 2,885,000 |

Notes: MPI estimates of the population eligible for the Deferred Action for Childhood Arrivals (DACA) program under its original criteria include unauthorized immigrant youth who had been in the United States since 2007, were under the age of 16 at the time of arrival, and were under the age of 31 as of 2012. Three populations are estimated: (1) Immediately eligible youth and adults who meet both age and educational criteria (i.e., they will be ages 15 to 39 as of 2021 and are projected to either be enrolled in school or have at least a high school diploma or equivalent); (2) youth and adults who are eligible but for education (i.e., those ages 15 to 39 in 2021 who meet the other requirements but are not projected to have a high school diploma or equivalent and will not be enrolled in school); and (3) children eligible in the future who meet the age-at-arrival requirements but will be age 14 or younger in 2021, and would become eligible when they reach age 15 provided they stay in school. Eligibility due to adult-education program enrollment and ineligibility due to criminal history or lack of continuous U.S. presence were not modeled due limitations of Census data. For the immediately eligible population, the MPI estimates capture those meeting the criteria to apply for DACA, whether or not they ever did. As a result, past and current DACA recipients would be included within the MPI estimates.

Source: MPI analysis of U.S. Census Bureau data from the 2014-18 American Community Survey (ACS) pooled and the 2008 Survey of Income and Program Participation (SIPP), drawing on a methodology developed in consultation with James Bachmeier of Temple University and Jennifer Van Hook of The Pennsylvania State University, Population Research Institute.

The COVID-19 pandemic has brought attention to many DACA recipients and DREAMers working in "essential" industries. Under the broadest definition of essential industries, MPI estimates that 361,000 of the 641,000 current DACA holders are employed in essential jobs, 268,000 are under a slightly narrower definition, and 72,000 under the most limited definition (see Essential Workers section below for a more detailed explanation of these definitions).[30] Legalizing DACA holders or a broader population of DREAMers

---

30   MPI analysis of U.S. Census Bureau data from the 2014-18 American Community Survey (ACS) pooled and the 2008 Survey of Income and Program Participation (SIPP), drawing on a methodology developed in consultation with James Bachmeier of Temple University and Jennifer Van Hook of The Pennsylvania State University, Population Research Institute; USCIS, "Approximate Active DACA Recipients: As of September 30, 2020;" Francine D. Blau, Josefine Koebe, and Pamela A. Meyerhofer, "Who Are the Essential and Frontline Workers?" (NBER Working Paper 27791, National Bureau of Economic Research, Cambridge, MA, September 2020).

would thus offer permanence to people who both came to the United States as children and are now doing critical jobs.

## Temporary Protected Status Holders

TPS offers temporary legal protection and work authorization to nationals of countries facing natural disasters, armed conflict, or other temporary and extraordinary circumstances, as designated by DHS. Its purpose is to provide temporary protection to those subject to removal until the country of origin is again safe for repatriation. The statute does not define a time period that could be considered "temporary."

*As of September 2020, an estimated 320,000 people from ten countries had TPS.*

As of September 2020, an estimated 320,000 people from ten countries had TPS.[31] All had been in the United States for at least three years, though 80 percent (256,000) had TPS for at least ten years.[32]

The Trump administration terminated TPS for nationals of six of these countries (97 percent of beneficiaries), arguing that years-long stays were no longer temporary and that the dangerous conditions that led to the original TPS designations had been resolved, though none of these terminations had gone into effect as of January 2021.[33] Several bills introduced since the termination of TPS for these countries' nationals would have legalized those with TPS or eligible for it as of a certain date, prior to termination.[34] A legalization bill for TPS holders would require a three-fifths vote in the Senate to overcome or repeal the prohibition in the statute against granting permanent residence to those holding TPS.

Extending legalization to certain TPS holders would recognize that a significant population—such as those having been permitted to remain in the United States for more than a decade—can no longer be realistically considered temporary migrants. Instead, it would acknowledge that the government has allowed TPS holders to stay for prolonged periods during which they have put down roots.

## Essential Workers

Throughout the COVID-19 pandemic, foreign-born workers, including unauthorized immigrants, have been key to the continued functioning of what have been considered essential industries. Unlike DACA and TPS holders, essential workers have not been granted any form of protection. Of the 6.8 million employed

---

31   These ten countries are El Salvador, Haiti, Honduras, Nepal, Nicaragua, Somalia, South Sudan, Sudan, Syria, and Yemen. Not all nationals from these countries are eligible; they must have lived in the United States since certain dates and meet other criteria. MPI calculation of Temporary Protected Status (TPS) population based on Jill H. Wilson, *Temporary Protected Status: Overview and Current Issues* (Washington, DC: Congressional Research Service, 2018), 5; USCIS, "Extension of the Designation of Somalia for Temporary Protected Status," *Federal Register* 85, no. 48 (March 11, 2020): 14229-35; USCIS, "Extension of the Designation of South Sudan for Temporary Protected Status," *Federal Register* 85, no. 212 (November 2, 2020): 69344-51; USCIS, "Extension of the Designation of Syria for Temporary Protected Status," *Federal Register* 84, no. 184 (September 23, 2019): 49751-57; USCIS, "Extension of the Designation of Yemen for Temporary Protected Status," *Federal Register* 85, no. 41 (March 2, 2020): 12313-19.

32   MPI calculation based on continuous residence requirements in USCIS, "Temporary Protected Status—Countries Currently Designated for TPS," updated December 7, 2020; MPI calculation based on *Federal Register* notices, available at U.S. Department of Justice, "Temporary Protected Status," updated December 9, 2020.

33   The Trump administration terminated TPS for El Salvador (which has the largest TPS population), Haiti, Honduras, Nepal, Nicaragua, and Sudan.

34   See, for example, *American Dream and Promise Act of 2019*, HR 6, 116th Cong., 1st sess., *Congressional Record* 165, no. 93, daily ed. (March 12, 2019): H 4292; *Keeping Salvadoran Families Together Act*, HR 4956, 115th Cong., 2nd sess. (February 6, 2018).

**AR2022_500886**

unauthorized immigrants, MPI estimates that between 1.1 million and 5.6 million (between 16 percent and 82 percent of the overall unauthorized population in the labor force) were working in such industries as of 2018, depending on the criteria used to select the occupations deemed essential.

A narrow definition, developed by MPI, encompasses industries directly related to combating the public-health crisis and to providing the U.S. population with basic necessities. By that definition, MPI estimates 1.1 million unauthorized immigrants work in essential industries, with the biggest shares in health care, food production and retail, and manufacturing (see Table 3). Of this 1.1 million, 72,000 are current DACA recipients, as mentioned above. These workers ensure that the country maintains its food supply, cares for coronavirus patients, and produces supplies needed to combat the outbreak.

A broader definition includes all "frontline" workers—those who work in occupations that do not allow most employees to work from home.[35] MPI estimates 4.7 million of these workers are unauthorized immigrants, out of whom 268,000 are DACA holders. These workers are among those ensuring that the economy continues to function and are, at the same time, more likely to be exposed to COVID-19.

The broadest definition of "essential" workers comes from the U.S. Cybersecurity and Infrastructure Security Agency (CISA) in DHS.[36] CISA issued guidance in 2020 that was originally meant to inform state and local decisions about who would be exempted from stay-at-home orders. Its purpose evolved to inform decisions about risk management in workplaces and to help jurisdictions prioritize distribution of resources to protect essential workers from the virus. Its definition of essential encompasses critical infrastructure industries, including those that directly provide and maintain critical infrastructure, as well as those involved in associated supply chains.

MPI estimates a majority of unauthorized immigrant workers—5.6 million out of the 6.8 million in the workforce—fall into one of the categories described in CISA's guidance. Of these 5.6 million, 361,000 are DACA holders. While this guidance is helpful in showing how many workers are employed in industries connected to critical infrastructure, it may be less useful in deciding how to prioritize eligibility for legal status for the most in-demand and most affected workers during the pandemic because of how broad the guidance is, in that it does not distinguish between workers who can and cannot work from home.

---

35   This definition comes from Blau, Koebe, and Meyerhofer, "Who Are the Essential and Frontline Workers?" The authors define frontline workers as those "in occupation groups where a third or less of workers can feasibly work from home."

36   Memorandum from Christopher C. Krebs, Director, Cybersecurity and Infrastructure Security Agency (CISA), "Advisory Memorandum on Ensuring Essential Critical Infrastructure Workers Ability to Work During the COVID-19 Response," August 18, 2020.

AR2022_500887

**TABLE 3**

**Number of Civilian, Unauthorized Immigrant Essential Workers by Major Industry Group, 2018**

| | Definition 1: Food Industries, Health Care, Deliveries, Scientific Research, and First Responders | Definition 2: Frontline Workers | Definition 3: CISA-Defined Essential Workers |
|---|---|---|---|
| Accommodation and food services | N/A | 974,000 | 1,057,000 |
| Agriculture, forestry, fishing, and hunting | 255,000 | 269,000 | 283,000 |
| Construction | N/A | 1,295,000 | 1,352,000 |
| Educational services | N/A | 44,000 | 222,000 |
| Finance and insurance, and real estate and rental and leasing | N/A | 68,000 | 185,000 |
| Health care | 302,000 | 263,000 | 327,000 |
| Information | N/A | 17,000 | 57,000 |
| Manufacturing | 172,000 | 383,000 | 497,000 |
| Mining, quarrying, and oil and gas extraction | N/A | 17,000 | 23,000 |
| Other services | N/A | 104,000 | 110,000 |
| Professional, scientific, and management, and administrative, and waste management services | 20,000 | 605,000 | 686,000 |
| Public administration | 12,000 | 19,000 | 46,000 |
| Retail trade | 173,000 | 255,000 | 319,000 |
| Social assistance | 40,000 | 76,000 | 104,000 |
| Transportation and warehousing | 23,000 | 167,000 | 215,000 |
| Utilities | N/A | 9,000 | 15,000 |
| Wholesale trade | 65,000 | 88,000 | 117,000 |
| **Total** | **1,063,000** | **4,654,000** | **5,615,000** |

Notes: N/A means that no industries within the industry group were included in that definition of "essential" jobs. The arts, entertainment, and recreation industry has been excluded because none of the three definitions included any unauthorized immigrant essential workers in that industry.

Sources: These 2018 data result from MPI analysis of U.S. Census Bureau data from the pooled 2014–18 ACS and the 2008 SIPP, weighted to 2018 unauthorized immigrant population estimates provided by Van Hook. The definitions of essential and frontline workers employ the coding used in Francine D. Blau, Josefine Koebe, and Pamela A. Meyerhofer, "Who Are the Essential and Frontline Workers?," NBER Working Paper 27791, National Bureau of Economic Research, Cambridge, MA, September 2020. However, MPI added educational workers in the definition of essential workers.

Regardless of how essential occupations are defined, a sizeable number in industries designated as critical during this crisis period are unauthorized immigrants. They are also disproportionately susceptible to contracting the infection, either because of crowded working conditions, such as those reported in meatpacking plants;[37] dense living conditions, such as those provided to temporary farmworkers; or

---

37   Kimberly Kindy, "More Than 200 Meat Plant Workers in the U.S. Have Died of COVID-19. Federal Regulators Just Issued Two Modest Fines," *Washington Post*, September 13, 2020.

AR2022_500888

because of direct work with COVID-19 patients. Yet most lack legal status and thus are vulnerable to deportation.

During the pandemic, other countries have provided legal protections to certain unauthorized immigrants given their role as essential workers. Italy granted six-month residence permits to migrants working in industries including agriculture, food processing, and caregiving.[38] Canada has offered permanent residence to a population of essential workers estimated to be 1,000, targeting the small number of asylum seekers who worked in hospitals or nursing homes in spring 2020.[39]

Essential workers demonstrate the dual argument for legalization: that legal status would provide legal protections and better access to health care for people who are risking their lives to serve the country, as well as benefit the United States at large by securing an essential workforce and reducing public-health risks overall.

## Farmworkers

While essential workers have emerged as a subgroup more recently, there has been longstanding support for specialized legalization programs for farmworkers. A separate process to legalize farmworkers in the *Immigration Reform and Control Act of 1986* (IRCA) allowed 1.1 million to become permanent residents. Excluding those on temporary agricultural work visas, as of 2016, about 49 percent of the estimated 2.4 million farmworkers in the United States were unauthorized immigrants.[40]

*As of 2016, about 49 percent of the estimated 2.4 million farmworkers in the United States were unauthorized immigrants.*

Unauthorized immigrant farmworkers have been recognized by both Democrats and Republicans as essential to the U.S. agriculture industry[41]—a sentiment likely increased since the COVID-19 pandemic has shone a light on the workers who are part of the essential domestic food supply. Since IRCA, other attempts at comprehensive immigration reform have included special pathways for legalizing farmworkers. For example, the 2013 comprehensive immigration reform bill that passed the Senate included an expedited legalization pathway for farmworkers who had worked in agriculture for a total of at least 100 days in 2011 and 2012.[42] The Congressional Budget Office estimated that 1.5 million farmworkers and their spouses and children could have attained LPR status through this pathway.[43]

---

38   Virginia Pietromarchi, "Thousands of Undocumented Migrants to Get Italian Work Permits," Al Jazeera, May 13, 2020.

39   Colin Harris, "Some Asylum Seekers Who Cared for Patients in Pandemic to Get Permanent Residency," CBC News, August 14, 2020.

40   Philip Martin and J. Edward Taylor, *Ripe with Change: Evolving Farm Labor Markets in the United States, Mexico, and Central America* (Washington, DC: MPI, 2013), 4; Trish Hernandez and Susan Gabbard, *Findings from the National Agricultural Workers Survey (NAWS) 2015-2016: A Demographic and Employment Profile of United States Farmworkers* (N.p.: JBS International, 2018), 52; U.S. Department of Labor, Employment and Training Administration, "Data Limitations," accessed January 12, 2021.

41   See, for example, statements from members of Congress on why farmworkers should be legalized: Mario Diaz-Balart, "Bipartisan Farm Workforce Modernization Act Passes the House of Representatives" (press release, December 11, 2019).

42   *Border Security, Economic Opportunity, and Immigration Modernization Act*, S. 744, 113th Cong., 1st sess., *Congressional Record* 159, no. 51, daily ed. (April 16, 2013): S2684.

43   Congressional Budget Office (CBO), "S. 744 Border Security, Economic Opportunity, and Immigration Modernization Act" (cost estimate, CBO, Washington, DC, June 18, 2013), 21.

More recently, Congress has tried to address farmworkers outside the comprehensive immigration reform framework. For example, in 2019, the House passed, on a bipartisan basis, the *Farm Workforce Modernization Act*, which similarly offered a pathway to legal residence for farmworkers who had worked at least 180 days in agriculture in the prior two years. The Senate did not consider this bill.[44]

## Family- and Employer-Sponsored Immigrants

Other groups of unauthorized immigrants would be eligible to legalize if not for provisions of the law that put up roadblocks for those who have stayed illegally in the country. Immigrants who have resided illegally in the United States for at least six months and then leave are barred from re-entry for three years, and those illegally present for at least 12 months are barred from return for ten years, due to provisions enacted under the *Illegal Immigration Reform and Immigrant Responsibility Act* (IIRIRA).[45]

Known as the three- and ten-year or unlawful presence bars, these provisions largely prevent immigrants who entered the country illegally but subsequently became eligible for lawful visas from getting legal permanent residence because (with some exceptions) they must leave the country to apply for a green card at a U.S. consulate abroad.[46] Knowing that leaving the country could trigger years-long separations from families or jobs leads immigrants to remain in the country without legal status, even though they are otherwise eligible for it through sponsorship by a family member or employer.[47]

> *An estimated 1.4 million unauthorized immigrants who are the spouses of U.S. citizens or LPRs could be eligible for permanent residence through family sponsorship.*

An estimated 1.4 million unauthorized immigrants who are the spouses of U.S. citizens or LPRs could be eligible for permanent residence through family sponsorship. An estimated 1.7 million unauthorized immigrants over age 25 have a bachelor's degree or higher. If the current pattern of employer sponsorship for green cards is any guide, a sizeable section of this population may have or could find employers to sponsor them for a green card (see Table 4). An additional group of unauthorized immigrants who do not have a bachelor's degree but work in skilled occupations could also be candidates for employer sponsorship for a green card.

---

44  *Farm Workforce Modernization Act of 2019*, HR 5038, 116th Cong., 1st sess., *Congressional Record* 165, no. 180, daily ed. (November 12, 2019): H8783.

45  *Illegal Immigration Reform and Immigrant Responsibility Act of 1996*, H. Rept. 104-828, 104th Cong., 2nd sess. September 24, 1996.

46  People who are being sponsored as immediate relatives (spouses, children, and parents of U.S. citizens) are exempted from this requirement if they entered the country legally and overstayed their visa. For a full list of exceptions, see USCIS, "Chapter 3 - Unlawful Immigration Status at Time of Filing (INA 245(c)(2))," USCIS Policy Manual, accessed January 12, 2021.

47  Kristi Lundstrom, "The Unintended Effects of the Three- and Ten-Year Unlawful Presence Bars," *Law and Contemporary Problems* 76, nos. 3 & 4 (2013): 389-412.

**AR2022_500890**

TABLE 4

**Unauthorized Immigrants Subject to Ten-Year Bar Who Have Potential Sponsors, 2018**

|  | Unauthorized Immigrants in the United States for One Year or Longer |
|---|---|
| Spouse of U.S. citizen or legal permanent resident (LPR)* | 1,380,000 |
| Spouse of U.S. citizen | 712,000 |
| Spouse of LPR | 668,000 |
| Potentially eligible for employer sponsorship** | At least 1,671,000 |

*Estimate includes all spouses of legal permanent residents (LPRs) plus those spouses of U.S. citizens who are estimated to have entered without inspection (versus overstaying a visa). Spouses of U.S. citizens who entered with a visa and overstayed could adjust under current law without triggering a ten-year bar. Other categories of family sponsorship not listed here are very difficult to estimate with any precision.

**The estimate of immigrants eligible for employer sponsorship is the number of unauthorized immigrants age 25 or older with a bachelor's degree or higher. The assumption is that this is the population that would be most likely to have an employer willing to sponsor them, based on current employment-based visa requirements and usage patterns. There may be overlap between people who could be sponsored by employers and those who could be sponsored by family members.

Sources: MPI analysis of U.S. Census Bureau data from pooled 2014-18 ACS, and 2008 SIPP, with legal-status assignments using a unique MPI methodology developed in consultation with Bachmeier and Van Hook. Estimates of unauthorized immigrants who entered without inspection were estimated using visa overstay rates by country from Robert Warren and Donald Kerwin, 2017, "The 2,000 Mile Wall in Search of a Purpose: Since 2007 Visa Overstays Have Outnumbered Undocumented Border Crossers by a Half Million," *Journal on Migration and Human Security* 5 (1): 124-36.

An unknowable, likely larger, number of unauthorized immigrants have U.S.-citizen children or U.S.-citizen or LPR parents who could sponsor them for family-based visas. Because they do not live in the same households, these potential beneficiaries are not included in the data required to make these estimates.

## Parents of U.S. Citizens and Lawful Permanent Residents

Parents of U.S. citizens or LPRs who have been in the United States for a specified period also have been considered for legalization, as the Obama administration attempted to do in late 2014 within the narrower scope of its executive action authority through a program similar to DACA, known as the Deferred Action for Parents of Americans (DAPA) program. However, the Obama action was quickly struck down in federal court, a decision later affirmed by the Supreme Court.[48] DAPA would have protected parents who had been in the United States for about five years—since 2010—and who were not otherwise immigration enforcement priorities. At the time, MPI estimated that 3.3 million unauthorized immigrants with U.S.-citizen or permanent resident children living in their households would have been eligible.[49] If DAPA were to be reinstated in 2021 with adjusted criteria to include those in the United States since 2016, thereby maintaining the five-year continuous residence requirement, MPI estimates that 3.4 million would be eligible.[50]

---

48   *State of Texas et al. v. United States of America et al.*, Civil No. B-14-254 (U.S. District Court for the Southern District of Texas, order of temporary injunction, February 16, 2015); *United States et al. v. Texas et al.*, No. 15–674 (U.S. Supreme Court, June 23, 2016).

49   Randy Capps, Heather Koball, James D. Bachmeier, Ariel G. Ruiz Soto, Jie Zong, and Julia Gelatt, *Deferred Action for Unauthorized Immigrant Parents: Analysis of DAPA's Potential Effects on Families and Children* (Washington, DC: MPI, 2016).

50   MPI analysis of U.S. Census Bureau data from pooled 2014-18 ACS, and 2008 SIPP, with legal-status assignments using a unique MPI methodology developed in consultation with Bachmeier and Van Hook. This estimate does not include parents with U.S.-citizen and legal permanent resident (LPR) children ages 18 or older who reside outside of the household. In 2016, MPI estimated there were 340,000 parents with U.S.-citizen adult children outside the household. This estimate likely would be larger as of 2021 due to children aging and moving outside their parents' households since 2016. For the 2016 estimate, see Capps, Koball, Bachmeier, Ruiz Soto, Zong, and Gelatt, *Deferred Action for Unauthorized Immigrant Parents*.

**AR2022_500891**

## Other Long-Term Residents with Discretionary Relief

Sixty percent (6.6 million) of the 11 million unauthorized immigrants in the country, including some with DACA and TPS, have resided in the country for ten years or longer, as stated  above.[51] Segments of this long-term population have been granted various forms of discretionary relief by DHS or by immigration judges, in the form of stays of removal or deferred action, for example. Discretionary relief protects unauthorized immigrants from deportation, and some forms allow eligibility for work authorization. The protections are temporary and sometimes can be terminated with little or no prior notice. They do not offer a pathway to permanent residence.

*Sixty percent of the 11 million unauthorized immigrants in the country have resided in the country for ten years or longer.*

Deferred action is granted on a humanitarian basis, for example to someone who has a U.S.-citizen dependent or is responsible for caring for a sick relative.[52] It can be granted, before a final order of removal is issued, by U.S. Immigration and Customs Enforcement (ICE), USCIS, or an immigration judge. ICE may grant stays of removal for humanitarian reasons, even after a noncitizen has been ordered removed. ICE, for example, granted stays of removal to noncitizens with removal orders who did not meet the administration's enforcement priorities during the final years of the Obama presidency.[53] In fiscal year 2020, 17,000 foreign nationals other than DACA recipients were granted deferred action and fewer than 24,000 were granted stays of removal.[54] Of this total, the duration for which they have been beneficiaries of the relief is not known. However, it is not uncommon that immigrants might consistently have these forms of short-term relief renewed for years on end, causing some with significant community ties to live in precarity for decades and face deportation at any time.[55]

Additionally, there are 69,000 noncitizens whose immigration court cases have been administratively closed as a form of discretion.[56] Between 2012 and 2017, immigration judges closed 88,000 cases as an exercise of prosecutorial discretion for people who did not meet the Obama administration's enforcement priorities. As of July 2020, proceedings had not been reopened in 69,000 such cases.[57] Noncitizens whose cases are administratively closed cannot be removed without reopening their removal proceedings, but they are not authorized to work in the United States.

---

51   MPI Migration Data Hub, "Profile of the Unauthorized Population: United States."

52   Shoba Sivaprasad Wadhia, "My Great FOIA Adventure and Discoveries of Deferred Action Cases at ICE," *Georgetown Immigration Law Journal* 27 (2013): 345-85.

53   Randy Capps, Muzaffar Chishti, Julia Gelatt, Jessica Bolter, and Ariel G. Ruiz Soto, *Revving Up the Deportation Machinery: Enforcement under Trump and the Pushback* (Washington, DC: MPI, 2018).

54   The number of stays of removal issued in fiscal year (FY) 2020 is based on the number of orders of supervision issued. There were 23,433 orders of supervision issued in FY 2020. People granted stays of removal typically receive orders of supervision also. However, orders of supervision may be issued to other noncitizens who cannot be deported but have already been ordered removed, so it is likely that 23,433 is an overestimate of the number with stays of removal. See USCIS, "Form I-765 Application for Employment Authorization: All Receipts, Approvals, Denials Grouped by Eligibility Category and Filing Type," accessed January 26, 2021.

55   See, for example, Rebecca Plevin, "'Do We Have to Say Goodbye?': Essential Worker, Mother of 4, Set to Be Deported in June," *Desert Sun*, May 26, 2020; Jomana Karadsheh and Kareem Khadder, "'Pillar of the Community' Deported From Us After 39 Years to a Land He Barely Knows," CNN, February 9, 2018.

56   Transactional Records Access Clearinghouse (TRAC), "The Life and Death of Administrative Closure," updated September 10, 2020.

57   TRAC, "The Life and Death of Administrative Closure."

**AR2022_500892**

While such discretionary forms of relief are temporary, many individuals have them for extended periods of time. As with TPS, legalization proponents argue that those whom the government has continually allowed to stay in the country, often for humanitarian reasons, should at some point—for example, after ten or more years—be given the opportunity to be considered for permanent residency.

Taken together, although the categories described above include overlapping numbers and characteristics, disaggregating the unauthorized population of approximately 11 million illustrates the range and complexity of circumstances and equities that have accumulated over more than 30 years and are now laced through the legalization question and public debates. As a policy matter, the continued presence of such a sizeable proportion of the foreign-born population having lived and worked in the country for long periods but lacking certainty in their legal status represents a failure of policymaking that brings harm not only to millions of individuals and their families but increasingly to the economic, political, and social well-being of the country at large.

# 3    Policy Options: Legislative Reform and Executive Action

There are two roads to take with regards to legalization. One is for Congress to enact legislation, either creating a new pathway to legal status for a share of the unauthorized population or removing obstacles to existing paths. The other is for the administration to employ executive actions that provide temporary protections for specific segments of the unauthorized population.

## A.    *Legislative Solutions*

Legalization established by statute provides the most enduring form of relief. There is a spectrum of options, many with precedents, for legislation that could confer eligibility for legal status on the unauthorized. Past actions have ranged from covering broad populations to targeted segments. Protections also may encompass anything from a quick pathway to citizenship to more modest and narrower legal protections.[58]

### Pathways to Citizenship for a Broad Population

The broadest legalization program would cover most of the unauthorized population, as Biden proposed on his first day in office with a plan that would cover unauthorized immigrants in the United States as of January 1, 2021,[59] and set out a path to citizenship for applicants meeting certain requirements. The Biden plan outline supports allowing unauthorized immigrants to apply for an initial temporary status, then permanent residence after five years if they pass background checks and pay taxes, and finally the ability to apply for citizenship after having LPR status for three years if they pass additional background checks and demonstrate a knowledge of English and U.S. civics. The proposal would also provide an expedited path for

---

58   Marc R. Rosenblum, *Immigration Legalization in the United States and European Union: Policy Goals and Program Design* (Washington, DC: MPI, 2010), 6. Rosenblum explained that "political conditions may permit a broader legalization … if benefits are limited to temporary visas, while a legalization leading to permanent visas may need to be more limited in scope in order to gain public support and political approval."

59   Biden-Harris Transition, "Fact Sheet: President Biden Sends Immigration Bill to Congress."

DREAMers, TPS holders, and certain farmworkers, allowing them to immediately apply for LPR status and then for citizenship after three years.

There has been one similar program passed into law in U.S history—IRCA, enacted in 1986, though Biden's proposal would cover a much broader population of unauthorized immigrants. IRCA legalized most unauthorized immigrants in the country at the time through its general legalization and through separate targeted measures for farmworkers and certain Cubans and Haitians.[60] Of the approximately 3.2 million unauthorized immigrants living in the United States at the time of the bill's passage, 1.6 million legalized through IRCA's general legalization, and another 1.1 million farmworkers and 38,000 Cubans and Haitians also received green cards.[61]

Applicants had to demonstrate continuous residence since 1982, pay a $185 filing fee, and have a clean criminal history and proof of financial resources to ensure self-sufficiency to qualify for the initial temporary status. To adjust to permanent residence, holders of this temporary status had to additionally demonstrate either a basic knowledge of English and U.S. history and government or show that they were enrolled in courses to achieve this knowledge. Subsequent research showed that those who had legalized were able to increase their educational attainment and boost their incomes.[62]

The 1986 legislation has been criticized for a number of reasons. The farmworker eligibility provisions were considered too lenient and as inviting fraud.[63] The accompanying employer sanctions for hiring unauthorized immigrants proved easy for employers to evade and difficult for the government to enforce. The resources for border enforcement included in the legislation were inadequate. A share of the population that had arrived more recently than the five-year cutoff remained uncovered. And the legislation did not include increased numbers of visas for working legally in the country at a time of robust economic growth. As a result, the unauthorized population began to grow again in the 1990s.[64]

In part due to IRCA's shortcomings, subsequent attempts to enact similar programs have failed.[65] The most recent legalization came in a comprehensive reform bill in 2013 that passed the Senate but was not taken up in the House. Its path to citizenship included two $1,000 fines, the participation of employers, complex procedures to renew an initial temporary status, and a requirement for processing years-long existing green-card backlogs prior to applications by newly legalizing immigrants.[66]

---

60   Kerwin, *More than IRCA*.

61   Ruth Ellen Wasem, *Unauthorized Aliens Residing in the United States: Estimates Since 1986* (Washington, DC: Congressional Research Service, 2012); Kerwin, *More than IRCA*.

62   Kalena E. Cortes, "Achieving the DREAM: The Effect of IRCA on Immigrant Youth Postsecondary Educational Access," *American Economic Review* 103, no. 3 (May 2013): 428-32. On income, initial research identified a general increase in wages for legalized immigrants, but more recent research has contended that such benefits accrued only to high-skilled immigrants who legalized. See Magnus Lofstrom, Laura Hill, and Joseph Hayes, "Wage and Mobility Effects of Legalization: Evidence from the New Immigrant Survey," *Journal of Regional Science* 53 (2013): 171-97.

63   Betsy Cooper and Kevin O'Neil, *Lessons from the Immigration Reform and Control Act of 1986* (Washington, DC: MPI, 2005).

64   Peter Brownell, "The Declining Enforcement of Employer Sanctions," *Migration Information Source*, September 1, 2005.

65   For example, *Comprehensive Immigration Reform Act of 2006*, S. 2611, 109th Cong., 2nd sess., *Congressional Record* 152, no. 44, daily ed. (April 7, 2006): S3378; *Comprehensive Immigration Reform Act of 2007*, S. 1348, 110th Cong., 1st sess., *Congressional Record* 153, no. 76, daily ed. (May 9, 2007): S5869; *Border Security, Economic Opportunity, and Immigration Modernization Act*, S. 744.

66   National Immigration Law Center (NILC), "Summary and Analysis: Border Security, Economic Opportunity, and Immigration Modernization Act of 2013," NILC, updated August 15, 2013; María E. Enchautegui, "Legalization Programs and the Integration of Unauthorized Immigrants: A Comparison of S. 744 and IRCA," *Journal on Migration and Human Security* 2, no. 1 (2014): 1-13.

Thus, even a broad legalization program aimed at sizeable populations can, in practice, reach varying shares of unauthorized populations, depending on the eligibility requirements it establishes.[67] The Biden plan outlines a broad approach by calling for a cutoff date for eligibility of January 1, 2021. Congress could establish a less recent date for continuous residence in the United States, as it did in IRCA, as well as mandate certain employment history, lack of criminal history, English ability, and/or payment of fines, among other possibilities. The precise length of a continuous residence requirement would affect how many immigrants would be eligible. MPI estimates that a little over 9.5 million unauthorized immigrants had been in the United States at least three years as of 2018, and slightly more than 8.5 million had been in the United States at least five years. Requirements beyond residence ones would shrink the eligible population to different degrees.[68]

## Reviving an Historical Approach

Another much simpler approach to legalization that would still cover a significant population—though smaller than a broad legalization—would be to update the date for registry in immigration law. The registry provision was last amended as part of IRCA and offers a straightforward process for legalization that has deep roots in immigration history.

Registry has been part of U.S. immigration law since 1929 when the *Registry Act* was enacted. It allowed noncitizens without immigration status to adjust to permanent residence if they entered the country prior to June 3, 1921, had resided in the United States since then, and had demonstrated good moral character. Congress has advanced the entry date four times, most recently in 1986, when it established eligibility for those who entered the country prior to January 1, 1972.[69]

*Registry has been part of U.S. immigration law since 1929 when the Registry Act was enacted ... The rationale is akin to that of statutes of limitation.*

Between 1930 and 2018, 410,000 immigrants received green cards through the registry provisions.[70] Registry aims to resolve the issue of legal status for those who have been in the country for an extended period. The rationale is akin to that of statutes of limitation, which do  not exist in immigration law. That is,

---

67  See, for example, the suggestion that designers of any legalization program can adjust four variables to broaden or narrow it: qualifications (cutoff date, grounds for exclusion, and continuous presence duration); requirements (fines/fees that must be paid, and passing a language/civics test); benefits (temporary status with no option of permanence, temporary status with the possibility of adjustment to permanence, or immediate permanence); program design/implementation (one-stage vs. phased program). See Rosenblum, *Immigrant Legalization in the United States and European Union*.

68  For example, research found that different types of requirements in five major legalization bills introduced between 2006 and 2010 impacted the eligible population differently. Language requirements made ineligible the most unauthorized immigrants, followed by employment requirements, and then continuous residence requirements. See Marc R. Rosenblum, Randy Capps, and Serena Yi-Ying Lin, *Earned Legalization: Effects of Proposed Requirements on Unauthorized Men, Women, and Children* (Washington, DC: MPI, 2011).

