# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔦𝔣𝔱𝔥 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

United States Courts
Southern District of Texas
FILED

*November 28, 2022*

Nathan Ochsner, Clerk of Court

United States Court of Appeals
Fifth Circuit
**FILED**
October 5, 2022

Lyle W. Cayce
Clerk

No. 21-40680

STATE OF TEXAS; STATE OF ALABAMA; STATE OF ARKANSAS; STATE OF LOUISIANA; STATE OF NEBRASKA; STATE OF SOUTH CAROLINA; STATE OF WEST VIRGINIA; STATE OF KANSAS; STATE OF MISSISSIPPI,

*Plaintiffs—Appellees,*

*versus*

UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, *Secretary, U.S. Department of Homeland Security*; TROY MILLER, *Acting Commissioner, U.S. Customs and Border Protection*; TAE D. JOHNSON, *Acting Director of U.S. Immigration and Customs Enforcement*; UR M. JADDOU, *Director of U.S. Citizenship and Immigration Services,*

*Defendants—Appellants,*

ELIZABETH DIAZ; JOSE MAGANA-SALGADO; KARINA RUIZ DE DIAZ; JIN PARK; DENISE ROMERO; ANGEL SILVA; MOSES KAMAU CHEGE; HYO-WON JEON; BLANCA GONZALEZ; MARIA ROCHA; MARIA DIAZ; ELLY MARISOL ESTRADA; DARWIN VELASQUEZ; OSCAR ALVAREZ; LUIS A. RAFAEL; NANCI J. PALACIOS GODINEZ; JUNG WOO KIM; CARLOS AGUILAR GONZALEZ; STATE OF NEW JERSEY,

*Intervenor Defendants—Appellants.*

No. 21-40680

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:18-CV-68

---

Before Richman, *Chief Judge*, and Ho and Engelhardt, *Circuit Judges*.

Priscilla Richman, *Chief Judge*:

In 2012 the Secretary of the Department of Homeland Security (DHS) announced the Deferred Action for Childhood Arrivals (DACA) program. The program was set forth in a three-page memorandum (to which we will refer as the DACA Memorandum or the memorandum).[1] Among other provisions, the DACA Memorandum directed that removal of certain aliens who entered the United States unlawfully as children should be deferred and that these immigrants should receive certain benefits. Eight states and the Governors of two states, led by Texas, have challenged DACA's validity.[2] In ruling on competing motions for summary judgment, the district court held that the DACA Memorandum violates procedural and substantive requirements of the Administrative Procedure Act (APA).[3] The district court vacated the DACA Memorandum and remanded to DHS for further consideration but temporarily stayed that vacatur as it applies to

---

[1] Memorandum from Janet Napolitano, Sec'y, Dep't of Homeland Sec., to David Aguilar, Acting Comm'r, U.S. Customs and Border Prot., et al. (June 15, 2012) (DACA Memorandum) (ROA.350-52), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[2] The Plaintiffs are the States of Texas, Alabama, Arkansas, Louisiana, Nebraska, South Carolina, West Virginia, and Kansas, and the Governors of Mississippi and Maine. ROA.4175 (Amended Complaint).

[3] 5 U.S.C. § 500 *et. seq.*; *Texas v. United States*, 549 F. Supp. 3d 572, 624 (S.D. Tex. 2021). We cite the district court's opinion as "Dist. Ct. Op., 549 F. Supp. 3d at —."

No. 21-40680

current DACA recipients.[4]  The district court further ruled that DHS may continue to accept new and renewal DACA applications but enjoined DHS from approving any new DACA applications.[5] We affirm the district court's judgment in part, but remand to the district court rather than DHS in light of a final rule promulgated by DHS in August 2022.[6]

## I

The 2012 DACA Memorandum applies to "certain young people who were brought to this country as children" unlawfully and would otherwise be removable.[7] The DACA Memorandum provides that an illegal alien qualifies for relief from removal and specified benefits if that person

- came to the United States under the age of sixteen;
- has continuously resided in the United States for at least five years preceding the date of the memorandum and was present in the United States on the date of the memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or does not otherwise pose a threat to national security or public safety;

---

[4] Dist. Ct. Op., 549 F. Supp. 3d at 624.

[5] *Id.*

[6] Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53,152 (Aug. 30, 2022) (to be codified at 8 C.F.R. pts 106, 236, and 274a).

[7] *Id.*

No. 21-40680

- is not above the age of thirty as of the date of the memorandum; and

- passes a background check.[8]

Under these criteria, the district court concluded that about 1.5 million aliens were covered by the DACA Memorandum.[9]

The memorandum instructs immigration agencies to "exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal...."[10]   United States Citizenship and Immigration Services (USCIS) was directed to "establish a clear and efficient process" to that end.[11]

Those granted deferred action became eligible for other benefits.  By virtue of deferred action, recipients were deemed "lawfully present" under pre-existing federal regulations and could seek work authorization, and were eligible for Social Security and Medicare.[12]   The memorandum expressly

---

[8] Memorandum from Janet Napolitano, Sec'y, Dep't of Homeland Sec., to David Aguilar, Acting Comm'r, U.S. Customs and Border Prot., et al. (June 15, 2012) (DACA Memorandum)   (ROA.350-52),   https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[9] *Texas v. United States*, 549 F. Supp. 3d 572, 578 n.10 (S.D. Tex. 2021) ("Estimates provided to the Court differ in the total number of DACA-eligible individuals.... Rather than relying on extrinsic sources, arguments from counsel, or government statistics that frequently change, the Court instead will use a midrange number of approximately 1.5 million eligible individuals.").

[10] DACA Memorandum at 2.

[11] *Id.*

[12] *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1902 (2020) (explaining that work authorization for deferred action recipients is "permitted under regulations long predating DACA's creation" and that "[p]ursuant to other regulations, deferred action recipients are considered 'lawfully present' for purposes of, and therefore eligible to receive, Social Security and Medicare benefits"); *see also* 8 C.F.R. § 274a.12(c)(14) (2022)

No. 21-40680

stated that "USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action."[13]

The memorandum contained several disclaimers. "DHS cannot provide any assurance that relief will be granted in all cases."[14] The memorandum says that it "confers no substantive right, immigration status or pathway to citizenship."[15] It purports to "set forth policy for the exercise of discretion within the framework of existing law."[16]

Two years later, in November 2014, DHS issued a memorandum to expand DACA and institute a related program called Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).[17] The DACA expansion would have removed the age limit, extended the entry date from 2007 to 2010, and extended the renewable deferred action period from two years to three years.[18] Up to 4.3 million parents of United States citizens or lawful permanent residents would have been eligible under the DAPA program.[19]

---

(work authorization); 8 C.F.R. § 1.3(a)(4)(vi) (Social Security); 42 C.F.R. § 417.422(h) (Medicare).

[13] DACA Memorandum at 3.

[14] *Id.* at 2.

[15] *Id.* at 3.

[16] *Id.*

[17] Memorandum from Jeh Johnson, Sec'y, Dep't of Homeland Sec., to León Rodríguez, Dir., U.S. Citizenship & Immigr. Servs., et al. (Nov. 20, 2014) (ROA.354-58), https://www.dhs.gov/sites/default/files/publications/14_1120_memo_deferred_action_2.pdf.

[18] *Id.* at 3-4.

[19] *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1902 (2020).

No. 21-40680

Twenty-six states filed suit in the Southern District of Texas to prevent DAPA's implementation.[20] The district court entered a nationwide preliminary injunction.[21] In *Texas v. United States (DAPA)*,[22] this court affirmed the grant of injunctive relief.[23] We held that DAPA likely violated procedural APA requirements because it was a substantive rule that required notice and comment.[24] We also held that DAPA likely violated substantive APA requirements because it was "manifestly contrary" to the Immigration and Naturalization Act (INA).[25] The Supreme Court affirmed this court's judgment without an opinion by an equally divided vote.[26]

After a change in Presidential administrations, the new Attorney General determined that DACA was likewise unlawful.[27] DHS then issued a memorandum attempting to rescind DACA.[28] In *Department of Homeland Security v. Regents of the University of California*,[29] the Supreme Court held that DACA's rescission violated the APA. The Court first determined that the rescission decision was reviewable.[30] DACA "conferr[ed] affirmative immigration relief," granting both forbearance from removal and other

---

[20] *Texas v. United States*, 86 F. Supp. 3d 591, 604 (S.D. Tex. 2015).

