IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS; | ) |
| | ) |
| STATE OF ALABAMA; | ) |
| | ) |
| STATE OF ARKANSAS; | ) |
| | ) |
| STATE OF LOUISIANA; | ) |
| | ) |
| STATE OF NEBRASKA; | ) |
| | ) |
| STATE OF SOUTH CAROLINA; | ) |
| | ) |
| STATE OF WEST VIRGINIA; | ) |
| | ) |
| STATE OF KANSAS; and | ) |
| | ) |
| STATE OF MISSISSIPPI, | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| *v.* | ) Case No. 1:18-cv-00068 |
| | ) |
| UNITED STATES OF AMERICA, *et al.,* | ) |
| | ) |
| *Defendants,* | ) |
| | ) |
| *and* | ) |
| | ) |
| KARLA PEREZ, *et al.*; | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| *Defendant-Intervenors.* | ) |

**SUPPLEMENTAL COMPLAINT**

1.     Plaintiffs adopt and incorporate by reference (as if fully stated herein) the allegations and arguments set forth in their First Amended Complaint, ECF 104.

## INTRODUCTION

2.     On August 30, 2022, the Biden Administration promulgated—pursuant to notice-and-comment rulemaking—a final rule ("Final Rule") that adopted, with immaterial changes, the Deferred Action for Childhood Arrivals ("DACA") policies from the 2012 memorandum issued by then-Secretary of the Department of Homeland Security Janet Napolitano (the "DACA Memorandum"). *See* AR2022_100195, Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53,152 (Aug. 30, 2022) (to be codified at 8 C.F.R. pts 106, 236, and 274a). The Final Rule went into effect on October 31, 2022. *Id*.

3.     However, the Final Rule suffers the same flaws as the DACA Memorandum found unlawful by this Court and the U.S. Court of Appeals for the Fifth Circuit.

4.     The Fifth Circuit has already upheld this Court's vacatur and permanent injunction against implementation of the DACA Memorandum as violative of the procedural and substantive requirements of the Administrative Procedure Act ("APA"). *Texas v. United States (DACA)*, 50 F.4th 498, 508 (5th Cir. 2022).

5.     Regarding the substantive requirements specifically, after assuming that *Chevron* deference applied, the Fifth Circuit held that DACA failed the first step of *Chevron* because it contravened Congress's rigorous and comprehensive statutory

schemes for classification, removal, allocation of lawful presence, and allocation of work authorization. *Id.* at 526 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). The Fifth Circuit also held that the DACA Memorandum failed the second step of *Chevron* because it was not an "exercise of [DHS's] inherent prosecutorial discretion," was "an unreasonable interpretation of the [Immigration and Nationality Act, or 'INA']," and had no "clear congressional authorization." *See id.* at 526–27.

6.      Before the Fifth Circuit issued its opinion and after it heard oral argument, DHS promulgated the Final Rule and then asked that court to review the substantive challenges to it on the ground that none of the changes in the Final Rule were material. *See id.* at 511–12.

7.      The Fifth Circuit declined, however, to address the validity of the Final Rule on the ground that it did not have an adequate administrative record and could not definitively determine whether "material differences" existed between the Final Rule and the DACA Memorandum. *See id.* at 512. As a result, the Fifth Circuit remanded to this Court for further proceedings regarding the Final Rule. *Id.*

8.      The Final Rule is materially and effectively the same as the policies in the DACA Memorandum held unlawful by the Fifth Circuit. It adopts the same provisions held unlawful in *DACA*.

9.      In a press release accompanying the issuance of the Final Rule, DHS stated that "[t]he rule continues the DACA policy as announced in the 2012

Napolitano Memorandum and is based on longstanding USCIS practice,"[1] and explained that the Final Rule "defer[s] [DACA recipients'] removal" and:

- Maintains the existing threshold criteria for DACA;

- Retains the existing process for DACA requestors to seek work authorization; and

- Affirms the longstanding policy that DACA is not a form of lawful status but that DACA recipients, like other deferred action recipients, are considered 'lawfully present' for certain purposes.

*Id.*

10.    Defendants have acknowledged that "the DACA regulations promulgated by the final rule are materially indistinguishable" from the DACA Memorandum, that "the final rule and 2012 memorandum are indistinguishable for purposes of plaintiffs' substantive lawfulness claims," and that "the parties' substantive arguments (albeit not plaintiffs' notice-and-comment arguments) are equally applicable to both" the Final Rule and the DACA Memorandum. Supplemental Brief for Federal Appellants, *DACA*, No.21-40680 (5th Cir.), 2022 WL 4080252, *2–3, 4.

11.    In their Rule 28(j) letter notifying the Fifth Circuit of the Final Rule, Defendants further admitted that it did not "materially change" the program implemented by the DACA Memorandum and that "the [Final] [R]ule preserves the basic features of DACA that plaintiffs contend—*and the district court has already*

---

[1] Press Release, DHS, DHS Issues Regulation to Preserve and Fortify DACA (Aug. 24, 2022), https://www.dhs.gov/news/2022/08/24/dhs-issues-regulation-preserve-and-fortify-daca.

*held*—exceed DHS's statutory authority." 08/24/2022 Appellants' Rule 28(j) Letter 1–2, Doc. 00516446276, *DACA*, No.21-40680 (5th Cir.) (emphasis added).

12.     Indeed, Defendants conceded in the Fifth Circuit that because this Court had already vacated the DACA Memorandum on substantive grounds, "the outcome in the district court [regarding the validity of the final rule] is *certain*" due to the lack of any material differences between the two agency actions. Supplemental Brief for Federal Appellants, *DACA*, No.21-40680 (5th Cir.), 2022 WL 4080252, *11 (alterations in original, emphasis added).

13.     Although this Court's injunction currently in place applies to the Final Rule, *see* ECF 603, that order only prevents Defendants from granting DACA status to new applicants—DHS may approve renewal applications for those renewing their status obtained before the July 16, 2021, permanent injunction. *Id*.

14.     Plaintiffs, however, are entitled to full relief against the implementation of the unlawful Final Rule—it should be vacated, declared unlawful and unconstitutional, and its implementation permanently and completely enjoined. Defendants should be prevented from issuing or renewing any DACA permits.

## PROCEDURAL HISTORY

15.     On May 5, 2018, after years of litigation surrounding the DACA Memorandum, Plaintiffs brought this suit against Defendants to challenge the Executive's authority to promulgate and implement the program in the first place. *See* ECF 1, Original Complaint.

16.     After numerous intervenors joined as co-Defendants, Plaintiffs requested a preliminary injunction, seeking to enjoin the implementation of the DACA Memorandum. *See* ECF 5, Plaintiffs' Motion for Preliminary Injunction. But this Court declined Plaintiffs' request for a preliminary injunction because of the delay in challenging the DACA Memorandum and its determination that the interests of the Defendant-Intervenors and the public outweighed the interests of Plaintiffs. *See Texas v. United States*, 328 F. Supp.3d 662, 743 (S.D. Tex. 2018). Nevertheless, this Court determined that Plaintiffs would likely succeed on the merits of their claims. *See id.* at 709–36.

