**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, ET AL.; | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 1:18-cv-00068 |
| | § | |
| UNITED STATES OF AMERICA, ET AL.; | § | |
| | § | |
| *Defendants,* | § | |
| | § | |
| *and* | § | |
| | § | |
| KARLA PEREZ, ET AL.; | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| *Defendants-Intervenors.* | § | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................ii

TABLE OF AUTHORITIES ............................................................................................iv

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING................................1

INTRODUCTION .............................................................................................................2

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ................................5

PROCEDURAL HISTORY .................................................................................................6

SUMMARY OF ARGUMENT ...........................................................................................9

FACTUAL BACKGROUND ...............................................................................................9

ARGUMENT..................................................................................................................10

I.    The Final Rule is unlawful because it violates Congress's statutory scheme. ..............10

    A.   DACA does not pass *Chevron*'s first step because Congress's immigration scheme unambiguously forecloses DACA..................................................12

    B.   Even if the Final Rule did pass *Chevron*'s first step, it would not pass the second. ...............................................................................................20

II.   The Final Rule violates the Take Care Clause. ..................................................20

III.  The Final Rule is arbitrary and capricious...........................................................21

IV.   Plaintiffs have standing to challenge the Final Rule for the same reasons they had standing to challenge the DACA Memorandum..............................................25

    A.   Plaintiffs are entitled to special solicitude in the standing analysis........................27

    B.   Plaintiffs have *parens patriae* standing...........................................................29

    C.   Plaintiffs have standing based on direct injury..........................................32

    D.   Plaintiffs' injuries are caused by the Final Rule and redressable by this Court. ...................................................................................................34

V.    Plaintiffs' claims are viable under the APA. .......................................................35

    A.   Plaintiffs have a cause of action under the APA because their claims are within the zone of interests protected by the INA...................................35

    B.   The Final Rule constitutes a reviewable agency action. ...........................36

VI.   The Court should vacate the Final Rule, declare it unlawful, and enjoin the Defendants from issuing or renewing DACA permits. ...................................36

    A.   The Final Rule should be vacated. .......................................................36

    B.   The implementation of the Final Rule should be permanently enjoined. ............37

    C.   The Court should issue a declaratory judgment that the Final Rule is unlawful. ...........................................................................................39

    D.   Relief against the Final Rule is not barred by 8 U.S.C. § 1252(f)(1)......................40

CONCLUSION.................................................................................................................41

CERTIFICATE OF SERVICE .......................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
  458 U.S. 592 (1982) ........................................................................................... 29, 30, 32

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
  522 U.S. 359 (1998) ................................................................................................... 25

*Alli v. Decker,*
  650 F.3d 1007 (3d Cir. 2011) ..................................................................................... 40

*Arizona v. United States,*
  567 U.S. 387 (2012) .............................................................................................. *passim*

*Arlington v. FCC,*
  569 U.S. 290 (2013) (Roberts, C.J., dissenting) ................................................... 12, 13

*Bd. of Trustees of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.,*
  563 U.S. 776 (2011) ................................................................................................... 16

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................................................................... 36

*Biden v. Texas,*
  142 S. Ct. 2528 (2022) ............................................................................................... 40

*Blackie's House of Beef, Inc. v. Castillo,*
  659 F.2d 1211 (D.C. Cir. 1981) ................................................................................. 38

*Burgess v. FDIC,*
  871 F.3d 297 (5th Cir. 2017) ..................................................................................... 38

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ...................................................................................... 3, 7, 12, 13

*City of Chicago v. Fulton,*
  141 S. Ct. 585 (2021) ................................................................................................. 16

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.,*
  452 F.3d 798 (D.C. Cir. 2006) ................................................................................... 36

*Demore v. Kim,*
  538 U.S. 510 (2003) ................................................................................................... 22

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ................................................................................2, 6

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) .........................................................................................38

*Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*,
    47 F.4th 408 (5th Cir. 2022) ...........................................................................26

*FCC v. Prometheus Radio Project*,
    141 S. Ct. 1150 (2021) ....................................................................................21

*Fisher v. Univ. of Texas at Austin*,
    758 F.3d 633 (5th Cir. 2014), *aff'd*, 579 U.S. 365 (2016) ................................26

*Franciscan All., Inc. v. Azar*,
    414 F. Supp. 3d 928 (N.D. Tex. 2019) (O'Connor, J.) .....................................36

*Free v. Abbott Labs., Inc.*,
    164 F.3d 270 (5th Cir. 1999) ..........................................................................26

*INS v. Natl. Ctr. for Immigrants' Rights*,
    502 U.S. 183 (1991) .........................................................................................22

*Jones v. Lumpkin*,
    No. 4:21-3638, 2022 WL 2954335 (S.D. Tex. July 22, 2022) ...........................1

*Judulang v. Holder*,
    565 U.S. 42 (2011) ...........................................................................................24

*Kendall v. United States ex rel. Stokes*,
    37 U.S. 524 (1838) ...........................................................................................21

*King v. Dogan*,
    31 F.3d 344 (5th Cir. 1994) (per curiam) ..........................................................1

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) .................................................................................. 29, 32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................... 22, 24

*Nielsen v. Preap*,
    139 S. Ct. 954 (2019) ......................................................................................40

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................. 38, 39

*Pratt v. Harris Cty.*,
　822 F.3d 174 (5th Cir. 2016).................................................................................5

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
　525 U.S. 471 (1999).............................................................................................40

*Sw. Elec. Power Co. v. EPA*,
　920 F.3d 999 (5th Cir. 2019)...............................................................................22

*Texas v. Biden*,
　— F. Supp. 3d —, No. 2:21-cv-067-Z, 2022 WL 17718634 (N.D. Tex. Dec. 15,
　2022) (Kacsmaryk, J.)..................................................................................27, 38

*Texas v. Biden (MPP)*,
　20 F.4th 928 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022) ...............................*passim*

*Texas v. EEOC*,
　933 F.3d 433 (5th Cir. 2019).................................................................................36

*Texas v. United States*,
　328 F. Supp.3d 662 (S.D. Tex. 2018) ................................................6, 14, 23, 29

*Texas v. United States*,
　40 F.4th 205 (5th Cir. 2022) (per curiam)....................................................24, 37

*Texas v. United States*,
　549 F. Supp. 3d 572 (S.D. Tex. 2021) ..........................................................*passim*

*Texas v. United States (DACA)*,
　50 F.4th 498 (5th Cir. 2022) ..........................................................................*passim*

*Texas v. United States (DAPA)*,
　809 F.3d 134 (5th Cir. 2015)..........................................................................*passim*

*Topalian v. Ehrman*,
　954 F.2d 1125 (5th Cir. 1992) ...............................................................................6

*United States v. Castillo*,
　179 F.3d 321 (5th Cir. 1999)................................................................................26

*United States v. Lee*,
　358 F.3d 315 (5th Cir. 2004)................................................................................26

*United Steel v. Mine Safety & Health Admin.*,
　925 F.3d 1279 (D.C. Cir. 2019)...........................................................................37

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
　985 F.3d 472 (5th Cir. 2021)................................................................................21

*Wages & White Lion Invs., LLC v. U.S. Food & Drug Admin.*,
   16 F.4th 1130 (5th Cir. 2021) ...............................................................................39

**Statutes**

5 U.S.C. § 701(a) ........................................................................................................36

5 U.S.C. § 701(a)(2) ...................................................................................................36

5 U.S.C. § 702 ............................................................................................................28

5 U.S.C. § 703 ............................................................................................................40

5 U.S.C. § 706(2) ..................................................................................................*passim*

5 U.S.C. § 706(2)(A) ..................................................................................................21

8 U.S.C. §§ 1101 *et seq.* ...........................................................................................14

8 U.S.C. § 1182(a) ......................................................................................................13

8 U.S.C. § 1182(a)(9)(B)(i) ...................................................................................12, 41

8 U.S.C. § 1182(d)(5)(A) ...........................................................................................10

8 U.S.C. §§ 1221-32 ..................................................................................................40

8 U.S.C. § 1227(a)(1)(C) ...........................................................................................13

8 U.S.C. § 1229a(e)(2) ..........................................................................................13, 14

8 U.S.C. § 1252(f)(1) .............................................................................................40, 41

8 U.S.C. § 1255(a), (a)(2) ..........................................................................................19

8 U.S.C. § 1430 ..........................................................................................................18

8 U.S.C. § 1611(a) ......................................................................................................31

8 U.S.C. § 1611(b)(2) .................................................................................................11

26 U.S.C. § 32(c)(1)(A), (c)(1)(E), (m) ....................................................................11

26 U.S.C. § 4980h ..................................................................................................23, 31

26 U.S.C. § 4980H(b) ................................................................................................31

Tex. Admin. Code § 21.24(d)(5) ...............................................................................11

Tex. Educ. Code § 56.075(a)(1) .................................................................................11

Tex. Health & Safety Code §§ 61.001 *et seq.*...................................................................32

**Other Authorities**

8 C.F.R part 103 ...............................................................................................................8

8 C.F.R. § 236.21 ............................................................................................................8

8 C.F.R. § 236.22 ............................................................................................................8

8 C.F.R. § 236.23 ............................................................................................................8

86 Fed. Reg. 53,736, 53,773 ...........................................................................................7

86 Fed. Reg. 53,762 .......................................................................................................19

86 Fed. Reg. 53756-53762 .............................................................................................19

87 Fed. Reg. 53,152 .........................................................................................................2

87 Fed. Reg. 53,156 .......................................................................................................10

87 Fed. Reg. 53,164 .......................................................................................................22

87 Fed. Reg. 53,167 .................................................................................................22, 24

87 Fed. Reg. 53,170 .......................................................................................................22

87 Fed. Reg. 53,175 .......................................................................................................23

87 Fed. Reg. 53,194 .......................................................................................................19

87 Fed. Reg. 53,197 .........................................................................................................9

87 Fed. Reg. 53,297-98 ....................................................................................................8

87 Fed. Reg. 53,298 .........................................................................................................8

87 Fed. Reg. 53,299 .........................................................................................................9

Fed. R. Civ. P. 15(d) ........................................................................................................1

Fed. R. Civ. P. 56(a) ........................................................................................................5

Fed. R. Civ. P. 57 ...........................................................................................................39

**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING**

Plaintiffs the States of Texas, Alabama, Arkansas, Louisiana, Nebraska, South Carolina, West Virginia, Kansas, and Mississippi move for summary judgment on the claims in their Supplemental Complaint. ECF No. 623.

