# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, ET AL.; | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 1:18-cv-00068 |
| | § | |
| UNITED STATES OF AMERICA, ET AL.; | § | |
| | § | |
| *Defendants,* | § | |
| | § | |
| *and* | § | |
| | § | |
| KARLA PEREZ, ET AL.; | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| *Defendants-Intervenors.* | § | |

### APPENDIX IN SUPPORT OF PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT

### VOLUME 2 OF 3

### EXHIBITS 6 THROUGH 34

### PAGES APP. 263 THROUGH APP. 653

CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2023, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

*/s/ Leif A. Olson*
LEIF A. OLSON

# Exhibit 6



<u>PRACTICE ADVISORY</u> [1]
June 2016

## DACA, ADVANCE PAROLE, AND FAMILY PETITIONS
By Lena Graber and Jose Magaña-Salgado

### Introduction

This advisory explains how Deferred Action for Childhood Arrivals (DACA) recipients who, independent of their DACA status, have a current or future immediate relative petition may be able to obtain lawful permanent resident status (also known as a "green card") within the United States. Only DACA recipients who fit certain criteria can do this; those criteria will be explained in depth below. Although the focus of this advisory is on DACA recipients, the same possibilities and considerations may apply to Temporary Protected Status (TPS) recipients.

IMPORTANT: **DACA is a form of prosecutorial discretion that does not, on its own, confer any permanent immigration benefits, including lawful permanent resident status. Similarly, advance parole is simply permission to leave and re-enter the country and, on its own, does not confer any permanent benefit.**

Undocumented immigrants—including those with DACA—who entered the country illegally cannot easily get lawful status, even if they have a family member who can sponsor them for permanent residence. They are inadmissible because of their unlawful entry. However, a person who travels abroad with permission from the government to depart and return (called advance parole) will reenter *legally* when they come back. They will be paroled into the U.S., which is considered a lawful entry. This reentry with parole allows some of those immigrants more opportunities to seek permanent residence.

Becoming a permanent resident through adjustment of status involves many different requirements. Lawful entry is just one of those requirements. However, as unlawful entry is one of the most common obstacles for undocumented immigrants seeking to adjust status within the U.S., traveling with advance parole is an important strategy to consider. This advisory will explain who can benefit from advance parole, what risks are involved, and what requirements they must meet, in order to get a green card.

---

[1] The Immigrant Legal Resource Center is a national, nonprofit resource center that provides legal trainings, educational materials, and advocacy to advance immigrant rights. The mission of the ILRC is to work with and educate immigrants, community organizations, and the legal sector to continue to build a democratic society that values diversity and the rights of all people. For the latest version of this practice advisory, please visit <u>www.ilrc.org</u>. For questions regarding the content of this advisory, please contact Lena Graber at <u>lgraber@ilrc.org</u> or Jose Magaña-Salgado at <u>jmagana@ilrc.org</u>.

**App. 264**

# I.      Advance Parole for DACA Recipients

Individuals who received deferred action under DACA may request permission to temporarily travel outside of the United States through a process known as "advance parole." Those without DACA or who are waiting for U.S. Citizenship and Immigration Services (USCIS) to process their DACA applications cannot apply for advance parole until they receive DACA.

A DACA recipient must request and receive advance parole approval before traveling outside of the United States.[2] If a DACA recipient travels outside of the United States without advance parole, USCIS may terminate her deferred action, and she will not be eligible to apply for renewal of DACA or file a new initial application.[3]

## A. What Is Advance Parole?

Advance parole is a way for certain immigrants to travel outside the United States. Advance parole allows a person inside the U.S., who seeks to depart, to receive advance authorization to re-enter the U.S. (to be "paroled") upon her return.[4] A person who has a green card or a valid multi-entry visa does not need advance parole to leave and return. A DACA recipient who leaves the country, however, has no lawful way to come back, unless DHS has granted approval for travel in advance. Leaving without advance parole will also result in termination of a DACA grant.

DACA recipients interested in traveling abroad must apply for advance parole by filing Form I-131 (Application for Travel Document)[5] along with supporting documents and pay the $360 filing fee.[6] The updated instructions to Form I-131 include information to help DACA recipients properly fill out the form. The instructions also explain what additional documents DACA recipients must submit with their application.[7]

## B. Requirements for Advance Parole for DACA Recipients

USCIS will currently only grant advance parole to DACA recipients if the travel abroad is in furtherance of one of the following categories:

- **Humanitarian purposes**, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative;
- **Educational purposes**, such as semester-abroad programs and academic research, or;

---

[2] USCIS DACA FAQ Question #51 explains that a DACA recipient will be permitted to travel outside of the United States *only if* she applies for and receives advance parole from USCIS.
[3] USCIS National Standard Operating Procedures, Deferred Action for Childhood Arrival (April 4, 2013) ("DACA SOP v.2") p. 57, available at http://legalactioncenter.org/sites/default/files/DACA%20Standard%20Operating%20Procedures.pdf.
[4] USCIS Adjudicator's Field Manual, § 54.1. See also USCIS's definition of "Parolee" and "Advance Parole," stating that advance parole "may be issued to [noncitizens] residing in the United States in other than lawful permanent resident status who have an unexpected need to travel and return, and whose conditions of stay do not otherwise allow for their readmission to the United States if they depart," available at http://www.dhs.gov/definition-terms#parolee.
[5] Form I-131, Application for Travel Document, is available at www.uscis.gov/i-131.
[6] For more information about how to apply for advance parole as a DACA recipient, see Immigrant Legal Resource Center, Travel for DACA Applicants, available at http://www.ilrc.org/resources/travel-for-daca-applicants-advance-parole; Legal Action Center: American Immigration Council and the Catholic Legal Immigration Network, Inc. practice advisory, "Advance Parole for Deferred Action for Childhood Arrivals (DACA) Recipients (Aug. 28, 2013), p. 3, available at www.legalactioncenter.org/practice-advisories/advance-parole-deferred-action-childhood-arrivals-daca-recipients; and E4FC and Curran & Burger, LLP, "Got DACA Now What?..." guide, available at http://e4fc.org/gotdacanowwhat.html.
[7] USCIS Form I-131, Instructions.

**App. 265**

- **Employment purposes** such as overseas assignments, interviews, conferences or, training, or meetings with clients overseas.[8]

USCIS has been generous with these categories. Some DACA recipients who wished to visit parents or grandparents they had not seen in many years received advance parole.[9] However, travel for purely vacation purposes is not a valid basis for advance parole for DACA recipients.[10] In contrast, USCIS is very strict with DACA recipients seeking renewal who traveled on advance parole. DACA recipients who did not travel within the exact dates of their advance parole period report being denied DACA renewal on the basis of traveling outside the country without a valid grant of advance parole. If a DACA recipient does not travel within the exact dates of their advance parole approval, USCIS will deny their renewal application.[11]

In addition, U.S. Customs and Border Protection (CBP) officers at the border may question DACA recipients about their purpose for travel and whether they did in fact travel for the reasons provided in their advance parole application, and whether those reasons were in fact true or fabricated. Therefore, it is extremely important to comply with all the terms of the advance parole approval and to be prepared to answer questions upon seeking reentry to the U.S.

**WARNING:** **An advance parole authorization document (Form I-512L) authorizes reentry into the U.S., but does not guarantee that its holder will be paroled into the United States upon her return.[12] When an advance parole recipient presents herself at a U.S. port-of-entry upon her return, she will be subject to inspection by an immigration official who will make a discretionary decision as to whether she will be paroled into the United States.[13] Generally, persons traveling on advance parole are allowed to enter without problem. However, see Section II below on the risks of travel on advance parole for more information.**

### C. Advance Parole for non-DACA recipients

Advance parole is not specific to DACA. A variety of individuals with pending applications or other forms of deferred action status may apply for advance parole. Individuals with TPS or pending applications for adjustment of status can seek advance parole to travel during the time they are in this temporary status. People with these other types of status do not need to meet the same criteria as DACA recipients; they can travel for purposes outside of employment, education, or humanitarian reasons. For example, TPS recipients can seek advance parole purely for vacation.

The application process and legal benefits for non-DACA advance parole are essentially the same, though less documentation is required. A person who entered unlawfully, later obtained TPS and travels with advance parole will be paroled into to the United States, curing the initial entry without inspection. Like a DACA recipient, a TPS recipient would no longer be subject to inadmissibility on the basis of his or her prior unlawful entry.

---

[8] USCIS DACA FAQs Question 57.

[9] In addition, some DACA recipients who will travel to a consulate in their country of origin for consular processing have received advance parole to provide a safeguard to allow their return and to allow them to go back to the United States while waiting for the Consulate to adjudicate waivers of inadmissibility.

[10] *Id.* Please note that advance parole is available in other contexts apart from DACA, such as for those with pending adjustment applications or those with TPS. Those with TPS or pending adjustment applications may travel for purposes outside those approved for the DACA program, such as for vacation. The requirements for advance parole are distinct for DACA.

[11] See Immigrant Legal Resource Center, DACA Renewal and Advance Parole, August 2015, available at http://www.ilrc.org/resources/daca-renewal-and-advance-parole-practice-advisory-english-spanish.

[12] USCIS Form I-131, Instructions, p. 1.

[13] *Id.*

**App. 266**

## II. Risks of Advance Parole and Grounds of Inadmissibility

Traveling outside of the United States, even for DACA recipients with advance parole, always carries a risk of being unable to return lawfully. In most cases this risk may be small, but still must be fully evaluated in case more complicated issues arise. DACA recipients interested in traveling abroad through advance parole should consult with an expert immigration practitioner before leaving the United States to evaluate the risks and benefits of such travel.

While advance parole permits a person to enter the U.S. in spite of their lack of a visa, CBP will still screen travelers for admissibility and may question their entire immigration history upon seeking reentry. Therefore, it is essential to determine if there are any circumstances in a person's immigration history, such as a prior removal order or other grounds of inadmissibility, that could present risks to reentering successfully. Even if there are no complications, however, CBP officers retain discretion to deny entry.[14] Accordingly, there is no absolute guarantee that a person traveling with advance parole will be authorized to re-enter.

### A. What is admissibility?

Admissibility is a legal term that means a person can be admitted in lawful status to the United States. This is separate from whether the person might be physically present or physically permitted to enter the United States. Admissibility is defined largely by which categories of immigrants are not admissible, and these categories are listed in INA § 212. These rules are commonly called grounds of inadmissibility. Receiving DACA is not an admission to the United States; it is an administrative form of prosecutorial discretion. Applicants do not need to meet all the requirements for admissibility under immigration law to receive DACA. Accordingly, a person may be eligible for DACA but not otherwise "admissible" under immigration law.

Entering the U.S. with advance parole is not an *admission*. It is an entry on parole. A person does not have to be admissible under immigration law to be paroled into the country.[15] In fact, in many cases parole is an exceptional remedy to allow someone who is specifically not admissible to enter the U.S. However, as discussed above, everyone presenting themselves at a port of entry will be screened for admission, and CBP officers retain discretion to deny entry.

### B. Removal proceedings and prior removal orders

A DACA recipient who has been previously ordered removed (also known as "deported" or "excluded") may still request and obtain advance parole.[16] However, if she leaves the United States after being ordered removed, her departure from the United States will result in her executing that removal order. This execution would have potentially serious future immigration consequences, including the inability to be lawfully admitted to the United States when applying for permanent residency, if that opportunity arises.[17] This is true even if the person received deferred action from USCIS or U.S. Immigration and Customs Enforcement (ICE) and possessed a grant of advance parole. DACA recipients with prior orders of removal or who are in proceedings should consult with an immigration attorney before leaving with advance parole. It is generally not advised to travel in that situation. It is particularly important to screen a person's immigration history for possible expedited removals at the border.

---

[14] *See* USCIS Form I-131 Instructions for Application for Travel Document, p. 1, 5.
[15] *See* INA § 212(d)(5)(A); 8 CFR § 212.5.
[16] USCIS DACA FAQs Question 57.
[17] See INA § 212(a)(9)(A).

**App. 267**

**Example:** James came to the United States by himself when he was 15. At the border, CBP apprehended and fingerprinted him and he does not really remember what else happened. James successfully entered without inspection a few days later. James now has DACA and would like to get advance parole to see his grandfather, who is ill and may not live much longer. In order to travel safely with advance parole, James must make sure that his previous stop did not involve an expedited removal, which would have triggered grounds of inadmissibility and could prevent him from reentering on advance parole.

Likewise, a person currently in removal proceedings, but who does not have a removal order, should be cautious when traveling with advance parole. If the immigration court will agree to terminate or administratively close[18] proceedings, then advance parole may be an option. Regardless, it is very risky to travel during ongoing removal proceedings. Specifically, a person risks being ordered removed in absentia if the hearing is scheduled and held in her absence.

## C.  Unlawful presence bars

In general, a person who leaves the United States after having been in the United States unlawfully for more than six months triggers the unlawful presence provisions of INA § 212(a)(9)(B) – the "unlawful presence bars."[19] These bars take effect *upon departure* from the United States. Unlawful presence is not counted against a person until she leaves. But once a person has left the U.S. after accruing more than 180 days of unlawful presence, she will be inadmissible.

However, there is an exception to the unlawful presence bars: they do not apply to a person traveling with advance parole. In 2012, the BIA ruled in *Matter of Arrabally and Yerrabelly* that travel on advance parole was not a "departure" for purposes of inadmissibility under 212(a)(9)(B)(i).[20] Therefore, the unlawful presence bars will not affect a person who departs and reenters the U.S. with advance parole. Importantly, advance parole, however, does not cure unlawful presence bars that were triggered by a previous, non-advance parole departure.

**Example:** Marta received DACA last year, when she was 24. Marta had years of unlawful presence before she got DACA. If she leaves the United States, she is subject to a ten year bar to admissibility under INA § 212(a)(9)(B). Marta's employer would like to send her on a trip to China for work. As a DACA recipient, Marta can qualify for advance parole because her travel is for employment purposes. If she travels with advance parole, she will not trigger the unlawful presence bars when she goes to China, because her trip will not count as a "departure" for purposes of INA § 212(a)(9)(B).

---

[18] "Administrative closure" does not mean removal proceedings have ended. Rather proceedings are taken off calendar, but still viable and not terminated. The Immigration Judge still has jurisdiction over the person in proceedings, and either side may request that the proceedings be placed back on calendar at any time. According to the I-131 instructions, a person who seeks to travel with advance parole during removal proceedings, including administratively closed proceedings, must apply for advance parole from ICE, not USCIS. However, many attorneys report applying to USCIS for advance parole for clients with administratively closed proceedings, and having no trouble.

[19] INA § 212(a)(9)(B) includes two grounds of inadmissibility commonly referred to as the "three" and "ten year" bars. Generally, someone who remains more than 180 days without authorization may be subject to a three year bar to legal re-entry upon departure from the U.S., and a person who has lived in the United States unlawfully for a year or more may be subject to the 10 year bar upon departure. However, the days of unlawful presence do not count while someone is under 18 years old, and there are certain other exceptions to these "bars" in the statute.

[20] *Matter of Arrabally and Yerrabelly*, 25 I&N Dec. 771 (BIA 2012). *Matter of Arrabally and Yerrabelly* has since been applied to TPS and DACA recipients who traveled on advance parole and then sought adjustment of status. They were able to adjust status because they had not triggered the unlawful presence bars when they left and returned under advance parole.

**App. 268**

### D.  Permanent bar

A person who re-enters the U.S. without authorization after being deported is subject to the "permanent bar" (which can only be waived after the individual has been outside the U.S. for 10 years) in INA § 212(a)(9)(C). In addition, a person who spent more than a year of unlawful presence who then left the country and re-entered unlawfully is subject to the same bar.[21]

If unlawful reentry after a deportation or more than a year of unlawful presence already occurred in the past, the permanent bar is already triggered and the person is inadmissible. However, the permanent bar does not make a person ineligible for DACA or advance parole. The bar simply makes travelling on advance parole very risky, because CBP could determine that the advance parole holder is inadmissible and not parole them back in.[22]

Because a departure and illegal reentry in the past could trigger the permanent bar, it is important to ask your client about all prior departures and entries. It is not advisable for a client to travel if they already triggered this bar, particularly by reentering after a removal order.

> **Example:** Manuel came to the U.S. without inspection in 1992, when he was ten years old, and lived in El Paso for nine years. When he was nineteen, he went back to Mexico for the summer, and then reentered without inspection to start college. He received DACA two years ago. Manuel is a scientist and wishes to get advance parole for a conference in Montreal. However, Manuel will still be inadmissible because he triggered the permanent bar when he went to Mexico and reentered unlawfully several years ago. As a result, he could be denied entry at the border.

### E.  Other grounds of inadmissibility

As discussed above, a person seeking to reenter the U.S. with advance parole is still an applicant for admission and can be denied entry for being inadmissible under immigration law.[23] CBP may screen for inadmissibility, even though permitting entry on parole does not count as an admission.[24]

There are many ways a person might be found to be inadmissible under the immigration laws. These include grounds based on smuggling (including helping a family member cross the border illegally), lying or making a material misrepresentation to an immigration official (such as using a false U.S. passport or green card to enter the U.S.), and criminal bars (such as drug offenses and other convictions). Advocates should pay close attention to criminal history, drug use, past contact with immigration officials, and multiple entries to the United States. These are just a few examples of the many ways that a person can be found to be inadmissible, even though they were eligible for and received DACA.

> **Example:** Two years ago, Sonja, a college student, was caught with a bag of marijuana and convicted of misdemeanor possession of a controlled substance. In spite of this, Sonja was able to get DACA, because her conviction was not a bar to eligibility, and she presented evidence of her strong ties to the U.S. and excellent academic achievements. Sonja would

---

[21] *See* INA § 212(a)(9)(C). This provision, unlike the unlawful presence bars, applies to minors. Therefore, if a child or adult had unlawful presence for more than a year in the United States after April 1, 1997, then leaves and re-enters illegally, she will be inadmissible under INA § 212(a)(9)(C).

[22] USCIS does not consider parole pursuant to INA § 212(d)(5) to be an illegal reentry without admission that would trigger the permanent bar. Therefore, reentry with advance parole would not make someone inadmissible under INA § 212(a)(9)(C).

[23] *See* USCIS Form I-131, Instructions for Application for Travel Document.

[24] The returning parolee remains an applicant for admission in the context of future immigration applications or proceedings.

**App. 269**

like to get advance parole and participate in a study abroad program in India. Although Sonja is eligible for advance parole because she has DACA and wishes to travel for an educational purpose, it is very risky for Sonja to leave the country if she hopes to return. Even if she has advance parole, she could be found inadmissible under INA § 212(a)(2)(A)(ii) for her conviction involving a controlled substance, and prevented from re-entering.

The example with Sonja illustrates the current conundrum of advance parole. While USCIS has authorized a re-entry for someone who is otherwise inadmissible, CBP may still exercise discretion in allowing this person to re-enter. Because CBP still inspects the person granted advance parole upon return, they may deny re-entry. Criminal and fraud grounds, in particular, might cause an officer to deny entry at time of inspection. CBP does have authority to parole people in spite of inadmissibility and CBP guidance recommends some flexibility with "minor or technical violations of the INA,"[25] but nonetheless CBP has discretion and there is no appeal of a denial of entry on parole.

## III.   Advance Parole and Adjustment of Status

A DACA recipient who travels on advance parole may gain the ability to adjust status in the United States upon her return if she meets the requirements for adjustment under existing immigration law. To adjust status, a person must have been inspected and admitted or paroled into the United States, among other requirements.[26] Many DACA recipients originally entered the U.S. without inspection, and therefore are not able to apply for adjustment of status within the United States under INA § 245(a). Obtaining DACA and then travelling and re-entering the U.S. with parole, may give some of these individuals the ability to adjust status through an "immediate relative"[27] family member after their return to the U.S.

Keep in mind that advance parole is not required to adjust status to permanent residence in some cases. Any applicant who meets the requirements in INA § 245 can qualify to adjust to permanent residence. Only in the case of someone who last entered without inspection *and* who is an "immediate relative" of a U.S. citizen, does advance parole become central to qualifying for adjustment.

### A. Requirements for Adjustment of Status.

DHS may adjust a person's status to permanent residence if they meet the requirements of INA § 245(a): 1) she must have been admitted or paroled into the U.S.; 2) she must apply for adjustment; 3) she must be eligible to receive an immigrant visa and be admissible to the United States for permanent residence, and 4) an immigrant visa must be available when they file the adjustment application.

The first requirement lies in the first clause of INA § 245(a), which provides that status can only be adjusted of a person "*who was admitted or paroled into the United States.*" A person who has not been lawfully admitted or paroled into the country is therefore not eligible for adjustment of status.[28]

---

[25] *See* CBP Directive No. 3340-043, "The Exercise of Discretionary Authority" Sept. 3, 2008, available at http://nationalimmigrationproject.org/legalresources/NIPNLG_v_DHS/CBP%20Parole%20Directive%20%28Partially%20Redacted%29%20-%20Sept%203%202008.pdf.
[26] *See* INA § 245(a).
[27] "Immediate relatives" are parents of adult U.S. Citizens, spouses, and minor unmarried children of U.S. citizens. Advance parole will not ordinarily help family preference beneficiaries be able to adjust status, because most of them would still face the INA § 245(c) bars to adjustment for failing to continuously maintain lawful status, and/or working without authorization. But these family preference beneficiaries may still be able to consular process.
[28] However they may still be able to get a green card outside the U.S. through consular processing.

**App. 270**

Traveling and reentering the country with advance parole, however, overcomes this problem, because the person has now been paroled into the United States.[29]

In addition, INA § 245 sets out several bars to eligibility for adjustment of status. In particular, INA § 245(c) creates bars to adjustment that may affect many DACA recipients and other undocumented immigrants, including if a person has ever worked unlawfully or failed to continuously maintain lawful status.[30] These are not grounds of inadmissibility. They are only bars to adjusting to permanent residence within the U.S. These bars, however, have important exceptions for immediate relatives of U.S. citizens. An immediate relative who did not continuously maintain lawful status or who has worked without authorization, can still adjust status, while other family petition beneficiaries, such as spouse of an LPR, cannot.[31] However, a person who is subject to any of these bars to adjustment of status may still be admitted to permanent residence at the Consulate abroad, through consular processing.

But in all cases, a person who is subject to any grounds of inadmissibility is not able to be admitted to permanent residence, unless they are exempt from particular grounds, or able to get a waiver for that inadmissibility.

## B.    Inadmissibility

### 1) Inadmissible for unlawful entry

One very common ground of inadmissibility is INA § 212(a)(6)(A)(i), which makes inadmissible any immigrant who is present in the United States "without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General."[32] In other words, those who entered illegally are subject to this ground of inadmissibility. This is one of the reasons it is so difficult for undocumented immigrants to get legal status. Conversely, a person who entered with a visa, even if it expired many years ago, is not subject to this particular ground of inadmissibility. That is, DACA recipients who entered lawfully do not need to be paroled in, because they already have avoided this issue.

However, a person who gets advance parole, travels outside the U.S., and re-enters the country pursuant to advance parole has now been "paroled" into the country. This person is no longer subject to inadmissibility under INA § 212(a)(6)(A)(i). The fact that they previously entered without inspection does not affect this analysis.[33]

---

[29] *See* USCIS Policy Memorandum 602-0091, Nov. 15, 2013 available at
http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2013/2013-1115_Parole_in_Place_Memo_.pdf.
[30] Additionally, some subsequent sections of INA § 245 provide for adjustment of status for particular types of applicants, such as Special Immigrant Juveniles (SIJ) or "U" victim of crime visas, where the rules and requirements may be substantially different.
[31] *See* INA § 245(c)(2).
[32] INA § 212(a)(6)(A)(i).
[33] In 2013, USCIS issued a memorandum describing a prosecutorial discretion option for "parole in place" which provided detailed guidance about how parole interacts with INA § 212(a)(6)(A)(i). In this memorandum, USCIS writes that: "An alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i)." Therefore, if a person's only bar to adjustment of status as an immediate relative was that they entered the United States without being "inspected, admitted, or paroled," then after advance parole they are no longer inadmissible on this basis, because they have now been paroled. Although the analysis and explanation is in the policy for "parole in place" for family members of U.S. military and veterans, the memo states: "This amendment to AFM chapter 40.6 applies to any paroled alien, not only to the family members of Armed Forces personnel." USCIS Policy Memorandum 602-0091, Nov. 15, 2013 available at
http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2013/2013-1115_Parole_in_Place_Memo_.pdf.
Furthermore, in 2014 DHS issued a memo directing DHS legal counsel to issue guidelines clarifying that this interpretation

**App. 271**

Therefore, a person who has entered pursuant to a grant of advance parole may be admissible for permanent residence under immigration law and may qualify for adjustment of status. Remember that a person must meet all the requirements for adjustment of status under INA § 245 and must 1) not have any other basis of inadmissibility or 2) be able to seek a waiver of inadmissibility.

> **Example:** Jose came across the border without inspection as a child and has lived here ever since. He received DACA and recently married a U.S. citizen. Jose applied for advance parole to travel to Mexico for work. When he returns Jose will be able to apply to adjust status as an immediate relative of a U.S. citizen. He will not be inadmissible because he was inspected and paroled on advance parole.

A DACA recipient does not need to have a U.S. citizen (or anyone else) petitioning for her to travel on advance parole. No petitioner is needed for advance parole. The immediate relative petitioner is only required for seeking *adjustment of status* after traveling with advance parole. The requirements for advance parole for DACA recipients are described above in section I. Thus, a DACA recipient who travels on advance parole and *later* marries a U.S. citizen can apply for her green card through adjustment of status as an immediate relative.

## 2) Other grounds of inadmissibility

Other common grounds of inadmissibility for undocumented immigrants are the "unlawful presence bars," discussed in section II-C above. As explained above, advance parole provides an exception to the normal operation of these grounds of inadmissibility, which are described in INA § 212(a)(9)(B). Most undocumented immigrants who leave the U.S. will be inadmissible for lawful status for three or ten years because of their prior unlawful presence totaling more than 180 days (three year "bar") or one year (ten year bar) with certain exceptions. However, leaving the U.S. with advance parole does not make a person inadmissible under that section, because it does not count as a "departure."

Nonetheless, other grounds of inadmissibility can still prevent a person from adjusting status. For example: the "permanent bar," discussed above in section II-D, false claims to U.S. citizenship, or any criminal grounds of inadmissibility.

> **Example:** Veronica entered the U.S. without inspection in 1993 and has never left. In 1999, Veronica was convicted of misdemeanor drug possession. In 2010 she married a U.S. citizen in 2010 and in 2013 she received DACA. Veronica would like to travel on advance parole so that she can adjust status through her U.S. citizen spouse. However, Veronica's conviction is a controlled substance offense and she is inadmissible. It would be very risky for her to try to travel with advance parole, even though her conviction occurred 16 years ago. The fact that she has been granted DACA and could apply for advance parole does not change her inadmissibility resulting from the drug conviction.  Even if she were successfully paroled back into the U.S., she would still be inadmissible to adjust status based on her U.S. citizen spouse's petition.  Veronica will have to try to get her conviction vacated in order to pursue any further immigration benefits.

---

applies to all cases of travel with advance parole. *See* DHS Secretary Jeh Johnson, Directive to Provide Consistency Regarding Advance Parole, Nov. 20, 2014, available at
http://www.dhs.gov/sites/default/files/publications/14_1120_memo_arrabally.pdf.

**App. 272**

**C. Summary of requirements for DACA recipients to travel on advance parole and adjust status:**

DACA recipients who entered without inspection, but who are not subject to any other grounds of inadmissibility (or who can get a waiver of their inadmissibility), may be able to adjust status as immediate relatives, if they successfully obtain a grant of advance parole and are paroled back into the United States after travel. As always, a person seeking to adjust status must have an immigrant visa immediately available to them, be eligible for adjustment, and must not be inadmissible.

# Exhibit 7



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Office of the Director (MS 2000)*
Washington, DC 20529-2000

**U.S. Citizenship
and Immigration
Services**

JUN 29 2016

The Honorable Charles E. Grassley
Chairman
Committee on the Judiciary
United States Senate
Washington, DC 20510

Dear Chairman Grassley:

Thank you for your March 2, 2016 letter. Secretary Johnson asked that I respond on his behalf.

U.S. Citizenship and Immigration Services (USCIS) appreciates the opportunity to respond to your questions about immigration parole authority and advance parole as it may relate to individuals who have been granted Deferred Action for Childhood Arrivals (DACA).

As this Administration previously emphasized, neither deferred action nor advance parole creates "a path to citizenship." Only individuals who qualify to be classified as an immigrant under the Immigration and Nationality Act (INA) are eligible for lawful permanent residence. The most common basis for such an immigrant classification is a specified family relationship or employment qualification. Obtaining deferred action or advance parole does not alter the requirement that an alien must meet all existing requirements to be classifiable as an immigrant and all other requirements for admissibility.

In your letter, you requested information regarding the population of DACA recipients who have received advance parole. According to USCIS electronic records, of the 713,300 individuals granted DACA through December 31, 2015, a total of 22,340 were subsequently approved for advance parole based on their submission of a separate advance parole request. This calculation is based on our identification of a common A-number associated with both the DACA and advance parole records. From among the 713,300 individuals who have been granted DACA, USCIS electronic records indicate that fewer than one percent were subsequently granted advance parole and also applied for adjustment of status—a total of 5,068. As of December 31, 2015, of those 5,068, a total of 2,994 have been approved for adjustment of status. The 2,994 constitutes less than one-half of one percent of the 713,300 DACA recipients.

It is important to note that some among the group of 2,994 DACA recipients who were approved for advance parole and who were subsequently granted adjustment of status may have been otherwise eligible for adjustment of status regardless of the grant of advance parole. For example, if a DACA recipient had been previously admitted (or paroled) into the United States and subsequently fell out of status, he or she would already meet the inspection and admission

The Honorable Charles E. Grassley
Page 2

(or parole) requirements of INA § 245(a) for adjustment of status. A subsequent parole into the United States would not affect that eligibility. It would be cost prohibitive and significantly burdensome to conduct a manual analysis of each of these files to identify such cases.

Without a manual review of each case, USCIS could not electronically determine which DACA recipients among the 2,994 who were approved for adjustment of status and who had applied for and received advance parole, actually traveled abroad, returned, and were paroled into the United States upon return. When an individual applies for adjustment of status, USCIS verifies on a manual, case-by-case basis whether the adjustment applicant has been inspected and admitted or paroled into the United States based on the evidence presented, such as a stamped parole document, and/or the review of the Department's records of that applicant.

Thank you again for your letter and interest in this important issue. Senator Lee, who co-signed your letter, will receive a separate, identical response. Should you wish to discuss this matter further, please do not hesitate to contact me.

Respectfully,

León Rodríguez
Director

**App. 276**

# Exhibit 8

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

November 20, 2014

MEMORANDUM FOR:   León Rodríguez
                  Director
                  U.S. Citizenship and Immigration Services

                  Thomas S. Winkowski
                  Acting Director
                  U.S. Immigration and Customs Enforcement

                  R. Gil Kerlikowske
                  Commissioner
                  U.S. Customs and Border Protection

FROM:             Jeh Charles Johnson
                  Secretary

SUBJECT:          **Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents**

This memorandum is intended to reflect new policies for the use of deferred action. By memorandum dated June 15, 2012, Secretary Napolitano issued guidance entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children.* The following supplements and amends that guidance.

The Department of Homeland Security (DHS) and its immigration components are responsible for enforcing the Nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. Secretary Napolitano noted two years ago, when she issued her prosecutorial discretion guidance regarding children, that "[o]ur Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case."

1

**App. 278**

Deferred action is a long-standing administrative mechanism dating back decades, by which the Secretary of Homeland Security may defer the removal of an undocumented immigrant for a period of time.[1]  A form of administrative relief similar to deferred action, known then as "indefinite voluntary departure," was originally authorized by the Reagan and Bush Administrations to defer the deportations of an estimated 1.5 million undocumented spouses and minor children who did not qualify for legalization under the *Immigration Reform and Control Act* of 1986.  Known as the "Family Fairness" program, the policy was specifically implemented to promote the humane enforcement of the law and ensure family unity.

Deferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission.  As an act of prosecutorial discretion, deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion.  Deferred action does not confer any form of legal status in this country, much less citizenship; it simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States.  Nor can deferred action itself lead to a green card.  Although deferred action is not expressly conferred by statute, the practice is referenced and therefore endorsed by implication in several federal statutes.[2]

Historically, deferred action has been used on behalf of particular individuals, and on a case-by-case basis, for classes of unlawfully present individuals, such as the spouses and minor children of certain legalized immigrants, widows of U.S. citizens, or victims of trafficking and domestic violence.[3]  Most recently, beginning in 2012, Secretary Napolitano issued guidance for case-by-case deferred action with respect to those who came to the United States as children, commonly referred to as "DACA."

---

[1]  Deferred action, in one form or another, dates back to at least the 1960s.  "Deferred action" per se dates back at least as far as 1975. *See,* Immigration and Naturalization Service, Operation Instructions § 103.1(a)(1)(ii) (1975).

[2]  INA § 204(a)(1)(D)(i)(II), (IV) *(Violence Against Women Act (VAWA) self-petitioners not in removal proceedings are "eligible for deferred action and employment authorization");* INA § 237(d)(2) *(DHS may grant stay of removal to applicants for T or U visas but that denial of a stay request "shall not preclude the alien from applying for . . . deferred action");* REAL ID Act of 2005 § 202(c)(2)(B)(viii), Pub. L. 109-13 *(requiring states to examine documentary evidence of lawful status for driver's license eligibility purposes, including "approved deferred action status");* National Defense Authorization Act for Fiscal Year 2004 § 1703(c) (d) Pub. L. 108-136 *(spouse, parent or child of certain U.S. citizen who died as a result of honorable service may self-petition for permanent residence and "shall be eligible for deferred action, advance parole, and work authorization").*

[3]  In August 2001, the former-Immigration and Naturalization Service issued guidance providing deferred action to individuals who were eligible for the recently created U and T visas.  Two years later, USCIS issued subsequent guidance, instructing its officers to use existing mechanisms like deferred action for certain U visa applicants facing potential removal.  More recently, in June 2009, USCIS issued a memorandum providing deferred action to certain surviving spouses of deceased U.S. citizens and their children while Congress considered legislation to allow these individuals to qualify for permanent residence status.

2

By this memorandum, I am now expanding certain parameters of DACA and issuing guidance for case-by-case use of deferred action for those adults who have been in this country  since January 1, 2010, are the parents of U.S. citizens or lawful permanent residents, and who are otherwise not enforcement priorities, as set forth in the November 20, 2014 <u>Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum</u>.

The reality is that most individuals in the categories set forth below are hard-working people who have become integrated members of American society. Provided they do not commit serious crimes or otherwise become enforcement priorities, these people are extremely unlikely to be deported given this Department's limited enforcement resources—which must continue to be focused on those who represent threats to national security, public safety, and border security.  Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests and make common sense, because they encourage these people to come out of the shadows, submit to background checks, pay fees, apply for work authorization (which by separate authority I may grant), and be counted.

### A.    Expanding DACA

DACA provides that those who were under the age of 31 on June 15, 2012, who entered the United States before June 15, 2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis.  The initial DACA announcement of June 15, 2012 provided deferred action for a period of two years.  On June 5, 2014, U.S. Citizenship and Immigration Services (USCIS) announced that DACA recipients could request to renew their deferred action for an additional two years.

In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:

**Remove the age cap.**  DACA will apply to all otherwise eligible immigrants who entered the United States by the requisite adjusted entry date before the age of sixteen (16), regardless of how old they were in June 2012 or are today.  The current age restriction excludes those who were older than 31 on the date of announcement (*i.e.*, those who were born before June 15, 1981).  That restriction will no longer apply.

**Extend DACA renewal and work authorization to three-years**.  The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments.  This change shall apply to all first-time applications as well as all applications for renewal effective November 24, 2014.  Beginning on that date, USCIS should issue all work

3

authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work authorization documents based on the renewal of their DACA grants.  USCIS should also consider means to extend those two-year renewals already issued to three years.

**Adjust the date-of-entry requirement.**  In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010.

USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.

### B.   Expanding Deferred Action

I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;

- have continuously resided in the United States since before January 1, 2010;

- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;

- have no lawful status on the date of this memorandum;

- are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and

- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Applicants must file the requisite applications for deferred action pursuant to the new criteria described above.  Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants.  Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of

4

**App. 281**

the Immigration and Nationality Act.[4]  Deferred action granted pursuant to the program shall be for a period of three years.  Applicants will pay the work authorization and biometrics fees, which currently amount to $465.  There will be no fee waivers and, like DACA, very limited fee exemptions.

USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement.  As with DACA, the above criteria are to be considered for all individuals encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or USCIS, whether or not the individual is already in removal proceedings or subject to a final order of removal.  Specifically:

- ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.

- ICE is further instructed to review pending removal cases, and seek administrative closure or termination of the cases of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations.  ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.

- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.  The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria.

Under any of the proposals outlined above, immigration officers will be provided with specific eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.

This memorandum confers no substantive right, immigration status or pathway to citizenship.  Only an Act of Congress can confer these rights.  It remains within the authority of the Executive Branch, however, to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law.  This memorandum is an exercise of that authority.

---

[4] INA § 274A(h)(3), 8 U.S.C. § 1324a(h)(3) ("As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the[Secretary].");  8 C.F.R. § 274a.12 (regulations establishing classes of aliens eligible for work authorization).

**App. 282**

# Exhibit 9

# The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others

The Department of Homeland Security's proposed policy to prioritize the removal of certain aliens unlawfully present in the United States would be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of U.S. citizens and legal permanent residents would also be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of recipients of deferred action under the Deferred Action for Childhood Arrivals program would not be a permissible exercise of DHS's enforcement discretion.

November 19, 2014

MEMORANDUM OPINION FOR THE SECRETARY OF HOMELAND SECURITY
AND THE COUNSEL TO THE PRESIDENT

You have asked two questions concerning the scope of the Department of Homeland Security's discretion to enforce the immigration laws. First, you have asked whether, in light of the limited resources available to the Department ("DHS") to remove aliens unlawfully present in the United States, it would be legally permissible for the Department to implement a policy prioritizing the removal of certain categories of aliens over others. DHS has explained that although there are approximately 11.3 million undocumented aliens in the country, it has the resources to remove fewer than 400,000 such aliens each year. DHS's proposed policy would prioritize the removal of aliens who present threats to national security, public safety, or border security. Under the proposed policy, DHS officials could remove an alien who did not fall into one of these categories provided that an Immigration and Customs Enforcement ("ICE") Field Office Director determined that "removing such an alien would serve an important federal interest." Draft Memorandum for Thomas S. Winkowski, Acting Director, ICE, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants* at 5 (Nov. 17, 2014) ("Johnson Prioritization Memorandum").

Second, you have asked whether it would be permissible for DHS to extend deferred action, a form of temporary administrative relief from removal, to certain aliens who are the parents of children who are present in the United States. Specifically, DHS has proposed to implement a program under which an alien could apply for, and would be eligible to receive, deferred action if he or she is not a DHS removal priority under the policy described above; has continuously resided in the United States since before January 1, 2010; has a child who is either a U.S. citizen or a lawful permanent resident; is physically present in the United

1

**App. 284**

States both when DHS announces its program and at the time of application for deferred action; and presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Draft Memorandum for Leon Rodriguez, Director, U.S. Citizenship and Immigration Services, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and Others* at 4 (Nov. 17, 2014) ("Johnson Deferred Action Memorandum"). You have also asked whether DHS could implement a similar program for parents of individuals who have received deferred action under the Deferred Action for Childhood Arrivals ("DACA") program.

As has historically been true of deferred action, these proposed deferred action programs would not "legalize" any aliens who are unlawfully present in the United States: Deferred action does not confer any lawful immigration status, nor does it provide a path to obtaining permanent residence or citizenship. Grants of deferred action under the proposed programs would, rather, represent DHS's decision not to seek an alien's removal for a prescribed period of time. *See generally Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483–84 (1999) (describing deferred action). Under decades-old regulations promulgated pursuant to authority delegated by Congress, *see* 8 U.S.C. §§ 1103(a)(3), 1324a(h)(3), aliens who are granted deferred action—like certain other categories of aliens who do not have lawful immigration status, such as asylum applicants—may apply for authorization to work in the United States in certain circumstances, 8 C.F.R. § 274a.12(c)(14) (providing that deferred action recipients may apply for work authorization if they can show an "economic necessity for employment"); *see also* 8 C.F.R. § 109.1(b)(7) (1982). Under DHS policy guidance, a grant of deferred action also suspends an alien's accrual of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I), provisions that restrict the admission of aliens who have departed the United States after having been unlawfully present for specified periods of time. A grant of deferred action under the proposed programs would remain in effect for three years, subject to renewal, and could be terminated at any time at DHS's discretion. *See* Johnson Deferred Action Memorandum at 2, 5.

For the reasons discussed below, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be permissible exercises of DHS's discretion to enforce the immigration laws. We further conclude that, as it has been described to us, the proposed deferred action program for parents of DACA recipients would not be a permissible exercise of enforcement discretion.

# I.

We first address DHS's authority to prioritize the removal of certain categories of aliens over others. We begin by discussing some of the sources and limits of

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

DHS's enforcement discretion under the immigration laws, and then analyze DHS's proposed prioritization policy in light of these considerations.

## A.

DHS's authority to remove aliens from the United States rests on the Immigration and Nationality Act of 1952 ("INA"), as amended, 8 U.S.C. §§ 1101 *et seq.* In the INA, Congress established a comprehensive scheme governing immigration and naturalization. The INA specifies certain categories of aliens who are inadmissible to the United States. *See* 8 U.S.C. § 1182. It also specifies "which aliens may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Id.* (citing 8 U.S.C. § 1227); *see* 8 U.S.C. § 1227(a) (providing that "[a]ny alien . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien" falls within one or more classes of deportable aliens); *see also* 8 U.S.C. § 1182(a) (listing classes of aliens ineligible to receive visas or be admitted to the United States). Removal proceedings ordinarily take place in federal immigration courts administered by the Executive Office for Immigration Review, a component of the Department of Justice. *See id.* § 1229a (governing removal proceedings); *see also id.* §§ 1225(b)(1)(A), 1228(b) (setting out expedited removal procedures for certain arriving aliens and certain aliens convicted of aggravated felonies).

Before 2003, the Department of Justice, through the Immigration and Naturalization Service ("INS"), was also responsible for providing immigration-related administrative services and generally enforcing the immigration laws. In the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, Congress transferred most of these functions to DHS, giving it primary responsibility both for initiating removal proceedings and for carrying out final orders of removal. *See* 6 U.S.C. §§ 101 *et seq.*; *see also Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005) (noting that the immigration authorities previously exercised by the Attorney General and INS "now reside" in the Secretary of Homeland Security and DHS). The Act divided INS's functions among three different agencies within DHS: U.S. Citizenship and Immigration Services ("USCIS"), which oversees legal immigration into the United States and provides immigration and naturalization services to aliens; ICE, which enforces federal laws governing customs, trade, and immigration; and U.S. Customs and Border Protection ("CBP"), which monitors and secures the nation's borders and ports of entry. *See* Pub. L. No. 107-296, §§ 403, 442, 451, 471, 116 Stat. 2135, 2178, 2193, 2195, 2205; *see also Name Change From the Bureau of Citizenship and Immigration Services to U.S. Citizenship and Immigration Services*, 69 Fed. Reg. 60938, 60938 (Oct. 13, 2004); *Name Change of Two DHS Components*, 75 Fed. Reg. 12445, 12445 (Mar. 16, 2010). The Secretary of Homeland Security is thus now "charged with the administration and

3

**App. 286**

enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1).

As a general rule, when Congress vests enforcement authority in an executive agency, that agency has the discretion to decide whether a particular violation of the law warrants prosecution or other enforcement action. This discretion is rooted in the President's constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and it reflects a recognition that the "faithful[]" execution of the law does not necessarily entail "act[ing] against each technical violation of the statute" that an agency is charged with enforcing. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Rather, as the Supreme Court explained in *Chaney*, the decision whether to initiate enforcement proceedings is a complex judgment that calls on the agency to "balanc[e] . . . a number of factors which are peculiarly within its expertise." *Id.* These factors include "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and . . . whether the agency has enough resources to undertake the action at all." *Id.* at 831; *cf. United States v. Armstrong*, 517 U.S. 456, 465 (1996) (recognizing that exercises of prosecutorial discretion in criminal cases involve consideration of "'[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan'" (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985))). In *Chaney*, the Court considered and rejected a challenge to the Food and Drug Administration's refusal to initiate enforcement proceedings with respect to alleged violations of the Federal Food, Drug, and Cosmetic Act, concluding that an agency's decision not to initiate enforcement proceedings is presumptively immune from judicial review. *See* 470 U.S. at 832. The Court explained that, while Congress may "provide[] guidelines for the agency to follow in exercising its enforcement powers," in the absence of such "legislative direction," an agency's non-enforcement determination is, much like a prosecutor's decision not to indict, a "special province of the Executive." *Id.* at 832–33.

The principles of enforcement discretion discussed in *Chaney* apply with particular force in the context of immigration. Congress enacted the INA against a background understanding that immigration is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (internal quotation marks omitted). Consistent with this understanding, the INA vested the Attorney General (now the Secretary of Homeland Security) with broad authority to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the statute. 8 U.S.C. § 1103(a)(3). Years later, when Congress created the Department of Homeland Security, it expressly charged DHS with responsibility for "[e]stablishing national immigration enforcement policies and

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

priorities." Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. § 202(5)).

With respect to removal decisions in particular, the Supreme Court has recognized that "the broad discretion exercised by immigration officials" is a "principal feature of the removal system" under the INA. *Arizona*, 132 S. Ct. at 2499. The INA expressly authorizes immigration officials to grant certain forms of discretionary relief from removal for aliens, including parole, 8 U.S.C. § 1182(d)(5)(A); asylum, *id.* § 1158(b)(1)(A); and cancellation of removal, *id.* § 1229b. But in addition to administering these statutory forms of relief, "[f]ederal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Arizona*, 132 S. Ct. at 2499. And, as the Court has explained, "[a]t each stage" of the removal process—"commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders"—immigration officials have "discretion to abandon the endeavor." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483 (quoting 8 U.S.C. § 1252(g) (alterations in original)). Deciding whether to pursue removal at each of these stages implicates a wide range of considerations. As the Court observed in *Arizona*:

> Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation's international relations. . . . The foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return. The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities.

132 S. Ct. at 2499.

Immigration officials' discretion in enforcing the laws is not, however, unlimited. Limits on enforcement discretion are both implicit in, and fundamental to, the Constitution's allocation of governmental powers between the two political branches. *See, e.g., Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952). These limits, however, are not clearly defined. The open-ended nature of the inquiry under the Take Care Clause—whether a particular exercise of discretion is "faithful[]" to the law enacted by Congress—does not lend itself easily to the application of set formulas or bright-line rules. And because the exercise of enforcement discretion generally is not subject to judicial review, *see*

**App. 288**

*Chaney*, 470 U.S. at 831–33, neither the Supreme Court nor the lower federal courts have squarely addressed its constitutional bounds. Rather, the political branches have addressed the proper allocation of enforcement authority through the political process. As the Court noted in *Chaney*, Congress "may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.* at 833. The history of immigration policy illustrates this principle: Since the INA was enacted, the Executive Branch has on numerous occasions exercised discretion to extend various forms of immigration relief to categories of aliens for humanitarian, foreign policy, and other reasons. When Congress has been dissatisfied with Executive action, it has responded, as *Chaney* suggests, by enacting legislation to limit the Executive's discretion in enforcing the immigration laws.[1]

Nonetheless, the nature of the Take Care duty does point to at least four general (and closely related) principles governing the permissible scope of enforcement discretion that we believe are particularly relevant here. First, enforcement decisions should reflect "factors which are peculiarly within [the enforcing agency's] expertise." *Chaney*, 470 U.S. at 831. Those factors may include considerations related to agency resources, such as "whether the agency has enough resources to undertake the action," or "whether agency resources are best spent on this violation or another." *Id*. Other relevant considerations may include "the proper ordering of [the agency's] priorities," *id.* at 832, and the agency's assessment of "whether the particular enforcement action [at issue] best fits the agency's overall policies," *id*. at 831.

Second, the Executive cannot, under the guise of exercising enforcement discretion, attempt to effectively rewrite the laws to match its policy preferences. *See id*. at 833 (an agency may not "disregard legislative direction in the statutory scheme that [it] administers"). In other words, an agency's enforcement decisions should be consonant with, rather than contrary to, the congressional policy underlying the statutes the agency is charged with administering. *Cf. Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (explaining that where Congress has given an agency the power to administer a statutory scheme, a court will not vacate the agency's decision about the proper administration of the statute unless, among other things, the agency "'has relied on factors which Congress had not intended it to consider'" (quoting

---

[1] *See, e.g.*, Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 503–05 (2009) (describing Congress's response to its dissatisfaction with the Executive's use of parole power for refugee populations in the 1960s and 1970s); *see also, e.g.*, *infra* note 5 (discussing legislative limitations on voluntary departure and extended voluntary departure).

6

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

Third, the Executive Branch ordinarily cannot, as the Court put it in *Chaney*, "'consciously and expressly adopt[] a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc)); *see id.* (noting that in situations where an agency had adopted such an extreme policy, "the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion'"). Abdication of the duties assigned to the agency by statute is ordinarily incompatible with the constitutional obligation to faithfully execute the laws. *But see, e.g.*, *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 200 (1994) (noting that under the Take Care Clause, "the President is required to act in accordance with the laws—including the Constitution, which takes precedence over other forms of law").

Finally, lower courts, following *Chaney*, have indicated that non-enforcement decisions are most comfortably characterized as judicially unreviewable exercises of enforcement discretion when they are made on a case-by-case basis. *See, e.g.*, *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996); *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671, 676–77 (D.C. Cir. 1994). That reading of *Chaney* reflects a conclusion that case-by-case enforcement decisions generally avoid the concerns mentioned above. Courts have noted that "single-shot non-enforcement decisions" almost inevitably rest on "the sort of mingled assessments of fact, policy, and law . . . that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion." *Crowley Caribbean Transp.*, 37 F.3d at 676–77 (emphasis omitted). Individual enforcement decisions made on the basis of case-specific factors are also unlikely to constitute "general polic[ies] that [are] so extreme as to amount to an abdication of [the agency's] statutory responsibilities." *Id.* at 677 (quoting *Chaney*, 477 U.S. at 833 n.4). That does not mean that all "general policies" respecting non-enforcement are categorically forbidden: Some "general policies" may, for example, merely provide a framework for making individualized, discretionary assessments about whether to initiate enforcement actions in particular cases. *Cf. Reno v. Flores*, 507 U.S. 292, 313 (1993) (explaining that an agency's use of "reasonable presumptions and generic rules" is not incompatible with a requirement to make individualized determinations). But a general policy of non-enforcement that forecloses the exercise of case-by-case discretion poses "special risks" that the agency has exceeded the bounds of its enforcement discretion. *Crowley Caribbean Transp.*, 37 F.3d at 677.

**B.**

We now turn, against this backdrop, to DHS's proposed prioritization policy. In their exercise of enforcement discretion, DHS and its predecessor, INS, have long

7

**App. 290**

employed guidance instructing immigration officers to prioritize the enforcement of the immigration laws against certain categories of aliens and to deprioritize their enforcement against others. *See, e.g.*, INS Operating Instructions § 103(a)(1)(i) (1962); Memorandum for All Field Office Directors, ICE, et al., from John Morton, Director, ICE, *Re: Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* (June 17, 2011); Memorandum for All ICE Employees, from John Morton, Director, ICE, *Re: Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011); Memorandum for Regional Directors, INS, et al., from Doris Meissner, Commissioner, INS, *Re: Exercising Prosecutorial Discretion* (Nov. 17, 2000). The policy DHS proposes, which is similar to but would supersede earlier policy guidance, is designed to "provide clearer and more effective guidance in the pursuit" of DHS's enforcement priorities; namely, "threats to national security, public safety and border security." Johnson Prioritization Memorandum at 1.

Under the proposed policy, DHS would identify three categories of undocumented aliens who would be priorities for removal from the United States. *See generally id.* at 3–5. The highest priority category would include aliens who pose particularly serious threats to national security, border security, or public safety, including aliens engaged in or suspected of espionage or terrorism, aliens convicted of offenses related to participation in criminal street gangs, aliens convicted of certain felony offenses, and aliens apprehended at the border while attempting to enter the United States unlawfully. *See id.* at 3. The second-highest priority would include aliens convicted of multiple or significant misdemeanor offenses; aliens who are apprehended after unlawfully entering the United States who cannot establish that they have been continuously present in the United States since January 1, 2014; and aliens determined to have significantly abused the visa or visa waiver programs. *See id.* at 3–4. The third priority category would include other aliens who have been issued a final order of removal on or after January 1, 2014. *See id.* at 4. The policy would also provide that none of these aliens should be prioritized for removal if they "qualify for asylum or another form of relief under our laws." *Id*. at 3–5.

The policy would instruct that resources should be directed to these priority categories in a manner "commensurate with the level of prioritization identified." *Id.* at 5. It would, however, also leave significant room for immigration officials to evaluate the circumstances of individual cases. *See id.* (stating that the policy "requires DHS personnel to exercise discretion based on individual circumstances"). For example, the policy would permit an ICE Field Office Director, CBP Sector Chief, or CBP Director of Field Operations to deprioritize the removal of an alien falling in the highest priority category if, in her judgment, "there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority." *Id.* at 3. Similar discretionary provisions would apply to

**App. 291**

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

aliens in the second and third priority categories.[2] The policy would also provide a non-exhaustive list of factors DHS personnel should consider in making such deprioritization judgments.[3] In addition, the policy would expressly state that its terms should not be construed "to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities," and would further provide that "[i]mmigration officers and attorneys may pursue removal of an alien not identified as a priority" if, "in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest." *Id.* at 5.

DHS has explained that the proposed policy is designed to respond to the practical reality that the number of aliens who are removable under the INA vastly exceeds the resources Congress has made available to DHS for processing and carrying out removals. The resource constraints are striking. As noted, DHS has informed us that there are approximately 11.3 million undocumented aliens in the country, but that Congress has appropriated sufficient resources for ICE to remove fewer than 400,000 aliens each year, a significant percentage of whom are typically encountered at or near the border rather than in the interior of the country. *See* E-mail for Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from David Shahoulian, Deputy General Counsel, DHS, *Re: Immigration Opinion* (Nov. 19, 2014) ("Shahoulian E-mail"). The proposed policy explains that, because DHS "cannot respond to all immigration violations or remove all persons illegally in the United States," it seeks to "prioritize the use of enforcement personnel, detention space, and removal assets" to "ensure that use of its limited resources is devoted to the pursuit of" DHS's highest priorities. Johnson Prioritization Memorandum at 2.

In our view, DHS's proposed prioritization policy falls within the scope of its lawful discretion to enforce the immigration laws. To begin with, the policy is based on a factor clearly "within [DHS's] expertise." *Chaney*, 470 U.S. at 831. Faced with sharply limited resources, DHS necessarily must make choices about which removals to pursue and which removals to defer. DHS's organic statute itself recognizes this inevitable fact, instructing the Secretary to establish "national

---

[2] Under the proposed policy, aliens in the second tier could be deprioritized if, "in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety, and should not therefore be an enforcement priority." Johnson Prioritization Memorandum at 4. Aliens in the third tier could be deprioritized if, "in the judgment of an immigration officer, the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority." *Id.* at 5.

[3] These factors include "extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length of time in the United States; military service; family or community ties in the United States; status as a victim, witness or plaintiff in civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, a young child or a seriously ill relative." Johnson Prioritization Memorandum at 6.

9

**App. 292**

immigration enforcement policies and priorities." 6 U.S.C. § 202(5). And an agency's need to ensure that scarce enforcement resources are used in an effective manner is a quintessential basis for the use of prosecutorial discretion. *See Chaney*, 470 U.S. at 831 (among the factors "peculiarly within [an agency's] expertise" are "whether agency resources are best spent on this violation or another" and "whether the agency has enough resources to undertake the action at all").

The policy DHS has proposed, moreover, is consistent with the removal priorities established by Congress. In appropriating funds for DHS's enforcement activities—which, as noted, are sufficient to permit the removal of only a fraction of the undocumented aliens currently in the country—Congress has directed DHS to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime." Department of Homeland Security Appropriations Act, 2014, Pub. L. No. 113-76, div. F, tit. II, 128 Stat. 5, 251 ("DHS Appropriations Act"). Consistent with this directive, the proposed policy prioritizes individuals convicted of criminal offenses involving active participation in a criminal street gang, most offenses classified as felonies in the convicting jurisdiction, offenses classified as "aggravated felonies" under the INA, and certain misdemeanor offenses. Johnson Prioritization Memorandum at 3–4. The policy ranks these priority categories according to the severity of the crime of conviction. The policy also prioritizes the removal of other categories of aliens who pose threats to national security or border security, matters about which Congress has demonstrated particular concern. *See, e.g.*, 8 U.S.C. § 1226(c)(1)(D) (providing for detention of aliens charged with removability on national security grounds); *id.* § 1225(b) & (c) (providing for an expedited removal process for certain aliens apprehended at the border). The policy thus raises no concern that DHS has relied "on factors which Congress had not intended it to consider." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658.

Further, although the proposed policy is not a "single-shot non-enforcement decision," neither does it amount to an abdication of DHS's statutory responsibilities, or constitute a legislative rule overriding the commands of the substantive statute. *Crowley Caribbean Transp.*, 37 F.3d at 676–77. The proposed policy provides a general framework for exercising enforcement discretion in individual cases, rather than establishing an absolute, inflexible policy of not enforcing the immigration laws in certain categories of cases. Given that the resources Congress has allocated to DHS are sufficient to remove only a small fraction of the total population of undocumented aliens in the United States, setting forth written guidance about how resources should presumptively be allocated in particular cases is a reasonable means of ensuring that DHS's severely limited resources are systematically directed to its highest priorities across a large and diverse agency, as well as ensuring consistency in the administration of the removal system. The proposed policy's identification of categories of aliens who constitute removal

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

priorities is also consistent with the categorical nature of Congress's instruction to prioritize the removal of criminal aliens in the DHS Appropriations Act.

And, significantly, the proposed policy does not identify any category of re-movable aliens whose removal may not be pursued under any circumstances. Although the proposed policy limits the discretion of immigration officials to expend resources to remove non-priority aliens, it does not eliminate that discre-tion entirely. It directs immigration officials to use their resources to remove aliens in a manner "commensurate with the level of prioritization identified," but (as noted above) it does not "prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities." Johnson Prioritization Memorandum at 5. Instead, it authorizes the removal of even non-priority aliens if, in the judgment of an ICE Field Office Director, "removing such an alien would serve an important federal interest," a standard the policy leaves open-ended. *Id*. Accordingly, the policy provides for case-by-case determinations about whether an individual alien's circumstances warrant the expenditure of removal resources, employing a broad standard that leaves ample room for the exercise of individualized discretion by responsible officials. For these reasons, the proposed policy avoids the difficulties that might be raised by a more inflexible prioritization policy and dispels any concern that DHS has either undertaken to rewrite the immigration laws or abdicated its statutory responsibilities with respect to non-priority aliens.[4]

## II.

We turn next to the permissibility of DHS's proposed deferred action programs for certain aliens who are parents of U.S. citizens, lawful permanent residents ("LPRs"), or DACA recipients, and who are not removal priorities under the proposed policy discussed above. We begin by discussing the history and current practice of deferred action. We then discuss the legal authorities on which deferred

---

[4] In *Crane v. Napolitano*, a district court recently concluded in a non-precedential opinion that the INA "mandates the initiation of removal proceedings whenever an immigration officer encounters an illegal alien who is not 'clearly and beyond a doubt entitled to be admitted.'" Opinion and Order Respecting Pl. App. for Prelim. Inj. Relief, No. 3:12-cv-03247-O, 2013 WL 1744422, at *5 (N.D. Tex. Apr. 23) (quoting 8 U.S.C. § 1225(b)(2)(A)). The court later dismissed the case for lack of jurisdiction. *See Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 WL 8211660, at *4 (N.D. Tex. July 31). Although the opinion lacks precedential value, we have nevertheless considered whether, as it suggests, the text of the INA categorically forecloses the exercise of enforcement discretion with respect to aliens who have not been formally admitted. The district court's conclusion is, in our view, inconsistent with the Supreme Court's reading of the INA as permitting immigration officials to exercise enforcement discretion at any stage of the removal process, including when deciding whether to initiate removal proceedings against a particular alien. *See Arizona*, 132 S. Ct. at 2499; *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483–84. It is also difficult to square with authority holding that the presence of mandatory language in a statute, standing alone, does not necessarily limit the Executive Branch's enforcement discretion, *see, e.g.*, *Chaney*, 470 U.S. at 835; *Inmates of Attica Corr. Facility v. Rockefeller*, 477 F.2d 375, 381 (2d Cir. 1973).

**App. 294**

action relies and identify legal principles against which the proposed use of deferred action can be evaluated. Finally, we turn to an analysis of the proposed deferred action programs themselves, beginning with the program for parents of U.S. citizens and LPRs, and concluding with the program for parents of DACA recipients.

### A.

In immigration law, the term "deferred action" refers to an exercise of administrative discretion in which immigration officials temporarily defer the removal of an alien unlawfully present in the United States. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (citing 6 Charles Gordon et al., *Immigration Law and Procedure* § 72.03[2][h] (1998)); *see* USCIS, *Standard Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices* at 3 (2012) ("USCIS SOP"); INS Operating Instructions § 103.1(a)(1)(ii) (1977). It is one of a number of forms of discretionary relief—in addition to such statutory and non-statutory measures as parole, temporary protected status, deferred enforced departure, and extended voluntary departure—that immigration officials have used over the years to temporarily prevent the removal of undocumented aliens.[5]

---

[5] Parole is available to aliens by statute "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Among other things, parole gives aliens the ability to adjust their status without leaving the United States if they are otherwise eligible for adjustment of status, *see id.* § 1255(a), and may eventually qualify them for Federal means-tested benefits, *see id.* §§ 1613, 1641(b)(4). Temporary protected status is available to nationals of designated foreign states affected by armed conflicts, environmental disasters, and other extraordinary conditions. *Id.* § 1254a. Deferred enforced departure, which "has no statutory basis" but rather is an exercise of "the President's constitutional powers to conduct foreign relations," may be granted to nationals of appropriate foreign states. USCIS, Adjudicator's Field Manual § 38.2(a) (2014). Extended voluntary departure was a remedy derived from the voluntary departure statute, which, before its amendment in 1996, permitted the Attorney General to make a finding of removability if an alien agreed to voluntarily depart the United States, without imposing a time limit for the alien's departure. *See* 8 U.S.C. §§ 1252(b), 1254(e) (1988 & Supp. II 1990); *cf.* 8 U.S.C. § 1229c (current provision of the INA providing authority to grant voluntary departure, but limiting such grants to 120 days). Some commentators, however, suggested that extended voluntary departure was in fact a form of "discretionary relief formulated administratively under the Attorney General's general authority for enforcing immigration law." Sharon Stephan, Cong. Research Serv., 85-599 EPW, *Extended Voluntary Departure and Other Grants of Blanket Relief from Deportation* at 1 (Feb. 23, 1985). It appears that extended voluntary departure is no longer used following enactment of the Immigration Act of 1990, which established the temporary protected status program. *See U.S. Citizenship and Immigration Services Fee Schedule*, 75 Fed. Reg. 33446, 33457 (June 11, 2010) (proposed rule) (noting that "since 1990 neither the Attorney General nor the Secretary have designated a class of aliens for nationality-based 'extended voluntary departure,' and there no longer are aliens in the United States benefiting from such a designation," but noting that deferred enforced departure is still used); H.R. Rep. No. 102-123, at 2 (1991) (indicating that in establishing temporary protected status, Congress was "codif[ying] and supersed[ing]" extended voluntary departure). *See generally* Andorra Bruno et al., Cong. Research Serv., *Analysis of June 15, 2012 DHS Memorandum,* Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children at 5–10 (July 13, 2012) ("CRS Immigration Report").

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

The practice of granting deferred action dates back several decades. For many years after the INA was enacted, INS exercised prosecutorial discretion to grant "non-priority" status to removable aliens who presented "appealing humanitarian factors." Letter for Leon Wildes, from E. A. Loughran, Associate Commissioner, INS at 2 (July 16, 1973) (defining a "non-priority case" as "one in which the Service in the exercise of discretion determines that adverse action would be unconscionable because of appealing humanitarian factors"); *see* INS Operating Instructions § 103.1(a)(1)(ii) (1962). This form of administrative discretion was later termed "deferred action." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484; *see* INS Operating Instructions § 103.1(a)(1)(ii) (1977) (instructing immigration officers to recommend deferred action whenever "adverse action would be unconscionable because of the existence of appealing humanitarian factors").

Although the practice of granting deferred action "developed without express statutory authorization," it has become a regular feature of the immigration removal system that has been acknowledged by both Congress and the Supreme Court. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (internal quotation marks omitted); *see id.* at 485 (noting that a congressional enactment limiting judicial review of decisions "to commence proceedings, adjudicate cases, or execute removal orders against any alien under [the INA]" in 8 U.S.C. § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations"); *see also, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"). Deferred action "does not confer any immigration status"—i.e., it does not establish any enforceable legal right to remain in the United States— and it may be revoked by immigration authorities at their discretion. USCIS SOP at 3, 7. Assuming it is not revoked, however, it represents DHS's decision not to seek the alien's removal for a specified period of time.

Under longstanding regulations and policy guidance promulgated pursuant to statutory authority in the INA, deferred action recipients may receive two additional benefits. First, relying on DHS's statutory authority to authorize certain aliens to work in the United States, DHS regulations permit recipients of deferred action to apply for work authorization if they can demonstrate an "economic necessity for employment." 8 C.F.R. § 274a.12(c)(14); *see* 8 U.S.C. § 1324a(h)(3) (defining an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]"). Second, DHS has promulgated regulations and issued policy guidance providing that aliens who receive deferred action will temporarily cease accruing "unlawful presence" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); Memorandum for Field Leadership, from Donald Neufeld, Acting Associate Director, Domestic Operations Directorate, USCIS, *Re: Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act* at 42

**App. 296**

(May 6, 2009) ("USCIS Consolidation of Guidance") (noting that "[a]ccrual of unlawful presence stops on the date an alien is granted deferred action"); *see* 8 U.S.C. § 1182(a)(9)(B)(ii) (providing that an alien is "unlawfully present" if, among other things, he "is present in the United States after the expiration of the period of stay authorized by the Attorney General").[6]

Immigration officials today continue to grant deferred action in individual cases for humanitarian and other purposes, a practice we will refer to as "ad hoc deferred action." Recent USCIS guidance provides that personnel may recommend ad hoc deferred action if they "encounter cases during [their] normal course of business that they feel warrant deferred action." USCIS SOP at 4. An alien may also apply for ad hoc deferred action by submitting a signed, written request to USCIS containing "[a]n explanation as to why he or she is seeking deferred action" along with supporting documentation, proof of identity, and other records. *Id.* at 3.

For decades, INS and later DHS have also implemented broader programs that make discretionary relief from removal available for particular classes of aliens. In many instances, these agencies have made such broad-based relief available through the use of parole, temporary protected status, deferred enforced departure, or extended voluntary departure. For example, from 1956 to 1972, INS implemented an extended voluntary departure program for physically present aliens who were beneficiaries of approved visa petitions—known as "Third Preference" visa petitions—relating to a specific class of visas for Eastern Hemisphere natives. *See United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 979–80 (E.D. Pa. 1977). Similarly, for several years beginning in 1978, INS granted extended voluntary departure to nurses who were eligible for H-1 visas. *Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses*, 43 Fed. Reg. 2776, 2776 (Jan. 19, 1978). In addition, in more than two dozen instances dating to 1956, INS and later DHS granted parole, temporary protected status, deferred enforced departure, or extended voluntary departure to large numbers of nationals of designated foreign states. *See, e.g.*, CRS Immigration Report at 20–23; Cong. Research Serv., ED206779, *Review of U.S. Refugee Resettlement Programs and Policies* at 9, 12–14 (1980). And in 1990, INS implemented a "Family Fairness" program that authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens who had been granted legal status under the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 ("IRCA"). *See* Memorandum for Regional Commissioners,

---

[6] Section 1182(a)(9)(B)(i) imposes three- and ten-year bars on the admission of aliens (other than aliens admitted to permanent residence) who departed or were removed from the United States after periods of unlawful presence of between 180 days and one year, or one year or more. Section 1182(a)(9)(C)(i)(I) imposes an indefinite bar on the admission of any alien who, without being admitted, enters or attempts to reenter the United States after previously having been unlawfully present in the United States for an aggregate period of more than one year.

INS, from Gene McNary, Commissioner, INS, *Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) ("Family Fairness Memorandum"); *see also* CRS Immigration Report at 10.

On at least five occasions since the late 1990s, INS and later DHS have also made discretionary relief available to certain classes of aliens through the use of deferred action:

*1. Deferred Action for Battered Aliens Under the Violence Against Women Act.* INS established a class-based deferred action program in 1997 for the benefit of self-petitioners under the Violence Against Women Act of 1994 ("VAWA"), Pub. L. No. 103-322, tit. IV, 108 Stat. 1796, 1902. VAWA authorized certain aliens who have been abused by U.S. citizen or LPR spouses or parents to self-petition for lawful immigration status, without having to rely on their abusive family members to petition on their behalf. *Id.* § 40701(a) (codified as amended at 8 U.S.C. § 1154(a)(1)(A)(iii)–(iv), (vii)). The INS program required immigration officers who approved a VAWA self-petition to assess, "on a case-by-case basis, whether to place the alien in deferred action status" while the alien waited for a visa to become available. Memorandum for Regional Directors et al., INS, from Paul W. Virtue, Acting Executive Associate Commissioner, INS, *Re: Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997). INS noted that "[b]y their nature, VAWA cases generally possess factors that warrant consideration for deferred action." *Id.* But because "[i]n an unusual case, there may be factors present that would militate against deferred action," the agency instructed officers that requests for deferred action should still "receive individual scrutiny." *Id.* In 2000, INS reported to Congress that, because of this program, no approved VAWA self-petitioner had been removed from the country. *See Battered Women Immigrant Protection Act: Hearings on H.R. 3083 Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 106th Cong. at 43 (July 20, 2000) ("H.R. 3083 Hearings").

*2. Deferred Action for T and U Visa Applicants.* Several years later, INS instituted a similar deferred action program for applicants for nonimmigrant status or visas made available under the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), Pub. L. No. 106-386, 114 Stat. 1464. That Act created two new nonimmigrant classifications: a "T visa" available to victims of human trafficking and their family members, and a "U visa" for victims of certain other crimes and their family members. *Id.* §§ 107(e), 1513(b)(3) (codified at 8 U.S.C. § 1101(a)(15)(T)(i), (U)(i)). In 2001, INS issued a memorandum directing immigration officers to locate "possible victims in the above categories," and to use "[e]xisting authority and mechanisms such as parole, deferred action, and stays of removal" to prevent those victims' removal "until they have had the opportunity to avail themselves of the provisions of the VTVPA." Memorandum

**App. 298**

for Michael A. Pearson, Executive Associate Commissioner, INS, from Michael D. Cronin, Acting Executive Associate Commissioner, INS, *Re: Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* at 2 (Aug. 30, 2001). In subsequent memoranda, INS instructed officers to make "deferred action assessment[s]" for "all [T visa] applicants whose applications have been determined to be bona fide," Memorandum for Johnny N. Williams, Executive Associate Commissioner, INS, from Stuart Anderson, Executive Associate Commissioner, INS, *Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status* at 1 (May 8, 2002), as well as for all U visa applicants "determined to have submitted *prima facie* evidence of [their] eligibility," Memorandum for the Director, Vermont Service Center, INS, from William R. Yates, USCIS, *Re: Centralization of Interim Relief for U Nonimmigrant Status Applicants* at 5 (Oct. 8, 2003). In 2002 and 2007, INS and DHS promulgated regulations embodying these policies. *See* 8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) (promulgated by *New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status*, 67 Fed. Reg. 4784, 4800–01 (Jan. 31, 2002)) (providing that any T visa applicant who presents "*prima facie* evidence" of his eligibility should have his removal "automatically stay[ed]" and that applicants placed on a waiting list for visas "shall maintain [their] current means to prevent removal (deferred action, parole, or stay of removal)"); *id.* § 214.14(d)(2) (promulgated by *New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status*, 72 Fed. Reg. 53014, 53039 (Sept. 17, 2007)) ("USCIS will grant deferred action or parole to U-1 petitioners and qualifying family members while the U-1 petitioners are on the waiting list" for visas.).

   *3. Deferred Action for Foreign Students Affected by Hurricane Katrina.* As a consequence of the devastation caused by Hurricane Katrina in 2005, several thousand foreign students became temporarily unable to satisfy the requirements for maintaining their lawful status as F-1 nonimmigrant students, which include "pursuit of a 'full course of study.'" USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* at 1 (Nov. 25, 2005) (quoting 8 C.F.R. § 214.2(f)(6)), *available at* http://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Special%20Situati ons/Previous%20Special%20Situations%20By%20Topic/faq-interim-student-relie f-hurricane-katrina.pdf (last visited Nov. 19, 2014). DHS announced that it would grant deferred action to these students "based on the fact that [their] failure to maintain status is directly due to Hurricane Katrina." *Id.* at 7. To apply for deferred action under this program, students were required to send a letter substantiating their need for deferred action, along with an application for work authorization. Press Release, USCIS, *USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina* at 1–2 (Nov. 25, 2005), *available at* http://www.uscis.gov/sites/default/files/files/pressrelease/F1Student_ 11_25_05_PR.pdf (last visited Nov. 19, 2014). USCIS explained that such

**App. 299**

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

requests for deferred action would be "decided on a case-by-case basis" and that it could not "provide any assurance that all such requests will be granted." *Id.* at 1.

*4. Deferred Action for Widows and Widowers of U.S. Citizens.* In 2009, DHS implemented a deferred action program for certain widows and widowers of U.S. citizens. USCIS explained that "no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death" and USCIS had not yet adjudicated a visa petition on the spouse's behalf. Memorandum for Field Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, *Re: Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* at 1 (Sept. 4, 2009). "In order to address humanitarian concerns arising from cases involving surviving spouses of U.S. citizens," USCIS issued guidance permitting covered surviving spouses and "their qualifying children who are residing in the United States" to apply for deferred action. *Id.* at 2, 6. USCIS clarified that such relief would not be automatic, but rather would be unavailable in the presence of, for example, "serious adverse factors, such as national security concerns, significant immigration fraud, commission of other crimes, or public safety reasons." *Id.* at 6.[7]

*5. Deferred Action for Childhood Arrivals.* Announced by DHS in 2012, DACA makes deferred action available to "certain young people who were brought to this country as children" and therefore "[a]s a general matter . . . lacked the intent to violate the law." Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1 (June 15, 2012) ("Napolitano Memorandum"). An alien is eligible for DACA if she was under the age of 31 when the program began; arrived in the United States before the age of 16; continuously resided in the United States for at least 5 years immediately preceding June 15, 2012; was physically present on June 15, 2012; satisfies certain educational or military service requirements; and neither has a serious criminal history nor "poses a threat to national security or public safety." *See id.* DHS evaluates applicants' eligibility for DACA on a case-by-case basis. *See id.* at 2; USCIS, *Deferred Action for Childhood Arrivals (DACA) Toolkit: Resources for Community Partners* at 11 ("DACA Toolkit"). Successful DACA applicants receive deferred action for a

---

[7] Several months after the deferred action program was announced, Congress eliminated the requirement that an alien be married to a U.S. citizen "for at least 2 years at the time of the citizen's death" to retain his or her eligibility for lawful immigration status. Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 568(c), 123 Stat. 2142, 2186 (2009). Concluding that this legislation rendered its surviving spouse guidance "obsolete," USCIS withdrew its earlier guidance and treated all pending applications for deferred action as visa petitions. *See* Memorandum for Executive Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, et al., *Re: Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children (REVISED)* at 3, 10 (Dec. 2, 2009).

**App. 300**

period of two years, subject to renewal. *See* DACA Toolkit at 11. DHS has stated that grants of deferred action under DACA may be terminated at any time, *id.* at 16, and "confer[] no substantive right, immigration status or pathway to citizenship," Napolitano Memorandum at 3.[8]

Congress has long been aware of the practice of granting deferred action, including in its categorical variety, and of its salient features; and it has never acted to disapprove or limit the practice.[9] On the contrary, it has enacted several pieces of legislation that have either assumed that deferred action would be available in certain circumstances, or expressly directed that deferred action be extended to certain categories of aliens. For example, as Congress was considering VAWA reauthorization legislation in 2000, INS officials testified before Congress about their deferred action program for VAWA self-petitioners, explaining that "[a]pproved [VAWA] self-petitioners are placed in deferred action status," such that "[n]o battered alien who has filed a[n approved] self petition . . . has been deported." H.R. 3083 Hearings at 43. Congress responded by not only acknowledging but also expanding the deferred action program in the 2000 VAWA reauthorization legislation, providing that children who could no longer self-petition under VAWA because they were over the age of 21 would nonetheless be "eligible for deferred action and work authorization." Victims of Trafficking and

---

[8] Before DACA was announced, our Office was consulted about whether such a program would be legally permissible. As we orally advised, our preliminary view was that such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis. We noted that immigration officials typically consider factors such as having been brought to the United States as a child in exercising their discretion to grant deferred action in individual cases. We explained, however, that extending deferred action to individuals who satisfied these and other specified criteria on a class-wide basis would raise distinct questions not implicated by ad hoc grants of deferred action. We advised that it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria. We also noted that, although the proposed program was predicated on humanitarian concerns that appeared less particularized and acute than those underlying certain prior class-wide deferred action programs, the concerns animating DACA were nonetheless consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion.

[9] Congress has considered legislation that would limit the practice of granting deferred action, but it has never enacted such a measure. In 2011, a bill was introduced in both the House and the Senate that would have temporarily suspended DHS's authority to grant deferred action except in narrow circumstances. *See* H.R. 2497, 112th Cong. (2011); S. 1380, 112th Cong. (2011). Neither chamber, however, voted on the bill. This year, the House passed a bill that purported to bar any funding for DACA or other class-wide deferred action programs, H.R. 5272, 113th Cong. (2014), but the Senate has not considered the legislation. Because the Supreme Court has instructed that unenacted legislation is an unreliable indicator of legislative intent, *see Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n.11 (1969), we do not draw any inference regarding congressional policy from these unenacted bills.

**App. 301**

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

Violence Protection Act of 2000, Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV)).[10]

Congress demonstrated a similar awareness of INS's (and later DHS's) deferred action program for bona fide T and U visa applicants. As discussed above, that program made deferred action available to nearly all individuals who could make a prima facie showing of eligibility for a T or U visa. In 2008 legislation, Congress authorized DHS to "grant . . . an administrative stay of a final order of removal" to any such individual. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 204, 122 Stat. 5044, 5060 (codified at 8 U.S.C. § 1227(d)(1)). Congress further clarified that "[t]he denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for . . . deferred action." *Id.* It also directed DHS to compile a report detailing, among other things, how long DHS's "specially trained [VAWA] Unit at the [USCIS] Vermont Service Center" took to adjudicate victim-based immigration applications for "deferred action," along with "steps taken to improve in this area." *Id.* § 238. Representative Berman, the bill's sponsor, explained that the Vermont Service Center should "strive to issue work authorization and deferred action" to "[i]mmigrant victims of domestic violence, sexual assault and other violence crimes . . . in most instances within 60 days of filing." 154 Cong. Rec. 24603 (2008).

In addition, in other enactments, Congress has specified that certain classes of individuals should be made "eligible for deferred action." These classes include certain immediate family members of LPRs who were killed on September 11, 2001, USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361, and certain immediate family members of certain U.S. citizens killed in combat, National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)–(d), 117 Stat. 1392, 1694. In the same legislation, Congress made these individuals eligible to obtain lawful status as "family-sponsored immigrant[s]" or "immediate relative[s]" of U.S. citizens. Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361; Pub. L. No. 108-136, § 1703(c)(1)(A), 117 Stat. 1392, 1694; *see generally Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191, 2197 (2014) (plurality opinion) (explaining which aliens typically qualify as family-sponsored immigrants or immediate relatives).

Finally, Congress acknowledged the practice of granting deferred action in the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, 302 (codified at

---

[10] Five years later, in the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960, Congress specified that, "[u]pon the approval of a petition as a VAWA self-petitioner, the alien . . . is eligible for work authorization." *Id.* § 814(b) (codified at 8 U.S.C. § 1154(a)(1)(K)). One of the Act's sponsors explained that while this provision was intended to "give[] DHS statutory authority to grant work authorization . . . without having to rely upon deferred action . . . [t]he current practice of granting deferred action to approved VAWA self-petitioners should continue." 151 Cong. Rec. 29334 (2005) (statement of Rep. Conyers).

49 U.S.C. § 30301 note), which makes a state-issued driver's license or identification card acceptable for federal purposes only if the state verifies, among other things, that the card's recipient has "[e]vidence of [l]awful [s]tatus." Congress specified that, for this purpose, acceptable evidence of lawful status includes proof of, among other things, citizenship, lawful permanent or temporary residence, or "approved deferred action status." *Id.* § 202(c)(2)(B)(viii).

### B.

The practice of granting deferred action, like the practice of setting enforcement priorities, is an exercise of enforcement discretion rooted in DHS's authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed. It is one of several mechanisms by which immigration officials, against a backdrop of limited enforcement resources, exercise their "broad discretion" to administer the removal system—and, more specifically, their discretion to determine whether "it makes sense to pursue removal" in particular circumstances. *Arizona*, 132 S. Ct. at 2499.

Deferred action, however, differs in at least three respects from more familiar and widespread exercises of enforcement discretion. First, unlike (for example) the paradigmatic exercise of prosecutorial discretion in a criminal case, the conferral of deferred action does not represent a decision not to prosecute an individual for past unlawful conduct; it instead represents a decision to openly tolerate an undocumented alien's continued presence in the United States for a fixed period (subject to revocation at the agency's discretion). Second, unlike most exercises of enforcement discretion, deferred action carries with it benefits in addition to non-enforcement itself; specifically, the ability to seek employment authorization and suspension of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). Third, class-based deferred action programs, like those for VAWA recipients and victims of Hurricane Katrina, do not merely enable individual immigration officials to select deserving beneficiaries from among those aliens who have been identified or apprehended for possible removal—as is the case with ad hoc deferred action—but rather set forth certain threshold eligibility criteria and then invite individuals who satisfy these criteria to apply for deferred action status.

While these features of deferred action are somewhat unusual among exercises of enforcement discretion, the differences between deferred action and other exercises of enforcement discretion are less significant than they might initially appear. The first feature—the toleration of an alien's continued unlawful presence—is an inevitable element of almost any exercise of discretion in immigration enforcement. Any decision not to remove an unlawfully present alien—even through an exercise of routine enforcement discretion—necessarily carries with it a tacit acknowledgment that the alien will continue to be present in the United States without legal status. Deferred action arguably goes beyond such tacit acknowledgment by expressly communicating to the alien that his or her unlawful

**App. 303**

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

presence will be tolerated for a prescribed period of time. This difference is not, in our view, insignificant. But neither does it fundamentally transform deferred action into something other than an exercise of enforcement discretion: As we have previously noted, deferred action confers no lawful immigration status, provides no path to lawful permanent residence or citizenship, and is revocable at any time in the agency's discretion.

With respect to the second feature, the additional benefits deferred action confers—the ability to apply for work authorization and the tolling of unlawful presence—do not depend on background principles of agency discretion under DHS's general immigration authorities or the Take Care Clause at all, but rather depend on independent and more specific statutory authority rooted in the text of the INA. The first of those authorities, DHS's power to prescribe which aliens are authorized to work in the United States, is grounded in 8 U.S.C. § 1324a(h)(3), which defines an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]." This statutory provision has long been understood to recognize the authority of the Secretary (and the Attorney General before him) to grant work authorization to particular classes of aliens. *See* 8 C.F.R. § 274a.12; *see also Perales v. Casillas*, 903 F.2d 1043, 1048–50 (5th Cir. 1990) (describing the authority recognized by section 1324a(h)(3) as "permissive" and largely "unfettered").[11] Although the INA

---

[11] Section 1324a(h)(3) was enacted in 1986 as part of IRCA. Before then, the INA contained no provisions comprehensively addressing the employment of aliens or expressly delegating the authority to regulate the employment of aliens to a responsible federal agency. INS assumed the authority to prescribe the classes of aliens authorized to work in the United States under its general responsibility to administer the immigration laws. In 1981, INS promulgated regulations codifying its existing procedures and criteria for granting employment authorization. *See Employment Authorization to Aliens in the United States*, 46 Fed. Reg. 25079, 25080–81 (May 5, 1981) (citing 8 U.S.C. § 1103(a)). Those regulations permitted certain categories of aliens who lacked lawful immigration status, including deferred action recipients, to apply for work authorization under certain circumstances. 8 C.F.R. § 109.1(b)(7) (1982). In IRCA, Congress introduced a "comprehensive scheme prohibiting the employment of illegal aliens in the United States," *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002), to be enforced primarily through criminal and civil penalties on employers who knowingly employ an "unauthorized alien." As relevant here, Congress defined an "unauthorized alien" barred from employment in the United States as an alien who "is not . . . either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter *or by the Attorney General*." 8 U.S.C. § 1324a(h)(3) (emphasis added). Shortly after IRCA was enacted, INS denied a petition to rescind its employment authorization regulation, rejecting an argument that "the phrase 'authorized to be so employed by this Act or the Attorney General' does not recognize the Attorney General's authority to grant work authorization except to those aliens who have already been granted specific authorization by the Act." *Employment Authorization; Classes of Aliens Eligible*, 52 Fed. Reg. 46092, 46093 (Dec. 4, 1987). Because the same statutory phrase refers both to aliens authorized to be employed by the INA and aliens authorized to be employed by the Attorney General, INS concluded that the only way to give effect to both references is to conclude "that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined 'unauthorized alien' in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the

**App. 304**

requires the Secretary to grant work authorization to particular classes of aliens, *see, e.g.*, 8 U.S.C. § 1158(c)(1)(B) (aliens granted asylum), it places few limitations on the Secretary's authority to grant work authorization to other classes of aliens. Further, and notably, additional provisions of the INA expressly contemplate that the Secretary may grant work authorization to aliens lacking lawful immigration status—even those who are in active removal proceedings or, in certain circumstances, those who have already received final orders of removal. *See id.* § 1226(a)(3) (permitting the Secretary to grant work authorization to an otherwise work-eligible alien who has been arrested and detained pending a decision whether to remove the alien from the United States); *id.* § 1231(a)(7) (permitting the Secretary under certain narrow circumstances to grant work authorization to aliens who have received final orders of removal). Consistent with these provisions, the Secretary has long permitted certain additional classes of aliens who lack lawful immigration status to apply for work authorization, including deferred action recipients who can demonstrate an economic necessity for employment. *See* 8 C.F.R. § 274a.12(c)(14); *see also id.* § 274a.12(c)(8) (applicants for asylum), (c)(10) (applicants for cancellation of removal); *supra* note 11 (discussing 1981 regulations).

The Secretary's authority to suspend the accrual of unlawful presence of deferred action recipients is similarly grounded in the INA. The relevant statutory provision treats an alien as "unlawfully present" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I) if he "is present in the United States after the expiration of the period of stay authorized by the Attorney General." 8 U.S.C. § 1182(a)(9)(B)(ii). That language contemplates that the Attorney General (and now the Secretary) may authorize an alien to stay in the United States without accruing unlawful presence under section 1182(a)(9)(B)(i) or section 1182(a)(9)(C)(i). And DHS regulations and policy guidance interpret a "period of stay authorized by the Attorney General" to include periods during which an alien has been granted deferred action. *See* 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); USCIS Consolidation of Guidance at 42.

The final unusual feature of deferred action programs is particular to class-based programs. The breadth of such programs, in combination with the first two features of deferred action, may raise particular concerns about whether immigration officials have undertaken to substantively change the statutory removal system rather than simply adapting its application to individual circumstances. But the salient feature of class-based programs—the establishment of an affirmative application process with threshold eligibility criteria—does not in and of itself cross the line between executing the law and rewriting it. Although every class-wide deferred action program that has been implemented to date has established

---

regulatory process, in addition to those who are authorized employment by statute." *Id.*; *see Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844 (1986) (stating that "considerable weight must be accorded" an agency's "contemporaneous interpretation of the statute it is entrusted to administer").

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

certain threshold eligibility criteria, each program has also left room for case-by-case determinations, giving immigration officials discretion to deny applications even if the applicant fulfills all of the program criteria. *See supra* pp. 15–18. Like the establishment of enforcement priorities discussed in Part I, the establishment of threshold eligibility criteria can serve to avoid arbitrary enforcement decisions by individual officers, thereby furthering the goal of ensuring consistency across a large agency. The guarantee of individualized, case-by-case review helps avoid potential concerns that, in establishing such eligibility criteria, the Executive is attempting to rewrite the law by defining new categories of aliens who are automatically entitled to particular immigration relief. *See Crowley Caribbean Transp.*, 37 F.3d at 676–77; *see also Chaney*, 470 U.S. at 833 n.4. Furthermore, while permitting potentially eligible individuals to apply for an exercise of enforcement discretion is not especially common, many law enforcement agencies have developed programs that invite violators of the law to identify themselves to the authorities in exchange for leniency.[12] Much as is the case with those programs, inviting eligible aliens to identify themselves through an application process may serve the agency's law enforcement interests by encouraging lower-priority individuals to identify themselves to the agency. In so doing, the process may enable the agency to better focus its scarce resources on higher enforcement priorities.

Apart from the considerations just discussed, perhaps the clearest indication that these features of deferred action programs are not per se impermissible is the fact that Congress, aware of these features, has repeatedly enacted legislation appearing to endorse such programs. As discussed above, Congress has not only directed that certain classes of aliens be made eligible for deferred action programs—and in at least one instance, in the case of VAWA beneficiaries, directed the expansion of an existing program—but also ranked evidence of approved deferred action status as evidence of "lawful status" for purposes of the REAL ID Act. These enactments strongly suggest that when DHS in the past has decided to grant deferred action to an individual or class of individuals, it has been acting in a manner consistent with congressional policy "'rather than embarking on a frolic of its own.'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139

---

[12] For example, since 1978, the Department of Justice's Antitrust Division has implemented a "leniency program" under which a corporation that reveals an antitrust conspiracy in which it participated may receive a conditional promise that it will not be prosecuted. *See* Dep't of Justice, *Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (November 19, 2008), available at* http://www.justice.gov/atr/public/criminal/239583.pdf (last visited Nov. 19, 2014); *see also* Internal Revenue Manual § 9.5.11.9(2) (Revised IRS Voluntary Disclosure Practice), *available at* http://www.irs.gov/uac/Revised-IRS-Voluntary-Disclosure-Practice (last visited Nov. 19, 2014) (explaining that a taxpayer's voluntary disclosure of misreported tax information "may result in prosecution not being recommended"); U.S. Marshals Service, *Fugitive Safe Surrender FAQs, available at* http://www.usmarshals.gov/safesurrender/faqs.html (last visited Nov. 19, 2014) (stating that fugitives who surrender at designated sites and times under the "Fugitive Safe Surrender" program are likely to receive "favorable consideration").

**App. 306**

(1985) (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 375 (1969)); *cf. id.* at 137–39 (concluding that Congress acquiesced in an agency's assertion of regulatory authority by "refus[ing] . . . to overrule" the agency's view after it was specifically "brought to Congress'[s] attention," and further finding implicit congressional approval in legislation that appeared to acknowledge the regulatory authority in question); *Dames & Moore v. Regan*, 453 U.S. 654, 680 (1981) (finding that Congress "implicitly approved the practice of claim settlement by executive agreement" by enacting the International Claims Settlement Act of 1949, which "create[d] a procedure to implement" those very agreements).

Congress's apparent endorsement of certain deferred action programs does not mean, of course, that a deferred action program can be lawfully extended to any group of aliens, no matter its characteristics or its scope, and no matter the circumstances in which the program is implemented. Because deferred action, like the prioritization policy discussed above, is an exercise of enforcement discretion rooted in the Secretary's broad authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed, it is subject to the same four general principles previously discussed. *See supra* pp. 6–7. Thus, any expansion of deferred action to new classes of aliens must be carefully scrutinized to ensure that it reflects considerations within the agency's expertise, and that it does not seek to effectively rewrite the laws to match the Executive's policy preferences, but rather operates in a manner consonant with congressional policy expressed in the statute. *See supra* pp. 6–7 (citing *Youngstown*, 343 U.S. at 637, and *Nat'l Ass'n of Home Builders*, 551 U.S. at 658). Immigration officials cannot abdicate their statutory responsibilities under the guise of exercising enforcement discretion. *See supra* p. 7 (citing *Chaney*, 470 U.S. at 833 n.4). And any new deferred action program should leave room for individualized evaluation of whether a particular case warrants the expenditure of resources for enforcement. *See supra* p. 7 (citing *Glickman*, 96 F.3d at 1123, and *Crowley Caribbean Transp.*, 37 F.3d at 676–77).

Furthermore, because deferred action programs depart in certain respects from more familiar and widespread exercises of enforcement discretion, particularly careful examination is needed to ensure that any proposed expansion of deferred action complies with these general principles, so that the proposed program does not, in effect, cross the line between executing the law and rewriting it. In analyzing whether the proposed programs cross this line, we will draw substantial guidance from Congress's history of legislation concerning deferred action. In the absence of express statutory guidance, the nature of deferred action programs Congress has implicitly approved by statute helps to shed light on Congress's own understandings about the permissible uses of deferred action. Those understandings, in turn, help to inform our consideration of whether the proposed deferred action programs are "faithful[]" to the statutory scheme Congress has enacted. U.S. Const. art. II, § 3.

**App. 307**

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

## C.

We now turn to the specifics of DHS's proposed deferred action programs. DHS has proposed implementing a policy under which an alien could apply for, and would be eligible to receive, deferred action if he or she: (1) is not an enforcement priority under DHS policy; (2) has continuously resided in the United States since before January 1, 2010; (3) is physically present in the United States both when DHS announces its program and at the time of application for deferred action; (4) has a child who is a U.S. citizen or LPR; and (5) presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Johnson Deferred Action Memorandum at 4. You have also asked about the permissibility of a similar program that would be open to parents of children who have received deferred action under the DACA program. We first address DHS's proposal to implement a deferred action program for the parents of U.S. citizens and LPRs, and then turn to the permissibility of the program for parents of DACA recipients in the next section.

### 1.

We begin by considering whether the proposed program for the parents of U.S. citizens and LPRs reflects considerations within the agency's expertise. DHS has offered two justifications for the proposed program for the parents of U.S. citizens and LPRs. First, as noted above, severe resource constraints make it inevitable that DHS will not remove the vast majority of aliens who are unlawfully present in the United States. Consistent with Congress's instruction, DHS prioritizes the removal of individuals who have significant criminal records, as well as others who present dangers to national security, public safety, or border security. *See supra* p. 10. Parents with longstanding ties to the country and who have no significant criminal records or other risk factors rank among the agency's lowest enforcement priorities; absent significant increases in funding, the likelihood that any individual in that category will be determined to warrant the expenditure of severely limited enforcement resources is very low. Second, DHS has explained that the program would serve an important humanitarian interest in keeping parents together with children who are lawfully present in the United States, in situations where such parents have demonstrated significant ties to community and family in this country. *See* Shahoulian E-mail.

With respect to DHS's first justification, the need to efficiently allocate scarce enforcement resources is a quintessential basis for an agency's exercise of enforcement discretion. *See Chaney*, 470 U.S. at 831. Because, as discussed earlier, Congress has appropriated only a small fraction of the funds needed for full enforcement, DHS can remove no more than a small fraction of the individuals who are removable under the immigration laws. *See supra* p. 9. The agency must therefore make choices about which violations of the immigration laws it

will prioritize and pursue. And as *Chaney* makes clear, such choices are entrusted largely to the Executive's discretion. 470 U.S. at 831.

The deferred action program DHS proposes would not, of course, be costless. Processing applications for deferred action and its renewal requires manpower and resources. *See Arizona*, 132 S. Ct. at 2521 (Scalia, J., concurring in part and dissenting in part). But DHS has informed us that the costs of administering the proposed program would be borne almost entirely by USCIS through the collection of application fees. *See* Shahoulian E-mail; *see also* 8 U.S.C. § 1356(m); 8 C.F.R. § 103.7(b)(1)(i)(C), (b)(1)(i)(HH). DHS has indicated that the costs of administering the deferred action program would therefore not detract in any significant way from the resources available to ICE and CBP—the enforcement arms of DHS—which rely on money appropriated by Congress to fund their operations. *See* Shahoulian E-mail. DHS has explained that, if anything, the proposed deferred action program might increase ICE's and CBP's efficiency by in effect using USCIS's fee-funded resources to enable those enforcement divisions to more easily identify non-priority aliens and focus their resources on pursuing aliens who are strong candidates for removal. *See id.* The proposed program, in short, might help DHS address its severe resource limitations, and at the very least likely would not exacerbate them. *See id.*

DHS does not, however, attempt to justify the proposed program solely as a cost-saving measure, or suggest that its lack of resources alone is sufficient to justify creating a deferred action program for the proposed class. Rather, as noted above, DHS has explained that the program would also serve a particularized humanitarian interest in promoting family unity by enabling those parents of U.S. citizens and LPRs who are not otherwise enforcement priorities and who have demonstrated community and family ties in the United States (as evidenced by the length of time they have remained in the country) to remain united with their children in the United States. Like determining how best to respond to resource constraints, determining how to address such "human concerns" in the immigration context is a consideration that is generally understood to fall within DHS's expertise. *Arizona*, 132 S. Ct. at 2499.

This second justification for the program also appears consonant with congressional policy embodied in the INA. Numerous provisions of the statute reflect a particular concern with uniting aliens with close relatives who have attained lawful immigration status in the United States. *See, e.g.*, *Fiallo v. Bell*, 430 U.S. 787, 795 n.6 (1977); *INS v. Errico*, 385 U.S. 214, 220 n.9 (1966) ("'The legislative history of the Immigration and Nationality Act clearly indicates that the Congress . . . was concerned with the problem of keeping families of United States citizens and immigrants united.'" (quoting H.R. Rep. No. 85-1199, at 7 (1957)). The INA provides a path to lawful status for the parents, as well as other immediate relatives, of U.S. citizens: U.S. citizens aged twenty-one or over may petition for parents to obtain visas that would permit them to enter and permanently reside

**App. 309**

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

in the United States, and there is no limit on the overall number of such petitions that may be granted. *See* 8 U.S.C. § 1151(b)(2)(A)(i); *see also Cuellar de Osorio*, 134 S. Ct. at 2197–99 (describing the process for obtaining a family-based immigrant visa). And although the INA contains no parallel provision permitting LPRs to petition on behalf of their parents, it does provide a path for LPRs to become citizens, at which point they too can petition to obtain visas for their parents. *See, e.g.*, 8 U.S.C. § 1427(a) (providing that aliens are generally eligible to become naturalized citizens after five years of lawful permanent residence); *id.* § 1430(a) (alien spouses of U.S. citizens become eligible after three years of lawful permanent residence); *Demore v. Kim*, 538 U.S. 510, 544 (2003).[13] Additionally, the INA empowers the Attorney General to cancel the removal of, and adjust to lawful permanent resident status, aliens who have been physically present in the United States for a continuous period of not less than ten years, exhibit good moral character, have not been convicted of specified offenses, and have immediate relatives who are U.S. citizens or LPRs and who would suffer exceptional hardship from the alien's removal. 8 U.S.C. § 1229b(b)(1). DHS's proposal to focus on the parents of U.S. citizens and LPRs thus tracks a congressional concern, expressed in the INA, with uniting the immediate families of individuals who have permanent legal ties to the United States.

At the same time, because the temporary relief DHS's proposed program would confer to such parents is sharply limited in comparison to the benefits Congress has made available through statute, DHS's proposed program would not operate to circumvent the limits Congress has placed on the availability of those benefits. The statutory provisions discussed above offer the parents of U.S. citizens and LPRs the prospect of permanent lawful status in the United States. The cancellation of removal provision, moreover, offers the prospect of receiving such status

---

[13] The INA does permit LPRs to petition on behalf of their spouses and children even before they have attained citizenship. *See* 8 U.S.C. § 1153(a)(2). However, the exclusion of LPRs' parents from this provision does not appear to reflect a congressional judgment that, until they attain citizenship, LPRs lack an interest in being united with their parents comparable to their interest in being united with their other immediate relatives. The distinction between parents and other relatives originated with a 1924 statute that exempted the wives and minor children of U.S. citizens from immigration quotas, gave "preference status"—eligibility for a specially designated pool of immigrant visas—to other relatives of U.S. citizens, and gave no favorable treatment to the relatives of LPRs. Immigration Act of 1924, Pub. L. No. 68-139, §§ 4(a), 6, 43 Stat. 153, 155–56. In 1928, Congress extended preference status to LPRs' wives and minor children, reasoning that because such relatives would be eligible for visas without regard to any quota when their LPR relatives became citizens, granting preference status to LPRs' wives and minor children would "hasten[]" the "family reunion." S. Rep. No. 70-245, at 2 (1928); *see* Act of May 29, 1928, ch. 914, 45 Stat. 1009, 1009–10. The special visa status for wives and children of LPRs thus mirrored, and was designed to complement, the special visa status given to wives and minor children of U.S. citizens. In 1965, Congress eliminated the basis on which the distinction had rested by exempting all "immediate relatives" of U.S. citizens, including parents, from numerical restrictions on immigration. Pub. L. No. 89-236, § 1, 79 Stat. 911, 911. But it did not amend eligibility for preference status for relatives of LPRs to reflect that change. We have not been able to discern any rationale for this omission in the legislative history or statutory text of the 1965 law.

**App. 310**

immediately, without the delays generally associated with the family-based immigrant visa process. DHS's proposed program, in contrast, would not grant the parents of U.S. citizens and LPRs any lawful immigration status, provide a path to permanent residence or citizenship, or otherwise confer any legally enforceable entitlement to remain in the United States. *See* USCIS SOP at 3. It is true that, as we have discussed, a grant of deferred action would confer eligibility to apply for and obtain work authorization, pursuant to the Secretary's statutory authority to grant such authorization and the longstanding regulations promulgated thereunder. *See supra* pp. 13, 21–22. But unlike the automatic employment eligibility that accompanies LPR status, *see* 8 U.S.C. § 1324a(h)(3), this authorization could be granted only on a showing of economic necessity, and would last only for the limited duration of the deferred action grant, *see* 8 C.F.R. § 274a.12(c)(14).

The other salient features of the proposal are similarly consonant with congressional policy. The proposed program would focus on parents who are not enforcement priorities under the prioritization policy discussed above—a policy that, as explained earlier, comports with the removal priorities set by Congress. *See supra* p. 10. The continuous residence requirement is likewise consistent with legislative judgments that extended periods of continuous residence are indicative of strong family and community ties. *See* IRCA, Pub. L. No. 99-603, § 201(a), 100 Stat. 3359, 3394 (1986) (codified as amended at 8 U.S.C. § 1255a(a)(2)) (granting lawful status to certain aliens unlawfully present in the United States since January 1, 1982); *id.* § 302(a) (codified as amended at 8 U.S.C. § 1160) (granting similar relief to certain agricultural workers); H.R. Rep. No. 99-682, pt. 1, at 49 (1986) (stating that aliens present in the United States for five years "have become a part of their communities[,] . . . have strong family ties here which include U.S. citizens and lawful residents[,] . . . have built social networks in this country[, and] . . . have contributed to the United States in myriad ways"); S. Rep. No. 99-132, at 16 (1985) (deporting aliens who "have become well settled in this country" would be a "wasteful use of the Immigration and Naturalization Service's limited enforcement resources"); *see also Arizona*, 132 S. Ct. at 2499 (noting that "[t]he equities of an individual case" turn on factors "including whether the alien has . . . long ties to the community").

We also do not believe DHS's proposed program amounts to an abdication of its statutory responsibilities, or a legislative rule overriding the commands of the statute. As discussed earlier, DHS's severe resource constraints mean that, unless circumstances change, it could not as a practical matter remove the vast majority of removable aliens present in the United States. The fact that the proposed program would defer the removal of a subset of these removable aliens—a subset that ranks near the bottom of the list of the agency's removal priorities—thus does not, by itself, demonstrate that the program amounts to an abdication of DHS's responsibilities. And the case-by-case discretion given to immigration officials under DHS's proposed program alleviates potential concerns that DHS has

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

abdicated its statutory enforcement responsibilities with respect to, or created a categorical, rule-like entitlement to immigration relief for, the particular class of aliens eligible for the program. An alien who meets all the criteria for deferred action under the program would receive deferred action only if he or she "present[ed] no other factors that, in the exercise of discretion," would "make[] the grant of deferred action inappropriate." Johnson Deferred Action Memorandum at 4. The proposed policy does not specify what would count as such a factor; it thus leaves the relevant USCIS official with substantial discretion to determine whether a grant of deferred action is warranted. In other words, even if an alien is not a removal priority under the proposed policy discussed in Part I, has continuously resided in the United States since before January 1, 2010, is physically present in the country, and is a parent of an LPR or a U.S. citizen, the USCIS official evaluating the alien's deferred action application must still make a judgment, in the exercise of her discretion, about whether that alien presents any other factor that would make a grant of deferred action inappropriate. This feature of the proposed program ensures that it does not create a categorical entitlement to deferred action that could raise concerns that DHS is either impermissibly attempting to rewrite or categorically declining to enforce the law with respect to a particular group of undocumented aliens.

Finally, the proposed deferred action program would resemble in material respects the kinds of deferred action programs Congress has implicitly approved in the past, which provides some indication that the proposal is consonant not only with interests reflected in immigration law as a general matter, but also with congressional understandings about the permissible uses of deferred action. As noted above, the program uses deferred action as an interim measure for a group of aliens to whom Congress has given a prospective entitlement to lawful immigration status. While Congress has provided a path to lawful status for the parents of U.S. citizens and LPRs, the process of obtaining that status "takes time." *Cuellar de Osorio*, 134 S. Ct. at 2199. The proposed program would provide a mechanism for families to remain together, depending on their circumstances, for some or all of the intervening period.[14] Immigration officials have on several

---

[14] DHS's proposed program would likely not permit all potentially eligible parents to remain together with their children for the entire duration of the time until a visa is awarded. In particular, undocumented parents of adult citizens who are physically present in the country would be ineligible to adjust their status without first leaving the country if they had never been "inspected and admitted or paroled into the United States." 8 U.S.C. § 1255(a) (permitting the Attorney General to adjust to permanent resident status certain aliens present in the United States if they become eligible for immigrant visas). They would thus need to leave the country to obtain a visa at a U.S. consulate abroad. *See id.* § 1201(a); *Cuellar de Osorio*, 134 S. Ct. at 2197–99. But once such parents left the country, they would in most instances become subject to the 3- or 10-year bar under 8 U.S.C. § 1182(a)(9)(B)(i) and therefore unable to obtain a visa unless they remained outside the country for the duration of the bar. DHS's proposed program would nevertheless enable other families to stay together without regard to the 3- or 10-year bar. And even as to those families with parents who would become subject to that bar, the proposed deferred action program would have the effect of reducing the

**App. 312**

occasions deployed deferred action programs as interim measures for other classes of aliens with prospective entitlements to lawful immigration status, including VAWA self-petitioners, bona fide T and U visa applicants, certain immediate family members of certain U.S. citizens killed in combat, and certain immediate family members of aliens killed on September 11, 2001. As noted above, each of these programs has received Congress's implicit approval—and, indeed, in the case of VAWA self-petitioners, a direction to expand the program beyond its original bounds. *See supra* pp. 18–20.[15] In addition, much like these and other programs Congress has implicitly endorsed, the program serves substantial and particularized humanitarian interests. Removing the parents of U.S. citizens and LPRs—that is, of children who have established permanent legal ties to the United States—would separate them from their nuclear families, potentially for many years, until they were able to secure visas through the path Congress has provided. During that time, both the parents and their U.S. citizen or LPR children would be deprived of both the economic support and the intangible benefits that families provide.

We recognize that the proposed program would likely differ in size from these prior deferred action programs. Although DHS has indicated that there is no reliable way to know how many eligible aliens would actually apply for or would be likely to receive deferred action following individualized consideration under the proposed program, it has informed us that approximately 4 million individuals could be eligible to apply. *See* Shahoulian E-mail. We have thus considered whether the size of the program alone sets it at odds with congressional policy or the Executive's duties under the Take Care Clause. In the absence of express statutory guidance, it is difficult to say exactly how the program's potential size bears on its permissibility as an exercise of executive enforcement discretion. But because the size of DHS's proposed program corresponds to the size of a population to which Congress has granted a prospective entitlement to lawful status

---

amount of time the family had to spend apart, and could enable them to adjust the timing of their separation according to, for example, their children's needs for care and support.

[15] Several extended voluntary departure programs have been animated by a similar rationale, and the most prominent of these programs also received Congress's implicit approval. In particular, as noted above, the Family Fairness policy, implemented in 1990, authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens granted legal status under IRCA—aliens who would eventually "acquire lawful permanent resident status" and be able to petition on behalf of their family members. Family Fairness Memorandum at 1; *see supra* pp. 14–15. Later that year, Congress granted the beneficiaries of the Family Fairness program an indefinite stay of deportation. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 301, 104 Stat. 4978, 5030. Although it did not make that grant of relief effective for nearly a year, Congress clarified that "the delay in effectiveness of this section shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date." *Id.* § 301(g). INS's policies for qualifying Third Preference visa applicants and nurses eligible for H-1 nonimmigrant status likewise extended to aliens with prospective entitlements to lawful status. *See supra* p. 14.

**App. 313**

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

without numerical restriction, it seems to us difficult to sustain an argument, based on numbers alone, that DHS's proposal to grant a limited form of administrative relief as a temporary interim measure exceeds its enforcement discretion under the INA. Furthermore, while the potential size of the program is large, it is neverthe-less only a fraction of the approximately 11 million undocumented aliens who remain in the United States each year because DHS lacks the resources to remove them; and, as we have indicated, the program is limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. There is thus little practical danger that the program, simply by virtue of its size, will impede removals that would otherwise occur in its absence. And although we are aware of no prior exercises of deferred action of the size contemplated here, INS's 1990 Family Fairness policy, which Congress later implicitly approved, made a comparable fraction of undocumented aliens—approximately four in ten—potentially eligible for discretionary extended voluntary departure relief. *Compare* CRS Immigration Report at 22 (estimating the Family Fairness policy extended to 1.5 million undocumented aliens), *with* Office of Policy and Planning, INS, *Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000* at 10 (2003) (estimating an undocumented alien population of 3.5 million in 1990); *see supra* notes 5 & 15 (discussing extended voluntary departure and Congress's implicit approval of the Family Fairness policy). This suggests that DHS's proposed deferred action program is not, simply by virtue of its relative size, inconsistent with what Congress has previously considered a permissible exercise of enforcement discretion in the immigration context.

In light of these considerations, we believe the proposed expansion of deferred action to the parents of U.S. citizens and LPRs is lawful. It reflects considera-tions—responding to resource constraints and to particularized humanitarian concerns arising in the immigration context—that fall within DHS's expertise. It is consistent with congressional policy, since it focuses on a group—law-abiding parents of lawfully present children who have substantial ties to the community—that Congress itself has granted favorable treatment in the immigration process. The program provides for the exercise of case-by-case discretion, thereby avoiding creating a rule-like entitlement to immigration relief or abdicating DHS's en-forcement responsibilities for a particular class of aliens. And, like several deferred action programs Congress has approved in the past, the proposed program provides interim relief that would prevent particularized harm that could otherwise befall both the beneficiaries of the program and their families. We accordingly conclude that the proposed program would constitute a permissible exercise of DHS's enforcement discretion under the INA.

### 2.

We now turn to the proposed deferred action program for the parents of DACA recipients. The relevant considerations are, to a certain extent, similar to those

**App. 314**

discussed above: Like the program for the parents of U.S. citizens and LPRs, the proposed program for parents of DACA recipients would respond to severe resource constraints that dramatically limit DHS's ability to remove aliens who are unlawfully present, and would be limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. And like the proposed program for LPRs and U.S. citizens, the proposed program for DACA parents would preserve a significant measure of case-by-case discretion not to award deferred action even if the general eligibility criteria are satisfied.

But the proposed program for parents of DACA recipients is unlike the proposed program for parents of U.S. citizens and LPRs in two critical respects. First, although DHS justifies the proposed program in large part based on considerations of family unity, the parents of DACA recipients are differently situated from the parents of U.S. citizens and LPRs under the family-related provisions of the immigration law. Many provisions of the INA reflect Congress's general concern with not separating individuals who are legally entitled to live in the United States from their immediate family members. *See, e.g.*, 8 U.S.C. § 1151(b)(2)(A)(i) (permitting citizens to petition for parents, spouses and children); *id.* § 1229b(b)(1) (allowing cancellation of removal for relatives of citizens and LPRs). But the immigration laws do not express comparable concern for uniting persons who lack lawful status (or prospective lawful status) in the United States with their families. DACA recipients unquestionably lack lawful status in the United States. *See* DACA Toolkit at 8 ("Deferred action . . . does not provide you with a lawful status."). Although they may presumptively remain in the United States, at least for the duration of the grant of deferred action, that grant is both time-limited and contingent, revocable at any time in the agency's discretion. Extending deferred action to the parents of DACA recipients would therefore expand family-based immigration relief in a manner that deviates in important respects from the immigration system Congress has enacted and the policies that system embodies.

Second, as it has been described to us, the proposed deferred action program for the parents of DACA recipients would represent a significant departure from deferred action programs that Congress has implicitly approved in the past. Granting deferred action to the parents of DACA recipients would not operate as an interim measure for individuals to whom Congress has given a prospective entitlement to lawful status. Such parents have no special prospect of obtaining visas, since Congress has not enabled them to self-petition—as it has for VAWA self-petitioners and individuals eligible for T or U visas—or enabled their undocumented children to petition for visas on their behalf. Nor would granting deferred action to parents of DACA recipients, at least in the absence of other factors, serve interests that are comparable to those that have prompted implementation of deferred action programs in the past. Family unity is, as we have discussed, a significant humanitarian concern that underlies many provisions of the INA. But a concern with furthering family unity alone would not justify the

32

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

proposed program, because in the absence of any family member with lawful status in the United States, it would not explain why that concern should be satisfied by permitting family members to remain in the United States. The decision to grant deferred action to DACA parents thus seems to depend critically on the earlier decision to make deferred action available to their children. But we are aware of no precedent for using deferred action in this way, to respond to humanitarian needs rooted in earlier exercises of deferred action. The logic underlying such an expansion does not have a clear stopping point: It would appear to argue in favor of extending relief not only to parents of DACA recipients, but also to the close relatives of any alien granted deferred action through DACA or any other program, those relatives' close relatives, and perhaps the relatives (and relatives' relatives) of any alien granted any form of discretionary relief from removal by the Executive.

For these reasons, the proposed deferred action program for the parents of DACA recipients is meaningfully different from the proposed program for the parents of U.S. citizens and LPRs. It does not sound in Congress's concern for maintaining the integrity of families of individuals legally entitled to live in the United States. And unlike prior deferred action programs in which Congress has acquiesced, it would treat the Executive's prior decision to extend deferred action to one population as justifying the extension of deferred action to additional populations. DHS, of course, remains free to consider whether to grant deferred action to individual parents of DACA recipients on an ad hoc basis. But in the absence of clearer indications that the proposed class-based deferred action program for DACA parents would be consistent with the congressional policies and priorities embodied in the immigration laws, we conclude that it would not be permissible.

### III.

In sum, for the reasons set forth above, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be legally permissible, but that the proposed deferred action program for parents of DACA recipients would not be permissible.

KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

33

**App. 316**

# Exhibit 10

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



June 15, 2017

MEMORANDUM FOR:    Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Joseph B. Maher
Acting General Counsel

Michael T. Dougherty
Assistant Secretary for Border, Immigration, and Trade Policy

FROM:    John F. Kelly

SUBJECT:    Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA")

On January 25, 2017, President Trump issued Executive Order No. 13768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, I issued an implementing memorandum, stating that "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing the Deferred Action for Childhood Arrivals ("DACA") policy[1] and November 20, 2014 memorandum providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") and for the

---

[1] Memorandum from Janet Napolitano, Sec'y, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

**Rescission of November 20, 2014 DAPA Memorandum**
Page 2

expansion of DACA[2].  After consulting with the Attorney General, I have decided to rescind the November 20, 2014 DAPA memorandum and the policies announced therein.[3]  The June 15, 2012 DACA memorandum, however, will remain in effect.

**Background**

      The November 20, 2014 memorandum directed U.S. Citizenship and Immigration Services ("USCIS") "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."  This process was to be known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or "DAPA."

      To request consideration for deferred action under DAPA, the alien must have satisfied the following criteria:  (1) as of November 20, 2014, be the parent of a U.S. citizen or lawful permanent resident; (2) have continuously resided here since before January 1, 2010; (3) have been physically present here on November 20, 2014, and when applying for relief; (4) have no lawful immigration status on that date; (5) not fall within the Secretary's enforcement priorities; and (6) "present no other factors that, in the exercise of discretion, make[ ] the grant of deferred action inappropriate."  The Memorandum also directed USCIS to expand the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and to lengthen the period of deferred action and work authorization from two years to three ("Expanded DACA").

      Prior to implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas.  In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide on the ground that the plaintiff states were likely to succeed on their claim that DHS violated the Administrative Procedure Act ("APA") by failing to comply with notice-and-comment rulemaking requirements.  *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).  The Fifth Circuit Court of Appeals affirmed, holding that Texas had standing, demonstrated a substantial likelihood of success on the merits of its APA claims, and satisfied the other requirements for a preliminary injunction.  *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4) and did not issue a substantive opinion.  *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

      The litigation remains pending before the district court.

---

[2] Memorandum from Jeh Johnson. Sec'y, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

[3] This Memorandum does not alter the remaining periods of deferred action under the Expanded DACA policy granted between issuance of the November 20, 2014 Memorandum and the February 16, 2015 preliminary injunction order in the Texas litigation, nor does it affect the validity of related Employment Authorization Documents (EADs) granted during the same span of time.  I remind our officers that (1) deferred action, as an act of prosecutorial discretion, may only be granted on a case-by-case basis, and (2) such a grant may be terminated at any time at the agency's discretion.

**Rescission of November 20, 2014 DAPA Memorandum**
Page 3


**Rescission of November 20, 2014 DAPA Memorandum**

      I have considered a number of factors, including the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities. After consulting with the Attorney General, and in the exercise of my discretion in establishing national immigration enforcement policies and priorities, I hereby rescind the November 20, 2014 memorandum.

# Exhibit 11



# KEN PAXTON
ATTORNEY GENERAL OF TEXAS

June 29, 2017

The Honorable Jeff Sessions
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

      Re:    *Texas, et al. v. United States, et al.*, No. 1:14-cv-00254 (S.D. Tex.)

Dear Attorney General Sessions:

The State plaintiffs that successfully challenged the Obama Administration's DAPA and Expanded DACA programs commend the Secretary of Homeland Security for issuing his June 15, 2017 memorandum rescinding, in large part, his predecessor's November 20, 2014 memorandum creating those DAPA and Expanded DACA programs.

As you know, this November 20, 2014 memorandum creating DAPA and Expanded DACA would have granted eligibility for lawful presence and work authorization to over four million unlawfully present aliens. Courts blocked DAPA and Expanded DACA from going into effect, holding that the Executive Branch does not have the unilateral power to confer lawful presence and work authorization on unlawfully present aliens simply because the Executive chooses not to remove them. Rather, "[i]n specific and detailed provisions, the [Immigration and Nationality Act] expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." *Texas v. United States*, 809 F.3d 134, 179 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam). "Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA." *Id.* Likewise, "[t]he INA also specifies classes of aliens eligible and ineligible for work authorization . . . with no mention of the class of persons whom DAPA would make eligible for work authorization." *Id.* at 180-81. Thus, "DAPA is not authorized by statute," *id.* at 184, and "DAPA is foreclosed by Congress's careful plan," *id.* at 186.



# KEN PAXTON
ATTORNEY GENERAL OF TEXAS

For these same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15, 2012 DACA memorandum is also unlawful. The original 2012 DACA program covers over one million otherwise unlawfully present aliens. *Id.* at 147. And just like DAPA, DACA unilaterally confers eligibility for work authorization, *id.*, and lawful presence without any statutory authorization from Congress.[1]

Nevertheless, the Secretary of Homeland Security's June 15, 2017 memorandum provided that "[t]he June 15, 2012 DACA memorandum, however, will remain in effect," and some "Expanded DACA" permits will also remain in effect.

We respectfully request that the Secretary of Homeland Security phase out the DACA program. Specifically, we request that the Secretary of Homeland Security rescind the June 15, 2012 DACA memorandum and order that the Executive Branch will not renew or issue any new DACA or Expanded DACA permits in the future. This request does not require the Executive Branch to immediately rescind DACA or Expanded DACA permits that have already been issued. This request does not require the Secretary to alter the immigration enforcement priorities contained in his separate February 20, 2017 memorandum.[2] And this request does not require the federal government to remove any alien.

If, by September 5, 2017, the Executive Branch agrees to rescind the June 15, 2012 DACA memorandum and not to renew or issue any new DACA or Expanded DACA permits in the future, then the plaintiffs that successfully challenged DAPA and Expanded DACA will voluntarily dismiss their lawsuit currently pending in the Southern District of Texas. Otherwise, the complaint in that case will be amended to challenge both the DACA program and the remaining Expanded DACA permits.

---

[1] *See, e.g.*, USCIS, DACA Frequently Asked Questions, https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last visited June 29, 2017) (DACA recipients "are considered to be lawfully present").

[2] *See* DHS, Enforcement of Immigration Laws to Serve the National Interest, https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf.



## KEN PAXTON
ATTORNEY GENERAL OF TEXAS

We appreciate the opportunity to continue working with you, and the entire Presidential Administration, to cooperatively enforce federal immigration laws.

Sincerely,

Ken Paxton
Attorney General of Texas

Steve Marshall
Attorney General of Alabama

Leslie Rutledge
Attorney General of Arkansas

Lawrence G. Wasden
Attorney General of Idaho

C.L. "Butch" Otter
Governor of Idaho

Derek Schmidt
Attorney General of Kansas

Jeff Landry
Attorney General of Louisiana

Doug Peterson
Attorney General of Nebraska

Alan Wilson
Attorney General of South Carolina

Herbert Slatery III
Attorney General and Reporter of Tennessee

Patrick Morrisey
Attorney General of West Virginia

# Exhibit 12



# Office of the Attorney General
## Washington, D. C. 20530

Dear Acting Secretary Duke,

I write to advise that the Department of Homeland Security (DHS) should rescind the June 15, 2012, DHS Memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," as well as any related memoranda or guidance. This policy, known as "Deferred Action for Childhood Arrivals" (DACA), allows certain individuals who are without lawful status in the United States to request and receive a renewable, two-year presumptive reprieve from removal, and other benefits such as work authorization and participation in the Social Security program.

DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. *See Texas v. United States*, 86 F. Supp. 3d 591, 669-70 (S.D. Tex.), *aff'd*, 809 F.3d 134, 171-86 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016). Then-Secretary of Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.

As Attorney General of the United States, I have a duty to defend the Constitution and to faithfully execute the laws passed by Congress. Proper enforcement of our immigration laws is, as President Trump consistently said, critical to the national interest and to the restoration of the rule of law in our country. The Department of Justice stands ready to assist and to continue to support DHS in these important efforts.

Sincerely,

Jefferson B. Sessions III

**App. 326**

# Exhibit 13

 Official website of the Department of Homeland Security

 **U.S. Department of Homeland Security**

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:**  September 5, 2017

**MEMORANDUM FOR:**

James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Joseph B. Maher
Acting General Counsel

Ambassador James D. Nealon
Assistant Secretary, International Engagement

Julie M. Kirchner

Citizenship and Immigration Services Ombudsman

**FROM:**

Elaine C. Duke

Acting Secretary

**SUBJECT:**

**Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," which established the program known as Deferred Action for Childhood Arrivals ("DACA"). For the reasons and in the manner outlined below, Department of Homeland Security personnel shall take all appropriate actions to execute a wind-down of the program, consistent with the parameters established in this memorandum.

## Background

The Department of Homeland Security established DACA through the issuance of a memorandum on June 15, 2012. The program purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis—to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law.[1] (# ftn1) Specifically, DACA provided certain illegal aliens who entered the United States before the age of sixteen a period of deferred action and eligibility to request employment authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things—such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization from two years to three—the November 20, 2014 memorandum directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

**App. 329**

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide.[2] (#_ftn2) The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied the other requirements for a preliminary injunction.[3] (#_ftn3) The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." According to the court, "DAPA is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary,[4] (#_ftn4) and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4).[5] (#_ftn5) The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum

establishing DACA,[6] (#_ftn6) and the November 20, 2014 memorandum establishing DAPA and expanding DACA.[7] (#_ftn7)

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

## Rescission of the June 15, 2012 DACA Memorandum

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents

**App. 331**

that have been accepted by the Department as of the date of this memorandum.

• Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.

• Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.

• Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.

• Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.

• Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.

• Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.

• Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

---

[1] (#_ftnref1) Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as

**App. 332**

outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

[2] (#_ftnref2) *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] (#_ftnref3) *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

[4] (#_ftnref4) *Id.*

[5] (#_ftnref5) *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

[6] (#_ftnref6) Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] (#_ftnref7) Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

Topics:  Border Security (/topics/border-security) , Deferred Action (/topics/deferred-action)

Keywords:  DACA (/keywords/daca) , Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017

# Exhibit 14

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| **UNITED STATES OF AMERICA**, et al., | ) | |
| | ) | |
| Defendants | ) | |

## DECLARATION OF DONALD DEERE, Ph.D.

My name is Donald Deere, and I am over the age of 18 and fully competent in all respects to make this declaration.  I have personal knowledge and expertise of the matters herein stated.

## Qualifications

1.      I am a Senior Economist for Welch Consulting, a firm that provides expert services in economics and statistics to the legal community, as well as general consulting in economics and statistics.  Previously, I served as a Senior Economist for Unicon Research Corporation, a firm that conducted grant and contract research for U.S. government agencies.

2.      In 2007, I retired from the tenured faculty of the Department of Economics at Texas A&M University, where I taught courses in labor economics, statistics, and public finance.  I have since served as an Adjunct Associate Professor of Economics at Texas A&M University.  Formerly, I was Associate Director of the

1

**App. 335**

George Bush School of Government and Public Service, where I also taught as a member of the visiting faculty in 2008.

3.    I received training in economics and statistics at the Massachusetts Institute of Technology, where I earned a Ph.D. in Economics in 1983.  I have taught at M.I.T., the University of California, Santa Barbara, and Texas A&M University. My research has been published in numerous professional, peer-reviewed journals, including the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, and the *Journal of Labor Economics*.

4.    Attached to this declaration are true and correct copies of the following documents:

- Appendix 1 includes my curriculum vitae and a list of my publications.

- Appendix 2 sets forth the cases in which I have testified in deposition or at trial during the last four years.

### Scope of Inquiry

5.    I have been retained in this case by the Office of the Attorney General of Texas to examine the potential economic impact on the labor market of the interaction between the Department of Homeland Security Memorandum dated June 15, 2012 ("DHS Memorandum")[1] and the employer mandate provisions in the Affordable Care Act ("ACA").

6.    My billing rate for this matter is $525 per hour.

---

[1] The DHS Memorandum regards the exercise of "prosecutorial discretion" for certain undocumented immigrants.  The subject of the DHS Memorandum, from Janet Napolitano, Secretary of Homeland Security, is "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."

**App. 336**

## Background on the Affordable Care Act
## and the DHS Memorandum

7.     It is my understanding that as a result of the DHS Memorandum the number of undocumented immigrants with an Employment Authorization Document ("EAD") has expanded nationwide.[2]   I also understand that these individuals authorized to work are not eligible for the premium subsidies provided by the ACA.[3]

8.     The Congressional Budget Office and the Joint Committee on Taxation in March 2012 estimated the impact of the ACA on nonelderly workers and their families who were projected to receive employment-based coverage in 2016 *in the absence of the ACA*.  The resulting estimates are that 64 million of these individuals will be eligible for subsidies in the exchanges under the ACA.[4]

9.     The ACA mandates that employers with 50 or more full-time employees offer health insurance that provides "minimum value" and is "affordable" to their full-time employees.[5]

---

[2] DACA_Population_Data_Jan_31_2018, available at https://www.uscis.gov/tools/reports-studies/immigration-forms-data.

[3]   HealthCare.gov, Immigration status and the Marketplace, available at https://www.healthcare.gov/immigrants/immigration-status. See also, 8 U.S. Code § 1611 - Aliens who are not qualified aliens ineligible for Federal public benefits, and 45 CFR 152.2 – Definitions, Legal Information Institute.

[4] Congressional Budget Office, *CBO and JCT's Estimates of the Effects of the Affordable Care Act on the Number of People Obtaining Employment-Based Health Insurance* at 12-14 (Mar. 2012), available at http://www.cbo.gov/sites/default/files/03-15-ACA_and_Insurance_2.pdf. An estimated 8.7 million Marketplace Enrollees were receiving Advance Premium Tax Credits in February 2017. See Kaiser Family Foundation, *Estimated Total Premium Tax Credits Received by Marketplace Enrollees*, available at https://www.kff.org/state-category/health-reform/february-2017-marketplace-enrollment/.

[5] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act at Question 1 (2018), available at https://www.irs.gov/affordable-care-act/employers/questions-and-answers-on-employer-shared-responsibility-provisions-under-the-affordable-care-act.

3

**App. 337**

10.     To my knowledge, "minimum value" requires that health insurance pay at least 60% of the cost of covered services for employees and their children up to age 26. The ACA does not require the employer to pay the entire cost of this coverage, but the mandate to be "affordable" requires that the cost to the employee for this coverage be no more than 9.5% of the employee's income.[6]

11.     An employer offering coverage that does not provide "minimum value" or is not "affordable" will owe a penalty under the ACA if any of its employees purchases coverage on the insurance exchange *and receives a premium subsidy.* It is my understanding that this penalty is the lesser of a) $2,320 per year per employee after the first 30 employees, or b) $3,480 per year per employee receiving a premium subsidy.[7]

12.     Because this penalty is not a deductible expense for the employer from federal (and possibly state) income taxes,[8] the before-tax penalty amount, which would be compared to the wage, is even larger.[9]

---

[6] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act, *supra*, at Questions 38-41.

[7] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act, *supra*, at Questions 52-54. See also, Edward A. Morse, *Lifting the Fog: Navigating Penalties in the Affordable Care Act*, 46 CREIGHTON L. REV. 207, 221-22 (2013). For the $3,480 penalty to apply, the employer must have less than a minimum of 26.7% of its employees receiving a premium subsidy. This cutoff % rises with the number of employees—to 46.7% for an employer with 100 total employees and to a maximum of 66.7% (the cutoff % equals 2/3 − 20/# employees).

[8] Morse, *supra*, at 223.

[9] For an employer facing a 21% federal corporate income tax rate and the $3,480 penalty, the equivalent annual before-tax amount is at least $4,405.06.

4

**App. 338**

### Interaction of the DHS Memorandum
### and the ACA on the Labor Market

13.     As a threshold matter, the addition of some 683,000 work-eligible individuals nationwide, with 112,000 of these in Texas, will, other things equal, put downward pressure on wages and make it more difficult for some U.S. citizens to find employment.  In addition, the interaction of the DHS Memorandum and the ACA will further impact employment and wages in the labor market.[10]

14.     Consider an employer facing this penalty that is considering hiring one of two prospective employees.  These two employees are equally productive and are the same in all relevant aspects to this employer, except that applicant A is a U.S. citizen and applicant B is a DACA recipient holding an EAD.

15.     Assume applicants A and B are relatively low skilled, so that the cost to the employee of the coverage offered by this employer exceeds 9.5% of the wage that would be offered to them.  Also assume that this employer expects less than 25% of its employees to obtain a premium subsidy.

16.     In this scenario, the employer would expect applicant A to be more expensive to employ than applicant B because of the interaction of the ACA penalties described above and the DHS Memorandum.  There is an extra cost of $3,480 per year (plus the tax impact noted above) from hiring applicant A if applicant A will receive a premium subsidy.  In contrast, hiring applicant B entails no extra cost because applicant B is not eligible for a premium subsidy.

---

[10] As an example, for the employer in footnote 9, the penalty would increase the relative annual cost of employing a worker 30 hours per week at the federal minimum wage who receives a premium subsidy by almost 40%.

**App. 339**

17.     An employer subject to the ACA penalties described above that is operating to minimize its expected cost of operations will hire applicant B instead of applicant A.  Applicant A, therefore, will take longer to find employment and the resulting employment is more likely to occur at a lower wage.

18.     Depending on the employee cost of insurance, the incentive to hire applicant B can occur at a range of wage levels, as illustrated in the following two examples.

***Example 1***

19.     In addition to the above facts, suppose that applicants A and B would be paid the federal minimum wage of $7.25 per hour.  Assuming 30 hours per week (the definition of full time in the ACA), a monthly employee cost of $89.54 or greater ($7.25 x 130 hours x 9.5%) would make the employer-provided coverage not "affordable" and would make applicant A eligible for the premium subsidy and potentially trigger the extra $3,480 per year cost (plus the tax impact) from hiring applicant A.[11]  There is no extra cost from hiring applicant B.

20.     As a result, the employer will hire applicant B instead of applicant A if the employer is operating to minimize its expected cost of operations.

---

[11] At 40 hours per week, the monthly employee cost would have to be no more than $119.38 to be "affordable."

**App. 340**

*Example 2*

21.    As an alternative, suppose that applicants A and B would be paid $30,000 per year (about twice the federal minimum wage for 40 hours per week).[12]  A monthly employee cost for employee and dependent coverage in excess of $237.50 (9.5% x $30,000/12) would not be "affordable" and would make applicant A eligible for the premium subsidy and potentially trigger the extra $3,480 per year cost (plus the tax impact) from hiring applicant A.  Again, there is no extra cost from hiring applicant B.

22.    Similar to the previous example, the employer in this example would be expected to hire applicant B instead of applicant A in an effort to minimize costs.

## Conclusion

23.    The interaction of the DHS Memorandum and the mandate provisions of the ACA gives employers a financial incentive to hire an undocumented immigrant who is authorized to work instead of an identically skilled citizen in certain instances.

24.    Based on my knowledge and expertise in labor economics, it is my expert opinion that as a result of the interaction between the DHS Memorandum and the ACA, there will be relatively less hiring of U.S. citizens and relatively lower wages on average for those who are hired.  The interplay between the DHS Memorandum

---

[12] Using 35 hours per week instead of the ACA limit of 30 to define full-time, the U.S. Census Bureau reports that more than 23.8 million persons were employed full-time and full-year in 2016 with annual earnings below $30,000.  U.S. Census Bureau, *Current Population Survey, 2017 Annual Social and Economic Supplement* at Table PINC-10, *available at* https://www.census.gov/data/tables/time-series/demo/income-poverty/cps-pinc/pinc-10.2016.html.

and the ACA makes some U.S citizens more expensive to hire than equally productive undocumented immigrants.

25.    This result will have adverse consequences for certain U.S. citizens because some employers will find it financially advantageous to hire an undocumented immigrant who is authorized to work in the U.S. instead of an equally productive U.S. citizen.

26.    All of the facts and information contained within this declaration are within my personal knowledge and are true and correct to the best of my knowledge.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th day of April, 2018.

*[signature]*

DONALD DEERE

8

Appendix 1



# Donald R. Deere, Ph.D.

## WELCH CONSULTING
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

Donald R. Deere is a Senior Economist in the Bryan, T           elch Consulting.
Dr. Deere's work has included statistical and economic analysis in cases involving claims of discrimination in employment, housing, transportation and insurance, in cases involving wage and hour violations, and in cases involving lost earnings or commercial damages. He also has conducted analyses of compensation practices for internal and OFCCP audit purposes. Dr. Deere has provided testimony in cases in both state and federal courts.

Dr. Deere has a Ph.D. in economics from the Massachusetts Institute of Technology. In 2007, Dr. Deere retired from the tenured faculty of the Department of Economics at Texas A&M University,

Texas A&M University, he also taught graduate statistics in, and was Associate Director of the George Bush School of Government and Public Service. Dr. Deere also is Senior Economist for Unicon Research Corporation, where he served as Vice President from 2001-2004. Dr. Deere's

employment. His research has been published in numerous professional peer-reviewed journals, including the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, and the *Journal of Labor Economics.*

## EDUCATION

Ph.D., Economics
Massachusetts Institute of Technology
Cambridge, Massachusetts
1983

B.S., Economics
Texas A&M University
College Station, Texas
1978

## PROFESSIONAL EXPERIENCE

Senior Economist
Welch Consulting
Bryan, Texas
2005 – Present

Senior Economist
Unicon Research Corporation
Bryan, Texas
2001 – 2016

Adjunct Associate Professor of Economics
Texas A&M University
College Station, Texas
2007 – 2009
2010 – Present

Visiting Faculty
George Bush School of Government
and Public Service
Texas A&M University
College Station, Texas
2008

Associate Professor of Economics
Texas A&M University
College Station, Texas
1990 – 2007

Senior Consultant
Welch Consulting
Bryan, Texas
1991 – 2005

Associate Director for Academic Programs
George Bush School of Government
and Public Service
Texas A&M University
College Station, Texas
1996 – 1999

## PUBLICATIONS

"Analyzing Reductions in Force and Other Termination Decisions," with James E. Pearce in Adverse Impact Analysis:  Understanding Data, Statistics, and Risk, edited by Scott B. Morris and Eric M. Dunleavy, Routledge Taylor & Francis Group, (2017): 239-257.

"Minimum Sense," NBIZ Magazine, (Winter 2006):8-10.  Also found on NBIZMag.com.

"Educational Wage Premia and the U.S. Income Distribution: A Survey," with Jelena Vesovic in Handbook of the Economics of Education, edited by E. Hanushek and F. Welch, Elsevier Science, (2006):255-306.

"Inequality, Incentives, and Opportunity," with F. Welch.  Social Philosophy & Policy, 19, no. 1, (Winter 2002).                                ealth Matter? edited by E.F. Paul, F.D. Miller, Jr. and J. Paul. Cambridge University Press (2002):84-109.

"Trends in Wage Inequality in the United States," in Increasing Inequality in America: The Facts, Causes, and Consequences, edited by F. Welch. University of Chicago Press, (2001):9-35.

"Don't Raise the Minimum Wage - The Bar is Already Too High," Brief Analysis No. 270, NCPA, (June 1998).

"Evidence on Minimum Wages and Employment Following the 1990/91 Increase in the Federal Minimum Wage," with K. Murphy and F. W                                age, edited by M. Kosters.  AEI Press, (1996).

"Minimum Sense: Raising Wages from $4.25 to $5.15 an Hour Will Cause Lower Skilled Workers to Lose Their Jobs," Texas Business, (September 1996).

"Employment and the 1990/91 Minimum Wage Hike," with K. Murphy and F. Welch.  American Economic Review, 85, no. 2, (May 1995):232-37.

"Sense and Nonsense on the Minimum Wage," with K. Murphy and F. Welch.  Regulation, 18, no.1, (1995):47-56.

**App. 344**



# Donald R. Deere, Ph.D.

**WELCH CONSULTING**
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

## PROFESSIONAL EXPERIENCE
(continued)

Visiting Assistant Professor of Economics
University of California
Santa Barbara, California, 1988 – 1989

Assistant Professor of Economics
Texas A&M University
College Station, Texas
1983 –1990

## PUBLICATIONS (continued)

"Home Equity: Texas Should Unlock This Asset," The Dallas Morning News, April 23, 1995.

Political Economy, (December 1994):1281-87.

An Empirical Analysis using Firm-Level Data," with S.G. Bronars and J.S. Tracy, Industrial Relations, (October 1994):426-51.

"A Study of Nonsubscription to the Texas Workers' Compensation System: The Employee Perspective," (July 1994) Texas Workers' Compensation Research Center.

"A Study of Nonsubscription to the Texas Workers' Compensation System," Texas Workers' Compensation Research Center, (August 1993).

"Union Organizing Activity, Firm Growth, and the Business Cycle," with S.G. Bronars. American Economic Review, (March 1993):203-20.

"Unionization, Incomplete Contracting, and Capital Investment," with S.G. Bronars. The Journal of Business, (January 1993):117-32.

Review of "Labor Unions and the Economic Performance of Firms," Industrial and Labor Relations Review, (July 1993):732-33.

"Unemployment Insurance and Employment." Journal of Labor Economics, (October 1991):307-24.

"The Threat of Unionization, the Use of Debt, and the Preservation of Shareholder Wealth," with S.G. Bronars.  Quarterly Journal of Economics, (February 1991):231-54.

," with S.G. Bronars.  Industrial Relations, (Winter 1990):15-37.

Review of Law and Economics, (December 1989):219-22.

"Internal Labor Markets, Large Personnel Systems, and the Military."  Economics of Defense Manpower Conference Final Report, United States Air Force Academy, (June 1988).

"Bilateral T                    Auction Over Time."  Journal of Political Economy, (February 1988):100-15.

"Labor Turnover, Job-
Economics, (November 1987):815-33.

## SELECTED WORKING PAPERS

Advance Notice Provision," with S.N. Wiggins.

"Tax Rates, Tax Complexity, and the Usage of Paid Tax Return Preparers," with C. Wolfe.

"Subscription to Workers' Compensation in Texas."

"Heads I Win, Tails You Lose:  The Economic Impact of the Texas Lottery on Demographic Groups," with J. Dyer.

**App. 345**



**WELCH CONSULTING**
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

# Donald R. Deere, Ph.D.

## SELECTED WORKING PAPERS (continued)

ages,"
with J.A. Miron.

"Part-Time Employment," with S.G. Bronars.

"Union Organizing Activity and Union Membership 1973-1988," with S.G. Bronars.

"Union Membership, Union Organizing Activity, and the Union W
S.G. Bronars.

"Competitive Incentives: School Accountability and Student Outcomes in Texas," with W.E. Strayer.

"Climbing the Economic Ladder," with A.J. Rettenmaier.

## HONORS AND AWARDS

**Fellowships:**
National Science Foundation Graduate Fellowship.
Rotary Foundation Graduate Fellowship.
Sloan Foundation Dissertation Research Fellowship.

**Research Grants/Contracts:**
Grant from the Smith Richardson Foundation, "Social Security, Wages and Retirement," 1995.

Four Contracts with the Texas Workers' Compensation Research Center, "Nonsubscription to the Texas Workers' Compensation System," 1992-1995.

Grant from the Texas                                              , and Firm
Behavior," 1988.

Grant from the U.S. Department of Health and Human Services, "Demand Variability, Structural Changes in the Labor Market and the Growth of Part-Time Employment," with S.G. Bronars, 1984.

**Peer Review:**

Professional Journals:
American Economic Review
Journal of Political Economy
Quarterly Journal of Economics
Journal of Labor Economics
Review of Economic Studies
Rand Journal of Economics
Review of Economics and Statistics
Economic Journal
Industrial Relations
Economic Inquiry
Industrial and Labor Relations Review
Industrial Relations
Journal of Labor Research

Grants Competition:
National Science Foundation

**ABOUT WELCH CONSULTING**

Welch Consulting has more than 30 years experience assisting clients of every size in matters involving employment issues and complex business litigation across a broad spectrum of industries and public sector entities. Our track record in producing rigorous analyses meeting the highest standards of accuracy, clarity and punctuality makes Welch Consulting a consistent choice for industry leading companies and the nation'

W
Los Angeles, Texas and
Washington DC.

For more information about our professionals and services visit us online at www.welchcon.com

Appendix 2

**Testimony Given in Last 4 Years by Donald Deere**

United States of America and the State of Texas, Ex Rel. Keith Waldmann et al. v. McAllen Medical Center, et al.
Deposition: 11/10/16
In the United States District Court for the Southern District of Texas McAllen Division
Civil Action No. 7:13-cv-495(M)

AJP Oil Company, LLC, D/B/A Grapeland Fuel and BBQ v. Velvin Oil Company, Inc.
Deposition: 07/12/16
In the 3rd District Court of Houston County, Texas
Civil Action No. 14-0217

Kimberly A. Nice, a Personal Representative of the Estate of Shawn R. Nice v. L-3 Communications Vertex Aerospace, LLC, et al
Deposition:  06/17/16
In the United States District Court for the Northern District of Florida, Pensacola Division
Civil Action No. 3:12-CV-00009-MCR-CJK

Barbara Semons, as Next Friend and Guardian of William Warren v. Houston Party Rental, Inc. and Sam Houston Area Council Boy Scouts of America
Deposition: 06/12/15
In the 80th Judicial District Court, Harris County, Texas
Cause No. 201407399

Noll, et al. v. Ebay Inc., et al.
Deposition: 09/29/14
United States District Court Northern District of California, San Jose Division
Case No. 5:11-CV-04585-EJD

# Exhibit 15

**STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.**
**Ike Brannon on 06/26/2018**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  BROWNSVILLE DIVISION

 3

 4    --------------------------------x
                                      )
 5    STATE OF TEXAS, et al.,         )
                                      )
 6                     Plaintiffs,    )
      v                               ) Case No.
 7                                    ) 1:18cv00068
      UNITED STATES OF AMERICA, et al.,)
 8                                    )
                       Defendants,    )
 9                                    )
      and                             )
10                                    )
      KARLA PEREZ, et al.,            )
11                                    )
              Defendant-intervenors.  )
12    --------------------------------x

13

14            DEPOSITION OF IKE BRANNON

15                 Washington, D C

16            Tuesday, June 26, 2018

17                   1:56 p.m.

18

19

20    Job No.: 207169

21    Pages: 1 - 138

22    Reported by: Donna Marie Lewis, RPR, CSR (HI)
```

**STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.**
Ike Brannon on 06/26/2018                                          Page 2

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       BROWNSVILLE DIVISION

 3

 4      -------------------------------x
                                       )
 5      STATE OF TEXAS, et al.,        )
                                       )
 6                       Plaintiffs, )
        v                              ) Case No.
 7                                     ) 1:18cv00068
        UNITED STATES OF AMERICA, et al.,)
 8                                     )
                         Defendants, )
 9                                     )
        and                            )
10                                     )
        KARLA PEREZ, et al.,           )
11                                     )
                 Defendant-intervenors. )
12      -------------------------------x

13

14              Deposition of IKE BRANNON, held at Regus

15      Business Center, 2200 Pennsylvania Avenue, NW, 4th

16      Floor East, Washington, D C 20037, pursuant to

17      Notice, before Donna Marie Lewis, Registered

18      Professional Reporter and Notary Public of and for

19      the District of Columbia.

20

21

22
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

**App. 351**

```
 1                 A P P E A R A N C E S

 2   ON BEHALF OF PLAINTIFFS:

 3           THE ATTORNEY GENERAL, TEXAS

 4           BY:  ADAM ARTHUR BIGGS,
                  SPECIAL COUNSEL FOR CIVIL LITIGATION
 5           P O Box 12548

 6           Austin, Texas 78711-2548

 7           Telephone: (512) 936-0750

 8           Facsimile: (512) 936-0545

 9           Email: adam.biggs@oag.texas.gov

10

11   ON BEHALF OF DEFENDANTS:

12           UNITED STATES DEPARTMENT OF JUSTICE
             OFFICE OF IMMIGRATION LITIGATION
13
             BY: AARON S. GOLDSMITH,
14               SENIOR LITIGATION COUNSEL

15           Liberty Square Building

16           450 5th Street, NW

17           Washington, D.C. 20530

18           Telephone: (202) 532-4107

19           Email: aaron.goldsmith@usdoj.gov

20

21

22
```

```
 1    APPEARANCES: (Continued)

 2   ON BEHALF OF THE WITNESS:

 3           STATE OF NEW JERSEY
             DEPARTMENT OF LAW AND PUBLIC SAFETY
 4
             BY: KENNETH S. LEVINE,
 5               DEPUTY ATTORNEY GENERAL

 6           124 Halsey Street

 7           P O Box 45029

 8           Newark, New Jersey 07101-5029

 9           Telephone: (973) 648-2881

10           Facsimile: (973) 648-3956

11           Email: Kenneth.Levine@law.njoag.gov

12

13   ON BEHALF OF DEFENDANT-INTERVENORS:

14           MALDEF

15           BY:  ALEJANDRA AVILA, ESQUIRE

16           110 Broadway

17           Suite 204

18           San Antonio, Texas 78205

19           Telephone: (210) 224-5476, ext. 204

20           Facsimile: (210)224-5382

21           Email: aavila@maldef.org

22
```

1    million.  It would have an impact on the labor

2    market if -- a more severe impact on the labor

3    market of low income people if they had 700,000

4    more people to compete with.

5         Q    Because it would increase competition

6    for those individuals, correct?

7         A    It would.

8         Q    How many DACA recipients are you aware

9    of that you would consider low skilled?

10        A    Well, two-thirds since -- we estimate

11   two-thirds are going to have some kind of college,

12   so at most it's going to be one-third or less.

13        Q    So one-third or less would be considered

14   low skilled, for lack of a better phrase?

15        A    Yeah.  And probably a little bit less

16   than that, yeah.

17        Q    That one-third, that would increase

18   competition with other people who are citizens who

19   are also competing for those low skilled jobs,

20   correct?

21        A    That's right.  But since these workers

22   are relatively mobile, we would argue that they

```
 1    would have relatively low impact on their wages.

 2        Q    But an impact nonetheless, correct?

 3        A    Correct.

 4             MR. BIGGS:  All right.  Let's actually

 5    take five minutes, if that's okay.

 6             THE WITNESS:  Sure.

 7             MR. BIGGS:  I think I'm getting close to

 8    being done.  We will get you out of here -- well,

 9    subject to anybody else asking you questions.

10             THE WITNESS:  That's great.

11             MR. GOLDSMITH:  I will have some

12    questions.

13             (The proceedings recessed from 3:50 p.m.

14    to 3:59 p.m.)

15             (Exhibit No. 2 was marked for

16    identification.)

17    BY MR. BIGGS:

18        Q    I hand you what is marked as Exhibit 2

19    to your deposition.  I actually might be one

20    short.  I apologize for that.

21             Sir, have you seen Exhibit 1 before --

22    or Exhibit 2 before?
```

```
 1                 REPORTER'S CERTIFICATE

 2            I, DONNA M. LEWIS, RPR, Certified

 3   Shorthand Reporter, certify;

 4            That the foregoing proceedings were

 5   taken before me at the time and place therein set

 6   forth, at which time the witness, Ike Brannon, was

 7   put under oath by me;

 8            That the testimony of the witness, the

 9   questions propounded and all objections and

10   statements made at the time of the examination

11   were recorded stenographically by me and were

12   thereafter transcribed;

13            I declare that I am not of counsel to

14   any of the parties, nor in any way interested in

15   the outcome of this action.

16            As witness, my hand and notary seal this

17   28th day of June, 2018.

18

19

20            _____
              Donna M. Lewis, RPR
              Notary Public
21
     My Commission expires:
22   March 14, 2023
```

# Exhibit 16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | Case No. 1:18-CV-68 |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.* | § | |
| | § | |
| Defendant Intervenors. | § | |

## BRIEF OF *AMICI CURIAE* THE HOUSTON HISPANIC CHAMBER OF COMMERCE, THE TEXAS ASSOCIATION OF BUSINESS, SEVEN OTHER TEXAS CHAMBERS OF COMMERCE, THE TEXAS BORDER COALITION, INTERNATIONAL BANCSHARES CORPORATION, MAREK BROTHERS CONSTRUCTION, INC., SOUTHWEST AIRLINES AND UNITED AIRLINES, INC. IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Thomas S. Leatherbury
*Attorney-in-Charge*
Tex. Bar No. 12095275
SD of Tex. Bar No. 19358
VINSON & ELKINS L.L.P.
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201-2975
214.220.7700 telephone
214.999.7792 facsimile
tleatherbury@velaw.com

Harry M. Reasoner
Tex. Bar No. 16642000
Fed. ID. No. 538
Alberto P. Cardenas, Jr.
Tex. Bar No. 24012382
SD of Tex. Bar No. 3253266
VINSON & ELKINS L.L.P.
1001 Fannin Street
Suite 2500
Houston, Texas 77002
713.758.2222 telephone
713.758.2346 facsimile
hreasoner@velaw.com
bcardenas@velaw.com

*Attorneys for Amici Curiae*

## **Table of Contents**

STATEMENT OF INTEREST ............................................................................................ 1

INTRODUCTION ............................................................................................................... 5

ARGUMENT ...................................................................................................................... 7

I.    Enjoining The DACA Initiative Will Cause Significant and Irreparable Harm to the
      Texas Economy............................................................................................................ 7

      A.    Dreamers Provide Significant Benefits To The Texas Economy .......................... 7

            1.    Texas's Dreamers Create Texas Jobs ........................................................ 7

            2.    Dreamers Strengthen Texas's Tax Base .................................................... 9

            3.    The DACA Initiative Unlocks The Substantial Spending Power Of
                  Dreamers ................................................................................................ 10

      B.    Dreamers Provide Significant Benefits To Texas Businesses ............................. 11

II.   The States Are Not Entitled to Preliminary Injunctive Relief ......................................... 15

CONCLUSION.................................................................................................................. 18

i

## Table of Authorities

**Cases**

*Clark v. Prichard*,
   812 F.2d 991 (5th Cir. 1987) ............................................................... 16

*Environmental Defense Fund, Inc. v. Alexander*,
   614 F.2d 474 (5th Cir. 1980) ............................................................... 17

*Feller v. Brock*,
   802 F.2d 722 (4th Cir. 1986) ............................................................... 18

*Harris v. Wilters*,
   596 F.2d 678 (5th Cir. 1979) ............................................................... 16

*High Tech Med. Instrumentation, Inc. v. New Image Indus.*,
   49 F.3d 1551 (5th Cir. 1995) ............................................................... 17

*Martinez v. Mathews*,
   544 F.2d 1233 (5th Cir. 1976) ............................................................. 16

*Regents of Univ. of Cal. v. United States Dep't of Homeland Sec.*,
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ............................................... 17

**Other Authorities**

*American Dreamers*, The New York Times (2017) ........................................ 14

Anna Nunez, *Dreamers Are an Essential Part of our Nation's Health Care*, America's
   Voice (Feb. 15, 2018) ......................................................................... 13

Beatriz Alvarado, *Building the American Dream: Texas Woman Graduates, Owns
   Business*, CORPUS CHRISTI CALLER-TIMES, Dec. 13, 2017 ................. 8, 11

Beatriz Alvarado, *South Texas Father, Laborer Works on Path to Citizenship*, CORPUS
   CHRISTI CALLER-TIMES, Dec. 13, 2017 ................................................. 10

Chloe Sikes and Angela Valenzuela, *Texas Dream Act [House Bill 1403]*, TEXAS STATE
   HISTORICAL ASSOCIATION (Aug. 23, 2016) ........................................... 15

CTR. FOR AM. PROGRESS, RESULTS OF TOM K. WONG, UNITED WE DREAM, NATIONAL
   IMMIGRATION CENTER, AND CENTER FOR AMERICAN PROGRESS NATIONAL SURVEY
   (2017) ........................................................................................ 8, 10, 12

*DACA Stories*, FWD.us ............................................................................. 14

Declaration of Dr. Randy Capps ................................................................. 12

Dianne Solis and James Barragan, *U.S. Could Lose An Estimated 20,000 Teachers, Many
   Bilingual, As DACA Is Phased Out*, Dallas Morning News (Oct. 5, 2017) ............ 13

Ileana Najarro and Monica Rhor, *Deeper Underground: Businesses Feel the Pinch As
   Undocumented Consumers Limit Shopping Expenses*, HOUSTON CHRONICLE, Oct. 20,
   2017 ......................................................................................... 7, 11

INSTITUTE ON TAXATION AND ECONOMIC POLICY, STATE & LOCAL TAX CONTRIBUTIONS OF YOUNG UNDOCUMENTED IMMIGRANTS (2018) ................................................................ 9

Jasper Scherer, *Julián Castro Says Nearly All DACA Recipients Employed, In School Or Serving In Military*, POLITIFACT TEXAS (Jan. 10, 2018 2:01 PM) ............................................ 12

JIE ZONG ET AL., MIGRATION POLICY INSTITUTE, A PROFILE OF CURRENT DACA RECIPIENTS BY EDUCATION, INDUSTRY, AND OCCUPATION (2017) ..................................... 11, 12

Karen Briscoe, *Diego Corzo – Secrets of a Top House Hacker Revealed: 5 Minute Success* (April 24, 2018) .................................................................................................... 9

Larry Collins, *DACA Decisions Could Affect Number of North Texas Teachers*, NBC-Dallas Fort Worth (Jan, 10, 2018 10:49 PM) ......................................................... 13

Nicole Prchal Svajlenka et al., *A New Threat to DACA Could Cost States Billions of Dollars*, CENTER FOR AMERICAN PROGRESS (July 21, 2017) ....................................... 7

P'SHIP FOR A NEW AM. ECON., AMS. SOC'Y AND COUNCIL OF THE AMS., IMMIGRATION AND THE REVIVAL OF AMERICAN CITIES: FROM PRESERVING MANUFACTURING JOBS TO STRENGTHENING THE HOUSING MARKET (2013) ....................................................... 9

P'SHIP FOR A NEW AM. ECON., EXAMINING THE CONTRIBUTIONS OF THE DACA-ELIGIBLE POPULATION IN KEY STATES (2017) ................................................................... 8, 10

Szilvia Altorjai & Jeanne Batalova, IMMIGRANT HEALTH-CARE WORKERS IN THE UNITED STATES, MIGRATION POLICY INSTITUTE (2017) ....................................................... 14

Todd Ackerman, *Houston Dreamers In Health Care Despair About DACA Debate*, Houston Chronicle, (Jan. 18, 2018) ................................................................... 13, 14

*Total Affidavit Students, Overview: Eligibility For In-State Tuition And State Financial Programs*, TEXAS HIGHER EDUCATION COORDINATING BOARD (2018) ............................. 15

U.S. CITIZENSHIP AND IMMIGRATION SERVS., NUMBER OF FORM I-821D, CONSIDERATION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS, BY FISCAL YEAR, QUARTER, INTAKE AND CASE STATUS, FISCAL YEAR 2012-2018 (March 31, 2018) ................................... 7

Zoe Henry, *800,000 Workers, $460 Billion in Economic Output, Dozens of Entrepreneurs: What the U.S. Loses if DACA Goes Away*, Inc. (2018) ...................................... 8

**App. 361**

**STATEMENT OF INTEREST**

*Amici Curiae* ("*Amici*") are Chambers of Commerce and business associations in Texas and companies with a significant presence in Texas. *Amici* Chambers of Commerce represent the interests of the business community across Texas and *Amici* companies represent various industries and have significant operations in the State. Texas businesses count Dreamers among their valued customers, employees, and fellow members of the Texas business community. Dreamers are young immigrants who came to the United States as children, and were granted deferred action based on the guidelines for prosecutorial discretion established under the Deferred Action for Childhood Arrivals (DACA) initiative. These grants of deferred action have enabled Dreamers to seek work authorization, attend school, and make valuable contributions to their communities. *Amici* have a strong interest in protecting the DACA initiative, and many *Amici* and their members stand to experience irreparable harm if the program is enjoined by this Court.

The **Houston Hispanic Chamber of Commerce** ("HHCC") represents approximately 90,000 Hispanic-owned businesses in the Greater Houston Region, ranging in size from start-ups to multi-national corporations including a variety of industries: financial services, health care and energy companies. Through its issue advocacy, media platforms reaching an audience of more than three million people, and its robust membership network, HHCC is the leading united voice for the Hispanic business community in Houston. If Dreamers lost the deferred action status granted under the DACA guidelines, it would result in a $460 billion loss to the United States' gross domestic product over the next decade, more than $6 billion in annual economic activity to the State of Texas, and a loss of more than $2 billion of annual economic activity in the Greater Houston Region.

The **Texas Association of Business** is the leading employer organization in Texas. It is the State's chamber of commerce. Representing companies from large multi-national corporations

1

**App. 362**

to small businesses in nearly every community of Texas, the Texas Association of Business works to improve the Texas business climate and to help make the State's economy the strongest in the world. For more than 85 years, the Texas Association of Business has fought for issues that impact business to ensure that employers' opinions are heard. *Amici* and their members stand to experience irreparable harm and significant economic harm if DACA is enjoined.

The **Brazoria County Hispanic Chamber of Commerce** ("BCHCC") is a not-for-profit organization established in 2011, which supports the Hispanic community by increasing opportunities for Hispanic-owned businesses to compete for public and private contracts in the area, providing Hispanic-owned businesses with resources to facilitate their growth, keeping the Hispanic business community connected with opportunities to promote community development, and encouraging more civic and political participation within the Hispanic community. The BCHCC believes that Dreamers play a critical role in the economic stability and sustainability of Texas, making important contributions to the State and providing a vital source of human capital.

The **El Paso Hispanic Chamber of Commerce** ("EPHCC") is the preeminent resource and advocate for small, minority, women, and veteran owned businesses in the El Paso Metroplex. Since 2003, the EPHCC has assisted over 12,000 clients start and grow their businesses, connected businesses with almost $2 billion in contracts and financing, and has generated an estimated economic impact to the El Paso Community of over $1.1 billion. The EPHCC is comprised of more than 1,200 member firms that entrust them with their resources, their leadership, and their support. The EPHCC believes that enjoining DACA will not only devastate families across Texas and the country; it will hurt the Texas economy and detrimentally affect the EPHCC, its members, and clients.

**App. 363**

The **Greater Austin Hispanic Chamber of Commerce** ("GAHCC") is a non-profit organization established in 1973 with the primary goal of continuing the advancement and progression of a strong and stable economic culture for the 33,000 Hispanic-owned Businesses in central Texas. The GAHCC supports permanent protections for Dreamers to allow young immigrants in local communities and across the country to continue to pursue their education, contribute to our labor force and tax base, and start new businesses that create jobs.

**International Bancshares Corporation** ("IBC Bank") is a Laredo-based multibank financial holding company. Founded in Laredo, Texas in 1966, IBC Bank has grown to be one of the largest holding companies in Texas serving 88 communities throughout Texas and Oklahoma, and has recently been ranked among one of the nation's best banks by Forbes magazine.

**Marek Brothers Construction, Inc.,** ("MAREK") is a privately-held construction company in Texas that employs over 1,000 individuals. Founded in 1938, MAREK now provides construction services to eight cities in Texas. MAREK has advocated for changes to the United States' immigration policies because the company has faced labor shortages as it struggles to find workers to field full construction crews and to resist competitive disadvantages from peer construction firms who hire undocumented workers. Enjoining DACA will make it more difficult for MAREK to recruit, develop, and invest in the skilled employees it relies on for its success.

The **Midland Hispanic Chamber of Commerce** ("MHCC") was founded in 1984 in order to serve Hispanic businesses in the Midland community, and has over 450 members. MHCC promotes networking and support within its membership and the greater Midland business community, offering networking events, training programs, and business counseling to its members.

**App. 364**

The **Rio Grande Valley Hispanic Chamber of Commerce** ("RGVHCC") promotes economic development and assists businesses in accessing the Hispanic market through networking, promoting education, and nurturing leadership. The RGVHCC serves the ever-growing small business community along the South Texas Border, and offers its members networking events, workshops and seminars on continuing education, and opportunities for leadership development. Many of the RGVHCC's members have staff who are students who have been granted deferred action pursuant to the DACA guidelines, and their removal would cause a major negative effect in the Rio Grande Valley. Many of the students even have aspirations to start their own businesses, which would be an economic boost to the region.

The **San Antonio Hispanic Chamber of Commerce** ("SAHCC") is San Antonio's leading resource and advocate for Hispanic businesses and Hispanics in business. SAHCC was the first Hispanic Chamber of Commerce in the United States.

**Southwest Airlines** ("Southwest") is the largest domestic air carrier in the United States in terms of domestic originating passengers boarded according to the U.S. Department of Transportation's latest reporting, serving more than 120 million passengers annually, in recent years. Southwest is based in Dallas, Texas, and employs more than 57,000 people, including more than 16,000 in the State of Texas. Southwest serves 10 Texas cities with a total of more than 500 daily departures.

The **Texas Border Coalition** ("TBC") is a collective voice of border mayors, county judges, and economic development commissions focused on issues that affect 2.5 million people along the Texas-Mexico border region and in economically disadvantaged counties from El Paso to Brownsville. TBC advocates for federal and state investments and incentives in education and the workforce, healthcare, ports of entry, transportation, and other areas considered vital to the

4

**App. 365**

fulfillment of its mission. TBC is committed to advocating for fair and effective immigration reform that strengthens our borders and recognizes the economic contributions immigrants make to the United States and Texas economies. TBC has long supported a lasting solution for Dreamers to remain in the United States.

**United Airlines, Inc.** ("United") is a leading international airline operating the world's most comprehensive global route network, serving more than 120 destinations internationally and 148 million passengers worldwide in 2017, and employing more than 85,000 people. United maintains an airline hub and corporate office in Houston, Texas, operating more than 500 flights per day from the city. One of Houston's largest employers, United has more than 14,000 Houston-based employees and employs an additional 523 people throughout Texas.

This brief was written by pro bono counsel, and no party made any monetary contribution toward this brief.

## INTRODUCTION

Of the approximately 800,000 individuals who have been granted deferred action under the DACA guidelines nationwide, more than 15 percent (approximately 126,000) reside in Texas, along with an additional estimated 145,000 individuals who may be eligible for deferred action under the DACA guidelines. As members of the Texas business community, *Amici* and their members have been witnesses to, and beneficiaries of, the many contributions these Dreamers have made to the Texas economy. Texas Dreamers have started small businesses, creating jobs for other Texans and joining many *Amici* Chambers of Commerce as members. In addition to creating jobs, Dreamers contribute to the Texas economy as consumers and taxpayers, and they have become valued customers of many *Amici* and their members.

Dreamers are also valued employees for businesses throughout Texas. These businesses have made significant investments in training Dreamers and are now benefiting from that

5

**App. 366**

investment. Dreamers are employed throughout Texas at levels matching the general population. They are employed across industries, including filling critical needs in the health and education fields and providing much-needed bilingual skills to the Texas community.

Now, approximately six years after the DACA initiative was announced, the Plaintiff States of Alabama, Arkansas, Louisiana, Nebraska, South Carolina, Texas, and West Virginia (the "States") ask this Court to use its equitable powers to grant the extraordinary relief of a preliminary injunction enjoining the United States from issuing or renewing grants of deferred action pursuant to the DACA guidelines. *Amici*, many of whom have invested in, and derived substantial benefit from, Dreamers' participation in the Texas economy, strongly dispute that the States are entitled to the injunction they seek. *Amici* join the arguments made by Defendant Intervenors in opposition to a preliminary injunction, and submit this brief to highlight the impact that such an injunction would have on the Texas business community. Because an injunction would cause businesses throughout Texas to lose valuable employees and customers and impose unrecoverable costs on the Texas business community, the balance of the equities weighs strongly against a preliminary injunction. Such an injunction would disserve the public interest. That the States waited to challenge the DACA initiative until approximately six years after it was announced, and after other Federal courts had enjoined its termination, has increased the harm that an injunction would cause the Texas business community, a factor which weighs further against the States' application. For all of these reasons, *Amici* respectfully urge the Court to deny the States' motion for a preliminary injunction.

## ARGUMENT

## I. ENJOINING THE DACA INITIATIVE WILL CAUSE SIGNIFICANT AND IRREPARABLE HARM TO THE TEXAS ECONOMY.

### A. Dreamers Provide Significant Benefits To The Texas Economy

Dreamers are important to the health of the Texas economy, and enjoining the DACA initiative will have significant negative consequences for Texas businesses. More than 126,000 young people in Texas have been granted deferred action under the DACA guidelines since 2012. U.S. CITIZENSHIP AND IMMIGRATION SERVS., NUMBER OF FORM I-821D, CONSIDERATION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS, BY FISCAL YEAR, QUARTER, INTAKE AND CASE STATUS, FISCAL YEAR 2012-2018 (March 31, 2018), App'x Tab W, at App. 232. Dreamers contribute to the Texas economy by creating jobs, strengthening the tax base, and supporting Texas businesses as customers. Researchers have estimated that if Dreamers could no longer be granted deferred action under the DACA guidelines, the United States would lose approximately $460 billion of its GDP over the next decade, and the State of Texas would lose more than $6 billion to its annual GDP. *See* Nicole Prchal Svajlenka et al., *A New Threat to DACA Could Cost States Billions of Dollars*, CENTER FOR AMERICAN PROGRESS (July 21, 2017), https://www.americanprogress.org/issues/immigration/news/2017/07/21/436419/new-threat-daca-cost-states-billions-dollars/, App'x Tab Q, at App. 150-51; Ileana Najarro and Monica Rhor, *Deeper Underground: Businesses Feel the Pinch As Undocumented Consumers Limit Shopping Expenses*, HOUSTON CHRONICLE, Oct. 20, 2017, App'x Tab J, at App. 77.

Enjoining the DACA initiative would unravel the Dreamers' many contributions to the Texas economy, damaging *Amici* and the larger Texas business community.

### 1. Texas's Dreamers Create Texas Jobs

By enabling Dreamers to directly participate in the economy, the deferred action granted based on DACA's guidelines has created thousands of jobs in Texas. Many Texas Dreamers create

7

**App. 368**

jobs directly through small business ownership. In 2015, Texas was home to an estimated 7,229 DACA-eligible entrepreneurs, and that number has almost certainly grown as more Dreamers have reached working age. *See* P'SHIP FOR A NEW AM. ECON., EXAMINING THE CONTRIBUTIONS OF THE DACA-ELIGIBLE POPULATION IN KEY STATES (2017) (hereinafter P'SHIP FOR A NEW AM. ECON., EXAMINING CONTRIBUTIONS), App'x Tab S, at App. 200.

For many Texas small business owners, a grant of deferred action pursuant to the DACA initiative was a catalyst for entrepreneurship. Nationally, nearly 8% of Dreamers over the age of twenty-five reported starting their own businesses after receiving deferred action under the DACA guidelines. *See* CTR. FOR AM. PROGRESS, RESULTS OF TOM K. WONG, UNITED WE DREAM, NATIONAL IMMIGRATION CENTER, AND CENTER FOR AMERICAN PROGRESS NATIONAL SURVEY (2017) (hereinafter CTR. FOR AM. PROGRESS, WONG SURVEY), App'x Tab F, at App. 38. Monica Rocha Alcaraz of Corpus Christi, Texas is one of these Dreamer entrepreneurs.[1] *See* Beatriz Alvarado, *Building the American Dream: Texas Woman Graduates, Owns Business*, CORPUS CHRISTI CALLER-TIMES, Dec. 13, 2017, App'x Tab C, at App. 18. For 16 years, Alcaraz struggled to support her family of four on her income as a waitress. *Id.* at App. 17. But shortly after being granted deferred action in 2014, she was finally able to open a successful restaurant of her own, which recently celebrated its four-year anniversary. *Id.* at App. 20. Another example is Dreamer Diego Corzo. Corzo's business, Nino Group, a real estate firm located in Austin, sells approximately 80 homes each year, representing over $50 million in sales volume in three years. Zoe Henry, *800,000 Workers, $460 Billion in Economic Output, Dozens of Entrepreneurs: What the U.S. Loses if DACA Goes Away*, Inc. (2018), *available at* https://www.inc.com/zoe-

---

[1] To avoid duplication, *Amici* have not included the stories of the Dreamers who are Parties to this action as Defendant-Intervenors. *See* Dkt. 14, Defendant-Intervenors' Memorandum Of Law In Support of Their Motion For Leave To Intervene, App'x A.

henry/dreamer-entrepreneurs-respond-to-daca-uncertainty.html, App'x Tab X at App. 237; Karen

Briscoe, *Diego Corzo – Secrets of a Top House Hacker Revealed: 5 Minute Success* (April 24,

2018), http://www.5minutesuccess.com/48-diego-corzo/, App'x Tab O, at App. 139.

 In addition, the availability of Dreamers to fill shortages in the workforce (*see infra* Section

I(B)) helps make Texas businesses successful and promotes the hiring of additional workers. For

example, studies have shown that for every 1,000 immigrants that arrive in a given county, forty-

six manufacturing jobs are preserved that would otherwise not exist or have moved elsewhere. *See*

P'SHIP FOR A NEW AM. ECON., AMS. SOC'Y AND COUNCIL OF THE AMS., IMMIGRATION AND THE

REVIVAL OF AMERICAN CITIES: FROM PRESERVING MANUFACTURING JOBS TO STRENGTHENING

THE HOUSING MARKET (2013), App'x Tab R, at App. 159. This statistic is attributed, in part, to the

fact that immigration permits companies to hire from a large pool of employees across all skill

levels, which enables companies to remain successful in the United States. *Id.*, App. 162-67.

Applying this trend to Texas's Dreamers, the continued presence of Texas' 126,000 Dreamers

would be responsible for the preservation of nearly 5,800 manufacturing jobs, and the benefits of

keeping such jobs in Texas are shared by immigrants and non-immigrants alike. Texas Dreamers'

purchasing power also creates jobs indirectly by increasing sales and demand for services at Texas

businesses. *See infra* at Section I(A)(3).

 2.   Dreamers Strengthen Texas's Tax Base

 Granting young immigrants deferred action under DACA brings them out of the shadows

and gives them the ability to participate fully in the Texas economy, which benefits Texas, in part,

through higher tax revenues. In 2018, Texans eligible to be considered for deferred action under

DACA guidelines (and, as a result, eligible for work authorization) are expected to contribute

approximately $244,686,000 in state and local taxes. INSTITUTE ON TAXATION AND ECONOMIC

POLICY, STATE & LOCAL TAX CONTRIBUTIONS OF YOUNG UNDOCUMENTED IMMIGRANTS (2018),

**App. 370**

App'x Tab K, at App. 94. And though many of Texas's Dreamers would perhaps remain in Texas even if the DACA initiative were enjoined, their tax dollars would not. If all of Texas's Dreamers lost their work authorization, it would cost the state $78,260,000 per year in state and local tax revenues. *Id.* Asking other Texas taxpayers to make up this shortfall if DACA is enjoined will harm Texas businesses and the larger Texas economy. By contrast, allowing Dreamers to fully participate in the Texas economy provides significant revenue for state and local government programs, which strengthens local communities and, by extension, the Texas economy.

3.  The DACA Initiative Unlocks The Substantial Spending Power Of Dreamers

DACA has also made it possible for Texas's Dreamers to participate fully in the Texas economy as consumers, which benefits *Amici* and their members, as well as the Texas economy. In 2015, Texans eligible to be considered for deferred action under DACA had more than $2.5 billion in disposable household income after subtracting federal, state, and local taxes. *See* App'x Tab S, at App. 200. Since a grant of deferred action pursuant to the DACA guidelines enables Dreamers to remain in the United States to pursue education and employment and live without an immediate fear of deportation, it has led to increased incomes among Dreamers and increased comfort with spending that income, including on major purchases. Nationally, 64% of Dreamers purchased their first car after being granted deferred action, and 15% purchased a home. *See* App'x Tab F, at App. 38. Ezequiel Rojas Martinez of Rockport, Texas is an example of a Dreamer with newfound purchasing power—after receiving deferred action under the DACA guidelines, he was able to finally upgrade his family vehicle, and upgraded to newer vehicles thereafter. *See* Beatriz Alvarado, *South Texas Father, Laborer Works on Path to Citizenship*, CORPUS CHRISTI CALLER-TIMES, Dec. 13, 2017, App'x Tab D, at App. 28. Mr. Martinez recently put plans to purchase a new vehicle on hold, however, when he learned that the DACA initiative would be

10

**App. 371**

rescinded. *Id.* Similarly, Rocha Alcaraz, the Corpus Christi restaurant owner described *supra*, at 8, put plans to purchase her first home on hold after learning that the DACA initiative, under which she had received deferred action, would be rescinded. *See* App'x Tab C, at App. 18.

Enjoining the DACA initiative would damage the Texas economy by forcing Texas's Dreamer consumers to the sidelines and reducing the revenues of Texas businesses. The instability of life as an undocumented immigrant who might be subject to deportation at any time discourages those Texans from spending their money freely. In the face of DACA rescission and other recent developments in immigration enforcement, immigrant communities in Texas are increasingly holding back from economic activity, focusing instead on saving to protect their families from the economic trauma (in the form of job loss and legal fees) that comes with deportation proceedings. *See, e.g.*, App'x Tab J, at App. 75-76. When Texas's Dreamers stop spending, saving for expenses that may never come, Texas businesses suffer.

### B.   Dreamers Provide Significant Benefits To Texas Businesses

In addition to the benefits that Dreamers provide for the Texas economy in general, Dreamers also provide direct, significant, and tangible benefits to Texas businesses. Dreamers are employed at robust rates that match the general Texas population, serve in sectors of the economy that are critical for growth, and have helped to fill the gaps when there are labor shortages or a need for specific skills. As a result, businesses throughout Texas would suffer significant harm if Dreamers lost eligibility for deferred action (and, therefore, eligibility for work authorization) under the DACA guidelines.

As of 2017, the majority of Dreamers were employed nationwide: 55% according to U.S. Census data, amounting to 382,000 workers. JIE ZONG ET AL., MIGRATION POLICY INSTITUTE, A PROFILE OF CURRENT DACA RECIPIENTS BY EDUCATION, INDUSTRY, AND OCCUPATION (2017), App'x Tab N, at App. 121. A clear majority of those Dreamers who are not employed are enrolled

**App. 372**

in school (62%), *id.*, bringing the total nationwide percentage of Dreamers employed or in school to 82.9%. In Texas, U.S. Census data shows that 55% of Dreamers are employed, which is roughly equivalent to the employment rate of United States citizens in the same age bracket (57% of Americans, ages 15-32). *Id.* Notably, studies based on U.S. Census data may underreport the number of Dreamers employed or in school, as other national analyses have found that the number of Dreamers employed or in school is as high as 97%. *See* App'x Tab F, at App. 38, 42; *see also* Jasper Scherer, *Julián Castro Says Nearly All DACA Recipients Employed, In School Or Serving In Military*, POLITIFACT TEXAS (Jan. 10, 2018 2:01 PM), http://www.politifact.com/texas/statements/2018/jan/10/julian-castro/julian-castro-daca-recipients-employed-school-mili/, App'x Tab M at App. 113-14.

Dreamers contribute to a broad spectrum of industries as employees. Dreamers are half as likely to work in the construction sector as other undocumented young adults. App'x Tab N, at App. 121. Instead, and in particular in Texas, Dreamers are employed in large numbers in the arts and entertainment sector (21%), the retail sector (15%), and the education, health, and social services sector (12%), which economists have interpreted as demonstrating DACA's potential for accelerating occupational mobility among Dreamers. *Id.* at App. 122-23. Additionally, research has indicated that approximately 1,000 Dreamers are employed as public servants in Texas alone, working as critical first responders such as police officers and fire fighters, as well as public school teachers (not including post-secondary teachers or teachers' assistants). Dec. of Dr. Randy Capps, App'x Tab H, at App. 58, ¶ 4. Without the work authorization that is available following a grant of deferred action under the DACA guidelines, Texas would lose the valuable contributions of these young people and the State would be harmed as a result.

12

**App. 373**

One example of the importance of Dreamers to the Texas workforce is in the education sector. It is estimated that the United States would lose 20,000 teachers without the DACA initiative, including 2,000 teachers in Texas. Dianne Solis and James Barragan, *U.S. Could Lose An Estimated 20,000 Teachers, Many Bilingual, As DACA Is Phased Out*, Dallas Morning News (Oct. 5, 2017), https://www.dallasnews.com/news/immigration/2017/10/05/us-lose-estimated-20000-teachers-many-bilingual-daca-phased, App'x Tab I, at App. 61. A report from January 2018 found that in the Dallas Independent School District alone, there are 68 employees who are Dreamers, including 36 teachers. Larry Collins, *DACA Decisions Could Affect Number of North Texas Teachers*, NBC-Dallas Fort Worth (Jan, 10, 2018 10:49 PM), https://www.nbcdfw.com/news/local/DACA-Decisions-Could-Affect-Number-of-North-Texas-Teachers-468693103.html, App'x Tab P, at App. 146. The Dallas Independent School District Superintendent, Michael Hinojosa, was quoted as saying that losing teachers with DACA status would be "catastrophic," since many are bilingual teachers, which is the school district's "biggest shortage area," and that losing them suddenly would have a "traumatic impact" on the school system. *Id.*

Dreamers also fill a critical need in Texas's healthcare sector. Houston Methodist Hospital, for example, employs 57 Dreamers, in positions including lab technicians, nurses, and pharmacists, and the Hospital's President, Dr. Marc Bloom, has stated that Dreamers are "essential" to the nation's health workforce. *See* Todd Ackerman, *Houston Dreamers In Health Care Despair About DACA Debate*, Houston Chronicle, (Jan. 18, 2018), App'x Tab U, at App. 219-20; Anna Nunez, *Dreamers Are an Essential Part of our Nation's Health Care*, America's Voice (Feb. 15, 2018), https://americasvoice.org/blog/health-care-dreamers/, App'x Tab B, at App. 9-10. Dreamers fill critical job shortages for Houston Methodist, which as of January 2018 had posted 415 job

13

**App. 374**

openings for registered nurses, 21 openings for pharmacy positions, and 250 support positions. *Id.* at App. 220. The needs of Houston Methodist are not unique – healthcare is among the fastest growing employment sectors, in part due to the aging population in the United States, and health care is projected to add 2.3 million jobs before 2024. Szilvia Altorjai & Jeanne Batalova, IMMIGRANT HEALTH-CARE WORKERS IN THE UNITED STATES, MIGRATION POLICY INSTITUTE (2017), available at https://www.migrationpolicy.org/article/immigrant-health-care-workers-united-states, App'x Tab T, at App. 208. Indeed, the University of Texas's MD Anderson Cancer Center employs 46 Dreamers and the Baylor College of Medicine employs 13 Dreamers. App'x Tab U, at App. 219.

Individual examples further illustrate the contributions of Dreamers to the healthcare sector. Twenty-three year old Dreamer Julio Ramos of Brownsville, Texas, teaches high school biology while pursuing a graduate degree in biomedical informatics. *American Dreamers*, The New York Times (2017), *available at* https://www.nytimes.com/interactive/projects/storywall/american-dreamers/, App'x Tab A, at 4. Ramos's goal is to become a physician to underserved communities. *Id.* Saba Nafees is a Dreamer from Fort Worth, Texas, who is now a PhD student at Texas Tech University conducting cancer research and teaching undergraduate students. *DACA Stories*, FWD.us, *available at* https://www.fwd.us/dacastories, App'x Tab G, at App. 50. Susana Rosas, a Dreamer and mother of two from Katy, Texas, worked her way through a community college program to become a paramedic and then a nurse at Methodist Sugar Land Hospital, where her goal is to "make a difference every day." *See* App'x Tab U, at App. 218.

The State of Texas has already recognized the importance of young immigrants like the Dreamers to the Texas economy and the State in general, and made a significant investment in

**App. 375**

their future. Since 2001, the State of Texas has provided in-state tuition rates and financial aid eligibility for many undocumented young Texans, pursuant to a bill which passed the Texas Legislature with bipartisan support. Tex. Educ. Code Ann. § 54.052(a)(3) [Act of June 16, 2001, 77th Leg., R.S., ch. 1392, § 2, sec. 54.052, 2001 Tex. Gen. Laws 1392] (amended 2009) (hereinafter "Texas Dream Act"); *see also* Chloe Sikes and Angela Valenzuela, *Texas Dream Act [House Bill 1403]*, TEXAS STATE HISTORICAL ASSOCIATION (Aug. 23, 2016), available at https://tshaonline.org/handbook/online/articles/mlt03, App'x Tab E, at App. 32. To be eligible for in-state tuition and financial aid, a student must have earned a high school diploma or its equivalent in Texas, resided in Texas for at least three years before graduation and one year before enrolling in college, and submit an affidavit declaring his or her intention to apply for legal permanent residence as soon as possible. *Id.* at App. 33. Many Texas Dreamers meet this criteria. In 2016 alone, 25,151 students submitted affidavits to qualify for in-state tuition under the Texas Dream Act. *Total Affidavit Students, Overview: Eligibility For In-State Tuition And State Financial Programs*, TEXAS HIGHER EDUCATION COORDINATING BOARD 3 (2018), App'x Tab V, at App. 225.

The Texas economy, including many *Amici* and their members, would experience significant economic harm if DACA is enjoined. As discussed above, Dreamers are active participants in the Texas economy, creating jobs, contributing to Texas businesses as employees, supporting Texas businesses as consumers, and paying taxes to the State to support important programs. Removing Dreamers from the Texas economy would have a concomitant detrimental effect. *See supra* at Section I(A).

**II.    THE STATES ARE NOT ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF**

In light of the substantial benefits that Dreamers provide to *Amici*, their members, and the Texas business community as described above, and the significant, unrecoverable costs if the

**App. 376**

DACA initiative is enjoined, the States have not come close to establishing their entitlement to preliminary injunctive relief. A preliminary injunction is an extraordinary and drastic remedy, particularly where, as here, the States seek a mandatory injunction which would change the *status quo*. To be entitled to a preliminary injunction, Plaintiffs must show (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury outweighs any harm that will result if the injunction is granted (also characterized as the balance of the equities favoring the movant), and (4) that the grant of an injunction will not disserve the public interest. *Clark v. Prichard*, 812 F.2d 991, 993-94 (5th Cir. 1987). Mandatory preliminary injunctions, which seek to change the *status quo* before the litigation is complete, are "particularly disfavored" in the Fifth Circuit and "should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976); *see also Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979) (mandatory injunctions should be granted only in rare instances).

The States fall far short of establishing the stringent requirements for a mandatory preliminary injunction. *Amici* adopt the arguments made by Defendant Intervenors that the States are not likely to succeed on the merits of their claims, and have not demonstrated an irreparable injury. As described above, the Texas business community, including many *Amici* and their members, stand to suffer substantial and irreparable injury if DACA is enjoined because Texas businesses will lose valuable customers, lose employees that fulfill critical business needs, and incur additional costs to fill positions now occupied by Dreamers. *See supra* at Section I(A). Furthermore, Texans stand to lose their jobs as Dreamers are forced to shutter their businesses, and other Texas businesses struggle with the loss of Dreamer customers and employees. *See supra* at Section I(A)(3). The State as a whole stands to lose substantial tax revenues and GDP if DACA

16

**App. 377**

is enjoined.  *See supra* at Section I(A).  Subjecting the Texas economy, including many *Amici* and their members, to this substantial and irreparable harm before an adjudication on the merits of this case outweighs any purported harm to Plaintiff States, and is manifestly contrary to the public interest.

The States' delay in bringing this application further weighs against the equitable relief they seek.  The States waited almost six years after the announcement of the DACA guidelines before challenging them in Court, despite challenging similar initiatives implemented *after* DACA in 2015.  Since an injunction is an equitable remedy, it may be denied on the basis of *laches* if an unreasonable delay by the party seeking injunctive relief works to the disadvantage or prejudice of another party.  *See Envtl. Defense Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980). The States' delay has substantially impacted  businesses in Texas, who have, as described above, come to rely upon Dreamers as valued employees, customers, and fellow members of the business community and now stand to incur significant costs if DACA is enjoined.  That the Texas business community, including many *Amici* and their members, have lived with, relied upon, and planned for the application of the DACA guidelines for the past six years strongly distinguishes the instant application from the injunction sought by the States and others to prevent the implementation of the Deferred Action for Parents of Americans and "expanded DACA" initiatives in 2015.  *See Regents of Univ. of Cal. v. United States Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1044 (N.D. Cal. 2018).  The States' delay also undercuts any claim they have to immediate, irreparable injury, since they have been living with the *status quo* for six years.  *See High Tech Med. Instrumentation, Inc. v. New Image Indus.*, 49 F.3d 1551, 1557 (5th Cir. 1995) (holding that substantial delay "militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.").

17

**App. 378**

Finally, the States' apparent decision to initiate this case in response to injunctive relief issued by other courts, rather than promptly in response to the Government's initial announcement of the DACA initiative, will subject the Texas business community, including many *Amici* and their members, to further harm, and also weighs against the injunction the States seek. As the States acknowledge, the Government has already announced its intention to end the DACA initiative, litigation regarding this decision is making its way through the courts in other Circuits, and nationwide orders enjoining the rescission of DACA are currently in effect. Should this Court issue an injunction, Texas businesses will be subject to conflicting rulings and will have to spend time and commit resources to determining their obligations to Dreamer employees and customers under competing injunctions. *Cf. Feller v. Brock*, 802 F.2d 722, 727 (4th Cir. 1986) ("[I]ssuance of [a conflicting] preliminary injunction did a grave disservice to the public interest in the orderly administration of justice."). This cost is entirely of the States' making and tips the balance of the equities and the public interest further against injunctive relief.

## CONCLUSION

For the reasons set forth above, *Amici* respectfully request that the Court deny the States' Application for a Preliminary Injunction.

**App. 379**

Respectfully submitted,


 _/s/ Thomas S. Leatherbury_
Thomas S. Leatherbury

Harry M. Reasoner
Tex. Bar No. 16642000
Fed. ID. No. 538
Alberto P. Cardenas, Jr.
Tex. Bar No. 24012382
SD of Tex. Bar No. 3253266
VINSON & ELKINS L.L.P.
1001 Fannin Street
Suite 2500
Houston, Texas 77002
713.758.2222 telephone
713.758.2346 facsimile
hreasoner@velaw.com
bcardenas@velaw.com

Thomas S. Leatherbury
Tex. Bar No. 12095275
SD of Tex. Bar No. 19358
Attorney-in-Charge
VINSON & ELKINS L.L.P.
3700 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201-2975
214.220.7700 telephone
214.999.7792 facsimile
tleatherbury@velaw.com

_Attorneys for Amici Curiae_

**App. 380**

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2018, I caused a true and accurate copy of the foregoing document to be served on all counsel of record via filing of the same with the Court's CM/ECF system.

/s/ *Thomas S. Leatherbury*
Thomas S. Leatherbury

**App. 381**

# Exhibit 17

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 1:18-cv-00068 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendants-Intervenors, | § | |
| | § | |

**BRIEF OF 114 COMPANIES AND ASSOCIATIONS AS *AMICI CURIAE* IN SUPPORT
OF DEFENDANTS-INTERVENORS AND IN OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

**App. 383**

# TABLE OF CONTENTS

Page

INTEREST OF AMICI CURIAE ........................................................................... 1

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 2

I.     ENJOINING DACA WOULD INFLICT IMMENSE AND IRREPARABLE
HARM ON U.S. COMPANIES AND THE U.S. ECONOMY AS A WHOLE ............. 2

     A.     Dreamers Contribute Directly To Our Nation's Economic Growth ...................... 3

     B.     Dreamers Help Grow The Economy By Filling Jobs For Which There
Otherwise Would Not Be A Sufficient Supply Of Workers ................................. 5

           1.     Permitting Dreamers To Participate In The Workforce Increases,
Rather Than Reduces, The Number Of Jobs .............................................. 5

           2.     Dreamers Fill Critical Labor Shortages ..................................................... 7

     C.     Enjoining DACA Will Inflict Enormous Harm On Individuals,
Companies, And The Economy ........................................................................... 9

II.     DACA IS NOT CONTRARY TO SUBSTANTIVE FEDERAL LAW AND
DOES NOT VIOLATE THE TAKE CARE CLAUSE ................................................. 12

CONCLUSION ...................................................................................................... 16

App. 384

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arizona v. United States,*
    567 U.S. 387 (2012)..................................................................13

*Hotel & Rest. Emps. Union, Local 25 v. Smith,*
    846 F.2d 1499 (D.C. Cir. 1988) .................................................13

*Perales v. Casillas,*
    903 F.2d 1043 (5th Cir. 1990) ...................................................16

*Reno v. American-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999)............................................................. 12-13

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) .....................................................15

**Constitutional Provisions, Statutes, and Regulations**

U.S. Const. art. II, § 3 ......................................................................14

8 C.F.R. § 274.a ........................................................................15, 16

6 U.S.C. § 202 .................................................................................12

8 U.S.C. § 1103 ...............................................................................12

8 U.S.C. § 1154 ...............................................................................14

8 U.S.C. § 1324a ......................................................................15, 16

49 U.S.C. § 30301 ...........................................................................14

National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136,
    117 Stat. 1392 (2013)...............................................................14

USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001) ..................................14

**Other Authorities**

44 Fed. Reg. 43480 (July 25, 1979)..............................................16

51 Fed. Reg. 39385 (Oct. 28, 1986)..............................................16

**App. 385**

Alan Nelson, *Legalization and Family Fairness: An Analysis* (Oct. 21, 1987), *in* 64 No. 41 INTERPRETER RELEASES 1191 (Oct. 26, 1987) .......................................13

Alexander Casey, *An Estimated 123,000 'Dreamers' Own Homes and Pay $380M in Property Taxes,* Zillow Research (Sept. 20, 2017), https://goo.gl/SxQzuW .......................4

Am. Farm Bureau Fed'n, *Agricultural Labor – Immigration Reform* (Oct. 2016), https://goo.gl/WUAz3e ...................................................................................................9

Am. Immigration Council, *Executive Grants of Temporary Immigration Relief, 1956-Present* (Oct. 2014), https://goo.gl/Q87gqn .................................................13

Andorra Bruno *et al.*, CRS, *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (July 13, 2012), https://goo.gl/deiGYz ...................................13

Ben Gitis & Jacqueline Varas, *The Labor and Output Declines From Removing All Undocumented Immigrants*, Am. Action Forum (May 5, 2016), https://goo.gl/UAt3dJ.................................................................................................12

Bob Davis, *The Thorny Economics of Illegal Immigration*, WALL ST. J. (Feb. 9, 2016), https://goo.gl/j4dd7J .....................................................................................11

Brad Smith, President and Chief Legal Officer, Microsoft, *DREAMers Make our Country and Communities Stronger* (Aug. 31, 2017), https://goo.gl/kJYDT3........................8

Buttonwood, *Keep on Trucking*, THE ECONOMIST (Feb. 11, 2012) ................................6

Ctr. for Am. Progress, *Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey* (2016), https://goo.gl/pe2i17.........................................................................................8

CHARLES GORDON ET AL., 6-72 IMMIGRATION LAW AND PROCEDURE (REV. ED. 1993) ............................................................................................................................13

Christopher S. Decker, *Nebraska's Immigrant Population: Economic and Fiscal Impacts* (2008), https://tinyurl.com/ybsduws5 ..............................................................6

David Bier, *Ending DACA Will Impose Billions in Employer Compliance Costs*, Cato Inst. (Sept. 1, 2017), https://goo.gl/1FMidk ..................................................10

David Bier, *Five Myths About DACA*, Cato Inst. (Sept. 7, 2017), https://goo.gl/y1e8gb ...................................................................................................6

David Kenny, *Kenny: One Dreamer, Weathering Two Storms*, HOUSTON CHRON. (Dec. 3, 2017), https://goo.gl/562Pme .......................................................................8

**App. 386**

*Economics A-Z Terms Beginning with L*, THE ECONOMIST,
    https://goo.gl/BvRwKU ...............................................................................5

Francesc Ortega *et al.*, *The Economic Effects of Providing Legal Status to
    DREAMers*, IZA Discussion Paper No. 11281 (Jan. 2018),
    http://ftp.iza.org/dp11281.pdf ...............................................................7, 10

FWD.us, *The Impact of DACA Program Repeal on Jobs* (2017),
    https://goo.gl/gJQHnn ...............................................................................9

Giovanni Peri, *The Effect of Immigrants on U.S. Employment and Productivity*,
    Fed. Reserve Bank of San Francisco Econ. Letter (Aug. 30, 2010),
    https://goo.gl/jK17fc ...............................................................................6, 9

Heather Boushey & Sarah Jane Glynn, *There Are Significant Business Costs to
    Replacing Employees, Ctr. for Am. Progress* (Nov. 16, 2012),
    https://goo.gl/ZSmRLq ...............................................................................10

H.R. Rep. No. 111-157 (2009)...............................................................................12

*I Felt Like a Normal American Kid . . . Then Everything Changed*, THINKPolicy
    Blog (Oct. 9, 2017), https://goo.gl/oV9P7h ...........................................8

Inst. on Taxation & Economic Policy, *State & Local Tax Contributions of Young
    Undocumented Immigrants* (Apr. 2018), https://goo.gl/Kifc9K.............4

Jacqueline Varas, *How Immigration Helps U.S. Workers and the Economy*, Am.
    Action Forum (Mar. 20, 2017), https://goo.gl/ovHQEh ........................6

Jose Magana-Salgado, Immigrant Legal Resource Center, *Money on the Table:
    The Economic Cost of Ending DACA* (2016), https://goo.gl/3ZwGVJ ...............9, 10

Julia Boorstin, *Illegal Entrepreneurs: Maria Has No U.S. Visa, and Jose's
    Expires Soon. Yet They Own a Profitable California Factory, Pay Taxes, and
    Create Jobs,* CNN MONEY (July 1, 2005), https://goo.gl/jq2Y1C ...........4

Kenneth Megan, *Immigration and the Labor Force,* Bipartisan Policy Ctr. (Aug.
    25, 2015), https://goo.gl/8p3SP8 ...........................................................5, 6

Logan Albright *et al.*, *A New Estimate of the Cost of Reversing DACA* 1, Cato
    Inst. (Feb. 15, 2018), https://goo.gl/pgNGKi..........................................4

ManpowerGroup, *2016/2017 Talent Shortage Survey: The United States Results*,
    https://goo.gl/rJTKs6 ...............................................................................7

**App. 387**

Mem. from Donald Neufeld, USCIS, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* (June 15, 2009), https://goo.gl/SHaCVZ ..................................................................................14

Mem. from Gene McNary, Comm'r, INS, to Reg'l Comm'rs, *Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990), in 67 No. 6 INTERPRETER RELEASES 153 (Feb. 5, 1990) .................................................. 13-14

Mem. from Janet Napolitano to David V. Aguilar Regarding Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012)..........................................................................1

Mem. from Michael D. Cronin, INS, for Michael A. Pearson, INS, *VTVPA Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* (Aug. 30, 2001), https://goo.gl/8djyjJ ..................................................................................14

Mem. from Paul Virtue, INS, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* (May 6, 1997), https://goo.gl/YSU412....................14

Mem. Op. for the Sec'y of Homeland Security and the Counsel to the President, 38 Op. O.L.C. 1 (Nov. 19, 2014), https://www.justice.gov/file/179206/download.....................................................................13

Michael A. Clemens, *Does Kicking Out Mexicans Create Jobs?*, POLITICO MAG. (Feb. 15, 2017), https://goo.gl/XwLj1x ...............................................................11

Michael A. Clemens & Lant Pritchett, *Temporary Work Visas: A Four-Way Win for the Middle Class, Low-Skill Workers, Border Security, and Migrants*, Ctr. for Glob. Dev. (Apr. 2013), https://goo.gl/p9NLuc ............................................................5, 9

Michael Greenstone & Adam Looney, *What Immigration Means for U.S. Employment and Wages*, The Hamilton Project (May 4, 2012), https://goo.gl/bvC7AE ..................................................................................5

Mitra Toossi, *Consumer Spending: An Engine for U.S. Job Growth*, Monthly Labor Rev. (Nov. 2002), https://goo.gl/iyTkdR .......................................................5

*My American Dream, Minus the Paperwork*, THINKPolicy Blog (Oct. 3, 2017), https://goo.gl/876JDm..................................................................................8

Natalie Kitroeff & Geoffrey Mohan, *Wages Rise on California Farms. Americans Still Don't Want the Job*, L.A. TIMES (Mar. 17, 2017), https://goo.gl/r1cH9Z. .......................9

Nat'l Conference of State Legislatures, *National Employment Monthly Update* (June 1, 2018), https://goo.gl/wZBJh8.................................................................6, 7

**App. 388**

New Am. Economy, *Reason for Reform: Entrepreneurship* (Oct. 2016), https://tinyurl.com/y784raj8 ..................................................................2

Nicole Prchal Svajlenka *et al.*, *A New Threat to DACA Could Cost States Billions of Dollars*, Ctr. for Am. Progress (July 21, 2017), https://goo.gl/7udtFu ..................9

Octavio Blanco, *The Worker Shortage Facing America's Farmers*, CNN MONEY (Sept. 29, 2016), https://goo.gl/ZF2Tdx ..................................................9

P'ship for a New Am. Economy, *Open for Business: How Immigrants Are Driving Small Business Creation in the United States* (Aug. 2012), https://goo.gl/3mFkVz ..............................................................2

Paul Krugman, Opinion, *Lumps of Labor*, N.Y. TIMES (Oct. 7, 2003), https://goo.gl/GyYTG5 ..........................................................5

President's Council of Advisors on Sci. and Tech., *Report to the President: Engage to Excel: Producing One Million Additional College Graduates with Degrees in Science, Technology, Engineering, and Mathematics* (Feb. 2012), https://goo.gl/v2YRVD ..............................................7

President Dwight Eisenhower, *Statement Concerning the Entry Into the United States of Adopted Foreign-Born Orphans* (Oct. 26, 1956), https://goo.gl/BkztnZ ....................................................13

Rachel Unruh & Amanda Bergson-Shilcock, Nat'l Skills Coalition, *Missing in Action* (Feb. 2015), https://goo.gl/gokfJW ............................................7

Sarah Bohn *et al.*, *Do E-Verify Mandates Improve Labor Market Outcomes of Low-Skilled Native and Legal Immigrant Workers?* (May 2014), https://goo.gl/7UihSE ........................................................11

Sarah Elizabeth Richards, *How Fear of Deportation Puts Stress on Families*, THE ATLANTIC (Mar. 22, 2017), https://goo.gl/qDgeRf ............................................10

Silva Mathema, *Assessing the Economic Impacts of Granting Deferred Action Through DACA and DAPA,* Ctr. for Am. Progress (Apr. 2, 2015), https://goo.gl/wxxek1 ........................................................4

Tiziana Rinaldi & Angilee Shah, *Immigration Limbo Is a 'Tug of Emotions.' It's Also a Mental Health Issue*, PRI'S THE WORLD (Aug. 22, 2017), https://goo.gl/WLXMZ4 ....................................................10

Tom K. Wong *et al.*, *DACA Recipients' Economic and Educational Gains Continue to Grow Ctr. for Am. Progress* (Aug. 28, 2017), https://goo.gl/dYJV1s ......................................................3, 4

**App. 389**

Tom K. Wong *et al.*, *Results from 2017 National DACA Study*,
https://goo.gl/nBZdP2 ......................................................................................3, 4, 5, 8

Tony Romm, *IBM CEO Ginni Rometty Is in D.C. Urging Congress to Save DACA*
(Sept. 19, 2017), https://goo.gl/NQeJUc ....................................................................8

U.S. Citizenship & Immigration Servs. ("USCIS"), *Interim Relief for Certain
Foreign Academic Students Adversely Affected by Hurricane Katrina:
Frequently Asked Questions (FAQ)* (Nov. 25, 2005),
https://tinyurl.com/ycw8gjry ....................................................................................14

U.S. Dep't of Labor, Bureau of Labor Statistics, *Job Openings and Labor
Turnover Survey*, https://goo.gl/g4n9Ag.....................................................................6

U.S. Dep't of Labor, Bureau of Labor Statistics, *Job Openings and Labor
Turnover Survey Highlights August 2017* (Oct. 11, 2017),
https://goo.gl/H28XkL ................................................................................................7

The UndocuScholars Project, *In the Shadows of the Ivory Tower: Undocumented
Undergraduates and the Liminal State of Immigration Reform* (2015),
https://tinyurl.com/y7svqsxr .......................................................................................8

World Health Org. & Int'l Labour Org., *Mental Health And Work: Impact, Issues
and Good Practices* (2000), https://goo.gl/ecH1Ut ................................................10

**App. 390**

## INTEREST OF *AMICI CURIAE*

*Amici* are 114 U.S. companies and associations that collectively contribute trillions of dollars in annual revenue to the American economy. Many *amici* employ Dreamers—the young people who, under the Deferred Action for Childhood Arrivals (DACA), are able to live and work in the country that has been their home for most of their lives. In addition, *amici*'s customers and end users are Dreamers; and *amici*'s businesses benefit from Dreamers' contributions to the overall economy through their tax payments, spending, and investments. Accordingly, *amici* have a strong interest in Dreamers' continued ability to work and participate in our country's economy and in society generally. A list of the *amici* is set forth in the Appendix.

## INTRODUCTION

The intangible benefits of DACA are undeniable and substantial: nearly 800,000 individuals (Dreamers) who "were brought to this country as children and know only this country as home" could for the first time live in America and participate fully in all aspects of our society without the constant and crippling fear of deportation. Mem. from Janet Napolitano to David V. Aguilar Regarding Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012) ("DACA Memorandum"). DACA is a concrete and essential example of America fulfilling its centuries-old promise to welcome people from around the world seeking a better and a freer life. And no group is more deserving of that welcome than the Dreamers.

In addition to these invaluable intangible benefits, DACA has produced—and is continuing to produce—important benefits for America's companies and for our economy as a whole. Most notably, thanks to longstanding regulations governing the employment of immigrants, Dreamers who have obtained deferred action under DACA may apply for work

authorization, and thereafter obtain jobs. Employment of Dreamers expands work opportunities for everyone, because employment is not a zero-sum game. Dreamers are filling vacancies at companies that cannot find enough workers to fill their needs. And Dreamers' wages lead to higher tax revenues and expansion of our national GDP—producing new jobs for all Americans.

Enjoining DACA will inflict serious harm on U.S. companies, all workers, and the American economy as a whole. Every day DACA is enjoined, approximately 1,700 people will lose their jobs—which in turn translates into lost productivity and revenue for companies, lost tax revenue for governments, and broader economic contraction. But those dire consequence should never come to fruition because plaintiffs cannot show a likelihood of success on the merits of their claims—certainly not enough to justify the enormous harm a preliminary injunction would cause to the public interest. DACA closely resembles deferred action programs adopted in the past and complies fully with the applicable statutes.

## ARGUMENT

I. **ENJOINING DACA WOULD INFLICT IMMENSE AND IRREPARABLE HARM ON U.S. COMPANIES AND THE U.S. ECONOMY AS A WHOLE.**

Since the nation's founding, immigrants have been an integral part of the fabric of our country, enhancing the lives and prosperity of all Americans. Immigrants' contributions to the U.S. economy are well-recognized: For example, companies founded by immigrants or their children generate over $4.8 trillion in annual revenue,[1] and employ approximately one in 10 American workers.[2]

---

[1] New Am. Economy, *Reason for Reform: Entrepreneurship* 2, 6-7 (Oct. 2016), https://tinyurl.com/y784raj8.

[2] P'ship for a New Am. Economy, *Open for Business: How Immigrants Are Driving Small Business Creation in the United States* 12, 14 (Aug. 2012), https://goo.gl/3mFkVz (immigrant-owned businesses generate over $775 billion in revenue and employ one out of every 10 workers)

**App. 392**

DACA enabled Dreamers—immigrants who were brought to the U.S. as children—to come out of the shadows, participate in the economy, and contribute to U.S. companies, which benefits all of us. Eliminating DACA harms not only individual Dreamers and their families, friends, and co-workers; but also the many U.S. businesses that count on them to help fuel continued innovation and economic growth.

## A. Dreamers Contribute Directly To Our Nation's Economic Growth.

In the over five years since DACA was implemented, Dreamers have become essential contributors to American companies and the American economy. Before DACA, these individuals—who have obtained at least a high school degree and, in many cases, have finished college and graduate school—would have been unable to even seek work authorization, and therefore unable to put their education and skills to use. DACA changed that, and as a result over 91 percent of Dreamers are employed and earn wages commensurate with their skill levels.[3] Permitting Dreamers to stay and work in the country in which they grew up not only benefits those individuals, but also benefits American companies and the American economy as a whole.

*First*, Dreamers directly contribute to the success of numerous U.S. companies. At least 72 percent of the top 25 Fortune 500 companies employ Dreamers—including IBM, Walmart, Apple, General Motors, Amazon, JPMorgan Chase, Home Depot, and Wells Fargo, among others. Those companies alone generate almost $3 trillion in annual revenue.[4]

Many Dreamers are entrepreneurs who have created their own businesses: According to one survey, five percent of Dreamers started their own businesses after receiving deferred action under DACA. Among those respondents 25 years and older, the figure is nearly eight percent—

---

[3]     Tom K. Wong *et al.*, *Results from 2017 National DACA Study* 3-4 ("Wong 2017 Results"), https://goo.gl/nBZdP2.

[4]     Tom K. Wong *et al.*, *DACA Recipients' Economic and Educational Gains Continue to Grow*, Ctr. for Am. Progress (Aug. 28, 2017) ("Wong DACA Gains"), https://goo.gl/dYJV1s.

**App. 393**

well above the 3.1 percent for all Americans.[5] These businesses create new jobs and provide goods and services that expand the economy.[6]

*Second*, Dreamers pay taxes to federal, state, and local governments.[7] The Cato Institute estimated that over 10 years, DACA recipients will increase federal tax revenues by approximately $93 billion;[8] they will contribute many billions more in state and local taxes.[9] These tax dollars help fund public goods like schools, firefighters, roads, and bridges. For example, Dreamers pay approximately $111 million and $81 million in property taxes in California and Texas alone, respectively, which is "enough to cover the annual salaries of roughly 1,500 elementary school teachers in each of those states."[10]

*Third*, Dreamers have used their earnings—and the increased stability and security resulting from their receipt of deferred action—to make purchases and investments that grow our nation's economy. In 2017, nearly two-thirds of Dreamers reported buying their first car, and almost 16 percent reported purchasing a first home.[11] These and other types of personal consumption expenditures are important drivers of the economy: they "account[] for the largest

---

[5]     Wong 2017 Results, *supra* n.3, at 3; Wong DACA Gains, *supra* n.4.

[6]     *See* Julia Boorstin, *Illegal Entrepreneurs: Maria Has No U.S. Visa, and Jose's Expires Soon. Yet They Own a Profitable California Factory, Pay Taxes, and Create Jobs*, CNN MONEY (July 1, 2005), https://goo.gl/jq2Y1C.

[7]     *See* Silva Mathema, *Assessing the Economic Impacts of Granting Deferred Action Through DACA and DAPA*, Ctr. for Am. Progress (Apr. 2, 2015), https://goo.gl/wxxek1.

[8]     Logan Albright *et al.*, *A New Estimate of the Cost of Reversing DACA* 1, Cato Inst. (Feb. 15, 2018), https://goo.gl/pgNGKi.

[9]     Inst. on Taxation & Economic Policy*, State & Local Tax Contributions of Young Undocumented Immigrants* (Apr. 2018), https://goo.gl/Kifc9K (estimating that DACA-eligible immigrants contribute approximately $2 billion a year in state and local taxes)

[10]    Alexander Casey, *An Estimated 123,000 'Dreamers' Own Homes and Pay $380M in Property Taxes,* Zillow Research (Sept. 20, 2017), https://goo.gl/SxQzuW.

[11]    Wong 2017 Results, *supra* n.3, at 3.

**App. 394**

share of GDP [and] are the main generator of employment in the economy."[12]

**B.      Dreamers Help Grow The Economy By Filling Jobs For Which There Otherwise Would Not Be A Sufficient Supply Of Workers.**

These benefits to the U.S. economy do not come at the expense of U.S.-born workers. Studies have consistently found that immigrants do not displace U.S.-born workers. They instead help grow the economy and create more opportunities for U.S.-born workers by filling positions that otherwise would remain vacant because of a shortage of qualified workers.[13]

**1.      Permitting Dreamers To Participate In The Workforce Increases, Rather Than Reduces, The Number Of Jobs.**

"One of the best-known fallacies in economics" is the "lump of labour fallacy."[14] Economists from across the policy and political spectrum have discredited the notion that "there is a fixed amount of work to be done—a lump of labour"—such that an increase in the number of workers reduces the number of available jobs.[15] Rather, the clear reality is that jobs beget more jobs. "When people work for a living, they earn money. They spend that money on goods and services that are produced by other people."[16] The greater demand for goods and services creates

---

[12]      Mitra Toossi, *Consumer Spending: An Engine for U.S. Job Growth*, Monthly Labor Rev. 12 (Nov. 2002), https://goo.gl/iyTkdR.

[13]      *See* Michael Greenstone & Adam Looney, *What Immigration Means for U.S. Employment and Wages* 1-2, The Hamilton Project (May 4, 2012), https://goo.gl/bvC7AE; Kenneth Megan, *Immigration and the Labor Force*, Bipartisan Policy Ctr. (Aug. 25, 2015), https://goo.gl/8p3SP8; Michael A. Clemens & Lant Pritchett, *Temporary Work Visas: A Four-Way Win for the Middle Class, Low-Skill Workers, Border Security, and Migrants* 4, Ctr. for Glob. Dev. (Apr. 2013), https://goo.gl/p9NLuc.

[14]      *Economics A-Z Terms Beginning with L*, THE ECONOMIST, https://goo.gl/BvRwKU.

[15]      *Id.*; *see also* Paul Krugman, Opinion, *Lumps of Labor*, N.Y. TIMES (Oct. 7, 2003), https://goo.gl/GyYTG5.

[16]      Buttonwood, *Keep on Trucking*, THE ECONOMIST (Feb. 11, 2012), https://goo.gl/x8vqaL; *see also* Megan, *supra* n.13 ("[A] breadth of research indicates that immigration can be complementary to native born employment, as it spurs demand for goods and services"); Giovanni Peri, *The Effect of Immigrants on U.S. Employment and Productivity*, Fed. Reserve Bank of San Francisco Econ. Letter (Aug. 30, 2010), https://goo.gl/jK17fc.

**App. 395**

new jobs.

The facts are indisputable. "From 1970 to 2017, the U.S. labor force doubled. Rather than ending up with a 50 percent unemployment rate, U.S. employment doubled."[17] Another study showed that countries with high employment levels of older workers also had high employment levels of young workers; in other words, high employment levels in one group benefited the other group, rather than depriving the other of employment opportunities.[18] And yet other studies have shown that increased immigration levels in the U.S. in the past have had largely *positive* impacts on the employment levels and income of U.S.-born workers.[19] For example, one study found that spending by immigrants generated approximately 12,000 jobs in plaintiff Nebraska in one year.[20]

These findings hold true today. The unemployment rate has more than halved since 2012, when DACA was created.[21] The number of total job openings has increased.[22] And studies have found that DACA has not had any significant effect on the wages of U.S.-born workers.[23]

### 2. Dreamers Fill Critical Labor Shortages.

The jobs being filled by Dreamers post-DACA are largely jobs for which there is a shortage of qualified workers—*not* the jobs that are or could be filled by U.S.-born workers. In a

---

[17]     David Bier, *Five Myths About DACA*, Cato Inst. (Sept. 7, 2017), https://goo.gl/y1e8gb.

[18]     Buttonwood, *supra* n.16.

[19]     *See* Jacqueline Varas, *How Immigration Helps U.S. Workers and the Economy*, Am. Action Forum (Mar. 20, 2017), https://goo.gl/ovHQEh.

[20]     Christopher S. Decker, *Nebraska's Immigrant Population: Economic and Fiscal Impacts* 1, 23 (2008), https://tinyurl.com/ybsduws5.

[21]     *See* Nat'l Conference of State Legislatures, *National Employment Monthly Update* (June 1, 2018) ("NCSL Employment Update"), https://goo.gl/wZBJh8.

[22]     U.S. Dep't of Labor, Bureau of Labor Statistics, *Job Openings and Labor Turnover Survey*, https://goo.gl/g4n9Ag (last accessed July 18, 2018).

[23]     Francesc Ortega *et al*., *The Economic Effects of Providing Legal Status to DREAMers* 18, IZA Discussion Paper No. 11281 (Jan. 2018), http://ftp.iza.org/dp11281.pdf.

**App. 396**

recent survey of U.S. employers, 46 percent of respondents reported difficulty filling jobs—particularly in skilled labor positions, such as teachers, accounting and finance staff, nurses, and engineers.[24] Almost a quarter of employers reported a lack of available applicants; another 34 percent cited a shortage of applicants with necessary skills and experience.[25] In 2012, the President's Council of Advisors on Science and Technology warned that within ten years, the U.S. could face a shortfall of nearly one million professionals in the science, technology, engineering, and mathematics (STEM) fields.[26] Even putting aside the skills mismatch, it is unlikely that there are enough available workers to fill the openings: The U.S. unemployment rate is currently quite low, and the number of job openings is high.[27]

   Dreamers help fill this gap. They all have a high school degree or equivalent—and a large percentage of Dreamers are pursuing or have received college or post-college degrees and therefore qualify for highly-skilled jobs.[28] In 2016, almost a quarter of Dreamers were employed in the educational or health services industry.[29] Many others work in technology, science, and finance,[30] and more still are majoring in STEM fields.[31] *Amici*'s experiences confirm this: For

---

[24]    *See* ManpowerGroup, *2016/2017 Talent Shortage Survey: The United States Results* ("ManpowerGroup 2016/2017"), https://goo.gl/rJTKs6; *see also* Rachel Unruh & Amanda Bergson-Shilcock, Nat'l Skills Coalition, *Missing in Action* 3-4 (Feb. 2015), https://goo.gl/gokfJW.

[25]    ManpowerGroup 2016/2017, *supra* n.23.

[26]    President's Council of Advisors on Sci. and Tech., *Report to the President: Engage to Excel: Producing One Million Additional College Graduates with Degrees in Science, Technology, Engineering, and Mathematics* 1 (Feb. 2012), https://goo.gl/v2YRVD.

[27]    *See* NCSL Employment Update, *supra* n.21; U.S. Dep't of Labor, Bureau of Labor Statistics, *Job Openings and Labor Turnover Survey Highlights August 2017* charts 1 & 2 (Oct. 11, 2017), https://goo.gl/H28XkL.

[28]    Wong 2017 Results, *supra* n.3, at 7-8.

[29]    Ctr. for Am. Progress, *Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey* 4 (2016), https://goo.gl/pe2i17.

[30]    *Id.*

---

**App. 397**

example, Microsoft employs 27 Dreamers as "software engineers with top technical skills; finance professionals driving [its] business ambitions forward; and retail and sales associates connecting customers to [its] technologies."[32] IBM has identified at least 31 Dreamers within the company who work in areas such as software development and client support.[33] One IBM Dreamer provided critical remote technical support to ensure continuity of IBM's Cloud services when Hurricane Harvey flooded Houston.[34] Lyft employs at least one Dreamer as a software engineer, who serves as one of the tech leads of the team driving critical data projects.[35]

Dreamers with lesser-skilled jobs are also filling positions for which there is an insufficient labor supply. "Among less-educated workers, those born in the United States tend to have jobs in manufacturing or mining, while immigrants tend to have jobs in personal services and agriculture."[36] The latter industries in particular "face[] a critical shortage of workers every year, as citizens are largely unwilling to engage in these . . . physically demanding . . .

---

[31] The UndocuScholars Project, *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform* 8 (2015), https://tinyurl.com/y7svqsxr.

[32] Brad Smith, President and Chief Legal Officer, Microsoft, *DREAMers Make our Country and Communities Stronger* (Aug. 31, 2017), https://goo.gl/kJYDT3.

[33] *See* Tony Romm, *IBM CEO Ginni Rometty Is in D.C. Urging Congress to Save DACA*, Recode.net (Sept. 19, 2017), https://goo.gl/NQeJUc; *My American Dream, Minus the Paperwork*, THINKPolicy Blog (Oct. 3, 2017), https://goo.gl/876JDm; *I Felt Like a Normal American Kid . . . Then Everything Changed*, THINKPolicy Blog (Oct. 9, 2017), https://goo.gl/oV9P7h.

[34] *See* David Kenny, *Kenny: One Dreamer, Weathering Two Storms*, HOUSTON CHRON. (Dec. 3, 2017), https://goo.gl/562Pme.

[35] *See* Decl. of Emily Nishi ¶ 4, Joint App. Vol. 5 at JA1099, 1103 Dkt. No. 118, *Batalla Vidal v. Trump*, Nos. 18-485, 18-488 (2d Cir. Mar. 16, 2018).

[36] Peri, *supra* n.16.

**App. 398**

activities"[37]—even when companies increase wages the maximum amount financially feasible.[38]

In sum, Dreamers are filling jobs that otherwise would remain vacant and are increasing demand for goods and services, which helps to grow the entire economy.

### C. Enjoining DACA Will Inflict Enormous Harm On Individuals, Companies, And The Economy.

All of the above benefits—and more—will be lost if DACA is enjoined or struck down. Over the next decade, our country's GDP will lose between $350 and $460.3 billion; and federal tax revenue will drop over $90 billion.[39]

This economic contraction would result directly from Dreamers' loss of work authorization. All of the hundreds of thousands of employed Dreamers would lose their jobs. If DACA is enjoined, in the first eight months alone, 300,000 would lose their jobs—an average of 1,700 people losing jobs every single business day.[40] In addition to the obvious harm to Dreamers themselves, the loss of so many workers will have severe repercussions for U.S. companies and workers.

Already, the uncertainty surrounding DACA is impacting Dreamers and, by extension, the companies for which they work. Dreamers now live with the constant threat of job loss and being forced into a life in the shadows, unable to participate in society, and facing forced

---

[37] Am. Farm Bureau Fed'n, *Agricultural Labor – Immigration Reform* (Oct. 2016), https:// goo.gl/WUAz3e; *see also* Clemens & Pritchett, *supra* n.13, at 3 (predicting that increase in low-skill jobs in the care industry will be more than the total increase in the age 25-54 labor force).

[38] *See*, *e.g.*, Natalie Kitroeff & Geoffrey Mohan, *Wages Rise on California Farms. Americans Still Don't Want the Job*, L.A. TIMES (Mar. 17, 2017), https://goo.gl/r1cH9Z; Octavio Blanco, *The Worker Shortage Facing America's Farmers*, CNN MONEY (Sept. 29, 2016), https://goo.gl/ZF2Tdx.

[39] *See* Nicole Prchal Svajlenka *et al.*, *A New Threat to DACA Could Cost States Billions of Dollars*, Ctr. for Am. Progress (July 21, 2017), https://goo.gl/7udtFu; Jose Magana-Salgado, Immigrant Legal Resource Center, *Money on the Table: The Economic Cost of Ending DACA* 4, 6-7 (2016), https://goo.gl/3ZwGVJ; *see also* Albright *et al.*, *supra* n.8, at 1.

[40] FWD.us, *The Impact of DACA Program Repeal on Jobs* (2017), https://goo.gl/gJQHnn.

**App. 399**

removal from the only country they have ever known. The fear for the future that is now a daily part of life for Dreamers and their families affects both physical and mental health.[41] That, in turn, negatively affects employee productivity and performance, illness and absenteeism, accidents, and turnover.[42]

If this Court were to enjoin DACA and thereby permit Dreamers' work authorizations to expire, companies will face an estimated $6.3 billion in costs to replace Dreamers—if they can even find new employees to fill the empty positions.[43] Companies will forfeit the money they invested in training Dreamers, and will incur costs recruiting and training new employees, who will be less experienced and therefore less productive.[44] These costs are particularly burdensome for small businesses.

The numbers are relevant, but numbers alone do not come close to capturing Dreamers' contributions and the tremendous harm that will result from their loss. People are the heart of every business; and every company's goal is to create teams that work seamlessly together—teams in which colleagues support one another both within and outside the workplace. Ripping Dreamers out of their jobs hurts not only Dreamers, but other employees who lose friends and colleagues, and companies that lose trusted members of their teams.

History shows that forcing Dreamers out of the workforce and into the shadows will also

---

[41]     *See* Tiziana Rinaldi & Angilee Shah, *Immigration Limbo Is a 'Tug of Emotions.' It's Also a Mental Health Issue*, PRI'S THE WORLD (Aug. 22, 2017), https://goo.gl/WLXMZ4; Sarah Elizabeth Richards, *How Fear of Deportation Puts Stress on Families*, THE ATLANTIC (Mar. 22, 2017), https://goo.gl/qDgeRf.

[42]     *See* World Health Org. & Int'l Labour Org., *Mental Health And Work: Impact, Issues and Good Practices* 1 (2000), https://goo.gl/ecH1Ut; Ortega, *supra* n.23, at 9-10.

[43]     *See* David Bier, *Ending DACA Will Impose Billions in Employer Compliance Costs*, Cato Inst. (Sept. 1, 2017), https://goo.gl/1FMidk; *see also* Magana-Salgado, *supra* n.39, at 4.

[44]     Heather Boushey & Sarah Jane Glynn, *There Are Significant Business Costs to Replacing Employees*, Ctr. for Am. Progress (Nov. 16, 2012), https://goo.gl/ZSmRLq.

**App. 400**

reduce job growth and harm the U.S. economy. After Arizona passed the Legal Arizona Workers Act in 2007, which targeted the use of unauthorized workers, its population of undocumented workers dropped by 40 percent. Economic growth fell, reducing job opportunities: The state's total employment was 2.5 percent less than what it would have been without the law, and its GDP was reduced by an average of 2 percent a year between 2008 and 2015.[45]

Similarly, in 1964, the U.S. expelled Mexican *braceros*, who were previously permitted to work temporarily in the U.S., mostly on farms. A recent study revealed that excluding the Mexican *braceros* "did not affect the wages or employment of U.S. farmworkers."[46] Instead, farms responded by *eliminating* the jobs—often by moving production abroad or going out of business.[47]

Removing Dreamers from the workforce is likely to have the very same negative effect on U.S. employment levels as companies are unable to fill critical jobs. That effect will be exacerbated as Dreamers are forced to shutter businesses that employ other workers and other companies lose the income that has helped drive demand and production of goods and services provided by U.S.-born workers.[48]

---

[45] *See* Bob Davis, *The Thorny Economics of Illegal Immigration*, WALL ST. J. (Feb. 9, 2016), https://goo.gl/j4dd7J; *see also* Sarah Bohn *et al.*, *Do E-Verify Mandates Improve Labor Market Outcomes of Low-Skilled Native and Legal Immigrant Workers?* 17-18, 21, 24-25 (May 2014), https://goo.gl/7UihSE (finding that employment rates of U.S.-born men dropped post-LAWA).

[46] Michael A. Clemens, *Does Kicking Out Mexicans Create Jobs?*, POLITICO MAG. (Feb. 15, 2017), https://goo.gl/XwLj1x.

[47] *Id*.

[48] *Cf.* Ben Gitis & Jacqueline Varas, *The Labor and Output Declines From Removing All Undocumented Immigrants*, Am. Action Forum (May 5, 2016), https://goo.gl/UAt3dJ (concluding that removing undocumented immigrants from the workforce would cause private sector employment to decline by 4 to 6.8 million workers, would reduce real private sector output by $381.5 to $623.2 billion, and would have further negative economic impacts through the loss of consumption, investments, and entrepreneurship).

App. 401

## II.     DACA IS NOT CONTRARY TO SUBSTANTIVE FEDERAL LAW AND DOES NOT VIOLATE THE TAKE CARE CLAUSE.

In addition to being contrary to the public interest, a preliminary injunction is inappropriate because plaintiffs are not likely to succeed on the merits of their claims.

The individual intervenors have challenged plaintiffs' standing. But even if plaintiffs have standing to bring this action, their challenge to DACA would not succeed on the merits.

DACA is entirely consistent with, and authorized by, federal statutes. The immigration laws specifically charge the secretary of Homeland Security with "establishing national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and with carrying out the "administration and enforcement of th[e INA] and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a); *see also* H.R. Rep. No. 111-157, at 8 (2009) ("[R]ather than simply rounding up as many illegal immigrants as possible, which is sometimes achieved by targeting the easiest and least threatening among the undocumented population, DHS must ensure that the government's huge investments in immigration enforcement are producing the maximum return in actually making our country safer.").

DACA is the execution of this statutory authority. Indeed, its grant of deferred action is but one instance of a long-established practice that has been engaged in by Administrations of both parties and expressly recognized by the Supreme Court. *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-85 (1999) (describing "regular practice" of "deferred action").[49] U.S. Presidents since 1956 have implemented formal programs deferring government action to remove individuals present in the United States—thereby enabling over two million

---

[49]     *See also Arizona v. United States*, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials."); CHARLES GORDON ET AL., 6-72 IMMIGRATION LAW AND PROC. § 72.03 (Matthew Bender, rev. ed. 1993); Mem. Op. for the Sec'y of Homeland Security and the Counsel to the President, 38 Op. O.L.C. 1, 12-20 (Nov. 19, 2014), https://www.justice.gov/file/179206/download.

**App. 402**

otherwise-removable aliens to remain temporarily in the country.

In the 1950s, President Eisenhower authorized the admission of ("paroled") almost 1,000 foreign-born children into the United States; and he and Presidents Kennedy, Johnson, and Nixon later paroled another 600,000 Cubans.[50] In the 1970s and 1980s, the Ford and Carter Administrations granted "extended voluntary departure," which "temporarily suspend[ed] enforcement" of deportation, to "particular group[s]" of immigrants.[51] The Reagan Administration introduced the "Family Fairness" program, which deferred removal actions against minor children whose parents were in the process of obtaining legal status but who did not themselves qualify for legal status.[52] President George H.W. Bush then extended the program in 1990 to cover qualified spouses.[53] And on at least four additional occasions, immigration officials have extended deferred action to specified classes of individuals.[54]

---

[50]     *See* President Dwight Eisenhower, *Statement Concerning the Entry Into the United States of Adopted Foreign-Born Orphans* (Oct. 26, 1956), https://goo.gl/BkztnZ; Am. Immigration Council, *Executive Grants of Temporary Immigration Relief, 1956-Present* (Oct. 2014), https://goo.gl/Q87gqn.

[51]     *Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (en banc); Andorra Bruno *et al*., CRS, *Analysis of June 15, 2012 DHS Memorandum*, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* App'x (July 13, 2012), https://goo.gl/deiGYz.

[52]     Alan Nelson, *Legalization and Family Fairness: An Analysis* (Oct. 21, 1987), *in* 64 No. 41 INTERPRETER RELEASES 1191 app. I (Oct. 26, 1987).

[53]     Mem. from Gene McNary, Comm'r, INS, to Reg'l Comm'rs, *Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990), *in* 67 No. 6 Interpreter Releases 153, app. I, at 164-65 (Feb. 5, 1990).

[54]     *See*, *e.g.*, Mem. from Paul Virtue, INS, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997), https://goo.gl/YSU412; U.S. Citizenship & Immigration Servs. ("USCIS"), *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* 1, 7 (Nov. 25, 2005), https://tinyurl.com/ycw8gjry; Mem. from Michael D. Cronin, INS, for Michael A. Pearson, INS, *VTVPA Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* (Aug. 30, 2001), https://goo.gl/8djyjJ; Mem. from Donald Neufeld, USCIS, *Guidance Regarding Surviving*

**App. 403**

None of these programs had explicit statutory authorization. Instead, the power to grant deferral of removal proceedings and other similar discretionary relief has long been recognized to be an exercise of prosecutorial authority that falls squarely within the Executive Branch's constitutional authority to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, as confirmed by Congress's codification of that discretion in the immigration laws, *see* p.12 *supra*. Moreover, Congress has on several occasions recognized the legal authority to grant deferred action by *expressly expanding* deferred action to certain categories of individuals.[55] Given this long historical practice and express congressional recognition, it is plain that the Executive Branch has broad authority to grant deferred action.

In arguing otherwise, plaintiffs attempt to conflate DACA with the program considered by this Court and the Fifth Circuit in earlier litigation—the Deferred Action for Parents of Americans and Lawful Permanent Residents program ("DAPA")—and argue that DACA is likely to be found unlawful because DAPA was. Pls.' Op. Br. 21-27. But the Fifth Circuit did not hold that the Executive Branch lacked authority to defer removal with respect to certain undocumented immigrants, even on a categorical basis. Instead, it held that DHS lacked authority to confer "lawful[] presen[ce]" to undocumented immigrants based on their children's immigration status because the INA already "prescribes how parents may derive an immigration

---

*Spouses of Deceased U.S. Citizens and Their Children* (June 15, 2009), https://goo.gl/SHaCVZ.

[55]     *See, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain aliens who self-petition for relief under the Violence Against Women Act of 1994, Pub. L. No. 103-322, Tit. V, 108 Stat. 1092, are eligible to request "deferred action"); USA PATRIOT Act, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 (2001) (providing that certain family members of lawful permanent residents killed on September 11, 2001, or of citizens killed in combat, are "eligible for deferred action"); National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694-1695 (2003) (same); *cf.* 49 U.S.C. § 30301 note (providing that certain states may issue driver's licenses to aliens with "approved deferred action status").

classification on the basis of their child's status." *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S.Ct. 2271 (2016). The memorandum announcing DACA contains no such language conferring "lawful[] presen[ce]" on Dreamers, and the INA provides no path to legal status for Dreamers; the Fifth Circuit's rationale is therefore inapplicable.

Plaintiffs' claim (Pls.' Op. Br. 28-31) that DACA is unlawful because it confers work authorization is likewise meritless. DACA does not confer work authorization: Eligibility for work authorization (and other benefits) arises through the operation of *other* independent and longstanding regulations and statutes, which plaintiffs do not challenge. *See, e.g.*, 8 C.F.R. § 274a.12 (promulgated 1987) (setting forth classes of aliens eligible for work authorization); 8 U.S.C. § 1324a(h)(3) (enacted 1986) (recognizing authority of Attorney General to authorize to authorize the employment of an alien). And those regulations and statutes make clear that eligibility for the benefits is not granted by DACA, which merely sets forth guidance for granting deferred action (*i.e.*, a deferral of government action to remove the individual from the United States). For example, 8 C.F.R. § 274.a(12) lists categories of aliens who are authorized to obtain employment "incident to [their immigration] status." Notably, aliens who have received deferred action are not among those aliens; instead, aliens who have received deferred action must independently demonstrate "an economic necessity for employment" to receive work authorization. 8 C.F.R. § 274a.12(c)(14).[56]

But in any event, permitting deferred action recipients to obtain work authorization has also long been recognized in U.S. immigration law. A regulation promulgated in the 1980s—

---

[56]     Indeed, the Fifth Circuit has held that "the agency's decision to grant voluntary departure and work authorization has been committed to agency discretion by law." *Perales v. Casillas*, 903 F.2d 1043, 1045 (5th Cir. 1990).

which plaintiffs do not contend is unlawful—provides that individuals who receive deferred action are eligible to apply for work authorization. *See* 8 C.F.R. § 274a.12(c)(14). This regulation codified the already-existing practice and procedure of granting employment authorization to such individuals. *See* 44 Fed. Reg. 43480 (July 25, 1979). And in the almost forty years since, Congress has declined to limit this practice in any way.

To the contrary, in the face of a challenge to the Attorney General's authority to grant work authorizations to individuals who have been granted deferred action (*see* 51 Fed. Reg. 39385 (Oct. 28, 1986)), Congress ratified the Attorney General's authority, enacting a law prohibiting employers from hiring unauthorized aliens, but expressly excluded from that category individuals "authorized to be so employed by this chapter *or by the Attorney General*." 8 U.S.C. § 1324a(h)(3) (emphasis added).[57]

## CONCLUSION

For the foregoing reasons, *amici* urge the Court to deny plaintiffs' motion for a preliminary injunction.

---

[57] The disjunctive nature of this provision refutes plaintiffs' contention that Congress's articulation of certain categories of aliens who must or may receive employment authorization forecloses the Executive from granting work authorization to any other alien.

**App. 406**

Dated: July 21, 2018

/s/ *Kevin Ranlett*
Kevin Ranlett
Attorney-in-charge
TX Bar No. 24084922
S.D. Tex. Bar No. 1124632
MAYER BROWN LLP
700 Louisiana Street, Suite 3400
Houston, TX 77002
Telephone: (713) 238-3000
Facsimile: (713) 238-4888
kranlett@mayerbrown.com

Andrew J. Pincus (*pro hac vice pending*)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
apincus@mayerbrown.com

Lauren R. Goldman (*pro hac vice pending*)
Karen W. Lin (*pro hac vice pending*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020-1001
(212) 506-2500
lrgoldman@mayerbrown.com
klin@mayerbrown.com

*Counsel* for Amici Curiae

**App. 407**

# APPENDIX

## LIST OF *AMICI*

1.        Amazon.com, Inc.

2.        A Medium Corporation

3.        American Hotel & Lodging Association

4.        Adobe Systems Incorporated

5.        AdRoll Group

6.        Airbnb, Inc.

7.        Ampush LLC

8.        Asana, Inc.

9.        Atlassian Corp. Plc

10.       Azavea Inc.

11.       Ben & Jerry's Homemade, Inc.

12.       Bigtooth Ventures

13.       Box, Inc.

14.       Braze

15.       Brightcove Inc.

16.       BSA | The Software Alliance

17.       CareZone Inc.

18.       Casper Sleep Inc.

19.       Castlight Health, Inc.

20.       Chegg, Inc.

21.       Chobani, LLC

22.       Cisco Systems, Inc.

23.     Citrix Systems, Inc.

24.     Civis Analytics, Inc.

25.     ClassPass Inc.

26.     Cloudera, Inc.

27.     Cloudflare Inc.

28.     Codecademy

29.     Color Genomics, Inc.

30.     The Copia Institute

31.     Cummins Inc.

32.     DocuSign, Inc.

33.     Dropbox, Inc.

34.     eBay Inc.

35.     Edmodo, Inc.

36.     Electronic Arts Inc.

37.     EquityZen Inc.

38.     Exelon Corp.

39.     Facebook, Inc.

40.     Foossa LLC

41.     General Assembly Space, Inc.

42.     Google Inc.

43.     Graham Holdings

44.     Greenhouse Software, Inc.

45.     Gusto

App. 409

46.     Hewlett Packard Enterprise

47.     Hilton Worldwide Holdings Inc.

48.     Homer Logistics, Inc.

49.     Host Hotels & Resorts, Inc.

50.     HP Inc.

51.     HR Policy Association

52.     IBM Corporation

53.     IDEO LP

54.     Indiegogo, Inc.

55.     Intel Corporation

56.     IKEA North America Services LLC

57.     Kargo

58.     Knotel

59.     Lam Research Corporation

60.     Levi Strauss & Co.

61.     Linden Research, Inc.

62.     LinkedIn Corporation

63.     Lyft, Inc.

64.     Mapbox

65.     Marin Software Incorporated

66.     Marriott International

67.     Medidata Solutions, Inc.

68.     Microsoft Corporation

**App. 410**

69.      Molecule Software, Inc.

70.      MongoDB, Inc.

71.      National Association of Hispanic Real Estate Professionals

72.      NETGEAR, Inc.

73.      NewsCred, Inc.

74.      NIO U.S.

75.      Niskanen Center

76.      Oath Inc.

77.      Okta, Inc.

78.      Patreon, Inc.

79.      Postmates Inc.

80.      Quantcast Corp.

81.      RealNetworks, Inc.

82.      Reddit, Inc.

83.      Redfin Corporation

84.      Red Ventures

85.      salesforce.com inc.

86.      Scopely, Inc.

87.      ServiceNow, Inc.

88.      Shutterstock, Inc.

89.      Singularity University

90.      The Software and Information Industry Association

91.      SpaceX

92.      Spokeo, Inc.

**App. 411**

93.         Spotify USA Inc.

94.         Square, Inc.

95.         Squarespace, Inc.

96.         SurveyMonkey Inc.

97.         TechNet

98.         Tesla, Inc.

99.         Thumbtack, Inc.

100.        TPG Capital

101.        TripAdvisor LLC

102.        Twilio Inc.

103.        Twitter Inc.

104.        Uber Technologies, Inc.

105.        Udacity Inc.

106.        Upwork Inc.

107.        Verizon Communications Inc.

108.        Via Transportation

109.        Warby Parker

110.        The Western Union Company

111.        Work & Co.

112.        Workday, Inc.

113.        Yelp Inc.

114.        Zendesk, Inc.

**App. 412**

# Exhibit 18

David Leit
Gavin J. Rooney
Craig Dashiell
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, New Jersey 07068
(973) 597 2400
grooney@lowenstein.com
dleit@lowenstein.com
cdashiell@lowenstein.com

*Attorneys for Amici Curiae*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>     Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>     Defendants,<br><br>-and-<br><br>KARLA PEREZ, *et al.*; and STATE of NEW JERSEY,<br><br>     Defendants-Intervenors. | Case No. 1:18-cv-00068 |

---

**BRIEF OF AMICI CURAIE IN SUPPORT OF DEFENDANT-INTERVENOR STATE OF
NEW JERSEY**

---

## STATEMENT OF INTEREST

Amici curiae are major companies and organizations that have significant operations in the State of New Jersey and who help drive the State's economy. Amici, and other institutions important to New Jersey's economy, employ, represent, and/or educate individuals who have been granted deferred action under Deferred Action for Childhood Arrivals ("DACA"), as well as individuals whose spouses have been granted DACA. New Jersey companies and institutions have benefitted from the skills and dedication of those people. Amici would be adversely impacted if DACA were enjoined because they would lose the contributions that these people make to their businesses and to the State's economy. Accordingly, amici submit this brief to highlight for the Court the significant harm that New Jersey businesses and the State's economy would suffer if the 22,000 New Jersey residents who have been granted DACA were no longer eligible to obtain work authorization.

A full list and description of amici are set forth in the Appendix to this brief.

## PRELIMINARY STATEMENT

DACA provides a means for young immigrants to integrate themselves into society. DACA recipients are commonly referred to as the Dreamers. Despite arriving as undocumented minor immigrants, since being afforded access to education and jobs under DACA, they have flourished. The 690,000 current DACA recipients in the United States have injected billions of dollars into the nation's economy, and are contributing members of their local communities. They are now being targeted for removal by the Plaintiff States based on burdens they allegedly place on those states' coffers.

A growing body of data, however, shows that the Dreamers have actually boosted the United States economy. Under DACA, which has been in effect since 2012, Dreamers have

**App. 415**

enrolled in schools, worked for businesses in their communities, and paid taxes to, and reinvested their incomes in, their respective States' economies. These contributions create increased demand for goods and services, and, in turn, create more jobs. The tremendous social and economic cost that would ensue if DACA were terminated and the Dreamers were suddenly deported cannot be underestimated. In New Jersey alone, enjoining DACA would force tens of thousands of taxpaying employees out of the workforce, and would result in an estimated decrease of $1.6 billion in New Jersey's GDP each year.

The Plaintiff States claim they are entitled to injunctive relief because the federal government has stated that it will begin winding down DACA, and because DACA allegedly conflicts with Congress's authority. The Plaintiff States do not address the tremendous economic harm that would result if hundreds of thousands of Dreamers were suddenly removed from the workforce. This immediate and significant economic harm weighs heavily against the issuance of the extraordinary relief of a mandatory preliminary injunction that would impact the economies not only of the Plaintiff States, but also of New Jersey, and indeed, the entire nation.

## **ARGUMENT**

## I.    **ENJOINING DACA WOULD SIGNIFICANTLY HARM NEW JERSEY COMPANIES AND THE NEW JERSEY ECONOMY.**

When ruling on a request for preliminary injunctive relief, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "[A] court must also consider . . . the overall public interest." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (alterations and quotation marks omitted). Mandatory preliminary injunctive relief that alters the status quo, such as the rescission of DACA that the Plaintiff States seek, "should not be issued unless the facts and law clearly favor

**App. 416**

the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976). In judging this issue, amici urge that the Court consider the economic harm that would result from enjoining DACA.

### A. Dreamers are Vital Contributors to New Jersey Businesses

Under DACA, "certain young people who were brought to this country as children and know only this country as home" may remain in the United States and continue to live and work as productive members of society. Memorandum from Janet Napolitano, Sec'y of Homeland Sec., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012). Dreamers "who ha[ve] been granted deferred action" under DACA can apply for work authorization upon a showing of "economic necessity for employment," 8 C.F.R. § 274a.12(c)(14), and hundreds of thousands of legal workers have been added to the United States workforce as a result of DACA. Contrary to the Plaintiff States' assertions, the detrimental impact of enjoining DACA is not de minimis. It "reaches beyond the geographical bounds" of any particular State and "affects every state and territory of the United States." *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1049 (N.D. Cal. 2018). That harm includes New Jersey.

"A national survey of DACA enrollees in 2016 found that more than 40 percent of respondents secured their first job after enrollment in DACA, and more than 60 percent landed a job with better pay." [1] DACA recipients now "work in diverse industries, including educational and health services, wholesale and retail trade, and professional and business services."[2] New Jersey has the ninth highest number of DACA recipients in the nation, and one out of every 406

---

[1] Misha E. Hill & Meg Wiehe, Inst. on Taxation & Econ. Policy, *State & Local Tax Contributions of Young Undocumented Immigrants* (Apr. 2017), https://itep.org/wp-content/uploads/2017DACA.pdf.

[2] *Id.*

**App. 417**

New Jersey residents is a DACA grantee.[3] As of March 31, 2017, there were 22,024 DACA recipients in New Jersey, and 87% of that population is working.[4]

Terminating DACA would result in an estimated 61% of New Jersey's DACA recipients (13,435 people) losing their work eligibility status, and ultimately their jobs, by June 2019.[5] Amici and other businesses in the State employ Dreamers, and removing those employees would harm amici's operations on an ongoing basis, forcing them to incur the substantial economic costs associated with retraining their workforces—*i.e.*, the lost time invested in employees as well as the lost institutional knowledge those employees possessed, the cost of advertising jobs and interviewing applicants, and the lost revenue associated with the lower productivity of new hires.[6] *See, e.g.*, *Regents of Univ. of California*, 279 F. Supp. 3d at 1034 (the resources that employers invest in "recruiting and retaining DACA recipients as employees" would be lost if those employees could no longer work in the United States); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 434 (E.D.N.Y. 2018) (finding that employers would suffer if DACA were rescinded "due to the inability to hire or retain erstwhile DACA recipients, affecting their operations on an ongoing basis and causing them to incur unrecoverable economic losses.").

---

[3] Erika J. Nava, *Fast Facts: DACA Directive Dims the Future of Thousands of Young New Jersey Immigrants*, New Jersey Policy Perspective (Sept. 19, 2017), https://www.njpp.org/reports/fast-facts-daca-directive-dims-the-future-of-thousands-of-young-new-jersey-immigrants; Michael Symons, *How Many NJ Residents Would be Hurt by End to DACA?* New Jersey 101.5 (Sept. 5, 2017), http://nj1015.com/how-many-nj-residents-would-be-hurt-by-end-to-daca/.

[4] Nicole P. Svajlenka et al., *A New Threat to DACA Could Cost States Billions of Dollars*, Ctr. for Am. Progress (July 21, 2017, 10:05 AM), https://www.americanprogress.org/issues/immigration/news/2017/07/21/436419/new-threat-daca-cost-states-billions-dollars/; Nava, *Fast Facts: DACA Directive*, *supra* note 3.

[5] Jocelyn Mosman, Walter Rand Inst. for Pub. Affairs, *What the End of DACA Means for New Jersey* (Dec. 2017), https://rand.camden.rutgers.edu/files/What-the-End-of-DACA-Means-for-New-Jersey.pdf.

[6] Esther Yu Hsi Lee, *Meet Pamela, a Soon-to-be Undocumented Immigrant Fighting to Stay and Contribute to the U.S.*, Think Progress (Nov. 17, 2017 12:40 PM), https://thinkprogress.org/pamela-chomba-daca-expiration-8f1590291c34/; David Bier, *Rescinding DACA, the Dream Act, Would Impose Massive Costs on Employers*, Newsweek (Sept. 5, 2017, 1:18 PM), http://www.newsweek.com/rescinding-dreamers-act-would-impose-massive-costs-employers-659813.

**App. 418**

"By some predictions, New Jersey would . . . experience decline in industries, such as finance, agriculture, retail, professional services, hospitality, and manufacturing" if DACA were terminated.[7]

Terminating DACA and returning the Dreamers to undocumented status represents "an unequivocal and extreme barrier to the well-being and mental health of current DACA recipients and their families."[8] Amici owe their employees an obligation to promote stability in the work environment. Studies have found that the threat of deportation contributes to increased anxiety and depression, both for those subject to deportation, and for their loved ones.[9] These stressors, in addition to harming the individuals themselves, lead to decreased productivity and job performance in the workplace,[10] which would harm amici.

## B.  Enjoining DACA Would Deplete New Jersey's Workforce

Terminating DACA would prevent future generations of qualified employees from being trained by New Jersey's institutions of higher education, and from entering New Jersey's workforce. Approximately 690,000 of the 1.3 million Dreamers who are eligible for DACA are current grantees.[11] New Jersey alone has approximately 53,000 DACA-eligible residents,[12] and

---

[7] Mosman, *supra* note 5.

[8] Press Release, New Jersey Counseling Association (Oct. 10, 2017), https://www.njcounseling.org/index.php/legislative-news/national-news/171-the-new-jersey-counseling-association-welcomes-daca-recipients-with-open-arms-and-hearts-and-urges-dhs-to-rescind-its-phase-out-of-the-daca-program-and-urges-congress-and-the-president-to-enact-the-dream-act-before-march-5-2018.

[9] Mallory Locklear, *Immigrant Protections Have Halved Kids' Mental Health Problems*, NewsScientist (Aug. 31, 2017) (noting the disparity in anxiety disorders between children whose parents are DACA eligible, and those who are not), https://www.newscientist.com/article/2145955-immigrant-protections-have-halved-kids-mental-health-problems/.

[10] *Mental Health in the Workplace*, World Health Organization (Sept. 2017), http://www.who.int/mental_health/in_the_workplace/en/.

[11] *Deferred Action for Childhood Arrivals (DACA) Data Tools*, Migration Policy Institute (last visited July 20, 2018), https://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles; U.S. Citizenship & Immigration Servs., *Approximate Active DACA Recipients: Country of Birth* (Sept. 4, 2017),

just over 22,000 of them have received DACA. Of those 22,000 recipients, 13% (2,860 people) are not yet working.[13]

"DACA has eased many of the burdens that undocumented students face in higher education—from gaining access to in-state tuition in many states, to being able to work legally for higher wages, to added job security after graduation."[14] *See, e.g.*, N.J. Stat. Ann. 18A:62-4.4; N.J. Stat. Ann. 18A:71B-2.1. "Many New Jersey DACA recipients are going to college, attending classes at Montclair State University, the New Jersey Institute of Technology, William Paterson University and Rutgers University . . . . They are working toward degrees in science, teaching, computer science and medicine."[15] Terminating DACA would eliminate recipients' ability to work to finance their schooling, thus preventing some of those individuals from completing their educations. This loss would ultimately shrink the labor pool by preventing the Dreamers from becoming part of the next generation of qualified employees.

Further, enjoining DACA, and making New Jersey (and the nation) less hospitable to those who are ready and willing to contribute to the economy, threatens New Jersey's economic growth.[16] Immigrants moving into New Jersey—including those who are eligible for DACA—

---

https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

[12] Migration Policy Institute, *National and State Estimates of Populations Eligible for Deferred Action for Childhood Arrivals (DACA) Program, 2016*, https://www.migrationpolicy.org/sites/default/files/datahub/State-County-DACA-Estimates.xlsx.

[13] *See* Svajlenka et al., *supra* note 4; Nava, *Fast Facts: DACA Directive*, *supra* note 3.

[14] Sanam Malik, *DACA Helps Undocuments Students Access Higher Education*, Center for Am. Progress (Apr. 7, 2015, 12:298 PM), https://www.americanprogress.org/issues/immigration/news/2015/04/07/110558/daca-helps-undocumented-students-access-higher-education/.

[15] Monsy Alvarado, *DACA Program: How the Repeal Affects New Jersey*, northjersy.com (Sept. 5, 2017, 6:36 PM), https://www.northjersey.com/story/news/nation/2017/09/05/daca-program-how-repeal-affects-new-jersey/635263001/.

[16] *See* U.S. Dep't of Labor, Bureau of Labor Statistics, *Local Area Unemployment Statistics* (last visited July 21, 2018) (noting the diminishing size of New Jersey's workforce),

**App. 420**

have bolstered the State's population, and have filled jobs that would otherwise be left vacant in the State's economy. As one report notes, "New Jersey residents are fleeing the state in droves, but the loss is primarily being offset by a continued influx of immigrants from other countries, without which the state's population would be declining precipitously." [17] "Between 2013 and 2014, New Jersey lost at least 55,000 residents who left for other states . . . . But in the same span, more than 51,000 people have moved to the Garden State from other countries, at the same time reshaping the state's population and stabilizing its slow growth.[18]

Amici and other businesses depend upon a qualified and available labor pool in the State of New Jersey. They will be harmed if the pool of qualified workers is restricted, leaving them unable to find sufficient numbers of persons to fill positions to operate their businesses.

### C.   Enjoining DACA Would Harm New Jersey's Economy

Enjoining DACA would stunt New Jersey's economy by eliminating important sources of revenue for the State. DACA recipients "contribute tax dollars to communities that help pay for schools, public infrastructure, and other services."[19] DACA eligible workers contribute approximately $66 million in state and local taxes to New Jersey each year—the seventh highest amount for all states.[20] If DACA were eliminated, New Jersey would lose an estimated $21

---

https://data.bls.gov/timeseries/LASST340000000000006?amp%253bdata_tool=XGtable&output_view=data&include_graphs=true.

[17] Stephen Stirling, *Immigrants Filling the Void as Resident Flee N.J. by the Tens of Thousands*, NJ.com (Mar. 27, 2015), https://www.nj.com/news/index.ssf/2015/03/as_tens_of_thousands_flee_nj_immigrants_are_filling_the_void.html.

[18] *Id.*

[19] *State & Local Tax Contributions of Young Undocumented Immigrants*, Inst. of Taxation & Econ. Policy (Apr. 2018), https://itep.org/state-local-tax-contributions-of-young-undocumented-immigrants/.

[20] Erika J. Nava, *DACA-Eligible New Jerseyans Pay $66 Million a Year in Taxes*, N.L. Policy Perspective (Apr. 25, 2017), https://www.njpp.org/blog/daca-eligible-new-jerseyans-pay-66-million-a-year-in-statelocal-taxes..

**App. 421**

million of its annual tax revenue.[21] This would harm the economic climate of New Jersey and adversely impact amici. *See, e.g.*, *Regents of Univ. of California*, 279 F. Supp. 3d at 1049 (noting "the widespread harm to [the states] and our economy that would result [if] . . . DACA enrollees . . . los[t] their ability to work in this country."); *Batalla Vidal*, 279 F. Supp. 3d at 435-36 (recognizing the "'staggering' adverse economic impacts" of rescinding DACA, including "$797 million in lost state and local tax revenue.").

Craig Silliman, Verizon's Executive Vice President for Public Policy and General Counsel has publicly noted the importance of Dreamers in Verizon's work force:

> At Verizon we have benefited immeasurably from the diverse experiences, talents and work ethic of our many immigrant employees…. The Dreamers are a truly valuable resource for our economy and our society…. At a time when we are fighting to ensure that the US economy remains strong on the global stage, it is vital that we not lose the advantage of the Dreamers with their energy, diverse experience and backgrounds. This is exactly the type of diverse talent that has made the United States successful to date and on which our success will depend in the future.[22]

Removing Dreamers from New Jersey would also slow job growth. Because DACA recipients are eligible to work and receive regular income, they are able to reinvest a portion of that money in New Jersey's economy, fueling demand for goods and services, and creating new jobs. "Without a steady supply of paying customers, [positions in the service sector]—in fields like retail, hospitality, and medicine—would struggle or cease to exist."[23] The spending power of

---

[21] *Id.*

[22] Craig Silliman, *Verizon Communications: Let's find ways to preserve DACA* (Aug. 31, 2017), http://www.4-traders.com/VERIZON-COMMUNICATIONS-4830/news/Verizon-Communications-Let-s-find-ways-to-preserve-DACA-25039084/.

[23] *Examining the Contributions of the DACA-Eligible Population in Key States*, New Am. Econ. Research Fund (Nov. 6, 2017), http://research.neweconomy.org/report/examining-the-contributions-ofthe-daca-eligible-population-in-key-states/.

**App. 422**

DACA eligible individuals in New Jersey was estimated at $679 million in 2015.[24] The total estimated GDP loss that would result from removing DACA workers in New Jersey is $1.6 billion, the fifth highest dollar loss of all states.[25] The seven Plaintiff States, by comparison, would stand to collectively lose $7.2 billion "annually in state GDP if they get their wish" and DACA is terminated.[26]

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that the Court deny the Plaintiff States' motion for a preliminary injunction.

Respectfully submitted,

Dated: July 20, 2018       By:      /s/ David Leit

David Leit
Gavin J. Rooney
Craig Dashiell
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, NJ 07068
(973) 597-2500
grooney@lowenstein.com
dleit@lowenstein.com
cdashiell@lowenstein.com
*Attorneys for Amici Curiae*

---

[24] *Id.*

[25] Erika J. Nava, *Fast Facts: Dream Act Would Help Many Young New Jersey Immigrants & Boost the Economy*, New Jersey Policy Perspective (Dec. 14, 2017), https://www.njpp.org/reports/fast-facts-dream-act-would-help-many-young-new-jersey-immigrants-boost-the-economy.

[26] Svajlenka et al., *supra* note 4.

**App. 423**

# APPENDIX

## List of *Amici Curiae*

Audible, Inc.

Bristol-Myers Squibb Company

Montclair State University

New Jersey Business & Industry Association

New Jersey State Chamber of Commerce

Prudential Financial, Inc.

Sanofi US Services Inc.

Verizon Communications Inc.

**App. 424**

# Exhibit 19

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF TEXAS

 3                    BROWNSVILLE DIVISION

 4
      STATE OF TEXAS, et al.,        )
 5                                   )
                   Plaintiffs,       )
 6                                   )
          vs                         ) No. 1:18-CV-68
 7                                   )
      UNITED STATES OF AMERICA,      )
 8    et al.,                        )
                                     )
 9                 Defendants.       )
                                     )
10          and                      )
                                     )
11    KARLA PEREZ, et al.,           )

12

13              The deposition of Esther Jeon called for

14    examination pursuant to notice and pursuant to the

15    Federal Rules of Civil Procedure for the United

16    States District Courts pertaining to the taking of

17    depositions taken before JO ANN LOSOYA, Certified

18    Shorthand Reporter within and for the County of Cook

19    and State of Illinois at 11 East Adams, Chicago,

20    Illinois, on June 15, 2018 at the hour of 11:00

21    o'clock a.m.

22

23

24

25
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 426

```
 1    APPEARANCES:

 2          MALDEF
            MS. PRISCILLA ORTA
 3          MS. GRISELDA VEGA SAMUEL
            11 East Adams Street
 4          Suite 700
            Chicago,Illinois 60603
 5          (312) 427-0701
            porta@maldef.org
 6          gvegasamuel@maldef.org
                    Appeared on behalf of the Deponent and
 7                  Intervenors;

 8          ATTORNEY GENERAL OF THE STATE OF TEXAS
            MR. ADAM N. BITTER
 9          MS. CRISTINA M. MORENO
            P.O. BOX 12548
10          Austin,Texas  78711
            (512) 463-2120
11          adam.bittter@oag.texas.gov
            cristina.moreno@oag.texas.gov
12                  Appeared on behalf of the Plaintiffs.

13          U.S. DEPARTMENT OF JUSTICE
            MR. JAMES WALKER
14          Ben Franklin Station
            P.O. Box 868
15          Washington, DC  20044
            (202) 532-4468
16          james.walker3@usdoj.gov
                    Appeared on behalf of the Defendant.
17
      APPEARING TELEPHONICALLY:
18
            ALEJANDRA AVILA, MALDEF
19          NINA PERALES, MALDEF
            NICHOLAS DOLINSKY, New Jersey Attorney General
20          Office

21    ALSO PRESENT:

22          NAYOUNG HANA
            SUSANA SANDOVAL VARGAS
23

24    REPORTED BY:  JO ANN LOSOYA
      CSR LICENSE:  084-002437
25
```

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
Esther Jeon on 06/15/2018                                        Page 37

```
 1        A.    In Houston.
 2              MS. AVILA:  Hello.  This is Alejandra.
 3    I'm calling from the San Antonio office for MALDEF.
 4              MR. BITTER:  Hi, Alejandra.  Adam Bitter.
 5    I have got a crew here with me in the deposition
 6    room and also on the line is Nina and Nicholas
 7    Dolinsky from New Jersey.
 8    BY MR. BITTER:
 9        Q.    So between -- just to clarify, between
10    your first year and your second year at Harvard,
11    where were you?
12        A.    Houston.
13        Q.    In Houston.  Did you work anywhere during
14    that time?
15        A.    I had assisted my family restaurant.
16        Q.    Is that in Houston?
17        A.    Yes.
18        Q.    Did you have any other job during your
19    summer break between first year and second year?
20        A.    No.
21        Q.    So, second year at Harvard, did you work
22    during any part of that year?
23        A.    Yes.
24        Q.    Where did you work first your second
25    year?
```

```
 1        A.    For the Office of Equity, Diversity and

 2   Inclusion.

 3        Q.    When did you begin working there?

 4        A.    Late first semester.

 5        Q.    And how did you apply for that job?  Did

 6   you apply for that job?

 7        A.    Yes.

 8        Q.    And how did you apply for it?

 9        A.    Through the Office of Equity Diversity

10   and Inclusion.

11        Q.    Just directly submitted your application

12   to them?

13        A.    Yes.

14        Q.    What were your responsibilities in that

15   position?

16        A.    I worked to create spaces for students

17   where they could talk about issues of race, gender,

18   and class.

19        Q.    Was that a competitive process to get

20   that job?

21        A.    I don't know.

22        Q.    Do you know if other people applied for

23   it?

24        A.    Yes.

25        Q.    Were there other people that had your
```

1   same position, or was it just one position that was

2   held by you?

3        A.    There was more than one.

4        Q.    But as far as you know, there were

5   multiple people that applied for the job that you

6   received?

7        A.    Yes.

8        Q.    And actually, let me ask that question

9   for the Harvard Financial Aid Initiative work that

10  you did your freshman year.  Do you know whether

11  other people applied for that position as well?

12       A.    Yes.

13       Q.    You know of people that were turned down

14  for that position; is that right?

15       A.    Yes.

16       Q.    The position with the -- I'll call it

17  Office of Equity for short, for that office, was

18  that a paid or unpaid position?

19       A.    Paid.

20       Q.    For that job, do you recall providing

21  verification of your employment eligibility?

22       A.    Yes.

23       Q.    So you began working there late in your

24  first semester of your sophomore year; is that

25  right?

Case 1:18-cv-00068   Document 626-2   Filed on 01/31/23 in TXSD   Page 171 of 393

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Esther Jeon on 06/15/2018                                    Page 99

```
 1                    REPORTER CERTIFICATE

 2

 3            I, JO ANN LOSOYA, a Certified Shorthand

 4   Reporter within and for the County of Cook and State

 5   of Illinois, do hereby certify:

 6                    That previous to the commencement

 7   of the examination of the witness, the witness was

 8   duly sworn to testify the whole truth concerning the

 9   matters herein;

10                    That the foregoing deposition

11   transcript was reported stenographically by me, was

12   thereafter reduced to typewriting under my personal

13   direction and constitutes a true record of the

14   testimony given and the proceedings had;

15                    That the said deposition was taken

16   before me at the time and place specified;

17                    That I am not a relative or

18   employee or attorney or counsel, nor a relative or

19   employee of such attorney or counsel for any of the

20   parties hereto, nor interested directly or

21   indirectly in the outcome of this action.

22

23

24

25
```

Case 1:18-cv-00068   Document 626-2   Filed on 01/31/23 in TXSD   Page 172 of 393

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Esther Jeon on 06/15/2018                                    Page 100

```
 1              IN WITNESS WHEREOF, I do hereunto set my

 2    hand this June 27, 2018.

 3

 4

 5

 6

 7

 8

 9              JO ANN LOSOYA, CSR
                C.S.R. No. 84-002437

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
        Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 432

# Exhibit 20

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,  )
      Plaintiffs,  )
      v.  )  Case No. 1:18-CV-68
UNITED STATES OF AMERICA, *et al.*,  )
      Defendants,  )
KARLA PEREZ, *et al.*,  )
      Defendant-Intervenors,  )
and  )
STATE OF NEW JERSEY,  )
      Proposed Defendant-Intervenor.  )

## DECLARATION OF ROSE ARACKATHARA

I, Rose Arackathara, hereby declare:

1. I am 31 years old and live in Bloomfield, New Jersey. I am a Family Service Specialist at the New Jersey Department of Children and Families (DCF), Division of Child Protection and Permanency (DCP&P).

2. During the past academic year I served as a Field Instructor for the Baccalaureate Child Welfare Education Program (BCWEP). BCWEP is a consortium of undergraduate social work programs in New Jersey that works in concert with the New Jersey Department of Children and Families (DCF), Division of Child Protection & Permanency (DCP&P). BCWEP provides prestigious, highly competitive yearlong internships and two-year employment contracts for students graduating from undergraduate social work programs.

**App. 434**

This program makes it possible for our Division to recruit, train, and employ top-notch social work students.

3. From approximately September 2017 to April 2018 I served as Field Instructor to Cinthia Osorio, an undergraduate social work intern in the BCWEP program. Cinthia worked under my supervision, primarily in the Intake Unit. I had an opportunity to closely observe her work.

4. Cinthia teamed up with experienced social workers to conduct initial home visits in Morris County, New Jersey. She and my other colleagues conducted these intake visits in response to referrals involving potential abuse or neglect or other child welfare concerns. They gathered information to determine whether the children at issue faced immediate danger, and referred families to community and contracted services for ongoing assistance.

5. Cinthia also shadowed a social worker in the Passaic County Permanency Unit, where she worked with families to achieve safe, permanent living situations for children with histories of abuse or neglect.

6. Throughout her internship, I observed Cinthia's natural rapport with the families she visited. She has a particular gift for identifying and articulating people's strengths and for making people feel comfortable. Child welfare workers have had a hard time building trust with parents, since our agency has the power to take children out of the home when they are in need of protection. Cinthia's approach to this work sent the message to parents and children alike that our agency was there to help. For example, Cinthia was able to build trust with an adolescent, and obtained information from this adolescent a more experienced social worker could not.

7. Because Cinthia is a DACA recipient who grew up in a low-income immigrant household and speaks Spanish, she was able to truly understand DCP&P's clients and the challenges they have faced, and connect with them in a natural way.

8. In early Spring 2018, I learned that Cinthia had been diagnosed with cancer. Even after beginning chemotherapy, she remained highly motivated to complete her internship, and worked from home so that she could continue to serve New Jersey's families and build her social work skills. Among other projects, she worked on building her skills in the "Nurtured Hearts" approach, which is utilized in working with children with ADHD and can benefit children with histories of trauma.

9. In Spring 2018 Cinthia recently graduated from Centenary College with her Bachelors of Social Work (B.S.W.) degree. She is due to begin fulltime employment at DCP&P this August.

10. As a fulltime DCP&P social worker, Cinthia will play a critical role in protecting New Jersey's most vulnerable children. If DACA is terminated, Cinthia would be unable to work for DCP&P, and our state's children will lose a particularly skilled, dedicated, and compassionate protector.

I declare under penalty of perjury that the foregoing is correct to the best of my information and

belief.

_____     5/18/18
Rose Arackathara                Date

# Exhibit 21

**STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.**
**Rose Arackathara on 06/18/2018**

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 BROWNSVILLE DIVISION
      - - - - - - - - - - - - - - - - - - - - - - - - - -
 3
    STATE OF TEXAS, et al.,        CASE NO. 1:18-CV-08
 4
       Plaintiffs,
 5
               vs.
 6
    UNITED STATES OF AMERICA,
 7  et al.,

 8     Defendants,

 9  KARLA PEREZ, et al.,

10     Defendant-Intervenors,

11  and

12  STATE OF NEW JERSEY,

13     Proposed Defendant-Intervenor

14     - - - - - - - - - - - - - - - - - - - - - - - - - -

15                      - - -

16             Monday, June 18, 2018

17                      - - -

18              DEPOSITION OF:

19             ROSE ARACKATHARA

20                      - - -

21

22

23

24

25
```

```
 1

 2                    Oral Deposition of ROSE ARACKATHARA,

 3    was taken pursuant to Notice at the offices of the

 4    NEW JERSEY ATTORNEY GENERAL'S OFFICE, 124 Halsey

 5    Street, 5th Floor, Newark, NJ 07101 on the above

 6    date before DEBRA G. JOHNSON-SPALLONE, CCR, RPR,

 7    Delaware CSR, Notary Public in and for the States of

 8    Pennsylvania, New Jersey, and Delaware, and a

 9    Federally Approved Reporter of the United States

10    District Court commencing on or about 10:10 a.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Rose Arackathara on 06/18/2018                                        Page 3

```
 1    APPEARANCES:

 2    ATTORNEY GENERAL KEN PATTON
      BY:  ADAM N. BITTER,
 3         adam.bitter@oag.texas.gov
           CRISTINA M. MORENO, ESQUIRE
 4         cristina.moreno@oag.texas.gov
      300 West 15th Street
 5    11th Floor
      P.O. Box 12548
 6    Austin, TX 78701
      (512) 463-2120
 7    Representing the Plaintiffs

 8

 9    U.S. DEPARTMENT OF JUSTICE
      BY:  JAMES WALKER, ESQUIRE
10    Ben Franklin Station
      P.O. Box 868
11    Washington, D.C. 20044
      (202) 532-4468
12    james.walker3@usdoj.gov
      Representing the U.S. Department of Justice
13

14    STATE OF NEW JERSEY
15    DEPARTMENT OF LAW AND PUBLIC SAFETY
      BY:  JEREMY E. HOLLANDER, ESQUIRE
16    124 Halsey Street
      P.O. Box 45029
17    Newark, NJ 07101-5029
      (973) 648-7453
18    Jeremy.Hollander@law.njoag.gov
      Representing the State of New Jersey
19

20    STATE OF NEW JERSEY
21    DEPARTMENT OF LAW & PUBLIC SAFETY
      BY:  RACHEL WAINER APTER, ESQUIRE
22    R.J. Hughes Justice Complex
      25 Market Street
23    P.O. Box 080
      Trenton, NJ 08625
24    (609) 376-2702
      Rachel.Apter@njoag.gov
25
```

```
 1              A.      Yes.

 2              Q.      In receiving the full-time

 3   employment, is it your testimony that Ms. Osorio, to

 4   your understanding, was selected over other

 5   applicants?

 6              A.      From my understanding, she was,

 7   based on the competitive nature of the program.

 8              Q.      Are you aware how many people are

 9   beginning full-time employment at DCP&P this Fall

10   through the BCWEP program?

11              A.      I believe there is, roughly, 40 in

12   the graduating class.  Not all of them are starting

13   in the Fall.  Some of them started right after

14   graduation.

15                      Cinthia herself was expected to

16   start right after graduation, but because of her

17   treatments, because of her cancer, she was able to

18   delay that start date.

19                      So, other students have already

20   started, some haven't, but it's all various time --

21   timelines.

22              Q.      So, within her class there is

23   approximately 40 people that are being brought up

24   for full-time employment.

25                      Is that correct?
```

1

2        I, Debra G. Johnson-Spallone, certify that the

3    foregoing is a true and accurate transcription of

4    the notes taken by me on the date set forth.

5        I further certify that I am not an attorney or

6    counsel of any of the parties, nor a relative or

7    employee of any attorney or counsel in connection

8    with the action, nor financially interested in the

9    action.

10

11

12

13

14    _____

15    DEBRA G. JOHNSON-SPALLONE, CSR, RPR

16

17

18

19    This transcript is not to be copied unless under the

20    direct control and supervision of the certifying

21    reporter.

22

23

24

25    Debra G. Johnson-Spallone, CSR, RPR

# Exhibit 22

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| **UNITED STATES OF AMERICA**, et al., | ) | |
| | ) | |
| Defendants | ) | |

## SUPPLEMENTAL DECLARATION OF DONALD DEERE, Ph.D.

My name is Donald Deere, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

### Qualifications

1.   I am a Senior Economist for Welch Consulting, a firm that provides expert services in economics and statistics to the legal community, as well as general consulting in economics and statistics. Previously, I served as a Senior Economist for Unicon Research Corporation, a firm that conducted grant and contract research for U.S. government agencies.

2.   In 2007, I retired from the tenured faculty of the Department of Economics at Texas A&M University, where I taught courses in labor economics, statistics, and public finance. I have since served as an Adjunct Associate Professor of Economics at Texas A&M University. Formerly, I was Associate Director of the

1

**App. 445**

George Bush School of Government and Public Service, where I also taught as a member of the visiting faculty in 2008.

3.    I received training in economics and statistics at the Massachusetts Institute of Technology, where I earned a Ph.D. in Economics in 1983. I have taught at M.I.T., the University of California, Santa Barbara, and Texas A&M University. My research has been published in numerous professional, peer-reviewed journals, including the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, and the *Journal of Labor Economics*.

4.    Attached to this declaration are true and correct copies of the following documents:

- Appendix 1 includes my curriculum vitae and a list of my publications.

- Appendix 2 sets forth the cases in which I have testified in deposition or at trial during the last four years.

### Scope of Inquiry

5.    I have been retained in this case by the Office of the Attorney General of Texas to examine the potential economic impact on the labor market of the Department of Homeland Security Memorandum dated June 15, 2012 ("DHS Memorandum")[1], with particular focus on the interaction between the DHS Memorandum and the employer mandate provisions in the Affordable Care Act ("ACA").

---

[1] The DHS Memorandum regards the exercise of "prosecutorial discretion" for certain immigrants who are not lawfully present. The subject of the DHS Memorandum, from Janet Napolitano, Secretary of Homeland Security, is "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."

2

**App. 446**

6.    My billing rate for this matter is $525 per hour.

## Background on the Affordable Care Act and the DHS Memorandum

7.    It is my understanding that as a result of the DHS Memorandum the number of immigrants who are not lawfully present with an Employment Authorization Document ("EAD") has expanded nationwide.[2] I also understand that these individuals authorized to work are not eligible for the premium subsidies provided by the ACA.[3]

8.    The Congressional Budget Office and the Joint Committee on Taxation in March 2012 estimated the impact of the ACA on nonelderly workers and their families who were projected to receive employment-based coverage in 2016 *in the absence of the ACA*.  The resulting estimates are that 64 million of these individuals will be eligible for subsidies in the exchanges under the ACA.[4]

---

[2] DACA_Population_Data_Mar_31_2018, available at https://www.uscis.gov/tools/reports-studies/immigration-forms-data.

[3]    HealthCare.gov, Immigration status and the Marketplace, available at https://www.healthcare.gov/immigrants/immigration-status. See also, 8 U.S. Code § 1611 - Aliens who are not qualified aliens ineligible for Federal public benefits, and 45 CFR 152.2 – Definitions, Legal Information Institute.

[4] Congressional Budget Office, *CBO and JCT's Estimates of the Effects of the Affordable Care Act on the Number of People Obtaining Employment-Based Health Insurance* at 12-14 (Mar. 2012), available at http://www.cbo.gov/sites/default/files/03-15-ACA_and_Insurance_2.pdf. An estimated 8.7 million Marketplace Enrollees were receiving Advance Premium Tax Credits in February 2017. See Kaiser Family Foundation, *Estimated Total Premium Tax Credits Received by Marketplace Enrollees*, available at https://www.kff.org/state-category/health-reform/february-2017-marketplace-enrollment/.

**App. 447**

9.     The ACA mandates that employers with 50 or more full-time employees offer health insurance that provides "minimum value" and is "affordable" to their full-time employees.[5]

10.     To my knowledge, "minimum value" requires that health insurance pay at least 60% of the cost of covered services for employees and their children up to age 26. The ACA does not require the employer to pay the entire cost of this coverage, but the mandate to be "affordable" requires that the cost to the employee for this coverage be no more than 9.56% of the employee's income.[6]

11.     An employer offering coverage that does not provide "minimum value" or is not "affordable" will owe a penalty under the ACA if any of its employees purchases coverage on the insurance exchange *and receives a premium subsidy*. It is my understanding that this penalty is the lesser of a) $2,320 per year per employee after the first 30 employees, or b) $3,480 per year per employee receiving a premium subsidy.[7]

---

[5] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act at Question 1 (2018), available at https://www.irs.gov/affordable-care-act/employers/questions-and-answers-on-employer-shared-responsibility-provisions-under-the-affordable-care-act.

[6] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act, *supra*, at Questions 38-41.

[7] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act, *supra*, at Questions 52-54. See also, Edward A. Morse, *Lifting the Fog: Navigating Penalties in the Affordable Care Act*, 46 CREIGHTON L. REV. 207, 221-22 (2013). For the $3,480 penalty to apply, the employer must have less than a minimum of 26.7% of its employees receiving a premium subsidy. This cutoff % rises with the number of employees—to 46.7% for an employer with 100 total employees and to a maximum of 66.7% (the cutoff % equals 2/3 − 20/# employees).

**App. 448**

12. Because this penalty is not a deductible expense for the employer from federal (and possibly state) income taxes,[8] the before-tax penalty amount, which would be compared to the wage, is even larger.[9]

### Interaction of the DHS Memorandum and the ACA on the Labor Market

13. As a threshold matter, the addition of some 694,000 work-eligible individuals nationwide, with 114,000 of these in Texas, will, other things equal, put downward pressure on wages and make it more difficult for some U.S. citizens to find employment.[10]  In addition, the interaction of the DHS Memorandum and the ACA will further impact employment and wages in the labor market.[11]

14. Consider an employer facing this penalty that is considering hiring one of two prospective employees.  These two employees are equally productive and are the same in all relevant aspects to this employer, except that applicant A is a U.S. citizen and applicant B is a DACA recipient holding an EAD.

15. Assume applicants A and B are relatively low skilled, so that the cost to the employee of the coverage offered by this employer exceeds 9.56% of the wage that would be offered to them.  Also assume that this employer expects less than 25% of its employees to obtain a premium subsidy.

---

[8] Morse, *supra*, at 223.
[9] For an employer facing a 21% federal corporate income tax rate and the $3,480 penalty, the equivalent annual before-tax amount is at least $4,405.06.
[10] See DACA_Population_Data_Mar_31_2018, *supra*.
[11] As an example, for the employer in footnote 9, the penalty would increase the relative annual cost of employing a worker for 30 hours per week at the federal minimum wage who receives a premium subsidy by almost 40%.

**App. 449**

16.    In this scenario, the employer would expect applicant A to be more expensive to employ than applicant B because of the interaction of the ACA penalties described above and the DHS Memorandum.  There is an extra cost of $3,480 per year (plus the tax impact noted above) from hiring applicant A if applicant A will receive a premium subsidy.  In contrast, hiring applicant B entails no extra cost because applicant B is not eligible for a premium subsidy.

17.    An employer subject to the ACA penalties described above that is operating to minimize its expected cost of operations will hire applicant B instead of applicant A.  Applicant A, therefore, will take longer to find employment and the resulting employment is more likely to occur at a lower wage.

18.    Depending on the employee cost of insurance, the incentive to hire applicant B can occur at a range of wage levels, as illustrated in the following two examples.

***Example 1***

19.    In addition to the above facts, suppose that applicants A and B would be paid the federal minimum wage of $7.25 per hour.  Assuming 30 hours per week (the definition of full time in the ACA), a monthly employee cost of $90.10 or greater ($7.25 x 130 hours x 9.56%) would make the employer-provided coverage not "affordable" and would make applicant A eligible for the premium subsidy and potentially trigger the extra $3,480 per year cost (plus the tax impact) from hiring applicant A.[12]  There is no extra cost from hiring applicant B.

---

[12] At 40 hours per week, the monthly employee cost would have to be no more than $120.13 to be "affordable."

**App. 450**

20.     As a result, the employer will hire applicant B instead of applicant A if the employer is operating to minimize its expected cost of operations.

***Example 2***

21.     As an alternative, suppose that applicants A and B would be paid $30,000 per year (about twice the federal minimum wage for 40 hours per week).[13] A monthly employee cost for employee and dependent coverage in excess of $239.00 (9.56% x $30,000/12) would not be "affordable" and would make applicant A eligible for the premium subsidy and potentially trigger the extra $3,480 per year cost (plus the tax impact) from hiring applicant A.  Again, there is no extra cost from hiring applicant B.

22.     Similar to the previous example, the employer in this example would be expected to hire applicant B instead of applicant A in an effort to minimize costs.

## Other Aspects of the Impact of the DHS Memorandum on the Labor Market

23.     Economic theory implies that the demand curve for a labor input slopes downward.[14] In other words, as the price (or wage) of a labor input decreases, other things equal, more of that labor input will be used by employers.  Conversely, as more of a labor input is made available, such as via immigration, the wage of that labor

---

[13] Using 35 hours per week instead of the ACA limit of 30 to define full-time, the U.S. Census Bureau reports that more than 23.8 million persons were employed full-time and full-year in 2016 with annual earnings below $30,000.  U.S. Census Bureau, *Current Population Survey, 2017 Annual Social and Economic Supplement* at Table PINC-10, *available at* https://www.census.gov/data/tables/time-series/demo/income-poverty/cps-pinc/pinc-10.2016.html.

[14] See, for example, Hal R. Varian, *Intermediate Microeconomics: A Modern Approach*, W. W. Norton & Company: New York, 1987, p. 327.

7

input will fall, other things equal.  Although the theoretical implication that, other things equal, immigration reduces the wages of native workers with the same skills is clear, there is no consensus in the economic literature on the magnitude of this effect.[15]

## Conclusion

24.    The DHS Memorandum and its interaction with the mandate provisions of the ACA gives employers a financial incentive to hire an immigrant who is not lawfully present and who is authorized to work instead of an identically skilled citizen in certain instances.

25.    Based on my knowledge and expertise in labor economics, it is my expert opinion that as a result of DHS Memorandum and its interaction with the ACA, there will be relatively less hiring of U.S. citizens and relatively lower wages on average for those who are hired.  The interplay between the DHS Memorandum and the ACA makes some U.S citizens more expensive to hire than equally productive immigrants who are not lawfully present.

26.    This result will have adverse consequences for certain U.S. citizens because some employers will find it financially advantageous to hire an immigrant

---

[15] See, for example, George J. Borjas, "The Labor Demand Curve *Is* Downward Sloping: Reexamining the Impact of Immigration on the Labor Market," *The Quarterly Journal of Economics*, Vol. 118, No. 4 (2003), pp. 1335-1374, and David Card, "Immigrant Inflows, Native Outflows, and the Local Labor Market Impacts of Higher Immigration," *Journal of Labor Economics*, Vol. 19, No. 1 (2001), pp. 22-64.

App. 452

who is not lawfully present and who is authorized to work in the U.S. instead of an equally productive U.S. citizen.

27.    All of the facts and information contained within this declaration are within my personal knowledge and are true and correct to the best of my knowledge.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this *14th* day of June, 2018.

DONALD DEERE

9

**App. 453**

Appendix 1



# Donald R. Deere, Ph.D.

**WELCH CONSULTING**
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

## EDUCATION

Ph.D., Economics
Massachusetts Institute of Technology
Cambridge, Massachusetts
1983

B.S., Economics
Texas A&M University
College Station, Texas
1978

## PROFESSIONAL EXPERIENCE

Senior Economist
Welch Consulting
Bryan, Texas
2005 – Present

Senior Economist
Unicon Research Corporation
Bryan, Texas
2001 – 2016

Adjunct Associate Professor of Economics
Texas A&M University
College Station, Texas
2007 – 2009
2010 – Present

Visiting Faculty
George Bush School of Government
and Public Service
Texas A&M University
College Station, Texas
2008

Associate Professor of Economics
Texas A&M University
College Station, Texas
1990 – 2007

Senior Consultant
Welch Consulting
Bryan, Texas
1991 – 2005

Associate Director for Academic Programs
George Bush School of Government
and Public Service
Texas A&M University
College Station, Texas
1996 – 1999

Donald R. Deere is a Senior Economist in the Bryan, Texas office of Welch Consulting. Dr. Deere's work has included statistical and economic analysis in cases involving claims of discrimination in employment, housing, transportation and insurance, in cases involving wage and hour violations, and in cases involving lost earnings or commercial damages. He also has conducted analyses of compensation practices for internal and OFCCP audit purposes. Dr. Deere has provided testimony in cases in both state and federal courts.

Dr. Deere has a Ph.D. in economics from the Massachusetts Institute of Technology. In 2007, Dr. Deere retired from the tenured faculty of the Department of Economics at Texas A&M University, where he taught courses in labor economics, economic principles and public finance. While at Texas A&M University, he also taught graduate statistics in, and was Associate Director of the George Bush School of Government and Public Service. Dr. Deere also is Senior Economist for Unicon Research Corporation, where he served as Vice President from 2001-2004. Dr. Deere's research has concentrated primarily on labor markets and public policy affecting wages and employment. His research has been published in numerous professional peer-reviewed journals, including the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, and the *Journal of Labor Economics*.

## PUBLICATIONS

"Analyzing Reductions in Force and Other Termination Decisions," with James E. Pearce in Adverse Impact Analysis: Understanding Data, Statistics, and Risk, edited by Scott B. Morris and Eric M. Dunleavy, Routledge Taylor & Francis Group, (2017): 239-257.

"Minimum Sense," NBIZ Magazine, (Winter 2006):8-10. Also found on NBIZMag.com.

"Educational Wage Premia and the U.S. Income Distribution: A Survey," with Jelena Vesovic in Handbook of the Economics of Education, edited by E. Hanushek and F. Welch, Elsevier Science, (2006):255-306.

"Inequality, Incentives, and Opportunity," with F. Welch. Social Philosophy & Policy, 19, no. 1, (Winter 2002). Also in Should Differences in Income and Wealth Matter? edited by E.F. Paul, F.D. Miller, Jr. and J. Paul. Cambridge University Press (2002):84-109.

"Trends in Wage Inequality in the United States," in Increasing Inequality in America: The Facts, Causes, and Consequences, edited by F. Welch. University of Chicago Press, (2001):9-35.

"Don't Raise the Minimum Wage - The Bar is Already Too High," Brief Analysis No. 270, NCPA, (June 1998).

"Evidence on Minimum Wages and Employment Following the 1990/91 Increase in the Federal Minimum Wage," with K. Murphy and F. Welch. In Effects of the Minimum Wage, edited by M. Kosters. AEI Press, (1996).

"Minimum Sense: Raising Wages from $4.25 to $5.15 an Hour Will Cause Lower Skilled Workers to Lose Their Jobs," Texas Business, (September 1996).

"Employment and the 1990/91 Minimum Wage Hike," with K. Murphy and F. Welch. American Economic Review, 85, no. 2, (May 1995):232-37.

"Sense and Nonsense on the Minimum Wage," with K. Murphy and F. Welch. Regulation, 18, no.1, (1995):47-56.

**App. 455**



# Donald R. Deere, Ph.D.

**WELCH CONSULTING**
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

## PROFESSIONAL EXPERIENCE
(continued)

Visiting Assistant Professor of Economics
University of California
Santa Barbara, California, 1988 – 1989

Assistant Professor of Economics
Texas A&M University
College Station, Texas
1983 –1990

## PUBLICATIONS (continued)

"Home Equity: Texas Should Unlock This Asset," The Dallas Morning News, April 23, 1995.

"Unionization and Profitability: Evidence of Spillover Effects," with S.G. Bronars,  Journal of Political Economy, (December 1994):1281-87.

"The Effects of Unions on Firm Behavior: An Empirical Analysis using Firm-Level Data," with S.G. Bronars and J.S. Tracy, Industrial Relations, (October 1994):426-51.

"A Study of Nonsubscription to the Texas Workers' Compensation System: The Employee Perspective," (July 1994) Texas Workers' Compensation Research Center.

"A Study of Nonsubscription to the Texas Workers' Compensation System," Texas Workers' Compensation Research Center, (August 1993).

"Union Organizing Activity, Firm Growth, and the Business Cycle," with S.G. Bronars. American Economic Review, (March 1993):203-20.

"Unionization, Incomplete Contracting, and Capital Investment," with S.G. Bronars. The Journal of Business, (January 1993):117-32.

Review of "Labor Unions and the Economic Performance of Firms," Industrial and Labor Relations Review, (July 1993):732-33.

"Unemployment Insurance and Employment." Journal of Labor Economics, (October 1991):307-24.

"The Threat of Unionization, the Use of Debt, and the Preservation of Shareholder Wealth," with S.G. Bronars.  Quarterly Journal of Economics, (February 1991):231-54.

"Union Representation Elections and Firm Profitability," with S.G. Bronars.  Industrial Relations, (Winter 1990):15-37.

"On the Potential for Private Insurers to Reduce the Inefficiencies of Moral Hazard."  International Review of Law and Economics, (December 1989):219-22.

"Internal Labor Markets, Large Personnel Systems, and the Military."  Economics of Defense Manpower Conference Final Report, United States Air Force Academy, (June 1988).

"Bilateral Trading as an Efficient Auction Over Time."  Journal of Political Economy, (February 1988):100-15.

"Labor Turnover, Job-Specific Skills, and Efficiency in a Search Model."  Quarterly Journal of Economics, (November 1987):815-33.

## SELECTED WORKING PAPERS

"Plant Closings, Large Layoffs, and Advance Notice Provision," with S.N. Wiggins.

"Tax Rates, Tax Complexity, and the Usage of Paid Tax Return Preparers," with C. Wolfe.

"Subscription to Workers' Compensation in Texas."

"Heads I Win, Tails You Lose:  The Economic Impact of the Texas Lottery on Demographic Groups," with J. Dyer.



# Donald R. Deere, Ph.D.

**WELCH CONSULTING**
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

## SELECTED WORKING PAPERS (continued)

"The Cross Sectional Impact of Unemployment Insurance on Layoffs, Employment, and Wages," with J.A. Miron.

"Part-Time Employment," with S.G. Bronars.

"Union Organizing Activity and Union Membership 1973-1988," with S.G. Bronars.

"Union Membership, Union Organizing Activity, and the Union Wage Differential 1973-1988," with S.G. Bronars.

"Competitive Incentives: School Accountability and Student Outcomes in Texas," with W.E. Strayer.

"Climbing the Economic Ladder," with A.J. Rettenmaier.

## HONORS AND AWARDS

**Fellowships:**
National Science Foundation Graduate Fellowship.
Rotary Foundation Graduate Fellowship.
Sloan Foundation Dissertation Research Fellowship.

**Research Grants/Contracts:**
Grant from the Smith Richardson Foundation, "Social Security, Wages and Retirement," 1995.

Four Contracts with the Texas Workers' Compensation Research Center, "Nonsubscription to the Texas Workers' Compensation System," 1992-1995.

Grant from the Texas Advanced Research Program, "Unionization, Profitability, and Firm Behavior," 1988.

Grant from the U.S. Department of Health and Human Services, "Demand Variability, Structural Changes in the Labor Market and the Growth of Part-Time Employment," with S.G. Bronars, 1984.

**Peer Review:**

Professional Journals:
American Economic Review
Journal of Political Economy
Quarterly Journal of Economics
Journal of Labor Economics
Review of Economic Studies
Rand Journal of Economics
Review of Economics and Statistics
Economic Journal
Industrial Relations
Economic Inquiry
Industrial and Labor Relations Review
Industrial Relations
Journal of Labor Research

Grants Competition:
National Science Foundation

**ABOUT WELCH CONSULTING**

Welch Consulting has more than 30 years experience assisting clients of every size in matters involving employment issues and complex business litigation across a broad spectrum of industries and public sector entities. Our track record in producing rigorous analyses meeting the highest standards of accuracy, clarity and punctuality makes Welch Consulting a consistent choice for industry leading companies and the nation's preeminent law firms.

Welch Consulting has offices in Los Angeles, Texas and Washington DC.

For more information about our professionals and services visit us online at www.welchcon.com

**App. 457**

Appendix 2

## Testimony Given in Last 4 Years by Donald Deere

United States of America and the State of Texas, Ex Rel. Keith Waldmann et al. v.
McAllen Medical Center, et al.
Deposition: 11/10/16
In the United States District Court for the Southern District of Texas McAllen Division
Civil Action No. 7:13-cv-495(M)

AJP Oil Company, LLC, D/B/A Grapeland Fuel and BBQ v. Velvin Oil Company, Inc.
Deposition: 07/12/16
In the 3rd District Court of Houston County, Texas
Civil Action No. 14-0217

Kimberly A. Nice, a Personal Representative of the Estate of Shawn R. Nice v. L-3
Communications Vertex Aerospace, LLC, et al
Deposition:  06/17/16
In the United States District Court for the Northern District of Florida, Pensacola
Division
Civil Action No. 3:12-CV-00009-MCR-CJK

Barbara Semons, as Next Friend and Guardian of William Warren v. Houston Party
Rental, Inc. and Sam Houston Area Council Boy Scouts of America
Deposition: 06/12/15
In the 80th Judicial District Court, Harris County, Texas
Cause No. 201407399

Noll, et al. v. Ebay Inc., et al.
Deposition: 09/29/14
United States District Court Northern District of California, San Jose Division
Case No. 5:11-CV-04585-EJD

2018

**App. 459**

# Exhibit 23

```
1                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
2                     BROWNSVILLE DIVISION

3                       + + + + +

4        ---------------------------
                                      :
5    IN THE MATTER OF:                :
                                      :
6    STATE OF TEXAS, et al.,          :
                                      :
7              Plaintiffs,            :
                                      :
8        v.                           : Case No.
                                      : 1:18-CV-68
9    UNITED STATES OF AMERICA,        :
     et al.,                          :
10                                    :
               Defendants,            :
11                                    :
     and                              :
12                                    :
     KARLA PEREZ, et al.,             :
13                                    :
               Defendant-             :
14             Intervenors,           :
                                      :
15   and                              :
                                      :
16   STATE OF NEW JERSEY,             :
                                      :
17             Defendant-             :
               Intervenor.           :
18       ---------------------------
19
               Wednesday,
20             June 27, 2018

21             Washington, D.C.

22
     DEPOSITION OF:
23
                    LEIGHTON KU
24

25
```

www.huseby.com        **Huseby, Inc.  Regional Centers**        800-333-2082
**Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco**

App. 461

 1   called for examination by Counsel for the
     Plaintiffs, pursuant to Notice of Deposition, in
 2   the Mexican American Legal Defense and Education
     Fund, located at 1016 16th Street, NW,
 3   Washington, D.C., when were present on behalf of
     the respective parties:

 4

 5   APPEARANCES:

 6
     On Behalf of the Plaintiffs, State of Texas, et
 7   al.:

 8   ADAM ARTHUR BIGGS, ESQ.
     State of Texas
 9   Office of the Attorney General
     P.O. Box 12548
10   Austin, TX 78711-2548
     512-936-0750
11   512-936-0545 fax
     adam.biggs@oag.texas.gov

12

13   On Behalf of the Defendants, United States of
     America, et al.:

14

15   AARON S. GOLDSMITH, ESQ.

16   U.S. Department of Justice

17   Civil Division

18   Office of Immigration Litigation

19   Liberty Square Building

20   450 5th Street, NW

21   Washington, D.C. 20530

22   202-532-4107

23   aaron.goldsmith@usdoj.gov

24

25

```
 1    APPEARANCES: (CONT.)

 2    On Behalf of the Defendant-Intervenors, Karla
      Perez, et al.:
 3
      ALEJANDRA AVILA, ESQ.
 4    Mexican American Legal Defense and Education
      Fund (MALDEF)
 5    110 Broadway
      Suite 204
 6    San Antonio, TX 78205
      210-224-5476
 7    210-224-5382 fax
      aavila@maldef.org
 8

 9    On Behalf of the Defendant-Intervenors, State of
      New Jersey, et al.:
10
      KENNETH S. LEVINE, ESQ.
11    State of New Jersey
      Department of Law and Public Safety
12    Division of Law

13    124 Halsey Street

14    P.O. Box 45029

15    Newark, NJ 07101-5029

16    973-648-2881

17    973-648-3956 fax

18    kenneth.levine@law.njoag.gov

19

20

21

22

23

24

25
```

```
 1      Q      And --

 2      A      I maybe have tried to contact them but

 3   I don't recall.

 4      Q      Were you asked to provide that email

 5   to your Attorney?

 6      A      My Attorney did not ask me for that

 7   email.

 8      Q      Do you still have that email?

 9      A      Probably.  I think so.

10      Q      Do you have any plans to delete that

11   email anytime soon?

12      A      I'm not planning to do so.

13      Q      All right.  To the extent that this

14   minor incentive exists, is the introductory

15   phrase in the next sentence, would you agree that

16   this incentive may exist?

17      A      The incentive may exist for, in some

18   cases.

19      Q      Do you claim it will be countered by

20   other employment compliance barriers that firms

21   may face in hiring DACA recipients?

22             What are those other employment

23   compliance barriers?

24      A      They're described in the citation that

25   I described, which is to say that there are
```

```
 1              C E R T I F I C A T E

 2   This is to certify that the foregoing transcript

 3   Deposition of: Dr. Leighton Ku

 4   In the matter of: State of Texas v USA

 5   Before: US District Court for Southern

 6        District of Texas

 7   Date: 06-27-18

 8   Place: Washington, DC

 9   were duly recorded and accurately transcribed

10   under my direction; further, that said transcript

11   is a true and accurate record of the proceedings;

12   and that I am neither counsel for, related to,

13   nor employed by any of the parties to this action

14   in which this deposition was taken; and further

15   that I am not a relative nor an employee of any

16   of the parties nor counsel employed by the

17   parties, and I am not financially or otherwise

18   interested in the outcome of the action.

19

20   ----------------------

21   Neal Gross

22   Court Reporter

23

24

25
```

# Exhibit 24

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:18-CV-68 |
| | ) |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| KARLA PEREZ, *et al.*, | ) |
| | ) |
| Defendant-Intervenors, | ) |
| and | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| Proposed Defendant-Intervenor. | ) |

## <u>DECLARATION OF MEG WIEHE AND MISHA HILL</u>

We, Meg Wiehe, and Misha Hill declare as follows:

1. We are tax policy experts working for the Institute on Taxation and Economic Policy (ITEP). ITEP is a non-profit, nonpartisan research organization that provides in-depth analyses on the effects of federal, state, and local tax policies. ITEP's mission is to ensure the nation has a fair and sustainable tax system that raises enough revenue to fund our common priorities, including education, health care, infrastructure and public safety. ITEP researchers use a tax incidence model to produce distributional and revenue analyses of current tax systems and proposed changes at the federal, state, and local level.

   a. Meg Wiehe is the Deputy Director of ITEP. She has worked with ITEP since 2010. Meg is nationally recognized expert on state and local taxation. She studies, writes and provides commentary and insight to a wide range of audiences on historical and current trends in state tax and budget policy. In particular, her analyses focus both on how tax and budget policies affect low- and moderate-income families as well as the intersection of fiscal policies and state and local

**App. 467**

governments' ability to fund basic public priorities, including education, infrastructure and health care. Meg has conducted hundreds of revenue and distributional analyses of proposed tax changes in more than 40 states using ITEP's microsimulation tax model.  She also is a lead author of ITEP's flagship report, *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States.* Meg holds a Master of Public Administration from the Maxwell School at Syracuse University and a Bachelor of Arts in Anthropology from the University of Virginia.

    b.   Misha Hill has been a State Policy Fellow at ITEP since 2016. Misha's work with ITEP has focused, in part, on supporting research and analysis of taxes paid by undocumented immigrants. She is a co-author of ITEP's first report examining the tax contributions of young undocumented immigrants and helped develop the methodology. She has updated analyses and reports on taxes paid by all undocumented immigrants. She has authored half a dozen blog posts related to taxes paid by undocumented immigrants and given Spanish-language press interviews presenting the findings. She holds a Master of Public Policy from The George Washington University and Bachelor of Arts in Hispanic Studies from the University of Pennsylvania.

2.   According to U.S. Citizenship and Immigration Services (USCIS), the agency that administers Deferred Action for Childhood Arrivals (DACA), as of January 31, 2018 over 680,000 young people who were brought to the United States as children without documentation are currently enrolled in DACA.[1] The Migration Policy Institute, a non-profit, non-partisan think tank that analyzes the movement of people worldwide,

---

[1] U.S. Citizenship and Immigration Services, "Deferred Action for Childhood Arrivals (DACA) as of Jan. 31, 2018." Available at:
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_Jan_31_2018.pdf

estimates an additional 643,000 individuals are eligible for DACA but not currently enrolled.[2]

3. We used the above estimates of the current population receiving and eligible for but not receiving Deferred Action for Childhood Arrivals (DACA) in each state to estimate the annual aggregate state and local tax contributions of the DACA-eligible population.

4. Young undocumented immigrants eligible for or enrolled in DACA, like all people living and working in the U.S., pay state and local income, property, sales, and excise taxes. We estimate that the total DACA-eligible population contributes more than $1.7 billion annually in state and local taxes. $1.2 billion of that is from the population currently enrolled in DACA. The following assumptions were made to calculate the sales and excise, income, and property taxes of the DACA-eligible population:

   a. Taxpaying units and employment status:

      i. ITEP's analysis treats each DACA-eligible immigrant who is working as a single taxpaying unit.

      ii. The employment rate of immigrants depends on legal status

      iii. 2017 national survey of 3,063 DACA recipients found that 91 percent of respondents were employed.[3] DACA enrollees pay the same income taxes (in states with income taxes) as other lawfully present individuals. DACA enrollees receive a temporary social security number which allows them to file federal and state income taxes and, additionally payroll taxes are deducted from their paychecks. This declaration assume 100 percent compliance with tax laws by DACA enrollees.

      iv. The previously mentioned national survey also found that prior to obtaining DACA only 44 percent of survey respondents were employed.

---

[2] Migration Policy Institute, "Estimates of DACA-Eligible Population at U.S., State, & County Levels." Available at: http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles#overlay-context=events

[3] "Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey." Center for American Progress, https://cdn.americanprogress.org/content/uploads/2017/11/02125251/2017_DACA_study_economic_report_updated.pdf

**App. 469**

Our analysis assumes that 44 percent of the population that is eligible for DACA but not currently enrolled are employed.

b. Income of DACA-eligible population

    i. Immigrant wages change depending on legal status. Undocumented workers earn $22,029 a year on average and granting DACA status increases wages by 8.5 percent, according to a 2014 report by the Center for American Progress.[4]  The average wages applied to the estimated DACA working population in ITEP's analysis are:

- $23,901 for the DACA-eligible population working and enrolled in the program.
- $22,029 for the DACA-eligible population working, but not enrolled in the program.

c. Estimated effective tax rates (taxes as share of income) for sales, income, and property taxes paid by DACA-eligible population in each state.

    i. ITEP's microsimulation computer model is a sophisticated program that applies the state and local tax laws in each state (including sales, excise, income, and property tax laws) to a statistically valid database of tax returns to generate estimates of the effective tax rates paid by taxpayers at various income levels under state and local tax law in place as of December 31, 2014. In January of 2015, ITEP released the 5th edition of *Who Pays?* which estimates the effect of the state and local tax laws as of January 2015 on taxpayers at 2012 income levels.[5] To estimate effective tax rates for the DACA-eligible population we applied effective tax rates calculated in the 2015 *Who Pays?* report to the DACA-eligible population.

d. We estimate that the DACA-eligible population contributes $287 million in state and local income taxes annually.

---

[4] Oakford, Patrick. "Administrative Action on Immigration Reform." Center for American Program, September 2014.
https://www.americanprogress.org/issues/immigration/reports/2014/09/04/96177/administrative-action-on-immigration-reform/
[5] Davis, Carl, et al. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 5th ed.", Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.

i. Eligible immigrants enrolled in DACA are required to pay personal income taxes using a temporary social security number. Thus, this study assumes the 682,00 DACA-enrolled workers are fully complying with state personal income taxes. Personal income tax effective rates in each state were applied accordingly. Various studies have estimated between 50 and 75 percent of undocumented immigrants currently pay personal income taxes predominantly using Individual Tax Identification (ITIN) numbers or with false social security numbers.[6] This analysis assumes a 50 percent compliance rate for DACA-eligible immigrants who are not enrolled and applies 50 percent compliance if DACA protections are lost. Personal income tax effective rates in each state were applied to 50 percent of the estimated income.

ii. Enrolled DACA recipients are eligible to receive the federal Earned Income Tax Credit (EITC) and the state versions of the credit as well, however state EITC benefits were not included in this study for two reasons: 1) all DACA-eligible workers are treated as single taxpaying units and 2) the average income of the enrolled DACA population is above the EITC income eligibility amounts for single workers. The impact of state EITCs was also left out of the other policy options given that DACA-eligible immigrants not enrolled in the program are ineligible for the credit.

e. We estimate the DACA-eligible population contributes $416 million annually in state and local property taxes.  The DACA-eligible population pays property taxes either directly as homeowners, or indirectly through higher rents as tenants.

---

[6] See among others: Feinleib, Joel, and David Warner. "Issue Brief #1: The Impact of Immigration on Social Security and the National Economy." Social Security Advisory Board, Social Security Advisory Board, Dec. 2005, www.ssab.gov/Portals/0/OUR_WORK/REPORTS/Impact%20of%20Immigration%20on%20Social%20Security%20Brief_2005.pdf; Singer, Paula, and Linda Dodd-Major. "Identification Numbers and U.S. Government Compliance Initiatives." Tax Analysts, 20 Sept, 2004; and Cornelius, Wayne, and Jessica Lewis. Impacts of Border Enforcement on Mexican Migration: The View from Sending Communities, La Jolla, Calif.: University of California at San Diego, Center for Comparative Immigration Studies, 2007.

      i.   The first step in calculating property taxes was to identify the share of DACA-eligible immigrants who are homeowners or renters in each state. This analysis used state-by-state data from the Migration Policy Institute to estimate homeownership rates for undocumented immigrants in each state.[7] The ITEP model assumes that for renters, half of the cost of the property tax paid initially by owners of rental properties is passed through to renters.

    f.   We estimate the DACA-eligible population contributes $1 billion annually in state and local sales and excise taxes. The DACA-eligible population, like anyone purchasing goods or services, pays consumption taxes directly at the point of sale on taxable items.

      i.   Sales and excise taxes are collected by retailers every time a purchase is made on a taxable good or service. It is reasonable to assume that DACA eligible immigrants pay sales and excise taxes at similar rates to U.S. citizens and legal immigrants with similar incomes thus the estimated rates in ITEP's *Who Pays?* for each state were applied to the various estimated DACA-eligible population incomes.

5.   A useful way to compare taxes paid across income levels is the effective tax rate. This is the total of all taxes paid - income, property, and sales and excise - as a share of income. The DACA-eligible population pays an average effective tax rate of 8.3 percent.[8] ITEP's 2015 report, *Who Pays: A Distributional Analysis of the Tax Systems in All Fifty States* found that the middle 20% of taxpayers pays on average an effective tax rate of 9.7 percent, and the top 1 percent of taxpayers pays just 7 percent of their income in taxes.[9]

---

[7] Christensen Gee, et al. "Undocumented Immigrants' State and Local Tax Contributions." Institute on Taxation and Economic Policy, Mar. 2017, http://www.itep.org/pdf/immigration2017.pdf. See Appendix 2

[8] Hill, Misha E. and Meg Wiehe. "State and Local Tax Contributions of Young Undocumented Immigrants", Institute on Taxation and Economic Policy, Apr. 2018, https://itep.org/state-local-tax-contributions-of-young-undocumented-immigrants-2/

[9] Davis, Carl, et al. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 5th ed.", Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.

**App. 472**

This means the DACA-eligible population pays state and local taxes at a similar rate to middle income taxpayers across the country.

6. We also estimate that if DACA protections were lost the population would continue to contribute to state and local revenues, but at much lower levels. We estimate a total loss of $693 million in state and local tax revenues.

   a. DACA protections increase state and local tax contributions because they increase employment rates,[10] increase average salaries,[11] and increase the share paying state personal income taxes from 50 to 100 percent.[12] Surveys of DACA recipients found that after receiving DACA protections respondents were employed at higher rates and earned higher wages. This is likely because the work authorizations and deferral from deportation provided by DACA allow recipients to better compete with legally present workers, pursue advanced degrees, and protects them from wage theft by unscrupulous employers. Thus, a loss of DACA protections would eliminate the revenue gained from the increased salaries DACA affords.

7. Every state revenue stream could be harmed by the loss of DACA protections. In New Jersey, 53,000 residents are eligible for or receiving DACA, given the previously stated assumptions, this represents a contribution $57.2 million in state and local taxes which represents an average effective tax rate 7.9 percent. This includes $7.7 million in state and local income tax, $22.7 million in property tax, and $26.6 million in sales and excise taxes. If DACA protections were lost their contributions would decrease by $18.7 million to $38.4 million.

8. For all the foregoing reasons, in our professional opinions rescinding DACA would reduce the state and local tax contributions of the population eligible for DACA by nearly half in New Jersey and nearly $700 million nationally. This would hamper state and local revenues and hurt their economies.

---

[10] See footnote 3

[11] See footnote 3

[12] See 4.a.3

**App. 473**

9. Attached as **<u>Exhibit A</u>** hereto is a list of publications each of us has authored over the past 10 years and our CVs.

10. Neither of us has testified as an expert at trial or by deposition over the past 4 years.

11. We are each being paid $187.50/hour for our services in connection with this litigation.


    We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of our knowledge.

Respectfully submitted,

_____
Meg Wiehe

6/15/18
Date


_____
Misha Hill

6/15/18
Date

**App. 474**

# EXHIBIT A

# MEG WIEHE

924 Green Street, Durham, NC 27701
(617) 230-3624 ● megwiehe@gmail.com

## EDUCATION

**Maxwell School of Syracuse University,** *Masters of Public Administration, June 2006*

**University of Virginia,** *Bachelor of Arts, Anthropology, May 1998.  Graduated with High Distinction*

## WORK EXPERIENCE

**Institute on Taxation and Economic Policy (ITEP)**                                        **Durham, NC/Washington, DC**
*Deputy Director (2016-present); State Tax Policy Director (2010-2016)*

- Responsible for planning, managing, and implementing ITEP's state and federal tax policy programmatic work.  This includes setting organizational goals and priorities, tracking policy developments in all 50 states and the federal level, ensuring ITEP is informing and influencing key tax debates, and building and maintaining key partnerships.
- Serve as a spokesperson for ITEP through media interviews, presentations, and meetings with policymakers and funders.
- Along with Executive Director, oversee ITEP's fundraising program including grant proposal and report writing, maintaining relationships with funders, and cultivating new donors.
- Directly manage and support six staff members.
- Authored numerous ITEP reports on topics including tax credits for workers and families, documenting the taxes paid by undocumented immigrants, closing tax loopholes, promoting progressive revenue raising options, and comprehensive state and local tax reform.  Co-author on ITEP's flagship report, *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States.*

**North Carolina Justice Center**                                        **Raleigh, NC**
*Senior Policy Analyst/Outreach Director; NC Budget and Tax Center (2006-2010)*

- Promoted progressive fiscal policy through coalition building, media outreach, lobbying, and public presentations
- Conducted research and wrote publications on state and local fiscal and economic policy
- Co-coordinator of statewide revenue coalition, Together NC, and led successful campaign to enact a state Earned Income Tax Credit in 2007

**Boston Museum Project**                                        **Boston, MA**
*Special Projects Coordinator/Project Coordinator (2002-2005)*

- Coordinated development operation laying ground work for $180 million capital campaign through prospect research, donor cultivation, and special events
- Led political and communications strategy including securing a site for project, producing newsletter, managing website content, and regular correspondence with project constituents
- Supervised two staff, conducted weekly staff meetings, and managed high-level Board of Directors

**MASSPIRG**                                        **Amherst and Boston, MA**
*Massachusetts Community Water Watch AmeriCorps Program Director (2000-2002)*

- Recruited, trained, and supervised 13 full-time AmeriCorps members
- Built collaborative relationships with non-profits and state and local government leaders
- Revised program mission, developed five year strategic plan, and established performance objectives

*Mass Student PIRG Campus Organizer (1998-2000)*

- Recruited, trained, and supervised college students and community volunteers to lead national, state, and local social change campaigns

**App. 476**

# Misha E. Hill

(C) 609.234.5931                804 Green St., Apt D-2, Durham, NC 27701                hill.misha@gmail.com

## EDUCATION

**Master of Public Policy,** concentration in Health Policy                                          May 2016
*The George Washington University* | Washington, DC
**B.A. Hispanic Studies,** concentrations in Modern Middle East Studies and Theatre Arts          May 2010
*University of Pennsylvania* | Philadelphia, PA

## POLICY RESEARCH EXPERIENCE

**State Policy Fellow** | *Institute on Taxation and Economic Policy* | Durham, NC            Sept 2016—Present
- ❖ Participated in quantitative and qualitative analyses of the varying impact of fiscal policy by income and citizenship status for the purpose of continuing dialogue within the organization, establishing and developing external written, and responding to technical assistance requests from key stake holders such as the California Attorney General
- ❖ Advocated within the organization for the inclusion of a race equity lens and drafted an internal document to support this advocacy
- ❖ Created written products in collaboration with senior staff and independently on various state tax policy topics, including taxes paid by undocumented immigrants and adding a gendered lens to tax and budget policy
- ❖ Responded to Spanish language media inquiries related to published reports
- ❖ Presented at a national conference on current and upcoming research and analytical capabilities of the organization
- ❖ Tracked state legislative action related to tax policies and identified trends in consumption tax policy

**Income Support Research Assistant** | *Center on Budget and Policy Priorities* | Washington, DC    Nov 2015—Sept 2016
- ❖ Compiled a weekly email for distribution to state and national advocates on the latest news and research related to TANF policies
- ❖ Collected national and state level TANF statistics, including annual spending, caseloads, and applications, from HHS and state agencies to inform internal analyses and future work
- ❖ Tracked state and federal legislative action related to income support programs

**Women's Health Policy Intern** | *The Henry J. Kaiser Family Foundation* | Washington, DC        Jun 2015—Aug 2015
- ❖ Compiled comprehensive database of Medicaid family planning expansion programs to inform future research
- ❖ Performed qualitative research for a fact sheet on financing of maternity care in the US
- ❖ Presented a summary of work to about 20 participants that articulated why Medicaid family planning expansion programs were an important topic for federal fiscal policy

**Income Support Intern** | *Center on Budget and Policy Priorities* | Washington, DC            Sep 2014—May 2015
- ❖ Co-authored a report on state General Assistance programs
- ❖ Drafted briefs for an advocacy tool kit at a national conference on expanding TANF work programs
- ❖ Modeled alternatives of changes to TANF policies displaying the effects on families' incomes
- ❖ Performed literature reviews of prior research related to various income support strategies
- ❖ Monitored and summarized media on state and federal legislative and policy changes to income support programs
- ❖ Compiled data on TANF policies into summaries, fact sheets, graphs, and graphics for organization website

## DIRECT SERVICE EXPERIENCE

**WorkFirst NJ Administrator** | *HomeFront, Inc.* | Lawrence, NJ                                Jun 2010—Oct 2012
- ❖ Supported TANF participants in goal setting, GED preparation, and finding employment

## COMMUNITY SERVICE

**Harm Free Zone Participant** | *SpiritHouse* | Durham, NC                                    Jun 2017—Present
- ❖ SpiritHouse uses art, culture, and media to support the empowerment of communities impacted by racism, criminalization, and incarceration. Harm Free Zone is a project that works to build communities that do not rely on law enforcement. Participated in performances, transformative justice, trainings, campaigns and book studies.

**End Shackling Campaign Participant** | *SisterSong, Inc.* | Durham, NC                        March 2018—Present
- ❖ Provided fiscal policy insight for campaign to end the shackling of pregnant persons in North Carolina prisons and jails

**Certified Application Counselor** | *Northern Virginia Family Services* | Falls Church, VA        Dec 2014—Mar 2015
- ❖ Assisted primarily Spanish-speaking consumers in applying for health insurance through the ACA Marketplace

## LANGUAGES AND TECHNOLOGY SKILLS

**Language:** Spanish, Fluent in written and oral
**Technology:** STATA and SPSS (academic training), Adobe Illustrator, Microsoft Excel, WordPress, MailChimp, and The Raiser's Edge

**App. 477**

Meg Wiehe's Publication

| Organization | Title | Date |
|---|---|---|
| Institute on Taxation and Economic Policy | Lottery, Casino and other Gambling Revenue: A Fiscal Game of Chance | 6/12/2018 |
| Institute on Taxation and Economic Policy | SALT/Charitable Workaround Credits Require a Broad Fix, Not a Narrow One | 5/23/2018 |
| Institute on Taxation and Economic Policy | How Long Has It Been Since Your State Raised Its Gas Tax? | 5/22/2018 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants | 4/30/2018 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants | 4/30/2018 |
| Institute on Taxation and Economic Policy | 10 Things You Should Know about the Nation's Tax System | 4/13/2018 |
| Institute on Taxation and Economic Policy | Many Large Corporations Reporting Tax Cut-Inspired Employee Bonuses Were Paying Low T | 4/12/2018 |
| Institute on Taxation and Economic Policy | Fifteen (of Many) Reasons We Need Real Corporate Tax Reform | 4/11/2018 |
| Institute on Taxation and Economic Policy | Who Pays Taxes in America in 2018? | 4/11/2018 |
| Institute on Taxation and Economic Policy | Extensions of the New Tax Law's Temporary Provisions Would Mainly Benefit the Wealthy | 4/10/2018 |
| Institute on Taxation and Economic Policy | Many Localities Are Unprepared to Collect Taxes on Online Purchases: Amazon.com and ot | 3/26/2018 |
| Institute on Taxation and Economic Policy | ITEP Testimony on "Post Tax Reform Evaluation of Recently Expired Tax Provisions" | 3/14/2018 |
| Institute on Taxation and Economic Policy | Preventing State Tax Subsidies for Private K-12 Education in the Wake of the New Federal S | 2/3/2018 |
| Institute on Taxation and Economic Policy | What the Tax Cuts and Jobs Act Means for States – A Guide to Impacts and Options | 1/26/2018 |
| Institute on Taxation and Economic Policy | Key Lessons for States as They Determine Responses to the Federal Tax Bill | 1/26/2018 |
| Institute on Taxation and Economic Policy | National and 50-State Impacts of House and Senate Tax Bills in 2019 and 2027 | 12/6/2017 |
| Institute on Taxation and Economic Policy | How True Tax Reform Would Eliminate Breaks for Real Estate Investors L ke Donald Trump | 12/1/2017 |
| Institute on Taxation and Economic Policy | Six More Things to Know About the Senate Tax Plan | 11/29/2017 |
| Institute on Taxation and Economic Policy | Revised Senate Plan Would Raise Taxes on at Least 29% of Americans and Cause 19 States t | 11/18/2017 |
| Institute on Taxation and Economic Policy | Analysis of the House Tax Cuts and Jobs Act | 11/6/2017 |
| Institute on Taxation and Economic Policy | 9 Things You Should Know About the Tax Debate | 11/3/2017 |
| Institute on Taxation and Economic Policy | The Domestic Production Activities Deduction: Costly, Complex and Ineffective | 10/26/2017 |
| Institute on Taxation and Economic Policy | Trickle-Down Dries Up | 10/26/2017 |
| Institute on Taxation and Economic Policy | Benefits of GOP-Trump Framework Tilted Toward the Richest Taxpayers in Each State | 10/4/2017 |
| Institute on Taxation and Economic Policy | State Tax Codes as Poverty Fighting Tools | 9/14/2017 |
| Institute on Taxation and Economic Policy | Trump Proposals Would Reduce the Share of Taxes Paid by the Richest 1%, Raise It for Ever | 9/13/2017 |
| Institute on Taxation and Economic Policy | Reducing the Cost of Child Care Through State Tax Codes in 2017 | 9/11/2017 |
| Institute on Taxation and Economic Policy | Property Tax Circuit Breakers in 2017 | 9/11/2017 |
| Institute on Taxation and Economic Policy | Options for a Less Regressive Sales Tax in 2017 | 9/11/2017 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits in 2017 | 9/11/2017 |
| Institute on Taxation and Economic Policy | Nearly Half of Trump's Proposed Tax Cuts Go to People Making More than $1 Million Annu: | 8/17/2017 |

| | | |
|---|---|---|
| Institute on Taxation and Economic Policy | Comment Letter to Treasury on Earnings Stripping Regulations | 8/4/2017 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits | 7/21/2017 |
| Institute on Taxation and Economic Policy | Trump's $4.8 Trillion Tax Proposals Would Not Benefit All States or Taxpayers Equally | 7/20/2017 |
| Institute on Taxation and Economic Policy | Comment Letter on Tax Reform to Senate Finance Chairman | 7/17/2017 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 7/12/2017 |
| Institute on Taxation and Economic Policy | Trump Budget Uses Unrealistic Economic Forecast to Tee Up Tax Cuts | 6/29/2017 |
| Institute on Taxation and Economic Policy | Public Loss Private Gain: How School Voucher Tax Shelters Undermine Public Education | 5/17/2017 |
| Institute on Taxation and Economic Policy | Why States That Offer the Deduction for Federal Income Taxes Paid Get It Wrong | 5/1/2017 |
| Institute on Taxation and Economic Policy | What Real Tax Reform Should Look Like | 4/27/2017 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants (2017) | 4/25/2017 |
| Institute on Taxation and Economic Policy | Comparing the Distributional Impact of Revenue Options in Alaska | 4/24/2017 |
| Institute on Taxation and Economic Policy | State and Local Tax Contributions of Undocumented Californians: County-by- County Data | 4/24/2017 |
| Institute on Taxation and Economic Policy | 10 Things You Should Know on Tax Day | 4/13/2017 |
| Institute on Taxation and Economic Policy | Who Pays Taxes in America in 2017? | 4/13/2017 |
| Institute on Taxation and Economic Policy | The U.S. Is One of the Least Taxed Developed Countries | 4/10/2017 |
| Institute on Taxation and Economic Policy | Testimony before the Alaska House Labor & Commerce Committee On House Bill 36 | 4/4/2017 |
| Institute on Taxation and Economic Policy | Assessing the Distributional Consequences of Alaska's House Bill 115 (Version L) | 3/28/2017 |
| Institute on Taxation and Economic Policy | Affordable Care Act Repeal Includes a $31 Billion Tax Cut for a Handful of the Wealthiest Ta | 3/17/2017 |
| Institute on Taxation and Economic Policy | Taxes and the On-Demand Economy | 3/15/2017 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants' State & Local Tax Contributions | 3/1/2017 |
| Institute on Taxation and Economic Policy | Combined Reporting of State Corporate Income Taxes: A Primer | 2/24/2017 |
| Institute on Taxation and Economic Policy | State Tax & Revenue Information | 1/31/2017 |
| Institute on Taxation and Economic Policy | State-by-State Tax Expenditure Reports | 1/31/2017 |
| Institute on Taxation and Economic Policy | Fairness Matters: A Chart Book on Who Pays State and Local Taxes | 1/26/2017 |
| Institute on Taxation and Economic Policy | State Estate and Inheritance Taxes | 12/21/2016 |
| Institute on Taxation and Economic Policy | The Federal Estate Tax: A Critical and Highly Progressive Revenue Source | 12/7/2016 |
| Institute on Taxation and Economic Policy | Fact Sheet: Preserving the Estate Tax | 12/7/2016 |
| Institute on Taxation and Economic Policy | Privatization, Waste, and Unfunded Projects: The Problems with Trump's Infrastructure Pr | 11/30/2016 |
| Institute on Taxation and Economic Policy | State Tax Preferences for Elderly Taxpayers | 11/28/2016 |
| Institute on Taxation and Economic Policy | Collecting Sales Taxes Owed on Internet Purchases | 11/18/2016 |
| Institute on Taxation and Economic Policy | Fact Sheet: Comparison of House GOP Tax Plan, Trump's Initial Tax Proposal and Trump's R | 11/15/2016 |
| Institute on Taxation and Economic Policy | The Short and Sweet on Taxing Soda | 10/28/2016 |
| Institute on Taxation and Economic Policy | Cigarette Taxes: Issues and Options | 10/18/2016 |
| Institute on Taxation and Economic Policy | State Tax Subsidies for Private K-12 Education | 10/12/2016 |

**App. 479**

| | | |
|---|---|---|
| Institute on Taxation and Economic Policy | Comment Letter to FASB on Income Tax Disclosure | 9/30/2016 |
| Institute on Taxation and Economic Policy | State Tax Codes as Poverty Fighting Tools | 9/15/2016 |
| Institute on Taxation and Economic Policy | Property Tax Circuit Breakers | 9/14/2016 |
| Institute on Taxation and Economic Policy | Reducing the Cost of Child Care Through State Tax Codes | 9/14/2016 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits | 9/14/2016 |
| Institute on Taxation and Economic Policy | Options for a Less Regressive Sales Tax | 9/14/2016 |
| Institute on Taxation and Economic Policy | How State Tax Changes Affect Your Federal Taxes: A Primer on the "Federal Offset" | 8/22/2016 |
| Institute on Taxation and Economic Policy | Indexing Income Taxes for Inflation: Why It Matters | 8/22/2016 |
| Institute on Taxation and Economic Policy | The Folly of State Capital Gains Tax Cuts | 8/17/2016 |
| Institute on Taxation and Economic Policy | Why Sales Taxes Should Apply to Services | 7/27/2016 |
| Institute on Taxation and Economic Policy | Income Tax Offers Alaska a Brighter Fiscal Future | 7/12/2016 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 7/11/2016 |
| Institute on Taxation and Economic Policy | Ryan Tax Plan Reserves Most Tax Cuts for Top 1 percent, Costs $4 Trillion Over 10 Years | 6/29/2016 |
| Institute on Taxation and Economic Policy | Distributional Analyses of Revenue Options for Alaska | 4/13/2016 |
| Institute on Taxation and Economic Policy | Higher Education Income Tax Deductions and Credits in the States | 3/22/2016 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants' State & Local Tax Contributions (2016) | 2/24/2016 |
| Institute on Taxation and Economic Policy | Tennessee Hall Tax Repeal Would Overwhelmingly Benefit the Wealthy, Raise Tennesseans | 2/23/2016 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits | 2/11/2016 |
| Institute on Taxation and Economic Policy | Tax Foundation Model Seeks to Revive Economic Voodoo | 2/11/2016 |
| Institute on Taxation and Economic Policy | Testimony before the Vermont Senate Committee on Finance: Tax Policy Issues with Legali | 1/19/2016 |
| Institute on Taxation and Economic Policy | ITEP Comments to the Vermont Senate Committee on Finance: Tax Expenditure Evaluation | 1/13/2016 |
| Institute on Taxation and Economic Policy | A Primer on State Rainy Day Funds | 10/20/2015 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools | 9/17/2015 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Tennessee is a "Low Tax State" Overall, But Not for Families Living in F | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: South Dakota is a "Low Tax State" Overall, But Not for Families Living | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Washington is a "Low Tax State" Overall, But Not for Families Living in | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Florida is a "Low Tax State" Overall, But Not for Families Living in Pove | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Texas is a "Low Tax State" Overall, But Not for Families Living in Pove | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Arizona is a "Low Tax State" Overall, But Not for Families Living in Pov | 9/17/2015 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 7/22/2015 |
| Institute on Taxation and Economic Policy | Pay-Per-Mile Tax is Only a Partial Fix | 6/24/2015 |
| Institute on Taxation and Economic Policy | Testimony: Adding Sustainability to the Highway Trust Fund | 6/17/2015 |
| Institute on Taxation and Economic Policy | Issues with Taxing Marijuana at the State Level | 5/6/2015 |

**App. 480**

| | | |
|---|---|---|
| Institute on Taxation and Economic Policy | Undocumented Immigrants' State & Local Tax Contributions (2015) | 4/15/2015 |
| Institute on Taxation and Economic Policy | State Tax Preferences for Elderly Taxpayers | 3/23/2015 |
| Institute on Taxation and Economic Policy | Grocery Tax Exemption Is No Improvement for Idaho | 2/5/2015 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools | 9/18/2014 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 8/5/2014 |
| Institute on Taxation and Economic Policy | Options for Progressive Sales Tax Relief | 7/30/2014 |
| Institute on Taxation and Economic Policy | State Estate and Inheritance Taxes | 7/21/2014 |
| Institute on Taxation and Economic Policy | Pay-Per-Mile Tax is Only a Partial Fix | 5/28/2014 |
| Institute on Taxation and Economic Policy | STAMP is an Unsound Tool for Gauging the Economic Impact of Taxes | 5/21/2014 |
| Institute on Taxation and Economic Policy | Improving Tax Fairness with a State Earned Income Tax Credit | 5/15/2014 |
| Institute on Taxation and Economic Policy | Tennessee Hall Tax Repeal Would Overwhelmingly Benefit the Wealthy, Raise Tennesseans | 3/24/2014 |
| Institute on Taxation and Economic Policy | Personal Income Tax Reform: Improving the Fairness of Taxes in the District of Columbia | 11/12/2013 |
| Institute on Taxation and Economic Policy | Paying for Education Finance Reform in Colorado | 10/16/2013 |
| Institute on Taxation and Economic Policy | Low Tax for Who? | 9/19/2013 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools | 9/19/2013 |
| Institute on Taxation and Economic Policy | Washington is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | Texas is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | Tennessee is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | South Dakota is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | Florida is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | Arizona is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | A Closer Look at TABOR (Taxpayer Bill of Rights) | 8/19/2013 |
| Institute on Taxation and Economic Policy | Tax Expenditure Reports: A Vital Tool with Room for Improvement | 8/14/2013 |
| Institute on Taxation and Economic Policy | Tax Incentives: Costly for States, Drag on the Nation | 8/14/2013 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 7/24/2013 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants' State and Local Tax Contributions (2013) | 7/10/2013 |
| Institute on Taxation and Economic Policy | 5% Cut in Indiana's Income Tax is Stacked in Favor of the Wealthy | 4/26/2013 |
| Institute on Taxation and Economic Policy | Indiana Senate's Income Tax Cut: Just as Lopsided as the Governor's | 4/8/2013 |
| Institute on Taxation and Economic Policy | Kansas House and Senate Proposals Set the Stage for Tax Hikes on Poor and Middle-Income | 4/2/2013 |
| Institute on Taxation and Economic Policy | Governor Jindal's Tax Plan Would Increase Taxes on Poorest 60 Percent of Louisianans | 4/1/2013 |
| Institute on Taxation and Economic Policy | States with "High Rate" Income Taxes are Still Outperforming No-Tax States | 2/28/2013 |
| Institute on Taxation and Economic Policy | Laffer's New Job Growth Factoid is All Rhetoric and No Substance | 2/27/2013 |
| Institute on Taxation and Economic Policy | IDACorp— Biggest Winner Under Property Tax Plan— Pays Nothing in State Income Taxes | 2/13/2013 |
| Institute on Taxation and Economic Policy | Kansas Governor's New Plan Increases Taxes on Poor Yet Slashes Revenue by $340 Million | 2/1/2013 |

**App. 481**

| Author | Title | Date |
|---|---|---|
| Institute on Taxation and Economic Policy | Who Pays? (Fourth Edition) | 1/30/2013 |
| Institute on Taxation and Economic Policy | More Inaccuracies, Bigger Omissions: Arthur Laffer's Newest Study of Income Tax Repeal Fa | 1/23/2013 |
| Institute on Taxation and Economic Policy | Proposal to Eliminate Income Taxes Amounts to a Tax Increase on Bottom 80 Percent of Lo | 1/11/2013 |
| Institute on Taxation and Economic Policy | Previewing Tax Reform in the States: National Trends and State-specific Prospects for 2013 | 12/13/2012 |
| Institute on Taxation and Economic Policy | Tax Principles: Building Blocks of A Sound Tax System | 12/1/2012 |
| Institute on Taxation and Economic Policy | Five Steps Toward a Better Tax Expenditure Debate | 10/1/2012 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools | 9/13/2012 |
| Institute on Taxation and Economic Policy | Most of Indiana Tax Rate Cut Would Flow to Upper-Income Taxpayers | 8/27/2012 |
| Institute on Taxation and Economic Policy | Corporate Income Tax Apportionment and the "Single Sales Factor" | 8/1/2012 |
| Institute on Taxation and Economic Policy | State Estate and Inheritance Taxes | 8/1/2012 |
| Institute on Taxation and Economic Policy | Four Tax Ideas for Jobs-Focused Governors | 7/15/2012 |
| Institute on Taxation and Economic Policy | The Progressive Income Tax: An Essential Element of Fair and Sustainable State Tax System | 7/1/2012 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: A Boondoggle | 7/1/2012 |
| Institute on Taxation and Economic Policy | Tax Bill Signed by Governor Brownback Makes Kansas an Outlier | 5/24/2012 |
| Institute on Taxation and Economic Policy | Latest Kansas Tax Bill Carries $680 Million Price Tag and Raises Taxes on Those Least Able t | 5/17/2012 |
| Institute on Taxation and Economic Policy | Three Strategies for Making Enacted Kansas Tax Plan Less Unfair and Less Costly | 5/10/2012 |
| Institute on Taxation and Economic Policy | Kansas Tax Bill Would Cost $600 Million a Year While Hiking Taxes on Low-Income Families | 5/8/2012 |
| Institute on Taxation and Economic Policy | How Federal Tax Reform Can Help or Hurt State and Local Governments | 4/25/2012 |
| Institute on Taxation and Economic Policy | Regarding Proposals to Increase Taxes on Upper-Income Rhode Islanders | 4/24/2012 |
| Institute on Taxation and Economic Policy | Repealing Estate Tax Will Not Create An Economic Boom | 4/1/2012 |
| Institute on Taxation and Economic Policy | Idaho House Tax Plan Stacked in Favor of the Wealthy | 3/24/2012 |
| Institute on Taxation and Economic Policy | Alaska Senate State Affairs Committee Regarding SB 29, The Alaska Tax Break Transparency, | 3/6/2012 |
| Institute on Taxation and Economic Policy | Tax Plans Put Kansas on Road Away from Fair & Adequate Tax Reform | 3/3/2012 |
| Institute on Taxation and Economic Policy | Testimony on Reinstating Maryland's "Millionaires' Tax" | 2/29/2012 |
| Institute on Taxation and Economic Policy | Arthur Laffer Regression Analysis is Fundamentally Flawed, Offers No Support for Economic | 2/15/2012 |
| Institute on Taxation and Economic Policy | "High Rate" Income Tax States Are Outperforming No-Tax States | 2/8/2012 |
| Institute on Taxation and Economic Policy | Kansas Governor Tax Proposal: Wealthy Kansans Pay Less, Poor and Middle-Income Kansan | 1/11/2012 |
| Institute on Taxation and Economic Policy | Costs of Personal Income Tax Repeal in Kansas | 10/4/2011 |
| Institute on Taxation and Economic Policy | Tax Expenditures: Spending By Another Name | 10/1/2011 |
| Institute on Taxation and Economic Policy | Cigarette Taxes: Issues and Options | 10/1/2011 |
| Institute on Taxation and Economic Policy | Uncertain Benefits, Hidden Costs: The Perils of State-Sponsored Gambling | 10/1/2011 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools (2011) | 9/22/2011 |
| Institute on Taxation and Economic Policy | Rewarding Work Through Earned Income Tax Credits | 9/1/2011 |
| Institute on Taxation and Economic Policy | State Income Taxes and Older Adults | 9/1/2011 |

| | | |
|---|---|---|
| Institute on Taxation and Economic Policy | State Treatment of Itemized Deductions | 9/1/2011 |
| Institute on Taxation and Economic Policy | Property Tax Circuit Breakers | 9/1/2011 |
| Institute on Taxation and Economic Policy | The Folly of State Capital Gains Tax Cuts | 9/1/2011 |
| Institute on Taxation and Economic Policy | Split Roll Property Taxes | 9/1/2011 |
| Institute on Taxation and Economic Policy | Reducing the Cost of Child Care Through Income Tax Credits | 9/1/2011 |
| Institute on Taxation and Economic Policy | Property Tax Homestead Exemptions | 9/1/2011 |
| Institute on Taxation and Economic Policy | Capping Property Taxes: A Primer | 9/1/2011 |
| Institute on Taxation and Economic Policy | Taxes and Economic Development 101 | 9/1/2011 |
| Institute on Taxation and Economic Policy | Fighting Back: Accountable Economic Development Strategies | 9/1/2011 |
| Institute on Taxation and Economic Policy | Examining Economic Development Research | 9/1/2011 |
| Institute on Taxation and Economic Policy | Texas is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Washington is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Tennessee is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Florida is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Arizona is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Why States That Offer the Deduction for Federal Income Taxes Paid Get it Wrong | 8/14/2011 |
| Institute on Taxation and Economic Policy | How State Personal Income Taxes Work | 8/1/2011 |
| Institute on Taxation and Economic Policy | Indexing Income Taxes for Inflation: Why It Matters | 8/1/2011 |
| Institute on Taxation and Economic Policy | How State Tax Changes Affect Your Federal Taxes: A Primer on the "Federal Offset" | 8/1/2011 |
| Institute on Taxation and Economic Policy | How Property Taxes Work | 8/1/2011 |
| Institute on Taxation and Economic Policy | Income Tax Simplification: How to Achieve It | 8/1/2011 |
| Institute on Taxation and Economic Policy | Tax Policy Nuts and Bolts: Understanding the Tax Base and Tax Rate | 8/1/2011 |
| Institute on Taxation and Economic Policy | Introduction to ITEP's Tax Incidence Analysis | 8/1/2011 |
| Institute on Taxation and Economic Policy | "Nowhere Income" and the Throwback Rule | 8/1/2011 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: A Boondoggle | 7/14/2011 |
| Institute on Taxation and Economic Policy | How Can States Collect Taxes Owed on Internet Sales? | 7/1/2011 |
| Institute on Taxation and Economic Policy | Options for Progressive Sales Tax Relief | 7/1/2011 |
| Institute on Taxation and Economic Policy | Should Sales Taxes Apply to Services? | 7/1/2011 |
| Institute on Taxation and Economic Policy | How Sales and Excise Taxes Work | 7/1/2011 |
| Institute on Taxation and Economic Policy | Illinois Must Ignore CME's Tax Tantrum | 6/11/2011 |
| Institute on Taxation and Economic Policy | ITEP's Testimony on Combined Reporting Legislation | 5/19/2011 |
| Institute on Taxation and Economic Policy | ITEP's Testimony on Tax Expenditure Procedural Reform | 5/19/2011 |
| Institute on Taxation and Economic Policy | Connecticut Takes a Stand for Progressive Tax Policy and a Balanced Budget Approach | 5/14/2011 |
| Institute on Taxation and Economic Policy | States Should Not Allow Amazon.com to Bully Them into Forgoing Sales Tax Reform | 4/14/2011 |

**App. 483**

| Institute on Taxation and Economic Policy | ITEP's Testimony on Sales Tax Modernization Proposal | 4/13/2011 |
| Institute on Taxation and Economic Policy | Don't Give Up on Pease: States Can Decouple from Recent Federal Tax Cuts for Wealthy Ite | 4/10/2011 |
| Institute on Taxation and Economic Policy | In It for the Long Haul: Why Concerns over Personal Income Tax "Volatility" Are Overblown | 3/31/2011 |
| Institute on Taxation and Economic Policy | Should Illinois Tax Retirement Income? | 3/24/2011 |
| Institute on Taxation and Economic Policy | ITEP's Testimony on EITC Legislation | 3/16/2011 |
| Institute on Taxation and Economic Policy | Topsy-Turvy: State Income Tax Deductions for Federal Income Taxes Turn Tax Fairness on it | 3/10/2011 |
| Institute on Taxation and Economic Policy | Five Reasons to Reinstate Maryland's "Millionaires' Tax" | 3/9/2011 |
| Institute on Taxation and Economic Policy | The ITEP Guide to Fair State and Local Taxes | 3/3/2011 |
| Institute on Taxation and Economic Policy | Dear Wall Street Journal: No Need to File a Missing Persons Report, Oregon's High-income | 12/22/2010 |
| Institute on Taxation and Economic Policy | How the Bush Tax Cuts Affect State Revenues | 12/15/2010 |
| Institute on Taxation and Economic Policy | The Good, the Bad and the Ugly: 2010 State Tax Policy Changes | 12/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Washington's Fundamental Tax Mismatch: Washington is a Low Tax Sta | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Texas' Fundamental Tax Mismatch: Texas is a Low Tax State, But Not fo | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Tennessee's Fundamental Tax Mismatch: Tennessee is a Low Tax State, | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Florida's Fundamental Tax Mismatch: Florida is a Low Tax State, But No | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Arkansas Fundamental Tax Mismatch: Arkansas is a Low Tax State, But | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Arizona's Fundamental Tax Mismatch: Arizona is a Low Tax State, But N | 9/15/2010 |
| Institute on Taxation and Economic Policy | Credit Where Credit is (Over) Due: Four State Tax Policies Could Lessen the Effect that State | 9/15/2010 |
| Institute on Taxation and Economic Policy | "Writing Off" Tax Giveaways: How States Can Help Balance Their Budgets by Reforming or F | 8/24/2010 |
| Institute on Taxation and Economic Policy | ITEP's Testimony on TRAC Sales and Use Tax Proposal | 8/13/2010 |
| North Carolina Budget and Tax Center | BTC Report: The Governor's 2010-11 Budget: A reasonable, though painful, approach to the | 5/25/2010 |
| North Carolina Budget and Tax Center | BTC REPORTS: All Hands on Deck: Predictions for the FY 2010-11 and FY 2011-12 budget sh | 4/8/2010 |
| Institute on Taxation and Economic Policy | A Capital Idea | 1/15/2010 |
| North Carolina Budget and Tax Center | BTC REPORTS: The 2009-2011 State Budget: Trifecta of spending cuts, tax increases and fed | 9/1/2009 |
| North Carolina Budget and Tax Center | BTC REPORTS: The House budget: deteriorating revenue picture forces tough decisions | 6/1/2009 |
| North Carolina Budget and Tax Center | BTC REPORTS: The Senate's Proposed Budget: Overall Spending Target Mirrors Governor's I | 4/1/2009 |
| North Carolina Budget and Tax Center | BTC BRIEF: Beyond the Crystal Ball: Projecting the 2009-10 General Fund Budget Shortfall | 2/1/2009 |

**App. 484**

Misha Hill's Publications

| Organization | Title | Date |
| --- | --- | --- |
| Institute on Taxation and Economic Policy | All Bets are Off: State-Sponsored Sports Betting Isn't Worth the Risk | 6/13/2018 |
| Institute on Taxation and Economic Policy | In the Face of the Trump Administration's Anti-Immigrant Agenda, We Must Rely on Evic | 5/4/2018 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants | 4/30/2018 |
| Institute on Taxation and Economic Policy | Trends We're Watching in 2018, Part 5: 21st Century Consumption Taxes | 4/20/2018 |
| Institute on Taxation and Economic Policy | We Must Protect Dreamers | 1/16/2018 |
| Institute on Taxation and Economic Policy | All I Want for Christmas is a Clean DREAM Act | 12/13/2017 |
| Institute on Taxation and Economic Policy | Poverty is Down, But State Tax Codes Could Bring It Even Lower | 9/15/2017 |
| Institute on Taxation and Economic Policy | Besides Eviscerating the Safety Net, Trump Budget Would Put States in a Fiscal Bind | 5/26/2017 |
| Institute on Taxation and Economic Policy | Trump Budget Plan Would Eliminate Child Tax Credits for Working Families Due to Paren | 5/23/2017 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants (2017) | 4/25/2017 |
| Institute on Taxation and Economic Policy | Young Undocumented Immigrants Pay Taxes Too | 4/25/2017 |
| Institute on Taxation and Economic Policy | What to Watch in the States: State Earned Income Tax Credits (EITC) on the Move | 3/24/2017 |
| Institute on Taxation and Economic Policy | A Tax Perspective on International Women's Day | 3/8/2017 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants Pay Taxes | 3/2/2017 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants' State & Local Tax Contributions | 3/1/2017 |
| Institute on Taxation and Economic Policy | What to Watch in the States: Modernizing Sales Taxes for a 21st Century Economy | 2/15/2017 |
| Institute on Taxation and Economic Policy | Lawmakers Should Not Use Disproven Trickle-Down Myth to Ramrod Tax Cuts for the Ri | 2/8/2017 |
| Institute on Taxation and Economic Policy | The Short and Sweet on Taxing Soda | 10/28/2016 |
| Center on Budget and Policy Priorities | State General Assistance Programs Are Weakening Despite Increased Need | 7/9/2015 |

# Exhibit 25

Transcript of the Testimony of

# Ray Perryman

## Date:

June 27, 2018

## Case:

STATE OF TEXAS vs UNITED STATES of AMERICA

Ray Perryman                                                    June 27, 2018

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF TEXAS

 3                    BROWNSVILLE DIVISION

 4

 5   STATE OF TEXAS,                    )

 6          Plaintiffs,                 ) Case No.

 7          vs.                         ) 1:18-cv-00068

 8   UNITED STATES OF AMERICA, et al., )

 9          Defendants,                 )

10          and                         )

11   KARLA PEREZ, et al.,               )

12            Defendant-Intervenors. )

13   ---------------------------------------------

14                  ORAL DEPOSITION OF

15                     RAY PERRYMAN

16              Wednesday, June 27, 2018

17   ---------------------------------------------

18          Oral deposition of RAY PERRYMAN, produced as

19   a witness at the instance of the Plaintiff States, and

20   duly sworn, was taken in the above-styled and numbered

21   cause on the 27th day of June, 2018, from 2:00 p.m. to

22   4:44 p.m., before Deborah L. Endler, Notary Public in

23   and for the State of Texas, reported by stenographic

24   means, at the offices of the Attorney General, 300

25   West 15th Street, 11th Floor, Austin, Texas 78701,
```

1   pursuant to the Federal Rules of Civil Procedure and

2   the provisions stated on the record or attached

3   hereto.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ray Perryman                                                June 27, 2018
                                                                 Page 3

```
 1                A P P E A R A N C E S

 2   FOR THE PLAINTIFF STATES:

 3   Todd Lawrence Disher, Attorney-in-Charge

 4   OAG - Assistant Attorney General

 5   Special Counsel for Civil Litigation

 6   General Litigation Division

 7   300 West 15th Street, 11th Floor

 8   Austin, Texas 78701

 9   512.463.2008

10   todd.disher@oag.texas.gov

11

12   FOR THE DEFENDANTS:

13   Keith Edward Wyatt, Assistant U.S. Attorney

14   U.S. Department of Justice, Civil Division

15   Southern District of Texas

16   1000 Louisiana Street, Suite 2300

17   Houston, Texas 77002

18   713.567.9713

19   keith.wyatt@usdoj.gov

20                    (continued)

21

22

23

24

25
```

```
 1   APPEARANCES: (continued)

 2   FOR THE DEFENDANT-INTERVENORS:

 3   Katherine A. Gregory

 4   Office of the Attorney General of New Jersey

 5   25 Market Street, 8th Floor

 6   Trenton, New Jersey 08625

 7   katherine.gregory@dol.lps.state.nj.us

 8

 9   FOR MALDEF:

10   Ernest I. Herrera, Esquire

11   Mexican American Legal Defense and Educational Fund

12   1100 Broadway, Suite 300

13   San Antonio, Texas 78205

14   eherrera@maldef.org

15

16   ALSO PRESENT:   Joseph Shaneyfelt, Baylor Law Student

17

18

19

20

21

22

23

24

25
```

1  different way.  If there are fewer workers in the

2  workforce, that can potentially increase wages?

3       A.    It can.  That's an unproductive thing to

4  have happen in society, but that can be one

5  consequence.

6       Q.    Okay.  Now, if we go down, it says retirees

7  have also been rehired?  Do you see that?

8       A.    Yes, sir.

9       Q.    So that's saying in response to the labor

10  shortage, retirees have also been rehired; right?

11      A.    I talk about several things.  That's one of

12  them, yes, sir.

13      Q.    Those retirees would have been outside of

14  the labor force participation prior to being rehired;

15  correct?

16      A.    That's correct.

17      Q.    So a labor shortage could potentially

18  increase labor force participation?

19      A.    Well, depending on how people respond to

20  it, it can.  What tends to happen is you have a trend

21  going on.  It's going to be socially going up or going

22  down.  And then depending on the economic conditions

23  you get fluctuations in that month to month.  The

24  trend has been going down for a long time.

25      Q.    Okay.

1  they all stayed, I don't think the number would

2  change.  But clearly to the extent people are

3  classified as DACA, persons who are in the high school

4  at this point in time, their education is being

5  funded.  But it's not because they are in DACA, it's

6  because they are here.

7       Q.    And is being funded in part by the State of

8  Texas?

9       A.    Correct, yes.

10      Q.    And I jumped ahead of myself there.  I

11 meant to ask you about health care.

12      A.    Okay.

13      Q.    But same question as a lead-in, you don't

14 dispute that the State of Texas does indeed incur a

15 cost to provide health care to DACA recipients?

16           MR. HERRERA:  Objection, asked and

17 answered.

18      A.    Again, the only clarification I would give

19 is, again, for the undocumented population, since they

20 use it, a little bit less for the DACA based

21 population, but nonetheless I assume there would be

22 some people in the DACA population who are likely to

23 have some type of care that is reimbursed in some way

24 by the state.

25      Q.    And those types of care would be things

Ray Perryman

June 27, 2018
Page 97

1        MR. HERRERA:  Objection, calls for
2   speculation.
3        A.    Again, there is no way to know with
4   certainty.  That would not be a shocking thing to have
5   happen, that you occasionally had something like that
6   occur.
7        Q.    Do you think it's likely to happen?
8        MR. HERRERA:  Objection, calls for
9   speculation.
10       A.    Again, I'm not sure how else I can answer
11  it.  It's certainly a theoretical possibility that it
12  could occur.
13       Q.    Do you know from 2012 to present whether an
14  employer has hired a DACA recipient for a job that a
15  U.S. citizen also applied for?
16       A.    I don't know one way or the other.  It very
17  well could have happened, but I don't know.
18       Q.    And going forward into the future, do you
19  know whether it is likely to happen again that an
20  employer will hire a DACA recipient to fill a job that
21  a U.S. citizen has also applied for?
22       MR. HERRERA:  Objection, calls for
23  speculation and mischaracterizes the witness's
24  testimony.
25       A.    Again, I have no way of knowing that.  It's

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3
     STATE OF TEXAS,                    )
 4        Plaintiffs,                   ) Case No.
          vs.                           ) 1:18-cv-00068
 5   UNITED STATES OF AMERICA, et al., )
          Defendants,                   )
 6            and                       )
     KARLA PEREZ, et al.,               )
 7            Defendant-Intervenors. )

 8                 REPORTER'S CERTIFICATION
                  DEPOSITION OF RAY PERRYMAN
 9                     June 27, 2018

10              I, Deborah Endler, Shorthand Reporter in and

11   for the State of Texas, do hereby certify that the

12   foregoing deposition is a full, true and correct

13   transcript:

14              That the foregoing deposition of RAY

15   PERRYMAN, the Witness, hereinbefore named was at the

16   time named, taken by me in stenograph on June 27,

17   2018, the said Witness having been by me first duly

18   cautioned and sworn to tell the truth, the whole truth

19   and nothing but the truth and the same were thereafter

20   reduced to typewriting by me or under my direction.

21              ( ) That by agreement of counsel, a reading

22   condensed copy of the deposition transcript along with

23   the full-sized original Changes and Signature Sheet

24   has been sent to _____ on

25   _____ for review and signature within 30 days
```

1   and if any corrections returned are attached hereto.

2            ( ) That the Witness shall have thirty (30)

3   days for review and signature of the original

4   transcript and if any corrections returned are

5   attached hereto.

6            ( ) That the signed transcript ( ) was ( )

7   was not received from the Witness within 30 days.

8            That the amount of time used by each party at

9   the deposition is as follows:

10            Mr. Disher - 2 hours, 44 minutes

11            That before the completion of the deposition,

12   the Deponent, andor the Plaintiff/Defendant _____ did

13   _____ did not request to review the transcript.

14            I further certify that I am neither counsel

15   for, related to, nor employed by any of the parties or

16   attorneys in this action in which this proceeding was

17   taken, and further that I am not financially or

18   otherwise interested in the outcome of the action.

19            WITNESS MY HAND, this the 28th day of June,

20   2018.

21   _____

22            DEBORAH L. ENDLER, Reporter
             EXPIRATION DATE:
23            Firm Registration No. 631
             Kim Tindall & Associates, LLC
24            16414 San Pedro, Suite 900
             San Antonio, Texas 78232
25            Phone 210-697-3400

# Exhibit 26

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:18-CV-68 |
| ) | |
| UNITED STATES OF AMERICA, *et al.*, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| KARLA PEREZ, *et al.*, ) | |
| ) | |
| Defendant-Intervenors, ) | |
| and ) | |
| ) | |
| STATE OF NEW JERSEY, ) | |
| ) | |
| Proposed Defendant-Intervenor. ) | |

## DECLARATION OF TOM K. WONG

I, Tom K. Wong, declare as follows:

1.  My name is Tom K. Wong and I am over eighteen years of age. I have personal knowledge of and could testify in Court concerning the following statements of fact.

2.  I am an Associate Professor with tenure at the University of California, San Diego (UCSD). I work in the political science department, which is consistently ranked by U.S. News & World Report as one of the top ten political science departments nationally. I am also the Director of the International Migration Studies Program Minor at UCSD.

3.  I am an expert on immigration politics and policy, which includes the Deferred Action for Childhood Arrivals (DACA) policy. I have written two peer-reviewed

books and several peer-reviewed journal articles, book chapters, and reports on these subjects. My most recent research on DACA is a national survey of 3,063 DACA recipients conducted in August 2017 (henceforth referred to as the "2017 DACA survey"). The 2017 DACA survey is in addition to two peer-reviewed journal articles on DACA (*International Migration Review* and *Journal on Migration and Human Security*), another forthcoming peer-reviewed journal article on DACA (*Social Problems*), one book-length monograph (supported by a grant from the U.S. Department of Homeland Security [DHS]), and three other reports based on national surveys that I have conducted of DACA recipients.

4.  I received a Ph.D. in political science at the end of the 2010-2011 academic year. I was a post-doctoral research fellow during the 2011-2012 academic year. I joined the political science department at UCSD during the 2012-2013 academic year. I served as an advisor to the White House Initiative on Asian Americans and Pacific Islanders (WHIAAPI), where I worked on the immigration portfolio, during the 2015-2016 academic year.

5.  I previously testified as an expert witness in the case, *City of El Cenizo, et. al. v. State of Texas, et. al.*

6.  I am not being compensated by the State of New Jersey.

7.  I have attached a true and complete copy of my curriculum vitae as Exhibit A to this Declaration. I have also attached a true and complete copy of the 2017 DACA survey as Exhibit B to this Declaration.

**DACA**

2

8.  Since it was first announced on June 15, 2012, the Deferred Action for Childhood Arrivals policy has provided temporary relief from deportation and work authorization to 793,026 people.[1] As of September 4, 2017, there are 689,900 active DACA recipients.[2]

**2017 National Survey of DACA Recipients**

9.  From August 1, 2017 to August 20, 2017, I conducted a national online survey of DACA recipients. The resulting survey is the largest study to date of DACA recipients with a sample size of 3,063 respondents in forty-six states plus the District of Colombia.

10. Methodologically, several steps were taken to account for the known sources of bias that can result from online panels. To prevent ballot stuffing, meaning one person submitting multiple responses, incentives were not given for each completed survey that was submitted. Moreover, the online survey platform used (Qualtrics) was programmed to prevent one IP address from submitting multiple responses. To prevent spoiled ballots, meaning people who responded to the survey who were not undocumented, I used a unique validation test for undocumented status. Multiple questions were asked about each respondent's migratory history. These questions were asked during different parts of the

---

[1] Based on the most recent publicly available data from U.S. Citizenship and Immigration Services (USCIS) at the time of this writing, which is up to June 30, 2017. USCIS provides quarterly reports on DACA. *See* https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20 Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf.

[2] The lesser 689,900 figure represents the total number of individuals who, as of September 4, 2017, were "active DACA recipients." For example, those who received DACA may have adjusted to lawful permanent resident (LPR) status. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20 Data/All%20Form%20Types/DACA/daca_population_data.pdf.

survey. When a question was repeated, it was posed using different wording. For example, "How old were you when you first came to the U.S.?" and, "In what year did you first come to the U.S.?" (current age was used to tether these answers). If there was agreement in the answers, meaning there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting sample. If there were inconsistencies, the respondent was excluded. Also, Facebook ads were used to improve the geographic representativeness of the resulting sample, as well as to recruit respondents who were outside of the networks of the organizations that conducted outreach for the survey. Because there is no directory of undocumented immigrants from which to randomly sample from, researchers need to partner with organizations that interact with undocumented immigrants to conduct such surveys. The outreach partners were United We Dream (UWD), the National Immigration Law Center (NILC), and the Center for American Progress (CAP). These partners distributed the survey link to their respective email lists. Given the nature of online opt-in surveys, it is not possible to construct a valid margin of error. Nevertheless, the survey is methodologically rigorous and sound. Indeed, a peer-reviewed academic journal on DACA based on survey results obtained using the methods described above is forthcoming in a top sociology journal.

11.    Evaluating the representativeness of the survey sample requires current and complete data on the characteristics of DACA recipients. The only publicly available data provided by U.S. Citizenship and Immigration Services (USCIS) in its quarterly DACA statistics that are both current and complete is the geographic

4

**App. 501**

breakdown of DACA recipients at the state level.[3] Using these data, a two-sample Kolmogorov-Smirnov (K-S) test of equality of distributions can be run to evaluate how well the survey sample matches the actual distribution of DACA recipients by state. The results of the K-S test of equality of distributions shows that the state-by-state breakdown of the survey sample is representative of the state-by-state breakdown of all DACA recipients ($p = .570$).[4]

## Characteristics of DACA Recipients

12. The average age of respondents is 25.2.[5] The average age that respondents first

---

[3] USCIS also provides publicly available data on the country of birth of DACA recipients, but these data are incomplete, as only the top twenty-five countries of birth are listed (and one of these is labeled "Unknown"). USCIS has analyzed the demographic characteristics of DACA recipients, but this initial analysis was based on data from August 2012 to September 2013. *See* https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Deferred%20Action%20for%20Childhood%20Arriv als/USCIS-DACA-Characteristics-Data-2014-7-10.pdf. More recently, USCIS published an updated analysis (September 2017). A Kolmogorov-Smirnov (K-S) test of equality of distributions shows that the state-by-state breakdown of the survey sample is representative of the state-by-state breakdown of all "active DACA recipients" ($p = .557$) that USCIS analyzed. The null hypothesis for the K-S test is that the two distributions are statistically the same. A $p$ value of .557 means that we are not confident that we can reject the null hypothesis. In other words, this result means we are only 44% confident (1 minus .557) that we can reject the null hypothesis (and thus say that the two distributions are different). By convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result. Moreover, the September 2017 USCIS report indicates that the average age of active DACA recipients is 23.8. The average age of the survey sample is similar at 25.2. The most recent USCIS data do not provide detailed cross-tabulations sufficient for weighting purposes.

[4] That is, there is no evidence to suggest that the distribution of survey respondents by state and the actual number of DACA recipients by state is statistically significantly different. Moreover, analyzing and comparing the unweighted and weighted results show that the findings are substantively similar throughout. As previously noted, the null hypothesis for the K-S test is that the two distributions are statistically the same. A $p$ value of .570 means that we are not confident that we can reject the null hypothesis. In other words, this result means we are only 43% confident (1 minus .570) that we can reject the null hypothesis (and thus say that the two distributions are different). By convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result.

[5] As previously noted, a September 2017 USCIS report shows that the average age of "active DACA recipients" is 23.8. The average age of the survey sample is thus similar to the average age of active DACA recipients as reported by USCIS.

arrived in the U.S. is 6.5.[6] The average number of years that respondents have lived in the U.S. is 18.8.[7] Regarding race and ethnicity, 93% of respondents identify as Hispanic/Latino, 4% identify as Asian or Pacific Islander, 2% identify as White, and 1% identify as Black.[8] Also, 10% of respondents personally identify as lesbian, gay, bisexual, or transgender (LGBT).

## DACA and Economic Integration

13. DACA has been critical in improving the economic integration of DACA recipients, which is evidenced by their employment rates, their employment in "white collar," higher-skilled jobs, greater job mobility, higher wages, more financial independence, and increased consumer purchasing power, among other indicators.

14. Regarding employment, the data show that 91% of DACA recipients are currently employed. Among those 25 years and older, this percentage climbs to 93%. Moreover, the data show that at least 72% of the top twenty-five Fortune 500 companies employ DACA recipients.

15. DACA recipients are most likely to work in *Office and Administrative Support Occupations* followed by *Sales and Related Occupations* and then *Management, Business, Science, and Arts Occupations*. U.S. Census occupation categories are

---

[6] In other words, on average, DACA recipients first entered the U.S. during kindergarten or first grade.

[7] Moreover, 38.5% of respondents have lived in the U.S. for 20 years or more.

[8] USCIS does not report race and ethnicity in its quarterly DACA statistics. However, the large majority of the "Top Countries of Origin" listed in the USCIS quarterly reports are Latin American countries.

6

**App. 503**

used to distinguish between types of occupations.[9] Table 1 lists the top ten

occupation categories for DACA recipients.

Table 1

|  |  | DACA |
|---|---|---|
| Office and Administrative Support Occupations | ..................................... | 16.5% |
| Sales and Related Occupations | ..................................... | 11.6% |
| Management, Business, Science, and Arts Occupations | ..................................... | 10.8% |
| Education, Training, and Library Occupations | ..................................... | 9.6% |
| Food Preparation and Serving Occupations | ..................................... | 6.8% |
| Healthcare Support Occupations | ..................................... | 6.4% |
| Healthcare Practitioners and Technical Occupations | ..................................... | 4.6% |
| Community and Social Services Occupations | ..................................... | 4.3% |
| Financial Specialists | ..................................... | 3.4% |
| Legal Occupations | ..................................... | 3.0% |
| Computer and Mathematical Occupations | ..................................... | 3.0% |
| Other | ..................................... | 19.9% |

16.    Table 2 below compares the occupations of DACA recipients to native-born

workers between the ages of sixteen and thirty-five. As the table shows, DACA

recipients are more likely to work in "white-collar" higher-skilled occupations

such as *Management, Business, Science, and Arts Occupations*, *Healthcare

Support Occupations*, and *Legal Occupations*, and they are less likely to work in

"blue-collar" lesser-skilled occupations such as *Building and Grounds Cleaning

and Maintenance Occupations*, *Construction and Extraction Occupations*, and

*Food Preparation and Serving Occupations.*

---

[9] For detailed occupation listing, see https://usa.ipums.org/usa/volii/c2ssoccup.shtml.

Table 2

|  | DACA | Native Born | Diff |
|---|---|---|---|
| Management, Business, Science, and Arts Occupations | 10.8% | 6.4% | +4.4% |
| Education, Training, and Library Occupations | 9.6% | 5.9% | +3.7% |
| Healthcare Support Occupations | 6.4% | 3.1% | +3.3% |
| Community and Social Services Occupations | 4.3% | 1.5% | +2.7% |
| Office and Administrative Support Occupations | 16.5% | 13.9% | +2.6% |
| Legal Occupations | 3.0% | 0.9% | +2.2% |
| Financial Specialists | 3.4% | 1.9% | +1.5% |
| Computer and Mathematical Occupations | 3.0% | 2.3% | +0.8% |
| Architecture and Engineering Occupations | 2.1% | 1.5% | +0.6% |
| Business Operations Specialists | 2.8% | 2.3% | +0.4% |
| Life, Physical, and Social Science Occupations | 1.2% | 0.8% | +0.4% |
| Extraction Workers | 0.1% | 0.2% | -0.1% |
| Farming, Fishing, and Forestry Occupations | 0.1% | 0.6% | -0.5% |
| Healthcare Practitioners and Technical Occupations | 4.6% | 5.2% | -0.5% |
| Arts, Design, Entertainment, Sports, and Media | 1.5% | 2.2% | -0.7% |
| Military Specific Occupations | 0.0% | 0.8% | -0.8% |
| Building and Grounds Cleaning and Maintenance | 1.4% | 2.8% | -1.4% |
| Sales and Related Occupations | 11.6% | 13.0% | -1.4% |
| Protective Service Occupations | 0.8% | 2.6% | -1.7% |
| Construction and Extraction Occupations | 1.8% | 3.9% | -2.1% |
| Installation, Maintenance, and Repair Workers | 0.8% | 3.2% | -2.3% |
| Personal Care and Service Occupations | 2.0% | 4.4% | -2.4% |
| Production Occupations | 2.6% | 5.1% | -2.5% |
| Transportation and Material Moving Occupations | 2.7% | 5.7% | -3.0% |
| Food Preparation and Serving Occupations | 6.8% | 9.9% | -3.0% |

Note: percentages may not sum to 100 due to rounding. The column "DACA" refers to DACA recipients. "Native Born" refers to native-born workers who are (a) employed and are (b) between the ages of sixteen and thirty-five. These data come from the U.S. Census 2011-2015 American Community Survey (ACS) 5-year Public Use Microdata, which represents the most up-to-date 5-year file. "Diff" is the difference in the percentage between DACA recipients and comparable native-born workers.

17.  Moreover, after receiving DACA:

    a.  54% got their first job;

    b.  69% got a job with better pay;

    c.  54% got a job that better fits their education and training;

    d.  54% got a job that better fits their long-term career goals;

8

e.    57% got a job with health insurance or other benefits[10];

f.    56% got a job with improved work conditions; and

g.    5% started their own businesses.[11]

Table 3 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 3

|  |  |  | ≥ 25 |
|---|---|---|---|
| Got my first job | ....................................... | 54.2% | 35.3% |
| Got a job with better pay | ....................................... | 68.5% | 77.7% |
| Got a job that better fits my education and training | ....................................... | 54.2% | 59.6% |
| Got a job that better fits my long-term career goals | ....................................... | 53.9% | 61.4% |
| Got a job with health insurance or other benefits | ....................................... | 57.3% | 66.9% |
| Got a job with improved work conditions | ....................................... | 56.2% | 64.4% |
| Started my own business | ....................................... | 5.4% | 7.9% |

Note: percentages do not sum to 100 as individuals may select all that apply. $n = 1,662$ for all respondents 25 years and older.

18.    Regarding earnings, the data make clear that DACA is having a positive and significant effect on the wages of DACA recipients.

19.    The average hourly wage of DACA recipients has increased by 69% since receiving DACA. Among those 25 years and older, the average hourly wage has increased by 81% since receiving DACA. I have noted in previous research that more work (and time) may be needed to parse out the short- and long-run wage effects of DACA, as well as to answer the question of whether short-run gains in wages represent a plateau in earnings or if more robust long-run wage effects exist. This continues to be true. However, because of the continued upward trajectory in the observed wages of DACA recipients, it is likely that there is even

---

[10] 49.2% of respondents in my 2016 DACA survey reported that they obtained health insurance through their employer and 46.8% of respondents reported that they had "Received health care using [their] newly obtained health insurance."

[11] This rate of business starts is higher than the rate of business starts for the American public as a whole (3.1%).

9

more room for wage growth as DACA recipients move further along in their careers. These gains will disappear if these individuals lose their DACA status and the accompanying work authorization.

20. The data also show that average annual earnings among DACA recipients is $36,232. Among those 25 years and older, it is $41,621. A multivariate Ordinary Least Squares (OLS) regression regressing annual earnings on age shows that annual earnings increase by $1,583 for each year that a DACA recipient grows older ($p < .001$).[12] These gains will also disappear if these individuals lose their DACA status and the accompanying work authorization.

21. Higher wages have meant greater financial independence and consumer purchasing power for DACA recipients:

    a.    69% reported that after their DACA application was approved, "[they] have been able to earn more money, which has helped [them] become financially independent";

    b.    71% reported that after their DACA application was approved, "[they] have been able to earn more money, which has helped [their] family financially";

    c.    Among those who have a bachelor's degree or higher and are no longer in school, 27% reported paying off some or all of their student loans after their DACA application was approved;

---

[12] The model controls for number of years in the U.S., whether the DACA recipient is in school, whether the DACA recipient has a bachelor's degree or higher, and state-level fixed effects. The null hypothesis for age is that age has no effect on annual earnings. A $p$ value of less than .001 means that we are over 99.9% confident (1 minus < .001) that we can reject the null hypothesis that age has no effect on annual earnings and thus say that age is positively and statistically significantly related to annual earnings. To recall, by convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result.

10

**App. 507**

     d.     65% purchased their first car after their DACA application was approved; and

     e.     16% purchased their first home after their DACA application was approved.

Table 4 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 4

|  |  | ≥ 25 |
|---|---|---|
| I have been able to earn more money, which has helped me become financially independent | 69.0% | 73.4% |
| I have been able to earn more money, which has helped my family financially | 70.8% | 73.7% |
| Paid off some/all of my student loans | 27.1% | 27.4% |
| Bought my first car | 64.5% | 67.2% |
| Bought a home | 15.7% | 23.5% |

Note: percentages do not sum to 100 as individuals may select all that apply. $n$ = 1,662 for all respondents 25 years and older.

22.     Higher wages are indicative of the broader positive economic impact of DACA. For example, higher wages translate into more in Federal Insurance Contributions Act (FICA) contributions, which are mandatory payroll deductions for Social Security and Medicare. Using data on wages and earnings from the 2017 DACA survey, I estimate that DACA recipients will add $39.3 billion in Social Security and Medicare contributions (half in employee contributions and half in employer contributions) over a ten-year period.[13] These contributions will disappear if these individuals lose their DACA status and the accompanying work authorization.[14]

---

[13] This breaks down into $31.8 billion in Social Security contributions and $7.4 billion in Medicare contributions. For a detailed explanation of the methodology used to estimate Social Security and Medicare contributions, see https://www.ilrc.org/sites/default/files/resources/2017-09-29_draining_the_trust_funds_final.pdf.

[14] Higher wages also translate into more in federal income taxes paid and more in state income taxes paid. Large purchases, such as cars, add to state tax revenues, as most states collect a percentage of the car purchase in sales tax,

**App. 508**

23.     In the 2017 DACA survey, respondents were asked to describe "what you will
lose if DACA ends." One DACA recipient writes, "If I were to lose DACA the
first thing to go with it would be my job as a nurse. This would [...] make it
impossible for my family to afford to pay our mortgage. I would lose my home."
Another DACA recipient writes, "I will lose my job and the associated
health/retirement benefits I have been paying into. Right now my family depends
on the income that I make working [...] I'm also paying off a new car that I
bought last year. It would be difficult for me to continue paying for it if I'm not
able to work where I do now." Another DACA recipient writes, "I will lose my
job, which then would have a trickle effect [...] losing my vehicle for non-
payment, losing my home and being evicted, going into higher debt for not being
able to pay credit cards." Another DACA recipient writes, "I have spoken to my
supervisors about what would happen if DACA were to end and they informed
me that since they know I have DACA they would not be able to keep me on if I
did not have work authorization." A DACA recipient who owns a business writes,
"our restaurant would disappear." Another DACA recipient writes, "I would no
longer be able to work as an EMT." Another DACA recipient writes, "If DACA
ends [...] my students would be left without a teacher for the rest of the year."
Another DACA recipient writes, "I won't be able to accept [a] fulltime offer from
[an employer], which is contingent on my completing my MBA in 2018."
Another DACA recipient writes, "I will not be able to practice medicine when I

---

along with additional registration and title fees. Similarly, home buying further adds to state and local tax revenues
in the form of property taxes. There is a large literature on how home buying creates new jobs and adds new
spending in local economies. For job creation, see https://www.nar.realtor/topics/home-ownership-matters/jobs-
impact-of-an-existing-home-purchase. For spending in local economies, see
https://www.cnbc.com/2017/04/12/immigrant-households-impact-success-of-real-estate-market-says-report.html.

graduate from medical school." Another DACA recipient writes, "I have a degree in engineering, and I want to obtain my professional engineering license. If I do not have DACA, I would not be able to work, thus I would not be able to accumulate the necessary work experience to obtain my PE license." Another DACA recipient writes, "I will lose my career, the opportunity to get my CDL [Commercial Driver License], the opportunity to eventually become a citizen and join the army like I've always wanted since a child."

### DACA and Education

24.     DACA improves educational outcomes for DACA recipients.

25.     Regarding education, 45% of DACA recipients are currently in school.[15]

26.     Among those who are currently in school, 94% reported, "[they] pursued educational opportunities that [they] previously could not" because of DACA.

27.     Moreover, among those in school, 72% are pursuing a bachelor's degree or higher (an additional 19% are pursuing an associate's degree). The majors and specializations that DACA recipients are pursuing include accounting, biochemistry, business administration, chemical engineering, civil engineering, computer science, early childhood education, economics, environmental science, history, law, mathematics, mechanical engineering, neuroscience, physics, psychology, and social work, to name a few. These majors and specializations concretize how the education that DACA recipients are receiving is contributing

---

[15] The percentage of respondents who are currently in school has slowly declined over the four years that I have been surveying DACA recipients. This makes intuitive sense: as DACA recipients grow older, they are more likely to transition out of school and into their careers. Moreover, as the USCIS quarterly DACA statistics show, older DACA recipients are not being replaced at anywhere close to the rate in which younger DACA recipients have aged into eligibility.

to the development of a better prepared and more competitive college-educated workforce.

28.   Regarding educational attainment, 36% of respondents 25 years and older have a bachelor's degree or higher. This percentage is higher than the 30% of native-born persons 25 years and older who have a bachelor's degree or higher, but is similar to the 34% of foreign-born naturalized persons 25 years and older who have a bachelor's degree or higher.[16]

29.   In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "DACA has given me the opportunity to be someone in life. Ever since I was in elementary school, I was a good student. I liked school and I liked to learn […] Depression was really getting to me because I saw my friends pursuing their dreams, and I was not allowed to do the same. It did not matter how smart I was, how much of a hard worker I was, or how much passion I had; I was never going to be able to become who I wanted to be. DACA opened the door, it gave a lot of us hope. Thanks to DACA, I am now a woman who is pursuing an engineering degree." Another DACA recipient writes, "With DACA, I have worked as a researcher and am now starting the grad school application process for PhD programs. I have wanted to be a scientist since I was nine years old, staring out of my first telescope. DACA allows that dream to not be hindered. I still cannot apply for anything funded by the National Science Foundation or work for NASA, but hopefully my status will one day become permanent and those doors will become open to me as well." Another DACA

---

[16] These data come from the U.S. Census 2011-2015 American Community Survey (ACS) 5-year Public Use Microdata, which represents the most up-to-date 5-year file.

14

recipient writes, "Without DACA, I would lose the ability to continue working legally and will have to stop attending school since I will not be able to afford it. I will lose the opportunity to become a certified teacher […] and will not be able to fulfill my dreams of being an educator." Another DACA recipient writes, "I will be unable to continue my education in computer science." Another DACA recipient writes, "If DACA ends, I will lose the opportunity of pursuing the career I've been studying for my whole life. I will not be able to work anywhere, so my degree won't matter."

### DACA and Normality in Day-to-Day Life

30. The data further show that DACA has given DACA recipients a sense of normality in their day-to-day lives, which has led to a greater sense of belonging and inclusion and, in some cases, improved mental health.

31. In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "I will lose my feeling of belonging in the only country I have truly ever known." Another DACA recipient writes, "I would lose my sense of belonging. For the first time I feel safe without fear." Another DACA recipient writes, "Having DACA has changed my life completely, I feel like I have purpose again. I can go to school and work. I can strive now for a better life. Things are more manageable. Before DACA, I lost all hope of ever becoming anything or accomplishing anything. I've regained a lot of that hope and now I have a strong drive to succeed." Another DACA recipient writes, "DACA was a glimpse of what I could have if I had papers and it made me

love this country more." Another DACA recipient writes, "DACA has allowed me to feel a sense of hope and security within the nation I grew up in […] its existence provides me with the reassurance that someone cares, that someone is listening, and that we are not alone." Another DACA recipient writes, "I will lose feeling safe and protected." Another DACA recipient writes, "I will lose the independence and freedom I had to wait so many years to have." Another DACA recipient writes, "I will no longer be able to drive to school or work." Another DACA recipient writes, "I will lose a sense of safety. I remember feeling a lot of fear, anxiety, and uncertainty about my future before DACA was passed. I'm worried all of that will come flooding back. Aside from the practical things, like losing my license, my job, my independence, I really don't want to feel that way again. I have become more open with people since DACA, and I don't want to go back to having to worry about what I say and to who."

32.    Moreover, despite being brought to the U.S., on average, at the age of 6.5, and despite having lived in the U.S., on average, 18.8 years, it was only after receiving DACA that:

    a.    61% opened a bank account;

    b.    66% got their first credit card;

    c.    90% got a driver's license or state identification card for the first time; and

    d.    49% became organ donors.

Table 5 summarizes these results. The column "$\geq 25$" reports the results for respondents 25 years and older.

Table 5

16

**App. 513**

|  |  |  | ≥ 25 |
|---|---|---|---|
| Opened a bank account | ....................................... | 61.0% | 47.3% |
| Got my first credit card | ....................................... | 65.7% | 67.9% |
| Got my driver's license or state identification card for the first time | ....................................... | 90.3% | 88.3% |
| Became an organ donor | ....................................... | 48.7% | 49.8% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

### DACA Recipients and American Citizen Family Members

33.    The data also show that DACA recipients are deeply interwoven in families that include American citizen siblings, spouses, and children. Indeed, 73% of DACA recipients have either an American citizen sibling, spouse, or child:

    a.    59% reported having an American citizen sibling;

    b.    17% reported having an American citizen spouse; and

    c.    26% reported having an American citizen child.

Table 6 summarizes these results.

Table 6

| American citizen spouse | ....................................... | 16.6% |
|---|---|---|
| American citizen child | ....................................... | 25.7% |
| American citizen sibling | ....................................... | 58.9% |
| American citizen spouse, child, or sibling | ....................................... | 72.7% |

Note: percentages do not sum to 100 as individuals may select all that apply.

34.    In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "My daughter is a 4 year old U.S. citizen and everything I do is to give her a better life. I would lose the ability to safely go to school and work. I would constantly worry that my daughter would end up in foster care." Another DACA recipient writes, "I will lose my job and face possible deportation and being separated from my son who is only 3 and

17

**App. 514**

needs his mom." Another DACA recipient writes, "Sometimes I can't even sleep just thinking of what's going to happen with DACA […] I'm not only thinking about my future, but my son's." Another DACA recipient writes, "I just had my second child 2 weeks ago […] my plans are to go back to work by next year and I'm truly scared that by that time I won't be able to […] Now more than ever I need DACA to support my kids." Another DACA recipient writes, "a year into my new DACAmented life, my daughter was born and she has been such a blessing, but I am more afraid than ever about the consequences my status might have. If DACA ends, I lose the peace of mind that I will be here to raise her. I work 60+ hours a week at 2 jobs so I can provide for her and if DACA ends I will not be able to do so." Another DACA recipient writes, "we risk being homeless with a new-born child if DACA ends." Another DACA recipient writes, "My kids are U.S. citizens […] I will lose my job, I will lose the opportunity to give my kids a better life […] Please, I beg to continue to have DACA. It is not just about being legal, but is also about having a better life for my kids." Another DACA recipient writes, "we would struggle providing for our kids who are all citizens […] I hope this never happens because our family has so much riding on whether my next permit is approved or not." Another DACA recipient writes, "I have a 3 year old daughter who is heading to Head Start this year and I am currently pregnant. I would miss out on my kid's lives, as they would most likely stay in the U.S. with their dad." Another DACA recipient writes, "I would lose healthcare coverage for me and my son." Another DACA recipient writes, "having my driver's license taken away would be a devastating blow […] I take my sons to

18

school and childcare almost every day." Another DACA recipient writes, "without my driver's license I won't be able to drive to school or any of my son's doctor's appointments." Another DACA recipient writes, "How do you tell your 5 year old mommy can't bring food to the table because of a simple paper? How do you explain to your child that there will be no more sports because we can no longer drive?" Another DACA recipient writes, "I would lose my job first of all and if I lose my job I will lose my apartment. I will have to stay with family or other people and hopefully find a way to make some money in order to take care of my 3 year old. I will definitely end up in debt without a way to pay my bills and I will have to ask for public assistance to feed my son. It sounds extreme but that's what will happen if I cannot work because I have no parents left and no one is going to take care of me or my son." Another DACA recipient writes, "I am married now with a 10 month old daughter [...] if DACA ended I would be really scared to be split up from my daughter and husband and family. I have been here since I was 8 months old, this is my home, I don't know my place of birth." Another DACA recipient writes, "My U.S. citizen husband and U.S. citizen children would constantly be worrying about me because the likelihood of deportation would increase greatly." Another DACA recipient writes, "My wife and I have barely just begun our adult lives together. We have medical and student debt, monthly utility expenses, a mortgage, car payments, insurance payments and groceries to buy. We are just like any other young responsible adults trying to kick start their careers to gain financial stability and potentially start a family. Without my job I lose my ability to contribute to our monthly

19

**App. 516**

expenses. We would lose our financial stability and could lose everything which could ruin our lives before they even begin." Another DACA recipient writes, "If DACA ended […] it would put a stress on my marriage." Another DACA recipient writes, "I would lose my family […] my husband is a U.S. citizen […] my brother is also a citizen, and a U.S. Marine."

### Many May Go "Into the Shadows" Without DACA

35.    Many DACA recipients may go back into the shadows if these individuals lose their DACA status and the accompanying work authorization.

36.    In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "I really can't imagine living in the darkness again […] I have been a good member of society, I pay my taxes, and I have never gotten in trouble with the law." Another DACA recipient writes, "With DACA I was able to begin planning for a better future, if it's taken away I'll go back to trying to get by day to day." Another DACA recipient writes, "Losing DACA will be devastating because everything that I have built up to this point will be lost. I will lose my current employment, the health insurance provided by my employer, and driver's license for starters. Most importantly, I will return back to the shadows facing certain deportation considering the government already has all of my information." Another DACA recipient writes, "If DACA ends […] I lose everything. I can no longer work and my mental health will suffer. Currently my mental health is already suffering because of the constant fear about whether DACA will be taken away. This is the only place that

20

I call home and people want to take that away from me. It is a terrible feeling and I hate that I have to be in this position, but none of us chose it and we are trying to do our best to make a living and do things the right way." Another DACA recipient writes, "I would go back to the shadows that I once thought I would never go back to. I would live in fear." Another DACA recipient writes, "I will live in fear and hiding, again." Another DACA recipient writes, "what hurts most is losing my ability to live without fear. To be back in the shadows, to feel less than and incapable of doing anything about the circumstances, [to] feel betrayed by the government who promised to protect us if we came out of the shadows and followed the rules." Another DACA recipient writes, "losing DACA would make me lose faith in a government [that] asked us to come forth and identify ourselves in exchange for a taste of regular American life." Another DACA recipient writes, "Everything that I've been working so hard for will suddenly mean nothing. All the contributions I've given to this country will be ignored and unrecognized by the government."

37. Moreover, when given a scenario in which they no longer had DACA[17]:

    a.    53% reported that they would be less likely to report a crime they witnessed;

    b.    47% reported that they would be less likely to report a crime even if they were the victim;

    c.    48% reported that they would be less likely to go to the hospital if they suffered an injury; and

---

[17] The question was worded, "If you no longer had DACA, would you be more or less likely to do the following . . . ."

21

**App. 518**

     d.     60% reported that they would be less likely to report wage theft by their employer.

38.    Moreover, many DACA recipients fear what the government will do with their personal information.

39.    Among respondents who were eligible to renew, but had not yet submitted a renewal application[18]:

     a.     18% reported that fear of providing updated information to the government was a prohibitive factor[19]; and

     b.     26% reported that fear that the government will use the information provided in the renewal application for immigration enforcement purposes was a prohibitive factor.

40.    Among respondents who were not yet eligible to renew,[20] 28% agreed or strongly agreed with the statement, "I'm less likely to apply to renew my DACA status when I become eligible to do so because I fear that the government will use my information for immigration enforcement purposes."

41.    The prospect of going back into the shadows and fear about what the government will do with their personal information likely exacerbates the concerns that DACA recipients had when they first applied for DACA.

42.    In my 2014 DACA survey, the concerns that DACA recipients had when they first applied included:

---

[18] This represents 11.2% of respondents.

[19] In my 2016 DACA survey, just 2% of respondents who were eligible to renew, but had not yet submitted a renewal application, reported that fear of providing updated information to the government was a prohibitive factor.

[20] This represents 46.9% of respondents.

a.    79% reported being concerned about what would happen if DACA ended;

b.    59% reported being concerned about letting the government know they were undocumented;

c.    49% reported being concerned about revealing their personal information;

d.    59% reported being concerned about revealing information about their family;

e.    59% reported being concerned "that the information [they] revealed in [their] application would be used to put [them] or [their] family in detention and/or deportation proceedings"; and

f.    32% reported hearing that "the government was not going to use the information in the DACA application for enforcement purposes (e.g., detention or deportation)."

**DACA Recipients by State**

43.    Below are examples of state-specific profiles of DACA recipients. Data from the survey, combined with data published by USCIS that identifies the number of DACA recipients by state, are used to construct these profiles.[21]

**DACA Recipients in the State of New Jersey**

44.    As of September 4, 2017, there were 17,400 active DACA recipients in the State

---

[21] State-specific profiles are constructed using data published by USCIS on the total number of individuals with DACA as of September 4, 2017. *See* https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

of New Jersey.[22]

45.     The Migration Policy Institute estimates that there are 53,000 DACA-eligible persons who live in the State of New Jersey.[23]

46.     Regarding employment and earnings:

   a.     An estimated 15,904 DACA recipients in the State of New Jersey are currently employed[24];

   b.     An estimated 940 DACA recipients in the State of New Jersey are business owners[25]; and

   c.     The State of New Jersey's DACA recipients earn an estimated $576.2 million annually.[26]

47.     Regarding education:

   a.     An estimated 7,813 DACA recipients in the State of New Jersey are currently in school[27];

   b.     Among those currently in school, an estimated 7,313 have "pursued educational opportunities that [they] previously could not" because of DACA[28]; and

---

[22]

https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

[23] https://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles.

[24] 91.4% of 17,400.

[25] 5.4% of 17,400.

[26] 15,904 multiplied by $36,231.91. This translates into $35.7 million annually in Social Security contributions (6.2% per FICA) and $8.4 million annually in Medicare contributions (1.45% per FICA).

[27] 44.9% of 17,400.

[28] 93.6 % of 7,813.

      c.     An estimated 5,586 DACA recipients in the State of New Jersey are currently pursuing a bachelor's degree or higher.[29]

48.    Regarding American citizen family members:

      a.     An estimated 12,650 DACA recipients in the State of New Jersey have an American citizen sibling, spouse, or child.[30]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 16 day of May, 2018, in San Diego, CA

Dr. Tom K. Wong

---

[29] 71.5% of 7,813.

[30] 72.7% of 17,400.

25

**App. 522**

# Exhibit 27

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| **UNITED STATES OF AMERICA**, et al., | ) | |
| | ) | |
| Defendants | ) | |

## DECLARATION OF MONICA SMOOT

My name is Monica Smoot, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1. I am the Chief Data and Analytics Officer of the Texas Health and Human Services Commission's Center for Analytics and Decision Support (CADS). The Texas Health and Human Services Commission (HHSC) is the state agency responsible for ensuring the appropriate delivery of health and human services in Texas. As such, HHSC has operational responsibility for

**App. 524**

certain health and human services programs and oversight authority over the state health and human services (HHS) agencies.

2. As a part of my employment with HHSC, I am responsible for analytic and quantitative research on health care utilization, demographic trends, and enrollment patterns for the state's health care and human service programs, including Medicaid. I am also responsible for program evaluation activities and analytic support across all of the HHS agencies and programs.

3. I have served in my current position since January 1, 2017. Prior to that, I served as the manager for the Data Dissemination Unit within CADS.

4. In 2007, as part of the 2008-2009 General Appropriations Act, the Texas Legislature required HHSC to report the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. This report, also known as the Rider 59 Report, was first completed by HHSC in 2008. Due to numerous requests for more recent information following the issuance of the 2008 report, the Rider 59 Report was updated in 2010, 2013, 2014 and 2017. The Rider 59 Report completed in 2017 covered state fiscal year (SFY) 2015.

5. Attached to this declaration are true and current copies of the following documents:

- <u>Exhibit 1</u>: SFY07 Report on Services and Benefits Provided to Undocumented Immigrants, the original version of the Rider 59 Report prepared by HHSC in 2008.

- <u>Exhibit 2</u>: SFY09 Report on Services and Benefits Provided to Undocumented Immigrants, the 2010 update of the Rider 59 Report.

- <u>Exhibit 3</u>: SFY11 Report on Services and Benefits Provided to Undocumented Immigrants, the 2013 update of the Rider 59 Report.

- **Exhibit 4**: SFY13 Report on Services and Benefits Provided to Undocumented Immigrants, the 2014 update of the Rider 59 Report.

- **Exhibit 5**: SFY15 Report on Services and Benefits Provided to Undocumented Immigrants, the 2017 update of the Rider 59 Report.

6. Each of the records attached to this declaration is kept by HHSC in the course of its regularly conducted activity, and it was HHSC's regular practice for an employee or representative of HHSC, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time of the act, event, condition, opinion, or diagnosis.

7. HHSC provides three principal categories of services and benefits to undocumented immigrants in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage. Undocumented immigrants also receive uncompensated medical care from public hospitals in the State.

8. Emergency Medicaid is a federally required program jointly funded by the federal government and the states. The program provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, to undocumented immigrants living in the United States. Because HHSC Medicaid claims data do not conclusively identify an individual's residency status, the portion of Emergency Medicaid payments attributable to undocumented immigrants must be estimated. The total estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was approximately $80 million in SFY 2007, $62 million in SFY 2009, $71 million in SFY 2011, and $90 million in SFY 2013; the estimate for SFY 2015 is $73 million.

**App. 526**

9.  The Family Violence Program contracts with non-profit agencies across the State to provide essential services to family violence victims, including undocumented immigrants, in three categories: shelter centers, non-residential centers, and Special Nonresidential Projects. Because the FVP does not ask individuals about their residency status, the portion of the FVP's expenditures attributable to undocumented immigrants must be estimated. The total estimated cost to the State for the provision of direct FVP services to undocumented immigrants residing in Texas was $1.2 million in SFY 2007, $1.3 million in SFY 2009, $1.3 million in SFY 2011, and $1.4 million in SFY 2013; the estimate for SFY 2015 is $1.0 million.

10.  Texas CHIP Perinatal Coverage provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. There is no way to definitively report the number of undocumented immigrants served by CHIP Perinatal Coverage because the program does not require citizenship documentation. CHIP Perinatal Coverage expenditures were not included in HHSC's original Rider 59 Report because a full year of program data was not available when the report was prepared. The total estimated cost to the State for CHIP Perinatal Coverage to undocumented immigrants residing in Texas was $33 million in SFY 2009, $35 million in SFY 2011, and $38 million in SFY 2013; the estimate for SFY 2015 is $30 million.

11.  In the 2008 and 2010 versions of the Rider 59 Report, HHSC also provided estimates of the amount of uncompensated medical care provided by state public hospital district facilities to undocumented immigrants. In these reports, HHSC estimated that the State's public hospital district facilities incurred approximately $596.8 million in uncompensated care for undocumented immigrants in SFY 2006 and $716.8 million in SFY 2008. HHSC has not provided any estimates of uncompensated care for

undocumented immigrants in more recent versions of the Rider 59 Report.

12. Based on my knowledge, expertise, and research regarding the provision of services and benefits to undocumented immigrants by HHSC, I believe that the total costs to the State of providing such services and benefits to undocumented immigrants will continue to reflect trends to the extent that the number of undocumented immigrants residing in Texas increases or decreases each year.

13. All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of April, 2018.


MONICA SMOOT

# REPORT TO THE UNITED STATES CONGRESS ON SERVICES AND BENEFITS PROVIDED TO UNDOCUMENTED IMMIGRANTS

*Required Reporting for*

Rider 59
House Bill Number 1
Eightieth Texas Legislature, Regular Session



EPIDEMIOLOGY TEAM
*Strategic Decision Support*
Financial Services Division

## TEXAS HEALTH AND HUMAN SERVICES COMMISSION

*— November 2008 —*

**App. 529**

# Table of Contents

I     Background.................................................................... 3

II    Executive Data Summary ................................................ 4

III   Analytical Notes .......................................................... 5

IV   Public Hospital District Facility Listing ................................ 8

V    References ................................................................. 13

*Required reporting for Rider 59, House Bill Number 1, Eightieth Texas Legislature, Regular Session — Texas Health and Human Services Commission*

- 2 -

**App. 530**

## I — Background

In 2007, the Eightieth Texas Legislature, Regular Session, passed House Bill Number 1, General Appropriations Act, Article II, Health and Human Services, Rider 59: "Report to the United States Congress on Services and Benefits Provided to Undocumented Immigrants."

This Rider requires the Texas Health and Human Services Commission (HHSC) to report the cost of services and benefits provided by HHSC to undocumented immigrants in the state. Rider 59 also requires HHSC to compile these data for each Texas public hospital district facility. The text of Rider 59 is included below, with the required data and supporting documentation on subsequent pages.

### Rider 59 — Report to the United States Congress on Services and Benefits Provided to Undocumented Immigrants

*The Health and Human Services Commission shall compile a report of the cost of services and benefits provided to undocumented immigrants, with the agency determining the extent to which undocumented immigrants are served by the agency, by individual program. The agency may use a statistical method developed by the agency in cases where it is not practical for the agency to directly determine whether recipients of a service or benefit are undocumented immigrants.*

*The Health and Human Services Commission shall also compile information on this subject from each public hospital district within the state and include this information in the report and shall not enforce Title 8 of the United States Code when compiling information on this subject.*

*The report must be produced using aggregated statistical data that does not contain personally identifiable information. The purpose of compiling this information is to perform analysis to assist the United States Congress and this state in making future health care and budgetary decisions. Information sought for the preparation of this report may not violate any federal or state laws, including rules, regarding privacy.*

*This report shall be provided to the United States Congress by December 1, 2008 and may be used as supporting materials by the State of Texas in requests for additional federal appropriations to assist with these costs.*

*The Health and Human Services Commission or a public hospital district may compile and report the information required by this rider only in a manner the attorney general of this state certifies as consistent with federal law.*

*The Health and Human Services Commission again shall submit the required report to the Lieutenant Governor, Speaker of the House of Representatives, and Members of the Legislature by December 1, 2008, and shall include the information in the agency's annual report for 2008.*

**App. 531**

## II — Executive Data Summary

A.   **TEXAS HEALTH AND HUMAN SERVICES COMMISSION**

*Estimated cost of services and benefits provided to undocumented immigrants* (SFY 2007 ♦)

### $81.2 million

Texas Emergency Medicaid *($80 million)* + Texas Family Violence Program *($1.2 million)*

(please see *Analytical Notes* on page 5 for subtotals and supporting documentation)

B.   **TEXAS PUBLIC HOSPITAL DISTRICTS**

*Estimated uncompensated care for undocumented immigrants* (FY 2006 ♦)

### $596.8 million

(please see *Analytical Notes* on page 7 for subtotals and supporting documentation)

---

♦ *Texas Health and Human Services Commission data are for state fiscal year 2007, the most recent data available. The Texas Public Hospital Districts data come from the Cooperative Annual Survey of Hospitals, which collects data for each facility's fiscal year. At the time of this report's publication, the most recent survey data available was for fiscal year 2006.*

*Required reporting for Rider 59, House Bill Number 1, Eightieth Texas Legislature, Regular Session — Texas Health and Human Services Commission*   - 4 -

**App. 532**

## III — Analytical Notes

A. **TEXAS HEALTH AND HUMAN SERVICES COMMISSION**
*Estimated cost of services and benefits provided to undocumented immigrants (SFY 2007)*

### $81.2 million

Texas Emergency Medicaid *($80 million)* + Texas Family Violence Program *($1.2 million)*

1. **Texas Emergency Medicaid**

Emergency Medicaid, Type Program 30 (TP 30), is a federal and state funded program that provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, for non citizens as well as undocumented immigrants living in the US. In SFY 2007, payments for Emergency Medicaid, TP 30 totaled as follows:

A — Texas Emergency Medicaid, Type Program 30, SFY 2007

| | |
|---|---:|
| *Inpatient hospital* | $252,300,000 |
| *Outpatient hospital* | $11,200,000 |
| *Professional and other services* | $53,700,000 |
| *Vendor drug* | $124,500 |
| Total | $317,324,500 |

Since HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of the $317.3 million in Emergency Medicaid payments attributable to undocumented immigrants must be estimated. According to the U.S. Census Bureau's *American Community Survey* (ACS) for Texas, approximately 2.6 million non citizens resided in Texas in 2006. The Department of Homeland Security reports that 1.64 million, or 63% of these residents, were undocumented. Therefore, this brings the estimated amount paid for Emergency Medicaid services to undocumented immigrants residing in Texas to about $200 million:

B — Texas Emergency Medicaid  *($317.3 million)* x
Estimated Percent of Non Citizens who are Undocumented Immigrants *(63%)*
= $200 million

The state shares the cost of the Medicaid program with the federal government, with Texas paying about 40% of Emergency Medicaid expenditures. Therefore, in SFY 2007 the total estimated state cost for Medicaid services to undocumented immigrants was about $80 million.

C — Estimated Texas Emergency Medicaid for Undocumented Immigrants
Residing in Texas *($200 million)* x Texas Share of Medicaid Cost *(40%)*
= $80 million

*Required reporting for Rider 59, House Bill Number 1, Eightieth Texas Legislature, Regular Session — Texas Health and Human Services Commission*     - 5 -

**App. 533**

IV — Analytical Notes, *continued*

---

2.   **Texas Family Violence Program**

The Texas Family Violence Program (FVP) contracts with shelters and non-residential centers across the state to provide essential services to victims of family violence. Core FVP services include shelter, 24 hour hotlines, emergency medical services, counseling, etc. In SFY 2007, FVP funded 72 nonprofit family violence shelters, 8 non-residential centers, and 19 special non-residential projects, with a total budget of $23,199,451. State general revenue accounted for nearly $16.8 million ($16,759,995) of the program's total spending for direct services.

FVP does not ask victims of family violence about their residency status. Therefore, the portion of the $16.8 million in FVP expenditures attributable to undocumented immigrants must be estimated. According to the U.S. Census Bureau's *American Community Survey* (ACS) for Texas, approximately 23.5 million individuals resided in Texas in 2006. The Department of Homeland Security reports that 1.64 million or 7% of these residents were undocumented. The total estimated state cost for direct FVP services to undocumented immigrants in SFY 2007 was:

Texas Family Violence Program budget  *($16.8 million)* **x**
Estimated Number of Undocumented Texas Residents *(7%)*
= $1.2 million

B.   **TEXAS PUBLIC HOSPITAL DISTRICTS**
*Estimated uncompensated care for undocumented immigrants (FY 2006,* 94 facilities*)*

$596.8 million

Limited information exists to estimate hospital-specific uncompensated care for undocumented immigrants. As such, the method adopted for this report relies on regional estimates of undocumented immigrants' share of hospital uncompensated care, applying those estimates to each hospital in the region.

The regional estimates are derived from a variety of sources. First, the software company Network Sciences created a web-based eligibility screening tool called the "Community Health and Social Services Information System" (CHASSIS™). The Indigent Care Collaboration (ICC), an alliance of safety net providers in three Central Texas counties (Travis, Williamson and Hays), employed CHASSIS™ to screen uninsured/under-insured patients for eligibility in government and local medical assistance or payment programs. This system also tracked the percent of uninsured undocumented immigrants served in these counties, and in 2005 found that nearly 14% of all patients screened in hospital settings were undocumented immigrants. (*Texas Comptroller of Public Accounts*, 2006). This figure was used as a foundation for estimating uncompensated care for undocumented immigrants in the remaining parts of Texas.

---

*Required reporting for Rider 59, House Bill Number 1, Eightieth Texas Legislature, Regular Session — Texas Health and Human Services Commission*     - 6 -

**App. 534**

IV — Analytical Notes, *continued*

---

This 14% figure was then adjusted for each Public Health Region (PHR) based on information from two additional sources. The first source — the 2006 American Hospital Association/Texas Department of State Health Services/Texas Hospital Association (AHA/TDSHS/THA) *Cooperative Annual Survey of Hospitals* — is required by state law. It is submitted annually by every Texas hospital, and lists each facility's reported uncompensated care (bad debt expenses + charity care charges). The second source — claims data from the state's Emergency Medicaid, TP 30 — is available for every hospital stay for non citizens paid for by the state's Medicaid program. In emergency cases, including childbirth and labor, the federal government allows Medicaid via this program to pay for services rendered to persons who would otherwise qualify for Medicaid regardless of their immigration status.

Based on the regional distribution of uncompensated care and Emergency Medicaid expenditures, the Central Texas region's share of the state's uncompensated care appeared to be about 40% higher than its share of Emergency Medicaid. Therefore, we estimate that approximately 20% of uncompensated care statewide is accounted for by undocumented immigrants, compared to 14% in the Central Texas region reported in the aforementioned ICC study. In order to account for this difference statewide, the following formula was applied to each specific region:

Estimated Statewide Uncompensated Care Attributable To Undocumented Immigrants *(20%)* x
(Public Health Region's Share of State Emergency Medicaid Expenditures /
Public Health Region's Share of State Uncompensated Care) =

**Estimated Percent of Uncompensated Care Attributed To
Undocumented Immigrants in a Public Health Region**

As expected, results varied widely by a region's demographic composition and proximity to the border, with the highest rate found in the Rio Grande Valley and the lowest rate in North Texas. The method produced approximately the same rate statewide as for the state's two largest population centers, Houston and Dallas/Fort Worth.

These region-specific values were then applied to the reported uncompensated care for each public hospital district facility to produce estimates of the uncompensated care for undocumented immigrants. These facility totals were then added to generate the state total. Please see the facility-specific listing below for more information.

---

*Required reporting for Rider 59, House Bill Number 1, Eightieth Texas Legislature, Regular Session — Texas Health and Human Services Commission*     - 7 -

**App. 535**

# IV — Public Hospital District Facility Listing

| Public Hospital District Facility † | City | County | Public Health Region (PHR) | Total Facility Uncompensated Care * (A) | Estimated Percent of Uncompensated Care Attributable to Undocumented Immigrants in a PHR ‡ (B) | Estimated Uncompensated Care for Undocumented Immigrants (A * B) |
|---|---|---|---|---|---|---|
| Permian Regional Medical Center | Andrews | ANDREWS | 9 | $1,426,975 | 5.79 | $82,622 |
| Bellville General Hospital | Bellville | AUSTIN | 6 | $1,888,004 | 21.20 | $400,257 |
| Muleshoe Area Medical Center | Muleshoe | BAILEY | 1 | $891,982 | 6.13 | $54,678 |
| Seymour Hospital | Seymour | BAYLOR | 2 | $1,314,921 | 2.35 | $30,901 |
| University Hospital | San Antonio | BEXAR | 8 | $329,954,339 | 7.79 | $25,703,443 |
| Angleton-Danbury Medical Center | Angleton | BRAZORIA | 6 | $9,151,361 | 21.20 | $1,940,089 |
| Sweeny Community Hospital | Sweeny | BRAZORIA | 6 | $1,798,967 | 21.20 | $381,381 |
| Burleson St. Joseph Health Center | Caldwell | BURLESON | 7 | $2,435,567 | 14.35 | $349,504 |
| Plains Memorial Hospital | Dimmitt | CASTRO | 1 | $2,069,565 | 6.13 | $126,864 |
| Bayside Community Hospital | Anahuac | CHAMBERS | 6 | $1,094,325 | 21.20 | $231,997 |
| Childress Regional Medical Center | Childress | CHILDRESS | 1 | $2,871,587 | 6.13 | $176,028 |
| Cochran Memorial Hospital | Morton | COCHRAN | 1 | $565,121 | 6.13 | $34,642 |
| Coleman County Medical Center | Coleman | COLEMAN | 2 | $1,867,080 | 2.35 | $43,876 |
| Rice Medical Center | Eagle Lake | COLORADO | 6 | $1,424,898 | 21.20 | $302,078 |
| Comanche County Medical Center | Comanche | COMANCHE | 2 | $2,508,293 | 2.35 | $58,945 |
| Concho County Hospital | Eden | CONCHO | 9 | $263,503 | 5.79 | $15,257 |
| North Texas Medical Center | Gainesville | COOKE | 3 | $8,802,166 | 21.50 | $1,892,466 |
| Muenster Memorial Hospital | Muenster | COOKE | 3 | $417,844 | 21.50 | $89,836 |
| Parkland Memorial Hospital | Dallas | DALLAS | 3 | $626,869,092 | 21.50 | $134,776,855 |
| Medical Arts Hospital | Lamesa | DAWSON | 9 | $2,717,784 | 5.79 | $157,360 |
| Cuero Community Hospital | Cuero | DE WITT | 8 | $3,678,475 | 7.79 | $286,553 |
| Hereford Regional Medical Center | Hereford | DEAF SMITH | 1 | $3,967,904 | 6.13 | $243,233 |

*Required reporting for Rider 59, House Bill Number 1, Eightieth Texas Legislature, Regular Session — Texas Health and Human Services Commission*   - 8 -

**App. 536**

*IV — Public Hospital District Facility Listing, continued*

| Public Hospital District Facility † | City | County | Public Health Region (PHR) | Total Facility Uncompensated Care * (A) | Estimated Percent of Uncompensated Care Attributable to Undocumented Immigrants in a PHR ‡ (B) | Estimated Uncompensated Care for Undocumented Immigrants (A * B) |
|---|---|---|---|---|---|---|
| Eastland Memorial Hospital | Eastland | EASTLAND | 2 | $1,745,600 | 2.35 | $41,022 |
| Medical Center Hospital | Odessa | ECTOR | 9 | $67,643,877 | 5.79 | $3,916,580 |
| R. E. Thomason General Hospital | El Paso | EL PASO | 10 | $200,673,706 | 18.70 | $37,525,983 |
| Fisher County Hospital District | Rotan | FISHER | 2 | $540,185 | 2.35 | $12,694 |
| W.J. Mangold Memorial Hospital | Lockney | FLOYD | 1 | $555,669 | 6.13 | $34,063 |
| Frio Regional Hospital | Pearsall | FRIO | 8 | $1,988,980 | 7.79 | $154,942 |
| Memorial Hospital | Seminole | GAINES | 9 | $1,358,152 | 5.79 | $78,637 |
| Memorial Hospital | Gonzales | GONZALES | 8 | $4,198,738 | 7.79 | $327,082 |
| Hamilton General Hospital | Hamilton | HAMILTON | 7 | $2,955,437 | 14.35 | $424,105 |
| Hansford County Hospital | Spearman | HANSFORD | 1 | $627,299 | 6.13 | $38,453 |
| Chillicothe Hospital | Chillicothe | HARDEMAN | 2 | $149,096 | 2.35 | $3,504 |
| Hardeman County Memorial Hospital | Quanah | HARDEMAN | 2 | $431,416 | 2.35 | $10,138 |
| Ben Taub General Hospital | Houston | HARRIS | 6 | $960,155,000 | 21.20 | $203,552,860 |
| Northeast Medical Center Hospital | Humble | HARRIS | 6 | $56,336,561 | 21.20 | $11,943,351 |
| Coon Memorial Hospital and Home | Dalhart | HARTLEY | 1 | $2,711,061 | 6.13 | $166,188 |
| Haskell Memorial Hospital | Haskell | HASKELL | 2 | $177,793 | 2.35 | $4,178 |
| Hemphill County Hospital | Canadian | HEMPHILL | 1 | $316,312 | 6.13 | $19,390 |
| Hopkins County Memorial Hospital | Sulphur Springs | HOPKINS | 4 | $7,661,397 | 6.94 | $531,701 |
| Presbyterian Hospital of Commerce | Commerce | HUNT | 3 | $1,782,289 | 21.50 | $383,192 |
| Presbyterian Hospital of Greenville | Greenville | HUNT | 3 | $23,701,017 | 21.50 | $5,095,719 |
| Golden Plains Community Hospital | Borger | HUTCHINSON | 1 | $5,964,363 | 6.13 | $365,615 |
| Faith Community Hospital | Jacksboro | JACK | 2 | $619,741 | 2.35 | $14,564 |

*Required reporting for Rider 59, House Bill Number 1, Eightieth Texas Legislature, Regular Session — Texas Health and Human Services Commission*     - 9 -

**App. 537**

*IV — Public Hospital District Facility Listing, continued*

| Public Hospital District Facility † | City | County | Public Health Region (PHR) | Total Facility Uncompensated Care * (A) | Estimated Percent of Uncompensated Care Attributable to Undocumented Immigrants in a PHR ‡ (B) | Estimated Uncompensated Care for Undocumented Immigrants (A * B) |
|---|---|---|---|---|---|---|
| Jackson Healthcare Center | Edna | JACKSON | 8 | $1,688,113 | 7.79 | $131,504 |
| CHRISTUS Jasper Memorial Hospital | Jasper | JASPER | 5 | $5,814,021 | 4.54 | $263,957 |
| Hamlin Memorial Hospital | Hamlin | JONES | 2 | $216,321 | 2.35 | $5,084 |
| Stamford Memorial Hospital | Stamford | JONES | 2 | $835,599 | 2.35 | $19,637 |
| Otto Kaiser Memorial Hospital | Kenedy | KARNES | 8 | $1,488,269 | 7.79 | $115,936 |
| Kimble Hospital | Junction | KIMBLE | 9 | $862,799 | 5.79 | $49,956 |
| Knox County Hospital | Knox City | KNOX | 2 | $566,483 | 2.35 | $13,312 |
| Lavaca Medical Center | Hallettsville | LAVACA | 8 | $939,479 | 7.79 | $73,185 |
| Limestone Medical Center | Groesbeck | LIMESTONE | 7 | $1,720,727 | 14.35 | $246,924 |
| University Medical Center | Lubbock | LUBBOCK | 1 | $123,005,488 | 6.13 | $7,540,236 |
| Lynn County Hospital District | Tahoka | LYNN | 1 | $493,512 | 6.13 | $30,252 |
| Martin County Hospital District | Stanton | MARTIN | 9 | $735,801 | 5.79 | $42,603 |
| Matagorda General Hospital | Bay City | MATAGORDA | 6 | $10,756,443 | 21.20 | $2,280,366 |
| Heart of Texas Memorial Hospital | Brady | MCCULLOCH | 9 | $2,363,776 | 5.79 | $136,863 |
| Midland Memorial Hospital | Midland | MIDLAND | 9 | $40,088,376 | 5.79 | $2,321,117 |
| Richards Memorial Hospital | Rockdale | MILAM | 7 | $1,544,100 | 14.35 | $221,578 |
| Mitchell County Hospital | Colorado City | MITCHELL | 2 | $2,409,895 | 2.35 | $56,633 |
| Nocona General Hospital | Nocona | MONTAGUE | 2 | $1,058,607 | 2.35 | $24,877 |
| Memorial Hospital | Dumas | MOORE | 1 | $3,295,274 | 6.13 | $202,000 |
| Nacogdoches Memorial Hospital | Nacogdoches | NACOGDOCHES | 5 | $49,096,407 | 4.54 | $2,228,977 |
| Rolling Plains Memorial Hospital | Sweetwater | NOLAN | 2 | $3,283,504 | 2.35 | $77,162 |
| Ochiltree General Hospital | Perryton | OCHILTREE | 1 | $1,370,332 | 6.13 | $84,001 |

*Required reporting for Rider 59, House Bill Number 1, Eightieth Texas Legislature, Regular Session — Texas Health and Human Services Commission*   - 10 -

**App. 538**

*IV — Public Hospital District Facility Listing, continued*

| Public Hospital District Facility † | City | County | Public Health Region (PHR) | Total Facility Uncompensated Care * (A) | Estimated Percent of Uncompensated Care Attributable to Undocumented Immigrants in a PHR ‡ (B) | Estimated Uncompensated Care for Undocumented Immigrants (A * B) |
|---|---|---|---|---|---|---|
| Palo Pinto General Hospital | Mineral Wells | PALO PINTO | 3 | $7,608,018 | 21.50 | $1,635,724 |
| Campbell Health System | Weatherford | PARKER | 3 | $17,393,965 | 21.50 | $3,739,702 |
| Iraan General Hospital District | Iraan | PECOS | 9 | $110,920 | 5.79 | $6,422 |
| Reagan Memorial Hospital | Big Lake | REAGAN | 9 | $97,206 | 5.79 | $5,628 |
| Reeves County Hospital | Pecos | REEVES | 9 | $1,717,598 | 5.79 | $99,449 |
| Refugio County Memorial Hospital District | Refugio | REFUGIO | 11 | $1,935,402 | 60.56 | $1,172,079 |
| Ballinger Memorial Hospital District | Ballinger | RUNNELS | 2 | $1,087,906 | 2.35 | $25,566 |
| North Runnels Hospital | Winters | RUNNELS | 2 | $259,451 | 2.35 | $6,097 |
| Sabine County Hospital | Hemphill | SABINE | 5 | $765,265 | 4.54 | $34,743 |
| Starr County Memorial Hospital | Rio Grande City | STARR | 11 | $3,519,126 | 60.56 | $2,131,183 |
| Stonewall Memorial Hospital | Aspermont | STONEWALL | 2 | $141,622 | 2.35 | $3,328 |
| Lillian M. Hudspeth Memorial Hospital | Sonora | SUTTON | 9 | $1,352,108 | 5.79 | $78,287 |
| Swisher Memorial Hospital | Tulia | SWISHER | 1 | $935,352 | 6.13 | $57,337 |
| John Peter Smith Hospital | Fort Worth | TARRANT | 3 | $618,729,000 | 21.50 | $133,026,735 |
| Brownfield Regional Medical Center | Brownfield | TERRY | 1 | $2,117,936 | 6.13 | $129,829 |
| Titus Regional Medical Center | Mount Pleasant | TITUS | 4 | $13,783,587 | 6.94 | $956,581 |
| Tyler County Hospital | Woodville | TYLER | 5 | $2,801,493 | 4.54 | $127,188 |
| McCamey Hospital | McCamey | UPTON | 9 | $586,995 | 5.79 | $33,987 |
| Rankin County Hospital District | Rankin | UPTON | 9 | $134,422 | 5.79 | $7,783 |
| Val Verde Regional Medical Center | Del Rio | VAL VERDE | 8 | $8,965,303 | 7.79 | $698,397 |
| El Campo Memorial Hospital | El Campo | WHARTON | 6 | $3,854,197 | 21.20 | $817,090 |
| Shamrock General Hospital | Shamrock | WHEELER | 1 | $386,101 | 6.13 | $23,668 |

**App. 539**

*IV — Public Hospital District Facility Listing, continued*

| Public Hospital District Facility † | City | County | Public Health Region (PHR) | Total Facility Uncompensated Care * (A) | Estimated Percent of Uncompensated Care Attributable to Undocumented Immigrants in a PHR ‡ (B) | Estimated Uncompensated Care for Undocumented Immigrants (A * B) |
|---|---|---|---|---|---|---|
| Parkview Hospital | Wheeler | WHEELER | 1 | $577,427 | 6.13 | $35,396 |
| Electra Memorial Hospital | Electra | WICHITA | 2 | $1,300,014 | 2.35 | $30,550 |
| Wilbarger General Hospital | Vernon | WILBARGER | 2 | $2,687,964 | 2.35 | $63,167 |
| Connally Memorial Medical Center | Floresville | WILSON | 8 | $5,226,033 | 7.79 | $407,108 |
| Wise Regional Health System | Decatur | WISE | 3 | $15,033,103 | 21.50 | $3,232,117 |
| Hamilton Hospital | Olney | YOUNG | 2 | $3,184,195 | 2.35 | $74,829 |

*Total for the ninety-four Texas public hospital district facilities in FY 2006 — $596,848,958*

Notes:

†   The AHA/THA/TXDSHS *Cooperative Annual Survey of Hospitals* is administered to all Texas hospitals, and collects data for each facility's fiscal year. The 94 facilities listed here reported being either owned or controlled by a public hospital district on the 2006 *Cooperative Annual Survey of Hospitals*. Data for FY 2007 were not available at the time of this report's publication.

*   Total facility uncompensated care is the sum of reported bad debt expenses and charity charges.

‡   Estimated percent of uncompensated care attributable to undocumented immigrants in a PHR was computed by using a formula designed for this report. Based on the regional distribution of uncompensated care and Emergency Medicaid expenditures, the Central Texas region's share of the state's uncompensated care appeared to be about 40% higher than its share of Emergency Medicaid. Therefore, we estimate that approximately 20% of uncompensated care statewide is accounted for by undocumented immigrants, compared to 14% in the Central Texas region reported in the aforementioned ICC study. In order to account for this difference statewide, the following formula was applied to each specific region. For more information, please see *Analytical Notes* on page 6.

Estimated Statewide Uncompensated Care Attributable To Undocumented Immigrants (20%) x
(Public Health Region's Share of State Emergency Medicaid Expenditures /
Public Health Region's Share of State Uncompensated Care) =
Estimated Percent of Uncompensated Care Attributed To Undocumented Immigrants in a Public Health Region

*Required reporting for Rider 59, House Bill Number 1, Eightieth Texas Legislature, Regular Session — Texas Health and Human Services Commission*      - 12 -

**App. 540**

# V — References

American Hospital Association/Texas Department of State Health Services/Texas Hospital Association, 2006. *Cooperative Annual Survey of Hospitals*. Chicago/Austin.

House Bill Number 1, Eightieth Texas Legislature, Regular Session, General Appropriations Act, Article II, Health and Human Services, Rider 59: *Report to the United States Congress on Services and Benefits Provided to Undocumented Immigrants*, pps. II-86-87.

Network Sciences, 2008. *Community Health and Social Services Information System* (CHASSIS Software™). Retrieved October 17, 2008, from http://www.netsci.net/chassis.asp

Texas Comptroller of Public Accounts, 2006. *Special Report: Undocumented Immigrants in Texas, A Financial Analysis of the Impact to the State Budget and Economy*. Publication #96-1224. Retrieved September 6, 2008, from http://www.window.state.tx.us/specialrpt/undocumented/undocumented.pdf

Texas Health and Human Services Commission, *Medicaid Administrative Data*, Austin.

U.S. Department of Homeland Security, 2007. *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2006*, Retrieved October 21, 2008, from http://www.dhs.gov/xlibrary/assets/statistics/publications/ill_pe_2006.pdf

U.S. Department of Commerce, 2007. *American Community Survey* (ACS): *Public Use Microdata Sample* (PUMS), 2006. Washington, DC: U.S. Department of Commerce, Bureau of the Census.

*Required reporting for Rider 59, House Bill Number 1, Eightieth Texas Legislature, Regular Session — Texas Health and Human Services Commission*   - 13 -

**App. 541**

# REPORT ON SERVICES AND BENEFITS PROVIDED TO UNDOCUMENTED IMMIGRANTS

*Updated report related to*

Rider 59
House Bill 1
Eightieth Texas Legislature, Regular Session, 2007

## — 2010 UPDATE —



*Strategic Decision Support*
**Financial Services Division**
**TEXAS HEALTH AND HUMAN SERVICES COMMISSION**

# Table of Contents

I    Background ................................................................................................ 1

II    Executive Data Summary ........................................................................ 2

III    Analytical Notes ...................................................................................... 3

IV    Public Hospital District Facility Listing ................................................ 8

V    References ............................................................................................... 12

# I – Background

The 80th Texas Legislature, Regular Session, 2007, passed House Bill 1, General Appropriations Act, Article II, Health and Human Services, Rider 59: "Report to the United States Congress on Services and Benefits Provided to Undocumented Immigrants."

This rider required the Texas Health and Human Services Commission (HHSC) to report the cost of services and benefits provided by HHSC to undocumented immigrants in the state. Rider 59 also required HHSC to compile these data for each Texas public hospital district facility. This report was originally completed in 2008. Due to numerous requests for related current information, this document is the 2010 update of that original report. The text of Rider 59 is included below, with the updated data and supporting documentation on subsequent pages.

### Rider 59 — Report to the United States Congress on Services and Benefits Provided to Undocumented Immigrants

*The Health and Human Services Commission shall compile a report of the cost of services and benefits provided to undocumented immigrants, with the agency determining the extent to which undocumented immigrants are served by the agency, by individual program. The agency may use a statistical method developed by the agency in cases where it is not practical for the agency to directly determine whether recipients of a service or benefit are undocumented immigrants.*

*The Health and Human Services Commission shall also compile information on this subject from each public hospital district within the state and include this information in the report and shall not enforce Title 8 of the United States Code when compiling information on this subject.*

*The report must be produced using aggregated statistical data that does not contain personally identifiable information. The purpose of compiling this information is to perform analysis to assist the United States Congress and this state in making future health care and budgetary decisions. Information sought for the preparation of this report may not violate any federal or state laws, including rules, regarding privacy.*

*This report shall be provided to the United States Congress by December 1, 2008, and may be used as supporting materials by the State of Texas in requests for additional federal appropriations to assist with these costs.*

*The Health and Human Services Commission or a public hospital district may compile and report the information required by this rider only in a manner the attorney general of this state certifies as consistent with federal law.*

*The Health and Human Services Commission again shall submit the required report to the Lieutenant Governor, Speaker of the House of Representatives, and Members of the Legislature by December 1, 2008, and shall include the information in the agency's annual report for 2008.*

## II – Executive Data Summary

**A.    TEXAS HEALTH AND HUMAN SERVICES COMMISSION**

Estimated cost of services and benefits provided to undocumented immigrants,
State Fiscal Year (SFY) 2009 ˙

### $96 million

➢  *Note — in the original, 2008 version of this report, this figure was: $81 million.*

*(Please see Analytical Notes on page 3 for subtotals and supporting documentation.)*

˙ Texas Health and Human Services Commission data are for state fiscal year 2009, the most recent data available.

**B.    TEXAS PUBLIC HOSPITAL DISTRICTS**

Estimated uncompensated care for undocumented immigrants, facility fiscal year 2008 ˙

### $717 million

➢  *Note — in the original, 2008 version of this report, this figure was: $597 million.*

*(Please see Analytical Notes on page 6 for subtotals and supporting documentation.)*

˙ The Texas public hospital districts data come from the Cooperative Annual Survey of Hospitals, which collects data for each facility's fiscal year. At the time of this report's publication, the most recent survey data available were for fiscal year 2008.

## III – Analytical Notes

**A.    TEXAS HEALTH AND HUMAN SERVICES COMMISSION**
*Estimated cost of services and benefits provided to undocumented immigrants, SFY 2009*

(1) Texas Emergency Medicaid — *$62 million* +

(2) Texas Family Violence Program — *$1.3 million* +

(3) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage — *$33 million*

=

<u>$96 million</u>

### 1.    <u>Texas Emergency Medicaid</u>

Emergency Medicaid, Type Program 30 (TP 30), is a federal and state funded program that provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, for non citizens as well as undocumented immigrants living in the US. Emergency Medicaid is a federally required program. In fiscal year 2009, payments for Emergency Medicaid, TP 30 totaled as follows:

— **A** —
<u>Texas Emergency Medicaid, Type Program 30, Fiscal Year 2009</u>

| | |
|---|---|
| *Inpatient hospital* | $275,010,314 |
| *Outpatient hospital* | $13,248,238 |
| *Professional and other services* | $20,778,110 |
| *Vendor drug* | $159,096 |
| Total | $309,195,758 |

Since HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of the $309.2 million in Emergency Medicaid payments attributable to undocumented immigrants must be estimated.

According to the U.S. Census Bureau's *American Community Survey* (ACS) for Texas, approximately 2.6 million non citizens resided in Texas in 2006. The Department of Homeland Security reports that 1.64 million, or 63 percent, of these residents were undocumented. Therefore, the estimated amount paid for Emergency Medicaid services to undocumented immigrants residing in Texas is about $194.8 million:

— **B** —
Texas Emergency Medicaid *($309.2 million)*
**x**
Estimated Percent of Non-Citizens Who Are Undocumented Immigrants *(63%)*
=
$194.8 million

### III – Analytical Notes (*Continued*)

The state shares the cost of the Medicaid program with the federal government, with Texas typically paying about 40 percent of Emergency Medicaid expenditures. However, in SFY 2009 due to provisions of the American Recovery and Reinvestment Act of 2009 (ARRA), the federal government temporarily increased its share of Medicaid expenditures to 68 percent, leaving the state with a 32 percent share. Therefore, the total estimated state cost for Emergency Medicaid services to undocumented immigrants residing in Texas in SFY 2009 was about $62 million**.**

— **C** —
Estimated Texas Emergency Medicaid for Undocumented
Immigrants Residing in Texas (*$194.8 million*)
**x**
Texas Share of Medicaid Cost under ARRA *(32%)*
=
$62 million

➢ *Note — in the original, 2008 version of this report, this figure was: $80 million.*


### 2.  Texas Family Violence Program

The Texas Family Violence Program (FVP) contracts with non-profit agencies in three categories (shelter centers, non-residential centers, and special non-residential projects (SNRP)) across the state to provide essential services to victims of family violence. Core FVP services include shelter, 24-hour hotlines, emergency medical services, counseling, etc. In SFY 2009, the FVP funded 72 nonprofit family violence shelters, 8 non-residential centers, and 20 SNRPs, providing comprehensive family violence services to victims, with a total budget of $24,028,440. State general revenue and Temporary Assistance for Needy Families (TANF) converted to Title XX accounted for about $19 million ($19,235,988) of the program's total spending for direct services. Services are provided without any financial eligibility testing and free of charge.

The FVP does not ask victims of family violence about their residency status. Therefore, the portion of the $19 million in FVP expenditures attributable to undocumented immigrants must be estimated. According to the U.S. Census Bureau's *American Community Survey* (ACS) for Texas, approximately 23.5 million individuals resided in Texas in 2006. The Department of Homeland Security reports that 1.64 million, or 7 percent, of these residents were undocumented. The total estimated state cost for direct FVP services to undocumented immigrants in SFY 2009 was:

Texas Family Violence Program budget *($19 million)*
**x**
Estimated Percent of Undocumented Immigrants in Texas *(7%)*
=
$1.3 million

➢ *Note — in the original, 2008 version of this report, this figure was: $1.2 million.*

III – Analytical Notes (*Continued*)

## 3.    Texas Children's Health Insurance Program (CHIP) Perinatal Coverage

Texas CHIP Perinatal Coverage provides prenatal care for the unborn children of low-income women. Specifically, it provides prenatal care for women living at up to 200% Federal Poverty Level (FPL) who do not otherwise qualify for Medicaid, typically due to their citizenship status. Nearly all participants of CHIP Perinatal are either documented or non-documented non-citizens. Since this program does not require citizenship documentation, there is no way to definitively report the number of undocumented immigrants served. Therefore, the portion of the $188 million in CHIP Perinatal Coverage expenditures (which represents prenatal services only) in SYF 2009 attributable to undocumented immigrants must be estimated. Note: CHIP Perinate Coverage expenditures were not included in the original Rider 59 report since, at the time its completion, a full year of program data was not available.

According to the U.S. Census Bureau's *American Community Survey* (ACS) for Texas, approximately 2.6 million non citizens resided in Texas in 2006. The Department of Homeland Security reports that 1.64 million, or 63 percent, of these residents were undocumented. Therefore, this brings the estimated amount paid for Texas CHIP Perinatal Coverage services to undocumented immigrants residing in Texas for SFY 2009 to about $118 million:

Texas CHIP Perinatal Coverage budget *($188 million)*

**x**

Estimated Percent of Non-Citizens Who Are Undocumented Immigrants *(63%)*

=

$118 million

The state shares the cost of the CHIP program with the federal government, with Texas typically paying about 28 percent of expenditures. Therefore, the total estimated state cost for CHIP Perinatal Coverage to undocumented immigrants residing in Texas in SFY 2009 was about $34 million**.**

Estimated CHIP Perinatal Coverage for Undocumented
Immigrants Residing in Texas (*$118 million*)

**x**

Texas Share of CHIP Expenditures *(28%)*

=

$33 million

> ➤  Note — *Expenditures for CHIP Perinate Coverage were not included in the original, 2008 version of the Rider 59 report since, at the time its completion, a full year of program data was not available.*

## III – Analytical Notes (*Continued*)

**B.    TEXAS PUBLIC HOSPITAL DISTRICTS**
*Estimated uncompensated care for undocumented immigrants* (fiscal year 2008; 99 facilities)

### $717 million

➤  *Note — in the original, 2008 version of this report, this figure was: $597 million.*

Limited information exists to estimate hospital-specific uncompensated care for undocumented immigrants. As such, the method adopted for this report relies on regional estimates of undocumented immigrants' share of hospital uncompensated care, applying those estimates to each public hospital district facility in the region.

The regional estimates (which have been rounded for this report's update) are derived from a variety of sources. First, a web-based eligibility screening tool called the "Community Health and Social Services Information System" (CHASSIS™). The Indigent Care Collaboration (ICC), an alliance of safety net providers in three Central Texas counties (Travis, Williamson and Hays), employed CHASSIS™ to screen uninsured/under-insured patients for eligibility in government and local medical assistance or payment programs (*Network Sciences, 2008*).

This system also tracked the percent of uninsured undocumented immigrants served in these counties, and in 2005 found that nearly 14 percent of all patients screened in hospital settings were undocumented immigrants. (*Texas Comptroller of Public Accounts*, 2006.) This figure was used as a foundation for estimating uncompensated care for undocumented immigrants in the remaining parts of Texas.

This 14 percent figure was adjusted for each Public Health Region (PHR) based on information from two additional sources. The first source, the 2008 American Hospital Association/Texas Department of State Health Services/Texas Hospital Association (AHA/TDSHS/THA) *Cooperative Annual Survey of Hospitals*, is required by state law. It is submitted annually by every Texas hospital and lists each facility's reported uncompensated care (bad debt expenses plus charity care charges).

The second source, claims data from the state's Emergency Medicaid Type Program (TP) 30, is available for every hospital stay for non citizens paid for by the state's Emergency Medicaid program. In emergency cases, including childbirth and labor, Medicaid pays for services rendered to persons who would otherwise qualify for Medicaid regardless of their immigration status.

**III – Analytical Notes (*Continued*)**

Based on the regional distribution of uncompensated care and Emergency Medicaid expenditures, the Central Texas region's share of the state's uncompensated care appeared to be about 40 percent higher than its share of Emergency Medicaid. Therefore, we estimate that approximately 20 percent of uncompensated care statewide is accounted for by undocumented immigrants, compared to 14 percent in the Central Texas region reported in the aforementioned ICC study. In order to account for this difference statewide, the following formula was applied to each specific region:

Estimated Statewide Uncompensated Care Attributable To Undocumented Immigrants (20%)
x
( Public Health Region's Share of State Emergency Medicaid Expenditures /
Public Health Region's Share of State Uncompensated Care )
=
Estimated Percent of Uncompensated Care Attributed to
Undocumented Immigrants in a Public Health Region

As expected, results varied widely by a region's demographic composition and proximity to the border, with the highest rate found in the Rio Grande Valley and the lowest rate in North Texas. The method produced approximately the same rate statewide as for the state's two largest population centers, Houston and Dallas/Fort Worth.

These region-specific values were then applied to the reported uncompensated care for each public hospital district facility to produce estimates of the uncompensated care for undocumented immigrants. These facility totals were then added to generate the state total. This computational logic was revisited for the report's 2010 update, and it was determined that there was no justification to change these formulas and values at this time. Please see the facility-specific listing below for more information.

## IV – Public Hospital District Facility Listing

| Public Hospital District Facility † | City | County | Public Health Region (PHR) | Total Facility Uncompensated Care * (A) | Estimated Percent of Uncompensated Care Attributable to Undocumented Immigrants in a PHR ‡ (B) | Estimated Facility Uncompensated Care for Undocumented Immigrants (A x B) |
|---|---|---|---|---|---|---|
| Permian Regional Medical Center | Andrews | ANDREWS | 9 | $3,872,258 | 0.06 | $232,335 |
| Bellville General Hospital | Bellville | AUSTIN | 6 | $2,177,652 | 0.21 | $457,307 |
| Muleshoe Area Medical Center | Muleshoe | BAILEY | 1 | $812,007 | 0.06 | $48,720 |
| Smithville Regional Hospital | Smithville | BASTROP | 7 | $5,629,736 | 0.14 | $788,163 |
| Seymour Hospital | Seymour | BAYLOR | 2 | $1,025,201 | 0.02 | $20,504 |
| University Hospital | San Antonio | BEXAR | 8 | $369,227,596 | 0.08 | $29,538,208 |
| Angleton-Danbury Medical Center | Angleton | BRAZORIA | 6 | $8,240,290 | 0.21 | $1,730,461 |
| Sweeny Community Hospital | Sweeny | BRAZORIA | 6 | $2,370,787 | 0.21 | $497,865 |
| Burleson St. Joseph Health Center | Caldwell | BURLESON | 7 | $3,864,113 | 0.14 | $540,976 |
| Atlanta Memorial Hospital | Atlanta | CASS | 4 | $5,787,215 | 0.07 | $405,105 |
| Plains Memorial Hospital | Dimmitt | CASTRO | 1 | $1,761,563 | 0.06 | $105,694 |
| Bayside Community Hospital | Anahuac | CHAMBERS | 6 | $1,627,946 | 0.21 | $341,869 |
| Childress Regional Medical Center | Childress | CHILDRESS | 1 | $3,187,285 | 0.06 | $191,237 |
| Cochran Memorial Hospital | Morton | COCHRAN | 1 | $202,007 | 0.06 | $12,120 |
| Coleman County Medical Center | Coleman | COLEMAN | 2 | $2,330,626 | 0.02 | $46,613 |
| Rice Medical Center | Eagle Lake | COLORADO | 6 | $1,536,586 | 0.21 | $322,683 |
| Comanche County Medical Center | Comanche | COMANCHE | 2 | $2,112,936 | 0.02 | $42,259 |
| Concho County Hospital | Eden | CONCHO | 9 | $291,931 | 0.06 | $17,516 |
| North Texas Medical Center | Gainesville | COOKE | 3 | $10,967,036 | 0.22 | $2,412,748 |
| Muenster Memorial Hospital | Muenster | COOKE | 3 | $392,877 | 0.22 | $86,433 |
| Coryell Memorial Hospital | Gatesville | CORYELL | 7 | $3,495,557 | 0.14 | $489,378 |
| Parkland Memorial Hospital | Dallas | DALLAS | 3 | $770,172,780 | 0.22 | $169,438,012 |

**App. 551**

## IV – Public Hospital District Facility Listing, Continued

| Public Hospital District Facility † | City | County | Public Health Region (PHR) | Total Facility Uncompensated Care * (A) | Estimated Percent of Uncompensated Care Attributable to Undocumented Immigrants in a PHR ‡ (B) | Estimated Facility Uncompensated Care for Undocumented Immigrants (A x B) |
|---|---|---|---|---|---|---|
| Richardson Regional Medical Center | Richardson | DALLAS | 3 | $28,107,007 | 0.22 | $6,183,542 |
| Medical Arts Hospital | Lamesa | DAWSON | 9 | $4,870,046 | 0.06 | $292,203 |
| Cuero Community Hospital | Cuero | DE WITT | 8 | $4,732,916 | 0.08 | $378,633 |
| Hereford Regional Medical Center | Hereford | DEAF SMITH | 1 | $5,343,007 | 0.06 | $320,580 |
| Eastland Memorial Hospital | Eastland | EASTLAND | 2 | $3,356,919 | 0.02 | $67,138 |
| Medical Center Hospital | Odessa | ECTOR | 9 | $74,028,538 | 0.06 | $4,441,712 |
| R. E. Thomason General Hospital | El Paso | EL PASO | 10 | $212,073,041 | 0.19 | $40,293,878 |
| Fisher County Hospital District | Rotan | FISHER | 2 | $537,418 | 0.02 | $10,748 |
| W.J. Mangold Memorial Hospital | Lockney | FLOYD | 1 | $903,277 | 0.06 | $54,197 |
| OakBend Medical Center | Richmond | FORT BEND | 6 | $26,351,512 | 0.21 | $5,533,818 |
| Frio Regional Hospital | Pearsall | FRIO | 8 | $2,063,071 | 0.08 | $165,046 |
| Memorial Hospital | Seminole | GAINES | 9 | $2,287,318 | 0.06 | $137,239 |
| Memorial Hospital | Gonzales | GONZALES | 8 | $4,260,810 | 0.08 | $340,865 |
| Hamilton General Hospital | Hamilton | HAMILTON | 7 | $4,433,680 | 0.14 | $620,715 |
| Hansford County Hospital | Spearman | HANSFORD | 1 | $718,184 | 0.06 | $43,091 |
| Hardeman County Memorial Hospital | Quanah | HARDEMAN | 2 | $512,530 | 0.02 | $10,251 |
| Chillicothe Hospital | Chillicothe | HARDEMAN | 2 | $190,958 | 0.02 | $3,819 |
| Ben Taub General Hospital | Houston | HARRIS | 6 | $1,107,257,370 | 0.21 | $232,524,048 |
| Tomball Regional Hospital | Tomball | HARRIS | 6 | $34,205,413 | 0.21 | $7,183,137 |
| Coon Memorial Hospital and Home | Dalhart | HARTLEY | 1 | $2,517,976 | 0.06 | $151,079 |
| Haskell Memorial Hospital | Haskell | HASKELL | 2 | $270,676 | 0.02 | $5,414 |
| Hemphill County Hospital | Canadian | HEMPHILL | 1 | $608,103 | 0.06 | $36,486 |

**App. 552**

**IV – Public Hospital District Facility Listing, Continued**

| Public Hospital District Facility † | City | County | Public Health Region (PHR) | Total Facility Uncompensated Care * (A) | Estimated Percent of Uncompensated Care Attributable to Undocumented Immigrants in a PHR ‡ (B) | Estimated Facility Uncompensated Care for Undocumented Immigrants (A x B) |
|---|---|---|---|---|---|---|
| Hopkins County Memorial Hospital | Sulphur Springs | HOPKINS | 4 | $8,855,915 | 0.07 | $619,914 |
| Hunt Regional Medical Center Greenville | Greenville | HUNT | 3 | $26,569,309 | 0.22 | $5,845,248 |
| Hunt Regional Community Hospital | Commerce | HUNT | 3 | $1,949,784 | 0.22 | $428,952 |
| Faith Community Hospital | Jacksboro | JACK | 2 | $1,336,009 | 0.02 | $26,720 |
| Jackson Healthcare Center | Edna | JACKSON | 8 | $1,511,280 | 0.08 | $120,902 |
| CHRISTUS Jasper Memorial Hospital | Jasper | JASPER | 5 | $8,386,654 | 0.05 | $419,333 |
| Stamford Memorial Hospital | Stamford | JONES | 2 | $1,263,715 | 0.02 | $25,274 |
| Hamlin Memorial Hospital | Hamlin | JONES | 2 | $118,858 | 0.02 | $2,377 |
| Otto Kaiser Memorial Hospital | Kenedy | KARNES | 8 | $1,956,818 | 0.08 | $156,545 |
| Knox County Hospital | Knox City | KNOX | 2 | $864,961 | 0.02 | $17,299 |
| Lavaca Medical Center | Hallettsville | LAVACA | 8 | $1,049,510 | 0.08 | $83,961 |
| Limestone Medical Center | Groesbeck | LIMESTONE | 7 | $2,966,202 | 0.14 | $415,268 |
| Llano Memorial Hospital | Llano | LLANO | 7 | $6,430,811 | 0.14 | $900,314 |
| University Medical Center | Lubbock | LUBBOCK | 1 | $116,021,682 | 0.06 | $6,961,301 |
| Lynn County Hospital District | Tahoka | LYNN | 1 | $485,660 | 0.06 | $29,140 |
| Martin County Hospital District | Stanton | MARTIN | 9 | $1,422,335 | 0.06 | $85,340 |
| Matagorda Medical Center | Bay City | MATAGORDA | 6 | $10,322,312 | 0.21 | $2,167,686 |
| Heart of Texas Memorial Hospital | Brady | MCCULLOCH | 9 | $2,354,023 | 0.06 | $141,241 |
| Medina Community Hospital | Hondo | MEDINA | 8 | $4,391,528 | 0.08 | $351,322 |
| Midland Memorial Hospital | Midland | MIDLAND | 9 | $48,655,866 | 0.06 | $2,919,352 |
| Mitchell County Hospital | Colorado City | MITCHELL | 2 | $3,674,336 | 0.02 | $73,487 |
| Bowie Memorial Hospital | Bowie | MONTAGUE | 2 | $3,216,286 | 0.02 | $64,326 |

**App. 553**

**IV – Public Hospital District Facility Listing, Continued**

| Public Hospital District Facility † | City | County | Public Health Region (PHR) | Total Facility Uncompensated Care * (A) | Estimated Percent of Uncompensated Care Attributable to Undocumented Immigrants in a PHR ‡ (B) | Estimated Facility Uncompensated Care for Undocumented Immigrants (A x B) |
|---|---|---|---|---|---|---|
| Nocona General Hospital | Nocona | MONTAGUE | 2 | $1,531,908 | 0.02 | $30,638 |
| Memorial Hospital | Dumas | MOORE | 1 | $3,725,461 | 0.06 | $223,528 |
| Nacogdoches Memorial Hospital | Nacogdoches | NACOGDOCHES | 5 | $54,003,977 | 0.05 | $2,700,199 |
| Rolling Plains Memorial Hospital | Sweetwater | NOLAN | 2 | $4,232,138 | 0.02 | $84,643 |
| Ochiltree General Hospital | Perryton | OCHILTREE | 1 | $1,777,167 | 0.06 | $106,630 |
| Palo Pinto General Hospital | Mineral Wells | PALO PINTO | 3 | $6,269,909 | 0.22 | $1,379,380 |
| Iraan General Hospital | Iraan | PECOS | 9 | $373,544 | 0.06 | $22,413 |
| Reagan Memorial Hospital | Big Lake | REAGAN | 9 | $222,237 | 0.06 | $13,334 |
| Reeves County Hospital | Pecos | REEVES | 9 | $2,637,636 | 0.06 | $158,258 |
| Refugio County Memorial Hospital District | Refugio | REFUGIO | 11 | $1,866,730 | 0.61 | $1,138,705 |
| Ballinger Memorial Hospital District | Ballinger | RUNNELS | 2 | $750,577 | 0.02 | $15,012 |
| North Runnels Hospital | Winters | RUNNELS | 2 | $290,514 | 0.02 | $5,810 |
| Cogdell Memorial Hospital | Snyder | SCURRY | 2 | $7,086,091 | 0.02 | $141,722 |
| Starr County Memorial Hospital | Rio Grande City | STARR | 11 | $3,075,916 | 0.61 | $1,876,309 |
| Stonewall Memorial Hospital | Aspermont | STONEWALL | 2 | $108,093 | 0.02 | $2,162 |
| Lillian M. Hudspeth Memorial Hospital | Sonora | SUTTON | 9 | $1,838,340 | 0.06 | $110,300 |
| Swisher Memorial Hospital | Tulia | SWISHER | 1 | $1,036,407 | 0.06 | $62,184 |
| John Peter Smith Hospital | Fort Worth | TARRANT | 3 | $773,861,000 | 0.22 | $170,249,420 |
| Brownfield Regional Medical Center | Brownfield | TERRY | 1 | $2,479,007 | 0.06 | $148,740 |
| Titus Regional Medical Center | Mount Pleasant | TITUS | 4 | $18,528,136 | 0.07 | $1,296,970 |
| Tyler County Hospital | Woodville | TYLER | 5 | $3,472,921 | 0.05 | $173,646 |
| Rankin County Hospital District | Rankin | UPTON | 9 | $193,275 | 0.06 | $11,597 |

**App. 554**

## IV – Public Hospital District Facility Listing, Continued

| Public Hospital District Facility † | City | County | Public Health Region (PHR) | Total Facility Uncompensated Care * (A) | Estimated Percent of Uncompensated Care Attributable to Undocumented Immigrants in a PHR ‡ (B) | Estimated Facility Uncompensated Care for Undocumented Immigrants (A x B) |
|---|---|---|---|---|---|---|
| McCamey Hospital | McCamey | UPTON | 9 | $55,186 | 0.06 | $3,311 |
| Uvalde Memorial Hospital | Uvalde | UVALDE | 8 | $8,347,207 | 0.08 | $667,777 |
| Val Verde Regional Medical Center | Del Rio | VAL VERDE | 8 | $10,632,139 | 0.08 | $850,571 |
| El Campo Memorial Hospital | El Campo | WHARTON | 6 | $3,507,501 | 0.21 | $736,575 |
| Shamrock General Hospital | Shamrock | WHEELER | 1 | $641,535 | 0.06 | $38,492 |
| Parkview Hospital | Wheeler | WHEELER | 1 | $450,335 | 0.06 | $27,020 |
| Electra Memorial Hospital | Electra | WICHITA | 2 | $1,366,414 | 0.02 | $27,328 |
| Wilbarger General Hospital | Vernon | WILBARGER | 2 | $3,562,302 | 0.02 | $71,246 |
| Connally Memorial Medical Center | Floresville | WILSON | 8 | $5,615,212 | 0.08 | $449,217 |
| Wise Regional Health System | Decatur | WISE | 3 | $25,177,926 | 0.22 | $5,539,144 |
| Hamilton Hospital | Olney | YOUNG | 2 | $2,004,045 | 0.02 | $40,081 |

*Total for the ninety-nine Texas public hospital district facilities in FY 2008 — $716,821,507*

Notes:

† The AHA/THA/TDSHS *Cooperative Annual Survey of Hospitals* is administered to all Texas hospitals, and collects data for each facility's fiscal year. The 99 facilities listed here reported being either owned or controlled by a public hospital district on the 2008 *Cooperative Annual Survey of Hospitals*. Data for FY 2009 were not available at the time of this report's publication.

* Total facility uncompensated care is the sum of reported bad debt expenses and charity charges.

‡ Estimated percent of uncompensated care attributable to undocumented immigrants in a PHR was computed by using a formula designed for this report's original 2008 edition, and retained for this 2010 update. Based on the regional distribution of uncompensated care and Emergency Medicaid expenditures, the Central Texas region's share of the state's uncompensated care appeared to be about 40% higher than its share of Emergency Medicaid. Therefore, we estimate that approximately 20% of uncompensated care statewide is accounted for by undocumented immigrants, compared to 14% in the Central Texas region reported in the aforementioned ICC study. In order to account for this difference statewide, the following formula was applied to each specific region. For more information, please see *Analytical Notes* on page 6.

Estimated Statewide Uncompensated Care Attributable To Undocumented Immigrants (20%) x
(Public Health Region's Share of State Emergency Medicaid Expenditures /
Public Health Region's Share of State Uncompensated Care) =
*Estimated Percent of Uncompensated Care Attributed To Undocumented Immigrants in a Public Health Region*

**App. 555**

# V – References

American Hospital Association/Texas Department of State Health Services/Texas Hospital Association, 2008. *Cooperative Annual Survey of Hospitals*. Chicago/Austin.

House Bill 1, 80th Legislature, Regular Session, General Appropriations Act, Article II, Health and Human Services, Rider 59: *Report to the United States Congress on Services and Benefits Provided to Undocumented Immigrants*, pp. II-86-87.

Network Sciences, 2008. *Community Health and Social Services Information System* (CHASSIS Software™). Retrieved October 17, 2008, from http://www.netsci.net/chassis.asp.

Texas Comptroller of Public Accounts, 2006. *Special Report: Undocumented Immigrants in Texas, A Financial Analysis of the Impact to the State Budget and Economy*. Publication #96-1224. Retrieved September 6, 2008, from http://www.window.state.tx.us/specialrpt/undocumented/undocumented.pdf.

Texas Health and Human Services Commission, *Medicaid Administrative Data*, Austin.

U.S. Department of Homeland Security, 2007. *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2006*, Retrieved October 21, 2008, from http://www.dhs.gov/xlibrary/assets/statistics/publications/ill_pe_2006.pdf.

U.S. Department of Commerce, 2007. *American Community Survey* (ACS): *Public Use Microdata Sample* (PUMS), 2006. Washington, D.C.: U.S. Department of Commerce, Bureau of the Census.

# REPORT ON TEXAS HEALTH AND HUMAN SERVICES COMMISSION SERVICES AND BENEFITS PROVIDED TO UNDOCUMENTED IMMIGRANTS

*Update to the Report Required by the*

2008-09 General Appropriations Act,
H.B. 1, 80th Legislature, Regular Session, 2007
(Article II, Health and Human Services Commission, Rider 59)

## FEBRUARY 2013 UPDATE



*Strategic Decision Support*
**Financial Services Division**
**TEXAS HEALTH AND HUMAN SERVICES COMMISSION**

# Table of Contents

I     Background.................................................................................................................3

II    Executive Data Summary........................................................................................4

III   Analytical Notes.......................................................................................................5

IV   References ................................................................................................................9

## I – Background

The 2008-09 General Appropriations Act, H.B. 1, 80th Legislature, Regular Session, 2007 (Article II, Health and Human Services Commission, Rider 59) required the Texas Health and Human Services Commission (HHSC) to report the cost of services and benefits provided by HHSC to undocumented immigrants in the state. Rider 59 also required HHSC to compile these data for each Texas public hospital district facility. This report was originally completed in 2008. Due to numerous requests for related current information, the report was updated in 2010. This report is the second update to that original report. The text of Rider 59 is included below, with the updated data and supporting documentation on subsequent pages.

### Rider 59 — Report to the United States Congress on Services and Benefits Provided to Undocumented Immigrants

*The Health and Human Services Commission shall compile a report of the cost of services and benefits provided to undocumented immigrants, with the agency determining the extent to which undocumented immigrants are served by the agency, by individual program. The agency may use a statistical method developed by the agency in cases where it is not practical for the agency to directly determine whether recipients of a service or benefit are undocumented immigrants.*

*The Health and Human Services Commission shall also compile information on this subject from each public hospital district within the state and include this information in the report and shall not enforce Title 8 of the United States Code when compiling information on this subject.*

*The report must be produced using aggregated statistical data that does not contain personally identifiable information. The purpose of compiling this information is to perform analysis to assist the United States Congress and this state in making future health care and budgetary decisions. Information sought for the preparation of this report may not violate any federal or state laws, including rules, regarding privacy.*

*This report shall be provided to the United States Congress by December 1, 2008, and may be used as supporting materials by the State of Texas in requests for additional federal appropriations to assist with these costs.*

*The Health and Human Services Commission or a public hospital district may compile and report the information required by this rider only in a manner the attorney general of this state certifies as consistent with federal law.*

*The Health and Human Services Commission again shall submit the required report to the Lieutenant Governor, Speaker of the House of Representatives, and Members of the Legislature by December 1, 2008, and shall include the information in the agency's annual report for 2008.*

## II – Executive Data Summary

## TEXAS HEALTH AND HUMAN SERVICES COMMISSION SERVICES AND BENEFITS PROVIDED TO UNDOCUMENTED IMMIGRANTS

*Estimated cost of services and benefits provided to undocumented immigrants in fiscal year **(FY) 2011**:*

(1) Texas Emergency Medicaid — *$71 million*

+

(2) Texas Family Violence Program (FVP) — *$1.28 million*

+

(3) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage — *$35 million*

=

**$107 million**

| Comparison of Estimates in Previous Reports and Current Estimate | | | |
|---|---|---|---|
| | **FY 2007** | **FY 2009** | **FY 2011** |
| (1) Texas Emergency Medicaid | $ 80 million | $ 62 million | $ 71 million |
| (2) Texas Family Violence Program (FVP) | $1.2 million | $1.3 million | $1.28 million |
| (3) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage | N/A* | $ 33 million | $ 35 million |
| **TOTAL TEXAS HEALTH AND HUMAN SERVICES COMMISSION** | **$ 81.2 million** | **$ 96 million** | **$ 107 million** |

*\* Expenditures for CHIP Perinatal Coverage were not included in the original 2008 Rider 59 report since, at the time of its completion, a full year of program data was not available.*

## III – Analytical Notes

### 1.   Texas Emergency Medicaid

Emergency Medicaid, Type Program 30 (TP 30), is a federal and state funded program that provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor to non-citizens including undocumented immigrants, living in the United States. Emergency Medicaid is a federally required program.

Three steps are necessary to estimate the cost of services and benefits that HHSC provided to undocumented immigrants: A) Determine total Emergency Medicaid (TP 30) expenditures during fiscal year 2011; B) Estimate the fraction of undocumented non-citizens during this timeframe and amounts expended on this population; and C) Calculate the state share of TP 30 expenditures for the undocumented population.

During fiscal year 2011 payments for Emergency Medicaid, TP 30, were as follows:

— **A** —

**Texas Emergency Medicaid, Type Program 30, Fiscal Year 2011**

| | |
|---|---:|
| Inpatient hospital | *$299,203,323* |
| Outpatient hospital | *$24,845,002* |
| Professional and other services | *$16,591,397* |
| Vendor drug | *$93,345* |
| **(A) Total** | **$340,733,067** |

Since HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of the $340.7 million in Emergency Medicaid payments attributable to undocumented immigrants must be estimated.

According to the U.S. Census Bureau's *American Community Survey* (ACS) for Texas, approximately 2.83 million non-citizens resided in Texas in 2011. The Department of Homeland Security reports that 1.79 million, or 63 percent, of these residents were undocumented. Therefore, the estimated amount paid for Emergency Medicaid services to undocumented immigrants residing in Texas is about $215 million:

## III – Analytical Notes (*Continued*)

— B —

**(A)** Texas Emergency Medicaid *($341 million)*

x

Estimated Percent of Non-Citizens Who Are Undocumented Immigrants *(63%)*

=

**(B₁) $215 million**

The state shares the cost of the Medicaid program with the federal government, with Texas typically paying about 40 percent of Emergency Medicaid expenditures. However, in fiscal year 2009, due to provisions of the American Recovery and Reinvestment Act of 2009 (ARRA), the federal government temporarily increased its share of Medicaid expenditures to 68 percent, leaving the state with a 32 percent share. In fiscal year 2011, Texas' share of Medicaid expenditures increased to 33 percent **(B₂)**. Therefore, the total estimated state cost for Emergency Medicaid services provided to undocumented immigrants residing in Texas in fiscal year 2011 was about $71 million**.**

— C —

**(B₁)** Estimated Texas Emergency Medicaid for Undocumented Immigrants Residing in Texas (*$215 million*)

x

**(B₂)** Texas Share of Medicaid Cost under ARRA *(33%)*

=

**$71 million**

| Comparison of Estimates in Previous Reports and Current Estimate | | | |
|---|---|---|---|
| | **FY 2007** | **FY 2009** | **FY 2011** |
| Inpatient hospital | $252,300,000 | $275,010,314 | $299,203,323 |
| Outpatient hospital | $11,200,000 | $13,248,238 | $24,845,002 |
| Professional and other services | $53,700,000 | $20,778,110 | $16,591,396 |
| Vendor Drug | $124,500 | $159,096 | $93,345 |
| **(A)** Sum of Expenditures | $317,324,500 | $309,195,758 | $340,733,067 |
| **(B₁)** Estimated amount paid for services to undocumented immigrants | $ 200 million | $ 194.8 million | $ 215 million |
| **(B₂)** Texas' share of TP 30 expenditures | 40% | 32% | 33% |
| **(C) TEXAS' SHARE OF EXPENDITURES** | **$ 80 million** | **$ 62 million** | **$ 71 million** |

## III – Analytical Notes (*Continued*)

### 2.  Texas Family Violence Program

The Texas Family Violence Program (FVP) contracts with non-profit agencies in three categories (shelter centers, non-residential centers, and special non-residential projects [SNRPs]) across the state to provide essential services to victims of family violence. Core FVP services include shelter, 24-hour hotlines, emergency medical services, counseling, etc. In fiscal year 2011, the FVP funded 70 non-profit family violence shelters, 10 non-residential centers, and 16 SNRPs, providing comprehensive family violence services to victims, with a total budget of $23,682,177. State general revenue and Temporary Assistance for Needy Families (TANF) converted to Title XX accounted for about $18 million ($18,281,411) of the program's total spending for direct services. Services are provided without any financial eligibility testing and are free of charge.

The FVP does not ask victims of family violence about their residency status. Therefore, the portion of the $18 million in FVP expenditures attributable to undocumented immigrants must be estimated. According to the U.S. Census Bureau's *American Community Survey* (ACS) for Texas, approximately 25.7 million individuals resided in Texas in 2011. The Department of Homeland Security reports that 1.79 million, or 7 percent, of these residents were undocumented. The total estimated state cost for direct FVP services to undocumented immigrants in fiscal year 2011 was:

Texas Family Violence Program budget *($18 million)*

**x**

Estimated Percent of Undocumented Immigrants in Texas *(7%)*

=

**$1.28 million**

| Comparison of Estimates in Previous Reports and Current Estimate | | | |
|---|---|---|---|
| | **SFY 2007** | **SFY 2009** | **SFY 2011** |
| Texas Family Violence Program budget | $ 16.8 million | $ 19 million | $ 18 million |
| **ESTIMATED COSTS FOR DIRECT FVP SERVICES TO UNDOCUMENTED IMMIGRANTS** | $1.2 million | $1.3 million | $1.28 million |

## III – Analytical Notes (*Continued*)

### 3.  Texas Children's Health Insurance Program (CHIP) Perinatal Coverage

Texas CHIP Perinatal Coverage provides prenatal care to low-income women living at up to 200% of the Federal Poverty Level (FPL) who do not otherwise qualify for Medicaid, typically due to their citizenship status. Nearly all CHIP Perinatal Coverage enrollees are either documented or undocumented non-citizens. Since this program does not require citizenship documentation, there is no way to definitively report the number of undocumented immigrants served. Therefore, the portion of the $201 million in CHIP Perinatal Coverage expenditures (which represents prenatal services only) in fiscal year 2011 attributable to undocumented immigrants must be estimated. Note: CHIP Perinatal Coverage expenditures were not included in the original Rider 59 report since, at the time of its completion, a full year of program data was not available.

According to the U.S. Census Bureau's *American Community Survey* (ACS) for Texas, approximately 2.83 million non-citizens resided in Texas in 2011. The Department of Homeland Security reports that 1.79 million, or 63 percent, of these residents were undocumented. Therefore, this brings the estimated amount paid for Texas CHIP Perinatal Coverage services to undocumented immigrants residing in Texas for fiscal year 2011 to about $127 million:

Texas CHIP Perinatal Coverage budget *($201 million)*
**x**
Estimated Percent of Non-Citizens Who Are Undocumented Immigrants *(63%)*
=
**$127 million**

The state shares the cost of the CHIP program with the federal government.  Texas typically pays about 28 percent of expenditures. Therefore, the total estimated state cost for CHIP Perinatal Coverage to undocumented immigrants residing in Texas in fiscal year 2011 was about $35 million**.**

Estimated CHIP Perinatal Coverage for Undocumented
Immigrants Residing in Texas (*$127 million*)
**x**
Texas Share of CHIP Expenditures *(28%)*
=
**$35 million**

| Comparison of Estimates in Previous Reports and Current Estimate | | | |
|---|---|---|---|
| | **FY 2007** | **FY 2009** | **FY 2011** |
| Texas CHIP Perinatal Coverage budget | * | $ 188 million | $ 201 million |
| Estimated amount paid for services to undocumented immigrants | * | $ 118 million | $ 127 million |
| **Texas' share of the expenditures** | * | $ 33 million | $ 35 million |

*\* Expenditures for CHIP Perinatal Coverage were not included in the original 2008 Rider 59 report since, at the time of its completion, a full year of program data was not available.*

# IV – References

The 2008-09 General Appropriations Act, H.B. 1, 80th Legislature, Regular Session, 2007 (Article II, Health and Human Services Commission, Rider 59).

Texas Comptroller of Public Accounts, 2006. *Special Report: Undocumented Immigrants in Texas, A Financial Analysis of the Impact to the State Budget and Economy.* Publication #96-1224. Retrieved September 6, 2008, from http://www.window.state.tx.us/specialrpt/undocumented/undocumented.pdf.

Texas Health and Human Services Commission, *Medicaid Administrative Data*, Austin.

U.S. Department of Homeland Security. *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011.* Retrieved from:
  http://www.dhs.gov/xlibrary/assets/statistics/publications/ois_ill_pe_2011. pdf
Date of publication: March 2012.

U.S. Department of Commerce.  *American Community Survey (ACS); Public Use Microdata Sample (PUMS) for 2011.* Washington, D.C.:  U.S. Census Bureau. Date of publication: October 2012.

# REPORT ON TEXAS HEALTH AND HUMAN SERVICES COMMISSION SERVICES AND BENEFITS PROVIDED TO UNDOCUMENTED IMMIGRANTS

*Update to the Report Required by the*

2008-09 General Appropriations Act,
H.B. 1, 80th Legislature, Regular Session, 2007
(Article II, Health and Human Services Commission, Rider 59)

## DECEMBER 2014 UPDATE



*Strategic Decision Support*
**Financial Services Division**
**TEXAS HEALTH AND HUMAN SERVICES COMMISSION**

App. 566

# Table of Contents

I      Background.................................................................................................................3

II     Executive Data Summary..................................................................................4

III    Analytical Notes ...................................................................................................5

IV    References ...............................................................................................................9

# I – Background

The 2008-09 General Appropriations Act, H.B. 1, 80th Legislature, Regular Session, 2007 (Article II, Health and Human Services Commission, Rider 59) required the Texas Health and Human Services Commission (HHSC) to report the cost of services and benefits provided by HHSC to undocumented immigrants in the state. This report was originally completed in 2008. Due to numerous requests for related current information, the report was updated in 2010 and 2012. This report is the third update to the original report. The text of Rider 59 is included below, with the updated data and supporting documentation on subsequent pages.

## Rider 59 — Report to the United States Congress on Services and Benefits Provided to Undocumented Immigrants

*The Health and Human Services Commission shall compile a report of the cost of services and benefits provided to undocumented immigrants, with the agency determining the extent to which undocumented immigrants are served by the agency, by individual program. The agency may use a statistical method developed by the agency in cases where it is not practical for the agency to directly determine whether recipients of a service or benefit are undocumented immigrants.*

*The Health and Human Services Commission shall also compile information on this subject from each public hospital district within the state and include this information in the report and shall not enforce Title 8 of the United States Code when compiling information on this subject.*

*The report must be produced using aggregated statistical data that does not contain personally identifiable information. The purpose of compiling this information is to perform analysis to assist the United States Congress and this state in making future health care and budgetary decisions. Information sought for the preparation of this report may not violate any federal or state laws, including rules, regarding privacy.*

*This report shall be provided to the United States Congress by December 1, 2008, and may be used as supporting materials by the State of Texas in requests for additional federal appropriations to assist with these costs.*

*The Health and Human Services Commission or a public hospital district may compile and report the information required by this rider only in a manner the attorney general of this state certifies as consistent with federal law.*

*The Health and Human Services Commission again shall submit the required report to the Lieutenant Governor, Speaker of the House of Representatives, and Members of the Legislature by December 1, 2008, and shall include the information in the agency's annual report for 2008.*

## II – Executive Data Summary

## TEXAS HEALTH AND HUMAN SERVICES COMMISSION SERVICES AND BENEFITS PROVIDED TO UNDOCUMENTED IMMIGRANTS

*Estimated cost of services and benefits provided to undocumented immigrants in fiscal year (FY) 2013:*

(1) Texas Emergency Medicaid — *$90 million*

+

(2) Texas Family Violence Program (FVP) — *$1.4 million*

+

(3) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage — *$38 million*

=

**$129 million**

| Comparison of Estimates in Previous Reports and Current Estimate | | | | |
|---|---|---|---|---|
| | **FY 2007** | **FY 2009** | **FY 2011** | **FY 2013** |
| (1) Texas Emergency Medicaid | $ 80 million | $ 62 million | $ 71 million | $ 90 million |
| (2) Texas Family Violence Program (FVP) | $1.2 million | $1.3 million | $1.3 million | $1.4 million |
| (3) Texas Children's Health Insurance Program (CHIP) | N/A* | $ 33 million | $ 35 million | $ 38 million |
| Perinatal Coverage | | | | |
| **TOTAL TEXAS HEALTH AND HUMAN SERVICES COMMISSION** | **$ 81 million** | **$ 96 million** | **$ 107 million** | **$ 129 million** |

*\* Expenditures for CHIP Perinatal Coverage were not included in the original 2008 Rider 59 report since, at the time of its completion, a full year of program data was not available.*

# III – Analytical Notes

## 1.   Texas Emergency Medicaid

Emergency Medicaid, Type Program 30 (TP 30), is a federal and state funded program that provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor to non-citizens including undocumented immigrants, living in the United States. Emergency Medicaid is a federally required program.

Three steps are necessary to estimate the cost of services and benefits that HHSC provided to undocumented immigrants: A) Determine total Emergency Medicaid (TP 30) expenditures during fiscal year 2013; B) Estimate the fraction of undocumented non-citizens during this timeframe and amounts expended on this population; and C) Calculate the state share of TP 30 expenditures for the undocumented population.

During fiscal year 2013 payments for Emergency Medicaid, TP 30, were as follows:

— A —

### Texas Emergency Medicaid, Type Program 30, Fiscal Year 2013

| | |
|---|---|
| Inpatient hospital | $299,447,148 |
| Outpatient hospital | $26,084,046 |
| Professional and other services | $19,043,497 |
| Vendor drug | $97,954 |
| **(A) Total** | **$337,672,645** |

Since HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of the $337.7 million in Emergency Medicaid payments attributable to undocumented immigrants must be estimated.

According to the U.S. Census Bureau's *American Community Survey* (ACS) for Texas, approximately 2.87 million non-citizens resided in Texas in 2013. HHSC Strategic Decision Support estimates based on 2012 Department of Homeland Security reports, that in 2013 1.88 million, or 65.5 percent, of these residents were undocumented. Therefore, the estimated amount paid for Emergency Medicaid services to undocumented immigrants residing in Texas is about $221 million:

# III – Analytical Notes (*Continued*)

## — B —

**(A)** Texas Emergency Medicaid *($337.7 million)*
x
Estimated Percent of Non-Citizens Who Are Undocumented Immigrants *(65.5%)*
=
**($B_1$) $221 million**

The state shares the cost of the Medicaid program with the federal government, with Texas typically paying about 40 percent of Emergency Medicaid expenditures. However, in fiscal year 2009, due to provisions of the American Recovery and Reinvestment Act of 2009 (ARRA), the federal government temporarily increased its share of Medicaid expenditures to 68 percent, leaving the state with a 32 percent share. In fiscal year 2011, Texas' share of Medicaid expenditures increased to 33 percent.  Texas' share for 2013 increased to pre ARRA levels (to approximately 41%) in 2013 (**$B_2$**). Therefore, the total estimated state cost for Emergency Medicaid services provided to undocumented immigrants residing in Texas in fiscal year 2013 was about $90 million**.**

## — C —

**($B_1$)** Estimated Texas Emergency Medicaid for Undocumented
Immigrants Residing in Texas *($221 million)*
x
**($B_2$)** Texas Share of Medicaid Cost *(40.79%)*
=
**$90 million**

| Comparison of Estimates in Previous Reports and Current Estimate | | | | |
|---|---|---|---|---|
| | **FY 2007** | **FY 2009** | **FY 2011** | **FY 2013** |
| Inpatient hospital | $252,300,000 | $275,010,314 | $299,203,323 | $299,447,148 |
| Outpatient hospital | $11,200,000 | $13,248,238 | $24,845,002 | $26,084,046 |
| Professional and other services | $53,700,000 | $20,778,110 | $16,591,396 | $19,043,497 |
| Vendor Drug | $124,500 | $159,096 | $93,345 | $97,954 |
| **(A)** Sum of Expenditures | $317,324,500 | $309,195,758 | $340,733,067 | $337,672,645 |
| **($B_1$)** Estimated amount paid for services to undocumented immigrants | $ 200 million | $ 195 million | $ 215 million | $ 221 million |
| **($B_2$)** Texas' share of TP 30 expenditures* | 39.23% | 31.74% | 32.68% | 40.79% |
| **(C) TEXAS' SHARE OF EXPENDITURES** | $ 80 million | $ 62 million | $ 71 million | $ 90 million |

*FY 2009 and 2011 represent years for which the Federal ARRA program reduced Texas' share of CHIP payments.

## III – Analytical Notes (*Continued*)

### 2. Texas Family Violence Program

The Texas Family Violence Program (FVP) contracts with non-profit agencies in three categories (shelter centers, non-residential centers, and Special Nonresidential Projects [SNRPs]) across the state to provide essential services to victims of family violence. Core FVP services include shelter, 24-hour hotlines, emergency medical services, counseling, etc. In fiscal year 2013, the FVP funded 70 non-profit family violence shelters, 10 non-residential centers, and 16 SNRPs, providing comprehensive family violence services to victims, with a total budget of $25,484,083. State general revenue and Temporary Assistance for Needy Families (TANF) converted to Title XX accounted for about $20 million ($20,139,326) of the program's total spending for direct services. Services are provided without any financial eligibility testing and are free of charge.

The FVP does not ask victims of family violence about their residency status. Therefore, the portion of the $20 million in FVP expenditures attributable to undocumented immigrants must be estimated. According to the U.S. Census Bureau's *American Community Survey* (ACS) for Texas, approximately 26.4 million individuals resided in Texas in 2013. HHSC Strategic Decision Support estimates based on 2012 Department of Homeland Security reports, that in 2013 1.88, or 7.1 percent, of these residents were undocumented. The total estimated state cost for direct FVP services to undocumented immigrants in fiscal year 2013 was:

Texas Family Violence Program budget *($20 million)*
**x**
Estimated Percent of Undocumented Immigrants in Texas *(7.1%)*
=
**$1.4 million**

| Comparison of Estimates in Previous Reports and Current Estimate | | | | |
|---|---|---|---|---|
| | **SFY 2007** | **SFY 2009** | **SFY 2011** | **SFY 2013** |
| Texas Family Violence Program budget | $ 17 million | $ 19 million | $ 18 million | $ 20 million |
| **ESTIMATED COSTS FOR DIRECT FVP SERVICES TO UNDOCUMENTED IMMIGRANTS** | **$1.2 million** | **$1.3 million** | **$1.3 million** | **$1.4 million** |

## III – Analytical Notes (*Continued*)

### 3.  Texas Children's Health Insurance Program (CHIP) Perinatal Coverage

Texas CHIP Perinatal Coverage provides prenatal care to low-income women living at up to 200% of the Federal Poverty Level (FPL) who do not otherwise qualify for Medicaid, typically due to their citizenship status. Nearly all CHIP Perinatal Coverage enrollees are either documented or undocumented non-citizens. Since this program does not require citizenship documentation, there is no way to definitively report the number of undocumented immigrants served. Therefore, the portion of the $204 million in CHIP Perinatal Coverage expenditures (which represents prenatal services only) in fiscal year 2013 attributable to undocumented immigrants must be estimated. Note: CHIP Perinatal Coverage expenditures were not included in the original Rider 59 report since, at the time of its completion, a full year of program data was not available.

According to the U.S. Census Bureau's *American Community Survey* (ACS) for Texas, approximately 2.87 million non-citizens resided in Texas in 2013. HHSC Strategic Decision Support estimates based on 2012 Department of Homeland Security reports, that in 2013 1.88, or 65.5 percent, of these residents were undocumented. Therefore, this brings the estimated amount paid for Texas CHIP Perinatal Coverage services to undocumented immigrants residing in Texas for fiscal year 2013 to about $134 million:

Texas CHIP Perinatal Coverage Expenditures *($204 million)*

**x**

Estimated Percent of Non-Citizens Who Are Undocumented Immigrants *(65.5%)*

=

**$134 million**

The state shares the cost of the CHIP program with the federal government.  Texas typically pays about 28.5 percent of expenditures. Therefore, the total estimated state cost for CHIP Perinatal Coverage to undocumented immigrants residing in Texas in fiscal year 2013 was about $38 million**.**

Estimated CHIP Perinatal Coverage for Undocumented
Immigrants Residing in Texas (*$134 million*)

**x**

Texas Share of CHIP Expenditures *(28.5%)*

=

**$38 million**

| Comparison of Estimates in Previous Reports and Current Estimate | | | | |
|---|---|---|---|---|
| | **FY 2007** | **FY 2009** | **FY 2011** | **FY 2013** |
| Texas CHIP Perinatal Coverage expenditures | * | $ 188 million | $ 201 million | $ 204 million |
| Estimated amount paid for services to undocumented immigrants | * | $ 118 million | $ 127 million | $ 134 million |
| **Texas' share of the expenditures** | * | **$ 33 million** | **$ 35 million** | **$ 38 million** |

*\* Expenditures for CHIP Perinatal Coverage were not included in the original 2008 Rider 59 report since, at the time of its completion, a full year of program data was not available.*

# IV – References


The 2008-09 General Appropriations Act, H.B. 1, 80th Legislature, Regular Session, 2007 (Article II, Health and Human Services Commission, Rider 59).

Texas Health and Human Services Commission, *Medicaid Administrative Data*, Austin.

U.S. Department of Homeland Security, Office of Immigration Statistics, Policy Directory: "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012". Original Date of Publication March 2013.

U.S. Census Bureau. American Community Survey for Texas: Public Use Micro Data Sample Files for 2012.

U.S. Census Bureau. American Community Survey for Texas: Public Use Micro Data Sample Files for 2013.

# Report on Texas Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants

## Update to the Report Required by
## Rider 59, H. B.  1,
## 80th Legislature,
## Regular Session, 2007



Center for Analytics and Decision Support ◆ Policy and Performance Division

## TEXAS HEALTH AND HUMAN SERVICES COMMISSION

March 2017

# Table of Contents

I      Background ...........................................................................................................3

II     Executive Data Summary ....................................................................................4

III    Analytical Notes...................................................................................................5

IV    References .........................................................................................................10

# I – Background

As required by the 2008-09 General Appropriations Act, H.B. 1, 80th Legislature, Regular Session, 2007 (Article II, Health and Human Services Commission, Rider 59) required the Texas Health and Human Services Commission (HHSC) to prepare a report indicating the cost of services and benefits provided by HHSC to undocumented immigrants in the state. This report was originally completed in 2008. Due to numerous requests for related current information, the report was updated in each subsequent biennium. This report is the fourth update to the original report. The text of Rider 59 is included below, with the updated data and supporting documentation on subsequent pages.

## Rider 59 — Report to the United States Congress on Services and Benefits Provided to Undocumented Immigrants

The Health and Human Services Commission shall compile a report of the cost of services and benefits provided to undocumented immigrants, with the agency determining the extent to which undocumented immigrants are served by the agency and by individual program. The agency may use a statistical method developed by the agency in cases where it is not practical for the agency to directly determine whether recipients of a service or benefit are undocumented immigrants.

The Health and Human Services Commission shall also compile information on this subject from each public hospital district within the state and include this information in the report and shall not enforce Title 8 of the United States Code when compiling information on this subject.

The report must be produced using aggregated statistical data that does not contain personally identifiable information. The purpose of compiling this information is to perform analysis to assist the United States Congress and this state in making future health care and budgetary decisions. Information sought for the preparation of this report may not violate any federal or state laws, including rules, regarding privacy.

This report shall be provided to the United States Congress by December 1, 2008, and may be used as supporting materials by the State of Texas in requests for additional federal appropriations to assist with these costs.

The Health and Human Services Commission or a public hospital district may compile and report the information required by this rider only in a manner the attorney general of this state certifies as consistent with federal law.

The Health and Human Services Commission again shall submit the required report to the Lieutenant Governor, Speaker of the House of Representatives, and Members of the Legislature by December 1, 2008, and shall include the information in the agency's annual report for 2008.

# II – Executive Data Summary

## TEXAS HEALTH AND HUMAN SERVICES COMMISSION
## SERVICES AND BENEFITS PROVIDED TO UNDOCUMENTED IMMIGRANTS

Estimated cost of services and benefits provided to undocumented immigrants in fiscal year 2015:

(1) Texas Emergency Medicaid — $73 million

+

(2) Texas Family Violence Program (FVP) — $1.0 million

+

(3) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage — $30 million

=

**$104 million**

### Comparison of Estimates in Previous Reports and Current Estimate (in millions)

| Program | FY 2007 | FY 2009 | FY 2011 | FY 2013 | FY 2015 |
|---|---|---|---|---|---|
| (1) Texas Emergency Medicaid | $80 | $62 | $71 | $90 | $73 |
| (2) Texas Family Violence Program | $1.2 | $1.3 | $1.3 | $1.4 | $1.0 |
| (3) Texas Children's Health Insurance Program Perinatal Coverage | N/A* | $33 | $35 | $38 | $30 |
| **TOTAL TEXAS HEALTH AND HUMAN SERVICES COMMISSION** | **$81** | **$96** | **$107** | **$129** | **$104** |

* Expenditures for CHIP Perinatal Coverage were not included in the original 2008 Rider 59 report since, at the time of its completion, a full year of program data was not available.

## III – Analytical Notes

### 1.  Undocumented Immigrant Estimates

For past reports, HHSC has relied on 2 separate sources of official federal government data to develop in-house estimates of the percent of Texas residents that are undocumented immigrants:

- The Texas-specific sample of the U.S. Census Bureau's American Community Survey (ACS), and;
- The Office of Immigration Statistics of the U.S. Department of Homeland Security (DHS).

The ACS provides direct (large survey-based) annual estimates of the total population in Texas according to U.S. citizen status (citizen versus non-citizen).  However, the estimate of non-U.S. citizens is not broken down according to documented/undocumented status. The most recent available estimate is 2015.

In contrast, DHS uses ACS and additional data taken from administrative records to estimate the number and percent of undocumented non-citizens. The estimates are calculated for the U.S. as a whole and for some of the larger states, including Texas.   The last available DHS estimates and reports were published in March 2013 for January 2012. No updates have been provided since then.

Before DHS suspended the publication of its estimates, HHSC derived its estimate by taking DHS's estimate for total undocumented immigrants in Texas and dividing it by the ACS estimate for total non-U.S. citizens in the state. This would result in the HHSC estimate of the proportion/percent of undocumented non-U.S. citizens in Texas.

With the indefinite suspension of DHS's reports, the ACS has become the most reliable source of official federal government data on the number of non-U.S. citizens in Texas.

In an attempt to avoid making uninformed estimates, and considering the historical record, HHSC opted to assume a conservative approach that presently no less than 50% of non-U.S. citizens residing in Texas are undocumented. Although the estimate is not as high as the former DHS method, and no other 'exact estimate' currently exists, given recent migration trends it's unlikely that the current estimate would be less than 50%.

### 2.  Texas Emergency Medicaid

Emergency Medicaid, Type Program 30 (TP 30), is a federal and state funded program that provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor to non-citizens including undocumented immigrants, living in the United States. Emergency Medicaid is a federally required program.

Three steps are necessary to estimate the cost of services and benefits that the Texas Health and Human Services Commission (HHSC) provided to undocumented immigrants: A) Determine total Emergency Medicaid (TP 30) expenditures during fiscal year 2015; B) Estimate the fraction of undocumented non-citizens during this timeframe and amounts expended on this population; and C) Calculate the state share of TP 30 expenditures for the undocumented population.

During fiscal year 2015 payments for Emergency Medicaid, TP 30, were as follows:

— **A** —

**Texas Emergency Medicaid, Type Program 30, Fiscal Year 2015**

| | |
|---|---|
| Inpatient hospital | $303,177,586 |
| Outpatient hospital | $25,110,412 |
| Professional and other services | $21,105,306 |
| Vendor drug | $112,961 |
| **(A) Total** | **$349,506,265** |

Since HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of the $349.5 million in Emergency Medicaid payments attributable to undocumented immigrants must be estimated.

According to the U.S. Census Bureau's *American Community Survey* (ACS) for Texas, approximately 2.96 million non-citizens resided in Texas in 2015. The HHSC's Center for Analytics and Decision Support (CADS) estimates that no less than 50 percent of these residents (1.48 million) were undocumented. Therefore, the estimated amount paid for Emergency Medicaid services to undocumented immigrants residing in Texas is about $174.8 million.

## III – Analytical Notes (*Continued*)

— B —

(A) Texas Emergency Medicaid ($349.5 million)

x

Estimated Percent of Non-Citizens Who Are Undocumented Immigrants (50 percent)

=

(B₁) $175 million

The state shares the cost of the Medicaid program with the federal government, with Texas typically paying about 40 percent of Emergency Medicaid expenditures.  However, in fiscal year 2009, due to provisions of the American Recovery and Reinvestment Act of 2009 (ARRA), the federal government temporarily increased its share of Medicaid expenditures to 68 percent, leaving the state with a 32 percent share. In fiscal year 2011, Texas' share of Medicaid expenditures increased to 33 percent.  Texas' share for 2013 increased to pre ARRA levels (to approximately 41 percent) in 2013.  In 2015, Texas's share of Medicaid program costs was 41.90 percent (B₂).  Therefore, the total estimated state cost for Emergency Medicaid services provided to undocumented immigrants residing in Texas in fiscal year 2015 was about $73 million.

— C —

(B₁) Estimated Texas Emergency Medicaid for Undocumented
Immigrants Residing in Texas ($175 million)

x

(B₂) Texas Share of Medicaid Cost (41.90 percent)

=

**$73 million**

### Comparison of Estimates in Previous Reports and Current Estimate

| Expenditures | FY 2007 | FY 2009 | FY 2011 | FY 2013 | FY 2015 |
|---|---|---|---|---|---|
| Inpatient hospital | $252,300,000 | $275,010,314 | $299,203,323 | $299,447,148 | $303,177,586 |
| Outpatient hospital | $11,200,000 | $13,248,238 | $24,845,002 | $26,084,046 | $25,110,412 |
| Professional and other services | $53,700,000 | $20,778,110 | $16,591,396 | $19,043,497 | $21,105,306 |
| Vendor Drug | $124,500 | $159,096 | $93,345 | $97,954 | $112,961 |
| (A) Sum of Expenditures | $317,324,500 | $309,195,758 | $340,733,067 | $337,672,645 | $349,506,265 |
| (B₁) Estimated amount paid for services to undocumented immigrants | $200 million | $195 million | $215 million | $221 million | $175 million |
| (B₂) Texas' share of TP 30 expenditures* | 39.23% | 31.74% | 32.68% | 40.79% | 41.90% |
| (C) TEXAS' SHARE OF EXPENDITURES | **$80 million** | **$62 million** | **$71 million** | **$90 million** | **$73 million** |

*FY 2009 and 2011 represent years for which the Federal ARRA program reduced Texas' share of Medicaid payments.

# III – Analytical Notes (*Continued*)

### 3. Texas Family Violence Program

The Texas Family Violence Program (FVP) provides emergency support and prevention services for survivors of family violence and their children through shelter, nonresidential and special nonresidential project contracts with local community and faith-based nonprofit organizations.  The FVP contracted family violence centers provide comprehensive services which includes: 24-hour emergency shelter and crisis hotline services, referrals to existing community services and employment resources, emergency medical care and transportation, crisis intervention for adults and children, educational arrangements for children, and legal advocacy in civil and criminal justice system.  In fiscal year 2015, the FVP funded 71 non-profit family violence shelters, 10 non-residential centers, 28 special nonresidential projects, and 17 exceptional item funding projects, providing comprehensive family violence services to victims, with a total budget of $27,360,863.

State general revenue and Temporary Assistance for Needy Families (TANF) converted to Title XX accounted for about $19 million ($18,548,732) of the program's total spending for direct services. Services are provided without any financial eligibility testing and are free of charge.

The FVP does not screen family violence clients for residency status data.  Therefore, the portion of the $19 million TANF to Title XX funds in Family Violence expenditures attributable to undocumented immigrants must be estimated.  According to the U.S. Census Bureau's ACS for Texas, approximately 27.5 million individuals resided in Texas in 2015.  This total includes 2.96 million non U.S. Citizens.

The HHSC's CADS estimates that at least half or 1.48 million of the non U.S. Citizens were undocumented.   Based on this estimate, 5.4 percent of the total population of 27.5 million in 2015 were undocumented.  The total estimated state cost for direct FVP services to undocumented immigrants residing in Texas in fiscal year 2015 was about $1 million.

Texas Family Violence Program Expenditures ($19 million)
**x**
Estimated Percent of Undocumented Immigrants in Texas (5.4 percent)
=
**$1.0 million**

### Comparison of Estimates in Previous Reports and Current Estimate (in millions)

| Expenditures | FY 2007 | FY 2009 | FY 2011 | FY 2013 | FY 2015 |
|---|---|---|---|---|---|
| Texas Family Violence Program expenditures | $17 | $19 | $18 | $20 | $19 |
| **ESTIMATED COSTS FOR DIRECT FVP SERVICES TO UNDOCUMENTED IMMIGRANTS** | **$1.2** | **$1.3** | **$1.3** | **$1.4** | **$1.0** |

# III – Analytical Notes (*Continued*)

### 4.   Texas Children's Health Insurance Program Perinatal Coverage

The Texas Children's Health Insurance Program (CHIP) Perinatal Coverage provides prenatal care to low-income women living at up to 200 percent of the Federal Poverty Level who do not otherwise qualify for Medicaid, typically due to their citizenship status.  Nearly all CHIP Perinatal Coverage enrollees are either documented or undocumented non-citizens.  Since this program does not require citizenship documentation, there is no way to definitively report the number of undocumented immigrants served.  Therefore, the portion of the $202.6 million in CHIP Perinatal Coverage expenditures (which represents prenatal services only) in fiscal year 2015 attributable to undocumented immigrants must be estimated.  Note: CHIP Perinatal Coverage expenditures were not included in the original Rider 59 report since, at the time of its completion, a full year of program data was not available.

According to the U.S. Census Bureau's ACS for Texas, approximately 2.96 million non-citizens resided in Texas in 2015.  The HHSC's CADS estimates that no less than 50 percent of these residents, or no less than 1.48 million were undocumented.  Therefore, this brings the estimated amount paid for Texas CHIP Perinatal Coverage services to undocumented immigrants residing in Texas for fiscal year 2015 to about $101.5 million.

Texas CHIP Perinatal Coverage Expenditures ($202.6 million)
x
Estimated Percent of Non-Citizens Who Are Undocumented Immigrants (50 percent)
=
**$101 million**

The state shares the cost of the CHIP program with the federal government.  Texas pays about 29.32 percent of expenditures.  Therefore, the total estimated state cost for CHIP Perinatal Coverage to undocumented immigrants residing in Texas in fiscal year 2015 was about $30 million**.**

Estimated CHIP Perinatal Coverage for Undocumented
Immigrants Residing in Texas ($101 million)
x
Texas Share of CHIP Expenditures (29.32 percent)
=
**$30 million**

### Comparison of Estimates in Previous Reports and Current Estimate (in millions)

| Expenditures | FY 2007 | FY 2009 | FY 2011 | FY 2013 | FY 2015 |
|---|---|---|---|---|---|
| Texas CHIP Perinatal Coverage expenditures | * | $188 | $201 | $204 | $203 |
| Estimated amount paid for services to undocumented immigrants | * | $118 | $127 | $134 | $101 |
| **TEXAS' SHARE OF THE EXPENDITURES** | * | **$33** | **$35** | **$38** | **$30** |

* Expenditures for CHIP Perinatal Coverage were not included in the original 2008 Rider 59 report since, at the time of its completion, a full year of program data was not available.

## IV – References

The 2008-09 General Appropriations Act, H.B. 1, 80th Legislature, Regular Session, 2007 (Article II, Health and Human Services Commission, Rider 59).

Texas Health and Human Services Commission, *Medicaid Administrative Data*, Austin.

U.S. Department of Homeland Security, Office of Immigration Statistics, Policy Directory: "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012." Original Date of Publication March 2013.

U.S. Census Bureau. American Community Survey for Texas: Public Use Micro Data Sample Files for 2012.

U.S. Census Bureau. American Community Survey for Texas: Public Use Micro Data Sample Files for 2013.

U.S. Census Bureau. American Community Survey for Texas: Public Use Micro Data Sample Files for 2015.

**App. 584**

# Exhibit 28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **STATE OF TEXAS**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| **UNITED STATES OF AMERICA**, et al., | ) | |
| | ) | |
| Defendants | ) | |

## DECLARATION OF LEONARDO R. LOPEZ

My name is Leonardo R. Lopez, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I am the Associate Commissioner for School Finance/Chief School Finance Officer at the Texas Education Agency ("TEA"). I have worked for TEA in this capacity since June 2016, having previously served as the Executive Director of Finance for the Austin Independent School District ("AISD") for four years. Prior to my time at AISD, I served for ten years in a variety of roles for TEA, including six years as the Foundation School Program Operations Manager for the TEA's State Funding Division.

2.      In my current position, I oversee TEA's school finance operations, including the administration of the Foundation School Program and analysis and

1

**App. 586**

327 of 393

Case 1:18-cv-00068   Document 626-2   Filed on 01/31/23 in TXSD   Page 327 of 393

processing of financial data. My responsibilities also include representing TEA in legislative hearings and school finance-related litigation.

3. TEA estimates that the average funding entitlement for 2018 will be $8,110 per student in attendance for an entire school year. If a student qualifies for the additional Bilingual and Compensatory Education weighted funding (for which most, if not all, UAC presumably would qualify), it would cost the State $9,841 to educate each student in attendance for the entire school year. Assuming additional Bilingual and Compensatory Education weighted funding, comparable student costs for fiscal year 2019 would be $9,826.

4. TEA has not received any information directly from the federal government regarding the precise number of unaccompanied children ("UAC") in Texas. However, I am aware that data from the U.S. Health and Human Services ("HHS") Office of Refugee Resettlement indicates that 3,272 UAC were released to sponsors during the 12-month period covering October 2014 through September 2015; 6,550 UAC were released to sponsors during the 12-month period covering October 2015 through September 2016; and 5,374 UAC were released to sponsors during the 12-month period covering October 2016 through September 2017. If each of these children is educated in the Texas public school system and qualifies for Bilingual and Compensatory Education weighted funding (such that the State's annual cost to educate each student for fiscal years 2016, 2017, and 2018 would be roughly $9,573, $9,639, and $9,841, respectively), the annual costs to educate these groups of children

2

**App. 587**

for fiscal years 2016, 2017, and 2018 would be approximately $31.32 million, $63.13 million, and $52.89 million, respectively.

5.      Additionally, if the same number of UAC are released to sponsors during the 12-month period covering October 2017 through September 2018 as were released during the 12-month period covering October 2016 through September 2017, and if each of these children is educated in the Texas public school system and qualifies for Bilingual and Compensatory Education weighted funding (such that the State's annual cost to educate each student for fiscal year 2019 would be roughly $9,826), the State's annual cost to educate this group of children for fiscal year 2019 would be approximately $52.81 million. Currently, all the costs of educating these students would be borne by the State.

6.      School formula funding is comprised of state and local funds. The state funding is initially based on projections made by each school district at the end of the previous biennium. Districts often experience increases in their student enrollment from year to year, and the State plans for an increase of approximately 70,000 students in enrollment growth across Texas each year.

7.      The Foundation School Program, which serves as the primary funding mechanism for providing state aid to public schools in Texas, currently has a deficit of funds that is expected to continue in fiscal year 2018 (September 2017 – August 2018). As of February 2018, this estimated deficit was $143.4 million, and the State cannot accommodate any additional UAC without adding to this deficit. Therefore, any Foundation School Program funds that are utilized to cover the State's costs of

3

**App. 588**

providing public education to UAC in Texas would not otherwise be spent and instead would be used to reduce the deficit.

      8.    Based on my knowledge and expertise regarding school finance issues impacting the State of Texas, I anticipate that the total costs to the State of providing public education to UAC will rise in the future to the extent that the number of UAC enrolled in the State's public school system increases.

      9.    All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

      Executed on this ____ day of April, 2018.

DIANE O. SALDANA
Notary Public, State of Texas
Comm. Expires 03-22-2022
Notary ID 125616163

LEONARDO R. LOPEZ

4

**App. 589**

# Exhibit 29

| From: | Ernest Herrera |
|---|---|
| To: | Disher, Todd |
| Cc: | Nina Perales; Bitter, Adam; Denise M. Hulett; rachel.apter@njoag.gov; jeremy.hollander@law.njoag.gov; kenneth.levine@law.njoag.gov; Celina Moreno; jeffrey.robins@usdoj.gov; Alejandra Avila; Biggs, Adam; Starr, Brantley; Peroyea, Trent; Goldsmith, Aaron (CIV) |
| Subject: | RE: Texas, et al. v. United States, et al. - Dr. Perryman"s Supporting Documents |
| Date: | Tuesday, July 03, 2018 4:45:04 PM |
| Attachments: | DACA TEXAS FISCAL ESTIMATES.pdf |

Todd:

Here are the calculations of costs and benefits by Dr. Perryman that you requested.

Happy 4th!

Ernest I. Herrera

-----Original Message-----
From: Disher, Todd [mailto:Todd.Disher@oag.texas.gov]
Sent: Friday, June 29, 2018 7:09 AM
To: Ernest Herrera; Nina Perales; Bitter, Adam; Denise M. Hulett; rachel.apter@njoag.gov;
jeremy.hollander@law.njoag.gov; kenneth.levine@law.njoag.gov; Celina Moreno; jeffrey.robins@usdoj.gov;
Alejandra Avila; Biggs, Adam; Starr, Brantley; Peroyea, Trent; Goldsmith, Aaron (CIV)
Subject: RE: Texas, et al. v. United States, et al. - Dr. Perryman's Supporting Documents

Nina and Ernest,

Please send us the declaration for Mr. Kerlikowske and his supporting expert documents today as soon as possible. Also, did you confirm with Dr. Perryman that we will receive his calculations of DACA's costs and benefits before the July 4 holiday?

Thank you,

Todd

Todd Lawrence Disher
Special Counsel for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov

-----Original Message-----
From: Disher, Todd
Sent: Wednesday, June 27, 2018 11:04 PM
To: 'Ernest Herrera' <eherrera@MALDEF.org>; Nina Perales <nperales@MALDEF.org>; Bitter, Adam
<Adam.Bitter@oag.texas.gov>; Denise M. Hulett <Dhulett@MALDEF.org>; rachel.apter@njoag.gov;
jeremy.hollander@law.njoag.gov; kenneth.levine@law.njoag.gov; Celina Moreno <cmoreno@MALDEF.org>;
jeffrey.robins@usdoj.gov; Alejandra Avila <Aavila@MALDEF.org>; Biggs, Adam <Adam.Biggs@oag.texas.gov>;
Starr, Brantley <Brantley.Starr@oag.texas.gov>; Peroyea, Trent <Trent.Peroyea@oag.texas.gov>; Goldsmith,
Aaron (CIV) <Aaron.Goldsmith@usdoj.gov>
Subject: RE: Texas, et al. v. United States, et al. - Dr. Perryman's Supporting Documents

Thank you, Ernest. Please confirm that you will produce the documents before the July 4 holiday.

**App. 591**

Todd

Todd Lawrence Disher
Special Counsel for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov

-----Original Message-----
From: Ernest Herrera [mailto:eherrera@MALDEF.org]
Sent: Wednesday, June 27, 2018 7:02 PM
To: Disher, Todd <Todd.Disher@oag.texas.gov>; Nina Perales <nperales@MALDEF.org>; Bitter, Adam
<Adam.Bitter@oag.texas.gov>; Denise M. Hulett <Dhulett@MALDEF.org>; rachel.apter@njoag.gov;
jeremy.hollander@law.njoag.gov; kenneth.levine@law.njoag.gov; Celina Moreno <cmoreno@MALDEF.org>;
jeffrey.robins@usdoj.gov; Alejandra Avila <Aavila@MALDEF.org>; Biggs, Adam <Adam.Biggs@oag.texas.gov>;
Starr, Brantley <Brantley.Starr@oag.texas.gov>; Peroyea, Trent <Trent.Peroyea@oag.texas.gov>; Goldsmith,
Aaron (CIV) <Aaron.Goldsmith@usdoj.gov>
Subject: RE: Texas, et al. v. United States, et al. - Dr. Perryman's Supporting Documents

Yes, we will produce them as soon as Dr. Perryman can extract them, as he described. His assistant who manages
those data is on vacation at the moment, so it may not happen this week.

From: Disher, Todd [Todd.Disher@oag.texas.gov]
Sent: Wednesday, June 27, 2018 6:40 PM
To: Ernest Herrera; Nina Perales; Bitter, Adam; Denise M. Hulett; rachel.apter@njoag.gov;
jeremy.hollander@law.njoag.gov; kenneth.levine@law.njoag.gov; Celina Moreno; jeffrey.robins@usdoj.gov;
Alejandra Avila; Biggs, Adam; Starr, Brantley; Peroyea, Trent; Goldsmith, Aaron (CIV)
Subject: Texas, et al. v. United States, et al. - Dr. Perryman's Supporting Documents

Ernest,

Please confirm that you are going to produce Dr. Perryman's estimates of the total costs and total benefits related to
his cost-benefit analysis of the DACA population. Those numbers formed the basis of Dr. Perryman's opinions
expressed in his declaration, in particular his conclusions contained in Paragraph 39. Dr. Perryman confirmed that
he can produce that information, and that information is responsive to Plaintiff States' requests for production.

Todd

Todd Lawrence Disher
Special Counsel for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>

**ESTIMATED ANNUAL NET FISCAL BENEFITS OF DACA RECIPIENTS IN TEXAS**

|  | Federal | State | Local | Total |
|---|---|---|---|---|
| **Direct Benefit** | $689,550,521 | $422,701,412 | $249,455,516 | $1,361,707,450 |
| **Indirect and Induced Net** | $1,640,661,256 | $1,083,841,205 | $515,435,131 | $3,239,937,592 |
| **Direct Costs** | ($242,128,726) | ($250,007,800) | ($533,661,055) | ($1,025,797,581) |
| **Net Total** | $2,088,083,051 | $1,256,534,817 | $231,229,593 | $3,575,847,461 |

*The Indirect and Induced Net Benefit estimate includes the spillover effects associated with both the Dire
  the Direct Costs.

ct Benefits and

# Exhibit 30

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF LEIGHTON KU, PhD, MPH

I, Leighton Ku, declare as follows:

1. My name is Leighton Ku and I am over eighteen years of age.  I have personal knowledge of and could testify in Court concerning the following statements of fact.

2. I am a Professor of Health Policy and Management and Director of the Center for Health Policy Research at the Milken Institute School of Public Health, George Washington University in Washington, DC.  I have attached my Curriculum Vitae as Exhibit A to this declaration.

3. I am a nationally-known health policy researcher with over 25 years of experience.  I have conducted substantial research about immigrant health, health care, and costs.  I have authored or co-authored more than a dozen articles and reports about immigrant health issues, including articles in peer-reviewed journals such as <u>Health Affairs</u> and

1

**App. 596**

American Journal of Public Health, as well as scholarly reports published by diverse non-profit organizations including the Migration Policy Institute, the Cato Institute and the Commonwealth Fund, as well as many more articles and reports on other subjects.  I have testified before the U.S. Senate Finance Committee about immigrant health issues and provided analyses and advice to state governments and non-governmental organizations in many states about immigrant health.

4. In November 2017, I provided an expert declaration about the effects of terminating DACA on health insurance coverage and states (*State of New York, et al. v Trump, et al.*).[1]  I have not provided testimony in any other court cases in the past four years.

5. In addition, I have conducted substantial research about health policy and employment. For example, in 2017, I authored studies about how repealing the Affordable Care Act (ACA) would affect employment levels and state economies, including "Repealing Federal Health Reform: The Economic and Employment Consequences for States" (2017).  This research is attached as Exhibit B.

6. I also have knowledge of health insurance and employment through my role as a voluntary (unpaid, appointed) Executive Board member for the District of Columbia's Health Benefits Exchange Authority, which governs the District's health insurance marketplace, formed under the federal ACA.  This includes oversight of health insurance for small businesses as well as individual health insurance in the District of Columbia.

7. I have a PhD in Health Policy from Boston University (1990) and Master of Public Health and Master of Science degrees from the University of California at Berkeley

---

[1] Declaration of Leighton Ku in *State of New York, et al. v Donald Trump, et al.* in U.S. District Court for the Eastern District of New York. Nov. 22, 2017.

(1979).  Prior to becoming a faculty member at George Washington University, I was on

the staff of the Urban Institute and the Center on Budget and Policy Priorities.

8.  I have been engaged by the Mexican American Legal Defense and Educational Fund and

the Office of the Attorney General of the State of New Jersey for this case. I am being

paid at a rate of $187.50 per hour.

### Overview

9.  This declaration discusses five topics: (1) a response to the declaration of Dr. Donald

Deere on joint effects of Deferred Action for Childhood Arrivals (DACA) and the ACA

on employment,[2] (2) the effects of terminating DACA on employment in the health sector

and on patient care, (3) a brief description of DACA recipients' eligibility for insurance

coverage under the ACA, (4) a review of the effects of DACA on mental health, and (5)

the effects of terminating DACA on health expenditures by states.  In that final section, I

also briefly discuss the declaration of Ms. Monica Smoot about medical expenditures in

Texas for undocumented immigrants.

### DACA and the ACA Do Not Create Incentives to Hire DACA Recipients Instead of U.S.-Born Citizens

10.  Dr. Donald Deere, a consultant paid by the Office of the Attorney General of Texas,

alleges that the combined effect of the ACA and DACA reduces the employment of

citizens in favor of DACA recipients (or as he calls them, "undocumented immigrants

who are authorized to work").

11. Dr. Deere's hypothesis that the ACA creates an incentive to hire DACA recipients

instead of citizens is misplaced.  I am not aware of any empirical evidence about the

---

[2] Declaration of Donald Deere, PhD, in *State of Texas, et al. v United States of America, et al.* in the United States District Court for the Southern District of Texas, Brownsville Division.  April 27, 2018.

3

number of citizens who are unemployed because of such a possibility or aware of any empirical evidence that employers are hiring DACA recipients in lieu of citizens because of potential differences in ACA-related penalties. Nor does Dr. Deere show any such actual evidence. His hypothesis is built on a series of unsupported assumptions. His argument contradicts logic and well-established research.

12. To understand his claim, a brief review of applicable provisions of the ACA is necessary. Under §1513 of the ACA, a large employer with 50 or more full-time employees may be assessed federal tax penalties if it fails to offer affordable employer-based insurance and one or more of its employees instead obtains coverage in a health insurance exchange and receives federal premium tax credits. Specifically, large employers who do not offer any health insurance coverage may be penalized $2,320 per full-time employee (minus first 30) if at least one full-time employee receives a federal premium subsidy for marketplace coverage. Moreover, if the employer offers health insurance but does not cover at least 60% of total allowed costs or the insurance is not affordable because the employee's share of an individual premium (not the premium for the full family) exceeds 9.56% of income (in 2018), then the employer may be assessed fines of the lesser of $3,480 per full-time employee receiving a premium tax credit or $2,320 per full-time employee, minus the first 30 employees.[3] This provision is also known as the "employer shared responsibility" requirement or "employer mandate."

---

[3] Cigna. Employer Mandate Fact Sheet. 2018. https://www.cigna.com/assets/docs/about-cigna/informed-on-reform/employer-mandate-fact-sheet.pdf

4

13. The employer shared responsibility does not apply to smaller firms with fewer than 50 employees.[4]

14. The employer shared responsibility was designed to ensure that large employers did not stop offering health insurance to their workers when the exchanges became available.

15. Large firms (50 or more workers) employ about three-quarters of all American workers,[5] and virtually all (97%) of businesses with 50 or more employees offer health insurance coverage to their employees and did so even before the ACA (for example, 96% in 2010). More specifically, in Texas, 97% of firms with 50 or more workers offered health insurance in 2016 and 95% did so in 2010.[6] Thus, the employer penalties are virtually irrelevant to employers with more than 50 workers and should not affect their hiring or wage decisions. The lack of employer-sponsored health insurance coverage is primarily a problem of smaller businesses, but the ACA penalty does not apply to them, so it ought not affect their hiring decisions either.

16. DACA recipients are not eligible for premium tax credits or for the health insurance exchanges (like other undocumented immigrants), in contrast to U.S. citizens or other immigrants like those who are lawful permanent residents.[7]

---

[4] Kaiser Family Foundation. Employer Responsibility Under the Affordable Care Act. Mar. 5, 2018. https://www.kff.org/infographic/employer-responsibility-under-the-affordable-care-act/.
[5] Bureau of Labor Statistics. Distribution of private sector employment by firm size class. ttps://www.bls.gov/web/cewbd/table_f.txt
[6] Agency for Healthcare Research and Quality. Table II.A.2 Percent of private-sector establishments that offer health insurance by firm size and State: United States, 2016. https://meps.ahrq.gov/data_stats/summ_tables/insr/state/series_2/2016/tiia2.pdf; see also https://meps.ahrq.gov/data_stats/summ_tables/insr/state/series_2/2010/tiia2.htm
[7] A more complete review of immigrant eligibility for health benefits is summarized in Ku L, *Strengthening Immigrants' Health Access: Current Opportunities.* GW Department of Health Policy Issue Brief, Dec. 13, 2013. http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29.

5

**App. 600**

17. Dr. Deere makes it seem like large numbers of citizen workers could get premium tax credits and therefore could trigger penalties for their employers.  This is misleading.  In order to be eligible for the health insurance exchanges and premium tax credits, a person cannot be eligible for other insurance coverage, such as employer-sponsored coverage, Medicaid or Medicare.  (In unusual cases where the employer coverage is too low, as described above, a person may be eligible for exchange coverage).  That is, whether or not an employee takes insurance from his or her employer is irrelevant. The key issue is whether the employer offers insurance to full-time employees.  In addition, to get the premium tax credits, people must generally have incomes between 100 and 400 percent of the poverty line.  According to Census data for 2017, about 49% percent of adults 18 to 35 (roughly the DACA age range) have incomes in this range, and the other half would not be eligible for tax credits.[8] Therefore, only a small share of citizen workers could get the premium tax credits that might trigger federal tax penalties. The overwhelming majority of citizen workers in large businesses are not eligible for premium tax credits and their employment poses no risk to their employers.

18. Dr. Deere hypothesizes that ACA and DACA policies combined create an incentive for employers to hire DACA recipients instead of citizens, since employers are potentially subject to tax penalties under the employer shared responsibility provisions when they hire citizens but not when they hire DACA recipients, and since citizens are eligible for premium tax credits, but not DACA recipients.  He suggests that these policies make it harder for U.S. citizens to find work and depresses their wages.  Although he does not indicate how many citizens may be affected, he suggests the number is large by

---

[8] Based on analyses of the Census Bureau's Annual Social and Economic Survey, March 2018, as tabulated by https://www.census.gov/cps/data/cpstablecreator.html

mentioning that there are about 683,000 DACA recipients, of which 112,000 are in Texas.  This is a huge exaggeration of the potential scope.  Dr. Deere also exaggerates the number of people receiving premium tax credits by citing an outdated statistic that 64 million people are eligible for premium tax credits. The actual number receiving them was 8.7 million in 2017.[9]

19. Moreover, the extent to which an employer would hire a DACA recipient in lieu of a citizen worker because the DACA recipient is not eligible for premium tax credits relies on the dubious assumption that many employers are aware of this obscure nuance of health law.  To the extent that this minor incentive exists, it may be counteracted by other employment compliance barriers that firms may face in hiring DACA recipients.[10]  There are small conflicting conceptual incentives which may favor or disfavor hiring citizens vs. DACA recipients. It is plausible that they balance out and are, in reality, immaterial.

20. At the current time, unemployment rates are at record lows and many businesses have serious problems finding enough qualified workers.[11]  In fact, the cancellation of DACA and the resulting loss of work authorization for hundreds of thousands of workers who have DACA will compound this shortage of qualified workers and create a severe hardship for many businesses and their customers.  Hundreds of business leaders have

---

[9] Kaiser Family Foundation.  Estimated Total Premium Tax Credits Received by Marketplace Enrollees.  https://www.kff.org/health-reform/state-indicator/average-monthly-advance-premium-tax-credit-aptc/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[10] Jones D, Ombok O.  DACA and the Challenges Faced by Employers in Workplace Compliance. Association of Corporate Counsel.  May 20, 2015.  http://www.acc.com/legalresources/quickcounsel/employers-in-workplace-compliance.cfm

[11] Lynch D.  'This is super tight': Companies struggle to find, retain workers in a hot economy."  Washington Post.  Jan. 12, 2018.  https://www.washingtonpost.com/business/economy/this-is-super-tight-companies-struggle-to-find-retain-workers-in-a-hot-economy/2018/01/12/0c1ce97e-f7cf-11e7-b34a-b85626af34ef_story.html?noredirect=on&utm_term=.94ad14c9418e

7

**App. 602**

noted that DACA recipients are vital to their firms and to the economy and have opposed its termination.[12]

21. More fundamentally, Dr. Deere's hypothesis about DACA recipients displacing citizen workers is based on a belief that there is a fixed number of jobs available for which citizens and non-citizen immigrants compete and, if one gains, then the other must inherently lose.  If we believe that line of reasoning, then it also follows that hiring women inevitably harms men's employment, hiring African Americans inevitably harms white Americans, etc.  There is not a "fixed number" of jobs in the U.S. economy; the economy is dynamic and having more qualified workers, as well as more entrepreneurs, whether immigrants, women or African Americans, can contribute to economic growth, creating more employment opportunities for both citizens and immigrants alike. It is certainly plausible that, in specific cases, a qualified DACA immigrant may be hired for a job over a similarly qualified citizen worker, or vice versa, but economic growth leads to better employment for both qualified citizens and qualified immigrants.

22. Dr. Deere's belief that DACA and the ACA harm employment is not supported by rigorous research.

23. Evidence suggests that the overall effect of DACA and related policies is to stimulate the economy and thereby to increase employment of both citizens and non-citizens. Analyses conducted in 2014 by the White House Council of Economic Advisers examined the effect of administrative actions on immigration taken by President Obama,

---

[12] America's Voice.  Hundreds of Business Leaders Write Letter in Support of DACA, Dreamers. Sept. 1, 2017.  https://americasvoice.org/blog/business-leaders-support-daca/

8

**App. 603**

particularly DACA, on employment and the economy.[13]  Its analyses indicated that these

immigration policies lead to increased growth in the U.S. economy and more jobs and

create no harm to employment or wages of U.S.-born workers.  (It is noteworthy that this

analysis was conducted after the ACA was enacted and includes effects of the Act.)

24. More recently, analyses by the Cato Institute indicated that terminating DACA could

reduce economic growth in the U.S. by $280 billion over the next decade.[14] These

reductions in economic growth ultimately cause a loss of jobs.

25. In a parallel study that I conducted last year, we found that repealing key elements of the

ACA (specifically the Medicaid expansion, health insurance exchanges (or marketplaces)

and premium tax credits) would have caused 3 million jobs to be lost by 2021, almost a

third of which would have been in the health care sector, and would have lowered states'

economies by $1.5 trillion over five years.[15]

26. A recent review of several economic studies, conducted since the ACA was adopted,

found that the Act did not reduce employment or lower wages.[16]

27. More broadly speaking, there is a strong scientific consensus that immigration benefits

the U.S. economy.  A distinguished panel of researchers was convened by the National

---

[13] White House Council of Economic Advisers. *The Economic Effect of Administrative Action on Immigration*. Nov. 2014. https://obamawhitehouse.archives.gov/sites/default/files/docs/cea_2014_economic_effects_of_immigration_executive_action.pdf

[14] Brannon I, Albright L.  *The Economic and Fiscal Impact of Repealing DACA*.  The Cato Institute.  Jan. 18,2017.

[15] Ku L Steinmetz E, Brantley E, Bruen B.  *Repealing Federal Health Reform: The Economic and Employment Consequences for States.*  Brief, Commonwealth Fund, Jan. 6, 2017. http://www.commonwealthfund.org/Publications/Issue-Briefs/2017/Jan/Repealing-Federal-Health-Reform

[16] Abraham J, Royalty A.  *How Has the Affordable Care Act Affected Work and Wages? Evidence Shows the Law Has Had Little Effect.*  Leonard Davis Institute of Health Economics, University of Pennsylvania.  Jan. 2017.  https://ldi.upenn.edu/brief/how-has-affordable-care-act-affected-work-and-wages

9

Academy of Sciences in 2016 to consider the economic and fiscal impact of immigration in the U.S.[17]  It concluded that, based on many years of rigorous research, that there is little evidence that immigration significantly reduces employment or wages of native-born workers in the U.S.  Even more recently, a letter signed by 1,470 economists, including Nobel Prize winners and former directors of the Office of Management and Budget, the Council of Economic Advisers and Congressional Budget Office from both parties, agreed that immigration strengthens the economy and policies that threaten immigrants would harm the economy.[18]

28. The skills of immigrant workers typically complement those of the U.S.-born workforce, enabling both to be more productive.  For example, the contributions of immigrant construction workers help build homes, office buildings, factories and roads that enable citizens to be employed in other sectors of the economy.  In addition, immigrant entrepreneurs have been important contributors to innovation and economic growth in the United States.[19]  Immigration helps lead to further economic growth and cancelling DACA would set back employment and the economy.

29. A simple and direct way to illustrate the flaw with Dr. Deere's arguments is to present Census data about changes over several years in unemployment levels, comparing U.S.-born citizens and non-citizens who are 18 to 30-year-old adults, the approximate age

---

[17] Blau F, Mackie , eds.  *The Economic and Fiscal Consequences of Immigration*.  National Academy of Sciences.  Washington DC: National Academy Press.  2016.

[18] *An Open Letter from 1,470 Economists on Immigration* (written to President Trump and leaders of both houses of Congress).  April 12, 2017. https://www.newamericaneconomy.org/feature/an-open-letter-from-1470-economists-on-immigration/

[19] Akcigit U, Grigsby J, Nicholas T.  *Research: Immigrants Played an Outsize Role in America's Age of Innovation.  Harvard Business Review.*  April 21, 2017.  https://hbr.org/2017/04/research-immigrants-played-an-outsize-role-in-americas-age-of-innovation?referral=03759&cm_vc=rr_item_page.bottom.

**App. 605**

range for working DACA recipients.  The Census data do not provide the detailed
immigration status that would enable us to separate DACA recipients from other non-
citizen immigrants, including those who are lawful permanent residents, temporary legal
immigrants (e.g., those with work or student visas) and the undocumented.  For the sake
of simplicity, I exclude data about naturalized citizens, who tend to have high
employment levels.  The chart below illustrates trends from 2011 to 2016 for Texas and
the overall United States.[20]



30. Under Dr. Deere's hypothesis that DACA and the ACA increase unemployment by
citizens, we would expect rising unemployment by U.S.-born citizens, while non-citizen
unemployment falls.  In fact, the data reveal that both citizens and non-citizens have had
falling unemployment rates in recent years.  In Texas, a high immigrant state,
unemployment levels fell faster for U.S. born citizens than for non-citizens.  There has

---

[20] These data are tabulated from a web-based application of the U.S. Census Bureau, located at
https://www.census.gov/cps/data/cpstablecreator.html

not been any overall decline in employment for U.S. born workers, following the implementation of DACA or the ACA.  DACA, the ACA and the strong economy have combined to fuel employment for citizens and non-citizens alike.

### Effects of the Loss of DACA for Health Care Providers

31. Termination of DACA will create very specific and substantial harm for those who have DACA and for the employers and customers of the DACA recipients.  One area that exemplifies the harm that will occur is the health care sector.  Many DACA recipients are health care professionals and support staff, such as physicians, nurses, medical aides, etc., who care for patients, including U.S. born citizens and others.  A large share of the nation's health workforce is immigrant.  Immigrant health care professionals not only provide additional manpower, but they also provide diversity, language skills and cultural understanding that help meet the health needs of diverse American patients.  The loss of DACA would cause them to lose work authorization, which would create hardships both for their employers as well as for their potential patients.  DACA termination could also cause students to lose eligibility for educational opportunities or scholarships, which may keep them from becoming health professionals.  States have an inherent interest in maintaining the supply and quality of medical care for their residents, and this jeopardizes that interest.

32. The Migration Policy Institute analyzed data from the Census Bureau's American Community Surveys and estimated that 5,300 current DACA recipients are health care professionals (e.g., doctors, nurses, technicians) and another 8,600 are health care support

12

**App. 607**

staff (e.g., medical aides, home health staff, etc.).[21]  More are engaged in other positions in health care organizations, such as administration, computer services, food service, etc. It estimated that 40,700 DACA recipients work in education, health care or social services organizations.  In addition, a large number of DACA recipients are receiving training to be health care professionals in the future, including doctors, nurses, etc. and the loss of status would short-circuit their ability to provide those services in the future.

33. Health care executives representing a number of Catholic hospitals have written to President Trump, explaining the importance of DACA recipients as valued members of their health care workforce and how their employment is vital to their patients.[22]  The American Association of Medical Colleges has noted that a substantial number of DACA recipients have applied for or are enrolled in medical colleges and cancellation of DACA would imperil their education and their ability to serve patients in the future.[23]  Similar problems are likely to occur for those in training for nursing and other health professions.

34. The loss of immigrant health workers would have adverse effects on the long-term care of frail elderly and disabled individuals: large numbers of DACA recipients work as home health workers, providing nursing home and community-based care to senior citizens and those with disabilities.[24]  It is particularly worth noting that the Medicaid

---

[21] Zong J, Soto A, Batalova J, Gelatt J, Capps R.  A *Profile of Current DACA Recipients by Education, Industry and Occupation*.  Washington, DC: Migration Policy Institute.  Nov. 2017. www.migrationpolicy.org.

[22] Hochman R, et al.  Letter to President Trump regarding DACA. Sept. 2, 2017. https://www.chausa.org/docs/default-source/media-resources/catholic-health-care-system-ceos-ltr-to-president-trump-re-daca-9-2-2017.pdf

[23] Cited by Japsen B.  How Trump's Move to End DACA May Worsen the Doctor Shortage. *Forbes.*  Sept. 5, 2017.  https://www.forbes.com/sites/brucejapsen/2017/09/05/how-trumps-move-to-end-daca-worsens-the-doctor-shortage/#6a7f47b65b06

[24] Scheiber N, Abrams R.  What Older Americans Stand to Lose If Dreamers are Deported.  *New York Times.*  S*e*pt. 7, 2017.

13

**App. 608**

program is the leading payer for long-term care services in the U.S. The lack of suitably trained long-term care staff will adversely affect state Medicaid programs and limit the ability of these state programs to provide the care that they are obligated to offer to Medicaid recipients.

**How DACA Affects Heath Insurance Coverage and Access to Health Care**

35. Under DACA, recipients have a temporary deferral of removal proceedings, can receive authorization to work legally and can engage in other activities of civil society such as continue their education, obtain drivers' licenses, etc. The survey and analysis conducted by Professor Tom Wong of the University of California at San Diego found that most DACA recipients are employed and most have private health insurance coverage.[25]

36. Federal law does not accord DACA recipients eligibility for federal health insurance benefits, including Medicaid, the health insurance program for low-income populations, nor are they permitted to enroll in the health insurance exchanges (marketplaces) formed under the ACA or to receive federal health insurance premium tax credits that are designed to make this insurance more affordable. DACA recipients are barred from federal health insurance assistance, like other undocumented immigrants. State or local governments may opt to offer public insurance coverage for certain undocumented immigrants, including DACA recipients, using state or local funds without federal funding support.[26] For example, the District of Columbia supports a state-funded Health

---

[25] Declaration of Prof. Tom Wong, *State of Texas, et al. v United States of America, et al.* in the United States District Court for the Southern District of Texas, Brownsville Division. May 16, 2018.

[26] A more complete review of immigrant eligibility for health benefits is summarized in Ku L, *Strengthening Immigrants' Health Access: Current Opportunities.* GW Department of Health

14

Care Alliance, which provides medical assistance to low-income adults not eligible for Medicaid including undocumented immigrants and DACA recipients; no federal funding is used.[27]  New York State provides Medicaid coverage to DACA recipients, but not other undocumented immigrants, without federal funding support.[28]

37. The only federal health insurance benefit available to low-income undocumented immigrants is very limited emergency Medicaid coverage (42 U.S.C. § 1396b(v)).[29]  The costs of their emergency care (e.g., emergency room care, ambulance, etc.) can be covered under Medicaid.  However, this limited benefit does not provide broader coverage for other ambulatory or inpatient hospital services, prescription drugs, etc.  It provides reimbursement to emergency providers for care rendered to low-income undocumented immigrants, including labor and delivery costs for children born to undocumented immigrant mothers.  Hospitals are separately required to provide emergency care, to at least screen and stabilize their emergency medical conditions, to all potential patients regardless of insurance coverage or citizenship status, under the Emergency Medical Treatment and Active Labor Act (EMTALA, 42 U.S.C. § 1395dd).  The Medicaid emergency care benefit essentially provides a mechanism to reimburse providers for the emergency care they are otherwise required to offer to low-income undocumented immigrants.

---

Policy Issue Brief, Dec. 13, 2013.  http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29.

[27] District of Columbia Department of Health Care Finance.  Health Care Alliance. https://dhcf.dc.gov/service/health-care-alliance

[28] New York State Department of Health.  GIS 13 MA/011: Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens. https://www.health.ny.gov/health_care/medicaid/publications/gis/13ma011.htm.

[29] A previous limited federal grant program, called "Section 1011," provided federal funding for emergency care for undocumented immigrants separate from Medicaid, but that program has now expired.  https://www.cms.gov/Regulations-and-Guidance/Legislation/UndocAliens/.

15

38. In addition, many community-based health care providers provide free- or subsidized ambulatory health care services to needy or uninsured patients, including undocumented immigrants.  Perhaps most important, community health centers that receive federal grants under Section 330 of the Public Health Service Act, sometimes also called Federally Qualified Health Centers (FQHCs), including the subset of Migrant Health Centers that focus on care for migrant workers, are required to provide primary health care to all patients regardless of insurance or immigration status.  Many other "safety net providers – including non-profit, charitable and state or local public clinics – often provide free or subsidized care to uninsured persons, including undocumented immigrants, although the basis for that care varies.  In some cases, state or local laws or regulations require such service, in other cases it is a matter of clinical practice and a belief in charitable mission.

39. Because of the barriers they face in securing health insurance coverage, non-citizen immigrants, which include DACA recipients, undocumented immigrants and other immigrants who have been legally admitted but are not citizens, are much more likely to be uninsured than U.S.-born or naturalized citizens and to have less private insurance and less Medicaid coverage, even when one compares low-income (below 200% of the poverty line) non-citizen immigrants and citizen adults.  The lack of insurance creates financial barriers and as a result non-citizens have substantially less access to and use of medical services, including primary health care services, emergency medical care, hospital care and most other forms of health care, than citizens.[30]

---

[30] Ku L, Jewers M.  Health Care for Immigrants: Policies and Current Issues.  Migration Policy Institute, June 2013.  www.migrationpolicy.org

16

40. DACA enables recipients to work and many are thereby able to obtain employment-based private health insurance, which is the dominant form of insurance in the United States. If DACA is lost, the former DACA recipients would lose their work authorization and, as a result, lose their jobs and their employer-based health insurance. If they are not working they have few other options to obtain health insurance, other than emergency Medicaid. Moreover, if the breadwinner in a family loses his or her job and private health insurance, his or her dependents may also lose their insurance coverage, even if they are U.S. born citizens. In principle, a person without employer-based health insurance, Medicaid, or other publicly subsidized coverage, could purchase individual (non-group) health insurance on the private market. The sad reality, however, is that individual health insurance is expensive and a person who is no longer employed or who has low income generally cannot afford individual health insurance premiums. Thus, the health insurance prospects for undocumented immigrants without DACA and unemployed are bleak.

**Mental Health Consequences of the Loss of DACA**

41. Even though DACA does not generally provide health insurance coverage benefits, research indicates that DACA improves the mental health of recipients and their families by reducing stress related to their undocumented status and the fear of adverse actions, such as deportation, loss of work, loss of educational opportunities, separation from their families, etc. Research, including studies published in peer-review journals by investigators at Harvard Medical School,[31] the University of California at Davis,[32] and

---

[31] Venkataramani AS, Shah SJ, O'Brien R, Kawachi I, Tsai AC. Health consequences of the US Deferred Action for Childhood Arrivals (DACA) immigration programme: a quasiexperimental study. *Lancet Public Health.* 2017; 2(4): e175-e181; Venkataramani AS, Tsai AC. Dreams Deferred: The Public Health Consequences of Rescinding DACA. *New England J Medicine.* 2017; 377(18):1707-9.

17

**App. 612**

the Universities of California at Berkeley and at San Francisco,[33] show that the receipt of DACA has significantly reduced psychological stress and improves mental health status. The researchers warn that the loss of DACA will lead to higher stress and additional mental health problems for hundreds of thousands of people. Recent research by my colleagues at George Washington University also indicates that recent threats to legal immigration status have created major psychological stress on immigrant parents, who are worried about their own status as well as the future well-being of their children.[34] In addition, a study by Stanford University researchers found that the DACA that protected mothers also led to better mental health status for their U.S.-born citizen children; children feel more secure when their parents do not fear deportation and can safely work. This shows the broader repercussions of changes in DACA policy which can even affect citizen children.[35]

42. The stress caused by loss of DACA could compound the harmful effects of employment and economic loss and could result in additional demands placed on our mental health and social welfare systems system and, in some cases, may lead to increased risk of disruptive behavior that could pose broader risks and further tax our social, educational

---

[32] Patler C, Laster Pirtle W. From undocumented to lawfully present: do changes to legal status impact psychological wellbeing among Latino immigrant young adults? *Social Science and Medicine.* 2017 March 9 (Epub ahead of print).

33 Siemons R, Raymond-Flesh M, Auerswald CL, Brindis CD. Coming of Age on the Margins: Mental Health and Wellbeing Among Latino Immigrant Young Adults Eligible for Deferred Action for Childhood Arrivals (DACA). *J Immigr Minor Health*. 2017 Jun;19(3):543-551. doi: 10.1007/s10903-016-0354-x.

[34] Roche K, Vaquera E, White R, Rivera MI. Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents. *J Adolescent Health*. 2018 Mar; 62(5): 525–531.

35 Hainmueller J, Lawrence D, Martén L, et al. Protecting unauthorized immigrant mothers improves their children's mental health. *Science* 2017 August 31 (Epub ahead of print).

**App. 613**

and criminal justice systems. DACA has helped many youth and young adults "come out of the shadows." Loss of DACA will push them back into the shadows and jeopardize the mental health of DACA recipients and their families, with broader societal effects within states. States have an inherent interest in the well-being, public health and safety of their residents. Terminating DACA undermines the interests of states.

### Estimates of Potential Health Costs at State Levels Due to the Loss of DACA

43. The loss of DACA would harm states because the loss of private health insurance coverage will increase public expenditures for emergency Medicaid and other uncompensated care for those who become uninsured, creating additional financial burdens on the states. States would have to bear higher expenditures for medical care that would be rendered to former DACA recipients who become uninsured. Without private health insurance, DACA recipients would become more reliant on emergency Medicaid and community-based uncompensated care. In the analysis below, I describe paths by which undocumented immigrants can get emergency medical care reimbursed by Medicaid and some forms of community-based uncompensated care. Nonetheless, these are not optimal forms of health care and would still leave many former DACA recipients with reduced access to medical care, which could endanger their health.

44. In this section, I estimate potential financial costs for states if DACA is lost. DACA provides work authorization to young adults who would otherwise be without immigration status and thereby enables them to work legally. A majority of working DACA recipients get private health insurance through their jobs. Loss of work authorization would cause them to lose their jobs. The loss of employment would also trigger the loss of employment benefits, like health insurance coverage for them and their

dependents.  In principle, some of those losing employment-based insurance might be able to purchase individual (non-group) health insurance on the private market, but without the income of a job, the cost of individual health insurance would be essentially unaffordable.  Undocumented immigrants, including DACA recipients, are ineligible for Medicaid or health insurance marketplaces (exchanges) and premium tax credits.  As a result, former DACA recipients must instead rely on emergency Medicaid coverage and/or community-based care for those without insurance, such as that provided by community health centers or state or local public health clinics.  I use recent national survey data to estimate the costs of emergency Medicaid and community-based care for individual states, as well as for the nation, if DACA recipients lose their status and, as a result, lose employment and private health insurance coverage.

45. I describe the basis and sources of data for my estimates below.  I note that these are estimates and that differences in methods or data sources could change the results somewhat, but the general magnitude and direction of results ought to be robust and valid.

46. For estimates of the number of people affected, I draw on data from the U.S. Citizenship and Immigration Services (USCIS) agency about persons approved for DACA as of June 30, 2017.[36]   I apply these data about the number of DACA recipients to Prof. Tom Wong's estimate that 91.4% of DACA recipients are employed and 57% have employer-based private insurance,[37] based on his survey of DACA recipients, to estimate the effects

---

[36] U.S. Citizenship and Immigration Services.  DACA Performance Data, 3rd Quarter, Fiscal Year 2017.
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf
[37] Declaration of Prof. Tom Wong, *op cit.*

20

**App. 615**

of potential loss of employment and private insurance coverage. (A Migration Policy Institute report[38] estimates somewhat lower employment levels, but their data are for DACA-eligible youth, not actual DACA recipients.  For example, they report that 83% of DACA-eligible men 16-32 not in secondary school were employed vs. 79% of average U.S. men that age.  It seems likely that actual DACA recipients work more than those who are DACA-eligible, since they must apply for DACA and receive it in order to get work authorization).

47. I conducted my own analyses of the 2016 National Health Interview Survey, conducted by the Centers for Disease Control and Prevention, and found that 55% of working DACA-eligible immigrants have private insurance (based on the criteria of being non-citizen immigrants between the ages of 18 and 36 residing in the U.S for more than 5 years, excluding Medicaid recipients since DACA recipients are not eligible for Medicaid, except emergency Medicaid coverage).  This level is essentially the same as Prof. Wong's estimate and corroborates it.

48. For estimates of the implications and costs of alternative sources of medical care that former DACA recipients are likely to use I draw on my own analyses of the Center for Disease Control and Prevention's 2016 National Health Interview Survey (NHIS) and the Agency for Healthcare Research and Quality's 2015 Medical Expenditure Panel Survey (MEPS). I am an experienced analyst of these data and have published numerous studies using these nationally representative survey data.

49. The NHIS and MEPS data do not directly indicate who receives DACA, but permit an estimate of DACA eligibility.  I use Prof. Wong's estimate that 57% of employed DACA

---

[38] Capps R, Fix M, Zong J.  The Education and Work Profiles of the DACA Population. August 2017.

recipients get insurance through work.  (My analysis of NHIS data show that 55% of the DACA-eligible immigrants, as described above, who are working have private insurance, about the same as Prof. Wong's estimate of employer-based insurance coverage among DACA recipients.  Two separate data sources yield almost the same estimate, corroborating each other). The loss of DACA and work authorization would trigger the loss of their jobs and therefore their private health insurance.

50. The 2016 NHIS data indicates that DACA-type adults who are not working have a 19 percent probability of using emergency room care in the last 12 months.  Since the loss of DACA would result in the loss of work authorization, legal work and employment-based insurance, it is reasonable to assume that about 19% of former DACA recipients would need to rely on emergency Medicaid to pay their emergency medical bills.  Although they may have had incomes above Medicaid eligibility limits when they were employed, the loss of DACA and work authorization will cause them to lose income and often become impoverished, so more will fall within Medicaid income criteria.  To estimate the costs of emergency medical care, I relied on my analyses of MEPS data and estimated that the average annual cost of emergency room care received by an 18-36 year old immigrant who had been in the US for more than five years was $1,275 in 2015.  I used estimates of national health expenditure price increases per capita from 2015 to 2018, conducted by the federal Centers for Medicare and Medicaid Services,[39] to estimate that the annual cost would rise by 13.7% to $1,450 each for the 19% of adults who had previously been

---

[39] Centers for Medicare and Medicaid Services.  National Health Expenditures. https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/index.html

22

privately-insured working DACA recipients in each state, but who would now be uninsured.

51. I estimated the costs of community-based uncompensated care that would be received by the newly uninsured immigrant adults, due to the loss of DACA. For this, I drew on estimates by Teresa Coughlin and her colleagues at the Urban Institute.[40] That study estimated that in 2013, the average uninsured person received uncompensated medical care costing $1,702 per person, of which 26% was provided as uncompensated care at publicly-supported state or local community-based ambulatory sites, such as community health centers or state or local clinics. This is equal to $449 in community-based ambulatory care per uninsured in 2013. This amount was inflated by 24.6% to account for health care cost inflation between 2013 and 2018 to $559 per uninsured person. I multiplied this amount by the number of former DACA recipients who would lose their jobs and private health insurance in each state.

52. Based on the methods and sources, described above, the additional public costs that would be borne at state levels in 2018 are shown in Table 1 below. These are annual costs in 2018; the cumulative costs over several years would be substantially higher. These estimates are conservative, since they do not include the additional costs that might be borne by states if dependents of DACA recipients – their spouses or children – lose private health insurance if the DACA recipient loses his or her job.

53. Table 1 presents estimates for the United States (excluding the territories, such as Puerto Rico and the Virgin Islands), for the seven plaintiff states in this case (Texas, Alabama,

---

[40] Coughlin T, Holahan J, Caswell K, McGrath M. *Uncompensated Care for the Uninsured, 2013: A Detailed Examination.* Kaiser Commission on Medicaid and the Uninsured. May 2014. https://kaiserfamilyfoundation.files.wordpress.com/2014/05/8596-uncompensated-care-for-the-uninsured-in-2013.pdf

23

Arkansas, Louisiana, Nebraska, South Carolina and West Virginia) and for all other states and the District of Columbia. These estimates are based on the loss of employment-based health insurance coverage and the need to rely on public sources of care, such as emergency Medicaid and community-based safety net services.

**App. 619**

Table 1.  Estimates of Additional Public Costs Due to the Loss of DACA Status

| State | Number Currently Employed (1) | Number Who Could Lose Private Insurance If They Lose Their Jobs (2) | Number Who Might Require Emergency Room Use If Uninsured (3) | 2018 Costs of Emergency Room Care (4) | 2018 Cost of Community-Based Uncompensated Care (5) | Total Estimated 2018 Public Costs Due to Loss of DACA (6) |
|---|---|---|---|---|---|---|
| Total, U.S. | 716,618 | 408,472 | 77,610 | $112,508,841 | $228,521,352 | $341,030,194 |
| **Plaintiff States** | | | | | | |
| Alabama | 3,918 | 2,233 | 424 | $615,125 | $1,249,406 | $1,864,531 |
| Arkansas | 4,663 | 2,658 | 505 | $732,126 | $1,487,051 | $2,219,177 |
| Louisiana | 1,892 | 1,078 | 205 | $297,040 | $603,331 | $900,372 |
| Nebraska | 3,093 | 1,763 | 335 | $485,597 | $986,315 | $1,471,912 |
| South Carolina | 5,879 | 3,351 | 637 | $922,978 | $1,874,699 | $2,797,677 |
| Texas | 114,043 | 65,005 | 12,351 | $17,904,797 | $36,367,172 | $54,271,969 |
| West Virginia | 108 | 61 | 12 | $16,933 | $34,393 | $51,326 |
| **Other States** | | | | | | |
| Alaska | 133 | 76 | 14 | $20,951 | $42,554 | $63,504 |
| Arizona | 25,530 | 14,552 | 2,765 | $4,008,181 | $8,141,182 | $12,149,363 |
| California | 204,507 | 116,569 | 22,148 | $32,107,494 | $65,214,856 | $97,322,349 |
| Colorado | 15,821 | 9,018 | 1,713 | $2,483,947 | $5,045,248 | $7,529,195 |
| Connecticut | 4,560 | 2,599 | 494 | $715,911 | $1,454,116 | $2,170,026 |
| Delaware | 1,326 | 756 | 144 | $208,215 | $422,915 | $631,130 |
| Dist Columbia | 707 | 403 | 77 | $110,924 | $225,302 | $336,226 |
| Florida | 30,351 | 17,300 | 3,287 | $4,765,132 | $9,678,657 | $14,443,789 |
| Georgia | 22,150 | 12,625 | 2,399 | $3,477,526 | $7,063,347 | $10,540,873 |
| Hawaii | 532 | 303 | 58 | $83,516 | $169,632 | $253,148 |
| Idaho | 2,873 | 1,637 | 311 | $451,014 | $916,072 | $1,367,086 |
| Illinois | 38,879 | 22,161 | 4,211 | $6,103,967 | $12,398,019 | $18,501,986 |
| Indiana | 9,020 | 5,142 | 977 | $1,416,180 | $2,876,462 | $4,292,642 |
| Iowa | 2,570 | 1,465 | 278 | $403,516 | $819,598 | $1,223,114 |
| Kansas | 6,234 | 3,554 | 675 | $978,799 | $1,988,078 | $2,966,877 |
| Kentucky | 2,814 | 1,604 | 305 | $441,830 | $897,419 | $1,339,249 |
| Maine | 90 | 51 | 10 | $14,063 | $28,564 | $42,626 |
| Maryland | 9,023 | 5,143 | 977 | $1,416,610 | $2,877,336 | $4,293,946 |
| Massachusetts | 7,360 | 4,195 | 797 | $1,155,588 | $2,347,162 | $3,502,750 |
| Michigan | 5,946 | 3,389 | 644 | $933,597 | $1,896,267 | $2,829,864 |
| Minnesota | 5,743 | 3,273 | 622 | $901,597 | $1,831,270 | $2,732,867 |
| Mississippi | 1,344 | 766 | 146 | $211,085 | $428,744 | $639,829 |
| Missouri | 3,244 | 1,849 | 351 | $509,274 | $1,034,407 | $1,543,681 |
| Montana | 69 | 40 | 8 | $10,906 | $22,151 | $33,057 |
| Nevada | 11,988 | 6,833 | 1,298 | $1,882,117 | $3,822,846 | $5,704,964 |
| New Hampshire | 342 | 195 | 37 | $53,668 | $109,008 | $162,676 |
| New Jersey | 20,315 | 11,580 | 2,200 | $3,189,526 | $6,478,378 | $9,667,904 |
| New Mexico | 6,250 | 3,562 | 677 | $981,238 | $1,993,033 | $2,974,271 |
| New York | 38,848 | 22,143 | 4,207 | $6,099,088 | $12,388,109 | $18,487,197 |
| North Carolina | 25,094 | 14,304 | 2,718 | $3,939,733 | $8,002,154 | $11,941,886 |
| North Dakota | 94 | 54 | 10 | $14,780 | $30,021 | $44,801 |
| Ohio | 4,101 | 2,338 | 444 | $643,875 | $1,307,801 | $1,951,675 |
| Oklahoma | 6,296 | 3,589 | 682 | $988,413 | $2,007,606 | $2,996,019 |
| Oregon | 10,347 | 5,898 | 1,121 | $1,624,539 | $3,299,668 | $4,924,207 |
| Pennsylvania | 5,468 | 3,117 | 592 | $858,404 | $1,743,540 | $2,601,944 |
| Rhode Island | 1,141 | 650 | 124 | $179,085 | $363,748 | $542,833 |
| South Dakota | 233 | 133 | 25 | $36,592 | $74,323 | $110,915 |
| Tennessee | 7,653 | 4,362 | 829 | $1,201,507 | $2,440,431 | $3,641,938 |
| Utah | 8,895 | 5,070 | 963 | $1,396,521 | $2,836,531 | $4,233,052 |
| Vermont | 40 | 23 | 4 | $6,314 | $12,824 | $19,138 |
| Virginia | 11,195 | 6,381 | 1,212 | $1,757,561 | $3,569,855 | $5,327,417 |
| Washington | 16,394 | 9,345 | 1,776 | $2,573,920 | $5,227,996 | $7,801,916 |
| Wisconsin | 6,931 | 3,951 | 751 | $1,088,144 | $2,210,174 | $3,298,318 |
| Wyoming | 569 | 325 | 62 | $89,399 | $181,582 | $270,981 |

Notes:  See text for explanation of the source of estimates.
Analyses by Leighton Ku, June 11, 2018

25

54. For the overall United States (not including the territories), about 408,000 DACA recipients would lose their private health insurance and become uninsured if DACA is terminated. Of them, about 78,000 would require emergency care in 2018, which would lead to about $113 million in additional Medicaid emergency care expenditures. The 408,000 newly uninsured individuals would incur about $229 million in community-based uncompensated care at community health centers, public clinics and other safety net sites. In total, the public costs of increased public health care would rise by about $341 million in 2018 due to the loss of DACA. It is worth noting that, despite the emergency or charity care provided, DACA recipients would still have substantial unmet medical needs because they would lack insurance coverage for other medical costs, such as specialty ambulatory care, medications and inpatient hospital care.

55. I also illustrate the effects for two states: Texas, the largest of the plaintiff states, and for New Jersey.

56. In Texas, the loss of DACA could lead about 65,000 more people to become uninsured. Of them, more than 12,000 would require emergency medical care in 2018, costing about $18 million. And the 65,000 uninsured people would require about $36 million in additional community-based uncompensated care. The total increase in one year in additional public medical expenditures in Texas would equal about $55 million in 2018 as a result of the termination of DACA.

57. For New Jersey, the loss of DACA could cause the number of uninsured people to rise by about 11,500. This would increase public medical care costs by $7.6 million, including $2.5 million in emergency Medicaid costs and $5.1 million in community-based uncompensated care costs. New Jersey also has an innovative Charity Care – Hospital

Care Payment Assistance Program that helps subsidize uncompensated care costs due to inpatient and outpatient hospital care for uninsured patients.[41] Increasing the number of uninsured patients, due to loss of DACA, would create additional financial burdens for this program and create hardships for hospitals across the state.

58. In her declaration, Ms. Monica Smoot of the Texas Health and Human Services Commission[42] notes that her agency incurs costs to provide emergency Medicaid services, family violence services and CHIP perinatal coverage for undocumented immigrants, as well as additional uncompensated medical care provided by state public hospitals.  She does not provide estimates of the costs of these services for DACA recipients.  While I cannot comment on the accuracy of her estimates, I note, as described above, that if DACA is lost, then a substantial number of those who currently have employer-sponsored health insurance will lose their work authorization and thereby lose their jobs and private health insurance and will become uninsured (and often become impoverished).  They will still have medical needs, however, and many will have to receive services such as emergency Medicaid or other charity care type facilities (including uncompensated care at state hospitals) that previously could have been financed by their private health insurance.  The loss of DACA will cause public expenditures for emergency Medicaid services and related services for uninsured people to rise even higher, creating additional costs for the state of Texas.

---

[41] New Jersey Department of Health.  Charity Care – New Jersey Hospital Care Payment Assistance Program.  http://www.nj.gov/health/charitycare/
[42] Declaration of Monica Smoot in in *State of Texas, et al. v United States of America, et al.* in the United States District Court for the Southern District of Texas, Brownsville Division.  April 9, 2018.

**App. 622**

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the forgoing is true and correct.

Respectfully submitted,

_____

Leighton Ku, PhD, MPH

June 15, 2018

28

# Exhibit 31

# Results from Tom K. Wong[1] et al., 2017 National DACA Study

Survey fielded 8/1/2017 to 8/20/2017
$n = 3,063$

| | | |
|---|---|---|
| Methodology | …………………………… | 1 |
| Economic Integration | …………………………… | 2-5 |
| Education | …………………………… | 6-7 |
| Inclusion and Belonging | …………………………… | 8-10 |
| DACA Post-November 2016 | …………………………… | 11-14 |
| Applying/Renewing DACA | …………………………… | 15-17 |

---

[1] Tom K. Wong is associate professor of political science at the University of California, San Diego.
tomkwong@ucsd.edu

**Methodology**

The questionnaire was administered to an online panel of DACA recipients recruited by the partner organizations. Several steps were taken to account for the known sources of bias that result from such online panels. To prevent ballot stuffing—one person submitting multiple responses—the authors did not offer an incentive to respondents for taking the questionnaire and used a state-of-the-art online survey platform that does not allow one IP address to submit multiple responses. To prevent spoiled ballots—meaning people responding who are not undocumented—the authors used a unique validation test for undocumented status. Multiple questions were asked about each respondent's migratory history. These questions were asked at different parts of the questionnaire. When repeated, the questions were posed using different wording. If there was agreement in the answers such that there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting pool of respondents. If not, the respondent was excluded. In order to recruit respondents outside of the networks of the partner organizations, Facebook ads were also used. Because there is no phone book of undocumented immigrants, and given the nature of online opt-in surveys, it is not possible to construct a valid margin of error.

**App. 626**

**How likely are you to leave the country if DACA ends?**
(*n* = 3,063)

| | |
|---|---|
| Very likely | 9.8% |
| Likely | 12.5% |
| Neither likely nor unlikely | 27.1% |
| Unlikely | 18.2% |
| Very unlikely | 31.5% |
| No response | 0.8% |
| | |
| Likely/very likely | 22.3% |

Note: percentages may not sum to 100 due to rounding.

**If DACA ends, would you be willing to participate in protest actions (e.g., rallies, marches, and demonstrations)?**
(*n* = 3,063)

| | |
|---|---|
| Yes | 84.9% |
| No | 12.9% |
| No response | 2.1% |

Note: percentages may not sum to 100 due to rounding.

**If DACA ends, would you be willing to engage in civil disobedience?**
(*n* = 3,063)

| | |
|---|---|
| Yes | 34.6% |
| No | 60.7% |
| No response | 4.7% |

Note: percentages may not sum to 100 due to rounding.

- 13 -

**App. 627**

# Exhibit 32

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| **UNITED STATES OF AMERICA**, et al., | ) | |
| | ) | |
| Defendants | ) | |

DECLARATION OF LLOYD B. POTTER, PH.D.

1.    My name is Lloyd B. Potter, and I am over the age of 18 and fully competent
in all respects to make this declaration. I have personal knowledge and
expertise of the matters herein stated.

2.    I was appointed State Demographer of Texas in June of 2010. I hold degrees
of Ph.D. in sociology from The University of Texas at Austin, Master of
Public Health in epidemiology from Emory University, Master of Science in
education from the University of Houston at Clear Lake and Bachelor of
Science in sociology from Texas A&M University. I have worked as an
Assistant Professor at Fordham University, a post-doctoral fellow at Emory
University and Centers for Disease Control and Prevention, a Behavior
Scientist at the Centers for Disease Control and Prevention, and as a
Research Scientist at the non-profit company Education Development

Center, Inc. I am currently a professor in the Department of Demography at The University of Texas at San Antonio where I also serve as the director of the Institute for Demographic and Socioeconomic Research (IDSER). I have extensive experience working as an applied demographer and my current work focuses on public policy related research and training applied demographers.

3.    Based on my education, qualifications, experience and knowledge of the relevant literature, I believe the following statements are true and accurate.

4.    Economic factors are strongly associated with many migrant flows. For example, differences in economic growth, wages, and the employment situation between the United States and Mexico are critical determinants of immigration, and migration of labor out of Mexico (Aguila, 2012). Most undocumented migrants coming to the U.S. are doing so to work.  Massey et.al. found that that undocumented migration from Mexico appears to reflect U.S. labor demand and access to migrant networks (Massey, Durand, & Pren, 2014).

5.    Most migration (inter-county) within the United States is employment related. Analysis of data from the Current Population Survey indicates that about 43% of moves across county lines between 2012 and 2013 were employment related and 30% were family related (Ihrke, 2014).

6.    Kennan and Walker found that interstate migration decisions are influenced to a substantial extent by income prospects. Their research suggests that

the link between income and migration decisions is driven both by geographic differences in mean wages and by a tendency to move in search of a better locational match when the income realization in the current location is unfavorable (Kennan & Walker, 2011).

7.  In part, the Immigration Reform and Control Act (IRCA) is intended to restrict unauthorized immigration into to the United States by making it illegal for employers to hire unauthorized immigrants and imposing sanctions on employers who employ unauthorized immigrants (Wishnie, 2007). Several states have adopted laws to require E-Verify to make hiring of undocumented immigrants more difficult. Orrenius and Zadvodny found that possible undocumented immigrants in states that had implemented such efforts may have more difficulty working and more difficulty changing jobs (Orrenius & Zavodny, 2016). They also found some evidence suggesting "...that most of the drop in the number of already-present unauthorized immigrants in states that adopt universal E-Verify laws is due to them leaving the USA entirely (Orrenius & Zavodny, 2016)."

8.  While DACA participants have motivation to stay in the U.S. and to comply with DACA rules, it is reasonable to conclude that some DACA participants would return to their country of origin if they lose or are not given permission to work in the U.S. The causes of return migration are difficult to address because there is limited research and understanding of return migration. Among DACA participants there is variation in a number of

App. 631

characteristics such as age at immigration, tenure in the U.S., educational attainment, language fluency, and others. Some of these characteristics and combinations would make it more or less likely for some DACA participants to emigrate if they were denied permission to work in the U.S.

9.   In a study of young immigrants to the U.S., Regan and Olsen found they were less likely than older immigrants to return to their country of origin (Reagan & Olsen, 2000). Child and young immigrants who migrated later in their childhood (having spent more time in their country of origin) were more likely to return to their country of origin than those who immigrated when they were younger. They also found that immigrants with college degrees were more likely to return to their country of origin than those without.

10.  In a study of characteristics associated with emigration of foreign born persons in the U.S. (return migration), Van Hook and Zhang found that "indicators of economic integration (home ownership, school enrollment, poverty) and social ties in the U.S. (citizenship, having young children, longer duration in the United States) deter emigration (Van Hook & Zhang, 2011)." They found that indicators favoring return migration to country of origin included having connections with the sending society, such having a spouse or close family there.

11.  With loss of permission to work in the U.S., some DACA participants could be expected to migrate out of the U.S. back to their country of origin or to

App. 632

another country where they would be able to work. DACA participants who would be more likely to return to their country of origin, under conditions where they could not work legally in the U.S., could be expected be similar to undocumented migrants who return to country of origin. That is, those DACA participants who migrated to the U.S. when they were older, who have strong family relationships in their country of origin, those who had met savings goals, and those who had achieved higher levels of education would be more likely to emigrate under conditions of not being able to work in the U.S. The variation in characteristics within the DACA applicant population suggests that some do have characteristics that have been associated with higher probability of emigration from the U.S. among undocumented immigrants (i.e., migrating as older teenagers and obtaining higher levels of educational attainment).

12. References:

13. Aguila, E. (2012). United States and Mexico: Ties That Bind, Issues That Divide (2 ed.). Santa Monica, CA: RAND.

14. Ihrke, D. (2014). Reason for Moving: 2012 to 2013. Current population reports. Washington, DC: US Census Bureau, 20, 574.

15. Kennan, J., & Walker, J. R. (2011). The Effect of Expected Income on Individual Migration Decisions. Econometrica, 79(1), 211-251. doi:doi:10.3982/ECTA4657

16.  Massey, D. S., Durand, J., & Pren, K. A. (2014). Explaining Undocumented Migration to the U.S. International Migration Review, 48(4), 1028-1061. doi:doi:10.1111/imre.12151

17.  Orrenius, P. M., & Zavodny, M. (2016). Do state work eligibility verification laws reduce unauthorized immigration? IZA Journal of Migration, 5(1), 5. doi:10.1186/s40176-016-0053-3

18.  Reagan, P. B., & Olsen, R. J. (2000). You can go home again: Evidence from longitudinal data. Demography, 37(3), 339-350. doi:10.2307/2648046

19.  Van Hook, J., & Zhang, W. (2011). Who Stays? Who Goes? Selective Emigration Among the Foreign-Born. Population Research and Policy Review, 30(1), 1-24. doi:10.1007/s11113-010-9183-0

20.  Wishnie, M. J. (2007). Prohibiting the employment of unauthorized immigrants: The experiment fails. U. Chi. Legal F., 193.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___26___ day of April, 2018.

LLOYD POTTER, PH.D.

# Lloyd B. Potter

**Department of Demography and**
**Institute for Demographic and Socioeconomic Research**
University of Texas at San Antonio
501 W. César Chávez Blvd.
Monterey Bldg., 4th Floor
San Antonio, Texas 78207-4415
Phone: (210) 458-6530
Email: Lloyd.Potter@utsa.edu

**Educational Background:**

| | |
|---|---|
| M.P.H. | Epidemiology, Emory University, Rollins School of Public Health, spring 1993. |
| Ph.D. | Demography/Sociology, University of Texas at Austin, fall 1989. Dissertation: Proximate and Non-Proximate Causes of Racial Life Expectancy Differentials in the U.S., 1970 and 1980. Co-Chairs: Omar Galle and Teresa Sullivan |
| M.S. | Education, University of Houston Clear Lake, spring 1981. |
| B.S. | Sociology, Texas A&M University, fall 1979. |
| | Clear Lake High School, Houston, TX.  Clear Creek Independent School District, spring 1975 |

**Professional Positions:**

| | |
|---|---|
| 2010-present | State Demographer of Texas and Director of the Texas Demographic Center. |
| 2008-present | Director, Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, San Antonio, TX. |
| 2008-present | Professor, Department of Demography, University of Texas at San Antonio, San Antonio, TX. |
| 2008-present | Adjunct faculty, The University of Texas School of Public Health at Houston through the San Antonio Regional Campus. |
| 2014-2015 | Associate Dean for Research, College of Public Policy, University of Texas at San Antonio, San Antonio, TX. |
| 2009- 2011 | Interim-Chair, Department of Demography, University of Texas at San Antonio, San Antonio, TX. |
| 2001-2004 | Adjunct faculty member, University of Michigan School of Public Health, Summer Epidemiology Seminar. |
| 2000-2008 | Director, Center for the Study and Prevention of Injury, Violence, and Suicide. Education Development Center Inc., Newton, MA. |

**App. 635**

| 1998-99 | Detail from CDC to Massachusetts Department of Public Health (9 months) – Injury Surveillance Program, Boston, Massachusetts. Developed surveillance report on suicide in the state. |
| --- | --- |
| 1997 | Detail from CDC to Hanoi School of Public Health, Field Epidemiology Training Program, Hanoi, Vietnam. Developed course on demographic methods in public health. |
| 1995-2000 | Team Leader (Branch Chief), Youth Violence and Suicide Prevention, Division of Violence Prevention, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Atlanta, Georgia. Managed CDC's scientific and grant program portfolio on youth violence and suicide prevention. |
| 1993-1995 | Team Leader, Suicide Prevention, Division of Violence Prevention, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Atlanta, Georgia. Manage CDC scientific program on suicide prevention. |
| 1992 | Consultant, Field Epidemiology Training Program, Taiwan Department of Health, Taipei, Taiwan, R.O.C. Provided training on research and survey methodology. |
| 1991-93 | National Institute of Mental Health HIV/AIDS Post-Doctoral Fellow, Emory University School of Public Health/Centers for Disease Control and Prevention, Atlanta, Georgia. Received Masters of Public Health and conducted HIV/AIDS prevention research at CDC. |
| 1989-91 | Assistant Professor of Sociology, Fordham University, Bronx, New York. |
| 1990 & 91 | Lecturer, summers, University of Texas at Austin, Department of Sociology. Managed and taught the NSF funded Research Experience for Undergraduates (REU) program. |
| 1989 | Research Associate, University of Texas at Austin, Departments of Social Work and Home Economics. Conducted research on adoption. |
| 1988 | Research Associate, University of Texas at Austin, Population Research Center. |
| 1987-88 | Research Associate, Texas A&M University, Department of Rural Sociology, College Station, Texas. Assisted with book on farm financial crisis, Texas population estimates and projections and socioeconomic impact assessments |
| 1986 | Social Science Analyst, summer, Center for International Research, U.S. Bureau of the Census, Washington D.C. Developed population estimates, projections, and profiles for various countries |
| 1985 | United Nations Intern, summer, Population Policy Section, New York, New York. Developed population estimates, projections, and profiles for various countries |
| 1984-87 | Research Assistant,, University of Texas at Austin, Population Research Center. Conducted research on consumer bankruptcy |
| 1983-84 | Research Assistant, Texas A&M University, Department of Rural Sociology, College Station, Texas. Assisted with population estimates and projections for Texas. |
| 1981-83 | Teacher, LaPorte Independent School District, LaPorte, Texas. |

**Awards and Honors**:

| 2017-present | Peter Flawn Professor |
| --- | --- |
| 2012 | Outstanding Clear Creek Independent School District (CCISD) Alumni Award, Clear Creek Education Foundation. |

**App. 636**

| | |
|---|---|
| 2005 | Allies for Action Award, Suicide Prevention Action Network |
| 2000 | Special Act of Service Award, CDC. For leadership in the conceptualization and production of "Best Practices of Youth Violence Prevention." |
| 2002 | Surgeon General's Exemplary Service Award. For leadership in developing a National Strategy for Suicide Prevention. |
| 1998 | Builder Award for the National Strategy for Suicide Prevention, Suicide Prevention Advocacy Network |
| 1996 | Special Act of Service Award, CDC. For leadership toward establishing CDC's Behavioral and Social Science Working Group. |
| 1996 | Special Act of Service Award, CDC. For efforts to assess achievement of Healthy People 2000 objectives in the area of injury and violence. |
| 1993-96 | Equal Opportunity Award, CDC. For leadership toward creating a diverse and work environment. |
| 1986 | Professional Development Award, Graduate School, University of Texas at Austin |
| 1984-85 & | National Institute of Child Health and Development Trainee. |
| 1988-89 | University of Texas at Austin. |

## Research Activities Summary:

*Peer Reviewed*

1. Valenzuela, C., Valencia, A., White, S., Jordan, J. J., Cano, S. L., Keating, J. P., Nagorski, J. J.,  Potter, L. B  An analysis of monthly household energy consumption among single-family residences in Texas, 2010, Energy Policy, 2014(69):263-272, ISSN 0301-4215, http://dx.doi.org/10.1016/j.enpol.2013.12.009. (senior and corresponding author with student as first).

2. Howard, J.T., Potter, L.B., An assessment of the relationships between overweight, obesity, related chronic health conditions and worker absenteeism. Obesity Research & Clinical Practice 2014(8):1-15. (student first author)

3. Goldston D, Walrath C, McKeon R, Puddy R, Lubell K, Potter L, Rodi M.. The Garrett Lee Smith Memorial Suicide Prevention Program. Suicide & Life-Threatening Behavior 2010;40 (3):245-256.

4. Durant T, Mercy J, Kresnow M, Simon T, Potter L, Hammond R. Racial Differences in Hopelessness as a Risk Factor for a Nearly Lethal Suicide. Journal of Black Psychology.2006; 32: 285-302

5. Stone D, Barber C, Potter L. Public health training online: the National Center for Suicide Prevention Training. American Journal of Preventive Medicine, 2005;29: 247–51.

6. Potter L, Stone D. Suicide prevention in schools: what can and should be done. American  Journal of Health Education,  2003, 34(5 Suppl): s35-s41

7. Powell K, Kresnow M, Mercy J, Potter L, Swann A, Frankowski R, Lee R, Bayer T. Alcohol Consumption and Nearly Lethal Suicide Attempts. Suicide and Life Threatening Behavior, 2001;31(5):SS 30-41.

8. Potter L, Kresnow M, Powell K, Simon T, Mercy J, Lee R, Frankowski R, Swann A, Bayer T, O'Carroll P. The Influence of Geographic Mobility on Nearly Lethal Suicide Attempts. Suicide and Life Threatening Behavior, 2001;31(5):SS 42-48.

3

**App. 637**

9.   Kresnow M, Ikeda R, Mercy J, Powell K, Potter L, Simon T, Lee R, Frankowski R. An Unmatched Case-Control Study of Nearly Lethal Suicide Attempts in Houston, Texas: Research Methods and Measurements. Suicide and Life Threatening Behavior, 2001;31(5):SS 7-20.

10.  Swahn M, Potter L. Factors Associated with the Medical Severity of Suicide Attempts in Youths and Young Adults. Suicide and Life Threatening Behavior, 2001;31(5):SS 21-29.

11.  Simon T, Swann A, Powell K, Potter L, Kresnow M, O'Carroll P. Characteristics of Impulsive Suicide Attempts and Attempters. Suicide and Life Threatening Behavior, 2001;31(5):SS 49-59.

12.  Ikeda R, Kresnow M, Mercy J, Powell K, Simon T, Potter L, Durant T, Swahn M. Medical Conditions and Nearly Lethal Suicide Attempts. Suicide and Life Threatening Behavior, 2001;31(5):SS 60-68.

13.  Anderson M,  Kaufman J,  Simon T, Barrios L. Paulozzi L, Ryan G, Hammond R, Modzeleski W, Feucht T, Potter L, School-Associated Violent Deaths Study Group. "School-Associated Violent Deaths in the United States, 1994-1999," JAMA. 2001;286:2695-2702.

14.  Dahlberg LL., Potter LB. Youth violence: developmental pathways and prevention challenges. American Journal of Preventive Medicine 2001;20(1 Supl 1):3-14.

15.  Kresnow M, Powell KE, Webb KB, Mercy JA, Potter LB, Simon TR, Ikeda RM, Frankowski R. Assigning time-linked exposure status to controls in unmatched case-control studies: alcohol use and nearly lethal suicide attempts. Statistics in Medicine 2001;20(9/10):1479-85

16.  Mercy J, Kresnow M, O'Carroll P, Lee R, Powell K, Potter L, Swann A, Frankowski R, Bayer T. Is Suicide Contagious? A Study of the Relation between Exposure to the Suicidal Behavior of Others and Nearly Lethal Suicide Attempts. Am. J. Epidemiol. 2001 154: 120-127

17.  Johnson G, Krug E, Potter L. Suicide Among Adolescents And Young Adults: A Cross-National Comparison Of 34 Countries. Suicide and Life-Threatening Behavior, 2000 Spring; 30(1):74-82.

18.  Potter L, Sacks J, Kresnow M, Mercy J. Nonfatal Physical Violence, United States, 1994.  Public Health Reports. 1999 Jul-Aug;114(4):343-52.

19.  Potter L, Kresnow M, Powell K, O'Carroll P, Lee R, Frankowski R, Swann A, Bayer T, Bautista M, Briscoe M. Identification of nearly fatal suicide attempts: Self-Inflicted Injury Severity Form. Suicide and Life-Threatening Behavior. 28(2):174-186, 1998.

20.  Grabbie L, Demi A, Camann M, Potter L. Suicide and health status among the elderly: The National Mortality Followback Survey. American Journal of Public Health, 1997 Mar;87(3):434-7.

21.  Mercy J, Potter L.  Combining analysis and action to solve the problem of youth violence.  American Journal of Preventive Medicine 1996; Supplement to Volume 12(5):1-2.

22.  Kachur S., Potter L, Powell K, Rosenberg M. Suicide: Epidemiology, Prevention, Treatment. Adolescent Medicine: State of the Art Reviews, 25(2):171-182, 1995.

23.  Potter L, Powell K, Kachur S. Suicide Prevention from a Public Health Perspective. Suicide and Life Threatening Behavior, 25(1):83-92, 1995.

4

**App. 638**

24. Potter L, Rogler L, Moscicki E. Depression Among Puerto Ricans in New York City: The Hispanic Health and Nutrition Examination Survey. Social Psychiatry and Psychiatric Epidemiology, 30:185-193, 1995.

25. Potter L, Anderson J.  Patterns of Condom Use, Sexual Behavior and STDs/HIV Among Never-Married Women. Sexually Transmitted Diseases, 20(4), 1993.

26. Burr J, Potter LB, Galle O, Fossett M.  Migration and Metropolitan Opportunity Structures: A Demographic Response to Racial Inequality. Social Science Research, 22, 1992.

27. Galle O, Burr J, Potter L.  Rethinking Measures of Migration: On the Decomposition of Net Migration. Social Indicators Research, 28, 1992.

28. Potter L.  Socioeconomic Determinants of Black-White Male Life Expectancy Differentials, 1980. Demography, 28(2):303-322, 1991.

29. Potter L, Galle O.  Residential and Racial Mortality Differentials in the South by Cause-of-Death.  Rural Sociology, Summer 1990.

**Edited Book**

1. Hoque, N., Potter, LB. (eds), Emerging Techniques in Applied Demography, Dordrecht Heidelberg New York London: Springer, (2014). ISBN 978-94-017-8989-9.

**Book Chapters**

1. Potter, L. Chapter 13 Youth Suicide. In Liller KD (ed), Injury Prevention for Children and Adolescents: Research, Practice, and Advocacy 2nd Edition. Washington, DC: American Public Health Association, 2012, eISBN: 978-0-87553-250-9

2. Potter L. Violence Prevention. In Gorin SS, Arnold J (eds), Health Promotion in Practice, Chapter 12 (pp. 392-426). San Francisco, CA: Jossey-Bass, 2006.

3. Potter L. Youth Suicide. In Liller KD (ed), Injury Prevention for Children and Adolescents: Research, Practice, and Advocacy, Chapter 13 (pp. 321-340). Washington, DC: American Public Health Association, 2006.

4. Potter L. Public Health and Suicide Prevention. In Lester D (ed), Suicide Prevention: Resources for the New Millennium, Chapter 5 (pp. 67-82). Ann Arbor, MI: Sheridan Books, 2000.

5. Potter L. Understanding the Incidence and Origins of Community Violence: Toward a Comprehensive Perspective of Violence Prevention.  In Gullota T (ed), Violence In Homes And Communities, Chapter 4 (pp. 101-132). Sage Publications, 1999.

6. Cohen L, Potter L.  Injuries and Violence: Risk Factors and Opportunities for Prevention During Violence. In: Fisher M, Juszczak L, Klerman L, eds. Adolescent Medicine: Prevention Issues in Adolescent Health Care. Philadelphia, PA: Hanley & Belfus, Inc., 1999:125-135.

7. Potter L, Mercy J.  Public health perspective on interpersonal violence among youths in the United States. In Stoff DM, Breiling J, Maser JD, editors.  Handbook of antisocial behavior.  New York: John Wiley & Sons, Inc; 1997

8. Potter L, Powell K. The Public Health Approach to Suicide Prevention in the United States. Pp.329-345, in Ramsey RF, Tanney BL (`eds), Global Trends in Suicide Prevention: Tow ard the Development of National Strategies for Suicide Prevention. Mumbai, India: Tata Institute of Social Sciences, 1996.

9. Murdock S, Leistritz F, Hamm R, Albrecht D, Potter L, Backman K.  Impacts of the Farm Financial Crisis of the 1980s on Resources and Poverty in Agriculturally

Dependent Counties in the United States. Pp. 67-94 in Rodgers H, Weiher G, (eds.). Rural Poverty: Special Causes and Policy Reforms. NY:Greenwood Press 1989.

10. Murdock S, Leistritz F, Hamm R, Albrecht D, Potter L, Backman K.  Impacts of the Farm Financial Crisis of the 1980s on Resources and Poverty in Agriculturally Dependent Counties in the United States. Policy Studies Review, 1988;7(4):810-827.

11. Murdock S, Potter L, Hamm R, Backman K, Albrecht D, Leistritz L.  The Implications of the Current Farm Crisis for Rural America.  Pp. 169-184 in Steve Murdock and Larry Leistritz (eds.)  The Farm Financial Crisis: Socioeconomic Dimensions and Implications for Producers and Rural Areas. Boulder, Colorado: Westview Press, 1988.

12. Murdock S, Potter L, Hamm R, Albrecht D. Demographic Characteristics of Rural Residents in Financial Distress and Social and Community Impacts of the Farm Crisis.  Pp. 113- 140 in Steve Murdock and Larry Leistritz (eds.) The Farm Financial Crisis: Socioeconomic Dimensions and Implications for Producers and Rural Areas. Boulder, Colorado: Westview Press, 1988.

13. Murdock S, Albrecht D, Potter L, Backman K, Hamm R.  Demographic, Socioeconomic and Service Characteristics of Rural Areas in the United States: The Human Resource Base for the Response to the Crisis. Pp. 45-73 in Murdock S, Leistritz L, (eds.)  The Farm Financial Crisis: Socioeconomic Dimensions and Implications for Producers and Rural Areas.  Boulder, Colorado: Westview Press, 1988.

14. Murdock S, Potter L, Backman K, Hamm R, Hwang S.  Patterns of Post-1980 Population Change in Towns and Cities in Texas: An Analysis of the U.S. Bureau of the Census Population Estimates for 1982, 1984 and 1986.  Department of Rural Sociology Technical Report No. 88-2. College Station, Texas: The Texas Agricultural Experiment Station, March 1988.

15. Murdock S, Schriner E, Hamm R, Jones L, Potter L.  An Analysis of Selected Human Resource and Environmental Impact Dimensions of the Amarillo and Dallas-Fort Worth Super-Conducting Super Collider Siting Areas.  Report submitted to The National Research Laboratory Commission, Office of the Governor, State of Texas, July 1987.

***Commentary***

1. Rosenberg M, Mercy J, Potter L. Firearms and suicide. New England Journal of Medicine. 1999 Nov 18;341(21):1609-11

2. Potter L, Rosenberg M, Hammond W. Suicide in youth: a public health framework [comment]. Journal of the American Academy of Child & Adolescent Psychiatry. 37(5);484-7, 1998 May.

***Other***

1. White, S., Potter, L. B., You, H., Valencia, A., Jordan, J., & Pecotte, B. (2016). Texas Mobility. demographics.texas.gov/Resources/publications/2016/2016_11_01_TexasMobility.pdf

2. Valencia, A., Potter, L. B., White, S., You, H., Jordan, J., & Pecotte, B. (2016). Aging in Texas: Introduction. demographics.texas.gov/Resources/publications/2016/2016_06_07_Aging.pdf

3. Potter, L. Community Assessment: Wintergarden Head Start and Early Head Start Program 2014. Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, 2014.

**App. 640**

4.    Potter, L. Community Assessment AVANCE-San Antonio Head Start and Early Head Start Program 2014. Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, 2014.

5.    Potter, L., Valenzuela, C., Flores, M., Jordan, J., Valencia, l., White, S., Keating, J., Canos,S., Nagorski, J., Karuppusamy, S. Robinson. S. Modeling Household Energy Consumption in Bexar County, 2010, Confidential Research Report. Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, 2014.

6.    Potter, L. Community Assessment Update, City of San Antonio Head Start Program. Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, 2013

7.    Potter, L (Chair), Horowitz, R., Robin, D., Tillyer, R. Recommendations for Fostering Research Productivity and Creating a Research Culture at the University of Texas at San Antonio. UTSA Research Advisory Board - Sub-Committee on Macro Research Issues, 2013

8.    You, H., White, S., Potter, L. An Examination of Static and Dynamic Aspects of Uninsurance In Texas. Institute for Demographic and Socioeconomic Research. Report for Methodist Healthcare Ministries. University of Texas at San Antonio, 2012.

9.    Potter, L., Ozuna, C., Campbell, J. Community Assessment San Antonio & Bexar County Head Start Program 2012. . Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, 2012

10.   Garza, J., Flores, M., Jordan, J., Potter, L.  Community Assessment Report for San Antonio Head Start. Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, 2010

11.   Garza, J., Potter, L., Jordon, J. Community Assessment Report for San Antonio Head Start. Institute for Demographic and Socioeconomic Research, University of Texas at San Antonio, 2009.

12.   Malley E, Posner M, Potter L. Suicide risk and prevention for lesbian, gay, bisexual,and transgender youth. Suicide Prevention Resource Center. Newton, MA: Education Development Center, Inc. 2008.

13.   Potter L, Silverman M, Connorton E, Posner M. Promoting Mental Health and Preventing Suicide in College and University Settings. Suicide Prevention Resource Center, Newton, MA: Education Development Center, Inc., 2004.

14.   Potter L. Suicide Prevention: Prevention Effectiveness and Evaluation. Atlanta, GA: SPAN, USA, 2001.

15.   Silverman M, Davidson L, Potter L, (eds.) National Suicide Prevention Conference Background Papers, October 1998, Reno, Nevada. Suicide and Life-Threatening Behavior, 31(S), 2001.

16.   Potter L, Hasbrouk L. Influence of Homicide on Racial Disparity in Life Expectancy --- United States, 1998. MMWR, September 14, 2001 / 50(36);780-3.

17.   Davidson L, Potter L, Ross V. The Surgeon General's Call To Action To Prevent Suicide. Washington, DC: U.S. Public Health Service,1999.

18.   Moscicki E, Muehrer P, Potter L.  Introduction to Supplemental Issue: Research Issues in Suicide and Sexual Orientation. Suicide and Life-Threatening Behavior 1995;Supplement:25:1-3.

19.	Kachur S, Potter L, James S, Powell K.  Suicide in the United States, 1980-1992. Atlanta: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, 1995. Violence Surveillance Summary Series, No. 1.

20.	O'Carroll P, Potter L., Mercy J. Suicide Contagion and the Reporting of Suicide: Recommendations from a National Workshop. MMWR 43(No. RR-6):8-18, 1994

21.	O'Carroll P, Potter L. Programs for the Prevention of Suicide Among Adolescents and Young Adults. MMWR 43(No.RR-6):1-7, 1994

**Under review:**

Valenzuela, C., Potter, L., Differential Residential Energy Consumption Patterns by Race and Ethnicity and Implications for Addressing Inequalities through Conservation Strategies. Revised and resubmitted (March 2018), Journal of Energy Policy.

**Selected Funding History:**

9/15-8/20	The New 100th Meridian: Urban Water Resiliency in a Climatic and Demographic Hot Spot (Co-PI). Funder: National Science Foundation.

8/15-present	Demographic Data and Assistance (PI). Funder: Texas Department of Transportation

1/12-8/13	SA2020 Indicators and Education Data (PI). Funder: City of San Antonio

1/12-6/13	Energy Efficiency in Residential Buildings (PI). Funder: CPS Energy

6/12-9/12	Demographic Profile and Projections of San Marcos, Texas (PI).  Funder: City of San Marcos.

2/09-present	Head Start Community Assessment (PI). City of San Antonio

8/09-present	Estimation Allocation Factors for Local Workforce Development Areas (PI). Funder: Texas Workforce Commission.

4/08-7/08	Development of Indicators for Violence Against Children (PI). Funder: World Health Organization and UNICEF.

9/07-9/09	TEACH-VIP E-Learning Initiative (PI). Funder: Centers for Disease Control and Prevention

9/02-9/10	Suicide Prevention Resource Center (PI). Funder: Substance Abuse and Mental Health Services Administration.

4/02-8/11	Children's Safety Network National Resource Center (PI). Health Resource and Services Administration, Maternal and Child Health Bureau.

**Teaching:**

*Dissertations chaired:*

Jewel Barnett, December 2017, Barriers to Health: Place and Food Insecurity as Determinants of Childhood Obesity

Pamela Willrodt, July 2016, Vietnam-Era Veteran Health:  A Life-Course Perspective at the End of Middle-Adulthood

Mikiko Oliver, August 2015, Population Aging and Economic Growth in the United States and Japan

Alexis Santos Lozono, April 2015, Inequalities in Human Papillomavirus Vaccination for Female Adolescents in the United States

John Garza, April 2014, Spatially Oriented Demographic Determinants of Foreclosures in Bexar County

Sadasivan Karuppusamy, September 2013, The Determinants and Trends in the Household Energy Consumption for Different End Uses in the United States During 2001-2009

Carlos Valenzuela, April 2013, An Analysis of Household Energy Consumption by Race/Ethnic Composition:  Incorporating Racial Stratification in the Lifestyle Perspective,

Frank Martinez III, December 2012, Las Colonias de la Frontera: A Study of Substandard Housing Settlements along the Texas-Mexico Border

*Dissertation Committee member:*

Dorian Galindo, May 2018

Sharon Goodwin, May 2017

Rebecca Adeigbe, May 2017

Clarissa Ozuna, December 2017

Xiaoling Liang, August, 2017

Paul Chance Kinnison, June 2016

Danielle Gordon, May 2016

Heidy Colon Lugo, December 2015

Romona Serban, August 2015

Mikiko Oliver, August 2015

Jeffrey Howard, April 2014

Susanne Schmidt, December 2013

Jinny Case , June 2013

Brian Munkombwe, April 2013

Rabindra K.C. ,December 2013

Mathew Martinez, December 2013

Ke Meng , December 2012

Samantha John, December 2012

Victoria Locke, May 2012

Alma Martinez-Jimenez, December 2011

Lila Valencia, May 2011

David Armstrong , May 2011

Emma Mancha, May 2011

Joseph Campbell, May 2011

9

**App. 643**

L. B. Potter  April 2018

Mary Hogan, May 2011
Gilbert Suarez, May 2011
Mike Cline, August 2010
Miguel Flores, August 2010
Deborah Perez, August 2010
Eliza Hernandez, August 2010
Jennifer Roth, August 2010
Marguerite Sagna, August 2010
Mary Bollinger, May 2010

*Courses taught at UTSA (all graduate):*
1. Applied Demography and Urban and Regional Planning
2. Applied Demography in Policy Settings
3. Demographic  Methods of Analysis I
4. Demographic  Methods of Analysis II
5. Social Demography and Community Trends
6. Social and Economic Impact Assessment
7. Survey Methods for Demographers
8. Special Topic Reading Courses (multiple)
9. Dissertation hours (multiple)

*Professional*
   *Co-Editor:* Population Research and Policy Review 2015 (peer-reviewed journal)
   *Peer reviewer:*
      Suicide and Life-Threatening Behavior
      American Journal of Preventive Medicine
      American Journal of Public Health
      Archives of General Psychiatry
      Demography
      Injury Prevention
      New England Journal of Medicine

10

**App. 644**

*Membership:*
> Southern Demographic Association, Past-President
> Population Association of America
> American Sociological Association
> Rural Sociological Association.
> International Union for the Scientific Study of Population
> American Public Health Association

*Miscellaneous:*
> State Demographer of Texas, 2010 to Present
> Testimony on demographic topics for Texas House and Senate standing and special committees
> Consultation with Texas House and Senate members and staff members on various demographic topics
> Demographic analysis for San Antonio Mayor's Office for Pre-K for SA
> Public speaking on demographic topics (~35 per year
> http://demographics.texas.gov/Presentations)
> San Antonio P-16 Data Support Council Member
> San Antonio CI Now Board Chair
> Applied Demography Conference, organizer and program chair for 2010, 2012, 2014, 2017.

# Exhibit 33

**From:**       Lee, Tyronda E
**Sent:**        Tuesday, May 8, 2018 12:09:41 PM
**To:**          Robinson, Brandon M; Holmes-Okeawolam, Malethea S; Liu, Jerry
**CC:**          Umoru, Victoria E; Garon, Michielle S; Nunez, Rosalba
**Subject:**     RE: DACA Discretionary Denials

Good morning Brandon,

I have confirmed with TSC's DACA Supervisory POC that to the best of our knowledge TSC has not issued a DACA denial purely on discretion when all other DACA guidelines have been met.

Tyronda Lee, Section Chief

Texas Service Center | U.S. Citizenship and Immigration Services | Security and Fraud Team

Office:  214-962-████ | Cell: 281- 513-████ Locator: 7-5N-561

CONFIDENTIALITY NOTICE:  The information contained in (or attached to) this e-mail is For Official Use Only / Law Enforcement Sensitive (FOUO/LES) and should be considered Sensitive but Unclassified. This communication (including attachments) is covered by the Electronic Communication Privacy Act, U.S.C. Sections 2510-2521.  It is intended only for the party to whom it is addressed and may contain privileged and confidential information.  Any unauthorized use, dissemination or copying of this communication is prohibited.  If you have received this communication in error,

App. 647

# Exhibit 34

STATE OF TEXAS, ET AL. vs UNITED STATES OF AMERICA, ET AL.
Stephen Legomsky on 08/01/2018

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
                   BROWNSVILLE DIVISION

STATE OF TEXAS, ET AL.,       )
                              )
Plaintiffs,                   )
                              )
vs.                           )   Case No. 1:18-cv-00068
                              )
UNITED STATES OF AMERICA, ET  )
AL.,                          )
                              )
Defendants,                   )
                              )
and                           )
                              )
KARLA PEREZ, ET AL.,          )
                              )
STATE OF NEW JERSEY,          )
                              )
Defendant-Intervenors.        )




            THE DEPOSITION OF STEPHEN LEGOMSKY




             Taken on behalf of Plaintiffs

                   August 1, 2018




                HUSEBY GLOBAL LITIGATION
          1230 WEST MOREHEAD STREET, SUITE 408
                  CHARLOTTE, NC 28208
                    (800) 333-2082
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

App. 649

```
 1                A P P E A R A N C E S

 2
       FOR THE PLAINTIFF STATES:
 3
                  TODD LAWRENCE DISHER
 4                Attorney-in-Charge
                  Special Counsel for Civil Litigation
 5                Assistant Attorney General State of Texas
                  300 W. 15th Street
 6                Austin, TX 78701
                  (512) 463-2100
 7                todd.disher@oag.texas.gov

 8     FOR KARLA PEREZ, ET AL.:

 9                NINA PERALES
                  Mexican American Legal Defense and Education
10                Fund
                  110 Broadway, Suite 300
11                San Antonio, TX 78205
                  (210) 224-5476
12                nperales@maldef.org

13     FOR THE FEDERAL DEFENDANTS:

14                JEFFREY S. ROBINS
                  U.S. Department of Justice, Civil Division
15                Office of Immigration Litigation
                  District Court Section
16                P.O. Box 868
                  Washington, D.C. 20044
17                jeffrey.robins@usdoj.gov

18     FOR THE STATE OF NEW JERSEY BY TELEPHONE:

19                KENNETH LEVINE
                  Office of the Attorney General of New Jersey
20                25 Market Street, 8th Floor
                  Trenton, NJ 08625
21                (973) 648-2881
                  kenneth.levine@law.njoag.gov
22
       REPORTED BY:
23
                  REBECCA L. TUGGLE, RPR, CCR, CSR
24                Huseby Global Litigation

25
```

1      Q    And because they got work authorization, the

2  regulations applying to protect those with work

3  authorization applied to these individuals and their

4  DACA status?

5      A    That's right.  The practical effect of

6  revoking DACA was that the work permit that depended

7  on it was no longer in force.

8      Q    And because of the protections of work

9  authorization, the court in this case ruled that the

10  Department of Homeland Security could not revoke these

11  individuals' DACA status?

12      A    That's right.  They have to follow their own

13  regulations.

14      Q    Okay.  I forgot to ask you one additional

15  question.  So earlier we had talked about the

16  differences between DACA and DAPA; right?  And you can

17  think of two right now.  One is the size of the

18  population, which you said doesn't affect the merits

19  of whether DACA and DAPA are legally the same thing;

20  correct?

21      A    In my opinion, it should not have that

22  effect.

23      Q    Okay.  And then the second thing you

24  mentioned was the ongoing nature of the DACA program

25  as opposed to the soon-to-be implemented nature of the

```
 1   DAPA program; correct?

 2       A    Correct.

 3       Q    But, again, in your opinion, going to the

 4   underlying merits of whether these two programs are

 5   legal, that shouldn't make a difference; correct?

 6       A    Correct.

 7            MR. DISHER:  Okay.  I have nothing further.

 8   I'll pass the witness.

 9            MS. PERALES:  Can we take a break before

10   Jeffrey gets his chance to ask questions?

11            MR. ROBINS:  Sure.

12            (Whereupon, a brief break was taken.)

13                          EXAMINATION

14   QUESTIONS BY MR. ROBINS:

15       Q    So thank you, Mr. Legomsky.  Again, my name

16   is Jeff Robins.  I'm the attorney representing the

17   federal defendants from the Department of Justice and

18   I probably only have three or four questions, give or

19   take some follow-up.

20            As we wound up Mr. Disher's questions, you

21   were indicating your understanding of what happened in

22   the Inland Empire matter based on Exhibit 11.  Do you

23   recall that?

24       A    Yes.

25       Q    And you stated that the court's ruling in
```

1                    REPORTER CERTIFICATE

2          I, REBECCA L. TUGGLE, a Registered
   Professional Reporter, Certified Court Reporter, and
3  Certified Shorthand Reporter within and for the State
   of Missouri, do hereby certify that there came before
4  me on August 1, 2018, at Alaris Litigation Services,
   711 N. 11th Street, St. Louis, Missouri 63101
5
                    STEPHEN LEGOMSKY
6
   who was by me first duly sworn; that the witness
7  was carefully examined; that said examination was
   reported by myself, translated and proofread using
8  computer-aided transcription; and the above transcript
   of proceedings is a true and accurate transcript of my
9  notes as taken at the time of the examination of this
   witness.
10
           I further certify that I am neither attorney
11 nor counsel for nor related nor employed by any of the
   parties to the action in which this examination is
12 taken; further, that I am not a relative or employee of
   any attorney or counsel employed by the parties hereto
13 or financially interested in this action.

14

15         Dated this 2nd day of August, 2018.

16

17

18              *Becca Tuggle*

19  _____
              Rebecca L. Tuggle, RPR, CCR, CSR
20

21

22

23

24

25