**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, ET AL.; | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 1:18-cv-00068 |
| | § | |
| UNITED STATES OF AMERICA, ET AL.; | § | |
| | § | |
| *Defendants,* | § | |
| | § | |
| *and* | § | |
| | § | |
| KARLA PEREZ, ET AL.; | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| *Defendants-Intervenors.* | § | |

**APPENDIX IN SUPPORT OF PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT**


**VOLUME 3 OF 3**

**EXHIBITS 35 THROUGH 39**

**PAGES APP. 654 THROUGH APP. 720**

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2023, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

*/s/ Leif A. Olson*
LEIF A. OLSON

# Exhibit 35

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, ET AL.; | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Case No. 1:18-cv-00068 |
| | ) |
| UNITED STATES OF AMERICA, ET AL.; | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| KARLA PEREZ, ET AL.; | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| Defendants-Intervenors. | ) |

## DECLARATION OF SUSAN BRICKER

1.  My name is Susan Bricker. I am an adult and competent to testify. The information and opinions contained in this declaration are based upon my personal knowledge, my review of the relevant documents, and my knowledge, skills, training, and experience.

2.  I am currently the manager (Manager V) of the Health Program Outcomes and Epidemiology Team ("HPOE") within the Office of Data, Analytics and Performance ("DAP") (the office formerly known as the Center for Analytics and

**App. 655**

Decision Support -CADS) at the Texas Health and Human Services Commission ("HHSC").

3.      Except for a brief eight-month period in 2014 when I worked in the private sector, I've been employed at HHSC since 2007. In that time, I have worked as an Epidemiologist II (2007-2012), Research Specialist V (2012-Jan. 2014), a Research Specialist V (Sept. 2014-Apr. 2018), a Program Specialist VII (May 2018-May 2021), and Manager V (June 2021-current). The HPOE Team conducts and/or coordinates legislative and HHS-directed research on health care utilization, demographic trends, and enrollment patterns for the state's health care and human service programs.

4.      In 2007, as part of the 2008-2009 General Appropriations Act, the Texas Legislature required HHSC to report the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. This report, also known as the Rider 59 Report, was first completed by HHSC in 2008. Due to numerous requests for more recent information following the issuance of the 2008 report, the Rider 59 Report was updated in 2010, 2013, 2014, 2017, and 2021. The Rider 59 Report completed in 2021 covered state fiscal year (SFY) 2019.

5.      HHSC provides three principal categories of services and benefits to undocumented immigrants in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage (a/k/a "CHIP Perinate"). Undocumented

**App. 656**

immigrants also receive uncompensated medical care from public hospitals in the State.

6.     In September 2022, HHSC updated the methodology for calculating the fraction of the Texas' Medicaid Type Program 30 (Emergency Medicaid) clients and CHIP Perinate clients that are likely to be undocumented immigrants. The newer methodology, described in paragraphs 7 and 9, provides the lower and upper bound for the estimated cost of services provided to undocumented immigrants. These estimates are calculated for calendar years (CY) 2019 through 2022. Due to the change in methodology and the shift from state fiscal year to calendar year, the current estimates will not match the estimates provided in previous testimony.

7.     Emergency Medicaid is a federally required program jointly funded by the federal government and the states. The program provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, to undocumented immigrants living in the United States. Because HHSC Medicaid claims data do not conclusively identify an individual's residency status, the portion of Emergency Medicaid payments attributable to undocumented immigrants must be estimated. As in previous years, the U.S. Census Bureau's American Community Survey (ACS) is used to estimate the percentage of non-U.S. citizen reproductive-age females in Texas who have not attained some form of legal permanent resident status. Attached as Exhibit 1 is a document that explains the methodology HHSC utilized to obtain estimates derived from the Census. It is the same methodology previously relied upon by HHSC for the Rider 59 Report and, in the current report, is used to

calculate the lower bound estimate for the fraction of Emergency Medicaid services provided to undocumented immigrants. The upper bound estimate for the fraction of Emergency Medicaid services provided to undocumented immigrants uses enrollment data collected by the Texas Integrated Eligibility Redesign System (TIERS). It is based on the percentage of Emergency Medicaid clients with 'UN' (for "undocumented") alien status among individuals that did not have a null/blank value for their Alien Type Code in TIERS. The total estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was between $78 and $116 million in CY 2019; between $58.5 and $88.3 million in CY 2020; between $61.3 and $9.6 million in CY 2021; and between $44.9 and $72.2 million in CY 2022.[1] Attached as Exhibit 2 is a report providing detailed information and data sources for these calculations.

      8.     The Family Violence Program contracts with non-profit agencies across the State to provide essential services to family violence victims, including undocumented immigrants, in three categories: shelter centers, non-residential centers, and Special Nonresidential Projects. Because the FVP does not ask individuals about their residency status, the portion of the FVP's expenditures attributable to undocumented immigrants must be estimated. Attached as Exhibit 1 is a document that explains the methodology HHSC utilized to obtain the estimates provided in this declaration. It is the same methodology relied upon by HHSC for

---

[1] Administrative claims and MCO encounter data for CY 2022 were downloaded on January 11, 2023. Claims and encounter data are subject to an 8-month time lag for claims adjudication. Therefore, expenditures shown for client services in CY 2022 do not reflect complete expenditure data for the year.

preparing internal estimates and for preparation of the Rider 59 Report. The total estimated cost to the State for the provision of direct FVP services to undocumented immigrants residing in Texas was $1.2 million in SFY 2007, $1.3 million in SFY 2009, $1.3 million in SFY 2011, $1.4 million in SFY 2013, $1.0 million in SFY 2015, $1.2 million in SFY 2017, and $1.0 million in SFY 2019. New estimates have been calculated for CY 2019 through 2022. The estimated costs for the provision of direct FVP services to undocumented immigrants residing in Texas was $1.1 million in CY 2019, $1.4 million in CY 2020, $1.6 million in CY 2021, and $1.9 million in CY 2022.

9.    Texas CHIP Perinatal Coverage provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. There is no way to definitively report the number of undocumented immigrants served by CHIP Perinatal Coverage because the program does not require citizenship documentation. As mentioned in paragraph 6, HHSC revised the methodology to include a lower and upper bound for the estimated number of undocumented immigrants served by CHIP Perinate. Attached as Exhibit 1 is a document that explains the methodology HHSC utilized to obtain the lower bound for estimates provided in this declaration. It is the same methodology previously relied upon by HHSC for preparing internal estimates and for preparation of Rider 59 Reports. The upper bound estimate for the cost of benefits provided to undocumented immigrants is based on the percentage of CHIP Perinate clients with 'UN' alien status among individuals that did not have a null/blank value for their Alien Type Code in TIERS. The total estimated cost to the State for CHIP Perinatal Coverage to undocumented immigrants residing in Texas

was between $7.6 million and $11.1 million in CY 2019; between $11 million and $16.9 million in CY2020; between $17 million and $25.8 million in CY 2021; and between $19.7 million and $30.9 million in CY2022.  Attached as Exhibit 2 is a report providing detailed information and data sources for these calculations.

10.    In the 2008 and 2010 versions of the Rider 59 Report, HHSC also provided estimates of the amount of uncompensated medical care provided by state public hospital district facilities to undocumented immigrants. In these reports, HHSC estimated that the State's public hospital district facilities incurred approximately $596.8 million in uncompensated care for undocumented immigrants in SFY 2006 and $716.8 million in SFY 2008. HHSC has not provided any estimates of uncompensated care for undocumented immigrants in more recent versions of the Rider 59 Report.

11.    For Emergency Medicaid and CHIP Perinate, the total estimated cost to the State each year is affected by both the volume and cost of services provided and annual changes in the percentage of expenditures matched by the federal government (i.e., Federal Medical Assistance Percentage (FMAP) and Enhanced Federal Medical Assistance Percentage (E-FMAP)), which determines the state share of overall Medicaid and CHIP expenditures. Although all of these numbers are estimated costs for the respective programs, it is a certainty that each of these programs has some positive cost to the State of Texas due to utilization by undocumented immigrants.

12.    All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 18th day of January 2023.

SUSAN BRICKER

# Declaration of Susan Bricker

# Exhibit 1

Appendix B: Estimating the Percent of Undocumented Clients

# Appendix B:  Estimating the Percent of Undocumented Clients

Previous Undocumented Immigrant Estimates

Previously, HHSC relied on different methods to estimate the percent of non-U.S. citizens in Texas who are undocumented. The first method consisted of assuming that one-half of the estimated non-U.S. citizen population in the state was undocumented. Under this method, HHSC would obtain the estimate for total number of non-U.S. citizens in the state, as reported from the U.S. Census Bureau's American Community Survey (ACS)[1], and would divide that number by two in order to obtain an estimate of the undocumented population in the state.

More recently HHSC relied on a method that uses two different sources of official federal government data to develop its own in-house estimates of the percent of Texas residents that are undocumented immigrants:

- The Texas-specific sample of the U.S. Census Bureau's American Community Survey (ACS), and
- The Office of Immigration Statistics of the U.S. Department of Homeland Security (DHS).

The ACS was the source for estimates of the total non-U.S. citizen population in the state while DHS was the source for the estimated number of persons in the state who are undocumented.

Using these two sources, HHSC estimated the percent of non-U.S. citizens who are undocumented by taking DHS' estimate of the number of undocumented immigrants in Texas (the numerator) and dividing it by the ACS estimate for the number of non-U.S. citizens in the state (the denominator). This calculation resulted in HHSC's estimate of the proportion/percent of non-U.S. citizens in the state who are undocumented.

---

[1] The ACS is a large-scale demographic survey that provides annual estimates of the total population in Texas according to U.S. citizen status (citizen versus non-citizen). However, the estimate for the non-U.S. citizen population is not broken down any further according to documented/undocumented status because that type of information is not collected by the survey.

**App. 663**

A-1

According to this method, during 2008-2014, an estimated two-thirds (62 to 66%) of non-citizens were considered undocumented on any given year within that period.

DHS temporarily suspended the publication of its estimates for the unauthorized/undocumented population after March 2013, when it published estimates for this population as of January 2012. It resumed publication of the estimates on April 19, 2021, when it released previously unpublished estimates for the years 2013-2018.  The new updates may be used to develop future versions of this report.

With the temporary suspension of DHS's estimates after March 2013, HHSC lost the official information source relied upon for data on the number of non-citizens who are undocumented, as none of the other Federal and Texas state agencies collected and published information about the legal status of non-U.S. citizens' residing in the state of Texas.

This situation resulted in the need to develop and alternative method for estimating the number and percent of non-U.S. citizens using HHSC services who are undocumented. The goal was to develop a method that does not rely on the simple assumptions previously used (that one-half of non-citizens are undocumented). The alternative method is explained below.

## Method for Current Estimates

<u>Benchmark Program: Texas' Medicaid Type Program 30</u>

Texas' Medicaid Type Program 30 (TP 30) plays an important role in paying for emergency medical services provided to non-U.S. citizens who do not meet the eligibility criteria for Medicaid. Given the high-profile role the program plays in compensating health care providers for services provided to non-eligible non-citizens, it was chosen as the benchmark program for developing an estimate of the percent of non-citizens provided HHSC services who are undocumented.

To a very significant degree, uninsured non-citizen reproductive-age (ages 15-44) females are the main caseload driver within TP 30. In SFY 2017, reproductive- age females accounted for 81% of the clients served. Given the highly disproportionate impact this group has on the program, it is by far the most important one to analyze to obtain the best and most accurate estimate possible of the percent of clients served under this program that are likely to be undocumented non-citizens.

**App. 664**

A-2

Data Analysis and Estimate

According to the U.S. Census Bureau's American Community Survey (ACS), in 2016 there were approximately 446,000 uninsured non-U.S. citizen reproductive-age females in Texas. Of those, 39 percent (176,000) had resided in the U.S. for 10 years or less and 61 percent (270,000) for more than 10 years.

It is reasonable to expect that the longer a non-citizen has resided in the U.S., the more likely he/she would have been able to attain some form of U.S. legal permanent resident status.

Assuming that the fraction of non-citizen reproductive-age females (ages 15-44) who have not attained some form of legal permanent resident status is 7 of every 10 (70%) among those who have lived in the U.S 10 years or less, and 4 of every 10 (40%) among those in the U.S. for more than 10 years, the estimated potential percentage for undocumented females of reproductive age in Texas is 52%.

**Calculation for Estimated Percent Undocumented**

**((0.7*176,000 + 0.4*270,000) / (446,000)) * 100 = 51.8% ~ 52%**

Extending these assumptions derived from the ACS data to non-citizen reproductive-age females that received assistance under TP 30 – for whom year of entry into the U.S. information is not known -- it is then estimated that 52% of them are likely to be undocumented.

Taking into consideration that uninsured, non-citizen reproductive-age females represent a highly disproportionate share of the program's caseload, the estimated potential percentage for undocumented clients applicable to them, slightly adjusted downwards to 50%, is also applied to the entire TP 30 program. Due to the lack of sufficient demographic data on populations at-risk for other programs of interest, the same percentage was also applied to the Family Violence and CHIP-P programs for the purposes of the analysis in this report.

# Declaration of Susan Bricker

# Exhibit 2

Health and Human Services Commission Services and Benefits Provided to
Undocumented Immigrants

**Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants**

|  | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| (1) Texas Emergency Medicaid | | | | |
|     Lower Estimate | $78,000,000 | $58,500,000 | $61,300,000 | $44,900,000* |
|     Upper Estimate | $116,000,000 | $88,300,000 | $95,600,000 | $72,200,000* |
| (2) Texas Family Violence Program (FVP) | $1,100,000 | $1,400,000 | $1,600,000 | $1,900,000 |
| (3) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage | | | | |
|     Lower Estimate | $7,600,000 | $11,000,000 | $17,000,000 | $19,700,000 |
|     Upper Estimate | $11,100,000 | $16,900,000 | $25,800,000 | $30,900,000 |
| **TOTAL TEXAS HEALTH AND HUMAN SERVICES COMMISSION** | | | | |
|     **Lower Estimate** | **$86,700,000** | **$70,900,000** | **$79,900,000** | **$66,500,000** |
|     **Upper Estimate** | **$128,200,000** | **$106,600,000** | **$123,000,000** | **$105,000,000** |

Notes:

*Administrative claims and MCO encounter data were downloaded on January 11, 2023. Claims and encounter data are subject to an 8-month time lag for claims adjudication. Therefore, expenditures shown for client services in CY 2022 do not reflect complete expenditure data for the year.

**Texas Emergency Medicaid Expenditures, Type Program 30, Calendar Years 2019 - 2022**

| Client Service[1] | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| Inpatient hospital | $330,920,650 | $317,411,166 | $340,355,399 | $229,137,501 |
| Outpatient hospital | $24,240,002 | $20,021,218 | $21,920,429 | $16,423,357 |
| Professional and other services | $23,975,315 | $20,204,430 | $17,634,540 | $12,325,562 |
| Vendor drug | $272,418 | $115,664 | $54,879 | $26,752 |
| **Total** | **$379,408,384** | **$357,752,477** | **$379,965,247** | **$257,913,172** |

| Texas' Share of TP 30 Expenditures | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| Texas' Share based on Federal Medical Assistance Percentage (FMAP)[2] | 41.14% | 32.68% | 32.24% | 34.78% |
| Texas' Share of TP 30 Expenditures *(row 7 x row 10)* | $156,088,609 | $116,913,510 | $122,500,796 | $89,702,201 |

| Estimated Percentage of TP30 Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| Census estimate[3] | 50% | 50% | 50% | 50% |
| TIERS estimate[4] | 74.3% | 75.5% | 78.0% | 80.5% |

| Estimated Cost of Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| **Lower Bound** *(row 11 x row 14)* | **$78,044,305** | **$58,456,755** | **$61,250,398** | **$44,851,101** |
| **Upper Bound** *(row 11 x row 15)* | **$115,973,837** | **$88,269,700** | **$95,550,621** | **$72,210,272** |

Data Sources:

[1] TMHP, AHQP Medicaid Claims

[2] FFY 2019 rates are final as stated in Federal Register Vol. 82, No. 223, November 21, 2017.

FFY 2020 rates are final as stated in Federal Register Vol. 83, No. 229, November 28, 2018.

FFY 2021 rates are final as stated in Federal Register Vol. 84, No. 232, December 3, 2019.

FFY 2022 rates are final as stated in Federal Register Vol. 85, No. 230, November 30, 2020.

[3] U.S. Census, 2020 American Community Survey, Texas-specific sample

[4] Texas Integrated Eligibility Redesign System (TIERS)

Notes:

Because HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of Emergency Medicaid payments attributable to undocumented immigrants mus be estimated. Two estimates have been provided to approximate upper and lower bounds of costs provided to undocumented immigrants:

Lower bound: According to the U.S. Census Bureau's American Community Survey (ACS) for Texas, approximately 2,743,000 non-citizens resided in Texas in 2020. HHSC's Office of Data, Analytics, and Performance (DAP) estimates that no less than 50% of these residents, or no less than 1,372,000 were undocumented.

Upper bound: based on enrollment the percentage of Emergency Medicaid clients with 'UN' alien status, among individuals that did not have a null/blank value for their Alien Type Code in T ERS

*Administrative claims and MCO encounter data were downloaded on January 11, 2023. Claims and encounter data are subject to an 8-month time lag for claims adjudication. Therefore, expenditures shown for client services in CY 2022 do not reflect complete expenditure data for the year.

