**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, ET AL.; ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:18-cv-00068 |
| ) | |
| UNITED STATES OF AMERICA, ET AL.; ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| KARLA PEREZ ET AL.; ) | |
| ) | |
| STATE OF NEW JERSEY, ) | |
| ) | |
| Defendants-Intervenors. ) | |

**BRIEF OF CHARLES BREITERMAN AS *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I. Widely Accepted Research Shows That The Rule of Law is Essential For Economic Growth. Therefore, An Unconstitutional DACA Program Is Not In the Best Interests of the DACA Recipients.................................................................................................................................p. 1

II. The Doctrine of Constitutional Avoidance Is Very Weak Here..................................................p. 2

III. English Cases 1486-1686 Explain the Dispensing Power........................ .............................p. 5

IV. In the Entire History of the English Monarchy, All the Monarchs Combined Issued 424,020 Dispensations...........................................................................................................................p. 7

V.  DACA Is A Mass Dispensation Program: It is 3 dispensations for each Dreamer.............................p. 9

VI. How Many Dispensations Have Been Granted Under DACA? 4.5 Million Under Obama; 26 Million Total......................................................................................................................p. 14

VII. The Dispensing Power As It Relates To the U.S. Constitution.............................................p. 16

VIII. The Constitution Vested No Dispensing Power In The President...............................................p. 19

IX. A Dispensing Power Erodes the Separation of Powers. A Mass Dispensing Power Destroys The Separation of Powers.......................................................................................p. 20

X. Reaching the Constitutional Issue Is Necessary..................................................................p. 23

XI. The Reliance Interest Must Yield To the Necessity of Stopping The Monstrous Unconstitutionality of the DACA Final Rule...............................................................................p. 24

## **TABLE OF AUTHORITIES**

## **CASES**

*State of Texas and State of Louisiana v. United States of America et al.*, __ F.Supp. 3d. , 2022 U.S. Dist. LEXIS 104521, June 10, 2022……………………………………………………………2

*Nw. Austin Mun. Util. Dist. No. One v. Holder* 557 U.S. 193, 205, 129 S.Ct. 2504, 2513, 174 L.Ed.2d 140 (2009)………………………………………………………………………………….……3

*Blodgett v. Holden* 275 U.S. 142, 147-148, 48 S. Ct. 105, 72 L. Ed. 206, 1928-1 C.B. 324 (1927)…….3

*Matal v. Tam,* ____ *U.S.* ____ , 137 S. Ct. 1744; 198 L. Ed. 2d 366……………………………... 4,23

*Case of the Sheriff* (Exchequer Chamber, 1486)……………………………………………….5,6

*Distinction Between Malum Prohibitum and Malum per Se* (1495)………………………………….5

*Case of the Penal Statutes* (Exchequer Chamber, 1605)………………………………………...5

*Thomas v. Sorrell* (King's Bench, 1673)………………………………………………5,6,10,12,13,14

*Godden v. Hales* (King's Bench, 1686)………………………………………………………..5

*Darcy v. Allen (1603), a/k/a The Case of Monopolies* 11 Co. Rep. 84b, 77 Eng. Rep. 1260………...5,22

*Kendall v. United States ex Rel Stokes* 37 U.S. (12 Pet.) 524 (1838)…………………………….16

*United States v. Smith*  27 F. Cas. 1192 C.C.D.N.Y (1806)…………………………… ……………...16

*Texas et. al v. United States et al.,* 549 F.Supp.3d 572, 2021 U.S. Dist. LEXIS 133114, 2021 WL 3025857, Civil Action No. 1:18-CV-00068 (2021)……………………………………………..23

*State of Texas et al. v. United States et al, 5th Circuit Court of Appeals,* Case 21-40680,  10/5/2022…23

*DHS v. Regents of the University of California,* 140 S.Ct. 1891 (Decided 6/18/2020)………..………24

## **STATUTES**

8 U.S.C. §1182(a)(6) and (7)………………………………………………………………………9

8 USC §1324a(a) and (b)……………………………………………………………...10,11,13

8 U.S.C. §1324c(a)(1-4)…………………………………………………………………...12

18 U.S.C. §1001(a)(3)……………………………………………………………………..12

18 U.S.C. §1546(a) and (b)……………………………………………………………12,13

18 U.S.C. §1001(a)(2)……………………………………………………………………..13

## RULES AND REGULATIONS

8 CFR 274a.2(a)(2) - 274a.12…………………………………………………………..10

## OTHER AUTHORITIES

Robert J. Barro and Xavier Sala-i-Martin, Economic Growth, 2nd Edition, Cambridge: MIT Press, 2004 at pp. 526-527.   …………………………………………………………….……1

Acemoglu et al., *The Colonial Origins of Comparative Development: An Empirical Investigation*, NBER Working Paper 7771, June 2000…………………………………………………………1

Congressional Research Service, *The Doctrine of Constitutional Avoidance: A Legal Overview*, September 2, 2014…………………………………………………………………………4

Alexander M. Bickel, The Least Dangerous Branch: The Supreme Court at the Bar of Politics (1962) at 129-130.   ……………………………………………………………………………...4

Jacob Corré, *The Argument, Decision, and Reports of Darcy v. Allen*, 45 Emory L. J. 1261 (1996)..…5

