**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:18-CV-68 |
| | ) |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| KARLA PEREZ, *et al.*, | ) |
| | ) |
| Defendant-Intervenors, | ) |
| and | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| Defendant-Intervenor. | ) |

**<u>DEFENDANT-INTERVENOR STATE OF NEW JERSEY'S OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ...............................1

SUMMARY OF THE ARGUMENT ...........................................................................................1

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ...............................3

    A.  DHS Enacts The DACA Policy With The 2012 Napolitano Memo In
Accordance With The Agency's Longstanding Practice Of Regulatory
Deferred Action .............................................................................................................3

    B.  Plaintiffs Challenge The 2012 DACA Memo Nearly Six Years After
Its Issuance, And Multiple Courts Recognize The Reliance Interests
That Developed In The Interim.......................................................................................6

    C.  This Court Vacates The 2012 Memo But Partially Stays Its Order,
Recognizing The Significant Reliance Interests At Stake ..............................................9

ARGUMENT

    I.     THE FINAL RULE IS NOT ARBITRARY AND CAPRICIOUS .......................11

        A.  Plaintiffs' Challenge Disregards The Final Rule's Significant
Benefits .................................................................................................12

            i.     Plaintiffs Disregard The Extraordinary Reliance Interests
At Stake....................................................................................13

            ii.    Plaintiffs Disregard A Wide Range Of Benefits Arising
From DACA................................................................................15

            iii.   Plaintiffs Incorrectly Argue That DHS Is Foreclosed
From Considering The Final Rule's Significant
Economic Benefits .......................................................................17

        B.  Plaintiffs' Arguments Concerning The Costs Of The Final Rule
Lack Support In The Administrative Record....................................................21

    II.    THE FINAL RULE IS SUBSTANTIVELY VALID.............................................24

    III.   THIS COURT SHOULD REJECT PLAITIFFS' PROPOSED REMEDY...........28

A.  This Court Should Retain Its Stay Pending Appeal.........................................29

B.  Beyond The Stay, Any Remedy This Court Orders Should
Accommodate The Extraordinary Reliance Interests Generated
By DACA.............................................................................................................33

C.  This Court Should Remand To DHS To Provide The Agency
An Opportunity To Address The Extraordinary Reliance
Interests Engendered By DACA....................................................................41

CONCLUSION.......................................................................................................43

## TABLE OF AUTHORITIES

**Pages**

<u>Cases</u>

*Abbott Laboratories v. Gardner,*
  387 U.S. 136 (1967) ..................................................................................................35

*Abraham v. Alpha Chi Omega,*
  708 F.3d 614 (5th Cir. 2013) ...................................................................................35

*Alcatel USA, Inc. v. DGI Techs., Inc.,*
  166 F.3d 772 (5th Cir. 1999) ...................................................................................34

*Andrade v. Lauer,*
  729 F. 2d 1475 (D.C. Cir. 1984) .............................................................................37

*Arizona v. United States,*
  567 U.S. 387 (2012) .............................................................................................3, 18

*Armco, Inc. v. Armco Burglar Alarm Co., Inc.,*
  693 F.2d 1155 (5th Cir. 1982) .................................................................................35

*Arpaio v. Obama*,
  27 F. Supp. 3d 185 (D.D.C. 2014) .............................................................................3

*Associated Builders & Contractors of Tex., Inc. v. Nat'l Labor Relations Bd.*,
  826 F.3d 215 (5th Cir. 2016) ...................................................................................12

*Aurelius Inv., LLC v. Puerto Rico,*
  915 F.3d 838 (1st Cir. 2019) ...................................................................................36

*Batalla Vidal v. Nielsen*,
  279 F. Supp. 3d 401 (E.D.N.Y. 2018) .......................................................................6

*Collins v. Lew*,
  --- F. Supp. 3d ---, No. 4:16-cv-03113, 2022 WL 17170955 (S.D. Tex. Nov. 21, 2022)...........39

*Collins v. Yellen*,
  141 S. Ct. 1761 (2021) ..................................................................................35, 39, 40

*Collum v. Edwards*,
  578 F.2d 110 (5th Cir. 1978) ...................................................................................34

*Connor v. Williams*,
   404 U.S. 549 (1972) ................................................................36

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
   538 F.3d 1172 (9th Cir. 2008) ...................................................22

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
   140 S. Ct. 1891  (2020) ...................................................... *passim*

*Drozd v. INS*,
   155 F.3d 81 (2d Cir. 1998) .......................................................36

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ................................................................34

*EME Homer City Generation, L.P. v. EPA*,
   795 F.3d 118 (D.C. Cir. 2015) ..................................................36

*Fano v. O'Neill*,
   806 F.2d 1262 (5th Cir. 1987) ..................................................36

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021) ............................................................11

*FMC Corp. v. United States*,
   853 F.2d 882 (Fed. Cir. 1988) ..................................................36

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ......................................................11

*Heckler v. Community Health Servs.*,
   467 U.S. 51 (1984) ..................................................................12

*Judulang v. Holder*,
   565 U.S. 42 (2011) ..................................................................17

*Lemon v. Kurtzmann*,
   411 U.S. 192 (1973) ................................................................33

*Luminant Generation Co., LLC v. EPA*,
   675 F.3d 917 (5th Cir. 2012) ....................................................12

*Michigan v. EPA*,
   576 U.S. 743 (2015) ................................................................11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983) ...........................................................................................18

*NAACP v. Trump*,
  298 F. Supp. 3d 209 (D.D.C. 2018) ....................................................................6

*New York v. Cathedral Academy*,
  434 U.S. 125 (1977) .........................................................................................33

*Nofire v. United States*,
  164 U.S. 657 (1897) .........................................................................................37

*Norton v. Shelby Cty.*,
  118 U.S. 425 (1886) .........................................................................................37

*Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*,
  140 S. Ct. 1649 (2020) .....................................................................................37

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014) .........................................................................................35

*Radiator Specialty Co. v. Pennzoil-Quaker State Co.*,
  207 F. App'x 361 (5th Cir. 2004) .....................................................................33

*Regents of Univ. of Cal. v. United States Dep't of Homeland Sec.*,
  279 F. Supp. 3d 1011 (N.D. Cal. 2018) ..............................................................6

*Rondeau v. Mosinee Paper Corp.*,
  422 U.S. 49 (1975) .......................................................................................9, 33

*Ryder v. United States*,
  515 U.S. 177 (1995) .........................................................................................37

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  239 F. Supp. 3d 77 (D.D.C. 2017) ....................................................................35

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002) ...........................................................................38

*Swann v. Charlotte–Mecklenburg Bd. of Educ.*,
  402 U.S. 1 (1971) .............................................................................................34

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) .............................................................................6

*Texas v. United States*,
  86 F. Supp. 3d 591 (S.D. Tex. Feb. 16, 2015) ...................................................................5

*Texas v. United States*,
  328 F. Supp. 3d 662 (S.D. Tex. Aug. 31, 2018) .......................................7, 14, 30, 38

*Texas v. United States*,
  549 F. Supp. 3d 572 (S.D. Tex. July 16, 2021) ................................................ *passim*

*Texas v. United States*,
  No. 18-0068, 2021 WL 3022434 (S.D. Tex. July 16, 2021) ......................9, 10, 30, 33

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ...................................................................................10, 30

*United States v. Texas*,
  136 S. Ct. 2272 (2016) ..............................................................................................6

*United States v. Texas*,
  No. 22-58 (argued Nov. 29, 2022) ..........................................................................29

*Watkins v. U.S. Army*,
  875 F.2d 699 (9th Cir. 1989) ...................................................................................36

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) .............................................................................................26

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7, 32 (2008) ..........................................................................................35,36

*Wisconsin v. EPA*,
  938 F.3d 303 (D.C. Cir. 2019) ................................................................................36

## Statutes

5 U.S.C. § 706...............................................................................................................1

6 U.S.C. § 202..........................................................................................................3, 25

8 U.S.C. § 1103.......................................................................................................3, 4, 25

8 U.S.C. § 1154(a)(1)(A)(iii)(II)(aa)(CC)..................................................................40

8 U.S.C. § 1182.......................................................................................................27, 28

8 U.S.C. § 1225 ..................................................................................................18

8 U.S.C. § 1226(a)(3) ...........................................................................................4

Consolidated Appropriations Act 2014,
  Pub. L. No. 113-76, sec. 8, tit. II, 128 Stat. 5 ...............................................4

Immigration Act of 1990,
  Pub. L. No. 101-649, Tit. III, § 301, 104 Stat. 4978 ....................................26


Rules and Regulations

8 C.F.R. § 236.2 ................................................................................................ 40

8 C.F.R. § 274a.12 ...............................................................................4, 18, 26

86 Fed. Reg. 53,736 (proposed Sept. 28, 2021)........................................10

87 Fed. Reg. 53,152 ................................................................... *passim*

**STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT**

On January 31, 2023, Plaintiffs moved for summary judgment, asking this Court to declare the Department of Homeland Security's (DHS) 2022 Final Rule, *Deferred Action for Childhood Arrivals* (DACA), 87 Fed. Reg. 53,152 (Aug. 30, 2022), unlawful and set it aside under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2). Defendant-Intervenor New Jersey now opposes that motion and cross-moves for summary judgment. The Court must determine whether to grant summary judgment, and whether to grant the remedies Plaintiffs seek. In particular, this includes deciding whether Plaintiffs' proposed remedy sufficiently accounts for the extraordinarily disruptive impact eliminating DACA would have on the reliance interests of DACA recipients and their families, their U.S. citizen children, employers, and state and local governments, all of which developed in part due to Plaintiffs' own nearly-six-year delay in bringing this action.

**SUMMARY OF THE ARGUMENT**

Plaintiffs are not entitled to the relief they seek for the following reasons:

I.       The Final Rule is not arbitrary and capricious because the Final Rule is reasonable and reasonably explained. As the administrative record confirms, Congress has not equipped DHS with sufficient resources to remove all of the more than 11 million undocumented noncitizens who currently live in the United States. DHS explained in the Final Rule how DACA enables the agency to focus its limited enforcement resources on the removal of dangerous criminal offenders and on confronting threats to national security by making eligible for deferred action on a case-by-case basis those individuals who arrived in the United States as young people with no significant criminal history, who pose no national security threat, and who are valued members of our communities. Plaintiffs focus their attack on the Final Rule's cost-benefit analysis, painting a distorted picture of the Final Rule that presents all costs and no benefits. But Plaintiffs do so only

1

by improperly disregarding the Final Rule's benefits, including to accommodate the extraordinary reliance interests that DACA recipients have on a policy that induced them to provide personal information to the government and that allowed them to live openly and to work in this country for over a decade—as well as the extraordinary reliance that further inures to families, U.S. citizen children, employers, and state and local governments. And even on their face, Plaintiffs' arguments concerning the costs of the Final Rule lack support in the actual administrative record.

