**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## APPENDIX

Pursuant to this Court's Civil Procedures, Rule 7, Defendant-Intervenor, State of New Jersey, hereby provides the Court with the following table of contents and copies of the documents and authorities cited in its Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment:

| Ex. | Description | Page |
|---|---|---|
| 1. | Statement by President Dwight Eisenhower Concerning the Admission of Additional Hungarian Refugees, dated Dec. 1, 1956 | NJAPP001 |
| 2. | Memorandum to President Gerald Ford, "History of the Use of Parole," dated April 17, 1975 | NJAPP003 |
| 3. | USCIS publication, "Refugee Timeline," available at: https://goo.gl/5fhA9y | NJAPP013 |
| 4. | Congressional Research Service Memorandum, "Analysis of June 15, 2012 DHS Memorandum, | NJAPP018 |

|  | Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," dated July 13, 2012 |  |
|---|---|---|
| 5. | Memorandum from Gene McNary, "Family Fairness: Guidelines For Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens," dated Feb. 2, 1990 | NJAPP064 |
| 6. | Memorandum from Janet Napolitano, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," dated June 15, 2012 | NJAPP068 |
| 7. | Memorandum from Jeh Johnson, "Exercising Prosecutorial Discretion with Respect to Individuals Who Cam to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents," dated Nov. 20, 2014 | NJAPP072 |
| 8. | Memorandum from Elaine Duke, "Rescission of Deferred Action for Childhood Arrivals," dated Sept. 5, 2017 | NJAPP078 |
| 9. | Letter from Texas and ten other states to Jeff Sessions urging the Trump Administration to phase out DACA, dated June 29, 2017 | NJAPP082 |
| 10. | Georgetown Law summary, "Law Enforcement Leaders and Prosecutors Defend DACA," dated March 20, 2018 | NJAPP086 |
| 11. | Congressional Research Service Report by Ben Harrington, "An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others," dated April 10, 2018 | NJAPP090 |
| 12. | Memorandum from Douglas W. Elmendorf, "Budgetary Effects of Immigration-Related Provisions of the House-Passed Version of H.R. 240, An Act Making Appropriations for the Department of Homeland Security," dated Jan. 29, 2015 | NJAPP114 |
| 13. | Report by Nicole P. Svajlenka, "A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response," dated April 6, 2020 | NJAPP124 |
| 14. | Comment submitted by Texas Restaurant Association, dated Dec. 2, 2021 | NJAPP132 |
| 15. | Report by Sam Bernsen, "Leave to Labor," dated Sept. 2, 1975 | NJAPP136 |
| 16. | Report by Nicole P. Svajlenka and Trinh Q. Truong, "The Demographic and Economic | NJAPP148 |

| | | Impacts of DACA Recipients: Fall 2021 Edition," dated Nov. 24, 2021 | |
| --- | --- | --- | --- |
| | 17. | Report by Tom K. Wong, "DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November," dated Sept. 19, 2019 | NJAPP156 |
| | 18. | Declaration of Angelo J. Onofri, dated June 22, 2018 | NJAPP164 |
| | 19. | Declaration of Tom K. Wong, dated May 16, 2018 | NJAPP171 |
| | 20. | Declaration of Meg Wiehe and Misha Hill, dated June 15, 2018 | NJAPP197 |

# Exhibit 1



The American Presidency Project™

John Woolley and Gerhard Peters

HOME   DATA   DOCUMENTS   ELECTIONS   MEDIA   LINKS

** NOTE: The American Presidency Project will soon launch a new website with a more contemporary look and improved search capability. While we continue "beta testing" the new site, please excuse lapses in updating this site. We expect to have the new site on-line in June.



The American Presidency Project Needs Your Support



Make a Gift

Consider a *tax-deductible* donation & click here

**Document Archive**
- Public Papers of the Presidents
- State of the Union Addresses & Messages
- Inaugural Addresses
- Farewell Addresses
- Weekly Addresses
- Fireside Chats
- News Conferences
- Executive Orders
- Proclamations
- Signing Statements
- Press Briefings
- Statements of Administration Policy
- Economic Report of the President
- Debates
- Convention Speeches
- Party Platforms
- 2016 Election Documents
- 2012 Election Documents
- 2008 Election Documents
- 2004 Election Documents
- 1996 Election Documents
- 1968 Election Documents
- 1960 Election Documents
- 2017 Transition
- 2009 Transition
- 2001 Transition
- White House Media Pool Reports

**Data Archive**
Data Index

**Media Archive**
Audio/Video Index

**Elections**
Election Index
Florida 2000

**Links**
Presidential Libraries

**View Public Papers by Month and Year**
[Month ▾]  [Year ▾]

☐ INCLUDE documents from the Office of the Press Secretary

☐ INCLUDE election campaign documents, vice presidential documents, first lady, and other executive branch officals



# DWIGHT D. EISENHOWER
XXXIV *President of the United States: 1953-1961*

**306 - White House Statement Concerning the Admission of Additional Hungarian Refugees.**
*December 1, 1956.*

Like 14K
Tweet
G+



COLLECTION:
*Public Papers of the Presidents*

Dwight D. Eisenhower
1956

Font Size:
A A A

🖨 Print

Share

The American Presidency Project
**facebook**

Name:
The American Presidency Project

Fans:
14288
Promote Your Page Too

THE PRESIDENT ANNOUNCED today that the United States will offer asylum to 21,500 refugees from Hungary. Of these, about 6500 will receive Refugee Relief Act visas under the emergency program initiated three weeks ago. The remaining 15,000 will be admitted to the United States under the provisions of Section 212 (d) (5) of the Immigration and Nationality Act. When these numbers have been exhausted, the situation will be re-examined.

The President emphasized that the flight of refugees into Austria had created an emergency problem which the United States should share with the other countries of the free world. Because of this emergency, those refugees who seek asylum in the United States will be brought here with the utmost practicable speed.

The President pointed out that the immigration visas available for Hungarian escapees under the Refugee Relief Act are practically exhausted and that the emergency compels the only other action which is available, namely, action under the provisions of the Immigration and Nationality Act which authorizes admission on parole.

Persons admitted into the United States on parole have no permanent status in the United States, but the President will request the Congress in January for emergency legislation which will, through the use of unused numbers under the Refugee Relief Act, or otherwise, permit qualified escapees who accept asylum in the United States to obtain permanent residence.

The President also stated that it was his intention to request the Congress to include in such legislation provisions which would allow at least some of the escapees who have proceeded to other countries for asylum to have the opportunity to apply for permanent resettlement in the United States, having in mind particularly the fact that many of those refugees undoubtedly have relatives here.

The President pointed out that other nations have already made increasingly generous offers of asylum and have waived the ordinary restrictions imposed upon immigration.

The President said that he had directed the Secretary of Defense to work out arrangements for the transportation of these refugees to the United States in accordance with agreements to be made with the Austrian Government and the Intergovernmental Committee for European Migration.

In making his announcement, the President said that providing asylum to these Hungarian refugees would give practical effect to the American people's intense desire to help the victims of Soviet oppression. It will also materially assist the Government of Austria, which has responded so generously to the refugees' needs, to carry out its policy of political asylum.

*Note: This statement was released at Augusta, Ca.*

*On December 6, 1956, the White House announced that transportation arrangements had been completed for bringing 21,500 Hungarian refugees to the United States with the utmost possible speed by air-lift and sea-lift.*

**Citation:** Dwight D. Eisenhower: "White House Statement Concerning the Admission of Additional Hungarian Refugees.," December 1, 1956. Online by Gerhard Peters and John T. Woolley, *The American Presidency Project.* http://www.presidency.ucsb.edu/ws/?pid=10712.

# Exhibit 2

THE WHITE HOUSE

WASHINGTON

April 17, 1975

MEMORANDUM FOR:             THE PRESIDENT

FROM:                       PHILIP BUCHEN
                            JOHN MARSH
                            GENERAL SCOWCROFT



Section 212(d)(5) of the Immigration and Nationality Act
provides inter alia that "The Attorney General may in his
discretion parole into the United States temporarily under
such conditions as he may prescribe for emergent reasons
or for reasons deemed strictly in the public interest any
alien applying for admission to the United States...."

A history of the use of this authority is provided at
Tab A.

From April 3 through April 15, 1,703 orphans have been
flown out of Vietnam/Cambodia.  The parole process has
been applied in these cases.  An updated report of this
action is attached at Tab B.

On April 13, authorization for movement of families
accompanying U. S. citizens returning from Vietnam was
given.  Parole is being used in this action.  It is
estimated that between 3,000 and 5,000 persons are involved.

It is now essential to consider additional actions:

1.  There are 1,000 Cambodians now in Thailand who were
evacuated as part of "Eagle Pull" and who may wish to
come to the United States.  The Thai Government has made
it clear that it urgently desires their onward movement.
State and Justice request your authorization to proceed
with parole for these persons.  We recommend your approval.

               AGREE _____✓_____

               DISAGREE _____

- 3 -

Department to authorize entry into the United States of all
such persons by parole whenever State determines that the
efforts of the UNHC for Refugees are not successful.
Immigration disagrees.

We recommend that the State Department position be accepted.

AGREE _____

DISAGREE _____

6.  Planning is also now required for the potential evacuation
of certain high risk Vietnamese.  These include U. S.
employees, labor leaders engaged in the free trade labor move-
ment (particularly those who have worked with U. S. unions),
governmental personnel and others along with their dependents.
There is no clear indication of just how great the number
will be.  Every effort will be made to involve third countries,
both directly and through international mechanisms such as the
UNHCR and the International Committee for European Refugees.
Nevertheless, it is apparent that a large number will wish to
come to the United States.  This will require the Attorney
General's use of parole.

State and INS agree that parole should be exercised for such
Vietnamese, but differ sharply as to numbers.

State believes that we should take our fair share of refugees
who are unable to be settled elsewhere, and recognizes that
the total number, given logistical and political limitations
could be approximately 200,000.  INS would limit the use of
parole to 50,000 or 40% of the total number to be evacuated,
whichever is less.  It is their view that (1) the domestic
impact on our society of admitting a large number is undesir-
able and (2) the Cuban experiences, wherein the President
permitted 675,000 persons to enter the United States, should
not be repeated.  The INS also believes that it may be
necessary to publicly announce this limit to prevent a mass
exodus based on false hopes.

We recommend that the State Department position be accepted.

AGREE _____

DISAGREE _____

7.  We recommend that you direct establishment of a small
full-time task force with the necessary authority to improve

NJAPP005





HISTORY OF THE USE OF PAROLE

Parole is a device by which an inadmissible alien seeking entry is permitted to proceed into the United States, but in contemplation of law is considered to be standing at the water's edge.  He is <u>not</u> deemed to be in the United States within the meaning of the expulsion provisions or other provisions of the Immigration and Nationality Act. Standing at the water's edge, as it were, he may be re- moved only in exclusion proceedings.

Parole is resorted to only in exceptional situations such as emergent medical treatment, avoiding unwarranted deten- tion, and prosecution of criminals returned to the United States.  It has also been used for refugees and orphans.

The first express statutory authorization for parole appeared in the Immigration and Nationality Act which became effective December 24, 1952. 1/ The statute provides that the Attorney General in his discretion may parole any alien seeking admission for emergent reasons or for reasons deemed strictly in the public interest.

Before 1952, parole was utilized as an administrative expedient. 2/  It's peculair status was recognized by the Supreme Court 50 years ago in the case of Kaplan v. Tod. 3/

There has never been any question concerning the authority to parole individual aliens.  However, questions have been raised by the Congress concerning authority to parole groups of aliens.  For example, a question was raised after 224 Russian Orthodox Old Believers were paroled into the United States in June 1963.  In the House Report on the 1965 Amend- ments, which established permanent Legislation for the con- ditional entry of refugees, the following statement was made: "The parole provisions were designed to authorize the Attorney General to act only in emergent, individual and isolated situa- tions, such as the case of an alien who requires immediate medi- cal attention, and not for the immigration of classes or groups outside of the limit of the law." 4/

Nevertheless, under the general parole authority of the 1952 Act, large numbers of refugees have been allowed to come into the United States after, as well as before publication of the House Report. 5/    These include:

Over 30,000 refugees from the 1956 Hungarian Revolution, by direction of President Eisenhower.

Over 600,000 refugees from Cuba who began to come to the United States in an almost unbroken stream for more than a decade after the Castro takeover in 1959.  (In 1965 when

-2-

he signed into law the abolition of the National
Origins System, President Johnson revived the Cuban
parole program despite the House report.)

15,000 Chinese refugees from Hong Kong, by direction
of President Kennedy in 1962.

6,500 Czechoslovak refugees after the Soviet invasion
of that country in 1968, at the urging of Congress.

Several hundred Soviet Jews and other minorities in
the U.S.S.R., at the urging of Congress in 1971.

1,000 stateless Ugandan-Asians, authorized in 1972,
at the urgent request of the State Department.

Following the suppression of the abortive Hungarian revolt
in the Fall of 1956 over 200,000 Hungarian refugees fled
the country, especially to Austria (180,000) and to Yugo-
slovia (20,000). Resettlement missions from many countries
were eager to accept Hungarian refugees, and the asylum
countries -- especially Austria -- served as staging areas.
President Eisenhower and the American people in general were
eager to accept a generous quota of the Hungarians. Fewer
than 7,000 refugee visas remained available, however, under
the Refugee Relief Act of 1953 as amended. These were quickly
used for Hungarians. At this juncture the decision was made
to invoke Section 212 (d)(5) of the Immigration and National-
ity Act in order to parole larger numbers of Hungarian refu-
gees into the United States.

The sympathetic 85th Congress enacted P.L. 85-559, which
provides for adjustment of status of paroled Hungarians
to that of permanent immigrants to the U.S. The majority of
the refugees were brought in from Austria into a U.S. staging
area, in Camp Kilmer, New Jersey, administered by the Depart-
ment of the Army. The refugees were resettled from Camp
Kilmer, primarily through the efforts of interested voluntary
agencies. A total of 30,701 Hungarian refugees regularized
their status in the United States under P.L. 85-559 during
1958-59. This represented the overwhelming majority of the
Hungarian refugees who were paroled into this country.

The Cuban refugee situation differs from others in that the
United States was the country of first asylum. From 1957-
72 this country admitted 621,403 Cuban nationals who fled
from Cuba. That exodus was generally divided into three
distinct periods: from the advent of the Castro government
in 1959 to the breaking of diplomatic relations in January
1961; from 1961 until the end of commercial travel in
October, 1962; the subsequent period. While diplomatic

-3-

relations existed, Cubans who wanted to leave Cuba went to the consulate in Havana.  They were issued B-2 (tourist visas) which documented them and enabled commercial carriers to bring them to the United States.  On arrival (usually Miami) the B-2 visa was cancelled by the Immigration Service (INS) and they were paroled into the United States under the parole provisions of the Immigration Act.  The B-2 visa was "pro-forma" documentation to enable travel to commence.

After the break in diplomatic relations, the United States initially avoided the use of parole for Cubans fleeing the island the resorted to the device of waiving the visa requirement on a mass basis on the theory that each case represented an unforeseen emergency because of the unavailability of consular services in Cuba.  This program largely terminated at the time of the Cuban Missile Crisis of 1962 because travel out of Cuba became impossible.

In October 1962, all commercial transportation between Cuba and the U.S. ended.  The Cuban refugee flow was reduced to a trickle.  In December 1962 the American Red Cross began sponsoring airflights and vessels which brought Cuban refugees to the United States, primarily relatives of Cubans already here and prisoners from the "Bay of Pigs" invasion. These people were directly paroled.

In 1965, Castro announced that certain Cubans who wanted to leave were free to do so.  President Johnson responded that the U.S. would accept all.  Direct parole was the method of entry.  Some Cubans went to third countries (primarily Spain) as they were unable to get places on the airlifts.  Those with close relatives in the U.S. were given "pre-parole" documentation (medicals, affidavit of support, security clearance) by our consulate in Madrid.  When they arrived at the U.S. port of entry, they were paroled into the U.S. by INS.  In October, 1973, the Attorney General agreed to a one year parole program for those without close relatives here.  Documentation was prepared by the consulates as with the pre-parole program, but INS personnel interviewed and issued the actual parole document in Madrid.  Cubans in the U.S. were received and processed by the Cuban Refugee Center in Miami run by HEW. The Act of November 2, 1966 enabled Cuban refugees to adjust status to permanent residents.





NJAPP010

16 April 1975

Point Paper for the Special Assistant to the Secretary and
Deputy Secretary of Defense

SUBJECT: Orphan Evacuation Program - Vietnam/Cambodia

MAIN THRUST OF POINT PAPER

- Provides an update on the orphan evacuation program.

DISCUSSION

- On 3 Apr 75, DOD developed procedures for orphan evacuation.
State/AID wholeheartedly concurred.

-- All orphans, upon verification by US Embassy in Vietnam
   and Cambodia, would be airlifted on first available
   military or commercial contract aircraft to Clark AB.

-- At Clark AB medical evaluation would be made to determine if
   orphans should be hospitalized, proceed on normal airlift,
   or be medically evacuated.

-- Flights then proceed to San Francisco or Los Angeles with
   Seattle as backup where military and volunteer agency
   personnel would further process them.

- From 3 through 15 April a total of 1703 orphans (52 Cambodians)
have been flown out of Vietnam/Cambodia. Military Airlift Command
(MAC) transported 883 through Clark AFB, Philippines, of which 43
are currently enroute. Non-DOD carriers, chartered by private
arrangements, transported the balance of 820 orphans.

-- 914 orphans have been moved to San Francisco.

-- 330 orphans have been moved to Los Angeles.

-- 409 orphans have been moved to Seattle.

-- 201 orphans have been moved to Fort Benning, Ga.

(These figures do not total 1703 due to double handling, i.e.,
L.A. and Benning)

- Number and location of orphans currently being processed:

-- Clark AB, Philippines - 5 hospitalized.
   Hickam AB, Hawaii - 5 hospitalized.
   San Francisco - 65
   Los Angeles - 87
   Seattle - 18
   Fort Benning - 170 (14 hospitalized)



*-- Enroute - 43 from Clark AB to Los Alamedas Air Station, Ca.

- Deaths:

  -- 5 April crash of C-5 - 190 (figure not final)

  -- One died enroute to Clark AB - cause of death, extreme
     dehydration. (Infant)

  -- One died at Clark AB Hospital - cause of death, sepsis
     (absorption of pathogenic microorganisms into blood stream).
     (Infant)
  -- One died enroute to Los Angeles - cause of death, pneumonia,
     dehydration and prematurity.  Reported 24 days old.

  -- Prognosis - No more deaths expected.

- Future orphan airlift requirements:

  -- Known - zero - original "Reported 2000" all processed

  -- Possible - 80 (Vietnam) Rumors of 500 to 5000 more.
     Tracking this.

- Problems:

  -- Despite the official State/AID/DOD system, certain individuals
     have operated as free agents making arrangments for contract
     flights and direct liaison with the orphanages.

  -- This has caused considerable confusion and resulted in less
     than desirable service for the orphans.

  -- News reporters covering commercial arrivals at San
     Francisco and Seattle (outside the State/AID/DOD system)
     cited health problems with orphans on these flights.

- Current funding status (funded by State/AID):

  -- Airlift $1,156,772

  -- Medical    166,938

  -- Support    71,916

  -- Total obligated as of 15 Apr - $1,395,626

Prepared by:  MGEN M.F. Casey, USAF
              DOD Orphan Lift Coordinator
              OX 74121



2

# Exhibit 3

NJAPP013



## U.S. Citizenship and Immigration Services

# Refugee Timeline

### Immigration and Naturalization Service Refugee Law and Policy Timeline, 1891-2003

USCIS began overseeing refugee admissions to the U.S. when it began operations on March 1, 2003. Before then, the Immigration and Naturalization Service (INS) administered refugee admissions. This timeline traces the major events and policies that affected refugee admissions under the INS and its predecessor agencies, from 1891 to 2003.

Note: In 1980, the U.S. formally adopted the United Nation's definition of the term "refugee" for legislative purposes. However, Congress, the INS, and the American public have long used and continue to use the term "refugee" to refer to a migrant who arrived in the U.S. after fleeing persecution or violence in his or her home country or after being displaced by natural disaster. This timeline uses that more general meaning of the word "refugee."

| |
|---|
| 1891: The Bureau of Immigration Established |
| 1910-1920: The Mexican Revolution |
| 1917: The Immigration Act of 1917 |
| 1921-1924: The Quota Acts |
| 1939-1945: World War II |
| 1945: The United Nations Established |
| 1945: Presidential Directive on Displaced Persons |
| 1948: Displaced Persons Act of 1948 |
| 1950-1951: The United Nations High Commissioner for Refugees and the 1951 Convention Relating to the Status of Refugees |
| 1952: Immigration and Nationality Act (INA) |
| 1953: Refugee Relief Act of 1953 |
| 1956-1957: Hungarian Escapee Program |

Following the rapid and violent 1956 Hungarian Revolution against the Soviet Union, thousands of Hungarians fled their homeland and



sought refuge in Austria, which soon became overwhelmed by the influx of refugees. As a result, 36 nations, including the U.S., offered to help resettle the displaced Hungarians. The U.S. admitted 6,130 Hungarian refugees under the Refugee Relief Act of 1953.

Additionally, over 30,000 Hungarians entered the U.S. under the attorney general's parole authority (section 212[d][5] of the INA). INS officers examined these applicants in Austria and again when they arrived in the U.S., where they were temporarily held at Camp Kilmer, New Jersey.

Two years later, on July 25, 1958, Congress passed a law allowing Hungarian parolees to become lawful permanent residents of the United States.

This program set the precedent for using the attorney general's parole authority to admit refugees to the U.S. and for Congress to later pass special legislation allowing the parolees to become lawful permanent residents. This process would be repeated on several occasions during the following decades.

Illustration: A group of Hungarian refugees leaving the Camp Kilmer Reception Center in New Jersey in 1956.
*USCIS History Library

---

1952: Azorean Refugee Act of 1958

---

1959-1960: Fair Share Refugee Act of July 14, 1960

---

1959-1962: Cuban Refugees

---



After the Cuban Revolution that brought Fidel Castro into power on Jan. 1, 1959, thousands of Cubans fled for the U.S.

When the U.S. broke diplomatic relations with Cuba in 1961, Cubans could no longer obtain visas in Havana. Instead, the U.S. admitted them under the attorney general's parole authority. During the years 1961-1962, more than 58,000 Cubans entered the U.S. under this program.

The INS operated special processing centers in the Miami, Florida area, where INS officers screened newly arrived Cubans. The INS also held the Cubans until they could be admitted to the U.S. as refugees.

Illustration: Cuban refugees arriving in the United States, 1962.
*State Library & Archives of Florida.

---

1962: Hong Kong Parole Program

---



Initiated in May 1962, the Hong Kong Parole Program used the Attorney General's parole authority to authorize approximately 15,000 Chinese refugees who had fled from communist China to Hong Kong to enter the U.S. The program ran until 1966 and

 approximately 15,000 Chinese refugees were admitted into the United States.

The 1965 Amendments to the INA included provisions that allowed these refugees to adjust to lawful permanent resident status.

Illustration: Wong Yick Yuen family, last group of Hong Kong parolees in fiscal year 1963. USCIS History Office and Library. Wong Yick Yuen family, last group of Hong Kong parolees in fiscal year 1963.
*USCIS History Office and Library.

1962: Migration and Refugee Assistance Act of 1962

1965: The 1965 Amendments to the Immigration and Nationality Act (INA)

1965: Cuban Airlift

 At the same time that he signed the 1965 Amendments to the Immigration and Nationality Act (INA) into law, President Lyndon B. Johnson announced he would open the U.S. to all Cubans seeking refuge from Fidel Castro's communist regime. Shortly thereafter, hundreds of small boats filled with refugees began making the journey from Cuba to southern Florida.

In order to more safely and efficiently bring Cubans to the U.S., the federal government created an airlift program on Dec. 1, 1965. Under this program, Cubans already in the U.S. could apply to have relatives brought into the country. Cuban refugees were screened in Cuba, flown to Miami, and screened again in special processing centers by the INS and other inspection agencies.

By the conclusion of the airlift program in1973, over 3,000 flights had brought more than 250,000 Cuban refugees to the United States.

Illustration: A group of young Cuban refugees entering the U.S. as part of the Cuban airlift arrive in Miami in 1967.
*USCIS History Library.

1966: Cuban Adjustment Act of 1966

 Congress passed the Cuban Adjustment Act of November 2, 1966, in reaction to the influx of Cubans brought by the airlift program. This Act allowed Cuban refugees who had entered the U.S. under the attorney general's parole authority to become lawful permanent residents after two years.

Illustration: Information counter and waiting room at the Cuban Adjustment Center, Miami.
*Annual Report of the Immigration and Naturalization Service, 1967.

Case 1:18-cv-00068   Document 636-3   Filed on 03/02/23 in TXSD   Page 20 of 208

1967: The 1967 United Nations High Commissioner for Refugees Refugee Protocol

1972: INS Administrative Asylum Policies

1975: Indochinese Immigration and Refugee Act of 1975

1977: INS Office of Refugee and Parole

1980: Refugee Act of 1980

1980: Mariel Boatlift

1990: The Lautenberg Amendment

1997: Nicaraguan Adjustment and Central American Relief Act (NACARA)

1998: Haitian Refugee Immigrant Fairness Act

2002-2003: Department of Homeland Security Established, USCIS, CBP, and ICE Created

Last Reviewed/Updated: 02/20/2018

# Exhibit 4

NJAPP018

168

[SEAL OMITTED]

*Congressional Research Service*

**MEMORANDUM**                    July 13, 2012

**To:**     Prepared for Distribution to Multiple
            Congressional Requesters

**From:**   Andorra Bruno, Specialist in Immigration
            Policy, 7-7865
            Todd Garvey, Legislative Attorney, 7-0174
            Kate Manuel, Legislative Attorney, 7-4477
            Ruth Ellen Wasem, Specialist in Immigration
            Policy, 7-7342

**Subject:** **Analysis of June 15, 2012 DHS Memorandum,**
            ***Exercising Prosecutorial Discretion with Re-***
            ***spect to Individuals Who Came to the United***
            ***States as Children***

This Congressional Research Service (CRS) memo-
randum provides background and analysis related to
the memorandum issued by the Department of Home-
land Security (DHS) on June 15, 2012, entitled *Exer-*
*cising Prosecutorial Discretion with Respect to Indi-*
*viduals Who Came to the United States as Children.*
Under the DHS directive, certain individuals who were
brought to the United States as children and meet
other criteria will be considered for relief from remov-
al.   Intended to respond to a variety of congressional
requests on the policy set forth in the DHS memoran-
dum, this CRS memorandum discusses the content of
the June 15, 2012 memorandum, as well as the unau-
thorized alien student issue and related DREAM Act
legislation, past administrative exercises of prosecuto-
rial discretion to provide relief from removal, the legal

169

authority for the actions contemplated in the DHS memorandum, and other related issues.  For further information, please contact Andorra Bruno (unauthorized students and the DREAM Act), Todd Garvey (constitutional authority), Kate Manuel (other legal issues), or Ruth Wasem (antecedents of deferred departure and access to federal benefits).

**Overview of Unauthorized Alien Students**

The unauthorized alien (noncitizen) population includes minors and young adults who were brought, as children, to live in the United States by their parents or other adults.  These individuals are sometimes referred to as "Unauthorized alien students," or, more colloquially, as "DREAM Act kids" or "DREAMers."

While living in the United States, unauthorized alien children are able to receive free public education through high school.[1]  Many unauthorized immigrants who graduate from high school and want to attend college, however, find it difficult to do so.  One reason for this is that they are ineligible for federal student financial aid.[2]  Another reason relates to a provision enacted in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA)[3] that discourages states and localities from granting unauthor-

---

[1]  The legal authority for disallowing state discrimination against unauthorized aliens in elementary and secondary education is the 1982 Supreme Court decision in Plyler v. Doe.  See also CRS Report RS22500, *Unauthorized Alien Students, Higher Education, and In-State Tuition Rates: A Legal Analysis*, by Jody Feder.

[2]  Higher Education Act (HEA) of 1965 (P.L. 89-329), as amended, November 8, 1965, 20 U.S.C. § 1001 *et seq.*

[3]  IIRIRA is Division C of P.L. 104-208, September 30, 1996.

170

ized aliens certain "postsecondary education benefits" (referred to here as the "1996 provision").[4]  More broadly, as unauthorized aliens, they are typically unable to work legally and are subject to removal from the United States.[5]

According to DHS estimates, there were 1.4 million unauthorized alien children under age 18 living in the United States in January 2011.  In addition, there were 1.6 million unauthorized individuals aged 18 to 24, and 3.7 million unauthorized individuals 25 to 34.[6]  These data represent totals and include all individuals in the specified age groups regardless of length of presence in the United States, age at time of initial entry into the United States, or educational status. Numerical estimates of potential beneficiaries of the policy set forth in DHS's June 15, 2012 memorandum are provided below.

---

[4]  This provision, section 505, nominally bars states from conferring postsecondary education benefits (e.g., in-state tuition) to unauthorized aliens residing within their jurisdictions if similar benefits are not conferred to out-of-state U.S. citizens.  Nevertheless, about a dozen states effectively do grant in-state tuition to resident unauthorized aliens without granting similar benefits to out-of-state citizens, and courts that have considered these provisions have upheld them.

[5]  For additional information, see CRS Report RL33863, *Unauthorized Alien Students:  Issues and "DREAM Act" Legislation*, by Andorra Bruno.

[6]  U.S. Department of Homeland Security, Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States:  January 2011*, by Michael Hoefer, Nancy Rytina, and Bryan C. Baker.

171

### Legislation

Multiple bills have been introduced in recent Congresses to provide relief to unauthorized alien students. These bills have often been entitled the Development, Relief, and Education for Alien Minors Act, or the DREAM Act. A common element in these bills is that they would enable certain unauthorized alien students to obtain legal status through an immigration procedure known as *cancellation of removal*[7] and at some point in the process, to obtain legal permanent resident (LPR) status, provided they meet all the applicable requirements. Multiple DREAM Act bills have been introduced in the 112th Congress but none have seen any legislative action.[8]

### Traditional DREAM Act bills

Since the 109th Congress, "standard" DREAM Act bills have included language to repeal the 1996 provision mentioned above and to enable certain unauthorized alien students to adjust status (that is, to obtain LPR status in the United States). These bills have proposed to grant LPR status on a conditional basis to an alien who, among other requirements, could demonstrate that he or she:

---

[7] Cancellation of removal is a discretionary form of relief that an alien can apply for while in removal proceedings before an immigration judge. If cancellation of removal is granted, the alien's status is adjusted to that of a legal permanent resident.

[8] For additional analysis of DREAM Act legislation, see CRS Report RL33863, *Unauthorized Alien Students: Issues and "DREAM Act" Legislation*.

172

- was continuously physically present in the United States for at least five years preceding the date of enactment;

- was age 15 or younger at the time of initial entry;

- had been a person of good moral character since the time of initial entry;

- was at or below a specified age (age has varied by bill) on the date of enactment; and

- had been admitted to an institution of higher education in the United States or had earned a high school diploma or the equivalent in the United States.

The bills also include special requirements concerning inadmissibility,[9] and some would disqualify any alien convicted of certain state or federal crimes. After six years in conditional LPR status, an alien could have the condition on his or her status removed and become a full-fledged LPR if he or she meets additional requirements, including completing at least two years in a bachelor's or higher degree program in the United States or serving in the uniformed services[10] for at

---

[9]  The Immigration and Nationality Act (INA) enumerates classes of inadmissible aliens. Under the INA, except as otherwise provided, aliens who are inadmissible under specified grounds, such as health-related grounds or criminal grounds, are ineligible to receive visas from the Department of State or to be admitted to the United States by the Department of Homeland Security.

[10]  As defined in Section 101(a) of Title 10 of the U.S. Code, *uniformed services* means the Armed Forces (Army, Navy, Air Force, Marine Corps, and Coast Guard); the commissioned corps of the

173

least two years.   Two similar bills with these elements
(S. 952, H.R. 1842)—both entitled the DREAM Act of
2011—have been introduced in the 112th Congress.

**Other Versions of the DREAM Act**

Revised versions of the DREAM Act have also been
introduced in Congress in recent years.   In the 111th
Congress, the House approved one of these DREAM
Act measures as part of an unrelated bill, the Removal
Clarification Act of 2010 (H.R. 5281).[11]    Unlike earlier
DREAM Act bills, this measure[12]  did not include a re-
peal of the 1996 provision and proposed to grant eligi-
ble individuals an interim legal status prior to enabling
them to adjust to LPR status.   Under this measure, an
alien meeting an initial set of requirements like those
included in traditional DREAM Act bills (enumerated
in the previous section) would have been granted condi-
tional *nonimmigrant*[13] status for five years.   This sta-
tus could have been extended for another five years if
the alien met additional requirements, including com-
pleting at least two years in a bachelor's or higher de-
gree program in the United States or serving in the
Armed Forces for at least two years.   The applications
to obtain conditional status initially and to extend this
status would have been subject to surcharges.   At the

---

National Oceanic and Atmospheric Administration; and the commis-
sioned corps of the Public Health Service.

   [11] The Senate failed, on a 55-41 vote, to invoke cloture on a motion
to agree to the House-passed DREAM Act amendment, and H.R.
5281 died at the end of the Congress.

   [12] The language is the same as that in H.R. 6497 in the 111th Con-
gress.

   [13] Nonimmigrants are legal temporary residents of the United
States.

174

end of the second conditional period, the conditional nonimmigrant could have applied to adjust to LPR status.

Two bills in the 112th Congress—the Adjusted Residency for Military Service Act, or ARMS Act (H.R. 3823) and the Studying Towards Adjusted Residency Status Act, or STARS Act (H.R. 5869)—follow the general outline of the House-approved measure described above, but include some different, more stringent requirements. These bills would provide separate pathways for unauthorized students to obtain LPR status through military service (ARMS Act) or higher education (STARS Act). Neither bill would repeal the 1996 provision and, thus, would not eliminate the statutory restriction on state provision of postsecondary educational benefits to unauthorized aliens.

The initial requirements for conditional nonimmigrant status under the ARMS Act are like those in the traditional DREAM Act bills discussed above. The STARS Act includes most of these requirements, as well as others that are not found in other DREAM Act bills introduced in the 112th Congress. Two new STARS Act requirements for initial conditional status are: (1) admission to an accredited four-year college, and (2) submission of the application for relief before age 19 or, in some cases, before age 21.

Under both the ARMS Act and the STARS Act, the conditional nonimmigrant status would be initially valid for five years and could be extended for an additional five years if applicants meet a set of requirements. In the case of the ARMS Act, these requirements would include service in the Armed Forces on active duty for at least two years or service in a reserve component of

175

the Armed Forces in active status for at least four years. In the case of the STARS Act, the requirements for an extension of status would include graduation from an accredited four-year institution of higher education in the United States. After obtaining an extension of status, an alien could apply to adjust to LPR status, as specified in each bill.

**DHS Memorandum of June 15, 2012**

On June 15, 2012, the Obama Administration announced that certain individuals who were brought to the United States as children and meet other criteria would be considered for relief from removal. Under the memorandum, issued by Secretary of Homeland Security Janet Napolitano, these individuals would be eligible for deferred action[14] for two years, subject to renewal, and could apply for employment authorization.[15] The eligibility criteria for deferred action under the June 15, 2012 memorandum are:

---

[14] Deferred action is "a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion." U.S. Department of Homeland Security, "Secretary Napolitano Announces Deferred Action Process for Young People Who Are Low Enforcement Priorities," http://www.dhs.gov/files/enforcement/deferred-action-process-for-young-people-who-are-lowenforcement-priorities.shtm.

[15] U.S. Department of Homeland Security, Memorandum to David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection, Alejandro Mayorkas, Director, U.S. Citizenship and Immigration Services, John Morton, Director, U.S. Immigration and Customs Enforcement, from Janet Napolitano, Secretary of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, June 15, 2012, http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

176

- under age 16 at time of entry into the United States;

- continuous residence in the United States for at least five years preceding the date of the memorandum;

- in school, graduated from high school or obtained general education development certificate, or honorably discharged from the Armed Forces;

- not convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, and not otherwise a threat to national security or public safety; and

- age 30 or below.

These eligibility criteria are similar to those included in DREAM Act bills discussed above.   The deferred action process set forth in the June 15, 2012 memorandum, however, would not grant eligible individuals a legal immigration status.[16]

Based on these eligibility criteria, the Pew Hispanic Center has estimated that the policy set forth in the June 15, 2012 memorandum could benefit up to 1.4 million unauthorized aliens in the United States.   This potential beneficiary population total includes 0.7 mil-

---

[16]  The DHS memorandum states:   "This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.   It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law."   Ibid., p. 3.

177

lion individuals under age 18 and 0.7 million individuals aged 18 to 30.[17]

**Antecedents of the Policy**

The Attorney General and, more recently, the Secretary of Homeland Security have had prosecutorial discretion in exercising the power to remove foreign nationals.   In 1959, a major textbook of immigration law stated, "Congress traditionally has entrusted the enforcement of its deportation policies to executive officers and this arrangement has been approved by the courts."[18]   Specific guidance on how prosecutorial discretion was applied in individual cases was elusive in the early years.[19]   Generally, prosecutorial discretion

---

[17] Pew Hispanic Center, "Up to 1.4 Million Unauthorized Immigrants Could Benefit from New Deportation Policy," June 15, 2012,   http://www.pewhispanic.org/2012/06/15/up-to-1-4-million-unauthorized-immigrants-could-benefit-from-new-deportation-policy/.

[18] Charles Gordon and Harry N. Rosenfield, *Immigration Law and Procedure*, Albany, New York:   Banks and Company, 1959, p. 406.

[19] For example, in 1961, an official with the former Immigration and Naturalization Service (INS) offered his insights on circumstances in which discretionary relief from removal might be provided.   The first factor he cited was age:   "I have always felt that young people should be treated in our proceedings as are juveniles in the Courts who have violated criminal law.   . . .   My personal opinion is that certainly someone under eighteen is entitled to extra consideration."   He added that persons over 60 or 65 years of age should be given special consideration.   He also emphasized length of residence in the United States as a factor, noting that "five years is a significant mark in immigration law."   Other factors he raised included good moral character, family ties in the United States, and exceptional and unusual hardship to the alien as well as family members.   Aaron I. Maltin, Special Inquiry Officer, "Relief from Depor-

178

is the authority that an enforcement agency has in deciding whether to enforce or not enforce the law against someone. In the immigration context, prosecutorial discretion exists across a range of decisions that include: prioritizing certain types of investigations; deciding whom to stop, question and arrest; deciding to detain an alien; issuing a notice to appear (NTA); granting deferred action; agreeing to let the alien depart voluntarily; and executing a removal order. (The legal authority to exercise prosecutorial discretion is discussed separately below.)

Over the next few decades, an official guidance on discretionary relief from removal began to take shape. A 1985 Congressional Research Service "white paper" on discretionary relief from deportation described the policies of Immigration and Naturalization Service (INS)[20] at that time.

> Currently, three such discretionary procedures are relatively routinely used by INS to provide relief from deportation. One of the procedures—stay of deportation—is defined under INS regulations; another—deferred departure or deferred action—is described in INS operating instructions; and the

---

tation," *Interpreter Releases*, vol. 38, no. 21 (June 9, 1961), pp. 150-155. He also discussed refugee and asylum cases.

[20] Most of the immigration-related functions of the former INS were transferred to the U.S. Department of Homeland Security when it was created in 2002 by the Homeland Security Act (P.L. 107-296). Three agencies in DHS have important immigration functions in which prosecutorial discretion may come into play: Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS).

NJAPP029

third—extended voluntary departure—has not been formally defined and appears to be evolving.

The CRS "white paper" further noted that the executive branch uses these three forms of prosecutorial discretion "to provide relief the Administration feels is appropriate but which would not be available under the statute."[21]

In an October 24, 2005, memorandum, William Howard, then-Principal Legal Advisor of DHS's Immigration and Customs Enforcement (ICE), cited several policy factors relevant to the need to exercise prosecutorial discretion.   One factor he identified was institutional change.   He wrote:

> "Gone are the days when INS district counsels . . . could simply walk down the hall to an INS district director, immigrant agent, adjudicator, or border patrol officer to obtain the client's permission to proceed  . . .  Now the NTA-issuing clients might be in different agencies, in different buildings, and in different cities from our own."

Another issue Howard raised was resources.   He pointed out that the Office of Principal Legal Advisor (OPLA) was "handling about 300,000 cases in the immigration courts, 42,000 appeals before the Board of Immigration Appeals (BIA or Board) and 12,000 motions to re-open each year." He further stated:

> "Since 2001, federal immigration court cases have tripled.   That year there were 5,435 federal court

---

[21] Sharon Stephan, *Extended Voluntary Departure and Other Blanket Forms of Relief from Deportation*, Congressional Research Service, 85-599 EPW, February 23, 1985.

180

cases.  Four years later, in fiscal year 2004, that number had risen to 14,699 federal court cases. Fiscal year 2005 federal court immigration cases will approximate 15,000."[22]

Howard offered examples of the types of cases to consider for prosecutorial discretion, such as someone who had a clearly approvable petition to adjust to legal permanent resident status, someone who was an immediate relative of military personnel, or someone for whom sympathetic humanitarian circumstances "cry for an exercise of prosecutorial discretion."[23]

In November 2007, then-DHS Assistant Secretary for ICE Julie L. Myers issued a memorandum in which she clarified that the replacement of the "catch and release" procedure with the "catch and return" policy for apprehended aliens (i.e., a zero-tolerance policy for all aliens apprehended at the border) did not "diminish the responsibility of ICE agents and officers to use discretion in identifying and responding to meritorious health-related cases and caregiver issues."[24]  Assistant Secretary Myers referenced and attached a November 7, 2000, memorandum entitled "Exercising Prosecutorial Discretion," which was written by former INS

---

[22] William J. Howard, Principal Legal Advisor, U.S. Immigration and Customs Enforcement, *Prosecutorial Discretion*, memorandum to all OPLA Chief Counsel, October 24, 2005.

[23] *Ibid.*

[24] Julie L. Myers, Assistant Secretary, Immigration and Customs Enforcement, *Prosecutorial and Custody Discretion*, memorandum, November 7, 2007. CRS Report R42057, *Interior Immigration Enforcement: Programs Targeting Criminal Aliens*, by Marc R. Rosenblum and William A. Kandel. (Hereafter CRS R42057, *Interior Immigration Enforcement*.)

181

Commissioner Doris Meissner.  The 2000 memorandum stated, in part:

> "Like all law enforcement agencies, the INS has finite resources, and it is not possible to investigate and prosecute all immigration violations.  The INS historically has responded to this limitation by setting priorities in order to achieve a variety of goals. These goals include protecting public safety, promoting the integrity of the legal immigration system, and deterring violations of the immigration law. It is an appropriate exercise of prosecutorial discretion to give priority to investigating, charging, and prosecuting those immigration violations that will have the greatest impact on achieving these goals."[25]

Meissner further stated that prosecutorial discretion should not become "an invitation to violate or ignore the law."[26]

The Meissner, Howard, and Myers memoranda provide historical context for the March 2011 memorandum on prosecutorial discretion written by ICE Director John Morton.[27]  Morton published agency guidelines that define a three-tiered priority scheme that applies to all ICE programs and enforcement activities related to

---

[25] Doris Meissner, Commissioner, Immigration and Naturalization Service, *Exercising Prosecutorial Discretion*, memorandum to regional directors, district directors, chief patrol agents, and the regional and district counsels, November 7, 2000.

[26] *Ibid.*

[27] John Morton, Director, Immigration and Customs Enforcement, *Civil Immigration Enforcement Priorities for the Apprehension, Detention, and Removal of Aliens*, memorandum, March 2, 2011.

182

civil immigration enforcement.[28] Under these guidelines, ICE's top three civil immigration enforcement priorities are to: (1) apprehend and remove aliens who pose a danger to national security or a risk to public safety, (2) apprehend and remove recent illegal entrants,[29] and (3) apprehend aliens who are fugitives or otherwise obstruct immigration controls.[30]

---

[28] ICE's mission includes the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration; see ICE, "ICE Overview: Mission," http://www.ice.gov/about/overview/. Laws governing the detention and removal of unauthorized aliens generally fall under ICE's civil enforcement authority, while laws governing the prosecution of crimes, including immigration-related crimes, fall under ICE's criminal enforcement authority. Also see Hiroshi Motomura, "The Discretion That Matters: Federal Immigration Enforcement, State and Local Arrests, and the Civil-Criminal Line," *UCLA Law Review*, vol. 58, no. 6 (August 2011), pp. 1819-1858.

[29] The memorandum does not define "recent illegal entrants." DHS regulations permit immigration officers to summarily exclude an alien present in the United States for less than two years unless the alien expresses an intent to apply for asylum or has a fear of persecution or torture; and DHS policy is to pursue expedited removal proceedings against aliens who are determined to be inadmissible because they lack proper documents, are present in the United States without having been admitted or paroled following inspection by an immigration officer at a designated port of entry, are encountered by an immigration officer within 100 miles of the U.S. border, and have not established to the satisfaction of an immigration officer that they have been physically present in the United States for over 14 days. See CRS Report RL33109, *Immigration Policy on Expedited Removal of Aliens*, by Alison Siskin and Ruth Ellen Wasem.

[30] CRS Report R42057, *Interior Immigration Enforcement: Programs Targeting Criminal Aliens*, by Marc R. Rosenblum and William A. Kandel.

183

In a June 17, 2011 memorandum, Morton spells out 18 factors that are among those that should be considered in weighing prosecutorial discretion. The factors include those that might halt removal proceedings, such as whether the person's immediate relative is serving in the military, whether the person is a caretaker of a person with physical or mental disabilities, or whether the person has strong ties to the community. The factors Morton lists also include those that might prioritize a removal proceeding, such as whether the person has a criminal history, whether the person poses a national security or public safety risk, whether the person recently arrived in the United States, and how the person entered. At the same time, the memorandum states:

> "This list is not exhaustive and no one factor is determinative. ICE officers, agents and attorneys should always consider prosecutorial discretion on a case-by-case basis. The decisions should be based on the totality of the circumstances, with the goal of conforming to ICE's enforcement priorities."

The Morton memorandum would halt removal proceedings on those foreign nationals that are not prioritized for removal. The foreign nationals whose removals are halted in keeping with the Morton memorandum might be given deferred action or some other relief from removal.[31]

---

[31] John Morton, Director of Immigration and Customs Enforcement, *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for Apprehension, Detention and Removal of Aliens*, memorandum to field office directors, special agents in charge, and chief counsels, June 17, 2011.

184

**Deferred Action**

In 1975, INS issued guidance on a specific form of prosecutorial discretion known as deferred action, which cited "appealing humanitarian factors." The INS Operating Instructions said that consideration should be given to advanced or tender age, lengthy presence in the United States, physical or mental conditions requiring care or treatment in the United States, and the effect of deportation on the family members in the United States. On the other hand, those INS Operating Instructions made clear that criminal, immoral or subversive conduct or affiliations should also be weighed in denying deferred action.[32]  Today within DHS, all three of the immigration-related agencies—ICE, U.S. Citizenship and Immigration Services (USCIS), and Customs and Border Protection (CBP)—possess authority to grant deferred action. A foreign national might be considered for deferred action at any stage of the administrative process.[33]

Because of where the foreign national may be in the process, ICE issuances of deferred action are more likely to be aliens who are detained or in removal proceedings. It is especially important to note, as mentioned above, that not all prosecutorial discretion decisions to halt removal proceedings result in a grant of deferred action to the foreign national. Voluntary

---

[32] Shoba Sivaprasad Wadhia, "The Role of Prosecutorial Discretion in Immigration Law," *Connecticut Public Interest Law Journal*, Spring 2010.

[33] Charles Gordon, Stanley Mailman, Stephen Yale-Loehr, *Immigration Law and Procedure*. Newark: LexisNexis, vol. 6, §72.03.

185

departure, for example, might be an alternative out-come of prosecutorial discretion.[34]

**Other Forms of Deferred Departure**

In addition to deferred action, which is granted on a case-by-case basis, the Administration may use prose-cutorial discretion, under certain conditions, to provide relief from deportation that is applied as blanket relief.[35]   The statutory authority cited by the agency for these discretionary procedures is generally that portion of the INA that confers on the Attorney General the broad authority for general enforcement and the sec-tion of the law covering the authority for voluntary departure.[36]

The two most common uses of prosecutorial discretion to provide blanket relief from deportation have been deferred departure or deferred enforced depar-ture (DED) and extended voluntary departure

---

[34] Voluntary departure typically means that the alien concedes removability and departs the United States on his or her own re-cognizance, rather than with a final order of removal.

[35] In addition to relief offered through prosecutorial discretion, the INA provides for Temporary Protected Status (TPS).   TPS may be granted under the following conditions:   there is ongoing armed conflict posing serious threat to personal safety; a foreign state requests TPS because it temporarily cannot handle the return of nationals due to environmental disaster; or there are extraordi-nary and temporary conditions in a foreign state that prevent aliens from returning, provided that granting TPS is consistent with U.S. national interests.   CRS Report RS20844, *Temporary Protected Status:   Current Immigration Policy and Issues*, by Ruth Ellen Wasem and Karma Ester.

[36] §240 of INA, 8 U.S.C. §1229a; §240B, 8 U.S.C. §1229c.

186

(EVD).[37]   The discretionary procedures of DED and EVD continue to be used to provide relief the Administration feels is appropriate.   Foreign nationals who benefit from EVD or DED do not necessarily register for the status with USCIS, but they trigger the protection when they are identified for deportation.   If, however, they wish to be employed in the United States, they must apply for a work authorization from USCIS.

The executive branch has provided blanket or categorical deferrals of deportation numerous times over the years.   CRS has compiled a list of these administrative actions since 1976 in **Appendix A**.[38]   As the table indicates, most of these discretionary deferrals have been done on a country-specific basis, usually in response to war, civil unrest, or natural disasters.   In many of these instances, Congress was considering legislative remedies for the affected groups, but had not yet enacted immigration relief for them.   The immigration status of those who benefited from these deferrals of deportation often—but not always—was resolved by legislation adjusting their status (**Appendix A**).

---

[37]  As TPS is spelled out in statute, it is not considered a use of prosecutorial discretion, but it does provide blanket relief from removal temporarily.

[38]  **Appendix A** only includes those administrative actions that could be confirmed by copies of official government guidance or multiple published accounts.   For example, reports of deferred action after Hurricane Katrina or the September 11, 2001, terrorist attacks could not be verified, though it seems likely that the Administration did provide some type of temporary reprieve.

187

**Two Illustrative Examples**

Several of the categorical deferrals of deportation that were **not** country-specific bear some similarities to the June 15, 2012 policy directive.  Two examples listed in **Appendix A** are summarized below: the "Silva letter-holders" class and the "family fairness" relatives. Both of these groups receiving discretionary relief from deportation were unique in their circumstances. While each group included many foreign nationals who would otherwise be eligible for LPR visas, they were supposed to wait in numerically-limited visa categories. These wait times totaled decades for many of them. Congress had considered but not enacted legislation addressing their situations.  Ultimately, their cases were resolved by provisions folded into comprehensive immigration legislation.[39]

The "Silva letterholders" were foreign nationals from throughout the Western Hemisphere who were in the United States without legal authorization.  In 1976, the Attorney General opined that the State Department had been incorrectly charging the visas for Cuban refugees against the Western Hemisphere numerical limits from 1966 to 1976.  A class action case named for Mr. Refugio Silva was filed to recapture the 145,000 LPR visas given to Cubans for foreign nationals with approved petitions from other Western Hemisphere nations.  Apparently many of the aliens involved in the case were already in the country, out-of-status, even though they had LPR petitions pending.  In other

---

[39] These policies and legal provisions pre-date the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (referenced above), which added substantial new penalties and bars for illegal presence in the United States.

188

words, they had jumped the line.  In 1977, the Attorney General temporarily suspended the expulsion while the class action case moved forward.  Class members were allowed to apply for work authorization.  Meanwhile, Congress passed amendments to the INA in 1978 that put the Western Hemisphere nations under the per-country cap, which further complicated their situation, by making visa availability more difficult for some but not all of the Western Hemisphere countries.  The courts ruled for the Silva class, but the 145,000 recaptured visas were inadequate to cover the estimated 250,000 people who had received letters staying their deportation and permitting them to work.  When the dependents of the Silva letterholders were included, the estimated number grew to almost half a million.  Most of those in the Silva class who did not get one of the recaptured visas were ultimately eligible to legalize through P.L. 99-603, the Immigration Reform and Control Act (IRCA) of 1986.

Another example are the unauthorized spouses and children of aliens who legalized through IRCA.  As Congress was debating IRCA, it weighed and opted not to provide a legalization pathway for the immediate relatives of aliens who met the requirements of IRCA unless they too met those requirements.  As IRCA's legalization programs were being implemented, the cases of unauthorized spouses and children who were not eligible to adjust with their family came to the fore.  In 1987, Attorney General Edward Meese authorized the INS district directors to defer deportation proceedings where "compelling or humanitarian factors existed."  Legislation addressing this population was introduced throughout the 1980s, but not enacted.  In 1990, INS Commissioner Gene McNary issued a new

189

"Family Fairness" policy for family members of aliens legalized through IRCA, dropping the where "compelling or humanitarian factors existed" requirement. At the time, McNary stated that an estimated 1.5 million unauthorized aliens would benefit from the policy. The new policy also allowed the unauthorized spouses and children to apply for employment authorizations. Ultimately, the Immigration Act of 1990 (P.L. 101-649) provided relief from deportation and employment authorization to them so they could remain in the United States until a family-based immigration visa became available.   P.L. 101-649 also provided additional visas for the family-based LPR preference category in which they were waiting.

**Legal Authority Underlying the June 15, 2012 Memorandum**

The Secretary of Homeland Security would appear to have the authority to grant both deferred action and work authorization, as contemplated by the June 15 memorandum, although the basis for such authority is different in the case of deferred action than in the case of work authorization.   The determination as to whether to grant deferred action has traditionally been recognized as within the prosecutorial discretion of immigration officers[40] and, thus, has been considered an inherent power of the executive branch, to which the

---

[40] *See, e.g.*, Matter of Yauri, 25 I. & N. Dec. 103 (2009) (characterizing a grant of deferred action as within the prosecutorial discretion of immigration officers); Doris Meissner, Commissioner, Immigration and Naturalization Service, *Exercising Prosecutorial Discretion*, Nov. 7, 2000, at 2 (listing "granting deferred action or staying a final order of removal" among the determinations in which immigration officers may exercise prosecutorial discretion).

190

Constitution entrusts decisions about whether to enforce particular cases.[41]  While it could perhaps be argued that decisions to refrain from fully enforcing a law might, in some instances, run afoul of particular statutes that set substantive priorities for or otherwise circumscribe an agency's power to discriminate among the cases it will pursue, or run afoul of the President's constitutional obligation to "take care" that the law is faithfully executed, such claims may not lend themselves to judicial resolution.[42]   In contrast, when it enacted the Immigration Reform and Control Act of 1986, Congress delegated to the Attorney General (currently, the Secretary of Homeland Security) the authority to grant work authorization to aliens who are unlawfully present.[43]

**Authority to Exercise Prosecutorial Discretion**

The established doctrine of "prosecutorial discretion" provides the federal government with "broad" latitude in determining when, whom, and whether to prosecute particular violations of federal law.[44]   The decision to

---

[41]  *See, e.g.,* United States v. Armstrong, 517 U.S. 456, 464 (1996) (noting that the Attorney General and the United States Attorneys have wide latitude in enforcing federal criminal law because "they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed'").

[42]  *See infra* notes 66-85 and accompanying text.

[43]  P.L. 99-603, 100 Stat. 3359 (Nov. 6, 1986) (codified, as amended, at 8 U.S.C. §§1324a-1324b).

[44]  United States v. Goodwin, 457 U.S. 368, 380 (1982).  *See also* Exercising Prosecutorial Discretion, *supra* note 40, at 2 (defining prosecutorial discretion as "the authority of an agency charged with enforcing a law to decide whether to enforce, or not enforce, the law against someone").

191

prosecute is one that lies "exclusively" with the prosecutor.[45]   This doctrine, which is derived from the Constitution's requirement that the President "shall take Care that the Laws be faithfully executed,"[46] has traditionally been considered to be grounded in the constitutional separation of powers.[47]   Indeed, both federal and state courts have ruled that the exercise of prosecutorial discretion is an executive function necessary to the proper administration of justice.   Thus, prosecutorial discretion may be appropriately characterized as a constitutionally-based doctrine.

### Prosecutorial Discretion Generally

In granting discretion to enforcement officials, courts have recognized that the "decision to prosecute is particularly ill-suited to judicial review," as it involves the consideration of factors—such as the strength of evidence, deterrence value, and existing enforcement priorities—"not readily susceptible to the kind of analysis the courts are competent to undertake."[48]   Moreover, the Executive Branch has asserted that "because the essential core of the President's constitutional responsibility is the duty to enforce the laws, the Executive Branch has exclusive authority to initiate and

---

[45]   *See* United States v. Nixon, 418 U.S. 683, 693 (1974) (citing the *Confiscation Cases*, 7 Wall. 454 (1869) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case   . . .   ")).

[46]   U.S. Const. art. II, §3 ("[H]e shall take Care that the Laws be faithfully executed   . . .   ").

[47]   *See, e.g.*, *Armstrong*, 517 U.S. at 464.

[48]   Wayte v. United States, 470 U.S. 598, 607 (1985).

192

prosecute actions to enforce the laws adopted by Congress."[49]

An agency decision to initiate an enforcement action in the *administrative* context "shares to some extent the characteristics of the decision of a prosecutor in the executive branch" to initiate a prosecution in the criminal context.[50]   Thus, just as courts are hesitant to question a prosecutor's decisions with respect to whether to bring a criminal prosecution, so to are courts cautious in reviewing an agency's decision not to bring an enforcement action.   In the seminal case of *Heckler v. Cheney*, the Supreme Court held that "an

---

[49] *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. Off. Legal Counsel 101, 114 (1984).   This traditional conception, however, may have been qualified in some respects following the Supreme Court's decision in *Morrison v. Olson*, in which the Court upheld a congressional delegation of prosecutorial power to an "independent counsel" under the Ethics in Government Act[49] In sustaining the validity of the statute's appointment and removal conditions, the Court suggested that although the independent counsel's prosecutorial powers—including the "no small amount of discretion and judgment [exercised by the counsel] in deciding how to carry out his or her duties under the Act"—were executive in that they had "typically" been performed by Executive Branch officials, the court did not consider such an exercise of prosecutorial power to be "so central to the functioning of the Executive Branch" as to require Presidential control over the independent counsel.   487 U.S. 654 (1988).   While the ultimate reach of *Morrison* may be narrow in that the independent counsel was granted only limited jurisdiction and was still subject to the supervision of the Attorney General, it does appear that Congress may vest certain prosecutorial powers, including the exercise of prosecutorial discretion, in an executive branch official who is independent of traditional presidential controls.

[50]  *Heckler v. Cheney*, 470 U.S. 821, 832 (1985).

193

agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."[51]   The Court noted that agency enforcement decisions, like prosecution decisions, involve a "complicated balancing" of agency interests and resources—a balancing that the agency is "better equipped" to evaluate than the courts.[52]   The *Heckler* opinion proceeded to establish the standard for the reviewability of agency non-enforcement decisions, holding that an "agency's decision not to take enforcement action should be presumed immune from judicial review."[53]   That presumption however, may be overcome "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers,"[54] as is discussed below.

### Prosecutorial Discretion in the Immigration Context

In *Reno v. American-Arab Anti-Discrimination Committee*, a majority of the Supreme Court found that the various prudential concerns that prompt deference to the executive branch's determinations as to whether to prosecute criminal offenses are "greatly magnified in the deportation context,"[55] which entails civil (rather

---

[51] *Id.* at 831.   Accordingly, such decisions are generally precluded from judicial review under the Administrative Procedure Act (APA). 5 U.S.C. §701 (establishing an exception to the APA's presumption of reviewability where "agency action is committed to agency discretion by law.").

[52] *Heckler*, 470 U.S. at 831.

[53] *Id.* at 832.

[54] *Id.* at 833.

[55] 525 U.S. 471, 490 (1999).   *See also* United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 543 (1950) (noting that immigration is

194

than criminal) proceedings. While the reasons cited by the Court for greater deference to exercises of prosecutorial discretion in the immigration context than in other contexts reflect the facts of the case, which arose when certain removable aliens challenged the government's decision *not* to exercise prosecutorial discretion in their favor,[56] the Court's language is broad and arguably can be construed to encompass decisions to favorably exercise such discretion. More recently, in its decision in *Arizona v. United States*, a majority of the Court arguably similarly affirmed the authority of the executive branch not to seek the removal of certain aliens, noting that "[a] principal feature of the removal system is the broad discretion entrusted to immigration officials," and that "[r]eturning an alien to his own country may be deemed inappropri-

---

a "field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program").

[56] Specifically, the Court noted that any delays in criminal proceedings caused by judicial review of exercises of prosecutorial discretion would "merely . . . postpone the criminal's receipt of his just desserts," while delays in removal proceedings would "permit and prolong a continuing violation of United States law," and could potentially permit the alien to acquire a basis for changing his or her status. *Reno*, 525 U.S. at 490. The Court further noted that immigration proceedings are unique in that they can implicate foreign policy objectives and foreign-intelligence techniques that are generally not implicated in criminal proceedings. *Id.* at 491. It also found that the interest in avoiding selective or otherwise improper prosecution in immigration proceedings, discussed below, is "less compelling" than in criminal proceedings because deportation is not a punishment and may be "necessary to bring to an end an ongoing violation of United States law." *Id.* (emphasis in original).

195

ate even where he has committed a removable offense or fails to meet the criteria for admission."[57]   According to the majority, such exercises of prosecutorial discretion may reflect "immediate human concerns" and the "equities of . . . individual case[s]," such as whether the alien has children born in the United States or ties to the community, as well as "policy choices that bear on . . . international relations."[58]

In addition to such general affirmations of the executive branch's prosecutorial discretion in the immigration context, other cases have specifically noted that certain decisions are within the prosecutorial discretion afforded first to INS and, later, the immigration components of DHS.   These decisions include:

- whether to parole an alien into the United States;[59]

- whether to commence removal proceedings and what charges to lodge against the respondent;[60]

- whether to cancel a Notice to Appear or other charging document before jurisdiction vests in an immigration judge;[61]

---

[57] No. 11-182, Opinion of the Court, slip op. at 4-5 (June 25, 2011). Justice Scalia's dissenting opinion, in contrast, specifically cited the June 15 memorandum when asserting that "there is no reason why the Federal Executive's need to allocate its scarce enforcement resources should disable Arizona from devoting its resources to illegal immigration in Arizona that in its view the Federal Executive has given short shrift."   Opinion of Scalia, J., slip op., at 19 (June 25, 2011).

[58] No. 11-182, Opinion of the Court, slip op. at 4-5.

[59] *See, e.g.,* Matter of Artigas, 23 I. & N. Dec. 99 (2001).

[61] *See, e.g.*, Matter of G-N-C, 22 I. & N. Dec. 281 (1998).

196

- whether to grant deferred action or extended voluntary departure;[62]

- whether to appeal an immigration judge's decision or order, and whether to file a motion to reopen;[63] and

- whether to impose a fine for particular offenses.[64]

The recognition of immigration officers' prosecutorial discretion in granting deferred action is arguably particularly significant here, because the June 15 memorandum contemplates the grant of deferred action to aliens who meet certain criteria (e.g., came to the United States under the age of sixteen).

**Limitations on the Exercise of Prosecutorial Discretion**

While the executive branch's prosecutorial discretion is broad, it is not "unfettered,"[65] and has traditionally been exercised pursuant to individualized determinations. Thus, an argument could potentially be made that the permissible scope of prosecutorial or enforcement discretion is exceeded where an agency utilizes its discretion to adopt a broad policy of non-enforcement as to particular populations in an effort to prioritize goals and maximize limited resources. It would ap-

---

[62] *See, e.g.*, Matter of Yauri, 25 I. & N. Dec. 103 (2009) (deferred action); Hotel & Rest. Employees Union Local 25 v. Smith, 846 F.2d 1499, 1510-11 (D.C. Cir. 1988), *aff'g*, 563 F. Supp. 157 (D.D.C. 1983) (extended voluntary departure).

[63] *See, e.g.*, Matter of Avetisyan, 25 I. & N. Dec. 688 (2012); Matter of York, 22 I. & N. Dec. 660 (1999).

[64] *See, e.g.*, Matter of M/V Saru Meru, 20 I. & N. Dec. 592 (1992).

[65] United States v. Batchelder, 442 U.S. 114, 125 (1979).

197

pear, especially with respect to agency enforcement actions, that the invocation of prosecutorial discretion does not create an absolute shelter from judicial review, but rather is subject to both statutory and constitutional limitations.[66]   As noted by the U.S. Court of Appeals for the District of Columbia Circuit:  "the decisions of this court have never allowed the phrase 'prosecutorial discretion' to be treated as a magical incantation which automatically provides a shield for arbitrariness."[67]  While it is apparent, then, that the exercise of prosecutorial discretion is subject to certain restrictions, the precise boundaries beyond which the executive may not cross remain unclear.  Moreover, even if existing statutory or constitutional restrictions were conceivably applicable to the June 15 memorandum, standing principles would likely prevent judicial resolution of any challenge to the memorandum on these grounds.[68]

---

[66]  Nader v. Saxbe, 497 F.2d 676, 679 (D.C. Cir. 1974) ("It would seem to follow that the exercise of prosecutorial discretion, like the exercise of Executive discretion generally, is subject to statutory and constitutional limits enforceable through judicial review.")

[67]  *Id.* at 679 (citing *Medical Committee for Human Rights v. SEC*, 432 F.2d 659 (D.C. Cir. 1970)).

[68]  In order to satisfy constitutional standing requirements, a prospective plaintiff must have suffered a personal and particularized injury that is "fairly traceable" to the defendant's conduct and is likely to be redressed by the relief requested from the court.  *See, e.g.*, Allen v. Wright, 468 U.S. 737 (1984).   It is difficult to envision a potential plaintiff who has been adequately injured by the issuance of the June 15 memorandum such that the individual could satisfy the Court's standing requirements.   Standing is a threshold justiciability requirement.   Thus, unless a plaintiff can attain standing to challenge the DHS directive, it would not appear that a court would have the opportunity to evaluate the directive's validity.

198

### *Potential Statutory Limitations on the Exercise of Prosecutorial Discretion*

With respect to statutory considerations, the presumption following the Supreme Court's decision in *Heckler v. Cheney* has been that agency decisions not to initiate an enforcement action are unreviewable.  However, *Heckler* expressly held that this presumption against the reviewability of discretionary enforcement decisions can be overcome "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."[69]  Consistent with *Heckler*, a court may be willing to review a broad agency non-enforcement policy where there is evidence that Congress intended to limit enforcement discretion by "setting substantive priorities, or by otherwise circumscribing the agency's power to discriminate among issues or cases it will pursue."[70]  The Heckler opinion also suggested that scenarios in which an agency has "'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities" may be subject to a different standard of review.[71]

---

[69]  470 U.S. 821, 833 (1985).

[70]  *Id.*

[71]  *Id.* at 833 n.4 ("Nor do we have a situation where it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities.   *See, e.g.*, Adams v. Richardson, 480 F.2d 1159 (1973) (en banc). Although we express no opinion on whether such decisions would be unreviewable under §701(a)(2), we note that in those situations the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion.'").

199

Reviewability of the policy underlying the June 15 memorandum might, however, be limited even under a broad reading of Heckler, in part, because the INA does not generally address deferred action,[72] much less provide guidelines for immigration officers to follow in exercising it.   Some commentators have recently asserted that amendments made to Section 235 of the INA by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 removed immigration officers' discretion as to whether to bring removal proceedings against aliens who unlawfully entered the United States.[73]   Specifically, this argument holds that, pursuant to Section 235, as amended:

---

[72] The INA uses the phrase "deferred action" only three times, in very specific contexts, none of which correspond to the proposed grant of deferred action contemplated by the June 15 memorandum. *See* 8 U.S.C. §1151 note (addressing the extension of posthumous benefits to certain surviving spouses, children, and parents); 8 U.S.C. §1154(a)(1)(D)(i)(IV) ("Any [victim of domestic violence] described in subclause (III) and any derivative child of a petition described in clause (ii) is eligible for deferred action and work authorization."); 8 U.S.C. §1227(d)(2) (providing that the denial of a request for an administrative stay of removal does not preclude the alien from applying for deferred action, among other things). However, INS and, later, DHS policies have long addressed the use of deferred action in other contexts on humanitarian grounds and as a means of prioritizing cases.   *See, e.g.*, Leon Wildes, *The Deferred Action Program of the Bureau of Citizenship and Immigration Services:   A Possible Remedy for Impossible Immigration Cases*, 41 SAN DIEGO L. REV. 819, 821 (2004) (discussing a 1970's INA Operations Instruction on deferred action).   This Instruction was rescinded in 1997, but the policy remained in place.   *See, e.g.*, Charles Gordon, Stanley Mailman, & Stephen Yale-Loehr, 6-72 IMMIGR. L. & PROC. §72.03 (2012).

[73] *See, e.g.*, Kris W. Kobach, *The "DREAM" Order Isn't Legal*, NEW YORK POST, June 21, 2012, http://www.nypost.com/p/news/

200

1)  any alien present in the United States who has not been admitted (i.e., aliens who entered unlawfully) "shall be deemed . . . an applicant for admission;"

2)  all aliens who are applicants for or otherwise seeking admission "shall be inspected by immigration officers;" and

3)  in the case of an alien who is an applicant for admission, if the examining immigration officer determines that the alien is not clearly and beyond a doubt entitled to be admitted, the alien "shall be detained" for removal proceedings.[74]

It appears, however, that this argument may have been effectively foreclosed by the majority opinion in *Arizona*, where the Supreme Court expressly noted the "broad discretion exercised by immigration officials" in the removal process.[75]   Moreover, the argument apparently relies upon a construction of the word "shall" that has generally been rejected in the context of prosecutions and immigration enforcement actions.[76]   Rather than viewing "shall" as indicating mandatory agency actions, courts and the Board of Immigration Appeals (BIA), the highest administrative body responsible for interpreting and applying immigration

---

opinion/opedcolumnists/the_dream_order_isn_legal_4WAYaqJuea EK6MS0onMJCO.

[74] Arizona v. United States, No. 11-182, *Amicus Curiae* Brief of Secure States Initiative in Support of Petitioners, at 8-9 (quoting 8 U.S.C. §1225(a)(1), (a)(3), and (b)(2)(A)).

[75] No. 11-182, Opinion of the Court, slip op. at 4-5.

[76] *Cf.* Exercising Prosecutorial Discretion, *supra* note 40, at 3 ("[A] statute directing that the INS 'shall' remove removable aliens would not be construed by itself to limit prosecutorial discretion.").

NJAPP051

201

law in removal cases, have instead generally found that prosecutors and enforcement officers retain discretion to take particular actions even when a statute uses "shall" or "must" when discussing these actions.[77]

It is also unclear that the actions contemplated by the June 15 memorandum conflict with any substantive priorities set by Congress, or are "so extreme as to amount to an abdication" of DHS's responsibilities under the INA.  For example, it appears that an argument could potentially be made to the contrary that the policy comports with the increased emphasis that Congress has placed upon the removal of "criminal aliens" with amendments made to the INA by IRCA, IIRIRA, and other statutes.[78]   The June 15 memorandum expressly excludes from eligibility for deferred action

---

[77] *See, e.g.*, Matter of E-R-M & L-R-M, 25 I. & N. Dec. 520, 523 (2011) (finding that determinations as to whether to pursue expedited removal proceedings (as opposed to removal proceedings under Section 240 of the INA) are within ICE's discretion, even though the INA uses "shall" in describing who is subject to expedited removal).  The Board here specifically noted that, "in the Federal criminal code, Congress has defined most crimes by providing that whoever engages in certain conduct 'shall' be imprisoned or otherwise punished.  But this has never been construed to require a Federal prosecutor to bring charges against every person believed to have violated the statute."   *Id.* at 522.

[78] *See, e.g.*, IRCA, P.L. 99-603, §701, 100 Stat. 3445 (codified, as amended, at 8 U.S.C. §1229(d)(1)) (making the deportation of aliens who have been convicted of certain crimes an enforcement priority by requiring immigration officers to "begin any deportation proceeding as expeditiously as possible after the date of  . . .  conviction"); IIRIRA, P.L. 104-208, div. C, 110 Stat. 3009-546 to 3009-724 (expanding the definition of "aggravated felony," convictions for which can constitute grounds for removal, and creating additional criminal grounds for removal).

202

persons who have been convicted of a felony, a significant misdemeanor, or multiple misdemeanors,[79] thereby potentially allowing immigration officers to focus their enforcement activities upon the "criminal aliens" who were identified as higher priorities for removal in earlier Obama Administration guidance on prosecutorial discretion.[80]   In addition, Congress has funded immigration enforcement activities at a level that immigration officials have indicated is insufficient for the removal of all persons who are present in the United States without authorization.   This level of funding figures prominently in the Obama Administration's rationale for designating certain aliens as lower priorities for removal,[81]   and could potentially be said to counter any assertion that the Obama Administration's policy amounts to an "abdication" of its statutory responsibilities.

### *Potential Constitutional Limitations on the Exercise of Prosecutorial Discretion*

With respect to constitutional considerations, it is clear that executive branch officials may not exercise prose-

---

[79] Janet Napolitano, Secretary of Homeland Security, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, June 15, 2012, http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretionindividuals-who-came-to-us-as-children.pdf.

[80] *See, e.g.*, John Morton, Director, U.S. ICE, Civil Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens, Mar. 2, 2011, at 1-2, http://www.ice.gov/doclib/news/releases/2011/110302washingtondc.pdf.

[81] *Id.*, at 1 (estimating that ICE has resources to remove annually less than four percent of the noncitizens who are in the United States without authorization).

203

cutorial discretion in a manner that is inconsistent with established constitutional protections or other constitutional provisions. Selective prosecution cases commonly illustrate such an abuse of prosecutorial discretion. These cases typically arise where certain enforcement determinations, such as whether to prosecute a specific individual, are made based upon impermissible factors, such as race or religion.[82] A separate constitutional argument may be forwarded, however, in situations where the executive branch has, in effect, broadly refused to enforce a duly enacted statute by implementing a blanket ban on enforcement such that the agency has "expressly adopted a general policy which is in effect an abdication of its statutory duty."[83] By refusing to fully enforce certain aspects of a statutory provision, such an action may exceed the permissible scope of prosecutorial discretion and violate the President's duty that the "laws be faithfully executed."[84] However, CRS was unable to find a single case in which a court invalidated a policy of non-enforcement founded upon prosecutorial discretion on the grounds that the policy violated the Take Care clause. Moreover, it is unclear whether the June 15 memorandum would constitute an absolute non-enforcement policy so as to amount to an "abdication" of a statutory obligation, as discussed previously.

---

[82] Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) (holding that a decision may not be "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification"). *But see Reno*, 525 U.S. at 488 ("[A]s a general matter . . . an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation.").

[83] *See* Adams v. Richardson, 480 F.2d 1159, 1162 (D.C. Cir. 1973).

[84] U.S. Const. art. II, §3.

NJAPP054

204

Though establishing a department-wide policy regarding a group of individuals who meet certain criteria, the directive suggests that the listed criteria should be "considered" in each individual case.  Thus, the directive could be interpreted as setting forth criteria for consideration in each individual exercise of prosecutorial discretion, rather than implementing a ban on deportation actions for qualified individuals.[85]

**Authority to Grant Work Authorization**

The INA grants the Secretary of Homeland Security arguably wide latitude to issue work authorization, including to aliens who are unlawfully present.  Since the enactment of IRCA in 1986, federal law has generally prohibited the hiring or employment of "unauthorized aliens."[86]  However, the definition of "unauthorized alien" established by IRCA effectively authorizes the Secretary to grant work authorization to aliens who are unlawfully present by defining an "unauthorized" alien as one who:

> with respect to the employment of an alien at a particular time,  . . .  is not either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General [currently, Secretary of Homeland Security].[87]

---

[85]  As is discussed elsewhere in this memorandum, there have been other instances where deferred action or extended voluntary departure was granted to individuals who were part of a more broadly defined group (e.g., persons from Nicaragua, surviving spouses and children of deceased U.S. citizens, victims and witnesses of crimes).

[86]  *See* 8 U.S.C. §§1324a-1324b.

[87]  8 U.S.C. §1324a(h)(3).

NJAPP055

Regulations promulgated by INS and DHS further provide that aliens who have been granted deferred action and can establish an "economic necessity for employment" may apply for work authorization.[88]

When first promulgated in 1987,[89] these regulations were challenged through the administrative process on the grounds that they exceeded INS's statutory authority.[90] Specifically, the challengers asserted that the statutory language referring to aliens "authorized to be . . . employed by this chapter or by the Attorney General" did not give the Attorney General authority to grant work authorization "except to those aliens who have already been granted specific authorization by the Act."[91] Had this argument prevailed, the authority of INS and, later, DHS to grant work authorization to persons granted deferred action would have been in doubt, because the INA does not expressly authorize the grant of employment documents to such persons. However, INS rejected this argument on the grounds that the:

> only logical way to interpret this phrase is that Congress, being fully aware of the Attorney Gen-

---

[88] 8 C.F.R. §274a.12(c)(14). Under these regulations, the "basic criteria" for establishing economic necessity are the federal poverty guidelines. See 8 C.F.R. §274a.12(e).

[89] See INS, Control of Employment of Aliens: Final Rule, 52 Fed. Reg. 16216 (May 1, 1987).

[90] INS, Employment Authorization; Classes of Aliens Eligible, 52 Fed. Reg. 46092 (Dec. 4, 1987) (denying a petition for rulemaking submitted by the Federation for American Immigration Reform, which sought the rescission of certain regulations pertaining to employment authorization for aliens in the United States).

[91] Id.

eral's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined "unauthorized alien" in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute.[92]

Subsequent case law has generally affirmed that immigration officials have broad discretion in determining whether to deny or revoke work authorizations to persons granted deferred action, or in other circumstances.[93]   These cases would appear to suggest that, by extension, immigration officials have similarly broad discretion to grant work authorization provided any requisite regulatory criteria (e.g., economic necessity) are met.

**Corollary Policy Implications:   Access to Federal Benefits**

Many observers characterize foreign nationals with relief from removal who obtain temporary work authori-

---

[92]  *Id.*

[93]  *See, e.g.*, Perales v. Casillas, 903 F.2d 1043, 1045 (5th Cir. 1990) ("[T]he agency's decision to grant voluntary departure and work authorization has been committed to agency discretion by law."); Chan v. Lothridge, No. 94-16936, 1996 U.S. App. LEXIS 8491 (9th Cir. 1996) (finding that INS did not abuse its discretion in denying interim work authorization to the petitioner while his application for asylum was pending); Kaddoura v. Gonzales, No. C06-1402RSL, 2007 U.S. Dist. LEXIS 37211 (W.D. Wash. 2007) (finding that the court lacked jurisdiction to hear a suit seeking to compel U.S. Citizenship and Immigration Services to grant work authorization because such actions are discretionary acts).

207

zations as "quasi-legal" unauthorized migrants.[94]   They may be considered "lawfully present" for some very narrow purposes under the INA (such as whether the time in deferred status counts as illegal presence under the grounds of inadmissibility) but are otherwise unlawfully present.   Foreign nationals to whom the government has issued temporary employment authorization documents (EADs) may legally obtain social security numbers (SSNs).[95]    Possession of a valid EAD or SSN issued for temporary employment, however, does not trigger eligibility for federal programs and services.   In other words, foreign nationals who are granted deferred action may be able to work but are not entitled to federally-funded public assistance, except for specified emergency services.[96]

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) of 1996 (P.L. 104-193) established comprehensive restrictions on the

---

[94]  The "quasi-legal" unauthorized aliens fall in several categories. The government has given them temporary humanitarian relief from removal, such as Temporary Protected Status (TPS).   They have sought asylum in the United States and their cases have been pending for at least 180 days.   They are immediate family or fiancées of LPRs who are waiting in the United States for their legal permanent residency cases to be processed.   Or, they have overstayed their nonimmigrant visas and have petitions pending to adjust status as employment-based LPRs.   These are circumstances in which DHS issues temporary employment authorization documents (EADs) to aliens who are not otherwise considered authorized to reside in the United States.

[95]  For further background, see CRS Report RL32004, *Social Security Benefits for Noncitizens*, by Dawn Nuschler and Alison Siskin.

[96]  CRS Report RL34500, *Unauthorized Aliens' Access to Federal Benefits: Policy and Issues*, by Ruth Ellen Wasem.

NJAPP058

208

eligibility of all noncitizens for means-tested public assistance, with exceptions for LPRs with a substantial U.S. work history or military connection. Regarding unauthorized aliens, Section 401 of PRWORA barred them from any federal public benefit except the emergency services and programs expressly listed in Section 401(b) of PRWORA. This overarching bar to unauthorized aliens hinges on how broadly the phrase "federal public benefit" is implemented. The law defines this phrase to be

> (A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.[97]

So defined, this bar covers many programs whose enabling statutes do not individually make citizenship or immigration status a criterion for participation.

Thus, beneficiaries of the June 15, 2012 policy directive will be among those "quasi-legal" unauthorized migrants who have EADs and SSNs—but who are not otherwise authorized to reside in the United States.

---

[97] § 401(c) of PRWORA, 8 U.S.C. § 1611.

209

## Appendix. Past Administrative Directives on Blanket or Categorical Deferrals of Deportation

**Selected Major Directives, 1976-2011**

| Year | Type of Action | Class of Aliens Covered | Estimated Number | Commentary |
|------|----------------|--------------------------|------------------|------------|
| 1976 | Extended voluntary departure (EVD) for Lebanese on a case-by-case basis | Otherwise deportable Lebanese in the United States. | NA | Lebanese received TPS from 1991 to 1993. |
| 1977 | EVD for Ethiopians | Otherwise deportable Ethiopians in the United States. | NA | P.L. 100-204 contained a special extension of the legalization program established by the Immigration Reform and Control Act (IRCA) of 1986 to include otherwise eligible aliens who had been granted EVD status during a time period that included the Ethiopians. |
| 1977 | The Attorney General temporarily suspended the expulsion of certain natives of Western Hemisphere countries, known as the "Silva Letterholders." They were granted stays and permitted to apply for employment authorization. | A group of aliens with approved petitions filed a class action lawsuit to recapture about 145,000 visas assigned to Cubans. | 250,000 | Many of these cases were not resolved until the passage of IRCA. |
| 1978 | EVD for Ugandans | Otherwise deportable Ugandans in the United States. | NA | P.L. 100-204 contained a special extension of the legalization program established by IRCA to include otherwise eligible aliens who had been granted EVD status during a time period that included the Ugandans. |
| 1979 | EVD for Nicaraguans | Otherwise deportable Nicaraguans in the United States. | NA | EVD ended in September 1980. |
| 1979 | EVD for Iranians | Otherwise deportable Iranians in the United States. | NA | EVD ended in December 1979, and they were encouraged to apply for asylum. |

NJAPP060

210

*Congressional Research Service*

| Year | Type of Action | Class of Aliens Covered | Estimated Number | Commentary |
|------|----------------|-------------------------|------------------|------------|
| 1980 | EVD for Afghans | Otherwise deportable Afghans in the United States. | NA | P.L. 100-204 contained a special extension of the legalization program established by IRCA to include otherwise eligible aliens who had been granted EVD status during a time period that included the Afghans. |
| 1984 | EVD for Poles | Otherwise deportable Poles in the United States. | NA | P.L. 100-204 contained a special extension of the legalization program established by IRCA to include otherwise eligible aliens who had been granted EVD status during a time period that included the Poles. |
| 1987 | Memorandum from Attorney General Edward Meese directing the Immigration and Naturalization Service (INS) not to deport any Nicaraguans and to grant them work authorizations. | Nicaraguans who demonstrated a "well-founded fear of persecution," who had been denied asylum, or had been denied withholding of deportation. | 150,000 to 200,000 | Legislation to grant stays of deportation to Nicaraguans as well as Salvadorans had received action by committees in both chambers during the 1980s. Congress ultimately enacted legislation legalizing the Nicaraguans, the Nicaraguan Adjustment and Central American Relief Act (P.L. 105-100). |
| 1987 | Attorney General Edward Meese authorized INS district directors to defer deportation proceedings of certain family members of aliens legalized through IRCA. | This policy directive applied where "compelling or humanitarian factors existed" in the cases of families that included spouses and children ineligible to legalize under IRCA. | NA | Legislation to enable the immediate family of aliens legalized through IRCA to also adjust status had been introduced. (See 1990 "Family Fairness" directive below.) |
| 1989 | Attorney General Richard Thornburgh instructed INS to defer the enforced departure of any Chinese national in the United States through June 6, 1990. | Chinese nationals whose nonimmigrant visas expired during this time were to report to INS to benefit from this deferral and to apply, if they wished, for work authorizations. | 80,000 | Legislation that included provisions to establish Temporary Protected Status (TPS) was moving through Congress at that time. |

211

*Congressional Research Service*

| Year | Type of Action | Class of Aliens Covered | Estimated Number | Commentary |
|------|----------------|-------------------------|------------------|------------|
| 1990 | Executive Order 12711 of April 11, 1990, provided temporary protection for certain nationals of the People's Republic of China (PRC) and their dependents. It permitted temporary deferral of enforcement of the departure from the United States and conferred eligibility for certain other benefits through January 1, 1994. | Chinese nationals and dependents who were in the U.S. on or after June 5, 1989, up to and including the date of Executive Order 12711. | 80,000 | The Chinese Student Protection Act of 1992 (CSPA) (P.L. 102-404) enabled Chinese with deferred enforced departure to become lawful permanent residents. |
| 1990 | INS Commissioner Gene McNary issued a new "Family Fairness" policy for family members of aliens legalized through IRCA. The policy dropped the where "compelling or humanitarian factors existed" requirement and allowed the family members to apply for employment authorizations. | Unauthorized spouses and children of aliens legalized under IRCA. | 1.5 million | P.L. 101-649 provided relief from deportation and employment authorization to an eligible alien who was the spouse or unmarried child of a legalized alien holding temporary or permanent residence pursuant to IRCA. |
| 1991 | Presidential directive to Attorney General instructing him to grant deferred enforced departure to Persian Gulf evacuees who were airlifted to the United States after the invasion of Kuwait in 1990 | Aliens who had U.S. citizen relatives or who harbored U.S. citizens during the invasion, largely persons originally from Palestine, India, and the Philippines. | 2,227 | It is not clear how these cases were handled. |
| 1992 | President George H.W. Bush instructed the Attorney General to grant deferred enforced departure (DED) to Salvadorans | Unauthorized Salvadorans who had fled the civil war in the 1980s. | 190,000 | Congress had passed a law in 1990 giving Salvadorans TPS for 18 months. |
| 1997 | President William J. Clinton instructed the Attorney General to grant DED to Haitians for one year. | Haitians who were paroled into the United States or who applied for asylum before December 1, 1995. | 40,000 | Haitians had been provided TPS from 1993-1997. Legislation enabling Haitians to adjust their status passed at the close of the 105th Congress (P.L. 105-277) in 1998. |

NJAPP062

212

| Year | Type of Action | Class of Aliens Covered | Estimated Number | Commentary |
|------|----------------|------------------------|------------------|------------|
| 1997 | INS General Counsel Paul Virtue issues guidelines for deferred action for certain foreign nationals who might gain relief through the Violence Against Women Act. | Battered aliens with approved LPR self-petitions, and their derivative children listed on the self-petition. | NA | Regulations to implement the U visa portions of P.L. 106-386 were promulgated in 2007. |
| 1998 | Attorney General Janet Reno temporarily suspended the deportation of aliens from El Salvador, Guatemala, Honduras, and Nicaragua. | Unauthorized aliens from El Salvador, Guatemala, Honduras, and Nicaragua. | NA | This relief was provided in response to Hurricane Mitch. Guatemalans and Salvadorans had their stays of removal extended until March 8, 1999. TPS was given to Hondurans and Nicaraguans. |
| 1999 | President William J. Clinton instructed the Attorney General to grant DED to Liberians for one year. | Liberian nationals with TPS who were living in the United States. | 10,000 | Liberians had been provided TPS from 1991 through 1999; they were given TPS again in 2002. |
| 2007 | President George W. Bush directed that DED be provided to Liberians whose TPS expired. | Liberian nationals who had lived in the United States since October 1, 2002, and who had TPS on September 30, 2007. | 3,600 | |
| 2011 | President Barack Obama extended Liberian DED through March 2013. | | | |

**Source:** CRS review of published accounts, archived CRS materials, and government policy documents.

Notes:  Excludes aliens with criminal records or who "pose a danger to national security." *Estimated Number* refers to estimated number of beneficiaries at time of issuance of directive. *NA* means "not available." Other countries whose nationals had some form of deferred deportation prior to 1976 include Cambodia, Cuba, Chile, Czechoslovakia, Dominican Republic, Hungary, Laos, Rumania, and Vietnam.

NJAPP063

# Exhibit 5

NJAPP064

213

| Memorandum | [SEAL OMITTED] |
|---|---|
| | C-1588-P |

| Subject | Date |
|---|---|
| Family Fairness: Guidelines For Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens | [Feb. 2, 1990] |

| To | From |
|---|---|
| Regional Commissioners<br>    Eastern<br>    Northern<br>    Southern<br>    Western | Office of the Commissioner |

On November 13, 1987, the Service implemented guidelines on granting voluntary departure to the ineligible spouses and children of legalized aliens, the so-called "family fairness" policy.

The Service is likely to face the issue of family fairness for several more years, because of the length of time needed for newly legalized aliens to acquire lawful permanent resident status and then to wait for a visa preference number to become available for family members. Accordingly, the Service is clarifying its family fairness policy, to assure uniformity in the granting of voluntary departure and work authorization for the ineligible spouses and children of legalized aliens.

Effective February 14, 1990, the following policy is to be implemented by all district directors in determining

214

the eligibility for voluntary departure of ineligible spouses and children of legalized aliens.

1. Voluntary departure will be granted to the spouse and to unmarried children under 18 years of age, living with the legalized alien, who can establish that they have been residing in the United States since on or before November 6, 1986, if

– the alien is admissible as an immigrant, except for documentary requirements;

– the alien has not been convicted of a felony or three misdemeanors committed in the United States;

– the alien has not assisted in the persecution of any person or persons on account of race, religion, nationality, membership in a particular social group or political opinion.

2. Voluntary departure will be granted for a one-year period to aliens who meet these requirements. Cases will be reviewed on an annual basis thereafter by district directors to determine whether extensions of voluntary departure should be issued.

– A grant of voluntary departure based on family fairness will be terminated if the legalized family member loses his or her status.

– A grant of voluntary departure based on family fairness will be terminated if the alien fails to maintain the requirements outlined in Paragraph 1.

– A grant of voluntary departure issued pursuant to this policy shall not be terminated for the sole

215

reasons that the legalized family member has become a lawful permanent resident.

3.   Documentary evidence must be submitted to establish

– the family relationship, through marriage certificates for spouses and birth or baptismal certificates for children and

– residence with the legalized alien, through a sworn affidavit, under penalty of perjury, by the legalized alien.

4.   Work authorization will be granted to aliens who qualify for voluntary departure under Paragraph One and as provided in Paragraph Two.

5.   In the case of a child born after November 6, 1986, no deportation proceedings shall be instituted as long as a parent maintains his or her status as a legalized alien.

The Legalization and Special Agricultural Worker Programs will eventually bring permanent lawful immigration status to nearly 3 million aliens.   It is critical that the Service continue to respond to the needs of these aliens and their immediate family members in a consistent and humanitarian manner.

/s/   <u>GENE MCNARY</u>
      GENE MCNARY
      Commissioner

# Exhibit 6

*Secretary*



**U.S. Department of Homeland Security**
Washington, DC 20528

June 15, 2012

MEMORANDUM FOR:   David V. Aguilar
                  Acting Commissioner, U.S. Customs and Border Protection

                  Alejandro Mayorkas
                  Director, U.S. Citizenship and Immigration Services

                  John Morton
                  Director, U.S. Immigration and Customs Enforcement

FROM:             Janet Napolitano
                  Secretary of Homeland Security

SUBJECT:          Exercising Prosecutorial Discretion with Respect to Individuals
                  Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home. As a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

2

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

3

# Exhibit 7

NJAPP072



*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

November 20, 2014

MEMORANDUM FOR:    León Rodríguez
                   Director
                   U.S. Citizenship and Immigration Services

                   Thomas S. Winkowski
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   R. Gil Kerlikowske
                   Commissioner
                   U.S. Customs and Border Protection

FROM:              Jeh Charles Johnson
                   Secretary

SUBJECT:           **Exercising Prosecutorial Discretion with Respect to**
                   **Individuals Who Came to the United States as**
                   **Children and with Respect to Certain Individuals**
                   **Who Are the Parents of U.S. Citizens or Permanent**
                   **Residents**

This memorandum is intended to reflect new policies for the use of deferred action. By memorandum dated June 15, 2012, Secretary Napolitano issued guidance entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*. The following supplements and amends that guidance.

The Department of Homeland Security (DHS) and its immigration components are responsible for enforcing the Nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. Secretary Napolitano noted two years ago, when she issued her prosecutorial discretion guidance regarding children, that "[o]ur Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case."

1

NJAPP073

Deferred action is a long-standing administrative mechanism dating back decades, by which the Secretary of Homeland Security may defer the removal of an undocumented immigrant for a period of time.[1]  A form of administrative relief similar to deferred action, known then as "indefinite voluntary departure," was originally authorized by the Reagan and Bush Administrations to defer the deportations of an estimated 1.5 million undocumented spouses and minor children who did not qualify for legalization under the *Immigration Reform and Control Act* of 1986.  Known as the "Family Fairness" program, the policy was specifically implemented to promote the humane enforcement of the law and ensure family unity.

Deferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission.  As an act of prosecutorial discretion, deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion. Deferred action does not confer any form of legal status in this country, much less citizenship; it simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States.  Nor can deferred action itself lead to a green card.  Although deferred action is not expressly conferred by statute, the practice is referenced and therefore endorsed by implication in several federal statutes.[2]

Historically, deferred action has been used on behalf of particular individuals, and on a case-by-case basis, for classes of unlawfully present individuals, such as the spouses and minor children of certain legalized immigrants, widows of U.S. citizens, or victims of trafficking and domestic violence.[3]  Most recently, beginning in 2012, Secretary Napolitano issued guidance for case-by-case deferred action with respect to those who came to the United States as children, commonly referred to as "DACA."

---

[1]  Deferred action, in one form or another, dates back to at least the 1960s.  "Deferred action" per se dates back at least as far as 1975. *See,* Immigration and Naturalization Service, Operation Instructions § 103.1(a)(1)(ii) (1975).

[2]  INA § 204(a)(1)(D)(i)(II), (IV) *(Violence Against Women Act (VAWA) self-petitioners not in removal proceedings are "eligible for deferred action and employment authorization");* INA § 237(d)(2) *(DHS may grant stay of removal to applicants for T or U visas but that denial of a stay request "shall not preclude the alien from applying for . . . deferred action");* REAL ID Act of 2005 § 202(c)(2)(B)(viii), Pub. L. 109-13 *(requiring states to examine documentary evidence of lawful status for driver's license eligibility purposes, including "approved deferred action status");* National Defense Authorization Act for Fiscal Year 2004 § 1703(c) (d) Pub. L. 108-136 *(spouse, parent or child of certain U.S. citizen who died as a result of honorable service may self-petition for permanent residence and "shall be eligible for deferred action, advance parole, and work authorization").*

[3]  In August 2001, the former-Immigration and Naturalization Service issued guidance providing deferred action to individuals who were eligible for the recently created U and T visas.  Two years later, USCIS issued subsequent guidance, instructing its officers to use existing mechanisms like deferred action for certain U visa applicants facing potential removal.  More recently, in June 2009, USCIS issued a memorandum providing deferred action to certain surviving spouses of deceased U.S. citizens and their children while Congress considered legislation to allow these individuals to qualify for permanent residence status.

2

NJAPP074

By this memorandum, I am now expanding certain parameters of DACA and issuing guidance for case-by-case use of deferred action for those adults who have been in this country  since January 1, 2010, are the parents of U.S. citizens or lawful permanent residents, and who are otherwise not enforcement priorities, as set forth in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum.

The reality is that most individuals in the categories set forth below are hard-working people who have become integrated members of American society. Provided they do not commit serious crimes or otherwise become enforcement priorities, these people are extremely unlikely to be deported given this Department's limited enforcement resources—which must continue to be focused on those who represent threats to national security, public safety, and border security. Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests and make common sense, because they encourage these people to come out of the shadows, submit to background checks, pay fees, apply for work authorization (which by separate authority I may grant), and be counted.

### A.     Expanding DACA

DACA provides that those who were under the age of 31 on June 15, 2012, who entered the United States before June 15, 2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis.  The initial DACA announcement of June 15, 2012 provided deferred action for a period of two years.  On June 5, 2014, U.S. Citizenship and Immigration Services (USCIS) announced that DACA recipients could request to renew their deferred action for an additional two years.

In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:

**Remove the age cap.**  DACA will apply to all otherwise eligible immigrants who entered the United States by the requisite adjusted entry date before the age of sixteen (16), regardless of how old they were in June 2012 or are today.  The current age restriction excludes those who were older than 31 on the date of announcement (*i.e.*, those who were born before June 15, 1981).  That restriction will no longer apply.

**Extend DACA renewal and work authorization to three-years**.  The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments.  This change shall apply to all first-time applications as well as all applications for renewal effective November 24, 2014.  Beginning on that date, USCIS should issue all work

3

authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work authorization documents based on the renewal of their DACA grants. USCIS should also consider means to extend those two-year renewals already issued to three years.

**Adjust the date-of-entry requirement.** In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010.

USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.

### B.    Expanding Deferred Action

I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;

- have continuously resided in the United States since before January 1, 2010;

- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;

- have no lawful status on the date of this memorandum;

- are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and

- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Applicants must file the requisite applications for deferred action pursuant to the new criteria described above. Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants. Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of

4

the Immigration and Nationality Act.[4]  Deferred action granted pursuant to the program shall be for a period of three years.  Applicants will pay the work authorization and biometrics fees, which currently amount to $465.  There will be no fee waivers and, like DACA, very limited fee exemptions.

USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement.  As with DACA, the above criteria are to be considered for all individuals encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or USCIS, whether or not the individual is already in removal proceedings or subject to a final order of removal.  Specifically:

- ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.

- ICE is further instructed to review pending removal cases, and seek administrative closure or termination of the cases of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations.  ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.

- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.  The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria.

Under any of the proposals outlined above, immigration officers will be provided with specific eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.

This memorandum confers no substantive right, immigration status or pathway to citizenship.  Only an Act of Congress can confer these rights.  It remains within the authority of the Executive Branch, however, to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law.  This memorandum is an exercise of that authority.

---

[4] INA § 274A(h)(3), 8 U.S.C. § 1324a(h)(3) ("As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the[Secretary]."); 8 C.F.R. § 274a.12 (regulations establishing classes of aliens eligible for work authorization).

5

# Exhibit 8

NJAPP078



U.S. Department of Homeland Security

## Archived Content

In an effort to keep DHS.gov current, the arch ve conta ns outdated nformat on that may not reflect current pol cy or programs.

# Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:** September 5, 2017

**MEMORANDUM FOR:**

James W. McCament
Act ng D rector
U.S. C t zensh p and Imm grat on Serv ces

Thomas D. Homan
Act ng D rector
U.S. Imm grat on and Customs Enforcement

Kev n K. McAleenan
Act ng Comm ss oner
U.S. Customs and Border Protect on

Joseph B. Maher
Act ng General Counsel

Ambassador James D. Nealon
Ass stant Secretary, Internat onal Engagement

Jul e M. K rchner
C t zensh p and Imm grat on Serv ces Ombudsman

**FROM:**

Ela ne C. Duke
Act ng Secretary

**SUBJECT:**

**Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

Th s memorandum resc nds the June 15, 2012 memorandum ent tled "Exerc s ng Prosecutor al D scret on w th Respect to Ind v duals Who Came to the Un ted States as Ch ldren," wh ch establ shed the program known as Deferred Act on for Ch ldhood Arr vals ("DACA"). For the reasons and n the manner outl ned below, Department of Homeland Secur ty personnel shall take all appropr ate act ons to execute a w nd down of the program, cons stent w th the parameters establ shed n th s memorandum.

## Background

The Department of Homeland Secur ty establ shed DACA through the ssuance of a memorandum on June 15, 2012. The program purported to use deferred act on  an act of prosecutor al d scret on meant to be appl ed only on an nd v dual zed case by case bas s  to confer certa n benef ts to llegal al ens that Congress had not otherw se acted to prov de by law. 1 | g ft \ Spec f cally, DACA prov ded certa n llegal al ens who entered the Un ted States before the age of s xteen a per od of deferred act on and el g b l ty to request employment author zat on.

NJAPP079

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization on from two years to three  the November 20, 2014 memorandum directed USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion on through the use of deferred action, on a case by case basis," to certain aliens who have  a son or daughter who  is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty six states  led by Texas  challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies announced on that date. 2] (# ft 2) The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied the other requirements for a preliminary injunction. 3] (# ft 3) The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act  flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization on." According to the court,  DAPA is foreclosed by Congress's careful plan; the program is manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary, 4] (# ft 4) and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply with the Administrative Procedure Act because the Department did not implement it through notice and comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4 4). 5] (# ft 5) The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768,  Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to  e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating  the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing DACA, 6] (# ft 6) and the November 20, 2014 memorandum establishing DAPA and expanding DACA. 7] (# ft 7)

On June 15, 2017, after consulting with the Attorney General, and considering the likel hood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA  but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that  f DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA  was effectuated by the previous administration through executive action, without proper statutory authority and with no established end date, after Congress repeatedly rejected proposed legislation that would have accomplished a similar result. Such an open ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA  has the same legal and constitutional defects that the courts recognized as to DAPA,  t s likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind  t down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

## Rescission of the June 15, 2012 DACA Memorandum

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General,  t s clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

NJAPP080

Recognizing the complex issues associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case by case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by the Department as of the date of this memorandum.
- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.
- Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.
- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.
- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.
- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.
- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.
- Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

---

[1] (# ft e 1) Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

[2] (# ft e 2) *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] (# ft e 3) *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

[4] (# ft e 4) *Id.*

[5] (# ft e 5) *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

[6] (# ft e 6) Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] (# ft e 7) Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)

## Keywords

DEFERRED ACTION FOR CHILDHOOD ARRIVALS (DACA) (/KEYWORDS/DEFERRED-ACTION-CHILDHOOD-ARRIVALS-DACA)

Last Updated: 09/23/2019

NJAPP081

# Exhibit 9



# KEN PAXTON

ATTORNEY GENERAL OF TEXAS

June 29, 2017

The Honorable Jeff Sessions
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

      Re:    *Texas, et al. v. United States, et al.*, No. 1:14-cv-00254 (S.D. Tex.)

Dear Attorney General Sessions:

The State plaintiffs that successfully challenged the Obama Administration's DAPA and Expanded DACA programs commend the Secretary of Homeland Security for issuing his June 15, 2017 memorandum rescinding, in large part, his predecessor's November 20, 2014 memorandum creating those DAPA and Expanded DACA programs.

As you know, this November 20, 2014 memorandum creating DAPA and Expanded DACA would have granted eligibility for lawful presence and work authorization to over four million unlawfully present aliens. Courts blocked DAPA and Expanded DACA from going into effect, holding that the Executive Branch does not have the unilateral power to confer lawful presence and work authorization on unlawfully present aliens simply because the Executive chooses not to remove them. Rather, "[i]n specific and detailed provisions, the [Immigration and Nationality Act] expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." *Texas v. United States*, 809 F.3d 134, 179 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam). "Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA." *Id.* Likewise, "[t]he INA also specifies classes of aliens eligible and ineligible for work authorization . . . with no mention of the class of persons whom DAPA would make eligible for work authorization." *Id.* at 180-81. Thus, "DAPA is not authorized by statute," *id.* at 184, and "DAPA is foreclosed by Congress's careful plan," *id.* at 186.

NJAPP083



## KEN PAXTON
### ATTORNEY GENERAL OF TEXAS

For these same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15, 2012 DACA memorandum is also unlawful. The original 2012 DACA program covers over one million otherwise unlawfully present aliens. *Id.* at 147. And just like DAPA, DACA unilaterally confers eligibility for work authorization, *id.*, and lawful presence without any statutory authorization from Congress.[1]

Nevertheless, the Secretary of Homeland Security's June 15, 2017 memorandum provided that "[t]he June 15, 2012 DACA memorandum, however, will remain in effect," and some "Expanded DACA" permits will also remain in effect.

We respectfully request that the Secretary of Homeland Security phase out the DACA program. Specifically, we request that the Secretary of Homeland Security rescind the June 15, 2012 DACA memorandum and order that the Executive Branch will not renew or issue any new DACA or Expanded DACA permits in the future. This request does not require the Executive Branch to immediately rescind DACA or Expanded DACA permits that have already been issued. This request does not require the Secretary to alter the immigration enforcement priorities contained in his separate February 20, 2017 memorandum.[2] And this request does not require the federal government to remove any alien.

If, by September 5, 2017, the Executive Branch agrees to rescind the June 15, 2012 DACA memorandum and not to renew or issue any new DACA or Expanded DACA permits in the future, then the plaintiffs that successfully challenged DAPA and Expanded DACA will voluntarily dismiss their lawsuit currently pending in the Southern District of Texas. Otherwise, the complaint in that case will be amended to challenge both the DACA program and the remaining Expanded DACA permits.

---

[1] *See, e.g.*, USCIS, DACA Frequently Asked Questions, https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last visited June 29, 2017) (DACA recipients "are considered to be lawfully present").

[2] *See* DHS, Enforcement of Immigration Laws to Serve the National Interest, https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf.



## KEN PAXTON
ATTORNEY GENERAL OF TEXAS

We appreciate the opportunity to continue working with you, and the entire Presidential Administration, to cooperatively enforce federal immigration laws.

Sincerely,

Ken Paxton
Attorney General of Texas

Jeff Landry
Attorney General of Louisiana

Steve Marshall
Attorney General of Alabama

Doug Peterson
Attorney General of Nebraska

Leslie Rutledge
Attorney General of Arkansas

Alan Wilson
Attorney General of South Carolina

Lawrence G. Wasden
Attorney General of Idaho

Herbert Slatery III
Attorney General and Reporter of Tennessee

C.L. "Butch" Otter
Governor of Idaho

Patrick Morrisey
Attorney General of West Virginia

Derek Schmidt
Attorney General of Kansas

NJAPP085

# Exhibit 10

NJAPP086

Case 1:18-cv-00068    Document 636-13    Filed on 03/02/23 in TXSD    Page 90 of 208

# Law Enforcement Leaders and Prosecutors Defend DACA

**MARCH 20, 2018**

*ICAP coauthors brief signed by 63 top law enforcement officials arguing DACA program increases cooperation with police and improves public safety*

Over 60 prominent national law enforcement leaders, including current sitting Police Chiefs,Sheriffs, District Attorneys, State's Attorneys, and Prosecuting Attorneys from 28 jurisdictions representing over 25 million people around the country are defending the Deferred Action for Childhood Arrivals (DACA) program, highlighting the essential benefits it provides to public safety by encouraging cooperation between immigrants and law enforcement, while warning of the damage to public trust rescinding the program would bring.

This group of prominent prosecutors and law enforcement leaders filed a friend-of-the-court (amicus) brief supporting a federal district court injunction to preserve DACA after the Trump Administration began unwinding the program in September 2017. The Department of Justice is challenging that nationwide injunction, which went into effect on January 9, 2018, and has appealed that order to the Ninth Circuit Court of Appeals. The case occupies an influential spot in the larger national debate on immigration policy, with the lives of 800,000 individuals brought to the country as children hanging in the balance.

"DACA protects individuals who have lived, worked, and studied as continuous residents of the United States for over a decade," said Miriam Aroni Krinsky, Executive Director of **Fair and Just Prosecution** and a signatory on the brief. "These individuals are active members of our workforce and our social circles, and prosecutors and law enforcement leaders understand their importance to the rich and diverse fabric of our community. Beyond its cruel significance for those the program directly protects, an end to DACA would threaten a serious loss of public trust and cooperation between immigrant populations and law enforcement. These developments could set off a dangerous chain reaction that would jeopardize public safety."

NJAPP087

Twenty eight current prosecutors and law enforcement leaders from diverse jurisdictions across the country were among the 63 signators on the **brief**, including District Attorneys **Diana Becton** (Contra Costa County, California), **Mark Dupree** (Wyandotte County (Kansas City), Kansas), **Sim Gill** (Salt Lake County, Utah), **Eric Gonzalez** (Kings County (Brooklyn), New York), **Mark Gonzalez** (Nueces County (Corpus Christi), Texas), **Larry Krasner** (Philadelphia, Pennsylvania), **Beth McCann** (2nd Judicial Circuit (Denver), Colorado), **Raúl Torrez** (Bernalillo County (Albuquerque), New Mexico) and **Cyrus Vance** (New York County (Manhattan), New York), State Attorney **Aramis Ayala** (Ninth Judicial Circuit (Orlando) Florida), State's Attorneys **Sarah George** (Chittenden County (Burlington), Vermont) and **Marilyn Mosby** (Baltimore City, Maryland), Prosecuting Attorneys **Dan Satterberg** (King County (Seattle), Washington) and **Carol Siemon** (Ingham County (Lansing), Michigan), Police Chiefs Art Acevedo (Houston, Texas Police Department), **Charles Beck** (Los Angeles, California Police Department) **Kenneth Ferguson** (Framingham, Massachusetts Police Department), **Ronald Haddad** (Dearborn, Michigan Police Department) **Chris Magnus** (Tucson, Arizona Police Department), **Abdul Pridgen** (Seaside, California Police Department), **Celestino Rivera** (Lorain, Ohio Police Department), **Michael Tupper** (Marshalltown, Iowa Police Department), Sheriffs **Jerry L. Clayton** (Washtenaw County, Michigan Sheriff's Office), **Mark Curran** (Lake County, Illinois Sheriff's Office), **Tony Estrada** (Santa Cruz County, Arizona Sheriff's Office), **Bill McCarthy** (Polk County, Iowa Sheriff's Office), **Joe Pelle** (Boulder County, Colorado Sheriff's Office), **Richard Wiles** (El Paso County, Texas Sheriff's Office), and Commissioner **Charles Ramsey** (Philadelphia, Pennsylvania Police Department, retired).

The brief lays out the multitude of advantages DACA provides to law enforcement officials and reflects the perspectives and experiences of leaders in jurisdictions heavily impacted by immigration. The signatories hail a community policing approach based on trust and engagement between law enforcement and those they protect, and consider DACA to be crucial to maintaining that trust. Its absence, they argue, would inflame fears that neither undocumented immigrants nor their lawfully present family and neighbors could turn to the police without facing drastic consequences.

"Rescinding DACA would be a devastating step backwards as my officers work to build trust with immigrant communities," said Chief Chris Magnus, of the Tucson, Arizona Police Department. "Without that trust, we lose valuable lines of communication, witnesses to crimes, and information needed to protect populations that face heightened risks of crime and exploitation."

DACA's guarantee of protection from deportation encourages helpful communication with law enforcement, without which community policing cannot thrive. Destruction of that public trust would hamper the capabilities of law enforcement and prosecutors while fostering crime-friendly conditions in at-risk communities, the brief's signatories argue.

The amicus brief was authored by the Chicago law firm of **Hughes Socol Piers Resnick**

NJAPP088

The amicus brief was authored by the Chicago law firm of **Hughes Socol Piers Resnick & Dym, Ltd.**, in conjunction with Georgetown Law's **Institute for Constitutional Advocacy and Protection** (ICAP). Fair and Just Prosecution, a national network of newly elected prosecutors committed to change and innovation, coordinated the amicus effort. In November of last year, the

same organizations filed an amicus brief on behalf of prosecutors and law enforcement leaders in support of a lawsuit by the State of California resisting Trump Administration efforts to entangle local police in federal immigration enforcement.

"This brief represents the expert opinions of leaders who interact with immigrant communities and work to preserve public safety on a daily basis," said **Joshua Geltzer**, ICAP's executive director and visiting professor at Georgetown Law. "At this critical juncture for resolving issues of immigration law and policy, their voices need to be heard. And they are clearly and definitively standing behind DACA."

**The amicus brief is available here**.

NJAPP089

# Exhibit 11

NJAPP090



Congressional
Research Service

Informing the legislative debate since 1914

# An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others

**Ben Harrington**
Legislative Attorney

April 10, 2018

**Congressional Research Service**

7-5700

www.crs.gov

R45158

**CRS REPORT**
Prepared for Members and
Committees of Congress

NJAPP091

# Summary

Since at least the 1970s, immigration authorities in the United States have sometimes exercised their discretion to grant temporary reprieves from removal to non-U.S. nationals (aliens) present in the United States in violation of the Immigration and Nationality Act (INA). Well-known types of reprieves include deferred action, Deferred Action for Childhood Arrivals (DACA), and Temporary Protected Status (TPS). The authority to grant some types of discretionary reprieves from removal, including TPS, comes directly from the INA. The authority to grant other types of reprieves generally arises from the Department of Homeland Security's (DHS's) enforcement discretion—that is, its discretion to determine the best manner for enforcing the immigration laws, including by prioritizing some removal cases over others.

The primary benefit that a reprieve offers to an unlawfully present alien is an assurance that he or she does not face imminent removal. Reprieves also generally confer other benefits, including eligibility for employment authorization and nonaccrual of unlawful presence for purposes of the three- and ten-year bars on admission to the United States under the INA. Reprieves do not confer "lawful immigration status," in the narrow sense that reprieve recipients typically remain removable under the INA's grounds of inadmissibility or deportability (although they may have defenses to removal, including a statutory defense in the case of TPS) and in the more general sense that recipients do not enjoy most of the statutorily fixed protections that come with lawful permanent resident (LPR), refugee, asylee, and nonimmigrant status. The availability and duration of reprieves often turn upon executive policies, and accordingly reprieves do not offer steadfast protection from removal or reliable access to other benefits.

Categories of reprieves premised upon executive enforcement discretion include the following:

- *Deferred Action.* The generic term that DHS uses for a decision not to remove an inadmissible or deportable alien pursuant to its enforcement discretion.
- *DACA.* A large-scale, programmatic type of deferred action available since 2012 for a subset of aliens who arrived in the United States as children.
- *Deferred Enforced Departure (DED).* A reprieve premised on the President's exercise of foreign policy powers to protect nationals of countries experiencing war or instability.
- *Extended Voluntary Departure (EVD).* An earlier version of DED little used since 1990.

Reprieves granted pursuant to statutory authority include the following:

- *TPS Relief.* A form of temporary protection from removal for aliens from countries that DHS designates as unsafe for return because of armed conflict, natural disaster, or other extraordinary conditions.
- *Parole.* A statutory power that authorizes DHS to grant entry (but not admission) to inadmissible aliens on a case-by-case basis.

Immigration authorities may grant other reprieves in connection with removal proceedings:

- *Administrative Closure.* A decision to discontinue temporarily a removal proceeding.
- *Voluntary Departure.* A brief reprieve that allows an alien to depart the United States at his own expense in lieu of removal proceedings or enforcement of a removal order.
- *Stay of Removal, Order of Supervision.* Mechanisms often used together that allow DHS or an immigration judge to postpone enforcement of a removal order.

# Contents

Introduction ......................................................................................................................... 1

Sources of Executive Authority to Grant Discretionary Reprieves from Removal ......................... 4

Nature of Protections for Recipients: In General .......................................................... 8

Glossary of Discretionary Reprieves ........................................................................ 11

    Generally Available Reprieves Premised upon Enforcement Discretion or Executive
      Powers .................................................................................................... 12

    Generally Available Reprieves Granted Pursuant to Statutory Authority ............................ 15

    Reprieves Granted Exclusively in Connection with the Removal Process ........................... 18

# Contacts

Author Contact Information ......................................................................................... 20

NJAPP093

# Introduction

The Immigration and Nationality Act (INA) establishes a system of rules as to which non-U.S. nationals (aliens) may enter the United States and under what conditions.[1] It sets forth, for instance, three primary categories—family-based, employment-based, and diversity-based—through which an alien may qualify for an immigrant visa and thereby seek admission to the United States as a lawful permanent resident (LPR).[2] The INA also establishes requirements for the admission of refugees,[3] and delineates the categories of aliens who may be admitted temporarily as nonimmigrants for particular purposes such as study, tourism, or temporary work.[4]

Those aliens who enter or remain in the country in violation of the INA's restrictions generally are subject to removal based on their presence within the United States alone.[5] As a consequence, the Department of Homeland Security (DHS)—the federal agency primarily responsible for enforcing the INA—has a statutory basis to seek the removal of such aliens even if they have not committed crimes or violated other INA provisions.[6] According to recent estimates, there are currently between ten and twelve million aliens in the United States whose presence violates the INA.[7] They arrive in two ways primarily: (1) surreptitiously, by crossing the border without inspection; or (2) on a temporary nonimmigrant visa (e.g., on a B-1/B-2 tourist visa,[8] which typically allows them to remain for six months), which they then overstay.[9] DHS has estimated in

---

[1] 8 U.S.C. §§ 1101, *et seq.*

[2] *See* 8 U.S.C. § 1151(a) (setting forth the three categories of immigrant visa eligibility). For an overview of immigrant visa categories and application procedure, see CRS Report R42866, *Permanent Legal Immigration to the United States: Policy Overview*, by William A. Kandel.

[3] 8 U.S.C. § 1157; *see generally* CRS Report RL31269, *Refugee Admissions and Resettlement Policy*, by Andorra Bruno.

[4] 8 U.S.C. § 1101(a)(15); *see generally* CRS Report R45040, *Nonimmigrant (Temporary) Admissions to the United States: Policy and Trends*, by Jill H. Wilson.

[5] *See* 8 U.S.C. § 1182(a)(6)(A)(i)("An alien present in the United States without being admitted or paroled . . . is inadmissible"); *id.* § 1229a(e)(2)(B) (defining inadmissible aliens who have not been admitted to the United States as "removable"); *id.* § 1227(a)(1)(B)(rendering any alien "who is present in the United States in violation of this chapter or any other law of the United States" deportable and thus subject to removal); *id.* § 1227(a)(1)(C) (rendering any alien "who was admitted as a nonimmigrant and who has failed to maintain . . . nonimmigrant status" deportable and thus subject to removal); *see generally*, DAVID WEISSBRODT & LAURA DANIELSON, IMMIGRATION LAW AND PROCEDURE 349 (6th ed. 2011) ("Non-citizens who are present in the U.S. in violation of the INA or any other law of the U.S. are removable . . . as are those who fail to maintain the nonimmigrant . . . status in which they were admitted.").

[6] *See, e.g.*, Mondragón v. Holder, 706 F.3d 535, 541 (4th Cir. 2013) ("It is uncontroverted that Mondragón entered the United States illegally and is therefore removable."); Ghaffar v. Mukasey, 551 F.3d 651, 653 (7th Cir. 2008) (denying petition for review of final order of removal based on overstay of nonimmigrant visa).

[7] Ctr. for Migration Studies, *The US Undocumented Population Fell Sharply During the Obama Era: Estimates for 2016* (Feb. 22, 2018) (estimating 10.8 million in 2016), http://cmsny.org/publications/warren-undocumented-2016/; Dep't of Homeland Sec. Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2014* (July 2017) (estimating 12.1 million in 2014), http://www.dhs.gov/sites/default/files/publications/Unauthorized%20Immigrant%20Population%20Estimates%20in%20the%20US%20January%202014_1.pdf; Pew Research Center, *Overall Number of U.S. Unauthorized Immigrants Holds Steady Since 2009* (Sept. 20, 2016) (estimating 11.1 million in 2014), http://www.pewhispanic.org/2016/09/20/overall-number-of-u-s-unauthorized-immigrants-holds-steady-since-2009/.

[8] *See generally* 9 Foreign Affairs Manual (FAM) 402.2.

[9] *See* Office of Immigration Statistics, *supra* note 7, at 1; David A. Martin, *A Defense of Immigration-Enforcement Discretion: The Legal and Policy Flaws in Kris Kobach's Latest Crusade*, 122 YALE L.J. ONLINE 167, 171 (2012) ("[E]ntrants without inspection (EWIs, in immigration-speak) probably constitute the stereotypical 'illegal alien' in the public mind, but by commonly accepted estimates they make up only fifty to sixty-seven percent of the unlawfully (continued...)

NJAPP094

the past that its resources allow it to remove a maximum of 400,000 aliens per year who are present in violation of the INA.[10]

For reasons that may range from administrative convenience to humanitarian concerns, immigration authorities sometimes decide not to seek the removal of unlawfully present aliens[11]—either during a specified timeframe or indefinitely—and communicate that decision to the affected aliens.[12] Well-known examples of such decisions include grants of deferred action,[13] protections granted under the Deferred Action for Childhood Arrivals (DACA) initiative,[14] and Temporary Protected Status (TPS).[15] The former two types of reprieves confer assurances from DHS, premised on its enforcement discretion, that the agency will not seek an alien's removal, often during a defined time period.[16] The latter, TPS, is a statutory mechanism that allows immigration authorities to grant temporary protection from removal to aliens from countries experiencing upheaval or instability.[17]

This report refers to executive decisions not to seek removal as "discretionary reprieves from removal" because their effective period generally depends on the duration of the Executive's inclination not to seek removal and because the reprieves (unlike statutory legalization

---

(...continued)
present population. The rest entered through normal nonimmigrant channels (primarily on a student, tourist, or business visa), were admitted after inspection at the border, and then overstayed or otherwise violated the conditions of their temporary admission.").

[10] *See* Dep't of Justice Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C. (2014) ("DHS has explained that although there are approximately 11.3 million undocumented aliens in the country, it has the resources to remove fewer than 400,000 such aliens each year."); Patricia L. Bellia, *Faithful Execution and Enforcement Discretion*, 164 U. PA. L. REV. 1753, 1759 (2016) (describing the "gap between the INA's putative scope and its enforceable scope").

[11] The INA defines unlawful presence as follows: "[A]n alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the [Secretary of Homeland Security] or is present in the United States without being admitted or paroled." 8 U.S.C. § 1182(a)(9)(B)(ii).

[12] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999) ("At each stage [of the removal process] the Executive has discretion to abandon the endeavor, and at the time [the Illegal Immigration Reform and Immigrant Responsibility Act of 1996] was enacted the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience."); *see also* Arizona v. United States, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all.").

[13] *See Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 483–84; *infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (describing deferred action).

[14] Memorandum from Secretary of Homeland Security Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 1 (June 15, 2012) [hereinafter DHS DACA Memo]; *see* CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions*, by Andorra Bruno; *infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (describing DACA).

[15] 8 U.S.C. § 1254a. TPS and some other reprieve programs may also provide relief to nonimmigrants and other aliens present pursuant to a statutory immigration status. *See, e.g., id.* § 1254a(c) (requiring aliens to have been physically present since a date specified by DHS in order to qualify for TPS, but not excluding lawfully present aliens from eligibility). This report focuses on the use of discretionary reprieves to regulate the population of aliens present in violation of the INA.

[16] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (discussing deferred action and DACA).

[17] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

NJAPP095

mechanisms such as cancellation of removal,[18] registry,[19] or asylum[20]) do not confer LPR status or create a direct avenue to that status.[21] (However, in some jurisdictions, TPS may facilitate adjustment to LPR status for aliens who otherwise qualify for immigrant visas in a family-based, employment-based, or diversity-based category.)[22] Discretionary reprieves from removal do not, in other words, offer steadfast protection from removal,[23] although they typically confer eligibility for work authorization, among other benefits.[24] A burgeoning body of legal scholarship about discretionary reprieves has coined an array of terms for the peculiar sort of relief that they provide, including "quasi-legal status,"[25] "liminal"[26] or "twilight" status,[27] and the "status of nonstatus."[28] In recent decades, discretionary reprieves have grown in prevalence and become an increasingly significant aspect of the federal government's regulation of the unlawfully present population.[29] The prevalence of discretionary reprieves may well decline in the near term,

---

[18] 8 U.S.C. § 1229b(b) (authorizing the cancellation of removal and adjustment of status for certain nonpermanent residents).

[19] *Id.* § 1259 (authorizing the conferral of a record of admission for permanent residence in the case of certain aliens who entered the United States prior to January 1, 1972).

[20] *Id.* § 1158.

[21] *See* Arpaio v. Obama, 797 F.3d 11, 17 (D.C. Cir. 2015) ("[D]eferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'") (quoting DHS DACA Memo, *supra* note 14, at 3); Texas v. United States, 809 F.3d 134, 148 (5th Cir. 2015) ("'Lawful presence' [obtained through deferred action] is not an enforceable right to remain in the United States and can be revoked at any time, but that classification nevertheless has significant legal consequences."); Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 412 (E.D.N.Y. 2018) ("By granting a removable alien deferred action, immigration officials convey that they do not currently intend to remove that individual from the country. As such, deferred action offers the recipient some assurance—however non-binding, unenforceable, and contingent on the recipient's continued good behavior—that he or she may remain, at least for now, in the United States.").

[22] *See* 8 U.S.C. § 1254a(f)(4) (providing that aliens granted TPS "shall be considered as being in, and maintaining, lawful status as a nonimmigrant" for purposes of adjustment of status eligibility); *infra* note 141 (citing cases on adjustment of status eligibility for TPS recipients).

[23] *See* Arpaio, 797 F.3d at 17; *Texas*, 809 F.3d at 148. TPS provides perhaps the most rigid protection against removal of any discretionary reprieve. *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[24] *See* 8 C.F.R. § 274a.12(c) (establishing categories of aliens eligible to apply for employment authorization).

[25] *See, e.g.,* Ingrid V. Eagly, *Criminal Justice for Noncitizens: An Analysis of Variation in Local Enforcement*, 88 N.Y.U. L. Rev. 1126, 1217 (2013); Hiroshi Motomura, *What Is "Comprehensive Immigration Reform"? Taking the Long View*, 63 Ark. L. Rev. 225, 226 (2010).

[26] Jennifer M. Chacon, *Producing Liminal Legality*, 92 Denv. Univ. L. Rev. 709, 713 (2015).

[27] David A. Martin, *Twilight Statuses: A Closer Examination of the Unauthorized Population*, 2 Migration Policy Inst. 1, 7-8 (June 2005).

[28] *See* Geoffrey Heeren, *The Status of Nonstatus*, 64 Am. U. L. Rev. 1115 (2015).

[29] *See id.* at 1120 ("[I]n recent years, the United States has expanded the number of persons placed in nonstatus."). Two events, in particular, did much to increase the number of aliens receiving discretionary reprieves: the enactment of the TPS statute in 1990 and the implementation of the DACA program in 2012. *See* CRS Report RS20844, *Temporary Protected Status: Overview and Current Issues*, by Jill H. Wilson, at 11 (calculating that 436,866 people held TPS as of October 12, 2017); CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions*, by Andorra Bruno, at 6 ("As of March 31, 2017, a total of 787,580 initial DACA requests and 799,077 renewal requests had been approved."); *see also* U.S. Citizenship and Immigration Servs., *Number of Approved Employment Authorization Documents, by Classification and Basis for Eligibility, Oct. 1, 2012 – June 29, 2017* (2017) (providing statistics for employment authorization documents approved for recipients of deferred action, DACA, parole, and other types of discretionary reprieves), http://www.uscis.gov/sites/default/files/USCIS/Resources/ Reports%20and%20Studies/Immigration%20Forms%20Data/BAHA/eads-by-basis-for-eligibility.pdf [hereinafter USCIS EAD Data]. The Obama Administration's proposed Deferred Action for Parents of Americans (DAPA) initiative, which federal courts enjoined before implementation, had the potential to make approximately four million unlawfully present aliens eligible for discretionary reprieves. *See* Texas v. United States, 809 F.3d 134, 148 (5th Cir. (continued...)

NJAPP096

however, as a result of changes in executive policy concerning DACA, TPS, and Deferred Enforced Departure (DED).[30]

This report provides an overview of discretionary reprieves from removal. It discusses the primary sources of authority on which discretionary reprieves are premised and describes, in general, the nature of the protections that they confer. The report concludes with a glossary of the principal types of discretionary reprieves.

# Sources of Executive Authority to Grant Discretionary Reprieves from Removal

The Executive's power to grant most of the existing forms of discretionary reprieves—including deferred action, DACA, and DED, among others—is typically attributed to its enforcement discretion: that is, its authority to determine the best method for enforcing federal immigration law.[31] This enforcement discretion includes the authority to prioritize some cases over others to conserve resources or avoid unjust results.[32] Criminal prosecutors in the United States possess a similar type of discretion.[33] They need not prosecute every crime of which they become aware, and their ability to set prosecution priorities that maximize the impact of their limited resources is considered fundamental to the American criminal justice system.[34] Drawing from this criminal law tradition, courts, immigration officials, and commentators often call the Executive's authority

---

(...continued)

2015) (affirming injunction against DAPA and observing that of "the approximately 11.3 million illegal aliens in the United States, 4.3 million would be eligible for [reprieves] pursuant to DAPA."), *aff'd by an equally divided Court*,— U.S.—, 136 S. Ct. 2271, 2272 (2016); Arpaio v. Obama, 797 F.3d 11, 18 n.1 (D.C. Cir. 2015) (similar estimate); *cf.* Randy Capps et. al., *Deferred Action For Unauthorized Immigrant Parents*, MIGRATION POLICY INST. 3 (Feb. 2016) (estimating that DAPA could have potentially reached "as many as 3.6 million unauthorized immigrants"), https://www.migrationpolicy.org/research/deferred-action-unauthorized-immigrant-parents-analysis-dapas-potential-effects-families.

[30] *See* CRS Legal Sidebar LSB10052, *UPDATE: The End of the Deferred Action for Childhood Arrivals Program: Some Immediate Takeaways*, by Hillel R. Smith; CRS Legal Sidebar LSB10070, *Termination of Temporary Protected Status for Sudan, Nicaragua, Haiti, and El Salvador: Key Takeaways and Analysis*, by Hillel R. Smith.

[31] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999); *Arpaio*, 797 F.3d at 16 ("The Secretary of Homeland Security is charged with the administration and enforcement of the immigration laws. With enforcement responsibility comes the latitude that all executive branch agencies enjoy to exercise enforcement discretion—discretion necessitated by the practical fact that '[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing.'") (quoting Heckler v. Chaney, 470 U.S. 821, 831 (1985)) (some internal quotation marks and citations omitted).

[32] Arizona v. United States, 567 U.S. 387, 396 (2012); *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 483–84.

[33] *See* United States v. Batchelder, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion."); CRS Report R43708, *The Take Care Clause and Executive Discretion in the Enforcement of Law*, by Todd Garvey, at 11 ("The judicial branch has traditionally accorded federal prosecutors 'broad' latitude in making a range of investigatory and prosecutorial determinations, including when, against whom, and whether to prosecute particular criminal violations of federal law.").

[34] *See* Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 VAND. L. REV. 671, 682 (2014) ("With limited resources and broad charging options, federal prosecutors must choose how to allocate investigative and prosecutorial resources; they must prioritize some offenses at the expense of others."); *cf.* LUIGI FERRAJOLI, LAW AND REASON 574 (1989) (categorizing prosecutorial discretion as an attribute of the Anglo-American system of accusatorial criminal justice that belongs to its historical tradition but not its theoretical framework, and noting that prosecutorial discretion does not form part of the civil law tradition).

to decline to seek removal of some unlawfully present aliens "prosecutorial discretion,"[35] even though removal proceedings are civil rather than criminal in nature.[36]

Enforcement discretion in the immigration context has unique attributes that distinguish it from prosecutorial discretion in the criminal context. The INA puts no general statute of limitations on removal.[37] Thus, the Executive's decision not to seek removal of an alien lacks the definitive quality of many decisions not to prosecute crimes, which become irreversible if an applicable statute of limitations expires.[38] Aliens present in violation of the INA remain removable indefinitely (unless they otherwise acquire a legal status), so an assurance that the Executive will not seek their removal at a particular juncture does not redress their long-term situation.[39] Further, perhaps as a consequence of this reality, a discretionary reprieve from removal differs from a decision not to prosecute a crime in that a discretionary reprieve from removal often carries a fixed term, which can typically be renewed.[40] DACA, for instance, carries a two-year renewable term.[41]

Over time, the Executive has employed its enforcement discretion to grant various types of reprieves under inconstant terminology. In 1974, John Lennon famously pursued a type of

---

[35] *See, e.g.*, Shoba Shivaprasad Wadhia, *The Role of Prosecutorial Discretion in Immigration Law*, 9 CONN. PUB. INT. L.J. 243 (2010); DHS DACA Memo, *supra* note 14, at 1.

[36] *Arizona*, 567 U.S. at 396 (2012) ("Removal is a civil, not criminal, matter."); *cf.* Maureen A. Sweeney, *Fact or Fiction: The Legal Construction of Immigration Removal for Crimes*, 27 YALE J. ON REG. 47, 49 (2010) ("[C]ourts have consistently held that removal is not punishment for crime but is instead a remedial civil sanction and a collateral, rather than direct, consequence of a conviction. This theoretical characterization of removal developed many decades ago in the context of the very different immigration law that existed then. It no longer corresponds in any meaningful way to the realities of immigration law and enforcement . . . .").

[37] *See* Adams v. Holder, 692 F.3d 91, 104 (2d Cir. 2012) ("[T]he INA . . . specifically imposes no time limitations on removal proceedings."); Asika v. Ashcroft, 362 F.3d 264, 269 (4ᵗʰ Cir. 2004) ("[T]he provisions of the [INA] that govern deportation [do not] refer . . . to any time limitation on deportation at all."). Some grounds of deportation, however, apply only to conduct that occurs within a certain time after entry. *See* 8 U.S.C. § 1227(a)(1)(E)(i) ("Any alien who (prior to the date of entry, at the time of any entry, or *within 5 years of the date of any entry*) knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law is deportable.") (emphasis added); *id.* § 1227(a)(5) ("Any alien who, *within five years after the date of entry*, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable.") (emphasis added); WEISSBRODT & DANIELSON, *supra* note 5, at 279-80 ("[N]on-citizens who become dependent on government benefits are removable only if they become a public charge within five years of entry . . . . Because there is no general statute of limitations, however, ICE can remove [such non-citizens] . . . *at any time*—even if [they] cease[] to be a public charge.") (emphasis in original). Also, one INA provision imposes a limitations period on actions to *rescind* a person's LPR status if he obtained it through adjustment despite being ineligible, 8 U.S.C. § 1256(a), but every federal appellate court to consider the issue, except one, has held that limitations period does not apply to removal proceedings. *See Adams*, 692 F.3d at 101-02, 102 n.6 (collecting cases and explaining that only the Third Circuit "has applied § 1256(a)'s five-year limitations period to removal proceedings based on alleged fraudulent procurement of adjustment of status").

[38] *See* United States v. Marion, 404 U.S. 307, 322 (1971) ("[Criminal] statutes [of limitation] . . . 'are made for the repose of society and the protection of those who may (during the limitation) . . . have lost their means of defence.' These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced.") (quoting Public Schools v. Walker, 9 Wall. 282, 288 (1870)).

[39] *See* 8 U.S.C. § 1182(a)(6)(A)(i); *id.* § 1227(a)(1)(B); Andrew Tae-Hyun Kim, *Deportation Deadline*, 95 WASH. U.L. REV. 531, 550 (2017) (noting the lack of any limitations period in the INA and explaining that because "deferred action is not an affirmative grant of relief from removal . . . a change in administrative policy or priorities could change what was once a low-priority case to a high-priority one. All this heightens the level of uncertainty for undocumented immigrants.").

[40] *See, e.g.*, DHS DACA Memo, *supra* note 14, at 2 (authorizing "deferring action for a period of two years" for qualified aliens).

[41] *Id.*

reprieve called "nonpriority status," which his lawyer accused the Immigration and Naturalization Service (INS)[42] of keeping secret.[43] Soon thereafter, the INS adopted the term "deferred action,"[44] which DHS continues to use today for a reprieve from removal granted under its general enforcement discretion.[45] Immigration authorities have also, however, granted reprieves under the labels "Extended Voluntary Departure" (EVD), DED, and DACA.[46] In some instances, such as DACA, these labels denote a particular reprieve type's focus on a discrete group.[47] In other instances, such as with EVD and DED, the bureaucratic terminology seems to supply multiple labels for the same type of reprieve.[48] The criteria for granting the reprieves (other than the statutorily authorized reprieves discussed below) are generally set forth in agency manuals and policy memoranda,[49] although for some reprieve types it can be difficult to locate a controlling document.[50] Federal statute does not set the criteria for reprieves grounded in enforcement discretion; nor does a particular law supply explicit authorization for the Executive to grant such reprieves,[51] although scattered provisions of the INA reference deferred action and describe narrow categories of aliens as eligible to receive it.[52] In recent years, questions have arisen as to

---

[42] The INS was the agency with primary responsibility for enforcing the INA until March 1, 2003, when it ceased to exist and most of its functions were transferred to DHS under the Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135. *See* Nijar v. Holder, 689 F.3d 1077, 1078-79 (9th Cir. 2012).

[43] Heeren, *supra* note 28, at 1134; Wadhia, *supra* note 35, at 246-47.

[44] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999); *see also* Heeren, *supra* note 28, at 1133-34; Wadhia, *supra* note 35, at 246-47.

[45] *See* 8 C.F.R. § 274a.12(c)(14) (describing deferred action as "an act of administrative convenience to the government which gives some cases lower priority").

[46] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion."

[47] *See* DHS DACA Memo, *supra* note 14, at 2 (describing the DACA initiative as premised on "the exercise of [] prosecutorial discretion . . . [for] certain young people who were brought to this country as children and know only this country as home").

[48] *See* U.S. IMMIGRATION AND NATURALIZATION SERVS, ADJUDICATOR'S FIELD MANUAL, ch. 38.2(a) ("DED, in use since 1990, was formerly known as Extended Voluntary Departure (EVD). EVD [was] in use from 1960 until 1990 . . . .") [hereinafter USCIS AFM].

[49] *See*, *e.g.*, *id.*; IMMIGRATION AND CUSTOMS ENFORCEMENT, DETENTION AND REMOVAL OPERATIONS POLICY AND PROCEDURE MANUAL, ch. 20.8 (concerning deferred action), https://www.ice.gov/doclib/foia/dro_policy_memos/09684drofieldpolicymanual.pdf [hereinafter DROPPM].

[50] *See infra* "Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers" (discussing deferred action); Heeren, *supra* note 28, at 1134 (contending that the controlling legal authority for discretionary reprieves "is tenuous and sometimes even secret . . . DHS will fill in requirements, if at all, using regulations or more commonly with non-binding policy guidance or memoranda").

[51] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999) (quoting treatise for the proposition that deferred action is a "commendable exercise in administrative discretion [] developed without express statutory authorization"); Texas v. United States, 809 F.3d 134, 167 (5th Cir. 2015) (same); *see also* Arpaio v. Obama, 797 F.3d 11, 16 (D.C. Cir. 2015) ("With [DHS's] enforcement responsibility comes the latitude that all executive branch agencies enjoy to exercise enforcement discretion—discretion necessitated by the practical fact that '[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing.'") (quoting Heckler v. Chaney*,* 470 U.S. 821, 831 (1985)).

[52] *See* 8 USC § 1227(d)(2) (providing that the denial of an administrative stay of removal to applicants for T or U nonimmigrant status "shall not preclude the alien from applying for . . . deferred action"); REAL ID Act of 2005, P.L. 109-13, § 202(c)(2)(B)(viii) (emphasis added) (listing deferred action as a "lawful status" for purposes of the minimum issuance standards for driver's licenses). At least two statutory provisions go so far as to state that specific groups of aliens are "eligible" for deferred action. *See* 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain self-petitioners for LPR status under the Violence Against Women Act are "eligible for deferred action and work authorization"); National Defense Authorization Act of 2004, P.L. 108-136, Div. A, Title VII, § 1703(c), 117 Stat. 1693 (codified at 8 U.S.C. § 1151 NOTE) (providing that the spouses and children of certain deceased U.S. combat veterans are "eligible for deferred action, advance parole, and work authorization"); *see also* Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 413 (E.D.N.Y. 2018) (reasoning that "Congress has repeatedly ratified immigration officials' practice of according (continued...)

NJAPP099

whether the Executive may lawfully use its enforcement discretion to provide reprieves in a programmatic fashion for large populations of aliens that meet specific criteria, instead of granting reprieves on a purely case-by-case basis.[53] The Supreme Court has yet to decide this issue.[54]

Although most types of discretionary reprieves from removal are grounded entirely in enforcement discretion, a few types have a statutory footing. First, the INA expressly gives DHS authority to grant immigration parole on a case-by-case basis to certain aliens,[55] providing legal permission for their physical presence in the United States without granting them admission (thereby leaving them "at the boundary line" of the United States for most immigration purposes).[56] DHS interprets its parole authority to encompass two types of discretionary grants of parole with implications for aliens whose presence violates the INA: parole-in-place and advance parole.[57] Second, the INA gives DHS authority to grant TPS relief to nationals from designated countries,[58] which resembles a discretionary reprieve in many respects but confers more rigid protection from removal than most reprieves because the bases for terminating TPS are statutorily limited.[59] Although TPS eligibility is not limited to unlawfully present aliens,[60] TPS may be particularly consequential for aliens who otherwise lack a legal foothold to remain in the United States.[61] Finally, the INA gives DHS and immigration courts authority to grant some types of discretionary reprieves in conjunction with the removal process, including voluntary departure,[62] stays of removal,[63] and orders of supervision.[64] (Other types of reprieves granted during removal proceedings, such as administrative closure, have a basis only in principles of executive discretion and docket management.)[65]

---

(...continued)

deferred action to certain aliens without lawful immigration status").

[53] *See* Texas v. United States, 809 F.3d 134, 179-82 (5th Cir. 2015) (reasoning that the Deferred Action for Parents of Americans (DAPA) reprieve program was "manifestly contrary to the INA" because "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present . . . [and] [e]ntirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA")."), *aff'd by an equally divided Court*, 136 S. Ct. 2271, 2272 (2016); *contra Batalla Vidal*, 279 F. Supp. 3d at 422 ("The court is aware of no principled reason why the Executive Branch may grant deferred action to particular immigrants but may not create a program by which individual immigrants who meet certain prescribed criteria are eligible to request deferred action.").

[54] *See* United States v. Texas, 136 S. Ct. 2271 (2016) (Mem.).

[55] 8 U.S.C. § 1182(d)(5).

[56] Leng May Ma v. Barber, 357 U.S. 185, 189 (1958).

[57] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing parole-in-place and advance parole).

[58] 8 U.S.C. § 1254a.

[59] *Id*. § 1254(c)(3); *see infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[60] *See* 8 U.S.C. § 1254(c)(1) (setting forth TPS eligibility standards).

[61] *See, e.g.,* Ramirez v. Brown, 852 F.3d 954, 958 (9th Cir. 2017) (concerning adjustment of status ramifications of a grant of TPS to an alien who entered without inspection).

[62] 8 U.S.C. § 1229c.

[63] *Id*. § 1229a(b)(5)(C); *id*. § 1231(c)(2).

[64] 8 U.S.C. § 1231(a)(3); *see infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing voluntary departure, stays of removal, and orders of supervision).

[65] Matter of Avetisyan, 25 I. & N. Dec. 688, 692 (BIA 2012); *see infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing administrative closure).

NJAPP100

# Nature of Protections for Recipients: In General

The principal benefit of a discretionary reprieve is the temporary assurance it provides to an unlawfully present alien that he or she does not face imminent removal, even though his or her presence in the United States violates the INA.[66] The nature of the Executive's ability to retract this assurance—and the resulting reliability of the assurance to the alien—varies by reprieve type. A grant of TPS to an individual alien, due to the applicable statutory parameters, is relatively difficult for DHS to withdraw during the grant's validity period.[67] In contrast, DHS asserts that it may terminate a grant of deferred action or DACA at its discretion,[68] although the Administrative Procedure Act and constitutional principles may require DHS to have an adequate justification for doing so.[69] No type of reprieve offers a bulwark against removal as rigid as the statutorily authorized presence that comes with LPR, refugee, and asylee status, whose holders can be removed only if they acquired their status unlawfully (e.g., through fraud) or if they engage in specified forms of misconduct.[70] Aliens present in violation of the INA who receive discretionary reprieves remain technically removable under the inadmissibility or deportability grounds of the INA, and, except in the case of TPS recipients, do not have a statutory defense against removal based on the reprieve itself.[71]

Discretionary reprieves also typically carry advantages beyond protection from removal, including eligibility to seek an employment authorization document (EAD) from DHS that allows aliens to work legally in the United States.[72] Perhaps most significantly, under DHS regulations, recipients of most types of reprieves are not considered "unlawfully present" within the United

---

[66] *See Reno*, 525 U.S. at 484.

[67] *See* 8 U.S.C. § 1254a(c)(3) (enumerating three bases for withdrawal of TPS); *infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing TPS).

[68] DROPPM, *supra* note 49, ch. 20.8(f) (concerning deferred action termination); U.S. Citizenship & Immigration Servs., *DHS DACA FAQs*, at Q27 (Apr. 25, 2017) ("DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion."), https://www.uscis.gov/archive/frequently-asked-questions [hereinafter DHS DACA FAQs].

[69] *See infra* note 119 (collecting precedents concerning potential limitations on termination of individual DACA grants and rescission of the DACA program).

[70] *See* 8 U.S.C. § 1227 (enumerating specific grounds of deportability for admitted aliens, including certain criminal convictions); *id.* § 1158(c)(2) (governing termination of asylum); *cf.* Amanda Frost, *Independence and Immigration*, 89 S. CAL. L. REV. 485, 503 (2016) ("Congress has expanded the grounds on which even longtime lawful permanent residents can be deported. Today, even longtime lawful permanent residents can be deported for fairly minor criminal offenses . . . ."). Nonimmigrant aliens do not enjoy a level of protection from removal commensurate with LPRs, asylees, and refugees, because the Department of State has discretion to revoke a nonimmigrant visa "at any time," 8 U.S.C. § 1201(i), and revocation renders the visa holder removable. 8 U.S.C. § 1227(a)(1)(B) (providing for the removal of any alien "whose nonimmigrant visa . . . has been revoked under section 1201(i)"); *see* Texas v. United States, 809 F.3d 134, 167 n.102 (5th Cir. 2015); Mier-Fiorito v. Mukasey, 282 Fed. Appx. 536, 538 (9th Cir. 2008) (unpublished) (holding that revocation of alien's nonimmigrant visa rendered him deportable).

[71] *See* 8 U.S.C. § 1182(a)(6)(A)(i)("An alien present in the United States without being admitted or paroled . . . is inadmissible"); *Id.* § 1227(a)(1)(C) (rendering any alien "who was admitted as a nonimmigrant and who has failed to maintain . . . nonimmigrant status" deportable and thus subject to removal); *see generally*, Amanda Frost, *Cooperative Enforcement in Immigration Law*, 103 IOWA L. REV. 1, 51 n.78 (2017) ("[D]eferred action does not provide any defense to removal and the executive has absolute discretion to revoke deferred action unilaterally . . . .") (internal quotation marks and citation omitted); *cf.* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (reasoning that DACA was "*specifically designed* for persons without lawful immigration status" but that DHS must supply a non-arbitrary or capricious reason for terminating a DACA grant).

[72] *See* 8 C.F.R. § 274a.12(c); *see also* REAL ID Act of 2005, P.L. 109-13, § 202(c)(2)(B)(viii) (listing deferred action as a "lawful status" for purposes of the minimum issuance standards for federal recognition of state-issued driver's licenses and other identification documents).

NJAPP101

States.[73] This is because DHS has "authorized" the aliens' presence by granting them reprieves.[74] As a consequence, time spent in the United States on deferred action, TPS, and most other types of reprieves does not count toward the accumulation of unlawful presence for purposes of the three- and ten-year bars on admission set forth in INA § 212(a)(9)(B)(i) (although a reprieve does not cure, for purposes of the bars, any unlawful presence already accumulated).[75] A discretionary reprieve may also trigger eligibility for certain benefits or programs for which "lawful presence" is a qualifying criterion, such as in-state university tuition under certain state laws.[76] More generally, even though state governments typically have broad discretion to deny state benefits to unlawfully present aliens, that discretion might be more limited in the event that such aliens are granted a discretionary reprieve from removal by the federal government.[77]

It is often said that discretionary reprieves do not confer lawful immigration status.[78] But "lawful immigration status" is an imprecise term. The INA uses variations of it in some places[79] but does not define it.[80] Although a determination that an alien lacks "lawful immigration status" triggers consequences under some INA provisions—most notably, a potential bar to adjustment of status[81]—it does little to describe the alien's legal condition in a formal sense. According to DHS

---

[73] Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 974 (9th Cir. 2017) (en banc); Texas v. United States, 809 F.3d 134, 147-48 (5th Cir. 2015) (explaining that deferred action recipients are "lawfully present" based on agency memoranda); *see also* 8 C.F.R. § 1.3(a)(4) (defining recipients of several types of reprieves as "lawfully present in the United States" for purposes of applying for social security benefits).

[74] *Arizona Dream Act Coal.*, 855 F.3d at 974.

[75] USCIS AFM, *supra* note 48, ch. 40.9(b)(3)(J) ("Accrual of unlawful presence stops on the date an alien is granted deferred action and resumes the day after deferred action is terminated. The granting of deferred action does not eliminate any prior periods of unlawful presence."). Aliens who are unlawfully present for more than 180 days but less than one year are, following departure from the country, barred from admission for three years. *See* 8 U.S.C. § 1182(a)(9)(B)(i)(I). Aliens unlawfully present for more than a year are subject to a ten-year bar on admission to the United States following departure or removal from the country. *Id*. § 1182(a)(9)(B)(i)(II).

[76] *See, e.g.*, 8 U.S.C. § 1623 (prohibiting states from providing any "postsecondary education benefit" on the basis of state residency to aliens who are "not lawfully present," unless the same benefit is made available to U.S. citizens without regard to residency). Some have argued that a discretionary reprieve recipient's lack of unlawful presence does not mean that he or she possesses lawful presence for purposes of other statutes. *Arizona Dream Act Coal.*, 855 F.3d at 960 n.3 (Kozinski, J., dissent from denial of rehearing en banc) ("Even if it were true that an immigrant was 'unlawfully present' if he stayed beyond a period approved by the Attorney General, this doesn't mean he would be 'lawfully present' if he didn't stay beyond such a period. In formal logic, the inverse of a conditional cannot be inferred from the conditional.").

[77] *See Arizona Dream Act Coal.*, 855 F.3d at 963 (rejecting as preempted by federal law a state policy that deemed individuals with employment authorization through DED and deferred action to be unlawfully present and denied them state-issued driver's licenses on that basis).

[78] *See* USCIS, *Consideration of Deferred Action for Childhood Arrivals (DACA)*, http://www.uscis.gov/archive/ consideration-deferred-action-childhood-arrivals-daca ("Deferred action does not provide lawful status."); United States v. Arrieta, 862 F.3d 512, 516 (5th Cir. 2017) (holding that DACA recipients lack "lawful status").

[79] *E.g.*, 8 U.S.C. § 1254a(f)(4) (providing that a TPS recipient "shall be considered as being in, and maintaining, lawful status as a nonimmigrant" for adjustment of status purposes); *id.* § 1644 ("[N]o State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.").

[80] Gazeli v. Sessions, 856 F.3d 1101, 1105 (6th Cir. 2017) ("[T]he INA does not define 'lawful immigration status' . . . ."); *see also* Tula Rubio v. Lynch, 787 F.3d 288, 293 (5th Cir. 2015) ("Although the word 'status' is not defined in the INA, its general meaning is '[a] person's legal condition.'") (quoting BLACK'S LAW DICTIONARY 1542 (10th ed. 2014)).

[81] *See* 8 U.S.C. § 1255(c)(2) (rendering some aliens who "fail to maintain continuously a lawful status" ineligible for adjustment of status).

regulations, TPS holders do not have "lawful status,"[82] even though they have a statutory protection against removal.[83] Nonimmigrants, however, indisputably possess lawful status,[84] but it can be revoked more easily than TPS.[85] Similarly, under the DHS definition, parole is a lawful status,[86] even though it, too, can be terminated at DHS's discretion.[87] Perhaps the only concrete legal meaning that can be attributed to the term "lawful immigration status" is that aliens who lack it—including those unlawfully present aliens who are granted discretionary reprieves—are removable under the inadmissibility or deportability grounds of the INA.[88]

When understood as a general concept rather than a formal legal term, however, "lawful immigration status" usefully describes the bundle of statutorily defined privileges and protections that come with the major statuses set forth in the INA (LPR, asylee, refugee, and nonimmigrant status).[89] To say that unlawfully present aliens who receive discretionary reprieves do not have lawful immigration status means, generally speaking, that they lack most such privileges and protections or possess them only as a matter of executive grace.[90] For example, aliens who receive discretionary reprieves generally cannot work legally unless DHS, in its discretion, authorizes them to do so (unlike LPRs, refugees, asylees, and some nonimmigrants);[91] they have no statutorily established prospects of remaining permanently in the United States (unlike LPRs, asylees, and refugees);[92] they are generally subject to removal by virtue of their presence within the United States alone (unlike all aliens with LPR, refugee, asylee, and unexpired nonimmigrant status);[93] they have no legal basis to facilitate the admission of immediate relatives into the United States (unlike LPRs, refugees and asylees in some circumstances, and some

---

[82] *See* 8 C.F.R. § 1245.1(d)(1) (omitting TPS from definition of "lawful immigration status"); Dep't of Homeland Security Office of Immigration Statistics, *supra* note 7, at 1 (classifying TPS holders as "unauthorized immigrants"); *see also* Heeren, *supra* note 28, at 1141 ("TPS meets most of the characteristics for nonstatus, although it is a close call."); *but cf.* United States v. Orellana, 405 F.3d 360, 370-71(5th Cir. 2005) (disagreeing with agency interpretations and holding that a TPS recipient is not an alien "illegally or unlawfully in the United States" for purposes of a statute criminalizing firearm possession by such aliens).

[83] *See* 8 U.S.C. § 1254a(c)(3).

[84] *See* 8 C.F.R. § 1245.1(d)(1)(ii).

[85] *See supra* note 70.

[86] 8 C.F.R. § 1245.1(d)(1)(v).

[87] *See infra* "Generally Available Reprieves Granted Pursuant to Statutory Authority" (discussing parole).

[88] *See* 8 U.S.C. § 1182(a)(6)(A)(i) (inadmissibility); *id.* § 1227(a)(1)(C) (deportability); *see* Judulang v. Holder, 565 U.S. 42, 46 (2011) ("[T]he immigration laws provide two separate lists of substantive grounds, principally involving criminal offenses, for [removal]. One list specifies what kinds of crime render an alien excludable (or in the term the statute now uses, 'inadmissible'), while another—sometimes overlapping and sometimes divergent—list specifies what kinds of crime render an alien deportable from the country.") (citations omitted); *see also, e.g.,* Matter of Ventura, 25 I. & N. Dec. 391, 392 (BIA 2010) ("[A] grant of TPS does not affect an alien's admissibility or inadmissibility for purposes of the Immigration and Nationality Act generally.").

[89] *See* Heeren, *supra* note 28, at 1122-24 (citing dictionaries for the proposition that "status" denotes "high standing" and explaining the statutory benefits of LPR, refugee, asylee, and nonimmigrant status).

[90] *Id.* at 1129-30; *see* Matter of Blancas–Lara, 23 I. & N. Dec. 458, 460 (B.I.A.2002) ("'Status' is a term of art . . . [that] denotes someone who possesses a certain legal standing, e.g., classification as an immigrant or nonimmigrant.").

[91] 8 C.F.R. § 274a.12.

[92] *Compare* DHS DACA FAQs, *supra* note 68, at Q68 ("Deferred action is a form of prosecutorial discretion that does not confer lawful permanent resident status or a path to citizenship."), *with* 8 U.S.C. § 1101(a)(20) (providing that LPRs are "accorded the privilege of residing permanently in the United States"), *and id.* § 1159 (providing for the adjustment of refugees and asylees to LPR status).

[93] *See* 8 U.S.C. § 1182(a)(6)(A)(i) (inadmissibility of aliens who enter without inspection); *id.* § 1227(a)(1)(C) (deportability of visa overstays).

nonimmigrants);[94] they face considerable restrictions on eligibility for federal public benefits (particularly as compared with LPRs, refugees, and asylees);[95] and, unless DHS decides to grant them advance parole, they generally cannot travel abroad with any legal basis to request re-entry to the United States (unlike all aliens with one of the four major statuses, except some nonimmigrants).[96] Strictly speaking, it is not correct to say that discretionary reprieves bestow no statutorily defined protections: TPS recipients have a statutory defense against removal, and recipients of most discretionary reprieves garner some advantages grounded in statute by virtue of DHS's authorization of their presence.[97] Generally speaking, however, the legal situation of aliens granted discretionary reprieves from removal ranks so low along the spectrum of immigration categories as to not be considered "lawful immigration status" in common parlance (even though most reprieves vitiate unlawful presence).[98]

In summary, recipients of discretionary reprieves obtain a temporary assurance against removal that varies in reliability by reprieve type. Such aliens, in most cases, are not unlawfully present in the United States during the term of the reprieve. Such aliens do not, however, possess "lawful immigration status," in the narrow sense that they remain technically removable under the INA's inadmissibility or deportability provisions and in the more general sense that they do not enjoy most of the statutorily fixed protections that come with LPR, refugee, asylee, and nonimmigrant status.

# Glossary of Discretionary Reprieves

This glossary describes the principal types of discretionary reprieves from removal granted by DHS or the Attorney General.[99] The glossary is divided into three categories: (1) reprieves

---

[94] *Compare* DHS DACA Memo, *supra* note 14, at 2 (not mentioning relief for family members of DACA recipients); *with, e.g.*, 8 U.S.C. § 1153(a)(2) (allocating immigrant visas to the "[s]pouses and unmarried sons and unmarried daughters" of LPRs), *id.* § 1159(a) (providing for the adjustment to LPR status of the spouses and children of refugees), and *id.* § 1101(a)(H) (providing for the issuance of nonimmigrant visas to the spouses and minor children of H-1B specialty occupation workers).

[95] The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), P.L. 104-193, 110 Stat. 2105, limited eligibility for many federal public benefits to "qualified aliens." *See* 8 U.S.C. §§ 1611-1613; *see generally* CRS Report RL33809, *Noncitizen Eligibility for Federal Public Assistance: Policy Overview*, coordinated by Audrey Singer. "Qualified alien" is defined to cover specific categories of aliens, such as LPRs, refugees, and asylees, but does not cover most aliens who obtain discretionary reprieves, other than aliens granted parole for at least one year. *See* 8 U.S.C. § 1641(b).

[96] *Compare, e.g.*, 8 U.S.C. § 1254a(f)(3) (providing that TPS holders "may travel abroad with the prior consent of the Attorney General"), *with* 8 U.S.C. § 1187(a)(7) (requiring possession of valid visa in order to apply for admission to the United States). Some nonimmigrants who have expired visas but still possess unexpired nonimmigrant status may not be able to leave and return to the United States without obtaining a new visa. *See* 9 FAM 403.9-4(A) ("For example, an alien whose B-1 visa may expire a month after entry into the United States, could be admitted by a Department of Homeland Security (DHS) officer at a port of entry (POE) for a stay of up to one year.").

[97] *See supra* text at notes 72-76.

[98] *See supra* note 78; Heeren, *supra* note 28, at 1132-33 (arguing that "immigration law affords a continuum of rights and privileges" and that holders of discretionary reprieves "fall in the nebulous middle of this spectrum," beneath holders of lawful status).

[99] The Attorney General, through the immigration judges of the Executive Office for Immigration Review (EOIR), administers removal proceedings and has authority to grant some discretionary reprieves from removal in those proceedings. *See* 8 U.S.C. § 1101(b)(4) (defining "immigration judge" as "an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under [8 U.S.C.] § 1229a [concerning removal proceedings]"); *see, e.g.*, *infra* note 134 (discussing Attorney General authority to adjudicate TPS applications in removal proceedings); *infra* "Reprieves Granted Exclusively in Connection with the Removal Process" (discussing Attorney General authority to (continued...)

premised upon enforcement discretion or presidential foreign policy powers (i.e., reprieves granted without express statutory authorization); (2) reprieves premised upon statutory authorization; and (3) reprieves granted exclusively in contemplation of or in connection with the removal process. The categories overlap—most of the reprieves in category (3) have statutory foundations,[100] and the reprieves in categories (1) and (2) can be granted to aliens before or after the initiation of removal proceedings[101]—but are nonetheless useful in conceptualizing the array of discretionary reprieves from removal available under current law and executive policy.

For additional information, or for information about any type of discretionary reprieve not listed below, please contact the author.

## Generally Available Reprieves Premised upon Enforcement Discretion or Executive Powers

***Deferred Action***. DHS regulations describe deferred action as "an act of administrative convenience to the government which gives some cases lower priority."[102] Thus, the term serves as a generic label for a decision by DHS not to remove an inadmissible or deportable alien pursuant to its enforcement discretion.[103] Some other types of discretionary reprieves, such as DACA, are forms of deferred action tailored to particular groups or circumstances.[104] By regulation, deferred action recipients qualify for work authorization if they show "an economic necessity for employment."[105] They are not considered unlawfully present for purposes of the three- and ten-year bars on admission to the United States that the INA imposes on aliens who depart the country after being unlawfully present for more than 180 days.[106] According to DHS employment authorization data, only a small number of people receive generic deferred action each year as opposed to DACA.[107] There does not appear to be one central, publicly available agency memorandum or policy document that governs the criteria and procedures for deferred

---

(...continued)

grant voluntary departure and stays of removal).

[100] *See, e.g.*, 8 U.S.C. § 1229c (voluntary departure); *id*. § 1231(a)(3) (orders of supervision).

[101] *See, e.g.*, DHS DACA Memo, *supra* note 14, at 2 (providing guidance on granting DACA to aliens in removal proceedings); 8 U.S.C. § 1229c(b)(5)(B) (requiring that TPS relief be available to aliens in removal proceedings).

[102] 8 C.F.R. § 274a.12(c)(14); *see also* USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(J) ("A DHS field office director may, in his or her discretion, recommend deferral of (removal) action, an act of administrative choice in determining, as a matter of prosecutorial discretion, to give some cases lower enforcement priority . . . . Deferred action simply recognizes that DHS has limited enforcement resources and that every attempt should be made administratively to utilize these resources in a manner which will achieve the greatest impact under the immigration laws.").

[103] *See id.*; Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483–84 (1999).

[104] *See* DHS DACA Memo, *supra* note 14, at 2 (describing DACA relief as "deferred action").

[105] 8 C.F.R. § 274a.12(c)(14).

[106] *See* 8 U.S.C. § 1182(a)(9)(B)(i)(I) (establishing a three-year bar for unlawful presence for "a period of more than 180 days but less than 1 year" following departure); *id*. § 1182(a)(9)(B)(i)(II) (establishing a ten-year bar for unlawful presence "for one year or more" following departure or removal); *id*. § 1182(a)(9)(B)(ii) (exempting any "period of stay authorized" by the Secretary of Homeland Security (formerly the Attorney General) from the construction of "unlawful presence" for purposes of the three- and ten-year bars); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 975 (9th Cir. 2017) ("[D]eferred action recipients do not accrue 'unlawful presence' for purposes of calculating when they may seek admission to the United States."); USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(J) ("Accrual of unlawful presence stops on the date an alien is granted deferred action and resumes the day after deferred action is terminated. The granting of deferred action does not eliminate any prior periods of unlawful presence.").

[107] *See* USCIS EAD Data, *supra* note 29 (showing 8,769 employment authorization documents approved under generic deferred action in fiscal year 2017, as opposed to 360,389 approved under DACA).

action.[108] According to one agency manual, when DHS grants deferred action, it informs recipients so that they may seek employment authorization.[109] DHS apparently does not specify a particular time period for which a grant of generic deferred action is valid (unlike DACA), but DHS does periodically review each grant.[110] DHS claims authority to terminate a grant of deferred action at any time in its discretion.[111]

***Deferred Action for Childhood Arrivals (DACA).*** DACA is a type of deferred action for aliens present in violation of the INA who meet the following criteria:

- came to the United States under the age of sixteen;
- have continuously resided in the United States since June 15, 2007, and were present in the United States on June 15, 2012;
- are in school, have graduated from high school, have obtained a general education development certificate, or are honorably discharged veterans;
- have not been convicted of certain criminal offenses and do not pose a threat to national security or public safety; and
- were under the age of thirty-one on June 15, 2012.[112]

The Secretary of Homeland Security created DACA by memorandum in 2012.[113] As a result, DACA has clearer eligibility criteria and application procedures than generic deferred action.[114] A grant of DACA lasts two years, subject to renewal.[115] DACA generally confers the same collateral advantages as generic deferred action (eligibility for work authorization, no unlawful presence).[116] Also like generic deferred action, DHS claims authority to terminate a grant of

---

[108] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 n.8 (1999) ("Prior to 1997, deferred-action decisions were governed by internal INS guidelines . . . . These were apparently rescinded on June 27, 1997, but there is no indication that the INS has ceased making this sort of determination on a case-by-case basis."); *Compare* DROPPM, *supra* note 49, ch. 20.8 (concerning deferred action), *with* DHS Office of Inspector General, *ICE Deportation Operations*, at 8 (Apr. 17, 2017) ("Officials we interviewed said ICE considers the 2003 Detention and Removal Operations Policy and Procedure Manual (manual) 'the official guide' to operations, but ICE has not periodically reviewed the manual or revised it since 2008. For a time, ICE would affix a memo to the front of the appropriate chapter to indicate changes, rather than incorporate changes and issue a revised manual."), https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-51-Apr17.pdf; *cf.* Memorandum from Secretary of Homeland Security John Kelly, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) ("The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action . . . .").

[109] DROPPM, *supra* note 49, ch. 20.8(c)(1).

[110] *Id*. ch. 20.8(e), (f).

[111] *Id*. ch. 20.8(f). As noted below, there is some authority for the proposition that principles of due process and administrative procedure restrict DHS's ability to terminate an individual DACA grant without good justification, and that proposition could arguably extend to generic deferred action as well. *See infra* note 119 (collecting cases concerning limits on termination of individual DACA grants); DHS DACA Memo, *supra* note 14, at 2-3 (describing DACA as conferring "deferred action" relief).

[112] DHS DACA Memo, *supra* note 14, at 1; *see generally* CRS Report R44764, *Deferred Action for Childhood Arrivals (DACA): Frequently Asked Questions*, by Andorra Bruno.

[113] *Id.*

[114] *See id*; *Consideration of Deferred Action for Childhood Arrivals*, *supra* note 78**Error! Hyperlink reference not valid.** (describing eligibility criteria and filing process).

[115] *Id.*

[116] *See* 8 C.F.R. § 274a.12(c)(14); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 975 (9th Cir. 2017).

DACA at its discretion,[117] although its internal Standard Operating Procedures (SOP) apparently set forth specific bases (such as fraud or criminal issues) for DACA termination.[118] There is ongoing litigation over whether the Administrative Procedure Act (APA) or the Constitution restricts DHS's ability to terminate an individual DACA grant without proper justification or in a manner that does not follow the SOP.[119] There is also ongoing litigation over the extent of DHS's authority to rescind the DACA program in its entirety. DHS announced plans to rescind the DACA program effective March 5, 2018,[120] but federal courts have enjoined the rescission in most respects on the ground that it is likely "arbitrary and capricious" under the APA.[121]

***Deferred Enforced Departure (DED)***. DHS describes DED as follows:

> [A] temporary, discretionary, administrative stay of removal granted to aliens from designated countries. Unlike TPS [which is authorized by statute], DED emanates from the President's constitutional powers to conduct foreign relations and has no statutory basis . . . . The President designates DED for nationals of a particular country through either an Executive Order or a Presidential Memorandum.[122]

DED resembles TPS in that it protects nationals of certain designated countries from removal, except that DED is rooted in inherent executive power rather than in statutory authority.[123] Eligibility criteria depend on the relevant presidential directive.[124] DED recipients are generally

---

[117] DHS DACA FAQs, *supra* note 68, at Q27 ("DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion.").

[118] DEP'T OF HOMELAND SEC., DACA NATIONAL STANDARD OPERATING PROCEDURES, 132-34 (April 4, 2013); *see* Medina v. U.S. Dep't of Homeland Sec., No. C17-0218RSM, 2017 WL 5176720, at *3 (W.D. Wash. Nov. 8, 2017) ("The National Standard Operating Procedures . . . issued by DHS describe the procedures to be followed in adjudicating DACA requests and terminating DACA status.").

[119] *See* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (holding that a DHS practice of "terminating DACA based solely on the issuance of a[] [document] charging the DACA recipient with presence without admission or overstaying a visa" likely violates the APA); *Medina*, 2017 WL 5176720 at *9 ("[T]he Court finds that Plaintiff has alleged a plausible claim that the government violated the APA because its conduct [in terminating his DACA grant without notice] was arbitrary, capricious and an abuse of discretion, and contrary to its own operating procedures, and that claim may proceed."); Coyotl v. Kelly, 261 F. Supp. 3d 1328, 1343 (N.D. Ga. 2017) (granting preliminary injunction against the termination of an individual DACA grant on the ground DHS's "fail[ure] to present any evidence that they complied with their own administrative processes and procedures with regard to the termination" sufficed to show a likelihood of success on the claim that the termination violated the APA).

[120] Memorandum from U.S. Dep't of Homeland Sec., *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"* (Sept. 5, 2017).

[121] Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 409 (E.D.N.Y. 2018) (holding that DHS's planned rescission of DACA program likely violates the APA because DHS based the rescission on an erroneous legal conclusion that DACA was unlawful); Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., 279 F.Supp.3d 1011, 1037 (N.D. Cal. 2018) (same); *contra* Casa De Maryland v. U.S. Dep't of Homeland Sec., 284 F. Supp. 3d 758, 772 (D. Md. 2018) ("[T]he decision to rescind DACA was neither arbitrary nor capricious, but rather was a carefully crafted decision supported by the Administrative Record."); *see* CRS Legal Sidebar LSB10057, *District Court Enjoins DACA Phase-Out: Explanation and Takeaways*, coordinated by Hillel R. Smith and Ben Harrington.

[122] USCIS AFM, *supra* note 48, ch. 38.2 (Deferred Enforced Departure).

[123] *See id*; Heeren, *supra* note 28, at 1131, 1140 ("Some countries, like El Salvador and Liberia, have shifted between TPS and DED designations. TPS is similar to the [Extended Voluntary Departure] and DED programs after which it was modeled, but . . . there is a specific standard for TPS set out in the statute.").

[124] *See* Presidential Memorandum, *Deferred Enforced Departure for Liberians* (Sept. 28, 2016) (setting forth DED eligibility criteria for Liberian nationals); USCIS AFM, *supra* note 48, ch. 38.2(d) ("In general, eligibility requirements and ineligibility bars are set forth in the Presidential designation of DED for each specific group of aliens.").

eligible for work authorization.[125] They do not accrue unlawful presence during the period of DED.[126] According to USCIS, an individual cannot be removed while he or she possesses DED.[127] Agency materials do not make provision for the termination of an individual's DED grant.[128] Currently, Liberia is the only country designated for DED, but the Trump Administration has decided to terminate that designation effective March 31, 2019.[129]

***Extended Voluntary Departure (EVD).*** EVD was an earlier version of DED that fell mostly into disuse with the advent of DED in 1990,[130] although DHS apparently continues to grant EVD to a small number of aliens.[131] Under EVD, the Attorney General—rather than the President—designated countries for protection due to unstable conditions.[132]

***Nonpriority Status.*** Prior to 1975, immigration authorities used the term "nonpriority status" to describe the type of reprieve now labeled deferred action.[133]

## Generally Available Reprieves Granted Pursuant to Statutory Authority

***Temporary Protected Status (TPS).*** Section 244 of the INA authorizes DHS to grant TPS to aliens who are nationals of countries that the Secretary of Homeland Security has designated as

---

[125] USCIS AFM, *supra* note 48, ch. 38.2(b); 8 C.F.R. § 274a.12(a)(11).

[126] *See* 8 U.S.C. § 1182(a)(9)(B)(ii); Arizona Dream Act Coal. v. Brewer, 855 F.3d 957, 974 (9th Cir. 2017) (rejecting state policy that deemed individuals with employment authorization through DED and deferred action as not "authorized to be present").

[127] U.S. CITIZENSHIP & IMMIGRATION SERVS, AFFIRMATIVE ASYLUM PROCEDURES MANUAL 37 (May 2016) ("DED does not prevent DHS from obtaining a removal order. Rather, it prevents DHS from executing that order during the pendency of DED.").

[128] *See id*; DROPPM, *supra* note 49, ch. 20.10(c) ("Aliens who have been granted DED may not be removed from the United States until the designated period of DED has expired."). These agency materials do not clarify whether DHS claims authority to terminate an individual grant of DED by initiating removal proceedings—an authority that DHS claims with respect to other reprieve types. *See* Inland Empire-Immigrant Youth Collective v. Nielsen, No. EDCV 17-2048, 2018 WL 1061408, at *17 (C.D. Cal. Feb. 26, 2018) (describing DHS practice of "terminating DACA based solely on the issuance of a[] [document] charging the DACA recipient with presence without admission or overstaying a visa").

[129] Presidential Memorandum for the Secretary of State and the Secretary of Homeland Security (Mar. 27, 2018).

[130] USCIS AFM, *supra* note 48, ch. 38.2(a) ("DED, in use since 1990, was formerly known as Extended Voluntary Departure (EVD). EVD [was] in use from 1960 until 1990 . . . .").

[131] Heeren, *supra* note 28, at 1138 (citing statistics obtained from DHS under the Freedom of Information Act for the proposition that the agency continued to grant "something it calls EVD to a small number of individuals" at least until 2014).

[132] *See* Hotel & Rest. Employees Union, Local 25 v. Smith, 846 F.2d 1499, 1501 (D.C. Cir. 1988) ("While the Attorney General has exercised his discretion to suspend deportation proceedings against nationals of other countries for a variety of reasons, he has declined to grant EVD status either to all Salvadorans or to a more narrowly defined subgroup. In making this determination, the Attorney General cited both political and economic factors."); Matter of Sosa Ventura, 25 I. & N. Dec. 391, 394 (BIA 2010) (noting that EVD "had existed for decades to address humanitarian concerns"); Matter of Medina, 19 I. & N. Dec. 734, 748 n.7 (BIA 1988) (defining EVD by explaining that "[t]hrough the years, the Attorney General, ordinarily with the advice of the Secretary of State, has exercised prosecutorial discretion to temporarily suspend deportation proceedings against nationals of various, usually war-torn countries (e.g., Uganda, Ethiopia, Poland, Afghanistan).").

[133] *See* Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999) ("'To ameliorate a harsh and unjust outcome, the INS may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation . . . . This commendable exercise in administrative discretion . . . originally was known as nonpriority and is now designated as deferred action.'") (quoting 6 C. GORDON, S. MAILMAN, & S. YALE-LOEHR, IMMIGRATION LAW AND PROCEDURE § 72.03 [2][h] (1998)); *see also* Heeren, *supra* note 28, at 1133-34; Wadhia, *supra* note 35, at 246-47.

unsafe for return because of armed conflict, natural disaster, or other extraordinary conditions.[134] A country's initial TPS designation is valid for up to 18 months and may be extended for up to 18 months, in the Secretary of Homeland Security's discretion, with no limit on the number of extensions.[135] Some countries, such as Sudan and Nicaragua, have been designated for TPS since the late 1990s, although the Trump Administration recently announced its intention not to extend those designations or the designations of Haiti and El Salvador when they expire in late 2018 and 2019.[136]

To qualify for TPS, nationals of designated countries must have resided in the United States since a specified date (usually, a date around the onset of the destabilizing conditions) and must meet certain other requirements set forth in the INA.[137] An alien granted TPS qualifies for work authorization[138] and does not accrue unlawful presence for purposes of the three- and ten-year bars to admission.[139] TPS provides statutorily based protection from removal: an alien cannot be removed while enrolled, and DHS may only withdraw the protection from an individual alien for specified statutory reasons (such as failure to maintain continuous residence in the United States or failure to comply with a yearly registration requirement).[140] Significantly, some (but not all) courts have held that a grant of TPS satisfies the lawful entry requirement for adjustment of status under INA § 245(a), such that aliens who enter the country surreptitiously and then receive TPS may adjust to LPR status if they become eligible for an immigrant visa on an independent basis (such as a qualifying family relationship with a U.S. citizen).[141]

---

[134] 8 U.S.C. § 1254a. DHS's authority to grant TPS is not exclusive. An immigration judge has jurisdiction to consider a TPS application from an alien in removal proceedings if DHS denied the application in the first instance. Matter of Lopez Aldana, 25 I. & N. Dec. 49, 51 (BIA 2009). Immigration judges may also have authority to consider TPS applications in the first instance in "certain limited circumstances," *id.* at 51 n.1, but in practice it appears that DHS typically considers applications in the first instance even for aliens already in removal proceedings. *See Matter of Sosa Ventura*, 25 I. & N. Dec. at 392-93 (considering docket management powers of immigration judge where DHS grants TPS during removal proceedings).

[135] *Id.* § 1254a(b)(2),(3).

[136] See CRS Legal Sidebar LSB10070, *Termination of Temporary Protected Status for Sudan, Nicaragua, Haiti, and El Salvador: Key Takeaways and Analysis*, by Hillel R. Smith.

[137] 8 U.S.C. § 1254a(a)(5); *see, e.g.,* Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476 (Jan. 21, 2010) (designating Haiti for TPS because of an earthquake that occurred on January 12, 2010, and restricting eligibility to Haitian nationals "who have continuously resided in the United States since January 12, 2010"); Designation of El Salvador Under Temporary Protected Status Program, 66 Fed. Reg. 14214 (Mar. 9, 2001) (designating El Salvador for TPS because of earthquakes that occurred on January 13, February 13, and February 17, 2001, and restricting eligibility to nationals of El Salvador "who have 'continuously resided' in the United States since February 13, 2001").

[138] 8 U.S.C. § 1254a(a)(1)(B).

[139] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(1)(F)(iii).

[140] 8 U.S.C. § 1254(c)(3); *cf.* Matter of Sosa Ventura, 25 I. & N. Dec. 391, 396 (BIA 2010) (holding that it was improper for immigration judge to terminate removal proceedings against alien who was granted TPS relief because "TPS only provides a temporary protection from removal," but that any removal order issued against the alien could not be executed during the period in which the alien had TPS relief).

[141] Ramirez v. Brown, 852 F.3d 954, 964 (9th Cir. 2017) (holding that "a TPS recipient is considered 'inspected and admitted' under [8 U.S.C.] § 1255(a)" and that an alien who entered surreptitiously before obtaining TPS was therefore eligible to adjust status on the basis of his marriage to a U.S. citizen); Flores v. U.S. Citizenship & Immigration Servs., 718 F.3d 548, 554 (6th Cir. 2013) (same); *contra* Serrano v. Attorney General, 655 F.3d 1260, 1265 (11th Cir. 2011) (holding that a grant of TPS does not satisfy the lawful entry requirement of § 1255(a)). Time spent in TPS counts as time in lawful nonimmigrant status for adjustment of status purposes; the question that has divided the courts is whether TPS also satisfies the lawful entry requirement for adjustment of status purposes. *See* 8 U.S.C. § 1254a(f)(4) ("[F]or purposes of adjustment of status under section 1255 of this title . . . the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant"); *see Ramirez*, 852 F.3d at 957 ("Reading the TPS and adjustment statutes together, the question we confront is whether the grant of TPS allows an alien not only to avoid the [failure to (continued...)

***Parole.*** The INA authorizes DHS to "parole" inadmissible aliens into the United States, on a case-by-case basis, "for urgent humanitarian reasons or significant public benefit."[142] Paroled aliens are considered unadmitted for purposes of the INA despite their physical presence within the United States.[143] Parole offers little formal protection against removal: DHS typically grants parole for a fixed period[144] but has discretion to terminate the parole whenever it determines that "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States."[145] Paroled aliens may obtain work authorization[146] and do not accrue unlawful presence while the parole remains valid.[147] DHS interprets its parole authority to include two types of discretionary grants of parole potentially relevant to aliens present in the United States in violation of the INA:

> ***Parole in place.*** Although the parole power generally applies to aliens seeking to enter the country, DHS claims the authority to grant parole to aliens who are physically present in the United States following surreptitious entry.[148] DHS calls this exercise of the parole power "parole in place" and, as a matter of policy, appears to reserve it primarily for the immediate relatives of certain members of the U.S. Armed Forces.[149] Parole in place removes significant legal obstacles to an unlawfully present alien's ability to obtain LPR status without leaving the United States, if the alien qualifies for an immigrant visa on an independent basis (such as a qualifying family relationship with a U.S. citizen).[150]

> ***Advance Parole.*** Advance parole, another exercise of the executive parole authority directed toward physically present aliens, allows aliens to depart the United States with parole already

---

(...continued)

maintain lawful status] bar under § 1255(c)(2) but also to meet the 'inspected and admitted or paroled' requirement in § 1255(a).").

[142] 8 U.S.C. § 1182(d)(5); *see* 8 C.F.R. § 212.5 (DHS regulation implementing statutory parole authority and identifying circumstances in which granting parole "would generally be justified").

[143] 8 U.S.C. § 1182(d)(5) ("[P]arole . . . shall not be regarded as an admission of the alien . . . .").

[144] *See, e.g.*, Reganit v. Sec'y, Dep't of Homeland Sec., 814 F.3d 1253, 1255 (11ᵗʰ Cir. 2016) (addressing case in which alien was granted parole for one month); Chaudhry v. Holder, 705 F.3d 289, 293 (7ᵗʰ Cir. 2013) (addressing case in which alien was granted parole for one year).

[145] 8 U.S.C. § 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled . . . ."); 8 C.F.R. § 212.5(e)(2)(i) ("[W]hen in the opinion of [specified] officials . . . neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated . . . ."); Hassan v. Chertoff, 593 F.3d 785, 789 (9ᵗʰ Cir. 2010) ("The statutory and regulatory provisions governing the grant of parole provide for the revocation of parole when it no longer serves its purpose.").

[146] 8 C.F.R. § 274a.12(c)(11) (with narrow exceptions, enabling parolees to apply for employment authorization).

[147] 8 U.S.C. § 1182(a)(9)(B)(ii); USCIS AFM, *supra* note 48, ch. 40.9.2(b)(1) ("An alien does not accrue unlawful presence . . . if he or she has been inspected and paroled into the United States and the parole is still in effect.").

[148] *See* U.S. Citizenship & Immigration Servs., Policy Memorandum, *Parole of Spouses, Children, and Parents of Active Duty Members of the U.S. Armed Forces*, at 2 (Nov. 13, 2013) ("Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission.").

[149] *Id.* at 3 ("[P]arole in place is to be granted only sparingly. The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.").

[150] *See* 8 U.S.C. § 1255(a) (rendering aliens who were not "inspected and admitted *or paroled*" ineligible for adjustment of status); *see generally*, Margaret D. Stock, *Parole in Place and Other Immigration Benefits for Military Family Members: An Update*, 16-02 IMMIGR. BRIEFINGS 1 (2016).

approved, so as to facilitate their re-entry.[151] Upon being paroled back into the country, such aliens receive the same advantages as recipients of parole in place and other parolees (e.g., eligibility for work authorization and a clearer path to adjustment of status).[152]

# Reprieves Granted Exclusively in Connection with the Removal Process

*Administrative Closure*. When Immigration and Customs Enforcement (ICE, a component of DHS responsible for interior enforcement) decides to discontinue temporarily a removal proceeding against a particular alien before the Department of Justice's Executive Office of Immigration Review (EOIR)—because ICE deems the case low-priority, because the alien has obtained or is seeking a form of discretionary relief such as DACA, or for some other reason—ICE may ask the presiding immigration judge to place the proceeding in a status called "administrative closure."[153] An immigration judge may also place removal proceedings in administrative closure upon the alien's motion and over the government's objection, although this course of events may be less common.[154] The effect of administrative closure is to suspend but not terminate the removal proceeding.[155] As such, administrative closure offers little formal protection from removal: the alien cannot be removed while the proceedings are suspended, but ICE can move to re-activate the proceedings at any time and will likely succeed in doing so if the alien is not in the midst of pursuing independent protections from removal outside of immigration court.[156] Furthermore, administrative closure does not itself confer any additional rights or

---

[151] *See* 8 C.F.R. § 212.5(f) ("Advance authorization. When parole is authorized for an alien who will travel to the United States without a visa, the alien shall be issued an appropriate document authorizing travel."); Ibragimov v. Gonzales, 476 F.3d 125, 132 (2d Cir. 2007) ("'Advance parole' is a practice whereby the government decides in advance of an alien's arrival that the alien will be paroled into the United States when he arrives at a port-of-entry . . . . Advance parole is not explicitly contemplated by the statute governing parole, but is permitted by 8 C.F.R. § 212.5(f) . . . .").

[152] *See* 8 U.S.C. § 1255(a); 8 C.F.R. § 274a.12(c)(11).

[153] Matter of Avetisyan, 25 I. & N. Dec. 688, 692 (BIA 2012) ("Administrative closure, which is available to an Immigration Judge and the Board [of Immigration Appeals], is used to temporarily remove a case from an Immigration Judge's active calendar or from the Board's docket. In general, administrative closure may be appropriate to await an action or event that is relevant to immigration proceedings but is outside the control of the parties or the court and may not occur for a significant or undetermined period of time.").

[154] *Id.* at 694-96 (holding that government consent to administrative closure is not required, but listing "the basis for any opposition" as a factor to consider when evaluating a closure motion and noting that the government may immediately appeal an administrative closure granted over its objection); *see also* Kristin Bohman, *Avetisyan's Limited Improvements Within the Overburdened Immigration Court System*, 85 U. COLO. L. REV. 189, 201 (2014) ("*Avetisyan* provides that immigration judges can override an objection if they find that administrative closure is in the best interests of the immigrant and if there will be some palpable final resolution to the case in the near future.").

[155] *Matter of Avetisyan*, 25 I. & N. Dec. at 695 ("[A]dministrative closure does not result in a final order . . . . In this way, administrative closure differs from termination of proceedings, where the Immigration Judge or the Board issues a final order, which constitutes a conclusion of the proceedings and which, in the absence of a successful appeal of that decision or a motion, would require the DHS to file another charging document to initiate new proceedings.").

[156] *See id.* ("[A]t any time after a case has been administratively closed, the DHS may move to recalendar it before the Immigration Judge or reinstate the appeal before the Board . . . ."); Matter of W-Y-U-, 27 I. & N. Dec. 17, 20 (BIA 2017) ("[T]he primary consideration for an Immigration Judge in determining whether to administratively close or recalendar proceedings is whether the party opposing administrative closure has provided a persuasive reason for the case to proceed and be resolved on the merits."); Matter of Pascual, No. A086-963-266, 2012 WL 1705592, at *2 (BIA Apr. 30, 2012) (unpublished) ("Immigration Judges and the Board lack the authority to decide matters of prosecutorial discretion or to decide for humanitarian reasons whether an order of removal should be entered or is in the national interest . . . . If DHS is denied its request to recalendar proceedings after action on the case has been deferred for a period of time, particularly when DHS is not contributing to any delay in resolving any petition, collateral matter or (continued...)

protections, such as work authorization or lawful presence.[157] However, administrative closure is often granted in conjunction with other discretionary reprieves that do provide additional protections.[158] For example, an alien whose removal case is placed in administrative closure may also have enrolled in DACA, which confers eligibility for work authorization and vitiates unlawful presence.[159]

***Voluntary Departure***. The INA authorizes grants of a brief discretionary reprieve called "voluntary departure" for aliens who agree to leave the United States at their own expense either before or prior to the conclusion of removal proceedings.[160] For aliens not yet in removal proceedings, DHS may grant a voluntary departure period of 120 days or less.[161] For aliens in removal proceedings, either DHS or the immigration judge may grant voluntary departure[162] for a maximum period of 120 days.[163] At the conclusion of removal proceedings, the immigration judge alone may grant voluntary departure for a maximum of 60 days.[164] Voluntary departure does not confer eligibility for work authorization[165] but does suspend the accumulation of unlawful presence for purposes of the three- and ten-year bars on admission following the alien's departure or removal from the United States.[166] Aliens who fail to leave the country within the voluntary departure period are subject to a fine and become ineligible to receive, for a period of ten years, adjustment of status, cancellation of removal, and certain other forms of relief from removal.[167]

---

(...continued)
other action that formed the basis for the administrative closure, the denial of the motion could undermine DHS's ability to enforce the immigration laws.").

[157] *See* 8 C.F.R. § 274a.12 (not listing administrative closure among bases for eligibility for work authorization); Amelia Wilson et. al., *Addressing All Heads of the Hydra: Reframing Safeguards for Mentally Impaired Detainees in Immigration Removal Proceedings*, 39 N.Y.U. REV. L. & SOC. CHANGE 313, 365 (2015) (explaining, based on agency practice and guidance, that administrative closure "does not confer any legal status or give rise to an independent basis to seek work authorization").

[158] *See* Matter of Sosa Ventura, 25 I. & N. Dec. 391, 396 (BIA 2010) (concluding that immigration judges may properly grant administrative closure in cases where aliens have received temporary forms of protections such as TPS).

[159] *See* Memorandum from Brian M. O'Leary, Chief Immigration Judge, Executive Office of Immigration Review, Dep't of Justice, on Continuances and Administrative Closure (March 7, 2013) (encouraging immigration courts to grant administrative closure where the respondent in removal proceedings has received DACA).

[160] 8 U.S.C. § 1229c.

[161] *Id.* § 1229c(a)(2)(A).

[162] 8 C.F.R. § 240.25(d); *id.* § 1240.26(b)(1).

[163] 8 U.S.C. § 1229c(a)(1), (2)(A).

[164] *Id.* § 1229c(b)(2); 8 C.F.R. § 1240.26(c).

[165] *See* 8 C.F.R. § 274a.14(a)(iii) (providing that a grant of voluntary departure automatically terminates any employment authorization). Regulations also use the term "voluntary departure" for the relief from removal granted under the statutorily created (and now largely obsolete) Family Unity Program to spouses and children of aliens who legalized under the Immigration Reform and Control Act. 8 C.F.R. § 236.15 (implementing § 301 of the Immigration Act of 1990, 104 Stat. 4978, and authorizing "voluntary departure" for up to two years). Such aliens do qualify for work authorization. *Id.* § 236.15(d), § 274a.12(a)(13). Despite the overlapping terminology, the Family Unity Program, on the one hand, and voluntary departure under § 1229b, on the other hand, are separate and distinct forms of relief. *Compare id.* § 236.15 (governing voluntary departure under the Family Unity Program), *with id.* § 240.25 (governing voluntary departure under 8 U.S.C. § 1229b).

[166] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(H) ("Accrual of unlawful presence stops on the date an alien is granted voluntary departure and resumes on the day after voluntary departure expires, if the alien has not departed the United States according to the terms of the grant of voluntary departure."); 9 FAM 302.11-3(B)(1)(b)(3).

[167] 8 U.S.C. § 1229c(d)(1).

NJAPP112

**Stay of Removal.** DHS, an immigration judge, or the Board of Immigration Appeals[168] may stay a final order of removal against an alien to allow him or her to pursue relief or in light of practical or humanitarian considerations.[169] A stay of removal does not confer eligibility for work authorization under DHS regulations,[170] but an order of supervision—which often accompanies a stay—does confer such eligibility in some circumstances.[171] Unlawful presence does not accrue during a stay of removal for purposes of the three- and ten-year bars on admission.[172]

**Order of Supervision** (OSUP). If DHS does not remove an alien within ninety days of the date that a removal order becomes final—either because DHS cannot identify an appropriate destination country or because of practical or public interest-related considerations—in most cases DHS places the alien under an "order of supervision."[173] An OSUP requires the alien to check in periodically with DHS and may impose other restrictions.[174] DHS regulations provide for the grant of work authorization to aliens present pursuant to OSUPs—subject, however, to criteria stricter than those that govern work authorization for other types of discretionary reprieves.[175] An OSUP does not, by itself, suspend the accumulation of unlawful presence for purposes of the three- and ten year bars on admission.[176] At least one federal court has held that due process principles restrict the reasons and the manner in which DHS may revoke an OSUP.[177]

## Author Contact Information

Ben Harrington
Legislative Attorney
pharrington@crs.loc.gov, 7-8433

---

[168] The Board of Immigration Appeals (BIA) within EOIR, has administrative appellate jurisdiction over various matters decided by immigration judges in removal and other proceedings. 8 C.F.R. § 1003.1(b).

[169] *Id.* § 241.6 (DHS authority); *id*. § 1003.6 (BIA authority); *id*. § 1003.23(b)(1)(v) (immigration judge authority). A few provisions of the INA that concern discrete motions for relief or specific categories of aliens directly authorize or mandate stays of removal. *See* 8 U.S.C. § 1227(d)(2) (authorizing stays of removal for applicants for T or U nonimmigrant status); *id*. § 1229a(b)(5)(C) (providing for an automatic stay upon the filing of certain motions challenging *in absentia* removal orders); *id*. § 1231(c)(2) (authorizing stays of removal of aliens arriving at ports of entry).

[170] *See* 8 C.F.R. § 274a.12 (not listing stays of removal as a basis for granting work authorization).

[171] *Id*. § 274a.12(c)(18); *see* 8 U.S.C. § 1231(c)(3) (providing an alien who has been granted a stay of removal may be released from detention pursuant to "conditions [that the Secretary of Homeland Security] may prescribe"); Heeren, *supra* note 28, at 1147 (explaining that individuals who receive stays of removal "typically" receive orders of supervision).

[172] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(3)(I).

[173] *See* 8 U.S.C. § 1231(a)(3) (authorizing supervision after 90-day period); 8 C.F.R. § 241.5(a) (order of supervision).

[174] 8 C.F.R. § 241.5(a).

[175] *See* 8 C.F.R. § 274a.12(c)(18).

[176] USCIS AFM, *supra* note 48, ch. 40.9.2(b)(6) ("Unless protected by some other provision . . . an alien present in an unlawful status continues to accrue unlawful presence despite the fact that the alien is subject to an order of supervision . . . .").

[177] Ragbir v. Sessions, No. 18-CV-236 (KBF), 2018 WL 623557, at *2 (S.D.N.Y. Jan. 29, 2018).

NJAPP113

# Exhibit 12

NJAPP114



**CONGRESSIONAL BUDGET OFFICE**
*U.S. Congress*
*Washington, DC  20515*

Douglas W. Elmendorf, Director

January 29, 2015

Honorable Thad Cochran
Chairman
Committee on Appropriations
United States Senate
Washington, DC 20510

*Re: Budgetary Effects of Immigration-Related Provisions of the House-Passed Version of H.R. 240, An Act Making Appropriations for the Department of Homeland Security*

Dear Mr. Chairman:

CBO and the staff of the Joint Committee on Taxation (JCT) have analyzed sections 579 through 583 of H.R. 240, the Department of Homeland Security Appropriations Act, 2015, as passed by the House of Representatives on January 14, 2015.

Sections 579 and 580 would permanently prohibit the executive branch from exempting or deferring from removal certain categories of aliens considered to be unlawfully present in the United States. Those two sections of the legislation also would prohibit the executive branch from treating the affected people as if they were lawfully present or had lawful immigration status, or providing them with the authorization to work legally.

CBO and JCT expect that enacting those sections of the House-passed legislation would reduce both revenues and outlays for direct spending programs.[1] Specifically, JCT estimates that, under those sections, revenues would be lower by $22.3 billion over the 2015-2025 period. In addition, CBO and JCT estimate that direct spending would be lower by $14.9 billion over the same period. On net, deficits would be higher by $7.5 billion over the 2015-2025 period (see enclosed table).

---

1.  CBO has not estimated the budgetary effects that enacting sections 579 and 580 might have on future spending subject to appropriation.

Honorable Thad Cochran
Page 2

We estimate that enacting sections 581, 582, and 583 of that act would have no significant budgetary effects.

**People Affected by Sections 579 and 580 of the Legislation**
From 2011 through 2014, the President announced a series of policy initiatives related to immigration that the Administration is carrying out or intends to carry out under current law. Sections 579 and 580 of H.R 240 would end or reverse many of those initiatives and would eliminate all of the programs discussed below that involve deferred action, a process where the Department of Homeland Security (DHS) delays removal proceedings for unauthorized residents who meet criteria specified in the Presidential memoranda. Deferred action grants lawful presence and potential work authorization but does not provide any other legal status, such as lawful permanent residence or the right to naturalize. Most of the budgetary effects of those sections stem from reversing the deferred action initiatives.

**Childhood Arrivals.** Under the Deferred Action for Childhood Arrivals (DACA) program, which began in August 2012, people are eligible to apply if they:

- Were under 31 years of age as of June 15, 2012,

- Were younger than 16 when they came to the United States,

- Have continuously resided in the United States since June 15, 2007, and

- Have been registered in and attending school, or graduated from high school or earned a GED certificate, or been honorably discharged from the military.

Deferred action is for an initial two-year period, but can be renewed. Based on information from DHS and research from organizations that study immigration, CBO estimates that about 2 million unauthorized residents are eligible for DACA. As of September 30, 2014, DHS had received about 700,000 initial applications and approved about 600,000 of them, and approved about 20,000 renewal applications. CBO estimates that, under current law, in 2017, about 600,000 people will be covered under this deferred action program.

Honorable Thad Cochran
Page 3

**Expansion of Childhood Arrivals.** On November 20, 2014, the President made three changes to the original DACA program that allow more people to qualify and extend the term of deferred action:

- Individuals who meet all of the other requirements but were 31 years or older as of June 15, 2012, are now eligible.

- Individuals who meet all of the other requirements but who arrived between June 15, 2007, and January 1, 2010, are now eligible.

- The duration of the deferred action is increased to three years instead of two years.

For this estimate, CBO assumes that under current law, DHS will begin accepting and approving applications for the expanded eligible population in the second half of fiscal year 2015. CBO expects that the newly eligible people will apply for and be approved for deferred action at a rate similar to that of the original applicants. Based on those considerations and information about the number of people who are eligible for deferred action under the expanded eligibility criteria, CBO estimates that in 2017 about 150,000 people will have been approved for such action.

**Parents of U.S. Citizens or Lawful Permanent Residents.** On November 20, 2014, the President also announced that parents of U.S. citizens or lawful permanent residents could apply for deferred action if they:

- Have been continuously present in the country since January 1, 2010,

- Were physically present in the country on November 20, 2014, and are physically present at the time they apply for deferred action,

- Had no legal status on November 20, 2014, and

- Are not considered a priority for enforcement for DHS.

Based on information from DHS and research from organizations that study immigration, CBO estimates that about 4 million parents are eligible for deferred action through this new initiative. For this estimate, CBO assumes that DHS will begin accepting and approving applications for the eligible population in the second half of fiscal year 2015. Although DHS has not yet promulgated regulations specifying how people will prove their eligibility

Honorable Thad Cochran
Page 4

for the program, CBO expects that the process will be similar to that for the DACA program. However, CBO expects that the parents who are eligible for this program will be less likely than the people who are eligible for the original program to declare their unlawful presence to the government for a three-year deferral; in addition, they may have a harder time proving eligibility. Therefore, CBO expects that the total participation rate will be somewhat lower than for DACA. CBO estimates that in 2017 about 1.5 million parents of U.S. citizens or lawful permanent residents will have been approved for deferred action.

**Citizen Children.** Although U.S. citizen children living with parents who are unauthorized residents are fully eligible for all federal benefit programs, their parents' immigration status can affect the likelihood that their parents choose to enroll them in such programs. CBO expects that granting deferred action to the parents of citizen children will increase those children's participation in benefit programs. Based on information from DHS and research from organizations that study immigration, CBO estimates that about 4.5 million U.S. citizens under the age of 18 have at least one parent who is an unauthorized resident. CBO also estimates that about 400,000 additional children will be born to parents who will receive deferred action over the next 10 years.

**Probability of Deferred Action Under a Different Administration**
Because the deferred action programs were created by administrative action and not by a new law, there is substantial uncertainty as to whether future Presidents will continue the programs. To account for that uncertainty, CBO's baseline incorporates a 50 percent chance that the programs will be continued after 2017 and a 50 percent chance that they will be discontinued after that date. As a result, CBO's estimate of the effects of eliminating those programs under H.R. 240 is also probabilistic, placing 50 percent weight on the possibility that the programs will be continued after 2017 under current law—and thus, that H.R. 240 would reverse their budgetary effects after that date—and 50 percent weight on the possibility that the programs will already have been stopped after 2017 by administrative action.

**Effects of Sections 579 and 580 of the Legislation on Revenues**
Sections 579 and 580 of H.R. 240 would affect tax revenues in a number of ways, some of which would decrease receipts and some of which would increase them. After accounting for both sets of effects, JCT estimates that enacting the legislation would reduce tax revenues by $22.3 billion over the

Honorable Thad Cochran
Page 5

2015-2025 period. Over that period, JCT estimates that off-budget receipts (Social Security payroll taxes) would decrease by $17.1 billion, and that on-budget receipts would decrease by $5.2 billion.

JCT expects that the largest effect of sections 579 and 580 would be decreased reporting of employment income by people who would be legally allowed to work because of the deferred action programs under current law but would not be legally allowed to work under the act. Moreover, JCT expects that wages for affected workers would decrease relative to their wages under current law as a result of their losing legal status under the act. That decrease in reported wages would cause decreases in receipts, most of which would be from Social Security taxes, which are categorized as off-budget.

Decreased reporting of employment income also would result in decreases in tax deductions by businesses for their labor compensation, including employers' contributions for payroll taxes. As a result, corporations would report higher taxable profits and pay more in income taxes. Non-corporate businesses, such as partnerships and sole proprietorships, also would report higher taxable income, which would increase individual income taxes paid by the partners and owners.

**Effects of Sections 579 and 580 of the Legislation on Direct Spending**
Under H.R. 240, participation in several federal programs and tax provisions would decline because some people would no longer be eligible to participate or because they would choose not to participate (or choose not to have their children participate) for fear of revealing their unlawful presence. Taking into account the effect on a number of programs, CBO and JCT expect that direct spending would be reduced under the legislation by $14.9 billion over the 2015-2025 period.

**Earned Income and Child Tax Credits.** JCT estimates that H.R. 240 would decrease outlays for the earned income and child tax credits by $10.2 billion over the 2015–2025 period. The earned income tax credit and the child tax credit are refundable tax credits. Refundable tax credits reduce a taxpayer's overall income tax liability; if the credits exceed the other liability, the excess may be refunded to the taxpayer. Those refunds are classified as outlays in the federal budget.

JCT estimates that the bulk of the decrease in outlays for refundable credits projected for the 2015–2025 period would be attributable to decreases in

Honorable Thad Cochran
Page 6

earned income tax credits. H.R. 240 would decrease the amount of earned
income tax credits by decreasing the number of people with Social Security
numbers, which are required for taxpayers and dependents to qualify for
earned income tax credits.

**Social Security and Medicare.** To collect Social Security and Medicare
benefits while in the United States, an individual must be lawfully present.
Individuals approved for deferred action are considered lawfully present in
the United States. Under the bill those individuals would no longer be
lawfully present and would be ineligible to receive such benefits. Over the
2015-2025 period relatively few of the people affected by the act would
have reached the eligibility ages for Social Security old-age benefits or for
Medicare benefits associated with age. However, some of the affected
people would have become eligible for Social Security disability benefits
and for Medicare based on that disability status. CBO estimates that
enacting sections 579 and 580 would reduce spending for Social Security
by $0.8 billion and for Medicare by $0.3 billion over the 2015-2025 period.
Spending for Social Security is off-budget.

**Other Federal Benefits.** The Administration has issued regulations that
make individuals granted deferred action under the initial DACA program
ineligible for subsidies for health insurance offered through exchanges
under the Affordable Care Act, and it has announced that it will also
exclude individuals granted deferred action under the new programs.
Although the Administration has not yet published an updated regulation to
that effect, CBO and JCT assume for this estimate that all of the people in
the deferred action programs will be ineligible for those subsidies.
Moreover, individuals approved for deferred action are generally ineligible
for other federal benefit programs and the legislation would not affect their
eligibility for those other programs.

However, many of the people who would be affected by the legislation
have children who are natural-born U.S. citizens. Those children, like other
citizens, are eligible for federal benefits if they meet the relevant eligibility
criteria for particular programs. CBO expects that once their parents have
been granted lawful presence under current law, they will apply for benefits
on their children's behalf, so their children's participation in various
programs will gradually increase for about five years before stabilizing at a
higher rate. If sections 579 and 580 of H.R. 240 were enacted, CBO expects
that many of those parents would opt not to apply for such benefits because

Honorable Thad Cochran
Page 7

they would fear revealing their own unlawful presence. Therefore, federal spending for certain benefits would be lower:

- **Health Care Benefits.** CBO estimates that under the bill the parents of about 60,000 children per year, on average, would choose not to enroll them in Medicaid or receive subsidies for health insurance purchased through an exchange, at an average savings of about $1,600 per person in 2015 and rising to about $2,600 in 2025. Thus, CBO and JCT estimate that federal spending for Medicaid and the subsidies for insurance obtained through an exchange would be about $1.5 billion lower over the 2015-2025 period.

- **Supplemental Security Income (SSI).** CBO estimates that under the bill the parents of about 15,000 children with disabilities would choose not to enroll them in SSI, which provides monthly cash payments to individuals with disabilities and low family income. The average benefit for SSI over the period will rise from about $8,000 to about $10,000 in 2025. Thus, CBO estimates that federal spending for SSI would be about $1.1 billion lower over the 2015-2025 period.

- **Supplemental Nutrition Assistance Program (SNAP).** CBO estimates that the parents of about 40,000 children, on average, would choose not to enroll those children in SNAP, which provides monthly food assistance benefits to low-income households. CBO estimates that the average per-person benefit for those children under SNAP will rise from about $1,600 per year in 2015 to about $2,100 per year in 2025. Thus, CBO estimates that spending for SNAP would be about $0.8 billion lower over the 2015-2025 period.

- **Higher Education Benefits.** CBO estimates that under the bill, by 2025, about 15,000 students per academic year would choose not to receive Pell grants. The average award level they would forego would be about $3,800. (The bulk of that grant amount, about $3,100, will be supported with discretionary funds, and that effect is not included in this estimate.) Additionally, about 5,000 students per academic year would no longer receive federal student loans by 2025, CBO projects. Thus, CBO estimates that federal direct spending for assistance for higher education would be about $0.1 billion lower over the 2015-2025 period, with most of that difference resulting from a reduction in newly awarded Pell grants.

Honorable Thad Cochran
Page 8

**Fees for Deferred Action Applications.** DHS collects fees to process new applications and renewals for the deferred action programs. Collections from those fees are classified as offsetting receipts (that is, offsets to outlays) and are available for spending by DHS without further appropriation action. Enacting sections 579 and 580 would prohibit new applications and renewals for those programs. Thus, CBO estimates that fee collections and associated spending would decrease by about $2.5 billion over the 2015–2025 period. Because of the lag between collecting and spending fees, CBO estimates that the decrease in collections would exceed the decrease in spending over that period by $26 million.

**Net Effect on the Deficit**
Under H.R. 240, as passed by the House, both revenues and direct spending would be lower than under current law.  However, the drop in revenues would be greater than the drop in direct spending. Deficits for the unified budget would increase by $7.5 billion over the 2015-2025 period, as compared to projected deficits under current law. As the majority of the forgone revenue would be for Social Security payroll taxes, enacting sections 579 and 580 would increase the off-budget deficit by about $16.3 billion over that same period. In contrast, the on-budget deficit would improve by $8.8 billion over the 2015-2025 period.

If you wish further details about this analysis, we will be pleased to provide them. The CBO staff contacts are Sam Papenfuss and Melissa Merrell.

Sincerely,

Douglas W. Elmendorf
Director

Enclosure

cc:   Honorable Barbara A. Mikulski
        Ranking Member

Identical letter sent to the Honorable Hal Rogers, Chairman, House Committee on Appropriations.

NJAPP122

January 29, 2015

**Estimated Budgetary Effects of Sections 579 and 580 of H.R. 240, the Department of Homeland Security Appropriations Act, 2015, as passed by the House of Representatives on January 14, 2015** [1]

(by fiscal year, in millions of dollars)

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2015 - 2020 | 2015 - 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CHANGES IN REVENUES** | | | | | | | | | | | | | |
| Social Security Taxes (off-budget) | -256 | -1,205 | -2,264 | -2,244 | -1,811 | -1,632 | -1,600 | -1,569 | -1,509 | -1,483 | -1,516 | -9,412 | -17,091 |
| Other Taxes | -116 | -475 | -733 | -657 | -517 | -478 | -472 | -461 | -441 | -438 | -451 | -2,976 | -5,242 |
| **Total Revenues** | -372 | -1,680 | -2,997 | -2,901 | -2,328 | -2,110 | -2,072 | -2,030 | -1,950 | -1,921 | -1,967 | -12,388 | -22,333 |
| *On-budget* | -116 | -475 | -733 | -657 | -517 | -478 | -472 | -461 | -441 | -438 | -451 | -2,976 | -5,242 |
| *Off-budget* | -256 | -1,205 | -2,264 | -2,244 | -1,811 | -1,632 | -1,600 | -1,569 | -1,509 | -1,483 | -1,516 | -9,412 | -17,091 |
| **CHANGES IN DIRECT SPENDING** | | | | | | | | | | | | | |
| **Earned Income and Child Tax Credits** | | | | | | | | | | | | | |
| Estimated Budget Authority | 0 | -459 | -1,582 | -1,719 | -1,206 | -948 | -902 | -894 | -873 | -836 | -829 | -5,914 | -10,249 |
| Estimated Outlays | 0 | -459 | -1,582 | -1,719 | -1,206 | -948 | -902 | -894 | -873 | -836 | -829 | -5,914 | -10,249 |
| **Social Security (off-budget)** [2] | | | | | | | | | | | | | |
| Estimated Budget Authority | * | -15 | -15 | -20 | -35 | -50 | -70 | -95 | -130 | -165 | -220 | -135 | -815 |
| Estimated Outlays | * | -15 | -15 | -20 | -35 | -50 | -70 | -95 | -130 | -165 | -220 | -135 | -815 |
| **Medicare** | | | | | | | | | | | | | |
| Estimated Budget Authority | * | * | * | * | -5 | -15 | -30 | -40 | -55 | -80 | -105 | -20 | -330 |
| Estimated Outlays | * | * | * | * | -5 | -15 | -30 | -40 | -55 | -80 | -105 | -20 | -330 |
| **Health Care** [3] | | | | | | | | | | | | | |
| Estimated Budget Authority | -5 | -55 | -90 | -130 | -175 | -175 | -175 | -175 | -175 | -175 | -170 | -630 | -1,500 |
| Estimated Outlays | -5 | -55 | -90 | -130 | -175 | -175 | -175 | -175 | -175 | -175 | -170 | -630 | -1,500 |
| **Supplemental Security Income** | | | | | | | | | | | | | |
| Estimated Budget Authority | -5 | -45 | -70 | -90 | -125 | -125 | -125 | -135 | -125 | -115 | -120 | -460 | -1,080 |
| Estimated Outlays | -5 | -45 | -70 | -90 | -125 | -125 | -125 | -135 | -125 | -115 | -120 | -460 | -1,080 |
| **Supplemental Nutrition Assistance Program** | | | | | | | | | | | | | |
| Estimated Budget Authority | -1 | -30 | -55 | -80 | -100 | -95 | -95 | -95 | -90 | -85 | -85 | -361 | -811 |
| Estimated Outlays | -1 | -30 | -55 | -80 | -100 | -95 | -95 | -95 | -90 | -85 | -85 | -361 | -811 |
| **Education** [4] | | | | | | | | | | | | | |
| Estimated Budget Authority | 0 | -2 | -4 | -6 | -7 | -8 | -9 | -10 | -11 | -12 | -12 | -27 | -81 |
| Estimated Outlays | 0 | -1 | -2 | -4 | -6 | -8 | -9 | -9 | -10 | -11 | -12 | -21 | -72 |
| **Deferred Action Fees** [5] | | | | | | | | | | | | | |
| Estimated Budget Authority | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Estimated Outlays | 62 | 70 | -113 | 20 | -4 | 11 | -8 | -8 | 8 | -4 | -8 | 46 | 26 |
| **Total Changes in Direct Spending** | | | | | | | | | | | | | |
| Estimated Budget Authority | -11 | -606 | -1,816 | -2,045 | -1,653 | -1,416 | -1,406 | -1,444 | -1,459 | -1,468 | -1,541 | -7,547 | -14,866 |
| Estimated Outlays | 51 | -535 | -1,927 | -2,023 | -1,656 | -1,405 | -1,414 | -1,451 | -1,450 | -1,471 | -1,549 | -7,541 | -14,857 |
| *On-budget budget authority* | -11 | -591 | -1,801 | -2,025 | -1,618 | -1,366 | -1,336 | -1,349 | -1,329 | -1,303 | -1,321 | -7,412 | -14,051 |
| *On-budget outlays* | 51 | -520 | -1,912 | -2,003 | -1,621 | -1,355 | -1,344 | -1,356 | -1,320 | -1,306 | -1,329 | -7,406 | -14,042 |
| *Off-budget budget authority* | * | -15 | -15 | -20 | -35 | -50 | -70 | -95 | -130 | -165 | -220 | -135 | -815 |
| *Off-budget outlays* | * | -15 | -15 | -20 | -35 | -50 | -70 | -95 | -130 | -165 | -220 | -135 | -815 |
| **NET INCREASE OR DECREASE (-) IN DEFICITS** | | | | | | | | | | | | | |
| **Increase or Decrease (-) in the Deficit** | 423 | 1,145 | 1,070 | 878 | 672 | 705 | 658 | 579 | 500 | 450 | 418 | 4,847 | 7,476 |
| *On-budget* | 167 | -45 | -1,179 | -1,346 | -1,104 | -877 | -872 | -895 | -879 | -868 | -878 | -4,430 | -8,800 |
| *Off-budget* | 256 | 1,190 | 2,249 | 2,224 | 1,776 | 1,582 | 1,530 | 1,474 | 1,379 | 1,318 | 1,296 | 9,277 | 16,276 |

Sources:  Congressional Budget Office and the staff of the Joint Committee on Taxation.

**Notes:**  Components may not sum to totals because of rounding;  Estimates relative to CBO's January baseline;  * = between -$500,000 and $0.

1.   CBO has not estimated the budgetary effects that enacting sections 579 and 580 might have on future spending subject to appropriation.

2.   Includes both Old Age and Survivors Insurance Program and the Disability Insurance Program.

3.   Includes outlays for Medicaid and for subsidies for health insurance purchased through an exchange.

4.   Includes student loans and mandatory outlays for Pell grants.  Does not include the discretionary component for Pell grants.

5.   Fees collected and spent by the Department of Homeland Security for processing deferred action applications and renewals.

NJAPP123

# Exhibit 13

NJAPP124

A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response - Center for American Progress



# Center for American Progress

☰

- DONATE

IMMIGRATION

# A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response

By Nicole Prchal Svajlenka   |   April 6, 2020, 9:01 am



Getty/B.A. Van Sise

A doctor stands in the middle of the makeshift COVID-19 screening center outside Elmhurst Hospital in Queens, New York, April 2020.

NJAPP125

Across the country, 202,500 DACA recipients are working to protect the health and safety of Americans as the country confronts COVID-19. They are ensuring that children are still being educated; food is still being grown, packaged, cooked, shipped, and put on the shelves of grocery stores; patients are being cared for; and much more. DACA recipients, for example, are doctors and medical students, putting their own health and safety on the line. They are also teachers, striving to provide a sense of well-being and continuity to America's youngest generation remotely. Such roles are crucial at a time when the United States is facing a critical shortage of workers in both professions.

This column looks at the demographics of DACA recipients who are working on the frontlines of the COVID-19 response, highlighting three inextricably linked industries and occupation groups identified as "essential critical infrastructure workers" by the Department of Homeland Security (DHS). According to the guidance, these are "essential workers needed to maintain the services and functions Americans depend on daily and that need to be able to operate resiliently during the COVID-19 pandemic response." Many governors who have issued stay at home orders have adopted some or all of DHS's guidelines on these 17 wide-ranging sectors into their list of essential workers.

**Table 1**

NJAPP126

Case 1:18-cv-00068 Document 636-3 Filed on 03/02/23 in TXSD Page 130 of 208

## Datawrapper

Login

## Across the country, DACA recipients are working in occupations at the forefront of the COVID-19 response

Number of DACA recipients working in health care, education, and food-related jobs, by state

| State | Number of DACA recipients |
|-------|---------------------------|
| Alabama | 1,100 |
| Alaska | N/A |
| Arizona | 6,800 |
| Arkansas | 1,500 |
| California | 56,900 |
| Colorado | 4,300 |
| Connecticut | 1,300 |
| Delaware | N/A |

# Health care

Health care workers may be the most visibly important force in the fight against COVID-19, working long hours at great personal risk to themselves to diagnose and treat the disease. An estimated 29,000 health care workers are DACA recipients. The table below identifies DACA recipients in Bureau of Labor Statistics-defined categories.

**Table 2**

NJAPP127

## DACA recipients work across all different types of roles in health care

Major occupation groups and selected individual occupations, by Standard Occupational Classification (SOC)

| | |
|---|---|
| **Home health and personal care aides, nursing assistants, orderlies, and psychiatric aides (SOC Code: 31-1100)** | **8,500** |
| Nursing, psychiatric, and home health aides | 4,800 |
| Personal care aides | 3,700 |
| **Other health care support occupations (SOC Code: 31-9000)** | **7,300** |
| Medical assistants | 3,700 |
| Dental assistants | 2,000 |
| **Health care diagnosing or treating practitioners (SOC Code: 29-1000)** | **6,400** |
| Registered nurses | 3,400 |
| **Health technologists and technicians (SOC Code: 29-2000)** | **6,000** |
| Licensed practical and licensed vocational nurses | 1,900 |
| Health practitioner support technologists and technicians | 1,600 |

Not surprisingly, states with the most DACA recipients are also home to the largest number of DACA recipients working in health care occupations: California (8,600), Texas (4,300), New York (1,700), Illinois (1,400), Florida (1,100), Arizona (1,000), and Washington (1,000) are all home to sizable numbers of these frontline health workers.

This list (Table 2) of essential health care and public health workers, though, goes far beyond these nurses, lab techs, and home health aides, as the DHS delineation of essential workers covers a wide range of both industries and occupations. The difference may appear to be an unimportant detail relegated to a footnote, but it is crucial—industries cover where people work, while occupations cover what people do while they are at work.

For example, while CAP analysis finds 29,000 DACA recipients who are frontline health care workers in the roles we typically associate with the medical field, it finds another 12,700 DACA recipients who work in the health care industry in critical roles such as custodians, food preparers, and management or administrators—including 4,100 DACA recipients working in hospitals and 1,700 in residential facilities such as nursing homes. The Center for Migration Studies recently published

NJAPP128

4/1/2021 A demographic profile of DACA recipients on the frontlines of the coronavirus response - Center for American Progress

Case 1:18-cv-00068 Document 636-3 Filed on 03/02/23 in TXSD Page 132 of 208

research on DACA recipients in essential sectors, with an industry-specific analysis highlighting this wider net of individuals.

# Education

Another group of essential workers who have been required to adapt quickly to COVID-19 are educators. Across the United States, 14,900 DACA recipients are among the hundreds of thousands of teachers who have pivoted from the physical to the digital classroom, including 4,300 in California, 2,800 in Texas, and 1,000 in Illinois.

# Food

From farms to grocery stores and distribution centers to restaurants, more than a quarter of employed DACA recipients—142,100—work in food-related occupations or industries across the country. Despite the fact that this sector includes so many different occupations, all food-related workers are undoubtedly impacted by COVID-19 in one way or another.

On the production end, 12,800 DACA recipients work in the farming and agriculture industry—with the vast majority as agricultural laborers—and 11,600 DACA recipients work in the food manufacturing industry, processing these agricultural products into a food product that can be sold.

To distribute food from production to its end users, 4,700 DACA recipients work in food-related wholesale trade, and 8,800 DACA recipients work in food warehousing, transportation, and delivery.

Another group of essential food-related workers are those keeping grocery stores open and operable. That includes 14,900 DACA recipients, employed in roles such as cashiers (6,000); stockers and laborers (2,900); and supervisors (1,200).

The majority of DACAmented workers in this industry are working in restaurants or food service establishments (82,200). This includes 23,700 servers; 20,800 cooks and prep workers; and 10,800 cashiers. While carryout restaurants and quick service food operations are deemed essential by DHS, dining in remains widely shuttered, and the restaurant industry has seen remarkable closures and layoffs.

And these statistics likely don't capture another critical group: DACAmented warehouse workers, now playing a larger role in moving food directly to consumers across the country, along with gig economy delivery drivers.

NJAPP129

Case 1:18-cv-00068  Document 636-3  Filed on 03/02/23 in TXSD  Page 133 of 208

# Conclusion

As recently profiled in a CAP publication, DACA recipients such as paramedic Jesus Contreras and Dr. Ever Arias are providing critical medical services to help those affected by COVID-19. Whether in health care, education, food services, and other critical professions, DACA recipients are stepping up at a time when America needs them most.

With a Supreme Court decision regarding the Trump administration's ongoing efforts to end DACA looming, it is critical that the court alleviate the fear and uncertainty that DACA recipients and their families are facing today by affirming the unanimous decisions of the lower courts protecting DACA today. During this time of uncertainty, rather than rip these and hundreds of thousands of other DACA recipients out of the workforce, the Trump administration should immediately extend work permits of at least those DACA recipients whose protections recently have expired or are set to expire in 2020. Without question, now is not the time for the Court to permit the administration to recklessly end DACA and it is not the time to take any actions that may jeopardize the health and safety of the nation.

*Nicole Prchal Svajlenka is the associate director for research on the Immigration team at the Center for American Progress.*

# Methodology

The findings presented in this column are based on CAP analysis of three years of pooled American Community Survey microdata—the 2016 1-year, 2017 1-year, 2018 1-year ACS, accessed via the University of Minnesota's IPUMS USA. Aggregating three years of data results in three times the number of samples, allowing researchers to drill deeper into smaller crosstabulations with higher levels of confidence. The analysis is benchmarked to the latest data filed as evidence in *Regents of the University of California, et al. v. U.S. Department of Homeland Security, et al.*, which show 643,430 active DACA recipients as of March 31, 2020. The data are on file with CAP.

This analysis defines occupational categories using the 2018 Standard Occupational Classification (SOC) system. Health care workers include "Healthcare practitioners and technical occupations" and "Healthcare support occupations." Educators include "Postsecondary teachers," "Preschool, elementary, middle, secondary, and special education teachers," "Other teachers and instructors," and "Other educational instruction and library occupations," which mainly includes teaching assistants. It excludes "Librarians, curators, and archivists."

NJAPP130

4/1/2021     Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response - Center for American Progress

Case 1:18-cv-00068 Document 636-3 Filed on 03/02/23 in TXSD Page 134 of 208

The estimate for health care workers presented here is slightly higher than CAP's previous estimate of 27,000 DACA recipients. The largest factor in this are 2018 revisions to the SOC. Where possible, all 2016 and 2017 ACS data were updated from the 2010 SOC into the 2018 SOC. Two changes are relevant to health care workers. First, occupational health and safety specialists and technicians were moved from "Healthcare Practitioners and Technical Occupations" to "Life, Physical and Social Science Occupations." Second, personal care aides were added to "Healthcare Support Occupations" from "Personal Care and Service Occupations."

**To find the latest CAP resources on the coronavirus, visit our coronavirus resource page.**



© 2021 - Center for American Progress

NJAPP131

# Exhibit 14

NJAPP132

An official website of the United States Government.    🇺🇸

Effective January 23, 2023, the new phone number for the Help Desk is 1-866-498-2945    ✕

Docket (/docket/USCIS-2021-0006)  / Document (USCIS-2021-0006-0001) (/document/USCIS-2021-0006-0001)
 / Comment

 **PUBLIC SUBMISSION**

# Comment Submitted by Texas Restaurant Association

Posted by the **U.S. Citizenship and Immigration Services** on Dec 2, 2021

View More Comments  16.36K  (/document/USCIS-2021-0006-0001/comment)

View Related Comments  16.36K  (/docket/USCIS-2021-0006/comments?filter=USCIS-2021-0006-16109)

Share ▾

---

Comment

Thank you for the opportunity to provide public comments on the Deferred Action for Childhood Arrivals (DACA) policy.

The Texas Restaurant Association (TRA) submits this comment in strong support of the Department of Homeland Security's (DHS) efforts in the proposed rule, "Deferred Action for Childhood Arrivals," DHS Docket No. 2021-0006, to "preserve and fortify" DACA. Formed in 1937, the TRA protects, advances, and educates the growing, $70 billion foodservice industry in Texas

The TRA has long championed commonsense immigration reform that strengthens our economy and our communities. Before the pandemic, the foodservice industry faced a significant labor shortage. The pandemic exacerbated this challenge, and as a result, 20 months after the pandemic started, Texas' leisure and hospitality industry is still down over 96,000 employees. Immigration reform is needed to shore up the workforce of not only restaurants, but many other critical industries like agriculture and food production across the United States.

As DHS acknowledges throughout its proposed rule, DACA has proven(1) to be an effective tool to both bring undocumented immigrants into the workforce and to enable them to fulfill their potential and maximize their contributions to their family, communities, schools, places of employment and worship, and this great country.
DACA recipients are a valued part of not only our restaurant workforce, but also our business owners and operators, our suppliers, and our customers. We must protect these DACA recipients and create additional pathways for hardworking, law-abiding immigrants to contribute to our economy and our communities.

NJAPP133

In response to DHS's request for feedback "with respect to the alternatives relating to employment authorization," and whether such an alternative (or other alternative policies) is warranted, we must emphasize the importance of protecting not just deferred action for DACA recipients, but their work authorization, as well, and to ensure the protection of both now and in the future. (See Sec. III.H). We do not believe that access to deferred action and work authorization are separate, as the ability for dreamers to freely live with their families and communities is synonymous with their ability to choose to legally work. Any alternative being considered by this administration must ensure that DACA recipients' access to work authorization is just as protected as their access to deferred action so long as the DACA policy exists.

The TRA urges DHS to protect current DACA recipients from uncertainty and legal limbo by swiftly finalizing this rule. We also call upon Congress and the Administration to prioritize additional commonsense immigration reforms that will make our country stronger and safer.

(1) https://www.americanprogress.org/issues/immigration/news/2019/09/19/474636/daca-recipients-livelihoods-families-sense-security-stake-november/



### Comment ID

USCIS-2021-0006-16109

### Tracking Number

kwl-iz03-vu8g

### Comment Details

#### Received Date

Nov 29, 2021



About

(/about)

Bulk Data Download

(/bulkdownload)

Agencies

(/agencies)

Learn

(/learn)

Reports

(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ

(/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

NJAPP135

# Exhibit 15

# INTERPRETER
# RELEASES

**An Information Service
on Immigration, Naturalization and Related Problems**

AMERICAN COUNCIL FOR NATIONALITIES SERVICE

20 WEST 40TH STREET, NEW YORK, N. Y. 10018

Maurice A. Roberts
        Editor

Vol. 52, No. 35
September 2, 1975

LEAVE TO LABOR*

by
Sam Bernsen
General Counsel
Immigration and Naturalization Service
U.S. Department of Justice

The question of alien employment ranges from the alien lawfully admitted as a permanent resident to the alien who is in the United States illegally, with many different situations in between.

With respect to the lawful permanent resident alien, there is very little question but that he has the right to work.  He has his blue-green alien registration receipt card, Form I-151, to prove it, and there should be no problem.  But there is one caution.  If the alien is admitted to the United States as a lawful permanent resident on the basis of a labor certification, it should be kept in mind that he is not free to ignore the terms of the certification by promptly proceeding from the port of arrival to some other employer who has no connection with the certification.  If the alien does take a job with another employer, rather than the employer who brought him to the United States, his status as a lawful permanent resident may be in jeopardy.  Otherwise, it can be said that there are no restrictions on the employment of lawful permanent residents, insofar as federal immigration laws are concerned.

---

* This is the fifth of a series of presentations made on the occasion of the Annual Conference of the Association of Immigration and Nationality Lawyers in Montreal, Canada from May 28 to May 30, 1975.

We were able to transcribe this presentation and the questions and answers which followed it through the cooperation of Dan Danilov, Esq., who made available a taped recording of the session.

NJAPP137

Many, if not most, of the aliens who enter the United States as lawful permanent residents on the basis of labor certifications, come for employment as live-in maids. When the petitioner finally gets his certification for a live-in maid, and he files his sixth preference petition, we find him pounding on the door of the Service demanding prompt approval of the petition. Very shortly after the maid arrives in the United States with an immigrant visa, and quits her job, we find the petitioner again pounding on the INS' door, this time demanding prompt deportation of the maid because she left him.

I'd like to mention some interesting aspects of the problems of lawful permanent resident aliens that don't have anything to do with the immigration laws but should be of interest to practicing attorneys. The Supreme Court has held that a <u>State</u> cannot refuse state government employment to a lawful permanent resident alien job applicant on the ground of alienage. The same question is now before the Supreme Court with respect to lawful permanent residents who are applicants for <u>federal</u> government employment. In the private employment sector, the Supreme Court has held that a private employer does not violate the Civil Rights Act by hiring only United States citizens, as long as he hires them without regard to race, religion or national origin.

<u>Students</u>

With respect to employment for nonimmigrants, I'd like to discuss the special rules that relate to F-1 student employment. These rules attracted a great deal of attention in the past year because INS changed its policy on student summer employment. In the spring of 1974, the Service notified school officials throughout the country that they would not be authorized to grant summer work permission to F-1 students during the summer of that year. Instead, students desiring to obtain employment would be required to make application to the Immigration Service for work permission and establish eligibility under the prescribed rules. This was not one of our most popular changes. We received about 1,000 letters of criticism, almost all from school officials, but the opposition was not unanimous -- we did get a few letters of support. The critics took their case to the Congress and succeeded in having some bills introduced that would give F-1 students blanket permission to work at any time with the approval of school officials. Favorable action has not been taken on the bills as of this time.

By way of background, INS had a summer program for student employment for almost 20 years. Annually, the Labor Department was first consulted before the program was authorized. For about the first 16 or 17 years, the Labor Department invariably said there would be no adverse impact on the domestic labor market if the alien students were allowed to work. Each of those years the Immigration Service sent a notice to school officials advising them that they could grant permission to the foreign students to work during the summer vacation period.

About three of four years ago, the job market began to tighten. The Labor Department then advised INS that it was concerned about the adverse impact of the employment of foreign students. So we thought we'd better get some broader consultation. We began to consult with the State Department. That Department looked at the problem from the foreign relations point of view and expressed a great concern about the effect that termination of the summer employment program would have on foreign relations with the countries the students came from. For several years we followed the advice of the Department of State, rather than the Labor Department, and we continued to let students work during the summer.

NJAPP138

-293

In the summer of 1974, we received a very strong letter from the Labor Department, with considerable statistics and data, and we received an equally strong letter from the State Department. INS had to weigh the adverse effect on foreign relations against the adverse effect on the labor market. When we considered the high unemployment among youth, which was much higher than the average unemployment, and the even higher unemployment among minority groups and veterans, we found the scales tipping in favor of not permitting the students to work during the summer. That led to our decision and its subsequent unpopularity.

Well, the seasons moved on, from the summer of '74 to the winter of '74. The Immigration Service announced in the Federal Register that it was terminating once and for all the policy of considering annually whether students would be allowed to work during the summer. The reason for the decision was that it was felt that the grant or denial of a request for student work permission should be made by an officer of the Immigration Service rather than a school official. It's important to note that this does not mean that students cannot work during the summer. It simply means that a different procedure has to be followed if the student wishes to obtain summer employment.

What is our policy on letting students work? The statute defines an F-1 student as an alien who is coming to the United States temporarily for the sole purpose of pursuing a full course of study at a school approved by the Attorney General for attendance by nonimmigrant students. The statute is completely silent on the question of student employment. In 1961 when the International Educational and Cultural Exchange Bill was under consideration by the Congress, there was a provision in that bill that would give students and their spouses blanket permission to work, without first obtaining INS approval. However, as the bill wound its way through the legislative process to enactment, the work provision for students was deleted.

Nevertheless, the Immigration Service view is that F-1 student work is not banned by the statute. The Service takes the position that if a student is to be employed on campus, no permission from the Service is needed. All we are concerned about is that a United States citizen or a United States lawful permanent resident will not be fired from a campus job to provide employment for a nonimmigrant student. But when the student intends to go out into the community to obtain employment, the Service is concerned.

There are two bases on which a student may apply to the Immigration Service for permission to work off the campus, economic necessity and practical training.

In the economic necessity situation, the student must show that the work is needed because of economic necessity arising after entry due to unforeseen circumstances. It should be remembered that the student would have been ineligible for a student visa unless he was able to establish that he could pay the expenses of his entire stay in the United States. If, after the student arrives, he is no longer able to pay his expenses because of inflation or currency restrictions, or because his parents have lost their source of income and are no longer able to support him, he is in a position to show an unforeseen change in circumstances that could support an application for work permission due to economic necessity.

The student must make an application to the District Director having jurisdiction over the area where the school is located. The application has to be endorsed by the responsible school official, who must certify that the student is

-294

taking a full course of study and that part-time employment will not interfere with his ability to successfully carry such course.

What is part-time employment?  Part-time employment means that the student may work up to 20 hours per week while school is in session.  When school is not in session, for example during the summer vacation, Christmas vacation or during the Easter recess, the student may work full-time.  When work permission is granted to an F-1 student, his Arrival-Departure Card, Form I-94 is endorsed "part-time employment authorized to (date)."  Part-time employment is granted in increments of up to one year, but not to exceed the period of the student's authorized stay in the United States.

Practical training we consider as a continuation of the student's full course of study.  The student must make an application for permission to engage in such training.  He applies to the District Director having jurisdiction over the place where the school is located.  The application must be endorsed by a school official who certifies that the employment is recommended for practical training in a field related to the student's course of study, and that the training is not believed to be available in the alien's home country.  When practical training is approved, it is granted in increments of six months, not to exceed 18 months in the aggregate.

The spouse of a student, visa symbol F-2, is not authorized to work.  For all practical purposes, she is treated as if she were here as a tourist.

### Illegal Aliens

Work permission for illegal aliens has a rather strange connotation for me. It would seem that if an alien is illegally in the United States, why should he get permission to work?  If he gets such permission, that doesn't make his illegal stay here any less illegal.  But in certain circumstances, the Service will endorse an illegal alien's I-94 (Arrival-Departure Card) with the notation, "Employment Authorized".  This notation is important to the alien.  Some employers will not hire an alien unless he is able to show some evidence of authorization to work, and the Social Security Administration will not issue a social security card without evidence of work authorization.

When does the Immigration Service endorse the I-94 of an illegal alien, "Employment Authorized"?  In general, the endorsement may be made when we do not intend or are unable to enforce the alien's departure.  The thought is that in such cases gainful employment should not be prevented and that it is reasonable to give the alien something that he can present to a prospective employer to show that he can work.

We place the work authorized notation on I-94's in several situations.  For example, we grant extended voluntary departure to a native of the Western Hemisphere who entered the United States on or before April 10, 1973 and married a lawful permanent resident alien.  In such case, it is Service policy to grant extended voluntary departure until the alien is reached on the visa waiting list, which is backed up for more than two years for the Western Hemisphere.  It's also Service policy to give extended voluntary departure to aliens in the United States who are immigrant visa applicants if they are within 60 days of being reached on the visa waiting list.

-295

In the cases of aliens who are granted extended voluntary departure after it is determined that they are eligible for asylum, we also endorse the I-94, "Employment Authorized".

The general rule is that extended voluntary departure is given in cases of compelling circumstances. This provides the flexibility needed to administer this kind of rule, and when we grant VD under those circumstances, we endorse the I-94, "Employment Authorized". We don't do it automatically. The alien has to come to the Service and make a request.

Even aliens found deportable after a hearing before an Immigration Judge may request that their I-94's be stamped "Employment Authorized". Some examples are aliens granted suspension of deportation or a stay of deportation on the basis of persecution, under section 243(h) of the Act. The I-94 is not stamped "Employment Authorized" when the Immigration Judge orders the alien deported with the option of leaving voluntarily prior to a specified date before the order of deportation becomes final.

In certain situations we routinely endorse the I-94, "Employment Authorized", at the time of arrival without a request. Examples are aliens admitted as conditional entrants, and refugees who are paroled into the United States.

The endorsement is also made in the cases of certain applications pending before the Service. If an alien has properly filed an application for adjustment of status to permanent resident under section 245, or if he's filed an application for the creation of a record of lawful entry under section 249, his Form I-94 on request will be endorsed "Employment Authorized". We will not make the endorsement merely on the filing or approval of a visa petition.

So much for the alien worker.


Refugees
=========

I've been asked to make some remarks about the Vietnamese Refugee situation. Originally the Service was planning to parole only those Vietnamese refugees into the United States who were related to United States citizens or lawful permanent residents, or who were U.S. Government employees, or who would be in danger because of their support of the U.S. effort in Southeast Asia if they remained behind. The plan was to screen the aliens in Vietnam, before they arrived in the United States, to be sure that they were admissible and that they met the prescribed criteria.

But events moved too swiftly, these people were evacuated in a great rush. It was not possible to screen all of them. Many were picked up at sea. All were initially brought to Guam or Wake Island. Those who were brought to Guam, the vast majority, were physically within the United States as defined by the Immigration and Nationality Act. We found ourselves in the position of having to screen aliens who were already in the United States.

In the course of the crises, we were in continuous consultation with the House and Senate Judiciary Committees. The situation changed rapidly. The estimates on the number of Vietnamese that would have to be paroled were revised frequently, always upward. We now expect that the number may come to about

150,000. That would be the largest number of aliens ever paroled into the United States under a refugee parole program in such a short time span.

In the course of the processing, the Vietnamese refugees will be requested to sign an affidavit that they are admissible under all provisions of the immigration laws except those relating to labor certification, public charge and immigrant visa. The affidavit includes a declaration that the refugee has not participated in any act of persecution against any person because of race, religion or political opinion. A statement concerning assets will also be required. Security checks will be completed before parole is authorized.

On arrival at the mainland the refugees will be sent to one of four military camps, Camp Pendleton, California; Eglin Air Force Base, Florida; Camp Chaffee, Arkansas; and Indiantown Gap, Pennysylvania. The aliens will have to remain in the camp until assurances concerning housing and employment or support are received.

With regard to Vietnamese refugees who are already in the United States, many as students or visitors, the Service will not require them to depart. A Vietnamese nonimmigrant student who requests permission to work because he can no longer get money from home will readily be granted such permission for part-time employment. If he wishes to work full-time, permission would also be granted, but since he could not maintain student status when working full time he would be accorded voluntary departure.

Any Vietnamese alien in the United States who believes he is eligible to apply for permanent residence may do so. If he's found eligible, the application will be approved.

On that happy note, I terminate my remarks.

\* \* \* \* \* \* \*

### QUESTIONS AND ANSWERS

Q. A number of the questions deal with the permission to work for aliens for whom I-130's have been filed but not approved. The complaint is made that in various offices there is a great time lag between filing and adjudication of the petition. The time lag results in hardship not only to the beneficiary, but also to other members of his family who would like to work. What answer do you see to that problem?

A. I wish I had a happy answer. But the Immigration Service itself is on the verge of filing a petition - a petition in bankruptcy. We are, as you've heard many, many times, badly understaffed, and badly in need of funds. The President, in his budget, has asked for some $30 million additional for the Immigration Service but we don't have those funds. We simply have to do the best we can with what we have.

Q. Could not the permission to work be granted with the filing of the petition which seems proper on its face?

-297

A. The Service has considered that question a number of times. The Association of Immigration and Nationality Lawyers, through its liaison committee in Washington, has submitted a request to that effect. However, the Service feels that it should not go any further than it has. Until we actually have received an application for permanent residence which is properly filed, the Service will not endorse "Employment Authorized" on the alien's Form I-94. You can submit a section 245 adjustment application at the same time that you file an immediate relative petition. Upon approval of the petition, the sec. 245 application would be considered as properly filed, and the applicant would be in a position to request that his I-94 be stamped "Employment Authorized".

Q. Where the principal alien applies for adjustment along with his wife, and both ask for employment authorization, some District Directors have endorsed the principal alien's I-94, but have refused to grant the privilege to the spouse. Is there any recourse from this decision?

A. First, I'd have to say that a refusal to stamp the I-94 of the spouse is incorrect. The recourse would be to immediately take the matter up with the District Director. If you find difficulty there, you should go to the Regional Office. If the problem still remains, your committee can take it up with the Central Office.

Q. Must the person applying for practical training show that he already has a specific job, or need he come in simply with a proposal to work without having prearranged employment?

A. For the first period of practical training, a specific job need not be shown. However, when the alien applies for an extension of his practical training, he will have to establish that he is working in a field related to his course of studies.

Q. You have just stated that an I-485 application may be filed with an I-130. However, New York does not permit this procedure. Can that be corrected?

A. There is an express provision in the regulations which permits the I-130 visa petition, or any other visa petition, to be submitted with a sec. 245 application, and perhaps that provision of the regulations has been overlooked. You may wish to call it to the District's attention. I believe you'll find it in 8 C.F.R. 245.

Q. A number of schools, such as Antioch College, have combined study and off-campus work programs as part of their education plans. Does the policy of the Service permit this off-campus employment?

A. Yes. There are special situations where some schools have a practice of requiring the student to engage in off-campus work for one semester and attending school the following semester. We recognize alternate work-study programs. In fact, work permission is not required for students in such programs. However, the time spent working is counted against the student's practical training period which may not exceed 18 months in the aggregate.

Q. You have stated that in deciding whether to permit students to accept employment, foreign policy considerations were considered along with domestic unemployment rates. Considering those two factors, is it correct to suppose that unemployment rates for particular areas are what is relevant? Second, are the foreign policy considerations for particular countries taken into consideration? For example, it may not affect our foreign relations with Canada, especially since students from that country may have the money to support themselves without working, but this policy for Nigeria may well cut off all students from that country. I guess the question is, are discrete considerations given to particular countries, or are all unemployment rates and all foreign policies lumped together in deciding whether or not students shall be permitted to work?

A. The question was treated on a broad basis. The Service does not have the facilities to determine the job market situation in separate areas throughout the country. And the Labor Department, I suspect, is not in a position to screen applications speedily. We also are not able to determine the foreign policy impact on an individual country basis. The State Department would have to be consulted and the inevitable delay necessarily involved would not be acceptable. If the student from Nigeria, which was the example given, is unable to obtain funds from that country for one reason or another, he'd be in an excellent position to apply for regular work permission based on economic necessity. If that work permission is granted, he could work for the entire year, including the summer.

Q. May the parent of a U.S. citizen child of the Western Hemisphere be authorized to work, while he is waiting for a visa appointment in his home country?

A. He can be authorized to work only if he is within 60 days of being reached on the immigrant visa waiting list. We do not have a special rule for parents in such situations.

Q. The District Director in New York has said that if a Vietnamese student now in the United States wants employment authorization, he must either follow the usual procedures or get out of status and proceed to the Investigations Section for an interview. Isn't this unreasonable? Suppose the student wants to remain in status but wants to work for the summer. Must this student show financial necessity?

A. The student should make an application on the prescribed form, Form I-538. If he is a Vietnamese student who wants to work part-time, that application should be approved just as soon as the adjudicator looks at it and sees that the applicant is a Vietnamese student. We take judicial notice of the situation.

Q. The Immigration and Naturalization Service in Baltimore has sent letters to various employers asking them to provide the names of all aliens in their employment. Since no distinction is made between permanent residents, nonimmigrants who have permission to work, and illegal aliens, do you believe this request by the Baltimore office is proper?

-299

I would rather not pass judgment here on what the Baltimore office has done. I think when something like this comes to your attention, and you believe it is wrong, you should take the matter up with the District officials, and if necessary, with the Regional officials. Finally, your liaison committee can take it up with the Central Office if you are not satisfied with the response that you get below.

Q. A serious student has been given INS permission to work. He makes application for an extension, but it takes four to six months for the District to adjudicate his application. What is his status vis-a-vis working and maintaining legal status during the period between the expiration of his original permission to work and the time the INS rules on his extension?

A. I don't believe we have an express instruction or policy on that point. On the initial application for work permission, the student should not work until he receives an approval of his application. Once his application is approved and he makes a timely request for an extension of work permission, I think the Service would be reasonable and would not take any action if he continued to work while waiting for the decision on his extension application.

Q. A man emigrates to the United States to retire, that is, not to enter the work force, but subsequently he begins to work. Does the Immigration and Naturalization Service take any action for violating his retirement status?

A. I think we are talking about an alien who was allowed to immigrate to the United States without obtaining a labor certification because he satisfied the consular and immigration officer that he had sufficient funds to support himself without working and did not intend to work. If this was the bona fide intention of the prospective immigrant and he subsequently has a genuine, legitimate change of mind, I don't think any action would be taken by the Service.

Q. The Hibi cases, Filipino veterans of World War II, are not given employment authorization even though they have petitions pending for naturalization, and no deportation proceedings have been filed against them. Is there any recourse which would give them permission to work?

A. We've never considered whether we should make it a policy to allow aliens who are not lawful permanent residents to work while they are seeking a legal interpretation in the courts concerning eligibility for naturalization. The Association may wish to take that matter up with the Service.

Q. A student applied for change of status to E-2 eighteen months ago. The application has not been adjudicated. May he work in the interim without violating his status? Also, may a business investor work while his application is pending?

A. If a person wants to change from one nonimmigrant status to another, the statute requires that he be in lawful status. He should not engage in employment until his application for change in nonimmigrant classification has been approved.

-300

Regarding the business investor, can someone who has applied under the non-preference portion of the quota for change in status as a business investor work, presumably at something other than his business, or perhaps in his business, while the application is pending?

A. If a person works while his application for change of status to permanent resident is pending it will not have any effect on his eligibility for status under the present law. I can't tell you to tell him to go to work. I can simply point out that his status and his eligibility for adjustment would not be affected if he worked while the application is pending.

Q. Can an immigration judge grant employment authorization?

A. The immigration judge does not have authority to grant work permission to an alien. He cannot endorse an I-94, "Employment Authorized". That's the prerogative of the District Director or his designee.

Q. Where a student violates his status by working without permission, but is otherwise a bona fide student, must his departure be required without a second chance, particularly when he shows his need for work and the Central Office has advised the District Director that strict construction should give way to the exercise of discretion based on circumstances?

A. The Service has a reasonable policy toward students. When a student unwittingly engages in unauthorized employment we don't make it a practice to rush in to seize him and institute deportation proceedings. The Service will consider giving him a second chance. We may make a notation in his file.

Q. Is this a national policy or a district policy?

A. It's a policy that depends on the individual circumstances.

Q. There are no individual circumstances in Philadelphia. We've got students, some who worked 5 hours over for two weeks, and as soon as their application comes in for an extension, they are given an order to show cause. They do wait in Philadelphia until the I-538 comes in, and then they schedule the hearings.

A. When you have a problem with an individual district, where you feel the district is arbitrary and unreasonable, you can take the matter up with the Regional office, and if necessary, with the Central Office. We do not require that a student be immediately placed under expulsion proceedings when he unwittingly and innocently engages in employment.

Q. In view of the individual variations among District Directors in handling applications for permission to work or to reinstate students, is there any provision for giving a uniform system of instruction to District Directors?

A. This is an area where it's very difficult to give uniform instructions. We have let our people know that students would be treated with consideration, and I can only repeat what I said before, we do not lie in wait to ambush every student who unwittingly takes a job.

(From the audience:  Texas doesn't know it!)

-301

/Editor's Note:  The following questions asked of Mr. Bernsen were of a more
general nature._7

Q.   What are the criteria in Section 13 cases?

A.   Well, section 13 is a provision of law which permits certain aliens who came
into the United States as diplomats, A-1 or A-2, or as international
organization aliens, G-1 or G-2, to obtain permanent residence once they are
no longer in official status.  Fifty aliens a year, without regard to visa
availability, may be granted permanent residence under this law.  When we
receive such an application, we interview the applicant, the State Department
is consulted to make security checks.  If the alien meets the statutory
criteria, his application is generally approved by the District Director.
The facts are then reported to the Congress.  The case has to pend in the
Congress for two sessions before approval becomes final.  However,
regardless of his visa classification, the applicant has to be a person of
diplomatic or semi-diplomatic rank.  Chauffeurs, clerks, butlers,
stenographers, typists are not eligible.

Q.   Would alien Chinese who are not Vietnamese citizens but who were brought out
on the Vietnamese airlift be granted the same asylum benefits granted to the
Vietnamese?

A.   The policy relates to those who are Vietnamese.  The probability is that on
an individual case basis, persons of other nationalities who are closely
related to Vietnamese nationals may be eligible.

Q.   These are persons who have lived in Vietnam, who are Vietnamese by place of
birth under American immigration law, but are regarded by the Chinese as
overseas Chinese.  In that circumstance, would they be treated by American
immigration law as Vietnamese or Chinese?

A.   If they were born in Vietnam, and applied for immigrant visas, they would
be chargeable to the numerical limitation for Vietnam.  The policy statements
for parole of Vietnamese refugees apply only to those of Vietnamese
nationality with the exceptions mentioned in my response to the previous
question.

Q.   Do the broad provisions for Cambodians apply to persons who are natives of
and last residents of Cambodia, but not citizens of Cambodia?

A.   The policy for the Vietnamese also applies to Cambodian refugees.

NJAPP147

# Exhibit 16

NJAPP148

Case 1:18-cv-00068 Document 636-3 Filed on 03/02/23 in TXSD Page 152 of 208



CAP

↗ Supreme Court    Gun Violence    Reproductive Justice    Education    COVID-19

**Issues**    **Experts**    **Events**    **Press**    **Take Action**    **About Us**    🔍    **Donate**

---

ARTICLE    NOV 24, 2021

# The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition

Nearly 600,000 DACA recipients live across the United States, raise 300,000 U.S.-citizen children, and pay $9.4 billion in taxes each year.

AUTHORS



**Nicole Prchal Svajlenka**

**Trinh Q. Truong**

**Advancing Racial Equity and Justice**, Deferred Action for Childhood Arrivals, Immigration

🐦  f  in  ✉  🖨



DACA recipients and immigrant rights leaders meet with Vice President Kamala Harris at the White House in Washington, D.C., on July 22, 2021. (Getty/Kent Nishimura)

In 2012, the Obama administration created the Deferred Action for Childhood Arrivals (DACA) program to protect certain young undocumented immigrants from deportation. Through DACA—in which applicants receive a temporary stay of deportation and work authorization—more than 825,000 people who arrived in the

NJAPP149

7/7/22, 9:27 AM    The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition - Center for American Progress

Case 1:18-cv-00068   Document 636-3   Filed on 03/02/23 in TXSD   Page 153 of 208

United States as young children were able to access more stability in their lives. DACA has enabled recipients to pursue higher education, become homeowners, and earn higher wages. And, alongside that, with higher earnings comes more tax revenue and economic contributions that are felt in their communities and nationwide.

But these protections are not permanent: They could be stripped away at any moment. Even as the Supreme Court ruled last year that the Trump administration's attempt to end the program was illegal, DACA is still under threat. In July, a federal judge in Texas ruled DACA itself unlawful and blocked the U.S. Department of Homeland Security from enrolling new applicants into the program, though it stayed the decision for current DACA recipients who, for now, are able to continue to renew their protections.

In response to this ruling, the Biden administration took steps to fortify and preserve DACA from these continual attacks through the federal rule-making process. This is only the first step, as only congressional action can provide a pathway to citizenship and permanent protections for DACA recipients.



# More than 1.3 million people live with a DACA recipient.

This column presents the most up to date national and state-by-state data on DACA recipients, including their long-time ties to the United States, their demographic characteristics, and their fiscal and economic contributions. Strengthening DACA would not only maintain stability for these individuals and their families, but it would also be integral to the country as it continues to recover from the coronavirus pandemic.

## DACA recipients' family ties to the United States

Given the eligibility requirements for DACA—arriving prior to the age of 16 and before June 15, 2007—DACA recipients have all spent more than 14 years in the United States. Simply put, the more time that elapses without updates to DACA eligibility, the longer the ties to United States as well. On average:

- DACA recipients arrived in the United State in 1999 at the age of 7.

- More than one-third of DACA recipients arrived in the United States before the age of 5.

- The average DACA recipient is now 26 years old.

But, in addition, more than 1.3 million people live with a DACA recipient, including 300,000 U.S.-born children who have at least one parent with DACA.

State level data on DACA recipients is presented below for the 39 states with more than 1,000 DACA recipients.

Table 1

# Characteristics of Deferred Action for Childhood Arrivals (DACA) recipients and their households, by state



NJAPP150

7/7/22, 9:27 AM   The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition - Center for American Progress

Case 1:18-cv-00068   Document 636-2   Filed on 03/02/23 in TXSD   Page 154 of 208

| State | Number of DACA recipients | Average age at arrival | Average year of arrival | Number indi hous wit re |
|---|---|---|---|---|
| Alabama | 3,720 | 7 | 2000 | |
| Arizona | 22,260 | 6 | 1999 | |
| Arkansas | 4,130 | 7 | 1999 | |
| California | 168,800 | 7 | 1998 | |
| Colorado | 13,320 | 6 | 1999 | |
| Connecticut | 3,200 | 7 | 2000 | |
| *Delaware** | *1,220* | *8* | *2002* | |
| Florida | 22,550 | 8 | 2000 | |
| Georgia | 18,960 | 7 | 2000 | |
| *Idaho** | *2,520* | *6* | *1998* | |
| Illinois | 30,880 | 7 | 1999 | |
| Indiana | 8,210 | 7 | 2001 | |
| *Iowa** | *2,290* | *7* | *2000* | |
| Kansas | 5,020 | 7 | 2000 | |
| Kentucky | 2,460 | 8 | 2002 | |
| *Louisiana** | *1,540* | *7* | *2000* | |
| Maryland | 7,230 | 8 | 2000 | |
| Massachusetts | 4,900 | 7 | 1999 | |
| Michigan | 4,830 | 7 | 1999 | |
| Minnesota | 4,780 | 7 | 1999 | |
| *Mississippi** | *1,200* | *8* | *2003* | |
| Missouri | 2,760 | 8 | 2002 | |
| Nebraska | 2,690 | 5 | 1999 | |
| Nevada | 11,370 | 7 | 1999 | |
| New Jersey | 14,680 | 8 | 2000 | |
| New Mexico | 5,190 | 5 | 2000 | |
| New York | 24,570 | 8 | 1999 | |
| North Carolina | 21,940 | 8 | 2000 | |
| Ohio | 3,570 | 6 | 2000 | |
| Oklahoma | 5,650 | 7 | 1999 | |
| Oregon | 8,960 | 7 | 1999 | |
| Pennsylvania | 4,180 | 8 | 2000 | |
| South Carolina | 5,330 | 8 | 2000 | |

NJAPP151

| Tennessee | 6,990 | 7 | 2001 | |
| Texas | 97,970 | 7 | 2000 | |
| Utah | 7,810 | 7 | 1999 | |
| Virginia | 8,530 | 7 | 2001 | |
| Washington | 14,740 | 7 | 1999 | |
| Wisconsin | 5,990 | 7 | 2000 | |
| United States | 590,070 | 7 | 1999 | 1 |

*Note:* Data are presented for states with more than 1,000 DACA recipients as

The protections of DACA reverberate beyond just individuals who are part of the program—their impacts can be felt among their families and communities as well. Twenty-three U.S. states are home to more than 10,000 people living in households with DACA recipients.

## DACA recipients in the workforce

While DACA offers protection from deportation, it is also an avenue for recipients to reach their fuller potential in the formal work economy. Surveys of DACA recipients echo this: After receiving DACA, more than half of these recipients reported moving to jobs with better pay and benefits that are more closely aligned with their education and training or fitting their long-term career goals.

The gains, however, are more than just personal, as the entire country benefits from their career pursuits. Data show that more than three-quarters of DACA recipients in the workforce—343,000 people—were employed in jobs deemed essential by the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency, helping to keep the country running and safe at great personal risk. This number includes 34,000 health care workers providing patient care and another 11,000 individuals working in health care settings keeping these facilities functioning. It includes 20,000 educators, ensuring millions of children can continue learning in classrooms, and 100,000 working in the food supply chain as food travels from farms to dinner tables.

# 343,000
**Number of DACA recipients employed in essential jobs**

The Biden administration's proposed rule to fortify and preserve DACA makes a notable change to the program. While, in the past, individuals applying for DACA were required to apply for both deferred action and work authorization, the proposed rule would allow applicants to apply only for deferred action with the option to also apply to work authorization, either at that time or in the future. This—along with an alternative scenario in which the Department of Homeland Security imagines a world where the courts do not allow work authorization to be granted to recipients—would potentially open the door to DACA only providing protection from deportation without work authorization. Considering the success DACA has played in the lives of its recipients and the beneficial impact DACA has had on economic recovery, work authorization remains a critical and necessary part of the program.

NJAPP152

7/7/22, 9:27 AM The demographic and economic impacts of DACA recipients: Fall 2021 edition - Center for American Progress

Case 1:18-cv-00068 Document 636-3 Filed on 03/02/23 in TXSD - Page 156 of 208

# Fiscal and economic contributions of DACA recipients and their households

Nationally, DACA recipients and their households make major economic and fiscal contributions each year. CAP analysis finds that DACA recipient households pay $6.2 billion in federal taxes and $3.3 billion in state and local taxes each year.

DACA recipients and their households are critical, too, in local economies. After taxes, these households hold $25.3 billion in spending power. They own 68,000 homes, making $760 million in mortgage payments and $2.5 billion in rental payments annually, money that could be in jeopardy if DACA goes away.

The table below provides state level data on these economic and fiscal contributions.

Table 2

## Annual tax contributions, spending power, and housing payments of DACA recipient households, by state

| State | Federal taxes | State and local taxes | Spending power | Number home own |
|---|---|---|---|---|
| Alabama | $48.8M | $16.4M | $179.6M | |
| Arizona | $149.6M | $92.3M | $763.8M | 3, |
| Arkansas | $29.6M | $20.9M | $157.6M | 9 |
| California | $2.1B | $1.0B | $8.2B | 10, |
| Colorado | $123.3M | $62.7M | $557.1M | 2, |
| Connecticut | $38.4M | $21.8M | $136.8M | |
| Delaware | $9.6M | $3.8M | $52.9M | |
| Florida | $173.5M | $71.7M | $784.3M | 2, |
| Georgia | $151.1M | $88.1M | $712.0M | 2, |
| Idaho | $18.9M | $9.8M | $91.0M | |
| Illinois | $326.2M | $217.0M | $1.3B | 4, |
| Indiana | $42.1M | $29.5M | $218.8M | 1, |
| Iowa | $19.8M | $13.3M | $94.2M | |
| Kansas | $31.3M | $22.9M | $166.6M | 8 |
| Kentucky | $29.0M | $16.1M | $122.3M | |
| Louisiana | $12.7M | $7.5M | $63.7M | |
| Maryland | $86.3M | $51.3M | $357.7M | 8 |
| Massachusetts | $65.6M | $30.2M | $241.1M | |
| Michigan | $37.6M | $20.9M | $174.4M | |
| Minnesota | $50.5M | $27.2M | $207.5M | |

NJAPP153

7/7/22, 9:27 AM     The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition - Center for American Progress

Case 1:18-cv-00068 Document 636-2 Filed on 03/02/23 in TXSD Page 157 of 208

| | | | |
|---|---|---|---|
| Mississippi | $5.4M | $3.6M | $29.4M | |
| Missouri | $18.1M | $10.5M | $87.9M | |
| Nebraska | $53.8M | $21.7M | $157.0M | |
| Nevada | $119.7M | $38.8M | $489.3M | 1,! |
| New Jersey | $229.5M | $112.8M | $793.4M | 8 |
| New Mexico | $30.6M | $18.9M | $152.0M | 1,0 |
| New York | $430.5M | $261.5M | $1.4B | 1,3 |
| North Carolina | $137.0M | $83.9M | $712.8M | 4,7 |
| Ohio | $26.9M | $17.1M | $125.6M | 1,1 |
| Oklahoma | $32.6M | $24.7M | $181.2M | |
| Oregon | $123.5M | $58.7M | $483.3M | 1,3 |
| Pennsylvania | $47.6M | $24.0M | $176.2M | |
| South Carolina | $33.4M | $18.8M | $174.2M | 9 |
| Tennessee | $41.3M | $23.7M | $234.8M | 1,0 |
| Texas | $782.7M | $436.8M | $3.7B | 14,0 |
| Utah | $65.1M | $32.9M | $305.5M | 1,7 |
| Virginia | $118.8M | $54.8M | $443.0M | 2 |
| Washington | $210.8M | $97.4M | $774.1M | 1,! |
| Wisconsin | $44.6M | $30.7M | $223.9M | 1,2 |
| **United States** | **$6.2B** | **$3.3B** | **$25.3B** | **68,4** |

*Note:* Data are presented for states with more than 1,000 DACA recipients as of June 30, 2021. Some data are not available due to small sample sizes.

## Conclusion

DACA has been a positive force not just for recipients but also for families and communities across the country. Their contributions as the economy recovers are real, but a pathway to citizenship would boost these to new heights, especially as the United States tracks its course for economic recovery.

Solidifying DACA is an important step, but the potential removal of work authorization from its protections is an example of how the program remains vulnerable, ultimately threatening the livelihoods of DACA recipients and their families.

The only way to extend permanent protections to current DACA recipients, to those locked out of the program, and to the undocumented community more broadly is via a pathway to citizenship. Congress must act to do so.

*Authors' note: This column contains updates to the Center for American Progress' 2019 and 2020 columns on national and state-by-state impacts of DACA recipients.*

## Methodology

NJAPP154

7/7/22, 9:27 AM    The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition - Center for American Progress

Case 1:18-cv-00068  Document 636-2  Filed on 03/02/23 in TXSD  Page 158 of 208

The data in this column are based on CAP analysis of two years of pooled American Community Survey (ACS) microdata: the 2018 1-year and 2019 1-year ACS, accessed via the University of Minnesota's IPUMS USA. These are the most recent data collected by the ACS, but it is important to note that it reflects years before the coronavirus pandemic. It also uses the most recent number of active DACA recipients, 590,070 as of June 30, 2021, as reported by U.S. Citizenship and Immigration Services.

**FOR MORE INFORMATION ON THE ECONOMIC CONTRIBUTIONS CALCULATIONS, SEE**

ARTICLE

### What We Know About DACA Recipients in the United States

Sep 5, 2019

Nicole Prchal Svajlenka

---

The positions of American Progress, and our policy experts, are independent, and the findings and conclusions presented are those of American Progress alone. A full list of supporters is available here. American Progress would like to acknowledge the many generous supporters who make our work possible.

---

AUTHORS

### Nicole Prchal Svajlenka

Associate Director, Research

---

### Trinh Q. Truong

Research Assistant

## YOU MIGHT ALSO LIKE

| ARTICLE | ARTICLE | ARTICLE | ARTICLE |
|---|---|---|---|
| **The Trump Administration's Harsh Immigration Policies Are Harming Schoolchildren** | **Why Immigration Relief Matters** | **Fact Sheet: State-by-State Estimates of Citizenship in Budget Reconciliation** | **A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response** |
| Nov 30, 2018 | Feb 1, 2022 | Sep 13, 2021 | Apr 6, 2020 |
| Lisette Partelow, Philip E. Wolgin | Trinh Q. Truong | Nicole Prchal Svajlenka, Claudia Flores, Philip E. Wolgin | Nicole Prchal Svajlenka |

## ALSO FROM CAP

# Exhibit 17

NJAPP156



# Center for American Progress

☰

- DONATE

IMMIGRATION

# DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November

By Tom K. Wong, Sanaa Abrar, Claudia Flores, Tom Jawetz, Ignacia Rodriguez Kmec, Greisa Martinez Rosas, Holly Straut-Eppsteiner, and Philip E. Wolgin   |   September 19, 2019, 5:00 am



Getty/Corbis News/VIEWpress/Kena Betancur

A woman takes part in a New York City march against President Trump's decision to end DACA, September 2017.

NJAPP157

*Note: The survey results can be found* here. *For more information on the survey, please contact* Tom K. Wong.

Since it was first announced on June 15, 2012, the Deferred Action for Childhood Arrivals (DACA) policy has provided temporary relief from deportation as well as work authorization to approximately 825,000 undocumented young people across the country.

From August 14 to September 6, 2019, Tom K. Wong of the U.S. Immigration Policy Center at the University of California, San Diego; United We Dream; the National Immigration Law Center; and the Center for American Progress fielded a national survey to further analyze the experiences of DACA recipients. This study includes 1,105 DACA recipients in 40 states as well as the District of Columbia.

2019 marks the fifth consecutive year that the authors have surveyed DACA recipients. This research, as with previous surveys, continues to show that DACA recipients are making significant contributions to the economy. In all, 96 percent of respondents are currently employed or enrolled in school.

Moreover, for the first time, the survey provides data about the widespread harms that DACA recipients could endure if they lost their status and faced potential deportation. A full 93 percent of respondents reported concerns about either their or their family's physical safety; ability to access health care or education; food security; or risk of homelessness if they were deported to their respective countries of birth. With the Supreme Court set to hear oral arguments on the legality of DACA's termination on November 12, these data make clear that the stakes could not be higher.

## DACA's impact on employment

Work authorization has been critical in helping DACA recipients participate more fully in the labor force. The data show that 89 percent of respondents are currently employed. Among respondents ages 25 and older, the employment rate jumps to 91 percent.

After receiving DACA:

- 58 percent of respondents moved to a job with better pay.

- 48 percent of respondents moved to a job with better working conditions.

- 53 percent of respondents moved to a job that "better fits [their] education and training."

NJAPP158

- 52 percent of respondents moved to a job that "better fits [their] long-term career goals."

- 53 percent of respondents moved to a job with health insurance or other benefits.

The data also show that 6 percent of respondents started their own businesses after receiving DACA. Among respondents 25 years and older, this figure increases to 9 percent. As the authors have noted in previous surveys, DACA recipients are outpacing the general population in terms of business creation. DACA business owners with full-time employees (48 percent of all DACA business owners), on average, employ 4 1/2 workers other than themselves.

Moreover, 17 percent have obtained professional licenses after receiving DACA. Among respondents 25 years and older, this figure increases to 20 percent.

## DACA's impact on earnings

Several years of data, including this 2019 survey, make clear that DACA is having a positive and significant effect on wages. Respondents' average hourly wage increased by 86 percent since they received DACA, rising from $10.46 per hour to $19.45 per hour. And among respondents 25 years and older, the average hourly wage increased by 128 percent since receiving DACA. These higher wages are not just important for recipients and their families but also for tax revenues and economic growth at the local, state, and federal levels.

The data also show that respondents' average annual earnings come out to approximately $42,000, and their median annual earnings total $38,000. Among respondents 25 years and older, these figures are $49,790 and $44,583, respectively.

In addition, DACA has led to greater financial independence and security for recipients and their families.

- 79 percent of respondents reported that their increased earnings have "helped [them] become financially independent."

- 79 percent reported that their increased earnings have "helped [their] family financially."

- 25 percent reported that their increased earnings have "helped [them] take care of an elderly parent or relative."

Specifically, among respondents currently in school, 80 percent reported that their increased earnings helped pay for tuition, and among respondents with children, 47 percent reported that

NJAPP159

their increased earnings have helped to pay for child care expenses. Meanwhile, 47 percent of respondents reported that their increased earnings have helped pay for medical expenses, and 46 percent reported being able to move into better or improved housing.

## DACA's impact on the economy

DACA recipients' purchasing power continues to increase. For example, 60 percent of respondents reported buying their first car after receiving DACA. These large purchases contribute to state revenue, as most states collect a percentage of the purchase price in sales tax, along with additional registration and title fees. The added revenue for states comes in addition to the safety benefits of having more licensed and insured drivers on the roads.

The data also show that 14 percent of respondents purchased their first home after receiving DACA. Among respondents 25 years and older, this figure increases to 19 percent. The broader positive economic effects of home purchases include increased job creation and the infusion of new spending in local economies.

These effects come on top of the combined $8.8 billion in federal, state, and local taxes paid annually by households with DACA recipients.

## DACA's impact on education

Overall, 40 percent of respondents are currently in school, a large majority—83 percent—of whom are pursuing a bachelor's degree or higher. When it comes to educational attainment, 46 percent of respondents reported already having a bachelor's degree or higher. Importantly, among those who are currently in school, a robust 93 percent said that because of DACA, "[They] pursued educational opportunities that [they] previously could not."

## Potential risks of deporting DACA recipients

As stated earlier, for the first time, the survey reveals DACA recipients' deep fears of return and the potential harms that they could face if they lost their protection and were deported. The results are stark:

- 80 percent reported, "In my country of birth, I would be concerned about the physical safety of myself and my family."

- 75 percent reported, "In my country of birth, I would be concerned about the quality of healthcare for myself and my family."

NJAPP160

- 77 percent reported, "In my country of birth, I would be concerned about the quality of education for myself and my family."

- 58 percent reported, "In my country of birth, I would be concerned about food insecurity for myself and my family."

- 41 percent reported, "In my country of birth, I would be concerned about homelessness for myself and my family."

Altogether, 93 percent of respondents reported concerns about either their or their family's physical safety, health care, education, food security, or risk of homelessness in their respective countries of birth.

Strikingly, the average age of arrival to the United States among respondents is just 6.1 years old, and more than two-thirds—69 percent—reported not having any immediate family members who still live in their respective countries of birth. These findings make clear that deporting DACA recipients would not only mean sending them to countries they barely know, but it would also put their physical safety, well-being, and livelihood at serious risk.

## Civic engagement of DACA recipients

Despite DACA's uncertainty, the data continue to show tremendous resolve among DACA recipients and suggest that the program is associated with a greater sense of belonging. Fifty-seven percent of respondents reported that they have become more involved in their communities after receiving DACA. After their DACA application was approved, 67 percent reported, "I am no longer afraid of my immigration status," and 67 percent reported, "I feel more like I belong in the U.S." Nearly half of respondents reported that they have become more politically active since receiving DACA.

## The uncertainty of life with DACA

The legal and political uncertainty surrounding DACA continues to weigh heavily on the minds of DACA recipients. For example, 56 percent of respondents reported that they think about either being detained in an immigration detention facility or deported from the United States at least once a day; and an even greater percentage, 69 percent, reported that they think about a family member being detained or deported at least once a day.

Fear of family separation is particularly strong among DACA recipients who are parents. Among those with children, 75 percent reported that they think about "being separated from [their] children

because of deportation" at least once a day, while 72 percent reported thinking about "not being able to see [their] children grow up because of deportation" at least once a day.

# Conclusion

As the Supreme Court prepares to hear arguments on DACA's termination on November 12, 2019, the implications for DACA recipients, their families, and the U.S. economy as a whole are clear. DACA has been a major success, evidenced by recipients' gains in employment outcomes and educational attainment, increased sense of belonging and stability, and contributions to local communities and economies. But now, these gains are on the line. And as the data show, stripping recipients of protections would have potentially disastrous impacts on them and their families, including the nearly 256,000 U.S. citizen children who have a parent with DACA.

*Tom K. Wong is associate professor of political science and founding director of the U.S. Immigration Policy Center at the University of California, San Diego, as well as a senior fellow at the Center for American Progress. Sanaa Abrar is advocacy director at United We Dream. Claudia Flores is the immigration campaign manager at the Center for American Progress. Tom Jawetz is vice president for Immigration Policy at the Center for American Progress. Ignacia Rodriguez Kmec is immigration policy advocate at the National Immigration Law Center. Greisa Martinez Rosas is deputy executive director at United We Dream. Holly Straut-Eppsteiner is research program manager at the National Immigration Law Center. Philip E. Wolgin is managing director for Immigration Policy at the Center for American Progress.*

*The authors would like to thank all those who took and shared the survey for their time and effort in helping to bring these stories to light.*

# Methodology

The questionnaire was administered to an online panel of DACA recipients recruited by the partner organizations. Several steps were taken to account for the known sources of bias that result from such online panels. To prevent ballot stuffing—one person submitting multiple responses—the authors did not offer an incentive to respondents for taking the questionnaire and used a state-of-the-art online survey platform that does not allow one IP address to submit multiple responses. To prevent spoiled ballots—people responding who are not undocumented—the authors used two validation tests for undocumented status. Multiple questions were asked about each respondent's migratory history and DACA application history. These questions were asked at different parts of the questionnaire. When repeated, the questions were posed using different wording. If there was agreement in the answers such that there was consistency regarding the respondent's migratory

NJAPP162

Case 1:18-cv-00068 Document 636-3 Filed on 03/03/23 in TXSD Page 166 of 208

history and DACA application history, the respondent was kept in the resulting pool of respondents. If not, the respondent was excluded.

© 2021 - Center for American Progress

# Exhibit 18

NJAPP164

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,           )
                                    )
          Plaintiffs,               )
                                    )
     v.                             )    Case No. 1:18-CV-68
                                    )
UNITED STATES OF AMERICA, *et al.*, )
                                    )
          Defendants,               )
                                    )
KARLA PEREZ, *et al.*,              )
                                    )
          Defendant-Intervenors,    )
                                    )
and                                 )
                                    )
STATE OF NEW JERSEY,                )
                                    )
          Proposed Defendant-Intervenor.  )

## DECLARATION OF ANGELO J. ONOFRI

I, Angelo J. Onofri, declare and state as follows

1. I am the current County Prosecutor for Mercer County, New Jersey. I was sworn in as the Mercer County Prosecutor on December 28, 2016. I began my career with the Mercer County Prosecutor's Office in May of 1998 as an assistant prosecutor. During my tenure as an assistant prosecutor, I served as the Chief of the Grand Jury Unit, municipal court liaison, case screening supervisor and community outreach/projects coordinator. In August of 2012, I was promoted to First Assistant Prosecutor. In that position, I was responsible for the day-to-day operations of the Mercer County Prosecutor's Office including the Mercer County Homicide Task Force, Victim-Witness Unit and Mercer County Shooting Response Team. My

1

responsibilities also included reviewing and approving U-Visa applications. On March 1, 2015, I was appointed as the Acting Mercer County Prosecutor.

2. During my 20 years with the Mercer County Prosecutor's Office, I have participated in and hosted hundreds of community forums, outreach events, and community engagement activities. At these community forums, events, and engagement activities, I have interacted with numerous undocumented persons and listened to their fears and concerns.

3. As I state on my office's website (http://mercercountyprosecutor.com/), it is "the mission of the Mercer County Prosecutor's Office . . . to preserve and enhance the quality of life of Mercer County residents by fostering an environment of law abidingness, safety and security. To that end, this Office is dedicated to the pursuit and attainment of justice." Thus, the fair administration of justice and ensuring the safety of the community we serve are central goals of my office.

4. In order to achieve these goals, it is important that all members of the local community that we police and are sworn to protect must themselves not only be willing to cooperate with us but they must trust my office as well.

5. We rely on members of our local community to report crimes, provide information, to come forward with evidence and to testify in criminal proceedings among other things. Without such help from our community we cannot successfully resolve many of the matters that come through my office, including the prosecution of violent criminal offenses.

6. A lack of trust between community members and law enforcement officers leads to a reduction in the reporting of crimes and negatively impacts the successful prosecution

NJAPP166

of crime.  That, in turn, can lead to violent offenders avoiding prosecution, which poses a threat to everyone in Mercer County and beyond.

7. Members of the local immigrant community, particularly those who are undocumented, often live in fear of and maintain a distrust of government and law enforcement agencies, at the state, local and federal level.  Due to this fear and distrust, members of the immigrant community are often unwilling to come forward to report crimes (both as witnesses and as victims) and/or are unwilling to assist in the prosecution of crimes.  This is not necessarily because they do not want to help, but because they fear their own deportation (or deportation of relatives) if they do.

8. Immigrants make up a substantial portion of our population in Mercer County.  By one government estimate that I have reviewed, 21.8% of the population of Mercer County (approximately 80,951 people) was foreign-born in 2016, and of that over 54% of them are not U.S. citizens.  (*See* Attached Exhibit A; Source: U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates.)

9. My office has done (and continues to do) a great deal of work to foster trust with immigrant communities.  For example, during my tenure with the Mercer County Prosecutor's Office and as the Mercer County Prosecutor, my office has:

- Partnered with the Latin American Legal Defense and Education Fund to provide information concerning reporting crime, the U-Visa process, the role of ICE, the Internal Affairs process, 287(g) status in Mercer County (Mercer County does not have any 287(g) agreements, but we do cooperate with ICE, especially on criminal immigration enforcement matters), crime prevention

3

tips specific to the undocumented community, and scams being perpetrated against the undocumented community.

- Partnered with El Centro of the Diocese of Trenton to conduct a community concerns forum in the aftermath of the death of Julio Cesar Cruz-Cruz in 2014. Mr. Cruz-Cruz was an 19-year old Guatemalan immigrant who was killed during a strong arm robbery. The defendants, who confessed to the crime, indicated that they were "going to whack poppies" that evening (a derogatory term for robbing people of Latin American descent). When asked why they planned to target people of Latin American descent, the defendants said that they don't have papers and won't talk. There is a perception among the criminal element that people of Latin American descent are easy targets who will not report crime because they are undocumented. Further, criminals view the Latin American population as walking ATMs because they are undocumented and cannot open bank accounts.

- Prosecuted scams targeting immigrants in Mercer County. For example, we recently broke up a scam in which a person was going to landscaping sites and telling workers that for $1,200, he could get them a driver's license and automobile insurance.

- Hosted outreach events, in partnership with the Guatemalan Civic Association, to discuss U-Visas, victim services, and filing criminal complaints.

- In partnership with the Capital City Community Coalition and My Eternal Family, conducted expungement informational sessions and expungement

4

events where we assisted the attendees in completing expungement documents. At a recent expungement event in March, many undocumented people attended.

- During my 20 year career with this office, we have held numerous of the aforementioned events in order to foster improved relationships and trust with the community. We often times hold these events in churches to make people feel comfortable.

10. I believe that these programs have had positive results and have helped my office build a more trusting relationship with the local immigrant communities.

11. On the other hand, the core missions of my office are undermined when a significant portion of the population is fearful of the government and, particularly, law enforcement, and thus, will not cooperate with us in our effort to protect them. To counter this we must be able to convince immigrants that they have no reason to fear law enforcement agents. I believe that DACA is an important tool to help us to do so.

12. Those who have received protections under DACA can call local police departments to report crimes that they have witnessed (or been the victims of) without fear of their own arrest based on their immigration status. They also can appear in public court proceedings to offer valuable testimony in support of criminal prosecutions without fear of other government agencies using that as an opportunity to detain or arrest them based on their immigration status. This benefits everyone in Mercer County.

13. I also believe, based on my experiences and general knowledge on the topic, that if DACA was to end, the amount of cooperation we receive from immigrant communities (which my office has been working hard to increase, as I have

5

NJAPP169

discussed) would decline.  And if members of immigrant communities are less likely to report crimes (even in situations where they themselves are the victims) or assist my office in prosecuting crimes, then the public safety will suffer.

14. For all these reasons, I believe that the termination of DACA would be detrimental to my Office's ability to fulfill its mission of administrating justice and protecting the member of the communities in Mercer County.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June _22_ , 2018, in _Trenton_ , New Jersey

_____
Angelo J. Onofri
Mercer County Prosecutor

6

# Exhibit 19

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,　　　　　　　）
　　　　　　　　　　　　　　　　　　）
　　　　　　Plaintiffs,　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
　　v.　　　　　　　　　　　　　　　 ）　Case No. 1:18-CV-68
　　　　　　　　　　　　　　　　　　）
UNITED STATES OF AMERICA, *et al.*,　 ）
　　　　　　　　　　　　　　　　　　）
　　　　　　Defendants,　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
KARLA PEREZ, *et al.*,　　　　　　　　 ）
　　　　　　　　　　　　　　　　　　）
　　　　　　Defendant-Intervenors,　　 ）
and　　　　　　　　　　　　　　　　 ）
　　　　　　　　　　　　　　　　　　）
STATE OF NEW JERSEY,　　　　　　　 ）
　　　　　　　　　　　　　　　　　　）
　　　　　　Proposed Defendant-Intervenor.　）

## <u>DECLARATION OF TOM K. WONG</u>

I, Tom K. Wong, declare as follows:

1.　My name is Tom K. Wong and I am over eighteen years of age. I have personal knowledge of and could testify in Court concerning the following statements of fact.

2.　I am an Associate Professor with tenure at the University of California, San Diego (UCSD). I work in the political science department, which is consistently ranked by U.S. News & World Report as one of the top ten political science departments nationally. I am also the Director of the International Migration Studies Program Minor at UCSD.

3.　I am an expert on immigration politics and policy, which includes the Deferred Action for Childhood Arrivals (DACA) policy. I have written two peer-reviewed

books and several peer-reviewed journal articles, book chapters, and reports on these subjects. My most recent research on DACA is a national survey of 3,063 DACA recipients conducted in August 2017 (henceforth referred to as the "2017 DACA survey"). The 2017 DACA survey is in addition to two peer-reviewed journal articles on DACA (*International Migration Review* and *Journal on Migration and Human Security*), another forthcoming peer-reviewed journal article on DACA (*Social Problems*), one book-length monograph (supported by a grant from the U.S. Department of Homeland Security [DHS]), and three other reports based on national surveys that I have conducted of DACA recipients.

4.   I received a Ph.D. in political science at the end of the 2010-2011 academic year. I was a post-doctoral research fellow during the 2011-2012 academic year. I joined the political science department at UCSD during the 2012-2013 academic year. I served as an advisor to the White House Initiative on Asian Americans and Pacific Islanders (WHIAAPI), where I worked on the immigration portfolio, during the 2015-2016 academic year.

5.   I previously testified as an expert witness in the case, *City of El Cenizo, et. al. v. State of Texas, et. al.*

6.   I am not being compensated by the State of New Jersey.

7.   I have attached a true and complete copy of my curriculum vitae as Exhibit A to this Declaration. I have also attached a true and complete copy of the 2017 DACA survey as Exhibit B to this Declaration.

**DACA**

2

8.  Since it was first announced on June 15, 2012, the Deferred Action for Childhood Arrivals policy has provided temporary relief from deportation and work authorization to 793,026 people.[1] As of September 4, 2017, there are 689,900 active DACA recipients.[2]

### 2017 National Survey of DACA Recipients

9.  From August 1, 2017 to August 20, 2017, I conducted a national online survey of DACA recipients. The resulting survey is the largest study to date of DACA recipients with a sample size of 3,063 respondents in forty-six states plus the District of Colombia.

10. Methodologically, several steps were taken to account for the known sources of bias that can result from online panels. To prevent ballot stuffing, meaning one person submitting multiple responses, incentives were not given for each completed survey that was submitted. Moreover, the online survey platform used (Qualtrics) was programmed to prevent one IP address from submitting multiple responses. To prevent spoiled ballots, meaning people who responded to the survey who were not undocumented, I used a unique validation test for undocumented status. Multiple questions were asked about each respondent's migratory history. These questions were asked during different parts of the

---

[1] Based on the most recent publicly available data from U.S. Citizenship and Immigration Services (USCIS) at the time of this writing, which is up to June 30, 2017. USCIS provides quarterly reports on DACA. *See* https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20 Data/All%20Form%20Types/DACA/daca_performancedata fy2017 qtr3.pdf.

[2] The lesser 689,900 figure represents the total number of individuals who, as of September 4, 2017, were "active DACA recipients." For example, those who received DACA may have adjusted to lawful permanent resident (LPR) status. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20 Data/All%20Form%20Types/DACA/daca_population_data.pdf.

3

NJAPP174

survey. When a question was repeated, it was posed using different wording. For example, "How old were you when you first came to the U.S.?" and, "In what year did you first come to the U.S.?" (current age was used to tether these answers). If there was agreement in the answers, meaning there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting sample. If there were inconsistencies, the respondent was excluded. Also, Facebook ads were used to improve the geographic representativeness of the resulting sample, as well as to recruit respondents who were outside of the networks of the organizations that conducted outreach for the survey. Because there is no directory of undocumented immigrants from which to randomly sample from, researchers need to partner with organizations that interact with undocumented immigrants to conduct such surveys. The outreach partners were United We Dream (UWD), the National Immigration Law Center (NILC), and the Center for American Progress (CAP). These partners distributed the survey link to their respective email lists. Given the nature of online opt-in surveys, it is not possible to construct a valid margin of error. Nevertheless, the survey is methodologically rigorous and sound. Indeed, a peer-reviewed academic journal on DACA based on survey results obtained using the methods described above is forthcoming in a top sociology journal.

11. Evaluating the representativeness of the survey sample requires current and complete data on the characteristics of DACA recipients. The only publicly available data provided by U.S. Citizenship and Immigration Services (USCIS) in its quarterly DACA statistics that are both current and complete is the geographic

4

breakdown of DACA recipients at the state level.[3] Using these data, a two-sample Kolmogorov-Smirnov (K-S) test of equality of distributions can be run to evaluate how well the survey sample matches the actual distribution of DACA recipients by state. The results of the K-S test of equality of distributions shows that the state-by-state breakdown of the survey sample is representative of the state-by-state breakdown of all DACA recipients ($p = .570$).[4]

## Characteristics of DACA Recipients

12.      The average age of respondents is 25.2.[5] The average age that respondents first

---

[3] USCIS also provides publicly available data on the country of birth of DACA recipients, but these data are incomplete, as only the top twenty-five countries of birth are listed (and one of these is labeled "Unknown"). USCIS has analyzed the demographic characteristics of DACA recipients, but this initial analysis was based on data from August 2012 to September 2013. *See* https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Deferred%20Action%20for%20Childhood%20Arriv als/USCIS-DACA-Characteristics-Data-2014-7-10.pdf. More recently, USCIS published an updated analysis (September 2017). A Kolmogorov-Smirnov (K-S) test of equality of distributions shows that the state-by-state breakdown of the survey sample is representative of the state-by-state breakdown of all "active DACA recipients" ($p = .557$) that USCIS analyzed. The null hypothesis for the K-S test is that the two distributions are statistically the same. A $p$ value of .557 means that we are not confident that we can reject the null hypothesis. In other words, this result means we are only 44% confident (1 minus .557) that we can reject the null hypothesis (and thus say that the two distributions are different). By convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result. Moreover, the September 2017 USCIS report indicates that the average age of active DACA recipients is 23.8. The average age of the survey sample is similar at 25.2. The most recent USCIS data do not provide detailed cross-tabulations sufficient for weighting purposes.

[4] That is, there is no evidence to suggest that the distribution of survey respondents by state and the actual number of DACA recipients by state is statistically significantly different. Moreover, analyzing and comparing the unweighted and weighted results show that the findings are substantively similar throughout. As previously noted, the null hypothesis for the K-S test is that the two distributions are statistically the same. A $p$ value of .570 means that we are not confident that we can reject the null hypothesis. In other words, this result means we are only 43% confident (1 minus .570) that we can reject the null hypothesis (and thus say that the two distributions are different). By convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result.

[5] As previously noted, a September 2017 USCIS report shows that the average age of "active DACA recipients" is 23.8. The average age of the survey sample is thus similar to the average age of active DACA recipients as reported by USCIS.

NJAPP176

arrived in the U.S. is 6.5.[6] The average number of years that respondents have lived in the U.S. is 18.8.[7] Regarding race and ethnicity, 93% of respondents identify as Hispanic/Latino, 4% identify as Asian or Pacific Islander, 2% identify as White, and 1% identify as Black.[8] Also, 10% of respondents personally identify as lesbian, gay, bisexual, or transgender (LGBT).

### DACA and Economic Integration

13.    DACA has been critical in improving the economic integration of DACA recipients, which is evidenced by their employment rates, their employment in "white collar," higher-skilled jobs, greater job mobility, higher wages, more financial independence, and increased consumer purchasing power, among other indicators.

14.    Regarding employment, the data show that 91% of DACA recipients are currently employed. Among those 25 years and older, this percentage climbs to 93%. Moreover, the data show that at least 72% of the top twenty-five Fortune 500 companies employ DACA recipients.

15.    DACA recipients are most likely to work in *Office and Administrative Support Occupations* followed by *Sales and Related Occupations* and then *Management, Business, Science, and Arts Occupations*. U.S. Census occupation categories are

---

[6] In other words, on average, DACA recipients first entered the U.S. during kindergarten or first grade.

[7] Moreover, 38.5% of respondents have lived in the U.S. for 20 years or more.
[8] USCIS does not report race and ethnicity in its quarterly DACA statistics. However, the large majority of the "Top Countries of Origin" listed in the USCIS quarterly reports are Latin American countries.

NJAPP177

used to distinguish between types of occupations.[9] Table 1 lists the top ten occupation categories for DACA recipients.

Table 1

| | DACA |
|---|---|
| Office and Administrative Support Occupations | 16.5% |
| Sales and Related Occupations | 11.6% |
| Management, Business, Science, and Arts Occupations | 10.8% |
| Education, Training, and Library Occupations | 9.6% |
| Food Preparation and Serving Occupations | 6.8% |
| Healthcare Support Occupations | 6.4% |
| Healthcare Practitioners and Technical Occupations | 4.6% |
| Community and Social Services Occupations | 4.3% |
| Financial Specialists | 3.4% |
| Legal Occupations | 3.0% |
| Computer and Mathematical Occupations | 3.0% |
| Other | 19.9% |

16.     Table 2 below compares the occupations of DACA recipients to native-born workers between the ages of sixteen and thirty-five. As the table shows, DACA recipients are more likely to work in "white-collar" higher-skilled occupations such as *Management, Business, Science, and Arts Occupations*, H*ealthcare Support Occupations*, and *Legal Occupations*, and they are less likely to work in "blue-collar" lesser-skilled occupations such as *Building and Grounds Cleaning and Maintenance Occupations*, *Construction and Extraction Occupations*, and *Food Preparation and Serving Occupations*.

[9] For detailed occupation listing, see https://usa.ipums.org/usa/volii/c2ssoccup.shtml.

7

NJAPP178

Table 2

|  | DACA | Native Born | Diff |
|---|---|---|---|
| Management, Business, Science, and Arts Occupations | 10.8% | 6.4% | +4.4% |
| Education, Training, and Library Occupations | 9.6% | 5.9% | +3.7% |
| Healthcare Support Occupations | 6.4% | 3.1% | +3.3% |
| Community and Social Services Occupations | 4.3% | 1.5% | +2.7% |
| Office and Administrative Support Occupations | 16.5% | 13.9% | +2.6% |
| Legal Occupations | 3.0% | 0.9% | +2.2% |
| Financial Specialists | 3.4% | 1.9% | +1.5% |
| Computer and Mathematical Occupations | 3.0% | 2.3% | +0.8% |
| Architecture and Engineering Occupations | 2.1% | 1.5% | +0.6% |
| Business Operations Specialists | 2.8% | 2.3% | +0.4% |
| Life, Physical, and Social Science Occupations | 1.2% | 0.8% | +0.4% |
| Extraction Workers | 0.1% | 0.2% | -0.1% |
| Farming, Fishing, and Forestry Occupations | 0.1% | 0.6% | -0.5% |
| Healthcare Practitioners and Technical Occupations | 4.6% | 5.2% | -0.5% |
| Arts, Design, Entertainment, Sports, and Media | 1.5% | 2.2% | -0.7% |
| Military Specific Occupations | 0.0% | 0.8% | -0.8% |
| Building and Grounds Cleaning and Maintenance | 1.4% | 2.8% | -1.4% |
| Sales and Related Occupations | 11.6% | 13.0% | -1.4% |
| Protective Service Occupations | 0.8% | 2.6% | -1.7% |
| Construction and Extraction Occupations | 1.8% | 3.9% | -2.1% |
| Installation, Maintenance, and Repair Workers | 0.8% | 3.2% | -2.3% |
| Personal Care and Service Occupations | 2.0% | 4.4% | -2.4% |
| Production Occupations | 2.6% | 5.1% | -2.5% |
| Transportation and Material Moving Occupations | 2.7% | 5.7% | -3.0% |
| Food Preparation and Serving Occupations | 6.8% | 9.9% | -3.0% |

Note: percentages may not sum to 100 due to rounding. The column "DACA" refers to DACA recipients. "Native Born" refers to native-born workers who are (a) employed and are (b) between the ages of sixteen and thirty-five. These data come from the U.S. Census 2011-2015 American Community Survey (ACS) 5-year Public Use Microdata, which represents the most up-to-date 5-year file. "Diff" is the difference in the percentage between DACA recipients and comparable native-born workers.

17.      Moreover, after receiving DACA:

    a.      54% got their first job;

    b.      69% got a job with better pay;

    c.      54% got a job that better fits their education and training;

    d.      54% got a job that better fits their long-term career goals;

NJAPP179

e.      57% got a job with health insurance or other benefits[10];

f.      56% got a job with improved work conditions; and

g.      5% started their own businesses.[11]

Table 3 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 3

|  |  |  | ≥ 25 |
|---|---|---|---|
| Got my first job | ......................................... | 54.2% | 35.3% |
| Got a job with better pay | ......................................... | 68.5% | 77.7% |
| Got a job that better fits my education and training | ......................................... | 54.2% | 59.6% |
| Got a job that better fits my long-term career goals | ......................................... | 53.9% | 61.4% |
| Got a job with health insurance or other benefits | ......................................... | 57.3% | 66.9% |
| Got a job with improved work conditions | ......................................... | 56.2% | 64.4% |
| Started my own business | ......................................... | 5.4% | 7.9% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

18.     Regarding earnings, the data make clear that DACA is having a positive and significant effect on the wages of DACA recipients.

19.     The average hourly wage of DACA recipients has increased by 69% since receiving DACA. Among those 25 years and older, the average hourly wage has increased by 81% since receiving DACA. I have noted in previous research that more work (and time) may be needed to parse out the short- and long-run wage effects of DACA, as well as to answer the question of whether short-run gains in wages represent a plateau in earnings or if more robust long-run wage effects exist. This continues to be true. However, because of the continued upward trajectory in the observed wages of DACA recipients, it is likely that there is even

_____

[10] 49.2% of respondents in my 2016 DACA survey reported that they obtained health insurance through their employer and 46.8% of respondents reported that they had "Received health care using [their] newly obtained health insurance."
[11] This rate of business starts is higher than the rate of business starts for the American public as a whole (3.1%).

9

more room for wage growth as DACA recipients move further along in their careers. These gains will disappear if these individuals lose their DACA status and the accompanying work authorization.

20.    The data also show that average annual earnings among DACA recipients is $36,232. Among those 25 years and older, it is $41,621. A multivariate Ordinary Least Squares (OLS) regression regressing annual earnings on age shows that annual earnings increase by $1,583 for each year that a DACA recipient grows older ($p < .001$).[12] These gains will also disappear if these individuals lose their DACA status and the accompanying work authorization.

21.    Higher wages have meant greater financial independence and consumer purchasing power for DACA recipients:

    a.    69% reported that after their DACA application was approved, "[they] have been able to earn more money, which has helped [them] become financially independent";

    b.    71% reported that after their DACA application was approved, "[they] have been able to earn more money, which has helped [their] family financially";

    c.    Among those who have a bachelor's degree or higher and are no longer in school, 27% reported paying off some or all of their student loans after their DACA application was approved;

---

[12] The model controls for number of years in the U.S., whether the DACA recipient is in school, whether the DACA recipient has a bachelor's degree or higher, and state-level fixed effects. The null hypothesis for age is that age has no effect on annual earnings. A $p$ value of less than .001 means that we are over 99.9% confident (1 minus < .001) that we can reject the null hypothesis that age has no effect on annual earnings and thus say that age is positively and statistically significantly related to annual earnings. To recall, by convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result.

NJAPP181

      d.     65% purchased their first car after their DACA application was approved; and

      e.     16% purchased their first home after their DACA application was approved.

Table 4 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 4

| | | | ≥ 25 |
|---|---|---|---|
| I have been able to earn more money, which has helped me become financially independent | .................................... | 69.0% | 73.4% |
| I have been able to earn more money, which has helped my family financially | .................................... | 70.8% | 73.7% |
| Paid off some/all of my student loans | .................................... | 27.1% | 27.4% |
| Bought my first car | .................................... | 64.5% | 67.2% |
| Bought a home | .................................... | 15.7% | 23.5% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

22.     Higher wages are indicative of the broader positive economic impact of DACA. For example, higher wages translate into more in Federal Insurance Contributions Act (FICA) contributions, which are mandatory payroll deductions for Social Security and Medicare. Using data on wages and earnings from the 2017 DACA survey, I estimate that DACA recipients will add $39.3 billion in Social Security and Medicare contributions (half in employee contributions and half in employer contributions) over a ten-year period.[13] These contributions will disappear if these individuals lose their DACA status and the accompanying work authorization.[14]

---

[13] This breaks down into $31.8 billion in Social Security contributions and $7.4 billion in Medicare contributions. For a detailed explanation of the methodology used to estimate Social Security and Medicare contributions, see https://www.ilrc.org/sites/default/files/resources/2017-09-29_draining_the_trust_funds_final.pdf.

[14] Higher wages also translate into more in federal income taxes paid and more in state income taxes paid. Large purchases, such as cars, add to state tax revenues, as most states collect a percentage of the car purchase in sales tax,

11

23.     In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "If I were to lose DACA the first thing to go with it would be my job as a nurse. This would [...] make it impossible for my family to afford to pay our mortgage. I would lose my home." Another DACA recipient writes, "I will lose my job and the associated health/retirement benefits I have been paying into. Right now my family depends on the income that I make working [...] I'm also paying off a new car that I bought last year. It would be difficult for me to continue paying for it if I'm not able to work where I do now." Another DACA recipient writes, "I will lose my job, which then would have a trickle effect [...] losing my vehicle for non-payment, losing my home and being evicted, going into higher debt for not being able to pay credit cards." Another DACA recipient writes, "I have spoken to my supervisors about what would happen if DACA were to end and they informed me that since they know I have DACA they would not be able to keep me on if I did not have work authorization." A DACA recipient who owns a business writes, "our restaurant would disappear." Another DACA recipient writes, "I would no longer be able to work as an EMT." Another DACA recipient writes, "If DACA ends [...] my students would be left without a teacher for the rest of the year." Another DACA recipient writes, "I won't be able to accept [a] fulltime offer from [an employer], which is contingent on my completing my MBA in 2018." Another DACA recipient writes, "I will not be able to practice medicine when I

---

along with additional registration and title fees. Similarly, home buying further adds to state and local tax revenues in the form of property taxes. There is a large literature on how home buying creates new jobs and adds new spending in local economies. For job creation, see https://www.nar.realtor/topics/home-ownership-matters/jobs-impact-of-an-existing-home-purchase. For spending in local economies, see https://www.cnbc.com/2017/04/12/immigrant-households-impact-success-of-real-estate-market-says-report.html.

NJAPP183

graduate from medical school." Another DACA recipient writes, "I have a degree in engineering, and I want to obtain my professional engineering license. If I do not have DACA, I would not be able to work, thus I would not be able to accumulate the necessary work experience to obtain my PE license." Another DACA recipient writes, "I will lose my career, the opportunity to get my CDL [Commercial Driver License], the opportunity to eventually become a citizen and join the army like I've always wanted since a child."

### DACA and Education

24.    DACA improves educational outcomes for DACA recipients.

25.    Regarding education, 45% of DACA recipients are currently in school.[15]

26.    Among those who are currently in school, 94% reported, "[they] pursued educational opportunities that [they] previously could not" because of DACA.

27.    Moreover, among those in school, 72% are pursuing a bachelor's degree or higher (an additional 19% are pursuing an associate's degree). The majors and specializations that DACA recipients are pursuing include accounting, biochemistry, business administration, chemical engineering, civil engineering, computer science, early childhood education, economics, environmental science, history, law, mathematics, mechanical engineering, neuroscience, physics, psychology, and social work, to name a few. These majors and specializations concretize how the education that DACA recipients are receiving is contributing

---

[15] The percentage of respondents who are currently in school has slowly declined over the four years that I have been surveying DACA recipients. This makes intuitive sense: as DACA recipients grow older, they are more likely to transition out of school and into their careers. Moreover, as the USCIS quarterly DACA statistics show, older DACA recipients are not being replaced at anywhere close to the rate in which younger DACA recipients have aged into eligibility.

NJAPP184

to the development of a better prepared and more competitive college-educated workforce.

28.    Regarding educational attainment, 36% of respondents 25 years and older have a bachelor's degree or higher. This percentage is higher than the 30% of native-born persons 25 years and older who have a bachelor's degree or higher, but is similar to the 34% of foreign-born naturalized persons 25 years and older who have a bachelor's degree or higher.[16]

29.    In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "DACA has given me the opportunity to be someone in life. Ever since I was in elementary school, I was a good student. I liked school and I liked to learn […] Depression was really getting to me because I saw my friends pursuing their dreams, and I was not allowed to do the same. It did not matter how smart I was, how much of a hard worker I was, or how much passion I had; I was never going to be able to become who I wanted to be. DACA opened the door, it gave a lot of us hope. Thanks to DACA, I am now a woman who is pursuing an engineering degree." Another DACA recipient writes, "With DACA, I have worked as a researcher and am now starting the grad school application process for PhD programs. I have wanted to be a scientist since I was nine years old, staring out of my first telescope. DACA allows that dream to not be hindered. I still cannot apply for anything funded by the National Science Foundation or work for NASA, but hopefully my status will one day become permanent and those doors will become open to me as well." Another DACA

---

[16] These data come from the U.S. Census 2011-2015 American Community Survey (ACS) 5-year Public Use Microdata, which represents the most up-to-date 5-year file.

NJAPP185

recipient writes, "Without DACA, I would lose the ability to continue working legally and will have to stop attending school since I will not be able to afford it. I will lose the opportunity to become a certified teacher […] and will not be able to fulfill my dreams of being an educator." Another DACA recipient writes, "I will be unable to continue my education in computer science." Another DACA recipient writes, "If DACA ends, I will lose the opportunity of pursuing the career I've been studying for my whole life. I will not be able to work anywhere, so my degree won't matter."

### DACA and Normality in Day-to-Day Life

30. The data further show that DACA has given DACA recipients a sense of normality in their day-to-day lives, which has led to a greater sense of belonging and inclusion and, in some cases, improved mental health.

31. In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "I will lose my feeling of belonging in the only country I have truly ever known." Another DACA recipient writes, "I would lose my sense of belonging. For the first time I feel safe without fear." Another DACA recipient writes, "Having DACA has changed my life completely, I feel like I have purpose again. I can go to school and work. I can strive now for a better life. Things are more manageable. Before DACA, I lost all hope of ever becoming anything or accomplishing anything. I've regained a lot of that hope and now I have a strong drive to succeed." Another DACA recipient writes, "DACA was a glimpse of what I could have if I had papers and it made me

15

love this country more." Another DACA recipient writes, "DACA has allowed me to feel a sense of hope and security within the nation I grew up in […] its existence provides me with the reassurance that someone cares, that someone is listening, and that we are not alone." Another DACA recipient writes, "I will lose feeling safe and protected." Another DACA recipient writes, "I will lose the independence and freedom I had to wait so many years to have." Another DACA recipient writes, "I will no longer be able to drive to school or work." Another DACA recipient writes, "I will lose a sense of safety. I remember feeling a lot of fear, anxiety, and uncertainty about my future before DACA was passed. I'm worried all of that will come flooding back. Aside from the practical things, like losing my license, my job, my independence, I really don't want to feel that way again. I have become more open with people since DACA, and I don't want to go back to having to worry about what I say and to who."

32.  Moreover, despite being brought to the U.S., on average, at the age of 6.5, and despite having lived in the U.S., on average, 18.8 years, it was only after receiving DACA that:

a.  61% opened a bank account;

b.  66% got their first credit card;

c.  90% got a driver's license or state identification card for the first time; and

d.  49% became organ donors.

Table 5 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 5

16

NJAPP187

|  |  | ≥ 25 |
|---|---|---|
| Opened a bank account | 61.0% | 47.3% |
| Got my first credit card | 65.7% | 67.9% |
| Got my driver's license or state identification card for the first time | 90.3% | 88.3% |
| Became an organ donor | 48.7% | 49.8% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

## DACA Recipients and American Citizen Family Members

33.     The data also show that DACA recipients are deeply interwoven in families that include American citizen siblings, spouses, and children. Indeed, 73% of DACA recipients have either an American citizen sibling, spouse, or child:

   a.     59% reported having an American citizen sibling;

   b.     17% reported having an American citizen spouse; and

   c.     26% reported having an American citizen child.

Table 6 summarizes these results.

Table 6

| | |
|---|---|
| American citizen spouse | 16.6% |
| American citizen child | 25.7% |
| American citizen sibling | 58.9% |
| American citizen spouse, child, or sibling | 72.7% |

Note: percentages do not sum to 100 as individuals may select all that apply.

34.     In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "My daughter is a 4 year old U.S. citizen and everything I do is to give her a better life. I would lose the ability to safely go to school and work. I would constantly worry that my daughter would end up in foster care." Another DACA recipient writes, "I will lose my job and face possible deportation and being separated from my son who is only 3 and

17

needs his mom." Another DACA recipient writes, "Sometimes I can't even sleep just thinking of what's going to happen with DACA […] I'm not only thinking about my future, but my son's." Another DACA recipient writes, "I just had my second child 2 weeks ago […] my plans are to go back to work by next year and I'm truly scared that by that time I won't be able to […] Now more than ever I need DACA to support my kids." Another DACA recipient writes, "a year into my new DACAmented life, my daughter was born and she has been such a blessing, but I am more afraid than ever about the consequences my status might have. If DACA ends, I lose the peace of mind that I will be here to raise her. I work 60+ hours a week at 2 jobs so I can provide for her and if DACA ends I will not be able to do so." Another DACA recipient writes, "we risk being homeless with a new-born child if DACA ends." Another DACA recipient writes, "My kids are U.S. citizens […] I will lose my job, I will lose the opportunity to give my kids a better life […] Please, I beg to continue to have DACA. It is not just about being legal, but is also about having a better life for my kids." Another DACA recipient writes, "we would struggle providing for our kids who are all citizens […] I hope this never happens because our family has so much riding on whether my next permit is approved or not." Another DACA recipient writes, "I have a 3 year old daughter who is heading to Head Start this year and I am currently pregnant. I would miss out on my kid's lives, as they would most likely stay in the U.S. with their dad." Another DACA recipient writes, "I would lose healthcare coverage for me and my son." Another DACA recipient writes, "having my driver's license taken away would be a devastating blow […] I take my sons to

18

NJAPP189

school and childcare almost every day." Another DACA recipient writes, "without my driver's license I won't be able to drive to school or any of my son's doctor's appointments." Another DACA recipient writes, "How do you tell your 5 year old mommy can't bring food to the table because of a simple paper? How do you explain to your child that there will be no more sports because we can no longer drive?" Another DACA recipient writes, "I would lose my job first of all and if I lose my job I will lose my apartment. I will have to stay with family or other people and hopefully find a way to make some money in order to take care of my 3 year old. I will definitely end up in debt without a way to pay my bills and I will have to ask for public assistance to feed my son. It sounds extreme but that's what will happen if I cannot work because I have no parents left and no one is going to take care of me or my son." Another DACA recipient writes, "I am married now with a 10 month old daughter […] if DACA ended I would be really scared to be split up from my daughter and husband and family. I have been here since I was 8 months old, this is my home, I don't know my place of birth." Another DACA recipient writes, "My U.S. citizen husband and U.S. citizen children would constantly be worrying about me because the likelihood of deportation would increase greatly." Another DACA recipient writes, "My wife and I have barely just begun our adult lives together. We have medical and student debt, monthly utility expenses, a mortgage, car payments, insurance payments and groceries to buy. We are just like any other young responsible adults trying to kick start their careers to gain financial stability and potentially start a family. Without my job I lose my ability to contribute to our monthly

19

expenses. We would lose our financial stability and could lose everything which could ruin our lives before they even begin." Another DACA recipient writes, "If DACA ended […] it would put a stress on my marriage." Another DACA recipient writes, "I would lose my family […] my husband is a U.S. citizen […] my brother is also a citizen, and a U.S. Marine."

**Many May Go "Into the Shadows" Without DACA**

35. Many DACA recipients may go back into the shadows if these individuals lose their DACA status and the accompanying work authorization.

36. In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "I really can't imagine living in the darkness again […] I have been a good member of society, I pay my taxes, and I have never gotten in trouble with the law." Another DACA recipient writes, "With DACA I was able to begin planning for a better future, if it's taken away I'll go back to trying to get by day to day." Another DACA recipient writes, "Losing DACA will be devastating because everything that I have built up to this point will be lost. I will lose my current employment, the health insurance provided by my employer, and driver's license for starters. Most importantly, I will return back to the shadows facing certain deportation considering the government already has all of my information." Another DACA recipient writes, "If DACA ends […] I lose everything. I can no longer work and my mental health will suffer. Currently my mental health is already suffering because of the constant fear about whether DACA will be taken away. This is the only place that

20

I call home and people want to take that away from me. It is a terrible feeling and I hate that I have to be in this position, but none of us chose it and we are trying to do our best to make a living and do things the right way." Another DACA recipient writes, "I would go back to the shadows that I once thought I would never go back to. I would live in fear." Another DACA recipient writes, "I will live in fear and hiding, again." Another DACA recipient writes, "what hurts most is losing my ability to live without fear. To be back in the shadows, to feel less than and incapable of doing anything about the circumstances, [to] feel betrayed by the government who promised to protect us if we came out of the shadows and followed the rules." Another DACA recipient writes, "losing DACA would make me lose faith in a government [that] asked us to come forth and identify ourselves in exchange for a taste of regular American life." Another DACA recipient writes, "Everything that I've been working so hard for will suddenly mean nothing. All the contributions I've given to this country will be ignored and unrecognized by the government."

37.   Moreover, when given a scenario in which they no longer had DACA[17]:

   a.   53% reported that they would be less likely to report a crime they witnessed;

   b.   47% reported that they would be less likely to report a crime even if they were the victim;

   c.   48% reported that they would be less likely to go to the hospital if they suffered an injury; and

---

[17] The question was worded, "If you no longer had DACA, would you be more or less likely to do the following . . . ."

21

    d.    60% reported that they would be less likely to report wage theft by their employer.

38.    Moreover, many DACA recipients fear what the government will do with their personal information.

39.    Among respondents who were eligible to renew, but had not yet submitted a renewal application[18]:

    a.    18% reported that fear of providing updated information to the government was a prohibitive factor[19]; and

    b.    26% reported that fear that the government will use the information provided in the renewal application for immigration enforcement purposes was a prohibitive factor.

40.    Among respondents who were not yet eligible to renew,[20] 28% agreed or strongly agreed with the statement, "I'm less likely to apply to renew my DACA status when I become eligible to do so because I fear that the government will use my information for immigration enforcement purposes."

41.    The prospect of going back into the shadows and fear about what the government will do with their personal information likely exacerbates the concerns that DACA recipients had when they first applied for DACA.

42.    In my 2014 DACA survey, the concerns that DACA recipients had when they first applied included:

---

[18] This represents 11.2% of respondents.

[19] In my 2016 DACA survey, just 2% of respondents who were eligible to renew, but had not yet submitted a renewal application, reported that fear of providing updated information to the government was a prohibitive factor.

[20] This represents 46.9% of respondents.

NJAPP193

a.    79% reported being concerned about what would happen if DACA ended;

b.    59% reported being concerned about letting the government know they were undocumented;

c.    49% reported being concerned about revealing their personal information;

d.    59% reported being concerned about revealing information about their family;

e.    59% reported being concerned "that the information [they] revealed in [their] application would be used to put [them] or [their] family in detention and/or deportation proceedings"; and

f.    32% reported hearing that "the government was not going to use the information in the DACA application for enforcement purposes (e.g., detention or deportation)."

## DACA Recipients by State

43.    Below are examples of state-specific profiles of DACA recipients. Data from the survey, combined with data published by USCIS that identifies the number of DACA recipients by state, are used to construct these profiles.[21]

## DACA Recipients in the State of New Jersey

44.    As of September 4, 2017, there were 17,400 active DACA recipients in the State

---

[21] State-specific profiles are constructed using data published by USCIS on the total number of individuals with DACA as of September 4, 2017. *See* https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20 Data/All%20Form%20Types/DACA/daca_population_data.pdf.

NJAPP194

of New Jersey.[22]

45.     The Migration Policy Institute estimates that there are 53,000 DACA-eligible persons who live in the State of New Jersey.[23]

46.     Regarding employment and earnings:

a.      An estimated 15,904 DACA recipients in the State of New Jersey are currently employed[24];

b.      An estimated 940 DACA recipients in the State of New Jersey are business owners[25]; and

c.      The State of New Jersey's DACA recipients earn an estimated $576.2 million annually.[26]

47.     Regarding education:

a.      An estimated 7,813 DACA recipients in the State of New Jersey are currently in school[27];

b.      Among those currently in school, an estimated 7,313 have "pursued educational opportunities that [they] previously could not" because of DACA[28]; and

---

[22] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

[23] https://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles.

[24] 91.4% of 17,400.

[25] 5.4% of 17,400.

[26] 15,904 multiplied by $36,231.91. This translates into $35.7 million annually in Social Security contributions (6.2% per FICA) and $8.4 million annually in Medicare contributions (1.45% per FICA).

[27] 44.9% of 17,400.

[28] 93.6 % of 7,813.

NJAPP195

    c.      An estimated 5,586 DACA recipients in the State of New Jersey are currently pursuing a bachelor's degree or higher.[29]

48.    Regarding American citizen family members:

    a.      An estimated 12,650 DACA recipients in the State of New Jersey have an American citizen sibling, spouse, or child.[30]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this <u>16</u> day of May, 2018, in <u>San Diego, CA</u>

Dr. Tom K. Wong

---

[29] 71.5% of 7,813.

[30] 72.7% of 17,400.

25

NJAPP196

# Exhibit 20

NJAPP197

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES OF AMERICA, *et al.*, )<br><br>Defendants, )<br><br>KARLA PEREZ, *et al.*, )<br><br>Defendant-Intervenors, )<br>and )<br><br>STATE OF NEW JERSEY, )<br><br>Proposed Defendant-Intervenor. ) | Case No. 1:18-CV-68 |

## DECLARATION OF MEG WIEHE AND MISHA HILL

We, Meg Wiehe, and Misha Hill declare as follows:

1. We are tax policy experts working for the Institute on Taxation and Economic Policy (ITEP).  ITEP is a non-profit, nonpartisan research organization that provides in-depth analyses on the effects of federal, state, and local tax policies. ITEP's mission is to ensure the nation has a fair and sustainable tax system that raises enough revenue to fund our common priorities, including education, health care, infrastructure and public safety. ITEP researchers use a tax incidence model to produce distributional and revenue analyses of current tax systems and proposed changes at the federal, state, and local level.

   a. Meg Wiehe is the Deputy Director of ITEP. She has worked with ITEP since 2010. Meg is nationally recognized expert on state and local taxation. She studies, writes and provides commentary and insight to a wide range of audiences on historical and current trends in state tax and budget policy. In particular, her analyses focus both on how tax and budget policies affect low- and moderate-income families as well as the intersection of fiscal policies and state and local

governments' ability to fund basic public priorities, including education, infrastructure and health care. Meg has conducted hundreds of revenue and distributional analyses of proposed tax changes in more than 40 states using ITEP's microsimulation tax model.  She also is a lead author of ITEP's flagship report, *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States.* Meg holds a Master of Public Administration from the Maxwell School at Syracuse University and a Bachelor of Arts in Anthropology from the University of Virginia.

b.  Misha Hill has been a State Policy Fellow at ITEP since 2016. Misha's work with ITEP has focused, in part, on supporting research and analysis of taxes paid by undocumented immigrants. She is a co-author of ITEP's first report examining the tax contributions of young undocumented immigrants and helped develop the methodology. She has updated analyses and reports on taxes paid by all undocumented immigrants. She has authored half a dozen blog posts related to taxes paid by undocumented immigrants and given Spanish-language press interviews presenting the findings. She holds a Master of Public Policy from The George Washington University and Bachelor of Arts in Hispanic Studies from the University of Pennsylvania.

2.  According to U.S. Citizenship and Immigration Services (USCIS), the agency that administers Deferred Action for Childhood Arrivals (DACA), as of January 31, 2018 over 680,000 young people who were brought to the United States as children without documentation are currently enrolled in DACA.[1] The Migration Policy Institute, a non-profit, non-partisan think tank that analyzes the movement of people worldwide,

---

[1] U.S. Citizenship and Immigration Services, "Deferred Action for Childhood Arrivals (DACA) as of Jan. 31, 2018." Available at:
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigrat
ion%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_Jan_31_2018.
pdf

estimates an additional 643,000 individuals are eligible for DACA but not currently enrolled.[2]

3. We used the above estimates of the current population receiving and eligible for but not receiving Deferred Action for Childhood Arrivals (DACA) in each state to estimate the annual aggregate state and local tax contributions of the DACA-eligible population.

4. Young undocumented immigrants eligible for or enrolled in DACA, like all people living and working in the U.S., pay state and local income, property, sales, and excise taxes. We estimate that the total DACA-eligible population contributes more than $1.7 billion annually in state and local taxes. $1.2 billion of that is from the population currently enrolled in DACA. The following assumptions were made to calculate the sales and excise, income, and property taxes of the DACA-eligible population:

    a. Taxpaying units and employment status:

        i. ITEP's analysis treats each DACA-eligible immigrant who is working as a single taxpaying unit.

        ii. The employment rate of immigrants depends on legal status

        iii. 2017 national survey of 3,063 DACA recipients found that 91 percent of respondents were employed.[3] DACA enrollees pay the same income taxes (in states with income taxes) as other lawfully present individuals. DACA enrollees receive a temporary social security number which allows them to file federal and state income taxes and, additionally payroll taxes are deducted from their paychecks. This declaration assume 100 percent compliance with tax laws by DACA enrollees.

        iv. The previously mentioned national survey also found that prior to obtaining DACA only 44 percent of survey respondents were employed.

---

[2] Migration Policy Institute, "Estimates of DACA-Eligible Population at U.S., State, & County Levels." Available at: http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles#overlay-context=events
[3] "Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey." Center for American Progress, https://cdn.americanprogress.org/content/uploads/2017/11/02125251/2017_DACA_study_economic_report_updated.pdf

       Our analysis assumes that 44 percent of the population that is eligible for DACA but not currently enrolled are employed.

b. Income of DACA-eligible population

    i. Immigrant wages change depending on legal status. Undocumented workers earn $22,029 a year on average and granting DACA status increases wages by 8.5 percent, according to a 2014 report by the Center for American Progress.[4]  The average wages applied to the estimated DACA working population in ITEP's analysis are:

- $23,901 for the DACA-eligible population working and enrolled in the program.
- $22,029 for the DACA-eligible population working, but not enrolled in the program.

c. Estimated effective tax rates (taxes as share of income) for sales, income, and property taxes paid by DACA-eligible population in each state.

    i. ITEP's microsimulation computer model is a sophisticated program that applies the state and local tax laws in each state (including sales, excise, income, and property tax laws) to a statistically valid database of tax returns to generate estimates of the effective tax rates paid by taxpayers at various income levels under state and local tax law in place as of December 31, 2014. In January of 2015, ITEP released the 5th edition of *Who Pays?* which estimates the effect of the state and local tax laws as of January 2015 on taxpayers at 2012 income levels.[5] To estimate effective tax rates for the DACA-eligible population we applied effective tax rates calculated in the 2015 *Who Pays?* report to the DACA-eligible population.

d. We estimate that the DACA-eligible population contributes $287 million in state and local income taxes annually.

---

[4] Oakford, Patrick. "Administrative Action on Immigration Reform." Center for American Program, September 2014.
https://www.americanprogress.org/issues/immigration/reports/2014/09/04/96177/administrative-action-on-immigration-reform/
[5] Davis, Carl, et al. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 5th ed.", Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.

    i. Eligible immigrants enrolled in DACA are required to pay personal income taxes using a temporary social security number. Thus, this study assumes the 682,00 DACA-enrolled workers are fully complying with state personal income taxes. Personal income tax effective rates in each state were applied accordingly. Various studies have estimated between 50 and 75 percent of undocumented immigrants currently pay personal income taxes predominantly using Individual Tax Identification (ITIN) numbers or with false social security numbers.[6] This analysis assumes a 50 percent compliance rate for DACA-eligible immigrants who are not enrolled and applies 50 percent compliance if DACA protections are lost. Personal income tax effective rates in each state were applied to 50 percent of the estimated income.

    ii. Enrolled DACA recipients are eligible to receive the federal Earned Income Tax Credit (EITC) and the state versions of the credit as well, however state EITC benefits were not included in this study for two reasons: 1) all DACA-eligible workers are treated as single taxpaying units and 2) the average income of the enrolled DACA population is above the EITC income eligibility amounts for single workers. The impact of state EITCs was also left out of the other policy options given that DACA-eligible immigrants not enrolled in the program are ineligible for the credit.

e. We estimate the DACA-eligible population contributes $416 million annually in state and local property taxes. The DACA-eligible population pays property taxes either directly as homeowners, or indirectly through higher rents as tenants.

---

[6] See among others: Feinleib, Joel, and David Warner. "Issue Brief #1: The Impact of Immigration on Social Security and the National Economy." Social Security Advisory Board, Social Security Advisory Board, Dec. 2005, www.ssab.gov/Portals/0/OUR_WORK/REPORTS/Impact%20of%20Immigration%20on%20Social%20Security%20Brief_2005.pdf; Singer, Paula, and Linda Dodd-Major. "Identification Numbers and U.S. Government Compliance Initiatives." Tax Analysts, 20 Sept. 2004; and Cornelius, Wayne, and Jessica Lewis. Impacts of Border Enforcement on Mexican Migration: The View from Sending Communities, La Jolla, Calif.: University of California at San Diego, Center for Comparative Immigration Studies, 2007.

    i.   The first step in calculating property taxes was to identify the share of DACA-eligible immigrants who are homeowners or renters in each state. This analysis used state-by-state data from the Migration Policy Institute to estimate homeownership rates for undocumented immigrants in each state.[7] The ITEP model assumes that for renters, half of the cost of the property tax paid initially by owners of rental properties is passed through to renters.

    f.   We estimate the DACA-eligible population contributes $1 billion annually in state and local sales and excise taxes. The DACA-eligible population, like anyone purchasing goods or services, pays consumption taxes directly at the point of sale on taxable items.

    i.   Sales and excise taxes are collected by retailers every time a purchase is made on a taxable good or service. It is reasonable to assume that DACA eligible immigrants pay sales and excise taxes at similar rates to U.S. citizens and legal immigrants with similar incomes thus the estimated rates in ITEP's *Who Pays?* for each state were applied to the various estimated DACA-eligible population incomes.

5.   A useful way to compare taxes paid across income levels is the effective tax rate. This is the total of all taxes paid - income, property, and sales and excise - as a share of income. The DACA-eligible population pays an average effective tax rate of 8.3 percent.[8] ITEP's 2015 report, *Who Pays: A Distributional Analysis of the Tax Systems in All Fifty States* found that the middle 20% of taxpayers pays on average an effective tax rate of 9.7 percent, and the top 1 percent of taxpayers pays just 7 percent of their income in taxes.[9]

---

[7] Christensen Gee, et al. "Undocumented Immigrants' State and Local Tax Contributions." Institute on Taxation and Economic Policy, Mar. 2017, http://www.itep.org/pdf/immigration2017.pdf. See Appendix 2

[8] Hill, Misha E. and Meg Wiehe. "State and Local Tax Contributions of Young Undocumented Immigrants", Institute on Taxation and Economic Policy, Apr. 2018, https://itep.org/state-local-tax-contributions-of-young-undocumented-immigrants-2/

[9] Davis, Carl, et al. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 5th ed.", Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.

This means the DACA-eligible population pays state and local taxes at a similar rate to middle income taxpayers across the country.

6.  We also estimate that if DACA protections were lost the population would continue to contribute to state and local revenues, but at much lower levels. We estimate a total loss of $693 million in state and local tax revenues.

    a.  DACA protections increase state and local tax contributions because they increase employment rates,[10] increase average salaries,[11] and increase the share paying state personal income taxes from 50 to 100 percent.[12] Surveys of DACA recipients found that after receiving DACA protections respondents were employed at higher rates and earned higher wages. This is likely because the work authorizations and deferral from deportation provided by DACA allow recipients to better compete with legally present workers, pursue advanced degrees, and protects them from wage theft by unscrupulous employers. Thus, a loss of DACA protections would eliminate the revenue gained from the increased salaries DACA affords.

7.  Every state revenue stream could be harmed by the loss of DACA protections. In New Jersey, 53,000 residents are eligible for or receiving DACA, given the previously stated assumptions, this represents a contribution $57.2 million in state and local taxes which represents an average effective tax rate 7.9 percent. This includes $7.7 million in state and local income tax, $22.7 million in property tax, and $26.6 million in sales and excise taxes. If DACA protections were lost their contributions would decrease by $18.7 million to $38.4 million.

8.  For all the foregoing reasons, in our professional opinions rescinding DACA would reduce the state and local tax contributions of the population eligible for DACA by nearly half in New Jersey and nearly $700 million nationally. This would hamper state and local revenues and hurt their economies.

---

[10] See footnote 3

[11] See footnote 3

[12] See 4.a.3

9.  Attached as **Exhibit A** hereto is a list of publications each of us has authored over the past 10 years and our CVs.

10. Neither of us has testified as an expert at trial or by deposition over the past 4 years.

11. We are each being paid $187.50/hour for our services in connection with this litigation.

    We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of our knowledge.

Respectfully submitted,

_____
Meg Wiehe

6/15/18
Date


_____
Misha Hill

6/15/18
Date

NJAPP205