UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:18-cv-00068 |
| UNITED STATES OF AMERICA, *et al.*, | |
| Defendants,[1] | |
| *and* | |
| KARLA PEREZ, *et al.*, | |
| and | |
| NEW JERSEY, | |
| Defendant-Intervenors. | |

FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT [ECF No. 625-1]
AND CROSS-MOTION FOR SUMMARY JUDGMENT

---

[1] Under Federal Rule of Civil Procedure 25(d)(1), the following individuals are automatically substituted as Defendants: Alejandro N. Mayorkas, Secretary of Homeland Security; Troy A. Miller, Acting Commissioner of U.S. Customs and Border Protection (CBP); Tae D. Johnson, Deputy Director and Senior Official Performing the Duties of the Director for U.S. Immigration and Customs Enforcement (ICE); Ur Jaddou, Director of U.S. Citizenship and Immigration Services (USCIS); Raul L. Ortiz, Chief of the U.S. Border Patrol, CBP.

## TABLE OF CONTENTS

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT............................ 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT................................................. 2

BACKGROUND ....................................................................................................................... 5

     I.   The Original *Texas v. United States* Litigation (*Texas I*) ................................ 5

     II.  The Rescission of DACA.................................................................................... 6

     III. The Current *Texas v. United States* Litigation (*Texas II*)................................ 6

ARGUMENT ............................................................................................................................ 9

     I.   Plaintiffs Continue To Lack Standing And A Statutory Right Of Action For The Reasons Previously Asserted ............................................................................ 9

     II.  DACA Is A Lawful Exercise Of The Secretary's Authority ........................... 15

     III. If The Court Finds The Final Rule Unlawful, It Should Limit Any Relief ....... 21

          A.  This Court Lacks Jurisdiction to Enjoin or Vacate DACA........................ 22

          B.  Any Remedy Must Account For The Severability Of The Final Rule's Features ................................................................................................... 25

          C.  DHS Should Be Charged With Making Policy Judgments About The Timing And Conditions Of Any Wind-Down. ........................................ 26

          D.  Any Injunctive Relief Should Operate Only Within Texas ...................... 28

          E.  The Court Should Maintain the Present Stay Pending Appeal................... 30

CONCLUSION ....................................................................................................................... 33

# TABLE OF AUTHORITIES

## Cases

*Alfred L. Snapp & Son v. Puerto Rico*,
   458 U.S. 592 (1982) ........................................................................................ 11

*Brackeen v. Haaland*,
   994 F.3d 249 (5th Cir. 2021) ......................................................................... 26

*California v. Texas*,
   141 S. Ct. 2104 (2021) ................................................................................... 24

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984) ................................................................................. 15-16

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .......................................................................................... 9

*Clarke v. Sec. Indus. Ass'n*,
   479 U.S. 388 (1987) ....................................................................................... 14

*Crane v. Johnson*,
   783 F.3d 244 (5th Cir. 2015) .................................................................... 13, 29

*Dalton v. Specter*,
   511 U.S. 462 (1994) ....................................................................................... 18

*Delaware Dep't of Natural Res. v. FERC*,
   558 F.3d 575 (D.C. Cir. 2009) ...................................................................... 10

*Department of Homeland Sec. v. New York*,
   140 S. Ct. 599 (2020) ..................................................................................... 28

*DHS v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ............................................................................ *passim*

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ....................................................................................... 18

*Garland v. Aleman Gonzalez*,
   142 S. Ct. 2057 (2022) ................................................................................... 23

*Guajardo v. Texas Dep't of Crim. Just.*,
   363 F.3d 392 (5th Cir. 2004) ......................................................................... 29

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ....................................................................................... 15

*Hernandez v. Reno*,
   91 F.3d 776 (5th Cir. 1996) ........................................................................... 28

*Lewis v. Casey*,
    518 U.S. 343 (1996) ..................................................... 29

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) ..................................................... 14

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................... 9, 10

*Lynch Props., Inc. v. Potomac Ins. Co.*,
    140 F.3d 622 (5th Cir. 1998) ............................................. 1

*Mississippi v. Johnson*,
    71 U.S. 475 (1866) ...................................................... 18

*NRDC, Inc. v. Train*,
    510 F.2d 692 (D.C. Cir. 1974) ........................................... 26

*Rais v. Holder*,
    768 F.3d 453 (6th Cir. 2014) ............................................ 18

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ................................................... 14-15

*Sure-Tan, Inc. v. N.L.R.B.*,
    467 U.S. 883 (1984) ..................................................... 14

*Texas Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ............................................ 26

*Texas Oil & Gas Ass'n v. EPA*,
    161 F.3d 923 (5th Cir. 1998) ............................................ 21

*Texas v. United States* (*Texas I*),
    809 F.3d 134 (5th Cir. 2015) ............................................. 5

*Texas v. United States* (*Texas II*),
    50 F.4th 498 (5th Cir. 2022) ....................................... *passim*

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) .................................................. 31

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ............................................... 28-29

*United States v. Texas*,
    579 U.S. 547 (2016) (per curiam) ........................................ 5

**Board of Immigration Appeals**

*Matter of Arrabally*,
   25 I. & N. Dec. 771 (BIA 2012) ............................................................ 18

**Statutes**

5 U.S.C. § 701 ....................................................................................... 15

5 U.S.C. § 702 ....................................................................................... 14

5 U.S.C. § 703 ....................................................................................... 24

5 U.S.C. § 706 ................................................................................... 23, 24

6 U.S.C. § 202 .............................................................................. 2, 18, 31

8 U.S.C. § 1103 ............................................................................... 18, 31

8 U.S.C. § 1182 ....................................................................... 16, 17, 18

8 U.S.C. § 1226 ..................................................................................... 15

8 U.S.C. § 1252(a)(5) ............................................................................ 14

8 U.S.C. § 1252(b)(9) ...................................................................... 14, 15

8 U.S.C. § 1252(g) ................................................................................. 14

8 U.S.C. § 1252(f)(1) ................................................................. 4, 21, 22, 23

8 U.S.C. § 1324a .................................................................................... 16

8 U.S.C. § 1611 ..................................................................................... 16

8 U.S.C. § 1226 ..................................................................................... 23

8 U.S.C. § 1227 ..................................................................................... 23

8 U.S.C. § 1229a .................................................................................... 23

**Regulations**

8 C.F.R. § 1.3 ........................................................................................ 16

8 C.F.R. § 212.5 .................................................................................... 18

8 C.F.R. § 236.24 ............................................................................ 17, 25

8 C.F.R. § 274a.12 ................................................................................. 16

**Rules**

Federal Rule of Civil Procedure 25 ....................................................... 1

**Other**

Black's Law Dictionary 529, 1314 (6th ed. 1990) ................................ 23

**STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT**

Plaintiff States' motion for summary judgment [ECF No. 625-1 (hereafter, "Pls' Mot.")] challenges the Deferred Action for Childhood Arrivals (DACA) Final Rule recently promulgated by the Department of Homeland Security (DHS). *See* Ex. 1, Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53,152 (Aug. 30, 2022) (Final Rule) (Defendants' Appendix ("D. App.") 001)). That rule rescinded Secretary of Homeland Security Janet Napolitano's 2012 DACA Memorandum and replaced it with DACA regulations. This Court previously granted Plaintiffs summary judgment on their challenge to the DACA Memorandum and enjoined Federal Defendants from issuing new or renewal DACA grants, but stayed that order as to renewals for existing DACA recipients (ECF Nos. 575, 576). The U.S. Court of Appeals for the Fifth Circuit affirmed in part, ordered a stay with respect to existing DACA recipients until further order of that court or the Supreme Court, and remanded the case to the district court to consider the Final Rule, which was issued while the appeal was pending. *Texas v. United States* (*Texas II*), 50 F.4th 498, 512 (5th Cir. 2022).

