**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

STATE OF TEXAS, *et al.*,

      Plaintiffs,

v.

UNITED STATES OF AMERICA, *et al.*,

      Defendants,

*and*

KARLA PEREZ, *et al.*,

and

NEW JERSEY,

      Defendant-Intervenors.

Case No. 1:18-cv-00068

**FEDERAL DEFENDANTS' APPENDIX IN SUPPORT OF OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

| Exhibit | Document[1] | Pages |
|---|---|---|
| 1 | U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Sec., Deferred Action for Childhood Arrivals, 87 FR 53152 (Final Rule) (Aug. 30, 2022) | D. App. 001 |
| 2 | U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Sec., Deferred Action for Childhood Arrivals, 86 FR 53736 (Proposed Rule) (Sept. 28, 2021) | D. App. 151 |
| 3 | Atheendar S. Venkataramani, et al., "Health Consequences of the US Deferred Action for Childhood Arrivals (DACA) Immigration Programme: A Quasi-Experimental Study", 2 The Lancet, Pub. Health 175 (2017). | D. App. 233 |
| 4 | Form I-131, Application for Travel Document Instructions (05.Form 131, Instructions Application for Travel Document-npw.pdf) | D. App. 241 |

---

[1] Each of these documents is taken directly from the Administrative Record for the Final Rule, certification of which is filed with the Court at ECF No. 607-1.

# Exhibit 1

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 106, 236, and 274a**

**[CIS No. 2691–21; DHS Docket No. USCIS–2021–0006]**

**RIN 1615–AC64**

### Deferred Action for Childhood Arrivals

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule.

---

**SUMMARY:** On September 28, 2021, the Department of Homeland Security (DHS) published a notice of proposed rulemaking (NPRM or proposed rule) that proposed to establish regulations to preserve and fortify the Deferred Action for Childhood Arrivals (DACA) policy to defer removal of certain noncitizens who years earlier came to the United States as children, meet other criteria, and do not present other circumstances that would warrant removal. After a careful review of the public comments received, DHS is now issuing a final rule that implements the proposed rule, with some amendments.

**DATES:** This rule is effective October 31, 2022.

**FOR FURTHER INFORMATION CONTACT:** Rená Cutlip-Mason, Chief, Office of Policy and Strategy, Division of Humanitarian Affairs, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone (240) 721–3000.

**SUPPLEMENTARY INFORMATION:**

### Preamble Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Summary of the 2021 Proposed Rule
  C. Summary of Changes From Proposed Rule to Final Rule
  D. Summary of Costs and Benefits
II. Response to Public Comments on the Proposed Rule
  A. General Feedback on the Rule
  1. General Support for Rule
  2. General Opposition to Rule
  3. Impacts on DACA Recipients and Their Families
  4. Impacts on Other Populations, Including U.S. Workers and Other Noncitizens
  5. Impacts on the Economy, Communities, and States
  6. Impacts on Businesses, Employers, and Educational Institutions
  7. Impacts on Migration
  8. Other Impacts on the Federal Government
  9. Criminality, National Security Issues, and Other Safety Concerns
  10. Creation of a ''Permanent'' Class of Individuals Without Legal Status
  11. Pathway to Lawful Status or Citizenship
  12. Other General Reactions and Suggestions
  B. Background, Authority, and Purpose
  1. Statutory Authority
  2. Litigation and Legal Disputes
  3. Other Comments and Suggestions
  C. Comments on Proposed Provisions
  1. Deferred Action/Forbearance From Enforcement Action (§ 236.21(c)(1))
  2. Employment Authorization (§§ 236.21(c)(2) and 274a.12(c)(33))
  a. General Comments on Employment Authorization
  b. Authority To Provide Employment Authorization to Deferred Action Recipients
  c. Unbundled Process To Make Form I–765 Optional
  d. Automatic Termination of Work Authorization
  3. Lawfully Present (§ 236.21(c)(3)) and Unlawful Presence (§ 236.21(c)(4))
  4. Discretionary Determination (§ 236.22)
  a. General Comments on Discretionary Determination
  b. Threshold Criteria
  (1) Arrival in United States Under the Age of 16
  (2) Continuous U.S. Residence From June 15, 2007
  (3) Physical Presence in United States
  (4) Lack of Lawful Immigration Status
  (5) Education
  (6) Criminal History, Public Safety, and National Security
  (7) Age at Time of Request
  (8) General Comments on Criteria and Comments on Multiple Overlapping Criteria
  5. Procedures for Request, Terminations, and Restrictions on Information Use (§ 236.23)
  a. Fees and Fee Waivers
  b. USCIS Jurisdiction (Including Comments on Inability To Grant DACA to Someone in Immigration Detention)
  c. Grants and Denials of a Request for DACA (Including Additional Evidence, 2-Year Period, Consultations, Notice of Decision)
  d. Notice To Appear or Referral to ICE
  e. Appeals and Reconsideration
  f. Termination of a Grant of DACA (Including Comments on Discretionary/Automatic Termination and Alternatives)
  g. Restrictions on Use of Information Provided by DACA Requestors (Including Information Sharing and Privacy Concerns)
  6. Severability (§ 236.24)
  7. Advance Parole and Adjustment of Status
  D. Other Issues Relating to the Rule
  1. Public/Stakeholder Engagement (e.g., Requests To Extend the Comment Period)
  2. Administrative Procedure Act and Rulemaking Requirements
  3. Processing Time Outlook (Including Comments on Backlogs)
  4. DACA FAQs
  5. Other Comments on Issues Relating to the Rule
  E. Statutory and Regulatory Requirements
  1. Impacts and Benefits (E.O. 12866 and E.O. 13563)
  a. Methodology and Adequacy of Cost-Benefit Analysis
  (1) Methodology of the RIA
  (2) Comments on Population Estimates and Assumptions
  (3) Comments on Wage Rages
  b. Benefits (No Action Baseline, Pre-Guidance Baseline, or Unspecified)
  c. Regulatory Alternatives
  d. Regulatory Flexibility Act (Impact on Small Entities)
  e. Other Comments on Costs and Benefits
  2. Paperwork Reduction Act (Including Comments on Actual Forms/Instructions, and Burden Estimates for Forms I–821D and I–765)
  3. Other Statutory and Regulatory Requirements (e.g., National Environmental Policy Act)
  F. Out of Scope
III. Statutory and Regulatory Requirements
  A. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)
  1. Summary of Major Provisions of the Regulatory Action
  2. Summary of Costs and Benefits of the Final Rule
  3. Background and Purpose of the Rule
  4. Cost-Benefit Analysis
  a. No Action Baseline
  (1) Population Estimates and Other Assumptions
  (2) Forms and Fees
  (3) Wage Assumptions
  (4) Time Burdens
  (5) Costs of the Final Regulatory Action
  (6) Benefits of the Final Regulatory Action
  (7) Transfers of the Final Regulatory Changes
  b. Pre-Guidance Baseline
  (1) Population Estimates and Other Assumptions
  (2) Forms and Fees
  (3) Wage Assumptions
  (4) Time Burdens
  (5) Costs of the Final Regulatory Action
  (6) Benefits of the Final Regulatory Action
  (7) Transfers of the Final Regulatory Changes
  c. Costs to the Federal Government
  d. Labor Market Impacts
  e. Fiscal Effects on State and Local Governments
  f. Reliance Interests and Other Regulatory Effects
  g. Discounted Direct Costs, Cost Savings, Transfers, and Benefits of the Final Regulatory Changes
  h. Regulatory Alternatives
  B. Regulatory Flexibility Act
  C. Unfunded Mandates Reform Act of 1995
  D. Small Business Regulatory Enforcement Fairness Act of 1996
  E. Executive Order 13132: Federalism
  F. Executive Order 12988: Civil Justice Reform
  G. Paperwork Reduction Act—Collection of Information
  H. Family Assessment
  I. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  J. National Environmental Policy Act
  K. Executive Order 12630: Governmental Actions and Interference With

**D. App. 002**

AR2022_100195

Constitutionally Protected Property Rights

L. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

## List of Abbreviations

ACA    Affordable Care Act
APA    Administrative Procedure Act
AST    Autonomous Surveillance Tower
BIA    Board of Immigration Appeals
BLS    Bureau of Labor Statistics
CBP    U.S. Customs and Border Protection
CEQ    Council on Environmental Quality
CFR    Code of Federal Regulations
CHIP    Children's Health Insurance Program
CLAIMS    Computer-Linked Application Information Management System
CMS    Centers for Medicare & Medicaid Services
CPI–U    Consumer Price Index for All Urban Consumers
DACA    Deferred Action for Childhood Arrivals
DAPA    Deferred Action for Parents of Americans and Lawful Permanent Residents
DHS    Department of Homeland Security
DOJ    Department of Justice
DREAM Act    Development, Relief, and Education for Alien Minors Act
DUI    Driving under the influence
EAD    Employment authorization document
ELIS    Electronic Immigration System
E.O.    Executive Order
EOIR    Executive Office for Immigration Review
EPS    Egregious public safety
EVD    Extended voluntary departure
FAIR    Federation for American Immigration Reform
FAQs    Frequently Asked Questions
FLCRAA    Farm Labor Contractor Registration Act Amendments of 1974
FR    Federal Register
FY    Fiscal Year
GED    General Education Development
HHS    Department of Health and Human Services
ICE    U.S. Immigration and Customs Enforcement
IIRIRA    Illegal Immigration Reform and Immigrant Responsibility Act of 1996
IMMACT 90    Immigration Act of 1990
INA    Immigration and Nationality Act of 1952
INS    Immigration and Naturalization Service
IOM    International Organization for Migration
IRCA    Immigration Reform and Control Act of 1986
LPR    Lawful Permanent Resident
MPI    Migration Policy Institute
NEPA    National Environmental Policy Act
NOA    Notice of action
NOIT    Notice of intent to terminate
NTA    Notice to appear
OCFO    Office of the Chief Financial Officer
OI    Operations Instructions
OIRA    Office of Information and Regulatory Affairs
OIS    Office of Immigration Statistics
OMB    Office of Management and Budget
OPQ    Office of Performance and Quality
PRA    Paperwork Reduction Act of 1995

PRWORA    Personal Responsibility and Work Opportunity Reconciliation Act of 1996
Pub. L.    Public Law
RFA    Regulatory Flexibility Act
RIA    Regulatory Impact Analysis
RIN    Regulation Identifier Number
RTI    Referral to ICE
SBREFA    Small Business Regulatory Enforcement Fairness Act of 1996
Secretary    Secretary of Homeland Security
SIJ    Special Immigrant Juvenile Classification
SORN    System of Record Notice
Stat.    U.S. Statutes at Large
STEM    Science, technology, engineering, and mathematics
TPS    Temporary Protected Status
UMRA    Unfunded Mandates Reform Act of 1995
USBP    U.S. Border Patrol
U.S.C.    United States Code
USCIS    U.S. Citizenship and Immigration Services
VAWA    Violence Against Women Act of 1994
VPC    Volume Projection Committee
VTVPA    Victims of Trafficking and Violence Protection Act of 2000

## I. Executive Summary

### A. Purpose of the Regulatory Action

On June 15, 2012, then-Secretary of Homeland Security (Secretary) Janet Napolitano issued a memorandum providing new guidance for the exercise of prosecutorial discretion with respect to certain young people who came to the United States years earlier as children, who have no current lawful immigration status, and who were already generally low enforcement priorities for removal.[1] The Napolitano Memorandum states that DHS will consider granting "deferred action," on a case-by-case basis, for individuals who:

1. Came to the United States under the age of 16;

2. Continuously resided in the United States for at least 5 years preceding June 15, 2012, and were present in the United States on that date;

3. Are in school, have graduated from high school, have obtained a General Education Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

4. Have not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, or otherwise do not pose a threat to national security or public safety; and

5. Were not above the age of 30 on June 15, 2012.[2]

Individuals who request relief under this policy, meet the criteria above, and pass a background check may be granted deferred action.[3] Deferred action is a longstanding practice by which DHS and the former Immigration and Naturalization Service (INS) have exercised their discretion to forbear from or assign lower priority to removal action in certain cases for humanitarian reasons, for reasons of administrative convenience, or on the basis of other reasonable considerations involving the exercise of prosecutorial discretion.[4]

In establishing this policy, known as DACA, then-Secretary Napolitano emphasized that for the Department to use its limited resources in a sensible manner, it necessarily must exercise prosecutorial discretion. Then-Secretary Napolitano observed that these "young people . . . were brought to this country as children and know only this country as home" and as a general matter "lacked the intent to violate the law." She reasoned that limited enforcement resources should not be expended to "remove productive young people to countries where they may not have lived or even speak the language."[5] The Napolitano Memorandum also instructs that the individual circumstances of each case must be considered, and that deferred action should be granted only where justified in light of the specific circumstances of each case.[6]

Since 2012, more than 825,000 people have received deferred action under the DACA policy.[7] The mean year of arrival in the United States for DACA recipients was 2001, and the average age at arrival was 6 years old.[8] In addition, 38 percent of recipients arrived before the age of 5.[9] For many, this country is

---

[1] Memorandum from Janet Napolitano, Secretary, DHS, to David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection (CBP), et al. (June 15, 2012), *https://www.dhs.gov/xlibrary/ assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf* (hereinafter Napolitano Memorandum).

[2] *Id.*

[3] *Id.*

[4] *See, e.g., Reno* v. *Am.-Arab Anti-Discrimination Comm.,* 525 U.S. 471, 484 (1999) (*AADC*); 8 CFR 274a.12(c)(14).

[5] Napolitano Memorandum.

[6] *Id.*

[7] *See* USCIS, *Deferred Action for Childhood Arrivals (DACA) Quarterly Report (Fiscal Year 2021, Q1)* (Mar. 2021), *https://www.uscis.gov/sites/ default/files/document/data/DACA_ performancedata_fy2021_qtr1.pdf.* As of the end of calendar year 2020, there were 636,000 noncitizens in the United States with a grant of deferred action under DACA currently in effect ("active DACA recipients"). *See* USCIS, *Count of Active DACA Recipients by Month of Current DACA Expiration (Dec. 31, 2020), https://www.uscis.gov/ sites/default/files/document/data/Active_DACA_ Recipients%E2%80%93December31%2C2020.pdf.*

[8] DHS, USCIS, Office of Performance and Quality (OPQ), Electronic Immigration System (ELIS) and Computer-Linked Application Information Management System (CLAIMS) 3 Consolidated (queried Mar. 2021).

[9] *Id.*

the only one they have known as home. In the 10 years since this policy was announced, DACA recipients have grown into adulthood and built lives for themselves and their loved ones in the United States. They have gotten married and had U.S. citizen children. Over 250,000 children have been born in the United States with at least one parent who is a DACA recipient, and about 1.5 million people in the United States share a home with a DACA recipient.[10] DACA recipients have obtained driver's licenses and credit cards, bought cars, and opened bank accounts.[11] In reliance on DACA, its recipients have enrolled in degree programs, started businesses, obtained professional licenses, and purchased homes.[12] Because of the health insurance that their deferred action allowed them to obtain through employment or State-sponsored government programs, many DACA recipients have received improved access to health care and have sought treatment for long-term health issues.[13]

For DACA recipients and their family members, receiving deferred action has increased DACA recipients' sense of acceptance and belonging to a community, increased their sense of hope for the future, and has given them the confidence to become more active members of their communities and increase their civic engagement.[14] The DACA policy has also encouraged its recipients to make significant investments in their careers and education. Many DACA recipients report that deferred action—and the employment authorization that DACA

permits them to request—allowed them to obtain their first job or move to a higher paying position more commensurate with their skills.[15] DACA recipients are employed in a wide range of occupations, including management and business, education and training, sales, office and administrative support, and food preparation; thousands more are self-employed in their own businesses.[16] Many have continued their studies, and some have become doctors, lawyers, nurses, teachers, or engineers.[17] In 2017, 72 percent of the top 25 Fortune 500 companies employed at least one DACA recipient.[18] About 30,000 are healthcare workers, many of whom have helped care for their communities on the frontlines during the COVID–19 pandemic.[19] DACA recipients who are healthcare workers are helping to alleviate a shortage of healthcare professionals in the United States, and they are more likely to work in underserved communities where shortages are particularly dire.[20]

As a result of these educational and employment opportunities, DACA recipients make substantial contributions in taxes and economic activity.[21] According to one estimate, as of 2020, DACA recipients and their households pay about $5.6 billion in annual Federal taxes and about $3.1 billion in annual State and local taxes.[22] In addition, through their employment, they make significant contributions to Social Security and Medicare funds.[23] Approximately two-thirds of recipients purchased their first car after receiving DACA,[24] and an estimated 56,000 DACA recipients own homes and are directly responsible for $566.7 million in annual mortgage payments.[25] DACA recipients also are estimated to pay $2.3 billion in rental payments each year.[26] Because of these contributions, the communities of DACA recipients—who reside in all 50 States and the District of Columbia[27]—have grown to rely on the economic contributions this policy facilitates.[28] In sum, despite the express limitations in the Napolitano Memorandum, over the 10 years in

---

[10] Nicole Prchal Svajlenka and Philip E. Wolgin, *What We Know About the Demographic and Economic Impacts of DACA Recipients: Spring 2020 Edition*, Center for American Progress (Apr. 6, 2020), *https://www.americanprogress.org/issues/immigration/news/2020/04/06/482676/know-demographic-economic-impacts-daca-recipients-spring-2020-edition* (hereinafter Svajlenka and Wolgin (2020)).

[11] *See* Roberto G. Gonzales and Angie M. Bautista-Chavez, *Two Years and Counting: Assessing the Growing Power of DACA*, American Immigration Council (June 2014); Zenén Jaimes Pérez, *A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three Years Later*, United We Dream (Oct. 2015), *https://unitedwedream.org/wp-content/uploads/2017/10/DACA-report-final-1.pdf* (hereinafter Jaimes Pérez (2015)); Tom K. Wong, et al., *Results from Tom K. Wong et al., 2020 National DACA Study*, Center for American Progress, *https://cdn.americanprogress.org/content/uploads/2020/10/02131657/DACA-Survey-20201.pdf* (hereinafter Wong (2020)).

[12] *See* Roberto G. Gonzales, et al., *The Long-Term Impact of DACA: Forging Futures Despite DACA's Uncertainty*, Immigration Initiative at Harvard (2019), *https://immigrationinitiative.harvard.edu/files/hii/files/final_daca_report.pdf* (hereinafter Gonzales (2019)); Wong (2020).

[13] Gonzales (2019).

[14] Gonzales (2019); Jaimes Pérez (2015); Wong (2020).

[15] Roberto G. Gonzales, et al., *Becoming DACAmented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)*, 58 a.m. Behav. Scientist 1852 (2014); Wong (2020); *see also* Nolan G. Pope, *The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants*, 143 J. of Pub. Econ. 98 (2016), *http://www.econweb.umd.edu/~pope/daca_paper.pdf* (hereinafter Pope (2016)) (finding that DACA increased participation in the labor force for undocumented immigrants).

[16] Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, Center for American Progress (Sept. 5, 2019), *https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states*; Jie Zong, et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, Migration Policy Institute (Nov. 2017), *https://www.migrationpolicy.org/sites/default/files/publications/DACA-Recipients-Work-Education-Nov2017-FS-FINAL.pdf* (hereinafter Zong (2017)).

[17] *See* Gonzales (2019); Nicole Prchal Svajlenka, *A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response*, Center for American Progress (Apr. 6, 2020), *https://www.americanprogress.org/issues/immigration/news/2020/04/06/482708/demographic-profile-daca-recipients-frontlines-coronavirus-response* (hereinafter Svajlenka (2020)); Wong (2020); Zong (2017).

[18] Tom K. Wong, et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, Center for American Progress (Aug. 28, 2017), *https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow* (hereinafter Wong (2017)).

[19] Svajlenka (2020).

[20] Angela Chen, et al., *PreHealth Dreamers: Breaking More Barriers Survey Report* (Sept. 2019) (hereinafter Chen (2019)), at 27 (presenting survey data showing that 97 percent of undocumented students pursuing health and health-science careers planned to work in an underserved community); *See also* Andrea N. Garcia, et al., *Factors Associated with Medical School Graduates' Intention to Work with Underserved Populations: Policy Implications for Advancing Workforce Diversity*, Acad. Med. (Sept. 2017), *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5743635* (hereinafter Garcia (2017)) (finding that underrepresented minorities graduating from medical school are nearly twice as likely as white students and students of other minorities to report an intention to work with underserved populations).

[21] See the regulatory impact analysis (RIA) for this final rule, which can be found in Section III.A. The RIA includes analysis and estimates of the costs, benefits, and transfers that DHS expects this rule to produce. Note that the estimates presented in the RIA are based on the specific methodologies described therein. Figures may differ from those presented in the sources discussed here.

[22] Svajlenka and Wolgin (2020). *See also* Misha E. Hill and Meg Wiehe, *State & Local Tax Contributions of Young Undocumented Immigrants*, Institute on Taxation and Economic Policy (Apr. 2017) (hereinafter Hill and Wiehe (2017)) (analyzing the State and local tax contributions of DACA-eligible noncitizens in 2017).

[23] Jose Magaña-Salgado and Tom K. Wong, *Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare*, Immigrant Legal Resource Center (Oct. 2017) (hereinafter Magaña-Salgado and Wong (2017)); *see also* Jose Magaña-Salgado, *Money on the Table: The Economic Cost of Ending DACA*, Immigrant Legal Resource Center (Dec. 2016) (hereinafter Magaña-Salgado (2016)) (analyzing the Social Security and Medicare contributions of DACA recipients in 2016).

[24] Wong (2017).

[25] Svajlenka and Wolgin (2020).

[26] *Id.*

[27] USCIS, *Deferred Action for Childhood Arrivals (DACA) Quarterly Report (FY 2021, Q1)* (Mar. 2021), *https://www.uscis.gov/sites/default/files/document/data/DACA_performancedata_fy2021_qtr1.pdf*, at 6.

[28] Reasonable reliance on the existence of the DACA policy is distinct from reliance on a grant of DACA to a particular person. Individual DACA grants are discretionary and may be terminated at any time, but communities, employers, educational institutions, and State and local governments have come to rely on the existence of the policy itself and its potential availability to those individuals who qualify.

which the DACA policy has been in effect, the good faith investments recipients have made in both themselves and their communities, and the investments that their communities have made in them, have been, in the Department's judgment, substantial.

This rule responds to President Biden's memorandum on January 20, 2021, ''Preserving and Fortifying Deferred Action for Childhood Arrivals (DACA),'' [29] in which President Biden stated:

DACA reflects a judgment that these immigrants should not be a priority for removal based on humanitarian concerns and other considerations, and that work authorization will enable them to support themselves and their families, and to contribute to our economy, while they remain.[30]

This rule embraces the consistent judgment that has been maintained by the Department—and by three presidential administrations since the policy first was announced—that DACA recipients should not be a priority for removal.[31] It is informed by the Department's experience with the policy over the past 10 years and the ongoing litigation concerning the policy's continued viability. It reflects the reality that DACA supports the Department's efforts to more efficiently allocate enforcement resources, by allowing DHS to focus its limited enforcement resources on higher-priority noncitizens. It also is meant to preserve legitimate reliance interests that have been engendered through the continued implementation of the decade-long policy under which deferred action requests will be considered, while emphasizing that individual grants of deferred action are an act of enforcement discretion to which recipients do not have a substantive right.

This rule recognizes that enforcement resources are limited, that sensible priorities are vital to the effective use of those resources, and that it is not generally the best use of those limited resources to remove from the United States those who arrived here as young people, have received or are pursuing an education or served in the military, have no significant criminal history, do not pose a threat to national security or

public safety, and are valued members of our communities. It recognizes that, as a general matter, DACA recipients, who came to this country many years ago as children and may not even speak the language of the country in which they were born, lacked the intent to violate the law. It reflects the conclusion that, while they are in the United States, they should have access to a process that, operating on a case-by-case basis, may allow them to work to support themselves and their families, and to contribute to the economy in multiple ways. This rule also accounts for the momentous decisions DACA recipients have made in ordering their lives in reliance on and as a result of this policy, and it seeks to continue the benefits that have accrued to DACA recipients, their families, their communities, their States, and the Department itself that have been made possible by the policy. And as discussed in detail elsewhere, this rule reflects DHS's continued belief, supported by available data, that DACA does not have a substantial effect on lawful or unlawful immigration into the United States. DHS emphasizes that the DACA policy set forth in this rule is not a permanent solution for the affected population, and legislative efforts to find such a solution remain critical.

DHS recognizes that this rule comes in the wake of prior attempts to wind down and terminate the DACA policy.[32] In rescission memoranda issued, respectively, by then-Secretary Kirstjen Nielsen and then-Acting Secretary Elaine Duke, DHS cited potential litigation risk as one reason that winding down and terminating DACA was warranted. But upon further consideration, it is DHS's view that those prior statements failed fully to account for all the beneficial aspects of the DACA policy for DHS as well as for many other persons and entities, which in DHS's view outweigh the costs. The position taken in the Duke and Nielsen Memoranda placed undue weight on litigation risk, failing to account for all the positive tangible and intangible benefits of the DACA policy, the economic and dignitary gains from that policy, the length of time that DACA opponents waited to challenge the

policy, and the risk that rescinding DACA would itself expose DHS to legal challenge—a risk that indeed materialized in the *Regents* litigation.[33] In short, proper consideration of all pertinent factors on balance establishes that the DACA policy is well worth the agency resources required to implement it and to defend it against subsequent legal challenges.

On July 16, 2021, the U.S. District Court for the Southern District of Texas vacated the 2012 DACA policy, finding, among other things, that it was contrary to the Immigration and Nationality Act of 1952 (INA).[34] DHS has carefully and respectfully considered all aspects of the analysis in that decision, including that decision's conclusions about DACA's substantive legality. DHS also invited comments on its conclusions in the proposed rule and discusses the comments received herein.

### B. Summary of the 2021 Proposed Rule

The proposed rule set forth DHS's proposal to preserve and fortify the DACA policy, which allows for the issuance of deferred action to certain young people who came to the United States many years ago as children, who have no current lawful immigration status, and who are generally low enforcement priorities.[35] The proposed rule included the following provisions of the DACA policy from the Napolitano Memorandum and longstanding USCIS practice:

• *Deferred Action.* The proposed rule provided a definition of deferred action as a temporary forbearance from removal that does not confer any right or entitlement to remain in or reenter the United States, and that does not prevent DHS from initiating any criminal or other enforcement action against the DACA recipient at any time.

• *Threshold Criteria.* The proposed rule included the following longstanding threshold criteria: that the requestor must have: (1) come to the United States under the age of 16; (2) continuously resided in the United States from June 15, 2007, to the time of filing of the request; (3) been

---

[29] 86 FR 7053 (hereinafter Biden Memorandum).

[30] *Id.*

[31] *See id.*; Sept. 5, 2017 Statement from President Donald J. Trump, *https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-donald-j-trump-7* (''I have advised [DHS] that DACA recipients are not enforcement priorities unless they are criminals, are involved in criminal activity, or are members of a gang.''); Napolitano Memorandum.

[32] *Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA)* from Elaine Duke, Acting Secretary, DHS (Sept. 5, 2017), *https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca* (hereinafter Duke Memorandum); Memorandum from Secretary Kirstjen M. Nielsen, DHS (June 22, 2018), *https://www.dhs.gov/sites/default/files/publications/18_0622_S1_Memorandum_DACA.pdf* (hereinafter Nielsen Memorandum), at 3 (''In setting DHS enforcement policies and priorities, I concur with and decline to disturb Acting Secretary Duke's decision to rescind the DACA policy'').

[33] *See Dep't of Homeland Sec.* v. *Regents of the Univ. of Cal.,* 140 S. Ct. 1891 (2020).

[34] *Texas* v. *United States,* 549 F. Supp. 3d 572 (S.D. Tex. 2021) (*Texas* July 16, 2021 memorandum and order).

[35] The preamble discussion in the NPRM, including the detailed presentation of the need to establish regulations implementing the DACA policy to defer removal of certain noncitizens who years earlier came to the United States as children, is generally adopted by reference in this final rule, except to the extent specifically noted in this final rule, or in the context of proposed regulatory text that is not contained in this final rule. *See* 86 FR 53736–53816 (Sept. 28, 2021).

AR2022_100198

physically present in the United States on both June 15, 2012, and at the time of filing of the DACA request; (4) not been in a lawful immigration status on June 15, 2012, as well as at the time of request; (5) graduated or obtained a certificate of completion from high school, obtained a GED certificate, currently be enrolled in school, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (6) not been convicted of a felony, a misdemeanor described in the rule, or three or more other misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or otherwise pose a threat to national security or public safety; and (7) been born on or after June 16, 1981, and be at least 15 years of age at the time of filing, unless the requestor is in removal proceedings, or has a final order of removal or a voluntary departure order. The proposed rule also stated that deferred action under DACA would be granted only if USCIS determines in its sole discretion that the requestor meets the threshold criteria and otherwise merits a favorable exercise of discretion.

• *Procedures for Request, Terminations, and Restrictions on Information Use.* The proposed rule set forth procedures for denial of a request for DACA or termination of a grant of DACA, the circumstances resulting in the issuance of a notice to appear (NTA) or referral to U.S. Immigration and Customs Enforcement (ICE) (RTI), and restrictions on use of information contained in a DACA request for the purpose of initiating immigration enforcement proceedings.

In addition to retaining these longstanding DACA policies and procedures, the proposed rule proposed the following changes:

• *Filing Requirements.* The proposed rule proposed to modify the existing filing process and fees for DACA by making the request for employment authorization on Form I–765, Application for Employment Authorization, optional and charging a filing fee of $85 for Form I–821D, Consideration of Deferred Action for Childhood Arrivals. DHS proposed to maintain the current total cost to DACA requestors who also file Form I–765 of $495 ($85 for Form I–821D plus $410 for Form I–765). As noted below, DHS has modified this approach in this final rule.

• *Employment Authorization.* The proposed rule proposed to create a DACA-specific regulatory provision regarding eligibility for employment authorization for DACA deferred action

recipients in a new paragraph designated at 8 CFR 274a.12(c)(33). The new paragraph did not constitute any substantive change in current policy; it merely proposed a DACA-specific provision in addition to the existing provision at 8 CFR 274a.12(c)(14) that provides discretionary employment authorization to deferred action recipients more broadly. Like the provision at 8 CFR 274a.12(c)(14), 8 CFR 274a.12(c)(33) continued to specify that the noncitizen [36] must have been granted deferred action and must establish an economic need to be eligible for employment authorization.

• *Automatic Termination of Employment Authorization.* The proposed rule proposed automatically terminating employment authorization granted under 8 CFR 274.12(c)(33) upon termination of a grant of DACA.

• *''Lawful Presence.''* The proposed rule reiterated USCIS' codification in 8 CFR 1.3(a)(4)(vi) of agency policy, implemented long before DACA, that a noncitizen who has been granted deferred action is considered ''lawfully present''—a specialized term of art that does not in any way confer ''lawful status'' or authorization to remain in the United States—for the discrete purpose of authorizing the receipt of certain Social Security benefits consistent with 8 U.S.C. 1611(b)(2). The term ''lawful presence'' historically has been applied to some persons who are subject to removal (and who may in fact have no ''lawful status''), and whose immigration status affords no protection from removal, but whose temporary presence in the United States the Government has chosen to tolerate for reasons of resource allocation, administrability, humanitarian concern, agency convenience, and other factors. Lawful presence also encompasses situations in which the Secretary, pursuant to express statutory authorization, designates certain categories of noncitizens as lawfully present for particular statutory purposes, such as receipt of Social Security benefits. *See* 8 U.S.C. 1611(b)(2); 8 CFR 1.3(a)(4)(vi). The proposed rule also reiterated longstanding policy that a noncitizen who has been granted deferred action does not accrue ''unlawful presence'' for purposes of INA sec. 212(a)(9), 8 U.S.C. 1182(a)(9)(B) (imposing certain inadmissibility grounds on noncitizens who departed after having accrued certain periods of unlawful presence in

the United States and again seek admission to the United States).

*C. Summary of Changes From Proposed Rule to Final Rule*

Following careful consideration of public comments received, DHS has made modifications to the regulatory text proposed in the proposed rule, as described below. The rationale for the proposed rule and the reasoning provided in that rule remain valid, except as described in this regulatory preamble. Section II of this preamble includes a detailed summary and analysis of the comments. Comments may be reviewed in the Federal Docket Management System at *https://www.regulations.gov*, docket number USCIS–2021–0006.

• The NPRM proposed to codify at 8 CFR 236.23(a)(1) a modification of the existing filing process and fees for DACA by making it optional to submit a request for employment authorization on Form I–765, Application for Employment Authorization (''unbundled process''), and charging a fee of $85 for Form I–821D, Consideration of Deferred Action for Childhood Arrivals. That proposal would have maintained the current total cost to DACA requestors who also file Form I–765 of $495 ($85 for Form I–821D plus $410 for Form I–765). Upon careful consideration of comments received on this NPRM provision, DHS is adopting the suggestion of a majority of commenters who addressed this provision to retain the existing requirement that DACA requestors file Form I–765 and Form I–765WS concurrently with the Form I–821D (''bundled process''). However, in this rule DHS adopts the fee structure proposed in the NPRM of an $85 filing fee for Form I–821D, as well as a Form I–765 filing fee, currently set at $410. This change codifies in regulation the process that has been in place since the Napolitano Memorandum was implemented in 2012, while maintaining a consistent overall current cost to requestors. *See* new 8 CFR 236.23(a)(1).

• The NPRM proposed to codify at 8 CFR 236.22(b)(6) the longstanding criminal history, public safety, and national security criteria found in the Napolitano Memorandum. Upon careful consideration of comments received on this NPRM provision, DHS is revising it to further clarify that, consistent with longstanding DACA policy, expunged convictions, juvenile delinquency adjudications, and immigration-related offenses characterized as felonies or misdemeanors under State laws are not considered automatically disqualifying

---

[36] For purposes of this discussion, USCIS uses the term ''noncitizen'' to be synonymous with the term ''alien'' as it is used in the INA.

convictions for purposes of this provision. *See* new 8 CFR 236.22(b)(6).

• The NPRM proposed to codify at 8 CFR 236.23(d)(1) and (2) DHS's longstanding DACA termination policy, prior to the preliminary injunction issued in *Inland Empire-Immigrant Youth Collective* v. *Nielsen*, No. 17–2048, 2018 WL 1061408 (C.D. Cal. Feb. 26, 2018), with some modifications. The NPRM proposed that USCIS could terminate DACA at any time in its discretion with or without a Notice of Intent to Terminate (NOIT). The NPRM also proposed that DACA would terminate automatically upon departure from the United States without advance parole or upon filing of an NTA with the Department of Justice (DOJ) Executive Office for Immigration Review (EOIR) (a modification from prior policy of automatic termination upon NTA issuance), but DACA would not terminate automatically in the case of a USCIS-issued NTA solely based on an asylum referral to EOIR. The NPRM raised four alternative approaches and invited comment on these and other alternatives for DACA termination. After careful consideration of the comments on this provision and the alternatives suggested in the NPRM and by commenters, DHS is maintaining in the final rule that USCIS may terminate DACA at any time in its discretion. However, DHS is revising this provision to provide that USCIS will provide DACA recipients with a NOIT prior to termination of DACA, but maintains discretion to terminate DACA without a NOIT if the individual is convicted of a national security related offense involving conduct described in 8 U.S.C. 1182(a)(3)(B)(iii), 1182(a)(3)(B)(iv), or 1227(a)(4)(A)(i), or an egregious public safety offense. DHS also is revising this provision to provide that USCIS may terminate a grant of DACA, in its discretion and following issuance of a Notice of Intent to Terminate, for those recipients who depart from the United States without first obtaining an advance parole document and subsequently enter the United States without inspection. *See* new 8 CFR 236.23(d)(1) and (2).

• The NPRM proposed at 8 CFR 236.23(d)(3) that employment authorization would terminate automatically upon termination of DACA. This provision included a cross-reference to 8 CFR 274a.14(a)(1)(iv). However, on February 8, 2022, 8 CFR 274a.14(a)(1)(iv) was vacated in *Asylumworks, et al.* v. *Mayorkas, et al.,* No. 20–cv–3815, 2022 WL 355213 (D.D.C. Feb. 7, 2022). As a result of the that vacatur, as well as additional revisions to the DACA termination provisions to eliminate automatic termination based on filing of an NTA, as described in this preamble, DHS is modifying 8 CFR 236.23(d)(3) in this final rule to remove the vacated cross-reference and clarify that employment authorization terminates when DACA is terminated and not separately when removal proceedings are instituted. *See* new 8 CFR 236.23(d)(3).

• In this final rule, DHS is clarifying at 8 CFR 236.21(d) that this subpart rescinds and replaces the DACA guidance set forth in the Napolitano Memorandum and from this point forward governs all current and future DACA grants and requests. DHS also clarifies that existing recipients need not request DACA anew under this new rule to retain their current DACA grants. Historically, DHS has promulgated rules without expressly rescinding prior guidance in the regulatory text itself. However, DHS has chosen to depart from previous practice in light of the various issues and concerns raised in ongoing litigation challenging the Napolitano Memorandum. *See* new 8 CFR 236.21(d).

### D. Summary of Costs and Benefits

This rule will result in new costs, benefits, and transfers. To provide a full understanding of the impacts of the DACA policy, DHS considered the potential impacts of this rule relative to two baselines. The No Action Baseline represents a state of the world under the DACA policy; that is, the policy initiated by the guidance in the Napolitano Memorandum in 2012 and prior to the July 16, 2021 *Texas* decision. (The No Action Baseline does not directly account for the *Texas* decision, as discussed further in the Population Estimates and Other Assumptions section of the Regulatory Impact Analysis (RIA).) The second baseline considered in the analysis is the Pre-Guidance Baseline, which represents a state of the world before the issuance of the Napolitano Memorandum, where the DACA policy does not exist and has never existed. To better understand the effects of the DACA policy, we focus on the Pre-Guidance Baseline as the most useful point of reference.

Table 1 provides a detailed summary of the provisions and their estimated impacts relative to the No Action Baseline. Table 2 provides a detailed summary of the provisions and their estimated impacts relative to the Pre-Guidance Baseline.

**BILLING CODE 9111–97–P**

    

**Table 1. Summary of Major Changes to Provisions and Estimated Impacts of the Final Rule, FY 2021–FY 2031 (Relative to the No Action Baseline)**

| Provision | Description of Provision | Estimated Impact of Provision |
|---|---|---|
| Amending 8 CFR 106.2(a)(38). Fees. | The $85 biometrics fee is eliminated and replaced by an $85 filing fee for Form I-821D. | **Qualitative:**<br><br>Benefits<br><br>• The final rule allows active DACA recipients to continue enjoying the advantages of the policy and also have the option to request renewal of DACA in the future if needed. |
| Amending 8 CFR 236.21(c)(2). Applicability. | DACA recipients receive a time-limited forbearance from removal, must apply to USCIS for employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33), and must demonstrate an economic need for employment to receive an Employment Authorization Document. DACA recipients are considered lawfully present and not unlawfully present for certain purposes. | • For DACA recipients and their family members, the rule would contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future, including by virtue of mitigating the risk of litigation resulting in termination of the DACA policy. |

| Amending 8 CFR 236.23(a)(1). Procedures for request. | No unbundling of deferred action and employment authorization requests. These requests must be filed concurrently. | |
|---|---|---|
| Adding 8 CFR 236.24(b). Severability. | The provisions in 8 CFR 236.21(c)(2) through (4) and 274a.12(c)(14) and 274a.12(c)(33) are intended to be severable from each other. The period of forbearance, employment authorization, and lawful presence are all severable under this provision. | |

Source: USCIS analysis.

Note: The No Action Baseline refers to a state of the world under the current DACA policy in effect under the guidance of the Napolitano Memorandum.

**53160** Federal Register / Vol. 87, No. 167 / Tuesday, August 30, 2022 / Rules and Regulations

**Table 2. Summary of Major Changes to Provisions and Estimated Impacts of the Final Rule, FY 2012–FY 2031 (Relative to the Pre-Guidance Baseline)**

| Provision | Description of Provision | Estimated Impact of Provision |
|---|---|---|
| Amending 8 CFR 106.2(a)(38). Fees. | The $85 biometrics fee is eliminated and replaced by an $85 filing fee for Form I-821D. | **Quantitative:**<br><br>Net Benefits<br><br>Income earnings of the employed DACA recipients due to obtaining an approved EAD, dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy, less the value of non-paid time: |
| Amending 8 CFR 236.21(c). Applicability. | DACA recipients receive a time-limited forbearance from removal, must apply to USCIS for employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33), and must demonstrate an economic need for employment. DACA recipients are considered | • Annualized net benefits are estimated to be as much as $21.9 billion at a 3-percent discount rate and $20.7 billion at a 7-percent discount rate. |

AR2022_100203

| | | |
|---|---|---|
| | lawfully present and not unlawfully present for certain purposes. | • Total net benefits over a 20-year period are estimated to be as much as: <br> ○ $455.0 billion for undiscounted benefits; <br> ○ $424.4 billion at a 3-percent discount rate; and <br> ○ $403.2 billion at a 7-percent discount rate. |
| Amending 8 CFR 236.23(a)(1). Procedures for request. | No unbundling of deferred action and employment authorization requests. These requests must be filed concurrently. | **Costs** <br><br> Costs to requestors associated with a DACA request, including filing Form I-821D, Form I-765, and Form I-765WS: <br><br> • Annualized costs could be $494.9 million at a 3-percent discount rate or $480.8 million at a 7-percent discount rate. |
| Adding 8 CFR 236.24(b). Severability. | The provisions in 8 CFR 236.21(c)(2) through (4) and 274a.12(c)(14) and 274a.12(c)(33) are intended to be severable from each other. The period of forbearance, employment authorization, and lawful presence are all severable under this provision. | • Total costs over a 20-year period could be: <br> ○ $10.1 billion undiscounted; <br> ○ $9.6 billion at a 3-percent discount rate; and <br> ○ $9.4 billion at a 7-percent discount rate. <br><br> **Transfer Payments** <br><br> Employment taxes from the employed DACA recipients and their employers to the Federal Government dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy: <br><br> • Annualized transfers could be up to $5.4 billion at a 3-percent discount rate or $5.2 billion at a 7-percent discount rate. <br> • Total transfers over a 20-year period could be up to: <br> ○ $113.2 billion undiscounted; <br> ○ $105.6 billion at a 3-percent discount rate; and <br> ○ $100.3 billion at a 7-percent discount rate. <br><br> **Qualitative:** |

| | | Cost Savings |
| --- | --- | --- |
| | | The DACA policy simplifies many encounters between DHS and certain noncitizens, reducing the burden upon DHS of vetting, tracking, and potentially removing DACA recipients. |
| | | Benefits |
| | | • The rule results in more streamlined enforcement encounters and decision making, as well as avoided costs associated with enforcement action against low-priority noncitizens. It also allows DHS to focus its limited enforcement resources on higher-priority noncitizens. |
| | | • The rule gives DACA recipients the option to request renewal of DACA in the future if needed. |
| | | • For DACA recipients and their family members, the rule would contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future. |

Source: USCIS analysis.

Note: The Pre-Guidance Baseline refers to a state of the world as it was before the guidance of the Napolitano Memorandum.

BILLING CODE 9111–97–C

## II. Response to Public Comments on the Proposed Rule

### A. General Feedback on the Rule

DHS received 16,361 public comments during the comment period for the NPRM. The majority of comment submissions, excluding duplicates, non-germane submissions, and a submission that contained only reference material, originated from individual or anonymous commenters. The remaining comments came from a range of entities, including advocacy groups, schools and universities, legal services providers, religious organizations, businesses, professional organizations, State and local government, Federal and State elected officials, and unions. Many comments expressed general support for the rule, with only 3 percent of the total expressing generalized opposition. A large majority of the comments indicated support for the proposal to preserve and fortify DACA, while opposing or offering suggestions to change some provisions.

Of the submissions expressing generalized opposition to the NPRM, only one was from a government entity; all other government submissions expressed generalized support or support for some provisions of the rule while suggesting revisions or providing feedback for others. DHS has reviewed all the public comments received, and below addresses the comments related to the substance of the NPRM.

1. General Support for Rule

*Comment:* Many commenters expressed general support for DACA and the rule for a variety of reasons. These commenters stated that DACA should be protected and is beneficial not only to the youth impacted but also to the United States; that childhood arrivals to the United States should not be removed from the only home they know; and that the United States has a

AR2022_100205

moral obligation as a nation to retain DACA and to lead by compassion, honor, and respect. One commenter expressed strong support for deferred action for DACA recipients as both appropriate and justified, stating that certain young productive people should not be a priority for deportation to countries where they have not lived and do not speak the language. Some commenters agreed that DACA recipients should not be a priority for removal as these individuals have no criminal history, pose no threat to national security, contribute to the economy and their communities, are blameless minors or are ''not morally blameworthy,'' and have lived in the United States for nearly all their lives. Several commenters stated that DACA recipients provide rich cultural traditions, share unique cultural contributions, and create a sense of community in the United States.

Another commenter said that they were pleased that the rule clarifies who is eligible for DACA. Another commenter remarked that the proposed rule would affect government stakeholders or departments, including DHS, ICE, CBP, EOIR, and State Departments of Motor Vehicles, and that retaining DACA best respects the rights of these stakeholders.

*Response:* DHS acknowledges these commenters' support for the rule and agrees that the DACA policy has benefits that extend not just to the recipients themselves, but also to their communities and the United States more broadly. DHS also agrees that removing DACA recipients, who came to the United States as children and may have only known this country as their home, would cause significant hardship to DACA recipients and their family members.

Regarding the comment that retaining the DACA policy respects the rights of impacted government stakeholders, DHS agrees that this rule reflects the Department's strong interests in the effective and judicious use of its limited enforcement resources. This preamble also discusses comments submitted by a range of government entities and officials.

### 2. General Opposition to Rule

*Comment:* Some commenters generally opposed the proposed rule. These commenters stated that allowing undocumented noncitizens into the United States harms U.S. citizens and must be stopped, that DACA should be abolished, and that DACA requestors and undocumented noncitizens claiming ''amnesty'' in the United States are ''illegal immigrants'' regardless of

how they are characterized. Several commenters said that the DACA policy was not a constructive way to handle the immigration challenges that the country is facing and that the Government should terminate DACA and implement new policies that protect borders and encourage more legal immigration.

*Response:* DHS respectfully acknowledges these commenters' opposition to the rule. This rule reflects the consistent judgment of DHS that DACA is an appropriate exercise of its prosecutorial discretion given the realities of the limited resources available to remove every noncitizen lacking lawful status from the United States. This rule does not authorize new entrants to the United States; indeed, it codifies, but does not expand, the threshold criteria for consideration for deferred action under the DACA policy that have existed since 2012. DHS has been attentive to all relevant reliance interests. DHS discusses in greater detail the rule's alleged impact on migration in Section II.A.7. However, as the rule does not confer lawful status on DACA recipients or provide DACA recipients with permanent protection from removal, DHS disagrees with the characterization of DACA as an amnesty program; it does not give amnesty to anyone. DHS also does not believe that this rule or the DACA policy is in conflict with policies that promote maintaining an orderly, secure, and well-managed border, which are high priorities for DHS and for the Administration, and except as specifically related to the DACA policy are generally beyond the scope of the rulemaking.[37] DHS declines to make changes to the rule in response to these comments.

### 3. Impacts on DACA Recipients and Their Families

*Comment:* Many commenters expressed support for the proposed rule, noting the positive impacts of DACA on recipients and their families. These commenters stated that the rule would provide the opportunity for DACA recipients to meet their professional goals, such as obtaining a college degree and pursuing a career, which would allow them to support their families. Commenters similarly noted that the rule would improve overall quality of life and provide opportunities to DACA recipients and their families, reduce fear and anxiety among DACA recipients and their families, and foster a sense of

belonging to the United States, which, they stated, DACA recipients consider as their home. In support of these statements, many commenters shared anecdotes about the positive impacts DACA has had on their or others' livelihoods, such as earning degrees and entering the workforce, attributing these opportunities to DACA.

Some commenters stated that writing the DACA policy into Federal regulations would be an essential step to fortifying DACA and protecting recipients, especially considering the adverse rulings in recent litigation. Other commenters expressed their concern that if DACA were revoked, their lives in the United States would be uprooted and their ability to pursue their goals would be hindered. They also stated the positive traits of DACA recipients and referred to them as kind and hardworking people. A commenter cited an article from a Brookings Institution blog, Brookings Now, to emphasize the importance of the policy in allowing children to remain with their families, attend school, and earn money to support themselves.[38] A group of commenters, citing figures contained in the NPRM,[39] stated that ending DACA would cause harm to over 250,000 children born in the United States to DACA recipients, the 1.5 million people in the United States who share a home with DACA recipients, and other close connections who would suffer from the loss of security and means for support that the DACA policy provides to recipients. Another commenter added that there are over 94,000 DACA and DACA-eligible students in California alone, and that the policy has a direct impact on current and future students.

Some commenters said that, because of DACA, recipients can obtain driver's licenses, auto insurance, bank accounts, Social Security numbers, and other benefits that are valuable to their daily lives. A commenter stated some States offer benefits to DACA recipients that they otherwise would be unable to obtain, such as in-state tuition and access to REAL IDs. Several commenters said that many DACA recipients financially support their families and children who also are living in the United States.

A commenter stated that DACA should not have to be reinstated by each president, as the issue of immigration is

---

[37] *See, e.g.,* DHS, *2022 Priorities, https://www.dhs.gov/2022-priorities* (last updated Mar. 17, 2022).

[38] Brennan Hoban, *The reality of DACA, the Deferred Action for Childhood Arrivals program,* Brookings Now (Sept. 22, 2017), *https://www.brookings.edu/blog/brookings-now/2017/09/22/the-reality-of-daca-the-deferred-action-for-childhood-arrivals-program.*

[39] *See* 86 FR 53738.

an ethical one and decisions should not be based on politics or economics. The commenter cited historical examples of the United States denying entry to immigrants to highlight the negative consequences immigrants may face when forced to return to their birth countries. The commenter went on to say that the DACA policy should continue to be in place indefinitely. Another commenter stated it would be unethical to send DACA recipients back to their birth countries, as they did nothing more than travel with their parents at a young age to the United States.

*Response:* DHS acknowledges the commenters' support for the rule and agrees with commenters that DACA has a positive impact on recipients' ability to pursue employment and education, maintain family unity, and make contributions to their communities. DHS further agrees that removing DACA recipients, who have been determined to be a low priority for enforcement, would cause significant hardship to DACA recipients and their family members. DHS acknowledges commenters' views that it would be unethical to remove childhood arrivals from the United States and agrees that DACA is an appropriate framework for making case-by-case determinations to defer the removal of certain eligible noncitizens who arrived in the United States as children.

*Comment:* Several commenters stated DACA has provided recipients with educational opportunities and professional growth that they would not have been able to pursue without the policy. Several commenters pointed to research finding that DACA significantly increased high school attendance and high school graduation rates, reducing the citizen-noncitizen gap in graduation by 40 percent; and also finding positive, though imprecise, impacts on college attendance.[40]

Multiple commenters provided statistics on the number of DACA recipients who are enrolled in postsecondary educational programs. A

group of commenters representing multiple States estimated that up to 37,000 students in the California Community Colleges system are DACA-eligible noncitizens, more than 19,000 post-secondary students are DACA recipients in New York, approximately 9,000 post-secondary students in New Jersey are DACA recipients or DACA-eligible, and that thousands more DACA recipients are enrolled in public universities and colleges in other States. The commenters described multiple State regimes under which DACA recipients or DACA-like populations may qualify for in-state tuition or other financial assistance. For instance, the commenters wrote that Minnesota "has invested in the education of individuals receiving DACA by extending student childcare grants, teacher candidate grants, and student loan programs to DACA recipients."

Similarly, a commenter stated DACA plays a major role in higher education affordability, remarking that 83 percent of DACA recipients attend public institutions, a fact that, according to the commenter, makes accessibility to in-state tuition and financial aid a vitally important issue. The commenter wrote that 8 States require undocumented students to have DACA in order to access in-state tuition; 17 additional States and the District of Columbia allow the State's eligible undocumented students, including DACA recipients, to access in-state tuition and State financial aid; and 4 States allow their State's undocumented students access to in-state tuition but not financial aid. The same commenter stated that work authorization enables DACA recipients to legally work, save, and pay for their higher education expenses.

A commenter stated the proposed rule would help numerous DACA recipient students continue to receive the benefits of DACA such as an employment authorization document to ease the financial burden of pursuing higher education and the opportunity to obtain an advance parole document. A commenter representing a higher education institution expressed support for the proposed rule and commented that many opportunities for young people to learn and develop skills are employment-based, leaving students without employment authorization at a significant disadvantage academically, professionally, and socially. The commenter stated that students without employment authorization may lack income, resume-building experiences, and opportunities to build networks among peers, staff, and faculty, whereas DACA recipient students can engage in on-campus jobs and employment-based

research opportunities, and cautiously plan for their futures.

*Response:* DHS acknowledges that by applying a more formal administrative framework to forbearance from enforcement with respect to DACA recipients, DHS has enabled a range of additional benefits to this population, including increased educational and professional opportunities that benefit DACA recipients and society at large. DHS agrees that members of the DACA population have achieved a significantly higher level of educational attainment than would likely have occurred without the DACA policy. DHS also appreciates commenters' acknowledgement of how DACA has increased graduation rates and expanded access to both earned income and, as a result of actions by certain States, financial aid, which DACA recipients have used to fund undergraduate, graduate, and professional degrees.

*Comment:* Multiple commenters, with some citing studies, said the rule would provide relief from legal uncertainty and offer a sense of security, minimizing the anxiety and other physical and mental health concerns related to the fear of deportation. One commenter referenced multiple studies to support their assertion that immigrants who fear deportation are much more vulnerable to deleterious health effects, including "heart disease, asthma, diabetes, depression, anxiety, and post-traumatic stress disorder." [41] Citing additional studies, the commenter further stated that by removing or limiting the fear of deportation, "DHS may be able to directly impact and improve the health of these individuals who are eligible for DACA, as well as their families and communities." [42] Another commenter cited a study finding that DACA significantly reduced the odds of

---

[40] *See* Elira Kuka, et al., *Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA,* 12 a.m. Econ. J. 293, 295–96 (2020) ("Our results imply that more than 49,000 additional Hispanic youth obtained a high school diploma because of DACA") (hereinafter Kuka (2020)); Victoria Ballerini and Miriam Feldblum, *Immigration Status and Postsecondary Opportunity: Barriers to Affordability, Access, and Success for Undocumented Students, and Policy Solutions,* 80 a.m. J. Econ. and Soc., 165 (2021) ("The advent of DACA and the extension of in-state tuition and financial aid to undocumented students in a growing number of states have increased college-going rates among undocumented students, yet these students still complete college at lower rates than their peers"); Wong (2020).

[41] Omar Martinez, et al., *Evaluating the impact of immigration policies on health status among undocumented immigrants: A systematic review,* J. of Immigrant and Minority Health, 17(3), 947–70 (2015), *https://doi.org/10.1007/s10903-013-9968-4*; Brian Allen, et al., *The children left behind: The impact of parental deportation on mental health,* J. of Child and Fam. Stud., 24(2), 386–92 (2015); Kalina M. Brabeck and Qingwen Xu, *The impact of detention and deportation on Latino immigrant children and families: A quantitative exploration,* Hisp. J. of Behav. Sci., 32(3), 341–61 (2010).

[42] Elizabeth Aranda, et al., *The Spillover Consequences of an Enforcement—First US Immigration Regime,* Am. Behav. Scientist, 58(13), 1687–95 (2014); Samantha Sabo and Alison Elizabeth Lee, *The Spillover of US Immigration Policy on Citizens and Permanent Residents of Mexican Descent: How Internalizing 'Illegality' Impacts Public Health in the Borderlands,* Frontiers in Pub. Health, 3, 155 (2015).

individuals reporting moderate or worse psychological distress.[43]

Another commenter stated that DACA facilitates the healthy development of recipients' children. The commenter remarked that DACA helps families feel comfortable accessing public programs that support their children and provides income that increases access to healthcare, nutritious food, and upward mobility. Relatedly, a commenter stated the DACA policy protects public health because DACA recipients are more likely to have health insurance than similarly situated undocumented noncitizens who do not have DACA. The commenter said DACA reduces the overall burden on the healthcare system because individuals with lawful status and health insurance are more likely to seek out preventive care, rather than relying on more expensive, more intrusive, and often less successful emergency-department care. According to the commenter, this increased ability to access healthcare also makes it easier to correctly monitor the public health of the population and respond to public health issues effectively.

Other commenters stated that DACA reduces noncitizens' vulnerability to domestic and sexual violence and other exploitation by helping to ensure they can live safely and be economically independent. One commenter said that DACA promotes safety for survivors of domestic violence, sexual assault, trafficking and other gender-based violence by eliminating the fear that their abusers can contact immigration authorities if they seek help or attempt to leave an abusive situation. The commenter went on to say that access to work authorization through DACA further strengthens survivors' ability to leave abusive or exploitative situations by enabling them to support themselves and their families.

*Response:* DHS appreciates commenters' recognition of the measure of assurance and stability DACA provides to recipients and their families. DHS agrees that these benefits help DACA recipients, their families, and communities. DHS also agrees that DACA facilitates the physical and mental well-being of recipients and their families by providing, in many cases, access to employer-sponsored health insurance and stable income that allows recipients in turn to provide their families with food, shelter, clothing, and adequate medical care. DHS also appreciates that in States that

have chosen to provide State-only funded health care programs to DACA recipients, DACA may better protect public health by expanding access to healthcare.

In addition, DHS agrees that there are reports concluding that by providing recipients with a measure of security with respect to immigration matters, the DACA policy reduces psychological stress and anxiety while also decreasing barriers to interacting with the healthcare system, helping to promote early detection and treatment of medical conditions before they worsen into serious conditions requiring more extensive treatment. DHS also notes that studies have demonstrated that uncertainty regarding one's immigration situation contributes to increased levels of stress, and that DACA may reduce such stress for its recipients.[44]

DHS also appreciates commenters stating that the DACA policy supports safety for survivors of gender-based violence, trafficking, and abuse by enabling economic self-sufficiency and minimizing fear of an abuser reporting them to immigration authorities, thereby providing recipients with more confidence to seek help or leave abusive or exploitative circumstances. DHS notes the existence of multiple additional immigration options specifically available to certain victims of crimes.[45]

*Comment:* One commenter, referencing evidence from a series of federal district court cases from Texas regarding the Napolitano Memorandum, cited a 2017 survey which found that roughly 22 percent of DACA participants stated they would "likely" or "very likely" return to their country of origin or elsewhere if DACA were to end, if they were not given permission to work in the United States, or if deferred action were not granted. The commenter stated that these data contradict the Department's rationale regarding the well-being of these individuals if the proposed rule were not issued, and that "[m]any if not all will depart our country for their place of origin or elsewhere."

*Response:* DHS acknowledges the data cited in connection with the commenter's statement that "many if not all" DACA recipients would leave the United States in the absence of the DACA policy. DHS notes that approximately 22 percent of DACA recipients surveyed stated in 2017 that they would "likely" or "very likely" return to their country of origin if they lost their work authorization or deferred action or if they could not receive either in the first place. However, DHS notes that this data is five years old, calls for some degree of speculation by DACA recipients, and was collected in a particular time and context. Even taking the results at face value, DHS notes that less than a quarter of DACA recipients surveyed assessed that they would "likely" or "very likely" leave the country if DACA ended, whereas approximately half reported that they were "unlikely" or "very unlikely" to leave. DACA recipients necessarily came to the United States at a very young age, and many have lived in the United States for effectively their entire lives. For many DACA recipients, the United States is their only home. Indeed, some DACA recipients do not even speak the language of their parents' home country. Precisely for these reasons, DACA recipients often would face significant barriers to living self-sufficiently in their countries of origin if they lost their grants of deferred action or work authorization.

*Comment:* One commenter stated that because the policy was never intended to be permanent, DACA recipients' reliance interests are very weak, and "can be remediated by other means such as grace period and/or congressional actions." Another commenter said it is unclear what kind of reliance interests DACA recipients have from a policy that did not receive any public comments or consider any alternatives. Another commenter stated that DHS made the wrong assumptions regarding existing DACA recipients' reliance interests and that it is unclear what reliance interests DACA recipients have when they request DACA when DACA recipients should be aware of the possibility that the policy could be terminated at any time.

*Response:* DHS disagrees with commenters to the extent that they suggest that DACA recipients lack reliance interests worthy of meaningful consideration. As explained by the Supreme Court's *Regents* decision, the method of DACA's original implementation—including the Napolitano Memorandum's statement that it "conferred no substantive rights" and the limitation to two-year grants—

---

[43] Atheendar Venkataramani, et al., *Health consequences of the US Deferred Action for Childhood Arrivals (DACA) immigration programme: a quasi-experimental study*, The Lancet, Pub. Health, 2(4), 175–81 (2017).

[44] *See, e.g.,* Luz M. Garcini, et al., *Health-Related Quality of Life Among Mexican-Origin Latinos: The Role of Immigration Legal Status*, 23 Ethnicity & Health 566, 578 (2018) [hereinafter Garcini (2018)] (finding significant differences in health-related quality of life across immigration legal status subgroups and noting that increased stress was one factor that diminished well-being for undocumented immigrants); Osea Giuntella, et al., *Immigration Policy and Immigrants' Sleep. Evidence from DACA*, 182 J. Econ. Behav. & Org. (2021) [hereinafter Giuntella (2021)].

[45] *See* DHS, *Immigration Options for Victims of Crimes, https://www.dhs.gov/immigration-options-victims-crimes* (last updated Jan. 30, 2022).

did not "automatically preclude reliance interests."[46] At the same time, the Court cautioned that such limitations "are surely pertinent in considering the strength of any reliance interests."[47] In the Court's view, before deciding to terminate the DACA policy, notwithstanding the method of DACA's original implementation, DHS was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests along with "other interests and policy concerns."[48]

DHS has evaluated the relevant reliance interests—and the policy stakes more generally—with the Court's decision in mind. With respect to reliance interests in particular, DHS recognizes, as the Court did, that the expressly limited and discretionary nature of the deferred action conferred upon individuals under the DACA policy (who are not guaranteed a grant or renewal of DACA, whose DACA may be terminated in USCIS' discretion, and who have no right or entitlement to remain in the United States) is relevant to the assessment of reliance interests. At the same time, DHS is aware of the real-world decisions that approximately 825,000 DACA recipients and their families, employers, schools, and communities have made over the course of more than 10 years of the policy being in place. While acknowledging and emphasizing the absence of a legal right, DHS would hesitate to conclude that reliance on DACA was "unjustified" or entitled to significantly "diminished weight" in light of the express limitations in the Napolitano Memorandum.[49] At the same time, DHS agrees that its determination regarding the existence of "serious" reliance interests does not dictate the outcome of this rulemaking proceeding, but is just one factor to consider.[50]

DHS appreciates the recommendation for a grace period, and observes that the Court discussed this possibility as well.[51] DHS believes that in many cases, a grace period (even a lengthy grace period) would be insufficient to avoid the significant adverse consequences associated with terminating the DACA policy, because the planned termination of the policy on a broad scale (whether within months or years) would ultimately prove far more harmful to DACA recipients and their families, employers, schools, and communities

than the policy pursued in this final rule. It would also not meaningfully change the number of people without lawful status in the United States. DHS notes that in staying its 2021 vacatur in *Texas* with respect to renewal requestors, the district court noted the "hundreds of thousands of DACA recipients and others who have relied upon this program for almost a decade" and that their "reliance has not diminished and may, in fact, have increased over time."[52]

DHS acknowledges that while new initial DACA requestors' reliance interests may be less robust or clear as those of current DACA recipients, it is also true that among prospective DACA requestors, there are many who have not yet "aged in" to request deferred action under DACA. These individuals and their families, schools, and communities may have deferred or made choices in reliance upon their future ability to request DACA, even as DHS's decision whether to confer deferred action to a DACA requestor remains a fully discretionary case-by-case decision, and even though deferred action itself does not provide any right or entitlement to remain in the United States.

### 4. Impacts on Other Populations, Including U.S. Workers and Other Noncitizens

#### Impacts on U.S. Workers and Wages

*Comment:* A few commenters generally opposed the proposed rule based upon its perceived impact on U.S. workers. Some of these commenters said that U.S. citizens would lose jobs to DACA recipients, while others stated more generally that DACA affects jobs and benefits for U.S. citizens or those with lawful immigration status. Other commenters stated that DACA recipients and other unauthorized noncitizens steal jobs from U.S. citizens and depress wages, often for the benefit of large corporations. One commenter said that DACA results in depressed wages and a lower standard of living for low-income persons of color.

One commenter stated that the proposed rule made an incorrect and unfounded assumption that jobs held by DACA recipients cannot be replaced by someone else. Instead, the commenter stated, terminating the DACA policy or its employment authorization would provide more jobs for U.S. workers, benefit communities, reduce unemployment rates, and potentially increase the wages of U.S. workers. The commenter stated that DHS's logic in analyzing the impacts of terminating the

DACA policy is flawed, because: (1) jobs currently held by DACA recipients can be replaced by someone else and (2) the time businesses need to find replacement workers does not differ from that involved in regular worker turnover in a market economy and is not based on workers' immigration status.

Another commenter stated that DHS made a "misleading and plainly wrong claim" that DACA recipients have been essential workers during the COVID–19 pandemic, arguing that, while some may indeed be essential workers, most are not. The commenter suggested that, if DHS wanted to prioritize this population for deferred action, it could have established additional requirements for DACA eligibility, such as employer sponsorship or evidence of being an essential worker.

In contrast, one commenter stated that DACA has a positive effect on wages, as compared to a circumstance where unauthorized noncitizens continue to work. The commenter wrote that according to the Department of Labor's National Agricultural Worker Survey, more than two thirds of farmworkers are foreign-born and a majority of those lack work authorization.[53] The commenter stated that DACA helps avoid a circumstance where undocumented workers are easily exploitable, which in turn depresses wages and working conditions for other farmworkers. Citing their own studies, joint commenters also said their research indicates that not only does the DACA policy not harm low-wage U.S. citizen workers, but also that it actually boosts the wages and employment of this population.[54] The commenters stated that the position that DACA harms citizens is based on the "faulty premise" that if the DACA policy were ended, the population of young undocumented noncitizens would leave the United States. The commenter said because many DACA recipients have spent most of their lives in the United States, and some do not speak the language of their country of

---

[46] *See Regents,* 140 S. Ct. at 1913.

[47] *See id.* at 1913.

[48] *See id.* at 1909–15.

[49] *See id.* at 1914.

[50] *See id.*

[51] *See id.*

[52] 549 F. Supp. 3d at 624.

[53] *See* U.S. Department of Labor, *Findings from the National Agricultural Workers Survey (NAWS) 2017–2018 (2021), https://www.dol.gov/sites/dolgov/files/ETA/naws/pdfs/NAWS%20Research%20Report%2014.pdf.*

[54] Ike Brannon and M. Kevin McGee, *Estimating the Economic Impacts of DACA* (July 5, 2019), *https://ssrn.com/abstract=3420511* or *http://dx.doi.org/10.2139/ssrn.3420511* (hereinafter Brannon and McGee (2019)). ("Eliminating DACA would merely increase the competition for the kinds of jobs that tend to have an excess supply of workers, while reducing the supply of employable skilled workers in the areas where we have the most acute labor shortages. Overall, we find that eliminating DACA is lose-lose-lose, benefiting virtually no one while hurting pretty much everyone.").

citizenship, voluntary self-deportation is unlikely.

*Response:* DHS acknowledges and shares commenters' desire to ensure that U.S. workers are not harmed by the DACA policy. As an initial matter, DHS notes that beginning in August 2021 and continuing into 2022, the U.S. economy experienced more job openings than available workers.[55] Nevertheless, DHS agrees, in principle, that jobs currently held by DACA recipients might potentially be performed by U.S. citizens or noncitizens with lawful immigration status if DACA recipients lost their work authorization. However, myriad factors influence employment rates in a market economy, including prevailing conditions in specific labor markets and unique characteristics of local economies, and importantly, these various factors are interrelated and dynamic rather than independent and static. (In some circumstances, for example, hiring DACA recipients might actually boost employment of citizens and those with lawful immigration status, such as where hiring DACA recipients increases the potential for business expansion and thus leads to increased employment.) For these reasons, it is overly simplistic to predict that elimination of employment authorization for DACA recipients would result in a transfer of jobs and their corresponding wages from DACA recipients to citizens or those with lawful immigration status.

As discussed in further detail in Section II.A.5, DHS cannot quantify the degree to which DACA recipients are substituted for other workers in the U.S. economy since this depends on factors such as industry characteristics as well as on the hiring practices and preferences of employers, which depend on many factors, such as worker skill levels, experience levels, education levels, and training needs, and labor market regulations, among others. As noted, labor market conditions are not static; the hiring of DACA workers might contribute to expansion in business activity and potentially in increased hiring of American workers.[56] As discussed in further detail in Section

II.A.5, similar to the citizen population, noncitizens, including DACA recipients, also pay taxes; stimulate the economy by consuming goods, services, and entertainment; and take part in domestic tourism. Such activities contribute to further growth of the economy and create additional jobs and opportunities for both citizen and noncitizen populations.[57] The net effect on employment of citizens is difficult to specify and might turn out to be positive. DHS believes that these investments that DACA recipients have made in their communities and in the country as a whole are substantial.

With regard to wage rates, DHS recognizes that, in general, any increase in labor supply or improvement in labor supply competition may potentially affect wages and, in turn, the welfare of other workers and employers.[58] But the magnitude and even the direction of the effect are challenging to specify in the abstract. As with employment, so with wages: Changes in wages depend on a range of factors and relevant market forces, such as the type of occupation and industry, and overall economic conditions. For example, in industries such as healthcare, agriculture, food services, and software development, labor demand might outpace labor supply. In such sectors, increases in the labor supply might not be enough to satisfy labor demand, resulting in increases in wages to attract qualified workers, thereby improving welfare for all workers in these sectors. The opposite could happen for industries or sectors where labor supply outpaces labor demand.[59]

With respect to comments regarding the assumptions and methodology for the labor market impact portion of the NPRM, the bases for DHS's assumptions and estimates of labor market impacts was discussed extensively in Section V.A.4.D. of the NPRM. This section included a discussion of the 2017 National Academies of Sciences, Engineering, and Medicine (NAS) Report, wherein an expert panel of immigration economists examined the peer-reviewed literature on displacement and wage effects of immigrants on native workers and attempted to describe what consensus exists around decades of findings. To the extent that this panel found research indicating that noncitizen workers displace or negatively affect the wages of U.S. citizen workers, most of these effects occur with the lowest wage jobs, potentially affecting teens and

individuals without a high school diploma.[60] DHS acknowledged this potential effect in the NPRM, and explained that the literature consistently finds these less favorable labor-market effects were more likely to occur to certain disadvantaged workers and recent prior immigrants, resulting in "very small" impacts for citizens overall.[61] The NPRM also described studies discussed in the 2017 NAS Report's survey of research indicating that highly skilled noncitizen workers positively impact wages and employment of both college-educated and non-college-educated citizens.[62] This is a similar finding to what commenters pointed to in their own studies.[63] Additionally, as a commenter noted, many current and potential DACA recipients would remain in the United States even without deferred action or employment authorization. A lack of access to employment authorization by these individuals would give rise to greater potential for exploitation and substandard wages, which in turn may have the effect of depressing wages for some U.S. workers.

Given the lack of additional evidence provided by the commenter on the impact of DACA recipients participation in the labor force, DHS has not substantially revised its analysis in response to this comment.

Impacts on Other Noncitizens

*Comment:* A commenter stated that DHS never elicited public comment or considered reliance interests when it proposed shifting costs from ICE and CBP to fee-paying noncitizens. Some commenters stated that DHS failed to sufficiently articulate why it prioritizes the DACA population over other lawful, well-qualified noncitizens, including international students, F–1 Optional Practical Training (OPT) students with postgraduate degrees, dependents of H–1B highly skilled workers, H–4 dependents, or EB–1 applicants. Commenters said that "hundreds of thousands" of individuals in these other groups face the same mental stress as DACA recipients when unable to work, secure employment authorization or visa status, or faced with deportation.

*Response:* As an initial matter, DHS did elicit public comments and consider reliance interests related to DACA, and so it disagrees with the claim that it did not do so. In the NPRM, DHS specifically and explicitly requested "comments on potential reliance

---

[55] Bureau of Labor Statistics data show that as of March 2022, there were 0.5 unemployed persons per job opening. U.S. Department of Labor, U.S. Bureau of Labor Statistics, *Number of Unemployed Persons per Job Opening, Seasonally Adjusted (March 2007 through March 2022), https://www.bls.gov/charts/job-openings-and-labor-turnover/unemp-per-job-opening.htm* (last visited May 23, 2022).

[56] NAS, *The Economic and Fiscal Consequences of Immigration* (2017), *https://www.nap.edu/catalog/23550/the-economic-and-fiscal-consequences-of-immigration* (hereinafter 2017 NAS Report), at 195.

[57] 86 FR 53801.
[58] 86 FR 53800.
[59] 86 FR 53800.

[60] 86 FR 53801.
[61] 86 FR 53801.
[62] 86 FR 53801.
[63] *See* Brannon and McGee (2019).

interests of all kinds, including any reliance interests established prior to the issuance of the Napolitano Memorandum, and how DHS should accommodate such asserted reliance interests in a final rule.'' [64] DHS acknowledges commenters' concerns about the numerous other classes of noncitizens who face stresses similar to those experienced by the DACA population with respect to their immigration status, lack of work authorization, and potential removal from the United States. DHS, however, scoped the proposed rule to address DACA in particular. DHS views the DACA-eligible population as particularly compelling candidates for deferred action by virtue of their entry to the United States as children, and by virtue of the substantial reliance interests that have developed over a period of time among DACA recipients and their families, schools, communities, and employers. DHS does not disagree with the view that other populations share characteristics that are compelling in their own way. But DHS has decided as a matter of policy to focus this rule on preserving and fortifying DACA as directed by the Biden Memorandum.

*Comment:* Some commenters stated that resources used on policies such as DACA increase backlogs, delays, and otherwise bog down the courts and enforcement agencies, which unfairly affects other noncitizens. Commenters said that DACA diverts staff and resources away from lawful immigration programs and increases the costs and delays for legal immigrants to service the interests of unauthorized noncitizens. Some commenters stated that DHS failed to consider the reliance interests of lawful immigrants and nonimmigrants in USCIS expeditiously adjudicating their petitions. One of these commenters opposed DACA requests taking precedence over other immigration filings, such as employment-based visas. The commenter objected that although many applicants for other immigration benefits are facing long processing delays due to the COVID–19 pandemic, USCIS shifted resources amid insufficient staffing levels due to fiscal challenges, built new case management system enhancements, and trained and reassigned officers to process initial DACA filings. Other commenters stated that claiming there is insufficient funding for Congress to enforce immigration laws on DACA recipients is ''puzzling,'' as the proposed rule would cost the Department ''millions of

dollars'' by not charging the full cost of processing DACA requests.

Another commenter remarked that the $93 million allocated to DACA adjudications would have been better spent upgrading USCIS' IT systems and expanding online filing capabilities. Commenters also stated that it is unfair to those seeking U.S. citizenship by following immigration laws and that DACA would make things worse for those legally trying to become citizens and easier for those who wish to use the United States for their own benefit. Another commenter urged USCIS to devote its limited resources to lawful immigration programs that Congress has authorized instead of diverting manpower, office space, and agency funds to ''amnesty programs'' benefiting undocumented individuals and ''those who profit off of continuous illegal immigration into the United States.''

*Response:* DHS acknowledges the interests of noncitizens seeking immigrant or nonimmigrant status in the timely adjudication of their petitions, and USCIS is strongly committed to reducing backlogs and improving processing times.[65] DHS notes as it did in the NPRM that the costs of USCIS are generally funded by fees paid by those who file immigration requests, and not by taxpayer dollars appropriated by Congress.[66] Funds spent on DACA adjudications do not take any resources away from other workloads, which (with very few exceptions) may be funded by other fees. Rather, DACA revenue provides USCIS with the resources it needs to maintain the policy. Consistent with that authority and USCIS' reliance on fees for its funding, and as discussed in greater detail in Section II.C.5.a, this rule amends DHS regulations to codify the existing requirement that requestors file Form I–765, Application for Employment Authorization, with Form I–821D, Consideration of Deferred Action for Childhood Arrivals, and re-classifies the $85 biometrics fee as a Form I–821D filing fee, to fully recover DACA adjudication costs.[67]

In the NPRM and related material,[68] USCIS explained that the proposed $85

fee for DACA would not recover the full costs for individuals who did not request an EAD and pay the full costs of the Form I–765.[69] In codifying the requirement that requestors submit both Forms I–765 and I–821D, USCIS is ensuring that all adjudicative costs are fully recovered and no costs of DACA are passed on to other fee-paying populations. As Tables 3 and 4 of the Supplemental Cost Methodology Document make clear, charging the full cost of $332 for each Form I–821D would be double-counting each requestor's fair share of the same indirect costs on both their Form I–821D and Form I–765 given that the estimated additional cost of processing a Form I–821D attached to a Form I–765 is negligible. Therefore, in light of the changes made in the final rule, DHS disagrees with the suggestion that this rule displaces resources, including staffing for other noncitizens. To the contrary, ending DACA would reduce USCIS revenue from DACA-related fees, which cover not only the direct costs of staffing, systems, and other resources to process DACA requests, but also contribute to recovering an appropriate portion of indirect costs that USCIS would incur even in the absence of DACA. As explained in the Supplemental Cost Methodology Document, the cost model proportionately distributes the total estimated budget for USCIS across various activities.[70] Table 4 of the same document lists all of the activities that contribute to the $332 cost estimate, including indirect activities in the DACA cost model. For example, the cost model includes the Management and Oversight activity which includes all offices that provide broad, high-level operational support and leadership necessary to deliver on the USCIS mission and achieve its strategic goals.[71] DACA's proportionate share of the activity cost is $140 in Table 4 of the Supplemental Cost Methodology Document. In the absence of DACA, USCIS would still incur costs for this activity. In short, as it relates to fees in particular, the DACA policy works in the interest of other immigrants and nonimmigrants by covering the full cost of DACA policy without burdening other USCIS customers with additional costs to fund DACA. Additionally, many investments in case management system development, training, or previous adjudications are sunk costs. In other words, ending DACA would not

---

[64] 86 FR 53803.

[65] *See, e.g.,* USCIS, *USCIS Announces New Actions to Reduce Backlogs, Expand Premium Processing, and Provide Relief to Work Permit Holders* (Mar. 29, 2022), *https://www.uscis.gov/ newsroom/news-releases/uscis-announces-new-actions-to-reduce-backlogs-expand-premium-processing-and-provide-relief-to-work.*

[66] *See* INA sec. 286(m), 8 U.S.C. 1356(m).

[67] *See* new 8 CFR 236.23(a)(1).

[68] *See* USCIS, *DACA NPRM Supplemental Cost Methodology Docket* (Sept. 28, 2021), *https:// www.regulations.gov/document?D=USCIS-2021-0006-0008* (hereinafter Supplemental Cost Methodology Docket).

[69] *See* 86 FR 53764.

[70] Supplemental Cost Methodology Docket at 8–10.

[71] *Id.* at 6.

recapture time or money invested in the past.

5. Impacts on the Economy, Communities, and States

Impacts on the Economy

*Comment:* A number of commenters expressed support for the proposed rule, stating that it would have positive economic effects at local, State, and national levels. The commenters said that the proposed rule would allow recipients to start, own, and contribute to businesses, which could help create jobs for other Americans, and would spur further economic activity. Commenters also noted the proposed rule would allow DACA recipients to contribute to State and Federal tax revenue, and to pursue education that would eventually help them work in critical jobs, which would decrease labor shortages facing the United States.

Citing their own research, another commenter stated DACA's implementation increased the education, employment, and wages of DACA recipients while also boosting tax revenue and output. The commenter cited its 2019 study that found that eliminating DACA would result in the DACA population losing about $120 billion in income, the Federal Government losing approximately $72 billion in tax revenue, and States and local governments losing about $15 billion in tax revenue over the 2020–2029 decade.[72] Likewise, a joint comment of 14 States' Attorneys General stated that given the economic contributions of DACA recipients, the effect of a full rollback of DACA would result in a loss of an estimated $280 billion in national economic growth over the course of a decade. Another commenter cited multiple studies indicating that the DACA policy improves labor market prospects of DACA recipients by expanding ''above the table'' work opportunities. The commenter stated that in some studies this is captured in simple measures like reduced unemployment and better wages, while other studies confirm that DACA recipients find jobs that are experienced as a better ''fit'' and more satisfactory even at similar wage levels.[73]

In addition to comments noted above regarding potential displacement of workers by DACA recipients, multiple commenters suggested DACA recipients help to fill labor gaps amid labor shortages in the United States, with a joint comment pointing to the 8.4 million job seekers as compared to the 10 million job openings in the United States as of September 2021. These commenters cited statistics that 46 percent of DACA recipients have a bachelor's degree or higher,[74] and as a group they tend to be younger, better educated, and more highly paid than the typical immigrant.[75] As a result, they are poised to contribute to the worker pool for higher-skilled jobs that U.S. employers have reported having difficulty filling with other workers.[76] Another joint comment cited a 2019 survey in which 64 percent of small businesses reported they had tried to hire workers, but of those, 89 percent reported they found few or no qualified applicants, and asserted that DACA recipients have helped to fill these worker shortages, especially during the COVID–19 pandemic.[77] Another commenter wrote that DACA recipients who pursue higher education help offset critical shortages of skilled labor in the United States and become better positioned to support their families, communities, and the U.S. economy. Some commenters stated that if the DACA policy were terminated, then worker shortages would increase. For example, a commenter stated that if DACA recipients were to lose their protections, an estimated 30,000 front line healthcare workers would be displaced. Additionally, a commenter stated that DACA recipients fill a need in the United States for bilingual employees.

Pointing to other labor market and economic benefits of DACA, a commenter cited a large study showing that DACA recipients play a critical role in the creation of jobs and increasing spending in local economies.[78] Commenters also said that the proposed rule would allow recipients to contribute to innovation in the U.S. economy and mitigate aging trends in the U.S. population.

*Response:* DHS acknowledges some commenters' support for the rule and agrees that DACA recipients and their households have made substantial economic contributions to their communities. The communities in which DACA recipients live, and DACA recipients themselves, have grown to rely on the economic contributions this policy facilitates.[79] As noted above, the Napolitano Memorandum contains express limitations, but over the 10 years in which the DACA policy has been in effect, DACA recipients have made major good faith investments in both themselves and their communities, and their communities have made major good faith investments in them. In the Department's judgment, the investments, and the resulting benefits, have been substantial and valuable.

DHS also acknowledges some commenters' concerns regarding the economic impact that terminating the DACA policy would have. DHS appreciates the comments regarding the number of healthcare workers who are DACA recipients and the role that DACA recipients play in job creation and spending in local economies. DHS agrees that without DACA, DACA recipients in the labor market would lose employment. Additionally, beyond the immediate impact of job loss to DACA workers and their employers, the impacts to the broader economy would depend on factors such as the nature of the jobs being performed, the level of substitutability with similarly skilled workers, and DACA recipients' ability and willingness to find undocumented employment. Similarly, as with any other population, DACA recipients participate in the local and broader U.S. economy in various employment or consumer roles and thus impact their communities and beyond.

DHS has described the assumptions used in the labor market section of the

---

[72] Brannon and McGee (2019).

[73] Pope (2016); Wong (2020); Erin R. Hamilton, Caitlin Patler, and Robin Savinar, *Transition into liminal legality: DACA's mixed impacts on education and employment among young adult immigrants in California,* Soc. Probs., 68(3), 675–95 (2021).

[74] Tom K. Wong, et al., *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November,* Center for American Progress (Sept. 19, 2019), *https://www.americanprogress.org/ issues/immigration/news/2019/09/19/474636/daca-recipients-livelihoods-families-sense-security-stake-november.*

[75] Ike Brannon and Logan Albright, *The Economic and Fiscal Impact of Repealing DACA,* Cato at Liberty (Jan. 18, 2017), *https://www.cato.org/blog/economic-fiscal-impact-repealing-daca* (hereinafter Brannon and Albright (2017)).

[76] William C. Dunkelberg and Holly Wade, *Small Business Economic Trends,* Nat'l Fed'n of Indep. Bus. (Oct. 2021), *https://www.nfib.com/surveys/small-business-economic-trends,* at 1; Anneken Tappe, *Nearly half of American companies say they are short of skilled workers,* CNN (Oct. 25, 2021), *https://www.cnn.com/2021/10/25/economy/business-conditions-worker-shortage/index.html.*

[77] Nat'l Fed'n of Indep. Bus., *Small Business Optimism Index* (Aug. 2019), *https://www.nfib.com/surveys/small-business-economic-trends.*

[78] Tom K. Wong, et al., *DACA Recipients' Economic and Educational Gains Continue to Grow,* Center for American Progress (Aug. 28, 2017), *https://www.americanprogress.org/article/daca-recipients-economic-educational-gains-continue-grow.*

[79] Reasonable reliance on the existence of the DACA policy is distinct from reliance on a grant of DACA to a particular person. Individual DACA grants are discretionary and may be terminated at any time, but communities, employers, educational institutions, and State and local governments have come to rely on the existence of the policy itself and its potential availability to those individuals who qualify.

RIA as well as in the estimated costs and benefits. There are many open questions here. It cannot be said with certainty whether all jobs held by DACA recipients are fully replaceable or irreplaceable by other workers, and local labor market conditions can vary such as industry characteristics and preferences for specific types of skills by employers. For example, U.S. employers apply for employment-based immigrant visas for foreign workers on an annual basis. These employment-based immigrant visas are for jobs for which there are not enough domestic workers, domestic workers with the required skills, and/or domestic workers with the required level of education. In these cases, domestic labor is not readily available as a substitute. For example, the medical field exhibits shortages of workers such as physicians, nurses, and other professionals, and nearly 30,000 DACA recipients are employed in the medical field.[80] Indeed, DACA recipients who are healthcare workers are also helping to alleviate a shortage of healthcare professionals in the United States, and they are more likely to work in underserved communities where shortages are particularly dire.[81] Whether jobs that DACA recipients occupy can be easily replaced by other authorized workers is a complex matter that depends on factors such as the nature of the job, the industry, and the employer, among others. Nevertheless, DHS considered evidence presented by these commenters, as well as the empirical findings discussed in the 2017 NAS report. DHS has determined that, on balance, the various positive economic impacts of DACA outweigh the potential adverse impacts to the labor market.

*Comment:* Many commenters cited studies indicating DACA recipients contribute to Federal, State, and local tax revenue, as well as Medicare and Social Security. For example, numerous commenters wrote that DACA recipients pay taxes—$5.6 billion in Federal taxes and $3.1 billion in State and local taxes annually according to one study using 2020 data—and contribute significantly to Social Security and Medicare.[82] Another commenter pointed to studies that in California alone, DACA-eligible

noncitizens make $905.4 million in Federal tax contributions and $626.6 million in State and local tax contributions,[83] and that ''reversing'' the DACA policy would result in a $351 billion loss for the U.S. economy and a $92.9 billion loss in tax revenue.[84] Another commenter, however, said that DHS could not establish these estimates without the names and tax returns of the affected populations.

Commenters identified other economic contributions of DACA recipients beyond tax payments. Some commenters cited statistics that DACA recipients hold $25.3 billion in spending power.[85] Many commenters also provided statistics and general information on other ways DACA recipients contribute to the economy by increasing consumer spending, purchasing homes and making $566.7 million in annual mortgage payments, paying $2.3 billion in annual rental payments, buying cars, applying for lines of credit, and opening businesses.[86] Commenters stated that recipients' purchasing power increases once they receive DACA, citing surveys stating that a majority of DACA recipients reported having purchased their first car after receiving DACA.[87]

Numerous commenters stated that many DACA recipients have been employed in essential industries such as education, the military, and healthcare during the COVID–19 pandemic. A commenter wrote that DACA recipients form a critical, stable, and reliable workforce that enables retailers to continue to provide goods and services throughout the pandemic. Some commenters stated that DACA recipients are critical members of unions and workforces across many sectors of the economy. Several commenters cited studies stating that DACA recipients boost wages and increase employment opportunities for all U.S. workers.[88] Others wrote that

there are significant business and economic reasons to preserve DACA as its recipients drive innovation, create breakthroughs in science, build new businesses, launch startups, and spur job growth. Another commenter stated that more than two-thirds of farmworkers are immigrants and most of them lack work authorization. The commenters continued that DACA is therefore necessary to protect immigrants from employer exploitation and abuse. The commenters further stated that the presence of an easily exploitable workforce depresses wages and working conditions for all farmworkers, including the hundreds of thousands of U.S. citizens and lawful immigrants who work in agriculture.

*Response:* DHS appreciates commenters' recognition of DACA recipients' contributions, both prior and ongoing, tangible and intangible, to the U.S. economy. DHS agrees members of the DACA population carry substantial spending power, generate billions in tax revenue, and fill vital roles across a broad array of industries. DHS disagrees with the comment that DHS is not able to establish various estimates without the names and tax returns of the affected populations. To develop estimates of the quantified costs and benefits presented in this rule, DHS did not need the names and tax returns of individuals in the estimated population. Moreover, DHS's methodology for the analysis is clearly presented in the RIA of this rulemaking.

Commenters, in DHS's view, correctly note that the DACA policy and DACA recipients improve economic conditions broadly in the United States by driving innovation, starting businesses, and employing themselves and others,

---

[80] *See, e.g.,* Xiaoming Zhang, et al., *Physician workforce in the United States of America: forecasting nationwide shortages,* Human Resources for Health, 18(1), 1–9 (2020); Svajlenka (2020).

[81] Chen (2019) presents survey data showing that 97 percent of undocumented students pursuing health and health-science careers planned to work in an underserved community.

[82] *See* Svajlenka and Wolgin (2020). *See also* Hill and Wiehe (2017) (analyzing the State and local tax contributions of DACA-eligible noncitizens in 2017).

[83] Higher Ed Immigration Portal, *California—Data on Immigrant Students, https:// www.higheredimmigrationportal.org/state/ california* (last visited June 9, 2022).

[84] Logan Albright, et al., *A New Estimate of the Cost of Reversing DACA,* Cato Inst. (Feb. 15, 2018), *https://www.cato.org/publications/working-paper/ new-estimate-cost-reversing-daca* (hereinafter Albright (2018)).

[85] *See* Nicole Prchal Svajlenka and Trinh Q. Truong, *The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition,* Center for American Progress (Nov. 24, 2021), *https:// www.americanprogress.org/article/the-demographic-and-economic-impacts-of-daca-recipients-fall-2021-edition.*

[86] *See* Svajlenka and Wolgin (2020).

[87] *See* Wong (2020).

[88] *See, e.g.,* Brannon and Albright (2017); Albright (2018); Brannon and McGee (2019); Ike Brannon and M. Kevin McGee, *Estimating the Economic*

*Impact of the 2021 Dream Act* (June 6, 2021), *https://ssrn.com/abstract=3861371* or *http:// dx.doi.org/10.2139/ssrn.3861371* (hereinafter Brannon and McGee (2021)); Martin Ruhs and Carlos Vargas-Silva, *The Labour Market Effects of Immigration,* Migration Observatory (Feb. 2021), *https://migrationobservatory.ox.ac.uk/resources/ briefings/the-labour-market-effects-of-immigration;* Matthew Denhart, *America's Advantage: A Handbook on Immigration and Economic Growth,* George W. Bush Inst. 118–19 (3d ed. Sept. 2013), *http://gwbcenter.imgix.net/Resources/gwbi-americas-advantage-immigration-handbook-2017.pdf;* Ryan D. Edwards and Mao-Mei Liu, *Recent Immigration Has Been Good for Native-Born Employment,* Bipartisan Pol'y Ctr. (June 2018), *https://bipartisanpolicy.org/download/?file=/wp-content/uploads/2019/03/Recent-Immigration-Has-Been-Good-for-Native-Born-Employment.pdf;* Gretchen Frazee, *4 Myths About How Immigrants Affect the U.S. Economy,* PBS NewsHour (Nov. 2, 2018), *https://www.pbs.org/newshour/economy/ making-sense/4- myths-about-how-immigrants-affect-the-u-s-economy;* Alex Nowrasteh, *Three Reasons Why Immigrants Aren't Going to Take Your Job,* Cato at Liberty (Apr. 22, 2020), *https:// www.cato.org/blog/three-reasons-why-immigrants-arent-going-take-job.*

**D. App. 020**

thereby reducing reliance on public assistance (to the extent that such reliance is possible given eligibility restrictions) and pressure on the job market for low-skilled workers. DHS also agrees that if members of the DACA population stopped performing their work, labor shortages could be exacerbated depending on the industry and employer.

DHS appreciates commenters' concern for the well-being of agricultural workers. DHS agrees that the ability to lawfully work empowers employees in all sectors to leave dangerous employment situations by decreasing fear that reporting exploitative or illegal employment practices could potentially result in immigration consequences. Additionally, as mentioned above, a lack of access to employment authorization raises the potential for exploitation and substandard wages, which in turn may have the effect of depressing wages for some U.S. workers. Thus, making employment authorization available to DACA recipients helps protect U.S. workers and employers against the possible effects of unauthorized labor.

Other Impacts on Communities

*Comment:* Some commenters described DACA recipients as law-abiding, valued members of their communities. Commenters also supported the proposed rule based on positive impacts on communities and society as a whole. These commenters stated that the proposed rule would prevent families and communities from being separated; encourage diversity; and allow recipients to participate in military service, jobs, and community service roles that keep communities safe. One commenter expressed agreement with DHS's overall description of the substantial reliance interests of communities on DACA recipients.

Other commenters stated that DACA was a crucial part of facilitating professional licensing eligibility, opening the door to licensure for many professions, including as a lawyer, teacher, doctor, nurse, social worker, or psychologist. These commenters further stated that communities have benefited from the education, professional expertise, and professional and economic contributions of DACA recipients in those professions. One of these commenters further stated that the increasing number of DACA recipients admitted to the Bar Associations of their respective States has promoted diversity in the legal profession while also helping to ensure all communities

understand the judicial process and have greater access to justice. A joint comment by 14 States also identified examples of reliance interests engendered by community and State-level investments in the DACA population; for example, losing the benefits of investment into the training of DACA recipients working in healthcare who have committed to four years of post-graduation work in underserved Illinois communities.

Other commenters opposed the rule, stating that undocumented noncitizens exacerbate affordable housing shortages and that U.S. citizens should instead be prioritized.

*Response:* DHS acknowledges some commenters' support of the rule and agrees, as discussed in this rule, that there is strong evidence that DACA has had a positive impact on communities in promoting family unity, encouraging diversity, and opening pathways to military and other community service roles. DHS also recognizes, as discussed by commenters below, that the reduction of fear among DACA recipients contributes to improved law enforcement and community relations, which improves public safety.

DHS acknowledges the commenter's support for DHS's description of the substantial reliance interests of DACA recipients and communities. DHS appreciates the additional reliance interests identified by the commenter and agrees that some States have structured or amended their professional licensing requirements in reliance on the existence of the DACA policy, and therefore have reliance interests in the preservation of the DACA policy, as do the DACA recipients who have established careers dependent upon licensure by the State and the entities that employ professionally licensed DACA recipients.

DHS also acknowledges a commenter's concern that undocumented noncitizens, including DACA recipients, exacerbate the affordable housing shortage confronting some communities. Although some studies have examined the impact of immigration on housing,[89] the housing market is influenced by many factors, and DHS is unable to quantify the potential impact of the DACA policy itself on housing availability, including affordable housing. It is important to distinguish the effect of the DACA policy itself from the impact of current

DACA recipients and the DACA eligible population in the United States. Current and potential DACA recipients have shown, through a course of years, that many would remain in the United States even without deferred action or employment authorization. The presence of these noncitizens affects housing availability regardless of the DACA policy. Nonetheless, DHS acknowledges that, as some DACA recipients have increased their earning potential and incomes as a result of the DACA policy, this could arguably affect the availability of housing for others in those communities in which these DACA recipients reside. DHS is cognizant that, like other community impacts of the DACA policy, the impact upon housing availability can vary across communities. However, DHS has determined that the many positive impacts of the DACA policy on communities, as discussed throughout this section, outweigh the possible impact of DACA recipients, as a subset of a larger undocumented noncitizen population, on the availability of affordable housing in some communities.

Impacts on States

*Comment:* Some commenters generally opposed the proposed rule based on the use of public benefits programs, education resources, and other costs to the government by noncitizens and DACA recipients. A commenter stated that USCIS ignores the costs borne by local, State, and Federal agencies for services provided to DACA recipients, such as Medicaid services to pregnant women and bilingual education services provided to students in local schools, which the commenter asserts also result in higher taxes to U.S. citizens at the State and local levels. Commenters also stated that U.S. citizens and States have reliance interests weighing against promulgating this rule. These commenters stated that the government should take care of U.S. citizens before spending money on undocumented noncitizens or DACA recipients, that DACA recipients generally divert limited resources from U.S. citizens, and that the United States cannot financially or otherwise afford to support undocumented noncitizens, including DACA recipients.

Other commenters stated that DACA recipients should not be given special privileges, benefits, or money at the expense of American taxpayers. A commenter wrote, without accompanying citations or other support, that DACA recipients "use much more than their fair share of social safety net programs especially in places

---

[89] *See, e.g.,* Abeba Mussa, et al., *Immigration and housing: A spatial econometric analysis,* J. of Housing Econ., 35, 13–25 (2017), *https://doi.org/10.1016/j.jhe.2017.01.002.*

like [N]ew [Y]ork where very few questions are asked, fake names and documentation is given and people without documentation are offered services citizens are unable to use at times.'' Some commenters stated that immigrants should prove that they can financially support themselves and will not be dependent on the U.S. Government. One commenter stated that in previous decades, DACA recipients have sent millions of American dollars in remittances back to their countries of origin with no repercussions.

The Attorney General of Texas submitted the only comment from a State expressing general opposition to the proposed rule. The comment stated that DACA increases the State's expenditures associated with education, healthcare, and law enforcement by incentivizing unauthorized noncitizens to remain in the country. The comment stated that Texas spends over $250 million each year in the provision of social services to DACA recipients. The comment also stated that unauthorized migration costs Texas taxpayers over $850 million each year: between $579 million and $717 million each year for public hospital districts to provide uncompensated care for undocumented noncitizens; $152 million in annual costs for incarceration of undocumented noncitizens in the penal system; between $62 million and $90 million to include undocumented noncitizens in the State Emergency Medicaid program; more than $1 million for The Family Violence Program to provide services to undocumented noncitizens for one year; between $30 million and $38 million per year on perinatal coverage for undocumented noncitizens through the Children's Health Insurance Program; and between $31 million and $63 million to educate unaccompanied noncitizen children each year.

In contrast, a joint comment submitted by the Attorneys General of 14 States[90] that together represent approximately 61 percent of the total DACA recipient population discussed how their States have adopted laws, regulations, and programs in reliance on the existing DACA policy and have a strong interest in preserving these frameworks and the benefits they secure to the States, as well as in avoiding the costs incurred upon adjusting or revoking these frameworks should DACA be revoked. The Attorneys General said that DACA recipients are vital members of and workers within

their communities, including essential workers and State government employees. To the extent that their States employ DACA recipients, they stated that ending the DACA policy would harm their States' reliance interests because they would lose the critical skills of these employees and their investments in these employees, while also incurring costs associated with terminating their employment and the additional costs of recruiting, hiring, and training their replacements. These States further noted that the increased earning power of DACA recipients is economically beneficial to their States, citing data that DACA recipients' estimated spending power is approximately $24 billion. The 14 States jointly commented that because the service sector represents approximately 80 percent of the U.S. GDP and 86 percent of total employment, and the service sector relies on consumer spending, this purchasing power is critical to the overall economic health of their States. Additionally, they noted that due to the economic stability and ability to make long-term plans provided by a DACA-related grant of deferred action and employment authorization, approximately a quarter of DACA recipients aged 25 and older have been able to purchase homes, creating jobs and boosting spending in their States, including California, where DACA recipients make yearly mortgage payments totaling $184.4 million. These States added that ending DACA, or limiting it to current active recipients, would result in significant losses in tax revenue—$260 million in State and local taxes over the next decade in California alone—and negatively impact their States' residents. They also noted that ending DACA would result in an estimated loss of $33.1 billion in Social Security contributions and $7.7 billion in Medicare contributions—funds that are critical to ensuring the financial health of these programs, upon which residents of their States depend.

These States also asserted that opponents of the DACA policy have failed to demonstrate a single law enforcement cost attributable to the policy, and cited an article in which numerous police chiefs, prosecutors, and other law enforcement professionals advocated for the continuation of DACA.[91] They went on to identify that mistrust of communities toward law enforcement is a significant challenge that results in individuals being less

likely to report being witnesses to or victims of crime. The commenters cited one recent study finding that in neighborhoods where 65 percent of residents are immigrants, there is only a 5 percent chance that a victim will report a violent crime, compared with a 48 percent chance in a neighborhood where only 10 percent of residents are born outside the United States (although the relationship in general was nonlinear).[92] Citing survey results that 59 percent of DACA recipients confirmed they would report crimes that they would previously have not reported in the absence of DACA, these States asserted that the benefits of such increasing cooperation far outweighs any alleged ways in which DACA hinders law enforcement.

The joint comment from these 14 States also disputed the notion that DACA imposes significant healthcare costs on the States, and stated that, to the extent there are costs, they do not outweigh the strong benefits and healthcare cost savings of DACA. They stated that DACA saves States money by allowing DACA recipients to receive employer-sponsored health insurance or to purchase insurance directly from carriers. Without DACA, they stated, those individuals would have to rely more on emergency services, as opposed to preventative services, in order to meet their healthcare needs, thereby increasing the costs to both the States themselves and their healthcare systems. The 14 States also stated that DACA reduces healthcare costs because its positive population-level mental health consequences reduce, rather than increase, State healthcare costs.

The joint comment from the States also characterized as a ''false premise'' the assumptions of opponents of the DACA policy that DACA recipients would depart the United States if the policy ended. They reasoned that, given the unlikelihood of large-scale departure of DACA recipients in the event DACA were terminated, the need to reduce healthcare expenses by making recipients eligible for insurance and by improving health outcomes becomes paramount. The States went on to explain that a number of States have structured healthcare access programs in reliance on the existence of DACA, and would incur costs to amend the programs were DACA limited or terminated. The commenters wrote that for example, New York currently uses

---

[90] The joint comment was submitted by the Attorneys General of California, New Jersey, New York, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, and Washington, DC.

[91] Georgetown Law, *Law Enforcement Leaders and Prosecutors Defend DACA* (Mar. 20, 2018), *https://www.law.georgetown.edu/news/law-enforcement-leaders-and-prosecutors-defend-daca.*

[92] *See* Min Xie and Eric P. Baumer, *Neighborhood Immigrant Concentration and Violent Crime Reporting to the Police: A Multilevel Analysis of Data from the National Crime Victimization Survey,* 57 Criminology 237, 249 (2019), *https://perma.cc/QS5RK867.*

State-only funds to provide full health coverage for deferred action recipients (including DACA recipients, whom New York State considers to be Permanently Residing Under Color of Law (PRUCOL)), while noncitizens without DACA or another qualified immigration status only qualify for emergency Medicaid coverage, which provides treatment of emergency medical conditions. Were DACA to be terminated or limited, the States explained, New York would incur the costs of seeking a State legislative change to maintain coverage for DACA-eligible persons (again, with State dollars only), or limit Medicaid coverage to treatment of emergency conditions for some or all of these individuals.

These 14 States also stated that DACA does not increase the States' educational costs, and that opponents of the DACA policy have not identified specific costs attributable to DACA, citing numerous other States' declarations in the record in *Texas*. The joint commenters stated that the assertion of educational costs attributable to DACA rely on, as discussed above, a flawed assumption that in the absence of DACA, recipients would depart the United States and thus reduce the cost of providing legally required public K–12 education to DACA recipients. Furthermore, the joint comment noted that the obligation imposed by *Plyler* v. *Doe* requires States to educate students regardless of their immigration status; thus, every State has the same responsibility for educating DACA-eligible students regardless of whether the DACA policy continues to exist. Rather than impose costs, the 14 States asserted that DACA benefits State and local governments by eliminating a major source of challenges for undocumented students and those with mixed-status families, allowing them to thrive and contribute to their communities and State economies, to the benefit of the entire community and to the States themselves. The 14 States pointed to research that DACA significantly increased both school attendance and high school graduation rates, closing the gap between citizen and noncitizen graduation rates by more than forty percent.[93]

Another joint comment stated that States lack any reliance interest in the nonexistence of a DACA policy because States are not harmed by how the Federal Government prioritizes and enforces its immigration laws. The rule as proposed, the commenters stated, does not harm any reliance interests on the part of States. The commenters stated that the reliance interests thus weigh strongly in favor of DACA recipients and of other individuals who benefit from a DACA policy and from other policies that spring from the same statutory authority.

*Response:* DHS acknowledges commenters' concerns about diversion of resources to DACA recipients. After carefully considering each of the concerns, DHS recognizes that while the final rule could result in some indirect fiscal effects on State and local governments, the size and even the direction of the effects is dependent on many factors, making for a complex calculation of the ultimate fiscal impacts. Section III.A.4.e of the RIA discusses fiscal impacts in more detail.

DHS disagrees with a comment that it ignored possible fiscal impacts at the local, State, and federal levels. The RIA specifically addresses potential fiscal impacts, both positive and negative, at various levels of government. As the commenter notes, a comprehensive quantified accounting of local and State fiscal impacts specifically due to DACA is not possible due to the lack of individual-level data on DACA recipients who might use State and local programs or contribute in a variety of ways to State and local budgets. In general, however, DACA is not a qualifying immigration category for Medicaid eligibility and does not affect access to public schools. DHS is aware that some State and local jurisdictions have chosen to expand assistance to deferred action recipients in certain contexts.

Furthermore, the claim of a causal link between Texas fiscal spending and the DACA policy relies to a significant extent on the assumption that in the absence of DACA, a substantial portion of DACA recipients who would otherwise impose a net fiscal burden on the States would depart the United States. DHS welcomed comment on all aspects of the NPRM, but received scant evidence in support of this

assumption.[94] Even in 2012 when the DACA policy was first announced, DACA-eligible persons would already have been residing in the United States for five years, without deferred action. At this stage, an additional ten years on, many DACA recipients have developed deep ties to the United States and have children and close relations with family and friends (and have also just entered their prime working years). Many recipients know only the United States as home, and English is their primary language. Leaving the country would mean leaving behind children, parents, other family members, and close friends. In short, DHS believes that DACA-eligible individuals generally would be unlikely to leave the United States if the DACA policy were discontinued. DHS thus does not believe that reliable evidence supports the conclusion that a decision to terminate the DACA policy would result in a net transfer to States. Although commenters provided some estimates of DACA recipients' fiscal effects on States, it is worth noting that commenters' concerns focus on the marginal effect of each DACA recipient on State and local revenues as well as expenditures. While some DACA recipients might leave the country if the program did not exist, DHS has no basis to assume those individuals would cause decreases in State expenditures that exceeded their contributions to tax revenue. Again, in the RIA, DHS presents additional available evidence and discusses possible labor market and fiscal impacts of the DACA policy.

DHS also acknowledges the comment of 14 other States—including multiple states in which large numbers of DACA recipients currently reside—that DACA does not increase States' law enforcement, healthcare, or education costs, and, if anything, reduces such costs. With respect to law enforcement in particular, DHS agrees that DACA mitigates a dilemma faced by those without lawful status; by virtue of the measure of assurance provided by the DACA policy, DACA recipients are more likely to proactively engage with law enforcement in ways that promote public safety. With respect to health care and education, DHS appreciates that some of these States, as well as some localities, have enacted laws

---

[93] *See, e.g.,* Kuka (2020). Moreover, deferred action actually saves local governments money by increasing attendance and preserving critical sources of funding to public school districts across the United States. School districts in many States receive funding based on primary and secondary school attendance; poor attendance rates jeopardize that funding. Laura Baams, et al., *Economic Costs of Bias-Based Bullying,* 32 Sch. Psychol. Q. 422 (2017), *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5578874*; Chandra Kring Villanueva, *Texas Schools at Risk of Significant Funding Cuts due to*

*Pandemic-Related Attendance Loss,* Every Texan (Feb. 22, 2021), *https://everytexan.org/2021/02/22/keeping-schools-whole-through-crisis.* In California, for example, student absenteeism costs public schools an estimated $1 billion per year. *See* Laura Baams, et al., *supra,* at 3.

[94] In contrast, DHS is aware of a peer-reviewed study that found no statistical causal link between the DACA policy and border crossings. For details, see Catalina Amuedo-Dorantes and Thitima Puttitanun, *DACA and the Surge in Unaccompanied Minors at the U.S.-Mexico Border,* International Migration, 54(4), 102–17 (2016) (hereinafter Amuedo-Dorantes and Puttitanun (2016)).

making DACA recipients eligible for more benefits than they otherwise would be eligible for without DACA, because DACA recipients are not "qualified alien[s]" as defined in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), 8 U.S.C. 1641(b), and are, therefore, generally ineligible for public benefits at the Federal, State, and local levels.[95] These States have made a judgment that providing such benefits to DACA recipients is beneficial to the State in some way. Other States have made different judgments, and as a consequence do not bear a substantially greater burden with respect to healthcare or education than they would if DACA were terminated and its current recipients remained in the United States regardless. In fact, because the DACA policy permits DACA recipients to obtain lawful employment, in many cases giving them access to private health insurance and reducing their dependence on state-funded healthcare, eliminating DACA could increase State and local healthcare expenditures.

In connection with this discussion of fiscal burdens, DHS reiterates its understanding that DACA recipients make substantial contributions in taxes and economic activity.[96] As discussed in the NPRM and this rule, and as cited by numerous commenters, according to one study, DACA recipients and their households pay approximately $5.6 billion in annual Federal taxes and approximately $3.1 billion in annual State and local taxes.[97] DHS notes that the estimates from this study show that in 2020, the State and local tax contributions of the 106,090 DACA recipients in Texas amounted to $409.9 million,[98] exceeding the $250 million that the comment from the Attorney General of Texas stated that Texas spends each year in the provision of social services to DACA recipients. DACA recipients also make significant contributions to Social Security and Medicare funds through their employment.[99] The governments and residents of States in which DACA recipients reside benefit from increased tax revenue due to the contributions of DACA recipients, and the States and their residents have also benefited and

come to rely on the broader economic contributions this policy facilitates.

With respect to comments suggesting that DHS should consider a DACA requestor's self-sufficiency, DHS does not believe it is necessary to supplement the rule in this way, both because there is little evidence that DACA results in a net fiscal burden on governments, and because the DACA criteria (such as the criteria related to educational attainment, age, and criminality) relate to the contributions DACA recipients have made and will make in the future. Additionally, the DACA policy allows its recipients to work lawfully in the United States and has allowed them to significantly increase their earning power over what they could earn without DACA.[100] Finally, although DACA recipients may have sent remittances abroad, DHS lacks data about the amount of those remittances or about the effect the DACA policy has had on this amount, and notes that many citizens and noncitizens both with and without lawful immigration status or deferred action send a portion of their income abroad.

As discussed in Section II.A.3, the DACA policy has encouraged its recipients to make significant investments in their education and careers. They have continued their studies, and some have become doctors, lawyers, nurses, teachers, or engineers.[101] About 30,000 are healthcare workers, and many of them have helped care for their communities on the frontlines during the COVID–19 pandemic.[102] In addition, DACA recipients have contributed substantially to the U.S. economy through taxes and other economic activity. DHS believes these benefits of the rule outweigh the potential negative impacts identified by some commenters. DHS therefore declines to make any changes in response to these comments.

DHS also acknowledges the joint commenters' statement that States have no reliance interests in the nonexistence of a DACA policy. To the extent that any State may have reliance interests in the nonexistence of DACA, DHS believes that those interests are significantly diminished by the fact that the DACA policy has been in place for a decade. After careful consideration, DHS agrees with these commenters that the reliance

interests weigh strongly in favor of recipients and others who benefit from the DACA policy, including the States themselves, in reliance on DACA as codified in this rule. After carefully considering these comments, DHS therefore declines to make any changes in response to them.

6. Impacts on Businesses, Employers, and Educational Institutions

Impacts on Businesses and Employers

*Comment:* A commenter said that businesses need DACA recipients' continued contributions as they work to reinvigorate the U.S. economy, and that failure to act would have a significant impact on businesses that rely on DACA recipients as employees and customers. Several commenters also stated that the proposed rule would provide a sense of security to organizations that employ recipients of DACA.

A group of commenters similarly said that the proposed rule would protect the substantial reliance interests of their very large companies in current and future employment relationships with DACA recipients. These commenters noted that more than 75 percent of the top 25 Fortune 500 companies—together representing every major sector of the U.S. economy and generating almost $3 trillion in annual revenue—employ Dreamers.[103] They further stated that DACA recipients have helped keep the U.S. economy running, particularly during the COVID–19 pandemic, and help ameliorate labor shortages. The commenters stated that ending DACA would cripple the nation's healthcare system and cost small business employers over $6 billion in turnover costs from losing investments in training DACA workers and having to recruit and train potentially less productive, new workers. Noting that DACA allows recipients to pursue careers that match their skills without the fear of deportation, the commenters stated that the policy therefore makes the economy more productive and decreases the extent to which immigrants compete with American citizens for lower income jobs. The commenters also identified businesses' reliance interests in DACA because employed DACA recipients have increased purchasing power, and that the rule, as proposed, would bring

---

[95] *See* 8 U.S.C. 1641(b), 1611 (general ineligibility for Federal public benefits), and 1621 (general ineligibility for State public benefits).

[96] 86 FR 53738 and 53802.

[97] Svajlenka and Wolgin (2020); *see also* Hill and Wiehe (2017).

[98] Svajlenka and Wolgin (2020).

[99] Magaña-Salgado and Wong (2017); *see also* Magaña-Salgado (2016).

[100] Wong (2017).

[101] *See* Gonzales (2019); Svajlenka (2020); Wong (2020); Zong (2017).

[102] Svajlenka (2020). DACA recipients who are healthcare workers also are helping to alleviate a shortage of healthcare professionals in the United States and they are more likely to work in underserved communities where shortages are particularly dire. Chen (2019); Garcia (2017).

[103] Use of the term "Dreamers" as a descriptor for young undocumented immigrants who came to the United States as children originated with the Development, Relief, and Education for Alien Minors Act (DREAM Act), a legislative proposal first introduced in 2001 (S.1291, 107th Cong.) that, if passed, would have granted them protection from removal, the right to work, and a path to citizenship.

stability to the DACA population, which has become an integral part of the U.S. economy.

A joint comment submitted by an educational institution and corporation stated that they have considerable reliance interests in a DACA policy because they have enrolled and employed DACA recipients who have made significant contributions to their institutions. The commenters further stated that DACA recipients contribute to the educational institutions they attend, and that communities and employers depend upon them and have invested significant time and money in training them, such that hiring and training replacements would cost employers $6.3 billion.

*Response:* DHS agrees that employers, including businesses and educational institutions, have relied upon the existence of the DACA policy over the course of 10 years and that restricting DACA to currently active recipients or ending the DACA policy altogether would harm the reliance interests identified by these commenters, including their reliance interests in the labor and spending contributions of DACA recipients. For those employers that hire DACA recipients with highly specialized skills and higher levels of education, if the DACA policy were to end, some of these employers could face challenges and higher costs in finding replacement labor for these highly specialized workers, assuming all else remains constant. Regarding DACA recipients' spending power, DHS agrees that the DACA policy does bring stability to the DACA population with employment authorization that enables them to earn compensation that, in turn, is spent, at least in part, in the economy. The preamble details further the motivations for this rule and the RIA the potential economic, labor, and fiscal impacts.

Impacts on Educational Institutions

*Comment:* As discussed in greater detail in Section II.A.5, some commenters opposed the proposed rule, stating that DACA recipients, and undocumented students in general, displace citizens from schools and cost localities and States to provide public primary and secondary schooling to these students. One of these commenters pointed to a study that found that, in 1994, lawful and unlawful immigration resulted in $4.51 billion in primary and secondary education costs. Meanwhile, as discussed above, another commenter stated that Texas spends between $31 million and $63 million to educate unaccompanied noncitizen children

each year. Another commenter also opposed the rule, saying that DACA recipients get special scholarships.

*Response:* DHS acknowledges these commenters' concerns that undocumented noncitizen students, including DACA recipients, receive education that is publicly funded. As discussed in greater detail in Section II.A.5 and Section III.A.4.e in the RIA, DHS recognizes that although the rule may result in some indirect fiscal effects on State and local governments, the direction of effects is dependent on many factors. DHS, however, notes that the Texas Attorney General cited the cost to Texas of educating unaccompanied noncitizen children, not DACA recipients specifically. Given the threshold criteria requiring that a noncitizen have continuously resided in the United States since June 15, 2007, it is a reasonable assumption that most unaccompanied children presently enrolled in Texas public schools are not potentially DACA eligible. Indeed, two-thirds (61 percent) of active DACA recipients are between the ages of 20 and 29, with most other recipients between the ages of 30 and 45 (38 percent), and therefore unlikely to be enrolled in a public K–12 school.[104] As of June 2022, the youngest noncitizens who meet DACA threshold criteria are generally in the 10th grade. DHS recognizes that other noncitizens who are enrolled in publicly funded K–12 schools may meet threshold criteria but have not previously requested DACA; however, as discussed in the RIA, retention of the existing threshold criteria means there is a diminishing number of noncitizens who may make initial DACA requests under this rule.

With respect to assertions that DACA recipients receive special scholarships, DHS recognizes that some educational institutions and States have established scholarships or other financial aid to support undocumented students, including DACA recipients. DHS cannot determine the degree to which, in the absence of a DACA policy, those underlying resources would instead be directed toward U.S. citizens or other students with lawful status. As for assertions that DACA recipients displace U.S. citizens in schools or colleges or otherwise impact educational resources, DHS generally agrees that educational resources in primary and secondary education are also shared by those enrolled DACA recipients as enrollment at these

educational levels generally is not dependent on immigration status. Enrollment in primary or secondary education by undocumented noncitizens is not predicated on this rule. Undocumented noncitizens without DACA can enroll in these institutions regardless of this rule. The commenter's assertions also assume that DACA recipients and/or their family members do not contribute economically and fiscally to their local schools and communities, that educational resources are fixed, and that local laws and regulations, economic conditions, and demographics remain constant. Many factors can impact local educational resources, including the level of local immigration, and a static analysis cannot appropriately assess a dynamic issue such as this. Assuming that DACA recipients only draw down government resources without also analyzing their beneficial contributions distorts realistic fiscal impacts, which are discussed in more detail in Section III.A.4.e in the RIA. DHS further notes that educational institutions (some of which accept undocumented students without deferred action as well) expressed widespread support for the proposed rule, as discussed below, which stands in contrast to some commenters' views that the DACA policy imposes a substantial strain on educational resources.

*Comment:* Numerous universities and colleges commented that DACA and DACA recipients positively impact their institutions, and that they have reliance interests in the various benefits that DACA recipients bring to their campuses. Commenters described DACA recipient students as bright, dedicated, and resilient. They identified various missions and core philosophies of their institutions, including diverse and inclusive learning environments that prepare students for living and working in an increasingly diverse workforce and society, social justice, developing global citizens, and advancing research, and commented that DACA recipient students make meaningful and important contributions to those missions.

Commenters also noted that the DACA policy enables them to hire DACA recipient students as teaching assistants, tutors, and researchers, among other on-campus work-study positions, benefiting the DACA recipients themselves, other students, and the universities more broadly. Commenters also stated that the availability of advance parole has enabled DACA recipients to pursue study abroad, fellowships, research, and other academic programs or related

---

[104] DHS, USCIS, Office of Performance and Quality (OPQ), Electronic Immigration System (ELIS) and Computer-Linked Application Information Management System (CLAIMS) 3 Consolidated (queried Apr. 30, 2022).

employment opportunities that significantly enhance the intellectual and professional development of individual students and increase their contributions to their campuses.

A comment jointly submitted by 14 States also identified the reliance interests of public universities and colleges in their States, which rely upon significant tuition revenue from DACA recipient students, and have made significant investments in financial aid and other programs to support DACA recipient students. These commenters further stated that such investments are "consistent with their interests in ensuring diversity and nondiscrimination and in developing a well-educated workforce that can contribute to the States' overall economies."

Another commenter highlighted studies estimating that there are approximately 9,000 DACA recipients working as teachers in the United States. The commenter stated that teacher shortages have become more strained during the COVID–19 pandemic, and the removal forbearance and work authorization provisions of DACA are critical to ensure the quality education of children in the United States. Similarly, a university commented that expanding pathways to DACA would have an immediate positive impact on the number of teachers its teacher preparation program could produce, addressing needs in their State to increase the number of teachers who reflect the State's diverse demographics.

*Response:* DHS acknowledges the commenters' discussion of specific reliance interests that educational institutions have in the preservation of the DACA policy as codified in this rule. DHS agrees that educational institutions have relied upon the existence of the DACA policy over the course of 10 years in the form of DACA recipients' tuition payments and academic and research contributions; and in preparing additional teachers to serve schools throughout the country. DHS agrees that restricting DACA to currently active recipients or ending the DACA policy altogether would harm the reliance interests identified by these commenters, and that the benefits of DACA identified by these institutions weigh in favor of promulgating this rule.

### 7. Impacts on Migration

*Comment:* Some commenters stated that DACA encourages criminals to enter the United States, rewards criminal activity, "promotes chain migration that the nation cannot afford," and incentivizes breaking U.S. laws.

Similarly, some commenters opposed the proposed rule on the basis that the creation of DACA resulted in a "pull factor" for additional migration to the United States, and stated that the United States is currently apprehending large numbers of minors at the Southwest border. The commenters stated the United States should not continue to reward those who enter the country unlawfully, and that the rule as proposed would incentivize unauthorized immigration. A commenter also characterized DACA as an amnesty that opens the door to the prospect of the executive branch exempting anyone from any law at any time, simply by designating them as "low-priority" for enforcement.

One commenter pointed to CBP statistics showing that the number of unaccompanied noncitizen children (UC) apprehended at the border had increased from 15,949 in FY 2011 to 68,541 in FY 2014, which the commenter asserted occurred when the U.S. Government, in their view, began signaling an unwillingness to enforce immigration law against this population. The commenter similarly stated that DACA encourages unauthorized immigration and trafficking of children across the U.S.-Mexico border, and that maintaining DACA and dismantling enforcement against undocumented noncitizens resulted in record apprehensions by CBP at the Southwest border, citing CBP statistics that Border Patrol apprehended 1,659,206 noncitizens who crossed the Southwest border without authorization in FY 2021. The commenter suggested that the humanitarian crisis on the border continues threaten national security, public health, wage levels, and employment security, and poses unsustainable strains to DHS, DOJ, and HHS resources. This commenter and others said that continuing the DACA policy sends the message that unauthorized entry into the United States will be rewarded, and periods of unlawful presence will be mooted by executive action. From their perspective, promulgating a DACA regulation would only perpetuate a widespread belief that immigration laws will not be enforced, therefore incentivizing unlawful entry and unlawful presence by raising the hopes of undocumented noncitizens of attaining DACA or an equivalent status in the future. This, commenters asserted, will exacerbate the situation at the border. One of the commenters similarly stated that continuing DACA would give other undocumented

noncitizens reason to risk their lives and the lives of their children by making the journey to the United States.

Other commenters urged that no action should permit undocumented immigrants to participate in, share, or otherwise obtain status and benefits without first becoming a U.S. citizen, and that no "lawful status" should be granted to those entering the country unlawfully. Some commenters also raised concerns about open borders, stating that DACA is not in the interest of the United States, and that the United States must protect its sovereignty and rule of law. Other commenters expressed concern about the migration of DACA recipients' relatives to the United States and said that such migration should be restricted.

Another commenter stated that DHS should supply additional evidence for its claim that DACA has no substantial effect on lawful or unlawful immigration to address the concerns of the Southern District of Texas, including: (1) the effects of DACA on legal and illegal immigration; (2) the secondary costs of DACA associated with any alleged increase in illegal immigration; and (3) the effect of illegal immigration on human trafficking activities. The commenter cited a 2021 Pew Research Center study showing that the number of unauthorized noncitizens in the United States steadily declined from 2007 to 2017.[105] The commenter further pointed to 2014 and 2017 studies showing that recent increases in children crossing the border are driven by migration increases across all age groups from Guatemala, Honduras, and El Salvador, which have experienced higher rates of violence and economic instability.[106] The commenter suggested DHS add a more detailed discussion of global immigration trends, which bolsters DHS's claim that DACA does not have a significant impact on immigration rates.

*Response:* DHS acknowledges these commenters' concerns and agrees that

---

[105] Mark Hugo Lopez, et al., *Key Facts About the Changing U.S. Unauthorized Immigrant Population,* Pew Research Center (Apr. 13, 2021), *https://www.pewresearch.org/fact-tank/2021/04/13/key-facts-about-the-changing-u-s-unauthorized-immigrant-population.*

[106] *See* Tom K. Wong, *Statistical Analysis Shows that Violence, Not Deferred Action, Is Behind the Surge of Unaccompanied Children Crossing the Border,* Center for American Progress (July 8, 2014), *https://www.americanprogress.org/article/statistical-analysis-shows-that-violence-not-deferred-action-is-behind-the-surge-of-unaccompanied-children-crossing-the-border* (hereinafter Wong (2014)); *see also* David J. Bier, *DACA Definitely Did Not Cause the Child Migrant Crisis,* Cato Institute (Jan. 9, 2017), *https://www.cato.org/blog/daca-definitely-did-not-cause-child-migrant-crisis.*

the United States is a sovereign nation committed to the rule of law. Maintaining an orderly, secure, and well-managed border, reducing irregular migration, and combatting human trafficking are priorities for DHS and for the Administration.[107] DHS disagrees, however, with the suggestion that this rule creates a pull factor for additional irregular immigration. This rule reflects DHS's continued belief, supported by available data, that a continuation of the DACA policy does not have a substantial effect on volumes of lawful or unlawful immigration into the United States. The final rule codifies without material change the threshold criteria that have been in place for a decade, further reinforcing DHS's clear policy and messaging since 2012 that DACA is not available to individuals who have not continuously resided in the United States since at least June 15, 2007, and that border security remains a high priority for the Department.

Even as it relates to the DACA policy under the Napolitano Memorandum, DHS respectfully disagrees with commenters' characterization of the policy's effects. In the proposed rule, DHS wrote that it does not ''perceive DACA as having a substantial effect on volumes of lawful and unlawful immigration into the United States,'' and DHS is not aware of any evidence that, and does not believe that, DACA ''has acted as a significant material 'pull factor' (in light of the wide range of factors that contribute to both lawful and unlawful immigration into the United States).'' [108] Although commenters offered data on overall levels of irregular migration as well as irregular migration by noncitizen minors, these data do not point to DACA as a substantial causal factor in driving such migration or, as some commenters asserted, trafficking of children across the southwest border.

DHS acknowledges commenters' statements that the 2012–2014 increase in the number of unaccompanied children apprehended at the border began in the months preceding DACA's announcement in June 2012 (and peaked in that fiscal year in March),[109]

and that overall border apprehensions actually decreased in the months directly following DACA's announcement.[110] But DHS is also aware of seasonal patterns in migration and other trends suggesting increasing levels of overall migration by children and family units during parts of this time period. DHS believes it would be unreasonable, on the basis of this data alone, to draw or completely disavow a direct causal line between apprehensions and a single policy. Such an approach would be inconsistent with available studies, which indicate that increases in migration of noncitizen children correlate closely with increased levels of violence in their countries of nationality. In short, it is likely that broader sociocultural factors drive youth migration much more than migrants' perception of receiving favorable immigration treatment in the United States.[111]

As DHS noted in the NPRM, Amuedo-Dorantes and Puttitanun (2016) investigated whether the DACA policy had an effect on the rate of irregular migration by noncitizen minors using data from 2007–2013. Their approaches employed multiple models to examine whether the DACA policy had any effect on border apprehensions of unaccompanied minors. These models accounted for additional factors beyond the DACA policy, such as enactment of TVPRA 2008, economic and social conditions in the United States and originating countries, and border conditions. The authors found no evidence of causality between the DACA policy and the number of border apprehensions of unaccompanied minors, and they identified stronger associations between other factors (namely, the economic and social conditions in the originating country and the enactment of TVPRA 2008) and apprehensions of unaccompanied minors at the U.S.-Mexico border. This finding suggests that even in the immediate aftermath of the initial DACA policy, migration decisions were the product of a range of factors, but not

primarily a consequence of the DACA policy.[112]

Additionally, the overall FY 2021 apprehensions by CBP at the southern border cited by a commenter represent total encounters, not the number of unique individuals apprehended. Although the total number of unique encounters did increase to record levels, DHS notes that a portion of the increased encounters cited by the commenter is attributable to noncitizens making multiple attempts to enter the United States during the period in which the Centers for Disease Control and Prevention (CDC) has exercised its Title 42 authority to prohibit the introduction of certain noncitizens into the United States. In FY 2019, prior to implementation of the CDC's Orders under 42 U.S.C. 265, 268 and 42 CFR 71.40, the rate of noncitizens encountered by CBP who attempted to enter the United States more than once in the same fiscal year was 7 percent. In FY2020, the recidivism rate rose significantly to 26 percent, and in FY 2021 further increased to 27 percent.[113]

As discussed above, there are many reasons why noncitizens decide to emigrate from their countries, with some reports claiming economic and social issues as primary reasons.[114] Still, as noted by another commenter, global migration trends are complex and multifaceted. The International Organization for Migration (IOM) found in its World Migration Report 2022 that recent years saw major migration and displacement events that caused great hardship, trauma, and loss of life. The IOM notes that the scale of international migration globally has increased, although at a reduced rate due to COVID–19. Long-term data on international migration, the IOM report states, demonstrate that migration is not uniform across the world, but is shaped by economic, geographic, demographic and other factors, resulting in distinct migration patterns.[115]

Beyond the complex factors underpinning migration patterns, the

---

[107] See generally DHS, 2022 Priorities, https://www.dhs.gov/2022-priorities (last updated Mar. 17, 2022).

[108] 81 FR 53803 (quoting Amuedo-Dorantes and Puttitanun (2016), at 112 (''DACA does not appear to have a significant impact on the observed increase in unaccompanied alien children in 2012 and 2013.'')).

[109] U.S. Border Patrol, Total Unaccompanied Alien Children (0–17 Years Old) Apprehensions By Month—FY 2010–FY 2014 (Jan. 2020), https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20UAC

%20Apprehensions%20by%20Sector%20%28FY%202010%20-%20FY%202019%29_0.pdf.

[110] U.S. Border Patrol, Total Illegal Alien Apprehensions By Month—FY 2000–FY 2019 (Jan. 2020), https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Monthly%20Apprehensions%20%28FY%202000%20-%20FY%202019%29_1.pdf.

[111] Wong (2014); see also Amelia Cheatham, Central America's Turbulent Northern Triangle, Council on Foreign Relations (July 1, 2021), https://www.cfr.org/backgrounder/central-americas-turbulent-northern-triangle.

[112] There are reports and surveys that investigate some of these factors. See, e.g., Ariel G. Ruiz Soto, et al., Charting a New Regional Course of Action: The Complex Motivations and Costs of Central American Migration, Migration Policy Institute (Nov. 2021), https://www.migrationpolicy.org/research/motivations-costs-central-american-migration (hereinafter Ruiz Soto (2021)).

[113] CBP, CBP Enforcement Statistics Fiscal Year 2022: U.S. Border Patrol Recidivism Rates, https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics (last modified June 15, 2022).

[114] See, e.g., Ruiz Soto (2021).

[115] Marie McAuliffe and Anna Triandafyllidou, Report Overview: Technological, Geopolitical and Environmental Transformations Shaping Our Migration and Mobility Futures, in World Migration Report 2022 (2021), IOM, Geneva.

core guidelines of the DACA policy itself—codified in this rule—refute the idea that DACA serves as a significant material "pull factor" for migration, as DHS has clearly messaged from the beginning of the DACA policy that only individuals continuously residing in the United States since June 15, 2007, can be considered for deferred action under DACA. That DHS declines, after careful consideration, to expand this or other criteria to permit other populations to request DACA further rebuts the notion that the Department is sending a message incentivizing unlawfully present noncitizens to remain in the United States or prospective migrants to enter without authorization in hopes of being granted lawful status. DHS further reiterates that DACA recipients are considered lawfully present under prior guidance, and now this rule, only for very limited purposes as described in this preamble and at sections 236.21(c)(3) and (4), and that the DACA policy does not confer "lawful status" to recipients.

Nevertheless, DHS acknowledges that, as with any discourse on immigration policy or legislation, some individual noncitizens might misinterpret the policy's intent and applicability and hope that they might benefit from the policy. DHS, however, is unaware of a substantial body of evidence to support such a theory, and in any event does not think it necessary or appropriate to terminate the DACA policy to address such concerns, in light of DHS's interests in setting appropriate enforcement priorities, as well as the significant reliance interests at play.

With respect to the suggestion that the DACA policy promotes "chain migration," DHS understands the commenter to be referring to family-sponsored immigration, one of the foundational principles of U.S. immigration law,[116] and notes that DACA recipients cannot sponsor relatives for immigrant visas under 8 U.S.C. 1153, 1154. DHS also refers the reader to the discussion of the DACA policy's economic effects in the RIA below. DHS does not believe that DACA's effects are "unaffordable" or detrimental to U.S. citizens, and is issuing this rule following detailed consideration of the policy's effects, as discussed elsewhere in this preamble.

8. Other Impacts on the Federal Government

*Comment:* Multiple commenters stated that the proposed rule would

increase costs and negatively impact the Federal Government, urging that although every undocumented individual cannot be deported, it is a waste of resources to have law enforcement release a removable individual who has already been apprehended. A commenter also stated that the DACA policy is less efficient, less secure, and more costly than prosecutorial discretion decisions made by ICE and CBP, especially given what is necessary to review and perform background checks, review travel history, interview requestors, and conduct biometrics. The commenter further stated that because few DACA recipients would be subject to removal even in the absence of this rule, the number of such individuals ICE and CBP would need to process would be minimal, and thus the enforcement resources savings engendered by DACA would be minimal.

Other commenters stated that it would be extremely costly, in the billions of dollars, for the U.S. Government to remove the hundreds of thousands of young people who qualify for DACA.

*Response:* DHS respectfully acknowledges the commenters' concerns regarding the potential for increased costs and negative impacts to the Federal Government as a result of this rule. DHS acknowledges that, by the very nature of identifying a segment of the population that is low priority for enforcement, most noncitizens who meet the DACA threshold criteria would continue to be a low priority for enforcement even in the absence of the DACA policy. In the RIA, DHS addresses the potential effects of the policy on the Federal Government, including cost savings resulting from the DACA policy that are not easily quantified or monetized; tax transfers; and other effects. However, the DACA policy simplifies many encounters between DHS and certain noncitizens, reducing the burden upon DHS of vetting, tracking, and potentially removing DACA recipients.

Indeed, the cost of apprehension is only one part of the process to remove a noncitizen; the removal process includes other significant costs to the Federal Government, including the costs of removal proceedings before EOIR, detention, potential for related federal litigation, and transportation. The DACA policy allows DHS, in line with its particular expertise, to proactively identify noncitizens who may be a low priority for removal should ICE or CBP encounter them in the field and once a valid DACA recipient is confirmed, ICE or CBP may be able to make a

determination without necessitating further investigation.[117] DHS further notes that USCIS can directly access a noncitizen's travel history from CBP databases, and that by virtue of the use of the Form I–821D and Form I–765, USCIS is provided with significant information and documentation relevant to a prosecutorial discretion determination that CBP and ICE would not have related to the noncitizen's residency, education, work history, criminal history, and other positive and negative discretionary factors. Most noncitizens would not have such information or documentation in their possession when encountered by CBP or ICE. As to the commenter's concern regarding the costs of interviews and biometric collection, interviews are very rarely required by USCIS, and the cost of biometrics is covered by the Form I–821D filing fees, which conserves resources for the Department.

Furthermore, under longstanding policy and procedure, in cases where ICE grants deferred action, the noncitizen is eligible to subsequently file Form I–765 to apply for work authorization. This process requires ICE to issue a document to the noncitizen, who then must include it in their work authorization application. USCIS routinely must verify the information provided in these letters, which requires time and uses USCIS and ICE personnel resources. It promotes administrative efficiency and preserves resources and time for both agencies to streamline the DACA-related processes within one DHS agency. Furthermore, while USCIS recovers the costs of conducting background checks via the DACA-related filing fees, ICE and CBP, which are funded primarily through congressionally appropriated taxpayer dollars, would not recover these costs from requestor fees unless they established additional fees for that purpose.

*Comment:* A commenter stated that DACA is a massive new government program that would require significant government resources to administer that will be placed on both the executive and judicial branches, while the Federal agencies specifically entrusted to secure the border continue to go understaffed and under-supported.

*Response:* DHS respectfully disagrees with this commenter's characterization of the DACA policy. This rule preserves and fortifies in regulation a policy that has been in place for 10 years. The rule does not establish a new program, nor does the policy require administration by the judicial branch. To the extent

---

[116] *See* 8 U.S.C. 1153 (providing allocation of immigrant visas among family-sponsored, employment-based, and diversity categories).

[117] 86 FR 53752.

that any resource burden is placed on the judicial branch, that is the result of outside parties who seek to challenge the DACA policy in court and is not a burden on the judicial branch that is inherent in the DACA policy itself.

The final rule does not introduce new criteria for consideration, expand the population eligible for consideration, change standards of review, provide lawful immigration status, or alter the forbearance from removal or employment authorization structure that has been in place for a decade. As discussed elsewhere in this rule and in the NPRM, the DACA policy reflects the reality that DHS must exercise discretion in immigration enforcement, and that its limited resources are best focused on noncitizens who pose a security threat, public safety, or border security threat to the United States or are otherwise a high priority for enforcement. Codification of the DACA policy in this rule does not divert needed funds from CBP or ICE, and instead supports their enforcement work by clearly identifying a subset of the noncitizen population already determined not to be a priority for enforcement.

9. Criminality, National Security Issues, and Other Safety Concerns

*Comment:* Some commenters expressed concerns about criminal or other negative conduct by DACA recipients, along with national security concerns. Some of these commenters stated that DACA recipients generally do not respect the rule of law, and that too many noncitizens without lawful status are present in the United States and commit crimes against citizens. Some commenters described noncitizens without lawful status as criminals because they entered the United States without authorization, and asserted that those individuals would not become law-abiding citizens.

Some commenters characterized DACA recipients as ''invaders'' or ''parasites'' or used other pejorative terms, and stated that some DACA recipients try to manipulate U.S. citizens into marriage for immigration purposes. Other commenters stated that DACA is a threat to the United States and its security, and that it creates avenues for drug cartels to operate in the United States, enabling human trafficking and drug trafficking.

In contrast, multiple commenters stated that undocumented immigrants are less likely to be convicted of crimes (*e.g.,* crimes involving drugs, violence, or property) compared to U.S.-born citizens. Another commenter stated that the proposed rule could help DHS focus

enforcement resources on noncitizens who commit crimes rather than on DACA recipients. Further, several commenters either cited data or expressed the notion that DACA removes barriers for immigrants to approach law enforcement and report crime. Referencing a 2020 survey, one commenter stated that DACA recipients would be more than 30 percent less likely to report a crime committed against them and almost 50 percent less likely to report wage theft without the protection of DACA.[118]

*Response:* DHS acknowledges the commenters' concerns about national security, public safety, and crime in the United States, and as a general matter, shares those concerns. At the same time, DHS is not aware of any data suggesting that the DACA policy contributes to those challenges, or that DACA recipients engage in criminal activity, commit fraud, or pose national security concerns to any greater degree than the general population. As an initial matter, data suggest that DACA recipients are arrested at far lower levels than the general U.S. adult population. As of February 1, 2018, 7.76 percent of approved DACA requestors had an arrest.[119] In contrast, a 2018 DOJ survey of State records found that 49 States, the District of Columbia, and Guam reported the total number of U.S. adults with criminal history records indicating arrests and subsequent dispositions to be more than 112 million, amounting to as much as 40 percent of the U.S. adult population.[120] In addition, DHS notes that an arrest indicates the individual was arrested or apprehended only; it does not mean the individual was convicted of a crime. Further, individuals may not have been charged with a crime resulting from the arrest, may have had their charges reduced or dismissed entirely, or may have been acquitted of any charges.[121]

As discussed in further detail in Section II.C.4.b.6, determining whether

someone poses a threat to national security or public safety is at the heart of DHS's mission, and Congress has directed the Secretary to prioritize national security, public safety, and border security. Consistent with this mission, the rule at new 8 CFR 236.22(a)(6) disqualifies from consideration for DACA individuals who have been convicted of any felony; three or more misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct; or who otherwise pose a threat to national security or public safety. In addition, the rule disqualifies from consideration for DACA any individual who is convicted of any misdemeanor, as defined by Federal law, that meets the following criteria: (i) regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; or (ii) if not one of these offenses, is one for which the individual was sentenced to time in custody of more than 90 days. And even if an individual requestor's background check shows a criminal history that does not meet the above criteria, DHS may still decide not to grant the DACA request as a matter of discretion. These criminal criteria are also grounds for terminating DACA, as discussed in Section II.C.5.f below, and because DHS conducts recurrent vetting on DACA recipients, the Department can take action to terminate DACA as it becomes aware of any evidence of such criminal criteria in a particular case.

DHS also does not believe that it is accurate or helpful to characterize DACA recipients or potential DACA requestors—who entered the United States as children and have resided in this country for over a decade—as ''invaders'' or to use other pejorative or inflammatory terms to refer to DACA recipients, noncitizens, or any other group of people who are, on the whole, peaceful and hardworking. With respect to all comments submitted, DHS has focused on the merits of commenters' inputs, rather than such characterizations.

With respect to the comment regarding DACA recipients and marriage, DHS notes that under 8 U.S.C. 1325(c), any individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years, or fined not more than $250,000, or both. Activity falling under 8 U.S.C. 1325(c) is a felony falling within the criminal

---

[118] *See* Wong (2020).

[119] USCIS, *DACA Requestors with an IDENT Response* (June 5, 2018), *https://www.uscis.gov/sites/default/files/document/data/DATA_DACA_CRIM.PDF* (arrests include apprehensions for immigration-related civil violations).

[120] DOJ, Office of Justice Programs, Bureau of Justice Statistics, *Survey of State Criminal History Information Systems, 2018* (Nov. 5, 2020), *https://www.ojp.gov/pdffiles1/bjs/grants/255651.pdf.* (''Readers should note that an individual offender may have records in more than one state and that records of deceased persons may be included in the counts provided by states. This means the number of living persons in the United States with criminal history records is less than the total number of subjects in state criminal history files.'').

[121] USCIS, *DACA Requestors with an IDENT Response* (June 5, 2018), *https://www.uscis.gov/sites/default/files/document/data/DATA_DACA_CRIM.PDF.*

disqualifications described above. To whatever extent such activity occurs among DACA recipients, DHS does not expect that a rescission of the DACA policy would reduce the incidence of such activity.

DHS does not believe that DACA creates avenues for drug cartels to operate in the United States or enables human trafficking and drug trafficking. Conviction for such offenses would result in termination of DACA or denial of DACA renewal, and as discussed above, DACA recipients receive work authorization that enables them to participate in the legitimate economy, an option that would not be available to them absent DACA. Human trafficking and drug trafficking are serious crimes and top priorities for DHS.[122] Again, DHS does not believe that terminating DACA would meaningfully reduce the incidence of such crimes or that DACA prevents DHS or other law enforcement officials from fully investigating or prosecuting such crimes or removing noncitizens involved in such activity.

With regard to concerns about public safety more broadly, as one commenter noted, the DACA policy may increase recipients' willingness to report crimes by deferring the possibility of immediate removal and thereby ameliorating the risk that approaching law enforcement would expose the recipient to an immigration enforcement action. DHS also agrees with the commenter that this rule will enable the Department to focus its enforcement resources on those that pose national security or public safety concerns. After careful consideration, DHS thus respectfully disagrees with commenters concerned that the DACA policy promotes criminal activity or otherwise undermines national security or public safety.

## 10. Creation of a "Permanent" Class of Individuals Without Legal Status

*Comment:* A few commenters generally opposed the proposed rule on the ground that it would create a "permanent" class of individuals without legal immigration status. One commenter stated that DACA recipients can renew their deferred action and employment authorization indefinitely, resulting in "de facto LPR [lawful permanent resident status]," which the

commenter stated is distinct from other immigration benefits and visa categories created by Congress that are limited in their ability to renew.

Another commenter stated that it is wrong to allow people to come to the United States unlawfully and stay in the country long enough until the Government decides they can become citizens. The commenter stated that letting people enter and remain in the United States unlawfully "does not instill a sense of patriotism for the recipient." Another commenter stated that the DACA policy lacked some of the benefits of naturalization, because naturalization applicants learn about the United States. The commenter stated that skipping this step is an affront to naturalized citizens and that the United States should end DACA and encourage prospective residents to naturalize legally.

Another commenter said that DACA is a "made-up policy" that holds its recipients in a purgatory-like state waiting for the Government to ultimately address the issue of lawful status, while another commenter added that DACA recipients live in a state that experts call "liminal legality," which has health implications for many undocumented individuals.

*Response:* DHS agrees that the rule does not extend lawful immigration status to DACA recipients and does not set a cap on the number of times a DACA recipient may submit a renewal request, but notes that even in the absence of DACA, DACA recipients generally would be unlikely to depart the United States. DHS disagrees, however, that the rule allows people to enter unlawfully and remain until they can become citizens. As discussed in the NPRM and in this rule, this rule applies to a specific class of individuals who entered the United States as children over a decade and a half ago, and who have made significant investments and contributions to their communities. Although the DACA criteria were developed administratively, the program is supported by longstanding administrative practice and precedent. DHS and the former INS have a long history of issuing policies under which groups of individuals without lawful status who are low enforcement priorities may receive a discretionary, temporary, and nonguaranteed reprieve from removal.[123] Deferred action under

the DACA policy is a form of prosecutorial discretion well within the Executive's authority to efficiently allocate limited enforcement resources.[124] In deferring removal under this rule, DHS is not creating a pathway to U.S. citizenship for DACA recipients. DHS also disagrees that the rule creates a "de facto" lawful permanent residence status. Unlike lawful permanent residence, which can only be rescinded or result in removability of the beneficiary in narrowly prescribed circumstances,[125] a grant of deferred action under DACA is by its nature temporary, and it can be terminated at any time.

As to the commenters' concerns that the DACA policy does not engender a sense of patriotism for recipients or that because there is no pathway to naturalization, DACA recipients do not benefit from learning about the United States as naturalization applicants do, DHS notes that many commenters wrote of DACA recipients' "dreams and aspirations to help America," sharing that they are "grateful for this country" and want to work hard to take advantage of the opportunities they have in the United States. And while the DACA policy has no U.S. history knowledge requirement, DHS notes that virtually all recipients have been enrolled in or completed some form of secondary education in the United States consistent with the education criteria for DACA. Several DACA recipients stated in their comments that through their studies, they knew more about American history than the history of their countries of origin. As to the commenter's suggestion that DHS terminate the DACA policy and encourage prospective residents to naturalize legally, DHS notes that those eligible for DACA generally do not have a pathway to lawful permanent status or naturalization, and as discussed in Section II.A.11 below, establishing such pathways requires Congressional action. However, DHS also notes, that nothing precludes a DACA recipient from

---

[122] See DHS, *DHS Efforts to Combat Human Trafficking* (Jan. 25, 2022), *https://www.dhs.gov/sites/default/files/2022-01/DHS%20Efforts%20to%20Combat%20Human%20Trafficking.pdf*; The White House, Executive Office of the President, Office of National Drug Control Policy, *National Drug Control Strategy* (Apr. 18, 2022), *https://www.whitehouse.gov/wp-content/uploads/2022/04/National-Drug-Control-2022Strategy.pdf*.

[123] *See generally* Ben Harrington, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others,* Congressional Research Service, No. R45158 (Apr. 10, 2018) [hereinafter CRS Report on Discretionary Reprieves from Removal). *See also* American Immigration

Council, *Executive Grants of Temporary Immigration Relief, 1956–Present* (Oct. 2, 2014), *https://www.americanimmigrationcouncil.org/research/executive-grants-temporary-immigration-relief-1956-present* (hereinafter AIC Report on Executive Grants of Temporary Immigration Relief) (identifying 39 examples of temporary immigration relief); Sharon Stephan, *Extended Voluntary Departure and Other Grants of Blanket Relief from Deportation,* Congressional Research Service, No. 85–599 EPW (Feb. 23, 1985) [hereinafter CRS Report on EVD].

[124] *See Regents of the Univ. of Cal.* v. *DHS,* 908 F.3d 476, 487 (9th Cir. 2018) (deferred action "arises . . . from the Executive's inherent authority to allocate resources and prioritize cases"), *aff'd,* 140 S. Ct. 1891 [2020].

[125] *See* 8 U.S.C. 1256; 8 U.S.C. 1227.

becoming a citizen through the existing naturalization provisions of the INA if they meet the preexisting eligibility requirements.[126]

DHS also acknowledges commenters' concerns that the legal uncertainty of the DACA policy causes stress and negative health outcomes for some DACA requestors. DHS reiterates that ameliorating legal uncertainty for the DACA population, and preserving and fortifying DACA as directed by the Biden Memorandum, are among the purposes for promulgating this rule. DHS therefore declines to make any changes in response to these comments.

11. Pathway to Lawful Status or Citizenship

*Comment:* Many commenters urged DHS to provide DACA recipients a pathway to citizenship, such as by providing eligibility for lawful permanent residency. Some commenters urged DHS to provide protections, including a pathway to citizenship, for all persons who would have been eligible for relief under prior versions of the DREAM Act, including ''Documented Dreamers.''[127]

Some commenters acknowledged and appreciated the proposed rule's discussion of the term of art ''lawfully present,'' and their joint submission proposed, without substantial additional explanation, that DHS interpret its ''lawful presence'' authority to allow a path to citizenship, through naturalization, to DACA recipients. Others suggested that DHS provide Temporary Protected Status (TPS), or some other form of legal status, to DACA recipients.

A commenter expressed concern that they may not be eligible for future promotions due to restrictions on work authorization associated with DACA, such as the program's prohibition on employment sponsorship. Another commenter likewise remarked that many DACA recipients do not have a path to employment-based permanent residence and, therefore, are barred from adjusting status through filing Form I–601 waiver applications. The commenter stated that continuing to

extend DACA in its current form or effectively making it a fixture of U.S. immigration law with only minor changes would be a ''cruel joke'' for the numerous individuals who are ineligible for both DACA and family-based immigration. The commenter urged the inclusion of provisions to address the gap in the treatment of DACA recipients to permit them to pursue employment-based immigration options. The commenter stated the provisions should include, at a minimum, the opportunity for DACA recipients to file Form I–601 waiver or Form or I–601A provisional waiver applications so that they can proceed with consular processing for approved Form I–140 petitions. Commenters stated that such solutions are preferable in light of the uncertainty, fear, and anxiety surrounding the DACA request process, legal challenges to the policy, and the complexity of the U.S. immigration system.

Some commenters said that providing a pathway to permanent residence or citizenship would provide much-needed stability and lift the psychological and financial burden of biennial renewals. Some of these commenters cited personal examples highlighting the negative effects of uncertainty on existing or hopeful DACA recipients and their families, including financial and psychological hardship. Expressing concern that DACA recipients' livelihood could be destroyed if they lost protections, a commenter remarked that citizenship would allow DACA recipients to continue to reside in the United States without assuming any further fees or expenses, reasoning that staying should cost recipients nothing after they have established their residence and livelihood here.

Some commenters said that DACA recipients experience unique disadvantages compared to other immigrants and those with a pathway to citizenship in terms of finding adequate employment or obtaining Federal employment, receiving Federal financial aid or grants, obtaining a driver's license, joining the military, traveling overseas, qualifying for State and Federal benefits and programs such as Premium Tax Credits and Medicaid, or obtaining legal status through alternative pathways such as employee sponsorship. Referencing various examples above, several commenters suggested that DACA recipients are ''citizens'' or ''Americans'' in various contexts, only lacking this status by law. Other commenters similarly said that children who grew up in the United

States inherently belong and deserve the same rights as citizens who consider this country their home.

Some commenters stated that a pathway to citizenship or permanent residency would reinforce the humanitarian and legal principles underlying DACA, the proposed rule, U.S. law, or U.S. values. One commenter said that creating a pathway to citizenship would be the right thing to do for human rights and society. The commenter further reasoned that citizenship would recognize that the United States has only benefitted from DACA recipients' contributions.

A couple of commenters stated that providing a path to citizenship would not only reduce uncertainty but would also ease the burden of the administrative and judicial review processes for DACA cases, as well as the costs of deportation. A couple of commenters also stated that, as individuals who are compelled to maintain a ''spotless record'' to keep their status, DACA recipients have earned their citizenship.

In the absence of a pathway to citizenship, some commenters suggested that, at a minimum, the rule could provide assurance to DACA recipients that they are safe and will not be deported without just cause. Similarly, several commenters stated the need for clear messaging and guidelines around DACA protections.

*Response:* Comments suggesting that DHS should provide a path to citizenship or similar relief are outside the scope of the rulemaking. DHS nonetheless agrees with commenters that DACA recipients make substantial contributions to their communities and the U.S. economy. DHS also acknowledges commenters' concerns about legal and political uncertainty around the DACA policy. As discussed elsewhere in this rule and in the NPRM, DHS emphasizes that while this rule represents the agency's best efforts to preserve and fortify DACA, a legislative solution would offer unique benefits for the DACA population, as congressional action would be needed to extend a pathway to lawful permanent residence or citizenship for DACA recipients. As it relates to this rule, DHS emphasizes that the benefits of the rule for DACA recipients are multifold. At its core, the DACA policy represents an exercise of enforcement discretion, under which DHS indicates its intention to forbear from enforcing the immigration laws against a DACA recipient, and which the courts have generally not questioned. Other features of the policy, including eligibility for employment authorization, lawful presence as

---

[126] 8 U.S.C. 1421, *et seq.*

[127] ''Documented Dreamer'' is a term used to identify children of long-term visa holders who have grown up in the United States with derivative nonimmigrant visa status, and who have aged out or are likely to age out of this status by virtue of turning 21 without a pathway to lawful immigrant status. *See Testimony of Pareen Mhatre,* Student Member of Improve the Dream, before the House Judiciary Committee Subcommittee on Immigration and Citizenship (Apr. 28, 2021), *https:// docs.house.gov/meetings/JU/JU01/20210428/ 112515/HHRG-117-JU01-Wstate-MhatreP-20210428.pdf.*

defined in 8 CFR 1.3, and non-accrual of unlawful presence for the purposes of INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B), have been the focus of litigation, but these features can be traced directly to DHS's statutory authority over these topics, are consistent with longstanding regulations and policy, and are, in DHS's view, broadly beneficial to DACA recipients and their families, schools, communities, and employers.

Although DHS does not have legal authority to amend the rule to provide a direct procedure for a DACA recipient to attain citizenship, as recommended by some commenters, DHS notes that nothing precludes DACA recipients from becoming LPRs or applying for naturalization through the existing provisions of the INA if they meet the preexisting eligibility requirements.[128] For example, DACA recipients who qualify to become LPRs through existing family or employment-based avenues may be eligible to apply for naturalization after 3 or 5 years, depending on their category of permanent resident status.[129] Similarly, a DACA recipient who is a member of the military or spouse of such a military member may ultimately meet the requirements for military naturalization.[130]

DHS also acknowledges the commenter's concerns about the professional implications that lack of a permanent legal immigration status may have on DACA recipients. DHS recognizes that some DACA recipients may not meet the eligibility requirements for certain employment-based nonimmigrant and immigrant visa categories. DHS notes, however, that there is nothing in the DACA policy or this rule that limits or prohibits a recipient from attaining such employment-based status if a petitioning employer and the individual are able to meet the requirements of the particular category. Certain restrictions that exist on employment-based nonimmigrant and immigrant classifications, moreover, as well as the waivable grounds of inadmissibility, are statutory, and DHS lacks authority to change them through this rulemaking. Solutions to statutory requirements must originate with Congress in the form of legislation. And because DHS did not propose modifications to regulatory requirements for immigrant and nonimmigrant work-based avenues to lawful immigration status, modifying those requirements in this final rule is outside the scope of this rule.

DHS appreciates the commenter's concern over protecting DACA recipients regardless of whether Congress passes an adjacent legislative solution. DHS agrees with commenters, that regardless of whether Congress acts to extend a pathway to lawful permanent residence or citizenship for the DACA-eligible population, there is ample justification to consider DACA recipients to generally be of a low enforcement priority.

*Comment:* A commenter suggested that DHS cooperate with the U.S. Department of Education to create a process by which school-age DACA recipients could take citizenship tests upon graduation of high school to help them attain legal citizenship. Another commenter, stating that DHS and the Federal Government need to end the uncertainty for DACA recipients by creating a path to lawful permanent residency and citizenship, suggested that the agency may need to enforce community service requirements to offset the fact that these individuals came to the United States without authorization.

*Response:* As discussed above, DACA does not provide a pathway to citizenship, and DHS cannot create such a pathway through this rulemaking. Congressional action is required to extend a pathway to lawful permanent residence or citizenship for DACA recipients. Additionally, while DHS appreciates the commenters' suggestions, creating such processes would be within the purview of entities external to the Department and outside of the scope of this rulemaking. DHS is unable to make any changes in response to this comment.

## 12. Other General Reactions and Suggestions

### Strengthening the Proposed Rule or DACA

*Comment:* Many commenters commended USCIS for preserving and fortifying DACA while adding that the proposed rule should go further to benefit and provide assurance to recipients. Commenters reasoned that, by maintaining the DACA framework, the proposed rule would perpetuate a "band-aid solution," reinforce the status quo, or fail to address the root problems recipients face in the absence of permanent protections against deportation or the loss of work authorization. Other commenters recommended that the rule expand eligibility for DACA by allowing those who entered the United States more recently to apply, or by revising or removing the criminality component of the adjudication.

Another commenter expressed strong opposition to the proposed rule, arguing that many of the proposed provisions conflict with DHS's stated intent of preserving and strengthening DACA. According to the commenter, the proposed rule would not do enough to preserve access to DACA for its intended beneficiaries, expand access to individuals that fall outside the Napolitano Memorandum's criteria, protect victims of domestic and sexual violence, ensure fair and consistent application of DACA, or protect DACA recipients and requestors from deportation.

One commenter stated that the 2012 eligibility requirements reiterated in the NPRM are overly narrow and now outdated. Furthermore, the commenter stated, unlike many other issues it canvasses, the proposed rule fails to suggest expanded alternatives to the core feature of DACA: its coverage. As a result, according to the commenter, this rule fails to provide ambitious protection for immigrant youth.

Many commenters said that, while the proposed rule, or DACA generally, would not provide a permanent solution for recipients, the policies represent a necessary step in the absence of congressional action or a better alternative. One commenter stated that DACA serves both national and international interests amid flawed legal standards, including for asylum, and policy gridlock. They stated that DACA, while imperfect, should be preserved and expanded. Some commenters expressed concern with legal or political uncertainty around DACA and the potential loss of protections for recipients. One commenter said that DACA is premised on Executive discretionary power and, therefore, is ill-equipped to endure changes in administrations. Other commenters provided examples highlighting the need to do more to address uncertainty and legal limbo among DACA recipients.

Describing the existing difficulties children and families face in the U.S. immigration system, as well as the need for DACA protections, commenters urged DHS to expand or improve efforts to protect, welcome, and support DACA recipients or DACA-eligible individuals. Some commenters alluded to a general need for a permanent solution or relief, through DACA or otherwise, while others added that, beyond protecting DACA, there also is a need for broad immigration reform.

---

[128] 8 U.S.C. 1421 *et seq.*
[129] *See* 8 U.S.C. 1427(a).
[130] *See* 8 U.S.C. 1439 *et seq.*

*Response:* DHS appreciates commenters' support for the rule and the agency's work to preserve and fortify DACA, and DHS agrees with those commenters who said that codifying the DACA policy is an appropriate step in the absence of a permanent solution. DHS also acknowledges the commenters' concern for the well-being of noncitizen survivors of domestic and sexual violence and individuals brought to the United States as children in general.

DHS recognizes the rule's limited scope, but this scope is consistent with the President's directive to focus efforts toward preserving and fortifying DACA. A central goal of this rule is to respect reliance interests. As discussed further in Section II.C, DHS does not believe that it would be appropriate to expand the policy in the final rule.

DHS also acknowledges some commenters' desire to see ambitious protections for immigrant youth written into law. DHS agrees that the DACA policy as codified in this rule does not address the circumstances of all immigrant youth, is not a permanent solution for affected persons, and does not provide lawful immigration status or a path to citizenship.

Other Feedback and Recommendations

*Comment:* DHS received other general feedback and recommendations from commenters regarding the DACA policy and DACA recipients more generally. Some commenters requested that the agency consider allowing DACA recipients to serve in the military. Another commenter stated that the United States should cut military funding and use the money to increase support for DACA recipients. Another commenter said that, while DACA has granted certain privileges to recipients, they continue to feel threatened by the Government while lacking access to the democratic process. The commenter said that they would like the privilege of voting in the only country they have known as home.

Citing personal experiences, another commenter expressed concern that DACA recipients are unable to obtain a Commercial Driver License (CDL) and requested that recipients be allowed to have a CDL. Considering the national driver shortage and opportunities for business owners, the commenter reasoned that this change would allow DACA recipients to serve their communities.

Other commenters recommended that the agency implement more safeguards for children coming to the United States, including through background

checks on DACA recipients' guardians or household members.

*Response:* DHS acknowledges these commenters' feedback but notes that their suggestions are outside of the purview of the Department and beyond the scope of this rulemaking. DHS, therefore, is unable to make any changes to the final rule in response to these comments.

*Comment:* Another commenter said that they would support the rule if it provided language stating that DACA would be "a one-time thing." The commenter reasoned that there should not be an opportunity for newly arrived individuals to participate in a policy created for those "who have fought tirelessly to achieve it."

*Response:* As discussed in the NPRM and in this rule, DHS is acting consistent with the direction of the President to preserve and fortify the DACA policy, and in light of the particular contributions and reliance interests of DACA recipients and related parties. In accordance with the President's instruction and in recognition of the significant reliance interests at stake, DHS is generally retaining the threshold criteria from the Napolitano Memorandum and longstanding policy as proposed in the NPRM, including the requirement that DACA requestors be physically present as of June 15, 2012, and continuously resided in the United States since June 15, 2007.[131] Therefore, consideration for deferred action under DACA will not be available to recently arrived noncitizens under this rulemaking.

*Comment:* Some commenters stated that the proposed rule failed to provide flexibility for the administration in terms of terminating the DACA policy. A commenter objected that if, in the future, DHS does have sufficient resources to remove DACA recipients, DHS could not simply terminate this rule without notice. Another commenter described DACA as outdated, urged it be abolished, and stated that the policy was supposed to be temporary.

*Response:* DHS and the former INS have a long history of issuing policies under which groups of individuals without lawful status may receive a discretionary, temporary, and nonguaranteed reprieve from removal.[132] Deferred action under DACA is a form of prosecutorial discretion well within the Executive's authority to efficiently allocate limited

enforcement resources.[133] This rule codifies an existing and appropriate use of such prosecutorial discretion to defer removal and does not expand upon or create new mechanisms by which the executive branch could exempt anyone from the enforcement of any law. DHS acknowledges that this rule codifies DACA, which reduces the agency's flexibility with regard to terminating or changing certain aspects of the policy, but reiterates the purpose of the rule is to preserve and fortify DACA, a policy that has been in place for 10 years.

Regarding a commenter's concern that DACA was intended to be a temporary policy, DHS notes that the Napolitano Memorandum did not impose temporal limits to the policy or otherwise indicate a temporary intent. To the extent that the policy was described as a temporary measure by President Barack Obama when he announced it in 2012, DHS notes that President Obama also stated that, "[i]n the absence of any immigration action from Congress to fix our broken immigration system, what we've tried to do is focus our immigration enforcement resources in the right places," and that DACA is a measure "that lets us focus our resources wisely while giving a degree of relief and hope to talented, driven, patriotic young people."[134]

As the DACA-eligible population remains a low priority for enforcement; in recognition of the investments that DACA recipients have made in their families, work, schools, and communities, and vice versa; and in light of the litigation history associated with the DACA policy, DHS has determined it is appropriate to codify the DACA policy in regulation. DHS agrees, however, that in general, such codification should not be necessary for policies guiding the case-by-case exercise of enforcement discretion. In response to a commenter's concern that promulgation of this rule restricts the flexibility of the Department to terminate the DACA policy, for example, if there are sufficient enforcement resources so as to not need to exercise prosecutorial discretion, DHS declines to make changes to the rule. In the event that DHS receives such a sustained infusion of resources,

---

[131] *See* new 8 CFR 236.22(b)(2) and (3).

[132] *See generally* CRS Report on Discretionary Reprieves from Removal. *See also* AIC Report on Executive Grants of Temporary Immigration Relief; CRS Report on EVD.

[133] *See Regents of the Univ. of Cal.* v. *DHS,* 908 F.3d 476, 487 (9th Cir. 2018) (deferred action "arises . . . from the Executive's inherent authority to allocate resources and prioritize cases"), *aff'd,* 140 S. Ct. 1891 (2020).

[134] White House Office of the Press Secretary, *Remarks by the President on Immigration* (June 15, 2012), *https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration.*

Congress could invalidate this rule or DHS could rescind or modify it.

*B. Background, Authority, and Purpose*

1. Statutory Authority

Assertions That Proposed Rule Is Unlawful

*Comment:* Many commenters stated, without providing an additional substantive rationale, that the DACA policy is unlawful and illegal, unconstitutional, or otherwise does not follow the law as enacted. Some commenters said generally that neither DHS nor USCIS has legal authority to issue the proposed rule. Other commenters stated the matter is "comprehensively" covered by provisions of 8 U.S.C. 1325 pertaining to improper entry by a noncitizen. Other commenters said neither of the two statutes that grant DHS authority broadly, 6 U.S.C. 202(5) and 8 U.S.C. 1103, nor any other statute grants authority for DHS to issue the rule. Many commenters stated Congress has considered legislation to protect a DACA-like population a number of times in the past but declined to enact such legislation each time, even after the issuance of the Napolitano Memorandum. Other commenters said the rule bypasses Congress' role in the legislative process, and only Congress has the authority to make and revise immigration law.

Similarly, one commenter wrote that Congress has not enacted legislation to authorize DHS to propose rules to implement the DACA policy. The commenter referenced the various authorities that DHS cited in proposing the rule, concluding that none of them permits DHS to propose this rule. Specifically, the commenter cited sources that in their view establish: (1) prosecutorial discretion does not permit DHS to implement sweeping policy changes; (2) "longstanding" DHS policies do not create authority for the proposed rule; and (3) court decisions are inapplicable or explicitly foreclose DHS's interpretation of its authority.

The commenter went on to state that the courts, not DHS, determine whether DHS has authority to implement DACA. The commenter wrote that the courts have, in that respect, "expressly concluded" that DHS does not have that authority. The commenter further stated that, because the rule implements the same program that the courts reviewed, the reasoning in those court decisions applies with equal force to the proposed rule. The commenter characterized this rulemaking as demonstrating DHS's opinion that certain court decisions concerning DHS's authority do not

apply to it. The commenter said DHS's policies, even if longstanding, do not hold greater weight than legal determinations by the judiciary, nor do they overcome the force of law as determined by the courts.

The commenter also stated that, throughout the NPRM, DHS cites a series of agency policies that Congress later codified, presumably to show authority for this rulemaking. The problem with these references, in the commenter's view, is the referenced policies are "distinguishable and unrelated" to the current proposed rule. The commenter wrote that in earlier instances of deferred action, DHS implemented a policy that was: (1) not held by a court of law to be outside the scope of DHS's authority; and (2) not relied on as authority for a proposed rule. The commenter said that a history of DHS policies, even where Congress ratified those policies, is not evidence of authority for an agency to implement the DACA rules or any rule because historical practice is not a duly enacted statute by Congress.

The commenter also stated that DHS is not consistent in its reliance on Congress' post-implementation treatment of DHS policy as authority for these rules. For example, the commenter wrote that DHS takes the position that Congress' inaction concerning the DREAM Act should not lead to an inference concerning the Secretary's authority, while simultaneously relying on Congress' inaction to support its position that the Secretary has authority to confer "lawful presence" as part of DACA. The commenter stated that DHS's "completely subjective" analysis illustrates why statutes, not Congress' action or inaction after a policy is implemented, must authorize any agency rulemaking endeavor.

Another commenter likewise wrote that maintaining DACA through rulemaking is both unlawful and bad immigration policy. The commenter stated that Congress has not authorized DACA, and DACA therefore is outside DHS's rulemaking authority. Citing the district court's 2021 decision in *Texas,* the commenter wrote that DHS bases the proposed rule on an impermissible interpretation of the INA. The commenter stated that DACA directly conflicts with Congress' legislative scheme to regulate the employment of noncitizens, adjustment of status of noncitizens who entered the United States without inspection, removal of certain noncitizens from the United States, and reentry into the United States by noncitizens who have accrued unlawful presence.

The commenter wrote that DACA is more than an exercise of prosecutorial discretion and instead goes further to ignore statutorily mandated removal proceedings and unlawfully provide immigration benefits to an ineligible population. The commenter also stated that Congress has spoken on DACA's legality by consistently and expressly rejecting legislation that would substantively enact the program or otherwise legalize DACA's intended beneficiaries. The commenter wrote that Congress has not implicitly ratified DACA, either. Citing case law, the commenter stated ratification requires "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned." The commenter wrote DACA "falls short" of satisfying this standard "because prior instances of Executive misconduct cannot be regarded as even a precedent, much less an authority for the present misconduct." The commenter stated that it disagrees with DHS's position that prior non-enforcement policies justify the proposed rule. And the commenter further said implementation of DACA would violate the Take Care Clause of the U.S. Constitution because it "dispens[es]" with certain statutes.

Multiple commenters stated that the rule cannot be issued as an executive decision. These commenters said DACA is an example of executive disregard of the Constitution and current law, and no administration has the authority to decide which laws agencies get to ignore. Many commenters stated the rule is in direct violation of U.S. immigration law, which requires that people living in this country illegally be apprehended and returned to their country. Some commenters also said there is an established procedure for U.S. citizenship, and DACA recipients should follow this path to legal citizenship the same as any other immigrant.

One commenter stated that, while previous administrations have granted deferred action to limited groups of immigrants, DHS lacks authority to provide "unconditional and indefinite" relief and benefits to a large group ("more than half million") of noncitizens without lawful immigration status. Another commenter similarly remarked that the main flaw in DHS pointing to prior deferred action programs as justification for this rule is that "none of them has the broad scope and indefinite timeframe of the [DACA] program." The commenter stated that "a litmus test is whether the department created a program that is narrowly scoped, and has a time restriction, either

**D. App. 034**

in terms of max number of renewals, or restricted to a bridge-gap measure before the applicant's next status take[s] effect.'' Providing examples, the commenter concluded that, while ''all previous deferred actions'' met these criteria, DACA does not. Another commenter asserted that the rule would grant lawful presence and work authorization to potentially hundreds of thousands of noncitizens by 2031 ''for whom Congress has made no provision and has consistently refused to make such a provision,'' and cited *King* v. *Burwell,* 576 U.S. 473, 474 (2015) for the proposition that ''had Congress wished to assign [a question of 'deep economic and political significance'] to an agency, it surely would have done so expressly.''

Multiple commenters stated that the rule comes on the heels of the *Texas* ruling, which struck down the DACA policy as unlawful. One commenter said that DHS mischaracterizes the district court's ruling throughout the NPRM in an apparent attempt to justify the NPRM as a legitimate rulemaking endeavor, writing that the finding that the Napolitano Memorandum violated the Administrative Procedure Act (APA) was only part of the district court's decision, and the district court also determined DHS could not cure DACA's underlying legal deficiencies even by using notice-and-comment rulemaking. The commenter stated the rule impermissibly substitutes DHS's own opinion in place of a legally binding court order. The commenter further said the rule demonstrates DHS's ''blatant disregard'' for the district court's ruling, exposing DHS to potential liability for contempt of court and setting a ''dangerous precedent'' with respect to our government's system of checks and balances. The commenter stated that regardless of whether DHS ''agrees'' with the district court's ruling, it is nonetheless bound by the ruling unless an appellate court overturns it. The commenter also said pursuing this rulemaking while litigation continues reflects a gross mismanagement of resources at DHS and USCIS. The commenter concluded by addressing the statutory authority of USCIS officers, stating DHS ''glosses over'' the distinct authorities Congress delegated to each of the three immigration components within DHS. Writing that USCIS is not an enforcement agency and, therefore, lacks the ability to grant deferred action to any noncitizen, the commenter stated the precise wording of the delegation in the Homeland Security Act (HSA) irrefutably demonstrates that Congress intentionally gave USCIS authority only

to adjudicate immigration benefit requests, not to take (or decline to take) enforcement actions against nonimmigrants. Thus, the commenter said, even if DHS's pursuit of rulemaking while simultaneously appealing the district court's ruling in *Texas* were proper, USCIS lacks the authority to administer DACA, making DACA inherently *ultra vires* and exposing DHS to significant litigation risk.

*Response:* DHS respectfully disagrees with commenters' statements that this rulemaking is unlawful, unconstitutional, or represents bad immigration policy. Both the INA and the HSA confer clear authority on the Secretary to administer the immigration laws of the United States, including authority to set ''national immigration enforcement policies and priorities.'' [135] DHS, the former INS, and the U.S. Supreme Court all have long recognized the fundamental role that prosecutorial discretion plays with respect to immigration enforcement. As the U.S. Court of Appeals for the Ninth Circuit has explained, ''[T]he INA explicitly authorizes the [Secretary] to administer and enforce all laws relating to immigration and naturalization. . . . As part of this authority, it is well settled that the Secretary can exercise deferred action, a form of prosecutorial discretion.'' [136] Stated another way, ''[d]eferred action is simply a decision . . . by DHS not to seek the removal of an alien for a set period of time,'' [137] a decision well within DHS's discretion in light of competing policy objectives and scarce resources. Deferred action thus is a well-established form of prosecutorial discretion, acknowledging ''that those qualifying individuals are the lowest priority for enforcement.'' [138]

DHS likewise disagrees with commenters' assertions that this rulemaking fails to follow the law as established by Congress, conflicts with Congress' legislative scheme to regulate the employment of noncitizens, adjustment of status, removal, and reentry, or otherwise violates the Executive's duty to ''take care that the Laws be faithfully executed'' under Article II, Section 3 of the Constitution. To the contrary, DHS strongly believes this rule is consistent with the text of all relevant statutes and furthers Congress' goals in enacting the INA and HSA. DHS acknowledges that the Constitution

vests Congress with the legislative power and, accordingly, the authority to make and revise the immigration laws. The Department's prioritization of the apprehension and removal of noncitizens who are a threat to national security, border security, and public safety is entirely consistent with the immigration laws, including provisions providing for mandatory detention and expedited removal of certain categories of individuals.[139] Indeed, as noted in the NPRM, a mandate to prioritize the removal of criminal offenders, taking into account the severity of the crime, has been included in every annual DHS appropriations act since 2009.[140] This rule facilitates those objectives.

More than 11 million undocumented noncitizens currently live in the United States,[141] demonstrating an obvious need for DHS to allocate its limited resources toward the removal of priority enforcement targets. For example, in fiscal year 2021, when ICE operations were dramatically impacted by the COVID–19 pandemic, ICE conducted a total of 74,082 administrative arrests and removed 59,011 noncitizens.[142] During fiscal years 2016–2020, ICE averaged 131,771 administrative arrests and 235,120 removals per year.[143] It is clear from

---

[135] 6 U.S.C. 202(5).

[136] *Ariz. Dream Act Coal.* v. *Brewer,* 855 F.3d 957, 967 (9th Cir. 2017).

[137] *Arpaio* v. *Obama,* 27 F. Supp. 3d 185, 192–93 (D.D.C. 2014), *aff'd,* 797 F.3d 11 (D.C. Cir. 2015).

[138] *Id.; see also AADC,* 525 U.S. at 484–85.

[139] *See, e.g.,* INA sec. 235(b)(1), 8 U.S.C. 1225(b)(1) (establishing ''expedited removal'' for certain noncitizens arriving in the United States); INA sec. 236(c), 8 U.S.C. 1226(c) (providing mandatory detention for certain criminal noncitizens); INA sec. 236A, 8 U.S.C. 1226a (providing mandatory detention of suspected terrorists); *see also, e.g.,* Public Law 114–113, 129 Stat. 2241, 2497 (providing that ''the Secretary . . . shall prioritize the identification and removal of aliens convicted of a crime by the severity of that crime''); DHS, *Secretary Mayorkas Announces New Immigration Enforcement Priorities* (Sept. 30, 2021), *https://www.dhs.gov/news/2021/09/30/secretary-mayorkas-announces-new-immigration-enforcement-priorities.*

[140] *See, e.g.,* Consolidated Appropriations Act, 2014, Public Law 113–76, div. F, tit. II, 128 Stat. 5, 251.

[141] *See* DHS, Office of Immigration Statistics (OIS), *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2015–January 2018* (Jan. 2021), *https://www.dhs.gov/sites/default/files/publications/immigrationstatistics/Pop_Estimate/UnauthImmigrant/unauthorized_immigrant_population_estimates_2015_-_2018.pdf.*

[142] ICE, *ICE Annual Report Fiscal Year 2021* (Mar. 11, 2022), *https://www.ice.gov/features/2021-year-review.*

[143] ICE, *Fiscal Year 2016 ICE Enforcement and Removal Operations Report, https://www.ice.gov/sites/default/files/documents/Report/2016/removal-stats-2016.pdf;* ICE, *Fiscal Year 2017 ICE Enforcement and Removal Operations Report, https://www.ice.gov/sites/default/files/documents/Report/2017/iceEndOfYearFY2017.pdf;* ICE, *Fiscal Year 2018 ICE Enforcement and Removal Operations Report, https://www.ice.gov/doclib/about/offices/ero/pdf/eroFY2018Report.pdf;* ICE, *Fiscal Year 2019 ICE Enforcement and Removal Operations Report, https://www.ice.gov/sites/*

Continued

these numbers that even if each of the estimated 1.7 million noncitizens who may be eligible to request initial or renewal deferred action under DACA (which as discussed in the regulatory analysis below is likely an overestimate) did so and were found to warrant deferred action as codified in this rule as low enforcement priorities, DHS would still lack adequate resources to pursue full enforcement actions against the estimated 9 million other undocumented noncitizens present in the United States. This rulemaking accordingly will allow DHS to focus its enforcement resources on the removal of dangerous criminal offenders and other noncitizens who threaten public safety and national security.

DHS shares commenters' recognition of and respect for the Constitution's separation of powers framework. But DHS disagrees with commenters' position that this rulemaking bypasses Congress' role in the legislative process or otherwise fails to adhere to DHS's proper place within the Government of the United States. DHS acknowledges that the INA generally provides for the removal of noncitizens who are in the United States without authorization. Never in the history of DHS or the former INS, however, has either agency or a court taken the position that the agency is obligated to seek the removal of every removable noncitizen in the United States at any given time. And both the long history of formal deferred action policies instituted both by DHS and the former INS (some of which Congress went on to ratify) and other forms of prosecutorial discretion that individual government officials lawfully exercise on a case-by-case basis every day belie any assertion to the contrary. DHS agrees that those prior policies are not "authority" for this rule. Rather, the authority for the rule lies in a range of statutory authorities, including DHS's general rulemaking authority under section 103 of the INA as well as DHS's power to exercise enforcement discretion, which is inherent in the delegation of authority over enforcement of the INA.[144] The prior, related policies discussed in the NPRM and by commenters are *evidence* of the Secretary's authority, recognized by Congress when it ratified those policies in later statutes without limiting INS's (and now DHS's) ability to create similar enforcement discretion policies in the

future. DHS also notes that many of these policies also contained similar or the same ancillary features, including employment authorization upon showing of economic necessity, lawful presence for the limited purposes stated in 8 CFR 1.3, and nonaccrual of unlawful presence for the duration of the period of deferred action. The lawfulness of these ancillary features is addressed at length in the sections corresponding to each such feature later in this preamble.

DHS disagrees with the commenter's assertion that a policy granting lawful presence and work authorization to the DACA-eligible population is a matter of such "deep economic and political significance" as to constitute a "major question," as recently described by the Supreme Court in *West Virginia* v. *EPA*.[145] While DHS expects that this rule would carry significant benefits and would result in significant tax transfers, this rule is not akin to the rule in *West Virginia,* where the agency's "own modeling concluded that the rule would entail billions of dollars in compliance costs (to be paid in the form of higher energy prices), require the retirement of dozens of coal-fired plants, and eliminate tens of thousands of jobs across various sectors." [146] This rule involves DHS's enforcement posture towards a population that is likely to remain in the United States regardless of the existence of DACA; the costs imposed by this rule are borne by DACA recipients themselves; and the rule's indirect effects are nowhere near as vast as the effects described in *West Virginia.*

Even if the major questions doctrine did apply, there is clear statutory authority and agency precedent for the rule. Unlike the authority at issue in *West Virginia,* this final rule reflects "the longstanding practice of [DHS] in implementing the relevant statutory authorities." [147] Congress was well aware of the long history of deferred action and similar enforcement discretion policies, as well as the deferred action provisions in the employment authorization and lawful presence rules, when Congress made the Secretary responsible for "[e]stablishing national immigration enforcement policies and priorities"; [148] charged the Secretary with "the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens"; [149] and

authorized the Secretary to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter." [150] Likewise, although the Secretary inherited from the Attorney General his statutory authority for determining which noncitizens should be authorized for employment, that grant of power clearly endorsed a longstanding practice as discussed in section II.C.2.b below.[151] And as discussed in section II.C.3 below, after the Department of Justice established the lawful presence regulation pursuant to express statutory authority, Congress in fact amended 8 U.S.C. 1611 to provide DHS additional authority. These authorities have long provided the basis for the exercise of prosecutorial discretion when making immigration enforcement decisions, or described some of the consequences of those decisions. These are not "ancillary provisions" of the Act that are rarely used,[152] but rather are foundational powers used daily in the Secretary's routine administration of the nation's immigration system. Nor is the exercise of prosecutorial discretion as laid out in this rule a "fundamental revision" of the statutory scheme; the exercise of prosecutorial discretion is and has long been a consequence of a lack of resources to enforce the terms of that scheme against each and every individual who may violate it.[153]

As detailed below, these policies date as far back as 1956 and DHS and its precursor agencies have "routinely" implemented prosecutorial discretion policies of a similar scale and type as the DACA policy, *Biden* v. *Missouri,* 142 S. Ct. 647, 653 (2022). There is no sense in which this rule exercises a "newfound power." And, although DHS recognizes that Congress has, on occasion, considered legislation concerning the population affected by this rule, such action does not negate the authority previously provided to and historically exercised by the Secretary in the same realm. As noted elsewhere in this preamble, unlike the legislative actions considered by Congress, the rule does not provide lawful status, a path to permanent residency or citizenship, or any other type of permanent immigration solution for the population, which the

---

*default/files/documents/Document/2019/
eroReportFY2019.pdf;* ICE, *FY 2020 Annual Report,
https://www.ice.gov/doclib/news/library/reports/
annual-report/iceReportFY2020.pdf.*

[144] *See* 6 U.S.C. 202(3), (5); 8 U.S.C. 1103(a)(1), (3); *see also Arizona,* 567 U.S. at 396–97; *AADC,* 525 U.S. at 483–84.

[145] 142 S. Ct. 2587 (2022).

[146] *Id.* at 2604.

[147] *See Biden* v. *Missouri,* 142 S. Ct. 647, 653 (2022).

[148] 6 U.S.C. 202(5).

[149] 8 U.S.C. 1103(a)(1).

[150] 8 U.S.C. 1103(a)(3).

[151] 8 U.S.C. 1324(a)(h)(3).

[152] 142 S.Ct. at 2610.

[153] *Id.* at 2612.

Department agrees only Congress can enact.

DHS disagrees with commenters who stated that prior instances of deferred action or similar enforcement discretion policies referenced in the NPRM are materially different from deferred action under the DACA policy. In essence, commenters said that the validity of prior policies such as EVD, Family Fairness, and deferred enforced departure turned on those programs' "interstitial" nature. Those programs, in the commenters' view, simply provided a stopgap measure intended to serve only as a temporary solution while Congress legislated a permanent fix. That may have been the ultimate result for the affected populations, but it was by no means assured that Congress would act when legacy-INS implemented those policies. The INS relied not on an assurance of future Congressional ratification, but on its authority to exercise enforcement discretion when implementing those policies, with the possibility that Congress might one day act. DACA in this respect is no different from the earlier programs. Congress is actively considering legislation to provide substantive immigration benefits to a DACA-like population. Thus, to the extent commenters characterized prior instances of deferred action as "interstitial" simply because they occupied the space between an agency seeking to implement a certain policy and Congress providing an adjacent legislative solution, DACA occupies an identical space. And also like DACA, the administrative enforcement discretion policies practiced by the INS did not provide beneficiaries with lawful immigration status, protection from removal, or a pathway to citizenship until Congress made a change in law.[154]

DHS further disagrees with commenters who stated that Congress' consistent failure to enact DACA-like legislation is evidence that this rule exceeds DHS's authority. For one thing, many of the bills the commenters point to differ greatly from DACA in substance. Both the DREAM Act and the American Dream and Promise Act differ dramatically from DACA in the protections and substantive benefits that they would offer to their respective

target populations, the most notable being lawful immigration status and a pathway to citizenship. DACA, by contrast, as preserved and fortified by this rule, does not and could not provide a blanket grant of lawful immigration status, conditional or permanent residence, or a pathway to citizenship because DHS lacks authority to do so without a change in law. For another, inaction is not legislation, and Congress does not legislate by failing to legislate. Congress' past inaction on any given topic is not a law. Congressional inaction may occur for any number of reasons, and it does not enact the status quo, or come with an account of Congress' reasons for declining to take action. In DHS's view, inaction as such has no bearing on the legality of an adjacent rulemaking. For example, the former INS instituted Family Fairness in the wake of Congress' express rejection of legislation that would have provided immigration benefits to spouses and children ineligible for such relief under the Immigration Reform and Control Act of 1986 (IRCA). Legislation stalls in Congress for myriad reasons, not the least of which include competing priorities of national and international importance and the sheer volume of business to which Congress must attend.

One more point bears mentioning with respect to congressional inaction in this space. While commenters drew much attention to Congress perennially declining to enact DACA-like legislation, commenters largely ignored Congress' comparable failure to legislatively override the DACA policy even though it has now existed for years. There is no basis to conclude that Congress has rejected a longstanding deferred action policy for the DACA population from its failure to enact more comprehensive legislation governing a similar population.

With respect to a commenter's statement that, setting aside the Secretary's authority to exercise prosecutorial discretion in favor of this rulemaking's target population, DHS cannot implement sweeping policy changes under the guise of prosecutorial discretion: DACA is no such sweeping change. As the NPRM makes clear, there is nothing new about a policy deferring enforcement action for nonviolent individuals who are low priorities for enforcement, nor is there anything new about the ancillary policies, regulations, and statutes associated with such forbearance, including according employment authorization to such individuals upon a showing of economic necessity, or deeming such individuals to be lawfully present for certain purposes or not unlawfully

present for the duration of the deferred action. Indeed, as it relates to the core of the policy (*i.e.*, its forbearance element), the former INS first implemented the EVD program in 1956, which provided relief to certain immigrant professionals whose lawful immigration status lapsed simply by virtue of constraints on visa availability.[155] This program continued until 1990 and was joined along the way by a variety of other deferred action policies all geared toward making the most efficient use of the former INS's limited enforcement resources.[156] DHS also reiterates the prior deferred action policies in favor of (1) "nonpriority" cases identified in the former INS's 1959 Operations Instructions (OI); (2) spouses and children of noncitizens granted benefits under IRCA; (3) Violence Against Women Act of 1994 (VAWA) self-petitioners; (4) children eligible for benefits under the Victims of Trafficking and Violence Protection Act of 2000 (VTVPA); (5) T visa applicants; (6) U visa petitioners; and (7) former F–1 students who lost their status due to intervening natural disasters.[157] Each of these populations by their nature possess characteristics that make them low enforcement priorities. DHS views the DACA population as prime candidates for deferred action for similar reasons.

The same commenter wrote that the "longstanding" nature of the above policies nevertheless does not excuse the absence of express statutory authority to engage in this rulemaking. DHS first disagrees with the commenter's premise that DHS lacks express statutory authority to issue this rule. To the contrary, as explained earlier, both the INA and the HSA vest the Secretary with authority to issue this rule by virtue of statutory directives that he administer and enforce the immigration laws of the United States, set "national immigration enforcement policies and priorities," and "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the INA.[158] This rulemaking is a lawful exercise of that authority, facilitating DHS's immigration enforcement priorities through a thoughtful exercise of prosecutorial

[154] *See* Alan C. Nelson, Commissioner, INS, *Legalization and Family Fairness—An Analysis* (Oct. 21, 1987), *reprinted in* 64 No. 41 Interpreter Releases 1191, App. I (Oct. 26, 1987); Memorandum to INS Regional Commissioners from Gene McNary, Commissioner, INS, *Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990); IMMACT 90, Public Law 101–649, sec. 301(g), 104 Stat. 4978, 5030 (1990).

[155] *See United States ex rel. Parco* v. *Morris*, 426 F. Supp. 976, 979–80 (E.D. Pa. 1977).

[156] *See* Adam B. Cox and Cristina M. Rodriguez, *The President and Immigration Law Redux*, 125 Yale L.J. 104, 122–24 (2015) (discussing the origins and various applications of EVD).

[157] *See* 86 FR 53747–53748.

[158] *See* 6 U.S.C. 112, 202; 8 U.S.C. 1103(a)(1), (3).

discretion. Because deferred action under the proposed rule would constitute a lawful exercise of prosecutorial discretion in line with over 60 years of similar policies (some of which, as discussed elsewhere in this preamble, came with grants of work authorization so recipients could support themselves and their families while in the United States without resorting to informal employment, which has the possibility of lowering wages and employment standards for some workers), DHS finds the commenter's arguments to the contrary unpersuasive.

DHS disagrees with multiple commenters' characterization of DHS's view of the July 2021 ruling of the United States District Court for the Southern District of Texas in the *Texas* litigation. Contrary to commenters' assertions, DHS respects the courts' role in this nation's government under the separation of powers framework. DHS has carefully and respectfully considered the court's ruling on all procedural and substantive issues involved in that litigation and is pursuing an appeal to vindicate its position on DACA's legality. In the meantime, DHS has complied with the district court's injunction, to the extent that the injunction has not been stayed, and will continue to do so as long as the injunction is in effect.

In any event, this rulemaking should not be construed as indicating that DHS doubts DACA's procedural or substantive legality. DHS elected to undertake this rulemaking for a variety of reasons, including to affirm administrative practices that help the Department to allocate its enforcement resources efficiently; accommodate the substantial reliance interests that have developed in connection with the DACA policy; implement the President's directive to preserve and fortify DACA; and facilitate compelling humanitarian objectives.

Last, DHS disagrees with the commenter's statement that USCIS lacks authority to administer DACA because it is not an enforcement agency. The authority to administer the immigration laws and set immigration enforcement priorities ultimately rests with the Secretary.[159] This rule is issued under

these and other broad authorities; as a consequence, there is no basis to distinguish between USCIS and other immigration components as the commenter proposes. And in any event, USCIS has historically been delegated and has exercised a range of functions that would fall under the rubric of "enforcement" as described by the commenter.[160] DHS has determined that USCIS has the expertise and administrative infrastructure to assess on a case-by-case basis whether a DACA requestor has met the threshold criteria and warrants a favorable exercise of discretion. Housing administration of the DACA policy within USCIS also furthers DHS's interest in encouraging candidates for deferred action under DACA to come forward and identify themselves to the Federal Government. Proactively identifying noncitizens eligible for and deserving of deferred action under the DACA policy will ultimately conserve department resources by helping ICE and CBP identify noncitizens who are low priorities for removal should those components encounter them in the field, as discussed in Section II.A.8, and utilizes existing structures for collecting fees from DACA requestors to cover the costs of such adjudication.[161]

Assertions That DACA/the Proposed Rule Is Lawful

*Comment:* Multiple commenters stated the DACA policy and its implementation are constitutional, lawful, and within the authority of DHS and the executive branch. Some commenters stated that DHS has authority to fortify, update, and expand the DACA policy. Another commenter stated that DACA is legal and within DHS's authority, and that both Congress

and the Federal courts have recognized that protecting the public interest of children is in the public interest. Citing sources, the commenter said the legislative history of the INA indicates Congress "intended to provide for a liberal treatment of children" and sought to keep mixed-status families together.[162] A different commenter stated that DACA is constitutional because "it transformed the lives of many individuals who came to the United States improperly as youngsters and because the court decision that resulted would provide Dreamers broader access to American citizenship." Quoting from the NPRM, a joint comment wrote that Congress' failure to pass the DREAM Act or any of the other similar acts identified by the district court in *Texas* does not limit DHS's ability to make a rule similar to the DACA policy first set forth in the Napolitano Memorandum.

A commenter stated that the DACA policy is a lawful exercise of the Secretary's authority, even without notice-and-comment rulemaking. A different commenter stated that DACA has a strong legal foundation and agreed with DHS that the proposed rule "should not be interpreted as suggesting that DHS itself doubts the legality of the 2012 DACA policy." Another commenter stated that, like DOJ and DHS, they strongly disagreed rulemaking is necessary for DACA. However, the commenter said, because litigation has challenged the legality of the policy and prompted DHS to engage in formal rulemaking, DHS taking the additional step to "preserve and fortify" the policy through the rulemaking process not only strengthens the legal foundation for the policy, but also provides DHS with the opportunity to expand and modernize it.

Referencing the proposed language at 8 CFR 236.21 set forth in the NPRM, a group of commenters characterized this section of the proposed rule as a "clarification (for the courts)" of DHS's authority to regulate in this space. The commenters stated they hoped the agency would keep this section as clear as possible given the likelihood of litigation.

One commenter said the proposed rule provides a "rigorous" review of the legal precedent and broad executive authority, all of which provides a "strong" justification for DACA's

---

[159] *See, e.g.,* 6 U.S.C. 112(a)(3) ("All functions of all officers, employees, and organizational units of the Department are vested in the Secretary"); 8 U.S.C. 1103(a)(1) ("The Secretary . . . shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens . . . ."), 1103(a)(3) ("He shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying

out his authority under the provisions of this chapter."), 1103(a)(4) ("He may require or authorize any employee of the Service or the Department . . . to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the Service.").

[160] *See, e.g.,* DHS Del. No. 0150.1 (June 5, 2003) (delegating to USCIS the authority to place noncitizens in removal proceedings, to cancel a notice to appear before jurisdiction vests with DOJ, and to grant voluntary departure and deferred action, among other things); Memorandum from Secretary John Kelly to the heads of CBP, ICE, and USCIS, et al., *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) ("The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, *or USCIS* that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents . . . ." (emphasis added)).

[161] *See* 86 FR 53764.

[162] *See INS* v. *Errico,* 385 U.S. 214, 220 n.9 (1966) ("The legislative history of the [INA] clearly indicates that the Congress intended to provide for a liberal treatment of children and was concerned with the problem of keeping families of United States citizens and immigrants united." (internal quotation marks omitted)).

establishment of national immigration policies and priorities and places the rule on strong legal footing. Another commenter stated that the historical examples of prior deferred action policies explain well why DACA is lawful as a subregulatory program fully within the Secretary's authority under the INA.

*Response:* DHS agrees with commenters that the proposed rule is a lawful exercise of DHS's authority under the INA. DHS agrees with commenters that the proposed rule is constitutional and that it furthers compelling humanitarian, public safety, and other policy objectives. Additionally, as discussed above, DHS agrees with commenters that Congress' failure to pass legislation to protect a DACA-like population does not implicate DHS's authority to engage in this rulemaking.

DHS agrees with commenters that the DACA policy has stood on strong legal footing since first set forth in the Napolitano Memorandum, even without engaging in full notice-and-comment rulemaking. DHS appreciates commenters' recognition of DHS's efforts to preserve and fortify DACA through this rulemaking. DHS agrees that 8 CFR 236.21 clearly articulates DACA's limited scope and DHS's authority for deferring action for the DACA population. DHS likewise agrees with commenters that DACA respects Congress' legislative scheme to regulate noncitizens present in the United States without authorization and eligibility for lawful immigration status, while providing stability to recipients through a lawful exercise of DHS's prosecutorial discretion.

DHS appreciates the commenter's concern about DACA recipients' current lack of ability to adjust status, but DHS disagrees with commenters to the extent they suggest the rule does or should provide a pathway to lawful immigration status, legal permanent residence, or U.S. citizenship. DHS appreciates commenters' concern about the current lack of a permanent immigration status for the DACA population. DHS reiterates its discussion in Section II.A.11 that it lacks the authority to provide legal immigration status through rulemaking. DHS nevertheless ultimately agrees with commenters that this rulemaking is a lawful exercise of its statutory authority.

Prosecutorial Discretion and Deferred Action Authority

*Comment:* Numerous commenters stated that DACA is a lawful application of DHS's broad authority to exercise prosecutorial discretion and defer

enforcement action for certain noncitizen youth.

Multiple commenters referenced 8 U.S.C. 1103(a) in stating that Congress empowered the Secretary with broad authority to administer and enforce immigration laws, with one commenter stating that such authority must include the ability to set enforcement priorities for an agency with limited resources. Also citing 6 U.S.C. 202(5), commenters wrote that Congress has broadly authorized DHS to establish national immigration enforcement policies and priorities. One of these commenters said that, as a purely practical matter, the Executive must be able to set priorities for administrative agencies with limited resources, and it may do so by choosing to defer action in certain areas. The commenter stated both the Supreme Court and Congress have recognized this authority, as Congress has enacted statutes expressly recognizing the legal authority to grant deferred action, and the Supreme Court has acknowledged the "regular practice" of "deferred action." Another commenter similarly stated that as a purely practical matter, the Executive must be able to set priorities for administrative agencies with limited resources, and it may do so by choosing to defer action in certain areas. The commenter stated both the Supreme Court and Congress have recognized this authority, as Congress has enacted statutes expressly recognizing the legal authority to grant deferred action and the Supreme Court has acknowledged the "regular practice" of "deferred action."

A commenter wrote that the president and executive agencies have the power to carry out legislation, interpret ambiguous provisions, and make decisions about how best to allocate scarce agency resources. Another commenter stated the Supreme Court on numerous occasions has reaffirmed the wide latitude agencies enjoy in deciding whether or when "to prosecute or enforce" laws within their purview. As recently as 2020, the commenter wrote, the Supreme Court affirmed the key part of deferred action when it stated in *Regents* that "[t]he defining feature of deferred action is the decision to defer removal." These commenters and others stated that, as existing 8 CFR 1.3(a)(4)(vi) makes clear, this rulemaking fits within the deferred action framework because it does not confer legal status, but instead merely exempts individuals from accumulating "unlawful presence." Similarly, a commenter agreed with USCIS that DACA is consistent with the INA because it is limited in scope and nature, conferring only "lawful

presence," not "lawful status," which does not create a legally enforceable right for undocumented immigrants able to avail themselves of the DACA policy.

A commenter added that for decades the Federal Government has implemented deferred action as a discretionary forbearance of removal. The commenter reasoned that this policy of deferring removal of noncitizens who came to this country as youth did not then (and does not now) create new rights for those individuals; rather, it is merely a recognition that as an agency, DHS (through USCIS), just as every other law enforcement agency, must exercise enforcement discretion. The commenter, writing that the proposed rule rightfully sets forth the position that people who otherwise qualify for DACA are not a priority for removal, urged DHS to maintain this policy in the final rule and use its discretion accordingly. A commenter stated that deportations are a discretionary duty of the executive branch as established by *Regents, Trump* v. *Hawaii,* and other cases establishing executive branch authority to regulate immigration policy.

A commenter stated that Congress, which has the ability to prohibit DHS from granting deferred action and work and travel authorization, through funding or through legislation, has not done so, implying the policy does not fall outside of congressional intent.

A commenter stated the DACA policy has been in place for a decade, and no State filed suit to challenge the legality of the Napolitano Memorandum until 2018—more than 5 years after the memorandum was issued. But beginning long before 2012, the commenter remarked, DHS and INS routinely exercised prosecutorial discretion to deprioritize categories of individuals for enforcement and to provide these individuals with adjacent, necessary privileges, such as work authorization. The commenter stated that the proposed rule, like the Napolitano Memorandum, therefore does not constitute a deviation from established practice, nor does the proposed rule constitute abandonment of the Executive's duty to enforce the immigration laws. Rather, the commenter stated, it represents the Executive's educated judgment about the best and most efficient way to enforce the immigration laws. Another commenter said this history refutes the Department's prior assertion in the Duke Memorandum that deferred action programs should be initiated by Congress. In fact, the commenter wrote, Congress later clarified, expanded, or adopted through statute many of the

deferred action programs that originated with INS or DHS. The commenter stated that, rather than refute DHS's assertion of authority to make such exceptions, Congress used them as a "legislative springboard," which the commenter said implies not only the legality of those programs, but also their political wisdom. The commenter concluded that DHS should thus use this long history of creating deferred action programs to rebut its prior assertion that only Congress should adopt deferred action policies as a matter of policy.

Commenters further stated that previous executive action bears out the Government's authority to exercise discretion in enforcing immigration laws, saying that, since 1956, immigration agencies have issued policies granting individuals temporary and discretionary relief from deportation and, in many cases, work authorization, without opposition from Congress or the courts. A commenter stated that these prosecutorial discretion policies have allowed the executive branch to balance competing domestic policy objectives, foreign policy concerns, and humanitarian considerations. Multiple commenters wrote that existing areas of humanitarian relief, such as VAWA self-petitions, U nonimmigrant status, and TPS, demonstrate the well-established character and practice of granting deferred action for sympathetic, nonpriority populations. Another commenter pointed to 17 deferred action policies other than DACA that were enacted without being judicially challenged. In particular, the commenter wrote, President Reagan's "Family Fairness" program often draws comparison with DACA, as it provided deferred action for the children of parents eligible for legal status and, like DACA, provided an opportunity for employment authorization.

Another commenter stated that even the detractors of DACA acknowledge its legality amid their challenges by recognizing DHS has the authority to defer enforcement against migrants. Subjected to scrutiny and rulemaking, the commenter said, DACA has been and remains a lawful vehicle for protecting migrants brought to the United States as young children. The commenter concluded that, just as the Napolitano Memorandum emphasizes not only the legality, but also the necessity, of exercising prosecutorial discretion on a case-by-case basis, so too does the proposed rule both meet and exceed the threshold requirements of the APA and INA. A commenter wrote that Congress and the courts have recognized the importance of child well-

being and family unity as a basis for humanitarian considerations in immigration law and the executive branch's authority to exercise its discretion.[163] The commenter concluded that "it clearly follows" that it is well within DHS's authority to use the powers given to it by Congress to grant deferred action to immigrants who are not and should not be a priority for deportation—immigrants who came to the United States as children—and preserve the family unity and well-being of these immigrants' children. Commenters thus stated DACA is a lawful and appropriate use of the Executive's longstanding deferred action authority, unless and until Congress passes a permanent solution to address the problems of undocumented youth.

A commenter stated that DHS's decision to undertake full notice-and-comment rulemaking in this instance does not reflect a requirement to do so when implementing deferred action policies or exercising other forms of prosecutorial discretion in the future. Citing DOJ's Justice Manual and Supreme Court caselaw on prosecutorial discretion,[164] the commenter said that DACA and other forms of prosecutorial discretion lie within the executive branch's power to determine "when, whom, how, and even whether to prosecute," a power that applies across criminal, civil, and administrative contexts. The commenter stated Congress and the Supreme Court have affirmed that prosecutorial discretion, including through deferred action, applies in the immigration context, and Congress also has given the executive branch the authority to establish national immigration enforcement policies and priorities.

*Response:* DHS agrees that deferring enforcement action for the DACA population on a case-by-case basis is a lawful exercise of DHS's broad

prosecutorial discretion, which both Congress and the courts have recognized for decades. DHS also agrees that the DACA policy furthers compelling humanitarian and law enforcement objectives by allowing DHS to focus limited agency resources on priority targets and deferring action on the cases of certain noncitizens who entered the United States as children. DHS recognizes that Congress' inaction with respect to the DACA population has been taken by commenters to cut both ways; regardless of that inaction, DHS agrees with commenters that Congress has vested the Secretary with clear authority to administer and enforce the immigration laws and to establish national immigration policies, objectives, and priorities. DHS agrees with commenters that DACA facilitates a prudent set of immigration enforcement priorities, allowing DHS to utilize its limited resources efficiently by targeting high-priority cases, such as those that pose a threat to public safety, national security, or border security. DHS likewise agrees with commenters that the proposed rule comfortably fits within the deferred action framework that DHS and INS before it have utilized for decades.

DHS also agrees the extensive use of deferred action in the past by both INS and DHS to facilitate enforcement priorities further indicates the lawfulness of this rule. Although VAWA self-petitions, U-visas, and TPS are statutory forms of substantive immigration benefits (and therefore distinguishable from the DACA policy, which constitutes only an exercise of prosecutorial discretion to defer enforcement action against removable noncitizens), DHS accordingly nevertheless agrees with commenters that the long history of deferred action immigration policies originating with INS or DHS rebuts any assertion that such policies must always originate in Congress with a law specific to the particular population at issue.

DHS appreciates commenters' recognition of the numerous similarities between DACA and prior instances of deferred action and agrees the DACA population shares a number of sympathetic characteristics with the target populations of prior deferred action policies, making members of the DACA population prime candidates for deferred action themselves. DHS agrees that DACA is another in a long line of deferred action policies that have facilitated the necessary prioritization of enforcement resources by granting forbearance to sympathetic populations of noncitizens in the United States. DHS agrees that such populations have

---

[163] The commenter cited *Prince* v. *Massachusetts*, 321 U.S. 158, 165 (1944) (noting "the interests of society to protect the welfare of children"); *Moore* v. *East Cleveland*, 431 U.S. 494, 503–04 (1977) ("Our substantive due process] decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition."); *INS* v. *Errico*, 385 U.S. 214, 220 n.9 (1966) (" 'The legislative history of the Immigration and Nationality Act clearly indicates that the Congress intended to provide for a liberal treatment of children and was concerned with the problem of keeping families of United States citizens and immigrants united.' " (quoting H.R. Rep. No. 85–1199, at 7 (1957))).

[164] The commenter cited DOJ, Justice Manual, § 9–27.110 (Comment), *https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution#9-27.001*; *Bordenkircher* v. *Hayes*, 434 U.S. 357, 364 (1978); *Heckler* v. *Chaney*, 470 U.S. 821, 831–32 (1985); and *Arizona* v. *United States*, 567 U.S. 387, 396 (2012).

included certain pending U nonimmigrant petitioners before they have attained lawful status and certain VAWA self-petitioners prior to their final approvals to adjust to permanent resident status, among many other compelling population groups that have received deferred action and that are discussed in detail in the preamble to the proposed rule.[165] DHS disagrees, however, that TPS beneficiaries, who are in a lawful temporary status, are an example of noncitizens with deferred action as that is not accurate.

DHS shares commenters' view that in addition to DHS's authority to forbear from pursuing the removal of DACA recipients, DHS has authority to allow such DACA recipients to work during their time in the United States, and that work authorization is just as necessary and appropriate for the DACA population as it was, for example, for the population that received deferred action under the Family Fairness policy. DHS addresses comments related to work authorization, lawful presence, and non-accrual of unlawful presence more fully later in this preamble.

### 2. Litigation and Legal Disputes

*Comment:* Multiple commenters stated that the rule adequately addressed the concerns raised by the district court in *Texas,* which held DACA to be unlawful. One commenter said the rule responds to prolonged litigation over the policy's legality. Another commenter summarized the litigation involving DACA. Citing legal memoranda and court cases, the commenter stated the core components of DACA are legally and historically well-established, including deferred action, a well-established form of prosecutorial discretion under which the Federal Government forbears removal action against an individual for a designated period of time; employment authorization; and nonaccrual of unlawful presence. Another commenter wrote that the *Texas* district court was wrong in concluding notice-and-comment rulemaking was necessary to create the DACA policy, as well as in its concerns about the policy's substantive legality. A couple of commenters noted that the

Supreme Court's June 23, 2016 affirmance without opinion of the Fifth Circuit's preliminary injunction blocking Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) and expanded DACA is not precedential and does not bind DHS, and further noted that the Court's *2020 Regents* decision does not restrict DHS from expanding DACA. The commenters said other courts have and would likely again grapple with similar questions. DHS therefore is, in the commenters' view, "completely justified" in continuing to litigate the district court's decision until a single, final disposition emerges.

A commenter stated that DACA does not violate the INA and is a lawful exercise of executive discretion conferred by Congress, contrary to the district court's 2021 decision in *Texas.* The commenter cited 8 U.S.C. 1103 in discussing DHS's authority and went on to say the Supreme Court recognized this authority with respect to immigration enforcement and removals in *Arizona* v. *United States* when it underscored that executive officials have "broad discretion" in deciding "whether to pursue removal at all." [166] The commenter reasoned that the case-by-case consideration of DACA requests is not the automatic conferral of a benefit as some detractors have characterized it, but rather an exercise of discretion in deciding whether to invest limited enforcement resources into the removal of low-priority individuals. The commenter stated that, while the court in *Texas* held DACA violates the INA by making statutorily "removable" individuals unremovable, DACA does not make any individual unremovable because the agency may initiate removal proceedings against the individual at any time.

A commenter stated that it was "unclear" whether the rulemaking would be deemed legal if the litigation begun in 2018 is upheld by the Supreme Court but remarked that their research disputes that any irreparable harm or additional costs to States would be caused by the proposed rule.[167]

Citing *Regents* and another source, a commenter stated that, in response to litigation surrounding the Trump administration's efforts to rescind DACA, the Supreme Court held that DHS failed to properly rescind DACA procedurally, but the Court did not issue a finding that DACA was illegal. Regardless of how the Fifth Circuit decides DHS's appeal in *Texas,* the commenter remarked, it appears inevitable that the Supreme Court ultimately will have to make a determination as to the legality of the DACA policy. A university characterized the evidentiary record of *Regents* as a tool in this rulemaking, as it outlines the many benefits of DACA to the university and society, including expert testimony and studies about the value of DACA. A few commenters noted that they are participating or have participated in ongoing litigation to support the DACA policy.

*Response:* DHS agrees that undertaking notice and comment through the proposed rule puts DACA on stronger legal footing in light of the district court's decision in *Texas* and other pertinent litigation. DHS continues to believe that notice-and-comment rulemaking is not necessary to implement in the exercise of prosecutorial discretion a deferred action policy for the DACA population. Nevertheless, DHS agrees that the notice-and-comment process has significant value, as a means of obtaining a variety of input on proposed rules (including this one), and it also agrees with commenters that the proposed rule addresses the district court's procedural concerns and plays an important role in DHS's vindication of its position on DACA's legality.

DHS has given careful consideration to the district court's reasoning regarding the substantive legality of the DACA policy and the court's conclusion that the policy is not authorized by the INA. For reasons set forth above and below, in the preamble to the proposed rule,[168] and also reflected in the government's publicly available briefs in the appeal from the district court's decision, DHS respectfully disagrees with the district court's reasoning and conclusion regarding the policy's substantive legality. Notwithstanding that disagreement, DHS recognizes that it is currently subject to an injunction and that it is obligated to comply with that injunction to the extent that the injunction is not stayed. Nothing in this

---

[165] *See* 53736 FR 53746–53749 (discussing the history of at least 60 years of prosecutorial discretion policies that have provided various sympathetic groups protection from removal action). DHS does note with respect to the examples of the pending U nonimmigrant petitioners and the VAWA self-petitioners that once they are granted U nonimmigrant status or permanent resident status, these individuals are not like DACA recipients because they are in a lawful status and no longer subject to the prosecutorial discretion afforded by deferred action.

[166] 567 U.S. 387, 388 (2012); *see also id.* at 396 ("Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation's international relations.").

[167] The commenter cited Brannon and Albright (2017), Albright (2018), Brannon and McGee (2019), and Brannon and McGee (2021).

[168] *See* 86 FR at 53753 n.145, 53756 n.178, 53759–61, 53761 at n.235.

**D. App. 041**

AR2022_100234

preamble or in the final rule itself is intended to suggest otherwise.

Additionally, DHS is clarifying at new 8 CFR 236.21(d) that this rule rescinds and replaces the DACA guidance set forth in the Napolitano Memorandum and governs all current and future DACA grants and requests from this point forward. It further clarifies that existing recipients need not request DACA anew under this new rule to retain their current DACA grants. Although incorporating such a provision into regulatory text is a departure from previous practice, in light of the various issues and concerns raised in ongoing litigation challenging the Napolitano Memorandum, DHS has determined that doing so is appropriate in this context.[169]

3. Other Comments and Suggestions

*Comment:* One commenter suggested that DHS more thoroughly address several arguments that it previously offered against DACA in the Duke and Nielsen rescission memoranda. On this point, the commenter stated, in the Duke Memorandum, Nielsen Memorandum, and subsequent court filings, DHS cited the risk of litigation as one basis for rescinding DACA, focusing on the risk of DACA being struck down as unlawful or enjoined to justify the position that DACA was too legally vulnerable to continue without properly balancing competing positive factors. The commenter said DHS's prior stance that DACA was bad policy because of litigation risk is inconsistent with the proposed rule, which finds that the benefits of the rule would exceed its costs. To address this inconsistency and give a "reasoned explanation" for "facts and circumstances" in the rescission, the commenter stated, DHS should address the risk of litigation in the final rule. The commenter recommended DHS: (1) explain how the prior rescission incorrectly analyzed litigation risk; or (2) conclude that the rule is justified even when litigation risk is properly accounted for. The commenter provided suggestions on how DHS may address these issues, citing an article that analyzed litigation risk in the context of DACA's rescission and identified four key factors for DHS to consider. The commenter stated that DHS should incorporate in the final rule an explanation for why its previous assertions about litigation risk are not dispositive here. In particular, the commenter added, DHS should explain how its previous attempt to rescind DACA failed to analyze properly the risks of litigation and put forth a more

rational framework to analyze DACA's litigation risk.

A couple of commenters understood the proposed rule as indicating that the forthcoming final rule would displace the Napolitano Memorandum and establish a new and independent basis through which existing DACA recipients can maintain their deferred action. The commenters agreed with that approach and suggested the final rule state even more clearly that it supplants the Napolitano Memorandum, which the commenters said would benefit current DACA recipients by providing them with additional certainty. In addition, the commenters stated that this clarification would provide broader certainty by making even clearer that the pending litigation over the Napolitano Memorandum is moot because that memorandum no longer has any independent legal effect.

A commenter urged the administration to make all reasonable efforts to preserve and strengthen DACA, including ensuring that DHS is authorized to promulgate future policy and operational guidance for the policy, consistent with the objectives of the 2012 policy.

A commenter wrote that a policy such as DACA should be a law written by Congress and not made as an agency rule change. However, the commenter stated, given the current partisan nature of Congress and the low likelihood of Congress settling the issue of DACA anytime soon, the proposed rule allowing DACA to continue is "perhaps the best we can hope for."

*Response:* As indicated in the NPRM, the prior memoranda referenced by the commenter have been vacated or deemed inoperative by various courts.[170] DHS acknowledges that such memoranda assigned more significant weight to the risks associated with adverse litigation against the DACA policy, but as noted earlier in this preamble, litigation materialized as a consequence of attempts to rescind DACA as well, and DHS believes that the significant costs associated with DACA rescission would not be justified by the benefits identified in those memoranda, including the asserted litigation risk benefit which, as evidenced by the *Regents* litigation and other cases, did not fully materialize. DHS agrees with commenters that codifying DACA will provide recipients and their families, schools, communities, and employers with additional certainty. DHS also will utilize appropriate messaging to ensure DACA recipients are aware that the new

DACA regulation, not the Napolitano Memorandum, governs the DACA policy going forward. DHS, however, will not be in a position to advise DACA recipients that pending litigation concerning the Napolitano Memorandum is moot unless and until a court issues a judgment of dismissal on mootness grounds.

DHS appreciates the comment concerning DHS's efforts to protect DACA recipients. DHS assures all interested parties that it is taking all available action to preserve and fortify DACA consistent with the President's directive. DHS likewise appreciates the commenter's statements concerning the desirability of Congress enacting legislation to protect the DACA population. In the absence of such action, DHS believes that DACA is a viable approach that accommodates the relevant reliance interests while preserving DHS's discretion on a case-by-case basis.

## C. Comments on Proposed Provisions

### 1. Deferred Action/Forbearance From Enforcement Action (§ 236.21(c)(1))

*Comment:* Several commenters expressed general support for DHS's provision of an official definition of "deferred action" and for the definition proposed. A few commenters expressed concern with the proposed definition of "deferred action." One stated that the definition does not guarantee the ability to permanently reside in the United States, which affects the ability to resettle, work, and thrive in the United States successfully and forces DACA recipients to "live on the precipice of fearing deportation and being able to successfully contribute to the community in which they choose to reside." Another said that providing a definition creates safeguards but expressed concern regarding the provision stating that deferred action does not prevent DHS from initiating any criminal or other enforcement action against the DACA recipient at any time. One commenter specifically recommended removing the following language from proposed 8 CFR 236.21(c)(1): "[a] grant of deferred action under this section does not preclude DHS from commencing removal proceedings at any time."

One commenter stated that the rule should directly address DHS's prior statements that

> DHS should enforce the policies reflected in the laws adopted by Congress and should not adopt public policies of non-enforcement of those laws for broad classes and categories of aliens under the guise of prosecutorial discretion—particularly a class that Congress

---

[169] *See* new 8 CFR 236.21(d).

[170] 86 FR 53749–53751.

has repeatedly considered but declined to protect. Even if a policy such as DACA could be implemented lawfully through the exercise of prosecutorial discretion, it would necessarily lack the permanence and detail of statutory law. DACA recipients continue to be illegally present, unless and until Congress gives them permanent status.[171]

The commenter stated that DHS should explicitly recognize the merits and benefits of a broader approach, which enables the development of enforcement priorities under limited resources, reduces the need for further investigation by officers, and streamlines an enforcement officer's review of whether a DACA recipient should be an enforcement priority. According to the commenter, these benefits, which are inherent to a broad scope and the ease with which DACA can be applied, refute DHS's previous assertions that DACA is unwisely broad.

One commenter expressed strong support for the aspects of the proposed rule that would maintain forbearance from removal. Another stated that temporary forbearance of removal would not carry the same protections as a more permanent forbearance, and that identifying DACA recipients as generally a low priority for enforcement action does not assuage fears that removal actions will nonetheless be taken as anxiety and reservation remains about the lack of stability. While recognizing that USCIS may not be able to address this directly, since permanent congressional action is needed to at least in part address this barrier, the commenter said that USCIS "tak[ing] all measures possible" to expand the protections and rights of DACA recipients to the extent permitted is in the best interests of USCIS resources; local, State, and Federal economies; the well-being of U.S. communities; and the individuals themselves.

One commenter, by contrast, suggested that individuals should only be considered for forbearance when apprehended. The commenter stated that this would not only release the pressure on USCIS' "already stressed system" but also provide "a more consistent application of law and allow[ ] DHS to propose rules to guide ICE and CBP on enforcement priorities." Another commenter stated that the proposed rule prevents the removal of DACA recipients despite Congress having dictated their eligibility for removal. This commenter also stated that the proposed rule is not simply a "non-enforcement policy" or prosecutorial discretion, but instead

creates standardized proceedings by which DHS solicits and reviews requests from eligible aliens, effectively engaging in adjudications where the result is (likely) an affirmative act of approval. Another commenter opposing the rule stated there is a difference between forbearance from enforcement and actively granting the benefits of employment authorization, travel permission, and lawful presence. The commenter said that the logic that forbearance from enforcement action requires grants of immigration benefits through USCIS is flawed and unexplained.

Similarly, a commenter stated that the proposal to charge separate fees for the deferred action request did not adequately address the *Texas* ruling, which provided the agency an opportunity to modify the policy only to include temporary deportation forbearance. The commenter based this statement on concerns that DACA was housed within USCIS to give noncitizens "permission to work lawfully in the country despite lacking a lawful immigration status." The commenter concluded that, instead of exploring a "true 'forbearance' policy within one of the enforcement components" in accordance with the court's order, DHS's proposal was "not a good faith effort" to adhere to the Federal district court's ruling and would "continue the inappropriate practice of giving USCIS adjudicators . . . decision-making authority they do not have under the law." One commenter questioned why ICE would agree to continue, administratively close, or dismiss a DACA recipient's removal proceeding without prejudice, stating: "Clearly any removal order or case logged against DACA recipients shall not be dismissed without prejudice because unless the case is based on wrong facts, DACA recipients did break immigration laws and it should be on their records, not without prejudice."

Some commenters suggested that additional policies should be adopted for coordination among DHS subagencies to prevent the erosion of DACA protections for recipients related to removal proceedings, including:

• Not issuing NTAs against DACA recipients or DACA-eligible individuals unless and until USCIS terminates their DACA.

• Exercising favorable prosecutorial discretion by joining motions by DACA recipients or DACA-eligible individuals to reopen, terminate, dismiss, or administratively close removal proceedings. The commenter stated that these protections would be in line with May 2021 guidance issued by the ICE

Office of the Principal Legal Advisor recognizing the dismissal of cases of noncitizens likely to be granted temporary or permanent relief or who present compelling humanitarian factors, as well as recent decisions recognizing immigration judges' authority to administratively close and terminate removal proceedings.

• Adopting provisions to provide for cooperation among components with respect to removal proceedings, ensuring consistent and fair DACA decisions.

A commenter stated that it is costly for ICE to litigate removal proceedings against DACA recipients and DACA-eligible individuals, adding that the cost savings referenced at 86 FR 53794 would be nullified if individual ICE officers issue NTAs or oppose, for example, motions to administratively close removal proceedings for DACA recipients and DACA-eligible individuals, and stating that the proposed rule erroneously assumes ICE acts in a manner consistent with DACA protections. Conversely, the commenter said, past practice demonstrated that ICE and CBP have issued NTAs to DACA recipients who, per DACA guidance and established definitions, are not enforcement priorities. The commenter concluded that, without regulatory language directing DHS components to act according to USCIS' DACA request determinations and eligibility guidelines, recipients would continue to be subject to ICE officers' de facto veto power over a DACA grant.

Another commenter stated that such additional policies would reduce mental health harms to recipients facing uncertainty while promoting efficiency and cost savings. The commenter said that the decreased likelihood of mental health problems would allow DACA recipients to flourish as members of society and of the U.S. workforce. Furthermore, the commenter stated that future administrations could alter ICE enforcement priorities without first going through notice-and-comment rulemaking, thus leaving DACA recipients vulnerable to termination of DACA with no due process protections. The commenter recommended that DHS codify the above additional protections to promote efficiency and due process and to adhere to the administration's directive to "preserve and fortify" DACA.

*Response:* DHS acknowledges the variety of views expressed, from support for providing an official definition of deferred action, to specific support for the definition proposed, to concern that the specific definition is insufficient,

---

[171] *See* Nielsen Memorandum at 2.

and to general opposition to forbearance from removal for DACA recipients.

DHS agrees with commenters that the proposed deferred action definition is consistent with longstanding legal and historical practice. DHS acknowledges commenters' concern with the temporary aspect of the definition of deferred action, but notes that DHS does not have the authority to provide a permanent solution absent action by Congress. DHS further acknowledges commenters' concern that the definition of deferred action does not prohibit DHS from initiating enforcement action; however, the purpose of deferred action is to identify a person as a low priority for removal, rather than to eliminate all possibility of enforcement action. DHS therefore intends to maintain the ability to determine that an individual is no longer a low priority for removal.

DHS disagrees with the suggestion that individuals should only be considered for forbearance when apprehended, as this merely shifts resource burdens within DHS, does not enable DHS to realize the full potential of resource savings, as discussed in Section II.A.8, and could create a perverse incentive for individuals to seek out immigration encounters. As explained in the proposed rule at 86 FR 53752, the proposed framework would enable DHS to continue to realize the efficiency benefits of the DACA policy. USCIS' determination that an individual meets the DACA guidelines and merits a favorable exercise of discretion assists law enforcement activities in several areas by streamlining the review required when officers encounter a DACA recipient.

DHS further disagrees that utilizing a standard process to consider requests for deferred action transforms DACA into more than prosecutorial discretion. As noted by the commenter who encouraged DHS to speak to the benefits of the approach taken here, this rule structures the exercise of prosecutorial discretion in a proactive, organized, and efficient manner. This approach allows for the exercise of the Secretary's authority while providing for case-by-case consideration and collection of fees to cover the cost of determining whether the noncitizen is a high or low enforcement priority. Such a structure has certain benefits, but does not make this rule any less of an exercise in enforcement discretion.

DHS disagrees with the suggestion that the rule ''requires grants of immigration benefits.'' Nothing in the Napolitano Memorandum, the proposed rule, or this final rule requires DHS to grant immigration benefits to recipients of deferred action. Rather, DHS, in the exercise of its discretion and pursuant to underlying statutory authority, may indicate its intention to forbear from removing certain individuals who are low priorities for enforcement. Separately, DHS also may grant ancillary benefits such as employment authorization, as well as provide for limited circumstances in which DACA recipients will be considered lawfully present, as explained more fully elsewhere in this rule. DHS further incorporates here its points in the preamble to the NPRM at 86 FR 53756– 53762 regarding DHS's view that employment authorization, advance parole, and lawful presence may be provided in conjunction with DACA's forbearance of removal. But DHS reiterates its view that deferred action provides for temporary forbearance from removal without ''requir[ing]'' the conferral of other benefits.

DHS also disagrees with a commenter's characterization of the NPRM as it relates to the *Texas* ruling. As DHS explained in the NPRM, DHS proposed to unbundle the requests for deferred action and employment authorization to provide flexibility and reduce cost barriers to noncitizens who sought forbearance protections but did not need, want, or prioritize employment authorization. Upon consideration of comments, DHS has made changes to the rule to retain the existing requirement of bundled deferred action and employment authorization requests, as discussed in greater detail in Section II.C.2.c. DHS nonetheless considers those elements to be severable from each other, in the event that a court of competent jurisdiction disagrees with DHS and concludes that any aspect of this rule is unlawful. DHS also disagrees with the commenter's characterization of the rationale for vesting jurisdiction to administer DACA within USCIS. To the contrary, in addition to the reasons discussed in Section II.A.8, vesting jurisdiction within USCIS fortifies DHS's prioritized approach to immigration and border enforcement by allowing DHS to continue to realize the efficiency benefits of the DACA policy, as discussed in this rule. Additionally, in vesting jurisdiction with USCIS to exercise prosecutorial discretion in the form of DACA, DHS also retains streamlined procedures for terminating an individual's DACA and EAD, because the same agency that exercised prosecutorial discretion as an initial matter would be determining whether to terminate it, in consultation with immigration enforcement components

when necessary.[172] USCIS also plays a crucial role in safeguarding the lawful immigration system of the United States, including by issuing Form I–862, Notice to Appear, to commence removal proceedings in some circumstances.[173]

DHS acknowledges commenters' suggestions that the rule include provisions relating to other DHS immigration components' enforcement actions with respect to DACA recipients or individuals who meet the DACA criteria. However, DHS believes that direction for CBP and ICE with respect to their handling of DACA recipients, beyond that which was contained in the NPRM, is most appropriately left for subregulatory guidance. Finally, DHS notes that the commenter suggesting that DACA recipients' removal proceedings should not be continued, administratively closed, or dismissed ''without prejudice'' misunderstands the meaning of ''without prejudice.'' In the removal proceedings context, an action taken ''without prejudice'' means without prejudice to further action (*i.e.,* that the recommencement of removal proceedings in the future will not be barred by the judicial doctrines of res judicata or collateral estoppel).

Accordingly, DHS will not be making any changes to 8 CFR 236.21(c)(1) in response to public comments.

2. Employment Authorization (§§ 236.21(c)(2) and 274a.12(c)(33))

a. General Comments on Employment Authorization

General Support for Work Authorization for DACA Recipients

*Comment:* Some commenters expressed support for strengthening and protecting employment authorization as a key part of the DACA policy. Multiple commenters discussed the benefits of employment authorization including self-reliance; access to health insurance, education, housing, and living needs; career advancement; safe working conditions; fair wages and narrowing of the wage gap between employment-authorized workers and workers without employment authorization; ability to obtain forms of identification; and the development, as well as the retention, of skilled workers in the community, especially frontline workers during the COVID–19 pandemic. (One study found more than 200,000 DACA recipients working in occupations deemed by DHS as ''essential critical

---

[172] *See* 86 FR 53752.

[173] *See, e.g.,* 8 CFR 239.1(a)(18) through (20) (authorizing ''Supervisory immigration services officers,'' ''Supervisory immigration officers,'' and ''Supervisory asylum officers,'' respectively, to issue NTAs).

infrastructure workers.'') [174] Commenters cited a 2020 survey of DACA recipients that found that nearly 90 percent of DACA recipients surveyed were employed; 83.7 percent of respondents reported that having work authorization related to DACA helped them become financially independent; and 86.4 percent reported that their increased earnings helped pay for tuition.[175]

Considering such personal and societal benefits, a commenter stated that it had significant interests in preventing the disruption of the employment relationship with its DACA-recipient personnel. The commenter stated that it employs 500 DACA beneficiaries across every division in the company, across 38 States, and in all regions of the country. Many commenters urged DHS to ensure that deferred action and employment authorization remain connected in the rule, and that DACA recipients' ability to request EADs is protected. Other commenters expressed support for including employment authorization in the proposed rule but commented that the proposed disaggregation of other benefits from enforcement forbearance would not make it any less important. Some commenters stated that DACA-eligible individuals should be granted work authorization, or the opportunity to work, because they deserve the opportunity to support themselves financially, and because they want to make, and are capable of making, important economic and labor contributions to society. A commenter stated that more should be done to minimize barriers to employment authorization. Another commenter recommended that DHS and the Federal Government continue to strongly defend the ability of DACA recipients to apply for work authorization and to reach their full potential. A commenter stressed that the proposed rule allows local communities to continue to benefit from the important contributions of the DACA workforce, including in frontline healthcare, law enforcement, social services, land-use planning, teaching, and road repair.

*Response:* DHS agrees employment authorization is an important component of the DACA policy with myriad positive impacts on recipients' families and communities. For one, employment authorization enables DACA recipients to exit the shadow economy of unauthorized employment, dramatically reducing the risk of exploitation by unscrupulous

employers. Maintaining DACA recipients' ability to work lawfully while in the United States is an important component of DHS's broader initiative to preserve and fortify the DACA policy. DHS appreciates and agrees with commenters' recognition of DACA recipients' contributions to their communities. DHS agrees, as stated elsewhere in the NPRM and this preamble, that DACA recipients, on balance, overwhelmingly make positive contributions to this nation. DHS also agrees that DACA recipients' ability lawfully to work while in the United States is beneficial to their economic and psychological well-being.

In this regard, DHS emphasizes that self-reliance is beneficial not only to the social and economic prosperity of recipients of deferred action under the DACA policy, but also to the well-being of those individuals' families and communities, and to the workforce more broadly. Work authorization enables DACA recipients lawfully to support themselves and their families instead of risking potential exploitation in the shadow economy. As a commenter pointed out, companies have invested substantial resources in their DACA-recipient employees, and DHS agrees DACA recipients are not the only population that benefits from this rule; this rule also serves businesses' substantial reliance interest in the continued employment of employees in whom they have made significant tangible and intangible investments. Furthermore, a 2020 survey indicates that employment authorization for DACA recipients supports business creation, indicating that 6.1 percent of DACA recipients surveyed reported that they started their own businesses after receiving DACA, and that among respondents 25 years old and older, this increased to 7 percent.[176] Moreover, work authorization allows individuals to leave the shadow economy and work on the books to provide for their families, thereby reducing the risk of exploitation by unscrupulous employers and distortion in our labor markets. Work authorization addresses practical concerns that could otherwise result from a decision solely to grant temporary forbearance from removal, and DHS therefore believes that it is appropriate to allow DACA recipients to work in conformity with its authority at

INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3).

Employment authorization for DACA recipients also helps to prevent their need for public assistance to the extent such limited assistance is available to them. Although DACA recipients do not constitute ''qualified alien[s]'' for purposes of eligibility for most Federal public benefits under PRWORA,[177] certain excepted emergency, in-kind, and other public benefits do remain available to them.[178] In addition, a State may affirmatively provide State and local public benefits to noncitizens who are not lawfully present in the United States if the State passes such a law after August 22, 1996.[179] Several States have enacted such laws.[180] Therefore, if DACA recipients were to lack a means to earn their own living, they would be more likely to utilize the limited forms of public assistance available to them.

DHS appreciates one commenter's desire to see even more done to minimize barriers to DACA recipients' employment. This commenter advocated that DHS lower the application fees, shorten the application processing backlog, guarantee work authorization, and extend the duration of work authorization. However, as set forth elsewhere in this rule, DHS believes the current application fees are appropriate for the time being. DHS also reiterates the limits of this rulemaking, which, as discussed elsewhere in this preamble in more detail, focuses on preserving and fortifying the policy as set forth in the Napolitano Memorandum.

### Positive Impacts on Universities and Healthcare Systems

*Comment:* Citing research, several commenters described DACA recipients' positive impact on their universities and

---

[174] *See* Svajlenka (2020).
[175] *See* Wong (2020).

[176] Wong, et al., *New DHS Policy Threatens to Undo Gains Made by DACA Recipients,* Center for American Progress (Oct. 5, 2020), *https://www.americanprogress.org/issues/immigration/news/2020/10/05/491017/new-dhs-policy-threatens-undo-gains-made-daca-recipients.*

[177] *See* 8 U.S.C. 1611(a) *et seq.;* 8 U.S.C. 1641(b) (providing definition of ''qualified alien'').

[178] *See* 8 U.S.C. 1611(b)(B) [providing for ''[s]hort-term, non-cash, in-kind emergency disaster relief'' to non-qualified aliens]; 8 U.S.C. 1611(b)(1)(D) (providing non-qualified aliens with access to ''[p]rograms, services, or assistance (such as soup kitchens, crisis counseling and intervention, and short-term shelter)'' that ''deliver in-kind services at the community level, including through public or private nonprofit agencies''; ''do not condition the provision of assistance, the amount of assistance provided, or the cost of assistance provided on the individual recipient's income or resources''; and ''are necessary for the protection of life or safety'').

[179] *See* 8 U.S.C. 1621(d). In addition, the general limitations PRWORA places on noncitizens' eligibility for State and local public benefits do not apply to certain emergency, in-kind, immunization, and other assistance. *See* 8 U.S.C. 1621(b).

[180] *See, e.g.,* Cal. Welf. & Inst. Code § 14007.8(a)(1); 130 Mass. Reg. 505.006(B); NY Soc. Serv. L. § 122; Or. Rev. Stat. § 414.231; Wash. Admin. Code 182–503–0535(2)(e); DC Code § 1–307.03.

AR2022_100238

**53196** **Federal Register** / Vol. 87, No. 167 / Tuesday, August 30, 2022 / Rules and Regulations

communities. Commenters stated that work authorization is critical to DACA recipients' ability to make such positive contributions. A university described the academic contributions of DACA recipients. The university also cited the proposed rule's statement on the number of DACA recipients in healthcare to underscore the need for the rule and work authorization. The commenter further remarked that work authorization for DACA recipients allows them to engage more deeply with their university's curriculum, campus, and community. Noting the successful academic and professional careers of DACA recipient alumni, a commenter stated that work authorization is critical to DACA recipients' ability to contribute on and off campus, warning that the lack of work authorization often discourages individuals from pursuing educational growth. The commenter also remarked that it relies on DACA to retain valuable employees, noting its university system employs around 466 non-student DACA recipients. A group of commenters similarly pointed out DACA recipients' impact on institutions of higher education, citing several sources to support their position that DACA recipients enrich school environments. The commenters stated employment authorization granted after a DACA grant allows students to pursue higher education and other improved educational and economic outcomes. The commenters added that many DACA recipients have gone on to work and provide valuable services (such as serving in educational positions or healthcare posts) in the communities associated with their educational institutions, noting DACA recipients possess valuable skills—like foreign language fluency—that benefit employers.

Citing references, a commenter discussed in detail the current and future need for medical physicians and how DACA work permits allow medical schools to accept these noncitizens, enabling the number of matriculants with DACA to steadily grow since 2013. This commenter stated that over the course of one year, DACA-recipient physicians will collectively care for 700,000 to 2.1 million patients, totaling more than 5.1 million U.S. patients over the course of their careers. The commenter concluded that the administration should take action to expand eligibility for Federal student aid and education loans to DACA recipients to enable these individuals to pay for the incredibly high costs of medical education. Another commenter stated that the current healthcare

staffing gaps associated with the COVID–19 pandemic could be filled by DACA recipients. The commenter cited research stating that 8,600 healthcare workers in California have DACA. The commenter concluded that DACA and work authorization would help to adequately address the current healthcare staffing shortage, which the commenter warned could last until 2026.

*Response:* DHS appreciates the commenters' recognition of DACA recipients' academic and professional contributions to their institutions and communities at large. DHS agrees that work authorization is critical to DACA recipients unlocking their full potential. By helping to lessen the financial burden of pursing higher education, DHS agrees that work authorization makes available to DACA recipients many educational and professional opportunities that otherwise would have remained out of reach.

DHS appreciates the comment citing statistics about the volume of care provided by DACA-recipient physicians. DHS deeply appreciates these contributions. DHS recognizes that DACA recipients fill critical roles in the healthcare field and the high cost of entry into this field, especially for physicians. At the same time, DHS lacks authority to alter DACA recipients' statutory ineligibility for Federal student aid through rulemaking. Comments concerning DACA recipients' eligibility for benefits not administered by DHS are also addressed elsewhere in this preamble. Still, DHS remains committed to preserving and fortifying the policies upon which DACA recipients and their families, employers, schools, and communities have come to rely.

''Economic Necessity'' and Work Authorization

*Comment:* A commenter stated that the proposed requirement to prove economic need appeared intentionally vague and could leave thousands of undocumented students without a form of income. Some commenters requested that the regulation provide clear guidelines and suggested that DHS limit discretion in the determination of ''economic necessity'' for all applicants. A commenter warned that ''economic necessity'' does not negate a student's expenses of pursuing an education (*e.g.,* tuition, living costs, groceries, textbooks, caring for family members) and said the term must acknowledge that higher education is vital for community and economic health. A commenter asked DHS to clarify that students' circumstances will be taken

into account in determining ''economic necessity,'' citing education-related expenses such as internet and computers required during the COVID–19 pandemic. Another commenter likewise suggested DHS should further clarify the definition of economic necessity in the DACA context while providing language that acknowledges the ''reality'' that most DACA requestors have an economic necessity to work. The commenter reasoned work authorization is critical to DACA recipients' entry into the labor market and their ability to support themselves and their families. A commenter similarly suggested DHS establish a rebuttable presumption that DACA recipients have an economic necessity to work, stating such a presumption would simplify the application and adjudication process because the need to work to support oneself is very often self-evident.

A commenter expressed opposition to the proposal's provision granting work authorization to DACA recipients who establish an arbitrary economic need and suggested instead that all DACA recipients receive work authorization under the proposal. A few other commenters likewise opposed the economic need requirement for employment authorization. A commenter stated that requiring economic need imposes assumptions and limitations on DACA recipients' choices and growth. A commenter recommended the statement of economic need be eliminated, as EADs often are used as a primary form of identification for noncitizens, aside from their intended purpose. Without an EAD, the commenter stated, a noncitizen cannot obtain a Social Security number or State identification, which are necessary to conduct activities of daily life.

One commenter went further, saying DHS should prioritize a DACA framework that automatically grants work permit benefits alongside ''deportation protection.'' A commenter likewise recommended work authorization ''continue to be granted automatically and coincide with granting DACA.'' Other commenters similarly suggested automatic, permanent, or guaranteed work authorization grants alongside deferred action.

Numerous commenters added that USCIS verifies underlying status with a Form I–821D approval, which could be sufficient for I–9 authorization. They concluded the I–765 adjudication is an unnecessary use of the agency's time and resources that creates significant

repercussions due to delays in adjudication.

*Response:* DHS thanks commenters for their input on the economic necessity component of this rulemaking. Some commenters characterized the requirement to prove economic need as a new component of a DACA request. However, the economic need requirement is not new to DACA or to employment authorization for deferred action recipients more broadly. It has been part of the DACA policy since 2012 and the deferred action employment authorization regulation since 1987.[181] DACA recipients, like all other deferred action recipients, fall within the categories of noncitizens for whom employment authorization is discretionary, not mandatory as it is for certain categories where Congress has made employment authorization incident to the noncitizen's lawful immigration status.[182] The rule makes no change to that longstanding policy for deferred action recipients, including for DACA recipients.[183] As explained in the NPRM, 8 CFR 274a.12(c)(14) has, for decades, authorized deferred action recipients to apply for and receive an EAD if they establish economic

necessity. The NPRM also explains that this rule does not change the eligibility of DACA recipients to apply for work authorization or alter the existing general rule that they must establish economic necessity.

DHS acknowledges some commenters' calls for DHS to eliminate the economic necessity requirement altogether, along with other commenters' suggestion to automatically grant employment authorization to DACA recipients alongside deferred action. DHS appreciates commenters' concern about DACA recipients' continued access to employment authorization under this rule. DACA is a discretionary policy, however, and DHS has determined that, as such, employment authorization also should remain discretionary and require a showing of economic need as has been the case since the beginning of the DACA policy in 2012, and in keeping with pre-existing regulatory requirements for deferred action recipients seeking employment authorization. To automatically grant employment authorization to every DACA recipient would mean that such authorization would effectively be "incident to status," as it is for certain types of lawful immigration status, such as refugee, asylum, and TPS.[184] As previously discussed, DACA is fundamentally not a lawful immigration status; thus, DHS believes that making employment authorization effectively automatic upon a DACA approval would not be appropriate. Moreover, DHS believes that the general rule requiring DACA recipients to show economic need before they may receive discretionary employment authorization has proved workable in the past and remains workable today. It also bears noting that most recipients of deferred action under the DACA policy also have been approved for employment authorization based on economic need. At this time, DHS declines to change the requirement for DACA recipients relative to the general rule for other deferred action recipients or to otherwise disturb the longstanding rule.

DHS thanks commenters for their suggestions pertaining to expanding on the concept of economic necessity in the final rule to expressly recognize the costs of pursuing higher education. However, DHS declines to write such granularity into the final rule. This rule continues historical practice by basing the economic necessity inquiry on the Federal Poverty Guidelines and existing regulations at 8 CFR 274a.12(e). That regulation broadly provides an applicant's assets, income, and expenses

all may constitute evidence of economic need to work. DHS believes that this regulation—particularly its provision for consideration of expenses—provides adjudicators with sufficient leeway to consider the costs attendant to pursuing higher education when determining an applicant's economic need to work. And while it may be true that DACA requestors' economic necessity to work is often obvious, DHS maintains its position that the current employment authorization framework is sufficient to capture all the types of costs and expenses, including those for higher education, that DACA requestors and recipients may have and that may support their economic need to work.

Moreover, DHS's decision whether to grant discretionary employment authorization entails more than verifying the requestor's identity through adjudication of the Form I–821D. As explained above, requestors must establish economic necessity to work. DHS therefore disagrees with the commenter that adjudicating the Form I–765 and accompanying Form I–765WS is an unnecessary use of DHS's time and resources. Rather, those adjudications ensure applicants establish the requisite economic need to work. Because the current framework on economic necessity and work authorization has not proven unworkable over DACA's 10-year lifespan, DHS elects to maintain the status quo on this point.

### Employment Authorization for DACA Recipients Versus Visa Categories

*Comment:* A commenter suggested that instead of spending time pursuing a rule for DACA, DHS should have drafted rules governing employment authorization for F–1 OPT students waiting for H–1B visas or establishing an improved process to ensure H–1B visas are used within a fiscal year. Another commenter similarly stated that DHS should prioritize action for F–1 students who do not win the H–1B lottery or H–4 dependents who wish to support their families, critiquing the proposal for failing to explain why DACA recipients deserve employment authorization.

*Response:* DHS acknowledges that members of the DACA population are not the only category of noncitizens with pressing matters in need of agency attention and resources. However, the DACA policy has distinctive functions and serves distinctive needs (including protection of reliance interests). In addition, the President has expressly directed DHS to preserve and fortify the DACA policy, and that is the subject of this rulemaking. Because DACA recipients necessarily came to the

---

[181] *Control of Employment of Aliens,* 52 FR 16216, 16228 (May 1, 1987). *See also* Instructions to Form I–765, Application for Employment Authorization (revised Jan. 19, 2011), at 5 (instructions for form version in use at time DACA implemented and including requirement for deferred action recipients to file Form I–765 with authorization of deferred action and evidence of economic necessity for EAD); ICR Reference No. 201208–1615–002, Instructions to Form I–765, Application for Employment Authorization (revised Aug. 6, 2014), at 5 (continuing requirement for economic necessity for EAD for deferred action recipients, including specific reference to DACA recipients, and requiring revised financial worksheet, Form I–765WS (Form I–765 Worksheet) (Aug. 6, 2014)). Proof of economic necessity for an EAD has continued to date for deferred action recipients, including for those with DACA. *See* Instructions to Form I–765, Application for Employment Authorization (revised Aug. 25, 2020), at 16–17.

[182] *See* 8 CFR 274a.12(c) (categories of noncitizens for whom employment authorization may be provided in DHS's discretion, including for deferred action recipients under paragraph (c)(14)). *But see* 8 CFR 274a.12(a) (categories of noncitizens for whom employment authorization is "incident to status," such as asylees, refugees, certain nonimmigrants, and others).

[183] As explained both in the NPRM and in this rule, the Attorney General and later the Secretary, have for decades interpreted their statutory authority to "establish such regulations . . . and perform such other acts as he deems necessary" for administering the INA (now vested in the Secretary) as allowing that officer to grant discretionary work authorization to recipients of deferred action. *See* 86 FR 53757. Congress confirmed this authority in INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3), which expressly contemplates a framework in which the Attorney General (now the Secretary) may authorize certain classes of noncitizens for employment. This interpretation has stood undisturbed for over 30 years.

[184] *See* 8 CFR 274a12(a)(3), (8), and (12).

United States as children, and because of the substantial reliance interests that have developed over a period of time, DACA recipients occupy a unique space in the world of noncitizens in need of work authorization. To be sure, DHS acknowledges the circumstances of the populations that the commenter identifies and is taking steps to address them where appropriate, lawful, and feasible.

Other Comments on Work Authorization

*Comment:* Expressing support for DACA, a commenter remarked that recipients with more qualifications should receive better benefits, such as a stronger work permit. Similarly, a commenter suggested that DHS should recommend that the Department of Labor place DACA recipients with science, technology, engineering, and mathematics (STEM) degrees onto Schedule A so that highly educated DACA recipients may self-petition for permanent residence by filing a Form I–140.

A commenter stated that, should DACA recipients receive the ability to seek relief through a future longer term but nonrenewable work permit program, their ability to re-request deferred action under DACA should be protected. The commenter further reasoned, if a recipient obtained alternate relief through a longer-term work permit in the future, and Congress failed to pass a pathway to citizenship during the relief period, it would be important for those who did not renew their DACA request in that period to be allowed to request DACA again.

*Response:* Employment authorization for a DACA recipient is based upon the DACA recipient's eligibility for deferred action and demonstrating an economic necessity, as it is for all other deferred action recipients, and not on any other status or authorization to be in the United States. There is no "stronger work permit" that DHS could offer to DACA recipients solely based on their deferred action. Rather, when a DACA recipient is granted employment authorization, the DACA recipient is then generally eligible for employment anywhere in the United States and with any legal employer for the duration of the validity period of the employment authorization document without additional restriction.[185] DHS also does not have the authority to place DACA recipients on the Department of Labor's Schedule A. Thus, while some DACA recipients may have different skill sets,

levels of education, or technical training, it is ultimately DACA recipients' eligibility for deferred action and economic necessity that make them eligible for employment authorization, and for the reasons explained and discussed throughout this preamble DHS is not changing the eligibility requirements for consideration for deferred action under DACA.

b. Authority To Provide Employment Authorization To Deferred Action Recipients

DHS Lacks Authority To Grant Work Authorization

*Comment:* A commenter stated, "DHS does not have the authority to grant employment authorization documents . . . to aliens [for] whom the INA does not provide such benefits or for whom the INA does not expressly grant the Secretary discretionary authority, such as is the case with asylum-based EADs." The commenter stated Congress has established an extensive scheme for the admission of immigrant and nonimmigrant foreign workers into the United States. The commenter went on to write that Congress has not authorized DHS to create employment eligibility for classes of noncitizens not already provided by law, reasoning that designating new classes of employment-eligible populations undermines the deliberate scheme created by Congress, which contemplates intricate social, economic, and foreign policy considerations beyond the scope of DHS's interests and mission. The commenter stated INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3) does not provide the authority that DHS claims because that section is "merely definitional" and does not itself grant the Secretary any authority. Citing the COVID–19 pandemic and inflation, the commenter wrote the U.S. Government has both a moral and legal obligation to ensure that U.S. workers of all backgrounds are first in line for jobs as the economy reopens and are not further harmed by unfair competition and wage suppression.

A commenter remarked that the proposal violates the provision at INA sec. 236(a)(3), 8 U.S.C. 1226(a)(3), prohibiting DHS from providing work authorization to an "alien," citing the statutory language. The commenter further stated that the interpretation cited in the proposed rule, 86 FR 53758, does not reflect the actual meaning of the statute, and that any examination of legislative history is irrelevant when the statutory language is clear. Ultimately, the commenter opposed the proposed rule, stating that it is inconsistent with the "INA's unambiguously specific and

intricate provisions" regarding immigration status and work authorization.

*Response:* DHS disagrees with commenters' position that DHS lacks authority to grant employment authorization to DACA recipients. The text of the relevant statute, understood in light of the relevant historical context, confers that authority on DHS. As the NPRM explains in detail, since at least the 1970s, the INS and later DHS have made employment authorization available for noncitizens without lawful immigration status but who receive deferred action or certain other forms of forbearance from removal.[186] As noted in the NPRM, INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3), enacted in 1986 in IRCA, defines an "unauthorized alien" for purposes of employment authorization as a noncitizen who "is not at that time either . . . an alien lawfully admitted for permanent residence, or . . . authorized to be so employed by this chapter or by the Attorney General" (now the Secretary of Homeland Security). This provision plainly recognizes that the Secretary may authorize employers to employ certain removable persons, endorsing the longstanding, pre-IRCA agency practice. And even before Congress enacted section 274a(h)(3), INS and Congress had consistently interpreted the broad authority in INA sec. 103(a), 8 U.S.C. 1103(a), to allow the Secretary to grant work authorization. That section charges the Attorney General and, since 2003, the Secretary, with "the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," and authorizes the Secretary to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out" the Secretary's authority under the INA. That provision also plainly allows for the granting of discretionary employment authorization to certain noncitizens even when no additional statute expressly so provides.[187]

DHS finds the commenters' arguments to the contrary unpersuasive. One commenter disagreed with DHS's interpretation that INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3), which defines an "unauthorized alien" for purposes of employment authorization as a noncitizen who "is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by

---

[185] *See* INA sec. 212(n)(4)(E), 8 U.S.C. 1182(n)(4)(E); 8 CFR 274a.12(c).

[186] *See* 86 FR 53737–53760.

[187] *See also id.* at 53757 and n.190.

the Attorney General.'' DHS has pointed out that this definition demonstrates that Congress recognized and accepted the former INS's long history of providing employment authorization to individuals under the general section 103 authority in the INA. The commenter stated that the section is ''merely definitional.'' But the commenter's reading of that provision fails to account for the importance of the definition of ''unauthorized alien'' in the statutory scheme and its extensive regulatory and legislative history.

In the decades leading up to IRCA, the INS frequently stated its view of its authority to grant work authorization to certain classes of noncitizens, or restrict the work authorization of the same.[188] The INS and later DHS have also regularly exercised that authority without congressional intervention.[189] In fact, Congress expressly acknowledged the Attorney General's—and now the Secretary's—authority to grant employment authorization to certain classes of noncitizens in 1974 when it passed the Farm Labor Contractor Registration Act Amendments, which in pertinent part made it unlawful for farm labor contractors knowingly to employ any ''alien not lawfully admitted for permanent residence, or who has not been authorized by the Attorney General to accept employment.''[190] INS sought

to codify its work authorization practice in a 1981 final rule permitting discretionary work authorization for certain noncitizens without lawful status, such as those who (1) had pending applications for asylum, adjustment of status, or suspension of deportation; (2) had been granted voluntary departure; or (3) had been recommended for deferred action.[191] In the proposed rule that preceded these changes, the INS explained that ''[t]he Attorney General's authority to grant employment authorization stems from section 103(a) of the Immigration and [Nationality] Act[,] which authorizes him to establish regulations, issue instructions, and perform any actions necessary for the implementation and administration of the Act.''[192]

Congress then passed IRCA in 1986, making it unlawful for the first time for employers knowingly to hire an ''unauthorized alien (as defined in subsection (h)(3))'' for employment. 8 U.S.C. 1324a(a). Subsection (h)(3) defines an ''unauthorized alien'' in part as an individual whom the Attorney General has not authorized for employment. Thus, even though INA sec. 274a(h)(3) is ''definitional'' as one commenter observes, it is not meaningless or unimportant. To the contrary, that definition is part of IRCA and defines the scope of IRCA's core substantive provision that makes it unlawful to hire ''an unauthorized alien *(as defined in subsection (h)(3)).*'' 8 U.S.C. 1324a(a) (emphasis added). As INS explained in IRCA's implementing regulations:

[T]he only logical way to interpret this phrase is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined ''unauthorized alien'' in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute.[193]

In other words, Congress was well aware of INS's view of its authority to grant work authorization when it passed IRCA, and chose expressly to acknowledge INS's practice on this point, ratifying it in the most comprehensive immigration legislation in a generation.

For this same reason, DHS disagrees with the commenter's assertion that Congress' expressly authorizing certain classes of noncitizens for employment in the years since IRCA's enactment negatively implicates DHS's ancillary and longstanding authority to grant discretionary work authorization. This assertion depends on a misuse of the ''expressio unius est exclusio alterius'' canon. The express authorization was supplemental to the general authority that already existed, and not in derogation of it or contradictory to it. As explained above, Congress has had ample opportunity for input through legislation on INS's authority to grant work authorization over the years. But in enacting IRCA Congress ratified the Attorney General's (now the Secretary's) authority to grant work authorization to various classes of noncitizens. Nor did Congress disturb this text or alter this authority in any way in other watershed immigration legislation since that time, including the Immigration Act of 1990, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, or the REAL ID Act of 2005.

DHS acknowledges that in prior litigation, the agency took the position that INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3) did not authorize the Secretary to grant work authorization to recipients of deferred action under the DACA policy.[194] However, after careful consideration, DHS now disagrees with that position. For the reasons explained throughout this preamble and the NPRM, Congress clearly ratified the Attorney General's longstanding authority to authorize classes of noncitizens for employment through the enactment of INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3). DHS accordingly disagrees with the commenter that it lacks authority to provide EADs to recipients of deferred action under the DACA policy who establish an economic need to work.

DHS acknowledges the commenter's concern for citizen workers during this period of particular economic uncertainty, but DHS disagrees that this rule would result in material adverse effects on such workers. As explained in greater detail elsewhere in this rule,

---

[188] *See, e.g., Aliens and Nationality,* 17 FR 11469, 11489 (Dec. 19, 1952) (codified at 8 CFR 214.2(c) (1952)) (prohibiting a nonimmigrant in the United States from engaging in ''any employment or activity inconsistent with and not essential to the status under which he is in the United States *unless such employment or activity has first been authorized by the district director or the officer in charge having administrative jurisdiction over the alien's place of temporary residence in the United States.''* (emphasis added)); *Aliens and Nationality,* 22 FR 9765, 9782 (Dec. 6, 1957) (codified at 8 CFR 214.2(c) (1957)) (same). *See also generally* Sam Bernsen, *Employment Rights of Aliens Under the Immigration Laws, In Defense of the Alien,* Vol. 2 (1979), at 21, 32–33 (collecting former INS Operating Instructions [OI] on employment authorization), *reprinted in https://www.jstor.org/stable/23142996;* Geoffrey Heeren, *The Immigrant Right to Work,* 31 Georgetown Immigr. L. J. 243 (2017). In addition, as noted in the NPRM, the former INS's OI in 1969 allowed for discretionary employment authorization to be issued to individuals who were provided voluntary departure, which permitted certain deportable noncitizens to remain in the United States until an agreed-upon date at which point they had to leave at their own expense but without the INS needing to obtain an order of removal. *See* INS OI 242.10(b) (Jan. 29, 1969).

[189] *See, e.g.,* 17 FR 11469; *Matter of S-,* 8 I&N Dec. 574, 575 (BIA 1960) (noting that ''the Immigration Service has issued printed material putting nonimmigrant aliens on notice that they may not engage in employment without permission of the Immigration Service Form I–358, which is routinely given to all entering nonimmigrant aliens.'' (cleaned up)).

[190] *See* Public Law 93–518 (Dec. 7, 1974).

[191] *See Employment Authorization to Aliens in the United States,* 46 FR 25079 (May 5, 1981).

[192] 45 FR 19563 (Mar. 26, 1980). The INS also stated that the Attorney General's authority to authorize employment aliens in the United States was ''a necessary incident of his authority to administer the Act'' and had recently been ''specifically recognized by the Congress in the enactment of section 6 of [Pub. L. 94–571].'' *Id.* As described by the INS, that provision ''amended section 245(c) of the Act to bar from adjustment of status any alien (other than an immediate relative of a United States citizen) who after January 1, 1977 engages in unauthorized employment prior to filing an application for adjustment of status.'' *Id.*

[193] *Employment Authorization: Classes of Aliens Eligible,* 52 FR 46093 (Dec. 4, 1987).

[194] *See* Reply Br. for Pet'r at 19, *U.S. Dep't of Homeland Security, et al.* v. *Regents of the Univ. of Cal.,* 140 S. Ct. 1891 (2020) (No. 18–587).

AR2022_100242

including the RIA at Section III.A.4.d, the relationship between DACA recipients and U.S. workers is more complicated. For instance, the data consistently indicate that introducing skilled noncitizen workers to the workforce positively impacts the wages and employment of both college-educated and non-college-educated citizens, suggesting that DACA recipient workers falling into this category would generally be complementary to, rather than competitive with, U.S. citizen workers.

DHS likewise disagrees with the other commenter's position that INA sec. 236(a)(3), 8 U.S.C. 1226(a)(3), prohibits DHS from granting work authorization. DHS first notes INA sec. 236 governs the apprehension and detention of noncitizens pending removal proceedings. The commenter seeks to overextend that statute's reach, for there is no indication that Congress intended it to apply beyond the context of removal proceedings. In any event, as explained in the NPRM, DHS interprets the clause of INA sec. 236(a)(3) stating that DHS may not provide work authorization to a noncitizen in removal proceedings "unless the alien . . . otherwise would (without regard to removal proceedings) be provided such authorization" to represent Congress' further recognition that noncitizens who are not also permanent residents may nevertheless receive work authorization.[195] That clause (added in 1996) preserves the Secretary's authority to grant work authorization to deferred action recipients, as the Secretary had done pursuant to preexisting regulation, 8 CFR 274a.12(c)(14) (1995). DHS maintains its position that because Congress expressly referenced situations in which a noncitizen "otherwise" would receive work authorization, Congress preserved DHS's authority to grant work authorization to categories of noncitizens other than lawful permanent residents, including to deferred action recipients, consistent with DHS's longstanding interpretation of its statutory authority. Any other reading renders that statutory text superfluous.

DHS has further considered the district and appellate court opinions questioning DHS's authority to provide employment authorizations to DAPA or DACA recipients, and respectfully disagrees with those decisions for the reasons explained in the proposed rule.[196]

## DHS Has Authority To Grant Work Authorization

*Comment:* Many commenters stated that the Department's statutory authority to provide work authorization to DACA recipients is clear, citing longstanding regulations and law to support their claim: INA sec. 103(a), INA sec. 274a(h)(3), and 8 CFR 274a.12(c)(9), (10), and (14). Citing INA sec. 274a(h)(3), one commenter stated that Congress delegated authority to DHS to administer and enforce the INA, saying the proposed rule is consistent with DHS's legal authority to grant work authorization to those "who benefit from prosecutorial discretion." Other commenters similarly agreed that granting work authorization does not "undermine" the INA or IRCA, contrary to the district court's recent holding in *Texas.* A commenter also reasoned that if the agency did not provide employment authorization, then the agency's action would be arbitrary and capricious for failing to consider the third parties impacted by the loss of employment authorization. Citing INA sec. 274a(h)(3), a commenter warned "undercutting" the clear statutory and regulatory authority the Department has to grant employment authorization would have far-reaching impacts beyond DACA to many other vulnerable groups of migrants. Another commenter likewise applauded DHS's "thorough" explanation of its discretionary authority to grant deferred action and work authorization to certain individuals. Several commenters urged the Department to add a DACA-specific provision to longstanding work authorization regulations to clarify and reinforce the policy for DACA recipients.

Several other commenters expressed concern with the separation of work authorization and deferred action, writing that access to deferred action and work authorization are not separate in their view. The commenters stated that the ability for DACA recipients to live with their families and communities without fear of deportation is synonymous with their ability to work legally and contribute to their families' and communities' economic well-being. The commenters acknowledged State legislators cannot grant work authorization to DACA recipients and instead must rely on DHS's discretion to do so.

*Response:* DHS agrees with commenters that it has authority to grant work authorization to DACA recipients attendant to their grant of deferred action. DHS agrees the pertinent regulatory and legislative context indicates Congress' consistent recognition and ratification of this authority.[197] With respect to the comment suggesting that eliminating employment authorization for DACA recipients would be arbitrary and capricious, DHS takes the commenter's point regarding the benefits of employment authorization and existing reliance interests, but notes that DHS has not eliminated employment authorization from the policy. DHS agrees with commenters that DACA recipients and their communities would be negatively affected if discretionary employment authorization upon demonstration of economic necessity were eliminated from the DACA policy. To this end, DHS has included a DACA-specific EAD provision in this rule at new 8 CFR 274a.12(c)(33).

### c. Unbundled Process To Make Form I–765 Optional

Support for Unbundled Process That Makes Form I–765 Optional

Financial Benefits to Applicants

*Comment:* Some commenters expressing support for the unbundled process stated that the provision would allow requestors to secure deferred action before applying for employment authorization, preventing them from losing the $410 Form I–765 filing fee upon a denial of deferred action. Other commenters said the unbundled process would provide flexibility and ease the financial burden for applicants who do not need employment authorization, such as some university students and those who are unable to work. Commenters said that the 181,000 DACA-eligible students in higher education would benefit from the ability to financially prioritize the separate requests, as many of these students may not need or want employment authorization during their enrollment in higher education. Another commenter reasoned that the $410 filing fee for Form I–765 is significant and a potential barrier for many requestors.

*Response:* DHS acknowledges these commenters' support for the proposed provision and agrees that an unbundled process would provide additional flexibility and reduce financial barriers to deferred action requests for some DACA requestors, including those who do not want to or cannot currently work. DHS agrees that the proposed unbundled process would provide DACA requestors with the ability to prioritize requests for forbearance from removal over employment authorization

---

[195] 86 FR 53759.
[196] 86 FR 53759–53760.

[197] *See* the preamble to the NPRM at 86 FR 53756–53760.

or to wait until they know their DACA request is approved before filing and paying the fees for an EAD, as needed. DHS has weighed these important interests carefully against countervailing considerations discussed below and, as discussed in greater detail in this section, has modified the proposed rule to codify the existing bundled process.

Protect the Integrity of DACA Against Future Litigation

*Comment:* Other commenters supporting the provision stated that unbundling the requests for employment authorization and deferred action would protect DACA recipients from the results of future litigation and possible deportation. A commenter agreed with what they perceived as DHS's rationale for the proposed change, namely that if employment authorization requests were optional, there would be a greater likelihood that the deferred action component of the policy and, thus, relief from deportation would be upheld if a court invalidated employment authorization for DACA recipients. Other commenters stated that while it was within the Executive's immigration authority to grant both deferred action and employment authorization, an unbundled process would bolster the continued existence of DACA in whole or in part.

A commenter stated that the proposed change would strengthen DACA's designation as an executive exercise of prosecutorial discretion because it would align DACA with other forms of prosecutorial discretion that grant employment authorization based on economic need. The commenter concluded that placing the program on firm ground with regard to prosecutorial discretion while providing financial relief and flexibility to DACA recipients would be essential ''until there is a permanent congressional solution.''

*Response:* DHS acknowledges commenters who reasoned that the proposed unbundled process would align DACA with other DHS exercises of deferred action and could fortify the forbearance component of the DACA policy in the event of ongoing or future DACA litigation. However, DHS disagrees that unbundling these forms is necessary to preserve and fortify the forbearance from removal component of the DACA policy. DHS therefore disagrees with commenters to the extent they characterize DHS's rationale for proposing the unbundled process as a necessary means to insulate the policy from litigation. Rather, DHS's primary reason for proposing the unbundled approach was to provide applicants with greater flexibility and to reduce

cost barriers to eligible noncitizens who sought forbearance but did not want, prioritize, or have economic need for employment authorization. And as discussed throughout the NPRM and this rule, DHS strongly believes it is legally authorized to implement the DACA policy, including to grant recipients discretionary work authorization. DHS accordingly disagrees with commenters' position that unbundling forbearance from removal and work authorization is necessary to place DACA on stronger legal footing. This rule, moreover, includes both a DACA-specific EAD provision at new 8 CFR 274a.12(c)(33) and a severability provision at new 8 CFR 236.24. Thus, even if a court were to hold that DHS lacked authority to grant discretionary work authorization to DACA recipients, DHS maintains that the court should sever the work authorization provision from the rest of the regulation, leaving DACA's forbearance component intact. As unbundling the filing of the DACA request from the employment authorization application is not legally required to preserve the forbearance component of DACA, and as discussed in greater detail below, despite the greater financial and other flexibility it would offer DACA requestors, DHS has decided to modify the proposed rule to maintain the status quo policy that requires all DACA requestors to file Form I–765, Application for Employment Authorization, and Form I–765WS concurrently with their form I–821D, Consideration of Deferred Action for Childhood Arrivals.

Mixed Feedback on the Provision

*Comment:* Some commenters provided mixed feedback on the proposed unbundled process without opposing or supporting the proposal. These commenters acknowledged, as discussed above, that an unbundled process would provide greater flexibility, reduce cost barriers to requestors, and that unbundling the forms could better protect deferred action should a court strike down access to employment authorization. A commenter, however, questioned the purpose of DACA if recipients could not legally work and obtain Social Security numbers and expressed concern that the change would cause confusion for DACA recipients. Commenters expressed concerns about delays that would result in misaligned validity dates for deferred action and work authorization. Citing USCIS historical processing times data that DACA initial requests were taking on average nearly 6 months and DACA-related

employment authorization requests were taking on average nearly 2 months to be processed, a commenter stated that unbundling Forms I–821D and I–765 could lead to additional delays in EAD adjudications, causing disruptions for U.S. employers and harming DACA recipients and their families. Likewise, a commenter stated that the rule, as proposed, could not guarantee the timely adjudication of employment authorization applications.

Without clearly supporting or opposing the proposed unbundled process, other commenters urged DHS to proceed with caution and suggested ways to ameliorate concerns with the proposed provision, including: clearly and carefully communicating the change to the DACA population, ensuring DACA recipients who work without authorization do not face penalties, maintaining a procedure that would not confuse or cause backlogs in applications due to the extended process, and adding language to the rule that DACA and EAD applications USCIS receives concurrently are adjudicated together and have the same validity dates.

Expressing support for this provision, a commenter raised concerns that the optional form would effectively change the cost of DACA and questioned whether the reduced cost would result in substantially lower revenue for USCIS.

*Response:* DHS acknowledges these comments on the proposed unbundled process. DHS agrees that the proposal would have provided additional flexibility to requestors regarding whether or when to request employment authorization in connection with their deferred action requests under the DACA policy. DHS, as discussed elsewhere in this rule, disagrees that unbundling these requests is necessary to strengthen the legal footing of the DACA policy or this rule. DHS also acknowledges these commenters' concerns that the proposed provision could introduce confusion among the DACA-eligible population and cause other unintended consequences, such as lengthier processing times, backlogs, and EAD validity dates that do not match the full 2-year period of deferred action for requestors who do not bundle their requests. USCIS has made important strides in reducing backlogs and ensuring efficient processing times for DACA-related requests. Of note, median processing times for DACA renewal requests and related employment authorization applications have decreased to half a month in Fiscal Year (FY) 2022 to date. As discussed above, since July 16, 2021, the *Texas*

district court order has prohibited USCIS from granting initial DACA requests and related employment authorization applications. Nevertheless, DHS agrees that an unbundled option could result in DACA recipients who receive EADs with validity periods of less than 2 years because the expiration date would necessarily be the end date of the deferred action period, while the EAD validity date would depend on the date of adjudication. DHS agrees with the commenter who suggested unbundling these forms could result in diminished cost recovery if a significant number of DACA requestors chose not to file Form I–765. In the NPRM, DHS considered carefully this concern and, based on projections, estimated that USCIS would charge, on average, approximately $93,736,500 less than the estimated full cost of adjudication for Form I–821D annually in FY 2022 and FY 2023 in the unbundled scenario.[198] Nevertheless, in the NPRM, DHS decided to hold the fee for Form I–821D below the approximately $332 estimated full cost of adjudicating that form alone and to propose the unbundled process to offer greater flexibility to DACA requestors, finding this framework to be in the public interest. In the NPRM, DHS explained its view that the proposed Form I–821D fee of $85 balances the need to recover some of the costs of reviewing DACA requests filed without Form I–765, including the costs of biometric services, with the humanitarian needs of the DACA requestor population and the benefits of expanding DACA to DHS and to communities at large. Many DACA recipients are young adults who are vulnerable because of their lack of immigration status and may have little to no means to pay the fee for the request for deferred action. However, DHS has considered these comments and, as further discussed elsewhere in this rule, has decided to instead codify the existing bundled process in this rule.

Opposition to the Optional Form I–765

Most commenters who provided feedback on this provision expressed concern about the consequences it would have for DACA recipients, the application process, program benefits, or the integrity of the program overall. Many of these commenters urged DHS to instead retain the existing bundled process that has been in place since 2012, with some stating the proposed unbundled process undermined DACA.

Recognition of the Rationale Behind the Provision

*Comment:* Many commenters opposed the proposal while also recognizing the financial and flexibility benefits the proposal would have provided to some requestors, as discussed in more detail above. Other commenters who expressed concern with the provision stated that they appreciated the absence of any substantive alterations to EAD adjudications or filing fees. One commenter noted that the requirement for the DACA request to be submitted with the employment authorization application is clearer, forces people to be "all in or all out on the Employment Authorization," and provides a greater understanding of DACA and its benefits to requestors.

*Response:* DHS appreciates these commenters' recognition that the proposed unbundled process would have benefitted some DACA requestors by reducing cost barriers and expanding choice and flexibility for these individuals. However, the Department accepts that these commenters nevertheless preferred the bundled process, which is the longstanding status quo practice since 2012 of requiring both the DACA request and the employment authorization application to be filed simultaneously. DHS addresses these commenters' opposition to the proposal in this section, and, for the reasons discussed, has modified this rule to codify the existing and longstanding bundled process.

Litigation and Loss of Employment Authorization

*Comment:* Many commenters remarked that strengthening the legal position of deferred action through the proposed unbundled process would create an opportunity for the courts or future administrations to invalidate employment authorization for DACA recipients altogether.

A commenter stated that this change would be legally unnecessary, citing DHS's recognition that deferred action has never created an entitlement to employment authorization and that DACA recipients must show an economic necessity to obtain such authorization. The commenter concluded that the existing bundled process has promoted access to an important benefit while minimizing costs to requestors and DHS.

Another commenter remarked that an unbundled process could leave the program vulnerable to political attacks labeling DACA recipients as unproductive members of society,

which could weaken support for DACA and leave the program open to future litigation. Similarly, another commenter noted that that the proposed unbundling could create an opportunity for individuals who are not motivated to work with authorization to forgo the Form I–765 filing fee.

*Response:* DHS disagrees that unbundling the deferred action and employment authorization requests would create any greater likelihood that the employment authorization for DACA recipients would be invalidated altogether. This rule again codifies an exercise of DHS's authority to grant employment authorization to DACA recipients and thereby serves to preserve and fortify DACA. This rule includes a DACA-specific EAD provision at new 8 CFR 274a.12(c)(33). Thus, DHS would need to engage in additional notice-and-comment rulemaking to remove the regulatory text and the ability for DACA requestors to request employment authorization. DHS agrees with commenters' assertion that the proposed change is not legally necessary to fortify the Department's authority to grant employment authorization to DACA recipients. As explained in detail in the NPRM and elsewhere in this rule, since at least the 1970s, the INS and later DHS have made employment authorization available for noncitizens without lawful immigration status but who receive deferred action or certain other forms of prosecutorial discretion.[199] In response to these comments, and for additional reasons explained elsewhere in this preamble, DHS is modifying the rule to adopt the existing bundled process instead of adopting the unbundled process as proposed in the NPRM. Finally, DHS notes that comments regarding political descriptions of DACA recipients are outside the scope of this rule and declines to respond to these comments.

DHS's Rationale Regarding the Need for Work Authorization

*Comment:* A few commenters critiqued DHS's rationale that some DACA requestors may not need employment authorization and questioned how likely it would be that DACA recipients would choose not to apply for an EAD. Similarly, a legal services provider stated that employment authorization is not an add-on benefit to DACA and that it would not expect any of its clients to request deferred action under the DACA policy without employment authorization. Echoing these arguments, a commenter further reasoned that it is

---

[198] 86 FR 53764.

[199] 86 FR 53757.

difficult to see work authorization and deferred action as two separate issues, adding that a deferred action-only DACA policy would have little to no value to individuals. A commenter reasoned that, as the only individuals who fit within the DACA policy under the *Texas* ruling and partial stay are seeking to renew DACA and have always requested deferred action alongside employment authorization, they would continue to request these protections jointly and would not require the additional flexibility. This commenter said that it would be important for recipients to have assurance that they would not have any lapses in employment authorization because of this change.

A commenter stated that the NPRM's projection that 30 percent of DACA requestors would opt out of requesting employment authorization was at odds with rapidly changing individual circumstances and the importance of having the ability to work even if it is not continually exercised. The commenter concluded the vast majority afforded the opportunity to request work authorization will do so.

*Response:* DHS agrees with these commenters that most DACA requestors likely will request employment authorization but reiterates that the unbundled process proposed in the NPRM was intended to not only offer options to requestors about whether to request employment authorization, but also when to request this authorization. DHS acknowledges some commenters' position that employment authorization is not an "add-on" benefit of deferred action, but DHS disagrees. Certainly, as discussed in the NPRM and elsewhere in this rule, policy considerations weigh heavily in favor of authorizing employment for individuals with deferred action. Nonetheless, as discussed throughout this rule, DACA is a exercise of prosecutorial discretion in the form of deferred action, upon which determination DHS has authority to confer employment authorization. Indeed, as other comments have indicated, there is likely to be a subset of the DACA population that does not want or need an EAD at a given time and, therefore, may benefit from the option to delay or defer requesting employment authorization. DHS also reiterates that although the *Texas* court order currently enjoins DHS from granting DACA to initial requestors, this rule addresses the threshold criteria and process for both initial DACA requests and renewal requests. DHS has carefully considered these comments, weighing the unbundled process's potential benefits to a subset of DACA requestors

against the complications posed to the larger population of DACA requestors. Upon careful consideration, as explained below, DHS agrees that the benefits of the proposed unbundled process do not outweigh the potential negative impacts raised by commenters as discussed in this rule. DHS therefore has decided to modify the proposed rule and instead to codify the longstanding bundled process that requires requestors to simultaneously file Form I–765, Application for Employment Authorization, and Form I–765WS along with their Form I–821D, Consideration of Deferred Action for Childhood Arrivals.

Administrative Burdens on Applicants, Confusion, and Impacts on Pro Se Applicants

*Comment:* Many commenters stated that the proposed unbundled process would create unnecessary burdens for current DACA recipients who are accustomed to the bundled process and those who may unknowingly opt out of work authorization due to financial necessity, confusion, or a lack of legal assistance. Another commenter said that any confusion resulting from this change could deprive DACA recipients of access to or ability to work, which the commenter stated is necessary to establish their families' safety and security in the United States.

A commenter stated that, in its experience with the administration of and access to public benefit programs, duplicative applications create unnecessary barriers to participation, while increasing the administrative burden on requestors and the granting agencies. Similarly, commenters stated this change could increase time and resources spent on legal fees to submit additional paperwork or to navigate the new process. In addition to compounding burdens for requestors, agencies, and legal services providers, a commenter suggested that confusion related to this provision would overwhelm under-resourced organizations that assist DACA requestors.

A commenter said that many requestors with financial limitations may fail to understand the benefits of concurrently filing Forms I–821D and I–765. Other requestors, commenters remarked, may erroneously believe they can apply for deferred action and automatically receive employment authorization, or inadvertently fail to opt into applying for employment authorization, leading to further delays and the potential loss of employment opportunities.

Many commenters stated that the burden of this change could fall largely on pro se requestors, making the policy less accessible for those lacking proper guidance to navigate complex, evolving processes. A commenter said this provision would create an acute risk that pro se requestors would not understand that they must apply separately for an EAD under the new process, and that there would be a "skeletal track" resulting in deferred action alone. This confusion, the commenter warned, could result in EAD applications lagging behind DACA requests and subsequent losses in the work authorization period, despite paying the full fee for an EAD. Other commenters stated that these challenges would largely fall on first-generation noncitizens and requestors with limited resources.

*Response:* DHS acknowledges these commenters' concerns and recognizes the need for clarity regarding the process to request consideration for deferred action and employment authorization under the DACA policy. DHS has carefully considered these concerns and agrees that the population of DACA requestors is accustomed to the well-established bundled process that has been in place since 2012. DHS recognizes that diverging from this longstanding process could cause confusion and agrees that requestors without the assistance of attorneys or accredited representatives could be disproportionately and adversely impacted by the proposed change. DHS also recognizes that codifying the unbundled process could strain resources among nonprofit legal services providers because it could result in more requestors seeking assistance from these providers and introduce more procedural options to consider, causing legal services providers to spend additional time and resources explaining the change, counseling requestors, and preparing and filing unbundled forms. DHS also acknowledges commenters' concerns that while the proposed change could reduce cost barriers to forbearance from removal, those DACA requestors with acute economic distress such that they could not afford the filing fee under a bundled process also likely would be among those individuals with the most economic need for employment authorization. DHS also agrees that it is important that DACA recipients who pay the Form I–765 filing fee receive an EAD with a validity period that matches the full deferred action period, and that those who have limited resources may be disproportionately impacted by

AR2022_100246

delaying filing the Form I–765 due to inability to pay. Because DHS has decided to maintain the 2-year DACA deferred action validity period set forth in the Napolitano Memorandum, the Department declines to make changes to this rule that would extend employment authorization validity periods beyond that timeframe. However, after careful consideration of these concerns raised by commenters, and having carefully weighed the potential benefits against the unintended negative consequences raised by the proposal, DHS agrees to make changes in the rule to codify the existing bundled approach, rather than offering requestors the option of an unbundled process.

Delays in Adjudication and Gaps in Employment Authorization

*Comment:* Several commenters expressed concern that unbundling requests for employment authorization and deferred action would increase administrative burdens for USCIS and lead to delays that could harm DACA recipients' ability to meet economic needs through work. A commenter stated that an unbundled process would magnify delays in grants of deferred action or work authorization, leading to incomplete protection and increased uncertainty. Citing current USCIS backlogs, a commenter similarly expressed concern that an unbundled process would compound bureaucratic delays in an agency already experiencing backlogs in adjudicatory functions, including EAD processing. Commenters stated that an unbundled process not only would lead to delays but also could result in the improper denial of work authorization requests. A commenter added that employment authorization gaps heighten the delays employers already experience with noncitizen employees amid labor shortages. Other commenters stated that the unbundled process would result in misaligned validity dates for DACA and employment authorization, leading to the potential loss of a full term of employment authorization and uncertainty for employers and recipients.

*Response:* DHS recognizes that DACA recipients and employers have significant reliance interests in the DACA policy this rule aims to preserve and fortify. DHS acknowledges these commenters' concerns regarding processing delays and bureaucratic complications arising from an unbundled process. DHS agrees that DACA requestors and their employers have an interest in efficiently processed DACA-related employment authorization requests and in EAD

validity dates that align with the authorized deferred action period. DHS notes that the median processing time for a DACA-related Form I–765 is 0.5 months in FY 2022, as of May 31, 2022,[200] reflecting important measures USCIS has taken to ensure properly filed requests are swiftly adjudicated. Nevertheless, DHS acknowledges it would require additional resources to operationalize an unbundled approach that results in multiple configurations of requests and an increased likelihood of "second touch" processing, whereby a requestor files a Form I–765 at some point after submitting their deferred action request. DHS has carefully weighed the intended benefits of additional flexibility for requestors and the potential unintended consequences of increased confusion, uncertainty, and bureaucratic delay, and agrees with these commenters that the flexibility benefits do not outweigh these potential negative impacts. DHS therefore agrees to adopt the suggestion of these commenters to codify the rule at new 8 CFR 236.23(a)(1) to require that a request for DACA also must contain a request for employment authorization filed pursuant to 8 CFR 274a.12(c)(33) and 274a.13.

Two-Tiered System and Unauthorized Employment

*Comment:* Many commenters stated that confusion, delays, or denial of work authorization under an unbundled process would create "unequal DACA tiers" between recipients with and without EADs. A few commenters expressed concern that unbundling deferred action and work authorization could create an opportunity for individuals who are not motivated to work with authorization to forgo the I–765 filing fee or for DACA recipients to avoid work at taxpayers' expense.

Most commenters who raised concerns about a two-tiered system discussed the adverse impact on unauthorized workers, workplace safety, and labor rights. A commenter stated that unbundling deferred action and work authorization would lead to persons opting out of paying the Form I–765 fee for reasons of poverty, suggesting that the choice to delay entry into the workforce would not be done freely. Another commenter said the proposed change to the application process would result in some DACA recipients being granted DACA and not employment authorization.

A commenter remarked that this provision would make work authorization more difficult to obtain, "forcing" some individuals into precarious situations where they pursue unauthorized employment. This outcome, the commenter stated, would run counter to the agency's intention of using its power to protect wages, facilitate workplace safety, and enforce other labor and employment standards. Another commenter noted that, whether due to fear, confusion, or cost, requestors may be deterred from accessing work authorization under an unbundled process, which would open the possibility of a new "second class" of DACA recipients without work authorization. These DACA recipients who lack employment authorization, commenters stated, would open the door for increased unauthorized employment and empower unscrupulous employers to take advantage of unauthorized labor, including lower pay and exploitative, even hazardous work conditions. A commenter added that unscrupulous employers often exploit the lack of employment authorization to chill workers' efforts to organize, protest substandard working conditions, and enforce wage, safety, and discrimination laws, and also interfere with collective bargaining rights, suggesting that the proposed change could cause irreversible harm to many individuals by forcing them into informal employment. Citing studies, a commenter stated that the economic consequences of this change and possible involvement in abusive work situations would be particularly acute for populations that are disproportionately harmed by systemic inequalities, including LGBTQ populations, racial minorities, and people with disabilities.

A commenter expressed concern that a reduced population of work-authorized DACA recipients would lead to the DACA population's increased reliance on nonprofits, community organizations, and city or State funding for daily needs.

*Response:* DHS acknowledges these commenters' concerns about the proposed unbundled process. DHS agrees that, to the extent that some DACA requestors would forgo employment authorization under the unbundled process, two groups of DACA recipients would result, those with and those without employment authorization. As discussed in the NPRM, DHS recognizes that, if offered the option to forgo employment authorization, some DACA recipients would opt out due to a financial

---

[200] USCIS, *Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year, Fiscal Year 2017 to 2022 (up to May 31, 2022),* https://egov.uscis.gov/processing-times/historic-pt (last visited June 29, 2022).

**D. App. 054**

AR2022_100247

inability to pay the Form I–765 filing fee. However, DHS disagrees with the commenter that an unbundled process would force some DACA requestors into unauthorized employment, although DHS acknowledges that such unauthorized employment may be more likely to occur. While DHS acknowledges commenters' point that an unbundled process could result in confusion or uncertainty among DACA requestors, DHS reiterates that it proposed the unbundled process as a mechanism to offer more flexibility and make forbearance from removal more accessible to individuals who might otherwise forgo DACA altogether due to an inability to pay filing fees for employment authorization. Nevertheless, DHS recognizes and agrees with commenters that there are strong policy reasons to make employment authorization requests accessible for those to whom DHS has extended deferred action. As discussed above, self-reliance of community members is critical not only to social and economic prosperity, but also to individuals' personal well-being. While the DACA policy, even without employment authorization, has substantial value, DHS recognizes that without employment authorization, DACA recipients would be unable to engage in lawful employment to support themselves and their families, potentially exposing them to exploitation and crime. DHS has carefully weighed the benefits of increased flexibility offered by the proposed unbundled process against these unintended negative consequences and agrees to modify the rule to codify the existing bundled process instead of the proposed unbundled process.

The Provision Would Undermine the Purpose and Benefits of DACA

*Comment:* Some commenters warned that the proposed unbundled process would, as a result of other residual consequences of the provision, frustrate the main purpose of DACA, to provide both protection from deportation and the ability to work in the United States. A commenter reasoned that the decision to make employment authorization "more challenging for DACA recipients belies [the] recognition of the pivotal role of employment authorization to the proper operation" of DACA. Several commenters similarly said that the provision would undermine the rationale behind DACA. A commenter stated that separating forbearance from deportation and work authorization would have negative effects on its city economy, arguing that DACA without

work authorization would mean an increase in poverty (including mixed-status families), a loss of desperately needed essential workers, and a significant loss to their city's economy and revenues. The commenter estimated that DACA-eligible New Yorkers contribute over $3 billion annually to New York City's GDP.

Commenters reasoned that deferred action and work authorization are not separate, as the ability for Dreamers to freely live with their families and communities is synonymous with their ability to legally work. A commenter said that DHS could not fortify DACA with a regulation that separates deferred action from employment authorization. In addition to stating the potential impacts of this change on the request process, the commenter added that the proposed change would weaken the purpose of DACA by undermining the worth and agency of childhood arrivals.

Many commenters noted that, if this provision led to any recipients losing their employment authorization, recipients also could lose the other benefits an EAD provides beyond the ability to work. Commenters said that the EAD functions as a foundational form of identification for many DACA recipients, who may find this new process confusing and, therefore, fail to reapply for this benefit. They reasoned that an EAD is often the only acceptable form of identification for obtaining a driver's license while providing access to a Social Security number, health insurance and preventative care, entrance to Federal buildings, social benefits, school registration for children, long-term educational opportunities, bank loans, and home utilities. Other commenters added that, without an EAD, DACA recipients have no way of demonstrating "lawful presence," which is the criterion that some States have chosen to use for eligibility for a State identification card, which could in turn affect their right to domestic travel when full enforcement of REAL ID requirements begins. A commenter similarly stated that, even among those who do not require work authorization, an EAD is valuable for obtaining these additional benefits. Considering the loss of benefits for individuals only granted deferred action under this change, commenters suggested that recipients should be allowed to receive an alternative form of identification with their approved DACA request, including a Social Security number and Federal identification.

*Response:* DHS acknowledges these commenters' concerns. DHS agrees that the ability to request employment authorization has been an important

component of the DACA policy since it was implemented in 2012. Although DHS reiterates that employment authorization is not incident to receipt of deferred action—which is an act of prosecutorial discretion—as it is incident to certain forms of lawful immigration status, such as TPS and asylum, DHS agrees that employment authorization is important to most DACA recipients. DHS also agrees with and is persuaded by comments that point to the many reasons beyond employment that DACA recipients may want or need an EAD to facilitate important aspects of daily living while they have deferred action. DHS acknowledges that DACA recipients may require an EAD for identification or to access a variety of State and local benefits, programs, or services. DHS agrees that the proposed unbundled process raises the prospect that some DACA recipients may unwittingly forgo or be deterred from applying for an important identity document or restrict their access to these benefits, programs, or services by virtue of forgoing an employment authorization request for any number of reasons discussed above. Although it is generally the purview of States and municipalities to make policies regarding eligibility of DACA recipients for these benefits, programs, and services, DHS has a strong interest in ensuring that individuals who have been granted DACA are not deterred from requesting an EAD to establish their identity and DACA forbearance. DHS appreciates the commenter's suggestion that DHS furnish individuals who request only deferred action under an unbundled process with an alternative identity document. However, DHS declines to adopt this suggestion as it would impose additional operational costs, could introduce confusion among States and localities, and would result in DACA recipients receiving an identity document not available to recipients of deferred action under other policies or processes. Instead, upon careful consideration of the important concerns raised by these commenters, DHS agrees to modify the final rule at new 8 CFR 236.23(a)(1) to require that a request for DACA also must contain a request for employment authorization filed pursuant to 8 CFR 274a.12(c)(33) and 274a.13.

Fee Waivers as an Alternative to the Unbundled Process

*Comment:* Commenters expressed concern that the proposed provision would have made filing Form I–765 optional while maintaining the existing fee structure. Recognizing that the provision would reduce fees for

applicants with financial hardship or not needing employment authorization, some commenters requested DHS consider other alternatives for making the application affordable or more accessible, including through fee waivers. A commenter also stated that, although separating the two forms and their fees could alleviate the financial burden of requesting DACA for some, it would not eliminate that burden entirely. Other commenters said that the only benefit of the unbundled process would be to offer a lower cost option, but stated that providing a fee waiver was a better alternative than restricting the application to a limited benefit for some. A commenter further expressed concern that DACA is one of the few immigration requests for which requestors are prohibited from requesting a fee waiver, while another commenter urged implementation of a fee waiver option, stating that the current fee exemption process for DACA requestors is cumbersome and further delays beneficiary status. Another commenter said that USCIS is authorized to carry out fee waivers under 8 CFR 106.3(b). To this end, a commenter recommended that USCIS allocate additional funds to waive the fee associated with Form I–765 to reduce the burden on DACA-eligible students.

*Response:* DHS agrees with commenters that policy interests favor making DACA accessible to those who meet the criteria and merit a favorable exercise of discretion and, as such, is not increasing the DACA-related fees in this rule. As discussed in greater detail elsewhere in this rule, DHS has carefully considered the suggestion to make fee waivers available to DACA requestors and weighed the benefits of fee waivers to requestors with the fiscal impact and objective to preserve and fortify DACA. Although DHS agrees to modify the rule to require the existing bundled process, DHS declines to adopt the suggestion to implement fee waivers.

Other Alternatives to an Unbundled Process

*Comment:* A commenter stated that DACA would benefit from not changing the application process in the manner set forth in the proposed rule due to the precarious situation of the policy's long-term viability. Alternatively, the commenter suggested that DHS amend the rule to provide an unbundled process option for initial DACA requestors should they be allowed to receive benefits in the future and maintain the existing bundled process for individuals seeking to renew their

status. A different commenter recommended that the agency provide a way for requestors to affirmatively decline filling out an application for work authorization, instead of unbundling these processes. Another commenter suggested that either the rule maintain the bundled process or that an additional option be included that combines the work permit and DACA renewal instead of "completely decoupling" the two requests. Another commenter urged DHS to continue to grant employment authorization concurrently with deferred action and to prominently list on Form I–821D the significant benefits and any known drawbacks of having an EAD for requestors.

*Response:* DHS acknowledges and thanks commenters for these suggestions. As an initial matter, DHS reiterates that the proposed unbundled process would not have completely "decoupled" deferred action and employment authorization requests for the DACA population. Under the proposed rule, requestors would have retained the option to bundle and concurrently file these requests, but would have the added option of filing for employment authorization separately or not at all. Nevertheless, as discussed above, upon careful consideration of comments received and the extensive comments filed in opposition to the proposed unbundled process, DHS is modifying the rule to codify the longstanding bundled process. DHS believes that a consistent request process for both initial and renewal requestors would best ensure efficient processing and minimize processing delays or other bureaucratic drawbacks of an unbundled process noted by commenters. DHS therefore declines to adopt an unbundled approach for initial requestors. In light of DHS's decision to adopt the existing bundled process, DHS also declines to adopt suggestions to provide a means for requestors to affirmatively decline employment authorization or to list on Form I–821D the benefits and drawbacks of having an EAD.

d. Automatic Termination of Work Authorization

*Comment:* One commenter expressed general concern that, under the proposed rule, termination of a DACA grant would result in termination of the EAD as well, while another stated that the automatic termination of work authorization provision is an example of the proposed rule giving the policy "more of a back[bone]," stating that this was not strictly enforced beforehand.

*Response:* DHS acknowledges the range of views expressed, from one commenter's concern that individuals are no longer eligible to work lawfully once their EAD is terminated, to another commenter's support for the provision. However, DHS disagrees that this provision was not strictly enforced previously. Historically, when an individual's grant of DACA has been terminated, so too has the individual's employment authorization been terminated, because the underlying basis for the employment authorization no longer exists upon the termination of DACA.

DHS is revising 8 CFR 236.23(d)(3) in this rule to remove the cross-reference to 8 CFR 274a.14(a)(1)(iv), which was vacated in *Asylumworks, et al.* v. *Mayorkas, et al.,* civ. 20–cv–3815 (D.D.C. Feb. 7, 2022). As a result of the vacatur and additional revisions made to the DACA termination provisions to eliminate automatic termination based on filing of an NTA, as discussed elsewhere in this rule, DHS is further clarifying at 8 CFR 236.23(d)(3) that employment authorization terminates when DACA is terminated and not separately when removal proceedings are instituted.

3. Lawfully Present (§ 236.21(c)(3)) and Unlawful Presence (§ 236.21(c)(4))

In proposed 8 CFR 236.21(c)(3) and (4), DHS proposed that DACA recipients, like all other deferred action recipients, would continue to be considered "lawfully present" (a legal term of art) for the purpose of receiving certain title II Social Security benefits under existing 8 CFR 1.3(a)(4)(vi) and would not accrue unlawful presence for inadmissibility determinations under INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B) while they have DACA. Both provisions reflect policy and practice for persons subject to deferred action more broadly since well before the inception of DACA. As detailed below, the public comments on these two proposals were overwhelmingly supportive of the two proposed lawful presence provisions, with only a few commenters expressing opposition to them. Several of the supportive commenters also provided recommendations for additional modifications to the proposed provisions. DHS responds first to the supporting comments, then to the opposing comments, and finally to those comments that supported the lawful presence provisions but recommended certain modifications.

Support for ''Lawfully Present'' and ''Unlawful Presence'' Proposals

*Comment:* In expressing their strong support for DHS's proposal that DACA recipients will continue to be deemed ''lawfully present'' for certain benefit purposes as noted in 8 CFR 1.3(a)(4)(vi), commenters provided several reasons. These reasons included: appreciation for DHS's clarification and confirmation that DACA recipients are ''lawfully present''; support for DHS's explanation in the preamble that it would continue to treat individuals granted deferred action under DACA as ''lawfully present,'' as well as the agency's discussion of the differences between lawful presence and lawful status; treating undocumented immigrants as ''lawfully present'' allows them to find employment to support themselves and their families; DACA recipients would be able to obtain Social Security numbers, an outcome the commenters said would allow individuals to obtain jobs and forms of identification, pay taxes, and surpass evidentiary barriers to services; the proposal on lawful presence would enable the recipients to qualify for Social Security and certain other public benefits; and there is no legitimate reason for treating DACA recipients differently from others with deferred action with respect to ''lawful presence.''

One commenter was particularly supportive of the proposal to treat DACA recipients as ''lawfully present'' for purposes of statutes governing eligibility for certain Federal benefits. Many commenters applauded the proposals for confirming that DACA recipients are deemed ''lawfully present'' and do not accrue unlawful presence, commenting that these individuals were not able to understand the implications of, or nor control, their entry into the United States at a young age.

Many commenters were similarly supportive of the proposed rule's incorporation of DHS's longstanding policy that DACA recipients, like other deferred action recipients, do not accrue unlawful presence for purposes of the inadmissibility grounds in INA sec. 212(a)(9), 8 U.S.C. 1182(a)(9) while their deferred action is valid. In expressing their support, commenters noted the following: accruing unlawful presence could otherwise present an obstacle to future admissibility; removing lawful presence for DACA recipients would create a permanent underclass and prevent such individuals from pursuing a green card; the treatment of DACA recipients as lawfully present helps shield and protect DACA recipients

against adverse immigration consequences associated with the accrual of unlawful presence, including bars on reentry; accrual of unlawful presence would present barriers for individuals or their relatives to pursue legal pathways to permanent residency; maintaining the proposed rule's provision on unlawful presence will help ensure that the largest possible percentage of DACA recipients remain eligible for other forms of immigration relief; and holding DACA protections always should prevent the accrual of unlawful presence.

Several commenters specifically responded to DHS's request for comments on whether persons who receive deferred action pursuant to the proposed rule should be regarded as ''lawfully present'' or ''unlawfully present'' for purposes of eligibility for specified Federal public benefits under 8 U.S.C. 1611(b) and admissibility under 8 U.S.C. 1182(a)(9), respectively. Commenters stated that individuals with deferred action always have been covered by the lawfully present regulation and that any other formulation would break from legal precedent and longstanding policy, as well as create an unworkable and overly complex adjudication framework. One commenter said that changing longstanding policy around deferred action and lawful presence would create a logistical nightmare in the complex realm of immigration law. The commenter further stated that if such a change were made retroactive, it would fly in the face of extensive legal precedent regarding retroactive lawmaking, but if the change were not retroactive, USCIS would have the problem of determining when different recipients had DACA that prevented the accrual of unlawful presence (pre-rule) and when their DACA did not protect them from accruing such unlawful presence. According to the commenter, this would involve an increase in adjudication and require the expenditure of more agency resources that would significantly counterbalance any possible benefit of such a change, resources the commenter noted the DACA policy is intended to preserve. The commenter also stated that this would present constitutional issues under the Fifth Amendment's equal protection guarantee [201] because that

guarantee requires the Government to provide sufficient rationale if it wants to treat persons in similar situations in a disparate manner. The commenter noted that USCIS would need to increase adjudication as those who are similarly situated are offered rights that new DACA recipients are not. Other commenters made similar points regarding the disadvantages of changing the longstanding practice regarding DACA recipients' nonaccrual of unlawful presence, including the constitutional equal protection concerns and the difficulties of applying such a change. The commenters added that the change likely would necessitate DHS deciding which DACA recipients had not accrued unlawful presence prior to the rule given that it would likely not be retroactive as compared to those who would accrue unlawful presence after promulgation of such a change. A commenter also noted that removal of the lawful presence designation could undermine postsecondary educational opportunities for DACA recipients in the workforce.

Some commenters stated that they supported the provision to consider individuals with deferred action as lawfully present and opposed any DACA rule that would fail to confirm lawful presence for individuals with deferred action. Similar to the commenter noted above, these commenters said that any DACA rule that fails to include lawful presence could present Equal Protection Clause implications, citing the Fourteenth Amendment of the U.S. Constitution and stating that DHS must treat DACA recipients the same as individuals with other forms of deferred action. A form letter submitted by several commenters cited the Department of Health and Human Services (HHS) action stripping lawful presence for DACA recipients for Affordable Care Act (ACA) purposes as an agency action that received significant public opposition and worsened healthcare outcomes for impacted individuals. Several commenters noted that DHS should formalize its longstanding policy that DACA recipients granted deferred action do not accrue unlawful presence for purposes of INA sec. 212(a)(9), 8 U.S.C. 1182(a)(9).

*Response:* The Department acknowledges and appreciates the many

---

[201] The commenter cited both the Fourteenth and Fifth Amendments. Although the Equal Protection Clause of the Fourteenth Amendment does not apply to the Federal Government, the Supreme Court in *Bolling* v. *Sharpe,* 347 U.S. 497, 500 (1954), held that while ''equal protection of the laws'' is a more explicit safeguard of prohibited unfairness than 'due process of law,' . . . discrimination may

be so unjustifiable as to be violative of due process.'' In the case of racial discrimination in DC public schools, the Court found that no lesser Constitutional protections apply to the Federal Government through the application of the Due Process Clause in the Fifth Amendment than by application of the Equal Protection Clause of the Fourteenth Amendment.

reasons that commenters provided for their support of the proposed rule's two provisions on lawful presence (proposed 8 CFR 236.21(c)(3) and (4)). For the reasons detailed in Section III.E of the proposed rule and discussed further below,[202] DHS agrees that DACA recipients are provided deferred action and should continue to be deemed "lawfully present" like all other deferred action recipients—as they have been since the start of DACA—under 8 CFR 1.3(a)(4)(vi) for purposes of receiving title II Social Security benefits described in that regulation. Similarly, DHS agrees that the rule properly codifies DHS's decade-long policy that DACA recipients are similarly situated to other individuals with deferred action who have, since at least 2002, not accrued unlawful presence for purposes of INA sec. 212(a)(9), 8 U.S.C. 1182(a)(9) inadmissibility while action is deferred in their case.[203] The Department sees no reason to treat DACA recipients any differently from other deferred action recipients for these purposes, and therefore is retaining proposed 8 CFR 236.21(c)(3) and (4) in the final rule. DHS notes, however, that although it firmly believes it has the legal authority to promulgate these provisions, as described in its response below to the opponents of the lawful presence provisions, DHS also maintains its views on severability, as provided in 8 CFR 236.24 and discussed elsewhere in this rule, in the event that any portion of the rule is declared invalid, including one or both of these lawful presence provisions. In particular, even if a court determines that DHS does not have the legal authority to promulgate one or both of the lawful presence provisions, DHS intends that the remainder of this rule, including the forbearance and work authorization provisions, should be maintained.

DHS also notes the concerns expressed by some commenters that a rule that states that DACA recipients, unlike other deferred action recipients, lack lawful presence would violate equal protection principles and that changing this policy would create significant operational complexity for DHS. Since DHS has not taken such an approach and the rule continues the long-existent policy that DACA recipients, similar to other deferred action recipients, are lawfully present for certain public benefits and do not accrue unlawful presence for purposes of section 212(a)(9)(B) of the INA, DHS does not express a position regarding the commenters' hypothetical equal protection arguments. DHS will address the claim if it becomes necessary to do so in a subsequent forum. However, DHS concurs that changing the policy regarding lawful presence would create significant operational complexity if done prospectively, as USCIS would need to determine in future adjudications the specific amount of unlawful presence accrued by DACA recipients on an individual basis.[204]

Opposition to "Lawfully Present" and "Unlawful Presence" Proposals

*Comment:* A few commenters opposed the proposed rule's provisions on lawful presence for certain public benefits and the nonaccrual of unlawful presence while in DACA for inadmissibility purposes. One commenter, who also set forth a view of the overall illegality of DACA, wrote that the proposed rule not only ignored statutorily mandated removal proceedings but also went further to provide immigration benefits to people with no lawful access to immigration benefits. In support of this view, the commenter quoted from the district court in *Texas:* "'Against the background of Congress' 'careful plan,' DHS may not award lawful presence and work authorization to approximately 1.5 million aliens for whom Congress has made no provision." The commenter further stated that the message to the world is that illegal entry will be rewarded and unlawful presence will be mooted by executive action. The commenter said that promulgating a DACA regulation only perpetuates the problem. Another commenter who expressed opposition to the DACA policy and the rule's provision of lawful presence to recipients wrote that DHS is bound by the *Texas* district court's ruling that DACA is unlawful and cannot continue with DACA rulemaking just because it disagrees with the court.

One commenter stated that Congress' careful plan for the allotment of lawful presence forecloses the possibility that DHS may designate hundreds of thousands of people to be lawfully present. The commenter noted that the proposed rule would allow the Secretary to grant lawful presence and work authorization to every "illegal alien" in the United States. The commenter stated that the INA does not permit DHS to reclassify "illegal aliens" as "lawfully present" and eligible for Federal and State benefits, including work authorization. Another commenter similarly expressed opposition to the proposed rule for intentionally choosing not to enforce immigration law, stating that DACA recipients do not have lawful presence regardless of any economic activity in which they engage after entering the country illegally. The commenter further noted that the recipients' intent or age at the time has no relevance and that the commenter could not present a personal defense in court based upon a lack of knowledge of the law or lack of intent if charged of any crime. The commenter stated that illegally entering the United States is no exception.

*Response:* DHS appreciates these comments but continues to respectfully disagree with the commenters who oppose the two provisions in this rule related to lawful presence for the reasons described in the preamble to the proposed rule in Section III.E.[205] As noted elsewhere in this rule, DHS fundamentally disagrees with the commenters who stated DHS does not have the legal authority to implement the DACA policy or to promulgate a rule continuing the policy. DHS also believes it has the legal authority to continue providing DACA recipients the same longstanding treatment it has afforded to all other recipients of deferred action, who are deemed "lawfully present" under 8 CFR 1.3(a)(4)(vi) for title II Social Security benefits and under DHS's guidance on nonaccrual of unlawful presence for INA sec. 212(a)(9) purposes.

In PRWORA,[206] Congress provided the Attorney General (now Secretary) the authority to determine which noncitizens would be considered

---

[202] *See* 86 FR 53760–53762. *See also* DHS response under *Opposition to "lawfully present" and "unlawful presence" proposals* below.

[203] *See* Memorandum to Field Leadership from Donald Neufeld, Acting Associate Director, USCIS Office of Domestic Operations, *Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act,* at 42 (May 6, 2009) (hereinafter Neufeld Memorandum); Memorandum for Johnny N. Williams, INS Executive Associate Commissioner, from Stuart Anderson, INS Executive Associate Commissioner, *Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status,* at 1 (May 8, 2002) (hereinafter Williams Memorandum); USCIS Adjudicator's Field Manual ch. 40.9.2(b)(3)(J).

[204] Several commenters cited *Vartelas* v. *Holder,* 566 U.S. 257 (2012) (noted in ruling against retroactive application of a law that court was "[g]uided by the deeply rooted presumption against retroactive legislation"). *Cf. also, e.g., Bowen* v. *Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988) ("a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms"). DHS takes note of commenters' stated retroactivity concerns, but declines to express a view at this time as to whether retroactive application of a policy change regarding DACA recipients and the accrual of unlawful presence for section 212(a)(9)(B) purposes would be impermissibly retroactive.

[205] 86 FR 53760–53762.

[206] Public Law 104–193, 110 Stat. 2105.

D. App. 058

"lawfully present" for purposes of retirement and disability benefits under title II of the Social Security Act.[207] The Balanced Budget Act of 1997 [208] amended PRWORA to add substantially identical exceptions for Medicare and railroad retirement and disability benefits.[209] States may also affirmatively enact legislation making noncitizens "who [are] not lawfully present in the United States" eligible for State and local benefits.[210] Federal law also limits the availability of residency-based State postsecondary education benefits for individuals who are "not lawfully present." [211] Thus, while there is no express definition of "lawfully present" or "unlawfully present" for all purposes, Congress clearly authorized the Secretary to determine who is "lawfully present" for certain purposes. DHS notes that in the intervening 26 years since the Attorney General determined by rule, 8 CFR 1.3(a)(4)(vi), that deferred action recipients are "lawfully present" for purposes of 8 U.S.C. 1611(b)(2), the provision has not been struck down by courts. Nor has Congress enacted any legislation contrary to the Secretary's determination to designate deferred action recipients as eligible for receiving Social Security benefits. To the contrary, Congress has enacted other similar provisions indicating that the Attorney General's determinations as to lawful presence for certain individuals make those individuals eligible for public benefits.[212] Noncitizens granted deferred action long have been considered "lawfully present" under 8 CFR 1.3(a)(4)(vi) for purposes of receiving title II Social Security benefits, and DHS sees no basis for distinguishing deferred action recipients under the DACA policy.

DHS also disagrees with the commenters who expressed opposition to the proposed codification of the decade-long DHS practice of including DACA recipients within the group of all other deferred action recipients who do not accrue "unlawful presence" for purposes of the inadmissibility grounds in INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). For purposes of those specific grounds, Congress stated "an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General

[now Secretary] or is present in the United States without being admitted or paroled." [213] As DHS explained in the proposed rule, since 2002 the Government has interpreted this deeming provision enacted by Congress to mean that persons should not be deemed "unlawfully present" during "period(s) of stay authorized by the Attorney General," including a period of deferred action.[214] DHS also notes that the first clause of the statutory definition of "unlawfully present" addresses how an alien's presence should be "deemed" after expiration of a period of stay, not during such a period. DHS sensibly construes Section 1182(a)(9)(B) as a whole not to deem a noncitizen "unlawfully present" during an authorized stay, regardless of whether the person was previously "admitted or paroled." Otherwise, "unlawful presence" would accrue when a noncitizen's presence has been authorized by DHS. For example, asylum is a lawful status, but it does not constitute an "admission" (or parole).[215] Such an interpretation would mean noncitizens who entered without inspection and then received asylum would still accrue "unlawful presence"—notwithstanding that they are authorized to remain in the United States, and in fact have lawful status. That would make little sense.

DHS's interpretation does not mean that, in a broad sense, deferred action recipients, such as those with DACA, are lawfully in the United States for all purposes.[216] Instead, the concept of "lawful presence" is a term of art, and very different from "lawful status." It encompasses situations in which the executive branch tolerates an individual being present in the United States at a certain, limited time or for a particular, well-defined period. The term is reasonably understood to include

someone who is (under the law as enacted by Congress) subject to removal, and whose immigration status affords no protection from removal, but whose temporary presence in the United States the Government has chosen to tolerate, including for reasons of resource allocation, administrability, humanitarian concern, agency convenience, and other factors. For these reasons, DHS believes that it is within its authority, as provided by INA sec. 212(a)(9)(B)(ii), 8 U.S.C. 1182(a)(9)(B)(ii) to deem DACA recipients, like other deferred action recipients, to be within "a period of stay authorized by the [Secretary]" and, thus, not accruing unlawful presence for purposes of inadmissibility under INA sec. 212(a)(9)(B).

DHS has further considered the district and appellate court opinions concerning DHS's authority to deem DAPA or DACA recipients "lawfully present" for certain purposes, and respectfully disagrees with those decisions for the reasons explained in the proposed rule.[217]

Support for "Lawfully Present" and "Unlawful Presence" Provisions, but With Suggested Modifications

*Comment:* A commenter stated that granting "lawful presence" instead of "lawful status" (as was the case under "previous rulings," according to the commenter) would establish different rules and protections for DACA recipients.

A commenter who commended DHS for its proposal to continue treating DACA recipients as "lawfully present," and for clarifying the distinction from "lawful status," also requested that DHS include details in the final rule explaining that DACA recipients would be eligible for any other forms of Federal benefits for lawfully present noncitizens associated with future laws or prospective legislative immigration reform (*e.g.,* any such benefits contained in the proposed Build Back Better legislation if it is enacted). Multiple other commenters similarly requested that the final rule explicitly establish that DACA recipients, considered lawfully present and eligible to receive certain Social Security benefits, would be eligible for title IV Federal student aid programs like Pell grants, work study, and direct loans under proposed legislation's extension of eligibility for these programs to individuals with deferred action and TPS. The same commenters urged DHS to allow for flexibility for DACA recipient students to demonstrate title IV eligibility, if that

---

[207] *See* 8 U.S.C. 1611(b)(2).
[208] Public Law 105–33, 111 Stat. 251.
[209] 8 U.S.C. 1611(b)(3) and (4).
[210] 8 U.S.C. 1621(d).
[211] 8 U.S.C. 1623(a).
[212] 8 U.S.C. 1611(b)(3) and (4).

[213] 8 U.S.C. 1182(a)(9)(B)(ii).
[214] *See* 86 FR 53761 (citing Neufeld Memorandum; Williams Memorandum; USCIS Adjudicator's Field Manual ch. 40.9.2(b)(3)(J)).
[215] *In re V– X–,* 26 I&N Dec. 147, 150–52 (BIA 2013).
[216] Nor does DHS's interpretation address similar terms. For example, it is unlawful for an "alien [who] is illegally or unlawfully in the United States" to possess a firearm or ammunition. *See* 18 U.S.C. 922(g)(5)(A). Multiple courts have concluded that this criminal bar encompasses DACA recipients. *See, e.g., United States* v. *Lopez,* 929 F.3d 783, 786–87 (6th Cir. 2019) (in noting that DACA recipient was an "alien illegally or unlawfully in the United States for purposes of section 922(g)(5)(A)," court distinguished 8 U.S.C. 1611(b)(2–4), concerning specific public benefits for individuals who are "lawfully present," and 8 U.S.C. 1182(a)(9)(B)(ii), concerning "unlawful presence" for inadmissibility purposes); *United States* v. *Arrieta,* 862 F.3d 512, 515–16 (5th Cir. 2017) (holding that DACA did not confer a legal status for purposes of section 922(g)(5)).

[217] 86 FR 53761–53762.

eligibility is extended to DACA recipients and those who qualify.

Several commenters expressed support for granting lawful presence to DACA recipients to confirm Social Security eligibility, with one commenter citing research [218] demonstrating that DACA recipients make significant contributions to Social Security and Medicare and that ending DACA could result in a $39.3 billion loss of Social Security and Medicare contributions over a 10-year period. The commenter further remarked that many States require lawful presence for public benefit eligibility. Citing research, a commenter similarly stated that the Social Security and Medicare trust funds would be significantly diminished if DACA recipients are not contributing to the program. The commenter also said that, because Social Security requires workers to reach retirement age with at least 10 years of covered work experience, some DACA recipients may pay Federal Insurance Contributions Act and Medicare taxes without ever receiving benefits. One commenter stated that the designation of lawful presence was important for DACA recipients to qualify for certain State benefits, referencing New York State regulations affording professional licensing eligibility to those ''not unlawfully present.''

Several of the commenters noted above, as well as other commenters, suggested that additional clarity was needed to assist State and Federal agencies in making decisions about benefit eligibility, including confirmation from USCIS that: (1) DACA recipients are authorized to be present in the United States during the period of their grant; (2) DACA recipients' grant of relief is identical to relief associated with any other person granted deferred action; and (3) individuals granted deferred action are permitted to establish domicile in the United States. Commenters also requested that the rule include language stating that individuals granted deferred action are not precluded by Federal law from establishing domicile in the United States, as this would assist the recipients in seeking certain State benefits. One such commenter also requested that DHS clarify that individuals with lawful presence are not prohibited from establishing domicile in the United States, stating that DACA recipients should be treated the same as other individuals with deferred action and suggesting that DHS take additional steps to communicate this clarification

to other Federal and State agencies. The commenter said that confusion over whether DACA recipients can establish domicile in the United States would result in DACA recipients' exclusion from certain benefits and programs that are available to other individuals with deferred action (citing eligibility for residential property tax relief in South Carolina as an example of such exclusion).

Commenters noted that USCIS' posted Frequently Asked Questions (FAQs) on DACA [219] include the following helpful clarifications that have assisted State and Federal agencies in making decisions about eligibility for services and public benefits that they control:

• While distinguishing lawful presence from lawful status, USCIS clarifies that ''[a]n individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect.'' (A. 1) [of the DACA FAQs]

• USCIS explains that ''[t]he relief an individual receives under DACA is identical for immigration purposes to the relief obtained by any person who receives deferred action as an act of prosecutorial discretion.'' (A. 3) [of the DACA FAQs]

• USCIS confirms that ''[i]ndividuals granted deferred action are not precluded by federal law from establishing domicile in the U.S.'' (A.5) [of the DACA FAQs]

By contrast, one such commenter said that some language in the proposed rule's preamble could contribute to confusion, such as the notation that the term lawful presence does not confer authorization or authority to remain in the United States, and gave examples at 86 FR 53740 and 53773. The commenter stated it assumed that the agency meant ''beyond the period of the grant'' or that ''individuals granted DACA do not have an absolute right to remain, and . . . may nevertheless be removed under certain conditions.'' The commenter recommended that DHS clarify that its interpretation of lawful presence is at least as broad as under previous DACA guidance. This commenter, as well as others, requested that DHS and USCIS confirm that individuals granted DACA are federally authorized to be present in the United States, and are considered to be lawfully present during the period of their grant; relief that DACA recipients receive is identical for immigration purposes to the relief obtained by any other person granted deferred action; and individuals granted deferred action are not precluded by Federal law from

establishing domicile in the United States.

Commenters expressed support for the proposal's confirmation that DACA recipients would be considered lawfully present and its statement that DHS has treated persons who receive a period of deferred action under DACA like other deferred action recipients for purposes of establishing lawful presence. The commenters stated that this would ensure DACA recipients are eligible for Social Security and do not accrue unlawful presence toward the 3- and 10-year bars. The commenters further suggested that additional clarification was needed to ensure other Federal and State agencies understand the implications of a DACA grant, its relation to deferred action for other individuals, and any related interpretations of immigration law, citing DACA recipients' exclusion from certain healthcare benefits under the ACA as one example of the need for additional clarity.

One commenter recommended that DHS work with the HHS to extend health insurance coverage under the ACA to DACA recipients, stating that a lack of eligibility for ACA marketplace coverage contributes to higher uninsured rates among DACA recipients. Another commenter expressed support for providing access to affordable healthcare for all individuals, including DACA recipients, and urged DHS to ensure that DACA recipients are not excluded from purchasing subsidized health coverage through the ACA marketplace. Additional commenters agreed and recommended that DHS align the definition of ''lawfully present'' with eligibility requirements for certain health coverage programs to allow DACA recipients to access such programs and avoid disparate treatment. The commenters expressed concern about HHS' exclusion of DACA recipients from participation in Medicaid, the Children's Health Insurance Program (CHIP), and the ACA health insurance marketplace and said that other individuals with deferred action are eligible for such programs. The commenters questioned why DACA recipients are excluded from these important health programs and, citing research, said that participation in Medicaid is associated with higher educational attainment and greater financial stability. The commenters recommended that DHS clarify the definition of ''lawfully present'' to ensure DACA recipients are not excluded from Medicaid, CHIP, and subsidized health insurance through the ACA marketplace.

---

[218] See Magaña-Salgado and Wong (2017).

[219] USCIS, *Frequently Asked Questions, https://www.uscis.gov/humanitarian/consideration-of-deferred-action-for-childhood-arrivals-daca/frequently-asked-questions* (last updated Aug. 31, 2021) (hereinafter DACA FAQs).

Citing research demonstrating the importance of access to healthcare for vulnerable immigrant populations, including immigrant women, a commenter also urged DHS to ensure that DACA recipients are eligible for all public benefits available to similarly situated immigrants, including Medicaid, CHIP, and subsidized health coverage through the ACA marketplace. The commenter said that access to healthcare is a critical equity consideration that the agency must consider in complying with Executive Order (E.O.) 13563 and its focus on promoting equity and fairness, and it urged DHS to ensure that DACA recipients are entitled to the same benefits as all other individuals considered "lawfully present."

A commenter recommended that DHS grant deferred action retroactively to erase periods of unlawful presence accrued prior to confirmation of deferred action, particularly noting that such retroactivity should cover any period since June 15, 2007, because DACA requestors must establish that they have resided in the United States since that date. The commenter further noted that USCIS has the authority for such retroactive application of deferred action and gave as an example current practice that permits USCIS to grant "nunc pro tunc" reinstatement of status to individuals who have filed untimely Extension or Change of Status applications, meaning that unlawful presence is erased because the applicant is considered to have been in status the whole time.

*Response:* DHS acknowledges and appreciates the many supportive comments on the proposed rule's two provisions regarding lawful presence, as well as the recommendations and suggestions for modifications. With respect to the comment that the rule only provides lawful presence to DACA recipients instead of the previous rulings' grant of lawful status, which the commenter indicated would institute different rules and protections for DACA recipients, DHS notes that DACA has never conferred lawful immigration status on recipients as the commenter mistakenly asserts, nor has any other grant of deferred action. DHS does not have the legal authority to deem deferred action recipients to be in a lawful immigration status by virtue of such deferred action. As discussed elsewhere in this rule and in the preamble to the proposed rule at Section IV.B, deferred action is not a lawful immigration status but rather is only an exercise of prosecutorial discretion not to remove a noncitizen from the United States for a designated period of time.

Thus, DHS declines to modify the rule to provide protections to DACA recipients akin to those with lawful status.

DHS also declines to adopt the suggestion of the commenter who urged that the rule allow for the retroactive elimination of any unlawful presence time between June 15, 2007, and an individual's approval for DACA because the individual had to demonstrate continuous residence in the United States since that date to obtain deferred action under the DACA policy. The commenter likened this suggestion to a noncitizen who is in a lawful nonimmigrant status but who files late to extend or change that status to another nonimmigrant category and who, if approved, is allowed "nunc pro tunc" reinstatement of nonimmigrant status for the period between the initial status and the changed or extended status. Unlike the person who files late to change or extend a lawful nonimmigrant status and is approved, a DACA recipient is not in a lawful immigration status that is amenable to reinstatement "nunc pro tunc," but rather enjoys a temporary period in which DHS has chosen not to remove them from the United States for a period of time in the future as an act of prosecutorial discretion. Thus, deferred action is a forward-facing step; forbearance not to remove a noncitizen for a period that already has passed would be meaningless and incompatible with DHS's general deferred action practices. For these reasons, DHS does not believe it may properly erase a person's pre-DACA unlawful presence by beginning deferred action from a date in the past.

Similarly, DHS is unable to adopt the suggestions of commenters to specify that DACA recipients will be considered "lawfully present" for purposes of current or future proposed legislation regarding noncitizens' eligibility for public benefits before such legislation is enacted. Until legislation is enacted that authorizes DHS to define who has lawful presence for particular purposes—as has occurred for the purpose of receiving certain Social Security benefits,[220] railroad retirement benefits,[221] and Medicare[222]—it is premature for DHS to attempt to predict the final terms of such legislation and the extent to which Congress may or may not authorize DHS to describe the categories of noncitizens who may be eligible to apply for particular public benefits. Other agencies whose statutes

independently link eligibility for benefits to lawful presence may have the authority to construe such language for purposes of those statutory provisions.

In response to commenters who recommended that DHS make clear that DACA recipients are affirmatively authorized to be in the United States during the period of their deferred action, DHS has plainly stated in 8 CFR 236.21(c) that the Department intends to forbear from removing DACA recipients from the United States. This is consistent with the fact that the DACA policy is an exercise of prosecutorial discretion and does not confer lawful immigration status, affirmative authorization to remain in the United States, or a defense to removal. In that sense, DACA differs from a grant of lawful immigration status such as permanent resident status, asylum, or TPS. At the same time and as noted previously, DHS also views an individual's time as a DACA recipient as "a period of stay authorized by the [Secretary]" under section 212(a)(9)(B)(ii); therefore, while the individual has DACA, there is no accrual of "unlawful presence" for inadmissibility purposes. DHS believes that the rule is more precise and sufficiently clear on this point as well. In response to the request that DHS clarify that its interpretation of "lawful presence" in the rule is at least as broad as its interpretation under prior DACA guidance, DHS confirms that the rule reflects the same longstanding treatment of DACA recipients as "lawfully present" for purposes described in 8 CFR 1.3(a)(4)(vi), and with regard to their nonaccrual of "unlawful presence" for purposes of INA sec. 212(a)(9), 8 U.S.C. 1182(a)(9) while they have deferred action under DACA, as existed under DHS's DACA policy prior to implementation of this rule.

In terms of whether DACA is "identical relief" to other forms of deferred action, DHS agrees that forbearance from removal for a designated period applicable to the individual is true for DACA recipients as it is for all other deferred action recipients and that EADs for all deferred action recipients, including DACA recipients, are available based on a determination of economic need. However, DHS declines to adopt the suggestion made by some commenters to label DACA as "identical relief" to that provided to all other recipients of deferred action because DHS believes that using such a label could create confusion with respect to the bases for obtaining deferred action and the conditions that may apply to an

---

[220] 8 U.S.C. 1611(b)(2).
[221] 8 U.S.C. 1611(b)(4).
[222] 8 U.S.C. 1611(b)(3).

individual's deferred action. For example, guidelines differ depending on the category under which deferred action is provided, as well as with respect to individual requests that are granted outside of special policies.[223] Different periods of deferred action also may be provided, and conditions placed on the individual's deferred action may vary. For these reasons, DHS declines to adopt the suggestions to modify the rule to state that DACA is an "authorization" to remain in the United States or that it is "identical" to all other forms of deferred action.

The Department understands the concerns expressed by some commenters regarding DACA recipients' ability to obtain State and local public benefits that require applicants to demonstrate "domicile" in a particular locality. Some commenters requested that the rule state that Federal law does not prohibit DACA recipients from establishing domicile while others urged an affirmative statement that DACA recipients may establish domicile in the United States. Although the Department knows of no Federal law that prohibits DACA recipients from establishing domicile within the United States, the Department declines to amend the text of the rule to address "domicile" explicitly because doing so would be outside the scope of the rule, and Congress has not directed the Department to provide guidance on or a definition of "domicile" for any Federal, State, or local public benefit purposes.

The Department also understands and respects the concerns expressed by several commenters who requested that the rule clarify for Federal, State, and local governments that DACA recipients are considered "lawfully present" for purposes of all public benefits that require such presence for eligibility. However, absent a specific authorizing law, the Department does not have the authority to mandate that other Federal, State, and local departments and agencies provide benefits that they administer to DACA recipients, even when DHS categorizes them as "lawfully present" for certain discrete, limited purposes. Subject to enacted laws, DHS may only determine the

categories of immigration status or other authorization (or lack of either) that apply to noncitizens. Through programs such as Systematic Alien Verification for Entitlements, DHS thus informs participating benefit-administering agencies of the immigration category that may apply to a particular person. DHS does not, however, establish the eligibility rules or administer Federal, State, or local public benefits such as those that provide for health, housing, food, education, and general welfare. Other departments and agencies, such as HHS, the Social Security Administration, and the U.S. Department of Agriculture, have those responsibilities.

With limited exceptions, noncitizens who are not "qualified aliens" as defined in 8 U.S.C. 1641 are not eligible for Federal public benefits.[224] Deferred action recipients are not encompassed within the definition of "qualified alien." As such, they are generally excluded from receipt of Federal public benefits.[225] Congress, however, did expressly except certain Federal benefits from the restrictions in 8 U.S.C. 1611(a). With respect to certain title II Social Security benefits, railroad retirement benefits, railroad unemployment insurance, and Medicare, Congress provided that the restrictions shall not apply to noncitizens who are "lawfully present" as determined by the Attorney General (now the Secretary).[226] Other agencies whose statutes independently link eligibility for benefits to lawful presence may have the authority to construe such language for purposes of those statutory provisions. For instance, any future revision of this determination for Medicaid, CHIP, or with respect to the ACA Exchange and private market programs would need to be made by HHS. DHS has determined that addressing the eligibility of DACA recipients for additional benefits is beyond its legal authority and the scope of this rule.

Commenters also recommended that DHS work with other Federal agencies, such as HHS, to amend their guidance and regulations to clarify that DACA recipients are eligible for benefits under the ACA. DHS acknowledges the suggestion, but these topics are also beyond the scope of this rulemaking.

## 4. Discretionary Determination (§ 236.22)

### a. General Comments on Discretionary Determination

#### Case-by-Case Determination and Discretion

*Comment:* A commenter said that DACA recipients should be vetted on a case-by-case basis. Another commenter stated that requestors should be considered for forbearance only when considered on a true case-by-case basis, which the commenter said would ease pressure on USCIS and provide a more consistent application of law. Similarly, a commenter said that DACA has a very low denial rate and that officers rarely ask for additional evidence to demonstrate that requestors have good moral character. The commenter added that the broad criteria for DACA "leave almost no room for officers to exercise discretion." Another commenter said that the proposed rule deprives ICE and CBP officers of discretion. The commenter stated that the proposed rule suggests that officers may be able to make a determination without necessitating further investigation, but it is unclear how an officer could have used their discretion without a full picture of the individual's immigration and criminal history.

*Response:* DHS acknowledges commenters' concerns but disagrees with the suggestion that DACA requests will not be assessed on a case-by-case basis as a result of this rule or that the threshold criteria are so broad that officers are limited in their ability to exercise discretion. On the contrary, the rule explicitly requires case-by-case assessments. At new 8 CFR 236.22, DHS lays out several threshold discretionary criteria that USCIS will assess on a case-by-case basis as a review of the totality of the circumstances. DHS proposed in the NPRM that, even when a request meets all threshold criteria, USCIS would examine the totality of the circumstances in the individual case to determine whether there are negative factors that make the grant of deferred action inappropriate or outweigh the positive factors presented by the threshold criteria or by any other evidence.[227] DHS is retaining this same approach to the individualized case-by-case assessment in this final rule and is now codifying it at new 8 CFR 236.22(b) and (c).

Regarding one commenter's concern that the NPRM deprives ICE and CBP officers of discretion by suggesting that an officer may be able to make a determination without necessitating

---

[223] *See, e.g.,* Military Deferred Action (available to certain relatives of certain active and former members of the military), *https://www.uscis.gov/military/discretionary-options-for-military-members-enlistees-and-their-families*; Special Immigrant Juveniles—Consideration of Deferred Action, 6 USCIS PM J.4 [G.1], *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220307-SIJAndDeferredAction.pdf*; VAWA—Deferred Action, 3 USCIS PM D.5 [C.2], *https://www.uscis.gov/policy-manual/volume-3-part-d-chapter-5.*

[224] *See* 8 U.S.C. 1611(a).

[225] There are exceptions for certain emergency, in-kind, and other benefits, as well as other limited exceptions to PRWORA's restrictions. *See* 8 U.S.C. 1611(b)(1).

[226] *See* 8 U.S.C. 1611(b)(2), (3), and (4).

[227] 86 FR 53765.

further investigation, there appears to be some confusion as to DHS's intended meaning. The language referenced pertains to how the regulatory provisions would ''fortify DHS's prioritized approach to immigration and border enforcement'' by streamlining the review required when DHS officers encounter a DACA recipient.[228] As USCIS already will have reviewed the individual's immigration and criminal history and made the individualized determination to defer enforcement action against that individual according to the DACA policy, it may be duplicative for an officer to conduct a full review again in circumstances such as the primary inspection booth at a checkpoint. As the NPRM further notes, and as discussed in Section II.A.8, while officers must exercise their judgment based on the facts of each individual case, the prior vetting of DACA recipients provides a baseline that can streamline an enforcement officer's review of whether a DACA recipient is otherwise an enforcement priority.[229] However, where warranted by the evidence, ICE and CBP may find that certain DACA recipients no longer merit a favorable exercise of enforcement discretion. DHS therefore declines to make any changes in response to these comments.

*Comment:* A commenter expressed due process and notice concerns related to the discretionary case-by-case assessment as part of a totality of circumstances review. The commenter wrote that USCIS would be wise to attach an automatic right of judicial review to their DACA determinations. Given that Section IV.C of the proposed rule clearly lays out the factors the agency is to consider when making its decision, the commenter said that a reviewing court should have no problem assuring the agency action is not arbitrary or capricious.

*Response:* Because deferred action is by its nature an exercise of prosecutorial discretion and not a benefit, USCIS will not provide for the right to file an administrative appeal or allow for the filing of a motion to reopen or motion to reconsider.[230] Furthermore, an act of prosecutorial discretion is generally not reviewable by the courts. As discussed in the NPRM, USCIS may, however, reopen or reconsider either an approval or a denial of such a request on its own initiative.[231] In addition, a denied requestor would be allowed to submit another DACA request on the required

form and with the requisite fees or apply for any applicable form of relief or protection under the immigration laws.[232] DHS therefore declines to make any changes in response to this comment.

USCIS Discretion To Deny if Criteria Are Met

*Comment:* Several commenters discussed the proposed rule's indication that, under the totality of circumstances review, even if all the threshold criteria are found to have been met, the adjudicator has discretion to deny deferred action if, in the adjudicator's judgment, the case presents negative factors that make the grant of deferred action inappropriate or that outweigh the positive factors. One commenter objected to using a totality of the circumstances test in lieu of granting those requests that meet threshold criteria and enumerated guidelines, even if this changes existing processes. The commenter stated that there would be too much room for adjudicator discretionary bias in the proposed process, particularly since there is no guidance or definition provided in the NPRM for determining the totality of the circumstances. Another commenter expressed concern about the proposed rule's layering of discretion and said the two-step process would be vulnerable to future abuses of discretion to deny requests. The commenter said that discretion is already exercised in devising eligibility requirements and the protocols for assessing them, thus there is no need for a final denial override that would discourage requestors out of concern that, even if fully eligible, they could be denied. Another commenter stated that, per the proposed rule, a requestor who has filed the proper documents, paid the required fees, and has a college degree may be denied DACA if USCIS, within its discretion, decides that the requestor's totality of positive contributions do not outweigh, for example, a one-time instance of driving under the influence.

Another commenter stated that they supported instituting the DACA policy via regulation but opposed empowering officers to deny, in an exercise of discretion, DACA requests that otherwise meet threshold criteria for a grant of deferred action. This commenter stated that the language of proposed 8 CFR 236.22(c) does not provide clarity to requestors or to USCIS adjudicators as to what circumstances would be considered nor what would make deferred action inappropriate, and the proposed rule preamble provides

little additional clarity. The commenter said that the proposed rule states only that: (1) USCIS would review the totality of the circumstances to see if there are any negative factors that would make the grant of deferred action inappropriate or that outweigh the positive factors; and (2) foreign convictions, minor traffic offenses, and other criminal activity outside of what is described by proposed 8 CFR 236.22(b)(6) would be considered in the totality of the circumstances. However, the commenter said, there is no further guidance in the proposed rule as to what, if any, additional factors should be considered nor how to analyze any of these factors in making a determination to grant deferred action. Contrary to DHS's explanation that the threshold discretionary requirements in combination with the exercise of discretion is meant to promote consistency and avoid arbitrariness in grants of deferred action, the commenter wrote, applying discretion to these adjudications would have the opposite effect.

The commenter also said that the absence of clarity in the proposed rule combined with USCIS' policy guidance for applying discretion in adjudications would result in inconsistent and arbitrary grants of deferred action for those individuals who otherwise meet the threshold requirements for DACA. The commenter discussed the USCIS Policy Manual guidance on discretion, stating that it would be the primary tool used by adjudicators in making a discretionary analysis. The commenter said that: (1) the methodology for discretionary analysis set out in the USCIS Policy Manual would result in arbitrary and capricious decisions that are inconsistent and reliant on biased assumptions; (2) the Policy Manual does not provide clear guidelines for adjudication; (3) the Policy Manual's guidance regarding the weighing of discretionary factors is confusing and contradictory; and (4) amendments to the Policy Manual were based on a discriminatory and illegal animus toward immigrants and were intended to further undermine the function of the lawful immigration system.

*Response:* DHS maintains the position expressed in the proposed rule and codified at new 8 CFR 236.22(c) that it is appropriate for adjudicators to have discretion to deny a deferred action request, even if they have found that the requestor meets all of the threshold criteria, if in their judgement the case presents negative factors that make the grant of deferred action inappropriate or

---

[228] 86 FR 53752.

[229] *Id.*

[230] *See* new 8 CFR 236.21(b) and 236.23(c)(3).

[231] 86 FR 53769.

[232] *See* new 8 CFR 236.22(d) and 236.23(c).

that outweigh the positive factors.[233] As discussed in the NPRM, case-by-case assessment is a longstanding feature of deferred action determinations, inherent in the exercise of discretion, that can provide important benefits in cases where the balance of the circumstances and relevant equities suggests a result that could not have been codified in prior policy guidance.[234] While DHS recognizes that there may be costs associated with maintaining adjudicator discretion to deny a request even where the requestor meets the threshold eligibility guidelines at new 8 CFR 236.22, DHS has concluded that this approach maintains an appropriate balance of guidelines and discretion, which serves to promote consistency and avoid arbitrariness in these determinations.

DHS appreciates the commenter's feedback on the USCIS Policy Manual but declines to address it further as the Policy Manual is outside of the scope of this rulemaking. DHS is therefore not making any changes in response to these comments.

### b. Threshold Criteria

Evidentiary Requirements for Threshold Criteria

*Comment:* A commenter recommended that DHS drastically reduce the evidentiary burden on DACA requestors. The commenter stated that currently, DHS requires initial requestors to produce decades' worth of evidence that is particularly difficult to gather given the age of many individuals when they entered the United States. The average age of a DACA recipient at the time they entered the country is only 7 years old, and given the length of time since then, the commenter said, primary evidence documenting physical presence may be impossible to obtain. Additionally, the commenter wrote that DHS has not publicly expressed any fraud-related concerns with affidavits. The commenter stated that with wildly varying Federal enforcement regimes in place, and many States creating hostile environments for noncitizen residents, immigrant families often go to great lengths to prevent their children from interacting with these systems, denying them the very proof that DHS currently requires to demonstrate DACA eligibility. In addition, the commenter said, whatever proof may have existed is rarely maintained long enough to be accessible, as many institutions maintain records for only 5 years or less before destroying them, and records are

rarely digitally stored. The commenter concluded that establishing a standard of review that recognizes this reality and ensures that the broadest possible eligible population is able to request and receive DACA is in the interests of DHS, potential requestors, their communities, and the advocates who are devoting significant resources to helping them submit requests.

Referencing the proposed rule's discussion in the preamble of primary and secondary evidentiary requirements, a commenter stated that the provisions continue to reflect a first world understanding of documentation from countries of origin and the ability of a DACA requestor to find and obtain these records. The commenter said the provisions would benefit from greater clarification on further examples of circumstantial documentary evidence that DHS would accept as part of DACA requests from individuals who do not benefit from the powerful consular help that a country of origin like Mexico provides. Other commenters said that many farmworkers and their families may have difficulty accessing identification documents, such as birth certificates, as births may not be registered or may be registered incorrectly. Considering these concerns, the commenters encouraged DHS to maintain a flexible approach regarding documentation.

*Response:* DHS appreciates commenters' concerns and acknowledges that some DACA requestors may face substantial challenges in obtaining or providing primary or secondary evidence demonstrating they meet the threshold criteria. Recognizing these challenges and that the evidence available may vary from requestor to requestor, DHS is declining to specify in detail in this preamble and will not include in regulatory text the types of evidence that may or may not be sufficient to meet the threshold criteria for DACA, to avoid creating a list that may unintentionally be construed as exhaustive or limiting to adjudicators or requestors.

The DACA requestor has the burden to demonstrate that they meet the threshold criteria by a preponderance of the evidence.[235] Under the preponderance of the evidence standard, the sufficiency of each piece of evidence is examined for relevance, probative value, and credibility, both individually and within the context of the totality of the evidence, to determine whether the fact to be proven is

probably true.[236] DHS believes this standard provides an appropriate balance between ensuring that deferred action under the DACA policy is extended to the intended population and retaining a threshold that the evidence show that the facts are more likely than not to be so. This also has been the standard of proof for DACA requests since the initiation of the DACA policy, and it is the standard of proof applicable to immigration benefit adjudications as well, unless otherwise specified. DHS is therefore retaining the preponderance of the evidence standard at new 8 CFR 236.22(a)(3).

Consistent with longstanding practice and as proposed in the preamble of the NPRM, DHS will accept either primary or secondary evidence to determine whether the DACA requestor meets the threshold criteria. As used in this final rule, primary evidence means documentation, such as a birth certificate, that, on its face, proves a fact. Secondary evidence means other documentation that could lead the reviewer to conclude that it is more likely than not that the fact sought to be proven is true. In response to a commenter's request that DHS provide greater clarification of what may constitute qualifying secondary evidence, DHS is expanding here on the examples provided in the NPRM preamble, but cautions that these examples are not meant to be exhaustive. Such examples of secondary evidence may include baptismal records issued by a church or school records with a date of birth showing that the DACA requestor was born at a certain time, rental agreements in the name of the DACA requestor's parents, or the listing of the DACA requestor as a dependent on their parents' tax return to demonstrate periods of residence in the United States. Secondary evidence may, but does not necessarily, require corroboration with other evidence submitted by the requestor. DHS will evaluate the totality of all the evidence to determine if the threshold criteria have been met.

### Affidavits

*Comment:* A commenter urged DHS to reduce barriers preventing people from receiving relief and to ensure the policy is accessible by continuing to accept affidavits. Another commenter suggested that DHS should incorporate into the final rule expanded ways for requestors to prove that they meet the eligibility criteria, including giving more weight to sworn affidavits and

---

[233] *See* 86 FR 53765.
[234] *See id.*

[235] *See* 86 FR 53766; proposed 8 CFR 236.22(a)(3).

[236] *Matter of Chawathe,* 25 I&N Dec. 369, 376 (AAO 2010).

letters for periods of continuous residence and proof of entry.

Another commenter stated that, if DHS publishes the proposed rule as is, it should clarify that affidavits will be accepted as evidence for all the eligibility requirements, including physical presence, continuous residence, and lack of lawful status. The commenter said that this policy should be codified in regulation, such as through a separate evidentiary section in 8 CFR 236.22. The commenter wrote that this regulation could adopt the "any credible evidence" standard used in other areas of immigration law, with which immigration practitioners are familiar, thus creating much-needed flexibility.

A joint comment also stated that DHS should demonstrate increased flexibility in allowing requestors to meet documentation requirements, commenting that farmworkers and their family members face extreme difficulty meeting the documentation requirements of DACA. To help remedy this issue, the commenter urged DHS to provide that affidavits would be accepted as secondary evidence for all requestors at all stages of their request and to not require supplemental documents beyond affidavits, as that undermines requestors who do not have other forms of documentation. Another commenter said that DHS could improve access to DACA by including references to sworn affidavits as acceptable evidence, accepting affidavits as proof of satisfying that the requestor came to the United States before reaching their 16th birthday, and accepting affidavits from the requestors themselves.

*Response:* DHS acknowledges commenters' concerns regarding the challenges some DACA requestors face in obtaining primary and secondary evidence to demonstrate eligibility under the threshold criteria. However, as discussed in the response above, DHS is declining to specify in detail in this rule the types of evidence that may or may not suffice to meet the threshold criteria for DACA, to avoid creating a list that may be unintentionally viewed as exhaustive or limiting to adjudicators or requestors. DHS therefore declines the commenter's suggestion to create a separate evidentiary section within new 8 CFR 236.22.

As stated in the NPRM and consistent with longstanding practice, while there are certain circumstances in which affidavits may be submitted in lieu of primary or secondary evidence, affidavits are generally not sufficient on their own to demonstrate that a requestor meets the DACA threshold

criteria. This is reflective of DHS's desire to balance that under the preponderance of the evidence standard, the evidence must show that the facts asserted are more likely than not to be so, while also allowing for some flexibility to account for circumstances in which DACA requestors may not have access to primary or secondary evidence for reasons beyond their control.

One circumstance in which affidavits may be used in lieu of primary and secondary evidence is in support of a requestor meeting the continuous residence requirement. Another circumstance is where there may be a shortcoming in documentation with respect to brief, casual, and innocent departures during the continuous residence period before August 15, 2012. DHS will consider affidavits in these contexts in recognition of the challenges DACA requestors may face in obtaining primary or secondary evidence in these contexts, particularly for those who may have been very young during the periods for which documentation is needed.

Finally, as discussed in further detail below, in recognition of the challenges faced in obtaining primary and secondary evidence for the start of the continuous residence period for new initial requestors for DACA who may have been very young at the time of entry to the United States, DHS will consider affidavits in this context when assessing whether the new initial requestor has submitted sufficient evidence to demonstrate their residence in the United States at the beginning of the continuous residence period.

(1) Arrival in United States Under the Age of 16

Support for the "Arrival in United States Under the Age of 16" Criterion

*Comment:* A few commenters generally supported maintaining the criterion of arrival into the United States before age of 16. One of these commenters said that this criterion would preserve the character of DACA as a program for individuals brought to the United States as children.

*Response:* DHS acknowledges commenters' support for maintaining the threshold requirement of arrival in the United States prior to age 16. DHS is retaining this threshold requirement in the final rule at new 8 CFR 236.22(b)(1), reflecting the Department's desire, as described in the NPRM, to limit DACA to those who came to the United States as children, and who therefore present special considerations that may merit assigning lower priority

for removal action due to humanitarian and other reasons.

USCIS Should Revise the "Arrival in United States Under the Age of 16" Criterion

*Comment:* Many commenters suggested changing the criterion regarding age at the time of entry to expand eligibility for DACA to those who entered at or after the age of 16. A few commenters stated that the threshold criterion of arrival before the age of 16 has left otherwise eligible immigrant youth and students out of DACA and the critical protection it offers. Another commenter said that these potential requestors who would be left out either arrived after their 16th birthday but before becoming an adult at age 18, or they had no proof that they entered the United States before the age of 16 (*e.g.,* their birthday is in the summer, and they turned 16 before enrolling in school). The commenter said that changing this criterion would ensure that more immigrant youth are covered and would improve their ability to cite more reliable evidence, such as school records, to prove their entry.

While some of these commenters did not suggest a specific age for modifying this threshold requirement, others urged DHS to change the age of entry to be consistent with other laws that define childhood and the age of majority. Many commenters suggested that DHS revise the arrival age to 18, with some saying that a minor is legally defined as someone under age 18. Some commenters stated that some of the proposed legislation for Dreamers requires a requestor to have entered the United States before the age of 18, including the DREAM Act, the Health, Opportunity, and Personal Empowerment Act, and the American Dream and Promise Act. A few commenters noted that the definition of an unaccompanied child under Federal law references children without a parent or legal guardian and without lawful immigration status who have not yet reached the age of 18 (6 U.S.C. 279(g)(2)). A joint comment submission also said that the cutoff age of 16 is contrary to other U.S. societal norms regarding who is considered a child, such as individuals under 18 not being allowed to vote, join the military, or work in most hazardous occupations.

Some commenters urged DHS to expand the age of entry to 21, as INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1) defines a child as "an unmarried person under twenty-one years of age." A couple of commenters remarked that this definition governs other types of immigration benefits (*e.g.,* family-based

visa petitions and derivative status on a parent's application). One commenter wrote that expanding the age to 21 would be consistent with other humanitarian immigration classifications such as Special Immigrant Juvenile (SIJ) classification. This commenter also cited the United Nations (UN) definition of a child as under the age of 18, under the UN Convention of the Rights of a Child, and definition of a youth as between the ages of 15 and 24 years. A couple of commenters said that DACA should be available to individuals who entered the United States prior to 21 years of age, or at most 18 years of age, to ensure that immigrant youth would be covered, as is the intended rationale for DACA.

One commenter stated the rule perpetuates the inconsistency and unfairness of an age-16 cap, and said that whether looking at ages of majority, high-school enrollment ages, humanitarian definitions of unaccompanied children, or the INA itself, defining children as under 18 or under 21 is more common and accurate. The commenter concluded that retaining this threshold requirement would echo anti-immigrant propaganda hostile to treating 16- and 17-year-old teenagers as children.

One commenter stated that the proposed rule must offer a justification and explanation for the age cutoff rather than reiterating the policy from the Napolitano Memorandum, as there is no way to determine that this decision of age 16 is not capricious. Another commenter stated that DHS should be concerned that the proposed rule would entirely exclude younger "Generation Z" undocumented students. The commenter remarked that this would amount to an unforced error and create bitterness and disillusionment among young people who have lived in the United States most of their lives and have witnessed the benefits of DACA.

*Response:* DHS acknowledges commenters' concerns about immigrant youth who may be similarly situated to those in the DACA population but who may not meet the criterion of having arrived in the United States prior to their 16th birthday. However, as discussed elsewhere in the NPRM and this rule, DHS has decided to focus this rulemaking on preserving and fortifying DACA, as directed by President Biden's memorandum. DHS has determined that the best approach to preserving and fortifying DACA for those recipients—and their families, employers, schools, and communities—who have significant reliance interests in DACA is to codify the threshold criteria as articulated in the Napolitano Memorandum.

DHS also recognizes that certain laws and intergovernmental bodies may define a child as a person up to the age of 18 or 21.[237] However, DHS notes that there is precedent in immigration law for limiting eligibility for a benefit to those under the age of 16, such as in the context of adoption-related immediate relative petitions, orphan cases, and Hague Convention adoptee cases—except in limited circumstances.[238] With this point in mind, and with an emphasis on protection of reliance interests for this particular rulemaking, DHS therefore disagrees that retaining the threshold requirement of arrival in the United States under 16 years of age is arbitrary or capricious and declines to make any changes in response to these comments.

(2) Continuous U.S. Residence From June 15, 2007

General Concerns With the "Continuous Residence" Date

*Comment:* Some commenters provided personal anecdotes about individuals not having access to DACA, and the opportunities that accompany it, due to the June 15, 2007, threshold date. A couple of commenters called the eligibility cutoff date arbitrary. Another commenter also described the requirement for continuous residence as arbitrary and wrote that the requirement would exclude many otherwise eligible applicants.

*Response:* DHS acknowledges that, as a result of the continuous residence date requirement, there are noncitizens who will not be eligible to request deferred action under the DACA policy. However, in the Department's effort to preserve and fortify DACA, it is maintaining this threshold criterion in line with longstanding policy and the Napolitano Memorandum.[239] As discussed elsewhere in this rule and the NPRM, this approach reflects the reliance interests of those who already have received DACA and those similarly situated who have not yet requested DACA, and their families, employers, schools, and communities. As discussed above, DHS has determined the best way to preserve and fortify DACA as directed by President Biden's memorandum is to codify in regulation the longstanding criteria in the Napolitano Memorandum. It is also informed by DHS's assessment that this and other threshold criteria in the

Napolitano Memorandum advance DHS's important enforcement mission and reflects the practical realities of a defined class of undocumented noncitizens who, for strong policy reasons, are unlikely to be removed in the near future and who contribute meaningfully to their communities, as discussed elsewhere in this rule. Finally, as discussed in greater detail in Section II.A.7, DHS also is retaining this requirement in recognition of the Department's desire to avoid creating an incentive to migrate in order to attain eligibility for deferred action under DACA. DHS is therefore not making any changes in response to these comments.

USCIS Should Revise the "Continuous Residence" Date

*Comment:* Many commenters discussed the exclusionary effects of the continuous residence threshold and suggested that USCIS revise the 2007 date to a more recent date in order to include more individuals. One commenter cited sources indicating that of the more than 450,000 undocumented students in higher education nationwide, less than half are DACA-eligible. The commenter said that the DACA policy, without an update to the eligibility criteria, would continue to beget this counterintuitive outcome of leaving new generations of students without avenues to success. Echoing these concerns, multiple legal services providers offered examples of clients who would be negatively impacted by the requirement. Other commenters asked that DHS consider either removing the continuous presence requirement in the rule or adjusting the date to provide relief for individuals who arrived in the United States after 2007.

Other commenters stated that USCIS should preserve and fortify DACA without turning back the clock to 2012. The commenters said that DACA's original eligibility date was arbitrary, and USCIS could advance the date to expand the number of eligible individuals through rulemaking, thus strengthening the program's humanitarian impact while yielding greater economic and social benefits. A commenter similarly said that DACA's timeline still operates from the Napolitano Memorandum, which has remained untouched despite the lack of progress in getting any permanent legislative solutions passed through Congress. The commenter said it is time to strengthen, not weaken, the program and protect those who have grown up in the United States as the only home they have ever known.

---

[237] *See, e.g.,* INA sec. 101(b)(1), 8 U.S.C. 1101(b)(1); 6 U.S.C. 279(g)(2); UN Convention on the Status of the Child.

[238] *See* INA sec. 101(b)(1)(E), (F), and (G), 8 U.S.C. 1101(b)(1)(E), (F), and (G).

[239] *See* new 8 CFR 236.22(b)(2).

Many commenters said that USCIS should revise the "continuous residence" date or "continuous presence" date to 5 years before the publication or implementation of this final rule to expand eligibility for DACA to younger individuals. Some of these commenters stated that the 2007 continuous residence date was 5 years before President Obama created DACA, and another remarked that this would be consistent with other areas of immigration law, such as naturalization. Other commenters similarly wrote that the continuous residence requirement should be updated to be closer to the date of the final rule given that the 2007 date is based on the 2012 issuance of the initial DACA policy. Similarly, another commenter said that DHS should draw from the original intent of DACA in 2012, which required a minimum continuous presence of 5 years, not 14 or more, which is unduly burdensome. The commenter said that Dreamers who spend their entire lives in the United States would be left without any relief if DHS does not adjust the continuous presence requirements to reflect the original intent of President Obama's Executive order.

Commenters recommended a number of alternative continuous residence dates, including June 15, 2017, January 21, 2021, or five years prior to the publication of the final rule. Commenters stated that advancing the continuous residence date would provide more young people with the opportunity to succeed and contribute to society. One of these commenters noted that, because individuals must be age 15 or over to request DACA and have had continuous presence since June 15, 2007, by June 15, 2022, the number of Dreamers eligible to apply would be locked into place, not including those over the age of 15 who had not yet applied. The commenter said that this would mean that the past 14 years of Dreamers, many of whom would be entering high school in the coming year, would not be eligible and would have no career prospects, which the commenter said would go against the purpose of DACA.

A joint submission expressed support for a continuous presence date 5 years prior to publication of the final rule that would be updated annually. Another commenter suggested that the continuous presence date should be revised to 5 years prior to when a requestor is first eligible for DACA.

Another commenter reflected this view, also stating that the rule already provide that moving forward, the President should review this requirement every 2 years to determine

if it should be further extended. Another commenter wrote that DHS should require no more than 3 years of continuous residence for DACA requestors.

Multiple commenters said that DHS should establish a rolling continuing presence requirement. Some commenters said that there should be a rolling date instead of moving the June 15, 2007 date forward, specifically suggesting a 5-year continuous presence from the date of the filing of the request for DACA consideration, which the commenter said would allow DHS the ability to make case-by-case determinations about its enforcement priorities as it relates to this population well into the future. Commenters said that this would expand DACA to populations of noncitizens who, but for their date of entry, would meet the criteria for DACA, and one remarked that it would reduce the burden of gathering 14 years of evidence of continuous residence. Another wrote that this suggestion would focus eligibility on those with significant ties to the United States, would not require routine regulatory updates, and would preserve the disincentive to immigrate to attain DACA protections.

Some commenters wrote that DHS should remove the requirement for continuous presence prior to a certain date, and instead require continuous presence prior to a certain age, as this would expand protection to undocumented youth. Similarly, a commenter stated that USCIS should eliminate the date requirement for continuous residence, and instead require that a person has lived in the United States before turning 18. The commenter stated that this would allow those originally left out of the policy to request DACA, while easing the burden on requestors who lack 14 years of continuous residence documentation. Another commenter wrote that the continuous residence requirement should be removed from the rule as long as applicants meet age and uninterrupted residence requirements.

*Response:* While DHS appreciates the many suggestions of commenters to modify or remove the continuous residence requirement to expand the threshold criteria to include a broader population, as noted above, DHS is maintaining this threshold criterion in line with longstanding policy and the Napolitano Memorandum.[240] As discussed elsewhere in this rule and the NPRM, this approach reflects the reliance interests of those who already have received DACA and those similarly

situated who have not yet requested DACA, and their families, employers, schools, and communities. This approach is also consistent with DHS's longstanding message that DACA is not available to individuals who have not continuously resided in the United States since at least June 15, 2007.[241] While several commenters stated that advancing the date for the start of the continuous residence requirement would not create an incentive to migrate to attain deferred action under DACA, DHS believes that advancing the date or eliminating the requirement would potentially undermine the agency's enforcement messaging, but that by keeping the dates from the 2012 Napolitano Memo, DHS is clear that it is not incentivizing future migration flows. As discussed in the NPRM and in additional detail in Section II.A.7 of this preamble, border security is a high priority for the Department, and by codifying the longstanding DACA policy, including the original continuous residence date, DHS focuses this rulemaking on the problem identified in the proposed rule and avoids the possibility of creating any unintended incentive for migration.

*Comment:* A commenter wrote that DHS does not offer a rationale for codifying the 2007 continuous residence date outside of stating that it would not impact border security. The commenter stated that this appears to be a reference to a false argument that DACA encourages unauthorized border crossings. Another commenter also mentioned DHS's decision to link the rationale for the continuous residence requirement to border security concerns, writing that this justification is not related to the agency's goals with DACA. The commenter wrote that DACA was initially intended to recognize the positive economic and social impacts of granting deferred action to young people brought to the United States at least 5 years prior to the policy's creation. The commenter stated that DHS does not explain why it only has considered alternatives where that goal is frozen in the past, rather than using a date such as analogously utilizing the date from other border policy, November 1, 2020 (which has been included in recent enforcement priorities memoranda), or implementing a 5-year cushion from the present. The commenter said that merely invoking border security is an insufficient justification, reasoning that moving the relevant dates forward would increase the positive effects that DACA already

---

[240] *See* new 8 CFR 236.22(b)(2).

[241] *See* new 8 CFR 236.22(b)(2).

has had on communities and on the national economy.

*Response:* DHS disagrees with commenters that the Department's strong interest in border security is an insufficient justification for maintaining the continuous residence requirement as proposed in the NPRM. It is also not DHS's only justification for codifying this threshold criterion. As discussed above, DHS's desire not to undermine its enforcement messaging, together with its adherence to the President's directive to preserve and fortify the DACA policy; its desire to protect the reliance interests of DACA recipients and those similarly situated and their families, employers, schools, and communities; and the Department's need to preserve finite resources, all serve as the underlying bases for DHS's determination to maintain this longstanding threshold requirement from the Napolitano Memorandum.

DHS also disagrees that retaining the continuous presence requirement for DACA conflicts with recent enforcement policy, including the September 30, 2021, DHS Guidelines for the Enforcement of Civil Immigration Law ("Enforcement Guidelines"), which are currently not in effect.[242] While the Enforcement Guidelines highlight that noncitizens who are "apprehended in the United States after unlawfully entering after November 1, 2020," will be considered a threat to border security and are therefore a priority for apprehension and removal, it also clarifies that any noncitizen "apprehended at the border or a port of entry while attempting to unlawfully enter" as of the effective date of the memorandum is also a priority for apprehension and removal.[243] This

serves to reinforce the Department's enforcement messaging while continuing to recognize that it must prioritize its use of limited resources.

*Comment:* A commenter said that continuous residence should incorporate a universal exception for brief, casual, and innocent departures, not the unsupportable distinction between departures before and after August 15, 2012. The commenter went on to state that such a bright-line rule is severe and unfair as there are many reasons why an individual may need to travel abroad and therefore interrupt their continuous residence. Another commenter recommended that DHS consider extraordinary circumstances when determining whether travel outside of the United States disrupts continuous residence, reasoning that it is unfair to deny DACA to an individual who would otherwise qualify, but for a brief, casual, or innocent departure after August 15, 2012, that resulted from an emergency or other exigent circumstance.

*Response:* DHS acknowledges that there may be reasons why a DACA requestor would need to travel abroad during the continuous residence period following August 15, 2012. However, it has been DHS's longstanding policy to allow for exceptions to the continuous residence period only for any brief, casual, and innocent travel *prior* to August 15, 2012, as this is the date of implementation of the DACA policy. After this date, noncitizens who met the DACA criteria could plan accordingly. Furthermore, those granted DACA after that date had the ability to request advance parole for certain kinds of travel. Prior to that date, in contrast, the DACA population may not have been eligible for advance parole. DHS therefore declines to make the commenters' suggested changes to the brief, casual, and innocent exception to the continuous residence requirement.

Documentation Standards for the "Continuous Residence" Date

*Comment:* Multiple commenters suggested that USCIS reduce the evidentiary burden and amount of documentation required to prove continuous residence. One commenter suggested that the evidentiary requirements in the proposed rule preamble could deter qualified requestors from making requests under the policy and require significant attorney and paralegal effort for nonprofits to prepare successful requests. Another commenter said that noncitizen requestors may fear interacting with systems that could provide the necessary documentation

and, as a result, would not have the appropriate evidence of continuous residence. One commenter similarly wrote that some States create hostile environments for noncitizen residents, resulting in noncitizen families avoiding institutions that could provide acceptable proof of physical presence in the country.

Other commenters stated that the continuous residence requirement should be satisfied for the relevant year if a requestor submits one document demonstrating residency during that particular year; or for multiple years if a requestor submits one document covering multiple years in the continuous residency period. Similarly, other commenters said that DHS should clarify that: (1) there is no minimum number of documents that a DACA requestor must provide per year to demonstrate continuous residence; and (2) agency adjudicators must draw reasonable inferences from the totality of the evidence of residence a requestor provides, including presuming residence for a reasonable period of time on the basis of point-in-time evidence that the requestor resided in the United States on a particular date. For example, in some cases a single document (such as a tax filing or lease) should suffice as evidence of residence for an entire year. In other cases, the requestor may show continuous residence over the course of a year by producing three or four point-in-time documents such as date-stamped photos or records of calls or purchases.

The commenter further stated that DHS should adopt a standard of accepting "any credible evidence" of a requestor's continuous residence. This standard of proof applies in other immigration contexts where, the commenter wrote, as in the DACA policy, requestors or applicants may experience significant difficulty obtaining primary or secondary evidence. Examples of documents that the commenter said should qualify as "credible evidence" include tax returns or tax transcripts (which, according to the commenter, should establish a full year of presence), a date-stamped photo of the requestor at a recognizable location in the United States, credit or debit card statements showing purchases made in the United States, insurance policies, vehicle registrations, and cell phone records showing calls placed from the United States. Another commenter also said that USCIS should adopt a "credible evidence" standard for the various forms of evidence that are allowed to show continuous residence, including primary sources like school and work records, as well as

---

[242] Memorandum from Alejandro N. Mayorkas, Secretary, DHS, to Tae D. Johnson, Acting Director, ICE, et al., *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021), *https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf* (hereinafter Enforcement Guidelines). On July 5, the U.S. Court of Appeals for the Sixth Circuit vacated a nationwide preliminary injunction that a district court had entered against the Enforcement Guidelines. *Arizona* v. *Biden,*—F.4th—, 2022 WL 2437870 (6th Cir. July 5, 2022). The district court's injunction had previously been stayed pending appeal. Nevertheless, the Enforcement Guidelines are not currently in effect because, on June 10, another district court vacated the guidance nationwide. On July 7, 2022, the Fifth Circuit denied the government's request to stay the district court's decision. *Texas* v. *United States,* 40 F.4th 205 (5th Cir. 2022). On July 21, 2022, the Supreme Court denied the Government's application for a stay of the district court's nationwide vacatur, but granted the petition for writ of certiorari. *United States* v. *Texas,* No. 22–58 (22A17), 597 U.S. ___, 2022 WL 2841804 (July 21, 2022). The case will be set for argument in the first week of the December 2022 argument session.

[243] *Id.* at 4.

secondary sources like parent documentation, church records, and affidavits. A commenter wrote that DHS should ensure that any credible evidence of continuous residence is accepted and clarify that it will draw reasonable inferences of residence and expand the use of affidavits to do this.

One commenter stated that the proposed rule is vague as to how much evidence requestors need to supply to prove continuous residence and added that the requirement that requestors provide as much documentation as "reasonably possible" is unclear. The commenter wrote that this vagueness has resulted in advocacy groups creating their own documentation requirement guidance with varying standards to better inform requestors. Another commenter stated that the requirements for documentation of continuous presence should be relaxed during the COVID–19 pandemic, writing that DACA requestors may have difficulty producing documentation from this period.

*Response:* DHS appreciates commenters' concerns and desire for greater clarity on the evidentiary requirements for the continuous residence requirement. DHS also acknowledges commenters' request for additional leniency in the evidentiary requirements for continuous residence, particularly in the context of the COVID pandemic and in light of the challenges that noncitizens may face in obtaining primary and secondary evidence. However, as discussed above, DHS is refraining from specifying in detail in this rule the types of evidence that may or may not be sufficient to meet the threshold criteria for DACA, to avoid creating a list that may be unintentionally exhaustive or limiting to adjudicators or requestors. DHS will take commenters' suggestions under advisement in the development of any subregulatory guidance on this subject.

*Comment:* A commenter said that it would be burdensome for initial DACA requestors to find proof of their continuous residence in the United States for 14 years, as well as burdensome for DHS officers who must then review 14 years' worth of documentation. The commenter recommended allowing requestors to show they have continuously resided in the United States for a shorter period prior to submitting their request, a length of time that they described as more reasonable. A commenter wrote that the added benefit of a shortened continuous residence requirement would be a reduced workload on legal service providers and, as a result, increased access to immigration services

for requestors. Other commenters stated that updating the eligibility dates would help prevent some of the documentation burdens of providing proof of continuous presence.

*Response:* DHS acknowledges that retaining the continuous residence requirement as proposed in the NPRM results in requestors needing to provide documentation for a lengthy period, which may be burdensome for some requestors. However, as stated above, DHS is maintaining this threshold guideline in its efforts to preserve and fortify DACA, in recognition of the particular reliance interests of those who already have received DACA and those similarly situated who have not yet requested DACA, and their families, employers, schools, and communities, and consistent with the agency's longstanding enforcement messaging. DHS declines to make any changes in response to these comments.

Affidavits as Acceptable Evidence of Continuous Residence

*Comment:* Multiple commenters stated that various forms of evidence, including affidavits attesting to presence, should be sufficient for the continuous residence criterion. One commenter expressed support for the use of affidavits as acceptable evidence for the start of the continuous residence period in initial requests and for any other gap in the continuous presence timeline, stating that as affidavits are written under the penalty of perjury, they should be taken as accurate. Another commenter stated that acceptance of affidavits is particularly important because undocumented individuals, and particularly those who are Indigenous and do not speak common languages, often do not have access to the services and resources that would provide the kinds of evidence DACA has previously required (*e.g.,* bank accounts, valid employment documents, evidence of property ownership).

*Response:* As discussed above and in the preamble of the NPRM, affidavits may be submitted to demonstrate that the requestor meets the continuous residence requirement if there is a gap in documentation for the requisite periods and primary and secondary evidence is not available. DHS will consider affidavits in this context in recognition of the challenges DACA requestors may face in obtaining primary or secondary evidence in these contexts, particularly for those who may have been very young during the periods for which documentation is needed. As described further below, DHS also will consider affidavits when

determining if the requestor has submitted sufficient evidence of their residence in the United States at the start of the requisite continuous residence period for new initial DACA requests where the requestor was unable to access primary or secondary evidence due to their young age at the time of entry to the United States.

*Comment:* Several commenters responded to DHS's request for comments on whether affidavits should be considered acceptable evidence of the start of the continuous residence period for new initial requestors for DACA who may have been very young at the time of entry to the United States. Multiple commenters expressed support for the use of affidavits as acceptable evidence of the start of the continuous residence period in initial DACA requests, as new requestors may have been very young at the time of entry and may have difficulty obtaining primary or secondary evidence. One commenter noted that this is a particular challenge for those who arrived as very young children as they typically do not enter the formal educational system until age 5 and therefore often do not have formal primary documentation of their presence in the United States until their enrollment in school.

Other commenters agreed that the use of affidavits should be acceptable evidence of the start of the continuous residence period for this population, but added that the use of affidavits should not be limited to just those who were very young at the time of entry. One commenter said expanding the use of affidavits is especially necessary if DHS retains the continuous residence requirement as proposed in the NPRM, as it would be difficult for requestors to demonstrate over 14 years of evidence for continuous presence. Similarly, another commenter said that other requestors, not just those who were very young at the time of entry, would face challenges in providing documentation.

*Response:* In the NPRM, DHS requested comments on whether affidavits should be considered acceptable evidence of the start of the continuous residence period for new initial requestors for DACA who may have been very young at the time of entry to the United States and may have difficulty obtaining primary or secondary evidence to establish this threshold requirement.[244] Many commenters expressed support for this suggestion, and as a result, DHS is clarifying in this final rule preamble that it will consider affidavits when determining if the requestor has

---

[244] 86 FR 53767.

submitted sufficient evidence of their residence in the United States at the start of the continuous residence period for new initial requestors who were very young at the time of entry to the United States. As one commenter noted, part of the challenge that those who arrived in the United States as a young child may face is that they may not have primary or secondary evidence of their physical presence until they enter the formal educational system. As age 8 is the highest age at which school attendance becomes compulsory within the United States, DHS plans to extend the flexibility of submitting affidavits for the start of the continuous residence period for new initial requestors who arrived in the United States at or before age 8 in subregulatory guidance.[245]

While DHS appreciates commenters' requests to further extend this flexibility beyond new initial requestors who arrived as very young children, as noted above, DHS will continue to consider affidavits to support evidence that the requestor meets the continuous residence requirement if there is a gap in documentation for the requisite periods and primary and secondary evidence is not available.

Other Comments on the "Continuous Residence" Date

*Comment:* Multiple commenters urged an exception that would allow deported individuals to meet the continuous residence requirement. Several commenters also stated that the proposed rule would penalize those individuals who complied with a legal directive to depart, noting that those who are subject to a final order of removal but who do not depart the United States remain eligible for DACA. The commenters further noted that many of those who departed the United States under a removal order did so as children, not on their own volition and without understanding the legal context.

*Response:* DHS will consider deferred action under DACA for noncitizens with final removal orders that have not been executed who otherwise meet the threshold guidelines for DACA, as DHS may still elect to exercise discretion as to whether to remove the noncitizen. However, it has been long-standing practice and policy for DHS to consider departures on or after June 15, 2007, due to an order of exclusion, deportation, voluntary departure, or removal to interrupt the continuous residence

criterion. In such a scenario, continuous residence would not only be interrupted by the departure, but the noncitizen may also be barred from re-entering the United States for years or permanently, further inhibiting any ability to comply with the continuous residence requirement.[246]

(3) Physical Presence in United States

Support for "Physical Presence in the United States" Criterion

*Comment:* A commenter stated that physical presence within the United States on the day that DACA was announced is an important qualifier toward acceptance and ensures that the policy is not being exploited by individuals entering the country after the fact to gain deferred status.

*Response:* DHS acknowledges the commenter's support for maintaining the threshold criterion of being physically present in the United States on June 15, 2012, which is the date of issuance of the Napolitano Memorandum. For the same reasons described above and as proposed in the NPRM, DHS is codifying this criterion in this rule.[247]

USCIS Should Revise the "Physical Presence in the United States" Criterion

*Comment:* Numerous commenters suggested moving forward the physical presence requirement from June 15, 2012, to expand eligibility for DACA to a larger population. Several commenters stated that the date is arbitrary and suggested removing this criterion or substituting it with a larger timeframe.

Multiple commenters said that the rule should advance the date for physical presence from June 15, 2012, to the date the final rule is implemented. A commenter similarly suggested advancing the date of physical presence to the date of final rule promulgation. Relatedly, another commenter recommended that the date should be advanced to a time closer to when individuals submit requests and recommended a time period of 5 years from the date the rule is published or implemented. A commenter recommended advancing the date for physical presence to at least 5 years prior to submitting a request.

Another commenter recommended replacing the June 15, 2012, date with a flexible standard that would expand access to those individuals who otherwise would qualify for DACA. The commenter stated that this

recommendation would align with the enforcement priorities set by the Secretary on September 30, 2021. A commenter suggested that a rolling date approach and linking the requirement dates only to the date of the request would reduce significant documentation burden on requestors and increase consistency with the Napolitano Memorandum.

Several commenters recommended that DHS advance the physical presence requirement to January 1, 2021, which matches the date set by H.R. 6, the American Dream and Promise Act of 2021. Many of these commenters stated that DHS has not updated the physical presence date in 9 years, and there is nothing that prevents DHS from moving the date in recognition that there are many Dreamers who arrived since the original physical presence date who are otherwise eligible for DACA. The commenter said that most individuals who would benefit would not be enforcement priorities, and enabling these Dreamers to access higher education and employment authorization through DACA would help them contribute to their communities and would be in line with the intent of the Napolitano Memorandum.

Similarly, a commenter suggested a revised date of January 20, 2021, stating that prescribing a date is at the discretion of USCIS and the rule should be more inclusive. Other commenters recommended updating the date to January 21, 2021, and another suggested updating the date to June 15, 2020. One commenter stated that if the requirement for physical presence is to be retained, the date should be based on the age of the requestor when they immigrated to the United States, rather than an arbitrary date from a policy memorandum.

A few commenters stated that the requirement of physical presence on June 15, 2012, should be eliminated, but the requirement of physical presence at the time of filing of the DACA request should be retained. One of these commenters said that this would ensure that DACA remains available only to individuals currently in the United States.

A commenter suggested that DHS grant deferred action and extend eligibility for a work permit to individuals who arrived after June 15, 2012, but meet all other eligibility criteria and commit to teaching or other public service. Given the teacher shortage and the need to diversify the teaching profession, the commenter asked that consideration be given to

---

[245] *See* Institute of Education Sciences, National Center for Education Statistics, State Education Practices, *Table 1.2. Compulsory school attendance laws, minimum and maximum age limits for required free education by state: 2017, https://nces.ed.gov/programs/statereform/tab1_2-2020.asp.*

[246] *See* INA sec. 212(a)(9)(B)(i)(I) and (II), INA sec. 212(a)(9)(C)(i)(I); 8 U.S.C. 1182(a)(9)(B)(i)(I) and (II), 8 U.S.C. 1182(a)(9)(C)(i)(I).

[247] *See* new 8 CFR 236.22(b)(3).

other eligibility factors, including individuals who desire to teach.

*Response:* DHS appreciates commenters' suggestions to modify or eliminate the physical presence requirement to expand eligibility for DACA to a larger population. However, for the same reasons as discussed in the continuous residence section above, DHS is maintaining this threshold criterion in line with the longstanding DACA policy, under which DACA is not available to individuals who were not physically present on June 15, 2012, the date of issuance of the Napolitano Memorandum.[248] As discussed in the NPRM and elsewhere in this rule, border security is a high priority for the Department, and by codifying the longstanding DACA policy, including the physical presence criterion, DHS is preserving its finite resources and avoiding the possibility of creating any unintended incentive for migration.

### (4) Lack of Lawful Immigration Status

USCIS Should Eliminate the "Lack of Lawful Immigration Status" Criterion

*Comment:* Numerous commenters stated USCIS should eliminate the threshold criterion that the requestor demonstrate that they were not in a lawful immigration status on June 15, 2012. Many of these commenters said that Documented Dreamers should be eligible to request DACA, with some stating that these children know America as their country, contribute to society, and should not be discriminated against. Some of these commenters said that, absent a clear, legal pathway to citizenship for Documented Dreamers, eligibility to receive DACA would allow Documented Dreamers an opportunity to remain in the United States with families, and access work and educational opportunities. Another commenter stated that expanding eligibility for immigrant youth in lawful status that meet all other DACA requirements would provide an opportunity to end one of the artificial distinctions that separates immigrant youth based on how they arrived in the United States.

Many commenters said that the exclusion of Documented Dreamers is unjust to children brought here lawfully by their parents and with lawful status (*e.g.,* H–4 dependents) who will have to self-deport when they "age out" at 21 due to backlogs. Other commenters stated that, by removing this requirement, thousands of young people who grew up in the United States as dependents of nonimmigrant visa

holders and had lawful status on June 15, 2012, would be afforded protection.

Citing sources, several companies stated that many Documented Dreamers follow in the footsteps of their parents and are leaders in STEM fields, only to age out of status at age 21. The commenters said this situation is untenable for these children and their employees on high-skilled visas who face the prospect of separation from family members if their child ages out before they receive a green card. Other commenters stated that the proposed criterion would result in the loss of valuable talent and potentially significant contributions to the national economy by children of visa holders that age out. The commenters also said this issue hinders U.S. companies' ability to retain highly skilled workers and prevents the United States from competing in the global economy, citing a source indicating the net economic cost of losing Documented Dreamers is over $30 billion.[249] Another commenter similarly stated that the parents of Documented Dreamers have skills that allowed them to build U.S. technologies, and every U.S. company has been able to be a leader in the world because of these high-skilled immigrants who were given visas and did everything right. The commenter said it is inhumane to ask Documented Dreamers to self-deport because of an unfair policy.

Another commenter asked DHS to update this criterion to allow individuals who had lawful status in the United States on June 15, 2012, but subsequently lost such status by the time of their request, to qualify for DACA. The commenter said that this update could be accomplished by changing the criterion to read: "had no lawful status at the time of filing of the request for DACA." The commenter further remarked that Documented Dreamers have been raised in the United States, went to school here, graduated from the U.S. education system, and have gone on to become productive members of our society, contributing greatly to the national economy and communities.

*Response:* DHS thanks commenters for highlighting the important contributions of Documented Dreamers

and agrees that many have strong ties to the United States and may not have known another country as their home. DHS also acknowledges that, as a result of the longstanding "lack of lawful status" criterion, Documented Dreamers are not able to request deferred action under the DACA policy. However, as with the other threshold criteria, in the Department's effort to preserve and fortify DACA, DHS is maintaining this criterion in line with longstanding policy.[250] As discussed in Sections II.A and III.A of this rule and in the NPRM, this approach reflects the Department's acknowledgement of the reliance interests of those who already have received DACA and those similarly situated who have not yet requested DACA, and their families, employers, schools, and communities. It also preserves limited agency resources while retaining the Napolitano Memorandum's focus on providing forbearance from removal for those who entered as children and did not have lawful status as of the time of the creation of the policy.

*Comment:* A commenter said that the lack of lawful status provision is outrageous and strange in that it would require DACA requestors to show they broke the law to be eligible. Some commenters said that it would encourage further unauthorized immigration.

*Response:* As discussed above and in the NPRM, this rule reflects the reality that DHS enforcement resources are limited, and that sensible priorities for the use of those limited resources are vital. It also recognizes that, as a general matter, DACA recipients, who came to this country many years ago as children, lacked the intent to violate the law, have not been convicted of any serious crimes, and remain valued members of our communities. Furthermore, the rule requires that a noncitizen have entered the United States prior to the age of 16 and have been continuously present in the United States since June 15, 2007, to meet the threshold criteria for DACA.[251] As discussed in Section II.A.7, the rule will not forbear the removal of any noncitizen who arrived after that date. Because DHS has declined to expand the threshold eligibility criteria and for the other reasons discussed in Section II.A.7, DHS disagrees with commenters that the "lack of lawful status" criterion would incentivize further irregular migration.

*Comment:* Multiple commenters stated that the June 15, 2012 date was arbitrary and that USCIS did not

---

[248] *See* new 8 CFR 236.22(b)(3).

[249] *See* Dip Patel, *Biden's Immigration Plan Must Reform DACA to Cover Dreamers Whose Parents Are Here Legally,* NBC News "Think" (Dec. 4, 2020), *https://www.nbcnews.com/think/opinion/biden-s-immigration-plan-must-reform-daca-cover-dreamers-whose-ncna1248885;* David J. Bier, *Huge Fiscal Benefits of Including Legal Immigrant Dreamers in the DREAM Act,* Cato at Liberty (Oct. 23, 2017), *https://www.cato.org/blog/huge-fiscal-benefits-including-legal-immigrant-dreamers-dream-act.*

[250] *See* new 8 CFR 236.22(b)(4).

[251] *See* 8 U.S.C. 236.22(b)(1) and (2).

sufficiently justify the reason for retaining the date. Several commenters remarked along the same line that DHS should remove the requirement that DACA requestors have no lawful status on that date in order to qualify for deferred action under the DACA policy. One commenter said that the proposed rule's claim that the requirement is implicit in the Napolitano Memorandum's reference to children and young adults who are subject to removal because they lack lawful immigration status ignores the memorandum's key goal, which was to give consideration to the individual circumstances of each case and not remove productive young people to countries where they may not have lived or even speak the language. Additionally, the commenter said that there is precedent from previous deferred action initiatives, such as a 2009 deferred action initiative via memorandum for certain widows of U.S. citizens.

*Response:* As several commenters point out, this explicit guideline was not in the Napolitano Memorandum issued on June 15, 2012. However, DHS disagrees that retaining this longstanding criterion conflicts with the primary goals of the Napolitano Memorandum or the underlying motivations in creating the DACA policy. To the contrary, this requirement is consistent with the purpose of the policy, inasmuch as it limits the availability of the policy to those individuals who were subject to removal at the time the memorandum was issued, and therefore reflects that the DACA policy is an enforcement discretion policy, allowing DHS to focus its limited enforcement resources on higher priority populations.[252] While DHS recognizes that there are other noncitizens, including Documented Dreamers, who will not be able to request deferred action under the DACA policy as a result of DHS codifying the lack of lawful immigration status criterion in this rule, as discussed above, this approach reflects the Department's careful balancing of its directive to preserve and fortify DACA, as well as the reliance of DACA recipients and those who have not yet requested DACA on the Napolitano Memorandum's criteria.

Other Comments on the "Lack of Lawful Immigration Status" Criterion

*Comment:* A few commenters urged the Department to consider amending proposed 8 CFR 236.22(b)(4) to remove the reference to June 15, 2012, and only

require a lack of lawful immigration status on the date of filing the DACA request. Commenters suggested that this change would better align with the intent of DACA to protect young people brought to the United States as children and reduce the significant burden of demonstrating lack of lawful status going back to 2012. Alternatively, some commenters suggested other modifications to the date of the criterion, including changing the date in proposed 8 CFR 236.22(b)(4) to the date the final rule is promulgated, or using a period of time, instead of a concrete date, in the provision.

*Response:* DHS appreciates commenters' suggestions and understands that the criterion that the requestor demonstrate lack of lawful status as of June 15, 2012, may present a burden to some requestors or result in others being unable to meet the DACA criteria. However, for the reasons stated above, DHS is retaining this threshold criterion as proposed.

(5) Education

Support for the "Education" Criteria

*Comment:* A few commenters provided general support for the educational criteria, stating that educational opportunities provide a chance for DACA recipients to further their contributions to society. While suggesting changes to other threshold requirements, another commenter recommended no changes to the current educational requirements.

Other commenters supported the codification of longstanding standards for establishing when an individual is "currently . . . enrolled in school" for purposes of the threshold criteria as proposed at 8 CFR 236.22(b)(5). The commenter stated that doing so would offer additional stability to DACA requestors as they consider their educational options and assess the consequences of those decisions for obtaining DACA.

*Response:* DHS appreciates commenters' support for the proposed education guideline and agrees that educational opportunities provide a chance for DACA recipients to further their contributions to society, and agrees that maintaining the current standards will provide clarity and stability for DACA requestors. As discussed in the NPRM, this guideline also reflects DHS's recognition of the importance of education and military service to the United States and the Department's desire to support and promote such opportunities.[253] In accordance with longstanding DHS policy and the

Napolitano Memorandum, DHS is therefore codifying the guideline that a DACA requestor must be currently enrolled in school, have graduated or received a certificate of completion from high school, have obtained a GED, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.[254]

As proposed in the NPRM preamble, and in accordance with longstanding DHS policy, to be considered enrolled in school for the purposes of new 8 CFR 236.22(b)(5), the DACA requestor must be enrolled in one of the following as of the date of the request:

• A public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or homeschool program that meets State requirements;

• an education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English, or is designed to lead to placement in postsecondary education, job training, or employment and where the requestor is working toward such placement; or

• an education program assisting students either in obtaining a regular high school diploma or its recognized equivalent under State law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other State-authorized exam (*e.g.*, HiSet or TASC) in the United States.[255]

Such education, literacy, or career training programs (including vocational training), or education programs assisting students in obtaining a regular high school diploma or its recognized equivalent under State law, or in passing a GED exam or other State-authorized exam in the United States, include programs funded, in whole or in part, by Federal, State, county, or municipal grants, or administered by nonprofit organizations. Under longstanding policy, which DHS currently plans to maintain (but could revise to the extent consistent with law at a future date) programs funded by other sources would qualify if they are programs of demonstrated effectiveness.[256] As discussed in the NPRM, DHS does not consider enrollment in a personal enrichment class (such as arts and crafts) or a recreational class (such as canoeing) to be an alternative educational

---

[252] *See* 86 FR 53767.

[253] 86 FR 53768.

[254] *See* new 8 CFR 236.22(b)(5).
[255] 86 FR 53768.
[256] *Id.*

program.[257] Therefore, enrollment in such a program will not be considered to meet the "currently enrolled in school" guideline for purposes of this final rule.

As noted above, DHS is also codifying the longstanding policy as proposed in the NPRM that a DACA requestor also can meet the educational guideline if they have graduated from high school or received a GED.[258] To meet this component of the educational guideline, consistent with longstanding policy and as discussed in the preamble of the NPRM, the DACA requestor will need to show that they have graduated or obtained a certificate of completion from a U.S. high school or have received a recognized equivalent of a high school diploma under State law; have passed a GED test or other equivalent State-authorized exam in the United States; or have graduated from a public or private college, university, or community college. USCIS considers graduation from a public or private college, university, or community college as sufficient proof of meeting the educational guideline because a college or university generally would require a high school diploma, GED certificate, or equivalent for enrollment.[259]

Finally, DHS also is codifying the longstanding policy as proposed in the NPRM that a DACA requestor may meet the educational guideline if they are an honorably discharged veteran (including honorably discharged reservists) of the Coast Guard or Armed Forces of the United States. As has been longstanding policy and as discussed in the NPRM preamble, current or ongoing service in the Coast Guard or Armed Forces of the United States will not, however, qualify under this component of the guideline, although such service may, in some instances, qualify noncitizens for other forms of enforcement discretion or for lawful immigration status.[260]

Opposition to the "Education" Criteria

*Comment:* One commenter voiced opposition to the proposed educational criteria, stating that the intent of the DACA policy—to protect young people who were brought to the United States as children and lacked the intent to violate the law—has no relation to an individual's educational attainment. The commenter stated that if the educational requirements were removed, and noncitizens who qualify for DACA but for the education requirements could enter the workforce,

States could benefit from increased tax revenue from those requestors. The commenter asked that if the educational requirements remain as proposed, the Department address what constitutes "demonstrated effectiveness" such that requestors are not limited based on the type of educational program they attend.

Another commenter opposed the education criteria that DACA recipients graduate high school and stated that the education requirements are unnecessarily stringent. The commenter asked why—if an individual has not been eliminated from disqualification due to any other criteria—their ability to pass the 12th grade would make an impact on their qualification.

*Response:* DHS acknowledges that there are many noncitizens who may meet the threshold guidelines for DACA but for the education requirement. DHS also does not disagree that were such noncitizens to be granted deferred action and work authorization under the DACA policy, States could potentially benefit from their increased economic contributions and tax revenue. However, DHS disagrees that the education criteria as codified in this rule is too stringent. To the contrary, DHS provides myriad ways for DACA requestors to meet this threshold guideline, including enrollment in a variety of educational programs, graduation from high school or a GED program, or honorable discharge from the Coast Guard or Armed Forces of the United States.[261]

DHS also disagrees that the education criteria is unsupported by the foundational principles undergirding the creation of the DACA policy. As the Napolitano Memorandum highlights, this policy was intended to defer removal for "productive young people" who have "contributed to our country in significant ways."[262] While the Department recognizes that there are many ways that the DACA population have and continue to contribute to the United States and their communities, by incorporating an education criteria into the threshold guidelines, DHS is highlighting the importance of education and military service by considering those who give back and invest in their future through education to be lower priorities for enforcement action.

In response to one commenter's request to address what constitutes "demonstrated effectiveness" for alternative education programs that are not publicly funded, DHS notes that it has provided subregulatory guidance on

its website explaining that when looking at demonstrated effectiveness, USCIS reviews:

• the duration of the program's existence;

• the program's track record in assisting students in obtaining a GED, or a recognized equivalent certificate;

• receipt of awards or special achievement or recognition that indicate the program's overall quality; and/or

• any other information indicating the program's overall quality.[263] DHS believes that these factors provide flexibility to requestors while also maintaining a threshold level of educational quality as it relates to a program's overall effectiveness, and that such factors are best provided in subregulatory guidance rather than in regulation. DHS is therefore not making any changes to new 8 CFR 236.22(b)(5) in response to these comments.

Other Comments on the "Education" Criteria

*Comment:* Several commenters recommended creating a hardship waiver for people who, for example, had to drop out of high school to work, to be caregivers due to the pandemic, due to domestic violence, or due to other reasons. Some commenters suggested that a requestor demonstrate compelling circumstances for the inability to satisfy the educational guidelines in Form I–821D, Part 8 or include an addendum in their DACA request for USCIS' consideration. Several commenters recommended adding a caregiving exemption to the educational requirements that would recognize the importance of domestic work, paid or unpaid, in immigrant communities. One of these commenters reasoned that caring for family members requires significant time and can be a barrier to meeting the current educational requirements. Another of these commenters requested that DHS also provide a hardship exemption to the education criteria in recognition of the financial hardship and challenges of residing in a remote location faced by many farmworker families. The commenter noted that farmworkers also have inflexible and long work hours that further exacerbate difficulties in obtaining an education. Another commenter urged DHS to expand eligibility to those who were unable to graduate from high school or earn a GED, stating that the requirement is biased toward youth who have supports that allow them to pursue an education.

Some commenters also recommended adding an exemption to the educational

---

[257] *Id.*

[258] *Id.*

[259] *Id.*

[260] *Id.*

[261] *See* new 8 CFR 236.22(b)(5).

[262] Napolitano Memorandum at 2.

[263] DACA FAQs.

**53224** Federal Register / Vol. 87, No. 167 / Tuesday, August 30, 2022 / Rules and Regulations

requirement through community service. One commenter reasoned that allowing a community service exemption would demonstrate a commitment to DACA objectives through structured volunteer activities and would strengthen future employability in the nonprofit sector.

*Response:* DHS appreciates the commenters raising the importance of caregiving and community service and agrees that these are meaningful occupations that contribute to society. DHS also acknowledges that caregiving duties, financial hardship, residing in a remote location, inflexible work schedules, domestic violence, the pandemic, and other challenges may impact a requestor's ability to meet the education criteria. However, as noted above, DHS believes that there is sufficient flexibility in the various ways a requestor may satisfy this threshold guideline to enable requestors in a variety of circumstances to find a program that fits their needs. For the reasons articulated throughout this rule, DHS also is retaining this threshold guideline as proposed in its efforts to preserve and fortify the policy. DHS therefore declines to create an exemption to the education criteria for hardship, caregiving, community service, or other reasons.

*Comment:* Some commenters recommended that individuals in current or ongoing military service be eligible to meet the education criteria, not just those who have received an honorable discharge. One commenter stated that this expansion of eligibility for current military service members would align with the requirements of the Department of Veterans Affairs benefits. Another commenter requested that USCIS clarify that union apprenticeships qualify as approved educational programs that meet current requirements.

*Response:* DHS appreciates commenters raising these possibilities for expanding the education criteria to include current military service or union apprenticeships. However, as discussed elsewhere in this rule, DHS is retaining this and the other threshold criteria as proposed in its efforts to preserve and fortify DACA, and in recognition of the reliance interests of current DACA requestors and those similarly situated who have not yet requested DACA, and their families, employers, schools, and communities.

*Comment:* A commenter referenced former USCIS Director Francis Cissna's May 25, 2018 response to Rep. Steve King's questions regarding the education levels of DACA recipients. The commenter said that the NPRM does not mention, as stated by Director Cissna, that education is a required field on Form I–821D for initial requests but is not a required field on renewal requests. The commenter went on to cite education-related figures for approved DACA recipients from 2012–2018, questioning whether the rule is simply allowing 800,000 children to get work authorization and a driver's license with little apparent hope of reaching their dreams. Another commenter said that many DACA requestors only register to study while the request is processed and then they abandon their studies.

*Response:* As discussed above, DHS incorporated the education criteria into the threshold guidelines for DACA in recognition of the importance of education and military service and of the contributions that DACA requestors make to the country. For example, one study of the effects of DACA on educational achievement concluded that, because of DACA, more than 49,000 additional Hispanic youth obtained a high school diploma, and that the gap in high school graduation between citizen and noncitizen youth in the study's sample closed by 40 percent.[264] The same study found positive, though imprecise, impacts on college attendance.[265]

DHS also recognizes that there may be circumstances beyond a requestor's control that may impede their ability to participate in or complete certain educational programs, and for that reason, DHS intentionally provided a variety of options for meeting this threshold guideline.

It is DHS's position that participation in or graduation from educational programs is beneficial to requestors and to the community writ large. As stated elsewhere in this rule, many DACA recipients have gone on to continue their studies at post-secondary and professional levels, and some have become doctors, lawyers, nurses, teachers, or engineers.[266] Approximately 30,000 DACA recipients are healthcare workers, and many of them have helped care for their communities on the frontlines during the COVID–19 pandemic.[267] DHS therefore disagrees with the commenters that this rule provides work authorization to DACA recipients without supporting educational outcomes or contributions.

DHS acknowledges commenters' correct assertion that DHS does not currently require requestors to affirmatively provide evidence of their continued participation in educational programs upon seeking renewal of DACA. Once the threshold educational guideline is met by evidence provided for adjudication of the initial request, DHS focuses its renewal adjudications on critical issues such as whether the individual continues to meet the criminality, public safety, national security, and continuous residence guidelines.

## (6) Criminal History, Public Safety, and National Security

### General Comments

*Comment:* Some commenters generally expressed that DACA should be more forgiving of minor offenses, with most stating that young people, like everyone, make mistakes that should not result in excessive punishment or deprive them of DACA. However, one commenter expressed that the requirement related to criminal history was sound judgment.

One commenter stated that DHS failed to elaborate on why it allows convicted criminals to obtain DACA, whereas law-abiding prospective immigrants are not considered for deferred action and employment authorization, saying that existing data do not support that officers exercise discretion in granting DACA. Another commenter said that DHS failed to conduct meaningful studies on crimes DACA recipients have committed and their negative impacts on U.S. society or on crime victims, nor did DHS consider any measures to enhance national security, such as banning all persons with any criminal records from receiving DACA. The commenter went on to cite data indicating that more than 10 percent of the approved DACA recipients have at least one arrest, which the commenter said was not acknowledged in the rule. This commenter questioned how much discretion the adjudicating officer has, stating that it is unimaginable that someone who has been accused of crimes such as murder or assault could receive favorable discretion.

A commenter expressed concern over the use of vague language to disqualify individuals who pose a threat to national security or public safety, stating that this abstract language provides no standard or guidance as to how an individual can prove by a preponderance of the evidence that they meet this requirement. Further, the

---

[264] Kuka (2020).

[265] *Id.*

[266] *See* Gonzales (2019); Svajlenka (2020); Wong (2020); Zong (2017).

[267] Svajlenka (2020). DACA recipients who are healthcare workers also are helping to alleviate a shortage of healthcare professionals in the United States and they are more likely to work in underserved communities where shortages are particularly dire. Chen (2019); Garcia (2017).

commenter stated that this vague language leaves open the possibility of uneven and discriminatory application, and officers who are unfriendly to the policy's ideals may wield it to exclude otherwise-qualified individuals for dishonorable and politically motivated aims. The commenter said that this concern is based on the historical use of similar grounds to incite fear and discriminate against individuals based on race, religion, sexual orientation, political ideology, and various other identities. Another commenter suggested eliminating or narrowing the public safety discretionary factor, stating that overbroad categorizations of being a threat to public safety rely heavily on often unfounded allegations of gang membership or participation in criminal activities, and that public safety long has been used as a pretext for criminalizing immigrants.

Multiple commenters opposed DHS requiring or requesting juvenile records as part of the DACA adjudication process, stating that requiring such records is a breach of confidentiality for juveniles and may be illegal in some States, such as California. The commenter recommended that DHS refrain from requesting juvenile records as a nationwide policy to ensure a consistent and fair process across all States.

*Response:* DHS acknowledges the variety of comments on this issue, ranging from concern that the rule should be more forgiving of minor offenses, to agreement with the criteria, to objection that someone with a criminal conviction at all (regardless of the severity of the offense) can receive DACA. DHS maintains that the criminal history, public safety, and national security criteria, as proposed, strike an appropriate balance that is generally consistent with the spirit of DHS's Enforcement Guidelines, which focus on threats to national security, public safety, and border security. Excluding all individuals with any criminal records from receiving DACA, as proposed by one commenter, would not serve DHS's enforcement priority goals, as DHS does not have the ability to pursue removal of every individual without lawful status who has a criminal record. DHS agrees with commenters that the rule should be forgiving of some minor offenses and maintains that the criteria as proposed do accomplish that goal: individuals with isolated minor convictions are not categorically excluded, including those with minor traffic offenses. While those with three or more misdemeanor convictions will not be granted DACA, this reflects DHS's judgment that an individual with multiple misdemeanor convictions, however minor as individual offenses, generally does not warrant a favorable exercise of enforcement discretion in the form of DACA.

DHS acknowledges one commenter's reference to the November 2019 USCIS report ''DACA Requestors with an IDENT Response,''[268] which includes data reflecting that approximately 10 percent of DACA requestors approved between 2012 and October 2019 had been arrested or apprehended for a criminal offense or immigration-related civil offense, but disagrees that the NPRM did not acknowledge this data as it is explicitly referenced in the preamble to the NPRM at 86 FR 53752. Additionally, because the report reflects arrests and apprehensions—not charges or convictions—and includes apprehensions for immigration-related civil violations which cannot be systematically excluded from the report, the report is significantly overinclusive and not a reliable basis for informing the development of the criminal conviction-related criteria.

DHS acknowledges a commenter's view that whether someone poses a threat to national security or public safety is vague, but disagrees with the assertion that this may lead to discriminatory application or that officers will use this provision to exclude individuals for dishonorable or politically motivated aims. Determining whether someone poses a threat to national security or public safety is at the heart of DHS's mission, and Congress has directed the Secretary to prioritize national security, public safety, and border security. These concepts are longstanding and familiar to officers based on both experience and training, and are incorporated into DHS's enforcement priorities, as reflected in the rule.

DHS further disagrees with a commenter's assertion that existing data do not support the conclusion that officers should exercise discretion in adjudicating DACA requests. The DACA policy has historically included threshold discretionary criteria that USCIS assesses on a case-by-case basis as a review of the totality of circumstances. The assessment of whether a requestor meets these criteria itself entails the exercise of discretion by adjudicators—such as whether the requestor meets the criminal history, public safety, and national security criteria or whether they meet the continuous residence criterion, and additionally, even when a requestor meets all threshold criteria, USCIS adjudicators have had (and will continue to have) discretion to determine that in the totality of circumstances, a favorable exercise of discretion is nonetheless not warranted. Thus, USCIS data on DACA denials is itself an indication that officers exercise discretion in adjudicating DACA requests. USCIS data through December 31, 2021, reflects that USCIS has denied 107,245 DACA requests since the policy was implemented.[269]

With respect to juvenile delinquency records, as explained elsewhere in this rule, USCIS does not consider a juvenile delinquency determination a conviction for immigration purposes, consistent with longstanding DACA policy and Board of Immigration Appeals (BIA) precedent. Also consistent with longstanding DACA policy, USCIS does not consider juvenile delinquency adjudications as automatically disqualifying for DACA. If a requestor cannot provide the record because it is sealed or because State law prohibits even the individual to whom the record relates (*i.e.,* the DACA requestor) from themselves disclosing the record, USCIS still may request information about the underlying conduct in order to perform a case-by-case analysis of whether the individual presents a threat to public safety or national security and whether a favorable exercise of prosecutorial discretion is otherwise warranted.

Mandatory/Categorical Criminal Bars to DACA

*Comment:* One commenter recommended no changes be made to the criminal criteria as drafted in the proposed rule. However, many commenters opposed categorically denying DACA based on contact with the criminal legal system, suggested removal of the criminal conviction bars entirely, and recommended instead instituting a case-by-case review for those with such convictions. Commenters stated that the proposed criminal criteria are much broader than DHS's current memorandum on enforcement priorities, undermining the claim that the criminal criteria identify young people who are a high priority for removal, and that categorical bars by their nature eliminate the option of case-by-case determinations.

---

[268] USCIS, Office of Policy & Strategy, Research & Evaluation Division, *DACA Requestors with an IDENT Response: November 2019 Update* (Nov. 2019), *https://www.uscis.gov/sites/default/files/document/data/DACA_Requestors_IDENT_Nov._2019.pdf* (last accessed February 25, 2022).

[269] USCIS, *Deferred Action for Childhood Arrivals (DACA) Quarterly Report (Fiscal Year 2022, Q1)* (Mar. 2022), *https://www.uscis.gov/sites/default/files/document/reports/DACA_performancedata_fy2022_qtr1.pdf* (last visited June 2, 2022).

Commenters added that as a result, mandatory criminal bars require DHS to deny certain requestors even when they have demonstrated that they warrant favorable discretion, noting that the very nature of DACA means that every eligible requestor entered the United States as a child, and this fact alone should obligate DHS to consider each case in the totality of circumstances without being constrained by mandatory criminal bars. One commenter stated that consideration of the final DHS enforcement priorities, issued after the proposed rule was published, should be incorporated into the final rule so that no one is denied DACA who is not an enforcement priority. The commenter further noted that the statement in the proposed rule that where DACA guidelines may not align with current or future enforcement discretion guidance, USCIS may consider that guidance when determining whether to deny or terminate DACA even when the guidelines are met, invites future administrations to nearly end DACA by determining that all immigrants encountered by DHS may be enforcement priorities. Commenters stated that eliminating criminal conviction exclusions would decrease barriers for individuals with criminal records seeking DACA, bringing the policy into compliance with basic tenets of racial equity as well as compliance with E.O. 13985.

Commenters who oppose the criminal conviction criteria stated that they are arbitrary and discriminatory; unjustly transfer the racial inequities of the criminal legal system into the administration of DACA in light of the long history of racial disparities in the U.S. criminal legal system; unfairly exclude communities who already are criminalized, surveilled, and facing discrimination; impose a "double punishment" on largely Black, Brown, and Indigenous immigrants who already have served their full sentences and complied with consequences; ignore the disparities in the criminal legal system and the over-policing and over-prosecution of people, particularly youths, in communities of color; and do not sufficiently take into account the impact on children, as children whose parents or caregivers would be ineligible could experience the harms of family separation through detention or deportation.

One commenter noted that no other area has changed as significantly since 2012 as social perceptions of the criminal legal system, concluding that the rule's exclusions for criminal history are fundamentally incompatible with this reform movement. A legal services

provider shared anecdotal examples of how the criminal bars disproportionately affected its clients. Another commenter stated that removing the criminal bars would align with the dual intentions of DACA—to preserve DHS resources and provide relief to individuals brought to the United States as children—because it would provide relief to a broader population and lead to greater stability for more families, more opportunities to pursue education or careers, and increased tax revenue. The commenter further noted that removing the criminal bars would acknowledge the capability of rehabilitation.

Commenters said that the criminal framework within DACA includes a unique system of criminal bars, separate from the grounds of inadmissibility and deportability, that is used to unfairly target certain members of the DACA population, by singling out certain contact with the criminal legal system based on the type of offense or conduct, and that does not account for differences in sentencing or severity of punishment across different localities. Commenters stated that this encourages officers to reach beyond the criminal legal system's disposition and form their own judgment without the benefit of due process.

Some commenters recommended eliminating certain per se criminal bars, including minor traffic offenses, driving under the influence, 8 U.S.C. 1325 (improper entry) and 1326 (reentry of removed individuals), and offenses involving marijuana or related paraphernalia, in light of the decriminalization of marijuana.

Commenters stated that a conviction does not necessarily indicate whether an individual poses a threat to persons or property, or otherwise does not warrant deferred action. The commenter further stated a conviction is an unreliable predictor of future danger, and is an unreliable indicator of past criminal conduct because of disparate policing practices and the significant number of people who may plead guilty to a crime for a number of reasons. The commenter stated that by adopting categorical criminal bars, the agency prevents itself from considering mitigating circumstances or humanitarian concerns.

One commenter stated that individualized consideration for those few exceptional cases in which DHS has an objectively reasonable, particularized belief that criminal history is currently relevant should account for differences in sentencing or severity of punishment across different localities and provide an opportunity for the requestor to

respond to and explain the information. The commenter further noted that the rule does not require most sentences described to be actually served and fails to cut off consideration of past conduct based on the passage of time since the conviction. Another commenter also recommended that the conviction definitions consider actual time served rather than potential sentences imposed.

One commenter stated that when a conviction occurred should limit exclusions, reasoning that no one should be defined solely by their long-past actions. The commenter recommended considering actual sentences served rather than the potential sentences captured by the felony and misdemeanor conviction definitions in order to reflect the courts' assessments of offense severity.

*Response:* DHS appreciates and acknowledges the range of views expressed by the commenters, with one supporting the criminal criteria as drafted, and many opposing categorical criminal criteria and instead recommending a framework that considers aggravating and mitigating factors on a case-by-case basis. DHS notes commenters' comparison of the criminal criteria with the Enforcement Guidelines, observation that the criteria are distinct from the criminal grounds of inadmissibility and deportability, and attention to the fact that the definitions provided of felonies and misdemeanors reference potential sentences rather than actual time served. DHS acknowledges commenters' statements that: the criminal criteria are arbitrary and discriminatory, systemic racism or other disparities may result in disproportionate contact with the criminal legal system, and it is improper to draw conclusions about future threats to public safety based on the fact of a past conviction.

Despite the limitations and imperfections of the criminal legal system, criminal convictions rendered under Federal and State laws often carry immigration consequences. It is therefore consistent with immigration law generally for DHS to take convictions into consideration when determining whether to favorably exercise its enforcement discretion to defer removal action. It is likewise consistent with Federal law definitions of felonies and misdemeanors for DHS to classify offenses for DACA purposes based on the potential sentence, rather than time served. DHS maintains that for purposes of consideration under DACA and consistent with longstanding DACA policy, it remains appropriate for USCIS to take into consideration a requestor's criminal convictions. As

AR2022_100269

noted in the NPRM, DHS acknowledges that the threshold DACA criteria and DHS's broader enforcement priorities may not always perfectly align. In its effort to preserve and fortify DACA, DHS does not believe that it is necessary or beneficial to tie the DACA threshold criteria to the specific DHS enforcement priorities that are in place at any given time, in light of the possibility for the priorities to change, because the DACA criteria are such that the DACA population will generally be considered a low priority. Although the criteria outlined in this rule are the primary factors considered in determining whether to grant DACA, because deferred action is a case-by-case act of prosecutorial discretion, DHS may consider other relevant factors, including changed enforcement priorities, when determining whether to grant deferred action in an individual case. Factors outside of the threshold criteria may not universally overrule the threshold criteria in all cases such that changed enforcement priorities render the threshold criteria entirely moot, but because DHS may consider all factors in a case, the current enforcement priorities may properly be taken into consideration. DHS acknowledges that as a result, there may be cases in which ICE or CBP determine in their discretion that an individual is not a priority for removal even when USCIS determines the individual does not warrant a favorable exercise of enforcement discretion in the form of DACA. But DACA was never intended to capture *every* individual who ICE or CBP determines is not a priority for removal. Indeed, the very nature of discretion is such that different DHS components may exercise their discretion differently based on differing operational considerations, reaching different outcomes for an individual, all while remaining within the boundaries of the applicable guidelines.

The criminal criteria reflect a targeted approach to considering public safety concerns, identifying convictions that do not support the favorable exercise of enforcement discretion, and balancing the positive equities of the requestor population as reflected in other threshold criteria. While the criteria serve as important benchmarks for consideration of DACA, they do not prevent or replace a case-by-case weighing of all relevant factors by USCIS adjudicators. Moreover, as explained in the proposed rule, DHS seeks to retain the threshold criteria of the DACA policy as applied by USCIS since 2012 in part due to recognition of the significant reliance interests in the

continued existence of the DACA policy of individuals who previously have received DACA grants, and those similarly situated who have not yet requested DACA, as well as their families, employers, schools, and communities. DHS determined that the best approach to preserving and fortifying DACA to ensure the continued existence of the policy to is to codify the existing threshold criteria. Accordingly, DHS believes the criminal criteria as proposed, and as implemented for 10 years, enable USCIS to identify more readily those who are likely to be a low priority based on their positive equities and successfully advance DHS's important enforcement mission.

Accordingly, DHS will not make any revisions to 8 CFR 236.22(b)(6) as a result of these comments.

Waivers and Exceptions

*Comment:* Multiple commenters stated that the rule should, at a minimum, include a waiver for individuals who trigger the criminal bars, so DACA requestors would not be rendered ineligible without a case-by-case determination. Commenters said that adjudicators should be able to consider the totality of circumstances, mitigating factors, and positive equities, including the severity of the crime, the age of the individual at the time the crime was committed, rehabilitation, minor drug-related offenses, whether a conviction was related to the individual having been a survivor of domestic violence or human trafficking, the time that has passed between the conviction and adjudication of the DACA request, length of residence, community ties, family ties, the impact of a possible denial of a request on U.S. citizen or permanent resident family members, and mental and physical health. One commenter said that requestors should be allowed to seek a waiver for ineligibility, similar to the waiver available under INA sec. 212(h), 8 U.S.C. 1182(h).

A few commenters stated that a program rooted in a case-by-case exercise of discretion should not categorically exclude a class of individuals without providing them an opportunity to present their equities to an adjudicator who can weigh the totality of the circumstances. Other commenters also noted concern that barring whole categories of individuals imports the biases of the criminal legal system into immigration decision making and unfairly targets portions of the population who are already targets of discriminatory policing practices. Some commenters said that DHS should use its authority to grant extraordinary

circumstances waivers in cases of DACA requestors with felony convictions to avoid the unjust, disproportionate impact of the felony conviction bar on communities of color and LGBTQ DACA-eligible individuals.

Multiple commenters also noted that the existing DACA policy allows a waiver of the criminal exclusions due to "exceptional circumstances," but stated that it is unclear what evidence a requestor should submit to establish exceptional circumstances, nor is it clear how adjudicators determine if the standard is met. One commenter urged DHS to codify and expand the availability of this exception for convictions from the existing DACA policy.

*Response:* DHS acknowledges commenters' concerns regarding communities of color and LGBTQIA+ individuals being disproportionately impacted by the criteria, and the suggestion that the criminal criteria include a waiver or exception that takes into consideration aggravating and mitigating factors on a case-by-case basis. However, DHS declines to accept the recommendation that DHS codify the longstanding "exceptional circumstances" exception to the criminal conviction criteria. Commenters correctly note that historically, under DACA FAQs 61 and 66,[270] USCIS retained discretion to determine that an individual with a disqualifying conviction nonetheless warranted a favorable exercise of enforcement discretion due to exceptional circumstances after careful consideration of the specific facts of the case. DHS is choosing not to codify that exception because it believes that the criminal criteria strike the correct balance for determining what criminal history should be disqualifying for enforcement discretion under DACA. Moreover, DHS notes that despite the long history of this exception, USCIS rarely, if ever, found exceptional circumstances that warranted a grant of DACA where the requestor did not meet the criminal guidelines. If such cases arise in the future, DHS may, where appropriate, consider the DACA requestor for other forms of enforcement discretion.

Statute of Limitations

*Comment:* One commenter stated that there should be no misdemeanor bar in the rule, but if there is one, there should be a "statute of limitations" on misdemeanors. Other commenters similarly stated that the rule should impose a statute of limitations, saying

[270] DACA FAQs.

that lack of a statute of limitations is punitive because few people are the same person they were 5 or 10 years before when they made bad decisions. Multiple commenters specifically recommended that DHS establish an administrative statute of limitations for consideration of convictions that occurred 5 or more years before the request date, and one recommended that all conviction-based exclusions be limited to within 5 years of the rule's promulgation.

Several commenters said that DACA-eligible youth have developed deep ties to family and community in the United States, deserve the chance to rehabilitate and contribute, and should not suffer further consequences if they have successfully completed the terms of any sentence resulting from a criminal conviction. A few commenters also stated that this approach would be in line with the administration's current enforcement priorities, which lists how long ago the conviction occurred as one of the factors in deciding whether to exercise prosecutorial discretion.

One commenter stated that this change to the rule is necessary when Southeast Asian immigrant and refugee communities have a long history of being over-policed and racially profiled, and to prevent further repercussions of racial inequities and injustices in the criminal legal system that disproportionately impact Black and Indigenous communities and other people of color.

*Response:* DHS acknowledges commenters' suggestion that the criminal criteria include an administrative "statute of limitations" to limit USCIS from considering convictions that occurred more than 5 or 10 years ago as automatically disqualifying. DHS further acknowledges commenters' statements that individuals may have rehabilitated following older convictions and that contact with the criminal legal system is often the result of systemic racism.

Despite the limitations and imperfections of the criminal legal system, criminal convictions rendered under Federal and State laws often carry immigration consequences. It is therefore consistent with immigration law generally for DHS to take convictions into consideration when determining whether to favorably exercise its enforcement discretion to defer removal action. DHS maintains that for purposes of consideration under DACA and consistent with longstanding DACA policy, in the exercise of discretion, it remains appropriate for USCIS to take into consideration convictions even if they occurred more

than 5 or 10 years in the past. The criminal criteria reflect a targeted approach to considering public safety concerns, identifying convictions that do not support the favorable exercise of enforcement discretion, and balancing the positive equities of the requestor population as reflected in other threshold criteria. As explained in the proposed rule and elsewhere in this rule, DHS seeks to retain the threshold criteria of the DACA policy as applied by USCIS since 2012 in part due to recognition of the significant reliance interests in the continued existence of the DACA policy of individuals who previously have received DACA grants, and those similarly situated who have not yet requested DACA, and their families, employers, schools, and communities. Accordingly, DHS believes the criminal criteria as proposed, and as implemented for 10 years, enable USCIS to identify more readily those who are likely to be a low priority based on their positive equities and successfully advance DHS's important enforcement mission. Accordingly, DHS will not make any revisions to 8 CFR 236.22(b)(6) as a result of these comments.

Expunged and Juvenile Convictions

*Comment:* Many commenters stated that the rule should clearly prohibit consideration of expunged convictions and juvenile delinquency adjudications in DACA determinations, including the many ways in which expungement is defined, and opposed the rule's reference to the definition of conviction at INA sec. 101(a)(48)(A), 8 U.S.C. 1101(a)(48)(a) because it includes expunged convictions. One commenter said that this could be read to limit DHS's discretion in this area.

Commenters stated that expungements were available for similar programs such as the Special Agricultural Worker and other legalization programs of the 1980s and are included in legislation currently before Congress. They noted recognizing the validity of expungements is critical to meeting the intent of DACA and giving effect to important safeguards of the criminal legal system that recognize the capacity for rehabilitation of impacted individuals and the special vulnerabilities of youth and counter the impact of policing in our communities. One commenter stated that expunged, sealed, or otherwise vacated records are a powerful indicator of change in an individual. One commenter noted that many DACA recipients are Black, Latinx, and/or other people of color who come from communities harmed by a

history of racial injustice and a deeply flawed law enforcement system.

Multiple commenters stated that considering expunged convictions and juvenile delinquency adjudications as disqualifying convictions would be a damaging departure from longstanding DACA policy that would result in current DACA recipients being unable to renew. Many stated that, at a minimum, the rule should codify existing DACA policy, which provides that expunged convictions and juvenile delinquency determinations do not presumptively bar an applicant from receiving DACA and are considered on a case-by-case basis to determine whether, under the particular circumstances, a favorable exercise of prosecutorial discretion is warranted.

However, multiple commenters opposed the case-by-case review of expunged convictions and juvenile delinquency adjudications as provided by current policy. Commenters stated that it leads to differing decisions for similarly situated requestors based on the adjudicating officer, undermining the finality of a State or local judicial decision to set aside and expunge an individual's criminal conviction, noting that the very purpose of expungement is to eliminate collateral consequences arising from the existence of the conviction on an individual's record. Commenters also noted that it wastes valuable agency time, as State and local authorities already examined the facts of the case and concluded that the conviction merited expungement, and almost all States have expungement mechanisms that do not allow for the expungement of felonies.[271] Another commenter stated that current guidance does not align with the purpose of expungement, nor comport with relevant research on young adults, their decision-making process, and their brain development. They cited the importance of the research because it suggests a person's past juvenile record is not indicative of their adult potential.

Commenters cited academic research demonstrating that individuals with expunged convictions present a low public safety risk and, thus, should be a low priority for removal, like other members of the DACA-eligible population. Additionally, a commenter said that legislative and policy changes providing for expungement—including automatic expungement—reflect an increased desire to create second-chance

---

[271] *See* Restoration of Rights Project, *50-State Comparison: Expungement, Sealing & Other Record Relief, https://ccresourcecenter.org/state-restoration-profiles/50-state-comparisonjudicial-expungement-sealing-and-set-aside* (last updated Oct. 2021).

opportunities in employment, housing, and professional licensing for individuals with prior criminal convictions. Commenters also stated that, in the criminal legal system, an expunged conviction is removed from the system entirely, including for housing, loan, employment, voting, and all other purposes, and DHS must similarly abide by this standard.

Commenters also noted that the immigration system recognizes the special position of juveniles in immigration court proceedings, where a juvenile delinquency adjudication is not considered to be a criminal conviction for immigration purposes and does not trigger adverse immigration consequences that flow from a conviction, which has been repeatedly affirmed by the BIA. Therefore, commenters state that the same should be true regarding DACA. One said that no conduct committed when under 18 should exclude someone from receiving DACA and that juvenile convictions should not be considered a negative factor, noting the inconsistency of saying that children lacked intent to violate the law in coming to the United States but then holding them responsible as a collateral consequence for other conduct while adolescents.

*Response:* DHS agrees with commenters that the longstanding DACA policy of not considering expunged convictions and juvenile delinquency adjudications as automatically disqualifying should be continued. DHS did not intend for the rule to abandon this policy as reflected in DACA FAQ 68,[272] which provides that expunged convictions and juvenile delinquency adjudications are not considered disqualifying convictions for purposes of the criminal criteria, but instead are assessed on a case-by-case basis to determine whether, under the particular circumstances, a favorable exercise of prosecutorial discretion is warranted.

However, DHS disagrees with commenters that case-by-case consideration of such criminal history should be eliminated and that the rule should prohibit entirely any consideration of expunged convictions or juvenile delinquency adjudications. By conducting an individual, case-by-case assessment that takes into consideration the nature and severity of the underlying conduct, DHS is giving effect to the State or local judicial determination to erase the conviction itself from the individual's criminal record, while still allowing DHS to consider the underlying facts to make a

proper determination as to whether a requestor poses a threat to public safety or national security and whether the favorable exercise of prosecutorial discretion is otherwise warranted. While DHS recognizes that in other immigration contexts, expungements are generally considered convictions for immigration purposes with few exceptions, providing for case-by-case consideration of the underlying nature and severity of the criminal offense rather than categorically excluding requestors with otherwise disqualifying convictions that were expunged is consistent with the nature of DACA as an exercise of enforcement discretion—as distinct from an adjudication involving statutory eligibility requirements plus the exercise of adjudicative discretion—and reflects a balancing of the use of guidelines and discretion, which serves to promote consistency and avoid arbitrariness in DACA determinations.

Likewise, in the case of juvenile delinquency adjudications, DHS agrees that the rule should not depart from longstanding DACA policy and BIA precedent establishing that a juvenile delinquency determination is not a conviction for immigration purposes.[273] Nonetheless, for the same reasons explained above, DHS maintains that it is appropriate for adjudicators to still consider the underlying conduct as part of a case-by-case analysis of whether the individual presents a threat to public safety or national security and whether a favorable exercise of prosecutorial discretion is otherwise warranted.

In this final rule, DHS is revising 8 CFR 236.22(b)(6) to clarify that expunged convictions and juvenile delinquency adjudications are not considered automatically disqualifying under the criminal history criteria. However, consistent with longstanding policy, expunged convictions and juvenile delinquency adjudications will still be assessed on a case-by-case basis to determine whether the individual presents a national security or public safety concern and otherwise warrants a favorable exercise of discretion.[274]

Misdemeanors

*Comment:* Multiple commenters asserted that the single-misdemeanor bar should be eliminated because the offenses are undefined, overbroad, and arbitrary, with one stating that the definition was at best vague and at worst unjustly punitive. A commenter noted that these categories are broad

and subject to interpretation, and conduct is criminalized differently in different jurisdictions, so there will continue to be wildly inconsistent application and arbitrary adjudications, stating that it undercuts the underlying spirit and intention of DACA, which was created to assist DHS by providing a well-defined framework for exercising its discretionary prosecutorial power and minimizing DHS waste on non-priority enforcement cases. One commenter suggested DHS define each offense rather than listing crimes, since States have different versions of every law; another suggested considering them on a case-by-case basis since young adults make dumb mistakes very often and a mistake should not ruin someone's life.

Commenters also stated that the use of an arbitrary length of sentence imposed in determining a particular misdemeanor is disqualifying is inappropriate and arbitrary, and will further prevailing trends of inequality in the justice system, as well as disparate treatment based on the applicant's jurisdiction and its sentencing scheme. One noted that this provision undervalues a federalist system in which a misdemeanor offense in one system can be considered a felony in another, and sentencing varies by locality.

One commenter stated that the misdemeanor definition used for the single-conviction and three-conviction bars include offenses that are considered non-criminal "violations" under New York law. The commenter noted that a violation of disorderly conduct under New York law is a violation, not a crime, but is a common disposition in criminal courts, often for minor alleged conduct, and pleas to this violation are often the release valve for the criminal legal system, yet regularly lead to ineligibility for DACA. The commenter stated that maintaining this bar will force people to choose between quickly and efficiently disposing of their case and defending their innocence through often prolonged and unnecessary litigation to that do not face a bar to obtaining DACA. The commenter additionally noted the criminal bars would disparately impact those who are routinely criminalized because of disparate policing practices, including based on race, sexual orientation, and gender, or in connection with experiences of trafficking and domestic violence, stating that DACA recipients often come from vulnerable communities that may be more susceptible to low-level offenses. Another commenter stated that disqualifying individuals based on

---

[272] DACA FAQs.

[273] *Matter of Ramirez-Rivero,* 18 I&N Dec. 135 (BIA 1981).

[274] *See* new 8 CFR 236.22(b)(6).

convictions incurred by a system characterized by institutionalized discrimination and racism only serves to compound punishment on Black and Brown immigrants.

Multiple commenters noted appreciation of the clarified definition of a "significant misdemeanor," but nonetheless opposed the criminal bars, stating that they add to the harmful rhetoric of immigrants as criminals. Some of these commenters expressed concern that a "significant misdemeanor" offense from many years ago may act as a bar to DACA, despite positive discretionary factors.

Many commenters said that individuals should not be barred from DACA by any single offense or offenses where a sentence of less than 90 days was imposed. The commenters stated that adjudicators have applied the misdemeanor bars inconsistently in the DACA context, State criminal legal systems present a wide array of different treatment for different offenses, and regional differences in policing compound the impact of disparate treatment for individuals who otherwise would be eligible for DACA. By adopting this measure, the commenters stated that the rule would increase consistency in DACA adjudications and ensure that individuals are not disqualified for offenses for which a lesser sentence was imposed.

One commenter said that TPS has a limit of two misdemeanors, and this rule should do the same.

*Response:* DHS acknowledges commenters' suggestion to remove single defined misdemeanors as disqualifying for DACA purposes, to instead consider such offenses on a case-by-case basis, and to provide that any offenses where a sentence of less than 90 days was imposed should not be disqualifying. DHS further notes commenters' statements that the categories of offenses listed are vague and broad and that contact with the criminal legal system is often the result of systemic racism.

Despite the limitations and imperfections of the criminal legal system, criminal convictions rendered under Federal and State law often carry immigration consequences. It is therefore consistent with immigration law generally for DHS to take convictions, including misdemeanors, into consideration when determining whether to favorably exercise its enforcement discretion to defer removal action. DHS maintains that for purposes of consideration under DACA and consistent with longstanding DACA policy, it remains appropriate for USCIS to take into consideration a requestor's

misdemeanor convictions. The criminal criteria reflect a targeted approach to considering public safety concerns, identifying convictions that do not support the favorable exercise of enforcement discretion, and balancing the positive equities of the requestor population as reflected in other threshold criteria. In addition to the merits of this targeted and balanced approach, and as explained in the proposed rule, DHS has decided to codify the threshold criteria of the DACA policy as applied by USCIS since 2012 in part due to recognition of the significant reliance interests in the continued existence of the DACA policy of individuals who previously have received DACA grants, and those similarly situated who have not yet requested DACA, as well as their families, employers, schools, and communities.[275] Furthermore, DHS has determined that retaining the criteria as set forth in the Napolitano Memorandum defines the population of those who may request DACA to those who are likely to continue to be a low priority for removal under the Department's general enforcement priorities. Accordingly, DHS believes the criminal criteria as proposed, and as implemented for 10 years, enable USCIS to identify more readily those who are likely to be a low priority based on their positive equities and successfully advance DHS's important enforcement mission. Accordingly, DHS will not make any revisions to 8 CFR 236.22(b)(6) as a result of these comments.

DHS acknowledges the commenter's statement that New York "violations" are "non-criminal" and often lead to denial of DACA requests. DHS further acknowledges that New York's penal code does not classify violations, such as disorderly conduct, as "crimes" but rather labels them "petty offenses."[276] DHS notes, however, that New York violations are punishable by up to 15 days of incarceration.[277] As such, New York violations meet the Federal definition of a misdemeanor as an offense for which the maximum term of imprisonment authorized is 1 year or less but greater than 5 days, which has been in DACA policy since 2012 and is

codified in this rule at new 8 CFR 236.22(b)(6). Moreover, New York violations meet the minimum constitutional requirements for criminal convictions discussed by the BIA in *Matter of Eslamizar*, such as requiring the "beyond a reasonable doubt" standard of proof.[278] DHS recognizes that certain low-level crimes, which some States and localities do not term "misdemeanors," will be encompassed under the Federal definition of that term in this rule. However, DHS believes that the rule's standardized sentence-based definition helps DHS treat many different State and local offenses similarly for DACA purposes, rather than relying on the many variations of terminology and classifications in State and local penal codes.[279] For these reasons, DHS declines to change this rule to exclude New York violations from being considered misdemeanors for DACA purposes.

Driving Under the Influence (DUI) Convictions

*Comment:* Multiple commenters recommended eliminating misdemeanor DUI convictions as an automatic bar to DACA, and several recommended instead a case-by-case review. One commenter said that including a DUI conviction is extreme, and that there should be allowances for one bad experience.

Another commenter suggested that DHS clarify its DUI restrictions under the proposed rule. The commenter stated that DUI charges should be reviewed on a case-by-case basis, or at a minimum the rule should provide that a DUI with no aggravating factors is an exception, because a DUI can have varying degrees of threat and culpability. The requestor also recommended including an exception for requestors under age 21 with a DUI conviction, absent aggravating factors on a case-by-case basis. Another commenter acknowledged that violent or drug crimes are a concern, but similarly stated that a single DUI should not be a bar to DACA and it is not an inadmissibility ground in other programs. A different commenter asked why the bar is so high for an undocumented person just to obtain DACA protections, when there are

---

[275] 86 FR 53766.

[276] N.Y. Crim. Proc. L. § 1.20(39). *See also Galenson* v. *Kirwan*, 324 N.Y.S. 2d 540, 541 (N.Y. Sup. Ct. 1971) (noting the revision of the N.Y. Penal Law that classified violations as petty or non-criminal offenses, but that retained criminal procedures and actions for trying and sentencing offenders).

[277] *See* N.Y Penal Law. § 10.00(3) ("A 'violation' means an offense, other than a 'traffic infraction,' for which a sentence to a term of imprisonment in excess of fifteen days cannot be imposed.")

[278] *See* 23 I&N Dec. 684, 687–88 (BIA 2004) (BIA provided helpful guideposts in assessing whether a conviction for an Oregon violation was a criminal conviction, including noting constitutional requirements of beyond a reasonable doubt standard of proof and the right to counsel where imprisonment is a possibility).

[279] State law is not controlling for Federal immigration purposes. *See, e.g., Franklin* v. *INS*, 72 F.3d 571(8th Cir. 1995).

AR2022_100273

lawyers with multiple DUIs that still hold their licenses.

Multiple commenters stated that DUIs have not been consistently or fairly adjudicated in DACA requests, which has led to erroneous denials and requests for evidence that are highly dependent upon the State in which the applicant resides. For example, the commenters said that: (1) some State laws criminalize sitting in a vehicle while inebriated, without attempting to operate it; (2) other States have statutes that criminalize offenses considered less than a "regular" DUI but that still have some element of impairment, or simply include the word "impairment" in the title, and these have been counted as DUI bars to DACA; and (3) yet other State laws do not require any finding of impairment of the ability to drive safely due to consumption of a substance, and some of these laws have been wrongly counted as a DUI and an automatic bar to DACA. The commenters concluded that because of this inconsistency, the rule should eliminate DUIs from the list of specific misdemeanors that would automatically bar someone from qualifying for DACA.

A commenter stated that, if DHS must continue to include DUIs in the list of enumerated misdemeanors, at minimum, it should clearly define that term to ensure consistent adjudication throughout the country. Because of the diverse State-law definitions of "DUI," the commenter wrote, requestors are erroneously denied due to a misdemeanor conviction that may constitute a DUI in one State but not another. The commenter said that a consistent definition would allow requestors to assess their eligibility and adequately prepare their requests with a full understanding of the consequences of their criminal convictions.

One commenter stated that a DUI is inappropriate as a categorically elevated misdemeanor given the array of circumstances covered and differential outcomes based on access to counsel and other means that depend on privilege and racial hierarchies. If DUI is included, the commenter suggested that elements of the offense should be defined to require either a blood alcohol content finding of 0.08 or higher or a finding of impaired ability to drive safely, noting that ICE has used such a definition. The commenter also recommended defining "impairment" as "to a degree that renders the operator incapable of safe operation."

A legal services provider stated that, despite having paid fees, attended court hearings, and participated in rehabilitation classes, several of its clients have either lost DACA protection

or been ineligible to apply. The commenter said that the uncertainty and upheaval to the lives of these individuals is immeasurable and further stated that individuals who seek to request DACA, and were otherwise eligible but for a single DUI conviction, will never have the opportunity to "rise out of the shadows" and take a path of greater success.

One commenter said that the DUI rule should be the same for DACA as it is for applying for citizenship to leave room for mistakes: if you have one in the last 5 years or two in the last 10 years, you cannot apply.

*Response:* DHS acknowledges commenters' suggestions to remove misdemeanor DUIs as disqualifying for DACA and instead consider such convictions on a case-by-case basis and to provide a clear definition of DUI for DACA purposes. DHS further notes commenters' concerns with inconsistent adjudications and variations in State law.

DHS maintains that for purposes of consideration under DACA and consistent with longstanding DACA policy, it remains appropriate for USCIS to consider a single DUI conviction disqualifying for DACA. The criminal criteria reflect a targeted approach to considering public safety concerns, identifying convictions that do not support the favorable exercise of enforcement discretion, and balancing the positive equities of the requestor population as reflected in other threshold criteria. As explained in the proposed rule and elsewhere in this section, DHS seeks to retain the threshold criteria of the DACA policy as applied by USCIS since 2012. DHS determined that the best approach to preserving and fortifying DACA, as directed by the Biden Memorandum, for these recipients, future similarly situated requestors, as well as their families, employers, schools, and communities, who have significant reliance interests in the continued existence of the DACA policy is to codify the existing threshold criteria.

Accordingly, DHS believes the criminal criteria as proposed, and as implemented for 10 years, enable USCIS to identify more readily those who are likely to be a low priority based on their positive equities and successfully advance DHS's important enforcement mission, and who are likely to continue to be a low priority under DHS's general enforcement priorities. DHS agrees with commenters that a clear definition of a DUI conviction for DACA purposes is valuable to promoting consistent adjudications, and longstanding internal guidance has provided such a

definition. However, DHS believes that such a definition is appropriately provided in subregulatory guidance to allow DHS the necessary flexibility to make revisions if changes in State laws or other circumstances make such adjustments necessary and appropriate. Accordingly, DHS will not make any revisions to 8 CFR 236.22(b)(6) as a result of these comments.

Domestic Violence

*Comment:* Multiple commenters recommended that the rule remove misdemeanor domestic violence convictions as a categorical bar to DACA, but most also stated that if the bar is retained, the rule should include a clear definition of a domestic violence offense for DACA purposes. Commenters noted that the lack of a definition has led to inconsistent adjudications and irrational bases for denials. Some of these commenters stated that, in practice, any misdemeanor related to a domestic conflict has been deemed a bar to DACA. The commenters said that consistent adjudications necessitate a definition of a domestic violence offense and a requirement that the person have been convicted of that offense. Also, the commenters reasoned, it is not possible for defense counsel to provide an adequate *Padilla*[280] advisal of the immigration effect of a plea without a clear definition of domestic violence. In addition, commenters said that DACA requestors who initially were charged with a domestic offense, but who were either convicted of a different offense not related to domestic conflict or never convicted of any offense at all, are routinely denied DACA.

Multiple commenters specifically recommended that DHS use the definition of a "crime of domestic violence" from INA sec. 237(a)(2)(E)(i), 8 U.S.C. 1227(a)(2)(E)(i), which requires conviction of a "crime of violence" (as defined in 18 U.S.C. 16(a)) in a qualifying domestic situation. One of the commenters said that definition "provides a relevant waiver for survivors of domestic violence who have a conviction but were not the primary perpetrators of violence in their relationships." Another of the commenters added that the new DHS enforcement priorities state that "a categorical determination that a domestic violence offense compels apprehension and removal could make victims of domestic violence more reluctant to report the offense conduct." Several commenters noted the potential impact of the bar on survivors of

---

[280] *Padilla* v. *Kentucky,* 559 U.S. 356 (2010).

domestic violence, stating that it is not uncommon for both the victim and perpetrator to be arrested, or for survivors of domestic violence to be convicted of crimes as a result of their victimization, and warned that perpetrators could potentially take advantage of the legal system to terrorize survivors.

One commenter suggested DHS abandon the domestic violence conviction exclusion and instead adopt a totality of circumstances approach with a presumption that an individual with a misdemeanor conviction for domestic violence who was not physically incarcerated for over 30 days be considered prima facie eligible for DACA.

*Response:* DHS acknowledges commenters' suggestions to remove misdemeanor domestic violence convictions as disqualifying for DACA and instead consider such convictions on a case-by-case basis and to provide a clear definition of domestic violence for DACA purposes, and DHS notes commenters' concerns with inconsistent adjudications and the exclusion's impact on victims of domestic violence.

DHS maintains that for purposes of consideration under DACA and consistent with longstanding DACA policy, it remains appropriate for USCIS to consider a single domestic violence conviction disqualifying for DACA. The criminal criteria reflect a targeted approach to considering public safety concerns, identifying convictions that do not support the favorable exercise of enforcement discretion, and balancing the positive equities of the requestor population as reflected in other threshold criteria. As discussed above, DHS does so in recognition that a central purpose of this rulemaking is to preserve and fortify DACA as directed by the President's memorandum, and modifications to the threshold criteria related to criminal history, public safety, and national security could invite additional challenges to the policy. DHS therefore does not believe that changing the threshold criteria best serves it purpose of preserving the policy for those DACA recipients and other similarly situated individuals who have not yet requested DACA, and their families, employers, schools, and communities, all of whom have significant reliance interests in the continued existence of the DACA policy. Accordingly, DHS believes the criminal criteria as proposed, and as implemented for 10 years, enable USCIS to identify more readily those who are likely to be a low priority based on their positive equities and successfully advance DHS's important enforcement

mission. The DHS Enforcement Guidelines acknowledge that a categorical determination that domestic violence offenses compel apprehension and removal could make victims more reluctant to report offenses; however, this is provided as an example in the Enforcement Guidelines of how the broader public interest is material in deciding whether to take enforcement action in a particular case, noting the specific facts of the case should be determinative. As noted in the NPRM and elsewhere in this rule, the threshold DACA criteria and DHS's broader enforcement priorities may not always perfectly align, as DHS has determined that to best preserve and fortify DACA, it is beneficial to maintain the longstanding threshold criteria rather than to tie the criteria to the specific DHS enforcement priorities in place at a given time. Regardless, the approach to domestic violence convictions reflected in this rule is still generally consistent with the spirit of the DHS Enforcement Guidelines: while the threshold criteria serve as important benchmarks for consideration of DACA, they do not prevent or replace a case-by-case weighing of all relevant factors by USCIS adjudicators, just as the DHS Enforcement Guidelines emphasize case specific determinations. DHS agrees with commenters that a clear definition of a domestic violence conviction for DACA purposes is valuable to promoting consistent adjudications, and longstanding internal guidance has provided such a definition. However, DHS believes that such a definition is appropriately provided in subregulatory guidance to allow DHS the necessary flexibility to make revisions if changes in State laws or other circumstances make such adjustments necessary and appropriate. Accordingly, DHS will not make any revisions to 8 CFR 236.22(b)(6) as a result of these comments.

Minor Traffic Offenses

*Comment:* Several commenters generally stated that minor traffic offenses should not be added as disqualifying offenses for DACA purposes, as a minor traffic offense does not make someone a high priority for enforcement and would open the door for disproportionately punishing communities of color, which are generally targeted by law enforcement. Numerous commenters supported including a definition of "minor traffic offenses" to prevent arbitrary deprivation of DACA and help prevent a minor traffic violation from being incorrectly deemed a misdemeanor. Multiple commenters recommended

that the rule define "minor traffic offenses" as any traffic-related infraction, misdemeanor, or felony where there was no serious bodily injury to a third party, including driving without a license, driving on a suspended license, driving without insurance, and violating traffic regulations such as speeding, regardless of the level of offense under State law—noting that Florida, Georgia, Illinois, Indiana, Kentucky, and Missouri all classify driving without a license as a felony. In contrast, one commenter discouraged DHS from defining "minor traffic offenses" and opposed including language that permits USCIS to consider such offenses in its discretion, stating that State traffic and criminal codes create consequences that are proportionate to the violation and the threat of deportation should never be a consequence of a minor traffic offense.

Multiple commenters stated that minor traffic offenses should explicitly be excluded from consideration in a totality of circumstances analysis, in addition to being excluded from triggering misdemeanor or felony bars, but stated that where a traffic offense does involve serious bodily injury, USCIS should use a totality of circumstances analysis to determine if a favorable exercise of prosecutorial discretion is warranted. Commenters stated that undocumented individuals face disproportionate barriers to obtaining driver's licenses, which they said directly leads to higher instances of traffic-related offenses. Commenters also noted that police officers are more likely to stop drivers of color than white drivers and that consideration of racially disparate minor traffic offenses in a totality of circumstances analysis compounds the racist impact of such traffic stops on communities of color. One commenter stated that minor traffic offenses are irrelevant to the objectives of DACA or any applicant's fitness.

A commenter said that the proposed rule eliminates the "minor traffic offenses" exception that always has existed and that this change would be "fatal" to new applicants, as almost any young immigrant who has been here since 2007 has had three or more traffic tickets. The commenter stated that the preamble language about considering minor traffic offenses in the totality of circumstances contradicts the unambiguous and mandatory language of the proposed rule, and officials would be obliged to follow the rule. The commenter also said that this provision would result in unequal treatment of immigrants, depending on where they live and whether their State allows licenses for undocumented immigrants.

D. App. 082

*Response:* DHS acknowledges commenters' support for adopting a definition of minor traffic offenses in light of the variations in State laws, the suggested definition some commenters provided, and other commenters' recommendation that such offenses be explicitly excluded from consideration in a totality of circumstances analysis. DHS notes that some commenters misunderstood the request for comments on whether to add a more detailed definition of minor traffic offenses to the rule as a request for comments on whether to make minor traffic offenses disqualifying offenses in the rule. DHS does not intend to treat minor traffic offenses as per se disqualifying for DACA purposes; rather, DHS will consider such offenses in the totality of circumstances to determine if a DACA requestor merits a favorable exercise of prosecutorial discretion. DHS disagrees with the suggestion that the rule prohibit USCIS from considering such offenses at all, as excluding particular factors is generally inconsistent with a totality of circumstances approach.

DHS maintains that for purposes of consideration under DACA and consistent with longstanding DACA policy, it remains appropriate for USCIS to consider a requestor's entire offense history along with other facts to determine whether, under the totality of circumstances, an individual warrants a favorable exercise of enforcement discretion. The criminal criteria, including the ability to consider an individual's entire offense history, reflect a targeted approach to considering public safety concerns, identifying convictions that do not support the favorable exercise of enforcement discretion, and balancing the positive equities of the requestor population as reflected in other threshold criteria. As explained above, DHS has determined that retaining the existing threshold criteria is the appropriate mechanism by which to preserve and fortify the DACA policy. In weighing the interests of preserving the policy to ensure its continued existence against altering the threshold criteria, DHS believes the criminal criteria as proposed, and as implemented for 10 years, enable USCIS to identify more readily those who are likely to be a low priority based on their positive equities and successfully advance DHS's important enforcement mission. DHS agrees with commenters that a clear definition of minor traffic offenses for DACA purposes is valuable to promoting consistent adjudications. However, upon consideration, DHS

believes that such a definition is appropriately provided in subregulatory guidance to allow DHS the necessary flexibility to make revisions if changes in State laws or other circumstances make such adjustments necessary and appropriate. Accordingly, DHS will not make any revisions to 8 CFR 236.22(b)(6) as a result of these comments.

Immigration-Related Offenses

*Comment:* One commenter stated that the final rule should codify the exception for immigration-related offenses in the regulatory text, as USCIS officials would be bound by the regulatory text, not the policy statements in the preamble to the **Federal Register** notice. Another commenter said that criminal exclusions should not be based on immigration-related conduct, as the proposal rightly recognizes in eliminating immigration-related offenses characterized as felonies or misdemeanors under State laws. The commenter said that one of the starkest examples of criminalizing immigrants is Federal law on border crossings and recommended removing convictions under 8 U.S.C. 1325 (improper entry) and 1326 (reentry of removed individuals) from consideration.

*Response:* As explained in the preamble to the NPRM, DHS intends to continue its longstanding policy that convictions under State laws for immigration-related offenses will not be treated as disqualifying crimes for the purposes of considering a request for DACA. Although the NPRM did not propose to codify this exception in the regulatory text and instead only referenced the exception in the preamble, because 8 CFR 236.22(b)(6) specifies that a requestor must not have been convicted of a felony, misdemeanor as described, or three or more other misdemeanors and this is an exception to that general premise, DHS agrees with the commenter's suggestion that this exception for State-level immigration-related offenses should be codified in the regulatory text. Accordingly, DHS is revising 8 CFR 236.22(b)(6) to include this exception.[281] While DHS acknowledges that certain federal statutes criminalize unlawful entry and re-entry, such regulation in the field of immigration is properly within the realm of the federal government, in contrast with State-level immigration offenses which may be preempted.[282] DHS therefore has

determined it is appropriate to consider federal immigration-related criminal offenses in determining whether the DACA criteria are met. Of course, where appropriate, DHS may consider such offenses when exercising discretion in individual cases.

(7) Age at Time of Request

*Comment:* A number of commenters suggested that DHS should remove the proposed rule's criterion that DACA requestors were born on or after June 16, 1981, (''upper age limit'') and are at least 15 years of age at the time of filing their request (''lower age limit''), unless, at the time of filing their request, they are in removal proceedings, have a final order of removal, or have a voluntary departure order.

Some commenters recommended eliminating the age limits to include requestors who meet all other requirements. Many of these commenters described the age limits as arbitrary and stated that they unfairly bar individuals from requesting DACA based on their age when DACA was announced, which is no fault of their own. Other commenters said the age limits disregard the benefits of protection for requestors under 15 years old and the continued necessity of protection for individuals who were older when DACA first was implemented.

Some commenters who suggested removing the upper age limit reasoned that childhood arrivals excluded by this limit have been living in the United States for more than 15 years without any immigration relief, that the limit goes against equal protection and law, and that it divides families and prevents individuals who have resided in the United States for decades longer than DACA recipients from receiving protections. Other commenters said that eliminating the upper age limit would particularly benefit older noncitizens who are more likely to have U.S. citizen children, and that doing so also would benefit older adult learners. Other commenters said that removing this age cap would further DACA's goal by addressing an arbitrary date that excludes many otherwise eligible requestors and would allow people who already are not enforcement priorities to receive lawful status and work authorization. Some commenters stated that DHS previously attempted to remove this age cap in a 2014 memorandum that was rescinded following the 2016 *Texas* opinion, partially due to failure to comply with the APA. The commenters said that nothing precludes the agency from

---

[281] *See* new 8 CFR 236.22(b)(6).

[282] *See, e.g., Arizona* v. *United States*, 567 U.S. 387 (2012).

removing this age cap through the instant notice-and-comment process.

Several commenters also urged DHS to remove the lower age limit, stating that parents want relief from deportation for their children as early as possible, and that opportunities for growth and development, such as school field trips, job opportunities, and driver's permits, arise before a child turns 15. Additionally, the commenters said that high school students pursuing a college education would benefit from having DACA and using their EAD and State identification card to prove their identity when taking college admission exams, and to be able to list a Social Security number on college applications. Likewise, some commenters who supported eliminating the lower age threshold stated that work authorization is important to youth in agricultural communities where the Fair Labor Standards Act allows children as young as age 12 to work in agriculture. Another commenter said the lower age cap leaves many young noncitizens with the fear of deportation, leading to poor mental health outcomes.

Some commenters stated that the age at time of request requirements impose undue barriers for requestors and should be revised. A couple of commenters suggested lowering the minimum age requirement for requestors and providing protections to children from removal until they are eligible to request DACA.

Other commenters discussed the exclusionary effects of the age restrictions and suggested that USCIS revise the age criterion to include noncitizens who were not above the age of 35 on June 15, 2012. Citing sources, one commenter discussed multiple benefits of raising the maximum age of requestors to 35, including a strengthened economy, less spending on enforcement, and improved access to healthcare for a greater number of immigrants. A commenter reasoned that not updating the outdated age eligibility criteria would have negative consequences on the health, well-being, and growth of undocumented individuals, their families, communities, and the economy. Other commenters stated that changing the dates and removing the age cap to expand eligibility would demonstrate to Congress the need for legislation to preserve and fortify DACA.

*Response:* DHS appreciates the many suggestions of commenters to modify or remove the upper and lower age caps in the threshold criteria and recognizes that the criteria exclude certain noncitizens who arrived as children from consideration for DACA deferred

action and employment authorization and delays it for otherwise eligible noncitizens until age 15. DHS agrees that it has legal authority to modify or remove these age caps through notice-and-comment rulemaking. However, as discussed elsewhere in the NPRM and this rule, DHS has determined as a matter of policy to focus this rulemaking on preserving and fortifying DACA by generally retaining the threshold criteria of the Napolitano Memorandum. Retaining the criteria fortifies the longstanding policy upon which the DACA population and their families, employers, schools, and communities have relied for a decade.

### (8) General Comments on Criteria and Comments on Multiple Overlapping Criteria

#### DACA Eligibility Criteria Related to Age and Dates Should Be Expanded

*Comment:* Commenters suggested that DHS change certain guidelines so that the proposed rule and DHS's Enforcement Guidelines correspond with one another, and so that DHS can concentrate its resources on border security. Specifically, the commenters recommended that DHS remove the age cap and require that requestors have continuously resided in the United States since November 1, 2020, to the time of filing the request; were physically present in the United States on the date of enactment of the proposed rule, as well as at the time of filing the request; and had no lawful immigration status on the date of enactment of the proposed rule, as well as at the time of filing of the request.

Another commenter suggested that work authorization be expanded to include recipients regardless of status to add additional security to the lives of recipients and their families.

*Response:* DHS acknowledges these commenters' suggestion to amend certain threshold criteria to align with the Secretary's enforcement priorities as defined in the Enforcement Guidelines. However, DHS reiterates that it is issuing this rule to preserve and fortify the DACA policy, to ameliorate legal uncertainty, and to clarify criteria for the DACA population, which, along with their families, employers, and communities, has significant reliance interests in DACA. Nor could DHS extend employment authorization to any non-DACA population through this rulemaking due to its limited scope. DHS therefore declines to make changes to the rule in response to this comment.

#### High Bar for DACA Recipients

*Comment:* A commenter said that multiple criteria, including criminal history and education, are a higher bar for DACA recipients than for the rest of the U.S. population. Another commenter said that DACA recipients have registered themselves to be under a microscope—they have given up their personal information and agreed to a higher standard than the average citizen.

A commenter stated that DACA has stricter requirements than does the process of adjustment of status or naturalization, which negatively impacts young people and their families. The commenter urged DHS to view DACA recipients as future U.S. citizens and, thus, ensure that the eligibility requirements are not stricter than those for adjustment of status or naturalization since strict requirements do not influence whether a DACA recipient ultimately will gain citizenship.

*Response:* DHS acknowledges these commenters' statements and suggestions. DHS reiterates that this rule is a reflection of the Department's authority to identify a target population—and the threshold criteria for inclusion in this target population—for deferred action as an exercise of prosecutorial discretion. DHS agrees that, by virtue of requesting DACA, requestors must provide personal information and have the burden to establish they satisfy threshold eligibility criteria and otherwise merit the favorable exercise of discretion. DHS reiterates that DACA is a form of time-bound deferred action, which requires an assessment of positive and negative discretionary factors. DHS notes that the eligibility criteria for benefit classifications such as adjustment of status and naturalization are outside the scope of this rulemaking, and disagrees that criteria for DACA, an exercise of prosecutorial discretion, necessarily should align with the criteria for adjustment of status or naturalization. DHS therefore declines to make changes to the rule in response to these comments.

#### Other Comments

*Comment:* Multiple commenters recommended that the final rule should explicitly state USCIS will accept new requests to prevent ambiguity caused by previous court decisions that kept USCIS from accepting new requests. Some of these commenters wrote that many more people would qualify for this vital policy if they are able to apply, and these future recipients should not be excluded as they merit the same

favorable exercise of discretion. Another commenter said that it supports DHS's decision to apply the proposed rule to both current and future DACA requestors, as both groups have reliance interests and should not be denied significant opportunities afforded by DACA.

One commenter stated that it assumed an extension of time would be given to requestors who missed a qualification deadline during the time of the July 16, 2021 injunction.

A commenter said that the proposed rule fails to provide alternatives to its narrow and outdated coverage. Another commenter stated that it disagreed with the notion that DACA's coverage cannot be expanded due to the reliance interests of previous recipients of DACA and those similarly situated who have not yet requested DACA.

*Response:* DHS acknowledges these commenters' concerns but for reasons expressed throughout this preamble, DHS believes the scope of this rule is amply justified. DHS does not assert in this rulemaking that reliance interests prohibit DHS from altering the criteria set forth in the Napolitano Memorandum. Rather, as explained in this rule, this focus on reliance interests and preservation of the primary features of the policy is consistent with the President's directive to preserve and fortify DACA, as well as the Supreme Court's decision in *Regents,* as described above. Further, DHS also has determined that the criteria contained in the Napolitano Memorandum successfully advance DHS's important enforcement mission and reflect the practical realities of a defined population of undocumented noncitizens who, because of limited enforcement resources are unlikely to be removed in the near future and who contribute meaningfully to their families, their communities, their employers, and the United States generally, as discussed elsewhere in this rule. Moreover, the establishment and continued application of these threshold criteria, while allowing for the residual exercise of discretion to account for other relevant considerations, serves to promote consistency and avoid arbitrariness in these determinations. Finally, because this final rule codifies longstanding threshold criteria, DHS does not believe any requestors impacted by the *Texas* decision have qualification deadlines that would need extension upon implementation of this rule. DHS therefore declines to adopt changes in response to these comments.

*Comment:* A commenter expressed support for DACA but recommended that DHS pick a date and, from that day forward, no person, including children, should be allowed to remain in the United States without lawful status.

*Response:* The comment is outside the scope of the proposed rule. DHS nonetheless acknowledges this commenter's suggestion, and emphasizes that it enforces the immigration laws consistent with available resources, statutory requirements, and agency priorities, including a particular focus on those who pose a threat to our national security, public safety, and border security. However, DHS maintains authority to exercise prosecutorial discretion and defer the removal of noncitizens lacking lawful status. DHS declines to make changes to the rule in response to this comment.

5. Procedures for Request, Terminations, and Restrictions on Information Use (§ 236.23)

a. Fees and Fee Waivers

Fees Are Too Low

*Comment:* A commenter stated that the proposed $85 DACA filing fee was too low and recommended that this fee should be at least $250. Another commenter recommended a larger one-time fee. A commenter stated that DACA requestors should at least pay the full cost of adjudicating their cases plus a surcharge to fund enforcement and restitution initiatives. The commenter went on to cite figures relating to USCIS' backlog. The commenter also stated that USCIS disclosed to Congress in 2018 that to fund DACA processing, the agency dipped into funds from application fees of lawful visa applicants and their sponsors. The commenter further remarked that the fee proposed in the NPRM for the Form I–821D is woefully insufficient to cover the costs associated with adjudicating a DACA request. The commenter reasoned that the cost of processing an initial DACA request is $446 and the cost of processing a DACA renewal request is $216, yet the proposed rule only requires DACA requestors to pay an $85 fee to cover the cost of fingerprinting, essentially making the cost of adjudication free to the requestor.

Another commenter stated that USCIS may make $310 less per DACA request for any number of requests, which could diminish the agency's budget by $34.9 million annually, or $384 million over the next 11 years. The commenter said that the proposed restructuring of the fees would make it nearly impossible for USCIS to meet its obligation for ensuring that the USCIS has enough capital to cover the total cost of full adjudication for each request considered, which is $332, and USCIS would recover only $85 of this potential cost from each request. The commenter remarked that, under the proposed fee restructuring, each request would recover $247 less than the potential cost of full adjudication, and that the proposed rule acknowledges that, under the current structure, USCIS would charge $93 million less than the estimated full cost of adjudication for every DACA request received annually. The commenter stated that the final rule should include evidence to justify the risks of the proposed rule for funding USCIS operations. The commenter further stated that estimating how many requestors would no longer apply for employment authorization under the proposed fee restructuring would allow for more accurate estimates of the total losses that USCIS would face. A commenter asked if the Government would be affected financially by the drastic reduction in the cost of DACA requests, or if the change would be negligible. Another commenter remarked that more research is needed to justify how restructuring fees may affect USCIS operations that rely on those fees for funding.

*Response:* As explained elsewhere in greater detail, this rule is amending DHS regulations to codify the existing requirement that requestors file Form I–765, Application for Employment Authorization, which currently requires a $410 fee, with Form I–821D, Consideration of Deferred Action for Childhood Arrivals, and reclassifying the $85 biometric services fee as a Form I–821D filing fee, to recover any additional DACA adjudication costs.[283] In the NPRM and Supplemental Cost Methodology Document, DHS explained that the current $85 fee for DACA would not recover the full costs for individuals who did not request an EAD and pay the full costs of the Form I–765. 86 FR 53764. At the time USCIS conducted its cost analysis for the proposed rule, it estimated that the unit cost of Form I–821D was $332. *Id.* This represents the most recent unit cost estimates for Form I–821D.

USCIS cost estimates may change over time. New information may be available, such as more recent receipts or adjudication hours. Estimates may use different assumptions. For example, the Supplemental Cost Methodology Document in the NPRM docket did not distinguish between initial and renewal DACA requests. However, the older USCIS cost estimate cited by a commenter relied on older information

[283] *See* new 8 CFR 236.23(a)(1).

and distinguished between initial and renewal DACA requests.[284] That old estimate used draft FY 2019–2020 fee rule information. The published proposed rule for the FY 2019–2020 fee rule had different results than the draft cited by the commenter. In the supporting documentation accompanying the FY 2019–2020 proposed fee rule, USCIS estimated the unit cost for Form I–821D was $273.[285] Ultimately, DHS removed DACA fees [286] from the final fee rule, which was later enjoined.[287] DHS maintains its position that the $332 in the NPRM and Supplemental Cost Methodology Document represents a reasonable estimate of the Government's costs of processing these forms. In the future, DHS plans to propose new USCIS fees in a separate rulemaking after reviewing fees for Form I–765 and other immigration benefit requests.[288] DHS determined that the cost for adjudicating concurrently filed Forms I–765 and I–821D, as required in this final rule, is a negligible increase in costs compared to the $332 estimated in the NPRM for adjudicating Form I–821D alone. USCIS determined there is a negligible workload difference between adjudicating Form I–821D alone and the combined Forms I–821D/I–765 DACA adjudicative action.[289] As such, DHS determined the $332 estimated cost in the NPRM is reasonable to use for the final rule. DACA requestors will therefore be covering the full cost of adjudicating a DACA request and should not create a deficit in USCIS' budget. However, DHS disagrees that DACA filing fees should include a surcharge to fund enforcement and restitution initiatives because DHS has an interest in ensuring that requests for DACA are accessible to those who may

meet threshold criteria. As discussed throughout this rule, the DACA policy reflects an appropriate use of the Department's resources to exercise deferred action for a specific population of individuals who are low priorities for removal. As discussed elsewhere, it serves DHS's interest in conserving enforcement resources when the DACA policy is accessible for those who are potentially eligible to come forward to submit requests so that DHS can conduct background checks and determine whether they merit the exercise of prosecutorial discretion and thereby conserve other congressionally appropriated resources for higher priority enforcement uses.

Fees Are Too High

*Comment:* By contrast, many commenters stated that DACA-related fees are too high and urged DHS to reduce them to make DACA more accessible. Commenters stated that many requestors come from low-income backgrounds and struggle to cover the costs. Others noted that the COVID–19 pandemic has resulted in a loss of work for many, while many DACA recipients continue to work in essential roles, with one commenter noting that DACA recipients with front-line jobs have endured additional costs related to acquiring Personal Protective Equipment and covering the costs of their own healthcare due to exclusions from ACA subsidies. Many commenters stated that requiring individuals to pay $495 in fees to renew DACA every 2 years presents a challenging financial burden. A commenter stated that the cost of filing the request for deferred action together with the application for work authorization should be reduced to a level that is realistically affordable to DACA-eligible requestors based on their age and level of income. The commenter said that the fees for deferred action and work authorization together amount to 69 hours of work at the Federal minimum wage rate, and there is no fee waiver available. The commenter stated that because the forms are lengthy, with legal jargon and generally confusing language, many requestors need filing assistance, with associated costs as high as $900. In addition to the costs of filing fees and filing assistance are the costs for obtaining documents, making copies, and mailing them. Other commenters cited research from the Migration Policy Institute indicating that fees remain a barrier to DACA renewal and that an estimated 35 percent of DACA eligible individuals live in families with incomes less than 100 percent of the Federal Poverty Line. Commenters

expressed concern that requestors often seek private loans that later develop into more challenging financial burdens. Other commenters cited data that 36 percent of DACA recipients reported a delay submitting their request to raise funds. A number of commenters stated that the fees created barriers to employment and would lead otherwise eligible noncitizens to engage in unauthorized employment.

*Response:* DHS acknowledges these commenters statements related to DACA related fees. DHS recognizes that the $85 Form I–821D filing fee, proposed to replace the existing $85 biometrics fee, coupled with the current $410 Form I–765 filing fee, may present a financial barrier to otherwise eligible requestors. However, DHS disagrees with comments that fees are arbitrarily determined. As stated in the NPRM, DHS recognizes that many DACA requestors are young adults who are vulnerable because of their lack of immigration status and may have little to no means to pay fees associated with a DACA request. DHS also acknowledges that DACA-eligible noncitizens may have a variety of financial burdens that make it difficult to afford the fees. DHS has accounted for filing costs to the requestors in the RIA, including the time burden for completing the request, costs related to assistance in completing and filing a DACA request, travel costs, and filing fees.

USCIS is funded primarily by immigration and naturalization benefit request fees charged to applicants and petitioners and must balance the need to recover some of the costs of reviewing DACA requests with the humanitarian needs of the DACA requestor population. As discussed in the NPRM and in this rule, DHS proposed to eliminate the DACA biometrics fee, replace it with an $85 Form I–821D filing fee, and unbundle the Forms I–821D and I–765 as a mechanism to recover some costs of adjudicating these requests while providing an option that would reduce financial barriers to DACA requestors. However, as discussed Section II.C.2.c, after careful consideration of comments, DHS has made changes in the rule to codify the existing bundled form requirements, thus requiring requestors to concurrently file Form I–821D with associated $85 filing fee, Form I–765 with associated $410 filing fee (currently set at $410), and Form I–765WS. DHS has determined this fee structure to be reasonable because it fully recovers adjudicatory costs. DHS has already determined, as explained in the NPRM and in the context of the unbundled filing process proposed, that it is in the

---

[284] USCIS, *USCIS Responses to the Congressional Research Service* (Oct. 2018), *https:// www.uscis.gov/sites/default/files/document/ questions-and-answers/USCIS_Responses_to_ Congressional_Research_Service_CRS_Questions_ on_DACA_Costs.pdf*.

[285] See USCIS, *FY 2019/2020 Immigration Examinations Fee Account: Fee Review Supporting Documentation* (Apr. 2019), *https:// www.regulations.gov/document/USCIS-2019-0010- 0007*. On page 24, the Model Output column of Appendix Table 3, Proposed Fees by Immigration Benefit Request, is $273 for Form I–821D. Model Output is the projected total cost from the ABC model divided by projected fee-paying volume. It is only a unit cost forecast (using a budget) and not the actual unit cost (using spending from prior years). USCIS does not track actual costs by immigration benefit request.

[286] 85 FR 46801.

[287] See 85 FR 46788 (Aug. 3, 2020) and 86 FR 7493 (Jan. 29, 2021).

[288] See 87 FR 5241.

[289] See Table 3 of the Supplemental Cost Methodology Document and the subsequent paragraph on page 8.

public interest to hold the fee for Form I–821D, Consideration of Deferred Action for Childhood Arrivals, below the estimated full cost of adjudication. But DHS has not so determined for the Form I–765, Application for Employment Authorization, which is filed by millions of noncitizens outside the DACA population. Additionally, as DACA is an act of enforcement discretion designed to allow DHS to focus enforcement resources on higher-priority cases, DHS believes it is appropriate for DACA recipients to cover the cost of adjudicating their requests. DHS therefore declines to make changes to the fee amounts proposed in the NPRM.

Need for Fee Waivers

*Comment:* In light of the financial hardship fees present many DACA requestors, many commenters urged DHS to permit DACA requestors to request a waiver or reduction of the filing fee, in addition to the existing limited fee exemption criteria. One commenter suggested eliminating the fees completely or, at a minimum, providing a fee waiver. A commenter cited data stating that naturalization almost doubled when eligible applicants were offered a fee waiver and increased by 30 percent when they were simply informed of their eligibility for a fee waiver. One commenter supported a fee waiver, even if it requires raising the overall fee for DACA requests to cover the adjudication costs of those who cannot pay.

Commenters proposed a variety of approaches to expand fee waiver access to the DACA population. Some commenters suggested a "hardship waiver" for individuals under economic or employment difficulties, including challenges affording secondary education, especially with the lack of access to Federal and State tuition aid, or those who are forced to prioritize other costs, such as childcare. Other commenters recommended reduced fees for individuals not interested in work authorization, especially students; and fee waivers for employment authorization applications. A commenter suggested replacing fee exemptions before applications with regular fee waivers simultaneous to applications. A commenter suggested that DHS can allow the fee waiver by amending 8 CFR 106.3 to add a paragraph providing that DACA requestors may apply for a waiver of any fees for DACA and any associated filing. Another commenter reasoned that the hardship of a recurring fee for DACA renewal requestors is considered an

emergent circumstance that allows for USCIS to authorize a fee waiver.

*Response:* DHS acknowledges commenters' suggestion to make fee waivers broadly available to DACA requestors. DHS recognizes that fee waivers may make DACA more accessible to eligible noncitizens who may have insufficient resources to pay DACA related fees. The INA authorizes DHS to establish and collect fees for adjudication and naturalization services to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants."[290] Through the collection of fees established under that authority, USCIS is funded primarily by immigration and naturalization fees charged to applicants, petitioners, and other requestors.[291] As discussed above, DHS is adopting in this rule the existing bundled process and fee structure that includes filing fees associated with the Form I–821D, Consideration of Deferred Action for Childhood Arrivals, and the Form I–765, Application for Employment Authorization.

DHS recognizes that some DACA requestors face economic hardship that impacts their ability to pay the required fees, but notes that DACA, as an exercise of prosecutorial discretion that allows DHS to focus limited resources on higher priority cases, is not an immigration benefit or associated filing authorized for fee waiver under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and that it is appropriate for beneficiaries of this enforcement discretion to cover the cost of adjudication.

In the NPRM, USCIS estimated the full cost for processing Form I–821D using the agency's established cost methodology and the available parameters at the time of the review.[292]

USCIS estimated that the total cost of adjudicating Form I–821D is approximately \$125.9 million. USCIS assumed that all DACA requestors in the workload would pay the fee.[293] Dividing the total cost by the estimated DACA workload resulted in a unit cost of approximately \$332 each, as illustrated in Table 4 of the of the Supplemental Cost Methodology Document. If some DACA requestors received fee waivers, then that would decrease the fee-paying workload and increase the unit cost. For example, if only 50 percent of DACA workload paid the fee, then the unit cost would be approximately twice as high because of the lower divisor.[294] USCIS uses 50 percent for illustrative purposes only. USCIS does not know how DACA fee waivers would affect fee-paying receipts. Based on FY 2021 revenue and receipts, USCIS estimates that approximately 44 percent of Form I–765 filings unrelated to DACA paid the \$410 fee. USCIS analysis indicated that approximately 77 percent of the TPS population may have paid the fee for Form I–765 because these individuals have a valid EAD as of April 12, 2021. Using any of these fee-paying percentages would reduce DACA revenue estimates.

DHS estimates that making fee waivers available to DACA requestors for Form I–765 would result in a reduction of approximately \$72,324,000 and \$100,105,600 in fees paid in FY 2022 and 2023, respectively, from the current policy permitting only limited fee exemptions. DHS must carefully balance the interest of making DACA available to those who may meet the criteria with the need for adequate resources to process requests efficiently and effectively. A reduction in fees collected would either negatively impact processing times or require increased fee amounts paid by others to offset revenue diminished by waived fees. In weighing these important interests, and in line with President Biden's directive to preserve and fortify DACA, DHS has determined that maintaining the existing fee structure with limited fee exemptions strikes the appropriate balance. For these reasons, DHS declines to modify the rule to extend fee waivers for DACA and related work authorization requests.

Fee Exemptions

*Comment:* Several commenters urged DHS to broaden its DACA fee exemption

---

[290] INA sec. 286(m), 8 U.S.C. 1356(m).

[291] On August 3, 2020, DHS published a final rule, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements* (hereinafter 2020 Fee Schedule Final Rule), which was to be effective October 2, 2020. 85 FR 46788 (Aug. 3, 2020). The 2020 Fee Schedule Final Rule, among other things, established a new USCIS fee schedule and effectively transferred the USCIS fee schedule from 8 CFR 103.7(b) to the new 8 CFR part 106 at 8 CFR 106.2, *Fees.* However, before the 2020 Fee Schedule Final Rule took effect it was enjoined. *See Immigr. Legal Resource Ctr.* v. *Wolf,* 491 F. Supp. 3d 520 (N.D. Cal. 2020); *Nw. Immigrant Rts. Proj.* v. *USCIS,* 496 F. Supp. 3d 21 (D.D.C. 2020). At this time, DHS is complying with the terms of these orders and is not enforcing the regulatory changes set out in the 2020 Fee Schedule Final Rule, including the specific fees found in 8 CFR 106.2. 86 FR 7493 (Jan. 29, 2021). Nothing in this proposed rule proposes any change to that ongoing compliance.

[292] *See* Supplemental Cost Methodology Document.

[293] *Id.* at 8.

[294] *Id.* at 8–9. In Table 4, the Total Cost of Form I–821D Activities and Cost Objects is \$125,853,334. The unit cost is the total cost divided by 379,500. The calculation for the 50 percent example is \$125,853,334/(379,500 * 50%) = \$663.26.

AR2022_100280

policy. Commenters also suggested DHS should, at minimum, codify the availability of fee exemptions for DACA and DACA-related EADs, stating that fee exemptions are a valuable failsafe for eligible individuals, and fee waivers should be available to the DACA requestor population to facilitate their entry into the workforce. The commenters took the position that adding a provision to the rule stating fee exemptions will be available under certain circumstances will help to ensure that the fee exemptions will remain available to requestors. The commenters provided draft language for the proposal at 8 CFR 263.23(a)(5) to clarify the availability of fee exemptions for DACA-related application for employment authorization. Some commenters suggested codifying the availability of fee exemptions and expanding to a broader group of people, such as children under age 18, similar to the policies for U Nonimmigrant Status petitioners or VAWA self-petitioners.

*Response:* DHS acknowledges these commenters' suggestion to codify and broaden its DACA fee exemption criteria. DHS agrees fee exemptions are necessary in some situations. Under current policy and practice, a requestor may be considered for a fee exemption if they submit a letter and supporting documentation to USCIS demonstrating that they meet one or more of the following circumstances: (1) their annual income is less than 150 percent of the U.S. poverty level, they are under 18, and are either homeless, in foster care or otherwise lacking any parental or other familial support; (2) they cannot care for themself because they suffer from a serious, chronic disability and their income is less than 150 percent of the U.S. poverty level; or (3) they have, at the time of the request, accumulated $10,000 or more in debt in the prior 12 months as a result of unreimbursed medical expenses for themself or an immediate family member, and their income is less than 150 percent of the U.S. poverty level.[295] As discussed in this rule, DHS must carefully weigh the interest of access to DACA with the need to collect fees at a level that ensures recovery of the full cost of providing immigration services except under very limited circumstances. DHS has determined that the current fee structure with limited fee exemptions strikes the appropriate balance. For these reasons, DHS declines to modify the rule to codify or expand fee exemptions for DACA and related work authorization requests.

DHS has further determined that subregulatory guidance provides the best vehicle for fee exemption guidance so that DHS maintains flexibility to retain or modify such agency procedures as necessary in the future, and thus declines to modify the rule to codify the existing fee exemption guidance.

Other Alternatives To Reduce the Fee Burden

*Comment:* A commenter recommended reducing the total fee for DACA by half if DHS does not lengthen the 2-year validity period for DACA related EADs. Another commenter suggested that fee waivers should be available to DACA renewal requestors, if not available for all requestors. A different commenter suggested that all fees should be capped at $250 and that the fee for associated advance parole requests be reduced or eliminated. Other commenters suggested that DHS reallocate funds to provide financial assistance and fee waivers for DACA requestors. Another commenter who suggested that the DACA request should be free and reasoned that any lost revenue could be replaced by dissolving ICE and its subsidiary departments. Other commenters suggested that fees should be as minimal as possible to still maintain the necessary DHS funding. Another commenter suggested that renewal fees for DACA should be less than the initial request fees because it should not take as much labor to review renewal requests. A different commenter said that the $85 fee for Form I–821D is appropriate if it is entirely devoted to application processing but suggested a reduction to the EAD fee. The commenter recommended mitigating costs as much as possible to facilitate employment.

A commenter suggested that DHS base fees on the requestor's age and income. Other commenters recommended establishing a family plan to ease the financial burden on families that must file separately for individual family members.

*Response:* DHS acknowledges the suggestions raised by these commenters. As discussed above, DHS has carefully considered the DACA fee structure, weighing the interests in recovering the costs of adjudicating these requests and in reasonably mitigating financial barriers to requestors. DHS has concluded that the proposed fee structure, in which the Form I–821D and Form I–765 filing fees, within a bundled filing process, recover the costs of processing DACA requests, represents a reasonable approach to balance these interests. Although DHS recognizes the

commenter's suggestion that initial and renewal requests should have different filing fees because renewal requests require less time to adjudicate, DHS has concluded that having two fees would be administratively burdensome and potentially confusing to requestors. Furthermore, as this rule does not modify longstanding threshold criteria to expand DACA eligibility, DHS expects that the majority of DACA requests moving forward will be renewal requests. DHS therefore declines to make changes to the rule in response to these comments. DHS also notes that recommendations regarding appropriations, budget allocation, and dissolution of DHS agencies fall outside the scope of this rule and declines to address these comments further.

b. USCIS Jurisdiction (Including Comments on Inability To Grant DACA to Someone in Immigration Detention)

*Comment:* Most commenters who submitted comments on this topic requested that USCIS adjudicate DACA requests from detained individuals rather than require DACA-eligible individuals to secure release from detention before their request can be granted. Several commenters expressed concern that the proposed approach would bar detained individuals from seeking DACA. Other commenters expressed that extending USCIS jurisdiction over detained individuals would provide more protection to immigrant youth. Commenters argued that the proposed framework would deprive certain individuals of the main benefit of DACA—the ability to demonstrate their low priority for removal and their eligibility for deferred action (which, according to a commenter, would necessarily constitute a strong basis for release from detention). One commenter argued that denying access to DACA to detained young people deprives them of a tool to advocate for their release and defend themselves against deportation while in removal proceedings.

Commenters expressed concern that the proposed approach would lead to unnecessary and prolonged detention of DACA-eligible individuals. A commenter similarly opposed the approach stating it would lead to unnecessary detention, where the commenter stated that they had witnessed abuse, inadequate legal and medical services, unsanitary conditions, and lax COVID–19 protocols.

Several commenters expressed concern that DACA decisions should be made by USCIS and not be subject to separate action or decision by ICE. Commenters argued that providing

---

[295] DACA FAQs.

USCIS jurisdiction over detained cases would permit USCIS to make informed decisions based on the totality of the circumstances.

Several commenters opposed granting ICE veto power over DACA decisions. Commenters expressed concern about ICE's decision-making process for release from detention, stating that the process is notoriously arbitrary and disorganized and noting inconsistent decisions would block individuals from receiving DACA even if USCIS determines an applicant is eligible and merits a favorable exercise of discretion. Another commenter stated that ICE staff often fail to execute ICE's mandate, fail to review cases accurately, are unresponsive to counsel, and are not transparent or accountable in decision-making. Other commenters expressed concern that ICE or CBP could prevent renewal of a DACA grant keeping an individual detained, and cited examples of *Inland Empire* class members who were unable to renew their DACA request due to being detained.

A commenter noted that release from detention is often based on factors that do not bear on an individual's fitness for DACA, and that decisions about bonds are similarly arbitrary and subject to great variety across different regions of the United States. Several commenters stated their concern that ICE and CBP detention decisions may be based on noncitizens' contact with the criminal legal system that does not always lead to a disqualifying conviction, and permitting ICE or CBP to take DACA decisions away from USCIS would unfairly reproduce racial inequities associated with the criminal legal system (stating that many DACA recipients are Black, Latinx, or other people of color whose communities experience a high rate of policing).

*Response:* DHS acknowledges commenters' concerns regarding the requirement that detained individuals be released from detention for USCIS to grant their DACA request. DHS likewise acknowledges commenters' requests to place DACA decisions solely in the hands of USCIS rather than ICE or CBP. DHS emphasizes that foundationally, DACA is a policy using the exercise of prosecutorial discretion for certain individuals who are low enforcement priority, and, as such, is necessarily connected to, and dependent on, immigration enforcement decisions made by the Department's enforcement agencies. USCIS' role in considering requests from individuals identifying themselves as low enforcement priorities does not strip ICE and CBP of the responsibility to enforce the immigration laws. DHS has determined

that the balance of the relevant agencies' responsibilities is best served by permitting individuals who have been apprehended and are currently in immigration detention to identify themselves as DACA-eligible so that ICE may consider whether they are a low enforcement priority such that they should be released from custody, after which USCIS may then approve or deny their request. DHS notes that USCIS has not previously had jurisdiction to grant DACA to a noncitizen in immigration detention under custody of ICE and that under longstanding DACA policy, detained noncitizens were instructed to identify themselves to ICE for potential release to pursue their DACA request.[296] Under current procedures, if, after review, these noncitizens appear to meet the DACA criteria, ICE may release them to file a DACA request with USCIS.[297] DHS believes that, as provided in this rule, permitting detained individuals to instead begin the DACA request process by filing a request with USCIS before being released from detention will make the decision-making process more efficient while maintaining ICE's role in determining the enforcement priority level of individual detainees. While requestors may file their requests while detained, under this rule, USCIS may not grant these requests until the individuals have been released from detention.

DHS acknowledges the concerns expressed by commenters regarding release-from-detention policies and the potential impact of decisions by individual ICE officers. As originally envisioned by the Napolitano Memorandum, DACA is one portion of implementing the Department's overall enforcement strategies. The Napolitano Memorandum included guidelines for identifying low enforcement priority individuals for deferred action under what became the DACA policy, including those individuals in detention and removal proceedings, and envisioned individuals would self-identify as candidates for deferred action. Similarly, the Department's Enforcement Guidelines set out enforcement priorities and instruct enforcement agencies to exercise discretion as appropriate for individuals

outside of those priorities. While all discretionary enforcement and adjudicatory decisions involve multiple decisions made by a single enforcement officer or adjudicator, DHS asserts that consistent policies, training, and review best address concerns of individual ICE officers "vetoing" otherwise DACA-eligible noncitizens. Additionally, DHS has set up a case review process for noncitizens to obtain expeditious review of enforcement actions, including decisions on detention.[298]

DHS thanks commenters for highlighting concerns that differential policing of communities will affect detention decisions based on contact with the criminal justice system. DHS acknowledges that arrests and convictions are best understood in the totality of the circumstances.

DHS acknowledges the related concern that detention of a DACA recipient could prevent that individual from renewing a DACA grant. However, individuals with DACA are generally not subject to enforcement action absent a determination that enforcement discretion is no longer warranted, typically due to activity that would serve as a basis for termination of the DACA grant. Additionally, DHS encourages DACA recipients to file renewal requests within the recommended filing window to best avoid gaps between periods of deferred action under DACA.[299]

Inefficiency Concern

*Comment:* Some commenters suggested it would be more efficient for USCIS to adjudicate requests from detained noncitizens. Several commenters stated that the proposed bifurcation of DACA adjudication for detained and non-detained individuals would be inefficient and impede individuals from making a showing of low priority for removal and eligibility for deferred action. One commenter suggested that ICE be granted authority to adjudicate DACA in certain cases to avoid double adjudication and promote efficiency.

*Response:* DHS appreciates suggestions on ensuring efficiency in the implementation of DACA. DHS emphasizes that USCIS remains responsible for the adjudication of all DACA requests. As discussed above, USCIS has determined that permitting detained individuals to request DACA from USCIS prior to release will increase efficiency. This change will

---

[296] DACA FAQ 12; ICE, *Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), https://www.ice.gov/daca* (last updated Mar. 17, 2022).

[297] ICE, *Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), https://www.ice.gov/daca* (last updated Mar. 17, 2022).

[298] ICE, *Contact ICE About an Immigration/ Detention Case, https://www.ice.gov/ICEcasereview* (last updated June 24, 2022).

[299] DACA FAQ 49.

also resolve situations under the previous policy where a requestor who had already been released from detention could be found ineligible for DACA because they were detained when they submitted the DACA request. DHS asserts that specific details of intra-department coordination between ICE and USCIS are best handled through subregulatory guidance in order to retain operational flexibility and to best respond to the circumstances that individual cases may present.

Lack of Justification or Rationale for Rule

*Comment:* Commenters stated there is no reason why USCIS would be prohibited from adjudicating DACA from detained individuals, noting that USCIS regularly adjudicates other applications for detained individuals. Another commenter stated that no other immigration benefit effectively precludes detained individuals from applying, and that tying approval for DACA to detention status is unprecedented and unwarranted. One commenter stated that DHS risks violating the principle that immigration detention be nonpunitive by promulgating a DACA rule that deems detained individuals ineligible for DACA. A commenter stated that there was no evidence on the ICE website suggesting that individuals cannot be granted DACA while in custody, and remarked that detained individuals have previously sought and been granted DACA, with that approval informing subsequent decisions on the individual's release from custody. The commenter further stated that it was arbitrary and capricious to require release from custody before USCIS can grant a DACA request because DACA eligibility requirements do not require that an individual *not* be detained and that past practice had created a reliance interest in adjudicating DACA requests from detained individuals.

*Response:* DHS acknowledges that USCIS sometimes adjudicates immigration applications and petitions benefiting detained individuals. DHS submits that as a discretionary exercise of prosecutorial discretion, DACA is difficult to compare to immigration benefits, some of which may be granted to detained individuals, and refers to the above response regarding the balance of responsibility between ICE and USCIS. DHS believes that it would not be appropriate to grant enforcement discretion under the DACA policy to an individual that ICE has determined warrants continued detention. As explained above, since the inception of the DACA policy, USCIS has not

exercised jurisdiction to grant DACA to a detained individual. Both the USCIS DACA FAQs and the ICE public web page containing DACA information instruct detained individuals to identify themselves for potential release to seek DACA with USCIS.[300] Additionally, to answer the first question on Form I–821D, Consideration of Deferred Action for Childhood Arrivals, the requestor states "I am not in immigration detention."[301] Acknowledging that some cases may present complicated detention histories, DHS submits that any such request referred to by commenters was likely granted in error if the requestor was in fact detained at the time of the adjudication of the request. DHS also notes that the regulation permits detained individuals to submit requests for DACA to USCIS, which were previously denied under the existing DACA policy. Given the longstanding DACA policy, DHS does not believe requestors have a reliance interest in USCIS adjudicating DACA requests from detained requestors. DHS recognizes the strong interest a noncitizen in immigration detention may have in requesting and receiving DACA, but denies that the rule's approach is punitive; in these cases, the immigration enforcement entity detaining the potential DACA requestor applies the Department's enforcement strategy in determining whether to release that person from detention prior to or in coordination with another agency's decision to grant deferred action for a period of time.

Further Recommendations

*Comment:* One commenter criticized DHS for failing to include in the proposed rule guarantees that ICE would release DACA-eligible individuals from detention. Another commenter recommended aligning DACA with other humanitarian programs by providing similar safeguards to other classes of vulnerable people DHS has recognized as unsuitable for detention, such as SIJ petitioners, petitioners and applicants for U and T nonimmigrant status, and VAWA self-petitioners. The commenter recommended expeditious processing of DACA requests for detainees, including explicitly allowing USCIS to accept biometrics taken by ICE to facilitate the

processing; that the rule afford automatic stays of removal for requestors until requests are adjudicated; and that the rule consider directing immigration judges to sua sponte continue proceedings where a DACA request is pending, and to terminate or administratively close proceedings where there is evidence that USCIS approved a DACA request. The commenter also urged USCIS to consider a prima facie or bona fide determination process for DACA requestors.

*Response:* DHS appreciates the suggestion to include guarantees that ICE will release DACA-eligible individuals from detention. Specific guidance on how USCIS and ICE will cooperate to address detained individuals who request DACA is best addressed in subregulatory guidance.

DHS notes that the DACA policy serves important humanitarian aims, as do immigration benefit requests such as U and T nonimmigrant status, SIJ classification, and relief under VAWA; however, there are important distinctions between DACA—a policy to exercise prosecutorial discretion to defer removal of noncitizens who demonstrate they are a low enforcement priority—and those benefits that are designed to assist abused, neglected, or abandoned minors, and victims of crime, human trafficking, and domestic battery or extreme cruelty. DHS notes that, unlike for petitions for U nonimmigrant status, there is no annual cap on the number of DACA requests that may be approved, and as a result, requestors do not wait years for a final adjudication of their request. As a result, DHS has not found it necessary to create a prima facie or bona fide determination policy for DACA. DHS appreciates suggestions on managing removal proceedings over the course of the adjudication of a DACA request. Because the rule is not a joint DHS/DOJ rule, DHS cannot insert provisions binding EOIR, though it notes the suggestions as applied to ICE's Office of the Principal Legal Advisor. DHS appreciates the request to streamline processing by allowing USCIS to accept biometrics taken by ICE. USCIS is examining whether it has the legal authority and technical capability to submit to the Federal Bureau of Investigation biometrics collected by a criminal justice agency or from a non-criminal justice agency when the biometrics were collected for a different purpose from USCIS' purpose of use. DHS will continue to explore the feasibility of permitting USCIS to use biometrics collected by ICE for

---

[300] DACA FAQs 12–14; ICE, *Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA), https://www.ice.gov/daca* (last updated Mar. 17, 2022).

[301] USCIS, Form I–821D, Consideration of Deferred Action for Childhood Arrivals, *https://www.uscis.gov/sites/default/files/document/forms/i-821d.pdf.*

adjudication of DACA requests from detained individuals.

c. Grants and Denials of a Request for DACA (Including Additional Evidence, 2-Year Period, Consultations, Notice of Decision)

Two-Year Grant Period for Deferred Action and Work Authorization

*Comment:* Many commenters opposed the 2-year DACA validity period, commenting that it is too short, limits DACA recipients' ability to plan between renewals, and places a financial burden on applicants due to a frequent and complex renewal process. A commenter also stated that the validity period undermines the goals of DACA by generating fear of imminent deportation or loss of schooling or work authorization approximately every 1½ years. Commenters expressed concern that the 2-year validity period for DACA and related EADs, coupled with slow processing times for renewals and a lack of sequential renewal option (such that DACA is renewed from the date of expiration of the previous grant, avoiding any overlap in approval periods), negatively impacts DACA recipients, employers, and others, causing lapses in deferred action that result in accrual of unlawful presence, lost work authorization and potentially suffering other lasting harms. A commenter stated that delays and lapses in employment authorization result in a trickle-down effect to manufacturers of consumer goods, customers, and other business stakeholders when applicants lose the ability to work. Some commenters highlighted that the 2-year period for DACA EADs creates additional burdens for USCIS, as well as requestors.

Commenters recommended that the DACA grant period be extended beyond 2 years, with suggestions ranging from 3 to 10 years. Commenters stated that longer grant periods would result in less taxing administrative processes and judicial review of renewals and, consequently, reduced backlogs. Commenters also expressed concern surrounding the financial hardship DACA recipients face, stating that many recipients are from low-income families and cannot afford the renewal fee. A commenter advocating for longer validity periods stated that working families need and deserve stability and the ability to plan for the future, and that a 2-year validity period is too short to provide adequate assurances that it is worth the risk to submit a detailed, personal application to DHS. The commenter also noted that the short timeframe creates disincentives for employers looking to hire and train DACA recipients. Commenters cited studies indicating the benefits of extending DACA and EAD grants beyond 2 years, including cost and time savings for applicants, reduced administrative burdens for USCIS, and avoided consequences for recipients, employers, and the workforce upon loss of employment authorization. Other commenters similarly discussed the economic benefits of extending DACA and EAD grants beyond 2 years. Commenters stated that USCIS approves more than 98 percent of DACA renewal requests each year and extending the validity period would reduce the burden of biennial renewal requests, while supporting DHS's stated policy goal of prioritizing limited enforcement resources. The commenters further stated that the Department could make this extension without undermining its enforcement authority, as it would retain the discretion to revoke DACA at any time.

*Response:* DHS acknowledges these commenters' concerns regarding the 2-year validity period for DACA and associated employment authorization. DHS recognizes and appreciates that biennial renewal requests may cause uncertainty for DACA recipients and employers and impose higher costs than a longer validity period. DHS also agrees that extending DACA and associated EAD validity periods could improve stability for recipients and reduce adjudicatory costs. DHS acknowledges one commenter's concern that the 2-year validity period could provide a disincentive for employers to hire and train DACA recipients, but notes that the commenter did not provide data to support this statement, and other sources indicate an 84- to 89-percent employment rate among DACA recipients.[302]

DHS must carefully balance the benefits of a longer validity period with the nature of deferred action as a discretionary, temporary exercise of prosecutorial discretion. In other contexts, DHS has provided deferred action for periods both greater than and less than 2 years. As DACA recipients do not have an underlying petition or application for nonimmigrant or immigrant status pending adjudication, DHS believes 2 years is an appropriate frequency for review and decision on whether to continue to favorably exercise discretion in the form of deferred action. DHS also has determined that codifying the longstanding 2-year validity period for deferred action best achieves President Biden's directive to preserve and fortify DACA. DHS appreciates that DACA recipients may risk either overlap or gaps in their DACA and EAD validity periods when renewing their requests and reiterates the importance of filing their renewal requests in accordance with guidance published on the USCIS website to mitigate these risks. Regarding a commenter's concern that 2 years is too short of a period of both deferred action and employment authorization to be worth the risk of submitting detailed, personal information to USCIS, DHS notes that this rule clarifies longstanding policy protecting information provided in DACA requests from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless DHS initiates immigration enforcement proceedings against the requestor due to a criminal offense, fraud, a threat to national security, or public safety concerns.[303] DHS therefore declines to make changes in the rule in response to these comments.

DACA Renewals: Sequential Grant Periods

*Comment:* Some commenters stated that, due to fluctuating processing times and concerns over losing work authorization, DACA recipients rarely benefit from the full 2-year validity period in practice. As such, these commenters stated that most DACA recipients submit their renewal applications well before the grant has expired, resulting in additional time and costs for requestors and USCIS. Because USCIS currently assigns the renewal approval date as the date the validity period begins, early filing can result in an overlap between the grant periods, described by one commenter as reducing the effective validity period to 1½ years.

Commenters recommended that the agency instead issue sequential approval validity dates for renewal requests. Some of these commenters stated that sequential grants, which they asserted were previously piloted, would allow DACA recipients to receive full 2-year periods of deferred action rather than one overlapping into the next. Commenters stated this would allow recipients to avoid disruptions to their work or education and better plan for the future, while another commenter stated it would mitigate the punitive effect on recipients who file renewal requests early. Another commenter

---

[302] Congressional Research Service, *Deferred Action for Childhood Arrivals (DACA): By the Numbers* (Apr. 14, 2021), *https://sgp.fas.org/crs/homesec/R46764.pdf.*

[303] *See* new 8 CFR 236.23(e).

suggested that sequential grant periods would reduce USCIS' workload.

*Response:* DHS thanks commenters for the suggestion to forward-date DACA and associated EAD validity periods. DHS recognizes that this suggestion could reduce recipients' disruptions to education and employment and mitigate the risk of gaps or significant overlap in validity periods. DHS notes that sequential grant periods were not previously piloted, but will continue to evaluate operational and processing mechanisms to improve efficiency and reliability for the DACA population and, if appropriate, issue subregulatory guidance. DHS therefore declines to make changes to the rule in response to these comments.

Automatic Renewals or Extensions

*Comment:* Some commenters urged USCIS to issue automatic extensions of deferred action and work authorization validity upon receipt of a DACA renewal request or when USCIS is experiencing staffing issues and processing delays. Commenters suggested automatic extensions would mitigate the profound impact of lapses in protection and disruption in employment for those who timely file renewal requests but risk lapse due to USCIS backlogs, as well as assist requestors who experience other financial and practical obstacles in the renewal process. As an alternative to automatic EAD renewals, commenters suggested that the agency add DACA to the list of employment authorization categories that receive an automatic 180-day extension of their EAD validity period when an employment authorization renewal application is timely filed. A commenter noted that the alternative 180-day automatic extension is an existing process that currently includes TPS holders. The commenter further reasoned that allowing for automatic extensions would be in line with the agency's rationale that this safeguard provides additional stability to U.S. employers and individuals eligible for employment authorization. A commenter added that allowing the receipt notice for a DACA-based EAD renewal application to serve as temporary work authorization would avoid disruptions to the workforce and free up USCIS resources used towards inquiries on pending cases.

*Response:* DHS appreciates these commenters' suggestions to automatically extend deferred action and employment authorization temporarily upon filing of a DACA renewal request. DHS notes that in FY 2022, USCIS has reduced median processing times for DACA renewal requests and related employment authorization requests to 0.5 months, as of May 31, 2022.[304] DHS reiterates that the decision to grant deferred action—initially and upon a renewal request—is a case-by-case determination of whether to favorably exercise prosecutorial discretion. Providing automatic temporary extensions of deferred action to DACA renewal requestors would be inconsistent with DHS's treatment of other deferred action populations' requests for renewed deferred action and the nature of enforcement discretion. DHS therefore declines to modify the rule to codify automatic temporary extension of deferred action based upon the filing of a renewed request. As employment authorization granted in connection with DACA is predicated upon the grant of deferred action, DHS also declines to make changes to the rule to qualify DACA renewal requestors for automatic extensions of their EADs beyond the validity of the underlying deferred action. DHS acknowledges that certain applicants who have filed Form I–765 in other categories are eligible for the automatic temporary extension. However, under 8 CFR 274a.13(d)(iii), a category can only be designated as eligible if the category does not require the adjudication of an underlying application or petition before the adjudication of the renewal application. DACA-based renewal requests for employment authorization do not meet this regulatory requirement.[305] DHS therefore declines to make changes to the rule in response to these comments.

Lapsed DACA Requestors

*Comment:* Some commenters recommended that USCIS deem as a renewal request any request from an individual who has previously been granted DACA, regardless of the length of time since their prior DACA grant lapsed. Citing instructions for USCIS considerations of DACA requests, a commenter opposed the current policy whereby DACA requests qualify for renewal only if the requestor files within 1 year after their last period of deferred action expired. The commenters concluded that, as DHS is enjoined from granting initial DACA requests, current policy bars eligible

individuals from obtaining DACA when they delay renewal due to financial, legal, or other reasons. Commenters suggested the policy could be updated in the instructions and online DACA FAQs.

A commenter recommended that USCIS provide an optional backdating of deferred action grants for requestors whose DACA expires and who later apply for initial or renewal of DACA. This, the commenter said, would prevent requestors from accruing unlawful presence during USCIS adjudication delays or other barriers to renewal.

*Response:* DHS acknowledges and thanks these commenters for their suggestions. DHS recognizes that in light of the *Texas* district court order, former DACA recipients whose DACA has lapsed for more than 1 year are precluded from receiving a renewed grant of DACA. However, DHS reiterates that this rule aims to preserve and fortify DACA for both initial and renewal requestors. DHS notes that "initial" DACA requests must be accompanied by evidence demonstrating that the requestor meets all of the DACA guidelines at the time of filing, while renewals only require evidence of some of the criteria, on the understanding that only some criteria are related to factors that are more prone to change (*e.g.,* comparing evidence of criminal history to evidence that the requestor entered the country before 2007). DHS believes it is important to retain the ability to fully review eligibility in cases where DACA has been allowed to lapse for a significant period of time. DHS also believes that granular policy matters such as filing requirements for lapsed recipients are better addressed through subregulatory guidance and therefore declines to modify the rule in response to these comments. DHS also declines to make changes to the rule to allow for backdating DACA grants to retroactively eliminate the accrual of any unlawful presence for individuals whose DACA expires and later are granted DACA again. As discussed above, deferred action is a forward-facing step; the decision to forbear removal of a noncitizen for a period that has already past would be meaningless. For these reasons, the Department does not believe it may properly erase a person's pre-DACA unlawful presence by beginning deferred action from a date in the past.

DHS Should Waive Biometrics Collection for Renewal

*Comment:* Several commenters urged the agency to utilize existing biometrics

---

[304] USCIS, *Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year, Fiscal Year 2017 to 2022 (up to May 31, 2022), https://egov.uscis.gov/processing-times/historic-pt* (last visited June 29, 2022).

[305] *See* USCIS, *Automatic Employment Authorization Document (EAD) Extension, https://www.uscis.gov/working-in-the-united-states/information-for-employers-and-employees/automatic-employment-authorization-document-ead-extension* (last updated July 22, 2022).

D. App. 092

**Federal Register** / Vol. 87, No. 167 / Tuesday, August 30, 2022 / Rules and Regulations **53243**

for DACA renewals rather than requiring new biometrics every 2 years upon renewal. Some of these commenters reasoned that there is no clear rationale for requiring new biometrics as biometrics are unlikely to change, and requesting them is costly for both the Government and requestors. Some commenters further reasoned that Application Support Center closures during the COVID–19 pandemic and the successful use of prior biometrics demonstrate that this step is unnecessary for DACA renewal. A commenter further reasoned that many DACA requests face significant physical and psychological struggles with presenting for biometrics. The commenter requested that, at minimum, USCIS allow the reuse of biometrics upon the request of requestors or their representatives where presenting for biometrics would impose an unnecessary burden on the requestor.

*Response:* DHS acknowledges commenters' suggestion to reuse requestor biometrics for DACA renewal requests. DHS notes that as of May 31, 2022, USCIS reduced FY 2022 median processing times for DACA renewal requests and related employment authorization requests to 0.5 months.[306] DHS continues to evaluate and implement, as appropriate, strategies to improve efficiency in processing DACA requests. DHS thanks commenters for the suggestion to reuse biometrics, but wishes to maintain flexibility in this type of processing decision and will consider whether to adopt this suggestion in subregulatory guidance. DHS therefore declines to make changes to the rule in response to these comments.

### Denials of a Request for DACA

*Comment:* Some commenters urged USCIS to provide requestors the reasons for denial or intended denial and allow requestors an opportunity to respond, with one commenter stating the requirement to submit another request without full knowledge of any administrative or eligibility errors in the first request unnecessarily increases costs for the individual seeking protection or renewal of protections.

*Response:* DHS appreciates these suggestions. Given the nature of deferred action as an exercise of prosecutorial discretion, as opposed to a benefit request, defined in 8 CFR 1.2, the decision to not confer deferred action, either initially or upon a

renewed request, is appropriately an action in DHS's sole and unreviewable discretion. DHS further notes that as a matter of existing practice and policy, USCIS typically issues either a Request for Evidence or a Notice of Intent to Deny that identifies the reason(s) DHS intends to deny, and provides an opportunity for requestors to respond before a request is denied. Furthermore, if DHS denies a DACA request, the notice of denial will generally state the reasons for denial. DHS acknowledges that a request denied as a matter of discretion will not repeat the negative discretionary factors in the request, but those issues are identified to the requestor in the RFE or NOID prior to DHS issuing a denial. DHS therefore declines to make changes to the rule in response to these comments.

### Other Comments and Recommendations

*Comment:* One commenter suggested that the agency consider a faster request process such that requestors would be able to apply between 30 and 45 days prior to the EAD permit expiring and possibly eliminating the fingerprinting process.

*Response:* DHS acknowledges this commenter's suggestions, but believes that operational considerations to improve adjudicatory efficiency and the potential reuse of biometrics for renewal applicants are better addressed through subregulatory guidance. DHS therefore declines to make changes to the rule in response to this comment.

### d. Notice to Appear or Referral to ICE

*Comment:* Some commenters stated that automatic NTAs after denial should not be permitted under any circumstances. While the commenters supported the rule's listing of situations in which USCIS would issue an NTA or refer a denial to ICE, noting it would provide clarity for requestors, they expressed concern about the inclusion of denials for fraud on that list. The commenters expressed concern that issuing an NTA after a denial for fraud could have a "chilling effect" on requestors that might frustrate DACA's ultimate goals, as requestors unfamiliar with immigration law could worry that simple errors could be perceived as fraud. The commenters asserted that issuing NTAs to fraud-based denials does little to further the sensible DHS priorities of "protecting national security, border security, and public safety."

*Response:* DHS appreciates the commenters' concerns, and notes that NTAs are not automatic, as each denial and decision to initiate removal

proceedings by issuing an NTA or referring a denied requestor to ICE is made by an adjudicator after assessing the evidence in a case. In response to the suggestion that denials for fraud should not be issued an NTA, DHS notes that the proposed 8 CFR 236.23(c)(2) codifies and clarifies longstanding DACA policy, including on referring fraud-based denials to ICE for purposes of removal proceedings.[307] As such, DHS does not anticipate a change in requestors' behavior based on fear of filing errors being mistaken for fraud. However, DHS appreciates the concern and will consider public perception when developing filing instructions, website language, and other public messaging. DHS strongly disagrees that countering immigration fraud does little to further DHS priorities. Combatting fraud and misrepresentation is central to DHS's mission and to DHS's ability to provide immigration benefits and relief to qualifying individuals. In recognition of this principle, Congress provided a specific ground of inadmissibility to address the use of fraud or willful misrepresentation when obtaining a benefit under the INA.[308]

### e. Appeals and Reconsideration

*Comment:* A few comment submissions addressed appeals and reconsideration of DACA denials. A few commenters said that the final rule should include a reconsideration process for requestors to challenge denials, with procedural protections and legal representation. While recognizing that reconsideration motions and appeals may not be required, one commenter stated that this does not explain why the proposed rule does not create a process for challenging denials and stated that the costs of an erroneous denial to the requestor, their family, community, and society are too high to rely on re-request as the sole corrective. One commenter stated that to promote filing and fairness, DACA requestors should have, among other things, avenues to challenge denials or terminations.

Commenters opposed the proposed rule's exclusion of administrative appeals, reopening, or reconsideration stating that it violates USCIS' inherent authority to exercise discretion to review prior decisions, as Service Officers generally retain an inherent ability to review past decisions via motion or appeal, citing 8 CFR 103.5 as an example. Commenters also noted that the proposed rule would limit the

---

[306] USCIS, *Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year, Fiscal Year 2017 to 2022 (up to May 31, 2022), https://egov.uscis.gov/processing-times/historic-pt* (last visited June 29, 2022).

[307] DACA FAQ 26.

[308] INA sec. 212(a)(6), 8 U.S.C. 1182(a)(6).

AR2022_100286

authority inherently granted to all USCIS officers and add another unnecessary burden to an immigration system that is already overburdened with gratuitous regulatory and administrative complications. Commenters further stated that the proposed rule would not stop officers from acting of their own accord and questioned whether attempting to foreclose any review of past DACA decisions would result in an increase in motions and letters requesting the reviewing Service Officer to exercise discretion to reconsider their decision via self-motion. Commenters also stated that the proposed rule will undermine USCIS' ability to adjudicate DACA requests, because the failure to provide an opportunity for reconsideration will undermine the deference attributed to USCIS when a DACA decision is challenged in APA litigation. The commenters noted criticism of the AAO and stated that USCIS should instead be empowered to exercise its inherent authority to review past DACA denials or rejections. The joint submission stated that DACA requestors must be afforded a mechanism for challenging denials on the basis of abuse of discretion and that whether a mechanism is embedded in the proposed rule will not prevent DACA recipients from attempting to challenge a DACA denial through an APA challenge. Finally, the submission stated that this would be one of the only instances where an applicant is barred from seeking to have a negative decision reviewed, reconsidered, or appealed, which they stated is notable given the lack of uniformity and clarity on which misdemeanors make an applicant ineligible, for example.

One group of commenters stated that incentivizing denied requestors to create and submit new materials rather than appealing or amending their prior requests burdens both USCIS and requestors because USCIS must reprocess and consider requests that are only marginally different from those it already considered, while requestors spend additional money on filing fees and try to ascertain and fix the error that led to the prior denial. The submission stated that allowing amendments to requests prior to denial would reduce workloads, as requestors could correct their forms that otherwise would impact their requests. They further stated that creating an appeal structure would not be procedurally difficult because such a structure already exists for appealing denials caused by administrative errors, and parallel structures already exist for most other immigration processes

through the AAO. They stated that expanding the existing DACA appeals process to accommodate substantive appeals and allow amendments to correct requestor errors is not likely to be substantially difficult.

*Response:* DHS appreciates commenters' suggestion that the rule include a reconsideration process for challenging denials or terminations. However, DHS disagrees with commenters that such a process is appropriate for DACA decisions. Given the nature of deferred action as an exercise of prosecutorial discretion, rather than as a benefit request as defined in 8 CFR 1.2, the decision not to exercise favorable enforcement discretion or not to continue to do so is appropriately an action within DHS's sole and unreviewable discretion.

While DHS recognizes that refiling a DACA request after denial requires an expenditure of money, time, and effort for the DACA requestor, so too would filing a motion to reopen/reconsider or an administrative appeal to the AAO, if USCIS were to permit such motions or appeals. Individuals seeking reopening, reconsideration, or appeal of a benefit request must do so by filing a Form I–290B, Notice of Appeal or Motion with a statement and supporting evidence, and generally must pay a $675 fee.[309] DHS additionally notes that it generally issues an RFE or a NOID before denying a DACA request, providing requestors notice of deficiencies in the request and an opportunity to fix them.

DHS also disagrees with commenters who state that by not providing for administrative appeals or motions to reopen or reconsider, DHS is violating USCIS' inherent authority to exercise discretion to review prior decisions. The preamble to the proposed rule specifies that USCIS would still be permitted to reopen or reconsider a DACA approval or denial on its own initiative.[310] The rule does not impact USCIS' inherent authority to reopen or reconsider its decisions, in its discretion. Further, under current policy and practice as reflected in DACA FAQ 25,[311] USCIS may also reopen or reconsider its DACA decisions if a DACA requestor seeks review of their DACA denial by contacting the USCIS Contact Center for creation of a Service Request, where the requestor believes USCIS incorrectly denied the request due to certain administrative errors. DHS intends to maintain the ability for requestors to

request review via the Contact Center in certain limited circumstances involving administrative error, however DHS believes this process is best suited to subregulatory guidance.

DHS further disagrees with commenters who state that the rule will undermine the deference attributed to USCIS when challenged in APA litigation and in any event, does not believe that the availability of deference to USCIS' decisions on DACA requests when challenged in litigation should determine how the final rule addresses the availability of appeals and reconsideration.

While DHS agrees with commenters that an existing appeal structure exists at the AAO for certain benefit requests, DHS disagrees with the cited criticism of the AAO and maintains that establishing an appeal process for DACA denials is inconsistent with the nature of deferred action as a temporary, favorable exercise of immigration enforcement discretion that gives some cases lower priority for enforcement action.

Accordingly, DHS is not making any changes to 8 CFR 236.23(c)(3) in response to public comments.

f. Termination of a Grant of DACA (Including Comments on Discretionary/Automatic Termination and Alternatives)

Notice of Intent To Terminate and Automatic Termination Upon Filing an NTA

*Comment:* No commenters wrote to support the termination provisions presented as the primary proposal in the proposed rule. Many commenters stated that USCIS should be required to provide a Notice of Intent to Terminate (NOIT) prior to terminating DACA in all cases in order to provide notice of the proposed grounds for termination and a fair opportunity to respond. Several of these commenters said that this change would preserve due process by allowing DACA recipients the opportunity to correct misinformation and provide supplementary support or documentation, thus preventing unjustified terminations. Similarly, many commenters emphasized the importance of fairness and accuracy in the decision process for terminating a DACA grant, stating that terminating a DACA grant without notice or opportunity to respond is inconsistent with the rule's principle of allowing USCIS to make decisions based on the totality of the circumstances. Commenters also stated that terminating a DACA grant without notice would be

---

[309] Only special immigrant Iraqi or Afghan nationals who work for or on behalf of the U.S. Government are not required to pay the Form I–290B filing fee.

[310] 86 FR 53769.

[311] DACA FAQs.

arbitrary and capricious in violation of the APA.

One commenter suggested that USCIS implement the third proposed alternative in the NPRM to specify the instances in which USCIS generally will issue a NOIT, with opportunity for the DACA recipient to respond before USCIS makes its final decision on DACA termination. Another expressed general agreement with implementing this third alternative but requested that the agency provide a narrower definition of cases involving criminal offenses or concerns regarding national security or public safety so as to only include the most extreme threats to public safety.

One organizational commenter stated that it was disappointed that the proposed regulation at 8 CFR 236.23(d)(1) would permit USCIS to terminate a DACA grant at any time in its discretion with or without issuance of a notice of intent to terminate and urged USCIS to provide DACA recipients with a fair process before termination. The commenter requested that, at a minimum, USCIS provide the recipient with an opportunity to respond, reasoning that procedural fairness is essential to minimize the risk of erroneous deprivation and to decrease racially disparate outcomes. The commenter proposed various amendments to the language at 8 CFR 236.23(d)(1) regarding USCIS' discretionary authority to terminate DACA. The commenter stated that providing notice and an opportunity to respond would: (1) decrease the risk of erroneous DACA terminations; (2) decrease the potential for racially discriminatory decision-making; and (3) honor the deeply held reliance interests that DACA recipients possess.

Many commenters opposed automatic termination based on the filing of an NTA, stating that the rule should not allow ICE or CBP to force USCIS to automatically terminate DACA by issuing and filing an NTA. Some of these pointed out that allowing ICE or CBP to take these actions is contradictory to the core principle of the proposed DACA regulations, which allows USCIS to make considered decisions based on the totality of the circumstances. Similarly, other commenters stated that automatic termination of DACA upon issuance of an NTA undermines the tenets of DACA, which protects against removal and can be requested while in proceedings. Other commenters stated that USCIS is in the best position to make DACA determinations based on agency policy and that ICE and CBP should not be permitted to override

USCIS' determinations. Commenters also stated that automatic termination upon NTA filing is arbitrary and capricious under the APA.

Multiple commenters expressed concerns that the proposal would perpetuate racial disparities in policing and the criminal justice since, since NTAs are often issued as a result of encounters with local law enforcement, which disproportionately impact Black people and other people of color. Many other commenters expressed similar concerns, adding that criminal charges are often later dismissed, but if a DACA recipient is placed in removal proceedings on the basis of a criminal charge that is eventually dismissed, their DACA protections are unjustifiably terminated regardless.

One commenter also stated that automatic termination would be a significant change to policy without adequately addressing DACA recipients' serious reliance interests, particularly for those granted DACA after the filing of an NTA or in the presence of a final order of removal who have made career and life plans for the immediate future in reliance on the continuation of DACA, and specifically, on the continuation of the individual's DACA despite the filing of an NTA. Another stated that there are significant reliance interests in the continuation of existing DACA grants because people make consequential decisions based on the 2-year grants of deferred action and many rely on DACA recipients for financial, emotional, and other support.

Many commenters supported the NPRM's first option in alternative two: striking the provision regarding automatic termination of DACA solely based on the filing of an NTA for all DACA recipients. Some recommended going further and specifically prohibiting DACA termination based solely on the filing of an NTA, with one proposing to allow exceptions for fraud, national security threats, or public safety concerns with additional safeguards and a NOIT. Multiple commenters stated that the alternatives proposed did not go far enough and presented problems with consistency and due process. One stated that they agreed with only the second proposed alternative, which would strike or modify the provision regarding automatic termination of DACA solely based on the filing of an NTA. A few commenters opposed the second option in alternative two, stating that tying automatic termination to the issuance of a final removal order would be irrational since individuals with final orders of removal still can be granted DACA. One commenter suggested that

the later point in the process when DACA should terminate automatically is upon removal. A few commenters opposed the first alternative—limiting automatic termination based on NTA filing to certain individuals, such as those subject to investigation, arrest, or conviction of an Egregious Public Safety (EPS) offense or who fall within certain terrorism or national security-related inadmissibility or deportability grounds—as too broad and vague, and as continuing to present due process concerns.

Multiple commenters recommended that, at a minimum, if DHS is not inclined to provide NOITs before terminating DACA in all cases and to eliminate automatic termination upon NTA filing, the rule should codify the approach required by the *Inland Empire-Immigrant Youth Collective* v. *Nielsen* ("*Inland Empire*") injunction and apply it to all DACA recipients. Commenters stated that DHS provided insufficient explanation for why DHS proposes to depart from the *Inland Empire* approach that it has followed for nearly 4 years and why instead DHS seeks to codify an approach that was already found unlawful by the *Inland Empire* court.

*Response:* DHS agrees with commenters that in most cases, there are good reasons to give DACA recipients adequate notice and an opportunity to respond prior to termination of their DACA. This approach will promote fairness and accuracy in the decision-making process for terminating a DACA grant by allowing DACA recipients the opportunity to correct any incorrect information and provide supplementary information to rebut the intended basis for termination.

DHS further agrees that the *Inland Empire* preliminary injunction provides a framework for the limited circumstances in which termination without a NOIT is necessary. However, DHS now intends to issue NOITs in even broader circumstances than required by *Inland Empire,* in recognition of the concerns raised by commenters about fairness and accuracy in the termination process. Accordingly, DHS is revising 8 CFR 236.23(d) to adopt the first option in alternative two (eliminate automatic termination based on filing of an NTA) and to codify that USCIS will issue a NOIT prior to terminating DACA in most circumstances not involving travel without advance parole, but retains discretion to terminate without a NOIT when the DACA recipient has been convicted of an EPS offense or a national security offense. For these purposes, an EPS offense is a crime

involving significant risk to the safety of others,[312] and a conviction for a national security offense is a conviction relating to conduct described in 8 U.S.C. 1182(a)(3)(B)(iii) (terrorist activity), (iv) (engage in terrorist activity), or 1227(a)(4)(A)(i)) (national security). This approach is a modified, simpler approach than required by the *Inland Empire* injunction, which permits USCIS to proceed quickly to termination (but not automatic termination) for those individuals who present a potential egregious public safety or national security risk. Eliminating automatic termination based on NTA issuance and generally providing NOITs except in circumstances involving certain convictions also mitigates commenters' concerns that automatic termination fails to take into consideration DACA recipients' reliance interests.

Automatic Termination Upon Departing the United States Without Advance Parole

*Comment:* Many commenters opposed automatic termination due to departure without advance parole, and multiple commenters specifically supported the fourth alternative proposed in the NPRM: providing an exception for departure without advance parole under exigent circumstances. Commenters said that this change would give DACA recipients much-needed flexibility, as recipients may experience emergency situations where they need to leave the country temporarily, but do not have time to obtain an advance parole document, or where the departure is brief and accidental. One commenter described obtaining an advance parole document as an arduous process that can take weeks, which complicates efforts to seek emergency advance parole when visiting a dying family member or attending to other pressing matters. Another commenter stated that the USCIS Contact Center may be unable or unwilling to schedule an in-person emergency advance parole appointment in time for those who need to depart on short notice. If given an appointment but denied emergency advance parole, the commenter stated, the DACA recipient would need to make the impossible choice between seeing a loved one for the last time and maintaining their right to reside and work in the country they call home.

Commenters supported what they called a more humane approach that

would consider the totality of the circumstances of the individual's departure. One commenter remarked that any DACA recipient who leaves the United States without an advance parole document should have the opportunity to explain their circumstances prior to the termination of their DACA grant. One commenter requested that USCIS communicate specific criteria under which a person would be allowed to leave the United States without securing an advance parole document, including the circumstances that would warrant leaving without advance parole, how long a DACA recipient would be permitted to remain outside of the United States, what evidence they might need to prove their request matches prescribed circumstances, the types of travel documentation they would need to bring along, and the process for returning.

*Response:* DHS agrees with commenters that there may be some limited circumstances where a DACA recipient departs the United States without first obtaining an advance parole document due to exigent circumstances—such as departures that are accidental or involuntary, and in such circumstances the automatic termination of their DACA may not be warranted. In consideration of the comments received, DHS is eliminating the provision at 8 CFR 236.23(d)(2)(ii) on automatic termination of DACA following departure without advance parole and revising 8 CFR 236.23(d)(2) to provide that USCIS may terminate DACA after NOIT if a DACA recipient departs the United States without first obtaining advance parole and subsequently enters without inspection. Generally, a recent entry without inspection will be a significant negative factor warranting termination of DACA as a threat to border security, but where there are exigent circumstances, such as accidental or involuntary border crossings, DHS may choose to continue exercising prosecutorial discretion and allow the grant of deferred action to continue. DACA recipients who depart the United States without first obtaining advance parole but who are paroled into the United States may resume their DACA upon expiration of the period of parole. However, DHS notes that DACA recipients who depart the United States without first obtaining an advance parole document run a significant risk of being unable to reenter the United States, and that obtaining an advance parole document prior to departure is strongly encouraged to reduce the risk of being unable to return and resume DACA.

Effect of Prior Termination

*Comment:* Several commenters discussed USCIS' past practice of automatically denying renewal requests for anyone whose DACA grant had been terminated previously at any point. The commenters stated that many DACA grants have been terminated based on arrests or charges that ultimately did not result in any serious criminal conviction. Considering these concerns, the commenters suggested that prior automatic termination of DACA not be used to justify the denial of a renewal request.

*Response:* DHS acknowledges commenters' concerns but believes that the elimination of automatic termination based on NTA issuance in the final rule will largely alleviate these concerns. Except in limited circumstances described elsewhere in this preamble and at new 8 CFR 236.23(d)(1), USCIS will generally issue a NOIT before terminating an individual's DACA. Where USCIS proceeds to termination and the individual also has a renewal request pending, USCIS believes that immediate denial of the pending renewal in light of the termination remains appropriate, as the underlying basis for the termination remains true such that favorably exercising prosecutorial discretion to grant a new period of deferred action is not warranted. In cases where an individual files a new DACA request after their DACA has been terminated, USCIS does not automatically deny the new request. However, DHS continues to believe that considering all relevant factors and evidence is appropriate in determining whether to grant a DACA request, including the basis for a prior termination, which may be an indication the individual is no longer a low enforcement priority. Accordingly, DHS is not making any revisions to the regulations based on these comments.

g. Restrictions on Use of Information Provided by DACA Requestors (Including Information Sharing and Privacy Concerns)

*Comment:* A few commenters expressed support for codifying the restrictions on use of information in the final rule. One commenter also stated that they supported the exceptions to the restrictions on information use as proposed in the rule, including for identifying and preventing fraudulent claims, for national security purposes, and for the investigation or prosecution of a criminal offense.

*Response:* DHS appreciates commenters' support for codifying the

---

[312] *See, e.g.,* definition of EPS in *Revised Guidance for the Referral of Cases and Issuances of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens,* USCIS PM–602–0050 (Nov. 7, 2011).

restrictions on use of information from DACA requestors in this rule. DHS proposed to codify the longstanding policy that has governed the use of information provided by DACA requestors to mitigate the possibility that noncitizens eligible for DACA may be disincentivized to file a request and become known to the U.S. Government. As described in the NPRM, under this longstanding policy, information provided by DACA requestors is collected and considered for the primary purpose of considering their DACA requests and may not be used for immigration enforcement-related purposes apart from limited exceptions.[313] In furtherance of the Department's dual desire to minimize concerns that DACA requestors may have in providing their information through the submission of a DACA request while also retaining exceptions for limited national security or public safety purposes, DHS is now codifying this policy at new 8 CFR 236.23(e).

*Comment:* Expressing concern about information sharing and use among ICE, CBP, and other Federal, State, or local law enforcement agencies, a few commenters advocated that DHS further strengthen data privacy under proposed 8 CFR 236.23(e). A few commenters recommended that DHS both ensure and demonstrate that requesting DACA would not lead to immigration enforcement against a requestor. A group of commenters said that the "need to know" policy for sharing information with ICE and CBP should be clarified, because the list of uses and instances in which information can be shared is not presented as exhaustive, making it possible to demonstrate "need to know" in other circumstances that may have a lower evidentiary threshold. Instead, the commenter suggested that DHS definitively enumerate the exclusion of any specific uses and instances not listed. A commenter requested that agencies protect DACA by strengthening data privacy, reasoning that the fear of immigration enforcement could preclude recipients from enrolling in healthcare coverage. Another commenter urged DHS to strengthen protections around the personal identifiable information (PII) of DACA recipients and expressed concern around ICE handling DACA recipients' PII. The commenter, along with another commenter, said that DACA recipients' PII should never be used for enforcement purposes. Another commenter recommended specific regulatory language for this provision to ensure the protection of requestors'

information from being shared with immigration enforcement agencies, along with appropriate administrative penalties for violations.

*Response:* DHS acknowledges these commenters' recommendations to further enhance data privacy in this rule, including to enumerate the exclusion of specific uses not listed. DHS however respectfully declines to write such granularity into the final rule. As discussed above, the rule codifies longstanding prohibitions on use of information for enforcement purposes with specific exceptions. This longstanding practice has worked to protect against improper uses of information provided in DACA requests for enforcement purposes. In January 2022, the U.S. Government Accountability Office (GAO) published a report on the extent to which USCIS shares information on DACA requestors and recipients with immigration enforcement agencies and for what purpose. The GAO report found that, in keeping with the DACA information-sharing policy, USCIS has shared information with ICE, for immigration enforcement purposes, on a small number of DACA requestors and recipients who engaged in activities that disqualified them from DACA, estimating that from June 2012 to June 2021, of the 106,000 DACA requests that USCIS denied, USCIS referred fewer than 900 cases (less than 1 percent) to ICE.[314] The report did not make any recommendations for necessary changes. Given this conclusion and DHS's experience since the inception of DACA, DHS believes that the longstanding policy governing use of DACA information sufficiently protects DACA requestors' privacy. Regarding one commenter's request that there be appropriate administrative penalties for violations of the information use provision, DHS declines to address penalties in regulatory text, as DHS components already have robust systems in place for ensuring that its personnel follow applicable laws, regulations, policies, and procedures in the performance of their duties, including but not limited to information sharing and use.

*Comment:* Some commenters expressed concern with broad exceptions pertaining to fraud, national, security, and public safety that in their view undermined the protective provisions under proposed 8 CFR 236.23(e). Citing reports indicating that

some gang databases are unreliable, one commenter recommended that the regulations eliminate these exceptions. The commenter added that, at the very least, the regulations should delineate the situations warranting national security or public safety exceptions that justify initiating removal proceedings while compelling DHS to establish clear and convincing evidence to bolster the exception when a requestor, recipient, or family member or guardian listed in the request is placed in removal proceedings.

Another commenter recommended that the regulations provide specific, clear and precise circumstances supporting a national security or public safety exception warranting initiation of proceedings. Pursuant to these exceptions, commenters recommended that, if removal proceedings are initiated against a DACA requestor or recipient, or against family members or guardians listed in a DACA request, DHS should assume the burden of proof to support the exception. Similarly, some commenters recommended that DHS be compelled to prove to the Immigration Judge by clear and convincing evidence that the information divulged in the request was not a basis for commencing removal proceedings. If DHS cannot meet this burden of proof, the commenters suggested that removal proceedings be terminated.

*Response:* DHS acknowledges commenters' concerns with the use of information provided in DACA requests for the purposes of immigration enforcement. DHS notes that new 8 CFR 236.23(e)(2) prohibits the use of information pertaining to family members or guardians provided in DACA requests for the purpose of enforcement proceedings against such family members or guardians, without exception. DHS refers commenters requesting additional guidelines on when removal proceedings may be initiated to the discussion of issuance of an NTA above.

*Comment:* One commenter stated that data privacy protections were and continue to be important for building sufficient trust between the DACA requestor and the government to submit sensitive information but expressed concern that there are few enforceable controls preventing ICE from accessing information on DACA requestors. The group recommended that USCIS prevent both direct and indirect disclosure of information in DACA requests to ICE or CBP. To the extent mutually accessible data systems must be used between agencies, another commenter recommended that USCIS be allowed to track which agencies view that

---

[313] 86 FR 53771.

[314] GAO, Report No. GAO–22–104734, *Immigration: Information on Deferred Action for Childhood Arrivals* (Jan. 2022), *https://www.gao.gov/assets/gao-22-104734.pdf* (last visited May 22, 2022).

information and to monitor and enforce limitations on the rationale for access or acceptable uses of information.

Some commenters recommended that USCIS modify the information use provisions to further restrict information use and sharing. These commenters recommended the provisions forbid the disclosure, circulation, or use of all past or future information—including via electronic systems—for reasons beyond implementing DACA. In the event that another agency obtained any information submitted during the DACA process, or if the information was used for any reason beyond carrying out the DACA policy, the commenters recommended that DHS notify the DACA requestor.

Several commenters also recommended that DHS incorporate guidelines on information storage and electronic access, including strict protocols on accessing information stored or obtained electronically, as well as transparency and oversight measures. One commenter urged DHS to make multiple specific improvements to information protection and sharing, including by establishing stronger safeguards for data from noncitizens who were denied DACA, such as not entering biographical information, biometric information, information about the requestor's family, or immigration status information for denied requestors into the A-file. The commenter said these protections are needed because these individuals are vulnerable to identification and removal by enforcement officers, even if their case is not affirmatively referred to ICE. This risk could deter individuals from requesting DACA. This commenter also suggested reconsidering the Form I–812D disclaimer and limiting third-party data sharing, because the combined risk and complexity it poses could potentially deter eligible DACA recipients and their family who depend on deferred action.

A commenter requested a firm and transparent commitment from all branches of the U.S. Government to refrain from collecting or sharing information on DACA requestors with ICE, including geolocation data from private apps requestors use. Another commenter urged DHS to limit its collection of biometric and biographical data to information that is absolutely necessary to verify eligibility for temporary forbearance under DACA. This commenter also requested the opportunity for public comment on any future proposals to expand biometric data collection or use.

*Response:* DHS appreciates commenters' suggestions for building

trust among the communities that DACA is intended to benefit. DHS notes that since the inception of the policy, the DACA requestor population has stepped forward to request DACA under the same guidelines on information use to be codified in this rule. DHS acknowledges the suggestion for monitoring access to data systems accessible by multiple agencies but believes that such modifications to DHS data systems are unwarranted at this time. As support for the adequacy of the current policies DHS refers to the GAO report on DACA information sharing referenced above, which documents the small number of DACA requests that have been referred to ICE for further investigation or issuance of an NTA and makes no recommendations for changes to DHS policy or practice. DHS therefore declines to make any changes to the rule in response to these comments.

*Comment:* Commenters wrote that requestors should be permitted to redact false Social Security numbers from documents used to demonstrate continuous residence, and privacy guidelines should state that this information will not be shared with immigration or law enforcement agencies or used against the requestor in any other manner.

*Response:* DHS recognizes that individual requestors will submit the evidence that they believe is appropriate in support of the threshold guidelines. However, DHS will afford the appropriate weight to the evidence based upon the information included. As noted elsewhere in this preamble, under the preponderance of the evidence standard, the sufficiency of each piece of evidence is examined for relevance, probative value, and credibility, both individually and within the context of the totality of the evidence, to determine whether the fact to be proven is probably true.

In response to commenter's request to modify the information use provision, as discussed above, the rule codifies longstanding prohibitions on use of information with specific exceptions. This longstanding practice has worked to protect against improper uses of information provided in DACA requests for enforcement purposes. DHS therefore respectfully declines to write such granularity into the final rule.

### 6. Severability (§ 236.24)

*Comment:* A number of commenters addressed the severability provision of the proposed rule. One commenter expressed support for the severability provision of the proposed rule because it would mitigate risks associated with the fact that the DACA policy faces

continued litigation risk. Another commenter supported making DACA benefits severable, reasoning that this aspect of the rule aligns with longstanding principles of contract law.

A commenter said that inserting a severability provision in the regulation is not enough to protect and insulate EADs from litigation and preserve access to work authorization. Another commenter echoed this while also expressing concern that future administrative or legal actions could create barriers to DACA recipients' efforts to secure work authorization in a timely manner. Another group of commenters argued against separating deferred action from work authorization, including via the severability provision, arguing that a severability provision should not be necessary because granting employment benefits to DACA recipients does not violate the INA.

*Response:* A severability clause is a standard legal provision. It indicates DHS's intent that if a court finds that a specific provision of a rule is unlawful, the court should allow the remainder of the rule to survive. Those provisions that are unaffected by a legal ruling can be implemented by an agency without requiring a new round of rulemaking simply to promulgate provisions that are not subject to a court ruling.

DHS understands the concern that if one portion of the rule is severed from the others by a court it could lead to undesirable consequences for DACA recipients. However, although DHS believes that all portions of this rule are well within its legal authority, if a court finds that portions of the rule are unlawful it is preferable to sever and strike only those portions, rather than having the rule stricken in its entirety. Although the important goals and policies reflected here are best served if each of the portions of the rule remains intact, DHS recognizes that each portion of the rule will remain workable without the others. Therefore, even if portions of the rule are struck down DHS will implement the provisions of this rule that survive judicial review. For example, DHS will continue to implement 8 CFR 236.21(c)(1) (relating to forbearance) and 8 CFR 236.21(c)(2) (relating to employment authorization) even if DHS is prohibited from deeming DACA recipients ''lawfully present'' for purposes of receiving certain Social Security benefits (8 CFR 236.21(c)(3)) or the unlawful presence provisions at INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B) (8 CFR 236.21(c)(4)). Similarly, although there are significant benefits to providing work authorization alongside forbearance, forbearance remains

workable and desirable without work authorization, and DHS would have adopted the forbearance portion of the policy even if it did not believe that the work authorization portion of the rule were legally authorized. There are further discussions of the comments received on the separation of deferred action and work authorization elsewhere in this preamble.

7. Advance Parole and Adjustment of Status

Strengthening and Expanding the Availability of Advance Parole

*Comment:* Many commenters expressed support for the proposal's clarification that advance parole will continue to be an option for DACA recipients. Several commenters remarked that DACA recipients should have the right to travel internationally and requested that DHS remove the requirements for advance parole or expand the circumstances that make DACA recipients eligible for advance parole. Other commenters stated that including advance parole for DACA recipients in regulation will allow them to study and conduct research abroad and would be critical for opening opportunities to develop international skills and gain experience via study abroad programs. Commenters described DACA recipients' significant contributions to campus life, corporate success, and the overall economy, and said that these contributions have engendered significant reliance interests, including recruiting and investments by educational institutions and employers.

Many commenters requested expanding advance parole beyond employment, educational, or humanitarian grounds. Commenters noted that current categories are often not applicable for DACA recipients, or that they may be difficult to predict or document months in advance. Some commenters reasoned that delays or denial of parole based on narrow restrictions have adverse impacts on students' educational experiences and outcomes and stated that DACA recipients' access to advance parole improves their educational outcomes and enhances their contributions on campus. Several commenters stated that there was no statutory, regulatory, or practical reason for the narrow grounds for advance parole available to DACA recipients. One commenter requested that USCIS exercise its discretion to issue advance parole to DACA recipients for the broadest range of travel purposes when justified by urgent humanitarian need or significant public

benefit, arguing that USCIS is clearly authorized to exercise such discretion. The commenter reported inconsistent application of the current standards by adjudicators and suggested that applying a broader interpretation and maximum discretion would be more efficient, allowing USCIS to timely adjudicate applications for advance parole.

Many commenters suggested DHS expand the grounds for advance parole to include any reason for travel. One commenter requested that advance parole apply to DACA recipients in the same manner as it is applied for TPS recipients (requiring less documentation of specific reasons for travel). Other commenters agreed and recommended that DHS harmonize advance parole requirements for DACA with other forms of humanitarian relief (such as TPS) that require less documentary evidence and allow travel for any reason. Other commenters recommended travel standards be revised to include cultural and familial reasons. One commenter cited research demonstrating that a high percentage (35.4 percent) of DACA students interviewed meet the clinical cutoff for anxiety, and recommended that DHS expand the parameters for advance parole to provide a greater opportunity for DACA recipients to travel abroad and visit family and loved ones over holiday breaks to support mental health.

*Response:* DHS acknowledges the comments in support of advance parole for DACA recipients. DHS agrees with the commenters that allowing DACA recipients to apply for advance parole is consistent with the INA. The INA authorizes DHS to grant parole on a case-by-case basis, for urgent humanitarian reasons or significant public benefit, to individuals, at the discretion of DHS. 8 U.S.C. 1182(d)(5). Advance parole allows a noncitizen to leave the United States and then be paroled back in, consistent with INA sec. 212(d)(5), 8 U.S.C. 1182(d)(5) and 8 CFR 212.5(f). The statute provides that the Secretary may parole "*any alien applying for admission to the United States*" for the purposes in the statute. 8 U.S.C. 1182(d)(5) (emphasis added). Because DACA recipients who depart the United States and seek to reenter are applicants for admission, they are statutorily eligible to apply for parole.[315] And because parole is not an

"admission," DACA recipients remain eligible for parole even if they are "inadmissible" under 8 U.S.C. 1182.[316]

Consistent with these comments in support of advance parole, DHS reiterates that under the rule, it would continue its adherence to that standard. In response to the commenters who suggest broadening the standard for advance parole to include all reasons for travel, or all reasons for travel if a significant public benefit or urgent humanitarian reason is articulated, DHS has considered this request, but declines to make changes, as statutory language in INA sec. 212(d)(5) that limits DHS's exercise of parole to urgent humanitarian or significant public benefit reasons requires case by case consideration of the reason for travel. While DHS acknowledges commenters' requests to specifically broaden DACA recipients' access to advance parole beyond travel for humanitarian, employment, and educational purposes, DHS declines to set such standards in this rule. DHS has generally found that permitting DACA recipients to travel in certain circumstances for humanitarian, educational, or employment related reasons provides a significant public benefit or is justified as an urgent humanitarian reason for travel. DHS additionally notes that specific instructions for applying for an advance parole document under several categories are provided in the Form I–131, Application for Travel Document itself, and declines to write them into this rule for only DACA requestors.[317]

With respect to the commenters who requested that advance parole for DACA recipients be harmonized with the standards for granting travel authorization to TPS beneficiaries, DHS first notes that TPS, unlike DACA, is a lawful immigration status expressly prescribed by statute. Indeed, Congress expressly contemplated that TPS beneficiaries be able to travel and return with advance authorization.[318] In addition, the law requires that a TPS beneficiary who travels abroad with such prior authorization, "shall be inspected and admitted in the same immigration status the alien had at the time of departure" unless certain narrow exceptions related to mandatory ineligibility for TPS apply.[319] DACA, on

---

[315] Although some DACA recipients were admitted as nonimmigrants or under other authorization, they overstayed their authorization period in the United States. When they depart and seek to reenter, they would become "applicants for admission" and may be paroled at that time in DHS's discretion.

[316] *See* 8 U.S.C. 1101(a)(13)(B) ("An alien who is paroled . . . shall not be considered to have been admitted.").

[317] Form instructions are incorporated into regulations by operation of 8 CFR 103.2(a)(1).

[318] *See* INA sec. 244(f)(3), 8 U.S.C. 1254a(f)(3).

[319] *See* 8 U.S.C. 1254a note ("Aliens Authorized to Travel Abroad Temporarily") (This note derives from section 304(c) of the Miscellaneous and
Continued

**53250** Federal Register / Vol. 87, No. 167 / Tuesday, August 30, 2022 / Rules and Regulations

the other hand, is not a statutorily-provided immigration status like TPS, but merely forbearance from removing an individual from the United States. Accordingly, the Department has a reasonable basis for prescribing different criteria for TPS beneficiaries seeking permission to travel and for DACA recipients seeking advance parole.

Advance Parole and Relation to INA Sec. 245(a)

*Comment:* Commenters stated that expanding the categories for advance parole would eliminate barriers to adjustment of status and would streamline the adjudication workload. Several other commenters expressed support for the proposed rule's recognition that DACA recipients who travel abroad and return to the United States can be paroled back into the country and will satisfy the "inspected and admitted or paroled" requirement for adjustment of status under INA sec. 245(a), 8 U.S.C. 1255(a). Expressing support for expanding the circumstances for requesting advance parole, a commenter said that advance parole has allowed many DACA recipients to travel internationally and satisfies the "inspected and admitted" requirement for adjustment of status. Multiple commenters expressed concern about the uncertainty of being allowed to reenter when DACA recipients return to a port of entry, arguing that this uncertainty prevents many DACA recipients from applying for advance parole. As a solution, the commenters recommended establishing a parole-in-place program, similar to the program available for U.S. military families, for eligible DACA recipients to adjust their status to lawful permanent resident to reduce uncertainty and improve administrative efficiency. Another commenter remarked that undocumented immigrants should have a pathway to achieve legal status without risking prohibitions or restrictions on international travel and reentry into the United States, suggesting that a Reentry Permit should be made available to DACA recipients

because this population should be permitted to travel and reenter the country legally without fear of rejection or other consequences.

Conversely, one commenter referred to the court's discussion in *Texas* stating that allowing DACA recipients to receive advance parole contradicts Congress' intention to restrict adjustment of status eligibility for those who have not been lawfully admitted or paroled into the United States. The commenter disagreed with DHS's rationalization that DACA recipients are subject to the same urgent humanitarian or significant public benefit analysis the statute requires, and therefore, providing DACA recipients the ability to seek advance parole is in line with the authorization provided by Congress in the statute. The commenter argued that applying the parole standard does not mean that "Congress intended to create a class-based exception to the adjustment of status restriction or the bars to reentry."

*Response:* Advance parole is rooted in INA sec. 212(d)(5), 8 U.S.C. 1182(d)(5), which authorizes parole on a case-by-case basis for urgent humanitarian or significant public benefit reasons. The INA contains several relevant statutory provisions and requirements for eligibility for adjustment of status to that of a lawful permanent resident, including those laid out at INA sec. 245, 8 U.S.C. 1255, which requires, among other things, that applicants for adjustment of status be eligible for an immigrant visa and be admissible under INA sec. 212, 8 U.S.C. 1182, and that applicants were "inspected and admitted or paroled" into the United States. Although advance parole granted to DACA recipients may aid certain recipients later seeking adjustment of status in meeting the requirement in 8 U.S.C. 1255(a) to have been "inspected and admitted, or paroled," that effect of parole was determined by Congress. Parole may have a similar effect with respect to the restriction in 8 U.S.C. 1182(a)(6)(A)(i), which applies only if an individual is "present in the United States without being admitted or paroled," but that too was determined by Congress and is likewise independent of DACA itself.[320]

Moreover, even if parole removes a particular bar to subsequent adjustment of status, parole itself does not entitle any individual to adjustment of status; each applicant for adjustment of status must meet all other statutory requirements relevant to their particular basis for adjusting status to that of a lawful permanent resident and be granted adjustment in an exercise of discretion, and those requirements are not affected by this rule. So long as DHS acts within the limits of its parole authority in 8 U.S.C. 1182(d)(5), there is no conflict with Congress' expressed intent for eligibility for adjustment of status. As discussed above, DHS believes the DACA-based advance parole guidance does just that. DHS also disagrees with the characterization of this process as "class-based," as all advance parole decisions are made on a case-by-case, individualized basis. DHS therefore declines to make any changes in response to the comments either requesting expansion or limitations to Congress' requirements for adjustment of status, which is beyond the scope of rulemaking.

Reducing Financial and Administrative Burdens for DACA Recipients Seeking Advance Parole

*Comment:* A few commenters recommended that DHS design a streamlined, less intricate, or less costly application process for advance parole. Some commenters recommended incorporating advance parole with a reduced or eliminated fee into the final rule. Another commenter requested that USCIS expand DACA provisions to allow for a right of reentry and stated that requiring DACA recipients to file form I–131 (at a significant cost of $575) creates delays and increased paperwork burdens. Other commenters recommended that DHS allow applications for advance parole to occur at the same time as both initial DACA requests, and requests for DACA renewal. One commenter suggested that the final rule allow for departures from the United States for 6 months or 1 year instead of the discrete windows allowed under current policy. The commenter further recommended USCIS develop clear procedures and criteria for adjudication of advance parole applications to allow for more efficient

---

Technical Immigration and Naturalization Amendments Act of 1991, Public Law 102–232, 105 Stat. 1733, 1749 (Dec. 12, 1991) (as amended). This provision requires admission in TPS of a TPS beneficiary who travels abroad with prior authorization, unless the individual is inadmissible for reasons that are also certain mandatory criminal or security ineligibility bars to TPS in INA sec. 244(c)(2)(A)(iii), 8 U.S.C. 1254a(c)(2)(A)(iii)). *See generally Duarte* v. *Mayorkas*, 27 F.4th 1044 (5th Cir. 2022). Accordingly, DHS is no longer using the advance parole mechanism to authorize TPS travel. *See Rescission of Matter of Z-R-Z-C- as an Adopted Decision; agency interpretation of travel authorized by TPS beneficiaries*, USCIS PM–602–0188 (Jul. 1, 2022).

[320] In response to the Intervenors' discovery request in *Texas*, USCIS estimated, with a +/−1.5% margin of error, that between 13,908 and 14,358 requestors who were approved for DACA between June 2012 and June 2018 and who had subsequently adjusted to LPR status as an immediate relative (*i.e.*, qualified spouse, child, or parent of a United States citizen) could not have met the requirement in 8 U.S.C. 1255(a) to have been "inspected and admitted, or paroled" but for their entries to the United States on DACA-based advance parole granted prior to the filing of their Forms I–485 for

adjustment of status. *See* Fed. Defs.' Revised Resp. to Def.-Intervenors' Revised Disc. Req., dated November 8, 2019, provided in *Texas*. Reaching this estimate involved several months of intensive statistical research, data sampling, manual file reviews, and subsequent data analysis. DHS has not had another occasion to undertake such a labor-intensive effort to update this estimate, which was based on the sampling of cases from the first 6 years of DACA.

and effective processing of such applications.

Another commenter stated that long processing times and the 2-year grant of DACA present challenges for DACA recipients to travel freely internationally. The commenter noted that USCIS policies already provide for a combined EAD and advance parole document for applicants for adjustment of status and recommended expanding this option to allow DACA recipients to receive joint EAD and advance parole cards. Similarly, a commenter suggested creating an EAD travel card for work, educational, or humanitarian purposes.

*Response:* DHS recognizes the financial costs and time required for adjudication of applications for advance parole for DACA recipients. The advance parole adjudication process, however, is the same for DACA recipients as for all noncitizens filing Form I–131 Application for Travel Document, including the filing costs, which are set by the fee rule, and processing times for an advance parole document. While acknowledging the financial costs and time required for processing advance parole requests, DHS notes that other noncitizens face similar processing times and fee costs for travel documentation and declines to provide differentiated treatment to DACA recipients. In response to concerns regarding the timing of advance parole, DHS does offer an expedited adjudication for exceptionally urgent reasons, and does offer longer time periods for advance parole where warranted. Finally, with regard to requests for a combination employment authorization document and advance parole card as is available for adjustment of status applicants, DHS has considered the various concerns of commenters, but notes that DACA recipients granted a temporary reprieve from removal action and applicants for adjustment of status awaiting visa availability are differently situated, and has determined not to create new forms, identity documents, and additional operational processes for advance parole for DACA recipients.

Easing or Eliminating Need for Advance Parole

*Comment:* A commenter expressed concern about what they perceived as DACA recipients' inability to travel internationally, writing that a continued restriction on international travel could hinder their professional development and prevent them from traveling abroad to visit relatives. Several commenters likewise requested that DHS consider proposals to eliminate advance parole requirements or travel restrictions more

generally. One commenter stated that advance parole for DACA recipients was unnecessarily restrictive and costly, and recommended that DHS consider ways to facilitate travel for DACA recipients by loosening advance parole requirements, including permitting DACA recipients to travel without advance parole in emergency situations. One commenter expressed general support for allowing DACA recipients to travel internationally and expressed a willingness to pay for an upgraded DACA that would allow for international travel without needing to establish advance parole.

*Response:* DHS acknowledges the commenter's concern about DACA recipients' ability to engage in international travel. DHS notes the existing DHS policy of granting advance parole to DACA recipients in its discretion on employment, educational or humanitarian grounds, if the applicant satisfies certain criteria, allowing recipients to travel internationally in some circumstances.

DHS also acknowledges commenters' requests to ease or eliminate advance parole requirements for DACA recipients, as well as the uncertainty associated with returning to the United States. DHS notes that it lacks the authority to do so through rulemaking. DHS does not have the legal authority to eliminate the statutory requirements for parole under INA sec. 212(d)(5), 8 U.S.C. 1182(d)(5), or broaden the requirement beyond the statutory standard of urgent humanitarian reasons or significant public benefit. For these reasons, and those discussed above, DHS is not altering the advance parole requirement in the rule.

*D. Other Issues Relating to the Rule*

1. Public/Stakeholder Engagement (*e.g.,* Requests To Extend the Comment Period)

Public Engagement

*Comment:* One commenter stated that DHS should communicate with immigrant communities and organizations about the rule and should read every comment submitted. Other commenters commented that DHS should continue to collaborate with and provide information to farmworker communities about DACA. The commenters suggested that DHS continue to share information in accessible languages, including Indigenous languages, through a variety of media, and engage in outreach sessions with trusted voices in the farmworker community.

*Response:* DHS appreciates these commenters' suggestions. DHS has

reviewed and carefully considered all comments that fall within the scope of this rulemaking. DHS communicates with the DACA requestor population through the online DACA FAQs, social media, and other stakeholder engagements, which it intends to continue upon publication of this rule.

2. Administrative Procedure Act and Rulemaking Requirements

Compliance With the Administrative Procedure Act

*Comment:* A few commenters wrote that DHS should establish DACA through notice-and-comment rulemaking following the requirements of the Administrative Procedure Act (APA). Others voiced opinions on the sufficiency with which the rule complies with the APA. One commenter remarked that the proposed rule was so long and complex that it may subvert the APA's public comment process.

*Response:* In this rule, DHS is establishing DACA through notice-and-comment rulemaking in accordance with the APA. During this process and as DHS explains throughout this rule, DHS has complied with the APA, in particular by welcoming comments on and carefully considering all comments received during the comment period. DHS understands that notice-and-comment rulemaking and the associated documents can be long and complex, but this rulemaking follows the appropriate process, and the rule is at an appropriate level of detail.

Negotiated Rulemaking

*Comment:* Multiple commenters requested that DHS require negotiated rulemaking for future changes made to the final rule since negotiated rulemaking involves enhanced stakeholder input and would be in the public's best interest.

*Response:* DHS appreciates that negotiated rulemaking can provide additional collaboration with affected parties outside of notice-and-comment rulemaking. All comments received during the comment period have been considered. However, DHS declines to limit the available means by which future changes to DACA regulations or policies can be made by requiring negotiated rulemaking, which is not a process typically used by DHS.

Future Changes Timeline

*Comment:* Multiple commenters suggested that any future changes to the final rule should not take effect for 240 days because modifications to DACA could result in significant impacts to those involved.

*Response:* DHS understands that future changes to these regulations could have significant effects on DACA recipients and in some instances longer lead times to implement changes might be desirable. Recognizing this, DHS will take such effects into consideration when considering future changes to the regulations and will comply with the APA and other legal requirements when doing so.

### 3. Processing Time Outlook (Including Comments on Backlogs)

*Comment:* Many commenters expressed general concern about long processing times and urged DHS to improve its infrastructure to shorten timeframes or otherwise address backlogs that slow down the immigration process overall to give individuals the chance to succeed academically and economically and preserve families. Citing research and government data, commenters highlighted wait times for DACA requests lasting more than 11 months, as well as an 85-percent increase in the USCIS backlog between 2015 and 2020. A commenter noted that that the COVID–19 pandemic has exacerbated processing delays at a time when many DACA recipients are on the front lines as essential workers. Commenters expressed concern that long wait times threaten DACA recipients' safety and jobs, and cause stress and uncertainty, and that processing delays of renewal requests cause lapses in recipients' work authorization.

Commenters suggested additional ways for USCIS to address processing times, including: resuming expedited request criteria for DACA recipients to reduce the backlog of requests; prioritizing processing of initial and renewal DACA requests; completing processing within 60 days and prioritizing renewal requests nearing their validity expiration; addressing staffing shortages that have contributed to the backlog; and DHS leveraging congressional appropriations to improve DACA request processing.

*Response:* DHS appreciates commenters' concerns with processing times for DACA-related requests and suggestions for improving efficiency in considering these requests. DHS recognizes the significant impact that backlogs and delays have on requestors, and acknowledges that policy changes, court rulings, and resource constraints in recent years contributed to increased backlogs and processing delays. As discussed in this rule, USCIS has taken important steps to ensure properly filed requests are swiftly adjudicated. These steps are reflected in significantly

improved processing times for renewal requests. As of May 31, 2022, the FY 2022 median processing time for a DACA-related Form I–765 is 0.5 months.[321] Further, USCIS continues to examine strategies for ensuring efficient processing of DACA-related requests.[322] Indeed, this rule serves to codify threshold criteria, clarify processes, and establish a filing and fee structure intended to fortify DACA and support efficient processing of requests. DHS takes under advisement commenters' suggestions, but believes that the operational details of resource allocation and prioritization of adjudications are best addressed through subregulatory guidance, which provides greater flexibility to address fluctuating workloads.

### 4. DACA FAQs

*Comment:* A commenter stated that the DACA FAQs are a large source of policy clarification that should be examined carefully, recommending that the final rule clarify that relevant policy and operational directives, or other guidance, will be incorporated or updated as appropriate, including anything related to pandemic relief assistance for DACA recipients. The commenter produced a non-exhaustive list of DACA FAQs that should be preserved, including those pertaining to request processing, acceptable documentary evidence, travel, and fee exemptions, as well as those that proscribe information sharing with immigration enforcement authorities.

*Response:* DHS appreciates the commenter's suggestions and has incorporated into the preamble and regulatory text some of the guidance from the DACA FAQs, including guidance on the definition of "currently enrolled in school" and acceptable documentary evidence in support of the threshold criteria. DHS takes under advisement the commenter's suggestions regarding any future revisions of the DACA FAQs.

---

[321] USCIS, *Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year, Fiscal Year 2017 to 2022 (up to May 31, 2022), https://egov.uscis.gov/processing-times/historic-pt* (last visited June 29, 2022).

[322] *See, e.g.,* USCIS, *USCIS Announces New Actions to Reduce Backlogs, Expand Premium Processing, and Provide Relief to Work Permit Holders* (Mar. 29, 2022), *https://www.uscis.gov/newsroom/news-releases/uscis-announces-new-actions-to-reduce-backlogs-expand-premium-processing-and-provide-relief-to-work.* Also, since April 2022, DACA recipients have had the option to submit their renewal request and associated work authorization request online. *See* USCIS, *USCIS Announces Online Filing for DACA Renewal Forms* (Apr. 12, 2022), *https://www.uscis.gov/newsroom/news-releases/uscis-announces-online-filing-for-daca-renewal-forms.*

### 5. Other Comments on Issues Relating to the Rule

#### Other Comments

*Comment:* A commenter requested that DHS remove what it described as dehumanizing language from the regulation, including the use of the word "alien." The commenter said that the use of this language is at odds with the Biden administration's own proposed immigration legislation and direction from the Department's leaders, citing relevant memoranda. Another commenter objected to the use of the term noncitizen and encouraged DHS to use the term "alien" instead.

*Response:* While the term "alien" is a legal term of art defined in the INA for immigration purposes, DHS recognizes that the term has been ascribed with a negative, dehumanizing connotation, and alternative terms, such as "noncitizen," that reflect our commitment to treat each person the Department encounters with respect and recognition of that individual's humanity and dignity are preferred. DHS will use the term "alien" when necessary in the regulatory text as the term of art that is used in the statute, but where possible DHS will use the terms "requestor" or "recipient" to refer to those who are seeking or who have received deferred action under the DACA policy.[323] This preamble uses the term noncitizen for that same reason.

*Comment:* A commenter stated that Asian and Pacific Islander communities have historically low rates of DACA requests and attributed this to cultural stigma, language barriers, high application fees, difficulties collecting required documents, and a lack of awareness. The commenter requested that USCIS work to remove these barriers to accessing the DACA policy.

*Response:* DHS appreciates commenter's request and takes it under advisement as it considers outreach to Asian and Pacific Islander communities.

*Comment:* A commenter stated that DACA provides essential protections and opportunities for survivors of gender-based violence. However, the commenter requested that DHS do more to protect this vulnerable population and consider establishing an "amnesty" program for DACA requestors who are survivors of sexual misconduct, harassment, and abuse that would provide automatic protection against deportation resulting from their report of such victimization.

*Response:* DHS appreciates the commenter's support of the DACA

---

[323] *See, e.g.,* new 8 CFR 236.21(c)(2) and 236.22(a)(3).

policy and acknowledgement that it provides important protections to eligible survivors of gender-based violence. However, the commenter's request to create a program that would provide automatic protection against removal for DACA requestors who report their victimization goes beyond the scope of this rulemaking.

*Comment:* One commenter said that any modifications or updates to DACA should allow spouses of U.S. citizens to obtain legal status by paroling in place.

*Response:* DHS acknowledges the commenter's feedback but notes that this suggestion is beyond the scope of this rulemaking.

*E. Statutory and Regulatory Requirements*

1. Impacts and Benefits (E.O 12866 and E.O. 13563)

a. Methodology and Adequacy of Cost-Benefit Analysis

(1) Methodology of the RIA

*Comment:* One commenter approved of DHS's consideration of various costs and benefits such as application costs and earned income of DACA recipients. The commenter also recommended that DHS supplement the RIA by more thoroughly addressing several arguments that DHS previously offered against the DACA policy in its rescission memoranda.

*Response:* DHS considered the input and suggestions received throughout the public comments and adjusted the RIA where it deemed applicable and feasible. The adjustments made are described in applicable comment responses and corresponding RIA sections. Additionally, we refer readers to Table 3 in the RIA of this final rule. The table provides details of the changes and adjustments made in the estimates of the analysis from the NPRM to the final rule. DHS also addresses the Duke and Nielsen recission memoranda in detail in Section II.B.3.

(2) Comments on Population Estimates and Assumptions

*Comment:* A commenter stated that the proposed rule should have also considered half a million existing DACA recipients, not just new DACA recipients in the labor market analysis section, which, the commenter stated, is not a small number.

*Response:* DHS appreciates the comment regarding the population estimates in labor market analysis section. As presented in the RIA, DHS analyzed possible labor market impacts relative to two baselines, a No Action baseline where only future DACA recipients where considered, and a Pre-

Guidance baseline where existing and future DACA recipients were considered, consistent with the commenter's suggestion. The RIA details this methodology and analysis.

*Comment:* A group of commenters stated that DHS assumptions about the DACA population are unsound. The commenter stated that new intakes under the DACA policy, "declined consistently between FY 2014 and FY 2016," even before the announced decision to rescind DACA further curtailed "new intakes in FY 2018–2020." The commenter further reasoned that conditioning DACA eligibility on having "continuously resided" in the United States since June 2007 and having been "physically present" in the United States since June 2012 would reduce DACA's new intakes more quickly than what DHS population estimates reflect.

*Response:* DHS appreciates the comment regarding the assumptions about the projections of an active DACA population presented in the RIA. The purpose of presenting active DACA population projections is not to project the trend of the "stable" period of FY 2015–FY 2017 identified in the RIA. DHS identified the "stable" period of FY 2015–FY 2017 as a period that was characterized by relatively consistent operations of the DACA policy in which there were no requestor surges nor stoppages in the processing due to policy changes or litigation. Although the rate of increase of the active DACA population was slowing during the "stable" period as some recipients ceased renewing their DACA requests, and the number of Initial Approved Requests was declining, DHS does not assume the same trend in the active DACA projections, as it is uncertain what trends will emerge in the future. Instead, DHS uses the average population during the "stable" period as the estimated active DACA population. By using the average population during the "stable" period, DHS is better able to account for policy uncertainties and the policy's population, and the gap between the views supporting the existence of large numbers of potentially eligible requestors and the views supporting the opposite. Further, although the threshold criteria set forth a minimum age at the time of request, which could reduce the number of future eligible requestors, DACA intake data for FY 2021 indicate the possibility still exists that there are many adults who may meet threshold criteria for consideration under the policy and

could submit a request.[324] For example, under threshold criteria in place since 2012 and as codified by this rule, a 15-year-old in 2025 would not meet threshold criteria, but an 18-year-old in 2025 would. There could be many or few 18-year-old potential requestors. Among those potential requestors, many or only a few might choose to request DACA, decisions that could be influenced by personal circumstances, political environments, and other factors.

*Comment:* A commenter stated that DHS projections in the NPRM at Table 8, 86 FR 53786, overstate the growth in the DACA population and inadequately account for the aging of the DACA population due to the threshold criteria. The commenter suggested that even if the proposal to unbundle the Forms I–821D and I–765 result in a larger number of initial applications, the number of initial applications resulting from this change will be too small to justify USCIS' estimates of the active DACA population. The commenter suggested that DHS should adopt more empirically responsible and internally consistent DACA modeling estimates. However, the commenter did not propose any specific methodological suggestions or guidelines for USCIS to implement, other than to take greater account of the role of age.

*Response:* DHS appreciates the commenter drawing attention to the NPRM's projections of an active DACA population, including the estimated labor force participation rate for the DACA population discussed in the NPRM RIA. As described in the NPRM RIA, the 30-percent threshold is based on data from the Bureau of Labor Statistics (BLS) on the labor force participation rates by age cohort. DHS acknowledges that such participation may fluctuate over time. As it relates to the population estimates more generally, as discussed in the NPRM RIA and in a previous comment response, the phenomenon of "aging in" to eligibility under the DACA threshold criteria does not solely control DHS's projections of the active DACA population, or prevent growth in the active DACA population in line with DHS projections.

DHS acknowledges that the projections may be an overestimate, as discussed above. DHS estimated this population based on available internal and external data, and carefully considered a wide variety of economic, policy, and legal expertise and relevant

[324] Source: USCIS, Office of Performance and Quality, NPD, C3, ELIS, queried Aug. 2021, TRK#8129.

literature. DHS acknowledges the possibility that the average age of the projected active DACA population could increase and, as a result, a higher proportion of active DACA individuals might choose to participate in the labor market relative to the NPRM. Therefore, in the final rule RIA, DHS is adjusting upwards the estimated percentage of DACA recipients who might choose to participate in the labor market from the estimated rate of 70 percent in the NPRM to the estimated rate of 78 percent in the final rule. The assumptions and methodology of this adjustment are discussed in greater detail in Section III.A.4.a.6.

*Comment:* A commenter expressed concern with the Department's methodology, noting it was sensitive to specific modeling assumptions that could cause an under- or overestimation of the residual subpopulation. They also noted that the Department does not have a tested methodology to predict how many potential DACA-eligible individuals will request DACA, and that to predict future DACA requests, DHS used historical request data that USCIS collected from individuals over the last several years, rather than estimating the overall DACA eligible population and then further estimating the share of the population eligible to request DACA in the future. However, despite these concerns, the commenter generally approved of the Department's population calculating methodology, noting that, all methodologies face challenges and that they see no reason to believe that another methodology would yield a more accurate estimate.

*Response:* DHS appreciates the commenter's support of DHS's analytical efforts as well as the feedback on the projections of the active DACA population. DHS has determined that estimating the population of those who are potentially eligible for DACA is not necessary to estimate the number of individuals who might choose to request DACA in the future. While estimating the total DACA-eligible population would offer an upper bound of potential requestors, such an estimate would not offer a precise number of those who will submit requests that are approved. Thus, it would likely be overinclusive because DHS lacks accurate data about several of the DACA criteria in the potentially eligible population, such as educational attainment and criminal histories, as well as the discretionary analysis performed in each request. Nevertheless, given external estimates of potential DACA-eligible populations, DHS believes that the projections offered in the NPRM RIA and this rule

are within the possible upper-bound estimates given the historical data on the policy, the uncertainty surrounding the DACA policy and its population, public comments that support larger or smaller population estimates, existing literature, and available expertise on the policy.

*Comment:* A commenter stated that given the bias of all available data, DHS should be cautious in considering the Migration Policy Institute's data suggesting that 700,000 DACA-eligible individuals have not submitted initial requests. The commenter expressed concern regarding DHS's statement that DACA requestors will stop "aging in" to the policy in June 2022, but that this should not impact the number of requests, based on available data. The commenter said that past administration attempts to rescind DACA and the recent Texas court case that bars new requestors have skewed the available data.

*Response:* DHS appreciates the comment concerning the assumptions in developing projections of the DACA population in this rule. To estimate the relevant populations for this rule, DHS considered the DACA-eligible population estimates from the Migration Policy Institute. As discussed in elsewhere in this section and in Section III.A.4.a.1, DHS agrees with the commenter that the "age in" restriction of the policy will not necessarily impact the number of potential DACA requestors, at least in the short run, and DHS did not base the population estimates on this restriction. Additionally, recent attempts at rescinding DACA and the district court injunction prohibiting DHS from administering DACA for new requestors were not factors that impacted DHS's population projections. The two baseline assumptions and the methodology for population projections are detailed in Sections III.A.2 and III.A.4, and III.A.4.a.1, respectively.

(3) Comments on Wage Rates

*Comment:* One commenter cited literature and other information in support of this rulemaking. The commenter stated that extending work authorization to undocumented noncitizens would reduce the wage penalty for those undocumented noncitizens, stabilize immigrant wages, and benefit the overall economy. The commenter stated that the wage-earning profiles of undocumented workers are far below authorized noncitizens' and citizens' workers' age-earning profiles and is virtually flat during most prime working years. The commenter further stated that undocumented noncitizen

women work fewer hours at lower pay than do their undocumented noncitizen male counterparts, and that State-level restrictions on undocumented employment increased the male wage penalty by around 40 percent. The commenter suggested that work authorization improves career and earnings prospects for DACA recipients and the resulting increase in earnings and spending increases tax revenue and labor demand, benefitting U.S. workers overall.

*Response:* DHS appreciates the comment in support of this rulemaking and in drawing attention to the direct and indirect wage penalty implications discussed in the NPRM RIA. In consideration of this comment, DHS presents additional qualitative discussion in the final rule RIA regarding the potential wage penalty implications of this rulemaking given the size of the affected population. For example, assuming all else is constant, granting employment authorization to undocumented noncitizens and allowing them to find employment in the formal labor market could reduce the number of undocumented workers in the informal labor market. Thus, informal labor market wages would rise as employers would find it necessary to raise wages to attract remaining informal labor market undocumented participants. In this scenario, the wage gap between documented and undocumented noncitizens would shrink. Conversely, "State-level restrictions" on the hiring of undocumented noncitizens could reduce employer demand for undocumented workers, lowering wages for this group, thus increasing the wage gap. These outcomes, however, are heavily dependent on theoretical assumptions. For example, countervailing forces may be present that could affect not just the magnitude of these wage penalty outcomes, but even push them in opposite directions.

b. Benefits (No Action Baseline, Pre-Guidance Baseline, or Unspecified)

Quantifying the Benefits of Advance Parole

*Comment:* A commenter wrote that certain benefits of advance parole to DACA recipients, such as the ability to maintain family ties across generations, simply cannot be quantified and that these and other benefits outweigh the policy's costs. The same commenter responded to DHS's request for comment on how to quantify the benefits of advance parole by stating that advance parole allows some DACA recipients to "be the bridge between

generations who cannot cross borders,'' providing an anecdotal example. Another commenter acknowledged DHS's qualitative discussion of the benefit of advance parole and offered suggestions to quantify this benefit, including assessing economic data on travel spending. Other commenters responded to USCIS' statement that the benefits of advance parole could not be quantified, stating that 45,000 DACA recipients have been approved for international travel under advance parole as of August 2017 (citing the Congressional Research Service). The commenters said that this figure demonstrates the deep importance of advance parole and listed other reasons why advance parole was beneficial for DACA recipients, including enhanced opportunities to apply for adjustment of status, participation in enriching educational programs, travel for work, and ability to visit families in countries of origin.

*Response:* DHS appreciates the suggestions from commenters that past demand for international travel under advance parole is indicative of the benefit to DACA recipients of traveling for work and education, or to visit families in countries of origin. DHS has taken these comments into consideration in the RIA of this rule but does not quantify these benefits. While some of the assumptions that commenters suggested would permit DHS to quantify benefits like a reduction of fear and anxiety, there is cause for concern about the accuracy of such estimates. For example, assuming average annual spending on international trips to be representative of the value of advance parole to a DACA recipient could either overstate the kind of spending that a DACA recipient would do or underestimate the nonmonetary benefit of attending a relative's funeral. Describing such impacts as non-quantified in the RIA should not be construed as a denial of their occurrence nor magnitude.

*Comment:* A commenter stated that, based on the USCIS analysis, the benefits of allowing DACA recipients to stay in the United States and work over 20 years at a 7-percent discount rate would be $400 billion and would far outweigh the approximately $7 billion in costs. Another commenter urged USCIS to consider the incalculable benefits DACA provides in terms of equity, human dignity, and fairness, as well as lifetime benefits to the economy. The commenter said that the proposed rule lays out some benefits that would be hard to quantify, such as: (1) a reduction of fear or anxiety for DACA recipients and their families; (2) an

increased sense of acceptance and belonging to a community; (3) an increased sense of family security; and (4) an increased sense of hope for the future. Another commenter similarly said that DHS should acknowledge that the proposed rule's quantifiable costs can be, and are, outweighed by the unquantifiable benefit to DACA recipients, their communities, and the nation.

*Response:* DHS appreciates the commenters' support of the rule and the additional evidence of the benefits of the DACA policy they provide. DHS presents its analysis of costs and benefits of the rulemaking in the RIA. In addition, DHS considers and discusses the unquantifiable impacts of this rule in the RIA. DHS agrees that the unquantifiable benefits are substantial and broadly agrees with the commentator's characterization of some of those benefits, including reduction of fear and anxiety.

*Comment:* A commenter urged DHS to use available research to quantify the mental health benefits of the proposed rule and offered suggestions on how to do so. The commenter also offered suggestions on how to quantify: (1) DACA's benefits from granting individuals the ability to travel outside of the United States; (2) the ancillary benefits of EADs; and (3) the benefits of streamlined enforcement encounters.

*Response:* DHS greatly appreciates the commenter's valuable suggestions regarding a methodology to address the quantification of certain benefits of this rulemaking. Consistent with E.O. 13563, DHS agrees that quantification and monetization are desirable, to the extent feasible and consistent with the best available evidence. As discussed in the NPRM and in this final rule, a complete valuation of many of these benefits is challenging and complex. There could be starting points as to how much DACA requestors value these benefits, such as filing costs, possibly representing a minimum willingness-to-pay value. It is not clear, however, that these starting points adequately capture the welfare benefits to the requestors. In addition, DHS appreciates the commenter's suggestion to use proxies, such as average U.S. population treatment costs for anxiety, average U.S. population international travel costs, or average officer licenses' costs. These are all instructive starting points or proxies for estimation of lower bounds, and DHS has referred to them in its final analysis. At the same time, and as explained in that analysis, DHS continues to believe that such starting points and proxies do not permit a full and accurate valuation of these benefits

to this population. Given this point, other public comments, and DHS's own assessment, DHS has determined that these unquantifiable benefits are of great positive magnitude and that attempts to fully monetize them raise serious conceptual, normative, and empirical challenges. Consistent with E.O. 13563, DHS has determined that considerations of human dignity are among the main drivers of this rule, which is focused on fortifying and preserving a policy for a vulnerable population that has been present in the United States since 2012 and is a low priority for enforcement measures, and on protecting the reliance interests of DACA recipients and similarly situated noncitizens, their families, schools, employers, communities, and States. The final analysis thus offers relevant information on the challenging task of fully quantifying and monetizing considerations of human dignity. Consistent with E.O. 13563, human dignity greatly matters and is a relevant consideration even if it cannot be quantified or turned into monetary equivalents.

*Comment:* A commenter stated that the economic benefits cited in the proposed rule come not only from DACA protections, but also from the benefit of work authorization. The commenter said that the proposed rule does not acknowledge that by introducing the option of severing the requests. The commenter stated that this provision creates a potential gap between a DACA grant, when an applicant can begin to establish reliance interests, and the economic production cited as a motivating factor behind the proposed rule.

*Response:* DHS appreciates the comment regarding the benefits of work authorization associated with DACA. DHS considered other request and fee structures as well as public input on this topic. As discussed in greater detail in Section II.C.2.c, DHS has decided to codify the longstanding required bundled process for deferred action and employment authorization requests under the DACA policy.

c. Regulatory Alternatives

*Comment:* In response to the NPRM's request for comments on regulatory alternatives in Section III.H, multiple commenters emphasized the importance of protecting deferred action and work authorization. Some of these commenters said that deferred action and work authorization are not separate, as the ability for Dreamers to freely live with their families and communities without fear of deportation is synonymous with their ability to legally

work and contribute to their communities. A commenter agreed that a policy of forbearance without work authorization would disrupt the reliance of interests of hundreds of thousands of people, as well as the families, employers, and communities that rely on them. The commenter stated it would result in substantial economic losses and would produce a great deal of human suffering, including harms to dignitary interests, associated with lost income and ability to self-support.

*Response:* DHS appreciates the commenters' statements regarding the regulatory alternatives. DHS considered a forbearance-only alternative, as well as other request and fee structures. Upon careful consideration of comments received, DHS agrees that a policy of forbearance without work authorization—while still a policy that would carry substantial benefits—would harm the substantial reliance interest of thousands of DACA recipients, their families, employers, and communities. In response to these commenters, DHS also notes its extensive discussion of its reasoning and support for maintaining employment authorization as a component of the DACA policy in Section II.C.2. DHS therefore is not making changes to the final rule regarding DACA requestors' ability to request employment authorization. Further, as discussed in detail elsewhere in this rule, DHS is codifying the longstanding requirement that requires requestors to concurrently file Form I–765, Application for Employment Authorization, and Form I–765WS with their Form I–821D, Consideration of Deferred Action for Childhood Arrivals.

d. Regulatory Flexibility Act (Impact on Small Entities)

*Comment:* A commenter, referencing the Small Business Regulatory Enforcement Act (SBREFA), said that strengthening DACA would create a limitless positive impact on small businesses, while any attempt to restrict DACA would be detrimental. Another commenter said that the nature of the economic evidence of DACA participants in the market and the labor force indicates that these individuals contribute in uniquely positive ways to the economy and to small businesses. The commenter said that immigrants are some of the nation's most prolific small business owners, and their rates of business ownership far exceed those of native-born citizens. Rather than harming small businesses by forcing them to match and contribute to Federal benefits, the commenter reasoned, DACA recipients increase the volume of

small businesses in the United States. The commenter concluded that DACA has an overall positive effect on the U.S. economy, and on the strength, proliferation, and livelihood of small businesses. The commenter said that these sizable benefits are attributable not only to the DACA policy, but more specifically to the designation that DACA recipients are lawfully present, which enables them to join the workforce and contribute in significant ways to the workforce and small business. More importantly, the commenter stated, the designation makes them eligible to receive benefits, like Social Security and Medicare, to which they are entitled after making such a mark on the U.S. economy.

*Response:* DHS appreciates the comment regarding the RFA, SBREFA, and the impact on small business in relation to DACA. DHS presents possible direct and indirect costs and benefits of this rulemaking in the RIA and in Section II.A.6. However, DHS reiterates that this rule does not directly regulate small entities, including small businesses, and is not expected to have a direct effect on small entities. This rule does not mandate any actions or requirements for small entities in the process of a noncitizen requesting deferred action or employment authorization under the DACA policy. Rather, this rule regulates individuals, and individuals are not defined as "small entities" by the RFA.[325] Based on the evidence presented in this analysis and throughout the rule, DHS certifies that this rule will not have a significant economic impact on a substantial number of small entities.

e. Other Comments on Costs and Benefits

*Comment:* Expressing mixed views on the proposed rule, a commenter encouraged DHS and the Office of Management and Budget to adopt the proposed rule once a final cost-benefit analysis is made.

*Response:* DHS appreciates the comment in support of promulgating the DACA final rule. DHS provided the public an opportunity to comment on the RIA that presents possible direct and indirect costs and benefits of this rulemaking as well as the quantified and qualitative costs and benefits. DHS has fully considered the public comments received and has made relevant changes to the RIA.

2. Paperwork Reduction Act (Including Comments on Actual Forms/Instructions, and Burden Estimates for Forms I–821D and I–765)

*Comment:* A commenter requested that prominent information be placed on the Form I–765WS, Employment Authorization Worksheet, that specifies and clearly explains the new, higher standard for passing the Form I–765WS review.

*Response:* DHS is not changing, nor did it propose to change, the standard for demonstrating economic necessity via Form I–765WS for DACA requestors applying for employment authorization. Although the NPRM proposed making it optional for DACA requestors to file a Form I–765, Application for Employment Authorization, DHS did not propose any changes to the existing general rule for establishing economic necessity, which is determined on a case-by-case basis pursuant to 8 CFR 274a.12(e). In this final rule, DHS is codifying the status quo bundled process that requires the Form I–765 with accompanying Form I–765WS be filed together with the Form I–821D. DHS is not modifying the rule to eliminate or change the requirement of demonstrating economic necessity. Therefore, DHS is not making any changes in response to the commenter's request.

3. Other Statutory and Regulatory Requirements (e.g., National Environmental Policy Act)

National Environmental Policy Act

*Comment:* Commenters expressed concerns that DHS has not adequately complied with the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 *et seq,* by failing to consider potential environmental impacts of this rule. Commenters contend that allowing DACA recipients to remain in the United States has the effect of adding people to (or not removing people from) the U.S. population, which requires preparation of an environmental impact statement or environmental assessment to comply with NEPA. Commenters contend that the environmental impact of the proposed regulatory action was not unduly speculative for DHS to analyze and make projections of various potential effects resulting from allowing individuals to remain in the United States. Commenters also disagreed with DHS's determination in the NPRM that categorical exclusion A3(c) applies to this action, arguing that A3(c) cannot be applied because no prior NEPA analysis was conducted for the DACA policy contained in the 2012 Napolitano Memorandum.

---

[325] 5 U.S.C. 601(6).

*Response:* This action codifies DHS policy regarding exercise of enforcement discretion and defines the criteria under which DHS may exercise that discretion, with respect to a defined category of persons that have been present in the United States since at least 2007.

The commenters assumed this rule will result in 800,000 "extra people" in the U.S. population because individuals meeting the threshold criteria would be removed from or depart the United States absent this rule. DHS disagrees with both assumptions. The persons subject to the Secretary's 2012 policy of enforcement discretion have, by definition, been present in the United States since at least 2007 without lawful status. Promulgation of this rule will neither directly "add" to the number of individuals currently residing in the United States nor increase population growth. DHS also disagrees with the commenters' assumption that in the absence of the rule DACA recipients would be removed or would leave the United States voluntarily. DACA recipients necessarily came to the United States at a very young age, and many have lived in the United States for effectively their entire lives. For many DACA recipients, the United States is their only home. Indeed, some DACA recipients do not even speak the language of their parents' home country. They are unlikely to voluntarily leave the only country they have ever known. Nor is it reasonably foreseeable that their removal would soon be a priority for the agency.

DHS disagrees with the commenters' assertion that this rule "would ultimately grant approximately 800,000 illegal aliens the right to stay and work in the U.S." This rule does not provide any protection from removal or access to employment authorization beyond what is contemplated in the 2012 DACA policy. It is intended to preserve and fortify the existing DACA policy; it does not alter DACA eligibility criteria, grant lawful immigration status or citizenship for noncitizens or provide a means for entry into the United States. Therefore, DHS anticipates no change in U.S. population as a direct effect of this rule.

In addition, as discussed above, DHS does not believe that codification of the DACA policy is likely to have measurable population effects nationwide or in any particular locations. If such effects were to occur, the relationship between such effects and this rule would likely be highly attenuated. Impacts in particular locations would be contingent upon the independent decisions of individual current and prospective DACA recipients, and upon choices and decision-making processes across a range of individuals and institutions (*e.g.,* employers, law enforcement officers, courts) at indeterminate times and locations in the future under unknown and unpredictable economic, personal, and employment conditions and circumstances entirely outside the control of DHS.

DHS Directive 023–01 Rev. 01 (Directive) and Instruction Manual 023–01–001–01 Rev. 01 (Instruction Manual) establish the policies and procedures DHS and its components use to comply with the National Environmental Policy Act (NEPA) and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("categorical exclusions") that experience has shown do not have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. The Instruction Manual establishes categorical exclusions that DHS has found to have no such effect. Under DHS implementing procedures for NEPA, for a proposed action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.

This rulemaking implements, without material change, the 2012 DACA policy addressing exercise of enforcement discretion with respect to a specifically defined population of noncitizens and is not part of a larger DHS action. It defines the criteria under which DHS will consider requests for DACA, the procedures by which one may request DACA, and what an affirmative grant of DACA will confer upon the requestor. DHS considered the potential environmental impacts of this rule with respect to an existing population that has been present in the United States since at least 2007 and determined, in accordance with the Instruction Manual, that this rule does not present extraordinary circumstances that would preclude application of a categorical exclusion.

This rule, therefore, satisfies the requirements for application of categorical exclusion A3(c) in accordance with the Department's approved NEPA procedures. DHS does not agree with commenters' assertion that categorical exclusion A3(c) cannot be applied to this action unless DHS first "establish[es] that it had not previously violated NEPA" because it would effectively impose a new procedural step or condition on application of categorical exclusions that is not required or approved for the Department's NEPA implementing procedures. Commenters also raised broader concerns about the adequacy of DHS's NEPA compliance procedures as set forth in the DHS Directive and Instruction Manual. Those concerns are outside the scope of this rulemaking.

Family Assessment

*Comment:* Two commenters stated that the proposed rule's Family Assessment is incomplete because the rule does not provide additional administrative relief for or properly considers DACA-eligible individuals' parents, spouses, grandparents, and other loved ones central to their lives.

*Response:* As described in the Family Assessment in Section III.H, DHS has assessed the effect of this rule on family well-being as required by section 654 of the Treasury and General Government Appropriations Act, 1999,[326] enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.[327] In doing so, DHS considered the effect of this rule on the family, as family is defined in section 654(b)(2) of that act. While DHS appreciates the commenters' desire to provide additional administrative relief to DACA recipients' parents, spouses, grandparents, and other loved ones central to their lives, such relief falls outside of the scope of this rule, which is limited to the population described within this rule.

*F. Out of Scope*

As noted throughout this preamble, a number of comments were submitted that did not relate to the substance of the NPRM. Several commenters expressed general opposition to the current administration or its handling of immigration policy, without referring to the proposed rule at all. Some commenters expressed direct opposition to specific political parties, while others opposed Congress.

Multiple commenters shared the challenges they faced in the United States as either an undocumented or documented immigrant without referring to the substance of this rulemaking. Other comments were from noncitizens seeking information or

---

[326] *See* 5 U.S.C. 601 note.
[327] Public Law 105–277, 112 Stat. 2681 (1998).

making requests regarding their own cases.

Numerous commenters provided general support for immigration but did not explicitly refer to DACA. Other out-of-scope comments related to the COVID–19 pandemic, asylum seekers and the Asylum Officer proposed rule, recommendations not pertaining to this rule, and general statements unrelated to the substance of the regulation. DHS has reviewed and considered all such comments and incorporated them as applicable.

## III. Statutory and Regulatory Requirements

### *A. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)*

E.O. 12866 and E.O. 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, to the extent permitted by law, to proceed only if the benefits justify the costs. They also direct agencies to select regulatory approaches that maximize net benefits while giving consideration, to the extent appropriate and consistent with law, to values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts. In particular, E.O. 13563 emphasizes the importance of not only quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility, but also considering equity, fairness, distributive impacts, and human dignity. The latter values are highly and particularly relevant here.

This final rule is designated as a ''significant regulatory action'' that is economically significant since it is estimated the rule will have an annual effect on the economy of $100 million or more, under section 3(f)(1) of E.O. 12866. Accordingly, OMB has reviewed this final regulation.

#### 1. Summary of Major Provisions of the Regulatory Action

This final rule will preserve and fortify DHS's DACA policy for the issuance of deferred action to certain young people who came to the United States many years earlier as children, who have no current lawful immigration status, and who are generally low enforcement priorities. The final rule codifies the following provisions of the DACA policy from the Napolitano Memorandum and longstanding USCIS practice:

• *Deferred Action.* The final rule codifies the definition of deferred action as a temporary forbearance from removal that does not confer any right or entitlement to remain in or reenter the United States and does not prevent DHS from initiating any criminal or other enforcement action against the DACA requestor at any time.

• *Threshold Criteria.* The final rule codifies the longstanding threshold criteria where the requestor must have: (1) come to the United States under the age of 16; (2) continuously resided in the United States from June 15, 2007, to the time of filing of the request; (3) been physically present in the United States on both June 15, 2012, and at the time of filing of the DACA request; (4) not been in a lawful immigration status on June 15, 2012, as well as at the time of request; (5) graduated or obtained a certificate of completion from high school, obtained a GED certificate, currently be enrolled in school, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (6) not been convicted of a felony, a misdemeanor described in 8 CFR 236.22(b)(6) of the final rule, or three or more other misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or otherwise pose a threat to national security or public safety—with additional clarifications explained below; and (7) been born on or after June 16, 1981, and be at least 15 years of age at the time of filing, unless the requestor is in removal proceedings, has a final order of removal, or a voluntary departure order. The final rule also codifies that deferred action under DACA may be granted only if USCIS determines in its discretion that the requestor meets the threshold criteria and merits a favorable exercise of discretion.

• *Employment Authorization.* The final rule codifies DACA-related employment authorization for deferred action recipients in a new paragraph designated at 8 CFR 274a.12(c)(33). The new paragraph does not constitute any substantive change in current policy and, therefore, the final rule will continue to specify that the noncitizen must have been granted deferred action and must establish economic need to be eligible for employment authorization.

• ''*Lawful Presence.*'' The final rule reiterates USCIS' longstanding codification in 8 CFR 1.3(a)(4)(vi) of agency policy that a noncitizen who has been granted deferred action is considered ''lawfully present''—a term that does not confer authority to remain in the United States—for the discrete purpose of authorizing the receipt of certain benefits under that regulation. The final rule also reiterates longstanding policy that a noncitizen who has been granted deferred action does not accrue ''unlawful presence'' for purposes of INA sec. 212(a)(9).

• *Procedures for Request and Restrictions on Information Use.* The final rule codifies the procedures for denial of a request for DACA, the circumstances that would result in the issuance of an NTA or RTI, and the restrictions on use of information contained in a DACA request for the purpose of initiating immigration enforcement proceedings.

In addition to the retention of longstanding DACA policy and procedure, the final rule includes the following changes in comparison to the NPRM:

• *Filing Requirements.* The final rule codifies the longstanding bundled filing requirement, in which requestors must file Form I–765, Application for Employment Authorization, and Form I–765WS, concurrently with the Form I–821D Consideration of Deferred Action for Childhood Arrivals. *See* new 8 CFR 236.23(a)(1).

• *Criminal History, Public Safety, and National Security:* The NPRM proposed to codify at 8 CFR 236.22(b)(6) the longstanding criminal history, public safety, and national security criteria for consideration of DACA. Upon careful consideration of comments received on this NPRM provision, DHS is revising this provision to additionally clarify that, consistent with longstanding DACA policy, expunged convictions, juvenile delinquency adjudications, and immigration-related offenses characterized as felonies or misdemeanors under State laws are not considered automatically disqualifying convictions for purposes of this provision. *See* new 8 CFR 236.22(b)(6).[328]

• *Termination of DACA:* The NPRM proposed to codify at 8 CFR 236.23(d)(1) and (2) DHS's longstanding DACA termination policy, as it existed prior to the preliminary injunction issued in *Inland Empire-Immigrant Youth Collective* v. *Nielsen,* No. 17–2048, 2018 WL 1061408 (C.D. Cal. Feb. 26, 2018), with some modifications. The rule proposed that USCIS could terminate DACA at any time in its discretion with or without a NOIT, and that DACA would terminate automatically upon departure from the United States

[328] Regarding the criteria related to criminal convictions, DHS also clarified in the preamble to this final rule that it does not intend to retain the provision in the DACA FAQs that in exceptional circumstances DHS may grant DACA notwithstanding that the requestor does not meet the criminal guidelines. USCIS has rarely, if ever, found exceptional circumstances that warrant a grant of DACA where the requestor does not meet the criminal guidelines.

without advance parole and upon filing of an NTA with EOIR (a modification from the prior policy of automatic termination upon NTA issuance), but DACA would not terminate automatically in the case of a USCIS-issued NTA solely based on an asylum referral to EOIR. The NPRM raised four alternative approaches and invited comment on these and other alternatives for DACA termination. After careful consideration of the comments on this provision and the alternatives suggested in the NPRM and by commenters, DHS is maintaining in the final rule that USCIS may terminate DACA at any time in its discretion. However, DHS is revising this provision to provide that USCIS will generally provide DACA recipients with a NOIT prior to termination of DACA, but maintains discretion to terminate DACA without a NOIT if the individual is convicted of a national security related offense involving conduct described in 8 U.S.C. 1182(a)(3)(B)(iii), (iv), or 1227(a)(4)(A)(i), or an egregious public safety offense. DHS is also revising this provision to provide that DACA recipients who depart the United States

without advance parole, but who are nonetheless paroled back into the United States, will resume their DACA upon expiration of the period of parole. *See* new 8 CFR 236.23(d)(1) and (2).

• *Automatic Termination of Employment Authorization.* The NPRM proposed at 8 CFR 236.23(d)(3) that employment authorization would terminate automatically upon termination of DACA. This provision included a cross reference to 8 CFR 274a.14(a)(1)(iv), however on February 8, 2022, 8 CFR 274a.14(a)(1)(iv) was vacated in *Asylumworks, et al.* v. *Mayorkas, et al.,* civ. 20–cv–3815 (D.D.C. Feb. 7, 2022). As a result of the vacatur and additional revisions to the DACA terminations provisions to eliminate automatic termination based on filing of an NTA, as described in this preamble, DHS is modifying 8 CFR 236.23(d)(3) in this final rule to remove the vacated cross reference and clarify that employment authorization terminates when DACA is terminated and not separately when removal proceedings are instituted. *See* new 8 CFR 236.23(d)(3).

• *Provision Rescinding and Replacing the Napolitano Memorandum.* In this final rule, DHS is clarifying at 8 CFR 236.21(d) that this subpart rescinds and replaces the DACA guidance set forth in the Napolitano Memorandum and from this point forward governs all current and future DACA grants and requests. DHS also clarifies that existing recipients need not request DACA anew under this new rule to retain their current DACA grants. Historically, DHS has promulgated rules without expressly rescinding prior guidance in the regulatory text itself. However, DHS has chosen to depart from previous practice in light of the various issues and concerns raised in ongoing litigation challenging the Napolitano Memorandum. *See* new 8 CFR 236.21(d).

2. Summary of Costs and Benefits of the Final Rule

In light of public comments, DHS has made some adjustment to parts of this RIA analysis. The following table captures the changes in the RIA from the NPRM to the final rule.

**BILLING CODE 9111–97–P**

**Table 3. Changes in RIA Estimates from the NPRM to the Final Rule**

| Variable | Section | NPRM and Final Rule Comparison | | | Description | Description of Changes |
|---|---|---|---|---|---|---|
| | | *NPRM* | *Final Rule* | *Difference* | | |
| Estimated DACA recipients' labor force participation rate | III.A.4.a.(6) | 70% | 78% | 8% | Rate is applied to the projected Active Population to estimate how many recipients might choose to participate in the labor market for Benefits estimation stemming from DACA recipients' labor market earnings. | This estimate increased in response to public comments that suggested the possibility of an upward shift of the DACA recipient age distribution into higher potential labor force participation brackets. |
| Estimated DACA recipient's average hourly compensation rate (in 2020 dollars) | III.A.4.a.(3) | $24.20 | $32.58 | $8.38 | Rate is used in the estimation of the costs of requesting DACA and the benefits and transfers from the earnings of DACA recipients that choose to participate in the labor market. | This estimate increased in response to public comments that suggested the possibility of an upward shift of the DACA recipient age distribution into higher potential earning brackets. |

| Biometrics travel cost ($ rate per mile traveled in a private vehicle; in 2020 dollars) | III.A.4.a.(4) | $0.56 | $0.54 | ($0.02) | Rate is used in the estimation of the cost of requesting DACA. Requestor biometrics-related costs are part of a DACA request. | This rate changed due to updated information from the Bureau of Labor Statistics on the Consumer Price Index. |
|---|---|---|---|---|---|---|
| Annualized monetized discounted (7%) cost savings (No Action baseline FY 2021-FY 2031; A-4 statement primary estimate in 2020 dollars) | III.A.4.g | $22.4 million | $0 | ($22.4) million | Potential cost savings from the NPRM provision that gave the DACA requestor population the option of requesting only deferred action without also applying for employment authorization. | The final rule requires a complete DACA request to include a request for both deferred action (Form I-821D) and employment authorization (Forms I-765 and I-765WS). There are no longer potential cost savings from the NPRM provision that gave the requestors the option of requesting only deferred action. |
| Annualized monetized discounted (7%) transfers (No Action baseline FY 2021-FY 2031; A-4 statement primary estimate in 2020 dollars) | III.A.4.g | $17.8 million | $0 | ($17.8) million | Potential transfers accounted for in the NPRM from USCIS to the DACA requestor population that would request only deferred action. | The final rule does not allow the DACA requestor population the option of only requesting deferred action through Form I-821D. The fees paid by DACA requestors for a complete application cover the USCIS cost for both Forms I-821D and I-765. As a result, there are no longer transfers from USCIS to the DACA requestor population that would have requested only deferred action. |

| | | | | | | |
|---|---|---|---|---|---|---|
| Annualized monetized discounted (7%) net benefits (Pre-Guidance baseline FY 2012-FY 2031; in 2020 dollars) | III.A.4.g | $20.72 billion | $20.70 billion | ($0.02) billion | Benefits from the labor market earnings of DACA recipients less the value of non-paid time | The gross benefits increased as the estimated DACA recipient average hourly compensation rate and the labor force participation rate increased. For the final rule, DHS subtracted the value of non-paid time from the estimated gross benefits. As a result, estimated net benefits decreased in the final rule. |
| Annualized monetized discounted (7%) costs (Pre-Guidance baseline FY 2012-FY 2031; A-4 statement primary estimate in 2020 dollars) | III.A.4.g | $410.4 million | $480.8 million | $70.4 million | Costs associated with requesting DACA. | This estimate increased as the estimated DACA recipient average hourly compensation rate increased. |
| Annualized monetized discounted (7%) transfers (Pre-Guidance baseline FY 2012-FY 2031; A-4 statement primary estimate in 2020 dollars) | III.A.4.g | $14.8 million | $0 | ($14.8) million | Potential transfers accounted for in the NPRM from USCIS to the DACA requestor population that would request only deferred action. | The final rule does not allow the DACA requestor population the option of only requesting deferred action through Form I-821D. The fees paid by DACA requestors for a complete request cover the USCIS cost for both Forms I-821D and I-765. As a result, there are no longer transfers from USCIS to the DACA requestor population that would have requested only deferred action. |

| Annualized monetized discounted (7%) transfers (Pre-Guidance baseline FY 2012-FY 2031; in 2020 dollars) | III.A.4.g | $3.4 billion | $5.1 billion | $1.7 billion | Transfers in terms of employment taxes from the employed DACA recipients and their employers to the Federal government. | This estimate increased as the estimated DACA recipient average hourly compensation rate and labor force participation rate increased. Therefore, the employment taxes from the employed DACA recipients and their employers to the Federal Government also increased. |
|---|---|---|---|---|---|---|

BILLING CODE 9111–97–C

The final rule will result in new costs, benefits, and transfers. To provide a full understanding of the impacts of DACA, DHS considers the potential impacts of this final rule relative to two baselines. The No Action Baseline represents a state of the world under the DACA policy; that is, the policy initiated by the guidance in the Napolitano Memorandum in 2012 and prior to the July 16, 2021 *Texas* decision. However, the No Action Baseline does not directly account for the *Texas* decision, as discussed further in the Population Estimates and Other Assumptions section discussing this baseline. The second baseline considered in the analysis is the Pre-Guidance Baseline, which represents a state of the world before the issuance of the Napolitano Memorandum, where the DACA policy did not exist and has never existed. To better understand the effects of the DACA policy, we focus on the Pre-Guidance Baseline as the most useful point of reference, as it captures the effects of going from a world completely without the DACA policy to a world with the DACA policy.

Table 4 provides a detailed summary of the provisions and their estimated impacts relative to the No Action Baseline. Additionally, Table 5 provides a detailed summary of the provisions and their estimated impacts relative to the Pre-Guidance Baseline.

BILLING CODE 9111–97–P

**Table 4. Summary of Major Changes to Provisions and Estimated Impacts of the Final Rule, FY 2021—FY 2031 (Relative to the No Action Baseline)**

| Final Provision | Description of Final Provision | Estimated Impact of Final Provision |
|---|---|---|
| Amending 8 CFR 106.2(a)(38). Fees. | The $85 biometrics fee is eliminated and replaced by an $85 filing fee for Form I-821D. | **Qualitative:**<br><br>Benefits<br>• The final rule allows the active DACA-approved population to continue enjoying the advantages of the policy and also have the option to request renewal of DACA in the future if needed.<br>• For DACA recipients and their family members, the final rule will contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future, including by virtue of mitigating the risk of litigation resulting in termination of the DACA policy. |
| Amending 8 CFR 236.21(c)(2). Applicability. | DACA recipients receive a time-limited forbearance from removal, must apply to USCIS for employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33), and must demonstrate an economic need for employment to receive an Employment Authorization Document. DACA recipients are considered lawfully present and not unlawfully present for certain limited purposes. | |
| Amending 8 CFR 236.23(a)(1). Procedures for request. | No unbundling of deferred action and employment authorization requests. These requests must be filed concurrently. | |
| Adding 8 CFR 236.24(b). Severability. | The provisions in 8 CFR 236.21(c)(2) through (4) and 274a.12(c)(14) and 274a.12(c)(33) are intended to be severable from each other. The period of forbearance, employment authorization, and lawful presence are all severable under this provision. | |

Source: USCIS analysis.

Note: The No Action Baseline refers to a state of the world under the current DACA policy in effect under the guidance of the Napolitano Memorandum.

**Table 5. Summary of Major Changes to Provisions and Estimated Impacts of the Final Rule, FY 2012–FY 2031 (Relative to the Pre-Guidance Baseline)**

| Final Provision | Description of Final Provision | Estimated Impact of Final Provision |
|---|---|---|
| Amending 8 CFR 106.2(a)(38). Fees. | The $85 biometrics fee is eliminated and replaced by an $85 filing fee for Form I-821D. | **Quantitative:**<br><br>Net Benefits<br><br>Income earnings of the employed DACA recipients due to obtaining an approved EAD less the value of non-paid time: |
| Amending 8 CFR 236.21(c). Applicability. | DACA recipients receive a time-limited forbearance from removal, must apply to USCIS for employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33), and must demonstrate an economic need for employment. DACA recipients are considered lawfully present and not unlawfully present for certain limited purposes. | • Annualized net benefits are estimated to be as much as $21.9 billion, at a 3-percent discount rate or $20.7 billion at a 7-percent discount rate, dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy.<br>• Total net benefits over a 20-year period are estimated to be as much as:<br>  ○ $455.0 billion undiscounted;<br>  ○ $424.4 billion at a 3-percent discount rate; and<br>  ○ $403.2 billion at a 7-percent discount rate. |
| Amending 8 CFR 236.23(a)(1). Procedures for request. | No unbundling of deferred action and employment authorization requests. These requests must be filed concurrently. | Costs<br><br>Costs to requestors associated with a DACA request, including filing Form I-821D, Form I-765, and Form I-765WS: |
| Adding 8 CFR 236.24(b). Severability. | The provisions in 8 CFR 236.21(c)(2) through (4) and 274a.12(c)(14) and 274a.12(c)(33) are intended to be severable from each other. The period of forbearance, employment authorization, and lawful presence are all severable under this provision. | • Annualized costs could be $ 494.9 million, at a 3-percent discount rate or $480.8 million at a 7-percent discount rate.<br>• Total costs over a 20-year period could be:<br>  ○ $10.1 billion undiscounted;<br>  ○ $9.6 billion at a 3-percent discount rate; and<br>  ○ $9.4 billion at a 7-percent discount rate.<br><br>Transfer Payments |

Employment taxes from the employed DACA recipients and their employers to the Federal Government dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy:

- Annualized transfers are estimated to be up to $ 5.4 billion at a 3-percent discount rate or $5.2 billion at a 7-percent discount rate.
- Total transfers over a 20-year period are estimated to be up to:
  - $113.2 billion undiscounted;
  - $105.6 billion at a 3-percent discount rate; and
  - $100.3 billion at a 7-percent discount rate.

**Qualitative:**

Cost Savings

DACA policy simplifies many encounters between DHS and certain noncitizens, reducing the burden upon DHS of vetting, tracking, and potentially removing DACA recipients.

Benefits

- The final rule will result in more streamlined enforcement encounters and decision making, as well as avoided costs associated with enforcement action against low-priority noncitizens. It also allows DHS to focus its limited enforcement resources on higher-priority noncitizens.
- The final rule gives the DACA-approved population the option to request renewal of DACA in the future if needed.
- For DACA recipients and their family members, the final rule will contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an

| | | increased sense of family security, and (4) an increased sense of hope for the future. |
|---|---|---|
| Source: USCIS analysis. | | |
| Note: The Pre-Guidance Baseline refers to a state of the world as it was before the guidance of the Napolitano Memorandum. | | |

In addition to the impacts summarized above, and as required by OMB Circular A–4, Table 6 and Table 7 present the prepared accounting statements showing the costs, benefits, and transfers associated with this regulation relative to the No Action Baseline and the Pre-Guidance Baseline, respectively.[329]

| Table 6. OMB A-4 Accounting Statement – No Action Baseline ($ in millions, 2020; period of analysis: FY 2021–FY 2031) | | | | |
|---|---|---|---|---|
| **Category** | **Primary Estimate** | **Minimum Estimate** | **Maximum Estimate** | **Source/ Citations** |
| Benefits | | | | |
| Annualized monetized benefits (3%) | N/A | N/A | N/A | RIA |
| Annualized monetized benefits (7%) | N/A | N/A | N/A | RIA |
| Unquantified benefits | The final rule will allow active DACA recipients to continue enjoying the advantages of the policy and have the option to request renewal in the future. For DACA recipients and their family members, the final rule will contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future, including by virtue of mitigating the risk of litigation resulting in termination of the DACA policy. | | | RIA |
| Costs | | | | |
| Annualized monetized costs (3%) | N/A | N/A | N/A | RIA |

[329] *See* OMB, Circular A–4 (Sept. 17, 2003), *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf.*

| | | | | |
|---|---|---|---|---|
| Annualized monetized costs (7%) | N/A | N/A | N/A | RIA |
| Unquantified costs | N/A | | | RIA |
| Transfers | | | | |
| From whom to whom? | N/A | | | RIA |
| Annualized monetized transfers (3%) | N/A | N/A | N/A | |
| Annualized monetized transfers (7%) | N/A | N/A | N/A | |
| Unquantified transfers | None | | | |
| **Miscellaneous Categories** | **Effects** | | | |
| Effects on State, local, and/or Tribal governments | No direct effects | | | RIA |
| Effects on small businesses | The final rule does not directly regulate small entities and is not expected to have a direct effect on small entities. DHS certifies that this final rule will not have a significant economic impact on a substantial number of small entities. | | | RFA |
| Effects on wages | None | | | RIA |
| Effects on growth | None | | | RIA |
| Source: USCIS analysis. | | | | |

Table 7 shows the pre-guidance baseline estimates, which are a comprehensive assessment of the costs and benefits of the rule. Note that the monetized benefits and transfers are a maximum estimate. We are unable to provide a range because of uncertainty as to two factors: (1) the substitutability of workers, and (2) the extent to which the relevant population would be willing and able to work without authorization in the absence of DACA. See discussion in Sections III.A.4.b.6. and III.A.4.b.7.

**Table 7. OMB A-4 Accounting Statement – Pre-Guidance Baseline ($ in millions, 2020; period of analysis: FY 2012–FY 2031)**

| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Source/ Citations |
|---|---|---|---|---|
| Benefits | | | | |
| Annualized monetized net benefits (3%) | N/A | N/A | $21,861.6 | RIA |
| Annualized monetized net benefits (7%) | N/A | N/A | $20,702.1 | RIA |
| Unquantified benefits | The final rule will allow DACA recipients to enjoy the advantages of the policy and have the option to request renewal in the future. For DACA recipients and their family members, the rule will contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future. | | | RIA |
| Costs | | | | |
| Annualized monetized costs (3%) | $494.9 | N/A | N/A | RIA |
| Annualized monetized costs (7%) | $480.8 | N/A | N/A | RIA |
| Unquantified costs | N/A | | | RIA |
| Unquantified Cost Savings | DACA policy simplifies many encounters between DHS and certain noncitizens, reducing the burden upon DHS of vetting, tracking, and potentially removing DACA recipients. | | | RIA |
| Transfers | | | | |

| From whom to whom? | Transfer payments in the form of employment taxes from the employed DACA recipients and their employers to the Federal Government dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy. | | | RIA |
|---|---|---|---|---|
| Annualized monetized transfers (3%) | N/A | N/A | $5,438.4 | RIA |
| Annualized monetized transfers (7%) | N/A | N/A | $5,149.9 | RIA |
| **Miscellaneous Categories** | **Effects** | | | |
| Effects on State, local, and/or Tribal governments | Indirect effects, such as tax revenues and provision of certain government services, depend on (among other factors) policy choices made by the State, local, and/or Tribal governments. | | | RIA |
| Effects on small businesses | The rule does not directly regulate small entities and is not expected to have a direct effect on small entities. DHS certifies that this final rule will not have a significant economic impact on a substantial number of small entities. | | | RFA |
| Effects on wages* | None | None | None | RIA |
| Effects on growth | None | None | None | RIA |
| Source: USCIS analysis.<br><br>*Note, as explained below, that the population of DACA recipients is small relative to the size of the national labor market so we do not find a national effect on wages; however, there is survey data indicating that individuals earn higher wages since receiving DACA. | | | | |

BILLING CODE 9111–97–C

3. Background and Purpose of the Rule

The INA generally charges the Secretary with the administration and enforcement of the immigration and naturalization laws of the United States.[330] The INA further authorizes the Secretary to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of" the INA.[331] In the Homeland Security Act of 2002, Congress also provided that the Secretary "shall be responsible for . . . [e]stablishing national immigration enforcement policies and priorities."[332] The Homeland Security Act also provides that the Secretary, in carrying out their authorities, must "ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland."[333]

The Secretary, in this final rule, establishes guidelines for considering requests for deferred action submitted by certain individuals who came to the United States many years ago as children, consistent with the Napolitano Memorandum described above. As with the 2012 DACA policy, this final rule will serve the significant humanitarian and economic interests animating and engendered by the DACA policy, with respect to the population covered by that policy. In addition, the final rule will preserve not only DACA recipients' substantial reliance interests, but also those of their families, schools, employers, faith groups, and communities.[334] The final rule also will

---

[330] Public Law 82–414, 66 Stat. 163 (as amended); INA sec. 103(a)(1), 8 U.S.C. 1103(a)(1). The INA also vests certain authorities in the President, Attorney General, and Secretary of State, among others. *See id.*

[331] INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3).

[332] Public Law 107–296, sec. 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. 202(5)).

[333] 6 U.S.C. 111(b)(1)(F).

[334] *See DHS* v. *Regents of the Univ. of Cal.,* 140 S. Ct. 1891, 1914 (2020) (*Regents*) ("DACA recipients have 'enrolled in degree programs,

help to appropriately focus the Department's limited immigration enforcement resources on threats to national security, public safety, and border security where they are most needed.

4. Cost-Benefit Analysis

In light of public comments received and relative to the NPRM RIA, DHS has adjusted parts of the RIA for this final rule to incorporate some of the ideas and suggestions presented in various public comments. For example, relative to the NPRM, DHS adjusted the projected DACA population age distribution to account for the possibility that the eligible and active population might age over the next 10 years, thereby moving into higher age groups. As a result of the updated age distribution, the estimated labor force participation rate of the active DACA population also changed. The age distribution is used in the estimation of an average compensation rate for DACA recipients. The average compensation rate together with the estimated labor force participation rate of the active DACA population are used in the estimation of costs, benefits, and transfers of this final rule. In the final rule, DHS also accounted for the value of non-paid time which individuals would forgo when approved for DACA and if they chose to participate in the labor market. This value was subtracted from the estimated benefits. Further, DHS made additions to the qualitative discussion regarding the unquantified and unmonetized benefits after considering suggestions from commenters regarding potential quantification and monetization of certain benefits bestowed on the DACA population by this rulemaking. Additionally, the final rule codifies the longstanding bundled filing requirements and reclassifies the $85 biometrics fee as a Form I–821D filing fee. As such, a complete DACA request under the final rule includes Forms I–821D, I–765, and I–765WS with total fees of $495. Relative to the NPRM, this final rule no longer estimates any

potential cost savings from the request and fee structure in the No Action Baseline and no potential transfers from USCIS to the DACA requestor population as DHS is codifying the status quo bundled filing process instead of the proposed provision to unbundle the requests for deferred action from the Application for Employment Authorization. The details of all the adjustments are presented and incorporated throughout this RIA.

DHS estimates the potential impacts of this final rule relative to two baselines. The first baseline is a No Action Baseline, which represents a state of the world wherein the DACA policy would be expected to continue under the Napolitano Memorandum guidance. The No Action Baseline does not account for the July 16, 2021, district court decision, as discussed further in the Population Estimates and Other Assumptions section below discussing this baseline. Relative to this baseline, there were no quantitative and monetized impacts.

The second baseline considered in the analysis is a Pre-Guidance Baseline, which represents a state of the world before the guidance in the Napolitano Memorandum, where the DACA policy does not exist and has never existed. The Pre-Guidance Baseline is included in this analysis in accordance with OMB Circular A–4 guidance, which directs agencies to include a pre-statutory baseline in an analysis if substantial portions of a rule may simply restate statutory requirements that would be self-implementing, even in the absence of the regulatory action.[335] In this case, the DACA policy was implemented through DHS and USCIS guidance. DHS has not performed a regulatory analysis on the regulatory costs and benefits of the DACA policy guidance previously and, therefore, includes a Pre-Guidance Baseline in this analysis for clarity and completeness. Moreover, DHS presents the Pre-Guidance Baseline to provide a more informed picture on the overall impacts of the DACA policy since its inception, while at the same time recognizing that many of these impacts have already been realized. DHS notes that the Pre-Guidance Baseline analysis also can be used to better understand the state of the world under the district court's decision in *Texas,* should the partial stay of that decision be lifted. Relative to this baseline, DHS estimated annualized net benefits of $21.9 billion at a 3-percent discount rate or $20.7 billion at a 7-percent discount rate,

annualized costs of $494.9 million at a 3-percent discount rate or $480.8 million at a 7-percent discount rate, and annualized transfers of $5.4 billion at a 3-percent discount rate or $5.2 billion at a 7-percent discount rate.

The cost-benefit analysis of the RIA presents the impacts of this final rule relative to the No Action Baseline first, and then relative to the Pre-Guidance Baseline. In each of the baseline analyses, we begin by specifying the assumptions and estimates used in calculating any costs, benefits, and transfers of this final rule.

a. No Action Baseline

(1) Population Estimates and Other Assumptions

The numbers presented in this section have not changed from the NPRM to the final rule. Based on the public comments received, DHS added more clarity to some of the assumptions used in making the population projections in this section. For example, DHS clarified further that the averages of the "stable" period and not its trends are used in the projections of the population numbers.

The final rule will affect certain individuals who came to the United States many years ago as children, who have no current lawful immigration status, and who are generally low enforcement priorities. DHS currently allows certain individuals to request an exercise of discretion in the form of deferred action on a case-by-case basis according to certain criteria outlined in the Napolitano Memorandum. Individuals may request deferred action under this policy, known as DACA.

DHS recognizes a growing literature on the impacts of DACA that identifies noncitizens who may potentially meet DACA threshold criteria based on age and length of time in the United States. This approach to estimating the population affected by this final rule estimates the total number of people who are potentially eligible for consideration for deferred action under the DACA policy and then predicts the proportion of those people who will request DACA in the future. Widely available national microdata that reports the immigration status of the foreign-born population does not exist. The subpopulation that is potentially eligible to request DACA must therefore be estimated by other means. In general, analysts estimate the size of the DACA-eligible population using a residual method in which the total foreign-born population is estimated using various

---

embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on the DACA policy. The consequences of the rescission, respondents emphasize, would 'radiate outward' to DACA recipients' families, including their 200,000 *U.S.* citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them. In addition, excluding DACA recipients from the lawful labor force may, they tell us, result in the loss of $215 billion in economic activity and an associated $60 billion in federal tax revenue over the next ten years. Meanwhile, States and local governments could lose $1.25 billion in tax revenue each year." (internal citations omitted)).

[335] *See* OMB, Circular A–4 (Sept. 17, 2003), *https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf.*

surveys.[336] The unlawfully and lawfully present foreign-born population can be estimated based on DHS administrative records, including a mix of DHS administrative records and logical rules based on foreign-born demographic characteristics.[337] Further, the demographic characteristics from some of the underlying survey data may be used to further identify the portion of the unauthorized population that would potentially meet the DACA criteria, although some factors, such as education, criminal history, and discretionary determinations may not be accounted for in such estimates. For example, the Migration Policy Institute (MPI) estimates an eligible DACA population of 1.7 million, including the currently active population, although this estimate looked only at certain eligibility criteria and did not consider the proportion of the potentially-eligible population who may not meet the criminal history or continuous physical presence criteria, or who might merit a favorable exercise of discretion, meaning that it is likely an overestimate.[338] Historical DHS administrative data between FY 2012 and FY 2021 show a total of around 1 million initial DACA requests.[339] Thus, MPI's estimate implies a remaining DACA-eligible population of up to roughly 700,000 people.

DHS has two concerns with adopting this approach to estimate the number of future DACA requestors. First, as analysts who use the residual method observe, the approach is complex and highly sensitive to specific modeling assumptions. In a 2021 report estimating the U.S. unauthorized immigrant population for the period January 2015 to January 2018, OIS states that "estimates of the unauthorized population are subject to sampling error in the ACS and considerable non-sampling error because of uncertainty in some of the assumptions required for

estimation [of the unauthorized population]." [340] Additionally, the U.S. Census Bureau (Census) details the many complex adjustments applied to produce estimates of the population by sex, age, race, Hispanic origin, and number of household units in the latest ACS design and methodology report on weighting and estimation,[341] clarifying that "[t]he ACS estimates are based on a probability sample, and will vary from their true population values due to sampling and non-sampling error." [342] A rigorous analysis by sociologists and statisticians of the external validity of available methods used to impute unauthorized status in Census survey data concluded that:

it is not possible to spin straw into gold. All approaches that we tested produced biased estimates. Some methods failed in all circumstances, and others failed only when the join observation condition was not met, meaning that the imputation method was not informed by the association of unauthorized status with the dependent variable.[343]

In light of these modeling challenges, it is possible that a new estimate of the DACA-eligible population based on the residual method would systematically under- or overestimate the authorized immigrant population, which would, in turn, lead to systematic, but unknown, under- or overestimation of the residual subpopulation.[344]

A second concern about using the residual method to estimate the number of future DACA requestors is that even if DHS accurately estimates the total DACA-eligible population, DHS will still need a reliable methodology to predict how many potentially DACA-eligible individuals will actually request DACA in the future. Given the nature of the DACA policy, political factors, the challenging legal history, and the characteristics of the active DACA and DACA-eligible populations, including varying personal circumstances and expectations, predicting how many potentially eligible noncitizens may request DACA would be uncertain and complex, even if a census of the remaining DACA-eligible population existed. Therefore, in the context of this final rule, DHS relies instead on the administrative data USCIS collects from individuals who have requested DACA over the past several years, as described later in this analysis.

To provide a framework for the baseline population estimates, DHS starts by first presenting historical USCIS data on the active DACA population and then presenting historical data on DACA request receipts. These data provide a sense of historical participation in the policy and insights into any trends. The data also allow DHS to make certain assumptions in estimating a potential future active DACA population that would enjoy the benefits of this policy and that may contribute potential transfers to other populations as well as in estimating potential future DACA request receipts (*i.e.*, the population that would incur the costs associated with applying under the policy). DHS therefore proceeds by presenting first the historical active DACA population and its estimates of a potential future active DACA population, and then the historical volume of DACA request receipts and its estimates of this potential future population.

However, before presenting the historical and projected populations associated with this rule, DHS first identifies certain historical time periods of interest for this analysis. Historically, the 2012 and, subsequently, the 2017 DACA-related memoranda have shaped the level of participation in the DACA policy. The 2012 Napolitano Memorandum initiated the policy, and the 2017 Duke Memorandum halted

---

[336] The surveys may include the U.S. Census Bureau's American Community Survey (ACS), the Current Population Survey (CPS), the American Time Use Survey, and the Survey of Income and Program Participation (SIPP), among others.

[337] *See, e.g.*, OIS, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2015–January 2018* (Jan. 2021), *https://www.dhs.gov/sites/default/files/publications/immigrationstatistics/Pop_Estimate/UnauthImmigrant/unauthorized_immigrant_population_estimates_2015_-_2018.pdf.*

[338] For more details and additional resources on this methodology, see Migration Policy Institute, *Back on the Table: U.S. Legalization and the Unauthorized Immigrant Groups that Could Factor in the Debate* (Feb. 2021), *https://www.migrationpolicy.org/research/us-legalization-unauthorized-immigrant-groups* (accessed May 16, 2022).

[339] Source: DHS/USCIS/OPQ (July 2021).

[340] *See* OIS, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2015–January 2018* (Jan. 2021), *https://www.dhs.gov/sites/default/files/publications/immigrationstatistics/Pop_Estimate/UnauthImmigrant/unauthorized_immigrant_population_estimates_2015_-_2018.pdf,* at 10.

[341] *See* U.S. Census Bureau, *American Community Survey Design and Methodology (January 2014), Chapter 11: Weighting and Estimation, https://www2.census.gov/programs-surveys/acs/methodology/design_and_methodology/acs_design_methodology_ch11_2014.pdf* (accessed Mar. 23, 2022).

[342] *Id.* at 16.

[343] *See* Jennifer Van Hook, et al., *Can We Spin Straw into Gold? An Evaluation of Immigrant Legal Status Imputation Approaches,* Demography 52(1), 329–54, at 330.

[344] In Pope (2016), *see* section 5, "Empirical method." *See also* George J. Borjas and Hugh Cassidy, *The wage penalty to undocumented immigration,* Lab. Econ. 61, art. 101757 (2019), *https://scholar.harvard.edu/files/gborjas/files/labourecon2020.pdf* (hereinafter Borjas and Cassidy (2019)). In section 2, "Imputing undocumented status in microdata files," the authors state that, "[i]n the absence of administrative data on the characteristics of the undocumented population, it is not possible to quantify the direction and magnitude of any potential bias," and in footnote 2 they describe DHS's assumed correction for sample bias. *See also* Catalina Amuedo-Dorantes and Francisca Antman, *Schooling and Labor Market Effects of Temporary Authorization: Evidence from DACA,* J. of Population Econ. 30(1): 339–73 (Jan. 2017), *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5497855/pdf/nihms866067.pdf.* In Section III.B, "Capturing Undocumented Immigrants and DACA Applicants," the authors describe a potential

effect of a limitation in the data relied upon as follows: "As such, some may be concerned that the control group may be made up of individuals who immigrated with the purpose of getting an educational degree in the United States, as is the case with F1 and J1 visa holders."

new requests.[345] As such, DHS

[345] As discussed above, the Duke Memorandum rescinded the DACA policy, allowing for a brief wind-down period in which a limited number of renewal requests would be adjudicated, but all initial requests would be rejected. Duke Memorandum at 4–5. In the litigation that followed, the Duke Memorandum was enjoined in part, such that DHS was required to adjudicate renewal requests as well as "initial" requests from individuals who had been granted DACA previously but did not qualify for the renewal process. *See Regents* v. *DHS; Batalla Vidal* v. *Nielsen,* 279 F. Supp. 3d 401 (E.D.N.Y. 2018). In July 2020, then-Acting Secretary Wolf issued a memorandum rescinding the Duke and Nielsen memoranda and making certain immediate changes to the DACA policy, namely directing DHS personnel to reject all pending and future initial requests for DACA, reject all pending and future applications for advance parole absent exceptional circumstances, and shorten DACA renewals. Memorandum from Chad F. Wolf, Acting Secretary, to heads of immigration components of DHS, *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,"* dated July 28, 2020 (hereinafter Wolf Memorandum). The effect of the Duke Memorandum, along with these court orders and the Wolf Memorandum, was that individuals who were granted DACA at some point before September 5, 2017, remained able to request DACA, while those who had never before received DACA were not able to do so until the Wolf Memorandum was vacated in December 2020. *See Batalla Vidal* v.

identifies three periods of interest: (1) a surge period, FY 2012–FY 2014, where initial requests were high compared to later years; (2) a stable policy period, FY 2015–FY 2017, where initial requests were slowing, renewal requests were leveling off, and the overall active DACA-approved population was stabilizing; and (3) a cooling-off period, FY 2018–FY 2020, where initial requests dramatically decreased, the active DACA-approved population started to decline, and most requests were for renewals.[346]

Table 8 presents historical data on the volume of DACA recipients who were

*Wolf,* No. 16–cv–4756, 2020 WL 7121849 (E.D.N.Y. Dec. 4, 2020).

[346] DHS believes it is likely that the initial surge in DACA requests reflects a rush of interest in the new policy, and that the slowdown in 2014–2017 simply reflects the fact that many of the eligible and interested noncitizens requested DACA shortly after it became available. It is also possible that there was a decline in interest due to the uncertainty caused by the *Texas* litigation regarding the 2014 Memorandum described above, which began in 2014. The limits on requests described above, *supra* n.345, along with changes in the national political sphere, likely account for much of the "cooling off" after 2017.

active as of September 30th of each fiscal year. For clarity, "active" is defined as those recipients who have an approved Form I–821D and I–765 in the relevant USCIS database. The approval can be either an initial or a renewal approval. Additionally, DHS does not need specificity or further breakdown of these data into initial and renewal recipients to project this active DACA population and calculate associated monetized benefits and transfers based on the methodology employed in this RIA. Both initial recipients and renewal recipients are issued an EAD that could be used to participate in the labor market.[347] Therefore, the annual cumulative totals of the active DACA population suffices for estimating the quantified and monetized benefits and transfers of this final rule that stem from the potential labor market earnings of the DACA population with an EAD.

BILLING CODE 9111–97–P

[347] See the Labor Market Impacts section of this RIA for discussion and analysis of labor force participation as well as discussion of the possibility that some DACA recipients might choose not to work despite having employment authorization.

**Table 8. Historical Active DACA Population, FY 2012–FY 2020 (as of September 30th of Each FY)**

| FY | Total Active DACA Recipients |
|---|---|
| 2012 | 2,019 |
| 2013 | 472,880 |
| 2014 | 608,037 |
| 2015 | 652,530 |
| 2016 | 679,830 |
| 2017 | 700,572 |
| 2018 | 704,095 |
| 2019 | 660,552 |
| 2020 | 647,278 |
| **Annual Growth Rate** | |
| FY 2015–FY 2016 | 4.1837% |
| FY 2016–FY 2017 | 3.0511% |
| **Average** | **3.6174%** |

Source: DHS/USCIS/OPQ ELIS, CLAIMS 3, and CIS2 (queried June 2021).

Notes: DHS considers FY 2015–FY 2017 to be a stable policy period in the DACA policy history—after the surge in DACA initial requests prompted by the Napolitano Memorandum, FY 2012–FY 2014, and before the cooling-off prompted by the Duke Memorandum, FY 2018–FY 2020. As noted below, the average annual growth rate of FY 2015–FY 2017 will be used to project the potential future active DACA population for FY 2021–FY 2031 and not the trend of FY 2015-FY 2017. Although not needed for the projections as explained above, the December 2021 active DACA population stood at approximately 611,470.

On July 16, 2021, the *Texas* decision enjoined USCIS from approving initial DACA requests.[348] Nevertheless, for this RIA, DHS employs the assumption that the historical trends in the active DACA population outlined remain a reasonable and useful indication of the trend in the future over the period of analysis. Table 9 presents DHS's estimates for the active DACA population for FY 2021–FY 2031.

Given the motivation and scope of this final rule, DHS assumes that upon the implementation of the final rule the DACA policy will be characterized by relatively more stability, where the yearly active DACA population will not continue to decrease as it did in FY 2018–FY 2020. Therefore, in our projections of the active DACA population, DHS uses the average

annual growth rate of 3.6174 percent in the stable policy period, FY 2015–FY 2017,[349] and multiplied it by the current year cumulative totals to obtain the next year's estimated active DACA population. Therefore, the values in Table 9 grow at an annual rate of 3.6174 percent. These estimates will be used later when calculating the monetized benefits and transfers of this final rule.

---

[348] As of July 20, 2021, USCIS ELIS and CLAIMS 3 data show 89,605 initial requests have been accepted at a lockbox in FY 2021.

[349] For clarity and in consideration of public comments, DHS reemphasizes that the average of period FY 2015–FY 2017 is used, and not the trend.

**Table 9. Projected Active DACA Policy Population (FY 2021–FY 2031)**

| FY | Active DACA Recipients |
|----|------------------------|
| 2020 | 647,278 |
| 2021 | 670,693 |
| 2022 | 694,954 |
| 2023 | 720,093 |
| 2024 | 746,142 |
| 2025 | 773,133 |
| 2026 | 801,100 |
| 2027 | 830,079 |
| 2028 | 860,106 |
| 2029 | 891,219 |
| 2030 | 923,458 |
| 2031 | 956,863 |

Source: USCIS analysis.

Notes: FY 2020 is included as a reference. Active DACA recipients equals previous year total plus the average annual growth rate (3.6174%) of the stable historical policy period FY 2015–FY 2017. The active DACA population is used to calculate the monetized benefits and transfers of this rule. Numbers are rounded for presentation purposes.

BILLING CODE 9111–97–C

DHS notes that although this methodology for projecting a future active DACA population has important advantages (including transparency, reproducibility, and a clear nexus to historical policy data), it also has some potential limitations. For instance, the methodology assumes that the active DACA population again will grow at the average rate it grew over the period FY 2015–FY 2017, which was just a few years after the Napolitano Memorandum was issued. Additionally, public comments on this rulemaking have raised concerns over the fact that potential DACA requestors stopped "aging in" to the policy in June 2022, which is when the youngest possible requestor reaches 15 years of age. However, DHS does not believe there will necessarily be a precipitous decline in the growth rate of DACA requestors after new requestors stop "aging in" in 2022. For example, some individuals may newly meet the criteria after June

2022, upon satisfying the educational or military service requirement for the first time. Nothing in the DACA age threshold criteria restrict the population projections made by DHS in this final rule. Nevertheless, DHS projects a decline over the analysis period, albeit gradual, of Initial requests in Table 11.

Similarly, the active DACA population projections do not directly capture the possibility that there could be a surge of request receipts following publication of a final rule, followed by a slower growth rate in later years. However, USCIS notes that projecting a surge in request receipts does not necessarily imply a surge in the active DACA population. The levels of approvals, renewals, and noncitizens renewing or lapsing deferred action under the DACA policy can vary. For example, there could be delays in processing requests caused by the surge of new requests (assuming USCIS maintains current staffing levels) or by other events, noncitizens could cease

making renewal requests at higher rates than before, or approval rates could change relative to historical trends. As mentioned previously, a continuation of the injunction on approving initial DACA requests would curtail initial requests.

Next, DHS presents the population used when calculating the monetized costs of this final rule. Table 10 presents historical data on the numbers of DACA request receipts. This population incurred the cost of requesting DACA. The population is composed of initial and renewal requestors, both of whom face similar costs, such as filing fees,[350] time burdens, and opportunity costs. For clarity, this table represents intake and processing data and is silent on the number of requests that were approved as that level of detail is not required to estimate the monetized costs of this final rule. DHS only needs total receipts to estimate the monetized costs of this final rule.

---

[350] The proposed fee does not differentiate between initial and renewal receipt costs. The

estimated full cost reflects a weighted average of

April 2020 to March 2021 initial and renewal workload receipt data.

| FY | Initials | Renewals | Total |
|---|---|---|---|
| **Table 10. Historical DACA Receipts** | | | |
| 2012 | 157,826 | | 157,826 |
| 2013 | 443,967 | | 443,967 |
| 2014 | 141,538 | 122,249 | 263,787 |
| 2015 | 92,470 | 391,878 | 484,348 |
| 2016 | 74,498 | 198,520 | 273,018 |
| 2017 | 45,637 | 470,668 | 516,305 |
| 2018 | 2,062 | 287,709 | 289,771 |
| 2019 | 1,574 | 406,588 | 408,162 |
| 2020 | 4,301 | 339,632 | 343,933 |

Source: DHS/USCIS/OPQ ELIS and CLAIMS 3 Consolidated (queried Dec. 2020).

Note: The paragraphs surrounding this table explain how this historical information is used to project the future population over FY 2021–FY 2031.

To project total DACA receipts, DHS uses the historical information from Table 10 with the intention to capture a possible surge effect in initial requests, a stabilization effect through the renewals, and then a steady decline in initial requests as the newly DACA-eligible population might dwindle over time because individuals stopped "aging in" in June 2022. DHS first calculates the percentage of initial requests in the previously defined surge years FY 2012–FY 2014 out of the total period FY 2012–FY 2017 to account for a similar possibility in projections, which DHS calls a surge rate.[351] This surge rate is 77.7595 percent. Second, DHS calculates the average initial requests over the stable period of FY 2015–FY 2017, which is 70,868.33. Third, DHS calculates the average annual rate of growth of 29.08806 percent for initial requests over FY 2015–FY 2017. Fourth, DHS calculates the average number of renewal requests over FY 2015–FY 2020, which is 349,165.83. DHS chose FY 2015–FY 2020 for this calculation due to the relatively stable nature of historical renewal requests. The intention is to capture a possible surge effect in initial requests, a stabilization effect through the renewals, and then a steady decline

in initial requests as the DACA-eligible population might dwindle over time.

Table 11 presents the projected volume of DACA request receipts. DHS estimates a surge component in initial requests over FY 2021–FY 2022. As stated, these projections do not adjust for the uncertain impacts of the *Texas* injunction on initial requests. To estimate the surge component, DHS first calculates the total number of historic initials over the stable period FY 2015–FY 2017, which is 212,605. DHS then multiplies this number by the surge rate of 77.7595 percent to estimate a potential surge in its projections of 165,320.57 initial requests in the first two projected years, FY 2021–FY 2022. DHS then divides this number in two to estimate a surge in initial requests for FY 2021 and FY 2022, which is 82,660.29. Adding to this number the average number of historic initial requests of 70,868.33 yields a total (surge) number of 153,528.62 initial requests for FY 2021 and FY 2022. Starting with FY 2024, DHS applies the historic FY 2015–FY 2017 growth rate of −29.08806 percent to initial requests for the rest of the projected years.[352]

The renewals in FY 2023–FY 2024 capture this surge as the historical average number of renewals of

349,165.83 plus 153,528.62. DACA recipients can renew their requests for deferred action every 2 years. Adding total initials and renewals for every fiscal year then yields a total number of requests that will be used in estimating the monetized costs of this final rule.

As with DHS's projection methodology for the active DACA population, DHS acknowledges potential limitations associated with the methodology used to project requests. For instance, although the methodology is transparent, reproducible, and has a clear nexus to historical policy data, the methodology assumes that the "surge rate" for DACA requests following publication of this rule would mirror the surge rate that followed issuance of the Napolitano Memorandum. There are reasons to support such an assumption, including a potential backlog of demand following the Duke Memorandum, subsequent guidance, and ongoing litigation. But there are also reasons to question it, such as the potential that demand was exhausted in the years before issuance of the Duke Memorandum, such that any "surge" in requests would consist primarily of requests from individuals who turned 15 after the Duke Memorandum was issued.

---

[351] Calculation: FY 2012–FY 2014 initials total = 743,331; FY 2012–FY 2017 initials total = 955,936;

initials surge rate = (743,331/955,936) * 100 = 77.7595%.

[352] For example: FY 2024 = FY 2023 * (1 − 29.08806%), which yields 70,868.33 * (1 − 0.2908806) = 50,254.11.

D. App. 126

**Table 11. Projected DACA Receipts (FY 2021–FY 2031)**

| FY | Initials | Renewals | Total |
|----|----------|----------|-------|
| 2021 | 153,529 | 349,166 | **502,695** |
| 2022 | 153,529 | 349,166 | **502,695** |
| 2023 | 70,868 | 502,695 | **573,563** |
| 2024 | 50,254 | 502,695 | **552,949** |
| 2025 | 35,636 | 420,034 | **455,670** |
| 2026 | 25,270 | 420,034 | **445,304** |
| 2027 | 17,920 | 420,034 | **437,954** |
| 2028 | 12,707 | 420,034 | **432,741** |
| 2029 | 9,011 | 420,034 | **429,045** |
| 2030 | 6,390 | 420,034 | **426,424** |
| 2031 | 4,531 | 420,034 | **424,565** |

Source: USCIS analysis.

Notes: For FY 2023, 70,868.33 represents initials averaged over the stable policy period of FY 2015–FY 2017. For the rest of the projection period this population declines at the average annual rate of 29.08806%. For FY 2021–FY 2022, 349,165.83 represents renewals averaged over FY 2015–FY 2020. For FY 2025–FY 2031, 420,034 represents historical average initials (349,165.83) plus historical average renewals (70,868.33). The calculations for the surges in initials in FY 2021–FY 2022 and renewals in FY 2023–FY 2024 are explained in the surrounding text. For simplicity, it is assumed the projected surges in the first two projected years are the same. Total receipts are used in calculating the monetized cost (to the requestors) of this final rule. Numbers are rounded for presentation purposes.

As of July 2021, DHS administrative data for quarters 2 and 3 of FY 2021 show that there were 89,701 initial DACA requests and 302,985 renewal DACA requests pending.[353] These data include requests filed during earlier periods in which DHS did not accept most initial DACA requests due to ongoing litigation and subsequent policy changes.[354] For the projections presented in this RIA, it is assumed that initial DACA requests would be accepted without interruptions from any legal rulings on the policy in FY 2021 and all other subsequent projected fiscal years. In the absence of these restrictions on initial requests, DHS's projection for FY 2021 tracks with the observed trend in the most recent FY 2021 administrative data.

In sum, while population estimates in this final rule are consistent with the overall MPI population estimate,[355] this RIA relies on historical request data to estimate future DACA requests rather than estimating the overall DACA-eligible population and then further estimating the share of the population likely to request DACA in the future. Either approach would still require a methodology for projecting how many potentially eligible individuals might choose to request DACA and also stay active. While both approaches face methodological challenges, the Department has no reason to believe the residual-based methodology would yield a more accurate estimate. At the same time, the current approach based on historical request data offers an especially transparent and easily reproducible estimation methodology.

(2) Forms and Fees

The final rule codifies, as proposed in the NPRM, that the Form I–821D require an $85 filing fee and eliminates the $85 biometrics fee that had been assessed since the Napolitano Memorandum was issued.[356] Individuals requesting deferred action under the DACA policy must file Form I–821D to be considered. Currently, and as codified in the final rule, all individuals filing Form I–821D to request deferred action under DACA, whether for initial consideration of or renewal of DACA, also must file Form I–765 and Form I–765WS (Form I–765 Worksheet) and pay relevant fees. Submission of Forms I–821D, I–765, and I–765WS and filing fees together is considered to comprise a complete DACA request.[357] Additionally, certain DACA requestors choose to have a representative, such as a lawyer, prepare and file their DACA request.[358] In such cases, a Form G–28 must accompany a complete DACA request.[359]

---

[353] Source: DHS/USCIS/OPQ (July 2021).

[354] See Section II.B above for litigation history, including *Regents*, 140 S. Ct. 1891 (2020), and *Texas*, 549 F. Supp. 3d 572 (S.D. Tex. 2021).

[355] That is, the DHS projected number of DACA requests, and active DACA recipients falls within the ranges estimated by the residual-based methodology.

[356] See new 8 CFR 106.2(a)(38).

[357] See new 8 CFR 236.23(a)(1).

[358] An internal OPQ data request reveals that 44 percent of requestors chose to have a preparer. We use this percentage breakdown in subsequent cost calculations.

[359] Individuals retained to help a requestor prepare and file their DACA request must submit a Form G–28, Notice of Entry of Appearance as Attorney or Accredited Representative, to provide

Continued

The final rule sets for the following fees associated with a DACA request: the fee to file Form I–765 is $410; a $85 filing fee for Form I–821D; no filing fee for Form I–765WS, or Form G–28; and no biometric services fee. Therefore, the total fee as of May 20, 2020, to submit a DACA request is $495, with or without the submission of Form G–28. DHS believes this is a reasonable proxy for the Government's costs of processing and vetting these forms when filed together.[360] As stated in the NPRM, USCIS data suggest there is a negligible workload difference from adjudicating Form I–821D when submitted with Form I–765.[361] These fees will allow DHS to recover the Government's costs of processing these forms in line with USCIS' standard fee-funded operating structure. In the future, DHS plans to propose new USCIS fees in a separate rulemaking after evaluating the resource requirements for Form I–765 and other immigration benefit requests.[362] The fee for Form I–765 as of May 20, 2020 may need to be adjusted because it has not changed since 2016.[363]

(3) Wage Assumptions

Compared to the NPRM, in this final rule, DHS adjusted the preparer's estimated total compensation rate to reflect BLS data updates and the estimated DACA recipients' total compensation rate to reflect an adjusted DACA population age distribution. These adjustments are described in detail below. The estimated hourly compensation rate of DACA requestors and the total compensation rate of those hired to prepare and file DACA requests are used as proxies for the opportunity cost of time in the calculation of costs. The estimated wage rate of the requestors also is used to estimate the benefits of income that accrue to those requestors who participate in the labor market through the grant of employment authorization. In the following, DHS explains how it estimates compensation rates of the preparers and requestors. All compensation estimates are in 2020 dollars.

A DACA request can be prepared on behalf of the requestor. In this final rule, DHS assumes that a preparer has similar knowledge and skills necessary for filing a DACA request as an average lawyer would for the same task. Based on Bureau of Labor Statistics (BLS) data, DHS estimates an average loaded wage,

information about their eligibility to act on behalf of the requestor (see 8 CFR 292.4(a)).

[360] USCIS Office of the Chief Financial Officer (OCFO) analysis.

[361] See 86 FR 53764.

[362] See 87 FR 5241.

[363] See 81 FR 73292.

or compensation, for a preparer of $103.81.[364]

To estimate the hourly opportunity cost of time of the DACA requestor population, DHS uses data from Census and USCIS. DHS assumes, for the purposes of this analysis, that the profile of DACA recipients follows that of the U.S. population at large. For example, DHS assumes that the average DACA recipient values education and employment in a similar way as the average person in the U.S. population. This allows DHS to use other government agencies' official data, such as Census data, to estimate DACA recipient compensation rates and other economic characteristics given the absence of DHS-specific DACA recipient population economic data.

USCIS data on the active DACA population[365] lend themselves to delineation by age group: 15 to 24, 25 to 34, and 35 to 44.[366] In an effort to provide a more focused estimate of wages, DHS uses these age groups in its estimates, assuming that different age groups have different earnings potential. DHS estimates these age groups to represent about 36 percent, 56 percent, and 9 percent, respectively, of the total DACA population. Based on the public comments DHS received regarding the FY 2022 "aging in" aspect of the DACA policy, DHS has adjusted its analysis in the final rule to account for the aging of the DACA recipient population, which implies a shift in the age distributions. As such, DHS takes the average of the FY 2021 age distribution of the DACA-eligible population (15 to 24 years old [36 percent], 25 to 34 years old [56 percent], and 35 to 44 years old [9 percent]) and FY 2031 age distribution

[364] DHS assumes the preparers with similar knowledge and skills necessary for filing DACA requests have average wage rates equal to the average lawyer wage of $71.59 per hour. Source: BLS, Occupational Employment and Wage Statistics, Occupational Employment and Wages, May 2020, 23–1011 Lawyers, https://www.bls.gov/oes/2020/may/oes231011.htm.

The benefits-to-wage multiplier is calculated as follows: (total employee compensation per hour)/(wages and salaries per hour) = $38.60/$26.53 = 1.4549 = 1.45 (rounded). See BLS, Economic News Release (Mar. 2021), Employer Cost for Employee Compensation—December 2020, Table 1. Employer Costs for Employee Compensation by ownership, https://www.bls.gov/news.release/archives/ecec_03182021.htm.

Total compensation rate calculation: (wage rate) * (benefits multiplier) = $71.59 * 1.45 = $103.81.

[365] Source: Count of Active DACA Recipients by Month of Current DACA Expiration as of Dec. 31, 2020. DHS/USCIS/OPQ ELIS and CLAIMS 3 Consolidated (queried Jan. 2021).

[366] We assume this distribution remains constant throughout the periods of analysis for both baselines as new DACA recipients enter and previous DACA recipients exit the policy. The current (age) requirements of the DACA policy do not prohibit us from making this assumption.

(15 to 24 years old [0 percent], 25 to 34 years old [36 percent], and 35 to 44 years old [64 percent]).[367] Therefore, DHS assumes an overall age group distribution of the DACA-eligible population to be 18 percent for those 15 to 24 years old; 46 percent for those 25 to 34 years old; and 37 percent for those 35 to 44 years old. For the purposes of this analysis, these calculations seek to account for a range of possible DACA recipients' skill, education, and experience levels. This age distribution could be expected to change over time.

Next, DHS seeks to estimate an average compensation rate that accounts for income variations across these age groups. DHS first obtains annual average Consumer Price Index information for calendar years 2012 through 2020.[368] DHS sets 2020 as the base year and then calculate historical average annual incomes (in 2020 dollars) based on Census historical income data.[369] To do this, DHS converts the annual mean incomes in the Census data (2019 dollars) into 2020 dollars and then averages the period 2012–2019 to obtain average full-time salary information for the population at large for these age groups as $18,389.39, $45,528.59, and $60,767.17, respectively.[370] DHS recognizes that not all DACA recipients work full time or have jobs that offer additional benefits beyond the offered wage. The employment and school attendance status of DACA recipients is varied and includes being in school only, working full or part time, or being unemployed. Moreover, some DACA recipients have additional compensation benefits such as health

[367] We assume the age group 15–24 has no members by the end of the projection period, FY 2031. To obtain the FY 2031 age group distribution, we shift the FY 2021 distribution under the assumption that DACA recipients in a particular age group retain their DACA approval as they age throughout the projection period of this analysis. That is, (a) age group 15–24 becomes 0 percent of the population; (b) FY 2031 age group 25–34 becomes the FY 2021 age group 15–24, with 36 percent of the population; and (c) FY 2031 age group 35–44 becomes 64 percent of the population, which is the sum of FY 2021 age group 25–34 (56 percent) and FY 2021 age group 35–44 (9 percent).

[368] Source: BLS, Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, index averages (Mar. 2021), https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202103.pdf.

[369] Source: U.S. Census Bureau, Historical Income Tables: People, Table P–10. Age—People (Both Sexes Combined) by Median and Mean, https://www.census.gov/data/tables/time-series/demo/income-poverty/historical-income-people.html (last revised Nov. 9, 2021).

[370] The Census data delineate age groups as 15 to 24, 25 to 34, and 35 to 44. DHS assumes the age groups identified in the USCIS data follow the same pattern on average as the age groups in the Census data (e.g., the Census income information by age group also represents the income information in the age groups identified in the USCIS data).

insurance whereas others do not. Additionally, DACA recipients could hold entry-level jobs as well as more senior positions. Some are employed in industries that generally pay higher wages and some are employed in industries where wages are relatively lower. To account for this wide range of possibilities, DHS takes a weighted average of the salaries presented above using the distribution of the age groups as weights, divided by 26 pay periods and 80 hours per pay period (the typical biweekly pay schedule), loading the wage to account for benefits, to arrive at an average hourly DACA requestor and recipient compensation of $32.58.[371]

(4) Time Burdens

Compared to the NPRM, this section contains no changes to the time burdens. In the final rule, DHS did adjust the GSA 2021 travel rate per mile for biometrics adjusted to 2020 values using BLS CPI. Calculating any potential costs associated with this final rule involves accounting for the time that it takes to fill out the required forms, submit biometrics collection, and travel to and from the biometrics collection site. DHS estimates the time burden of completing Form I–821D is 3 hours per request, including the time for reviewing instructions and completing and submitting the form.[372] Moreover, DHS estimates the time burden of completing Form I–765 is 4.75 hours, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application, and the time burden of completing Form I–765WS is 0.5 hours, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application.[373] Additionally, DHS

estimates the time burden of completing Form G–28 is 0.83 hours.[374]

In addition to the filing fee, the requestor will incur the costs to comply with the biometrics submission requirement as well as the opportunity cost of time for traveling to an USCIS Application Support Center (ASC), the mileage cost of traveling to an ASC, and the opportunity cost of time for submitting their biometrics. While travel times and distances vary, DHS estimates that a requestor's average roundtrip distance to an ASC is 50 miles and takes 2.5 hours on average to complete the trip.[375] Furthermore, DHS estimates that a requestor waits an average of 70 minutes or 1.17 (rounded, 70 divided by 60 minutes) hours for service and to have their biometrics collected at an ASC according to the PRA section of the instructions for Form I–765, adding up to a total biometrics-related time burden of 3.67 hours (2.5 plus 1.17). In addition to the opportunity cost of time for providing biometrics and traveling to an ASC, requestors will incur travel costs related to biometrics collection. The per-requestor cost of travel related to biometrics collection is about $27.00 per trip,[376] based on the 50-mile roundtrip distance to an ASC and the General Services Administration's (GSA) travel rate of $0.54 per mile.[377] DHS assumes that each requestor travels independently to an ASC to submit their biometrics.

(5) Costs of the Final Regulatory Action

The provisions of this final rule would not impose any new costs on the

potential DACA requestor population when requesting deferred action through Form I–821D and an EAD through Form I–765 and Form I–765WS. The final rule would not implement any new forms to file, nor would it change the estimated time burden for completing and filing any of the required forms to request deferred action, and thus the total DACA request cost would not change from the current amount if requestors continued to file Forms I–821D, I–765, and I–765WS. Therefore, relative to the No Action Baseline, the final rule does not impose any new costs on requestors.

(6) Benefits of the Final Regulatory Action

There are quantified and monetized benefits as well as unquantified and qualitative benefits associated with the DACA policy under the Napolitano Memorandum and this final rule. The quantified and monetized benefits stem from the income earned by DACA recipients who participate in the labor market. DHS recognizes that some recipients will not participate in the labor market. For example, this category could include DACA recipients who are currently enrolled in school, who perhaps have scholarships or other types of financial aid, and who may not need additional financial support (e.g., young DACA requestors, including high school students, who are supported by their parents or guardians). Therefore, such individuals may choose not to participate in the labor market.

To identify the proportion of the DACA recipients who might participate in the labor market, DHS uses data from BLS on labor force participation rates.[378] BLS data show historical and projected labor force participation rates (as a percent of total working-age population) by age group. Assuming the DACA requestors' population profiles (such as education and employment status) match those of the U.S. population at large, DHS combines the BLS data on labor force participation by age group with previously presented USCIS data on the distribution of ages for the approved DACA requestor population (*see Wage Assumptions*

---

[371] Calculation: $32.58 = (((\$18,389.39 * 18\%) + (\$45,528.59 * 46\%) + (\$60,767.17 * 37\%))/26)/80 * 1.45.

[372] USCIS, Instructions for Consideration of Deferred Action for Childhood Arrivals (Form I–821D), OMB No. 1615–0124 (expires Mar. 31, 2023), *https://www.uscis.gov/sites/default/files/document/forms/i-821dinstr.pdf*.

[373] Department of Homeland Security, USCIS, Instructions for Application for Employment Authorization (Form I–765), OMB No. 1615–0040, *https://www.uscis.gov/sites/default/files/document/forms/i-765instr.pdf*. Last accessed Aug. 12, 2022. On July 26, 2022, OMB approved an emergency revision action (ICR# 202207–1615–004) associated with the final rule titled Asylumworks Vacatur 1615–AC66. This action will change the future Form I–765 time burden from 4.75 hours to 4.50 hours once USCIS releases new Form I–765 and

form instructions. This time burden change of 15 minutes was not a result of the DACA rulemaking and/or its provisions. In our estimations, we use the time burden of 4.75 as it is the most current Form I–765 time burden published by USCIS as of August 12, 2022.

[374] USCIS, Instructions for Notice of Entry of Appearance as Attorney or Accredited Representative (Form G–28), OMB No. 1615–0105, *https://www.uscis.gov/sites/default/files/document/forms/g-28instr.pdf*. Last accessed Aug. 12, 2022.

[375] See Final Rule, *Employment Authorization for Certain H–4 Dependent Spouses*, 80 FR 10284 (Feb. 25, 2015), and Final Rule, *Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives*, 78 FR 536, 572 (Jan. 3, 2013).

[376] Calculation: 50 miles * $0.54 per mile = $27 per trip.

[377] See the U.S. General Services Administration website at *https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-mileage-rates/pov-mileage-rates-archived* for privately owned vehicle mileage reimbursement rates.

Also see BLS CPI information at *https://www.bls.gov/cpi/tables/seasonal-adjustment/revised-seasonally-adjusted-indexes-2021.xlsx*.

Calculation: GSA 2021 rate = $0.56 per mile; average 2021 CPI = 270.97, average 2020 CPI = 258.84. Rate per mile in 2020 dollars is $0.56/((1 + ([270.97 − ;258.84]/258.84)) = $0.5349, rounded to $0.54.

[378] Source: BLS, Employment Projections (Sept. 2020), *Civilian labor force participation rate by age, sex, race, and ethnicity*, Table 3.3. Civilian labor force participation rates by age, sex, race, and ethnicity, 1999, 2009, 2019, and projected 2029, *https://www.bls.gov/emp/tables/civilian-labor-force-participation-rate.htm*.

section) to calculate an age group-adjusted weighted average. Based on this methodology, DHS estimates that the average rate of the potential DACA recipients who will participate in the labor market and work is 78 percent and the rate of those who might not is 22 percent.[379] The 78 percent estimate is interpreted as an average estimate over the analysis period meant to encapsulate any fluctuations due to labor market dynamics. DHS recognizes that the estimated 78 percent participation rate of potential DACA recipients does not directly account for the potential additional benefits of an EAD beyond income earnings. DHS describes these potential additional benefits in the analysis below, regarding the benefits of the rule relative to the Pre-Guidance Baseline.

DHS calculates the quantified and monetized benefits associated with this final rule by taking the sum of the approved initial and renewal populations (*i.e.,* those who have been granted an EAD) and multiplying it by an estimated yearly compensation total of $67,769, which is the previously estimated compensation rate of $32.58, multiplied by 80 hours in a pay period, times 26 pay periods per year. As previously discussed, DHS assumes that over the analysis period, on average, 78 percent of DACA recipients will work, so the total population projections presented previously are adjusted to reflect this (population * 78 percent). Given the previously delineated provisions of this final rule and the stated assumptions, there are no new quantified and monetized benefits

relative to the No Action Baseline. In the No Action Baseline, the same average estimate of 78 percent of DACA recipients will work, which is the same percentage of people estimated that would work under this final rule.

The unquantified and qualitative benefits of an approved DACA request are discussed in significantly greater detail in the analysis below, regarding the benefits of the rule relative to the Pre-Guidance Baseline.

### (7) Transfers of the Final Regulatory Changes

The provisions of this final rule will produce no transfers relative to the No Action Baseline.

### b. Pre-Guidance Baseline

The period of analysis for Pre-Guidance Baseline also includes the period FY 2012–FY 2020, which includes the period during which DHS has operated under the Napolitano Memorandum, to provide a more informed picture of the total impact of the DACA policy. DHS proceeds by considering the DACA population from this period (given by the historical data of Table 8 and Table 10), but applying all the assumptions as presented before (*e.g.,* on wages and age distributions). In essence, in this baseline, we assume the DACA policy never existed, but instead of the period of analysis beginning in FY 2021, the Pre-Guidance Baseline period of analysis is FY 2012–FY 2031, which allows DHS to analyze the potential effects of the final rule's provisions starting in FY 2012. As a result, the Pre-Guidance baseline condition is similar to the state of the world under the July 16, 2021, district court decision, should the partial stay of that decision ultimately be lifted.

### (1) Population Estimates and Other Assumptions

For the Pre-Guidance Baseline, the total population estimates include all the projected populations described earlier in this analysis for FY 2021–FY 2031, in Table 9 and Table 11, while also adding the historical population numbers presented in Table 8 and Table 10 for FY 2012–FY 2020. To conserve space and time, we will not repeat those numbers here.

### (2) Forms and Fees

All the forms and fees remain the same in the Pre-Guidance Baseline as those presented for the No Action Baseline.

### (3) Wage Assumptions

For the Pre-Guidance Baseline, the wage assumptions remain as presented previously for the No Action Baseline with an overall average compensation rate for the DACA requestors of $32.58 and an average compensation rate for preparers of $103.81.

### (4) Time Burdens

For the Pre-Guidance Baseline, all the time burdens remain as presented previously for the No Action Baseline.

### (5) Costs of the Final Regulatory Changes

The Pre-Guidance Baseline represents a world without DACA; that is, all baseline impacts are $0. DHS calculates the final rule's impacts relative to this baseline of $0 costs, benefits, and transfers. Given the population estimates, form fees, time burdens, wage assumptions (including preparers'), biometrics fee, travel costs, and biometrics time burden information presented in Section III.A.4.a, DHS presents the requestors' application costs for period FY 2012–FY 2031. The estimated cost per average DACA request is $1,206.83.[380] Multiplying these per-request costs by the population estimates yields the total estimated cost. The following table presents our quantified and monetized cost estimates.

BILLING CODE 9111–97–P

---

[379] BLS labor force calculated averages by age group, United States: 16 to 24 years old average is 53.6 percent (average of FY 2019 [55.9%] and FY 2029 [51.3%]); 25 to 34 years old average is 82.4 percent (average of FY 2019 [82.9%] and FY 2029 [81.9%]); and 35 to 44 years old average is 82.15 percent (average of FY 2019 [82.1%] and FY 2029 [82.2%]). Previously estimated USCIS age group distribution of the active DACA-approved population: 16 to 24 years old is 18 percent; 25 to 34 years old is 46 percent; and 35 to 44 years old is 37 percent. Calculations: Age group adjusted weighted average is (53.6% * 18%) + (82.4% * 46%) + (82.15% * 37%) = 78.151% = 78% (rounded) of the DACA recipient population who potentially will participate in the labor market. Thus, it follows, (1 − 78.151%) = 21.849% = 22% (rounded) of the DACA recipients who potentially will opt out of the labor market.

[380] The average request cost equals Form I–821D average cost plus Form I–765 average cost, that is $1,206.83 = $461.24 + $745.59. Breaking this down, Form I–821D average cost = Preparer average cost + DACA requestor average cost + Biometrics cost. Preparer average cost = ($103.81 (estimated compensation) * 3.83 hours (total time burden) + $85 (fee)) * 0.44 (application preparer use rate) = $212.34. DACA applicant average cost = ($32.58 (estimated compensation) * 3 (time burden)) + $85) * (1 − 0.44) = $102.33. Biometrics cost = ($32.58 * 3.67 hours (time burden)) + $27 (50 miles * $.54/mile) = $146.57. Average Form I–821D cost = $212.34 + $102.33 + $146.57 = $461.24. Average Form I–765 cost = $420.20 (preparer average cost) + $325.39 (DACA requestor average cost) = $745.59.

**Table 12. Total Costs Relative to the Pre-Guidance Baseline, FY 2012–FY 2031 (2020 dollars)**

| FY | Request Costs |
|---|---|
| 2012 | $190,469,138 |
| 2013 | $535,792,656 |
| 2014 | $318,346,042 |
| 2015 | $584,525,654 |
| 2016 | $329,486,289 |
| 2017 | $623,092,318 |
| 2018 | $349,704,310 |
| 2019 | $492,582,111 |
| 2020 | $415,068,632 |
| 2021 | $606,666,703 |
| 2022 | $606,666,703 |
| 2023 | $692,192,928 |
| 2024 | $667,315,063 |
| 2025 | $549,916,378 |
| 2026 | $537,406,537 |
| 2027 | $528,535,567 |
| 2028 | $522,244,990 |
| 2029 | $517,784,221 |
| 2030 | $514,621,003 |
| 2031 | $512,377,903 |
| **Undiscounted Total** | **$10,094,795,145** |

Source: USCIS analysis.

Note: Numbers are rounded for readability.

BILLING CODE 9111–97–C

The DACA policy also creates cost savings for DHS that are not easily quantified and monetized. For instance, the DACA policy simplifies many encounters between DHS and certain noncitizens, reducing the burden upon DHS of vetting, tracking, and potentially removing DACA recipients. Cost savings vary considerably depending on the circumstances of the encounter; the type of enforcement officer involved; relevant national security, border security, and public safety considerations; and any intervening developments in the noncitizen's situation and equities. In addition, some cost savings that historically have been considered as part of deferred action decision making are inherently difficult to quantify, such as costs associated with taking enforcement action without first considering "the likelihood of ultimately removing the alien, the presence of sympathetic factors that could adversely affect future cases or generate bad publicity . . ., and whether the alien had violated a provision that had been given high enforcement priority." [381]

(6) Benefits of the Final Regulatory Changes

There are potential quantified and monetized benefits and unquantified and qualitative benefits associated with this final rule. The quantified and monetized benefits stem from the income earned by DACA recipients who have an EAD and choose to participate in the labor market. By participating in the labor market, DACA recipients are increasing the production of the economy and earning wages, which, in turn, leads to additional consumption. DHS acknowledges the possibility that certain DACA recipients might have participated in the informal labor market and earned wages prior to being granted lawful presence and work authorization under the DACA policy. For this segment of the DACA-recipient population, DHS would be overestimating the quantified benefits in the form of earned income directly attributable to receiving work authorization. Adjusting the quantified benefits to show only income attributable to work authorization under DACA would entail estimating the difference between the compensation these individuals might expect to earn

[381] See AADC, 525 U.S. at 484 n.8 (citing 16 Charles Gordon, et al., Immigr. L. and Proc. § 242.1 (1998)).

in the informal labor market and the compensation estimates presented in this analysis, multiplied by the estimate of this population.[382]

For example, Borjas and Cassidy (2019) examine the wage differential between informal and formal work for immigrant populations. They apply their analysis of a wage differential, or ''wage penalty,'' to an estimated proxy of the DACA-eligible population, suggesting that the wage earned as a documented noncitizen could be, on average, 4 percent to 6 percent higher than the wage of an individual working as an undocumented noncitizen. This phenomenon also is discussed in a recently published report on the economic benefits of unauthorized immigrants gaining permanent legal status, which points out that per-hour income differentials exist when comparing unauthorized immigrant workers to citizen and legal immigrant workers.[383] In contrast, in a survey of 1,157 DACA recipients, Wong (2020) finds that respondents age 25 and older (n=882) reported wage increases of 129 percent ($27.17/$11.89 = 2.285) since receiving DACA.[384] Such an adjustment would yield a more accurate estimate of the quantified benefits attributable to the receipt of work authorization under DACA.[385] DHS received public comments on the topic of wage differentials specifically mentioning that, for undocumented women, wage differentials could be even higher. However, no comments made suggestions about whether DHS should adjust the benefit estimates to account for possible wage differentials, or how to adjust these estimates. Therefore, DHS made no adjustments in this final rule RIA.

In addition, DHS considered an additional modification to the estimated benefits to help ensure DHS is not overestimating the quantified benefits directly attributable to receiving DACA. For those who entered the labor market after receiving work authorization and began to receive paid compensation from an employer, counting the entire amount received by the employer as a benefit could likely results in an overestimate. Even without working for wages, the time spent by an individual has value. For example, if someone performs childcare, housework, or other activities without paid compensation, that time still has value. DHS notes that for many workers, paid work can also provide subjective value that exceeds and is not adequately captured by wages; we bracket that possibility here.

Because nonpaid time still has value, a more accurate estimate of the net benefits of receiving work authorization under the final rule would take into account the value of time of the individual before receiving work authorization. For example, the individual and the economy would gain the benefit of the DACA recipients entering the workforce and receiving paid compensation but would lose the value of their time spent performing non-paid activities. Due to the wide variety of non-paid activities an individual could pursue without DACA-based work authorization, it is difficult to estimate the value of that time. DHS requested public comment on how to best value the non-paid time of those who were not part of the authorized workforce without DACA, but did not receive any suggestions as to whether DHS should adjust the estimated benefits to possibly account for leisure or non-paid activities, nor how to adjust the estimated benefits. For this reason, and based on approaches from previous DHS rules,[386] DHS estimated that a reasonable proxy of the value of one hour of non-paid time is equal to the federal minimum wage, adjusted for benefits and in 2020 dollars, at

$10.05.[387] For an annual value, as before, DHS takes the hourly rate (including benefits), $10.05, and multiplies it by 80 hours in a pay period and further multiplies by 26 pay periods, which yields an annual value for non-paid time of $20,904.

For total yearly income earnings calculations, DHS uses the previously estimated average annual compensation of DACA EAD recipients of $67,768.79 multiplied by 78 percent of the active population data in Table 9 and the active population estimates in Table 11. DHS estimated 78 percent of DACA recipients will choose to participate in the labor market, potentially earning income. This earned income is presented here as part of the quantified and monetized benefit of this final rule because of recipients having an EAD and working. The benefit (from earned income) per working DACA recipient is adjusted by subtracting the portion that is a transfer from working recipients to the Federal Government, which ends up being $62,584.47 ($67,768.79 * (1 − 0.0765)). These calculations assume that DACA workers were not substituted for other already employed workers, and that all workers looking for work can find employment in the labor market. As stated in the NPRM and discussed below in Section III.A.4.d, DHS cannot predict the degree to which DACA recipients are substituted for other workers in the U.S. economy since this depends on many factors. Multiplying this per-recipient benefit (income earnings) by the population projections presented earlier in Table 9 and Table 11 yields the results in column A in Table 13.[388] Similarly, using the 78 percent rate applied to the active DACA populations in Tables 9 and 11 yields the results in column B in Table 13. Subtracting the two columns, A−B, yields our quantified and monetized net benefits presented in column C of Table 13.

**BILLING CODE 9111–97–P**

---

[382] *See* Borjas and Cassidy (2019).

[383] *See* White House Council of Economic Advisors, *The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants* (Sept. 17, 2021), *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants.*

[384] *See* Wong (2020). DHS notes that the intervening years of experience could explain some of this growth rate.

[385] Borjas and Cassidy (2019) and Wong (2020) suggest that the additional earnings from wages presented in this final rule, for this segment of the DACA population, would have to be adjusted by this formula: NPRM estimated DACA wage—[NPRM DACA estimated wage/(1 + wage differential %)]. This adjustment multiplied by this population yields a more accurate estimate of the quantified and monetized benefits of this final rule.

[386] For example, in prior rules, the DHS position was that the value of time for those not authorized to be in the workforce still has a positive value. DHS valued this time as the minimum wage of $7.25 * a benefits multiplier of approximately 1.45. *See Employment Authorization for Certain H–4 Dependent Spouses,* 80 FR 10283 (Feb. 25, 2015), and *International Entrepreneur Rule,* 82 FR 5238 (Jan. 17, 2017).

[387] Federal minimum wage equals $7.25. Benefits multiplier from before = 1.45. Average annual 2021 CPI = 270.970; 2020 CPI = 258.811. Value of non-paid time = (7.25/(270.970/258.811)) * 1.45 = $10.05 (rounded).

[388] The portion of total potential income earned that is a payroll tax transfer from the DACA working population to the Federal Government is 7.65%. Multiplying the benefits numbers in Table 13 by [1/(1 − 0.0765)] yields the pre-tax overall total potential income earned. The section below on Transfers discusses more details on the calculations and transfer estimates.

**Table 13. Total Net Benefits Relative to the Pre-Guidance Baseline, FY 2012–FY 2031 (2020 dollars)**

| FY | Column | | |
|---|---|---|---|
| | A | B | C = A - B |
| | Income Earnings | Value of Non-Paid Time | Net Benefits |
| 2012 | $98,559,281 | $32,920,037 | $65,639,244 |
| 2013 | $23,084,057,955 | $7,710,365,146 | $15,373,692,809 |
| 2014 | $29,681,867,169 | $9,914,116,249 | $19,767,750,920 |
| 2015 | $31,853,832,553 | $10,639,579,954 | $21,214,252,599 |
| 2016 | $33,186,506,344 | $11,084,709,730 | $22,101,796,614 |
| 2017 | $34,199,045,529 | $11,422,910,529 | $22,776,135,000 |
| 2018 | $34,371,023,909 | $11,480,353,466 | $22,890,670,443 |
| 2019 | $32,245,433,621 | $10,770,379,626 | $21,475,053,995 |
| 2020 | $31,597,451,500 | $10,553,945,463 | $21,043,506,037 |
| 2021 | $32,740,453,377 | $10,935,722,439 | $21,804,730,938 |
| 2022 | $33,924,802,048 | $11,331,309,763 | $22,593,492,285 |
| 2023 | $35,151,993,185 | $11,741,207,009 | $23,410,786,176 |
| 2024 | $36,423,576,566 | $12,165,931,821 | $24,257,644,745 |
| 2025 | $37,741,158,030 | $12,606,020,570 | $25,135,137,460 |
| 2026 | $39,106,401,505 | $13,062,029,029 | $26,044,372,476 |
| 2027 | $40,521,031,110 | $13,534,533,076 | $26,986,498,034 |
| 2028 | $41,986,833,332 | $14,024,129,420 | $27,962,703,912 |
| 2029 | $43,505,659,284 | $14,531,436,354 | $28,974,222,930 |
| 2030 | $45,079,427,036 | $15,057,094,540 | $30,022,332,496 |
| 2031 | $46,710,124,048 | $15,601,767,813 | $31,108,356,235 |
| **Undiscounted Total** | **$683,209,237,384** | **$228,200,462,035** | **$455,008,775,347** |

Source: USCIS analysis.
Note: Numbers rounded for readability.

BILLING CODE 9111–97–C

DHS notes that to whatever extent a DACA recipient's wages otherwise would be earned by another worker, the income earnings and therefore net benefits in Table 13 would be overstated (see Labor Market Impacts section for additional analysis).

The unquantified and qualitative benefits stem in part from the forbearance component of an approved DACA request. The DACA requestors who receive deferred action under this final rule would enjoy additional benefits relative to the Pre-Guidance Baseline. DHS describes these next along with any other qualitative impacts of this final rule relative to the Pre-Guidance Baseline.

Some of the benefits associated with the DACA policy accrue to DHS (as discussed above), whereas others accrue to the noncitizens who are granted deferred action and employment authorization, and still others accrue to family members, employers, universities, and others. Quantification and monetization of many of these benefits is unusually challenging. E.O. 13563 states that:

each agency is directed to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible. Where appropriate and permitted by law, each agency may consider (and discuss qualitatively) values that are difficult or impossible to quantify,

including equity, human dignity, fairness, and distributive impacts.[389]

DHS emphasizes that the goals of this regulation include protection of equity, human dignity, and fairness, and the Department is keenly alert to distributive impacts. DHS also recognizes that while some of those qualitative benefits are difficult or impossible to measure, it is essential that they be considered. Under the final rule, deferred action may be available to people who came to the United States many years ago as children—often as young children. As discussed above, in DHS's view, scarce resources are not best expended with respect to people

---

[389] 76 FR 3821 (Jan. 21, 2011).

who meet the relevant criteria and are deemed, on a case-by-case basis, to warrant a favorable exercise of discretion. In addition, DHS believes forbearance of removal for such individuals furthers values of equity, human dignity, and fairness.

It is not simple to quantify and monetize the benefits of forbearance for those who obtain deferred action and their family members. These challenging-to-quantify benefits include (1) a reduction of fear and anxiety for DACA recipients and their families,[390] (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future. Some of these benefits are connected with equity and fairness, mentioned in E.O. 13563; others are plausibly connected with human dignity, also mentioned in that E.O. Again, these benefits are difficult to quantify.[391] One might attempt to compare the benefits of the reduced risk of deportation to other benefits from risk reduction, such as the reduction of mortality and morbidity risks. But any such comparison would be highly speculative, and DHS does not believe that it can monetize the total value of these specific benefits to DACA recipients. A possible (and very conservative) lower bound estimate could be the cost of requesting DACA; that is, it would be reasonable to assume that the DACA-approved population values these benefits at least as much as the cost of requesting DACA. DHS does not speculate on an upper bound but concludes that it could well be a substantially large sum, much larger than the lower bound; the benefits of items (1), (2), (3), and (4) above are likely to be high.

DHS notes as well that DACA recipients could be approved for discretionary advance parole, which permits them to seek parole into the United States upon their return from travel outside the United States.[392] In addition to the benefits of travel itself, DHS recognizes that some DACA recipients who were not previously lawfully admitted or paroled into the United States and are otherwise eligible to adjust status to that of a lawful permanent resident (such as through employment or family sponsorship) may satisfy the "inspected and admitted or

paroled" requirement of the adjustment of status statute at 8 U.S.C. 1255(a) after being paroled into the United States upon their return. However, DHS may grant advance parole to any individual who meets the statutory criteria with or without lawful status or deferred action, and a grant of advance parole alone does not create a pathway to lawful status or citizenship. Regardless, DHS is also unable to quantify the value of advance parole to the DACA population.

Employment authorization and receipt of an EAD provides additional benefits to the DACA-approved population and their families. An EAD can serve as official personal identification, in addition to serving as proof that an individual is authorized to work in the United States for a specific period. In certain States, depending on policy choices made by the State, an EAD also could be used to obtain a driver's license or other government-issued identification. Like the discussion on the benefits that are derived from being granted deferred action, DHS is unable to fully quantify and monetize the benefits from having official personal identification or a driver's license for individuals in the DACA population.

DHS requested and received public comments on the additional benefits from forbearance and employment authorization beyond the estimated potential labor market earnings of the approved DACA population. A commenter offered some valuable insights as to how to potentially estimate or proxy for some of these additional benefits. For example, the commenter suggested looking at the average treatment costs for anxiety disorders and anxiety reducing services such as anxiety app downloads and purchases as a proxy for the value that people might place on the reduction of fear and anxiety. Further, the commenter suggested looking into the financial and education investments people make as a possible proxy for the value people might place on community belongingness; U.S. data on the average amount of spending for international travel as a possible proxy for the value of advance parole to the DACA recipient population; and the cost of driver licenses as a possible proxy for the value of an EAD beyond the labor market benefits. These are all instructive starting points or proxies for estimation of perhaps lower bound. At the same time, and as explained in that analysis, DHS continues to believe that such starting points and proxies do not permit a full and accurate valuation of these benefits to this population. DHS continues to believe that these

unquantifiable benefits are of great positive value and that attempts at fully monetizing them raise serious conceptual, normative, and empirical challenges. It is nonetheless the position of DHS that consistent with E.O. 13563, considerations of human dignity are some of the main drivers of this rule, which is focused on fortifying and preserving a policy for a vulnerable population in the United States since 2012, and on protecting a range of reliance interests.

Finally, as discussed above, this rule reiterates USCIS' longstanding codification in 8 CFR 1.3(a)(4)(vi) of agency policy that a noncitizen who has been granted deferred action is considered "lawfully present"—a specialized term of art that does not confer lawful status or the right to remain in the United States—for the discrete purpose of authorizing receipt of certain Social Security benefits consistent with 8 U.S.C. 1611(b)(2). The final rule also reiterates longstanding policy that a noncitizen who has been granted deferred action does not accrue "unlawful presence" for purposes of INA sec. 212(a)(9) (imposing certain admissibility limitations for noncitizens who departed the United States after having accrued certain periods of unlawful presence). These benefits as well are difficult to quantify in part due to the time-limited nature of the benefits and the various ways in which accrual of unlawful presence might ultimately affect an individual based on their immigration history.

(7) Transfers of the Final Regulatory Changes

Relative to the Pre-Guidance Baseline, the final rule could yield tax transfers to different levels of government, assuming that DACA recipients with an EAD who are employed are not substituting their labor for the labor of workers already employed in the economy, and that all workers looking for work can find employment in the labor market. DHS makes this assumption for the purposes of this analysis only.[393] It is difficult to quantify tax transfers because individual tax situations vary widely (as do taxation rules imposed by different levels of government), but DHS estimates the increase in transfer payments to Federal employment tax programs, namely Medicare and Social Security, which have a combined payroll tax rate of 7.65 percent (6.2 percent and 1.45 percent,

---

[390] Giuntella (2021).

[391] On some of the conceptual and empirical issues, *see* Matthew Adler, *Fear Assessment: Cost-Benefit Analysis and the Pricing of Fear and Anxiety*, 79 Chicago-Kent L. Rev. 977 (2004).

[392] *See* 8 U.S.C. 1182(d)(5), 8 CFR 212.5, authorizing parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

[393] The assumption is based on Section III.4.d, Labor Market Impacts, which summarizes the research of isolating immigration effects on labor markets and discusses the relative impact of DACA recipients entering the work force.

**Federal Register** / Vol. 87, No. 167 / Tuesday, August 30, 2022 / Rules and Regulations      **53285**

respectively).[394] With both the employee and employer paying their respective portion of Medicare and Social Security taxes, the total estimated increase in tax transfer payments from employees and employers to Medicare

and Social Security is 15.3 percent. This analysis relies on this total tax rate to calculate these transfers relative to the Pre-Guidance Baseline. DHS takes this rate and multiplies it by the total (pre-tax income earnings) benefits,[395] which

yields our transfer estimates for this section. Table 14 presents these estimates.

BILLING CODE 9111–97–P

| FY | Transfers |
|----|-----------|
| **Table 14. Total Employment Federal Tax Transfers, FY 2012–FY 2031 (from DACA Employees and Employers to the Federal Government) (2020 dollars)** | |
| **FY** | **Transfers** |
| 2012 | $16,328,717 |
| 2013 | $3,824,429,742 |
| 2014 | $4,917,515,622 |
| 2015 | $5,277,353,958 |
| 2016 | $5,498,143,444 |
| 2017 | $5,665,894,928 |
| 2018 | $5,694,387,285 |
| 2019 | $5,342,232,100 |
| 2020 | $5,234,878,267 |
| 2021 | $5,424,244,035 |
| 2022 | $5,620,459,895 |
| 2023 | $5,823,773,641 |
| 2024 | $6,034,442,030 |
| 2025 | $6,252,731,108 |
| 2026 | $6,478,916,546 |
| 2027 | $6,713,283,985 |
| 2028 | $6,956,129,399 |
| 2029 | $7,207,759,470 |
| 2030 | $7,468,491,972 |
| 2031 | $7,738,656,177 |
| **Undiscounted Total** | **$113,190,052,322** |

Source: USCIS analysis.

Note: Numbers rounded for readability.

BILLING CODE 9111–97–C

c. Costs to the Federal Government

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing

immigration adjudication and naturalization services by DHS, including administrative costs and services provided without charge to

---

[394] Internal Revenue Service, *Topic No. 751 Social Security and Medicare Withholding Rates,* *https://www.irs.gov/taxtopics/tc751* (last updated May 20, 2022).

[395] The estimated benefit (from pre-tax income earnings) per applicant is $67,768.79. Multiplying

this benefit per applicant by the population projections presented earlier in Table 9 and Table 11 adjusted (or multiplied) by the labor force participation rate of 78% yields total pre-tax earnings (for example FY 2012 calculation: $67,768.79 * 2,019 * 0.78 = $106,723,639.90).

Multiplying the 15.3% payroll tax rate to this pre-tax total yields the Table 14 estimates (*e.g.,* FY 2012 = 106,723,639.90 * 0.153 = $16,328,716.91 or $16,328,717 rounded).

certain applicants and petitioners.[396] Generally, DHS establishes USCIS fees according to the estimated cost of adjudication based on its relative adjudication burden and use of USCIS resources. Fees are established at an amount that is necessary to recover these assigned costs, such as clerical, officer, and managerial salaries and benefits, plus an amount to recover unassigned overhead (*e.g.*, facility rent, information technology equipment and systems) and immigration benefits provided without a fee charge. For this final rule, DHS considered other application and fee structures as well as public input on this topic and decided to re-classify, as proposed in the NPRM, the $85 biometrics fee as an $85 Form I–821D filing fee, and maintain the current framework requiring all DACA requestors to file both Form I–821D and Form I–765, for a total fee of $495 after biometrics services. These fees will allow DHS to recover the Government's costs of processing these forms in line with USCIS' standard fee-funded operating structure. As part of the biennial fee review and subsequent fee setting process, DHS plans to propose new USCIS fees in a separate rulemaking after evaluating the resource requirements for Form I–765 and other immigration benefit requests.[397] The fee for Form I–765 may need to be adjusted in the process because it has not changed since 2016.[398]

### d. Labor Market Impacts

The projected active DACA population in the *No Action Baseline* section of the analysis suggests that about 18,263 new participants[399] could enter the U.S. labor force in the first year of implementation of the final rule as compared to the number of DACA recipients in the labor market in FY 2020 (based on the 78 percent labor force participation rate presented earlier). This number increases annually at a growth rate of 3.6174 percent, reaching up to 26,056 new participants in the last year of analysis, FY 2031. As of 2020, there were an estimated 160,742,000 people in the U.S. civilian labor force.[400] The aforementioned estimate of 18,263 new potential active DACA participants in the U.S. labor

force in FY 2021 would represent approximately 0.0114 percent of the 2020 overall U.S. civilian labor force.[401] These figures could represent an overestimate, insofar as some individuals otherwise might choose to be engaged in informal employment.

The top four States where current DACA recipients reside represent about 55 percent of the total DACA-approved population: California (29 percent), Texas (16 percent), Illinois (5 percent), and New York (4 percent).[402] These States may have a slightly larger share of potential additional DACA workers compared with the rest of the United States. Assuming the estimate for first year impacts could be distributed following the same patterns, DHS estimates the following potential impacts. California could receive approximately 5,296 (*i.e.*, 29% * 18,263) additional workers in the first year of implementation; Texas 2,922 additional workers; Illinois 913 additional workers; and New York 731 additional workers. To provide additional context, in April of 2021, California had a population of 18,895,158 in the civilian labor force in February 2021, Texas had 14,034,972, Illinois had 6,146,496, and New York had 9,502,491.[403] As an example, the additional 5,296 workers who could be added to the Californian labor force in the first year after promulgation of this final rule would represent about 0.0280 percent of the overall California labor force.[404] The potential impacts to the other States would be lower. For Texas, the impact would be about 0.0208 percent; for Illinois, 0.0149 percent; and for New York, 0.0077 percent.

As noted above, the analysis of the final rule relative to the Pre-Guidance Baseline entails consideration of effects going back to FY 2012, when the policy was introduced and the surge of new requestors occurred. Because the Napolitano Memorandum was issued in June of 2012, the FY 2012 September 30th count of 2,019 active DACA participants does not cover a full fiscal year; therefore, DHS adds FY 2012 and FY 2013 together, adjusting by the 78 percent labor market participation rate, for a count of new active DACA entrants

in the U.S. labor market equal to 370,421. Applying this number to the U.S. labor market statistics, as in the No Action Baseline labor market analysis above, we estimate that this number of new potential active DACA entrants would represent about 0.2384 percent of the 2013 overall U.S. civilian labor force of 155,389,000.[405] As discussed in the preceding paragraph, for California, the new active DACA entrant population in FY 2012 and FY 2013 would represent about 0.5685 percent of California's April 2021 labor force, 0.4223 percent of Texas's, 0.3013 percent of Illinois's, and 0.1599 percent of New York's. These figures could represent an overestimate, insofar as some individuals otherwise might choose to be engaged in informal employment.

As noted above, the relative proportion of DACA recipients in any given labor market would depend on the number of active DACA recipients who choose to work and the size of the labor market at that time. DHS expects the number of DACA recipients in the labor force to increase in future years within the period of analysis because, as indicated in Table 9, the RIA projects an increase in the active DACA population in future years. Even in FY 2031, however—when the projected active DACA population would be at its peak of 956,863—the number estimated to participate in the labor force would be 746,353, or 0.4643 percent of the 2020 U.S. civilian labor force.[406]

Although the estimated annual increases in the active DACA population in this final rule are small relative to the total U.S. and individual State labor forces, DHS recognizes that, in general, any increase in worker supply may affect wages and, in turn, the welfare of other workers and employers. However, the effects are not obvious as changes in wages depend on many factors and various market forces, such as the type of occupation and industry, geographic market locations, and overall economic conditions. For example, there are growing industries where labor demand might outpace labor supply, such as in healthcare, food services, and software development sectors. BLS projects that home health and personal care aide occupations will grow by about 34 percent over the next 10 years, cooks in restaurants by about

---

[396] *See* INA sec. 286(m), 8 U.S.C. 1356(m).

[397] *See* 87 FR 5241 (Jan. 31, 2022).

[398] *See* 81 FR 73292 (Oct. 24, 2016).

[399] Calculation: (FY 2021 projected active DACA population—FY 2020 projected active DACA population) * 0.78 = (670,693—647,278) = 23,415 * 0.78 = 18,263.

[400] Source: BLS, *Labor Force Statistics from the Current Population Survey,* Household Data Annual Averages: Table 3. Employment status of the civilian noninstitutional population by age, sex, and race, *https://www.bls.gov/cps/cpsaat03.htm.*

[401] Calculation: (18,263/160,742,000) * 100 = 0.0114%.

[402] Source: Count of Active DACA Recipients by Month of Current DACA Expiration as of Dec. 31, 2020. DHS/USCIS/OPQ ELIS and CLAIMS 3 Consolidated (queried Jan. 2021).

[403] Source: BLS, News Release, *State Employment and Unemployment—May 2021,* Labor Force Data Seasonally Adjusted: Table 1. Civilian labor force and unemployment by State and selected area, seasonally adjusted, *https://www.bls.gov/news.release/pdf/laus.pdf.*

[404] Calculation: (5,296/18,895,158) * 100 = 0.0280%.

[405] Source: BLS, *Labor Force Statistics from the Current Population Survey,* Household Data Annual Averages: Table 1. Employment status of the civilian noninstitutional population, 1950 to date, *https://www.bls.gov/cps/cpsaat01.pdf.*

Calculation: (332,429/155,389,000) * 100 = 0.2139%.

[406] Calculation: (746,353/160,742,000) * 100 = 0.4643%.

23 percent, and software development occupations by about 22 percent.[407] In growing industries or sectors such as these, holding everything else constant, increases in the labor supply might not be enough to temporarily satisfy labor demand. As a result, employers might offer higher wages to attract qualified workers. The opposite could happen for industries or sectors where labor supply is greater than labor demand due to these industries not growing and/or too many workers entering these industry relative to labor demand. DHS also notes the possibility of positive dynamic effects from employing DACA recipients; hiring DACA recipients might permit businesses to grow and thus have positive, rather than negative, effects of other workers, including U.S. citizens. DHS cannot predict the degree to which DACA recipients are substituted for other workers in the U.S. economy since this depends on factors such as industry characteristics as described above as well as on the hiring practices and preferences of employers, which depend on many factors, such as worker skill levels, experience levels, education levels, training needs, and labor market regulations, among others.[408] Current and potential DACA recipients have shown, over the course of years, that they would remain in the United States even without deferred action or employment authorization. However, undocumented noncitizens looking for work without authorization may be easily exploited, and employers may pay substandard wages, which in turn potentially depresses wages for some U.S. workers. By reducing this possibility, the policy may help to protect U.S. workers and employers against the possible effects of unauthorized labor.

Isolating immigration's effect on labor markets has been an ongoing task in the research. A 2017 National Academies of Sciences, Engineering, and Medicine (NAS) publication synthesizes the current peer-reviewed literature on the effects of immigration and empirical findings from various publications.[409] Notably, the 2017 NAS Report addresses a different subject than this final rule, which relates to a policy of enforcement discretion with respect to those who arrived in the United States as children and have lived here continuously for well over a decade. Nonetheless, the

analysis presented in that report may be instructive.

The 2017 NAS Report cautions that:

economic theory alone is not capable of producing definitive answers about the net impacts of immigration on labor markets over specific periods or episodes. Empirical investigation is needed. But wage and employment impacts created by flows of foreign-born workers into labor markets are difficult to measure. The effects of immigration have to be isolated from many other influences that shape local and national economies and the relative wages of different groups of workers.[410]

Whether immigrants are low-skilled or high-skilled workers can matter with respect to effects on wages and the labor market generally.[411] According to the 2017 NAS Report, some studies have found high-skilled immigrant workers positively impact wages and employment of both college-educated and non-college-educated native workers, consistent with the hypothesis that high-skilled immigrants often complement native-born high-skilled workers, and some studies looking at "narrowly defined fields" involving high-skilled workers have found adverse wage or productivity effects on citizens.[412] In addition:

some studies have found sizable negative short-run wage impacts for high school dropouts, the native-born workers who in many cases are the group most likely to be in direct competition for jobs with immigrants. Even for this group, however, there are studies finding small to zero effects, likely indicating that outcomes are highly dependent on prevailing conditions in the specific labor market into which immigrants flow or the methods and assumptions researchers use to examine the impact of immigration. The literature continues to find less favorable effects for certain disadvantaged workers and for prior immigrants than for natives overall.[413]

With respect to wages, in particular, the 2017 NAS Report described recent research showing that,

when measured over a period of more than 10 years, the impact of immigration on the wages of natives overall is very small. However, estimates for subgroups [of noncitizens] span a comparatively wider range, indicating a revised and somewhat more detailed understanding of the wage impact of immigration since the 1990s. To the extent that negative wage effects are found, prior immigrants—who are often the closest substitutes for new immigrants—are most likely to experience them, followed by native-born high school dropouts, who share job qualifications similar to the large share of

low-skilled workers among immigrants to the United States.[414]

With respect to employment, the report described research finding

little evidence that immigration significantly affects the overall employment levels of native-born workers. However, recent research finds that immigration reduces the number of hours worked by native teens (but not their employment rate). Moreover, as with wage impacts, there is some evidence that recent immigrants reduce the employment rate of prior immigrants—again suggesting a higher degree of substitutability between new and prior immigrants than between new immigrants and natives.[415]

Further, the characteristics of local economies matter with respect to wage and employment effects. For instance, the impacts to local labor markets can vary based on whether such market economies are experiencing growth, stagnation, or decline. On average, immigrants tend to locate in areas with relatively high labor demand or low unemployment levels where worker competition for available jobs is low.[416]

Overall, as noted, the 2017 NAS Report observed that when measured over a period of 10 years, the impact of immigration on the wage of the citizen population overall was "very small."[417] Although the current and eligible DACA population is a subset of the overall immigrant population, it still shares similar characteristics with the overall immigrant population, including varying education and skill levels, although DACA recipients must at least be enrolled in school or be an honorably discharged veteran. Therefore, one could expect the DACA population to have similar economic impacts as the overall immigrant population, relative to the Pre-Guidance Baseline.

The 2017 NAS Report also discusses the economic impacts of immigration and considers effects beyond labor market impacts. Similar to citizens, immigrants also pay taxes; stimulate the economy by consuming goods, services, and entertainment; engage in the real estate market; and take part in domestic tourism. Such activities contribute to further growth of the economy and create additional jobs and opportunities for both citizen and noncitizen populations.[418] DHS sought and received public comments on these issues, which it discusses in detail in Sections II.A.4, II.A.5, and II.A.6 of this rule.

---

[407] Source: BLS, Employment Projections (Sept. 2020), *Occupations with the most job growth*, Table 1.4, Occupations with the most job growth, 2019 and projected 2029, *https://www.bls.gov/emp/tables/occupations-most-job-growth.htm*.

[408] DHS also discusses the possibility of informal employment elsewhere in this analysis.

[409] *See supra* n.56.

[410] *Id.* at 4.

[411] *Id.* at 4.

[412] *Id.* at 6.

[413] *Id.* at 267.

[414] *Id.* at 5.

[415] *Id.* at 5–6.

[416] *Id.* at 5.

[417] *Id.* at 5.

[418] *Id.* at 6–7.

e. Fiscal Effects on State and Local Governments

In this section, in consideration of the *Texas* court's discussion of fiscal effects (as described in the next section of this RIA), DHS briefly addresses the final rule's potential fiscal effects on State and local governments. It would be extremely challenging to measure the overall fiscal effects of this final rule, in particular, especially due to those governments' budgetary control. The 2017 NAS Report discussed above canvassed studies of the fiscal impacts of immigration as a whole, and it described such analysis as extremely challenging and dependent on a range of assumptions. Although the 2017 NAS Report addresses a different subject than this final rule (which relates to a policy of enforcement discretion with respect to those who arrived in the United States as children and have lived here continuously for well over a decade), DHS discusses the 2017 NAS Report to offer general context for this topic. DHS then offers a discussion of the potential effects of this final rule, in particular.

With respect to its topic of study, the NAS wrote that:

estimating the fiscal impacts of immigration is a complex calculation that depends to a significant degree on what the questions of interest are, how they are framed, and what assumptions are built into the accounting exercise. The first-order net fiscal impact of immigration is the difference between the various tax contributions immigrants make to public finances and the government expenditures on public benefits and services they receive. The foreign-born are a diverse population, and the way in which they affect government finances is sensitive to their demographic and skill characteristics, their role in labor and other markets, and the rules regulating accessibility and use of government-financed programs.[419]

In addition, second-order effects also clearly occur; analysis of such effects also presents methodological and empirical challenges.[420]

For example, as with the citizen population, the age structure of immigrants plays a major role in assessing any fiscal impacts. Children and young adults contribute less to society in terms of taxes and draw more in benefits by using public education, for example. On average, as people age and start participating in the labor market they become net contributors to public finances, paying more in taxes than they draw from public benefit programs. Moreover, people in post-retirement again could become net users of public benefit programs. Compared to

the citizen population, immigrants also can differ in their characteristics in terms of skills, education levels, income levels, number of dependents in the family, the places they choose to live, etc., and any combination of these factors could have varying fiscal impacts.

Local and State economic conditions and laws that govern public finances and availability of public benefits also vary and can influence the fiscal impacts of immigration. The 2017 NAS Report explained that fiscal impacts of immigration:

vary strongly by level of governments. States and localities bear the burden of funding educational benefits enjoyed by immigrant and native children. The federal government transfers relatively little to individuals at young and working ages but collects much tax revenue from working-age immigrant and native-born workers. Inequality between levels of government in the fiscal gains or losses associated with immigration appears to have widened since 1994.[421]

The extent of such gaps among Federal, State, and local impacts necessarily varies by jurisdiction and due to a range of surrounding circumstances.[422]

Based on the information presented in the 2017 NAS Report, DHS approaches the question of State and local fiscal impacts as follows. First, it is clear that the fiscal impacts of the final rule to State and local governments would vary based on a range of factors, such as the characteristics of the DACA-recipient population within a particular jurisdiction at a particular time (or over a particular period of time), including recipients' age, educational attainment, income, and level of work-related skill as well as the number of dependents in their families. In addition, fiscal effects would vary significantly depending on local economic conditions and the local rules governing eligibility for public benefits.[423] For example, some States may allow DACA recipients to apply for subsidized driver's licenses or allow DACA recipients to qualify for in-state tuition at public universities, which

may not be available to similarly situated individuals without deferred action. These costs to the State will depend on choices made by States and will be location specific and are, therefore, difficult to quantify let alone predict.

Second, as compared to the Pre-Guidance Baseline, multiple aspects of this final rule suggest that any burden on State and local fiscal resources imposed by the final rule is unlikely to be significant, and the rule may well have a positive net effect. Under the Pre-Guidance Baseline, most noncitizens who otherwise would be DACA recipients likely would remain in the country, but without the additional measure of security, employment authorization, and lawful presence that this rule would provide. Under the Pre-Guidance Baseline, these noncitizens would continue to use and rely, as necessary, on those safety net and other public resources for which they are eligible. As noted above, DACA recipients may be eligible for more benefits under current State and local law than they otherwise would be eligible for without DACA, but they still do not fall under the "qualified alien" category, and are, therefore, generally ineligible for public benefits at the Federal, State, and local levels.[424] Under the final rule, these noncitizens can work and build human capital and, depending on the choices made by a State, may be able to secure driver's licenses and other identification, obtain professional licenses, or otherwise realize benefits from the policy. In short, this rule could have the effect of increasing tax revenues, with uncertain outcomes on the reliance on safety net programs, as effects on specific programs may vary based on a range of factors including eligibility criteria that may exclude DACA recipients.

Third, DHS notes the relatively small size of the DACA population in any particular region relative to any given jurisdiction's overall population. The overall long-term fiscal health of State and local jurisdictions where DACA recipients choose to work and live will depend on many other factors not within DHS's control. In the long term, DHS expects State and local governments to continue to choose how to finance public goods, set tax structures and rates, allocate public resources, and set eligibilities for various public benefit programs, and to adjust these approaches based on the

---

[419] *Id.* at 28.

[420] *Id.* at 342.

[421] *Id.* at 407.

[422] *See, e.g., id.* at 518, 545 (tables displaying State and local revenues per independent person unit and State and local expenditures per independent person unit, by immigrant generation by State, but without adjusting for eligibility rules specific to noncitizens).

[423] DHS notes that DACA recipients are not considered "qualified aliens." *See* 8 U.S.C. 1641(b). As noted elsewhere in the preamble, PRWORA also limits the provision of "state and local public benefits" to noncitizens who are "qualified aliens," with limited exceptions, but provides that States may affirmatively enact legislation making noncitizens "who [are] not lawfully present in the United States" eligible for such benefits. *See* 8 U.S.C. 1621(d).

[424] *See* 8 U.S.C. 1641(b), 1611 (general ineligibility for Federal public benefits), and 1621 (general ineligibility for State public benefits).

evolving conditions of their respective populations.

In short, DHS acknowledges that though the final rule may result in some indirect fiscal effects on State and local governments (both positive and negative), such effects would be extremely challenging to quantify fully and would vary based on a range of factors, including policy choices made by such governments. DHS sought and received public comments on these issues, which it discusses in detail in Section II.A.5.

f. Reliance Interests and Other Regulatory Effects

In the *Texas* district court's decision, the court identified a range of considerations potentially relevant to "arbitrary and capricious" review of any actions that DHS might take on remand,[425] although the court noted that many of these considerations were matters raised by parties and amici in the course of *Texas* (2015) and *Texas* (2021), and the court did not appear to suggest that DHS was required to analyze each of these considerations. The court further cautioned that it did not mean to suggest "this is an exhaustive list, and no doubt many more issues may arise throughout the notice and comment period. Further, the Court takes no position on how DHS (or Congress, should it decide to take up the issue) should resolve these considerations, as long as that resolution complies with the law." [426] DHS has assessed the considerations presented by the district court and sought public comment on these and any other potential reliance interests. DHS discusses the reliance interests raised by commenters, including from States, in Section II.A, and it presents its views in this section as relevant to this analysis.[427]

First, the court raised potential reliance interests of States and their residents, writing that

for decades have relied upon DHS (and its predecessors) to protect their employees by enforcing the law as Congress had written it. Once again, neither the DACA Memorandum nor its underlying record gives any consideration to these reliance interests. Thus, if one applies the Supreme Court's rescission analysis from *Regents* to DACA's creation, it faces similar deficiencies and would likely be found to be arbitrary and capricious.[428]

In developing this final rule, DHS has considered a wide range of potential reliance interests. As noted throughout this preamble, reliance interests can take multiple forms, and may be entitled to greater or lesser weight depending on the nature of the Department action or statement on which they are based. Such interests can include not only the reliance interests of DACA recipients, but also those indirectly affected by DHS's actions, including DACA recipients' family members, employers, schools, and neighbors, as well as the various States and their other residents. Some States have relied on the existence of DACA in setting policies regarding eligibility for driver's licenses, in-state tuition, State-funded healthcare benefits, and professional licenses.[429]

In addition, prior to 2012, some States may have relied on the pre-DACA status quo in various ways, although the relevance of such reliance interests may be attenuated by the fact that DACA has been in existence since 2012, and by the fact, as discussed in detail in the NPRM, that the executive branch has long exercised, even prior to 2012, various forms of enforcement discretion with features similar to DACA.[430] DHS is aware of such interests and has taken them into account, as discussed in Section II.A.5. However, DHS does not believe they are sufficient to outweigh the many considerations, outlined above and in Section II.A.5, that support the final rule.

Second, the court wrote that "the parties and amici curiae have raised various other issues that might be considered in a reformulation of

DACA," as follows (in the court's terms):

1. the benefits bestowed by the DACA recipients on this country and the communities where they reside;

2. the effects of DACA or similar policies on legal and illegal immigration;

3. the effects of DACA on the unemployed or underemployed legal residents of the States;

4. whether DACA amounts to an abandonment of the executive branch's duty to enforce the law as written (as the plaintiff States have long claimed);

5. whether any purported new formulation violates the equal protection guarantees of the Constitution (as Justice Sotomayor was concerned that DACA's rescission would [431]); and

6. the costs DACA imposes on the States and their respective communities.[432]

The court also identified "more attenuated considerations," as follows:

7. the secondary costs imposed on States and local communities by any alleged increase in the number of undocumented immigrants due to DACA; and

8. what effect illegal immigration may have on the lucrative human smuggling and human trafficking activities of the drug cartels that operate on our Southern border.[433]

DHS sought comment on these reliance interests and discusses them in detail in Section II.A.7 (as to effect on migration and the border), Section II.A.4 (as to effect on other populations, including U.S. workers), and Section II.A.5 (as to effects on communities and States). In those sections, and in this RIA specifically, DHS has addressed several of these issues relative to both baselines.

With respect to item (1), the benefits bestowed by DACA recipients on this country and the communities where they reside are numerous, as discussed in detail in the preamble and RIA. DACA recipients have made substantial contributions, including as members of families and communities, and have offered substantial productivity and tax revenue through their work in a wide range of occupations.

With respect to item (2), as discussed in greater detail elsewhere in the final rule, available data supports DHS's determination that DACA does not act as a significant material "pull factor" (in light of the wide range of factors that contribute to both lawful and unlawful

---

[425] In the same section of the court's opinion, the court also suggested that DHS consider a forbearance-only alternative to DACA. The court wrote that "the underlying DACA record points out in multiple places that while forbearance fell within the realm of prosecutorial discretion, the award of status and benefits did not. Despite this distinction, neither the DACA Memorandum nor the underlying record reflects that any consideration was given to adopting a policy of forbearance without the award of benefits." 549 F. Supp. 3d at 622. DHS has addressed this issue in the Regulatory Alternatives section below.

[426] 549 F. Supp. 3d at 623–24.

[427] DHS has opted to address these considerations out of deference to the district court's memorandum and order, and in an abundance of caution. This decision should not be viewed as a concession that DHS is required to consider the various considerations raised by the district court, with respect to this final rule or any other final rule.

[428] 549 F. Supp. 3d at 622.

[429] *See, e.g.,* National Conference of State Legislators, *Deferred Action for Childhood Arrivals | Federal Policy and Examples of State Actions, https://www.ncsl.org/research/immigration/deferred-action.aspx* (last updated Apr. 16, 2020) (describing State actions, in the years following the Napolitano Memorandum, with respect to unauthorized noncitizens generally, DACA recipients in particular, and other classes of noncitizens); National Conference of State Legislators, *States Offering Driver's Licenses to Immigrants, https://www.ncsl.org/research/immigration/states-offering-drivers-licenses-to-immigrants.aspx* (last updated Aug. 9, 2021) (describing multiple State decisions to offer driver's licenses to noncitizens with lawful presence).

[430] *See* 86 FR 53746–53749.

[431] *See* 140 S. Ct. at 1916 (Justice Sotomayor's opinion, dissenting in part and noting that she would have permitted respondents to develop their equal protection claims against DACA's rescission on remand).

[432] 549 F. Supp. 3d at 622–23.

[433] *Id.* at 623.

immigration into the United States).[434] The final rule codifies without material change the threshold criteria that have been in place for a decade, further reinforcing DHS's clear policy and messaging since 2012 that DACA is not available to individuals who have recently entered the United States, and that border security remains a high priority for the Department.[435] Because the final rule codifies criteria in place for a decade and does not expand consideration of deferred action under DACA to new populations, nor would it increase irregular migration as explained elsewhere in this rule, DHS does not believe it necessary to address items (7) and (8) above.

With respect to item (3), DHS details its consideration of potential harm to unemployed and underemployed individuals in the Labor Market Impacts section. That section discusses findings from the 2017 NAS Report, which summarizes the work of numerous social scientists who have studied the costs and benefits of immigration for decades.

This RIA does not contain a section that discusses the costs of a regulatory alternative in which DACA EADs are terminated or phased out relative to a No Action baseline, although it does contain estimates of costs, benefits, and transfers relative to the Pre-Guidance Baseline, which may be instructive for understanding some of these effects. In a scenario where EADs are terminated

and DACA recipients lose their labor market compensation, the estimated monetized benefits in the Pre-Guidance Baseline, could serve as a proxy for the cost of lost productivity to U.S. employers that are unable to find replacement workers in the U.S. labor force. There also could be additional employer costs related to searching for new job applicants.

With respect to item (4), DHS continues to enforce the law as written. As discussed in greater detail throughout the final rule, prioritization and discretion are necessary strategies to fulfill the DHS mission, and the use of deferred action for this purpose is consistent with decades of practice of DHS and the former INS.

With respect to item (5), DHS does not believe that the DACA policy as embodied in this final rule would violate the equal protection component of the Fifth Amendment's Due Process Clause. The rule preserves and fortifies DACA as opposed to rescinding it. Thus, Justice Sotomayor's equal protection concerns over rescission are not implicated. The rule also continues the longstanding practice of treating DACA recipients the same as other recipients of deferred action in that all such recipients are subject to forbearance from removal while they have deferred action, may obtain discretionary employment authorization based on economic need, may obtain advance parole to travel, continue to be deemed "lawfully present" for purposes of receiving certain Social Security benefits identified in 8 CFR 1.3(a)(iv), and do not accrue unlawful presence for purposes of INA sec. 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B). Therefore, DHS cannot discern a basis for any equal protection claims, much less whether they would have any legal merit.

With respect to item (6), DHS addresses the issue in Section III.A.4.e above. In short, although such an analysis is challenging for a variety of reasons, multiple aspects of this rule suggest that it is unlikely to impose a significant burden on State and local fiscal resources, and it may well have a positive effect.

With respect to items (7) and (8), which relate to the costs of unlawful immigration and human smuggling,

DHS disagrees with the premise, as noted in DHS's discussion of item (2) above.

Finally, the court also stated that "if DHS elects to justify DACA by asserting that it will conserve resources, it should support this conclusion with evidence and data. No such evidence is to be found in the administrative record or the DACA Memorandum. DHS should consider the costs imposed on or saved by all governmental units."[436] DHS agrees on the importance of evidence and data and has addressed the resource implications of DACA throughout the final rule, including at Sections II.C and III.A.4.b.(5).

g. Discounted Direct Costs, Cost Savings, Transfers, and Benefits of the Final Regulatory Changes

The quantified impact categories are direct costs, benefits, and transfers. The drivers of quantified direct costs stem from the opportunity cost of time associated with requesting deferred action and work authorization under the DACA policy by the requestor population, application fees for Forms I–821D and I–765, and biometrics travel costs. The drivers of quantified direct benefits stem from the total compensation received by those DACA recipients that are employed due to the EAD granted through the DACA policy less the value of non-paid time. The drivers of quantified direct transfers stem from the federal taxes (Social Security and Medicare) paid by the employed DACA recipients.

To compare costs over time, DHS applied a 3 percent and a 7 percent discount rate to the total estimated costs, transfers, and benefits associated with the final rule. Relative to the No Action Baseline, there are no new quantified and monetized costs, benefits, and transfers associated with this final rule. The tables present the costs, benefits, and transfers relative to the Pre-Guidance Baseline. Table 15 presents a summary of the potential costs relative to the Pre-Guidance Baseline in undiscounted dollars and discounted at 3 percent and 7 percent.

BILLING CODE 9111–97–P

---

[434] See, e.g., Amuedo-Dorantes and Puttitanun (2016) ("DACA does not appear to have a significant impact on the observed increase in unaccompanied alien children in 2012 and 2013.").

[435] For example, DHS continues to invest in new CBP personnel, including hiring more than 100 additional U.S. Border Patrol (USBP) Processing Coordinators in FY 2021, with plans to hire hundreds more. CBP is also investing in technology that enhances its border security mission. Over the last few years, CBP has increased the use of relocatable Autonomous Surveillance Towers (ASTs) along the border, which enable enhanced visual detection, identification, and classification of subjects or vehicles at a great distance via autonomous detection capabilities. ASTs can be moved to areas of interest or high traffic, as circumstances on the ground dictate. To increase situational awareness, CBP also recently integrated the Team Awareness Kit, which provides near real-time situational awareness for USBP agents and the locations of suspected illegal border activities. Advanced technology returns agents to the field and increases the probability of successful interdiction and enforcement.

[436] 549 F. Supp. 3d at 623.

**Table 15. Total Estimated Potential Costs of the Final Rule Discounted at 3 Percent and 7 Percent (relative to the Pre-Guidance Baseline) (FY 2012–FY 2031)**

| Form | Source of Costs | Annualized Costs | Total Estimated Costs Over 20-Year Period (Undiscounted) |
|---|---|---|---|
| Form I-821D | • $85 to file form + opportunity costs | | |
| Form I-765 | • $410 to file form + opportunity costs + travel costs; • $0 for Biometrics | | $10,094,795,145 |
| | | | **Total Estimated Costs Over 20-Year Period (Discounted)** |
| **3-Percent Discount Rate** | | **$494,890,483** | **$9,606,680,563** |
| **7-Percent Discount Rate** | | **$480,773,363** | **$9,363,860,806** |

Source: USCIS analysis.

Note: The Pre-Guidance Baseline applies reverse-discounts to the costs associated with the FY 2012–FY 2021 population applying under the DACA policy.

Table 16 presents a summary of the potential net benefits relative to the Pre-Guidance Baseline in undiscounted dollars and discounted at 3 percent and 7 percent.

    AR2022_100334

**Table 16. Total Estimated Potential Net Benefits of the Final Rule Discounted at 3 Percent and 7 Percent (relative to the Pre-Guidance Baseline) (FY 2012–FY 2031)**

| Form | Source of Benefits | Estimated Annualized Net Benefits | Total Estimated Potential Net Benefits Over 20-Year Period (Undiscounted) |
|---|---|---|---|
| Form I-821D | • Deferred Action | | |
| Form I-765 | • Total compensation earned less the value of non-paid time | | $455,008,775,347 |
| | | | **Total Potential Net Benefits Over 20-Year Period (Discounted)** |
| **3-Percent Discount Rate** | | **$21,861,586,546** | **$424,371,220,680** |
| **7-Percent Discount Rate** | | **$20,702,075,777** | **$403,207,355,098** |
| Source: USCIS analysis. | | | |

Table 17 presents a summary of the potential tax transfers relative to the Pre-Guidance Baseline in undiscounted dollars and discounted at 3 percent and 7 percent.

**Table 17. Final Rule Employment Federal Tax Transfers from DACA Employees and Employers to the Federal Government Discounted at 3 Percent and 7 Percent (relative to the Pre-Guidance Baseline) (FY 2012–FY 2031)**

| Form | Source of Tax Transfers | Total Estimated Potential Annual Tax Transfer (Undiscounted) | Total Estimated Potential Tax Transfers Over 20-Year Period (Undiscounted) |
|---|---|---|---|
| Form I-821D | • N/A | | |
| Form I-765 | • Taxes paid on the total compensation earned | | $113,190,052,322 |
| | | **Total Estimated Potential Annual Tax Transfer (Discounted)** | **Total Estimated Potential Tax Transfers Over 20-Year Period (Discounted)** |
| **3-Percent Discount Rate** | | **$5,438,387,695** | **$105,568,514,885** |
| **7-Percent Discount Rate** | | **$5,149,942,523** | **$100,303,695,430** |
| Source: USCIS analysis. | | | |

BILLING CODE 9111–97–C

**h. Regulatory Alternatives**

Consistent with the Supreme Court's general analysis in *Regents*, and the more recent analysis of the district court in *Texas,* DHS is keenly alert to the importance of exploring all relevant alternatives. This focus is also consistent with E.O. 12866 and E.O. 13563. As stated in E.O. 12866,

[i]n deciding whether and how to regulate, agencies should assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating. Costs and benefits shall be understood to include both quantifiable measures (to the fullest extent that these can be usefully estimated) and qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider. Further, in choosing among alternative regulatory approaches, agencies should select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity), unless a statute requires another regulatory approach.

Consistent with these requirements, DHS has considered a range of regulatory alternatives to the final rule, including alternatives related to a policy of forbearance from removal without employment authorization or the benefits associated with so-called lawful presence. As discussed in detail in Section II.B, the authority to forbear from removal is an undisputed feature of DHS's enforcement discretion,

whereas the district court in *Texas* held that DHS lacked authority to provide employment authorization and benefits such as Social Security benefits to DACA recipients.[437]

The analysis of this forbearance-only alternative is in a sense relatively straightforward. Like the final rule, as compared to the Pre-Guidance Baseline, such an approach would confer a range of benefits to DHS, while also conferring benefits to DACA recipients and their families, in the form of increased security, reduced fear and anxiety, and associated values (which we have not been able to quantify). Unlike the final rule, however, such an approach would not confer upon DACA recipients, their families, and their communities the benefits of their work authorization and employment, or impose the corresponding costs (both quantified here, to the extent feasible). To that extent, although a forbearance-only approach would still have value, such an alternative would have substantially lower net benefits, consistent with the numbers discussed above.

For instance, as discussed in Section II.C.2.a, a policy of forbearance without work authorization also would disrupt the reliance interests of hundreds of

thousands of people, as well as the families, employers, schools, and communities that rely on them. It would result in substantial economic losses. It would produce a great deal of human suffering, including harms to dignitary interests, associated with lost income and ability to self-support. Any change that eliminates employment authorization for the DACA population, whether a forbearance-only policy or a wholesale termination of the DACA policy, would result in hundreds of thousands of prime-working-age people remaining in the United States while lacking authorization to work lawfully to support either themselves or their families. Importantly, it also would deprive American employers and the American public at large of the ability to benefit from valuable work of hundreds of thousands of skilled and educated individuals and disappoint their own, independent reliance interests as well. For the Federal Government, as well as for State and local governments, it likely would have adverse fiscal implications, due to reduced tax revenues. In addition, unlike the proposed rule, such an approach would produce reduced transfers to Medicare and Social Security funds, as well as any other transfers associated with the DACA policy under the No Action Baseline. Nonetheless, as explained elsewhere in this preamble, DHS believes that if a

---

[437] As the court stated in *Texas* in objecting to work authorization and lawful presence, "the individualized notion of deferred action" is an approach "that courts have found permissible in other contexts." 549 F. Supp. 3d at 620–21.

court finds certain provisions of this rule to be contrary to law, it is preferable to sever and strike only those provisions found unlawful while retaining the remaining provisions. Doing so has significant disadvantages relative to retaining the entire policy, but the remaining provisions will remain workable and are preferable to a regime in which none of the provisions operate at all.

A possible alternative to the policy in the final rule would include (1) forbearance and (2) work authorization, but exclude (3) "lawful presence" and the resulting elimination of one ground of ineligibility for the associated benefits. DHS has carefully considered this alternative and sought public comment on the issues of law and policy associated with it, including data as to the potential effects of such an approach. As noted above, "lawful presence" is not a universal concept but rather is a term of art, referring to eligibility for certain limited Social Security, Medicare, and Railroad Retirement benefits, or the lack of accrual of unlawful presence for purposes of determining inadmissibility under INA sec. 212(a)(9), 8 U.S.C. 1182(a)(9). It could not and does not mean "lawful status." But DHS believes that this alternative approach also may be inferior, for at least two reasons. First, that approach would single out DACA recipients—alone among other recipients of deferred action, as well as others whose continued presence DHS has chosen to tolerate for a period of time—for differential treatment. Second, DHS is aware that some States have keyed benefits eligibility to lawful presence and may experience unintended indirect impacts if DHS, a decade after issuance of the Napolitano Memorandum, revises that aspect of the policy.

As discussed in greater detail in this rule, DHS also has carefully considered comments related to DHS's authority to confer work authorization and whether the Department should codify a forbearance-only alternative in this rule. The majority of commenters who discussed work authorization supported DHS's proposal that the final rule maintain DACA requestors' ability to request employment authorization, and provided persuasive reasoning for rejecting a forbearance-only alternative, including the substantial reliance interests of DACA requestors, their families, employers, schools, and broader communities in their ability to engage in lawful employment and receive a government-issued ID in the form of an EAD. Upon careful consideration of data available and

public comments received, DHS has determined that policy and reliance interests weigh strongly in favor of maintaining forbearance and work authorization in promulgating this rule.

Finally, consistent with the *Texas* district court's equitable decision to stay its vacatur and injunction as it relates to existing DACA recipients, DHS considered the alternative of applying this final rule only to existing DACA recipients. Existing DACA recipients have clearer reliance interests in the continuation of DACA than do prospective requestors who have yet to request DACA. On the other hand, the benefits of the policy are equally applicable to those who have yet to request DACA, and some who might have benefited under the Napolitano Memorandum but have yet to "age in" to eligibility to request DACA, given the limitations on initial requests in recent years due to litigation. DHS has determined that restricting the ability to request consideration for DACA to existing recipients would not be desirable or maximize net benefits.

### B. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA),[438] as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA),[439] requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.[440]

This final rule does not directly regulate small entities and is not expected to have a direct effect on small entities. It does not mandate any actions or requirements for small entities in the process of a DACA requestor seeking DACA or employment authorization. Rather, this final rule regulates individuals, and individuals are not defined as "small entities" by the RFA.[441] Based on the evidence presented in this analysis and throughout this preamble, DHS certifies that this final rule would not have a

significant economic impact on a substantial number of small entities.

### C. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and tribal governments, in the aggregate, or by the private sector. The inflation-adjusted value of $100 million in 1995 is approximately $177.8 million in 2021 based on the CPI–U.[442]

The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate.[443] The term "Federal intergovernmental mandate" means, in relevant part, a provision that would impose an enforceable duty upon State, local, or Tribal governments (including as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program).[444] The term "Federal private sector mandate" means, in relevant part, a provision that would impose an enforceable duty upon the private sector (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program).[445]

This final rule does not contain such a mandate, because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to their voluntary choices and would not be a consequence of an enforceable duty.

---

[438] 5 U.S.C. ch. 6.

[439] Public Law 104–121, tit. II, 110 Stat. 847 (5 U.S.C. 601 note).

[440] A small business is defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act (15 U.S.C. 632).

[441] 5 U.S.C. 601(6).

[442] *See* BLS, *Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month* (Dec. 2021), *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202112.pdf*.

Steps in calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the most recent current year available (2021); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100.

Calculation of inflation: [(Average monthly CPI–U for 2021 − Average monthly CPI–U for 1995)/ (Average monthly CPI–U for 1995)] * 100 = [(270.970 − 152.383)/152.383] * 100 = (118.587/ 152.383) * 100 = 0.7782 * 100 = 77.82 percent = 77.8 percent (rounded).

Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.778 = $177.8 million in 2021 dollars.

[443] *See* 2 U.S.C. 1502(1), 658(6).

[444] 2 U.S.C. 658(5), 1555.

[445] 2 U.S.C. 658(7).

Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA.[446] The requirements of title II of UMRA, therefore, do not apply, and DHS has not prepared a statement under UMRA. DHS has, however, analyzed many of the potential effects of this action in the RIA above. While DHS welcomed public comment in the proposed rule about the UMRA with regard to this analysis, it did not receive any comments.

*D. Small Business Regulatory Enforcement Fairness Act of 1996*

OIRA has designated this final rule as a major rule as defined by section 804 of SBREFA.[447] Accordingly, this final rule will be effective no earlier than 60 days after the date on which this Rule is published in the **Federal Register** as required by 5 U.S.C. 801(a)(3).

*E. Executive Order 13132: Federalism*

This final rule would not have substantial direct effects on the States, on the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government. DHS does not expect that this rule would impose substantial direct compliance costs on State and local governments or preempt State law. Therefore, in accordance with section 6 of E.O. 13132, this final rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988: Civil Justice Reform*

This rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This rule was written to provide a clear legal standard for affected conduct and was reviewed carefully to eliminate drafting errors and ambiguities, so as to minimize litigation and undue burden on the Federal court system. DHS has determined that this rule meets the applicable standards provided in section 3 of E.O. 12988.

*G. Paperwork Reduction Act— Collection of Information*

Under the PRA,[448] all Departments are required to submit to OMB, for review and approval, any reporting or recordkeeping requirements inherent in a rule. In compliance with the PRA, DHS published a notice of proposed rulemaking on September 28, 2021, in which comments on the revisions to the information collections associated with this rulemaking were requested for a period of 60 days. DHS responded to those comments in Section II of this final rule. Table 18, Information Collections, below lists the information collections that are part of this rulemaking. In this final rule, DHS invites written comments and recommendations for the proposed information collection within 30 days of publication of this notice to *https:// www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting ''Currently under Review—Open for Public Comments'' or by using the search function.

**Table 18. Information Collections**

| OMB Control No. | Form No. | Form Name | Type of PRA Action |
|---|---|---|---|
| 1615-0124 | I-821D | Consideration of Deferred Action for Childhood Arrivals | Revision of a Currently Approved Collection |
| 1615-0040 | I-765; I-765WS | Application for Employment Authorization. | Revision of a Currently Approved Collection |
| 1615-0013 | I-131 | Application for Travel Document. | No material change/Non-substantive change to a currently approved collection |

This final rule requires non-substantive edits to the form listed above where the Type of PRA Action column states, ''No material change/ Non-substantive change to a currently approved collection.'' USCIS has submitted a Paperwork Reduction Act

Change Worksheet, Form OMB 83–C, and amended information collection instruments to OMB for review and approval in accordance with the PRA.

USCIS Form I–821D

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

---

[446] *See* 2 U.S.C. 1502(1), 658(6).

[447] *See* 5 U.S.C. 804(2).

[448] Public Law 104–13, 109 Stat. 163.

(2) *Title of the Form/Collection:* Consideration of Deferred Action for Childhood Arrivals.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–821D; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. The information collected on this form is used by USCIS to determine whether certain noncitizens who entered the United States as minors meet the guidelines to be considered for DACA.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the I–821D initial requests information collection is 112,254 annually, and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the I–821D renewal requests (paper) information collection is 221,167, and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the I–821D renewal requests (electronic) information collection is 55,292, and the estimated hour burden per response is 2.5 hours; the estimated total number of respondents for the biometrics collection is 388,713 annually, and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,593,287 hours.

(7) *An estimate of the total public burden (in cost) associated with this collection:* The estimated total annual cost burden associated with this collection of information is $42,758,430.

USCIS Form I–765; I–765WS

Overview of Information Collection

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Employment Authorization.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–765 and I–765WS; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses Form I–765 to collect information needed to determine if a noncitizen is eligible for an initial EAD, a new replacement EAD, or a

subsequent EAD upon the expiration of a previous EAD under the same eligibility category. Noncitizens in many immigration statuses are required to possess an EAD as evidence of employment authorization.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the I–765 information collection is 2,178,820 annually, and the estimated hour burden per response is 4.5 hours; the estimated total number of respondents for the Form I–765 (e-file) information collection is 107,180 annually, and the estimated hour burden per response is 4 hours; the estimated total number of respondents for the I–765WS information collection is 302,000 annually, and the estimated hour burden per response is 0.5 hours; the estimated total number of respondents for the biometrics collection is 302,535 annually, and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for the passport photos collection is 2,286,000 annually, and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 11,881,376 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $400,895,820.

*H. Family Assessment*

DHS has reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999,[449] enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.[450] DHS has systematically reviewed the criteria specified in section 654(c)(1) of that act, by evaluating whether this regulatory action: (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local government or by

the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines the regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

DHS has determined that the implementation of this rule will not negatively affect family well-being, but rather will strengthen it. This regulation creates a positive effect on the family by helping certain mixed-status families to remain together in the United States and enabling access to greater financial stability. More than 250,000 children have been born in the United States with at least one parent who is a DACA recipient.[451] DACA provides recipients with U.S. citizen children a greater sense of security, which is important for families' overall well-being and success. It also makes recipients eligible for employment authorization and motivates DACA recipients to continue their education, graduate from high school, pursue post-secondary and advanced degrees, and seek additional vocational training, which ultimately provides greater opportunities, financial stability, and disposable income for themselves and their families.[452] DHS received comments on the family assessment. Those comments are discussed earlier in the preamble.

*I. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This rule has been reviewed in accordance with the requirements of E.O. 13175, Consultation and Coordination with Indian Tribal Governments. E.O. 13175 requires Federal agencies to consult and coordinate with Tribes on a Government-to-Government basis on policies that have Tribal implications, including regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes. DHS has assessed the impact of this rule on Indian Tribes and determined that this rule does not have Tribal implications that require Tribal consultation under E.O. 13175.

[449] *See* 5 U.S.C. 601 note.
[450] Public Law 105–277, 112 Stat. 2681 (1998).

[451] Svajlenka and Wolgin (2020).
[452] Gonzales (2019); Wong (2020).

## J. National Environmental Policy Act

DHS Directive 023–01 Rev. 01 (Directive) and Instruction Manual 023–01–001–01 Rev. 01 (Instruction Manual) establish the policies and procedures DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions (''categorical exclusions'') that experience has shown do not have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement. The Instruction Manual establishes categorical exclusions that DHS has found to have no such effect. Under DHS implementing procedures for NEPA, for a proposed action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.

As discussed earlier in this preamble, DHS does not believe the rule triggers NEPA obligations in the first instance because it simply codifies existing policy toward a population already in the United States and thus does not alter the environmental status quo. As discussed above, many DACA recipients have lived in the United States for nearly their entire lives and are unlikely to voluntarily leave. And because DACA recipients would be at very low priority for removal even absent DACA, it is very unlikely that DACA recipients would be involuntarily removed. That said, DHS continues to believe that speculating about the difference in the population effects between the existing DACA policy and the DACA rule—or between existing DACA policy and no DACA—would require predicting a myriad of independent decisions by a range of actors (including current and prospective DACA recipients, employers, law enforcement officers, and courts) at indeterminate times in the future. Such predictions are unduly speculative and not amenable to NEPA analysis.

Nevertheless, if NEPA does apply to this action, the action would fit within categorical exclusion number A3(c), which includes rules that ''implement, without substantive change, procedures, manuals, and other guidance documents'' as set forth in the Instruction Manual. This rulemaking implements, without material change, the 2012 DACA policy addressing exercise of enforcement discretion with respect to a specifically defined population of noncitizens and is not part of a larger DHS action. It defines the criteria under which DHS will consider requests for DACA, the procedures by which one may request DACA, and what an affirmative grant of DACA will confer upon the requestor. DHS considered the potential environmental impacts of this rule with respect to an existing population that has been present in the United States since at least 2007 and determined, in accordance with the Instruction Manual, that this rule does not present extraordinary circumstances that would preclude application of a categorical exclusion. This rule, therefore, satisfies the requirements for application of categorical exclusion A3(c) in accordance with the Department's approved NEPA procedures.

## K. Executive Order 12630: Governmental Actions and Interference With Constitutionally Protected Property Rights

This rule would not cause a taking of private property or otherwise have taking implications under E.O. 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights. Therefore, a takings implication assessment is not required.

## L. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

E.O. 13045 requires agencies to consider the impacts of environmental health risk or safety risk that may disproportionately affect children. DHS has reviewed this rule and determined that this rule is not a covered regulatory action under E.O. 13045. Although the rule is economically significant, it would not create an environmental risk to health or risk to safety that may disproportionately affect children. Therefore, DHS has not prepared a statement under this E.O.

## List of Subjects and Regulatory Amendments

## List of Subjects

*8 CFR 106*

Fees, Immigration.

*8 CFR Part 236*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Cultural exchange program, Employment, Penalties, Reporting and recordkeeping requirements, Students.

Accordingly, DHS amends parts 106, 236, and 274a of chapter I of title 8 of the Code of Federal Regulations as follows:

## PART 106—USCIS FEE SCHEDULE

■ 1. The authority citation for 8 CFR part 106 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1254a, 1254b, 1304, 1356; Pub. L. 107–609; 48 U.S.C. 1806; Pub. L. 115–218; Pub. L. 116–159.

■ 2. Amend § 106.2 by revising paragraph (a)(38) to read as follows:

## § 106.2 Fees.

(a) * * *

(38) *Application for Deferred Action for Childhood Arrivals, Form I–821D:* $85.

\* \* \* \* \*

## PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

■ 3. The authority citation for part 236 is revised to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 6 U.S.C. 112(a)(2), 112(a)(3), 112(b)(1), 112(e), 202, 251, 279, 291; 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1231, 1232, 1324a, 1357, 1362, 1611; 18 U.S.C. 4002, 4013(c)(4); 8 CFR part 2.

■ 4. Add subpart C, consisting of §§ 236.21 through 236.25, to read as follows:

## Subpart C—Deferred Action for Childhood Arrivals

Sec.
236.21   Applicability.
236.22   Discretionary determination.
236.23   Procedures for request, terminations, and restrictions on information use.
236.24   Severability.
236.25   No private rights.

## § 236.21 Applicability.

(a) This subpart applies to requests for deferred action under the enforcement discretion policy set forth in this subpart, which will be described as Deferred Action for Childhood Arrivals (DACA). This subpart does not apply to or govern any other request for or grant of deferred action or any other DHS deferred action policy.

(b) Except as specifically provided in this subpart, the provisions of 8 CFR

**D. App. 147**

part 103 do not apply to requests filed under this subpart.

(c)(1) Deferred action is an exercise of the Secretary's broad authority to establish national immigration enforcement policies and priorities under 6 U.S.C. 202(5) and section 103 of the Act. It is a form of enforcement discretion not to pursue the removal of certain aliens for a limited period in the interest of ordering enforcement priorities in light of limitations on available resources, taking into account humanitarian considerations and administrative convenience. It furthers the administrability of the complex immigration system by permitting the Secretary to focus enforcement on higher priority targets. This temporary forbearance from removal does not confer any right or entitlement to remain in or reenter the United States. A grant of deferred action under this section does not preclude DHS from commencing removal proceedings at any time or prohibit DHS or any other Federal agency from initiating any criminal or other enforcement action at any time.

(2) During this period of forbearance, on the basis of this subpart only, USCIS may grant employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33) to DACA recipients who have demonstrated an economic need.

(3) During this period of forbearance, on the basis of this subpart only, a DACA recipient is considered "lawfully present" under the provisions of 8 CFR 1.3(a)(4)(vi).

(4) During this period of forbearance, on the basis of this subpart only, a DACA recipient is not considered "unlawfully present" for the purpose of inadmissibility under section 212(a)(9) of the Act.

(d) This subpart rescinds and replaces the DACA guidance set forth in the Memorandum issued by the Secretary of Homeland Security on June 15, 2012. All current grants of deferred action and any ancillary features previously issued pursuant to the Memorandum remain in effect and will expire according to their existing terms. All such current grants of deferred action and any ancillary features, as well as any requests for renewals of those grants and new requests, are hereafter governed by this subpart and not the Memorandum.

### § 236.22   Discretionary determination.

(a) *Deferred Action for Childhood Arrivals; in general.* (1) USCIS may consider requests for Deferred Action for Childhood Arrivals submitted by aliens described in paragraph (b) of this section.

(2) A pending request for deferred action under this section does not authorize or confer any interim immigration benefits such as employment authorization or advance parole.

(3) Subject to paragraph (c) of this section, the requestor bears the burden of demonstrating by a preponderance of the evidence that he or she meets the threshold criteria described in paragraph (b) of this section.

(b) *Threshold criteria.* Subject to paragraph (c) of this section, a request for deferred action under this section may be granted only if USCIS determines in its sole discretion that the requestor meets each of the following threshold criteria and merits a favorable exercise of discretion:

(1) *Came to the United States under the age of 16.* The requestor must demonstrate that he or she first resided in the United States before his or her sixteenth birthday.

(2) *Continuous residence in the United States from June 15, 2007, to the time of filing of the request.* The requestor also must demonstrate that he or she has been residing in the United States continuously from June 15, 2007, to the time of filing of the request. As used in this section, "residence" means the principal, actual dwelling place in fact, without regard to intent, and specifically the country of the actual dwelling place. Brief, casual, and innocent absences from the United States will not break the continuity of one's residence. However, unauthorized travel outside of the United States on or after August 15, 2012, will interrupt continuous residence, regardless of whether it was otherwise brief, casual, and innocent. An absence will be considered brief, casual, and innocent if it occurred before August 15, 2012, and—

(i) The absence was short and reasonably calculated to accomplish the purpose for the absence;

(ii) The absence was not because of a post-June 15, 2007 order of exclusion, deportation, or removal;

(iii) The absence was not because of a post-June 15, 2007 order of voluntary departure, or an administrative grant of voluntary departure before the requestor was placed in exclusion, deportation, or removal proceedings; and

(iv) The purpose of the trip, and the requestor's actions while outside the United States, were not contrary to law.

(3) *Physical presence in the United States.* The requestor must demonstrate that he or she was physically present in the United States both on June 15, 2012, and at the time of filing of the request

for Deferred Action for Childhood Arrivals under this section.

(4) *Lack of lawful immigration status.* Both on June 15, 2012, and at the time of filing of the request for Deferred Action for Childhood Arrivals under this section, the requestor must not have been in a lawful immigration status. If the requestor was in lawful immigration status at any time before June 15, 2012, or at any time after June 15, 2012, and before the submission date of the request, he or she must submit evidence that lawful status had expired or otherwise terminated prior to those dates.

(5) *Education or veteran status.* The requestor must currently be enrolled in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development certificate, or be an honorably discharged veteran of the United States Coast Guard or Armed Forces of the United States.

(6) *Criminal history, public safety, and national security.* The requestor must not have been convicted (as defined in section 101(a)(48) of the Act and as demonstrated by any of the documents or records listed in § 1003.41 of this chapter) of a felony, a misdemeanor described in this paragraph (b)(6), or three or more other misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or otherwise pose a threat to national security or public safety. For purposes of this paragraph (b)(6) only, expunged convictions, juvenile delinquency adjudications, and convictions under State (including U.S. territory) laws for immigration-related offenses are not considered disqualifying convictions. For purposes of this paragraph (b)(6) only, a single misdemeanor is disqualifying only if it is a misdemeanor as defined by Federal law (specifically, one for which the maximum term of imprisonment authorized is 1 year or less but greater than 5 days) and that meets the following criteria:

(i) Regardless of the sentence imposed, is an offense of domestic violence, sexual abuse or exploitation, burglary, unlawful possession or use of a firearm, drug distribution or trafficking, or driving under the influence; or

(ii) If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days. The sentence must involve time to be served in custody and, therefore, does not include a suspended sentence.

(7) *Age at time of request.* The requestor must have been born on or after June 16, 1981. Additionally, the requestor must be at least 15 years of age at the time of filing his or her request, unless, at the time of his or her request, he or she is in removal proceedings, has a final order of removal, or has a voluntary departure order.

(c) *Final discretionary determination.* Deferred action requests submitted under this section are determined on a case-by-case basis. Even if the threshold criteria in paragraph (b) are all found to have been met, USCIS retains the discretion to assess the individual's circumstances and to determine that any factor specific to that individual makes deferred action inappropriate.

### § 236.23   Procedures for request, terminations, and restrictions on information use.

(a) *General.* (1) A request for Deferred Action for Childhood Arrivals must be filed in the manner and on the form designated by USCIS, with the required fee, including any biometrics required by 8 CFR 103.16. A request for Deferred Action for Childhood Arrivals must also contain a request for employment authorization filed pursuant to 8 CFR 274a.12(c)(33) and 274a.13.

(2) All requests for Deferred Action for Childhood Arrivals, including any requests made by aliens in removal proceedings before EOIR, must be filed with USCIS. USCIS has exclusive jurisdiction to consider requests for Deferred Action for Childhood Arrivals. EOIR shall have no jurisdiction to consider requests for Deferred Action for Childhood Arrivals or to review USCIS approvals or denials of such requests. A voluntary departure order or a final order of exclusion, deportation, or removal is not a bar to requesting Deferred Action for Childhood Arrivals. An alien who is in removal proceedings may request Deferred Action for Childhood Arrivals regardless of whether those proceedings have been administratively closed. An alien who is in immigration detention may request Deferred Action for Childhood Arrivals but may not be approved for Deferred Action for Childhood Arrivals unless the alien is released from detention by ICE prior to USCIS' decision on the Deferred Action for Childhood Arrivals request.

(3) USCIS may request additional evidence from the requestor, including, but not limited to, by notice, interview, or other appearance of the requestor. USCIS may deny a request for Deferred Action for Childhood Arrivals without prior issuance of a request for evidence or notice of intent to deny.

(4) A grant of Deferred Action for Childhood Arrivals will be provided for an initial or renewal period of 2 years, subject to DHS's discretion. Related work authorization granted pursuant to 8 CFR 274a.12(c)(33), if approved in DHS's discretion, will be issued, subject to DHS's discretion, for the period of the associated grant of Deferred Action for Childhood Arrivals.

(b) *Consideration of a request for Deferred Action for Childhood Arrivals.* In considering requests for Deferred Action for Childhood Arrivals, USCIS may consult, as it deems appropriate in its discretion and without notice to the requestor, with any other component or office of DHS, including ICE and CBP, any other Federal agency, or any State or local law enforcement agency, in accordance with paragraph (e) of this section.

(c) *Notice of decision.* (1) USCIS will notify the requestor and, if applicable, the requestor's attorney of record or accredited representative of the decision in writing. Denial of a request for Deferred Action for Childhood Arrivals does not bar a requestor from applying for any benefit or form of relief under the immigration laws or requesting any other form of prosecutorial discretion, including another request for Deferred Action for Childhood Arrivals.

(2) If USCIS denies a request for Deferred Action for Childhood Arrivals under this section, USCIS will not issue a Notice to Appear or refer a requestor's case to U.S. Immigration and Customs Enforcement for possible enforcement action based on such denial unless USCIS determines that the case involves denial for fraud, a threat to national security, or public safety concerns.

(3) There is no administrative appeal from a denial of a request for Deferred Action for Childhood Arrivals. The alien may not file, pursuant to 8 CFR 103.5 or otherwise, a motion to reopen or reconsider a denial of a request for Deferred Action for Childhood Arrivals.

(d) *Termination.* (1) *Discretionary termination.* USCIS may terminate a grant of Deferred Action for Childhood Arrivals at any time in its discretion. USCIS will provide a Notice of Intent to Terminate and an opportunity to respond prior to terminating a grant of Deferred Action for Childhood Arrivals, except USCIS may terminate a grant of Deferred Action for Childhood Arrivals without a Notice of Intent to Terminate and an opportunity to respond if the Deferred Action for Childhood Arrivals recipient is convicted of a national security-related offense involving conduct described in 8 U.S.C. 1182(a)(3)(B)(iii), (iv), or 1227(a)(4)(A)(i), or an egregious public safety offense. If USCIS terminates a grant of Deferred Action for Childhood Arrivals without a Notice of Intent to Terminate and an opportunity to respond, USCIS will provide the individual with notice of the termination.

(2) *Departure without advance parole and reentry without inspection.* USCIS may terminate a grant of Deferred Action for Childhood Arrivals, in its discretion and following issuance of a Notice of Intent to Terminate with an opportunity to respond, for DACA recipients who depart from the United States without first obtaining an advance parole document and subsequently enter the United States without inspection.

(3) *Automatic termination of employment authorization.* Any grant of employment authorization pursuant to § 274a.12(c)(33) of this chapter will automatically terminate upon termination of a grant of Deferred Action for Childhood Arrivals, rather than in accordance with § 274a.14(a)(1)(ii) of this chapter. Notice of intent to revoke employment authorization is not required pursuant to § 274a.14(a)(2) of this chapter.

(e) *Restrictions on information use.* (1) Information contained in a request for Deferred Action for Childhood Arrivals related to the requestor will not be used by DHS for the purpose of initiating immigration enforcement proceedings against such requestor, unless DHS is initiating immigration enforcement proceedings against the requestor due to a criminal offense, fraud, a threat to national security, or public safety concerns.

(2) Information contained in a request for Deferred Action for Childhood Arrivals related to the requestor's family members or guardians will not be used for immigration enforcement purposes against such family members or guardians.

### § 236.24   Severability.

(a) Any provision of this subpart held to be invalid or unenforceable as applied to any person or circumstance shall be construed so as to continue to give the maximum effect to the provision permitted by law, including as applied to persons not similarly situated or to dissimilar circumstances, unless such holding is that the provision of this subpart is invalid and unenforceable in all circumstances, in which event the provision shall be severable from the remainder of this subpart and shall not affect the remainder thereof.

(b) The provisions in § 236.21(c)(2) through (4) and § 274a.12(c)(14) and

274a.12(c)(33) are intended to be severable from one another, from this subpart and any grant of forbearance from removal resulting from this subpart, and from any provision referenced in those paragraphs, including such referenced provision's application to persons with deferred action generally.

### § 236.25   No private rights.

This subpart is an exercise of the Secretary's enforcement discretion. This subpart—

(a) Is not intended to and does not supplant or limit otherwise lawful activities of the Department or the Secretary; and

(b) Is not intended to and does not create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal.

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 5. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1105a, 1324a; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 114–74, 129 Stat. 599.

■ 6. Amend § 274a.12 by revising paragraph (c)(14) and adding paragraph (c)(33) to read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

\*     \*     \*     \*     \*

(c) \* \* \*

(14) Except as provided for in paragraph (c)(33) of this section, an alien who has been granted deferred action, an act of administrative convenience to the government that gives some cases lower priority, if the alien establishes an economic necessity for employment.

\*     \*     \*     \*     \*

(33) An alien who has been granted deferred action pursuant to 8 CFR 236.21 through 236.23, Deferred Action for Childhood Arrivals, if the alien establishes an economic necessity for employment.

\*     \*     \*     \*     \*

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2022–18401 Filed 8–24–22; 4:15 pm]

**BILLING CODE 9111–97–P**

# Exhibit 2

# DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 106, 236, and 274a**

**[CIS No. 2691–21; DHS Docket No. USCIS–2021–0006]**

**RIN 1615–AC64**

## Deferred Action for Childhood Arrivals

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** On June 15, 2012, the U.S. Department of Homeland Security (DHS) established the Deferred Action for Childhood Arrivals (DACA) policy. The policy—which describes the Secretary of Homeland Security's (Secretary's) exercise of her prosecutorial discretion in light of the limited resources that DHS has for removal of undocumented noncitizens—directed U.S. Citizenship and Immigration Services (USCIS) to create a process to defer removal of certain noncitizens who years earlier came to the United States as children, meet other criteria, and do not present other circumstances that would warrant removal. Since that time, more than 825,000 people have applied successfully for deferred action under this policy. On January 20, 2021, President Biden directed DHS, in consultation with the Attorney General, to take all appropriate actions to preserve and fortify DACA, consistent with applicable law. On July 16, 2021, the U.S. District Court for the Southern District of Texas vacated the June 2012 memorandum that created the DACA policy and what the court called the "DACA program," and it permanently enjoined DHS from "administering the DACA program and from reimplementing DACA without compliance with" the Administrative Procedure Act (APA). However, the district court temporarily stayed its vacatur and injunction with respect to most individuals granted deferred action under DACA on or before July 16, 2021, including with respect to their renewal requests. The district court's vacatur and injunction were based, in part, on its conclusion that the June 2012 memorandum announced a legislative rule that required notice-and-comment rulemaking. The district court further remanded the "DACA program" to DHS for further consideration. DHS has appealed the district court's decision. Pursuant to the Secretary's broad authorities to administer and enforce the immigration laws, consistent with the district court's direction to consider a number of issues on remand, and after careful consideration of the arguments and conclusions on which the district court's decision is based, DHS puts forward for consideration the following proposed rule. DHS invites public comments on the proposed rule and possible alternatives.

**DATES:** Written comments and related material must be submitted on or before November 29, 2021.

**ADDRESSES:** You may submit comments on the entirety of this proposed rulemaking package, identified by DHS Docket No. USCIS–2021–0006, through the Federal eRulemaking Portal at *https://www.regulations.gov.* Follow the website instructions for submitting comments.

Comments submitted in a manner other than the one listed above, including emails or letters sent to DHS or USCIS officials, will not be considered comments on the proposed rule and may not receive a response from DHS. Please note that DHS and USCIS cannot accept any comments that are hand-delivered or couriered. In addition, USCIS cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives. USCIS also is not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact Samantha Deshommes, Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 for alternate instructions.

For additional instructions on sending comments, see the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document.

**FOR FURTHER INFORMATION CONTACT:** Andria Strano, Acting Chief, Office of Policy and Strategy, Division of Humanitarian Affairs, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746; telephone (240) 721–3000.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
II. Executive Summary
  A. Purpose of the Regulatory Action
  B. Summary of Major Provisions of the Regulatory Action
  C. Costs and Benefits
III. Background, Authority, and Purpose
  A. History of Discretionary Reprieves From Removal
  B. Litigation History
  C. Forbearance From Enforcement Action
  D. Employment Authorization
  E. Lawful Presence
  F. Fees
  G. Advance Parole
  H. Further Analysis, Alternatives, and Call for Comments
IV. Provisions of Proposed Rule
  A. Section 106.2—Fees
  B. Section 236.21—Applicability
  C. Section 236.22—Discretionary Determination
  D. Section 236.23—Procedures for Request, Terminations, and Restrictions on Information Use
  E. Section 236.24—Severability
  F. Section 236.25—No Private Rights
V. Statutory and Regulatory Requirements
  A. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)
  B. Regulatory Flexibility Act
  C. Unfunded Mandates Reform Act of 1995
  D. Small Business Regulatory Enforcement Fairness Act of 1996
  E. Executive Order 13132: Federalism
  F. Executive Order 12988: Civil Justice Reform
  G. Paperwork Reduction Act—Collection of Information
  H. Family Assessment
  I. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  J. National Environmental Policy Act
  K. Executive Order 12630: Governmental Actions and Interference With Constitutionally Protected Property Rights
  L. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

## List of Abbreviations

APA   Administrative Procedure Act
AST   Autonomous Surveillance Tower
BLS   Bureau of Labor Statistics
CBP   U.S. Customs and Border Protection
CEQ   Council on Environmental Quality
CFR   Code of Federal Regulations
CLAIMS   Computer-Linked Application Information Management System
CPI–U   Consumer Price Index for All Urban Consumers
DACA   Deferred Action for Childhood Arrivals
DAPA   Deferred Action for Parents of Americans and Lawful Permanent Residents
DED   Deferred enforced departure
DHS   Department of Homeland Security
DOJ   Department of Justice
DREAM   Act Development, Relief, and Education for Alien Minors Act
EAD   Employment authorization document
ELIS   Electronic Immigration System
E.O.   Executive Order
EOIR   Executive Office for Immigration Review
EPS   Egregious public safety
EVD   Extended voluntary departure
FAIR   Federation for American Immigration Reform
FLCRAA   Farm Labor Contractor Registration Act Amendments of 1974

**Federal Register** / Vol. 86, No. 185 / Tuesday, September 28, 2021 / Proposed Rules

FR    Federal Register
FY    Fiscal Year
GED    General Education Development
ICE    U.S. Immigration and Customs Enforcement
IIRIRA    Illegal Immigration Reform and Immigrant Responsibility Act of 1996
IMMACT    90 Immigration Act of 1990
INA    Immigration and Nationality Act of 1952
INS    Immigration and Naturalization Service
IRCA    Immigration Reform and Control Act of 1986
MPI    Migration Policy Institute
NEPA    National Environmental Policy Act
NOA    Notice of action
NOIT    Notice of intent to terminate
NTA    Notice to appear
OCFO    Office of the Chief Financial Officer
OI    Operations Instructions
OIRA    Office of Information and Regulatory Affairs
OIS    Office of Immigration Statistics
OMB    Office of Management and Budget
OPQ    Office of Performance and Quality
PRA    Paperwork Reduction Act of 1995
PRWORA    Personal Responsibility and Work Opportunity Reconciliation Act of 1996
Pub. L.    Public Law
RFA    Regulatory Flexibility Act
RIA    Regulatory Impact Analysis
RIN    Regulation Identifier Number
RTI    Referral to ICE
SBREFA    Small Business Regulatory Enforcement Fairness Act of 1996
Secretary    Secretary of Homeland Security
SORN    System of Record Notice
Stat.    U.S. Statutes at Large
TPS    Temporary Protected Status
UMRA    Unfunded Mandates Reform Act of 1995
U.S.C.    United States Code
USCIS    U.S. Citizenship and Immigration Services
VAWA    Violence Against Women Act of 1994
VPC    Volume Projection Committee
VTVPA    Victims of Trafficking and Violence Protection Act of 2000

**I. Public Participation**

DHS invites all interested parties to participate in this rulemaking by submitting written data, views, comments, and arguments on all aspects of this proposed rule. DHS also invites comments that relate to the economic, environmental, or federalism effects of this proposed rule. Comments must be submitted in English, or an English translation must be provided. Comments that will provide the most assistance to USCIS in implementing these changes will refer to a specific portion of the proposed rule; explain the reason for any recommended change; and include data, information, or authority that supports such recommended change. Comments submitted in a manner other than the one listed above, including emails or letters sent to DHS or USCIS officials, will not be considered comments on the proposed rule and may not receive a response from DHS.

*Instructions:* If you submit a comment, you must include the agency name (U.S. Citizenship and Immigration Services) and the DHS Docket No. USCIS–2021–0006 for this rulemaking. All comments or materials submitted in the manner described above will be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to DHS. DHS may withhold from public viewing information provided in comments that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Notice available at *https://www.regulations.gov/privacy-notice.*

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov,* referencing DHS Docket No. USCIS–2021–0006. You also may sign up for email alerts on the online docket to be notified when comments are posted or a final rule is published.

**II. Executive Summary**

*A. Purpose of the Regulatory Action*

On June 15, 2012, then-Secretary Janet Napolitano issued a memorandum providing new guidance for the exercise of prosecutorial discretion with respect to certain young people who came to the United States years earlier as children, who have no current lawful immigration status, and who were already generally low enforcement priorities for removal.[1] The Napolitano Memorandum states that DHS will consider granting "deferred action," on a case-by-case basis, for individuals who:

1. Came to the United States under the age of 16;

2. Continuously resided in the United States for at least 5 years preceding June 15, 2012, and were present in the United States on that date;

3. Are in school, have graduated from high school, have obtained a General Education Development (GED) certificate, or are an honorably

discharged veteran of the Coast Guard or Armed Forces of the United States;

4. Have not been convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, or otherwise do not pose a threat to national security or public safety; and

5. Were not above the age of 30 on June 15, 2012.[2]

Individuals who request relief under this policy, meet the criteria above, and pass a background check may be granted deferred action.[3] Deferred action is a longstanding practice by which DHS and the former Immigration and Naturalization Service (INS) have exercised their discretion to forbear or assign lower priority to removal action in certain cases for humanitarian reasons, administrative convenience, or other reasonable prosecutorial discretion considerations.[4]

In establishing this policy, known as DACA, then-Secretary Napolitano emphasized that for the Department to use its limited resources in a strong and sensible manner, it necessarily must exercise prosecutorial discretion. Then-Secretary Napolitano observed that these "young people . . . were brought to this country as children and know only this country as home" and as a general matter "lacked the intent to violate the law," reasoning that limited enforcement resources should not be expended to "remove productive young people to countries where they may not have lived or even speak the language."[5] The Napolitano Memorandum also instructs that the individual circumstances of each case must be considered and that deferred action should be granted only where justified.[6]

Since 2012, more than 825,000 people have applied successfully for deferred action under the DACA policy.[7] On average, DACA recipients arrived in the United States in 2001 and at the age of 6.[8] In addition, 38 percent of recipients

---

[1] Memorandum from Janet Napolitano, Secretary, DHS, to David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection (CBP), et al. (June 15, 2012), *https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf* (hereinafter Napolitano Memorandum).

[2] *Id.*

[3] *Id.*

[4] *See, e.g., Reno* v. *Am.-Arab Anti-Discrimination Comm.,* 525 U.S. 471, 484 (1999) (*AADC*); 8 CFR 274a.12(c)(14).

[5] Napolitano Memorandum.

[6] *Id.*

[7] *See* USCIS, DACA Quarterly Report (FY 2021, Q1), *https://www.uscis.gov/sites/default/files/document/data/DACA_performancedata_fy2021_qtr1.pdf.* As of the end of CY 2021, there were over 636,00 active DACA recipients in the United States. *See* USCIS, Count of Active DACA Recipients By Month of Current DACA Expiration (Dec. 31, 2020), *https://www.uscis.gov/sites/default/files/document/data/Active_DACA_Recipients%E2%80%93December31%2C2020.pdf.*

[8] DHS, USCIS, Office of Performance and Quality (OPQ), Electronic Immigration System (ELIS) and

Continued

arrived before the age of 5.[9] For many, this country is the only one they have known as home. In the nearly 10 years since this policy was announced, DACA recipients have grown into adulthood and built lives for themselves and their loved ones in the United States. They have gotten married and had U.S. citizen children. Over 250,000 children have been born in the United States with at least one parent who is a DACA recipient, and about 1.5 million people in the United States share a home with a DACA recipient.[10] DACA recipients have obtained driver's licenses and credit cards, bought cars, and opened bank accounts.[11] In reliance on DACA, its recipients have enrolled in degree programs, started businesses, obtained professional licenses, and purchased homes.[12] Depending on the health insurance that their deferred action allowed them to obtain through employment or State-sponsored government programs, DACA recipients have received improved access to health insurance and medical care and have sought treatment for long-term health issues.[13] For DACA recipients and their family members, the conferral of deferred action has increased DACA recipients' sense of acceptance and belonging to a community, increased their sense of hope for the future, and given them the confidence to become more active members of their communities and increase their civic engagement.[14]

The DACA policy has encouraged its recipients to make significant investments in their careers and education. Many DACA recipients report that deferred action—and the employment authorization that DACA permits them to request—has allowed them to obtain their first job or move to a higher paying position more commensurate with their skills.[15] DACA recipients are employed in a wide range of occupations, including management and business, education and training, sales, office and administrative support, and food preparation; thousands more are self-employed in their own businesses.[16] They have continued their studies, and some have become doctors, lawyers, nurses, teachers, or engineers.[17] About 30,000 are health care workers, and many of them have helped care for their communities on the frontlines during the COVID–19 pandemic.[18] In 2017, 72 percent of the top 25 Fortune 500 companies employed at least one DACA recipient.[19]

As a result of these educational and employment opportunities, DACA recipients make substantial contributions in taxes and economic activity.[20] According to one estimate, as of 2020, DACA recipients and their households pay about $5.6 billion in annual Federal taxes and about $3.1 billion in annual State and local taxes.[21] In addition, through their employment, they make significant contributions to Social Security and Medicare funds.[22] Approximately two-thirds of recipients purchased their first car after receiving DACA,[23] and an estimated 56,000 DACA recipients own homes and are directly responsible for $566.7 million in annual mortgage payments.[24] DACA recipients also are estimated to pay $2.3 billion in rental payments each year.[25] Because of this, the communities of DACA recipients—who reside in all 50 States and the District of Columbia [26]—in addition to the recipients themselves, have grown to rely on the economic contributions this policy facilitates.[27] In

Computer-Linked Application Information Management System (CLAIMS) 3 Consolidated (queried Mar. 2021).

[9] *Id.*

[10] Nicole Prchal Svajlenka and Philip E. Wolgin, *What We Know About the Demographic and Economic Impacts of DACA Recipients: Spring 2020 Edition*, Center for American Progress (Apr. 6, 2020), *https://www.americanprogress.org/issues/immigration/news/2020/04/06/482676/know-demographic-economic-impacts-daca-recipients-spring-2020-edition* (hereinafter Svajlenka and Wolgin (2020)).

[11] *See* Roberto G. Gonzales and Angie M. Bautista-Chavez, *Two Years and Counting: Assessing the Growing Power of DACA*, American Immigration Council (June 2014); Zenén Jaimes Pérez, *A Portrait of Deferred Action for Childhood Arrivals Recipients: Challenges and Opportunities Three Years Later*, United We Dream (Oct. 2015), *https://unitedwedream.org/wp-content/uploads/2017/10/DACA-report-final-1.pdf* (hereinafter Jaimes Pérez (2015)); Tom K. Wong, et al., *Results from Tom K. Wong et al., 2020 National DACA Study*, *https://cdn.americanprogress.org/content/uploads/2020/10/02131657/DACA-Survey-20201.pdf* (hereinafter Wong (2020)).

[12] *See* Roberto G. Gonzales, et al., *The Long-Term Impact of DACA: Forging Futures Despite DACA's Uncertainty*, Immigration Initiative at Harvard (2019), *https://immigrationinitiative.harvard.edu/files/hii/files/final_daca_report.pdf* (hereinafter Gonzales (2019)); Wong (2020).

[13] Gonzales (2019).

[14] Gonzales (2019); Jaimes Pérez (2015); Wong (2020).

[15] Roberto G. Gonzales, et al., *Becoming DACAmented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)*, 58 Am. Behav. Scientist 1852 (2014); Wong (2020); *see also* Nolan G. Pope, *The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants*, 143 J. of Pub. Econ. 98 (2016), *http://www.econweb.umd.edu/~pope/daca_paper.pdf* (hereinafter Pope (2016)) (finding that DACA increased participation in the labor force for undocumented immigrants).

[16] Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, Center for American Progress (Sept. 5, 2019), *https://www.americanprogress.org/issues/immigration/news/2019/09/05/474177/know-daca-recipients-united-states*; Jie Zong, et al., *A Profile of Current DACA Recipients by Education, Industry, and Occupation*, Migration Policy Institute (Nov. 2017), *https://www.migrationpolicy.org/sites/default/files/publications/DACA-Recipients-Work-Education-Nov2017-FS-FINAL.pdf* (hereinafter Zong (2017)).

[17] *See* Gonzales (2019); Nicole Prchal Svajlenka, *A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response*, Center for American Progress (April 6, 2020), *https://www.americanprogress.org/issues/immigration/news/2020/04/06/482708/demographic-profile-daca-recipients-frontlines-coronavirus-response* (hereinafter Svajlenka (2020)); Wong (2020); Zong (2017).

[18] Svajlenka (2020). DACA recipients who are health care workers also are helping to alleviate a shortage of health care professionals in the United States and they are more likely to work in underserved communities where shortages are particularly dire. Angela Chen, et al., *PreHealth Dreamers: Breaking More Barriers Survey Report* at 27 (Sept. 2019) (presenting survey data showing that 97 percent of undocumented students pursuing health and health-science careers planned to work in an underserved community); Andrea N. Garcia, et al., *Factors Associated with Medical School Graduates' Intention to Work with Underserved Populations: Policy Implications for Advancing Workforce Diversity*, Acad. Med. (Sept. 2017), *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5743635* (finding that underrepresented minorities graduating from medical school are nearly twice as likely as white students and students of other minorities to report an intention to work with underserved populations).

[19] Tom K. Wong, et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, Center for American Progress (Aug. 28, 2017), *https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow* (hereinafter Wong (2017)).

[20] Please see the Regulatory Impact Analysis (RIA) for this proposed rule, which can be found in Section V.A. The RIA includes analysis and estimates of the costs, benefits, and transfers that DHS expects this rule to produce. Please note that the estimates presented in the RIA are based on the specific methodologies described therein. Figures may differ from those presented in the sources discussed here. As noted below, USCIS welcomes input on the methodologies employed in the RIA, as well as any other data, information, and views related to the costs, benefits, and transfers associated with this rulemaking.

[21] Svajlenka and Wolgin (2020). *See also* Misha E. Hill and Meg Wiehe, *State & Local Tax Contributions of Young Undocumented Immigrants*, Institute on Taxation and Economic Policy (Apr. 2017) (analyzing the State and local tax contributions of DACA-eligible noncitizens in 2017).

[22] Jose Magaña-Salgado and Tom K. Wong, *Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare*, Immigrant Legal Resource Center (Oct. 2017); *see also* Jose Magaña-Salgado, *Money on the Table: The Economic Cost of Ending DACA*, Immigrant Legal Resource Center (Dec. 2016) (analyzing the Social Security and Medicare contributions of DACA recipients in 2016).

[23] Wong (2017).

[24] Svajlenka and Wolgin (2020).

[25] *Id.*

[26] USCIS, *Deferred Action for Childhood Arrivals (DACA) Quarterly Report (Fiscal Year 21, Q1)* 6, *https://www.uscis.gov/sites/default/files/document/data/DACA_performancedata_fy2021_qtr1.pdf*.

[27] Reasonable reliance on the existence of the DACA policy is distinct from reliance on a grant of DACA to a particular person. Individual DACA grants are discretionary and may be terminated at any time but communities, employers, educational

sum, despite the express limitations in the Napolitano Memorandum, over the 9 years in which the DACA policy has been in effect, the good faith investments recipients have made in both themselves and their communities, and the investments that their communities have made in them, have been, in the Department's judgment, substantial.

This proposed rule responds to President Biden's memorandum of January 20, 2021, "Preserving and Fortifying Deferred Action for Childhood Arrivals (DACA)," [28] in which President Biden stated:

DACA reflects a judgment that these immigrants should not be a priority for removal based on humanitarian concerns and other considerations, and that work authorization will enable them to support themselves and their families, and to contribute to our economy, while they remain.[29]

This proposed rule embraces the consistent judgment that has been maintained by the Department—and by three presidential administrations since the policy first was announced—that DACA recipients should not be a priority for removal.[30] It is informed by the Department's experience with the policy over the past 9 years and the ongoing litigation concerning the policy's continued viability. It is particularly meant to preserve legitimate reliance interests in the continued implementation of the nearly decade-long policy under which deferred action requests will be considered, while emphasizing that individual grants of deferred action are, at bottom, an act of enforcement discretion to which recipients do not have a substantive right.

The proposed rule recognizes that enforcement resources are limited, that sensible priorities must necessarily be set, and that it is not generally the best use of those limited resources to remove productive young people to countries where they may not have lived since early childhood and whose languages they may not even speak. It recognizes that, as a general matter, DACA recipients, who came to this country

many years ago as children, lacked the intent to violate the law, have not been convicted of any serious crimes, and remain valued members of our communities. It reflects the conclusion that, while they are in the United States, they should have access to a process that, operating on a case-by-case basis, may allow them to work to support themselves and their families, and to contribute to our economy in multiple ways. This proposed rule also accounts for the momentous decisions DACA recipients have made in ordering their lives in reliance on and as a result of this policy, and it seeks to continue the benefits that have accrued to DACA recipients, their families, their communities, and to the Department itself that have been made possible by the policy. DHS emphasizes that the DACA policy as proposed in this rule is not a permanent solution for the affected population and does not provide lawful status or a path to citizenship for noncitizens who came to the United States many years ago as children. Legislative efforts to find such a solution remain critical. On July 16, 2021, the U.S. District Court for the Southern District of Texas vacated the 2012 DACA policy, finding, among other things, that is was contrary to the Immigration and Nationality Act of 1952 (INA).[31] DHS is carefully and respectfully considering the analysis in that decision and its conclusions about DACA's substantive legality and invites comment on how, if correct, those conclusions should affect this rulemaking.

### B. Summary of Major Provisions of the Regulatory Action

This proposed rule would preserve and fortify DHS's DACA policy for the issuance of deferred action to certain young people who came to the United States many years ago as children, who have no current lawful immigration status, and who are generally low enforcement priorities. The proposed rule would include the following provisions of the DACA policy from the Napolitano Memorandum and longstanding USCIS practice:

• *Deferred Action.* The proposed rule would provide a definition of deferred action as a temporary forbearance from removal that does not confer any right or entitlement to remain in or re-enter the United States, and that does not prevent DHS from initiating any criminal or other enforcement action against the DACA recipient at any time.

• *Threshold Criteria.* The proposed rule would include the following longstanding threshold criteria: That the requestor must have (1) come to the United States under the age of 16; (2) continuously resided in the United States from June 15, 2007, to the time of filing of the request; (3) been physically present in the United States on both June 15, 2012, and at the time of filing of the DACA request; (4) not been in a lawful immigration status on June 15, 2012, as well as at the time of request; (5) graduated or obtained a certificate of completion from high school, obtained a GED certificate, currently be enrolled in school, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (6) not been convicted of a felony, a misdemeanor described in the rule, or three or more other misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or otherwise pose a threat to national security or public safety; and (7) been born on or after June 16, 1981, and be at least 15 years of age at the time of filing, unless the requestor is in removal proceedings, or has a final order of removal or a voluntary departure order. The proposed rule also would state that deferred action under DACA may be granted only if USCIS determines in its sole discretion that the requestor meets the threshold criteria and otherwise merits a favorable exercise of discretion.

• *Procedures for Request, Terminations, and Restrictions on Information Use.* The proposed rule would set forth procedures for denial of a request for DACA or termination of a grant of DACA, the circumstances that would result in the issuance of a notice to appear (NTA) or referral to U.S. Immigration and Customs Enforcement (ICE) (RTI), and the restrictions on use of information contained in a DACA request for the purpose of initiating immigration enforcement proceedings.

In addition to proposing the retention of longstanding DACA policy and procedure, the proposed rule includes the following changes:

• *Filing Requirements.* The proposed rule would modify the existing filing process and fees for DACA by making the request for employment authorization on Form I-765, Application for Employment Authorization, optional and charging a fee of $85 for Form I-821D, Consideration of Deferred Action for Childhood Arrivals. DHS would maintain the current total cost to DACA requestors who also file Form I-765 of

---

institutions, and State and local governments have come to rely on the existence of the policy itself and its potential availability to those individuals who qualify.

[28] 86 FR 7053 (hereinafter Biden Memorandum).

[29] *Id.*

[30] *See id.;* Sept. 5, 2017 Statement from President Donald J. Trump, *https://trumpwhitehouse.archives.gov/briefings-statements/statement-president-donald-j-trump-7* ("I have advised [DHS] that DACA recipients are not enforcement priorities unless they are criminals, are involved in criminal activity, or are members of a gang."); Napolitano Memorandum.

[31] *Texas v. United States,* No. 1:18–cv–00068, 2021 WL 3025857 (S.D. Tex. July 16, 2021) (*Texas II* July 16, 2021 memorandum and order).

$495 ($85 for Form I–821D plus $410 for Form I–765).

• *Employment Authorization.* The proposed rule would create a DACA-specific regulatory provision regarding eligibility for employment authorization for DACA deferred action recipients in a new paragraph designated at 8 CFR 274a.12(c)(33). The new paragraph would not constitute any substantive change in current policy; it merely would create a DACA-specific provision in addition to the existing provision dealing with deferred action recipients more broadly. Like that provision, this one would continue to specify that the noncitizen [32] must have been granted deferred action and must establish economic need to be eligible for employment authorization.

• *Automatic Termination of Employment Authorization.* The proposed rule would automatically terminate employment authorization granted under 8 CFR 274.12(c)(33) upon termination of a grant of DACA.

• *"Lawful Presence."* Additionally, the proposed rule reiterates USCIS' codification in 8 CFR 1.3(a)(4)(vi) of

---

[32] For purposes of this discussion, USCIS uses the term "noncitizen" to be synonymous with the term "alien" as it is used in the INA.

agency policy, implemented long before DACA, that a noncitizen who has been granted deferred action is considered "lawfully present"—a specialized term of art that does not in any way confer authorization to remain in the United States—for the discrete purpose of authorizing the receipt of certain Social Security benefits consistent with 8 U.S.C. 1611(b)(2). The proposed rule also would reiterate longstanding policy that a noncitizen who has been granted deferred action does not accrue "unlawful presence" for purposes of INA sec. 212(a)(9) (imposing certain admissibility limitations for noncitizens who departed after having accrued certain periods of unlawful presence in the United States).

*C. Costs and Benefits*

The proposed rule would result in new costs, benefits, and transfers. To provide a full understanding of the impacts of DACA, DHS considers the potential impacts of this proposed rule relative to two baselines. The first baseline, the No Action Baseline, represents a state of the world under the current DACA policy; that is, the policy initiated by the guidance in the Napolitano Memorandum in 2012. For

reasons explained in Section V.A.4.a.(1) below, this baseline does not directly account for the July 16, 2021 district court decision. The second baseline, the Pre-Guidance Baseline, represents a state of the world where the DACA policy does not exist, a world as it existed before the guidance in the Napolitano Memorandum. DHS emphasizes that the Pre-Guidance Baseline gives clarity about the impact of the DACA policy as such, and that it is, therefore, the more useful baseline for understanding the costs and benefits of that policy. Relative to that baseline, the monetized benefits, including above all income earnings, greatly exceed the monetized costs. DHS also notes that the Pre-Guidance Baseline analysis also can be used to better understand the state of the world under the July 16, 2021 district court decision, should the stay of that decision ultimately be lifted.

Table 1 provides a detailed summary of the proposed provisions and their potential impacts relative to the No Action Baseline. Table 2 provides a detailed summary of the proposed provisions and their potential impacts relative to the Pre-Guidance Baseline.

BILLING CODE 9111–97–P

D. App. 156

AR2022_100005

**Table 1. Summary of Major Changes to Provisions and Estimated Impacts of the Proposed Rule, FY 2021–FY 2031 (Relative to the No Action Baseline)**

| Proposed Provision | Description of Proposed Provision | Estimated Impact of Proposed Provision |
|---|---|---|
| Amending 8 CFR 106.2(a)(38). Fees. | The fee for Form I-821D, Consideration of Deferred Action for Childhood Arrivals, will change from $0 to $85. | **Quantitative:**<br><br>Cost Savings<br><br>Part of the DACA requestor population might choose only to request deferred action through Form I-821D, thus forgoing the cost of applying for an EAD through Form I-765: |
| Amending 8 CFR 236.21(c)(2). Applicability. | DACA recipients who can demonstrate an economic need may apply to USCIS for employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33). | • Annual undiscounted cost savings for no longer filing the Form I-765 for employment authorization could range from $0 to $43.9 million, depending on how many individuals choose this option. |
| Amending 8 CFR 236.23(a)(1). Procedures for request. | If a request for DACA does not include a request for employment authorization, employment authorization still may be requested subsequent to approval, but not for a period of time to exceed the grant of deferred action. | • Total cost savings over a 11-year period could range from:<br> o $0 to $483.6 million for undiscounted cost savings;<br> o $0 to $422.2 million at a 3-percent discount rate; and<br> o $0 to $359.0 million at a 7-percent discount rate.<br><br>Transfer Payments<br><br>Part of the DACA requestor population may choose only to request deferred action through Form I-821D. This would result in a transfer from USCIS to DACA requestors as requestors filing only the Form I-821D would now pay less in filing fees than the current filing fee cost for both Forms I-821D and I-765:<br><br>• Annual undiscounted transfer payments could range from $0 to $34.9 million.<br>• Total transfers over a 11-year period could range from:<br> o $0 to $384.1 million undiscounted;<br> o $0 to $335.4 million at a 3-percent discount rate; and |

|  |  | ○ $0 to $285.1 million at a 7-percent discount rate.<br><br>**Qualitative:**<br><br><u>Benefits</u><br><br>● Having the option to file Form I-765 could incentivize requests by reducing some of the financial barriers to entry for some requestors who do not need employment authorization but who will still file Form I-821D for deferred action.<br><br>● The proposed rule allows the active DACA-approved population to continue enjoying the advantages of the policy and also have the option to request renewal of DACA in the future if needed.<br><br>● For DACA recipients and their family members, the proposed rule would contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future, including by virtue of mitigating the risk of litigation resulting in termination of the DACA program. |
| Source: USCIS analysis. | | |
| Note: The No Action Baseline refers to a state of the world under the current DACA program in effect under the guidance of the Napolitano Memorandum. | | |

AR2022_100007

**Table 2. Summary of Major Changes to Provisions and Estimated Impacts of the Proposed Rule, FY 2012–FY 2031 (Relative to the Pre-Guidance Baseline)**

| Proposed Provision | Description of Proposed Provision | Estimated Impact of Proposed Provision |
|---|---|---|
| Amending 8 CFR 106.2(a)(38). Fees. | The fee for Form I-821D, Consideration of Deferred Action for Childhood Arrivals, will be $85. | **Quantitative:** <br><br> Benefits <br><br> Income earnings of the employed DACA-approved requestors due to obtaining an approved EAD dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy: <br><br> • Annual undiscounted benefits could be $22.8 billion. <br> • Total benefits over a 20-year period could be: <br> ○ $455.5 billion for undiscounted benefits; <br> ○ $424.8 billion at a 3-percent discount rate; and <br> ○ $403.6 billion at a 7-percent discount rate. |
| Amending 8 CFR 236.21(c). Applicability, regarding forbearance, employment authorization, and lawful presence. | DACA approved requestors receive a time-limited forbearance from removal. Those who can demonstrate an economic need may apply to USCIS for employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33) and are considered lawfully present and not unlawfully present for certain purposes. | Costs <br><br> Costs to requestors associated with a DACA request, including filing Form I-821D, Form I-765, and Form I-765WS: <br><br> • Annual undiscounted costs could range from $385.6 million to $476.1 million. <br> • Total costs over a 20-year period could range from: <br> ○ $7.7 billion to $9.5 billion for undiscounted costs; <br> ○ $7.3 billion to $9.1 billion at a 3-percent discount rate; and <br> ○ $7.2 billion to $8.8 billion at a 7-percent discount rate. |
| Amending 8 CFR 236.23(a)(1). Procedures for request. | If a request for DACA does not include an application for employment authorization, employment authorization still may be requested subsequent to approval, but not for a period of time to exceed the grant of deferred action. | Transfer Payments <br><br> Part of the DACA requestor population may choose only to request deferred action through Form I-821D. This would |

| | | result in a transfer from USCIS to DACA requestors as requestors filing only the Form I-821D would now pay less in filing fees than the current filing fee cost for both Forms I-821D and I-765: |
|---|---|---|
| | | • Annual undiscounted transfer payments could range from $0 to $30.9 million.<br>• Total transfers over a 20-year period could range from:<br>  ○ $0 to $619.8 million undiscounted;<br>  ○ $0 to $589.9 million at a 3-percent discount rate; and<br>  ○ $0 to $574.9 million at a 7-percent discount rate.<br><br>Employment taxes from the employed DACA recipients and their employers to the Federal Government dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy:<br><br>• Annual undiscounted transfers could be $3.8 billion.<br>• Total transfers over a 20-year period could be:<br>  ○ $75.5 billion undiscounted;<br>  ○ $70.4 billion at a 3-percent discount rate; and<br>  ○ $66.9 billion at a 7-percent discount rate.<br><br>**Qualitative:**<br><br>Cost Savings<br><br>DACA program simplifies many encounters between DHS and certain noncitizens, reducing the burden upon DHS of vetting, tracking, and potentially removing DACA recipients.<br><br>Benefits<br><br>• The proposed rule results in more streamlined enforcement encounters and decision making, as well as avoided |

| | | |
|---|---|---|
| | | costs associated with enforcement action against low-priority noncitizens. |
| | | • The proposed rule allows the DACA-approved population to enjoy the advantages of the policy and also have the option to request renewal of DACA in the future if needed. |
| | | • For DACA recipients and their family members, the proposed rule would contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future. |

Source: USCIS analysis.

Note: The Pre-Guidance Baseline refers to a state of the world as it was before the guidance of the Napolitano Memorandum.

BILLING CODE 9111–97–C

## III. Background, Authority, and Purpose

Section 102 of the Homeland Security Act of 2002 [33] and section 103 of the INA [34] generally charge the Secretary with the administration and enforcement of the immigration and naturalization laws of the United States.[35] The INA further authorizes the Secretary to ''establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of'' the INA.[36] In the Homeland Security Act of 2002, Congress also provided that the Secretary ''shall be responsible for . . . [e]stablishing national immigration enforcement policies and priorities.'' [37] The Homeland Security Act also provides that the Secretary, in carrying out their authorities, must ''ensure that the overall economic security of the United States is not diminished by

efforts, activities, and programs aimed at securing the homeland.'' [38]

The Secretary proposes in this rule to establish specified guidelines for considering requests for deferred action submitted by certain individuals who came to the United States many years ago as children. This proposed rule would help appropriately focus the Department's limited immigration enforcement resources on threats to national security, public safety, and border security where they are most needed. In doing so, the proposed rule also would serve the significant humanitarian and economic interests animating and engendered by the DACA policy. In addition, the proposed rule would preserve not only DACA recipients' serious reliance interests, but also those of their families, schools, employers, faith groups, and communities.[39] Above all, DHS is

committed to a rulemaking process and outcome that is entirely consistent with the broad authorities and enforcement discretion conferred upon the Secretary in the INA and the Homeland Security Act.

As the head of the Department, and the official responsible for ''the administration and enforcement'' of the nation's immigration laws, the Secretary is directed to set national immigration enforcement policies and priorities.[40] While other officials, such as the Directors of ICE and USCIS and the Commissioner of CBP, may set policies within their respective spheres, and individual immigration officers are able to make case-by-case enforcement discretion decisions in the course of their duties, the Secretary holds the ultimate responsibility and authority for establishing the Department's priorities and for setting the parameters for other officials' exercise of discretion. Unlike officers in the field, the Secretary is uniquely positioned to make informed judgments regarding the humanitarian, public safety, border security, and other implications of national immigration enforcement policies and priorities. The Secretary is ultimately accountable for

---

[33] Public Law 107–296, sec. 102(a)(3), 116 Stat. 2135, 2143 (codified at 6 U.S.C. 112(a)(3)).

[34] Public Law 82–414, 66 Stat. 163 (as amended).

[35] INA sec. 103(a)(1), 8 U.S.C. 1103(a)(1). The INA also vests certain authorities in the President, Attorney General, and Secretary of State, among others. *See id.*

[36] INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3).

[37] Public Law 107–296, sec. 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. 202(5)).

[38] 6 U.S.C. 111(b)(1)(F).

[39] *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020) (*Regents*) (''DACA recipients have 'enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on the DACA program. The consequences of the rescission, respondents emphasize, would 'radiate outward' to DACA recipients' families, including their 200,000 U.S.-citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them. In addition, excluding DACA recipients from the lawful labor force may, they tell us, result in the loss of $215 billion in economic activity and an associated $60 billion in

federal tax revenue over the next ten years. Meanwhile, States and local governments could lose $1.25 billion in tax revenue each year.'' (internal citations omitted)).

[40] INA sec. 103(a)(1), 8 U.S.C. 1103(a)(1); *see also* 6 U.S.C. 202(5).

appropriately using the resources available to the Department as a whole and for taking a comprehensive view of the enforcement landscape. A regulation codifying a national enforcement discretion policy for the DACA population would reinforce the Department's focusing its resources on those noncitizens who pose a threat to national security, public safety, and border security.

Of course, there are many tools available to the Secretary to execute such policy choices. Historically, DHS has implemented deferred action policies with respect to identified groups via general statements of policy and rules of agency organization, procedure, or practice. Such policies are not legally binding on any private parties (and do not bind the agency from making changes), do not constitute legislative rules, and are not codified in the Code of Federal Regulations. In the case of DACA, DHS proposes to promulgate regulations to reflect the Secretary's enforcement priorities and implement the deferred action policy with respect to the DACA population. DHS has decided to propose this rule in consideration of the important reliance interests of DACA beneficiaries, their employers, and their communities; in response to the President's direction to take all actions appropriate to preserve and fortify DACA; and in light of the various issues and concerns raised in ongoing litigation challenging DACA.

DHS's decision to proceed by rulemaking, rather than the less formal procedures typically associated with the creation of policy guidance, represents a departure from previous practice in light of current circumstances. DHS emphasizes that its approach here has important benefits, such as providing a more formal opportunity for public participation. DHS also recognizes that the use of less formal procedures, and the absence of notice-and-comment rulemaking, has been challenged in court, in some cases successfully. But the approach here should not be interpreted as suggesting that DHS itself doubts the legality of the 2012 DACA policy or any other past, present, or future deferred action policy. It is consistent with section 553 of the APA, and a longstanding principle, that an agency may use non-binding, non-legislative guidance, lacking the force of law, "to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." [41] DHS has consistently

maintained, and continues to maintain here, that it has such discretionary power with respect to deferred action. [42]

The proposed rule also would aid DHS's enforcement branches in identifying classes of noncitizens whose removal Congress has signaled should be prioritized [43] and focus a greater portion of their limited time, space, and funds on these higher risk situations that pose a threat to public safety or national security. While a grant of deferred action may have additional consequences under other provisions of law and regulation, including State law, at its core it reflects a decision made by the Executive to forgo removal against an individual for a limited period while the individual remains a low priority. It reflects a policy of forbearance. It is well within the Department's authority, and consistent with historical practice, for DHS to create a nationwide policy for efficiently allocating limited enforcement resources. [44]

### A. History of Discretionary Reprieves From Removal

Since at least 1956, DHS and the former INS have issued policies under which groups of individuals without lawful status may receive a

discretionary, temporary, and nonguaranteed reprieve from removal, even outside the context of immigration proceedings. [45] These policies have been implemented through a range of measures, including, but not limited to, extended voluntary departure (EVD) and deferred enforced departure (DED), indefinite voluntary departure, parole, and deferred action. [46] From at least the early 1980s, each such measure resulted in not only the termination of immigration proceedings, but also the availability of collateral "benefits" such as work authorization. A brief history of some such policies follows.

### 1. Extended Voluntary Departure and Deferred Enforced Departure

Beginning in the Eisenhower administration, a string of executive actions authorized various classes of noncitizens to stay in the United States and work under the rubric of EVD. From 1956 to 1972, the INS offered EVD to certain noncitizen professionals and those with exceptional ability in the sciences or arts who were otherwise subject to deportation due to visa quotas applicable to natives of the Eastern Hemisphere. [47] Through this policy, although a noncitizen's lawful status might have lapsed, "[d]eportation, or even departure from the United States, was . . . entirely avoided." [48] And beginning in 1978, the INS offered EVD to certain former H–1 nurses whose "lack of lawful immigration status [was] due only to the nurse's having changed employer without authority, or to his/her having failed the licensure examination." [49] From at least 1960

---

[41] See *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 302 n.31 (1979) (quoting *Attorney General's Manual on the Administrative Procedure Act* (1947)).

[42] That DHS has determined voluntarily to use notice-and-comment procedures does not reflect any legal determination by the executive branch that it must do so or that it will be required to do so in the future. *See, e.g., Hoctor* v. *U.S. Dep't of Agric.,* 82 F.3d 165, 171–72 (7th Cir. 1996) (observing that courts should "attach no weight to [an agency]'s inconsistency" in deciding whether to use notice-and-comment procedures for similar rules and that "there is nothing in the [APA] to forbid an agency to use the notice and comment procedure in cases in which it is not required to do so"); *Indep. Living Res.* v. *Oregon Arena Corp.,* 982 F. Supp. 698, 744 n.62 (D. Or. 1997) ("There are many reasons why an agency may voluntarily elect to utilize notice and comment rulemaking: The proposed rule may constitute a material amendment to the old rule, the agency may wish to avoid potential litigation over whether the new rule is legislative or interpretive, or the agency may simply wish to solicit public comment."); *cf. Perez* v. *Mort. Bankers Ass'n,* 575 U.S. 92, 101 (2015) ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").

[43] *See, e.g.,* INA sec. 235(b)(1), 8 U.S.C. 1225(b)(1) (establishing "expedited removal" for certain noncitizens arriving in the United States); INA sec. 236(c), 8 U.S.C. 1226(c) (providing mandatory detention for certain criminal noncitizens); INA sec. 236A, 8 U.S.C. 1226a (providing mandatory detention of suspected terrorists); *see also, e.g.,* Public Law 114–113, 129 Stat. 2241, 2497 (providing that "the Secretary . . . shall prioritize the identification and removal of aliens convicted of a crime by the severity of that crime"); Public Law 113–76, 128 Stat. 5, 251 (same); Public Law 113–6, 127 Stat. 198, 347 (same).

[44] *See Regents of the Univ. of Cal.* v. *DHS,* 908 F.3d 476, 487 (9th Cir. 2018) (deferred action "arises . . . from the Executive's inherent authority to allocate resources and prioritize cases"), *aff'd,* 140 S. Ct. 1891 (2020).

[45] *See generally* Ben Harrington, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others,* Congressional Research Service, No. R45158 (Apr. 10, 2018) (hereinafter CRS Report on Discretionary Reprieves from Removal). *See also* American Immigration Council, *Executive Grants of Temporary Immigration Relief, 1956–Present* (Oct. 2, 2014), *https://www.americanimmigrationcouncil.org/research/executive-grants-temporary-immigration-relief-1956-present* (identifying 39 examples of temporary immigration relief); Sharon Stephan, *Extended Voluntary Departure and Other Grants of Blanket Relief from Deportation,* Congressional Research Service, No. 85–599 EPW (Feb. 23, 1985) (hereinafter CRS Report on EVD).

[46] *See* CRS Report on Discretionary Reprieves from Removal (cataloguing types of discretionary reprieves from removal, including reprieves that are generally only available in conjunction with the removal process, such as voluntary departure, stays of removal, orders of supervision, and administrative closure). *See also generally* Geoffrey Heeren, *The Status of Nonstatus,* 64 Am. U. L. Rev. 1115 (2015).

[47] *See United States ex rel. Parco* v. *Morris,* 426 F. Supp. 976, 979–80 (E.D. Pa. 1977).

[48] *Id.* at 980.

[49] *See, e.g.,* 43 FR 2776 (Jan. 19, 1978) (announcing a period of discretionary "extended voluntary departure" or "deferred departure" for

**D. App. 162**

AR2022_100011

until 1990, executive agencies granted EVD to nationals of at least 14 countries.[50] EVD was invoked repeatedly to allow discretionary reprieves from removal for groups of individuals without lawful status.

The use of EVD abated following the passage of the Immigration Act of 1990 (IMMACT 90), which expressly authorized the Attorney General (whose authorities in this respect are now assigned to the Secretary), following consultation with the Secretary of State, to designate a foreign country for Temporary Protected Status (TPS) in certain circumstances.[51] But even after 1990, Presidents of both parties have extended similar treatment to nationals of certain countries under the rubric of DED.[52]

2. Indefinite ''Voluntary Departure'' Under the ''Family Fairness'' Policies

In 1987, the INS announced a policy known as ''family fairness'' to allow for indefinite residence in the United States and work authorization [53] for spouses and children of certain noncitizens who had been made eligible for legal immigration in the Immigration Reform and Control Act of 1986 (IRCA).[54] In IRCA, Congress made millions of noncitizens eligible for temporary residency, lawful permanent residency, and eventually naturalization,[55] but it did not similarly provide for such noncitizens' spouses and children who had arrived too recently or were otherwise ineligible.[56] Notwithstanding the apparently intentional gap in eligibility,[57] the INS provided for a discretionary reprieve from removal for many such spouses and children.[58] Under the policy, the INS announced that it would ''indefinitely defer deportation'' for (1) ineligible spouses and children who could show compelling or humanitarian factors; and (2) ineligible unmarried minor children who could show that both parents (or their only parent) had achieved lawful temporary resident status.[59] Those individuals also could obtain work authorization.[60] Ultimately such spouses and children might be able to benefit from an immediate relative petition filed on their behalf.

The INS expanded the family fairness policy in 1990, ''to assure uniformity in the granting of voluntary departure and work authorization for the ineligible spouses and children of legalized aliens,'' and ''to respond to the needs'' of legalized noncitizens and their family members ''in a consistent and humanitarian manner.'' [61] As expanded, the policy provided indefinite voluntary departure for any ineligible spouse or minor child of a legalizing noncitizen who showed that they (1) had been residing in the country by the date of IRCA's 1986 enactment; (2) were otherwise inadmissible; (3) had not been convicted of a felony or three misdemeanors; and (4) had not assisted in persecution.

Estimates of the potentially eligible population varied, but many were very large.[62] The INS Commissioner testified that 1.5 million people were estimated to be eligible.[63] Congress ultimately responded by ratifying the family fairness program and by authorizing an even broader group to obtain lawful status beginning 1 year thereafter.[64] Congress stated that this 1-year delay ''shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date.'' [65]

3. Deferred Action

Beginning as early as 1959, INS Operations Instructions (OI) referred to ''nonpriority'' cases—a category that later became known as ''deferred action.'' [66] In 1959, such instructions identified top priorities for investigative case assignments and provided that, ''[i]n every case involving appealing humanitarian factors, appropriate measures must be taken to insure that action taken by [INS] will not subject the law, its administration, or the Government of the United States to public ridicule. Form G–312 shall be used to report each such nonpriority

---

certain H–1 nurses who no longer had lawful immigration status); 44 FR 53582 (Sept. 14, 1979) (extension of same).

[50] See Adam B. Cox and Cristina M. Rodríguez, *The President and Immigration Law Redux*, 125 Yale L.J. 104, 122–24 (2015) (discussing the origins of various applications of EVD); *see also* CRS Report on EVD; Lynda J. Oswald, Note, *Extended Voluntary Departure: Limiting the Attorney General's Discretion in Immigration Matters*, 85 Mich. L. Rev. 152, 152 n.1 (1986) (cataloguing grants of EVD based on nationality).

[51] See Public Law 101–649, sec. 302, 104 Stat. 4978, 5030–36 (codified as amended at 8 U.S.C. 1254a). In fact, in establishing TPS in IMMACT 90, Congress understood that the Attorney General (now Secretary) had continuing authority to establish such policies on grounds other than the individuals' nationality, providing that TPS would be the exclusive authority for the Attorney General to permit otherwise removable aliens to remain temporarily in the United States ''because of their particular nationality.'' INA sec. 244(g), 8 U.S.C. 1254a(g); *see* Statement by President George H.W. Bush upon Signing S. 358, 26 Weekly Comp. Pres. Doc. 1946 (Dec. 3, 1990), 1990 U.S.C.C.A.N. 6801 (Nov. 29, 1990) (expressing concern with INA sec. 244(g) because it would impinge on the Executive's prosecutorial discretion).

[52] See, e.g., 57 FR 28700 (June 26, 1992) (President George H.W. Bush directing DED for certain Salvadorans); 86 FR 6845 (Jan. 25, 2021) (President Trump directing DED for certain Venezuelans); 86 FR 43587 (Aug. 10, 2021) (President Biden directing DED for certain Hong Kong residents).

[53] The family fairness policies referred to this reprieve as indefinite voluntary departure or voluntary departure.

[54] See Alan C. Nelson, Commissioner, INS, *Legalization and Family Fairness—An Analysis* (Oct. 21, 1987) (hereinafter 1987 Family Fairness Memorandum), *reprinted in* 64 No. 41 Interpreter Releases 1191, App. I (Oct. 26, 1987); *see also* Memorandum to INS Regional Commissioners from Gene McNary, Commissioner, INS, *Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) (hereinafter 1990 Family Fairness Memorandum).

[55] See 1987 Family Fairness Memorandum.

[56] See S. Rep. No. 132, 99th Cong., 1st Sess., at 16 (1985) (''It is the intent of the Committee that the families of legalized aliens will obtain no special petitioning rights by virtue of the legalization.'').

[57] See Paul W. Schmidt, Acting General Counsel, INS, *Legal Considerations On The Treatment Of Family Members Who Are Not Eligible For Legalization* (May 29, 1987) (''[IRCA] does not cover spouses and children of legalized aliens. . . . The legislative history on this issue is crystal clear.''). Two weeks prior to the announcement of the family fairness policy, Senator John Chafee proposed a legislative path to legalization for the spouses and children excluded from IRCA; however, the proposal was rejected. *See* Record Vote No. 311, S. Amend. 894 to S. 1394, 100th Cong. (1987), *https://www.congress.gov/amendment/100th-congress/senate-amendment/894/actions.* A narrower effort to block funding for deportations of such individuals was introduced soon after the 1987 Family Fairness Memorandum but also did not become law. *See* H.J. Res. 395, 100th Cong. § 110 (as introduced Oct. 29, 1987); Act of Dec. 22, 1987, Public Law 100–202, 101 Stat. 1329; *see also* 133 Cong. Rec. 12,038–43 (1987) (statement of Rep. Roybal).

[58] See 1987 Family Fairness Memorandum.

[59] See id.

[60] See Recent Developments, 64 No. 41 Interpreter Releases 1191, App. II at 1206 (Oct. 26, 1987).

[61] See 1990 Family Fairness Memorandum. *See also* Record Vote No. 107, S. Amend. 244 to S. 358, 101st Cong. (1989), *https://www.congress.gov/amendment/101st-congress/senate-amendment/244/actions;* IRCA Amendments of 1989, H.R. 3374, 101st Cong. (1989), *https://www.congress.gov/bill/101st-congress/house-bill/3374/all-actions* (reflecting subcommittee hearings held as last action on the bill).

[62] See, e.g., Recent Developments, 67 No. 8 Interpreter Releases 201, 206 (Feb. 26, 1990); *see also, e.g.,* 55 FR 6058 (Feb. 21, 1990) (anticipating requests from ''approximately one million'' people); J.A. 646 (internal INS memorandum estimating ''greater than one million'' people ''will file''); J.A. 642 (''potentially millions''); 67 No. 8 Interpreter Releases 206 (''no more than 250,000''); Tim Schreiner, ''INS Reverses Policy That Split Alien Families,'' S.F. Chron., Feb. 3, 1990, at A15 (''more than 100,000 people'' estimated to file); Paul Anderson, ''New Policy on Illegal Immigrants,'' Phila. Inquirer, Feb. 3, 1990, at A10 (it ''may run to a million'').

[63] Immigration Act of 1989: Hearings Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary, 101st Cong., 2d Sess. Pt. 2, at 49, 56 (1990).

[64] See IMMACT 90, Public Law 101–649, sec. 301(g), 104 Stat. 4978, 5030 (1990).

[65] Id.

[66] See AADC, 525 U.S. at 484.

case.'' [67] In 1972, the INS OI provided that

[i]n every case where the district director determines that adverse action would be unconscionable because of the existence of appealing humanitarian factors, he shall recommend consideration for nonpriority. . . . If the recommendation is approved the alien shall be notified that no action will be taken by [INS] to disturb his immigration status, or that his departure from the United States has been deferred indefinitely, whichever is appropriate.[68]

A 1975 version of the same policy called for interim or biennial reviews of each case in deferred action status, and further provided, inter alia, that

[w]hen determining whether a case should be recommended for deferred action category, consideration should include the following: (1) advanced or tender age; (2) many years presence in the United States; (3) physical or mental condition requiring care or treatment in the United States; (4) family situation in the United States—effect of expulsion; (5) criminal, immoral or subversive activities or affiliations—recent conduct.[69]

In short, from at least 1959 until the late 1990s,

deferred-action decisions were governed by internal INS guidelines which considered, *inter alia*, such factors as the likelihood of ultimately removing the alien, the presence of sympathetic factors that could adversely affect future cases or generate bad publicity for the INS, and whether the alien had violated a provision that had been given high enforcement priority.[70]

Although such internal guidelines were moved to the INS's Interim Enforcement Procedures in June 1997, the following year the Supreme Court noted that ''there is no indication that the INS has ceased making this sort of determination on a case-by-case basis.'' [71] On the contrary, by the time of the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA),[72] ''the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising

[enforcement] discretion for humanitarian reasons or simply for its own convenience.'' [73]

**4. More Recent Deferred Action Policies**

In recent years, the INS and DHS have established a number of specific policies for consideration of deferred action requests by members of certain groups. For instance, in 1997, the INS established a deferred action policy for self-petitioners under the Violence Against Women Act of 1994 (VAWA).[74] The INS policy required immigration officers who approved a VAWA self-petition to assess, ''on a case-by-case basis, whether to place the alien in deferred action'' while the noncitizen waited for a visa to become available.[75] The INS noted that, ''[b]y their nature, VAWA cases generally possess factors that warrant consideration for deferred action.'' [76] Under this policy, from 1997 to 2000, no approved VAWA self-petitioner was removed from the country.[77] In the Victims of Trafficking and Violence Protection Act of 2000 (VTVPA), Congress expanded the availability of this type of deferred action, providing that children who could no longer self-petition under VAWA because they were over the age of 21 would nonetheless be ''eligible for deferred action and work authorization.'' [78]

In 2001, the INS instituted a similar deferred action policy for applicants for nonimmigrant status made available under the VTVPA's new nonimmigrant classifications for certain victims of human trafficking and their family members (T visas) and certain victims of other crimes and their family members (U visas).[79] The INS issued a memorandum directing immigration officers to locate ''possible victims in the above categories,'' and to use ''[e]xisting authority and mechanisms such as parole, deferred action, and stays of removal'' to prevent those victims' removal ''until they have had the opportunity to avail themselves of the provisions of the VTVPA.'' [80] The

INS later instructed officers to consider deferred action for ''all [T visa] applicants whose applications have been determined to be bona fide,'' [81] as well as for all U visa applicants ''determined to have submitted *prima facie* evidence of [their] eligibility.'' [82] In 2002 and 2007, INS and DHS promulgated regulations implementing similar policies.[83]

These policies, as well, were later ratified by Congress. In 2008, when Congress authorized DHS to grant an administrative stay of removal to a T or U visa applicant whose application sets forth a prima facie case for approval, Congress ratified the existing deferred action policies by clarifying that the denial of a request for an administrative stay of removal under this new authority would ''not preclude the alien from applying for a stay of removal, deferred action, or a continuance or abeyance of removal proceedings under any other provision of the immigration laws of the United States.'' [84] And Congress also required DHS to submit a report to Congress covering, inter alia, ''[i]nformation on the time in which it takes to adjudicate victim-based immigration applications, including the issuance of visas, work authorization and deferred action in a timely manner consistent with the safe and competent processing of such applications, and steps taken to improve in this area.'' [85]

In 2005, following Hurricane Katrina, DHS issued another deferred action policy applicable to foreign students who lost their lawful status as F–1 nonimmigrant students by virtue of failing to pursue a ''full course of study'' following the disaster.[86] Eligible F–1

---

[67] INS OI 103.1(a)(1) (Jan. 15, 1959).

[68] INS OI 103.1(a)(1)(ii) (Apr. 5, 1972).

[69] INS OI 103.1(a)(1)(ii) (Dec. 31, 1975).

[70] *See AADC,* 525 U.S. at 484 n.8 (citing 16 C. Gordon, S. Mailman, and S. Yale-Loehr, *Immigration Law and Procedure* § 242.1 (1998)).

[71] *Id.* The INS began rescinding OI on an ongoing basis as it moved to a Field Manual model for policies and procedures for officers. *See INS Field Manual Project to Eventually Replace Operations Instructions;* 77 No. 3 Interpreter Releases 93 (Jan. 14, 2000). The OI on deferred action were rescinded when the procedures were moved to the Interim Enforcement Procedures in June 1997, though the procedures remained substantively the same. *See Interim Enforcement Procedures: Standard Operating Procedures for Enforcement Officers: Arrest, Detention, Processing and Removal* (June 5, 1997) (accessed via USCIS historical archive).

[72] Public Law 104–208, 110 Stat. 3009.

[73] *See AADC,* 525 U.S. at 483–84.

[74] Public Law 103–322, tit. IV, 108 Stat. 1796.

[75] *See* Memorandum to INS Regional Directors, et al., from Paul W. Virtue, Acting Executive Associate Commissioner, INS, *Re: Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997).

[76] *Id.*

[77] *See Battered Women Immigrant Protection Act: Hearings on H.R. 3083 Before the Subcomm. on Immigration and Claims of the House Comm. on the Judiciary,* 106th Cong., at 43 (July 20, 2000).

[78] *See* Public Law 106–386, sec. 1503(d), 114 Stat. 1464, 1521–22.

[79] *See* 8 U.S.C. 1101(a)(15)(T)(i) and (U)(i).

[80] *See* Memorandum for Michael A. Pearson, INS Executive Associate Commissioner, from Michael

D. Cronin, Acting Executive Associate Commissioner, INS, *Re: Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—'T' and 'U' Nonimmigrant Visas* at 2 (Aug. 30, 2001).

[81] Memorandum for Johnny N. Williams, INS Executive Associate Commissioner, from Stuart Anderson, INS Executive Associate Commissioner, *Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status* at 1 (May 8, 2002) (hereinafter Williams Memorandum).

[82] *See* Memorandum for the Director, Vermont Service Center, INS, from USCIS Associate Director of Operations William R. Yates, *Re: Centralization of Interim Relief for U Nonimmigrant Status Applicants* (Oct. 8, 2003).

[83] *See* 67 FR 4784 (Jan. 31, 2002) (providing for deferred action for certain T visa applicants) (codified as amended at 8 CFR 214.11(j)); 72 FR 53014 (Sept. 17, 2007) (same for certain U visa applicants) (codified as amended at 8 CFR 214.14(d)).

[84] *See* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Public Law 110–457, sec. 204, 122 Stat. 5044, 5060 (codified as amended at 8 U.S.C. 1227(d)).

[85] *See id.* at sec. 238(b)(7), 122 Stat. at 5085.

[86] USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions*

students were allowed to request deferred action individually by letter, which was required to include a written affidavit or unsworn declaration confirming that the applicant met eligibility requirements.

In 2009, DHS implemented a deferred action policy for (1) surviving spouses of U.S. citizens whose U.S. citizen spouse died before the second anniversary of the marriage and who are unmarried and residing in the United States; and (2) their qualifying children who are residing in the United States.[87] USCIS explained that "no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death" and USCIS had not yet adjudicated an immigrant petition on the spouse's behalf.[88] Congress subsequently eliminated the requirement that a noncitizen be married to a U.S. citizen "for at least 2 years at the time of the citizen's death" to retain their eligibility for lawful immigration status.[89] USCIS later withdrew its guidance and treated all pending applications for deferred action under this policy as widow(er)s' petitions.[90]

In sum, for more than 60 years, executive agencies have issued policies under which deserving groups of individuals without lawful status may receive a discretionary, temporary, and nonguaranteed reprieve from removal. Many of these policies, including all the deferred action policies, resulted in collateral "benefits," such as eligibility to apply for work authorization. Many of these policies, including those involving the use of deferred action, also were subsequently ratified by Congress. The policy in this proposed rule is another such act of enforcement discretion and is similarly within the Executive's authority to implement.[91]

## B. Litigation History

When DACA was first implemented in 2012, 10 ICE officers and the State of Mississippi challenged both the Napolitano Memorandum and then-ICE Director John Morton's previously issued memorandum on prosecutorial discretion, "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens" (Morton Memorandum).[92] The plaintiffs in those cases were found to lack standing.[93]

In 2014, DHS sought to implement the policy Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) and to expand DACA to a larger population by removing the age cap for filing, providing grants of deferred action for a longer period of time, and making certain other adjustments (Expanded DACA).[94] The State of Texas and 25 other States brought an action for injunctive relief to prevent implementation of DAPA and Expanded DACA, alleging that they violated the APA, the Take Care Clause of the Constitution, and the INA.[95] On February 16, 2015, the U.S. District Court for the Southern District of Texas entered a nationwide preliminary injunction barring implementation of the policies in the 2014 DAPA Memorandum, which included both DAPA and Expanded DACA. On November 9, 2015, the Fifth Circuit affirmed the preliminary injunction, finding that the plaintiff States were substantially likely to establish that (1) DAPA and Expanded DACA required notice-and-comment rulemaking; and (2) DAPA and Expanded DACA violated the INA.[96] On June 23, 2016, an equally divided Supreme Court affirmed, leaving the nationwide injunction in place.[97] In the summer of 2017, Texas and the other plaintiff States voluntarily dismissed *Texas I.*

On September 5, 2017, then-Acting Secretary Elaine Duke issued a memorandum rescinding and beginning a wind-down of the 2012 DACA policy, citing the Supreme Court and Fifth Circuit decisions in *Texas I* and a letter from then-Attorney General Jefferson Sessions recommending rescission and an orderly wind-down of the 2012 DACA policy as it was likely to receive a similar decision in "imminent litigation."[98] In response to the Duke Memorandum, the Regents of the University of California, several States, a county, city, union, and individual DACA recipients brought suit in the U.S. District Court for the Northern District of California challenging the rescission as arbitrary and capricious under the APA, claiming that the rescission of DACA required notice and comment, violated the Regulatory Flexibility Act, and denied plaintiffs equal protection and due process.[99] Other groups of plaintiffs filed similar challenges, or amended existing lawsuits, in the U.S. District Courts for the Eastern District of New York,[100] the District of Columbia,[101] the Southern District of Florida,[102] and the District of Maryland.[103]

In two separate orders in January 2018, in *Regents* v. *DHS,* the U.S. District Court for the Northern District of California denied the Government's motion to dismiss and, finding plaintiffs had a likelihood of success in proving the rescission was arbitrary and capricious, entered a preliminary nationwide injunction requiring DHS to maintain the DACA policy largely as it

---

*(FAQ)* at 1 (Nov. 25, 2005) (quoting 8 CFR 214.2(f)(6)).

[87] Memorandum to USCIS Field Leadership from Donald Neufeld, Acting Associate Director, USCIS Office of Domestic Operations, *Re: Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* at 4 (June 15, 2009).

[88] *Id.* at 1.

[89] *See* Department of Homeland Security Appropriations Act, 2010, Public Law 111–83, sec. 568(c), 123 Stat. 2142, 2186–87.

[90] *See* Memorandum to USCIS Executive Leadership from Donald Neufeld, Acting Associate Director, USCIS Office of Domestic Operations, *Re: Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children (REVISED)* at 3, 10 (Dec. 2, 2009).

[91] *See* Section II.A above for a description of DACA's creation.

[92] *See* Crane v. *Napolitano,* 920 F. Supp. 2d 724, (N.D. Tex. 2013).

[93] *See* Crane v. *Johnson,* 783 F.3d 244, 255 (5th Cir. 2015).

[94] Memorandum from Jeh Johnson, Secretary, DHS, to León Rodríguez, Director, USCIS, et al., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who are the Parents of U.S. Citizens or Permanent Residents* (Nov. 20, 2014) (hereinafter 2014 DAPA Memorandum). The policy memorandum was rescinded on June 15, 2017. Memorandum from John Kelly, Secretary, DHS, to Kevin McAleenan, Acting Commissioner, CBP, et al., *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA)* (June 15, 2017).

[95] *See* Texas v. *United States,* 86 F. Supp. 3d 591 (S.D. Tex. 2015) (*Texas I*).

[96] *Texas* v. *United States,* 809 F.3d 134 (5th Cir. 2015) (*Texas I*). The Fifth Circuit included the directives of Expanded DACA as part of DAPA for purposes of its decision. *See id.* at 147 n.11.

[97] *United States* v. *Texas,* 136 S. Ct. 2271 (2016) (per curiam).

[98] *Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA)* from Elaine Duke, Acting Secretary, DHS (Sept. 5, 2017), *https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca* (hereinafter Duke Memorandum); *see also Letter from Attorney General Sessions to Acting Secretary Duke on the Rescission of DACA* (Sept. 4, 2017), *https://www.dhs.gov/sites/default/files/publications/17_0904_DOJ_AG-letter-DACA.pdf.*

[99] *Regents of the Univ. of Cal.* v. *DHS,* No. 17–cv–5211 (N.D. Cal. 2017) (*Regents* v. *DHS*).

[100] *See Batalla Vidal* v. *Nielsen,* No. 16–cv–4756 (E.D.N.Y.). Mr. Batalla Vidal's original complaint challenged DHS's revocation of the 3-year EAD issued under Expanded DACA and the Government's application of the *Texas I* preliminary injunction to New York residents such as himself. Compl., *Vidal v. Baran,* No. 16–cv–4756 (E.D.N.Y.) (Aug. 25, 2016).

[101] *See NAACP* v. *Trump,* No. 17–cv–1907 (D.D.C.).

[102] *See Diaz* v. *DHS,* No. 17–cv–24555 (S.D. Fla.).

[103] *See Casa de Maryland* v. *DHS,* No. 17–cv–2942 (D. Md.).

was in effect prior to rescission.[104] The injunction did not require the Government to accept requests from individuals who had never received DACA before, nor to provide advance parole to DACA recipients. In February 2018, in *Batalla Vidal* v. *Nielsen,* the U.S. District Court for the Eastern District of New York also entered a nationwide preliminary injunction on the basis that DHS's rescission of the DACA policy was likely arbitrary and capricious.[105]

In April 2018, in *NAACP* v. *Trump,* the U.S. District Court for the District of Columbia granted plaintiffs partial summary judgment on one of their APA claims, finding the Government failed to explain the rescission adequately. The court vacated the Duke Memorandum, but it stayed its order for 90 days so that DHS could provide additional explanation of its action.[106] Then-Secretary Kirstjen Nielsen issued a second memorandum (Nielsen Memorandum) further explaining DHS's decision to rescind DACA.[107] Upon consideration of the Nielsen Memorandum, the *NAACP* v. *Trump* court declined to reconsider its order vacating the Duke Memorandum, again finding the rescission arbitrary and capricious under the APA.[108]

The Government appealed the orders to the U.S. Courts of Appeals for the Ninth, Second, and D.C. Circuits. While awaiting those courts' decisions, the Government petitioned the Supreme Court for a writ of certiorari before judgment in each case,[109] asking the Court to grant similar petitions and consolidate the rescission cases.[110]

Before the Supreme Court acted on the Government's petitions, the Ninth Circuit affirmed the preliminary injunction in *Regents,* and the Supreme Court granted certiorari in that case and certiorari before judgment in the Second Circuit and D.C. Circuit cases. Over the course of the litigation, DHS continued to adjudicate DACA requests from previous DACA holders as required by the nationwide injunctions.

The Supreme Court heard the consolidated rescission cases to determine the issues of (1) whether the rescission was reviewable; (2) whether it was arbitrary and capricious under the APA; and (3) whether it violated the equal protection principles of the Fifth Amendment's Due Process Clause.[111] On June 18, 2020, the Court issued its decision and found the policy's rescission reviewable under the APA.[112] The Court found that the decision to rescind DACA was arbitrary and capricious under the APA because then-Acting Secretary Duke had not adequately considered alternatives to rescission, nor had she considered the reliance interests of DACA recipients. The Court held that plaintiffs failed to state a cognizable equal protection claim. And the Court declined to consider the Nielsen Memorandum. Ultimately, the Court remanded the matter to DHS ''to consider the problem anew.'' [113] In a letter to then-Acting Secretary Chad Wolf, then-Attorney General William Barr withdrew the September 4, 2017 Sessions letter, in order to ''facilitate that consideration.'' [114]

Subsequently, then-Acting Secretary Chad Wolf issued a memorandum limiting grants of DACA to those

individuals who had previously held DACA and reducing the grant from 2- to 1-year increments, while DHS considered the future of the policy.[115] The Wolf Memorandum also required rejection of all pending and future advance parole applications from DACA recipients and a refund of the associated fees, absent ''exceptional circumstances.'' [116] The plaintiffs in *Batalla Vidal* v. *Nielsen* and *New York* v. *Trump* amended their complaints to challenge the Wolf Memorandum.[117] The U.S. District Court for the Eastern District of New York vacated the Wolf Memorandum after finding that Mr. Wolf had not been lawfully serving as the Acting Secretary under the Homeland Security Act at the time of the memorandum's issuance.[118] The court ordered DHS to post public notice on DHS and USCIS websites that it was accepting initial DACA requests and applications for advance parole documents under the terms in place prior to the September 5, 2017 rescission, as well as to notify and provide a remedy to those applicants affected by processing under the now-vacated Wolf Memorandum.[119] USCIS then returned to operating DACA in accordance with the Napolitano Memorandum, as a result of the *Batalla Vidal* court's order.[120]

Meanwhile, in May 2018 and prior to the Supreme Court's decision in *Regents,* Texas and nine other States filed suit in the U.S. District Court for

[104] The Northern District of California previously consolidated the following cases: *California* v. *DHS,* No. 17–cv–5235 (N.D. Cal.); *Garcia* v. *United States,* No. 17–cv–5380 (N.D. Cal.); *City of San Jose* v. *Trump,* No. 17–cv–5329 (N.D. Cal.); *Regents* v. *DHS;* and *County of Santa Clara* v. *Trump,* No. 17–cv–5813 (N.D. Cal.).

[105] *See Batalla Vidal* v. *Nielsen,* 279 F. Supp. 3d 401 (E.D.N.Y. 2018); *see also Batalla Vidal* v. *Trump,* No. 18–485 (2d Cir.) (consolidating appeals from *New York* v. *Trump,* No. 17–cv–5228 (E.D.N.Y.) and *Batalla Vidal* v. *Baran,* No. 16–4756 (E.D.N.Y.)).

[106] *NAACP* v. *Trump,* 298 F. Supp. 3d 209, 249 (D.D.C. 2018).

[107] Memorandum from Kirstjen M. Nielsen, Secretary, DHS (June 22, 2018).

[108] *NAACP* v. *Trump,* 315 F. Supp. 3d 457, 474 (D.D.C. 2018).

[109] The Ninth Circuit later affirmed the district court's preliminary injunction, 908 F.3d 476 (9th Cir. 2018), and the Government converted its petition to a petition for a writ of certiorari. *DHS* v. *Regents of the Univ. of Cal.,* No. 18–587 (Supreme Court) (petition for writ of certiorari before judgment filed Nov. 5, 2018; request to convert to petition for writ of certiorari filed Nov. 19, 2018).

[110] *McAleenan* v. *Vidal,* No. 18–589 (Supreme Court) (petition for writ of certiorari before judgment filed Nov. 5, 2018); *Batalla Vidal* v.

*Trump,* No. 18–485 (2d Cir.) (consolidating appeals from *New York* v. *Trump,* 17–cv–5228 (E.D.N.Y.) and *Batalla Vidal* v. *Baran,* No. 16–04756 (E.D.N.Y.)) (appeal filed Feb. 20, 2018); *Trump* v. *NAACP,* No. 18–588 (Supreme Court) (petition for writ of certiorari before judgment filed Nov. 5, 2018); *Trustees of Princeton Univ.* v. *United States,* No. 18–5245 (D.C. Cir.) (appeal filed Aug. 13, 2018) (*Trustees of Princeton Univ.* v. *United States,* No. 17–cv–2325 (D.D.C.) consolidated with *NAACP* v. *Trump,* No. 17–cv–1907 (D.D.C.)). Although the district court granted the Government's motion for summary judgment in part in *Casa de Maryland,* the Fourth Circuit reversed, vacating the Duke Memorandum, though it stayed its order, and the Supreme Court denied cert. *DHS* v. *Casa De Maryland,* 18–1469 (petition for writ of certiorari); *Casa de Maryland* v. *DHS,* 18–1521 (4th Cir. May 17, 2019) (appeal and cross-appeal filed May 8, 2018) (*Casa de Maryland* v. *DHS,* No. 17–cv–2942 (D. Md.)).

[111] *Regents,* 140 S. Ct. 1891 (2020).

[112] *Id.* at 1907, 1910.

[113] *Id.* at 1916.

[114] *Attorney General William P. Barr's letter to Acting Secretary Chad F. Wolf on DACA* (June 30, 2020), *https://www.dhs.gov/sites/default/files/publications/20_0630_doj_aj-barr-letter-as-wolf-daca.pdf.*

[115] *See Reconsideration of the June 15, 2012 Memorandum Entitled ''Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children''* Memorandum from Chad F. Wolf, Acting Secretary, to heads of immigration components of DHS, dated July 28, 2020, at p. 7 (hereinafter Wolf Memorandum).

[116] *Id.* at p. 8.

[117] Plaintiffs in the previously consolidated cases in *Regents* v. *DHS* likewise filed amended complaints in the Northern District of California, challenging the Wolf Memorandum and the subsequent implementing guidance (Joseph Edlow, Deputy Director of Policy, USCIS, to Associate Directors and Program Office Chiefs, *Implementing Acting Secretary Chad Wolf's July 28, 2020 Memorandum, ''Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children' ''* (Aug. 21, 2020)) on the basis that the memoranda were ultra vires and violated the APA, and also challenging then-Acting Secretary Wolf's appointment. *See, e.g.,* Pls.' First Am. Compl. For Declaratory and Injunctive Relief, *Regents* v. *DHS,* No. 17–cv–5211, 2020 WL 8270391 (N.D. Cal. Nov. 2, 2020). The parties stipulated to stay proceedings pending DHS's actions pursuant to the Biden Memorandum.

[118] *Batalla Vidal* v. *Wolf,* 501 F. Supp. 3d 117, 129–33 (E.D.N.Y. 2020).

[119] *See Batalla Vidal* v. *Wolf,* No. 16–cv–4756, 2020 WL 7121849 (E.D.N.Y. Dec. 4, 2020).

[120] DHS expects that the proposed rule would supersede both the Napolitano Memorandum and, to the extent necessary, the vacated Wolf Memorandum.

**D. App. 166**

the Southern District of Texas, challenging the legality of the Napolitano Memorandum [121] (which, despite the rescission, remained in place due to numerous court orders [122]). As the States had waited 6 years to file suit, the court declined to enter a preliminary injunction against DACA "due to their delay." [123] The court explained that the plaintiff States could not show irreparable harm from continuation of the policy during the litigation. [124] But the court found that the States had a likelihood of success on the merits on their substantive and procedural APA claims. [125] After discovery, the court stayed the case awaiting the then-forthcoming decision in *DHS* v. *Regents.*

Following the Supreme Court's decision in *Regents,* and after additional discovery, the parties in *Texas II* filed cross-motions for summary judgment. On July 16, 2021, the court in *Texas II* issued its memorandum and order on the motions for summary judgment, holding that the Napolitano Memorandum is contrary to the APA's rulemaking requirements and the INA, and vacating the Napolitano Memorandum. [126] The court remanded the Napolitano Memorandum to DHS for further consideration. The court further issued a permanent injunction prohibiting DHS's continued administration and reimplementation of DACA without compliance with the APA, but temporarily stayed the vacatur and permanent injunction as to most individuals granted DACA on or before July 16, 2021, including with respect to renewal requests. The *Texas II* court also held that while DHS may continue to accept both DACA initial and renewal filings, DHS is prohibited from granting initial DACA requests and accompanying requests for employment authorization.

Currently, termination of an individual's grant of deferred action under DACA must adhere to the requirements of the nationwide preliminary injunction issued by the U.S. District Court for the Central District of California in *Inland Empire-Immigrant Youth Collective* v. *Nielsen.* [127] The *Inland Empire* court

certified a limited class of DACA recipients whose DACA grants had been or would be terminated without notice under particular circumstances, and it required USCIS to reinstate their deferred action under DACA and provide advance notice and an opportunity to respond prior to terminating a class member's grant of DACA. In accordance with the preliminary injunction and modified class definition and implementation procedures, USCIS is required to issue a notice of intent to terminate (NOIT) if it decides to terminate an individual's DACA grant, unless the individual (1) has a criminal conviction that is disqualifying for DACA; (2) has a charge for a crime that falls within the egregious public safety (EPS) grounds referenced in the USCIS 2011 NTA policy memorandum; [128] (3) has a pending charge for certain terrorism and security crimes described in 8 U.S.C. 1182(a)(3)(B)(iii) and (iv) or 8 U.S.C. 1227(a)(4)(A)(i); (4) departed the United States without advance parole; (5) was physically removed from the United States pursuant to an order of removal, voluntary departure order, or voluntary return agreement; or (6) maintains a nonimmigrant or immigrant status. As the *Inland Empire* class does not include these categories of DACA recipients, a NOIT is not required to terminate DACA. DHS is preliminarily enjoined from terminating a grant of DACA based solely on the issuance of an NTA that charges the individual as overstaying an authorized period of admission or being present without inspection and admission. DHS appealed the preliminary injunction to the U.S. Court of Appeals for the Ninth Circuit, which heard oral arguments on the appeal on June 13, 2019. The Ninth Circuit placed the case in abeyance on April 7, 2021, pending the present rulemaking. [129]

### C. Forbearance From Enforcement Action

In every area of law enforcement— both civil and criminal—executive agencies exercise enforcement discretion. [130] When, as is the norm, legislatures provide law enforcement agencies with only enough resources to arrest, detain, or prosecute a fraction of those who are suspected of violating the law, these agencies must establish priorities. DHS and its predecessor agencies have long exercised enforcement discretion, prioritizing national security, border security, and public safety mandates over civil infractions that do not represent a similar threat to the United States and its citizens. [131] Given DHS's limited resources to pursue immigration enforcement and the approximately 11 million noncitizens estimated to reside in the United States without legal status, [132] the use of discretion and prioritization is a necessary element of fulfilling the DHS mission.

In Fiscal Year (FY) 2016–FY 2020, DHS resources appropriated by Congress allowed ICE to conduct an

---

[121] *Texas* v. *United States,* 328 F. Supp. 3d 662 (S.D. Tex. 2018) (*Texas II* denial of motion for preliminary injunction).

[122] *See, e.g., NAACP* v. *Trump,* 315 F. Supp. 3d 457, 474 (D.D.C. 2018).

[123] *See Texas II* denial of motion for preliminary injunction at 740.

[124] *Id.*

[125] *Id.* at 736.

[126] *Texas II* July 16, 2021 memorandum and order.

[127] Order Granting Preliminary Injunction and Class Certification, *Inland Empire-Immigrant Youth

*Collective* v. *Nielsen,* 17–cv–2048, 2018 WL 1061408 (C.D. Cal. Feb. 26, 2018), *modified by* Modified Class Definition and Implementation Procedures—Corrected, *Inland Empire-Immigrant Youth Collective* v. *Nielsen,* 17–cv–2048 (C.D. Cal. Mar. 20, 2018).

[128] For an individual with an EPS charge for a crime of violence, as set forth in section IV(A)(1)(d) of the USCIS 2011 NTA policy memorandum, the minimum sentence for that charge must be at least 1 year of imprisonment before the individual will be deemed excluded from the class definition in *Inland Empire. See id.,* Modified Class Definition and Implementation Procedures—Corrected, at pp. 2–3.

[129] Order Holding Appeal in Abeyance, *Inland Empire-Immigrant Youth Collective* v. *Mayorkas,* 18–55564 (9th Cir. Apr. 7, 2021).

[130] *See Heckler* v. *Chaney,* 470 U.S. 821, 831 (1985).

[131] While the priorities have shifted between administrations, DHS and its components have issued enforcement priority and prosecutorial discretion policy memoranda since at least 1976, including in 2017 and 2021. *See, e.g.,* Sam Bernsen, General Counsel, INS, *Legal Opinion Regarding [Immigration and Naturalization] Service Exercise of Prosecutorial Discretion* (July 15, 1976); John Kelly, Secretary, DHS, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017); Memorandum from Acting Secretary David Pekoske to Senior Official Performing the Duties of the CBP Commissioner, et al., *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* (Jan. 20, 2021) (hereinafter Pekoske Memorandum); Acting ICE Director Tae D. Johnson, *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* (Feb. 18, 2021). On September 15, 2021, the U.S. Court of Appeals for the Fifth Circuit partially stayed a preliminary injunction issued by the U.S. District Court for the Southern District of Texas with respect to the latter two policies. *See State of Texas* v. *United States,* No. 21–40618 (5th Cir. Sept. 15, 2021).

[132] *See* DHS, Office of Immigration Statistics (OIS), *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2015–January 2018* (Jan. 2021), *https:// www.dhs.gov/sites/default/files/publications/ immigration-statistics/Pop_Estimate/ UnauthImmigrant/unauthorized_immigrant_ population_estimates_2015_-_2018.pdf (hereinafter OIS Report)* ("DHS estimates that 11.4 million unauthorized immigrants were living in the United States on January 1, 2018, roughly unchanged from 11.4 million on January 1, 2015"); Randy Capps, et al., *Unauthorized Immigrants in the United States: Stable Numbers, Changing Origins,* Migration Policy Institute (2020), *https://www.migration policy.org/sites/default/files/publications/mpi- unauthorized-immigrants-stablenumbers- changingorigins_final.pdf (hereinafter Capps (2020))* ("As of 2018 . . . there were 11 million unauthorized immigrants in the country, down slightly from 12.3 million in 2007.").

average of 235,120 removals of noncitizens per fiscal year, a small proportion of the roughly 11 million undocumented noncitizens present in the United States.[133] Because of this mismatch between available resources and the number of potential enforcement targets, DHS must prioritize those that pose the greatest risk to public safety, national security, and border security. For instance, in FY 2020, 92 percent of the noncitizens that ICE removed after arrest by ICE Enforcement and Removal Operations (as opposed to those arrested by CBP at or near the border) had criminal convictions or pending criminal charges.[134] By contrast, USCIS data released in 2019 on arrests of DACA recipients reflect that just 10 percent of DACA recipients had ever been so much as arrested or apprehended for a criminal or immigration-related civil offense. Of those arrests, the most common offenses were non-DUI-related driving offenses and immigration-related civil or criminal offenses.[135] This suggests that even in the absence of the DACA policy, the vast majority of DACA recipients would not be enforcement targets and likely would remain in the country without becoming the subject of enforcement action.

ICE is currently further focusing resources on the identification of those individuals with serious criminal convictions and those individuals who pose a threat to national security, border security, and public safety.[136] DHS's focus on high-priority cases generally, as well as the DACA policy in particular, provides additional

reassurance to people who present low or no risk to the United States, their families, and their communities. (This, in turn, has larger societal benefits, as discussed in Section V.A.4.b.(6) and elsewhere in this proposed rule.)

Adopting the proposed regulatory provisions would fortify DHS's prioritized approach to immigration and border enforcement by allowing DHS to continue to realize the efficiency benefits of the DACA policy. USCIS' determination that an individual meets the DACA guidelines and merits a favorable exercise of discretion assists law enforcement activities in several areas by streamlining the review required when officers encounter a DACA recipient. For example, when a CBP law enforcement officer encounters a DACA recipient in the course of their activities, they can see that USCIS confirmed that the noncitizen did not recently cross the border and had no significant criminal history at the time of the most recent DACA adjudication. Rather than conducting a full review of the DACA recipient's immigration and criminal history, in some circumstances, such as at the primary inspection booth at a checkpoint, the officer may be able to make a determination without necessitating further investigation (such as secondary inspection)—an effort that could involve multiple officers, with time costs ranging from minutes to hours.[137] Additionally, while officers must exercise their judgment based on the facts of each individual case, the prior vetting of DACA recipients provides a baseline that can streamline an enforcement officer's review of whether a DACA recipient is otherwise an enforcement priority.

Similarly, when ICE encounters a DACA recipient in the course of operations, ICE may review that person's history to ascertain if a disqualifying conviction has been rendered against them since the granting or renewal of DACA and proceed with an appropriate law enforcement resolution in each case. As appropriate, a law enforcement action, such as an arrest or immigration detainer being issued, may be avoided if someone is a DACA recipient or eligible individual and has no disqualifying convictions subsequent to the granting or renewal of DACA and continues to merit a

favorable exercise of prosecutorial discretion.

In either scenario, DACA helps save time and resources, which then could be spent on priority matters. At the same time, the DACA recipient could avoid time in DHS custody, resulting in lower costs for the DACA recipients and greater resource availability for DHS.

Likewise, ICE relies on the fact that a noncitizen has received DACA in determining whether to place the noncitizen into removal proceedings or, if the noncitizen is already in removal proceedings, in determining whether to agree to continue, administratively close, or dismiss the removal proceedings without prejudice.[138] Depending on the surrounding circumstances, such decisions could allow priority cases to move through the overloaded immigration courts more quickly, reduce resource burdens on ICE attorneys and the immigration courts, provide more immediate respite to those who present low or no risk to the country, or avoid costs associated with detaining and ultimately removing a noncitizen.

As was the case when the DACA policy was first established in 2012, DHS recognizes that it is unable now, or in the foreseeable future, to take enforcement action against every noncitizen who resides in the United States without legal status. Given this reality, it is necessary for DHS to focus its resources and efforts on higher priority cases, such as those individuals who present a threat to national or border security. DHS policy long has reflected a determination that strong humanitarian and practical considerations make these noncitizens, who entered the United States as children and were not aware of, or in control of, the manner or means of their entry, excellent candidates for designation as low enforcement priorities. Enforcement actions against this population are not aligned with a prioritization of border or national security or public safety, or with DHS's commitment to values-based enforcement policies.

---

[133] ICE, *Fiscal Year 2020 Enforcement and Removal Operations Report* 4 (2020); ICE, *Fiscal Year 2019 Enforcement and Removal Operations Report* 19 (2019); ICE, *Fiscal Year 2018 Enforcement and Removal Operations Report* 10 (2018); ICE, *Fiscal Year 2017 Enforcement and Removal Operations Report* 12 (2017); ICE, *Fiscal Year 2016 Enforcement and Removal Operations Report* 2 (2016).

[134] *See ICE Annual Report: Fiscal Year 2020*, *https://www.ice.gov/doclib/news/library/reports/annual-report/iceReportFY2020.pdf*. ICE's interior enforcement operations are most likely to encounter the DACA-eligible population because DACA recipients must have been continuously physically present in the United States since June 15, 2012, and, therefore, generally are not encountered by CBP's border security actions.

[135] *See* USCIS, *DACA Requestors with an IDENT Response* (Nov. 2019), *https://www.uscis.gov/sites/default/files/document/data/DACA_Requestors_IDENT_Nov._2019.pdf*.

[136] *See* Acting ICE Director Tae D. Johnson, *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* (Feb. 18, 2021). As noted above, on September 15, 2021, the U.S. Court of Appeals for the Fifth Circuit partially stayed a preliminary injunction issued by the U.S. District Court for the Southern District of Texas with respect to this policy. *See State of Texas* v. *United States*, No. 21–40618 (5th Cir. Sept. 15, 2021).

[137] In the U.S. Border Patrol (USBP) context, subject-matter experts estimate that potential time savings could range from 30 minutes to 2 hours, depending on the circumstances of the encounter and available staff and resources. Time savings would accrue to the agent in the field as well as radio operators who work to confirm identity. Specific data on this point are not available because USBP does not separately collect data on this type of encounter.

[138] DHS cannot quantify the frequency with which ICE makes such decisions, because ICE does not track enforcement discretion decisions made based on DACA. Source: Enforcement and Removal Operations; Office of the Principal Legal Advisor. In addition, such decisions also can be affected by other policies (*e.g.*, overall enforcement priorities), such that in some cases, the decision to forbear from enforcement action could be attributed to either DACA or those other policies. But even when DHS is operating under enforcement priorities that generally would produce the same decision to forbear from enforcement action, ICE benefits from being able to rely on the fact that USCIS already has vetted the noncitizen via the DACA framework.

Therefore, in accordance with relevant statutory provisions, DHS's duty to enforce the immigration laws, and a long history of court decisions upholding acts of prosecutorial discretion, DHS is proposing this rule to continue and fortify its policy of exercising its enforcement discretion to defer removal as to a particular, identified class of noncitizens, so as to allow limited appropriated resources to be applied to higher priority cases.[139]

### 1. The Secretary Is Authorized by Statute To Establish This Deferred Action Policy

When Congress created DHS in 2002, it gave the Secretary authority over most immigration matters and placed both ICE and CBP, the two agencies responsible for immigration enforcement, under the Secretary's direction.[140] Section 103(a)(1) of the INA states that "the [Secretary] shall be charged with the administration and enforcement of this Act and all other laws relating to the immigration and naturalization of aliens."[141] This sweeping grant includes authority to issue enforcement discretion policies such as the one proposed here.[142] Congress also explicitly charged that "the Secretary shall be responsible for . . . [e]stablishing national immigration enforcement policies and priorities," recognizing that the Secretary must provide guidance on the proper exercise of the Department's immigration enforcement authorities and on the allocation of scarce resources.[143]

The review of historical practice above shows that deferred action has played an important role in immigration enforcement for more than 60 years. Congress has affirmatively encouraged its use in various settings. In INA sec. 204(a)(1)(D)(i)(II) and (IV), 8 U.S.C. 1154(a)(1)(D)(i)(II) and (IV), for example, Congress called attention to deferred action as a remedy for certain domestic violence victims and their children, by expressly providing that children who no longer could self-petition under VAWA because they were over the age of 21 nonetheless would be "eligible for deferred action and work authorization." Similarly, in INA sec. 237(d)(2), 8 U.S.C. 1227(d)(2), Congress clarified that a denial of a request for a temporary stay of removal does not preclude deferred action for pending T and U nonimmigrant applicants. And through IMMACT 90, Congress provided post-hoc ratification of the use of indefinite voluntary departure in the family fairness policy, stating that a delay in the effective date "shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date."[144] Provisions like

these reflect Congress' recognition—acting after the executive branch already has implemented such a policy—that identifying classes of individuals who may be eligible for deferred action, as an act of enforcement discretion,[145] is both lawful and appropriate.[146] Moreover, numerous regulations refer to deferred action, some which have been in force for nearly 40 years, and Congress has allowed them to remain in force.[147]

---

[139] There are roughly 636,410 active DACA recipients and an estimated total of 1.3 million individuals who could meet the criteria set out in this proposed rule. Migration Policy Institute, *DACA Recipients & Eligible Population by State, https://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles.* Even if all such individuals are granted deferred action, that number represents only a small portion of the estimated 11 million undocumented noncitizens present in the United States and the available appropriated resources would remain grossly inadequate to the task of prosecuting and removing the estimated remaining 9.7 million undocumented individuals. This means that the proposed rule will not prevent DHS from continuing to enforce the immigration laws to the full extent that the resources Congress has given it will permit; to the contrary, as discussed below, these policies will facilitate still more effective use of the Department's finite resources.

[140] *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2136.

[141] *See* 8 U.S.C. 1103(a)(1).

[142] *See Ariz. Dream Act Coal.* v. *Brewer,* 855 F.3d 957, 967 (9th Cir. 2017) ("'[T]he INA explicitly authorizes the [Secretary] to administer and enforce all laws relating to immigration and naturalization. INA 103(a)(1), 8 U.S.C. 1103(a)(1). As part of this authority, it is well settled that the Secretary can exercise deferred action, a form of prosecutorial discretion . . . .'").

[143] 6 U.S.C. 202(5).

[144] *See* IMMACT 90 sec. 301(g). As noted above, *supra* note 57, the 1987 Family Fairness Memorandum was promulgated against a backdrop of a failed legislative effort to provide a pathway to legalization for IRCA-excluded spouses and children. The 1990 Family Fairness Memorandum came amidst rejection of protection from deportation in a House bill mirroring a Senate provision. *See supra* note 61. As such, while Congress later ratified INS's administrative practice, there was little to no apparent prospect for legislative action prompting the family fairness policies at the time they were promulgated in 1987 and 1990. *But see Texas I,* 809 F.3d at 185 ("Although the 'Family Fairness' program did grant voluntary departure to family members of legalized aliens while they 'waited for a visa preference number to become available for family members,' that program was interstitial to a statutory legalization scheme. DAPA is far from interstitial: Congress has repeatedly declined to enact the Development, Relief, and Education for Alien Minors Act ('DREAM Act'), features of which closely resemble DACA and DAPA.") (footnotes omitted); *Texas II* July 16, 2021 memorandum and order at 66 (citing *Texas I,* 809 F.3d at 185) ("Family Fairness was 'interstitial to a statutory legalization scheme,' because its purpose was to delay prosecution until Congress could enact legislation providing the same benefits, which it did when it passed [IMMACT 90]."). To whatever extent the 1990 Family Fairness Memorandum can be described as "interstitial" due to earlier passage of the Senate provision, DACA now occupies a similar interstitial space—the American Dream and Promise Act of 2021 passed the House in March 2021, and the bill is currently under consideration in the Senate. *See* H.R. 6, 117th Cong., American Dream and Promise Act of 2021 (as passed by House, Mar. 18, 2021), *https://www.congress.gov/bill/117th-congress/house-bill/6* (last visited Sept. 16, 2021). The Department maintains, however, that the DACA policy fits within the longstanding administrative practice of deferred action and is authorized by statute regardless of whether it is

[145] In the *Texas II* district court's July 16, 2021 memorandum and order, the court distinguished between "prosecutorial discretion" and "adjudicative discretion," citing a past statement in congressional testimony by Secretary Napolitano and a memorandum from an INS General Counsel. DHS respectfully disagrees with the court's interpretation of those statements—which do not draw the distinction made by the district court—and also disagrees with the court's legal conclusions on this point. It is true, of course, that under the proposed rule, DHS does not simply forbear from initiating proceedings; it also creates a process by which applicants must seek forbearance through an adjudicative proceeding. But that process is designed to answer one question: is forbearance appropriate? Whenever an agency decides to exercise forbearance, it must engage in some kind of process. The process in the proposed rule is more formal and structured than many exercises of prosecutorial discretion, but that is deliberate and serves important goals; it ensures appropriate, consistent, and efficient consideration of the equities deemed most relevant by the Secretary.

[146] For other statutory references to deferred action, *see, e.g.,* REAL ID Act of 2005, Public Law 109–13, div. B, sec. 202(c)(2)(B)(viii), 119 Stat. 231, 313 (49 U.S.C. 30301 note) (including deferred action recipients among the classes of individuals with "lawful status" eligible for REAL ID-compliant driver's licenses or identification cards); National Defense Authorization Act for Fiscal Year 2004, Public Law 108–136, sec. 1703(c)(1)(A) and (2), 117 Stat. 1693, 1694–95 (2003) (providing that the spouse, parent, or child of a U.S. citizen who died as a result of honorable service in combat and who was granted posthumous citizenship may self-petition for permanent residence and "shall be eligible for deferred action, advance parole, and work authorization").

[147] *See, e.g.,* 8 CFR 109.1(b)(7) (1982); 8 CFR 274a.12(c)(14) (2014); 8 CFR 1.3(a)(4)(vi) (including noncitizens granted deferred action among categories of those deemed "lawfully present in the United States" for purposes of eligibility for benefits under title II of Social Security Act); 8 CFR 214.11(m)(2) (deferred action for trafficking victims who are provisionally approved for T nonimmigrant status and on waiting list for available visa number); 8 CFR 214.14(d)(2) and (3) (same for U nonimmigrant status); 8 CFR 245.24(a)(3) ("U Interim Relief means deferred action and work authorization benefits provided by USCIS or [INS] to applicants for U nonimmigrant status deemed prima facie eligible for U nonimmigrant status prior to publication of the U nonimmigrant status regulations."); 8 CFR 245a.2(b)(5) (including among noncitizens eligible for adjustment to temporary resident status those who were granted deferred action before 1982); 28 CFR 1100.35(b) (encouraging the granting of deferred action and other forms of "continued presence" for victims of severe forms of trafficking in persons who are potential witnesses to that trafficking); 45 CFR 152.2 (noncitizens "currently in deferred action status"—except those "with deferred action under [DHS's] deferred action

Continued

Finally, the fact that Congress has repeatedly considered but failed to enact legislative proposals to give legal status to a population that substantially overlaps with the population eligible for DACA does not call into question the Secretary's statutory authority to establish this deferred action policy. As the Supreme Court often has made clear, Congress can legislate only by following the constitutional procedure for enactment of law.[148] The non-actions of a subsequent Congress, including its failure to do something significantly different from an agency action, are not themselves legislation, and they are "a hazardous basis for inferring the intent of an earlier one," particularly with respect to determining whether the agency action is authorized by statutes that an earlier Congress enacted.[149] When Congress does not act, it might be for a wide variety of reasons, including competing priorities and the sheer press of business.[150] In any case, the DREAM Act[151] is a substantially different policy from DACA. The DREAM Act proposed to grant individuals lawful status, first conditional and then permanent, which DHS cannot do and is not proposing here. By declining to enact the DREAM Act, then, Congress has not rejected or otherwise spoken to the Secretary's authority to establish the DACA policy. It bears repeating that, though well aware of DHS's longstanding administrative practice, including the Napolitano Memorandum, Congress has not taken any action to override or prohibit this use of deferred action.[152]

2. The Courts Have Long Recognized the Executive's Authority To Establish Enforcement Priorities and Grant Deferred Action

It long has been recognized that executive agencies are entitled to exercise their discretion in setting enforcement priorities when they have limited resources. The Supreme Court

explicitly recognized that authority in *Heckler* v. *Chaney,* when the Food and Drug Administration declined to proceed against an allegedly unlawful use of a particular drug for lethal injections.[153] The decision whether to enforce was, the Court held, "committed to agency discretion by law" within the meaning of the APA.[154] The Court said: "This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." [155] The Court added that an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall priorities, and, indeed, whether the agency has enough resources to undertake the action at all.[156]

Regarding immigration enforcement, in *Arizona* v. *United States,* the Supreme Court relied on the Federal Government's broad immigration enforcement discretion to declare several provisions of an Arizona immigration enforcement statute unconstitutional.[157] The Court described the scope of that enforcement discretion in sweeping terms: "A principal feature of the removal system is the broad discretion exercised by immigration officials. . . . Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." [158] Over a decade earlier, the Court emphasized that even after choosing to initiate enforcement action, immigration officials may "abandon the endeavor" of immigration enforcement "at each stage" of the process.[159] Several Federal courts of appeals have made similar statements, recognizing that the Executive has extremely broad discretionary authority when deciding how to allocate enforcement resources, including when to forbear removal on humanitarian grounds.[160]

Indeed, for more than 20 years the Supreme Court specifically has recognized deferred action—that is, the decision to temporarily forbear from pursuing the removal of a noncitizen—as a core feature and "regular practice" of the Executive's discretionary authority.[161] The Court confirmed this understanding in the context of the 2012 DACA policy, stating that "[t]he defining feature of deferred action is the decision to defer removal (and to notify the affected alien of that decision)." [162] One Federal court aptly described deferred action this way:

[T]he executive branch has long used an enforcement tool known as "deferred action" to implement enforcement policies and priorities, as authorized by statute. Deferred action is simply a decision by an enforcement agency not to seek enforcement of a given statutory or regulatory violation for a limited period of time. In the context of the immigration laws, deferred action represents a decision by DHS not to seek the removal of an alien for a set period of time. In this sense, eligibility for deferred action represents an acknowledgment that those qualifying individuals are the lowest priority for enforcement.[163]

The Court in *Arizona* recognized the Federal Government's appropriate focus on just the type of criteria for forbearance policies found in the 2012 DACA policy and in this proposed rule:

Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including . . . long ties to the community, or a record of distinguished

---

for childhood arrivals process, as described in the [Napolitano Memorandum]"—are deemed "lawfully present" for purposes of the Pre-Existing Condition Insurance Plan Program).

[148] *See, e.g., INS* v. *Chadha,* 462 U.S. 919, 951 (1983).

[149] *Mackey* v. *Lanier Collection Agency & Serv., Inc.* 486 U.S. 825, 840 (1988) (quoting *United States* v. *Price,* 361 U.S. 304, 313 (1960)); *see also, e.g., Cal. Div. of Labor Stds. Enf.* v. *Dillingham Constr., N.A.,* 519 U.S. 316, 331 n.8 (1997).

[150] *See, e.g., Central Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 187 (1994).

[151] The DREAM Act was first introduced in 2001 (*see* DREAM Act, S. 1291, 107th Cong., 1st Sess. (2001)) and subsequently has been reintroduced several times.

[152] Indeed, Congress has taken up, but never passed, bills to defund DACA processing by DHS. *See, e.g.,* H.R. 5160, 113th Cong. (2014).

[153] 470 U.S. 821 (1985) (*Chaney*).

[154] 5 U.S.C. 701(a)(2).

[155] *Chaney,* 470 U.S. at 831.

[156] *Id.*

[157] 132 S. Ct. 2492 (2012).

[158] *Id.* at 2499, citing Brief for Former Commissioners of the United States Immigration and Naturalization Service as Amici Curiae 8–13.

[159] *AADC,* 525 U.S. at 483–84.

[160] *See AADC,* 525 U.S. at 483–84 ("[A]t the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as

'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience."); *Regents of the Univ. of Cal.* v. *DHS,* 908 F.3d 476, 487 (9th Cir. 2018) ("Deferred action refers to an exercise of administrative discretion by the [immigration agency] under which [it] takes no action to proceed against an apparently deportable alien based on a prescribed set of factors generally related to humanitarian grounds." Internal quotation marks omitted); *Arpaio* v. *Obama,* 797 F.3d 11, 16 (D.C. Cir. 2015) ("Whether to initiate removal proceedings and whether to grant relief from deportation are among the discretionary decisions the immigration laws assign to the executive."); *Crane* v. *Johnson,* 783 F.3d 244, 247 (5th Cir. 2015) ("Under the INA, the [Secretary] is 'charged with the administration and enforcement of the INA and all other laws relating to the immigration and naturalization of aliens. . . .' Although the [Secretary] is charged with enforcement of the INA, 'a principal feature of the removal system is the broad discretion exercised by immigration officials.' In fact, the Supreme Court has recognized that the concerns justifying criminal prosecutorial discretion are 'greatly magnified in the deportation context.' " (internal brackets and citations omitted)).

[161] *See AADC,* 525 U.S. at 483–84.

[162] *Regents,* 140 S. Ct. at 1911.

[163] *Arpaio* v. *Obama,* 27 F. Supp. 3d 185, 192–93 (D.D.C. 2014), *aff'd,* 797 F.3d 11 (D.C. Cir. 2015).

military service. . . . Returning an alien to his own country may be deemed inappropriate even where he . . . fails to meet the criteria for admission.[164]

The Supreme Court's 8–1 decision in *AADC,* cited above, is noteworthy. Emphasizing the breadth of the Executive power to decide whether to grant deferred action, the Court observed that ''[a]t each stage the Executive has discretion to abandon [the removal process], and at the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience.''[165]

The lower courts have described this specific form of enforcement discretion in equally broad terms. In *Regents of the Univ. of Cal.* v. *DHS,* the U.S. Court of Appeals for the Ninth Circuit stated that ''[d]eferred action is a decision by Executive Branch officials not to pursue deportation proceedings against an individual or class of individuals otherwise eligible for removal from this country.''[166] It likewise found that ''it is well settled that the Secretary can exercise deferred action, a form of prosecutorial discretion whereby [DHS] declines to pursue the removal of a person unlawfully present in the United States.''[167] The Fifth and Eleventh Circuits also have acknowledged deferred action as an appropriate exercise of enforcement discretion.[168] Indeed, the courts' acceptance of this type of policy announcing enforcement discretion long predates DACA, including several cases that refer to deferred action by name (or in some cases by its earlier name, ''non-priority

status'') as a nonreviewable exercise of immigration enforcement discretion.[169]

Of course, as explained above, the DAPA and Expanded DACA policies were subjected to court challenges and ultimately were not implemented, and the Napolitano Memorandum recently was vacated by a district court. But to the extent that courts have found substantive flaws in those policies, they have not found that DHS may not forbear from removing certain noncitizens, or identifying policy considerations and criteria relevant to such forbearance, because forbearance from removal is so strongly rooted in long-recognized executive enforcement discretion authorities.[170] In focusing on those individuals who came to the country many years ago as children, have grown up here, have gone to school here, in some cases have served honorably in the Armed Forces, and do not pose a threat to public safety, national security, or border security, the DACA policy appropriately affords deferred action to some of the lowest priority removable noncitizens in the immigration system.

### 3. This Deferred Action Policy Conforms to Legal Limitations on the Executive's Enforcement Discretion

DHS recognizes that the Executive's enforcement discretion is not unlimited. Respect for Article I of the Constitution, the bedrock principles of separation of powers, and the rule of law compels careful consideration of the legal limits on all executive action, including enforcement discretion. After careful consideration, DHS proposes a rule that fully respects those limits.[171]

One limit, as the Supreme Court has observed, is that an agency may not ''disregard legislative direction in the statutory scheme that the agency administers. Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive

priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue.''[172]

The proposed rule does not ''disregard'' legislative direction; it affirmatively effectuates it. As the Court pointed out in *Chaney,* Congress can limit executive discretion by ''setting substantive priorities.'' With respect to immigration enforcement, Congress in fact has directed the Secretary to prioritize three missions: National security, public safety through the removal of serious criminal offenders (by level of severity of the crime), and border security.[173] Those are precisely the central priorities that the proposed rule expressly incorporates. Nor does any statutory provision attempt to ''limit [DHS's] exercise of enforcement power'' by ''otherwise circumscribing [DHS's] power to discriminate among issues or cases it will pursue.''

Further, as noted earlier, INA sec. 103(a), 8 U.S.C. 1103(a), confers broad powers on the Secretary in connection with ''the administration and enforcement'' of the immigration laws, and section 402(5) of the Homeland Security Act, 6 U.S.C. 202(5), charges the Secretary with the more specific duty of ''establishing national immigration enforcement policies and priorities.'' In discharging that responsibility to establish immigration enforcement policies and priorities, the Secretary exercises their ''control, direction, and supervision'' over DHS employees, INA sec. 103(a)(2), 8 U.S.C. 1103(a)(2), and may ''establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority,'' INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3). The proposed rule is thus consistent with another important congressional policy—the decision to entrust the optimal allocation of finite immigration enforcement resources to the Secretary's broad discretion.

As discussed above, the enforcement priorities that animate the proposed rule include national security, public safety through the removal of serious criminal

---

[164] *Arizona,* 132 S. Ct. at 2499. *See also Casa de Maryland* v. *DHS,* 924 F.3d 684, 691 (4th Cir. 2019) (''Because of the 'practical fact,' however, that the government can't possibly remove all such noncitizens, the Secretary has discretion to prioritize the removal of some and to deprioritize the removal of others.'').

[165] *AADC,* 525 U.S. at 483–84.

[166] 908 F.3d at 487.

[167] *Ariz. Dream Act Coal.* v. *Brewer,* 818 F.3d 901 (9th Cir. 2016).

[168] *Pasquini* v. *Morris,* 700 F.2d 658, 662 (11th Cir. 1983) (granting or withholding deferred action ''is firmly within the discretion of the INS'' and, therefore, can be granted or withheld ''as [the relevant official] sees fit, in accord with the abuse of discretion rule when any of the [then] five determining conditions is present''); *Soon Bok Yoon* v. *INS,* 538 F.2d 1211, 1213 (5th Cir. 1976) (''The decision to grant or withhold non-priority status [the former name for deferred action] therefore lies within the particular discretion of the INS, and we decline to hold that the agency has no power to create and employ such a category for its own administrative convenience without standardizing the category and allowing applications for inclusion in it.'').

[169] *See, e.g., AADC,* 525 U.S. at 483–84; *Botezatu* v. *INS,* 195 F.3d 311, 314 (7th Cir. 1999); *Mada-Luna* v. *Fitzpatrick,* 813 F.2d 1006, 1008 (9th Cir. 1987); *Pasquini* v. *Morris,* 700 F.2d 658, 661 (11th Cir. 1983); *David* v. *INS,* 548 F.2d 219, 223 (8th Cir. 1977); *Soon Bok Yoon* v. *INS,* 538 F.2d 1211, 1213 (5th Cir. 1976).

[170] *See Texas I* at 655–56. *Texas* v. *United States,* 787 F.3d 733 (5th Cir. 2015), *aff'd by equally divided Court,* 136 S. Ct. 2271 (2016); *see also Texas II* July 16, 2021 memorandum and order at 74.

[171] Other cogent discussions of the legal constraints on enforcement discretion in immigration reach analogous conclusions. *See* Written Testimony of Stephen H. Legomsky, Washington University School of Law, in *Unconstitutionality of Obama's Executive Actions on Immigration: Hearing Before the House Comm. on the Judiciary,* 114th Cong., at 74–76 (2015), *https://www.govinfo.gov/content/pkg/CHRG-114hhrg93526/pdf/CHRG-114hhrg93526.pdf.*

[172] *Chaney,* 470 U.S. at 833.

[173] A mandate to prioritize the removal of criminal offenders, taking into account the severity of the crime, has been included in every annual DHS appropriations act since 2009. *See, e.g.,* Consolidated Appropriations Act, 2014, Public Law 113–76, div. F, tit. II, 128 Stat. 5, 251; Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Public Law 110–329, div. D, tit. II, 122 Stat. 3574, 3659 (2008); *see also* INA secs. 235(b)(1) and (c) and 236(c)(1)(D), 8 U.S.C. 1225(b)(1) and (c) and 1226(c)(1)(D) (prioritizing national security and border security).

offenders based on the severity of the particular crimes, and border security. At the same time, when resources do not permit universal enforcement, prioritizing some goals requires deprioritizing others. The proposed rule deprioritizes the removal of those individuals who came to the United States many years ago as children; have lived in the United States peacefully and productively for substantial periods; and have been or are likely to be productive contributors to American society, via education, employment, and national service.

The use of deferred action as the particular vehicle for exercising this enforcement discretion is equally rational. This proposed deferred action policy would (1) encourage undocumented noncitizens to come forward, identify and present themselves to the Department, provide their addresses and other personal information, and supply fingerprints that will permit background checks; (2) enable USCIS—using funds raised by fees, provided in part by the deferred action requestors themselves—periodically to identify and investigate a large class of undocumented noncitizens who do not pose a threat to national security, border security, or public safety, thus permitting the DHS immigration enforcement agencies to focus their resources on the remaining higher priority individuals; (3) make communities safer by further enabling undocumented noncitizens who are crime victims or witnesses to report crimes to the police without fear of being arrested, detained, and removed; (4) significantly increase tax revenues as the wages and tax filing rates of deferred action recipients rise; and (5) protect the reliance interests of current DACA recipients—as well as their family members, employers, and educational institutions, among others—who have built lives and structured programs based on the existence of a national enforcement discretion program for this low-priority population.[174]

A second limit, to quote the Supreme Court's *Chaney* decision once more, is that an agency's enforcement policy cannot amount to an "abdication of its statutory responsibilities."[175] The proposed rule comes nowhere close to an abdication, given the enormous resources that the Department would continue to dedicate toward immigration enforcement during implementation of the proposed rule, and the basic practical reality that Congress has not appropriated sufficient resources for DHS to pursue all immigration enforcement that is available.[176] Indeed, the proposed rule would not prevent DHS from continuing to use all the resources Congress has appropriated for immigration enforcement. There can thus be no suggestion of abdication; DHS will continue to enforce the immigration laws as fully as its appropriated resources allow.

In view of these two limits, the Department does not believe that it could grant deferred action to every noncitizen in the United States who lacks lawful status, whether all at once or "in smaller numbers, group-by-group."[177] But the proposed rule, limited in nature and scope, would stop far short of such drastic action. And after careful consideration, the Department believes it does possess the authority to adopt the deferred action policy reflected in the proposed rule.[178]

### D. Employment Authorization

Since the inception of DACA in 2012, DACA recipients—like all other deferred action recipients—have been eligible for employment authorization under 8 CFR 274a.12(c)(14), a decades-old regulation that allows noncitizens who are provided deferred action from immigration enforcement the opportunity to apply for such authorization and receive an EAD if they establish an economic necessity for employment.[179] "Economic necessity" is based on the Federal Poverty Guidelines at 45 CFR 1060.2, and existing regulations at 8 CFR 274a.12(e) define the criteria necessary to establish the noncitizen's economic need to work. This proposed rule would not change the eligibility of DACA recipients to apply for work authorization or alter the existing general rule for establishing economic necessity. This rule proposes to codify DACA-related employment authorization in a new paragraph designated 8 CFR 274a.12(c)(33).[180] As with 8 CFR 274a.12(c)(14), the new paragraph (c)(33) would continue to specify that the noncitizen must have been granted deferred action and must establish economic need to be eligible for employment authorization.

This rule also proposes a relatively modest change to existing DACA practice, which requires all DACA requestors to submit the Form I–765,

---

[174] *See Regents*, 140 S. Ct. at 1914 ("DACA recipients have 'enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on the DACA program. The consequences of the rescission, respondents emphasize, would 'radiate outward' to DACA recipients' families, including their 200,000 U.S.-citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them. In addition, excluding DACA recipients from the lawful labor force may, they tell us, result in the loss of $215 billion in economic activity and an associated $60 billion in federal tax revenue over the next ten years. Meanwhile, States and local governments could lose $1.25 billion in tax revenue each year." (internal citations omitted)).

[175] *Chaney*, 470 U.S. at 833 n.4.

[176] The "abdication" standard was tested in *Texas* v. *United States*, 106 F.3d 661 (5th Cir. 1997). The State of Texas sued the Federal Government, alleging that the Government had failed to control undocumented immigration and that the State had incurred economic costs as a result. A unanimous panel of the U.S. Court of Appeals for the Fifth Circuit dismissed the claim. The court held: "We reject out-of-hand the State's contention that the federal defendants' alleged systemic failure to control immigration is so extreme as to constitute a reviewable abdication of duty." 106 F.3d at 667. The claim failed because "[t]he State does not contend that federal defendants are doing nothing to enforce the immigration laws or that they have consciously decided to abdicate their enforcement responsibilities. Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty." *Id.; see also id.* ("The State candidly concedes . . . that [INA sec. 103] places no substantive limits on the Attorney General and commits enforcement of the INA to her discretion.").

[177] *Texas II* July 16, 2021 memorandum and order at 64.

[178] The district court in *Texas II* also concluded that "DACA is an unreasonable interpretation of the law because it usurps the power of Congress to dictate a national scheme of immigration laws and is contrary to the INA." The Department respectfully disagrees and reiterates that its authority to create and implement DACA is vested in the Secretary's broad authority under the INA and the Homeland Security Act of 2002 to administer the immigration laws of the United States and establish national immigration

enforcement policies and priorities, as explained above.

Relying on a Supreme Court case, *Arizona* v. *United States*, 567 U.S. 387, 406 (2012), the *Texas II* court concluded that the Department's interpretation of its authority is unreasonable because "Congress intended to completely preempt further regulation in the area of immigration," including regulation by the Department with respect to employment authorization of noncitizens. In the Department's view, the *Texas II* court's reliance on *Arizona* was misplaced. There, the Court held that an Arizona statute that made it a criminal offense for a noncitizen without work authorization to seek or engage in employment was preempted by Federal law because "it would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens." The DACA policy gives rise to no such interference. DACA is not a State statute that impinges or usurps Congress' plenary power over the "field" of immigration. Rather, DACA is a policy created by a department of the executive branch of government that, under Federal law, is vested with the authority to act on immigration matters.

[179] As discussed below, such discretionary employment authorization for individuals provided deferred action has been codified in similar regulations since publication of the predecessor regulation at 8 CFR 109.1(b)(6) in 1981. *See Employment Authorization to Aliens in the United States*, 46 FR 25079 (May 5, 1981).

[180] Although currently issued under 8 CFR 274a.12(c)(14), a DACA-related EAD does not have the "C–14" code on its face, but rather "C–33" to assist DHS in distinguishing DACA recipients' EADs for operational and statistical tracking purposes.

Application for Employment Authorization, and the Form I–765WS, Employment Authorization Worksheet. DHS proposes instead to make it optional for each DACA requestor to apply for employment authorization and an EAD. DHS proposes as well to modify the Form I–821D, Consideration of Deferred Action for Childhood Arrivals, to contain a place for the requestor to indicate whether they also are filing the Form I–765 and the Form I–765WS concurrently. A DACA requestor may also wait until after receiving a DACA approval notice before applying for employment authorization. A DACA requestor or recipient who chooses to request employment authorization must file Form I–765 and Form I–765WS and pay all associated fees.[181] This rule does not propose any changes to the existing general rule for establishing economic necessity, which will continue to be determined on a case-by-case basis pursuant to 8 CFR 274a.12(e). This rule further proposes that the termination of a noncitizen's DACA, in accordance with 8 CFR 274a.14(a), would result in the automatic termination of any DACA-related employment authorization and employment authorization documentation obtained by the noncitizen.

Since at least the 1970s, the INS and later DHS have made employment authorization available for noncitizens without lawful immigration status who nevertheless are provided deferred action or certain other forms of prosecutorial discretion.[182] Although there was no general Federal prohibition on employing noncitizens without work authorization until the enactment of IRCA in 1986,[183] working without authorization nevertheless could cause certain categories of nonimmigrants to violate their status. INS thus had a long practice of noting the I–94 of a nonimmigrant provided such authorization,[184] and it continued the

practice for certain categories of noncitizens without nonimmigrant status.[185] In 1972, Congress made work authorization a prerequisite for certain noncitizens to obtain a Social Security number.[186] Congress ratified the INS's position that it had discretion under the INA to authorize noncitizens to work in enacting the Farm Labor Contractor Registration Act Amendments of 1974 (FLCRAA).[187] The FLCRAA made it unlawful for farm labor contractors to employ knowingly any "alien not lawfully admitted for permanent residence or who has not been authorized by the Attorney General to accept employment." [188]

In 1975, INS's General Counsel explained that INS authorized certain noncitizens to work in cases "when we do not intend or are unable to enforce the alien's departure . . . ." [189] The broad authority in section 103(a) of the INA, 8 U.S.C. 1103(a), charging the "Attorney General" and, ever since 2003, the Secretary, with "the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens" consistently has been interpreted to allow for the granting of such discretionary employment authorization to noncitizens.[190]

By the late 1970s, INS work authorizations commonly were issued. In 1979, the INS published a proposed rule that for the first time sought to codify its existing employment authorization practices.[191] In the preamble, the INS stated that "[t]he Attorney General's authority to grant employment authorization stems from section 103(a) of the Immigration and [Nationality] Act[,] which authorizes

him to establish regulations, issue instructions, and perform any actions necessary for the implementation and administration of the Act." [192] The INS also noted additional recognition by Congress of this authority in the enactment of an amendment that barred from adjustment of status to permanent residence any noncitizen (with certain exceptions) who after January 1, 1977, engages in unauthorized employment prior to filing an application for adjustment of status.[193] The preamble further noted that employment authorization could be obtained by noncitizens who were prima facie entitled to an immigration benefit such as adjustment of status, suspension of deportation, or asylum, as well as

[a]n alien who, as an exercise of [INS's] prosecutorial discretion, has been allowed to remain in the United States for an indefinite or extended period of time . . . . The proposed regulation states that the application for employment authorization may be granted if the alien establishes that he is financially unable to maintain himself during the applicable period.[194]

When the final rule was published in 1981 as new part 109 to title 8 of the Code of Federal Regulations,[195] it not only enabled various classes of noncitizens authorized by specific statutes to work, but also permitted discretionary work authorization for certain other noncitizens without lawful status, such as those who (1) had pending applications for asylum, adjustment of status, or suspension of deportation; (2) had been granted voluntary departure; or (3) had been recommended for deferred action.[196] The new 8 CFR 109.1(b)(6) published in 1981 specifically listed the following as a class of noncitizens who could apply for work authorization to the INS district director for the district in which the noncitizen resided:

Any alien in whose case the district director recommends consideration of deferred action, an act of administrative convenience to the government which gives some cases lower priority: Provided, the alien

---

[181] See discussion of fees at Section IV.A below.

[182] See generally Sam Bernsen, *Employment Rights of Aliens Under the Immigration Laws, In Defense of the Alien,* Vol. 2 (1979), at pp. 21, 32–33 (collecting former INS OI on employment authorization), *reprinted at https://www.jstor.org/stable/23142996.* For example, the former INS's OI in 1969 allowed for discretionary employment authorization to be issued to individuals who were provided voluntary departure, which permitted certain deportable noncitizens to remain in the United States until an agreed-upon date at which point they had to leave at their own expense but without the INS needing to obtain an order of removal. See INS OI 242.10(b) (Jan. 29, 1969).

[183] Public Law 99–603, 100 Stat. 3359.

[184] See, e.g., INS OI 214.2(j) (Nov. 16, 1962) and 214.2(f) (Aug. 15, 1958). See generally Sam Bernsen, *Lawful Work for Nonimmigrants,* 48 No. 21 Interpreter Releases, 168 (June 21, 1971) (noting

that nonimmigrants were not subject to numerical limitations but were subject to work restrictions).

[185] See supra note 182.

[186] See Social Security Amendments of 1972, Public Law 92–603, sec. 137, 86 Stat. 1329, 1364–65 (codified as amended at 42 U.S.C. 405(c)(2)(B)(i)(II) (1979)); see also Sam Bernsen, *Leave to Labor,* 52 No. 35 Interpreter Releases 291, 294 (Sept. 2, 1975).

[187] Public Law 93–518, sec. 11(a)(3), 88 Stat. 1652, 1655.

[188] 7 U.S.C. 1045(f) (Supp. IV 1974); see 7 U.S.C. 2044(b) (1970 and Supp. IV 1974) (contractor's license could be revoked on same basis).

[189] Sam Bernsen, *Leave to Labor;* 52 No. 35 Interpreter Releases 291, 294–95 (Sept. 2, 1975).

[190] See Proposed Rules for Employment Authorization for Certain Aliens, 44 FR 43480 (July 25, 1979) (first regulation collecting employment authorization policies). These provisions grant the Secretary broad discretion to determine the most effective way to administer the laws. See Narenji v. Civiletti, 617 F.2d 745, 747 (D.C. Cir. 1979) (observing that the INA "need not specifically authorize each and every action taken by the Attorney General [(now Secretary)], so long as his action is reasonably related to the duties imposed upon him").

[191] 44 FR 43480 (July 25, 1979).

[192] Id. (further noting that the Attorney General had delegated the authority to the Commissioner of the INS).

[193] Id. (citing Pub. L. 94–571, sec. 6, 90 Stat. 2703, 2705–06 (1976), which amended INA sec. 245(c) regarding adjustment of status to permanent resident—the INS mistakenly cited the law as "Pub. L. 95–571").

[194] Id.

[195] In 1980, the INS had issued a second proposed rule for notice and comment after modifying the initial rule based on public comments. See Employment Authorization, 45 FR 19563 (March 26, 1980) (preamble continued to note that INA sec. 103(a) provides legal authority for issuance of employment authorization).

[196] See Employment Authorization to Aliens in the United States, 46 FR 25079 (May 5, 1981).

**D. App. 173**

establishes to the satisfaction of the district director that he/she is financially unable to maintain himself/herself and family without employment.[197]

In November 1981, the INS moved the employment authorization provision for individuals granted deferred action to 8 CFR 109.1(b)(7) when it further expanded the categories of noncitizens who could be granted employment authorization to include paroled noncitizens and deportable noncitizens granted voluntary departure, either prior to or at the conclusion of immigration proceedings.[198]

When Congress passed IRCA in 1986,[199] making it unlawful for the first time for employers knowingly to hire "an unauthorized alien" for employment, Congress was well aware of the INS's longstanding practice of granting employment authorization to noncitizens, including the regulations permitting the agency to provide employment authorization to certain categories of noncitizens who had no lawful immigration status.[200] During the extensive legislative deliberations leading to IRCA, the INS also was considering a petition for rulemaking from the Federation for American Immigration Reform (FAIR) that directly challenged the 1981 employment authorization regulations as ultra vires, particularly INS's authority to provide such authorization to noncitizens who had not been specifically authorized by statute to work, which the INS had published for public comment.[201] FAIR's petition sought to have the INS rescind 8 CFR 109.1(b) through a new rulemaking.

Before the agency acted on FAIR's petition, Congress intervened and ratified the INS's interpretation of its legal authority to provide employment authorization by providing in IRCA that:

the term "unauthorized alien" means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by [the INA] or by the Attorney General.[202]

At the very same time that Congress made it unlawful for an employer knowingly to hire a person who is unauthorized to work, Congress

recognized that a person could be authorized to work by the Attorney General.

After publishing proposed regulations to implement IRCA and soliciting extensive public comment, including extending the comment period on the still-pending FAIR petition, the INS ultimately denied that petition.[203] In its denial, the INS noted both its broad authority in section 103(a) of the INA, 8 U.S.C. 1103(a), to administer the immigration laws and the new definition of "unauthorized alien" in section 274A(h)(3) of the INA, 8 U.S.C. 1324a(h)(3), by explaining that

the only logical way to interpret this phrase is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined "unauthorized alien" in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute.[204]

This contemporaneous interpretation—which has remained undisturbed by Congress for nearly 35 years—is entitled to considerable weight.

The final IRCA regulations incorporated the statutory definition of "unauthorized alien" from section 274a(h)(3) of the INA, 8 U.S.C. 1324a(h)(3), for employment purposes at 8 CFR 274a.1. The rules also redesignated the employment authorization regulations in part 109, with amendments, as part 274a, subpart B, in title 8 of the Code of Federal Regulations, with work authorization made available for noncitizens with deferred action who establish an economic necessity in 8 CFR 274a.12(c)(14).[205] In 8 CFR 274a.12(d) (1987), the rules further described the basic criteria and procedures to establish "economic necessity" as based on the Federal Poverty Guidelines. The new rules also included employment authorization for noncitizens who were members of a nationality group granted EVD, a form of prosecutorial discretion described in greater detail above.[206]

In the years following the enactment of IRCA and promulgation of the employment authorization regulations, the provisions relating to employment authorization for noncitizens with deferred action have remained substantively the same. As noted above, under subsequent administrations since the 1987 promulgation of 8 CFR 274a.12(c)(14), the INS and then DHS have continued to provide deferred action to individuals who are members of specific groups and to grant them eligibility for employment authorization on a case-by-case basis.[207]

After IRCA, Congress made certain limited amendments to the employment-related provisions in the INA,[208] but Congress never has modified INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3), the provision that recognizes that the Attorney General (now the Secretary) may authorize noncitizens to be lawfully employed.[209] Congress also periodically has limited the classes of noncitizens who may receive employment authorization,[210]

---

[197] *Id.* at 25081.

[198] *See Employment Authorization; Revision to Classes of Aliens Eligible,* 46 FR 55920 (Nov. 13, 1981).

[199] Public Law 99–603, 100 Stat. 3359.

[200] *See* 8 U.S.C. 1324a(a)(1).

[201] *See Employment Authorization,* 51 FR 39385, 39386–39387 (Oct. 28, 1986).

[202] *See* IRCA sec. 101(a)(1), 100 Stat. 3359, 3368 (codified at INA sec. 274a(h)(3), 8 U.S.C. 1324a(h)(3)).

[203] *See Employment Authorization; Classes of Aliens Eligible,* 51 FR 45338 (Dec. 18, 1986); *Control of Employment of Aliens,* 52 FR 8762 (Mar. 19, 1987); and *Employment Authorization; Classes of Aliens Eligible,* 52 FR 46092 (Dec. 4, 1987) (denial of FAIR petition).

[204] *See Employment Authorization; Classes of Aliens Eligible,* 52 FR 46093 (Dec. 4, 1987).

[205] *See* 52 FR 16216 (May 1, 1987).

[206] *See* 8 CFR 274a.12(a)(11) (1987). *See also* general discussion above of EVD and its successor, DED. After the term EVD became obsolete, the employment authorization provision was amended to cover noncitizens provided DED pursuant to a

directive from the President to the Secretary and under the conditions established by the Secretary in accord with the presidential directive. *See* current 8 CFR 274a.12(a)(11).

[207] *See, e.g.,* Memorandum for Regional Directors, et al., INS, from Paul W. Virtue, Acting Executive Associate Commissioner, INS, *Re: Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* (May 6, 1997) (directing individualized determinations of deferred action for pending self-petitioners under VAWA); *USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina,* press release, dated Nov. 25, 2005; Memorandum from Donald Neufeld, Acting Associate Director, USCIS Office of Domestic Operations, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* (Sept. 4, 2009) (directing deferred action and employment authorization for widows and widowers whose immigrant petitions had not been decided before their spouses died); Napolitano Memorandum (establishing DACA and directing that determinations be made as to whether eligible individuals qualify for work authorization during their period of deferred action).

[208] *See, e.g.,* IMMACT 90, Public Law 101–649, tit. V, subtit. C, 104 Stat. 4978 (1990) (codified as amended at various sections of 8 U.S.C. 1324a and 1324b—additional provisions related to employer sanctions and anti-discrimination in employment of noncitizens); IIRIRA, Public Law 104–208, div. C, tit. IV, 110 Stat. 3009, 3009–655–3009–670 (codified as amended at various sections of 8 U.S.C. 1324a and 1324b—adding provisions for pilot programs on identity and employment eligibility verification, amendments regarding employer sanctions, and amendments regarding unfair immigration-related employment practices).

[209] Section 274A(h)(3)(B) of the INA, 8 U.S.C. 1324a(h)(3)(B), recognizes that employment may be authorized by statute or by the Secretary. *See, e.g., Ariz. Dream Act Coal.* v. *Brewer,* 757 F.3d 1053, 1062 (9th Cir. 2014) ("Congress has given the Executive Branch broad discretion to determine when noncitizens may work in the United States."); *Perales* v. *Casillas,* 903 F.2d 1043, 1050 (5th Cir. 1990) (noting the broad, discretionary employment authorization authority in INA sec. 274A(h)(3) and the implementing EAD regulations).

[210] *See, e.g.,* 8 U.S.C. 1158(d)(2) (asylum applicants not otherwise eligible for employment

AR2022_100023

but it never has altered the policy in existence since at least the 1970s (and codified in regulations since 1981) that noncitizens granted deferred action may apply for and obtain discretionary employment authorization. In fact, as noted above, Congress has enacted statutes that recognized and adopted existing USCIS deferred action practices for certain noncitizens, such as pending T and U nonimmigrant applicants and petitioners, without altering 8 CFR 274a.12(c)(14), which provided for their ability to apply for employment authorization.[211]

The Department has carefully considered, but respectfully disagrees with, the *Texas II* court's decision finding that it is unlawful to provide employment authorization to persons who receive deferred action under DACA.[212] The *Texas II* court found that DACA recipients are not in the categories of noncitizens whom Congress specifically has authorized to be employed, nor in the categories of noncitizens for whom Congress has allowed DHS to provide discretionary employment authorization.[213] The Department believes that the court's conclusion is inconsistent with the long history of Congress' recognition of the former INS's and DHS's practice of providing discretionary employment authorization to individuals granted deferred action both before and after IRCA, as described earlier in this section, and the best interpretation of the Secretary's broad authorities under INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3), and INA sec. 274A(h)(3), 8 U.S.C.

1324a(h)(3), which indicates that with respect to employment, an "unauthorized alien" may be eligible and authorized to work either by the INA or "by the Attorney General," now the Secretary. Nothing in INA sec. 274A(h)(3), 8 U.S.C. 1324a(h)(3), indicates that there must be some underlying statute that separately provides the Secretary with discretion to authorize employment for a given category of noncitizens before the Secretary may exercise the discretion that is provided directly to the Secretary through INA sec. 274A(h)(3), 8 U.S.C. 1324a(h)(3).[214] In addition to individuals granted deferred action, DHS notes that DHS, and the Department of Justice (DOJ) before it, long has authorized employment for many categories of noncitizens for whom no additional statute expressly provides for employment authorization.[215] Although these categories of noncitizens whom the Attorney General and later the Secretary have authorized for employment eligibility have been placed into regulations at various times, many of them were in the 1981 codification of the former INS employment

authorization rules, while others were added later.[216] The regulatory employment authorization categories have continued to exist to this day. Were DHS to adopt the interpretation of the *Texas II* court, many of these other employment authorization categories that also rely on the Secretary's broad authorities under INA secs. 103(a)(3) and 274(h)(3) might be called into question. DHS respectfully declines to adopt such a restrictive interpretation. In noting that DACA also applies to individuals in removal proceedings, the *Texas II* court interpreted INA sec. 236(a)(3), 8 U.S.C. 1226(a)(3), as making "aliens not lawfully admitted for permanent residency with pending removal proceedings . . . *ineligible* for work authorization." [217] But the last clause of INA sec. 236(a)(3), 8 U.S.C. 1226(a)(3), recognizes such an individual may have employment authorization even if they have not been afforded lawful permanent resident status:

[The Secretary] . . . may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence *or otherwise would (without regard to removal proceedings) be provided such authorization.* (Emphasis added)

The Department interprets the last clause of INA sec. 236(a)(3), 8 U.S.C. 1226(a)(3), to represent a further recognition by Congress that noncitizens who are not permanent residents also can be authorized to work by other means, and that there must necessarily be categories of noncitizens other than lawful permanent residents who can obtain work authorization under these circumstances. Moreover, the *Texas II* court's reading would render superfluous provisions of the INA that explicitly bar employment authorization for certain categories of noncitizens in the United States without lawful status.[218] Read as a whole, the INA most naturally would permit work authorization for those individuals covered either by statute specifically or as authorized by the Secretary pursuant to INA sec. 103(a)(3), 8 U.S.C.

---

[211] *See, e.g.,* INA sec. 237(d)(2), 8 U.S.C. 1227(d)(2) (law enacted in 2008 following INS policy of using deferred action and other measures to forbear removing individuals who demonstrate eligibility for T or U nonimmigrant status).

[212] *See Texas II* July 16, 2021 memorandum and order at 76–77 (granting summary judgment to plaintiff States and enjoining administration and implementation of DACA, but staying injunction with respect to DACA renewal requestors). *See also* Section III.B above.

[213] *Texas II* July 16, 2021 memorandum and order at 54–55.

authorization shall not be eligible for employment authorization prior to 180 days after filing asylum application if regulations authorize such employment); 8 U.S.C. 1226(a)(3) (detained noncitizen may not be provided work authorization, even if released, unless the noncitizen is lawfully admitted for permanent residence or otherwise would—without regard to removal proceedings—be provided such authorization); 8 U.S.C. 1231(a)(7) (limiting circumstances in which noncitizens ordered removed may be eligible to receive employment authorization). Indeed, those provisions restricting employment authorization reasonably can be construed as reflecting Congress' general understanding that the Attorney General, now the Secretary, otherwise has statutory authority to provide employment authorization to noncitizens, including those who do not have a lawful immigration status, except where expressly prescribed in the INA.

[214] The *Texas II* court relied heavily on the opinion of the U.S. Fifth Circuit Court of Appeals decision in *Texas I*, which was based in part on that court's views that INA sec. 274A(h)(3), 8 U.S.C. 1324a(h)(3), would not support DAPA and its attendant employment authorization. *See Texas.* v. *United States,* 809 F.3d 134, 179–86 (5th Cir. 2015), *aff'd by equally divided court, United States* v. *Texas,* 136 S. Ct. 2271 (2016) (*Texas I*). The Department has considered the Fifth Circuit's opinion, and for the reasons stated in this section, the Department respectfully disagrees with this single appellate court. In particular, the Fifth Circuit's view that INA sec. 274A(h)(3) was a miscellaneous definitional provision (*i.e.,* a provision that could not plausibly grant DHS the authority to grant work authorization) is contradicted by the statutory context recited above. That definition was added as part of the IRCA reforms (*i.e.,* reforms to make it unlawful to knowingly employ unauthorized aliens). In that context, the definition of "unauthorized alien" is an essential feature on which Congress acted with intentionality.

[215] *See, e.g.,* 8 CFR 274a.12(a)(11) (noncitizens provided DED pursuant to a presidential directive); 8 CFR 274a.12(c)(9) (certain pending applicants for adjustment of status); 8 CFR 274a.12(c)(1) (foreign national spouses or unmarried dependent children of foreign government officials present on A–1, A–2, G–1, G–3, or G–4 visas); 8 CFR 274a.12(c)(3)(i)(B) (nonimmigrant students present on an F–1 visa seeking Optional Practical Training); 8 CFR 274a.12(c)(10) (noncitizens provided suspension of deportation/Cancellation of Removal (including NACARA)); 8 CFR 274a.12(c)(11) (noncitizens paroled in the public interest); 8 CFR 274a.12(c)(16) (foreign nationals who have filed "application[s] for creation of record" of lawful admission for permanent residence); 8 CFR 274a.12(c)(21) (S nonimmigrants who assist law enforcement in prosecuting certain crimes); and 8 CFR 274a.12(c)(26) (certain H–4 nonimmigrant spouses of H–1B nonimmigrants). This is a nonexhaustive list only.

[216] *See* 46 FR 15079 (May 5, 1981) (final rule codifying categories of employment-authorized noncitizens in former 8 CFR part 109, later moved, as amended, to 8 CFR 274a.12).

[217] *Texas II* July 16, 2021 memorandum and order at 55 (emphasis in original).

[218] *See, e.g.,* 8 U.S.C. 1226(a)(3) (barring employment authorization for noncitizens released on bond or recognizance during removal proceedings); 8 U.S.C. 1231(a)(7) (barring employment authorization for noncitizens released on orders of supervision after final order of removal).

1103(a)(3), and INA sec. 274A(h)(3), 8 U.S.C 1324a(h)(3).

To be clear, however, under the proposed rule DACA recipients would not ''have the 'right''' to employment authorization.[219] While DACA recipients are eligible to request employment authorization, they never have been in the category of individuals who are automatically authorized to work ''incident to status,'' such as asylees, TPS beneficiaries, and other groups identified in 8 CFR 274a.12(a) whose employment authorization is a component of their immigration status. DACA recipients have no lawful immigration status and have always been within the categories of noncitizens who apply for a discretionary grant of employment authorization under 8 CFR 274a.12(c). The *Texas II* court also was influenced by the fact that DACA requestors thus far have been required to apply for employment authorization when they seek DACA.[220] However, the Department is proposing to change that practice in this rule by no longer making it compulsory for a DACA requestor to apply for employment authorization. Under the proposed rule, an application for employment authorization would be optional. A DACA recipient would need to apply for and be granted employment authorization in order to work lawfully.

Although DHS believes that the INA directly authorizes the Secretary to provide employment authorization to persons who receive deferred action under DACA, to the extent there is any ambiguity, humanitarian concerns, reliance interests, economic concerns, and other relevant policy concerns strongly weigh in favor of DHS continuing to make discretionary employment authorization available for individual DACA recipients who establish economic necessity. Existing DACA recipients have relied on deferred action and employment authorization for years, and planned their lives—and, in many cases, their families' lives—around them. Without work authorization, many DACA recipients would have no lawful way to support themselves and their families and contribute fully to society and the economy. At the same time, to make DACA recipients ineligible for work authorization would squander the important economic and social contributions that many DACA recipients are making as a result of their authorization to work (including by working in frontline jobs during the

ongoing coronavirus emergency).[221] In addition, it would increase the likelihood that they no longer would be able to support their families, including U.S. citizen children, or perhaps that they might perceive no alternative but to work without authorization. This proposed rule therefore seeks to serve an assortment of important public policy goals by providing discretionary employment authorization to DACA recipients who demonstrate an economic necessity to work, and by allowing employers to lawfully hire DACA recipients. The ability to work lawfully provides numerous benefits to DACA recipients, their families, and their communities, and contributes to the collection of income tax and other payroll taxes at the Federal, State, and local levels, where applicable under law.[222]

*E. Lawful Presence*

Various Federal statutes draw distinctions between noncitizens who are ''lawfully present'' in the United States and those who are not. The INA does not contain a general definition of ''lawfully present'' or related statutory terms for purposes of Federal immigration law.[223] The statutory provisions that use ''lawfully present'' and related terms (*e.g.,* ''unlawfully present'') likewise leave those terms undefined, and they do not expressly address whether and in what sense individuals subject to a period of deferred action are to be considered ''lawfully present'' or ''unlawfully present'' in the United States during that period for purposes of various statutes.

Eligibility for certain Federal benefits depends in part on whether a noncitizen is ''lawfully present'' in the United States. The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA)[224] generally provides that noncitizens who are not ''qualified aliens'' are not eligible for ''federal public benefits.''[225] However, PRWORA includes an exception to this ineligibility rule for retirement and disability benefits under title II of the Social Security Act for ''an alien who is lawfully present in the United States as

determined by the Attorney General'' (now the Secretary).[226] The Balanced Budget Act of 1997[227] amended PRWORA to add similar exceptions for Medicare and railroad retirement and disability benefits.[228]

PRWORA also limits the provision of ''state and local public benefits'' to noncitizens who are ''qualified'' noncitizens, nonimmigrants, or parolees, but it provides that States may affirmatively enact legislation making noncitizens ''who [are] not lawfully present in the United States'' eligible for such benefits.[229] Moreover, IIRIRA limits the availability of residency-based State post-secondary education benefits for individuals who are ''not lawfully present.''[230]

In addition to making persons who are ''lawfully present'' potentially eligible for certain Federal public benefits for which they otherwise would be disqualified, and restricting eligibility for certain benefits under State law of persons who are ''not lawfully present,'' Congress has incorporated a formulation of the term ''lawful presence'' into the rules governing admissibility.[231] IIRIRA provides that a noncitizen who departs the United States after having been ''unlawfully present'' for specified periods is not eligible for admission for 3 or 10 years after the date of departure, depending on the duration of unlawful presence.[232] IIRIRA further provides that, with certain exceptions, an individual who has been ''unlawfully present'' for more than 1 year and who enters or attempts to re-enter the United States without being admitted is inadmissible.[233]

''For purposes of'' the 3-year and 10-year inadmissibility bars, IIRIRA provides that an individual is ''deemed to be unlawfully present'' if they are ''present in the United States after the expiration of the period of stay authorized by the Attorney General'' or are ''present in the United States without being admitted or paroled.''[234] But apart from that provision, which is limited by its terms to that paragraph of the statute, Congress has not attempted to prescribe the circumstances in which persons are or should be deemed to be ''lawfully present'' or ''unlawfully

---

[219] *Texas II* July 16, 2021 memorandum and order at 38.

[220] *See id.* at 55–56.

[221] Svajlenka (2020).

[222] *See* Cong. Budget Office, ''Budgetary Effects of Immigration-Related Provisions of the House-Passed Version of H.R. 240, An Act Making Appropriations for the Department of Homeland Security'' (Jan. 29, 2015) (estimating that blocking deferral of removal for certain noncitizens would cost the Federal Government $7.5 billion from 2015 to 2025), *https://www.cbo.gov/publication/49920;* Wong (2020).

[223] *See* 8 U.S.C. 1101.

[224] Public Law 104–193, 110 Stat. 2105.

[225] 8 U.S.C. 1611(a).

[226] 8 U.S.C. 1611(b)(2); *see also* 8 U.S.C. 1641(b) (defining ''qualified alien'').

[227] Public Law 105–33, 111 Stat. 251.

[228] 8 U.S.C. 1611(b)(3) and (4).

[229] 8 U.S.C. 1621(d).

[230] 8 U.S.C. 1623(a).

[231] *See generally* 8 U.S.C. 1182.

[232] 8 U.S.C. 1182(a)(9)(B)(i).

[233] 8 U.S.C. 1182(a)(9)(C).

[234] 8 U.S.C. 1182(a)(9)(B)(ii).

present.''[235] Instead, Congress has left the definition of those terms under Federal laws to the executive branch. In some instances, it has done so explicitly, such as with respect to Social Security, Medicare, and railroad retirement benefits.[236] In others, it has done so implicitly, such as with respect to restrictions on State and local public benefits and residency-based State post-secondary education benefits, by using the terms without defining them or addressing their applicability to particular circumstances.[237]

The executive branch has not previously promulgated an overarching and unified definition of ''lawfully present'' and related terms for the various Federal laws that use those terms. On several occasions, however, the executive branch has addressed whether persons who are subject to a period of deferred action should be deemed to be ''lawfully present'' or ''unlawfully present'' not generally or in the abstract, but for the specific purposes of certain of those provisions. These phrases are terms of art, with specialized meanings for those purposes, as explained in more detail below.

Shortly after Congress enacted PRWORA in 1996, and prior to the enactment of IIRIRA and the Balanced Budget Act of 1997, the Attorney General exercised her express authority under 8 U.S.C. 1611(b)(2) to define ''lawfully present'' for purposes of eligibility for Social Security benefits. The Attorney General issued an interim regulation that defines the term to include, inter alia, ''[a]liens currently in deferred action status.''[238] Following the Attorney General's administrative interpretation of the term ''lawfully present'' to include deferred action recipients for purposes of Social Security eligibility, Congress added the provisions in 8 U.S.C. 1611(b)(3) and (4) that permit the Attorney General to exercise the same authority with respect

to eligibility for Medicare and railroad retirement benefits.

Subsequent administrative interpretations have taken a similar approach. The Government has interpreted ''lawfully present'' to include persons with a period of deferred action for purposes of other Federal programs.[239] In addition, the Government has interpreted the deeming provision in 8 U.S.C. 1182(a)(9)(B)(ii) to mean that persons should not be deemed ''unlawfully present'' during ''period[s] of stay authorized by the Attorney General,'' including periods of deferred action.[240]

Although the Federal Government has not adopted a comprehensive definition of ''lawfully present'' and related statutory terms, and although the implementation of those terms will depend on the specific statutory context in which they are used, the positions discussed above reflect certain more general views about the meaning of ''lawfully present.''

As a general matter, DHS understands the phrase ''lawfully present'' as a term of art—not in a broad sense, or to suggest that presence is in all respects ''lawful,'' but to encompass situations in which the executive branch tolerates an individual being present in the United States at a certain, limited time or for a particular, well-defined period. The term is reasonably understood to include someone who is (under the law as enacted by Congress) subject to removal, and whose immigration status affords no protection from removal (again, under the law as enacted by Congress), but whose temporary presence in the United States the Government has chosen to tolerate, including for reasons of resource allocation, administrability, humanitarian concern, agency convenience, and other factors.[241] In the case of persons with deferred action, because DHS has made a non-binding decision to forbear from taking enforcement action against them (for a limited period), those individuals' presence has been tolerated by the officials executing the immigration laws.

''Lawful presence'' is a ''distinct concept'' from the much broader

concept of ''lawful status,'' which refers to an immigration status granted pursuant to a provision of the INA, such as lawful permanent residence, a nonimmigrant student status, or asylum.[242] Lawful status can be conferred only pursuant to statute because it provides a legally enforceable right to remain in the United States. Lawful presence, as understood and implemented by DHS, confers no such right. As noted by the court in *Texas II,* Congress has defined who is and is not entitled to lawful immigration status in the detailed provisions of the INA. DHS agrees that it is bound by those provisions and, except to the extent the INA itself includes a discretionary element in certain adjudications, does not have the ability to confer or deny lawful status beyond the terms laid out by Congress.[243] By contrast, according persons a period of deferred action and regarding them as ''lawfully present'' confers no substantive defense to removal or independent pathway to citizenship, and deferred action may be revoked at any time.

After careful consideration and with respect, DHS believes that the *Texas II* court erred in conflating the two concepts of ''lawful presence'' and ''lawful status.'' As the U.S. Court of Appeals for the Fifth Circuit put it, ''lawful status'' implies a ''right [to be in the United States] protected by law'' while lawful presence ''describes an exercise of discretion by a public official.''[244] The statutory concept of lawful presence covers those individuals who may not have lawful status but whose presence the Federal Government has elected to tolerate. It is merely a recognition of the fact that DHS has decided to tolerate the presence of a noncitizen in the United States temporarily, under humanitarian or other particular circumstances, and that the individual is known to immigration officials and will not be removed for the time being.

The Napolitano Memorandum does not address lawful presence and does

---

[235] On this question DHS disagrees with the court in *Texas II,* which cited a number of statutory provisions in finding that ''the INA specifies several particular groups of aliens for whom lawful presence is available.'' *Texas II* July 16, 2021 memorandum and order at 53. However, these provisions confer lawful status, an entirely separate concept to lawful presence, and one that DHS agrees it does not have the authority to grant in this proposed rule.

[236] *See, e.g.,* 8 U.S.C. 1611(b)(2) through (4) (''lawfully present in the United States as determined by the Attorney General''); 42 U.S.C. 402(y) (same).

[237] *See, e.g.,* 8 U.S.C. 1621(d) and 1623(a).

[238] 61 FR 47039 (Sept. 6, 1996) (codified as transferred at 8 CFR 1.3(a)(4)(vi)); *see also* 76 FR 53778 (Aug. 29, 2011) (transferring the rule from 8 CFR 103.12 to 8 CFR 1.3).

[239] *See, e.g.,* 42 CFR 417.422(h) (eligibility for Medicare health maintenance organizations and competitive medical plans).

[240] *See* Memorandum to Field Leadership from Donald Neufeld, Acting Associate Director, USCIS Office of Domestic Operations, *Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act* at 42 (May 6, 2009); Williams Memorandum; USCIS Adjudicator's Field Manual ch. 40.9.2(b)(3)(J).

[241] *See* AADC, 525 U.S. at 483–84.

[242] *Chaudhry* v. *Holder,* 705 F.3d 289, 292 (7th Cir. 2013); *see also* 8 CFR 245.1(d)(1) (defining ''lawful immigration status'' as any one of several types of immigration status granted pursuant to the INA). *See also Texas II* July 16, 2021 memorandum and order at 53.

[243] As noted above, however, the REAL ID Act of 2005 provides that deferred action serves as acceptable evidence of ''lawful status'' for purposes of eligibility for a REAL ID-compliant driver's license or identification card. *See* 49 U.S.C. 30301 note. In the regulations implementing the REAL ID Act, DHS clarified its view that this definition does not affect other definitions or requirements that may be contained in the INA or other laws. *See* 6 CFR 37.3.

[244] *See Dhuka* v. *Holder,* 716 F.3d 149, 156 (5th Cir. 2013).

not itself prescribe how DACA recipients are to be treated in the various arenas in which "lawful presence" is germane. However, DHS has treated persons who receive a period of deferred action under DACA like other deferred action recipients for these purposes. Thus, for example, DACA recipients are included in the Department's definition of "lawfully present" at 8 CFR 1.3(a)(4)(vi) for purposes of eligibility for Social Security benefits under 8 U.S.C. 1611(b)(2), and DHS has not regarded their time in deferred action as "unlawful presence" for purposes of inadmissibility determinations.[245]

As noted above, the executive branch has not previously proposed a singular definition of "lawfully present" that applies across the board to all statutes that include that and related terms. DHS recognizes that the statutory terms "lawfully present" and "unlawfully present," and the distinction between "lawful presence" and "lawful status," have caused significant confusion in debate about and litigation over the legality of the 2012 DACA policy and related DAPA policy. Questions have been raised about whether it is appropriate for persons with deferred action under DACA to be treated as "lawfully present" for purposes of statutes governing eligibility for Federal benefits.[246]

For the reasons discussed above, DHS believes that it is authorized to deem DACA recipients and other persons subject to deferred action to be "lawfully present," as defined here, under these circumstances for the particular purposes in 8 U.S.C. 1611(b)(2) and 1182(a)(9). The proposed rule addresses two specific instances in which the term is used: eligibility for certain public benefits under 8 U.S.C. 1611(b)(2), and the accrual of "unlawful presence" for purposes of admissibility under 8 U.S.C. 1182(a)(9)(B). Section 1611(b)(2) expressly refers to the Secretary's determination of who is lawfully present for the specific purpose of that provision, and longstanding agency regulations and policies treat persons with deferred action as lawfully

present for purposes of both provisions. In the intervening 25 years since the Attorney General issued her rule, Congress has not offered any indication to question or countermand that determination that the specified categories of noncitizens are eligible for Social Security benefits, and in fact, Congress only has enacted other similar provisions indicating that the Attorney General's determinations as to lawful presence for certain individuals make those individuals eligible for public benefits.[247]

The provisions of the proposed rule relating to lawful presence would not extend the benefits of lawful status to DACA recipients. From the beginning of the DACA policy (based on longstanding policies and regulations that far predate DACA), DHS has made clear that deferred action cannot and does not convey lawful status and, therefore, does not contradict the boundaries on lawful status that Congress has enacted via the INA. As then-Secretary Jeh Johnson said, "[d]eferred action does not confer any form of legal status in this country, much less citizenship; it simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States."[248] Indeed, being treated as "lawfully present" or not "unlawfully present" for purposes of one or more of these statutes does not confer on noncitizens whose presence Congress has deemed unlawful the right to remain lawfully in the United States. They remain subject to removal proceedings at the Government's discretion, and they gain no defense to removal.

### F. Fees

The INA authorizes DHS to establish and collect fees for adjudication and naturalization services to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants."[249] Through the collection of fees established under that authority, USCIS is funded primarily by immigration and naturalization fees charged to applicants, petitioners, and other requestors.[250] Fees collected from

individuals and entities filing immigration requests are deposited into the Immigration Examinations Fee Account and used to fund the cost of providing immigration requests.[251] Consistent with that authority and USCIS' reliance on fees for its funding, and as discussed in greater detail below, this rule would amend DHS regulations to require a fee for Form I–821D, Consideration of Deferred Action for Childhood Arrivals.

### G. Advance Parole

The INA authorizes the Attorney General, now the Secretary, "in his discretion [to] parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien."[252] On a case-by-case basis, and under appropriate circumstances consistent with the statute, DHS exercises its discretion to authorize advance parole, so that a noncitizen may leave the United States and then be paroled back in. The access of DACA recipients to "advance parole" under 8 CFR 212.5(f) raises questions of both law and policy that were discussed by the *Texas II* district court in its July 16, 2021 memorandum and order. DHS emphasizes that the same statutory standard, "for urgent humanitarian reasons or significant public benefit," applies to all noncitizens, including DACA recipients, and that this statutory standard does not depend on whether an individual is a DACA recipient. DHS reiterates that under the proposed rule, it would continue its adherence to that standard.

Likewise, the INA lays out a comprehensive scheme for eligibility for adjustment of status to that of a lawful permanent resident. There are several relevant statutory provisions and requirements, including those laid out

[245] *See Consideration of Deferred Action for Childhood Arrivals: Frequently Asked Questions,* Questions 1 and 5, *https://www.uscis.gov/ humanitarian/consideration-of-deferred-action-for-childhood-arrivals-daca/frequently-asked-questions* (hereinafter DACA FAQs).

[246] *Cf. Texas v. United States,* 809 F.3d 134, 184 (5th Cir. 2015) (*Texas I*) (holding that, for purposes of DAPA, "the INA flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits"), *aff'd by equally divided Court,* 136 S. Ct. 2271 (2016).

[247] *See* 8 U.S.C. 1611(b)(3) and (4).

[248] 2014 DAPA Memorandum.

[249] INA sec. 286(m), 8 U.S.C. 1356(m).

[250] *See* INA sec. 286(m) and (n), 8 U.S.C. 1356(m) and (n); 8 CFR 103.7(b)(1)(i) (Oct. 1, 2020) (current USCIS fees). On August 3, 2020, DHS published a final rule, *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements* (hereinafter 2020 Fee Schedule Final Rule), which was to be effective October 2, 2020. 85 FR 46788 (Aug. 3, 2020). The 2020 Fee Schedule Final Rule,

among other things, established a new USCIS fee schedule from 8 CFR 103.7(b) to the new 8 CFR part 106 at 8 CFR 106.2, Fees. However, before the 2020 Fee Schedule Final Rule took effect it was enjoined. *See Immigr. Legal Resource Ctr. v. Wolf,* 491 F. Supp. 3d 520 (N.D. Cal. Sept. 29, 2020); *Nw. Immigrant Rts. Proj. v. USCIS,* 496 F. Supp. 3d 21 (D.D.C. Oct. 8, 2020). At this time, DHS is complying with the terms of these orders and is not enforcing the regulatory changes set out in the 2020 Fee Schedule Final Rule, including the specific fees found in 8 CFR 106.2. 86 FR 7493 (Jan. 29, 2021). Nothing in this proposed rule proposes any change to that ongoing compliance.

[251] *See* 81 FR 73292, 73292 (Oct. 24, 2016).

[252] 8 U.S.C. 1182(d)(5)(A); *see also* 8 U.S.C. 1103(a), 8 CFR 212.5.

at 8 U.S.C. 1255(a), which requires, among other things, that applicants for adjustment of status be eligible for an immigrant visa and be admissible under 8 U.S.C. 1182,[253] and that applicants were "inspected and admitted or paroled" into the United States. The parole authority at 8 U.S.C. 1182(d)(5), when read together with the adjustment of status provisions at 8 U.S.C. 1255(a), creates a statutory pathway to adjustment of status for individuals who meet all the other adjustment criteria, including eligibility for an immigrant visa, but entered without inspection. Congress clearly intended that parole be available to a subset of noncitizens, and that such parole would affect eligibility for adjustment of status in these limited ways. These effects of parole are entirely separate from DACA, and do not depend on any executive actions not explicitly authorized by statute. So long as DHS acts within the limits on its parole authority in 8 U.S.C. 1182(d)(5), which as discussed above DHS believes the DACA-based advance parole guidance does, there is no conflict with Congress' expressed intent for eligibility for adjustment of status.

### H. Further Analysis, Alternatives, and Call for Comments

As noted by the *Texas II* district court in its July 16, 2021 memorandum and order, the above features of the proposed rule—forbearance from enforcement action, employment authorization, and lawful presence—are amenable to further analysis. DHS takes seriously the district court's suggestion that it may enact a forbearance-only policy, and that features of the DACA policy may be modified through the rulemaking process. DHS anticipates that presenting the full DACA policy in the notice-and-comment process, and giving full consideration to public comments, will enable it to determine whether such an alternative (or other alternative policies) is warranted.

Further analysis of these features of the proposed rule, including an assessment of regulatory alternatives, also can be found in Section V. Specifically—

• Section V.A.4 contains estimates of wages earned and certain tax transfers by DACA recipients;

• Section V.A.4.d discusses the proposed rule's potential labor market impacts;

• Section V.A.4.f discusses a range of reliance interests and certain potential

effects of the DACA policy identified by the *Texas II* district court (such as certain fiscal effects and effects on migration flows); and

• Section V.A.4.h discusses regulatory alternatives, including the alternatives of (1) implementing a policy of forbearance without employment authorization and lawful presence; and (2) implementing a policy of forbearance with employment authorization, but without lawful presence.

With respect to the alternatives relating to employment authorization and lawful presence in particular, DHS welcomes comments on whether there is any basis or reason for treating deferred action under DACA differently from other instances of deferred action in these respects, as well as any suggestions for alternatives. And with respect to lawful presence in particular, DHS invites comments on whether persons who receive deferred action pursuant to the proposed rule should be regarded as "lawfully present" or "unlawfully present" for purposes of eligibility for specified Federal public benefits under 8 U.S.C. 1611(b) and admissibility under 8 U.S.C. 1182(a)(9), respectively.

## IV. Provisions of Proposed Rule

In this section, DHS describes the DACA policy contained in the proposed rule. DHS proposes to amend 8 CFR part 236 by adding new subpart C, Deferred Action for Childhood Arrivals. Proposed 8 CFR 236.21 through 236.23 establish the applicability, guidelines, and procedures for requests for DACA. Proposed 8 CFR 236.24 and 236.25 incorporate provisions on severability and no private rights. Nothing in this proposed rule diminishes DHS's authority to issue deferred action policies through subregulatory or other means, or otherwise exercise its authorities to administer and enforce the immigration laws of the United States.

DHS welcomes comments on all aspects of the proposed policy, including potential changes to maximize the rule's net benefits and provide necessary clarity to DHS officials and the public. For instance, DHS welcomes comment on whether specific provisions of the proposed rule should be changed; whether additional aspects of the existing DACA FAQs should be incorporated into the final rule; and whether any other aspect of the proposed rule could be improved materially.

### A. Section 106.2—Fees

Under current practice, DACA requestors must file a Form I–765,

Application for Employment Authorization, and the Form I–765WS, Employment Authorization Worksheet, with the filing of Form I–821D, Consideration of Deferred Action for Childhood Arrivals. The current total fee for DACA requests is $495, which reflects the $410 fee for Form I–765 and the $85 biometrics services fee; the total fee is not waivable.[254] This proposed rule would modify existing practice for requesting DACA by making the request for employment authorization optional.[255] Although USCIS did not provide a policy rationale for its 2012 decision to require Form I–765 for all DACA requestors, DHS believes that, overall, this policy change will benefit DACA requestors. It recognizes that some DACA requestors may not need employment authorization or the accompanying EAD and should be given the option either to apply for DACA alone or to apply for both DACA and employment authorization. In addition, this change allows DACA requestors who so desire to learn first whether they are approved for DACA before they file the Form I–765 and pay the fee for employment authorization. While providing the choice to delay filing the Form I–765 means the EAD arrives later than the DACA approval notice, it potentially could provide some cost savings to those requestors who are found ineligible for DACA and previously would have been required to pay the filing fee for the Form I–765.

To cover some of the costs associated with reviewing DACA requests that USCIS will continue to incur in the absence of an I–765 filing, DHS proposes to charge a fee of $85 for Form I–821D and remove the discrete biometrics fee from the fees required to file Form I–765 under the (c)(33) eligibility category. This rule does not propose any changes to the fees for Form I–765; therefore, the DHS proposal of an $85 fee for the Form I–821D request for DACA means that the

---

[253] Parole also satisfies the admissibility requirement at 8 U.S.C. 1182(a)(6)(A)(i). Additionally, many of the inadmissibility provisions at 8 U.S.C. 1182 are waivable, including 8 U.S.C. 1182(a)(9)(B). *See* 8 U.S.C. 1182(a)(9)(B)(v).

[254] *See* USCIS, "I–821D, Consideration of Deferred Action for Childhood Arrivals," *https:// www.uscis.gov/i-821d.*

[255] *See* proposed 8 CFR 106.2(a)(38) and 236.23(a). This rule proposes to implement a fee for the Form I–821D, Consideration of Deferred Action for Childhood Arrivals. *See* proposed 8 CFR 106.2(a)(38). This proposed amendment will be made in a section of the regulation DHS is not currently implementing. As noted above, through this rulemaking process, DHS is proposing to codify a new fee where one did not exist before. *See* 8 CFR 106.2(a)(38). The fee for the Form I–821D is not germane to either lawsuit, it was not included in the enjoined 2020 Fee Schedule Final Rule, and the basis for the fee is explained in this proposed rule. If DHS ultimately codifies the new Form I–821D fee as part of this rulemaking, 8 CFR 106.2(a)(38) would provide the fee for the Form I–821D independent of other portions of 8 CFR part 106 that DHS is not enforcing at this time.

current total cost to DACA requestors who also file the optional Form I–765 remains at $495 ($85 for Form I–821D plus $410 for Form I–765) as of the time of this proposed rule.[256] Individuals who choose to request DACA by filing Form I–821D but do not file Form I–765 would pay $85, which is $410 less than under the current fee structure for DACA. Should the fee for Form I–765 for employment authorization change in a separate DHS fee rulemaking, then DACA requestors who choose to file that form would pay the same filing fee for the Form I–765 as all other applicants for employment authorization who are required to pay the fee. DHS proposes no changes to the existing DACA fee exemptions, which would continue to apply to both the proposed Form I–821D fee and the Form I–765 fee if the requestor also seeks employment authorization.[257]

Under this proposed model, a DACA requestor or recipient who believes they can demonstrate economic need on the Form I–765WS, Employment Authorization Worksheet, may apply to USCIS for employment authorization on the Form I–765, Application for Employment Authorization, with the required fee.[258] Under the current USCIS fee schedule, the fee for Form I–765 is $410. This rule proposes to modify the existing total fee for DACA with the following new fee structure:

• Required Form I–821D, Consideration of Deferred Action for Childhood Arrivals, $85 fee

• Optional Form I–765, Application for Employment Authorization, $410 fee (current fee as of date of publication)

| Form | Required | Current Form Fee | Current Biometrics Fee | Proposed Form Fee in this Rule | Proposed Biometrics Fee | Fee Waiver Eligibility |
|------|----------|------------------|------------------------|-------------------------------|-------------------------|------------------------|
| I-821D | Yes | $0 | $0 | $85 | $0 | No |
| I-765 | No | $410 | $85 | $410 | $0 | No |

USCIS is funded primarily by immigration and naturalization benefit request fees charged to applicants and petitioners. DHS believes that the proposed I–821D fee of $85 balances the need to recover some of the costs of reviewing DACA requests filed without Form I–765, including the costs of biometric services, with the humanitarian needs of the DACA-eligible population. Many DACA recipients are young adults who are vulnerable because of their lack of immigration status and may have little to no means to pay the fee for the request for deferred action. DHS therefore proposes to hold the fee for Form I–821D, Consideration of Deferred Action for Childhood Arrivals, below the estimated full cost of adjudication. DHS estimates that the full cost of adjudicating Form I–821D, including the cost of providing biometric services and indirect activities that support adjudication, is approximately $332, based on initial budget and volume projections for FY 2022 and FY 2023.[259] [260] DHS proposes a fee of $85 for Form I–821D because it maintains the current total cost for DACA requestors who choose to file Form I–765, at its current fee level, to apply for employment authorization. Based on the estimated Form I–821D full cost of adjudication of approximately $332 and the proposed Form I–821D fee of $85, USCIS estimates that it would charge $247 ($332 minus $85) less than the full cost of adjudication for each Form I–821D filing. For budgetary purposes, at the time USCIS conducted its cost analysis for the proposed rule, the projected average number of Form I–821D filings was 379,500 for FY 2022 and FY 2023.[261] This implies that USCIS would charge, on average, approximately $93,736,500[262] less than the estimated full cost of adjudication for Form I–821D annually in FY 2022 and FY 2023.

As the agency that administers this country's immigration system, USCIS has the expertise to assess on a case-by-case basis whether a DACA requestor has met the threshold criteria and warrants a favorable exercise of discretion in a uniform manner. Moreover, because USCIS operations are fee-funded, funds spent on DACA adjudications do not take any resources away from DHS's enforcement branches. Finally, DHS has an interest in encouraging eligible DACA requestors to come forward and apply for deferred action (aided by a low fee), because it allows DHS to proactively identify noncitizens who may be a low priority for removal should they be encountered by ICE or CBP in the field. For these reasons, DHS believes that USCIS' adjudication of DACA requests with the proposed $85 fee is reasonable.

We invite public comments on how DHS should structure fees for the required Form I–821D, Consideration of Deferred Action for Childhood Arrivals, and the optional Form I–765,

---

[256] The current fee for the Form I–765 is based upon the USCIS fee schedule that USCIS currently is following. 8 CFR 103.7(b)(1)(i)(II) (Oct. 1, 2020). Any future fees, including the fee for the Form I–821D or the Form I–765, may be affected by adjustments to the USCIS fee schedule.

[257] USCIS data suggest there is a negligible workload difference between adjudicating Form I–821D alone and the combined Forms I–821D/I–765 DACA adjudicative action. This is because the primary adjudicative decision is issued on Form I–821D. The adjudicative decision is conferred to the EAD, as the Form I–765 will be denied if the Form I–821D is denied, and approved if the Form I–821D is approved and the requestor demonstrates an economic need to work. Because current policy requires that these forms be filed together, the Form I–765 DACA action is adjudicated in tandem with Form I–821D. Workload data suggest that the difference equals the I–765 DACA decision and/or issuance of an EAD card upon benefit adjudication.

[258] See proposed 8 CFR 236.21(c)(2).

[259] Historically, USCIS excludes DACA volumes, costs, and revenues from its fee calculations. See 81 FR 73312. To estimate the projected full cost of adjudication for Form I–821D for the FY 2022/FY 2023 biennial period, USCIS included projected DACA volumes, costs, and revenues, as well as a completion rate activity-driven, in its activity-based costing model. At its January 2021 meetings, the USCIS Volume Projection Committee forecasted an average Form I–821D filing volume of 379,500 annually for FY 2022 and FY 2023. USCIS attributed the following activities to the adjudication of Form I–821D in its activity-based cost model: Intake; Inform the Public; Conduct TECS Check; Fraud Detection and Prevention; Perform Biometric Services; Make Determination; Management and Oversight; and Records Management. Based on the activity-based cost model, USCIS estimates that the full cost of adjudication for Form I–821D is approximately $332 for FY 2022 and FY 2023. Because the USCIS activity-based cost model relies on budget and volume projections, the estimated cost to adjudicate

Form I–821D may change based on revisions to the budget or volume projections.

[260] OMB Circular A–25 defines "full cost" to mean the sum of direct and indirect costs that contribute to the output, including the costs of supporting services provided by other segments and entities. Available at https://www.whitehouse.gov/wp-content/uploads/2017/11/Circular-025.pdf.

[261] This projection is used for budgetary planning purposes and is determined by USCIS' Volume Projection Committee (VPC). The quantitative and qualitative methodologies used by the VPC differ from the methodologies used in projecting future application volumes as part of the RIA for this proposed rule, which makes different volume projections based on the methodologies described therein. As noted below, USCIS welcomes input on the methodologies employed to estimate the size and nature of the population likely to be affected by this rule.

[262] Calculation: (Estimated annual average I–821D filing volume of 379,500) * (Estimated gap between adjudication cost and fee of $247) = $93,736,500.

Application for Employment Authorization.

### B. Section 236.21—Applicability

Paragraph (a) of proposed 8 CFR 236.21 makes clear that the proposed new subpart C would apply to requests for deferred action under the DACA policy only. Proposed subpart C would not apply to or govern any other request for or grant of deferred action or any other DHS deferred action policy. This provision is consistent with the exceptional circumstances giving rise to this rulemaking, as described above. This rulemaking is not intended to address issues that relate to deferred action more broadly and would not affect other deferred action policies and procedures.

Proposed paragraph (b) provides that the provisions that govern benefit requests within 8 CFR part 103 would not apply to requests for DACA except as specifically provided in this proposed rule. DHS proposes to include this provision because, as discussed, a request for deferred action is a temporary forbearance from removal and is not a "benefit request" as defined in 8 CFR 1.2. Benefit requests are subject to the provisions of 8 CFR part 103, which provides regulatory guidance on filings, evidence and processing, denials, appeals, precedent decisions, certifications, and motions to reopen and reconsider. Because deferred action is an exercise of prosecutorial discretion and not a benefit, these provisions do not apply to DACA requests.

Proposed paragraph (c) explains that the Secretary has broad authority to establish national immigration enforcement policies and priorities under 6 U.S.C. 202(5) and section 103 of the INA. Deferred action is a temporary, favorable exercise of immigration enforcement discretion that gives some cases lower priority for enforcement action in order to permit DHS to focus its limited enforcement resources on those cases that are higher priorities for removal.[263] As explained in the existing regulations, deferred action is "an act of administrative convenience to the government which gives some cases lower priority."[264] In exercising its discretionary authority to forbear a noncitizen's removal, DHS is recognizing that the noncitizen is, for a temporary period, not an immigration enforcement priority. The temporary forbearance from removal does not confer any right or entitlement to remain in or re-enter the United States,

nor does it prevent DHS or any other Federal agency from initiating any criminal or other enforcement action against the DACA requestor at any time if DHS determines in its sole and unreviewable discretion not to continue to exercise favorable enforcement discretion with respect to the individual.[265]

In the Napolitano Memorandum, the Secretary determined that certain children and young adults without lawful immigration status or parole who came to this country years ago as children were low-priority cases and warranted, for humanitarian and other reasons, a favorable exercise of enforcement discretion.[266] The memorandum explains that these vulnerable individuals "know only this country as home" and generally "lacked the intent to violate the [immigration] law[s]."[267]

During the period of forbearance from removal, a DACA recipient is considered "lawfully present" for purposes of 8 CFR 1.3(a)(4)(vi) and does not accrue "unlawful presence" for purposes of INA sec. 212(a)(9). DACA recipients may apply for employment authorization based on economic necessity.[268] The provision of employment authorization and consideration of "lawful presence" for DACA recipients is pursuant to longstanding and independent DHS regulations and implementing guidance promulgated for all recipients of deferred action, as discussed elsewhere in this proposed rule.[269] Deferred action, however, is not a lawful immigration status and does not cure previous or subsequent periods of unlawful presence.

### C. Section 236.22—Discretionary Determination

Section 236.22 contains the proposed provisions governing DHS's discretionary determination of requests for DACA. As explained, deferred action is a temporary, favorable exercise of immigration enforcement discretion that gives some cases lower priority for enforcement action. A pending request for deferred action does not authorize or confer any immigration benefits such as employment authorization or advance parole.[270] Deferred action requests submitted under this section would be determined on a case-by-case basis.[271]

The proposed rule lays out several threshold discretionary criteria that USCIS would assess on a case-by-case basis as part of a review of the totality of the circumstances. Even if all the threshold criteria are found to have been met, USCIS would examine the totality of the circumstances in the individual case to determine whether there are negative factors that make the grant of deferred action inappropriate or outweigh the positive factors presented by the threshold criteria or by any other evidence. Under the proposed rule, even if the adjudicator finds that an individual meets all the enumerated guidelines, the adjudicator has the discretion to deny deferred action after supervisory review and concurrence if, in the adjudicator's judgment, the case presents negative factors that make the grant of deferred action inappropriate or that outweigh the positive factors.

Although DHS could issue a policy from which individual adjudicators have no discretion to depart, and thus create something like a firm rule for adjudicators to apply,[272] DHS recognizes that (1) case-by-case assessment is a longstanding feature of deferred action policies; and (2) case-by-case assessments can yield important benefits in cases where the balance of the circumstances and relevant equities suggests a result that could not have been codified in an ex ante policy. Nonetheless, DHS recognizes that there could be costs associated with maintaining adjudicator discretion to deny a request notwithstanding

---

[263] Proposed 8 CFR 236.21(c)(1).

[264] 8 CFR 274a.12(c)(14).

[265] *See* Proposed 8 CFR 236.21(c)(1).

[266] *See* Napolitano Memorandum at 1.

[267] *Id.*

[268] *See* proposed 8 CFR 236.21(c) and 274a.12(c)(33).

[269] *See* 8 CFR 274a.12(c)(14); 8 CFR 1.3(a)(4)(vi).

[270] Proposed 8 CFR 236.22(a)(2).

[271] Proposed 8 CFR 236.22(c).

[272] *See, e.g., Lopez* v. *Davis,* 531 U.S. 230, 243–44 (2001) (observing that, "'even if a statutory scheme requires individualized determinations,' . . . 'the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority'" and that such categorical applications or rules help to order the exercise of discretion, avoiding "favoritism, disunity, and inconsistency" (quoting *Am. Hosp. Ass'n* v. *NLRB,* 499 U.S. 606, 612 (1991))); *Fook Hong Mak* v. *INS,* 435 F.2d 728, 730 (2d Cir. 1970) (holding that there is no legal principle "forbidding an [agency], vested with discretionary power, to determine," in a manner consistent with the APA, "that he will or will not use it in favor of a particular class on a case-by-case basis" and that the agency "could select one characteristic as entitling a group to favorable treatment despite minor variables"); *see also Reno* v. *Flores,* 507 U.S. 292, 313 (1993) (observing that although the Attorney General's discretion in making immigration custody determinations required "some level of individualized determination," the INS need not "forswear use of reasonable presumptions and generic rules"); *id.* at 313–14 ("In the case of each detained alien juvenile, the INS makes those determinations that are specific to the individual and necessary to accurate application of the regulation," which established a "blanket" presumption against release to custodians other than parents, close relatives, and guardians, and "[t]he particularization and individuation need go no further . . . .").

satisfaction of the eligibility guidelines in the proposed rule. DHS believes that its proposed approach maintains the right mix of guidelines and discretion, but it welcomes comments on that approach.[273]

In this section of the proposed rule, as well as in 8 CFR 236.23 (which is discussed below), DHS has chosen generally to adhere to the threshold criteria for eligibility for DACA from the Napolitano Memorandum and as applied by DHS since 2012. DHS proposes to retain the threshold criteria of the DACA policy in part for reasons previously discussed and in part due to recognition of the significant reliance interests of individuals who have previously received DACA grants, as well as those similarly situated who have not yet requested DACA. This focus on reliance interests and preservation of the primary features of the policy is consistent with the President's direction to preserve and fortify DACA, as well as the Supreme Court's decision in *Regents,* as described above. This approach also is informed by DHS's assessment that the policy contained in the Napolitano Memorandum successfully advances DHS's important enforcement mission and reflects the practical realities of a defined class of undocumented noncitizens who are for strong policy reasons unlikely to be removed in the near future and who contribute meaningfully to their families, their communities, their employers, and the United States generally, as discussed elsewhere in this proposed rule. Moreover, the establishment and continued application of threshold discretionary criteria, while allowing for the residual exercise of discretion to account for other relevant considerations, serves to promote consistency and avoid arbitrariness in these determinations.

DHS believes that the proposed rule is drafted at an appropriate level of specificity, but it anticipates the need for further guidance, along the lines of the current DACA FAQs, to interpret the regulations and guide adjudicators in the exercise of their duties. DHS welcomes comment on whether other aspects of the DACA FAQs should be codified in the final rule.

### 1. Threshold Criteria and Burden of Proof

As proposed in this rule, and subject to the discretionary considerations described below, USCIS would consider requests for DACA from individuals who meet the following threshold criteria:

• Came to the United States before reaching their 16th birthday;

• Have continuously resided in the United States since June 15, 2007, to the time of filing of the request;

• Were physically present in the United States on June 15, 2012, and at the time of making their request for consideration of deferred action with USCIS;

• Had no lawful immigration status on June 15, 2012, as well as at the time of filing of the request for DACA;

• Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a GED certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

• Have not been convicted of a felony, a misdemeanor described in the rule, or three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety; and

• Were born on or after June 16, 1981, and are at least 15 years of age at the time of filing their request, unless, at the time of filing their request, they are in removal proceedings, have a final order of removal, or have a voluntary departure order.

The burden would be on the DACA requestor to demonstrate that they meet the threshold criteria by a preponderance of the evidence.[274] Under the preponderance of the evidence standard, the sufficiency of each piece of evidence would be examined for relevance, probative value, and credibility, both individually and within the context of the totality of the evidence, to determine whether the fact to be proven is probably true.[275]

Consistent with current practice, DHS would accept either primary or secondary evidence to determine whether the DACA requestor meets the threshold criteria. As used in the proposed rule, primary evidence would mean documentation, such as a birth certificate, that, on its face, proves a fact. Secondary evidence would mean other documentation that is more circumstantial and could lead the reviewer to conclude that it is more likely than not that the fact sought to be proven is true. Examples of secondary evidence include baptismal records issued by a church showing that the DACA requestor was born at a certain time or rental agreements in the name of the DACA requestor's parents to demonstrate periods of residence in the United States. Secondary evidence may require corroboration with other evidence submitted by the requestor.

DHS would evaluate the totality of all the evidence to determine if the other threshold criteria have been met. Consistent with practice under the Napolitano Memorandum, affidavits submitted in lieu of primary or secondary evidence would generally not be sufficient on their own to demonstrate that a requestor meets the DACA threshold criteria, except in certain circumstances as discussed in this proposed rule.

### 2. Arrival in the United States Under the Age of 16

Under proposed 8 CFR 236.22(b)(1), a noncitizen requesting DACA would be required to demonstrate that they arrived in the United States when they were under 16 years of age. This is a codification of the requirement in the Napolitano Memorandum that the noncitizen "came to the United States under the age of sixteen."[276] Retaining this threshold requirement is also reflective of DHS's desire to limit DACA to those individuals who came to the United States as children and, as a result, present special considerations that may merit assigning lower priority for removal action due to humanitarian and other reasons, as described elsewhere in this proposed rule.

### 3. Continuous Residence in the United States From June 15, 2007

A DACA requestor would be required to demonstrate that they have continuously resided in the United States since at least June 15, 2007.[277] This criterion is taken directly from the Napolitano Memorandum, such that the population of potentially eligible

---

[273] DHS notes that historically, DACA requests have been approved at a relatively high rate. *See* USCIS, DACA Quarterly Report (FY 2021, Q1). DHS believes this is likely because DACA requestors generally have self-selected based on their belief that they qualify based on the Napolitano Memorandum criteria and public-facing guidance. *See Texas* v. *United States,* 809 F.3d 134, 174 (5th Cir. 2015) (*Texas I*). Accurate self-selection has advantages for requestors, who may wish to pay a fee only if they are relatively certain that they will obtain deferred action, and DHS believes it likely that a similar approval rate would continue under the proposed rule, although it is possible that the rate will decline if more noncitizens with borderline cases choose to apply for DACA once Form I–765 (and accompanying filing fee) is not also required. In either case, DHS does not believe that a relatively high approval rate raises legal or policy concerns, because the proposed rule would continue to provide clear guidance to potential requestors while maintaining DHS's ability to deny those requests that do not meet the enumerated criteria or that otherwise do not merit a favorable exercise of prosecutorial discretion.

[274] *See* proposed 8 CFR 236.22(a)(3).

[275] *Matter of Chawathe,* 25 I&N Dec. 369, 376 (AAO 2010).

[276] Napolitano Memorandum at 1.

[277] Proposed 8 CFR 236.22(b)(2).

**D. App. 182**

noncitizens would remain substantially the same under the proposed rule. Applying this same continuous residence criterion in the codified DACA policy is in line with DHS's longstanding message that DACA is not available to individuals who have not continuously resided in the United States since at least June 15, 2007. Border security is a high priority for the Department, and we do not believe that codifying the DACA policy, with the continuous residence requirement included, would undermine DHS's enforcement messaging.

To provide further clarity on the meaning of this requirement, DHS proposes to define "residence" for the purpose of 8 CFR 236.22(b)(2) to mean "the principal, actual dwelling place in fact, without regard to intent," which aligns with the INA definition of "residence" at section 101(a)(33), 8 U.S.C. 1101(a)(33). The proposed regulatory text also explains that the term "residence" is "specifically [the] country of actual dwelling place." [278]

As has been longstanding DHS policy generally, any brief, casual, and innocent absences from the United States prior to August 15, 2012, would not result in a break of continuous residence for the purpose of this requirement.[279] Any travel outside of the United States on or after August 15, 2012, without prior DHS authorization, such as advance parole, would be considered an interruption in continuous residence.[280] Section 236.22 delineates the circumstances under which absences prior to August 15, 2012, would be considered brief, casual, and innocent. An absence would be considered brief, casual, and innocent if:

• The absence was short and reasonably calculated to accomplish the purpose for the absence;

• the absence was not because of a post-June 15, 2007 order of exclusion, deportation, or removal;

• the absence was not because of a post-June 15, 2007 order of voluntary departure, or an administrative grant of voluntary departure before the requestor was placed in exclusion, deportation, or removal proceedings; and

• the purpose of the trip, and the requestor's actions while outside the United States, were not contrary to law.[281]

This definition of continuous residence is rooted in case law and has been codified in other contexts, such as

TPS and the Legal Immigration Family Equity Act legalization provisions.[282] As discussed, affidavits in lieu of primary or secondary evidence would generally not be sufficient on their own to demonstrate that a requestor meets the DACA threshold criteria. However, affidavits may be used to support evidence that the requestor meets the continuous residence requirement if there is a gap in documentation for the requisite periods and primary and secondary evidence is not available. DHS requests comments on whether affidavits should be considered acceptable evidence of the start of the continuous residence period for new initial requestors for DACA who may have been very young at the time of entry to the United States and may have difficulty obtaining primary or secondary evidence to establish this threshold requirement.

### 4. Physical Presence in the United States

For the same reasons described in the section on continuous presence immediately above, this proposed rule would codify the requirement from the Napolitano Memorandum and longstanding DACA policy that the requestor must demonstrate that they were physically present in the United States on June 15, 2012, which is the date of the issuance of the Napolitano Memorandum, as well as on the date of filing the DACA request.[283] As with the other guidelines, DHS would generally not accept affidavits alone as proof of satisfying the physical presence requirement.

### 5. Lack of Lawful Immigration Status

As discussed above, the proposed rule is intended to codify the DACA policy without significantly changing the potentially eligible population. It is longstanding DHS policy that to be considered for DACA, the requestor must demonstrate that they were not in a lawful immigration status on June 15, 2012.[284] This explicit guideline was not in the Napolitano Memorandum issued on June 15, 2012, but it is implicit in the memorandum's reference to children and young adults who are subject to removal because they lack lawful immigration status. This requirement is consistent with the underlying purpose of the policy, inasmuch as it limits the availability of the program to those individuals who were subject to removal at the time the memorandum was issued. Individuals also must be

without lawful immigration status at the time of the request for DACA in order to be eligible for deferred action from removal.

DHS is proposing to codify this guideline by requiring that the requestor must not have been in a lawful immigration status on June 15, 2012, as well as at the time of filing of the request for deferred action under this section. If the requestor was in lawful immigration status at any time before June 15, 2012, or at any time after June 15, 2012, and before the date of the request, they would be required to submit evidence that that lawful status had expired prior to those dates.[285] For purposes of this proposed rule, the requirement regarding lack of lawful immigration status would mean either that the requestor never had a lawful immigration status, or that any lawful immigration status that they obtained prior to June 15, 2012, had expired before June 15, 2012, and likewise any lawful immigration status acquired after June 15, 2012, must have expired before the date of filing the request for DACA. If the requestor was admitted for duration of status, USCIS would not consider the requestor to be a person who is not in lawful immigration status for purposes of eligibility for DACA, unless the Department of Justice, Executive Office for Immigration Review (EOIR), terminated their status by issuing a final order of removal against them or their status is listed as "terminated" in the Student and Exchange Visitor Information System on or before June 15, 2012. Requestors who were admitted for duration of status as dependent nonimmigrants who aged out of their nonimmigrant status on or before June 15, 2012, could be considered for deferred action under the proposed rule.

### 6. Education

In accordance with longstanding DHS policy and the Napolitano Memorandum, DHS is proposing to codify the guideline that a DACA requestor must be currently enrolled in school, have graduated or received a certificate of completion from high school, have obtained a GED, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.[286] This guideline is reflective of DHS's recognition of the importance of education and military service, as well as of the significant contributions to this country of noncitizen youth who have been educated in and/or served in the Coast

---

[278] *See* proposed 8 CFR 236.22(b)(2).

[279] *See* DACA FAQs.

[280] Proposed 8 CFR 236.22(b)(2).

[281] Proposed 8 CFR 236.22(b)(2)(i) through (iv).

[282] *See* 8 CFR 244.9(a)(2) and 245a.16(b).

[283] Proposed 8 CFR 236.22(b)(3).

[284] DACA FAQs.

[285] Proposed 8 CFR 236.22(b)(4).

[286] Proposed 8 CFR 236.22(b)(5).

Guard or Armed Forces of the United States.

To be considered currently enrolled in school, under longstanding DHS policy, as of the date of the request, the DACA requestor must be enrolled in:

• A public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or homeschool program that meets State requirements;

• an education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English, or is designed to lead to placement in postsecondary education, job training, or employment and where the requestor is working toward such placement; or

• an education program assisting students either in obtaining a regular high school diploma or its recognized equivalent under State law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other State-authorized exam (*e.g.*, HiSet or TASC) in the United States.[287]

Such education, literacy, or career training programs (including vocational training), or education programs assisting students in obtaining a regular high school diploma or its recognized equivalent under State law, or in passing a GED exam or other State-authorized exam in the United States, include programs funded, in whole or in part, by Federal, State, county, or municipal grants, or administered by non-profit organizations. Under longstanding policy, which DHS currently intends to maintain (but could revise to the extent consistent with law at a future date), programs funded by other sources would qualify if they are programs of demonstrated effectiveness.[288] DHS does not consider enrollment in a personal enrichment class (such as arts and crafts) or a recreational class (such as canoeing) to be an alternative educational program. Therefore, enrollment in such a program would not be considered to meet the "currently enrolled in school" guideline for purposes of this proposed rule.

As noted above, DHS proposes to codify the longstanding policy that a DACA requestor also can meet the educational guideline if they have graduated from high school or received a GED.[289] To meet this component of the educational guideline, consistent with longstanding policy, the DACA

requestor would need to show that they have graduated or obtained a certificate of completion from a U.S. high school or have received a recognized equivalent of a high school diploma under State law; have passed a GED test or other equivalent State-authorized exam in the United States; or have graduated from a public or private college, university, or community college.[290]

As proposed, and consistent with longstanding policy, in lieu of being currently enrolled in school, having graduated from high school, or having received a GED, a DACA requestor may be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.[291] This may include reservists who were honorably discharged. Current or ongoing service in the Coast Guard or Armed Forces of the United States would not qualify under this component of the guideline.

### 7. Criminal History/Public Safety

Under the proposed rule, and consistent with longstanding policy, in order to be eligible for DACA, the requestor must not have been convicted of a felony, a misdemeanor described in § 236.22(b)(6) of the proposed rule,[292] or three or more other misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or otherwise pose a threat to national security or public safety.[293] DHS currently uses the following definitions for each type of offense, and it would continue to rely on such definitions under the proposed rule as they have been effective at ensuring that those individuals who are a high priority for removal are not eligible for DACA while allowing for an individualized, case-by-case determination about whether to grant deferred action to each requestor:

• A "felony" is a Federal, State, or local criminal offense punishable by imprisonment for a term exceeding 1 year;

• a "misdemeanor" is a Federal, State, or local criminal offense for which the maximum term of

imprisonment authorized is 1 year or less but greater than 5 days; and

• a misdemeanor described in § 236.22(b)(6) of this proposed rule refers to a misdemeanor that is an offense of domestic violence, sexual abuse or exploitation, burglary, unlawful possession or use of a firearm, drug distribution or trafficking, or driving under the influence; or is one for which the individual was sentenced to time to be served in custody of more than 90 days.

The time to be served in custody does not include any time served beyond the sentence for the criminal offense based on a State or local law enforcement agency honoring a detainer issued by ICE. Immigration-related offenses characterized as felonies or misdemeanors under State laws would not be treated as disqualifying crimes for the purpose of considering a request for consideration of deferred action pursuant to this process. Other offenses, such as foreign convictions and minor traffic offenses, would generally not be treated as a felony or misdemeanor, but they may be considered under a review of the totality of the circumstances. Under current policy, cases involving foreign convictions should be elevated for supervisory review. DHS does not currently anticipate changing this practice. DHS welcomes comments on whether a more detailed definition of these offenses, including "minor traffic offenses," should be added to the rule (and if so, how the offenses should be defined) or whether the matter remains appropriate for subregulatory guidance.

If the evidence establishes that an individual has been convicted of a felony, a misdemeanor described in § 236.22(b)(6) of the proposed rule, or three or more other misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, USCIS would deny the request for deferred action. As discussed throughout this rule, the decision whether to defer action in a particular case is an individualized one, and thus would take into account the totality of the circumstances, including the nature and severity of the underlying criminal, national security, or public safety concerns. USCIS would retain the discretion to determine that an individual does not warrant deferred action on the basis of, for instance, a single criminal offense for which the individual was sentenced to time in custody of 90 days or less, or an arrest for an extremely serious crime where criminal proceedings are ongoing. Additionally, to the extent that the DACA guidelines may not align with other current or future DHS enforcement

---

[287] DACA FAQs.

[288] *Id.*

[289] Proposed 8 CFR 236.22(b)(5).

[290] USCIS considers graduation from a public or private college, university, or community college as sufficient proof of meeting the educational guideline because a college or university generally would require a high school diploma, GED certificate, or equivalent for enrollment.

[291] Proposed 8 CFR 236.22(b)(5).

[292] Under the Napolitano Memorandum, this concept is described as a "significant misdemeanor." Because some stakeholders have expressed confusion regarding this term, DHS proposes to revise this terminology as part of the rulemaking. The substantive policy would remain the same.

[293] Proposed 8 CFR 236.22(b)(6); DACA FAQs.

discretion guidance, USCIS may consider that guidance when determining whether to deny or terminate DACA even where the DACA guidelines are met. Therefore, the absence or presence of a criminal history would not necessarily be determinative, but it would be a factor to be considered.

### 8. Age at Time of Request

To simplify the guideline from the Napolitano Memorandum and longstanding DHS policy that the requestor must have been under the age of 31 on June 15, 2012, DHS is clarifying that the requestor must have been born on or after June 16, 1981.[294] DHS also proposes to incorporate the longstanding guideline that a DACA requestor must be over the age of 15 at the time of filing the request, unless they are in removal proceedings, have a final removal order, or have a voluntary departure order.[295] As noted above, these proposed provisions are in line with the Department's goal of preserving and fortifying the DACA policy as it currently exists.

### D. Section 236.23—Procedures for Request, Terminations, and Restrictions on Information Use

#### 1. USCIS Jurisdiction

Consistent with longstanding policy, proposed § 236.23 would provide that USCIS has exclusive jurisdiction over requests for DACA for non-detained individuals.[296] Individuals who are in immigration detention may request DACA but may not be approved for DACA unless they are released from detention by ICE prior to USCIS' decision on the DACA request.[297] A noncitizen in removal proceedings would be allowed to apply for deferred action regardless of whether those proceedings have been administratively closed. And a voluntary departure order or a final order of exclusion, deportation, or removal would not bar a noncitizen from requesting DACA under this subpart.[298]

USCIS would notify the requestor, and if applicable, the requestor's attorney of record or accredited representative, of the decision to approve or deny the request for DACA in writing.[299] Continuing with current practice, this rule proposes that a grant

of DACA generally will be provided for an initial period of 2 years.[300] Consistent with longstanding policy and given the nature of deferred action as an exercise of prosecutorial discretion and not a benefit, USCIS is not proposing any new requirements to issue a request for evidence or a notice of intent to deny if the requestor does not meet the eligibility guidelines or if USCIS denies the request as a matter of discretion.[301] Nor would USCIS be required to indicate the reasons for the denial, provide for the right to file an administrative appeal, or allow for the filing of a motion to reopen or motion to reconsider.[302] USCIS would be permitted to reopen or reconsider either an approval or a denial of such a request on its own initiative, however, and in addition a denied requestor would be allowed to submit another DACA request on the required form and with the requisite fees or apply for any form of relief or protection under the immigration laws.[303]

#### 2. Issuance of a Notice To Appear or Referral to ICE

USCIS' policy for issuance of an NTA or RTI for denied DACA requests has remained unchanged since the inception of DACA in 2012, and DHS proposes to retain the essential elements of that policy in this rule.[304] USCIS would not issue an NTA or RTI for possible enforcement action against a DACA requestor as part of a denial unless the requestor meets DHS's criteria for enforcement action as proposed in this rule.[305] Current DHS policy for DACA as described under the DACA FAQs provides that if a requestor's case is denied, they will not be referred to ICE for purposes of removal proceedings unless their case involves a criminal offense, fraud, a threat to national security or public safety, or where DHS determines there are exceptional circumstances.[306] In this proposed rule, DHS intends to provide additional clarity for when an individual whose case has been denied would be referred to ICE or issued an NTA and has identified based on current practice the three general categories of cases that are prioritized as subject to immigration enforcement. Pursuant to these guidelines, USCIS would issue an NTA or RTI for possible enforcement action against a DACA

requestor under this proposed rule if the case involves a denial for fraud, a threat to national security, or public safety concerns.[307] This approach to enforcement is consistent with interim DHS guidelines to "implement civil immigration enforcement based on sensible priorities," which include "protecting national security, border security, and public safety."[308] The appropriate charges on the Form I–862, Notice to Appear, will be determined on a case-by-case basis, and DHS may charge an individual who falls under any of these immigration enforcement priorities with grounds for removal that are unrelated to the underlying fraud, criminality, national security, or public safety factors.

#### 3. Termination of Deferred Action

The decision on whether to grant a request for DACA is determined on a case-by-case basis as an exercise of the agency's prosecutorial discretion. Accordingly, DHS maintains its position that USCIS also may terminate a grant of DACA at any time if it determines that the recipient did not meet the threshold criteria; there are criminal, national security, or public safety issues; or there are other adverse factors resulting in a determination that continuing to exercise prosecutorial discretion is no longer warranted. Despite its broad prosecutorial discretion to terminate DACA, USCIS generally has provided a NOIT with an opportunity for the DACA recipient to respond before USCIS makes its final decision on termination. However, subject to the Federal district court's 2018 nationwide preliminary injunction in *Inland Empire*,[309] USCIS does exercise its discretion to terminate DACA immediately upon issuance of a Termination Notice in cases involving certain criminal, national security, or public safety concerns. For example, USCIS may issue a Termination Notice where there is a criminal charge based on an EPS offense described in the USCIS 2011 NTA policy memorandum.[310] In addition and except

---

294 Proposed 8 CFR 236.22(b)(7).
295 Proposed 8 CFR 236.22(b)(7).
296 Proposed 8 CFR 236.23(a)(2).
297 *Id.; see also* ICE, "Deferred Action for Childhood Arrivals (DACA) and Deferred Action for Parents of Lawful Permanent Residents (DAPA)," *https://www.ice.gov/daca.*
298 Proposed 8 CFR 236.23(a)(2).
299 Proposed 8 CFR 236.23(c).

300 Proposed 8 CFR 236.23(a)(4).
301 *See* Proposed 8 CFR 236.23(a)(3).
302 *See* Proposed 8 CFR 236.21(b).
303 *See* Proposed 8 CFR 236.22(d) and 236.23(c).
304 *See* DACA FAQs.
305 *See* Proposed 8 CFR 236.23(c)(2).
306 *See* DACA FAQs.

307 Proposed 8 CFR 236.23(c)(2).
308 *See* Pekoske Memorandum. Previous guidelines pertaining to enforcement and removal policies similarly have identified "national security, public security, and border security" as the Department's top priorities. *See* Memorandum from Secretary Jeh Charles Johnson to Acting Director of ICE, et al., *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* (Nov. 20, 2014).
309 For a full description of the *Inland Empire* litigation, including the preliminary injunction, *see* discussion of litigation history at Section III.B of this preamble.
310 Available at *https://www.uscis.gov/sites/default/files/document/memos/*

Continued

with regard to class members in *Inland Empire*, DACA terminates automatically upon the issuance of an NTA to a DACA recipient, although USCIS sends the individual a notice of action (NOA) informing the recipient that automatic termination has occurred as of the date of the NTA issuance. DACA also automatically terminates and an NOA is issued when the recipient departs the United States without having obtained an advance parole document from USCIS.[311]

Although the *Inland Empire* injunction currently prohibits USCIS from terminating a class member's DACA without issuance of a NOIT, a reasoned explanation, or an opportunity to respond prior to termination, or terminating DACA at all based on an NTA that charges the individual solely as being present without inspection and admission or being an overstay, it is significant that the court granted the parties' agreement to carve out from class membership individuals who: (1) Have a criminal conviction that is disqualifying for DACA; (2) have a charge for a crime that falls within the EPS grounds referenced in the USCIS 2011 NTA policy memorandum;[312] (3) have a pending charge for certain terrorism and security crimes described in 8 U.S.C. 1182(a)(3)(B)(iii) and (iv) or 8 U.S.C. 1227(a)(4)(A)(i); (4) departed the United States without advance parole; (5) were physically removed from the United States pursuant to an order of removal, voluntary departure order, or voluntary return agreement; or (6) maintain a nonimmigrant or immigrant status. In excluding these individuals from the *Inland Empire* class, the court effectively recognized USCIS' prosecutorial discretion to terminate DACA, with or without notice, including the automatic termination of DACA when an NTA is issued to a non-class member or when any DACA recipient departs the United States without advance parole.

Although DHS disagrees with the *Inland Empire* court's preliminary injunction and DHS's appeal of the order remains pending, DHS will continue to comply fully with the court's order, as it has for more than 3

years, unless and until that order is no longer in effect. Subject to such continued compliance if necessary when this rule becomes final, DHS currently proposes to codify USCIS' prosecutorial discretion to terminate a grant of DACA at any time, with or without the issuance of a NOIT.[313] This provision would allow for terminations under this paragraph in circumstances where the DACA recipient does not meet the threshold criteria proposed in this rule, the recipient committed disqualifying criminal offenses or presents national security or public safety concerns, or other adverse factors result in a determination that continuing to exercise prosecutorial discretion is no longer warranted. Although the provision permits the termination of DACA without a NOIT, USCIS intends to maintain its longstanding practice of generally providing a NOIT where appropriate.

Non-automatic terminations of a grant of DACA, regardless of whether a NOIT is issued, would be made on a case-by-case basis pursuant to an assessment of the totality of the circumstances, including any documentary evidence. The proposed rule also would codify two bases for automatic termination: (1) Filing of an NTA for removal proceedings with EOIR, unless the NTA is issued by USCIS solely as part of an asylum referral to EOIR; or (2) departure of the DACA recipient from the United States without an advance parole document.[314] Although the proposed grounds for automatic termination are consistent with longstanding policy, DHS is proposing to modify when termination will occur based upon an NTA by shifting from the current policy of termination at the time of issuance of an NTA to termination at the time the NTA is filed with EOIR, marking the commencement of proceedings before an immigration judge.[315] DHS proposes this change to avoid termination in instances where NTAs are issued but later canceled prior to filing with EOIR. In addition, DHS is proposing to create a new exception to termination based upon an NTA where USCIS files an NTA with EOIR solely as part of an asylum referral. This exception would preserve DACA for those whose asylum cases are referred to the immigration court by the USCIS Asylum Division. Without such an exception, a DACA recipient either must lose DACA with the filing of the NTA referring the case to the immigration court, or keep DACA but forgo the opportunity to continue

seeking asylum as a principal applicant or as a dependent on a parent or spouse's claim in immigration court (as allowed by existing DHS and DOJ regulations).[316] DHS has determined that, in the balancing of the equities and for humanitarian reasons, DACA will not terminate automatically for reasons based solely on the filing of an NTA for purposes of referring an asylum case to EOIR. However, DHS continues to reserve its prosecutorial discretion to terminate the individual's DACA, as appropriate, for other reasons permitted by the rule.

Under proposed 8 CFR 236.23(d)(3), termination of a grant of DACA also would result in the automatic termination of any employment authorization granted under proposed 8 CFR 274a.12(c)(33) and any related employment authorization documentation as of the date DACA is terminated, as it would not be reasonable for employment authorization based on a grant of DACA to continue where the DACA has been affirmatively terminated by DHS. The individual retains the ability to seek employment authorization under any other ground applicable to the individual's particular circumstances in 8 CFR 274a.12.

DHS also is considering other alternatives for this termination of DACA section of the proposed rule, on which DHS welcomes comment. One alternative would be to modify the provision regarding automatic termination of DACA solely based on the filing of an NTA so that such termination would be applicable only to certain categories of DACA recipients, such as individuals who are subject to an investigation regarding, have been arrested for, or have a conviction for an EPS offense, and certain individuals who fall within the terrorism or national security related provisions of the INA grounds for inadmissibility or deportability. A second alternative would be to strike the provision regarding automatic termination of DACA solely based on the filing of an NTA or to modify it to make termination automatic at a later point in the process for some or all DACA recipients (*e.g.,* upon issuance of an administratively final order of removal).

A third alternative, which could be implemented separately or in conjunction with the first or second, would be to specify the instances in which USCIS generally will issue a NOIT, with opportunity for the DACA recipient to respond before USCIS makes its final decision on DACA

---

[311] *NTA%20PM%20%28Approved%20 as%20final%2011-7-11%29.pdf.* As discussed in the litigation history section of this rule and below, individuals with pending EPS charges are not class members covered by the *Inland Empire* preliminary injunction.

[311] Unlike cases where USCIS makes an affirmative decision to terminate DACA, these two instances of automatic DACA termination currently occur upon issuance of the NTA or departure without advance parole and do not require any USCIS decision to terminate.

[312] *See supra* note 128.

[313] Proposed 8 CFR 236.23(d).

[314] Proposed 8 CFR 236.23(d)(2).

[315] *See* 8 CFR 1003.14(a).

[316] *See* 8 CFR 208.14(c); 8 CFR 1208.14(c).

termination. Under this alternative, USCIS would continue to retain the discretionary authority to terminate DACA without a NOIT in cases involving criminal offenses or concerns regarding national security or public safety. Depending upon whether other alternative proposals described here are adopted, this alternative also could allow for automatic DACA termination where the recipient leaves the United States without advance parole or an NTA is filed in a case, generally or only in cases involving certain EPS, national security, or other public safety concerns.

Finally, DHS is considering an alternative related to automatic termination upon the DACA recipient's departure from the United States without an advance parole document. DHS is considering an alternative under which departure from the United States in certain exigent circumstances and without an advance parole document would not automatically result in termination, such as where the DACA recipient left the country temporarily in an emergency and did not have sufficient time to obtain an advance parole document.

In short, although termination on the provided grounds, including automatic termination, is a longstanding feature of DACA and serves important policy interests, DHS recognizes that there may be potentially beneficial alternatives in this area. DHS welcomes comment on each of the above alternatives, and other alternatives that would address the same issues.

### 4. Information Use

In order to mitigate a potential disincentive for noncitizens with no current lawful immigration status to file a request for DACA and make their presence known to the Government, DHS implemented an information use policy for DACA requests in 2012, which has not changed in any way since it was first announced in 2012 (including through previous attempts to rescind DACA) and remains in effect in its original form to this day. Under this longstanding policy, information provided by DACA requestors is collected and considered for the primary purpose of adjudicating their DACA requests and is safeguarded from use for certain immigration enforcement-related purposes. DHS policy as described in the DACA FAQs provides that information about the DACA requestor and their family members and guardians is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria set forth in the 2011 USCIS

NTA policy memorandum, but it notes that the information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense.[317] Additionally, the policy assures that individuals whose cases are deferred pursuant to DACA will not be referred to ICE.[318] DHS policy regarding information provided in DACA requests has not changed since the initiation of DACA. However, DHS proposes in this rule under 8 CFR 236.23(e) to codify longstanding policy and practice, while clarifying that the policy is better understood as a restriction on the use of information provided in DACA requests than as a policy governing information sharing.

Since the inception of DACA and long before the DACA policy was initiated, the three immigration components of DHS (USCIS, ICE, and CBP) have had shared access to a variety of DHS electronic systems of records, as well as the paper Alien File or "A-File," that contain information on noncitizens as they pass through the U.S. immigration process, so that each component can conduct its statutory functions properly within the overall DHS mission to administer and enforce U.S. immigration laws. For example, ICE and CBP officers with a "need to know" may query the systems on individual noncitizens they encounter to verify whether they are permitted to remain in or enter the United States and to ensure that the officers do not erroneously remove or take other enforcement action (*e.g.*, issuing an NTA for removal proceedings) against a person, such as a DACA recipient, who is so permitted.

Pursuant to the Privacy Act of 1974,[319] DHS regularly publishes System of Record Notices (SORNs) for immigration systems that provide the public with notice of each system's categories of individuals and categories of records, the purposes and legal authority for the collection of the information maintained in the system(s), and the potential use of the information described in "routine uses" for those systems that permit disclosure external to DHS. Information contained in DHS systems may be accessed by officers and employees of DHS "who have a need for the record in the

performance of their duties," either pursuant to the Privacy Act[320] or DHS privacy policy. The instructions for the Form I–821D, Consideration of Deferred Action for Childhood Arrivals, advise requestors that "[t]he information you provide on this form may be shared with other Federal, state, local, and foreign government agencies and authorized organizations following approved routine uses described in the associated published [SORNs]." In particular, the A-File/Central Index System SORN and the Benefits Information System SORN referenced therein describe what records are collected on and related to DACA requestors and recipients and how such records may be used by government officials in the immigration components of DHS as they perform their duties.[321] As such, ICE and CBP officers with a demonstrated "need to know" have always been able to access an individual's immigration-related information, including that contained in DACA requests, by querying DHS electronic systems on a case-by-case basis (for instance, by querying an individual's A-number or full name and date of birth).

Under the DACA information usage policy as set forth immediately below the description of "Routine Uses" in the instructions for Form I–821D, the "[i]nformation provided in this request is protected from disclosure to ICE and [CBP] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of [an NTA or RTI] under the criteria set forth in USCIS' 2011 [NTA] guidance (*www.uscis.gov/NTA*)." In conjunction with the described routine uses, DHS upholds this policy by (1) prohibiting the affirmative provision of information provided by DACA requestors to ICE or CBP for the purpose of immigration enforcement, unless the listed exception applies; and (2) prohibiting ICE and CBP's use of information provided in a DACA

---

[317] *See* DACA FAQs; Instructions for Consideration of Deferred Action for Childhood Arrivals, USCIS Form I–821D at 13 (Apr. 24, 2019).

[318] *See* DACA FAQs.

[319] 5 U.S.C. 552a.

[320] *See* 5 U.S.C. 552a(b)(1).

[321] *See* DHS/USCIS/ICE/CBP–001—Alien File, Index, and National File Tracking System of Records, 82 FR 43556 (Sept. 18 2017); DHS/USCIS–007—Benefits Information System, 84 FR 54622 (Oct. 10, 2019); *see also* DHS/USCIS/PIA–003(a) Integrated Digitization Document Management Program (Sept. 24, 2013), *https://www.dhs.gov/ sites/default/files/publications/privacy-pia-uscis-iddmp-09242013.pdf*; DHS/USCIS/PIA–016(a)— Computer Linked Application Information Management System and Associated Systems (Mar. 25, 2016), *https://www.dhs.gov/sites/default/files/ publications/privacy-pia-uscis-claims3appendixupdated-september2019.pdf*; DHS/ USCIS/PIA–056—USCIS Electronic Immigration System (May 17, 2016), *https://www.dhs.gov/sites/ default/files/publications/privacy-pia-uscis-elisappendixaupdate-may2018.pdf*.

request for the purpose of immigration enforcement, unless the listed exception applies. Additionally, DHS policy always has specified that if the information would be used for purposes other than removal, it could be shared with national security and law enforcement agencies, including ICE and CBP, and provided examples of such non-enforcement purposes, including for assistance in the consideration of a DACA request, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. But this policy does not limit (and has never limited) ICE or CBP's access to information indicating that an individual has DACA where ICE or CBP needs such information in order to ensure that it does not take inappropriate enforcement action against the individual.

DHS proposes to codify this policy that has governed the use of information provided by DACA requestors since the beginning of DACA.[322]

*E. Section 236.24—Severability*

Deferred action is at its core an act of forbearance from removal granted by DHS to noncitizens who are a low priority for enforcement action. According to statute, regulation, and longstanding practice, the Secretary also may, as an act of discretion, authorize employment for such individuals, enabling them to support themselves and their families while in the United States. During the period of deferred action, such individuals have no legal immigration status but are considered "lawfully present" for the specific purposes of 8 CFR 1.3(a)(4)(vi) and do not accrue "unlawful presence" for purposes of the inadmissibility grounds at INA sec. 212(a)(9). For the reasons described above, DHS believes that its authority to implement each of these three aspects or consequences of deferred action in the proposed regulation is well-supported in law and practice and should be upheld in any legal challenge. DHS also believes that its exercise of its authority reflects sound policy.

However, in the event that any portion of the proposed rule is declared invalid, DHS intends that the various aspects of lawful presence for DACA recipients be severable. For example, if a court were to find unlawful (1) the provision of employment authorization for DACA recipients, (2) the pause on accrual of unlawful presence for DACA recipients, or (3) the provision of lawful presence for these noncitizens under 8

CFR 1.3(a)(4)(iv), or some combination thereof, DHS still would intend the remaining features of the policy to stand. Likewise, DHS proposes that employment authorization for DACA recipients would be severable from lawful presence as well as forbearance from removal. DHS is including a provision in the proposed regulatory text to that effect.

DHS believes that a forbearance-only enforcement discretion policy is also viable, although not preferred for the reasons expressed above. While lawful presence and employment authorization are important to the DACA policy's overall success for DHS, as well as to DACA recipients and their communities, DHS believes that any DACA rule should not be struck down in its entirety so long as the forbearance policy is found lawful.[323] As the Supreme Court noted in *Regents,* forbearance is the DACA policy's "defining feature," offering DACA recipients an important measure of assurance, one that is important in itself. Neither employment authorization nor lawful presence is categorically required for the forbearance portion of the proposed rule to serve a meaningful purpose.[324] Even without the proposed rule or a DACA policy, individuals who meet the DACA guidelines are unlikely to be high enforcement priorities, although as discussed elsewhere DHS believes that there are significant benefits to both the Department and DACA recipients to codifying the policy choices behind that low-priority status and accompanying forbearance and providing a process for such individuals to affirmatively come forward to provide the Government with necessary information to complete background checks and otherwise conduct necessary vetting.

DHS believes that it is in the interests of both DACA recipients and the nation as a whole for the noncitizens granted deferred action under the proposed rule to be able to work lawfully and be treated as lawfully present (in the narrow sense explained here) during the period of deferred action. Employment authorization in particular allows DACA recipients to contribute more fully to their communities while supporting themselves and their families, many of

whom are U.S. citizens. But a forbearance-only rule still would have significant advantages and be worthwhile in itself, in that it would allow DACA recipients to have a measure of assurance that they are indeed low priorities for enforcement and are unlikely to be removed while enforcement action is deferred. This alone could justify the continued implementation of the policy. Likewise, so long as the forbearance aspect of the policy is in effect, employment authorization without lawful presence, or lawful presence without employment authorization, would be justified on both legal and policy grounds and could be implemented effectively by the Department.[325]

*F. Section 236.25—No Private Rights*

Consistent with the rule's purpose as an exercise of the Secretary's enforcement discretion, DHS proposes to include a section specifically providing that this rule is not intended to and does not supplant or limit otherwise lawful activities of DHS or the Secretary, and is not intended to and does not create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal.[326] The proposed inclusion of a disclaimer is consistent with other DHS regulations governing immigration enforcement [327] and provides appropriate notice to the public of the intended effect of these regulations.

## V. Statutory and Regulatory Requirements

*A. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)*

Executive Order (E.O.) 12866 and E.O. 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, to the extent permitted by law, to proceed only if the benefits justify the costs. They also direct agencies to select regulatory approaches that maximize net benefits while giving consideration, to the extent appropriate and consistent with law, to values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts. In particular, E.O. 13563 emphasizes the importance of not only quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility, but also considering equity, fairness, distributive impacts, and

---

[322] *See* proposed 8 CFR 236.23(e).

[323] *See Alaska Airlines, Inc.* v. *Brock,* 480 U.S. 678, 683 (1987) ("Unless (1) it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part [of a statute] may be dropped if [2] what is left is fully operative as a law."); *K-Mart Corp.* v. *Cartier,* 486 U.S. 281 (1988) (applying similar test to regulatory severability provision).

[324] 140 S. Ct. at 1911.

[325] *See* Section IV.A above for a discussion of fees.

[326] Proposed 8 CFR 236.25.

[327] *See* 8 CFR 287.12.

human dignity. The latter values are highly and particularly relevant here.

This proposed rule is designated a "significant regulatory action" that is economically significant since it is estimated the proposed rule would have an annual effect on the economy of $100 million or more, under section 3(f)(1) of E.O. 12866. Accordingly, OMB has reviewed this proposed regulation.* * *

1. Summary of Major Provisions of the Regulatory Action

This proposed rule would preserve and fortify DHS's DACA policy for the issuance of deferred action to certain young people who were brought to the United States many years earlier as children, who have no current lawful immigration status, and who are generally low enforcement priorities. The proposed rule would codify the following provisions of the DACA policy from the Napolitano Memorandum and longstanding USCIS practice:

• *Deferred Action.* The proposed rule would codify the definition of deferred action as a temporary forbearance from removal that does not confer any right or entitlement to remain in or re-enter the United States, and that does not prevent DHS from initiating any criminal or other enforcement action against the DACA requestor at any time.

• *Threshold Criteria.* The proposed rule would codify the following longstanding threshold criteria: That the requestor must have: (1) Come to the United States under the age of 16; (2) continuously resided in the United States from June 15, 2007, to the time of filing of the request; (3) been physically present in the United States on both June 15, 2012, and at the time of filing of the DACA request; (4) not been in a lawful immigration status on June 15, 2012, as well as at the time of request; (5) graduated or obtained a certificate of completion from high school, obtained a GED certificate, currently be enrolled in school, or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (6) not been convicted of a felony, a misdemeanor described in § 236.22(b)(6) of the proposed rule, or three or more other misdemeanors not

occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or otherwise pose a threat to national security or public safety; and (7) been born on or after June 16, 1981, and be at least 15 years of age at the time of filing, unless the requestor is in removal proceedings, has a final order of removal, or a voluntary departure order. The proposed rule also would codify that deferred action under DACA may be granted only if USCIS determines in its discretion that the requestor meets the threshold criteria and merits a favorable exercise of discretion.

• *Procedures for Request, Terminations, and Restrictions on Information Use.* The proposed rule would codify the procedures for denial of a request for DACA or termination of a grant of DACA, the circumstances that would result in the issuance of an NTA or RTI, and the restrictions on use of information contained in a DACA request for the purpose of initiating immigration enforcement proceedings.

In addition to proposing the retention of longstanding DACA policy and procedure, the proposed rule includes the following changes:

• *Filing Requirements.* The proposed rule would modify the existing filing process and fees for DACA by making the request for employment authorization on Form I–765, Application for Employment Authorization, optional and charging a fee of $85 for Form I–821D, Consideration of Deferred Action for Childhood Arrivals. DHS would maintain the current total cost to DACA requestors who also file Form I–765 of $495 ($85 for Form I–821D plus $410 for Form I–765).

• *Employment Authorization.* The proposed rule would codify DACA-related employment authorization for deferred action recipients in a new paragraph designated at 8 CFR 274a.12(c)(33). The new paragraph would not constitute any substantive change in current policy: It would continue to specify that the noncitizen must have been granted deferred action and must establish economic need to be eligible for employment authorization.

• *Automatic Termination of Employment Authorization.* The

proposed rule would automatically terminate employment authorization granted under 8 CFR 274.12(c)(33) upon termination of a grant of DACA.

• "*Lawful Presence.*" Additionally, the proposed rule reiterates USCIS' longstanding codification in 8 CFR 1.3(a)(4)(vi) of agency policy that a noncitizen who has been granted deferred action is considered "lawfully present"—a term that does not confer authority to remain in the United States—for the discrete purpose of authorizing the receipt of certain benefits under that regulation. The proposed rule also would reiterate longstanding policy that a noncitizen who has been granted deferred action does not accrue "unlawful presence" for purposes of INA sec. 212(a)(9).

2. Summary of Costs and Benefits of the Proposed Rule

The proposed rule would result in new costs, benefits, and transfers. To provide a full understanding of the impacts of DACA, DHS considers the potential impacts of this proposed rule relative to two baselines. The No Action Baseline represents a state of the world under the DACA program; that is, the program initiated by the guidance in the Napolitano Memorandum in 2012 and prior to the July 16, 2021 district court decision. For reasons explained in Section V.A.4.a.(1) below, this baseline does not directly account for the July 16, 2021 district court decision. The second baseline is the Pre-Guidance Baseline, which represents a state of the world before the issuance of the Napolitano Memorandum (*i.e.*, a state of the world where the DACA program does not exist and has never existed). If the goal is to understand the consequences of the DACA program, the Pre-Guidance Baseline is the more useful point of reference.

Table 3 provides a detailed summary of the proposed provisions and their potential impacts relative to the No Action Baseline. Additionally, Table 4 provides a detailed summary of the proposed provisions and their potential impacts relative to the Pre-Guidance Baseline.

**BILLING CODE 9111–97–P**

**Table 3. Summary of Major Changes to Provisions and Estimated Impacts of the Proposed Rule, FY 2021—FY 2031 (Relative to the No Action Baseline)**

| Proposed Provision | Description of Proposed Provision | Estimated Impact of Proposed Provision |
|---|---|---|
| Amending 8 CFR 106.2(a)(38). Fees. | The fee for Form I-821D, Consideration of Deferred Action for Childhood Arrivals, will change from $0 to $85. | **Quantitative:**<br><br>Cost Savings<br><br>Part of the DACA requestor population might choose only to request deferred action through Form I-821D, thus forgoing the cost of applying for an EAD through Form I-765: |
| Amending 8 CFR 236.21(c)(2). Applicability. | DACA recipients who can demonstrate an economic need may apply to USCIS for employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33). | • Annual undiscounted cost savings for no longer filing the Form I-765 for employment authorization could range from $0 to $43.9 million, depending on how many individuals choose this option. |
| Amending 8 CFR 236.23(a)(1). Procedures for request. | If a request for DACA does not include a request for employment authorization, employment authorization still may be requested subsequent to approval, but not for a period of time to exceed the grant of deferred action. | • Total cost savings over a 11-year period could range from:<br>  ○ $0 to $483.6 million for undiscounted cost savings;<br>  ○ $0 to $422.2 million at a 3-percent discount rate; and<br>  ○ $0 to $359.0 million at a 7-percent discount rate. |
| Adding 8 CFR 236.24(b). Severability. | The provisions in § 236.21(c)(2) through (4) are intended to be severable from each other. The period of forbearance, employment authorization, and lawful presence are all severable under this provision. | Transfer Payments<br><br>Part of the DACA requestor population may choose only to request deferred action through Form I-821D. This would result in a transfer payment from USCIS to DACA requestors as requestors filing only the Form I-821D would now pay less in filing fees than the current filing |

| | | fee cost for both Forms I-821D and I-765: |
|---|---|---|
| | | • Annual undiscounted transfers could range from \$0 to \$34.9 million. |
| | | • Total transfers over a 11-year period could range from: |
| | | ○ \$0 to \$384.1 million undiscounted; |
| | | ○ \$0 to \$335.4 million at a 3-percent discount rate; and |
| | | ○ \$0 to \$285.2 million at a 7-percent discount rate. |
| | | **Qualitative:** |
| | | <u>Benefits</u> |
| | | • Having the option to file Form I-765 could incentivize requests by reducing some of the financial barriers to entry for some requestors who do not need employment authorization but who will still file Form I-821D for deferred action. |
| | | • The proposed rule allows the active DACA-approved population to continue enjoying the advantages of the policy and also have the option to request renewal of DACA in the future if needed. |
| | | • For DACA recipients and their family members, the proposed rule would contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future, including by virtue of mitigating the risk of litigation resulting in termination of the DACA program. |

Source: USCIS analysis.

Note: The No Action Baseline refers to a state of the world under the current DACA program in effect under the guidance of the Napolitano Memorandum.

**Table 4. Summary of Major Changes to Provisions and Estimated Impacts of the Proposed Rule, FY 2012–FY 2031 (Relative to the Pre-Guidance Baseline)**

| Proposed Provision | Description of Proposed Provision | Estimated Impact of Proposed Provision |
|---|---|---|
| Amending 8 CFR 106.2(a)(38). Fees. | The fee for Form I-821D, Consideration of Deferred Action for Childhood Arrivals, will be $85. | **Quantitative:**<br><br>Benefits<br><br>Income earnings of the employed DACA recipients due to obtaining an approved EAD: |
| Amending 8 CFR 236.21(c). Applicability, regarding forbearance, employment authorization, and lawful presence. | DACA recipients receive a time-limited forbearance from removal. Those who can demonstrate an economic need may apply to USCIS for employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33) and are considered lawfully present and not unlawfully present for certain purposes. | • Annual undiscounted benefits could be $22.8 billion dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy.<br>• Total benefits over a 20-year period could be:<br>  ○ $455.5 billion for undiscounted benefits;<br>  ○ $424.8 billion at a 3-percent discount rate; and<br>  ○ $403.6 billion at a 7-percent discount rate. |
| Amending 8 CFR 236.23(a)(1). Procedures for request. | If a request for DACA does not include a request for employment authorization, employment authorization still may be requested subsequent to approval, but not for a period of time to exceed the grant of deferred action. | Costs<br><br>Costs to requestors associated with a DACA request, including filing Form I-821D, Form I-765, and Form I-765WS:<br><br>• Annual undiscounted costs could range from $385.6 million to $476.1 million.<br>• Total costs over a 20-year period could range from:<br>  ○ $7.7 billion to $9.5 billion for undiscounted costs;<br>  ○ $7.3 billion to $9.1 billion at a 3-percent discount rate; and<br>  ○ $7.2 billion to $8.8 billion at a 7-percent discount rate. |
| | | Transfer Payments<br><br>Part of the DACA requestor population may choose only to request deferred action through Form I-821D. This would result in a transfer payment from USCIS |

to DACA requestors as requestors filing only the Form I-821D would now pay less in filing fees than the current filing fee cost for both Forms I-821D and I-765:

- Annual undiscounted transfers over a 20-year period could range from $0 to $30.9 million.
- Total transfers over a 20-year period could range from:
  o $0 to $619.8 million undiscounted;
  o $0 to $589.9 million at a 3-percent discount rate; and
  o $0 to $574.9 million at a 7-percent discount rate.

Employment taxes from the employed DACA recipients and their employers to the Federal Government dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy:

- Annual undiscounted transfers could be $3.8 billion.
- Total transfers over a 20-year period could be:
  o $75.5 billion undiscounted;
  o $70.4 billion at a 3-percent discount rate; and
  o $66.9 billion at a 7-percent discount rate.

**Qualitative:**

Cost Savings

DACA program simplifies many encounters between DHS and certain noncitizens, reducing the burden upon DHS of vetting, tracking, and potentially removing DACA recipients.

Benefits

- The proposed rule results in more streamlined enforcement encounters and decision making, as well as avoided

D. App. 193                                    AR2022_100042

| | | costs associated with enforcement action against low-priority noncitizens. |
| | | • The proposed rule allows the DACA-approved population to enjoy the advantages of the policy and also have the option to request renewal of DACA in the future if needed. |
| | | • For DACA recipients and their family members, the proposed rule would contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future. |

Source: USCIS analysis.

Note: The Pre-Guidance Baseline refers to a state of the world as it was before the guidance of the Napolitano Memorandum.

In addition to the impacts summarized above, and as required by OMB Circular A–4, Table 5 and Table 6 present the prepared accounting statements showing the costs, benefits, and transfers associated with this proposed regulation relative to the No Action Baseline and the Pre-Guidance Baseline, respectively.[328] The primary estimate of annualized cost savings of the proposed rule relative to the No Action baseline is approximately $51.4 million, discounted at 3 percent, or $51.9 million, discounted at 7 percent. The primary estimate represents an average of the minimum estimate of cost savings, $0, and the high estimate, $102.7 million, discounted at 3 percent, or $103.7 million, discounted at 7 percent.

[328] *See* OMB Circular A–4, *https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/circulars/A4/a-4.pdf.*

| Table 5. OMB A-4 Accounting Statement – No Action Baseline ($ in millions, 2020; period of analysis: FY 2021–FY 2031) | | | | |
|---|---|---|---|---|
| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Source/ Citations |
| Benefits | | | | |
| Annualized monetized benefits (3%) | $0 | $0 | $0 | RIA |
| Annualized monetized benefits (7%) | $0 | $0 | $0 | RIA |
| Unquantified benefits | The proposed optional Form I-765 could increase DACA Form I-821D requests by reducing some financial barriers for those requestors who do not need employment authorization but who would file for deferred action. Additionally, the proposed rule allows the active DACA-approved population to continue enjoying the advantages of the policy and have the option to request renewal in the future. For DACA recipients and their family members, the proposed rule would contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future, including by virtue of mitigating the risk of litigation resulting in termination of the DACA program. | | | RIA |
| Cost Savings | | | | |
| Annualized monetized cost savings (3%) | $22.2 | $0 | $44.3 | RIA |
| Annualized monetized cost savings (7%) | $22.4 | $0 | $44.7 | RIA |
| Transfers | | | | |
| From whom to whom? | Part of the DACA requestor population may choose only to request deferred action through Form I-821D. This would result in a transfer payment from USCIS to DACA requestors as requestors filing only the Form I-821D would now pay less in filing fees than the current filing fee cost for both Forms I-821D and I-765. | | | RIA |

AR2022_100044

| Annualized monetized transfers (3%) | $17.6 | $0 | $35.2 | |
|---|---|---|---|---|
| Annualized monetized transfers (7%) | $17.8 | $0 | $35.5 | |
| Unquantified transfers | None. | | | |
| **Miscellaneous Categories** | **Effects** | | | |
| Effects on State, local, and/or Tribal governments | No direct effects. | | | RIA |
| Effects on small businesses | The proposed rule does not directly regulate small entities and is not expected to have a direct effect on small entities. DHS certifies that this proposed rule would not have a significant economic impact on a substantial number of small entities. | | | RFA |
| Effects on wages | None | None | None | RIA |
| Effects on growth | None | None | None | RIA |
| Source: USCIS analysis. | | | | |

**AR2022_100045**

**Table 6. OMB A-4 Accounting Statement – Pre-Guidance Baseline ($ in millions, 2020; period of analysis: FY 2012–FY 2031)**

| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Source/ Citations |
|---|---|---|---|---|
| Benefits | | | | |
| Annualized monetized benefits (3%) | $2,188.3 | N/A | N/A | RIA |
| Annualized monetized benefits (7%) | $2,072.3 | N/A | N/A | RIA |
| Unquantified benefits | The proposed optional Form I-765 could increase DACA Form I-821D requests by reducing some of the financial barriers for those requestors who do not need employment authorization but who would file for deferred action. Additionally, the proposed rule allows the DACA-approved population to enjoy the advantages of the policy and have the option to request renewal in the future. For DACA recipients and their family members, the proposed rule would contribute to (1) a reduction of fear and anxiety, (2) an increased sense of acceptance and belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future. | | | RIA |
| Costs | | | | |
| Annualized monetized costs (3%) | $422.5 | $378.1 | $466.8 | RIA |
| Annualized monetized costs (7%) | $410.4 | $367.3 | $453.5 | RIA |
| Unquantified Cost Savings | DACA program simplifies many encounters between DHS and certain noncitizens, reducing the burden upon DHS of vetting, tracking, and potentially removing DACA recipients. | | | |
| Transfers | | | | |
| From whom to whom? | Transfer payments in the form of employment taxes from the employed DACA recipients and their employers to the Federal Government dependent on the degree to which DACA recipients are substituted for other workers in the U.S. economy. | | | RIA |

**AR2022_100046**

| | | | |
|---|---|---|---|
| Annualized monetized transfers (3%) | $3,625.5 | N/A | N/A | |
| Annualized monetized transfers (7%) | $3,433.2 | N/A | N/A | |
| From whom to whom? | Part of the DACA requestor population may choose only to request deferred action through Form I-821D. This would result in a transfer payment from USCIS to DACA requestors as requestors filing only the Form I-821D would now pay less in filing fees than the current filing fee cost for both Forms I-821D and I-765. | | | RIA |
| Annualized monetized transfers (3%) | $15.2 | $0 | $30.4 | |
| Annualized monetized transfers (7%) | $14.8 | $0 | $29.5 | |
| **Miscellaneous Categories** | **Effects** | | | |
| Effects on State, local, and/or Tribal governments | Indirect effects, such as tax revenues and provision of certain government services, depending on (among other factors) policy choices made by the State, local, and/or Tribal governments. | | | RIA |
| Effects on small businesses | The proposed rule does not directly regulate small entities and is not expected to have a direct effect on small entities. DHS certifies that this proposed rule would not have a significant economic impact on a substantial number of small entities. | | | RFA |
| Effects on wages | None | None | None | RIA |
| Effects on growth | None | None | None | RIA |
| Source: USCIS analysis. | | | | |

BILLING CODE 9111–97–C

## 3. Background and Purpose of the Rule

The INA [329] generally charges the Secretary with the administration and enforcement of the immigration and naturalization laws of the United States. [330] The INA further authorizes the Secretary to ''establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of'' the INA. [331] In the Homeland Security Act of 2002, Congress also provided that the Secretary ''shall be responsible for . . . [e]stablishing national immigration

---

[329] Public Law 82–414, 66 Stat. 163 (as amended).

[330] INA sec. 103(a)(1), 8 U.S.C. 1103(a)(1). The INA also vests certain authorities in the President, Attorney General, and Secretary of State, among others. *See id.*

[331] INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3).

enforcement policies and priorities.'' [332] The Homeland Security Act also provides that the Secretary, in carrying out their authorities, must ''ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland.'' [333]

The Secretary proposes in this rule to establish specified guidelines for considering requests for deferred action submitted by certain individuals who came to the United States many years ago as children, consistent with the Napolitano Memorandum described above. As with the 2012 DACA policy, this proposed rule would serve the significant humanitarian and economic interests animating and engendered by the DACA policy, with respect to the population covered by that policy. In addition, the proposed rule would preserve not only DACA recipients' substantial reliance interests, but also those of their families, schools, employers, faith groups, and communities.[334] The proposed rule also would help appropriately focus the Department's limited immigration enforcement resources on threats to national security, public safety, and border security where they are most needed.

4. Cost-Benefit Analysis

DHS estimates the potential impacts of this proposed rule relative to two baselines. The first baseline is a No Action Baseline that represents a state of the world in which the DACA program would be expected to continue under the Napolitano Memorandum guidance. For reasons explained in Section V.A.4.a.(1), this baseline does not directly account for the July 16, 2021 district court decision. The second baseline is a Pre-Guidance Baseline, which represents a state of the world before the guidance in the Napolitano Memorandum, where the DACA

program does not exist and has never existed. The Pre-Guidance Baseline is included in this analysis in accordance with OMB Circular A–4, which directs agencies to include a pre-statutory baseline in an analysis if substantial portions of a rule may simply restate statutory requirements that would be self-implementing, even in the absence of the regulatory action.[335] In this case, the DACA program was implemented through DHS and USCIS guidance. DHS has not performed a regulatory analysis on the regulatory costs and benefits of that guidance previously and, therefore, includes a Pre-Guidance Baseline in this analysis for purposes of clarity and completeness. In other words, notwithstanding that the program does in fact exist, we present the Pre-Guidance Baseline to provide a more informed picture on the overall impacts of the program since its inception, while at the same time recognizing that many of these impacts have been realized already. DHS notes that the Pre-Guidance Baseline analysis also can be used to better understand the state of the world under the July 16, 2021 district court decision, should the stay of that decision ultimately be lifted.

The rest of this cost-benefit analysis section is organized to present the impacts of this proposed rule relative to the No Action Baseline first and then relative to the Pre-Guidance Baseline second. In each baseline section of the analysis, we begin by laying out the assumptions and estimates used in calculating any costs, benefits, and transfers of this proposed rule.

a. No Action Baseline

(1) Population Estimates and Other Assumptions

The proposed rule would affect certain individuals who came to the United States many years ago as children, who have no current lawful immigration status, and who are generally low enforcement priorities. DHS currently allows eligible individuals to request an exercise of discretion, called ''deferred action,'' on a case-by-case basis according to certain criteria outlined in the Napolitano Memorandum. Individuals may request deferred action under this policy, known as DACA. The proposed rule would affect individuals seeking deferred action under the DACA policy.

DHS recognizes a growing literature on the impacts of DACA that identifies potentially DACA-eligible noncitizens based on age and length of time in the United States. This approach to

estimating the population affected by this proposed rule estimates the total number of people who are potentially eligible for DACA and then predicts the proportion of those people who actually will request DACA in the future. Given that no widely available, national microdata survey exists that reports on the immigration status of the foreign-born population, the subpopulation potentially eligible for DACA must be estimated by other means. In general, analysts typically estimate the size of the DACA-eligible population using the so-called residual method, in which the total foreign-born population is estimated based on the U.S. Census Bureau's American Community Survey (ACS), Current Population Survey, American Time Use Survey, Survey of Income and Program Participation, or some other sample, and the lawfully present foreign-born population is estimated based on DHS administrative records or a mix of DHS administrative records and logical rules based on foreign-born demographic characteristics, with the difference between these estimates (*i.e.,* the residual) being the unauthorized population.[336] With this approach, the demographic characteristics of the underlying survey data may further be used to identify the portion of the unauthorized population that would be potentially eligible for DACA, although some factors, such as education, criminal history, and discretionary determinations may not be accounted for in such estimates.

The Migration Policy Institute (MPI) estimates an eligible DACA population of 1.7 million, including the currently active population.[337] Historical DHS administrative data between FY 2012 and FY 2021 show a total of around 1 million initial DACA program requests.[338] Thus, MPI's estimate implies a remaining DACA-eligible population of around 700,000 people.

DHS has two concerns with adopting this approach to estimate the number of future DACA applicants. First, as analysts who use the residual method observe, the approach is complex and highly sensitive to specific modeling assumptions. In a DHS Office of

---

[332] Public Law 107–296, sec. 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. 202(5)).

[333] 6 U.S.C. 111(b)(1)(F).

[334] *See DHS* v. *Regents of the Univ. of Cal.,* 140 S. Ct. 1891, 1914 (2020) [*Regents*] (''DACA recipients have 'enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on the DACA program. The consequences of the rescission, respondents emphasize, would 'radiate outward' to DACA recipients' families, including their 200,000 U.S. citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them. In addition, excluding DACA recipients from the lawful labor force may, they tell us, result in the loss of $215 billion in economic activity and an associated $60 billion in federal tax revenue over the next ten years. Meanwhile, States and local governments could lose $1.25 billion in tax revenue each year.'' (internal citations omitted)).

[335] *See* OMB Circular A–4.

[336] *See, e.g.,* OIS Report (''DHS estimates that 11.4 million unauthorized immigrants were living in the United States on January 1, 2018, roughly unchanged from 11.4 million on January 1, 2015''); Capps (2020) (''As of 2018 . . . there were 11 million unauthorized immigrants in the country, down slightly from 12.3 million in 2007.'').

[337] Migration Policy Institute, *Back on the Table: U.S. Legalization and the Unauthorized Immigrant Groups that Could Factor in the Debate* (Feb. 2021), *https://www.migrationpolicy.org/research/us-legalization-unauthorized-immigrant-groups.*

[338] Source: DHS/USCIS/OPQ July 2021.

AR2022_100048

Immigration Statistics (OIS) report, "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2015–January 2018," OIS stated that "estimates of the unauthorized population are subject to sampling error in the ACS and considerable non-sampling error because of uncertainty in some of the assumptions required for estimation [of the unauthorized population]." [339] In the chapter on weighting and estimation in the latest ACS design and methodology report,[340] the U.S. Census Bureau details the many complex adjustments applied to produce estimates of the population by sex, age, race, Hispanic origin, and number of household units, clarifying that "[t]he ACS estimates are based on a probability sample, and will vary from their true population values due to sampling and non-sampling error." [341] A rigorous analysis by sociologists and statisticians of the external validity of available methods used to impute unauthorized status in Census survey data concluded that

it is not possible to spin straw into gold. All approaches that we tested produced biased estimates. Some methods failed in all circumstances, and others failed only when the join observation condition was not met, meaning that the imputation method was not informed by the association of unauthorized status with the dependent variable.[342]

In light of these modeling challenges, it is possible that a new estimate of the DACA-eligible population based on the residual method would systematically under- or overestimate the authorized immigrant population, which would in turn lead to systematic but unknown under- or overestimation of the residual subpopulation.[343]

A second concern about using the residual method to estimate the number of future DACA applicants is that, even if DHS accurately estimates the total DACA-eligible population, the Department does not have a ready methodology to predict how many potentially DACA-eligible individuals will actually request DACA in the future. Given the nature of the DACA program, its population, political factors, the challenging legal history, and characteristics of the active DACA and DACA-eligible populations, including varying personal circumstances and expectations, it is uncertain and would be complex to predict how many potentially eligible noncitizens may request DACA even if a census of the remaining DACA-eligible population existed.

Therefore, in the context of this proposed rule, DHS relies instead on the limited administrative data USCIS collects from individuals who have requested DACA over the past several years, as described later in this analysis. The Department nonetheless acknowledges potential limitations to the population estimate methodologies that USCIS uses in this analysis, and it emphasizes that USCIS remains open to modifying its approach or using alternative approaches at a later stage in the rulemaking. DHS particularly welcomes public comment and data from demographers, statisticians, researchers, and the public on available data sources and the validity, risks, and advantages to incorporating these methods in a final rule.

To provide a framework for our baseline population estimates, we start by first presenting historical USCIS data on the active DACA population and then presenting historical data on DACA program request receipts. These data provide a sense of historical participation in the program and insights into any trends. They also allow us to make certain assumptions in estimating a potential future active DACA population who would enjoy the benefits of this policy and contribute potential transfers to other populations as well as in estimating potential future DACA program request receipts (i.e., the population who would incur the costs

associated with applying to the program). We therefore proceed by presenting first the historical active DACA population and our estimates of a potential future active DACA population, and then the historical volume of DACA program request receipts and our estimates of this potential future population.

Before presenting the historical and projected populations associated with this proposed rule, we first identify certain historical time periods of interest to this analysis. Historically, the 2012 and then 2017 DACA-related memoranda have shaped the level of participation in the DACA program. The 2012 Napolitano Memorandum initiated the program, and the 2017 Duke Memorandum halted new requests.[344] As such, DHS identifies three periods of interest: A surge period, FY 2012–FY 2014, where initial requests were high compared to later years; a stable period, FY 2015–FY 2017, where initial requests were slowing, renewal requests were leveling off, and the overall active DACA-approved population was stabilizing; and a cool-off period, FY 2018–FY 2020, where initial requests dramatically decreased, the active DACA-approved population started to decline, and most requests were for renewals.[345]

Table 7 presents historical data on the volume of DACA recipients who were active as of September 30th of each year. For clarity, "active" is defined as those requestors who have an approved Form

[339] See OIS Report at 10.

[340] See also U.S. Census Bureau, *American Community Survey Design and Methodology (January 2014), Chapter 11: Weighting and Estimation, https://www2.census.gov/programs-surveys/acs/methodology/design_and_methodology/acs_design_methodology_ch11_2014.pdf.*

[341] Id. at 16.

[342] See Jennifer Van Hook, et al., *Can We Spin Straw into Gold? An Evaluation of Immigrant Legal Status Imputation Approaches*, Demography 52(1): 329–54, at 330.

[343] In Pope (2016), see section 5, "Empirical method." See also George J. Borjas and Hugh Cassidy, *The wage penalty to undocumented immigration*, Lab. Econ. 61, art. 101757 (2019), https://scholar.harvard.edu/files/gborjas/files/labourecon2020.pdf (hereinafter Borjas and Cassidy (2019)). In section 2, "Imputing undocumented status in microdata files," the authors state that, "[i]n the absence of administrative data on the characteristics of the undocumented population, it is not possible to quantify the direction and magnitude of any potential bias," and in footnote 2 they describe DHS's assumed correction for sample bias. See also Catalina Amuedo-Dorantes and Francisca Antman, *Schooling and Labor Market*

*Effects of Temporary Authorization: Evidence from DACA*, J. of Population Econ. 30(1): 339–73, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5497855/pdf/nihms866067.pdf. In section III.B, "Capturing Undocumented Immigrants and DACA Applicants," the authors describe a potential effect of a limitation in the data relied upon as follows: "As such, some may be concerned that the control group may be made up of individuals who immigrated with the purpose of getting an educational degree in the United States, as is the case with F1 and J1 visa holders."

[344] As discussed above, the Duke Memorandum rescinded the DACA policy, allowing for a brief wind-down period in which a limited number of renewal requests would be adjudicated, but all initial requests would be rejected. Duke Memorandum at 4–5. In the litigation that followed, the Duke Memorandum was enjoined in part, such that DHS was required to adjudicate renewal requests as well as "initial" requests from individuals who had been granted DACA previously but did not qualify for the renewal process. See Regents v. DHS; Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401 (E.D.N.Y. 2018). The effect of the Duke Memorandum, along with these court orders and the Wolf Memorandum also discussed above, was that individuals who were granted DACA at some point before September 5, 2017, remained able to request DACA, while those who had never before received DACA were not able to do so until the Wolf Memorandum was vacated in December 2020. See Batalla Vidal v. Wolf, No. 16–cv–4756, 2020 WL 7121849 (E.D.N.Y. Dec. 4, 2020).

[345] DHS believes it is likely that the initial surge in DACA requests reflects a rush of interest in the new program, and that the slowdown in 2014–2017 simply reflects the fact that many of the eligible and interested noncitizens requested DACA shortly after it became available. It is also possible that there was a decline in interest due to the uncertainty caused by the *Texas I* litigation described above, which began in 2014. The limits on requests described above, supra note 344, along with changes in the national environment, likely account for much of the "cooling off" after 2017.

I–821D and I–765 in the relevant USCIS database. The approval can be either an initial or a renewed approval. Additionally, we do not need specificity or further breakdown of these data into initials and renewals to project this active DACA population and calculate associated monetized benefits and

transfers based on the methodology employed in this RIA. Whether initial participants in the program or renewal participants, both categories of participants will have been issued an EAD that could be used to participate in the labor market.[346] Therefore, the annual cumulative totals of the active

DACA population will suffice for estimating the quantified and monetized benefits and transfers of this proposed rule that stem from the potential labor market earnings of the DACA population with an EAD.

BILLING CODE 9111–97–P

| Table 7. Historical Active DACA Program Population, FY 2012–FY 2020 (as of September 30th of each fiscal year) | |
|---|---|
| **FY** | **Total Active DACA Recipients** |
| 2012 | 2,019 |
| 2013 | 472,880 |
| 2014 | 608,037 |
| 2015 | 652,530 |
| 2016 | 679,830 |
| 2017 | 700,572 |
| 2018 | 704,095 |
| 2019 | 660,552 |
| 2020 | 647,278 |
| **Annual Growth Rate** | |
| FY 2015–FY 2016 | 4.1837% |
| FY 2016–FY 2017 | 3.0511% |
| **Average** | **3.6174%** |

Source: DHS/USCIS/OPQ ELIS, CLAIMS 3, and CIS2 (queried June 2021).

Notes: DHS considers FY 2015–FY 2017 to be a stable period in the DACA program history—after the surge in DACA initial requests prompted by the Napolitano Memorandum, FY 2012–FY 2014, and before the cool-off prompted by the Duke Memorandum, FY 2018–FY 2020. As noted below, the average annual growth rate of FY 2015–FY 2017 will be used to project the potential future active DACA population for FY 2021–FY 2031.

On July 16, 2021, the U.S. District Court for the Southern District of Texas issued a decision enjoining USCIS from approving new DACA requests.[347] At this time, it remains uncertain what impact this injunction will have on total projected initial requests for FY 2021. Projecting if and when USCIS might begin to approve initial requests again absent this rulemaking presents added difficulty. Consequently, the No Action baseline used for this RIA employs the

assumption that the historical trends in the active DACA population outlined remain a reasonable and useful indication of the trend in the future over the period of analysis. Table 8 presents DHS's estimates for the active DACA population for FY 2021–FY 2031. Given the motivation and scope of this proposed rule, DHS assumes that upon the implementation of a final rule the DACA program will be characterized by relatively more stability, meaning the

yearly active DACA population will not continue to decrease as it did in FY 2018–FY 2020. Therefore, in our projections of the active DACA population, DHS used the average annual growth rate of the stable period, FY 2015–FY 2017, which was 3.6174%, and multiplied it by the current year cumulative totals to obtain the next year's estimated active DACA population. In other words, the values in Table 8 grow at an annual rate of

---

[346] Please see the *Labor Market Impacts* section of this RIA for discussion and analysis of labor force participation as well as discussion of the possibility that some DACA recipients might choose not to

work despite having employment authorization, or that some DACA recipients might opt out of requesting an EAD given the choice as this rulemaking is proposing.

[347] As of July 20, 2021, USCIS ELIS and CLAIMS 3 data show 89,605 initial requests have been accepted at a lockbox for FY 2021.

3.6174%. These estimates will be used later when calculating the monetized benefits and transfers of this proposed rule.

DHS notes that although this methodology for projecting a future active DACA population has important advantages (including transparency, reproducibility, and a clear nexus to historical program data), it also has some potential limitations. For instance, the methodology assumes that the active DACA population again will grow at the same rate that it did in FY 2015–FY 2017, just a few years after the Napolitano Memorandum was first issued. The methodology does not account, for instance, for the fact that when the Duke Memorandum was issued, the growth rate had been declining, or for the fact that potential DACA requestors will stop "aging in" to the policy in June 2022, when the youngest possible requestor reaches 15

years of age. DHS does not believe there necessarily will be a precipitous decline in the growth rate of DACA requestors after new requestors stop "aging in" in 2022. A substantial portion of initial DACA requests have come from individuals who applied long after they were eligible. And some individuals may become newly eligible after June 2022, upon satisfying the educational or military service requirement for the first time. DHS has included data in the rulemaking docket regarding DACA requestors' age at time of filing. DHS welcomes comments regarding whether and how DHS might incorporate these data into the population estimate methodology for the final rule.

Similarly, the active DACA population projections do not directly capture the possibility that there will be a surge of request receipts following publication of a final rule (or in the wake of the vacatur of the Wolf

Memorandum, which already has occurred), followed by a slower growth rate in later years. However, USCIS notes that projecting a surge in application receipts does not necessarily imply a surge in the active DACA population. The levels of approvals, renewals, and noncitizens remaining in or exiting the program can vary. For example, there could be delays in processing requests caused by the surge of new applications (assuming that USCIS maintains current staff levels) or by other events, noncitizens could exit the program at higher rates than before, and approval rates could change relative to historical trends. As mentioned previously, a continuation of the injunction of approvals of new DACA requests would curtail initial requests. As noted above, DHS welcomes comments on its methodology for projecting the active DACA population, as well as all other aspects of this RIA.

## Table 8. Projected Active DACA Program Population (FY 2021–FY 2031)

| FY | Active DACA Recipients |
|---|---|
| 2020 | 647,278 |
| 2021 | 670,693 |
| 2022 | 694,954 |
| 2023 | 720,093 |
| 2024 | 746,142 |
| 2025 | 773,133 |
| 2026 | 801,100 |
| 2027 | 830,079 |
| 2028 | 860,106 |
| 2029 | 891,219 |
| 2030 | 923,458 |
| 2031 | 956,863 |

Source: USCIS analysis.

Notes: FY 2020 is included as a reference. Active DACA recipients equals previous year total plus the average annual growth rate (3.6174%) of the stable historical period FY 2015–FY 2017. The active DACA population is used to calculate the monetized benefits and transfers of this proposed rule.

Next, we present the population that will be used when calculating the monetized costs of this proposed rule. Table 9 presents historical data on the numbers of DACA program receipts. This population incurred the cost of requesting DACA. The population is made up of initial and renewal

requestors, both of whom face similar costs, such as application fees,[348] time burdens, and opportunity costs. For

---

[348] The proposed fee does not differentiate between initial and renewal receipt costs. The estimated full cost reflects a weighted average of April 2020 to March 2021 initial and renewal workload receipt data.

clarity, this table represents intake and processing data and does not say anything about how many requests were approved. DHS does not need that level

**AR2022_100051**

of detail to estimate the monetized costs of this proposed rule. We only need total receipts to estimate the monetized costs of this proposed rule.

| **Table 9. Historical DACA Program Receipts** | | | |
|---|---|---|---|
| **FY** | **Initials** | **Renewals** | **Total** |
| 2012 | 157,826 | | 157,826 |
| 2013 | 443,967 | | 443,967 |
| 2014 | 141,538 | 122,249 | 263,787 |
| 2015 | 92,470 | 391,878 | 484,348 |
| 2016 | 74,498 | 198,520 | 273,018 |
| 2017 | 45,637 | 470,668 | 516,305 |
| 2018 | 2,062 | 287,709 | 289,771 |
| 2019 | 1,574 | 406,588 | 408,162 |
| 2020 | 4,301 | 339,632 | 343,933 |

Source: DHS/USCIS/OPQ ELIS and CLAIMS 3 Consolidated (queried Dec. 2020).

Note: The paragraphs surrounding this table explain how this historical information is used to project the future population over FY 2021–FY 2031.

To project total DACA program receipts, DHS makes use of the historical information from Table 9 as follows. In doing so, the intention is to capture a possible surge effect in initial requests, a stabilization effect through the renewals, and then a steady decline in initial requests as the newly DACA-eligible population might dwindle over time because individuals stop "aging in" after June 2022. We first calculate the percentage of initials in the previously defined surge years FY 2012–FY 2014 out of the total over period FY 2012–FY 2017, to account for a similar possibility in our projections, which we call a surge rate.[349] This rate is 77.76%. Second, DHS calculates the average initial requests over the stable period of FY 2015–FY 2017, which is 70,868. Third, we calculate the average annual rate of growth in initial requests over FY 2015–FY 2017, which is −29.08%. Fourth, DHS calculates the average number of renewal requests over FY 2015–FY 2020, which is 349,166. We chose FY 2015–FY 2020 for this calculation due to the relatively stable nature of historical renewal requests. The intention is to capture a possible surge effect in initial requests, a stabilization effect through the

renewals, and then a steady decline in initial requests as the DACA-eligible population might dwindle over time.

Table 10 presents the projected volume of DACA program request receipts. DHS estimates a surge component in initials over FY 2021–FY 2022. As stated, these projections make no adjustment for the uncertain impacts of the July 16, 2021 injunction on initial requests. To do so, we first calculate the total number of historic initials over the stable period FY 2015–FY 2017, which is 212,605. We then multiply this number by the surge rate of 77.76% to estimate a potential surge in our projections of 165,321 initial requests in the first two projected years, FY 2021–FY 2022. DHS then divides this number in two to estimate a surge in initial requests for FY 2021 and FY 2022, which is 82,660. Adding to this number the average number of historic initial requests of 70,868 yields a total (surge) number of 153,529 initial requests for FY 2021 and FY 2022. Starting with FY 2024, DHS applies the historic FY 2015–FY 2017 growth rate of −29.08% to initial requests for the rest of the projected years.[350]

The renewals in FY 2023–FY 2024 capture this surge as the historical average number of renewals of 349,166

plus 153,529. Recall, DACA approved participants can renew their deferred action every 2 years. Adding total initials and renewals for every fiscal year then yields a total number of requests that will be used in estimating the monetized costs of this proposed rule.

As with DHS's projection methodology for the active DACA population, DHS acknowledges potential limitations associated with the methodology used to project requests. For instance, although the methodology is transparent, reproducible, and has a clear nexus to historical program data, the methodology assumes that the "surge rate" for DACA requests following publication of this proposed rule would mirror the surge rate that followed issuance of the Napolitano Memorandum. There are reasons to support such an assumption, including a potential backlog of demand following the Duke Memorandum and subsequent guidance and ongoing litigation. But there are also reasons to question it, such as the potential that demand was exhausted in the years prior to the Duke Memorandum's issuance such that any "surge" in applications would consist primarily of applications from individuals who turned 15 after the issuance of the Duke Memorandum.

[349] Calculation: FY 2012–FY 2014 initials total = 743,331; FY 2012–FY 2017 initials total = 955,936; initials surge rate = (743,331/955,936) * 100 = 77.76%.

[350] For example: FY 2024 = FY 2023 * (1 − 29.08%), which yields 70,868 * (1 − 0.2908) = 50,254.

| FY | Initials | Renewals | Total |
|----|----------|----------|-------|
| 2021 | 153,529 | 349,166 | **502,694** |
| 2022 | 153,529 | 349,166 | **502,694** |
| 2023 | 70,868 | 502,695 | **573,563** |
| 2024 | 50,254 | 502,695 | **552,949** |
| 2025 | 35,636 | 420,034 | **455,670** |
| 2026 | 25,270 | 420,034 | **445,304** |
| 2027 | 17,920 | 420,034 | **437,954** |
| 2028 | 12,707 | 420,034 | **432,741** |
| 2029 | 9,011 | 420,034 | **429,045** |
| 2030 | 6,390 | 420,034 | **426,424** |
| 2031 | 4,531 | 420,034 | **424,565** |

**Table 10. Projected DACA Program Receipts (FY 2021–FY 2031)**

Source: USCIS analysis.

Notes: For FY 2023, 70,868 represents initials averaged over FY 2015–FY 2017. For the rest of the projection period this population declines at the average annual rate of 29.08%. For FY 2021–FY 2022, 349,166 represents renewals averaged over FY 2015–FY 2020. For FY 2025–FY 2031, 420,034 represents historical average initials (349,166) plus historical average renewals (70,868). The surges in initials in FY 2021–FY 2022 and renewals in FY 2023–FY 2024 are explained in the surrounding text. Total receipts are used in calculating the monetized cost (to the requestors) of this proposed rule.

BILLING CODE 9111–97–C

As of July 2021, DHS administrative data for quarters 2 and 3 of FY 2021 show that there were 89,701 initial DACA requests and 302,985 renewal DACA requests pending.[351] These data include requests filed during periods in which DHS did not accept most initial DACA requests due to ongoing litigation and subsequent policy changes.[352] In this RIA's projections, it is assumed that initial DACA requests would be accepted without interruptions from any legal rulings on the program in FY 2021 and all other subsequent projected fiscal years. In the absence of these restrictions on initial requests, DHS's projection for FY 2021 tracks with the observed trend in the most recent FY 2021 administrative data.

In sum, while population estimates in this NPRM are consistent with the overall MPI population estimate, this RIA relies on historical application data to estimate future DACA applications

rather than estimating the overall DACA-eligible population and then further estimating the share of the population likely to apply for DACA in the future. While both approaches face methodological challenges, the Department has no reason to believe the residual-based methodology would yield a more accurate estimate. At the same time, the current approach based on historical application data offers an especially transparent and easily reproducible estimation methodology. The Department invites public comment on the ability to improve accuracy and validity of unbiased estimates of the active population projections using other methodologies in the final rule.

(2) Forms and Fees

Individuals seeking deferred action under the DACA program must file Form I–821D in order to be considered for approval. Currently, all individuals filing Form I–821D to request deferred action under DACA, whether for the initial consideration for or a renewal of DACA, also must file Form I–765 and Form I–765WS (Form I–765 Worksheet) and submit biometrics. Submission of

Forms I–821D, I–765, and I–765WS and biometrics together is considered to comprise a complete DACA request. Additionally, certain DACA requestors choose to have a representative, such as a lawyer, prepare and file their DACA request.[353] If that is the case, a Form G–28 must accompany a complete DACA request.[354]

Currently, the fees associated with a DACA request are as follows: For Form I–821D, $0; for Form I–765, $410; for Form I–765WS, $0; for Form G–28, $0; and for biometrics collection, $85. This yields a total current fee of $495, with or without the submission of a Form G–28. DHS believes this is a reasonable proxy for the Government's costs of processing and vetting these forms

---

[351] Source: DHS/USCIS/OPQ July 2021.

[352] See Section III.B above for litigation history, including *Regents*, 140 S. Ct. 1891 (2020), and *Texas II*, No. 1:18–cv–00068, 2021 WL 3025857 (S.D. Tex. July 16, 2021).

[353] An internal OPQ data request reveals that 44 percent of requestors chose to have a preparer. We use this percentage breakdown in subsequent cost calculations.

[354] Individuals retained to help a requestor prepare and file their DACA request must submit a Form G–28, Notice of Entry of Appearance as Attorney or Accredited Representative, to provide information about their eligibility to act on behalf of the requestor (*see* 8 CFR 292.4(a)).

AR2022_100053

when filed together.[355] However, DHS expects there would be little savings in the Government's costs of processing and vetting for applicants who choose not to apply for an EAD. Therefore, fees for these applicants are not anticipated to cover the Government's costs for these applicants since they would be paying only $85.

(3) Wage Assumptions

The estimated wage rate of DACA requestors and the total compensation rate of those hired to prepare and file DACA requests are used as proxies for the opportunity cost of time in the calculation of costs. The estimated wage rate of the requestors also is used to estimate the benefits of income that accrue to those requestors who participate in the labor market through the grant of employment authorization. In the following paragraphs, DHS explains how it estimates the preparers' and requestors' compensation rates. All compensation estimates are in 2020 dollars.

A DACA request can be prepared on behalf of the applicant. In this proposed rule, we assume that a preparer has similar knowledge and skills necessary for filing a DACA request as an average lawyer would for the same task. Based on Bureau of Labor Statistics (BLS) data, DHS estimates an average loaded wage, or compensation, for a preparer of $103.81.[356]

To estimate the DACA requestor population's hourly opportunity cost of time, DHS uses data from the U.S. Census Bureau and USCIS. We assume, for the purposes of this analysis, that the profile of the DACA-approved requestors matches that of the population at large; that is, the average DACA-approved requestor values education and employment in a similar way as the average person in the population at large and in that age group. This allows DHS to use other government agencies' official data, such

as the Census Bureau's, to estimate DACA-approved requestor compensation rates and other economic characteristics given the absence of DHS-specific DACA-approved population economic data, but DHS welcomes comments about other methods for estimating compensation rates and economic characteristics.

USCIS data on the active DACA population[357] lend themselves to delineation by age group: 15 to 25, 26 to 35, and 36 to 39.[358] In an effort to provide a more focused estimate of wages, DHS takes this information into account. We estimate these age groups to represent 43 percent, 51 percent, and 6 percent, respectively, out of this total population. Next, DHS seeks to estimate an average compensation rate that accounts for income variations across these age groups. We first obtain annual average Consumer Price Index information for years 2012 through 2020.[359] We set 2020 as the base year and then calculate historical average annual incomes (in 2020 dollars) based on U.S. Census Bureau historical income data.[360] To do this, DHS converts the annual mean incomes in the Census data (2019 dollars) into 2020 dollars and then averages the period 2012–2019 to obtain average full-time salary information for the population at large for these age groups as $18,389, $45,529, and $60,767, respectively.[361] DHS recognizes that not all DACA recipients work full time or have jobs that offer additional benefits beyond the offered wage. The employment and school attendance status of DACA recipients is varied and includes being in school only, working full or part time, or being unemployed. Moreover, some DACA recipients have additional compensation benefits such as health

insurance whereas others do not. Additionally, DACA recipients could hold entry-level jobs as well as more senior positions in companies. Some are employed in industries that generally pay higher wages and some are employed in industries where wages are relatively lower. To account for this wide range of possibilities, DHS takes a weighted average of the salaries presented above using the distribution of the age groups as weights, divided by 26 pay periods and 80 hours per pay period (the typical biweekly pay schedule), loading the wage to account for benefits, to arrive at an average hourly DACA requestor compensation of $24.20.[362]

(4) Time Burdens

Calculating any potential costs associated with this proposed rule involves accounting for the time that it takes to fill out the required forms, submit biometrics collection, and travel to and from the biometrics collection site. The Paperwork Reduction Act (PRA) section of the instructions for Form I–821D estimates a response time of 3 hours for reviewing instructions and completing and submitting the form: For Form I–765, 4.75 hours; for Form I–765WS, 0.5 hours; and for Form G–28, 0.83 hours.

In addition to the biometrics services fee, the requestor will incur the costs to comply with the biometrics submission requirement as well as the opportunity cost of time for traveling to an USCIS Application Support Center (ASC), the mileage cost of traveling to an ASC, and the opportunity cost of time for submitting his or her biometrics. While travel times and distances vary, DHS estimates that a requestor's average roundtrip distance to an ASC is 50 miles and takes 2.5 hours on average to complete the trip.[363] Furthermore, DHS estimates that a requestor waits an average of 70 minutes or 1.17 (rounded, 70 divide by 60 minutes) hours for service and to have his or her biometrics collected at an ASC according to the PRA section of the instructions for Form I–765, adding up to a total biometrics-related time burden of 3.67 hours. In addition to the opportunity cost of time for providing biometrics and traveling to an ASC, requestors will incur travel costs related to biometrics collection. The per-requestor cost of travel related to biometrics collection is about $28.00

---

[355] USCIS Office of the Chief Financial Officer (OCFO) analysis.

[356] DHS assumes the preparers with similar knowledge and skills necessary for filing DACA requests have average wage rates equal to the average lawyer wage of $71.59 per hour. Source: BLS, Occupational Employment and Wage Statistics, Occupational Employment and Wages, May 2020, 23–1011 Lawyers, *https://www.bls.gov/oes/2020/may/oes231011.htm#nat.*

The benefits-to-wage multiplier is calculated as follows: (total employee compensation per hour)/ (wages and salaries per hour) = $38.60/$26.53 = 1.4549 = 1.45 (rounded). *See* BLS, Economic News Release (Mar. 2021), *Employer Cost for Employee Compensation—December 2020,* Table 1. Employer Costs for Employee Compensation by ownership, *https://www.bls.gov/news.release/archives/ecec_03182021.htm.* Total compensation rate calculation: (wage rate) * (benefits multiplier) = $71.59 * 1.45 = $103.81.

[357] Source: Count of Active DACA Recipients by Month of Current DACA Expiration as of Dec. 31, 2020. DHS/USCIS/OPQ ELIS and CLAIMS 3 Consolidated (queried Jan. 2021).

[358] We assume this distribution remains constant throughout the periods of analysis for both baselines as new DACA recipients enter and previous DACA recipients exit the program. The current (age) requirements of the DACA program does not prohibit us from making this assumption.

[359] Source: BLS, *Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, index averages, https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202103.pdf.*

[360] Source: U.S. Census Bureau, *Historical Income Tables: People,* Table P–10. Age—People (Both Sexes Combined) by Median and Mean, *https://www.census.gov/data/tables/time-series/demo/income-poverty/historical-income-people.html.*

[361] The Census data delineate age groups as 15 to 24, 25 to 34, and 35 to 44. DHS assumes the age groups identified in the USCIS data follow the same pattern on average as the age groups in the Census data (*e.g.,* the Census income information by age group also represents the income information in the age groups identified in the USCIS data).

[362] Calculation: $24.20 = {[($18,389 * 43%) + ($45,529 * 51%) + ($60,767 * 6%)]/26}/80 * 1.45.

[363] *See* Final Rule, *Employment Authorization for Certain H–4 Dependent Spouses,* 80 FR 10284 (Feb. 25, 2015), and Final Rule, *Provisional and Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives,* 78 FR 536, 572 (Jan. 3, 2013).

per trip, based on the 50-mile roundtrip distance to an ASC and the General Services Administration's (GSA) travel rate of $0.56 per mile.[364] DHS assumes that each requestor travels independently to an ASC to submit his or her biometrics.

### (5) Costs of the Proposed Regulatory Action

The provisions of this proposed rule would not impose any new costs on the potential DACA requestor population if requesting both deferred action through Form I–821D and applying for an EAD using Form I–765 and Form I–765WS (though this rule would change the composition of these fees). The proposed rule would not implement any new forms to file, nor would it change the estimated time burden for completing and filing any of the required forms to request deferred action, and thus the total DACA request cost would not change from the current amount if requestors continued to file all Forms I–821D, I–765, and I–765WS. With this proposed rule, DHS seeks to (1) make it optional to file Form I–765 to apply for employment authorization; (2) eliminate the $85 biometrics fee when filing Form I–765; and (3) implement a new $85 fee to file Form I–821D. Requestors still would be required to submit biometrics information, but that process would be included as part of the requirements for filing Form I–821D. Requestors who both request DACA and apply for employment authorization would incur the same total costs as they currently incur.

Nevertheless, the provisions of the proposed rule would make requesting an EAD optional when filing for DACA. DHS recognizes the possibility that some requestors might forgo applying for employment authorization using Form I–765 and opt only to request deferred action by filing Form I–821D. For example, this category could include DACA requestors who are currently enrolled in school, who perhaps have scholarships or other types of aid, and who may not need additional financial support (*e.g.,* young DACA requestors, including high school students, who are supported by their parents or guardians). Therefore, such individuals may choose not to participate in the labor market. DHS acknowledges that such requestors might choose to save the $410 fee to file

Form I–765. As a result, requestors who forgo seeking employment authorization would incur fewer costs when requesting DACA. These requestors would be required to submit Form I–821D and pay the proposed $85 form fee only. Therefore, DHS conducts a sensitivity analysis to account for the possibility that some DACA requestors likely would not seek employment authorization.

In order to identify the proportion of the DACA requestor population who might forgo applying for employment authorization, DHS uses data from BLS on labor force participation rates.[365] BLS data show historical and projected labor force participation rates (as a percent of total working-age population) by age group. Assuming the DACA requestors' population profiles (such as education and employment status) match those of the U.S. population at large, DHS combines the BLS data on labor force participation by age group with previously presented USCIS data on the distribution of ages for the approved DACA requestor population (*see Wage Assumptions* section) to calculate an age-group-adjusted weighted average. Based on this methodology, DHS estimates that the rate of the potential DACA requestor population who may opt in and apply for employment authorization is 70 percent and the rate of those who may opt out and not apply for employment authorization is 30 percent.[366] Under this sensitivity analysis using a 70/30 percent population split, the entire population would file Form I–821D to request deferred action and would pay an $85 fee, while only 70 percent of the population of those who file Form I–821D to request deferred action would file Form I–765 and Form I–765WS to request an EAD. DHS recognizes that the

70-percent estimate does not directly account for the potential additional benefits of an EAD, which may result in a greater percentage of DACA requestors also requesting an EAD. DHS describes these potential additional benefits in the analysis below, at Section V.A.4.b.(6), regarding the benefits of the proposed rule relative to the Pre-Guidance Baseline.

If 100 percent of the estimated population applies for an EAD, the costs of the proposed rule relative to the No Action Baseline are zero since currently all DACA requestors filing Form I–821D must file Forms I–765 and I–765WS and request employment authorization. Using the estimated requestors' wage rate ($24.20 per hour), the preparers' total compensation rate ($103.81 per hour), and the percentage of requestors who use a preparer (44%), we find that applicants would face the same total numbers of fees, the same forms time burdens, and the same biometric travel costs. The quantified and monetized costs of the proposed rule relative to the No Action Baseline would be zero.

By contrast, if 70 percent of DACA requestors apply for an EAD based on the provision of this proposed rule that makes such application optional, there would be cost savings. In particular, there would be cost savings to DACA requestors in terms of opportunity costs of time in no longer having to fill out forms to apply for an EAD. For example, some requestors, including renewal requestors, do not need an EAD. Such requestors would have the option to save the costs associated with submitting Form I–765 and Form I–765WS to apply for employment authorization relative to the No Action Baseline where they are required to submit these forms as part of the application. They now have the option not to do so.

The potential cost savings are calculated as the difference between the total costs associated with 100 percent of the population applying for an EAD and the total costs associated with 70 percent of the population applying for an EAD, less the $410 fee for Form I–765 multiplied by 30% of the DACA requestor population estimates. In Table 11, DHS then subtracts the $410 fee from the cost savings estimate, because in this analysis we account for the distributional effect of a lower fee as a transfer rather than a cost saving. (We acknowledge that in this scenario the requestor and USCIS avoid the costs of filing and processing the Form I–765, respectively. For this proposed rule, this fee will not be considered a cost saving as there are no estimated government resources saved. The time it takes to

---

[364] See the U.S. General Services Administration website for privately owned vehicle mileage reimbursement rates, *https://www.gsa.gov/travel/plan-book/transportation-airfare-rates-pov-rates/privately-owned-vehicle-povmileage-reimbursement-rates.*

[365] Source: BLS, Employment Projections (Sept. 2020), *Civilian labor force participation rate by age, sex, race, and ethnicity,* Table 3.3. Civilian labor force participation rates by age, sex, race, and ethnicity, 1999, 2009, 2019, and projected 2029, *https://www.bls.gov/emp/tables/civilian-labor-force-participation-rate.htm.*

[366] BLS labor force calculated averages by age group, United States: 16-to-24-year-old average is 53.6 percent (average of FY 2019 [55.9%] and FY 2029 [51.3%]); 25-to-34-year-old average is 82.4 percent (average of FY 2019 [82.9%] and FY 2029 [81.9%]); and 34-to-44-year-old average is 82.15 percent (average of FY 2019 [82.1%] and FY 2029 [82.2%]). USCIS age group distribution of the active DACA-approved population: 16 to 24 years old is 43 percent; 25 to 34 years old is 51 percent; and 35 to 44 years old is 6 percent. Calculations: Age group adjusted weighted average is (53.6% * 43%) + (82.4% * 51%) + (82.15% * 6%) = 70.001% = 70% (rounded) of the DACA applicant population who potentially will opt in to apply for employment authorization. Thus, it follows, (1–70.001%) = 29.999% = 30% (rounded) of the DACA requesting population who potentially will opt out of applying for employment authorization.

adjudicate Form I–765 with Form I–821D is negligible compared to adjudicating only Form I–821D.[367]

Table 11 presents the estimates used in calculating any potential cost savings.

BILLING CODE 9111–97–P

| | Costs | | | |
|---|---|---|---|---|
| **FY** | **If 100% Apply for an EAD (A)** | **If 70% Apply for an EAD (B)** | **Less $410 I-765 Fee (C)** | **Cost Savings D = A - B - C** |
| 2021 | $572,247,113 | $463,521,979 | $61,831,418 | $46,893,716 |
| 2022 | $572,247,113 | $463,521,979 | $61,831,418 | $46,893,716 |
| 2023 | $652,920,958 | $528,868,050 | $70,548,243 | $53,504,665 |
| 2024 | $629,454,553 | $509,860,187 | $68,012,693 | $51,581,673 |
| 2025 | $518,716,551 | $420,162,054 | $56,047,430 | $42,507,068 |
| 2026 | $506,916,464 | $410,603,945 | $54,772,428 | $41,540,090 |
| 2027 | $498,548,793 | $403,826,106 | $53,868,299 | $40,854,388 |
| 2028 | $492,615,116 | $399,019,808 | $53,227,164 | $40,368,143 |
| 2029 | $488,407,430 | $395,611,570 | $52,772,523 | $40,023,338 |
| 2030 | $485,423,679 | $393,194,722 | $52,450,128 | $39,778,829 |
| 2031 | $483,307,844 | $391,480,888 | $52,221,511 | $39,605,444 |
| **Undiscounted Total** | $5,900,805,614 | $4,779,671,287 | $637,583,255 | **$483,551,071** |

**Table 11. Total Cost Savings, FY 2021–FY 2031, Relative to the No Action Baseline (2020 dollars) (if 100% EAD requests, cost savings = 0)**

Source: USCIS analysis.

Note: Assuming 30% of the I-821D population estimates in Table 10, FY 2021: 502,694 * 0.30 = 150,808.336 * $410 I-765 fee = $61,831,418 (rounded).

(6) Benefits of the Proposed Regulatory Action

There are quantified and monetized benefits as well as unquantified and qualitative benefits associated with the DACA program under the Napolitano Memorandum and this proposed rule. The quantified and monetized benefits stem from the income earned by DACA recipients who have been granted an EAD and participate in the labor market. DHS calculates the quantified and monetized benefits associated with this proposed rule by taking the sum of the approved initial and renewal populations (*i.e.,* those who have been granted an EAD) and multiplying it by an estimated yearly compensation total of $50,341, which is the previously estimated compensation rate of $24.20, multiplied by 80 hours in a pay period, times 26 pay periods per year. As previously discussed, DHS assumes

only 70 percent of DACA recipients will choose to work, so the total population projections presented previously will be adjusted to reflect this (population * 70 percent). Given the previously delineated provisions of this proposed rule and the stated assumptions, there are no new quantified and monetized benefits relative to the No Action Baseline. In the No Action Baseline, 70 percent of DACA recipients will work, which is the same percentage of people who would work under this proposed rule.

The unquantified and qualitative benefits stem from the forbearance component of an approved DACA request, and they are discussed in significantly greater detail in the analysis below, at Section V.A.4.b.(6), regarding the benefits of the proposed rule relative to the Pre-Guidance Baseline. These benefits are generally

the same under this proposed rule and under the No Action Baseline.

(7) Transfers of the Proposed Regulatory Changes

The provisions of this proposed rule could produce transfers relative to the No Action Baseline. The proposed rule would change the fee for Form I–821D from $0 to $85 and the fee for biometrics from $85 to $0. These changes move in opposite directions, cancelling each other out. However, the full cost of adjudication to USCIS for Form I–821D, including biometrics adjudication costs, is estimated at $332.[368] Table 12 presents the pre- and post-rulemaking fees to applicants with and without filing Form I–765, along with the estimated pre- and post-rulemaking costs to the Government for processing and vetting each application.

[367] USCIS OCFO analysis.

[368] USCIS OCFO analysis.

**Table 12. Pre- and Post-Rulemaking Per-Applicant Fees to Applicants and Processing Costs to DHS**

| Pre-Rulemaking | | | | |
|---|---|---|---|---|
| | Form I-821D | Form I-765 | Biometrics | **Total** |
| Fees to Applicants | $0 | $410 | $85 | $495 |
| Processing and Vetting Costs to DHS | $280 | $0 | $52 | $332 |
| **Post-Rulemaking with EAD** | | | | |
| | Form I-821D | Form I-765 | Biometrics | **Total** |
| Fees to Applicants | $85 | $410 | $0 | $495 |
| Processing and Vetting Costs to DHS | $280 | $0 | $52 | $332 |
| **Post-Rulemaking without EAD** | | | | |
| | Form I-821D | Form I-765 | Biometrics | **Total** |
| Fees to Applicants | $85 | N/A | $0 | $85 |
| Processing and Vetting Costs to DHS | $280 | N/A | $52 | $332 |

Source: USCIS OCFO analysis.

Note: Form I-765 incurs negligible processing and vetting costs because Form I-821D already captures the information requested on Form I-765.

For the 30% of the projected population who are assumed to file Form I–821D without filing and paying the fee for Form I–765, DHS subtracts the new fee of $85 from the full cost of $332 for an estimated $247 transfer payment from USCIS to each DACA requestor who chooses to request only deferred action by filing Form I–821D without Form I–765. This would result in a transfer payment from USCIS to DACA requestors as requestors filing only the Form I–821D would now pay less in filing fees than the current filing fee cost for both Forms I–821D and I–765. Table 13 presents the estimates of these potential transfers.

AR2022_100057

| Table 13. Total Transfers, FY 2021–FY 2031, If 30% of DACA Requestors Forgo EAD Applications (from USCIS to certain DACA requestors) (2020 dollars) | |
| --- | --- |
| **FY** | **Transfers** |
| 2021 | $37,249,659 |
| 2022 | $37,249,659 |
| 2023 | $42,501,015 |
| 2024 | $40,973,501 |
| 2025 | $33,765,159 |
| 2026 | $32,997,048 |
| 2027 | $32,452,366 |
| 2028 | $32,066,121 |
| 2029 | $31,792,227 |
| 2030 | $31,598,004 |
| 2031 | $31,460,276 |
| **Undiscounted Total** | **$384,105,034** |
| Source: USCIS analysis. | |

**b. Pre-Guidance Baseline**

As noted above, the period of analysis for this baseline also includes the time period FY 2012–FY 2020, which includes the time period during which DHS has operated under the Napolitano Memorandum, to provide a more informed picture of the total impact of the DACA program. We proceed by taking into account the DACA population from this time period (given by the historical data of Table 7 and Table 9), but applying all the assumptions (for example, on wages and age distributions) as presented before. In essence, in this baseline, we assume the DACA program never existed but instead of starting the analysis in FY 2021 we start the analysis from FY 2012 spanning to FY 2031, analyzing the potential effects of the proposed rule's provisions starting in FY 2012. As a result, the Pre-Guidance baseline condition is similar to the state of the world under the July 16, 2021 district court decision, should the stay of that decision ultimately be lifted.

**(1) Population Estimates and Other Assumptions**

For the Pre-Guidance Baseline, the total population estimates include all the projected populations described earlier in this analysis for FY 2021–FY 2031, in Table 8 and Table 10, while also adding the historical population numbers presented in Table 7 and Table 9 for FY 2012–FY 2020. To conserve space and time, we will not repeat those numbers here.

**(2) Forms and Fees**

All the forms and fees remain the same in the Pre-Guidance Baseline, except that Form I–821D has a fee of $85 and there is no fee charged for biometrics collection.

**(3) Wage Assumptions**

For the Pre-Guidance Baseline, the wage assumptions remain as presented previously with an overall average compensation for the DACA requestors of $24.20 and a total compensation rate for preparers of $103.81.

**(4) Time Burdens**

For the Pre-Guidance Baseline, all the time burdens remain as presented previously.

**(5) Costs of the Proposed Regulatory Changes**

The Pre-Guidance Baseline represents a world without DACA; that is, all baseline impacts are $0. DHS calculates the proposed rule's impacts relative to this baseline of $0 costs, benefits, and transfers. As presented previously, we maintain the assumption that only 70 percent of requestors will apply for an EAD given that this proposed rule allows this option. This will serve as a lower bound estimate of costs. Given the population estimates, form fees, time burdens, wage assumptions, biometrics fee, travel costs, and biometrics time burden information, DHS presents next the application costs for time period FY 2012–FY 2031. The cost per requestor in a scenario where all DACA requestors (100%) apply for an EAD is $1,138.36. The cost per requestor in a scenario where only 70 percent of DACA requestors apply for an EAD is $922.07. Multiplying these per-requestor costs with the population estimates yields total costs. The following tables present our quantified and monetized cost estimates.

| | **Table 14. Total Costs Relative to the Pre-Guidance Baseline, FY 2012–FY 2031 (2020 dollars)** | |
|---|---|---|
| **FY** | **Costs if 100% Apply for an EAD** | **Costs if 70% Apply for an EAD** |
| 2012 | $179,662,760 | $145,527,406 |
| 2013 | $505,394,146 | $409,370,864 |
| 2014 | $300,284,493 | $243,231,393 |
| 2015 | $551,362,250 | $446,605,173 |
| 2016 | $310,792,692 | $251,743,067 |
| 2017 | $587,740,811 | $476,071,924 |
| 2018 | $329,863,632 | $267,190,590 |
| 2019 | $464,635,177 | $376,355,969 |
| 2020 | $391,519,471 | $317,132,015 |
| 2021 | $572,247,113 | $463,521,979 |
| 2022 | $572,247,113 | $463,521,979 |
| 2023 | $652,920,958 | $528,868,050 |
| 2024 | $629,454,553 | $509,860,187 |
| 2025 | $518,716,551 | $420,162,054 |
| 2026 | $506,916,464 | $410,603,945 |
| 2027 | $498,548,793 | $403,826,106 |
| 2028 | $492,615,116 | $399,019,808 |
| 2029 | $488,407,430 | $395,611,570 |
| 2030 | $485,423,679 | $393,194,722 |
| 2031 | $483,307,844 | $391,480,888 |
| **Undiscounted Total** | **$9,522,061,046** | **$7,712,899,688** |
| Source: USCIS analysis. | | |

The DACA program also creates cost savings for DHS that are not simple to quantify and monetize. For instance, the DACA program simplifies many encounters between DHS and certain noncitizens, reducing the burden upon DHS of vetting, tracking, and potentially removing DACA recipients. Cost savings vary considerably depending on the circumstances of the encounter; the type of enforcement officer involved; relevant national security, border security, and public safety considerations; and any intervening developments in the noncitizen's situation and equities. In addition, some cost savings that historically have been considered as part of deferred action decision making are inherently difficult to quantify, such as costs associated with taking enforcement action without first considering "the likelihood of ultimately removing the alien, the presence of sympathetic factors that could adversely affect future cases or generate bad publicity . . . , and whether the alien had violated a provision that had been given high enforcement priority." [369]

(6) Benefits of the Proposed Regulatory Changes

There are quantified and monetized benefits and unquantified and qualitative benefits associated with this proposed rule. The quantified and monetized benefits stem from the income earned by DACA recipients who have received an EAD and choose to participate in the labor market. By participating in the labor market, DACA recipients are increasing the production of the economy and earning wages, which in turn leads to additional consumption. DHS acknowledges the possibility that certain DACA recipients might have participated in the informal labor market and earned wages prior to being granted lawful presence and work authorization under the DACA program. For this segment of the DACA-recipient population, DHS could be overestimating the quantified benefits in the form of earned income directly attributable to receiving work authorization. Adjusting the quantified benefits to show only income attributable to work authorization under DACA would entail estimating the difference between the compensation these individuals might expect to earn in the informal labor market and the compensation estimates presented in

[369] *See AADC*, 525 U.S. at 484 n.8 (citing 16 C. Gordon, S. Mailman, and S. Yale-Loehr, *Immigration Law and Procedure* § 242.1 (1998)).

AR2022_100059

this analysis, multiplied by the estimate of this population.[370]

For example, Borjas and Cassidy (2019) examine the wage differential between informal and formal work for immigrant populations. They apply their analysis of a wage differential, or ''wage penalty,'' to an estimated proxy of the DACA-eligible population, suggesting that the wage earned as a documented noncitizen would be, on average, 4.5% to 6.8% higher than the wage of an individual working as an undocumented noncitizen. This phenomenon also is discussed in a recently published piece on the economic benefits of unauthorized immigrants gaining permanent legal status, which points out that there exist per-hour income differentials when comparing unauthorized immigrant workers to native-born and legal immigrant workers.[371] In contrast, in a survey of 1,157 DACA recipients fielded by Wong (2020), respondents age 25 and older (n = 882) reported wage increases of 129% ($27.17/$11.89 = 2.285) since receiving DACA.[372] If done properly, such an adjustment would yield a more accurate estimate of the quantified benefits attributable to the receipt of work authorization under DACA.[373] DHS welcomes public comment

regarding wage differentials and wage penalties of unauthorized and authorized workers, including differences in wages among those immigrant workers participating in formal or informal employment.

Other empirical and conceptual issues are also challenging here. In addition to the difficulty of identifying the correct adjustment to the quantified benefits due to wages presented in this analysis, the Department recognizes that the lack of work authorization under DACA could push immigrants to seek informal work with greater hazards and vulnerabilities to exploitation. Seeking and engaging in that informal work would involve welfare losses (hedonic as well as economic).

In addition, DHS is considering whether to make an additional modification to the estimated benefits in order to help ensure DHS is not overestimating the quantified benefits directly attributable to receiving DACA. For those who entered the labor market after receiving work authorization and began to receive paid compensation from an employer, counting the entire amount received by the employer as a benefit likely results in an overestimate. Even without working for wages, the time spent by an individual has value. For example, if someone performs childcare, housework, or other activities without paid compensation, that time still has value. Consequently, a more accurate estimate of the net benefits of receiving work authorization under the proposed rule would take into account the value of time of the individual before receiving work authorization. For example, the individual and the economy would gain the benefit of the DACA recipients entering the workforce and receiving paid compensation but would lose the value of their time spent performing non-paid activities. Due to the wide variety of non-paid activities an individual could pursue without DACA work authorization, it is difficult to estimate the value of that time. DHS

is requesting public comment on how to best value the non-paid time of those who were not part of the authorized workforce without DACA. One possible method is to use 50% of wages as a proxy of the value for this non-paid time. DHS requests public comment on ways to best estimate the value of this non-paid time.

DHS welcomes public comment and/or data on all these issues, including, for example, data regarding wages earned by the DACA-eligible or DACA-approved populations both with and without work authorization, which DHS may be able to use in order to adjust the benefit estimates presented in Table 14 in a final rule.

For benefit calculations, DHS makes use of the previously estimated average annual compensation of DACA EAD recipients of $50,341 multiplied by 70 percent of each the population data in Table 7 and the population estimates in Table 8. Recall, DHS estimated that 70 percent of DACA recipients will choose to participate in the labor market, potentially earning income. This earned income is presented here as the quantified and monetized benefit of this proposed rule because of recipients having an EAD and working. The benefit (from income earnings) per applicant is $35,238.77 ($50,341 * 70%), assuming that these jobs were added to the economy and that DACA workers were not substituted for other workers. Multiplying this per-applicant benefit by the population projections presented earlier in Table 7 and Table 8 and subtracting the portion of income that is a transfer from the DACA population to the Federal Government yields the results in Table 15.[374]

---

[370] See Borjas and Cassidy (2019).

[371] See White House Council of Economic Advisors, *The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants* (Sept. 17, 2021), *https:// www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants*.

[372] See Wong (2020). DHS notes that the intervening years of experience could explain some of this growth rate.

[373] Borjas and Cassidy (2019) and Wong (2020) suggest that the additional earnings from wages presented in this proposed rule, for this segment of the DACA population, would have to be adjusted by this formula: NPRM estimated DACA wage— (NPRM DACA estimated wage/(1 + wage differential %)). This adjustment multiplied by this population yields a more accurate estimate of the quantified and monetized benefits of this proposed rule.

[374] The portion of total potential income earned that is a payroll tax transfer from the DACA working population to the Federal Government is 7.65%. Multiplying the benefits numbers in Table 15 by [1/(1 − 0.0765)] yields the pre-tax overall total potential income earned. Section V.A.4.b.(7) discusses more details on the calculations and transfer estimates.

| Table 15. Total Benefits Relative to the Pre-Guidance Baseline, FY 2012–FY 2031 (2020 dollars) | |
| --- | --- |
| **FY** | **Benefits** |
| 2012 | $65,704,318 |
| 2013 | $15,388,934,012 |
| 2014 | $19,787,348,312 |
| 2015 | $21,235,284,027 |
| 2016 | $22,123,707,937 |
| 2017 | $22,798,714,851 |
| 2018 | $22,913,363,841 |
| 2019 | $21,496,343,976 |
| 2020 | $21,064,368,190 |
| 2021 | $21,826,347,756 |
| 2022 | $22,615,891,066 |
| 2023 | $23,433,995,208 |
| 2024 | $24,281,693,337 |
| 2025 | $25,160,055,982 |
| 2026 | $26,070,192,397 |
| 2027 | $27,013,251,962 |
| 2028 | $27,990,425,634 |
| 2029 | $29,002,947,452 |
| 2030 | $30,052,096,096 |
| 2031 | $31,139,145,259 |
| **Undiscounted Total** | **$455,459,811,615** |
| Source: USCIS analysis. | |

DHS notes that to whatever extent a DACA recipient's wages otherwise would be earned by another worker, the benefits in Table 15 could be overstated (*see* Section V.A.4.d for additional analysis).

The unquantified and qualitative benefits stem in part from the forbearance component of an approved DACA request. The DACA requestors who receive deferred action under this proposed rule would enjoy additional benefits relative to the Pre-Guidance Baseline. We will describe these next along with any other qualitative impacts this proposed rule creates relative to the Pre-Guidance Baseline.

Some of the benefits associated with the DACA program accrue to DHS (as discussed above), whereas others accrue to the noncitizens who are granted deferred action and employment authorization, and still others accrue to family members, employers, universities, and others. Quantification and monetization of many of these benefits is unusually challenging. E.O. 13563 states that

each agency is directed to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible. Where appropriate and permitted by law, each agency may consider (and discuss qualitatively) values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts.[375]

It is essential to emphasize that the goals of this regulation include protection of equity, human dignity, and fairness, and that DHS is keenly alert to distributive impacts. DHS also recognizes that while some of those qualitative benefits are difficult or impossible to measure, it is essential

that they be considered. Under the proposed regulation, deferred action may be available to people who came to the United States many years ago as children—often as young children. As discussed above, in DHS's view, scarce resources are not best expended with respect to people who meet the relevant criteria. In addition, DHS believes forbearance of removal for such individuals furthers values of equity, human dignity, and fairness.

It is not simple to quantify and monetize the benefits of forbearance for those who obtain deferred action and their family members. These challenging-to-quantify benefits include (1) a reduction of fear and anxiety for DACA recipients and their families,[376] (2) an increased sense of acceptance and

---

[375] 76 FR 3821 (Jan. 21, 2011).

[376] Osea Giuntella, et al., *Immigration policy and immigrants' sleep. Evidence from DACA*, 182 J. of Econ. Behav. & Org. 1 (Feb. 2021).

AR2022_100061

belonging to a community, (3) an increased sense of family security, and (4) an increased sense of hope for the future. Some of these benefits are connected with equity and fairness, mentioned in E.O. 13563; others are plausibly connected with human dignity, also mentioned in that E.O. Again, these benefits are difficult to quantify.[377] It might be tempting to try to compare the benefits of the reduced risk of deportation to other benefits from risk reduction, such as the reduction of mortality and morbidity risks. But any such comparison would be highly speculative, and DHS does not believe that it can monetize the total value of these specific benefits to DACA recipients. A possible (and very conservative) lower bound estimate could be the cost of requesting DACA; that is, it would be reasonable to assume that the DACA-approved population values these benefits at least as much as the cost of requesting DACA. DHS does not speculate on an upper bound but concludes that it could well be a substantially large sum, much larger than the lower bound; the benefits of items (1), (2), (3), and (4) above are likely to be high. DHS invites comments on the challenges of quantification here and on how they might be met.

DHS notes as well that DACA recipients could qualify for discretionary advance parole, which would allow them to travel outside of the United States during the duration of their deferred action and be allowed to return to the United States.[378] In addition to the benefits of travel itself, DHS recognizes that some DACA recipients who were not previously lawfully admitted or paroled into the United States and are otherwise eligible to adjust status to that of a lawful permanent resident (such as through employment or family relationships) may satisfy the "inspected and admitted or paroled" requirement of the adjustment of status statute at 8 U.S.C. 1255(a) upon their return to the United States through advance parole. However, DHS may grant advance parole to any individual who meets the statutory criteria with or without lawful status or deferred action, and a grant of advance parole alone does not create a pathway to lawful status or citizenship. Regardless, DHS is also unable to quantify the value of advance parole to the DACA population. DHS welcomes

public comments on these specific benefits and, in particular, on whether and how quantitative estimates might be operationalized.

Employment authorization and receipt of an EAD grants additional benefits to the DACA-approved population and their families. An EAD can serve as official personal identification, in addition to serving as proof that an individual is authorized to work in the United States for a specific time period. In certain States, depending on policy choices made by the State, an EAD also could be used to obtain a driver's license or other government-issued identification. Similar to the benefits that are derived from being granted deferred action, DHS is unable to estimate the total value of benefits from having official personal identification or a driver's license for individuals in the DACA population. DHS invites public comments on whether and how quantitative estimates might be used for benefits derived from being granted employment authorization and receiving an EAD, such as serving as official personal identification, or as a conduit to receiving additional tangential benefits like a driver's license.

The fee structure in the proposed rule may result in some additional qualitative benefits relative to the No Action Baseline, and may result in increased benefits relative to the Pre-Guidance Baseline, as compared to the existing fee structure. Providing the option to forgo requesting employment authorization when requesting deferred action using Form I–821D, and thus pay only the accompanying $85 fee, could incentivize noncitizens to request DACA by reducing some of the financial barriers to entry for individuals who potentially qualify for deferred action, but do not need (or yet need) employment authorization, and desire the benefits associated with deferred action. Such individuals otherwise may be discouraged from requesting DACA due to the current $495 cost to file. For example, it is possible that some persons who are in school, receive scholarships, or have other types of school or non-school aid, and who value the benefits from deferred action, might find the lower cost of the program ($85 without employment authorization) more attractive than the current cost to request DACA ($495) and be encouraged to do so. Additionally, the proposed rule allows the current DACA-approved population to continue enjoying the advantages of the policy and have the option to request renewal of DACA in the future without also requesting a renewal of employment authorization.

Finally, as discussed above, the proposed rule reiterates USCIS' longstanding codification in 8 CFR 1.3(a)(4)(vi) of agency policy that a noncitizen who has been granted deferred action is considered "lawfully present"—a specialized term of art that does not confer lawful status or the right to remain in the United States—for the discrete purpose of authorizing the receipt of certain Social Security benefits consistent with 8 U.S.C. 1611(b)(2). The proposed rule also reiterates longstanding policy that a noncitizen who has been granted deferred action does not accrue "unlawful presence" for purposes of INA sec. 212(a)(9) (imposing certain admissibility limitations for noncitizens who departed the United States after having accrued certain periods of unlawful presence). These benefits as well are difficult to quantify in part due to the time-limited nature of the benefit, the age of the relevant population, and the various ways in which accrual of unlawful presence might ultimately affect an individual based on their immigration history. DHS welcomes comments on ways to evaluate these benefits.

(7) Transfers of the Proposed Regulatory Changes

Relative to the Pre-Guidance Baseline, the proposed rule would result in tax transfers to different levels of government, assuming that DACA recipients who have employment perform work that is new to the economy rather than substituting their labor for the labor of workers already employed in the economy. It is difficult to quantify tax transfers because individual tax situations vary widely (as do taxation rules imposed by different levels of government), but DHS estimates the potential increase in transfer payments to Federal employment tax programs, namely Medicare and Social Security, which have a combined payroll tax rate of 7.65 percent (6.2 percent and 1.45 percent, respectively).[379] With both the employee and employer paying their respective portion of Medicare and Social Security taxes, the total estimated increase in tax transfer payments from employees and employers to Medicare and Social Security is 15.3 percent. This analysis relies on this total tax rate to calculate these transfers relative to the Pre-Guidance Baseline. DHS takes this rate and multiplies it by the total (pre-

---

[377] On some of the conceptual and empirical issues, *see* Matthew Adler, *Fear Assessment: Cost-Benefit Analysis and the Pricing of Fear and Anxiety,* 79 Chicago-Kent L. Rev. 977 (2004).

[378] *See* 8 U.S.C. 1182(d)(5), 8 CFR 212.5, authorizing parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit.

[379] Internal Revenue Service, "Topic No. 751 Social Security and Medicare Withholding Rates," *https://www.irs.gov/taxtopics/tc751* (last updated Mar. 10, 2021).

tax income earnings) benefits,[380] which yields our transfer estimates for this section. Table 16 presents these estimates.

| FY | Transfers |
|---|---|
| **Table 16. Total Employment Federal Tax Transfers, FY 2012–FY 2031 (from DACA employees and employers to the Federal Government) (2020 dollars)** | |
| 2012 | $10,885,501 |
| 2013 | $2,549,547,270 |
| 2014 | $3,278,250,451 |
| 2015 | $3,518,135,849 |
| 2016 | $3,665,324,650 |
| 2017 | $3,777,155,790 |
| 2018 | $3,796,150,155 |
| 2019 | $3,561,386,712 |
| 2020 | $3,489,819,527 |
| 2021 | $3,616,059,780 |
| 2022 | $3,746,866,630 |
| 2023 | $3,882,405,270 |
| 2024 | $4,022,846,866 |
| 2025 | $4,168,368,777 |
| 2026 | $4,319,154,777 |
| 2027 | $4,475,395,290 |
| 2028 | $4,637,287,625 |
| 2029 | $4,805,036,232 |
| 2030 | $4,978,852,954 |
| 2031 | $5,159,059,778 |
| **Undiscounted Total** | **$75,457,989,883** |
| Source: USCIS analysis. | |

Part of the DACA requestor population may choose only to request deferred action through Form I–821D. If this were to happen, this would result in a transfer from USCIS to those DACA requestors as requestors filing only the Form I–821D (proposed fee: $85) would now pay less in filing fees than the current filing fee cost for both Forms I–821D and I–765. As previously discussed, the cost to USCIS of adjudicating Form I–821D is $332. The difference of $247 multiplied by 30% of the DACA requestor population yields the potential transfers if 30% of DACA requestors apply for deferred action only. Table 17 presents the estimates of these potential transfers.

---

[380] The benefit (from pre-tax income earnings) per applicant is $35,238.77 ($50,341 * 70%). Multiplying this benefit per applicant by the population projections presented earlier in Table 7 and Table 8 yields total pre-tax earnings. Multiplying the 15.3% payroll tax rate to this pre-tax total yields the Table 16 estimates.

**Table 17. Total Transfers, FY 2012–FY 2031, If 30% of DACA Requestors Forgo EAD Applications (from USCIS to certain DACA requestors) (2020 dollars)**

| FY | Transfers |
|---|---|
| 2012 | $11,694,907 |
| 2013 | $32,897,955 |
| 2014 | $19,546,617 |
| 2015 | $35,890,187 |
| 2016 | $20,230,634 |
| 2017 | $38,258,201 |
| 2018 | $21,472,031 |
| 2019 | $30,244,804 |
| 2020 | $25,485,435 |
| 2021 | $37,249,659 |
| 2022 | $37,249,659 |
| 2023 | $42,501,015 |
| 2024 | $40,973,501 |
| 2025 | $33,765,159 |
| 2026 | $32,997,048 |
| 2027 | $32,452,366 |
| 2028 | $32,066,121 |
| 2029 | $31,792,227 |
| 2030 | $31,598,004 |
| 2031 | $31,460,276 |
| **Undiscounted Total** | **$619,825,804** |

Source: USCIS analysis.

BILLING CODE 9111–97–C

c. Costs to the Federal Government

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing immigration adjudication and naturalization services by DHS, including administrative costs and services provided without charge to certain applicants and petitioners.[381] Generally, DHS establishes USCIS fees according to the estimated cost of adjudication based on its relative adjudication burden and use of USCIS resources. Fees are established at an amount that is necessary to recover these assigned costs, such as clerical, officer, and managerial salaries and benefits, plus an amount to recover

unassigned overhead (*e.g.*, facility rent, information technology equipment and systems) and immigration benefits provided without a fee charge. DHS established the current fee for Form I–765, Application for Employment Authorization, in its FY 2016/FY 2017 USCIS Fee Rule at a level below the estimated full cost of adjudication but raised other fees to provide for full cost recovery to USCIS overall. DHS proposes no change to the $410 fee for Form I–765 in this NPRM and will review the fee in the context of an overall adjustment to the USCIS fee schedule. However, in instances where DHS determines it to be in the public interest, DHS establishes fees that are below the estimated full cost and charges other benefit requestors more to provide for the recovery of USCIS' costs. As previously discussed, DHS has

determined that it is in the public interest to hold the fee for Form I–821D, Consideration of Deferred Action for Childhood Arrivals, below the estimated full cost of adjudication. Consequently, if the primary fee proposal is finalized, the rule may result in the transfer of a portion of these estimated full costs of adjudication to the fee-paying population. Moreover, another form affected by this proposed rule that currently does not charge a filing fee is Form I–765WS, I–765 Worksheet, which DACA requestors must file with Form I–765. DHS notes the time necessary for USCIS to review the information submitted with each of these forms includes the time to adjudicate the underlying benefit request. DHS notes that the proposed rule may increase USCIS' costs associated with adjudicating immigration benefit

381 *See* INA sec. 286(m), 8 U.S.C. 1356(m).

requests. Future adjustments to the fee schedule may be necessary to recover these additional operating costs and will be determined at USCIS's next comprehensive biennial fee review. DHS invites public comments on the potential impacts of these additional operating costs.

d. Labor Market Impacts

The projected active DACA population of the proposed rule in the *No Action Baseline* section of the analysis suggests that about 16,391 new participants [382] could enter the U.S. labor force in the first year of implementation of the proposed rule as compared to the number of DACA recipients in the labor market in FY 2020 (based on the 70% labor force participation rate presented earlier). This number increases annually at a growth rate of 3.6174%, reaching up to 23,384 new participants in the last year of analysis, FY 2031. As of 2020, there were an estimated 160,742,000 people in the U.S. civilian labor force.[383] The aforementioned estimate of 16,391 new participants in the U.S. labor force in FY 2021 would represent approximately 0.0102% of the 2020 overall U.S. civilian labor force.[384] Of course, as noted above, these figures likely represent an overestimate, insofar as some individuals otherwise would be engaged in informal employment.

The top four States where current DACA recipients reside represent about 55 percent of the total DACA-approved population: California (29%), Texas (16%), Illinois (5%), and New York (4%).[385] These States may have a slightly larger share of potentially additional DACA workers compared with the rest of the United States. Assuming the estimate for first year impacts could be distributed following the same patterns, DHS estimates the following potential impacts. California could receive approximately 4,753 (*i.e.,* 29% * 16,391) additional workers in the first year of implementation; Texas 2,623 additional workers; Illinois 820 additional workers; and New York 656 additional workers. To provide

additional context, in April of 2021, California had a population of 18,895,158 in the civilian labor force in February 2021, Texas had 14,034,972, Illinois had 6,146,496, and New York had 9,502,491.[386] As an example, the additional 4,753 workers who could be added to the Californian labor force in the first year after promulgation of this proposed rule would represent about 0.0252% of the overall California labor force.[387] The potential impacts to the other States would be lower (*e.g.,* for Texas, the impact would be 0.0187%).

As noted above, the analysis of the proposed rule relative to the Pre-Guidance Baseline entails consideration of effects going back to FY 2012, when the program was introduced and the surge of new requestors occurred. Because the Napolitano Memorandum was released in June of 2012, the FY 2012 September 30th count of 2,019 active DACA participants does not cover a full fiscal year; therefore, we add FY 2012 and FY 2013 together, adjusting by the 70% labor market participation rate, for a count of new active DACA entrants in the U.S. labor market equal to 332,429. Applying this number to the U.S. labor market statistics, as in the No Action Baseline labor market analysis above, we estimate that this number of new entrants would represent about 0.2139% of the 2013 overall US. civilian labor force of 155,389,000.[388] As discussed in the preceding paragraph, for California, the new active DACA entrant population in FY 2012 and FY 2013 would represent about 0.5102% of California's April 2021 labor force, 0.3790% of Texas's, 0.2704% of Illinois's, and 0.1399% of New York's. Again, these figures likely represent an overestimate, insofar as some individuals otherwise would be engaged in informal employment.

As noted above, the relative proportion of DACA recipients in any given labor market would depend on the number of active DACA recipients who choose to work and the size of the labor market at that time. In future years within the period of analysis, the

number of DACA recipients in the labor force would be expected to increase because, as indicated in Table 8, the RIA projects an increase in the active DACA population in future years. Even in FY 2031, however—when the projected active DACA population would be at its peak of 956,863—the number estimated to participate in the labor force would be 669,804, or 0.4167 percent of the 2020 U.S. civilian labor force.[389]

Although the estimated annual increases in the active DACA population in this proposed rule are small relative to the total U.S. and individual State labor forces, DHS recognizes that, in general, any increase in worker supply may affect wages and, in turn, the welfare of other workers and employers. However, the effects are not obvious as changes in wages depend on many factors and various market forces, such as the type of occupation and industry, geographic market locations, and overall economic conditions. For example, there are industries where labor demand might outpace labor supply, such as in healthcare, food services, and software development sectors. BLS projects that home health and personal care aides occupations will grow by about 34 percent over the next 10 years, cooks in restaurants by about 23 percent, and software development occupations by about 22 percent.[390] In industries or sectors such as these, holding everything else constant, increases in the labor supply might not be enough to satisfy labor demand. As a result, wages might rise to attract qualified workers, thereby improving welfare for all workers in these sectors. The opposite could happen for industries or sectors where labor supply outpaces labor demand. DHS cannot predict the degree to which DACA recipients are substituted for other workers in the U.S. economy since this depends on factors such as industry characteristics as described above as well as on the hiring practices and preferences of employers, which depend on many factors, such as worker skill levels, experience levels, education levels, training needs, and labor market regulations, among others.[391]

Isolating immigration's effect on labor markets has been an ongoing task in the research. A 2017 National Academies of Sciences, Engineering, and Medicine

---

[382] Calculation: (FY 2021 projected active DACA population − FY 2020 projected active DACA population) * 0.70 = (670,693 − 647,278) = 23,415 * 0.70 = 16,391.

[383] Source: BLS, *Labor Force Statistics from the Current Population Survey,* Household Data Annual Averages: Table 3. Employment status of the civilian noninstitutional population by age, sex, and race, *https://www.bls.gov/cps/cpsaat03.htm.*

[384] Calculation: (16,391/160,742,000) * 100 = 0.0102%.

[385] Source: Count of Active DACA Recipients by Month of Current DACA Expiration as of Dec. 31, 2020. DHS/USCIS/OPQ ELIS and CLAIMS 3 Consolidated (queried Jan. 2021).

[386] Source: BLS, News Release, *State Employment and Unemployment—May 2021,* Labor Force Data Seasonally Adjusted: Table 1. Civilian labor force and unemployment by state and selected area, seasonally adjusted, *https://www.bls.gov/news.release/pdf/laus.pdf.*

[387] Calculation: (4,753/18,895,158) × 100 = 0.0252%.

[388] Source: BLS, *Labor Force Statistics from the Current Population Survey,* Household Data Annual Averages: Table 1. Employment status of the civilian noninstitutional population, 1950 to date, *https://www.bls.gov/cps/cpsaat01.htm.*

Calculation: (332,429/155,389,000) * 100 = 0.2139%.

[389] Calculation: (669,804/160,742,000) * 100 = 0.4167%.

[390] Source: BLS, Employment Projections (Sept. 2020), *Occupations with the most job growth,* Table 1.4. Occupations with the most job growth, 2019 and projected 2029, *https://www.bls.gov/emp/tables/occupations-most-job-growth.htm.*

[391] DHS also discusses the possibility of informal employment elsewhere in this analysis.

**D. App. 216**

AR2022_100065

(NAS) publication synthesizes the current peer-reviewed literature on the effects of immigration and empirical findings from various publications.[392] Notably, the 2017 NAS Report addresses a different subject than this proposed rule, which relates to a policy of enforcement discretion with respect to those who arrived in the United States as children and have lived here continuously for well over a decade. Nonetheless, the analysis presented in that report may be instructive.

The 2017 NAS Report cautions that

economic theory alone is not capable of producing definitive answers about the net impacts of immigration on labor markets over specific periods or episodes. Empirical investigation is needed. But wage and employment impacts created by flows of foreign-born workers into labor markets are difficult to measure. The effects of immigration have to be isolated from many other influences that shape local and national economies and the relative wages of different groups of workers.[393]

Whether immigrants are low-skilled or high-skilled workers can matter with respect to effects on wages and the labor market generally.[394] According to the 2017 NAS Report, some studies have found high-skilled immigrant workers positively impact wages and employment of both college-educated and non-college-educated native workers, consistent with the hypothesis that high-skilled immigrants often complement native-born high-skilled workers, and some studies looking at ''narrowly defined fields'' involving high-skilled workers have found adverse wage or productivity effects on native-born workers.[395] In addition,

some studies have found sizable negative short-run wage impacts for high school dropouts, the native-born workers who in many cases are the group most likely to be in direct competition for jobs with immigrants. Even for this group, however, there are studies finding small to zero effects, likely indicating that outcomes are highly dependent on prevailing conditions in the specific labor market into which immigrants flow or the methods and assumptions researchers use to examine the impact of immigration. The literature continues to find less favorable effects for certain disadvantaged workers and for prior immigrants than for natives overall.[396]

With respect to wages, in particular, the 2017 NAS Report described recent research showing that,

when measured over a period of more than 10 years, the impact of immigration on the wages of natives overall is very small. However, estimates for subgroups [of noncitizens] span a comparatively wider range, indicating a revised and somewhat more detailed understanding of the wage impact of immigration since the 1990s. To the extent that negative wage effects are found, prior immigrants—who are often the closest substitutes for new immigrants—are most likely to experience them, followed by native-born high school dropouts, who share job qualifications similar to the large share of low-skilled workers among immigrants to the United States.[397]

With respect to employment, the report described research finding

little evidence that immigration significantly affects the overall employment levels of native-born workers. However, recent research finds that immigration reduces the number of hours worked by native teens (but not their employment rate). Moreover, as with wage impacts, there is some evidence that recent immigrants reduce the employment rate of prior immigrants—again suggesting a higher degree of substitutability between new and prior immigrants than between new immigrants and natives.[398]

Further, the characteristics of local economies matter with respect to wage and employment effects. For instance, the impacts to local labor markets can vary based on whether such market economies are experiencing growth, stagnation, or decline. On average, immigrants tend to locate in areas with relatively high labor demand or low unemployment levels where worker competition for available jobs is low.[399]

Overall, as noted, the 2017 NAS Report observed that when measured over a period of 10 years, the impact of immigration on the wage of the native-born population overall was ''very small.''[400] Although the current and eligible DACA population is a subset of the overall immigrant population, it still shares similar characteristics with the overall immigrant population, including varying education and skill levels. Therefore, one could expect the DACA population to have similar economic impacts as the overall immigrant population, relative to the Pre-Guidance Baseline.

The 2017 NAS Report also discusses the economic impacts of immigration and considers effects beyond labor market impacts. Similar to the native-born population, immigrants also pay taxes; stimulate the economy by consuming goods, services, and entertainment; engage in the real estate market; and take part in domestic

tourism. Such activities contribute to further growth of the economy and create additional jobs and opportunities for both native-born and noncitizen populations.[401]

DHS welcomes public comments and information that can further inform any labor market or wage impact analysis.

e. Fiscal Effects on State and Local Governments

In this section, in consideration of the *Texas II* court's discussion of fiscal effects (as described in the next section of this RIA), DHS briefly addresses the proposed rule's potential fiscal effects on State and local governments. It would be extremely challenging to measure the overall fiscal effects of this proposed rule in particular, especially due to those governments' budgetary control. The 2017 NAS Report discussed above canvassed studies of the fiscal impacts of immigration as a whole, and it described such analysis as extremely challenging and dependent on a range of assumptions. Although the 2017 NAS Report addresses a different subject than this proposed rule (which relates to a policy of enforcement discretion with respect to those who arrived in the United States as children and have lived here continuously for well over a decade), DHS discusses the 2017 NAS Report to offer general context for this topic. DHS then offers a discussion of the potential effects of this proposed rule in particular.

With respect to its topic of study, the NAS wrote that

estimating the fiscal impacts of immigration is a complex calculation that depends to a significant degree on what the questions of interest are, how they are framed, and what assumptions are built into the accounting exercise. The first-order net fiscal impact of immigration is the difference between the various tax contributions immigrants make to public finances and the government expenditures on public benefits and services they receive. The foreign-born are a diverse population, and the way in which they affect government finances is sensitive to their demographic and skill characteristics, their role in labor and other markets, and the rules regulating accessibility and use of government-financed programs.[402]

In addition, second-order effects also clearly occur; analysis of such effects also presents methodological and empirical challenges.[403]

For example, as with the native-born population, the age structure of immigrants plays a major role in assessing any fiscal impacts. Children and young adults contribute less to

---

[392] NAS, *The Economic and Fiscal Consequences of Immigration* (2017), https://www.nap.edu/catalog/23550/the-economic-and-fiscal-consequences-of-immigration (hereinafter 2017 NAS Report).

[393] *Id.* at p. 4.

[394] *Id.* at p. 4.

[395] *Id.* at 6.

[396] *Id.* at 267.

[397] *Id.* at 5.

[398] *Id.* at 5–6.

[399] *Id.* at 5.

[400] *Id.* at 5.

[401] *Id.* at 6–7.

[402] *Id.* at 28.

[403] *Id.* at 342.

society in terms of taxes and draw more in benefits by using public education, for example. On average, as people age and start participating in the labor market they become net contributors to public finances, paying more in taxes than they draw from public benefit programs. Moreover, people in post-retirement again could become net users of public benefit programs. Compared to the native-born population, immigrants also can differ in their characteristics in terms of skills, education levels, income levels, number of dependents in the family, the places they choose to live, etc., and any combination of these factors could have varying fiscal impacts.

Local and State economic conditions and laws that govern public finances and availability of public benefits also vary and can influence the fiscal impacts of immigration. The 2017 NAS Report explained that fiscal impacts of immigration

vary strongly by level of governments. States and localities bear the burden of funding educational benefits enjoyed by immigrant and native children. The federal government transfers relatively little to individuals at young and working ages but collects much tax revenue from working-age immigrant and native-born workers. Inequality between levels of government in the fiscal gains or losses associated with immigration appears to have widened since 1994.[404]

The extent of such gaps among Federal, State, and local impacts necessarily varies by jurisdiction and due to a range of surrounding circumstances.[405]

Based on the information presented in the 2017 NAS Report, DHS approaches the question of State and local fiscal impacts as follows. First, it is clear that the fiscal impacts of the proposed rule to State and local governments would vary based on a range of factors, such as the characteristics of the DACA-recipient population within a particular jurisdiction at a particular time (or over a particular period of time), including recipients' age, educational attainment, income, and level of work-related skill as well as the number of dependents in their families. In addition, fiscal effects would vary significantly depending on local economic conditions and the local rules governing eligibility for public benefits.[406] For example, some States

may allow DACA recipients to apply for subsidized driver's licenses or allow DACA recipients to qualify for instate tuition at public universities, which may not be available to similarly situated individuals without deferred action. These costs to the State will be highly location specific and are, therefore, difficult to quantify.

Second, as compared to the Pre-Guidance Baseline, multiple aspects of this proposed rule suggest that the burden on State and local fiscal resources imposed by the proposed rule is unlikely to be significant, and it may well have a positive net effect. Recall that under the Pre-Guidance Baseline, most noncitizens who otherwise would be DACA recipients likely would remain in the country, but without the additional measure of security, employment authorization, and lawful presence that this proposed rule would provide. Under the Pre-Guidance Baseline, these noncitizens would continue to use and rely, as necessary, on those safety net and other public resources for which they are eligible. As noted above, DACA recipients may be eligible for more benefits under current State and local law than they otherwise would be eligible for without DACA, but they still do not fall under the "qualified alien" category, and are, therefore, generally ineligible for public benefits at the Federal, State, and local levels.[407] Under the proposed rule, these noncitizens can work and build human capital and, depending on the choices made by a State, may be able to secure driver's licenses and other identification, obtain professional licenses, or otherwise realize benefits from the policy. In short, the proposed rule likely would result in increases in tax revenues, as well as decreases in reliance on safety net programs, although effects on specific programs may vary based on a range of factors.

Third, DHS notes the relatively small size of the DACA population in any particular region relative to any given jurisdiction's overall population. The overall long-term fiscal health of State and local jurisdictions where DACA recipients choose to work and live will depend on many other factors not within DHS's control. In the long term, DHS expects State and local governments to continue to choose how

to finance public goods, set tax structures and rates, allocate public resources, and set eligibilities for various public benefit programs, and to adjust these approaches based on the evolving conditions of their respective populations.

In short, DHS acknowledges that though the proposed rule likely would result in some indirect fiscal effects on State and local governments (both positive and negative), such effects would be extremely challenging to quantify fully and would vary based on a range of factors, including policy choices made by such governments. DHS welcomes comment on such fiscal effects and how, if at all, DHS should weigh those fiscal effects in the context of the full range of policy considerations relevant to this rulemaking.

DHS invites public comments on State and local fiscal effects that could be incorporated in the analysis.

### f. Reliance Interests and Other Regulatory Effects

In the *Texas II* district court's decision, the court identified a range of considerations potentially relevant to "arbitrary and capricious" review of any actions that DHS might take on remand,[408] although the court noted that many of these considerations were matters raised by parties and amici in the course of *Texas I* and *Texas II,* and the court did not appear to suggest that DHS was required to analyze each of these considerations. The court further cautioned that it did not mean to suggest "this is an exhaustive list, and no doubt many more issues may arise throughout the notice and comment period. Further, the Court takes no position on how DHS (or Congress, should it decide to take up the issue) should resolve these considerations, as long as that resolution complies with the law." DHS has assessed the considerations presented by the district court, and it presents its preliminary views in this section.[409]

---

[404] *Id.* at 407.

[405] *See, e.g., id.* at 518, 545 (tables displaying State and local revenues per independent person unit and State and local expenditures per independent person unit, by immigrant generation by State, but without adjusting for eligibility rules specific to immigrants).

[406] DHS notes that DACA recipients are not considered "qualified aliens." *See* 8 U.S.C. 1641(b). As noted elsewhere in this preamble, PRWORA also limits the provision of "state and local public

benefits" to noncitizens who are "qualified aliens," with limited exceptions, but provides that States may affirmatively enact legislation making noncitizens "who [are] not lawfully present in the United States" eligible for such benefits. *See* 8 U.S.C. 1621(d).

[407] *See* 8 U.S.C. 1641(b), 1611 (general ineligibility for Federal public benefits), and 1621 (general ineligibility for State public benefits).

[408] In the same section of the court's opinion, the court also suggested that DHS consider a forbearance-only alternative to DACA. The court wrote that "the underlying DACA record points out in multiple places that while forbearance fell within the realm of prosecutorial discretion, the award of status and benefits did not. Despite this distinction, neither the DACA Memorandum nor the underlying record reflects that any consideration was given to adopting a policy of forbearance without the award of benefits." DHS has addressed this issue in the *Regulatory Alternatives* section below.

[409] DHS has opted to address these considerations out of deference to the district court's memorandum and order, and in an abundance of caution. This decision should not be viewed as a concession that DHS must or should consider the various considerations raised by the district court, with respect to this proposed rule or any other proposed rule.

First, the court raised potential reliance interests of States and their residents, writing that

for decades the states and their residents have relied upon DHS (and its predecessors) to protect their employees by enforcing the law as Congress has written it. Once again, neither the DACA Memorandum nor its underlying record gives any consideration to these reliance interests. Thus, if one applies the Supreme Court's rescission analysis from *Regents* to DACA's creation, it faces similar deficiencies and would likely be found to be arbitrary and capricious.

In developing this proposed rule, DHS has considered a wide range of potential reliance interests. As noted throughout this preamble, reliance interests can take multiple forms, and may be entitled to greater or lesser weight depending on the nature of the Department action or statement on which they are based. Such interests can include not only the reliance interests of DACA recipients, but also those indirectly affected by DHS's actions, including DACA recipients' family members, employers, schools, and neighbors, as well as the various States and their other residents. Some States have relied on the existence of DACA in setting policies regarding eligibility for driver's licenses, instate tuition, State-funded health care benefits, and professional licenses.[410] Other States may have relied on certain aspects of DACA—such as employment authorization or lawful presence—in making other policy choices.[411]

In addition, prior to 2012, some States may have relied on the pre-DACA status quo in various ways, although the relevance of such reliance interests may be attenuated by the fact that DACA has been in existence since 2012, and by the fact that the executive branch has long exercised, even prior to 2012, various forms of enforcement discretion with features similar to DACA (*see* Section III.A for examples). DHS is aware of such interests and has taken them into account; it does not believe they are sufficient to outweigh the many considerations, outlined above, that support the proposed rule. DHS seeks

comments on potential reliance interests of all kinds, including any reliance interests established prior to the issuance of the Napolitano Memorandum, and how DHS should accommodate such asserted reliance interests in a final rule.

Second, the court wrote that "the parties and amici curiae have raised various other issues that might be considered in a reformulation of DACA," as follows (in the court's terms):

1. The benefits bestowed by the DACA recipients on this country and the communities where they reside;

2. the effects of DACA or similar programs on legal and illegal immigration;

3. the effects of DACA on the unemployed or underemployed legal residents of the States;

4. whether DACA amounts to an abandonment of the executive branch's duty to enforce the law as written (as the plaintiff States have long claimed);

5. whether any purported new formulation violates the equal protection guarantees of the Constitution (as Justice Sotomayor was concerned that DACA's rescission would); and

6. the costs DACA imposes on the States and their respective communities.

The court also identified "more attenuated considerations," as follows:

7. The secondary costs imposed on States and local communities by any alleged increase in the number of undocumented immigrants due to DACA; and

8. what effect illegal immigration may have on the lucrative human smuggling and human trafficking activities of the drug cartels that operate on our Southern border.

Throughout the preamble generally and in this RIA specifically, DHS has addressed several of these issues relative to both baselines, and we seek comment on all of them. DHS addresses each question briefly below, with the expectation of additional engagement by the public during the comment period for this proposed rule.

With respect to item (1), the benefits bestowed by DACA recipients on this country and the communities where they reside are numerous. DHS directs the reader to Section II.A, as well as the discussions of benefits and transfers in this RIA. DACA recipients have made substantial contributions, including as members of families and communities, and have offered substantial productivity and tax revenue through their work in a wide range of occupations.

With respect to item (2), as noted above, DHS does not perceive DACA as having a substantial effect on volumes of lawful and unlawful immigration into the United States.[412] DHS is not aware of any evidence, and does not believe that, DACA acts as a significant material "pull factor" (in light of the wide range of factors that contribute to both lawful and unlawful immigration into the United States).[413] DHS policy and messaging have been and continue to be clear that DACA is not available to individuals who have not continuously resided in the United States since at least June 15, 2007, and that border security remains a high priority for the Department.[414] DHS does not propose to open up the DACA policy to new groups of noncitizens and does not believe that codifying the DACA policy would undermine DHS's enforcement messaging.[415] For the same reasons, DHS does not believe it necessary to address items (7) and (8) above, although DHS welcomes comments to inform DHS's analysis further.

With respect to item (3), DHS details its consideration of potential harm to unemployed and underemployed individuals in the *Labor Market Impacts* section. That section discusses findings from the 2017 NAS Report, which

---

[410] *See, e.g.,* National Conference of State Legislators, "Deferred Action for Childhood Arrivals | Federal Policy and Examples of State Actions," *https://www.ncsl.org/research/immigration/deferred-action.aspx* (last updated Apr. 16, 2020) (describing State actions, in the years following the Napolitano Memorandum, with respect to unauthorized noncitizens generally, DACA recipients in particular, and other classes of noncitizens).

[411] *See, e.g.,* National Conference of State Legislators, "States Offering Driver's Licenses to Immigrants," *https://www.ncsl.org/research/immigration/states-offering-driver-s-licenses-to-immigrants.aspx* (last updated Aug. 9, 2021) (describing multiple State decisions to offer driver's licenses to noncitizens with lawful presence).

[412] As discussed elsewhere in this rule, DHS believes that the proposed rule will not necessarily affect the number of noncitizens it removes each year, but rather helps ensure that finite removal resources are focused on the highest priority cases.

[413] *See, e.g.,* Catalina Amuedo-Dorantes and Thitima Puttitanun, *DACA and the Surge in Unaccompanied Minors at the US-Mexico Border,* 54(4) Int'l Migration 102, 112 (2016) ("DACA does not appear to have a significant impact on the observed increase in unaccompanied alien children in 2012 and 2013.").

[414] For example, DHS continues to invest in new CBP personnel, including hiring more than 100 additional Border Patrol Processing Coordinators in FY 2021, with plans to hire hundreds more. CBP also is investing in technology that enhances its border security mission. Over the last few years, CBP has increased its use of relocatable Autonomous Surveillance Towers (ASTs) along the border, which enable enhanced visual detection, identification, and classification of subjects or vehicles at a great distance via autonomous detection capabilities. ASTs can be moved to areas of interest or high traffic, as circumstances on the ground dictate. To increase situational awareness, CBP also recently integrated the Team Awareness Kit, which provides near real-time situational awareness for USBP agents and the locations of suspected illegal border activities. Advanced technology returns agents to the field and increases the probability of successful interdiction and enforcement.

[415] *See* DACA FAQs; Pekoske Memorandum; *see also* Acting ICE Director Tae D. Johnson, *Interim Guidance: Civil Immigration Enforcement and Removal Priorities* (Feb. 18, 2021). As noted above, on September 15, 2021, the U.S. Court of Appeals for the Fifth Circuit partially stayed a preliminary injunction issued by the U.S. District Court for the Southern District of Texas with respect to the two 2021 policies. *See State of Texas* v. *United States,* No. 21–40618 (5th Cir. Sept. 15, 2021).

summarizes the work of numerous social scientists who have studied the costs and benefits of immigration for decades.

This RIA does not contain a section that discusses the costs of a regulatory alternative in which DACA EADs are terminated or phased out relative to a No Action baseline, although it does contain estimates of costs, benefits, and transfers relative to the Pre-Guidance Baseline, which may be instructive for understanding some of these effects. In such a scenario, as discussed in USCIS' Asylum Application, Interview, and Employment Authorization for Applicants Final Rule (85 FR 38532, June 26, 2020), the lost compensation from DACA recipients could serve as a proxy for the cost of lost productivity to U.S. employers that are unable to find replacement workers in the U.S. labor force. There also could be additional employer costs related to searching for new job applicants.

With respect to item (4), DHS continues to enforce the law as written. As noted in Sections II.A, III.A, and III.C, the use of prioritization and discretion is a necessary element of fulfilling the DHS mission, and the use of deferred action for this purpose is consistent with the longstanding practice of DHS and the former INS.

With respect to item (5), DHS does not believe that the DACA policy or this proposed rule would violate the equal protection component of the Fifth Amendment's Due Process Clause. DHS nonetheless invites comment on whether equal protection principles bear on or would preclude DACA.[416]

With respect to item (6), DHS addresses the issue in Section V.A.4.e above. In short, although such an analysis is challenging for a variety of reasons, multiple aspects of this proposed rule suggest that the proposed rule is unlikely to impose a significant

---

[416] Although the Equal Protection Clause of the Fourteenth Amendment does not apply to the Federal Government, the Supreme Court in *Bolling* v. *Sharpe*, 347 U.S. 497, 500 (1954), held that while "'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' . . . discrimination may be so unjustifiable as to be violative of due process.''

burden on State and local fiscal resources, and it may well have a positive effect.

With respect to items (7) and (8), which relate to the costs of unlawful immigration and human smuggling, DHS disagrees with the premise, as noted in DHS's discussion of item (2) above. As with each of these items, however, DHS welcomes the submission of evidence pertinent to the empirical question, as well as information and views as to how to evaluate and use such evidence.

Finally, the court also stated that "if DHS elects to justify DACA by asserting that it will conserve resources, it should support this conclusion with evidence and data. No such evidence is to be found in the administrative record or the DACA Memorandum. DHS should consider the costs imposed on or saved by all governmental units.'' DHS agrees on the importance of evidence and data and has addressed the resource implications of DACA throughout the proposed rule, including at Sections III.C and V.A.4.b.(5).

g. Discounted Direct Costs, Cost Savings, Transfers, and Benefits of the Proposed Regulatory Changes

To compare costs over time, DHS applied a 3-percent and a 7-percent discount rate to the total estimated costs, cost savings, transfers, and benefits associated with the proposed rule. Table 18 presents a summary of the proposed rule's quantified cost savings relative to the No Action Baseline at 3-percent and 7-percent discount rates.

**BILLING CODE 9111–97–P**

| Form | Source of Cost Savings | Total Estimated Annual Cost Savings (Undiscounted) | Total Estimated Cost Savings Over 11-Year Period (Undiscounted) |
|---|---|---|---|
| | | **Table 18. Total Estimated Potential Cost Savings of the Proposed Rule Discounted at 3 Percent and 7 Percent (relative to the No Action Baseline) (FY 2021–FY 2031)** | |
| Form I-821D | • $85 fee to file form; • Biometrics collection (additional time burden) | Could range between $0 and $43,959,188 | Could range between $0 and $483,551,071 |
| Form I-765 | • $410 fee to file form; • Optional form; • No biometrics collection (less total time burden) | | |
| Form I-765WS | No changes | | |
| **Total Undiscounted Cost Savings** | | **Could range between $0 and $43,959,188** | **Could range between $0 and $483,551,071** |
| **Total Cost Savings at 3-Percent Discount Rate** | | **Could range between $0 and $44,306,430** | **Could range between $0 and $422,249,263** |
| **Total Cost Savings at 7-Percent Discount Rate** | | **Could range between $0 and $44,747,009** | **Could range between $0 and $359,031,274** |

Source: USCIS analysis.

Notes: The larger numbers represent the higher bound cost savings estimates presented earlier based on the 70/30 percent population split assumption. The $0 represents when the entire DACA population requests deferred action and EAD.

Table 19 presents a summary of the proposed rule's potential transfers relative to the No Action Baseline at 3-percent and 7-percent discount rates.

**Table 19. Proposed Rule Potential Transfers from USCIS to Certain DACA Requestors Discounted at 3 Percent and 7 Percent (relative to the No Action Baseline) (FY 2021–FY 2031)**

| Form | Source of Transfers | Total Estimated Annual Transfer (Undiscounted) | Total Estimated Transfers Over 11-Year Period |
|---|---|---|---|
| Form I-821D | • $85 fee to file form;<br>• Biometrics collection (additional time burden) | Could range between $0 and $34,918,639 | Could range between $0 and $384,105,034 |
| Form I-765 | Optional form (optional EAD) | | |
| **Total Undiscounted Transfers** | | **Could range between $0 and $34,918,639** | **Could range between $0 and $384,105,034** |
| **Total Transfers at 3-Percent Discount Rate** | | **Could range between $0 and $35,194,468** | **Could range between $0 and $335,410,419** |
| **Total Transfers at 7-Percent Discount Rate** | | **Could range between $0 and $35,544,439** | **Could range between $0 and $285,193,701** |
| Source: USCIS analysis. | | | |

Table 20 presents a summary of the potential costs relative to the Pre-Guidance Baseline in undiscounted dollars and discounted at 3 percent and 7 percent.

| **Table 20. Total Estimated Potential Costs of the Proposed Rule Discounted at 3 Percent and 7 Percent (relative to the Pre-Guidance Baseline) (FY 2012–FY 2031)** | | | |
|---|---|---|---|
| **Form** | **Source of Costs** | **Total Estimated Annual Costs (Undiscounted)** | **Total Estimated Costs Over 20-Year Period** |
| Form I-821D | • $85 fee to file form; • Biometrics collection (additional time burden) | Could range between $385,644,984 and $476,103,052 | Could range between $7,712,899,688 and $9,522,061,046 |
| Form I-765 | Optional form (optional EAD) | | |
| **Total Undiscounted Costs** | | **Could range between $385,644,984 and $476,103,052** | **Could range between $7,712,899,688 and $9,522,061,046** |
| **Total Costs at 3-Percent Discount Rate** | | **Could range between $378,119,675 and $466,812,583** | **Could range between $7,339,957,122 and $9,061,639,930** |
| **Total Costs at 7-Percent Discount Rate** | | **Could range between $367,333,528 and 453,496,405** | **Could range between $7,154,431,373 and $8,832,596,693** |
| Source: USCIS analysis. | | | |
| Note: The Pre-Guidance Baseline applies reverse-discounts to the costs associated with 100 percent of the FY 2012–FY 2021 population applying for EAD. The lower numbers represent the lower bound cost estimates for FY 2022–FY 2031, presented earlier based on the 70/30 percent population split assumption. The larger numbers represent the costs if the entire projected DACA population requests deferred action/EAD. | | | |

Table 21 presents a summary of the potential benefits relative to the Pre-Guidance Baseline in undiscounted dollars and discounted at 3 percent and 7 percent.

**Table 21. Total Estimated Potential Benefits of the Proposed Rule Discounted at 3 Percent and 7 Percent (relative to the Pre-Guidance Baseline) (FY 2012–FY 2031)**

| Form | Source of Benefits | Total Estimated Annual Benefits (Undiscounted) | Total Estimated Benefits Over 20-Year Period |
|---|---|---|---|
| Form I-821D | • $85 fee to file form;<br>• Biometrics collection (additional time burden) | Could be $22,772,990,581 | Could be $455,459,811,615 |
| Form I-765 | Optional form (optional EAD) | | |
| **Total Undiscounted Benefits** | | **Could be $22,772,990,581** | **Could be $455,459,811,615** |
| **Total Benefits at 3-Percent Discount Rate** | | **Could be $21,883,257,823** | **Could be $424,791,897,651** |
| **Total Benefits at 7-Percent Discount Rate** | | **Could be $20,722,598,193** | **Could be $403,607,063,268** |
| Source: USCIS analysis. | | | |

Table 22 presents a summary of the potential tax transfers relative to the Pre-Guidance Baseline in undiscounted dollars and discounted at 3 percent and 7 percent.

**Table 22. Proposed Rule Employment Federal Tax Transfers from DACA Employees and Employers to the Federal Government Discounted at 3 Percent and 7 Percent (relative to the Pre-Guidance Baseline) (FY 2012–FY 2031)**

| Form | Source of Tax Transfers | Total Estimated Annual Tax Transfer (Undiscounted) | Total Estimated Tax Transfers Over 20-Year Period |
|---|---|---|---|
| Form I-821D | • $85 fee to file form; • Biometrics collection (additional time burden) | Could be $3,772,899,494 | Could be $75,457,989,883 |
| Form I-765 | Optional form (optional EAD) | | |
| **Total Undiscounted Tax Transfers** | | **Could be $3,772,899,494** | **Could be $75,457,989,883** |
| **Total Tax Transfers at 3-Percent Discount Rate** | | **Could be $3,625,492,432** | **Could be $70,377,081,077** |
| **Total Tax Transfers at 7-Percent Discount Rate** | | **Could be $3,433,199,809** | **Could be $66,867,275,980** |
| Source: USCIS analysis. | | | |

Table 23 presents a summary of the potential transfers relative to the Pre-Guidance Baseline in undiscounted dollars and discounted at 3 percent and 7 percent.

AR2022_100074

**Table 23. Proposed Rule Potential Transfers from USCIS to Certain DACA Requestors Discounted at 3 Percent and 7 Percent (relative to the Pre-Guidance Baseline) (FY 2012–FY 2031)**

| Form | Source of Transfers | Total Estimated Annual Transfer (Undiscounted) | Total Estimated Transfers Over 20-Year Period |
|---|---|---|---|
| Form I-821D | • $85 fee to file form;<br>• Biometrics collection (additional time burden) | Could range between $0 and $30,991,290 | Could range between $0 and $619,825,804 |
| Form I-765 | Optional form (optional EAD) | | |
| **Total Undiscounted Transfers** | | **Could range between $0 and $30,991,290** | **Could range between $0 and $619,825,804** |
| **Total Transfers at 3-Percent Discount Rate** | | **Could range between $0 and $30,386,540** | **Could range between $0 and $589,855,308** |
| **Total Transfers at 7-Percent Discount Rate** | | **Could range between $0 and $29,519,741** | **Could range between $0 and $574,946,046** |
| Source: USCIS analysis. | | | |

BILLING CODE 9111–97–C

h. Regulatory Alternatives

Consistent with the Supreme Court's general analysis in *Regents,* and the more recent analysis of the district court in *Texas II,* DHS is keenly alert to the importance of exploring all relevant alternatives. This focus is also consistent with E.O. 12866 and E.O. 13563. As stated in E.O. 12866,

[i]n deciding whether and how to regulate, agencies should assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating. Costs and benefits shall be understood to include both quantifiable measures (to the fullest extent that these can be usefully estimated) and qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider. Further, in choosing among alternative regulatory approaches, agencies should select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity), unless a statute requires another regulatory approach.

Consistent with these requirements, DHS has considered a range of regulatory alternatives to the proposed rule, including alternatives related to a policy of forbearance without employment authorization or the benefits associated with so-called lawful presence. As discussed in detail in Sections III.A through III.C above, the authority to forbear is an undisputed feature of DHS's enforcement discretion, whereas the district court in *Texas II* held that DHS lacked authority to provide employment authorization and benefits such as Social Security benefits to DACA recipients.[417]

The analysis of this forbearance-only alternative is in a sense relatively straightforward. Like the proposed rule, as compared to the Pre-Guidance Baseline, such an approach would confer a range of benefits to DHS, while also conferring benefits to DACA recipients and their families, in the form of increased security, reduced fear and anxiety, and associated values (which we have not been able to quantify). Unlike the proposed rule, however, such an approach would not confer upon DACA recipients, their families, and their communities the benefits of their work authorization and employment, or impose the corresponding costs (both quantified here, to the extent feasible). To that

[417] As the court stated in *Texas II* in objecting to work authorization and lawful presence, "the

individualized notion of deferred action" is an approach "that courts have found permissible in other contexts."

**53811**

extent, a forbearance-only alternative would have substantially lower net benefits, consistent with the numbers discussed above.

For instance, as discussed in Section III.D. above, a policy of forbearance without work authorization also would disrupt the reliance interests of hundreds of thousands of people, as well as the families, employers, and communities that rely on them. It would result in substantial economic losses. It would produce a great deal of human suffering, including harms to dignitary interests, associated with lost income and ability to self-support. It potentially would result in hundreds of thousands of prime-working-age people remaining in the United States while lacking authorization to work to support either themselves or their families. Importantly, it also would deprive American employers and the American public at large of the ability to benefit from valuable work of hundreds of thousands of skilled and educated individuals and disappoint their own, independent reliance interests as well. For the Federal Government, as well as for State and local governments, it likely would have adverse fiscal implications, due to reduced tax revenues. In addition, unlike the proposed rule, such an approach would produce reduced transfers to Medicare and Social Security funds, as well as any other transfers associated with the DACA policy under the No Action Baseline.

A possible alternative to the policy in the proposed rule would include (1) forbearance and (2) work authorization, but exclude (3) ''lawful presence'' and the resulting elimination of one ground of ineligibility for the associated benefits. DHS has considered this alternative and seeks comment on the issues of law and policy associated with it, including data as to the potential effects of such an approach. As noted above, ''lawful presence'' is a term of art; it could not and does not mean ''lawful status.'' But DHS believes that this alternative approach also may be inferior to the proposal, for at least two reasons. First, that approach would single out DACA recipients—alone among other recipients of deferred action, as well as others whose continued presence DHS has chosen to tolerate for a period of time—for differential treatment. Second, DHS is aware that some States have keyed benefits eligibility to lawful presence and may experience unintended indirect impacts if DHS, a decade after issuance of the Napolitano Memorandum, revises that aspect of the

policy.[418] For these reasons, DHS does not at this time believe that it would be preferable to limit the proposal to forbearance and work authorization, but it welcomes comments on that alternative, and on all reasonable alternatives.

Finally, consistent with the *Texas II* district court's equitable decision to stay its vacatur and injunction as it relates to existing DACA recipients, DHS considered the alternative of applying this proposed rule only to existing DACA recipients. Existing DACA recipients have clearer reliance interests in the continuation of DACA than do prospective applicants who have yet to apply. On the other hand, the benefits of the program are equally applicable to those who have yet to apply, and some who might have benefited under the Napolitano Memorandum but have yet to ''age in'' to eligibility to request DACA. Although DHS believes that restricting eligibility to existing DACA recipients would not be desirable or maximize net benefits, DHS welcomes comment on the matter.

DHS invites the public to provide input regarding the current regulatory alternatives presented, suggest any other possible regulatory alternatives, or both.

### B. Regulatory Flexibility Act

The Regulatory Flexibility Act of 1980 (RFA),[419] as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA),[420] requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. The term ''small entities'' comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.[421]

The proposed rule does not directly regulate small entities and is not expected to have a direct effect on small entities. It does not mandate any actions or requirements for small entities in the process of a DACA requestor seeking DACA or employment authorization. Rather, this proposed rule regulates individuals, and individuals are not defined as ''small entities'' by the

RFA.[422] Based on the evidence presented in this analysis and throughout this preamble, DHS certifies that this proposed rule would not have a significant economic impact on a substantial number of small entities. DHS nonetheless welcomes comments regarding potential economic impacts on small entities, which DHS may consider as appropriate in a final rule. For example, DHS seeks data and information on the number of DACA recipients who have started small businesses or work at small businesses.

### C. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector.[423] The inflation-adjusted value of $100 million in 1995 is approximately $169.8 million in 2020 based on the CPI–U.[424] The term ''Federal mandate'' means a Federal intergovernmental mandate or a Federal private sector mandate.[425] The term ''Federal intergovernmental mandate'' means, in relevant part, a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program).[426] The term ''Federal private sector mandate'' means, in relevant part, a provision that would impose an enforceable duty upon the

---

[418] *See supra* note 411.

[419] 5 U.S.C. ch. 6.

[420] Public Law 104–121, tit. II, 110 Stat. 847 (5 U.S.C. 601 note).

[421] A small business is defined as any independently owned and operated business not dominant in its field that qualifies as a small business per the Small Business Act (15 U.S.C. 632).

[422] 5 U.S.C. 601(6).

[423] *See* 2 U.S.C. 1532(a).

[424] *See* BLS, *Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. City Average, All Items, https://www.bls.gov/cpi/tables/ supplemental-files/historical-cpi-u-202103.pdf.*

Steps in calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the most recent current year available (2020); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100.

Calculation of inflation: [(Average monthly CPI–U for 2020—Average monthly CPI–U for 1995)/ (Average monthly CPI–U for 1995)] * 100 = [(258.811 − 152.383)/152.383] * 100 = (106.428/ 152.383) * 100 = 0.6984 * 100 = 69.84 percent = 69.8 percent (rounded).

Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.698 = $169.8 million in 2020 dollars.

[425] *See* 2 U.S.C. 1502(1), 658(6).

[426] 2 U.S.C. 658(5).

private sector except (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program).[427]

This proposed rule does not contain such a mandate, because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to their voluntary choices and would not be a consequence of an enforceable duty. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA.[428] The requirements of title II of UMRA, therefore, do not apply, and DHS has not prepared a statement under UMRA. DHS has, however, analyzed many of the potential effects of this action in the RIA above. DHS welcomes comments on this analysis.

### D. Small Business Regulatory Enforcement Fairness Act of 1996

This proposed rule, if finalized, would be a major rule as defined by section 804 of SBREFA.[429] This proposed rule likely would result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based companies to compete with foreign-based companies in domestic and export markets. Accordingly, absent exceptional circumstances, this rule, if enacted as a final rule, would be effective at least 60 days after the date on which Congress receives a report submitted by DHS as required by 5 U.S.C. 801(a)(1).

### E. Executive Order 13132: Federalism

This proposed rule would not have substantial direct effects on the States, on the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government. DHS does not expect that this rule would impose substantial direct compliance costs on State and local governments or preempt State law. Therefore, in accordance with section 6 of E.O. 13132, this proposed rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### F. Executive Order 12988: Civil Justice Reform

This proposed rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This final rule was written to provide a clear legal standard for affected conduct and was reviewed carefully to eliminate drafting errors and ambiguities, so as to minimize litigation and undue burden on the Federal court system. DHS has determined that this final rule meets the applicable standards provided in section 3 of E.O. 12988.

### G. Paperwork Reduction Act— Collection of Information

Under the PRA,[430] all Departments are required to submit to OMB, for review and approval, any reporting or recordkeeping requirements inherent in a rule. DHS and USCIS are revising two information collections in association with this rulemaking action:

#### USCIS Form I–821D

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0124 and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology (*e.g.*, permitting electronic submission of responses).

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Consideration of Deferred Action for Childhood Arrivals.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–821D; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. The information collected on this form is used by USCIS to determine eligibility of certain noncitizens who entered the United States as minors and meet the guidelines to be considered for DACA.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the I–821D initial requests information collection is 112,254 annually, and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the I–821D renewal requests information collection is 276,459, and the estimated hour burden per response is 3 hours; the estimated total number of respondents for the biometrics collection is 388,713 annually, and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 1,620,933 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $42,758,430.

#### USCIS Form I–765

DHS and USCIS invite the general public and other Federal agencies to comment on the impact to the proposed collection of information. In accordance with the PRA, the information collection notice is published in the **Federal Register** to obtain comments regarding the proposed edits to the information collection instrument.

Comments are encouraged and will be accepted for 60 days from the publication date of the proposed rule. All submissions received must include the OMB Control Number 1615–0040 and the agency name. Comments on this information collection should address one or more of the following four points:

(1) Evaluate whether the collection of information is necessary for the proper performance of the functions of the

---

[427] 2 U.S.C. 658(7).
[428] *See* 2 U.S.C. 1502(1), 658(6).
[429] *See* 5 U.S.C. 804(2).

[430] Public Law 104–13, 109 Stat. 163.

agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology (*e.g.,* permitting electronic submission of responses).

*Overview of information collection:*

(1) *Type of Information Collection:* Revision of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Application for Employment Authorization.

(3) *Agency form number, if any, and the applicable component of DHS sponsoring the collection:* I–765 and I–765WS; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* Primary: Individuals or households. USCIS uses Form I–765 to collect information needed to determine if a noncitizen is eligible for an initial EAD, a new replacement EAD, or a subsequent EAD upon the expiration of a previous EAD under the same eligibility category. Noncitizens in many immigration statuses are required to possess an EAD as evidence of employment authorization.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the I–765 information collection is 2,062,880 annually, and the estimated hour burden per response is 4.5 hours; the estimated total number of respondents for the Form I–765 (e-file) information collection is 106,506 annually, and the estimated hour burden per response is 4 hours; the estimated total number of respondents for the I–765WS information collection is 185,386 annually, and the estimated hour burden per response is 0.5 hours; the estimated total number of respondents for the biometrics collection is 302,535 annually, and the estimated hour burden per response is 1.17 hours; the estimated total number of respondents for the passport photos collection is 2,169,386 annually, and the estimated hour burden per response is 0.5 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 11,240,336 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $379,642,550.

*H. Family Assessment*

DHS has reviewed this proposed rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999,[431] enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.[432] DHS has systematically reviewed the criteria specified in section 654(c)(1) of that act, by evaluating whether this proposed regulatory action: (1) Impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local government or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines the proposed regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

DHS has determined that the implementation of this proposed rule would not negatively affect family well-being, but rather would strengthen it. This regulation would create a positive effect on the family by allowing families to remain together in the United States and enabling access to greater financial stability. More than 250,000 children have been born in the United States with at least one parent who is a DACA recipient.[433] DACA would provide recipients with U.S. citizen children a greater sense of security, which is important for families' overall well-being and success. It would also make recipients eligible for employment authorization, which would motivate DACA recipients to continue their education, graduate from high school,

pursue post-secondary and advanced degrees, and seek additional vocational training, which ultimately would provide greater opportunities, financial stability, and disposable income for themselves and their families.[434]

*I. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This proposed rule has been reviewed in accordance with the requirements of E.O. 13175, Consultation and Coordination with Indian Tribal Governments. E.O. 13175 requires Federal agencies to consult and coordinate with Tribes on a Government-to-Government basis on policies that have Tribal implications, including regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes. DHS has assessed the impact of this rule on Indian Tribes and determined that this proposed rule does not have Tribal implications that require Tribal consultation under E.O. 13175.

*J. National Environmental Policy Act*

DHS Directive 023–01 Rev. 01 (Directive) and Instruction Manual 023–01–001–01 Rev. 01 (Instruction Manual) establish the policies and procedures DHS and its components use to comply with the National Environmental Policy Act (NEPA) and the Council on Environmental Quality (CEQ) regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions (''categorical exclusions'') that experience has shown do not have a significant effect on the human environment and, therefore, do not require an Environmental Assessment or Environmental Impact Statement.[435] The Instruction Manual establishes categorical exclusions that DHS has found to have no such effect.[436] Under DHS implementing procedures for NEPA, for a proposed action to be categorically excluded, it must satisfy each of the following three conditions: (1) The entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no

---

[431] *See* 5 U.S.C. 601 note.
[432] Public Law 105–277, 112 Stat. 2681 (1998).
[433] Svajlenka and Wolgin (2020).

[434] Gonzales (2019); Wong (2020).
[435] 40 CFR 1507.3(e)(2)(ii) and 1501.4.
[436] *See* Instruction Manual, Appendix A, Table 1.

extraordinary circumstances exist that create the potential for a significant environmental effect.[437]

This proposed rule codifies the enforcement discretion policy stated in the Napolitano Memorandum into DHS regulations. It defines the criteria under which DHS will consider requests for DACA, the procedures by which one may request DACA, and what an affirmative grant of DACA will confer upon the requestor.

To whatever extent this rule might have effects on the human environment, if any, DHS believes that analysis of such effects would require predicting a myriad of independent decisions by a range of actors (including current and prospective DACA recipients, employers, law enforcement officers, and courts) at indeterminate times in the future. Such predictions are unduly speculative and not amenable to NEPA analysis.

Nevertheless, if NEPA did apply to this action, the proposed action would clearly fit within categorical exclusion number A3(c), which includes rules that "implement, without substantive change, procedures, manuals, and other guidance documents" as set forth in the Instruction Manual,[438] as the proposed rule codifies the existing DACA policy and is not expected to alter the population who qualify for DACA.

This proposed rule is not part of a larger action and presents no extraordinary circumstances creating the potential for significant environmental effects. Therefore, if NEPA were determined to apply, this rule would be categorically excluded from further NEPA review.

*K. Executive Order 12630: Governmental Actions and Interference With Constitutionally Protected Property Rights*

This proposed rule would not cause a taking of private property or otherwise have taking implications under E.O. 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights. Therefore, a takings implication assessment is not required.

*L. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

E.O. 13045 requires agencies to consider the impacts of environmental health risk or safety risk that may disproportionately affect children. DHS has reviewed this rule and determined that this rule is not a covered regulatory

action under E.O. 13045. Although the rule is economically significant, it would not create an environmental risk to health or risk to safety that may disproportionately affect children. Therefore, DHS has not prepared a statement under this E.O.

## VI. List of Subjects and Regulatory Amendments

### List of Subjects

*8 CFR 106*

Fees, Immigration.

*8 CFR Part 236*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Cultural exchange program, Employment, Penalties, Reporting and recordkeeping requirements, Students.

Accordingly, DHS proposes to amend parts 106, 236, and 274a of chapter I of title 8 of the Code of Federal Regulations as follows:

## PART 106—USCIS FEE SCHEDULE

■ 1. The authority citation for 8 CFR part 106 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1254a, 1254b, 1304, 1356; Pub. L. 107–609; Pub. L. 115–218.

■ 2. Amend § 106.2 by revising paragraph (a)(38) to read as follows:

### § 106.2  Fees.

(a) * * *

(38) *Application for Deferred Action for Childhood Arrivals, Form I–821D:* $85.

* * * * *

## PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

■ 3. The authority citation for part 236 is revised to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 6 U.S.C. 112(a)(2), 112(a)(3), 112(b)(1), 112(e), 202, 251, 279, 291; 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1231, 1232, 1324a, 1357, 1362, 1611; 18 U.S.C. 4002, 4013(c)(4); 8 CFR part 2.

■ 4. Add subpart C, consisting of §§ 236.21 through 236.25, to read as follows:

### Subpart C—Deferred Action for Childhood Arrivals

Sec.
236.21   Applicability.
236.22   Discretionary determination.

236.23   Procedures for request, terminations, and restrictions on information use.
236.24   Severability.
236.25   No private rights.

### § 236.21  Applicability.

(a) This subpart applies to requests for deferred action under the enforcement discretion policy set forth in this subpart, which will be described as Deferred Action for Childhood Arrivals (DACA). This section does not apply to or govern any other request for or grant of deferred action or any other DHS deferred action policy.

(b) Except as specifically provided in this subpart, the provisions of 8 CFR part 103 do not apply to requests filed under this subpart.

(c)(1) Deferred action is an exercise of the Secretary's broad authority to establish national immigration enforcement policies and priorities under 6 U.S.C. 202(5) and section 103 of the Act. It is a form of enforcement discretion not to pursue the removal of certain aliens for a limited period in the interest of ordering enforcement priorities in light of limitations on available resources, taking into account humanitarian considerations and administrative convenience. It furthers the administrability of the complex immigration system by permitting the Secretary to focus enforcement on higher priority targets. This temporary forbearance from removal does not confer any right or entitlement to remain in or re-enter the United States. A grant of deferred action under this section does not preclude DHS from commencing removal proceedings at any time or prohibit DHS or any other Federal agency from initiating any criminal or other enforcement action at any time.

(2) During this period of forbearance, on the basis of this subpart only, DACA recipients who can demonstrate an economic need may apply to USCIS for employment authorization pursuant to 8 CFR 274a.13 and 274a.12(c)(33).

(3) During this period of forbearance, on the basis of this subpart only, a DACA recipient is considered "lawfully present" under the provisions of 8 CFR 1.3(a)(4)(vi).

(4) During this period of forbearance, on the basis of this subpart only, a DACA recipient is not considered "unlawfully present" for the purpose of inadmissibility under section 212(a)(9) of the Act.

### § 236.22  Discretionary determination.

(a) *Deferred Action for Childhood Arrivals; in general.* (1) USCIS may consider requests for Deferred Action for Childhood Arrivals submitted by

---

[437] *See id.* at Section V.B(2)(a) through (c).
[438] *See id.* at Appendix A, Table 1.

aliens described in paragraph (b) of this section.

(2) A pending request for deferred action under this section does not authorize or confer any interim immigration benefits such as employment authorization or advance parole.

(3) Subject to paragraph (c) of this section, the requestor bears the burden of demonstrating by a preponderance of the evidence that he or she meets the threshold criteria described in paragraph (b) of this section.

(b) *Threshold criteria.* Subject to paragraph (c) of this section, a request for deferred action under this section may be granted only if USCIS determines in its sole discretion that the alien meets each of the following threshold criteria and merits a favorable exercise of discretion:

(1) *Came to the United States under the age of 16.* The requestor must demonstrate that he or she first resided in the United States before his or her sixteenth birthday.

(2) *Continuous residence in the United States from June 15, 2007, to the time of filing of the request.* The requestor also must demonstrate that he or she has been residing in the United States continuously from June 15, 2007, to the time of filing of the request. As used in this section, "residence" means the principal, actual dwelling place in fact, without regard to intent, and specifically the country of the actual dwelling place. In particular, brief, casual, and innocent absences from the United States will not break the continuity of one's residence. However, unauthorized travel outside of the United States on or after August 15, 2012, will interrupt continuous residence, regardless of whether it was otherwise brief, casual, and innocent. An absence will be considered brief, casual, and innocent if it occurred before August 15, 2012, and—

(i) The absence was short and reasonably calculated to accomplish the purpose for the absence;

(ii) The absence was not because of a post-June 15, 2007 order of exclusion, deportation, or removal;

(iii) The absence was not because of a post-June 15, 2007 order of voluntary departure, or an administrative grant of voluntary departure before the requestor was placed in exclusion, deportation, or removal proceedings; and

(iv) The purpose of the trip, and the requestor's actions while outside the United States, were not contrary to law.

(3) *Physical presence in the United States.* The requestor must demonstrate that he or she was physically present in the United States both on June 15, 2012,

and at the time of filing of the request for Deferred Action for Childhood Arrivals under this section.

(4) *Lack of lawful immigration status.* Both on June 15, 2012, and at the time of filing of the request for Deferred Action for Childhood Arrivals under this section, the requestor must not have been in a lawful immigration status. If the requestor was in lawful immigration status at any time before June 15, 2012, or at any time after June 15, 2012, and before the submission date of the request, he or she must submit evidence that that lawful status had expired or otherwise terminated prior to those dates.

(5) *Education or veteran status.* The requestor must currently be enrolled in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development certificate, or be an honorably discharged veteran of the United States Coast Guard or Armed Forces of the United States.

(6) *Criminal history and public safety.* The requestor must not have been convicted (as defined in section 101(a)(48) of the Act and as demonstrated by any of the documents or records listed in § 1003.41 of this chapter) of a felony, a misdemeanor described in this paragraph (b)(6), or three or more other misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or otherwise pose a threat to national security or public safety. For purposes of paragraph (b)(6) of this section only, a single misdemeanor is disqualifying if it is a misdemeanor as defined by Federal law (specifically, one for which the maximum term of imprisonment authorized is 1 year or less but greater than 5 days) and that meets the following criteria:

(i) Regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence; or

(ii) If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days. The sentence must involve time to be served in custody and, therefore, does not include a suspended sentence.

(7) *Age at time of request.* The requestor must have been born on or after June 16, 1981. Additionally, the requestor must be at least 15 years of age at the time of filing his or her request, unless, at the time of his or her request, he or she is in removal proceedings, has

a final order of removal, or has a voluntary departure order.

(c) *Final discretionary determination.* Deferred action requests submitted under this section are determined on a case-by-case basis. Even if the threshold criteria in paragraph (b) are all found to have been met, USCIS retains the discretion to assess the individual's circumstances and to determine that any factor specific to that individual makes deferred action inappropriate.

**§ 236.23  Procedures for request, terminations, and restrictions on information use.**

(a) *General.* (1) A request for Deferred Action for Childhood Arrivals must be filed in the manner and on the form designated by USCIS, with the required fee, including any biometrics required by 8 CFR 103.16. A request for Deferred Action for Childhood Arrivals may also contain a request for employment authorization filed pursuant to 8 CFR 274a.12(c)(33) and 274a.13. If a request for Deferred Action for Childhood Arrivals does not include a request for employment authorization, employment authorization may still be requested subsequent to approval for deferred action, but not for a period of time to exceed the grant of deferred action.

(2) All requests for Deferred Action for Childhood Arrivals, including any requests made by aliens in removal proceedings before EOIR, must be filed with USCIS. USCIS has exclusive jurisdiction to consider requests for Deferred Action for Childhood Arrivals. EOIR shall have no jurisdiction to consider requests for Deferred Action for Childhood Arrivals or to review USCIS approvals or denials of such requests. A voluntary departure order or a final order of exclusion, deportation, or removal is not a bar to requesting Deferred Action for Childhood Arrivals. An alien who is in removal proceedings may request Deferred Action for Childhood Arrivals regardless of whether those proceedings have been administratively closed. An alien who is in immigration detention may request Deferred Action for Childhood Arrivals but may not be approved for Deferred Action for Childhood Arrivals unless the alien is released from detention by ICE prior to USCIS' decision on the Deferred Action for Childhood Arrivals request.

(3) USCIS may request additional evidence from the requestor, including, but not limited to, by notice, interview, or other appearance of the requestor. USCIS may deny a request for Deferred Action for Childhood Arrivals without prior issuance of a request for evidence or notice of intent to deny.

(4) A grant of Deferred Action for Childhood Arrivals will be provided for an initial or renewal period of 2 years, subject to DHS's discretion.

(b) *Consideration of a request for Deferred Action for Childhood Arrivals.* In considering requests for Deferred Action for Childhood Arrivals, USCIS may consult, as it deems appropriate in its discretion and without notice to the requestor, with any other component or office of DHS, including ICE and CBP, any other Federal agency, or any State or local law enforcement agency, in accordance with paragraph (e) of this section.

(c) *Notice of decision.* (1) USCIS will notify the requestor and, if applicable, the requestor's attorney of record or accredited representative of the decision in writing. Denial of a request for Deferred Action for Childhood Arrivals does not bar a requestor from applying for any benefit or form of relief under the immigration laws or requesting any other form of prosecutorial discretion, including another request for Deferred Action for Childhood Arrivals.

(2) If USCIS denies a request for Deferred Action for Childhood Arrivals under this section, USCIS will not issue a Notice to Appear or refer a requestor's case to U.S. Immigration and Customs Enforcement for possible enforcement action based on such denial unless the case involves denial for fraud, a threat to national security, or public safety concerns.

(3) There is no administrative appeal from a denial of a request for Deferred Action for Childhood Arrivals. The alien may not file, pursuant to 8 CFR 103.5 or otherwise, a motion to reopen or reconsider a denial of a request for Deferred Action for Childhood Arrivals.

(d) *Termination.* (1) *Discretionary termination.* USCIS may terminate a grant of Deferred Action for Childhood Arrivals at any time in its discretion with or without issuance of a notice of intent to terminate.

(2) *Automatic termination.* Deferred Action for Childhood Arrivals is terminated automatically without notice upon:

(i) Filing of a Notice to Appear for removal proceedings with EOIR, unless the Notice to Appear is issued by USCIS solely as part of an asylum case referral to EOIR; or

(ii) Departure of the noncitizen from the United States without advance parole.

(3) *Automatic termination of employment authorization.* Upon termination of a grant of Deferred Action for Childhood Arrivals, any grant of employment authorization pursuant to § 274a.12(c)(33) of this chapter will automatically terminate in accordance with § 274a.14(a)(1)(iv) of this chapter, and notice of intent to revoke employment authorization is not required pursuant to § 274a.14(a)(2) of this chapter.

(e) *Restrictions on information use.* (1) Information contained in a request for Deferred Action for Childhood Arrivals related to the requestor will not be used by DHS for the purpose of initiating immigration enforcement proceedings against such requestor, unless DHS is initiating immigration enforcement proceedings against the requestor due to a criminal offense, fraud, a threat to national security, or public safety concerns.

(2) Information contained in a request for Deferred Action for Childhood Arrivals related to the requestor's family members or guardians will not be used for immigration enforcement purposes against such family members or guardians.

### § 236.24   Severability.

(a) Any provision of this subpart held to be invalid or unenforceable as applied to any person or circumstance shall be construed so as to continue to give the maximum effect to the provision permitted by law, including as applied to persons not similarly situated or to dissimilar circumstances, unless such holding is that the provision of this subpart is invalid and unenforceable in all circumstances, in which event the provision shall be severable from the remainder of this subpart and shall not affect the remainder thereof.

(b) The provisions in § 236.21(c)(2) through (4) are intended to be severable from one another, from any grant of forbearance from removal resulting from this subpart, and from any provision referenced in those paragraphs, including such referenced provision's application to persons with deferred action generally.

### § 236.25   No private rights.

This subpart is an exercise of the Secretary's enforcement discretion. This subpart—

(a) Is not intended to and does not supplant or limit otherwise lawful activities of the Department or the Secretary; and

(b) Is not intended to and does not create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal.

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 5. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1105a, 1324a; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 114–74, 129 Stat. 599.

■ 6. Amend § 274a.12 by revising paragraph (c)(14) and adding paragraph (c)(33) to read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

\*    \*    \*    \*    \*

(c) \* \* \*

(14) Except as provided for in paragraph (c)(33) of this section, an alien who has been granted deferred action, an act of administrative convenience to the government that gives some cases lower priority, if the alien establishes an economic necessity for employment.

\*    \*    \*    \*    \*

(33) An alien who has been granted deferred action pursuant to 8 CFR 236.21 through 236.23, Deferred Action for Childhood Arrivals, if the alien establishes an economic necessity for employment.

\*    \*    \*    \*    \*

**Alejandro N. Mayorkas,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2021–20898 Filed 9–27–21; 8:45 am]

**BILLING CODE 9111–97–P**

**D. App. 232**          AR2022_100081

# Exhibit 3

# Health consequences of the US Deferred Action for Childhood Arrivals (DACA) immigration programme: a quasi-experimental study

*Atheendar S Venkataramani, Sachin J Shah, Rourke O'Brien, Ichiro Kawachi, Alexander C Tsai*



## Summary

**Background** The effects of changes in immigration policy on health outcomes among undocumented immigrants are not well known. We aimed to examine the physical and mental health effects of the Deferred Action for Childhood Arrivals (DACA) programme, a 2012 US immigration policy that provided renewable work permits and freedom from deportation for a large number of undocumented immigrants.

**Methods** We did a retrospective, quasi-experimental study using nationally representative, repeated cross-sectional data from the US National Health Interview Survey (NHIS) for the period January, 2008, to December, 2015. We included non-citizen, Hispanic adults aged 19–50 years in our analyses. We used a difference-in-differences strategy to compare changes in health outcomes among individuals who met key DACA eligibility criteria (based on age at immigration and at the time of policy implementation) before and after programme implementation versus changes in outcomes for individuals who did not meet these criteria. We additionally restricted the sample to individuals who had lived in the USA for at least 5 years and had completed high school or its equivalent, in order to hold fixed two other DACA eligibility criteria. Our primary outcomes were self-reported overall health (measured on a 5 point Likert scale) and psychological distress (Kessler 6 [K6] scale), the latter was administered to a random subset of NHIS respondents.

**Findings** Our final sample contained 14 973 respondents for the self-reported health outcome and 5035 respondents for the K6 outcome. Of these individuals, 3972 in the self-reported health analysis and 1138 in the K6 analysis met the DACA eligibility criteria. Compared with people ineligible for DACA, the introduction of DACA was associated with no significant change among DACA-eligible individuals in terms of self-reported overall health ($b=0.056$, 95% CI $-0.024$ to $0.14$, p=$0.17$) or the likelihood of reporting poor or fair health (adjusted odds ratio [aOR] $0.98$, 95% CI $0.66–1.44$, p=$0.91$). However, DACA-eligible individuals experienced a reduction in K6 score compared with DACA-ineligible individuals (adjusted incident risk ratio $0.78$, 95% CI $0.56–0.95$, p=$0.020$) and were less likely to meet screening criteria for moderate or worse psychological distress (aOR $0.62$, 95% CI $0.41–0.93$, p=$0.022$).

**Interpretation** Economic opportunities and protection from deportation for undocumented immigrants, as offered by DACA, could confer large mental health benefits to such individuals. Health consequences should be considered by researchers and policy makers in evaluations of the broader welfare effects of immigration policy.

**Funding** None.

**Copyright** © The Author(s). Published by Elsevier Ltd. This is an Open Access article under the CC BY license.

## Introduction

Undocumented migration has become an important public policy issue worldwide. From a public health perspective, it is well recognised that the estimated 11 million undocumented immigrants in the USA[1] and 8 million in Europe[2] are at risk of poor health outcomes.[3–6] In particular, the results of studies from both the USA and European settings suggest that immigration policies that raise the risk of deportation or place limits on legal rights and access to social services might raise the risk of poor mental health outcomes, such as depression and anxiety, and curtail access to health care more generally.[7–15]

In recent years, the USA has witnessed substantial changes in policies towards undocumented immigrants. In June, 2012, the US Government initiated the Deferred Action for Childhood Arrivals (DACA) programme, which provided temporary work permits and freedom from deportation to individuals who met specific eligibility criteria (panel).[16] Although the programme has not been a pathway to citizenship, the work permits are renewable, ostensibly staving off the risk of deportation. Since its inception, the programme has enrolled more than 720 000 of an estimated 1.9 million eligible individuals.[17]

In addition to any microeconomic and macroeconomic benefits, DACA could improve the health of beneficiaries in several ways. First, research has shown increases in employment and income after DACA implementation,[18,19] both of which are well known social determinants of health.[20] Second, expanded economic opportunities might raise future aspirations and thereby increase

*Lancet Public Health* 2017; 2: e175–81

Published Online March 14, 2017 http://dx.doi.org/10.1016/S2468-2667(17)30047-6

This online publication has been corrected. The corrected version first appeared at thelancet.com/public-health on April 6, 2017

See **Comment** page e160

Division of General Internal Medicine, Massachusetts General Hospital and Harvard Medical School, Boston, MA, USA (A S Venkataramani MD, S J Shah MD); La Follette School of Public Affairs, University of Wisconsin-Madison, Madison, WI, USA (R O'Brien PhD); Department of Social and Behavioral Sciences, Harvard T H Chan School of Public Health, Boston, MA, USA (Prof I Kawachi PhD); and Chester M Pierce, MD Division of Global Psychiatry, Massachusetts General Hospital and Harvard Medical School, Boston, MA, USA (A C Tsai MD)

Correspondence to: Dr Atheendar S Venkataramani, Division of General Internal Medicine, Massachusetts General Hospital and Harvard Medical School, Boston, MA 02114, USA avenkataramani@partners.org

**D. App. 234**       AR2022_500311

**Research in context**

**Evidence before this study**
We searched PubMed, Google Scholar, and EconLit with the terms ("undocumented immigrants" OR "illegal immigrant" OR "undocumented migrant") AND ("health" OR "mental health" OR "depression") AND ("immigration policy" OR "deportation" OR "DACA") OR ("Deferred Action for Childhood Arrivals"). We did not apply any restrictions by language or date, and the latest search was done on Feb 7, 2017. We found two summative reviews and several commentary and research articles examining the association between immigration policy and health outcomes in the USA, Europe, and Australia. Most studies were descriptive in nature and used both qualitative and quantitative methods to show links between immigration policy and mental health outcomes, health-care access, or both. No studies used quasi-experimental methods to assess causality between changes in immigration policy and health. Although we found two studies investigating the economic effects of the US Deferred Action for Childhood Arrival (DACA) programme, we did not find any study examining its effects on health.

**Added value of this study**
We used a large, nationally representative survey of non-citizen, Hispanic adults living in the USA to investigate

the effects of the DACA programme on self-reported overall health and psychological distress. We found that DACA eligibility was associated with large, clinically meaningful reductions in symptoms of psychological distress. We found no effects on self-reported overall health, although this finding was anticipated given the overall youth of the DACA-eligible population. Our findings contribute to the public health literature by showing for the first time robust, quasi-experimental evidence of the effect of immigration policy towards undocumented immigrants on their mental health.

**Implications of all the available evidence**
Our findings add to a growing evidence base showing strong links between immigration policy choices and health outcomes. These results might be informative for clinicians providing health care to undocumented immigrants, public health officials, and policy makers. Our findings are relevant to ongoing debates around immigration policy in the USA and Europe and suggest that mental health outcomes should be taken into account when considering policy alternatives.

perceived returns on health investments, both of which can in turn affect health outcomes.[21] Third, eliminating the risk of deportation and providing access to employment opportunities could raise hope and reduce psychosocial stress, which might directly improve mental health and indirectly affect physical health by leading to improved health behaviours.[22,23]

Despite these strong theoretical links, the health consequences of the DACA programme have not yet been explored. More generally, studies linking policies targeting undocumented migrants to health outcomes are generally descriptive, with the underlying causality less clear.[7-15] This broader question has gained significance in recent months, as fundamental changes in US immigration policy are being debated.[24,25]

In this study we aimed to examine the consequences of the US DACA programme on self-reported overall and mental health among undocumented immigrants of Hispanic origin (who represent the majority of DACA-eligible individuals). We used a quasi-experimental research strategy based on the timing of programme implementation, as well as eligibility rules, to estimate causal relationships.

## Methods

### Data
We used data from the US National Health Interview Survey (NHIS), an annual, nationally representative, repeated cross-sectional sample survey that tracks health outcomes, behaviours, and access to care in the

US civilian, non-institutionalised population.[26] We used surveys for the period January, 2008, to December, 2015. We restricted our sample to adults (aged 19–50 years) who reported Hispanic ethnicity because nearly 90% of DACA beneficiaries were born in central America or South America.[27] Following evidence from the economics literature,[18] we prespecified that we would exclude individuals with less than a high school education and recently arrived immigrants to minimise confounding from well established differential trends in socioeconomic outcomes.[28,29] These sample restrictions hold fixed two key DACA eligibility criteria (panel): completion of high school or its equivalent and residence in the USA for at least 5 years.

### Exposures and outcomes
Our exposure measure was DACA eligibility based on two key criteria: age at immigration and age at the time of the policy change. We estimated age at immigration by subtracting years living in the USA from the participant's current stated age; individuals aged 16 years or younger at the time of immigration were defined as meeting this DACA eligibility criterion. Because the public-use files from the NHIS provide a binned value for years living in the USA (<1 year, 1–4 years, 5–9 years, 10–14 years, and ≥15 years), our estimates of age at immigration were not exact and are therefore subject to classic measurement error. We used the exact date of birth to assess whether the individual met the other DACA eligibility criterion of

being age 31 years or younger at the time of the policy announcement.

Our primary outcomes were self-reported overall health (measured on a 5 point Likert scale, where a score of 1 represents poor health, 2 represents fair health, 3 represents good health, 4 represents very good health, and 5 represents excellent health) and symptoms of non-specific psychologic distress as represented by the summed score from the Kessler 6 (K6) scale (symptoms of feeling nervous, hopeless, depressed, restless, depressed, that everything was an effort, and worthless over the past 30 days assessed by six questions that are coded by frequency, with 0 representing none of the time, 1 representing a little of the time, 2 representing some of the time, 3 representing most of the time, and 4 representing all of the time; the summed score can thus range from 0 to 24).[30,31] The K6 was administered only to a randomly selected one-third sample of NHIS respondents. The K6 has been shown to have high reliability, validity, and internal consistency in identifying of the symptoms serious mental illness as denoted by the DSM-IV.[30] We also used these variables to specify binary outcomes denoting self-reported classifications of poor or fair health (vs good, very good, or excellent health) and presence of moderate or worse psychological distress (K6 score ≥5).[31]

### Statistical analyses

We used the difference-in-differences[32] method to estimate the health consequences of DACA. Specifically, we estimated versions of the following regression models:

$$H_{it} = g(\beta_0 + \beta_1 \times Eligible_i \times DACA_t + \beta_2 \times Eligible_i + \beta_3 \times DACA_t + \beta \times X_{i(t)} + \varepsilon_{it})$$

where the subscript $i$ references the individual and $t$ the year–month of the survey. $Eligible_i$ is a binary indicator denoting whether the individual met DACA eligibility criteria (1 if DACA-eligible, 0 otherwise), and $DACA_t$ is a binary indicator for survey timing (1 if surveyed after DACA implementation in June, 2012, and 0 otherwise). $H_{it}$ is the health outcome of interest and the function $g(\cdot)$ refers to a least squares, Poisson, or logistic link function. The vector $X_{i(t)}$ consists of key covariates, consisting of participant age in years at the time of the policy change, estimated age at immigration, census region of residence, gender, and year–month of interview. We adjusted for the complex survey design of the NHIS—which included use of sample weights (along with SEs robust to heteroscedasticity where appropriate)—in all analyses to recover nationally representative estimates.[33] This step is particularly important given the reported (potentially non-random) decline in participation in the NHIS and other US sample surveys,[34] which the weights are designed to take into account.

The difference-in-differences estimate (both in linear and non-linear models[35]) is denoted by the coefficient

**Panel: Deferred Action for Childhood Arrivals (DACA) eligibility criteria**

- No lawful status and physically present in USA as of June, 2012
- Under age 31 years as of June 15, 2012
- Arrived in USA prior to 16th birthday
- Continuous residence in USA since June 15, 2007
- Currently in school; have graduated or obtained certificate of completion from high school; have obtained general education development certificate; or honourably discharged veteran of Armed Forces
- Have not been convicted of a felony, significant misdemeanour (or more than two other misdemeanours), and/or otherwise do not pose threat to public safety or security

Source: Citizenship and Immigration Services, US Department of Homeland Security (2017).

on the product term ($\beta_1$). This estimate can be interpreted as the effect of the policy on DACA-eligible individuals before versus after the policy change, compared with the effect on DACA-ineligible individuals. We estimated least-squares regression models for self-reported health, and Poisson regression models for the count outcome (K6), both with heteroscedasticity-corrected standard errors. For the binary outcomes (poor or fair self-reported overall health and moderate or worse psychological distress), we estimated logistic regression models. We hypothesised larger estimates on mental health outcomes in view of findings from previous descriptive studies on migration,[7–9,36] quasi-experimental studies on the health benefits of social policies,[37,38] and the relative youth of our study population (who would otherwise be expected to be in good physical health).

Importantly, the NHIS did not elicit undocumented immigrant status from survey respondents. This is a long-standing feature of publicly available, large-scale US databases that are used to examine undocumented immigration.[18,29] Among self-reported non-citizens, 60% of individuals are estimated to be undocumented.[18] Thus, our effect estimates will be smaller than the intention-to-treat effect. Additionally, data for other DACA eligibility criteria—criminal offenses and recent honourable discharge from the military—were also not available in the NHIS (because crimes and misdemeanours are not directly queried and honourable discharges were not queried after 2010). This data limitation is also likely to lead to attenuated estimates, as individuals with these histories might be inaccurately assigned to the treatment or control group.

We did four sensitivity analyses. First, because the Great Recession (2007–09) could have had differential effects on DACA-eligible versus DACA-ineligible individuals, we restricted our sample to participants

**Articles**

| | Eligible for DACA | | Not eligible for DACA | |
|---|---|---|---|---|
| | Pre-DACA | Post-DACA | Pre-DACA | Post-DACA |
| Number of respondents | | | | |
| Self-reported overall health outcomes | 2188 | 1784 | 6331 | 4670 |
| Mental health outcomes | 598 | 540 | 2217 | 1680 |
| Self-reported overall health (Likert scale score 1–5) | 3·99 (0·91) | 4·00 (0·94) | 3·83 (0·98) | 3·81 (0·98) |
| Fair or poor health | 95 (4%) | 101 (6%) | 523 (8%) | 408 (9%) |
| K6 score (0–24) | 3·06 (4·49) | 2·66 (4·3) | 2·72 (4·57) | 2·70 (4·38) |
| Moderate or worse psychological (K6 score ≥5) | 168 (28%) | 133 (25%) | 554 (25%) | 423 (25%) |
| Gender, female | 1116 (51%) | 906 (51%) | 3270 (52%) | 2428 (52%) |
| Age (years) | 23·0 (3·32) | 25·39 (4·02) | 36·9 (6·73) | 38·27 (6·71) |
| Age at immigration (years) | 9·6 (4·19) | 10·6 (3·81) | 24·2 (6·48) | 24·9 (6·01) |
| Census region | | | | |
| Northeast | 240 (11%) | 168 (9%) | 884 (14%) | 536 (11%) |
| North central or midwest | 161 (7%) | 199 (11%) | 536 (8%) | 430 (9%) |
| South | 728 (38%) | 587 (33%) | 2216 (35%) | 1750 (33%) |
| West | 1059 (42%) | 830 (47%) | 2695 (43%) | 1954 (48%) |

Data are mean (SD) or n (%) unless specified otherwise. All data are from the NHIS, 2008–15. The sample is restricted to non-citizen, Hispanic men and women aged 18–50 years who have lived in the USA for at least 5 years and who have completed at least a high school education or above. Eligible for DACA refers to individuals who were 31 years or younger as of June, 2012, and had immigrated to the USA at age 16 years or before. Pre-DACA denotes respondents interviewed before June, 2012, and post-DACA those interviewed thereafter. The K6 instrument was administered to a random subset of NHIS respondents. Descriptive statistics were weighted by NHIS sampling weights. DACA=Deferred Action for Childhood Arrivals. K6=Kessler 6 scale. NHIS=National Health Interview Survey.

*Table 1:* Descriptive statistics of study population

See Online for appendix

interviewed in 2010 and thereafter. Second, we further restricted the sample to individuals younger than 40 years. This would help to account for differential time trends in the health of middle-aged immigrants, which might be distinct from younger DACA-eligible individuals, and therefore bias the difference-in-differences estimates. Finally, as a pre-specified falsification test,[39] we estimated our models for adults who had completed less than a high school education (and were not currently in school at the time of the survey): because these individuals were not DACA-eligible, we expected to observe no effect of the policy on their health outcomes. Fourth, we re-estimated all models without sampling weights; differences in coefficient estimates in weighted versus unweighted models might reflect errors in model specification, incorporation of the survey sampling process, or both.[40]

We did all analyses with Stata version 14. This study relied solely on public-use data so no ethical approval was sought for the study procedures.

**Role of the funding source**
There was no funding source for this study. The corresponding author had full access to all the data in the study and had final responsibility for the decision to submit for publication.

**Results**
During the study period, 783 026 people were interviewed, and 14 973 people met our inclusion criteria (appendix). For the outcome of self-reported overall health, our total sample consisted of 14 973 survey respondents, of whom 3972 were eligible for DACA. For the K6 psychological distress outcomes, our total sample contained 5035 respondents, 1138 of whom were eligible for DACA. Before the start of DACA, DACA-eligible respondents reported slightly better overall health than did ineligible respondents, but had higher K6 scores and rates of moderate psychological distress (table 1). Mean K6 scores and the likelihood of meeting screening criteria for moderate or worse psychological distress declined among DACA-eligible respondents in the survey years after policy implementation. However, similar declines did not occur for DACA-ineligible individuals. For both groups, mean self-reported overall health did not change, although we noted small increases in the likelihood of reporting poor or fair health in both groups. As expected on the basis of eligibility criteria, eligible respondents were younger and had immigrated to the USA earlier in their lives than had ineligible respondents. The sex and residential composition of the eligible and ineligible respondent samples were similar.

Difference-in-differences estimates (table 2) did not show significant changes in self-reported overall health before and after programme implementation for eligible versus ineligible respondents (adjusted $b$=0·056, 95% CI −0·024 to 0·14, p=0·17). However, our estimates showed significant reductions in K6 scores among DACA-eligible versus DACA-ineligible respondents (adjusted incident risk ratio 0·78, 95% CI 0·56–0·95, p=0·020). The binary outcomes showed similar patterns, with no significant differences estimated for the odds of reporting poor or fair health (adjusted odds ratio [aOR] 0·98, 95% CI 0·66–1·44, p=0·91), but a significant decline in the odds of reporting moderate or worse psychological distress before and after programme implementation for eligible versus ineligible respondents (aOR 0·62, 95% CI 0·41–0·93, p=0·022).

Sensitivity analyses (table 3) showed similar coefficient estimates when we restricted estimation to individuals in the same age range interviewed between 2010 and 2015 and when we further restricted the sample to individuals younger than 40 years. Consistent with programme eligibility criteria, we found no evidence that DACA improved outcomes for DACA-ineligible people (ie, individuals with less than a high school education). We found mostly similar results in analyses without sampling weights (appendix), suggesting that the specification of our model and handling of the complex survey design was appropriate.

**Discussion**
In this quasi-experimental study of Hispanic adults in the USA, we found that exposure to the DACA programme

**Articles**

| | Self-reported health (Likert scale score 1–5) | Poor or fair health | K6 score (0–24) | Moderate or worse psychological distress (K6 score ≥5) |
|---|---|---|---|---|
| Regression method (estimate) | Least squares (b) | Logistic (adjusted OR) | Poisson (adjusted IRR) | Logistic (adjusted OR) |
| Differences-in-differences estimate (95% CI) | 0·056 (−0·024 to 0·14) | 0·98 (0·66 to 1·44) | 0·78 (0·56 to 0·95) | 0·62 (0·41 to 0·93) |
| p value | 0·17 | 0·91 | 0·020 | 0·022 |
| Number | 14 973 | 14 973 | 5035 | 5035 |

Differences-in-differences estimates of the effects of the DACA programme on health outcomes. Estimator and interpretation of coefficient is provided in the column header. For the ordinary least-squares (self-reported health) and Poisson (K6 score) models, we calculated 95% CIs with heteroscedasticity-corrected SEs. The estimates shown reflect coefficients on the interaction between binary indicators that denote meeting the eligibility criteria of age at immigration (16 years or younger) and age at policy implementation (31 years or younger) and being surveyed after programme implementation (June, 2012). All models include the main effects for meeting DACA eligibility thresholds, interview year-month fixed effects (which subsume the main effects of being surveyed after DACA implementation), and adjust for respondent age (at the time of policy), gender, fixed-effects for years living in the USA, and fixed effects census region of residence. All models use National Health Interview Survey sampling weights. K6=Kessler 6 scale. IRR=incident risk ratio. OR=odds ratio. DACA=Deferred Action for Childhood Arrivals.

*Table 2:* **Difference-in-differences estimates**

| | Self-reported health (Likert scale score 1–5) | Poor or fair health | K6 score (0–24) | Moderate or worse psychological distress (K6 score ≥5) |
|---|---|---|---|---|
| **Restricted to 2010–15** | | | | |
| Regression method (estimate) | Least squares (b) | Logistic (adjusted OR) | Poisson (adjusted IRR) | Logistic (adjusted OR) |
| Differences-in-differences estimate (95% CI) | 0·017 (−0·072 to 0·11) | 1·00 (0·65 to 1·54) | 0·69 (0·52 to 0·92) | 0·56 (0·36 to 0·87) |
| p value | 0·71 | 0·99 | 0·010 | 0·011 |
| Number | 11 672 | 11 672 | 4008 | 4008 |
| **Restricted to 2010–15 and younger than 40 years** | | | | |
| Regression method (estimate) | Least squares (b) | Logistic (adjusted OR) | Poisson (adjusted IRR) | Logistic (adjusted OR) |
| Differences-in-differences estimate (95% CI) | −0·013 (−0·11 to 0·08) | 1·16 (0·73 to 1·83) | 0·76 (0·56 to 1·02) | 0·61 (0·38 to 0·99) |
| p value | 0·78 | 0·53 | 0·073 | 0·044 |
| Number | 8715 | 8715 | 2963 | 2963 |
| **Restricted to less than high-school education (falsification test)** | | | | |
| Regression method (estimate) | Least squares (b) | Logistic (adjusted OR) | Poisson (adjusted IRR) | Logistic (adjusted OR) |
| Differences-in-differences estimate (95% CI) | 0·043 (−0·06 to 0·14) | 0·72 (0·49 to 1·06) | 1·07 (0·76 to 1·49) | 1·38 (0·89 to 2·15) |
| p value | 0·40 | 0·11 | 0·67 | 0·15 |
| Number | 16 552 | 16 552 | 5696 | 5696 |

Models are identical to those presented in table 2, except the sample is restricted as denoted. K6=Kessler 6 scale. IRR=incident risk ratio. OR=odds ratio.

*Table 3:* **Sensitivity analyses**

led to meaningful reductions in symptoms of psychological distress among DACA-eligible individuals. The effects on mental health were large and clinically significant, with the DACA programme significantly reducing the odds of individuals reporting moderate or worse psychological distress. We did not find any improvements in self-reported overall health, which was consistent with the fact that the population was relatively young (mean age <40 years in all groups) and therefore generally in good physical health.

Our findings advance the existing public health literature by providing the first quasi-experimental evidence of a link between immigration policies that target undocumented immigrants and their health outcomes. The findings of large effects on mental health are consistent with results from observational studies showing rising symptoms of anxiety and depression with policies that raise the risk of deportation.[7–15] These findings could be of considerable importance in the current policy environment, with the USA broadening the legal infrastructure and human resources base needed to deport undocumented immigrants and restrict the entry of new migrants.[24,41] Additionally—as of the time of writing—the future of the DACA programme itself seems to be in doubt.[42]

In addition to informing the public health community about the health impacts of immigration policy, our findings add to a growing evidence base on the mental health consequences of social policies more generally.[37,38] Our findings also show the importance of economic opportunities for health outcomes. In particular, the use of quasi-experimental methods builds on and greatly

**D. App. 238**

**AR2022_500315**

**Articles**

advances findings from observational studies linking measures of area-level economic opportunity to various health outcomes.[21,43–45]

Several limitations are inherent to the data available and the study design. First, despite the quasi-experimental research strategy, unobserved bias from time-varying factors that differentially affect immigrants who are eligible or ineligible for DACA cannot be definitively excluded. The potential for such confounders might be exacerbated by the fact that the NHIS data represent repeated cross sections rather than a panel. Moreover, well described downward trends exist in sample survey participation in the USA.[34] We supported the robustness of our findings by showing that estimates remained similar when we applied tighter restrictions to the estimation sample. We also did a falsification test, the results of which showed the absence of an association among individuals who met all other eligibility criteria except for high school completion.

Second, differences in mean ages among DACA-eligible and DACA-ineligible respondents, which are inevitable because age is part of the eligibility criteria, might also generate bias in our results. To address these differences, we included individual age-specific fixed effects to flexibly control for non-linear age effects. We also estimated our models with a narrower age band, which produced mostly similar estimates.

Third, the NHIS did not specifically identify undocumented immigrants, exact age at immigration, or individuals who met two other DACA eligibility criteria (absence of criminal history and honourable discharge from the military). However, each of these data limitations would bias our estimates toward the null, either by deflating estimates of the intention-to-treat effect, introducing classic measurement error, or inaccurately assigning respondents to eligible and ineligible groups. Finally, well known differences exist between US states in the implementation and acceptance of DACA,[17,46] which might have modified programme effects on health outcomes. Unfortunately, we cannot examine this possibility in the NHIS because the public-use data do not include state identifiers.

In conclusion, we found that the DACA programme had important, positive effects on mental health outcomes. These benefits have so far been underappreciated and, in conjunction with the reported positive economic benefits,[18] can help to guide ongoing policy debates[47] around the overall benefit of the DACA programme and its future in US immigration policy, as well as around the design of policies towards undocumented migrants in Europe.

**Contributors**
ASV, SJS, and ACT conceived the study. ASV obtained the publicly available NHIS data, did the statistical analysis, and wrote the first draft of the manuscript. SJS, ROB, IK, and ACT suggested improvements to the statistical analysis and contributed important revisions to the manuscript. All authors approved the final submission of the manuscript.

**Declaration of interests**
We declare no competing interests.

**Acknowledgments**
No specific funding was received for this study. We report salary support from the National Institutes of Health (NIH Mentored Patient-Oriented Research Career Development Award, K23MH106362 to ASV; NIH Patient-Oriented Research Career Development Award, K23MH096620 to ACT).

**References**
1    Passel JS, Cohn DV. Overall number of U.S. unauthorized immigrants holds steady since 2009. Washington, DC: Pew Research Center, 2016.
2    The Lancet. Access to health care for undocumented migrants in Europe. *Lancet* 2008; **370:** 2070.
3    Castañeda H, Holmes SM, Madrigal DS, De Trindad Young M-E, Beyeler N, Quesada J. Immigration as a social determinant of health. *Annu Rev Public Health* 2015; **36:** 375–92.
4    Sanggaran J-P, Haire B, Zion D. The health care consequences of australian immigration policies. *PLoS Med* 2016; **13:** e1001960.
5    Devi S. US health and immigration systems failing migrants. *Lancet* 2009; **373:** 448–49.
6    Rechel B, Mladovsky P, Ingleby D, Mackenbach JP, McKee M. Migration and health in an increasingly diverse Europe. *Lancet* 2013; **381:** 1235–45.
7    Hacker K, Chu J, Leung C, et al. The impact of immigration and customs enforcement on immigrant health: perceptions of immigrants in Everett, Massachusetts, USA. *Soc Sci Med* 2011; **73:** 586–94.
8    Steel Z, Momartin S, Silove D, Coello M, Aroche J, Tay KW. Two year psychosocial and mental health outcomes for refugees subjected to restrictive or supportive immigration policies. *Soc Sci Med* 2011; **72:** 1149–56.
9    Hacker K, Chu J, Arsenault L, Marlin RP. Provider's perspectives on the impact of Immigration and Customs Enforcement (ICE) activity on immigrant health. *J Health Care Poor Underserved* 2013; **23:** 651–65.
10   Sommers BD. Stuck between health and immigration reform—care for undocumented immigrants. *N Engl J Med* 2013; **369:** 593–95.
11   Cimas M, Gullon P, Aguilera E, Meyer S, Manuel Freire J, Perez-Gomez B. Healthcare coverage for undocumented migrants in Spain: Regional differences after Royal Decree Law 16/2012. *Health Policy* 2016; **120:** 384–95.
12   Giannoni M, Franzini L, Masiero G. Migrant integration policies and health inequaliteis in Europe. *BMC Public Health* 2016; **16:** 463.
13   Hatzenbuehler ML, Prins SJ, Flake M, et al. Immigration policies and mental health morbidity among Latinos: a state-level analysis. *Soc Sci Med* 2017; **174:** 169–78.
14   Ikram UZ, Malmusi D, Juel K, Rey G, Kunst AE. Association between integration policies and immigrant mortality: an explorative study across three European countries. *PLoS One* 2015; **10:** e0129916.
15   Malmusi D. Immigrants' health and helath inequality by type of intergration policies in European countries. *Eur J Public Health* 2014; **25:** 293–99.
16   US Citizenship and Immigration Services. Consideration of Deferred Action for Childhood Arrivals (DACA). 2017. https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca (accessed Feb 7, 2017).
17   Hispman F, Gómez-Aguiñaga B, Capps R. DACA at four: participation in the deferred action program and its impacts on recipients. Washington, DC: Migration Policy Institute, 2016.
18   Pope NG. The effects of DACAmentation: the impact of Deferred Action for Childhood Arrivals on unauthorized immigrants. *J Public Econ* 2016; **143:** 98–114.
19   Amuedo-Dorantes C, Antman F. Can authorization reduce poverty among undocumented immigrants? Evidence from the Deferred Action for Childhood Arrivals Program. *Econ Lett* 2016; **147:** 1–4.
20   Marmot M, Wilkinson RG, eds. Social determinants of health, 2nd edn. New York: Oxford University Press, 2006.
21   Venkataramani AS, Brigell R, O'Brien R, Chatterjee P, Kawachi I, Tsai AC. Economic opportunity, health behaviours, and health outcomes in the USA: a population-based cross-sectional study. *Lancet Public Health* 2016; **1:** e18-e25.
22   Scioli A, Chamberlain CM, Samor CM, et al. A prospective study of hope, optimism, and health. *Psychol Rep* 1997; **81:** 723–33.

**D. App. 239**

23   Snyder CR, Irving LM, Anderson JR. Hope and health. In: Snyder CR, Forsyth DR, eds. Handbook of social and clinical psychology: the health perspective, vol 162. Elmsford: Pergamon Press, 1991.

24   Davis JH. Trump orders Mexican border wall to be built and plans to block Syrian refugees. *The New York Times* (New York), Jan 26, 2017: A1.

25   Shear MD, Cooper H. Trump bars refugees and citizens of 7 Muslim countries. *The New York Times* (New York), Jan 28, 2017: A1.

26   Minnesota Population Center and State Health Access Data Assistance Center. Integrated health interview series: version 6.21. Minneapolis: University of Minnesota, 2016.

27   Batalova J, Hooker S, Capps R, Bachmeier JD. DACA at the two year mark: a national and state profile of youth eligible and applying for deferred action. Washington, DC: Migration Policy Institute, 2014.

28   Ross M, Svajlenka NP. Employment and disconnection among teens and young adults: the role of place, race, and education. Washington, DC: Brookings Institution, 2016.

29   Pew Research Center. Modern immigration wave brings 59 million to U.S., driving population growth and change through 2065. Washington, DC: Pew Research Center, 2015.

30   Kessler RC, Green JG, Gruber MJ, et al. Screening for serious mental illness in the general population with the K6 screening scale: results from the WHO World Mental Health (WMH) survey initiative. *Int J Methods Psychiatr Res* 2010; **19** (suppl 1): 4–22.

31   Prochaska J, Sung H, Max W, Shi Y, Ong M. Validity study of the K6 scale as a measure of moderate mental distress based on mental health treatment need and utilization. *Int J Methods Psychiatric Res* 2012; **21**: 88–97.

32   Dimick JB, Ryan AM. Methods for evaluating changes in health care policy: the differences-in-differences approach. *JAMA* 2014; **312**: 2401–02.

33   Bieler GS, Brown GG, Williams RL, Brogan DJ. Estimating model-adjusted risks, risk differences, and risk rations from complex survey data. *Am J Epidemiol* 2010; **171**: 618–23.

34   Hill JM. Survey response rate trends. *Survey News.* November 2014. Washinton, DC: US Census Bureau, 2014.

35   Karaca-Mandic P, Norton EC, Dowd B. Interaction terms in nonlinear models. *Health Sev Res* 2012; **47**: 255–74.

36   Lindert J, Ehrenstein O, Priebe S, Mielck A, Brahler E. Depression and anxiety in labor migrants and refugees—a systematic review and meta-analysis. *Soc Sci Med* 2009; **69**: 246–57.

37   Reeves A, Clair A, McKee M, Stuckler D. Reductions in the United Kingdom's Government Housing Benefit and symptoms of depression in low-income household. *Am J Epidemiol* 2016; **184**: 421–29.

38   Reeves A, McKee M, Mackenbach JP, Whitehead M, Stuckler D. Introduction of a national minimum wage reduced depressive symptoms in low-wage workers: a quasi-natural experiment in the UK. *Health Econ* 2016: published online April 4. DOI:10.1002/hec.3336.

39   Prasad V, Jena AB. Prespecified falsification end points: can they validate true observational associations? *JAMA* 2013; **309**: 241–42.

40   Solon G, Haider SJ, Wooldridge JM. What are we weighting for? *J Hum Resour* 2015; **50**: 301–16.

41   Hartmann M. What President Trump's executive orders could actually do. *New York Magazine* (New York), Feb 1, 2017.

42   Whitely J. "My life is made here": undocumented students fear fate under Trump. Feb 2, 2017. http://www.cbsnews.com/news/undocumented-students-daca-immigrants-fears-under-trump/ (accessed Feb 8, 2017).

43   O'Brien R, Venkataramani AS, Tsai AC. Economic opportunity and mortality among US middle aged whites. *Epidemiology* 2017; **28**: e12–e13.

44   Venkataramani AS, Chatterjee P, Kawachi I, Tsai AC. Economic opportunity, health behaviors, and mortality in the United States. *Am J Public Health* 2016; **106**: 478–84.

45   Katikireddi SV. Economic opportunity: a determinant of health? *Lancet Public Health* 2016; **1**: e4–e5.

46   Cebulko K, Silver A. Navigating DACA in hospitable and hostile states: State responses and access to membership in the wake of Deferred Action for Childhood Arrivals. *Am Behav Sci* 2016: **60**: 1553–74.

47   Goldman F. What Trump's presidency will mean for the dreamers. *New Yorker* (New York), November 19, 2016.

**D. App. 240**

**AR2022_500317**

# Exhibit 4



# Instructions for Application for Travel Document

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS
Form I-131**
OMB No. 1615-0013
Expires 04/30/2022

---

## What Is the Purpose of This Form?

This form is for applying to U.S. Citizenship and Immigration Services (USCIS) for the following travel documents:

1. **Reentry Permit**

   A Reentry Permit allows a lawful permanent resident or conditional permanent resident to apply for admission to the United States upon returning from abroad during the permit's validity without the need to obtain a returning resident visa from a U.S. Embassy or U.S. Consulate.

2. **Refugee Travel Document**

   A Refugee Travel Document is issued to an individual in valid refugee or asylee status, or to a lawful permanent resident who obtained such status as a refugee or asylee in the United States. Individuals who hold asylee or refugee status and are not lawful permanent residents must have a Refugee Travel Document to return to the United States after travel abroad, unless they possess an Advance Parole Document. A Department of Homeland Security (DHS) officer at the U.S. port-of-entry will determine your admissibility when you present your travel document.

3. **Advance Parole Document for Individuals Who Are Currently in the United States**

   Parole allows an alien to physically enter into the United States for a specific purpose. An individual who has been "paroled" has not been admitted to the United States and remains an "applicant for admission" even while paroled.

   DHS, as a matter of discretion, may issue an Advance Parole Document to authorize an alien to appear at a port-of-entry to seek parole into the United States. The document may be accepted by a transportation company in lieu of a visa as an authorization for the holder to travel to the United States. An Advance Parole Document is not issued to serve in place of any required passport.

   **WARNING:** The document does not entitle you to be paroled into the United States; a separate discretionary decision on a request for parole will be made when you arrive at a port-of-entry upon your return.

   **WARNING:** DHS may revoke or terminate your Advance Parole Document at any time, including while you are outside the United States, in which event you may be unable to return to the United States unless you have a valid visa or other document that permits you to travel to the United States and seek admission.

   **NOTE:** Generally, if you are in the United States and have applied for adjustment of status to that of a lawful permanent resident, your application will be deemed abandoned if you leave the United States without first obtaining an Advance Parole Document. Your application for adjustment of status generally will not be deemed abandoned, even if you do not apply for an Advance Parole Document before traveling abroad while an adjustment application is pending, if you currently are in one of the following nonimmigrant classifications, and remain eligible for and would be admissible in one of the following categories upon applying for admission at a port-of-entry:

   a. An H-1 temporary worker, or H-4 spouse or child of an H-1;

   b. An L-1 intracompany transferee, or L-2 spouse or child of an L-1;

   c. A K-3 spouse, or K-4 child of a U.S. citizen; or

   d. A V-1 spouse, or V-2/V-3 child of a lawful permanent resident.

---

**D. App. 242**

AR2022_100362

**NOTE:** Upon returning to the United States, most individuals must present a valid H, L, K, or V nonimmigrant visa and must continue to be otherwise admissible. If you do not have a valid or unexpired H, L, K, or V nonimmigrant visa, then you generally need to obtain an H, L, K, or V nonimmigrant visa at a U.S. Department of State (DOS) visa issuing post. Individuals will need a valid nonimmigrant visa, advance parole, or other travel document to present for reentry.

4. **Advance Parole Document for Individuals Outside the United States**

The granting of an Advance Parole Document for individuals outside the United States is an extraordinary measure used sparingly to allow an otherwise inadmissible alien to travel to the United States and to seek parole into the United States for a temporary period of time due to urgent humanitarian reasons or for significant public benefit (significant public benefit parole is typically limited to law enforcement or homeland security-related reasons). An Advance Parole Document cannot be used to circumvent normal visa-issuance procedures and is not a means to bypass delays in visa issuance.

5. **Advance Permission to Travel for CNMI Long-Term Residents**

A grant of Advance Permission to Travel for CNMI Long-Term Residents, who are otherwise not permitted to travel to the rest of the United States, allows them to travel to any other part of the United States for temporary and legitimate purposes without automatically terminating their CNMI long-term resident status. CNMI long-term residents must obtain advance permission **before** departing the CNMI to travel to any other part of the United States (including Guam). Any travel in violation of these restrictions will result in the automatic termination of status. Travel to or from a foreign place through a direct transit in Guam does not require advance permission.

---

## Who May File Form I-131?

Each applicant must file a separate application for a travel document.

**NOTE:** Do not file Form I-131 if you are seeking release from immigration custody and you want to remain in the United States as a parolee. You should contact ICE about your request.

1. **Reentry Permit**

   a. If you are in the United States as a lawful permanent resident or conditional permanent resident, you may apply for a Reentry Permit. You must be physically present in the United States when you file the Reentry Permit application and complete the biometrics services requirement. After filing your application for a Reentry Permit, USCIS will inform you in writing when to go to your local Application Support Center (ASC) for your biometrics services appointment. (See **Item Number 3. Biometrics Services Requirement** in the **General Requirements** section of these Instructions.)

   **NOTE:** A Reentry Permit may be sent to a U.S. Embassy, U.S. Consulate, or DHS office abroad for you to pick up, if you make such a request when you file your application.

   With the exception of having to obtain a returning resident visa abroad, a Reentry Permit does not exempt you from compliance with any of the requirements of U.S. immigration laws. If you are in possession of a valid, unexpired Reentry Permit, you will not be deemed to have abandoned your status as a lawful permanent resident or conditional permanent resident based solely on the duration of your absences from the United States while the permit is valid.

   An absence from the United States for 1 year or more will generally break the continuity of your required continuous residence for the purpose of naturalization. If you intend to remain outside the United States for 1 year or more, you may be eligible to file Form N-470, Application to Preserve Residence for Naturalization Purposes. For further information, contact your local USCIS office.

---

**D. App. 243**

AR2022_100363

**b. Validity of Reentry Permit**

**(1)** Generally, a Reentry Permit issued to a lawful permanent resident is valid for 2 years from the date of issuance.  See 8 CFR section 223.3(a)(1).  However, if you have been outside the United States for more than 4 of the last 5 years since becoming a lawful permanent resident, the permit will be limited to 1 year, except that a permit with a validity of 2 years may be issued to the following:

**(a)** A lawful permanent resident whose travel is on the order of the U.S. Government, other than an exclusion, deportation, removal, or rescission order;

**(b)** A lawful permanent resident employed by a public international organization of which the United States is a member by treaty or statute; or

**(c)** A lawful permanent resident who is a professional athlete and regularly competes in the United States and worldwide.

**(2)** A Reentry Permit issued to a conditional permanent resident is valid for 2 years from the date of issuance, or to the date the conditional permanent resident must apply for removal of the conditions on his or her status, whichever date comes first.

**(3)** A Reentry Permit may not be extended.

**c. A Reentry Permit may not be issued to you if:**

**(1)** You have already been issued such a document, and it is still valid, unless the prior document has been returned to USCIS or you can demonstrate that it was lost; or

**(2)** A notice was published in the Federal Register that precludes the issuance of such a document for travel to the area where you intend to go.

**NOTICE to lawful permanent or conditional permanent residents concerning possible abandonment of status:**  If you do not obtain a Reentry Permit, lengthy or frequent absences from the United States could be factors supporting a conclusion that you have abandoned your lawful permanent resident status.  If DHS determines, upon your return to the United States, that you have abandoned your lawful permanent resident status, you may challenge that determination if you are placed in removal proceedings.

**2. Refugee Travel Document**

**a. If you are in the United States** in valid refugee or asylee status, or if you are a lawful permanent resident as a direct result of your refugee or asylee status in the United States, you may apply for a Refugee Travel Document. You should apply for a Refugee Travel Document **BEFORE** you leave the United States.  **If biometrics services are required and you fail to appear to have the biometrics collected, the application may be denied.**

After filing your application for a Refugee Travel Document, USCIS will inform you in writing when to go to your local USCIS ASC for your biometrics services appointment.  Unless you have other appropriate documentation, such as a Permanent Resident Card and passport, you must have a Refugee Travel Document to return to the United States after temporary travel abroad.  A Refugee Travel Document may be sent to a U.S. Embassy, U.S. Consulate, or DHS office abroad for you to pick up, if you request it when you file your application.

**b. If you are outside of the United States** and:

**(1)** Have valid refugee or asylee status; or

**(2)** You are a lawful permanent resident as a direct result of your refugee or asylee status in the United States, you may be permitted to file Form I-131 and apply for a Refugee Travel Document.  The USCIS Overseas District Director with jurisdiction over your location makes this decision in his or her discretion.

Your application must be filed within 1 year of your last departure from the United States and should include an explanation of why you failed to apply for a Refugee Travel Document before you departed from the United States.

---

Form I-131 Instructions   04/24/19 C

**D. App. 244**

**Travel Warning Regarding Voluntary Re-availment**

**WARNING to asylees who travel to the country of claimed persecution:** If you applied for asylum on or after April 1, 1997, your asylum status may be terminated if the U.S. Government determines that you have voluntarily availed yourself of the protection of your country of nationality or, if stateless, country of last habitual residence. See section 208(c)(2)(D) of the Immigration and Nationality Act (INA), 8 USC 1158(c)(2)(D).

**c. Validity of Refugee Travel Document**

**(1)** A Refugee Travel Document is valid for 1 year.

**(2)** A Refugee Travel Document may not be extended.

**d. A Refugee Travel Document may not be issued to you if:**

**(1)** You have already been issued such a document and it is still valid, unless the prior document has been returned to USCIS or you can demonstrate that it was lost; or

**(2)** A notice was published in the Federal Register that precludes the issuance of such a document for travel to the area where you intend to go.

**NOTE:** You should apply for a Refugee Travel Document before you leave the United States. However, a Refugee Travel Document may be sent to a U.S. Embassy, U.S. Consulate, or DHS office abroad for you to pick up, if you make such a request when you file your application. Departure from the United States before a decision is made on the application usually does not affect the application decision. However, if biometrics collection is required and the applicant departs the United States before biometrics are collected, the application may be denied.

**NOTICE to lawful permanent residents who obtain permanent residence as a result of their refugee or asylee status:** If you do not obtain a Reentry Permit (see **Item 1. Reentry Permit** above) and remain outside the United States, lengthy or frequent absences from the United States could be factors supporting a conclusion that you have abandoned your lawful permanent resident status. With the exception of having to obtain a returning resident visa abroad, a Reentry Permit does not exempt you from compliance with any of the requirements of U.S. immigration laws. If you are in possession of a valid unexpired Reentry Permit, you will not be deemed to have abandoned your status as a lawful permanent resident or conditional permanent resident based solely on the duration of your absences from the United States while the permit is valid.

An absence from the United States for 1 year or more will generally break the continuity of your required continuous residence for purpose of naturalization. If you intend to remain outside the United States for 1 year or more, you may be eligible to file Form N-470, Application to Preserve Residence for Naturalization Purposes. For further information, contact your local USCIS office.

If DHS determines, upon your return to the United States, that you have abandoned your lawful permanent resident status, you may challenge that determination if you are placed in removal proceedings, and seek a determination whether you may retain asylum status even if you cannot retain lawful permanent resident status.

**3. Advance Parole Document for Individuals Who Are Currently in the United States**

**If any of the items listed under Item a. below apply to you, select Item Number 1.d. in Part 2. of the form.**

**a. If you are in the United States and seek an Advance Parole Document, you may apply if:**

**(1)** You have a pending application to adjust status, Form I-485, and you seek to travel abroad temporarily for "urgent humanitarian reasons" or in furtherance of a "significant public benefit," which may include a personal or family emergency or bona fide business reasons.

**(2)** You have a pending application for Temporary Protected Status (TPS) (Form I-821), have been granted TPS, or have been granted T or U nonimmigrant status. Whether you are permitted to retain TPS upon your return will depend on whether you continue to meet the requirements for TPS. If you have TPS and leave and reenter the United States during the validity period of your Advance Parole Document, you will not break the continuous physical presence requirement for maintaining your TPS.

**D. App. 245**

**Important:** If you have a TPS or other application pending and you leave the United States on advance parole, you may miss important notices from USCIS regarding your application, including requests for additional evidence. If you do not respond timely to these notices, USCIS may deem your application abandoned and, in that event, you will not receive the benefit you seek. It is very important that you make appropriate arrangements to ensure that you do not miss any such important notices.

**(3)** You have been granted parole pursuant to INA section 212(d)(5), **AND** you seek to travel abroad temporarily for urgent humanitarian reasons or in furtherance of a significant public benefit. Humanitarian reasons include travel to obtain medical treatment, attend funeral services for a family member, or visit an ailing relative.

**(4)** USCIS or U.S. Immigration and Customs Enforcement (ICE) has deferred action in your case as a childhood arrival based on the guidelines described in the Secretary of Homeland Security's memorandum issued on June 15, 2012 ("Deferred Action for Childhood Arrivals" (DACA)). USCIS may, in its discretion, grant advance parole if you are traveling outside the United States for educational purposes, employment purposes, or humanitarian purposes.

    **(a)** Educational purposes include, but are not limited to, semester abroad programs or academic research;

    **(b)** Employment purposes include, but are not limited to, overseas assignments, interviews, conferences, training, or meetings with clients; and

    **(c)** Humanitarian purposes include, but are not limited to, travel to obtain medical treatment, attend funeral services for a family member, or visit an ailing relative.

**NOTE:** Travel for vacation is not a valid purpose. You must **NOT** file Form I-131 with your deferred action request or your package will be rejected and returned to you.

**(5)** USCIS has granted you IMMACT 90 or LIFE Act Family Unity Program benefits, **AND** you seek to travel abroad temporarily for urgent humanitarian reasons or in furtherance of a significant public benefit, which may include a personal or family emergency or bona fide business reasons.

**(6)** You have a pending application for temporary resident status pursuant to INA section 245A, and you seek to travel abroad temporarily for urgent humanitarian reasons or in furtherance of a significant public benefit, which may include a personal or family emergency or bona fide business reasons.

**(7)** You have been granted V nonimmigrant status in the United States, **AND** you seek to travel abroad temporarily for urgent humanitarian reasons or in furtherance of a significant public benefit, which may include a personal or family emergency or bona fide business reasons.

**b.** **Travel Warning**

**Before you apply for an Advance Parole Document, read the following travel warning carefully.**

For any kind of Advance Parole Document provided to you while you are in the United States:

**(1)** Leaving the United States, even with an Advance Parole Document, may impact your ability to return to the United States.

**(2)** If you use an Advance Parole Document to leave and return to a port-of-entry in the United States, you will, upon your return, be an "applicant for admission."

**(3)** As an applicant for admission, you will be subject to inspection at a port-of-entry, and you may not be admitted if you are found to be inadmissible under any applicable provision of INA section 212(a) or 235 or any other provision of U.S. law regarding denial of admission to the United States. If DHS determines that you are inadmissible, you may be subject to expedited removal proceedings or to removal proceedings before an immigration judge, as authorized by law and regulations.

**(4)** As noted above, issuance of an Advance Parole Document does **NOT** entitle you to parole and does not guarantee that DHS will parole you into the United States upon your return.

**(5)** As noted above, DHS will make a separate discretionary decision whether to parole you each time you use an Advance Parole Document to return to the United States.

**(6)** If, upon your return, you are paroled into the United States, you will remain an applicant for admission.

**(7)** As noted above, DHS may revoke or terminate your Advance Parole Document at any time, including while you are outside the United States.  Even if you have already been paroled, upon your return to the United States, DHS may also revoke or terminate your parole in accordance with 8 CFR 212.5.

If you are outside the United States, revocation or termination of your Advance Parole Document may preclude you from returning to the United States unless you have a valid visa or other document that permits you to travel to the United States and seek admission.

**(8)** If you are in the United States when DHS revokes or terminates your parole, you will be an unparoled applicant for admission, and may be subject to removal as an applicant for admission who is inadmissible under INA section 212, rather than as an admitted alien who is deportable under INA section 237.  In addition to the above, if you received deferred action under DACA, you should also be aware of the following:

**(a)** Even after USCIS has deferred action in your case under DACA, you should not travel outside the United States unless USCIS has approved your application for an Advance Parole Document.  USCIS may terminate deferred action in your case, and your ability to renew DACA may be adversely impacted, if you travel outside the United States without obtaining an Advance Parole Document from USCIS.

**(b)** If you obtain an Advance Parole Document in connection with a decision to defer removal in your case under DACA and if, upon your return, you are paroled into the United States, your case will generally continue to be deferred.  The deferral will continue until the date specified by USCIS or ICE in the deferral notice given to you or until the decision to defer removal action in your case has been terminated, whichever is earlier.

**(c)** If you have been ordered excluded, deported, or removed, departing from the United States without having had your exclusion, deportation, or removal proceedings reopened and administratively closed or terminated will result in your being considered excluded, deported, or removed, even if USCIS or ICE has deferred action in your case under DACA and you have been granted advance parole.

**c.  If you are in the United States and seek an Advance Parole Document, a document may not be issued to you if:**

**(1)** You hold a nonimmigrant status, such as J-1, that is subject to the 2-year foreign residence requirement as a result of that status.  Exception:  If you are someone who was subject to this requirement but are now eligible to apply for adjustment of status to lawful permanent resident, USCIS may consider your application for advance parole; or

**(2)** You are in exclusion, deportation, removal, or rescission proceedings, unless you have received deferred action under DACA.  You may, however, request parole from ICE.  See **NOTE** below.

**d.  If you depart from the United States before the Advance Parole Document is issued, your application for an Advance Parole Document will be considered abandoned.**

**NOTE:**  Do not use this form if you are seeking release from immigration custody and you want to remain in the United States as a parolee.  You should contact your local ICE office about your request (**www.ice.gov/contact/ero**).

**4.  Advance Parole Document for Individuals Outside the United States**

**a.  If you or someone else is outside the United States and needs to visit the United States temporarily for an urgent humanitarian reason or for significant public benefit:**

**(1)** You may apply for an Advance Parole Document if you cannot obtain the necessary visa and any required waiver of inadmissibility or consent to reapply for admission. Under these conditions, an Advance Parole Document is granted on a case-by-case basis for a temporary period of time, according to any conditions that may be placed on parole.

**(2)** An individual in the United States may file this application on your behalf. This individual must complete **Part 1.** of the form with information about himself or herself.

**(3)** If you were paroled into the United States when you arrived with an Advanced Parole Document, and need to remain in the United States beyond the authorized parole period to accomplish the purpose for which parole was approved, you must file a new Form I-131 with all supporting documentation to request a new parole authorization and type or print REPAROLE in capital letters at the top of the new Form I-131.

**b. An Advance Parole Document may also be granted to qualified individuals outside the United States as part of specific USCIS Family Reunification Parole policies.**

**If Items (1), (2), or (3) below apply to you, type or print the appropriate parole policy name at the top of Form I-131 and check box 1.f. under Part 2. of the form.**

**NOTE:** A derivative beneficiary can only receive benefits under any of the specific Family Reunification Parole policies if the principal beneficiary receives benefits. A separate application and fee for each individual principal and derivative beneficiary is required. Applications for a principal beneficiary and any of his or her derivative beneficiaries must be submitted in one package when mailed to USCIS.

**(1) Cuban Family Reunification Parole (CFRP) Program.** Under the CFRP Program, USCIS offers certain beneficiaries of approved family-based immigrant petitions the opportunity to seek, on a case-by-case basis, a discretionary grant of parole into the United States to apply for lawful permanent resident status, rather than remain in Cuba waiting for their immigrant visas to become available. You may apply for advance parole under this program ONLY if you have received an invitation to apply. The invitation contains instructions on eligibility and how to apply. If you apply for parole under this program without having received an invitation to apply, your application for parole may be denied.

**(2) Haitian Family Reunification Parole (HFRP) Program.** Under the HFRP program, USCIS offers certain beneficiaries of family-based immigrant petitions, approved on or before December 18, 2014, an opportunity to seek, on a case-by-case basis, a discretionary grant of parole into the United States up to approximately 2 years before their immigrant visas become available (as indicated in the Application Final Action Dates chart in the Department of State's Visa Bulletin), rather than remain in Haiti awaiting availability of their immigrant visas. You may apply for advance parole under this program ONLY if you have received an invitation to apply. The invitation contains instructions on eligibility and how to apply. If you apply for this program without having received an invitation to apply, your application for parole may be denied.

**(3) Filipino WWII Veterans Parole (FWVP) Program.** Under the FWVP program, USCIS offers certain beneficiaries of family-based immigrant petitions, approved on or before the date the request for advance parole is filed, an opportunity to seek, on a case-by-case basis, a discretionary grant of parole into the United States before their immigrant visas become available, rather than remain in another country awaiting availability of their immigrant visas. An invitation is not needed to apply for parole under this program.

You may apply for parole on behalf of your family members under this program if:

**(a)** You are living in the United States and are either a Filipino World War II veteran, as defined by section 405 of IMMACT 90, as amended, or the surviving spouse of such individual;

**(b)** You have filed a Form I-130, Petition for Alien Relative, for a family member whose visa is not yet available (as indicated in the Application Final Action Dates chart in the Department of State's Visa Bulletin), and whose Form I-130 petition was approved on or before the date your request for advance parole under the FWVP program is filed; and

**(c)** Your qualifying relationship with your family member existed on or before May 9, 2016.

**D. App. 248**

NOTE:  If you are the surviving spouse of a Filipino World War II veteran, you may only apply for parole under the FWVP program on behalf of a child, son, or daughter who is also the child, son, or daughter of the Filipino World War II veteran.  You may apply for parole under the FWVP program on behalf of such individuals, even if the approved Form I-130 on which they are beneficiaries had been filed by the deceased veteran, as long as that Form I-130 was reinstated by USCIS.

NOTE:  If the Filipino World War II veteran and his or her spouse are both deceased, certain beneficiaries of an approved Form I-130 that was automatically revoked and which USCIS reinstated, may apply for parole under this program on their own behalf.

NOTE:  Additional information regarding eligibility under the terms of the FWVP program is described under "**Filipino WWII Veterans Parole Program**" at **www.uscis.gov/FWVP**.

**5.  Advance Permission to Travel for CNMI Long-Term Residents**

If this applies to you, type or print **CNMI LONG-TERM RESIDENT TRAVEL at the top of Form I-131 and DO NOT check a box in Part 2. of the form.**

NOTE:  **Failure to indicate CNMI LONG-TERM RESIDENT TRAVEL on the top of the form may result in the rejection of your application.**

**a.**   If you have been granted CNMI long-term resident status pursuant to Public Law 116-24, Northern Mariana Islands Long-Term Legal Residents Relief Act (48 U.S.C. 1806(e)(6)), you may apply for **Advance Permission to Travel for CNMI Long-Term Residents.**

If you are in the CNMI and you have been granted CNMI long-term resident status, you must obtain advance permission before departing the CNMI to travel to any other part of the United States (including Guam).  Travel to or from a foreign place through a direct transit in Guam does not require advance permission.

**b.**   To request advance permission to travel, you must file Form I-131, in accordance with the filing instructions contained in this document.

Along with your completed Form I-131, and proof of CNMI long-term resident status, you must also include a statement describing:

**(1)**  The purpose(s) of your intended travel;

**(2)**  The specific dates of your trip; and

**(3)**  Travel destination(s).

Please include with your statement any supporting documentation you wish USCIS to consider in deciding your request.

**c.   Travel Warnings**

If you travel to Guam (not in direct transit between the CNMI and a foreign place) or elsewhere in the United States without advance permission, your status will be automatically terminated and you may be subject to removal from the United States.

If you travel to Guam (not in direct transit between the CNMI and a foreign place) or elsewhere in the United States in violation of any other restrictions regarding the dates, destination(s), or purpose(s) of your travel, your status will be automatically terminated and you may be subject to removal from the United States.

Generally, the approval will not exceed six months.  Advance permission to travel may be valid for one entry, or multiple entries, depending on the stated purpose(s).

**D. App. 249**

## General Instructions

If you are completing this form on a computer, the data you enter will be captured using 2D barcode technology. This capture will ensure that the data you provide is accurately entered into USCIS systems. As you complete each field, the 2D barcode field at the bottom of each page will shift as data is captured. Upon receipt of your form, USCIS will use the 2D barcode to extract the data from the form. Please **do not damage the 2D barcode** (puncture, staple, spill on, write on, etc.) as this could affect the ability of USCIS to timely process your form.

USCIS provides most forms in PDF format free of charge through the USCIS website. In order to view, print, or fill out our forms, you should use the latest version of Adobe Reader, which can be downloaded for free at **http://get.adobe.com/reader/**.

Each application must be properly signed and accompanied by the appropriate fee. (See the **What is the Filing Fee** section of these Instructions.) A photocopy of a signed application or a typewritten name in place of a signature is not acceptable. If you are under 14 years of age, your parent or legal guardian may sign the application on your behalf.

**Evidence.** You must submit all required initial evidence along with all the supporting documentation with your application at the time of filing.

**Biometrics Services Appointment.** After receiving your application and ensuring completeness, USCIS will inform you in writing when to go to your local USCIS Application Support Center (ASC) for your biometrics services appointment. Failure to attend the biometrics services appointment may result in denial of your application.

**Copies.** Unless specifically required that an original document be filed with an application, a legible photocopy may be submitted. Original documents submitted when not required may remain a part of the record, and will not be automatically returned to you.

**Translations.** Any document containing foreign language submitted to USCIS must be accompanied by a full English language translation which the translator has certified as complete and accurate, and by the translator's certification that he or she is competent to translate from the foreign language into English.

**How To Fill Out Form I-131**

1. Type or print legibly in black ink.

2. If extra space is needed to complete any item, attach a separate sheet and type or print your name and Alien Registration Number (A-Number) (if any), at the top of each sheet of paper; indicate the **Part** and **Item Number**s to which your answer refers; and date and sign each sheet.

3. Answer all questions fully and accurately. If an item is not applicable or the answer is none, print or type N/A.

## General Requirements

1. **Initial Evidence**

   All applications must include a **copy of an official photo identity document showing your photo, name, and date of birth.** (Examples: Your current Employment Authorization Document, if available; a valid government-issued driver's license; passport identity page; Form I-551, Permanent Resident Card; or any other official identity document.) The copy must **clearly** show the photo and identity information. **Form I-94 Arrival-Departure Record is not acceptable as a photo identity document.**

   You must file your application with all required evidence. Not submitting required evidence will delay the issuance of the document you are requesting. USCIS may request additional information or evidence or may request that you appear at a USCIS office for an interview or for fingerprinting. (See **Item 3. Biometric Services Requirement** below).

**If you are applying for:**

**a. Reentry Permit**

You **must** attach:

**(1)** A copy of the front and back of your Form I-551; or

**(2)** If you have not yet received your Form I-551, a copy of the biographic pages of your passport and a copy of the visa page showing your initial admission as a lawful permanent resident, or other evidence that you are a lawful permanent resident; or

**(3)** A copy of the Form I-797, Notice of Action, approval notice of an application for replacement of your Form I-551 or temporary evidence of lawful permanent resident status.

**b. Refugee Travel Document**

You **must** attach a copy of the document issued to you by USCIS showing your refugee or asylee status and the expiration date of such status.

**c. Advance Parole Document for Individuals Who Are Currently in the United States**

If you are in the United States, you **must** attach:

**(1)** A copy of any document issued to you by USCIS showing your present status, if any, in the United States; and

**(2)** An explanation or other evidence showing the circumstances that warrant issuance of an Advance Parole Document; or

**(3)** If you are an applicant for adjustment of status, a copy of a USCIS receipt as evidence that you filed the adjustment application; or

**(4)** If you are traveling to Canada to apply for an immigrant visa, a copy of the U.S. consular appointment letter; or

**(5)** If USCIS has deferred action in your case under DACA, you must include a copy of the Form I-797, Notice of Action, showing that the decision on your Form I-821D was to defer action in your case.  If ICE deferred action in your case under DACA, submit a copy of the approval order, notice or letter issued by ICE.

**You must complete Part 4. of the form indicating how your intended travel fits within 1 of the 3 purposes below.**  You must also provide evidence of your reason for travel outside of the United States including the dates of travel and the expected duration outside the United States.  If your advance parole application is approved, the validity dates of your Advance Parole Document will be for the duration of the documented need for travel.  Below are examples of acceptable evidence:

**Educational Purposes**

**(a)** A letter from a school employee acting in an official capacity describing the purpose of the travel and explaining why travel is required or beneficial; or

**(b)** A document showing enrollment in an educational program requiring travel.

**Employment Purposes**

A letter from your employer or a conference host describing the need for the travel.

**Humanitarian Purposes**

**(a)** A letter from your physician explaining the nature of your medical condition, the specific medical treatment to be sought outside of the United States, and a brief explanation why travel outside the U.S. is medically necessary; or

**(b)** Documentation of a family member's serious illness or death.

**d. Advance Parole Document for Individuals Outside the United States**

**(1)** If you are applying for an Advance Parole Document for an individual who is outside the United States under one of the Family Reunification Parole policies, you must attach:

**(a)** For the HFRP Program, complete documentation as described in the application instructions included in the invitation letter;

**(b)** For the CFRP Program, complete documentation as described in the application instructions included in the invitation letter; or

**(c)** For the FWVP program:

**(i)** A copy of your Form I-797, Notice of Action, indicating approval of your Form I-130, or printout from Case Status Online, which shows an approved Form I-130, Petition for Alien Relative, filed by the Filipino veteran or the surviving spouse, for your family member;

**(ii)** Form I-134, Declaration of Financial Support, completed as directed in the Form I-134 instructions;

**(iii)** Evidence that the Filipino veteran's World War II military service was previously recognized by the U.S. Army as defined by section 405 of the Immigration Act of 1990, as amended; and

**(iv)** If you are the surviving spouse of the Filipino World War II veteran: evidence of your marriage, and a copy of the veteran's death certificate.

**NOTE:** If you wish to apply for a child who is the derivative beneficiary of an approved Form I-130 petition, he or she must be under 21 years of age and unmarried on the date USCIS receives the FWVP program application you file on his or her behalf and otherwise satisfy the definition of "child" as defined by INA section 203(d). You may only apply for a derivative beneficiary if you are also applying for the principal beneficiary on that same approved Form I-130.

**NOTE:** If you are eligible to self-apply for parole under the FWVP program as described in the **Who May File Form I-131** section of these Instructions, you must complete documentation described above and also submit evidence to establish a qualifying family relationship with the deceased Filipino World War II veteran or his or her spouse and evidence of reinstatement by USCIS of your Form I-130.

**NOTE:** Additional information regarding required documentation is described in "**Filipino WWII Veterans Parole Program**" at **www.uscis.gov/FWVP**.

**(2)** If you are applying for an Advance Parole Document for an individual who is outside the United States (either for yourself or another individual), other than under one of the Family Reunification Parole policies noted in **Item (1)** above, you must attach:

**(a)** A detailed description of the urgent humanitarian or significant public benefit reason for which an Advance Parole Document is requested, an explanation for the length of time for which parole is requested, and copies of evidence that support the basis for your request;

**(b)** Form I-134, Affidavit of Support, completed as directed in the Form I-134 instructions;

**(c)** A statement explaining why a U.S. visa cannot be obtained, including when and where attempts were made to obtain a visa, or an explanation of why a visa was not sought to enter the United States;

**(d)** If applicable, a statement explaining why a waiver of inadmissibility cannot be obtained to allow issuance of a visa, including when and where attempts were made to obtain a waiver, and a copy of any DHS decision on your waiver request, or an explanation of why a waiver has not been sought;

**(e)** A copy of any decision on an immigrant or non-immigrant petition or application filed for an individual seeking to enter the United States, and evidence regarding any pending immigrant or non-immigrant petition or application;

**D. App. 252**

 **(f)** In addition to the identity document described in **Item 1. Initial Evidence** above, unless such document is a valid passport:

  **(i)** A copy of the biographical page of the beneficiary's passport or, if it is not available, an explanation why a passport is not available and another government-issued identity document that establishes the beneficiary's citizenship; and

  **(ii)** Copies of the petitioner's and Form I-134 sponsor's official identity documents and evidence of their citizenship or U.S. immigration status (such as a copy of a U.S. passport, lawful permanent resident card, or birth certificate).

  **NOTE:** If a civil document submitted in support of a request for advance parole has annotations on either the front or the back of the document, copies of both sides of the document must be submitted.

 **NOTE:** Additional information regarding types of evidence that may be relevant to specific parole requests is described under "**Humanitarian Parole**" at **www.uscis.gov/humanitarian/humanitarian-parole**.

**e.** **Advance Permission to Travel for CNMI Long-Term Residents**

 **If this applies to you, type or print CNMI LONG-TERM RESIDENT TRAVEL at the top of Form I-131 and DO NOT check a box in Part 2. of the form.**

 **NOTE:  Failure to indicate CNMI LONG-TERM RESIDENT TRAVEL on the top of the form may result in the rejection of your application.**

 You **must** attach:

 **(1)** A copy of the front and back of your Employment Authorization Document (Form I-766) indicating CNMI long-term resident status; or

 **(2)** If you have not yet received your Form I-766, a copy of the Form I-797, Notice of Action, indicating your CNMI long-term resident status has been approved;

 **(3)** A statement describing the purpose(s) of your intended travel, including the specific dates of your trip and travel destination(s); and

 **(4)** Any supporting documentation you wish USCIS to consider in deciding your request.

**2.** **Photographs**

 **a.** **If you are outside the United States and filing for a Refugee Travel Document, or if you are in the United States and filing for an Advance Parole Document:**

 You **must** submit 2 identical color photographs of yourself taken within 30 days of the filing of this application. The photos must have a white to off-white background, be printed on thin paper with a glossy finish, and be unmounted and unretouched.

 **NOTE:  Because of the current USCIS scanning process, if a digital photo is submitted, it must be produced from a high-resolution camera that has at least 3.5 mega pixels of resolution.**

 Passport-style photos must be 2" x 2." The photos must be in color with full face, frontal view on a white to off-white background. Head height should measure 1" to 1 3/8" from top of hair to bottom of chin, and eye height is between 1 1/8" to 1 3/8" from bottom of photo. Your head must be bare unless you are wearing headwear as required by a religious denomination of which you are a member. Using pencil or felt pen, lightly print your name and A-Number on the back of the photo.

 **b.** **If applying for an Advance Parole Document for individuals outside the United States:**

 **(1)** If you are applying for an Advance Parole Document on your own behalf, and you are outside the United States, submit photographs with your application.

---

**(2)** If you are applying for an Advance Parole Document on behalf of another individual who is outside the United States, submit the required photographs of the individual who would be issued the Advance Parole Document.

**3. Biometrics Services Requirement**

**a.** All applicants for a Refugee Travel Document or a Reentry Permit must complete biometrics at a USCIS Application Support Center (ASC) or, if applying for a Refugee Travel Document while outside of the United States at an overseas USCIS facility. If you are between ages 14 through 79 and you are applying for a Refugee Travel Document or a Reentry Permit, you must also be fingerprinted as part of USCIS biometrics services requirement. After you have filed this application, USCIS will notify you in writing of the time and location for your biometrics services appointment. Failure to appear to be fingerprinted or for other biometrics services may result in a denial of your application.

**b.** All applicants for Reentry Permits and/or Refugee Travel Documents between the ages of 14 through 79 are required to pay the additional **$85** biometrics services fee. (See the **What Is the Filing Fee** section of these Instructions.)

**c.** An individual outside the United States who is seeking an Advance Parole Document for humanitarian reasons or for significant public benefit, including under one of the Family Reunification Parole policies, and who is between ages 14 through 79, must be fingerprinted as part of the USCIS biometrics services requirement. Depending on the individual's location, USCIS or the Department of State will advise the location for the biometrics services appointment.

**4. Invalidation of Travel Document**

Any travel document obtained by making a material false representation or concealment in this application will be invalid. A travel document will also be invalid if you are ordered removed or deported from the United States.

In addition, a Refugee Travel Document will be invalid if the United Nations Convention of July 28, 1951, shall cease to apply or shall not apply to you as provided in Articles 1C, D, E, or F of the Convention.

**5. Expedite Request Instructions**

To request expedited processing of an application for a Reentry Permit, a Refugee Travel Document, or an Advance Parole Document for an individual outside the United States, other than under one of the Family Reunification Parole policies, type or print the word EXPEDITE in the top right corner of the application in black ink. USCIS recommends that you provide e-mail addresses and a fax number with any expedite request for a Reentry Permit, Refugee Travel Document, or Advance Parole Document.

Include a written explanation of the reason for the request to expedite with any supporting evidence available. The burden is on the applicant to demonstrate that one or more of the expedite criteria have been met. The criteria are as follows:

**a.** Severe financial loss to company or individual;

**b.** Extreme emergent situation;

**c.** Humanitarian situation; or

**d.** Non-profit status of requesting organization in furtherance of the cultural and social interests of the United States Department of Defense or National Interest Situation. (**Note:** The request must come from an official United States Government entity and state that a delay will be detrimental to the U.S. Government.)

## What Is the Filing Fee?

**Reentry Permit:**  The filing fee for a Reentry Permit is **$575**.  A biometrics services fee of **$85** is required for applicants ages 14 through 79.

**Refugee Travel Document:**  The filing fee for a Refugee Travel Document for an applicant **age 16 or older** is **$135**.  The fee for a child younger than 16 is **$105**.  A biometrics services fee of **$85** is required for applicants ages 14 through 79.

**Advance Parole Document for Individuals Who Are Currently in the United States (including individuals whose cases were deferred pursuant to DACA):**  The filing fee for an Advance Parole Document for an individual who is currently in the United States is **$575**.  The biometrics services fee is not required.

**Advance Parole Document for Individuals Outside the United States, Including Under Family Reunification Parole Policies:**  The filing fee for an Advance Parole Document for an individual who is outside the United States is **$575**.  The biometrics services fee is not required. The filing fee may be waived based upon a demonstrated inability to pay. Applicants should file Form I-912, Request for Fee Waiver, when filing Form I-131 to ensure such requests are supported in accordance with 8 CFR 103.7(c).

**Advance Permission to Travel for CNMI Long-Term residents:**  The filing fee for Advance Permission to Travel for a CNMI Long-Term Resident who is currently in the CNMI is **$575**.  The biometric services fee is not required.  Please note the filing fee may not be waived for this category.

**NOTE:  If you filed Form I-485 on or after July 30, 2007, and you paid the Form I-485 application fee required, then no fee is required to file a request for an Advance Parole Document or Refugee Travel Document on Form I-131 if your Form I-485 is still pending, if:**

1.  You now hold U.S. refugee or asylee status, and are applying for a Refugee Travel Document (see **Part 2. Application Type**, **Item Number 1.b.** of Form I-131); or

2.  You are applying for an Advance Parole Document to allow you to return to the United States after temporary foreign travel (see **Part 2. Application Type**, **Item Number 1.d.** of Form I-131).

Under these circumstances, you may file Form I-131 together with your Form I-485, or you may submit Form I-131 at a later date.  If you file Form I-131 separately, you must also submit a copy of your Form I-797, Notice of Action, receipt as evidence that you filed and paid the fee for Form I-485 required on or after July 30, 2007.

**Replacement Travel Document:**  If you are filing to replace a travel document that was lost, stolen, mutilated, or contains erroneous information, such as a misspelled name, a filing fee is required.

**NOTE:**  If you are requesting a replacement Advance Parole Document as an adjustment applicant filed under the fee structure implemented July 30, 2007, then the full filing fee will be required; however, no biometrics services fee is required.

**Incorrect Card:**  No fee is required if you are filing to correct a USCIS error on your travel document.  If USCIS did not cause the error, you must pay the application fees.

**NOTE:**  The filing fee and biometric services fee are not refundable, regardless of any action USCIS takes on this application.  **DO NOT MAIL CASH.**  You must submit all fees in the exact amounts.

**Use the following guidelines when you prepare your checks or money orders for the Form I-131 filing fee and biometric services fee:**

1.  The check or money order must be drawn on a bank or other financial institution located in the United States and must be payable in U.S. currency; **and**

**2.** Make the checks or money orders payable to **U.S. Department of Homeland Security**

**NOTE:**  Spell out U.S. Department of Homeland Security; do not use the initials "USDHS" or "DHS."

**3.** If you live outside the United States, contact the nearest U.S. Embassy or U.S. Consulate for instructions on the method of payment.

**Notice to Those Making Payment by Check.**  If you send us a check, USCIS will convert it into an electronic funds transfer (EFT). This means we will copy your check and use the account information on it to electronically debit your account for the amount of the check.  The debit from your account will usually take 24 hours and your bank will show it on your regular account statement.

You will not receive your original check back.  We will destroy your original check, but will keep a copy of it.  If USCIS cannot process the EFT for technical reasons, you authorize us to process the copy in place of your original check.  If your check is returned as unpayable, USCIS will re-submit the payment to the financial institution one time.  If the check is returned as unpayable a second time, we will reject your application and charge you a returned check fee.

**How To Check If the Fees Are Correct**

Form I-131's filing fee and biometric services fees are current as of the edition date in the lower left corner of this page. However, because USCIS fees change periodically, you can verify that the fees are correct by following one of the steps below.

**1.** Visit the USCIS website at **www.uscis.gov**, select "FORMS," and check the appropriate fee; or

**2.** Call the USCIS Contact Center at **1-800-375-5283** and ask for fee information. For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

**Fee Waiver**

You may be eligible for a fee waiver under 8 CFR 103.7(c).  If you believe you are eligible for a fee waiver, complete Form I-912, Request for Fee Waiver (or a written request), and submit it and any required evidence of your inability to pay the filing fee with this application. You can review the fee waiver guidance at **www.uscis.gov/feewaiver** .

| Where to File? |
| --- |

Please see our website at **www.uscis.gov/I-131** or call our USCIS Contact Center at **1-800-375-5283** for the most current information about where to file this benefit request.  For TTY (hearing impaired) call: **1-800-767-1833**.

| Address Changes |
| --- |

If you have changed your address, you must inform USCIS of your new address.  For information on filing a change of address go to the USCIS website at **www.uscis.gov/addresschange** or contact the USCIS Contact Center at **1-800-375-5283**.  For TTY (hearing impaired) call: **1-800-767-1833**.

**NOTE:**  Do not submit a change of address to the USCIS Lockbox facilities because the USCIS Lockbox facilities do not process change of address requests.

**D. App. 256**

## Processing Information

Any Form I-131 that is not signed or accompanied by the correct fees will be rejected with a notice that Form I-131 is deficient.  You may correct the deficiency and resubmit Form I-131.  An application or petition is not considered properly filed until accepted by USCIS.

### Initial Processing

Once a Form I-131 has been accepted, it will be checked for completeness, including submission of the required initial evidence.  If you do not completely fill out the form, or file it without required initial evidence, you will not establish a basis for eligibility, and we may deny your Form I-131.

### Requests for More Information, Including Biometrics, or Interview

We may request more information or evidence, or we may request that you appear at a USCIS office, U.S. Embassy, or U.S. Consulate for an interview.  We may also request that you submit the originals of any copy.  We will return these originals when they are no longer required.

At the time of any interview or other appearance at a USCIS office, U.S. Embassy, or U.S. Consulate, USCIS may require you to provide biometrics information (for example, photographs, fingerprints) to verify your identity and update your background information.

### Decision

The decision on Form I-131 involves a determination of whether you have established eligibility for the requested document.  You will be notified of the decision in writing.

### What If You Claim Nonresident Alien Status on Your Federal Income Tax Return?

If you are an alien who has been admitted as an immigrant or adjusted status to that of an immigrant, and are considering the filing of a nonresident alien tax return or the non-filing of a tax return on the ground that you are a nonresident alien, you should carefully review the consequences of such actions under the INA.

If you file a nonresident alien tax return or do not file a tax return, you may be regarded as having abandoned residence in the United States and as having lost your lawful permanent resident status under the INA.  As a consequence, you may be ineligible for a visa or other document for which lawful permanent resident aliens are eligible.

You may also be inadmissible to the United States if you seek admission as a returning resident, and you may become ineligible for adjustment of status as a lawful permanent resident or naturalization on the basis of your original entry.

## USCIS Forms and Information

To ensure you are using the latest version of this form, visit the USCIS website at **www.uscis.gov** where you can obtain the latest USCIS forms and immigration-related information.  If you do not have internet access, you may order USCIS forms by calling the USCIS Contact Center at **1-800-375-5283**.  The USCIS Contact Center provides information in English and Spanish.  For TTY (deaf or hard of hearing) call: **1-800-767-1833**.

Instead of waiting in line for assistance at your local USCIS office, you can schedule an appointment online at **www.uscis.gov**.  Select "Tools," then under "Self Service Tools," select "Appointments" and follow the screen prompts to set up your appointment.  Once you finish scheduling an appointment, the system will generate an appointment notice for you.

## Penalties

If you knowingly and willfully falsify or conceal a material fact or submit a false document with this request, we will deny your Form I-131 and may deny any other immigration benefit. In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

## DHS Privacy Notice

**AUTHORITIES:** The information requested on this application, and the associated evidence, is collected under the Immigration and Nationality Act sections 103, 208(c)(1)(C), 211, 212(d)(5)(A), 215 and 8 CFR sections 211.1(a)(3-4), 212.5, and 223.1-223.3.

**PURPOSE:** The primary purpose for providing the requested information on this application is to apply for a Reentry Permit, Refugee Travel Document, or Advance Parole Document, to include urgent humanitarian reasons or in furtherance of a significant public benefit. DHS uses the information you provide to grant or deny the immigration benefit you are seeking.

**DISCLOSURE:** The information you provide is voluntary. However, failure to provide the requested information, including your Social Security number (if applicable), and any requested evidence, may delay a final decision or result in denial of your application.

**ROUTINE USES:** DHS may share the information you provide on this application and any additional requested evidence with other Federal, state, local, and foreign government agencies and authorized organizations. DHS follows approved routine uses described in the associated published system of records notices [DHS/USCIS-001 - Alien File, Index, and National File Tracking System and DHS/USCIS-007 - Benefits Information System] and the published privacy impact assessments [DHS/USCIS/PIA-003(b) Integrated Digitization Document Management Program, DHS/USCIS/PIA-016a Computer Linked Application Information Management System and Associated Systems, and DHS/USCIS/PIA-051 Case and Activity Management for International Operations] which you can find at **www.dhs.gov/privacy**. DHS may also share this information, as appropriate, for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection, and a person is not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number. The public reporting burden for this collection of information is estimated at 1.90 hours per response, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application. The collection of biometrics is estimated to require 1.17 hours. The collection of passport-style photographs is estimated at 0.50 hours. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: U.S. Citizenship and Immigration Services, Office of Policy and Strategy, Regulatory Coordination Division, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No .1615-0013. **Do not mail your completed Form I-131 to this address.**