**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.,* | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.,* | § | |
| | § | |
| Defendant-Intervenors. | § | |

**BRIEF OF DEFENDANT-INTERVENORS ELIZABETH DIAZ, ET AL.**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN**
**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

STATEMENT OF THE ISSUES........................................................................................ 1

INTRODUCTION.................................................................................................................. 1

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS ...................... 3

    A.    The History of Deferred Action in the Immigration Context. ...................... 3

    B.    The Memorandum, DAPA, and the Rescission Cases.................................... 4

    C.    The *Texas (Memo)* Litigation.......................................................................... 5

    D.    The 2022 Rule............................................................................................... 7

SUMMARY OF THE ARGUMENT ................................................................................... 9

ARGUMENT .................................................................................................................... 10

   I.   **The Court Must Consider the 2022 Rule Afresh Because It Differs from the Previously Challenged Memorandum in Important, Legally Significant Ways.**........ 10

    A.    By Emphasizing Discretion at Every Step, the 2022 Rule Demonstrates Unambiguously that DACA Can Now Be Issued Only on a Case-by-Case, Discretionary Basis, to a Limited Set of Eligible Immigrants. ..................... 11

    B.    These Changes Require the Court to Consider Anew Each Aspect of Plaintiffs' Motion and Defendant-Intervenors' Cross Motion........................................ 14

  II.  **Plaintiffs Lack Standing to Challenge The 2022 Rule.**..................................... 16

    A.    Plaintiffs Cannot Rely on Stale Evidence or Decisions in *Texas (Memo)* to Satisfy Their Heavy Summary-Judgment Burden. .................................... 16

    B.    Plaintiffs Fail to Identify Specific Evidence of Any Concrete, Particularized Injury Caused by the Rule............................................................................ 19

       1.   *Social services expenditures.* .......................................................... 19

       2.   Parens patriae *standing.* ................................................................. 23

    C.    Plaintiffs Fail to Identify Specific Evidence Supporting Their Theory of Redressability................................................................................................ 26

    D.    Plaintiffs Are Not Owed Special Solicitude. .............................................. 29

    E.    At the Very Least, Disputed Issues of Material Fact as to Standing Prevent the Court from Granting Summary Judgment for Plaintiffs. ............................ 30

 III. **The Rule Is Entirely Consistent with the INA.** ............................................... 32

    A.    Through the INA, Congress Has Empowered DHS to Exercise the Exact Type of Prosecutorial Discretion Outlined in the Rule. ....................................... 33

    B.    The Rule Is an Inherently Reasonable Interpretation of DHS's Authority, as Evidenced by DHS's Long-Established Historical Practice of Deferred Action.......... 36

 IV. **The Rule Is Not Arbitrary and Capricious.** ..................................................... 37

    A.    Arbitrary and Capricious Review Is Deferential and Narrow........................ 38

i

 B. The Rule Easily Satisfies that Deferential Standard. ....................................... 38

**V. The Rule Does Not Violate the Take Care Clause** ................................................ **40**

**VI. The Court Cannot and Should Not Vacate the Rule Or Enter a Permanent Nationwide Injunction.** ........................................................................................... **41**

 A. Under § 1252(f)(1), this Court Lacks Jurisdiction to Vacate or Enjoin the Rule. ........ 42

 B. If the Court Does Enjoin the Rule, the Injunction Must Be Limited to Remedying Plaintiffs' Actual Injuries. ........................................................ 44

  1. *The Rule should not be enjoined nationwide.* .............................................. 44

  2. *Plaintiffs are not entitled to class-wide relief, because the appropriateness of the remedy as to any individual must be assessed on an individual basis.* ...................... 45

 C. Any Remedy Must Account for Reliance Interests, Permit an Orderly Wind-Down, and Be Stayed Pending Appeal. ...................................................... 49

**CONCLUSION** ............................................................................................................. **50**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta v. Hensel Phelps Const. Co.*,
    909 F.3d 723 (5th Cir. 2018) ...............................................................................36

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982)...............................................................................................23

*Am. Stewards of Liberty v. Dep't of Interior*,
    960 F.3d 223 (5th Cir. 2020) ...............................................................................34

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) ..........................................................................30, 45

*Arizona v. United States*,
    567 U.S. 387 (2012)...............................................................................11, 33, 34

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*,
    178 F.3d 350 (5th Cir. 1999) ...............................................................................16

*Avitia v. Metro. Club of Chi.*,
    49 F.3d 1219 (7th Cir. 1995) ...............................................................................47

*Brackeen v. Haaland*,
    994 F.3d 249 (5th Cir. 2021) (en banc) ..............................................................24

*Brown v. Allen*,
    344 U.S. 443 (1953)...............................................................................................48

*California v. Texas*,
    141 S. Ct. 2104 (2021)...........................................................................................25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...............................................................................16, 26, 28

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)...............................................................................................32

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)...............................................................................................16

*Collins v. Lew*,
    -- F. Supp. 3d --, 2022 WL 17170955 (S.D. Tex. Nov. 21, 2022)...................46, 48

*Collins v. Yellen*,
   141 S. Ct. 1761 (2021)..................................................................................41, 46, 48

*Ctr. for Bio. Diversity v. U.S. EPA*,
   937 F.3d 533 (5th Cir. 2019) .................................................................................22

*Dep't of Homeland Sec. v. New York*,
   140 S. Ct. 599 (2020).............................................................................................45

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020)................................................................................... *passim*

*El Paso Cnty. v. Trump*,
   982 F.3d 332 (5th Cir. 2020) ...........................................................18, 27, 29, 30

*Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*,
   47 F.4th 408 (5th Cir. 2022), *vacated for reh'g en banc*, -- F.4th --, 2023 WL
   2229665 (5th Cir. Feb. 17, 2023)...............................................................20, 28, 29

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021)....................................................................................38, 39, 40

*Feds for Med. Freedom v. Biden*,
   25 F.4th 354 (5th Cir. 2022) ..................................................................................45

*Florida v. HHS*,
   19 F.4th 1271 (2021)...............................................................................................24

*Garland v. Aleman Gonzalez*,
   142 S. Ct. 2057 (2022).................................................................................15, 41, 42, 44

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018)......................................................................................41, 44

*Gov't of Manitoba v. Bernhardt*,
   923 F.3d 173 (D.C. Cir. 2019) ...............................................................................23

*Hecht Co. v. Bowles*,
   321 U.S. 321 (1944).................................................................................................47

*Heckler v. Chaney*,
   470 U.S. 821 (1985).................................................................................................41

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ...............................................................................33, 38

*Joseph Eichelberger & Co. v. Comm'r*,
   88 F.2d 874 (5th Cir. 1937) ...................................................................................48

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022) ................................................................24

*Las Americas Immigr. Advoc. Ctr. v. Biden*,
   571 F. Supp. 3d 1173 (D. Or. 2021) .....................................................40

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020).........................................................................33

*Louisiana v. Becerra*,
   20 F.4th 260 (5th Cir. 2021) (per curiam) ............................................44

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..............................................................................16

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)................................................................................6

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923)..............................................................................23

*Michigan v. EPA*,
   581 F.3d 524 (7th Cir. 2009) ................................................................23

*Oklahoma v. Biden*,
   577 F. Supp. 3d 1245 (W.D. Okla. 2021) ............................................23

*Pluet v. Frasier*,
   355 F.3d 381 (5th Cir. 2004) ...........................................................16, 17

*Propes v. Quarterman*,
   573 F.3d 225 (5th Cir. 2009) ................................................................17

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
   279 F. Supp. 3d 1011 (N.D. Cal. 2018), *aff'd*, 908 F.3d 476 (9th Cir. 2018),
   *rev'd in part, vacated in part*, 140 S. Ct. 1891 (2020) (describing programs
   since 1975)..............................................................................................4

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999)..............................................................................36

*Ryder v. United States*,
   515 U.S. 177 (1995)..............................................................................48

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998)................................................................................18

*Texas v. Biden*,
-- F. Supp. 3d --, 2022 WL 17718634 (N.D. Tex. Dec. 15, 2022) .........................................18

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) (per curiam) ..............................................................................40

*Texas v. United States* (*Texas (Memo)*),
328 F. Supp. 3d 662 (S.D. Tex. 2018) ...........................................................5, 25, 40, 48

*Texas v. United States* (*Texas (Memo)*),
2021 WL 3022433 (S.D. Tex. July 16, 2021)..........................................................................32

*Texas v. United States* (*Texas (Memo)*),
2021 WL 3022434 (S.D. Tex. July 16, 2021).................................................................2, 6, 50

*Texas v. United States* (*Texas (Memo)*),
549 F. Supp. 3d 572 (S.D. Tex. 2021) ...........................................................................*passim*

*Texas v. United States* (*Texas (Memo)*),
50 F.4th 498 (5th Cir. 2022) .........................................................................................*passim*

*Texas v. United States* (*Texas (Parents)*),
86 F. Supp. 3d 591 (S.D. Tex. 2015) .................................................................................4, 5

*Texas v. United States* (*Texas (Parents)*),
809 F.3d 134 (5th Cir. 2015) .................................................................................5, 11, 15, 44

*Trump v. Hawaii*,
138 S. Ct. 2392 (2018)............................................................................................................45

*United States v. Armstrong*,
517 U.S. 456 (1996)................................................................................................................41

*United States v. Texas*,
136 S. Ct. 2271 (2016)..............................................................................................................5

*Ute Indian Tribe of Uintah & Ouray Rsrv. v. U.S. Dep't of Interior*,
560 F. Supp. 3d 247 (D.D.C. 2021) .......................................................................................24

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022)............................................................................................................36

**Statutes**

6 U.S.C. § 202(5) ...............................................................................................................3, 33

8 U.S.C. § 1103(a)(1) .........................................................................................................3, 33

8 U.S.C. § 1182(d)(5)(A) ...............................................................................................3, 33, 35

8 U.S.C. § 1225 ...................................................................................................43

8 U.S.C. § 1226 ...................................................................................................43

8 U.S.C. § 1227 ...................................................................................................43

8 U.S.C. § 1229a ..................................................................................................43

8 U.S.C. § 1252(f)(1) ...............................................................................15, 41, 42

8 U.S.C. § 1324a(h)(3) ................................................................................3, 33, 34

8 U.S.C. § 1611(b)(2) .................................................................................3, 33, 34

**Rules & Regulations**

8 C.F.R. § 1.3(a)(4)(vi) .......................................................................................34

8 C.F.R. § 236.21(c)(1) ............................................................................4, 11, 12, 34

8 C.F.R. § 236.22(a)(3) .......................................................................................12

8 C.F.R. § 236.22(b) .......................................................................................12, 13

8 C.F.R. § 236.22(b)(2) .......................................................................................13

8 C.F.R. § 236.22(b)(7) .......................................................................................13

8 C.F.R. § 236.22(c) .......................................................................................12

8 C.F.R. § 236.23(a)(4) ...................................................................................12, 35

8 C.F.R. § 236.23(b) .......................................................................................12

8 C.F.R. § 236.23(d)(1) ...................................................................................12, 34

8 C.F.R. § 274a.12(a)(19) .................................................................................46

8 C.F.R. § 274a.12(a)(20) .................................................................................46

8 C.F.R. § 274a.12(c)(14) .................................................................................35

8 C.F.R. § 274a.12(c)(18) .................................................................................46

76 Fed. Reg. 53780 (Aug. 29, 2011)...................................................................34

86 Fed. Reg. 53736 (Sept. 28, 2021) ....................................................................2

87 Fed. Reg. 53152 (Aug. 30, 2022)....................................................................1, 2

**Treatises**

10A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*
§ 2720 (4th ed. 2022) ............................................................................................................17

18B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*
§ 4478.5 (3d ed. 2022) ..........................................................................................................17

## STATEMENT OF THE ISSUES

On August 30, 2022, the Department of Homeland Security ("DHS") promulgated Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53152 (the "2022 Rule" or "Rule"), which was scheduled to go into effect on October 31, 2022.  In light of that development, on October 5, 2022, the Fifth Circuit affirmed in part and vacated in part this Court's July 16, 2021, order and injunction with respect to Janet Napolitano's June 15, 2012, memo (the "Memorandum") regarding Deferred Action for Childhood Arrivals ("DACA"), and it remanded for further proceedings regarding the 2022 Rule.  *See Texas v. United States* (*Texas (Memo)*), 50 F.4th 498 (5th Cir. 2022); *Texas (Memo)*, 549 F. Supp. 3d 572 (S.D. Tex. 2021).  Plaintiffs, the States of Texas, Alabama, Arkansas, Louisiana, Nebraska, South Carolina, West Virginia, Kansas, and Mississippi ("Plaintiffs"), filed a Supplemental Complaint, Dkt. 623, and later a Motion for Summary Judgment ("Motion" or "Mot."), Dkt. 625-1.  Defendant-Intervenors Elizabeth Diaz, *et al.* ("Defendant-Intervenors"), respectfully request that the Court deny Plaintiffs' Motion and instead grant Defendant-Intervenors' Cross-Motion for Summary Judgment ("Cross-Motion").[1]

## INTRODUCTION

In 2012, DHS issued the Memorandum, which provided a framework for DHS to consider whether to forbear removal for "certain young people who were brought to this country as children and know only this country as home."  Dkt. 400-7, Ex. 36 at App. 0002.  The Memorandum explained that it represented an exercise of DHS's discretion under the Immigration and Nationality Act ("INA") to establish immigration enforcement priorities.  *Id.* at App. 0002–0003.

---

[1] Defendant-Intervenors incorporate by reference their preliminary injunction briefing and evidence and their previous briefing on the cross-motions for summary judgment regarding the Memorandum (Dkts. 504, 528, 532, and 568) in this Cross-Motion.