69  Congressional Research Service (CRS), *Immigration: Registry as Means of Obtaining Lawful Permanent Residence* (Washington, DC: CRS, 2001).

70  MPI calculation based on House Judiciary Committee, *Recording the Lawful Admission for Permanent Residence of Certain Aliens Who Entered the United States Prior to June 28, 1940*, House Report No. 1727 (Washington, DC: U.S. Congress, 1958); Department of Justice, *Annual Report of the Immigration and Naturalization Service* (Washington, DC: Department of Justice, various years); Department of Justice, *Statistical Yearbook of the Immigration and Naturalization Service* (Washington, DC: Department of Justice, various years); Department of Homeland Security (DHS), Office of Immigration Statistics, *Yearbook of Immigration Statistics* (Washington, DC: DHS, various years).

that at a certain point no further public interest is served by pursuing long-ago violations. Rather, it is in the public interest to—in the case of immigration—facilitate full legal status.

Different approaches could be used to revive the registry statute. One is to follow past practice by carrying out a one-time update of the registry date. Historically, the registry date has been between eight and 18 years prior to the date of updating the provision. On average, the prior interval has been 15 years. If a new registry date were to be set in accordance with this historical pattern, MPI estimates that, as of 2018, between 2.8 million and 8.0 million people would be eligible to apply for LPR status (see Table 5).

TABLE 5

**Unauthorized Immigrants Potentially Eligible to Adjust Status under Updated Registry Dates of January 1, 2000-2010, as of 2018**

| Registry Date | Eligible Population | Share of Unauthorized Population |
|---|---|---|
| 2000 | 2,811,000 | 26% |
| 2001 | 3,641,000 | 33% |
| 2002 | 4,213,000 | 38% |
| 2003 | 4,691,000 | 43% |
| 2004 | 5,148,000 | 47% |
| 2005 | 5,650,000 | 51% |
| 2006 | 6,233,000 | 57% |
| 2007 | 6,735,000 | 61% |
| 2008 | 7,195,000 | 66% |
| 2009 | 7,613,000 | 69% |
| 2010 | 7,957,000 | 72% |

Note: To calculate how many unauthorized immigrants would be eligible for each potential registry date, MPI looked at the year of immigration of each unauthorized immigrant in its five-year data file, and added up how many entered the United States before each registry date.
Source: MPI analysis of U.S. Census Bureau data from pooled 2014-18 ACS, and 2008 SIPP, with legal-status assignments using a unique MPI methodology developed in consultation with Bachmeier and Van Hook.

In addition to a one-time advancing of the registry date, Congress could require consideration of advancing the registry date at periodic intervals, for example every five years. Such a measure would trigger a process of systematic congressional review of the trends and characteristics attendant to the existence of an unauthorized population, with the goal of acting to prevent the growth of such a sizeable unauthorized population again. This would not be a unique approach. Countries in Europe have commonly conducted multiple broad legalization efforts, with the understanding that a one-time program will inevitably become outdated.[71]

## Pathway to Citizenship for Designated Groups

Despite the prominence of IRCA in the national memory, smaller, targeted programs combined have provided legal status to more people in the United States over time than IRCA's general legalization

---

71   Kate Brick, *Regularizations in the European Union: The Contentious Policy Tool* (Washington, DC: MPI, 2011).

program did.[72] Such programs include the *Cuban Adjustment Act* of 1966, which provided a fast track to permanent residence for Cubans admitted or paroled into the United States; the *Nicaraguan Adjustment and Central American Relief Act* (NACARA) of 1997, which allowed certain Central American and Cuban asylum seekers to adjust to LPR status; and the *Haitian Refugee Immigration Fairness Act* of 1998, making some Haitian asylum seekers eligible for permanent residence. They also include the components of IRCA that made certain farmworkers and Cubans and Haitians eligible to legalize. Through these five programs, more than 3 million immigrants have been granted green cards.[73]

However, since 2000, there has been similar legislation for just two small populations. The *Help Haiti Act*, passed in 2010, provided a path to permanent residence for Haitian orphans undergoing U.S. adoptions who had been paroled into the United States during a four-month period after a devastating earthquake in 2010. The *Liberian Refugee Immigration Fairness Act*, passed as part of the *National Defense Authorization Act* for FY 2020, provided a path to permanent residence for several thousand Liberians in the country since November 2014. As of October 2020, at least 261 of the 2,532 applications received had been approved, and most of the rest were pending.[74]

Although rare since 2000, legalization programs for subgroups of the population have garnered political and public support than for a broader population.[75]

### Statutory Protections Granting Legal Status Short of Permanent Residence

Congress could provide less than the full protections that come with permanent resident status and a pathway to citizenship, but still allow broad or designated groups within the unauthorized immigrant population to reside and remain in the country with a more secure legal status. This approach would require creating a new legal status that would provide protection from removal and eligibility for work authorization. It would be renewable at regular intervals, for example every five years, subject to a clean criminal history, other background checks, and payment of requisite fees or fines.

In being formalized by Congress as part of immigration law, such a status would be akin to DACA but would be more stable, durable, and available to broader segments of the unauthorized population because it would be statutorily provided. As a program created administratively, DACA has been vulnerable to court challenges and to reversal by a successor administration, demonstrated in the September 2017 Trump administration directive seeking to wind down the program and the July 2020 attempt to reduce the validity period to one year after federal courts kept the program alive.[76] DACA also does not constitute a statutorily recognized legal status. A statutory status, on the other hand, would allow those eligible to adjust to LPR status through another provision of immigration law, such as through family or employer sponsorship.

---

72   Kerwin, *More than IRCA*.

73   MPI calculation based on DHS, Office of Immigration Statistics, *Yearbook of Immigration Statistics* (various years); Department of Justice, *Statistical Yearbook of the Immigration and Naturalization Service* (various years); Department of Justice, *Annual Report of the Immigration and Naturalization Service* (various years); Kerwin, *More than IRCA*.

74   Jill H. Wilson, *Applications for Liberian Refugee Immigration Fairness (LRIF): Fact Sheet* (Washington, DC: CRS, 2020).

75   Kerwin, *More than IRCA*.

76   Memorandum from Chad Wolf, Acting Secretary of Homeland Security, to Mark Morgan, Senior Official Performing the Duties of Commissioner, U.S. Customs and Border Protection (CBP); Matthew Albence, Senior Official Performing the Duties of Director, U.S. Immigration and Customs Enforcement (ICE); and Joseph Edlow, Deputy Director of Policy, USCIS, "Reconsideration of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,'" July 28, 2020.

AR2022_500897

> *Given the opposition to legalization with a path to citizenship that has stymied immigration reform in past years, a more limited protection status may be more feasible politically.*

Given the opposition to legalization with a path to citizenship that has stymied immigration reform in past years, a more limited protection status may be more feasible politically. Many members of Congress who typically take restrictive approaches to immigration signed on to a bill in 2018 that included a version of this proposal for DACA recipients.[77] A statutory provision for protections from deportation and eligibility for work authorization could be designed to reach a broad population or cover any of the subgroups within the unauthorized population profiled above.

The limitations are that unlike permanent residents, individuals holding such a status would not be able to petition for visas for their family members, vote in elections, access most social safety-net programs, or hold jobs requiring U.S. permanent residence or citizenship. Work authorization documents other than green cards may be confusing for employers, particularly when the government is slow to issue renewals.[78] The uncertainty of limited protections can also make it difficult for beneficiaries to establish roots and make long-term investments such as by buying homes, pursuing higher education, or starting a business.

Nonetheless, the experience of people who have benefited from similar programs, such as DACA and TPS, has shown that protection from deportation and work authorization offer significant benefits, and those who have these protections are generally better off than the unauthorized. They are able to obtain important documentation, such as Social Security numbers and driver's licenses.[79] DACA has been shown to increase high school attendance and graduation rates, and to give beneficiaries access to new educational opportunities.[80] Both DACA and TPS have allowed immigrants to move into better jobs.[81] DACA has led to higher incomes for holders, as has TPS for male TPS holders.[82]

## Addressing Barriers to Legal Status under Existing Law

Aside from creating new legalization programs, Congress could amend existing laws to eliminate current barriers to obtaining legal status. Many noncitizens are eligible for LPR status under current immigration law but are prevented from obtaining it due to changes to immigration law in the 1990s. Addressing those disqualifying factors could benefit large segments of the current unauthorized population.

---

77  *Securing America's Future Act of 2018*, HR 4760, 115th Cong., 2nd sess., *Congressional Record* 164, no. 6, daily ed. (January 10, 2018): H131.

78  Cecilia Menjívar, *Temporary Protected Status in the United States: The Experiences of Honduran and Salvadoran Immigrants* (Lawrence, KS: University of Kansas, 2017).

79  Kara Cebulko, "Documented, Undocumented, and Liminally Legal: Legal Status During the Transition to Adulthood for 1.5-Generation Brazilian Immigrants," *The Sociological Quarterly* 55, no. 1 (2014): 143-67.

80  Elira Kuka, Na'ama Shenhav, and Kevin Shih, "Do Human Capital Decisions Respond to the Returns to Education? Evidence From DACA" (working paper 24315, National Bureau of Economics Research, Cambridge, MA, February 2018); Tom K. Wong et al., "DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November," Center for American Progress, September 19, 2019.

81  Menjívar, *Temporary Protected Status in the United States*; Pia Orrenius and Madeline Zavodny, "The Impact of Temporary Protected Status on Immigrants' Labor Market Outcomes" (working paper 1415, Federal Reserve Bank of Dallas, Dallas, TX, December 2014); Jie Zong, Ariel G. Ruiz Soto, Jeanne Batalova, Julia Gelatt, and Randy Capps, *A Profile of Current DACA Recipients by Education, Industry, and Occupation* (Washington, DC: MPI, 2017).

82  Orrenius and Zavodny, "The Impact of Temporary Protected Status;" Wong et al., "DACA Recipients' Livelihoods, Families, and Sense of Security."

AR2022_500898

## Eliminating the Three- and Ten-Year Bars

Many noncitizens eligible for green cards through family or employer sponsorship are barred from getting them inside the United States because of their initial unlawful entry. But they can obtain them at a U.S. consulate abroad. However, if they have stayed unlawfully in the United States for longer than six months, they are subject to a three-year bar on re-entry, and to a ten-year bar if their unlawful stay is longer than one year, as discussed earlier. The three- and ten-year bars are triggered by leaving the United States for any reason, including pursuing a visa application at a U.S. consulate.

These bars can be waived upon an application for those whose absence from the country would cause extreme hardship to a U.S.-citizen or LPR spouse or parent, but since there is no guarantee that these unlawful presence waivers will be granted, most noncitizens are unwilling to take the risk for fear that, if denied, they would be unable to return to the United States. Even for those who are provisionally approved for a waiver before they leave the United States, there is always the risk that they could be denied their visa at the consulate. Thus, ironically, the three- and ten-year bars intended by Congress in 1996 to deter long-term unlawful stay have created a perverse incentive for foreign nationals to prolong their stay in the United States, when they are otherwise eligible to receive permanent residence through family or employment sponsorship. Eliminating the unlawful presence bars would clear the way for sizeable numbers of individuals residing in the United States to obtain permanent residence. MPI estimates suggest that 1.4 million unauthorized immigrant spouses of U.S. citizens and permanent residents and the (likely overlapping) at least 1.7 million unauthorized immigrants who may be more likely to be sponsored by an employer, as described above, could benefit from this change.

> *Ironically, the three- and ten-year bars intended by Congress in 1996 to deter long-term unlawful stay have created a perverse incentive for foreign nationals to prolong their stay in the United States.*

## Restoring In-Country Inadmissibility Waivers

Similar to eliminating the three- and ten-year bars, restoring a provision of immigration law known as Section 245(i), which was enacted in 1994 but has since lapsed, would remove additional obstacles for unauthorized immigrants who are otherwise eligible for green cards.

Section 245(i) permitted unauthorized immigrants to receive their green cards from within the United States if sponsored by a qualifying family member or employer and if they paid a penalty, rather than being required to apply at a U.S. consulate abroad. The fee was five times the standard fee to adjust status. Originally intended to reduce consular workloads and lessen travel burdens for immigrants applying for adjustment while still imposing a penalty for breaking the law,[83] it became especially advantageous once the unlawful presence bars were imposed in 1996, as it allowed immigrants who would have been subject to the bars if they left the country to adjust status from within the United States.[84]

---

83   CRS, *Immigration: Adjustment to Permanent Resident Status Under Section 245(i)* (Washington, DC: CRS, 2003).

84   CRS, *Immigration: Adjustment to Permanent Resident Status.*

AR2022_500899

The provision expired in October 1997 but was extended twice. The last extension, which remains in effect today, allows unauthorized immigrants who were in the United States on December 21, 2000, to adjust status from within the United States if a sponsor had filed a petition for a green card or labor certification for them by April 30, 2001 and if they paid a $1,000 fine, in addition to the existing fee to apply for adjustment.[85]

For a renewed version of 245(i), the $1,000 fee from the latest extension of 245(i), adjusted for inflation, would be just under $1,500 in 2020. If the fee were to be five times the fee to adjust status, as in the 1994 formulation of 245(i), it would be $5,700. The same immigrants who would stand to benefit from a repeal of the three- and ten-year bars—those with potential sponsors as described in the previous subsection— would benefit from a reinstatement of 245(i).

### Reconfiguring Cancellation of Removal

Cancellation of removal, known as suspension of deportation until 1996, has been part of U.S. immigration law since 1940. It evolved over the years, with the final version pre-1996 allowing unauthorized immigrants who had resided in the United States for at least seven years, shown good moral character, and demonstrated that their deportation would cause extreme hardship to them or to their U.S.-citizen or resident spouse, child, or parent to seek suspension of their deportation proceedings and subsequently become permanent residents. Somewhat like a statute of limitations, it acknowledged the greater utility of regularizing the legal status of long-term U.S. residents in hardship circumstances, rather than expending resources trying to deport them.

IIRIRA imposed limitations on this process and renamed it cancellation of removal. It removed the possibility that an applicant could meet the hardship standard by showing hardship to themselves and raised the standard that an applicant had to meet. At present, noncitizens other than LPRs in removal proceedings who have resided in the United States for ten years, demonstrated good moral character, and lack certain criminal convictions must show that their deportation would cause "exceptional and extremely unusual hardship" to their LPR or U.S.-citizen spouse, child, or parent in order to have their removal proceedings cancelled and adjust to LPR status. Annual grants of cancellation and LPR status for unauthorized immigrants also have been capped at 4,000.

Between 1945 and 1996, 65,373 applications for suspension of deportation were granted, and between 1997 and 2019, another 80,694 were approved.[86] The increase post-1996 may be due to the growth of the long-term unauthorized population in the last 25 years. There were an estimated 30,000 cancellation cases waiting to be adjudicated as of 2019.[87] Additionally, the only way to apply for cancellation of removal is

---

85   Ariel Brown, "245(i): Everything You Always Wanted to Know but Were Afraid to Ask" (practice advisory, Immigrant Legal Resource Center, Washington, DC, June 2018).

86   MPI calculation based on DHS, Office of Immigration Statistics, *Yearbook of Immigration Statistics* (various years); Department of Justice, *Statistical Yearbook of the Immigration and Naturalization Service* (various years); Department of Justice, *Annual Report of the Immigration and Naturalization Service* (various years). Calculations do not include cancellation of removal under the *Violence against Women Act, or under the Nicaraguan Adjustment and Central American Relief Act* (NACARA); they also do not include suspension of deportation for crewmen on board ships or aircraft who entered before July 1, 1964, as permitted by the 1965 *Immigration and Nationality Act.*

87   As of April 2019, there were 30,000 cases in the affirmative asylum backlog that were filed more than ten years after the applicant arrived in the United States, which are likely to be cases where an applicant is trying to open removal proceedings to apply for cancellation.

**AR2022_500900**

to have a case pending before an immigration judge. This creates incentives for people not in removal proceedings to try to be placed in them, most often by submitting an asylum application that will not be granted and then referred to an immigration court for removal.

A pragmatic way to avoid this misuse of court proceedings would be to open an application process where people eligible for cancellation could affirmatively apply for it with USCIS. An immigration officer would adjudicate such requests using the same criteria that immigration judges do in removal proceedings. This would help reduce backlogs in both the asylum and immigration court systems. Restoring the hardship criteria to their pre-1996 form, which was not being abused; removing the numerical cap; and/or creating an affirmative path to open cancellation proceedings all would facilitate the use of this existing legalization mechanism for hardship cases.

## B.   *Executive Action*

In the absence of legislation to provide legal status for all or portions of the unauthorized population, the executive branch could provide a certain degree of protections through administrative actions. Such protections are less enduring and would be narrower in scope than legislation. However, as a practical matter, executive actions have generally been used as an alternative—or a bridge—to legislation in the absence of congressional action.

*Although executive action cannot provide relief to the entire unauthorized population, it could protect certain subgroups.*

Though Biden has forwarded a blueprint for legalization to Congress, immigrant-rights advocates may press to see quicker executive action. This will be especially true because Congress is unlikely to be able to act on legislation soon. Further, the COVID-19 pandemic may present a strong case to extend some protections quickly, especially to protect essential workers. Although executive action cannot provide relief to the entire unauthorized population, it could protect certain subgroups, particularly while legislation is being developed by Congress.

The options available to the executive branch for granting administrative relief to subgroups of the population are as follows:

► **Deferred action.** This is an exercise of prosecutorial discretion by DHS not to remove a noncitizen. The most prominent example of such discretionary relief is DACA, but deferred action has also been granted to other classes of immigrants; for example, in 2009 it was extended to widows of U.S. citizens who were prevented from adjusting to LPR status because they had not been married long enough.[88] DACA and deferred action for widows of U.S. citizens have validity periods of two years, but there is no statutory time limit for issuances of deferred action.[89] Immigrants with deferred action are eligible for work authorization if they can demonstrate economic necessity.[90] Instructions to consider certain

---

88   Memorandum from Donald Neufeld, Acting Associate Director, Office of Domestic Operations, USCIS, to field leadership, "Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children," June 15, 2009.

89   Ben Harrington, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others* (Washington, DC: CRS, 2018).

90   "Classes of Aliens Authorized to Accept Employment," 8 *Code of Federal Regulations* 274.a12(c)(14).

noncitizens for deferred action have been set out via USCIS policy guidance in the past, but deferred action eligibility criteria could also be issued by regulation.

► **Parole in place.** This is an extension of the Homeland Security Secretary's authority to parole noncitizens applying for admission into the United States for humanitarian purposes or significant public benefit.[91] Parole in place allows noncitizens already living in the United States who have not been lawfully admitted to the country to stay legally, though it does not constitute a lawful admission or a legal status. USCIS has made parole in place available to spouses, children, and parents of certain members of the military and veterans since November 2013 and of certain military recruits since November 2016, both through policy guidance.[92] While the parole-in-place authority was first formally recognized in a 1998 legal opinion by the Immigration and Naturalization Service (the precursor agency to DHS), it did not appear in statute until 2020.[93] The *National Defense Authorization Act for Fiscal Year 2020* reaffirmed "the importance of the parole-in-place authority of the Secretary of Homeland Security," and included the eligibility criteria for relatives of members of the military. While classes of noncitizens have been designated as potentially eligible for parole in place, their applications are nonetheless adjudicated on a case-by-case basis. Those granted relief are authorized to stay in the United States for one year and can apply for work authorization if they demonstrate economic necessity.[94]

► **Deferred Enforced Departure (DED).** This form of relief provides temporary protection from removal to nationals of certain countries.[95] In the past, it has been used in the same manner as TPS, to protect certain noncitizens already in the United States from being sent back to unstable conditions in their country of origin. DED has been granted to noncitizens from El Salvador, China, the Persian Gulf, Haiti, and Liberia.[96] The authority was most recently used on January 19, 2021, when outgoing President Donald Trump extended DED to Venezuelan migrants in the country illegally.[97] MPI estimates there are a little under 150,000 Venezuelans in the United States who could be eligible. DED is typically issued by a presidential order. The president's directive sets out eligibility criteria, validity period, and can allow beneficiaries to apply for work authorization. Unlike deferred action and parole in place, there is no application process for DED—anyone who meets the criteria is considered to be covered; however, DED holders who want to work lawfully need to apply for work authorization, and their eligibility is then assessed.[98]

91   "Inadmissible aliens," 8 *United States Code* 1182(d)(5)(A).

92   USCIS Policy Memorandum, "Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)," November 15, 2013; USCIS Policy Memorandum, "Discretionary Options for Designated Spouses, Parents, and Sons and Daughters of Certain Military Personnel, Veterans, and Enlistees," November 23, 2016.

93   Memorandum from Paul W. Virtue, General Counsel, Immigration and Naturalization Service (INS), to Executive Associate Commissioner for Policy and Planning, Executive Associate Commissioner for Field Operations, All Regional Counsels, All District Counsels, and All Sector Counsels, "Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens," August 21, 1996; *National Defense Authorization Act for Fiscal Year 2020*, Public Law 116-92 *U.S. Statutes at Large* 133 (2019): 1198-2316.

94   USCIS, *Adjudicator's Field Manual* (Washington, DC: USCIS, n.d.), 2-4.

95   USCIS, *Adjudicator's Field Manual*.

96   Jill H. Wilson, *Temporary Protected Status: Overview and Current Issues* (Washington, DC: CRS, 2020), 5.

97   White House, "Deferred Enforced Departure for Certain Venezuelans," *Federal Register* 86, no. 14 (January 25, 2021): 6845-46.

98   USCIS, *Adjudicator's Field Manual*.

▶ **Temporary Protected Status.** DHS can grant TPS, described in more detail in Section 2.A., to nationals of certain countries who are already in the United States if there are temporary conditions in their home country that would make returning dangerous. This is done through a notice in the *Federal Register*. In late 2020, the governments of Guatemala and Honduras requested that the U.S. government grant TPS to their nationals because of two hurricanes that caused severe, widespread damage in those countries.[99] DHS had not designated these countries for TPS as of January 2021. There are a little over 750,000 Guatemalan and 500,000 Honduran immigrants in the United States who could be covered by this relief if invoked.

These executive actions can generally be implemented through DHS guidance or memoranda, presidential orders, or regulations (although TPS can be done only by regulation). Of them, policies implemented through regulation take longer but are the most secure against a legal challenge. The process—governed by the *Administrative Procedures Act*—requires issuing a proposed regulation, with a public comment period, followed by promulgating a final regulation. It typically takes several months or more to complete. An expansion of DACA, as described in Section 2.A., or a version of DAPA could be implemented through regulations for increased security. The Obama administration's DAPA program, for example, was initially struck down by a federal judge not on the merits but because it did not go through the notice-and-comment period required by the *Administrative Procedures Act*.[100]

The four types of executive action described here vary slightly from each other. Deferred action in the past has been issued for two-year periods, while parole in place has had one-year validity. Courts have split on whether someone who has received parole and has a valid sponsor is eligible to adjust to permanent residence. Someone granted deferred action is clearly not automatically eligible to adjust.[101] TPS is the most insulated from court challenges out of these four actions, but it can only be issued based on nationality and country conditions, so it cannot be used to protect other subgroups of the unauthorized population described above, such as parents of U.S. citizens and LPRs or essential workers. While DED has also traditionally been used to protect people of designated nationalities from repatriation, there is nothing in statute or regulations that limits it in this way, so it could conceivably be used to protect other populations, though such a usage would be without precedent, thus perhaps more susceptible to a legal challenge.

Each of these administrative forms of relief, while not opening new pathways to permanent residence, would provide significant protections against removal and the ability to work lawfully to segments of the unauthorized population.

---

99   Presidency of Honduras, "Honduras pide a Estados Unidos un nuevo TPS tras desastre por Eta y Iota" (news release, December 4, 2020); Reuters, "United States Asked to Allow Guatemalans to Stay on Humanitarian Grounds After Storm," Reuters, November 11, 2020.

100  *State of Texas et al. v. United States of America et al.*

101  Some DACA recipients have been able to adjust status after receiving a grant of advanced parole, which allows them to re-enter the United States after traveling abroad, despite being legally inadmissible to the country. See Roxana Kopetman, "Students, Who Entered the U.S. Illegally, Travel to Mexico Before Trump Becomes President," *Orange County Register*, December 23, 2016. For a discussion of the use of advance parole to adjust status, see Ben Harrington, *Legalization Framework Under the Immigration and Nationality Act (INA)* (Washington, DC: CRS, 2019), 12-16.

AR2022_500903

# 4     Conclusion

With its sweeping Day One immigration proposal, the Biden administration has put legalization back on the table, declaring it key to any attempt to reform or rethink the U.S. immigration system. The profiles and policy options presented in this report provide a jumping-off point to determine the many ways such efforts could be accomplished, whether by legislation or executive action. There are various approaches and combinations of approaches that could address the decades-long immigration policy failings that have resulted in one-fourth of the foreign-born population in the country without the protections of a legal status—60 percent of whom have lived in the United States for a decade or more.

In today's polarized political climate, legislation that legalizes large swaths of the unauthorized immigrant population will be difficult to achieve. Those who oppose legalization argue that it rewards lawbreakers and invites further illegal immigration, while proponents point to the strong equities most in the unauthorized population have because of their contributions to the broader well-being of the country and the communities in which they have lived for many years.

As a renewed debate between these contending views returns, the policy approaches and new data presented in this report can provide a guide to policymakers as they seek to break the legalization impasse that has for too long paralyzed Congress from making much-needed changes to modernize the nation's immigration laws and system.

*The Biden administration has put legalization back on the table, declaring it key to any attempt to reform or rethink the U.S. immigration system.*

# About the Authors



**JESSICA BOLTER**     @jessicabolter

Jessica Bolter is an Associate Policy Analyst with the U.S. Immigration Policy Program at the Migration Policy Institute (MPI). Her research focuses on migration patterns at the U.S.-Mexico border, immigration enforcement, and asylum and refugee issues. She also works across programs on Latin American migration policy, particularly on regional responses to Venezuelan migration.

She has interned with MPI, the Capital Area Immigrants' Rights Coalition, the Ohio Commission on Hispanic and Latino Affairs, and the Center for Democracy in the Americas. Ms. Bolter holds a bachelor's degree in American studies and Spanish area studies from Kenyon College, where she focused on relations between the United States and Latin America.



**MUZAFFAR CHISHTI**

Muzaffar Chishti, a lawyer, is a Senior Fellow and Director of MPI's office in New York, based at the New York University School of Law. His work focuses on U.S. immigration policy at the federal, state, and local levels; the intersection of labor and immigration law; immigration enforcement; civil liberties; and immigrant integration.

Prior to joining MPI, Mr. Chishti was Director of the Immigration Project of the Union of Needletrades, Industrial & Textile Employees (UNITE). Mr. Chishti was educated at St. Stephen's College, Delhi; the University of Delhi; Cornell Law School; and the Columbia School of International Affairs.



**DORIS MEISSNER**

Doris Meissner, former Commissioner of the U.S. Immigration and Naturalization Service (INS), is a Senior Fellow at MPI, where she directs the Institute's U.S. immigration policy work. Her responsibilities focus on the role of immigration in America's future and on administering the nation's immigration laws, systems, and government agencies. Her work and expertise also include immigration and politics, immigration enforcement, border control, cooperation with other countries, and immigration and national security.

From 1993 to 2000, she served in the Clinton administration as Commissioner of the INS. Her accomplishments included reforming the nation's asylum system; creating new strategies for managing U.S. borders; improving naturalization and other services for immigrants; shaping responses to migration and humanitarian emergencies; strengthening cooperation with Mexico, Canada, and other countries; and managing growth that doubled the agency's personnel and tripled its budget.

In 1986, Ms. Meissner joined the Carnegie Endowment for International Peace as a Senior Associate. There, she created the Endowment's Immigration Policy Project, which evolved into MPI in 2001.

AR2022_500905

# Acknowledgments

The authors are grateful to their Migration Policy Institute (MPI) colleagues, including Julia Gelatt for providing guidance and thoughtful review, as well as for generating with Ariel G. Ruiz Soto most of the statistical estimates presented in this report; Jeanne Batalova and Michael Fix for coming up with estimates of the DACA/DREAMer essential worker population; Randy Capps for advising on statistical estimates; Michelle Mittelstadt for her insightful edits; and Mary Hanna for research assistance. They also thank former MPI Policy Analyst Claire Bergeron for sharing her initial research, data, and sources on this topic; and Francine D. Blau, Josefine Koebe, and Pamela A. Meyerhofer for sharing their coding of "essential" and "frontline" workers.

This report is part of the Rethinking U.S. Immigration Policy initiative, which is generously supported by the Ford Foundation, Open Society Foundations, the Carnegie Corporation of New York, and Unbound Philanthropy. The Lumina Foundation also provided support for this research.

MPI is an independent, nonpartisan policy research organization that adheres to the highest standard of rigor and integrity in its work. All analysis, recommendations, and policy ideas advanced by MPI are solely determined by its researchers.

© 2021 Migration Policy Institute.
All Rights Reserved.

Design: Sara Staedicke, MPI
Layout: Liz Heimann
Photo: iStock.com/brazzo

No part of this publication may be reproduced or transmitted in any form by any means, electronic or mechanical, including photocopy, or any information storage and retrieval system, without permission from the Migration Policy Institute. A full-text PDF of this document is available for free download from www.migrationpolicy.org.

Information for reproducing excerpts from this publication can be found at www.migrationpolicy.org/about/copyright-policy. Inquiries can also be directed to communications@migrationpolicy.org.

Suggested citation: Bolter, Jessica, Muzaffar Chishti, and Doris Meissner. 2021. *Back on the Table: U.S. Legalization and the Unauthorized Immigrant Groups that Could Factor in the Debate*. Washington, DC: Migration Policy Institute.

The Migration Policy Institute is an independent,
nonpartisan think tank that seeks to improve immigration and integration
policies through authoritative research and analysis, opportunities for
learning and dialogue, and the development of
new ideas to address complex policy questions.



**www.migrationpolicy.org**

1400 16th St NW, Suite 300, Washington, DC 20036
202-266-1940

  

**AR2022_500907**



# Fact Sheet

November 2017

# A Profile of Current DACA Recipients by Education, Industry, and Occupation

By Jie Zong, Ariel G. Ruiz Soto, Jeanne Batalova, Julia Gelatt, and Randy Capps

**DACA Facts**

## Executive Summary

Amid years of protracted congressional gridlock over immigration reform, the Obama administration in 2012 created the Deferred Action for Childhood Arrivals (DACA) program to offer work authorization and a temporary reprieve from deportation to certain unauthorized immigrants brought to the United States as children. Implemented through executive action, DACA was viewed by critics as an unconstitutional overreach of presidential authority, and the Trump administration announced in September 2017 that it would wind down the program.

While approximately 793,000 unauthorized immigrants have ever received DACA status since the program was launched on August 15, 2012, nearly 690,000 were current recipients as of September 4, 2017, according to U.S. Citizenship and Immigration Services (USCIS), which stopped accepting new applications the following day. Program participants will continue to retain their protections until their two-year DACA grant expires—a date that will vary by individual based on when status was initially received or renewed.

*Data released for the first time by USCIS in September 2017 have allowed researchers to update the methodology to better reflect the DACA-participating population.*

Using a unique Migration Policy Institute (MPI) methodology that assigns legal status in U.S. Census Bureau data, thus permitting the modeling of the size and characteristics of certain foreign-born groups including unauthorized immigrants, this fact sheet provides new data on key characteristics of DACA holders. Among the indicators examined: recipients' educational attainment, school enrollment, labor force participation, industries, and occupations. MPI previously released analysis of some of these characteristics for the DACA-*eligible* population,[1] but data released for the first time by USCIS in September 2017 have allowed researchers to update the methodology to better reflect the DACA-*participating* population.

With DACA holders set to begin losing their protection in growing numbers starting early next year—MPI estimates about 915 people on average will fall out of DACA status each day beginning March 6, 2018—there is growing momentum in Congress to find a legislative solution for the population of young unauthorized immigrants referred to as DREAMers.

Among the fact sheet's top findings:

- DACA recipients are almost as likely as U.S. adults in the same age group (15-32) to be enrolled in college (18 percent versus 20 percent), but less likely to have completed college (4 percent versus 18 percent). Forty-four percent of DACA



have completed secondary education, but not enrolled in college. Another 20 percent remain in secondary school.

- Among DACA participants, women are more likely than men to be enrolled in college (20 percent versus 15 percent), but less likely to be working (48 percent versus 64 percent).

- Fifty-five percent of DACA holders are employed, amounting to 382,000 workers. They account for 0.25 percent of all U.S. workers. Most DACA participants (62 percent) who are not in the labor force are enrolled in school.

- One out of three DACA recipients who are enrolled in school also work—a rate roughly equivalent to that of the U.S. young adult population.

- DACA holders are much less likely than young unauthorized immigrants who are not eligible for deferred action to work in construction jobs and are more likely to work in office support jobs, showing that DACA can be a means to occupational mobility.

- There are about 9,000 DACA recipients employed as teachers or similar education professionals, and another 14,000 in health-care practitioner and support jobs.

- While MPI estimates an average 915 individuals will fall out of DACA status daily beginning in March, the peak period will be in January – March 2019, when around 50,000 individuals a month will lose their DACA protections. MPI projects that all recipients will have lost status by early March 2020.

The estimates of DACA holders' characteristics offered here, as well as earlier MPI modeling of the populations that could be covered under several legalization scenarios introduced in Congress,[2] could help inform the ongoing debate over the future of these unauthorized immigrants who came to the United States as children.