[21] *Id.* at 677-78.

[22] 809 F.3d 134 (5th Cir. 2015).

[23] *Id.* at 146.

[24] *Id.* at 177-78.

[25] *Id.* at 182 (quoting *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 53 (2011)).

[26] *United States v. Texas*, 579 U.S. 547 (2016) (per curiam).

[27] *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1903 (2020).

[28] ROA.366-71.

[29] 140 S. Ct. 1891 (2020).

[30] *Id.* at 1907.

No. 21-40680

benefits attendant to deferred action: eligibility for work authorization, Social Security, and Medicare.[31] "Because the DACA program is more than a non-enforcement policy, its rescission is subject to review under the APA," the Court explained.[32]

The Court then held that the decision to rescind DACA was arbitrary and capricious.[33] DHS did not explain why it was terminating "the forbearance policy at the heart of DACA," instead of the benefits alone.[34] "[G]iven DHS's earlier judgment that forbearance is 'especially justified' for 'productive young people' who were brought here as children and 'know only this country as home,' the DACA Memorandum could not be rescinded in full 'without any consideration whatsoever' of a forbearance-only policy," the Court concluded.[35] The rescission was also arbitrary and capricious because DHS "failed to address whether there was 'legitimate reliance' on the DACA Memorandum."[36]

In May 2018, while litigation over DACA's rescission was ongoing, several states filed this lawsuit against the Government challenging DACA's implementation in the first instance.[37] A group of twenty-two DACA recipients and the State of New Jersey intervened as codefendants.[38] The

---

[31] *Id.* at 1906.

[32] *Id.* at 1907.

[33] *Id.* at 1913.

[34] *Id.* at 1912.

[35] *Id.* (internal citation omitted) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983)).

[36] *Id.* at 1913 (quoting *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996)).

[37] ROA.135.

[38] ROA.15354.

7

No. 21-40680

plaintiff States and Governors, to whom we will hereafter refer as "the States" for simplicity, requested a preliminary injunction. Although the district court held that the States would likely succeed on the merits of their procedural and substantive APA claims, the court declined to issue a preliminary injunction[39] because of the States' delay in raising the challenge and the relative hardship enjoining DACA would cause to the defendants and the public.[40]

After the Supreme Court's decision in *Regents*, the States and the DACA Recipients filed cross-motions for summary judgment.[41] The district court granted summary judgment in favor of the States.[42] It concluded that DACA violated the procedural and substantive requirements of the APA.[43] The court held that DACA was procedurally deficient because it failed to undergo notice and comment.[44] DACA was not a general policy statement exempt from notice and comment because it involved "significant rights and obligations" and imposed "fixed criteria."[45] The district court further held that DACA was substantively unlawful because it violated the INA and other immigration statutes.[46] The district court concluded that DACA was "'in excess of statutory jurisdiction' and 'short of statutory right' . . . ." because "Congress's clear articulation of laws for removal, lawful presence, and work

---

[39] *Texas v. United States*, 328 F. Supp.3d 662, 743 (S.D. Tex. 2018).

[40] *Id.* at 742.

[41] ROA.22370, 23891.

[42] *Texas v. United States*, 549 F. Supp. 3d 572, 624 (S.D. Tex. 2021).

[43] *Id.* at 603, 621.

[44] *Id.* at 602-03.

[45] *Id.* at 602.

[46] *Id.* at 615-17.

No. 21-40680

authorization illustrates a manifest intent to reserve for itself the authority to determine the framework of the nation's immigration system."[47]

The district court vacated the DACA Memorandum and remanded the proceedings to DHS.[48] However, the district court temporarily stayed the vacatur as to the approximately 600,000 existing DACA recipients.[49] The court's judgment also permitted DHS to accept new and renewal DACA applications but enjoined the DHS from approving any new applications and granting any attendant status.[50] The defendants appealed to this court.[51] The DHS also issued a notice of proposed rulemaking with the stated intent to "preserve and fortify DHS's DACA policy"[52] in response to the district court's remand.

After we heard oral argument on July 6, 2022, the agency promulgated a final rule on August 30, 2022 ("Final Rule").[53] DHS urges us to review the substantive challenges to the Final Rule, asserting that we have jurisdiction to do so and that none of the changes in the Final Rule are material. The States (other than New Jersey) contend that if we do not decide this appeal until October 31, 2022, or thereafter, we should treat the Final Rule as the

---

[47] *Id.* at 614.

[48] *Id.* at 624.

[49] *Id.*; *see also Count of Active DACA Recipients by Month of Current DACA Expiration as of June 30, 2021*, U.S. CITIZENSHIP & IMMIGR. SERVS., https://go.usa.gov/xMwtK.

[50] Dist. Ct. Op., 549 F. Supp. 3d at 624.

[51] ROA.25313, 25317, 25320.

[52] Deferred Action for Childhood Arrivals, 86 Fed. Reg. 53,736, 53,773 (proposed Sept. 28, 2021) (to be codified in scattered sections of 8 C.F.R.).

[53] Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53,152 (Aug. 30, 2022) (to be codified at 8 C.F.R. pts 106, 236, and 274a).

No. 21-40680

agency action under consideration because, they assert, the Final Rule is substantially similar to the 2012 DACA Memorandum. DACA recipients contend that in light of the Final Rule, this court should remand the case to the district court to consider that rule in the first instance because "it is far from clear how the District Court here will address the DACA [Final] Rule" and this court does not have the administrative record regarding the Final Rule before it. New Jersey essentially agrees with the DACA recipients.

For the reasons discussed below, we affirm the district court's judgment with regard to the procedural and substantive provisions of the DACA memorandum. Assuming without deciding that we presently have jurisdiction to review the Final Rule, we decline to do so at this juncture. We do not have the administrative record before us. We cannot determine whether there are material differences in that record and the record before the district court regarding the 2012 DACA Memorandum. The DACA Memorandum remains in effect until October 31, 2022. To the extent our determinations about questions of law in the present appeal would also apply to the Final Rule, those issues of law should be resolved sooner rather than later to move this case forward as expeditiously as possible. A district court is in the best position to review the administrative record in the rulemaking proceeding and determine whether our holdings as to the 2012 DACA Memorandum fully resolve issues concerning the Final Rule.

The district court's remand to DHS pending the issuance of a Final Rule has been rendered unnecessary by supervening events. That portion of the district court's judgment is accordingly vacated, and we remand to the district court for further proceedings that the parties may pursue regarding the Final Rule. That does not, of course, foreclose remanding to DHS upon review of the Final Rule in any future proceedings. Today, we consider only the challenges to the 2012 DACA Memorandum.

No. 21-40680

## II

We first consider the relief that the States sought in the district court. Among many other allegations, the States assert in their Amended Complaint that "[b]ut for the Executive's implementation of DACA, aliens covered by that program would not be eligible for lawful presence, and would be removable under the INA."[54] They further contend that because of the unlawful DACA program, aliens covered by it are eligible for work authorization, lawful-permanent-resident status by obtaining advance parole, and United States citizenship by obtaining advance parole.[55] The remedy the States ultimately seek is to "phase out the DACA program within two years."[56] They do not seek to "require the Executive to immediately rescind any existing DACA permits that confer lawful presence or work authorization."[57] They assert that though a court would have the power to immediately rescind all DACA permits that confer lawful presence and work authorizations, the "Plaintiff States are amenable to an injunction that prospectively enjoins Defendants in the future from renewing or issuing any new DACA permits."[58] Without DACA permits, current and prospective DACA recipients would be subject to removal under the same conditions and terms as other similarly situated immigrants who are illegally present in the United States. Throughout the Amended Complaint and briefing, the States contend that the special treatment afforded by the DACA Memorandum, not just the benefits conferred, have encouraged those eligible for DACA to

---

[54] Amended Complaint ¶ 211. ROA.4225.