17.     Subsequently, there was a change in presidential administrations, and the Trump Administration determined that the DACA Memorandum was unlawful, rescinding it. But the Supreme Court held that DHS's attempt to rescind DACA itself violated the APA because it constituted arbitrary-and-capricious decisionmaking. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1901, 1915 (2020).

18.     After the Supreme Court's decision, Plaintiffs and the Defendant-Intervenors filed cross-motions for summary judgment, and this Court granted partial summary judgment in Plaintiffs' favor. *See Texas v. United States*, 549 F. Supp. 3d 572, 624 (S.D. Tex. 2021). This Court found the DACA Memorandum procedurally unlawful for failing to undergo notice-and-comment rulemaking, *id.* at 603, and substantively unlawful for exceeding the bounds of statutory immigration provisions. *Id.* at 621.

19.    This Court determined that "DHS violated the APA with the creation of DACA and its continued operation," so it vacated the DACA Memorandum and remanded the proceedings to DHS. *Id.* at 624. This Court recognized, however, that "hundreds of thousands of DACA recipients and others … have relied upon this program for almost a decade." *Id.* As a result, it temporarily stayed its immediate order of vacatur and allowed DHS to accept new DACA applications and renewal DACA applications. *Id.* Nonetheless, it enjoined DHS from approving any new DACA applications and granting the attendant status. *Id.*

20.    Defendants appealed this Court's judgment to the Fifth Circuit. *See DACA*, 50 F.4th at 511.

21.    Meanwhile, in response to the remand to the agency that this Court issued in its summary judgment order, DHS issued a notice of proposed rulemaking on September 28, 2021, that would "preserve and fortify DHS's DACA policy." AR2022_100001, Deferred Action for Childhood Arrivals, 86 Fed. Reg. 53,736, 53,773 (proposed Sept. 28, 2021).

22.    Then, on August 30, 2022, after the Fifth Circuit had already heard oral arguments in *DACA*, DHS promulgated the Final Rule and asked the Fifth Circuit to review the substance of that action on the ground that none of the changes in it was material. *See DACA*, 50 F.4th at 511–12.

23.    But the Fifth Circuit refused to address the Final Rule on appeal, remanding to this Court on the ground that it did not have an adequate

administrative record and could not determine whether "material differences" existed between the Final Rule and the DACA Memorandum. *DACA*, 50 F.4th at 512.

24.    Nonetheless, the Fifth Circuit affirmed the portion of this Court's judgment that vacated the DACA Memorandum as violating the procedural requirements of the APA because it was a substantive rule that was required to undergo notice-and-comment rulemaking. *Id.* at 522–24.

25.    The Fifth Circuit also affirmed this Court's judgment that the DACA Memorandum violated the substantive requirements of the APA. Specifically, after assuming that the two-part *Chevron* framework applied, the Fifth Circuit held that the DACA Memorandum failed the first step of *Chevron* because it contravened Congress's rigorous and comprehensive statutory schemes for classification, removal, allocation of lawful presence, and allocation of work authorization. *Id.* at 525–26.

26.    The Fifth Circuit also held that the DACA Memorandum failed the second step of *Chevron* because it was not an "exercise of [DHS's] inherent prosecutorial discretion," was "an unreasonable interpretation of the INA," and had no "clear congressional authorization." *See id.* at 526–27.

27.    Importantly, though, the Final Rule is materially and effectively the same as the DACA Memorandum. Indeed, the Final Rule adopts several of the provisions held unlawful by this Court and the Fifth Circuit: it maintains the existing threshold eligibility criteria from the DACA Memorandum for forbearance from removal, retains the existing process for DACA requestors to seek work

authorization, and affirms that DACA recipients are considered lawfully present in the United States.[2]

28.     The Final Rule creates a new 8 C.F.R. §236.21, captioned "Applicability," which promulgates several subsections. AR2022_100340–41, 87 Fed. Reg. 53,297–98.

29.     Sections 236(a) and (b) explain that this provision applies to requests for deferred action under the DACA policy only, and that the provisions of 8 C.F.R part 103 do not apply unless specifically provided for. AR2022_100340–41, 87 Fed. Reg. 53,297–98.

30.     Section 236(c)(1) defines "[d]eferred action" as an exercise "of discretion not to pursue the removal of certain aliens for a limited period" undertaken for various reasons, and a "temporary forbearance from removal." AR2022_100341, 87 Fed. Reg. 53,298.

31.     Section 236(c)(2) provides that "[d]uring this period of forbearance, on the basis of this subpart only, USCIS may grant employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33) to DACA recipients who have demonstrated an economic need." AR AR2022_100341, 87 Fed. Reg. 53,298.

32.     Section 236(c)(3) provides that "[d]uring this period of forbearance, on the basis of this subpart only, a DACA recipient is considered 'lawfully present' under the provisions of 8 CFR 1.3(a)(4)(vi)." AR2022_100341, 87 Fed. Reg. 53,298.

33.     Section 236(c)(4) provides that "[d]uring this period of forbearance, on the basis of this subpart only, a DACA recipient is not considered 'unlawfully present'

---

[2] Press Release, DHS, DHS Issues Regulation to Preserve and Fortify DACA (Aug. 24, 2022), https://www.dhs.gov/news/2022/08/24/dhs-issues-regulation-preserve-and-fortify-daca.

for the purpose of inadmissibility under section 212(a)(9) of the [INA]."
AR2022_100341, 87 Fed. Reg. 53,298.

34.     Section 236(d) provides that:

This subpart rescinds and replaces the DACA guidance set forth in the
Memorandum issued by the Secretary of Homeland Security on June 15,
2012. All current grants of deferred action and any ancillary features
previously issued pursuant to the Memorandum remain in effect and
will expire according to their existing terms. All such current grants of
deferred action and any ancillary features, as well as any requests for
renewals of those grants and new requests, are hereafter governed by
this subpart and not the Memorandum.

AR2022_100341, 87 Fed. Reg. 53,298.

35.     The Final Rule creates a new 8 C.F.R. § 236.22, captioned "Discretionary
determination," which sets for the same eligibility criteria as the DACA
Memorandum. AR2022_100341–42, 87 Fed. Reg. 53,298–99.

36.     The Final Rule creates a new 8 C.F.R. § 236.23, captioned "Procedures
for requests, terminations, and restrictions on information use," which sets forth the
mechanics of applying for (and termination of) DACA status, as well as restrictions
on use of information obtained from applicants for immigration enforcement.
AR2022_100342, 87 Fed. Reg. 53,299.

37.     The Final Rule also contains express severability provisions. The new 8

C.F.R. § 236.24, captioned "Severability," provides:

> (a) Any provision of this subpart held to be invalid or unenforceable as applied to any person or circumstance shall be construed so as to continue to give the maximum effect to the provision permitted by law, including as applied to persons not similarly situated or to dissimilar circumstances, unless such holding is that the provision of this subpart is invalid and unenforceable in all circumstances, in which event the provision shall be severable from the remainder of this subpart and shall not affect the remainder thereof.