Generally, "[a]n amended complaint supersedes the original complaint and renders it of no legal effect." *King v. Dogan,* 31 F.3d 344, 346 (5th Cir. 1994) (per curiam). The only exception is when "the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading." *Id.* But a supplemental pleading is appropriate to challenge "any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Even if a party files a motion to amend, courts will construe that motion as a motion to supplement when it concerns events that occurred after the lawsuit was filed. *See Jones v. Lumpkin,* No. 4:21-3638, 2022 WL 2954335, at *4 (S.D. Tex. July 22, 2022) (citing *Haggard v. Bank of Ozarks Inc.*, 668 F.3d 196, 202 (5th Cir. 2012)).

In this case, Plaintiffs filed the Supplemental Complaint because the challenged agency action constitutes a subsequent "transaction, occurrence, or event that happened after the date" of Plaintiffs' First Amended Complaint, ECF No. 104. *See* Fed. R. Civ. P. 15(d). A supplemental complaint, unlike an amended one, does not supersede the earlier operative pleading. As Plaintiffs have already obtained a summary judgment in their favor, affirmed by the U.S. Court of Appeals for the Fifth Circuit, judicial resolution of the claims in the Supplemental Complaint will avoid any undermining of this Court's previous judgment and the Fifth Circuit's affirmance.

Because the Supplemental Complaint is ancillary to the First Amended Complaint, and the nearly identical substance of the Final Rule with the DACA Memorandum, Plaintiffs incorporate their briefing on the motion for summary judgment (ECF Nos. 486, 529) for the claims against the DACA Memorandum in their First Amended Complaint, this Court's Memorandum and Order granting

summary judgment on those claims (ECF No. 575), and all other evidence already in the record before the Court.

## INTRODUCTION

This lawsuit is about the scope of executive power, not the wisdom of any particular immigration policy. No President can unilaterally override Congress's duly enacted laws simply because he prefers different policy choices

On August 30, 2022, the Biden Administration promulgated a final rule that adopted, with immaterial changes, the Deferred Action for Childhood Arrivals ("DACA") policies from the 2012 memorandum issued by then-Secretary of the Department of Homeland Security Janet Napolitano (the "DACA Memorandum"). *See* AR2022_100195, Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53,152 (Aug. 30, 2022) (to be codified at 8 C.F.R. pts 106, 236, and 274a). The Final Rule went into effect on October 31, 2022. *Id.* Although the Final Rule, being issued following notice and comment, remedies the procedural defects of the DACA Memorandum, it suffers from the same substantive flaws, which have already found unlawful by this Court and the Fifth Circuit.

At DACA's inception, the program was justified as an exercise of prosecutorial discretion. Ex. 1 (App. 2). In other words, the Obama Administration claimed that it was simply forbearing from enforcing the Nation's immigration laws against individuals who satisfied the criteria stated in the DACA Memorandum. The Administration attempted to assure the public that the DACA Memorandum "confer[ed] no substantive right, immigration status or pathway to citizenship." *Id.*

If there were ever any doubt that DACA's central premise was false, it evaporated when the U.S. Supreme Court held that "the DACA Memorandum *does not* announce a passive non-enforcement policy." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020) (emphasis added). Rather, "it created a program for conferring affirmative immigration relief." *Id.* That confirmed this Court's prior determination that DACA "institute[d] a program that gives lawful

2

presence, work authorization, and multiple other benefits to 1.5 million people." ECF No. 319 at 71; *see also Texas v. United States*, 549 F. Supp. 3d 572, 578 n.10 (S.D. Tex. 2021) (noting same estimates in granting summary judgment against DACA Memorandum post-*Regents*).

Further, discovery in this case uncovered that approximately 14,000 otherwise ineligible, unlawfully present aliens have used DACA to adjust their immigration status, *see* Ex. 2 at 2 (App. 7), giving them a clear pathway to citizenship contrary to law (and the Obama Administration's assurances). The Final Rule continues this policy.

The Fifth Circuit has already upheld this Court's vacatur and permanent injunction against implementation of the DACA Memorandum as violating substantive requirements of the Administrative Procedure Act ("APA"). *Texas v. United States (DACA)*, 50 F.4th 498, 508 (5th Cir. 2022).

The Fifth Circuit assumed that *Chevron* deference applied and held that the DACA Memorandum failed the first step of that analysis because it contravened Congress's rigorous and comprehensive statutory schemes for classification, removal, allocation of lawful presence, and allocation of work authorization. *DACA*, 50 F.4th at 526 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). The Fifth Circuit also held that the DACA Memorandum failed *Chevron*'s second step because it was not an "exercise of [DHS's] inherent prosecutorial discretion," was "an unreasonable interpretation of the [Immigration and Nationality Act, or 'INA']," and had no "clear congressional authorization." *Id.* at 526– 27.

Before the Fifth Circuit issued its opinion but after it heard oral argument, DHS promulgated the Final Rule and then asked that court to review the substantive challenges to it on the ground that none of the changes in the Final Rule were material. *DACA*, 50 F.4th at 511–12. The Fifth Circuit declined, however, to address the validity of the Final Rule on the ground that it did not have an adequate administrative record and could not definitively determine whether there were "material

differences" existed between the Final Rule and the DACA Memorandum. *See id.* at 512. As a result, the Fifth Circuit remanded to this Court for further proceedings regarding the Final Rule. *Id.*

The substance of the Final Rule is effectively that of the already-held-unlawful DACA Memorandum. Indeed, in a press release accompanying the Final Rule, DHS stated that "[t]he rule continues the DACA policy as announced in the 2012 [DACA] Memorandum," and explained that the Final Rule "defer[s] [DACA recipients'] removal" and:

- Maintains the existing threshold criteria for DACA;

- Retains the existing process for DACA requestors to seek work authorization; and

- Affirms the longstanding policy that DACA is not a form of lawful status but that DACA recipients, like other deferred action recipients, are considered 'lawfully present' for certain purposes.

Ex. 37 at 1–2 (App. 683–84).

Defendants have acknowledged that "the DACA regulations promulgated by the final rule are materially indistinguishable" from the DACA Memorandum, that "the final rule and 2012 memorandum are indistinguishable for purposes of plaintiffs' substantive lawfulness claims," and that "the parties' substantive arguments (albeit not plaintiffs' notice-and-comment arguments) are equally applicable to both" the Final Rule and the DACA Memorandum. Supp. Br. for Fed. Appellants 2–3, *DACA*, No. 21-40680 (5th Cir.), 2022 WL 4080252, *2–3.

Defendants further admitted to the Fifth Circuit that the Final Rule did not "materially change" the program implemented by the DACA Memorandum and that "the [Final] [R]ule preserves the basic features of DACA that plaintiffs contend—*and the district court has already held*—exceed DHS's statutory authority." Appellants' Rule 28(j) Letter 1–2, *DACA*, No. 21-40680 (5th Cir.), Doc. 00516446276 (filed Aug. 24, 2022) (emphasis added).

Indeed, Defendants conceded that because this Court had already vacated the DACA Memorandum on substantive grounds, "the outcome in the district court [regarding the validity of the

final rule] *is certain*" due to the lack of any material differences between the two agency actions. Supp. Br. for Fed. Appellants 11, *DACA*, No. 21-40680 (5th Cir.), 2022 WL 4080252, *11 (alterations in original) (emphasis added).

Although this Court's current injunction applies to the Final Rule, *see* ECF No. 603, that only prevents Defendants from granting DACA status to new applicants—DHS may approve renewal applications for those renewing their status obtained before the July 16, 2021, permanent injunction. *Id.*

Plaintiffs are entitled to full relief against the implementation of the unlawful Final Rule—it should be vacated, declared unlawful and unconstitutional, and its implementation permanently and universally enjoined. Defendants should be prevented from approving (1) any new DACA applications, and (2) after two years from the date of judgment, any DACA renewal applications. This prudent transition period would recognize the interests of current DACA recipients in an orderly winding down of the program as well as avoid unnecessary disruption while appellate review takes place. This Court has previously taken into consideration these concerns in fashioning equitable relief. ECF No. 576 at 3–4 (Permanent Injunction).

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

The issue is whether—particularly in light of the Fifth Circuit's *DACA* ruling—the Court should grant Plaintiffs summary judgment and (1) declare that the Final Rule is substantively unlawful and unconstitutional; (2) order that, under 5 U.S.C. § 706(2) of the APA, the Final Rule be set aside, *i.e.*, vacated; and (3) tailor permanent injunctive relief that allows for the orderly phasing out of the unlawful program.

Summary judgment is warranted where there is no genuine dispute as to any material fact and Plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Pratt v. Harris Cty.*, 822 F.3d 174, 180 (5th Cir. 2016) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "Such a showing

entitles the movant to summary judgment as a matter of law." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992) (citing Fed. R. Civ. P. 56(c)).

## PROCEDURAL HISTORY

On May 5, 2018, after years of litigation surrounding the DACA Memorandum, Plaintiffs sued Defendants to challenge their authority to promulgate and implement the program in the first place. *See* ECF No. 1, Original Complaint.

Plaintiffs requested a preliminary injunction that would bar the implementation of the DACA Memorandum. *See* ECF No. 5, Plaintiffs' Motion for Preliminary Injunction. This Court declined the request despite finding that Plaintiffs would likely succeed on the merits of their claims. *See Texas v. United States*, 328 F. Supp.3d 662, 709–36, 743 (S.D. Tex. 2018) (ECF No. 319).

After a change in presidential administrations, and the Department of Justice determined that the DACA Memorandum was unlawful, and DHS rescinded it. But the Supreme Court held that DHS's rescission itself violated the APA because it constituted arbitrary-and-capricious decisionmaking. *Regents*, 140 S. Ct. at 1901, 1915.

After the Supreme Court's decision, Plaintiffs and the Defendant-Intervenors (who had joined the suit to defend the DACA Memorandum's legality) cross-moved for summary judgment. This Court granted partial summary judgment in Plaintiffs' favor, finding the DACA Memorandum procedurally unlawful for failing to undergo notice-and-comment rulemaking, *Texas*, 549 F. Supp. 3d at at 603, and substantively unlawful for exceeding the bounds of immigration statutes, *id.* at 621.