**App. 668**

**Texas Family Violence Program Expenditures, Calendar Years 2019 - 2022**

| FVP Date of Service | Expenditures[*] | Percent of Texas Residents who were undocumented | Estimated Costs for Direct FVP Services to Undocumented Immigrants[**] |
|---|---|---|---|
| 1/1/2019 – 12/31/2019 | $23,700,539 | 4.7% | $1,113,925 |
| 1/1/2020 – 12/31/2020 | $30,590,825 | 4.7% | $1,437,769 |
| 1/1/2021 – 12/31/2021 | $33,213,070 | 4.7% | $1,561,014 |
| 1/1/2022 – 12/31/2022 | $40,463,500 | 4.7% | $1,901,784 |

Data Source: CAPPS Financials, 1/12/2023

Notes:

[*] Represents all funds for the Family Violence Program (appropriated and supplemental).

[**] The FVP does not screen family violence clients for residency status data. Therefore, the portion of FVP expenditures attributable to undocumented immigrants must be estimated. According to the U.S. Census Bureau's American Community Survey (ACS) for Texas, approximately 29,354,000 individuals resided in Texas in 2020. HHSC's Office of Data, Analytics, and Performance (DAP) estimates that in 2020 no less than 1,372,000 or 4.7 percent of these residents were undocumented.

**App. 669**

**Texas Children's Health Insurance Program (CHIP) Perinatal Coverage Expenditures, Calendar Years 2019 - 2022**

| | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| Texas CHIP Perinatal Coverage expenditures[1] | $175,103,677 | $154,717,301 | $150,341,871 | $161,628,934 |

| **Texas' Share of CHIP Expenditures** | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| Texas' Share based on Enhanced Federal Medical Assistance Percentage (EFMAP)[2] | 8.67% | 14.25% | 22.57% | 24.35% |
| Texas' Share of CHIP-Perinate Expenditures (row 3 x row 6) | $15,181,489 | $22,047,215 | $33,932,160 | $39,356,645 |

| **Estimated Percentage of CHIP-Pernate Services Provided to Undocumented Immigrants** | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| Census estimate[3] | 50% | 50% | 50% | 50% |
| TIERS estimate[4] | 73.3% | 76 6% | 76.1% | 78.4% |

| **Estimated Cost of Services Provided to Undocumented Immigrants** | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| **Total (row 7 x row 10)** | **$7,590,744** | **$11,023,608** | **$16,966,080** | **$19,678,323** |
| **Total (row 7 x row 11)** | **$11,128,031** | **$16,888,167** | **$25,822,374** | **$30,855,610** |

Data Sources:
[1] HHSC, DAP SQL Server, CHIP_hx ile

[2] FFY 2019 rates are final as stated in Federal Register Vol. 82, No. 223, November 21, 2017.
 FFY 2020 rates are final as stated in Federal Register Vol. 83, No. 229, November 28, 2018.
 FFY 2021 rates are final as stated in Federal Register Vol. 84, No. 232, December 3, 2019.
 FFY 2022 rates are final as stated in Federal Register Vol. 85, No. 230, November 30, 2020.

[3] U.S. Census, 2020 American Community Survey, Texas-specific sample

[4] Texas Integrated Eligibility Redesign System (TIERS)

Notes:

Because HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of Emergency Medicaid payments attributable to undocumented immigrants must be estimated. Two estimates have been provided to approximate upper and lower bounds of costs provided to undocumented immigrants:

Lower bound: According to the U.S. Census Bureau's American Community Survey (ACS) for Texas, approximately 2,743,000 non-citizens resided in Texas in 2020. HHSC's Office of Data, Analytics, and Performance (DAP) estimates that no less than 50% of these residents, or no less than 1,372,000 were undocumented.

Upper bound: based on the percentage of CHIP-Perinate clients with 'UN' alien status, among individuals that did not have a null/blank value for their Alien Type Code in TIERS

**TEXAS MEDICAID PERCENTAGE MATCH**
**As of March 2022**

| | State Fiscal Year (Sept - Aug) | | | | Federal Fiscal Year (Oct - Sept) | | | | Calendar Year (Jan - Dec) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | State Share | | Federal Share | | State Share | | Federal Share | | State Share | | Federal Share | |
| | FMAP | EFMAP | FMAP | EFMAP | FMAP | EFMAP | FMAP | EFMAP | FMAP | EFMAP | FMAP | EFMAP |
| 2004 | 39.80% | 27.86% | 60.20% | 72.14% | 39.78% | 27.85% | 60.22% | 72.15% | 39.62% | 27.74% | 60.38% | 72.26% |
| 2005 | 39.18% | 27.43% | 60.82% | 72.57% | 39.13% | 27.39% | 60.87% | 72.61% | 39.18% | 27.43% | 60.82% | 72.57% |
| 2006 | 39.32% | 27.53% | 60.68% | 72.47% | 39.34% | 27.54% | 60.66% | 72.46% | 39.31% | 27.52% | 60.69% | 72.48% |
| 2007 | 39.23% | 27.46% | 60.77% | 72.54% | 39.22% | 27.45% | 60.78% | 72.55% | 39.28% | 27.49% | 60.72% | 72.51% |
| 2008 | 39.42% | 27.60% | 60.58% | 72.40% | 39.44% | 27.61% | 60.56% | 72.39% | 39.72% | 27.81% | 60.28% | 72.19% |
| 2009[1] | 40.47% | 28.32% | 59.53% | 71.68% | 40.56% | 28.39% | 59.44% | 71.61% | 40.74% | 28.52% | 59.26% | 71.48% |
| 2010[1] | 41.21% | 28.85% | 58.79% | 71.15% | 41.27% | 28.89% | 58.73% | 71.11% | 40.81% | 28.57% | 59.19% | 71.43% |
| 2011[1] | 39.59% | 27.72% | 60.41% | 72.28% | 39.44% | 27.61% | 60.56% | 72.39% | 40.03% | 28.02% | 59.97% | 71.98% |
| 2012 | 41.58% | 29.11% | 58.42% | 70.89% | 41.78% | 29.25% | 58.22% | 70.75% | 41.51% | 29.06% | 58.49% | 70.94% |
| 2013 | 40.79% | 28.55% | 59.21% | 71.45% | 40.70% | 28.49% | 59.30% | 71.51% | 40.85% | 28.60% | 59.15% | 71.40% |
| 2014 | 41.26% | 28.88% | 58.74% | 71.12% | 41.31% | 28.92% | 58.69% | 71.08% | 41.47% | 29.03% | 58.53% | 70.97% |
| 2015 | 41.90% | 29.32% | 58.10% | 70.68% | 41.95% | 29.36% | 58.05% | 70.64% | 42.18% | 29.52% | 57.82% | 70.48% |
| 2016[3] | 42.79% | 29.96% | 57.21% | 70.04% | 42.87% | 30.01% | 57.13% | 69.99% | 43.11% | 30.18% | 56.89% | 69.82% |
| 2017[3] | 43.74% | 30.61% | 56.26% | 69.39% | 43.82% | 30.67% | 56.18% | 69.33% | 43.65% | 30.55% | 56.35% | 69.45% |
| 2018[3] | 43.18% | 30.22% | 56.82% | 69.78% | 43.12% | 30.18% | 56.88% | 69.82% | 42.79% | 29.95% | 57.21% | 70.05% |
| 2019[3] | 41.92% | 29.35% | 58.08% | 70.65% | 41.81% | 29.27% | 58.19% | 70.73% | 41.14% | 28.80% | 58.86% | 71.20% |
| 2020[2] | 39.33% | 27.54% | 60.67% | 72.46% | 39.11% | 27.38% | 60.89% | 72.62% | 38.88% | 27.22% | 61.12% | 72.78% |
| 2020 Stimulus[2,3] | 32.91% | 23.04% | 67.09% | 76.96% | 32.91% | 23.04% | 67.09% | 76.96% | 32.68% | 22.88% | 67.32% | 77.12% |
| 2020 Blended[2,3] | 35.20% | 24.64% | 64.80% | 75.36% | 34.46% | 24.12% | 65.54% | 75.88% | 32.68% | 22.88% | 67.32% | 77.12% |
| 2021 | 38.27% | 26.78% | 61.73% | 73.22% | 38.19% | 26.73% | 61.81% | 73.27% | 38.44% | 26.91% | 61.56% | 73.09% |
| 2021 Stimulus[3] | 32.07% | 22.45% | 67.93% | 77.55% | 31.99% | 22.39% | 68.01% | 77.61% | 32.24% | 22.57% | 67.76% | 77.43% |
| 2021 Blended[3] | 32.07% | 22.45% | 67.93% | 77.55% | 31.99% | 22.39% | 68.01% | 77.61% | 32.24% | 22.57% | 67.76% | 77.43% |
| 2022 | 39.12% | 27.38% | 60.88% | 72.62% | 39.20% | 27.44% | 60.80% | 72.56% | 39.43% | 27.60% | 60.57% | 72.40% |
| 2022 Stimulus[3] | 32.92% | 23.04% | 67.08% | 76.96% | 33.00% | 23.10% | 67.00% | 76.90% | 34.78% | 24.35% | 65.22% | 75.65% |
| 2022 Blended[3] | 32.92% | 23.04% | 67.08% | 76.96% | 33.00% | 23.10% | 67.00% | 76.90% | 34.78% | 24.35% | 65.22% | 75.65% |
| 2023 | 40 05% | 28.04% | 59.95% | 71 96% | 40.13% | 28 09% | 59.87% | 71.91% | 40.15% | 28.11% | 59.85% | 71.89% |
| 2023 Stimulus[3] | 33.85% | 23.70% | 66.15% | 76 30% | 33.93% | 23.75% | 66.07% | 76.25% | 35.50% | 24.85% | 64.50% | 75.15% |
| 2023 Blended[3] | 37.99% | 26.59% | 62.01% | 73.41% | 38.58% | 27.01% | 61.42% | 72.99% | 38.99% | 27.30% | 61.01% | 72.70% |
| 2024 | 40.21% | 28.14% | 59.79% | 71.86% | 40.22% | 28.15% | 59.78% | 71.85% | 40.22% | 28.15% | 59.78% | 71.85% |
| 2025 | 40.22% | 28.15% | 59.78% | 71.85% | 40.22% | 28.15% | 59.78% | 71.85% | 40.22% | 28.15% | 59.78% | 71.85% |
| 2026 | 40.22% | 28.15% | 59.78% | 71.85% | 40.22% | 28.15% | 59.78% | 71.85% | 40.22% | 28.15% | 59.78% | 71.85% |
| 2027 | 40.22% | 28.15% | 59.78% | 71.85% | 40.22% | 28.15% | 59.78% | 71.85% | 40.22% | 28.15% | 59.78% | 71.85% |
| 2028 | 40.22% | 28.15% | 59.78% | 71.85% | 40.22% | 28.15% | 59.78% | 71.85% | 40.22% | 28.15% | 59.78% | 71.85% |

[1] Non-stimulus FMAPs are shown in columns C-P. For the period of October 2008-June 2011, stimulus FMAPs were in effect. See columns R-U for the stimulus match rates.

[2] Standard EFMAPs are shown in columns C-P. Per FFIS Budget Brief 18-03 (January 24, 2018), for the period of October 2015-September 2019, CHIP programs and expenditures funded with Title XXI will be eligible for a +23 percentage point enhancement; for October 2019-September 2020 for an +11.5 percentage point enhancement; and beginning October 2020 wi receive no enhancement. See columns W-Z.

[3] Stimulus FMAP increase of 6.2% is assumed for the period January 2020 - December 2022. "2020 Stimulus" (row 24), "2021 Stimulus" (row 27), "2022 Stimulus" (row 30), and "2023 Stimulus" (row 33) FMAPs represent the stimulus period only. "2020 Blended" (row 25), "2021 Blended" (row 28), "2022 Blended" (row 31), and "2023 Blended" (row 34) FMAPs represent their respective full fiscal or calendar year.

FFY 2010 rates are final, as stated in Federal Register Vol. 73, No. 229, November 26, 2008.
FFY 2011 non-stimulus rates are final as stated in FFIS Issue Brief 09-38, October 21, 2009.
FFY 2012 rates are final as stated in Federal Register Vol. 75, No. 217, November 10, 2010.
FFY 2013 rates are final as stated in Federal Register Vol. 76, No. 230, November 30, 2011.
FFY 2014 rates are final as stated in Federal Register Vol. 77, No. 231, November 30, 2012.
FFY 2015 rates are final as stated in Federal Register Vol. 79, No. 13, January 21, 2014.
FFY 2016 rates are final as stated in Federal Register Vol. 79, No. 231, December 2, 2014.
FFY 2017 rates are final as stated in Federal Register Vol. 80, No. 227, November 25, 2015.
FFY 2018 rates are final as stated in Federal Register Vol. 81, No. 220, November 15, 2016.
FFY 2019 rates are final as stated in Federal Register Vol. 82, No. 223, November 21, 2017.
FFY 2020 rates are final as stated in Federal Register Vol. 83, No. 229, November 28, 2018.
FFY 2021 rates are final as stated in Federal Register Vol. 84, No. 232, December 3, 2019.
FFY 2022 rates are final as stated in Federal Register Vol. 85, No. 230, November 30, 2020.
FFY 2023 rates are final as stated in Federal Register Vol. 86, No. 225, November 26, 2021.

**TEXAS MEDICAID PERCENTAGE MATCH WITH STIMULUS/ENHANCEMENTS**

| | FMAP Only: Stimulus Rates | | | | EFMAP Only: +23% Enhanced Match | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | State Share | | Federal Share | | State Share | | | Federal Share | | |
| | SFY FMAP | FFY FMAP | SFY FMAP | FFY FMAP | SFY EFMAP | CY EFMAP | FFY EFMAP | SFY EFMAP | CY EFMAP | FFY EFMAP |
| 2004 | | | | | | | | | | |
| 2005 | | | | | | | | | | |
| 2006 | | | | | | | | | | |
| 2007 | | | | | | | | | | |
| 2008 | | | | | | | | | | |
| 2009[1] | 31.74% | 30.97% | 68.26% | 69.03% | | | | | | |
| 2010[1] | 29.15% | 29.06% | 70.85% | 70.94% | | | | | | |
| 2011[1] | 32.68% | 33.54% | 67.33% | 66.46% | | | | | | |
| 2012 | | | | | | | | | | |
| 2013 | | | | | | | | | | |
| 2014 | | | | | | | | | | |
| 2015 | | | | | | | | | | |
| 2016[3] | | | | | 8.87% | 7.18% | 7.01% | 91.13% | 92.82% | 92.99% |
| 2017[3] | | | | | 7.61% | 7.55% | 7.67% | 92.39% | 92.45% | 92.33% |
| 2018[3] | | | | | 7.22% | 6.95% | 7.18% | 92.78% | 93.05% | 92.82% |
| 2019[3] | | | | | 6.35% | **8.67%** | 6.27% | 93.65% | 91.33% | 93.73% |
| 2020[3] | | | | | 15.08% | 18.59% | 15.88% | 84.92% | 81.41% | 84.12% |
| 2020 Stimulus[2,3] | | | | | 11.54% | 14.25% | 11.54% | 88.46% | 85.75% | 88.46% |
| 2020 Blended[3,3] | | | | | 12.18% | **14.25%** | 12.62% | 87.82% | 85.75% | 87.38% |
| 2021 | | | | | 25.83% | 26.91% | 26.73% | 74.17% | 73.09% | 73.27% |
| 2021 Stimulus[3] | | | | | 21.49% | 22.57% | 22.39% | 78.51% | 77.43% | 77.61% |
| 2021 Blended[3] | | | | | 21.49% | **22.57%** | 22.39% | 78.51% | 77.43% | 77.61% |
| 2022 | | | | | 27.38% | 27.60% | 27.44% | 72.62% | 72.40% | 72.56% |
| 2022 Stimulus[3] | | | | | 23.04% | 24.35% | 23.10% | 76.96% | 75.65% | 76.90% |
| 2022 Blended[3] | | | | | 23.04% | **24.35%** | 23.10% | 76.96% | 75.65% | 76.90% |
| 2023 | | | | | | | | | | |
| 2023 Stimulus[3] | | | | | | | | | | |
| 2023 Blended[3] | | | | | | | | | | |
| 2024 | | | | | | | | | | |
| 2025 | | | | | | | | | | |
| 2026 | | | | | | | | | | |
| 2027 | | | | | | | | | | |
| 2028 | | | | | | | | | | |

State Fiscal Year stimulus rates are based on 11 months stimulus rate in SFY 2009, 12 months in SFY 2010 and 10 months in SFY 2011.

Stimulus Assumptions are Tier I Oct 2008-June 2009 (68.76%), Tier II July 2009-Sept 2009 (69.85%), Tier III Oct 2009-Dec 2010 (70.94%). A phased-down 6-month extension from Jan-Jun 2011 is included for FY 11 as stated in FFIS IB 10-33 (August 17, 2010).

Expenditures in Medicaid and CHIP paid with Title XXI funds will be eligible for this match between Oct 1, 2015 - Sept 30, 2020.

App. 672

# Exhibit 36

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

|  |  |
|---|---|
| STATE OF TEXAS, ET AL.; | ) |
|  | ) |
| *Plaintiffs,* | ) |
|  | ) |
| *v.* | ) Case No. 1:18-cv-00068 |
|  | ) |
| UNITED STATES OF AMERICA, ET AL.; | ) |
|  | ) |
| *Defendants,* | ) |
|  | ) |
| *and* | ) |
|  | ) |
| KARLA PEREZ, ET AL.; | ) |
|  | ) |
| STATE OF NEW JERSEY, | ) |
|  | ) |
| *Defendants-Intervenors.* | ) |
|  | ) |

## DECLARATION OF JAMES TERRY

My name is James Terry, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.    I am the Associate Commissioner for School Finance/Chief School Finance Officer at the Texas Education Agency ("TEA") with 30 years of experience at the school district level. I have worked for TEA in this capacity since December 1, 2022, having previously served as the Chief Financial Officer for Third Future Schools and the Chief Financial Officer at Dallas Independent School District from

**App. 674**

2013 to 2017.  Previously I served as the Executive Director of Finance for the North East Independent School District from 1999 to 2011.