Zachary Price, *Enforcement Discretion and Executive Duty*, 67 Vanderbilt Law Review 671 (2014)...10

Deferred Action for Childhood Arrivals (DACA) Quarterly Report (quarter ending March 31, 2022)..15

Deferred Action for Childhood Arrivals (DACA) Quarterly Report (Fiscal Year 2022, Q4)…………..16

Christopher N. May, Presidential Defiance of "Unconstitutional" Laws: Reviving the Royal Prerogative Westport: Greenwood Press (1998)……………………………………………..…...18,20

Max Farand, Records of the Federal Convention of 1787, Volume 2 Yale University Press (1911)..…18

Francis Morgan Nichols, <u>Britton</u>, Volume I, Oxford: Clarendon Press (1865)…………………………18

Blackstone, <u>Commentaries,</u> (1765) Online Library of Liberty, Volume I……………………….…..19

Dennis R. Nolan, *Sir William Blackstone and the New American Republic: A Study of Intellectual Impact*, 51 N.Y.U. L. REV. 731 (1976)………………………………………………………….…...…19

John Yoo, <u>Defender in Chief: Donald Trump's Fight for Presidential Power,</u> New York: All Points Books, (2020)………………………………………………………………………….…………..19

Count of Active DACA Recipients By Month of Current DACA Expiration
As of September 30, 2022……………………………………………………...………………………...23

### FRAP Rule 29(a)(4)(E) Statement

No party's counsel authored this brief in whole or in part. This counsel was the sole author. No party or party's counsel contributed money towards the brief. No person aside from this *amicus* contributed money to fund the brief.

 /s/Charles Breiterman   
Charles Breiterman

# I.  Widely Accepted Research Shows That The Rule of Law is Essential For Economic Growth. Therefore, An Unconstitutional DACA Program Is Not In the Best Interests of the DACA Recipients

A DACA Final Rule that violates statutory law and the Constitution is not in the best interests of DACA's recipients. One of the leading analyses of the effect of the rule of law on economic growth is by Barro and Sala-i-Martin (2004).[1]  The authors rank the quality of the nation's rule of law on a 7 rung ladder from 0 to 1 with 1 being perfect rule of law. So the scale is 0, .1667, .33, .5, .667, .833, 1.  Zero is the lowest step on the ladder, and 1 is the highest. The rule of law score can be any number between 0 and 1.  A score like .2 is somewhere between 5th and 6th lowest rung of the ladder.

Barro and Sala-i-Martin's statistical analysis finds that each rank higher on the scale is worth  0.31% of economic growth per year. Any president would prefer to give a news conference to inform the public that economic growth increased by 2% instead of 1.7%. Moreover, the impact builds over time because economic growth is computed like compound interest.

After 20 years, a one-step-of-the-ladder improvement in the rule of law is worth a cumulative total of 6% in economic growth. After 100 years, 36%. After

---

[1] Robert J. Barro and Xavier Sala-i-Martin, Economic Growth, 2nd Edition, Cambridge: MIT Press, 2004 at pp. 526-527. This a durable finding of mainstream economics. An article with a confirmatory statistical result is: Acemoglu et al., *The Colonial Origins of Comparative Development: An Empirical Investigation*, NBER Working Paper 7771, June 2000.  In the June 2000 paper, column 1 of Appendix Table A4d is the location the rule of law-economic growth result.

233 years, (the number of years from 1789 to 2022) the one rung of the ladder improvement leads to an 206% larger GDP. The rule of law is a crucial factor explaining the rise of nations over time.

It is logical that the converse is true. If a nation loses the quality of its rule of law by a quantity equal to one rung on the ladder, that would be a hit to economic growth of 0.31% per year. As will be shown in this brief, DACA is a significantly corrodes the rule of law. If DACA is allowed to stand, 20 years from now, we could see our economy 6.3% smaller than it otherwise could have been, after 100 years 36% smaller and so on.

If we allow our rule of law to decline, will our economy be able to generate enough jobs for the DACA recipients, legal immigrants and U.S. citizens? A proper court ruling on DACA is vital to ensuring that the former DACA recipients will be able to live the life that their parents hoped for them.


II.     **The Doctrine of Constitutional Avoidance Is Very Weak Here**

The DACA case involves a constitutional issue because the Constitution vested no dispensing power in the executive branch, and dispensing violates the separation of powers.

As summarized recently by a federal judge deciding the case *States of Texas*

*and Lousiana*,[2] the doctrine of constitutional avoidance means, "A federal court normally does not reach a constitutional question if it can dispose of the case on another ground." However, the doctrine of constitutional avoidance is very weak in the case at bar.

The judge in *States of Texas and Lousiana* cited to a Supreme Court decision, *Nw. Austin Mun. Util. Dist. No. One v. Holder*,[3] which states, "… we are keenly mindful of our institutional role. We fully appreciate that judging the constitutionality of an Act of Congress is "the gravest and most delicate duty that this Court is called on to perform." (at 205-206).