II.     Plaintiffs err in arguing that the Final Rule is substantively invalid, because DACA is consistent with DHS's own longstanding practice under the Immigration and Nationality Act (INA) of granting and administering deferred action policies. Although the Court has already ruled that the 2012 DACA policy is foreclosed by the INA, the subsequent Final Rule provides additional information and context that further bolsters the United States' and Intervenors' argument that DACA lies well within DHS's prosecutorial discretion authority and its long and unbroken history of deferred action policies. The administrative record details not only prior policies involving forbearance from removal but also explains the decades-old policies, established by separate and longstanding federal regulations that were not challenged in this case, that link deferred action to employment authorization. The Final Rule further shows that DHS has made no special allowance for DACA recipients as to advance parole, which it grants on a case-by-case basis in accordance with criteria set forth by a separate statute, which also is not challenged in this action.

III.     Finally, even if this Court believes that Plaintiffs are entitled to summary judgment and that the Final Rule is unlawful, it should reject Plaintiffs' draconian remedial demands, which would wreak havoc on DACA recipients, their families, their U.S. citizen children, employers, and state and local governments all across the Nation. As an initial matter, this Court should retain its stay pending appeal, consistent with its prior order in this litigation and with the Fifth Circuit's

affirmance. Moreover, should this Court reach the question of what remedy would be appropriate at the end of the case, when appeals have concluded, it should reject Plaintiffs' dramatic demand and instead craft an equitable remedy that protects the extraordinary reliance interests at stake— reliance interests this Court and the Supreme Court have repeatedly recognized. At the very least, this Court should permit DHS, which is best equipped to weigh the complex policy interests at issue, to craft the appropriate remedy to best accommodate these reliance interests.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

**A.    DHS Enacts The DACA Policy With the 2012 Napolitano Memo In Accordance With The Agency's Longstanding Practice Of Regulatory Deferred Action.**

The Secretary of DHS is charged by Congress with administering and enforcing federal immigration laws and "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5); *see also* 8 U.S.C. § 1103(a)(1). Establishing enforcement priorities is necessary because there are over 11 million undocumented immigrants in the United States, but Congress appropriated only enough funds to remove 400,000 each year. *See* 87 Fed. Reg. 53,185; *Arpaio v. Obama*, 27 F. Supp. 3d 185, 192-93 (D.D.C. 2014). In fact, federal immigration authorities have not had sufficient resources to meet even this target, averaging 235,120 removals from 2016-2020, and removing only 59,011 noncitizens in 2021, when operations were hampered by the COVID-19 pandemic. 87 Fed. Reg. 53,185. Given this reality, "[a] principal feature of the removal system" in the United States is "the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012). "Federal officials . . . must decide whether it makes sense to pursue removal at all," and whether to afford an alien "discretionary relief allowing [them] to remain in the country." *Id.* In exercising such discretion, the Supreme Court has held, DHS may be guided by "immediate human concerns" as well as the need to prioritize limited resources. *Id.* After all, Congress authorized the DHS Secretary to "perform such . . . acts as he deems necessary

3

for carrying out his authority," 8 U.S.C. § 1103(a)(3), and to prioritize removals of criminal aliens and aliens detained at the border. *See* Consolidated Appropriations Act 2014, Pub. L. No. 113-76, sec. 8, tit. II, 128 Stat. 5, 251; 8 U.S.C. § 1225.

DHS's authority to manage and prioritize enforcement efforts includes "deferred action," a well-recognized practice of "administrative convenience to the government which gives some cases lower priority." 8 C.F.R. § 274a.12(c)(14). Dating back to the 1950s, the Executive Branch has established more than 20 policies for exercising deferred action or other forms of prosecutorial discretion to forbear from removal particular classes of undocumented immigrants from the United States. Early examples of such policies include: (a) President Eisenhower's parole of Hungarian refugees, Ex. 1 (NJAPP002); (b) the parole of more than 600,000 Cubans in the United States through a series of discretionary programs that took place over the course of four Presidential administrations, Ex. 2 (NJAPP007); and (c) President Kennedy's establishment of the Hong Kong Parole Program, which provided extended voluntary departure to 15,000 refugees, Ex. 3 (NJAPP015-16). More recently, the "Family Fairness" policies of 1987 and 1990 allowed for both forbearance and work authorization for up to 1.5 million undocumented spouses and children of legalized immigrants or those in the process of legalizing their status, or about 40% of the undocumented population at that time. *See* Ex. 4 (NJAPP039-40); Ex. 5 (NJAPP065-67). *See also* 87 Fed. Reg. at 53187-91 (describing similarities between Family Fairness policies and DACA). And deferred action has long included eligibility for work authorization on a case-by-case basis, pursuant to a longstanding rule, 8 C.F.R. § 274a.12(c)(14). Congress has repeatedly encouraged such use of deferred action for decades and has never passed any laws to encumber it.

On June 15, 2012, DHS Secretary Janet Napolitano issued a Memorandum laying out criteria to be considered when evaluating whether to defer removal of what DHS considered "low

enforcement priorit[y]" undocumented immigrants, namely "'certain young people who were brought to [the United States] as children and know only this country as home.'" 87 Fed. Reg. 53,153 (quoting Memorandum from Janet Napolitano, Sec'y of Homeland Sec., to David Aguilar, Acting Comm'r, U.S. Customs and Border Prot., et al., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) (hereinafter Napolitano Memo or 2012 DACA Memo)), Ex. 6 (NJAPP069-71). Said another way, the Napolitano Memo allowed certain young people born outside the United States and raised in this country to apply for deferred action. Much like previous deferred actions, the Napolitano Memo specified requests were "to be decided on a case by case basis," and it "confer[red] no substantive right, immigration status or pathway to citizenship" for anyone. Ex. 6 (NJAPP070-71). Importantly, Plaintiffs here did not file any legal challenge to the Napolitano Memo when it was issued in 2012.

Two years later, DHS Secretary Jeh Johnson issued a separate memorandum: *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* (November 14, 2014) (hereinafter Johnson Memo or DAPA Memo), Ex. 7 (NJAPP073-77). The Johnson Memo established deferred action for undocumented parents of U.S. citizens or lawful permanent residents, and it expanded DACA in certain respects. Ex. 7 (NJAPP075-76). Texas and several other states sued DHS over the Johnson Memo but again declined to challenge the Napolitano Memo. *See Texas v. United States*, 86 F. Supp. 3d 591, 604-15 (S.D. Tex. Feb. 16, 2015).

On February 16, 2015, this Court granted Plaintiffs' motion for a preliminary injunction and enjoined the Johnson Memo. *See id.* at 677-78. A divided Fifth Circuit panel affirmed, *see*

*Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (hereinafter *Texas I*), and the Supreme

Court affirmed by an equally divided Court. *See United States v. Texas*, 136 S. Ct. 2272 (2016).

During this period, DACA recipients continued to reasonably rely on the unchallenged DACA

policy in providing their information to the government, obtaining stable jobs, starting families,

and otherwise building their lives in this country.

**B.      Plaintiffs Challenge The 2012 DACA Memo Nearly Six Years After Its Issuance, And Multiple Courts Recognize The Reliance Interests That Developed In The Interim.**

After President Trump took office, DHS Secretary John Kelly rescinded the Johnson Memo

but left the Napolitano Memo in place. *See* Ex. 8 (NJAPP080). On June 29, 2017, more than five

years after issuance of the Napolitano Memo, Texas and ten other states wrote to Attorney General

Jeff Sessions, asserting for the very first time that the Napolitano Memo is illegal and threatening

to challenge it in this Court if the United States did not rescind it by September 5, 2017. Ex. 9

(NJAPP083-85). On September 5, 2017, Acting Secretary of Homeland Security Elaine Duke

issued a memorandum rescinding the Napolitano Memo. *See* Ex. 8 (NJAPP79-81).

Various plaintiffs (including twenty States and the District of Columbia) filed lawsuits in

six federal courts seeking to enjoin the rescission. Those cases led to three nationwide injunctions.

*See Regents of Univ. of Cal. v. United States Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1048

(N.D. Cal. 2018); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 437 (E.D.N.Y. 2018); *NAACP v.

Trump*, 298 F. Supp. 3d 209, 215-16 (D.D.C. 2018). In the wake of these nationwide injunctions,

on May 1, 2018, Texas and seven other states filed the instant lawsuit—five years, ten months,

and sixteen days after the 2012 DACA Memo was first issued. Plaintiffs alleged that the 2012

DACA Memo was unlawful and sought both (1) "[a]n order enjoining Defendants from issuing or

renewing any DACA permits in the future," and (2) a declaratory judgment that DACA is

unlawful. Dkt. 1 at 73 (Complaint); *see also* Dkt. 104 at 73 (Amended Complaint). On May 2,

2018, Plaintiffs filed a motion for a preliminary injunction, in which they sought to "enjoin the 2012 memorandum creating DACA" on a nationwide basis. Dkt. 5 at 13.

Defendant-Intervenors opposed the request for preliminary relief, and this Court denied the motion. *Texas v. United States*, 328 F. Supp. 3d 662, 741 (S.D. Tex. Aug. 31, 2018) (hereinafter *Texas II*). In its ruling, this Court indicated its belief that the Napolitano Memo violated the INA, but also identified multiple open questions of fact—including conflicting evidence as to whether individual decision-makers in DHS were allowed to exercise, and were in fact exercising, discretion in adjudicating requests pursuant to governing SOPs. *See id.* at 734 (noting "individuals screening the applications may have some discretion"). As a result, this Court determined Plaintiffs had not made the "clear showing" necessary to carry their burden on this point. *Id.* at 735; *see also id.* at 736-37 (open question as to nature and extent of any economic harm incurred by Texas).

This Court further found that the balance of harms and the public interest weighed against injunctive relief, especially given Plaintiffs' almost six-year delay in filing the suit, and Defendant-Intervenors' reliance on such inaction and the existence of grants of deferred action in the interim. *Id.* at 738-40, 742. The Court recognized the "immediate effects" an injunction would have on individual recipients who rely upon deferred action for "their ongoing lawful status and their ability to work," and "their ability to travel within the United States and many other benefits that flow from lawful presence." *Id.* at 741. The Court found that enjoining the 2012 DACA Memo would harm New Jersey and other states, cities, and employers who "could lose residents whom they consider to be valuable members of their communities or employees who are integral to various schools, municipalities, and industries." *Id.* This Court ultimately held that a preliminary injunction should not issue because "the egg has been scrambled. To try to put it back in the shell

with only a preliminary injunction record, and perhaps at great risk to many, does not make sense nor serve the best interests of this country." *Id.* at 742.