Plaintiffs filed a supplemental complaint to challenge the Final Rule and now seek summary judgment on those claims, requesting declaratory relief and an injunction prohibiting Federal Defendants from issuing new DACA grants under the Final Rule and, after two years from the date of judgment, from approving any DACA renewal applications. Plaintiffs concede that the Final Rule remedies their procedural challenges to DACA, but assert both constitutional and Administrative Procedure Act (APA) claims that the Final Rule is substantively unlawful. Summary judgment is appropriate where "there is no genuine issue of material fact" and "the moving party is entitled to a judgment as a matter of law." *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing Fed. R. Civ. P. 56(c)).

Federal Defendants and Plaintiffs agree that the Final Rule is substantively the same policy

as the DACA Memorandum. *Texas II*, 50 F.4th at 512. Federal Defendants do not seek to relitigate before this Court any matter currently foreclosed by the Fifth Circuit's prior decision in this case, but they incorporate by reference and preserve for further review all previously raised arguments regarding Plaintiffs' lack of standing and the lawfulness of the policies now embodied in the Final Rule. Those arguments are outlined below, along with Federal Defendants' responses to new points raised by Plaintiffs; under the proper view of those matters, Defendants, not Plaintiffs, are entitled to summary judgment. Moreover, as reflected by Plaintiffs' own proposed remedy, this Court has equitable discretion in crafting relief for any legal violation it finds in this case. Assuming this Court finds such a violation under the Fifth Circuit's prior decision in this case, it must therefore choose a remedy in light of the Supreme Court's observations regarding the scope of DHS's discretion in choosing the means of winding down the DACA program if it is determined to be unlawful, as well as the Fifth Circuit's previous decision to "preserve the stay as to existing [DACA] recipients." *Texas II*, 50 F.4th at 531.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

For over a decade, and consistent with longstanding practice, DHS has deferred the removal of certain undocumented immigrants who were brought to the United States years earlier as children, meet other criteria, and do not present other circumstances that would warrant removal. This policy, known as DACA, allows DHS to focus its limited enforcement resources on higher priorities, while furthering significant humanitarian interests. DACA is an exercise of DHS's statutory authority to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to otherwise "administ[er] and enforc[e]" the immigration laws, 8 U.S.C. § 1103(a)(1), by deferring the removal of certain undocumented noncitizens. DACA is carefully designed to address a difficult National problem involving severe resource constraints and significant humanitarian and policy concerns.

2

Although DHS fully uses available appropriations to remove or expel hundreds of thousands of noncitizens annually, its resources are limited. DACA addresses this reality by using discretionary deferred action for a category of noncitizens who the agency has determined are a low priority for removal and who have particularly strong ties to this country: people who were brought here as children (now over 15 years ago), many of whom have never known another country as home. DACA allows DHS to focus its limited resources on noncitizens who pose the greatest threats to homeland security—individuals who are higher priorities for removal from the United States than the current and former students, veterans, and other individuals who comprise the DACA population.

As under the DACA Memorandum, the Final Rule affords DHS the discretion to decide to temporarily forbear from removing certain noncitizens, who are consequently eligible for work authorization and certain other benefits. The Final Rule is consistent with the Immigration and Nationality Act (INA) and with decades of agency practice, approved by Congress and the Supreme Court, to grant deferred action (or exercise similar forms of enforcement discretion) to persons who are lower priorities for removal and to and to issue work authorization in comparable circumstances.

While Federal Defendants continue to press these points, which they believe establish the legality of the DACA policy regardless of the form in which it was issued, they recognize that Fifth Circuit precedent and this Court's prior rulings regarding the DACA Memorandum likely require this Court to hold that the substantively equivalent Final Rule is inconsistent with the INA. To preserve their arguments for higher court review, Federal Defendants incorporate by reference each of their defenses of DACA policy made in prior briefing, *see* ECF No. 569, Supplemental Brief in Response to Plaintiffs' Motion for Summary Judgment, and respond to new arguments

3

made by Plaintiffs in their motion for summary judgment.

Plaintiffs reassert many of their previous challenges to the DACA Memo to the Final Rule, and also contend that the Final Rule is arbitrary and capricious. Those arguments largely restate Plaintiffs' contrary-to-law arguments in a different guise. Furthermore, Plaintiffs fail to acknowledge DHS's extensive discussion in the Final Rule responding to the thousands of comments it received. This Court should therefore grant Defendants summary judgment on this claim.

As a remedial matter, neither an injunction nor vacatur of the Final Rule are available remedies under either 8 U.S.C. § 1252(f) or the APA. But if they were, and if this Court concludes that any part of the Final Rule is unlawful, this Court should limit any relief in several important ways. First, consistent with the express severability provision the Secretary chose to include in the Final Rule, the Court should sever any aspect of the Rule it considers inconsistent with the statute, but leave in effect the remaining parts, undisturbed by any remedial order here. Second, the most appropriate remedy if any portions of the Final Rule are found unlawful is that presaged by the Supreme Court in *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020): an order directing DHS to design and conduct an orderly wind-down of those portions (and only those portions). And even if this Court were to impose a timeframe after which DHS is to stop renewing current recipients' DACA grants, as Plaintiffs propose, it should choose one substantially longer than the two years Plaintiffs suggest without acknowledging any recognition of the complexities involving in discontinuing DACA entirely. Accordingly, any instruction to DHS to consider the parameters of a wind-down, or any timeline on which to carry one out, should not become operative until the conclusion of appellate review of this Court's judgment, at a point when judicial instructions to the agency will be no longer subject to alterations that could dictate significant changes in the

contours of any wind-down.

Next, the Court should, under longstanding federal law, tailor the relief to only those Plaintiffs who have established an injury-in-fact due to DACA. Texas is the only state to have even offered evidence of injury, so there is no basis in the record to find that DACA has injured any other state. And an injunction that provides that DACA may not operate in Texas, but that DHS may continue administering DACA (including new and renewal grants) outside of Texas, resolves Texas's injury fully. Finally, if this Court enters any new order enjoining the Final Rule, it should once again stay that injunction pending further review. Indeed, the Fifth Circuit itself indicated that such a stay with respect to current DACA recipients was a key part of its decision upholding the prior injunction in this litigation, and entered a stay of the current injunction that it directed should remain in effect until further order of either that court or the Supreme Court.

## BACKGROUND

### I.      The Original *Texas v. United States* Litigation (*Texas I*)

In 2014, two years after the original DACA Memorandum, the Secretary issued another memorandum that expanded DACA and permitted other individuals to request deferred action under a policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). Twenty-six States challenged the legality of DAPA and expansion of DACA as announced in the 2014 memorandum. They did not challenge the 2012 DACA Memorandum or seek to enjoin DACA in its original form. This Court entered a preliminary injunction barring implementation of DAPA and expanding DACA, and a divided panel of the Fifth Circuit affirmed. *Texas v. United States* (*Texas I*), 809 F.3d 134, 147-48 (5th Cir. 2015). The Supreme Court affirmed by an equally divided Court. *United States v. Texas*, 579 U.S. 547 (2016) (per curiam).

5

## II.        The Rescission of DACA

In 2017, DHS rescinded the 2012 DACA Memorandum, subject to a wind-down period.[2] In June 2020, the Supreme Court vacated the rescission as arbitrary and capricious under the APA, holding that DHS had failed to consider alternatives to rescinding DACA in its entirety, and failed to adequately address the reliance interests of DACA recipients, their families, and their communities. *Regents*, 140 S. Ct. at 1910-16. The Court indicated that DACA as a forbearance policy is within the Secretary's authority. *Id*. at 1911 (*Texas I* invalidated DAPA recipients' eligibility for benefits, but it left "the Secretary's forbearance authority . . . unimpaired."); *id*. at 1912 ("[C]ontinuing forbearance remained squarely within the discretion of [DHS]."). The Court also acknowledged that deciding the best way to move forward with "a program with the breadth of DACA" involves "important policy choices" that are best left to DHS, *id*. at 1910, and that DHS has "considerable flexibility in carrying out" this policy-making responsibility, *id*. at 1914. The Supreme Court held that a remand to DHS was appropriate "so that it may consider the problem anew." *Id*. at 1916.