For six years, hundreds of thousands of DACA recipients made important life decisions in reliance on the Memorandum.  They started families, embarked on new careers and courses of study, and in the process developed even deeper community.  Then, in 2018, Plaintiffs sued the Executive Branch, claiming for the first time that the Memorandum was unlawful.  This Court entered summary judgment for Plaintiffs in 2021, but, in light of those DACA recipients' strong reliance interests, the Court left DACA in place in important respects pending appeal and further proceedings, including an anticipated rulemaking.  *See* 549 F. Supp. 3d at 624; *Texas (Memo)*, 2021 WL 3022434, at *2 (S.D. Tex. July 16, 2021).  At the same time, and while the appeal proceeded, DHS issued a Notice of Proposed Rulemaking ("NPRM"), Dkt. 607-1, AR2022_100001 (86 Fed. Reg. 53736 (Sept. 28, 2021)); received and considered more than 16,000 public comments; evaluated the factors identified by this Court in its 2021 summary judgment decision; and promulgated the 2022 Rule.  Dkt. 607-1, AR2022_100195 (87 Fed. Reg. 53152 (Aug. 30, 2022)).  On October 5, 2022, the Fifth Circuit affirmed in part and vacated in part this Court's July 16, 2021, Order, and remanded for further proceedings to consider the effect of the 2022 Rule.  *See* 50 F.4th at 508.  As this Court had done, in light of the strong reliance interests of DACA recipients, the Fifth Circuit left the DACA Memorandum in place in significant respects pending further proceedings in this Court and further appeal.  *Id.* at 531.

Plaintiffs now challenge the 2022 Rule, asking the Court to summarily vacate the Rule and enjoin DHS from applying it anywhere across the United States.  Plaintiffs offer no new relevant evidence regarding the application or effect of the 2022 Rule on their State interests.  Rather, Plaintiffs rely on declarations, affidavits, and exhibits that are now nearly five years old and relate to a now-superseded memorandum and different political context.  Instead of coming forward with actual evidence of harm from the 2022 Rule, Plaintiffs invoke a controversial theory of standing

2

that has attracted considerable skepticism from the Supreme Court.  Contrary to Plaintiffs'
premise, much has changed since their 2018 challenge that makes their stale evidence inapposite.
The Rule underscores DHS's enforcement discretion, which means that the presumptions
underlying Plaintiffs' earlier challenge and evidence no longer hold.  Moreover, the population of
immigrants eligible for DACA has changed dramatically, rendering Plaintiffs' dated evidence even
more inapposite.  Finally, over the past 5 years, DACA recipients' ties to the United States and
their reliance interests have only grown deeper.

Any one of those changes would be enough to compel a different result with respect to the
Rule than it did with respect to the Memorandum, but together they are insurmountable for
Plaintiffs and warrant judgment in favor of Defendant-Intervenors.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

### A.    The History of Deferred Action in the Immigration Context.

Through the INA, Congress empowered the Secretary of DHS (the "Secretary") with broad
discretion to "administ[er] and enforce[] . . . all [ ] laws relating to [ ] immigration and
naturalization," 8 U.S.C. § 1103(a)(1), to "[e]stablish[] national immigration enforcement policies
and priorities," 6 U.S.C. § 202(5), to "determine[]" which immigrants are "lawfully present in the
United States" for the purposes of certain Social Security benefits, 8 U.S.C. § 1611(b)(2), to
determine which immigrants are "authorized to be [ ] employed," 8 U.S.C. § 1324a(h)(3), and to
parole into the United States "any [immigrant] applying for admission" in the Secretary's
"discretion." 8 U.S.C. § 1182(d)(5)(A).  Congress's statutory command that the Secretary exercise
discretion in these respects is also a practical necessity, as Congress has allocated to DHS only
enough resources to remove or return just under 4 percent of the immigrants potentially subject to
removal each year.  *See* Dkt. 400-3, Ex. 15 ¶¶ 8–10; Dkt. 400-9, Ex. 62-A.  Indeed, during fiscal

years 2016–2020, DHS removed an average of just 235,120 noncitizens annually.  Dkt. 607-1 at

AR2022_100228–29 (87 Fed. Reg. 53185–86).  Thus, the Secretary *must* exercise discretion.  *Id.*

One form of discretion that the Secretary has frequently used is "deferred action."  Deferred

action is "an exercise of the Secretary's broad authority to establish national immigration

enforcement policies and priorities," and is "a form of enforcement discretion not to pursue [ ]

removal . . . for a limited period in the interest of ordering enforcement priorities in light of

limitations on available resources, taking into account humanitarian considerations and

administrative convenience."  8 C.F.R. § 236.21(c)(1).  For decades, discretionary relief from

removal has been granted to both individuals and various classes of non-U.S. citizens through

deferred action.  *See, e.g.*, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F.

Supp. 3d 1011, 1019-22 (N.D. Cal. 2018), *aff'd*, 908 F.3d 476 (9th Cir. 2018), *rev'd in part,

vacated in part*, 140 S. Ct. 1891 (2020) (describing programs since 1975).  One example, the

Family Fairness Program, extended deferred action and employment authorization to

approximately 1.5 million people.  *See* Dkt. 6, Ex. 7 at App. 0224–25, App. 0247, App. 0249–51.

### B.    The Memorandum, DAPA, and the Rescission Cases.

In 2012, the Secretary issued the Memorandum, which provided guidelines for the exercise

of discretion to grant deferred action to non-U.S. citizens who arrived in the United States as

children and who meet certain criteria.  *See* Dkt. 400-7, Ex. 36.  In 2014, DHS announced a distinct

policy, referred to as Deferred Action for Parents of Americans ("DAPA"), which covered a

potential group of up to 4 million parents of U.S. citizens and lawful residents.  *See* Dkt. 400-3,

Ex. 18; Dkt. 626-2, Ex. 8.[2]  Almost immediately, a number of states challenged the legality of

---

[2] Although the DAPA memorandum also made changes that would have expanded DACA, those changes never went into effect because the DAPA memorandum was enjoined.  *Texas v. United States* (*Texas (Parents)*), 86 F. Supp. 3d 591, 677–78 & n.111 (S.D. Tex. 2015).  The Court made

DAPA—but not DACA—culminating in the Fifth Circuit affirming a ruling by this Court that the Secretary's adoption of DAPA exceeded his authority. *Texas v. United States* (*Texas (Parents)*), 809 F.3d 134, 188 (5th Cir. 2015). The Supreme Court granted review but did not reach the merits. *United States v. Texas*, 136 S. Ct. 2271, 2272 (2016). In 2017, the Trump Administration attempted to rescind DACA, *see* Dkt. 400-4, Ex. 21; Dkt. 400-4, Ex. 22, but the Supreme Court held the recission was arbitrary and capricious, *see Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 (2020).

      C.    **The *Texas (Memo)* Litigation.**

On May 1, 2018—nearly six years after the Secretary issued the Memorandum—Plaintiffs filed suit in this Court challenging, for the *first* time, the Memorandum's lawfulness. Dkt. 1; *contra* Mot. at 6 (mistakenly referring to "years of litigation surrounding the DACA Memorandum"). The next day, Plaintiffs filed a motion for a preliminary injunction, Dkt. 5, which this Court denied after limited discovery, citing Plaintiffs' six-year delay in explaining that Plaintiffs had failed to establish irreparable harm. *See Texas (Memo)*, 328 F. Supp. 3d 662, 738-40, 743 (S.D. Tex. 2018). This Court also held that vacatur of DACA on the then-existing record did "not make sense nor serve the best interests of this country." *Id.* at 742.

The parties then proceeded to merits discovery. On February 4, 2019—before discovery closed—Plaintiffs filed a motion for summary judgment. Dkt. 356. The Court denied that motion without prejudice on August 21, 2020, Dkt. 473 at 8, and Plaintiffs filed a second summary judgment motion on October 9, 2020. Dkt. 486. On July 16, 2021, this Court granted Plaintiffs' motion, denied Defendant-Intervenors' cross motion, and issued a permanent injunction against

---

clear, however, that "the actions taken by Secretary Napolitano" through the Memorandum were "not before the Court and [were] not addressed by [its] opinion." *Id.* at 606.

the enforcement of DACA. *Texas (Memo)*, 549 F. Supp. 3d at 624. Although the Court recognized that Defendant-Intervenors had presented "contrary evidence in the record" creating a "fact issue" as to whether Plaintiffs suffered damages either directly or as *parens patriae*, *see id.* at 595–96, it held that Plaintiffs were entitled to special solicitude and thus had standing. *Id.* The Court then held that the Memorandum should have gone through notice-and-comment rulemaking and thus violated the procedural requirements of the Administrative Procedure Act ("APA"). *Id.* at 603. The Court also held that the Memorandum was contrary to the INA. *Id.* at 609–10. It ordered that enforcement of the Memorandum cease as to new applicants, but it stayed its order with respect to current DACA recipients in recognition of the "significant equitable interests" of the "[h]undreds of thousands of individual DACA recipients, along with their employers, states, and loved ones[.]" *Texas (Memo)*, 2021 WL 3022434, at *2.

Defendant-Intervenors appealed, Dkt. 582, and the Fifth Circuit affirmed in part. *Texas (Memo)*, 50 F.4th at 508. With respect to standing, the Fifth Circuit declined to address Plaintiffs' *parens patriae* theory, but it granted Plaintiffs special solicitude to challenge the Memorandum under *Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007). With that special solicitude, the panel was satisfied that Plaintiffs had demonstrated concrete, redressable injuries traceable to the Memorandum through indirect social services expenditures. *Id.* at 519–20. Crucially, however, the Fifth Circuit went no further. *Id.* at 512 ("Today, we consider only the challenges to the 2012 DACA Memorandum."). On the merits, the Fifth Circuit first addressed whether the Memorandum complied with the APA's procedural requirements, *id.* at 524, an issue no longer relevant with respect to the Rule, which was promulgated through notice-and-comment rulemaking. The Fifth Circuit also affirmed this Court's holding on Plaintiffs' substantive APA challenge to the Memorandum's lawfulness, *id.* at 524–28, but it did not address Plaintiffs' Take

Care clause claim or assess whether the Memorandum was arbitrary and capricious.  And, although the Fifth Circuit affirmed this Court's vacatur, injunction, and declaratory judgment as to the Memorandum, it left in place this Court's stay pending appeal.  *Id.* at 531.  It did so because "DACA has had profound significance to recipients, and many others in the ten years since its adoption," and because DACA's termination would result in "inevitable disruption . . . from a lack of continuity and stability."  *Id.* (cleaned up).

      **D.**      **The 2022 Rule.**

      On September 28, 2021, DHS published an NPRM for the establishment of regulations related to "the Deferred Action for Childhood Arrivals (DACA) policy" to "defer removal of certain noncitizens who years earlier came to the United States as children, meet other criteria, and do not present other circumstances that would warrant removal."  Dkt. 607-1, AR2022_100001 (86 Fed. Reg. 53736).  Explicitly responding to this Court's July 16, 2021, Order, DHS's NPRM requested public comment on features of the proposed rule, with emphasis on "forbearance from enforcement action, employment authorization, and lawful presence."  *Id.* at AR2022_100028 (86 Fed. Reg. 53763).  The NPRM further noted, "DHS takes seriously the district court's suggestion that it may enact a forbearance-only policy, and that features of the DACA policy may be modified through the rulemaking process."  *Id.*  Section V of the NPRM included an assessment of regulatory alternatives (including those with and without a lawful presence component), as well as analyses of wages earned and tax transfers by DACA recipients, the labor market impacts of the proposed rule, and a discussion of reliance interests and potential effects of the proposed rule identified by this Court.  *See generally id.* at AR2022_10037–79 (86 Fed. Reg. 53772–814).

      DHS received 16,361 public comments on the NPRM, and only 3 percent expressed generalized opposition.  *See* Dkt. 607-1, AR2022_100205 (87 Fed. Reg. 53162).  Texas was the only state to submit a comment expressing general opposition to the proposed rule.  *Id.* at

AR2022_100215 (87 Fed. Reg. 53172).   By contrast, attorneys general from fourteen other states—that together represent approximately 61 percent of the DACA recipient population—voiced their support for the Rule.   *Id.*   DHS vetted the commenters' requests carefully.   It considered but rejected several proposals that the Rule implement longer grant periods, citing the two-year grant period as "an appropriate frequency for review and decision on whether to continue to favorably exercise discretion in the form of deferred action."   *Id.* at AR2022_100284 (87 Fed. Reg. 53241).   DHS also rejected several comments calling for a "path to citizenship," noting that DHS lacks "legal authority to amend the rule to provide a direct procedure for a DACA recipient to attain citizenship" consistent with DHS's position that "the DACA policy represents an exercise of enforcement discretion."   *Id.* at AR2022_100224–26 (87 Fed. Reg. 53181–83).

DHS also considered the Rule's impact on "native workers" and this Court's Order vacating the Memorandum.   *See id.* at AR2022_100329–33 (87 Fed. Reg. 53286–90).   As to native workers, DHS consulted a 2017 National Academies of Sciences, Engineering, and Medicine ("NAS") publication that surveyed the peer-reviewed literature on the effect of immigration on labor markets.   *Id.* at AR2022_100330 (87 Fed. Reg. 53287).   That survey underscored the difficulty of isolating immigration's effect on labor markets but generally concluded that, "[t]o the extent that negative wage effects are found," the impact of immigration on the wages of native workers is very small and limited to narrow groups of younger, less-well-educated workers.   *Id.* (cleaned up).   The NAS report also acknowledged non-labor market effects of immigration: "Similar to citizens, immigrants also pay taxes; stimulate the economy by consuming goods, services, and entertainment; engage in the real estate market; and take part in domestic tourism. Such activities contribute to further growth of the economy and create additional jobs and opportunities for both citizen and noncitizen populations."   *Id.*

In light of those findings, DHS considered but ultimately rejected proposals to decouple work authorization from deferred action.  DHS's analysis began with a recognition that this Court "held that DHS lacked authority to provide employment authorization and benefits such as Social Security benefits to DACA recipients," but that "the individualized notion of deferred action" is an approach "that courts have found permissible in other contexts."  *Id.* at AR2022_100336 (87 Fed. Reg. 53293) (quoting 549 F. Supp. 3d at 620-21).  DHS explored the possibility of excluding work authorization, but decided that "a policy of forbearance without work authorization" would:

- "disrupt the reliance interests of hundreds of thousands of people, as well as the families, employers, schools, and communities that rely on them";
- "result in substantial economic losses";
- "produce a great deal of human suffering, including harms to dignitary interests, associated with lost income and ability to self-support";
- "result in hundreds of thousands of prime-working-age people remaining in the United States while lacking authorization to work lawfully to support themselves and their families";
- "deprive American employers and the American public at large of the ability to benefit from valuable work of hundreds of thousands of skilled and educated individuals and disappoint their own, independent reliance interests as well";
- result in "adverse fiscal implications" for Federal, state, and local governments "due to reduced tax revenues"; and
- "produce reduced transfers to Medicare and Social Security funds, as well as any other transfers associated with the DACA policy."