## I. Introduction and Methodology

For more than a decade, Migration Policy Institute (MPI) researchers have offered estimates and described characteristics of the population of unauthorized immigrants referred to as DREAMers: those brought to the United States as children, and who have been largely educated in this country, with many now in the workforce. Following creation of the Deferred Action for Childhood Arrivals (DACA) program in 2012,[3] MPI has described the population potentially eligible to apply, via a number of publications and data tools.[4]

In 2017, MPI researchers estimated that 1.3 million unauthorized immigrants met all the eligibility requirements to apply for DACA;[5] 897,605 ultimately did apply as of June 30, 2017, for an application rate of 68 percent.[6]

As with the earlier MPI research, the findings in this fact sheet draw upon a unique MPI methodology that permits estimation of the unauthorized population meeting the criteria to apply for the DACA program, as well as their demographic and other characteristics. The method combines data from two U.S. Census Bureau datasets: a pooled five-year file of the American Community Survey (ACS), which contains detailed characteristics of noncitizen populations at national and state levels, and the Survey of Income and Program Participation (SIPP), which includes data identifying which noncitizens are legal permanent residents and which are not.[7] MPI uses the legal status information in the SIPP to identify noncitizens who are likely to be unauthorized in the ACS—which does not collect legal status information—and in turn identifies unauthorized immigrants who are DACA-eligible based on their age, year of U.S. entry, and educational attainment.[8]

This fact sheet first examines the rate at which current DACA recipients are expected to lose their status under the program termination outlines announced by the Trump administra-

# Fact Sheet

tion on September 5, 2017. It then uses a revised dataset of DACA-eligible immigrants—reweighted to the participating population by age, gender, origin country, and state of residence in 2017—to provide national and state-level portraits of DACA holders on additional characteristics such as education, industry, and occupations, which are either not collected or not released by U.S. Citizenship and Immigration Services (USCIS).[9]

Understanding the characteristics of DACA recipients is important to assess the impact of the loss of work authorization—and potential deportation—of students and middle- and high-skilled workers in schools, universities, businesses, and immigrant communities.

## II.   Losing DACA Protections: A Timeline

A total of 793,026 unauthorized immigrants were approved for DACA status between the program's launch on August 15, 2012 and June 30, 2017, according to the most recent data provided by USCIS.[10] Of these, nearly 689,800

(or 87 percent) still participated in the program as of September 4, 2017[11]—the day before the Trump administration announced a six-month wind-down of the program.[12] On September 5, USCIS stopped accepting applications from new applicants and restricted renewal to participants whose DACA eligibility would expire by March 5, 2018—six months later. October 5 was the last day renewal applications were accepted. According to the latest media accounts, USCIS estimated that 21,000 to 22,000 of the 154,000 individuals eligible to renew their status had failed to do so as of October 19, while 132,000 to 133,000 did apply for renewal.[13] Unless Congress, the administration, or federal courts take further action, DACA participants will begin to lose their status starting March 6, 2018.

MPI forecasts that on average approximately 915 DACA holders will lose their work authorization and protection from deportation each day between March 6, 2018 and March 5, 2020. When these immigrants fall back into unauthorized status and lose their work authorization, some employers may be forced to lay them off, and some may find themselves identified for deportation. Figure 1 shows the number of DACA holders expected to see their protections end by

**Figure 1. Predicted DACA Expirations from March 2018 through March 2020**



*Notes:* Expirations are based on U.S. Citizenship and Immigration Services (USCIS) reported data for March 2018 through August 2019 and Migration Policy Institute (MPI) estimates derived from USCIS data for September 2019 through March 2020. MPI's estimates assume that the distribution of expirations from September 2019 through March 2020 matches the distribution of renewal applications from September 2017 through March 2018, and that everyone who applied for renewal would be approved for benefits for a two-year period starting in the month when their prior eligibility period expired.
*Sources:* MPI calculations based on USCIS administrative data; USCIS, "Approximate Active DACA Recipients as of September 4, 2017 by Month Validity Expires and Status of Associated Renewal as of September 7, 2017 (If Submitted)," accessed October 19, 2017, www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_renewal_data.pdf.



month over this two-year period. The numbers are based on USCIS reporting that goes through August 2019 and MPI estimates of who is expected to lose protection from September 2019 onward through March 2020.

## III. Education and Labor Force Profile of Current DACA Participants

This section discusses the education and labor force characteristics of unauthorized immigrants participating in the DACA program as of September 2017. To develop these estimates, the researchers employed USCIS administrative data released in September on DACA participants by age, gender, origin country, and state of residence, and used these data to reweight MPI's database on the DACA-eligible population to provide a more refined view of those holding the status as of September 2017.[14]

### A. The Educational Profile of Current Recipients

DACA has an educational requirement: to qualify for the program, participants must either be in school[15] or hold a high school diploma or GED. Yet DACA holders are somewhat less educated than the overall U.S. population of similar ages (15 to 32). MPI estimates that 20 percent of DACA participants are still enrolled in secondary school (see Table 1). Forty-four percent have completed secondary education but have not pursued a college education at the time of the survey, compared to 19 percent among the broader U.S. population of similar age. Additionally, 18 percent of DACA recipients have enrolled in college, but have not yet graduated. Four percent have completed a bachelor's degree versus 17 percent of the broader U.S. population. The overall U.S. population, however, includes 9 percent who had dropped out of high school, while the DACA program excludes high-school dropouts unless they were enrolled in an adult education program.[16]

**Table 1. Educational Attainment and School Enrollment of U.S. Adults (ages 15-32) and Current DACA Recipients, by Gender**

| Education and Enrollment Status | Total U.S. Population | Current DACA Recipients | | |
|---|---|---|---|---|
| | | Total | Female | Male |
| **Total** | **78,108,000** | **689,800** | **362,700** | **326,900** |
| Not enrolled and have not completed high school (%) | 9 | N/A | N/A | N/A |
| Enrolled in secondary school (%) | 19 | 20 | 20 | 20 |
| Completed high school and not in higher education (%) | 19 | 44 | 41 | 47 |
| Enrolled in college (%) | 20 | 18 | 20 | 15 |
| Completed some college, not enrolled (%) | 16 | 15 | 15 | 15 |
| Completed at least a bachelor's degree (%) | 17 | 4 | 4 | 3 |

*Note:* "N/A" refers to the fact that virtually all current DACA participants have either completed high school or are currently enrolled—consistent with the program's education requirement. Secondary school includes middle school and high school. The U.S. population and DACA-participant samples are limited to those ages 15 to 32 in 2010-14. The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by USCIS as of September 4, 2017.
*Sources:* MPI analysis of data from the U.S. Census Bureau pooled 2010-14 ACS and 2008 SIPP, with legal status assignments by Bachmeier and Van Hook.

# Fact Sheet

For school enrollment rates for the 34 states with the most DACA holders, see Appendix 1.[17]

Women participating in DACA are more likely to be enrolled in college than men (20 percent versus 15 percent) but have similar college completion rates (see Table 1.)

## B.   The Workforce Status of Current Recipients

Most DACA participants work, but they represent a very small share of the U.S. labor force. The majority of DACA participants (64 percent) are in the labor force: 55 percent are working, and 8 percent are unemployed and looking for work (see Table 2). The 442,000 DACA recipients in the labor force amounted to 0.27 percent of the total U.S. labor force of 161 million people in September 2017.[18]

Many DACA participants are enrolled in school—either secondary school or college—and one out of three enrollees attends school and works at the same time, similar to the U.S. young adult population (see Table 2). Among those not enrolled in school, 69 percent are employed, and 22 percent are not in the labor force.

DACA-recipient men are more likely to be employed than women (64 percent versus 48 percent), reflecting a pattern similar to the overall unauthorized population.[19] Most of this gender gap in employment occurs among those who are not enrolled in school: 81 percent of men holding DACA status work, compared to 58 percent of women. Some female DACA holders, like other young women, are likely to be out of school and out of the labor force due to child-care responsibilities. Lack of English skills could also be a barrier to their employment, as women with DACA status who are not in school

**Table 2. School Enrollment and Employment Rates of U.S. Adults (ages 15-32) and Current DACA Recipients, by Gender**

| | Total U.S. Population | Current DACA Recipients | | |
|---|---|---|---|---|
| | | Total | Female | Male |
| **Total Number** | **78,108,400** | **689,800** | **362,700** | **326,900** |
| Employed (%) | 57 | 55 | 48 | 64 |
| Unemployed (%) | 9 | 8 | 8 | 8 |
| Not in labor force (%) | 35 | 36 | 44 | 27 |
| **Number Enrolled in School** | **33,303,500** | **261,200** | **145,100** | **116,100** |
| Employed (%) | 37 | 33 | 32 | 34 |
| Unemployed (%) | 7 | 8 | 8 | 8 |
| Not in labor force (%) | 56 | 59 | 60 | 58 |
| **Number Not Enrolled in School** | **44,804,900** | **428,600** | **217,600** | **210,800** |
| Employed (%) | 71 | 69 | 58 | 81 |
| Unemployed (%) | 10 | 9 | 9 | 9 |
| Not in labor force (%) | 19 | 22 | 33 | 11 |

*Notes:* School enrollment includes those in middle school, high school, or college. The U.S. population and DACA-participant samples are limited to those ages 15 to 32 in 2010-14. The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients as of September 4, 2017. Percentages may not add up to 100 percent due to rounding.
*Sources:* MPI analysis of data from the U.S. Census Bureau 2010-14 ACS and 2008 SIPP, with legal status assignment by Bachmeier and Van Hook.



and not in the labor force are more likely to have limited English proficiency than DACA men out of the labor force: 44 percent versus 32 percent.

See Appendix 2 for employment rates for the DACA population, both in and out of education, for the 34 states with the greatest numbers of participants.

## C.   *Major Industries and Occupations of Employment*

DACA participants work in a wide variety of industries and occupations, including many in professional jobs. They are less likely than unauthorized workers who do not have DACA to work in outdoor, manual labor occupations such as construction.

1.      Top Industries of Employment

The most common industries of employment for DACA recipients are hospitality, retail trade, construction, education, health and social services, and professional services (see Table 3). Twenty-three percent of the estimated 382,000 employed DACA recipients (89,000 workers) are employed in the hospitality industry, i.e., arts, entertainment, recreation, accommodations, and food services. Fourteen

**Table 3. Employed Current DACA Recipients, by Major Industry Group**

|  | Number | Share (%) |
|---|---|---|
| **Total Current DACA Recipients** | **689,800** | **100** |
| **Employment** | | |
| Unemployed or not in labor force | 307,400 | 45 |
| Employed | 382,400 | 55 |
| **Employed Current DACA Recipients by Major Industry Group** | **382,400** | **100** |
| Arts, Entertainment, Recreation, Accommodations, and Food Services | 88,900 | 23 |
| Retail Trade | 54,000 | 14 |
| Construction | 41,300 | 11 |
| Educational, Health, and Social Services | 40,700 | 11 |
| Professional, Scientific, Management, Administrative, and Waste Management Services | 39,000 | 10 |
| Manufacturing | 36,100 | 9 |
| Other Services (except public administration) | 23,900 | 6 |
| Agriculture | 14,400 | 4 |
| Finance, Insurance, Real Estate, and Rental and Leasing | 13,600 | 4 |
| Wholesale | 11,300 | 3 |
| Transportation and Warehousing | 9,600 | 3 |
| Information and Communications | 4,100 | 1 |
| Public Administration | 2,300 | <1 |
| Mining | <2,000 | <1 |
| Utilities | <1,000 | <1 |
| Armed Forces | <500 | <1 |

*Note:* Major industry groups are based on Census Bureau classifications. The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of active DACA recipients as of September 4, 2017.
*Sources:* MPI analysis of data from the U.S. Census Bureau 2010-14 ACS and 2008 SIPP, with legal status assignment by Bach-meier and Van Hook.

# Fact Sheet

percent (about 54,000) are employed in retail trade, while 11 percent (41,000) are employed in construction and a similar number in the education, health, and social services industry. One-tenth (39,000) are employed in profes-sional scientific, management, administrative, and waste management services. Thus, DACA recipients are employed in a broad range of sec-tors, including many in industries with substan-tial numbers of professional jobs. Industry-level

**Table 4. Employed Current DACA Recipients, by Major Occupational Group**

|  | Number | Share (%) |
|---|---|---|
| **Total Current DACA Recipients** | **689,800** | **100** |
| **Employment** |  |  |
| Unemployed or not in labor force | 307,400 | 45 |
| Employed | 382,400 | 55 |
| **Employed Current DACA Recipients by Major Occupational Group** | **382,400** | **100** |
| Food Preparation and Serving | 59,500 | 16 |
| Sales | 53,500 | 14 |
| Office and Administrative Support | 47,000 | 12 |
| Construction | 38,700 | 10 |
| Building and Grounds Cleaning and Maintenance | 32,300 | 8 |
| Production | 31,200 | 8 |
| Transportation and Material Moving | 26,400 | 7 |
| Management | 14,200 | 4 |
| Personal Care and Service | 14,000 | 4 |
| Farming, Fishing, and Forestry | 12,300 | 3 |
| Installation, Maintenance, and Repair | 10,800 | 3 |
| Education, Training, and Library | 8,800 | 2 |
| Health-Care Support | 8,600 | 2 |
| Health-Care Practitioners and Technical | 5,300 | 1 |
| Arts, Design, Entertainment, Sports, and Media | 3,500 | <1 |
| Business Operations Specialists | 2,800 | <1 |
| Computer and Mathematical | 2,600 | <1 |
| Protective Service | 2,300 | <1 |
| Financial Specialists | 2,200 | <1 |
| Architecture and Engineering | <2,000 | <1 |
| Community and Social Services | <2,000 | <1 |
| Life, Physical, and Social Science | <1,500 | <1 |
| Legal | <1,000 | <1 |
| Extraction | <1,000 | <1 |
| Military Specific | <500 | <1 |

*Note:* Major occupational groups are based on Census Bureau classifications. The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of active DACA recipients as of September 4, 2017.
*Sources:* MPI analysis of data from the U.S. Census Bureau 2010-14 ACS and 2008 SIPP, with legal status assignment by Bachmeier and Van Hook.



data do not allow for analysis of the types of jobs that DACA recipients perform within each industry, however.

Appendix 3 provides data on the shares of employed DACA recipients working in the major industry groups for the 21 states with the most DACA workers.

### 2. Top Occupations

Analysis of occupations allows for more precision in identifying the types of jobs in which DACA recipients work, though here also sample sizes limit MPI's analysis to the major groups provided by the Census Bureau. The occupations most commonly employing DACA holders are food preparation and serving (16 percent, or 60,000 workers), sales (14 percent, or 54,000 workers), and office and administrative support (12 percent, or 47,000 workers) (see Table 4). Among unauthorized immigrants in the same age range who are not eligible for DACA, a similar share is employed in food preparation, but the share of ineligible unauthorized immigrants working in sales and office jobs is lower.[20] DACA recipients are half as likely to work in construction as compared to their unauthorized counterparts not eligible for DACA (10 percent versus 20 percent), and the share working in production jobs is slightly lower: 8 percent versus 9 percent. These occupational distributions suggest that DACA recipients are substantially less likely to work in outdoor, manual-labor jobs than similarly aged unauthorized immigrants not eligible for DACA.

Significant numbers of DACA recipients are also employed in professional occupations. Approximately 14,000 are managers, while 9,000 are employed as teachers or related workers ("education, training, and library" occupations).[21] About 5,000 work as health-care practitioners and another 9,000 in health-care support occupations. Almost 3,000 each work in business operations and in computer or mathematical occupations.

See Appendix 4 for the shares of employed DACA recipients working in the major occupational groups for the 21 states with the most DACA workers.

## IV.  Conclusions

Recent data from U.S. Citizenship and Immigration Services, offering more specifics on the population currently holding status under the Deferred Action for Childhood Arrivals program, have permitted the Migration Policy Institute to offer more detailed characteristics of those receiving DACA protections at the time the Trump administration placed the program on a six-month path to rescission in September 2017. These estimates should be useful for policymakers considering the potential impact at national and state levels of rescinding the program, as well as proposals to legalize DACA recipients and other DREAMers via legislation in Congress.

DACA has provided significant benefits to participants, which have been catalogued elsewhere.[22] The analysis in this fact sheet supports the notion that DACA recipients obtain better jobs than other unauthorized immigrants, with many employed in professional occupations.

The analysis presented here shows that DACA recipients are a largely middle-skilled population, either enrolled in school or working or both. DACA recipients are widely dispersed across industries and occupations, and so are integrated into many different parts of the nation's economy. While they represent a fraction of the U.S. millennial labor force, they have taken on prominence in the national immigration debate—by their own efforts as well as recognition in both parties that DREAMers here since childhood are a particularly sympathetic population.

As the DACA end date looms, with an average 915 young adults expected to begin losing their work authorization and protection from deportation daily beginning March 6, 2018 by MPI's count, resolving their futures undoubtedly will take on new urgency.



Fact Sheet

## Appendices

**Appendix 1. School Enrollment Rates of Current DACA Recipients, Top States**

| | Current DACA Recipients | Enrolled in School | |
|---|---|---|---|
| | | In Secondary School (%) | In Postsecondary Institution (%) |
| **United States** | **689,800** | **20** | **18** |
| Alabama | 3,900 | 14 | 10 |
| Arizona | 25,500 | 19 | 14 |
| Arkansas | 4,700 | 31 | 9 |
| California | 197,900 | 18 | 20 |
| Colorado | 15,500 | 22 | 10 |
| Connecticut | 3,800 | 18 | 21 |
| Florida | 27,000 | 17 | 18 |
| Georgia | 21,600 | 22 | 13 |
| Illinois | 35,600 | 16 | 17 |
| Indiana | 9,000 | 22 | 15 |
| Kansas | 5,900 | 25 | 16 |
| Kentucky | 2,800 | 21 | 15 |
| Louisiana | 1,800 | 17 | 9 |
| Maryland | 8,100 | 23 | 23 |
| Massachusetts | 5,900 | 18 | 26 |
| Michigan | 5,400 | 19 | 21 |
| Minnesota | 5,500 | 28 | 21 |
| Missouri | 3,300 | 28 | 21 |
| Nevada | 12,400 | 25 | 12 |
| New Jersey | 17,400 | 20 | 16 |
| New Mexico | 6,000 | 24 | 20 |
| New York | 32,900 | 14 | 25 |
| North Carolina | 25,100 | 28 | 12 |
| Ohio | 4,000 | 22 | 16 |
| Oklahoma | 6,100 | 23 | 13 |
| Oregon | 10,200 | 18 | 17 |
| Pennsylvania | 4,900 | 21 | 24 |
| South Carolina | 6,000 | 25 | 11 |
| Tennessee | 7,900 | 27 | 7 |
| Texas | 113,000 | 22 | 17 |
| Utah | 8,900 | 22 | 18 |
| Virginia | 10,100 | 28 | 19 |
| Washington | 16,300 | 24 | 14 |
| Wisconsin | 6,700 | 24 | 16 |

*Notes:* The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by U.S. Citizenship and Immigration Services (USCIS) as of September 4, 2017. Only states with sufficient sample sizes are shown. Secondary school includes both middle school and high school.
*Sources:* Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the pooled 2010-14 American Community Surveys (ACS) and 2008 Survey of Income and Program Participation (SIPP), with legal status assignments by James Bachmeier of Temple University and Jennifer Van Hook of the Pennsylvania State University, Population Research Institute.

**Fact Sheet**

**Appendix 2. Employment Rates of Current DACA Recipients In and Out of Education, Top States**

| | Current DACA Recipients | Employed | | | Unemployed | | | Not in Labor Force | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Total (%) | Enrolled (%) | Not Enrolled (%) | Total (%) | Enrolled (%) | Not Enrolled (%) | Total (%) | Enrolled (%) | Not Enrolled (%) |
| United States | 689,800 | 55 | 12 | 43 | 8 | 5 | 3 | 36 | 22 | 14 |
| Alabama | 3,900 | 52 | 7 | 45 | 10 | 2 | 8 | 37 | 15 | 22 |
| Arizona | 25,500 | 47 | 9 | 38 | 8 | 2 | 6 | 45 | 23 | 22 |
| Arkansas | 4,700 | 52 | 7 | 44 | 9 | 2 | 6 | 40 | 30 | 10 |
| California | 197,900 | 55 | 12 | 43 | 9 | 3 | 6 | 36 | 22 | 13 |
| Colorado | 15,500 | 60 | 10 | 50 | 6 | 3 | 3 | 34 | 20 | 15 |
| Connecticut | 3,800 | 65 | 18 | 48 | 8 | 3 | 5 | 27 | 19 | 8 |
| Florida | 27,000 | 59 | 12 | 47 | 8 | 3 | 5 | 33 | 21 | 12 |
| Georgia | 21,600 | 55 | 10 | 45 | 7 | 2 | 5 | 38 | 23 | 15 |
| Illinois | 35,600 | 60 | 12 | 48 | 9 | 3 | 6 | 31 | 18 | 13 |
| Indiana | 9,000 | 56 | 13 | 43 | 6 | 2 | 4 | 38 | 22 | 16 |
| Kansas | 5,900 | 57 | 16 | 41 | 6 | 4 | 2 | 37 | 21 | 16 |
| Kentucky | 2,800 | 55 | 11 | 44 | 10 | 6 | 4 | 34 | 19 | 16 |
| Louisiana | 1,800 | 66 | 10 | 56 | 4 | 1 | 3 | 30 | 15 | 15 |
| Maryland | 8,100 | 58 | 17 | 41 | 9 | 5 | 4 | 33 | 24 | 9 |
| Massachusetts | 5,900 | 58 | 17 | 40 | 10 | 4 | 6 | 32 | 23 | 10 |
| Michigan | 5,400 | 59 | 18 | 41 | 9 | 4 | 5 | 33 | 18 | 14 |
| Minnesota | 5,500 | 56 | 19 | 36 | 10 | 5 | 5 | 34 | 24 | 10 |
| Missouri | 3,300 | 58 | 20 | 39 | 6 | 3 | 2 | 36 | 26 | 10 |
| Nevada | 12,400 | 58 | 12 | 46 | 8 | 2 | 6 | 34 | 22 | 12 |
| New Jersey | 17,400 | 60 | 12 | 48 | 8 | 3 | 5 | 32 | 20 | 12 |
| New Mexico | 6,000 | 48 | 11 | 36 | 7 | 2 | 4 | 46 | 31 | 15 |
| New York | 32,900 | 55 | 13 | 42 | 10 | 4 | 6 | 35 | 23 | 13 |
| North Carolina | 25,100 | 53 | 12 | 41 | 9 | 4 | 6 | 38 | 25 | 13 |
| Ohio | 4,000 | 49 | 12 | 37 | 14 | 2 | 12 | 37 | 24 | 12 |
| Oklahoma | 6,100 | 56 | 12 | 43 | 7 | 3 | 4 | 37 | 21 | 16 |
| Oregon | 10,200 | 57 | 12 | 46 | 10 | 4 | 7 | 32 | 20 | 12 |
| Pennsylvania | 4,900 | 51 | 12 | 39 | 11 | 4 | 6 | 38 | 29 | 10 |
| South Carolina | 6,000 | 47 | 9 | 38 | 11 | 2 | 9 | 42 | 25 | 18 |
| Tennessee | 7,900 | 57 | 9 | 48 | 6 | 3 | 3 | 37 | 23 | 14 |
| Texas | 113,000 | 53 | 12 | 41 | 7 | 2 | 5 | 40 | 24 | 16 |
| Utah | 8,900 | 59 | 14 | 44 | 10 | 3 | 7 | 31 | 22 | 9 |
| Virginia | 10,100 | 62 | 20 | 42 | 6 | 3 | 4 | 32 | 24 | 8 |
| Washington | 16,300 | 57 | 12 | 46 | 8 | 2 | 6 | 35 | 24 | 10 |
| Wisconsin | 6,700 | 51 | 12 | 39 | 12 | 5 | 6 | 37 | 22 | 15 |

Notes: The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by USCIS as of September 4, 2017. Refers to all current DACA recipients, whether in or out of education, and regardless of age. Those under age 16 are categorized as not in the labor force. Those enrolled in school include those enrolled in middle school, high school, or college/university. Only states with sufficient sample sizes are shown. Percentages may not add up to 100 due to rounding.

Sources: MPI analysis of U.S. Census Bureau data from the pooled 2010-14 ACS and 2008 SIPP, with legal status assignments by Bachmeier and Van Hook.

Migration Policy Institute

11



# Fact Sheet

**Appendix 3. Employed Current DACA Recipients by Major Industry Group, Top States**

| | US | AZ | CA | CO | CT | FL | GA | IL | MD | MA | NV | NJ | NY | NC | OK | OR | PA | TN | TX | UT | VA | WA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current DACA Recipients** | 689,800 | 25,500 | 197,900 | 15,500 | 3,800 | 27,000 | 21,600 | 35,600 | 8,100 | 5,900 | 12,400 | 17,400 | 32,900 | 25,100 | 6,100 | 10,200 | 4,900 | 7,900 | 113,000 | 8,900 | 10,100 | 16,300 |
| **Employment** | | | | | | | | | | | | | | | | | | | | | | |
| Employed (%) | 55% | 47% | 55% | 60% | 65% | 59% | 55% | 60% | 58% | 58% | 58% | 60% | 55% | 53% | 56% | 57% | 51% | 57% | 53% | 59% | 62% | 57% |
| Unemployed or not in labor force (%) | 45% | 53% | 45% | 40% | 35% | 41% | 45% | 40% | 42% | 42% | 42% | 40% | 45% | 47% | 44% | 43% | 49% | 43% | 47% | 41% | 38% | 43% |
| **Employed Current DACA Recipients** | 382,400 | 12,100 | 108,900 | 9,200 | 2,500 | 15,900 | 11,900 | 21,400 | 4,700 | 3,400 | 7,200 | 10,400 | 18,000 | 13,200 | 3,400 | 5,900 | 2,500 | 4,500 | 60,300 | 5,200 | 6,300 | 9,300 |
| *Share by Major Industry Group (%)* | | | | | | | | | | | | | | | | | | | | | | |
| Agriculture | 4% | 2% | 5% | 1% | 2% | 7% | 2% | <1% | <1% | <1% | 1% | <1% | 1% | 4% | 2% | 11% | 8% | 4% | 2% | 2% | 4% | 14% |
| Arts, Entertainment, Recreation, Accommodations, and Food Services | 23% | 19% | 22% | 29% | 28% | 21% | 21% | 27% | 19% | 27% | 32% | 25% | 24% | 26% | 29% | 21% | 23% | 20% | 21% | 30% | 28% | 19% |
| Construction | 11% | 14% | 7% | 13% | 13% | 12% | 21% | 5% | 14% | 5% | 11% | 7% | 10% | 17% | 18% | 8% | 15% | 25% | 15% | 9% | 15% | 9% |
| Educational, Health, and Social Services | 11% | 14% | 11% | 8% | 9% | 8% | 9% | 10% | 20% | 16% | 8% | 9% | 13% | 7% | 5% | 14% | 15% | 3% | 12% | 10% | 10% | 10% |
| Finance, Insurance, Real Estate, and Rental and Leasing | 4% | 6% | 3% | 5% | 3% | 4% | 6% | 4% | 3% | 2% | 6% | 3% | 4% | 1% | 3% | 4% | 1% | <1% | 4% | 6% | 2% | 3% |
| Information and Communications | 1% | 1% | 1% | <1% | <1% | <1% | <1% | 2% | <1% | 2% | 1% | <1% | 1% | <1% | <1% | 1% | 1% | 1% | <1% | <1% | <1% | 1% |
| Manufacturing | 9% | 3% | 9% | 4% | 5% | 3% | 12% | 16% | 4% | 11% | 5% | 7% | 5% | 17% | 11% | 6% | 6% | 8% | 8% | 17% | 4% | 7% |
| Mining | <1% | <1% | <1% | 2% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 3% | <1% | <1% | 2% | 2% | <1% | <1% | <1% |
| Professional, Scientific, Management, Administrative, and Waste Management Services | 10% | 13% | 10% | 13% | 16% | 13% | 10% | 12% | 16% | 9% | 9% | 13% | 10% | 8% | 5% | 10% | 8% | 18% | 8% | 5% | 9% | 11% |
| Public Administration | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 1% | <1% | <1% | 2% | <1% | <1% | <1% | <1% | 2% | <1% |
| Retail Trade | 14% | 15% | 16% | 12% | 17% | 19% | 9% | 14% | 12% | 18% | 15% | 15% | 16% | 8% | 9% | 17% | 11% | 6% | 15% | 11% | 15% | 12% |
| Transportation and Warehousing | 3% | 1% | 3% | 1% | <1% | 2% | 2% | 2% | 2% | 2% | 5% | 4% | 4% | 2% | 3% | <1% | 1% | 5% | 3% | 1% | 2% | 4% |
| Utilities | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 5% | <1% | <1% | <1% | 1% | <1% |
| Wholesale | 3% | 3% | 4% | 2% | 1% | 3% | 4% | 3% | 2% | 4% | 2% | 6% | 9% | 2% | 2% | 3% | 4% | 1% | 2% | 2% | 1% | 4% |
| Other Services (except public administration) | 6% | 8% | 7% | 8% | 4% | 7% | 3% | 5% | 6% | 3% | 4% | 9% | 9% | 6% | 9% | 3% | 4% | 4% | 7% | 5% | 7% | 5% |
| Armed Forces | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |

*Notes: The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by USCIS as of September 4, 2017. Refers to all current DACA recipients regardless of age. Those under age 16 are categorized as not in the labor force. Only states with sufficient sample sizes are shown. Major industry groups are based on the U.S. Census Bureau's classification. Percentages may not add up to 100 due to rounding. Industry group percentages are of employed recipients.*

*Sources: MPI analysis of U.S. Census Bureau data from the pooled 2010-14 ACS and 2008 SIPP, with legal status assignments by Bachmeier and Van Hook.*

AR2022_500918

# Fact Sheet

**Appendix 4.  Employed Current DACA Recipients by Major Occupational Group, Top States**

| | US | AZ | CA | CO | CT | FL | GA | IL | MD | MA | NV | NJ | NY | NC | OK | OR | PA | TN | TX | UT | VA | WA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current DACA Recipients** | 689,800 | 25,500 | 197,900 | 15,500 | 3,800 | 27,000 | 21,600 | 35,600 | 8,100 | 5,900 | 12,400 | 17,400 | 32,900 | 25,100 | 6,100 | 10,200 | 4,900 | 7,900 | 113,000 | 8,900 | 10,100 | 16,300 |
| **Employment** | | | | | | | | | | | | | | | | | | | | | | |
| Employed (%) | 55% | 47% | 55% | 60% | 65% | 59% | 55% | 60% | 58% | 58% | 58% | 60% | 55% | 53% | 56% | 57% | 51% | 57% | 53% | 59% | 62% | 57% |
| Unemployed or not in labor force (%) | 45% | 53% | 45% | 40% | 35% | 41% | 45% | 40% | 42% | 42% | 42% | 40% | 45% | 47% | 44% | 43% | 49% | 43% | 47% | 41% | 38% | 43% |
| **Employed Current DACA Recipients** | 382,400 | 12,100 | 108,900 | 9,200 | 2,500 | 15,900 | 11,900 | 21,400 | 4,700 | 3,400 | 7,200 | 10,400 | 18,000 | 13,200 | 3,400 | 5,900 | 2,500 | 4,500 | 60,300 | 5,200 | 6,300 | 9,300 |
| **Share by Major Occupational Group (%)** | | | | | | | | | | | | | | | | | | | | | | |
| Architecture and Engineering | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 2% | 4% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Arts, Design, Entertainment, Sports, and Media | <1% | <1% | <1% | <1% | <1% | 1% | 1% | 1% | 1% | 2% | <1% | <1% | 2% | 1% | 1% | 4% | <1% | 1% | <1% | <1% | <1% | <1% |
| Building and Grounds Cleaning and Maintenance | 8% | 11% | 8% | 11% | 19% | 13% | 8% | 7% | 10% | 8% | 8% | 11% | 8% | 10% | 6% | 9% | 6% | 17% | 6% | 6% | 11% | 9% |
| Business Operations Specialists | <1% | 1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 2% | <1% | <1% | <1% | <1% | <1% | 2% | <1% | 2% | <1% | 1% | <1% | 2% |
| Community and Social Services | <1% | <1% | <1% | <1% | 2% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 4% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 2% |
| Computer and Mathematical | <1% | <1% | <1% | <1% | 1% | <1% | <1% | <1% | 4% | 2% | <1% | <1% | 1% | <1% | <1% | <1% | <1% | <1% | <1% | 1% | 2% | 2% |
| Construction Trades | 10% | 10% | 6% | 14% | 13% | 11% | 18% | 6% | 10% | 4% | 10% | 7% | 9% | 15% | 17% | 7% | 11% | 23% | 3% | 10% | 15% | 10% |
| Education, Training, and Library | 2% | 3% | 2% | 1% | <1% | 1% | 1% | 2% | 5% | 3% | <1% | 1% | 4% | 2% | 2% | 3% | 4% | 1% | 3% | 4% | 2% | 2% |
| Extraction Workers | <1% | <1% | <1% | 1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 1% | <1% | 1% | <1% | <1% |
| Farming, Fishing, and Forestry | 3% | 2% | 5% | <1% | <1% | 6% | 2% | <1% | <1% | 2% | 1% | <1% | 1% | 4% | 2% | 9% | 7% | <1% | 1% | 2% | 2% | 12% |
| Financial Specialists | <1% | <1% | <1% | <1% | 1% | <1% | <1% | <1% | 1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 2% | <1% | <1% |
| Food Preparation and Serving | 16% | 13% | 13% | 18% | 21% | 14% | 15% | 18% | 14% | 21% | 18% | 19% | 19% | 20% | 16% | 16% | 14% | 18% | 13% | 17% | 17% | 15% |
| Health-Care Practitioners and Technical | 2% | 1% | 1% | 3% | <1% | 1% | <1% | 2% | 5% | 1% | <1% | 1% | 2% | 1% | <1% | 3% | 3% | <1% | 2% | 3% | 2% | 2% |
| Health-Care Support | 2% | 2% | 2% | 3% | 1% | 1% | 3% | 2% | 5% | 2% | 2% | 2% | 2% | 1% | 1% | 3% | 2% | <1% | 2% | 2% | 3% | 2% |
| Installation, Maintenance, and Repair Workers | 3% | 4% | 3% | 3% | <1% | 3% | 2% | 2% | 2% | 2% | 4% | 3% | 2% | 2% | 2% | 3% | 2% | 5% | 4% | <1% | 3% | 3% |
| Legal | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |
| Life, Physical, and Social Science | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 3% | <1% | <1% | 1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 3% | <1% |
| Management | 4% | 3% | 4% | 4% | 1% | 3% | 4% | 4% | 3% | 2% | 7% | 4% | 3% | 2% | 5% | 3% | 4% | 6% | 4% | 5% | 3% | 3% |
| Office and Administrative Support | 12% | 13% | 14% | 9% | 12% | 12% | 10% | 16% | 11% | 16% | 15% | 12% | 13% | 11% | 12% | 9% | 8% | 6% | 12% | 12% | 7% | 7% |
| Personal Care and Service | 4% | 6% | 3% | 4% | 6% | 5% | <1% | 4% | 2% | 2% | 3% | 2% | 7% | 3% | 2% | 6% | 6% | <1% | 4% | <1% | 4% | 4% |
| Production | 8% | 5% | 7% | 4% | 4% | <1% | 14% | 13% | 5% | 5% | 5% | 5% | 7% | 12% | <1% | 6% | 6% | 10% | 8% | 13% | 3% | 8% |
| Protective Service | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | 1% | 2% | <1% | <1% | <1% | <1% | <1% |
| Sales | 14% | 16% | 16% | 16% | 16% | 16% | 11% | 14% | 13% | 13% | 13% | 12% | 14% | 8% | 10% | 10% | 7% | 6% | 15% | 10% | 20% | 12% |
| Transportation and Material Moving | 7% | 5% | 8% | 7% | 2% | 6% | 5% | 6% | 5% | 5% | 10% | 12% | 4% | 6% | 10% | 7% | 6% | <1% | 6% | 11% | 3% | 9% |
| Military Specific | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |

*Notes: The 2010-14 DACA-eligible population is reweighted to match the age, gender, origin-country, and state-of-residence distribution of current DACA recipients reported by USCIS as of September 4, 2017. Refers to all current DACA recipients regardless of age. Those under age 16 are categorized as not in the labor force. Only states with sufficient sample sizes are shown. Major occupational groups are based on the U.S. Census Bureau's classification. Percentages may not add up to 100 due to rounding. Occupational group percentages are of employed recipients.*

*Sources: MPI analysis of U.S. Census Bureau data from the pooled 2010-14 ACS and 2008 SIPP, with legal status assignments by Bachmeier and Van Hook.*



# Endnotes

1   See Randy Capps, Michael Fix, and Jie Zong, *The Education and Work Profiles of the DACA Population* (Washington, DC: Migration Policy Institute, 2017), www.migrationpolicy.org/research/education-and-work-profiles-daca-population.