[55] Amended Complaint ¶¶ 212-214. ROA.4225.

[56] Amended Complaint ¶ 339. ROA.4244.

[57] Amended Complaint ¶ 339. ROA.4244.

[58] Amended Complaint ¶ 339. ROA.4244.

No. 21-40680

remain in this country.  A key component for obtaining relief, the States say, is that at least some DACA recipients would be motivated to leave the States if the DACA program is ended.  Deferring removal for DACA recipients, that is, special treatment under the immigration laws governing removal, is an integral part of the causation of the States' injuries, according to their Amended Complaint and briefing.  For example, the States assert in the Appellees' Brief in our court that "[t]he district court's injunction redresses the States' injuries because many of those aliens would and will return to their countries of origin without DACA."

In sum, the States seek an end to the DACA program in its entirety at some point in the future.  They seek to end both forbearance of removal and the conferral of benefits to existing DACA recipients as existing permits expire.  The States make clear in their filings and briefing that once the DACA program has ended, former DACA recipients should be removable on the same basis as any other similarly situated illegal alien.

## III

Before considering the merits of the appeals from the district court's judgment, we must resolve whether any Plaintiff has standing to assert the claims at issue.  Article III of the Constitution restricts the federal judicial power to the resolution of "Cases" or "Controversies."[59]  "For there to be a case or controversy under Article III, the plaintiff must have a 'personal

---

[59] U.S. Const. art. III, § 2.

stake' in the case—in other words, standing."[60]   "Standing is a question of law that we review de novo."[61]

. As the parties invoking federal jurisdiction, the States bear the burden of establishing standing.[62]  To do so, they "must show (i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."[63]  The States must make this showing "with the manner and degree of evidence required at the successive stages of the litigation."[64]  At summary judgment, they "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'"[65]

The presence of one party with standing is sufficient to authorize our review.[66]  Texas is the only state that has attempted to demonstrate standing.

## A

Texas contends that it warrants special solicitude in the standing analysis.  "States are not normal litigants for the purposes of invoking federal jurisdiction" and may be "entitled to special solicitude."[67]  When special

---

[60] *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).

[61] *N. Cypress Med. Ctr. Op. Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) (quoting *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002)).

[62] *TransUnion*, 141 S. Ct. at 2207.

[63] *Id.* at 2203.

[64] *Id.* at 2208 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

[65] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013) (quoting *Lujan*, 504 U.S. at 561).

[66] *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

[67] *Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007).

No. 21-40680

solicitude is appropriate, a state can establish standing "without meeting all the normal standards for redressability and immediacy."[68]  Standing will exist "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."[69]

Special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests.[70]  Texas satisfies the first requirement.  As in *DAPA*, Texas asserts a procedural right under the APA to challenge agency action.[71]  "In enacting the APA, Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall well within that definition."[72]  Once again, now with DACA, Texas "challenges DHS's affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens."[73]

To satisfy the second requirement, DACA must affect a quasi-sovereign interest.  The leading Supreme Court decision regarding this concept is *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*.[74]  A quasi-sovereign interest is "a judicial construct that does not lend itself to a simple or exact definition."[75]  Quasi-sovereign interests are "not sovereign

---

[68] *Id.* at 517-18 (quoting *Lujan*, 504 U.S. at 572 n.7).

[69] *Id.* at 518.

[70] *DAPA*, 809 F.3d 134, 151-52 (5th Cir. 2015).

[71] *See id.* at 152.

[72] *Id.* (footnote omitted) (quoting 5 U.S.C. § 702).

[73] *Id.* at 152.

[74] 458 U.S. 592 (1982).

[75] *Id.* at 601.

No. 21-40680

interests, proprietary interests, or private interests pursued by the State as a nominal party."[76] Rather, they "consist of a set of interests that the State has in the well-being of its populace."[77] These include interests in "the health and well-being—both physical and economic—of its residents" and in "not being discriminatorily denied its rightful status in the federal system."[78] "One helpful indication" of a quasi-sovereign interest is "whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers."[79]

An agency action may affect a quasi-sovereign interest if it is alleged to damage certain "sovereign prerogatives [that] are now lodged in the Federal Government."[80] In *DAPA*, we observed that "[w]hen the states joined the union, they surrendered some of their sovereign prerogatives over immigration," including their power to "establish their own classifications of aliens."[81] We concluded that this interest in classifying aliens was analogous to the interest in regulating emissions that the Supreme Court deemed a quasi-sovereign interest in *Massachusetts v. EPA*.[82] "Both these plaintiff states and Massachusetts now rely on the federal government to protect their interests," so DAPA affected the states' quasi-sovereign

---

[76] *Id.* at 602.

[77] *Id.*

[78] *Id.* at 607.

[79] *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007) (quoting *Snapp*, 458 U.S. at 607).

[80] *Id.*

[81] *DAPA*, 809 F.3d 134, 153 (5th Cir. 2015).

[82] 549 U.S. 497 (2007); *DAPA*, 809 F.3d at 155.

No. 21-40680

interests.[83]  DACA does the same.  Like DAPA, DACA implicates Texas's quasi-sovereign interest in classifying aliens.

The DACA Recipients claim that this case is different.  In *DAPA*, they point out, we recognized a quasi-sovereign interest on two grounds: "the direct, substantial pressure directed at the states [to change their laws] and the fact that they have surrendered some of their control over immigration to the federal government."[84]  Here, the Recipients suggest, there is only the surrender of control over immigration; there is no pressure on Texas to change specific laws.

The *DAPA* decision considered a Texas law that required issuance of a driver's license to a noncitizen who presented proper documentation authorizing the alien to be present in the United States.[85]  DAPA granted lawful permanent status to those eligible for that program, and there was evidence that a substantial number of DAPA beneficiaries would apply for a driver's license.[86]  Texas subsidizes its licenses, and the record reflected that the State would lose $130.89 on each license it issued to a DAPA beneficiary.[87]  We concluded that the economic incentive Texas had to change its laws subsidizing driver's licenses for authorized noncitizens gave

---

[83] *DAPA*, 809 F.3d at 154.

[84] *Id.* at 154-55.

[85] *Id.* at 155.

[86] *Id.* ("If permitted to go into effect, DAPA would enable at least 500,000 illegal aliens in Texas to satisfy that requirement with proof of lawful presence or employment authorization. Texas subsidizes its licenses and would lose a minimum of $130.89 on each one it issued to a DAPA beneficiary. Even a modest estimate would put the loss at 'several million dollars.'") (footnotes omitted).

[87] *Id.*

16

rise to a quasi-sovereign interest.[88] But we also noted Texas might not be able to change its laws if challenges based on federal preemption or violations of the Equal Protection Clause were mounted.[89] We recognized that a State's inability to legislate around DACA can create a quasi-sovereign interest.[90] In *Massachusetts*, the State had a quasi-sovereign interest because it could not regulate greenhouse gases.[91] The Court explained that "Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions, it cannot negotiate an emissions treaty with China or India, and in some circumstances the exercises of its police powers to reduce in-state motor-vehicle emissions might well be pre-empted."[92] The Court did not identify any law that Massachusetts would be moved to change. Rather, its holding depended on the constraints on the State's ability to respond. Similarly, in *DAPA*, we indicated that a quasi-sovereign interest could arise based on "federal preemption of state law."[93]

DACA implicates preemption concerns. It classifies aliens and their status while in this country. "The federal government alone, however, has the power to classify non-citizens."[94] "Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to

---

[88] *Id.*

[89] *Id.* at 153.

[90] *Id.* at 154 ("So too are the states asserting institutional injury to their lawmaking authority.").

[91] *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007).

[92] *Id.*

[93] *DAPA*, 809 F.3d at 153; *see also Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) ("Federal regulatory action that preempts state law creates a sufficient injury-in-fact to satisfy this prong.")

[94] *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 536 (5th Cir. 2013) (en banc).