> (b) The provisions in § 236.21(c)(2) through (4) [concerning employment authorization, eligibility for Social Security benefits, and inadmissibility under 8 U.S.C. § 1182(a)(9), respectively] and § 274a.12(c)(14) and 274a.12(c)(33) [concerning employment authorization] are intended to be severable from one another, from this subpart and any grant of forbearance from removal resulting from this subpart, and from any provision referenced in those paragraphs, including such referenced provision's application to persons with deferred action generally.

AR2022_100342–43, 87 Fed. Reg. at 53,299–300.

38.     The Final Rule creates a new 8 C.F.R. § 236.25, captioned "No private

rights," a boilerplate provision that the Final Rule

> (a) Is not intended to and does not supplant or limit otherwise lawful activities of the Department or the Secretary; and

> (b) Is not intended to and does not create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal.

AR2022_100343, 87 Fed. Reg. at 53,300.

39.     Finally, the Final Rule amends 8 C.F.R. 274a.12, captioned "Classes of aliens authorized to accept employment," to read:

> (c) * * *
> (14) Except as provided for in paragraph (c)(33) of this section, an alien who has been granted deferred action, an act of administrative convenience to the government that gives some cases lower priority, if the alien establishes an economic necessity for employment.
>
> * * * * *
>
> (33) An alien who has been granted deferred action pursuant to 8 CFR 236.21 through 236.23, Deferred Action for Childhood Arrivals, if the alien establishes an economic necessity for employment.
>
> * * * * *

AR2022_100343, 87 Fed. Reg. at 53,300.

## JURISDICTION AND VENUE

40.     The Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution, art. III, § 3, and the APA, 5 U.S.C. §§ 702–06. The Court also has jurisdiction under 28 U.S.C. § 1346(a)(2) because this is a civil action or claim against the United States. Finally, the Court has jurisdiction to compel an officer or employee of the above-named federal agencies to perform his duty under 28 U.S.C. § 1361.

41.     Venue is proper in this District under 28 U.S.C. § 1391(e) because the State of Texas is a resident of this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

42.     This Court is authorized to award the requested declaratory, injunctive and vacation relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, the APA, 5 U.S.C. §§ 703, 706, and 28 U.S.C. § 1361.

## THE PARTIES

43.     Plaintiffs are the States of Texas, Alabama, Arkansas, Louisiana, Nebraska, South Carolina, West Virginia, Kansas, and Mississippi.

44.     Defendant the United States of America is sued under the APA. *See* 5 U.S.C. § 703 ("[T]he action for judicial review may be brought against the United States.").

45.     Defendant Alejandro Mayorkas is the Secretary of the U.S. Department of Homeland Security ("DHS").[3] Defendant Mayorkas and DHS are responsible for U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"). Defendant Mayorkas also is responsible for the continued administration of the Final Rule.

46.     Defendant Troy A. Miller is the Acting Commissioner of CBP.[4] Defendant Miller shares responsibility for the administration of the Final Rule.

---

[3] On February 2, 2021, Alejandro Mayorkas, Secretary of DHS, was automatically substituted as a party in this proceeding in place of former Secretary Kirsten M. Nielsen. Fed. R. Civ. P. 25(d).

[4] On November 12, 2022, Troy A. Miller, Acting Commissioner of CBP, was automatically substituted as a party in this proceeding in place of former Commissioner Kevin K. McAleenan, former Acting Commissioners John P. Sanders, Mark A. Morgan, and (during a previous stint) Troy A. Miller, and former Commissioner Chris Magnus. Fed. R. Civ. P. 25(d).

47.     Defendant Tae D. Johnson is the Director for ICE.[5] ICE administers a formal program for allowing unlawfully present aliens to apply for deferred action and to appeal for reconsideration if deferred action is denied.

48.     Defendant Ur M. Jaddou is the Director of USCIS.[6] Defendant Jaddou and USCIS administer the DACA program pursuant to the Final Rule. USCIS is the principal agency responsible for the continued administration of the Final Rule.

49.     Defendant Raul L. Ortiz is the Chief of the U.S. Border Patrol.[7] Defendant Ortiz and the U.S. Border Patrol are responsible for enforcing immigration laws and the detection, interdiction, and apprehension of those who attempt to illegally enter or smuggle people or contraband across U.S. borders between official ports of entry.

## LEGAL BACKGROUND

### A. The Final Rule is Unlawful Because It Violates Congressional Statutes.

50.     The APA requires this Court to hold unlawful and set aside any agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or

---

[5] On January 13, 2021, Tae D. Johnson, Director of ICE, was automatically substituted as a party in this proceeding in place of former Acting Director Jonathan Fahey, former Acting Director Tony Pham, former Acting Director Matthew Albence, former Acting Director Ronald Vitiello, and former Deputy Director and Acting Director Thomas D. Homan. Fed. R. Civ. P. 25(d).

[6] On August 3, 2021, Ur M. Jaddou, Director of the USCIS, was automatically substituted as a party in this proceeding in place of former Director L. Francis Cissna. Fed. R. Civ. P. 25(d).

[7] On August 15, 2021, Raul L. Ortiz, Chief of the U.S. Border Patrol, was automatically substituted as a party in this proceeding in place of former Chief Rodney Scott and former Chief Carla L. Provost. Fed. R. Civ. P. 25(d).

immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

51.    Congress created "an intricate statutory scheme for determining which classes of aliens may receive lawful presence, discretionary relief from removal, deferred action, and work authorization." *DACA*, 50 F.4th at 525 (footnotes omitted).

52.    The Final Rule is contrary to law because it is "foreclosed by Congress's careful plan" and is "manifestly contrary to the statute." *DACA*, 50 F.4th at 524–28. "Congress's clear articulation of laws for removal, lawful presence, and work authorization illustrates a manifest intent to reserve for itself the authority to determine the framework of the [N]ation's immigration system." *Id.* at 511 (quoting *Texas*, 549 F. Supp. 3d at 614).

53.    Congress provided for specifically defined classes of aliens to be eligible for deferred action and discretionary relief from removal. *DACA*, 50 F.4th at 525–26 & nn.196–97.

54.    In addition, Congress enacted immigration classifications for lawful presence and unlawful presence. *DACA*, 50 F.4th. at 525–26 & n.195.

55.    As part of Congress's statutory scheme, the classification of lawful presence is a necessary prerequisite for aliens to be eligible for several benefits, including Social Security,[8] Medicare,[9] retirement benefits under the Personal

---

[8] *See* 8 U.S.C. § 1611(b)(2).

[9] *See id.* § 1611(b)(3).

Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"),[10] and the Earned Income Tax Credit.[11] *See Texas*, 549 F. Supp. 3d at 578 & n.9.

56.   Conversely, the classification of unlawful presence makes time spent in the country count towards a reentry ban under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), subject to statutory exception.[12]

57.   Congress also provided for work authorization for specific categories of illegal aliens. *DACA*, 50 F.4th at 525–26 & n.198.

58.   Despite this carefully crafted, intricate, and extensive statutory scheme, Congress never gave the Executive Branch *carte blanche* to sidestep these statutes and create new classes of aliens eligible for deferred action protecting them from removal.

59.   Nor did Congress permit unlawfully present aliens to be lawfully present, much less allow such unlawfully present aliens to obtain attendant benefits and work authorization simply because the Executive chooses not to remove them. But that is what the Executive accomplished through the DACA Memorandum and continues with the Final Rule.