Because "DHS [had] violated the APA with the creation of DACA and its continued operation," this Court vacated the DACA Memorandum and remanded the proceedings to DHS. *Id.* at 624. The Court simultaneously recognized that "hundreds of thousands of DACA recipients and others … have relied upon this program for almost a decade," *id.*, and temporarily stayed its immediate order of vacatur and allowed DHS to *accept* new DACA applications and renewal DACA applications.

6

*Id.* It nonetheless enjoined DHS from *approving* any new DACA applications and granting the attendant status. *Id.*

Defendants appealed, and DHS issued a notice of proposed rulemaking that would "preserve and fortify DHS's DACA policy." AR2022_100001, Deferred Action for Childhood Arrivals, 86 Fed. Reg. 53,736, 53,773 (proposed Sept. 28, 2021).

Then, on August 30, 2022—after the Fifth Circuit had already heard oral argument in *DACA*—DHS promulgated the Final Rule and asked the Fifth Circuit to review the substance of that action on the ground that no changes from the DACA Memorandum were material. *DACA*, 50 F.4th at 511–12.

The Fifth Circuit declined to do so, remanding to this Court on the ground that it did not have an adequate administrative record and could not determine whether "material differences" existed between the Final Rule and the DACA Memorandum. *Id.* at 512. Nevertheless, the Fifth Circuit affirmed the portion of this Court's judgment that vacated the DACA Memorandum as violating the procedural requirements of the APA because it was a substantive rule that was required to undergo notice-and-comment rulemaking. *Id.* at 522–24.

The Fifth Circuit also affirmed this Court's judgment that the DACA Memorandum violated the substantive requirements of the APA. Assuming that the two-step *Chevron* framework applied, the DACA Memorandum failed the first step because it contravened Congress's rigorous and comprehensive statutory schemes for classification, removal, allocation of lawful presence, and allocation of work authorization, *DACA*, 50 F.4th at 525–26, and it failed the second step because it was not an "exercise of [DHS's] inherent prosecutorial discretion," was "an unreasonable interpretation of the INA," and had no "clear congressional authorization." *Id.* at 526–27.

The Final Rule is substantively the same as the DACA Memorandum. Indeed, the Final Rule adopts many of the portions of the DACA Memorandum already held unlawful by this Court and the

Fifth Circuit. As DHS admits, the Final Rule maintains the existing threshold eligibility criteria from the DACA Memorandum for forbearance from removal, retains the existing process for DACA requestors to seek work authorization, and affirms that DACA recipients are considered lawfully present in the United States. Ex. 37 at 1–2 (App. 683–84).

The Final Rule creates a new 8 C.F.R. § 236.21, AR2022_100340–41, 87 Fed. Reg. 53,297–98, which contains several subsections:

- Sections 236.21(a) and (b) explain that the section applies to requests for deferred action under the DACA policy only, and that 8 C.F.R part 103 does not apply unless specifically stated. AR2022_100340–41, 87 Fed. Reg. 53,297–98.

- Section 236.21(c)(1) defines "[d]eferred action" as an exercise "of discretion not to pursue the removal of certain aliens for a limited period" undertaken for various reasons, and a "temporary forbearance from removal." AR2022_100341, 87 Fed. Reg. 53,298.

- Section 236.21(c)(2) states, "USCIS may grant employment authorization … to DACA recipients who have demonstrated an economic need." AR AR2022_100341, 87 Fed. Reg. 53,298.

- Section 236.21(c)(3) states, "a DACA recipient is considered 'lawfully present'" in the United States. AR2022_100341, 87 Fed. Reg. 53,298.

- Section 236.21(c)(4) states, that "[d]uring this period of forbearance, on the basis of this subpart only, a DACA recipient is not considered 'unlawfully present' for the purpose of inadmissibility under section 212(a)(9) of the [INA]." AR2022_100341, 87 Fed. Reg. 53,298.

- Section 236.21(d) states that the Final Rule "rescinds and replaces" the DACA Memorandum, that "grants of deferred action and any ancillary features previously issued pursuant to the Memorandum remain in effect and will expire according to their existing terms, and that those current grants are now "governed by [the Final Rule] and not the Memorandum."AR2022_100341, 87 Fed. Reg. 53,298.

The Final Rule's new 8 C.F.R. § 236.22, captioned "Discretionary determination," sets forth the same eligibility criteria as the DACA Memorandum. AR2022_100341–42, 87 Fed. Reg. 53,298–99. The new 8 C.F.R. § 236.23, sets forth the mechanics of applying for (and termination of) DACA status, as well as restrictions on use for immigration enforcement of information obtained from

applicants. AR2022_100342, 87 Fed. Reg. 53,299. And the C.F.R. section governing "Classes of aliens authorized to accept employment" is amended to include "alien[s] who [have] been granted deferred action" and "alien[s] who [have] been granted deferred action [through] Deferred Action for Childhood Arrivals," if they "establish[] an economic necessity for employment." AR2022_100343, 87 Fed. Reg. 53,300 (codified at 8 C.F.R. § 274a.12(c)(14), (33)). This "economic necessity" standard "makes no change to that longstanding policy … for DACA recipients," as recipients being required to show that need "has been the case since the beginning of the DACA policy in 2012." AR2022_100240, 87 Fed. Reg. 53,197.

## SUMMARY OF ARGUMENT

The Final Rule is untenable under the U.S. Constitution's principles regarding separation of powers, under Congress's duly enacted immigration laws, and under judicial precedent binding on this Court. Therefore, Plaintiffs ask that the Court hold the Final Rule unlawful, set it aside and enjoin its enforcement, and prevent Defendants from approving (1) any new DACA applications, and (2) after two years from the date of judgment, any DACA renewal applications.

## FACTUAL BACKGROUND

Approximately 800,000 otherwise unlawfully present aliens have applied for and received deferred action pursuant to DACA, including around 100,000 Texas residents. *See* Ex. 39, USCIS, Count of Active DACA Recipients by Month of Current DACA Expiration as of Sept. 30, 2022 (App. 716); Ex. 3, USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Fiscal Year 2012–2017(App. 12–13). DACA's deferred action entails much more than Defendants simply choosing not to remove subject aliens—it confers lawful presence. According to Defendants, an "individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect." Ex. 4 at 2, USCIS, *Frequently Asked Questions* (App. 16). Thus, "while [a

DACA recipient's] deferred action is in effect and, for admissibility purposes, [the DACA recipient is] considered to be lawfully present in the United States...." *Id.* at 3 (App. 17). This was true under the DACA Memorandum, and it remains true under the Final Rule. Ex. 38, USCIS, *DACA Frequently Asked Questions* (Nov. 3, 2022) (App. 688–89).

Additionally, Defendants construe "deferred action" under DACA as conferring eligibility for "work authorization." Ex. 1 at 3 (App. 4). Defendants have consistently told aliens that their DACA applications *must* be accompanied by applications for a Form I-765 application for work authorization. *Texas*, 549 F. Supp. 3d at 610; *see also* Ex. 4 at 3 (App. 17). This continues with the Final Rule. *See* AR2022_100199, 87 Fed. Reg. 53,156 ("to retain the existing requirement that DACA requestors file Form I–765 and Form I–765WS concurrently with the Form I–821D ("bundled process")).

The Final Rule even clears a pathway to citizenship. DACA recipients may apply for advance parole, which removes a significant impediment that would otherwise prevent many illegal aliens from adjusting their immigration status. Advance parole allows aliens to leave the United States and then lawfully re-enter the country without being turned away at a port of entry. *See* 8 U.S.C. § 1182(d)(5)(A). Congress designed parole to be awarded only "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.* Defendants have nevertheless made the entire DACA population eligible to apply for advance parole. Ex. 5, U.S. Dep't of Homeland Security, DACA National Standard Operating Procedures (2013) (App. 209).

## ARGUMENT

## I. The Final Rule is unlawful because it violates Congress's statutory scheme.

The APA requires courts to hold unlawful and set aside agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

Congress created "an intricate statutory scheme for determining which classes of aliens may receive lawful presence, discretionary relief from removal, deferred action, and work authorization." *DACA*, 50 F.4th at 525 (footnotes omitted). The Final Rule is contrary to law because it is "foreclosed by Congress's careful plan" and is "manifestly contrary to the statute." *Id.* at 524–28. "Congress's clear articulation of laws for removal, lawful presence, and work authorization illustrates a manifest intent to reserve for itself the authority to determine the framework of the [N]ation's immigration system." *Id.* at 511 (quoting *Texas*, 549 F. Supp. 3d at 614).

Congress specifically defined classes of aliens who are eligible for deferred action and discretionary relief from removal. *DACA*, 50 F.4th at 525–26 & nn.196–97. In addition, Congress enacted immigration classifications for lawful and unlawful presence. *Id.* at 525–26 & n.195. Congress also allowed for work authorization for specific categories of illegal aliens. *Id.* at 525–26 & n.198.

As part of Congress's statutory scheme, the classification of lawful presence is a prerequisite for aliens to be eligible for several benefits, including Social Security,[1] Medicare,[2] retirement benefits under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996,[3] and the Earned Income Tax Credit,[4] *see Texas*, 549 F. Supp. 3d at 578 & n.9, as well as various State benefits, such as Texas's state-subsidized work-study program, *id.* at 578. (citing Tex. Educ. Code § 56.075(a)(1); 19 Tex. Admin. Code § 21.24(d)(5).

---

[1] *See* 8 U.S.C. § 1611(b)(2).
[2] *See id.* § 1611(b)(3).
[3] *See id.* § 1611(b)(3).
[4] *See* 26 U.S.C. § 32(c)(1)(A), (c)(1)(E), (m) (eligibility based on an individual having a valid Social Security number).

Conversely, the classification of unlawful presence makes time spent in the country count towards a reentry ban under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.[5]

Congress never gave the Executive Branch permission to sidestep this carefully crafted, intricate, and extensive statutory scheme and create new classes of aliens eligible for deferred action protecting them from removal. Nor did Congress permit unlawfully present aliens to be lawfully present, much less allow such unlawfully present aliens to obtain attendant benefits and work authorization simply because the Executive chooses not to remove them. But that is precisely what Defendants did in the DACA Memorandum and continue to do with the Final Rule.

### A. DACA does not pass *Chevron*'s first step because Congress's immigration scheme unambiguously forecloses DACA.

"[A]n agency literally has no power to act … unless and until Congress confers power on it." *Arlington v. FCC*, 569 U.S. 290, 317 (2013) (Roberts, C.J., dissenting) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). Thus, courts must hold unlawful agency actions that are in "excess of statutory jurisdiction" or "short of statutory right." 5 U.S.C. § 706(2). Under *Chevron*'s familiar two-part test, a court must defer to an agency's interpretation of its own statute if the text of the statute is ambiguous, and the agency's interpretation is reasonable. *Chevron*, 467 U.S. at 844.