2.      In my current position, I oversee TEA's school finance operations, including the administration of the Foundation School Program and analysis and processing of financial data. My responsibilities also include representing TEA in legislative hearings and school finance-related litigation.

3.      TEA estimates that the average funding entitlement for fiscal year 2023 will be $9,564 per student in attendance for an entire school year. If a student qualified for the additional Bilingual and Compensatory Education weighted funding (for which most, if not all, UAC presumably would qualify), it would cost the State $11,781 to educate each student in attendance for the entire school year.

4.      TEA has not received any information directly from the federal government regarding the precise number of unaccompanied children ("UAC") in Texas. However, I am aware that data from the U.S. Health and Human Services ("HHS") Office of Refugee Resettlement (accessed on January 5, 2023 at 11:35 a.m. CST at https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state) (attached as Exhibit 1), indicates that in Texas, 3,272 UAC were released to sponsors during the 12-month period covering October 2014 through September 2015; 6,550 UAC were released to sponsors during the 12-month period covering October 2015 through September 2016; 5,391 UAC were released to sponsors during the 12-month period covering October 2016 through September 2017; 4,136 UAC were released to sponsors during the 12-month period covering October 2017

**App. 675**

through September 2018; 9,900 UAC were released to sponsors during the 12-month period covering October 2018 through September 2019; 2,336 UAC were released to sponsors during the 12-month period covering October 2019 through September 2020; 15,341 UAC were released during the 12-month period covering October 2020 through September 2021; and 19,071 UAC were released during the 12-month period covering October 2021 through September 2022. If each of these children is educated in the Texas public school system and qualifies for Bilingual and Compensatory Education weighted funding (such that the State's annual cost to educate each student for fiscal years 2016, 2017, 2018, 2019, 2020, 2021, 2022, and 2023 would be roughly $9,573, $9,639, $9,841, $10,330, $11,323, $11,536, $11,719, and $11,781, respectively), the annual costs to educate these groups of children for fiscal years 2016, 2017, 2018, 2019, 2020, 2021, 2022, and 2023 would be approximately $31.32 million, $63.13 million, $53.05 million, $42.73 million, $112.10 million, $26.95 million, $179.78 million, and $224.67 million, respectively.

5.      School formula funding is comprised of state and local funds. The state funding is initially based on projections made by each school district at the end of the previous biennium. Districts often experience increases in their student enrollment from year to year, and the State plans for an increase of approximately 15,000 students in enrollment growth across Texas each year.

6.      The Foundation School Program serves as the primary funding mechanism for providing state aid to public schools in Texas. Any additional UAC

enrolled in Texas public schools would increase the State's cost of the Foundation School Program over what would otherwise have been spent.

7.     Based on my knowledge and expertise regarding school finance issues impacting the State of Texas, I anticipate that the total costs to the State of providing public education to UAC will rise in the future to the extent that the number of UAC enrolled in the State's public school system increases.

8.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of January 2023.

_____

JAMES TERRY

# Declaration of James Terry

# Exhibit 1

Data from U.S. Health and Human Services office of Refugee Resettlement

1/5/23, 11:50 AM
Unaccompanied Children Released to Sponsors by State | The Administration for Children and Families
Case 1:18-cv-00068 Document 626-3 Filed on 01/31/23 in TXSD Page 28 of 69

# Unaccompanied Children Released to Sponsors by State

 Listen ▶

**Current as of:** December 12, 2022

When a child who is not accompanied by a parent or legal guardian is apprehended by immigration authorities, the child is transferred to the care and custody of the Office of Refugee Resettlement (ORR). Federal law requires that ORR feed, shelter, and provide medical care for unaccompanied children until it is able to release them to safe settings with sponsors (usually family members), while they await immigration proceedings. These sponsors live in many states.

Sponsors are adults who are suitable to provide for the child's physical and mental well-being and have not engaged in any activity that would indicate a potential risk to the child. All sponsors must pass a background check. The sponsor must agree to ensure the child's presence at all future immigration proceedings. They also must agree to ensure the minor reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.

HHS is engaging with state officials to address concerns they may have about the care or impact of unaccompanied children in their states, while making sure the children are treated humanely and consistent with the law as they go through immigration court proceedings that will determine whether they will be removed and repatriated, or qualify for some form of relief.

HHS has strong policies in place to ensure the privacy and safety of unaccompanied children by maintaining the confidentiality of their personal information. These children may have histories of abuse or may be seeking safety from threats of violence. They may have been trafficked or smuggled. HHS cannot release information about individual children that could compromise the child's location or identity.

---

The data in the table below shows **state-by-state** data of unaccompanied children released to sponsors as of October 31, 2022. ACF will update this data each month. **Additional data on unaccompanied children released to sponsors by state is available on the HHS website** .

**View unaccompanied children released to sponsors by county.**

**Please note:** ORR makes considerable effort to provide precise and timely data to the public, but adjustments occasionally occur following review and reconciliation. The FY2014 release data posted in the chart below were updated on March 13, 2015. The FY2015 release data were updated May 9, 2016. The FY2017 release data were updated May 22, 2018. The FY2018 release data were updated December 3, 2019. Questions may be addressed to ORR directly, at (202) 401-9246.

## Unaccompanied Children Release Data

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — SEPT. 2021)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY22 (OCT. 2021 — SEPT. 2022) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY22 (OCT. 2022 — OCT. 2022) |
|---|---|---|---|---|---|---|---|---|---|
| Alabama | 808 | 870 | 598 | 736 | 1,111 | 247 | 1,946 | 2,378 | 167 |
| Alaska | 2 | 5 | 3 | 0 | 4 | 0 | 4 | 6 | 2 |
| Arizona | 167 | 330 | 322 | 258 | 493 | 162 | 631 | 782 | 67 |
| Arkansas | 186 | 309 | 272 | 193 | 359 | 87 | 790 | 926 | 85 |
| California | 3,629 | 7,381 | 6,268 | 4,675 | 8,447 | 2,225 | 10,773 | 13,730 | 987 |
| Colorado | 248 | 427 | 379 | 313 | 714 | 172 | 1,088 | 1,424 | 147 |
| Connecticut | 206 | 454 | 412 | 332 | 959 | 260 | 1,447 | **App. 679**99 |  |
| Delaware | 152 | 275 | 178 | 222 | 383 | 107 | 519 | 573 | 49 |

1/5/23, 11:50 AM
Case 1:18-cv-00068 Document 626-2 Filed on 01/31/23 in TXSD Page 29 of 69
Unaccompanied Children Released to Sponsors by State | Office of Refugee Resettlement | Administration for Children and Families

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — SEPT. 2021)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY22 (OCT. 2021 — SEPT. 2022) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY22 (OCT. 2022 — OCT. 2022) |
|---|---|---|---|---|---|---|---|---|---|
| DC | 201 | 432 | 294 | 138 | 322 | 48 | 307 | 421 | 26 |
| Florida | 2,908 | 5,281 | 4,059 | 4,131 | 7,408 | 1,523 | 11,145 | 13,195 | 1,074 |
| Georgia | 1,041 | 1,735 | 1,350 | 1,261 | 2,558 | 559 | 4,358 | 5,233 | 406 |
| Hawaii | 2 | 4 | 4 | 1 | 16 | 6 | 23 | 22 | 17 |
| Idaho | 11 | 39 | 11 | 28 | 62 | 19 | 84 | 125 | 14 |
| Illinois | 312 | 519 | 462 | 475 | 863 | 211 | 1,712 | 2,930 | 278 |
| Indiana | 240 | 354 | 366 | 394 | 794 | 209 | 1,593 | 1,867 | 125 |
| Iowa | 201 | 352 | 277 | 238 | 489 | 119 | 677 | 820 | 66 |
| Kansas | 245 | 326 | 289 | 305 | 453 | 95 | 718 | 807 | 76 |
| Kentucky | 274 | 503 | 364 | 370 | 710 | 158 | 1,042 | 1,242 | 80 |
| Louisiana | 480 | 973 | 1,043 | 931 | 1,966 | 355 | 2,851 | 3,420 | 223 |
| Maine | 4 | 9 | 11 | 22 | 26 | 11 | 64 | 96 | 11 |
| Maryland | 1,794 | 3,871 | 2,957 | 1,723 | 4,671 | 825 | 5,471 | 6,062 | 478 |
| Massachusetts | 738 | 1,541 | 1,077 | 814 | 1,756 | 448 | 2,549 | 2,700 | 186 |
| Michigan | 132 | 227 | 160 | 136 | 248 | 74 | 451 | 673 | 54 |
| Minnesota | 243 | 318 | 320 | 294 | 624 | 151 | 1,002 | 1,071 | 95 |
| Mississippi | 207 | 300 | 237 | 299 | 482 | 108 | 707 | 745 | 56 |
| Missouri | 170 | 261 | 234 | 203 | 431 | 93 | 794 | 1,008 | 103 |
| Montana | 2 | 0 | 2 | 3 | 0 | 2 | 28 | 38 | 4 |
| Nebraska | 293 | 486 | 355 | 374 | 563 | 130 | 889 | 919 | 53 |
| Nevada | 137 | 283 | 229 | 132 | 324 | 79 | 465 | 616 | 59 |
| New Hampshire | 14 | 25 | 27 | 20 | 25 | 8 | 67 | 61 | 1 |
| New Jersey | 1,462 | 2,637 | 2,268 | 1,877 | 4,236 | 921 | 5,911 | 6,648 | 524 |
| New Mexico | 19 | 65 | 46 | 43 | 89 | 34 | 116 | 141 | 7 |
| New York | 2,630 | 4,985 | 3,938 | 2,845 | 6,367 | 1,663 | 8,534 | 8,543 | 674 |
| North Carolina | 844 | 1,493 | 1,290 | 1,110 | 2,522 | 610 | 4,249 | 4,888 | 380 |
| North Dakota | 2 | 10 | 3 | 2 | 10 | 1 | 14 | 19 | 1 |
| Ohio | 483 | 693 | 584 | 547 | 1,091 | 260 | 1,675 | 1,993 | 154 |
| Oklahoma | 225 | 301 | 267 | 286 | 581 | 120 | 906 | 1,170 | **App. 680** |

SHARES  f  ✕  in  +

| STATE | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY15 (OCT. 2014 — SEPT. 2015) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY16 (OCT. 2015 — SEPT. 2016) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY17 (OCT. 2016 — SEPT. 2017)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY18 (OCT. 2017 — SEPT. 2018)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY19 (OCT. 2018 — SEPT. 2019) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY20 (OCT. 2019 — SEPT. 2020) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY21 (OCT. 2020 — SEPT. 2021)* | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY22 (OCT. 2021 — SEPT. 2022) | TOTAL NUMBER OF UC RELEASED TO SPONSORS IN FY22 (OCT. 2022 — OCT. 2022) |
|---|---|---|---|---|---|---|---|---|---|
| Pennsylvania | 333 | 604 | 501 | 563 | 1,229 | 271 | 2,103 | 2,518 | 182 |
| PR | 0 | 0 | 0 | 1 | 3 | 3 | 0 | 3 | 0 |
| Rhode Island | 185 | 269 | 234 | 235 | 453 | 92 | 520 | 609 | 40 |
| South Carolina | 294 | 562 | 483 | 508 | 1,012 | 255 | 1,743 | 2,251 | 193 |
| South Dakota | 61 | 81 | 81 | 96 | 149 | 44 | 233 | 272 | 13 |
| Tennessee | 765 | 1,354 | 1,066 | 1,173 | 2,191 | 510 | 4,267 | 4,821 | 311 |
| Texas | 3,272 | 6,550 | 5,391 | 4,136 | 9,900 | 2,336 | 15,341 | 19,071 | 1,433 |
| Utah | 62 | 126 | 99 | 97 | 179 | 75 | 307 | 491 | 51 |
| Vermont | 1 | 1 | 0 | 2 | 6 | 1 | 8 | 4 | 1 |
| Virginia | 1,694 | 3,728 | 2,888 | 1,650 | 4,215 | 770 | 5,400 | 6,213 | 450 |
| Washington | 283 | 476 | 494 | 435 | 723 | 237 | 1,113 | 1,301 | 90 |
| West Virginia | 12 | 26 | 23 | 23 | 41 | 4 | 60 | 89 | 6 |
| Wisconsin | 38 | 85 | 94 | 98 | 246 | 62 | 531 | 721 | 51 |
| Wyoming | 6 | 23 | 14 | 15 | 15 | 6 | 22 | 34 | 3 |
| Virgin Islands | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 1 | 0 |
| TOTAL | 27,840 | 52,147 | 42,497 | 34,953 | 72,837 | 16,837 | 107,686 | 127,447 | 9,783 |

*The FY2015 numbers have been reconciled.

*The FY2017 numbers have been reconciled.

*The FY2018 numbers have been reconciled.

*The FY2021 numbers have been reconciled.

For more information, please read ORR's reunification policy.

Topics:
Unaccompanied Children (UC)

Types:
Grants & Funding

Audiences:
Unaccompanied Children (UC)

**App. 681**

SHARES

# Exhibit 37



U.S. Department of Homeland Security

# DHS Issues Regulation to Preserve and Fortify DACA

**Release Date:** August 24, 2022

WASHINGTON – Homeland Security Secretary Alejandro N. Mayorkas today announced that the Department has issued a final rule (https://public-inspection.federalregister.gov/2022-18401.pdf) that will preserve and fortify the Deferred Action for Childhood Arrivals (DACA) policy for certain eligible noncitizens who arrived in the United States as children, deferring their removal and allowing them an opportunity to access a renewable, two-year work permit. Since its inception in 2012, DACA has allowed over 800,000 young people to remain in the only country many of them have ever known, with their families. Across the country, DACA recipients are doctors and nurses, working to ensure the health and safety of Americans; they are teachers, striving to give back to younger generations; they are members of our military serving to protect our country; they are our neighbors, friends, and family.

"Today, we are taking another step to do everything in our power to preserve and fortify DACA, an extraordinary program that has transformed the lives of so many Dreamers," **said Secretary of Homeland Security Alejandro N. Mayorkas.** "Thanks to DACA, we have been enriched by young people who contribute so much to our communities and our country. Yet, we need Congress to pass legislation that provides an enduring solution for the young Dreamers who have known no country other than the United States as their own."

"DACA has transformed the lives of its recipients and has made us better and stronger as a nation," **said U.S. Citizenship and Immigration Services Director Ur M. Jaddou**. "USCIS is proud to play an important role in implementing the DACA final rule and is committed to ensuring DACA recipients can continue to remain a vital part of their communities and contribute to this country that is their home."

The rule continues the DACA policy as announced in the 2012 Napolitano Memorandum (http://www.dhs.gov /xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf) and is based on longstanding USCIS practice. The rule embraces the consistent judgment that has been maintained by the Department—and by three presidential administrations since the policy first was announced—that DACA recipients should not be a priority for removal.

A product of careful review and in response to the more than 16,000 comments received during the public

**App. 683**

comment period, the final review codifies existing DACA policy, with limited changes, and replaces the DACA policy guidance set forth in the 2012 Napolitano memorandum. The final rule:

- **Maintains the existing threshold criteria for DACA;**
- **Retains the existing process for DACA requestors to seek work authorization; and**
- **Affirms the longstanding policy that DACA is not a form of lawful status but that DACA recipients, like other deferred action recipients, are considered "lawfully present" for certain purposes.**

The final rule is effective Monday, October 31, 2022. However, while a July 16, 2021, injunction (https://www.uscis.gov/sites/default/files/document/legal-docs/Texas%20II%20Dkt.%20576%20Injunction.pdf) from the U.S. District Court for the Southern District of Texas remains in effect, DHS is prohibited from granting initial DACA requests and related employment authorization under the final rule. Because that injunction has been partially stayed, DHS presently may grant DACA renewal requests under the final rule.

For more information, visit USCIS' DACA webpage (https://www.uscis.gov/humanitarian/humanitarian-parole/consideration-of-deferred-action-for-childhood-arrivals-daca) .

###

## Keywords

DEFERRED ACTION FOR CHILDHOOD ARRIVALS (DACA) (/KEYWORDS/DEFERRED-ACTION-CHILDHOOD-ARRIVALS-DACA)

DEPARTMENT OF HOMELAND SECURITY (DHS) (/KEYWORDS/DEPARTMENT-HOMELAND-SECURITY-DHS)

Last Updated: 09/02/2022

**App. 684**

# Exhibit 38

USCIS Response to Coronavirus (COVID-19)



**U.S. Citizenship
and Immigration
Services**

Home > Humanitarian > Consideration of Deferred Action for Childhood Arrivals (DACA) > Frequently Asked Questions
# Frequently Asked Questions

> ℹ **ALERT: Deferred Action for Childhood Arrivals Final Rule Effective Oct. 31, 2022.**
>
> **See less** ⌃
>
> The DACA final rule takes effect on Oct. 31, 2022, to the extent permitted by current court orders. The final rule generally codifies existing policies with limited changes to preserve and fortify DACA. While the new rule will apply to applications considered as of Oct. 31, currently valid grants of DACA, related employment authorization, and advance parole will continue to be recognized as valid under the final rule. If you have a pending renewal application, you do not need to reapply.
>
> Effective Oct. 31, 2022, we will accept and process renewal DACA requests and accompanying requests for employment authorization under the final rule, consistent with court orders and an ongoing partial stay. We will also continue to accept and process applications for advance parole for current DACA recipients, and we will continue to accept but not process initial DACA requests. DHS is currently prohibited from granting initial DACA requests and related employment authorization under the final rule due to the Oct. 14, 2022 order issued by the U.S. District Court for the Southern District of Texas, which extended its injunction and partial stay to the DACA final rule.
>
> For more information, see the News Release.