But the DACA case is not judging the constitutionality of an Act of Congress. The dispensation aspect of this case is evaluating the constitutionality of (first an executive action and now) a Final Rule that undermines perfectly constitutional Acts of Congress that are codified in Title 8 of the U.S. Code and are known collectively as the immigration laws. It is the opposite situation of the Court's rationale for the constitutional avoidance doctrine, as expressed in *Nw Austin*. *Nw Austin* in turn cites to the Supreme Court case *Blodgett v. Holden*.[4] Therein, Justice Holmes wrote, "Although research has shown and practice has

---

[2] State of Texas and State of Louisiana v. United States of America et al., ___ F.Supp. 3d. ___ , 2022 U.S. Dist. LEXIS 104521, June 10, 2022 at p. 87.

[3] 557 U.S. 193, 205, 129 S.Ct. 2504, 2513, 174 L.Ed.2d 140 (2009)

[4] 275 U.S. 142, 147-148, 48 S. Ct. 105, 72 L. Ed. 206, 1928-1 C.B. 324 (1927) (Holmes, J.,concurring).

established the futility of the charge that it was a usurpation when this Court

undertook to declare an Act of Congress unconstitutional, I suppose that we all

agree that to do so is the gravest and most delicate duty that this Court is called on

to perform." at 148-149. Again, in this DACA case, the constitutionality of the

immigration law is not questioned. What is questioned is the constitutionality of a

Final Rule that is undermining the immigration laws.

Last, the judge quoted from *Matal v. Tam*, __ U.S. __, 137 S. Ct. 1744; 198 L.

Ed. 2d 366, "Indeed, courts "ought not to pass on questions of constitutionality

unless such adjudication is unavoidable.'" at 1764. But *Matal* is another case that

involved declaring (part of) an Act of Congress unconstitutional. The Court ruled

that a provision of federal trademark law violated the Free Speech Clause of the

First Amendment.

Finally, an authoritative text explains, "When a court "declares

unconstitutional a legislative act or the action of an elected executive, [the court]

thwarts" the enforcement of an act that presumably reflects the will of the voters."[5]

That, at least, contains an additional rationale for the doctrine.

The DACA case is the opposite of all the above rationales for constitutional

avoidance. The executive is the one *thwarting* the enforcement of acts of Congress

---

[5] Congressional Research Service, The Doctrine of Constitutional Avoidance: A Legal Overview, September 2, 2014, citing in turn: Alexander M. Bickel, The Least Dangerous Branch: The Supreme Court at the Bar of Politics (1962) at 129-130.

and the court, by reaching the constitutional question, would be *upholding* the enforcement of the acts. The doctrine of constitutional avoidance is at its strongest when a court is asked to void an act of Congress that has been duly signed into law by a president. There, the court would be ruling against the action of two co-equal branches. In contrast, here, constitutional avoidance doctrine is at a weak point. A court, by voiding the Final Rule in its entirety, would be upholding duly enacted laws, the product of agreement between two branches, against a single branch, the executive branch, that is undermining those laws.

Reaching the constitutional issue is also necessary. But the point can only be explained near the end of the brief after developing the requisite concepts.

## III.   English Cases 1486-1686 Explain the Dispensing Power

The dispensing power was one of the English monarchy's prerogative powers before the power was abolished by the English Bill of Rights in 1689. The English judiciary developed dispensing power doctrine in a line of cases from 1486 to 1686.[6]

---

[6] Dispensing power cases included: *Case of the Sheriff* (Exchequer Chamber, 1486), *Distinction Between Malum Prohibitum and Malum per Se* (1495) [more properly characterized as a Note], *Case of the Penal Statutes* (Exchequer Chamber, 1605), Reported by Sir Edward Coke, 7th Book of Reports, page 36b and elsewhere, Thomas v. Sorrell (King's Bench, 1673), and *Godden v. Hales* (King's Bench, 1686).  Another dispensation case was *Darcy v. Allen* (1603), a/k/a *The Case of Monopolies* 11 Co. Rep. 84b, 77 Eng. Rep. 1260. However, the accuracy of the report on that case by Sir Edward Coke has been called into question in the article, Jacob Corré, *The Argument, Decision, and Reports of Darcy v. Allen*, 45 Emory L. J. 1261 (1996).

It was *de jure* lawful for English monarch to set aside statutory law (an Act that had been passed by the legislature (Parliament) and received royal assent)[7] by issuing a royal document to a person. Once the royal document had been handed over, for that person, what was once unlawful became lawful *Case of the Sheriff* (1486). English monarchs also could issue a dispensation to an organization (a trade guild) and the dispensation would apply to every member of that organization. *Case of the Penal Statutes* (1605).

In *Thomas v. Sorrell* (King's Bench, 1673), the King's Bench stated that a dispensation "makes an action lawful, which without it, had been unlawful." And, "For a dispensation is properly to license a person to do a thing which he can do, but is by law penally prevented from doing it." Translating the above formulation to contemporary U.S. legal terms, the key difference between a license and a dispensation is that a license enables *pursuant to* statute, while a dispensation enables *contrary to* statute.

The dispensing power works *pre hoc* to authorize an action contrary to statute; it is a preauthorization. It is distinct from the pardon power which works *post hoc* to relieve the pardon recipient of consequences the act has been committed.

---

[7] Royal assent was granted to an Act of Parliament by the monarch writing "*le roi le veult*" (the king wills it), or "*la reine le veult*", and thus it became law.