While discovery in this matter was ongoing, the Supreme Court decided the consolidated cases challenging DHS's rescission of the Napolitano Memo. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (hereinafter *Regents*). The Court held that this rescission was arbitrary and capricious. In particular, the Court reached that conclusion because DHS "failed to address whether there was 'legitimate reliance'" on the grants of deferred action. *Id.* at 1913. The Court noted that "[w]hen an agency changes course, as DHS did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* (quotation marks omitted). The Court highlighted the "noteworthy concerns" that the respondents and amici had emphasized, including: that "DACA recipients have 'enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on [DACA]"; the impacts that rescission of DACA would have on "recipients' families, including their 200,000 U.S.-citizen children," "the schools where DACA recipients study and teach," and "the employers who have invested time and money in training them"; and the extreme economic consequences of excluding these recipients from the labor force, including an annual loss of $1.25 billion in state and local tax revenue. *Id.* at 1914.

The Court explained that, had DHS properly considered these reliance interests, it might have considered providing "a broader renewal period based on the need for DACA recipients to reorder their affairs," granting "more accommodating termination dates for recipients caught in the middle of a time-bounded commitment" such as a course of study, military service, or medical treatment, or "instruct[ing] immigration officials to give salient weight to [] reliance interests . . . when exercising individualized enforcement discretion." *Id.* While DHS was not required to adopt

any of these suggestions, the Court held that its failure to even consider "accommodating particular reliance interests" was arbitrary. *Id.* at 1914-15. The Court remanded the issue back to DHS to determine the proper approach, reasoning that "deciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding concerns a program with the breadth of DACA. Those policy choices are for DHS." *Id.* at 1910.

### C. This Court Vacates the 2012 Memo But Partially Stays Its Order, Recognizing The Significant Reliance Interests At Stake.

After *Regents*, Plaintiffs and the individual Defendant-Intervenors cross-moved for summary judgment, and, on July 16, 2021, this Court granted partial summary judgment in Plaintiffs' favor. *Texas v. United States*, 549 F. Supp. 3d 572, 624 (S.D. Tex. July 16, 2021) (hereinafter *Texas II*). It found the 2012 DACA Memo procedurally unlawful for failing to undergo notice-and-comment rulemaking, *id.* at 603, and substantively unlawful under the INA, *id.* at 621. This Court permanently enjoined and vacated the 2012 DACA Memo, remanding the matter to DHS for further consideration, and permanently enjoining DHS from granting new requests. *Texas v. United States*, No. 18-0068, 2021 WL 3022434, at *2 (S.D. Tex. July 16, 2021) (hereinafter *Texas II*).

With respect to renewal requests for existing DACA recipients, this Court partially stayed its injunction, recognizing that any equitable remedy must be molded "'to the necessities of the particular case'" using "'[f]lexibility rather than rigidity,'" and that "the 'qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs.'" *Id.* at *1 (quoting *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61 (1975)). Acknowledging the reality that "[h]undreds of thousands of individual DACA recipients and others … have relied upon [the DACA policy] for almost a decade," *Texas II*, 549 F. Supp. 3d at 624, the Court stayed the order of immediate vacatur and the permanent injunction,

reasoning that "it is not equitable for [DACA, which] has engendered such significant reliance to terminate suddenly." *Texas II*, 2021 WL 3022434, at *2.

Defendants and Defendant-Intervenors appealed, Dkt. 581-583 (Notices of Appeal), and DHS issued a notice of proposed rulemaking concerning the DACA policy, *Deferred Action for Childhood Arrivals*, 86 Fed. Reg. 53,736 (proposed Sept. 28, 2021), and subsequently issued the Final Rule, 87 Fed. Reg. 53,152 (Aug. 30, 2022) (to be codified at 8 C.F.R. pts 106, 236, and 274a). The Final Rule largely retains the Napolitano Memo's threshold criteria for eligibility for deferred action under DACA. 87 Fed. Reg. 53,183. In the Final Rule, DHS provides a lengthy discussion of DACA's costs and benefits—including its impacts on DACA recipients and their families, workers, the economy, state and local governments, businesses, employers, and other institutions—and gives considerable attention to the issues previously raised in this litigation by this Court and in the Fifth Circuit.

On October 5, 2022, the Fifth Circuit affirmed this Court's decision in part, agreeing the 2012 DACA Memo was procedurally and substantively unlawful. *Texas v. United States*, 50 F.4th 498, 524, 528 (5th Cir. 2022). However, in light of the intervening issuance of the Final Rule, the Fifth Circuit remanded to this Court "for further proceedings that the parties may pursue regarding the Final Rule," which, the panel observed, "does not, of course, foreclose remanding to DHS upon review of the Final Rule in any future proceedings." *Id.* at 512. The Fifth Circuit also agreed with and thus continued the partial stay of this Court's vacatur and injunction for renewals, "pending a further order of this court or the Supreme Court," in light of both the "profound significance [of DACA] to recipients and many others in the ten years since its adoption," and "the uncertainty of final disposition and the inevitable disruption that would arise from a lack of continuity and stability." *Id.* at 531-32 (cleaned up).

On remand, Plaintiffs filed a Supplemental Complaint, Dkt. 623, and have now filed a motion for summary judgment, Dkt. 625-1, urging this Court to declare the Final Rule arbitrary and capricious under the APA, substantively contrary to the INA, and in violation of the Take Care Clause. Plaintiffs further seek to have the Final Rule "permanently and universally enjoined," including seeking an injunction not only against any new requests, but also against any renewal requests "after two years from the date of judgment." Dkt. 625-1 at 5.

## ARGUMENT

### I.    THE FINAL RULE IS NOT ARBITRARY AND CAPRICIOUS.

Confronted with the reality that Congress has not equipped Defendants with the resources to remove all of the more than 11 million undocumented noncitizens who live in the United States, DHS concluded that "it is not generally the best use of those limited resources to remove from the United States those who arrived here as young people, have received or are pursuing an education or served in the military, have no significant criminal history, do not pose a threat to national security or public safety, and are valued members of our communities," 87 Fed. Reg. 53,155, and that the overall public would be better served by a DHS policy that allows the agency to "focus its enforcement resources on the removal of dangerous criminal offenders and other noncitizens who threaten public safety and national security," 87 Fed. Reg. 53,186.

That policy reflects an exercise in "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015); *see FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158, 1160 (2021) (reviewing court must not "substitute" its "own policy for that of the agency" and agency action should be upheld if it is reasonable and reasonably explained"). Although Plaintiffs attack DHS's accounting of costs and benefits, Dkt. 625-1 at 21-25, the agency is entitled to deference on that question, and Plaintiffs have not met their high burden. *See Huawei Techs. USA, Inc. v. FCC*, 2

F.4th 421, 452 (5th Cir. 2021) (noting "cost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency"). As explained below, the Final Rule sets forth in detail how its benefits far exceeded its costs, including the core benefit of preserving "not only DACA recipients' substantial reliance interests, but also those of their families, schools, employers, faith groups, and communities." 87 Fed. Reg. 53,270. DHS's detailed explanation of its cost-benefit analysis does far more than enough to satisfy the APA. *See Associated Builders & Contractors of Tex., Inc. v. Nat'l Labor Relations Bd.*, 826 F.3d 215, 228-29 (5th Cir. 2016) (agency did not violate the APA arbitrarily when it "articulate[d] a rational relationship between the facts found and the choice made").[1] It is Plaintiffs who ignore myriad significant benefits, and assert costs that lack support.

### A.   Plaintiffs' Challenge Disregards The Final Rule's Significant Benefits.

An arbitrary-and-capricious challenge requires this Court to engage in a "holistic review" of an agency's analysis. *See Luminant Generation Co., LLC v. EPA*, 675 F.3d 917, 926-27 (5th Cir. 2012). Plaintiffs' challenge does no such thing. Plaintiffs argue the costs of the Final Rule exceed its benefits based exclusively on their view of the labor market. Dkt. 625-1 at 24. Although those asserted flaws are themselves erroneous, *see infra* at Part I.B, that cramped picture also fails to engage with the actual cost-benefit analysis before DHS. Indeed, Plaintiffs charge DHS with misapplying its cost-benefit calculus, but err on benefits in three ways: they ignore benefits to

---

[1] In addition to challenging the Final Rule's cost-benefit analysis, Plaintiffs argue that the Final Rule "fail[s] to consider the legality of [the] employment authorization [attendant to the lawful presence provided by DACA] in light of the limited nature of Congress's permissions for such authorizations for different categories of aliens." Dkt. 625-1 at 25. This is little more than a rehash of Plaintiffs' argument that the Final Rule is substantively invalid under the INA. However, as discussed further *infra*, the Final Rule does not fail to consider this issue, but rather addresses it squarely and at length, 87 Fed. Reg. 53,191-92, explaining that the agency continues to respectfully disagree with Plaintiffs' position on that statutory question.

reliance interests, ignore other material and significant benefits, and incorrectly refuse to consider certain economic benefits from the Final Rule. Their approach thus cannot withstand scrutiny.

          i.    *Plaintiffs Disregard The Extraordinary Reliance Interests At Stake.*

"A central goal of [the Final Rule] is to respect reliance interests." 87 Fed. Reg. 53,183. In its Final Rule, DHS identified the reliance interests engendered by DACA's continued existence, enabled by Plaintiffs' failure to promptly challenge it, over the past decade. 87 Fed. Reg. 53,154; *see Texas II*, 549 F. Supp. 3d at 624 (noting in 2021 that "DACA recipients and others" had by then already "relied upon th[e] [DACA policy] for almost a decade"). "Such interests ... include not only the reliance interests of DACA recipients, but also those indirectly affected by DHS's actions, including DACA recipients' family members, employers, schools, and neighbors, as well as the various States and their other residents." 87 Fed. Reg. 53,289. The agency thus considered "the real-world decisions that approximately 825,000 DACA recipients and their families, employers, schools, and communities have made over the course of more than 10 years of the policy being in place." 87 Fed. Reg. 53,166. Its calculus included that "[o]ver 250,000 children have been born in the United States with at least one parent who is a DACA recipient, and about 1.5 million people in the United States share a home with a DACA recipient." 87 Fed. Reg. 53,154; *see also* 87 Fed. Reg. 53,164 (noting DACA has had "a positive impact on recipients' ability" to "maintain family unit[s] and make contributions to their communities").

DHS found that DACA recipients and their family members—relying on DACA—have become active members of their communities, increasing their civic engagement and investing in both their careers and education. 87 Fed. Reg. 53,154. DACA "recipients have enrolled in degree programs, started businesses, obtained professional licenses, and purchased homes." *Id.* They "achieved a significantly higher level of educational attainment than would likely have occurred

without the DACA policy." 87 Fed. Reg. 53,164. And "[m]any DACA recipients report that deferred action—and the employment authorization that [the] DACA [policy] permits them to request—[has] allowed them to obtain their first job or move to a higher paying position more commensurate with their skills." 87 Fed. Reg. 53,154.