## III.       The Current *Texas v. United States* Litigation (*Texas II*)

In 2018, six years after the DACA policy was adopted, Plaintiff States filed this action to challenge the legality of DACA. ECF Dkt. 1. Plaintiffs argued that the DACA policy (1) was issued in contravention of the APA's notice-and-comment rulemaking requirements; (2) is contrary to the INA; and (3) violates the Constitution's Take Care Clause. Certain DACA recipients and States appeared as Defendant-Intervenors. This Court denied Plaintiffs' motion for a preliminary injunction, citing Plaintiffs' delay in bringing this suit, *see* ECF No. 319, and stayed this case pending the Supreme

---

[2] *See* https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca (last visited Feb. 28, 2023).

Court's decision in *Regents*.

In 2021, this Court granted Plaintiffs' Motion for Summary Judgment in part and denied Defendant-Intervenors' cross-motion, ECF No. 575, and issued a permanent injunction prohibiting the Federal Defendants from administering the DACA policy, ECF No. 576. This Court held that Plaintiffs have standing both as *parens patriae* and because Texas allegedly will increase its expenditures on emergency healthcare and public education in response, ECF No. 575 at 14-33; that the DACA Memorandum was procedurally unlawful because it was instituted without notice-and-comment rulemaking, *id*. at 33-44; and that DACA conflicts with the INA, *id*. at 44-73. The Court declined to reach Plaintiffs' Take Care Clause claim. *Id*. at 73-74. The Court vacated the DACA Memorandum, remanded for further administrative proceedings, and entered a nationwide permanent injunction prohibiting the government "from administering the DACA program and from reimplementing DACA without compliance with the APA." ECF No. 576 3-4. The Court stayed portions of its permanent injunction, permitting the Federal Defendants to continue to grant renewal requests for DACA recipients who obtained that status before the date of the injunction, and, with respect to DACA applications "not already granted by the date of this order," permitting DHS to "continue to accept applications" but not to "grant these applications." *Id*. at 4. Federal Defendants appealed this Court's judgment to the Fifth Circuit.

While the appeal was pending, DHS published in the Federal Register a notice of proposed rulemaking regarding the DACA policy. Ex. 2, 86 Fed. Reg. 53,736 (Sept. 28, 2021) (D. App. 151). On August 30, 2022, DHS published the Final Rule, which replaces the 2012 DACA memorandum. Ex. 2 (D. App. 001). The Rule took effect on October 31, 2022. However, DHS is prohibited by this Court's injunction from granting initial DACA requests and related employment

authorization under the final rule. ECF No. 603 (Oct. 14, 2022) (order extending the injunction to the new regulations).

In October 2022, the Fifth Circuit affirmed this Court's judgment in part. Relying on its decision in *Texas I*, the Fifth Circuit concluded that the State of Texas possessed standing to challenge the DACA Memorandum, *Texas II*, 50 F.4th at 513-21; that the DACA Memorandum violated the APA's notice-and-comment rulemaking requirements, *id*. at 522-24; and that the DACA Memorandum was substantively unlawful, *id*. at 525-528. The Fifth Circuit also upheld this Court's vacatur and nationwide injunction, and preserved the stay as to existing recipients, granting intervenors' request for such a stay "pending a further order of [the Fifth Circuit] or the Supreme Court." *Id*. at 530-32. In doing so, the Fifth Circuit commended this Court's "restraint by partially and temporarily staying the application of" its orders in view of the "[h]undreds of thousands of individual DACA recipients, along with their employers, states, and loved ones, have come to rely on the DACA program." *Id*. at 530 (quoting this Court's order); *see also id*. at 531 (holding that a stay is proper because, among other things, "DACA has had profound significance to recipients and many others in the ten years since its adoption"). Finally, the Fifth Circuit remanded to the district court rather than DHS, "for further proceedings that the parties may pursue regarding the Final Rule." *Id*. at 512 (noting "[t]hat does not, of course, foreclose remanding to DHS upon review of the Final Rule in any future proceedings").

On remand, Plaintiffs filed a Supplemental Complaint challenging the Final Rule as substantively unlawful under the APA and Constitution, ECF No. 620-1, and now seek summary judgment, ECF No. 625-1.

**ARGUMENT**

I.    **Plaintiffs Continue To Lack Standing And A Statutory Right Of Action For The Reasons Previously Asserted**

**A.** To establish Article III standing, Plaintiffs must demonstrate an injury that is (1) concrete, particularized, and actual or imminent; (2) fairly traceable to the challenged conduct, and (3) redressable. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Although Federal Defendants acknowledge the Fifth Circuit's ruling that "Texas has demonstrated standing" to challenge the DACA Memorandum, *Texas II*, 50 F.4th at 520; *see id.* at 513-520, applies equally to Texas's standing to challenge the Final Rule and is, therefore, binding at this juncture, Federal Defendants maintain that no plaintiff has satisfied "the irreducible constitutional minimum of standing," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), and preserve their disagreement with the court of appeals' analysis for further review. As previously explained in this Court and the Fifth Circuit, Plaintiffs: are not entitled to "special solicitude" in establishing standing in this context, *see* ECF No. 504 at 31-33; cannot establish standing to challenge the Government's enforcement decisions and policies, *see* ECF No. 569 at 4-5; U.S. Br. 13-19, *Texas II*; U.S. Reply Br. 2-4, *Texas II*; may not invoke *parens patriae* standing to challenge DACA on behalf of their citizens, *see* ECF No. 569 at 3-4; U.S. Br. 19-20, *Texas II*; U.S. Reply Br. 4-6, *Texas II*; have no legally protected or judicially cognizable interest in avoiding the incidental and derivative effects of the policy on state expenditures; and have not met their burden to establish injury, causation, or redressability, particularly given their obligation to do so with undisputed facts for purposes of prevailing at summary judgment.

Plaintiffs err in arguing that they are entitled to special solicitude in the standing inquiry because they have not identified any quasi-sovereign interests affected by DACA. Plaintiffs argue that their "inability to legislate around DACA" due to federal preemption "can create a quasi-

sovereign interest." Pls' Mot. 27-29 (quoting *Texas II*, 50 F.4th at 515). But that argument could be made concerning nearly any federal law or regulation, and Plaintiffs' reasoning would turn federal courts into an arena for myriad policy disagreements between particular States and the national government with little burden on the States to demonstrate any injury. In any event, even a State entitled to special solicitude has an obligation to establish a concrete injury. *Delaware Dep't of Natural Res. v. FERC*, 558 F.3d 575, 579 n.6 (D.C. Cir. 2009).

In fact, it is Defendants who are entitled to summary judgment given Plaintiffs' failure to meet their burden—after five years of litigation, two discovery periods, and over ten years of DACA operating in their states—to show any direct injury *because of DACA*. And without an injury-in-fact, they cannot establish Article III standing regardless of any relaxed causation or redressability analysis. In their attempt to establish harm, Plaintiffs continue to rely on prior allegations that amount to no more than conjecture that there *must* be some DACA recipients costing Texas *some* amount of money. *See*, *e.g.*, Pls' Mot. at 33 (acknowledging that the "record does not indicate precisely what portion of all costs for illegal aliens is spent on DACA recipients, but no one disputes that some are.") (citing *Texas II*, 50 F.4th at 517-18)). Such conjecture is insufficient at summary judgment. *Spokeo, Inc.*, 136 S. Ct. at 1547–48 (Injuries that are "hypothetical" or "conjectural" cannot establish standing); *Lujan*, 504 U.S. at 561 (at summary judgment, Plaintiffs "can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts" that demonstrate their injury). This Court's prior conclusions are equally speculative. *See* ECF No. 575 at 29 ("DACA recipients *in all probability* make up some of" the "tens of millions of dollars" Texas spends annually on emergency Medicaid services for

all undocumented immigrants) (emphasis added).[3] Nor is Plaintiffs' assertion that "DACA allow[s] recipients to compete with legally present workers for jobs" sufficient to show injury to legally present workers. Pls' Mot. 30. Plaintiffs offer no evidence that any business is actually hiring DACA recipients over equally qualified legally present workers, or that any such practice is substantial enough to alter the labor market or cause lower wages. *See Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 607 (1982) ("more must be alleged than injury to an identifiable group of individual residents," a State has to allege injury "to a sufficiently substantial segment of its population.").