*Id.* (cleaned up).  Following its careful and reasoned decision-making, DHS promulgated the Rule.

## SUMMARY OF THE ARGUMENT

The Rule is not the Memorandum, both as a matter of substance and as a matter of context.  Yet, Plaintiffs have failed to bring forward *any* new evidence to demonstrate that they are entitled to relief with respect to the Rule.  To start, Plaintiffs have not met their evidentiary burden to prove that they have standing to challenge the *Rule*.  Instead, they rely on the record *as it existed in 2018*, entirely ignoring that five years have passed and that both DACA and the affected population have changed.  Plaintiffs' failure to take their Article III burden seriously, and their invocation of stale,

speculative evidence and tenuous legal theories, entitles Defendant-Intervenors to summary judgment.  At the very least, Plaintiffs' inability to prove beyond dispute that the Rule would cause them concrete and redressable harm precludes judgment in Plaintiffs' favor.

Plaintiffs have similarly failed to demonstrate that the Rule is substantively unlawful.  To the contrary, each aspect of the Rule that Plaintiffs find objectionable reflects DHS's entirely reasonable exercise of the broad discretion Congress granted it in the INA.  Plaintiffs' cramped reading of the INA would impose limits on DHS's authority that appear nowhere in the text, and Plaintiffs' bald assertion that the Rule is arbitrary and capricious is unsupported by the APA.

Finally, even if Plaintiffs have standing and the Rule is unlawful, Plaintiffs' proposed remedies—vacatur and a permanent, nationwide injunction—are both unlawful and inequitable.  As a matter of law, this Court lacks power to bar DHS from enforcing the Rule, and as a matter of equity, this Court should not grant sweeping nationwide relief in light of the weighty reliance interests of DACA recipients, especially when not a single Plaintiff has demonstrated *any* harm that it would avoid if the 2022 Rule were enjoined, especially as to the diminishing population of existing DACA recipients.

## ARGUMENT

## I.     THE COURT MUST CONSIDER THE 2022 RULE AFRESH BECAUSE IT DIFFERS FROM THE PREVIOUSLY CHALLENGED MEMORANDUM IN IMPORTANT, LEGALLY SIGNIFICANT WAYS.

As they did in *Texas (Memo)*, Plaintiffs rely heavily on previous decisions about distinct deferred action policies rather than the actual 2022 Rule that is before the Court.  Plaintiffs cite both this Court's and the Fifth Circuit's opinions in *Texas (Memo)* more than three dozen times, as though the outcome here flowed *a fortiori* from those earlier rulings.  *See* Mot. at 1.  However, the 2022 Rule is *not* the Memorandum.  For example, the 2022 Rule unequivocally and explicitly requires adjudicators to exercise *individualized discretion*, not only with respect to whether to

grant DACA, but also with respect to work authorization and whether and when to terminate an individual's DACA.   Thus, far from a "decision to change the immigration classification of millions . . . on a class-wide basis," *Texas (Parents)*, 809 F.3d at 170, the 2022 Rule merely guides the individualized, case-by-case prosecutorial discretion that has long been a "principal feature of the removal system." *Arizona v. United States,* 567 U.S. 387, 396 (2012).   Because the 2022 Rule is not the Memorandum, the Court must consider the 2022 Rule afresh.[3]

     **A.**    **By Emphasizing Discretion at Every Step, the 2022 Rule Demonstrates Unambiguously that DACA Can Now Be Issued Only on a Case-by-Case, Discretionary Basis, to a Limited Set of Eligible Immigrants.**

Although the 2022 Rule and the Memorandum both invoke the Secretary's "discretion," 8 C.F.R. § 236.21(c)(1), *see* Dkt. 400-7, Ex. 36 at App. 0002–0003, the 2022 Rule ensures, through a series of detailed directives at each step of the DACA application process, that DACA will be granted only in a temporary, contingent, and individualized way.   The 2022 Rule thus squarely resolves the Fifth Circuit's previous uncertainty over "whether [DHS] retain[s] discretion to reject [facially qualified] applicants."   *Texas (Memo)*, 50 F.4th at 524.   Under the 2022 Rule, USCIS officers unquestionably retain that discretion.   As such, prior determinations that *the Memorandum* provided broader ("class-wide") relief are inapplicable.

First, the 2022 Rule clarifies that USCIS must "in its sole discretion" determine, including by consulting with other government agencies as it "deems appropriate in its discretion," that a DACA applicant has "demonstrat[ed] by a preponderance of the evidence that [the applicant]

---

[3] Plaintiffs rely on the Federal Defendants' statements before the Fifth Circuit to bolster their argument that the Court can simply apply its Memorandum summary-judgment decision to the 2022 Rule.   *See* Mot. at 3–5.   Notably, however, the Fifth Circuit did not accept those assertions by the Federal Defendants, but instead remanded to this Court to "review the administrative record in the rulemaking proceeding" in the first instance and to "determine whether there are material differences in that record and the record . . . regarding the 2012 DACA Memorandum."   *Texas (Memo)*, 50 F.4th at 512.   Plaintiffs cannot short-circuit that process.

meets the threshold criteria."  8 C.F.R. §§ 236.22(a)(3)–(b), 236.23(b).  Second, the 2022 Rule makes clear that an applicant will not necessarily receive DACA even if the applicant satisfies "threshold" eligibility criteria.  8 C.F.R. § 236.22(b)–(c).  The 2022 Rule states plainly that the threshold criteria *precede* USCIS's exercise of discretion, rather than constrain it: "[e]ven if the threshold criteria . . . are all found to have been met, USCIS retains the discretion to assess the individual's circumstances and to determine that any factor specific to the individual makes deferred action inappropriate."  8 C.F.R. § 236.22(c).  Third, the 2022 Rule specifies that work authorization is not automatically tethered to DACA.  *See* 8 C.F.R. § 236.23(a)(4).  To the contrary, DACA recipients *may* receive work authorization, but only "if approved in DHS's discretion."  *Id.*  And fourth, the 2022 Rule makes clear that USCIS "may terminate a grant of [DACA] *at any time in its discretion*," 8 C.F.R. § 236.23(d)(1) (emphasis added), and, moreover, that DACA "does not preclude DHS from commencing removal proceedings *at any time,*" 8 C.F.R. § 236.21(c)(1) (emphasis added).  Thus, the 2022 Rule does not, by its own force, "grant lawful presence and work authorization to over a million people."  *Texas (Memo)*, 549 F. Supp. 3d at 615.  Rather, the 2022 Rule merely allows certain immigrants to apply for an individualized grant of prosecutorial discretion, which DHS can terminate at any time, in its discretion.

The 2022 Rule also narrows the population eligible for a temporary exercise of prosecutorial discretion in the first place.  Because the 2022 Rule "*does not expand* the threshold criteria" under the Memorandum, Dkt. 607-1 at AR2022_100206 (87 Fed. Reg. 53163) (cleaned up, emphasis added), the actual practical effect of the 2022 Rule is to *narrow* the class of potentially impacted individuals.  While no *new* individuals are covered, those who were eligible under the Memorandum but "subsequently obtained a lawful immigration status, left the United States and established residence in another country, or [were] convicted of a felony would no

longer be eligible for DACA." Dkt. 608-4 at AR2022_400260. Moreover, under the 2022 Rule, the discretionary threshold criteria are now unquestionably mandatory: *only* those individuals who satisfy the threshold criteria are eligible for a discretionary grant of deferred action. *Compare* 8 C.F.R. § 236.22(b) ("a request for deferred action under this section may be granted *only if* USCIS determines in its sole discretion that the requestor meets *each* of the following threshold criteria and merits a favorable exercise of discretion") (emphases added), *with* Dkt. 400-7, Ex. 36 at App. 0002 ("The following criteria *should* be satisfied before an individual is considered for an exercise of prosecutorial discretion") (emphasis added).

Due to the passage of time, the *characteristics* of the population eligible under the 2022 Rule are also distinct from the characteristics of the population initially eligible under the Memorandum. Because applicants must have been residing in the United States since at least June 15, 2007, *see* 8 C.F.R. § 236.22(b)(2), and must be at least 15 years old, 8 C.F.R. § 236.22(b)(7), there were already, by the time of the 2022 Rule, *no* individuals who had not already met both criteria, and the average age of DACA applicants, which had already been increasing, will only increase further. *See, e.g.*, Dkt. 607-1 at AR2022_100344–45 (showing shift in distribution of ages at time of initial DACA application); Dkt. 608-4 at AR2022_400261 (explaining how date-of-entry requirement impacts age demographics); *id.* at AR2022_400267 (mean and median age of DACA recipients increased from 2017 to 2020). It also means that the average age of those re-applying has also increased. These demographic shifts mean that individuals who receive DACA under the 2022 Rule are more likely to find employment, be engaged in higher-wage jobs, and be married and have U.S. citizen children. *See* Dkt. 607-1 at 343–44, AR2022_100314, 100321–22 (87 Fed. Reg. 53271, 53278–79), Dkt. 608-4 at AR2022_400267. Any substantive assessment of the 2022 Rule, and of Plaintiffs' standing, must take into account these significant differences.

Prior predictions regarding the anticipated impact of the Memorandum's rescission on a different demographic population are simply inapposite.

### B.   These Changes Require the Court to Consider Anew Each Aspect of Plaintiffs' Motion and Defendant-Intervenors' Cross Motion.

Plaintiffs assert that *Texas (Parents)* and *Texas (Memo)* bind the Court with respect to the 2022 Rule, *see, e.g.*, Mot. at 3–5, 25–27, and Plaintiffs urge the Court to grant summary judgment based on a nearly identical evidentiary record.  Just 5 of the 39 substantive exhibits Plaintiffs attach to their Motion postdate the 2022 Rule's NPRM; the other 34 exhibits are identical to what Plaintiffs submitted in connection with the Memorandum motion.  *Compare* Pls.' App. in Support of Mot. for Summary J., Dkt. 487 at 2–4 (Oct. 9, 2020), *with* Pls.' App. in Support of Mot. for Summary J., Dkt. 626 at 2–4 (Jan. 31, 2023).  And those five new exhibits add no new substantive facts: two are irrelevant and inapposite declarations about Texas's social services expenditures unconnected to DACA recipients, *see* Dkt. 626-3, Exs. 35–36; *see also* Part II.B.1; two are DHS websites confirming that, under the 2022 Rule, DHS will make case-by-case discretionary determinations whether to grant DACA, *see* Dkt. 626-3, Exs. 37–38; and one confirms that, as of September 30, 2022, the overwhelming majority of DACA recipients lived in states other than Texas, Dkt. 626-3, Ex. 39 at App. 716, the only state that has even attempted to show standing. However, the 2022 Rule's clear requirement that DHS must exercise individualized, case-by-case discretion—along with the 5 years that have passed since Plaintiffs first mustered their purported evidence—fundamentally tilts the analysis on each issue in Defendant-Intervenors' favor and renders much of that evidence irrelevant.

*Standing*:  Plaintiffs' citations to stale declarations and testimony about the Memorandum fail to demonstrate injury-in-fact, traceability, and redressability.  Not only is Plaintiffs' purported evidence outdated, Plaintiffs rely almost exclusively on analyses of DACA under the

Memorandum.  *See, e.g.*, Dkt. 626-2, Ex. 22 at App. 446 ¶ 5 (purporting to examine potential economic impact of the Memorandum, not the 2022 Rule).  Plaintiffs introduce no evidence or specific facts, as they must, to suggest that the unequivocally discretionary, contingent, and temporary removal-forbearance and work authorization available to a more limited, older population under the 2022 Rule would have the same purported effects on Plaintiffs' social services expenditures and labor markets.  Nor do Plaintiffs introduce any evidence, as they must, to show that the older population of individuals eligible for DACA under the 2022 Rule, more of whom are likely to be married and have families (and thus have even deeper ties to the United States), would "self-deport" if the 2022 Rule were enjoined.  *See infra*, Part II.

*Merits*:  In *Texas (Parents)*, the Fifth Circuit held that DHS's purported re-classification of "millions of [immigrants] on a class-wide basis" violated the INA.  809 F.3d at 170.  This Court and the Fifth Circuit adopted *Texas (Parents)*'s reasoning in *Texas (Memo)*, *see* 549 F. Supp. 3d at 604; 50 F.4th at 525, and Plaintiffs urge the Court to do the same with respect to the 2022 Rule.  *See, e.g.*, Mot. at 10–13.  However, because the 2022 Rule unquestionably requires DHS to exercise individualized, case-by-case discretion before granting DACA, and permits DHS to terminate an individual's DACA at any time, the 2022 Rule does not act on a "class-wide basis."  The reasoning of *Texas (Parents)* is therefore inapposite.  *See infra*, Part III.

*Remedies*:  Plaintiffs seek a nationwide injunction to invalidate and then wind down the 2022 Rule (just as they did with the Memorandum).  However, the Supreme Court's recent decision in *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064–65 (2022), makes clear that 8 U.S.C. § 1252(f)(1) prohibits courts other than the Supreme Court from issuing this type of injunctive relief.  And, even if the Court had power to issue an injunction, the injunction and wind-down period proposed by Plaintiffs is contrary both to the public interest—ignoring the even

stronger reliance interests of those eligible for DACA under the 2022 Rule—and to the Supreme Court's directive in *Regents* to consider all alternatives (including, potentially, further consideration by DHS), prior to taking action that would upend recipients' significant reliance interests. *See Regents*, 140 S. Ct. at 1915; *infra*, Part VI.

## II.   PLAINTIFFS LACK STANDING TO CHALLENGE THE 2022 RULE.

The Court should grant the Cross-Motion because Plaintiffs have failed to satisfy their burden to prove standing. At the very least, the Court should deny Plaintiffs' Motion and set the case for trial to resolve questions of fact concerning Plaintiffs' standing.