2   For Migration Policy Institute (MPI) estimates of populations that could qualify for legal status under a range of legislative proposals, see Jeanne Batalova, Ariel G. Ruiz Soto, Sarah Pierce, and Randy Capps, *Differing DREAMs: Estimating the Unauthorized Populations that Could Benefit under Different Legalization Bills* (Washington, DC: MPI, 2017), www.migrationpolicy.org/research/differing-dreams-estimating-unauthorized-populations-could-benefit-under-different.

3   The specific eligibility requirements for the Deferred Action for Childhood Arrivals (DACA) program were: (1) minimum age of 15 to apply; (2) arrival in the United States before age 16; (3) maximum age of 30 as of June 15, 2012 (when the program was announced); (4) physical presence and lack of lawful status in the United States on June 15, 2012; (5) continuous presence in the United States since June 15, 2007, five years before DACA was announced; (6) current school enrollment, completion of high school or its equivalent, or honorable discharge from the U.S. armed forces or Coast Guard; and (7) absence of a felony, significant misdemeanor, three or more misdemeanor convictions; and does not pose a threat to public safety or national security. See U.S. Citizenship and Immigration Services (USCIS), "Consideration of Deferred Action for Childhood Arrivals (DACA)," updated October 6, 2017, www.uscis.gov/archive/consideration-deferred-action-childhood-arrivals-daca#guidelines.

4   For a complete listing of MPI's work in this area, see MPI, "DREAM ACT/Deferred Action," www.migrationpolicy.org/topics/dream-actdeferred-action.

5   MPI estimated that as of 2017, there were 1.9 million unauthorized immigrants who met the age at entry and years of U.S. residence requirements constituting the minimum threshold to potentially be considered for DACA. Of that number, an estimated 1.3 million immediately met all eligibility requirements, another 408,000 could have met eligibility by enrolling in an adult education program leading to a high school degree or equivalent, while 120,000 would have aged into eligibility once they reached the program's minimum application age of 15. Because USCIS stopped accepting applications in September 2017, these last two groups can no longer age into eligibility or enroll in adult education to qualify for the program. Eligibility due to adult education program enrollment and ineligibility due to criminal background or lack of continuous U.S. presence were not modeled due to lack of data. For methodological details, see the appendix section in Capps, Fix, and Zong, *The Education and Work Profiles of the DACA Population*.

6   USCIS, "Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (June 30)," accessed October 30, 2017, www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf.

7   MPI used data from the Census Bureau's 2010-14 American Community Survey (ACS) and the 2008 Survey of Income and Program Participation (SIPP). While the ACS is issued annually, the SIPP is released only every several years. MPI is in the process of adapting the methodology to the 2014 SIPP, which was issued earlier in 2017. By using the SIPP's numbers on legal permanent residents and naturalized citizens, MPI is able to look at the characteristics of the remaining foreign-born population, removing those likely to be on long-term nonimmigrant visas, Temporary Protected Status, or similar programs, leaving a residual population of those believed to be unauthorized. The characteristics of that population can then be assigned to the much larger and more recent ACS file. For more on MPI's methodology, see Jeanne Batalova, Sarah Hooker, and Randy Capps, *DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action* (Washington,

A Profile of Current DACA Recipients by Education, Industry, and Occupation

# Fact Sheet

DC: MPI, 2014), www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action.

8       The SIPP and ACS data do not permit modeling enrollment in adult education programs that lead to a high school degree or equivalent, or to model criminal convictions or security-related disqualifications.

9       USCIS publication in September 2017 of new data on DACA recipients' age, gender, origin-country, and residence-state distributions permits MPI to describe the educational and employment characteristics of the DACA-*recipient* population. Previously, MPI could only model characteristics for the DACA-*eligible* population, in particular those meeting all criteria to apply. The characteristics detailed here for DACA recipients vary somewhat from those previously offered for the DACA-eligible population (see Capps, Fix, and Zong, *The Education and Work Profiles of the DACA Population*) because the DACA-recipient profile looks somewhat different than that of the DACA-eligible cohort, as individuals did not apply in similar proportions. Younger immigrants, for instance, are more likely to be enrolled in school and less likely to be employed. Women are more likely than men to be enrolled in school, less likely to be employed overall and in construction, and more likely to be employed in service industries.

10      USCIS, "Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals."

11      USCIS, "Approximate Active DACA Recipients: Country of Birth As of September 4," accessed October 28, 2017, www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

12      Justice Department, "Attorney General Sessions Delivers Remarks on DACA," September 5, 2017, www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca. See also Department of Homeland Security (DHS), "Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA)," last updated September 5, 2017, www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

13      Jill Colvin, "22,000 Young Immigrants Eligible for DACA Renewals Failed to Apply in Time," *Business Insider,* October 19, 2017, www.businessinsider.com/22000-daca-recipients-missed-renewal-deadline-2017-10; Alan Neuhauser, "DHS: 1 in 7 DACA Recipients Did Not Apply to Renew Status," *U.S. News and World Report, October 19, 2017, www.usnews.com/news/national-news/articles/2017-10-19/dhs-1-in-7-daca-recipients-did-not-apply-to-renew-status.*

14      MPI used the 2010-14 American Community Survey (ACS) to develop the database of the population eligible for DACA: five years of data were used to improve the precision of the analysis, allowing for estimates for a broader range of industries, occupations, and states than would be possible using the single-year 2014 ACS. MPI has not yet finalized a dataset of the unauthorized population using more recent years of the ACS.

15      Three types of schools are considered according to USCIS guidelines: 1) a public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or homeschool program that meets state requirements; 2) an education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where the enrollee is working to achieve such placement; or 3) an education program assisting students either in obtaining a regular high school diploma or its equivalent, or in passing a GED exam or other state-authorized exam. See USCIS, "Frequently Asked Questions," updated October 6, 2017, www.uscis.gov/archive/frequently-asked-questions.



16    The ACS data employed here do not identify individuals enrolled in adult education or career training programs, so unauthorized immigrants who meet other eligibility requirements but who have not completed high school and are not enrolled in school are excluded from the DACA-participating group. USCIS has not released data on participants' educational attainment or school enrollment.

17    This analysis was limited to 34 states because the other states did not have sufficiently large DACA populations to develop reliable estimates. In some cases, the data offered are limited to 21 states, for the same reason.

18    An estimated 382,000 DACA recipients are employed (see Table 2). This represents 0.25 percent of all U.S. workers (152 million) as of September See U.S. Department of Labor, Bureau of Labor Statistics, "The Employment Situation—September 2017" (news release USDL-17-1347, October 6, 2017), www.bls.gov/news.release/pdf/empsit.pdf.

19    MPI Data Hub, "Unauthorized Immigrant Population Profiles," accessed October 24, 2017, www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles.

20    Capps, Fix, and Zong, *The Education and Work Profiles of the DACA Population.* The population not eligible for DACA includes those who met all DACA eligibility criteria except for the educational requirement, those who arrived in the United States after 2012, those who arrived when they were over age 15, and those who were ages 31 or older in 2012.

21    Prior to publication of the more complete USCIS data on current DACA recipients in September 2017, MPI estimated that 20,000 unauthorized immigrants who were DACA-*eligible* were in the teaching occupation. This estimate included those who were eligible for DACA but not participating in the program as of September 2017, as well as those who reported a teaching occupation but were not employed at the time of the ACS survey in 2010-14. The lower estimate presented here is limited to those *participating* in the program and employed as teachers and similar education professionals at the time of the ACS survey.

22    See for instance, Tom K. Wong and Carolina Valdivia, *In Their Own Words: A Nationwide Survey of Undocumented Millennials* (United We Dream Network and Unbound Philanthropy, 2014), http://unitedwedream.org/wp-content/uploads/2014/05/Undocumented-Millennials-Survey-Summary.pdf; Tom K. Wong, Greisa Martinez Rosas, Adrian Reyna, Ignacia Rodriguez, Patrick O'Shea, Tom Jawetz, and Philip E. Wolgin, *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes* (Washington, DC: Center for American Progress, 2016), www.americanprogress.org/issues/immigration/news/2016/10/18/146290/new-study-of-daca-beneficiaries-shows-positive-economic-and-educational-outcomes/; Roberto G. Gonzalez, *DACA at Year Three: Challenges and Opportunities in Accessing Higher Education and Employment* (Washington, DC: American Immigration Council, 2016), www.americanimmigrationcouncil.org/research/daca-year-three-challenges-and-opportunities-accessing-higher-education-and-employment.

A Profile of Current DACA Recipients by Education, Industry, and Occupation

# Fact Sheet

## About the Authors



**Jie Zong** is an Associate Policy Analyst at the Migration Policy Institute, where she provides quantitative research support across MPI programs, particularly the National Center on Immigrant Integration Policy. Her research areas include structural and cultural integration of first- and second-generation immigrants, protective factors for children in refugee families, and workforce development in the United States.

Previously, Ms. Zong interned with the Center for Migration Studies of New York, where she provided research support on U.S. refugee and asylum issues, as well as the U.S. immigration detention system.

She holds a master's degree of public administration from New York University's Wagner Graduate School of Public Service with a specialization in policy analysis, and a bachelor of the arts degree in international finance from the Central University of Finance and Economics in China.



**Ariel G. Ruiz Soto** is an Associate Policy Analyst at MPI, where he provides quantitative research support across MPI programs. His research areas focus on the impact of U.S. immigration policies on immigrants' experiences of socioeconomic integration across varying geographical and political contexts. More recently, Mr. Ruiz Soto has analyzed methodological approaches to estimate sociodemographic trends of the unauthorized immigrant population in the United States.

Mr. Ruiz Soto holds a master's degree from the University of Chicago's School of Social Service Administration with an emphasis on immigration policy and service provision, and a bachelor's degree in sociology from Whitman College.

**Jeanne Batalova** is a Senior Policy Analyst at MPI and Manager of the MPI Data Hub, a one-stop, online resource that provides instant access to the latest facts, stats, and maps covering U.S. and global data on immigration and immigrant integration. She is also a Nonresident Fellow with the Migration Policy Institute Europe.

Her areas of expertise include the impacts of immigrants on society and labor markets; social and economic mobility of first- and second-generation youth and young adults; and the policies and practices regulating immigration and integration of highly skilled workers and foreign students in the United States and other countries.

Dr. Batalova earned her PhD in sociology, with a specialization in demography, from the University of California-Irvine; an MBA from Roosevelt University; and bachelor of the arts in economics from the Academy of Economic Studies, Chisinau, Moldova.





**Julia Gelatt** is a Senior Policy Analyst at the MPI, working with the U.S. Immigration Policy Program. Her work focuses on the legal immigration system, demographic trends, and the implications of local, state, and federal U.S. immigration policy.

She previously worked as a Research Associate at the Urban Institute, where her mixed-methods research focused on state policies toward immigrants; barriers to and facilitators of immigrant families' access to public benefits and public prekindergarten programs; and identifying youth victims of human trafficking. She was a Research Assistant at MPI before graduate school.

Dr. Gelatt earned her PhD in sociology, with a specialization in demography, from Princeton University, where her work focused on the relationship between immigration status and children's health and well-being. She earned a bachelor of the arts in sociology/anthropology from Carleton College.



**Randy Capps** is Director of Research for U.S. Programs at MPI. His areas of expertise include immigration trends, the unauthorized population, immigrants in the U.S. labor force, the children of immigrants and their well-being, and immigrant health-care and public benefits access and use.

Dr. Capps, a demographer, has published widely on immigrant integration at the state and local level. He also has examined the impact of the detention and deportation of immigrant parents on children.

Prior to joining MPI, Dr. Capps was a researcher in the Immigration Studies Program at the Urban Institute (1993-96, and 2000-08).

He received his PhD in sociology from the University of Texas in 1999 and his Master of Public Affairs degree, also from the University of Texas, in 1992.

## Acknowledgments

This research was supported by the Ford Foundation, the Carnegie Corporation of New York, Unbound Philanthropy, and the Open Society Foundations.

© 2017 Migration Policy Institute.
All Rights Reserved.

Cover Design and Layout: Liz Heimann, MPI

No part of this publication may be reproduced or transmitted in any form by any means, electronic or mechanical, including photocopy, or any information storage and retrieval system, without permission from the Migration Policy Institute. A full-text PDF of this document is available for free download from www.migrationpolicy.org.

Information for reproducing excerpts from this publication can be found at www.migrationpolicy.org/about/copyright-policy. Inquiries can also be directed to communications@migrationpolicy.org.

Suggested citation: Zong, Jie, Ariel G. Ruiz Soto, Jeanne Batalova, Julia Gelatt, and Randy Capps. 2017. *A Profile of Current DACA Recipients by Education, Industry, and Occupation*. Washington, DC: Migration Policy Institute.

The Migration Policy Institute (MPI) is an independent, nonpartisan, nonprofit think tank dedicated to the study of the movement of people worldwide. The Institute provides analysis, development, and evaluation of migration and refugee policies at the local, national, and international levels. It aims to meet the rising demand for pragmatic responses to the challenges and opportunities that migration presents in an ever more integrated world.

WWW.MIGRATIONPOLICY.ORG



1400 16th Street, NW, Suite 300, Washington, DC 20036
202-266-1940 (t) | 202-266-1900 (f)



AR2022_500925

Policy Report  |  October 2017



# DRAINING THE TRUST FUNDS

*Ending DACA and the Consequences to Social Security and Medicare*

By Jose Magaña-Salgado with Tom K. Wong

## I. Executive Summary[1]

Originally implemented in 2012 by President Barack Obama, Deferred Action for Childhood Arrivals (DACA) is a prosecutorial discretion initiative that provides employment authorization (the ability to lawfully work) and protection from deportation for certain undocumented immigrants who entered the United States before the age of 16. Beginning in 2012 and through June of 2017, U.S. Citizenship and Immigration Services (USCIS) granted deferred action under DACA to 793,026 individuals. Approximately 91.4% of DACA recipients are employed, contributing to the Social Security and Medicare trust funds through the Federal Insurance Contributions Act (FICA) through their own contributions and that of their employers.

On September 5, 2017, President Donald J. Trump, through Attorney General Jeff Sessions, announced that, effective immediately, the federal government would functionally end Deferred Action for Childhood Arrivals (DACA). Under this announcement, the Administration will no longer accept initial requests for DACA and will only accept a small portion of renewal requests before October 5, 2017. Beginning March 6, 2018, DACA recipients will begin to lose their DACA status on a rolling basis until March of 2020. Consequently, DACA recipients will lose the ability to be lawfully employed, forcing employers to terminate them and foregoing the Social Security and Medicare contributions that their employment otherwise would have generated. Using updated survey information from DACA recipients, wage growth projections from Bureau of Labor and Statistics (BLS) data, and the latest data from USCIS, this report provides updated ten-year estimates of the Social Security and Medicare losses stemming from President Trump's decision to end DACA.

- The report concludes that the Administration's decision to end DACA will lead to **$40.9 billion in losses to Social Security and Medicare contributions over ten years**, half of which represents lost employee contributions and half employer contributions.

- Of these losses, **$33.1 billion represents the decrease in Social Security contributions** and **$7.7 billion in Medicare contributions.**

- Moreover, as both trust funds use contributions from today's workers to pay out current obligations, the **reduction in contributions reduces the immediately available funds to pay today's U.S. citizen seniors** and others currently eligible for these programs.

- Thus, passage of legislation to provide permanent relief to all current DACA recipients, such as the Dream Act of 2017 or the Recognizing America's Children Act, **would lead to the contribution of at least these same amounts and likely even more because of the broader population protected under potential legislation.**

---

[1] The authors thank Philip Wolgin for his assistance in this report. For questions regarding this report, please contact Professor Tom K. Wong at tomkwong@ucsd.edu.

This report represents an update of the ILRC's previous estimates on this topic, originally released in December of 2016.[1] As part of the previous report, the ILRC also calculated estimated losses for businesses associated with turnover costs. While this report does not update projected turnover costs to businesses, David Bier of CATO calculated updated turnover costs associated with the loss of DACA, concluding those losses to be at least $6.3 billion.[2]

## II. Background

Deferred action represents an exercise of prosecutorial discretion by the Executive branch that allows it to defer the deportation of an immigrant. Deferred action and prosecutorial discretion in the immigration context have a long legal history and precedent.[3] In light of this firm legal foundation and ongoing pressure by immigrant youth in 2012, President Obama, through then-Secretary of the U.S. Department of Homeland Security (DHS) Janet Napolitano, announced the creation of DACA.[4] DACA allowed immigrant youth who came to the United States before the age of 16 and met a series of other stringent public safety and evidentiary requirements to apply for deferred action through USCIS.[5]

Out of a universe of 1.7 million potentially eligible individuals,[6] USCIS eventually granted DACA to 793,026 individuals as of June 30, 2017.[7] These DACA recipients were able to obtain driver's licenses, obtain employment, pursue their careers, further their educational paths, and more. As of August 2017, approximately 91.4% of DACA recipients secured employment,[8] with many of these individuals working at prestigious businesses, including Fortune 500 companies, such as "Walmart, Apple, General Motors, Amazon, JPMorgan Chase, Home Depot, and Wells Fargo."[9] Critically, with every paycheck, these individuals and their employers contribute to the Social Security[10] and Medicare[11] trust funds, which represent the government's two largest entitlement programs that provide financial support to seniors, disabled, and lower income individuals. These trust funds pay out obligations to seniors and other eligible individuals with the contributions provided by current workers. Consequently, eligible recipients—including U.S. citizens and seniors—who receive payments from Social Security and Medicare today, have been, in part, receiving contributions from DACA recipients since 2012.

While President Trump continued DACA for a short time during the beginning of his Administration, on September 5, 2017, the Administration—through Attorney General Jeff Sessions—announced that DACA would end.[12] Allowing approximately a quarter of DACA recipients to apply for renewal one last time (those with expirations between September 5, 2017 and March 5, 2018), the Administration announced that all other requests for DACA, including first-time requests, other renewals, and those whose DACA expired before September 5, 2017, would no longer be able to apply for or be considered for DACA.[13] Beginning March 6, 2018, DACA recipients will begin to lose their DACA on a rolling basis until the end of February of 2020 where the last DACA grants will expire. Thus, over the course of the next two and a half years, DACA recipients will lose the protections associated with deferred action and—critically—their ability to be lawfully employed.

Under federal law, employers are prohibited from hiring and continuing to employ individuals who do not have a valid employment authorization document, commonly known as a work permit.[14] Consequently, over the next two and a half years, employers will regularly have to terminate the employment of DACA recipients as their DACA expires. Accompanying this termination will be a corresponding reduction in Social Security and Medicare contributions both by the employee and the employer. This report quantifies those losses.

In light of the potential for these economic losses, employers are already strongly advocating for the protection of DACA recipients and Dreamers. Notably, over 800 employers, including major names such as Wal-Mart, Target, and PepsiCo, have called on Congress to provide permanent protection for DACA recipients through legislation.[15] Indeed, Congress is currently contemplating a variety of legislation vehicles to protect this population, including the Dream Act of 2017[16] and Recognizing America's Children Act.[17] Passage of one of these pieces of legislation would substantially help mitigate the projected losses to both the Social Security and Medicare trust funds while kickstarting the nation's economic engine

with collateral, significant economic benefits.[18] It is incumbent on Congress to enact one of these bills, provide protection for this population, and mitigate the losses to the trust funds.

## III. Methodology

### A. Overview

This methodology estimates the losses to the Social Security and Medicare trust funds over the course of ten years. However, for the first two years, it does so on a *monthly* basis due to the rolling nature of DACA expirations. To do so, we first establish the number of DACA recipients that will be affected by the Administration's announcement in March 2018. We determine the approximate number of DACA expirations per month to later discount contributions on a monthly basis. We then calculate the average wage increases on a yearly and monthly basis. Finally, we project the number of DACA recipients who are employed and discount their month-to-month and eventually yearly contributions over the course of ten years, factoring projected wage growth throughout.

### B. Methodology Updates

In December of 2016, the ILRC released a report projecting the losses to the Social Security and Medicare trust funds as a result of potentially ending DACA.[19] The current report updates that methodology in a few key ways. Initially, this report employs the latest data from the annual surveys of the DACA population conducted by Professor Tom K. Wong.[20] The latest survey provides the most up-to-date estimates of the percentage of employed DACA recipients and their average yearly wage.[21] Moreover, the report uses the most recently released data by USCIS regarding the current number of DACA recipients and pending applications.[22] Finally, employing Bureau of Labor Statistics data analyzed by the Federal Reserve Bank of Atlanta,[23] this report projects the average wage earnings increase for DACA recipients over the next decade. This report provides estimates for the ten-year period beginning in March of 2018, the month DACA grants will begin to expire.

### C. DACA Population in March of 2018

To project future Social Security and Medicare losses, we need to determine the number of individuals who will likely hold DACA beginning in March of 2018, when expirations begin to occur. To project the total number of individuals with valid grants of DACA in March of 2018 ("f"), we:

- take the total number of approved initial requests as of June 30 ("a");
- add the projected number of approvals for all pending initial applications as of Sept. 5, 2017 ("b");
- subtract those who have adjusted status ("c"); and
- subtract those who did not renew or were not allowed to renew ("d").

Thus, to obtain the projected population of DACA recipients in March of 2018, the formula is:

$$a + b - c - d = f$$

Data for "a" and "b" come from USCIS quarterly statistics. Data from "c" and "d" come from a one-time USCIS data release on September 5, 2017.

### D. Approval Rate

To calculate "b," we need to obtain the overall approval rate, e.g. the rate which accepted requests are eventually approved. To obtain this number, we take the total number of approved initial requests as of June 30 and divide it by the total number of accepted initial requests as of June 30.[24]

| Table A1. Approval Rate for Initial Requests | |
|---|---|
| Accepted initial requests as of June 30 | 897,605 |
| Approved initial requests as of June 30 | 793,026 |
| Approval rate | **88.35%** |

Source: *USCIS Data 2017*

## E. Pending Initial Request as of September 5, 2017 ("b")

The quarterly data shows that there are 34,298 initial accepted applications pending as June 30, 2017.[25] However, this data only represents Quarter 3, e.g. April – June of 2017. Thus, there are 67 days (July 1 through September 5) of initial pending applications not reflected in the data that we must account for when calculating "b".

To do so, we take the average number of initial accepted applications per day for Quarters 1 through 3 of 2017. We obtain this number by dividing the total number of initial accepted applications in these three quarters by 273, the number of total days in all three quarters. We then multiply the average per day by 67 to obtain the number of initial accepted applications filed July through September 5. We add the total number of initial accepted application as of June 30, 2017.

Now that we have the total number of pending applications as of September 5, 2017, we multiply this number by the approval rate to obtain the projected number of initial accepted applications filed by September 5 that will be approved by March 2018 ("b").

| Table A2. Initial Requests Accepted by USCIS | |
|---|---|
| Q1. Oct. - Dec. initial accepted | 15,325 |
| Q2. Jan. - March initial accepted | 10,321 |
| Q3. April - June initial accepted | 10,801 |
| Average per day | 134 |
| July - Sept. 5 initial accepted (projected) | 8,945 |
| June 30 initial accepted | 36,447 |
| Pending initial as of Sept. 5 (projected) | 45,392 |
| Approvals based on pending initial as of Sept. 5, 2017 (projected) | **40,103** |

Source: *USCIS Data 2017*

*Pending initial accepted multiplied by 88.35% approval rate

## F. DACA Approvals Grants in March of 2018 ("f")

We begin with the total number of approved initial requests as of June 30, 2017, the latest date for which data are available, which represents the total number of DACA grants ever approved ("a").[26] Next, we add the number of approvals based on all pending initial applications as of September 5, 2017 ("b"). We need to adjust this number by subtracting the number of individuals who previously held DACA but no longer do. Thus, we subtract the number of DACA recipients who adjusted status and became lawful permanent residents ("c").[27] We also subtract the number of DACA recipients who did not renew or where USCIS denied the renewal ("d").[28] This leaves us with the projected population of the total number of individuals who will hold DACA in March of 2018, or "f."

**Table A3. Projected DACA Recipients in March of 2018**

| | |
|---|---:|
| Approved initial as of June 30 | 793,026 |
| Approvals based on pending initial as of Sept. 5, 2017 (projected) | 40,103 |
| Adjusted status | -39,514 |
| Did not renew or renewal denied | -70,000 |
| March 2018 DACA recipients (projected) | **723,615** |

Source: *USCIS Data 2017; Grassley 2017*

## G. Expirations Per Month

As DACA recipients will lose their DACA on a rolling basis instead of all at once, we need to determine the estimated monthly losses from March 2017 to March 2020. To calculate the average number of expirations per month, we divide the total number of projected DACA recipients in March of 2018 ("f") by 24 (e.g. the number of months in two years). This assumes that previous approvals and renewals are roughly equal on a per month basis. Beginning in March of 2018, we use this number to represent the number of monthly expirations and therefore the monthly decrease in FICA contributions.

**Table B. Expirations per Month**

| Total DACA recipients | Expirations per month |
|---|---:|
| 723,615 | **30,151** |

Source: *USCIS Data 2017*

## H. Projected Wage Growth

The Current Population Survey (CPS) is a survey conducted monthly by the Bureau of Census on behalf of the Bureau of Labor Statistics (BLS). Using microdata from the CPS survey, the Federal Reserve Bank of Atlanta (the Atlanta branch of the Federal Reserve) calculates the median percentage change for wage growth on a monthly basis.[29] Averaging out the overall wage growth for the most recent ten-year period, we obtain the average median wage growth for a ten-year period—the wage growth percentage.[30] We can then employ this average wage growth to project the increase in earnings for DACA recipients on a monthly and per-year basis.

AR2022_500930

**Table C. Historic and Average Wage Growth**

| Date | Overall (%) | Date | Overall (%) | Date | Overall (%) | Date | Overall (%) |
|---|---|---|---|---|---|---|---|
| 8/1/2007 | 4.3 | 2/1/2010 | 1.7 | 8/1/2012 | 2.1 | 2/1/2015 | 3 |
| 9/1/2007 | 4.4 | 3/1/2010 | 1.9 | 9/1/2012 | 2.1 | 3/1/2015 | 3.2 |
| 10/1/2007 | 4.3 | 4/1/2010 | 1.9 | 10/1/2012 | 2.1 | 4/1/2015 | 3.3 |
| 11/1/2007 | 4.3 | 5/1/2010 | 1.6 | 11/1/2012 | 2.3 | 5/1/2015 | 3.3 |
| 12/1/2007 | 4.1 | 6/1/2010 | 1.7 | 12/1/2012 | 2.3 | 6/1/2015 | 3.2 |
| 1/1/2008 | 3.9 | 7/1/2010 | 1.8 | 1/1/2013 | 2.4 | 7/1/2015 | 3.1 |
| 2/1/2008 | 3.9 | 8/1/2010 | 2 | 2/1/2013 | 2.3 | 8/1/2015 | 3.1 |
| 3/1/2008 | 4 | 9/1/2010 | 1.9 | 3/1/2013 | 2.2 | 9/1/2015 | 3 |
| 4/1/2008 | 4.1 | 10/1/2010 | 1.7 | 4/1/2013 | 2.2 | 10/1/2015 | 2.9 |
| 5/1/2008 | 4.1 | 11/1/2010 | 1.7 | 5/1/2013 | 2.2 | 11/1/2015 | 3.1 |
| 6/1/2008 | 4.1 | 12/1/2010 | 1.7 | 6/1/2013 | 2.1 | 12/1/2015 | 3.1 |
| 7/1/2008 | 4.1 | 1/1/2011 | 1.9 | 7/1/2013 | 2.3 | 1/1/2016 | 3.1 |
| 8/1/2008 | 4 | 2/1/2011 | 1.9 | 8/1/2013 | 2.3 | 2/1/2016 | 3.2 |
| 9/1/2008 | 4 | 3/1/2011 | 1.9 | 9/1/2013 | 2.4 | 3/1/2016 | 3.2 |
| 10/1/2008 | 4 | 4/1/2011 | 1.9 | 10/1/2013 | 2.2 | 4/1/2016 | 3.4 |
| 11/1/2008 | 4 | 5/1/2011 | 2 | 11/1/2013 | 2 | 5/1/2016 | 3.5 |
| 12/1/2008 | 3.8 | 6/1/2011 | 2 | 12/1/2013 | 2.2 | 6/1/2016 | 3.6 |
| 1/1/2009 | 3.7 | 7/1/2011 | 2.1 | 1/1/2014 | 2.3 | 7/1/2016 | 3.4 |
| 2/1/2009 | 3.4 | 8/1/2011 | 2.2 | 2/1/2014 | 2.5 | 8/1/2016 | 3.3 |
| 3/1/2009 | 3.3 | 9/1/2011 | 2.1 | 3/1/2014 | 2.4 | 9/1/2016 | 3.6 |
| 4/1/2009 | 3.2 | 10/1/2011 | 2.2 | 4/1/2014 | 2.3 | 10/1/2016 | 3.9 |
| 5/1/2009 | 3.3 | 11/1/2011 | 2 | 5/1/2014 | 2.3 | 11/1/2016 | 3.9 |
| 6/1/2009 | 3.1 | 12/1/2011 | 2 | 6/1/2014 | 2.3 | 12/1/2016 | 3.5 |
| 7/1/2009 | 3 | 1/1/2012 | 1.9 | 7/1/2014 | 2.4 | 1/1/2017 | 3.2 |
| 8/1/2009 | 2.5 | 2/1/2012 | 1.9 | 8/1/2014 | 2.4 | 2/1/2017 | 3.2 |
| 9/1/2009 | 2.3 | 3/1/2012 | 2 | 9/1/2014 | 2.6 | 3/1/2017 | 3.4 |
| 10/1/2009 | 2.1 | 4/1/2012 | 2.2 | 10/1/2014 | 2.8 | 4/1/2017 | 3.5 |
| 11/1/2009 | 2.1 | 5/1/2012 | 2.1 | 11/1/2014 | 2.9 | 5/1/2017 | 3.4 |
| 12/1/2009 | 1.7 | 6/1/2012 | 2.3 | 12/1/2014 | 2.9 | 6/1/2017 | 3.2 |
| 1/1/2010 | 1.6 | 7/1/2012 | 2.1 | 1/1/2015 | 3 | 7/1/2017 | 3.3 |
| | | | | | | Ten-year average (%) | **2.77** |

Source: BLS CPS 2017

To project future wage growth for the DACA population, we begin with the Wong survey regarding the average yearly wage for DACA recipients.[31] From there, we calculate the average yearly wage growth (by increasing the annual wage by the wage growth percentage) and average monthly wage growth (by dividing the yearly wage growth by 12). During the month-by-month rolling expirations, the report uses the average monthly wage growth to determine lost contributions. When all DACA grants expire, we begin to employ the yearly wage growth instead of the monthly wage growth (because there are no longer any monthly decreases of the DACA population).