No. 21-40680

Congress...."[95]   An attempt by Texas to establish an alternative classification system or work authorizations would be preempted, despite the State's likely interest in doing so.[96]   "'The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States,' which 'bear[] many of the consequences of unlawful immigration.'"[97]   The importance of immigration policy and its consequences to Texas, coupled with the restraints on Texas' power to make it, create a quasi-sovereign interest.[98]

The Recipients argue that DACA does not affect quasi-sovereign interests because it regulates private actors rather than the States. They cite the Supreme Court's decision in *Murphy v. NCAA*,[99] which invalidated a federal law that prohibited states from authorizing sports gambling schemes.[100]   The law violated the anticommandeering doctrine because it "unequivocally dictate[d] what a state legislature may and may not do."[101] DACA does not operate as a direct command to the states, the Recipients argue, so it does not infringe upon states' sovereignty.

The DACA Memorandum may not commandeer the states, but that does not mean it is unrelated to state sovereignty. As *Murphy* itself explains, anticommandeering and preemption are separate doctrines. In contrast to

---

[95] *Galvan v. Press*, 347 U.S. 522, 531 (1954).

[96] *See Arizona v. United States*, 567 U.S. 387, 409 (2012).

[97] *DAPA*, 809 F.3d at 163 (quoting *Arizona*, 567 U.S. at 397).

[98] *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 607 (1982) (observing that a state's desire to legislate suggests a quasi-sovereign interest).

[99] 138 S. Ct. 1461 (2018).

[100] *Id.* at 1485.

[101] *Id.* at 1478.

No. 21-40680

anticommandeering, "every form of preemption is based on a federal law that regulates the conduct of private actors, not the States."[102]    Both commandeering and preemption pertain to states' "sovereign interest in 'the power to create and enforce a legal code.'"[103]    DACA is a program for alien classification, and it relates to preemption.    That DACA addresses classification and rights of individual aliens does not extinguish the quasi-sovereign interests at stake.

The Government asserts there is a presumption against standing by plaintiffs who are not the objects of the government action they challenge. Our decision in *DAPA* rejected the applicability of this presumption.[104] There, as here, the cases that the Government cites "concerned only nonprosecution (as distinguished from both nonprosecution and the conferral of benefits)"[105] or "merely reaffirmed that a plaintiff must satisfy the standing requirements."[106]    None of the cited cases concern state plaintiffs, who the Supreme Court has recognized "are not normal litigants" in the standing analysis.[107]    The Government has not offered any reason why the presumption would apply here when it did not in *DAPA*.

---

[102] *Murphy*, 138 S. Ct. at 1481.

[103] *DAPA*, 809 F.3d 134, 153 (5th Cir. 2015) (quoting *Tex. Off. of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999)).

[104] *DAPA*, 809 F.3d at 154.

[105] *Id.* (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 615-16 (1973)); *see also Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984).

[106] *Id.*

[107] *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *cf. Sure-Tan*, 467 U.S. at 897 (observing that "private persons such as petitioners have no judicially cognizable interest in procuring enforcement of the immigration laws").

No. 21-40680

Texas warrants special solicitude because of its procedural right under the APA to challenge DACA and Texas' quasi-sovereign interest in alien classification, an area in which the State would like to, but cannot, regulate.

## B

Texas asserts standing based on direct injury. It claims that DACA inflicts pocketbook injuries on the State in the form of healthcare, education, and social services costs.

Texas has satisfied the first standing requirement by demonstrating injury in fact.[108] Federal law requires the State to provide emergency Medicaid to noncitizens and public education to all children, regardless of their immigration status.[109] Texas presented evidence that it spends millions of dollars providing these services to unauthorized aliens each year.[110] As the district court's opinion reflects, the estimated cost to Texas of providing Emergency Medicaid services to undocumented immigrants residing in Texas was $90 million in fiscal year 2013 and $73 million for 2015.[111] The Texas Health and Human Services Commission estimated that the state's public hospital district facilities incurred approximately $596.8 million in uncompensated care for undocumented immigrants in fiscal year 2006 and $716.8 million in fiscal year 2008.[112] The record does not indicate precisely what portion of all costs for illegal aliens is spent on DACA recipients, but no

---

[108] *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

[109] *See* 42 C.F.R. § 435.406(b) (2022) (emergency Medicaid); *Plyler v. Doe*, 457 U.S. 202, 230 (1982) (public education).

[110] ROA.22959-61, 23020-21.

[111] Dist. Ct. Op., 549 F. Supp. 3d at 593.

[112] ROA.22960.

one disputes that some are.[113] An expert for defendants estimated that DACA recipients overall impose a cost of more than $250,000,000 on Texas per year and another $533,000,000 annually in costs to local Texas communities.[114] "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"[115]

The Government cites estimates that if the DACA program were to be terminated, the State's healthcare costs would increase for aliens who remain in Texas, because they would lose their jobs and employer-based health insurance and would rely more on emergency Medicaid.[116] That may be, but these estimates do not account for the cost savings—healthcare *and educational*—from others' departure.[117] Texas would no longer be required to educate those who depart or the children who depart with them. In any event, this court held with regard to standing in the *DAPA* case that "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant."[118] In resolving standing, courts do not engage in such an "accounting exercise."[119]

---

[113] *See DAPA*, 809 F.3d 134, 155 (5th Cir. 2015) (holding that Texas established injury in fact without precisely quantifying the costs of issuing driver's licenses to DAPA beneficiaries).

[114] ROA.23026.

[115] *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017).

[116] ROA.18005.

[117] ROA.18004 ("These estimates are based on the loss of employment-based health insurance coverage and the need to rely on public sources of care.").

[118] *DAPA*, 809 F.3d 134, 155-56 (5th Cir. 2015) (quoting 13A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3531.4, at 147 (3d ed. 2015) (footnote omitted)).

[119] *Id.* at 156 (quoting *NCAA v. Gov. of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013)).

No. 21-40680

The defendants claim that this theory of injury lacks a limiting principle. If social services costs qualify as injury, they argue, states could routinely call on federal courts to broker complex debates over immigration policy. They liken this case to *El Paso County v. Trump*,[120] in which the county alleged injury because the Department of Defense canceled a construction project, thereby reducing economic activity and tax revenues.[121] We held the county did not have standing, holding that a "loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact."[122] We recognized courts' reluctance to recognize general tax injuries, which could result from virtually any federal action.[123]

This case is different. Texas does not allege a tax injury, let alone a generic one. It identifies expenditures in providing emergency medical services, social services and public education for illegal aliens. In *El Paso*, we expressly noted that "the loss of a specific tax revenue" could establish standing.[124] Specific social services costs likewise suffice. In other cases regarding DHS programs, we have specifically recognized a state's "obligation to subsidize ... additional aliens' healthcare and costs" as injury in fact.[125]

It may be true that standing theories based on social services costs could spur policy-oriented litigation. However, our precedent rejects the

---

[120] 982 F.3d 332 (5th Cir. 2020).

[121] *Id.* at 338-39.

[122] *Id.* at 339.

[123] *Id.* at 339-41.

[124] *Id.* at 341.

[125] *Texas v. United States*, 40 F.4th 205, 217 (5th Cir. 2022), *cert. granted*, ___ S. Ct. ___, 2022 WL 2841804; *see also Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022).

No. 21-40680

significance of this risk. As we explained in *DAPA*, the Supreme Court considered similar arguments in *Massachusetts* and deemed them unpersuasive.[126] After *Massachusetts*, "the answer to those criticisms is that there are other ways to cabin policy disagreements masquerading as legal claims."[127] Restrictions on standing, special solicitude, and causes of action serve this purpose.[128]

Texas has satisfied the second requirement for standing by showing that its costs are "fairly traceable" to DACA.[129] Texas contends that the rescission of DACA would cause some recipients to leave, thereby reducing the financial burdens on the State. It cites a survey of over three thousand DACA recipients in which twenty-two percent of respondents said they were likely or very likely to leave the country if DACA ended.[130] The Government presents evidence that many recipients would remain without DACA, but that does not controvert Texas's showing that some would leave.[131]

The Government argues that DACA did not cause the injury because the State must pay for emergency Medicaid and education under preexisting federal law.[132] DACA is not the sole cause of the State's injury, but DACA has exacerbated it. That is sufficient. In *Massachusetts*, the Court held that the State's injury was traceable to EPA's decision not to regulate greenhouse

---

[126] *DAPA*, 809 F.3d 134, 161 (5th Cir. 2015).