---

[10] *See id.* § 1611(b)(3).

[11] *See* 26 U.S.C. § 32(c)(1)(A), (c)(1)(E), (m) (eligibility based on an individual having a valid Social Security number).

[12] *See* 8 U.S.C. § 1182(a)(9)(B)(i) (3-year reentry ban for aliens "unlawfully present in the United States for a period of more than 180 days but less than 1 year"; 10-year reentry ban for aliens "unlawfully present in the United States for one year or more").

60.     And it did not stop there. On top of the new class of eligible aliens, the Final Rule further provides some DACA recipients with United States citizenship or a pathway to citizenship without any statutory authorization to do so from Congress.

61.     "Advance parole is a privilege that allows aliens to leave the United States and then lawfully re-enter the country without being turned away at a port of entry." *Texas*, 549 F. Supp. 3d at 612 (citations omitted). "It is designed to be awarded only 'on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" *Id*. (quoting 8 U.S.C. § 1182(d)(5)(A)).

62.     "DACA, however, made the entire DACA population eligible to apply for advance parole, and expanded these two enumerated categories beyond their intended scope," *id*., and "enable[d] certain individuals to change their inadmissible status (due to unlawful entry) into an admitted/paroled category and in some cases then provides a clearer pathway to citizenship." *Id*. at 614.

63.     Advance parole granted to DACA recipients has also led to the subversion of the "unlawful presence bars" instituted by statute. *Id*. (citing 8 U.S.C. § 1182(a)(9)(B)(i)). "[T]hose illegally present for more than a year must remain out for ten years before they may again become admissible to the United States." *Id*. "All of the DACA recipients have been in the country illegally for more than one year, so the ten-year bar would apply." *Id*. "DACA's grant of advance parole eligibility, however, allows DACA recipients to travel abroad and then return to the United States without complying with" the ten-year bar imposed by Congress. *Id*.

17

64.     The Final Rule continues this abuse of advance parole that was implemented pursuant to the DACA Memorandum.

65.     The Final Rule "further incorporates here its points in the preamble to the [Notice of Proposed Rulemaking] at 86 FR 53756–53762 regarding DHS's view that employment authorization, advance parole, and lawful presence may be provided in conjunction with DACA's forbearance of removal." AR2022_100237, 87 Fed. Reg. 53,194.

66.     That incorporated language from the Notice of Proposed Rulemaking expressly disagrees with this Court's conclusions regarding advance parole:

> The access of DACA recipients to "advance parole" under 8 CFR 212.5(f) raises questions of both law and policy that were discussed by the *Texas II* district court in its July 16, 2021 memorandum and order. DHS emphasizes that the same statutory standard, "for urgent humanitarian reasons or significant public benefit," applies to all noncitizens, including DACA recipients, and that this statutory standard does not depend on whether an individual is a DACA recipient. *DHS reiterates that under the proposed rule, it would continue its adherence to that standard.*

AR2022_100027, 86 Fed. Reg. 53,762 (emphasis added).

67.     Additional language from that incorporated into the Final Rule sets forth Defendants' rationale for allowing illegal aliens accelerated access to citizenship or other lawful status through advance parole:

> [T]he INA lays out a comprehensive scheme for eligibility for adjustment of status to that of a lawful permanent resident. There are several relevant statutory provisions and requirements, including those laid out at 8 U.S.C. 1255(a), which requires, among other things, that applicants for adjustment of status be eligible for an immigrant visa and be admissible under 8 U.S.C. 1182, and that applicants were "inspected and admitted or paroled" into the United States. The parole authority at 8 U.S.C. 1182(d)(5), when read together with the adjustment of status

provisions at 8 U.S.C. 1255(a), creates a statutory pathway to adjustment of status for individuals who meet all the other adjustment criteria, including eligibility for an immigrant visa, but entered without inspection.

Congress clearly intended that parole be available to a subset of noncitizens, and that such parole would affect eligibility for adjustment of status in these limited ways. These effects of parole are entirely separate from DACA, and do not depend on any executive actions not explicitly authorized by statute. So long as DHS acts within the limits on its parole authority in 8 U.S.C. 1182(d)(5), which as discussed above DHS believes the DACA-based advance parole guidance does, there is no conflict with Congress' expressed intent for eligibility for adjustment of status.

AR2022_100027–28, 86 Fed. Reg. 53,762–63 (footnote omitted).

68.   Defendants have made clear that the Final Rule authorizes advance parole in a manner found unlawful by this Court.

69.   As the Fifth Circuit concluded:

Congress's rigorous classification scheme forecloses the contrary scheme in the DACA Memorandum. "Entirely absent from those specific classes" Congress defined is the group of 1.7 million aliens "who would be eligible for lawful presence" under DACA. DACA creates a new class of otherwise removable aliens who may obtain lawful presence, work authorization, and associated benefits. Congress determined which aliens can receive these benefits, and it did not include DACA recipients among them. We agree with the district court's reasoning and its conclusions that the DACA Memorandum contravenes comprehensive statutory schemes for removal, allocation of lawful presence, and allocation of work authorization.

*DACA*, 50 F.4th at 526 (citations omitted).

70.   The same is true for the Final Rule, as it provides for deferred action, forbearance from removal, work authorization, and lawful presence exceeding statutory authority.

71.     And while the Defendants assert that the Final Rule is "an exercise of its inherent prosecutorial discretion," *DACA*, 50 F.4th at 526, the Final Rule "undoubtedly implicates questions of deep economic and political significance that are central to this statutory scheme; had Congress wished to assign that decision to an agency, it surely would have done so expressly.'" *Id.* (cleaned up; citation omitted).

72.     As a result, "Congress's rigorous classification scheme forecloses the contrary scheme" under the Final Rule, and the Final Rule thus "contravenes [the] comprehensive statutory schemes for removal, allocation of lawful presence, and allocation of work authorization." *DACA*, 50 F.4th at 526.

73.     Therefore, the Final Rule violates the substantive requirements of the APA because it adopted and implemented the same provisions held unlawful under DACA. *See id.* at 524–28.

**B. The Final Rule Violates the Take Care Clause.**

74.     Through its adoption of the policies of the DACA Memorandum, the Final Rule dispenses with certain immigration statutes by declaring as lawful conduct that Congress established as unlawful, thereby violating the Take Care Clause.

75.     Moreover, the Final Rule further violates the Take Care Clause because it dispenses with certain immigration statutes by granting United States citizenship or a pathway to citizenship to aliens who would otherwise be unlawfully present but for the Final Rule.

76.     The Take Care Clause has its roots in the dispute between Parliament and King James II, who was overthrown in the Glorious Revolution of 1688.

Parliament was infuriated at King James's use of his purported power to suspend or dispense with Parliament's laws. Zachary Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671, 676, 690–91 (2014). As a result, the subsequent monarchs, William and Mary, agreed to the English Bill of Rights, which stripped the monarchy of all suspending and dispensing authority. *See* English Bill of Rights of 1689, art. 1.

77.     In light of this historical background, the Framers of the U.S. Constitution unanimously rejected a proposal to grant dispensing powers to the President.