*Chevron*'s first step asks whether the statute directly speaks to the precise question at issue. *Id.* at 842–43. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"; if so, the court owes no

---

[5] *See* 8 U.S.C. § 1182(a)(9)(B)(i) (3-year reentry ban for aliens "unlawfully present in the United States for a period of more than 180 days but less than 1 year"; 10-year reentry ban for aliens "unlawfully present in the United States for one year or more").

deference to the agency. *Id.* at 844; *see also City of Arlington,* 569 U.S. at 307 ("Where Congress has established a clear line, the agency cannot go beyond it …").

Congress's specification of "laws for removal, lawful presence, and work authorization illustrates a manifest intent" to preclude any contrary rules through administrative action. *DACA*, 50 F.4th at 511 (quoting *Texas*, 549 F. Supp. 3d at 614).

### 1. The INA specifies which aliens are subject to removal.

As this Court found, "DACA beneficiaries entered the country either by overstaying a visa or by entering without inspection, and the INA instructs that aliens in both classes are removable." *Texas*, 549 F. Supp. 3d at 608 (citation omitted).

Recipients who entered the country legally but overstayed their legal permission are deportable under 8 U.S.C. § 1227(a)(1)(C), which renders these individuals "removable." *See* 8 U.S.C. § 1229a(e)(2). Second, DACA recipients who entered the country illegally are also removable because the INA requires all applicants for admission, including aliens present in the United States who have not been admitted, to be inspected by immigration officers. *Id.* §§ 1225(a)(1), (3). "[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [of the INA]." *Id.* § 1225(b)(2)(A). The alien has the burden of proof in a section 1229a removal proceeding to show that he or she is not removable either because he or she is "clearly and beyond doubt entitled to be admitted and is not inadmissible under section 1182,"[6] or because "by clear and convincing evidence" he or she is "lawfully present in the United States pursuant to a prior admission." *Id.* § 1229a(c)(2)(A)–

---

[6] Section 1182 defines classes of aliens who are ineligible to receive visas and admission to the United States. 8 U.S.C. § 1182(a).

13

(B). Aliens who cannot carry the burden of proof under one of these tests are "removable." 8 U.S.C. § 1229a(e)(2).

As this Court has held, "Congress has already determined that the DACA-eligible population is removable through a variety of provisions of the INA." *Texas*, 549 F. Supp. 3d at 607–08. Congress has made no other special exception for these populations and has repeatedly declined to do so.

But the Final Rule bars immigration officials from enforcing these parts of the INA and, as to DACA recipients, prevents the removal of individuals whom Congress has deemed removable. "In other words, DACA"—including in the Final Rule—"prevents the removal of its recipients, despite Congress having dictated their eligibility for removal." *Texas*, 549 F. Supp. 3d at 608. Defendants lack authority to nullify the INA in this way.

### 2. The INA creates a comprehensive statutory scheme governing lawful presence.

"Policies pertaining to the entry of aliens and their right to remain here are … entrusted exclusively to Congress," *Arizona v. United States*, 567 U.S. 387, 409 (2012), which has exercised this exclusive authority and enacted "extensive and complex" statutes governing "immigration and alien status." *Id.* at 395. Title 8 of the United States Code functions as a "single integrated and all-embracing system" governing the presence of aliens in the country. *Id.* at 400 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 74 (1941)).

The INA, 8 U.S.C. §§ 1101 *et seq.*, delineates "specifi[c] categories of aliens" who may be admitted into and lawfully present in the country as well as the consequences for unlawful presence. *Arizona*, 567 U.S. at 395; *see also Texas*, 549 F. Supp. 3d at 608–10. Congress has enacted complex rules detailing how over forty different classes of immigrants, nonimmigrants, refugees, and other aliens can attain lawful presence in the country. *See Texas v. United States (DAPA)*, 809 F.3d 134, 179 (5th Cir. 2015).

14

As this Court noted, Congress has specified particular groups of aliens for whom lawful presence is available and groups of aliens eligible to remain in the country during deportation hearings. *Texas*, 549 F. Supp. 3d at 609. Congress has enacted statutes allocating lawful presence based on service in the armed service, work, or educational status, but "the statutory scheme does not encompass the population given lawful presence by DACA." *Id.*

"Where Congress has explicitly described a statutory scheme with the detail present in these circumstances, an agency may not supplant the scheme with its own methods. In this instance, Congress's careful plan for the allotment of lawful presence forecloses the possibility that DHS may designate up to 1.5 million people to be lawfully present" through the Final Rule. *Texas*, 549 F. Supp. 3d at 609.

### 3. The INA creates a comprehensive statutory scheme for the allocation of work authorization.

"The INA also specifies classes of aliens eligible and ineligible for work authorization, including those eligible for work authorization and deferred action." *DAPA*, 809 F.3d at 180–81. But Congress has made no mention of or provision for the classes of persons that the Final Rule purports to make eligible for work authorization. *Texas*, 549 F. Supp. 3d at 610.

Further, DACA contradicts the INA's express limitations on work authorization. "Congress has also specified that aliens not lawfully admitted for permanent residency with pending removal proceedings are *ineligible* for work authorization," *id.* (emphasis in original) (citing 8 U.S.C. § 1226(a)(3)). But the Final Rule "specifically applies to individuals in removal proceedings and contradicts Congress's intent, as it enables those aliens to apply for work authorization." *Id.*

As this Court previously found, when Congress wants to "provide certain groups of aliens with work authorization, it has promulgated specific laws requiring DHS to do so." *Texas*, 549 F. Supp. 3d at 610 & n.48 (collecting examples). If DHS may simply extend work authorization to whomever

it pleases, this thicket of laws becomes surplusage. That cannot be right. *City of Chicago v. Fulton*, 141 S. Ct. 585, 591 (2021); *Bd. of Trustees of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 788 (2011).

Through the Immigration Reform and Control Act of 1986 ("IRCA"), Congress likewise created "a comprehensive framework for 'combating the employment of illegal aliens.'" *Texas*, 549 F. Supp. 3d at 610 (quoting *Arizona*, 567 U.S. at 404). "Through criminal and civil penalties for employers and civil penalties for employees, IRCA made it "'illegal for employers to knowingly hire, recruit, refer, or continue to employ unauthorized workers.'" *Id.* (quoting *Arizona*, 567 U.S. at 404).

Congress reinforced these laws in 1996, responding to the States' concerns about the effects of extending benefits to unlawfully present aliens. *See, e.g.*, 142 Cong. Rec. S11882 (daily ed. Sept. 30, 1996). Congress has never authorized the Executive Branch to waive, dispense with, or otherwise ignore these statutes—let alone authorized it to unilaterally permit unlawfully present aliens to be lawfully present and obtain attendant benefits and work authorization.

"DACA actually goes further to undermine Congress's intent to protect American workers as it *requires* applicants to apply for work authorization." *Texas*, 549 F. Supp. 3d at 610 (emphasis in original); s*ee also* Ex. 4 at 3 (App. 17). "The DACA program is therefore contrary to the immigration statutes and to Congress's goal of 'closely guarding access to work authorization and preserving jobs for those lawfully in the country.'" *Id.* at 610–11 (quoting *DAPA*, 809 F.3d at 181). The Fifth Circuit upheld this Court's analysis regarding the DACA Memorandum, and it applies equally to the Final Rule.

### 4. Advance parole is limited by statute.

On top of creating a new class of aliens eligible for lawful presence and work authorization, the Final Rule grants some DACA recipients United States citizenship or a pathway to citizenship without any statutory authorization to do so.

16

"Advance parole is a privilege that allows aliens to leave the United States and then lawfully re-enter the country without being turned away at a port of entry." *Texas*, 549 F. Supp. 3d at 612 (citations omitted). "It is designed to be awarded only 'on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)).

"DACA, however, made the entire DACA population eligible to apply for advance parole, and expanded these two enumerated categories beyond their intended scope," *id.* at 612, and "enable[d] certain individuals to change their inadmissible status (due to unlawful entry) into an admitted/paroled category and in some cases then provides a clearer pathway to citizenship." *Id.* at 614.

Advance parole granted to DACA recipients has also led to the subversion of the "unlawful presence bars" instituted by statute. *Texas*, 549 F. Supp. 3d at 614 (citing 8 U.S.C. § 1182(a)(9)(B)(i)). "[T]hose illegally present for more than a year must remain out for ten years before they may again become admissible to the United States." *Id.* "All of the DACA recipients have been in the country illegally for more than one year, so the ten-year bar would apply." *Id.* "DACA's grant of advance parole eligibility, however, allows DACA recipients to travel abroad and then return to the United States without complying with" the ten-year bar imposed by Congress. *Id.*

The procedures implementing the DACA Memorandum defined the conditions sufficient to meet the requirements for advance parole broadly to include "education purposes, such as semester-abroad programs, school-sponsored trips abroad, or travel necessary to conduct academic research" and "employment purposes include: an overseas assignment, interview, conference, [] training[, or] a meeting with overseas clients." Ex. 5, U.S. Dep't of Homeland Security, DACA National Standard Operating Procedures (2013) (App. 209–10). That definition continues with the Final Rule. Ex. 38, USCIS, *DACA Frequently Asked Questions* (Nov. 3, 2022) (App. 704) (listing same circumstances).

17

One of the individual Defendant-Intervenors co-authored what this Court termed a "veritable roadmap" for DACA recipients interested in skirting statutory requirements through the advanced parole program. ECF No. 319 at 77 n.82. He explained that, once a DACA recipient leaves the country and returns to the United States through advance parole, the recipient may then apply for adjustment to lawful-permanent-resident status. Ex. 6 (App. 264). That status, commonly known as possessing a Green Card, is a crucial step on the pathway to citizenship. *See, e.g.*, 8 U.S.C. § 1430.

Plaintiffs previously estimated that approximately 3,000 DACA recipients were approved for advance parole and then obtained an adjustment of status. Ex. 7 (App. 275). That estimate was far too low. Discovery in this case uncovered that, thousands more illegal aliens now have the opportunity to obtain adjustment of status because of DACA. According to the Defendants, approximately 14,000 DACA recipients who otherwise would not be eligible to adjust their status have done so through the advance parole that DACA made available. Ex. 2 at 2 (App. 7).