**App. 686**

> ℹ️ **ALERT: Court Decisions Regarding DACA**
>
> **See less** ∧
>
> Please see the DACA Litigation Information Page for important updates and information related to court rulings on the DACA policy. On Oct. 5, the U.S. Court of Appeals for the Fifth Circuit affirmed a July 2021 decision of the U.S. District Court for the Southern District of Texas declaring the 2012 DACA policy unlawful. The Fifth Circuit, however, preserved the partial stay issued by the district court in July 2021 and remanded the case back to the district court for further proceedings regarding the new DACA rule. On Oct. 14, the U.S. District Court for the Southern District of Texas issued an order extending its injunction and partial stay to the DACA final rule.
>
> At this time and while the stay remains in place, current grants of DACA and related Employment Authorization Documents are valid, and USCIS will accept and process renewal DACA requests and accompanying requests for employment authorization under the final rule. USCIS will continue to accept and process applications for advance parole for current DACA recipients and will continue to accept but not process initial DACA requests.

*DHS DACA FAQs*

- **General Information for All Requestors**
  - **What Is Deferred Action for Childhood Arrivals?**
  - **DACA Process**
  - **Background Checks**
  - **After USCIS Makes a Decision**
- **Initial Requests for DACA**
- **Renewal of DACA**
- **Travel**
- **Criminal Convictions**
- **Miscellaneous**

# I. General Information for All Requestors

## A. What Is Deferred Action for Childhood Arrivals?

As the Department of Homeland Security (DHS) continues to focus its enforcement resources on those who pose the greatest threat to homeland security, DHS will exercise prosecutorial discretion as appropriate to ensure that enforcement resources are not expended on individuals who do not fall into this category, such as individuals who came to the United States as children and meet other key guidelines. Individuals who demonstrate that they meet the guidelines below may request consideration of deferred action for childhood arrivals (DACA) for a period of 2 years, subject to renewal for a period of 2 years, and may be eligible for employment authorization.

USCIS may approve a request for DACA only if we determine, in our sole discretion, that you meet each of the following threshold criteria and merit a favorable exercise of discretion:

    1. Were under the age of 31 as of June 15, 2012 (that is, you were born on or after June 16, 1981);

**App. 687**

2. Came to the United States before reaching your 16th birthday;

3. Have continuously resided in the United States since June 15, 2007, up to the time of filing your request for DACA;

4. Were physically present in the United States on June 15, 2012, and at the time you filed your request for DACA with USCIS;

5. Had no lawful immigration status on June 15, 2012, and at the time you filed your request for DACA, meaning that:

- You never had a lawful immigration status on or before June 15, 2012*, or

- Any lawful immigration status or parole that you had before June 15, 2012, expired on or before June 15, 2012, and

- Any lawful status that you had after June 15, 2012, expired or otherwise terminated before you submitted your request for DACA;

6. Are currently enrolled in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the U.S. Coast Guard or armed forces of the United States; and

7. Have not been convicted of a felony, a misdemeanor described in 8 CFR 236.22(b)(6), or 3 or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

\* Please review Q19 below if you are currently in a lawful immigration status.

**Individuals can call USCIS at 800-375-5283 with questions or to request more information on DACA.** If you have a pending request, we have online self-help tools you can use to check your case status and processing times, change your address, and send an inquiry about a case pending longer than posted processing times or about non-delivery of a card or document.

**Q1: What is deferred action?**
A1: Deferred action is a discretionary determination to defer removal of an individual as an act of prosecutorial discretion. For purposes of future inadmissibility based on prior periods of **unlawful presence** in the United States, an individual is not considered to be unlawfully present during the period when deferred action is in effect. An individual who has received deferred action is authorized by DHS to be in the United States for the duration of the deferred action period. Deferred action recipients are also considered to be **lawfully present** as described in 8 C.F.R. sec. 1.3(a)(4)(vi) for purposes of eligibility for certain public benefits (such as certain Social Security benefits) during the period of deferred action. However, deferred action does not confer **lawful immigration status** upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence they may have.

Under 8 CFR 274a.12(c)(33), an individual who has been granted deferred action under 8 CFR 236.21 through 236.23, Deferred Action for Childhood Arrivals, may receive employment authorization for the period of deferred action, provided they can demonstrate "an economic necessity for employment."

Under 8 CFR 236.23(d), USCIS may terminate a grant of DACA at any time, at the agency's discretion. Please see Q28 for more information.

**Q2: What is DACA?**
A2: On June 15, 2012, the secretary of homeland security announced that certain people who came to the United States as children and meet several key guidelines may request consideration of deferred action for a period of 2 years, subject to renewal, and, if approved, will then be eligible for work authorization if they can demonstrate economic necessity. On Aug. 30, 2022, DHS issued the Deferred Action for Childhood Arrivals (DACA) Final Rule to preserve and fortify the DACA policy. This rule, which puts into effect regulations at 8 CFR 236.21-236.25, rescinds and replaces the DACA guidance set forth in the 2012 Napolitano Memorandum. The final rule is effective as of Oct. 31, 2022.

Individuals who can demonstrate through verifiable documentation that they meet these guidelines will be considered for deferred action. We will make determinations on a case-by-case basis under the DACA final rule.

**App. 688**

All guidance in these FAQs stems from the regulations at 8 CFR 236.21-236.25.

**Q3: I currently have DACA. How does the DACA Final Rule impact me?**
A3: If you are a current DACA recipient, your grant of deferred action and related work authorization, as well as any DACA advance parole document issued, will remain in effect and will expire according to their existing terms. Any requests for renewals of those grants are now governed by the regulations at 8 CFR 236.21-236.25 and not the 2012 Napolitano Memorandum.

**Q4: Is there any difference between "deferred action" and DACA under 8 CFR 236.21-236.25?**
A4: DACA is a form of deferred action. The relief an individual receives with a grant of DACA under 8 CFR 236.21-236.25 is identical for immigration purposes to the relief obtained by any person who receives deferred action as an act of prosecutorial discretion.

**Q5: If my removal is deferred under the DACA final rule, am I eligible for employment authorization?**
A5: Yes. Under the regulations at 8 CFR 274a.12(c)(33) , if you receive DACA under the DACA final rule, you may obtain employment authorization from USCIS provided you can demonstrate an economic necessity for employment.

**Q6: If my case is deferred, am I in lawful status for the period of deferral?**
A6: No. Although action on your case has been deferred and you do not accrue unlawful presence (for admissibility purposes) during the period of deferred action, deferred action does not confer any lawful immigration status.

The fact that you are not accruing unlawful presence does not change that you are in unlawful status while you remain in the United States. However, although deferred action does not confer a lawful immigration status, you may stay in the United States while your deferred action is in effect.  For admissibility purposes, you will not accrue "unlawful presence" while you have deferred action.  You are also considered to be "lawfully present" in the United States while you have deferred action for purposes of certain public benefits (such as certain Social Security benefits) as described in 8 C.F.R. sec. 1.3(a)(4)(vi). Federal law does not prevent individuals granted deferred action from establishing domicile in the United States.

Apart from the immigration laws, "lawful presence," "lawful status" and similar terms are used in various other federal and state laws. For information on how those laws affect individuals who receive a favorable exercise of prosecutorial discretion under DACA, please contact the appropriate federal, state, or local authorities.

Note: It is a federal crime for a noncitizen who is "illegally or unlawfully in the United States," among others, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition, or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.  See 18 U.S. 922(g)(5)(A). This prohibition applies to DACA recipients.

**Q7: Can I renew my period of deferred action and employment authorization under DACA?**
A7: Yes. You may request consideration for a renewal of your DACA. We will consider your request for a renewal on a case-by-case basis under 8 CFR 236.22-23. If USCIS renews its exercise of discretion under DACA for your case, you will receive deferred action for another 2 years, and if you demonstrate an economic necessity for employment, you may receive employment authorization for that period.

Return to top.

# B. DACA Process

**Q8: How do I request consideration of DACA?**
A8: To request consideration of DACA (either as an initial request or to request renewal), you must submit Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to USCIS. Please visit the Form I-821D webpage before you begin the process to make sure you are using the most current version of the form available. You must complete this form, sign the form, and include the required filing fee of $85. With Form I-821D you must also submit Form I-765, Application for Employment Authorization, the required Form I-765 filing fee, and Form I-765WS, Worksheet (PDF, 243.14 KB), establishing your economic need for employment. If you fail to submit a completed Form I-765 (along with the worksheet and

**App. 689**

accompanying filing fees for that form, please see the Form I-821D page for more information), we will not consider your request for deferred action. Please read the form instructions to ensure you answer the appropriate questions (determined by whether you are submitting an initial or renewal request) and that you submit all the required documentation to support your initial request.

If you are making an initial DACA request, you must file your request for consideration of DACA at the USCIS Lockbox. You can find the mailing address and instructions on the [Form I-821D](#) webpage. After we receive your Form I-821D, Form I-765, and Form I-765 Worksheet, we will review them for completeness, including submission of the required fee, initial evidence and supporting documents (for initial filings). Pursuant to current court orders, USCIS is accepting initial DACA requests but cannot adjudicate them at this time. If you are submitting a renewal DACA request, you may file your request at the USCIS Lockbox or online.

*Instructions for Online Filing (DACA Renewal Requests Only)*

DACA recipients may submit a DACA renewal request online. To file Form I-821D and Form I-765 online, you must first create a USCIS online account, which provides a convenient and secure method to submit Form I-821D, Form I-765 and Form I-765WS, pay fees, and track the status of any pending USCIS immigration request throughout the adjudication process. There is no cost to create an account, which offers a variety of features, including the ability to communicate with USCIS through a secure inbox and respond online to Requests for Evidence. For additional information on filing a DACA renewal request online, see the [Form I-821D](#) webpage.  To be considered for DACA, you must submit Form I-821D, Form I-765, and Form I-765WS with your online DACA renewal requests.

<u>After You Submit Your Request</u>

If we determine your request is complete, we will send you a receipt notice. If you need to visit an Application Support Center (ASC) for biometric services, we will send you an appointment notice. Please make sure you read and follow the instructions in the notice. If you fail to attend your biometrics appointment, it may take longer for us to process your request for consideration of deferred action, or we may deny your request. You may also choose to receive an email or text message or both notifying you that we have accepted your form by completing a [Form G-1145, E-Notification of Application/Petition Acceptance](#).

We will review each request for consideration of DACA on an individual, case-by-case basis. We may request more information or evidence from you, or ask you to appear at a USCIS office. We will notify you of our determination in writing.

**Note:** All individuals who believe they meet the guidelines, including those in removal proceedings, with a final removal order, or with a voluntary departure order, may affirmatively request consideration of DACA from USCIS through this process. If you are currently in immigration detention and believe you meet the guidelines, you may request consideration of deferred action from USCIS, but we will not approve the request until you are released from detention. If you are requesting DACA, you should tell your deportation officer or follow directions at the [U.S. Immigration and Customs Enforcement (ICE) DACA webpage](#), which also has more information.

**Q9: Can I obtain a fee waiver or fee exemption for this process?**
A9: There are no fee waivers available for DACA requests or employment authorization applications connected to DACA. There are very limited fee exemptions available for Form I-821D and related Form I-765s. You must file a request for a fee exemption, and we must approve your request, before you file your Form I-821D and Form I-765 without fees. To be considered for a fee exemption, you must submit a letter and supporting documentation to USCIS demonstrating that you meet 1 of the following conditions:

- You cannot care for yourself because you suffer from a serious, chronic disability and your income is less than 150 percent of the U.S. poverty level; or

- You have, at the time of the request, accumulated **$10,000** or more in debt in the past 12 months as a result of unreimbursed medical expenses for yourself or an immediate family member, and your income is less than 150 percent of the U.S. poverty level; or

**App. 690**

- You are under 18 years of age, your income is less than 150% of the U.S. poverty level, and you are:
  - homeless, or
  - in foster care, or
  - otherwise lacking any parental or other familial support.

You can find additional information on our [Fee Exemption Guidance](#) webpage. Your fee exemption request must be submitted and decided before you submit a Form I-821D and related Form I-765 without fees. You must provide evidence that you meet any of the above conditions when you make the request. For evidence, we will accept:

- Affidavits from community-based or religious organizations establishing that you are homeless or lack parental or other familial financial support;
- Copies of tax returns, bank statement, pay stubs, or other reliable evidence of income level. Evidence can also include an affidavit from you or a responsible third party attesting that you do not file tax returns, have no bank accounts, or have no income to prove income level; and
- Copies of medical records, insurance records, bank statements, or other reliable evidence of unreimbursed medical expenses of at least **$10,000**.

We will address factual questions through Requests for Evidence (RFEs).

**Q10: If individuals meet the guidelines for consideration of DACA and are encountered by U.S. Customs and Border Protection (CBP) or ICE, will they be placed into removal proceedings?**
A10: Under the direction of the Secretary of Homeland Security, if an individual meets the guidelines for DACA, CBP or ICE should exercise their discretion on a case-by-case basis to prevent qualifying individuals from being apprehended, placed into removal proceedings, or removed. If individuals believe that, in light of this policy, they should not have been apprehended or placed into removal proceedings, contact your case officer or the ICE Detention Reporting and Information Line at 1-888-351-4024 (staffed 8 a.m. – 8 p.m., Monday – Friday); or email [ERO.INFO@ice.dhs.gov](mailto:ERO.INFO@ice.dhs.gov)

**Q11: Does this process apply to me if I am currently in removal proceedings, have a final removal order, or have a voluntary departure order?**
A11: This process is open to any individual who can demonstrate they meet the guidelines for DACA consideration under 8 CFR 236.21 – 236.25, including those who have never been in removal proceedings as well as those in removal proceedings, with a final order of removal, or with a voluntary departure order.

**Q12: If I am not in removal proceedings but believe I meet the guidelines for consideration of DACA, should I seek to place myself into removal proceedings through encounters with CBP or ICE?**
A12: No. If you are not in removal proceedings but believe that you meet the guidelines for DACA consideration under 8 CFR 236.21 – 236.25, you should submit your DACA request to USCIS under the process outlined below and at 8 CFR 236.23.

**Q13: Can I request consideration of DACA from USCIS if I am in immigration detention under the custody of ICE?**
A13: Yes. If you are currently in immigration detention, you may request consideration of DACA from USCIS. However, if we decide to grant you DACA, we will not approve your DACA request until you are released from detention. If you are requesting DACA, you should tell your deportation officer.

**Q14: If I am about to be removed by ICE and believe that I meet the guidelines for consideration of DACA, what should I do to seek review of my case before removal?**
A14: If you believe you can demonstrate that you meet the guidelines and are about to be removed, you should immediately contact your case officer or the ICE Detention Reporting and Information Line at 1-888-351-4024 (staffed 8 a.m. – 8 p.m. Eastern, Monday – Friday) or email [ERO.INFO@ice.dhs.gov](mailto:ERO.INFO@ice.dhs.gov).

**Q15: What should I do if I meet the guidelines of this process and have been issued an ICE detainer following an arrest by a state or local law enforcement officer?**
A15: If you meet the guidelines and have been served a detainer, you should immediately contact the ICE Detention

**App. 691**

Reporting and Information Line at 1-888-351-4024 (staffed 8 a.m. – 8 p.m. Eastern, Monday–Friday); or email ERO.INFO@ice.dhs.gov

**Q16: If I accepted an offer of administrative closure under the case-by-case review process or my case was terminated or dismissed as part of the case-by-case review process, can I be considered for deferred action under this process?**
A16: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you have accepted an offer of administrative closure or termination under the case-by-case review process.

**Q17: If I declined an offer of administrative closure under the case-by-case review process, can I be considered for deferred action under this process?**
A17: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you declined an offer of administrative closure under the case-by-case review process.

**Q18: If my case was reviewed as part of the case-by-case review process but I was not offered administrative closure, can I be considered for deferred action under this process?**
A18: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you were not offered administrative closure following review of your case as part of the case-by-case review process.

**Q19: Can I request consideration of DACA under this process if I am in a nonimmigrant status (for example F-1, E-2, H-4) or have Temporary Protected Status (TPS) at the time I submit my request?**
A19: No. You can only request consideration of DACA under this process if, at the time of submitting your request and at the time of adjudication of your request, you have no immigration status and were not in any lawful status on June 15, 2012. However, a **pending** petition or application for nonimmigrant status does not prevent you from requesting DACA, if you otherwise meet the threshold criteria at 8 CFR 236.22.

**Q20: Will the information I share in my request for consideration of DACA be used for immigration enforcement purposes?**
A20: Under 8 CFR 236.23(e)(1), DHS will not use information about a requestor in a request for DACA to initiate immigration enforcement proceedings against that requestor, unless DHS is initiating immigration enforcement proceedings  due to a criminal offense, fraud, or a threat to national security, or public safety concerns. Individuals whose cases are deferred under DACA will not be referred to ICE. The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or to investigate or prosecute a criminal offense.

**Q21: If my case is referred to ICE for immigration enforcement purposes or if I receive a Notice to Appear, will ICE receive information about my family members and guardians for immigration enforcement purposes?**
A21: Under 8 CFR § 236.23(e)(2), information contained in your DACA request related to your family members or guardians will not be used for immigration enforcement purposes against them. However, we may share this information with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense.

**Q22: Will USCIS verify documents or statements I provide to support my request for DACA?**
A22: We have the authority to verify documents, facts, and statements provided to support requests for DACA. We may contact education institutions, other government agencies, employers, or other entities to verify information.

Return to top.

# C. Background Checks

**Q23: Will USCIS conduct a background check when you review my request for DACA?**
A23: Yes. You must undergo biographic and biometric background checks before we will consider your DACA request.

**Q24: What do background checks involve?**

**App. 692**

A24: Background checks involve checking biographic and biometric information provided by an individual against a variety of databases maintained by DHS and other federal government agencies.