In contrast, the suspension power was the power to declare that nobody in the realm needed follow a specified statutory law. People could behave as if the law did not exist. The suspension power was usually exercised by means of a royal proclamation. For example, if there were a statute that read "no hunting is allowed in the national forest," a king would be able to proclaim that the law is suspended. From that point forward, nobody needed to follow that law; nobody needed any document or permission to hunt in the national forest, anybody could just walk in and hunt.

The reason that DACA is not a suspension of the law is because the situation is not one where DACA recipients can behave as if the immigration law does not exist. DACA recipients must be entered in the DHS database as such. Their DACA EAD serves as proof of legal presence and as a work permit. If they encounter ICE and they are not in the database and/or do not have their EAD, they could be detained for some time before the agents verify their status. And when DACA recipients wish to accept a job as an employee, they need their DACA EAD in order to demonstrate that they are legally authorized to hold a job.

## IV.     In the Entire History of the English Monarchy, All the Monarchs Combined Issued 424,020 Dispensations

In my forthcoming book on DACA, I devote 45 pages to calculating an estimate of the number of dispensations issued by all the English monarchs in the

history of the monarchy. I constructed a purposefully liberal estimate so that maybe the DACA program's number of dispensations will not look so bad in comparison to what the English monarchs were doing.

Aethelstan, the grandson of Alfred the Great, was the first to achieve the title of king of all England, in 927 A.D. I researched English legal history and concluded it was possible that English monarchs were issuing dispensations that far back. I considered that English monarchs continued issuing dispensations until the power was formally abolished in the English Bill of Rights of 1689.

Clearly, the 45 pages of calculations cannot be included here. But I can supply a representative example- the estimated number of dispensations issued to English nobles (peers of the realm) for the years 1341-1689. The number of peers varied over time. In 1341, there were 175. In 1509 there were only 42 because of killings during the Wars of the Roses. In 1685, there were 244. I used those numbers and also numbers at other dates for which I could find reliable evidence of the number of peers at those dates. I assume that each noble held the title for 30 years. Some nobles may have only held the title for a few years, others for 50 years or more. 30 years seems average. Analysis of the data by results in the estimate that from 1341-1689 there were distinct 1,230 noble lives, each holding the title for 30 years duration. If each held 5 dispensations, that was 6,150 dispensations.

8

The result of the calculations yielded a total of 442,020 dispensations issued by all the English monarchs combined in the entirety of the period that the monarchy had the dispensing power (927 A.D. – 1689 A.D.).

## V.   **DACA Is A Mass Dispensation Program: It is 3 dispensations for each Dreamer**

Each grant of DACA is a dispensation. DACA functions as follows: an executive agency (DHS by its subdivisions ICE and USCIS), which is an arm of the President, is setting aside statutory law (an Act that has been passed by the legislature (Congress) and been signed into law by the President) by issuing official government documents to numerous individuals. Once in possession of the government documents, for that person, what was once unlawful becomes lawful.

The lawful presence dispensation works as follows: After a person is accepted into the DACA program, the person receives a letter welcoming them into DACA and a government-issued work permit (called an Employment Authorization Document (EAD). At that point the person is *de facto* lawfully present. The statutory provisions at 8 U.S.C. §1182(a)(6) or (7), relating to entry without inspection or overstaying a visa, are set aside as to that person.

The 'action' is entry without inspection or overstaying a visa- 8 U.S.C. §1182(a)(6) or (7)- those provisions of the law have no requirement as to age or

intent.[8] DACA makes the action *de facto* lawful, which without DACA, had been unlawful, to paraphrase *Thomas v. Sorrell*. It is *de facto* because their presence, as a matter of practical fact, is legal, even though the claim of this brief is that the program (now regulation) is contrary to statute and unconstitutional.

Continuing with *Sorrell*, "For a dispensation is properly to license a person to do a thing which he can do, but is by law penally prevented from doing it."[9] Prior to DACA the person could be here unlawfully, but was under threat of deportation, while with the DACA grant, the person effectively has a license to remain in the United States.[10]

Now for the 2nd dispensation issued with every DACA grant. This involves the employment authorization feature of DACA. In order to hold a job as an employee, 8 USC §1324a(a) and (b) require that the individual present valid documents demonstrating that the person is legally authorized to work in the United States. These statutory requirements are implemented by 8 CFR 274a.2(a)(2) - 274a.12, some 16 pages of regulations. 8 CFR §274a.2(a)(2) states

---

[8] Mitigating circumstances, such as the is a person is a victim of smuggling, are matters to bring up with the examining officer after the person has been detained. But once the person is enrolled in DACA, none of that matters because the person is *de facto* lawfully present and ICE will leave them alone.

[9] Zachary Price has called the dispensation a "prospective license." Zachary Price, *Enforcement Discretion and Executive Duty*, 67. Vanderbilt Law Review 671 (2014). In that article, so far as this counsel can ascertain, Zachary Price never formally identifies a grant of DACA as a dispensation. But he certainly sets up the framework to make the inference.

[10] It is reasonable to object that the DACA recipients were brought here as minors, so they committed no legally relevant action. However, their situation was considered in the debates and proceedings leading to the passage of the 1996 immigration bill, and since then the DREAM Act has repeatedly failed to pass Congress, so the law is intended to apply to them.