The ability for recipients to enter the workforce and invest in their careers and education has created further reliance interests for States and employers. *See Texas II*, 328 F. Supp. 3d at 741 (noting "States, cities, and employers" now rely on "residents whom they consider to be valuable members of their communities or employers who are integral to various schools, municipalities, and industries"). The Final Rule observes that, because DACA recipients have work authorization, employers rely on them to address difficult-to-satisfy needs, especially in the healthcare field and for employers who need bilingual employees. *See* 87 Fed. Reg. 53,169; 87 Fed. Reg. 53,154 (increased number of healthcare workers); 87 Fed. Reg. 53,176 (teachers). DHS also found that employers have a "substantial reliance interest in the continued employment of employees in whom they have made significant tangible and intangible investment." 87 Fed. Reg. 53,195; 87 Fed. Reg. 53,171; 87 Fed. Reg. 53,174-75.

DHS also identified States' reliance interests in DACA. "Some States have relied on the existence of DACA in setting policies regarding eligibility for driver's licenses, in-state tuition, State-funded healthcare benefits, and professional licenses." 87 Fed. Reg. 53,289. State employers, like private employers, have also invested significant time and money in training DACA recipients as employees. 87 Fed. Reg. 53,172 (noting evidence that States' reliance interests would be harmed by terminating DACA because States "would lose the critical skills of these employees, while also incurring costs associated with terminating their employment, ... hiring, and training their replacements"). And, because recipients have been able to invest in their education, public colleges

14

and universities "have relied upon the existence of the DACA policy over the course of 10 years in the form of DACA recipients' tuition payments and academic and research contributions." 87 Fed. Reg. 53,176; *see also* 87 Fed. Reg. 53,196 (noting that "[b]y helping to lessen the financial burden of pursuing higher education ... work authorization makes available to DACA recipients many educational and professional opportunities that otherwise would have remained out of reach").

The Final Rule preserves these reliance interests by maintaining both deferred action and work authorization. 87 Fed. Reg. 53,194-95. DHS considered decoupling forbearance and work authorization, *see infra* at 23-24, and determined this approach would gravely harm the reliance interests of DACA recipients, their employers, family members, and communities because it is the pairing of the two that has allowed "DACA recipients, on balance, [to] overwhelmingly make positive contributions to this nation." 87 Fed. Reg. 53,195. By providing for both forbearance and work authorization, the Final Rule allows DACA recipients to continue to "lawfully ... support themselves and their families instead of risking potential exploitation in the shadow economy" and also "serves businesses' substantial reliance interest in the continued employment of employees in whom they have made significant tangible and intangible investments." *Id.*

        ii.        *Plaintiffs Disregard A Wide Range Of Benefits Arising From DACA.*

Because Plaintiffs look only at the labor market, they fail to consider a range of material and significant benefits from DACA—ones that expressly played a significant role in DHS's own evaluation of the Final Rule. Beyond economic costs and benefits, which are discussed below, the Final Rule identified—and the administrative record confirms—myriad benefits, including to both law enforcement operations and educational institutions. 87 Fed. Reg. 53,169-80. As for the above-described benefits to recipients and families, Plaintiffs fail to address these.

Law enforcement. A primary rationale animating the Final Rule's exercise of enforcement discretion is that by not focusing resources on deportation of DACA recipients, Defendants could instead "focus the Department's limited immigration enforcement resources on threats to national security, public safety, and border security where they are most needed." 87 Fed. Reg. 53,271. As such, the Final Rule enables Defendants to better fulfill Congress's directive to the DHS Secretary "to prioritize national security, public safety, and border security." 87 Fed. Reg. 53,179.

Benefits also redound to other forms of law enforcement, including at the state and local levels. As the Final Rule explains, DACA "mitigates a dilemma faced by those without lawful status": "by virtue of the measure of assurance provided by the DACA policy, DACA recipients are more likely to proactively engage with law enforcement in ways that promote public safety." 87 Fed. Reg. 53,173. Put another way, "the DACA policy may increase recipients' willingness to report crimes by deferring the possibility of immediate removal and thereby ameliorating the risk that approaching law enforcement would expose the recipient to an immigration enforcement action." 87 Fed. Reg. 53,180. The Final Rule notes that numerous police chiefs, prosecutors, and other law enforcement professionals have advocated for the continuation of the DACA policy. 87 Fed. Reg. 53,172 (noting evidence that "mistrust of communities toward law enforcement is a significant challenge that results in individuals being less likely to report being witnesses to or victims of crime"). The record contains a summary of the positions of these law enforcement officials, explaining that DACA benefits public safety by encouraging cooperation between immigrants and law enforcement. Ex. 10 (NJAP087).

Education. Defendants also considered the impact of DACA on schools and educational institutions when promulgating the Final Rule, finding that the DACA policy helps increase school funding and boost attendance among students. 87 Fed. Reg. 53,224. One study of DACA's effects

on educational achievement concluded that, as a result of the policy, "more than 49,000 additional Hispanic youth obtained a high school diploma, and that the gap in high school graduation between citizen and noncitizen youth in the study's sample closed by 40 percent." *Id*.

Moreover, DHS considered research that "deferred action actually saves local governments money by increasing attendance and preserving critical sources of funding to public school districts across the United States." 87 Fed. Reg. 53,224 n.93. This is because "[s]chool districts in many States receive funding based on primary and secondary school attendance," and "poor attendance rates jeopardize that funding." *Id*. "[T]he DACA policy has encouraged its recipients to makes significant investments in their education and careers," going on to "become doctors, lawyers, nurses, teachers, or engineers." 87 Fed. Reg. 53,174. In short, "the DACA policy has benefits that extend not just to the recipients themselves, but also to their communities and the United States more broadly." 87 Fed. Reg. 53,163. DHS concluded that "these benefits of the rule outweigh the potential negative impacts." 87 Fed. Reg. 53,174.

iii.    *Plaintiffs Incorrectly Argue That DHS Is Foreclosed From Considering The Final Rule's Significant Economic Benefits*.

Plaintiffs err a third time as to benefits, claiming that DHS was foreclosed from considering economic benefits associated with DACA. Plaintiffs' argue that "Congress did not intend" for DHS to consider such benefits because they flow from "the continued (or increased) presence of removable illegal aliens," which they suggest is unrelated "'to the purposes of the immigration laws or the appropriate operation of the immigration system.'" Dkt. 625-1 at 24 (quoting *Judulang v. Holder*, 565 U.S. 42, 55 (2011). But this is incorrect. Indeed, this Court urged Defendants to consider in any future rulemaking, *inter alia*, "benefits bestowed by the DACA recipients on this country and the communities where they reside" and the "the effects of DACA on the unemployed or underemployed legal residents of the states." *Texas II*, 549 F. Supp. 3d at 622-23.

Moreover, it is common sense that in choosing whether to devote limited immigration enforcement resources to removal of "dangerous criminal offenders and other noncitizens who threaten public safety and national security," 87 Fed. Reg. 53,186, or DACA recipients, DHS must consider the costs and benefits of permitting continued presence in the United States of DACA recipients as compared to other noncitizen aliens who may be eligible for deferred action. As the Final Rule notes, DACA recipients, in light of their work authorization, are employed in a wide range of occupations and make substantial contributions in taxes and economic activity. *See* 87 Fed. Reg. 53,154. Indeed, Plaintiffs' position is backwards: a *failure to consider* these important factors when evaluating forbearance policies may well have rendered the Final Rule arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (agency action arbitrary and capricious if it "entirely failed to consider an important aspect of the problem"). But the Final Rule shows that DHS comprehensively considered all the economic and labor benefits of DACA and determined they outweighed any costs. 87 Fed. Reg. 53,169-80.[2]

Economy. In promulgating the Final Rule, DHS found that "DACA recipients improve economic conditions broadly in the United States by driving innovation, starting businesses, and

---

[2] Texas further incorrectly suggests employment authorization should not be granted by regulatory action to removable aliens. *See* Dkt. 625 at 23. To the contrary, DHS regulations have long provided employment authorization to removable aliens, including those with deferred action, which is a reprieve from removal. *See* 8 C.F.R. § 274a.12(c)(14); Ex. 11 (NJAPP101)(explaining that individuals who receive deferred action are still removable). The Supreme Court has explicitly affirmed that the Executive has discretion not to remove a person who is removable. *Arizona v. United States*, 567 U.S. at 396 ("[r]eturning an alien to his own country may be deemed inappropriate even where he has committed a removable offense"). And while this Court has observed that 8 U.S.C. § 1226(a)(3) generally disallows work authorization for individuals in removal *proceedings* (as opposed to those who are removable, i.e., *eligible* for removal), *see Texas II*, 549 F. Supp. 3d at 608-09, that provision does not prohibit work authorization for removable aliens because it in fact explicitly allows for work authorization for anyone who "otherwise would (without regard to removal proceedings) be provided such authorization." 8 U.S.C. § 1226(a)(3).

employing themselves and others, thereby reducing reliance on public assistance (to the extent that such reliance is possible given eligibility restrictions) and pressure on the job market for low-skilled workers." 87 Fed. Reg. 53,170-71. Not only that, but studies indicate that DACA recipients contribute to Federal, State, and local tax revenue, as well as Medicare and Social Security. *See* 87 Fed. Reg. 53,170. DHS found that "that DACA recipients make substantial contributions in taxes and economic activities," and that "DACA recipients and their households pay approximately $5.6 billion in annual Federal taxes and approximately $3.1 billion in annual State and local taxes." 87 Fed. Reg. 53,174. Based on this data, the Final Rule found that "[t]he governments and residents of States in which DACA recipients reside benefit from increased tax revenue." *Id.*

In addition to taxes, research shows that DACA recipients hold $25.3 billion in spending power and contribute to the economy by increasing consumer spending. *See* 87 Fed. Reg. 53,170. This includes purchasing homes and making $566.7 million in annual mortgage payments, paying $2.3 billion in annual rental payments, buying cars, applying for lines of credit, and opening businesses. *See* 87 Fed. Reg. 53,170. Notably, recipients' purchasing power increases after they receive deferred action, with some studies showing that a majority of DACA recipients reported having purchased their first car after receiving deferred action. *See* 87 Fed. Reg. 53,170. This should be no surprise, as work authorization "allows individuals to leave the shadow economy and work on the books to provide for their families, thereby reducing the risk of exploitation by unscrupulous employers and distortion in our labor markets." 87 Fed. Reg. 53,195.

Labor market. DHS found "DACA recipients are employed in a wide range of occupations, including management and business, education and training, sales, office and administrative support, and food preparation," while "thousands more are self-employed in their own businesses." 87 Fed. Reg. 53,154. The Final Rule also notes that "[m]any [DACA recipients] have continued

their studies, and some have become doctors, lawyers, nurses, teachers, or engineers." *Id*. The Final Rule includes data indicating that DACA recipients have helped "fill labor gaps amid labor shortages in the United States." 87 Fed. Reg. 53,169 (noting evidence that there were "8.4 million job seekers as compared to the 10 million job openings in the United States as of September 2021"). Because 46 percent of recipients have a bachelor's degree or higher, "they are poised to contribute to the worker pool for higher-skilled jobs that U.S. employers have reported having difficulty filling with other workers." *Id*. The Final Rule observes that work authorization is critical to filling these gaps. *See* 87 Fed. Reg. 53,176 (noting evidence that "work authorization provision of DACA are critical to ensure the quality education of children").