Instead, the administrative record for the Final Rule establishes that all DACA recipients currently make up no more than 0.69% of Texas's workforce.[4] Furthermore, through a model assuming the Final Rule operating without an injunction, DHS estimates that Texas could receive only approximately 2,922 additional workers in the first year of the Final Rule, representing "about 0.0208% of the overall Texas labor force." *See* Ex. 1, 87 Fed. Reg. at 53,286 ("The potential impacts to the other States would be lower.") (D. App. 136). And DHS estimated that compared to the pre-2012 baseline, DACA caused workers to join the Texas workforce in numbers representing only 0.4223% of the total workforce. *See id.* While DHS also acknowledges in the

---

[3] Plaintiffs have also been on notice since 2019 of their mistaken reliance on expert testimony purporting to acknowledge that DACA costs the state of Texas $250 million a year. *See* ECF No. 400-2, Decl. of M. Ray Perryman (June 15, 2019). Dr. Perryman made clear that Plaintiffs had taken the figure out of context and that he is "not aware of any costs to the State of Texas as a result of DACA and I provide no evidence of such costs in my report or analysis." *Id.* at ¶6; *id.* at ¶9 ("The sources on which I relied to form my assumptions . . . estimate costs related to undocumented immigrants and their children and do not identify any costs attributable to DACA recipients.").

[4] Ex. 2, 86 Fed. Reg. at 53,800 (Section V.a.4.d, Regulatory Impact Analysis (RIA)) ("In February 2021, Texas had 14,034,972 people in the civilian labor force") (D. App. 216); ECF No. 626-3, Pls' Ex. 39 (Pls' App. 716) (showing approximately 97,140 DACA recipients residing in Texas as of September 30, 2022).

Final Rule that "the increase in the supply of labor [from DACA] could potentially have a negative effect on overall wages, [. . .] the effect of DACA on overall wages would likely be very small and would be unable to be detected in these data." *Id*. at 53,154 (D. App. 004).

DACA likely does not increase usage of Texas's medical services. To the extent this can be accurately measured, a 2017 study shows that receipt of DACA "significantly reduc[ed] the odds of individuals reporting moderate or worse psychological distress," and noted that the DACA "population was relatively young (mean age <40 years in all groups) and therefore generally in good physical health."[5] It is Plaintiffs' burden to show otherwise, and they do not.

Nor do Texas's new declarations help it satisfy Plaintiffs' burden of establishing standing. The declaration from the Texas Education Agency (TEA) describes certain expenditures that Texas makes or will make to educate unaccompanied children ("UAC") apprehended by immigration authorities in fiscal years 2016-2023, but it does not identify any funds expended to educate even a single individual with DACA, much less an individual who would have left the state in the absence of DACA. *See* Pls' Br. 23 (citing ECF No. 626-3, Pls' Ex. 36, Terry Decl. ¶4 (Pls' App. 675–76)). Because DACA recipients must have been present in the United States in 2007 and, as minors, enrolled in school at the time of requesting DACA, *see* ECF No. 626-1, Pls' Ex. 4, DACA FAQ (Pls' App. 016), it is highly unlikely a child without a guardian was able to navigate the DACA application process or successfully establish the threshold criteria to obtain DACA. Thus, Plaintiffs' declaration regarding costs to educate UAC beginning nearly a decade after 2007 does not sustain Plaintiffs' summary-judgment burden to show a concrete injury

---

[5] *See* Ex. 3, Health consequences of the US Deferred Action for Childhood Arrivals (DACA) immigration programme: a quasi-experimental study, Atheendar S Venkataramani (April 2017), (D. App. 237-38).

attributable to DACA.[6] *Spokeo, Inc.*, 136 S. Ct. at 1547-48 (conjectural injuries cannot establish standing).

Plaintiffs have also submitted a declaration from Susan Bricker identifying Texas's estimated healthcare spending on undocumented immigrants. ECF No. 626-3, Pls' Ex. 35, Bricker Decl. (Pls' App. 655-661). As with Plaintiffs' previous evidence, however, the declaration fails to identify how much, if any, of these healthcare expenditures were made for DACA recipients or (more importantly) how much was spent on DACA recipients who would leave the state if DACA were terminated. *See* ECF No. 569 at 5; U.S. Br. 15-18, *Texas II*.

The Plaintiffs' failure to establish standing is underscored by *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015), which neither this Court nor the Fifth Circuit previously addressed. In *Crane*, the Fifth Circuit found that Mississippi lacked standing to challenge the DACA policy based on categories of state costs for all undocumented immigrants, which is precisely what the Plaintiff States allege here. 783 F.3d at 252. And Plaintiffs here similarly fail to establish a concrete injury tied specifically to DACA. At a minimum, there is a genuine dispute of material fact as to whether Texas suffered any injury traceable to DACA, precluding summary judgment for Plaintiffs. *See* U.S. Br. 17, *Texas II*; U.S. Reply Br. 3-4, *Texas II*.

**B.** Federal Defendants also acknowledge that this Court is bound by the Fifth Circuit's determination that Plaintiffs have a right to sue under the APA, *Texas II*, 50 F.4th at 520-521, but continue to maintain (and intend to press on appeal) that that ruling is incorrect and that Plaintiffs lack prudential standing to bring this suit. As an initial matter, although this Court did not address

---

[6] *See also* Ex. 2, 86 Fed. Reg. at 53,175 ("Indeed, two thirds (61 percent) of active DACA recipients are between the ages of 20 and 29, with most other recipients between the ages of 30 and 45 (38 percent), and therefore unlikely to be enrolled in a public K–12 school. As of June 2022, the youngest noncitizens who meet DACA threshold criteria are generally in the 10th grade.") (D. App. 025).

this issue in its last disposition of this case, the Fifth Circuit was mistaken that Federal Defendants did not earlier raise it in this Court. *See* ECF No. 569 at 5-6 (arguing that Plaintiffs did not fall within the zone of interests and noting that "the INA only provides *noncitizens* an opportunity for judicial review of removal policies, as part of its detailed review scheme").

Here, Plaintiffs have no basis to sue under the APA, which does not "allow suit by every person suffering injury in fact." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 395 (1987). The APA provides a cause of action only to a Plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved" in that sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke*, 479 U.S. at 396 (alteration and citation omitted). When a Plaintiff is not itself the object of the challenged regulatory action, it has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* at 399.

Even if they were cognizable for Article III purposes, the Plaintiffs' alleged injuries are not protected by the INA, which governs the enforcement of immigration laws as to noncitizens, and does not recognize any cognizable interest in third parties in the enforcement of those laws against someone else. *See Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883, 897 (1984); *see also Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Moreover, the INA's detailed provisions afford only noncitizens—not States or other third parties— an opportunity to challenge removal policies. *See* 8 U.S.C. § 1252(b)(9), (g) (providing that review is available only for an "alien").  And even when review is available for a noncitizen, Congress narrowly tailored access to courts to seek relief from the Secretary's decisions regarding removability (*see* 8 U.S.C. §§ 1252(a)(5), (b)(9)), and to

completely preclude challenges to the Secretary's decisions to initiate and conduct removal proceedings, or to execute removal orders (8 U.S.C. § 1252(g)), *see Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 487 (1999), including decisions not to initiate removal proceedings, or to end them at any stage. *Heckler v. Chaney*, 470 U.S. 821, 832 (1985); *see also* 8 U.S.C. § 1226(e) ("The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review"); 8 U.S.C. § 1252(b)(4)(D) ("[T]he Attorney General's discretionary judgment whether to grant relief under section 1158(a) of this title shall be conclusive unless manifestly contrary to the law and an abuse of discretion"). These features of the statutory scheme further underscore the absence of a right of action by the plaintiff States. The INA thus precludes review by third parties here. 5 U.S.C. § 701(a)(1).