### A.   Plaintiffs Cannot Rely on Stale Evidence or Decisions in *Texas (Memo)* to Satisfy Their Heavy Summary-Judgment Burden.

Although Defendant-Intervenors cross-move for summary judgment, the burden to prove standing rests with the Plaintiffs. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). And because the three familiar elements of standing (injury-in-fact, traceability, and redressability) are "not mere pleading requirements but rather an indispensable part of [a] plaintiff's case," Plaintiffs are required to support each of the standing elements "in the same way as any other matter on which [they] bear[] the burden of proof." *Id.* Thus, to defeat Defendant-Intervenors' Cross-Motion, Plaintiffs must establish "specific *facts*" demonstrating at least a genuine dispute as to each of standing's three elements. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013) (emphasis added) (citation omitted); *see, e.g.*, *Pluet v. Frasier*, 355 F.3d 381, 383 (5th Cir. 2004); *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 357 (5th Cir. 1999). In contrast, Defendant-Intervenors need not "negat[e]" Plaintiffs' standing theories or prove that no supportive evidence could possibly exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Rather, Defendant-Intervenors can prevail on their Cross-Motion merely by identifying a single element of standing that Plaintiffs failed to support with specific facts. *See id.* at 322 (summary

judgment required "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"); *Pluet*, 355 F.3d at 383 ("moving party is not required to negate all elements of the non-moving party's" theory of standing).  If there are disputed questions of material fact related to Plaintiffs' purported standing, then both motions must be denied and the case set for trial to resolve those disputed facts.  *See* 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2720 (4th ed. 2022).

Plaintiffs purport to carry their weighty burden in part by asking this Court to apply the doctrine of law of the case and the mandate rule.  *See* Mot. at 25–27.  But the law of the case doctrine is purely discretionary and should rarely if ever be applied to matters of standing, subject-matter jurisdiction, and justiciability, given the centrality of those requirements.  *See Propes v. Quarterman*, 573 F.3d 225, 228 (5th Cir. 2009) (Article III issues "more likely to be reconsidered because of their conceptual importance"); 18B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4478.5 (3d ed. 2022) (reconsideration of subject-matter jurisdiction and justiciability "particularly appropriate").  That is particularly true here because the issues have changed on remand.  *See Propes*, 573 F.3d at 228 (recognizing "substantially different" evidence as exception to law of the case doctrine).  The 2022 Rule is *not* the Memorandum, and it differs in ways that are important to standing.  *See* Part I.  Plaintiffs' bald assertion to the contrary—that "the impact of the Final Rule can be no different from the substantively identical DACA Memorandum"—is supported by absolutely no facts, evidence, or even analysis.  *See* Mot. at 26.

Nor does the mandate rule apply.  In *Texas (Memo)*, the Fifth Circuit "consider[ed] only the challenges to the 2012 DACA Memorandum," and explicitly declined to decide whether it even had jurisdiction to review the 2022 Rule.  50 F.4th at 512.  It remanded and directed this

Court to decide whether its "determinations about questions of law . . . would also apply to the [2022] Rule." *Id.* Plainly, the Fifth Circuit did not, through its mandate, foreclose this Court from considering issues, including standing, afresh—indeed, the purpose of remand was for this Court to do so. Reading the mandate otherwise would give precedential effect to what was at most a drive-by jurisdictional ruling, which the Supreme Court has admonished lower courts not to do. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) (collecting cases).[4]

Because law of the case and the mandate rule do not preclude this Court from examining threshold Article III issues with respect to the 2022 Rule, Plaintiffs must carry their summary-judgment burden, consistent with the Fifth Circuit's clear admonition that "[s]tanding must exist at all stages of the litigation." *El Paso Cnty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020). Plaintiffs' citations to stale declarations and testimony about the Memorandum—*compare* Dkt. 487 at 2–4 (2020 summary-judgment exhibits), *with* Dkt. 626 at 2–4 (nearly identical)—fall far short. Plaintiffs fail to introduce specific facts demonstrating that the *2022 Rule* is likely to cause them *any* concrete injury. Nor have Plaintiffs introduced any specific facts showing that any purported injuries are traceable to the *2022 Rule*, or would be redressed by the *2022 Rule's* elimination. And Plaintiffs' plea for special solicitude to "shore[] up [the] alleged weaknesses presented by [their] attenuated causation and redressability arguments," *Texas (Memo)*, 549 F. Supp. 3d at 592; *see* Mot. at 27–29, is particularly tenuous and unconvincing in light of the

---

[4] Plaintiffs cite *Texas v. Biden*, -- F. Supp. 3d --, 2022 WL 17718634 (N.D. Tex. Dec. 15, 2022), to argue that the Court need not examine standing on remand. Mot. at 27. But *Texas v. Biden* only underscores why the mandate rule does not apply here. In *Texas v. Biden*, the Supreme Court remanded for the district court to address whether DHS's subsequent explanation of a previous action was arbitrary and capricious. Only the agency's explanation, *not its policy*, had changed. *See id.* at *4–5. Thus, the policy's effects with respect to standing were identical on remand. *See id.* Here, in stark contrast, DHS has changed DACA, following a substantial and considered rulemaking process. *See* Part I. Because the 2022 Rule affects Plaintiffs differently than did the Memorandum, *Texas v. Biden* is wholly distinguishable, and the mandate rule does not apply.

Supreme Court's grant of certiorari to address state standing in *United States v. Texas*, No. 22-58, and *Biden v. Nebraska*, No. 22-506,[5] and the growing chorus of commentators urging the Court to reconsider the "extravagant theories" of standing that special solicitude encourages states to assert. *See, e.g.*, Ex. 2 at 9–17, Br. for Samuel L. Bray & William Baude as Amici Curiae in Support of Petitioners (Bray & Baude), *Biden v. Nebraska*, Nos. 22-506 & 22-535 (U.S., Jan. 11, 2023).

Because Plaintiffs cannot identify specific facts demonstrating that they have standing to challenge the 2022 Rule, the Court should grant summary judgment for Defendant-Intervenors. At the very least, the Court should deny Plaintiffs' Motion. Indeed, this Court previously held, based on the same half-decade-old declarations and testimony that Plaintiffs now invoke to challenge the 2022 Rule, that there was "contrary evidence" in the record that "creates a fact issue as to whether the Plaintiff States have suffered damages" from the Memorandum. *Texas (Memo)*, 549 F. Supp. 3d at 595–96. That contrary evidence and those disputed facts foreclose the Motion, particularly given that Plaintiffs' evidence relates to the Memorandum, and not the 2022 Rule.

**B.   Plaintiffs Fail to Identify Specific Evidence of Any Concrete, Particularized Injury Caused by the Rule.**

Texas, the only Plaintiff to even attempt to demonstrate standing, asserts that the Rule injures it in two ways: by increasing its indirect social services costs, and by causing labor market competition. *See* Mot. at 29–34. Texas fails to identify specific evidence supporting either theory.

*1.   Social services expenditures.*

Plaintiffs point to no specific facts showing that Texas has spent a cent on healthcare, education, or social services for a DACA recipient. Instead, Plaintiffs rely almost exclusively on

---

[5] Defendant-Intervenors respectfully request that the Court stay its decision until the Supreme Court decides those cases. *Cf.* Dkt. 447 (staying decision on Plaintiffs' summary-judgment motion with respect to the Memorandum pending the Supreme Court's decision in *Regents*).

the same years-old speculation about Texas's *aggregate* expenditures on social services for immigrants generally that they used to support their previous summary-judgment motion. *See* Mot. at 32–34. Plaintiffs argue, without any factual support, that, because DACA recipients are immigrants, at least some of those aggregate expenditures must have been directed to DACA recipients. *See id.* at 33. But even if "in all probability" some of Texas's DACA recipients benefited from the State's social services expenditures, *Texas (Memo)*, 549 F. Supp. 3d at 593, "Article III requires more than theoretical possibilities." *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 47 F.4th 408, 427 (5th Cir. 2022) (Oldham, J., dissenting) (cleaned up), *vacated for reh'g en banc*, -- F.4th --, 2023 WL 2229665 (5th Cir. Feb. 17, 2023).

Likewise, Plaintiffs yet again heavily rely on Dr. M. Ray Perryman's assumption about DACA's possible costs. *See* Mot. 33. But Dr. Perryman himself clarified that he was "not aware of any costs to the State of Texas as a result of DACA"; that he "provide[d] no evidence of such costs in [his] report or analysis"; that he "did not conduct a study of whether DACA recipients imposed costs on the State of Texas"; and that he was "aware of no studies or other research that identifies such costs." *See* Dkt. 400-2, Ex. 7 ¶¶ 6, 8. And Dr. Perryman made clear that, even if Texas *had* identified a DACA recipient that creates costs for Texas (and Texas cannot and has not), the State would incur such costs whether or not the individual was a DACA recipient. *See id.* ¶ 14 (DACA does not cause any assumed costs; "it's not because they have DACA, it's because they are here") (cleaned up). In light of Dr. Perryman's explanation, along with Plaintiffs' concessions that they could not tie any specific social services expenditure to DACA, *see* Dkt. 504-3, Exs. 27–54, this Court and the Fifth Circuit correctly concluded that Plaintiffs had failed to "indicate precisely what portion of all costs for [immigrants] is spent on DACA recipients." *Texas (Memo)*, 50 F.4th at 517–18; *see* 549 F. Supp. 3d at 593. At the very least, competing views of

Dr. Perryman's testimony must be resolved by a finder of fact.

Plaintiffs' failure to demonstrate that Texas (let alone any other Plaintiff) has incurred any social services expenditures traceable to DACA is even more pronounced with respect to the Rule than it was with respect to the Memorandum, entitling Defendant-Intervenors to summary judgment on that theory.  Plaintiffs' only two attempts to update the record on standing—with declarations from Susan Bricker and Jason Terry, officials from Texas's Health & Human Services Commission and Education Agency, *see* Dkt. 626-3, Exs. 35–36—illustrate why.  Neither even purports to connect increased social services expenditures to DACA recipients, much less to those who would benefit from the 2022 Rule.  Ms. Bricker concedes that "all of [the] numbers" she cites in her declaration—including estimates on uncompensated care at state public hospitals in 2006 and 2008, more than 15 years before the Rule and at least 4 years before the Memorandum—"are *estimated costs* for the respective programs," and she does not even purport to speculate that any of these costs can be tied to DACA recipients, much less to the Rule.  Dkt. 626-3, Ex. 35 ¶¶ 10–11 (emphasis added).  Likewise, Mr. Terry merely estimates the increased costs to Texas in 2016 through 2023 of providing education to unaccompanied children released to sponsors in Texas. Dkt. 626-3, Ex. 36 ¶ 4.  Mr. Terry similarly does not purport to attribute those increased costs to DACA recipients or the Rule.  *See id.*  Nor could he: "[g]iven the threshold criteria [under the Rule] requiring that a noncitizen have continuously resided in the United States since June 15, 2007, . . . most unaccompanied children presently enrolled in Texas public schools are not potentially DACA eligible."  *See* Dkt. 607-1, AR2022_100218 (87 Fed. Reg. 53175).

Those two declarations—Plaintiffs' only standing-related evidence that postdate and purportedly are offered specifically in regards to the Rule—are wholly insufficient.  Although the Fifth Circuit held in *Texas (Memo)* that "[s]pecific social services costs [ ] suffice" to demonstrate

standing, 50 F.4th at 518, Plaintiffs here have failed to identify *any* social services costs at all related to the 2022 Rule, which is the only agency action under review.  Instead, Plaintiffs merely *assume* that some of the estimated social services costs Texas incurs for undocumented immigrants must be attributable to DACA recipients, and then make the further logical leap that some must be tied to immigrants eligible for DACA under the 2022 Rule.  *See* Mot. at 32–33.  But the Fifth Circuit has rejected precisely that type of conjecture.  *See, e.g.*, *Ctr. for Bio. Diversity v. U.S. EPA*, 937 F.3d 533, 545 (5th Cir. 2019).  In complex, fact-specific cases like this one, where "the size and even the direction of the effects [of an agency action] is dependent on many factors, making for a complex calculation of the ultimate fiscal impacts," Dkt. 607-1, AR2022_100216 (87 Fed. Reg. 53173), even "common sense observation[s]" about standing "become[] little more than surmise," which is insufficient to satisfy the requirements of Article III.  *Ctr. for Bio. Diversity*, 937 F.3d at 545 (cleaned up).  For that reason, Plaintiffs' purported syllogism—undocumented immigrants increase social services costs; DACA recipients are undocumented immigrants; therefore DACA recipients must increase social services costs—does not suffice.  *Id.* (rejecting the purported "truism that water flows downstream [and so] any injury suffered downstream is fairly traceable to unlawful discharges upstream") (cleaned up).  Defendant-Intervenors are entitled to summary judgment with respect to Plaintiffs' social services costs theory of standing.[6]

---

[6] Even if Plaintiffs had demonstrated that the Rule would increase Texas's social services expenditures (and they have not), at least two Justices during arguments in *United States v. Texas* questioned whether that theory of standing could suffice without taking into account the *benefits* of the Rule.  *See* Ex. 4, Tr. of Oral Arg. at 89:6–25, *United States v. Texas* (No. 22-58) (JUSTICE KAGAN: "[I]f all you need to do is to say we have a dollar's worth of costs and you don't even need to think about the benefits on the other side . . . every immigration policy . . . is going to have some effect on a state's fiscal condition. . . . [W]e're just going to be in a situation where every administration is confronted by suits by states that can . . . bring a policy to a dead halt[.]"); *id.* at 15:9–19 (JUSTICE SOTOMAYOR: "Judge Sutton, in a related case . . . pointed out, however, that . . . you have to show us that it's a net cost.").

2.   Parens patriae *standing.*

Plaintiffs assert that they are entitled to *parens patriae* standing based on the same purported evidence of labor-market distortions and increased competition that they used to support their earlier summary-judgment motion.  Plaintiffs conspicuously fail to mention, however, that the Fifth Circuit in *Texas (Memo)* declined to reach their *parens patriae* argument.  *See* 50 F.4th at 517 (discussing only Texas's pocketbook injury theory of standing).  And although this Court previously granted summary judgment to Plaintiffs on their *parens patriae* theory in connection with their challenge to the Memorandum, Defendant-Intervenors respectfully urge the Court to reach the opposite conclusion when analyzing Plaintiffs' standing to challenge the 2022 Rule.