AR2022_500931

### Table D. Projected DACA Wage Growth

| Year | Avg. yearly wage | Avg. yearly wage growth | Avg. monthly wage |
|------|-----------------|------------------------|-------------------|
| 2017 | $36,232 | $1,005 | $3,019 |
| 2018 | $37,237 | $1,033 | $3,103 |
| 2019 | $38,270 | $1,062 | $3,189 |
| 2020 | $39,332 | $1,091 | $3,278 |
| 2021 | $40,423 | $1,121 | $3,369 |
| 2022 | $41,544 | $1,153 | $3,462 |
| 2023 | $42,697 | $1,184 | $3,558 |
| 2024 | $43,881 | $1,217 | $3,657 |
| 2025 | $45,099 | $1,251 | $3,758 |
| 2026 | $46,350 | $1,286 | $3,862 |
| 2027 | $47,636 | $1,321 | $3,970 |
| 2028 | $48,957 | $1,358 | $4,080 |

Source: Tom Wong Survey 2017; BLS CPS 2017

## I. Social Security and Medicare Tax Rates

The Federal Insurance Contributions Act (FICA) is a federal employment tax that requires contributions from both employers and employees to fund the Social Security and Medicare trust funds.[32] Both of these trust funds require contributions from workers to fund current, outstanding obligations to individuals who are eligible to receive benefits.[33]

The withholding rate for Social Security is 6.2% for employees[34] and 6.2% for employers,[35] for a total of 12.4%. The withholding rate for Medicare is 1.45% for employees[36] and 1.45% for employers,[37] for a total of 2.9%. Social Security tax is only applied to a certain amount of wages each year, for example, in 2016, that limit was $127,200.[38] Additionally, for Medicare, employers must withhold an additional 0.9% on wages in excess of $200,000.[39] As the average yearly wage for DACA recipients is $36,231.91,[40] we do not incorporate the $118,500 limit or additional withholding requirements into our calculations.

## J. Monthly, Yearly, and Ten-year Social Security and Medicare Losses

To estimate the loss in contributions to the Social Security and Medicare trust funds we, with a starting point of March of 2018, determine the number of individuals who would have contributed to both trust funds but cannot due so due to the end of DACA. We estimate these losses on a monthly basis for the first two years (as a result of rolling expirations) and then yearly for the last eight years (as all DACA grants have expired by this point). Additionally, we only estimate the losses for the percentage of individuals who are likely employed (based on the data from the Wong survey regarding the percentage of employed DACA recipients) as non-employed individuals do not contribute FICA taxes.

First, we determine the number of individuals with valid grants of DACA ("Valid grants") at the end of each month. We then calculate the number of individuals whose DACA will expire during each timeframe, whether monthly or yearly ("Expired grants"). We apply the Wong percentage regarding the percentage of DACA recipients employed to determine the percentage of the individuals with expired DACA who are employed ("Prev. employed."). We then multiply this population by the monthly wage or yearly wage ("Monthly wage" and "Yearly wage") to obtain the total lost wages for that month or year ("Total lost wages.") We multiply the total lost wages by the 12.4% Social Security tax rate to obtain the monthly or yearly losses to the Social Security trust fund ("Soc. sec. losses (12.4%)"). We also multiply the total lost wages by the 2.9% Medicare tax rate to obtain the monthly or yearly losses to the Medicare trust fund ("Medicare losses (2.9%)". We have twenty-four separate monthly calculations to reflect the rolling nature of DACA expiration during the first two years of the time period. We then calculate these numbers on a yearly basis during the last eight years to reflect the

AR2022_500932

portion of the ten-year time period where 100% of DACA grants are expired. We do, however, switch back to a monthly calculation for January and February of 2028 to complete our ten-year window.

**Table E. Expiration of Employed DACA Recipients and Social Security and Medicare Losses**

| Date | Valid grants | Expired grants | Prev. employed | Monthly wage | Total lost wages | Soc. sec. losses (12.4%) | Medicare lossess (2.9%) |
|---|---|---|---|---|---|---|---|
| **2018** | | | | | | | |
| Feb. | 723,615 | 0 | 0 | $3,103 | $0 | $0 | $0 |
| March | 693,465 | 30,151 | 27,558 | $3,103 | $85,513,887 | $10,603,722 | $2,479,903 |
| April | 663,314 | 60,301 | 55,115 | $3,103 | $171,027,774 | $21,207,444 | $4,959,805 |
| May | 633,163 | 90,452 | 82,673 | $3,103 | $256,541,661 | $31,811,166 | $7,439,708 |
| June | 603,013 | 120,603 | 110,231 | $3,103 | $342,055,548 | $42,414,888 | $9,919,611 |
| July | 572,862 | 150,753 | 137,788 | $3,103 | $427,569,435 | $53,018,610 | $12,399,514 |
| Aug. | 542,711 | 180,904 | 165,346 | $3,103 | $513,083,322 | $63,622,332 | $14,879,416 |
| Sept. | 512,561 | 211,054 | 192,904 | $3,103 | $598,597,209 | $74,226,054 | $17,359,319 |
| Oct. | 482,410 | 241,205 | 220,461 | $3,103 | $684,111,096 | $84,829,776 | $19,839,222 |
| Nov. | 452,260 | 271,356 | 248,019 | $3,103 | $769,624,984 | $95,433,498 | $22,319,125 |
| Dec. | 422,109 | 301,506 | 275,577 | $3,103 | $855,138,871 | $106,037,220 | $24,799,027 |
| **2019** | | | | | | | |
| Jan. | 391,958 | 331,657 | 303,135 | $3,189 | $966,748,033 | $119,876,756 | $28,035,693 |
| Feb. | 361,808 | 361,808 | 330,692 | $3,189 | $1,054,634,218 | $130,774,643 | $30,584,392 |
| March | 331,657 | 391,958 | 358,250 | $3,189 | $1,142,520,403 | $141,672,530 | $33,133,092 |
| April | 301,506 | 422,109 | 385,808 | $3,189 | $1,230,406,587 | $152,570,417 | $35,681,791 |
| May | 271,356 | 452,260 | 413,365 | $3,189 | $1,318,292,772 | $163,468,304 | $38,230,490 |
| June | 241,205 | 482,410 | 440,923 | $3,189 | $1,406,178,957 | $174,366,191 | $40,779,190 |
| July | 211,054 | 512,561 | 468,481 | $3,189 | $1,494,065,142 | $185,264,078 | $43,327,889 |
| Aug. | 180,904 | 542,711 | 496,038 | $3,189 | $1,581,951,327 | $196,161,964 | $45,876,588 |
| Sept. | 150,753 | 572,862 | 523,596 | $3,189 | $1,669,837,511 | $207,059,851 | $48,425,288 |
| Oct. | 120,603 | 603,013 | 551,154 | $3,189 | $1,757,723,696 | $217,957,738 | $50,973,987 |
| Nov. | 90,452 | 633,163 | 578,711 | $3,189 | $1,845,609,881 | $228,855,625 | $53,522,687 |
| Dec. | 60,301 | 663,314 | 606,269 | $3,189 | $1,933,496,066 | $239,753,512 | $56,071,386 |
| **2020** | | | | | | | |
| Jan. | 30,151 | 693,465 | 633,827 | $3,278 | $2,077,458,763 | $257,604,887 | $60,246,304 |
| Feb. | 0 | 723,615 | 661,384 | $3,278 | $2,167,783,057 | $268,805,099 | $62,865,709 |
| | | | | *Yearly wage* | | | |
| **2021** | 0 | 723,615 | 661,384 | $40,423 | $26,735,051,667 | $3,315,146,407 | $775,316,498 |
| **2022** | 0 | 723,615 | 661,384 | $41,544 | $27,476,726,559 | $3,407,114,093 | $796,825,070 |
| **2023** | 0 | 723,615 | 661,384 | $42,697 | $28,238,976,748 | $3,501,633,117 | $818,930,326 |
| **2024** | 0 | 723,615 | 661,384 | $43,881 | $29,022,373,028 | $3,598,774,255 | $841,648,818 |
| **2025** | 0 | 723,615 | 661,384 | $45,099 | $29,827,502,026 | $3,698,610,251 | $864,997,559 |
| **2026** | 0 | 723,615 | 661,384 | $46,350 | $30,654,966,645 | $3,801,215,864 | $888,994,033 |
| **2027** | 0 | 723,615 | 661,384 | $47,636 | $31,505,386,511 | $3,906,667,927 | $913,656,209 |
| **2028** | 0 | 723,615 | 661,384 | $48,957 | $32,379,398,442 | $4,015,045,407 | $939,002,555 |
| | | | | *Monthly wage* | | | |
| **2028** | | | | | | | |
| Jan. | 0 | 723,615 | 661,384 | $4,080 | $2,698,283,204 | $334,587,117 | $78,250,213 |
| Feb. | 0 | 723,615 | 661,384 | $4,080 | $2,698,283,204 | $334,587,117 | $78,250,213 |
| | | | | Total | $267,586,918,234 | $33,180,777,861 | $7,760,020,629 |
| | | | | | Total Social Security and Medicare Losses Over 10 Years | | $40,940,798,490 |

*Source: USCIS DACA Data 2017; Tom Wong Survey 2017; CPS BLS Data 2017; IRS FICA 2017*

DRAINING THE TRUST FUNDS

## K. Additional Notes

Employers who are forced to terminate their DACA employees may engage in a variety of different conduct in regard to the open position. Some may choose to consolidate the position with another position to avoid the difficulties and turnover costs associated with identifying a new employee. Others may hire another individual at a lower introductory wage rate. And yet others may struggle to fill the position in a timely manner or at all. All of these actions would lead to a decrease in FICA contributions. This report, however, does not speculate on how employers across the nation would address the economic shock of being forced to terminate close to a million workers over the course of two and a half years or any remunerative steps they would attempt to take.

## IV. Conclusion

The end of DACA will have significant and far reaching economic impacts on contributions to the Social Security and Medicare trust funds. President Trump's decision to end DACA will cost these trust funds at least $40.9 billion over ten years, $33.1 billion from Social Security and $7.7 billion from Medicare. Passing legislation to provide permanent protection to the DACA population, however, will guarantee their contributions over the same ten-year period. Moreover, as pending legislation will likely provide protection to more than just the DACA population, these potential gains represent the floor of the contributions that DACA recipients and other immigrants eligible for relief could potentially contribute over a decade.

AR2022_500934

# End Notes

[1] Jose Magaña-Salgado, *Money on the Table: The Economic Impact of Ending DACA*, Immigrant Legal Resource Center, Dec. 2016, https://www.ilrc.org/report-daca-economic-cost.

[2] David Bier, *Ending DACA Will Impose Billions in Employer Compliance Costs*, CATO, Sept. 1, 2017, https://www.cato.org/blog/ending-daca-will-impose-billions-employer-compliance-costs.

[3] Letter from Shoba Sivaprasad Wadhia Esq., Samuel Weiss Faculty Scholar & Clinical Professor of Law Director, Center for Immigrants' Rights Clinic, Penn State Law, et. al, to President Donald J. Trump, President, United States Aug. 14, 2017, *available at* https://pennstatelaw.psu.edu/sites/default/files/documents/pdfs/Immigrants/LawProfLetterDACAFinal8.13.pdf.

[4] Memorandum from Janet Napolitano, Secretary, U.S. Department of Homeland Security, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, to David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection, et. al, (June 15, 2012), *available at* http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[5] *See* U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SECURITY, *Frequently Asked Questions* (September 9, 2017), *available at* https://www.uscis.gov/archive/frequently-asked-questions.

[6] *DACA at Four: Participation in the Deferred Action Program and Impacts on Recipients*, Migration Policy Institute, Aug. 2016, http://www.migrationpolicy.org/research/daca-four-participation-deferred-action-program-and-impacts-recipients.

[7] U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SECURITY, NUMBER OF I-821D, CONSIDERATION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS BY FISCAL YEAR, QUARTER, INTAKE, BIOMETRICS AND CASE STATUS FISCAL YEAR 2012-2017 (June 30) Sep. 20, 2017, *available at* https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals [hereinafter "USCIS DACA Data - Intake"].

[8] Tom K. Wong, *Results from Tom K. Wong et al, 2017 National DACA Survey* 3, University of California, San Diego, August 28, 2017, https://cdn.americanprogress.org/content/uploads/2017/08/27164928/Wong-Et-Al-New-DACA-Survey-2017-Codebook.pdf [hereinafter "Wong 2017 Survey"].

[9] Tom K. Wong, et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, CENTER FOR AMERICAN PROGRESS, Aug. 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[10] SOCIAL SECURITY ADMINISTRATION, *Understanding the Benefits*, 2017, https://www.ssa.gov/pubs/EN-05-10024.pdf.

[11] SOCIAL SECURITY ADMINISTRATION, *Medicare*, 2017, https://www.ssa.gov/pubs/EN-05-10043.pdf.

[12] *See* Memorandum from Elaine C. Duke, Acting Secretary, U.S. Department of Homeland Security, Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA), to James W. McCament, Acting Director, U.S. Citizenship and Immigration Services, et. al, (Sept. 5, 2017), *available at* https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

[13] *Id.*

[14] 8 U.S.C. 1324a (West 2017).

[15] *These Fortune 100 Companies Just Joined Facebook-Backed Call for 'Dreamer' Legislation*, FORTUNE, Sept. 20, 2017, http://fortune.com/2017/09/20/walmart-pepsi-target-dreamer-daca-legislation.

[16] *See* Dream Act of 2017, S.1615, 115th Cong. (2017), https://www.congress.gov/bill/115-congress/senate-bill/1615.

[17] *See* Recognizing America's Children Act, HR.1468, 115th Cong. (2017), https://www.congress.gov/bill/115-congress/house-bill/1468.

[18] Tom K. Wong, et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, CENTER FOR AMERICAN PROGRESS, Aug. 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[19] Jose Magaña-Salgado, *Money on the Table: The Economic Impact of Ending DACA*, Immigrant Legal Resource Center, Dec. 2016, https://www.ilrc.org/report-daca-economic-cost.

[20] Wong 2017 Survey, *supra* note 8, at 3.

[21] *Id.* at 4

[22] USCIS DACA Data - Intake, *supra* note 7.

[23] FEDERAL RESERVE BANK OF ATLANTA, *Wage Growth Tracker*, Sept. 14, 2017, https://www.frbatlanta.org/chcs/wage-growth-tracker.aspx?panel=1.

[24] USCIS DACA Data - Intake, *supra* note 7.

[25] *Id.*

[26] *Id.*

[27] U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SECURITY, *Approximate Active DACA Recipients as of September 4, 2017 by Month Validity Expires and Status of Associated Renewal as of September 7, 2017 (If Submitted)*, Sept. 4, 2017, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_renewal_data.pdf [hereinafter "USCIS DACA Data – Active Grants"]; U.S. Senate, Office of Senator Chuck Grassley, *Data Indicate Unauthorized Immigrants Exploited Loophole to Gain Legal Status, Pathway to Citizenship*, Sept. 1, 2017, https://www.grassley.senate.gov/news/news-releases/data-indicate-unauthorized-immigrants-exploited-loophole-gain-legal-status ("The data provided indicates 59,778 DACA recipients have applied for Lawful Permanent Resident (LPR) status—also known as a 'green card'—and 39,514 have been approved.").

[28] USCIS DACA Data – Active Grants, *supra* note 27.

[29] FEDERAL RESERVE BANK OF ATLANTA, *Wage Growth Tracker*, Sept. 14, 2017, https://www.frbatlanta.org/chcs/wage-growth-tracker.aspx?panel=1.

[30] *Id.* (To obtain the raw data, select "Export" under the Wage Growth Tracker table).

[31] Wong 2017 Survey, *supra* note 8, at 3.

[32] 26 U.S.C. §§ 3101-3128 (West 2017).

AR2022_500936

[33] The Social Security trust fund is projected to become insolvent in 2034 while the Medicare trust fund is projected to become insolvent in 2029. *See* Carolyn Y. Johnson, *Medicare's hospital trust fund will run out of money in 2029*, WALL STREET JOURNAL, July 13, 2017, https://www.washingtonpost.com/news/wonk/wp/2017/07/13/medicares-hospital-trust-fund-will-run-out-of-money-in-2029/. A decrease in contributions, e.g. because of the removal of close to three quarter of million employees from the workforce, is thus likely to move forward the insolvency dates for both of these programs.

[34] 26 U.S.C. §3101(a) (West 2017).

[35] *Id.* at § 3111(a).

[36] *Id.* at § 3101(b)(1).

[37] *Id.* at § 3111(b).

[38] INTERNAL REVENUE SERVICE, *Topic 751 - Social Security and Medicare Withholding Rates*, April 14, 2017, https://www.irs.gov/taxtopics/tc751.html.

[39] 26 U.S.C. § 3101 (West 2017).

[40] Wong 2017 Survey, *supra* note 8, at 4.

AR2022_500937

POLICY BRIEF



# Money on the Table:

## The Economic Cost of Ending DACA

Immigrant Legal Resource Center    |    By Jose Magaña-Salgado    |    December 2016

AR2022_500938



## ACKNOWLEDGEMENTS

The author extends his thanks to the Immigrant Legal Resource Center (ILRC) and colleagues for their assistance in developing and editing this report, including Angie Junck and Kemi Bello. The author is also grateful to Philip Wolgin, Silva Mathema, Harry Stein, and professor Tom K. Wong. Additionally, the author extends his thanks for the support of ILRC's Executive Director, Eric Cohen, and the ILRC's Board of Directors.

Founded in 1979, ILRC is a national resource center that provides training, consultations, publications, and advocacy support to individuals and groups assisting low-income persons with immigration matters. ILRC works with a broad array of individuals, agencies, and institutions, including immigration attorneys and advocates, criminal defense attorneys, civil rights advocates, social workers, law enforcement, judges, and local and state elected officials.

For more on the Immigrant Legal Resource Center, please visit http://www.ilrc.org.

© 2016 Immigrant Legal Resource Center

All Rights Reserved.

Suggested citation: Jose Magaña-Salgado, *Money on the Table: The Economic Cost of Ending DACA*, Immigrant Legal Resource Center, Dec. 2016, available at https://www.ilrc.org/report-daca-economic-cost.

AR2022_500939



# TABLE OF CONTENTS

I. EXECUTIVE SUMMARY......................................................................................... **4**

II. INTRODUCTION................................................................................................... **5**

III. METHODOLOGY.................................................................................................. **5**

     A. MEDICARE AND SOCIAL SECURITY CALCULATIONS............................................. **6**

     B. TURNOVER COST CALCULATIONS................................................................... **7**

IV. CONCLUSION..................................................................................................... **7**

V. CITATIONS.......................................................................................................... **8**



# I. EXECUTIVE SUMMARY

Deferred Action for Childhood Arrivals (DACA) provides employment authorization, e.g. the ability to lawfully work in the United States, and protection from deportation for undocumented immigrants who entered the United States before the age of 16 and meet other requirements. **Through June of 2016, U.S. Citizenship and Immigration Services (USCIS) has granted DACA to 741,546 individuals.**

DACA represents an immense success in the context of immigration policy, building the foundation for young immigrants to put their skills and education to better use for themselves, their families, and the American economy. **Eighty-seven percent, or 645,145 of DACA recipients are currently employed with businesses in the United States.** Through this employment, DACA has also broadened the payroll tax base, dramatically increasing Social Security and Medicare contributions.

DACA recipients bring a variety of educational and professional backgrounds to a wide spectrum of industries, from educators and community service providers to retail, manufacturing and hospitality workers. With DACA, many individuals have gotten their first job; contributed greater amounts in state, local, and federal taxes; increased their educational attainment; supported their families; and obtained state identification and driver's licenses.

> **Through June of 2016, U.S. Citizenship and Immigration Services (USCIS) has granted DACA to 741,546 individuals.**

Yet these boosts to our nation's income are at risk of being cut as early as next month. President-elect Trump has promised to end DACA, which would **lead to the immediate unemployment of the 645,145 DACA recipients who are currently employed**. This massive unemployment would lead businesses and employers to **incur turnover costs, e.g. costs associated with termination and potential replacement of an employee, of at least $3.4 billion.**

In the tax context, **ending DACA would reduce Social Security and Medicare tax contributions by $24.6 billion over a decade, half of which would have been paid by employers. Of these contributions, the reduction in Social Security contributions would be $19.9 billion, while the reduction to Medicare contributions would be $4.6 billion.**

From an economic perspective, the incoming Administration would be wise to leave DACA fully intact. Our nation is significantly better off when our economy is driven by a healthy and robust workforce that is able to keep pace with industry demand. The billions of dollars in tax contributions resulting from the program should be reinvested in our nation's workers and retirees, not left on the table.

As the President-elect gears up to prepare his fiscal policy, one thing is clear: ending DACA is bad for business and bad for American workers.

AR2022_500941



## II. INTRODUCTION

As one of his first post-inauguration actions, President-elect Trump has promised to end President Obama's executive actions on immigration, including Deferred Action for Childhood Arrivals or DACA.[1] Originally announced on June 15, 2012, DACA represents a prosecutorial discretion initiative that provides employment authorization and protection from deportation for certain young adults who entered the age before the age of 16 and meet other, stringent requirements.[2] Over 741,546 undocumented immigrants currently hold DACA, all of whom are at risk of losing their employment authorization and being targeted for deportation when President-elect Trump takes office on January 20, 2017. The  Center of American Progress estimates that ending DACA would reduce the nation's GDP by $433.4 billion over a decade.[3] This brief expands on those findings and provides estimates on the negative impact on certain payroll tax revenues and increased replacement and retraining costs for employers, or turnover costs.

This policy brief synthesizes existing research—including a comprehensive survey conducted by political scientist Tom K. Wong, Center for American Progress, United We Dream, and National Immigration Law Center ("Professor Wong's study");[4] federal tax law; the Federal Income Contributions Act; and studies regarding turnover cost—

**Eighty-seven percent, or 645,145 of DACA recipients are currently employed with businesses in the United States.**

to calculate the economic impact of ending DACA in two key areas: (a) Social Security and Medicare revenues and (b) employer turnover costs. The policy brief concludes that ending DACA would have a significantly negative economic impact in these areas, shrinking the tax base, and imposing unneeded and burdensome turnover costs on employers.

## III. METHODOLOGY

As of June 30, 2016, USCIS granted DACA to 741,546 individuals.[5] Professor Wong's study surveyed over 1,000 DACA recipients and concluded that 87% were employed,[6] with the average hourly wage being $13.96.[7] According to the Organisation for Economic Co-operation and Development, the average number of hours worked by employees in the United States is 1,790.  Consequently, to calculate the average yearly wage for a DACA recipient, we multiply $13.96 by 1,790,[8] yielding $24,988.40. To calculate the number of DACA Recipients who are actually employed, we multiply 87% by 741,546 and obtain 645,145. Using these baseline numbers, we are able to apply certain tax and employment cost assumptions to yield the conclusions of this report.

This report assumes that the DACA population would not increase over the course of a decade. The Migration Policy Institute, however, estimates the total potentially eligible population for DACA at 1.9 million individuals.[9]

AR2022_500942

Due to the uncertainty of DACA's continued existence and future application rates, this brief does not attempt to estimate the number of individuals who could potentially obtain DACA in the future and the associated economic impact of subsequently revoking DACA for those individuals. Additionally, USCIS' data regarding the total number of DACA recipients are from June of 2016, but since then, USCIS has likely approved tens of thousands additional DACA requests, e.g. in June USCIS had over 40,000 pending requests for initial DACA alone.[10] However, as the June 2016 data represents the most recent data release by USCIS, this report uses those numbers. In light of these two limitations, the estimates in this report likely undercount the true economic impact of ending DACA.

## A. MEDICARE AND SOCIAL SECURITY CALCULATIONS

The Federal Insurance Contributions Act (FICA) is a federal employment tax that requires contributions from both employers and employees to fund the Social Security and Medicare trust funds.[11] Both of these trust funds require contributions from workers to fund current, outstanding obligations to individuals who are eligible to receive benefits.[12]

The withholding rate for Social Security is 6.2% for employees[13] and 6.2% for employers,[14] for a total of 12.4%. The withholding rate for Medicare is 1.45% for employees[15] and 1.45% for employers,[16] for a total of 2.9%. Social Security tax is only applied to a certain amount of wages each year, for example, in 2016, that limit was $118,500.[17] Additionally, for Medicare, employers must withhold an additional 0.9% on wages in excess of $200,000.[18] As the average yearly wage for DACA recipients is $24,988.40, we do not incorporate the $118,500 limit or additional withholding requirements into our calculations.

> **...ending DACA would reduce Social Security and Medicare tax contributions by $24.6 billion over a decade, half of which would have been paid by employers.**

To obtain the amount the average DACA employee and employer contributes in Social Security taxes per year, we multiply $24,988.40 (the average yearly wage) by 12.4% (the total Social Security tax rate), which yields $3,098.56. To obtain the amount all DACA employees and employers contribute to Social Security taxes per year, we multiply $3,098.56 by 645,145 (the number of DACA recipients employed), yielding $1,999,021,585.40. To obtain the total amount contributed through Social Security taxes over a decade, we multiply $1,999,021,585.40 by 10, yielding $19,990,215,854.03 or $19.9 billion. By dividing $19,990,215,854.03 by half, we obtain $9,995,107,927.02, which represents both the DACA employer and employee contribution over a decade.

To obtain the amount the average DACA employee and employer contribute to Medicare taxes per year, we multiply $24,988.40 (the average yearly wage) by 2.9% (the total Medicare tax rate), which yields $724.66. To obtain the amount all average DACA employees and employers contribute to Medicare taxes per year,

AR2022_500943

we multiply $724.66 by 645,145 (the number of DACA recipients employed), yielding $467,513,112.72. To obtain the total amount contributed to Medicare taxes over a decade, we multiply $467,513,112.72 by 10, yielding $4,675,131,127.15 or $4.6 billion. By dividing $4,675,131,127.15 by half, we obtain $2,337,565,563.58, which represents both the DACA employer and employee Medicare contribution over a decade.

Combining $19,990,215,854.03 (DACA employer and employee Social Security contribution over ten years) and $4,675,131,127.15 (DACA employer and employee Medicare contribution over ten years) yields $24,665,346,981.19 or $24.6 billion, the total amount of FICA contributions over a decade by DACA employers and employees.

### B. TURNOVER COST CALCULATION

The end of DACA would mean that the 645,145 DACA recipients who are employed would lose their employment authorization—which allows lawful employment in the United States. Consequently, employers would have to lay off these individuals and incur turnover costs. Employers incur a variety of turnover costs when an employee leaves a position, costs compounded when that employer must replace the absent employee. These costs can include the cost to temporarily cover an employee's responsibilities, replacement costs (such as searching, interviewing, and hiring replacement candidates), training costs of new employees, and more.[19] Analyzing a variety of case studies, the Center for American Progress estimates that the cost of turnover is approximately 21.4% of an employee's yearly salary.[20]

To obtain the turnover cost for the massive lay-off of close to three quarter of a million DACA employees, we multiply $24,988.40 (the average yearly salary of a DACA recipient) by 645,145 to obtain $16,121,141,817.77. We then multiply $16,121,141,817.77 by 21.4% (the turnover cost) to yield $3,449,924,349.00 or $3.4 billion, the total turnover cost for the wholesale lay-off of the entire employed DACA population.

## IV. CONCLUSION

The costs of ending DACA are immense, not only the personal costs to nearly one million individuals and their families, but also to our country's economic engine. President-elect Trump prides himself on his business prowess. As such, the continued existence of DACA represents one of the President-elect's first major economic tests. The failure of this test would undoubtedly lead to significant, unnecessary costs to our nation's businesses and the undermining of the Social Security and Medicare trust funds. DACA represents a good deal for our nation, and President-elect Trump would be wise to continue what amounts to one our nation's most successful immigration and economic policies.

AR2022_500944



# V. CITATIONS

[1] Julia Preston and Jennifer Medina, *Immigrants Who Came to U.S. as Children Fear Deportation Under Trump*, N.Y. TIMES, Nov. 19, 2016, http://www.nytimes.com/2016/11/20/us/immigrants-donald-trump-daca.html.

[2] See Memorandum from Janet Napolitano, Secretary, U.S. Department of Homeland Security, Memorandum on Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), *available* at http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[3] Philip E. Wolgin, *The High Cost of Ending Deferred Action for Childhood Arrivals*, CENTER FOR AMERICAN PROGRESS, Nov. 18, 2016, https://www.americanprogress.org/issues/immigration/news/2016/11/18/292550/the-high-cost-of-ending-deferred-action-for-childhood-arrivals/.

[4] Tom K. Wong, Greisa Martinez Rosas, Adrian Reyna, Ignacia Rodriguez, Patrick O'Shea, Tom Jawetz, and Philip E. Wolgin, *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*, CENTER FOR AMERICAN PROGRESS, Oct. 18, 2016, https://cdn.americanprogressaction.org/content/uploads/2016/10/21111136/2016daca_survey_draft_updated-FINAL2.pdf [hereinafter "Professor Wong study"].

[5] U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SECURITY, NUMBER OF I-821D, CONSIDERATION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS BY FISCAL YEAR, QUARTER, INTAKE, BIOMETRICS AND CASE STATUS: 2012-2016, 1 (Sep. 13, 2016), https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals [hereinafter "USCIS DACA Data"].

[6] Professor Wong study, *supra* note 4, at 4.

[7] *Id.* at 5.

[8] *Average annual hours actually worked per worker*, ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, 2015, http://stats.oecd.org/index.aspx?DataSetCode=ANHRS.

[9] Faye Hipsman, Bárbara Gómez-Aguiñaga, and Randy Capps, *DACA at Four: Participation in the Deferred Action Program and Impacts on Recipients*, MIGRATION POLICY INSTITUTE 2, Aug. 2016, *available* at http://www.migrationpolicy.org/research/daca-four-participation-deferred-action-program-and-impacts-recipients.

[10] USCIS DACA Data, *supra* note 5, at 1.

[11] 26 U.S.C. §§ 3101-3128 (West 2016).

[12] The Social Security trust fund is projected to become insolvent in 2034 while the Medicare trust fund is projected to become insolvent in 2028. *See* Nick Timiraos, *Social Security, Medicare Face Insolvency Over 20 Years, Trustees Report*, WALL STREET JOURNAL, June 22, 2016, http://www.wsj.com/articles/social-security-medicare-trust-funds-face-insolvency-over-20-years-trustees-report-1466605893. A decrease in contributions, e.g. because of the removal of close to three quarter of million employees from the workforce, is thus likely to move forward the insolvency dates for both of these programs.

[13] 26 U.S.C. §3101(a) (West 2016).

[14] *Id.* at § 3111(a).

[15] *Id.* at § 3101(b)(1).

[16] *Id.* at § 3111(b).

[17] INTERNAL REVENUE SERVICE, *Topic 751 - Social Security and Medicare Withholding Rates*, Oct. 10, 2016, https://www.irs.gov/taxtopics/tc751.html.

[18] 26 U.S.C. §3101 (West 2016).

[19] Heather Boushey and Sarah Jane Glynn, *There Are Significant Business Costs to Replacing Employees*, CENTER FOR AMERICAN PROGRESS, Nov. 16, 2012, https://www.americanprogress.org/issues/economy/reports/2012/11/16/44464/there-are-significant-business-costs-to-replacing-employees/.

[20] *Id.*

AR2022_500945

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/247721989

# The Impact of Detention and Deportation on Latino Immigrant Children and Families: A Quantitative Exploration

**Article** *in* Hispanic Journal of Behavioral Sciences · July 2010

DOI: 10.1177/0739986310374053

CITATIONS
201

READS
9,584

2 authors:



Kalina M Brabeck
Rhode Island College

**27** PUBLICATIONS    **771** CITATIONS

SEE PROFILE

Qingwen Xu
Tulane University

**42** PUBLICATIONS    **998** CITATIONS

SEE PROFILE

All content following this page was uploaded by Kalina M Brabeck on 08 September 2014.

The user has requested enhancement of the downloaded file.

**AR2022_500946**

**Rhode Island College**
**Digital Commons @ RIC**

Faculty Publications                          Faculty Books and Publications

1-1-2010

# The Impact of Detention and Deportation on Latino Immigrant Children and Families: A Quantitative Exploration

Kalina M. Brabeck
*Rhode Island College*, kbrabeck@ric.edu

Qingwen Xu

Recommended Citation

Brabeck, Kalina M. and Xu, Qingwen, "The Impact of Detention and Deportation on Latino Immigrant Children and Families: A Quantitative Exploration" (2010). *Faculty Publications.* Paper 262.
http://digitalcommons.ric.edu/facultypublications/262

This Article is brought to you for free and open access by the Faculty Books and Publications at Digital Commons @ RIC. It has been accepted for inclusion in Faculty Publications by an authorized administrator of Digital Commons @ RIC. For more information, please contact hbenaicha@ric.edu.