[127] *Id.*

[128] *Id.*

[129] *Id.* at 150 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

[130] ROA.23060.

[131] ROA.17968, 18075-76.

[132] *See* 42 C.F.R. § 440.255(c) (2022); *Plyler v. Doe*, 457 U.S. 202, 230 (1982).

No. 21-40680

gas emissions.[133]  Of course, the refusal to regulate was not the sole cause of the emissions.   It was enough that EPA's decision "contribute[d] to Massachusetts' injuries."[134]  Similarly, DACA has contributed to an injury, saddling the State with additional healthcare and education costs each year. The causal chain is much more direct than the one the Court accepted in *Massachusetts*.[135]

The third element of standing requires Texas to show that rescinding DACA will redress its injury.   Normally, "[t]o satisfy redressability, a plaintiff must show that 'it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"[136]  With special solicitude, however, a state can establish redressability "without meeting all the normal standards."[137]  The standard is met "if there is some possibility that the requested relief" will reduce the harm.[138]

Texas has made the requisite showing. Those presently subject to DACA would be removable if the DACA program were ended, providing

---

[133] *Massachusetts v. EPA*, 549 U.S. 497, 523 (2007).

[134] *Id.*; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct.").

[135] *See Massachusetts*, 549 U.S. at 521-23 (holding that traceability was satisfied because EPA's refusal to regulate contributed to motor-vehicle emissions, which may in turn contribute to a rise in sea levels, which may in turn erode state coastal property).

[136] *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (emphasis omitted) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

[137] *Massachusetts*, 549 U.S. at 517-18 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992)).

[138] *Id.* at 518; *see also id.* at 526 (holding that Massachusetts satisfied redressability because the risk of harm "would be reduced to some extent if petitioners received the relief they seek").

24

No. 21-40680

incentives for some if not many to leave the United States, including Texas. There is evidence that if DACA were no longer in effect, at least some recipients would leave, and their departure would reduce the State's Medicaid, social services and education costs for those individuals and their families who depart with them. Especially with the benefit of special solicitude, Texas has established that rescinding DACA would redress its harm. Accordingly, Texas has demonstrated standing based on its direct injury.

## IV

As discussed above, while this appeal was pending, DHS concluded its rulemaking proceeding regarding DACA and issued a Final Rule. However, the Final Rule does not become effective until October 31, 2022.[139] The issuance of the Final Rule does not moot the present appeal. The 2012 DACA Memorandum would continue in full effect but for the district court's judgment. Were we to reverse the district court's judgment and conclude that the DACA Memorandum did not violate substantive law, its provisions would once again have full effect until October 31, 2022. Among other effects, such a ruling would permit DHS to grant DACA status to applicants before October 31, 2022, which it is not now permitted to do under the district court's judgment. Whether the DACA Memorandum is inconsistent with the INA is ripe for decision and not moot.

## V

For the first time on appeal, the Government argues that the States' claims fall outside the INA's zone of interests. We need not consider zone-of-interests objections that were not raised below, but at times we have

---

[139] Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53,152 (Aug. 30, 2022) (to be codified at 8 C.F.R. pts 106, 236, and 274a).

No. 21-40680

exercised our discretion to do so.[140] Even if we exercised that discretion here, we would conclude that the States' claims fall within the zone of interests.

The test here is "not 'especially demanding.'"[141] We assess the zone of interests "in keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'"[142] The test is satisfied if the claims are "arguably within the zone of interests to be protected or regulated by the statute."[143] The Supreme Court has "always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff."[144] Review is foreclosed "only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"[145]

With the INA, Congress "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'"[146] The States argue that DACA

---

[140] *See Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 474 n.4 (5th Cir. 2013) (citing cases).

[141] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)).

[142] *Patchak*, 567 U.S. at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).

[143] *Id.* at 224 (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

[144] *Id.* at 225.

[145] *Id.* (quoting *Clarke*, 479 U.S. at 399).

[146] *Chamber of Com. v. Whiting*, 563 U.S. 582, 587 (2011) (quoting *DeCanas v. Bica*, 424 U.S. 351, 353 (1976)).

No. 21-40680

violates that scheme. They have an interest in seeing the INA enforced, and in participating in notice and comment to voice their concerns.[147]

In *DAPA*, we held that the states' challenge fell within the INA's zone of interests.[148] The Government argues that this case is different because of the different harms alleged. The driver's license costs in *DAPA* fell within the INA, the Government says, because Congress permitted states to deny those benefits to unauthorized aliens. Not so, the Government argues, with emergency medical and public education costs, which federal law requires states to provide.

This argument misunderstands the States' claims. The States do not contest their obligation to pay these costs. Rather, they seek to reduce them. The INA encompasses their concerns about the financial burdens of illegal immigration. "It's clear that the INA aimed, at least in part, to protect States from just those kinds of [fiscal] harms."[149] The States' objectives are consistent with the INA's, so they pass the lenient zone-of-interests test.

## VI

We now turn to the merits. On summary judgment, the district court held that DACA violates the APA's procedural and substantive requirements.[150] We review a grant of summary judgment de novo, applying the same standards as the district court.[151] Summary judgment is appropriate

---

[147] *See Arizona v. United States*, 567 U.S. 387, 397 (2012); *DAPA*, 809 F.3d 134, 163 (5th Cir. 2015).

[148] *DAPA*, 809 F.3d at 163.

[149] *Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022).

[150] *Texas v. United States*, 549 F. Supp. 3d 572, 603, 621 (S.D. Tex. 2021).

[151] *Johnson v. World All. Fin. Corp.*, 830 F.3d 192, 195 (5th Cir. 2016).

No. 21-40680

"if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[152] When there are cross-motions for summary judgment, "we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party."[153]

## A

Procedurally, the States argue that DACA failed to undergo necessary notice and comment. The Government maintains that DACA is a general statement of policy exempt from notice and comment.

The APA requires substantive rules to undergo notice and comment, whereas policy statements need not.[154] Substantive rules "create law."[155] They typically "grant rights, impose obligations, or produce other significant effects on private interests."[156] By contrast, policy statements "announc[e] motivating factors the agency will consider, or tentative goals toward which it will aim, in determining the resolution of a substantive question of regulation."[157] The notice-and-comment exemption for policy statements "must be narrowly construed."[158]

---

[152] FED. R. CIV. P. 56(a).

[153] *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014) (quoting *Duval v. N. Assur. Co. of Am.*, 722 F.3d 300, 303 (5th Cir. 2013)).

[154] *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) (citing 5 U.S.C. § 553(b)(3)(A), (d)(2)).

[155] *W&T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019) (quoting *Phillips Petrol. Co. v. Johnson*, 22 F.3d 616, 619 (5th Cir. 1994)).

[156] *Id.* (quoting *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 908 (5th Cir. 1983)).

[157] *Shalala*, 56 F.3d at 601 (quoting *Phillips*, 22 F.3d at 620).

[158] *Id.* at 595 (quoting *United States v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989)).

No. 21-40680

We distinguish policy statements from substantive rules based on two criteria: whether the pronouncement "(1) 'impose[s] any rights and obligations' and (2) 'genuinely leaves the agency and its decision-makers free to exercise discretion.'"[159] We are "mindful but suspicious of the agency's own characterization" of what it has done.[160] "[C]ourts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply."[161] Our primary focus is "whether the rule has binding effect on agency discretion or severely restricts it."[162]

Under the first factor, DACA imposes rights and obligations. In *Regents*,[163] the Supreme Court explained that "the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief."[164] This relief is granted following extensive proceedings that are "effectively 'adjudications.'"[165] At the memorandum's direction, "USCIS solicited applications from eligible aliens, instituted a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance."[166] Over 800,000 individuals have obtained forbearance under these

---

[159] *DAPA*, 809 F.3d 134, 171 (5th Cir. 2015) (quoting *Shalala*, 56 F.3d at 595).