78.     Indeed, the Fifth Circuit recently had occasion to examine the Executive's inability to dispense with the laws. *See Texas v. Biden (MPP),* 20 F.4th 928, 978-82 (5th Cir. 2021), *reversed on other grounds*, 142 S. Ct. 2528 (2022). In short, "[t]he Framers agreed that the executive should have neither suspending nor dispensing powers." *Id.* at 980.

79.     The Supreme Court has held likewise. *Kendall v. United States ex rel. Stokes,* 37 U.S. 524 (1838). "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution, and entirely inadmissible." *Id.* at 613. Any other conclusion would "vest[] in the President a dispensing power." *Id.*

80.     In this case, the Final Rule dispenses with certain immigration statutes. Just as King James attempted to make unlawful office-holding lawful, Price, *supra*, at 691, the Executive sought to make unlawful presence lawful through the

promulgation and implementation of DACA under the Final Rule. And the use of advance parole to affirmatively confer United States citizenship or a pathway to citizenship on DACA recipients compounds the problem.

81.     Thus, Justice Scalia properly noted that DACA is a program that involves "biennial requests for *dispensation*" from immigration statutes. *Arizona v. United States*, 567 U.S. 387, 435 (2012) (Scalia, J., concurring in part and dissenting in part) (emphasis added).

82.     Rewriting the laws to match the Executive's policy is precisely what the Final Rule does when it adopts the unlawful provisions under DACA. The Final Rule thus contravenes the law and the Constitution.

83.     Thus, the Final Rule is a programmatic decision to confer benefits on hundreds of thousands of aliens.

84.     Here, the Final Rule is "incompatible with the express or implied will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

85.     As did the DACA Memorandum, the Final Rule violates explicit and implicit congressional objectives.

86.     But the Final Rule is an "abdication" of immigration statutes that specify in careful detail which aliens may be lawfully present, may obtain work authorization, and may obtain United States citizenship or a pathway to citizenship. *See Texas v. United States*, 86 F. Supp. 3d 591, 663 (S.D. Tex. 2015) (describing DAPA and Enhanced DACA).

87.     Accordingly, the Final Rule violates the Take Care Clause because it dispenses with certain immigration statutes.

**C. The Final Rule is Arbitrary and Capricious Agency Action.**

88.     The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

89.     The Final Rule does not represent reasoned decisionmaking.

90.     The Final Rule repeatedly treats illegal aliens being participants in the U.S. workforce as a positive. *See, e.g.*, AR2022_100207, 87 Fed. Reg. 53,164 ("DHS … agrees … that DACA has a positive impact on recipients' ability to pursue employment"); AR2022_100210, 87 Fed. Reg. 53,167 ("The net effect on employment of citizens is difficult to specify and might turn out to be positive. DHS believes that these investments that DACA recipients have made in their communities and in the country as a whole are substantial."); *id.* ("the hiring of DACA workers might contribute to expansion in business activity and potentially in increased hiring of American workers"); AR2022_100213, 87 Fed. Reg. 53,170 ("DHS agrees members of the DACA population carry substantial spending power, generate billions in tax revenue, and fill vital roles across a broad array of industries.").

91.     But Congress has enacted a "comprehensive framework for combating the employment of illegal aliens" and "forcefully made combating the employment of illegal aliens central to the policy of immigration law." *Arizona v. United States*, 567 U.S. 387, 404 (2012) (cleaned up). And "as Congress [has] explained, '[a]liens who enter or remain in the United States in violation of our law are effectively taking

immigration opportunities that might otherwise be extended to others.'" *Demore v. Kim*, 538 U.S. 510, 518 (2003) (quoting S.Rep. No. 104–249, p. 7 (1996)). Indeed, "a primary purpose in restricting immigration is to preserve jobs for American workers." *INS v. Natl. Ctr. for Immigrants' Rights*, 502 U.S. 183, 194 (1991).

92.    The Final Rule flips Congress's priorities, instead prioritizing the interests of illegal alien labor and the businesses that employ them:

> DHS agrees that employers, including businesses and educational institutions, have relied upon the existence of the DACA policy over the course of 10 years and that restricting DACA to currently active recipients or ending the DACA policy altogether would harm the reliance interests identified by these commenters, including their reliance interests in the labor and spending contributions of DACA recipients. For those employers that hire DACA recipients with highly specialized skills and higher levels of education, if the DACA policy were to end, some of these employers could face challenges and higher costs in finding replacement labor for these highly specialized workers, assuming all else remains constant.

AR2022_100218, 87 Fed. Reg. 53,175.

93.    In litigation over DACA, this Court has twice examined the laws prohibiting the employment of illegal aliens and specific statutory exceptions to that general feature of immigration law. *See Texas*, 328 F. Supp. 3d at 716–18; *Texas*, 549 F. Supp. 3d at 610–12. Where Congress has permitted employment authorization, it has done so for limited categories of illegal aliens who—unlike the DACA recipients— have been deemed non-removable for various reasons set forth by statute. *See Texas*, 549 F. Supp. 3d at 610 & nn.48–49 (citing statutory provisions for various categories, including human-trafficking victims and asylum applicants). The Final Rule never addresses the existence of these specific provisions and how the employment

authorization for DACA recipients can nonetheless be justified, despite this Court's previous rulings on this issue.

94.     This Court has also explained how the Affordable Care Act's minimum essential coverage requirement, 26 U.S.C. § 4980h, "exacerbates this problem." *Texas*, 549 F. Supp. 3d at 587. While "[a]n employer who offers coverage that does not provide minimum essential coverage will face a penalty if any of its employees purchases coverage on the insurance exchange and receives a premium subsidy," employers "may offer to DACA-recipient employees coverage that does not provide minimum essential coverage without risking a penalty." *Id*. The Final Rule never addresses how "[t]his facet of the ACA can make DACA recipients less costly to employ for some employers, thereby incentivizing employers to hire DACA recipients over similarly qualified legal Texas residents." *Id*.; *see also id.* at 612.

95.     The Final Rule disregards both Congress's determinations that employment of illegal aliens harms American workers and the negative incentives to hire American workers created by the Affordable Care Act. Instead, the Final Rule adopts a cost-benefit analysis that relies on potential downstream effects that could help some American workers despite harms to those directly competing with DACA recipients. *See* AR2022_100210, 87 Fed. Reg. 53,167.

96.     The articulated reasons for the Final Rule fail to consider Congress's framework, "undermining Congress's stated goal of closely guarding access to work authorization and preserving jobs for those lawfully in the country." *Texas v. United States (DAPA)*, 809 F.3d 134, 181 (5th Cir. 2015). "[B]ecause agency action must be

based on non-arbitrary, relevant factors, the agency's approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (cleaned up). The rationale for agency action reflected in the Final Rule contradicts those purposes.

97.    An agency rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Congress did not intend Defendants to consider purported positive effects of what it has forbidden by statute—the employment of illegal aliens. Instead, Congress allowed employment authorization for certain categories of illegal aliens while they were not removable, not to encourage the continued (or increased) presence of removable illegal aliens.