That Defendants continue to consider DACA recipients for advance parole in *any* circumstances confirms what Plaintiffs have said of DACA all along: DACA confers a legal status and attendant benefits. Defendants do not consider aliens present in the United States without lawful status to be eligible for advance parole. This is true even now that the Final Rule has gone into effect. *See Advance Parole*, U.S. Customs and Border Protection, https://www.cbp.gov/travel/us-citizens/advance-parole (last visited January 28, 2023) ("Aliens in the United States are not eligible for Advance Parole if they are … [i]n the United States illegally.").

But once Defendants grant DACA relief to an alien, that alien becomes eligible to receive permission to leave the country and return under a grant of advance parole. Typically, an illegal alien who leaves the country may not re-enter the United States for either three or ten years. *Texas*, 549 F. Supp. 3d at 614. But Defendants do not consider travel from the United States under a grant of advance parole to be a "departure" for purposes of triggering that new inadmissibility bar. *See, e.g.*,

18

*Matter of Arrabally and Yerrabelly*, 25 I&N Dec. 771, 779 (BIA 2012). A typical unlawfully present alien, that is, could face severe immigration consequences for leaving the country. DACA recipients, on the other hand, can benefit: DACA recipients who are currently ineligible to adjust their status to that of a lawful permanent-resident status can—as one of the Defendant-Intervenors has outlined—travel abroad, return under a grant of advance parole, and thereby become eligible for adjustment of status by virtue of having been paroled, all without triggering a separate inadmissibility bar from prior unlawful presence. *See* 8 U.S.C. § 1255(a), (a)(2) (requiring that an alien be "admitted or paroled" and "admissible" in order to adjust status). And, as described above, at least 14,000 DACA recipients have laundered their prior unlawful presence into a pathway to citizenship through precisely this process.

The Final Rule continues this abuse of advance parole that was implemented under the DACA Memorandum. It "further incorporates here its points in the preamble to the [Notice of Proposed Rulemaking] at 86 FR 53756–53762 regarding DHS's view that employment authorization, advance parole, and lawful presence may be provided in conjunction with DACA's forbearance of removal." AR2022_100237, 87 Fed. Reg. 53,194.

That incorporated language from the Notice of Proposed Rulemaking acknowledges the Final Rule continues the same advance parole practices as the DACA Memorandum and, while acknowledging that this Court had directly addressed this abuse in its earlier ruling, expressly ignores the Court's reasoning and conclusions:

> The access of DACA recipients to "advance parole" under 8 CFR 212.5(f) raises questions of both law and policy that were discussed by the *Texas II* district court in its July 16, 2021, memorandum and order. DHS emphasizes that the same statutory standard, "for urgent humanitarian reasons or significant public benefit," applies to all noncitizens, including DACA recipients, and that this statutory standard does not depend on whether an individual is a DACA recipient. *DHS reiterates that under the proposed rule, it would continue its adherence to that standard.*

AR2022_100027, 86 Fed. Reg. 53,762 (emphasis added).

19

Defendants have made clear that the Final Rule authorizes advance parole in a manner found unlawful by this Court, and it should meet the same fate as its predecessor.

*            *            *

While the Defendants assert that the Final Rule is "an exercise of [their] inherent prosecutorial discretion," *DACA*, 50 F.4th at 526, the Final Rule "undoubtedly implicates questions of deep economic and political significance that are central to this statutory scheme; had Congress wished to assign that decision to an agency, it surely would have done so expressly.'" *Id.* (cleaned up) (citation omitted).

As a result, "Congress's rigorous classification scheme forecloses the contrary scheme" under the Final Rule, and the Final Rule thus "contravenes [the] comprehensive statutory schemes for removal, allocation of lawful presence, and allocation of work authorization." *Id.* at 526. Therefore, the Final Rule violates the substantive requirements of the APA because it adopted and implemented the same substance held unlawful by the Fifth Circuit. *See id.* at 524–28.

**B. Even if the Final Rule did pass *Chevron*'s first step, it would not pass the second.**

Even if the Court were to proceed to *Chevron*'s second step, "DACA would fail at step two because it is an unreasonable interpretation of the INA." *DACA*, 50 F.4th at 526. The INA's general grants of authority to DHS "cannot reasonably be construed as assigning 'decisions of vast economic and political significance' to an agency" and therefore fail under the major-questions doctrine. *Id.* at 527 (quoting *DAPA*, 809 F.3d at 183; otherwise cleaned up). The Final Rule is "manifestly contrary" to the statutory scheme promulgated by Congress and therefore unreasonable. *Id.* at 528 (quoting *DAPA*, 809 F.3d at 186).

**II.     The Final Rule violates the Take Care Clause.**

Since our Founding, "both courts and the executive branch itself have recognized the president's inability to suspend or dispense with the law." *Texas v. Biden (MPP)*, 20 F.4th 928, 981 (5th

Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022). "The Framers agreed that the executive should have neither suspending nor dispensing powers." *Id.* at 980. The Supreme Court has held likewise. *Kendall v. United States ex rel. Stokes,* 37 U.S. 524 (1838). "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution, and entirely inadmissible." *Id.* at 613. Any other conclusion would "vest[] in the President a dispensing power." *Id.*

Through its adoption of the policies of the DACA Memorandum, the Final Rule dispenses with certain immigration statutes by declaring as lawful conduct that Congress established as unlawful, thereby violating the Take Care Clause. U.S. Const. art. II, § 3 ("[The president] shall take Care that the Laws be faithfully executed …"). Moreover, the Final Rule further violates the Take Care Clause because it dispenses with certain immigration statutes by granting a pathway to citizenship to aliens who would otherwise be unlawfully present but for the Final Rule. As Justice Scalia properly noted, DACA is a program that involves "biennial requests for *dispensation*" from immigration statutes. *Arizona v. United States*, 567 U.S. 387, 435 (2012) (Scalia, J., concurring in part and dissenting in part) (emphasis added).

## III.   The Final Rule is arbitrary and capricious.

The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts have the duty to "hold unlawful and set aside agency action[s]" that fall within those categories. 5 U.S.C. § 706(2). While a reviewing court must not "substitute" its "own policy for that of the agency" and must apply this standard deferentially, the agency action must still "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Courts "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quotation omitted). Arbitrary and

capricious review "is not toothless." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself," not reasons developed *post hoc. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). The Final Rule does not represent reasoned decisionmaking.

The Final Rule repeatedly treats illegal aliens being participants in the U.S. workforce as a positive. *See, e.g.*, AR2022_100207, 87 Fed. Reg. 53,164 ("DHS … agrees … that DACA has a positive impact on recipients' ability to pursue employment"); AR2022_100210, 87 Fed. Reg. 53,167 ("The net effect on employment of citizens is difficult to specify and might turn out to be positive. DHS believes that these investments that DACA recipients have made in their communities and in the country as a whole are substantial."); *id.* ("[T]he hiring of DACA workers might contribute to expansion in business activity and potentially in increased hiring of American workers."); AR2022_100213, 87 Fed. Reg. 53,170 ("DHS agrees members of the DACA population carry substantial spending power, generate billions in tax revenue, and fill vital roles across a broad array of industries.").

This contradicts Congress's "comprehensive framework for combating the employment of illegal aliens," which has "forcefully made combating the employment of illegal aliens central to the policy of immigration law." *Arizona v. United States*, 567 U.S. 387, 404 (2012) (cleaned up). And "as Congress [has] explained, '[a]liens who enter or remain in the United States in violation of our law are effectively taking immigration opportunities that might otherwise be extended to others.'" *Demore v. Kim*, 538 U.S. 510, 518 (2003) (quoting S. Rep. No. 104–249, p. 7 (1996)). Indeed, "a primary purpose in restricting immigration is to preserve jobs for American workers." *INS v. Natl. Ctr. for Immigrants' Rights*, 502 U.S. 183, 194 (1991).

The Final Rule flips Congress's priorities, instead prioritizing the interests of illegal alien labor and the businesses that employ them:

> DHS agrees that employers, including businesses and educational institutions, have relied upon the existence of the DACA policy over the course of 10 years and that restricting DACA to currently active recipients or ending the DACA policy altogether would harm the reliance interests identified by these commenters, including their reliance interests in the labor and spending contributions of DACA recipients. For those employers that hire DACA recipients with highly specialized skills and higher levels of education, if the DACA policy were to end, some of these employers could face challenges and higher costs in finding replacement labor for these highly specialized workers, assuming all else remains constant.

AR2022_100218, 87 Fed. Reg. 53,175.

This Court has twice in this case examined the laws prohibiting the employment of illegal aliens and specific statutory exceptions to that general feature of immigration law. *See Texas*, 328 F. Supp. 3d at 716–18; *Texas*, 549 F. Supp. 3d at 610–12. Where Congress has permitted employment authorization, it has done so for limited categories of illegal aliens who—unlike the DACA recipients—have been deemed non-removable for various reasons set forth by statute. *See Texas*, 549 F. Supp. 3d at 610 & nn.48–49 (citing statutes setting forth various categories, including human-trafficking victims and asylum applicants). The Final Rule never addresses the existence of these specific, congressionally delineated categories, much less how DACA's employment authorization can be squared with them—and this despite this Court's previous rulings on this issue.

This Court has also explained how the Affordable Care Act's minimum essential coverage requirement, 26 U.S.C. § 4980h, "exacerbates this problem." *Texas*, 549 F. Supp. 3d at 587. While "[a]n employer who offers coverage that does not provide minimum essential coverage will face a penalty if any of its employees purchases coverage on the insurance exchange and receives a premium subsidy," employers "may offer to DACA-recipient employees coverage that does not provide minimum essential coverage without risking a penalty." *Id.* The Final Rule never addresses how "[t]his facet of the ACA can make DACA recipients less costly to employ for some employers, thereby incentivizing employers to hire DACA recipients over similarly qualified legal Texas residents." *Id.*; *see also id.* at 612.

The Final Rule disregards both Congress's determinations that employment of illegal aliens harms American workers and the negative incentives to hire American workers created by the Affordable Care Act. Instead, the Final Rule adopts a cost-benefit analysis that relies on potential downstream effects that could help some American workers despite harms to those directly competing with DACA recipients. *See* AR2022_100210, 87 Fed. Reg. 53,167.