**Q25: What steps will USCIS and ICE take if I engage in fraud through the new process?**
A25: If you knowingly misrepresent information, or knowingly fail to disclose facts, in an effort to obtain DACA or work authorization through this process, DHS will treat you as an immigration enforcement priority to the fullest extent permitted by law, and you will be subject to criminal prosecution or removal from the United States or both.

Return to top.

# D. After USCIS Makes a Decision

**Q26: Can I appeal USCIS' determination?**
A26: No. You cannot file a motion to reopen or reconsider and cannot administratively appeal the decision if we deny your DACA request.

You may request a review of your Form I-821D denial by contacting the USCIS Contact Center at 800-375-5283 Monday to Friday, 8 a.m. to 8 p.m. Eastern. For people who are deaf, hard of hearing or have a speech disability: TTY 800-767-1833. USCIS will not review its discretionary determination to deny your request for DACA.  However, you can have a Service Request created if you believe that you actually met all of the DACA guidelines and that your request was denied because USCIS:

- Denied the request based on abandonment, when you actually responded to an RFE or Notice of Intent to Deny (NOID) within the prescribed time;

- Mailed the RFE or NOID to the wrong address although you had changed your address, either online at How to Change Your Address or with a customer service representative on the phone and submitted a Form AR-11, Change of Address, before USCIS issued the RFE or NOID.

  - To ensure the address is updated on a pending case as quickly as possible, we recommend that customers change your address online.  Please note that only an online change of address or a Form AR-11 submission will satisfy the legal requirements to notify us of an address change. Therefore, if you called a customer service representative to change your address, please be sure you also change your address online or with a Form AR-11.

- Denied the request on the grounds that you did not come to the United States before your 16th birthday, but the evidence submitted at the time of filing shows that you did arrive before reaching that age.

- Denied the request on the grounds that you were under age 15 at the time of filing but not in removal proceedings, while the evidence submitted at the time of filing show that you indeed were in removal proceedings when the request was filed;

- Denied the request on the grounds that you were 31 or older as of June 15, 2012, but the evidence submitted at the time of filing shows that you were under the age of 31 as of June 15, 2012;

- Denied the request on the grounds that you had lawful status on June 15, 2012, but the evidence submitted at the time of filing shows that you indeed were in an unlawful immigration status on that date;

- Denied the request on the grounds that you were not physically present in the United States on June 15, 2012, and up through the date of filing, but the evidence submitted at the time of filing shows that you were, in fact, present;

- Denied on the grounds that you are not currently in school, have not graduated or obtained a certificate of completion from high school, have not obtained a GED certificate, and are not an honorably discharged veteran of the U.S. Coast Guard or armed forces of the United States;

- Denied the request due to your failure to appear at a USCIS ASC where we may collect your biometrics, when you in fact either did appear at a USCIS ASC to have this done or requested before the scheduled date of your biometrics appointment to have the appointment rescheduled; or

- Denied the request because you did not pay the filing fees for Form I-821D or Form I-765, when you actually did pay

**App. 693**

these fees.

**Q27: If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?**
A27: If USCIS denies your request for DACA under 8 CFR 236.23, we will not issue a Notice to Appear or refer your case to ICE for possible enforcement action based on our denial, unless we determine that your case involves denial for a criminal offense, fraud, a threat to national security, or public safety concerns. We may consider factors including, but not limited to, whether a misrepresentation is willful, material, and knowing in determining whether fraud is involved in a case.

**Q28: Can USCIS terminate my DACA before it expires?**
A28: Yes. DACA is an exercise of prosecutorial discretion, and under 8 CFR 236.23(d), we may terminate a grant of DACA at any time, at USCIS' discretion. We will provide a Notice of Intent to Terminate (NOIT) and an opportunity to respond before terminating a DACA grant, except we may terminate a grant of DACA without an NOIT and an opportunity to respond if you are convicted of a national security-related offense involving conduct described in 8 U.S.C. 1182(a)(3)(B)(iii), (iv), or 1227(a) (4)(A)(i)), or an egregious public safety offense. If we terminate your grant of DACA without an NOIT and an opportunity to respond, we will notify you of the termination.

**Q29: What happens to my employment authorization if USCIS terminates my DACA before it expires?**

A29: A grant of employment authorization based on DACA, under 8 CFR 274a.12(c)(33), will automatically terminate when DACA terminates. See 8 CFR 236.23(d)(3).

[Return to top.](#)

# II. Initial Requests for DACA

**Q30: What guidelines must I meet to be considered for DACA?**
A30: Pursuant to current court orders, USCIS is accepting, but not adjudicating, initial requests for DACA. Under 8 CFR 236.22, to be considered for DACA you must submit evidence, including supporting documents, showing that you:

1. Were under the age of 31 as of June 15, 2012 (that is, you were born on or after June 16, 1981);

2. Came to the United States before reaching your 16th birthday;

3. Have continuously resided in the United States since June 15, 2007, up until you filed your request for DACA;

4. Were physically present in the United States on June 15, 2012, and when you filed your request for DACA with USCIS;

5. Had no lawful immigration status on June 15, 2012,* and when you filed your request for DACA, meaning that:

   - You never had a lawful immigration status on or before June 15, 2012, or
   - Any lawful immigration status or parole that you had before June 15, 2012, expired as of June 15, 2012, and
   - Any lawful status that you had after June 15, 2012, expired or otherwise terminated before you submitted your request for DACA;

6. Are currently enrolled in school, have graduated or obtained a certificate of completion from high school, have obtained a GED certificate, or are an honorably discharged veteran of the U.S. Coast Guard or armed forces of the United States; and

7. Have not been convicted of a felony, a misdemeanor described in 8 CFR 236.22(b)(6), or 3 or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

We consider on a case-by-case basis deferred action requests submitted under 8 CFR 236.21-236.25. Even if you meet the threshold criteria listed above and at 8 CFR 236.22(b), we retain the discretion to assess your circumstances and determine that any specific factor makes deferred action inappropriate. See 8 CFR 236.22(c).

**App. 694**

\* Please review Q19 if you are currently in a lawful immigration status.

**Q31: I first came to the United States before I turned 16 years old, and I have been continuously residing in the United States since at least June 15, 2007. Before I turned 16 years old, however, I left the United States for some period of time before returning and beginning my current period of continuous residence. May I be considered for deferred action under 8 CFR 236.21-236.25?**

A31: Yes, but only if you established residence in the United States during the period before you turned 16 years old, as evidenced, for example, by records showing you attended school or worked in the United States during that time, or that you lived in the United States for multiple years during that time. In addition to establishing that you initially resided in the United States before you turned 16 years old, you must also have maintained continuous residence in the United States from June 15, 2007, until the present time to be considered for deferred action under this process. See 8 CFR 236.22(b)(1)-(2).

**Q32: To prove my continuous residence in the United States since June 15, 2007, must I provide evidence documenting my presence for every day, or every month, of that period?**

A32: To meet the continuous residence guideline under 8 CFR 236.22(b)(2), you must submit documentation that shows you have been living in the United States from June 15, 2007, up until the time of filing your request. You should provide documentation to account for as much of the period as reasonably possible, but there is no requirement that every day or month of that period be specifically accounted for through direct evidence.

It is helpful to USCIS if you can submit evidence of your residence during at least each year of the period. USCIS will review the documentation in its totality to determine whether it is more likely than not that you were continuously residing in the United States for the period since June 15, 2007. Gaps in the documentation for certain periods may raise doubts about your continued residence if they are lengthy or the record otherwise indicates that you may have been outside the United States for a period of time that was not brief, casual or innocent.

If gaps in your documentation raise questions, USCIS may issue a Request for Evidence to allow you to submit additional documentation that supports your claimed continuous residence.

You may submit affidavits to explain a gap in the documentation demonstrating that you meet the 5-year continuous residence requirement. If you submit affidavits related to the continuous residence requirement, you must submit 2 or more affidavits, sworn to or affirmed by people other than yourself who have direct personal knowledge of the events and circumstances during the period when there is a gap in the documentation. You may only use affidavits to explain gaps in your continuous residence; you cannot use them as evidence that you meet the entire 5-year continuous residence requirement.

**Q33: I came to the United States when I was very young and before I began attending school, so I do not have primary evidence of the start of my continuous residence in the United States. Can I submit an affidavit as proof of the start of my continuous residence period?**

A33: DHS will accept affidavits for the start of the continuous residence period if you are a new initial requestor who arrived in the United States at or before age 8. We recognize that age 8 is the highest age at which school attendance becomes required within the United States, and that it may be more challenging for individuals who arrived before that age to provide primary evidence of the start of their continuous residence period.

**Q34: Does "currently enrolled in school" refer to the date when I file the request for consideration of deferred action?**

A34: To be considered "currently enrolled in school" under 8 CFR 236.22(b)(5), you must be enrolled in school on the date you submit a DACA request.

**Q35: Who is considered to be "currently enrolled in school" under 8 CFR 236.22(b)(5)?**

A35: To be considered "currently enrolled in school" under 8 CFR 236.22(b)(5), you must be enrolled in:

- A public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or homeschool program that meets state requirements;
- An education, literacy, or career training program (including vocational training) that has a purpose of improving

**App. 695**

literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement; or

- An education program helping students obtain a regular high school diploma or its recognized equivalent under state law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other state-authorized exam (such as HiSet or TASC) in the United States.

Education, literacy, and career training programs (including vocational training), or education programs helping students obtain a regular high school diploma or its recognized equivalent under state law, or in passing a GED exam or other state-authorized exam in the United States, may include, but are not limited to, programs wholly or partially funded by federal, state, county or municipal grants or administered by nonprofit organizations. Programs funded by other sources may qualify if they have demonstrated effectiveness.

In assessing whether programs are of demonstrated effectiveness, USCIS will consider:

- The duration of the program's existence;
- The program's track record in:
  - Assisting students in obtaining a regular high school diploma or its recognized equivalent;
  - Passing a GED or other state-authorized exam (such as HiSet or TASC); or
  - Placing students in postsecondary education, job training, or employment; and
- Other indicators of the program's overall quality.

If you seek to demonstrate that you are "currently enrolled in school" with your enrollment in such a program, you must show the program's demonstrated effectiveness.

**Q36: How do I establish that I am currently enrolled in school?**
A36: Documentation demonstrating that you are currently enrolled in school may include, but is not limited to:

- Evidence that you are enrolled in a public, private, or charter elementary school, junior high or middle school, high school or secondary school, alternative program, or homeschool program that meets state requirements; or
- Evidence that you are enrolled in an education, literacy, or career training program (including vocational training) that:
  - Has a purpose of improving literacy, mathematics, or English, or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement; and
  - Is wholly or partially funded by federal, state, county or municipal grants or administered by nonprofit organizations or, if funded by other sources, is of demonstrated effectiveness; or
- Evidence that you are enrolled in an education program assisting students in obtaining a high school equivalency diploma or certificate recognized under state law (such as by passing a GED exam or other state-authorized exam such as HiSet or TASC), and that the program is wholly or partially funded by federal, state, county or municipal grants or administered by nonprofit organizations or, if funded by other sources, is of demonstrated effectiveness.

Evidence of enrollment may include acceptance letters, school registration cards, letters from a school or program, transcripts, report cards, or progress reports that may show the name of the school or program, date of enrollment, and current educational or grade level, if relevant. See Chart #1, below, for examples of documents.

**Q37: What documentation may be sufficient to demonstrate that I have graduated or obtained a certificate of completion from high school?**
A37: See Chart #1, below, for examples of documents. Documentation demonstrating that you have graduated or obtained a certificate of completion from high school for purposes of 8 CFR 236.22(b)(5) may include, but is not limited to:

- A high school diploma from a public or private high school or secondary school; or

**App. 696**

- A certificate of completion, a certificate of attendance, or an alternate award from a public or private high school or secondary school or a recognized equivalent of a high school diploma under state law, or a GED certificate or certificate from passing another such state authorized exam (e.g., HiSet or TASC) in the United States.

**Q38: What documentation may be sufficient to demonstrate that I have obtained a GED certificate or certificate from passing a similar state-authorized exam (such as HiSet or TASC)?**
A38: See Chart #1, below, for examples of documents. Documentation demonstrating that you have obtained a GED certificate or certificate from passing a similar state-authorized exam for purposes of 8 CFR 236.22(b)(5) may include, but is not limited to, evidence that you have passed a GED exam or other state-authorized exam (such as HiSet or TASC) and received the recognized equivalent of a regular high school diploma under state law.

**Q39: If I am enrolled in a literacy or career training program, can I meet the guidelines at 8 CFR 236.22(b)(5)?**
A39: Yes, in certain circumstances. You may be able to establish that you meet the education guidelines at 8 CFR 236.22(b)(5) if you are enrolled in an education, literacy, or career training program that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement. Such programs include, but are not limited to, programs wholly or partially funded by federal, state, county or municipal grants or administered by nonprofit organizations, or if funded by other sources, are programs of demonstrated effectiveness.

**Q40: If I am enrolled in an English as a second language (ESL) program, can I meet the guidelines?**
A40: Yes, in certain circumstances. You may be able to establish that you meet the education criteria at 8 CFR 236.22(b)(5) through enrollment in an ESL program if the ESL program is wholly or partially funded by federal, state, county or municipal grants or administered by nonprofit organizations, or is a program of demonstrated effectiveness. You must submit direct documentary evidence that the program is wholly or partially funded by federal, state, county or municipal grants, administered by a nonprofit organization, or of demonstrated effectiveness.

**Q41: Will USCIS consider evidence other than that listed in Chart #1 to show that I have met the education guidelines at 8 CFR 236.22(b)(5)?**
A41: No. We will not accept evidence that is not listed in Chart #1 to establish that you are currently enrolled in school, have graduated or obtained a certificate of completion from high school, or have obtained a GED or passed another state-authorized exam (such as HiSet or TASC) for purposes of 8 CFR 236.22(b)(5). You must submit any of the documentary evidence listed in Chart #1 to show that you meet the education guidelines at 8 CFR 236.22(b)(5).

**Q42: Will USCIS consider evidence other than that listed in Chart #1 to show that I have met certain threshold criteria at 8 CFR 236.22(b)?**
A42: You may use evidence other than those documents listed in Chart #1 to establish that you meet the following guidelines and factual showings, if available documentary evidence is insufficient or lacking and shows that:

- You were physically present in the United States on June 15, 2012;

- You came to the United States before reaching your 16th birthday;

- You satisfy the continuous residence requirement, as long as you present direct evidence of your continued residence in the United States for a portion of the required period and the circumstantial evidence is used only to fill in gaps in the length of continuous residence demonstrated by the direct evidence; and

- Any travel outside the United States during the period of required continuous presence was brief, casual, and innocent.

However, USCIS will not accept evidence other than the documents listed in Chart #1 as proof that you meet any of the following guidelines:

- You were under the age of 31 on June 15, 2012 (that is, you were born on or after June 16, 1981); and

- You are currently enrolled in school, have graduated or obtained a certificate of completion from high school, have obtained a GED certificate, or are an honorably discharged veteran of the Coast Guard or armed forces of the United States.

**App. 697**

For example, even if you do not have documentary proof of your presence in the United States on June 15, 2012, you may still be able to demonstrate that you meet the guideline. You may do so by submitting credible documentary evidence that you were present in the United States shortly before and shortly after June 15, 2012, which may be enough to infer you were present June 15, 2012, as well. However, we will not accept evidence other than that listed in Chart #1 to establish that you have graduated high school. You must submit the designated documentary evidence to satisfy that you meet this guideline.

Chart #1 provides examples of documentation you may submit to demonstrate you meet the threshold criteria for DACA under 8 CFR 236.21-236.25. Please see the instructions for Form I-821D, Consideration of Deferred Action for Childhood Arrivals, for additional details of acceptable documentation.

| **Chart #1 Examples of Documents to Submit to Demonstrate You Meet the Guidelines** | |
| --- | --- |
| Proof of identity | <ul><li>Passport or national identity document from your country of origin</li><li>Birth certificate with photo identification</li><li>School or military ID with photo</li><li>Any U.S. government immigration or other document bearing your name and photo</li></ul> |
| Proof you came to U.S. before your 16th birthday | <ul><li>Passport with admission stamp</li><li>Form I-94, Form I-95, or Form I-94W</li><li>School records from the U.S. schools you have attended</li><li>Any Immigration and Naturalization Service or DHS document stating your date of entry (Form I-862, Notice to Appear)</li><li>Travel records</li><li>Hospital or medical records</li><li>Rent receipts or utility bills</li><li>Employment records (pay stubs, W-2 Forms, etc.)</li><li>Official records from a religious entity confirming participation in a religious ceremony</li><li>Copies of money order receipts for money sent in or out of the United States</li><li>Birth certificates of children born in the United States</li><li>Dated bank transactions</li><li>Automobile license receipts or registration</li><li>Deeds, mortgages, rental agreement contracts</li><li>Tax receipts, insurance policies</li></ul> |

**App. 698**

**Chart #1 Examples of Documents to Submit to Demonstrate You Meet the Guidelines**

| | |
|---|---|
| Proof of lack of lawful immigration status on June 15, 2012, and at the time of filing your DACA request (8 CFR 236.22(b)(4)) | • Form I-94/I-95/I-94W with authorized stay expiration date<br><br>• Final order of exclusion, deportation, or removal issued as of June 15, 2012<br><br>• A charging document placing you into removal proceedings |
| Proof of physical presence in the United States on June 15, 2012, and at the time of filing your DACA request (8 CFR 236.22(b)(3)) | • Rent receipts or utility bills<br><br>• Employment records (pay stubs, W-2 Forms, etc.)<br><br>• School records (letters, report cards, etc.)<br><br>• Military records (Form DD-214 or NGB Form 22)<br><br>• Official records from a religious entity confirming participation in a religious ceremony<br><br>• Copies of money order receipts for money sent in or out of the United States |
| Proof you continuously resided in the United States from June 15, 2007, to the time of filing your DACA request (8 CFR 236.22(b)(2)) | • Passport entries<br><br>• Birth certificates of children born in the United States<br><br>• Dated bank transactions<br><br>• Automobile license receipts or registration<br><br>• Deeds, mortgages, rental agreement contracts<br><br>• Tax receipts, insurance policies<br><br>• Affidavits for the start of the continuous presence period if you arrived in the United States before age 8 |
| Proof of your education status at the time of requesting consideration of DACA (8 CFR 236.22(b)(5)) | • School records (transcripts, report cards, etc.) from the school that you are currently attending in the United States showing the name(s) of the school(s) and periods of school attendance and the current educational or grade level<br><br>• U.S. high school diploma, certificate of completion, or other alternate award<br><br>• High school equivalency diploma or certificate recognized under state law<br><br>• Evidence that you passed a state-authorized exam, including the GED or other state-authorized exam (such as HiSet or TASC) in the United States |

**App. 699**

**Chart #1 Examples of Documents to Submit to Demonstrate You Meet the Guidelines**

| | |
|---|---|
| Proof you are an honorably discharged veteran of the U.S. armed forces or the U.S. Coast Guard (8 CFR 236.22(b)(5)) | • Form DD-214, Certificate of Release or Discharge from Active Duty<br>• NGB Form 22, National Guard Report of Separation and Record of Service<br>• Military personnel records<br>• Military health records |

**Q43: May I file affidavits as proof that I meet the threshold criteria for consideration of DACA at 8 CFR 236.22(b)?**
A43: Affidavits generally will not be sufficient on their own to demonstrate that you meet the threshold criteria at 8 CFR 236.22(b) for USCIS to consider you for DACA. However, you may use affidavits to support meeting the following guidelines if the documentary evidence available to you is insufficient or lacking:

- Demonstrating that you meet the 5-year continuous residence requirement;

- Establishing the start of the continuous residence period if you entered the United States before age 8; and

- Establishing that departures during the required period of continuous residence were brief, casual, and innocent.