"Form I–9, Employment Eligibility Verification Form, is used in complying with the requirements of" the immigration statute (Title 8 U.S. Code).  That section of the regulations delineates the contents of the Form I-9. Nearly everybody in the United States who is a new hire must fill out Form I-9.[11]

The Form I-9 guides the employer and employee through the process of presenting the documents proving the individual is legally authorized to work in the United States. Page 3 of that form provides a list of acceptable documents. Crucial for the Dreamers is an "Employment authorization document issued by the Department of Homeland Security." That is the EAD. It is  a plastic card with the person's photo that resembles a driver license or any high security form of identification.

Reflecting the requirements of 8 USC §1324a(a)-(b), Form I-9  requires that the employee attest under penalty of law that the documents are not fraudulent. The employee must sign the following:

> *I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.*

---

[11] Temp workers are hired by the employment  agency that sends them on their temp jobs, so the paperwork must be filled out at the employment agency.

11

If the new employee presented fraudulent documents in order to get past the I-9, that would be a violation of 8 U.S.C. §1324c(a)(1-4), 18 U.S.C. §1001(a)(3) and 18 U.S.C. §1546(a) and (b). Before the DACA program, to get through the I-9 process, Dreamers knowingly had to present fraudulent documents and therefore, they were violating the above several provisions of statutory law. which meant they were committing multiple federal crimes.

But with the DACA program, the DACA recipient holds an authentic, genuine EAD issued by DHS. The language of the I-9 form pertains to "false documents."  Even the plaintiff-states agree that the DACA EAD is a genuine, government-issued document. So when the DACA recipient is offered a job and fills out the Form I-9, the individual can present an authentic EAD.

By reason of the foregoing, each grant of an EAD under DACA transforms makes an action lawful, which without DACA, would otherwise have been unlawful (following the wording of *Thomas v. Sorrell*). The DACA EAD is a "work permit" in other words, it is a "license," by which the person is no longer penally prevented from obtaining a job. "For a dispensation is properly to license a person to do a thing which he can do, but is by law penally prevented from doing it." (*Thomas v. Sorrell*)[12]

---

[12] With the benefit of another 300 years, the proper formulation is "a dispensation enables a person to do a thing which he can do, but is by statutory law prevented from doing it." A dispensation enables contrary to law; a license enables pursuant to law.

Now for the 3rd dispensation that DACA grants. Reflecting the requirements of 8 USC §1324a(a)-(b), Form I-9 requires that the employee attest that s/he is legally authorized to work in this country:

> *I attest, under penalty of perjury, that I am (check one of the following boxes):* [the relevant box is...]   *4. An alien authorized to work*

If the new employee falsely attests that fraudulent documents were genuine, that would be a violation of 18 U.S.C. §1001(a)(2) and 18 U.S.C. §1546(a) and (b). Before the DACA program, to get through the I-9 process, Dreamers knowingly had to make a perjurious attestation that they were legally authorized to work. Therefore, they were violating the above statutory provisions, which meant they were committing multiple federal crimes.

But with the DACA program, the DACA recipient holds an authentic, genuine EAD issued by DHS. Nobody can blame a DACA recipient for believing they are 100% authorized to work. The government told them so in official documents. Therefore, the DACA recipient can truthfully attest to be "An alien authorized to work."   Thus, each grant of an EAD under DACA makes an action lawful, which without DACA, would otherwise have been unlawful (after *Thomas v. Sorrell*).

Each grant of DACA results in the recipient having documents (the

13

welcoming letter and the work permit) that allows 3 otherwise illegal actions to be done lawfully: it allows (1) an inadmissible alien to be lawfully present,[13] then (2) to present a document authorizing employment without violating multiple statutes, as enumerated above, and lastly (3) it allows the attestation that they are "an alien authorized to work" to be made without violating multiple statutes.

The material in this brief and this circuit's earlier decisions in the DACA litigation shows that DACA sets aside and violates a total of 12 statutory provisions. So why is each grant of DACA not 12 dispensations instead of "only" 3? Because you count by number of actions made lawful.  A dispensation "makes an action lawful, which without it, had been unlawful," *Thomas v. Sorrell*. DACA makes lawful 3 unlawful actions: being present in the United States, presenting a work permit, and attesting to be an alien authorized to work.

## VI.   How Many Dispensations Have Been Granted Under DACA? 4.5 Million Under Obama; 26 Million Total

Let us start from the beginning with the Obama administration. From 2012-2016, there were a total of 752,022 initial DACA grants approved. The first

---

[13]  When DACA started in 2012, the lawful presence was *de facto*, then when the 9th circuit ruled on *Arizona Dream Act Coalition v. Arizona* in 2014, it became *de curia* lawful presence in the 9th Circuit, and so on until June of 2020 when the Supreme Court ruled in *DHS v. Regents*, that gave DACA recipients definitive *de curia* lawful presence in the United States. This brief maintains that no matter what the Supreme Court wrote in *DHS v. Regents*, their discussion is ignorant of the dispensing power and is therefore wrong- DACA is *de jure* unlawful and unconstitutional.

renewal grants were made starting in 2014, and from 2014-2016 there were a total of 587,557 renewal grants of DACA approved. So during the Obama administration, there were 1,339,579 grants of DACA through September 30 of 2016. Since the Obama administration did not leave office until January 20, 2017, I calculate the number of DACA grants from June 15, 2012 through the end of 2016, as 1,528,781.[14] We have established that each grant of DACA is 3 dispensations. That yields 4,586,343 dispensations for the entire Obama administration.