DACA recipients' role in the labor market has been particularly crucial during the COVID-19 pandemic. 87 Fed. Reg. 53,154 (noting DACA recipients working as healthcare workers served an important role during the pandemic); 87 Fed. Reg. 53,170 (noting evidence that many DACA recipients have "have been employed in essential industries such as education, the military, and healthcare during the COVID-19 pandemic"). DACA recipients form a critical, stable, and reliable workforce that enabled retailers to continue to provide goods and services through the COVID-19 pandemic. *See* 87 Fed. Reg. 53,170. More than 200,000 DACA recipients work in occupations deemed "essential critical infrastructure workers." 87 Fed. Reg. 53,194-95. About 30,000 are healthcare workers, many of whom "helped care for their communities on the frontlines during the COVID-19 pandemic. 87 Fed. Reg. 53,224. Of significance, DHS has found that DACA recipients serving as healthcare workers "are helping to alleviate a shortage of healthcare professionals in the United States" and "are more likely to work in underserved communities where shortages are particularly dire." 87 Fed. Reg. 53,155. The same is true for teacher shortages in the United States, which have also become more severe during the pandemic. *See* 87 Fed. Reg. 53,176 (noting

evidence that "teacher shortages have become more strained during the COVID-19 pandemic"). Studies show approximately 9,000 DACA recipients working as teachers. *Id.* Given this significant labor market participation, it is no surprise DHS concluded that "DACA recipients and their households have made substantial economic contributions to their communities," 87 Fed. Reg. 53,169, and "have contributed substantially to the U.S. economy through taxes and other economic activity," 87 Fed. Reg. 53,174.

### B.  Plaintiffs' Arguments Concerning The Costs Of The Final Rule Lack Support In The Administrative Record.

DHS reasonably determined that the Final Rule's significant and quantifiable benefits will far outweigh its costs. Specifically, the DHS concluded that, as compared to a baseline where no DACA policy exists, "the monetized benefits, including above all income earnings, greatly exceed the monetized costs." 86 Fed. Reg. 53740. As compared to the baseline, annual net benefits under the final rule would be up to $21.9 billion, or as much as $455.0 billion over a 20-year period. 87 Fed. Reg. 53,160-61. Annualized costs would only be $494.9 million, and the program would generate up to $5.4 billion annually in employment taxes. 87 Fed. Reg. 53,161. DHS also considered intangible benefits, such as the "reduction of fear and anxiety" for DACA recipients and their families, and the "increased sense of family security." *Id.* at 53162. Similarly, the record includes a report by the Congressional Budget Office, finding that if DACA were eliminated, the reduction in federal revenues would exceed cost savings, creating a $7.5 billion deficit. Ex. 12 (NJAPP115-23). DHS's cost-benefit analysis was manifestly "reasonable and reasonably explained." *Prometheus Radio Project*, 141 S. Ct. at 1158.

In objecting to this analysis, Plaintiffs not only "put a thumb on the scale by undervaluing the benefits" (as discussed above) but also by "overvaluing the costs" of the Final Rule. *Ctr. for*

*Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1198 (9th Cir. 2008). Indeed, Plaintiffs' asserted costs are simply not supported by the record.

DHS thoroughly considered the argument that DACA recipients take opportunities away from U.S.-citizen workers, but found the evidence on the ground did not support that theoretical claim. 87 Fed. Reg. 53,167. The agency did not contest, "in principle, that jobs currently held by DACA recipients might potentially be performed by U.S. citizens or noncitizens with lawful immigration status if DACA recipients lost their work authorization." *Id.* But DHS observed that real-world labor market trends are actually influenced by myriad factors, making it very difficult to show DACA is a but-for cause of labor market effects. *Id.* DHS noted the current labor shortage in the United States—8.4 million job seekers for 10 million jobs as of September 2021, which DACA recipients help fill. 87 Fed. Reg. 53,169. Further, evidence suggested that economic activity spurred by DACA would instead *expand* job opportunities, and some studies have found that high-skill immigration could *raise* wages for U.S. citizen workers. *Id.*; 87 Fed. Reg. 53,287. By contrast, DHS found that if DACA recipients did not have employment authorization, they could be an easily exploitable labor group that would work for substandard wages, hurting U.S. workers. 87 Fed. Reg. 53,171.[3] DHS thus reasonably concluded that "it is overly simplistic to predict that elimination of employment authorization for DACA recipients would result in a transfer of jobs and their corresponding wages from DACA recipients to citizens or those with lawful immigration

---

[3] This undercuts Plaintiffs' contention that certain provisions of the Affordable Care Act (ACA) necessarily make DACA recipients cheaper to hire. *See* Dkt. 625 at 23. Whatever the merits of that premise, Plaintiffs have not shown that stripping recipients of work authorization would level the playing field. Rather, the Final Rule concludes that the opposite is true. *See* 87 Fed. Reg. 53,195 (concluding that employment authorization "allows individuals to leave the shadow economy and work on the books to provide for their families, thereby reducing the risk of exploitation by unscrupulous employers and distortion in our labor markets").

status." 87 Fed. Reg. 53,167. To the contrary, the evidence indicated that the *elimination* of DACA risked negatively impacting other U.S. workers.

Further, the evidence shows DACA recipients fill labor shortages in areas of pressing need. One study cited in the record found that that 200,000 DACA recipients nationally (30,600 in Texas alone) work in fields categorized by DHS as "essential critical infrastructure workers" including 30,000 in healthcare (4,300 in Texas, Ex. 13 (NJAPP128)), where those workers "are helping to alleviate a shortage of healthcare professionals in the United States and they are more likely to work in underserved communities where shortages are particularly dire." *See* 87 Fed. Reg. 53,194-95. Service industries are another area where DACA alleviates labor shortages. One comment stated that the leisure and hospitality industry in Texas alone had over 96,000 positions that were unfilled, and that DACA recipients are essential to addressing this need. Ex. 14 (NJAPP133-35). In sum, the claim that DACA recipients are crowding out other laborers or are depressing wages does not comport with the record evidence that DHS had to consider during the rulemaking process.

DHS did consider the suggestion of maintaining forbearance without work authorization, and found that outcome to be harmful and unworkable. The agency found that work authorization is critical for DACA recipients to support both themselves and their families. 87 Fed. Reg. 53,195. Further, the work authorization itself creates a reliance interest on the part of employers who hire DACA recipients. *Id.* To make matters worse, without work authorization, then DACA recipients would be easily exploitable in the labor market, potentially resulting in depressed wages for all workers, and would require greater levels of public assistance. *Id.* So while DHS had considered decoupling the requests for forbearance and work authorization, DHS ultimately determined that approach would only increase confusion and add significant procedural delays—and generate

detrimental real-world results. *See* 87 Fed. Reg. 53,194, 53,200-02.

DHS also considered the reliance interests of states and their residents on the enforcement of immigration law in response to the Court's request. See 87 Fed. Reg. 53,289 (citing *Texas II*, 549 F. Supp. 3d at 622). DHS stated that it considered a "wide range of potential reliance interests" but that not all carry the same weight. *Id.* The states' reliance on immigration enforcement as it existed prior to DACA is diminished by the fact that DACA has existed for more than a decade. *Id.* At the same time, other states have relied on the existence of DACA as they enacted their own policies related to driver's licenses, in-state college tuition, public benefits, and professional licenses. *Id.* Thus, DHS considered the interest of some states and residents in having the agency protect them from immigrant labor, but concluded that that interest was not as strong as the reliance interests of DACA recipients, their families, employers, and other institutions. *Id.* Plaintiffs offer nothing in their brief to undermine the reasonableness of that conclusion.

DHS did not err in finding that the benefits of DACA outweigh its costs. Plaintiffs, on the other hand, err in urging this Court to overturn DHS's findings without even addressing reliance interests, other material benefits to recipients, families, law enforcement, and/or universities, and clear economic benefits, all while simultaneously pressing costs that lack record support.

## II.        THE FINAL RULE IS SUBSTANTIVELY VALID.

As New Jersey has previously argued, the Final Rule is consistent with DHS's longstanding practice under the INA of administering deferred action policies. Although this Court previously rejected DHS's authority to promulgate the 2012 DACA Memorandum, *Texas II*, 549 F. Supp. at 603-21, the Final Rule confirms and bolsters New Jersey's arguments. *See* 87 Fed. Reg. 53,191 (DHS explaining that it gave "careful consideration to the district court's reasoning regarding the substantive legality of the DACA policy and the court's conclusion that the policy is not authorized

24

by the INA," but concluding that it could not agree with this Court's analysis). The agency's determination regarding its authority is entitled to deference, but because this Court has previously found to the contrary, New Jersey focuses only on the core points in the Final Rule that most directly bolster its prior claims relating to DACA's validity.

1. In the Final Rule, DHS amassed an expanded record pertaining to the agency's statutory authority. The Final Rule explains DHS's authority to promulgate DACA lies in "DHS's power to exercise enforcement discretion, which is inherent in the delegation of authority over enforcement of the INA." 87 Fed. Reg. 53,186 (citing 6 U.S.C. § 202(3), (5); 8 U.S.C. § 1103(a)(1), (3)). "Deferred action under the DACA policy is a form of prosecutorial discretion well within the Executive's authority to efficiently allocate limited enforcement resources." 87 Fed. Reg. 53,180. Those conclusions are entitled to deference: DHS is best positioned to construe its authorizing statutes and prosecutorial discretion authority.

DHS's interpretation also merits deference because it is grounded in decades of historical precedent. In the administrative record, DHS describes in helpful detail the "long history of formal deferred action policies instituted both by DHS and the former INS (some of which Congress went on to ratify)." 87 Fed. Reg. 53,186. Beginning in the 1950s, a series of executive actions allowed groups of individuals without lawful status to receive forbearance, even absent any pending immigration proceedings. *See* 86 Fed. Reg. 53746-47 (describing early policies). These policies targeted large populations of otherwise removable immigrants—with or without authority from Congress. *See id.* The Final Rule therefore makes clear that DACA "comfortably fits within the deferred action framework that DHS and INS before it have utilized for decades," 87 Fed. Reg. 53,190, and belies the prior conclusion that DACA is not supported by historical precedent, *Texas*

*II*, 549 F. Supp. 3d at 617.[4]

2. The administrative record confirms that deferred action recipients have been eligible to request work authorization for decades. Those granted deferred action have been able to apply for work authorization since the 1970s, *see* Ex. 15 (NJAPP140) (noting noncitizens can apply for work authorization when the INS "do[es] not intend or [is] unable to enforce the alien's departure"), and the practice was codified through a separate regulation in 1981, *see* Documentary Requirements: Nonimmigrants; Waivers; Admission of Certain Inadmissible Aliens; Parole; Revision of Border Crossing Card Procedures, 46 Fed. Reg. 25,081 (May 5, 1981), and again in 1987 following the enactment of the Immigration Reform and Control Act of 1986 (IRCA), *see* 8 C.F.R. § 274a.12(c)(14) (permitting individuals granted deferred action to apply for work authorization if they can "establish[] an economic necessity for employment"). The Final Rule codifies DACA-related employment authorization for deferred action recipients in a new paragraph designated at 8 C.F.R. § 274a.12(c)(33). However, the addition of this regulation "does not constitute any substantive change in current policy," because work authorization has been a consistent feature of deferred action for nearly half a century. 87 Fed. Reg. 53,258.