Nothing in the INA's text, structure, or purpose suggests that it protects a State's interest in limiting incidental healthcare and public-education expenditures, or limiting competition in its labor markets, or provide grounds to contest the validity of the federal government's immigration-enforcement policies. And no relevant statutory provision establishes or recognizes a legally cognizable interest in a State in preventing the noncitizens who happen to reside within its borders from obtaining deferred action, work authorization, or potential eligibility for federal benefits. The Plaintiffs have failed to establish that Congress intended to undermine the Executive's plenary authority over immigration whenever a State disagrees with the Executive's enforcement priorities or other immigration policy choices.

## II.    DACA Is A Lawful Exercise Of The Secretary's Authority

**A.** Federal Defendants also recognize that the court of appeals affirmed this Court's conclusion that the DACA Memorandum—which relied on the same statutory authority as the Final Rule—was inconsistent with the INA, *see Texas II*, 50 F.4th at 525-528, but continue to disagree and preserve all previously made arguments to the contrary, *see* ECF No. 569 at 6-11;

15

U.S. Br. 27-53, *Texas II*; U.S. Reply Br. 11-22, *Texas II*. The Final Rule and DHS's interpretation of the INA must be evaluated under the two-step analysis established by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-844 (1984). Although the Fifth Circuit assumed that framework applied in *Texas II*, it reached incorrect results at each step of its analysis. *See Texas II*, 50 F.4th at 525. Federal Defendants maintain that the DACA policy neither conflicts with any unambiguous provisions in the INA nor represents an unreasonable interpretation and implementation of those provisions.

Federal Defendants have previously explained why the forbearance component of DACA is consistent with the INA, as the Supreme Court itself recognized in *Regents*. ECF No. 569 at 6-11; U.S. Br. 27-53, *Texas II*; U.S. Reply Br. 11-16, *Texas II*. Similarly, Federal Defendants have demonstrated that work authorization for DACA recipients has long been expressly permitted by a regulation (8 C.F.R. § 274a.12(c)(14)) adopted pursuant to statutory authority (8 U.S.C. § 1324a(h)(3)); *see* ECF No. 569 at 8; U.S. Br. 42-50, *Texas II*; U.S. Reply Br. 16-20, *Texas II*.

The Final Rule's treatment of lawful presence is likewise consistent with the governing statutes. Plaintiffs err in arguing that the INA "creates a comprehensive statutory scheme governing lawful presence." Pls' Mot. 14. In fact, as the Final Rule explains, Congress expressly granted the Secretary authority to determine who is "lawfully present" for the purpose of applying Social Security benefits and inadmissibility under 8 U.S.C. § 1182(a)(9). Ex. 1, 87 Fed. Reg. at 53,208-53,209 (D. App. 058-59). In particular, 8 U.S.C. § 1611(a) provides that certain unlawful immigrants generally are not eligible for federal public benefits, but subsection (b)(2) lifts that bar with regard to Social Security benefits for any "alien who is lawfully present in the United States as determined by the Attorney General" (now the Secretary). Longstanding regulations provide that individuals for whom DHS has exercised forbearance from removal under a policy of deferred

action will be treated as "lawfully present" for the purpose of this provision. 8 C.F.R. § 1.3(a)(4)(vi). The Final Rule merely reconfirms this prior regulation. *See* Ex. 1, 87 Fed. Reg. at 53,298 (D. App. 148). Likewise, 8 U.S.C. § 1182(a)(9)(B) provides that noncitizens who have departed after accruing a certain period of unlawful presence in the United States and again seek admission to the United States are inadmissible. But the INA clarifies that "an alien is deemed to be unlawfully present in the United States" under that paragraph "if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General." 8 U.S.C. § 1182(a)(9)(B)(ii). DHS has long interpreted this provision to mean that persons should not be deemed "unlawfully present" during "period[s] of stay authorized by the Attorney General" (now the Secretary), *id.*, including a period of deferred action; and, the Final Rule simply continues this policy for DACA recipients. Ex. 1, 87 Fed. Reg. at 53,298 (D. App. 148). For both of these issues, Plaintiffs fail to recognize or challenge DHS's stated statutory basis for the Final Rule. Thus, they have again forfeited any challenge to that statutory construction. Plaintiffs instead contend that "Congress has enacted complex rules detailing how" certain groups of non-citizens "can attain lawful presence in the country." Pls' Mot. 14. Part and parcel of those "complex rules," however, is a grant of authority to the Secretary to determine when certain individuals are lawfully present.

Finally, as discussed below, *see* p. 24, Section III.B, *infra*, each aspect of DACA—forbearance, work authorization, and lawful presence—must be analyzed separately for consistency with the statute before any remedy is applied to them. *See* 8 C.F.R. § 236.24 (governing "[s]everability").

**B.** Plaintiffs' renewed attack on the advance-parole regime is misplaced. *See* U.S. Br. 50-53, *Texas II*; U.S. Reply Br. 21-22, *Texas II*. Advance parole is not a feature of DACA. Nor is the

advance parole process specific to DACA recipients, and DACA alone does not guarantee any individual advance parole. *See* Ex. 4, USCIS, Form I-131, Instructions for Application for Travel Document (Apr. 24, 2019) 4-5 (D. App. 245-46). Indeed, the Final Rule explains that advance parole is not governed by the Rule, Ex. 1, 87 Fed. Reg. at 53,250 (D. App. 100), and no provision of the regulations adopted in the Final Rule addresses eligibility for advance parole. Instead, advance parole is a practice rooted in the INA, which provides that "any alien applying for admission to the United States" may be paroled into the country "temporarily . . . on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5); *see* Ex. 1, 87 Fed. Reg. at 53,250 (D. App. 100). Noncitizens without a visa currently in the United States may, in certain instances, request parole in advance, which allows them to travel and reenter upon a final parole decision made by DHS at a port of entry. *See* 8 C.F.R. § 212.5(f); *see also Rais v. Holder*, 768 F.3d 453, 456 n.2 (6th Cir. 2014) (describing nature, purpose, and limits of advance parole); *Matter of Arrabally*, 25 I. & N. Dec. 771, 777-78 & n.6 (BIA 2012) (same). The statutory authority for advance parole thus has no bearing on DACA's legality.

**C.** Nor do Plaintiffs have any basis for relief under the Take Care Clause. *See* ECF No. 569 at 14-16. That Clause is addressed to the President and does not create a judicially enforceable interest or a basis for a suit under the APA. *See Franklin v. Massachusetts*, 505 U.S. 788, 802-803 (1992); *Mississippi v. Johnson*, 71 U.S. 475, 498-499 (1866). Plaintiffs' argument on this score turns entirely on their contention that the DACA policy is unlawful under the INA. Pls' Br. 20-21. "[C]laims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). In any event, DACA does not dispense with any immigration statutes; it faithfully implements them. Congress expressly vested the Secretary with the authority and duty to set immigration enforcement priorities. *See* 6

18

U.S.C. § 202(5); 8 U.S.C. § 1103(a). DACA thus reflects the Secretary's exercise of legal authority to determine where to focus limited resources by temporarily deferring action for eligible low-priority individuals, who then obtain the opportunity to live and work lawfully under other, longstanding regulations. As the settled history of prosecutorial discretion confirms, nothing about the Take Care Clause precludes the Executive Branch from exercising discretion when enforcing the laws.

**D.** Plaintiffs briefly assert that the Final Rule is arbitrary and capricious, but they fail to recognize or engage with DHS's extensive reasoning in the Rule. Pls' Mot. 21-25. Indeed, DHS thoroughly considered the thousands of comments that were submitted in response to the notice of proposed rulemaking and explained its decision to promulgate the Final Rule.

Plaintiffs first argue that the Final Rule is arbitrary and capricious because it "repeatedly treats illegal aliens being participants in the U.S. workforce as a positive." *Id*. at 22. In large part, Plaintiffs' arbitrary-and-capricious argument simply restates their contrary-to-law arguments under a different guise: They assert that DHS's reasoning "contradicts Congress's 'comprehensive framework for combating the employment of illegal aliens.'" *Id*. For the same reasons that Plaintiffs err with respect to their contrary-to-law arguments regarding work authorization, Plaintiffs are also incorrect in their invocation of Congress's intentions in regulating the employment of undocumented immigrants.