A "State does not have standing as *parens patriae* to bring an action against the Federal Government."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) (citing *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)).  Courts have extended the so-called *Mellon* bar to prohibit states from challenging agency actions.  *See, e.g.*, *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179–83 (D.C. Cir. 2019) (barring challenge to action by Bureau of Reclamation); *Michigan v. EPA*, 581 F.3d 524, 529 (7th Cir. 2009) (barring challenge to Environmental Protection Agency's administrative rulings).  A straightforward application of *Mellon* and its progeny thus prohibits Plaintiffs from challenging DACA as *parens patriae*.

Since this Court's decision in *Texas (Memo)*, a number of courts in other circuits have reaffirmed that "a state, as parens patriae, may [not] institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof."  *Mellon*, 262 U.S. at 485; *see, e.g.*, *Oklahoma v. Biden*, 577 F. Supp. 3d 1245, 1253 (W.D. Okla. 2021) ("[T]he State does

---

Given that DACA recipients and their households are estimated to pay about $3.1 billion in annual state and local taxes, Dkt. 607-1, AR2022_100197 (87 Fed. Reg. 53154), Plaintiffs fail to demonstrate how they could satisfy that "net costs" standard.

not have standing as *parens patriae* to bring an action on behalf of its citizens against the federal government because the federal government is presumed to represent the State's citizens.") (cleaned up); *Ute Indian Tribe of Uintah & Ouray Rsrv. v. U.S. Dep't of Interior*, 560 F. Supp. 3d 247, 263–64 (D.D.C. 2021) (declining to recognize distinction between "an attempt to force Defendants to follow federal law, as opposed to a challenge postured against the federal government"); *see also Florida v. HHS*, 19 F.4th 1271, 1293 (2021) (citing *Mellon*, 262 U.S. at 485–86).[7]  The Fifth Circuit is itself undecided whether States can establish standing under such a theory, *see Brackeen v. Haaland*, 994 F.3d 249, 292 n.13 (5th Cir. 2021) (en banc) (opinion of Dennis, J., for equally divided court) (rejecting states' *parens patriae* standing theory in suit against federal government because "the Federal Government [is] the ultimate parens patriae of every American citizen"), and the issue is potentially implicated in at least three cases currently pending before the Supreme Court: *United States v. Texas*, No. 22-58, *Biden v. Nebraska*, No. 22-506, and *Haaland v. Brackeen*, Nos. 21-376, 21-377, 21-378 & 21-380.  For those reasons, Defendant-Intervenors respectfully submit that the Court should decline to decide that, as a matter of law, Plaintiffs can bring a *parens patriae* suit against the federal government here.

In any event, Plaintiffs fail to identify any *facts* to support their controversial *parens patriae* theory.  As they did in *Texas (Memo),* Plaintiffs rely on economists' *predictions* about how, all other things equal, the Memorandum *might* affect the labor market.  *See* Mot. at 29–31 (citing Dkt.

---

[7] In *Kentucky v. Biden*, 23 F.4th 585, 594–601 (6th Cir. 2022), the Sixth Circuit held that states have a quasi-sovereign interest in their economies, and so "likely have standing" to challenge federal government actions to "defend their economies from . . .. negative ramifications" of federal actions.  Here, however, Plaintiffs seek not to defend *their* economies, but instead to "protect their *citizens'* economic . . . interests."  Mot. at 30 (cleaned up).  *Kentucky* holds that states lack *parens patriae* standing to protect economic interests of their citizens.  *See* 23 F.4th at 597 ("To the extent that the complaint asserts purely third-party interests of covered contractors that happen to reside within the states, we agree . . . that this third-party theory is impermissible under the *Mellon* bar.").

626-2, Exs. 14–15, 22–26).[8]   These economists' guesses are insufficient as a matter of law.  *See California v. Texas*, 141 S. Ct. 2104, 2118–19 (2021) (predictions alone cannot establish standing).  Nor do Plaintiffs' anecdotes about employers outside of Texas who hired DACA recipients demonstrate that any DACA recipient actually received a job *in Texas* for which a non-DACA applicant was denied—a deficiency in Plaintiffs' evidence this Court previously identified when considering a materially identical record.  *See Texas (Memo)*, 328 F. Supp. 3d 662, 695 n.44 (S.D. Tex. 2018) ("the record *does not indicate* why these candidates were chosen") (emphasis added).

Just as crucially, Plaintiffs have also failed to demonstrate that any prior speculative evidence still has probative value under the Rule, or that the economists whose predictions Plaintiffs relied on with respect to the Memorandum would make the same guesses now with respect to the Rule.  Just as the Rule is not the Memorandum, current labor market conditions are significantly different than those in 2018, when Plaintiffs compiled their supposed evidence.  *See, e.g.*, Dkt. 607-1, AR2022_100210 (87 Fed. Reg. 53167) ("beginning in August 2021 and continuing into 2022, the U.S. economy experienced more job openings than available workers").  The Rule also operates on a materially different population than did the Memorandum.  As described above, the population eligible for DACA under the Rule is older and more likely to earn a higher hourly wage.  *See* Part I.A; Dkt. 607-1, AR2022_100314, 100321–22 (87 Fed. Reg. 53271, 53278–79).  Yet, Plaintiffs offer evidence that estimates DACA's impact only on "low skilled," "low income" workers.  *See* Mot. at 30 (citing Dkt. 626-2, Ex. 15); *see also* Dkt. 607-1, AR2022_100210 (87 Fed. Reg. 53167) (any effect of immigration on wages occurs mostly "with the lowest wage jobs, potentially affecting teens and individuals without a high school diploma").

---

[8] Plaintiffs' sole economic expert on this issue, Dr. Donald Deere, admitted that he has not studied immigration's effect on wages or the economy, Dkt. 400-4, Ex. 28 at 8:9–17, 64:11–20, nor has he conducted any analysis focused on the DACA population specifically.

Plaintiffs introduce absolutely no evidence that the Rule, under which many fewer young and less-well-educated individuals are eligible for DACA, would have similar effects. And, although Defendant-Intervenors bear no burden to prove that the Rule will not cause labor-market distortions, *see Celotex*, 477 U.S. at 323 (defendant moving for summary judgment need not "negat[e]" other side's theory), the evidence in the administrative record, actually cuts the other way. Indeed, an economist whose testimony Plaintiffs cite in their Motion has *disclaimed* that his work supports a finding of labor market harm. *See* Ex. 5, Ike Brannon & Kevin McGee, *Federal Register Comment on NPRM 86 FR 53736* (6 Nov. 2021) ("[W]e not only find no evidence that DACA hurts low-wage American-citizen workers, our analysis suggests that it boosts the wages and employment of this population."). At the very least, the facts are in dispute. Because Plaintiffs identify no specific evidence to support their legally questionable *parens patriae* argument, Defendant-Intervenors are thus entitled to summary judgment on that theory.

### C.   Plaintiffs Fail to Identify Specific Evidence Supporting Their Theory of Redressability.

To argue that the Rule's termination would somehow redress their supposed injuries, Plaintiffs rely solely on the same half-decade-old survey from Dr. Tom K. Wong and the same pure speculation from Dr. Lloyd B. Potter as they did in *Texas (Memo)*. Mot. at 34–35. According to Plaintiffs, that purported evidence demonstrates that DACA's termination would "cause some recipients to leave, thereby reducing the financial burdens on the State." *Id.* at 34 (cleaned up).

Dr. Wong's outdated survey and Dr. Potter's uninformed guess are insufficient to establish redressability, particularly with respect to the Rule. Dr. Potter based his opinions on the erroneous assumption that DACA recipients could not work if DACA were rescinded, and therefore would leave the United States, but he acknowledged that he "hadn't really kind of thought that whole thing through," Dkt. 390 at 13–15, and further explained that he could not provide *any* estimate of

how many DACA recipients were likely to leave Texas under his "self-deportation" theory.  *See* Dkt. 390-2, Ex. 2 at 66:10-67:16, 91:16-92:3 ("I don't believe that I can quantify a number[.]").  Dr. Wong's survey also does not support Plaintiffs' "self-deportation" theory, as it asked a misleading question that was unlikely to predict actual behavior.  *See* Dkt. 288 at 11 (highlighting established research on survey design showing that question order can inaccurately bias survey-takers); *see also* Dkt. 400-2, Ex. 7 ¶¶ 15–16.  Nor did Plaintiffs establish *any* overlap between the limited number of survey respondents who hypothesized that they might leave the United States if the Memorandum were to end and DACA recipients in Texas.

Dr. Wong's stale survey and Dr. Potter's rank speculation are even more insufficient to demonstrate redressability with respect to the 2022 Rule.  Dr. Potter's declaration predates the Rule by nearly 5 years, and Dr. Wong's survey results are even older.  *See* Dkt. 626-2, Exs. 31 & 32.  Indeed, Dr. Wong conducted his survey in August 2017, *see id.*, Ex. 31 at App. 625, at a point of great perceived hostility to DACA recipients and other immigrants, including from the federal government, which was attempting to dismantle DACA.  The world is different now than it was in 2017.  *Cf.* Dkt. 607-1, AR2022_100208 (87 Fed. Reg. 53165) (2017 survey occurred "in a particular time and context").  Individuals eligible for DACA under the Rule are also different than the DACA recipients who responded to Dr. Wong's survey in 2017, and there is no evidence that any respondent then would or would not be eligible for DACA under the Rule now, and no evidence that any respondent then would offer the same answer today.  *See* Part I.A.  And based on Dr. Potter's own theories about the causes of emigration, today's DACA recipients are even less likely to "self-deport."  *See* Dkt. 626-2, Ex. 32 ¶ 10.

"Standing must exist at all stages of the litigation."  *El Paso Cnty.*, 982 F.3d at 341–42.  Conspicuously, however, despite a half-decade's worth of changes, Plaintiffs fail to identify even

a single piece of more recent evidence supporting their "self-deportation" theory under the 2022 Rule.  *See* Mot. at 35–36; *see also* Dkt. 607-1, AR2022_100216 (87 Fed. Reg. 53173) (DHS "received scant evidence in support of [ ] assumption" that "a substantial portion of DACA recipients who would otherwise impose a net fiscal burden on the States would depart the United States" if DACA ended).  It is Plaintiffs' burden to prove that such evidence exists, s*ee Celotex*, 477 U.S. at 323, and Plaintiffs entirely fail to meet that evidentiary burden.

Instead, Plaintiffs assert that such evidence is unnecessary.  *See* Mot. at 26.  "Because injury must only be *fairly* traceable to the challenged conduct," Plaintiffs contend, they "need not connect the exact time of their injuries with the exact time of an alleged violation."  *Id.* (cleaned up).  To support that novel proposition, Plaintiffs cite only *Environment Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, an inapposite, recently vacated panel decision addressing the traceability standard in citizen suits under the Clean Air Act.  *See* 47 F.4th at 413–14 *vacated for reh'g en banc*, -- F.4th --, 2023 WL 2229665 (5th Cir. Feb. 17, 2023).  In *Environment Texas*, which the Fifth Circuit vacated and agreed to take en banc, a divided Fifth Circuit panel initially held, over Judge Oldham's strenuous dissent, that the plaintiffs did not need to specifically trace their injuries to each of the defendant's 16,386 alleged days of violation by proving that their members were in the affected areas on each of the violation days.  *Id.* at 417.  Rather, it was enough for the plaintiffs to show that the violations caused or contributed to injuries that, because of a specific geographic or temporal nexus, could have affected the plaintiffs' members.  *Id.*  Even before it was vacated, the *Environmental Texas* majority opinion did *not* hold that the plaintiffs would have had standing to challenge an entirely different type of violation in an entirely different area at an entirely different time.  Yet that is exactly the analogy Plaintiffs seek to draw.  They argue that responses to a 2017 survey (none of which are attributed to Texas residents) demonstrate that supposed

28

injuries to Texas are redressable today.  Even if a Texas DACA recipient had made such a response in 2017 (and there is no reason to think one did), there is no evidence that this same person would give the same answer today, or even lives in Texas today.  Embracing Plaintiffs' radical interpretation of *Environmental Texas* would thus stretch it far beyond its limited holding—a holding that Judge Oldham already believed was "alarming."  *Id.* at 428 (Oldham, J., dissenting), *vacated for reh'g en banc*, -- F.4th --, 2023 WL 2229665 (5th Cir. Feb. 17, 2023).

The Court should instead hold Plaintiffs to their burden to prove their standing to challenge the Rule now.  *See El Paso Cnty.*, 982 F.3d at 341–42.  In *El Paso County*, the Fifth Circuit refused to speculate (for purposes of redressability) whether Congress, having entered a new annual budget cycle, would reallocate disputed funds to the plaintiff's desired project.  *Id.*  Here, Plaintiffs' leap of logic is even greater.  Plaintiffs ask this Court to speculate that DACA recipients under the 2022 Rule would make the same choices about whether to "leav[e] behind children, parents, other family members, and close friends" and sever their "deep ties to the United States," Dkt. 607-1, AR2022_100216 (87 Fed. Reg. 53173), as a group of anonymous online survey recipients around the country in 2017.  The Court should reject Plaintiffs' rank speculation and grant summary judgment for Defendant-Intervenors.

### D.    Plaintiffs Are Not Owed Special Solicitude.

As they did in *Texas (Memo)*, Plaintiffs again ask the Court for special solicitude to reduce their evidentiary burden.  *See* 549 F. Supp. 3d at 592; *see* Mot. at 27.  And as they did in *Texas (Memo)*, Plaintiffs have again chosen not to allege any quasi-sovereign injury due to driver's licenses costs.  *See* 549 F. Supp. 3d at 586.  Unlike in *Texas (Memo)*, however, Plaintiffs here have also declined to argue for special solicitude because of their "interest in [their] own economic well-being and that of [their] citizens," which was the sole basis for this Court's previous decision.  *Id.*  Instead, in this Motion, Plaintiffs contend that they are entitled to special solicitude because of

their supposed quasi-sovereign interest "in classifying aliens." Mot. at 29. Because "classif[ying] aliens and their status [ ] is a power only the federal government can exercise," Plaintiffs assert, the Rule "implicates preemption concerns." *Id.* (cleaned up). In other words, Plaintiffs contend that precisely *because* the Constitution grants the Federal Government exclusive power over immigration, *see, e.g.*, *Arizona*, 567 U.S. at 394–95, states should have an *easier* time proving their standing to challenge the Federal Government's exercise of that exclusive power. *See* Mot. at 29.