AR2022_500947

*Articles*

# The Impact of Detention and Deportation on Latino Immigrant Children and Families: A Quantitative Exploration

Hispanic Journal of Behavioral Sciences
32(3) 341–361
© The Author(s) 2010
Reprints and permission: http://www.
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0739986310374053
http://hjbs.sagepub.com

⑤SAGE

## Kalina Brabeck[1,2,3] and Qingwen Xu[2,3]

## Abstract

Children of Latino immigrants, many of whom live in "mixed-status" families, are a rapidly growing group in the United States. It is widely accepted that their development is affected by multiple and complex factors, including those in their distal context (e.g., laws, institutions, policies). Despite the enormity of the deportation system and its vigorous implementation in recent years, little research has investigated how this particular component of the distal context affects Latino immigrant families. The present survey was designed to statistically explore the impact of detention/deportation on Latino immigrant parents and children ($N = 132$). Regression analyses indicated that (1) parents with higher levels of legal vulnerability report a greater impact of detention/deportation on the family environment (parent emotional well-being, ability to provide financially, and relationships with their children) and children's well-being (child's emotional well-being and academic performance) and (2) parents' legal vulnerability and the impact of detention/deportation on the family predict outcomes for children. Implications for practice and policy are discussed.

[1]Rhode Island College, Providence, RI, USA
[2]Boston College, Chestnut Hill, MA, USA
[3]Center for Human Rights & International Justice, Boston College, MA, USA

**Corresponding Author:**
Kalina Brabeck, Rhode Island College, 600 Mount Pleasant Avenue, Providence, RI 02908, USA
Email: kbrabeck@ric.edu

**AR2022_500948**

**Keywords**

detention, deportation, Latino immigrant families, Latino immigrant children, mixed-status families

It is widely accepted that immigrant children's development is influenced by proximal context (e.g., peer, family, extended family) as well as distal context (sometimes called "macrosystems"; Brofenbrenner & Morris, 1998), which include laws, institutions, social structures, and policies. Research has documented that this distal context contributes to several specific developmental challenges for children from immigrant families in general and from Latino immigrant families in particular. For example, researchers have demonstrated that poverty affects all children's development, contributing to, for example, lower developmental scores on a range of instruments (Aber, Bennett, Conley, & Li, 1997). In 2005, 28% of all children living in low-income families in United States were born into immigrant families (across nationalities; Capps & Fortuny, 2006); currently, 34% of first-generation Latino children live in poverty, compared with 26% of those in the second generation (Fry & Passel, 2009). While immigrant parents (across nationalities) are likely to be working, they tend to be employed in low-skilled jobs with lower wages and no benefits (Hernandez, 2004).

Across nationalities, children of immigrants, particularly when their parents are undocumented, are less likely to have health insurance (Capps & Fortuny, 2006) and less likely to participate in public programs (e.g., Temporary Assistance to Needy Families [TANF], Medicaid, food stamps; Capps, Hagan, & Rodriguez, 2004). Even when the children are U.S. citizens, their undocumented parent(s) may fail to understand their child's eligibility and/or fear that seeking help puts them at risk for deportation (Capps et al., 2004). Prior research has found that undocumented parents, particularly those from Latin America, experience higher levels of food insecurity compared with their U.S.-born parent peers (Kalil & Chen, 2008). Research has also found that children of immigrants (across nationalities) are at risk for slower cognitive and language development as well as poorer academic performance, in part because their parents' limited English language ability complicates their efforts to read to their children, help with homework, and get involved in children's schools (Capps, Fix, Murray, et al., 2005). Finally, research has documented the potential challenges posed to children of Latino immigrants by English language learning; discrimination and racism; adjusting to a new peer group, culture, and society; and negotiating between the norms of their parents and those of their peer groups (Fry & Passel, 2009; Gil, Wagner, & Vega, 2000; Guarnaccia & Lopez, 1998).

**AR2022_500949**

Parents' legal status is an understudied, but important, component of the distal context that affects children of Latino immigrants' development (Yoshikawa & Way, 2008). Policies that define who have access to the benefits of citizenship influence children's development indirectly, through the family's economic status and parents' psychological functioning (Fuligni & Yoshikawa, 2003). Yoshikawa, Godfrey, and Rivera (2008), for example, found that Mexican and Dominican immigrant parents who lacked access to resources that required identification as a legal U.S. resident (i.e., drivers licenses and financial services) were more likely to experience economic hardship and psychological distress, which, in turn, predicted lower levels of cognitive ability in children at 24 months of age on standardized assessment.

While previous research suggests that children in Latino immigrant families face a number of developmental challenges specific to their social and cultural contexts, research has not explored how the shifting policies and attitudes toward immigrants in the United States have affected the children born into these families. Such research is particularly important in light of recently increased implementation of policies that restrict the rights and opportunities of undocumented immigrants (Kremer, Moccio, & Hammell, 2009) and the growing numbers of children, most of whom are U.S. citizens, with at least one parent who is undocumented (Capps & Fortuny, 2006).

## Children of Undocumented Parents

Most immigrants are not U.S. citizens and many are undocumented. In the United States, in 2005, 30% of the foreign-born population was estimated to be undocumented, 28% were legal permanent residents, and 31% were U.S. citizens by naturalization (Passel, 2006). The majority of undocumented immigrants come from Mexico and Central American countries (Passel, 2006). The vast majority of the children born into immigrant families, however, are U.S.-born citizens. In 2005, 80% of children born to immigrant families were born as U.S. citizens (Capps & Fortuny, 2006). Many of these children are born into "mixed-status" families, in which at least one parent is undocumented, while the child is U.S.-born and hence a citizen with all the rights and privileges that citizenship carries (Capps, Fix, Ost, Anderson, & Passel, 2005; Capps & Fortuny, 2006). Among children of Latino immigrants, about 4 in 10 second-generation immigrant children have at least one undocumented immigrant parents and hence live in a mixed-status family (Fry & Passel, 2009).

The mixed-status family faces a difficult dilemma when faced with policies and practices that threaten the deportation of an undocumented parent: (1) the entire family may leave the United States, including the children who

**AR2022_500950**

are U.S. citizens, uprooting all from their familiar cultural, social, and linguistic environments; (2) the undocumented parent may leave, creating a single-parent family in the United States or leaving the child with other caregivers; or (3) the intact family may remain in the United States but with the chronic risk of being caught and deported (Fix & Zimmerman, 2001). These dilemmas have become more challenging for mixed-status families in the wake a changing climate for undocumented immigrants in the United States, which will be discussed next.

## A Changing Climate for Undocumented Latino Parents

Legislation passed in 1996—the Antiterrorism and Effective Death Penalty Act and the Illegal Immigration Reform and Immigrant Responsibility Act—and in 2001—the USA PATRIOT Act—and vigorously implemented in recent years, has profoundly altered the climate for undocumented immigrants living in the United States (Kanstroom, 2008). These laws expanded the offenses for which a person can be deported from the United States. They also restricted judicial discretion in deportation cases and limited judicial review formerly available to those facing deportation. These laws further made it more difficult for noncitizens to stay in the United States if issued an order of deportation and made it harder for noncitizens to reenter the United States (Fix & Zimmerman, 2001; Hagan, Eschbach, & Rodriguez, 2008). Additionally, some local and state police have been ordered to be involved in enforcing these laws in their communities (as an example, see Carcieri, State of Rhode Island and Providence Plantations Executive Order 08-01, 2008).

Largely as a result of the implementation of the aforementioned legislation, the number of cases before immigration courts increased 30.6%, from 282,396 in 2001 to 368,848 in 2005; the percentage of noncitizens ordered to be removed from the United States increased from 78% in 2001 to 84% in 2005 (Office of Planning, Analysis, & Technology, 2006). In 2008, Immigration Customs Enforcement apprehended 792,000 noncitizens, detained more than 397,000, and deported more than 359,000 of them; this was the sixth consecutive year with a record high number of deportations (Office of Immigration Statistics, 2008). The majority of deportees migrated from Latin American countries: Mexican nationals accounted for nearly 89% of those apprehended in 2008, while the next largest source countries were Honduras, Guatemala, El Salvador, Cuba, and Brazil (Office of Immigration Statistics, 2008). A 2006 report found that 70% of individuals in formal removal proceedings had lived in the United States for more than a decade, and the

**AR2022_500951**

median length of residence was 14 years (TRAC Immigration, 2006). Many deportees leave U.S.-born children behind; the U.S. Immigration Customs Enforcement agency reported that more than 100,000 parents of U.S. citizen children were deported between 1997 and 2007 ("108,000 people deported," 2009). A recent report issued by the University of California Berkley and Davis Schools of Law found that between 1997 and 2007, 88,000 U.S. citizen children (44,000 of whom were less than the age of 5 years) lost a legal permanent resident parent to deportation (Baum, Jones, & Barry, 2010). How the risk and experience of detention and deportation affect Latino immigrants and their children is largely understudied.

## *Impact of Deportation Policies on Children of Immigrants*

Scholars (e.g., Capps & Fortuny, 2006; Suarez-Orozco & Carhill, 2008) have called for research that explores the effects of deportation policies and practices on immigrant parents, families, and children. The research generated thus far has either been primarily descriptive, has focused on the impact of deportation on parents, or has used a simplified definition of legal vulnerability (i.e., documented vs. undocumented). The National Council of La Raza (NCLR; 2007) studied three communities where large-scale workplace raids occurred, affecting almost exclusively undocumented Latino workers. They reported that in the immediate aftermath of the raids, a total of 500 children, mostly U.S.-born citizens, were temporarily or permanently separated from parent(s). Consequences for children and families included feelings of abandonment, symptoms of trauma, fear, isolation, depression, and family fragmentation (NCLR, 2007). Financial hardship following deportation was also found to be a harsh consequence for family members left behind (Kremer et al., 2009). In one quantitative study that focused on legal status, but not specifically on impact or experience of detention and deportation, Cavazos-Regh, Zayas, and Spitznagle (2007) surveyed 143 Latino adult immigrants and found statistically significant relationships between legal status, concern regarding deportation, and a heightened risk of negative emotional and health states (particularly anger) as well as increased stress associated with low-paying jobs and limited opportunities for employment promotion. Hence, previous research, despite the limitations identified above, has suggested a link between vulnerability to and experience of deportation, negative financial consequences, and poor outcomes for parent and child emotional well-being. The study discussed here expanded on this prior research to statistically explore the impact of deportation (as a threat and direct experience)

**AR2022_500952**

on Latino immigrant families and their children, among families with parents of differing legal statuses.

## *Purpose of the Current Study*

The purpose of the current study was to statistically explore the impact of parents' legal vulnerability and threat and experience of detention and deportation on family environment (defined as parents' perceptions of their own emotional well-being, ability to provide financially for the family, and parent-child relationships), and child well-being (defined as parent's perceptions of child's emotional well-being and of child's academic performance).

## **Method**

A survey was conducted between March and May 2009, as a part of a larger community-university collaborative project. The findings presented here represent a quantitative exploration of themes that arose in a participatory action research (PAR) project of the Post-Deportation Human Rights Project (PDHRP), an initiative of the Center for Human Rights and International Justice at Boston College (for a description of the PDHRP's PAR project and previous qualitative research, see Brabeck, Lykes, & Hershberg, in press). The questions explored in the present survey were informed by the PDHRP's PAR activities, including previous qualitative interviews that explored Central American immigrants' experiences related to detention and deportation, ongoing reflection and dialogue with participants, and action steps identified and enacted (e.g., participatory community-led Know Your Rights workshops). Moreover, this previous and ongoing work of the PDHRP facilitated the authors' relationship building with community leaders, who helped the researchers access a population that is difficult to reach and ask sensitive questions, for example, regarding legal status.

The present survey aimed to document the impact of the policies of detention/deportation and the threat they pose on a sample drawn from the entire Latino immigrant community (not solely undocumented immigrants) and to compare the different impacts for individuals with varying degrees of legal vulnerability. Criteria for participation included: (1) immigrants from a Latin American country, (2) 18 years or older, and (3) parent of at least one child less than the age of 18 years living currently in the United States. Participants with more than one child less than the age of 18 years were asked to consider only one child when answering survey questions that referenced the participant's child.

**AR2022_500953**

## *Hypotheses*

This study tested the following hypotheses:

- *Hypothesis 1:* Parents' legal vulnerability, while controlling demographic variables, would predict the impact of detention and/or deportation on family environment (defined as parents' perceptions of emotional well-being, perceived ability to provide financially, and parent-child relationship).
- *Hypothesis 2:* Parents' legal vulnerability, while controlling demographic variables, would predict the impact of detention and deportation on parents' perception of child well-being (defined as parents' perceptions of child's emotional well-being and academic performance).
- *Hypothesis 3:* Parents' legal vulnerability and the impact on family environment, while controlling demographic variables, would predict the impact of detention and deportation on child well-being.

Hypothesis 3 is based on the literature (e.g., Gelfand & Teti, 1990), which indicates that a healthy family environment is critical to child's psychological, academic, and social well-being and development.

## *Instrument*

As previously noted, the present survey was heavily informed by analyses of previous PDHRP qualitative research and PAR project (see Brabeck et al., in press). Additionally, the survey was based on a review of other relevant research literature and consultation with the Latino immigrant community organization/program leaders who participated in the survey. These leaders made suggestions to clarify wording, simplify the survey, and reduce discomfort that might arise from answering questions about sensitive topics such as legal status. After an agreed upon list of survey questions was arrived at, the survey was translated by a native Spanish speaker and back-translated by a native English speaker until an adequate translation was accomplished. Finally, two additional native Spanish speakers from different countries made minor suggestions to the Spanish language materials to ensure that the language was comprehensible across nationalities. The survey was pilot tested with a sample of eight participants before commencement of the study.

Informed consent was explained to participants who, for confidentiality reasons, were asked to provide only their verbal consent. They were assured

**AR2022_500954**

of the anonymity and confidentiality of their responses. Bilingual researchers were present to answer questions or help complete the survey as participants filled out the questionnaire at the site of the community organization. Each participant received a $15 gift certificate to a local store for completing the survey. Survey completion took between 15 and 40 minutes.

### Recruitment of participants

Survey participants were recruited through Latino immigrant community organizations in metropolitan areas in the northeast region of the United States. As noted, the previous and ongoing PAR work of the PDHRP facilitated the process of building relationships with these community organizations. Five community organizations, including three English as Second Language (ESL)/ Adult Education Programs, which work closely with Latino immigrants, assisted participant recruitment for the study. All five organizations are community-based Latino immigrant organizations and offer a variety of programs and services on site. Ultimately, 132 Latino immigrants completed the survey. The coauthors met initially with organization/program leaders and explained the purposes of the project and the procedures for informed consent and confidentiality. Subsequently, either the coauthors or the organization/ program leader explained the purposes and procedures of the project to potential participants, who were invited to participate at a later date. The majority of surveys were administered to groups of participants; anyone requesting individual assistance met with a research assistant individually to complete the survey.

### Measures

Based on state demographics of the local Latino immigrant population, previous PHDRP qualitative research (Brabeck et al., in press), discussion with community leaders about the characteristics of their communities, and pilot testing, the majority of the participants were expected to be monolingual Spanish-speaking immigrants working in lower skilled jobs and without experience in research. Hence, all attempts were made to make the survey as straightforward, comprehensible, and parsimonious as possible. There are few valid measures for studies involving Latino immigrants. Because the survey was based on previous PDHRP PAR work and the available literature, and was reviewed by community leaders, the survey developed for this study adds a useful tool for empirical work in this area. In addition to demographic variables (age, gender, child's age, years in the United States, marital status, and participant and partners' employment), the final survey measured the following variables:

**AR2022_500955**

*Parent legal vulnerability*. A series of dichotomously scored "true/false" questions assessed participants' legal vulnerability. These questions assessed whether the participant: (1) was undocumented, (2) has a current deportation order, (3) had been detained by immigration authorities in the past, (4) was previously deported, (5) has a family member currently in detention, (6) has a family member who had been deported (7) is a U.S. citizen; and (8) is a legal U.S. resident. One variable representing "legal vulnerability" with five levels was created, with the assumption that people who lack legal documentation, who have experienced the detention/deportation of a family member, and who have personally been previously detained/deported will experience greater vulnerability to detention/deportation policies than individuals who are documented and who have not experienced detention/deportation personally or in their family. The variable "legal vulnerability" contained five levels: (1) legal U.S. residents or citizens, (2) legal U.S. residents or citizens who have had a family member detained and/or deported, (3) undocumented participants without a personal or family history of detention/deportation, (4) undocumented participants with family member previously detained and/or deported, and (5) undocumented with a personal history of detention and/or deportation and a family member's history of detention and/or deportation. (While U.S. citizens and legal residents, e.g., green card holders, face different vulnerability under current U.S. immigration laws, these two groups were collapsed into one group based on a nonsignificant *t* test between the two groups on all dependent variables.) Higher numbers indicate greater levels of legal vulnerability.

*Impact of deportation on family environment.* Family environment typically measures the social and environmental characteristics of families and is usually constructed with several dimensions (e.g., relationships among family members, family system) and a long list of items (e.g., Moos & Moos, 1983). Because of the concern regarding participants' level of education and cultural context, only three elements of family environment were selected, based on qualitative themes from prior literature (Brabeck et al., in press; NCLR, 2007): (1) parents' emotional well-being in the context of deportation, (2) parents' perceived ability to provide financially for their children in the context of deportation, and (3) parents' perceptions of parent-child relationship in the context of deportation. These three elements were measured by self-report; participants were asked to respond to the following statements: "The existence of deportation affects my ability to provide financially for my children;" "The existence of deportation affects how I feel;" and "The existence of deportation affects my relationship with my child." The wording "existence of deportation" was chosen after extensive deliberation and consultation with three community leaders and two additional native Spanish speakers because

**AR2022_500956**

it encompasses both direct and indirect effects, that is, those participants who have not personally experienced deportation might still be affected by its existence in their communities. Participants responded on a 3-point Likert-type scale where 1 = *yes*, 2 = *somewhat*, and 3 = *no*. (Note that although variability was reduced by reducing the Likert-type scale options, the items were shortened after extensive discussions with community organization leaders and pilot testing to increase comprehension among this community sample.) The impact of deportation on family environment was assessed by adding the three items together; higher numbers indicate lower levels of agreement with the statements. Cronbach's alpha was calculated to be .69.

*Impact of deportation on child well-being*. Measures of immigrant children's well-being include cognitive, psychological, academic, and physical development (Birman & Chan, 2008). Based on previous descriptive research (NCLR, 2007) as well as the PDHRP qualitative interviews, experience and risk of detention and deportation affect children largely in their psychological and academic functioning; hence, in the present study, children's well-being was composed of two elements: (1) parents' perceptions of child's emotional well-being in the context of deportation and (2) parents' perceptions of child's academic performance in the context of deportation. These two elements were measured by parents' self-report; participants were asked to respond to the following statements: "The existence of deportation affects how my child feels" and "The existence of deportation affects how my child performs in school." Again, participants responded on a 3-point Likert-type scale where 1 = *yes*, 2= *somewhat*, and 3 = *no*, and higher numbers indicate lower levels of agreement with the statements. The impact of deportation on child well-being was created by adding the two items together; Cronbach's alpha was calculated to be .85.

### Analysis

Multiple hierarchical regression models were then used to test the hypotheses that predicted the impact of detention and deportation on the family environment and children's well-being, after controlling the demographic variables.

## Results

### Participant Demographics

Among the 132 Latino immigrants, more than two thirds (70.5%) of the participants were women, and the mean age was 36.7 years (*SD* = 8.11). Ages of

**AR2022_500957**

target child (i.e., the child considered by the respondent when completing the survey) were almost equally distributed across age categories: 32% of target children were less than 6 years old, 31% were ages 6 to 12 years, and 37% were ages 12 to 18 years. Most participants (60.6%) were employed, working on average 34.87 hours per week ($SD$ = 10.78). Most participants (80.3%) had a partner. Among participants' partners, 81.13% were employed, working on average 37.32 hours per week ($SD$ = 7.96). Twelve participants (9%) reported that neither they nor their partners were employed.

The greatest number of participants migrated from Guatemala (37.2%), followed by Colombia (17.8%), the Dominican Republic (14.0%), El Salvador (10.9%), Mexico (10.1%), and Honduras (3.9%); 6.2% of participants indicated "other Latin American country." Slightly more than 21% of participants were recent immigrants who had been in the United States for less than 5 years, while 48.8% were long-term residents who lived in the United States for more than 10 years.

Across participants, the vast majority (73.5%) had children who were born in the United States, while 41.7% had children born in their country of origin. All participants had at least one child currently living in the United States (this was one criterion for participation), while 14.4% of participants also had children currently living in their country of origin. Among the 50 undocumented participants, 76% reported that they had U.S.-born children (10% reported no U.S.-born children, while 14% did not answer the question).

## *Participants' Legal Status and Experience With Detention/Deportation*

A total of 6.8% of the participants reported that they have a current deportation order, 13.6% have been previously detained, and 4.5% were previously deported. Nearly 38% ($N$ = 50) of the participants acknowledged being undocumented. Among the 50 undocumented participants, 14% reported a current deportation order, 26% have been previously detained, and 8% were previously deported. Almost half (40.2%) of the participants across legal status had family members who were deported. More specifically, slightly more than 37% of legal residents and 60% of undocumented participants reported a family member had been detained and/or deported. The average score for participants' legal vulnerability was 2.54 ($SD$ = 1.66; see Table 1 for distribution of legal vulnerability scores). (Note that six participants [4.5%] were recorded as missing data because they either endorsed "true" for all statements or did not endorse any statements as "true" or "false.") Participants with different

**AR2022_500958**

**Table 1.** Frequency and Percentage of Participants' Legal Vulnerability

|  | Frequency | Percentage |
|---|---|---|
| 1. Documented participant (citizen or legal resident) | 45 | 34.1 |
| 2. Documented participant (citizen or legal resident) with family member detained and/or deported | 32 | 24.2 |
| 3. Undocumented participant | 17 | 12.9 |
| 4. Undocumented participant, with family member detained and/or deported | 16 | 12.1 |
| 5. Undocumented participant, with family member detained and/or deported and personal history of deportation | 16 | 12.1 |
| Missing | 6 | 4.5 |
| Total | 132 | 100.0 |

levels of legal vulnerability did not differ with regards to gender, marital status, child's age, years in United States, country of origin, having a partner, or self and partner's employment status; they did, however, differ with regard to age ($p < .01$), with younger participants having greater levels of legal vulnerability.

### Predictors of Impact on Child and Family

Three multiple regression models were run. The first two models tested Hypotheses 1 and 2, that is, the parent's legal vulnerability would predict the impact of detention and deportation on family environment and on child well-being, while controlling for demographic variables. (See Table 2 for distribution of participants' responses to five Likert-items.) The third model tested Hypothesis 3, that is, that impact on the family environment and parent's legal vulnerability would predict impact on the child well-being. (See Table 3 for results of the analysis.) In the first model, the first hypothesis was supported: Parent's legal vulnerability significantly predicted impact on family environment, accounting for 27.1% of the variance. In the second model, Hypothesis 2 was supported: Parent's legal vulnerability significantly predicted the impact on child well-being, accounting for 30.6% of the variance. The greater the legal vulnerability of the parent, the greater the reported impact of detention and deportation on family environment (i.e., perceptions of parent's emotional well-being, perceived ability to provide financially for the family, and parent-child relationship) and child well-being (i.e., perceptions

**AR2022_500959**

**Table 2.** Participants' Responses: Negative Impacts of Deportation

| Variable: The Existence of Deportation Affects … | Yes (%) | Somewhat (%) | No (%) |
|---|---|---|---|
| How my child feels | 48.5 | 18.9 | 33.1 |
| How my child performs at school | 45.5 | 17.4 | 34.1 |
| How I feel | 69.7 | 7.6 | 21.2 |
| My relationship with my child | 39.4 | 9.8 | 49.2 |
| My ability to financially provide for my child | 53.0 | 4.5 | 40.2 |

**Table 3.** Regression Models: Predicting the Impact of Deportation on Children and Families

| | Model 1[a] (Beta/*SD*) | Model 2[b] (Beta/*SD*) | Model 3[c] (Beta/*SD*) |
|---|---|---|---|
| Age | −.133/.025 | −.136/.037 | .015/.019 |
| Gender (male) | .079/.341 | −0.17/.479 | .124/.247 |
| Child's age <6 | .087/.436 | −.038/.601 | .121/.309 |
| Child's age >12 | .079/.368 | .127/.518 | −.006/.267 |
| Years in the United States | .007/.131 | .033/.185 | −.020/.095 |
| Employment | .086/.309 | .065/.436 | .023/.224 |
| Having a partner | .004/372 | .115/.517 | −.076/.267 |
| Legal vulnerability | −.521/0.96** | −.491/.131** | −.192/.078** |
| Impact on the family | | | .705/.052** |

a. Model 1: $R^2 = .271$, $F(7, 104) = 6.192$, $p < .01$ (Dependent variable: Impact on the child).
b. Model 2: $R^2 = .306$, $F(7, 104) = 6.558$, $p < .01$ (Dependent variable: Impact on the family).
c. Model 3: $R^2 = .641$, $F(8, 100) = 22.279$, $p < .01$ (Dependent variable: Impact on the child).
**$p < .01$.

of child's emotional well-being and academic performance). Results of the third model supported Hypothesis 3: Parent's legal vulnerability and impact on family environment were significant predictors of impact on child well-being. As this model accounted for 64.1% of the variance of the data, it was a substantial improvement over Models 1 and 2.

## Discussion

This study represented an attempt to statistically examine the impact of deportation policies and practices on Latino immigrant children and families. Previous research has documented risk factors specific to immigrant children. However, to date, there has been insufficient research that quantitatively

**AR2022_500960**

explores the impact of deportation policies and practices on immigrant families and their children. A number of important findings emerged.

First, a large portion of Latino immigrants, in this convenience sample of 132, were directly affected by detention and deportation. A substantial number of participants (38%) were undocumented, and almost half of the sample (including both undocumented and documented parents) experienced the detention or deportation of a family member. Given the potential risk from disclosing this information, it is plausible that these numbers, while substantial, are still underestimates of the participants' direct interactions with the detention and deportation system. Moreover, more than two thirds of the participants reported that the existence of deportation policies and practices affects how they personally feel. More than half reported that these policies and practices affect their ability to provide financially for their family as well as how their children feel and perform in school. Hence, a large portion of the participants in this study reported direct experience with, vulnerability to, and effects of the deportation system.

Second, the impact of detention and deportation on family environment and child well-being is associated with the level of legal vulnerability. That is, immigrant parents with greater levels of legal vulnerability reported greater impacts of detention and deportation. It may not be surprising to learn that those who are at more risk of being affected by detention and deportation (i.e., the undocumented or those themselves or whose family members have been directly affected) report greater effects of its negative affect. However, it is notable that most of these parents live in mixed-status households (nearly three quarters of the undocumented parents), and many children who are affected by the deportation policies are U.S.-born citizens.

Third, consistent with previous studies (e.g., Gelfand & Teti, 1990; Phares & Compas, 1992), parents in this study report their children are affected by parents' wellbeing. Similar to national data sets that report that 66% of children born to undocumented immigrant parents are U.S. citizen children (Capps & Fortuny, 2006), the majority of children living in families with undocumented parents in this study are U.S.-born citizens. Hence, when undocumented Latino parents suffer as a result of detention and deportation, so too do their U.S.-born children. Parents' legal vulnerability affects them in regard to emotional well-being, financial capability, and relationships with children, which in turn affects outcomes for children. The lack of variability in the data precluded the use of causal models to analyze the data. However, results from the regression models indicated that, while controlling demographic variations, parent legal vulnerability alone is a predictor of the impact of detention and deportation on child well-being; when both parent legal

vulnerability *and* impact on family environment were entered as predictors, they significantly predicted the impact of detention deportation on child well-being, and the result of $R^2$ ($R^2 = .641$) suggests a much stronger and improved model. Similar to the Family Stress Model (Conger et al., 2002), which posits that parents' economic stress affects their mental health, intra-familial relationships, and children's outcomes, we found that the combination of the parent's experience and vulnerability to detention and deportation, with the impact that had on the parent's financial, psychological, and relational well-being, affect children in a statistically significant and practically meaningful way.

Importantly, the participants in this study do not represent a homogenous group, and their various national origins suggest unique histories, psychosocial stressors, and structural barriers that influence their migration patterns and experiences of detention and deportation. For example, the majority (32.2%) of the participants in this study migrated from Guatemala, a country in which extreme poverty is tied to the longest (36 years) civil war in Central American history, which included state-sponsored violence and government repression, particularly against the indigenous population (Black, Jamail, & Chinchilla, 1984). Hence, many immigrants from Guatemala endure the long and arduous journeys through Mexico to reach United States as political refugees from the violence of the 1970s, 1980s, and 1990s or as economic refugees from the aftermath that these decades' violence had on their communities (Davy, 2006). Previous PDHRP research has found that Guatemalan families understand and experience the threats posed to them by the current U.S. detention and deportation systems as deeply embedded within the context of these historical forces (Brabeck et al., in press). While the scope of article does not afford a full discussion of the unique histories and contemporary challenges that shape the experiences of each national origin group represented in this survey, readers are advised to consider these distinctive factors when understanding the impact of detention and deportation policies on Latino immigrant families. Readers are further directed to research that documents Latino immigrant subgroups' unique experiences with migration and deportation (e.g., for Guatemalan and Salvadoran immigrants, see Brabeck et al., in press; Menjivar & Abrego 2009; for Dominican immigrants, see Brotherton & Barrios, 2009; for Honduran immigrants, see Sladkova, 2007).

## *Implications for Policy and Practice*

This study statistically explored what more descriptive and qualitative studies (e.g., Brabeck et al., in press; NCLR, 2007) have previously found: The

**AR2022_500962**

existence of deportation policies and practice has negative emotional, relational, financial, and academic consequences for Latino immigrant parents and their children. Parent's legal vulnerability is an important component of the distal context that affects the development of children in immigrant families. The present findings suggest that practitioners and service providers working with children in immigrant families would benefit from exploring how parents' legal status and history of detention and deportation affect the emotional and financial well-being of individual members and the family unit as a whole. Understanding whether and if so, how, parents communicate with their children about the threat of deportation, make plans for how to respond in the event that a family member (particularly a caretaker) is detained, and discuss (or not) these plans with children are important to incorporate into human-service work. Practitioners might explore how the child understands detention, deportation, and legal status and provide space to process their fears, uncertainties, confusion, and anger. When engaging in such dialogues with parents and children or facilitating parent-child communication, however, consideration must be given to the potential such conversations have for inviting significant fear and anxiety. Moreover, parents' reasons for *not* communicating with their children about legal status and policies that threaten the family should be understood and respected. Finally, communicating with and educating teachers about how parents' legal status affects their children's academic performance and emotional well-being are also indicated.

Individual efforts to help children of immigrants may be of limited effectiveness if the policies that threaten their families do not change. These findings lend support to the caution of some scholars (e.g., Kremer, Moccio, & Hammell, 2009) that policies and practices that threaten undocumented adult immigrants harm U.S.-born citizen children, who are perhaps unintended, but nonetheless real, victims in the detentions and deportations—and fear caused by the threat of these actions—aimed at their parents. It follows, then, that to act in the best interests of these children, policy makers and practitioners must address the emotional and financial toll that the threat of deportation exerts on immigrant parents.

### Limitations

Several limitations are notable in the present study. First, the reliance on self-report measures potentially resulted in distorted data (i.e., we relied on parent's perceptions of their ability to provide financially for their families and of their children's academic performance rather than on an objective measure of financial capacity or academic performance). Given the sensitivity

**AR2022_500963**

of our questions, particularly with regard to legal status, it is likely that our data may have been skewed (likely toward underreporting undocumented status). Second, the lack of appropriately validated instruments for this population limited the possibilities for measuring our dependent variables. Similarly, the fact that we shortened the Likert-type scales to make the survey more accessible and comprehensible for our sample reduced the variability in responses and precluded the use of causal statistical techniques, for example, path analysis, to analyze the data. In addition, these data were cross-sectional and hence researchers were unable to suggest any trends over time. This study was limited by the exclusion of the children of the parents surveyed; their voices might have provided rich and important perspectives on the effects of detention and deportation policies on immigrant families. Finally, the sample in this study is a convenience sample and cannot be considered as a representative sample of all Latino immigrants in the metropolitan areas of northeastern United States. Because the recruitment was done through the collaborations with five Latino immigrant community organizations, including three ESL and Adult Education programs, participants in this study were more likely be of the low-income group and less proficient in English. Given these limitations, caution should be used when extrapolating the results to the entire Latino immigrant populations.

## *Future Research*

Future research might replicate the present study with a larger sample and use causal modeling to statistically explore the relationships among variables. For example, adaptation of the Family Stress Model (Conger et al., 2002) to include legal vulnerability as an independent variable might provide a useful theoretical framework for exploring the direct and indirect relationships among parents' legal vulnerability, economic hardship, parent mental health, family relationships, and outcomes for children. Future research might employ a longitudinal approach to explore the impact of detention/deportation on immigrant families over time. Finally, future research should also include child participants.