[160] *Shalala*, 56 F.3d at 595.

[161] *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019).

[162] *DAPA*, 809 F.3d at 171 (quoting *Shalala*, 56 F.3d at 595).

[163] 140 S. Ct. 1891 (2020).

[164] *Id.* at 1906.

[165] *Id.* (alteration omitted).

[166] *Id.*

No. 21-40680

directives.[167]  This expansive, organized process has none of the tentative character of a policy statement.[168]

The relief at stake is of vital importance to recipients.[169]  The program consists of two parts, a "forbearance component" and "eligibility for benefits."[170]  The two-year forbearance grant is "an 'affirmative act of approval,'"[171] and "[t]he benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy."[172]  "[B]y virtue of receiving deferred action," recipients may seek work authorization and become eligible for Social Security and Medicare.[173]  "[A]ccess to these types of benefits is an interest 'courts often are called upon to protect.'"[174]  There is no doubt that these rewards "produce . . . significant effects on private interests."[175]

The Government argues that DACA confers no rights because the memorandum says it does not.  To be sure, the memorandum states that it "confers no substantive right, immigration status, or pathway to

---

[167] Dist. Ct. Op., 549 F. Supp. 3d at 599.

[168] See *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 908 (5th Cir. 1983); *Am. Bus Ass'n v. United States,* 627 F.2d 525, 530 (D.C. Cir. 1980).

[169] See *DHS v. Regents of the Univ. of Cal.,* 140 S. Ct. 1891, 1914 (2020).

[170] *Id.* at 1911.

[171] *Id.* at 1906 (quoting *Heckler v. Chaney,* 470 U.S. 821, 831 (1985)).

[172] *Id.*

[173] *Id.*

[174] *Id.* (quoting *Heckler,* 470 U.S. at 832).

[175] *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 908 (5th Cir. 1983) (quoting *Batterton v. Marshall,* 648 F.2d 694, 702 (D.C. Cir. 1980)).

No. 21-40680

citizenship."[176]  But an agency's characterization of its own action is only "the starting point."[177] Our ultimate concern is the "*contents* of the agency's action."[178] Even on its face, the memorandum describes the significance of what it does.  The memorandum directs agencies to "defer[] action for a period of two years, subject to renewal" for eligible individuals, and it says that USCIS "shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action."[179]  The memorandum attests to the rights that DACA makes available, and the reality goes beyond that.

Under the second factor, we assess whether DACA genuinely leaves the agency and its decision-makers free to exercise discretion. An agency's pronouncement "will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding."[180]

There is language in the memorandum that appears to confer discretion.  It instructs agencies to review applications "on a case by case basis" and repeatedly refers to the program as an "exercise of prosecutorial discretion."[181]  Importantly, however, the memorandum narrows and

---

[176] Memorandum from Janet Napolitano, Sec'y, Dep't of Homeland Sec., to David Aguilar, Acting Comm'r, U.S. Customs and Border Prot., et al. (June 15, 2012) (DACA Memorandum)    (ROA.350-52),    https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[177] *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995).

[178] *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019).

[179] DACA Memorandum at 2-3.

[180] *DAPA*, 809 F.3d 134, 171 (5th Cir. 2015) (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002)).

[181] DACA Memorandum at 1-2.

No. 21-40680

channels that discretion. That is its stated purpose. It "set[s] forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people."[182] It lists a fixed set of "criteria [that] should be satisfied before an individual is considered for an exercise of prosecutorial discretion."[183] It dictates what that discretion should be used to do. Agencies "should exercise prosecutorial discretion . . . by deferring action for a period of two years, subject to renewal."[184]

There is a fact dispute over whether agents retain discretion to reject applicants who meet the criteria. The States cite evidence that a USCIS center in Texas never rejected an applicant who met the criteria.[185] But other evidence in the record shows the criteria are not dispositive. DACA training staff report that discretionary denials occur according to a totality of the circumstances standard that boils down to "whether or not you would want to live next door to the person."[186]

Viewing this evidence in the light most favorable to the defendants, we assume that agents do have discretion to reject applicants who meet the criteria. Even so, DACA is not a policy statement. "The mere existence of some discretion is not sufficient, although it is necessary for a rule to be classified as a general statement of policy."[187] Here, little else suggests that

---

[182] *Id.* at 1.

[183] *Id.*

[184] *Id.* at 2.

[185] ROA.23080.

[186] ROA.7705; *see also* ROA.935-36.

[187] *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 667 (D.C. Cir. 1978).

No. 21-40680

DACA would be a policy statement. DACA created a detailed, streamlined process for granting enormously significant, predefined benefits to over 800,000 people. This constitutes a substantive rule.[188] Because DACA did not undergo notice and comment, it violates the procedural requirements of the APA.

## B

The States contend, and the district court held, that DACA also violates the APA's substantive requirements.[189] The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[190]   We assume without deciding that the two-part *Chevron*[191] framework applies.[192]

Under *Chevron*, we first "ask whether Congress has 'directly addressed the precise question at issue.'"[193] For many of the reasons we explained in *DAPA*, Congress has. "Federal governance of immigration and

---

[188] *See Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1112-13 (D.C. Cir. 1974) (holding that parole guidelines were "substantive agency action, for they define a fairly tight framework to circumscribe the Board's statutorily broad power" and "were of a kind calculated to have a substantial effect on ultimate parole decisions").

[189] Dist. Ct. Op., 549 F. Supp. 3d at 624 (holding that "DHS violated the APA with the creation of DACA and its continued operation").

[190] 5 U.S.C. § 706(2)(A), (C).

[191] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

[192] *See DAPA*, 809 F.3d 134, 178 & n.160 (5th Cir. 2015).

[193] *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 52 (2011) (quoting *Chevron*, 467 U.S. at 843).

No. 21-40680

alien status is extensive and complex."[194]   Congress created an intricate statutory scheme for determining which classes of aliens may receive lawful presence,[195] discretionary relief from removal,[196] deferred action,[197] and work authorization.[198]   As we said in *DAPA*:

> In specific and detailed provisions, the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present and confers eligibility for "discretionary relief allowing [aliens in deportation proceedings] to remain in the country." Congress has also

---

[194] *DAPA*, 809 F.3d 134, 178-79 (5th Cir. 2015) (quoting *Arizona v. United States*, 567 U.S. 387, 396 (2012)).

[195] *Id.* at 179 & n.162 (citing 8 U.S.C. §§ 1101(a)(20), 1255 (lawful permanent resident status); §§ 1101(a)(15), 1201(a)(1) (nonimmigrant status); §§ 1101(a)(42), 1157-59, 1231(b)(3) (refugee and asylum status); § 1182(d)(5) (humanitarian parole); § 1254a (temporary protected status)).

[196] *Id.* & n.163 (citing 8 U.S.C. § 1158 (asylum); § 1227(d) (administrative stays of removal for victims of human trafficking and other serious crimes who assist law enforcement); § 1229b (cancellation of removal), § 1229c (voluntary departure)).

[197] *Id.* at 179 & n.164-66 (citing 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (Violence Against Women Act petitioners); § 1227(d)(2) (specifying that "[t]he denial of a request for an administrative stay of removal [for visa applicants who are victims of human trafficking and other serious crimes] shall not preclude the alien from applying for . . . deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws"); USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 (immediate family members of lawful permanent residents killed by terrorism); National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694-95 (immediate family members of lawful permanent residents killed in combat and granted posthumous citizenship)).