98.    Courts must also "set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *MPP*, 20 F.4th at 989 (quoting *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021)). Failing to consider the effects on American workers of employment authorization of DACA recipients, when combined with the Affordable Care Act's minimum essential coverage requirement, is arbitrary and capricious. And failing to consider the legality of such employment authorization in light of the limited nature of Congress's provisions for such authorizations for different categories of aliens suffers from the same flaw.

99.    The challenged action here fails the test of rational decisionmaking.

### D. Plaintiffs Have Standing to Challenge the Final Rule for the Same Reasons They Had Standing to Challenge the DACA Memorandum.

100.   Plaintiffs have satisfied their burden of proving standing to challenge the Final Rule because they have suffered, and will continue to suffer, concrete injuries that are traceable to the Final Rule, and relief against the Final Rule will redress those injuries. *See DACA*, 50 F.4th at 517–20. Plaintiffs therefore have a "personal stake" in the outcome of this litigation. *See id.* at 513 (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021)).

101.   Indeed, both this Court and the Fifth Circuit have already concluded that Plaintiffs had standing to challenge the Executive's unilateral actions conferring class-based deferred action to grant lawful presence and work authorizations. And because the Final Rule encompasses such unilateral action by the Executive and adopts the same unlawful provisions of DACA, Plaintiffs have established standing in this case for the same reasons they had standing to challenge the DACA Memorandum.

### 1. Plaintiffs are entitled to special solicitude in the standing analysis.

102.   Because "States are not normal litigants for the purposes of invoking federal jurisdiction," they may be entitled to "special solicitude"—a doctrine that allows a state to establish standing "without meeting all the normal standards for redressability and immediacy." *Id.* at 514 (citing *Massachusetts v. EPA*, 549 U.S. 497, 517–18, 520 (2007)). Under this special solicitude standard, a state will establish standing "if there is some possibility that the requested relief will prompt the injury-

causing party to reconsider the decision that allegedly harmed the litigant." *Id.* (quoting *Massachusetts*, 549 U.S. at 518).

103.   Plaintiffs have satisfied the special solicitude standing because they have shown (1) that there is "a procedural right to challenge the action in question" and (2) that the challenged action "affect[ed] on of the State's quasi-sovereign interests." *Id.* (citing *DAPA*, 809 F.3d at 151–52).

104.   Plaintiffs in this case established a procedural right to challenge the Final Rule under the APA because they have suffered a legal wrong and been adversely affected or aggrieved by the promulgation of the Final Rule. *See* 5 U.S.C. § 702.

105.   As in *DACA*, Plaintiffs here use their procedural right to "challenge[] DHS's affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens." *See DACA*, 50 F.4th at 514. Further like *DACA*, Plaintiffs' procedural right under the APA in this case does not evaporate because of their status as States; instead, "Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall well within that definition." *Id.* (quoting *DAPA*, 809 F.3d at 152). Plaintiffs thus satisfy the first element of special solicitude.

106.   Plaintiffs also satisfy the second element of special solicitude because the Final Rule affects the quasi-sovereign interests of Plaintiffs.

107.   The Supreme Court and the Fifth Circuit have defined a "quasi-sovereign interest" as "a judicial construct that does not lend itself to a simple or exact

28

definition." *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)). While "sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party" are not considered quasi-sovereign interests, there are several interests that do satisfy that definition, including the "set of interests that the State has in the well-being of its populace"; the State's interest in "the health and well-being—both physical and economic—of its residents"; and the State's interest in "not being discriminatorily denied its rightful status in the federal system." *Id.* (quoting *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 602, 607).

108.   "'One helpful indication' of a quasi-sovereign interest is 'whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.'" *Id.* at 515 (quoting *Massachusetts*, 549 U.S. at 519). Indeed, "[a]n agency action may affect a quasi-sovereign interest if it is alleged to damage certain "sovereign prerogatives [that] are now lodged in the Federal Government." *Id.* (quoting *Massachusetts*, 549 U.S. at 519).

109.   For example, in *DACA*, the Fifth Circuit concluded that the State's interest in classifying aliens was a quasi-sovereign interest. *Id*. Specifically, the Fifth Circuit reasoned that the State's "interest in classifying aliens was analogous to the interest in regulating emissions that the Supreme Court deemed a quasi-sovereign interest in *Massachusetts v. EPA*." *Id.* And because the States "surrendered some of their sovereign prerogatives over immigration" upon entering the union, including their power to "establish their own classifications of aliens," they relied on the federal

government to protect their interests and were analogous to the plaintiffs in *Massachusetts*. *Id.*

110.   Therefore, the Fifth Circuit determined that "DACA implicate[d] Texas's quasi-sovereign interest in classifying aliens." *Id.* The Fifth Circuit also recognized that "a State's inability to legislate around DACA can create a quasi-sovereign interest," meaning that "a quasi-sovereign interest could arise based on 'federal preemption of state law.'" *Id.*

111.   Such quasi-sovereign interests are present in this case. If Plaintiffs sought to change their benefits programs to prevent DACA recipients from being eligible under the Final Rule, they would be threatened with federal preemption.

112.   Indeed, the Fifth Circuit acknowledged these federal preemption concerns in *DACA*. In that case, the Fifth Circuit concluded that "DACA implicates preemption concerns" because it classifies aliens and their status, which is a power only the federal government can exercise. *See DACA*, 50 F.4th at 516; *see also Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 536 (5th Cir. 2013) (en banc); *Galvan v. Press*, 347 U.S. 522, 531 (1954). The Fifth Circuit reasoned that "[a]n attempt by Texas to establish an alternative classification system or work authorizations would be preempted, despite the State's likely interest in doing so." *DACA*, 50 F.4th at 516 (citing *Arizona v. United States*, 567 U.S. 387, 409 (2012)).

113.   But these federal preemption concerns are not limited to the DACA Memorandum. Instead, these preemption concerns apply equally to the Final Rule because it adopts the same provisions held unlawful under DACA. Therefore,

Plaintiffs' quasi-sovereign interests are threatened by such preemption, representing another injury imposed by the Final Rule's adoption and implementation of DACA.

114.   Thus, Plaintiffs have satisfied both elements of the test for special solicitude in the standing analysis.

### 2.   Plaintiffs have *parens patriae* standing.

115.   Plaintiffs also have *parens patriae* standing to protect the quasi-sovereign interest in "the health and well-being" of their citizens. *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607.

116.   "*Parens patriae* permits a state to bring suit to protect the interests of its citizens, even if it cannot demonstrate a direct injury to its separate interests as a sovereign entity." *Texas*, 549 F. Supp. 3d at 590–91 (citing *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 601).

117.   In this case, Plaintiffs seek to protect their citizens' "economic and commercial interests" from labor-market distortion caused by the Final Rule. *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 609. Plaintiffs seek such protection because, if the Final Rule were to stay in effect, it would create a distorted labor market and thereby injure the economic well-being of Plaintiffs' lawful workers by making it harder for them to obtain jobs.