The articulated reasons for the Final Rule fail to consider Congress's framework, "undermining Congress's stated goal of closely guarding access to work authorization and preserving jobs for those lawfully in the country." *DAPA*, 809 F.3d at 181. Although this Court suggested that the promised notice-and-comment process should consider "the effects of DACA on the unemployed or underemployed legal residents of the states," Texas, 549 F. Supp. 3d at 623, the Final Rule offers a "dismissive analysis, which dots 'I's' and crosses 't's' without actually saying anything." *Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022) (per curiam). "Stating that a factor was considered is not a substitute for considering it. Rather, courts must make a searching and careful inquiry to determine if the agency actually *did* consider it." *Id.* (cleaned up; emphasis in original).

"[B]ecause agency action must be based on non-arbitrary, relevant factors, the agency's approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (cleaned up). The rationale for agency action reflected in the Final Rule contradicts those purposes.

An agency rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. Congress did not intend Defendants to consider purported positive effects of what it has forbidden by statute—the employment of illegal aliens. Instead, Congress allowed employment authorization for certain categories of illegal aliens while they were not removable, not to encourage the continued (or increased) presence of removable illegal aliens.

24

Courts must also "set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *MPP*, 20 F.4th at 989 (quoting *M.D. Anderson*, 985 F.3d at 475). Failing to consider the effects on American workers displaced by DACA recipients granted employment authorization, when combined with the Affordable Care Act's minimum essential coverage requirement, is arbitrary and capricious. And failing to consider the legality of such employment authorization in light of the limited nature of Congress's permissions for such authorizations for different categories of aliens suffers from the same flaw.

Federal administrative agencies are required to engage in "reasoned decisionmaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* The Final Rule fails the test of rational decisionmaking.

## IV. Plaintiffs have standing to challenge the Final Rule for the same reasons they had standing to challenge the DACA Memorandum.

Plaintiffs have satisfied their burden of proving standing to challenge the Final Rule because they have suffered, and will continue to suffer, concrete injuries that are traceable to the Final Rule, and relief against the Final Rule will redress those injuries. *See DACA*, 50 F.4th at 517–20. Plaintiffs therefore have a "personal stake" in the outcome of this litigation. *See id.* at 513 (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021)).

Indeed, both this Court and the Fifth Circuit have already concluded that Plaintiffs had standing to challenge the Executive's unilateral actions conferring class-based deferred action to grant lawful presence and work authorizations. And because the Final Rule encompasses such unilateral action by the Executive and adopts the same unlawful rule of DACA, Plaintiffs have established standing in this case for the same reasons they had standing to challenge the DACA Memorandum.

The law of the case applies to determinations of subject matter jurisdiction. *See Free v. Abbott Labs., Inc.,* 164 F.3d 270, 272–73 (5th Cir. 1999) (joining other circuits in refusing to recognize a jurisdictional exception to the law of the case doctrine and explaining that although a federal court must examine each case to determine the basis for subject matter jurisdiction, "perpetual re-examination of precisely the same issue of subject matter jurisdiction" is not required) (citing *United States v. Becerra,* 155 F.3d 740, 753 (5th Cir. 1998)). And "[i]n implementing the mandate, the district court must 'take into account the appellate court's opinion and the circumstances it embraces.'" *United States v. Lee,* 358 F.3d 315, 321 (5th Cir. 2004) (quoting *Sobley v. S. Natural Gas Co.,* 302 F.3d 325, 333 (5th Cir. 2002)).

Because the impact of the Final Rule can be no different from the substantively identical DACA Memorandum, the standing inquiry need not start over. "[B]ecause injury must only be *fairly* traceable to the challenged conduct, plaintiffs need not connect the exact time of their injuries with the exact time of an alleged violation." *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.,* 47 F.4th 408, 417 (5th Cir. 2022) (cleaned up). "Article III is satisfied if [the challenged action] were *of a type* that 'causes or contributes to the kinds of injuries alleged by the plaintiffs.'" *Id.* (emphasis added) (cleaned up) (rejecting the view that "Article III requires plaintiffs to show that each challenged [action] is a but-for cause of their injuries.").

And "the 'mandate rule,' a corollary of the law of the case doctrine, 'compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court.'" *Fisher v. Univ. of Texas at Austin,* 758 F.3d 633, 639–40 (5th Cir. 2014), *aff'd,* 579 U.S. 365 (2016) (citation omitted); *United States v. Castillo,* 179 F.3d 321, 329 (5th Cir. 1999) ("The mandate rule requires a district court on remand to effect our mandate and to do nothing else."). Here, the Fifth Circuit noted that "to the extent [its] determinations about questions of law in the present appeal also apply to the Final Rule," this Court should do so "to move this case forward as

expeditiously as possible … and determine whether our holdings as to the 2012 DACA Memorandum fully resolve issues concerning the Final Rule." *DACA*, 50 F.4th at 512; *see also Texas v. Biden*, — F. Supp. 3d —, No. 2:21-cv-067-Z, 2022 WL 17718634, at *4–5 (N.D. Tex. Dec. 15, 2022) (Kacsmaryk, J.) (finding no need to examine standing on remand because previous determinations regarding earlier agency action that had same effect as present one). As the Final Rule has the same substantive effect as the DACA Memorandum, the determinations of this Court and the Fifth Circuit regarding the latter remain true for the former.

### A. Plaintiffs are entitled to special solicitude in the standing analysis.

Because "States are not normal litigants for the purposes of invoking federal jurisdiction," they may be entitled to "special solicitude"—a doctrine that allows a state to establish standing "without meeting all the normal standards for redressability and immediacy." *DACA*, 50 F.4th at 514 (citing *Massachusetts v. EPA*, 549 U.S. 497, 517–18, 520 (2007)). Under this standard, a state will establish standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.* (quoting *Massachusetts*, 549 U.S. at 518).

When special solicitude is appropriate, a state can establish standing "without meeting all the normal standards for redressability and immediacy." *DACA*, 50 F.4th at 514. This Court has also recognized that special solicitude can "mitigate perceived weaknesses in causation and redressability arguments." *Texas*, 549 F. Supp. 3d at 585.

Plaintiffs have satisfied the special solicitude standing because they have shown that (1) there is "a procedural right to challenge the action in question" and (2) the challenged action "affect[ed] one of the State's quasi-sovereign interests." *DACA*, 50 F.4th at 514 (citing *DAPA*, 809 F.3d at 151–52).

Plaintiffs in this case established a procedural right to challenge the Final Rule under the APA because they have suffered a legal wrong and been adversely affected or aggrieved by the promulgation

of the Final Rule. *See* 5 U.S.C. § 702; *see also MPP*, 20 F.4th at 970 n.10 (noting that such a procedural right is not limited to notice-and-comment claims but includes substantive claims under the APA).

As in *DACA*, Plaintiffs here use their procedural right to "challenge[] DHS's affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens." *See DACA*, 50 F.4th at 514. Further like *DACA*, Plaintiffs' procedural right under the APA in this case does not evaporate because of their status as States; instead, "Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall well within that definition." *Id.* (quoting *DAPA*, 809 F.3d at 152). Plaintiffs thus satisfy the first element of special solicitude.

Plaintiffs also satisfy the second element of special solicitude because the Final Rule affects their quasi-sovereign interests. Those "quasi-sovereign interests" are "a judicial construct that does not lend [themselves] to a simple or exact definition." *DACA*, 50 F.4th at 514 (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)). While "sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party" are not considered quasi-sovereign interests, there are several interests that do satisfy that definition, including the "set of interests that the State has in the well-being of its populace"; the State's interest in "the health and well-being—both physical and economic—of its residents"; and the State's interest in "not being discriminatorily denied its rightful status in the federal system." *Id.* (quoting *Alfred L. Snapp*, 458 U.S. at 602, 607).

"'One helpful indication' of a quasi-sovereign interest is 'whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.'" *DACA*, 50 F.4th at 515 (quoting *Massachusetts*, 549 U.S. at 519). Indeed, "[a]n agency action may affect a quasi-sovereign interest if it is alleged to damage certain "sovereign prerogatives [that] are now lodged in the Federal Government." *Id.* (quoting *Massachusetts*, 549 U.S. at 519).

28

In *DACA*, the Fifth Circuit concluded that the State's interest in classifying aliens was a quasi-sovereign interest. *Id.* Specifically, the Fifth Circuit reasoned that the State's "interest in classifying aliens was analogous to the interest in regulating emissions that the Supreme Court deemed a quasi-sovereign interest in *Massachusetts v. EPA.*" *Id.* And because the States "surrendered some of their sovereign prerogatives over immigration" upon entering the union, including their power to "establish their own classifications of aliens," they relied on the federal government to protect their interests and were analogous to the plaintiffs in *Massachusetts. Id.*

Therefore, the Fifth Circuit determined, "DACA implicate[d] Texas's quasi-sovereign interest in classifying aliens." *DACA*, 50 F.4th at 515. It also recognized that "a State's inability to legislate around DACA can create a quasi-sovereign interest," meaning that "a quasi-sovereign interest could arise based on 'federal preemption of state law.'" *Id.*

The Final Rule implicates those quasi-sovereign interests just as the DACA Memorandum did. If Plaintiffs sought to change the classifications of DACA recipients to alleviate their injuries, they would be threatened with federal preemption. The Fifth Circuit acknowledged these federal preemption concerns in *DACA*, concluding that "DACA implicates preemption concerns" because it classifies aliens and their status, which is a power only the federal government can exercise. *Id.* at 516. "An attempt by Texas to establish an alternative classification system or work authorizations would be preempted, despite the State's likely interest in doing so." *Id.* (citing *Arizona*, 567 U.S. at 409). The same is true under the Final Rule.

### B. Plaintiffs have *parens patriae* standing.

Plaintiffs also have *parens patriae* standing to protect the quasi-sovereign interest in "the health and well-being" of their citizens. *See Alfred L. Snapp*, 458 U.S. at 607.  "*Parens patriae* permits a state to bring suit to protect the interests of its citizens, even if it cannot demonstrate a direct injury to its separate interests as a sovereign entity." *Texas*, 549 F. Supp. 3d at 590–91 (citing *Alfred L. Snapp*, 458

29

U.S. at 601). Here, Plaintiffs seek to protect their citizens' "economic and commercial interests" from labor-market distortion caused by the Final Rule. *Alfred L. Snapp*, 458 U.S. at 609. They do so because it would distort the labor market and thereby injure the economic well-being of Plaintiffs' lawful workers by making it harder for them to obtain jobs. *See* Ex. 14, Deere Decl. ¶ 13 (App. 339) (noting that DACA increases competition for available jobs); *see also* Ex. 15, Brannon Depo. 95:1–96:3 (App. 354–55).