If you submit affidavits related to the above criteria, you must submit 2 or more affidavits, sworn to or affirmed by people other than yourself, who have direct personal knowledge of the events and circumstances. If we determine that the affidavits are insufficient to overcome the unavailability or lack of documentary evidence with respect to either of these guidelines, we will issue a Request for Evidence, indicating you must submit further evidence to demonstrate that you meet these guidelines.

USCIS will not accept affidavits to satisfy the following guidelines at 8 CFR 236.22(b):

- You are currently enrolled in school, have graduated or obtained a certificate of completion or other alternate award from high school, have obtained a high school equivalency diploma or certificate (such as by passing the GED exam or other similar state-authorized exam such as HiSet or TASC), or are an honorably discharged veteran from the U.S. Coast Guard or armed forces of the United States;

- You were physically present in the United States on June 15, 2012;

- You came to the United States before reaching your 16th birthday;

- You were under the age of 31 on June 15, 2012 (that is, you were born on or after June 16, 1981); and

- Your lack of disqualifying criminal history.

If the only evidence you submit to demonstrate you meet any of the above guidelines is an affidavit, we will issue a Request for Evidence, indicating that you have not demonstrated that you meet these guidelines and that you must submit evidence to demonstrate that you meet that guideline.

**Q44: Can I be considered for deferred action under this process if I had an application for asylum or cancellation of removal pending before either USCIS or the Executive Office for Immigration Review (EOIR) on June 15, 2012?**
A44: Yes. If you had an application for asylum or cancellation of removal, or similar relief, pending before either USCIS or EOIR as of June 15, 2012, but had no lawful status, you may request consideration of DACA.

**Q45: I was admitted for "duration of status" or for a period of time that extended past June 14, 2012, but I violated my immigration status (for example, by engaging in unauthorized employment, failing to report to my employer, or failing to pursue a full course of study) before June 15, 2012. May I be considered for deferred action under 8 CFR**

**App. 700**

236.21-236.25?

A45: No, unless the Executive Office for Immigration Review terminated your status by issuing a final order of removal against you before June 15, 2012.

**Q46: I was admitted for "duration of status" or for a period of time that extended past June 14, 2012, but I "aged out" of my dependent nonimmigrant status as of June 15, 2012. May I be considered for deferred action under 8 CFR 236.21-236.25?**

A46: Yes. For purposes of satisfying the "had no lawful status on June 15, 2012," guideline at 8 CFR 236.22(b)(4) alone, if you were admitted for duration of status or for a period of time that extended past June 14, 2012, but aged out of your dependent nonimmigrant status on or before June 15, 2012, (meaning you turned 21 years old on or before June 15, 2012), you may be considered for deferred action under 8 CFR 236.21-236.25.

**Q47: I was admitted for duration of status, but my status in the Student and Exchange Visitor Information System (SEVIS) is listed as terminated on or before June 15, 2012. May I be considered for deferred action under 8 CFR 236.21-236.25?**

A47: Yes. For the purposes of satisfying the "had no lawful status on June 15, 2012," guideline at 8 CFR 236.22(b)(4) alone, if your status as of June 15, 2012, is listed as "terminated" in SEVIS, you may be considered for DACA under 8 CFR 236.21-236.25.

**Q48: I am a Canadian citizen who was inspected by CBP but was not issued a Form I-94 at the time of admission. May I be considered for deferred action under 8 CFR 236.21-236.25?**

A48: In general, a Canadian citizen who was admitted as a visitor for business or pleasure and not issued a Form I-94, Arrival/Departure Record (also known as a "non-controlled" Canadian nonimmigrant) is lawfully admitted for a period of 6 months. For that reason, unless there is evidence, including verifiable evidence provided by the individual, that they were specifically advised that their admission would be for a different length of time, DHS will consider, for purposes of 8 CFR 236.21-236.25 only, that the noncitizen was lawfully admitted for a period of 6 months. If DHS is able to verify from its records that your last noncontrolled entry occurred on or before Dec. 14, 2011, DHS will consider your nonimmigrant visitor status to have expired as of June 15, 2012, and you may be considered for deferred action under 8 CFR 236.21-236.25.

**Q49: I used my Border Crossing Card (BCC) to obtain admission to the United States and was not issued a Form I-94 at the time of admission. May I be considered for deferred action under 8 CFR 236.21-236.25?**

A49: Because the limitations on entry for a BCC holder vary based on location of admission and travel, DHS will assume that the BCC holder who was not provided a Form I-94 was admitted for the longest period legally possible—30 days—unless the individual can demonstrate, through verifiable evidence, that they were specifically advised that their admission would be for a different length of time. Accordingly, if DHS is able to verify from its records that your last admission was using a BCC, you were not issued a Form I-94 at the time of admission, and it occurred on or before May 14, 2012, DHS will consider your nonimmigrant visitor status to have expired as of June 15, 2012, and you may be considered for deferred action under 8 CFR 236.21-236.25.

**Q50: Do I accrue unlawful presence if I have a pending initial request for consideration of DACA?**

A50: You will continue to accrue unlawful presence while the request for consideration of DACA is pending unless you are under 18 years of age at the time of the request. If you are under 18 years of age at the time you submit your request, you will not accrue unlawful presence while the request is pending, even if you turn 18 while your request is pending with USCIS. If we grant your DACA request, you will not accrue unlawful presence during the period of deferred action. However, having deferred action will not excuse previously accrued unlawful presence.

Return to top.

# III. Renewal of DACA

**Q51: When should I file my DACA renewal request?**

A51: We strongly encourage you to submit your DACA renewal request between 120 and 150 days (4 to 5 months) before the expiration date located on your current Form I-797 DACA approval notice and EAD. Filing during this window reduces the risk

**App. 701**

that your current period of DACA will expire before you receive a decision on your renewal request. Filing earlier than 150 days before your current DACA expiration date will not result in a faster decision.

DACA recipients may submit a DACA renewal request online. To file Form I-821D and Form I-765 online, a DACA requestor must first create a USCIS online account, which provides a convenient and secure method to submit forms, pay fees and track the status of any pending USCIS immigration request throughout the adjudication process. There is no cost to set up an account, which offers a variety of features, including the ability to communicate with USCIS through a secure inbox and respond online to Requests for Evidence. For additional information on filing a DACA renewal request online, go to the Form I-821D webpage. All online DACA renewal requests must include Form I-821D, Form I-765, and Form I-765WS and accompanying fees.

- USCIS' current goal is to process DACA renewal requests within 120 days. You may submit an inquiry online about the status of your renewal request after it has been pending more than 105 days. Please Note: Factors that may affect the timely processing of your DACA renewal request include, but are not limited to:

  ○ If you fail to appear at an ASC for a scheduled biometrics appointment to obtain fingerprints and photographs. It will take longer to process your request if you miss or reschedule your appointments;

  ○ Issues of national security, criminality or public safety discovered during the background check process that require further vetting;

  ○ Issues of travel abroad that need additional evidence or clarification;

  ○ Name or date of birth discrepancies that may require additional evidence or clarification; or

  ○ A renewal submission that is incomplete or contains evidence that suggests a requestor may not satisfy the DACA renewal guidelines and we must request additional evidence or an explanation.

**Q52: Can I file a renewal request outside the recommended filing period of 120 to 150 days before my current DACA expires?**
A52: USCIS strongly encourages you to file your renewal request within the recommended 120- to 150-day filing period to minimize the possibility that your current period of DACA will expire before you receive a decision on your renewal request. We will accept requests we receive earlier than 150 days before your current DACA expires; however, this could result in an overlap between your current DACA and your renewal. This means your renewal period may extend for less than a full 2 years from the date that your current DACA period expires.

If you file less than 120 days before your current period of DACA expires, there is more risk that your current period of DACA and employment authorization will expire before you receive a decision on your renewal request. If you file after your most recent DACA period expires, but within 1 year of its expiration, you may submit a request to renew your DACA. If you are filing beyond 1 year after your most recent period of DACA expired, or if your most recent grant of DACA was terminated at any time, you may still request DACA by submitting a new initial request.

Please note: An ongoing July 16, 2021, injunction (PDF, 401.59 KB) from the U.S. District Court for the Southern District of Texas, which was affirmed by the U.S. Court of Appeals for the Fifth Circuit, and, on Oct. 14, 2022, was extended by the district court to the DACA final rule, remains in effect and prohibits DHS from granting initial DACA requests and related employment authorization under the final rule. Due to the partial stay of the injunction, DHS presently may grant DACA renewal requests under the final rule.

**Q53: How will USCIS evaluate my request for renewal of DACA under 8 CFR 236.21-236.25?**
A53: We may consider renewing your DACA if you met the guidelines for consideration of Initial DACA (see above and 8 CFR 236.22(b)) and you:

- Did not engage in unauthorized travel outside the United States on or after Aug. 15, 2012;

- Have continuously resided in the United States since you submitted your most recent request for DACA that was approved up to the present time; and

- Have not been convicted of a felony, a misdemeanor described in 8 CFR 236.22(b)(6), or 3 or more other misdemeanors,

**App. 702**

and do not otherwise pose a threat to national security or public safety.

These guidelines must be met for consideration of DACA renewal. We consider deferred action requests submitted under 8 CFR 236.21-236.25 on a case-by-case basis. Even if you meet the guidelines, we have discretion to assess your circumstances and determine that deferred action is inappropriate. See 8 CFR 236.22I.

**Q54. Do I accrue unlawful presence if I am seeking renewal and my previous period of DACA expires before I receive a renewal of deferred action under DACA? Similarly, what would happen to my work authorization?**
A54: Yes, if your previous period of DACA expires before you receive a renewal of deferred action under DACA, you will accrue unlawful presence for any time between the periods of deferred action, unless you are under 18 years of age at the time you submit your renewal request.

Similarly, if your previous period of DACA expires before you receive a renewal of deferred action under DACA, you will not be authorized to work in the United States regardless of your age at time of filing until and unless you receive a new EAD from USCIS.

**Q55. Do I need to provide additional documents when I request renewal of deferred action under DACA?**
A55. No, unless you have new documents pertaining to removal proceedings or criminal history that you have not already submitted to USCIS in a previously approved DACA request. However, we reserve the authority, at our discretion, to request additional documents, information or statements relating to a DACA renewal request determination.

CAUTION: If you knowingly and willfully provide materially false information on Form I-821D, you will be committing a federal felony punishable by a fine, imprisonment up to 5 years, or both under 18 U.S.C. Section 1001. In addition, you may be placed into removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

**Q56.; If I am no longer enrolled in school, can I still request to renew my DACA?**
A56. Yes. Neither Form I-821D nor the instructions ask renewal requestors for information about continued school enrollment or graduation. The instructions for renewal requests specify that you may be considered for DACA renewal if you met the guidelines for consideration of initial DACA, including the educational guidelines and:

1. Did not engage in unauthorized travel outside the United States on or after Aug. 15, 2012, without advance parole;

2. Have continuously resided in the United States, up to the present time, since you submitted your most recent request for DACA that was approved; and

3. Have not been convicted of a felony, a misdemeanor described in 8 CFR 236.22(b)(6)or 3 or more other misdemeanors and are not a threat to national security or public safety.

**Q57. If I initially received DACA and was under age 31 on June 15, 2012, but have since become 31 or older, can I still request renewal of DACA?**
A57. Yes. You may request consideration for a renewal of DACA as long as you were under age 31 as of June 15, 2012.

# IV. Travel

**Q58: May I travel outside the United States before I submit an initial DACA request or while my initial DACA request is pending with USCIS?**
A58: Any unauthorized travel outside of the United States on or after Aug. 15, 2012, will interrupt your continuous residence, and you will not be considered for deferred action under 8 CFR 236.21-236.25. We will assess any travel outside of the United States that occurred on or after June 15, 2007, but before Aug. 15, 2012, to determine whether the travel qualifies as brief, casual and innocent. (See Chart #2.)

CAUTION: You should be aware that if you have been ordered deported or removed, and you then leave the United States, your departure will likely mean you are considered deported or removed, with potentially serious future immigration consequences.

**App. 703**

**Q59: If my case is deferred under DACA, will I be able to travel outside of the United States?**

A59: Not automatically. If we decide to defer action in your case and you want to travel outside the United States, you must apply for an advance parole document by filing Form I-131, Application for Travel Document, and paying the applicable fee. We will determine whether your purpose for international travel is justifiable based on the circumstances you describe in your request. Generally, we will only issue an advance parole document if your travel abroad is for:

- Humanitarian purposes, including travel to obtain medical treatment, attend funeral services for a family member, or visit an ailing relative;

- Educational purposes, such as semester abroad programs and academic research; or

- Employment purposes, such as overseas assignments, interviews, conferences or training, or meetings with clients overseas.

Travel for vacation is not a valid basis for advance parole.

Travel for educational purposes means travel affiliated with an institution that provides education as its primary purpose. The DACA recipient does not have to be enrolled in the institution that the program is affiliated with, but you must be enrolled in the program you will be traveling with.

You may not apply for an advance parole document unless and until USCIS approves your DACA request. If you are a current DACA recipient and submitting a renewal request, you may apply for advance parole at the same time to the separate filing address for advance parole requests. We will consider all advance parole requests on a case-by-case basis.

If USCIS has granted DACA under 8 CFR 236.21-236.25 after you have been ordered deported or removed, you may still request advance parole if you meet the guidelines for advance parole described above.

CAUTION: If you have been ordered deported or removed, before you actually leave the United States, you should seek to reopen your case before the EOIR and obtain administrative closure or termination of your removal proceeding. Even after you have asked EOIR to reopen your case, you should not leave the United States until after EOIR has granted your request. If you depart after being ordered deported or removed, and your removal proceeding has not been reopened and administratively closed or terminated, you may be considered deported or removed, with potentially serious future immigration consequences. If you have any questions about this process, you may contact ICE through the local ICE Office of the Principal Legal Advisor with jurisdiction over your case.

**Q60: What happens to my DACA grant if I leave the United States without advance parole?**

A60: CAUTION: When you leave the United States, you are no longer in a period of deferred action. DACA recipients who leave the United States without first obtaining an advance parole document run a significant risk of being unable to reenter the United States. We strongly encourage you to obtain an advance parole document before you leave to reduce the risk of being unable to return and resume DACA.

USCIS may terminate a grant of DACA, in its discretion and following issuance of a Notice of Intent to Terminate with an opportunity to respond, for DACA recipients who depart from the United States without first obtaining an advance parole document and subsequently enter the United States without inspection. See 8 CFR 236.23(d)(2). Generally, a recent entry without inspection will be a significant negative factor warranting termination of DACA as a threat to border security, but where there are exigent circumstances, such as accidental or involuntary border crossings, DHS may choose to continue exercising prosecutorial discretion and allow the grant of deferred action to continue.

DACA recipients who depart the United States without first obtaining advance parole but who are paroled into the United States may resume their DACA upon expiration of the period of parole.

**Q61: Why does my advance parole document show a 1-day parole period?**

A61: Your advance parole document may show a parole period of 1 day because it is to facilitate your reentry into the United States, at which time you will resume your current DACA validity period. This is different from the language on your advance

**App. 704**

parole document that authorizes a departure and reentry between specified dates. Please review your advance parole document carefully to understand the details of your travel authorization.

**Q62: Do brief departures from the United States interrupt the continuous residence requirement?**
A62: A brief, casual, and innocent absence from the United States will not interrupt your continuous residence. However, unauthorized travel outside of the United States on or after Aug. 15, 2012, will interrupt continuous residence, regardless of whether it was otherwise brief, casual, and innocent. Your absence from the United States will be considered brief, casual, and innocent if it was on or after June 15, 2007, and before Aug. 15, 2012, and:

1. The absence was short and reasonably calculated to accomplish the purpose for the absence;

2. The absence was not because of a post-June 15, 2007, order of exclusion, deportation, or removal;

3. The absence was not because of a post-June 15, 2007, order of voluntary departure, or an administrative grant of voluntary departure before you were placed in exclusion, deportation, or removal proceedings; and

4. The purpose of the absence and your actions while outside the United States were not contrary to law.

Once USCIS has approved your request for DACA, you may file Form I-131, Application for Travel Document, to request advance parole to travel outside of the United States.