As this brief has previously explained, all the English monarchs ever granted 424,2020 dispensations. Compare this to the 4.5 million dispensations the Obama administration granted. In only 4 years, the Obama administration granted 10 times the number of dispensations that all the English kings and queens combined granted in the 762 years that the monarchy had the dispensing power.

Many have claimed that with his DACA program, President Obama acted like a king. But no English monarch ever had such dispensing power. All the English monarchs in the entire history of the English monarchy never wielded such dispensing power. DACA was the edict of an emperor.

But DACA continued when Obama left office. Adding in the cumulative

---

[14] Number of DACA grants from the "approvals" column of Deferred Action for Childhood Arrivals (DACA) Quarterly Report (for quarter ending March 31, 2022), USCIS publication, covers the time period Aug. 15, 2012 – March 31, 2022.  Available at USCIS website by going to the following URL and restricting the search filter to "2021" and "Deferred Action for Childhood Arrivals." https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data. DHS tabulates DACA grants by fiscal year. January 20, 2017, was the day Obama left office and Trump was inaugurated. DHS was doing about 200,000 total grants per year in 2016, and there is an extra ¼ year to account for (October 1-January 20, 2017), so for total accuracy add 50,000 to 1,528,781

numbers for the Trump and Biden administrations, the DHS reports that as of September 30, 2022, a cumulative total of 1,014,388 initial grants of DACA have been approved, and 2,672,267 renewal grants have been approved, for a grand total of 3,686,655 grants.[15]  That makes over 11 million dispensations, roughly 26 times the number ever issued by all the English monarchs combined.

## VII.   The Dispensing Power As It Relates To the U.S. Constitution

The ready objection to the entire discussion of DACA as a mass dispensation program is that the dispensation is a concept from the old law of England that has no application to the contemporary United States. One answer to this is that Obama himself opened the door by claiming so many times that he was not a king or emperor, as enumerated by earlier briefs and documents submitted in this case. Another answer is that the Supreme Court expressly brought it into American law in the case *Kendall v. United States ex Rel Stokes* (1838) when it strongly rejected the notion that the President, and by extension the executive branch, has the dispensing power. Another federal case, *United States v. Smith* (1806) utterly rejected the idea that the President or executive branch has a dispensing power.

---

[15] *Deferred Action for Childhood Arrivals (DACA) Quarterly Report (Fiscal Year 2022, Q4)*. Currently available at: https://www.uscis.gov/sites/default/files/document/data/DACA_performancedata_fy2022_qtr4.pdf

While that was only a federal district court case, the presiding judge was a Supreme Court justice riding circuit. It was William Paterson, a participating member of the Constitutional Convention, appointed to the Court by George Washington himself.

The The Supplemental Complaint[16] of plaintiff-states insists that:

> 76. *The Take Care Clause has its roots in the dispute between Parliament and King James II, who was overthrown in the Glorious Revolution of 1688. Parliament was infuriated at King James's use of his purported power to suspend or dispense with Parliament's laws. As a result, the subsequent monarchs, William and Mary, agreed to the English Bill of Rights, which stripped the monarchy of all suspending and dispensing authority. See English Bill of Rights of 1689, art. 1.*
> 77. *In light of this historical background, the Framers of the U.S. Constitution unanimously rejected a proposal to grant dispensing powers to the President.*
> 78. *"[t]he Framers agreed that the executive should have neither suspending nor dispensing powers."[17]*

Professor Christopher N. May did extensive research on the matter of ¶¶77-78. He demonstrates that the Framers did expressly reject the suspending power at

---

[16] Supplemental Complaint, ¶76-78 at p. 21 of 43, Document 623, submitted 1/3/23 in Case 1:18-cv-00068.
[17] Plaintiff-states citing *Texas v. Biden (MPP)*, 20 F.4th 928, 978-82 (5th Cir. 2021),

the Convention.[18] However, Professor May never suggests there was any vote or agreement as to the dispensing power. This author is aware of sporadic quotes from the writings of the Framers, but nothing approaching an agreement.

Then there is the claim of ¶76 that the Take Care Clause has its roots in a late 1680s struggle over that suspending and dispensing powers. If that is so, why do we have a take care clause 400 years earlier? Britton wrote circa 1275 that the attorneys, officials, and judges must[19]

*prendre garde* de la quantite et de la qualite de la pleinte

**take care** as to the quantity and quality of the complaint

Britton is a comprehensive treatise for attorneys (*attourné*), the king's officials bailiff (*baillif*), sheriff (*viscounte*), and judges (*justice*), mostly on procedure. The Take Care Clause must have had its roots far earlier.

Because two of the pillars of the plaintiff-states' claimed ban on dispensing are weak, we need an alternative analysis.

---

[18] "On the question 'for giving this suspending power' all the States …. were--no." Christopher N. May, Presidential Defiance of "Unconstitutional" Laws, at p. 12 citing Max Farand, Records of the Federal Convention, Volume 2, pp. 103-104.

[19] Francis Morgan Nichols, Britton, Volume I, Oxford: Clarendon Press (1865) at Book II, Chapter XXII, §3..