3. The Final Rule confirms that DACA is merely a temporary forbearance from removal—

---

[4] Contrary to Texas' assertion, Dkt. 625 at 20, the major questions doctrine is not implicated here. As DHS explains in the Final Rule, the doctrine does not apply in light of the Supreme Court's decision in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), and even if it did, "there is clear statutory authority and agency precedent for the rule." 87 Fed. Reg. 53,186. Moreover, DHS's exercise of this type of removal forbearance is well-established, as evidenced by Congress's decision to ratify the Family Fairness policies of 1987 and 1990. Specifically, in 1987, the INS created the Family Fairness policy, which deferred deportation for the children or spouses of individuals who were in the process of obtaining lawful status under IRCA, and the INS expanded the policy in 1990. In November 1990, Congress codified the Family Fairness protections, but the law did not go into effect until October 1991; during that period Congress explicitly relied upon the "existing family fairness program." Immigration Act of 1990, Pub. L. No. 101-649, Tit. III, § 301, 104 Stat. 4978.

*not* any status. The Rule explains DACA "does not confer lawful immigration status, affirmative authorization to remain in the United States, or a defense to removal." 87 Fed. Reg. 53,211. Rather, it "codifies the definition of deferred action as a temporary forbearance from removal that does not confer any right or entitlement to remain in or reenter the United States and does not prevent DHS from initiating any criminal or other enforcement action against the DACA requestor at any time." 87 Fed. Reg. 53,258. DHS was keenly aware of the limits of its statutory authority over the DACA population, acknowledging in the Rule that it "does not have the authority to provide a permanent solution absent action by Congress." 87 Fed. Reg. 53,194.

4. Although this Court previously expressed concerns that DACA would allow recipients to apply for advance parole and gain a pathway to adjustment of status in some cases, *Texas II*, 549 F. Supp. 3d at 612-14, the Final Rule addresses that directly. Initially, the Final Rule makes clear DHS's practice of granting advance parole conforms to relevant statutes, and DHS has made no special allowances for DACA recipients. The INA authorizes DHS to grant parole on a case-by-case basis, either for urgent humanitarian reasons or significant public benefit, to individuals at the agency's discretion. *See* 8 U.S.C. § 1182(d)(5). DHS has exercised its discretion to grant parole to DACA recipients on those bases—and *only* those bases. In the Final Rule, DHS acknowledged it would not have authority to expand the eligibility criteria for parole via rulemaking because those criteria derive from statutes. 87 Fed. Reg. 53,251.

Moreover, while advance parole may help certain DACA recipients in applying for adjustment of status, as this Court previously noted, the Final Rule clarifies that this is a result of other statutes, not the DACA policy itself:

> Although advance parole granted to DACA recipients may aid certain recipients later seeking adjustment of status in meeting the requirement in 8 U.S.C. 1255(a) to have been 'inspected and admitted, or paroled,' that effect of parole was *determined by*

> *Congress*. Parole may have a similar effect with respect to the restriction in 8 U.S.C. 1182(a)(6)(A)(i), which applies only if an individual is 'present in the United States without being admitted or paroled,' but that too was determined by Congress and is likewise *independent of DACA itself*.

87 Fed. Reg. 53,250 (emphases added).

Finally, advance parole does not automatically make a noncitizen eligible for adjustment of status, as applicants must meet other criteria:

> [E]ven if parole removes a particular bar to subsequent adjustment of status, parole itself does not entitle any individual to adjustment of status; each applicant for adjustment of status must meet all other statutory requirements relevant to their particular basis for adjusting status to that of a lawful permanent resident and be granted adjustment in an exercise of discretion, and those requirements are not affected by this rule.

*Id*.

Thus, DHS is administering existing immigration laws, rather than creating new bases for adjustment to status, when it makes DACA recipients eligible to apply for advance parole. "So long as DHS acts within the limits of its parole authority in 8 U.S.C. 1182(d)(5),"—as it clearly does when it declines to expand the bases for advance parole in the Rule—"there is no conflict with Congress' expressed intent for eligibility for adjustment of status." *Id*.

Accordingly, the Final Rule is substantively valid under the APA.[5]

## III.  THIS COURT SHOULD REJECT PLAINTIFFS' PROPOSED REMEDY.

Not only do Plaintiffs ask that this Court again grant summary judgment, but they demand relief this Court has sensibly previously refused to grant them: a final end date for DACA, meaning

---

[5] Plaintiffs argue further that the Final Rule violates the Take Care Clause. Dkt. 625 at 20-21. The Court did not reach this issue when it previously disposed of this case on the basis of a statutory violation, and if the Court finds a statutory violation here, it should take the same approach. In any event, the Final Rule does not violate the Take Care Clause because it is a valid exercise of prosecutorial discretion consistent with immigration law. *See* Dkt. 502 at 41-42.

that even *renewals* of DACA could not issue after a date certain. Dkt. 625-1 at 5, 9. But granting

Plaintiffs their demanded two-year end date is inconsistent with this Court's prior approach, with

the reliance interests this Court and the Supreme Court identified, and with *Regents*'s instruction

that these questions belong before DHS in the first instance. Instead, this Court should stay any

remedy pending appeal so that DHS could continue to renew individual grants of deferred action

under DACA while the merits of DACA are reviewed on appeal—thus accounting for the reliance

interests of DACA recipients, families (including their U.S. citizen children), employers, and state

and local governments. Should this Court reach the question of what remedy would be appropriate

when the appeals have concluded, it should craft a careful equitable remedy that allows current

DACA recipients, who provided information to DHS and built their lives in reliance on DACA, to

remain eligible for continued, ongoing renewals to allow them to maintain their status quo, *i.e.*,

the forbearance and employment authorization on which they and others have come to rely. At the

very least, this Court should remand these questions to DHS in the first instance.[6]

### A.     This Court Should Retain Its Stay Pending Appeal.

Should this Court find the Final Rule unlawful and issue a remedy vacating or enjoining it,

this Court should preserve the stay pending appeal currently in effect. Plaintiffs never expressly

ask that the stay be lifted, but they do ask for "full relief" against implementation of the Final Rule

in addition to a two-year wind-down period, without reference to the existing stay. Dkt. 625-1 at

5. To the extent that Plaintiffs mean to have the stay lifted, this Court cannot do so because it

---

[6] Regardless of what approach it selects, this Court should not issue any remedial order before the
Supreme Court issues its decision in *United States v. Texas*, No. 22-58 (argued Nov. 29, 2022), in
which the meaning of Section 706(2) of the APA and the scope of allowable remedies are at issue.
Waiting for that decision will allow this Court to receive the benefit of the Court's reasoning and
avoid the needless expenditure of resources and re-litigation of these issues.

remains bound by the Fifth Circuit's own stay. *See Texas v. United States*, 50 F.4th 498, 532 (5th Cir. 2022) (confirming that DHS was permitted to continue renewing DACA for current recipients of deferred action "pending further order of this court [*i.e.*, the Fifth Circuit] or the Supreme Court").

Even if it were not bound, this Court should retain its partial stay pending further appeal because the same considerations continue to apply today as when the Court originally granted the stay. *See Texas II*, 2021 WL 3022434, at *2-3 (discussing "the significant reliance interests that DACA has engendered since its inception"). As this Court has acknowledged, "[h]undreds of thousands of individual DACA recipients, along with their employers, states, and loved ones" rely on DACA. *Texas II*, 2021 WL 3022434, at *2; *see also Texas II*, 328 F. Supp. 3d at 741 (adding that "states, cities, and employers … could lose residents whom they consider to be valuable members of their communities or employees who are integral to various schools, municipalities, and industries"). "Given those interests," this Court already recognized, "it is not equitable for a government program that has engendered such significant reliance to terminate suddenly," and thus "equity will not be served by a complete and immediate cessation of DACA" while the case remains ongoing. *Texas II* , 2021 WL 3022434, at *2. That conclusion has since been bolstered by the Fifth Circuit's decision to affirm the stay. *See Texas v. United States*, 50 F.4th 498, 531 (5th Cir. 2022) ("recogniz[ing] that DACA has had profound significance to recipients and many others in the ten years since its adoption," and continuing the stay pending appeal as to existing recipients "[g]iven the uncertainty of final disposition and the inevitable disruption that would arise from a lack of continuity and stability" (quotations omitted)). The Fifth Circuit's reasoning extends to any remedies that this Court may grant, which should not take effect until appellate review has been exhausted. Plaintiffs' bright-line two-year end date does not change this calculus—especially not

while future appeals are all but guaranteed, and while their length remains uncertain.

This Court's conclusion has been strengthened not only by the Fifth Circuit, but by DHS's comprehensive and thoughtful findings as to reliance. If the promises that the Executive made to forebear removal for 590,070 individuals vanished in total on a date certain, Ex. 16 (NJAPP152), all these individuals would lose their jobs, livelihoods, and health coverage. *See, e.g.*, 87 Fed. Reg. 53,169 (noting "over the 10 years in which the DACA policy has been in effect, DACA recipients have made major good faith investments in both themselves and their communities, and their communities have made major good faith investments in them"); 87 Fed. Reg. 53,205 (concluding that without the current work authorization "DACA recipients would be unable to engage in lawful employment to support themselves and their families, potentially exposing them to exploitation and crime"). DACA recipients who are business owners—over 6% of all recipients—could be forced to close their businesses, *see* 87 Fed. Reg. 53,195, putting 86,000 other U.S. workers at risk of losing their jobs. *See* Ex. 17 (NJAPP159). They may lose access to education, as a result of being unable to pay for school. *See* 87 Fed. Reg. 53,164 (finding DACA "has increased graduation rates and expanded access to both earned income ... and financial aid, which DACA recipients have used to fund undergraduate, graduate, and professional degrees"); 87 Fed. Reg. 53,154 (finding DACA "encouraged its recipients to make significant investments in their careers and education"). And they could be separated from their U.S. citizen children. 87 Fed. Reg. 53,296 (finding "[m]ore than 250,000 children have been born in the United States with at least one parent who is a DACA recipient"); *Regents*, 140 S. Ct. at 1914. Moreover, this would have dramatic downstream impacts on important industries and on the Armed Services, who rely on DACA recipients as employees and as members of the military. *See* Brief of Former Serv. Secretaries, Modern Military Ass'n of Am., and Military and Veteran Advocacy Organizations as *Amici Curiae*

31

at 13-24, *Regents*, 140 S. Ct. 1891 (explaining that over 800 DACA recipients serve in the armed services, which struggle to meet recruiting goals); *see also* 87 Fed. Reg. 53,154 (noting 30,000 DACA recipients serve as healthcare workers); 87 Fed. Reg. 53,196 (noting evidence that "DACA-recipient physicians will collectively care for … more than 5.1 million U.S. patients over the course of their careers").