In any event, the Final Rule makes clear that DHS considered Plaintiffs' concerns. DHS considered DACA's effects on wages and the welfare of other workers and employers. It observed that "the estimated annual increases in the active DACA population in this final rule are small relative to the total U.S. and individual State labor forces" and that "changes in wages depend on many factors and various market forces, such as the type of occupation and industry, geographic

market locations, and overall economic conditions." Ex. 1, 87 Fed. Reg. at 53,286 (D. App. 136). In some growing industries, labor demand might outpace labor supply such that employers will offer higher wages even when the labor supply increases. *Id.* at 53,286-53,287 (D. App. 136-37). Furthermore, allowing DACA recipients to work may create "positive dynamic effects" by "permit[ting] business to grow," and thus have "positive, rather than negative, effects o[n] other workers, including U.S. citizens." *Id.* Although DHS could not "predict the degree to which DACA recipients are substituted for other workers in the U.S. economy," it observed that immigrant populations "tend to locate in areas with relatively high labor demand or low unemployment levels where worker competition for available jobs is low." *Id.* It also explained that "undocumented noncitizens looking for work without authorization may be easily exploited, and employers may pay substandard wages, which in turn potentially depresses wages for some U.S. workers." *Id.* DACA diminishes this possibility, and thus "the policy may help to protect U.S. workers and employers against the possible effects of unauthorized labor." *Id.*

Plaintiffs similarly err in arguing that the Final Rule does not address how granting DACA recipients' employment authorization can be squared with the existence of "specific, congressionally delineated categories" of immigrants who may obtain work authorization. Pls' Mot. 23. DHS addressed that argument as raised by commenters, explaining that a "commenter's assertion that Congress' expressly authorizing certain classes of noncitizens for employment . . . negatively implicates DHS's ancillary and longstanding authority to grant discretionary work authorization . . . depends on a misuse of the 'expressio unius est exclusio alterius' canon." Ex. 1, 87 Fed. Reg. at 53,199 (D. App. 049); *see also id.* at 53,198-53,200 & nn.187-197 (D. App. 048-50). DHS explained that Congress's express authorization for employment of certain immigrants is "supplemental to the general authority that already existed, and not in derogation of it or

contradictory to it," and that Congress has both "ratified" and declined to "disturb . . . or alter" the statutory authority long invoked by DHS and its predecessors to grant work authorization to various classes of noncitizens. *Id.*

Plaintiffs also contend that the Affordable Care Act's minimum-essential-coverage requirement creates an incentive to hire DACA recipients over U.S. citizen workers. But Plaintiffs did not raise that issue in their comments and have thus forfeited the argument. *See* Texas Office of the Attorney General Comments, USCIS-2021-0006-15366 (Dec. 2, 2021), available at https://www.regulations.gov/comment/USCIS-2021-0006-15366; *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 n.7 (5th Cir. 1998) (arguments not raised before the agency during the notice-and-comment period are waived). In any event, Plaintiffs have not provided any evidence that any employer actually denies DACA recipients the health insurance coverage that it offers to its U.S. citizen employees, or that it prefers to hire DACA recipients because it can do so. To the contrary, DHS reasonably found that bringing undocumented noncitizens out of the shadows of unlawful employment reduces the potential for employers to exploit and pay substandard wages to immigrants, and thus may have the effect of increasing wages and benefits for some U.S. workers. Ex. 1, 87 Fed. Reg. at 53,167 (D. App. 017).[7]

### III.   If The Court Finds The Final Rule Unlawful, It Should Limit Any Relief

If this Court concludes that any part of the Final Rule is unlawful, a variety of factors counsel in favor of limited relief. This Court may not enjoin or vacate the Final Rule, given 8 U.S.C.

---

[7] Notably, Plaintiffs' arbitrary-and-capricious arguments are directed only at the employment-authorization provisions of the Final Rule. Thus, even if Plaintiffs were to prevail on those arguments, the employment-authorization provisions should be severed and the remaining provisions of the Final Rule (including forbearance and lawful presence) should remain intact. *See* p. 24, Section III.B, *infra*.

§ 1252(f) and the limits of the redress available under the APA. And even if those remedies are available, this Court should confine its relief in connection with such equitable relief for a number of reasons. First, any remedy should account for the severability of the Final Rule's independent pieces, barring the operation of only those found unlawful. Next, this Court should remand to DHS to make the necessary policy judgments regarding the timeline and conditions of any orderly wind-down of any aspect of DACA deemed unlawful—or at minimum, the Court should afford DHS and the many stakeholders with tremendous DACA reliance interests significantly more time than the two years Plaintiffs propose to stop renewing existing recipients' DACA grants. Importantly, any such remand or order regarding a wind-down should go into effect only *after* all avenues for further review have been finally exhausted, and there is no remaining chance that a determination about the legality of the program or its constituent parts will be altered. Any relief should, moreover, be confined to Texas, the only Plaintiff State to have even attempted to demonstrate an injury that requires redress, and, at the very most, to the Plaintiff States. And finally, any form of relief this Court orders should be subject to the stay pending further review, which the Fifth Circuit relied on in upholding the prior injunction and independently entrenched in its disposition of the earlier appeal in this litigation.

## A. This Court Lacks Jurisdiction to Enjoin or Vacate DACA.

As an initial matter, 8 U.S.C. § 1252(f) deprives this Court of jurisdiction to enjoin or vacate the Final Rule. *See* U.S. 28(j) Letter, Doc. 222, *Texas II* (July 1, 2022). The Fifth Circuit held that Section 1252(f) does not apply to vacatur or to the injunction this court previously entered that "prohibit[ed] the grant of DACA status to those who were not presently DACA recipients at the time of the district court's judgment." *See* 50 F.4th 528-29. That conclusion would be binding on this Court to the extent the Court enters similar relief as to the Final Rule. But Federal Defendants respectfully disagree with the Fifth Circuit's conclusion, including for the reasons set

22

forth in the government's brief in *United States v. Texas*, No. 22-58 (S. Ct.) (argued Nov. 29, 2022), and preserve their contrary arguments for further review. In short, Section 1252(f)(1) provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221-1232]." This restriction "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022). Plaintiffs' requested relief would flout Section 1252(f) because they invoke 8 U.S.C. §§ 1226, 1227, and 1229a and argue that DACA prohibits "immigration officials from enforcing these parts of the INA." Pls' Mot. at 13-15.

Section 1252(f)(1) applies with equal force to Plaintiffs' request for "vacatur." The statute forbids lower courts to "enjoin *or restrain*" the Executive Branch's operation of the covered provisions. 8 U.S.C. § 1252(f)(1) (emphasis added). The terms "enjoin" and "restrain" both involve coercion, *see Black's Law Dictionary* 529, 1314 (6th ed. 1990), and taken together they indicate that a lower court may not impose relief that "interfere[s] with the Government's efforts to operate" the covered provisions in a particular way, *Aleman Gonzalez*, 142 S. Ct. at 2065. Much like an injunction, vacatur would "enjoin or restrain" the operation of the covered INA provisions by compelling officials "to refrain from actions" that, in the government's view, are "allowed by" the covered statutory provisions. *Id*.

Nor does the APA's provision permitting courts to "hold unlawful and set aside" agency actions authorize vacatur of agency rules. 5 U.S.C. § 706(2). No party pressed this argument as to the DACA Memorandum, and for that reason neither this Court nor the Fifth Circuit previously

considered it.[8] Although the Fifth Circuit held that vacatur was an appropriate remedy as to the DACA Memorandum, *see Texas II*, 50 F.4th at 529-530, that conclusion was premised on the court of appeals' assumption that Section 706(2) of the APA authorizes such vacatur. *See Texas II*, 50 F.4th at 529-30. That assumption is incorrect. Section 706(2) provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary [and] capricious," "without observance of procedure required by law," or "otherwise not in accordance with law." 5 U.S.C. § 706(2). But "set aside" in this context means "[t]o put to one side; discard; dismiss" and b: "To reject from consideration; overrule." *Webster's New International Dictionary of the English Language* 2291 (2d ed. 1958).