Plaintiffs' special solicitude argument flips federalism on its head, and this Court should reject it. "The key sovereign with authority and 'solicitude' with respect to immigration is the National Government, not the States." *Arizona v. Biden*, 40 F.4th 375, 386–87 (6th Cir. 2022) (Sutton, CJ.). For that reason, the "States have distinctly less, not more, solicitude in this area." *Id.* Although the Fifth Circuit stated that Texas has a "quasi-sovereign interest in alien classification," *Texas (Memo)*, 50 F.4th at 514–17, leading commentators and Supreme Court Justices have recognized the dangerous implications of the Fifth Circuit's reasoning. Ex. 2, Bray & Baude at 9; Ex. 4, Tr. of Oral Arg. at 89:6–94:11, *United States v. Texas* (No. 22-58).

This Court should likewise decline to take part in that inversion of our federal system. Plaintiffs cannot demonstrate that the Rule has caused any redressable injury, regardless of whether the Court grants special solicitude, but the Court should decline, in any event, to reduce Plaintiffs' burden, and should instead enter summary judgment in Defendant-Intervenors' favor.

### E. At the Very Least, Disputed Issues of Material Fact as to Standing Prevent the Court from Granting Summary Judgment for Plaintiffs.

Plaintiffs face—and fail to meet—a heavy burden to defeat Defendant-Intervenors' Cross-Motion, but their burden to prevail on their own Motion is even higher. "As the party seeking to invoke federal jurisdiction, the [Plaintiffs] bear the burden of establishing standing" through "evidence to support controverted factual allegations." *El Paso Cnty.*, 982 F.3d at 338.

If the Court does not grant summary judgment in favor of Defendant-Intervenors, disputed issues of material fact should, at the very least, defeat Plaintiffs' Motion.

***Injury in fact***:  With respect to Plaintiffs' theory of injury based on increased social services expenditures, the evidence suggests that DACA recipients *decrease* law enforcement costs, *see, e.g.*, Dkt. 225-3, Ex. 65 at 6–7, Ex. 66 at 5–6, and that DACA *reduces* DACA recipients' healthcare expenditures.  *See, e.g.*, *id.*, Ex. 72 at 16–27; Dkt. 504-2, Ex. 19 at 3; Dkt. 504-3, Ex. 25 at 2.  With respect to Plaintiffs' theory of injury as *parens patriae*, record evidence shows that DACA *creates* jobs.  *See, e.g.*, Dkt. 400-1, Ex. 4 at 7, Ex. 6 at 14–15; Dkt. 400-8, Ex. 61 at 2.

***Traceability***:  The record includes evidence that, to the extent any Plaintiff does spend money on DACA recipients, it is because those recipients are here, not because they have DACA. Dkt. 400-2, Ex. 7 at 4.  The record also includes evidence that DACA-eligible individuals can compete in the labor market even without receiving DACA or employment authorization, *see* Dkt. 400-1, Ex. 5 at 4; Dkt. 400-2, Ex. 9 at 3–8, casting doubt on Plaintiffs' claim that the Rule causes labor market distortions.

***Redressability***:  There is ample evidence showing that if DACA were rescinded, DACA recipients would remain where they are, as undocumented immigrants, instead of leaving the United States.  *See* Dkt. 288 at 12 (noting Defendant-Intervenors' testimony about their desire to remain in the United States even if DACA ended); Dkt. 400-1, Ex. 2 ¶¶ 43–44 (expert testifying DACA rescission would not cause recipients to leave the U.S.); Dkt. 400-2, Ex. 9 ¶ 36 (expert testifying that, if DACA ends, DACA recipients are likely to simply "return to the shadows").  As Dr. Robert Smith explains in his declaration, current studies show that DACA recipients do not return to their country of origin, including because of the ties to the United States that the Supreme Court highlighted in *Regents*.  *See* Dkt. 400-2, Ex. 8 ¶¶ 35–36; 140 S. Ct. at 1914.  That is

particularly true for the individuals eligible for DACA under the Rule, who tend to have even stronger ties to this country.  Defendant-Intervenors also adduced evidence casting doubt on Dr. Wong's outdated survey results and Dr. Potter's gratuitous speculation.  Dkt. 400-2, Ex. 7 at 4–5.

This Court previously concluded, based on a nearly identical record, that the parties had introduced competing evidence that created factual disputes.  *See* 549 F. Supp. 3d at 596 ("Plaintiff States . . . have evidence to support their claims.  The fact that Defendant-Intervenors have contrary evidence at best creates a fact issue as to whether the Plaintiff States have suffered damages."); *see also* 2021 WL 3022433, at *3–4 (encouraging Defendant-Intervenors to use cross-examination *at trial* to probe disputed issues relevant to standing).  Because, at the very least, that evidence remains in dispute, the Court should deny Plaintiffs' Motion.

## III.   THE RULE IS ENTIRELY CONSISTENT WITH THE INA.

Plaintiffs misapply each step of *Chevron*'s two-step framework in arguing that the Rule is contrary to the INA.  *See* Mot. at 10–20 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)).  First, in arguing that "Congress has *directly* spoken to the *precise* question at issue," *Chevron*, 467 U.S. at 842 (emphasis added)—*i.e.*, to whether DHS may grant individualized, contingent, and temporary forbearance-removal, lawful presence, and work authorization—Plaintiffs mistakenly impose limitations on DHS's authority found nowhere in the INA itself, while simultaneously ignoring the 2022 Rule's repeated emphasis on *individualized discretion*, rather than class-wide relief.  Second, Plaintiffs' invocation of the major-questions doctrine ignores the significance of *Regents*, in which the Supreme Court confirmed (pointing to decades of DHS historical practice) that Congress intended to delegate the important policy choices surrounding deferred action to DHS.  Because the 2022 Rule is not contrary to the INA, the Court should grant Defendant-Intervenors' Cross-Motion.

### A.    Through the INA, Congress Has Empowered DHS to Exercise the Exact Type of Prosecutorial Discretion Outlined in the Rule.

To determine whether Congress granted DHS discretion to implement the Rule, the Court's "analysis begins and ends with the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2380 (2020) (citation omitted).  In the INA, Congress empowered the Secretary to "administ[er] and enforce[] . . . all [ ] laws relating to [ ] immigration and naturalization," 8 U.S.C. § 1103(a)(1), to "[e]stablish national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), to "determine[]" which immigrants are "lawfully present in the United States" for the purposes of certain Social Security benefits, 8 U.S.C. § 1611(b)(2), to determine which immigrants are "authorized to be [ ] employed," 8 U.S.C. § 1324a(h)(3), and to parole into the United States "any [immigrant] applying for admission" on a "case-by-case basis" in the Secretary's "discretion."  8 U.S.C. § 1182(d)(5)(A).  On their face, those provisions give the Secretary broad prosecutorial discretion.  *See, e.g.*, *Arizona*, 567 U.S. at 396.  Congress can limit an agency's "discretion in any number of ways," but here "it chose not to do so" and "enacted expansive language offering no indication" that the Rule exceeds DHS's authority.  *See Little Sisters*, 140 S. Ct. at 2380 (cleaned up); *see also Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 438 (5th Cir. 2021) ("Congress's use of . . . open-textured term[s] suggests an express delegation of authority to the agency to elucidate the provision.") (cleaned up).

Plaintiffs argue that the 2022 Rule violates the INA in four specific ways: by allowing DHS to forbear from removing DACA recipients, by permitting DHS to treat DACA recipients as lawfully present; by allowing DACA recipients to receive work authorization; and by enabling DACA recipients to receive advance parole.  *See* Mot. at 13–20.  Each of Plaintiffs' arguments fails.  It is "a fundamental principle" that a statute must not be interpreted to "impos[e] limits on an agency's discretion that are not supported by the text."  *Little Sisters*, 140 S. Ct. at 2381

(citations omitted).  Plaintiffs' arguments violate this fundamental principle because the text provides no support for their cramped interpretation of DHS's authority.

*First*, while the INA makes DACA recipients removable, Mot. at 13–14, it does not limit the "broad discretion exercised by immigration officials" to "decide whether to pursue removal at all." *Arizona*, 567 U.S. at 396.  There is thus no conflict with the Rule, which emphasizes that DACA is merely a discretionary, temporary forbearance, and DACA recipients remain removable at any time in DHS's discretion.  *See* 8 C.F.R. § 236.21(c)(1) ("temporary forbearance from removal does not . . . preclude DHS from commencing removal proceedings at any time"); 8 C.F.R. § 236.23(d)(1) ("USCIS may terminate a grant of [DACA] at any time in its discretion.").

*Second*, the INA expressly permits the Secretary to determine whether immigrants are "lawfully present" in the United States for purposes of "any benefit payable under title II of the Social Security Act."  8 U.S.C. § 1611(b)(2).  A separate regulation, promulgated in 2011, classifies immigrants "currently in deferred action status" as lawfully present.  8 C.F.R. § 1.3(a)(4)(vi); *see* 76 Fed. Reg. 53780 (Aug. 29, 2011).  Plaintiffs have not challenged that 2011 regulation, nor could they do so now.  *See, e.g.*, *Am. Stewards of Liberty v. Dep't of Interior*, 960 F.3d 223, 229 (5th Cir. 2020) ("to bring a challenge to an original agency action adopting a regulation, . . . plaintiffs must bring their claims within six years of publication of the rule").

*Third*, that Congress has made some immigrants expressly eligible for work authorization, Mot. at 15–16, does not suggest that Congress intended to preclude work authorization for everyone else.  That is particularly true because the INA expressly *permits* DHS to "authorize[]" classes of immigrants to be employed by promulgating separate regulations.  8 U.S.C. § 1324a(h)(3).  While the Fifth Circuit believed that the Memorandum exercised an impermissible class-wide grant of employment authorization, *Texas (Memo)*, 50 F.4th at 526, that rationale does

34

not apply to the 2022 Rule.  The Rule's emphasis on discretion with respect to work authorization addresses any concerns that Rule would result in "[a]dding approximately 1.5 million workers" en masse, *Texas (Memo)*, 549 F. Supp. 3d at 611.  The Rule specifies that work authorization, "if approved in DHS's discretion, will be issued, subject to DHS's discretion," 8 C.F.R. § 236.23(a)(4), pursuant to a determination of economic necessity.  By layering discretion on discretion—only individuals who receive a discretionary grant of DACA are even eligible for discretionary work authorization—the 2022 Rule guarantees that it will *not* add 1.5 million workers in one fell swoop.  It is, rather, an exercise of the authority that Congress expressly granted the Secretary in the INA.  Notably, the Secretary has, by formal regulation, granted work authorization to individual immigrants "who have been granted deferred action, an act of administrative convenience to the government," since 1981.  8 C.F.R. § 274a.12(c)(14).  That regulation has never been held invalid, and Plaintiffs have never even challenged it.  Even assuming a class-wide grant of employment authorization would be impermissible, as the Fifth Circuit held with respect to the memorandum, the longstanding, unchallenged practice of granting such authorization as a matter of *individual discretion* under express statutory authority, as the 2022 Rule does, is an insurmountable hurdle for Plaintiffs.

**Fourth**, that DACA recipients are eligible to apply for a discretionary grant of advance parole, Mot. at 16–20, is a function not of DACA, but of the INA itself.  Congress has specified that the Attorney General may "in his discretion parole into the United States . . . any alien."  8 U.S.C. § 1182(d)(5)(A).  The Rule did not make "the entire DACA population eligible to apply for advance parole," as Plaintiffs claim.  Mot. at 17 (cleaned up).  That is because the "entire DACA population" (and every other non-citizen) has *always* been eligible for advance parole and will *remain* eligible even if the Rule is terminated.  The Rule thus passes *Chevron*'s first step.

**B.     The Rule Is an Inherently Reasonable Interpretation of DHS's Authority, as Evidenced by DHS's Long-Established Historical Practice of Deferred Action.**

For similar reasons, because the Rule "conforms to [ ] minimal standards of rationality and is well within the bounds of permissible interpretation," it also passes *Chevron*'s second step. *Acosta v. Hensel Phelps Const. Co.*, 909 F.3d 723, 735 (5th Cir. 2018).   Plaintiffs argue to the contrary merely by invoking the "major-questions doctrine," and asserting that the Rule is too important to be delegated to DHS.   Mot. at 20.   To start, there is no evidence to suggest that the 2022 Rule will result in the "billions of dollars in compliance costs" that supported the Supreme Court's major-questions doctrine holding in *West Virginia v. EPA*, 142 S. Ct. 2587, 2604 (2022), and DHS has expressly determined that it would not, *see* Dkt. 607-1, AR2022_100229 (87 Fed. Reg. 53186).   Moreover, the Supreme Court expressed the opposite view to Plaintiffs in *Regents*, recognizing that questions relating to Dreamers implicate varied and significant interests, including the weighty reliance interests of DACA recipients, that make weighing those interests "the agency's job."   140 S. Ct. at 1914.   The Supreme Court's holding follows from the text of the INA itself: Congress did not specifically address DACA, but instead delegated to DHS broad discretion to set priorities for the enforcement of immigration laws.   In the Rule, DHS did precisely what the Supreme Court directed it to do—exercise its formal rulemaking authority to resolve these important interests within the broad discretion that the INA affords the agency.