### **Acknowledgments**

This study is part of a larger research project of the Center for Human Rights and International Justice at Boston College, codirected by M. Brinton Lykes, PhD, and Daniel Kanstroom, LLM, JD. The authors gratefully acknowledge the contributions of M. Brinton Lykes, PhD, to this article as well as the assistance of the community

leaders and of Catharine Hellwig, BA, Rhode Island College, and Alfonso Alvarez, LICSW, Boston College, in collecting data.

## Declaration of Conflicting Interests

The author(s) declared no conflicts of interest with respect to the authorship and/or publication of this article.

## Funding

The author(s) disclosed receipt of the following financial support for the research and/ or authorship of this article:

The authors acknowledge the financial support of the Dean of the Feinstein School of Education and Human Development at Rhode Island College and of the Office of the Provost at Boston College.

## References

108,000 people deported had U.S. born children. (2009, February 14). *Boston Globe*, p. A12.

Aber, L., Bennett, N. G., Conley, D. C., & Li, J. (1997). The effects of poverty on child health and development. *Annual Review of Public Health*, *18*, 463-483.

Baum, J., Jones, R., & Barry, C. (2010). *In the child's best interest? The consequences of losing a lawful immigrant parent to deportation*. University of California, Berkley, School of Law & University of California, Davis, School of Law. Retrieved from http://www.law.berkeley.edu/files/IHRLC/In_the_Childs _Best_Interest.pdf

Birman, D., & Chan, W. Y. (2008). *Screening and assessing immigrant and refugee youth in school-based mental health programs.* Washington, DC: Center for Health and Health Care in the Schools.

Black, G., Jamail, M., & Chinchilla, N. (1984). *Garrison Guatemala.* New York, NY: Monthly Review Press.

Brabeck, K. M., Lykes, M. B. L., & Hershberg, R. (in press). Framing immigration to and deportation from the United States: Guatemalan and Salvadoran families make meaning of their experiences. *Community, Work, & Family.*

Brofenbrenner, U., & Morris, P. A. (1998). The ecology of developmental processes. In W. Damon & R. M. Lerner (Eds.), *Handbook of child psychology. Vol. 1: Theoretical models of human development* (pp. 993-1028). New York, NY: Wiley.

Brotherton, D. C., & Barrios, L. (2009). Displacement and stigma: The social-psychological crisis of the deportee. *Crime, Media, Culture*, *5*, 29-55.

Capps, R., Fix, M., Ost, J., Reardon-Anderson, J., & Passel, J. (2005). *The health and well-being of young children of immigrants*. Washington, DC: Urban Institute.

**AR2022_500965**

Capps, R., & Fortuny, K. (2006). *Immigration and child and family policy*. Washington, DC: Urban Institute.

Capps, R., Hagan J., & Rodriguez, N. (2004). Border residents manage the U.S. immigration and welfare reforms. In P. Kretsedemas & A. Aparicio (Eds.), *Immigrants, welfare reform, and the poverty of policy* (pp. 229-250) Westport, CT: Prager.

Capps, R., Fix, M., Murray, J., Ost, J., Passel, J., & Herwantoro, S. (2005). *The new demography of America's schools: Immigration and the No Child Left Behind Act.* Washington, DC: Urban Institute.

Carcieri, D. (2008). *Illegal immigration control order*. Executive Order, State of Rhode Island and Providence Plantations.

Cavazos-Rehg, P. A., Zayas, L. H., & Sptiznagel, E. L. (2007). Legal status, emotional well-being, and subjective health status of Latino immigrants. *Journal of the National Medical Association*, *99*, 1126-1131.

Conger, R., Wallace, L. E., Sun, Y., Simons, R. L., McLoyd, V. C., & Body, G. H. (2002). Economic pressure in African American families: A replication and extension of the family stress model. *Developmental Psychology*, *38*, 179-193.

Davy, M. (2006). *The Central American foreign born in the United States*. Retrieved from http://www.migrationinformation.org/USfocus/display.cfm?ID=385

Fix, M., & Zimmerman, W. (2001). All under one roof: Mixed-status families in an era of reform. *International Migration Review*, *35*, 397-419.

Fry, R., & Passel, J. (2009). *Latino children: A majority are U.S.-born offspring of immigrants*. Washington, DC: Pew Hispanic Center.

Fuligni, A. J., & Yoshikawa, H. (2003). Socioeconomic resources, parenting, and child development among immigrant families. In M. Bornstein & R. Bradley (Eds.), *Socioeconomic status, parenting, and child development* (pp. 107-124). Mahwah, NJ: Erlbaum.

Gelfand, D. M., & Teti, D. M. (1990). The effects of maternal depression on children. *Clinical Psychology Review*, *3*, 329-353.

Gil, A. G., Wagner, E. F., & Vega, W. A. (2000). Acculturation, familism and alcohol use among Latino adolescent males: Longitudinal relations. *Journal of Community Psychology*, *28*, 443-458.

Guarnaccia, P. J., & Lopez, S. R. (1998). The mental health and adjustment of immigrant and refugee children. *Child and Adolescent Psychiatric Clinics of North America*, *7*, 537-553.

Hagan, J., Eschbach, K., & Rodriguez, N. (2008). U.S. deportation policy, family separation, and circular migration. *International Migration Review*, *42*, 62-88.

Hernandez, D. J. (2004). Demographic change and the life circumstances of immigrant families. *The Future of Children*, *2*, 17-47.

**AR2022_500966**

Kalil, A., & Chen, J.-H. (2008). Mothers' citizenship status and household food insecurity among low-income children of immigrants. *New Directions in Child and Adolescent Research*, *121*, 43-62.

Kanstroom, D. (2008). *Deportation nation: Outsiders in America's history*. Cambridge, MA: Harvard University Press.

Kremer, J. D., Moccio, K. A., & Hammell, J. W. (2009). *Severing a lifeline: The neglect of citizen children in America's immigration policy*. Washington, DC: Urban Institute.

Menjivar, C., & Abrego, L. (2009). Parents and children across borders: Legal instability and intergenerational relations in Guatemalan and Salvadoran families. In N. Foner (Ed.), *Immigrant families: Ties across generations* (pp. 160-189). New York: New York University Press.

Moos, R., & Moos, B. (1983). Clinical applications of the Family Environment Scale. In E. Filsinger (Ed.), *A sourcebook of marriage and family assessment* (pp. 253-273). Beverly Hills, CA: Sage.

National Council of La Raza. (2007). *Paying the price: The impact of immigration raids on America's children*. Washington, DC: Author.

Office of Immigration Statistics, U.S. Department of Homeland Security. (2008). *Immigration enforcement actions: 2007*. Retrieved from http://www.dhs.gov/xlibrary/assets/statistics/publications/enforcement_ar_07.pdf

Office of Planning, Analysis, & Technology, U.S. Department of Justice. (2006). *FY 2005 statistical yearbook*. Retrieved from http://pards.org/eoir/EOIRStatisticalYearbook2006,0301-fy05statyrbk.pdf

Passel, J. S. (2006). *The size and characteristics of the unauthorized migrant population in the United States*. Washington, DC: Pew Hispanic Center.

Phares, V., & Compas, B. E. (1992). The role of fathers in child and adolescent psychopathology: Make room for daddy. *Psychological Bulletin*, *111*, 387-412.

Sladkova, J. (2007). Expectations and motivations of Hondurans migrating to the United States. *Journal of Community & Applied Psychology*, *17*, 187-202.

Suarez-Orozco, C., & Carhill, A. (2008). Afterword: New directions in research with immigrant families and their children. *New Directions for Child and Adolescent Development*, *121*, 87-104.

TRAC Immigration. (2006). *How often is the aggravated felony statute used?* Retrieved from http://trac.syr.edu/immigration/reports/158/

Yoshikawa, H., Godfrey, E. B., & Rivera, A. C. (2008). Access to institutional resources as a measure of social exclusion: Relations with family process and cognitive development in the context of immigration. *New Directions in Child and Adolescent Development*, *121*, 63-86.

Yoshikawa, H., & Way, N. (2008). From peers to policy: How broader social contexts influence the adaptation of children and youth in immigrant families. *New Directions in Child and Adolescent Development*, *121*, 1-8.

**AR2022_500967**

## Bios

**Kalina Brabeck**, PhD, is a licensed counseling psychologist and an assistant professor of counseling at Rhode Island College. She is also an affiliated faculty member of the Center for Human Rights and International Justice at Boston College. Her research interests include community trauma, intimate partner violence, feminist and participatory action research, and migration and deportation. She is fluent in Spanish and has 7 years of clinical experience conducting both psychotherapy and forensic evaluations with immigrants and refugees.

**Qingwen Xu**, PhD, is a licensed attorney and an assistant professor at the Graduate School of Social Work, Boston College. She is also an affiliated faculty member of the Center for Human Rights and International Justice at Boston College. Her research focuses on the impact of welfare and immigration policies on the well-being of immigrant children, families, and community. Her research engages immigrant community-based organizations and social service agencies, using interdisciplinary approaches to address immigrants' needs in health and mental health services.

**AR2022_500968**

View publication stats

School Psychology Quarterly
2017, Vol. 32, No. 3, 422–433

© 2017 American Psychological Association
1045-3830/17/$12.00   http://dx.doi.org/10.1037/spq0000211

BRIEF REPORT

# Economic Costs of Bias-Based Bullying

Laura Baams
University of Texas at Austin

Craig A. Talmage
Hobart and William Smith Colleges

Stephen T. Russell
University of Texas at Austin

Because many school districts receive funding based on student attendance, absenteeism results in a high cost for the public education system. This study shows the direct links between bias-based bullying, school absenteeism because of feeling unsafe at school, and loss of funds for school districts in California. Data from the 2011–2013 California Healthy Kids Survey and the California Department of Education were utilized. Results indicate that annually, California school districts lose an estimated $276 million of unallocated funds because of student absences resulting from feeling unsafe at school. Experiences of bias-based bullying were significantly associated with student absenteeism, and the combination of these experiences resulted in a loss of funds to school districts. For example, the absence of students who experienced bullying based on their race or ethnicity resulted in a projected loss of $78 million in unallocated funds. These data indicate that in addition to fostering student safety and well-being, schools have the societal obligation and economic responsibility to prevent bias-based bullying and related absenteeism.

---

***Impact and Implication***

Because school districts receive funding based on attendance, student absenteeism related to feeling unsafe and bias-based bullying results in a high cost for the public education system. In the current study, bias-based bullying is significantly associated with student absenteeism, and the combination of bias-based bullying and absenteeism results in an estimated annual loss of $276 million of funds for California school districts. These data indicate that in addition to fostering student safety and well-being, schools have the societal obligation and economic responsibility to prevent bias-based bullying and related absenteeism.

---

*Keywords:* bias-based bullying, absenteeism, economic costs, education system, daily attendance

*Supplemental materials:* http://dx.doi.org/10.1037/spq0000211.supp

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This article was published Online First June 29, 2017.

Laura Baams, Human Development and Family Sciences, Population Research Center, University of Texas at Austin; Craig A. Talmage, Department of Entrepreneurial Studies, Hobart and William Smith Colleges; Stephen T. Russell, Human Development and Family Sciences, Population Research Center, University of Texas at Austin.

This research was supported by grant 5 R24 HD042849, awarded to the Population Research Center at The University of Texas at Austin by the Eunice Kennedy Shriver National Institute of Child Health and Human Develop-ment. The authors acknowledge generous support from the Communities for Just Schools Fund, and support for Russell from the Priscilla Pond Flawn Endowment at the University of Texas at Austin. We are grateful to Jack Day and Katerina O. Sinclair for their input on earlier versions of the manuscript.

Correspondence concerning this article should be addressed to Laura Baams, who is now at Pedagogics and Educational Sciences, Groningen University, Grote Rozenstraat 38, 9712 TJ Groningen, the Netherlands. E-mail: l.baams@rug.nl

**AR2022_500969**

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 970 of 990

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Bias-based bullying, or bullying based on prejudice or discrimination, continues to be a prevalent, pervasive, and damaging form of bullying in school (Newman & Fantus, 2015; Toomey & Storlie, 2016). Approximately 40% of high school students experience bullying directed at their race or ethnicity, religion, gender, sexual orientation, or disability (Russell, Sinclair, Poteat, & Koenig, 2012), driving students to miss school (e.g., Gastic, 2008; Kearney, 2008). Further, bias-based bullying contributes to lower student well-being and poorer academic performance (Coker et al., 2009; Fisher, Wallace, & Fenton, 2000; Rosenthal et al., 2015; Russell et al., 2012), even more than nonbiased bullying (Russell et al., 2012).

To date, the economic cost of bias-based bullying to schools has not been examined. Funding for school districts in several states in the United States is calculated based on data for average daily attendance in schools; if students are chronically absent because they feel unsafe, average daily attendance will be depressed. Bias-based bullying, absenteeism because of feeling unsafe, and the projected loss of funds for school districts because of missed attendance by students is examined in this study using data from the California Department of Education and the California Healthy Kids Survey.

## Bias-Based Bullying and School Functioning

Bias-based bullying is defined as bullying motivated by a person's actual or perceived membership in a social group or legally protected class, such as race or ethnicity, whereas nonbias based bullying does not have such a motivation (e.g., Greene, 2006; Rigby, 2002; Russell et al., 2012). Youth experience bias-based bullying in school for a number of reasons, many of which stem from not conforming to social norms or from perceived differences in personal characteristics or social status (Killen, 2007; Killen & Stangor, 2001). Victims of bias-based bullying report poorer mental health and higher substance use compared with students who experience nonbias-based harassment and compared with students who do not experience harassment at all (Russell et al., 2012). In addition, students who experience bias-based bullying report lower grades and school connectedness (Nishina, Juvonen, & Witkow, 2005).

Bullying is one of the reasons why students feel unsafe in school. Other reasons include the presence of guns or witnessing aggression (Goldstein, Young, & Boyd, 2008). Students' experiences of victimization, however, are a strong predictor of school absence because of feeling unsafe (Astor, Benbenishty, Zeira, & Vinokur, 2002). In addition, bias-based bullying is prevalent and a strong predictor of lower student well-being (Coker et al., 2009; Fisher et al., 2000; Rosenthal et al., 2015; Russell et al., 2012). For example, anti-LGBT harassment is linked to student absenteeism (Birkett, Espelage, & Koenig, 2009; D'Augelli, Pilkington, & Hershberger, 2002; Russell et al., 2006), and students often feign illness or skip school to avoid bullying (Rivers, 2000). Based on this prior research, this study examines bias-based bullying and its link to student absenteeism (e.g., Dake, Price, & Telljohann, 2003).

Absenteeism has serious consequences for students. Even at young ages, absence is related to lower academic performance (Chang & Romero, 2008), and even to a lack of academic growth (Ready, 2010). By middle school, attendance is predictive of on-time high school graduation (BERC, 2011). Further, minority students who are chronically absent have lower odds of closing the achievement gap (Balfanz & Byrnes, 2006). By high school, school attendance plays a role in test scores (Allensworth & Easton, 2007), dropping out of school, and being overage for their grade (Balfanz & Byrnes, 2012; State of California Department of Justice Office of the Attorney General, 2015). In addition, bullying and school absenteeism can have potentially lasting effects on their adjustment in college (Goodboy, Martin, & Goldman, 2016). In a sample of British youth, truancy during high school related to lower academic achievement and higher rates of unemployment after graduation (Attwood & Croll, 2006). Among gay, bisexual, and transgender adults from the United Kingdom, academic achievement was lower among those who reported retrospective absenteeism and suicidal ideation and self-harm behavior was higher (Rivers, 2000).

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

In addition to negative outcomes for students, there are also effects in the form of financial losses to the school system (State of California Department of Justice Office of the Attorney General, 2015). For example, students who are bullied can suffer negative mental health consequences for which they may require mental health services, which can be costly to schools (Nabors, Leff, & Mettrick, 2001; Taras & the American Academy of Pediatrics Committee on School Health, 2004). Further, in the state of California, school districts receive funding based on average daily attendance (ADA). Hence, when students miss school, the school district's average attendance falls and funding allocation is lower. Recent attention has shifted to the economic costs of absenteeism. In 2013, the total estimated loss of funds to the California school system because of absenteeism and related costs added up to $1 billion per year (State of California Department of Justice Office of the Attorney General, 2013). This dollar amount shows a "truancy crisis" in California schools, but it does not address the reasons why students miss school, or how bias-based bullying and feeling unsafe translate to costs for California school districts.

### Current Study

In this study, data from the California Department of Education and California Healthy Kids Survey is utilized to estimate the projected economic cost to California school districts when students are absent because they feel unsafe at school. The current study uses this information to fulfill two aims. First, the association between bias-based bullying and school absenteeism because of feeling unsafe is examined, specifying five forms of bias-based bullying: (a) race or ethnicity, (b) religion, (c) gender, (d) sexual identity, and (e) disability. The first hypothesis is: Students who experience higher levels of bias-based bullying report higher levels of absenteeism because of feeling unsafe.

Second, the projected economic cost to school districts when students are absent because of experiences of bias-based bullying and feeling unsafe is estimated in this study. The second hypothesis is: A fiscal loss of

potential funds because of student absenteeism is incurred from students feeling unsafe and experiencing bias-based bullying at school.

### Method

#### Procedure and Participants

Participants in this study came from the cross-sectional 2011–2013 California Healthy Kids Survey ($N = 800,740$). WestEd administers the California Healthy Kids Survey in middle and high schools, generally in Grade 7, 9, or 11, with support from the California Department of Education. Its goal was to track health risks and resilience among youth in California (Austin, Hanson, Skager, Polik, & Clingman, 2014). Students with consent of parents or guardians could participate, and each student's participation was voluntary, anonymous, and confidential. Of California middle and high schools, 46.4% of schools participated. As recommended by WestEd, we excluded youth whose response validity were questionable. Exclusion of these youth was based on meeting two or more criteria related to inconsistent responses (e.g., never using a drug and use in the past 30 days, exaggerated drug use, using a fake drug, and answering dishonestly to all or most of the questions on the survey; Austin, Bates, & Duerr, 2013). Based on these criteria 2.06% of participants were excluded from the current analyses.

In total, the analytic sample included 784,280 students (age range 10–18). Slightly less than one half of respondents identified as male (49.2%), 50.8% identified as female. A subsample ($n = 41,132$) completed an additional question about school absence because of feeling unsafe. See Table 1 for demographic characteristics of the full sample and the subsample.

#### Measures

**Average daily attendance.** For the current study, 2011–2012 and 2012–2013 expense per ADA for high school and unified school districts were obtained from the California Department of Education (California Department of Education, 2016).

**Bias-based bullying.** To assess experiences with bias-based bullying, five items from

Table 1
*Demographic Characteristics of the Full Sample and Subsample*

| Demographic Characteristics | Full sample ($N$ = 784,280) | Subsample ($n$ = 41,132) |
| --- | --- | --- |
| Female (%) | 50.78 | 51.79 |
| Grade (%) | | |
| 6th grade | 0.66 | 0.54 |
| 7th grade | 29.02 | 28.58 |
| 8th grade | 0.84 | 0.65 |
| 9th grade | 30.04 | 32.31 |
| 10th grade | 5.94 | 1.91 |
| 11th grade | 27.64 | 33.44 |
| 12th grade | 5.65 | 2.36 |
| Other grade | 0.11 | 0.11 |
| Ungraded | 0.11 | 0.12 |
| Age min/max | 10/18 | 10/18 |
| Ethnicity (%) | | |
| Latino/Hispanic | 51.56 | 45.34 |
| Race (%) | | |
| Asian | 12.54 | 16.69 |
| Native Hawaiian or Pacific Islander | 2.60 | 2.83 |
| Black or African American | 5.91 | 3.63 |
| White | 31.67 | 35.02 |
| American Indian or Alaska Native | 4.74 | 4.48 |
| Mixed (two or more) races | 42.54 | 37.34 |

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

the 2011–2013 California Healthy Kids Survey were used. Students were presented with the prompt: "During the past 12 months, how many times on school property were you harassed or bullied for any of the following reasons?" Types of bias-based bullying that were presented include: your race, ethnicity, or national origin; your religion; your gender (being male or female); because you are gay or lesbian or someone thought you were; and a physical or mental disability. As part of this question, students were presented with the following definition of bullying: You were bullied if you were shoved hit, threatened, called mean names, teased, or had other unpleasant physical or verbal things done to you repeatedly or in a severe way. It is not bullying when two students of about the same strength quarrel or fight." Possible responses were: *0 times*, *1 time*, *2 to 3 times*, and *4 or more times*. See Table 2 for an overview of bullying experiences for the full sample and the subsample.

**Absenteeism because of feeling unsafe.** To assess student absenteeism because of feeling unsafe, a subset of participants ($n$ = 41,132) completed items from a module on Safety and Violence. These students were presented with the prompt, "During the past 30 days, on how

many days did you not go to school because you felt unsafe at school." Possible responses were: *0 times*, *1 time*, *2 to 3 times*, and *4 or more times*. Students in schools that included the Safety and Violence module (695 schools in total) reported feeling safer in school and reported lower rates of bullying based on religion, compared with students in schools that did not include this module.

**Analytical Strategy**

The California Healthy Kids Survey data has a nested structure (students nested in schools); therefore, the survey adjusted frequencies (svy) command in Stata version 14 was used to obtain frequencies (using the school identifier as the primary sampling unit) and provide corrected standard error estimates. To examine the correlations between bias-based bullying and school absenteeism Pearson's correlations were estimated. Again, to handle the nested structure of the data, the estimates were weighted by the number of students per school by adding the command [aw = aweight]. To regress the different forms of bias-based bullying on school absenteeism because of feeling unsafe, a survey

AR2022_500972

Table 2

*Interrelations Between Bias-Based Bullying and Absence Because of Feeling Unsafe, Proportion of Students Bullied, and Logistic Regression Results*

| Variables | 1 | 2 | 3 | 4 | 5 | $M$ (SE) | % Ever bullied | | Odds ratio | [95% CI] |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Full sample | Sub sample | | |
| 1. Bullying based on race or ethnicity[a] | — | | | | | .29 (.00) | 15.8 | 15.0 | 1.13 | [1.08, 1.18] |
| 2. Bullying based on religion | .44*** | — | | | | .15 (.00) | 9.1 | 8.4 | 1.18 | [1.11, 1.26] |
| 3. Bullying based on gender | .40*** | .43*** | — | | | .14 (.00) | 8.0 | 7.9 | 1.21 | [1.13, 1.29] |
| 4. Bullying based on sexual orientation | .31*** | .34*** | .44*** | — | | .17 (.00) | 9.2 | 9.0 | 1.24 | [1.16, 1.32] |
| 5. Bullying based on disability | .31*** | .37*** | .43*** | .41*** | — | .10 (.00) | 5.6 | 5.4 | 1.45 | [1.35, 1.56] |
| 6. Absence due to feeling unsafe[b] | .14*** | .17*** | .18*** | .19*** | .23*** | .19 (.02) | — | — | — | — |

*Note.* CI = confidence interval.
[a] The correlations for types of bullying are estimated in the total sample of 784,280.   [b] The correlations for types of bullying and absence because of feeling unsafe are estimated in the subsample of students who completed the item on school absenteeism because of feeling unsafe = 41,132 students.
*** $p < .001$.

adjusted logistic regression analysis was conducted.

To estimate the average daily cost per student, 2011–2012 and 2012–2013 current expense per ADA across high school and unified school districts were averaged ($8,709.67 and 8,801.70, respectively), and this resulted in an average annual state expenditure cost of $8,755.69 per ADA. To establish a figure associated with the expenditure per student per day, the average annual state expenditure figure was divided by the number of school days per year. In the 2011–2012 school year, California schools were mandated to have an instructional year of 180 days (Education Commission of the States, 2011). For every day a student is present at school for a full school day, the school was allocated an average amount of $48.64:

State Cost($) per Student per Day =

$$\frac{\text{Annual State Expense per ADA}}{\text{Number of School Days/Year}} = \frac{\$8,755.69}{180}$$

$$= \$48.64$$

To calculate the proportion of students who missed class because of feeling unsafe *and* reported bias-based bullying at least once, the percentage of students who reported both for each form of bias-based bullying was observed (see online supplemental materials for detailed calculations). These calculations provide the percentage of students from the current sample who reported both absenteeism because of feeling unsafe and reported bias-based bullying. These percentages were calculated for each category of response of absenteeism because of feeling unsafe (missing 1 day, 2 to 3 days, or 4 or more days of school a month) and each form of bias-based bullying in the past 12 months (1 time, 2 to 3 times, and 4 or more times). The percentages of students who missed school because of feeling unsafe *and* reported bias-based bullying were used to estimate the number of days students were absent related to bullying each month in the California population. To then estimate the projected loss of funds because of absenteeism related to bias-based bullying, the estimated number of students who missed at least 1 day of school were multiplied by the state average daily attendance value ($48.64), which gives the monthly unrealized costs because of absences and bias-based bullying. This figure was then multiplied by 9 to account for the nine school months in a year, which then resulted in the estimated annual loss of unallocated funds because of school absence and bias-based bullying (see online supplemental materials for detailed calculations).

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

## Results

### Bias-Based Bullying and School Absence

Consistent with the first hypothesis, correlational analyses show that different forms of bias-based bullying were interrelated ($rs$ ranged from .32 to .45). A correlation analysis among the subset of participants who reported on their absenteeism ($n = 41,132$), shows that those who experienced bias-based bullying reported more frequent absences because of feeling unsafe ($rs$ ranged from .14 to .23). Further, a logistic regression analysis shows that all forms of bias-based bullying significantly predicted school absenteeism because of feeling unsafe (dichotomized; odds ratios ranged from 1.12 to 1.45, see Table 2).

### Cost of School Absence

Results indicate that 10.4% of students in the current study reported missing at least 1 day of school in the last month because they felt unsafe. Extrapolation for the averaged student body of California Grades 7–12 in the school years of 2011–2012 and 2012–2013 (2,907,223 students) estimates the number of students who miss school at least 1 day a month because of feeling unsafe as 300,926 students in California. Applying the average ADA, this projects a cost of absenteeism of $276 million dollars a year that California school districts do not receive because students miss school because of feeling unsafe (see Table 3).

### Costs of School Absence and Experiences of Bias-Based Bullying

Calculations of students in the current sample who reported student absenteeism *and* bias-based bullying were used to extrapolate the projected annual loss of funds for each form of bias-based bullying—5.4% of all students reported absenteeism because of feeling unsafe but did not report bias-based bullying; 18.8% of all students reported bias-based bullying but did not miss class in the last month because of feeling unsafe.

Of the 10.4% of students who missed school at least 1 day in the last month because they felt unsafe, 45.0% also reported experiencing a form of bias-based bullying. The percentages of students who missed school because of feeling unsafe *and* reported bias-based bullying (see Table 4) were used to estimate the number of days students were absent related to bullying each month in the California population. This figure was then multiplied by the state average daily attendance value ($48.64), which resulted in the estimated annual loss of unallocated funds because of school absence and bias-based bullying (see online supplemental materials for detailed calculations).

Results indicate an estimated projected annual loss of funds of $77.9 million for school absenteeism because of feeling unsafe and related to bullying based on race or ethnicity. For bullying based on religion and associated school absence because of feeling unsafe the

Table 3

*Annual Economic Cost to California State School System for Student Absenteeism Because of Feeling Unsafe*

| School absence because of lack of safety | Monthly absence $N$ (%) | Estimated monthly absence in California population[a] $N$ | Estimated monthly absence in California population days |
|---|---|---|---|
| 0 days | 36,875 (89.65) | 0 | 0 |
| 1 day | 1,875 (4.56) | 132,511.22 | 132,511.22 |
| 2–3 days | 1,241 (3.02) | 87,710.92 | 175,421.84 |
| 4 or more days | 1,142 (2.78) | 80,704.51 | 322,818.04 |
| | | Total absences | 630,751.10 [times] |
| | | Cost per student per day | $48.64 |
| | | Estimated monthly cost | $30,681,450.65 |
| | | Estimated annual cost | $276,133,055.85 |

*Note.* Two to 3 days was conservatively calculated as 2 days absent. Four or more days was conservatively calculated as 4 days absent.
[a] Total grade 7–12 enrollment in California averaged across 2011–2012 and 2012–2013 was 2,907,223.

Table 4
*Annual Economic Cost to California State School System for Student Absenteeism by Type of Bias-Based Bullying*

| Bias-based bullying of . . . | Monthly absence because of unsafety $N$ (%) | Estimated monthly absence in California population days[a] | Estimated annual cost |
|---|---|---|---|
| Race or ethnicity | 1,167 (2.92) | 178,135.64 | $77,985,020.31 |
| Religion | 820 (2.05) | 124,658.65 | $54,573,624.82 |
| Gender | 817 (2.04) | 124,715.78 | $54,598,635.30 |
| Sexual orientation | 927 (2.32) | 143,438.92 | $62,795,337.10 |
| Disability | 726 (1.82) | 112,138.55 | $49,092,521.13 |

[a] Total grade 7–12 enrollment in California averaged across 2011–2012 and 2012–2013 was 2,907,223 (California Department of Education, 2015).

projected annual loss of funds was $54.5 million; for bullying based on gender, $54.5 million; for bullying based on sexual orientation, $62.7 million; and for bullying based on disability, $49.0 million (see Table 4).

Correlations between the different forms of bias-based bullying indicate that some students experienced multiple forms of bias-based bullying. For example, of the students in the current sample 12.8% reported one form of bias-based bullying, 5.7% reported two forms of bias-based bullying, and 2.8% reported three forms of bias-based bullying. Further, the correlation between bias-based bullying and school absence indicates that students who reported multiple forms of bias-based bullying were also likely to miss school because of feeling unsafe. For example, 27,286 students in the current sample reported being bullied based on both their gender and sexual orientation. Among this group, 35.0% of students reported having missed school because of feeling unsafe in the past month; projecting this percentage onto the California school populations, this results in a projected annual loss of unallocated funds of $9.1 million for California school districts.

### Discussion

Despite clear evidence of the negative impact of bias-based bullying on student well-being, no study has associated the economic costs to the school system with school absenteeism and bias-based bullying. With the current study we utilized two sources of data from the California Department of Education and California Healthy Kids Survey to show the association between bias-based bullying and school absen-

teeism, and to estimate the projected annual unrealized funds because of school absenteeism and feeling unsafe. The findings of the current study confirm that experiences of bias-based bullying relate to higher reports of absenteeism because of feeling unsafe. The harassment of students for their race or ethnicity, religion, gender, sexual orientation, and disability has grave consequences for students' feelings of school safety and attendance. The current study also documents that different forms of bias-based bullying are likely to co-occur, and that students who report multiple forms of bias have especially high risks of absenteeism because they feel unsafe. These findings are consistent with past research on absenteeism and bullying, but also have important implications for schools and those they serve.

This study highlighted that just over 10% of students miss school at least 1 day a month because they do not feel safe at school. This becomes especially important because in California missing 3 days of school per year is considered "habitual" and parents can be prosecuted and fined for this (State of California Department of Justice Office of the Attorney General, 2015). Almost half of those students who missed school because of feeling unsafe (45.0%) also reported experiencing bias-based bullying. California school districts receive a projected $276 million less in annual funding because students feel unsafe and at least partly in response to bias-based bullying. The correlation and regression findings supported the connections between bias-based bullying and absenteeism, and these findings are consistent with previous studies (e.g., Card & Hodges, 2008).

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Further, the current data show that some students experience multiple forms of bias-based bullying. For example, 35.0% of students who experience bullying based on their gender *and* sexual orientation also report missing school because of feeling unsafe, resulting in a projected loss of unallocated funding of $9.1 million. As a call for bullying prevention and intervention continues to go out (Cook et al., 2010; Merrell et al., 2008), prevention program developers and interventionists like school psychologists must consider the intertwining of biases in bullying's forms.

The role of school psychologists has shifted from assessment of mental ability and health to consultation and prevention services (Hawken, 2006). These services have to be sensitive to the different backgrounds and struggles students face at school (Lopez & Rogers, 2001). School psychologists have also been encouraged to work more with parents (Christenson, 1995) and teachers (Snyder, Lopez, Shorey, Rand, & Feldman, 2003) in addition to the students they serve. All of these stakeholders will need to be involved in cultivating safer school environments through daily work and bullying prevention and intervention programs.

## Implications

Acknowledging that feeling unsafe in school may differ across regions and urban versus rural areas, the loss of unallocated funds adds up to significant amounts, especially for poorly resourced or large school districts. For example, for California's largest school district Los Angeles Unified, with a 2015–2016 enrollment of 639,337 students, the calculations from the current study would project that an estimated $60.7 million a year in unallocated funds is lost because of student absence because of feeling unsafe. For a smaller but quickly growing school district such as Fresno Unified (2015–2016 enrollment = 73,460), the annual loss of unallocated funds because of student absence because of feeling unsafe is estimated to be $6.9 million. Thus, policies and practices that promote student safety can increase funds for individual school districts.

In addition, the Every Student Succeeds Act (ESSA) specifies that schools' accountability systems need to include at least one indicator that goes beyond academic achievement and graduation rates, such as student engagement or school climate and safety (California Department of Education, 2017; U.S. Department of Education, 2017). Thus, ESSA gives states and school districts the opportunity to focus on school climate and safety as one of their goals to improve the school and student success. At the same time, under ESSA, schools also have the obligation to support marginalized or underperforming youth, and limit dropout. The results from this study indicate that decreasing bullying and improving school safety is an important avenue for accomplishing these goals. For school psychologists, counselors, and school nurses the current findings highlight the importance of considering bullying in student attendance and student success. Not only does school absenteeism limit students' learning opportunities, inadequate safety in school leads to high costs for school districts, further limiting the resources available to support marginalized students.