[198] *Id.* at 181 & n.172 (citing 8 U.S.C. § 1101(i)(2) (human-trafficking victims in lawful-temporary-resident status pursuant to a T-visa); § 1105a(a) (nonimmigrant battered spouses); § 1154(a)(1)(K) (grantees of self-petitions under the Violence Against Women Act); § 1158(c)(1)(B), (d)(2) (asylum applicants and grantees); § 1160(a)(4) (certain agricultural workers in lawful-temporary-resident status); § 1184(c)(2)(E), (e)(6) (spouses of L- and E-visa holders); § 1184(p)(3)(B) (certain victims of criminal activity in lawful-temporary-resident status pursuant to a U visa); § 1254a(a)(1)(B) (temporary-protected-status holders); § 1255a(b)(3)(B) (temporary-resident status holders)).

No. 21-40680

identified narrow classes of aliens eligible for deferred action, including certain petitioners for immigration status under the Violence Against Woman Act of 1994, immediate family members of lawful permanent residents ("LPRs") killed by terrorism, and immediate family members of LPRs killed in combat and granted posthumous citizenship. . . .

The INA also specifies classes of aliens eligible and ineligible for work authorization. . . . Congress "'forcefully' made combating the employment of illegal aliens central to '[t]he policy of immigration law,'" in part by "establishing an extensive 'employment verification system,' designed to deny employment to aliens who . . . are not *lawfully present* in the United States."[199]

Congress's rigorous classification scheme forecloses the contrary scheme in the DACA Memorandum. "Entirely absent from those specific classes" Congress defined is the group of 1.7 million aliens "who would be eligible for lawful presence" under DACA.[200] DACA creates a new class of otherwise removable aliens who may obtain lawful presence, work authorization, and associated benefits. Congress determined which aliens can receive these benefits, and it did not include DACA recipients among them. We agree with the district court's reasoning and its conclusions that the DACA Memorandum contravenes comprehensive statutory schemes for removal, allocation of lawful presence, and allocation of work authorization.[201] DACA fails at step one of *Chevron*.

---

[199] *Id.* at 179-81 (footnotes omitted) (first quoting *Arizona*, 567 U.S. at 396 (2012); and then quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002) (alteration in original) (emphasis added) (quoting *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 194 n.8 (1991))).

[200] *Id.* at 179.

[201] *See* Dist. Ct. Op., 549 F. Supp. 3d at 607-10.

No. 21-40680

DHS asserts that the program set forth in the DACA Memorandum is an exercise of its inherent prosecutorial discretion. The district court cogently and thoroughly analyzed this argument and rejected it.[202] We agree with the district court. As our court held in *DAPA*, "'[a]lthough prosecutorial discretion is broad, it is not "unfettered."' Declining to prosecute does not transform presence deemed unlawful by Congress into lawful presence and confer eligibility for otherwise unavailable benefits based on that change."[203]

Even if the INA were ambiguous, DACA would fail at step two because it is an unreasonable interpretation of the INA.[204] Like DAPA, DACA "undoubtedly implicates 'question[s] of deep "economic and political significance" that [are] central to this statutory scheme; had Congress wished to assign that decision to an agency, it surely would have done so expressly.'"[205]

There is no "clear congressional authorization" for the power that DHS claims.[206] The Government cites provisions that authorize the Secretary to "[e]stablish[] national immigration enforcement policies and priorities" and to carry out the administration and enforcement of immigration laws, including to "establish such regulations," "issue such instructions," and "perform such other acts as he deems necessary for

---

[202] *See id.* at 605-06.

[203] *DAPA*, 809 F.3d 134, 167 (5th Cir. 2015) (footnote omitted) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

[204] *See id.* at 182.

[205] *Id.* at 181 (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)).

[206] *West Virginia v. EPA*, 142 S. Ct. 2587, 2614 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

No. 21-40680

carrying out his authority."[207]   Writing about these same provisions in *DAPA*, we said that these "broad grants of authority . . . cannot reasonably be construed as assigning 'decisions of vast economic and political significance' . . . to an agency."[208]

The defendants' attempts to distinguish DACA and DAPA are unavailing.  They argue that DACA is different because DAPA contravened a statutory process for how parents can derive lawful classification from their children.  While the INA contains no such process for DACA recipients, that does not reduce the conflict.  It simply means that Congress made no provision for DACA recipients to obtain lawful presence.  In any case, that contradiction was just one among the many that we identified.[209]

The defendants also attempt to distinguish DACA based on its size.  About 4.3 million aliens would have been eligible for DAPA, whereas about 1.5 million aliens are eligible for DACA.[210]  The Government likens DACA to the Reagan Administration's Family Fairness program, which deferred deportation indefinitely for about 1.5 million family members of legalized aliens.[211]  This comparison is not revealing.  As we explained in *DAPA*, "historical practice . . . 'does not, by itself, create power,' and in any event, previous deferred-action programs are not analogous."[212]  We specifically

---

[207] *See* 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a).

[208] *DAPA*, 809 F.3d at 183 (internal quotations and citations omitted) (quoting *Util. Air Reg. Grp.*, 573 U.S. at 324); *see also West Virginia*, 142 S. Ct. at 2614 ("[A] vague statutory grant is not close to the sort of clear authorization required by our precedents.").

[209] *See DAPA*, 809 F.3d at 179-81.

[210] *See DAPA*, 809 F.3d at 148; ROA.25167.

[211] ROA.573.

[212] *DAPA*, 809 F.3d at 179, 184 (5th Cir. 2015) (footnote omitted) (quoting *Medellin v. Texas*, 552 U.S. 491, 532 (2008)).

No. 21-40680

distinguished the Family Fairness program for being "interstitial to a statutory legalization scheme."[213]  By contrast, "Congress has repeatedly declined to enact the Development, Relief, and Education for Alien Minors Act ('DREAM Act'), features of which closely resemble DACA and DAPA."[214]

The relevant comparison is between DAPA and DACA.  Any difference in size does not meaningfully diminish the importance of the issues at stake.  As the parties and their amici attest, DACA is of enormous political and economic significance to supporters and opponents alike.  Amici businesses report that national GDP may contract by as much as $460 billion without DACA.[215]  An expert for the Intervenors estimated that DACA contributes over $3.5 billion in net fiscal benefits to federal, state, and local entities.[216]  Our concerns about the scale of DAPA apply with force here too.

Like DAPA, DACA "is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute.'"[217]  DACA violates the substantive requirements of the APA.

---

[213] *Id.* at 185 (footnote omitted).

[214] *Id.*

[215] *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020) (reporting estimates that "excluding DACA recipients from the lawful labor force may . . . result in the loss of $215 billion in economic activity and an associated $60 billion in federal tax revenue over the next ten years").

[216] ROA.23026.

[217] *DAPA*, 809 F.3d at 186 (quoting *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 23 (2011)).

No. 21-40680

# VII

The district court vacated and remanded DACA to DHS, and it granted a permanent injunction, which it stayed as to existing recipients.[218] The defendants raise several remedies issues. First, they suggest that the district court lacked jurisdiction to vacate and enjoin DACA. Second, they argue that vacatur was inappropriate. Third, they dispute the nationwide scope of the injunction. Finally, they ask that this court retain the stay as to existing recipients pending additional appeal.

## A

After the conclusion of appellate briefing, in a Rule 28(j)[219] letter, the Government suggested for the first time that 8 U.S.C. § 1252(f)(1) deprives the district court of jurisdiction to vacate and enjoin DACA.[220] Section 1252(f)(1) reads:

> (f) Limit on injunctive relief
>
> (1) In general
>
> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221-32], other than with respect to the application of such

---

[218] ROA.25240-44.

[219] *See* FED. R. APP. P. 28(j) ("If pertinent and significant authorities come to a party's attention after the party's brief has been filed—or after oral argument but before decision—a party may promptly advise the circuit clerk by letter, with a copy to all other parties, setting forth the citations. The letter must state the reasons for the supplemental citations, referring either to the page of the brief or to a point argued orally.").

[220] Dkt. #222 (Rule 28(j) letter); *see also* Dkt. #223 (States' response).

No. 21-40680

provisions to an individual alien against whom proceedings under such part have been initiated.[221]

The Supreme Court recently explained that "§ 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions."[222]

We assume without deciding that the § 1252(f)(1) argument the Government has raised for the first time on appeal is not subject to forfeiture.[223] The statute does not bar the relief ordered here.