118.   For instance, the Final Rule would enable DACA recipients to compete with lawful workers for jobs in Texas by granting lawful presence status and requiring that USCIS accept applications for work authorizations. *See Texas*, 549 F. Supp. 3d at 592. The Final Rule would further harm the economic well-being of

31

Texans because the Affordable Care Act would financially incentivize Texas employers to hire a DACA recipient over a legal Texas resident. *See id.* But if this Court enjoins the Final Rule, then legal residents of Texas would not have to compete with as many eligible workers. *See id.*

119.   Because the relevant provisions of the Final Rule operate in the same way as the DACA Memorandum, Plaintiffs have *parens patriae* standing for the same reasons. Plaintiffs seek the enforcement of federal law "to assure [their] residents that they will have the full benefit of federal laws designed to address th[e] problem" of illegal immigration and labor-market distortion. *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 609–10.

### 3. Plaintiffs have standing based on direct injury.

120.   Like the DACA Memorandum, the Final Rule imposes significant costs on Plaintiffs. As the Supreme Court has explained, States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012).

121.   Under the standing analysis, only one plaintiff needs to establish standing for an Article III case or controversy to exist. *See DACA*, 50 F.4th at 514 (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)). And once a concrete injury is shown, the magnitude of that injury is irrelevant to the standing inquiry. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 525–26 (2007).

122.   Further, Plaintiffs have incurred and will incur considerable financial injuries on education, healthcare, and law-enforcement costs that they would not otherwise incur but for the Final Rule. *See Texas*, 86 F. Supp. 3d at 628–30. These costs arise because the Final Rule incentivizes aliens—who would otherwise be unlawfully present and unauthorized to work without DACA—to remain in the country, thereby causing Plaintiffs to incur those additional financial costs. *Id.* at 634–35.

123.   Moreover, States are required by federal law to incur some of these costs. For example, the Supreme Court has held that States are constitutionally obligated to provide free education to children of unlawfully present aliens. *Plyler v. Doe,* 457 U.S. 202 (1982). Similarly, both Medicare and Medicaid require the provision of emergency services as a condition of participation, regardless of lawful-presence status. *See* 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255.

124.   And on top of these federally required costs, other expenditures are required by preexisting state law. Texas law, for instance, requires local governments to provide healthcare for the indigent. *See* Tex. Health & Safety Code §§ 61.001 *et seq.* Texas law also requires nonprofit hospitals to provide unreimbursed care for the indigent as a condition of maintaining their nonprofit status. *See id.* § 311.043.

125.   As a result of these financial injuries inflicted by the Final Rule and required by law, "DACA recipients overall impose a cost of more than $250,000,000 on Texas per year and another $533,000,000 annually in costs to local Texas communities." *See DACA*, 50 F.4th at 518.

126.   "The Texas Health and Human Services Commission estimated that the state's public hospital district facilities incurred approximately $596.8 million in uncompensated care for undocumented immigrants in fiscal year 2006 and $716.8 million in fiscal year 2008." *Id.* at 517.

127.   It is further estimated that the cost of emergency Medicaid services to illegal aliens in Texas amounted to $90 million in 2013 and $73 million in 2015. *See DACA*, 50 F.4th at 517.

128.   "Federal law requires the State to provide emergency Medicaid to noncitizens and public education to all children, regardless of their immigration status. Texas presented evidence that it spends millions of dollars providing these services to unauthorized aliens each year." *Id.* at 517 (footnote omitted).

129.   "An expert for defendants estimated that DACA recipients overall impose a cost of more than $250,000,000 on Texas per year and another $533,000,000 annually in costs to local Texas communities." *DACA*, 50 F.4th at 518.

130.   "The record does not indicate precisely what portion of all costs for illegal aliens is spent on DACA recipients, but no one disputes that some are." *Id.* at 517–18.

131.   And while certain financial injuries may increase at the termination of the Final Rule or be "offset" at its continuation, courts do not examine such information in an Article III standing analysis because courts do not engage in such "accounting exercise[s]." *DACA*, 50 F.4th at 518. Rather, "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has

enjoyed from the relationship with the defendant." *Id.* (quoting *DAPA*, 809 F.3d at 155–56)).

132.   Thus, any hypothetical financial gains to Plaintiffs caused by the Final Rule are irrelevant for determining whether they have standing. Accordingly, these injuries and costs show that Plaintiffs have also established injury they suffer from the Final Rule. *DACA*, 50 F.4th at 517–20.

133.   "Texas has satisfied the second requirement for standing by showing that its costs are 'fairly traceable' to DACA" because the rescission of DACA would "cause some recipients to leave, thereby reducing the financial burdens on the State." *Id.* at 519.

134.   Plaintiffs also satisfy the third element of standing by showing that rescinding DACA will redress their injury. "Normally, to satisfy redressability, a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *DACA*, 50 F.4th at 519–20 (cleaned up). "With special solicitude, however, … [t]he standard is met if there is some possibility that the requested relief will reduce the harm." *Id.* at 520 (cleaned up).

135.   Because "[t]hose presently subject to DACA would be removable if the DACA program were ended, providing incentives for some if not many to leave the United States, including Texas … and their departure would reduce the State's Medicaid, social services and education costs for those individuals and their families who depart with them." *DACA*, 50 F.4th at 520.

**E. Plaintiffs' Claims are Reviewable Because Their Interests Are Within the Zone of Interests Protected by Immigration Statutes and the APA.**

136.    Plaintiffs have a cause of action under the APA because their interests are at least arguably within the zone of interests protected by immigration statutes and the APA. *See DACA*, 50 F.4th at 520–21 (determining that the States' claims against the DACA Memorandum fall within the zone of interests).

137.    The zone-of-interest test is satisfied if the claims are "arguably within the zone of interests to be protected or regulated by the statute." *Id.* at 521 (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)). The only time that review is foreclosed under this test is "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (internal quotations omitted) (quoting *Patchak*, 567 U.S. at 225).

138.    In this case, the interests or purposes of the INA and the immigration statutes are to provide "a comprehensive federal statutory scheme for regulation of immigration and naturalization" and to "set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Id.* (internal quotations omitted) (quoting *Chamber of Com. v. Whiting*, 563 U.S. 582, 587 (2011)).

139.    But the Final Rule violates this intricate statutory scheme established by Congress. Thus, Plaintiffs have an interest in seeing the INA and other statutes enforced and upheld. *See id.* (first citing *Arizona*, 567 U.S. at 397, and then citing

*DAPA*, 809 F.3d at 163). Indeed, this entire lawsuit is emphatically about the rule of law. And in line with the rule of law, this lawsuit seeks to have the Executive Branch fulfil its duty to take care that the law is faithfully executed—substantive immigration law and procedural administrative law alike.

140.   Accordingly, Plaintiffs satisfy the lenient zone-of-interest test by establishing that their interests in upholding immigration statutes and the APA are arguably within the zone of interests protected by those statutes. *See DACA*, 50 F.4th at 520–21.

**F. The Final Rule Constitutes a Reviewable Agency Action.**

141.   The Final Rule constitutes reviewable agency action because (1) no statute precludes its review, and (2) it is not committed to agency discretion by law. *See* 5 U.S.C. § 701(a).

142.   Generally, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. There is a "strong presumption favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015) (quotation marks omitted). But before a state can ever obtain review, it must first show the following: (1) no statute precludes review, and (2) the agency action is not committed to agency discretion by law. *DAPA*, 809 F.3d at 163; 5 U.S.C. § 701(a).