Many businesses appearing as amici curiae in this case indicated they would hire non-DACA employees if DACA ceased. Ex. 16, Br. of *Amici Curiae* Tex. Ass'n of Bus., *et al.* 16, ECF No. 221-1 (App. 377); Ex. 17, Br. of *Amici Curiae* 114 Cos. 10, ECF No. 204-1 (App. 400); Ex. 18, Br. of *Amici Curiae* New Jersey Buss. 5, ECF No. 192-1 (App. 418). And testimony from some Intervenors in this case confirms that DACA recipients have been hired to fill jobs for which other non-DACA recipients applied. Ex. 19, Jeon Depo. 38:3–39:22 (App. 429–30); Ex. 20, Arackathara Decl. ¶¶ 3–7 (App. 434–36); Ex. 21, Arackathara Depo. 65:2–21 (App. 442).

The Final Rule, simply put, enables DACA recipients to compete with lawful workers for jobs in Texas by granting lawful presence status and requiring that USCIS accept applications for work authorizations. *See Texas*, 549 F. Supp. 3d at 592. Defendant-Intervenors' own experts admitted that work authorizations granted through DACA allow recipients to compete with legally present workers for jobs. *See, e.g.,* Ex. 24, Wiehe & Hill Decl. ¶ 6a (App. 473) ("[T]he work authorizations and deferral from deportation provided by DACA allow recipients to better compete with legally present workers"); Ex. 25, Perryman Depo. 97:13–17 (App. 494); Ex. 15, Brannon Depo. 95:8–96:3 (App. 354–55); *see also* Ex. 26, Wong Decl. ¶ 23 (App. 509) (survey responses from DACA recipients who reported career opportunities as what they would "lose if DACA ends").

Moreover, the influx of additional workers as a result of DACA not only increases competition, but it also potentially depresses wages for similarly skilled workers who are lawfully

present. Ex. 22, Deere Suppl. Decl. ¶ 23 (App. 451–52). Defendant-Intervenors' own expert agreed, as he must, that decreasing the number of workers in the workforce can lead to an increase in wages. Ex. 25, Perryman Depo. 28:1–5 (App. 492).

And, as this Court has already recognized, the Patient Protection and Affordable Care Act, 26 U.S.C. § 4980H, only exacerbates this problem. *See Texas*, 549 F. Supp. 3d at 587; ECF No. 319 at 36. Under that law, businesses are not required to provide health insurance to DACA recipients like they must provide to other employees. *See* 8 U.S.C. § 1611(a); 26 U.S.C. § 4980H(b). This makes DACA recipients less costly to employ, creating incentives for employers to hire DACA recipients over similarly qualified Texas residents. Ex. 14, Deere Decl. ¶¶ 24–25 (App. 341–42); *see also* Ex. 22, Deere Suppl. Decl. ¶ 24 (App. 452); *see also* Ex. 23, Ku Depo. 68:13–17 (App. 464). "This facet of the ACA can make DACA recipients less costly to employ for some employers, thereby incentivizing employers to hire DACA recipients over similarly qualified legal Texas residents." *Texas*, 549 F. Supp. 3d at 587. Plaintiffs have a quasi-sovereign interest in protecting their citizens from this harm, and if this Court enjoins the Final Rule, legal residents of Texas would not have to compete with as many eligible workers. *See id.* at 592.

Finally, to the extent there may be some limits on a state's ability to sue the federal government as *parens patriae,* this Court properly found that those potential limits would not apply in this case. *See id.* at 591. Plaintiffs here are suing the federal government not to "'protect [their] citizens from the operation of federal statutes,'" but "to assert [their] rights under federal law." *Id.* (citing *Massachusetts*, 549 U.S. at 520 n.17). Plaintiffs have "demonstrated a concrete injury to [their] quasi-sovereign interest in the economic well-being of [their] citizens." *Id.* DACA causes that injury because it grants its recipients lawful presence and work authorization, without which they could not compete with lawful workers for many jobs. *Id.* at 592–93. And that injury is redressable by a ruling from this Court because

nothing prevents this Court from setting aside DACA, which would remove lawful presence and work authorization for its recipients. *Id.* at 593.

Because the relevant portions of the Final Rule operate the same way as the DACA Memorandum, Plaintiffs have *parens patriae* standing for the same reasons. Plaintiffs seek the enforcement of federal law "to assure [their] residents that they will have the full benefit of federal laws designed to address th[e] problem" of illegal immigration and labor-market distortion. *Alfred L. Snapp*, 458 U.S. at 609–10.

### C.  Plaintiffs have standing based on direct injury.

Like the DACA Memorandum, the Final Rule imposes significant costs on Plaintiffs. As the Supreme Court has explained, states "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.

Under the standing analysis, only one plaintiff needs to establish standing for an Article III case or controversy to exist. *See DACA*, 50 F.4th at 514 (citing *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)). And once a concrete injury is shown, the magnitude of that injury is irrelevant to the standing inquiry. *See, e.g., Massachusetts*, 549 U.S. at 525–26.

"Federal law requires the State to provide emergency Medicaid to noncitizens and public education to all children, regardless of their immigration status." *DACA*, 50 F.4th at 517. And on top of these federally required costs, other expenditures are required by preexisting state law. Texas law, for instance, requires local governments to provide healthcare for the indigent. *See* Tex. Health & Safety Code §§ 61.001 *et seq.* Texas law also requires nonprofit hospitals to provide unreimbursed care for the indigent as a condition of maintaining their nonprofit status. *See id.* § 311.043.

"The Texas Health and Human Services Commission estimated that the state's public hospital district facilities incurred approximately $596.8 million in uncompensated care for undocumented

immigrants in fiscal year 2006 and $716.8 million in fiscal year 2008." *DACA*, 50 F.4th at 517; Ex. 27,

Smoot Decl. ¶¶ 11–12 (App. 527–28); Ex. 35, Bricker Decl. ¶¶ 5, 10 (App. 656–60) (same).

It is further estimated that the cost of emergency Medicaid services to illegal aliens in Texas

amounted to $90 million in 2013 and $73 million in 2015. *See DACA*, 50 F.4th at 517; Ex. 27, Smoot

Decl. ¶¶ 7–8 (App. 526); Ex. 35, Bricker Decl. ¶¶6–7 (App. 657–58) (estimating such expenses as

between $44.9 and $72.2 million in 2022). "Federal law requires the State to provide emergency

Medicaid to noncitizens and public education to all children, regardless of their immigration status.

Texas presented evidence that it spends millions of dollars providing these services to unauthorized

aliens each year." *Id.* at 517 (footnote omitted); Ex. 28, Lopez Decl. ¶¶ 4–5 (App. 587–88) (education

expenses); Ex. 36, Terry Decl. ¶4 (App. 675–76) (estimating annual cost of educating unaccompanied

alien minors—a subset of all illegal aliens—as $179.78 million in FY 2022 and $224.67 million in FY

2023).

These costs are confirmed by evidence from Defendant-Intervenors. "An expert for

defendants estimated that DACA recipients overall impose a cost of more than $250,000,000 on Texas

per year and another $533,000,000 annually in costs to local Texas communities." *DACA*, 50 F.4th at

518; *see* Ex. 29, Estimated Annual Net Fiscal Benefits of DACA Recipients in Texas 3 (App. 593).

"The record does not indicate precisely what portion of all costs for illegal aliens is spent on DACA

recipients, but no one disputes that some are." *Id.* at 517–18. Defendant-Intervenors' own expert

confirms that DACA recipients rely on emergency Medicaid services, a portion of which is funded by

the States. Ex. 25, Perryman Depo. 76:10–24 (App. 493); Ex. 30, Ku Decl. ¶¶ 43–44, 50 (App.

614, 617).

And while certain financial injuries may increase at the termination of the Final Rule or be

"offset" at its continuation, courts do not examine such information in an Article III standing analysis

because courts do not engage in such "accounting exercise[s]." *DACA*, 50 F.4th at 518. Rather,

"[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." *Id.* (quoting *DAPA*, 809 F.3d at 155–56)).

Thus, any hypothetical financial gains to Plaintiffs caused by the Final Rule are irrelevant for determining whether they have standing. Accordingly, these injuries and costs show that Plaintiffs have also established injury they suffer from the Final Rule. *DACA*, 50 F.4th at 517–20.

### D.  Plaintiffs' injuries are caused by the Final Rule and redressable by this Court.

"Texas has satisfied the second requirement for standing by showing that its costs are 'fairly traceable' to DACA" because the rescission of DACA would "cause some recipients to leave, thereby reducing the financial burdens on the State." *Id.* at 519. Even a report by an expert for Defendant-Intervenors supports the causal link between DACA and Texas' injuries. Ex. 31, Wong Survey at 13 (App. 627) (showing that 22.3% of surveyed DACA recipients would be likely or very likely to leave the country should DACA end); *see also* Ex. 32 Potter Decl. ¶ 8 (App. 631) ("[I]t is reasonable to conclude that some DACA participants would return to their country of origin if they lose or are not given permission to work in the U.S.").

Plaintiffs also satisfy the third element of standing because rescinding DACA will redress their injury. "Normally, to satisfy redressability, a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *DACA*, 50 F.4th at 519–20 (cleaned up). "With special solicitude, however, … [t]he standard is met if there is some possibility that the requested relief will reduce the harm." *Id.* at 520 (cleaned up).

Judicial relief would ease Plaintiffs' injuries because "[t]hose presently subject to DACA would be removable if the DACA program were ended, providing incentives for some if not many to leave the United States, including Texas … and their departure would reduce the State's Medicaid, social

services and education costs for those individuals and their families who depart with them." *DACA*, 50 F.4th at 520.

## V.    Plaintiffs' claims are viable under the APA.

### A.    Plaintiffs have a cause of action under the APA because their claims are within the zone of interests protected by the INA.

The Fifth Circuit has already determined that the Plaintiffs' claims challenging the DACA Memorandum fall within the zone of interests of the INA. *Id.* at 520–21. Nothing could justify a different result here as the subsequent Final Rule implements the same program as the DACA Memorandum. This determination is the law of the case.

The zone-of-interest test is satisfied if the claims are "arguably within the zone of interests to be protected or regulated by the statute." *Id.* at 521 (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)). The only time that review is foreclosed under this test is "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (internal quotations omitted) (quoting *Patchak*, 567 U.S. at 225).