CAUTION: If you travel outside the United States on or after Aug. 15, 2012, without authorization and subsequently enter without inspection, DHS will issue you a Notice of Intent to Terminate and may, barring exigent circumstances, terminate your deferred action under DACA in its discretion,

Travel Guidelines (Chart #2)

| Travel Dates | Type of Travel | Does It Affect Continuous Residence |
|---|---|---|
| On or after June 15, 2007, but before Aug. 15, 2012 | Brief, casual and innocent | No |
| | For an extended time<br><br>Because of an order of exclusion, deportation, voluntary departure, or removal<br><br>To participate in criminal activity | Yes |
| On or after Aug. 15, 2012, and before you have requested DACA | Any | Yes. You cannot apply for advance parole unless and until DHS has determined whether to defer action in your case, and you cannot travel until you receive advance parole.<br><br>In addition, if you have previously been ordered deported and |

**App. 705**

| Travel Dates | Type of Travel | Does It Affect Continuous Residence |
|---|---|---|
| On or after Aug. 15, 2012, and after you have requested DACA | Any | removed and you depart the United States without taking additional steps to address your removal proceedings, your departure will likely mean you are considered deported or removed, with potentially serious future immigration consequences. |
| On or after Aug. 15, 2012, and after receiving DACA | Any | It depends. If you travel after receiving advance parole, the travel will not interrupt your continuous residence. However, if you travel **without** authorization, the travel **will** interrupt your continuous residence. |

**Q63: May I file a request for advance parole concurrently with my DACA package?**
A63: You may file your DACA renewal request and a request for advance parole at the same time. The filing addresses are different, so you must file the requests separately. USCIS may not concurrently adjudicate the 2 requests.

If you are filing an initial DACA request, you may not concurrently file an advance parole request.

**Q64: Will USCIS expedite the processing of a DACA Form I-131 advance parole application currently pending with USCIS?**
A64: USCIS considers all expedite requests on a case-by-case basis and generally requires documentation to support such requests. The decision to grant or deny an expedite request is within the sole discretion of USCIS.  Please visit the USCIS Policy Manual Chapter 5 - Requests to Expedite Applications or Petitions for more information and guidance on expedite requests.

**Q65: What if I am experiencing an extremely urgent situation and have not filed my Form I-131 advance parole application?**
A65:If you are experiencing an extremely urgent situation and need to travel within 90 days, you may request an emergency advance parole appointment at your local field office by contacting the USCIS Contact Center. You should bring the following items to your appointment:

- A completed and signed Form I-131, Application for Travel Document;
- The correct Form I-131 filing fee;
- Evidence to support the emergency request (such as medical documentation, death certificate, etc.); and
- 2 passport-style photos.

Return to top.

# V. Criminal Convictions

**Q66: If I have a conviction for a felony offense, a misdemeanor offense described in 8 CFR 236.22(b)(6), or multiple other misdemeanors, can I be granted DACA under 8 CFR 236.21-236.25?**
A66: No. If you have been convicted of a felony offense, a misdemeanor offense described in 8 CFR 236.22(b)(6), or 3 or more other misdemeanor offenses not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, we will not consider you for DACA under 8 CFR 236.21-236.25.

**App. 706**

**Q67: What offenses qualify as a felony?**
A67: A felony is a federal, state, or local criminal offense punishable by imprisonment for a term exceeding 1 year.

A single conviction for a felony offense is disqualifying for purposes of DACA.

**Q68: What offenses constitute disqualifying misdemeanors (as described at 8 CFR 236.22(b)(6)) for purposes of DACA?**
A68: For purposes of DACA, a misdemeanor (as described at 8 CFR 236.22(b)(6)) is a misdemeanor as defined by federal law (specifically, a misdemeanor for which the maximum term of imprisonment authorized is 1 year or less but greater than 5 days) that meets the following criteria:

1. Regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; or

2. If not an offense listed above, is an offense for which you were sentenced to time in custody of more than 90 days. The sentence must involve time to be served in custody, and does not include a suspended sentence.

The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by ICE.

A single conviction for a misdemeanor offense as described above is disqualifying for purposes of DACA.

A single misdemeanor conviction that is not a misdemeanor as described at 8 CFR 236.22(b)(6) is not per se disqualifying for DACA purposes. However, we may consider such offenses in the totality of circumstances to determine whether a DACA requestor merits a favorable exercise of prosecutorial discretion.

Notwithstanding the above, the decision whether to defer action in a particular case is an individualized, discretionary decision that takes into account all the circumstances. The absence of any misdemeanor convictions as described in 8 CFR 236.22(b)(6) is not necessarily determinative, but it is a factor we will consider when we exercise our discretion.

**Q69: What offenses constitute "other misdemeanors" at 8 CFR 236.22(b)(6))?**
A69: For purposes of 8 CFR 236.22(b)(6), an "other misdemeanor" is any misdemeanor as defined by federal law (specifically, a misdemeanor for which the maximum term of imprisonment authorized is 1 year or less but greater 5 days) that meets the following criteria:

1. Is not an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; and

2. Is an offense for which the individual was sentenced to time in custody of 90 days or less. The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by ICE.

Three or more convictions of "other misdemeanors" not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct are disqualifying for purposes of DACA.

The decision to defer action in a particular case is an individualized, discretionary decision that takes into account all the circumstances. The absence of three or more convictions of "other misdemeanors"  is not necessarily determinative, but it is a factor we will consider when we exercise our discretion.

A single misdemeanor conviction that is not a misdemeanor as described at 8 CFR 236.22(b)(6) is not per se disqualifying for DACA purposes. However, we may consider such offenses in the totality of circumstances to determine whether a DACA requestor merits a favorable exercise of prosecutorial discretion.

**Q70: If I have a minor traffic offense, such as driving without a license, will it be considered a misdemeanor that counts towards the "3 or more other misdemeanors" and make me unable to receive consideration for an exercise of prosecutorial discretion under 8 CFR 236.21-236.25?**
A70: We will not consider a minor traffic offense a misdemeanor for purposes of 8 CFR 236.22(b)(6), and it is not per se

**App. 707**

disqualifying for DACA purposes. However, we can consider your entire offense history along with other facts to determine whether, under the totality of the circumstances, you warrant a favorable exercise of prosecutorial discretion.

It is important to emphasize that driving under the influence is a disqualifying misdemeanor as described at 8 CFR 236.22(b)(6), regardless of the sentence imposed.

**Q71: What qualifies as a national security or public safety threat?**
A71: If the background check or other information uncovered during the review of your request for deferred action indicates that your presence in the United States threatens public safety or national security, we will not grant your DACA request. Indicators that you pose such a threat include, but are not limited to, gang membership, participation in criminal activities, or participation in activities that threaten the United States.

**Q72: Will offenses criminalized as felonies or misdemeanors by state immigration laws be considered disqualifying convictions for purpose of DACA?**
A72: No. Under 8 CFR 236.22(b)(6), convictions under state laws (including U.S. territories) for immigration-related offenses are not considered convictions for purposes of DACA.

**Q73: Will USCIS consider my expunged conviction or juvenile delinquency adjudication as a disqualifying conviction for purposes of DACA?**
A73: No. Under 8 CFR 236.22(b)(6), we do not consider expunged convictions and juvenile delinquency adjudications disqualifying convictions for purposes of DACA. However, we will assess expunged convictions and juvenile delinquency adjudications on a case-by-case basis to determine whether, under the particular circumstances, you present a national security or public safety concern and a favorable exercise of prosecutorial discretion is otherwise warranted. If you were a juvenile, but tried and convicted as an adult, we will not consider your conviction a juvenile delinquency adjudication.

Return to top.

# VI. Miscellaneous

**Q74: Can USCIS terminate my DACA grant?**
A74: DHS may seek to terminate a grant of DACA at any time in its discretion. However, in most cases USCIS will provide DACA recipients with a Notice of Intent to Terminate (NOIT), with an opportunity to respond, before termination. We have discretion to terminate without providing a DACA recipient a NOIT and opportunity to respond if you were convicted of a national security-related offense involving conduct described in 8 U.S.C. 1182(a)(3)(B)(iii), 1182(a)(3)(B)(iv), or 1227(a)(4)(A)(i), or an egregious public safety offense.

**Q75: Does deferred action provide a path to permanent resident status (a Green Card) or citizenship?**
A75: No. Deferred action is a form of prosecutorial discretion that does not confer lawful permanent resident status or a path to citizenship. Only Congress, acting through its legislative authority, can confer these rights.

**Q76: Can I be considered for deferred action even if I do not meet the guidelines to be considered for DACA?**
A76: The process at 8 CFR 236.21-236.25 is only for individuals who meet the specific guidelines for DACA. Other individuals may, on a case-by-case basis, request deferred action from USCIS or ICE in certain circumstances, consistent with longstanding practice.

**Q77: How will ICE and USCIS handle cases involving individuals who do not satisfy the guidelines of this process but believe they may otherwise warrant an exercise of prosecutorial discretion?**
A77: If USCIS determines that you do not satisfy the DACA guidelines at 8 CFR 236.22(b) or otherwise determines you do not warrant a favorable exercise of prosecutorial discretion, then we will decline to defer action in your case. If you are currently in removal proceedings, have a final order, or have a voluntary departure order, you may then request ICE consider whether to exercise prosecutorial discretion. Guidance on requests to ICE for prosecutorial discretion is available at ICE's Prosecutorial Discretion webpage.

**Q78: How should I fill out question 9 on Form I-765, Application for Employment Authorization?**        **App. 708**

A78. When you are filing a Form I-765 as part of a DACA request, question 9 is asking you to list those Social Security numbers that were officially issued to you by the Social Security Administration.

**Q79: Is there supervisory review of decisions by USCIS under this process?**
A79: Yes. USCIS has implemented a successful supervisory review process to ensure a consistent process for considering requests for DACA under 8 CFR 236.21-236.25.

**Q80: Do USCIS personnel responsible for reviewing requests for DACA receive special training?**
A80: Yes. USCIS personnel responsible for considering requests for consideration of DACA have received special training.

**Q81: Must attorneys and accredited representatives who provide pro bono services to deferred action requestors at group assistance events file a Form G-28 with USCIS?**
A81: Under 8 C.F.R. §§ 292.3 and 1003.102, practitioners are required to file Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, when they engage in practice in immigration matters before DHS, either in person or through the preparation or filing of any brief, application, petition, or other document. Under these rules, a practitioner who consistently violates the requirement to file a Form G-28 may be subject to disciplinary sanctions; however on Feb. 28, 2011, USCIS issued a statement indicating that it does not intend to initiate disciplinary proceedings against practitioners (attorneys and accredited representatives) based solely on the failure to submit a Form G-28 in relation to pro bono services provided at group assistance events. DHS is in the process of issuing a final rule, at which time this matter will be reevaluated.

**Q82: When must an individual sign a Form I-821D as a preparer?**
A82: Anytime someone other than the requestor prepares or helps fill out the Form I-821D, that individual must complete Part 5 of the form.

**Q83: If I provide my employee with information regarding their employment to support a request for consideration of DACA, will that information be used for immigration enforcement purposes against me or my company?**
A83: You may, as you determine appropriate, provide individuals requesting DACA with documentation which verifies their employment. This information will not be shared with ICE for civil immigration enforcement purposes under section 274A of the Immigration and Nationality Act (relating to unlawful employment) unless there is evidence of egregious violations of criminal statutes or widespread abuses.

**Q84: Can I request consideration for deferred action under 8 CFR 236.21-236.25 if I live in the Commonwealth of the Northern Mariana Islands (CNMI)?**
A84: Yes, in certain circumstances. The CNMI is part of the United States for immigration purposes and is not excluded from this process. However, because of the specific guidelines for consideration of DACA, individuals who have been residents of the CNMI are in most cases unlikely to meet the criteria at 8 CFR 236.22(b). You must, among other things, have come to the United States before your 16th birthday and have resided continuously in the United States since June 15, 2007.

Under the Consolidated Natural Resources Act of 2008, the CNMI became part of the United States for purposes of immigration law only on Nov. 28, 2009. Therefore, entry into, or residence in, the CNMI before that date is not entry into, or residence in, the United States for purposes of 8 CFR 236.22(b).

USCIS has used parole authority in a variety of situations in the CNMI to address particular humanitarian needs on a case-by-case basis since Nov. 28, 2009. If you live in the CNMI and believe that you meet the guidelines for consideration of deferred action under this process, except that your entry or residence to the CNMI took place entirely or in part before Nov. 28, 2009, USCIS is willing to consider your situation on a case-by-case basis for a grant of parole. If this situation applies to you, you should make an appointment in Saipan to discuss your case with an immigration officer.

**Q85: Will USCIS expedite the processing of my pending DACA request?**
A85: USCIS considers all expedite requests on a case-by-case basis and generally requires documentation to support such requests. The decision to grant or deny an expedite request is within the sole discretion of USCIS. Please visit the USCIS Policy Manual Chapter 5 - Requests to Expedite Applications or Petitions for more information and guidance on expedite requests.

**App. 709**

Evidence demonstrating the humanitarian need for expediting your DACA request may include, but is not limited to, evidence of loss of employment, disenrollment from an educational program, or medical or health-related emergencies.

USCIS continues to strongly recommend that you submit your DACA renewal requests between 120 and 150 days before your current period of DACA expires to minimize the risk of your DACA lapsing.

**Q86: Someone told me if I pay them a fee, they can expedite my DACA request. Is this true?**
A86: No. While practitioners may charge a fee for preparation of your DACA request, including a request to expedite, an attorney or accredited representative who guarantees faster processing by USCIS if you pay them a fee may be trying to scam you and take your money. Visit our Avoid Scams page to learn how you can protect yourself from immigration scams.

Although you may request that USCIS expedite processing of your DACA request, there is no fee to request expedited processing. Make sure you seek information about requests for consideration of DACA from official government sources such as USCIS or DHS. If you are seeking legal advice, visit our Find Legal Services page to learn how to choose a licensed attorney or accredited representative.

**Q87: Am I required to register with the Selective Service?**
A87:  Most male persons residing in the United States, who are ages 18 through 25, are required to register with Selective Service. Visit the Selective Service System website for more information.

**Q88: How can I tell if an employer is discriminating against me because I am a DACA recipient?**
A88: An employer may be engaging in discrimination if they:

- Demand that an employee show specific documents or ask for more or different documents than are required to complete Form I-9, Employment Eligibility Verification, or create an E-Verify case; or

- Reject documents from the Lists of Acceptable Documents that reasonably appear to be genuine and relate to the employee, including documentation showing work authorization because it has a future expiration date or because of an employee's prior unauthorized status.

The Civil Rights Division of the U.S. Department of Justice has an office dedicated to ensuring that employers do not discriminate against individuals who are permitted to work in the United States. These include DACA recipients who have been granted work authorization. If you think your employer may be discriminating against you, contact the Immigrant and Employee Rights Section (IER) at 1-800-255-7688 (TDD for the deaf and hard of hearing: 1-800-237-2515).

For more information about unfair employment practices against DACA recipients, please read IER's factsheet in English (PDF) or Spanish (PDF).

For additional resources and information about workers' rights, visit the Department of Justice Reminders for DACA Recipients and Employers webpage.

Return to top.

Last Reviewed/Updated:  11/03/2022

**App. 710**

# Exhibit 39

| Count of Active DACA Recipients<br>By Month of Current DACA Expiration<br>As of September 30, 2022 |  U.S. Citizenship<br>and Immigration<br>Services |
| --- | --- |
| **Month of Current DACA Expiration** | **Active DACA Recipients (Rounded)** |
| | |
| **TOTAL** [1] | **589,660** |
| | |
| Sep-22 | 10 |
| Oct-22 | 9,260 |
| Nov-22 | 10,710 |
| Dec-22 | 27,010 |
| Jan-23 | 15,190 |
| Feb-23 | 16,240 |
| Mar-23 | 29,840 |
| Apr-23 | 15,410 |
| May-23 | 25,790 |
| Jun-23 | 24,510 |
| Jul-23 | 31,870 |
| Aug-23 | 54,420 |
| Sep-23 | 43,390 |
| Oct-23 | 32,890 |
| Nov-23 | 19,940 |
| Dec-23 | 20,970 |
| Jan-24 | 26,980 |
| Feb-24 | 29,770 |
| Mar-24 | 39,790 |
| Apr-24 | 22,410 |
| May-24 | 19,140 |
| Jun-24 | 16,780 |
| Jul-24 | 16,280 |
| Aug-24 | 20,950 |
| Sep-24 | 20,090 |

**Reference:**

[1] Totals may not sum due to rounding.

**Notes:**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Counts may differ from previous periods due to system updates and post-adjudicative outcomes.

3) This report reflects the number of individuals with DACA expiration on or after Sep. 30, 2021 as of Sep. 30, 2021.

4) Individuals who have obtained Lawful Permanent Resident status or U.S. citizenship are excluded.