## VIII.  The Constitution Vested No Dispensing Power In The President

Dispensing was not considered an executive power at the time of the Founding. The Vesting Clause (Article II, Section 1, Subsection 1) states, "The executive Power shall be vested in a President of the United States of America." Of the dispensing power, Blackstone (writing circa 1765) stated, "It is true it was formerly held, that the king might, in many cases, dispense with penal statutes: but now, by statute 1 W. and M. st. 2, c. 2, [the English Bill of Rights] it is declared that the suspending or dispensing with laws by regal authority, without consent of parliament, is illegal."[20] To illustrate the importance of Blackstone to the Framers, Madison inspirited at the Virginia Ratification Convention, "I will refer you to a book which is in every man's hand—Blackstone's Commentaries."[21]  Because the Federalist Papers (#67-77) went to great lengths to explain that the President would not have the powers of the King of England, it strains credulity to think that the Constitution (drafted in 1787) granted the president a prerogative that even the King of England had not had since 1689.[22] Since the executive power was vested

---

[20] Blackstone, Commentaries, Online Library of Liberty, Volume I, at p. 129.

[21] Dennis R. Nolan, *Sir William Blackstone and the New American Republic: A Study of Intellectual Impact*, 51 N.Y.U. L. REV. 731 (1976) at 15 of 42 citing 3 Elliott's Debates 506, June 18, 1788.

[22] John Yoo has written "The Framers would not have vested a federal executive modeled on the governor of New York with a power that had long since been denied to the English king." I agree with that, and my sentence above was written before I obtained his book. John Yoo, <u>Defender in Chief: Donald Trump's Fight for Presidential Power</u>, New York: All Points Books, (2020) at 89.

in the President, and since the executive power did not include a dispensing power, then if the Framers wanted to grant that power, they would have done so expressly, yet they did not.[23]

Moreover, there is no Necessary and Proper Clause in Article II that would allow the power of the executive to be expanded to include a dispensing power. Article I has that clause, but not Article II. Article II does have a Necessary and Expedient Clause (the Recommendation Clause) but that only applies to the president suggesting (recommending) legislation to Congress during the State of the Union address.

But in this case the court need not rule on whether the President has the power to grant a few dispensations per year, or even a hundred dispensations per year. This case is about whether the President is vested with the power to grant in the range of a million dispensations per year- a mass dispensing power.

## IX.   A Dispensing Power Erodes the Separation of Powers. A Mass Dispensing Power Destroys The Separation of Powers

A mass dispensing power allows the president to lacerate any statutory law with thousands or millions of cuts. Imagine there is a statute, passed by Congress

---

[23] See, Professor Christopher N. May's discussion of the two competing theories as to the source and scope of executive power under the Constitution. These are Vesting Clause Theory and Residuum Theory. "Under neither approach does the executive power embrace a presidential prerogative" to dispense with laws. May, Presidential Defiance at pp. 18-19.

and signed into law by a president, that all smokestacks must emit no more than 75 parts per billion of sulfur dioxide. With modern printing technology, the president can issue a dispensation to each of 100 thousand emitters and thereby render the law a nullity.

If the executive branch had a dispensing power, it would make the function of the criminal justice system far more difficult because many criminals would claim their activity had been approved by some government official or even the president. It would open up our nation to innumerable scams run by government officials. A government official could authorize some group of cronies to violate a law, perhaps a law against the dumping of toxic waste, who must then remit (kickback) to the official some portion of the money they saved by not needing to dispose of the waste properly. When the authorities initiate prosecution of the scheme, the violators would plead innocence on the ground that their activities were approved by the government.

Even the power to grant a single dispensation is dangerous. The importation of Cuban cigars was banned by executive order on February 7, 1962. Because it was done by executive order, President Obama had the lawful ability to ease that ban, which he did beginning on January 1, 2015. But imagine that the Cuban cigar ban was done by statute and was still in full effect on that date. A President Fred Flintstone could issue a dispensation stating that only Barney Rubble can import

21

Cuban cigars to the United States. The law remains in effect, and only Rubble has a license to violate it. Rubble becomes a billionaire thanks to the huge demand for Cuban cigars. In the text of the dispensation, President Flintstone requires 25% of net revenues to be paid to him. President Flintstone would secure a revenue stream for himself independent of any congressional appropriation. In fact, the English monarchs were running analogous schemes with the dispensing power- even the hallowed Queen Elizabeth I.[24] They were granting monopolies on the importation of Irish yarn, Spanish wool, and playing cards, *et cetera*, with the same intent and outcome. The English monarchs were granting dispensations to favored parties, thus benefiting persons and themselves. With DACA, the Obama administration granted dispensations to a favored party (DACA recipients) to the benefit of these persons and to Obama himself in his re-election bid. *Inter alia*, the Obama administration formulated the DACA program to generate enthusiasm in a certain portion of the electorate because certain interest groups had indicated they would not advocate for his re-election unless he did something on immigration.[25]

---

[24] See William Hyde Price, The English Patents of Monopoly, Boston: Houghton Mifflin and Company, 1906  pp. 145-149; and  See Darcy v. Allen (11 Coke's King's Bench Reports 84)(1602) (a/k/a The Case of Monopolies).