Nor are recipients and employers alone impacted: state and local governments also rely on DACA in myriad ways and would suffer greatly from a cessation of DACA, particularly while an appeal is pending. *See* Dkt. 215 at 50-55; *see also* 87 Fed. Reg. 53,172-74 (finding States benefit from tax revenues due to contributions of DACA recipients, and that DACA reduces States' law enforcement, healthcare, and education costs). *First*, the record shows that if DACA were terminated, DACA recipients would be less willing to interact with law enforcement to report crime. *See* Ex. 18 (NJAPP169-70); Ex. 19 (NJAPP192-93) ; *see also* 87 Fed. Reg. 53,173 (finding that "by virtue of the measure of assurance provided by the DACA policy, DACA recipients are more likely to proactively engage with law enforcement in ways that promote public safety"). *Second*, thousands of recipients are enrolled in post-secondary education, including in New Jersey, 87 Fed. Reg. 53,164; the State's colleges and universities would be harmed by the loss of these valued students and their contributions to campus life. 87 Fed. Reg. 53,176 (finding educational institutions, including public universities and colleges in the States, "have relied upon the existence of the DACA policy over the course of 10 years in the form of DACA recipients' tuition payments and academic and research contributions"). *Third*, ending DACA "would harm the States' reliance interests because they would lose the critical skills of [DACA recipients working as government] employees and their investments in these employees, while also incurring costs associated with terminating their employment and the additional costs of recruiting, hiring, and training their

replacements." 87 Fed. Reg. 53,172. *Fourth*, "because the DACA policy permits DACA recipients to obtain lawful employment, in many cases giving them access to private health insurance and reducing their dependence on state-funded healthcare, eliminating DACA could increase State and local healthcare expenditures." 87 Fed. Reg. 53,174. *Finally*, recipients in New Jersey contribute an estimated $18.7 million per year in income tax. *See* Ex. 20 (NJAPP204). *See also* 87 Fed. Reg. 53,270-71 n.334 (noting that "'States and local governments could lose $1.25 billion in tax revenue each year'" (quoting *Regents*, 140 S. Ct. at 1914)).

The stay this Court already granted remains necessary to preserve these reliance interests and to avoid extraordinary disruption while the merits of DACA remain on appeal.

**B.    Beyond The Stay, Any Remedy This Court Orders Should Accommodate The Extraordinary Reliance Interests Generated By DACA.**

While a stay pending appeal *mitigates* the disruptive consequences of eliminating DACA, it does not of course address how to accommodate the same profound reliance interests after final judgment—interests that remain compelling at that time, too. But this extraordinary case demands a remedy to match: one that accounts for the unprecedented reliance interests at stake.

This Court's authority to craft an equitable remedy that achieves a "'nice adjustment and reconciliation between the public interest and private needs'"—even assuming that the Final Rule is unlawful—is well established. *See Texas II*, 2021 WL 3022434, at *1 (quoting *Rondeau v. Mosinee Paper Corp.*, 422 U.S. at 61)); *see also, e.g.*, *New York v. Cathedral Academy*, 434 U.S. 125, 129 (1977) (explaining that "in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable") (quoting *Lemon v. Kurtzmann*, 411 U.S. 192, 200 (1973)); *Radiator Specialty Co. v. Pennzoil-Quaker State Co.*, 207 F. App'x 361, 362 (5th Cir. 2004) (agreeing that both "breadth and flexibility are inherent in equitable remedies") (quoting *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15

(1971)); *Collum v. Edwards*, 578 F.2d 110, 112 (5th Cir. 1978) (noting the district court's "broad and flexible equitable powers"); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 393–94 (2006) (standard for permanent injunctions, including balancing hardships and public interest, comes from "well-established principles of equity").

The law is replete with examples where courts have applied equitable discretion to refrain from enjoining the full scope of an unlawful action, especially where, as here, an injunction would result in extraordinary disruption to individuals who have reasonably relied to their detriment on a government policy that went unchallenged for years. New Jersey is unaware of a case answering precisely what remedy should follow from finding a policy invalid after 600,000 individuals relied on it for a decade to live openly, start families with U.S. citizen children, obtain education and jobs, hire U.S. workers, and provide their personal identifying information to the U.S. government, putting themselves and their families at great risk. Still, authorities from a range of contexts make clear that this Court *can* craft a careful remedy that allows the current status quo—*i.e.*, eligibility for renewals of forbearance and employment authorization—to continue for current recipients. While no authority perfectly fits these circumstances, the federal courts have in appropriate cases declined to upend the full scope of even unlawful policies where either individuals have reasonably and detrimentally relied on them, or where the proverbial egg could no longer be unscrambled.

The need to accommodate detrimental reliance via a remedial order is particularly acute where Plaintiffs' decision to delay challenging that government action exacerbated the disruption that would follow. "It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted with unclean hands." *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 794 (5th Cir. 1999) (cleaned up). As a manifestation of this principle, a party may be barred by the equitable doctrine of laches from obtaining relief, whatever the merits of its

claims, if that party has delayed inexcusably in asserting its legal rights in a manner that causes undue prejudice to another party. *See Abraham v. Alpha Chi Omega*, 708 F.3d 614, 622, 624-25 (5th Cir. 2013); *see, e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 86-87 (D.D.C. 2017) (applying laches to bar injunction where plaintiffs waited two years to sue to enjoin pipeline project, during which time defendant-intervenor firm relied to its detriment in building the pipeline to near completion). Just two Terms ago, the Supreme Court recognized that laches could apply even when the challenged federal action was adopted in violation of separation of powers principles. *See Collins v. Yellen*, 141 S. Ct. 1761, 1789 n.26 (2021). Bluntly, "[t]here is no doubt that laches may defeat claims for injunctive relief." *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1161 n.14 (5th Cir. 1982). And it is beyond peradventure that "laches [may] be asserted" in an APA action, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 155 (1967), including not just to bar a claim outright but to support the "curtailment of the relief equitably awardable," *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 685 (2014).

Beyond equitable considerations relating to delay, there are a number of other examples— from a range of distinct contexts—that more broadly illuminate courts' power to adjust remedies concomitant to the circumstances in the case. *See, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) (emphasizing that "the balance of equities and consideration of the public interest—are pertinent" in assessing final relief at the end of the case, not just at the preliminary injunction stage, and emphasizing on those facts that even if a group of plaintiffs seeking to enjoin military exercises demonstrate the claimed violations, "it would be an abuse of discretion to enter a permanent injunction" because the potential of threat to national security far outweighed harm caused by failure to prepare environmental impact statement). Such considerations can include,

*inter alia*, a third party's reasonable reliance. *Cf., e.g.*, *Fano v. O'Neill*, 806 F.2d 1262, 1265 (5th Cir. 1987) (quoting *Heckler v. Community Health Servs.*, 467 U.S. 51, 60-61 (1984)) ("[E]stoppel might be appropriate when the 'public interest in ensuring that the Government can enforce the law free from estoppel [is] outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government'"); *FMC Corp. v. United States*, 853 F.2d 882, 886 (Fed. Cir. 1988) (recognizing estoppel could apply to contracts if "costs have been incurred pursuant to a practice acquiesced in or approved by the Government, and the contractor has reasonably believed that the Government would allow the practice to continue"); *Watkins v. U.S. Army*, 875 F.2d 699, 711 (9th Cir. 1989) (observing that "[t]his is a case where equity cries out and demands that the Army be estopped" from barring soldier's reenlistment where it inaccurately represented he qualified for reenlistment); *Drozd v. INS*, 155 F.3d 81, 90 (2d Cir. 1998) (suggesting that estoppel could apply in removal proceedings). In other cases, courts look not just at reliance but also at disruption—and craft remedies to avoid chaos that could otherwise follow on the ground from invalidating a policy. *See, e.g.*, *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 130, 132 (D.C. Cir. 2015) (Kavanaugh, J.) (despite finding that EPA's policy reflected "clear transgressions of [its] statutory boundaries," declining to vacate due to clear risk of "substantial disruption to the trading markets that ha[d] developed around […] emissions budgets"); *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) (same); *see also Connor v. Williams*, 404 U.S. 549 (1972) (declining to set aside election conducted under unlawful apportionment plan given settled reliance).[7] Across disparate contexts, the same point applied time

---

[7] The de facto officer doctrine, which dates back to the 15th century, provides another particularly useful illustration of this principle. *See Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 862 (1st Cir. 2019), *rev'd and remanded sub nom. Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649 (2020). That doctrine offers a basis for a court not to invalidate the acts

and again: in addition to considerations of delay, extensive reliance on government action and/or the potential for great disruption that would harm the public interest may warrant a federal court crafting a real-world remedy that accommodates both.

Each of those considerations applies here. In this case, Plaintiffs delayed nearly six years in filing this action in 2018, and they have offered no excuse justifying this delay at any stage in this case. As a result, DACA recipients have, for over a decade now, relied on DACA—including to their detriment. The nearly 600,000 current DACA recipients all voluntarily provided their personal information, including names and addresses to the Federal Government, despite the risks to them if DACA terminates. DACA recipients chose to enroll in school, *see supra* at 13-14, many taking out loans on the reasonable belief they would be eligible to obtain employment after they completed their education. Some recipients entered the armed forces, *see supra* at 31-32, on the reasonable belief that they could remain enrolled in the military. Others started families, *see supra* at 13, on the reasonable belief that their employment would provide them the necessary finances and health care to support their U.S. citizen children. The reliance is hardly limited to DACA recipients alone. Businesses hired hundreds of thousands of DACA recipients, and spent years and capital investing in and training them—including into specialized roles. *See supra* at 14. And knowingly or not, thousands of other U.S. workers accepted employment at businesses run by

---

of a person acting under color of law, even after it is later discovered that the officer is not properly serving in that office in the first place. *See Ryder v. United States*, 515 U.S. 177, 180 (1995) (citing *Norton v. Shelby Cty.*, 118 U.S. 425, 440 (1886)). While the doctrine concerns technical defects in the appointment of officers not at issue here, its animating rationale is nonetheless instructive: the doctrine was created in equity to "avoid[] the chaos that might ensue if all of the actions taken by an official improperly in office for years were subject to invalidation" and to "protect citizens' reliance on past government actions and the government's ability to take effective and final action." *Andrade v. Lauer*, 729 F. 2d 1475, 1499 (D.C. Cir. 1984); *see also Nofire v. United States*, 164 U.S. 657 (1897) (applying de facto officer doctrine so as not to require annulment of marriage when person who signed marriage certificate was not validly appointed clerk or deputy).