Thus, properly understood, Section 706(2) establishes a rule of decision directing the reviewing court to disregard unlawful agency actions when resolving the case before it, with regard to the parties before it. It is a different provision of the APA, 5 U.S.C. § 703, that governs remedies under the APA, providing that in the absence of a "special statutory review proceeding" authorizing a court to act directly upon an agency order, Section 703 remits Plaintiffs to traditional remedies like "declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. § 703; *see also e.g.*, Administrative Procedure Act, S. Doc. No. 248, 79th Cong, 2d Sess. 36-37 (1946) (referring to Section 703 as governing remedies); 92 Cong. Rec. 2159 (1946) (same). Congress did not intend to adopt any new remedies when it enacted Section 706, much less to depart drastically from traditional principles of equity and create a novel remedy of universal vacatur that operates "on legal rules in the abstract" rather than granting traditional

---

[8] This argument is also currently pending before the Supreme Court. *See* Gov't Br. at 40-44, *United States v. Texas*, No. 22-58 (S. Ct.).

equitable relief "with respect to specific parties." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (citations omitted).

### B. Any Remedy Must Account For The Severability Of The Final Rule's Features

Any remedy this Court orders should not treat the Final Rule as an undifferentiated whole. As expressly contemplated by the Supreme Court in *Regents*, the Secretary has chosen to consider as a policy matter the viability of each aspect of the current DACA regime separately. *See* 140 S. Ct. at 1913 (observing that "forbearance and benefits are legally distinct and can be decoupled," and concluding that the then-Acting Secretary acted unlawfully by failing to consider "the option of retaining forbearance without benefits"). In the Final Rule, the Secretary concluded that "even if a court were to hold that DHS lacked authority to grant discretionary work authorization to DACA recipients, DHS maintains that the court should sever the work authorization provision from the rest of the regulation, leaving DACA's forbearance component intact." 87 Fed. Reg. 53,201; *see also id.* at 53,208 (similar with respect to lawful presence). Accordingly, the Secretary provided in the Final Rule that if any provision is held to be "invalid and unenforceable in all circumstances," it "shall be severable from the remainder of this subpart and shall not affect the remainder thereof." 8 C.F.R. § 236.24(a); *see also id.* § 236.24(b) ("The provisions in § 236.21(c)(2) through (4) and § 274a.12(c)(14) and 274a.12(c)(33) are intended to be severable from one another, from this subpart and any grant of forbearance from removal resulting from this subpart.").

In crafting any remedy here, this Court should apply this severability clause and preserve any aspect of the Final Rule it does not conclude to be unlawful. For example, to the extent that the receipt of deferred action under DACA makes recipients eligible for certain benefits, or removes a disqualification for benefits, those benefits do not "flow inexorably from forbearance,"

and the agency could "exclude DACA recipients" from those benefits but nonetheless maintain "the forbearance policy." *Regents*, 140 S. Ct. at 1911-12 nn.5, 6; *see also* Pls' Mot. 2 (noting that "[a]t DACA's inception, the program was justified as an exercise of prosecutorial discretion" in which the government "was simply forbearing from enforcing the Nation's immigration laws against individuals who satisfied the criteria stated in the DACA Memorandum"). Thus, even if this Court were to conclude that the INA does not authorize DHS to consider DACA recipients to be lawfully present for purposes of determining the application of certain statutory provisions, or eligible for work authorization, the proper remedy would be to so hold without casting doubt on the remainder of the Final Rule. *See Brackeen v. Haaland*, 994 F.3d 249, 431-32 (5th Cir. 2021) (invalidating only "discrete parts" of regulation).

### C. DHS Should Be Charged With Making Policy Judgments About The Timing And Conditions Of Any Wind-Down.

Even assuming the Court finds that the Final Rule is unlawful and that universal vacatur is an available remedy, it should decline to order it here. Instead, the more appropriate course would be to remand without vacatur in order to permit DHS to craft an orderly wind-down of any legally defective aspects of the Final Rule that this Court identifies, to be initiated once all avenues of further review are exhausted and the contours of any legal rule under which the agency must operate are no longer subject to change. *Cf. Texas Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) ("Only in 'rare circumstances' is remand for agency reconsideration not the appropriate solution.") (citing *Central and South West Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000)); *see also, e.g.*, *NRDC, Inc. v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974) ("A federal equity court may exercise its discretion to give or withhold its mandate in furtherance of the public interest, including specifically the interest in effectuating the congressional objective incorporated in regulatory legislation.").

The Supreme Court's decision in *Regents* highlights the propriety of this remedy in the specific context of DACA. As the Court explained, "[m]aking th[e] difficult decision" about how to weigh factors such as "reliance interests," "policy concerns," and "other interests" in response to a determination DACA was unlawful is "the agency's job." 140 S. Ct. at 1914. The Court emphasized that "DHS has considerable flexibility in carrying out [that] responsibility," noting that the previous "wind-down" accompanying the attempted recission of DACA "is a good example of the kind of options available." *Id.* The Court even gave examples of how the agency might have chosen to exercise its flexibility, flagging the possibility that the Secretary could "consider[] a broader renewal period based on the need for DACA recipients to reorder their affairs," and adopt "more accommodating termination dates for recipients caught in the middle of a time-bounded commitment" in light of, *e.g.*, educational, military-related, or medical needs. *Id.* Nor did the Court limit the Secretary's discretion to temporal matters; it indicated instead that the Secretary could "instruct[] immigration officials to give salient weight to any reliance interests engendered by DACA when exercising individualized enforcement discretion." *Id.*

In light of the complexities involved in a policy involving over half a million noncitizens living in the United States, and the "serious reliance interests that must be taken into account," *Regents*, 140 S. Ct. at 1913 (citations omitted), DHS is best positioned to exercise the "full scope of [its] discretion," *id.* at 1911, in considering how to effectuate any wind-down of part or all of that policy. Plaintiffs appear to recognize that immediate cessation of DHS's ability to renew existing DACA grants is unwarranted, instead proposing a two-year period after this Court's judgment in which DHS could continue to issue renewals. *See* Pls' Mot. 5, 9. But Plaintiffs offer no justification for that arbitrary timeframe, nor for their assumption that there are no further policy choices to be made in crafting a wind-down—an assumption that cannot be squared with *Regents*.

This Court and the Fifth Circuit have acknowledged the reliance interests at stake in considering a vacatur of DACA. *Texas II*, 50 F.4th at 527 ("As the parties and their amici attest, DACA is of enormous political and economic significance to supporters and opponents alike. Amici businesses report that national GDP may contract by as much as $460 billion without DACA. An expert for the Intervenors estimated that DACA contributes over $3.5 billion in net fiscal benefits to federal, state, and local entities."). Indeed, given these powerful reliance interests, this Court's injunction against the 2012 DACA Memorandum explained that "it is not equitable for a government program that has engendered such significant reliance to terminate suddenly." ECF 576 at 3; *see id.* ("[E]quity will not be served by a complete and immediate cessation of DACA."). The questions of how long an orderly wind-down will take, and what other flexibility the agency might utilize in effectuating it, in light of these weighty interests, are questions best left to DHS.[9]

At a minimum, this Court should not craft an order forbidding DHS from "approving . . . after two years from the date of judgment, any DACA renewal applications." Pls' Mot. at 5, 9. That timeframe is inadequate in light of the serious reliance interests at stake in hundreds of thousands of homes and workplaces. And any wind-down should begin only after all avenues of appellate and Supreme Court review have been exhausted.