The Rule is also consistent with DHS's historical practice: deferred action is not a recent innovation, but instead longstanding and widely endorsed.   *See, e.g.*, *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484–85 (1999) (praising deferred action as a "commendable exercise in administrative discretion") (cleaned up).   Indeed, DACA is strikingly similar to the Family Fairness Program, instituted by President Ronald Reagan in 1987 and extended by President George H.W. Bush in 1990, which ultimately provided immigration benefits, on a non-

country specific basis, to approximately 1.5 million people who lacked immigration status (as compared to DACA, which has to date been afforded to 814,000 people). *Compare* Dkt. 6, Ex. 7 at App. 0224–25, 0247, 0249–51., *with Texas (Memo)*, 549 F. Supp. 3d at 579. That historical practice provides further evidence that the Rule is an entirely reasonable exercise of DHS's broad discretion, *see* Dkt. 607-1, AR2022_100229 (87 Fed. Reg. 53186), and Plaintiffs say nothing to distinguish it. Plaintiffs are not entitled to judgment on their theory that the Rule violates the INA, and the Court should instead enter summary judgment in favor of Defendant-Intervenors.

## IV.    THE RULE IS NOT ARBITRARY AND CAPRICIOUS.

In the 2022 Rule and its preamble, which span nearly 150 pages in the Federal Register, DHS carefully considered DACA's justification and impact. DHS: received and responded to 16,361 comments—*97 percent of which expressed general support for the Rule*, Dkt. 607-1 at AR2022_100205 (87 Fed. Reg. 53162); thoroughly explained its reasoning for declining to decouple removal forbearance and work authorization; analyzed the Rule's effect on Plaintiffs, their economies, and their communities; and evaluated the other reliance interests and issues this Court highlighted in *Texas (Memo)*. Plaintiffs' complaints that the Rule is arbitrary and capricious because DHS "[f]ail[ed] to consider the effects on American workers" and "fail[ed] to consider the legality of [ ] employment authorization," Mot. at 25, are belied by the administrative record, and are in fact contrary to the Supreme Court's admonition in *Regents* that it would be arbitrary and capricious for DHS *not* to consider retaining a policy of deferred action for DACA recipients. *See* 140 S. Ct. at 1915. Plaintiffs' argument thus merely reflects Plaintiffs' political disagreement with the outcome of DHS's reasoned decision-making. That Plaintiffs wish DHS had reached a different conclusion, however, is no reason to find the Rule arbitrary and capricious and set it aside. The Rule easily satisfies the APA's deferential standard for arbitrary and capricious review, and the Court should deny Plaintiffs' Motion (and grant Defendant-Intervenors') on that theory.

## A.   Arbitrary and Capricious Review Is Deferential and Narrow.

"The APA's arbitrary-and-capricious standard requires" only that an "agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.*  Instead, a court merely "ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.*  So long as the agency examines relevant data and "articulate[s] a satisfactory explanation for its action," including by citing specific studies and responding to comments, the agency's action will not be set aside as arbitrary and capricious. *Huawei Techs., USA*, 2 F.4th at 433–34, 449–56.

## B.   The Rule Easily Satisfies that Deferential Standard.

As the Rule and the administrative record show, DHS did far more than what was minimally required to reasonably consider the relevant issues, study the relevant data, and explain its actions.  The administrative record comprises approximately 7,600 pages, *see* Dkts. 607–611, and it includes dozens of government studies, academic research papers and analyses, and raw data files, all of which DHS analyzed before promulgating the Rule.  *See* Dkt. 607-1 at 1–19.  The administrative record and Rule also include DHS's thoughtful response to public comments. Indeed, DHS explained at length why it declined to expand the Rule's scope and reach, despite comments urging it to "go further to benefit and provide assurance to recipients," *id.* at AR2022_100255 (87 Fed. Reg. 53212); to "provide DACA recipients a pathway to citizenship," *id.* at AR2022_10224 (87 Fed. Reg. 53211); to "guarantee . . . and extend the duration of work authorization" or eliminate the discretionary economic need requirement, *id.* at AR2022_100238– 40 (87 Fed. Reg. 53195–97); and to limit DHS's ability to exercise discretion by, for example,

"prohibit[ing] entirely any consideration of expunged convictions or juvenile delinquency adjudications." *Id.* at AR2022_100272 (87 Fed. Reg. 53229).

DHS also thoroughly justified its decision not to unbundle applications for DACA from applications for work authorization, explaining that unbundling would increase administrative burdens for both applicants and USCIS, decrease incentives for DACA recipients to find employment and establish "self-reliance," and create risk that DACA recipients without work authorization would be exposed to "exploitation and crime," outweighing the flexibility of an unbundled system. *Id.* at AR2022_100243–49 (87 Fed. Reg. 53200–06). And DHS specifically responded to and explained its rationale regarding each of the reliance factors this Court identified as appropriate for DHS to consider on remand. *Compare Texas (Memo)*, 549 F. Supp. 3d at 622– 23 (suggesting that DHS consider forbearance without removal and reliance interests), *with* Dkt. 607-1 at AR2022_100243–49, AR2022_100331–33 (87 Fed. Reg. 53200–06, 53288–90) (DHS doing just that). In short, DHS considered available evidence and comments and reached a policy decision. "The APA requires no more." *Prometheus Radio Project*, 141 S. Ct. at 1160.

Plaintiffs, however, seek to use the APA as a weapon to demand a politically preferred outcome. Mot. at 21–25. Plaintiffs accuse DHS of never explaining "how DACA's employment authorization can be squared" with the INA and of "[f]ailing to consider the effects on American workers" and "the legality of [ ] employment authorization." *Id.* But the administrative record contains materials related to each of those points, *see* Dkt. 607-1 at 1–19,[9] and DHS specifically

---

[9] The record includes, for example, Geoffrey Heeren, "Work and Employment for DACA Recipients," Yale J. on Reg. Bulletin (2021); Unconstitutionality of Obama's Executive Actions on Immigration: Hearing Before the House Comm. on the Judiciary, 114th Cong., at 74–76 (2015) (Written statement of Stephen H. Legomsky, Wash. Univ. School of Law); Cecilia Rouse, et al., "The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrations", The White House Council of Economic Advisors (Sept. 17, 2021); Kate Manuel, et al., Cong. Research Serv., "Prosecutorial Discretion in Immigration Enforcement, Legal Overview" (2014);

and explicitly considered and explained them in the Rule.  *See* Dkt. 607-1 at AR2022_100241–43 (87 Fed. Reg. 53198–200) (explaining legal justification for work authorization); *id.* at AR2022_100329–32 (87 Fed. Reg. 53286–89) (detailed analysis of 2017 NAS study, which concluded that "the impact of immigration on the wages of the citizen population overall was 'very small,'" found "little evidence that immigration significantly affects the overall employment levels of native-born workers," and isolated any effects to lower-skilled workers and teens—exactly the demographics of employees least likely to be eligible for DACA under the Rule).  That Plaintiffs wish DHS's consideration had led it to reach a different policy decision is no reason for the Court to set it aside.  *See, e.g.*, *Prometheus Radio Project*, 141 S. Ct. at 1158 ("a court [let alone a litigant] may not substitute its own policy judgment for that of the agency") (cleaned up).[10]

## V.     THE RULE DOES NOT VIOLATE THE TAKE CARE CLAUSE

This Court has, in the past, correctly declined to address Plaintiffs' Take Care Clause challenge, as the Take Care Clause is understudied and widely misunderstood, *see Texas (Memo)*, 328 F. Supp. 3d at 710–12 (collecting sources), and courts that have assessed the Take Care Clause have held that it does not create a private right of action.  *See Las Americas Immigr. Advoc. Ctr. v. Biden*, 571 F. Supp. 3d 1173, 1180 (D. Or. 2021).  If the Court does address the issue, it should

---

Shoba S. Wadhia, "Demystifying Employment Authorization and Prosecutorial Discretion in Immigration Cases," 6 Columbia J. of Race and Law 1 (2015); and George J. Borjas & Hugh Cassidy, "The Wage Penalty to Undocumented Immigration," 61 Labour Econ. 101757 (2019).

[10] Plaintiffs' citation (at Mot. 24) to *Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022) (per curiam), is not to the contrary.  In *Texas*, the Fifth Circuit found that DHS had merely "dot[ted] 'i's and crosse[d] 't's' without actually saying anything," because the agency "explicitly declin[ed] to quantify or at least reasonably describe the costs of [the] policy," and "flatly conclude[d] . . . [i]n a single paragraph citing no evidence," that the states lacked any reliance interests. *Id.* at 228.  Not so here.  Although DHS recognized the analytical difficulties of precisely measuring the Rule's costs and benefits, DHS cited specific empirical studies that attempt to quantify the Rule's impact on wages, employment, and other outcomes.  Dkt. 607-1 at AR2022_100212–17, AR2022_100329–32 (87 Fed. Reg. 53169–74, 53286–89).

reject Plaintiffs' arguments.  The Take Care Clause is a source of executive prosecutorial discretion, including the Executive's discretion *not* to prosecute.  *See, e.g.*, *United States v. Armstrong*, 517 U.S. 456, 464 (1996); *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (because "it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed,'" the Executive has "special province" not to prosecute).  DACA is precisely the sort of prosecutorial discretion that the Supreme Court recognized is firmly rooted in, not a violation of, the Take Care Clause.  *E.g.*, *Heckler*, 470 U.S. at 832.

## VI.   THE COURT CANNOT AND SHOULD NOT VACATE THE RULE OR ENTER A PERMANENT NATIONWIDE INJUNCTION.

Even if the Court grants Plaintiffs' Motion, there are three independent reasons that it should nonetheless reject Plaintiffs' fundamentally flawed request for vacatur and a permanent nationwide injunction.  *First*, the Supreme Court held in *Aleman Gonzalez* that, under 8 U.S.C. § 1252(f)(1), lower courts are generally prohibited from ordering "federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out [ ] specified statutory provisions" of the INA.  142 S. Ct. at 2065.  That holding, which was not before this Court in *Texas (Memo)* and which was not fully briefed by any party on appeal, strips this Court of jurisdiction to enter an injunction—and its logic applies equally to vacatur.  *Second*, Plaintiffs' "remedy must be tailored to redress [their] particular injury."  *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018).  This means that: (1) the Court should not award nationwide relief when only a single Plaintiff, Texas, has even attempted to demonstrate any injury; and (2) Texas must prove on a person-by-person basis not only that the Rule is unlawful, but also that, with respect to each particular DACA-eligible immigrant, that the Rule caused or would cause Texas harm.  *See Collins v. Yellen*, 141 S. Ct. 1761, 1789 (2021).  *Third*, the Supreme Court emphasized in *Regents* that any response to a finding that DACA is unlawful must take DACA recipients', their families', and

their communities' reliance interests into account.  *See* 140 S. Ct. at 1913–14.  Plaintiffs' proposed remedy, which does not contemplate a stay pending appeal and proposes an arbitrary two-year period leading to wind-down, falls far short of complying with *Regents*.

### A.    Under § 1252(f)(1), this Court Lacks Jurisdiction to Vacate or Enjoin the Rule.

The INA precludes this Court from granting Plaintiffs' requested relief.  Under 8 U.S.C. § 1252(f)(1), "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of" 8 U.S.C. §§ 1221–32.  In *Aleman Gonzalez*, the Supreme Court suggested that Section 1252(f)(1) precludes lower courts from entering a broader set of remedies, defining "enjoin" as any action that "'require[s],' 'command[s],' or 'positively direct[s]' an action or [ ] 'require[s] a person to perform, . . . or to abstain or desist from, some act.'"  *See* 142 S. Ct. at 2064.  In the context of the INA, the Court concluded that Section 1252(f)(1) thus prevents lower courts from "order[ing] federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* at 2065.  Because both an injunction *and* vacatur would have the effect of ordering DHS to take or refrain from taking actions to implement the specified provisions of the INA, Section 1252(f)(1) prohibits the Court from enjoining *or* vacating the Rule.

The Fifth Circuit's decision with respect to Section 1252(f)(1) in *Texas (Memo)* does not compel a different conclusion, or restore in this Court power that Congress chose to remove. Indeed, of the three justifications the Fifth Circuit asserted (and that Plaintiffs have embraced) to avoid Section 1252(f)(1) and distinguish *Aleman Gonzalez*, *see Texas (Memo)*, 50 F.4th at 528–29, one has been questioned as a matter of law by the Supreme Court, another is belied by Plaintiffs' briefs here, and the third is distinguishable based on Plaintiffs' current request for relief.

*First*, the Fifth Circuit found, and Plaintiffs now assert, that vacatur is not an injunction, and therefore vacatur is not subject to Section 1252(f)(1)'s jurisdictional bar. *See id.*; Mot. at 40.

Yet, *Aleman Gonzalez*'s reasoning suggests that this jurisdictional bar applies equally to vacatur. And, even if does not, the Supreme Court called the distinction between vacatur and injunction into question during oral argument in *United States v. Texas*, No. 22-58.   Justice Thomas questioned whether "vacatur is actually possible under 1252(f)."  Ex. 4, Tr. of Oral Arg. at 75:22–23.   Justice Gorsuch went even further, asking how, in practical terms, vacatur and an injunction differ, noting that vacatur (and maybe even declaratory relief), like an injunction, would result in the government being "effectively required to enforce the immigration laws differently than it otherwise would."  *Id.* 46:23–47:4, 81:17–24.   And he wondered how Texas could possibly demonstrate that vacatur would redress its asserted injuries, as it must do to establish standing if vacatur does *not* actually require the government to change how it implements the INA.  *Id.* 79:19–80:3.  So too here.  Either vacatur prevents DHS from implementing the Rule, and vacatur is precluded in this Court under Section 1252(f)(1), or vacatur does *not* prevent DHS from implementing the Rule, and vacatur would not redress Plaintiffs' supposed injuries so Plaintiffs would lack standing.  In either case, vacatur is not available to Plaintiffs in this Court.

*Second*, the Fifth Circuit held Section 1252(f)(1) inapplicable because it only prevents lower courts from enjoining the government from operating with respect to specific provisions of the INA, none of which it believed were implicated by Plaintiffs' claims.  *Texas (Memo)*, 50 F.4th at 529.  Plaintiffs' brief, however, says exactly the opposite.  With respect to the Rule's substantive lawfulness, Plaintiffs argue that the Rule impermissibly contravenes 8 U.S.C. §§ 1225, 1226, 1227, and 1229a by preventing the removal of DACA recipients and permitting them to apply for work authorization.  Mot. at 12–16.  Incongruously, Plaintiffs later assert that the parts of the INA with which the 2022 Rule supposedly conflicts "are not within §§ 1221–1232 and thus fall outside the scope of Section 1252(f)(1)."  Mot. at 41.  But, Sections 1225, 1226, 1227, and 1229a (on which

Plaintiffs base their substantive arguments) are *all* within that range specified by Section 1252(f)(1), which means the Court lacks jurisdiction to enjoin the Rule.  If, on the other hand, the Rule does *not* violate those sections of the INA, then Plaintiffs have no claim to relief.