Further, research on absenteeism and punitive measures in California schools has identified marginalized groups that are more likely to be absent *and* disproportionately disciplined: students with disabilities, gender and sexual minority students, and students of color (Snapp & Russell, 2016). Moreover, school discipline and suspension of these youth costs the state of California an estimated $2.7 billion in increased criminal justice costs and lower taxed paid over the course of their lifetimes (Rumberger & Losen, 2017). The current findings again highlight these vulnerable groups of youth: Those with multiple marginalized identities that leave them as targets to multiple forms of harassment and school punitive measures, exacerbating minority stress and detrimental school and health outcomes (Parks, 2001; Snapp & Russell, 2016). Thus, for school districts an important question is: How can bias-based bullying and absenteeism because of feeling unsafe be prevented?

Although research into effective (preventive) interventions to specifically target bias-based bullying is limited, recent research into antibullying policies and their effects suggest that schools play a crucial role in improving school climates (Hatzenbuehler & Keyes, 2013; Saewyc, Konishi, Rose, & Homma, 2014). In addition to efforts to reduce bullying in school, school districts are paying more attention to the

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

consequences of absenteeism. Preliminary findings from school districts in California show that involving parents, streamlining referral to support systems, improving onsite health services and monitoring can reduce absenteeism (State of California Department of Justice Office of the Attorney General, 2015). Changing school norms and values that ultimately protect and improve student well-being is not only a school's responsibility, but is economically strategic.

## Limitations

The current study applied a novel design to calculate projected loss of funds because of bullying, school safety, and student absenteeism for school districts. However, there are several important limitations to note. First, the current study used self-report measures of both bias-based bullying and school absenteeism because of feeling unsafe. Although reliable peer- or teacher report of bias-based bullying and feelings of safety are difficult to obtain, the shared-method variance may pose a problem. One solution would be to ask schools for their official student records of absenteeism, although one would not be able to ascertain the reasons for their absenteeism. The second limitation pertains to the measurement of absenteeism because of feeling unsafe. In the current study, students were asked about the number of days they missed school because they felt unsafe in the past month, with "4 or more days" as the highest option. With this question, we may have underestimated the number of days students missed. Further, we cannot conclude whether they missed the same number of days across the school year; nor can we conclude whether they missed school *because* they were bullied. Important to note here, the analyses on bias-biased bullying and school absenteeism because of feeling unsafe were based on a smaller subsample of students ($n = 41,132$). This subsample of students reported greater school safety and lower bullying based on religion, indicating that the current findings are based on a subsample of students who feel comparatively safe in school—this may have, therefore, underestimated our projections for the California population of students.

Finally, data come from a state-wide survey in California schools; rates of bias-based bully-

ing and absenteeism because of feeling unsafe may differ in other U.S. states and in other countries. Further, education funding models and rates also vary across U.S. states. Although it is unlikely that the associations between bias-based bullying and absenteeism dramatically vary, these calculations of economic costs are not generalizable beyond the state of California. Still, survey methods are important measures because bullying can often go unreported by students to teachers or other school officials (Cortes & Kochenderfer-Ladd, 2014).

## Conclusion

This study combined student reports with data on economic costs to the school system to provide the first estimate of the annual loss of funding because of bias-based bullying and absenteeism. Given the pervasiveness of bias-based bullying, these findings also reveal the economic costs of bullying and absenteeism to the school system. Thus, preventing bullying and absenteeism while promoting feelings of safety has both economic and social benefits. While existing research often focuses on consequences of bullying to the individual, the work presented here gives schools information to assess costs of bias-based bullying and missed daily attendance to their school district. Now is the time for future research to elucidate what effectively improves feelings of safety in school, especially for students with (often multiple) marginalized identities.

## References

Allensworth, E. M., & Easton, J. Q. (2007). What matters for staying on-track and graduating in Chicago public highs schools: A close look at course grades, failures, and attendance in the freshman year. *Consortium on Chicago School Research*. Retrieved from https://eric.ed.gov/?id=ED498350

Astor, R. A., Benbenishty, R., Zeira, A., & Vinokur, A. (2002). School climate, observed risky behaviors, and victimization as predictors of high school students' fear and judgments of school violence as a problem. *Health Education & Behavior, 29,* 716–736. http://dx.doi.org/10.1177/10901980 2237940

Attwood, G., & Croll, P. (2006). Truancy in secondary school pupils: Prevalence, trajectories and pupil perspectives. *Research Papers in Education, 21,* 467–484. http://dx.doi.org/10.1080/026715 20600942446

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Austin, G., Bates, S., & Duerr, M. (2013). *Guidebook to the California Healthy Kids Survey. Part II: Survey content—Core module*. San Francisco, CA: WestEd. Retrieved from http://surveydata.wested .org/resources/chks_guidebook_2_coremodules .pdf

Austin, G., Hanson, T., Skager, R., Polik, J., & Clingman, M. (2014). *Alcohol and other drug use among California students, 2011–2013*. Results of the 14th Biennial California Healthy Kids Survey, Grades 7, 9 & 11. San Francisco, CA: WestEd. Retrieved from http://chks.wested.org/wp-content/ uploads/14thBiennialReport.pdf

Balfanz, R., & Byrnes, V. (2006). Closing the mathematics achievement gap in high-poverty middle schools: Enablers and constraints. *Journal of Education for Students Placed at Risk, 11,* 143–159. http://dx.doi.org/10.1207/s15327671espr1102_2

Balfanz, R., & Byrnes, V. (2012). *Chronic absenteeism: Summarizing what we know from nationally available data*. Baltimore, MD: Johns Hopkins University Center for Social Organization of Schools. Retrieved from http://new.every1graduates.org/wp-content/ uploads/2012/05/FINALChronicAbsenteeismReport_ May16.pdf

BERC. (2011). *Destination graduation: Sixth grade early warning indicators for Baltimore city schools: Their prevalence and impact*. Baltimore, MD: Baltimore Education Research Consortium. Retrieved from http://baltimore-berc.org/pdfs/ SixthGradeEWIFullReport.pdf

Birkett, M., Espelage, D. L., & Koenig, B. (2009). LGB and questioning students in schools: The moderating effects of homophobic bullying and school climate on negative outcomes. *Journal of Youth and Adolescence, 38,* 989–1000. http://dx .doi.org/10.1007/s10964-008-9389-1

California Department of Education. (2015). *Enrollment by grade comparison*. Retrieved from http:// www.cde.ca.gov/ds/sd/cb/cefenrollmentcomp.asp

California Department of Education. (2016). *Current expense of education*. Retrieved from http://www .cde.ca.gov/ds/fd/ec/currentexpense.asp

California Department of Education. (2017). *Every Student Succeeds Act*. Retrieved from http://www .cde.ca.gov/re/es/

Card, N. A., & Hodges, E. V. (2008). Peer victimization among schoolchildren: Correlations, causes, consequences, and considerations in assessment and intervention. *School Psychology Quarterly, 23,* 451–461. http://dx.doi.org/10.1037/ a0012769

Chang, H. N., & Romero, M. (2008). *Present, engaged, and accounted for: The critical importance of addressing chronic absence in the early grades*. New York, NY: National Center for Children in Poverty. Retrieved from http://www.nccp.org/ publications/pub_837.html

Christenson, S. L. (1995). Families and schools: What is the role of the school psychologist? *School Psychology Quarterly, 10,* 118–132. http://dx.doi .org/10.1037/h0088315

Coker, T. R., Elliott, M. N., Kanouse, D. E., Grunbaum, J. A., Schwebel, D. C., Gilliland, M. J., . . . Schuster, M. A. (2009). Perceived racial/ethnic discrimination among fifth-grade students and its association with mental health. *American Journal of Public Health, 99,* 878–884. http://dx.doi.org/ 10.2105/AJPH.2008.144329

Cook, C. R., Williams, K. R., Guerra, N. G., Kim, T. E., & Sadek, S. (2010). Predictors of bullying and victimization in childhood and adolescence: A meta-analytic investigation. *School Psychology Quarterly, 25,* 65–83. http://dx.doi.org/10.1037/ a0020149

Cortes, K. I., & Kochenderfer-Ladd, B. (2014). To tell or not to tell: What influences children's decisions to report bullying to their teachers? *School Psychology Quarterly, 29,* 336–348. http://dx.doi .org/10.1037/spq0000078

Dake, J. A., Price, J. H., & Telljohann, S. K. (2003). The nature and extent of bullying at school. *The Journal of School Health, 73,* 173–180. http://dx .doi.org/10.1111/j.1746-1561.2003.tb03599.x

D'Augelli, A. R., Pilkington, N. W., & Hershberger, S. L. (2002). Incidence and mental health impact of sexual orientation victimization of lesbian, gay, and bisexual youths in high school. *School Psychology Quarterly, 17,* 148–167. http://dx.doi.org/ 10.1521/scpq.17.2.148.20854

Education Commission of the States. (2011). *Number of instructional days/hours in the school year*. Retrieved from http://www.ecs.org/clearinghouse/95/ 05/9505.pdf

Fisher, C. B., Wallace, S. A., & Fenton, R. E. (2000). Discrimination distress during adolescence. *Journal of Youth and Adolescence, 29,* 679–695. http:// dx.doi.org/10.1023/A:1026455906512

Gastic, B. (2008). School truancy and the disciplinary problems of bullying victims. *Educational Review, 60,* 391–404. http://dx.doi.org/10.1080/0013191 0802393423

Goldstein, S. E., Young, A., & Boyd, C. (2008). Relational aggression at school: Associations with school safety and social climate. *Journal of Youth and Adolescence, 37,* 641–654. http://dx.doi.org/ 10.1007/s10964-007-9192-4

Goodboy, A. K., Martin, M. M., & Goldman, Z. W. (2016). Students' experiences of bullying in high school and their adjustment and motivation during the first semester of college. *Western Journal of Communication, 80,* 60–78. http://dx.doi.org/10 .1080/10570314.2015.1078494

Greene, M. B. (2006). Bullying in schools: A plea for measure of human rights. *Journal of Social Issues,*

AR2022_500978

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

*62,* 63–79. http://dx.doi.org/10.1111/j.1540-4560 .2006.00439.x

Hatzenbuehler, M. L., & Keyes, K. M. (2013). Inclusive anti-bullying policies and reduced risk of suicide attempts in lesbian and gay youth. *Journal of Adolescent Health, 53*(Suppl.), S21–S26. http://dx .doi.org/10.1016/j.jadohealth.2012.08.010

Hawken, L. S. (2006). School psychologists as leaders in the implementation of a targeted intervention: The Behavior Education Program. *School Psychology Quarterly, 21,* 91–111. http://dx.doi .org/10.1521/scpq.2006.21.1.91

Kearney, C. A. (2008). School absenteeism and school refusal behavior in youth: A contemporary review. *Clinical Psychology Review, 28,* 451–471. http://dx.doi.org/10.1016/j.cpr.2007.07.012

Killen, M. (2007). Children's social and moral reasoning about exclusion. *Current Directions in Psychological Science, 16,* 32–36. http://dx.doi.org/10 .1111/j.1467-8721.2007.00470.x

Killen, M., & Stangor, C. (2001). Children's social reasoning about inclusion and exclusion in gender and race peer group contexts. *Child Development, 72,* 174–186. http://dx.doi.org/10.1111/1467-8624 .00272

Lopez, E. C., & Rogers, M. R. (2001). Conceptualizing cross-cultural school psychology competencies. *School Psychology Quarterly, 16,* 270–302. http://dx.doi.org/10.1521/scpq.16.3.270.19889

Merrell, K. W., Gueldner, B. A., Ross, S. W., & Isava, D. M. (2008). How effective are school bullying intervention programs? A meta-analysis of intervention research. *School Psychology Quarterly, 23,* 26–42. http://dx.doi.org/10.1037/1045-3830.23.1.26

Nabors, L. A., Leff, S. S., & Mettrick, J. E. (2001). Assessing the costs of school-based mental health services. *The Journal of School Health, 71,* 199–200. http://dx.doi.org/10.1111/j.1746-1561.2001 .tb07317.x

Newman, P. A., & Fantus, S. (2015). A social ecology of bias-based bullying of sexual and gender minority youth: Toward a conceptualization of conversion bullying. *Journal of Gay & Lesbian Social Services, 27,* 46–63. http://dx.doi.org/10 .1080/10538720.2015.988315

Nishina, A., Juvonen, J., & Witkow, M. R. (2005). Sticks and stones may break my bones, but names will make me feel sick: The psychosocial, somatic, and scholastic consequences of peer harassment. *Journal of Clinical Child and Adolescent Psychology, 34,* 37–48. http://dx.doi.org/10.1207/s1537 4424jccp3401_4

Parks, C. W. (2001). African-American same-gender-loving youth and families in urban schools. *Journal of Gay & Lesbian Social Services, 13,* 41–56. http://dx.doi.org/10.1300/J041v13n03_03

Ready, D. D. (2010). Socioeconomic disadvantage, school attendance, and early cognitive development the differential effects of school exposure. *Sociology of Education, 83,* 271–286. http://dx.doi .org/10.1177/0038040710383520

Rigby, K. (2002). *New perspectives on bullying.* Philadelphia, PA: Jessica Kingsley Publishers.

Rivers, I. (2000). Social exclusion, absenteeism, and sexual minority youth. *Support for Learning, 15,* 13–18. http://dx.doi.org/10.1111/1467-9604 .00136

Rosenthal, L., Earnshaw, V. A., Carroll-Scott, A., Henderson, K. E., Peters, S. M., McCaslin, C., & Ickovics, J. R. (2015). Weight- and race-based bullying: Health associations among urban adolescents. *Journal of Health Psychology, 20,* 401–412. http://dx.doi.org/10.1177/1359105313502567

Rumberger, R. W., & Losen, D. J. (2017). *The hidden costs of California's harsh school discipline: And the localized economic benefits from suspending fewer high school students.* Los Angeles, CA: The Civil Rights Project. Retrieved from https://www .civilrightsproject.ucla.edu/news/press-releases/ 2017-press-releases/school-suspensions-cost-california-billions-1

Russell, S. T., McGuire, J. K., Laub, C., Manke, E., O'Shaughnessy, M., Heck, K., & Calhoun, C. (2006). *Harassment in school based on actual or perceived sexual orientation: Prevalence and consequences (California Safe Schools Coalition Research Brief No. 2).* San Francisco, CA: California Safe Schools Coalition. Retrieved from http:// www.casafeschools.org/CSSC_Research_Brief_2 .pdf

Russell, S. T., Sinclair, K. O., Poteat, V. P., & Koenig, B. W. (2012). Adolescent bullying and harassment based on discriminatory bias. *American Journal of Public Health, 102,* 493–495. http://dx .doi.org/10.2105/AJPH.2011.300430

Saewyc, E. M., Konishi, C., Rose, H. A., & Homma, Y. (2014). School-based strategies to reduce suicidal ideation, suicide attempts, and discrimination among sexual minority and heterosexual adolescents in Western Canada. *International Journal of Child, Youth, and Family Studies, 5,* 89–112. http://dx.doi.org/10.18357/ijcyfs.saewyce.512014

Snapp, S. D., & Russell, S. T. (2016). Discipline disparities for LGBTQ youth: Challenges that perpetuate disparities and strategies to overcome them. In R. J. Skiba, K. Mediratta, & M. K. Rausch (Eds.), *Inequality in school discipline* (pp. 207–223). New York, NY: Springer Nature. http://dx .doi.org/10.1057/978-1-137-51257-4_12

Snyder, C. R., Lopez, S. J., Shorey, H. S., Rand, K. L., & Feldman, D. B. (2003). Hope theory, measurements, and applications to school psychology. *School Psychology Quarterly, 18,* 122–139. http://dx.doi.org/10.1521/scpq.18.2.122.21854

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

State of California Department of Justice Office of the Attorney General. (2013). *In School + On Track 2013*. Retrieved from https://oag.ca.gov/truancy/2013

State of California Department of Justice Office of the Attorney General. (2015). *In School + On Track 2015*. Retrieved from https://oag.ca.gov/truancy/2015

Taras, H. L., & the American Academy of Pediatrics Committee on School Health. (2004). School-based mental health services. *Pediatrics, 113,* 1839–1845. http://dx.doi.org/10.1542/peds.113.6.1839

Toomey, R. B., & Storlie, C. A. (2016). School counselors' intervention in bias-related incidents among Latino students. *Journal of School Violence, 15,* 343–364. http://dx.doi.org/10.1080/15388220.2015.1049354

U.S. Department of Education. (2017). *Every Student Succeeds Act (ESSA)*. Retrieved from https://www.ed.gov/essa?src=rn

Received December 16, 2016
Revision received May 12, 2017
Accepted May 14, 2017 ■

7/7/22, 10:25 AM
Case 1:18-cv-00068
Document 610-4
Law Enforcement Leaders and Prosecutors Defend DACA | Georgetown Law
Filed on 11/04/22 in TXSD
Page 981 of 990

# Law Enforcement Leaders and Prosecutors Defend DACA

**MARCH 20, 2018**

*ICAP coauthors brief signed by 63 top law enforcement officials arguing DACA program increases cooperation with police and improves public safety*

Over 60 prominent national law enforcement leaders, including current sitting Police Chiefs,Sheriffs, District Attorneys, State's Attorneys, and Prosecuting Attorneys from 28 jurisdictions representing over 25 million people around the country are defending the Deferred Action for Childhood Arrivals (DACA) program, highlighting the essential benefits it provides to public safety by encouraging cooperation between immigrants and law enforcement, while warning of the damage to public trust rescinding the program would bring.

This group of prominent prosecutors and law enforcement leaders filed a friend-of-the-court (amicus) brief supporting a federal district court injunction to preserve DACA after the Trump Administration began unwinding the program in September 2017. The Department of Justice is challenging that nationwide injunction, which went into effect on January 9, 2018, and has appealed that order to the Ninth Circuit Court of Appeals. The case occupies an influential spot in the larger national debate on immigration policy, with the lives of 800,000 individuals brought to the country as children hanging in the balance.

"DACA protects individuals who have lived, worked, and studied as continuous residents of the United States for over a decade," said Miriam Aroni Krinsky, Executive Director of **Fair and Just Prosecution** and a signatory on the brief. "These individuals are active members of our workforce and our social circles, and prosecutors and law enforcement leaders understand their importance to the rich and diverse fabric of our community. Beyond its cruel significance for those the program directly protects, an end to DACA would threaten a serious loss of public trust and cooperation between immigrant populations and law enforcement. These developments could set off a dangerous chain reaction that would jeopardize public safety."

**AR2022_500981**

Twenty eight current prosecutors and law enforcement leaders from diverse jurisdictions across the country were among the 63 signators on the **brief**, including District Attorneys **Diana Becton** (Contra Costa County, California), **Mark Dupree** (Wyandotte County (Kansas City), Kansas), **Sim Gill** (Salt Lake County, Utah), **Eric Gonzalez** (Kings County (Brooklyn), New York), **Mark Gonzalez** (Nueces County (Corpus Christi), Texas), **Larry Krasner** (Philadelphia, Pennsylvania), **Beth McCann** (2nd Judicial Circuit (Denver), Colorado), **Raúl Torrez** (Bernalillo County (Albuquerque), New Mexico) and **Cyrus Vance** (New York County (Manhattan), New York), State Attorney **Aramis Ayala** (Ninth Judicial Circuit (Orlando) Florida), State's Attorneys **Sarah George** (Chittenden County (Burlington), Vermont) and **Marilyn Mosby** (Baltimore City, Maryland), Prosecuting Attorneys **Dan Satterberg** (King County (Seattle), Washington) and **Carol Siemon** (Ingham County (Lansing), Michigan), Police Chiefs Art Acevedo (Houston, Texas Police Department), **Charles Beck** (Los Angeles, California Police Department) **Kenneth Ferguson** (Framingham, Massachusetts Police Department), **Ronald Haddad** (Dearborn, Michigan Police Department) **Chris Magnus** (Tucson, Arizona Police Department), **Abdul Pridgen** (Seaside, California Police Department), **Celestino Rivera** (Lorain, Ohio Police Department), **Michael Tupper** (Marshalltown, Iowa Police Department), Sheriffs **Jerry L. Clayton** (Washtenaw County, Michigan Sheriff's Office), **Mark Curran** (Lake County, Illinois Sheriff's Office), **Tony Estrada** (Santa Cruz County, Arizona Sheriff's Office), **Bill McCarthy** (Polk County, Iowa Sheriff's Office), **Joe Pelle** (Boulder County, Colorado Sheriff's Office), **Richard Wiles** (El Paso County, Texas Sheriff's Office), and Commissioner **Charles Ramsey** (Philadelphia, Pennsylvania Police Department, retired).

The brief lays out the multitude of advantages DACA provides to law enforcement officials and reflects the perspectives and experiences of leaders in jurisdictions heavily impacted by immigration. The signatories hail a community policing approach based on trust and engagement between law enforcement and those they protect, and consider DACA to be crucial to maintaining that trust. Its absence, they argue, would inflame fears that neither undocumented immigrants nor their lawfully present family and neighbors could turn to the police without facing drastic consequences.

"Rescinding DACA would be a devastating step backwards as my officers work to build trust with immigrant communities," said Chief Chris Magnus, of the Tucson, Arizona Police Department. "Without that trust, we lose valuable lines of communication, witnesses to crimes, and information needed to protect populations that face heightened risks of crime and exploitation."

DACA's guarantee of protection from deportation encourages helpful communication with law enforcement, without which community policing cannot thrive. Destruction of that public trust would hamper the capabilities of law enforcement and prosecutors while fostering crime-friendly conditions in at-risk communities, the brief's signatories argue.

The amicus brief was authored by the Chicago law firm of **Hughes Socol Piers** **Resnick** **Dym, Ltd**

AR2022_500982

Case 1:18-cv-00068   Document 610-4   Filed on 11/04/22 in TXSD   Page 983 of 990

The amicus brief was authored by the Chicago law firm of **Hughes Socol Piers Resnick & Dym, Ltd.**, in conjunction with Georgetown Law's **Institute for Constitutional Advocacy and Protection** (ICAP). Fair and Just Prosecution, a national network of newly elected prosecutors committed to change and innovation, coordinated the amicus effort. In November of last year, the same organizations filed an amicus brief on behalf of prosecutors and law enforcement leaders in support of a lawsuit by the State of California resisting Trump Administration efforts to entangle local police in federal immigration enforcement.

"This brief represents the expert opinions of leaders who interact with immigrant communities and work to preserve public safety on a daily basis," said **Joshua Geltzer**, ICAP's executive director and visiting professor at Georgetown Law. "At this critical juncture for resolving issues of immigration law and policy, their voices need to be heard. And they are clearly and definitively standing behind DACA."

**The amicus brief is available here**.

AR2022_500983

# A New Estimate of the Cost of Reversing DACA

By Logan Albright
Ike Brannon
M. Kevin McGee

February 15, 2018

## CATO WORKING PAPER
No. 49



1000 Massachusetts Avenue NW
Washington DC 20001

*Cato Working Papers are intended to circulate research in progress for comment and discussion.*
*Available at www.cato.org/workingpapers.*

AR2022_500984

# A New Estimate of the Cost of Reversing DACA

**Logan Albright[1]**
**Ike Brannon[2]**
**M. Kevin McGee[3]**

February 15, 2018

## Abstract

We obtained data on the age and educational outcomes of nearly 3,000 college students who are DACA recipients—Deferred Action for Childhood Arrivals—and used it to forecast their income in the ensuing decade. We then used this data, along with the income we forecast for DACA recipients not in college, to estimate the total economic and fiscal impact over the next decade of allowing this cohort to remain in the country and legally pursue employment.  We estimate that reversing DACA would cost the U.S. economy $351 billion from 2019 to 2028 in lost income and that the U.S. Treasury would lose $92.9 billion in tax revenue.

## Background

As of our publication date, the status of the recipients of the Deferred Action for Childhood Arrivals—or DACA—has yet to be resolved.  DACA provides work authorization and protections from deportations for individuals who were transported to the United States as children and who have since proven themselves to be productive members of society by meeting education benchmarks and having refrained from criminal activity.  In October, President Trump announced that he was suspending the program—which was originally provided via an executive order from President Obama—but that he would delay its termination by six months to give Congress sufficient time to pass legislation to replace the executive order. Such legislation has proven elusive.

One argument put forth by those opposed to any renewal is that allowing these immigrants to remain in the country would impose a cost on U.S. taxpayers; a CBO study published in December 2017 estimates that legislation reinstating the legal status of the estimated 800,000 DACA immigrants would cost the federal government $26 billion over the next ten years.[4]

1

These results were at odds with our own research published in early 2017.[5] In that research, we stated that our *a priori* perspective was that cancelling DACA would make it nearly impossible for this cohort to obtain lawful employment and result in a reduction in tax revenues and economic activity in the domestic economy.

We estimated the economic and fiscal impact by extrapolating from related research that estimated the impact of expanding the pool of H-1B visa holders on economic activity.[6]  We compared the demographic characteristics of the H-1B population and the DACA population—in general DACA recipients are younger and a sizeable fraction will likely not complete college. The result is that their income is quite a bit lower than for H-1B holders but it grows at a faster rate. We then estimated income and tax revenue by using the estimates for the H-1B population and adjusting those numbers by the income path and population differences.

We determined that reversing the policy would cost the U.S. economy $280 billion over a ten-year period, and that the resulting loss of government revenue would amount to roughly $60 billion in that decade.

**A Brief History of DACA**

President Barack Obama first established DACA visa executive action in 2012. From 2012 to 2017, roughly 800,000 people received DACA status. While this population could attend most colleges despite their lack of a legal status, the program gave them a temporary work permit and a Social Security number, which allowed them to work as well.

During his presidential campaign, Donald Trump promised to rescind DACA early in his presidency, and in September of 2017, the Attorney General announced that the program was, in fact, being suspended, with DACA recipients given up to a six-month grace period to get their affairs in order. The president challenged Congress to pass its own legislation to protect the status of DACA recipients, and at various times indicated that he felt some empathy for their plight and wanted a humane and reasonable solution of the issue.

This announcement was met with multiple legal challenges from state governments and individuals alike. The U.S. District Court of the Northern District of California has ruled that the reversal of DACA was unlawful, and has ordered the government to continue the program until further notice.

2

One proposed bill under consideration is the DREAM Act of 2017.  The Congressional Budget Office estimated that it would increase budget deficits by approximately $26 billion over the next decade.[7]  The rationale given for this result is that immigrants without work permits pay certain taxes, most notably payroll taxes, but cannot claim benefits. By granting them legal status these workers become eligible for various benefit programs and Social Security but without paying much more in federal income taxes.

**The DACA Population**

To understand the economic impact of reversing DACA it helps to understand what distinguishes DACA recipients from other cohorts of legal and illegal immigrants. Since the DACA population grew up in the United States, they more closely resemble native-born Americans and second-generation immigrants more than first-generation immigrants. Having experienced the American school system and a peer group comprised mainly of Americans, the difficulties presented by language barriers, culture shock, and other obstacles to assimilation have dissipated, thus affording DACA recipients more opportunities for economic success than immigrants as a whole.

Moreover, DACA recipients must necessarily be free from criminal activity, as well as have the ability to enroll and remain in some sort of post-secondary education in order to qualify for the program, leaving us with a cohort that has largely performed well in school and stayed out of trouble.

Analysis done by the Center for American Progress found that DACA recipients tend to perform well in post-secondary education and have lower attrition rates than their peers.[8] A primary reason for this is that the opportunity cost for a DACA student to leave school before completion is higher than for a native student: it is more difficult for DACA students to procure financial aid or scholarships and it becomes nearly impossible to do such a thing if a student leaves school for a spell.

The Migration Policy Institute (MPI) estimated that in 2014 nearly half of the DACA-eligible population who have completed a high school degree had no further education, with an additional 29 percent enrolled in college, 16 percent having completed some post-secondary education, and only 7 percent with college degrees.[9] Since DACA enrollment only began in

3

2012, this paucity of college graduates is understandable; more impressive is the surge in college enrollment. For the rest of the U.S. population, approximately 60 percent of high school graduates attended some sort of post-secondary institution and one third of the population eventually obtained a college degree.

These numbers would presumably have been even higher had MPI been able to look only at DACA enrollees. They estimated that in 2016, only 68 percent of the DACA-eligible population enrolled in the program. Clearly, those with at least some post-secondary education have a greater incentive to apply for DACA status than the average DACA-eligible person, since that status opens up legal employment opportunities that substantially increase with education. Therefore, we conclude that those with DACA *status* have a higher college enrollment rate as compared to the entire population of DACA-eligible unlawful immigrants.[10] From that, we assume that the college-enrollment rate among DACA enrollees is around 40 percent in 2014, about a third higher than for all DACA-eligibles, which would in turn suggest that by 2019 the current DACA-enrolled population will be--roughly--evenly divided between those with only a high school degree, those with some post-secondary education, those currently in college, and those with college degrees.[11]

**Methodology**

Estimating the economic production and tax revenues that DACA enrollees are likely to generate over the next decade entails three steps. First, we needed to generate a profile of the DACA-eligible population over time, as its members move from high school either directly into the workforce, or through post-secondary education and then into the workforce. That profile needs to include reasonable transition probabilities that would estimate both high school and college drop out rates that are consistent with the patterns observed in the data.

Second, we needed to estimate reasonable age-earnings profiles for three groups of DACA-eligible individuals: those projected to have only high school degrees, those projected to have some college or other post-secondary education but no degree, and those projected to complete college. Finally, we needed to estimate how many of those DACA-eligible individuals would in fact apply for and be approved for DACA status.

AR2022_500988

*DACA-eligible Workforce Entry*

We used Migration Policy Institute research on the characteristics and numbers of the DACA-eligible population to estimate the distribution of educational attainment for this population.[12] Using the Hispanic dropout rates in the Census Department's CPS Historical Time Series Tables on School Enrollment, we generated a plausible pattern of DACA-eligible high school enrollment, which gradually tapered from 98,000 freshmen in 2012 to 8,000 freshmen in 2023.[13] We then assumed that 35 percent of these high school graduates would move directly into the workforce. MPI estimated that there were 396,000 DACA-eligible high school graduates in 2014 who were not pursuing additional education, which would then imply that 309,000 DACA-eligible, unlawful immigrants had already graduated from high school by 2011.

The remaining high school graduates were divided between college enrollment (50 percent) and other post-secondary enrollment (15 percent). Even those numbers were insufficient to generate MPI's estimate of 241,000 DACA-eligible college enrollees in 2014; so we assumed a surge of over 95,000 college enrollees in 2013, from among the population that had previously graduated from high school. Our estimates imply that by 2033, 36.35 percent of the DACA-eligible population will have college degrees, in line with Census department's 2017 estimate that by the age of 34, 36.4 percent of Hispanics who graduate from high school have gone on to earn college degrees.[14]

We assumed that college enrollees have an 81 percent graduation rate, consistent both with the rates observed by thedream.us, an organization that provides scholarship money for DACA students to help cover the cost of college. This is above the national 6-year graduation rates for full-time college students; we attribute this to the fact that a substantial proportion of our sample obtained an associate's degree, which is a common step for this cohort seeking post-college education. We assumed that enrollees in other post-secondary programs had a 50 percent annual attrition rate, either from dropping out or from completion of their program. This gave a flow of DACA-eligibles into the workforce that includes about 44,000 college graduates per year between 2017 and 2023.

We then had to reduce this workforce-entry flow for two reasons. First, not all high school graduates are in the labor force, and not all labor force participants are employed as the population includes those who are unemployed but looking for work. The Bureau of Labor

5

Statistics (BLS) reports a 75.3 percent employment-population ratio among Hispanics age 25 to 34, so we reduced our estimates of labor force entrants accordingly.[15]

Secondly, not all DACA-eligible unlawful immigrants apply for, or are granted, DACA status. MPI estimated that 68 percent of DACA-eligibles have applied for that status with an acceptance rate above 95 percent.[16] We reasoned that since the benefits of DACA status are greater the greater one's earnings potential, we ascribed DACA status to all of the DACA-eligibles with some college or a college degree, but to only one-third of those with only high school degrees. Those assumptions imply that DACA status will slowly rise to 68.8 percent of the eligible population by 2028. If DACA is not just reinstated as a temporary, 2-year renewable status, but is legally enshrined in a permanent status, we would expect DACA participation to rise and the revenue impacts of DACA will increase accordingly.

*DACA-eligible Age-earnings Profiles*

The estimated age-earnings profiles of DACA-eligibles with only high school or some college are based on the corresponding median 2017 weekly earnings for Hispanics as reported by the BLS.[17] For individuals with high school degrees only, median earnings were $33,852 a year; using Thornton and his coauthor's research, real earnings rise by about 1 percent a year until about age 40, and are flat thereafter.[18] The resulting pattern begins at about $27,500 at age 19, when these individuals are assumed to enter the workforce, and rises to the median wage by age 40.

For individuals with some college, median earnings were $38,324 a year. According to Tamborini and his coauthors, median earnings for these workers are 5.6 percent higher than their high school-only counterparts for those aged 20-29, and 12.6 percent higher for those aged 30-39.[19] The resulting estimated real earnings profile consistent with these values rises from $28,000 at age 21 to $39,300 at age 40.

We assigned the starting median salary to all employed DACA-participating individuals at the beginning of their work careers and assumed that their real incomes would rise with age according to the rates above. In reality, some individuals will earn more than those median earnings, and others less. The progressivity of the tax code implies that our revenue estimates for these workers will understate the true revenue impacts, although probably not my much, since