As an initial matter, § 1252(f)(1) does not apply to vacatur. The Supreme Court has cautioned that, "[b]y its plain terms, and even by its title, [§ 1252(f)(1)] is nothing more or less than a limit on injunctive relief."[224] We have declined to extend the statutory bar to vacatur because of this admonition and the "meaningful differences" between injunctions and vacatur.[225] Vacatur is "a less drastic remedy."[226] "Apart from the constitutional or statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making."[227]

---

[221] 8 U.S.C. § 1252(f)(1).

[222] *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022).

[223] *See Biden v. Texas*, 142 S. Ct. 2528, 2540 n.4 (2022) (expressing no view on whether § 1252(f)(1) is "subject to forfeiture").

[224] *Id.* at 2540 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999)).

[225] *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022), *cert. granted*, ___S. Ct. ___, 2022 WL 2841804.

[226] *Id.* (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)).

[227] *Id.* at 220.

No. 21-40680

Nor does § 1252(f)(1) apply to the injunction in this case. The district court's judgment vacates the DACA Memorandum but stays the vacatur as to those who have been granted DACA status. No present DACA recipient is subject to removal under the district court's existing judgment.

As to those seeking admission to the DACA program, as noted, § 1252(f)(1) prohibits injunctions only as to §§ 1221-1232. Nothing in §§ 1221-1232 authorizes DHS to broaden the categories of aliens who are entitled to lawful presence in the United States, and the district court correctly so held. The district court's judgment does prohibit the grant of DACA status to those who were not presently DACA recipients at the time of the district court's judgment. However, that judgment does not require the removal of any DACA applicant. It bears repeating: the district court's judgment does not require DHS to remove anyone.

## B

We next consider the propriety of vacatur. We review the district court's vacatur decision for abuse of discretion.[228] Two factors determine whether vacatur is warranted: "(1) the seriousness of the deficiencies of the action, that is, how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur."[229] Remand without vacatur of the agency action is "generally appropriate when there is

---

[228] *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021).

[229] *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 556 F.3d 193, 197 (D.C. Cir. 2009)).

at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so."[230]

Under the first factor, DACA's deficiencies are severe. The district court's excellent opinion correctly identified fundamental substantive defects in the program. The DACA Memorandum contradicts significant portions of the INA. There is no possibility that DHS could obviate these conflicts on remand.

New Jersey suggests DACA's deficiencies are not severe and remand without vacatur is appropriate because "even assuming DACA is unlawful" "the Supreme Court itself has recognized that significant policy choices remain available to DHS." New Jersey asserts DHS is engaged in promulgating a new regulation and "some form of forbearance explicitly 'remain[s] squarely within [DHS's] discretion.'" The Supreme Court has recognized that the DACA Memorandum has two components, forbearance and benefits.[231] But in order to determine whether the district court abused its discretion in ordering vacatur of the DACA Memorandum, we need not and do not decide, in light of our holdings today that the DACA Memorandum was contrary to provisions of the INA, what the bounds of DHS's discretion with regard to "forbearance without benefits" might be.

First, the district court stayed vacatur as to existing DACA recipients.[232] Second, the district court's decision not to stay vacatur as to the grant of new DACA permits implicitly and reasonably recognized that the

---

[230] *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389-90 (5th Cir. 2021).

[231] *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) ("[D]eferred action coupled with the associated benefits are the two legs upon which the DACA policy stands.").

[232] Dist. Ct. Op., 549 F. Supp. 3d at 624; ROA.25243.

pool of DACA recipients who might come to rely on DACA's forbearance as to removal should not be enlarged pending appeal. Third, the district court explicitly left open how DHS might address "forbearance without the award of benefits" in the then-ongoing rulemaking.[233]

The second factor in considering the propriety of vacatur is the disruptive consequences. New Jersey argues that the district court neglected the weighty reliance interests that have developed. On the contrary, the district court recognized that "[h]undreds of thousands of individual DACA recipients, along with their employers, states, and loved ones, have come to rely on the DACA program."[234] Because DACA has created "such significant reliance," the district court decided to stay the effects of vacatur as to the existing recipients, who could both retain current benefits and seek to renew them, pending the outcome of a rulemaking proceeding.[235]

Especially in light of DACA's critical substantive failings, the district court was well within its discretion to order vacatur.[236] The district court further exhibited restraint by partially and temporarily staying the application of its vacatur order.

## C

The defendants also contest the nationwide scope of the district court's judgment. We review the grant of a permanent injunction for abuse

---

[233] Dist. Ct. Op., 549 F. Supp. 3d at 622.

[234] ROA.25242.

[235] ROA.25242-43.

[236] *See Am. Bankers Ass'n v. Nat'l Credit Union Ass'n,* 934 F.3d 649, 673 (D.C. Cir. 2019) (quoting *United Steel v. Mine Safety & Health Admin.,* 925 F.3d 1279, 1287 (D.C. Cir. 2019)) ("When a rule is contrary to law, the 'ordinary practice is to vacate' it.").

No. 21-40680

of discretion.[237] "A district court abuses its discretion if it (1) relies on clearly erroneous factual findings or erroneous conclusions of law when deciding to grant the injunction, or (2) misapplies the factual or legal conclusions when fashioning its injunctive relief."[238]

The district court explained that a nationwide injunction was appropriate because the "public interest of the nation is always served by the cessation of a program that was created in violation of law and whose existence violates the law."[239]  It considered the "reliance interests of the Plaintiff States on the duly enacted immigration laws of this country, the interests of the public in having the Government and its agencies comply with the law, and the significant reliance interests that DACA has engendered since its inception" and concluded that nationwide relief with a partial stay was appropriate.[240]

This reasoning was not an abuse of discretion.  Our decision to uphold the nationwide injunction, rather than more narrowly tailored relief, is based on our reading of circuit precedent.  "In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement."[241]   A more limited remedy would "detract[] from the 'integrated scheme of regulation' created by Congress.'"[242]

---

[237] *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021).

[238] *Id.* (internal quotations omitted).

[239] ROA.25241.

[240] ROA.25244.

[241] *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th Cir. 2022), *cert. granted*, ___ S. Ct. ___, 2022 WL 2841804.

[242] *DAPA*, 809 F.3d 134, 187 (5th Cir. 2015) (quoting *Arizona v. United States*, 567 U.S. 387, 402 (2012)).

44

No. 21-40680

## D

Finally, New Jersey requests that we retain the stay of the injunction as to current DACA recipients pending further appeal. The plaintiff States do not indicate any opposition to this request.

A stay is "an exercise of judicial discretion," and "[t]he propriety of its issue is dependent upon the circumstances of the particular case."[243] Our stay inquiry considers four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."[244] We do not apply the factors "in a rigid, mechanical fashion."[245] Our stay authority permits responsible action when we are "faced with serious legal questions that merit careful scrutiny and judicious review."[246]

The legal questions that DACA presents are serious, both to the parties and to the public. In our view, the defendants have not shown that there is a likelihood that they will succeed on the merits. But we are mindful that, in the similar *DAPA* case, the Supreme Court was equally divided over our judgment.[247] We also recognize that DACA has had profound significance to recipients and many others in the ten years since its

---

[243] *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672-73 (1926)).

[244] *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014).

[245] *United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 39 (5th Cir. 1983).

[246] *Campaign for S. Equality v. Bryant*, 773 F.3d 55, 57 (5th Cir. 2014).

[247] *United States v. Texas*, 579 U.S. 547, 548 (2016) (per curiam).

No. 21-40680

adoption.[248]   Given the "uncertainty of final disposition"[249] and the "inevitable disruption that would arise from a lack of continuity and stability,"[250] we preserve the stay as to existing recipients.

\*     \*     \*

The judgment of the district court is AFFIRMED in part. This case is REMANDED to the district court, rather than DHS. The motion for a partial stay is GRANTED pending a further order of this court or the Supreme Court.

---

[248] *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913-15 (2020).

[249] *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981).

[250] *Campaign for S. Equality*, 773 F.3d at 58.