143.   In this case, the Final Rule satisfies the first element because the Defendants cannot identify any "clear and convincing evidence of legislative intention

to preclude review" of the Final Rule. *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986).

144. The Fifth Circuit has held that the DACA Memorandum was a substantive rule that was required to undergo notice-and-comment rulemaking. *DACA*, 20 F.4th at 522–24. If an agency takes an action that ordinarily requires notice and comment, that action "by definition" constitutes "final agency action." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019); *see also Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006) (explaining that the "final agency action" requirement is satisfied where the agency has issued a "de facto rule or binding norm that could not properly be promulgated absent ... notice-and-comment rulemaking," since the "two inquiries are alternative ways of viewing" the same "question").

145. The Final Rule—which adopts the same substantive provisions of the DACA Memorandum—is therefore final agency action.

## G. Relief Against the Final Rule is not Barred by 8 U.S.C. § 1252(f)(1).

146. The Fifth Circuit held that judicial relief against the DACA Memorandum was not barred by 8 U.S.C. § 1252(f)(1). *DACA*, 50 F.4th at 528.

147. Section 1252(f)(1) provides the following:

(f) Limit on injunctive relief
(1) In general

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221-32], other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).

148.    The Fifth Circuit explained that this provision "does not apply to vacatur." *DACA*, 50 F.4th at 528. Indeed, "[b]y its plain terms, and even by its title, [section 1252(f)(1)] is nothing more or less than a limit on injunctive relief." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999).

149.    Section 1252(f)(1) is also no bar to declaratory relief. *See Alli v. Decker*, 650 F.3d 1007, 1013 (3d Cir. 2011). This construction is consistent with the Supreme Court's most recent pronouncement on the provision. *See Biden v. Texas*, 142 S. Ct. 2528, 2540 (2022) (describing how, in *Nielsen v. Preap*, 139 S. Ct. 954 (2019), the Court "proceeded to reach the merits of the suit, notwithstanding the District Court's apparent violation of section 1252(f)(1), by reasoning that '[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' request for declaratory relief.'") (alterations in original) (quoting *Preap*, 139 S. Ct. at 962).

150.    Finally, the Fifth Circuit also held that Section 1252(f)(1) did not bar even injunctive relief against implementation of the DACA Memorandum, because that section

> prohibits injunctions only as to §§ 1221–1232. Nothing in §§ 1221–1232 authorizes DHS to broaden the categories of aliens who are entitled to lawful presence in the United States, and the district court correctly so held. The district court's judgment does prohibit the grant of DACA status to those who were not presently DACA recipients at the time of the district court's judgment. However, that judgment does not require the removal of any DACA applicant.

*DACA*, 50 F.4th at 529.

151.    The Final Rule conflicts with several provisions of the INA—but they are not within §§ 1221–1232 and thus fall outside the scope of Section 1252(f)(1). *E.g.*, 8 U.S.C. §§ 1182(a)(9)(B)(i) (unlawful presence); (d)(5)(A) (parole); 1324a (employment).

152.    Section 1252(f)(1) does not preclude any of the relief against the Final Rule sought in this action.

## H. The Court Should Vacate the Final Rule, Declare it Unlawful, and Enjoin the Defendants Nationwide from Issuing or Renewing DACA Permits.

153.    For the reasons explained above, the Court should set aside the Final Rule and enter a declaratory judgment that it is unlawful.

154.    This Court should also enjoin Defendants from renewing or issuing any new DACA permits that confer lawful presence or work authorization in the future.

155.    The injunction should also be nationwide. Both the Constitution and Congress have directed that the Nation needs a uniform, nationwide immigration policy. *See DAPA*, 809 F.3d at 187–88. Specifically, "[i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *DACA*, 50 F.4th at 531. In contrast, a more limited remedy would "detract[] from the integrated scheme of regulation[] created by Congress." *Id.* (internal quotations omitted). Thus, a nationwide injunction is warranted.

156.    Finally, the Court should grant any and all other relief to which Plaintiffs may be entitled.

## CLAIMS

### FIRST CAUSE OF ACTION
### Violation of the APA's Substantive Requirements

157.    The allegations in all other paragraphs in this Supplemental Complaint and the First Amended Complaint are incorporated herein.

158.    Defendants have acted contrary to law in violation of 5 U.S.C. § 706 by promulgating the Final Rule.

### SECOND CAUSE OF ACTION
### Violation of the Take Care Clause

159.    The allegations in all other paragraphs in this Supplemental Complaint and the First Amended Complaint are incorporated herein.

160.    Defendants' actions here in creating and implementing the Final Rule violate the President's constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

### THIRD CAUSE OF ACTION
### Arbitrary and Capricious Agency Action

161.    The allegations in all other paragraphs in this Supplemental Complaint and the First Amended Complaint are incorporated herein.

162.    The APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

163.    Federal administrative agencies are required to engage in "reasoned decision-making." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result

must be logical and rational." *Id.* Put differently, "agency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

164. Defendants' explanations for their actions here in creating and implementing the Final Rule violate this requirement of reasoned decisionmaking.

## DEMAND FOR RELIEF

Plaintiffs respectfully request that the Court issue the following relief regarding the Final Rule:

A.     An order permanently enjoining Defendants from issuing or renewing any DACA permits in the future under the Final Rule;

B.     An order vacating the Final Rule as substantively unlawful and unconstitutional, and arbitrary and capricious under the APA;

C.     A declaratory judgment that the Final Rule is substantively unlawful under the APA;

D.     A declaratory judgment that the Final Rule violates the Take Care Clause;

E.     A declaratory judgment that the Final Rule is arbitrary and capricious;

F.     Any and all other relief to which Plaintiffs may be entitled.

Date: December 16, 2022                    Respectfully submitted.

STEVE MARSHALL                             KEN PAXTON
Attorney General of Alabama                Attorney General of Texas

LESLIE RUTLEDGE                            BRENT WEBSTER
Attorney General of Arkansas               First Assistant Attorney General

DEREK SCHMIDT                              WILLIAM T. THOMPSON
Attorney General of Kansas                 Acting Chief, Special Litigation Unit
                                           *Attorney-in-Charge*
JEFF LANDRY                                Texas Bar No. 24088531
Attorney General of Louisiana              Southern District of Texas Bar No. 3053077

LYNN FITCH                                 */s/ Ryan D. Walters*
Attorney General of Mississippi            RYAN D. WALTERS
                                           Special Counsel
DOUGLAS J. PETERSON                        Texas Bar No. 24105085
Attorney General of Nebraska               Southern District of Texas Bar No. 3369185

ALAN WILSON                                Special Litigation Unit
Attorney General of South Carolina         P.O. Box 12548 (MC-009)
                                           Austin, Texas 78711-2548
PATRICK MORRISEY                           Phone: (512) 936-2714
Attorney General of West Virginia          Fax: (512) 457-4410
                                           will.thompson@oag.texas.gov
                                           ryan.walters@oag.texas.gov

                                           **Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF) on December 16, 2022.

                                           */s/ Ryan D. Walters*
                                           RYAN D. WALTERS