In this case, the interests or purposes of the INA and related immigration statutes are to set forth "a comprehensive federal statutory scheme for regulation of immigration and naturalization" and to "set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *DACA*, 50 F.4th at 521 (internal quotations omitted) (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 587 (2011)). Thus, Plaintiffs have an interest in seeing the INA and other statutes enforced and upheld. *See id.* at 521 (citing *Arizona*, 567 U.S. at 397, and *DAPA*, 809 F.3d at 163). Plaintiffs also have an interest in reducing the financial burdens of illegal immigration, as shown by the injuries that demonstrate their standing. *Id.*

### B.  The Final Rule constitutes a reviewable agency action.

The Final Rule constitutes reviewable agency action because (1) no statute precludes its review, and (2) it is not committed to agency discretion by law. *See* 5 U.S.C. § 701(a).

This Court has already rejected the argument that the DACA Memorandum was "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and therefore not subject to judicial review. *Texas*, 549 F. Supp. 3d at 581; *see also id.* at 606. The Final Rule is no different.

The Final Rule is also final agency action. Agency action is "final" for the purposes of judicial review if two conditions are met: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

The Fifth Circuit has held that the DACA Memorandum was a substantive rule that was required to undergo notice-and-comment rulemaking. *DACA*, 20 F.4th at 522–24. If an agency takes an action that ordinarily requires notice and comment, that action "by definition" constitutes "final agency action." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019); *see also Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006) (explaining that the "final agency action" requirement is satisfied where the agency has issued a "de facto rule or binding norm that could not properly be promulgated absent ... notice-and-comment rulemaking," since the "two inquiries are alternative ways of viewing" the same "question"). The Final Rule—which adopts the same substance as the DACA Memorandum—is therefore final agency action.

### VI.  The Court should vacate the Final Rule, declare it unlawful, and enjoin the Defendants from issuing or renewing DACA permits.

### A.  The Final Rule should be vacated.

Under the APA, an agency action that a court holds unlawful is "set aside," *i.e.*, vacated. 5 U.S.C. § 706(2). Indeed, "district courts have a duty to vacate unlawful agency actions." *Franciscan All.*,

*Inc. v. Azar*, 414 F. Supp. 3d 928, 945 (N.D. Tex. 2019) (O'Connor, J.). The D.C. Circuit takes a similar approach. *See, e.g., United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action.")

The Fifth Circuit recently explained that "[r]emand without vacatur of the agency action is 'generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so.'" *MPP*, 20 F.4th at 1000 (quoting *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021)). "But by default, remand *with* vacatur is the appropriate remedy." *Id.* (emphasis in original). The test focuses on "'(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur.'" *Id.* (quoting *United Steel*, 925 F.3d at 1287).

Remand without vacatur would be particularly inappropriate here because the Final Rule is substantively unlawful, not just insufficiently explained. Defendants could not solve that problem after remand. "Especially in light of DACA's critical substantive failings, the district court was well within its discretion to order vacatur." *DACA*, 50 F.4th at 530.

The Fifth Circuit recently "reject[ed] DHS's contention that the nationwide vacatur is overbroad" because "[i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas*, 40 F.4th at 229 n.18. Furthermore, "[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective because [aliens] would be free to move among states." *Id.* (citing *DAPA*, 809 F.3d at 188).

## B.  The implementation of the Final Rule should be permanently enjoined.

Permanent injunctive relief is proper where the plaintiffs show (1) irreparable harm; (2) no adequate remedy at law; (3) the balance of hardships between the plaintiffs and defendants favors

injunctive relief; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 291 (2006).

### 1. Permanent injunctive relief would alleviate Plaintiffs' irreparable injuries that have no adequate remedy at law.

For an injury to be sufficiently "irreparable," the States need only show the injury "cannot be undone through monetary remedies." *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017) (quoting *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981)). States "bear[] many of the consequences of unlawful immigration" and will suffer irreparable harm absent an injunction. *Arizona*, 567 U.S. at 397. As shown in the standing inquiry, the increase in the presence of illegal aliens will inflict significant financial costs on the States, including but not limited to healthcare and education. *See MPP*, 20 F.4th at 1001 (approving of "the district court incorporat[ing] by reference its discussion of injuries in the standing context" for its analysis of the irreparable injury prong).

These financial injuries are irreparable. Sovereign immunity prevents the States from recovering from the Defendants the money they have spent in the past and will have to spend in the future to furnish social services to illegal aliens who would have remained present without the Final Rule. *Id.* at 1002; *see also DAPA*, 809 F.3d at 186.

### 2. The balance of hardships and the public interest are in favor of permanent injunctive relief.

Because this case involves governments as the parties, the final two elements, the balance of hardships and the public interest, "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *accord DAPA*, 809 F.3d at 187. The balance of the hardships favors the Plaintiffs, and the public interest will be served by barring the Defendants' continuation of unlawful agency action.

"[T]he public interest favors Plaintiffs because the public has an interest in stemming the flow of illegal immigration through the enforcement of immigration laws." *Biden*, 2022 WL 17718634, at *17 (cleaned up); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981) (collecting

38

cases) ("[T]he public interest in enforcement of the immigration laws is significant."); *cf. Nken*, 556 U.S. at 436 ("There is always a public interest in prompt execution of removal orders[.]"). "DHS has no interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas*, 40 F.4th at 229 (cleaned up). And any policy arguments in favor of the Final Rule cannot override these statutory limits. *See Wages & White Lion Invs., LLC v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1143 (5th Cir. 2021) ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends.") (citation omitted).

This Court has already determined that "[c]easing the DACA program would not impose a significant hardship on the [Federal Defendants]." ECF No. 576, Order of Permanent Injunction. Regardless, any hardships the federal government would face from an injunction against the Final Rule are "outweighed by the major financial losses [that] states face." *DAPA*, 809 F.3d at 187.

### 3. Injunctive relief should apply throughout the Nation.

The injunction should also be nationwide. Both the Constitution and Congress have directed that the Nation needs a uniform, nationwide immigration policy. *See id.* at 187–88. Specifically, "[i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *DACA*, 50 F.4th at 531. In contrast, a more limited remedy would "detract[] from the integrated scheme of regulation[] created by Congress." *Id.* (internal quotations omitted). In particular, since DACA recipients can move freely within the United States, nationwide relief is appropriate because nothing would prevent them from moving to the Plaintiff States and creating the same harms the district court crafted its injunction to mitigate. Thus, a nationwide injunction is warranted.

### C. The Court should issue a declaratory judgment that the Final Rule is unlawful.

"The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. The APA expressly contemplates declaratory relief: "The

form of proceeding for judicial review … includ[es] actions for declaratory judgments or writs of prohibitory or mandatory injunction[.]" 5 U.S.C. § 703. Plaintiffs have established that the Final Rule violates the APA and they are entitled to a declaration delineating the rights and legal relations among themselves and the Defendants. The Court should declare that the Final Rule is substantively unlawful, arbitrary and capricious, and unconstitutional.

### D.  Relief against the Final Rule is not barred by 8 U.S.C. § 1252(f)(1).

The Fifth Circuit held that judicial relief against the DACA Memorandum was not barred by 8 U.S.C. § 1252(f)(1). *DACA*, 50 F.4th at 528.

Section 1252(f)(1) states:

> In general, regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of [8 U.S.C. §§ 1221–32], other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

The Fifth Circuit explained that this "does not apply to vacatur." *DACA*, 50 F.4th at 528. Indeed, "[b]y its plain terms, and even by its title, [section 1252(f)(1)] is nothing more or less than a limit on injunctive relief." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999).

Section 1252(f)(1) is also no bar to declaratory relief. *See Alli v. Decker*, 650 F.3d 1007, 1013 (3d Cir. 2011). This construction is consistent with the Supreme Court's most recent pronouncement on the question. *See Biden v. Texas*, 142 S. Ct. 2528, 2540 (2022) (describing how, in *Nielsen v. Preap*, 139 S. Ct. 954 (2019), the Court "proceeded to reach the merits of the suit, notwithstanding the District Court's apparent violation of section 1252(f)(1), by reasoning that '[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' request for declaratory relief'") (alterations in original) (quoting *Preap*, 139 S. Ct. at 962).

Finally, the Fifth Circuit also held that Section 1252(f)(1) did not bar even injunctive relief against implementation of the DACA Memorandum, because that section

> prohibits injunctions only as to §§ 1221–1232. Nothing in §§ 1221–1232 authorizes DHS to broaden the categories of aliens who are entitled to lawful presence in the United States, and the district court correctly so held. The district court's judgment does prohibit the grant of DACA status to those who were not presently DACA recipients at the time of the district court's judgment. However, that judgment does not require the removal of any DACA applicant.

*DACA*, 50 F.4th at 529.

The Final Rule conflicts with many parts of the INA—but they are not within §§ 1221–1232 and thus fall outside the scope of Section 1252(f)(1). *See, e.g.*, 8 U.S.C. §§ 1182(a)(9)(B)(i) (unlawful presence); 1182(d)(5)(A) (parole); 1324a (employment). Section 1252(f)(1) thus does not preclude any of the relief against the Final Rule sought in this action.

## CONCLUSION

The Final Rule—as the latest manifestation of the DACA program—is substantively unlawful for the same reasons as the DACA Memorandum. The Court should declare it unlawful and unconstitutional, vacate it in its entirety, and permanently enjoin its implementation (with a prudent transition for existing DACA recipients).

Date: January 31, 2023

STEVE MARSHALL
Attorney General of Alabama

TIM GRIFFIN
Attorney General of Arkansas

KRIS KOBACH
Attorney General of Kansas

JEFF LANDRY
Attorney General of Louisiana

LYNN FITCH
Attorney General of Mississippi

MICHAEL T. HILGERS
Attorney General of Nebraska

ALAN WILSON
Attorney General of South Carolina

PATRICK MORRISEY
Attorney General of West Virginia

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

*/s/ Leif A. Olson*
LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas Bar No. 33695

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Division
*Attorney-in-Charge*
Texas Bar No. 24088531
Southern District of Texas Bar No. 3053077

RYAN D. WALTERS
Special Counsel
Texas Bar No. 24105085
Southern District of Texas Bar No. 3369185

Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-2714
Fax: (512) 457-4410
leif.olson@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov

*Counsel for Plaintiff States*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF) on January 31, 2023.

*/s/ Leif A. Olson*
LEIF A. OLSON