5) For a complete list of USCIS forms and descriptions, visit: https://www.uscis.gov/forms

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality
ELIS, CLAIMS3, queried 11/2022, TRK 10763

**App. 712**

**Count of Active DACA Recipients**
**By Country of Birth**
**As of September 30, 2022**



| Country of Birth[1] | Count (Rounded)[2] | Country of Birth[1] | Count (Rounded)[2] |
|---|---|---|---|
| **TOTAL** | | | **589,660** |
| Mexico | 476,600 | El Salvador | 22,940 |
| Guatemala | 15,570 | Honduras | 14,300 |
| Peru | 5,560 | Korea, South | 5,510 |
| Brazil | 4,500 | Ecuador | 4,170 |
| Colombia | 3,660 | Argentina | 2,930 |
| Philippines | 2,870 | Jamaica | 1,970 |
| India | 1,910 | Venezuela | 1,830 |
| Dominican Republic | 1,690 | Uruguay | 1,500 |
| Trinidad and Tobago | 1,260 | Bolivia | 1,240 |
| Costa Rica | 1,160 | Nicaragua | 1,150 |
| Chile | 1,060 | Poland | 1,000 |
| Pakistan | 980 | Nigeria | 820 |
| Guyana | 730 | Belize | 600 |
| Indonesia | 590 | Canada | 560 |
| Kenya | 530 | China | 510 |
| Bangladesh | 400 | United Kingdom | 380 |
| Portugal | 380 | Ghana | 370 |
| Mongolia | 370 | Panama | 320 |
| Italy | 270 | Israel | 250 |
| Bahamas, The | 230 | Albania | 210 |
| Taiwan | 180 | Saint Lucia | 180 |
| Jordan | 180 | Paraguay | 160 |
| Germany | 160 | Zambia | 160 |
| Turkey | 150 | Thailand | 150 |
| Saudi Arabia | 140 | South Africa | 140 |
| Egypt | 140 | Armenia | 130 |
| Hong Kong | 130 | United Arab Emirates | 130 |
| Haiti | 130 | Malaysia | 120 |
| France | 120 | Ukraine | 110 |
| Senegal | 110 | Russia | 110 |
| Lithuania | 110 | Sri Lanka | 110 |
| Guinea | 100 | Japan | 100 |
| Cameroon | 100 | Zimbabwe | 100 |
| Morocco | 90 | Greece | 90 |
| Grenada | 90 | Côte D'Ivoire | 90 |
| Saint Vincent and the Grenadines | 90 | Romania | 90 |
| Gambia, The | 90 | Spain | 80 |
| Lebanon | 80 | Suriname | 80 |
| Sierra Leone | 70 | Barbados | 70 |
| Fiji | 70 | Dominica | 70 |
| Malawi | 60 | Tanzania | 60 |
| Hungary | 60 | Czech Republic | 60 |
| Macedonia | 60 | Uganda | 60 |
| New Zealand | 50 | Antigua and Barbuda | 50 |

**App. 713**



**Count of Active DACA Recipients
By Country of Birth
As of September 30, 2022**

U.S. Citizenship
and Immigration
Services

| Country of Birth[1] | Count (Rounded)[2] | Country of Birth[1] | Count (Rounded)[2] |
|---|---|---|---|
| Bulgaria | 50 | Iran | 50 |
| Nepal | 50 | Vietnam | 50 |
| Cabo Verde | 40 | Tonga | 40 |
| Kuwait | 40 | Angola | 40 |
| Australia | 40 | Montenegro | 40 |
| Netherlands | 40 | Democratic Republic of Congo | 40 |
| Cambodia | 40 | Singapore | 40 |
| Mali | 30 | Liberia | 30 |
| Uzbekistan | 30 | Ethiopia | 30 |
| Samoa | 30 | Qatar | 30 |
| Slovakia | 30 | Turks and Caicos Islands | 30 |
| Virgin Islands, British | 30 | Saint Kitts and Nevis | 30 |
| Serbia | 20 | Yemen | 20 |
| Bahrain | 20 | Belgium | 20 |
| Gabon | 20 | Sweden | 20 |
| Togo | 20 | Estonia | 20 |
| Netherlands Antilles | 20 | Yugoslavia | 20 |
| Austria | 20 | Ireland | 20 |
| Bermuda | 20 | Botswana | 20 |
| Cayman Islands | 20 | Kosovo | 20 |
| Syria | 20 | Congo | 10 |
| USSR | 10 | Algeria | 10 |
| Belarus | 10 | Laos | 10 |
| Montserrat | 10 | Niger | 10 |
| Azerbaijan | 10 | Benin | 10 |
| Denmark | 10 | Oman | 10 |
| Switzerland | 10 | Croatia | D |
| Latvia | D | Libya | D |
| Madagascar | D | Afghanistan | D |
| Burkina Faso | D | Georgia | D |
| Iraq | D | Kazakhstan | D |
| Macau | D | Namibia | D |
| Slovenia | D | Somalia | D |
| Burundi | D | French Guiana | D |
| Guadeloupe | D | Moldova | D |
| Norway | D | Western Samoa | D |
| Kyrgyzstan | D | Lesotho | D |
| Luxembourg | D | Mauritania | D |
| Aruba | D | Bosnia and Herzegovina | D |
| Brunei | D | Central African Republic | D |
| Chad | D | Cyprus | D |
| Mauritius | D | Rwanda | D |
| Guinea-Bissau | D | Marshall Islands | D |
| Martinique | D | Micronesia, Federated States of | D |

**App. 714**

**Count of Active DACA Recipients**
**By Country of Birth**
**As of September 30, 2022**



U.S. Citizenship
and Immigration
Services

| Country of Birth[1] | Count (Rounded)[2] | Country of Birth[1] | Count (Rounded)[2] |
|---|---|---|---|
| Sudan | D | Tunisia | D |
| Tuvalu | D | Palau | D |
| Palestine | D | Swaziland | D |
| Zaire | D | Andorra | D |
| Anguilla | D | Bhutan | D |
| Burma | D | Cuba | D |
| Equatorial Guinea | D | Eritrea | D |
| Finland | D | French Polynesia | D |
| Korea, North | D | Malta | D |
| Mozambique | D | New Caledonia | D |
| Papua New Guinea | D | Tajikistan | D |
| Turkmenistan | D | Not available | 180 |

**Table Key:**

D Disclosure standards not met

**References**

[1] Country of birth reflects the country of birth reported on form I-821D.

[2] Totals may not sum due to rounding.

**Notes:**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Counts may differ from previous periods due to system updates and post-adjudicative outcomes.

3) This report reflects the number of individuals with DACA expiration on or after Sep. 30, 2022 as of Sep. 30, 2022.

4) Individuals who have obtained Lawful Permanent Resident status or U.S. citizenship are excluded.

5) For a complete list of USCIS forms and descriptions, visit: https://www.uscis.gov/forms

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

ELIS, CLAIMS3, queried 11/2022, TRK 10763

**App. 715**

**Count of Active DACA Recipients**
**By State or Territory**
**As of September 30, 2022**

U.S. Citizenship
and Immigration
Services

| State or Territory of Residence | Count (Rounded)[1] | State or Territory of Residence | Count (Rounded)[1] |
|---|---|---|---|
| **TOTAL** | | | **589,660** |
| | | | |
| California | 168,120 | Texas | 97,140 |
| Illinois | 31,230 | New York | 24,260 |
| Florida | 23,060 | North Carolina | 22,450 |
| Arizona | 22,360 | Georgia | 19,310 |
| New Jersey | 14,760 | Washington | 14,600 |
| Colorado | 13,080 | Nevada | 11,460 |
| Oregon | 8,610 | Virginia | 8,570 |
| Indiana | 8,280 | Utah | 7,790 |
| Maryland | 7,200 | Tennessee | 7,120 |
| Wisconsin | 5,930 | Oklahoma | 5,750 |
| South Carolina | 5,320 | New Mexico | 5,010 |
| Massachusetts | 4,950 | Kansas | 4,920 |
| Michigan | 4,770 | Minnesota | 4,640 |
| Pennsylvania | 4,150 | Arkansas | 4,090 |
| Alabama | 3,750 | Ohio | 3,600 |
| Connecticut | 3,240 | Missouri | 2,760 |
| Nebraska | 2,660 | Idaho | 2,550 |
| Kentucky | 2,470 | Iowa | 2,210 |
| Louisiana | 1,550 | Delaware | 1,220 |
| Mississippi | 1,220 | Rhode Island | 810 |
| District of Columbia | 530 | Wyoming | 450 |
| Hawaii | 350 | New Hampshire | 250 |
| South Dakota | 190 | North Dakota | 130 |
| West Virginia | 110 | Montana | 80 |
| Alaska | 70 | Puerto Rico | 60 |
| Maine | 60 | Armed Forces Americas (except Canada) | 50 |
| Vermont | 40 | Virgin Islands | 20 |
| Guam | 10 | American Samoa | D |
| Federated States of Micronesia | D | Northern Mariana Islands | D |
| Armed Forces Pacific | D | Palau | D |
| Armed Forces Africa, Canada, Europe, Middle East | D | Marshall Islands | D |
| Not available | 300 | | |

**Table Key:**
D Disclosure standards not met

**Reference:**
[1] Totals may not sum due to rounding.

**Notes:**
1) The report reflects the most up-to-date estimate available at the time the database is queried.
2) Counts may differ from previous periods due to system updates and post-adjudicative outcomes.
3) This report reflects the number of individuals with DACA expiration on or after Sep. 30, 2022 as of Sep. 30, 2022.
4) Individuals who have obtained Lawful Permanent Resident status or U.S. citizenship are excluded.
5) For a complete list of USCIS forms and descriptions, visit: https://www.uscis.gov/forms

**Source:**
Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality
ELIS, CLAIMS3, queried 11/2022, TRK 10763

**App. 716**

**Count of Active DACA Recipients**
**By Core Based Statistical Area**
**As of September 30, 2022**


U.S. Citizenship and Immigration Services

| Core Based Statistical Area[1] | Count (Rounded)[2] | Core Based Statistical Area[1] | Count (Rounded)[2] |
|---|---|---|---|
| **TOTAL** | | | **589,660** |
| | | | |
| Los Angeles-Long Beach-Anaheim, CA | 71,790 | New York-Newark-Jersey City, NY-NJ-PA | 35,990 |
| Dallas-Fort Worth-Arlington, TX | 31,430 | Houston-The Woodlands-Sugar Land, TX | 30,020 |
| Chicago-Naperville-Elgin, IL-IN-WI | 29,760 | Riverside-San Bernardino-Ontario, CA | 22,230 |
| Phoenix-Mesa-Scottsdale, AZ | 19,550 | Atlanta-Sandy Springs-Roswell, GA | 13,610 |
| San Francisco-Oakland-Hayward, CA | 11,630 | Washington-Arlington-Alexandria, DC-VA-MD-WV | 10,790 |
| San Diego-Carlsbad, CA | 9,580 | Las Vegas-Henderson-Paradise, NV | 9,140 |
| Miami-Fort Lauderdale-West Palm Beach, FL | 8,570 | Denver-Aurora-Lakewood, CO | 8,180 |
| San Jose-Sunnyvale-Santa Clara, CA | 7,420 | Austin-Round Rock, TX | 6,650 |
| Seattle-Tacoma-Bellevue, WA | 6,480 | McAllen-Edinburg-Mission, TX | 6,470 |
| Sacramento--Roseville--Arden-Arcade, CA | 5,370 | Charlotte-Concord-Gastonia, NC-SC | 5,330 |
| Portland-Vancouver-Hillsboro, OR-WA | 5,030 | Bakersfield, CA | 4,760 |
| San Antonio-New Braunfels, TX | 4,710 | Fresno, CA | 4,580 |
| Salt Lake City, UT | 4,090 | Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 3,870 |
| Boston-Cambridge-Newton, MA-NH | 3,740 | Minneapolis-St. Paul-Bloomington, MN-WI | 3,650 |
| Indianapolis-Carmel-Anderson, IN | 3,570 | Oxnard-Thousand Oaks-Ventura, CA | 3,530 |
| Raleigh, NC | 3,350 | Visalia-Porterville, CA | 3,240 |
| Stockton-Lodi, CA | 3,210 | Kansas City, MO-KS | 3,070 |
| Nashville-Davidson--Murfreesboro--Franklin, TN | 2,920 | Tampa-St. Petersburg-Clearwater, FL | 2,890 |
| Modesto, CA | 2,810 | Oklahoma City, OK | 2,730 |
| Santa Maria-Santa Barbara, CA | 2,660 | Salinas, CA | 2,630 |
| Orlando-Kissimmee-Sanford, FL | 2,490 | Albuquerque, NM | 2,380 |
| Milwaukee-Waukesha-West Allis, WI | 2,380 | Santa Rosa, CA | 2,200 |
| Detroit-Warren-Dearborn, MI | 2,100 | Winston-Salem, NC | 2,090 |
| Baltimore-Columbia-Towson, MD | 2,070 | Brownsville-Harlingen, TX | 1,870 |
| Salem, OR | 1,840 | Greensboro-High Point, NC | 1,810 |
| Merced, CA | 1,800 | Yakima, WA | 1,790 |
| Tulsa, OK | 1,720 | Kennewick-Richland, WA | 1,710 |
| Columbus, OH | 1,700 | Memphis, TN-MS-AR | 1,650 |
| Tucson, AZ | 1,640 | Reno, NV | 1,630 |
| Bridgeport-Stamford-Norwalk, CT | 1,600 | Durham-Chapel Hill, NC | 1,590 |
| Provo-Orem, UT | 1,540 | Fayetteville-Springdale-Rogers, AR-MO | 1,530 |
| Vallejo-Fairfield, CA | 1,430 | North Port-Sarasota-Bradenton, FL | 1,400 |
| Cape Coral-Fort Myers, FL | 1,380 | El Paso, TX | 1,380 |
| Omaha-Council Bluffs, NE-IA | 1,360 | Birmingham-Hoover, AL | 1,300 |
| Grand Rapids-Wyoming, MI | 1,260 | Gainesville, GA | 1,250 |
| Greenville-Anderson-Mauldin, SC | 1,230 | Lakeland-Winter Haven, FL | 1,210 |
| Ogden-Clearfield, UT | 1,200 | Providence-Warwick, RI-MA | 1,130 |
| Santa Cruz-Watsonville, CA | 1,120 | Wichita, KS | 1,120 |
| Boise City, ID | 1,100 | Laredo, TX | 1,080 |
| Elkhart-Goshen, IN | 1,070 | Richmond, VA | 1,050 |
| Greeley, CO | 1,010 | Other CBSA | 90,090 |
| Not available | 1,620 | Non CBSA | 17,720 |

App. 717

**Table Key**

D Disclosure standards not met


**References:**

[1]Core Based Statistical Areas (CBSA) at the time of most recent adjudication. CBSAs are defined by the Office of Management and Budget.

[2] Totals may not sum due to rounding.


**Notes:**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Counts may differ from previous periods due to system updates and post-adjudicative outcomes.

3) This report reflects the number of individuals with DACA expiration on or after Sep. 30, 2022 as of Sep. 30, 2022.

4) Individuals who have obtained Lawful Permanent Resident status or U.S. citizenship are excluded.

5) For a complete list of USCIS forms and descriptions, visit: https://www.uscis.gov/forms


**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

CLAIMS3, ELIS queried 11/2022, TRK 10763


**App. 718**



| Count of Active DACA Recipients By Gender As of September 30, 2022 | |
| --- | --- |
| **Gender** | **Count (Rounded)[1]** |
| **TOTAL** | **589,660** |
| Female | 316,850 |
| Male | 272,140 |
| Not available | 670 |

**Reference:**

[1] Totals may not sum due to rounding.

**Notes:**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Counts may differ from previous periods due to system updates and post-adjudicative outcomes.

3) This report reflects the number of individuals with DACA expiration on or after Sep. 30, 2022 as of Sep. 30, 2022.

4) Individuals who have obtained Lawful Permanent Resident status or U.S. citizenship are

5) For a complete list of USCIS forms and descriptions, visit: https://www.uscis.gov/forms

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality ELIS, CLAIMS3, queried 11/2022, TRK 10763

| Count of Active DACA Recipients By Marital Status As of September 30, 2022 | |
| --- | --- |
| **Marital Status** | **Count (Rounded)[1]** |
| **TOTAL** | **589,660** |
| Single | 411,790 |
| Married | 162,540 |
| Divorced | 13,120 |
| Widowed | 560 |
| Not available | 1,650 |

**Reference:**

[1] Totals may not sum due to rounding.

**Notes:**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Counts may differ from previous periods due to system updates and post-adjudicative outcomes.

**App. 719**

3) This report reflects the number of individuals with DACA expiration on or after Sep. 30, 2022 as of Sep. 30, 2022.

4) Individuals who have obtained Lawful Permanent Resident status or U.S. citizenship are excluded.

5) Marital status reflects the DACA recipient's marital status as of the most recent adjudication.

7) For a complete list of USCIS forms and descriptions, visit: https://www.uscis.gov/forms

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

ELIS, CLAIMS3, queried 11/2022, TRK 10763

| Count of Active DACA Recipients By Age on September 30, 2022 As of September 30, 2022 | U.S. Citizenship and Immigration Services |
|---|---|
| **Age** | **Count (Rounded)[1]** |
| **TOTAL** | **589,660** |
| Under 16 | D |
| 16-20 | 9,500 |
| 21-25 | 172,250 |
| 26-30 | 205,090 |
| 31-35 | 137,500 |
| 36-39 | 56,080 |
| Not available | 9,240 |
| Average Age | 28.7 |
| Median Age | 28.0 |
| Interquartile Range | 25 to 32 |

**Reference:**

[1] Totals may not sum due to rounding.

**Notes:**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Counts may differ from previous periods due to system updates and post-adjudicative outcomes.

3) This report reflects the number of individuals with DACA expiration on or after Sep. 30, 2022 as of Sep. 30, 2022.

4) Individuals who have obtained Lawful Permanent Resident status or U.S. citizenship are excluded.

5) For a complete list of USCIS forms and descriptions, visit: https://www.uscis.gov/forms

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

ELIS, CLAIMS3, queried 11/2022, TRK 10763

**App. 720**