[25] See, Julia Preston, *While Seeking Support, Obama Faces a Frustrated Hispanic Electorate*, New York Times, June 10, 2012 and Miriam Jordan, *Anatomy of a Deferred-Action Dream*, Wall Street Journal, 10/14/2012, "In an election year in which his future might turn on Hispanic votes," [the last thing Obama needed was] "young, illegal immigrants who decided to step out of the shadows" ... "agitating, with increasing volume and sophistication..." See also, Peter Wallsten, *President Obama bristles when he is the target of activist tactics he once used*, Washington Post, June 10, 2012. The more informative part of the article begins with: "Tensions mounted …" The article also adds to coverage of the electoral calculus.

## X.      Reaching the Constitutional Issue Is Necessary

*Matal v. Tam* stated that the constitutional question must be unavoidable. By 2 federal court orders, new grants of DACA under the original program are enjoined.[26] Despite DACA's procedural and statutory illegality as found by the federal district court for the southern district of Texas and by the Fifth Circuit, these same courts have allowed existing DACA (renewal grants) to continue. These rulings preserve a monstrously unconstitutional program; they merely prevent it from getting any larger.

As of the end of FY 2022 (Sept. 2022) there were 589,660 participants in the DACA program,[27] receiving only renewal grants.  589,660 participants means that each person gets 3 dispensations every 2 years, which means 1,768,980 dispensations being issued every 2 years, or approximately 884,490 dispensations every year. Remember, the entire English monarchy only issued 424,020 dispensations.  So every year, even after all the litigation over DACA, the executive branch in this "constitutional republic" is still issuing over twice the number of dispensations granted by all the English monarchs, ever. This is

---

[26] *Texas et. al v. United States et al.*, 549 F.Supp.3d 572, 2021 U.S. Dist. LEXIS 133114, 2021 WL 3025857, Civil Action No. 1:18-CV-00068 (2021); *State of Texas et al. v. United States et al*, 5th Circuit Court of Appeals, Case 21-40680, decision filed 10/5/2022.

[27] *Count of Active DACA Recipients By Month of Current DACA Expiration As of September 30, 2022.* Available at https://www.uscis.gov/sites/default/files/document/data/Active_DACA_Recipients_Sept_FY22_qtr4.pdf

outrageous and must cease. Therefore, the constitutional issue of the dispensing power is unavoidable in this case.

### XI.    The Reliance Interest Must Yield To the Necessity of Stopping The Monstrous Unconstitutionality of the DACA Final Rule

Existing DACA has been preserved by the Fifth Circuit because the Supreme Court has declared that DACA recipients have a reliance interest in their grants.[28] But I find no mention of the dispensing power in the Supreme Court's decision, nor in any of the briefs, nor in the oral argument transcript. The Supreme Court may not have been aware of the relevance of the dispensing power. By the concepts developed in this brief, the decision of the Supreme Court in *DHS v. Regents* was wrong. The Final Rule continues the monstrous unconstitutionality of the American presidency wielding a dispensing power greater than all the English monarchs combined, ever. The reliance interest of the DACA recipients must yield to the constitutional issue. What about the reliance interest of 300 million citizens and tens of millions of legal immigrants on the rule of law? Because of the importance of the rule of law for economic growth, ending DACA in its entirety is in the best interest of the DACA recipients as well.

---

[28] *DHS v. Regents of the University of California*, 140 S.Ct. 1891, U.S. Supreme Court  slip opinion (Decided 6/18/2020) at p. 1913 and at pp. 23-26 of the slip opinion.

Moreover, this writer can suggest a way to protect the ability of the DACA recipients to work for a period of some years if the Final Rule is voided. First, it is perfectly lawful for DHS to exercise its discretion to refrain from deporting former DACA recipients on a case-by-case basis as they are encountered in normal enforcement operations. (The problem is the handing over of a document to an entire class of persons in violation of the law guaranteeing that they will face no consequences). Next, the I-9 requirements of the work permit and attestation are only required to work as a formal "employee." A Member of an LLC is not legally an employee of the LLC. DACA recipients can form an LLC with 1 to 3 Members, and a business wishing to "hire" them will contract with the LCC for the services. The contracting business pays the LLC. No need to hire anybody as an employee. The hundreds of companies that have participated in amicus briefs supporting DACA must step up to pay the expenses to form the LLCs. The DACA recipients must not mention their status, otherwise the contracting business will "know" they are not authorized to work and would be required not to contract with that LLC. It would be a "don't ask, don't tell" situation. It appears this temporary arrangement is something DHS actually does have the discretion to allow.

Dated: February 7th, 2023                    Respectfully Submitted,

Charles Breiterman
N.Y. Bar #4513685
45 East 89 Street #24B
New York, NY 10128
Tel. 917-528-0474
email: BreitermanLaw@gmail.com

## CERTIFICATE OF COMPLIANCE

Microsoft Word gives a word count of 6,488 words for this brief. Federal Rule of Appellate Procedure (FRAP) 29(a)(5) states "Length. Except by the court's permission, an amicus brief may be no more than one-half the maximum length authorized by these rules for a party's principal brief."  FRAP 32(a)(7)(B) states, "(i) A principal brief is acceptable if it:
• contains no more than 13,000 words." One-half of 13,000 is 6,500, and this brief is below that number. Therefore, the brief is incompliance.

Charles Breiterman

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of February, 2023, I caused this document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Charles Breiterman