DACA recipients, which themselves are subject to collapse if leadership cannot remain employed. *See supra* at 31. States, too, invested in DACA recipients as employees and valued members of universities—where they, of course, invest in their students. *See supra* at 14-15, 32-33.

Had Plaintiffs wished to avoid a situation in which 600,000 DACA recipients would offer their names, addresses, and other personal information to the Federal Government, in which these recipients would structure their entire lives in reasonable reliance on DACA for a decade, or where their families, employers, and state and local governments would likewise rely on the policy, they had every ability to do so by bringing suit to enjoin the DACA immediately after the policy's issuance—just as they did with respect to DAPA. But given their own strategic decision to delay such a challenge, ending DACA now "would 'radiate outward' to DACA recipients' families, including their 200,000 U.S.-citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them." *Regents*, 140 S. Ct. at 1914. The administrative record establishes that these reliance interests are so great that it would be impossible "to restore the status quo ante" from eleven years ago. *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002); *see also supra* at 13 (laying out agency's extensive discussion of reliance). Given Plaintiffs' inexcusable delay, they cannot justify their demand for hundreds of thousands of children born in this country to see their families thrown into chaos, or their demand that businesses and schools lose individuals they have long invested in. *See Texas II*, 328 F. Supp. 3d at 742 (denying Plaintiffs' preliminary injunction application in 2018 due to their "delay in confronting DACA" that caused "many DACA recipients and others nationwide [to] have relied on it for the last six years"). Should this Court find DACA unlawful, an equitable order would recognize these reliance interests by allowing DHS to maintain the status quo of granting renewals that permit current DACA recipients to remain and work in this country,

and would thereby avoid irreparably disrupting the lives they have built over the past decade. Such an order would not preclude DHS from lawfully modifying or even terminating the DACA policy, but it would preserve the status quo until the agency determined to do so.

Finally, as the Supreme Court confirmed just two Terms ago, a court's remedial order can take into account whether the offending legal action is truly the sine qua non of the claimed injury. In *Collins v. Yellen*, the Supreme Court held that Federal Housing Finance Agency's limitation on removal of its Director only "for cause" violated separation of powers. *See* 141 S. Ct. at 1775, 1783. Although shareholders in FHFA-controlled entities sought an injunction ordering return of certain funds made pursuant to action authorized by the unlawfully-protected Director, the Court declined to grant that relief. Instead, the Court required that the shareholders be able to demonstrate "compensable harm" sufficient to justify their requested remedy, *i.e.*, that the President might actually have replaced the Director but for the unlawful provision, and that the new Director would have taken actions to plaintiffs' benefit. *Id.* at 1775, 1788-89. And on remand, the district court held that plaintiffs were *not* entitled to an equitable remedy because they had failed to meet that burden. *See Collins v. Lew*, --- F. Supp. 3d ---, No. 4:16-cv-03113, 2022 WL 17170955, at *4 (S.D. Tex. Nov. 21, 2022) (appeal pending) ("Plaintiffs do not demonstrate that the Administration had a concrete plan in place, that this plan necessarily involved liquidating Treasury's preferred stock, or that the Administration would have completed these actions within four years.").

Plaintiffs run into the same issues with DACA, based on the precise legal theory that they have pressed throughout this case. Plaintiffs have never argued that DHS lacks authority to grant deferred action to individual applicants on the individualized facts of their request, but instead have challenged DACA as a policy for structuring those discretionary grants. And Plaintiffs have not taken issue with the longstanding separate regulations that link all individual grants of deferred

action to employment authorization. Nor could they. *See Regents*, 140 S. Ct. at 1911-13 (explaining DHS has authority to exercise prosecutorial discretion as to individual applicants). But that means Plaintiffs failed to demonstrate that each individual DACA recipient would *necessarily* not have been entitled to be considered by DHS on an individual basis for a grant of deferred action, absent the DACA policy. And Plaintiffs have further failed to address whether individuals who requested and were granted DACA may otherwise have applied for and received other forms of deferred action or immigration relief over the past decade—avenues individuals declined to pursue precisely because they had received deferred action through DACA.[8] Without showing that particular recipients would not have merited individual grants of deferred action (or other forms of relief), Plaintiffs have plainly not justified upending the status quo for those individuals—that is, they have not justified stripping *these individuals* of their eligibility for renewals of forbearance and employment authorization. Plaintiffs bear the burden to make this showing, *see Collins*, 141 S. Ct. at 1788-89, and they have failed to even try here.[9]

Plaintiffs' remedial demand should be rejected, and a remedial order that continues to allow existing recipients to retain and renew DACA would be appropriate instead. This Court has ample support in equity and case law to adopt such an approach, and the extraordinary equities here—

---

[8] For example, for any DACA recipients who experienced domestic violence in the last decade, the two-year window to file a VAWA self-petition following divorce or death of an abusive spouse may have long since closed, barring such abuse survivors from relief they had little reason to pursue at the time due to DACA. *See* 8 U.S.C. § 1154(a)(1)(A)(iii)(II)(aa)(CC).

[9] The Final Rule confirms that the adjudication of DACA application requests is a highly individualized process that affords discretion to officers. In the Rule, "DHS maintains the position expressed in the proposed rule and codified at new 8 C.F.R. § 236.22(c) that it is appropriate for adjudicators to have discretion to deny a deferred action request, even if they have found that the requestor meets all of the threshold criteria, if in their judgement the case presents negative factors that make the grant of deferred action inappropriate or that outweigh the positive factors." 87 Fed. Reg. 53,213-14.

the reliance of 600,000 recipients and their 250,000 U.S. citizen children, of employers, and of state and local governments; Plaintiffs' unexplained delay; and Plaintiffs' decision to challenge DACA but not individual grants of deferred action—warrant that result.

### C. This Court Should Remand To DHS To Provide The Agency An Opportunity To Address The Extraordinary Reliance Interests Engendered By DACA.

In the alternative, if this Court does not itself craft an equitable remedy that would account for the extraordinary reliance interests of DACA recipients, their families and U.S. citizen children, employers, and state and local governments—and countless others—then it should remand to the agency to provide DHS with an opportunity, after all appeals conclude, to do so in the first instance.

The Supreme Court itself has recognized that significant policy choices remain available to DHS even assuming that DACA is unlawful. *See Regents*, 140 S. Ct. at 1910 (explaining that "deciding how best to address a finding of illegality moving forward can involve important policy choices," and emphasizing that "[t]hose policy choices are for DHS"). The Court added that DHS retained "considerable flexibility" in addressing the "reliance interests of DACA recipients" and "administrative complexities," whatever the legality of the DACA itself. *Id.* at 1914; *see also id.* at 1910, 1914 (adding that DHS is the correct entity to make the "difficult" decisions, "especially when the finding concerns a program with the breadth of DACA"). Indeed, Plaintiffs previously admitted "weighing the DACA recipients' reliance interests against competing policy concerns ... involves important policy choices that Congress has reserved for the DHS." Dkt. 486 at 55. Especially given that some form of forbearance explicitly "remain[s] squarely within [DHS's] discretion," *Regents*, 140 S. Ct. at 1912, should this Court determine the Final Rule to be unlawful, it should then remand to DHS to craft appropriate remedies, particularly given that Plaintiffs offer no justification for their two-year end date.

Indeed, in *Regents*, the Court concluded that DHS's attempt to rescind DACA was arbitrary

and capricious because DHS had "failed to address whether there was 'legitimate reliance'" on the grants of deferred action. *Id.* at 1913. The Court noted that "[w]hen an agency changes course, as DHS did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* (citation omitted). The Court highlighted the "noteworthy concerns" that the respondents and amici had emphasized, including: that "DACA recipients have 'enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on [DACA]"; the impacts that rescission of DACA would have on "recipients' families, including their 200,000 U.S.-citizen children," "the schools where DACA recipients study and teach," and "the employers who have invested time and money in training them"; and the economic consequences of excluding these recipients from the labor force, including an annual loss of $1.25 billion in state and local tax revenue. *Id.* at 1914. These interests have only grown stronger since. *See Texas II*, 549 F. Supp. 3d. at 624; 87 Fed. Reg. 53,153-54. Ordering a blanket end date hardly accommodates *Regents*'s demand for flexibility for DHS on remand.

The Court in *Regents* also noted a broad range of options that DHS might have considered after the then-Attorney General found DACA to be unlawful. The Court explained that, had DHS properly considered these interests, it might have considered providing "a broader renewal period based on the need for DACA recipients to reorder their affairs;" granting "more accommodating termination dates for recipients caught in the middle of a time-bounded commitment" such as a course of study, military service, or medical treatment; or even "instruct[ing] immigration officials to give salient weight to … reliance interests ... when exercising individualized enforcement discretion." *Id.* While DHS was not required to adopt any of these suggestions, the Court held that its failure to consider "accommodating particular reliance interests" was arbitrary. *Id.* at 1914-15.

42

It thus makes no sense to impose a particular plan to end DACA when a range of options remain available to DHS—and when doing so would lead to disruptive consequences for recipients and families, businesses, and state and local governments that have relied on DACA for eleven years. And Plaintiffs' approach thus makes especially little sense: to place an end date on DACA *without* addressing or accounting for these other options. To the contrary, and at the very least, this Court should follow the Supreme Court's clear instructions in *Regents* and remand to DHS, which is best equipped to tailor relief to address this unprecedented reliance and extraordinary disruption.

## CONCLUSION

This Court should grant New Jersey's motion, deny Plaintiffs' motion, and enter summary judgment against Plaintiffs.

Dated: March 2, 2023

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Mayur P. Saxena*
MAYUR P. SAXENA
Attorney-in-Charge
Assistant Attorney General
(admitted pro hac vice)
124 Halsey St., 5th Floor
Newark, New Jersey 07101
PO Box 45029-5029
Phone: (973) 877-1280
Fax: (973) 648-4887
Mayur.Saxena@law.njoag.gov

Jeremy Feigenbaum, Solicitor General
(admitted pro hac vice)
Shireen Farahani, Deputy Attorney General
Melissa Fich, Deputy Attorney General
Amanda I. Morejón, Deputy Attorney General
Samuel L. Rubinstein, Deputy Attorney General
*Attorneys for Defendant-Intervenor State of New Jersey*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 2, 2023, I caused this document (and exhibits hereto) to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Mayur P. Saxena*
Mayur P. Saxena