### D.     Any Injunctive Relief Should Operate Only Within Texas

Federal Defendants continue to contend that a nationwide injunction is inappropriate here as a policy matter and under the law. An injunction may not afford more relief than "necessary to give the prevailing party the relief to which he or she is entitled"—even in cases about immigration policy. *See Hernandez v. Reno*, 91 F.3d 776, 781 & n.16 (5th Cir. 1996) (narrowing an overly

---

[9] In the event of a remand without vacatur, the Court could maintain its preliminary injunction of the Final Rule, with a stay of the injunction to allow DACA recipients to renew pending further orders of this Court or higher courts.

broad injunction affecting immigration policy); *Department of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in grant of stay) ("Equitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular Plaintiff in a particular lawsuit."). This principle of "providing equitable relief only to parties" protects against "[m]isuses of judicial power" that could "threaten 'the general liberty of the people'" by allowing courts to adjudicate more than "the rights of 'individual[s].'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2427-28 (2018) (Thomas, J., concurring) (quoting The Federalist No. 78, at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961)).

Here, no state besides Texas even attempted to establish a harm because of DACA. Moreover, the Fifth Circuit has previously held that another of the Plaintiff States *lacked* standing to challenge DACA. *See Crane*, 783 F.3d at 252. Accordingly, any injunctive relief should be limited to Texas. *Lewis v. Casey*, 518 U.S. 343, 360, 360 n.7 (1996) ("Courts have no power to presume and remediate harm that has not been established."); *Guajardo v. Texas Dep't of Crim. Just.*, 363 F.3d 392, 397 (5th Cir. 2004) ("[T]he Supreme Court has required system-wide injury for system-wide injunctive relief.") (citing *Lewis,* 518 U.S. 343). Expanding relief here far beyond the harm allegedly shown to one State out of concerns for "ensur[ing] uniformity and consistency in enforcement" of the immigration laws, *Texas II*, 50 F.4th at 531, would have a cruel and devastating effect on the individuals and communities that rely on DACA across the country. Plaintiff West Virginia has presented no evidence that its 110 DACA recipients are upending its labor market or have required any healthcare or education expenditure from the state. *See* ECF No.

626-3 (Pls' App. 716). Nor have any of the other Plaintiff states, none of which has more than a few thousand DACA recipients among their millions of U.S. citizen residents.[10]

Plaintiffs contend that a limited injunction would be inadequate to remedy their alleged injury. Pls' Mot. 39. But they offer no reason to think that meaningful numbers of DACA recipients would leave their homes, jobs, and communities in states like New Jersey, which welcome their presence, to work in Texas, or that those numbers would be sufficiently significant to support the extraordinary remedy of a nationwide injunction. Further, an injunction that limits DACA's operation within Texas's borders would certainly apply to someone who obtained DACA elsewhere and then moved to Texas.

### E.  The Court Should Maintain the Present Stay Pending Appeal

If the Court concludes that the Final Rule is unlawful and adopts any remedy that would enjoin or disrupt operation of the Rule, the Court should at minimum maintain the present stay pending appeal to allow current DACA recipients to continue to retain and renew DACA. Although the Fifth Circuit has already endorsed and "preserve[d] the stay as to existing recipients" in this litigation until further order of that court or the Supreme Court, *Texas II*, 50 F.4th at 531-32, out of abundance of caution, Federal Defendants request that this Court similarly stay any order it issues.

As recognized by this Court and the Fifth Circuit, each factor favors a stay. To begin, it remains true that "[t]he legal questions that DACA presents are serious, both to the parties and to the public," and that "in the similar *DAPA* case, the Supreme Court was equally divided over [the

---

[10] Among Plaintiffs, South Carolina has the largest population of DACA recipients after Texas, with just 5,320 individuals. *Id.* DACA accounts for no more than 0.22% of its over two million-person labor force. *See* Bureau of Labor Statistics, https://www.bls.gov/regions/southeast/south_carolina.htm#eag (retrieved February 24, 2023).

*Texas I*] judgment." *Texas II*, 50 F.4th at 531. And as explained above, Federal Defendants have made a substantial case on the merits. The Fifth Circuit, moreover, repeatedly emphasized the existence of a stay in its remedial analysis. *See, e.g.*, *id.* at 530 (concluding that a remand-without-vacatur was unnecessary because "the district court stayed vacatur as to existing DACA recipients"); *id.* at 530-31 (upholding injunction "with a partial stay").

Further, the lack of a stay would inflict irreparable injury and disserve the public interest. As the Fifth Circuit recognized, "DACA has had profound significance to recipients and many others in the ten years since its adoption," and there would be "inevitable disruption that would arise from a lack of continuity and stability" pending further review. *Texas II*, 50 F.4th at 531 (quotation marks omitted); *see also* ECF No. 575 at 76-77. The importance of the public's reliance interest on DACA—and in maintaining the status quo that has existed throughout this litigation— is even clearer now than it was when the Supreme Court highlighted them in *Regents*. At the end of the calendar year before this Court issued its injunction concerning the DACA Memorandum, over 600,000 noncitizens in the United States were living in "all 50 States and the District of Columbia" "with a grant of deferred action under DACA currently in effect." Ex. 1, 87 Fed. Reg. 53,153-53,154 & n.7 (D. App. 003-04). "In reliance on DACA," recipients have "enrolled in degree programs," "started businesses," and built careers, like the 30,000 DACA recipients who "are healthcare workers, many of whom have helped care for their communities on the frontlines during the COVID-19 pandemic." *Id.* The effects of lifting the stay would profoundly affect not only those noncitizens, but also the more than 250,000 children born as U.S citizens to at least one DACA-recipient parent. *See id.* (noting that approximately 1.5 million people in the United States share a home with a DACA recipient). States and local communities also would suffer. DACA recipients and their households pay an estimated "$5.6 billion in annual Federal taxes" and $3.1

billion in state and local taxes. *Id*. And having "purchased homes" in reliance on the policy, DACA recipients are now directly responsible for $566.7 million in annual mortgage payments. *See id*. Equity sharply favors insulating such weighty interests from the full brunt of an order holding (any portion of) DACA unlawful during the pendency of appellate proceedings.

The government also plainly has an interest in preventing the widespread, operational disruption that an immediate termination would cause. Under Article II, "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021); *see also* 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a). Further, "the realities of the limited resources available to remove every noncitizen lacking lawful status from the United States" demand that the Secretary exercise "prosecutorial discretion" in administering the immigration laws, Ex. 1, 87 Fed. Reg. at 53,163 (D. App. 013), and the DACA policy is a critical part of the Secretary's discharge of that duty. DACA prevents DHS from having to expend resources to determine whether to initiate enforcement proceedings each time it encounters a low-priority individual. As the Supreme Court has recognized, even if DACA were found unlawful, "deciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding concerns a program with the breadth of DACA"—and "[t]hose policy choices are for DHS." *Regents*, 140 S. Ct. at 1910.

On the other side of the ledger, Plaintiffs do not seek an immediate termination of DACA, and their asserted harms—indirect and incidental effects on state expenditures—are speculative. *See* pp. 9-13, Section I.A, *supra*. Such considerations cannot justify the human and economic toll that will be exacted if the full sweep of an injunction were to go into effect immediately.

## CONCLUSION

For the reasons stated above and in Federal Defendants' prior briefing, the Court should deny Plaintiffs' motion for summary judgment, grant summary judgment for Federal Defendants, and uphold the Final Rule in its entirety. If the Court finds the Final Rule to be invalid in any respect, it should preserve any discrete aspect of the Final Rule not found unlawful, and remand to DHS for further consideration without vacating or enjoining the Final Rule. If the Court does craft injunctive relief of some variety, it should not limit DACA renewals to only two years post-judgment, and should grant no more relief than is warranted by the limited evidence of harm to the state of Texas. In any event, the Court should stay any remedial order to allow DACA recipients to continue to renew DACA pending all available further review.

Dated: March 2, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation
District Court Section

JEFFREY S. ROBINS
Attorney-in-Charge
Deputy Director

*/s/ James J. Walker*
JAMES J. WALKER
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 532-4468
Fax: (202) 305-7000
Email: james.walker3@usdoj.gov

*Attorneys for Federal Defendants*

33

**CERTIFICATE OF SERVICE**

I certify that on March 2, 2023, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ James J. Walker*
JAMES J. WALKER