 *Third*, the Fifth Circuit held that Section 1252(f)(1) did not "apply to the injunction in this case" because it was stayed as to current DACA recipients.  *Texas (Memo)*, 50 F.4th at 529.  Of course, nothing in Section 1252(f)(1) or *Aleman Gonzalez* suggests that a lower court's power to issue an injunction turns on when the injunction takes effect.  Even if it did, however, Plaintiffs here seek a full and permanent injunction that has an immediate effect on current DACA recipients: as of the date that the Court issues its order, DHS would be prohibited from issuing more than one renewal to any given DACA recipient.  *See* Dkt. 625-2 at 2.  That is exactly the type of order that Section 1252(f)(1) prohibits this Court from entering.  *See Aleman Gonzalez*, 142 S. Ct. at 2065.

 **B.** **If the Court Does Enjoin the Rule, the Injunction Must Be Limited to Remedying Plaintiffs' Actual Injuries.**

 Any injunction issued by the Court should apply only in Texas, and only as to the particular DACA applicants or recipients who Texas can prove caused it harm as a result of the Rule.

 *1.* *The Rule should not be enjoined nationwide.*

 Although Texas implies that, if it prevails on the merits, nationwide relief is a foregone conclusion, the Fifth Circuit has clarified that *Texas (Parents)* "does not hold that nationwide injunctions are required or even the norm." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (per curiam).  Instead, the general rule is that Plaintiffs' remedy "must be tailored to redress" their injury.  *Gill*, 138 S. Ct. at 1934.  Here, only a small minority of states seek the Rule's termination (unlike *Texas (Parents)*, where more than half the states challenged DHS's action, *see* 809 F.3d at 146)), and only one even attempted to establish actual injuries.  In contrast, a coalition of 14 states, which are home to approximately 61 percent of all DACA recipients, submitted a public comment

arguing that the Rule causes them no harm at all.  Dkt. 607-1 at AR2022_100215 (87 Fed. Reg. 53172).  Those dynamics only exacerbate the fundamental problem with nationwide injunctions: decisions across the country upholding government action apply solely to that specific case, but the first ruling adverse to the government would preclude enforcement of the policy anywhere— including in those jurisdictions where the policy has been upheld (or is even viewed as beneficial).

For precisely these reasons, the Justices have questioned the wisdom of nationwide injunctions.  *See, e.g.*, *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (nationwide injunctions are "flaw[ed]" because they dictate "how the defendant must act towards persons who are not parties to the case"); *Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring) (describing "universal injunctions" as "legally and historically dubious").  Indeed, in little more than a decade, nationwide injunctions have reshaped the relationship between the federal judiciary and the executive, with significant deleterious effects.  *See Arizona*, 40 F.4th at 394–98 (Sutton, C.J., concurring); *Feds for Med. Freedom v. Biden*, 25 F.4th 354, 360 (5th Cir. 2022) (Higginson, J., dissenting).  The Court should be particularly wary of granting nationwide relief where, as here, the Court has to date considered and credited evidence of harm from only a single plaintiff, and, even then, only as to the Memorandum, not the 2022 Rule actually under review.  If the Court determines that DACA should be enjoined (and it should not), it should do so on a much narrower basis, and limit the injunction's application to Texas, the only state that even attempted to demonstrate actual injury.

> 2.     *Plaintiffs are not entitled to class-wide relief, because the appropriateness of the remedy as to any individual must be assessed on an individual basis.*

Even assuming that both the Memorandum and 2022 Rule were unlawful (and they are not), that would not mean that Plaintiffs are entitled to a remedy stripping every DACA recipient of deferred action and work authorization.  Rather, it is the Plaintiffs' burden to demonstrate that,

but for DACA, that individual recipient would not have that status.  As the Supreme Court has made clear, a plaintiff challenging an unlawful agency action is not entitled to relief merely because the plaintiff demonstrates some legal defect.  Instead, the plaintiff must demonstrate that the resulting situation would not exist in a counterfactual world in which the unlawful action never occurred.  In *Collins v. Yellen*, 141 S. Ct. 1761 (2021), the Supreme Court indicated that, notwithstanding an unconstitutional limitation on removal of the Federal Housing Finance Agency's director, plaintiffs were not entitled to relief if they could not show that, but for the illegal restriction, the executive action in question would not have occurred, *id.* at 1788–89 (giving, as an example, if "the President had attempted to remove a Director but was prevented from doing so by a lower court decision").  If the plaintiff cannot make that counterfactual showing, the court must not grant a remedy; if it does, the plaintiff would be "put [ ] in a better place than otherwise warranted" by avoiding an alleged injury that the plaintiff would have suffered no matter what. *Collins v. Lew*, -- F. Supp. 3d --, 2022 WL 17170955, at *4 (S.D. Tex. Nov. 21, 2022) (cleaned up).  Applying that principle with respect to the Rule, Plaintiffs are not entitled to a class-wide remedy—rather, they must demonstrate that each DACA recipient would not have obtained lawful presence and work authorization by other means that Plaintiffs do not challenge.

A counterfactual world without the Memorandum, the Rule, and a decade of deferred action is difficult to construct.  But we know that the world for DACA recipients would not have stood still, and many of them would have availed themselves of other available avenues of relief. During the 10 years since the Memorandum, at least some individuals who applied for and received DACA would instead have received work authorization and lawful presence through other channels, such as through U Visas, *see* 8 C.F.R. § 274a.12(a)(19)–(20), or an order of supervision, *see* 8 C.F.R. § 274a.12(c)(18).  And at least some of those DACA recipients would have acquired

green cards, including through marriage to a United States citizen.  *See* Dkt. 608-4 at AR2022_400274–78.  Any injuries those DACA recipients purportedly caused to Plaintiffs would have occurred *anyway*, and thus they are not the result of the Rule or the Memorandum, but "because they are here."  Dkt. 400-2, Ex. 7 ¶ 14 (cleaned up).  Granting Plaintiffs class-wide relief would thus put Plaintiffs in a *better* position than they would have had absent DACA, and would put those immigrants in a *worse* position than they would otherwise have occupied.  Plaintiffs must therefore demonstrate, for each DACA recipient, that the individual would not have remained in the country, obtained lawful presence, and received work authorization in the counterfactual "no-DACA" scenario.  While Plaintiffs will no doubt complain of the near-impossibility of making that showing on an individual-by-individual basis, that difficulty is the product of Plaintiffs' own making.  Plaintiffs delayed *six years* before bringing a challenge to DACA, a delay that gave rise to legitimate reliance interests on the part of DACA recipients and justified the Court in denying a preliminary injunction and leaving DACA in place for the past four years for existing recipients.

*Collins* reflects the broader principle that, as a matter of equity, not all wrongs can or should be righted by a court.  Indeed, no plaintiff has a right to an equitable remedy.  *See, e.g.*, *Avitia v. Metro. Club of Chi.*, 49 F.3d 1219, 1231 (7th Cir. 1995) ("The effect of equitable remedies on third parties, not to mention on the courts that must take the time to supervise them, is the practical reason why there is no 'right' to an equitable remedy, why the plaintiff's claim to such a remedy may have to yield to competing considerations.").  For centuries, the "essence of equity jurisdiction has been the power . . . to do equity and to mould each decree to the necessities of the particular case.  Flexibility rather than rigidity has distinguished it.  The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs . . ."  *Hecht Co. v. Bowles*, 321 U.S. 321, 329-30 (1944).  In some cases, that

flexibility to take into account "mercy and practicality," along with considerations of the "public interests and private needs," requires a court to leave unlawful actions unremedied—either to avoid a windfall to the plaintiff, *see Collins*, 2022 WL 17170955, at *4; to maintain stability and trust, *see, e.g.*, *Ryder v. United States,* 515 U.S. 177, 180 (1995) (de facto officer doctrine "seeks to protect the public by insuring the orderly functioning of the government despite technical defects in title to office"); *Joseph Eichelberger & Co. v. Comm'r*, 88 F.2d 874, 875 (5th Cir. 1937) (allowing unlawful tax decision to stand because, "[w]hether that decision was right or wrong, the accredited officer of the United States made it"); or to avoid doing injustice, *cf. Brown v. Allen*, 344 U.S. 443, 540 (1953) ("[R]eversal by a higher court is not proof that justice is thereby better done.").

Particularly in light of the reliance interests discussed below, the equitable principles underlying *Collins* should guide the Court's crafting of a remedy.  DACA recipients have, for the past decade, lived their lives in reliance on DACA.  They have continued their studies, bought homes, started families, and developed community ties because of DACA, and many of them have forgone other avenues through which they could have achieved immigration status because they have had the space and time to mature into adulthood.  *See generally* Ex. 7.  Those reliance interests have only grown stronger over time, particularly because Plaintiffs waited six years to seek relief in the first place.  *See Texas (Memo)*, 328 F. Supp. 3d at 738–40 ("[a] delay in seeking an injunction has been viewed as a concession or an indication that the alleged harm does not rise to a level that merits an injunction"); *cf. Collins*, 141 S. Ct. at 1788 n. 26 ("The lower courts may also consider all issues related to the federal parties' argument that the doctrine of laches precludes any relief.").  Against that backdrop, unless and until Plaintiffs demonstrate that individual DACA recipients

would not have obtained immigration status in a counterfactual world without DACA, the Court should leave the Rule in place for current recipients, even if the Court finds it unlawful.

> ### C.      Any Remedy Must Account for Reliance Interests, Permit an Orderly Wind-Down, and Be Stayed Pending Appeal.

Even if the Court does not leave the Rule in place with respect to current DACA recipients, *Regents* unequivocally requires the Court "to assess whether there [are] reliance interests [in the Rule], determine whether they [are] significant, and weigh any such interests against competing policy concerns." 140 S. Ct. at 1915.  And as this Court and the Supreme Court have previously recognized, the reliance interests in DACA are profound.  "DACA recipients have 'enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on the DACA program." *Regents*, 140 S. Ct. at 1914 (citation omitted).   Indeed, DACA recipients, along with their families, friends, employers, and communities, have built their lives and futures around DACA recipients' presence in the United States. *See, e.g.*, Dkt. 504-2, Ex. 18 at 2, Ex. 22 at 2.  DACA recipients have embarked on U.S.-focused careers. *See, e.g.*, Dkt. 504-2, Ex. 17 at 1-2, Ex. 25 at 2.  They are advocates with deep ties to their local communities. *See, e.g.*, Dkt. 504-2, Ex. 19 at 2, Ex. 21 at 2; Dkt. 504-3, Ex. 26 at 2.  They have played critical roles in the efficient administration of healthcare and public services during COVID-19. *See, e.g.*, Dkt 502-2, Ex. 19 at 1–4, Ex. 20 at 1–5; Dkt 504-2, Ex. 20 at 2.  And many now have more than 250,000 U.S. citizen children from whom separation will cause great upheaval and trauma.  Dkt. 607-1, AR2022_100197 (87 Fed. Reg. 53154); Ex. 7.

Those significant reliance interests counsel in favor of remanding the Rule to DHS if the Court determines it is unlawful and that Plaintiffs are entitled to DACA's termination.  In *Regents*, the Court highlighted that, before DHS rescinded the Memorandum, it should have "considered more accommodating dates for recipients caught in the middle of a time-bounded commitment."

140 S. Ct. at 1914.  Texas purports to respect *Regents*, Mot. at 5, but Plaintiffs' two-year period leading to wind down is arbitrary, and it fails to give due consideration to DACA recipients who have structured their lives according to certain time-bound commitments.  *Regents*, 140 S. Ct. at 1914; *Texas (Memo)*, 2021 WL 3022434, at *2–3 ("Given [reliance] interests, it is not equitable for a government program that has engendered such significant reliance to terminate suddenly.").  In any event, *Regents* made clear that it is DHS, not a court, that is best positioned to weigh those considerations.  For that reason, if the Court vacates or enjoins the Rule, it should remand to DHS for further consideration about the appropriate remedy.  The 2022 Rule reflects DHS's good faith effort to (1) address the procedural deficiencies that this Court identified in the Memorandum, and (2) engage in a thoughtful, informed manner with the Memorandum's substantive defects.  If this Court determines that the 2022 Rule does not address the latter, substantive concerns, then it remains for DHS in the first instance to consider the proper remedy in light of that holding.

At the very least, any relief issued by the Court should be stayed pending appeal.  The Fifth Circuit's remand order expressly contemplated that there would be an opportunity for further appellate review before any judgment unwinding DACA for current recipients would be given effect.  *Texas (Memo)*, 50 F.4th at 531.  Given the strong reliance interests, no disruptive action should be taken until a final ruling on appeal has been reached.

## CONCLUSION

For the foregoing reasons, Defendant-Intervenors respectfully request that the Court grant Defendant-Intervenors' motion for summary judgment and deny Plaintiffs' motion for summary judgment or, in the alternative, deny both motions and set a schedule for further proceedings.

Dated:  March 2, 2023

Respectfully Submitted,

**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND**

By:  /s/ *Nina Perales*
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone:  (210) 224-5476
Facsimile:  (210) 224-5382
Email:  nperales@maldef.org

**ROPES & GRAY LLP**
Douglas H. Hallward-Driemeier
2099 Pennsylvania Ave NW
Washington, DC  20006-6807
(202) 508-4600
(202) 508-4776 (direct dial)
Douglas.Hallward-Driemeier@ropesgray.com
(Admitted pro hac vice)

**GARCÍA & GARCÍA,
ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX  78502
Phone:  (956) 630-3889
Facsimile:  (956) 630-3899
Email:  cgarcia@garciagarcialaw.com

Attorneys for Defendant-Intervenors

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on the 2nd day of March, 2023, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Nina Perales*
Nina Perales