**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

**DEFENDANT-INTERVENORS' APPENDIX
IN SUPPORT OF THEIR BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# VOLUME 1
# Exhibits 1–9

Dated:  March 2, 2023

Respectfully Submitted,

**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND**

By:  /s/ Nina Perales
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone:  (210) 224-5476
Facsimile:  (210) 224-5382
Email:  nperales@maldef.org

**ROPES & GRAY LLP**
Douglas H. Hallward-Driemeier
2099 Pennsylvania Ave NW
Washington, DC  20006-6807
(202) 508-4600
(202) 508-4776 (direct dial)
Douglas.Hallward-Driemeier@ropesgray.com
(Admitted pro hac vice)

**GARCÍA & GARCÍA,
ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX  78502
Phone:  (956) 630-3889
Facsimile:  (956) 630-3899
Email:  cgarcia@garciagarcialaw.com

Attorneys for Defendant-Intervenors

| Exhibit No. | Description/Source | Vol. No. |
|:-----------:|--------------------|:--------:|
| 1 | *Texas v. Biden*, No. 2-21-cv-067-Z, 2022 WL 17718634 (N.D. Tex. Dec. 15, 2022) | 1 |
| 2 | Brief for Samuel L. Bray & William Baude as Amici Curiae in Support of Petitioners, *Biden v. Nebraska*, Nos. 22-506 & 22-535 (U.S., Jan. 11, 2023) | 1 |
| 3 | *Environment Texas Citizens Lobby, Inc. v. ExxonMobil Corp.*, No. 17-20545, 2023 WL 2229665 (Mem.) (5th Cir., Feb. 17, 2023) | 1 |
| 4 | Oral Argument transcript in *United States v. Texas*, No. 22-58 (U.S. Nov. 29, 2022) | 1 |
| 5 | Ike Brannon & Kevin McGee, *Federal Register Comment on NPRM 86 FR 53736*, available at https://www.regulations.gov/comment/USCIS-2021-0006-5313 (Nov. 6, 2021). | 1 |
| 6 | *Collins v. Lew*, No. 4:16-cv-03113, 2022 WL 17170955 (S.D. Tex. Nov. 21, 2022) | 1 |
| 7 | Declaration of Karla Quetzalli Perez Ramirez, dated March 1, 2023 | 1 |
| 8 | Order in *Texas v. United States*, No. 1:18-cv-00068, 2021 WL 3022433 (S.D. Tex. July 16, 2021) | 1 |
| 9 | Order of Permanent Injunction in *Texas v. United States*, No. 1:18-cv-00068, 2021 WL 3022434 (S.D. Tex. July 16, 2021) | 1 |

# Exhibit 1

2022 WL 17718634
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Amarillo Division.

State of TEXAS, et al., Plaintiffs,

v.

Joseph R. BIDEN, Jr., et al., Defendants.

2:21-CV-067-Z
|
Signed December 15, 2022

**Synopsis**

**Background:** States of Texas and Missouri brought action for declaratory and injunctive relief and vacatur against Secretary of Department of Homeland Security (DHS) and others, alleging that Department's termination of its Migrant Protection Protocols (MPP), which provided for returning to Mexico non-Mexican noncitizens detained when attempting to enter the United States by land illegally from Mexico, violated Administrative Procedure Act (APA) and Immigration and Nationality Act (INA). Following bench trial, the District Court, Matthew J. Kacsmaryk, J., 554 F.Supp.3d 818, vacated Secretary's termination Memorandum, granted nationwide permanent injunction requiring DHS to implement MPP in good faith until such time as it was lawfully rescinded in compliance with APA or Government had sufficient detention resources, and remanded. DHS appealed. The Court of Appeals, 10 F.4th 538, denied motion by DHS for emergency stay pending appeal. The District Court, Kacsmaryk, J., 2021 WL 5399844, granted in part States' motion to enforce permanent injunction and for expedited discovery. DHS appealed, and Secretary issued two Memoranda for terminating MPP. The Court of Appeals, 20 F.4th 928, affirmed. Certiorari was granted. The Supreme Court, 142 S.Ct. 2528, 213 L.Ed.2d 956, reversed and remanded. The Court of Appeals remanded. States filed motion for stay, seeking under APA to postpone effective date of agency action pending judicial review.

**Holdings:** The District Court, Matthew J. Kacsmaryk, J., held that:

as a matter of first impression, relief under APA, by a stay postponing effective date of agency action pending

judicial review, is not barred by INA's general prohibition of injunctive relief by lower courts;

stay relief under APA was available even though Memoranda had already taken effect;

States were likely to succeed on merits of claim that Memoranda failed to adequately consider how contiguous-territory return authority under INA would allow federal officials to avoid violations of INA's detention mandate;

States were likely to succeed on merits of claim that Memoranda failed to adequately consider whether terminating MPP would increase the violations of INA's limits on parole authority;

States were likely to succeed on merits of claim that Memoranda failed to adequately account for key benefits of MPP;

States were likely to succeed on merits of claim that Memoranda failed to adequately consider costs to States if MPP were terminated and States' reliance interests in MPP; and

geographic limitation of stay remedy was not warranted.

Motion granted.

**Attorneys and Law Firms**

William Thomas Thompson, Patrick K. Sweeten, Ryan Daniel Walters, Office of the Attorney General, Austin, TX, for Plaintiff State of Texas.

Dean John Sauer, Pro Hac Vice, Jesus A. Osete, Pro Hac Vice, Office of the Missouri Attorney General, Jefferson City, MO, Michael E. Talent, Missouri Attorney General's Office Missouri Attorney General's Office, St. Louis, MO, for Plaintiff State of Missouri.

Erez Reuveni, Brian C. Ward, Joseph Anton Darrow, U.S. Department of Justice Civil Division, Washington, DC, Brian Walters Stoltz, U.S. Attorney's Office, Dallas, TX, for Defendants.

Walter Stephen Zimolong, III, Zimolong LLC, Wayne, PA, for Amicus Advocates for Victims of Illegal Alien Crime.

Matt Austin Crapo, Pro Hac Vice, Alexandria, VA, for Amicus Immigration Reform Law Institute.

Robert S. Velevis, Amanda Crawford-Steger, Sidley Austin LLP, Dallas, TX, Tamara Frances Goodlette, Raices, San Antonio, TX, for Amicus Refugee and Immigrant Center for Education and Legal Services.

**OPINION AND ORDER**

MATTHEW J. KACSMARYK, UNITED STATES DISTRICT JUDGE

**\*1** This case began as a challenge to the termination of the Migrant Protection Protocols ("MPP") program in January 2021. Although the legal instruments governing the termination evolved over time by issuance of new memoranda, this case continued. Most recently, the Supreme Court remanded the case for this Court to consider Plaintiff States of Texas and Missouri's ("Plaintiffs") claims against the most recent memoranda. The Court now considers Plaintiffs' Motion to Postpone the Effective Date of Agency Action ("Motion") (ECF No. 149), filed on August 8, 2022. Plaintiffs carry their burden to show — among other things — they will likely prevail on the merits. Accordingly, the Court **GRANTS** the Motion and **STAYS** the most recent memoranda, issued on October 29, 2021, and corresponding decision to terminate MPP until the Court can resolve the merits of Plaintiffs' claims.

**Background**
This action has a complex procedural history, having gone from this Court to the Fifth Circuit, to the Supreme Court, and back to this Court on remand. Or, "there and back again." *See* J.R.R. Tolkien, The Hobbit, or There and Back Again (1937). The Court first addresses that procedural history before more thoroughly detailing the facts relevant on remand.

**A. Procedural Background**
On December 20, 2019, the Department of Homeland Security ("DHS") announced MPP. DHS created the program in response to an immigration surge at the southern border of the United States and a resulting "humanitarian and border security crisis" in which federal immigration officials were encountering about 2,000 inadmissible aliens each day. ECF No. 94 at 7. MPP required DHS to return certain non-Mexican nationals arriving by land from Mexico back to Mexico to

await the results of their removal proceedings under 8 U.S.C. § 1229a. The Government of Mexico agreed to temporarily cooperate in administering MPP. *Id.* at 8.

Congress authorized MPP in the Immigration and Nationality Act ("INA"). The INA provides: "In the case of an alien ... who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title."[1] 8 U.S.C. § 1225(b)(2)(C). A separate provision of the same INA section states: If "an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." *Id.* § 1225(b)(2)(A).

DHS began implementing MPP in January 2019. ECF No. 94 at 8. President Trump's administration implemented MPP because DHS lacks the resources to detain every alien seeking admission to the United States. *Id.* at 43. MPP ensured "[c]ertain aliens attempting to enter the U.S. illegally or without documentation, including those who claim asylum, will no longer be released into the country, where they often fail to file an asylum application and/or disappear before an immigration judge can determine the merits of any claim." *Id.* at 8. By December 31, 2020, DHS had enrolled 68,039 aliens in the program. *Id.* at 12.

**\*2** On January 20, 2021, the Acting Secretary of DHS wrote: "Effective January 21, 2021, the Department will suspend new enrollments in [MPP] pending further review of the program. Aliens who are not already enrolled in MPP should be processed under other existing legal authorities." *Id.* at 15 ("January Suspension"). President Biden's administration later issued Executive Order No. 14010, which directed DHS Secretary Alejandro Mayorkas to "promptly review and determine whether to terminate or modify [MPP]." 86 Fed. Reg. 8269 (2021).

On June 1, 2021, Secretary Mayorkas issued a memorandum officially ending MPP. *See* Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Security, *Termination of the Migrant Protection Protocols Program* (June 1, 2021) ("June 1 Memorandum"). In doing so, Secretary Mayorkas "direct[ed] DHS personnel to take all appropriate actions to terminate MPP, including taking all steps necessary to rescind implementing guidance and other directives or policy guidance issued to implement the program." ECF No. 54-2 at 172.

On April 13, 2021, Plaintiffs initiated this litigation challenging President Biden's administration's termination of MPP. *See generally* ECF No. 1. Plaintiffs' initial Complaint challenged the January Suspension that paused new enrollments in MPP. Following the June 1 Memorandum, Plaintiffs amended their Complaint to challenge the termination of the entire program. *See generally* ECF No. 48. Plaintiffs' First Amended Complaint asserted the June 1 Memorandum violated the INA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and sought preliminary and permanent injunctive relief, declaratory relief, and vacatur of the termination under the APA. *See id.*

After a consolidated hearing and a trial on the merits under Federal Rule of Civil Procedure 65(a)(2), the Court vacated the June 1 Memorandum and enjoined Defendants to continue to implement MPP "in good faith until such a time as it has been lawfully rescinded in compliance with the APA *and* until such a time as the federal government has sufficient detention capacity to detain all aliens subject to mandatory detention under Section 1225 without releasing any aliens *because of a* lack of detention resources." ECF No. 94 at 52–53. Defendants sought a stay of that order, which the Fifth Circuit denied. *State v. Biden*, 10 F.4th 538, 543–61 (2021) (per curiam). The Supreme Court also denied Defendants' stay request because Defendants "had failed to show a likelihood of success on the claim that the [June 1 Memorandum] was not arbitrary and capricious." *Biden v. Texas*, —— U.S. ——, 142 S. Ct. 926, 926, 210 L.Ed.2d 1014 (2021) (mem. op.).

On the cusp of oral argument in the Fifth Circuit, DHS issued two memoranda ("October 29 Memoranda") declaring that it had made a new decision terminating MPP. *See* ECF No. 162 at 19–61, Termination of the Migrant Protection Protocols ("Termination Memorandum") and Explanation of the Decision to Terminate the Migrant Protection Protocols ("Explanation Memorandum"). At the same time, Defendants asked the Fifth Circuit to hold the case moot, to vacate this Court's judgment and permanent injunction, and to remand the case for further proceedings. *Texas v. Biden*, 20 F.4th 928, 946 (5th Cir. 2021) ("*Biden II*"). The Fifth Circuit declined. It instead held that the October 29 Memoranda did not moot or have any legal effect on the appeal. *Id.* at 956–66, 998–1000. The Fifth Circuit then affirmed this Court on the merits. *See generally id.*

**\*3** On June 30, 2022, the Supreme Court reversed the Fifth Circuit. *See generally Biden v. Texas*, —— U.S. ——,

142 S. Ct. 2528, 213 L.Ed.2d 956 (2022) ("*Biden II*"). First, the Supreme Court determined 8 U.S.C. § 1252(f)(1) barred this Court's injunction, though that provision does not deprive this Court of subject-matter jurisdiction over this action. *See id.* at 2538-39. The Supreme Court also held the termination of MPP did not itself violate the mandatory-detention requirement of Section 1225(b)(2)(A), although the Supreme Court "assume[d] *arguendo* ... that the dissent's interpretation of section 1225(b)(2)(A) is correct, and that the Government is currently violating its obligations under that provision." *Id.* at 2542. *Biden III* did not disturb any of the holdings of this Court or the Fifth Circuit on issues of standing or reviewability to challenge a termination of MPP, the limits on parole authority, or the mandatory nature of the detention requirements of Section 1225.

Although the Supreme Court determined the October 29 Memoranda constitute final agency action that suspended the June 1 Memorandum, the Supreme Court did not answer whether the October 29 Memoranda are arbitrary and capricious under the APA. That task, the Supreme Court stated, is for this Court. *See id.* at 2548 ("On remand, the District Court should consider in the first instance whether the October 29 Memoranda comply with section 706 of the APA." (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46–57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983))), 2549 (Kavanaugh, J., concurring) ("The question of whether DHS's October 29 decision satisfies the *State Farm* standard is not before this Court at this time. The Court today therefore properly leaves the *State Farm* issue for consideration on remand."), 2559 (Alito, J., dissenting) ("I agree with the majority that the District Court on remand should consider in the first instance whether the October 29 Memoranda complied with § 706 of the APA."). Plaintiffs now challenge the October 29 Memoranda.

**B. Background Relevant to the October 29 Memoranda**
On October 29, 2021, the Secretary issued the two memoranda, which the Court collectively calls the "October 29 Memoranda." The October 29 Memoranda consist of the "Termination Memorandum" (four pages again announcing the termination of MPP) and the "Explanation Memorandum" (thirty-nine pages explaining the reasons for doing so). *See generally* ECF No. 162 at 19–61. The October 29 Memoranda claim the Secretary "examined the considerations that th[is] District Court determined were insufficiently addressed in the June 1 Memorandum, including the view that MPP discouraged unlawful border

crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, impose undue costs on states, put a strain on U.S.-Mexico relations, and cause DHS to fail to comply with its [detention] obligations under 8 U.S.C. § 1225." *Id.* at 34.

In the October 29 Memoranda, the Secretary identified what he believed to be "the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border." *Id.* at 21. The Secretary nonetheless concluded MPP's "benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values." *Id.* Finally, the Secretary noted that "[e]fforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration." *Id.*

**\*4** Considering these conclusions, the Secretary announced he would once again terminate MPP. *Id.* at 22. The Secretary explained DHS would "continue complying with [this Court's] injunction requiring good-faith implementation and enforcement of MPP," but that "the termination of MPP" would be "implemented as soon as practicable after a final judicial decision to vacate" that injunction. *Id.* This Court vacated its injunction on August 8, 2022. *See* ECF No. 147.

#### C. The Pending Motion

On August 8, 2022, Plaintiffs filed the instant Motion. *See* ECF No. 149. Plaintiffs ask the Court to issue "a stay of the October 29 Memoranda pending a final merits determination as to whether they satisfy the requirements of reasoned decisionmaking under the APA." *Id.* at 11. Plaintiffs allege the Secretary failed to adequately consider: (1) "how using contiguous-territory return authority would allow Defendants to avoid violations of the INA's clear detention mandate"; (2) "MPP's deterrent effect in reducing dangerous attempted illegal border crossings, as well as MPP's reduction of unmeritorious asylum claims"; (3) "the justification of changed factual determinations regarding *in absentia* removal orders"; (4) "whether DHS's rescission of MPP is causing [DHS] to violate the limits on its parole authority"; and (5) "costs to States and their reliance interests." *Id.*

Defendants dispute these assertions. *See* ECF No. 163 at 34–51. But before addressing the substance of Plaintiffs' APA claims, Defendants argue this Court lacks jurisdiction and the request for stay is not justiciable. *See id.* at 17–25. Specifically, Defendants argue: (1) 8 U.S.C. § 1252(f)(1) "bars jurisdiction to stay an agency action directing how DHS will implement [8 U.S.C. §] 1225(b)(2)(C)"; (2) a court may not "stay agency action that has already gone into effect"; (3) "Plaintiffs lack standing to challenge the October 29 memorandum"; and (4) "Plaintiffs' APA claim is not reviewable." *See id.* at 25–51.

### Analysis

The Court separates Parties' arguments into two categories: justiciability arguments and merits arguments. The Court will reorder and consider Defendants' justiciability arguments before turning to Plaintiffs' APA claims.

#### A. Plaintiffs Possess Standing

The judicial power of federal courts is limited to certain "Cases" and "Controversies." U.S. Const. art. III, § 2. The case-or-controversy requirement requires a plaintiff to establish standing to sue. *See Gill v. Whitford*, ––– U.S. ––––, 138 S. Ct. 1916, 1923, 201 L.Ed.2d 313 (2018); *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) ("Every party that comes before a federal court must establish that it has standing to pursue its claims.").

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To possess standing, the party invoking federal jurisdiction must establish he suffered: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) his injury is "fairly ... trace[able] to the challenged action of the defendant"; and (3) his injury is "likely" rather than "speculative[ly]" to be "redressed by a favorable decision." *Id.* at 560-61, 112 S.Ct. 2130 (internal marks omitted).

Plaintiffs have standing to challenge the October 29 Memoranda for the same reasons that they had standing to challenge the previous termination of MPP. *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 47 F.4th 408, 416 (5th Cir. 2022); ECF No. 94 at 21–26. Additionally, the Court's previous determinations on standing constitute the law of the case because the agency action at issue is identical

to the previously challenged action. *See Free v. Abbott Lab'ys, Inc.*, 164 F.3d 270, 272–73 (5th Cir. 1999) (joining other circuits in refusing to recognize jurisdiction exception to law-of-the-case doctrine and explaining that although a federal court must examine each case to determine basis for jurisdiction, "perpetual re-examination of precisely the same issue of subject matter jurisdiction" is not required). That is, under MPP, large numbers of aliens who would otherwise impose costs on the States were instead required to remain in Mexico pending determinations of their asylum proceedings, and the termination of the program led to the imposition of those costs. *See* ECF No. 94 at 17–26; *Biden II*, 20 F.4th at 966–76 (finding States had standing to challenge agency action terminating MPP, including for claim of arbitrary-and-capricious decisionmaking under the APA).

**\*5**  Although Defendants argue the Court cannot rely on its previous standing determination, the Supreme Court did not overturn the standing determinations of this Court or the Fifth Circuit. *See* ECF No. 163 at 28–29; *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 856 n.2 (5th Cir. 2022); *Texas v. United States*, 40 F.4th 205, 222 n.9 (5th Cir. 2022) (per curiam) (considering *Biden II* binding on all grounds not reversed), *cert. granted*, —— U.S. ——, 143 S.Ct. 51, 213 L.Ed.2d 1138 (2022); *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 n.57 (5th Cir. 2001) (concluding circuit opinions in which judgment reversed on only some grounds are still precedential with respect to portions not reversed). The Supreme Court implied standing is satisfied — as it remanded this action for the limited consideration of whether the October 29 Memoranda were arbitrary and capricious. *See Biden III*, 142 S. Ct. at 2548; *Fisher v. Univ. of Tex. at Austin*, 758 F.3d 633, 640 (5th Cir. 2014), *aff'd*, 579 U.S. 365, 136 S.Ct. 2198, 195 L.Ed.2d 511 (2016) ("The Supreme Court did not address the issue of standing, although it was squarely presented to it."). The Supreme Court would not have remanded this case to this Court if Plaintiffs lacked standing to challenge the October 29 Memoranda.

Moreover, "the mandate rule, a corollary of the law of the case doctrine, compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *Fisher*, 758 F.3d at 639–40 (internal marks omitted); *see also United States v. Castillo*, 179 F.3d 321, 329 (5th Cir. 1999) ("The mandate rule requires a district court on remand to effect our mandate and to do nothing else."); *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) (A court "must implement both the letter and the spirit of the appellate court's mandate and may

not disregard the explicit directives of that court." (quoting *United States v. Becerra*, 155 F.3d 740, 753 (5th Cir. 1998))).

This Court will not exceed the Supreme Court or Fifth Circuit's mandates. *See Biden III*, 142 S. Ct. at 2548 ("On remand, the District Court should consider in the First instance whether the October 29 Memoranda comply with section 706 of the APA."); *Texas v. Biden*, 43 F.4th 446, 447 (5th Cir. 2022) (per curiam) (mem. op.) ("We remand for further proceedings consistent with the Supreme Court's decision." (emphasis removed)). Accordingly, the Court finds no reason to dismiss this case for an alleged absence of standing.

**B. Plaintiffs Assert a Valid Cause of Action**
Defendants renew two arguments against judicial review of the Secretary's decision to terminate MPP. First, Defendants argue agency action terminating MPP is "committed to agency discretion" by law and, therefore, not subject to judicial review. ECF No. 163 at 32; *see also* 5 U.S.C. § 701(a) (2). Second, Defendants argue Plaintiffs' claims challenging the termination of MPP fall outside the zone of interests of the INA. ECF No. 163 at 32–33. The Court has rejected both arguments. *See* ECF No. 94 at 31–34. The Fifth Circuit has done the same. *See Biden II*, 20 F.4th at 975–76, 978–88. The portion of the Fifth Circuit's opinion rejecting these arguments remains good law. *See Data Mktg. P'ship*, 45 F.4th 846, 856 n.2. And again, the Supreme Court expressly remanded this case to this Court to "consider in the first instance whether the October 29 Memoranda comply with section 706 of the APA." *Biden III*, 142 S. Ct. at 2548. The Court therefore finds Defendants' arguments unpersuasive.

**C. Section 1252(f)(1) Does Not Bar Jurisdiction**
Parties dispute whether the Court has "jurisdiction or authority" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" under Section 705 of the APA. The Court determines it does.

**\*6**  Section 705 of the APA provides:

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may

be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705. Section 1252(f)(1) of the INA states:

Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). The Supreme Court recently held Section 1252(f)(1) "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, ––– U.S. ––––, 142 S. Ct. 2057, 2065, 213 L.Ed.2d 102 (2022).

Neither the Supreme Court nor the Fifth Circuit have answered whether Section 1252(f)(1) prohibits relief under Section 705. In fact, the Supreme Court has expressly reserved whether Section 1252(f)(1) prohibits various types of non-injunctive relief. *See Biden III*, 142 S. Ct. at 2548 (directing this Court to consider whether October 29 Memoranda comply with Section 706 of the APA), 2552 (Alito, J., dissenting) (noting whether Section 1252(f)(1) bars review under Section 706 "is an important question" that remains), 2562 (Barrett, J., dissenting) (noting the Supreme Court "reserves the question whether § 1252(f) (1) bars declaratory relief" and "avoids a position on whether § 1252(f)(1) prevents a lower court from vacating or setting aside an agency action under the [APA]" (internal marks omitted)); *Aleman Gonzalez*, 142 S. Ct. at 2077 n.9 (Sotomayor, J., concurring) ("Section 1252(f)(1) limits lower courts' authority to 'enjoin or restrain,' whereas a declaratory judgment (unlike an injunction) 'is not ultimately coercive.' " (quoting *Steffel v. Thompson*, 415 U.S. 452, 471, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974)) (collecting cases)).

Because neither the Supreme Court nor the Fifth Circuit have answered whether Section 1252(f)(1) prohibits relief under Section 705, this Court will decide the issue. The Court begins with the text of Section 705. The Court construes statutory text to give effect to the ordinary public meaning

conveyed when Congress enacted the statute. *New Prime Inc. v. Oliveira*, ––– U.S. ––––, 139 S. Ct. 532, 536, 202 L.Ed.2d 536 (2019); Antonin Scalia & Bryan A. Garner, Reading Law: the Interpretation of Legal Texts 69–92 (2012) ("Reading Law"). When doing so, the Court "read[s] the statute as a whole, so as to give effect to each of its provisions without rendering any language superfluous." *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 397 (5th Cir. 2006). And the Court must abide by judicially accepted principles of linguistics in reading the whole — including compositionality. *See generally James C. Phillips, The Overlooked Evidence in the Title VII Cases: The Linguistic (and Therefore Textualist) Principle of Compositionality* (May 11, 2020) (unpublished manuscript); *Bostock v. Clayton County*, ––– U.S. ––––, 140 S. Ct. 1731, 1769 n.22, 207 L.Ed.2d 218 (2020) (Alito, J., dissenting) (same). Although courts start with the words themselves, the text should be "interpreted in its statutory and historical context and with appreciation for its importance to the [statute] as a whole." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). Context includes the *corpus juris* of which a statute is a part. *See* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 539 (1947) ("Statutes cannot be read intelligently if the eye is closed to considerations evidenced in affiliated statutes.").

**\*7** The Fifth Circuit recently determined a district court may hold unlawful and set aside an agency action under Section 706 despite Section 1252(f)(1). *See Texas*, 40 F.4th at 219–20; *Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022) (Section 1252(f)(1) "does not apply to vacatur."). Section 706 grants a court reviewing agency action remedial options, including: (1) compelling agency action; and (2) holding unlawful and setting aside agency action. The latter of these options is often called "vacatur." The Fifth Circuit has acknowledged "meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is 'a less drastic remedy.' " *See Texas*, 40 F.4th at 219 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010)). Whereas an injunction "tells someone what to do or not to do," a vacatur only reinstates "the status quo absent the unlawful agency action and neither compels nor restrains further agency decision-making." *Aleman Gonzalez*, 142 S. Ct. at 2064 (quoting *Nken v. Holder*, 556 U.S. 418, 428, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)); *Texas*, 40 F.4th at 219. Accordingly, the Fifth Circuit has not extended Section 1252(f)(1)'s limitations on injunctive relief to vacatur,[2] "especially when doing so would be contrary

to the 'strong presumption favoring judicial review of administrative action.' " *Texas*, 40 F.4th at 220 (quoting *Salinas v. U.S. R.R. Ret. Bd.*, ––– U.S. ––––, 141 S. Ct. 691, 698, 208 L.Ed.2d 608 (2021)).

Just as Section 1252(f)(1) does not prohibit "vacatur" under Section 706, Section 1252(f)(1) does not prohibit issuance of a "stay" under Section 705. Although Section 705 does not use the term "stay," courts characterize the provision as allowing for such relief. *See, e.g., Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) ("We have the power *to stay* the agency's action 'to the extent necessary to prevent irreparable injury[.]' " (quoting 5 U.S.C. § 705) (emphasis added) (alteration in original)); *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (Section 705 "authorizes reviewing courts *to stay* agency action pending judicial review." (emphasis added)).

Revisit Section 706. That provision states a court shall "hold unlawful and set aside agency action" under certain circumstances. 5 U.S.C. § 706(2). Neither "vacate" nor "vacatur" appear in the statute. Still, courts understand Section 706 to permit vacatur — *i.e.*, "[t]he act of annulling or setting aside." *Vacatur*, Black's Law Dictionary (11th ed. 2019). Just as Section 706 does not employ the term "vacatur," Section 705 does not use the term "stay." But the same logic applies: Section 705 should be understood to permit the issuance of a stay, rather than injunctive relief. *Compare* 5 U.S.C. § 705 (A court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."), *with Stay*, Black's Law Dictionary ("The postponement or halting of a proceeding, judgment, or the like.").

Unlike an injunction, a stay would not "order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions" at issue. *Aleman Gonzalez*, 142 S. Ct. at 2065; *see also* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950-51, 1016 (2018) ("Preliminary relief under section 705 differs from a preliminary injunction, which blocks the executive from *enforcing* a law but does not postpone the effective date of the law itself. Section 705, by contrast, empowers courts to delay the effective date of the challenged agency action.").[3] A Section 705 stay can instead be seen as an interim or lesser form of vacatur under Section 706. Just as a preliminary injunction is often a precursor to a permanent injunction, a stay under Section 705 can be viewed

as a precursor to vacatur under Section 706. *Compare Stay*, Black's Law Dictionary ("The postponement or halting of a proceeding, judgment, or the like."), *and Vacatur* ("The act of annulling or setting aside."), *with Injunction* ("A court order commanding or preventing an action.").

**\*8** It would be "particularly dubious in light of the [Supreme] Court's caveats" to extend *Aleman Gonzalez* or Section 1252(f)(1) to stays under Section 705. *Texas*, 40 F.4th at 219, 220 ("The Supreme Court has indicated that § 1252(f) is to be interpreted relatively narrowly. Indeed, the Court described § 1252(f) as 'nothing more or less than a limit on injunctive relief.' " (quoting *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 481, 119 S.Ct. 936)). Accordingly, the Court finds it has authority to "issue all necessary and appropriate process to postpone the effective date of an agency action" in light of Section 1252(f)(1). 5 U.S.C. § 705.

### D. The Court May Stay the October 29 Memoranda under Section 705

Defendants argue Section 705 may only remedy an agency action that has yet to take effect. ECF No. 163 at 25. In support of their argument, Defendants cite cases[4] interpreting an agency's ability to "postpone the effective date of action taken by it." *Id.* Although these cases do not interpret what it means for "the reviewing court ... to postpon[e] the effective date of an agency action," Defendants argue "[t]he use of an identical phrase in ...Section 705 must be presumed to be intentional." *Id.* at 26 (quoting 5 U.S.C. § 705). And therefore, the Court cannot issue interim relief to stay the effect of an already-effective agency action.[5]

Whether the effective date of the October 29 Memoranda has passed is irrelevant to this Court's ability to issue a Section 705 stay.[6] Courts — including the Supreme Court — routinely stay already-effective agency action under Section 705. *See, e.g., West Virginia v. EPA*, 577 U.S. 1126, 136 S.Ct. 1000, 194 L.Ed.2d 17 (2016) (mem. op.); *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., U.S. Dep't of Lab.*, 17 F.4th 604 (5th Cir. 2021); *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130 (5th Cir. 2021); *Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016). Defendants attempt to distinguish a federal appellate court's power to stay agency action under Section 705 from a district court's power to do same. *See* ECF No. 173 at 2–3. But district courts have the same authority as appellate courts in issuing Section 705 stays because of the nature of judicial review of agency action.[7]

**\*9** Whereas an agency may only "postpone the effective date of action taken by it, pending judicial review," a federal court has broader power to "issue all necessary and appropriate process to postpone the effective date of an agency action *or to preserve status or rights pending conclusion of the review proceedings.*" 5 U.S.C. § 705 (emphasis added). The greater limitation on agencies exists because "agencies are creatures of statute" and, thus, "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, ––– U.S. ––––, 142 S. Ct. 661, 665, 211 L.Ed.2d 448 (2022).

The cases Defendants cite preclude agencies — not courts — from staying the effective date of agency actions after the effective date. Authorizing an agency to stay an already-taken action would allow the agency to evade notice-and-comment requirements. *See, e.g., Ctr. for Biological Diversity,* ––– F.Supp.3d at ––––, 2022 WL 971067, at \*21 ("[I]t is one thing to permit an agency to stay an administrative decision pending judicial review in order to maintain the status quo, but something altogether different to alter the status quo without providing an opportunity for notice and comment."). An agency's "order delaying [a] rule's effective date ... [is] tantamount to amending or revoking a rule." *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017). The APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101, 135 S.Ct. 1199, 191 L.Ed.2d 186 (2015). This includes the general requirement that rules be subject to notice-and-comment procedures.[8]

The limitation on agencies contrasts with courts' inherent authority to stay agency action to facilitate judicial review. *See Nken*, 556 U.S. at 426, 129 S.Ct. 1749; *see also McQuiggin v. Perkins*, 569 U.S. 383, 397, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013) (Courts should "not construe a statute to displace courts' traditional equitable authority absent the clearest command." (quoting *Holland v. Florida*, 560 U.S. 631, 636, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010))). The All Writs Act "preserves" courts' authority to issue such stays. *See* 28 U.S.C. § 1651(a) ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.").

Just as vacating an agency action "does nothing but re-establish the status quo absent the unlawful agency action,"

staying an agency action under Section 705 (even after the effective date) restores the same status quo *ex ante. Texas*, 40 F.4th at 220; *see also Wages & White Lion Invs.*, 16 F.4th at 1144. The "status quo" to be restored is "the last peaceable uncontested status existing between the parties before the dispute developed." Charles Alan Wright & Arthur R. Miller, 11A Federal Practice & Procedure § 2948 (3d ed. 2013) (cleaned up); *see also Texas*, 40 F.4th at 219 (stating relevant status quo is "status quo absent the unlawful agency action" (quoting *Nken*, 556 U.S. at 428, 129 S.Ct. 1749)); *Wages & White Line Invs.*, 16 F.4th at 1144 ("[T]he status quo [is] the state of affairs before the" challenged agency action.). The "status quo" is thus the administration of MPP, the status before the Secretary issued the October 29 Memoranda. "In other words, 'the relief sought here would simply suspend *administrative* alteration of the *status quo.*' " *Wages & White Lion Invs.*, 16 F.4th at 1144 (quoting *Nken*, 556 U.S. at 430 n.1, 129 S.Ct. 1749).

### E. A Stay Is Appropriate

**\*10** "Motions to stay agency action pursuant to [Section 705] are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Affinity Healthcare Servs.*, 720 F. Supp. 2d at 15 n.4; *see also Texas*, 829 F.3d at 435 (applying preliminary injunction factors). These factors require the movant to show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). Plaintiffs satisfy all four factors.

#### 1. Plaintiffs are likely to succeed on the merits.

A court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Although a reviewing "court may not substitute its own policy judgment for that of the agency" and must apply this standard deferentially, the agency action must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, ––– U.S. ––––, 141 S. Ct. 1150, 1158, 209 L.Ed.2d 287 (2021). Agency "action must be upheld, if at all, on the basis articulated by the agency itself," not reasons developed *ex post. State Farm*, 463 U.S. at 50, 103 S.Ct. 2856. Agency "action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment' " must be set aside. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat.*

*Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)).

Judicial review of agency action "is not toothless." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). The agency must examine relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). The agency must also consider reliance interests of those affected by a contemplated decision and consider less-disruptive policies given those interests. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, ––– U.S. ––––, 140 S. Ct. 1891, 1913– 15, 207 L.Ed.2d 353 (2020). In the immigration context, the agency's "approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang v. Holder*, 565 U.S. 42, 55, 132 S.Ct. 476, 181 L.Ed.2d 449 (2011). Merely saying something "was considered is not enough to show reasoned analysis." *Biden*, 10 F.4th at 555.

> a. *Defendants fail to adequately consider how using contiguous-territory return authority would allow them to avoid violations of the INA's detention mandate.*

The October 29 Memoranda rely on incorrect legal conclusions, including that "Section 1225 does not impose a near-universal detention mandate," and that Section 1182(d) (5)(A)'s parole authority permits DHS to parole nearly all aliens subject to Section 1225's mandatory-detention obligation. ECF No. 162 at 49–51. Under 8 U.S.C, § 1225(b) (2)(A), an alien "seeking admission [who] is not clearly and beyond a doubt entitled to be admitted ... shall be detained for a proceeding under section 1229a of this title." *See also Jennings v. Rodriguez*, ––– U.S. ––––, 138 S. Ct. 830, 842, 200 L.Ed.2d 122 (2018) ("Read most naturally, [the statute] mandate[s] detention ...."). This Court has already determined Section 1225's detention requirements are mandatory. *See* ECF No. 94 at 42–44. Likewise, the Fifth Circuit determined Section 1225(b)(2)(A)'s "shall be detained" language is "obviously a mandatory statutory command — not a commitment to agency discretion." *Biden II*, 20 F.4th at 978, 992–96. *Biden III* does not upset this Court and the Fifth Circuit's determinations stating as much.[9]

**\*11** Before terminating MPP, Defendants had to thoroughly consider the effect of the termination on mandatory-detention

duties. *Cf Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (stating "an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates — especially when the change impacts a contemporaneous and closely related rulemaking"); *Off. of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1441–12 (D.C. Cir. 1983) (Finding it "seriously disturbing" and "almost beyond belief" that an agency would take rulemaking action undercutting another "concurrent" rulemaking process). Defendants failed to do so.

Terminating MPP lessened Defendants' ability to detain all arriving aliens, as mandated by Congress. Although DI-IS may exercise its discretion and parole certain aliens on a "case-by-case basis," the exercise of that discretion must "be reasonable and reasonably explained." *Biden III*, 142 S. Ct. at 2548–49 (Kavanaugh, J., concurring); *see also Biden III*, 142 S. Ct. at 2543 ("DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained."). That DHS may, on a "case-by-case basis," parole some aliens rather than detaining them or returning them to Mexico, does not mean the October 29 Memoranda sufficiently explained why those aliens were paroled. 8 U.S.C. § 1182(d)(5)(A).

An assertion that "the Secretary did consider Section 1225(b) (2)(A)" does not adequately address the issue. ECF No. 163 at 37. The Secretary did consider Section 1225(b)(2)(A) — though only to conclude that he did not need to detain all inadmissible aliens as mandated by statute. ECF No. 162 at 49. In full, the Secretary stated:

> Section 1225 does not impose a near-universal detention mandate for all inadmissible applicants for admission either as a general matter or conditionally where noncitizens are not returned to a contiguous territory. Section 1225 'does not mean' that every noncitizen 'must be detained from the moment of apprehension until the completion of removal proceedings.' The INA provides DHS with latitude for processing noncitizens beyond returns or detention. DHS 'may ... in [its] discretion' release a noncitizen placed in Section 1229a proceedings through 'parole,' pursuant to 8 U.S.C. § 1182(d)(5) 'for urgent humanitarian reasons or significant public benefit.' *Id.* (citing *Matter of M-S-*, 27 I & N Dec. 509, 516–17 (A.G. 2019), *and Rodriguez*, 138 S. Ct. at 837). Defendants highlight other portions of the Explanation Memorandum, contending the Secretary determined "reading Section 1225 to impose such a near-universal mandate is inconsistent with the statutory text, the history of immigration detention in

this country, and the agency's consistent and longstanding interpretation of its statutory authorities." ECF No, 163 at 37. But those portions push aside the undisturbed holdings of the Fifth Circuit and this Court, impermissibly replacing caselaw with agency-made "law." *See* ECF No. 162 at 30–33.

The Secretary's consideration does not — in and of itself—mean he *adequately* considered obligations imposed by Section 1225(b)(2)(A). *See Biden III*, 142 S. Ct. at 2543 (requiring a reasonable explanation). Reasonable consideration would address that terminating MPP affects DHS's ability to comply with mandatory-detention requirements. The October 29 Memoranda do not reflect necessary reasonable consideration. Instead, they merely make an assertion contrary to this Court's prior conclusion — a conclusion vindicated by the Fifth Circuit and relied upon by the Supreme Court. *See* ECF No. 94 at 42–44; *Biden III*, 142 S. Ct. at 2541–42; *Biden III*, 142 S. Ct. at 2553–54 (Alito, J., dissenting); *Biden II*, 20 F.4th at 978, 992–96.

**\*12** Defendants appear to base the renewed termination of MPP on arbitrary and capricious grounds by denying that Section 1225 creates a detention mandate, despite this Court's earlier conclusion to the contrary. *See* ECF No. 94 at 42–44. Accordingly, Defendants likely could not — and did not — properly analyze the strength of using MPP to reduce their noncompliance with their detention mandates.

> b. *Defendants fail to adequately examine whether DHS's rescission of MPP causes it to violate the limits on its parole authority.*

In the Explanation Memorandum, the Secretary relies on DHS's "parole" authority under Section 1182(d)(5) of the INA to support his conclusion that "Section 1225 does not impose a near-universal detention mandate for all inadmissible applicants for admission." ECF No. 162 at 49. The INA grants DHS the express authority to "parole" applicants for admission "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A); *see also Biden III*, 142 S. Ct. at 2543 (noting "the INA expressly authorizes DHS to process applicants for admission under a third option: parole") (citing 8 U.S.C. § 1182(d)(5)(A)).

DHS's parole authority "is not unbounded." *Biden III*, 142 S. Ct. at 2543. "DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.' " *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)). "And under the APA,

DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Id.* The October 29 Memoranda fail to consider how terminating MPP — combined with Defendants' inability to detain all arriving aliens — leads to increased violations of limits on their parole authority as they release aliens into the United States. *Cf. Portland Cement Ass'n*, 665 F.3d at 187; *Office of Comm'n of United Church of Christ*, 707 F.2d at 1441–42.

"Throughout the mid-twentieth century, the executive branch on multiple occasions purported to use the parole power to bring in large groups of immigrants," so, "[i]n response, Congress twice amended 8 U.S.C. § 1182(d)(5) to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool." *Biden II*, 20 F.4th at 947 (internal marks omitted); *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011). Limiting the scope of Section 1182(d)(5) did not completely remove Defendants' discretion to parole aliens. But parole cannot be granted on a categorical basis by a broad, programmatic decision. *See, e.g., Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *FBI v. Abramson*, 456 U.S. 615, 631, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982). Section 1182(d)(5) explicitly limits DHS's parole authority to "case-by-case" consideration: "The power *must* be exercised on a case-by-case basis." *Biden II*, 20 F.4th at 947 (emphasis added).

The Court previously found MPP's termination forced Defendants "to release and parole aliens into the United States because [Defendants] simply do not have the resources to detain aliens as mandated by statute." ECF No. 94 at 17. And Defendants continue to do so. *See* ECF No. 143-1 at 4–5 (noting Defendants released 11,424 applicants for admission and released 72,611 applicants for admission, "whether paroled or otherwise," in June 2022). The October 29 Memoranda attempt to justify Defendants' actions by stating "the [parole] statute does not set any limit on the number of individuals DHS can decide to release on parole." ECF No. 162 at 49. That may be true. But "the number of aliens paroled each month ... gives rise to a strong inference that the Government is not really making these [parole] decisions on a case-by-case basis." *Biden III*, 142 S. Ct. at 2554 (Alito, J., dissenting); *see also Biden II*, 20 F.4th at 997 (stating "the Government's proposal to parole every alien it cannot detain is the opposite of the 'case-by-case basis' determinations required by law"). The October 29 Memoranda also attempt to justify Defendants' actions by relying on past DHS practice, claiming DHS has "long

interpreted" its parole authority to enable it to simply parole aliens when it lacks sufficient detention capacity.[10] ECF No. 162 at 50. Yet practice "does not, by itself, create power." *Medellin v. Texas*, 552 U.S. 491, 532, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981)); *see also Judulang*, 565 U.S. at 61, 132 S.Ct. 476 ("Arbitrary agency action becomes no less so by simple dint of repetition," and "longstanding capriciousness receives no special exemption from the APA.").

**\*13** Section 1182(d)(5)(A)'s text and historical context contradict any claim to such power. Section 1182(d)(5)(A)'s text is clear: "Deciding to parole aliens *en masse* is the opposite of case-by-case decisionmaking." *Biden II*, 20 F.4th at 942; *see also Biden III*, 142 S. Ct. at 2554 (Alito, J., dissenting) ("[T]he number of aliens paroled each month under that provision — more than 27,000 in April of [2022] — gives rise to a strong inference that the Government is not really making these decisions on a case-by-case basis."). Applying *Chevron* deference does not change Section 1182(d)(5)(A)'s requirements. *See generally Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Defendants "must operate within the bounds of reasonable interpretation," even when applying *Chevron. Michigan v. EPA*, 576 U.S. 743, 751, 135 S.Ct. 2699, 192 L.Ed.2d 674 (2015).

While an agency generally "has the authority to rely on rulemaking" to resolve "certain issues of general applicability," Congress can withhold that authority. *Lopez v. Davis*, 531 U.S. 230, 243-44, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001) (quoting *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 612, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991)). Congress did so when it passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") to cabin the executive branch's parole authority, believing the executive used that authority to evade congressionally mandated detention. *Cruz-Miguel*, 650 F.3d at 199 & n.15; *see also Biden II*, 20 F.4th at 947 (After "the executive branch on multiple occasions purported to use the parole power to bring in large groups of immigrants, ... Congress twice amended 8 U.S.C. § 1182(d)(5) to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool." (internal marks omitted)). "By enacting [IIRIRA], Congress 'specifically narrowed the executive's discretion to grant' parole due to 'concern that parole ... was being used by the executive to circumvent congressionally established

immigration policy.' " ECF No. 94 at 43 n.11 (quoting *Cruz-Miguel*, 650 F.3d at 199 & n.15).

Likewise, Section 1182(d)(5)(A)'s historical context confirms DHS cannot exercise its parole authority to parole categories of aliens, rather than individuals. Before IIRIRA, federal immigration authorities enjoyed a parole power "under such conditions as [the Attorney General] may prescribe for emergent reasons or for reasons deemed strictly in the public interest." Pub. L. No. 414 ch. 477, Title II, ch. 2, § 212, 66 Stat. 182. This parole authority was "close to plenary." *Amanullah v. Nelson*, 811 F.2d 1, 6 (1st Cir. 1987). But again, Congress curtailed the parole authority by amending Section 1182(d)(5)(A), thereby expressly limiting the parole authority to require case-by-case determinations.

As for Section 1226(a), that provision does not apply to individuals eligible for MPP. Section 1226(a) governs the arrest, detention, and release of aliens who are already "present in the country." *Rodriguez*, 138 S. Ct. at 837. By contrast, Section 1225 applies to aliens arriving to the United States. Because neither side disputes only aliens apprehended at the border are eligible for MPP, Defendants cannot use Section 1226(a) to parole MPP-eligible aliens in lieu of detention or contiguous return. ECF No. 149 at 23; ECF No. 162 at 49.

Considering the above, the Court finds the October 29 Memoranda likely fail to adequately consider the relevant costs and benefits of MPP. Therefore, the Court finds the October 29 Memoranda are likely arbitrary and capricious in this fashion.

### c. *Defendants fail to adequately account for severed key benefits of MPP.*

**\*14** The October 29 Memoranda fail to consider MPP's deterrent effect on illegal border crossings and the reduction of unmeritorious asylum claims. For example, the October 29 Memoranda extensively discuss conditions migrants face while they remain in Mexico. ECF No. 162 at 34–10. Yet the Memoranda do not mention the hardships aliens face when making the dangerous journey to the southern border in the first instance,[11] despite acknowledging MPP "likely ... contributed to a decrease in migration flows." *Id.* at 45. The October 29 Memoranda further fail to analyze how MPP deterred migrants with unmeritorious asylum claims from traveling to the southern border, just as the June 1 Memoranda failed to do. *Id.* at 40–43; *see also* ECF No. 94 at 36 (stating

June 1 Memoranda failed to "address the problems created by false claims of asylum or how MPP addressed those problems").

Defendants abandoned statistic-based decisionmaking for intuitional decisionmaking. *See, e.g.*, ECF No. 162 at 45 ("In making his determination decision, the Secretary has *presumed* — as is *likely* — that MPP contributed to a decrease in migrant flows." (emphasis added)). When MPP was first announced, DHS "observed that 'approximately 9 out of 10 asylum claims from Northern Triangle countries are ultimately found non-meritorious by federal immigration judges.' " *Id.* at 42–13. But when terminating MPP, the October 29 Memoranda acknowledge Defendants "do[ ] not have a record of the methodology used to generate this '9 out of 10' statistic." *Id.* at 43. Defendants implemented a policy change because, in their view, MPP led to too few asylum grants. *Id.* To support their conclusion, Defendants cite lower rates for granting asylum claims for those enrolled in MPP. *Id.* But Defendants fail to articulate why higher rates outside MPP are more accurate determinations than the lower rates for aliens enrolled in the program. Instead, Defendants conclude "[t]hese discrepancies strongly suggest that at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims." *Id.*

The October 29 Memoranda do not appear to demonstrate "a rational connection between the facts found and the choice made" to terminate MPP. *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (internal marks omitted). Absent some qualification, presumptions and speculations do little — if anything — to justify agency action. The Court finds "[s]uch intuitional ... decisionmaking, completely opaque to judicial review," links "fall[s] somewhere on the distant side of arbitrary." *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 855 (D.C. Cir. 1987) (quoting *Cent. Fla. Enters., Inc. v. FCC*, 598 F.2d 37, 50 (D.C. Cir. 1978)). Decisionmaking based on "policy preferences" cannot replace required reasoned decisionmaking. *See Dep't of Commerce v. New York*, ––– U.S. ––––, 139 S. Ct. 2551, 2574–75, 204 L.Ed.2d 978 (2019).

Defendants also fail to consider MPP's impact on human trafficking. *Cf.* ECF 94 at 20. They instead focus on other crimes, including narcotics smuggling. ECF No. 162 at 47–18. Although the data Defendants cite for these crimes suggests a decline, several problems with the data exist. First, Defendants note "[t]hese declines have been driven

by a substantial decrease in marijuana smuggling," as "hard narcotics ... are historically smuggled through ports of entry and thus have very little connection to MPP's implementation." *Id.* at 47. Second, although Defendants state "[s]cizurcs of narcotics [are not] necessarily indicative of [human] trafficking activity," they use this data to conclude there is no evidence of MPP's effect on human trafficking. *Id.*

**\*15** By using irrelevant data, Defendants again fail to articulate "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856; *see also Biden II*, 20 F.4th at 992 ("We do not fault DHS for failing to provide a study. We fault DHS for cherry-picking a *single* statistic from the administrative record and relying on it in an entirely nonsensical fashion."). The use of admittedly irrelevant data strongly evidences a lack of rational decisionmaking, as agencies "must examine the *relevant* data" — not just *any* data. *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (emphasis added).

d. *Defendants fail to adequately justify factual determinations regarding* in absentia *removal orders.*

The October 29 Memoranda provide no rational explanation why the increased rates of *in absentia* removals for aliens enrolled in MPP are not an indicator of MPP working. *See* ECF No. 162 at 22–23 (noting 32 percent of aliens enrolled in MPP were subject to *in absentia* orders of removal at some point during removal proceedings, whereas the rate was only 13 percent for aliens not processed through MPP during the same time period), 43 (stating MPP was "deterring non-meritorious claims"). The Court previously noted that "[a] higher rate of *in absentia* removal is consistent with DHS's [previous] findings that MPP reduced the 'perverse incentives' to pursue meritless asylum applications." ECF No. 94 at 40–41; *see also* ECF No. 162 at 41 ("The fact that *in absentia* removal order rates (and *in absentia* removal order rates plus termination rates) were respectively higher for MPP cases than for comparable non-MPP cases might not, by itself, indicate a problem with MPP."); *cf.* ECF No. 162 at 43 n.89 (noting "implicit" in claim that MPP deterred aliens from asserting asylum claims, "many of which may be meritless" is that "some such claims do have merit" (emphasis removed)).

In the administrative record, DHS only addresses that fact by asserting MPP "deterred too many meritorious asylum claims at the expense of deterring non-meritorious claims." ECF No. 162 at 43. And Defendants simply reiterate this claim in briefing. *See id.* The Court is unaware of any attempt

by a federal actor to quantify, estimate, or show how many deterred meritorious asylum claims there are. DHS was under no obligation "to conduct or commission [its] own empirical or statistical studies" as a general matter. *Prometheus Radio Project*, 141 S. Ct. at 1160. But the failure to do so does not permit one to compare anecdotes that MPP deterred meritorious claims with hard numbers regarding the rate of *in absentia* orders, especially where the anecdotes and hard numbers are not clearly comparable. The anecdotes (while showing that some aliens abandoned or lost their claims due to conditions in Mexico) do not establish that those claims were meritorious.[12] Likewise, the raw rate of *in absentia* orders contain a mixture of meritorious and non-meritorious claims. So, one cannot conclude that the rate of deterrence of meritorious claims is high relative to non-meritorious claims based on the raw rate of *in absentia* orders.

**\*16**  Accordingly, the Secretary fails to link the high *in absentia* removal rate for aliens enrolled in MPP with his claim that MPP deterred too many meritorious asylum claims compared to nonmeritorious claims. So again, the failure to appreciate the relevant costs and benefits of MPP indicates Defendants failed to make a reasoned determination by considering all relevant factors.

e. *Defendants fail to adequately consider costs to States and their reliance interests.*

The October 29 Memoranda devote little consideration of the costs to States and their reliance interests. *See* ECF No. 162 at 46–48. Defendants noted aliens "received COVID-19 tests before crossing the border and entering the United States," the Secretary "worked with nongovernmental organizations and local officials in border communities to connect migrants with short-term supports," and the Secretary has taken actions to combat "criminal activity." *Id.* at 46–47. Notably missing — however — are considerations of the greater short-term and long-term impacts on the States and any level of detail regarding the softening of those impacts. *See id.* at 46–48.

The Explanation Memorandum acknowledges "the termination of MPP could lead to an increased number of noncitizens without proper documentation in [Texas and Missouri], which might cause the States to incur additional costs related to the costs of driver's licenses, public education, state-funded healthcare, and law enforcement and correctional costs." *Id.* at 46; *see also* ECF No. 94 at 17-21 (discussing harms to Plaintiffs caused by termination of MPP). Yet the Secretary concludes "[f]ederal immigration

policy virtually always affects the number of people living within the States." ECF No. 162 at 48. To Defendants, these are "marginal costs" that are "outweighed by the other considerations and policy concerns." *Id.* Defendants did not attempt to quantify these burdens to perform a cost-benefit analysis — despite possessing data readily available to do so. *See* ECF No. 94 at 17–21.

This case resembles *Texas v. United States*, where the Fifth Circuit determined the defendants overlooked both States' costs and their reliance interests in federal immigration policies. *See generally* 40 F.4th 205 (5th Cir. 2022) (per curiam). Although the DHS memorandum at issue contained "a multi-page section ... analyzing the 'Impact on States,' " the Fifth Circuit found the analysis "dismissive," as it merely "dots 'i's' and crosses 't's' without actually saying anything," *Id.* at 228. By failing to "quantify or at least reasonably describe the cost of th[e] policy to the States" and making the "audacious[ ] conclu[sion] that 'any effects from implementation of priorities guidance are unlikely to be significant,' " the defendants did not satisfy the requirement that agencies consider the costs to the States. *Id.* (internal marks omitted).

Defendants also gloss over the States' reliance interests. The October 29 Memoranda assert "the Secretary is unaware of any State that has materially taken any action in reliance on the continued implementation ... of MPP" and state "any claimed reliance interest is undermined by the fact that [MPP] is itself discretionary." ECF No. 162 at 48. In *Department of Homeland Security v. Regents of the University of California*, "the Supreme Court acknowledged that DACA was a discretionary program .... [but still] faulted DHS for not considering reliance interests ... [t]hat included the States' reliance interests." *Biden II*, 20 F.4th at 990 (citing 140 S. Ct. at 1910, 1913–14). Just as DHS was required to consider States' reliance interests before terminating DACA, Defendants must consider States' reliance interests before terminating MPP. *Id.* at 990. The October 29 Memoranda also discount Plaintiffs' reliance interests, stating: "The short time in which MPP was in place, as well as the small percentage of noncitizens encountered along the [southwest border] who were enrolled in MPP while it was in operation, undercut any claimed reliance interest, as well as any claim regarding significant burdens to the States." ECF No. 162 at 48. Like MPP, DACA had only existed for a short time. *See Regents*, 140 S. Ct. at 1901. This statement is further contradicted by the Secretary's statements that the benefits of MPP include *deterring* aliens from arriving. So, the Court

must look beyond *enrollment* numbers when considering Plaintiffs' reliance interests.

**\*17** Plaintiffs, particularly the State of Texas, shoulder much of the burden of unlawful immigration, which "must not be underestimated." *Arizona v. United States*, 567 U.S. 387, 397–98, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). Texas is "a 900-mile border state." *Texas*, 40 F.4th at 228. It cannot be that Texas "has *no reliance interests* in the enforcement of federal criminal immigration law." *Id.* Giving short shrift to a relevant consideration "is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). In fact, the Fifth Circuit has recognized Plaintiffs' reliance interests in MPP's continuation: "The Supreme Court has recognized that border states 'bear[ ] many of the consequences of unlawful immigration.' It therefore follows that a 'potential reliance interest' that DHS must consider includes Texas." *Biden*, 10 F.4th at 553 (quoting *Arizona*, 567 U.S. at 397, 132 S.Ct. 2492) (alteration in original).

By terminating MPP without adequately considering the reliance interests of States in control of the flow of aliens (as assisted by MPP), Defendants do not appear to have tied their approach, "even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang*, 565 U.S. at 55, 132 S.Ct. 476; *see also Texas*, 40 F.4th at 228 ("At this point, DHS has not shown a likelihood that it adequately considered the relevant costs to the States or their reliance interests in the pre-existing enforcement policy."). Failure to adequately consider the costs imposed on States and their reliance interests likely constitutes arbitrary and capricious decisionmaking.

2. Plaintiffs will likely suffer irreparable harm without preliminary relief.

"To show irreparable injury" in lieu of a stay, "it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). "The plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.* As the Court previously determined, "Plaintiffs have shown that they are suffering ongoing and future injuries as a result of the termination of MPP." ECF No. 94 at 49. The same injuries giving rise to standing are relevant to the irreparable injury analysis. *See Biden II*, 20 F.4th at 1002 (factual findings regarding injury made in standing context show increased costs to States from termination of MPP, and inability to recover from

federal government supports determination that States have suffered an irreparable injury for which remedies available at law are precluded due to sovereign immunity). Accordingly, Plaintiffs satisfy this factor.

3. The balance of equities tips in Plaintiffs' favor and relief under Section 705 is in the public interest.

When considering the propriety of a Section 705 stay, the two final prongs "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435, 129 S.Ct. 1749. The analysis of the public interest and the balance of the equities is the same regarding the new attempt to terminate MPP as it was when the Court last addressed these factors. *See* ECF No. 94 at 50. Defendants lack a legitimate interest in implementing an unlawful agency action. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Rather, there is a "public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994). This remains true "even in pursuit of desirable ends." *Wages & White Lion Invs.*, 16 F.4th at 1143 (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, ─── U.S. ───, 141 S. Ct. 2485, 2490, 210 L.Ed.2d 856 (2021)). And the public interest favors Plaintiffs because the public has an "interest in stemming the flow of illegal immigration" through the enforcement of immigration laws, including Section 1225. *United States v. Escobar*, No. 2:17-CR-529, 2017 WL 5749620, at \*2 (S.D. Tex. Nov. 28, 2017); *see also* ECF No. 94 at 50.

**F. A Section 705 Remedy Need Not Be Geographically Limited**

**\*18** "In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas*, 40 F.4th at 229 n.18. Here, "[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective," as aliens would simply enter the United States through a non-party State. *Id.*

In any event, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated — not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). The text of Section 705 confirms this interpretation when applied to a stay. By "postpon[ing] the effective date of an agency action," the Court would stop the agency action in total. 5 U.S.C. § 705. The postponement clause does not merely speak to

2022 WL 17718634

*part* of an agency action or indicate courts should take a piecemeal approach. And under the postponement clause's sister provision — allowing the Court "to preserve status or rights" — the relevant status quo was that MPP was administered along the southern border as a whole. *Id.*

## Conclusion

Based on the above, the Court **GRANTS** the Motion. The Court **STAYS** the October 29 Memoranda and corresponding decision to terminate MPP pending final resolution of the merits of this action. The Court **DENIES** all relief not expressly granted herein.

**SO ORDERED.**

## All Citations

--- F.Supp.3d ----, 2022 WL 17718634

## Footnotes

1   Although this provision refers to the Attorney General, the authority it confers has been transferred to the Secretary of Homeland Security. *See* 6 U.S.C. § 251(2) (transferring authority over "[t]he detention and removal program" to DHS); *Dep't of Homeland Sec. v. Thuraissigiam*, ––– U.S. ––––, 140 S. Ct. 1959, 1965 n.3, 207 L.Ed.2d 427 (2020).

2   In fact, the title of Section 1252(f) is "Limit on injunctive relief." *See INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991); Scalia & Garner, Reading Law 221 ("Title-and-Headings Canon"). "By its plain terms, and even by its title, that provision is nothing more or less than a limit on injunctive relief." *Reno v. Am- Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).

3   To be sure, stays and injunctions share similarities. *See Nken*, 556 U.S. at 428–29, 129 S.Ct. 1749 ("A stay [of an agency action] pending appeal certainly has some functional overlap with an injunction, particularly a preliminary one.... [due to both having] the practical effect of preventing some action before the legality of that action has been conclusively determined. But a stay achieves this result by temporarily suspending the source of authority to act — the order or judgment in question — not by directing an actor's conduct."). Indeed, "[i]n a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating *in personam.*" *Id.* at 428, 129 S.Ct. 1749.

4   These cases include: *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1997 WL 159424, 1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996); *Ctr. for Biological Diversity v. Regan*, No. CV-21-119 (RDM), –––– F.Supp.3d ––––, ––––, 2022 WL 971067, at *21 (D.D.C. Mar. 30, 2022); *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 151 (S.D.N.Y. 2019); and *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1118 (N.D. Cal. 2017).

5   It is of no issue to Defendants that Section 705 also allows a court to "issue all necessary and appropriate process ... to preserve status or rights pending conclusion of the review proceedings." Defendants argue this "clause is subject to the same temporal limitation as the first clause for the simple reason that the status quo, once a rule goes into effect, is that the rule is in effect." ECF No. 163 at 27.

6   Although Supreme Court has held the October 29 Memoranda constitute "final" and "operative agency action[ ]," thereby qualifying the Memoranda as a rule, it did not detail the effective date of the action. *Biden III*, 142 S. Ct. at 2545; *see also* 5 U.S.C. § 551(4). The APA does not define "effective date" as used in Section 705. "In general, an effective date is part of an agency statement of general or particular applicability and of future effect." *Nat. Res. Def. Council, Inc. v. EPA*, 683 F.2d 752, 761–62 (3d Cir. 1982) (internal marks omitted); *see also Effective Date*, Black's Law Dictionary ("The date on which a statute, contract, or insurance policy, or other such instrument becomes enforceable or otherwise takes effect. This date sometimes differs from the date on which the instrument was enacted or signed."). Because this case does not turn on the effective date of the October 29 Memoranda, the Court need not divine that date.

7   The APA allows for judicial review in a court "of competent jurisdiction" absent a "special statutory review proceeding." 5 U.S.C. § 703. Without a special statutory provision, courts of appeals may not directly review agency actions. *In re Sch. Bd. of Broward Cnty.*, 475 F.2d 1117, 1119 (5th Cir. 1973); *see also Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1481 (D.C. Cir. 1994) ("Unless a statute provides otherwise, persons seeking review of agency action go first to district court rather than to a court of appeals."). The APA's stay provision is not limited to exclusive application by appellate

courts. Instead, the "reviewing court[ ] may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Here, this Court is the relevant reviewing court.

8    The memoranda implementing MPP were published in the Federal Register. *See* Notice of Availability for Policy Guidance Related to Implementation of the Migrant Protection Protocols, 84 Fed. Reg. 6811 (issued January 25, 2019, with publication date of February 25, 2019). By contrast, the October 29 Memoranda were not published in the Federal Register.

9    In *Biden III*, the Supreme Court rejected the insinuation that its "opinion authorizes the Government to release aliens subject to detention under section 1225(b)(2)(A)," and clarified that it "need not and d[id] not decide whether the detention requirement in section 1225(b)(2)(A) is subject to principles of law enforcement discretion ... or whether the Government's current practices simply violate that provision." *Biden III*, 142 S. Ct. at 2542 n.4. Instead, the Court only "assum[d] *arguendo* for purposes of [its] opinion that the dissent's interpretation of section 1225(b)(2)(A) [as mandating detention] is correct, and that the Government is currently violating its obligations under that provision." *Id.* at 2542. Justice Alito's dissent interpreted Section 1225(b)(2)(A) in harmony with this Court's interpretation. Justice Alito's dissent pointed to the conclusion in *Jennings v. Rodriguez* that "[r]ead most naturally, §§ 1225(b)(1) and (b)(2) ... mandate detention of applicants for admission until certain proceedings have concluded." *Biden III*, 142 S. Ct. at 2554 (Alito, J., dissenting) (quoting 138 S. Ct. at 842). That Section 1225(b)(2)(C) confers discretionary authority does not nullify Section 1225(b)(2)(A)'s mandatory-detention requirement. The Secretary can violate his mandatory-detention duty under Section 1225(b)(2)(A) while exercising discretion not to return certain aliens under Section 1225(b)(2)(C).

10   The Court notes, however, the October 29 Memoranda fail to address Defendants' prior determinations that lack of detention space is not an appropriate reason to parole an alien. *See* ECF No. 162 at 177, 179, 181. "An agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decisionmaking." *Ramaprakash v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003) (internal marks omitted).

11   Plaintiffs do not press claims on behalf of third parties. Instead, Plaintiffs highlight the reduction in journeys to the southern border "as a benefit the Secretary failed to consider, and [Plaintiffs] have standing to raise that procedural injury since it affects the States' concrete interests." ECF No. 168 at 7-8 n.1; *cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009).

12   The Explanation Memorandum notes "only 732 individuals enrolled in MPP out of 67,694 cases were granted relief or protection front removal — a grant rate of just 1.1 [percent]." ECF No. 162 at 42. But the grant rate of a "comparable set of non-MPP cases from the same time period" was "2.7 percent." *Id.* According to Defendants, this discrepancy suggests "at least some MPP enrollees with meritorious claims either abandoned or were unable to adequately present their claims given the conditions faced by migrants in Mexico and barriers to legal access." *Id.* at 43. It is doubtful a difference of 1.6 percent in meritorious claims from the comparable datasets is largely attributable to conditions in Mexico but not MPP's effectiveness. In any event, such a conclusion fails to account for the possibility that aliens enrolled in MPP differ from those not enrolled in the program.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 2

Nos. 22-506 & 22-535

# In the
# Supreme Court of the United States

JOSEPH R. BIDEN, PRESIDENT OF THE UNITED STATES,
ET AL.,

*Petitioners*,

v.

STATE OF NEBRASKA, ET AL.,

*Respondents.*

DEPARTMENT OF EDUCATION, ET AL.,

*Petitioners*,

v.

MYRA BROWN, ET AL.,

*Respondents.*

ON WRITS OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURTS OF APPEALS
FOR THE EIGHTH AND FIFTH CIRCUITS

## BRIEF FOR SAMUEL L. BRAY AND
## WILLIAM BAUDE AS AMICI CURIAE IN
## SUPPORT OF PETITIONERS

SAMUEL L. BRAY
NOTRE DAME LAW SCHOOL
1100 Eck Hall of Law
Notre Dame, IN 46556

WILLIAM BAUDE
UNIVERSITY OF CHICAGO
LAW SCHOOL
1111 East 60th Street
Chicago, IL 60637

MELISSA ARBUS SHERRY
  *Counsel of Record*
URIEL HINBERG*
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
melissa.sherry@lw.com

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................... iii

INTEREST OF AMICI CURIAE ................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT .................................................. 1

ARGUMENT ............................................................. 3

I. THE CONSTITUTION REQUIRES THE PROPER PARTY TO BRING SUIT .................... 4

   A. Article III Standing Requires The Proper Party To Bring Suit ........................................ 4

   B. Missouri Is Not The Proper Party To Bring This Suit ................................................ 6

II. THIS COURT SHOULD REJECT EXTRAVAGANT THEORIES OF STATE STANDING .......................................................... 9

   A. *Massachusetts v. EPA*'s Reference to "Special Solicitude" Has Emboldened States ................................................................ 9

   B. Some Of The States' Theories Of Standing Are Emblematic Of Unchecked "Special Solicitude" ..................................................... 12

III. THE REMEDY IN THIS CASE REINFORCES THE STATES' LACK OF STANDING ........................................................ 17

   A. Under Both Article III Standing Doctrine And Equitable Principles, A More Intense Remedy Demands A Stronger Demonstration Of Standing ......................... 18

ii

## TABLE OF CONTENTS—Continued

**Page**

B.  The States' Tenuous Basis For Standing Cannot Support The Extraordinarily Broad Equitable Remedy In This Case .......22

CONCLUSION.........................................................25

iii

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alemite Manufacturing Corp. v. Staff,*
    42 F.2d 832 (2d Cir. 1930) ................................ 21

*Alfred L. Snapp & Son, Inc. v. Puerto Rico
    ex rel. Barez,*
    458 U.S. 592 (1982).......................................... 16

*Allen v. Wright,*
    468 U.S. 737 (1984)........................................ 1, 3

*Allen Engineering Co. v. Kays,*
    152 S.W. 992 (Ark. 1913).................................... 9

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) ...................... 15, 23

*Arkansas v. Texas,*
    346 U.S. 368 (1953)........................................ 6, 9

*Atlas Life Insurance Co. v. W.I. Southern,
    Inc.,*
    306 U.S. 563 (1939)........................................... 19

*Califano v. Yamasaki,*
    442 U.S. 682 (1979)........................................... 21

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018)............................ 23

*CASA de Maryland, Inc. v. Trump,*
    971 F.3d 220 (4th Cir.), *reh'g en banc
    granted and vacated*, 981 F.3d 311 (4th
    Cir. 2020)........................................................ 23

iv

## TABLE OF AUTHORITIES—Continued

Page(s)

*City of Chicago v. Sessions,*
888 F.3d 272 (7th Cir.), *reh'g en banc
granted in part and vacated in part*, No.
17-2991, 2018 WL 4268817 (7th Cir.
June 4, 2018), *vacated*, Nos. 17-2991, 18-
2649, 2018 WL 4268814 (7th Cir. Aug.
10, 2018) .......................................................... 23

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983)................................. 18, 19, 21

*Clapper v. Amnesty International USA,*
568 U.S. 398 (2013)................................... 3, 5, 12

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006)............................................. 3

*Davis v. FEC,*
554 U.S. 724 (2008)..................................... 17, 18

*Department of Homeland Security v. New
York,*
140 S. Ct. 599 (2020)........................................ 22

*Doe #1 v. Trump,*
957 F.3d 1050 (9th Cir. 2020)........................... 23

*Doster v. Kendall,*
54 F.4th 398 (6th Cir. 2022) ............................ 23

*Dykes v. MOHELA,*
No. 4:21-CV-00083, 2021 WL 3206691
(E.D. Mo. July 29, 2021) ................................. 7, 8

v

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ............................................. 1

*Feds for Medical Freedom v. Biden*,
   25 F.4th 354 (5th Cir. 2022) ............................. 23

*Florida v. Mellon*,
   273 U.S. 12 (1927) ............................................. 16

*Georgia v. President of the United States*,
   46 F.4th 1283 (11th Cir. 2022) ......................... 23

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ................................. 18, 21

*Good v. United States Department of
   Education*,
   No. 21-CV-2539, 2022 WL 2191758 (D.
   Kan. June 16, 2022) ........................................... 8

*Gordon v. Washington*,
   295 U.S. 30 (1935) ............................................. 20

*Gowens v. Capella University, Inc.*,
   No. 4:19-CV-362, 2020 WL 10180669
   (N.D. Ala. June 1, 2020) .................................... 8

*Grupo Mexicano de Desarrollo, S.A. v.
   Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999) ........................................... 19

*Kansas v. Colorado*,
   533 U.S. 1 (2001) ............................................... 6

vi

## TABLE OF AUTHORITIES—Continued

Page(s)

*Lewis v. Casey,*
    518 U.S. 343 (1996)........................................... 18

*Markham v. Allen,*
    326 U.S. 490 (1946)........................................... 19

*Marshall v. Marshall,*
    547 U.S. 293 (2006)........................................... 19

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)............................ 2, 9, 10, 16

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923)........................................... 16

*Missouri v. Jenkins,*
    515 U.S. 70 (1995)............................................. 18

*New Hampshire v. Louisiana,*
    108 U.S. 76 (1883)............................................... 6

*NLRB v. P\*I\*E\* Nationwide, Inc.,*
    894 F.2d 887 (7th Cir. 1990)........................... 24

*Oklahoma ex rel. Johnson v. Cook,*
    304 U.S. 387 (1938)............................................. 6

*Pennsylvania v. New Jersey,*
    426 U.S. 660 (1976)...................................... 6, 14

*Perkins v. Equifax Information Services, LLC,*
    No. SA-19-1281-FB, 2020 WL 13120600
    (W.D. Tex. May 1, 2020) ..................................... 8

vii

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Puerto Rico Ports Authority v. Federal*
  *Maritime Commission,*
  531 F.3d 868 (D.C. Cir. 2008)............................ 8

*Ramos v. Wolf,*
  975 F.3d 872 (9th Cir. 2020)............................ 23

*Rodgers v. Bryant,*
  942 F.3d 451 (8th Cir. 2019)................ 21, 22, 23

*South Carolina v. North Carolina,*
  558 U.S. 256 (2010)............................................ 6

*TransUnion LLC v. Ramirez,*
  141 S. Ct. 2190 (2021).................................... 3, 4

*Trump v. Hawaii,*
  138 S. Ct. 2392 (2018)...................................... 23

*United States v. Richardson,*
  418 U.S. 166 (1974)............................................ 3

*Valley Forge Christian College v. Americans*
  *United for Separation of Church &*
  *State, Inc.,*
  454 U.S. 464 (1982)........................................ 4, 5

*Whole Woman's Health v. Jackson,*
  142 S. Ct. 522 (2021)........................................ 20

*Younger v. Harris,*
  401 U.S. 37 (1971)............................................ 21

viii

## TABLE OF AUTHORITIES—Continued

**Page(s)**

### FEDERAL STATUTES

26 U.S.C. § 61(a)(11) ............................................... 13

26 U.S.C. § 108(f)(5) ............................................... 14

### STATE STATUTES

Mo. Rev. Stat. § 173.385 ........................................ 12

Mo. Rev. Stat. § 173.385.1(3) .................................. 7

Mo. Rev. Stat. § 173.385.1(6) .................................. 7

Mo. Rev. Stat. § 173.385.1(14) ................................ 7

Mo. Rev. Stat. § 173.385.1(15) ................................ 7

Mo. Rev. Stat. § 173.392 ........................................ 12

Mo. Rev. Stat. § 173.425 ........................................ 7

### OTHER AUTHORITIES

William Baude, *Standing in the Shadow of Congress*, 2016 Sup. Ct. Rev. 197 (2017) ........... 4

Alexander M. Bickel, *The Voting Rights Cases*, 1966 Sup. Ct. Rev. 79 (1966)................. 15

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417 (2017)................................... 23

ix

## TABLE OF AUTHORITIES—Continued

**Page(s)**

Samuel L. Bray & Paul B. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763 (2022).................................................................. 20

Fed. R. Civ. P. 65(c)................................................. 22

Bradford Mank & Michael E. Solimine, *State Standing and National Injunctions*, 94 Notre Dame L. Rev. 1955 (2019).................................................................. 11

MOHELA Financial Statements, FY 2022 (2022), https://www.mohela.com/DL/common/ publicInfo/financialStatements.aspx ......... 12, 13

Paul Nolette & Colin Provost, *Change and Continuity in the Role of State Attorneys General in the Obama and Trump Administrations*, 48 Publius 469 (2018), https://doi.org/10.1093/publius/pjy012 ............. 10

Richard M. Re, *Relative Standing*, 102 Geo. L.J. 1191 (2014) ................................................. 5

State Litigation and AG Activity Database, *Multistate Litigation Database*, https://attorneysgeneral.org/list-of-lawsuits-1980-present/ (last visited Jan. 9, 2023)............................................................. 11

Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine*, 102 Mich. L. Rev. 689 (2004)........................ 4, 5, 6, 9

x

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

D.E.C. Yale, *Introduction*, to *Lord Nottingham's "Manual of Chancery Practice" and "Prolegomena of Chancery and Equity"* (D.E.C. Yale ed., 1965) ................ 17

Ernest A. Young, *Standing, Equity, and Injury in Fact*, 97 Notre Dame L. Rev. 1885 (2022) ...................................................... 21

## INTEREST OF AMICI CURIAE

Samuel L. Bray and William Baude are professors at the Notre Dame Law School and the University of Chicago Law School, respectively. They teach and write about constitutional law, federal courts, and remedies, and have an interest in the sound development of these fields.[1]

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

Amici believe that the administration's student loan forgiveness program is unlawful. But even if the executive branch has exceeded its authority under Article II, that does not permit the judicial branch to exceed *its* authority under Article III. "The case-or-controversy doctrines state fundamental limits on federal judicial power in our system of government." *Allen v. Wright*, 468 U.S. 737, 750 (1984). Any executive overreach is troubling. But "[t]here is no reason to magnify the separation-of-powers dilemma . . . by letting Article III judges—like jackals stealing the lion's kill—expropriate some of the power that [the Executive] has wrested from [Congress]." *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 525-26 (2009) (plurality opinion).

The standing theories that have been thrown at the wall in these cases are wrong, and many of them would have dangerous implications. Each theory

---

[1]   No counsel for a party authored this brief in whole or in part; and no such counsel, any party, or any other person or entity—other than amici curiae and their counsel—made a monetary contribution intended to fund the preparation or submission of this brief.

2

falters on several grounds, but amici focus this brief on three points.

*First*, when it comes to standing, the critical question is who is the "proper party" to sue. This inquiry has been framed in different ways but the central aim is to ensure that the person most affected by the challenged action is before the court. Applying that principle here, Missouri has no standing to complain about the loan servicing fees that the Missouri Higher Education Loan Authority (MOHELA) might lose. Missouri set up MOHELA as a separate legal and financial entity, with the power to sue and be sued. MOHELA is far and away the most interested plaintiff, with Missouri's claims being merely derivative of MOHELA's. MOHELA has chosen not to bring a lawsuit, and as the "proper party" to the suit, its decision ought to carry the day.

*Second*, there is danger in countenancing extravagant theories of state standing that have exploded in the wake of this Court's decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007). In the last decade, state attorneys general have relied on that case's underexplained language about "special solicitude," *see id.* at 520, producing a barrage of suits with tenuous standing theories against administrations of the opposing political party. Overbroad readings of that case should be forcefully rejected by this Court, lest state standing be allowed to transform the role of the federal judiciary.

*Third*, there is a fundamental disconnect between the states' weak claim for standing and the broad remedy they obtained—a national injunction. That disconnect is incompatible with the traditional limits of equitable jurisdiction and with this Court's instruction that standing must be demonstrated for

3

each form of relief. The Court has not granted review specifically on the scope of the injunction, and may not wish to consider all aspects of that question in this case. But the scope of the relief is relevant, whether as part of the standing inquiry or as part of the broader questions of judicial power the Court should consider. Not only did the states seek and obtain a national injunction—a remedy lacking any traditional basis in equity—but they obtained this exceedingly broad remedy with an unusually weak basis for standing. That combination is at odds with basic principles of standing and equity jurisprudence that are applicable in the federal courts.

## ARGUMENT

Article III gives the federal judiciary, including this Court, the "judicial Power" to be exercised only in deciding "Cases" and "Controversies." Those terms, and the justiciability doctrines expounding them, help define "the judiciary's proper role in our system of government." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341-42 (2006) (citation omitted). Standing "is perhaps the most important of these doctrines." *Allen v. Wright*, 468 U.S. 737, 750 (1984). As this Court recently reiterated, "[t]he 'law of Art. III standing is built on a single basic idea—the idea of separation of powers.'" *TransUnion LLC v. Ramirez,* 141 S. Ct. 2190, 2203 (2021) (citation omitted). As such, "[r]elaxation of standing requirements is directly related to the expansion of judicial power." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408-09 (2013) (quoting *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring)). Because "[f]ederal courts do not possess a roving commission to publicly opine on every legal question," nor do they

4

"exercise general legal oversight of the . . . Executive Branch[]," the Court must decline "to publicly opine" on the "legal question" here. *TransUnion*, 141 S. Ct. at 2203.

## I. THE CONSTITUTION REQUIRES THE PROPER PARTY TO BRING SUIT

Article III standing requires the proper party to bring suit. Missouri primarily argues it has standing to challenge the loan forgiveness program because MOHELA stands to lose loan servicing fees if federal student loans are forgiven. Missouri is not the proper party to pursue relief for MOHELA's lost loan servicing fees.

### A. Article III Standing Requires The Proper Party To Bring Suit

Distilled to its core, "[t]he fundamental inquiry that standing derives from is who is a 'proper party' to a given lawsuit." William Baude, *Standing in the Shadow of Congress*, 2016 Sup. Ct. Rev. 197, 228 (2017); *see* Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine*, 102 Mich. L. Rev. 689, 695 (2004) ("The concept of proper parties is central to standing doctrine, and it may also infuse notions of a 'Case.'"). When the proper party is bringing the lawsuit, courts can act judicially, and are not transformed into "publicly funded forums for the ventilation of public grievances or the refinement of judicial understanding." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982).

The "proper party" inquiry is deeply rooted in the courts. "[E]arly American courts did not use the term 'standing' much . . . . But eighteenth- and nineteenth-century courts were well aware of the need for proper

5

parties . . . ." Woolhandler & Nelson, *supra*, at 691. This principle "cut across various causes of action," and was understood both as a general principle of law and equity and as a constitutional principle. *Id.* at 692. So to ask whether the plaintiffs have standing to challenge executive action is to ask whether any of them is the "proper party," in the constitutional sense.

In a similar vein, modern standing doctrine frequently depends on whether the plaintiff is the right one to sue, relatively speaking. The underpinning of many modern standing decisions, argues Professor Richard Re, is the "most interested plaintiff rule." Richard M. Re, *Relative Standing*, 102 Geo. L.J. 1191, 1196 (2014). Standing often is "made available on a *relative* basis," taking into account "where the particular plaintiff before the court stands as compared" to other potential plaintiffs, *id.* at 1195-96, with standing often being awarded to "plaintiffs with the greatest stake in obtaining the requested remedy," *id.* at 1196. For instance, in *Clapper* the Court denied standing and concluded its analysis by pointing to other plaintiffs who would have "a stronger evidentiary basis for establishing standing than do respondents in the present case." 568 U.S. at 421-22. Though not the only basis for denying standing, the Court's decision to draw attention to this point reflects the continuing influence of the fundamental principle of proper parties.

Whether under modern doctrine or more classical terminology, the federal courts have the power to issue the requested relief only if it is being requested by the correct plaintiffs. In this respect, "standing also reflects a due regard for the autonomy of those persons likely to be most directly affected by a judicial order." *Valley Forge*, 454 U.S. at 473.

6

In cases involving state plaintiffs, across various doctrines, this Court has repeatedly scrutinized whether a state is the proper constitutional party. For instance, *Oklahoma ex rel. Johnson v. Cook* held that Oklahoma could not invoke state statutory authority to sue the shareholder of a state bank. 304 U.S. 387, 395-96 (1938). And *New Hampshire v. Louisiana* rejected the states' attempt to prosecute debts that really belonged to their citizens. 108 U.S. 76, 91 (1883); *cf. South Carolina v. North Carolina*, 558 U.S. 256, 277-78 (2010) (Roberts, C.J., concurring in the judgment in part and dissenting in part) ("To invoke [original] jurisdiction, a State 'must, of course, represent an interest of her own and not merely that of her citizens or corporations.'" (quoting *Arkansas v. Texas*, 346 U.S. 368, 370 (1953); and citing *Kansas v. Colorado*, 533 U.S. 1, 8-9 (2001); *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) (per curiam)). As Woolhandler and Nelson put it, if "a state . . . could not point to any litigable interest of its own, the Court did not view it as a proper party to a genuine case or controversy, even if state law purported to let the state bring suit." Woolhandler & Nelson, *supra*, at 716.

## B. Missouri Is Not The Proper Party To Bring This Suit

The strongest argument for standing made by any of the plaintiffs in these cases is the state of Missouri's argument that it has standing to challenge the loan forgiveness program because MOHELA is a state entity that will lose loan servicing fees if federal student loans are forgiven.

But the state of Missouri is not the "proper party" to bring this lawsuit. MOHELA was established with

7

financial and legal independence from the state of Missouri. For starters, MOHELA has the power "[t]o sue and be sued . . . in any court having jurisdiction of the subject matter and of the parties." Mo. Rev. Stat. § 173.385.1(3). In earlier litigation, MOHELA conceded that Missouri is not legally liable for any judgments against it. *Dykes v. MOHELA*, No. 4:21-CV-00083, 2021 WL 3206691, at *3 (E.D. Mo. July 29, 2021). MOHELA also has the power "[t]o issue bonds or other forms of indebtedness" and "[t]o acquire, hold, and dispose of personal property." Mo. Rev. Stat. § 173.385.1(6), (14). And MOHELA has the power to contract with any government agency, person, or corporation, *id.* § 173.385.1(15), which is how it entered into multiple contracts with the Department of Education to service federal student loans.

As to MOHELA's assets, none are "considered to be part of the revenue of the state"; none are "subject to appropriation by the general assembly"; and, other than what MOHELA is required to contribute to the Lewis and Clark discovery fund, none "shall be required to be deposited into the state treasury." *Id.* § 173.425. That is, "the vast majority of MOHELA's funds are segregated from state funds and controlled exclusively by MOHELA." *Dykes,* 2021 WL 3206691, at *4.

The parties have discussed MOHELA partly through the "arm of the state" doctrine. It is disputed whether, under various multifactor tests, these facts would be sufficient to establish that MOHELA is not an "arm of the state" for the purposes of sovereign

8

immunity.[2]  But under the more traditional approach "prevailing until the 1970s," which was described by Judge Stephen Williams, the fact that MOHELA has the capacity to sue and be sued would establish that it is not an arm of the state.  *See Puerto Rico Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 881 (D.C. Cir. 2008) (Williams, J., concurring).  Perhaps that insight from Judge Williams should be enough to resolve the standing inquiry as well.

But even putting aside how the "arm of the state" doctrine is formulated, MOHELA, not Missouri, is the proper party in this case.  Any dispute about the loan cancellation is between MOHELA and the federal executive, and not between the state of Missouri and the federal executive.  MOHELA's ability to sue and be sued means that it can vindicate its own injuries if it chooses.  To the extent that the loss of servicing fees is a cognizable injury, MOHELA is far and away the most interested plaintiff, and Missouri's claim is entirely derivative.  For whatever reason—whether politics or mission or something else—MOHELA has chosen not to do so, and the federal courts should be skeptical of another party's attempt to force that interest into federal court.

Additionally, it is salient that MOHELA alone is responsible for any judgment against it, and that it alone is the direct beneficiary of any judgment for it. Who would be bound or benefitted by the judgment

---

[2]    *Compare Dykes*, 2021 WL 3206691, at *2-4, *and Perkins v. Equifax Info. Servs., LLC*, No. SA-19-1281-FB, 2020 WL 13120600, at *5 (W.D. Tex. May 1, 2020), *with Good v. U.S. Dep't of Educ.*, No. 21-CV-2539, 2022 WL 2191758, at *3 (D. Kan. June 16, 2022), *and Gowens v. Capella Univ., Inc.*, No. 4:19-CV-362, 2020 WL 10180669, at *4 (N.D. Ala. June 1, 2020).

9

was another central question in the proper party inquiry, especially when the government was litigating. Woolhandler & Nelson, *supra*, at 723-24. MOHELA's ability to vindicate its own injuries, buttressed by its financial independence regarding judgments, demonstrates that MOHELA, not Missouri, is the "proper party" to bring this suit.[3]

## II. THIS COURT SHOULD REJECT EXTRAVAGANT THEORIES OF STATE STANDING

The states have put forward other, vaguer, theories of standing. Those theories are both weaker as a matter of law and more dangerous if accepted. The states' more extravagant theories are emblematic of the broader trend where states are taking advantage of vague language in *Massachusetts v. EPA*, 549 U.S. 497 (2007), to challenge any federal action with which they disagree. Unless this Court wishes to sit in constant judgment of every major executive action—which is not its constitutional role—it is time to say "stop."

### A. *Massachusetts v. EPA*'s Reference to "Special Solicitude" Has Emboldened States

In *Massachusetts v. EPA*, the Court concluded that Massachusetts had standing to challenge the EPA's

---

[3] By contrast, in *Arkansas v. Texas* (cited in Resp. to Appl. to Vacate Inj. 15, *Biden v. Nebraska*, No. 22A444), the Court noted that "the State owns all the property used by the University," 346 U.S. at 370, and that "a suit against the University is a suit against the State," *id.*, and cited authority noting that the University was "not authorized by the statutes to sue and be sued," *Allen Eng'g Co. v. Kays*, 152 S.W. 992 (Ark. 1913) (cited in 346 U.S. at 370 n.9).

10

denial of a petition seeking to have the agency regulate emissions of certain greenhouse gases.  *Id.* at 519-20.  In so concluding, the Court announced that "the Commonwealth is entitled to special solicitude in our standing analysis."  *Id.* at 520.  Although the Court made passing mention of "Massachusetts' stake in protecting its quasi-sovereign interests," *id.*, it did little to explain the scope and contours of the "special solicitude" due to a state in the standing analysis.

The dissent—authored by Chief Justice Roberts and joined by Justices Scalia, Thomas, and Alito— accused the Court of inventing a new standing doctrine out of whole cloth.  "Relaxing Article III standing requirements because asserted injuries are pressed by a State," the dissent argued, "has no basis in our jurisprudence, and support for any such 'special solicitude' is conspicuously absent from the Court's opinion."  *Id.* at 536.  On a practical level, the dissent also worried that the newly-minted doctrine of special solicitude would make "standing seem a lawyer's game, rather than a fundamental limitation ensuring that courts function as courts and not intrude on the politically accountable branches."  *Id.* at 548.

The dissent's practical concerns have proved prophetic.  In the years since *Massachusetts v. EPA*, the number of lawsuits brought by state attorneys general challenging actions by the federal government has skyrocketed.  *See generally* Paul Nolette & Colin Provost, *Change and Continuity in the Role of State Attorneys General in the Obama and Trump Administrations*, 48 Publius 469, 473-74 (2018), https://doi.org/10.1093/publius/pjy012 (noting a dramatic rise in such lawsuits during the Obama and Trump administrations).  The pattern has become familiar and predictable.  When a Republican

11

administration is in power, attorneys general from Democratic states line up (most often as a group) to challenge any politically controversial act by the federal government; and when a Democratic administration is in power, the roles are reversed. Republican state attorneys general initiated around 50 lawsuits against the Obama Administration; Democratic state attorneys general initiated over 130 lawsuits against the Trump Administration; and Republican state attorneys general have already initiated close to 50 lawsuits against the Biden Administration.[4]

The Court is familiar with this dynamic, as states have repeatedly pressed extreme theories of standing, pointing to the "special solicitude" they are due. *See, e.g.*, *United States v. Texas*, No. 22-58. It is almost as though states have been proceeding on the assumption that *Massachusetts v. EPA* somehow announced "a bright-line rule that states *always* have standing to sue the federal government." Bradford Mank & Michael E. Solimine, *State Standing and National Injunctions*, 94 Notre Dame L. Rev. 1955, 1969 (2019). Whether the Court wishes to officially abandon *Massachusetts v. EPA*, or simply to clarify its limits, the Court should not resolve this case in a way that encourages this dynamic.

---

[4] State Litigation and AG Activity Database, *Multistate Litigation Database*, https://attorneysgeneral.org/list-of-lawsuits-1980-present/ (last visited Jan. 9, 2023).

12

### B. Some Of The States' Theories Of Standing Are Emblematic Of Unchecked "Special Solicitude"

The states' other theories of standing in this case demonstrate this problem. They are contrary to basic principles of standing and so they implicitly depend on a boundless solicitude of the states' desire to sue.

1. For instance, an alternative version of the MOHELA theory claims that the state is injured because loan forgiveness reduces the chances MOHELA will make statutorily-required contributions to the Lewis and Clark discovery fund, which is used to make capital improvements at higher education institutions in Missouri. *See* Mo. Rev. Stat. §§ 173.385, 173.392. Black-letter standing law requires a plaintiff seeking injunctive relief to point to a future injury that is "certainly impending," *Clapper*, 568 U.S. at 410, or at the very least, for which there is "substantial risk." *Id.* at 414 n.5 (citation omitted). Missouri's alleged injury is far too speculative to meet either standard.

For one thing, the number of federal accounts MOHELA services for the Department of Education can fluctuate wildly from year to year, and indeed it almost doubled last year.[5] It is accordingly too soon to tell whether any of MOHELA's revenue losses will be offset.

For another, just a quick reading of MOHELA's latest financial statement reveals that it has already

---

[5]    MOHELA Financial Statements, FY 2022 ("Mohela FY 2022 Statement") at 4 (2022), https://www.mohela.com/DL/common/publicInfo/financialStatements.aspx (accounts went to 5.2 million from 2.7 million, increasing MOHELA servicing fees to $107.5 million from $69.9 million).

13

received numerous extensions for payment to the Lewis and Clark discovery fund and that, as of June 30, 2022 (without any mass loan forgiveness), "payment of the unfunded amount has not been deemed probable."[6] So it is far from certain, or even a substantial risk, that loan forgiveness is going to be the reason MOHELA misses a payment.

More fundamentally, the MOHELA-misses-a-check theory of standing is too attenuated: Missouri will suffer injury, the theory goes, because MOHELA owes Missouri money, and if MOHELA loses revenue, it will then be less likely to make required payments. That theory would not be taken seriously in ordinary contexts. By that logic, any lender would have Article III standing to sue the government to enjoin enforcement of any regulation that reduced the income of any of its borrowers. And there is no reason why this theory of standing would be limited to government regulation. If one friend owed another money, the lender would seemingly be able to litigate any of his friend's interests, from wrongful termination to a divorce settlement. Such a theory should not be taken more seriously here.

2. MOHELA aside, four of the six respondent states—Nebraska, Iowa, Kansas, and South Carolina—have argued that loan forgiveness would reduce their tax revenue. The theory is fairly convoluted. Those states have chosen to adopt the federal Adjusted Gross Income (AGI) as a baseline for calculating state income tax. In general, student loan discharge is included in federal AGI, 26 U.S.C.

---

[6] Mohela FY 2022 Statement 21 (explaining why MOHELA does not record the unfunded amount as a liability).

14

§ 61(a)(11), but Congress passed a law in 2021 excluding from that rule any discharge occurring before January 1, 2026. *See id.* § 108(f)(5). Without loan cancellation, the states argue, a substantial number of student loans stand to be discharged after 2025, in which case they will be included in the federal AGI, and therefore subject to state income tax. But if the federal government cancels loans now, that would reduce the number of loans that stand to be discharged after 2025, which would, in turn, reduce the income subject to state income tax.

Even if we grant the assumptions undergirding this theory, it still fails. It directly contradicts the teaching of *Pennsylvania v. New Jersey* that "[n]o state can be heard to complain about damage inflicted by its own hand." 426 U.S. 660, 664 (1976). In that case, Pennsylvania argued that it was injured by an allegedly unconstitutional New Jersey tax that New Jersey collected from nonresidents for New Jersey-derived income. *Id.* at 662-63. Pennsylvania's theory of injury was that New Jersey's tax diverted revenue from Pennsylvania's treasury because Pennsylvania allowed a tax credit for income tax its residents paid to other states. *Id.* at 664. In a consolidated case, Maine, Massachusetts, and Vermont challenged a New Hampshire tax on a similar theory. The Court soundly rejected those theories, noting that "[t]he injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures." *Id.* After all, "[n]othing required Maine, Massachusetts, and Vermont to extend a tax credit to their residents for income taxes paid to New Hampshire, and nothing prevents Pennsylvania from withdrawing that credit for taxes paid to New Jersey." *Id.* The same, of course, goes for the states' theory

15

here.  Nothing requires Nebraska, Iowa, Kansas, and South Carolina to adopt the Federal AGI as the baseline for calculating state taxes, and nothing stops them from adopting a carveout for loan discharges. Any injury flowing from not making those choices is self-inflicted and cannot support Article III standing.

This tax revenue theory is also representative of another common feature of overreaching state standing arguments: the invocation of "indirect fiscal burdens" caused by government action.  "But," as Chief Judge Sutton asked, "why would that humdrum feature of a regulation count as a uniquely sovereign harm?  Most regulations have costs.  A State has no more, and no less, reason to fear harms to its bottom line from federal regulations than a person or business does." *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022).  To say otherwise would "make a mockery . . . of the constitutional requirement of case or controversy."  *Id.* (omission in original) (quoting Alexander M. Bickel, *The Voting Rights Cases*, 1966 Sup. Ct. Rev. 79, 89 (1966)).

3.  Respondent states have also argued that they have standing to vindicate their quasi-sovereign interests in the health and well-being of their residents.  This type of claim, sometimes referred to as a *parens patriae* claim, is also a mainstay in litigation by state attorneys general against the federal government.  These claims are foreclosed by canonical precedent.

16

*Massachusetts v. Mellon* said:

> It cannot be conceded that a state, as parens patriae, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof.  While the state, under some circumstances, may sue in that capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government.  In that field it is the United States, and not the state, which represents them as parens patriae, when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status.

262 U.S. 447, 485-86 (1923) (citation omitted).  In other words, "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982); *see also Florida v. Mellon*, 273 U.S. 12, 18 (1927).  The dissent thought that those cases doomed the state claim in *Massachusetts v. EPA*.  549 U.S. at 539.  And while the Court did not agree, that is only because the majority perceived "a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what [*Massachusetts v.*] *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)."  *Id.* at 520 n.17 (citation

17

omitted).   That distinction provides no help to the states here.[7]

## III. THE REMEDY IN THIS CASE REINFORCES THE STATES' LACK OF STANDING

"Equity is essentially a system of remedies." D.E.C. Yale, *Introduction*, to *Lord Nottingham's "Manual of Chancery Practice" and "Prolegomena of Chancery and Equity"* 16 (D.E.C. Yale ed., 1965).  But the potency of equitable remedies has consequences for the circumstances in which courts will grant them.  In particular, equity has never had a sharp disjuncture between what it takes to get into equity (broadly, "standing") and what the plaintiff can get out of equity (broadly, "remedies").  The plaintiff's grievance and the plaintiff's remedy are instead connected.  The broader and more intense the relief requested, the stronger the plaintiff's showing of harm must be.  These principles of traditional equity have a counterpart in the Article III requirement that "'a plaintiff must demonstrate standing . . . 'for each form of relief'" that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation omitted).

The states' basis for standing in these cases is especially tenuous, while the remedy they sought and obtained—a national injunction—is especially broad.  Whether viewed from the perspective of equitable principles or the requirement of standing for each form of relief, plaintiffs utterly lack standing for the remedy they received.

_____

[7]   To be clear, the non-state respondents in No. 22-535 also lack standing, substantially for the reasons set forth in the Brief for the Petitioners at 31-33.

18

### A. Under Both Article III Standing Doctrine And Equitable Principles, A More Intense Remedy Demands A Stronger Demonstration Of Standing

The connection between standing and remedy can be considered as a matter of Article III standing doctrine or as a matter of traditional equitable principles. Either way, the conclusion is the same: stronger remedies require stronger standing.

First consider Article III. It is often said that "standing is not dispensed in gross." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (citation omitted). Seen from the standing end of litigation, that proposition means that "'a plaintiff must demonstrate standing . . . "for each form of relief"' that is sought." *Davis*, 554 U.S. at 734 (citation omitted). Seen from the remedy end of litigation, that proposition means that "the remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (citing a case about equitable remedies, *Missouri v. Jenkins*, 515 U.S. 70, 88-89 (1995)); *see also Gill*, 138 S. Ct. at 1934 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury.").

One implication is that the slight injuries that might suffice to establish standing for nominal damages are not enough to establish standing for an injunction, and the broader the injunction, the stronger the showing of injury needed. One case that illustrates this point is *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). The district court issued a preliminary injunction that prohibited the use of certain chokehold techniques by police officers, as

19

well as requiring police training, record-keeping, and reporting. *Id.* at 99-100. This Court did not ask whether Mr. Lyons had been injured in the past or whether he faced any conceivable risk in the future, but rather it scrutinized "Lyons' standing to seek the injunction requested." *Id.* at 105. He had none because there was a remedy available at law and his fears of future injury were too speculative. *See id.* at 106 n.7 (rejecting the view, expressed in Justice Marshall's dissent, that because Mr. Lyons had standing to recover damages, there was standing to obtain "the scope of the injunction that Lyons prayed for"); *id* at 108 ("[I]t is surely no more than speculation to assert . . . that Lyons himself will again be involved in one of those unfortunate instances . . . .").

Next consider equitable principles. As this Court has often reiterated, the Judiciary Act of 1789 grants to the federal courts the equitable jurisdiction that was possessed by the English Court of Chancery. *See, e.g.*, *Marshall v. Marshall*, 547 U.S. 293, 308 (2006) ("[T]he equity jurisdiction conferred by the Judiciary Act of 1789 . . . , which is that of the English Court of Chancery in 1789 . . . ." (first omission in original) (quoting *Markham v. Allen*, 326 U.S. 490, 494 (1946)); *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) ("We have long held that '[t]he "jurisdiction" [the Judiciary Act of 1789] thus conferred . . . is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries.'" (first alteration and omission in original) (quoting *Atlas Life Ins. Co. v. W.I. S., Inc.*, 306 U.S. 563, 568 (1939)));

20

*Gordon v. Washington*, 295 U.S. 30, 36 (1935) ("From the beginning, the phrase 'suits in equity' [in the Judiciary Act of 1789] has been understood to refer to suits in which relief is sought according to the principles applied by the English Court of Chancery before 1789, as they have been developed in the federal courts."); *see also Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021) ("The equitable powers of federal courts are limited by historical practice.").  It is therefore beyond dispute that federal courts today need to trace their exercise of equity jurisdiction to traditional equitable principles.

And what do traditional equitable principles say about the relationship between the plaintiff's basis for equitable jurisdiction and the relief granted?

> For legal claims, justiciability is a threshold, and once through the door the plaintiff is able to obtain remedies without much consideration of whether the plaintiff just barely made it over the threshold.  But in equity it all connects—the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be.

Samuel L. Bray & Paul B. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763, 1797 (2022); *see also id.* at 1792-95, 1798.

That point can be illustrated by this Court's own cases.  It is not an accident that the cases in which this Court has emphasized the standing–remedy connection—cases like *Lyons*, *Lewis*, and *Gill*—have almost always involved equitable remedies.  As this Court said in *Lyons*, "case or controversy considerations obviously shade into those determining whether the complaint states a sound

21

basis for equitable relief." 461 U.S. at 103 (citation omitted); *see also id.* at 111. More generally, this Court's cases regarding standing overwhelmingly involve equitable remedies. *See* Ernest A. Young, *Standing, Equity, and Injury in Fact*, 97 Notre Dame L. Rev. 1885, 1906 (2022) ("[T]he familiar landmarks of standing doctrine—*Data Processing*, *Warth v. Seldin*, *Allen v. Wright*, *Lujan v. Defenders of Wildlife*—all involved equitable relief.").

The reason the Article III doctrine and the equity doctrine coincide on the standing–remedy connection is that they reflect a common understanding of the judicial role. Judges decide cases for parties, and give remedies to those parties. They do not dispense standing "in gross," *Gill*, 138 S. Ct. at 1934 (citation omitted); and they do not "enjoin the world at large," *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (L. Hand, J.). And equitable doctrines, even though not designed for our constitutional system, often reinforce constitutional principles. *See Younger v. Harris*, 401 U.S. 37, 44 (1971) ("The doctrine may originally have grown out of circumstances peculiar to the English judicial system and not applicable in this country, but its fundamental purpose of restraining equity jurisdiction within narrow limits is equally important under our Constitution . . . .").[8]

---

[8] The Eighth Circuit decision below appealed to the "principle[] of equity jurisprudence" that the injunction should match the "extent of the violation." JA166 (citation omitted). That language allows the remedy to be untethered from the harm to the plaintiff and be attached to "the violation" at large. But there is no such principle. The authority cited for that principle is *Rodgers v. Bryant*, 942 F.3d 451 (8th Cir. 2019), an Eighth Circuit decision relying on this Court's decision in *Califano v. Yamasaki*, 442 U.S. 682 (1979). *Rodgers*, 942 F.3d at

22

The trends of the last decade undermine this case-focused understanding of the federal judicial role. These trends in particular are (i) exceedingly broad claims of state standing and (ii) exceedingly broad equitable remedies, especially national injunctions. And both trends are exacerbated by the failure of lower courts to require injunction bonds. *But see* Fed. R. Civ. P. 65(c). These, if routinely required, would strongly encourage plaintiffs seeking preliminary injunctions to align the scope of those injunctions with their own injuries.

In short, even though this Court has used various rubrics for its analysis—Article III standing, traditional equitable principles, and even prudential standing—it has consistently considered the connection between the basis for standing and the scope of the remedy. The lesson is that standing and remedy can and should be brought into equilibrium: either by denying standing to obtain an excessively broad remedy, or else by narrowing the remedy to match the standing.

## B. The States' Tenuous Basis For Standing Cannot Support The Extraordinarily Broad Equitable Remedy In This Case

The connection needed between standing and remedy demolishes the states' case. Their basis for standing is tenuous, as analyzed in Parts I and II of this brief. And their remedy is a national injunction.

The national injunction is the broadest remedy known to contemporary American law. It is a remedy with no basis in traditional equity. *See Dep't of*

---

457-58. But *Rodgers* misunderstood *Califano*, as made clear by Judge Stras in his separate opinion in that case. *Id.* at 467 n.10 (Stras, J., concurring in part and dissenting in part).

23

*Homeland Sec. v. New York*, 140 S. Ct. 599, 600-01 (2020) (Gorsuch, J., concurring in the grant of stay); *Trump v. Hawaii*, 138 S. Ct. 2392, 2425-29 (2018) (Thomas, J., concurring). *See generally* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417 (2017).

But despite its breadth and novelty, in less than a decade, the national injunction has reshaped the relationship between the federal judiciary and the federal executive. An increasing number of federal judges have warned about the deleterious effects of the national injunction. *See Arizona*, 40 F.4th at 394-98 (Sutton, C.J., concurring); *Feds for Med. Freedom v. Biden*, 25 F.4th 354, 360 (5th Cir. 2022) (Higginson, J., dissenting); *Georgia v. President of the United States*, 46 F.4th 1283, 1303-08 (11th Cir. 2022) (Grant, J., joined separately by Anderson, J., with Edmondson, J., concurring in the result); *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 255-63 (4th Cir.) (Wilkinson, J., joined by Neimeyer, J.), *reh'g en banc granted and vacated*, 981 F.3d 311 (4th Cir. 2020) (mem.); *Doe #1 v. Trump*, 957 F.3d 1050, 1094-98 (9th Cir. 2020) (Bress, J., dissenting); *Ramos v. Wolf*, 975 F.3d 872, 902-06 (9th Cir. 2020) (R. Nelson, J., concurring); *Rodgers v. Bryant*, 942 F.3d 451, 460-65 (8th Cir. 2019) (Stras, J., concurring in part and dissenting in part); *California v. Azar*, 911 F.3d 558, 583 (9th Cir. 2018) (Wallace, J., joined by Graber, J.); *City of Chicago v. Sessions*, 888 F.3d 272, 296-99 (7th Cir.) (Manion, J., concurring in the judgment in part and dissenting in part), *reh'g en banc granted in part and vacated in part*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated*, Nos. 17-2991, 18-2649, 2018 WL 4268814 (7th Cir. Aug. 10, 2018); *see also Doster v. Kendall*, 54 F.4th 398, 439 (6th Cir.

24

2022) (Murphy, J., joined by Kethledge & Bush, JJ.) ("If, as the rising chorus would seem to suggest, courts eventually scrap these universal remedies, Rule 23(b)(2)'s importance will reemerge.").

In this case, the questions the Court has granted certiorari to consider are standing and the merits. So it may well choose not to address specifically the scope of the remedy. But even so, the breadth of the remedy should affect its scrutiny of the states' basis for standing. *See NLRB v. P\*I\*E\* Nationwide, Inc.*, 894 F.2d 887, 893 (7th Cir. 1990) (Posner, J.) ("The principles of equitable jurisprudence are not suspended merely because a government agency is the plaintiff."). The narrow and derivative basis for standing cannot support the massive remedy the states sought and obtained.

25

## CONCLUSION

The judgment of the United States District Court for the Eastern District of Missouri should be affirmed. The judgment of the United States District Court for the Northern District of Texas should be reversed.

Respectfully submitted,

SAMUEL L. BRAY
NOTRE DAME LAW SCHOOL
1100 Eck Hall of Law
Notre Dame, IN 46556

WILLIAM BAUDE
UNIVERSITY OF CHICAGO
LAW SCHOOL
1111 East 60th Street
Chicago, IL 60637

MELISSA ARBUS SHERRY
*Counsel of Record*
URIEL HINBERG*
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
melissa.sherry@lw.com

\* *Not admitted to practice in Washington, DC. Admitted in Maryland. All work supervised by a member of the DC Bar.*

*Counsel for Amici Curiae*

January 11, 2023

# Exhibit 3

2023 WL 2229665
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

ENVIRONMENT TEXAS CITIZEN
LOBBY, INCORPORATED;
Sierra Club, Plaintiffs—Appellees,

v.

EXXONMOBIL CORPORATION;
ExxonMobil Chemical Company;
ExxonMobil Refining & Supply
Company, Defendants—Appellants.

No. 17-20545
|
FILED February 17, 2023
|
CORRECTED FEBRUARY 24, 2023

Appeal from the United States District Court for the Southern District of Texas, USDC No. 4:10-CV-4969, David Hittner, U.S. District Judge

(Opinion July 29, 2020, 5 Cir., 2020, 968 F.3d 357) (Opinion August 30, 2022, 5 Cir., 2022, 47 F.4th 408)

**Attorneys and Law Firms**

Philip Harlan Hilder, Hilder & Associates, P.C., Houston, TX, Charles Craig Caldart, Esq., National Environmental Law Center, Seattle, WA, Joshua Robert Kratka, National Environmental Law Center, Boston, MA, David A. Nicholas, Newton, MA, for Plaintiffs-Appellees.

Russell S. Post, Fields Alexander, Beck Redden, L.L.P., Houston, TX, Keith Alan Courtney, McGinnis Lochridge, L.L.P., Austin, TX, Eric J. R. Nichols, Butler Snow, L.L.P., Austin, TX, Hicks, Davis & Wynn, P.C., Houston, TX, for Defendants-Appellants.

Aaron Michael Streett, Baker Botts, L.L.P., Houston, TX, for Amici Curiae American Fuel and Petrochemical Manufacturers, BCCA Appeal Group, Chamber of Commerce of the United States of America, National

Association of Manufacturers, Texas Association of Business, American Chemistry Council, Texas Chemical Council, Texas Oil & Gas Association.

Christopher Anderson, U.S. Department of Justice, Environment & Natural Resources Division-Appellate, Washington, DC, for Special Respondent United States Environmental Protection Agency.

Suzanne Reddell Chauvin, Esq., City of Houston, Legal Department, Houston, TX, for Amicus Curiae City of Houston.

Michael Robert Hull, Senior Assistant County Attorney, County Attorney's Office for the County of Harris, Houston, TX, for Amicus Curiae Harris County Attorney Vince Ryan.

Kelly Leigh Haragan, Esq., University of Texas School of Law Environmental Law Clinic, Austin, TX, Kirti Datla, Earthjustice Legal Defense Fund, Washington, DC, for Amicus Curiae Air Alliance Houston.

Before Richman, Chief Judge, and Jones, Smith, Stewart, Elrod, Southwick, Haynes, Graves, Higginson, Willett, Ho, Duncan, Engelhardt, Oldham, Wilson, and Douglas, Circuit Judges.

ON PETITION FOR REHEARING EN BANC

Per Curiam:

**\*1** A member of the court having requested a poll on the petition for rehearing en banc, and a majority of the circuit judges in regular active service and not disqualified having voted in favor,

IT IS ORDERED that this cause shall be reheard by the court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs. Pursuant to 5th Circuit Rule 41.3, the panel opinions in this case dated July 29, 2020, and August 30, 2022, are VACATED.

**All Citations**

--- F.4th ----, 2023 WL 2229665 (Mem)

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 4

# SUPREME COURT
# OF THE UNITED STATES

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - -

UNITED STATES, ET AL.,                    )

        Petitioners,            )

          v.                    ) No. 22-58

TEXAS, ET AL.,                            )

        Respondents.            )

- - - - - - - - - - - - - - - - - -

Pages:  1 through 151

Place:  Washington, D.C.

Date:   November 29, 2022

## HERITAGE REPORTING CORPORATION

*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
www.hrccourtreporters.com

Official - Subject to Final Review

1

1    IN THE SUPREME COURT OF THE UNITED STATES

2    - - - - - - - - - - - - - - - - - -

3    UNITED STATES, ET AL.,              )

4              Petitioners,              )

5              v.                        ) No. 22-58

6    TEXAS, ET AL.,                      )

7              Respondents.             )

8    - - - - - - - - - - - - - - - - - -

9

10                  Washington, D.C.

11              Tuesday, November 29, 2022

12

13        The above-entitled matter came on for

14   oral argument before the Supreme Court of the

15   United States at 10:04 a.m.

16

17   APPEARANCES:

18

19   GEN. ELIZABETH B. PRELOGAR, Solicitor General,

20        Department of Justice, Washington, D.C.; on behalf

21        of the Petitioners.

22   JUDD E. STONE, II, Solicitor General, Austin, Texas;

23        on behalf of the Respondents.

24

25

2

1                    C O N T E N T S

2    ORAL ARGUMENT OF:                       PAGE:

3    GEN. ELIZABETH B. PRELOGAR, ESQ.

4         On behalf of the Petitioners         3

5    ORAL ARGUMENT OF:

6    JUDD E. STONE, II, ESQ.

7         On behalf of the Respondents        73

8    REBUTTAL ARGUMENT OF:

9    GEN. ELIZABETH B. PRELOGAR, ESQ.

10        On behalf of the Petitioners        147

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceeding Subject to Final Review

3

```
 1                P R O C E E D I N G S
 2                               (10:04 a.m.)
 3           CHIEF JUSTICE ROBERTS:  We'll hear
 4      argument this morning in Case 22-58, United
 5      States versus Texas.
 6           General Prelogar.
 7      ORAL ARGUMENT OF GEN. ELIZABETH B. PRELOGAR
 8             ON BEHALF OF THE PETITIONERS
 9           GENERAL PRELOGAR:  Mr. Chief Justice,
10      and may it please the Court:
11                There are more than 11 million
12      removable non-citizens in this country, and DHS
13      has about 6,000 interior enforcement officers.
14      To focus the agency's limited resources on
15      threats to public safety, national security, and
16      border security, DHS adopted enforcement
17      priorities.  But the district court issued a
18      sweeping ruling vacating the guidelines
19      nationwide.  This Court should reverse.
20                First, the states lack standing.  They
21      argue states can challenge any federal policy
22      that imposes even one dollar of indirect harms
23      on their own taxing or spending.  That theory
24      has no limiting principle.  It's incompatible
25      with our constitutional structure, and it
```

Official - Subject to Final Review

4

1   contradicts more than 200 years of history and

2   tradition where states could not sue the United

3   States on this basis.  Federal courts should not

4   now be transformed into open forums for each and

5   every policy dispute between the states and the

6   national government.

7          On the merits, the INA does not create

8   an unyielding mandate to apprehend and remove

9   every non-citizen described in provisions that

10  use the term "shall."  This Court has repeatedly

11  held that the word "shall" does not displace

12  background principles of enforcement discretion.

13         Across 25 years and five presidential

14  administrations, the agency has never

15  implemented the INA in the manner that

16  Respondents suggest.  Given congressional

17  funding choices, it would be impossible for DHS

18  to do so.

19         Adopting Respondents' reading would

20  not lead to more immigration enforcement.

21  Instead, it would just deprive the Secretary of

22  his statutory authority to set priorities to

23  protect the nation's security and borders.

24         Finally, as to remedies, the APA did

25  not create a novel remedy of universal vacatur,

1    and the INA specifically bars that remedy.

2    Section 1252(f)(1) prohibits the lower courts

3    from granting coercive relief against the

4    operation of the covered INA provisions, and

5    vacatur is plainly coercive.

6           I welcome the Court's questions.

7           JUSTICE THOMAS:  General, does that

8    same provision, 1252(f), also affect

9    redressability for standing purposes?

10          GENERAL PRELOGAR:  Well, you know, I

11   think that we've obviously analyzed these issues

12   in two separate ways, and I think that here,

13   assuming that there were standing, it would have

14   been possible to get a different remedy, like a

15   declaratory judgment, which the state sought in

16   their complaint.

17          JUSTICE THOMAS:  But you don't think

18   that 1252(f) precludes a declaratory judgment?

19          GENERAL PRELOGAR:  That's right, we do

20   not think that.  So long as the declaratory

21   judgment is not issued in such a way that the

22   court has made clear that it's coercive and, for

23   example, would be backed up by contempt, that

24   would effectively function like an injunction.

25   We're not disputing that litigants would be able

Proposed Subject to Final Review

6

1    to obtain a declaratory judgment in line with

2    Section 1252(f)(1).

3            JUSTICE THOMAS:  So which remedies

4    would it preclude in this case?

5            GENERAL PRELOGAR:  So it would

6    preclude the nationwide vacatur that the states

7    obtained here, and the reason for that is

8    because the -- the statute clearly focuses on

9    forms of coercive relief.

10            As the Court said in Aleman Gonzalez

11    last term, it prevents orders that would require

12    DHS officials to take or refrain from taking

13    action to implement the covered INA provisions

14    while a suit proceeds, and that's because

15    Congress's judgment in this area was that only

16    this Court should have authority to enter that

17    kind of broad programmatic interference with the

18    operation of the statute while a suit is

19    proceeding.

20            So we think that here, vacatur shares

21    the -- the same feature as an injunction in

22    terms of preventing DHS from being -- being able

23    to implement these covered INA provisions while

24    the litigation runs its course.

25            CHIEF JUSTICE ROBERTS:  Your Linda

Official Subject to Final Review

7

```
1   R.S. argument under standing, doesn't that mean
2   that no state would ever have standing to
3   challenge immigration policies concerning
4   apprehension or removal of aliens?
5             GENERAL PRELOGAR:  That's right.  We
6   think that the Court articulated a principle
7   there that an individual or a state doesn't have
8   a judicially cognizable injury in seeking
9   enforcement of the law against a third party.
10            CHIEF JUSTICE ROBERTS:  Well, what
11  about Biden against Texas?
12            GENERAL PRELOGAR:  The MPP case from
13  last term?  There --
14            CHIEF JUSTICE ROBERTS:  Four -- four
15  months ago.  Your position seems inconsistent
16  with that to me.
17            GENERAL PRELOGAR:  Well, we did
18  protest the state's standing in that case as
19  well.  In the lower courts, we litigated that
20  issue, and the Fifth Circuit and the district
21  court ultimately rejected our arguments.
22            We had also contested the state
23  standing at the stay stage in this Court, and
24  the Court ultimately declined to grant us stay
25  relief and found that the states had a
```

Official - Subject to Final Review

8

```
1    likelihood of success on the merits.
2              And, at that point, we went back to
3    the drawing board and thought hard about these
4    arguments and believe very strongly that the
5    states here lack standing both under the kind
6    of constitutional --
7              CHIEF JUSTICE ROBERTS:  So you went
8    from one argument to believing very strongly the
9    other way?
10             GENERAL PRELOGAR:  This has been a
11   through line.  We have been protesting state
12   standing, broad theories of state standing in
13   the lower courts, and, Mr. Chief Justice, the
14   lower courts have not been accepting those
15   arguments, but we think that the lower courts
16   are fundamentally misunderstanding this Court's
17   precedents as it relates to our constitutional
18   structure and the kind of separation --
19             CHIEF JUSTICE ROBERTS:  I would have
20   thought you'd have a little more concern about
21   an opinion of ours that's four months old.  I
22   mean, it's not even out of the cradle yet and
23   you're throwing it under the bus --
24             GENERAL PRELOGAR:  No, no.
25             CHIEF JUSTICE ROBERTS:  -- to kind of
```

1    mix the analogies there.

2              GENERAL PRELOGAR:  We -- we certainly

3    aren't suggesting that that opinion should be

4    thrown under the bus.  We were obviously

5    briefing these issues with multiple mistakes

6    that we thought the district court had made in

7    that case, but I don't think this is a -- you

8    know, this is a jurisdictional principle, and I

9    don't think that it would prevent the Court here

10   from recognizing that the kind of theories of

11   state standing that the states here are pressing

12   and that the lower courts are accepting would

13   really remove every possible restriction that

14   could exist in this space, and that's just

15   fundamentally incompatible with the

16   constitutional structure and the separation of

17   powers.

18             JUSTICE ALITO:  Let me ask you about

19   another case.  Is it the position of the United

20   States that the states lacked standing in the

21   Little Sisters of the Poor case from two years

22   ago because their expected additional healthcare

23   spending was an indirect injury?

24             GENERAL PRELOGAR:  Justice Alito, I

25   can't recall whether the government made

Proceedings Subject to Final Review

1    standing arguments in that case.

2           JUSTICE ALITO:  Well, I'm just asking

3    you now what do you think about that.  The

4    argument was that they -- the states,

5    Pennsylvania, I believe, and another state, had

6    standing because the regulation they were

7    challenging would have the effect of imposing --

8    it would remove healthcare from certain

9    residents, students who were away at college in

10   other states, and thereby impose an additional

11   cost on the states.

12          Was that wrong?

13          GENERAL PRELOGAR:  So, if I understand

14   the facts of the case correctly, I think that

15   it's possible that that would constitute the

16   kind of direct injury that this Court's

17   precedents have recognized in this space if the

18   challenged regulation operated directly on the

19   states with respect to dictating, for example,

20   their federal funds or requiring curriculum and

21   directly --

22          JUSTICE ALITO:  No.  It's just they --

23   no, they just said that they would have to pick

24   that up under state programs.  Well, let me move

25   on to something else.

1          On this indirect/direct injury

2     distinction that you're drawing, should we hold

3     that injury -- that an indirect injury is never

4     injury in fact for Article III purposes for all

5     plaintiffs?

6          GENERAL PRELOGAR:  No, we're not

7     asking for that.

8          So we think that this is a distinctive

9     principle that the Court has applied when states

10    are seeking to vindicate sovereign or

11    quasi-sovereign interests, and the reason for

12    that, I think the reason the Court's precedents

13    recognize that the states are then under an

14    obligation to show this form of direct injury is

15    about our constitutional structure.  It's for

16    that --

17          JUSTICE ALITO:  So this is a -- this

18    is a special standing rule for states that

19    disfavors state standing?

20          GENERAL PRELOGAR:  Well, let me be

21    perfectly clear that when the states are seeking

22    to proceed on the basis of proprietary harms,

23    the same kinds of interests that other private

24    litigants can bring --

25          JUSTICE ALITO:  Yes, but --

Proceedings subject to final review

12

```
1              GENERAL PRELOGAR:  -- we think that

2       the same rules apply.

3              JUSTICE ALITO:  Yes, but an injury

4       that would be sufficient for Article III

5       purposes for an individual or for a private

6       entity is not sufficient in your view for the

7       states?  There's a special rule for the states?

8              GENERAL PRELOGAR:  With respect to

9       quasi-sovereign and sovereign interests, yes.

10      And the reason that we think the Court has --

11             JUSTICE ALITO:  So this is a rule of

12      special hostility to state standing.  How is

13      that consistent with Massachusetts versus EPA,

14      where the Court said that there is a special

15      solicitude for state standing?

16             GENERAL PRELOGAR:  Special solicitude,

17      as we understand it in this Court's precedents,

18      reflects the fact that states have more theories

19      of injury available to them, so they're not

20      limited to the same proprietary interests that

21      other parties can assert with respect to their

22      contract rights where being regulated as an

23      employer.  Instead, special solicitude reflects

24      the fact that states can also seek to proceed on

25      the basis of sovereign or quasi-sovereign harms.
```

Official - Subject to Final Review

```
 1                But I don't think it's right to
 2    suggest that the Court's rules or framework in
 3    this area amount to hostility.  This is about
 4    recognizing that when one sovereign is suing
 5    another sovereign under our constitutional
 6    structure, that implicates fundamental
 7    constitutional principles.
 8                And I think a contrary rule --
 9                JUSTICE ALITO:  Well, maybe you don't
10    like the --
11                GENERAL PRELOGAR:  -- would
12    effectively mean that states can sue about
13    anything.
14                JUSTICE ALITO:  -- maybe you don't
15    like the -- you don't like the word "hostility,"
16    but you have a special rule for state standing
17    that disfavors the states.  The states are in a
18    less favorable position than they would have
19    been if they were a private entity or an
20    individual.
21                Let me move on to one other case.  Do
22    you concede that Federal Election Commission
23    versus Akins acknowledges that Congress can
24    permit civil actions challenging nonenforcement
25    decisions?
```

14

1        GENERAL PRELOGAR:  Yes, in that case,

2   I recognize that the Court concluded obviously

3   over Justice Scalia's dissent, but that is an

4   example where the Court allowed standing in that

5   circumstance.

6        JUSTICE SOTOMAYOR:  General --

7        JUSTICE ALITO:  And why doesn't that

8   principle apply here?

9        GENERAL PRELOGAR:  Well, I think that

10  the -- the more on point precedent in this case

11  is Sure-Tan, where the Court specifically took

12  the Linda R.S. principle and said that it

13  applied in the realm of immigration law as well.

14       JUSTICE KAVANAUGH:  What do you do

15  with Heckler versus Chaney, where the Court

16  recognized that general principle but also said,

17  when Congress puts specific limits on executive

18  enforcement, that courts have authority to

19  enforce those limits?

20       GENERAL PRELOGAR:  Well, in that case,

21  of course, the Court wasn't confronted with

22  standing questions.  That was a case about

23  whether a decision was committed to agency

24  discretion by law.

25       And I think the Court's recognition

Official - Subject to Final Review

1   there is that Congress has statutory authority

2   to make its own judgments that sometimes will

3   direct agencies in the exercise of discretion.

4   But we think that that presents a merits issue

5   and it raises the question whether you should

6   interpret particular statutory language to

7   create that kind of displacement of discretion

8   in the first place.

9           JUSTICE SOTOMAYOR:  General, assuming

10  hypothetically that I don't accept your

11  argument, that the costs to a state could give

12  it standing in a certain situation, Judge

13  Sutton, in a related case to this one or a

14  similar case to this one, pointed out, however,

15  that under Arizona versus Wynn we have said that

16  if you're going to claim costs, you have to show

17  us that it's a net cost.

18          Could you address that as an

19  alternative theory here?

20          GENERAL PRELOGAR:  Yes, of course,

21  Justice Sotomayor.

22          And we think, here, getting into the

23  facts of this case, that there was no basis in

24  this record to conclude that the states will

25  actually incur these kinds of indirect effects

Official - Subject to Final Review

1    on their own taxing or spending or regulating.

2            The district court seemed to think

3    that these enforcement priorities would suppress

4    overall levels of enforcement such that there

5    would be the prospect that there might be

6    additional non-citizens present in Texas.

7            But, if you look at how the

8    enforcement priorities are intended to operate,

9    this is not about reducing enforcement of the

10   immigration laws.  It's about prioritizing

11   limited resources to say go after person A

12   instead of person B, and there is no reason to

13   conclude that that's actually going to lead to

14   less enforcement against individuals overall.

15           JUSTICE ALITO:  Suppose Congress

16   passed a law that said that every person must

17   buy seven apples per week.  And let's say I

18   don't like apples, and the cost of seven apples

19   is, I don't know, $8, and that's -- I say that's

20   a pocketbook injury for me, so I have standing

21   to challenge that.

22           Do I -- do I have standing, or do I

23   have to show that the net benefit to me,

24   monetary benefit to me of buying all these

25   apples is that it will improve my long-term

1    health and so I will -- healthcare costs that I

2    might have otherwise incurred I'll avoid by

3    buying all these apples.  If I buy them, I'll

4    feel that I have to eat at least some.

5              GENERAL PRELOGAR:  Justice --

6              JUSTICE ALITO:  Do I have to show net

7    injury there?

8              GENERAL PRELOGAR:  Justice Alito, I

9    acknowledge that in that hypothetical, no, you

10   could challenge that regulation that is directly

11   operating on you.

12             But I think the problem for the states

13   here is that they're asserting indirect harms.

14   They're suggesting that there, through an

15   attenuated chain of events, there is going to be

16   perhaps the prospect of one additional

17   non-citizen in their borders and that's going to

18   cause them harms.

19             JUSTICE ALITO:  Well, no, no.  You're

20   --

21             GENERAL PRELOGAR:  And there I think

22   you need to substantiate it.

23             JUSTICE ALITO:  -- you're -- you've

24   gone back to a different argument.  I understood

25   those to be two separate arguments.  You have

1    the direct/indirect argument and you have the

2    net cost argument.

3              GENERAL PRELOGAR:  Well, here, I think

4    I was trying to --

5              JUSTICE ALITO:  Well, I'm talking

6    about the --

7              GENERAL PRELOGAR:  -- engage on

8    whether the district court could have reasonably

9    concluded that there would be that kind of

10   actual out-of-pocket expense for the states, and

11   I was trying to make the overarching point that

12   that's not how these enforcement priorities work

13   in the first place.  But, even on the specific

14   conclusions that the district court reached, we

15   think that the findings were fundamentally

16   flawed.

17             JUSTICE BARRETT:  So clearly

18   erroneous?

19             GENERAL PRELOGAR:  Yes.

20             JUSTICE BARRETT:  To agree with you,

21   we have to find -- because you didn't talk a lot

22   about the clearly erroneous standard in your

23   brief, so I wondered whether you were

24   saying that the district court's factual

25   findings were clearly erroneous or that the

1    district court made an error of law because it

2    didn't offset burdens with benefits.

3         GENERAL PRELOGAR:  No, we are arguing

4    that these factual findings are clearly

5    erroneous.  And I recognize that the Court

6    infrequently delves into facts like these, but I

7    guess what I would say is that if any facts are

8    clearly erroneous, it's -- it's these facts, and

9    it's not hard to see on the record why.

10        The district court committed really

11   two independent errors here.  The first thing is

12   that it looked at the wrong time frame.  It

13   focused on fiscal year 2021 to suggest that the

14   states had incurred costs.  But that was a time

15   period before these guidelines even took effect,

16   and so it was improper to draw those kinds of

17   causal errors based on that data.

18        But, even putting that to the side and

19   looking at the data, it doesn't support the

20   district court's analysis.  The court said DHS

21   is not detaining the same number of criminal

22   non-citizens.  But the -- the very chart that

23   the district court included at JA 314 shows that

24   over the time in question, the number of

25   criminal non-citizens in custody remained

1    essentially unchanged.

2           And then, with respect to removals,

3    the district court said DHS has done far less

4    enforcement action with removals and focused on

5    a comparison between fiscal year 2019, about

6    250,000 removals, and fiscal year 2021, where

7    there were about 55,000.  But the district court

8    ignored entirely that that was during the

9    pandemic and the CDC's public health order under

10   Title 42 was in effect, and DHS excluded more

11   than a million non-citizens under the Title 42

12   order.  So the bottom-line conclusion here that

13   there was less immigration enforcement overall,

14   I think, was clear error.

15           JUSTICE JACKSON:  General --

16           CHIEF JUSTICE ROBERTS:  General, if I

17   could move to the merits, let's say that I

18   disagree with you on standing and on the

19   remedies and I have to reach the merits, and

20   when we get to the merits, I think "shall" means

21   "shall."  Then we're in a position where, as you

22   see it, Congress has passed a law that is -- it

23   is impossible for the executive to comply with.

24           Now it's our job to say what the law

25   is, not whether or not it can be possibly

Proposed – Subject to Final Review

1    implemented or whether there are difficulties

2    there.  And I don't think we should change that

3    responsibility just because Congress and the

4    executive can't agree on something that's

5    possible to address this -- this problem.  I

6    don't think we should let them off the hook.  So

7    shouldn't we just say what we think the law is,

8    even if we think "shall" means "shall," and then

9    leave it for them to sort that out?

10            GENERAL PRELOGAR:  Well, Mr. Chief

11   Justice, let me take a stab at trying to

12   persuade you that these considerations of

13   resource constraints do properly inform the task

14   for this Court, which is to interpret the

15   meaning of "shall" and the statute itself.

16            And the first thing --

17            CHIEF JUSTICE ROBERTS:  Well, it seems

18   to me that you're arguing with one of the

19   predicates to my question, that we think -- I

20   think anyway -- "shall" means "shall."  What do

21   we do in that situation?

22            GENERAL PRELOGAR:  If this Court were

23   to actually adopt that interpretation of the

24   statute, then I think that it would be

25   incredibly destabilizing on the ground.

1          CHIEF JUSTICE ROBERTS:  No, I didn't
2     ask you what it would be.  I want to know what
3     we should do.  Should we still fulfill our
4     responsibility to say what the law is, and then
5     it's up to Congress and the executive to figure
6     out a way to comply with that?
7          GENERAL PRELOGAR:  I think, if the
8     Court did that -- and the reason I'm turning to
9     the practical implications here is because, in
10    the meantime, while Congress and the executive
11    try to figure it out, it would absolutely
12    scramble immigration enforcement efforts on the
13    ground.  It would mean that DHS, I think, if it
14    were under this kind of judicially enforceable
15    obligation to treat each of those "shalls" as a
16    mandatory "shall," would have to --
17         CHIEF JUSTICE ROBERTS:  So you're
18    still arguing -- I'm sorry to --
19         GENERAL PRELOGAR:  Yeah.
20         CHIEF JUSTICE ROBERTS:  You're still
21    arguing that that would be wrong, to say "shall"
22    means "shall"?
23         GENERAL PRELOGAR:  I think it would --
24    I think it would be wrong to say that "shall"
25    means "shall," and I would -- I would welcome

Proceedings Subject to Final Review

23

1      the chance to explain as a matter of statutory

2      interpretation why that's so, but, at the very

3      least, I don't think the Court should announce

4      it as a judicially cognizable injury here that

5      could justify interference by the courts in

6      light of the practical ramifications.

7              And they're really two sides of the

8      same coin, because I think one of the reasons

9      the Court has recognized that there is

10     enforcement discretion in this area is precisely

11     because of the practical necessity that agencies

12     cannot proceed against every violation of the

13     statute.  That's what the Court said in Heckler,

14     or in Town of Castle Rock.  The Court emphasized

15     that an arrest mandate, if it were truly a

16     mandatory, judicially enforceable duty, would be

17     a duty of entirely uncertain scope and priority

18     and duration.  It would be impossible to comply

19     with it.  And the Court said that these

20     background principles of enforcement discretion

21     are a practical necessity.

22             JUSTICE KAVANAUGH:  Are those --

23             JUSTICE JACKSON:  But --

24             JUSTICE KAVANAUGH:  -- are those

25     background principles constitutional principles?

1    In other words, if Congress says "shall" means

2    "shall" and we really mean "shall" means

3    "shall," is that unconstitutional?

4         GENERAL PRELOGAR:  So not in each and

5    every case.

6         JUSTICE KAVANAUGH:  Is it -- is it

7    ever --

8         GENERAL PRELOGAR:  I -- I -- I think

9    that --

10        JUSTICE KAVANAUGH:  -- is it ever

11   unconstitutional?  In other words, does the

12   President have an Article II ability to say I

13   possess enforcement discretion under the

14   Constitution and any attempt by Congress to

15   restrict that enforcement discretion by saying

16   "shall" means "shall" would itself violate

17   Article II?  You gestured Article II briefly in

18   your brief, but you don't really unpack it very

19   much.  I'm curious what your answer is to

20   whether that could be unconstitutional.

21        GENERAL PRELOGAR:  So I think that,

22   yes, there could be certain circumstances where

23   Congress has engaged in a really intrusive

24   effort to command the executive to take

25   particular enforcement actions to prosecute

```
 1    individuals in a particular way where we would
 2    say that that does transgress Article II limits.
 3              JUSTICE KAVANAUGH:  And does this one
 4    --
 5              GENERAL PRELOGAR:  But we're not --
 6              JUSTICE KAVANAUGH:  -- does this one
 7    transgress Article II, this statute, if -- if
 8    the Chief Justice posits "shall" means "shall"?
 9    I don't see an argument in your brief that if
10    the statute is read to mean what it says,
11    "shall" means "shall," that the statute would be
12    unconstitutional.  But I just want to make sure
13    I'm reading your brief correctly.  I didn't see
14    an argument that that would be unconstitutional.
15              GENERAL PRELOGAR:  That's right, we
16    haven't argued that the statute would be
17    unconstitutional.  And we accept that Congress
18    in various provisions of the INA has created
19    mandatory duties.
20              JUSTICE SOTOMAYOR:  General, can --
21              JUSTICE JACKSON:  But can --
22              JUSTICE SOTOMAYOR:  -- can -- General,
23    can we break down 1226(c)'s "shall"?
24              GENERAL PRELOGAR:  Yes.
25              JUSTICE SOTOMAYOR:  Section 20 --
```

```
 1    1226(a) applies to arrest and detention pending

 2    a decision on whether the alien is to be

 3    removed, correct?

 4            GENERAL PRELOGAR:  That's correct.

 5            JUSTICE SOTOMAYOR:  In Reno and

 6    elsewhere, we have repeatedly recognized the

 7    agency's broad prosecutorial discretion to not

 8    put someone in removal proceedings and to drop

 9    proceedings, correct?

10            GENERAL PRELOGAR:  That's right.  The

11    Court said that exists at all stages of the

12    removal process, including whether to charge a

13    non-citizen in the first place.

14            JUSTICE SOTOMAYOR:  So, if someone's

15    not in a removal proceeding, you have the

16    discretion to drop them -- if they are, if

17    they're not, you can say we're not going to

18    remove you, correct?

19            GENERAL PRELOGAR:  That's correct,

20    yes.

21            JUSTICE SOTOMAYOR:  We've said that in

22    a legion of cases.

23            GENERAL PRELOGAR:  Yes.

24            JUSTICE SOTOMAYOR:  So (c) is only

25    applicable, mandatory detention, when there's a
```

1    removal proceeding in place, correct?

2              GENERAL PRELOGAR:  That is correct,

3    yes, under --

4              JUSTICE SOTOMAYOR:  And so --

5              GENERAL PRELOGAR:  -- the provision in

6    (a).

7              JUSTICE SOTOMAYOR:  -- so we would

8    have to basically say that (c) trumps (a), and

9    (c) trumps a discretionary power we've

10   recognized for decades, correct?  That you

11   cannot proceed with removal, correct?

12             GENERAL PRELOGAR:  That's right, I

13   think, if you were focused on the decision

14   whether --

15             JUSTICE SOTOMAYOR:  All right.

16             GENERAL PRELOGAR:  -- to proceed with

17   removal in the first place.  And we don't --

18             JUSTICE SOTOMAYOR:  So the only issue

19   is, if there is a proceeding, if someone is in

20   removal already, whether or not you are

21   mandatorily required under (c) to put them into

22   removal, correct --

23             GENERAL PRELOGAR:  Yes.

24             JUSTICE SOTOMAYOR:  -- and take

25   custody of --

1          GENERAL PRELOGAR:  The -- the state's

2     assertion here is that we would have a mandatory

3     obligation, I think, to seek out and identify

4     and go out and apprehend every person who could

5     possibly be described under that provision.

6          JUSTICE SOTOMAYOR:  That's the logic

7     of their -- that's the logic of us saying that

8     "shall" means "shall" in all contexts.  It means

9     that you have to go look for everybody, even

10    when you don't know where they are, correct?

11         GENERAL PRELOGAR:  That's right.  And

12    I want to --

13         JUSTICE SOTOMAYOR:  So --

14         GENERAL PRELOGAR:  -- emphasize it's

15    not just this provision.  There are "shalls"

16    throughout the INA that would, if it were

17    interpreted to mean a mandatory, inflexible duty

18    that displaces enforcement discretion, would

19    create these kinds of unyielding mandates across

20    the realm of actions and --

21         JUSTICE ALITO:  Well, I don't

22    understand the states' argument to depend on the

23    proposition that the executive must detain

24    everybody even if it doesn't have the capacity

25    to detain them.  I understood their argument to

1    be centered on something quite different.

2           So let's just assume for the sake of

3    argument that there isn't an issue about how

4    many people you were going to detain but only a

5    question about which ones you were going to

6    detain.  And the -- the problem that I see with

7    your final memorandum is that Congress has

8    established its own set of priorities and has

9    said that certain categories of aliens must be

10   detained, shall be detained.  And the final

11   memorandum says -- tells ICE officers don't do

12   that.  Don't detain anybody based solely on that

13   person's criminal history.  You must make a

14   totality-of-the-circumstances decision about

15   every single alien whom -- who you're

16   considering for detention.  Isn't that correct?

17          GENERAL PRELOGAR:  No, that's

18   incorrect, and let me be really clear about how

19   the Guidelines operate with respect to

20   detention.  They don't govern the question of

21   continued detention at all.  They're focused on

22   apprehension and removal, and, therefore, when

23   DHS officers have someone in custody and there

24   are -- there are pending removal proceedings,

25   the Guidelines leave it to the statute to

Original Subject to Final Review

30

1    dictate those kinds of detention decisions, and

2    DHS does treat 1226(c)(2) as mandatory in that

3    circumstance.

4           JUSTICE JACKSON:  And so, therefore,

5    it's sort of analogous to mandatory pretrial

6    detention statutes, where Congress says, if you

7    as a prosecutor determine that you're going to

8    go after somebody, you're going to prosecute

9    them in the criminal realm, there are certain

10   people you have to detain during the

11   prosecution.  There are certain -- you know,

12   people who have been convicted of certain

13   crimes.  We have statutes where Congress says

14   those people have to be detained.  But that

15   doesn't speak to the antecedent determination of

16   whether or not to prosecute those people.

17          I think the problem that I'm seeing

18   with the state's argument is that they appear to

19   be conflating Congress's mandates with respect

20   to detention and Congress's statements with

21   respect to removal and that the idea of 1226 --

22   1226(c) is that once the determination has been

23   made pursuant to prosecutorial discretion that

24   you're going to remove someone, if those people

25   fall into the particular criminal alien

31

1    categories, they have to be detained for the

2    purpose of that removal.

3         Am I reading that correctly?

4         GENERAL PRELOGAR:  Yes.  So the way

5    that DHS has long understood and implemented

6    this provision is that if we have a non-citizen

7    in custody with pending removal proceedings, as

8    1226(a) requires, then, if the non-citizen is

9    described in 1226(c), detention is mandatory.

10        And the reason for that is not because

11   it says "shall detain."  We don't think that

12   that bare use of "shall" alone displaces

13   enforcement discretion.  It's because in

14   1226(c)(2) Congress specifically delineated the

15   permissible bases for -- for release and said

16   the Secretary may release only for narrow

17   witness protection purposes --

18        JUSTICE JACKSON:  And isn't it also --

19        JUSTICE ALITO:  General, if we --

20        GENERAL PRELOGAR:  -- and that kind of

21   mandatory language.

22        JUSTICE JACKSON:  -- isn't it also --

23   isn't it also related to sort of conceptions of

24   government power?  In other words, the reason

25   why you are -- you have the authority to detain

1    someone is because you made the determination

2    that they're going to be removed.

3         The government doesn't just go around

4    detaining people without having made a

5    determination about their prosecutorial ability

6    without the fact that they're going to prosecute

7    these people or they're going to remove these

8    people.  That's where the authority comes from,

9    right?

10        GENERAL PRELOGAR:  Yes.  And I think

11    that this relates both to the colloquy that I

12    was having with Justice Sotomayor and with

13    Justice Kavanaugh.  It would be a really

14    extraordinary thing for Congress to have

15    dictated to the executive that it has to seek

16    out, identify, apprehend, and remove as an

17    inflexible mandate each and every non-citizen

18    who's described in a provision that uses the

19    word "shall" in the INA.

20        JUSTICE KAGAN:  Well, is that true --

21    I -- I -- I guess your stronger argument is

22    where their removal proceedings have not been

23    initiated.  But how about, are there some

24    circumstances in which there are pending removal

25    proceedings so that 1226 kicks in, but you

1    haven't apprehended the person?  And are you
2    then saying that you don't have an obligation to
3    apprehend the person even while removal -- even
4    once you've initiated a removal proceeding?
5           Has that ever happened?  Is that your
6    argument?  Why is it your argument?
7           GENERAL PRELOGAR:  Yes.  So it's
8    possible that that could happen in a
9    circumstance, for example, where DHS encounters
10   someone at the border who lacks papers and so
11   they're removable and they're issued a notice to
12   appear and have pending removal proceedings, but
13   the agency isn't aware that they're a
14   non-citizen described in 1226(c) and then later
15   gains that kind of information after the
16   non-citizen has already been released and
17   therefore is aware of the information at that
18   juncture.
19          But I do want to be clear that it's
20   not as though DHS has a database and an
21   awareness ex ante of each and every non-citizen
22   who might have a 1226(c) credit because --
23          JUSTICE SOTOMAYOR:  Answer that
24   question which is the one Justice Kagan did.  If
25   someone is in removal proceedings, you know it,

34

 1    can you release them?

 2              GENERAL PRELOGAR:  So I -- I --

 3              JUSTICE KAGAN:  No, that was -- that

 4    was not the question.  The question was that the

 5    person had not been apprehended.

 6              GENERAL PRELOGAR:  Yes.

 7              JUSTICE KAGAN:  And the question is

 8    does this statute force you to apprehend the

 9    person once you've initiated removal proceedings

10    as to that person.

11              GENERAL PRELOGAR:  The answer to that

12    question is no, we think that the "shall take

13    into custody" language has to be read against

14    the backdrop of enforcement discretion, and it

15    would be totally unmanageable to have a

16    judicially enforceable duty to go out and

17    apprehend, because how many officers do we have

18    to put on the manhunt?  How long do we have to

19    look?  How many resources do we have to devote

20    to it?

21              But I should also be clear about the

22    factual premise, which is that we would know

23    with certainty that the person is subject to

24    1226(c).  That's actually a really complicated

25    legal analysis under this Court's categorical

1    approach.  It requires parsing the elements of

2    the state statute, comparing that to the generic

3    federal offense or the federal crime, deciding

4    whether there's an overmatch, deciding whether

5    the statute's divisible, tracking down the

6    Shepard documents.

7         So it's not as though DHS conducts

8    that analysis or knows in advance.  Instead, it

9    conducts the 1226(c) analysis when it's making

10   release determinations for people who are

11   already in its custody.

12        CHIEF JUSTICE ROBERTS:  Counsel, maybe

13   we can move on to individual questions now, and

14   I'm sure that some of it'll deal with remedy,

15   which is the one area -- area we haven't

16   addressed yet.  And, in that area, your -- your

17   position on vacatur, that sounded to me to be

18   fairly radical and inconsistent with, for

19   example, you know, with those of us who were on

20   the D.C. Circuit, you know, five times before

21   breakfast, that's what you do in an APA case.

22        And all of a sudden you're telling us

23   that, no, you can't vacate it, you do something

24   different.  Are you overturning that whole

25   established practice under the APA?

36

```
 1            GENERAL PRELOGAR:  Yes, I acknowledge,
 2    Mr. Chief Justice, that the lower courts,
 3    including the D.C. Circuit, have in our view
 4    been getting this one wrong.  They have
 5    reflexively assumed that vacatur is authorized
 6    under Section 706 of the APA.
 7            But what I would say is that they
 8    haven't reached --
 9            CHIEF JUSTICE ROBERTS:  Wow.
10            GENERAL PRELOGAR:  -- that conclusion
11    with --
12            CHIEF JUSTICE ROBERTS:  I mean, this
13    is a long -- that's what the D.C. Circuit and
14    other courts of appeals have been doing all the
15    time as a staple of their decision output.
16            GENERAL PRELOGAR:  But they haven't
17    been doing it with any attention to the text,
18    context, and history of the provision.  So it's
19    not as though there are decisions out there that
20    have really engaged with these arguments and
21    come out the other way.
22            Instead, it seems like this happened
23    and came about because courts just reflexively
24    transposed remedies that were available under
25    special statutory review provisions, which do
```

1    sometimes authorize vacatur, to the APA context

2    writ large.

3              And our argument is that if you

4    actually drill down on the text of 706 and look

5    at its context and also look at the history of

6    the APA, which was not intended to create any

7    kinds of new remedies but instead to simply

8    provide for the remedies that had preexisted the

9    statute's enactment and the traditional forms of

10   legal action under Section 703, it demonstrates

11   that the courts have erred here.

12             CHIEF JUSTICE ROBERTS:  How --

13             GENERAL PRELOGAR:  And I don't think

14   --

15             CHIEF JUSTICE ROBERTS:  -- how many

16   cases would you say that we have issued over the

17   past year, decade, whatever, where we have

18   upheld decisions vacating agency rulings under

19   the APA?

20             GENERAL PRELOGAR:  The Court has --

21             CHIEF JUSTICE ROBERTS:  Thousands?

22             GENERAL PRELOGAR:  -- done it in a --

23   in a number of cases.  Some of those involve

24   special statutory review provisions, so I do

25   want to box those off.  But I acknowledge, yes,

1    the Court has sometimes affirmed decisions that

2    we think the agency --

3              CHIEF JUSTICE ROBERTS:  No, no,

4    sometimes, over and over and over again.

5              GENERAL PRELOGAR:  But also never with

6    attention to the remedial arguments that we're

7    making here, and I -- I don't think it's ever

8    too late for this Court to give the statute its

9    proper construction when you actually look at

10   its text, context, and history.

11             CHIEF JUSTICE ROBERTS:  Thank you.

12             GENERAL PRELOGAR:  And I don't

13   think --

14             CHIEF JUSTICE ROBERTS:  Justice

15   Thomas?

16             Justice Alito?

17             JUSTICE ALITO:  Well, I want to come

18   back to the last question that I asked you and

19   break it down, and I hope you can give me a

20   succinct answer to these questions that I'm

21   going to ask.

22             If "shall" means "shall," is there

23   a -- well, let me amend that.  Does the statute

24   say that an alien who has been convicted of an

25   aggravated felony shall be detained?

1          GENERAL PRELOGAR:  Yes, it says that

2     in Section 1226(c).

3          JUSTICE ALITO:  All right.  And I'm

4     looking at the final memorandum, pages 114 to

5     115 of the Joint Appendix, where you set out

6     certain aggravating factors, which includes a

7     serious prior criminal record, the gravity of

8     the offense of conviction and the sentence

9     imposed, and then a list of mitigating factors,

10    advanced or tender age, mental condition,

11    various others, military or public service.

12          And then you say on 115:  "Our

13    personnel should not rely on the fact of

14    conviction or the result of the database search

15    alone."

16          Now that's what I was getting at.

17    Congress has set out certain priorities.  With

18    respect to an alien convicted of an aggravated

19    felony, it says that person shall be detained.

20          And what your final memorandum says is

21    no, that person shall not be detained based

22    solely on this prior conviction for an

23    aggravated felony.  You have to take into

24    account that as one of the aggravating factors

25    and then all of these mitigating factors and

Official Subject to Final Review

40

1    then the officer must make a determination.

2            So we have one set of priorities

3    established by Congress and a different set of

4    priorities established by the executive branch.

5    Isn't that correct?

6            GENERAL PRELOGAR:  No, that's wrong

7    because the Guidelines govern only decisions

8    about apprehension and removal, whether to

9    charge a non-citizen in the first place.  And I

10   think that the kind of mismatch here is that

11   1226(c) governs when DHS has already made the

12   charging decision, so there are pending removal

13   proceedings, and at that point, if we have a

14   non-citizen in custody, we will detain them if

15   they're described in Section 1226(c).  ICE does

16   not make release determinations without running

17   that analysis.

18           And so I don't think that there is any

19   fundamental override here of the detention

20   provisions because the Guidelines don't have

21   anything to do with continued detention.

22           CHIEF JUSTICE ROBERTS:  Justice

23   Sotomayor?

24           JUSTICE SOTOMAYOR:  Let's break that

25   down again, okay?  (a) and (c) operate only when

```
 1    you've decided to remove somebody, correct?
 2              GENERAL PRELOGAR:  Correct, because of
 3    the pending removal proceedings --
 4              JUSTICE SOTOMAYOR:  All right.
 5              GENERAL PRELOGAR:  -- pending a
 6    decision on whether the non-citizen --
 7              JUSTICE SOTOMAYOR:  Nothing in (a) and
 8    (c) takes away your discretion, explicitly or
 9    otherwise, to decide not to remove any
10    particular person?
11              GENERAL PRELOGAR:  That's correct.
12              JUSTICE SOTOMAYOR:  What it says is
13    you have to do something when you decide to
14    arrest and detain and remove, correct?
15              GENERAL PRELOGAR:  And, at that point,
16    we are prohibited from release if there are
17    pending removal proceedings.
18              JUSTICE SOTOMAYOR:  So that at any
19    point in this process, you're saying the
20    Guidelines -- we're focusing in on the
21    Guidelines as making the determination of
22    whether to detain, you're saying, no, you're
23    making a determination as to whether to remove
24    or not, correct?
25              GENERAL PRELOGAR:  Yes, that's
```

Official subject to final review

1   correct.

2          JUSTICE SOTOMAYOR:  And it's only then

3   that (a) and (c) come into effect?

4          GENERAL PRELOGAR:  Yes.

5          JUSTICE SOTOMAYOR:  All right.

6          GENERAL PRELOGAR:  And we've been

7   talking about 1226, but, Justice Sotomayor, your

8   questions touch on 1231 as well, which has in --

9   in subsection (a) a directive that DHS shall

10  remove non-citizens with final orders of

11  removal.  But this Court already said in Reno

12  versus AADC, in -- in Justice Scalia's opinion

13  for the Court, that the executive retains

14  discretion not to remove at all stages,

15  including after a final order of removal.

16         So I think we see the same kinds of

17  situations, and these principles of enforcement

18  discretion apply there.

19         JUSTICE SOTOMAYOR:  Thank you.

20         CHIEF JUSTICE ROBERTS:  Justice Kagan?

21         JUSTICE KAGAN:  You referred a little

22  while ago to past administrations' practice and

23  said what you were doing was consistent with

24  that or at least that Texas's view would be

25  inconsistent with that, and I wondered if you

43

1    could give a little bit more detail on that.

2              And I'll tell you just that it seems

3    to me that your -- the -- you have a quite

4    strong argument under 1231, but I'm not so sure

5    of your argument under 1226.  And so if you

6    would address each of the two provisions and

7    what prior administrations have done.

8              GENERAL PRELOGAR:  Yes, I would be

9    happy to.  So the -- the agency has always

10   implemented these provisions, which were added

11   to the INA in 1996, in recognition that it

12   retains its background principles of enforcement

13   discretion.  And so it has never implemented the

14   statute with respect to 1226, 1231, or some of

15   the other big ones, like 1225, that use "shall"

16   as creating an inflexible mandate to -- to go

17   after each and every one of the non-citizens

18   described in those provisions.  And that has

19   been constant.

20             With respect to 1226(c) itself, the

21   other thing that's been constant is what I was

22   describing to Justice Alito, which is that DHS

23   has long understood (c)(2) to require mandatory

24   detention in circumstances where we have pending

25   removal proceedings and already have an

1   individual in custody.  But it has never

2   interpreted that provision as requiring it to go

3   out and arrest every individual who's described

4   in that provision, both because that would be an

5   impossible burden and because it's never

6   understood that the "shall" language, the bare

7   use of "shall" with respect to the "take into

8   custody" provision to create that kind of

9   inflexible mandate.

10          JUSTICE SOTOMAYOR:  Thank you.

11          CHIEF JUSTICE ROBERTS:  Justice

12   Gorsuch?

13          JUSTICE GORSUCH:  We haven't had a

14   chance to discuss 1252 much, and I'd like your

15   thoughts on that.  In particular, if we were to

16   agree with you on that, do we have to address

17   your standing arguments, let alone the merits?

18          GENERAL PRELOGAR:  No, I think that if

19   the Court agreed with us on the scope of

20   1252(f)(1) as prohibiting the vacatur that was

21   ordered here, the Court can say that alone and

22   stop.  That's also a jurisdictional threshold

23   issue in this case.

24          JUSTICE GORSUCH:  Is it

25   jurisdictional, though?  We've had some question

45

1    about that last term, as you'll recall, as well
2    and whether it's just a remedial -- a limitation
3    on remedial options for the district court
4    or whether it is truly a jurisdictional statute.
5            GENERAL PRELOGAR:  So we think that it
6    is clearly a jurisdictional obstacle to entering
7    a form of relief, and Congress is free to attach
8    the jurisdictional label and the jurisdictional
9    consequences to provisions like this one which
10   take particular remedies off the table.  And
11   1252(f)(1) itself says that courts shall not
12   have jurisdiction to -- to issue these kinds of
13   orders that enjoin or restrain.  So we think
14   that it does clearly function as a
15   jurisdictional limit.
16           JUSTICE GORSUCH:  Okay.  And your --
17   your friend on the other side has made certain
18   arguments about why 1252 doesn't apply, and I
19   just want to give you a chance to address those.
20           GENERAL PRELOGAR:  So we think that
21   their arguments are fundamentally inconsistent
22   with both the text and the purpose of the
23   statute.  Their argument seems to be that the
24   word "restrain" in the statute does no work at
25   all, that "enjoin and restrain" is just

1    superfluous, Congress didn't need to use that

2    term.  But we think that that clearly ignores

3    the fact that the Court generally doesn't

4    interpret statutory language to produce that

5    kind of superfluity.

6              And then there's a second statutory

7    principle here, where the very next subsection

8    of (f)(2), 1252(f)(2), uses just the term

9    "enjoin."  And that implicates the principles

10    this Court has articulated that Congress

11    generally means different things when it uses

12    different language in adjacent subsections of

13    the same provision.

14              And then, on top of all of that, we

15    think that Texas's arguments would essentially

16    create a giant loophole in what Congress was

17    attempting to do with this statute.  The whole

18    point of this provision is to prevent lower

19    courts, not this Court, the lower courts from

20    entering coercive programmatic relief while the

21    case is being litigated, and that's precisely

22    the effect of universal vacatur here.

23              JUSTICE GORSUCH:  You indicated

24    earlier, I believe, that you thought a district

25    court could still enter a declaratory judgment,

1    and at least my recollection is the federal

2    government tries to abide by declarations of the

3    law.  So how is that -- how does that fit into

4    your theory?

5              GENERAL PRELOGAR:  So I think a

6    declaratory judgment would not have been

7    coercive in the same way.  If the district court

8    had entered a declaratory judgment here, it

9    wouldn't have required us to comply.  We would

10   have thought that that judgment was entered in

11   error.  We would have pursued our appeal rights.

12   And I think that DHS would have been free to

13   continue to apply the Guidelines in the interim

14   while the case was proceeding.

15             JUSTICE GORSUCH:  Okay.  And on the

16   APA argument, some of us didn't have the benefit

17   of sitting on the district -- the D.C. Circuit

18   --

19             (Laughter.)

20             JUSTICE GORSUCH:  -- five times before

21   breakfast entering these orders.  And, you know,

22   I stare at the language and I -- I'm -- I hear

23   your argument.  I think your friend on the other

24   side's going to point us most specifically to

25   the -- the language "set aside" in 706 and --

1      and hang his hat there if I had to guess, and

2      I'd just like to hear your response.

3               GENERAL PRELOGAR:  So we have never

4      disputed that "set aside" can sometimes mean

5      "vacate."  But I think it's equally clear that

6      that text can sometimes bear the meaning of

7      "disregard" or literally "set to the side."

8      That's how the Court uses it when it reviews

9      federal statutes.  For example, if the Court

10     thinks a statute is invalid, it might say we're

11     setting aside the statute --

12               JUSTICE GORSUCH:  We don't erase them

13     from the books.

14               GENERAL PRELOGAR:  Correct.  You do

15     not vacate or void the statute and take it off

16     the statute books.  Instead, you literally

17     disregard it for purposes of fixing the rights

18     of the parties before you.  And we think that's

19     how Section 706 uses the term.

20               The reason for that is because 706 is

21     setting forth a rule of decision that governs

22     across all of the cases where APA claims can be

23     brought, including things like habeas actions or

24     judicial enforcement -- or judicial review of --

25     of agency enforcement actions.  And there, it

```
 1      would be just like a statute.  You can't vacate
 2      an agency regulation in a habeas case.  You
 3      would have to set it to the side.
 4              It's Section 703 that sets forth the
 5      remedies under the APA, not 706, and we think
 6      that if you look at the context here and also
 7      the history that there was no intent by Congress
 8      to create a truly unprecedented, sweeping,
 9      non-party-specific remedy, it -- it fortifies
10      the conclusion that that would not be the proper
11      interpretation of the text.
12              JUSTICE GORSUCH:  I think it is kind
13      of interesting that remedies are expressly
14      listed in 703, that Congress would sneak in the
15      most important remedy and by far the most
16      sweeping one in Section 706, what is it, (2)(b),
17      something like that, which governs the scope of
18      review, and that nobody at the time, Davis,
19      Jaffe, you know, people who noticed things,
20      noticed this innovation.
21              GENERAL PRELOGAR:  That's correct.  We
22      think that certainly, if Congress were going to
23      take the action of creating this kind of
24      unprecedented remedy that operates directly on
25      the agency rule itself rather than with respect
```

```
 1    to the parties, someone would have said

 2    something and Congress would have made that much

 3    clearer in the text of the statute and not

 4    separately addressed remedies in 703.

 5              JUSTICE GORSUCH:  Thank you, General.

 6              CHIEF JUSTICE ROBERTS:  Justice --

 7              JUSTICE KAVANAUGH:  I have questions

 8    on each bucket.  So, on standing, if a new

 9    administration comes in and says we're not going

10    to enforce the environmental laws, we're not

11    going to enforce the labor laws, your position,

12    I believe, is no state and no individual and no

13    business would have standing to challenge a

14    decision to, as a blanket matter, just not

15    enforce those laws, is that correct?

16              GENERAL PRELOGAR:  That's correct

17    under this Court's precedent, but the framers

18    intended political checks in that circumstance.

19    You know, if -- if an administration did

20    something that extreme and said we're just not

21    going to enforce the law at all, then the

22    President would be held to account by the

23    voters, and Congress has tools at its disposal

24    as well.

25              JUSTICE KAVANAUGH:  And what -- and
```

```
1    what are those tools?  Because you mentioned

2    earlier this would be extraordinary.  But I

3    think Congress in 1996 and today, but in 1996,

4    which is the relevant date, thought the

5    immigration problem in the United States was

6    extraordinary and the lack of enforcement to the

7    degree that Congress as of 1996 wanted.  And so

8    that's why they toughened the laws and

9    constrained the executive's discretion.  At

10   least that would be, I think, the position.

11           So, if courts aren't going to be able

12   to enforce those congressional mandates, what

13   are the exact tools that Congress has to make

14   sure that the laws are enforced in the United

15   States?

16           GENERAL PRELOGAR:  Well, I think that

17   Congress obviously has the power of the purse.

18   It can make the executive's life difficult with

19   respect to its decisions about how to

20   appropriate funds.  Congress has oversight

21   powers.

22           These were the same kinds of

23   considerations that the Court cited in Raines

24   versus Byrd when it was confronted with some of

25   these same separation of powers, structural,
```

52

1   constitutional considerations and re -- and --

2   and identified the fact that Congress wasn't

3   powerless to act.

4           But, Justice Kavanaugh, if I could

5   just for a minute press on the premise of your

6   question that Congress in 1996 intended these to

7   be judicially enforceable mandates, I guess I

8   would say two things.

9           One is that Congress has never

10  actually appropriated funds to DHS to permit

11  treating all of these "shalls" as mandatory,

12  judicially enforceable "shalls," and the other

13  thing is that Congress specifically precluded

14  judicial review in provisions like 1226(e) and

15  1231(h) --

16          JUSTICE KAVANAUGH:  And --

17          GENERAL PRELOGAR:  -- which we haven't

18  had a chance to discuss.

19          JUSTICE KAVANAUGH:  Right.  Those

20  are --

21          GENERAL PRELOGAR:  And I think that

22  demonstrates --

23          JUSTICE KAVANAUGH:  -- those are good

24  arguments, except we have precedent that's

25  against you on those, so -- at least on 1226.

53

1      And I -- I take -- I know you have a response to
2      that, but we don't need to go into it now.
3              But -- but I think your position is,
4      instead of judicial review, Congress has to
5      resort to shutting down the government or
6      impeachment or dramatic steps if it -- if some
7      administration comes in and says we're not going
8      to enforce laws or at least not going to enforce
9      the laws to the degree that Congress by law has
10     said the laws should be enforced, and -- and
11     that's forcing -- I mean, I understand your
12     position, but it's forcing Congress to take
13     dramatic steps, I think.
14              GENERAL PRELOGAR:  Well, I think that
15     if those dramatic steps would be warranted, it
16     would be in the face of a dramatic abdication of
17     statutory responsibility by the executive.
18              And there's a reason we don't see that
19     throughout our history because of those
20     political checks that prevent the executive from
21     taking those kinds of actions.  And it would be
22     like saying, if the President decided to pardon
23     every federal criminal and release them all,
24     obviously, no one could sue about that, but
25     there's a reason that doesn't happen.

1           JUSTICE KAVANAUGH:  Right, but there's

2    also -- just to press on this a little more,

3    you -- you make a big point in your brief

4    this -- this is unusual, this is rare, but it's

5    unusual for Congress to mandate particular

6    exercises of enforcement or prosecutorial

7    discretion.  Most statutes in -- do not say the

8    executive shall detain, shall prosecute.  And I

9    think that's why this is an unusual situation,

10   but I take your point on that.

11          Can I move to remedy then because I

12   still have -- I have some problems with that, as

13   you might imagine.

14          Set aside, you said the judges on the

15   D.C. Circuit haven't paid attention to text,

16   context, and history.  I guess I would

17   respectfully push back pretty strongly on that.

18   I sat with judges like Silberman and Garland and

19   Tatel and Edwards and Williams.  They paid a lot

20   of attention to that.

21          And the government never has made this

22   argument in all the years of the APA, at least

23   not that I remember sitting there for 12 years.

24   I haven't seen it made.  It's a pretty radical

25   rewrite, as the Chief Justice says, of what's

1    been standard administrative law practice.

2                And you devote three pages in your

3    brief to this complete change that all these

4    judges have been doing for all these years, and

5    the government comes up and acknowledges that in

6    case after case after case with labor, energy,

7    environmental.  And I think it's a big step.

8                And you say they're not paying

9    attention to the text.  Yeah, we did.  "Set

10   aside" means "set aside."  That's always been

11   understood to mean the -- the rule's no longer

12   in place.  No one's really had this -- no case

13   has ever said what you're saying anywhere.

14               No one -- you know, it's a recent law

15   review proposal, good for that, but, you know,

16   that's not been the law.  And so I find it

17   pretty astonishing that you come up here and

18   make -- and I realize it's not your -- you know,

19   the main part of your submission, but I'm just

20   going to push back pretty strongly on the, you

21   know, three pages for just -- just toss out

22   decades of -- of this Court's law, of circuit

23   law.

24               And you've got Public Citizen and

25   Texas coming after you on this.  They don't

1    usually unite in a administrative law case in my

2    experience, and they both say your position is

3    completely unprecedented on that.  So that's not

4    really a question, but that is a --

5         (Laughter.)

6         JUSTICE KAVANAUGH:  -- that is a

7    comment on which -- what I think is a pretty

8    extreme argument, and I know it's not your whole

9    argument, but this piece of the argument -- so I

10   don't want to overstate what I'm saying here --

11   just this piece of your argument I think is

12   pretty extreme, so --

13        GENERAL PRELOGAR:  So, Justice

14   Kavanaugh, let me say first, let me clarify,

15   that, of course, I didn't mean that the D.C.

16   Circuit isn't generally paying attention to

17   text, context, and history, and I should have

18   been more precise that I don't think that the

19   Court has ever had the opportunity to actually

20   engage with the arguments that we're making here

21   in this case.

22        And -- and what I was trying to -- to

23   point out is that I don't think it's too late

24   for courts to start to engage with these

25   arguments.  And I recognize that we ourselves

1      are landing on them somewhat late in the day,

2      but we have been making these arguments

3      consistently.

4              I think the first time we started to

5      make them was in 2008 in the Summers versus

6      Earth Island Institute case.  We've repeated it

7      pretty consistently since the Little Sisters

8      case in the last administration and in cases

9      here, and some lower courts, now that they are

10     actually looking at our arguments, have

11     recognized the force of those arguments.

12             It's not accurate to say that no court

13     ever has considered this or accepted it.  The

14     Fourth Circuit has said that universal vacatur

15     is not a permissible remedy under the APA.

16     Chief Judge Sutton in the Arizona versus Biden

17     case in his separate concurrence recognized the

18     force of our arguments about vacatur under

19     Section 706.  A few courts --

20             JUSTICE KAVANAUGH:  And what does it

21     mean just in this case if -- does it mean, for

22     example, if we rule against you on the other

23     issues but then agree with you on the remedy,

24     the -- the set aside point, does that mean the

25     government can then ignore the substance of this

Obtained subject to official review

58

1    Court's ruling in other states?

2              GENERAL PRELOGAR:  No, not at all.  I

3    think, if this Court then --

4              JUSTICE KAVANAUGH:  Why not?

5              GENERAL PRELOGAR:  -- determined to

6    issue -- well, this Court would have authority,

7    of course, to issue a declaratory judgment and

8    we would abide by that throughout the nation if

9    this Court said what the law meant in this area.

10             So I don't think it suggests that

11   courts are going to be powerless to issue

12   remedies here.  They'll just be confined to the

13   traditional legal remedies that preexisted the

14   APA, as Congress intended, and that can include

15   in other contexts injunctions, injunctive

16   relief.  It can include declaratory judgments

17   and any other permissible remedy that preexisted

18   the APA.

19             JUSTICE KAVANAUGH:  Thank you.

20             CHIEF JUSTICE ROBERTS:  Justice

21   Barrett?

22             JUSTICE BARRETT:  Let me pick up on

23   the vacatur point.  So one question I have,

24   obviously, the Chief and Justice Kavanaugh have

25   pointed out that the courts of appeals,

1    particularly the D.C. Circuit, have employed the

2    remedy of vacatur for a long time.

3          Why isn't it possible -- and let's say

4    that I agree with you and agree with some of the

5    scholarship that says that this was not

6    contemplated at the time of the APA's enactment.

7          Why can't remedial authority evolve

8    over time?  You know, even if injunctions and

9    declaratory judgments are what those, you know,

10   who enacted the APA, Congress at the time,

11   scholars at the time, Jaffe, thought that

12   didn't -- vacatur didn't occur to them.

13         Remedial authority is a flexible

14   concept, and so maybe the courts of appeals have

15   expanded that concept.  Why would that be

16   impermissible?

17         GENERAL PRELOGAR:  Well, I think it

18   would be inconsistent with how the Court

19   ordinarily approaches these types of questions

20   of statutory interpretation.

21         And I think, if you agreed with us

22   that this is not what Congress meant to

23   authorize when it enacted Section 706 of the

24   APA, then there would be kind of no basis to

25   alter the text at this state and to suggest that

1    actually the Court can read into that language

2    that all agree was not intended to cover vacatur

3    to --

4            JUSTICE BARRETT:  But set aside is

5    broad, right?  It's not specific.  And even in

6    703, it says including actions for declaratory

7    judgments or writs of, you know, probatory or

8    mandatory injunctions.  It doesn't exclude it.

9            And given that set aside is broad, you

10   know, it's -- it's -- it's -- you're asking for

11   a narrowing construction of it.  And I guess

12   what I'm saying is, when set aside could be read

13   to include vacatur, doesn't preclude it, why is

14   it not subject to evolution?

15           GENERAL PRELOGAR:  Well, I think that

16   there is an additional problem here with trying

17   to expand it in that basis insofar as it would

18   expand beyond party-specific relief, and that

19   implicates its own considerations under Article

20   III and implicates the same arguments we've been

21   making about nationwide injunctions, that when

22   courts issue remedies that go beyond the parties

23   in the case, it can take courts beyond the

24   traditional forms of relief that are authorized,

25   whether under Article III or under the statute.

 1          So I think, here, reading into the

 2     statute a new unprecedented remedy that would

 3     apply on the agency action itself instead of

 4     with respect to the parties would be

 5     problematic.

 6          JUSTICE BARRETT:  Okay.  I'm glad you

 7     brought that up because I have a question about

 8     that too.  Why don't you treat this then as a

 9     jurisdictional argument?

10          You concede that vacatur could be

11     appropriate in a special statutory scheme but

12     say simply that as a matter of statute,

13     statutory interpretation, that APA doesn't

14     authorize it.

15          Why isn't it a matter of Article III

16     jurisdiction?  Why do you concede that it would

17     be acceptable if Congress specifically

18     authorizes it?

19          GENERAL PRELOGAR:  Well, you know, as

20     this Court well knows from its various cases,

21     trying to parse that line on whether specific

22     statutes are jurisdictional or not, it -- it can

23     often require Congress to speak very clearly if

24     it's trying to attach that jurisdictional label.

25     And, here, with respect to the remedies that the

1    APA contemplates, we don't --

2              JUSTICE BARRETT:  No, no, no.  I mean

3    as a matter of Article III.

4              GENERAL PRELOGAR:  As a matter of

5    Article III jurisdiction, you know, I guess it

6    would be possible to think about it that way.

7    We haven't made that argument, but I wouldn't

8    want to shut the door on it because of the --

9    the particular concerns with extending beyond

10   party-specific relief.

11             JUSTICE BARRETT:  Last question on

12   jurisdiction.  You know, in response to some of

13   Justice Gorsuch's questions about whether we

14   should interpret 1252 to be a preclusion of

15   remedial authority or actually tied into

16   jurisdiction, you said you thought it was

17   jurisdictional.

18             If you think that the APA doesn't

19   authorize the remedy of vacatur, is that

20   jurisdictional --

21             GENERAL PRELOGAR:  We --

22             JUSTICE BARRETT:  -- by that same

23   logic, I mean?

24             GENERAL PRELOGAR:  So no, because I

25   think, if the APA doesn't authorize vacatur in

1    the first place, then you wouldn't have any

2    issue under Section 1252(f)(1).  So we're not

3    disputing that a set-aside order in the terms of

4    just setting an unlawful agency action to the

5    side for purposes of rendering the --

6              JUSTICE BARRETT:  No, no.  Maybe I

7    didn't articulate my question well.  I

8    understand that 1252 precludes jurisdiction.

9              GENERAL PRELOGAR:  Yes.

10             JUSTICE BARRETT:  I'm saying that if a

11   court lacks jurisdiction when it lacks the

12   authority to issue a particular remedy, why

13   wouldn't we understand the APA then -- why

14   wouldn't we understand this issue as a matter of

15   statutory interpretation to be jurisdictional?

16   Because, if the district court is entertaining

17   an action to award a particular kind of relief

18   that it lacks authority to award, would that be

19   jurisdictional?

20             GENERAL PRELOGAR:  We have not

21   previously argued that this APA limit is

22   jurisdictional.  The reason we made the

23   arguments under 1252 is because it specifically

24   says no court shall have jurisdiction to do

25   this, and we think that that is Congress clearly

1    acting to attach jurisdictional consequences to

2    an exercise of remedial authority.  But I take

3    the point and I think it might be possible to

4    conceive of a jurisdictional basis as well if a

5    statute is actually preventing a remedy from

6    being ordered.

7         JUSTICE BARRETT:  Okay.  Last

8    question.  This one goes to the merits.  So

9    Justice Alito was asking you -- you were kind of

10   going back and forth with him about the

11   complexities of making the determination whether

12   a non-citizen even falls in one of these

13   categories in the first place.

14        And I just wanted to give you a chance

15   to address how -- you know, there's a portion of

16   the statute that talks about your -- it's in (c)

17   -- (d), "the Attorney General shall devise and

18   implement a system to make available daily on a

19   24-hour basis to state, federal, and local

20   authorities to determine whether individuals

21   arrested for such authorities for aggravated

22   felonies are aliens."  And then it goes on.

23        Why isn't that where the discretion

24   and the resources should be channeled as a

25   matter of statute rather than into the holistic

1    inquiry that the memorandum dictates?

2              GENERAL PRELOGAR:  So I -- I certainly

3    acknowledge the point that Congress might have

4    anticipated that it would be easier to make this

5    determination about aggravated felony status and

6    it set up mechanisms to try to ensure that there

7    was information sharing between the federal

8    government and the states, and I think maybe

9    Congress couldn't have anticipated the -- the

10   developments in this Court with respect to the

11   categorical approach and the legal complexities

12   that would raise about trying to monitor any

13   number of varied state statutes that can be

14   drafted in very different ways, with the end

15   result being that before it's possible to

16   determine with certainty that someone is subject

17   to 1226(c)(2), it often involves an investment,

18   a considerable investment, of resources and

19   consultation between officers and -- and legal

20   advisors to try to ascertain the scope of that

21   provision.

22             JUSTICE BARRETT:  But you do have such

23   a system?

24             GENERAL PRELOGAR:  Yes, we do have

25   systems to share information between states and

66

 1    the federal government with respect to those who

 2    -- who have criminal convictions in state court.

 3              JUSTICE BARRETT:  Thank you.

 4              CHIEF JUSTICE ROBERTS:  Justice

 5    Jackson?

 6              JUSTICE JACKSON:  Yes.  As you might

 7    imagine, I would like to circle back to the

 8    concerns that the Chief Justice and Justice

 9    Kavanaugh raised about vacatur and the argument

10    that you're making in this case.  And --

11              JUSTICE KAGAN:  Seems to be a kind of

12    D.C. Circuit cartel.

13              (Laughter.)

14              JUSTICE JACKSON:  It is.  It is.

15              And, in particular, the -- the -- the

16    conceptual problem that I'm having with your

17    argument, you point to text, context, and

18    history, and I understand those things, but,

19    ordinarily, there's a symmetry between the claim

20    that is being made in a case and the remedy that

21    is provided to a successful plaintiff.  And your

22    remedy, the way that you're reading this,

23    actually creates a disconnect for me.

24              Here's what I mean.  It is clear that

25    the claim under the APA is about the manner in

67

 1    which the agency has exercised its discretion.

 2    And we know -- we know that agencies have no

 3    inherent authority.  They get all of their power

 4    to make valid and legally binding policies from

 5    Congress, and Congress has said in the APA that

 6    in order to make valid and legally binding

 7    policies, agencies have to follow certain

 8    procedures.  So, when a plaintiff is making a

 9    claim under the APA, they're complaining about

10    the agency's failure to follow the procedures

11    that are necessary in order to reach a valid and

12    legally binding result.

13           Given that that's the case, I think

14    there's a disconnect to say that the successful

15    plaintiff only gets a remedy that is about the

16    application of that rule to them, because their

17    complaint is not about the application.  Their

18    complaint is that the agency did not have the

19    authority to do what it did because it didn't

20    follow the procedures under the APA.  It's as

21    though they're saying what the agency did is

22    void.  It's a null set because they did not

23    follow the procedures that Congress required.

24           So I just don't even understand --

25    setting aside the -- how you read the statute to

1    get to that result, it seems to me to not make

2    sense to say that the remedy is to allow the

3    agency to apply its void, defective rule to

4    anyone else who's not the plaintiff.

5              GENERAL PRELOGAR:  So, Justice

6    Jackson, I think where I disagree with the --

7    with your analysis is in suggesting that a

8    plaintiff in a case isn't protesting the

9    application of the invalid agency regulation to

10   that party.  That's the very nature of this kind

11   of dispute.  Now it might be the case that the

12   -- the arguments they're making outlie --

13             JUSTICE JACKSON:  But, I'm sorry, it's

14   not the nature, because -- I mean, obviously,

15   they -- they are saying it was applied to them

16   as a matter of standing.  You have to have it

17   applied to you in order to make the charge.

18             But the claim is that the agency has

19   failed to have notice and comment where it was

20   required or the agency has engaged in arbitrary

21   and -- and capricious decision-making.  And, if

22   that's true, what it means is that the agency

23   does not have a valid exercise of its discretion

24   per Congress's requirements.  The result then is

25   that the agency doesn't have a rule that it can

1     apply.

2          And the statute says very plainly the

3     most commonsense result of that is just like in

4     a contracts case.  If a court were to find in a

5     contracts case that the contract is void because

6     it wasn't properly formed, you don't -- the

7     result is not you can apply it to whomever, just

8     not the plaintiff standing there.  It's -- it's

9     not a thing anymore.  And -- and -- and that's

10    to me what the statute says.  You set it aside

11    because you haven't formed it properly and

12    consistently with what Congress has said.

13          GENERAL PRELOGAR:  I certainly

14    acknowledge that when a plaintiff is challenging

15    the agency's decision-making, their legal theory

16    could suggest that the agency regulation is

17    invalid in all of its applications and as

18    applied to other parties too.  But I still think

19    that in that case, just like in the case of

20    interpreting a statute, the proper remedy is the

21    party-specific relief of --

22          JUSTICE JACKSON:  But we don't have --

23    the APA is a different kind of claim.  It's not

24    a -- the statutory claim is not about Congress's

25    authority to make the policy decision.  Did they

1    follow the right procedures in making it?

2              Let me ask you about 1252(f) because

3    that's another basis that you sort of suggest

4    that courts' authority is limited.  When I look

5    at 1252(f), it says that there's no jurisdiction

6    or authority to enjoin or restrain the operation

7    of the provisions of this subchapter, which

8    seems to me as though Congress is prohibiting an

9    injunctive -- an injunction of the statute.

10   You've interpreted it, I think, to mean

11   operation in the sense of any regulations, any

12   policies of the government that are implementing

13   that statute.

14             But I guess I'm concerned about that

15   because, in (e)(3), just the provision prior,

16   Congress was very clear about spelling out

17   things like regulations, guidelines, et cetera.

18   I know that's a different provision because it

19   applies to expedited removal, but Congress knows

20   how to say when it's talking about claims being

21   brought about guidelines, procedures, and things

22   that the agency does.  And yet, in this statute,

23   in (f), which would, I think, also apply to (e),

24   it talks about the operation of the statute.

25             So why isn't really what's going on

1   here that Congress didn't want its new

2   regulations, its new policies concerning

3   immigration to themselves be enjoined, and it

4   wasn't really talking about the agency's

5   implementation in this -- in this provision?

6           GENERAL PRELOGAR:  So I think that

7   that approach would be inconsistent with the

8   Court's decision last term in Aleman Gonzalez,

9   where the claims of the non-citizens in that

10  case is that they were entitled to bond hearings

11  under these provisions, and the Court recognized

12  that this bar prevents an injunction that would

13  prevent the executive from implementing its

14  policies with respect to bond under that

15  statutory language.  And so I think that the

16  same argument potentially could have been made

17  there, that that's not actually enjoining the

18  statute; it's enjoining the agency's policies

19  that are consistent with, in the agency's views,

20  those statutory provisions.  But the Court --

21          JUSTICE JACKSON:  All right.  So what

22  do we do about (f) as it applies to (e)?  And,

23  again, I know (e) is not in this case, but, if

24  we're going to be interpreting (f), do you -- do

25  you -- is it your view that the limitation on

 1    injunctive relief, as you have interpreted it in

 2    (f), applies to challenges on the validity of

 3    the system in (e), in the -- in the expedited

 4    removal context?

 5              GENERAL PRELOGAR:  Yes.  I think that

 6    we would take that position because I -- you

 7    know, as we understand this Court's

 8    interpretation in Aleman Gonzalez, it focuses on

 9    whether the claims in the case are premised on

10    these statutory provisions and are seeking to

11    require DHS to implement the covered INA

12    provisions in a particular way.

13              And so, if the theory of the case were

14    under 1226, any of its provisions, DHS is

15    required to interpret the statute in a

16    particular way or to take particular action,

17    that comes within the bar that --

18              JUSTICE JACKSON:  All right.  But then

19    why --

20              GENERAL PRELOGAR:  -- 1252 announces.

21              JUSTICE JACKSON:  -- then -- then --

22    then -- then we have a statute here at (e) in

23    which Congress has authorized very specifically

24    a claim that Congress has said that you can

25    bring a case in order to challenge a regulation,

1    policy directive, written policy guideline, or
2    written procedure of the Attorney General or,
3    here, DHS, Congress has allowed that, and you're
4    suggesting that the only relief is declaratory
5    relief under those circumstances that you don't
6    even have to follow really?
7         GENERAL PRELOGAR:  So there is the
8    opportunity for declaratory relief in any court.
9    1252(f)(1) also permits coercive relief on
10   behalf of individual non-citizens, and
11   1252(f)(1) preserves this Court's authority to
12   enter any form of relief.  So I think that those
13   are the remedies that Congress delineated under
14   these statutory provisions.
15        JUSTICE JACKSON:  Thank you.
16        CHIEF JUSTICE ROBERTS:  Thank you,
17   counsel.
18        General Stone?
19        ORAL ARGUMENT OF JUDD E. STONE, II,
20          ON BEHALF OF THE RESPONDENTS
21        MR. STONE:  Thank you, Mr. Chief
22   Justice, and may it please the Court:
23        The states proved their standing at
24   trial based on harms well recognized by this
25   Court's precedents, prevailed on merits

1    arguments grounded firmly in the INA's text, and

2    received vacatur, the standard APA remedy.

3            Petitioners respond by attempting to

4    rewrite the law of Article III, the INA, and the

5    APA.  They are wrong.

6            Petitioners call the states' standing

7    illegitimate because -- because it is based on

8    the costs states incur when Petitioners violate

9    federal law.  But such costs fall well within

10   those held as sufficient in at least

11   Massachusetts versus EPA and Department of

12   Commerce.

13           As this Court has recognized before,

14   the states bear many of the consequences of

15   federal immigration decisions.  Those

16   consequences fit comfortably in this Court's

17   traditional Article III standing framework.

18           On the merits, the final memorandum is

19   unlawful for multiple reasons, most clearly

20   because it treats Section 1226(c) as

21   discretionary, while both this Court and every

22   previous administration have acknowledged it as

23   mandatory.

24           Petitioners respond by appealing to

25   resource constraints and their prosecutorial

1    discretion, both of which are beside the point.

2         The states do not claim the

3    Petitioners must remove anyone in particular.

4    Rather, Petitioners' detention obligations run

5    only to -- arise before and after their decision

6    to prosecute and run only to a small subset of

7    this nation's illegal aliens.

8         Finally, eliminating the APA's vacatur

9    remedy would jettison nearly a century of

10   administrative practice.  When Congress

11   empowered federal courts under Section 706 to

12   set aside agency action, it authorized courts,

13   consistent with pre-APA practice, to vacate

14   unlawful rules, not merely to disregard them.

15   This Court should not hold otherwise.

16        I welcome the Court's questions.

17        JUSTICE THOMAS:  General Stone, I'd

18   like you to respond to some of our back and

19   forth about 1252(f), particularly as it affects

20   your standing in this case and whether or not

21   you can obtain the remedies that you seek.

22        For example, is vacatur -- vacatur

23   actually possible under 1252(f)?

24        MR. STONE:  Certainly, Justice Thomas.

25        So, in our view, vacatur is left

1    available by 1252(f)(1) for several reasons.

2    First of all, vacatur is not injunctive relief.

3    The terms "enjoin" and "restrain" in 1252(f)(1)

4    speak to two traditional kinds of injunctive

5    relief:  injunctions and temporary restraining

6    orders.

7            And perhaps if there were other orders

8    that operated like them in key regards, which is

9    to say they operated in personam, they had a

10   prohibitory or a mandatory character, it might

11   bar those as well.

12           Vacatur is, as this Court has put in

13   Monsanto, a much less drastic remedy, and the

14   most important way in which it's less drastic

15   can easily be seen by the perspective of someone

16   who, in fact, has been enjoined.

17           A party who's been enjoined to do or

18   not do something is effectively under the

19   supervision of a federal district judge and has

20   to go to that district judge or suffer their

21   counterparty going to that district judge if

22   they want to attempt to re-implement or

23   otherwise take the action that's been -- that's

24   been subject to that injunction.  No such

25   obligation and no collateral contempt potential

1    exposure exists with vacatur.

2          Now my friend on the other side said

3    quite -- quite candidly that in the event that

4    Texas were to have received a declaration, of

5    course, and I believe her words were, the United

6    States would follow that declaration or would be

7    bound by it.

8          It's very hard to explain how it is

9    that vacatur, which acts against -- directly

10    against a rule and does not in personam bind any

11    officer or agency of the United States, is

12    coercive or otherwise prohibited in the meaning

13    of 1252(f)(1), but that declaratory relief,

14    which the United States acknowledges it would,

15    in fact, follow, is somehow not coercive.

16          I think -- I think that line is

17    evanescent, if it exists at all, and so the best

18    reading of 1252(f)(1) is only to injunctions and

19    those sorts of orders and that Texas, the

20    state --

21          JUSTICE KAGAN:  It strikes me,

22    General, that you had a better argument on this

23    score and maybe a good argument before Aleman

24    Gonzalez, but after Aleman Gonzalez, it -- it

25    seems hard to me for you to make the case.

1          I'm just going to read you a quote
2    there.  We held that 1252(f)(1) "barred orders
3    that require officials to take actions that in
4    the government's views are not required by the
5    INA and to refrain from actions that again in
6    the government's view are allowed by the INA."
7          So wouldn't vacating the Guidelines
8    here require DHS officials to take enforcement
9    actions that in the government's view are not
10   required by the INA?  It just falls with the --
11   the direct language of that decision?
12         MR. STONE:  I don't think so, Your
13   Honor, and I have two points.  First, vacatur is
14   self-executing.  The vacatur order is affirmed
15   by this Court or, if it's issued otherwise in
16   any court, it acts against the -- it acts
17   against the challenged thing, the challenged
18   rule or order on its own and makes it legally
19   void.  It does not require any action
20   whatsoever.  It does not on its own prohibit any
21   action whatsoever.
22         And second, to the extent that
23   Petitioners have been attempting to draw a
24   distinction consistent with Aleman Gonzalez
25   between vacatur and declaratory relief, again, I

1    think there's no -- for purposes of what would

2    coerce or otherwise would restrain in the sense

3    of Aleman -- Aleman Gonzalez petitioners, an

4    adverse declaration saying that their -- that

5    the Guidelines, the final memorandum, has been

6    unlawful under 1226(c) and 1231 certainly has at

7    much -- at least as much coercive pressure -- I

8    think that's none -- but the same amount of

9    coercive pressure.

10           And so, if that's the case, if -- if

11   Petitioners are saying that 1230 -- that

12   1252(f)(1) removes all available remedies, then,

13   one, it's a very strange way of writing that

14   provision, and, two, they should come out and

15   say it and then say that, in fact, there are no

16   remedies available whatsoever.  I just don't

17   think -- the vacatur/declaratory relief

18   distinction doesn't work.

19           JUSTICE GORSUCH:  General, I take your

20   point about declaratory judgments, but just -- I

21   just want to press a little bit further on this

22   same point, and -- and that is, for purposes

23   of -- of standing and -- and redressability,

24   you -- you took the position, I believe, that

25   vacatur does solve Texas's problems because the

1    immigration laws will be enforced differently

2    without the Guidelines than with the Guidelines,

3    right?

4              MR. STONE:  Yes.  And to be a little

5    more specific, there are findings of fact from

6    the trial court --

7              JUSTICE GORSUCH:  Sure.  Sure.

8              MR. STONE:  -- that the Guidelines --

9              JUSTICE GORSUCH:  That support that.

10   Yeah.

11             MR. STONE:  Yes.

12             JUSTICE GORSUCH:  So, without the

13   Guidelines, the government will enforce the

14   immigration laws differently in a way that

15   satisfies Texas?

16             MR. STONE:  Without the Guidelines,

17   yes.  And just to specify a little bit, that

18   without the Guidelines, federal immigration

19   officials will no longer view their discretion

20   -- their mandatory obligations as discretionary.

21             JUSTICE GORSUCH:  We can spin it out

22   as long as you want.

23             MR. STONE:  I'm agreeing, Justice --

24             JUSTICE GORSUCH:  But the answer is

25   yes, right?

```
 1              MR. STONE:  Yes, Your Honor.

 2              JUSTICE GORSUCH:  Okay.  And if that's

 3     the case, then why isn't a vacatur of the

 4     Guidelines enjoining in the language that we

 5     used last term the government's ability to

 6     enforce the immigration laws in a certain way?

 7              MR. STONE:  In part because, Your

 8     Honor, the essence of an injunction is not

 9     whether or not people will react to it in a way

10     that -- that remedies someone's harm.  It's that

11     they're compelled to.

12              Something about injunction doesn't

13     just say fix this person's injury.  It says, you

14     must under pain of court supervision, under pain

15     of penalty, you must do these things or refrain

16     from them going --

17              JUSTICE GORSUCH:  Well, isn't that

18     Texas's whole point, is that under 1226, 1231,

19     the government must do certain things and it's

20     not doing it because of the Guidelines.  Getting

21     rid of the Guidelines will fix the problem, and,

22     therefore, the government is now effectively

23     required to enforce the immigration laws

24     differently than it otherwise would.

25              MR. STONE:  Those are our merits
```

1    arguments as to 1226 and 1232(a).

2             JUSTICE GORSUCH:  Mm-hmm.

3             MR. STONE:  Our remedy is simply,

4    because the Guidelines are unlawfully causing

5    DHS agents essentially not to treat mandatory

6    things as -- or rather to treat mandatory things

7    as discretionary, they are as a matter of fact

8    reducing the number of detentions, et cetera.

9    But our relief would not coerce them into doing

10    anything.  It's merely a matter of fact that DHS

11    agents would so respond.  We're not asking for

12    anything coercive.

13             JUSTICE GORSUCH:  Thank you.

14             JUSTICE BARRETT:  But they could -- I

15    mean, the Guidelines are gone, but that doesn't

16    mean that ICE officers or DHS couldn't more

17    informally say we're going to exercise our

18    prosecutorial discretion not to institute a

19    removal proceeding against this particular

20    non-citizen.

21             MR. STONE:  That certainly might well

22    be the case, Your Honor.  Of course, that would

23    have been the kind of evidence that would have

24    attacked our redressability, that had

25    Petitioners submitted that to the district court

1    certainly would have undermined a number of the

2    findings.

3              JUSTICE BARRETT:  But it's your burden

4    to show standing, right?

5              MR. STONE:  Yes, Your Honor, and we

6    did by, again, findings supported by clear error

7    showing the causal relationship between actual

8    enforcement actions and this memorandum,

9    including, for example, 22 e-mails specifically

10   citing the Guidelines as -- as a reason for

11   removing detainers.

12             JUSTICE JACKSON:  But why isn't the

13   causal relationship the chain broken in the

14   sense that you have voluntary decision-making by

15   Texas, say, in relation to the criminal justice

16   costs, that you are -- you feel compelled or you

17   want to go after individual people?

18             In other words, aren't the costs

19   associated with Texas's decision to incarcerate

20   or parole certain non-citizens if the federal

21   government decides not to detain them, aren't

22   those a result of the state's own policy choices

23   in a way, you know, that we have recognized or

24   decided is not sufficient in a case like

25   Pennsylvania versus New Jersey?

1           MR. STONE:  Your Honor, I think,

2   ordinarily, in the Court's Article III standing

3   analysis, for example, in -- in the DACA case in

4   Regents, the Court didn't go, well, California

5   is -- is suffering this injury in the first

6   place because they have chosen to employ

7   individuals subject to this immigration right,

8   et cetera, and so, really, to some extent, the

9   loss of these individuals is a self-inflicted

10  injury.

11          More to the point, Texas suffers

12  injuries regardless of what it does, whether it

13  detains, releases, or paroles individuals,

14  because we have not only law enforcement costs

15  but social services costs and very serious

16  threats of recidivism that must be considered.

17          JUSTICE JACKSON:  All right.  Well,

18  separate -- separate out the -- the -- can we

19  just for a second separate out the criminal

20  justice costs from the healthcare and other

21  things that would be required?  With respect to

22  the criminal justice costs, presumably -- first

23  of all, the federal government has said that

24  they have determined that these particular

25  individuals aren't going to be a high risk and

Document 642-2 subject on 03/02/23 review TXSD

85

1 so that's why they're not detaining them.

2    So why isn't Texas's determination to

3 detain them on Texas?  I mean, presumably, there

4 will be other states that might agree with the

5 federal government and say, you know, we're not

6 going to expend any money to try to supervise or

7 detain these particular individuals.

8    MR. STONE:  Well, two points, Your

9 Honor.  First of all, there are district court

10 findings of fact.  This was a disputed subject

11 at the trial court regarding whether or not the

12 rates of recidivism were unacceptably high, what

13 kinds of risks Texas was exposed to by these

14 releases.  And, more to the point, Congress has

15 made the determination specifically in the

16 passage of IIRAIRA and 1226(c) whether or not

17 these individuals are unacceptably --

18    JUSTICE JACKSON:  Well, that's on the

19 merits.

20    MR. STONE:  -- high of a risk.

21    JUSTICE JACKSON:  That's a merits

22 question.  I mean, you know, I guess my point is

23 just in terms of injury and who is bearing the

24 cost and why.  Isn't it Texas's determination to

25 go after and detain or keep detained these

1     people, you know, a cost that Texas has chosen

2     to incur?  The Guidelines don't require states

3     to keep these people in custody.

4            MR. STONE:  No, Your Honor, and I

5     think that's because Texas is put to what we

6     call -- might call sort of an Article III

7     dilemma where it either pays the costs of

8     continued detention or pays the costs that are

9     incurred through recidivism, again, recidivism

10    in this case being a hotly contested question at

11    trial upon which there was direct testimony from

12    one of the largest counties in Texas regarding

13    the criminal population there, actual evidence

14    of recidivism by specific individuals who had

15    been detained and released pursuant to

16    detainers --

17            JUSTICE JACKSON:  All right.

18            JUSTICE KAVANAUGH:  Does --

19            JUSTICE JACKSON:  So can we answer

20    Judge -- Justice Sotomayor's question about net

21    costs then?  So, fine, there might be costs with

22    respect to this group of people, but the

23    government -- the federal government says that

24    you're going to save a whole lot based on other

25    aspects of the operation of the Guidelines.

```
 1    What -- what's your response to that?

 2                MR. STONE:  Two responses to that

 3    question.  The first is somewhat

 4    straightforward, which is to say that's in the

 5    nature of a factual assertion, a factual

 6    assertion about which Petitioners offered zero

 7    evidence whatsoever.  That was a disputed fact

 8    question at trial.  They offered no evidence.

 9                If there were, in fact, evidence, I

10    think that would go -- that would be powerful

11    evidence attacking our standing.  Their

12    assertions afterwards --

13                JUSTICE SOTOMAYOR:  I'm sorry.

14                MR. STONE:  -- are not a kind of

15    evidence.

16                JUSTICE SOTOMAYOR:  You have to prove

17    standing.  And we have said in Arizona, the

18    Arizona case, that you have to show the net

19    effect.  And you didn't.  You didn't show the --

20    what the government has said and what the record

21    clearly proves is that there's been a surge at

22    the border; if left unattended, that surge would

23    overwhelm all of the border states, not just

24    Texas; and that the cost of doing that has to

25    give them greater priorities in terms of aliens
```

88

1    who are already here.

2              But we know that many of those people

3    coming in will be risks to the State of Texas,

4    et cetera.  Why haven't you shown that that net

5    effect of keeping more people out is going to

6    mean less than the few people that they decide

7    to erroneously let go?

8              MR. STONE:  Respectfully, Your Honor,

9    I think there's two points here.  One is that

10   this Court doesn't typically treat standing as

11   an accounting exercise as to whether or not an

12   individual who shows --

13             JUSTICE SOTOMAYOR:  No, but you have

14   to -- you have to show -- you can't look at a

15   piece of a policy and say I don't like a piece.

16   You have to look at the policy altogether.

17             MR. STONE:  Well, certainly, Justice

18   Sotomayor, what we are looking at here is a very

19   specific challenge to the exercise of detention

20   authority under two sections.  I don't think

21   it's an Article III vice that Texas isn't

22   challenging the entire immigration code's

23   application in all cases.

24             JUSTICE KAGAN:  General, do you think

25   that there's any immigration policy that you

89

1     could not challenge under the way you view

2     standing?

3          MR. STONE:  I think that's hard to

4     discuss in the abstract.  There might well be,

5     Your Honor, but it shouldn't come as a --

6          JUSTICE KAGAN:  It's hard to think of,

7     I guess is what I'm saying.  I mean, if all you

8     need to do is to say we have a dollar's worth of

9     costs and you don't even need to think about the

10    benefits on the other side, I mean, every

11    immigration policy, you let in more people, you

12    let in fewer people, is going to have some

13    effect on a state's fiscal condition.  Maybe

14    they'll get less or more tax dollars.  Maybe

15    they'll have to spend less or more money.  I

16    mean, every single immigration policy.  And

17    then, you know, not to mention all the other

18    policies in the world that if a state comes in

19    and says I got a dollar's worth of costs that I

20    can show you.

21         I mean, we're just going to be in a --

22    in a situation where every administration is

23    confronted by suits by states that can, you

24    know, bring a policy to a dead halt, to a dead

25    stop, by just showing a dollar's worth of costs?

```
 1              MR. STONE:  Two points, Your Honor.
 2    The first is -- and I can't speak for all
 3    states, obviously, even though 37 of them are
 4    participating in this case, and none have
 5    adopted the United States' theory of standing.
 6    Texas has more than half of the southern border.
 7              JUSTICE KAGAN:  That's not responsive
 8    to my question.
 9              MR. STONE:  Yes, Your Honor.  Texas --
10              JUSTICE KAGAN:  I mean, look -- and
11    this isn't anything that has to do with this
12    Administration.  You know, some other
13    administration will come in and the California
14    solicitor general will be standing where you
15    are.
16              And, you know, there's an issue here,
17    especially with respect to immigration policy.
18    Immigration policy is supposed to be the zenith
19    of federal power, and it's supposed to be the
20    zenith of executive power.  And, instead, we're
21    creating a system where a combination of states
22    and courts can bring immigration policy to a
23    dead halt.
24              MR. STONE:  Two points, Your Honor.
25    The first is, again, speaking at least for
```

```
 1    Texas, it shouldn't be particularly surprising
 2    that we would suffer outsized Article III
 3    injuries given the fact that half of the
 4    southern border immediately abuts Texas.
 5              JUSTICE KAGAN:  But would you --
 6              MR. STONE:  We're --
 7              JUSTICE KAGAN:  You're -- you're not
 8    saying that you have a special kind of injury
 9    here.  You're saying all the usual rules apply,
10    maybe more than the usual rules, and all you
11    need to show is a dollar's worth of costs.
12              MR. STONE:  We are indeed saying the
13    usual rules apply, with one twist, which is, to
14    the extent the usual rules don't apply,
15    immigration surely is the kind of sort of
16    sovereign prerogative that in the sense of
17    Massachusetts versus EPA, Texas has had
18    to surrender to the union as a part of the state
19    of joining the union, and Texas has been given a
20    procedural right, just like in Massachusetts
21    versus EPA, to vindicate those interests that it
22    has had to surrender to the federal government.
23    So --
24              JUSTICE KAGAN:  I guess what strikes
25    me is that these very broad arguments that the
```

1    Solicitor General is making, maybe we shouldn't

2    -- even if we don't think that we should accept

3    them as broad prohibitions, the fact that you

4    are not the party directly regulated, the fact

5    that you are challenging an enforcement action,

6    particularly an enforcement action where the

7    most discretion has been given to executive

8    officials, but -- but those form the backdrop by

9    which we should say, you know, it's just not

10   enough that you're coming in here with a set of

11   speculative possibilities about your costs.  You

12   have to do more than that given the backdrop of

13   -- of what has become, I think, a system that

14   nobody ever thought would occur, which is that

15   the states can go into court at the drop of a

16   pin and stop federal policies in their tracks.

17         MR. STONE:  So, Your Honor, I think

18   there's two points there, the first being, to

19   the extent you're describing a rule that sort of

20   shows special skepticism of the states, that's

21   at minimum -- that's at minimum in the teeth of

22   Massachusetts versus EPA.

23         JUSTICE KAGAN:  Yeah, I'm -- I'm

24   saying that, like, coming in and saying, you

25   know, it seems to us that we have some costs

1  associated with this and we're not going to look

2  at the benefits and we're not going to look at

3  the fact that, as Judge Sutton said, the fact

4  that there are priorities, you know, that person

5  A will be -- you know, will -- will not be

6  removed versus person B will, that -- that that

7  doesn't particularly show that your net costs

8  are -- even that your -- your -- your gross

9  costs are going to rise, let alone your net

10  costs.

11          And all of the speculation and all of

12  this kind of like we think we kind of showed it

13  is just not enough given the backdrop of this

14  case.

15          MR. STONE:  We don't think we showed

16  it, Your Honor.  A trial court judge reviewable

17  for clear error thinks that we showed it, and he

18  based that on --

19          JUSTICE KAGAN:  Can I -- can I --

20          CHIEF JUSTICE ROBERTS:  Thank you.

21          JUSTICE KAGAN:  -- say something about

22  that?  Can I -- one more?

23          CHIEF JUSTICE ROBERTS:  One more.

24          (Laughter.)

25          JUSTICE KAGAN:  I mean, just to think

1    about just the backdrop of this case and what's

2    going on here, I mean, just add to the notion,

3    not your fault, this is not, you know, but in

4    Texas, there are divisions within districts.

5    You can pick your trial court judge.

6              You know, you play by the rules,

7    that's fine, but you pick your trial court

8    judge.  One judge stops a federal immigration

9    policy in its tracks because you have a kind of

10   sort of speculative argument that your budget is

11   going to be affected.

12             MR. STONE:  Respectfully, Your Honor,

13   it's not speculative.  In fact, this is how

14   concrete it is.  We have at least one example in

15   the record of a specific alien, Ruben Abonza,

16   who specifically had a detainer placed on him.

17   That detainer was removed.  He had a final order

18   of removal and was a 1226(c) alien.

19             That detainer was removed.  He was

20   released.  And then he was reapprehended for

21   committing human trafficking.  That commits the

22   kind of cost, both law enforcement and

23   recidivism, that certainly forms the basis of an

24   Article III injury.  That is not speculative.

25   It occurred.

1          CHIEF JUSTICE ROBERTS:  Thank you,

2     counsel.  I'd like to move to the merits a

3     little bit.

4          The Solicitor General on the -- on the

5     other side responded to some of my questioning

6     about the impossibility by emphasizing that,

7     well, that's a good reason to think that

8     Congress really didn't intend that result.

9          You know, it's -- it's -- it's a

10     compelling argument, and what is your answer?  I

11     mean, to the extent it is impossible -- it is

12     impossible for the executive to do what you want

13     him to do, right?

14          MR. STONE:  I don't think so, Your

15     Honor, at least as applied to the narrow 60- to

16     80,000 -- and this is a matter of finding of

17     fact, there is evidence in the record, so I want

18     to just claim that -- the 60- to 80,000 pool of

19     individuals who are criminal aliens under

20     subsection C.

21          CHIEF JUSTICE ROBERTS:  Are there 60-

22     to 80,000 empty beds?

23          MR. STONE:  No, Your Honor, but the

24     way that those beds work is they work both in

25     terms of having a bed and the velocity with

Objected to, subject to further review

1    which the individuals are removed under the

2    system.  And, of course, under 1226(c), the

3    government's detention obligation runs only

4    until they make a determination whether or not

5    to remove the individual.

6           If the government says we made a

7    determination we're not going to remove, the

8    1226(c) obligation ends instantly.

9           CHIEF JUSTICE ROBERTS:  Well, assuming

10   we think it would be, if not impossible,

11   surprising and very difficult for the executive

12   to comply, isn't that a consideration we should

13   take into account in trying to figure out if

14   "shall" means "shall"?  Because, certainly,

15   there are cases where we've said "shall" means

16   "may."

17          MR. STONE:  Your Honor, I don't think

18   so for two reasons, one being the backdrop that

19   "shall," indeed, means "shall" and that 1226 has

20   a variety of other intertextual clues that

21   suggest this "shall" especially means "shall,"

22   it's contradistinction with "may" in 1226(a),

23   its extremely tight restrictive possible release

24   provision in 1221(c)(2).

25          But, more importantly, Congress

1    actually considered this exact excuse in the

2    transition rules following IIRAIRA, where

3    Congress gave the executive two years, saying,

4    if the executive in any given 1226 case believes

5    it simply does not have the enforcement ability,

6    doesn't have the resources, that will excuse

7    mandatory detention.

8          After two years, the executive went

9    back to Congress and asked for renewal of that.

10   Congress said no, and then immediately, then the

11   Clinton Administration acknowledged that the

12   obligations under 1226(c) became mandatory.

13         JUSTICE KAVANAUGH:  But the -- but the

14   resources are still not there.  And so I guess,

15   on both standing and to pick up on Justice

16   Kagan's question, standing and merits, and the

17   Chief Justice's questions as well, there's a

18   tradition of not allowing people to challenge

19   non-enforcement decisions.  Linda R.S. stands as

20   probably the lead precedent on that.

21         And so too on the merits question,

22   there is a tradition of reading statutes with --

23   against the backdrop of prosecutorial discretion

24   that at least in the federal context is rooted

25   in Article II and then Castle Rock talks about

```
 1    that background principle in the state context.

 2    Those two things together are both probably

 3    united by the fact that there are never enough

 4    resources or almost never enough resources to

 5    detain every person who should be detained,

 6    arrest every person who should be arrested,

 7    prosecute every person who's violated the law.

 8         And so those two principles seem to me

 9    to come from the same problem, and that problem,

10    even after the two-year period you described, is

11    present today, right?

12         MR. STONE:  Taking as an assumption

13    that it would not be possible, we think that's

14    at least disputable, that it's not possible to

15    detain everyone covered by this.

16         A couple of points.  First of all, the

17    prosecutorial discretion, typically,

18    prosecutorial discretion means the power to

19    bring a criminal action and then pursue it or

20    not pursue it against someone, or in this

21    context a notice to appear, and to bring that

22    all the way through to a final order of removal

23    and execute or not execute it.

24         Prosecutorial discretion doesn't

25    prevent, as you pointed out, for example, in
```

1    Heckler versus Chaney, Congress setting
2    enforcement priorities, and it's not an excuse
3    for an executive not to comply with a mandate on
4    the executive itself.
5            Now I take the exception, of course,
6    for a possibility that Congress said you must
7    prosecute this individual.  I think that would
8    be the sort of very core of an argument.
9            JUSTICE KAVANAUGH:  How about if
10   Congress said you must prosecute, that the
11   executive must prosecute everyone who violates
12   this law?
13           MR. STONE:  I think that would be the
14   strongest possible Article II argument
15   available.  Nothing in the text, nothing in the
16   states' theory --
17           JUSTICE KAVANAUGH:  That would be a
18   problem under Article II, don't you think?
19           MR. STONE:  I think so, Your Honor,
20   yes, Your Honor, I think that would be the
21   strongest possible --
22           JUSTICE KAVANAUGH:  Well, isn't -- how
23   is that different from what we have here in
24   terms of -- you know, let's change that
25   hypothetical, you must arrest, the executive

```
 1    must arrest everyone who there's probable cause
 2    to believe violated the law.  How is that
 3    different from, theoretically, from this -- this
 4    provision?
 5              MR. STONE:  Certainly, because -- two
 6    reasons:  One, because arrest -- essentially,
 7    prosecutorial discretion doesn't cover every
 8    potential possible act of enforcement from soup
 9    to nuts in the process.  It is -- the core of
10    prosecutorial discretion is the ability to
11    choose whether or not to bring charges and
12    prosecute them.
13              Now I agree that perhaps that Article
14    II question gains strengths or loses it
15    depending on how intrusive the invasion is.
16    But, here, 1226(c)(1) as read alongside 1226(a)
17    and 1230 -- 12 -- 1231(a)(1), both respect the
18    executive's prosecutorial discretion immensely.
19              1226(c)(1) only applies until they
20    have made a decision whether or not to
21    prosecute.  If they decide not to, it
22    immediately ends.
23              JUSTICE SOTOMAYOR:  Counsel, I -- I --
24              JUSTICE KAVANAUGH:  Right, but the --
25              JUSTICE SOTOMAYOR:  I'm sorry, go
```

1    ahead.

2          JUSTICE KAVANAUGH:  I was -- the last

3    question to tie this up, I'm sorry, is, if you

4    prevail here, what will happen?  That's a

5    concern because I'm not sure much will change

6    because they don't have the resources to change.

7    So what -- what do you envision?

8          I know Florida's amicus brief says,

9    well, the executive will then strive to meet its

10    obligations.  "Strive to" is not a usual term of

11    a judicial order.  So what do you think happens

12    if you prevail here?

13          MR. STONE:  We think, consistent with

14    the district court's findings, that individual

15    officers in ICE will go back to -- to not

16    believing that their enforcement discretion has

17    been restrained in the ways the prosecutorial --

18    the -- rather, the Guidelines and those have --

19    have caused that to be.

20          More specifically about the -- the

21    lack of -- the lack of resources, though, Your

22    Honor, there is an on-the-record finding of bad

23    faith in this specific context for two reasons.

24    One, here, Petitioners have repeatedly sought to

25    decrease their enforcement capabilities, to

102

 1   decrease their detention capabilities, and, two,
 2   they've persistently underused them.
 3          JUSTICE KAVANAUGH:  Okay.  Why don't
 4   you go to Justice Sotomayor.
 5          JUSTICE SOTOMAYOR:  Counsel, I don't
 6   know that I understand your theory, but maybe
 7   I'm getting it.
 8          Number one, you're saying there is no
 9   command to remove anyone who falls under 1226
10   and 1231?
11          MR. STONE:  We're certainly not saying
12   that there is, Your Honor, whether or not --
13          JUSTICE SOTOMAYOR:  All right.  You're
14   -- you're -- you're saying there is complete and
15   absolute discretion for the government to say
16   anybody charged with any crime, we're not going
17   to remove you?
18          MR. STONE:  I -- I'm not sure that I'd
19   concede that much, but we're certainly not
20   arguing otherwise.
21          JUSTICE SOTOMAYOR:  All right.  So
22   what are you arguing?  Are you arguing that only
23   if they are told that there is a criminal who
24   fits the 1226(c) or 1231 conditions, that they
25   must remove those people?

1          MR. STONE:  Our argument doesn't run

2     to removal at all, Justice Sotomayor.

3          JUSTICE SOTOMAYOR:  All right.  So --

4          MR. STONE:  It runs to arrest and

5     detention.

6          JUSTICE SOTOMAYOR:  -- why isn't the

7     policy guidelines exactly what the government

8     said, which is this has nothing to do with

9     detention, it has to do with removal.  We've

10    made a decision that certain categories of

11    people, we're not going to spend the money on

12    giving them a notice of appearance or giving --

13    or removing them.

14         MR. STONE:  Well, Your Honor, in part

15    because the Guidelines on their face -- and

16    1226(c) contains an arrest requirement.  We

17    believe that's the natural reading of "take into

18    custody."  But the Guidelines on their face

19    refer to individuals who should be subject to

20    arrest detainers and removal proceedings.

21         JUSTICE SOTOMAYOR:  Should be, but you

22    just said to me they don't have to be.

23         MR. STONE:  They don't have to remove

24    --

25         JUSTICE SOTOMAYOR:  The government has

1    the discretion to say I don't want to remove

2    this person, correct?

3          MR. STONE:  I apologize, Justice.  I

4    was referring to how this does affect detainers.

5    I agree once again we are not seeking to

6    have any individual in specific removed.

7          JUSTICE SOTOMAYOR:  So, really, this

8    case is all about the people that a detainer has

9    been put on and that the government can't

10    withdraw that detainer once they put it on?

11          MR. STONE:  This case is about, under

12    two different --

13          JUSTICE SOTOMAYOR:  Answer yes or no

14    to that.  Is that -- because there's a lot of

15    states, for example, that don't cooperate with

16    ISIS and they don't tell the government about

17    somebody, but maybe the government found out

18    about it.  Do they have to go and put the

19    detainer on that person?

20          MR. STONE:  The -- the answer to your

21    previous question is no.  The answer to this

22    question is yes.

23          JUSTICE SOTOMAYOR:  All right.  So

24    they have to go and spend the resources to sit

25    outside of that prison and find out what day

1    that person is going to be released so they can

2    arrest that person that day?

3              MR. STONE:  1226(d) actually directs

4    the federal government to create a 24-hour

5    accessible system for purposes of having this --

6              JUSTICE SOTOMAYOR:  I -- I just asked

7    you a direct question.  Does the government now

8    have to put the resources in place to watch the

9    prison every day to see if someone has been

10   released?

11             MR. STONE:  The government must

12   attempt to fulfill its mandatory detention.  How

13   it does it in terms of --

14             JUSTICE SOTOMAYOR:  How -- how --

15             MR. STONE:  -- individual resources or

16   expenditures --

17             JUSTICE SOTOMAYOR:  You -- you -- you

18   just told me something contradictory.

19             How do you deal with 1231(h) and the

20   fact that it says that the statute, 1231, "does

21   not create any right or benefit that is legally

22   enforceable by any party"?

23             MR. STONE:  May I?

24             CHIEF JUSTICE ROBERTS:  Sure.

25             JUSTICE SOTOMAYOR:  So how do you get

1  into court under 1231(h)?

2  MR. STONE: Two points, Your Honor.

3  The first is this Court in Zadvydas v. Davis

4  said that 1231 of its own force only prevents an

5  individual from saying that 1231 gives them

6  essentially a right or cause of action. It did

7  not block it --

8  JUSTICE SOTOMAYOR: Well, that --

9  that's -- you're any person. You're Texas. You

10  saying you have a right or a cause of action,

11  under your theory of indirect harm, that permits

12  you to attack it under the APA, to attack it

13  under whatever else, you fit right in any person

14  saying that you have a right or a benefit under

15  the APA to attack 1231, a policy?

16  MR. STONE: No, Your Honor. At least

17  two points. One, no more than an individual

18  seeking release under 2241 did. And that was a

19  very good --

20  JUSTICE SOTOMAYOR: It doesn't say any

21  more than an individual. It says that you --

22  does not create any -- and "any" is very broad

23  -- right or benefit that is legally enforceable

24  by any party. It doesn't say any alien party.

25  It doesn't say anything like that.

107

```
 1          MR. STONE:  I agree, Justice
 2   Sotomayor.  And in Zadvydas, an individual alien
 3   through a habeas corpus action was claiming his
 4   detention was illegal because of a violation of
 5   1231 --
 6          JUSTICE SOTOMAYOR:  Well, that -- that
 7   may be prototypical, but that's not -- the
 8   language isn't limited to that situation.
 9          MR. STONE:  But --
10          JUSTICE SOTOMAYOR:  It doesn't say any
11   right or benefit that is legally enforceable by
12   an undocumented alien.  It says any party.
13          MR. STONE:  But the Court --
14          JUSTICE SOTOMAYOR:  You're any party.
15          MR. STONE:  -- the Court didn't hold
16   that 2241 -- that act of -- that exercise of
17   jurisdiction illegal.  It said 1231 was
18   restricted only to that section, and the use of
19   2241 was permitted.  The APA is at least as
20   separate from Section 1231 as the general habeas
21   statute.  And more to the point --
22          CHIEF JUSTICE ROBERTS:  Counsel, why
23   -- why don't we just spend a little bit of time
24   on remedy before we move to individual
25   questioning, and on that, an important question
```

1    for me was the one raised by Justice Gorsuch.

2              How did the APA's new vacatur remedy

3    slip by unnoticed from all these administrative

4    law scholars?

5              MR. STONE:  It -- I can't speak as to

6    the attention of the administrative law

7    scholarship universe, Mr. Chief Justice, but I

8    can tell you that the -- the vacatur remedy

9    recognized in 706(2) was consistent with

10   then-existing APA practice.  And to put a fine

11   point on it, this Court around 1920, reviewing

12   generally speaking Interstate Commerce

13   Commission orders, specifically described the

14   relief that was being sought below and that it

15   sometimes affirmed, sometimes refused, as orders

16   attempting to annul or revoke a given commission

17   rule.  Idaho versus United States actually does

18   double work for us here.  One, this Court

19   affirmed an order annulling an Interstate

20   Commerce clause -- an Interstate Commerce

21   Commission order.  And then, also, Idaho's

22   theory of harm was entirely premised on the

23   federal regulation of a private party in its

24   state.  So --

25              CHIEF JUSTICE ROBERTS:  Well, as -- as

109

1    the Solicitor General on the other side pointed

2    out, the courts really haven't dealt with the

3    analysis that raises this question, namely, the

4    one in Professor Harrison's article.

5           MR. STONE:  I think --

6           CHIEF JUSTICE ROBERTS:  The D.C.

7    Circuit may have been doing it for a long time

8    but sort of did not address the arguments that

9    are being raised today.

10           MR. STONE:  And perhaps that might be

11    a reason why, strictly speaking, they aren't

12    precluded by stare decisis, Your Honor, but the

13    fact that the lower courts had --

14           JUSTICE GORSUCH:  That they're

15    precluded by stare decisis from a lower court?

16    I mean, lower -- lower courts often do things

17    for long periods of time, unthinkingly or maybe

18    thinkingly and thoughtfully, that turn out to be

19    wrong, and --

20           MR. STONE:  I'm sorry, that --

21           JUSTICE GORSUCH:  -- this Court

22    doesn't afford stare decisis effect.

23           MR. STONE:  I said that it wasn't.

24    I'm sorry.

25           JUSTICE GORSUCH:  Oh, I'm sorry.

110

1          MR. STONE:  I -- I must have either

2   misspoken or meant to say it was not.

3          JUSTICE GORSUCH:  I -- I'm sure I

4   misheard, General.  I'm sorry.

5          MR. STONE:  That it does not -- it is

6   not precluded by stare decisis.  But it is,

7   again, a thoughtful 80-year history that has

8   essentially informed everything Congress has

9   done subsequently.  Congress has enacted

10  subsequent review statutes using the same

11  language, for example, 28 U.S.C. 2342, with a

12  specific administrative review statute --

13         JUSTICE GORSUCH:  There are definitely

14  specific administrative review statutes that

15  contemplate this.  But let's put those aside for

16  the moment and just look at the APA itself.

17         Isn't it a little odd that -- that

18  Section 706 governs the scope of review and

19  proceeds to tell us to review questions of law

20  de novo, and that's a whole other kettle of

21  fish, whether we do that, but tells us to do

22  that and then goes on and tells us, when we find

23  an unlawful agency action, finding, or

24  conclusion, we should set it aside.  We don't

25  think of negating or vacating or erasing

111

```
 1    findings or conclusions.  We -- we -- we put
 2    them aside and go ahead and decide the case
 3    without them usually.
 4            Why -- why wouldn't the same apply to
 5    -- to errors of law under a de novo standard of
 6    review, especially when 703 does list all the
 7    remedial forms available in an APA action,
 8    declaratory judgment, injunctions?  It -- it
 9    would seem like it would be a monster swallowing
10    all of the other remedies that -- that sits in
11    these five words, you know, hold unlawful and
12    set aside.  It's in a scope of review section.
13    It's -- just on its face, putting aside our
14    learned friends on the D.C. Circuit on the one
15    hand and our learned friends from the Sixth and
16    the Fourth on the other.
17            MR. STONE:  So I think the answer,
18    Your Honor, is to look at both 703 and 706
19    together.  I disagree with you that 703 provides
20    remedies, and I think taken sentence by
21    sentence, it's just that it doesn't --
22            JUSTICE GORSUCH:  Well, take a look at
23    it again, counsel, and tell me if you really
24    think that, because I look at it, and it talks
25    about venue and forms of proceeding, and the
```

112

 1    forms of proceeding listed include injunctive

 2    relief and declaratory judgments.  Those are

 3    classic remedial forms of relief or forms of

 4    proceeding.

 5            MR. STONE:  Well, Your Honor, two

 6    points.  First of all, I don't think anyone has

 7    ever thought that Federal Rule of Civil

 8    Procedure 2, which provides one form of action

 9    -- and this is the same words you here used,

10    form of proceeding -- and it specifies --

11            JUSTICE GORSUCH:  That's different.

12            MR. STONE:  -- the applicable legal

13    form of action.  I don't think anyone thinks --

14            JUSTICE GORSUCH:  Forms of proceeding

15    and it lists them as declaratory and injunctive.

16    You -- you'd agree those are remedies?

17            MR. STONE:  I agree they are forms of

18    action, Your Honor.  I think that -- and, yes,

19    they can --

20            JUSTICE GORSUCH:  Remedies?

21            MR. STONE:  -- include remedies, yes.

22            JUSTICE GORSUCH:  Okay.  So those are

23    remedies, declaratory relief, injunctions.

24    There they are in 703.  So it's a little odd

25    that there'd be those giant remedies that

1    swallow the whole of 703 lurking over in 706.

2             And then put -- put that aside too.

3    What about 702, which limits the power of

4    certain persons to come into court under the

5    APA, limits them to aggrieved persons who have

6    actually been personally and concretely injured?

7    There, Congress is carefully respecting our

8    standing rules at the front end.  Wouldn't it be

9    odd for it to blow a giant hole in our

10   traditional remedial rules at the back end

11   through five words in 706?

12            MR. STONE:  I don't think so, Your

13   Honor.  Two points, the first being this Court

14   has recognized, I believe in Lujan in 1990, that

15   the APA provides an especially generous sort --

16   form of judicial review.  Ordinarily, you have

17   to have some sort of legal right typically, and

18   this provides, as you point out, Justice

19   Gorsuch, both availability for someone suffering

20   a legal wrong as well as a party adversely

21   affected or aggrieved.  So I think that's much

22   broader than the traditional form of action.

23            JUSTICE GORSUCH:  It's -- it's -- it's

24   not everybody in the world who has a generalized

25   grievance.

114

```
1            MR. STONE:  Certainly not.
2            JUSTICE GORSUCH:  It has to be someone
3    who's specifically harmed, consistent with
4    Article III, right?
5            MR. STONE:  That's certainly true.
6    That's certainly true, Justice Gorsuch.  The
7    fact that Congress created -- and I'm going to
8    speak specifically to the assumption that
9    vacatur exists on your Article III question and
10   then I could step back --
11           JUSTICE GORSUCH:  Oh, yeah.  Where
12   does that word appear in the APA?
13           MR. STONE:  It comes from "set aside,"
14   as you -- as you previously --
15           JUSTICE GORSUCH:  It doesn't appear in
16   the APA, right?
17           MR. STONE:  It does not.  It comes
18   from --
19           JUSTICE GORSUCH:  It's just -- it's
20   just -- it just -- we assume it from those five
21   words.
22           MR. STONE:  And from previous
23   practice, Justice Gorsuch, previous practice
24   that had been recognized in this Court more than
25   10 times.  As a matter of fact, it had been --
```

1   had been recognized in this Court in the terms

2   of "annul" or "revoke," synonyms that were

3   recognized by contemporary legal dictionaries at

4   the time as being synonymous with "set aside."

5             JUSTICE JACKSON:  And synonyms that

6   relate to the claim at issue in the case.  I

7   mean, aren't -- aren't -- what is your thought

8   on my point about the claim at issue in this

9   case being about the agency's invalid exercise

10  of authority because it didn't follow the right

11  procedures?

12            MR. STONE:  I agree with you, Justice

13  Jackson, that to the extent the kind of claims

14  that Congress provided for underneath the

15  Administrative Procedure Act included claims

16  that run to the essential invalidity of a thing,

17  that it's -- that it simply is not valid

18  exercise of power.

19            Congress chose to give that power over

20  both orders and rules when it provided for

21  review of agency action, a term defined in

22  statute to include both.  And so I agree with

23  you that vacatur is the natural remedy, which is

24  to say vacating the actual thing itself that

25  is -- that is categorically invalid.

116

1          JUSTICE JACKSON:  And it's in Section

2     06, along with the kinds of claims that people

3     can make.  What the Court is reviewing and

4     looking for are these kinds of errors by the

5     agency, and we're told that when they exist, you

6     set aside the -- the -- the agency action.

7          MR. STONE:  I agree with you.  Both

8     706(1) and 706(2) follow the same structure,

9     which is to say the initial words provide the

10    remedy, order, agency action, and then the next

11    component says what the substantive standard you

12    have to meet is.

13         JUSTICE JACKSON:  And wouldn't it be

14    odd for the Court to go back to 703?  I mean, it

15    seems to me that if you read all of the

16    provisions in order, there's sort of a logical

17    progression of how one brings an action, the

18    form of action you can bring, the venue of the

19    proceeding, that's 702, 703; which actions are

20    reviewable, 704; and then, when we finally get

21    to 706, it's what the court is looking for and

22    the relief that can be provided.

23         MR. STONE:  I agree with you.  I would

24    only point out 705, which you skipped over --

25         JUSTICE JACKSON:  Yes.

```
1            MR. STONE:  -- which provides the

2     ability for a court in interim relief to delay

3     the effective date of agency action.

4            CHIEF JUSTICE ROBERTS:  Counsel, what

5     --

6            MR. STONE:  Delaying the --

7            CHIEF JUSTICE ROBERTS:  I'm sorry, go

8     ahead.

9            MR. STONE:  I was just going to say

10    that delaying the effective date unquestionably

11    acts on the action itself and is against all the

12    world, and I think that's a strong textual clue

13    Congress intended that sort of remedy.

14           CHIEF JUSTICE ROBERTS:  Why don't we

15    move to individual questions.

16           Justice Alito?

17           JUSTICE ALITO:  Well, I was quite

18    surprised by the argument based on Aleman

19    Gonzalez.  I don't have a proprietary interest

20    in the opinion.  However, I understood the issue

21    there to be the meaning of the operation of a

22    statute, not the meaning of an injunction.

23           Have I misread that?

24           MR. STONE:  No, Your Honor, and part

25    of the thrust of our argument is what is meant
```

1    by an order that enjoins or restrains.

2             JUSTICE ALITO:  And I also see --

3    admittedly, this is not the slip opinion or the

4    United States report, but it's the Supreme Court

5    Reporter, so probably this is accurate.

6             There's a Footnote 2 which says that

7    at oral government, the government suggested

8    that 1252(f)(1) not only bars class-wide

9    injunctive relief but also prohibits any other

10   form of relief that is "practically similar to

11   an injunction, including class-wide declaratory

12   relief."  And we, according to this footnote,

13   specifically reserved decision on that, on that

14   question.

15            Is your -- is your -- is it your

16   understanding that that's actually an accurate

17   footnote and that we took pains in this decision

18   to reserve decision on -- on whether injunction

19   means something that's not formally an

20   injunction but might have the effect of -- an

21   effect that is analogous to an injunction?

22            MR. STONE:  I agree entirely, Justice

23   Alito, and would only add that the line between

24   vacatur and declaratory relief that my friend on

25   the other side suggests here and that that note

119

1    I think suggests that the United States'

2    position might be something else in a subsequent

3    case is another reason why their interpretation

4    should be rejected.

5         JUSTICE ALITO:  Now, like Justice

6    Gorsuch, I did not have the -- the benefit of

7    serving many years on the D.C. Circuit and

8    vacating regulations three times before

9    breakfast or however many -- five times -- five

10   times before breakfast, but this does seem to me

11   like a pretty big issue.

12        And, as Justice Kavanaugh mentioned,

13   we have three pages -- we have three pages from

14   the government on this in its opening brief.

15   The argument is based primarily on a law review

16   article, a innovative law review article that

17   appeared in 2020, and then you came back with

18   three pages on this, and then the government

19   expanded their argument to four pages in -- in

20   the reply brief.

21        Now what do we do with this?  We --

22   are we supposed -- are we left to do all of the

23   scholarship that would be required to figure out

24   whether this new interpretation is the correct

25   interpretation?

120

 1          But you do say -- and -- and you're

 2    right -- that this is not a clear case of stare

 3    decisis, so how would you approach -- how would

 4    you suggest we approach that?

 5          MR. STONE:  I don't think it's clearly

 6    presented, fairly eclipsed within the questions

 7    presented, Your Honor.  It's just that the

 8    United States made such a colossal argument or

 9    an argument with such far-flung consequences

10    that we would have been remiss not to address

11    it.  I think this Court can essentially choose

12    to charitably ignore it on that ground.  Of

13    course, we believe that the 80 years of practice

14    and for the reasons we outline in our brief,

15    that they're also wrong on the merits.

16          CHIEF JUSTICE ROBERTS:  Justice

17    Sotomayor?

18          JUSTICE SOTOMAYOR:  Yes.  We could

19    also assume that it's not encompassed by the

20    question presented and deal just with the 1252

21    issue, correct?

22          MR. STONE:  Yes, Justice Sotomayor.

23          JUSTICE SOTOMAYOR:  All right.  Now,

24    secondly, you said the Guidelines were binding

25    on immigration officers, that that's what the

1    district court held.  I'm not sure I understand
2    its holding.
3            Do you understand the district court
4    to have said that the Guidelines are wrong
5    because they impose on immigration officers a
6    bunch of factors to look at before they decide
7    whether to remove someone?
8            MR. STONE:  I think my answer is in
9    two parts.
10            JUSTICE SOTOMAYOR:  Okay.
11            MR. STONE:  The first is that the
12    district court found as a matter of fact that --
13    that -- that as a matter of fact, that
14    individuals applying these items would treat
15    them as mandatory.  And then there's a problem
16    with all --
17            JUSTICE SOTOMAYOR:  Mandatory to
18    consider, correct?
19            MR. STONE:  No, Your Honor.  The
20    finding was that they would think that the --
21    the framework provided by the Guidelines was, in
22    fact, mandatory, period.
23            JUSTICE SOTOMAYOR:  The framework.
24    The framework says you look at the totality of
25    circumstances, you look at all of these things.

1   If that's all the Guidelines say, would you have

2   a day in court today?

3          MR. STONE:  Certainly, Your Honor, in

4   part because the essence of 1226(c), of

5   Congress's considered judgment behind that

6   provision --

7          JUSTICE SOTOMAYOR:  So you are going

8   back on what you said to me earlier.  You're

9   saying that you believe that this statute, 1226

10  and 1231, take away all discretion to decide

11  whether to remove somebody or not?

12         MR. STONE:  No, Your Honor, only

13  discretion whether to detain them pending the

14  decision for removal.

15         JUSTICE SOTOMAYOR:  Well, I know you

16  keep going back to that.  But the Guidelines are

17  talking about a decision to remove someone, to

18  arrest, detain, or remove.  And if a DHS officer

19  looks at the totality of circumstances and says

20  this is a person we're not going to remove, can

21  you argue about that?

22         MR. STONE:  At that point, I think the

23  1226(c)(1) -- assuming that was the final

24  decision, the 1226(c)(1) obligation is resolved

25  by 1226(a).  The problem --

```
 1              JUSTICE SOTOMAYOR:  Which says pending

 2    removal, okay.

 3              MR. STONE:  Pending a decision.

 4              JUSTICE SOTOMAYOR:  All right.  So,

 5    if -- did the district court anywhere say that

 6    the Guidelines categorically prevent DH officers

 7    from ever going outside of the priorities?

 8              MR. STONE:  He -- he made a finding

 9    that those three categories were looked at as

10    exclusive.  And that's in part backed up by, for

11    example, an internal tool, the ART tool that was

12    promulgated by DHS to its line-level officials,

13    which specifically --

14              JUSTICE SOTOMAYOR:  But that has to go

15    to the issue of removal.  Everybody has to use

16    Guidelines in determining whether to remove

17    someone.

18              If there are Guidelines to look over

19    where are we spending our money to remove, what

20    are we doing to remove, I don't know why, if

21    that power is within my discretion, I can't set

22    binding, mandatory, whatever you want to call

23    it, Guidelines on my officers to say these are

24    the people that I want to remove and these are

25    the people I don't want to remove.
```

124

1        MR. STONE:  As I -- as I understood

2    your previous question, Justice Sotomayor, I

3    thought you were asking me whether or not there

4    was something showing that officers did not have

5    the discretion to go outside of the Guidelines.

6        JUSTICE SOTOMAYOR:  Right.

7        MR. STONE:  There is, in fact, and I

8    believe it's record 11610, it states in bold

9    other priority, as in not one of the three

10   Guidelines components, is no longer permitted.

11   It says that in bold text in internal training.

12       JUSTICE SOTOMAYOR:  All right.  Then

13   we're back to my point.  You are basically

14   trying to sneak into -- you want to cabin

15   removal and say you must remove these people,

16   whether or not you want to or not.

17       MR. STONE:  No, Your Honor, we have

18   repeatedly --

19       JUSTICE SOTOMAYOR:  So, once you say

20   that, then how can the Guidelines be wrong?

21   Because it's simply a statement that says these

22   aliens we're not going to remove.

23       MR. STONE:  Because the Guidelines

24   also say we have the absolute discretion to

25   decide whether to arrest or detain anyone.

125

1    Congress has -- and, again, I want to make clear

2    we're disclaiming that any of our arguments

3    require the Petitioners to remove any individual

4    in particular.

5         JUSTICE SOTOMAYOR:  So, once they

6    decide they're not, and that's what a decision

7    not to arrest or detain means, we're not going

8    to remove you.

9         MR. STONE:  I don't think that's

10   accurate, Your Honor.  I think -- I think,

11   conceivably, Petitioners could make all three

12   decisions at once.  The problem is they have

13   said that every --

14        JUSTICE SOTOMAYOR:  Well, at the

15   moment that they make the decision, if they know

16   the person is in jail, they don't put a detainer

17   on them, they don't file a notice to appear, all

18   of those acts says, at this moment today, I'm

19   not removing you.

20        MR. STONE:  They have to actually make

21   that decision before their 1226(c) obligation is

22   absolved.  In the circumstance where they simply

23   haven't --

24        JUSTICE SOTOMAYOR:  Well, but they

25   have by saying we're not going to put a detainer

126

1    on you.

2          MR. STONE:  I think some of the

3    slippage here is the situation where the United

4    States simply hasn't made a decision at all

5    relative to some given alien covered by 1226(c).

6    1226 --

7          JUSTICE SOTOMAYOR:  Well, that might

8    be, but I don't know how you would ever know

9    that, because I know the things I see.  I know

10   he's here.  I know I could put a detainer on

11   him.  I choose not to because I'm not going to

12   choose to remove him.

13         MR. STONE:  Well, the United States

14   postulated there would be individuals in this

15   category that were part of 1226(c)(1) --

16         JUSTICE SOTOMAYOR:  That -- by

17   mistake.  That --

18         MR. STONE:  -- that they were unaware

19   of.

20         JUSTICE SOTOMAYOR:  Exactly, but

21   you're not saying to me, and I think you

22   disavowed earlier, that they have to spend the

23   resources to find everybody who falls into these

24   categories and to affirmatively then say I'm not

25   going to remove you.

1          MR. STONE:  They certainly have to

2     make that affirmative statement because of the

3     inter- -- the way that 1226(c) --

4          JUSTICE SOTOMAYOR:  Well, they have to

5     -- they have to not remove.  Okay.  Thank you.

6          MR. STONE:  12 --

7          CHIEF JUSTICE ROBERTS:  Justice Kagan?

8          JUSTICE KAGAN:  You might get a chance

9     to clarify that because I completely lost the

10    thread, and I apologize, General Stone, but are

11    you saying that 1226(c) applies only once

12    removal proceedings are pending?

13         MR. STONE:  We are not.  We are saying

14    it applies until a decision regarding removal

15    has been made.  So, with the --

16         JUSTICE KAGAN:  I don't understand how

17    you can possibly read 1226(a) and (c) to be

18    about anything other than what happens pending

19    removal -- pending the removal decision, in

20    other words, when removal proceedings are

21    ongoing.

22         MR. STONE:  In our view, 1226(a)'s

23    "pending a removal decision" does not just begin

24    with a notice to appear.  Of course, the removal

25    decision begins when the executive decides

128

1    whether or not to bring a notice to appear.

2    Until that decision has been made and anywhere

3    along the lines of that initial prosecutorial

4    judgment, all the way through the end of

5    enforcing a -- enforcing an order, at any time,

6    Petitioners can say we made the decision not to

7    -- we made the decision not to remove, and the

8    obligation under 1226(c) comes to an end

9    instantly.

10        JUSTICE KAGAN:  I guess the question

11    is, where does the -- the -- it start in your

12    view?  In other words, prior to the government

13    initiating removal proceedings, do you think

14    1226 applies?

15        MR. STONE:  Yes.  That's in 12 --

16        JUSTICE KAGAN:  Okay.  Because 12 --

17    -- that seems to me a pretty hard argument to

18    make and not consistent with our precedent.  I

19    mean, Demore v. Kim addresses this issue pretty

20    precisely, and it just says that this is -- what

21    this is about is it's about while removal

22    proceedings are pending, while they're taking

23    place.

24        MR. STONE:  At a minimum, Your Honor,

25    first of all, Demore doesn't speak to the

129

1    situation where there's an individual required

2    to be detained about which the United States

3    hasn't yet made a decision.  1226(c) says -- or

4    (c)(1) says when it applies in some terms, when

5    an alien is released.  1226(d) directs the

6    Attorney General, or now the federal executive,

7    to create a system in order to know when these

8    individuals -- individuals are going to be

9    released.  And then that obligation ends in

10   1226(a) when they've made a decision pending

11   removal.  That could be --

12            JUSTICE KAGAN:  Okay.  I mean, I guess

13   what -- what -- what -- what I'm drawing from

14   this is that even putting aside the does "shall"

15   really mean "shall" argument, that -- that --

16   that you're reading the "shall" to kick in at a

17   place where we've never understood it to kick in

18   before.

19            MR. STONE:  I don't believe that this

20   Court's passed one way or another on that

21   question.  But even if not, that would be a

22   small subset -- subset of individuals.  And

23   these Guidelines claim the power to treat

24   detention as discretionary for individuals in

25   removal proceedings as well.

```
 1              JUSTICE KAGAN:  And if I could ask
 2      about 1231 a similar question, which is, like,
 3      even putting aside all the Castle Rock issues,
 4      especially in a context in which we know that
 5      DHS can't really do what -- what -- whatever the
 6      "shall" means, but, even putting that aside, if
 7      you look at the language of 1231, it's the
 8      Attorney General "shall detain" the alien.  It
 9      doesn't say anything about shall remove.  It
10      doesn't say anything about shall apprehend,
11      shall arrest.  It just says "shall detain."  And
12      -- and, again, these Guidelines don't say
13      anything about detention.
14              MR. STONE:  First, I believe that on
15      -- by speaking as to arrest and detainer, they
16      do, but that's a small point compared to the
17      rest of your question, Justice Kagan.  1231(a)
18      -- or 1231(a)(1) specifies the circumstances
19      under which the detention obligation exists,
20      which is only where the United States has used
21      its prosecutorial discretion to bring a notice
22      to appear, to prosecute that all the way to a
23      final removal -- an order of removal, and then
24      they have a final order of removal.
25              Only then do Petitioners have an
```

```
1    obligation to detain, and under no circumstances
2    release for a subset of individuals, that alien.
3    If at any point they choose to discontinue
4    proceedings, they're not bringing them in the
5    first place, 1231 at no point attaches.
6            JUSTICE KAGAN:  But -- but -- but it
7    seems to me that you're reading 1231 to impose
8    an obligation on DHS to go apprehend people, and
9    1231 specifically does not use that language.
10   It's used in lots of other places in this
11   statute.  But 1231 only imposes an obligation to
12   detain certain people who have orders of removal
13   already made.  It doesn't obligate anybody to do
14   anything with respect to finding them.
15           MR. STONE:  At a minimum, Your Honor,
16   1226(c)'s "take into custody" certainly means to
17   arrest, but as far as -- I think, in context,
18   1231(a)(2)'s "shall detain" and then the "under
19   no circumstances" language should be best read
20   as a mandatory requirement of both acquiring an
21   individual, of arresting them, as well as
22   detaining, in part because, for example, in the
23   Fourth Amendment context, this Court understands
24   detention or if someone's been asking if they're
25   detained as significant for purposes of an
```

132

1    arrest --

2              JUSTICE KAGAN:  And reading in context

3    to insert a different word, which actually is an

4    extraordinarily onerous obligation on DHS, to go

5    around finding people, everybody that -- who has

6    had orders of removal put in that -- where they

7    don't have the faintest idea where they are, I

8    mean, talking about distorting the agency's

9    priority.  And you're basically saying it

10   doesn't really say that.  It's just we're

11   reading this in context to imply it.

12             MR. STONE:  Your Honor, I think

13   "detained" can be fairly meant -- and for some

14   of the resources that we cite in our brief, can

15   be fairly understood to also mean arrest.  If

16   someone has to be detained, it can --

17             JUSTICE KAGAN:  Well, then we would

18   have a question about why be -- why this statute

19   uses "arrest" and "apprehend" all over the place

20   and not in that section.

21             MR. STONE:  Certainly.  Certainly,

22   Your Honor.  I might also point out that there's

23   the -- the second sentence, the individuals --

24   under no circumstances.  Petitioners agree that

25   that is mandatory.  There is a complete overlap

 1    between those --

 2              JUSTICE KAGAN:  They do agree that

 3    that's mandatory because that's a person that

 4    they know where the person is, and -- and so

 5    they don't have to do anything to apprehend that

 6    person.  We already have them.  We're not

 7    releasing them.  And -- and that -- the language

 8    in the statute is very different and makes that

 9    completely clear, and they're complying with

10    that language.

11              MR. STONE:  Respectfully, Your Honor,

12    I don't think that's accurate.  I think before

13    my friends on the other side noted they don't

14    always know where a 1226(c)(1) individual is.

15    Every single individual --

16              JUSTICE KAGAN:  I was talking about

17    1231.

18              MR. STONE:  Yeah -- I understand,

19    Justice Kagan.  Every individual covered by

20    1226(c)(1) who has a final order of removal

21    falls into that second sentence.

22              JUSTICE KAGAN:  Thank you.

23              MR. STONE:  So, if they're --

24              JUSTICE KAGAN:  Thank you, General.

25              CHIEF JUSTICE ROBERTS:  Justice

134

1    Gorsuch?

2                    Justice Kavanaugh?

3                    JUSTICE KAVANAUGH:  I have a few

4    questions.  So, first, on the resource

5    constraints issue that's been raised, I'm just

6    trying to figure out how this will play out if

7    you were to prevail.  So the government says we

8    don't have the money to comply.  Then -- then

9    what do you do?

10                   MR. STONE:  I don't think we even have

11   final agency action at that point to sue over,

12   let alone that we could point at 1226(c) or

13   1231.

14                   JUSTICE KAVANAUGH:  So nothing

15   changes?

16                   MR. STONE:  If the government said

17   that they didn't have -- they didn't have money

18   to comply and then continued ignoring this

19   Court's order, we might be able to put together

20   some sort of de facto rule --

21                   JUSTICE KAVANAUGH:  Well, it's not

22   ignoring it; it's just we don't have -- if -- if

23   they say we don't have the money to comply with

24   the -- with the court's order or the statute as

25   written, as construed by you, the "shall" --

135

```
 1          MR. STONE:  I agree that presents a

 2    difficult hypothetical, Justice Kavanaugh.  But,

 3    in this case, where there are findings of fact

 4    regarding persistently underused detention

 5    ability, it's a much harder case where there's a

 6    world where, as a matter of fact, Petitioners

 7    are using in their own best judgment all of the

 8    resources they have.  I think that's a much

 9    harder case.  It would be a harder case at least

10    on redressability grounds.  That's not this

11    case, and there are findings of fact in this --

12    on this record supported by ample evidence that

13    --

14          JUSTICE KAVANAUGH:  If you play it out

15    and you go into district court, the district

16    court would have to issue an order then

17    essentially mandating arrests.

18          MR. STONE:  Certainly not, Your Honor.

19    We're only seeking vacatur of the Guidelines.

20    Now --

21          JUSTICE KAVANAUGH:  No, here.  I'm

22    talking about, if you win here, then the

23    government doesn't do anything because it says

24    we don't have the money to do anything, then you

25    try some action.  I guess you already said there
```

136

1    wouldn't be final agency action then.

2              MR. STONE:  I don't believe there

3    would be --

4              JUSTICE KAVANAUGH:  Okay.  So that's

5    --

6              MR. STONE:  -- final agency action

7    after that.

8              JUSTICE KAVANAUGH:  Okay.  Second, the

9    hypothetical raised by the government which I

10   don't think has been raised -- would -- could a

11   state challenge the President's exercise of war

12   powers, for example, being a violation of -- of

13   the Constitution or the war powers resolution?

14   They raise that as a -- an issue that your

15   theory would lead to.

16             MR. STONE:  I don't believe so, Your

17   Honor, in part because, for example --

18             JUSTICE KAVANAUGH:  Why not?

19             MR. STONE:  Well --

20             JUSTICE KAVANAUGH:  There would

21   definitely be cost to the state from its people

22   going into a foreign war, so why couldn't the

23   state then challenge under your theory here?

24             MR. STONE:  At a minimum, the

25   President -- the President isn't an agency, so

1   the President typically -- neither is Congress

2   --

3         JUSTICE KAVANAUGH:  So that you'd

4   bring -- you'd bring something against the

5   Secretary of Defense, as was -- has been done

6   before?

7         MR. STONE:  I -- I think almost

8   certainly political question doctrine then also

9   to some extent ends up coming --

10        JUSTICE KAVANAUGH:  I don't know about

11  that after Zivotofsky, but that's a different

12  argument.

13        Okay.  So I'll go on to my next

14  question.  Justice Kagan raises a good point

15  about the problem of government programs getting

16  shut down quickly.  Now, first, that -- that can

17  only happen -- this is a helpful question to

18  you, but that can only happen if you not only

19  have standing, but you have a successful claim

20  on the merits, likelihood of success on the

21  merits, correct?

22        MR. STONE:  That's correct.

23        JUSTICE KAVANAUGH:  Okay.  And if you

24  -- you know, I think the follow-up question was

25  you might get a judge with an idiosyncratic view

1  of a particular issue and that -- that can shut

2  down a government program, but you can seek an

3  immediate -- the government can seek an

4  immediate appeal in that circumstance or an

5  emergency motion, correct?

6       MR. STONE:  Not only can but

7  frequently does and sought it in this Court.

8       JUSTICE KAVANAUGH:  We are aware.

9  Yeah.  Okay.  And -- okay.  The last question is

10  on the set aside, I just want you to say more.

11  I -- I have obviously shown what I think about

12  that, but the set-aside argument is not just new

13  as I understand it, but it was wrong from the

14  beginning is your point and that 706 deals with

15  remedies not just in 706(2) but 706(1) as a

16  remedy.  Just say a couple sentences about why

17  you think it's wrong from the beginning, not

18  just wrong because a few judges like me did it

19  for years on the D.C. Circuit.

20       MR. STONE:  Certainly, Justice

21  Kavanaugh.  So contemporary legal dictionaries,

22  indeed, even the dictionary, Merriam-Webster's,

23  on which Petitioners cite in its E definition,

24  define -- defined "set aside" to mean annul or

25  to overrule, that's in (1)(b) of their

1  definition.  That -- that fits comfortably with

2  the history recognized in this Court prior to

3  and leading up to the Administrative Procedure

4  Act.  That definition pairs 706(2)'s whole

5  unlawful and set aside, which has the vacatur

6  remedy we've been discussing, along with 706(1),

7  which is a -- which unquestionably provides a

8  remedy to order agency action unreasonably

9  withheld.

10         So the textual clues, the intertextual

11  clues and history from this Court and

12  administrative practice prior to and leading up

13  to the APA all point in the same direction that

14  courts have properly been issuing vacatur under

15  706(2) since the beginning.

16         JUSTICE KAVANAUGH:  Thank you.

17         CHIEF JUSTICE ROBERTS:  Justice

18  Barrett?

19         JUSTICE BARRETT:  Just a quick one on

20  vacatur.  I mean, I -- I agree with Justice

21  Alito this is a huge issue, and -- and, frankly,

22  I wasn't expecting the 706 briefing.  I thought

23  we were just going to get briefing about the

24  1252(f)(1) issue.  But, you know, this Court,

25  when it comes to jurisdiction, gives little

140

     1    weight to drive-by jurisdictional rulings, you

     2    know, and the Solicitor General pointed out that

     3    this is not an issue -- we might think of these

     4    as drive-by remedial rulings because it's not an

     5    issue that this Court or -- or maybe even the

     6    lower courts have analyzed in depth.

     7              If I think you're wrong about the

     8    original meaning of the APA or what people

     9    expected "set aside" meant at that time and

    10    these are all drive-by remedial rulings, do you

    11    lose?

    12              MR. STONE:  If you think I'm wrong,

    13    then I think you'd have to ask whether or not

    14    you thought it was fairly within the question

    15    presented.  I agree that the lower courts'

    16    rulings don't bind this Court and this Court's

    17    previous rulings.  I think the fact this Court

    18    has -- has affirmed vacatur many, many times

    19    should give you pause before thinking that we're

    20    wrong.  But, yes, I'd agree with that point.

    21    You could rule against us on the merits.

    22              JUSTICE BARRETT:  Thanks.

    23              CHIEF JUSTICE ROBERTS:  Justice

    24    Jackson?

    25              JUSTICE JACKSON:  Yes.  So, on the

141

1    merits, it was very clarifying to me in your

2    exchanges with Justice Sotomayor and Justice

3    Kagan that you said you're not challenging the

4    removal determination, that you're saying this

5    is really about detention, as the statute says,

6    and that you're interpreting Section 1226(c) to

7    require the detention of certain criminal

8    non-citizens before DHS decides to initiate

9    removal proceedings.  Am I right about that?

10          MR. STONE:  And arrest, which we think

11    both of those come from take into custody.  But,

12    yes.

13          JUSTICE JACKSON:  But it's before --

14    before.

15          MR. STONE:  Yes.

16          JUSTICE JACKSON:  You said, when they

17    make the decision not to remove someone, then

18    that -- then their duty dissipates and they can

19    let them go.

20          MR. STONE:  It attaches once the --

21    the individual is released and it dissipates as

22    soon as they make a decision.

23          JUSTICE JACKSON:  The reason why

24    that's troubling me so, and you mentioned the

25    Fourth Amendment at one point, the reason why

```
 1    that's troubling me so is that isn't the
 2    executive branch's authority to take people into
 3    custody because they're going to effectuate
 4    their removal, that you get to arrest and detain
 5    this person based on your decision?
 6            And -- and -- and I'm sort of thinking
 7    about a hypothetical situation in which it might
 8    take the government nine months, a year, or
 9    whatnot, to make a decision as to whether or not
10    to remove such a person.  Is it your view that
11    once this person has served their criminal
12    sentence in state court and they're about to be
13    released, the government -- federal government
14    has to, per the statute, come in and detain that
15    person even if they haven't decided to remove
16    them and they could hold them, I suppose,
17    indefinitely until they make that determination?
18            MR. STONE:  Two parts.  The first part
19    is a very direct yes.  But the second part is
20    perhaps in certain extreme circumstances there
21    might be an as-applied constitutional challenge.
22            That having been said, to me, the idea
23    that the federal government hasn't decided
24    whether to prosecute but will detain someone
25    sounds analogous to that the federal government
```

1    believes someone has committed a crime and has

2    probable cause and arrests them and then

3    may perhaps choose later to let them go if they

4    decide to null prosse.

5          JUSTICE JACKSON:  Yeah, but we don't

6    -- but, under our criminal system, don't you

7    have a limited amount of time as the government

8    to decide whether or not to prosecute someone,

9    that you might arrest them based on probable

10   cause, but then the government's got to pretty

11   promptly arraign them, meaning charge them and,

12   you know, start the prosecution.  You can't just

13   indefinitely hold people.

14          And so what -- what I'm worried about

15   is that your conception of this is that the

16   government has to come in even before they've

17   decided whether or not they're going to remove

18   this person and -- and detain them and,

19   apparently, according to this very detailed

20   statute, there's no limit from Congress as to

21   how long this person can be detained prior to

22   the determination of bringing charges?  That

23   just seems totally anathema to what we've

24   thought of in terms of valid exercises of

25   government detention power.

1          MR. STONE:  Three points, Your Honor,

2    the first being that this Court has held

3    previously that exercises of detention over

4    non-citizens can be constitutionally tolerable

5    even when they're constitutionally intolerable

6    against citizens.

7          The second being it may very well be

8    the case there could be an as-applied

9    constitutional challenge in an extreme case here

10   for some --

11         JUSTICE JACKSON:  Well, wouldn't --

12   wouldn't Congress have to be clear that that's

13   what that was actually trying to do?  I mean, I

14   would think constitutional avoidance would

15   counsel us to read their statute not to -- to

16   even, you know, create the kind of

17   constitutional problem you're talking about.

18         And there is a very legitimate way to

19   read it, which is the way that many of the

20   Justices have been pointing out and that the

21   Solicitor General points out, which is this

22   applies to detention once the determination has

23   been made.  That makes it similar to criminal,

24   that makes it consistent with the Constitution,

25   everything that we've -- we've said.

    1            MR. STONE:  I think it applies to both

    2    arrest and detention from take into custody.

    3    But not to lose the forest for the trees,

    4    Justice Jackson, even if, in fact, this

    5    Court held that that's the duration permissible

    6    begins only with a notice to appear, the final

    7    memorandum would still be unlawful because it

    8    says essentially that Petitioners have the

    9    unbridled, absolute discretion to arrest or

   10    detain or not arrest or not detain anyone under

   11    any circumstances, including individuals who

   12    have, in fact, committed actions that subject

   13    them to mandatory detention under 1226(c).

   14            So, even if -- even if we stipulated

   15    that that was how the Court were to interpret

   16    1226(a), that the detention period ends upon the

   17    -- doesn't attach until the beginning of a

   18    notice to removal proceeding, which I think

   19    doesn't follow from the statute's text, even

   20    stipulating that --

   21            JUSTICE JACKSON:  But -- I'm sorry --

   22    can I just say one more thing?  And I know we're

   23    running low on time.

   24            The statute's text in (a) says, "...

   25    pending a decision on whether the alien is to be

1    removed from the United States."  And, as

2    Justice Kagan pointed out in -- in Demore, we

3    made very clear that there -- that that's a

4    process, that it starts with the -- the -- the

5    DHS's determination that they're going to seek

6    removal and it ends ultimately with an order of

7    removal.  So it seems to me that (a) is talking

8    about detention during the duration of that

9    period.

10            What you're saying is they can detain

11    them prior to the United States' determination

12    that they're even going to seek the person's

13    removal and -- and I guess indefinitely until

14    they make that decision?

15            MR. STONE:  The problem, Your Honor,

16    is that pending a determination about whether

17    someone is to be removed itself in that passive

18    voice contemplates the possibility that will be

19    a negative determination.  Otherwise, Congress

20    would have said something like you must detain

21    these individuals for the duration of their

22    removal proceedings or something to indicate

23    removal proceedings had already begun.  That's

24    just not the text.

25            CHIEF JUSTICE ROBERTS:  Thank you,

1    counsel.

2              Rebuttal, General Prelogar.

3         REBUTTAL ARGUMENT OF GENERAL ELIZABETH B.

4         PRELOGAR ON BEHALF OF THE PETITIONERS

5              GENERAL PRELOGAR:  Thank you,

6    Mr. Chief Justice.

7              On 1252(f)(1), my friend fundamentally

8    misunderstands the difference between a

9    declaratory judgment and vacatur.  If the

10   district court here had entered a declaratory

11   judgment, we would have still had the

12   enforcement priorities and DHS would have been

13   entitled to rely on those while it continued to

14   pursue its appeal rights.  It's not a course of

15   remedy.

16             Vacatur stands in an entirely

17   different posture because the district court

18   voided the Guidelines, and that prevented DHS

19   officials from being able to continue to rely on

20   those while the case was litigated, and that is

21   precisely contrary to the judgment that Congress

22   made in 1252(f)(1).

23             On the merits, make no mistake it is

24   impossible for DHS to comply with each and every

25   "shall" in the INA if that is truly a judicially

1    enforceable duty.  I don't think that my friend

2    can reasonably contest that point.

3          Justice Kavanaugh, you asked what the

4    consequences of that would be on the ground.

5    Here's what I think it would mean.  If this

6    Court actually said that "shall" displaces all

7    enforcement discretion, then DHS would be under

8    a judicially enforceable obligation to take

9    enforcement action against whomever it first

10    encounters on the ground who might be subject to

11    one of these provisions.

12          But there are non-citizens out there

13    who have criminal convictions for serious

14    offenses like murder and sex offenses that --

15    that wouldn't qualify under a "shall" because of

16    the court's categorical approach, and that means

17    we wouldn't have the resources or ability to go

18    after those individuals who are threats to

19    public safety, national security, and border

20    security.  That is a senseless way to run an

21    immigration enforcement system, and it is not

22    the statute that Congress enacted.

23          On standing, my friend has articulated

24    no limits on the -- the circumstances that would

25    permit a state to sue.  He gestured at the idea

1    that maybe it's when states have relinquished

2    their sovereignty to the federal government.

3    But that explains every exercise of the federal

4    government's powers.  It's always pursuant to

5    the enumerated powers -- powers where there has

6    been that relinquishment of sovereignty.

7              He agrees that even one more

8    non-citizen or one fewer, one dollar of indirect

9    costs on taxing and spending would get states

10   into court, and that would be an indirect effect

11   of every single federal government policy

12   because the national government and the states

13   share sovereignty over the same people.

14             And what means is that anytime we

15   regulate with respect to the people of the

16   states, the states will be able to point at

17   those kinds of indirect, incidental downstream

18   effects on their own taxing and spending.  That

19   has not provided a basis for standing if you

20   look at our history and tradition, and the Court

21   should make that limit clear.

22             Finally, I think it's worth taking a

23   step back here.  We think the district court

24   committed a lot of different independent errors,

25   any one of which would entitle us to relief,

1     and it gives the Court options about how to

2     resolve this case.

3               But I think it's worth pausing on

4     the consequences of the district court's very

5     broad conception of standing here and its claim

6     of remedial authority.  Under the versions of

7     state standing that the lower courts have been

8     accepting, it means that states can challenge

9     the federal government with any policy with

10    which they disagree.  All 50 state Attorneys

11    General can come to court.  They can file

12    multiple suits, as they frequently do, in

13    multiple jurisdictions.  And, at that point, the

14    federal government has to run the table.  We

15    have to win each and every one of those cases,

16    as we did here with these enforcement guidelines

17    in the Sixth Circuit.

18              But, if the states can persuade even

19    one single district judge in a forum of their

20    choosing to be skeptical of the federal

21    government's position, then that judge can claim

22    authority to issue a universal remedy that is

23    going to immediately put the federal

24    government's policies on hold.  And that puts --

25    that resolves the issue for everyone everywhere

151

1     and puts the government in the position where it

2     frequently has to seek emergency relief from

3     this Court, as the Court well knows.  As members

4     of the Court have recognized, that requires

5     high-stakes decision-making with very little

6     time and in a situation where it has stymied the

7     ability of the Court to rely on lower courts to

8     vet the issues and give them consideration

9     because one district judge has claimed authority

10    to resolve the issue for the nation.

11           And I think that that is bad for the

12    executive branch.  I think it's bad for the

13    American public.  And I think it's bad for

14    Article III courts.  So we would encourage this

15    Court to say that and to reverse.

16           CHIEF JUSTICE ROBERTS:  Thank you,

17    counsel.  The case is submitted.

18           (Whereupon, at 12:20 p.m., the case

19    was submitted.)

20

21

22

23

24

25

## $

$8 [1] **16**:19

## 0

06 [1] **116**:2

## 1

**1)(b** [1] **138**:25
**10** [1] **114**:25
**10:04** [2] **1**:15 **3**:2
**11** [1] **3**:11
**114** [1] **39**:4
**115** [2] **39**:5,12
**11610** [1] **124**:8
**12** [5] **54**:23 **100**:17 **127**:6 **128**:15,16
**12:20** [1] **151**:18
**1221(c)(2** [1] **96**:24
**1225** [1] **43**:15
**1226** [15] **30**:21 **32**:25 **42**:7 **43**:5,14 **52**:25 **72**:14 **81**:18 **82**:1 **96**:19 **97**:4 **102**:9 **122**:9 **126**:6 **128**:14
**1226(a** [8] **26**:1 **31**:8 **96**:22 **100**:16 **122**:25 **127**:17 **129**:10 **145**:16
**1226(a)'s** [1] **127**:22
**1226(c** [29] **30**:22 **31**:9 **33**:14,22 **34**:24 **35**:9 **39**:2 **40**:11,15 **43**:20 **74**:20 **79**:6 **85**:16 **94**:18 **96**:2,8 **97**:12 **102**:24 **103**:16 **122**:4 **125**:21 **126**:5 **127**:3,11 **128**:8 **129**:3 **134**:12 **141**:6 **145**:13
**1226(c)'s** [2] **25**:23 **131**:16
**1226(c)(1** [7] **100**:16,19 **122**:23,24 **126**:15 **133**:14,20
**1226(c)(2** [3] **30**:2 **31**:14 **65**:17
**1226(d** [2] **105**:3 **129**:5
**1226(e** [1] **52**:14
**1230** [2] **79**:11 **100**:17
**1231** [23] **42**:8 **43**:4,14 **79**:6 **81**:18 **102**:10,24 **105**:20 **106**:4,5,15 **107**:5,17,20 **122**:10 **130**:2,7 **131**:5,7,9,11 **133**:17 **134**:13
**1231(a** [1] **130**:17
**1231(a)(1** [2] **100**:17 **130**:18
**1231(a)(2)'s** [1] **131**:18
**1231(h** [3] **52**:15 **105**:19 **106**:1
**1232(a** [1] **82**:1
**1252** [7] **44**:14 **45**:18 **62**:14 **63**:8,23 **72**:20 **120**:20
**1252(f** [6] **5**:8,18 **70**:2,5 **75**:19,23
**1252(f)(1** [17] **5**:2 **6**:2 **44**:20 **45**:11 **63**:2 **73**:9,11 **76**:1,3 **77**:13,18 **78**:2 **79**:12 **118**:8 **139**:24 **147**:7,22
**1252(f)(2** [1] **46**:8

## 2

**147** [1] **2**:10
**1920** [1] **108**:11
**1990** [1] **113**:14
**1996** [5] **43**:11 **51**:3,3,7 **52**:6

## 2

**2** [2] **112**:8 **118**:6
**2)(b** [1] **49**:16
**20** [1] **25**:25
**200** [1] **4**:1
**2008** [1] **57**:5
**2019** [1] **20**:5
**2020** [1] **119**:17
**2021** [2] **19**:13 **20**:6
**2022** [1] **1**:11
**22** [1] **83**:9
**22-58** [1] **3**:4
**2241** [3] **106**:18 **107**:16,19
**2342** [1] **110**:11
**24-hour** [2] **64**:19 **105**:4
**25** [1] **4**:13
**250,000** [1] **20**:6
**28** [1] **110**:11
**29** [1] **1**:11

## 3

**3** [1] **2**:4
**314** [1] **19**:23
**37** [1] **90**:3

## 4

**42** [2] **20**:10,11

## 5

**50** [1] **150**:10
**55,000** [1] **20**:7

## 6

**6,000** [1] **3**:13
**60** [1] **95**:15,18,21

## 7

**702** [2] **113**:3 **116**:19
**703** [12] **37**:10 **49**:4,14 **50**:4 **60**:6 **111**:6,18,19 **112**:24 **113**:1 **116**:14,19
**704** [1] **116**:20
**705** [1] **116**:24
**706** [17] **36**:6 **37**:4 **47**:25 **48**:19,20 **49**:5,16 **57**:19 **59**:23 **75**:11 **110**:18 **111**:18 **113**:1,11 **116**:21 **138**:14 **139**:22
**706(1** [3] **116**:8 **138**:15 **139**:6
**706(2** [4] **108**:9 **116**:8 **138**:15 **139**:15
**706(2)'s** [1] **139**:4
**73** [1] **2**:7

## 8

**80** [1] **120**:13
**80,000** [3] **95**:16,18,22
**80-year** [1] **110**:7

## A

**a.m** [2] **1**:15 **3**:2
**AADC** [1] **42**:12
**abdication** [1] **53**:16
**abide** [2] **47**:2 **58**:8
**ability** [9] **24**:12 **32**:5 **81**:5 **97**:5 **100**:10 **117**:2 **135**:5 **148**:17 **151**:7
**able** [6] **5**:25 **6**:22 **51**:11 **134**:19 **147**:19 **149**:16
**Abonza** [1] **94**:15
**above-entitled** [1] **1**:13
**absolute** [3] **102**:15 **124**:24 **145**:9
**absolutely** [1] **22**:11
**absolved** [1] **125**:22
**abstract** [1] **89**:4
**abuts** [1] **91**:4
**accept** [3] **15**:10 **25**:17 **92**:2
**acceptable** [1] **61**:17
**accepted** [1] **57**:13
**accepting** [3] **8**:14 **9**:12 **150**:8
**accessible** [1] **105**:5
**according** [2] **118**:12 **143**:19
**account** [2] **39**:24 **50**:22 **96**:13
**accounting** [1] **88**:11
**accurate** [5] **57**:12 **118**:5,16 **125**:10 **133**:12
**acknowledge** [5] **17**:9 **36**:1 **37**:25 **65**:3 **69**:14
**acknowledged** [2] **74**:22 **97**:11
**acknowledges** [3] **14**:23 **55**:5 **77**:14
**acquiring** [1] **131**:20
**Across** [4] **4**:13 **28**:19 **48**:22
**act** [5] **52**:3 **100**:8 **107**:16 **115**:15 **139**:4
**acting** [1] **64**:1
**action** [37] **6**:13 **20**:4 **37**:10 **49**:23 **61**:3 **63**:4,17 **72**:16 **75**:12 **76**:23 **78**:19,21 **92**:5,6 **98**:19 **106**:6,10 **107**:3 **123**:11 **117**:2 **112**:8,13,18 **113**:22 **115**:21 **116**:6,10,17,18 **117**:3,11 **134**:11 **135**:25 **136**:1,6 **139**:8 **148**:9
**actions** [13] **13**:24 **24**:25 **28**:20 **48**:23,25 **53**:21 **60**:6 **78**:3,5,9 **83**:8 **116**:19 **145**:12
**acts** [5] **77**:9 **78**:16,16 **117**:11 **125**:18
**actual** [4] **18**:10 **83**:7 **86**:13 **115**:24
**actually** [24] **15**:25 **16**:13 **21**:23 **34**:24 **37**:8 **43**:9 **52**:10 **56**:19 **57**:10 **60**:1 **62**:15 **64**:5 **66**:23 **71**:17 **75**:23 **97**:1 **105**:3 **108**:17 **113**:6 **118**:

**16** **125**:20 **132**:3 **144**:13 **148**:6
**add** [2] **94**:2 **118**:23
**added** [1] **43**:10
**additional** [5] **9**:22 **10**:10 **16**:6 **17**:16 **60**:16
**address** [8] **15**:18 **21**:5 **43**:6 **44**:16 **45**:19 **64**:15 **109**:8 **120**:10
**addressed** [2] **35**:16 **50**:4
**addresses** [1] **128**:19
**adjacent** [1] **46**:12
**administration** [9] **50**:9,19 **53**:7 **57**:8 **74**:22 **89**:22 **90**:12,13 **97**:11
**administrations** [2] **4**:14 **43**:7
**administrations'** [1] **42**:22
**administrative** [10] **55**:1 **56**:1 **75**:10 **108**:3,6 **110**:12,14 **115**:15 **139**:3,12
**admittedly** [1] **118**:3
**adopt** [1] **21**:23
**adopted** [2] **3**:16 **90**:5
**Adopting** [1] **4**:19
**advance** [1] **35**:8
**advanced** [1] **39**:10
**adverse** [1] **79**:4
**adversely** [1] **113**:20
**advisors** [1] **65**:20
**affect** [2] **5**:8 **104**:4
**affected** [2] **94**:11 **113**:21
**affects** [1] **75**:19
**affirmative** [1] **127**:2
**affirmatively** [1] **126**:24
**affirmed** [3] **38**:1 **78**:14 **108**:15,19 **140**:18
**afford** [1] **109**:22
**afterwards** [1] **87**:12
**age** [1] **39**:10
**agencies** [4] **15**:3 **23**:11 **67**:2,7
**agency** [45] **4**:14 **14**:23 **33**:13 **37**:18 **38**:2 **43**:9 **48**:25 **49**:2,25 **61**:3 **63**:4 **67**:1,18,21 **68**:3,9,18,20,22,25 **69**:16 **70**:22 **75**:12 **77**:11 **110**:23 **115**:21 **116**:5,6,10 **117**:3 **134**:11 **136**:1,6,25 **139**:8
**agency's** [9] **3**:14 **26**:7 **67**:10 **69**:15 **71**:4,18,19 **115**:9 **132**:8
**agents** [2] **82**:5,11
**aggravated** [5] **38**:25 **39**:18,23 **64**:21 **65**:5
**aggravating** [2] **39**:6,24
**aggrieved** [2] **113**:5,21
**ago** [3] **7**:15 **92**:22 **108**:25
**agree** [24] **18**:20 **21**:4 **44**:16 **57**:23 **59**:4,4 **60**:2 **85**:4 **100**:13 **104**:5 **107**:1 **112**:16,17 **115**:12,22 **116**:7,23 **118**:22 **132**:24 **133**:2 **135**:

**1** **139**:20 **140**:15,20
**agreed** [2] **44**:19 **59**:21
**agreeing** [1] **80**:23
**agrees** [1] **149**:7
**ahead** [3] **101**:1 **111**:2 **117**:8
**AL** [2] **1**:3,6
**Akins** [1] **13**:23
**Aleman** [9] **6**:10 **71**:8 **72**:8 **77**:23,24 **78**:24 **79**:3,3 **117**:18
**alien** [15] **26**:2 **29**:15 **30**:25 **38**:24 **39**:18 **94**:15,18 **106**:24 **107**:2,12 **126**:5 **129**:5 **130**:8 **131**:2 **145**:25
**aliens** [7] **7**:4 **29**:9 **64**:22 **75**:7 **87**:25 **95**:19 **124**:22
**ALITO** [30] **9**:18,24 **10**:2,22 **11**:17,25 **12**:3,11 **13**:9,14 **14**:7 **16**:15 **17**:6,8,19,23 **18**:5 **28**:21 **31**:19 **38**:16,17 **39**:3 **43**:22 **64**:9 **117**:16,17 **118**:2,23 **119**:5 **139**:21
**allow** [1] **68**:2
**allowed** [3] **14**:4 **73**:3 **78**:6
**allowing** [1] **97**:18
**almost** [2] **98**:4 **137**:7
**alone** [6] **31**:12 **39**:15 **44**:17,21 **93**:9 **134**:12
**alongside** [1] **140**:10
**already** [11] **27**:20 **33**:16 **35**:11 **40**:11 **42**:11 **43**:25 **88**:1 **131**:13 **133**:6 **135**:25 **146**:23
**alter** [1] **59**:25
**alternative** [1] **15**:19
**altogether** [1] **88**:16
**amend** [1] **38**:23
**Amendment** [2] **131**:23 **141**:25
**American** [1] **151**:13
**amicus** [1] **101**:8
**amount** [3] **13**:3 **79**:8 **143**:7
**ample** [1] **135**:12
**analogies** [1] **9**:1
**analogous** [3] **30**:5 **118**:21 **142**:25
**analysis** [8] **19**:20 **34**:25 **35**:8,9 **40**:17 **68**:7 **84**:3 **109**:3
**analyzed** [2] **5**:11 **140**:6
**anathema** [1] **143**:23
**announce** [1] **23**:3
**announces** [1] **72**:20
**annul** [3] **108**:16 **115**:2 **138**:24
**annulling** [1] **108**:19
**another** [6] **9**:19 **10**:5 **13**:5 **70**:3 **119**:3 **129**:20
**answer** [12] **24**:19 **33**:23 **34**:11 **38**:20 **80**:24 **86**:19 **95**:10 **104**:13,20,21 **111**:17 **121**:8

Official - Subject to Final Review

**ante** [1] 33:21

**antecedent** [1] 30:15

**anticipated** [2] 65:4,9

**anybody** [3] 29:12 102:16
131:13

**anytime** [1] 149:14

**anyway** [1] 21:20

**APA** [41] 4:24 35:21,25 36:
6 37:1,6,19 47:16 48:22
49:5 54:22 57:15 58:14,18
59:10,24 61:13 62:1,18,25
63:13,21 66:25 67:5,9,20
69:23 74:2,5 106:12,15
107:19 108:10 110:16 111:
7 113:5,15 114:12,16 139:
13 140:8

**APA's** [1] 59:6 75:8 108:2

**apologize** [2] 104:3 127:
10

**apparently** [1] 143:19

**appeal** [3] 47:11 138:4 147:
14

**appealing** [1] 74:24

**appeals** [3] 36:14 58:25 59:
14

**appear** [10] 30:18 33:12 98:
21 114:12,15 125:17 127:
24 128:1 130:22 145:6

**appearance** [1] 103:12

**APPEARANCES** [1] 1:17

**appeared** [1] 119:17

**Appendix** [1] 39:5

**apples** [5] 16:17,18,18,25
17:3

**applicable** [2] 26:25 112:
12

**application** [4] 67:16,17
68:9 88:23

**applications** [1] 69:17

**applied** [6] 11:9 14:13 68:
15,17 69:18 95:15

**applies** [11] 26:1 70:19 71:
22 72:2 100:19 127:11,14
128:14 129:4 144:22 145:
1

**apply** [14] 12:2 14:8 42:18
45:18 47:13 61:3 68:3 69:
1,7 70:23 91:9,13,14 111:4

**applying** [1] 121:14

**apprehend** [4] 10:4 28:4
32:16 33:3 34:8,17 130:10
131:8 132:19 133:5

**apprehended** [2] 33:1 34:
5

**apprehension** [3] 7:4 29:
22 40:8

**approach** [6] 35:1 65:11
71:7 120:3,4 148:16

**approaches** [1] 59:19

**appropriate** [2] 51:20 61:
11

**appropriated** [1] 52:10

**arbitrary** [1] 68:20

**area** [7] 6:15 13:3 23:10 35:

15,15,16 58:9

**aren't** [8] 9:3 51:11 83:18,
21 84:25 109:11 115:7,7

**argue** [3] 3:21 122:21

**argued** [2] 25:16 63:21

**arguing** [7] 19:3 21:18 22:
18,21 102:20,22,22

**argument** [57] 11:4 2:2,5,8
3:4,7 7:1 8:8 10:4 15:11
17:24 18:1,2 25:9,14 28:
22,25 29:3 30:18 32:21 33:
6,6 37:3 43:4,5 45:23 47:
9 62:7 66:9,17 71:16 73:
19 77:22,23 94:10 95:10
99:8,14 103:1 117:18,25
119:15,19 120:8,9 128:17
129:15 137:12 138:12 147:
3

**arguments** [26] 7:21 8:4,
15 10:1 17:25 36:20 38:6
44:17 45:18,21 46:15 52:
24 56:20,25 57:2,10,11,18
60:20 63:23 68:12 74:1 82:
1 91:25 109:8 125:2

**arise** [1] 75:5

**Arizona** [4] 15:15 57:16 87:
17,18

**around** [2] 32:3 108:11

**arraign** [1] 143:11

**arrest** [27] 23:15 26:1 41:
14 44:3 98:6 99:25 100:1,
6 103:4,16,20 105:2 122:
18 124:25 125:7 130:11,15
131:17 132:1,15,19 141:10
142:4 143:9 145:2,9,10

**arrested** [2] 64:21 98:6

**arresting** [1] 131:21

**arrests** [2] 135:17 143:2

**ART** [1] 123:11

**Article** [29] 11:4 12:4 24:12,
17,17 25:2,7 60:19,25 61:
15 62:3,5 74:4,17 84:2 86:
6 88:21 91:2 94:24 97:25
99:14,18 100:13 109:4
114:4,9 119:16,16 151:14

**articulate** [1] 63:7

**articulated** [3] 7:6 46:10
148:23

**as-applied** [2] 142:21 144:
8

**ascertain** [1] 65:20

**aside** [29] 47:25 48:4,11 54:
14 55:10,10 57:24 60:4,9,
12 67:25 69:10 75:12 110:
15,24 111:2,12,13 113:2
114:13 115:4 116:6 129:
14 130:3,6 138:10,24 139:
5 140:9

**aspects** [1] 86:25

**assert** [1] 12:21

**asserting** [1] 17:13

**assertion** [3] 28:2 87:5,6

**assertions** [1] 87:12

**associated** [2] 83:19 93:1

**assume** [3] 29:2 114:20
120:19

**assumed** [1] 36:5

**assuming** [4] 5:13 15:9 96:
9 122:23

**assumption** [2] 98:12 114:
5

**astonishing** [1] 55:17

**attach** [4] 45:7 61:24 64:1
145:17

**attaches** [2] 131:5 141:20

**attack** [3] 106:12,12,15

**attacked** [1] 82:24

**attacking** [1] 87:11

**attempt** [3] 24:14 76:22
105:12

**attempting** [4] 46:17 74:3
78:23 108:16

**attention** [7] 36:17 38:6 54:
15,20 55:9 56:16 108:6

**attenuated** [1] 17:15

**Attorney** [4] 64:17 73:2
129:6 130:8

**Attorneys** [1] 150:10

**Austin** [1] 1:22

**authorities** [2] 64:20,21

**authority** [25] 4:22 6:16 14:
18 15:1 31:25 32:8 58:6
59:7,13 62:15 63:12,18 64:
2 67:3,19 69:25 70:4,6 73:
11 88:20 115:10 142:2
150:6,22 151:9

**authorize** [5] 37:1 59:23
61:14 62:19,25

**authorized** [4] 36:5 60:24
72:23 75:12

**authorizes** [1] 61:18

**availability** [1] 113:19

**available** [8] 12:19 36:24
64:18 76:1 79:12,16 99:15
111:7

**avoid** [1] 17:2

**avoidance** [1] 144:14

**award** [2] 63:17,18

**aware** [3] 33:13,17 138:8

**awareness** [1] 33:21

**away** [3] 10:9 41:8 122:10

**B**

**back** [18] 8:2 17:24 38:18
54:17 55:20 64:10 66:7 75:
18 97:9 101:15 113:10
114:10 116:14 119:17 122:
8,16 124:13 149:23

**backdrop** [7] 34:14 92:8,
12 93:13 94:1 96:18 97:23

**backed** [2] 5:23 123:10

**background** [5] 4:1 22:3:
20,25 43:12 98:1

**bad** [4] 101:22 151:11,12,
13

**bar** [3] 71:12 72:17 76:11

**bare** [2] 31:12 44:6

**barred** [1] 78:2

**BARRETT** [19] 18:17,20
58:21,22 60:4 61:6 62:2,
11,22 63:6,10 64:7 65:22
66:3 82:14 83:3 139:18,19
140:22

**bars** [2] 5:1 118:8

**based** [8] 19:17 29:12 39:
21 73:24 74:7 86:24 93:18
117:18 119:15 142:5 143:
9

**bases** [1] 31:15

**basically** [3] 27:8 124:13
132:9

**basis** [41] 4:3 11:22 12:25
15:23 59:24 60:17 64:4,19
70:3 94:23 149:19

**bear** [2] 48:6 74:14

**bearing** [1] 85:23

**became** [1] 97:12

**become** [1] 92:13

**bed** [1] 95:25

**beds** [2] 95:22,24

**begin** [1] 127:23

**beginning** [4] 138:14,17
139:15 145:17

**begins** [2] 127:25 145:6

**begun** [1] 146:23

**behalf** [9] 1:20,23 2:4,7,10
3:8 73:10,20 147:4

**behind** [1] 122:5

**believe** [16] 8:4 10:5 46:24
50:12 77:5 79:24 100:2
103:17 113:14 120:13 122:
9 124:8 129:19 130:14
136:2,16

**believes** [2] 97:4 143:1

**believing** [2] 8:8 101:16

**below** [1] 108:14

**benefit** [8] 16:23,24 47:16
105:21 106:14,23 107:11
119:6

**benefits** [3] 19:2 89:10 93:
2

**beside** [1] 75:1

**best** [3] 77:17 131:19 135:7

**better** [1] 77:22

**between** [11] 4:5 20:5 65:7,
19,25 66:19 78:25 83:7
118:23 133:1 147:8

**beyond** [4] 60:18,22,23 62:
9

**Biden** [2] 7:11 57:16

**big** [4] 43:15 54:3 55:7 119:
11

**bind** [2] 77:10 140:16

**binding** [5] 67:4,6,12 120:
24 123:22

**bit** [5] 43:1 79:21 80:17 95:
3 107:23

**blanket** [1] 50:14

**block** [1] 106:7

**blow** [1] 113:9

**board** [1] 8:3

**bold** [2] 124:8,11

**bond** [2] 71:10,14

**books** [2] 48:13,16

**border** [7] 3:16 33:10 87:
22,23 90:6 91:4 148:19

**borders** [4] 4:23 17:17

**both** [20] 8:5 32:11 44:4 45:
22 56:2 74:21 75:1 94:22
95:24 97:15 98:2 100:17
111:18 113:19 115:20,22
116:7 131:20 141:11 145:
1

**bottom-line** [1] 20:12

**bound** [1] 77:7

**box** [1] 37:25

**branch** [2] 40:4 151:12

**branch's** [1] 112:14

**break** [3] 25:23 38:19 40:
24

**breakfast** [4] 35:21 47:21
119:9,10

**brief** [11] 18:23 24:18 25:9,
13 54:3 55:3 101:8 119:14,
20 120:14 132:14

**briefing** [3] 9:5 139:22,23

**briefly** [1] 24:17

**bring** [11] 24 72:25 89:
24 90:22 98:19,21 100:11
116:18 128:1 130:21 137:
4,4

**bringing** [2] 131:4 143:22

**brings** [1] 116:17

**broad** [9] 6:17 8:12 26:7
60:5,9 91:25 92:3 106:22
150:5

**broader** [1] 113:22

**broken** [1] 83:13

**brought** [3] 48:23 61:7 70:
21

**bucket** [1] 50:8

**budget** [1] 94:10

**bunch** [1] 121:6

**burden** [2] 44:5 83:3

**burdens** [1] 19:2

**bus** [2] 8:23 9:4

**business** [1] 50:13

**buy** [2] 16:17 17:3

**buying** [2] 16:24 17:3

**Byrd** [1] 51:24

**C**

**c)(1** [1] 129:4

**c)(2** [1] 43:23

**cabin** [1] 124:14

**California** [2] 84:4 90:13

**call** [4] 74:6 86:6,6 123:22

**came** [3] 1:13 36:23 119:17

**candidly** [1] 77:3

**cannot** [2] 23:12 27:11

**capabilities** [2] 101:25
102:1

**capacity** [1] 28:24

**capricious** [1] 68:21

**carefully** [1] 113:7

**cartel** [1] 66:12

**Case** [79] 3:4 6:4 7:12,18 9:
7,19,21 **10:**1,14 13:21 14:1,
10,20,22 **15:**13,14,23 24:5
35:21 44:23 46:21 47:14
49:2 55:6,6,6,12 56:1,21
57:6,8,17,21 60:23 66:10,
20 67:13 68:8,11 69:4,5,19,
19 71:10,23 72:9,13,25 75:
20 77:25 79:10 81:3 82:22
83:24 84:3 86:10 87:18 90:
4 93:14 94:1 97:4 104:8,
11 111:2 115:6,9 119:3
120:2 135:3,5,9,9,11 144:8,
9 147:20 150:2 151:17,18

**cases** [9] 26:22 37:16,23
48:22 57:8 61:20 88:23 96:
15 150:15

**Castle** [3] 23:14 97:25 130:
3

**categorical** [3] 34:25 65:
11 148:16

**categorically** [2] 115:25
123:6

**categories** [6] 29:9 31:1
64:13 103:10 123:9 126:
24

**category** [1] 126:15

**causal** [3] 19:17 83:7,13

**cause** [6] 17:18 100:1 106:
6,10 143:2,10

**caused** [1] 101:19

**causing** [1] 82:4

**CDC's** [1] 20:9

**centered** [1] 29:1

**century** [1] 75:9

**certain** [19] 10:8 15:12 24:
22 29:9 30:9,11,12 39:6,17
45:17 67:7 81:6,19 83:20
103:10 113:4 131:12 141:
7 142:20

**certainly** [25] 9:2 49:22 65:
2 69:13 75:24 79:6 82:21
83:1 88:17 94:23 96:14
100:5 102:11,19 114:1,5,6
122:3 127:1 131:16 132:
21,21 135:18 137:8 138:20

**certainty** [2] 34:23 65:16

**cetera** [4] 70:17 82:8 84:8
88:4

**chain** [2] 17:15 83:13

**challenge** [14] 3:21 7:3 16:
21 17:10 50:13 72:25 88:
19 89:1 97:18 136:11,23
142:21 144:9 150:8

**challenged** [2] 10:18 78:
17,17

**challenges** [1] 72:2

**challenging** [6] 10:7 13:24
69:14 88:22 92:5 141:3

**chance** [6] 23:1 44:14 45:
19 52:18 64:14 127:8

**Chaney** [2] 14:15 99:1

**change** [5] 21:2 55:3 99:24
101:5,6

**changes** [1] 134:15

**channeled** [1] 64:24

**character** [1] 76:10

**charge** [4] 26:12 40:9 68:
17 143:11

**charged** [1] 102:16

**charges** [2] 100:11 143:22

**charging** [1] 40:12

**charitably** [1] 120:12

**chart** [1] 19:22

**checks** [2] 50:18 53:20

**CHIEF** [60] 3:3,9 6:25 7:10,
14 8:7,13,19,25 20:16 21:
10,17 22:1,17,20 25:8 35:
12 36:2,9,12 37:12,15,21
38:3,11,14 40:22 42:20 44:
11 50:6 54:25 57:16 58:20,
24 66:4,8 73:16,21 93:20,
23 95:1,21 96:9 97:17 105:
24 107:22 108:7,25 109:6
117:4,7,14 120:16 127:7
133:25 139:17 140:23 146:
25 147:6 151:16

**choices** [2] 4:17 83:22

**choose** [6] 100:11 120:11
126:11,12 131:3 143:3

**choosing** [1] 150:20

**chose** [1] 115:19

**chosen** [2] 84:6 86:1

**circle** [1] 66:7

**Circuit** [19] 7:20 35:20 36:3,
13 47:17 54:15 55:22 56:
16 57:14 59:1 66:12 109:7
111:14 119:7 138:19 150:
17

**circumstance** [6] 14:5 30:
3 33:9 50:18 125:22 138:4

**circumstances** [13] 24:22
32:24 43:24 73:5 121:25
122:19 130:18 131:1,19
132:24 142:20 145:11 148:
24

**cite** [2] 132:14 138:23

**cited** [1] 51:23

**citing** [1] 83:10

**Citizen** [1] 55:24

**citizens** [1] 144:6

**civil** [2] 13:24 112:7

**claim** [16] 15:16 66:19,25
67:9 68:18 69:23,24 72:24
75:2 95:18 115:6,8 129:23
137:19 150:5,21

**claimed** [1] 151:9

**claiming** [1] 107:3

**claims** [7] 48:22 70:20 71:
9 72:9 115:13,15 116:2

**clarify** [2] 56:14 127:9

**clarifying** [1] 141:1

**class-wide** [2] 118:8,11

**classic** [1] 112:3

**clause** [1] 108:20

**clear** [17] 5:22 11:21 20:14

29:18 33:19 34:21 48:5 66:
24 70:16 83:6 93:17 120:2
125:1 133:9 144:12 146:3
149:21

**clearer** [1] 50:3

**clearly** [14] 6:8 18:17,22,25
19:4,8 45:6,14 46:2 61:23
63:25 74:19 87:21 120:5

**Clinton** [1] 97:11

**clue** [1] 117:12

**clues** [3] 96:20 139:10,11

**code's** [1] 88:22

**coerce** [2] 79:2 82:9

**coercive** [12] 5:3,5,22 6:9
46:20 47:7 73:9 77:12,15
79:7,9 82:12

**cognizable** [2] 7:8 23:4

**coin** [1] 23:8

**collateral** [1] 76:25

**college** [1] 10:9

**colloquy** [1] 32:11

**colossal** [1] 120:8

**combination** [1] 90:21

**come** [13] 36:21 38:17 42:3
55:17 79:14 89:5 90:13 98:
9 113:4 141:11 142:14
143:16 150:11

**comes** [10] 32:8 50:9 53:7
55:5 72:17 89:18 114:13,
17 128:8 139:25

**comfortably** [2] 74:16 139:
1

**coming** [5] 55:25 88:3 92:
10,24 137:9

**command** [2] 24:24 102:9

**comment** [2] 56:7 68:19

**Commerce** [4] 74:12 108:
12,20,20

**Commission** [4] 13:22
108:13,16,21

**commits** [1] 94:21

**committed** [5] 14:23 19:10
143:1 145:12 149:24

**committing** [1] 94:21

**commonsense** [1] 69:3

**compared** [1] 130:16

**comparing** [1] 35:2

**comparison** [1] 20:5

**compelled** [2] 81:11 83:16

**compelling** [1] 95:10

**complaining** [1] 67:9

**complaint** [3] 5:16 67:17,
18

**complete** [3] 55:3 102:14
132:25

**completely** [3] 56:3 127:9
133:9

**complexities** [2] 64:11 65:
11

**complicated** [1] 34:24

**comply** [10] 20:23 22:6 23:
18 47:9 96:12 99:3 134:8,
18,23 147:24

**complying** [1] 133:9

**component** [1] 116:11

**components** [1] 124:10

**concede** [4] 13:22 61:10,
16 102:19

**conceivably** [1] 125:11

**conceive** [1] 64:4

**concept** [2] 59:14,15

**conception** [2] 143:15 150:
5

**conceptions** [1] 31:23

**conceptual** [1] 66:16

**concern** [2] 8:20 101:5

**concerned** [1] 70:14

**concerning** [2] 7:3 71:2

**concerns** [2] 62:9 66:8

**conclude** [2] 15:24 16:13

**concluded** [2] 14:2 18:9

**conclusion** [4] 20:12 36:
10 49:10 110:24

**conclusions** [2] 18:14 111:
1

**concrete** [1] 94:14

**concretely** [1] 113:6

**concurrence** [1] 57:17

**condition** [2] 39:10 89:13

**conditions** [1] 102:24

**conducts** [2] 35:7,9

**confined** [1] 58:12

**conflating** [1] 30:19

**confronted** [3] 14:21 51:
24 89:23

**Congress** [85] 13:23 14:17
15:1 16:15 20:22 21:3 22:
5,10 24:1,14,23 25:17 29:7
30:6,13 31:14 32:14 39:17
40:3 45:7 46:1,10,16 49:7,
14,22 50:2,23 51:3,7,13,17,
20 52:2,6,9,13 53:4,9,12
54:5 58:14 59:10,22 61:17,
23 63:25 65:3,9 67:5,5,23
69:12 70:8,16,19 71:1 72:
23,24 73:3,13 75:10 85:14
95:8 96:25 97:3,9,10 99:1,
6,10 110:8,9 113:7 114:7
115:14,19 117:13 125:1
137:1 143:20 144:12 146:
19 147:21 148:22

**Congress's** [6] 6:15 30:19,
20 68:24 69:24 122:5

**congressional** [2] 4:16 51:
12

**consequences** [7] 45:9
64:1 74:14,16 120:9 148:4
150:4

**consider** [1] 121:18

**considerable** [1] 65:18

**consideration** [2] 96:12
151:8

**considerations** [4] 21:12
51:23 52:1 60:19

**considered** [4] 57:13 84:
16 97:1 122:5

**considering** [1] 29:16

**consistent** [10] 12:13 42:

23 71:19 75:13 78:24 101:
13 108:9 114:3 128:18
144:24

**consistently** [2] 57:3,7 69:
12

**constant** [2] 43:19,21

**constitute** [1] 10:15

**Constitution** [3] 24:14
136:13 144:24

**constitutional** [13] 3:25 8:
6,17 9:16 11:15 13:5,7 23:
25 52:1 142:21 144:9,14,
17

**constitutionally** [2] 144:4,
5

**constrained** [1] 51:9

**constraints** [3] 21:13 74:
25 134:5

**construction** [2] 38:9 60:
11

**construed** [1] 134:25

**consultation** [1] 65:19

**contains** [1] 103:16

**contemplate** [1] 110:15

**contemplated** [1] 59:6

**contemplates** [2] 62:1
146:18

**contemporary** [2] 115:3
138:21

**contempt** [2] 5:23 76:25

**contest** [1] 148:2

**contested** [2] 7:22 86:10

**context** [18] 36:18 37:1,5
38:10 49:6 54:16 56:17 66:
17 72:4 97:24 98:1,21 101:
23 130:4 131:17,23 132:2,
11

**contexts** [2] 28:8 58:15

**continue** [2] 47:13 147:19

**continued** [5] 29:21 40:21
86:8 134:18 147:13

**contract** [2] 12:22 69:5

**contracts** [2] 69:4,5

**contradictory** [1] 105:18

**contradicts** [1] 4:1

**contradistinction** [1] 96:
22

**contrary** [2] 13:8 147:21

**convicted** [2] 30:12 38:24
39:18

**conviction** [3] 39:8,14,22

**convictions** [2] 66:2 148:
13

**cooperate** [1] 104:15

**core** [2] 99:8 100:9

**corpus** [1] 107:3

**correct** [30] 26:3,4,9,18,19
27:1,2,10,11,22 28:10 29:
16 40:5 41:1,2,11,14,24 42:
1 48:14 49:21 50:15,16
104:2 119:24 120:21 121:
18 137:21,22 138:5

**correctly** [3] 10:14 25:13
31:3

Official - Subject to Final Review

cost [9] 10:11 15:17 16:18
18:2 85:24 86:1 87:24 94:
22 136:21
costs [26] 15:11,16 17:1 19:
14 74:8,9 83:16,18 84:14,
15,20,22 86:7,8,21,21 89:9,
19,25 91:11 92:11,25 93:7,
9,10 149:9
couldn't [3] 65:9 82:16
136:22
Counsel [11] 35:12 73:17
95:2 100:23 102:5 107:22
111:23 117:4 144:15 147:
1 151:17
counterparty [1] 76:21
counties [1] 86:12
country [1] 3:12
couple [2] 98:16 138:16
course [12] 6:24 14:21 15:
20 56:15 58:7 77:5 82:22
96:2 99:5 120:13 127:24
147:14
COURT [143] 1:1,14 3:10,
17,19 4:10 5:22 6:10,16 7:
6,21,23,24 9:6,9 11:9 12:
10,14 14:2,4,11,15,21 16:2
18:8,14 19:1,5,10,20,23 20:
3,7 21:14,22 22:8 23:3,9,
13,14,19 26:11 37:20 38:1,
8 42:11,13 44:19,21 45:3
46:3,10,19,25 47:7 48:8,9
51:23 56:19 57:12 58:3,6,
9 59:18 60:1 61:20 63:11,
16,24 65:10 66:2 69:4 71:
11,20 73:8,22 74:13,21 75:
15 76:12 78:15,16 80:6 81:
14 82:25 84:4 85:9,11 88:
10 92:15 93:16 94:5,7 106:
1,3 107:13,15 108:11,18
109:15,21 113:4,13 114:24
115:1 116:3,14,21 117:2
118:4 120:11 121:1,3,12
122:2 123:5 131:23 135:
15,16 138:7 139:2,11,24
140:5,16,17 142:12 144:2
145:5,15 147:10,17 148:6
149:10,20,23 150:1,11 151:
3,3,4,7,15
Court's [27] 5:6 8:16 10:16
11:12 12:17 13:2 14:25 18:
24 19:20 34:25 50:17 55:
22 58:1 71:8 72:7 73:11,
25 74:16 75:16 84:2 101:
14 129:20 134:19,24 140:
16 148:16 150:4
courts [36] 4:3 5:2 7:19 8:
13,14,15 9:12 14:18 23:5
36:2,14,23 37:11 45:11 46:
19,19 51:11 56:24 57:9,19
58:11,25 59:14 60:22,23
75:11,12 90:22 109:2,13,
16 139:14 140:6 150:7
151:7,14
courts' [2] 70:4 140:15

cover [2] 60:2 100:7
covered [7] 5:4 6:13,23 72:
11 98:15 126:5 133:19
cradle [1] 8:22
create [13] 4:7,25 15:7 28:
19 37:6 44:8 46:16 49:8
105:4,21 106:22 129:7
144:16
created [2] 25:18 114:7
creates [1] 66:23
creating [3] 43:16 49:23
90:21
credit [1] 33:22
crime [3] 35:3 102:16 143:
1
crimes [1] 30:13
criminal [20] 19:21,25 29:
13 30:9,25 39:7 53:23 66:
2 83:15 84:19,22 86:13 95:
19 98:19 102:23 141:7
142:11 143:6 144:23 148:
13
curious [1] 24:19
curriculum [1] 10:20
custody [15] 19:25 27:25
29:23 31:7 34:13 35:11 40:
14 44:1,8 86:3 103:18 131:
16 141:11 142:3 145:2

D

D.C [14] 1:10,20 35:20 36:3,
13 47:17 54:15 56:15 59:1
66:12 109:6 111:14 119:7
138:19
DACA [1] 84:3
daily [1] 64:18
data [2] 19:17,19
database [2] 33:20 39:14
dated [3] 51:4 117:3,10
Davis [2] 49:18 106:3
day [5] 57:1 104:25 105:2,9
122:2
de [3] 110:20 111:5 134:20
dead [3] 89:24,24 90:23
deal [3] 35:14 105:19 120:
20
deals [1] 138:14
dealt [1] 109:2
decade [1] 37:17
decades [2] 27:10 55:22
decide [11] 41:9,13 88:6
100:21 111:2 121:6 122:
10 124:25 125:6 143:4,8
decided [6] 41:1 53:22 83:
24 142:15,23 143:17
decides [3] 83:21 127:25
141:8
deciding [1] 35:3,4
decision [42] 14:23 26:2
27:13 29:14 36:15 40:12
41:6 48:21 50:14 69:25 71:
8 75:5 78:11 83:19 100:20
103:10 118:13,17,18 122:
14,17,24 123:3 125:6,15,

21 126:4 127:14,19,23,25
128:2,6,7 129:3,10 141:17,
22 142:5,9 145:25 146:14
decision-making [4] 68:
21 69:15 83:14 151:5
decisions [10] 13:25 30:1
36:19 37:18 38:1 40:7 51:
19 74:15 97:19 125:12
decisis [5] 109:12,15,22
110:6 120:3
declaration [3] 77:4,6 79:4
declarations [1] 47:2
declaratory [24] 5:15,18,
20 6:1 46:25 47:6,8 58:7,
16 59:9 60:6 73:4,8 77:13
78:25 79:20 111:8 112:2,
15,23 118:11,24 147:9,10
declined [1] 7:24
decrease [2] 101:25 102:1
defective [1] 68:3
Defense [1] 137:5
define [1] 138:24
defined [2] 115:21 138:24
definitely [2] 110:13 136:
21
definition [3] 138:23 139:1,
4
degree [2] 51:7 53:9
delay [1] 117:2
Delaying [2] 117:6,10
delineated [2] 31:14 73:13
delves [1] 19:6
demonstrates [2] 37:10
52:22
Demore [3] 128:19,25 146:
2
Department [2] 1:20 74:11
depend [1] 28:22
depending [1] 100:15
deprive [1] 4:21
depth [1] 140:6
described [10] 4:9 28:5 31:
9 32:18 33:14 40:15 43:18
44:3 98:10 108:13
describing [2] 43:22 92:19
destabilizing [1] 21:25
detail [1] 43:1
detailed [1] 143:19
detain [35] 28:23,25 29:4,6,
12 30:10 31:11,25 40:14
41:14,22 54:8 83:21 85:3,
7,25 98:5,15 122:13,18
124:25 125:7 130:8,11
131:1,12,18 142:4,14,24
143:18 145:10,10 146:10,
20
detained [15] 29:10,10 30:
14 31:1 38:25 39:19,21 85:
25 86:15 98:5 129:2 131:
25 132:13,16 143:21
detainer [19] 94:16,17,19
104:8,10,19 125:16,25 126:
10 130:15
detainers [4] 83:11 86:16

103:20 104:4
detaining [4] 19:21 32:4
85:1 131:22
detains [1] 84:13
detention [36] 26:1,25 29:
16,20,21 30:1,6,20 31:9 40:
19,21 43:24 75:4 86:8 88:
19 96:3 97:7 102:1 103:5,
9 105:12 107:4 129:24
130:13,19 131:24 135:4
141:5,7 143:25 144:3,22
145:2,13,16 146:8
detentions [1] 82:8
determination [22] 30:15,
22 32:1,5 40:1 41:21,23
64:11 65:5 85:2,15,24 96:
4,7 141:4 142:17 143:22
144:22 146:5,11,16,19
determinations [2] 35:10
40:16
determine [3] 30:7 64:20
65:16
determined [2] 58:5 84:24
determining [1] 123:16
developments [1] 65:10
devise [1] 64:17
devote [2] 34:19 55:2
DH [1] 123:6
DHS [37] 3:12,16 4:17 6:12,
22 19:20 20:3,10 22:13 29:
23 30:2 31:5 33:9,20 35:7
40:11 42:9 43:22 47:12 52:
10 72:11,14 73:3 78:8 82:
5,10,16 122:18 123:12 130:
5 131:8 132:4 141:8 147:
12,18,24 148:7
DHS's [1] 146:5
dictate [1] 30:1
dictated [1] 32:15
dictates [1] 65:1
dictating [1] 10:19
dictionaries [2] 115:3 138:
21
dictionary [1] 138:22
difference [1] 147:8
different [19] 5:14 17:24
29:1 35:24 40:3 46:11,12
65:14 69:23 70:18 99:23
100:3 104:12 112:11 132:
3 133:8 137:11 147:17
149:24
differently [3] 80:1,14 81:
24
difficult [3] 51:18 96:11
135:2
difficulties [1] 21:1
dilemma [1] 86:7
direct [7] 10:16 11:14 15:3
78:11 86:11 105:7 142:19
direct/indirect [1] 18:1
direction [1] 139:13
directive [2] 42:9 73:1
directly [6] 10:18,21 17:10
49:24 77:9 92:4

directs [2] 105:3 129:5
disagree [4] 20:18 68:6
111:19 150:10
disavowed [1] 126:2
disclaiming [1] 125:2
disconnect [2] 66:23 67:
14
discontinue [1] 131:3
discretion [45] 4:12 14:24
15:3,7 23:10,20 24:13,15
26:7,16 28:18 30:23 31:13
34:14 41:8 42:14,18 43:13
51:9 54:7 64:23 67:1 68:
23 75:1 80:19 82:18 92:7
97:23 98:17,18,24 100:7,
10,18 101:16 102:15 104:1
122:10,13 123:21 124:5,24
130:21 145:9 148:7
discretionary [5] 27:9 74:
21 80:20 82:7 129:24
discuss [3] 44:14 52:18 89:
4
discussing [1] 139:6
disfavors [2] 11:19 13:17
displace [1] 4:11
displacement [1] 15:7
displaces [3] 28:18 31:12
148:6
disposal [1] 50:23
disputable [1] 98:14
dispute [2] 4:5 68:11
disputed [3] 48:4 85:10 87:
7
disputing [2] 5:25 63:3
disregard [3] 48:7,17 75:
14
dissent [1] 14:3
dissipates [2] 141:18,21
distinction [3] 11:2 78:24
79:18
distinctive [1] 11:8
distorting [1] 132:4
district [36] 3:17 7:20 9:6
16:2 18:8,14,24 19:1,10,20,
23 20:3,7 45:3 46:24 47:7,
17 63:16 76:19,20,21 82:
25 85:9 101:14 121:1,3,12
123:5 135:15,15 147:10,17
149:23 150:4,19 151:9
districts [1] 94:4
divisible [1] 35:5
divisions [1] 94:4
doctrine [1] 137:8
documents [1] 35:6
doing [9] 36:14,17 42:23
55:4 81:20 82:9 87:24 109:
7 123:20
dollar [2] 3:22 149:8
dollar's [4] 89:8,19,25 91:
11
dollars [1] 89:8
done [5] 20:3 37:22 43:7
110:9 137:5
door [1] 62:8

Heritage Reporting Corporation

double [1] 108:18
down [8] 25:23 35:5 37:4 38:19 40:25 53:5 137:16 138:2
downstream [1] 149:17
drafted [1] 65:14
dramatic [4] 53:6,13,15,16
drastic [2] 76:13,14
draw [2] 19:16 78:23
drawing [3] 8:3 11:2 129:13
drill [1] 37:4
drive-by [3] 140:1,4,10
drop [3] 26:8,16 92:15
duration [4] 23:18 145:5 146:8,21
duties [1] 25:19
duty [6] 23:16,17 28:17 34:16 141:18 148:1

**E**

e)(3 [1] 70:15
e-mails [1] 83:9
each [10] 4:4 22:15 24:4 32:17 33:21 43:6,17 50:8 147:24 150:15
earlier [4] 46:24 51:2 122:8 126:22
Earth [1] 57:6
easier [1] 65:4
easily [1] 76:15
eat [1] 17:4
eclipsed [1] 120:6
Edwards [1] 54:19
effect [12] 10:7 19:15 20:10 42:3 46:22 87:19 88:5 89:13 109:22 118:20,21 149:10
effective [2] 117:3,10
effectively [4] 5:24 13:12 76:18 81:22
effects [2] 15:25 149:18
effectuate [1] 142:3
effort [1] 24:24
efforts [2] 22:12
either [2] 86:7 110:1
Election [1] 13:22
elements [1] 35:1
eliminating [1] 75:8
ELIZABETH [5] 1:19 2:3,9 3:7 147:3
elsewhere [1] 26:6
emergency [2] 138:5 151:2
emphasize [1] 28:14
emphasized [1] 23:14
emphasizing [1] 95:6
employ [1] 84:6
employed [1] 59:1
employer [1] 12:23
empowered [1] 75:11
empty [1] 95:22

enacted [4] 59:10,23 110:9 148:22
enactment [2] 37:9 59:6
encompassed [1] 120:19
encounters [2] 33:9 148:10
encourage [1] 151:14
end [6] 65:14 113:8,10 128:4,8
ends [6] 96:8 100:22 129:9 137:9 145:16 146:6
energy [1] 55:6
enforce [1] 14:19 50:10,11,15,21 51:12 53:8,8 80:13 81:6,23
enforceable [10] 22:14 23:16 34:16 52:7,12 105:22 106:23 107:11 148:1,6
enforced [3] 51:14 53:10 80:1
enforcement [45] 3:13,16 4:12,20 7:9 14:18 16:3,4,8,9,14 18:12 20:4,13 22:12 23:10,20 24:13,15,25 28:18 31:13 34:14 42:17 43:12 48:24,25 51:6 54:6 78:5 83:3 84:14 92:5,6 94:22 97:5 99:2 100:8 101:16,25 147:12 148:7,9,21 150:16
enforcing [2] 128:5,5
engage [3] 18:7 56:20,24
engaged [3] 24:23 36:20 68:20
enjoin [5] 45:13,25 46:9 70:6 76:3
enjoined [3] 71:3 76:16,17
enjoining [3] 71:17,18 81:4
enjoins [1] 118:1
enough [4] 92:10 93:13 98:3,4
ensure [1] 65:6
enter [3] 6:16 46:25 73:12
entered [3] 47:8,10 147:10
entering [3] 45:6 46:20 47:21
entertaining [1] 63:16
entire [1] 88:22
entirely [5] 20:8 23:17 108:22 118:22 147:16
entitle [1] 149:25
entitled [2] 71:10 147:13
entity [2] 12:6 13:19
enumerated [1] 149:5
environmental [2] 50:10 55:7
envision [1] 101:7
EPA [5] 12:13 74:11 91:17,21 92:22
equally [1] 48:5
erase [1] 48:12
erasing [1] 110:25
erred [1] 37:11
erroneous [5] 18:18,22,25

19:5,8
erroneously [1] 88:7
error [5] 19:1 20:14 47:11 83:6 93:17
errors [5] 19:11,17 111:5 116:4 149:24
especially [5] 90:17 96:21 111:6 113:15 130:4
ESQ [3] 2:3,6,9
essence [2] 81:8 122:4
essential [1] 115:16
essentially [9] 20:1 46:15 82:5 100:6 106:6 110:8 120:11 135:17 145:8
established [4] 29:8 35:25 40:3,4
ET [6] 1:3,6 70:17 82:8 84:8 88:4
evanescent [1] 77:17
even [38] 3:22 8:22 18:13 19:15,18 21:8 28:9,24 33:3,3 59:8 60:5 64:12 67:24 73:6 89:9 90:3 92:2 93:8 98:10 129:14,21 130:3,6 134:10 138:22 140:5 142:15 143:16 144:5,16 145:4,14,14,19 146:12 149:7 150:18
event [1] 77:3
events [1] 17:15
everybody [6] 28:9,24 113:24 125:15 126:23 132:5
everyone [4] 98:15 99:11 100:1 150:25
everything [2] 110:8 144:25
everywhere [1] 150:25
evidence [9] 82:23 86:13 87:7,8,9,11,15 95:17 135:12
evolution [1] 60:14
evolve [1] 59:7
ex [1] 33:21
exact [2] 51:13 97:1
exactly [2] 103:7 126:20
example [18] 5:23 10:19 14:4 33:9 35:19 48:9 57:22 75:22 83:9 84:3 94:14 96:25 104:15 110:11 123:11 131:22 136:12,17
except [1] 52:24
exception [1] 99:5
exchanges [1] 141:2
exclude [1] 60:8
excluded [1] 20:10
exclusive [1] 123:10
excuse [3] 97:1,6 99:2
execute [2] 98:23,23
executive [30] 14:17 20:23 21:4 22:5,10 24:24 28:23 32:15 40:4 42:13 53:17,20 54:8 71:13 90:20 92:7 95:5 12 96:11 97:3,4,8 99:3,4, 11,25 101:9 127:25 129:6

142:2 151:12
executive's [3] 51:9,18 100:18
exercise [11] 15:3 64:2 68:23 82:17 88:11,19 107:16 115:9,18 136:11 149:3
exercised [1] 67:1
exercises [3] 54:6 143:24 144:3
exist [2] 9:14 116:5
exists [5] 26:11 77:1,17 114:9 130:19
expand [2] 60:17,18
expanded [2] 59:15 119:19
expected [4] 9:22 140:9
expecting [1] 139:22
expedited [2] 70:19 72:3
expend [1] 85:6
expenditures [1] 105:16
expense [1] 18:10
experience [1] 56:2
explain [2] 23:1 77:8
explains [1] 149:3
explicitly [1] 41:8
exposed [1] 85:13
exposure [1] 77:1
expressly [1] 49:13
extending [1] 62:9
extent [7] 78:22 84:8 91:14 92:19 95:11 115:13 137:9
extraordinarily [1] 132:4
extraordinary [3] 32:14 151:2,6
extreme [5] 50:20 56:8,12 142:20 144:9
extremely [1] 96:23

**F**

f)(2 [1] 46:8
face [4] 53:16 103:15,18 111:13
fact [38] 11:4 12:18,24 32:6 39:13 46:3 52:2 76:16 77:15 79:15 80:5 82:7,10 85:10 87:7,9 91:3 92:3,4 93:3,3 94:13 95:17 98:3 105:20 109:13 114:7,25 121:12,13, 22 124:7 135:3,6,11 140:17 145:4,12
facto [1] 134:20
factors [3] 39:6,9,24,25 121:6
facts [5] 10:14 15:23 19:6,7,8
factual [5] 18:24 19:4 34:22 87:5,5
failed [1] 68:19
failure [1] 67:10
faintest [1] 132:7
fairly [5] 35:18 120:6 132:13,15 140:14
faith [1] 101:23
fall [2] 30:25 74:9

falls [5] 64:12 78:10 102:9 126:23 133:21
far [3] 20:3 49:15 131:17
far-flung [1] 120:9
fault [1] 94:3
favorable [1] 13:18
feature [1] 6:21
federal [40] 3:21 4:3 10:20 13:22 35:3,3 47:1 48:9 53:23 64:19 65:7 66:1 74:9, 15 75:11 76:19 80:10 83:20 84:23 85:5 86:23 90:19 91:22 92:16 94:8 97:24 105:4 108:23 112:7 129:6 142:13,23,25 149:2,3,11 150:9,14,20,23
feel [2] 17:4 83:16
felonies [1] 64:22
felony [4] 38:25 39:19,23 65:5
few [4] 57:19 88:6 134:3 138:18
fewer [2] 89:12 149:8
Fifth [1] 7:20
figure [5] 22:5,11 96:13 119:23 134:6
file [2] 125:17 150:11
final [9] 29:7,10 39:4,20 42:10,15 74:18 79:5 94:17 98:22 122:23 130:23,24 133:20 134:11 136:1,6 145:6
Finally [4] 4:24 75:8 116:20 149:22
find [6] 18:21 55:16 69:4 104:25 110:22 126:23
finding [7] 95:16 101:22 110:23 121:20 123:8 131:14 132:5
findings [11] 18:15,25 19:4 80:5 83:2,6 85:10 101:14 111:1 135:3,11
fine [3] 86:21 94:7 108:10
firmly [1] 74:1
First [34] 3:20 15:8 18:13 19:11 21:16 26:13 27:17 40:9 56:14 57:4 63:1 64: 13 76:2 78:13 84:5,22 85: 9 87:3 90:2,25 92:18 98: 16 106:3 112:6 113:13 121:11 128:25 130:14 131: 5 134:4 137:16 142:18 144:2 148:9
fiscal [4] 19:13 20:5,6 89:13
fish [1] 110:21
fit [3] 47:3 74:16 106:13
fits [2] 102:24 139:1
five [8] 4:13 35:20 47:20 111:11 113:11 114:20 119:9,9
fix [2] 81:13,21
fixing [1] 48:17
flawed [1] 18:16

Heritage Reporting Corporation

Official - Subject to Final Review

**flexible** [1] 59:13
**Florida's** [1] 101:8
**focus** [1] 3:14
**focused** [4] 19:13 20:4 27:13 29:21
**focuses** [2] 6:8 72:8
**focusing** [1] 41:20
**follow** [11] 67:7,10,20,23 70:1 73:6 77:6,15 115:10 116:8 145:19
**follow-up** [1] 137:24
**following** [1] 97:2
**Footnote** [3] 118:6,12,17
**force** [4] 34:8 57:11,18 106:4
**forcing** [2] 53:11,12
**foreign** [1] 136:22
**forest** [1] 145:3
**form** [11] 11:14 45:7 73:12 92:8 112:8,10,13 113:16,22 116:18 118:10
**formally** [1] 118:19
**formed** [2] 69:6,11
**forms** [11] 6:9 37:9 60:24 94:23 111:7,25 112:1,3,3,14,17
**forth** [4] 48:21 49:4 64:10 75:19
**fortifies** [1] 49:9
**forum** [1] 150:19
**forums** [1] 4:4
**found** [3] 7:25 104:17 121:12
**Four** [4] 7:14,14 8:21 119:19
**Fourth** [4] 57:14 111:16 131:23 141:25
**frame** [1] 19:12
**framers** [1] 50:17
**framework** [5] 13:2 74:17 121:21,23,24
**frankly** [1] 139:21
**free** [2] 45:7 47:12
**frequently** [2] 138:7 150:12 151:2
**friend** [7] 45:17 47:23 77:2 118:24 147:7 148:1,23
**friends** [3] 111:14,15 133:13
**front** [1] 113:8
**fulfill** [2] 22:3 105:12
**function** [2] 5:24 45:14
**fundamental** [2] 13:6 40:19
**fundamentally** [5] 8:16 9:15 18:15 45:21 147:7
**funding** [1] 4:17
**funds** [3] 10:20 51:20 52:10
**further** [1] 79:21

**G**

**gains** [2] 33:15 100:14
**Garland** [1] 54:18

**gave** [1] 97:3
**GEN** [4] 1:19 2:3,9 3:7
**General** [145] 1:19 2:3,6,9 5:7,10,19 6:5 7:5,12,17 8:10,24 9:2,24 10:13 11:6,20 12:1,8,16 13:1 14:1,6,9, 16,20 15:9,20 17:5,8,21 18:3,7,19 19:3 20:15,16 21:10, 22 22:7,19,23 24:4,8,21 25:5,15,20,22,24 26:4,10,19, 23 27:2,5,12,16,23 28:1,11, 14 29:17 31:4,19,20 32:10 33:7 34:2,6,11 36:1,10,16 37:13,20,22 38:5,12 39:1 40:6 41:2,5,11,15,25 42:4, 6 43:8 44:18 45:5,20 47:5 48:3,14 49:21 50:5,16 51:16 52:17,21 53:14 56:13 58:2,5 59:17 60:15 61:19 62:4,21,24 63:9,20 64:17 65:2,24 68:5 69:13 71:6 72:5,20 73:2,7,18 75:17 77:22 79:19 88:24 90:14 92:1 95:4 107:20 109:1 110:4 127:10 129:6 130:8 133:24 140:2 144:21 147:2,3,5 150:11
**generalized** [1] 113:24
**generally** [4] 46:3,11 56:16 108:12
**generic** [1] 35:2
**generous** [1] 113:15
**gestured** [2] 24:17 148:25
**gets** [1] 67:15
**getting** [6] 15:22 36:4 39:16 81:20 102:7 137:15
**giant** [3] 46:16 112:25 113:9
**give** [10] 15:11 38:8,19 43:1 45:19 64:14 87:25 115:19 140:19 151:8
**Given** [11] 4:16 60:9 67:13 91:3,19 92:7,12 93:13 97:4 108:16 126:5
**gives** [3] 106:5 139:25 150:1
**giving** [2] 103:12,12
**glad** [1] 61:6
**Gonzalez** [8] 6:10 71:8 72:8 77:24,24 78:24 79:3 117:19
**Gorsuch** [41] 44:12,13,24 45:16 46:23 47:15,20 48:12 49:12 50:5 79:19 80:7, 9,12,21,24 81:2,17 82:2,13 108:1 109:14,21,25 110:3, 13 111:22 112:11,14,20,22 113:19,23 114:2,6,11,15, 19,23 119:14 134:1
**Gorsuch's** [1] 62:13
**got** [3] 55:24 89:19 143:10
**govern** [2] 29:20 40:7
**government** [58] 4:6 9:25 31:24 32:3 47:2 53:5 54:

21 55:5 57:25 65:8 66:1 70:12 80:13 81:19,22 83:21 84:23 85:5 86:23,23 87:20 91:22 96:6 102:15 103:7,25 104:9,16,17 105:4,7, 11 118:7,7 119:14,18 128:12 134:7,16 135:23 136:9 137:15 138:2,3 142:8,13, 13,23,25 143:7,16,25 149:2,11,12 150:9,14 151:1
**government's** [9] 78:4,6,9 81:5 96:3 143:10 149:4 150:21,24
**governs** [4] 40:11 48:21 49:17 110:18
**grant** [1] 7:24
**granting** [1] 5:3
**gravity** [1] 39:7
**greater** [1] 87:25
**grievance** [2] 113:25
**gross** [1] 93:8
**ground** [5] 21:25 22:13 120:12 148:4,10
**grounded** [1] 74:1
**grounds** [1] 135:10
**group** [1] 86:22
**guess** [16] 19:7 32:21 48:1 52:7 54:16 60:11 62:5 70:14 85:22 89:7 91:24 97:14 128:10 129:12 135:25 146:13
**guideline** [1] 73:1
**guidelines** [49] 3:18 19:15 29:19,25 40:7,20 41:20,21 47:13 70:17,21 78:7 79:5 80:2,2,8,13,16,18 81:4,20, 21 82:4,15 83:10 86:2,25 101:18 103:7,15,18 120:24 121:4,21 122:1,16 123:6, 16,18,23 124:5,10,20,23 129:23 130:12 135:19 147:18 150:16

**H**

**habeas** [4] 48:23 49:2 107:3,20
**half** [2] 90:6 91:3
**halt** [2] 89:24 90:23
**hand** [1] 111:15
**hang** [1] 48:1
**happen** [5] 33:8 53:25 101:4 137:17,18
**happened** [2] 33:5 36:22
**happens** [2] 101:11 127:18
**happy** [1] 43:9
**hard** [7] 8:3 19:9 77:8,25 89:3,6 128:17
**harder** [1] 135:5,9,9
**harm** [3] 81:10 106:11 108:22
**harmed** [1] 114:3
**harms** [6] 3:22 11:22 12:25 17:13,18 73:24
**Harrison's** [1] 109:4

**hat** [1] 48:1
**health** [2] 17:1 20:9
**healthcare** [4] 9:22 10:8 17:1 84:20
**hear** [3] 3:3 47:22 48:2
**hearings** [1] 71:10
**Heckler** [3] 14:15 23:13 99:1
**held** [7] 4:11 50:22 74:10 78:2 121:1 144:2 145:5
**helpful** [1] 137:17
**high** [3] 84:25 85:12,20
**high-stakes** [1] 151:5
**history** [4] 4:1 29:13 36:18 37:5 38:10 49:7 53:19 54:16 56:17 66:18 110:7 139:2,11 149:20
**hold** [7] 11:2 75:15 107:15 111:11 142:16 143:13 150:24
**holding** [1] 121:2
**hole** [1] 113:9
**holistic** [1] 64:25
**Honor** [47] 78:13 81:1,8 82:22 83:5 84:1 85:9 86:8 88:9 89:5 90:1,9,24 92:17 93:16 94:12 95:15,23 96:17 99:19,20 101:22 102:12 103:14 106:2,16 109:12 111:18 112:5,18 113:13 117:24 120:7 121:19 122:3,12 124:17 125:10 128:24 131:15 132:12,22 133:11 135:18 136:17 144:1 146:15
**hook** [1] 21:6
**hope** [1] 38:19
**hostility** [3] 12:12 13:3,15
**hotly** [1] 86:10
**however** [3] 15:14 117:20 119:9
**huge** [1] 139:21
**human** [1] 94:21
**hypothetical** [5] 17:9 99:25 135:2 136:9 142:7
**hypothetically** [1] 15:10

**I**

**ICE** [4] 29:11 40:15 82:16 101:15
**Idaho** [1] 108:17
**Idaho's** [1] 108:21
**idea** [4] 30:21 132:7 142:22 148:25
**identified** [1] 52:2
**identify** [2] 28:3 32:16
**idiosyncratic** [1] 137:25
**ignore** [2] 57:25 120:12
**ignored** [1] 20:8
**ignores** [1] 46:2
**ignoring** [2] 134:18,22
**II** [12] 1:22 2:6 24:12,17,17 25:2,7 73:19 97:25 99:14, 18 100:14

**III** [17] 11:4 12:4 60:20,25 61:15 62:3,5 74:4,17 84:2 86:6 88:21 91:2 94:24 114:4,9 151:14
**IIRAIRA** [2] 85:16 97:2
**illegal** [3] 75:7 107:4,17
**illegitimate** [1] 74:7
**imagine** [2] 54:13 66:7
**immediate** [2] 138:3,4
**immediately** [4] 91:4 97:10 100:22 150:23
**immensely** [1] 100:18
**immigration** [27] 4:20 7:3 14:13 16:10 20:13 22:12 51:5 71:13 74:15 80:1,14, 18 81:6,23 84:7 88:22,25 89:11,16 90:17,18,22 91:5 94:8 120:25 121:5 148:21
**impeachment** [1] 53:6
**impermissible** [1] 59:16
**implement** [4] 6:13,23 64:18 72:11
**implementation** [1] 71:5
**implemented** [5] 4:15 21:1 31:5 43:10,13
**implementing** [2] 70:12 71:13
**implicates** [4] 13:6 46:9 60:19,20
**implications** [1] 22:9
**imply** [1] 132:11
**important** [3] 49:15 76:14 107:25
**importantly** [1] 96:25
**impose** [3] 10:10 121:5 131:7
**imposed** [1] 39:9
**imposes** [2] 3:22 131:11
**imposing** [1] 10:7
**impossibility** [1] 95:6
**impossible** [6] 4:17 20:23 23:18 44:5 95:11,12 96:10 147:24
**improper** [1] 19:16
**improve** [1] 16:25
**INA** [16] 4:7,15 5:1,4 6:13, 23 25:18 28:16 32:19 43:11 72:11 74:4 78:5,6,10 147:25
**INA's** [1] 74:1
**incarcerate** [1] 83:19
**incidental** [1] 149:17
**include** [6] 58:14,16 60:13 112:1,21 115:22
**included** [2] 19:23 115:15
**includes** [1] 39:6
**including** [8] 26:12 36:3 42:15 48:23 60:6 83:9 118:11 145:11
**incompatible** [2] 3:24 9:15
**inconsistent** [6] 7:15 35:18 42:25 45:21 59:18 71:7

Heritage Reporting Corporation   flexible - inconsistent

Official - Subject to Final Review

**incorrect** [1] 29:18

**incredibly** [1] 21:25

**incur** [3] 15:25 74:8 86:2

**incurred** [1] 17:2 19:14 86:9

**indeed** [3] 91:12 96:19 138:22

**indefinitely** [3] 142:17 143:13 146:13

**independent** [2] 19:11 149:24

**indicate** [1] 146:22

**indicated** [1] 46:23

**indirect** [9] 3:22 9:23 11:3 15:25 17:13 106:11 149:8, 10,17

**indirect/direct** [1] 11:1

**individual** [28] 7:7 12:5 13:20 35:13 44:1,3 50:12 73:10 83:17 88:12 96:5 99:7 101:14 104:6 105:15 106:5,17,21 107:2,24 117:15 125:3 129:1 131:21 133:14,15,19 141:21

**individuals** [24] 16:14 25:1 64:20 84:7,9,13,25 85:7,17 86:14 95:19 96:1 103:19 121:14 126:14 129:8,8,22, 24 131:2 132:23 145:11 146:21 148:18

**inflexible** [4] 28:17 32:17 43:16 44:9

**inform** [1] 21:13

**informally** [1] 82:17

**information** [4] 33:15,17 65:7,25

**informed** [1] 110:8

**infrequently** [1] 19:6

**inherent** [1] 67:3

**initial** [2] 116:9 128:3

**initiate** [1] 141:8

**initiated** [3] 32:23 33:4 34:9

**initiating** [1] 128:13

**injunction** [12] 5:24 6:21 70:9 71:12 76:24 81:8,12 117:22 118:11,18,20,21

**injunctions** [8] 58:15 59:8 60:8,21 76:5 77:18 111:8 112:23

**injunctive** [8] 58:15 70:9 72:1 76:2,4 112:1,15 118:9

**injured** [1] 113:6

**injuries** [2] 84:12 91:3

**injury** [19] 7:8 9:23 10:16 11:1,3,3,4,14 12:3,19 16:20 17:7 23:4 81:13 84:5, 10 85:23 91:8 94:24

**innovation** [1] 49:20

**innovative** [1] 119:16

**inquiry** [1] 65:1

**insert** [1] 132:3

**insofar** [1] 60:17

**instantly** [2] 96:8 128:9

**Instead** [10] 4:21 12:23 16:12 35:8 36:22 37:7 48:16 53:4 61:3 90:20

**Institute** [2] 57:6 82:18

**intend** [1] 95:8

**intended** [7] 16:8 37:6 50:18 52:6 58:14 60:2 117:13

**intent** [1] 49:7

**inter** [1] 127:3

**interest** [1] 117:19

**interesting** [1] 49:13

**interests** [5] 11:11,23 12:9, 20 91:21

**interference** [2] 6:17 23:5

**interim** [2] 47:13 117:2

**interior** [1] 3:13

**internal** [2] 123:11 124:11

**interpret** [6] 15:6 21:14 46:4 62:14 72:15 145:15

**interpretation** [1] 21:23 23:2 49:11 59:20 61:13 63:15 72:8 119:3,24,25

**interpreted** [4] 28:17 44:2 70:10 72:1

**interpreting** [3] 69:20 71:24 141:6

**Interstate** [3] 108:12,19,20

**intertextual** [2] 96:20 139:10

**intolerable** [1] 144:5

**intrusive** [2] 24:23 100:15

**invalid** [5] 48:10 68:9 69:17 115:9,25

**invalidity** [1] 115:16

**invasion** [1] 100:15

**investment** [2] 65:17,18

**involve** [1] 37:23

**involves** [1] 65:17

**ISIS** [1] 104:16

**Island** [1] 57:6

**isn't** [27] 29:3,16 31:18,22, 23 33:13 40:5 56:16 59:3 61:15 64:23 68:8 70:25 81:3,17 83:12 85:2,24 88:21 90:11 96:12 99:22 103:6 107:8 110:17 136:25 142:1

**issue** [32] 7:20 15:4 27:18 29:3 44:23 45:12 58:6,7, 11 60:22 63:2,12,14 90:16 115:6,8 117:20 119:11 120:21 123:15 128:19 134:5 135:16 136:14 138:1 139:21,24 140:3,5 150:22, 25 151:10

**issued** [5] 3:17 5:21 33:11 37:16 78:15

**issues** [5] 5:11 9:5 57:23 130:3 151:8

**issuing** [1] 139:14

**it'll** [1] 35:14

**items** [1] 121:14

**itself** [11] 21:15 24:16 43:

20 45:11 49:25 61:3 99:4 110:16 115:24 117:11 146:17

---

## J

**JA** [1] 19:23

**JACKSON** [36] 20:15 23:4 23:25 21 30:4 31:18,22 66: 5,6,14 68:6,13 69:22 71:21 72:18,21 73:15 83:12 84:17 85:18,21 86:17,19 115:5,13 116:1,13,25 140:24, 25 141:13,16,23 143:5 144:11 145:4,21

**Jaffe** [2] 49:19 59:11

**jail** [1] 125:16

**Jersey** [1] 83:25

**jettison** [1] 75:9

**job** [1] 20:24

**joining** [1] 91:19

**Joint** [1] 39:5

**JUDD** [3] 1:22 2:6 73:19

**Judge** [15] 15:12 57:16 76: 19,20,21 86:20 93:3,16 94: 5,8,8 137:25 150:19,21 151:9

**judges** [4] 54:14,18 55:4 138:18

**judgment** [17] 5:15,18,21 6:1,15 46:25 47:6,8,10 58: 7 111:8 122:5 128:4 135:7 137:9,11,21

**judgments** [6] 15:2 58:16 59:9 60:7 79:20 112:2

**judicial** [6] 48:24,24 52:14 53:4 101:11 113:16

**judicially** [9] 7:8 22:14 23: 4,16 34:16 52:7,12 147:25 148:8

**juncture** [1] 33:18

**jurisdiction** [11] 45:12 61: 16 62:5,12,16 63:8,11,24 70:5 107:17 139:25

**jurisdictional** [9] 9:8 44: 22,25 45:4,6,8,8,15 61:9, 22,24 62:17,20 63:15,19, 22 64:1,4 140:1

**jurisdictions** [1] 150:13

**Justice** [371] 1:20 3:3,9 5:7, 17 6:3,25 7:10,14 8:7,13, 19,25 9:18,24 10:2,22 11: 17,25 12:3,11 13:9,14 14:3, 6,7,14 15:9,21 16:15 17:5, 6,8,19,23 18:5,17,20 20:15, 16 21:11,17 22:1,17,20 23: 22,23,24 24:6,10 25:3,6,8, 20,21,22,25 26:5,14,21,24 27:4,7,15,18,24 28:6,13,21 30:4 31:18,19,22 32:12,13, 20 33:23,24 34:3,7 35:12 36:2,9,12 37:12,15,21 38:3, 11,14,14,16,17 39:3 40:22, 22,24 41:4,7,12,18 42:2,5, 7,12,19,20,20,21 43:22 44:

10,11,11,13,24 45:16 46: 23 47:15,20 48:12 49:12 50:5,6,6,7,25 52:4,16,19, 23 54:1,25 56:6,13 57:20 58:4,19,20,20,22,24 60:4 61:6 62:2,11,13,22 63:6,10 64:7,9 65:22 66:3,4,4,6,8, 8,11,14 68:5,13 69:22 71: 21 72:18,21 73:15,16,22 75:17,24 77:21 79:19 80:7, 9,12,21,23,24 81:2,17 82:2, 13,14 83:3,12,15 84:17,20, 22 85:18,21 86:17,18,19,20 87:13,16 88:13,17,24 89:6 90:7,10 91:5,7,24 92: 23 93:19,20,21,23,25 95:1, 21 96:9 97:13,15 99:9,17, 22 100:23,24,25 101:2 102: 3,4,5,13,21 103:2,3,6,21, 25 104:3,7,13,23 105:6,14, 17,24,25 106:8,20 107:1,6, 10,14,22 108:1,7,25 109:6, 14,21,25 110:3,13 111:22 112:11,14,20,22 113:18,23 114:2,6,11,15,19,23 115:5, 12 116:1,13,25 117:4,7,14, 16,17 118:2,22 119:5,5,12 120:16,16,18,22,23 121:10, 17,23 122:7,15 123:1,4,14 124:2,6,12,19 125:5,14,24 126:7,16,20 127:4,7,7,8,16 128:10,16 129:12 130:1,17 131:6 132:2,17 133:2,16, 19,22,24,25 134:2,3,14, 21 135:2,14,21 136:4,8,18, 20 137:3,10,14,23 138:8, 20 139:16,17,17,19,20 140: 22,23,23,25 141:2,2,13,16, 23 143:5 144:11 145:4,21 146:2,25 147:6 148:3 151: 16

**Justice's** [1] 97:17

**Justices** [1] 144:20

**justify** [1] 23:5

---

## K

**KAGAN** [38] 32:20 33:24 34:3,7 42:20,21 66:11 77: 21 88:24 89:6 90:7,10 91: 5,7,24 92:23 93:19,21,25 127:7,8,16 128:10,16 129: 12 130:1,17 131:6 132:2, 17 133:2,16,19,22,24 137: 14 141:3 146:2

**Kagan's** [1] 97:16

**KAVANAUGH** [49] 14:14 23:22,24 24:6,10 25:3,6 32:13 50:7,25 52:4,16,19, 23 54:1 56:6,14 57:20 58: 4,19,24 66:9 86:18 97:13 99:9,17,22 100:24 101:2 102:3 119:12 134:2,3,14, 21 135:2,14,21 136:4,8,18, 20 137:3,10,23 138:8,21

139:16 148:3

**keep** [3] 85:25 86:3 122:16

**keeping** [1] 88:5

**kettle** [1] 110:20

**key** [1] 76:8

**kick** [2] 129:16,17

**kicks** [1] 32:25

**Kim** [1] 129:13

**kind** [32] 6:17 8:5,18,25 9: 10 10:16 15:7 18:9 22:14 31:20 33:15 40:10 44:8 46: 5 49:12,23 59:24 63:17 64: 9 66:11 68:10 69:23 82:23 87:14 91:8,15 93:12,12 94: 9,22 115:13 144:16

**kinds** [15] 11:23 15:25 19: 16 28:19 30:1 37:7 42:16 45:12 51:22 53:21 76:4 85: 13 116:2,4 149:17

**knows** [4] 35:8 61:20 70:19 151:3

---

## L

**label** [2] 45:8 61:24

**labor** [2] 50:11 55:6

**lack** [5] 3:20 8:5 51:6 101:21,21

**lacked** [1] 9:20

**lacks** [4] 33:10 63:11,11,18

**landing** [1] 57:1

**language** [19] 15:6 31:21 34:13 44:6 46:4,12 47:22, 25 60:1 71:15 78:11 81:4 107:8 110:11 130:7 131:9, 19 133:7,10

**large** [1] 37:2

**largest** [1] 86:12

**last** [11] 6:11 7:13 38:18 45:1 57:8 62:11 64:7 71:8 81:5 101:2 138:9

**late** [3] 38:8 56:23 57:1

**later** [2] 33:14 143:3

**Laughter** [4] 47:19 56:5 66:13 93:24

**law** [32] 7:9 14:13,24 16:16 19:1 20:22,24 21:7 22:24 47:3 50:21 53:9 55:1,14, 16,22,23 56:1 58:9 74:4,9 84:14 94:22 98:7 99:12 100:2 108:4,6 110:19 111:5 119:15,16

**laws** [13] 16:10 50:10,11,15 51:8,14 53:8,9,10 80:1,14 81:6,23

**lead** [4] 4:20 16:13 97:20 136:15

**leading** [2] 139:3,12

**learned** [2] 111:14,15

**least** [18] 14:7 23:3 42:24 47:1 51:10 52:25 53:8 54: 22 74:10 79:7 90:25 94:14 95:15 97:24 98:14 106:16 107:19 135:9

**leave** [2] 21:9 29:25

**left** [3] 75:25 87:22 119:22

**legal** [11] 34:25 37:10 58: 13 65:11,19 69:15 112:12 113:17,20 115:3 138:21

**legally** [7] 67:4,6,12 78:18 105:21 106:23 107:11

**legion** [1] 26:22

**legitimate** [1] 144:18

**less** [9] 13:18 16:14 20:3, 13 76:13,14 88:6 89:14,15

**levels** [1] 16:4

**life** [1] 51:18

**light** [1] 23:6

**likelihood** [2] 8:1 137:20

**limit** [4] 45:15 63:21 143:20 149:21

**limitation** [2] 45:2 71:25

**limited** [6] 3:14 12:20 16: 11 70:4 107:8 143:7

**limiting** [1] 3:24

**limits** [6] 14:17,19 25:2 113:3,5 148:24

**Linda** [3] 6:25 14:12 97:19

**line** [5] 6:1 8:11 61:21 77: 16 118:23

**line-level** [1] 123:12

**lines** [1] 128:3

**list** [2] 39:9 111:6

**listed** [2] 49:14 112:1

**lists** [1] 112:15

**literally** [2] 48:7,16

**litigants** [2] 5:25 11:24

**litigated** [3] 7:19 46:21 147:20

**litigation** [1] 6:24

**little** [15] 8:20 9:21 42:21 43:1 54:2 57:7 79:21 80:4, 17 95:3 107:23 110:17 112:24 139:25 151:5

**local** [1] 64:19

**logic** [3] 28:6,7 62:23

**logical** [1] 116:16

**long** [10] 5:20 31:5 34:18 36:13 43:23 59:2 80:22 109:7,17 143:21

**long-term** [1] 16:25

**longer** [3] 55:11 80:19 124: 10

**look** [23] 16:7 28:9 34:19 37:4,5 38:9 49:6 70:4 88: 14,16 90:10 93:1,2 110:16 111:18,22,24 121:6,24,25 123:18 130:7 149:20

**looked** [2] 19:12 123:9

**looking** [6] 19:19 39:4 57: 10 88:18 116:4,21

**looks** [1] 122:19

**loophole** [1] 46:16

**lose** [2] 140:11 145:3

**loses** [1] 100:14

**loss** [1] 84:9

**lost** [1] 127:9

**lot** [5] 18:21 54:19 86:24 104:14 149:24

**lots** [1] 131:10

**low** [1] 145:23

**lower** [18] 5:2 7:19 8:13,14, 15 9:12 36:2 46:18,19 57: 9 109:13,15,16,16 140:6, 15 150:7 151:7

**Lujan** [1] 113:14

**lurking** [1] 113:1

**M**

**made** [33] 5:22 9:6,25 19:1 30:23 32:1,4 40:11 45:17 50:2 54:21,24 62:7 63:22 66:20 71:16 85:15 96:6 100:20 103:10 120:8 123: 8 126:4 127:15 128:2,6,7 129:3,10 131:13 144:23 146:3 147:22

**main** [1] 55:19

**mandate** [7] 4:8 23:15 32: 17 43:16 44:9 54:5 99:3

**mandates** [4] 28:19 30:19 51:12 52:7

**mandating** [1] 135:17

**mandatorily** [1] 27:21

**mandatory** [29] 22:16 23: 16 25:19 26:25 28:2,17 30: 2,5 31:9,21 43:23 52:11 60:8 74:23 76:10 80:20 82: 5,6 97:7,12 105:12 121:15, 17,22 123:22 131:20 132: 25 133:3 145:13

**manhunt** [1] 34:18

**manner** [2] 4:15 66:25

**many** [11] 29:4 34:17,19 37: 15 74:14 88:2 119:7,9 140: 18,18 144:19

**Massachusetts** [5] 12:13 74:11 91:17,20 92:22

**matter** [11] 1:13 23:1 50:14 61:12,15 62:3,4 63:14 64: 25 68:16 82:7,10 95:16 114:25 121:12,13 135:6

**mean** [45] 7:1 8:22 13:12 22:13 24:2 25:10 28:17 36: 12 48:4 53:11 55:11 56:15 57:21,21,24 62:2,23 66:24 68:14 70:10 82:15,16 85:3, 22 88:6 89:7,10,16,21 90: 10 93:25 94:2 95:11 109: 16 115:7 116:14 128:19 129:12,15 132:8,15 138:24 139:20 144:13 148:5

**meaning** [7] 21:15 48:6 77: 12 117:21,22 140:8 143:11

**means** [28] 20:20 21:8,20 22:22,25 24:1,2,16 25:8,11 28:8,8 38:22 46:11 55:10 68:22 96:14,15,19,21 98: 18 118:19 125:7 130:6 131:16 148:16 149:14 150: 8

**meant** [6] 58:9 59:22 110:2 117:25 132:13 140:9

**meantime** [1] 22:10

**mechanisms** [1] 65:6

**meet** [2] 101:9 116:12

**members** [1] 151:3

**memorandum** [9] 29:7,11 39:4,20 65:1 74:18 79:5 83:8 145:7

**mental** [1] 39:10

**mention** [1] 89:17

**mentioned** [3] 51:1 119:12 141:24

**merely** [2] 75:14 82:10

**merits** [22] 4:7 8:1 15:4 20: 17,19,20 44:17 64:8 73:25 74:18 81:25 85:19,21 95:2 97:16,21 120:15 137:20,21 140:21 141:1 147:23

**Merriam-Webster's** [1] 138:22

**might** [28] 16:5 17:2 33:22 48:10 54:13 64:3 65:3 66: 6 68:11 76:10 82:21 85:4 86:6,21 89:4 109:10 118: 20 119:2 126:7 127:8 132: 22 134:19 137:25 140:3 142:7,21 143:9 148:10

**military** [1] 39:11

**million** [2] 3:11 20:11

**minimum** [5] 92:21,21 128: 24 131:15 136:24

**minute** [1] 52:5

**misheard** [1] 110:4

**mismatch** [1] 40:10

**misread** [1] 117:23

**misspoken** [1] 110:2

**mistake** [2] 126:17 147:23

**mistakes** [1] 9:8

**misunderstanding** [1] 8: 16

**misunderstands** [1] 147: 8

**mitigating** [2] 39:9,25

**mix** [1] 9:1

**Mm-hmm** [1] 82:2

**moment** [3] 110:16 125:15, 18

**monetary** [1] 16:24

**money** [8] 85:6 89:15 103: 11 123:19 134:8,17,23 135: 24

**monitor** [1] 65:12

**Monsanto** [1] 76:13

**monster** [1] 111:9

**months** [3] 7:15 8:21 142: 9

**morning** [1] 3:4

**most** [8] 47:24 49:15,15 54: 7 69:3 74:19 76:14 92:7

**motion** [1] 138:5

**move** [8] 10:24 13:21 20: 13,15 34:11 95:2 107: 24 117:15

**MPP** [1] 7:12

**much** [11] 24:19 44:14 50:2

**multiple** [4] 9:5 74:19 150: 12,13

**murder** [1] 148:14

**must** [16] 16:16 28:23 29:9, 13 40:1 75:3 81:14,15,19 84:16 99:6,10,11,25 100:1 102:25 105:11 110:1 124: 15 146:20

76:13 79:7,7 101:5 102:19 113:21 135:5,8

**N**

**namely** [1] 109:3

**narrow** [2] 31:16 95:15

**narrowing** [1] 60:11

**nation** [2] 58:8 151:10

**nation's** [2] 4:23 75:7

**national** [4] 3:15 4:6 148: 19 149:12

**nationwide** [3] 3:19 6:6 60: 21

**natural** [2] 103:17 115:23

**nature** [3] 68:10,14 87:5

**nearly** [1] 75:9

**necessary** [1] 67:11

**necessity** [2] 23:11,21

**need** [6] 17:22 46:1 53:2 89:8,9 91:11

**negating** [1] 110:25

**negative** [1] 146:19

**neither** [1] 137:1

**net** [9] 15:17 16:23 17:6 18: 2 86:20 87:18 88:4 93:7,9

**never** [12] 4:14 11:3 38:5 43:13 44:1,5 48:3 52:9 54: 21 98:3,4 129:17

**new** [9] 37:7 50:8 61:2 71:1, 2 83:25 108:2 119:24 138: 12

**next** [3] 46:7 116:10 137:13

**nine** [1] 142:8

**nobody** [2] 49:18 92:14

**non-citizen** [15] 4:9 17:17 26:13 31:6,8 32:17 33:14, 16,21 40:9,14 41:6 64:12 82:19 87:5

**non-citizens** [13] 3:12 16: 6 19:22,25 20:11 42:10 43: 17 71:9 73:10 83:20 141:8 144:4 148:12

**non-enforcement** [1] 97: 19

**non-party-specific** [1] 49: 9

**none** [2] 79:8 90:4

**nonenforcement** [1] 13: 24

**note** [1] 118:25

**noted** [1] 133:13

**Nothing** [5] 41:7 99:15,15 103:8 134:14

**notice** [10] 33:11 68:19 98: 21 103:12 125:17 127:24 128:1 130:21 145:6,18

**noticed** [2] 49:19,20

**notion** [1] 94:2

**novel** [1] 4:25

**November** [1] 1:11

**novo** [2] 110:20 111:5

**null** [2] 67:22 143:4

**number** [7] 19:21,24 37:23 65:13 82:8 83:1 102:8

**nuts** [1] 100:9

**O**

**obligate** [1] 131:13

**obligation** [27] 11:14 22: 15 28:3 33:2 76:25 96:3,8 122:24 125:21 128:8 129: 9 130:19 131:1,8,11 132:4 148:8

**obligations** [4] 75:4 80:20 97:12 101:10

**obstacle** [1] 45:6

**obtain** [2] 6:1 75:21

**obtained** [1] 6:7

**obviously** [5] 5:11 9:4 14: 2 51:17 53:24 58:24 68:14 90:3 138:11

**occur** [2] 59:12 92:14

**occurred** [1] 94:25

**odd** [4] 110:17 112:24 113: 9 116:14

**offense** [2] 35:3 39:8

**offenses** [2] 148:14,14

**offered** [2] 87:6,8

**officer** [3] 40:1 77:11 122: 18

**officers** [12] 3:13 29:11,23 34:17 65:19 82:16 101:15 120:25 121:5 123:6,23 124:4

**officials** [6] 6:12 78:3,8 80: 19 92:8 123:12 147:19

**offset** [1] 19:2

**often** [3] 61:23 65:17 109: 16

**okay** [19] 40:25 45:16 47: 15 61:6 64:7 81:2 102:3 112:22 121:10 123:2 127: 5 128:16 129:12 136:4,8 137:13,23 138:9,9

**old** [1] 8:21

**on-the-record** [1] 101:22

**once** [12] 30:22 33:4 34:9 104:5,10 124:19 125:5,12 127:11 141:20 142:11 144: 22

**one** [57] 3:22 8:8 13:4,21 15:13,14 17:16 21:18 23:8 25:3,6 33:24 35:15 36:4 39:24 40:2 43:17 45:9 49: 16 52:9 53:24 55:14 58:23 64:8,12 79:13 86:12 88:9 91:13 93:22,23 94:8,14 96: 18 100:6 101:24 102:8 106:17 108:1,18 109:4 111:14 112:8 116:17 124:

9 **129:**20 **139:**19 **141:**25
**145:**22 **148:**11 **149:**7,8,8,
25 **150:**15,19 **151:**9
**one's** [1] **55:**12
**onerous** [1] **132:**4
**ones** [2] **29:**5 **43:**15
**ongoing** [1] **127:**21
**only** [33] **6:**15 **26:**24 **27:**18
**29:**4 **31:**16 **40:**7,25 **42:**2
**67:**15 **73:**4 **75:**5,6 **77:**18
**84:**14 **96:**3 **100:**19 **102:**22
**106:**4 **107:**18 **116:**24 **118:**
8,23 **122:**12 **127:**11 **130:**20,
25 **131:**11 **135:**19 **137:**17,
18,18 **138:**6 **145:**6
**open** [1] **4:**4
**opening** [1] **119:**14
**operate** [3] **16:**8 **29:**19 **40:**
25
**operated** [3] **10:**18 **76:**8,9
**operates** [1] **49:**24
**operating** [7] **17:**11
**operation** [7] **5:**4 **6:**18 **70:**
6,11,24 **86:**25 **117:**21
**opinion** [5] **8:**21 **9:**3 **42:**12
**117:**20 **118:**3
**opportunity** [2] **56:**19 **73:**8
**options** [2] **45:**3 **150:**1
**oral** [6] **1:**14 **2:**2,5 **3:**7 **73:**
19 **118:**7
**order** [28] **20:**9,12 **42:**15 **63:**
3 **67:**6,11 **68:**17 **72:**25 **78:**
14,18 **94:**17 **98:**22 **101:**11
**108:**19,21 **116:**10,16 **118:**1
**128:**5 **129:**7 **130:**23,24
**133:**20 **134:**19,24 **135:**16
**139:**8 **146:**6
**ordered** [4] **44:**21 **64:**6
**orders** [13] **6:**11 **42:**10 **45:**
13 **47:**21 **76:**6,7 **77:**19 **78:**
2 **108:**13,15 **115:**20 **131:**12
**132:**6
**ordinarily** [4] **59:**19 **66:**19
**84:**2 **113:**16
**original** [1] **140:**8
**other** [43] **8:**9 **10:**10 **11:**23
**12:**21 **13:**21 **24:**1,11 **31:**24
**36:**14,21 **43:**15,21 **45:**17
**47:**23 **52:**12 **57:**22 **58:**1,15,
17 **69:**18 **76:**7 **77:**2 **83:**18
**84:**20 **85:**4 **86:**24 **89:**10,17
**90:**12 **95:**5 **96:**20 **109:**1
**110:**20 **111:**10,16 **118:**9,25
**124:**9 **127:**18,20 **128:**12
**131:**10 **133:**13
**others** [1] **39:**11
**otherwise** [10] **17:**2 **41:**9
**75:**15 **76:**23 **77:**12 **78:**15
**79:**2 **81:**24 **102:**20 **146:**19
**ourselves** [1] **56:**25
**out** [41] **8:**22 **15:**14 **21:**9 **22:**
6,11 **28:**3,4 **32:**16 **34:**16
**36:**19,21 **39:**5,17 **44:**3 **55:**
21 **56:**23 **58:**25 **70:**16 **79:**

14 **80:**21 **84:**18,19 **88:**5 **96:**
13 **98:**25 **104:**17,25 **109:**2,
18 **113:**18 **116:**24 **119:**23
**132:**22 **134:**6,6 **135:**14
**140:**2 **144:**20,21 **146:**2
**148:**12
**out-of-pocket** [1] **18:**10
**outlie** [1] **68:**12
**outline** [1] **120:**14
**output** [1] **36:**15
**outside** [3] **104:**25 **123:**7
**124:**5
**outsized** [1] **91:**2
**over** [15] **14:**3 **19:**24 **37:**16
**38:**4,4,4 **59:**8 **113:**1 **115:**
19 **116:**24 **123:**18 **132:**19
**134:**11 **144:**3 **149:**13
**overall** [3] **16:**4,14 **20:**13
**overarching** [1] **18:**11
**overlap** [1] **132:**25
**overmatch** [1] **35:**4
**override** [1] **40:**19
**overrule** [1] **138:**25
**oversight** [1] **51:**20
**overstate** [1] **56:**10
**overturning** [1] **35:**24
**overwhelm** [1] **87:**23
**own** [7] **3:**23 **15:**2 **16:**1 **29:**
8 **60:**19 **78:**18,20 **83:**22
**106:**4 **135:**7 **149:**18

## P

**p.m** [1] **151:**18
**PAGE** [1] **2:**2
**pages** [7] **39:**4 **55:**2,21 **119:**
13,13,18,19
**paid** [2] **54:**15,19
**pain** [2] **81:**14,14
**pairs** [1] **118:**17
**pairs** [1] **139:**4
**pandemic** [1] **20:**9
**papers** [1] **33:**10
**pardon** [1] **53:**22
**parole** [1] **83:**20
**paroles** [1] **84:**13
**parse** [1] **61:**21
**parsing** [1] **35:**1
**part** [12] **55:**19 **81:**7 **91:**18
**103:**14 **117:**24 **122:**4 **123:**
10 **126:**15 **131:**22 **136:**17
**142:**18,19
**participating** [1] **90:**4
**particular** [21] **15:**6 **24:**25
**25:**1 **30:**25 **41:**10 **44:**15 **45:**
10 **54:**5 **62:**9 **63:**12,17 **66:**
15 **72:**12,16,16 **75:**3 **82:**19
**84:**24 **85:**7 **125:**4 **138:**1
**particularly** [5] **59:**1 **75:**19
**91:**1 **92:**6 **93:**7
**parties** [6] **12:**21 **48:**18 **50:**
1 **60:**22 **61:**4 **69:**18
**parts** [2] **121:**9 **142:**18
**party** [11] **7:**9 **68:**10 **76:**17
**92:**4 **105:**22 **106:**24,24

**107:**12,14 **108:**23 **113:**20
**party-specific** [3] **60:**18
**62:**10 **69:**21
**passage** [1] **85:**16
**passed** [3] **16:**16 **20:**22
**129:**20
**passive** [1] **146:**17
**past** [2] **37:**17 **42:**22
**pause** [1] **140:**19
**pausing** [1] **150:**3
**paying** [2] **55:**8 **56:**16
**pays** [2] **86:**7,8
**penalty** [1] **81:**15
**pending** [21] **26:**1 **29:**24 **31:**
7 **32:**24 **33:**12 **40:**12 **41:**3,
5,17 **43:**24 **122:**13 **123:**1,3
**127:**12,18,19,23 **128:**22
**129:**10 **145:**25 **146:**16
**Pennsylvania** [2] **10:**5 **83:**
25
**people** [38] **29:**4 **30:**10,12,
14,16,24 **32:**4,7,8 **35:**10 **49:**
19 **81:**9 **83:**17 **86:**1,3,22
**88:**2,5,6 **89:**11,12 **97:**18
**102:**25 **103:**11 **104:**8 **116:**
2 **123:**24,25 **124:**15 **131:**8,
12 **132:**5 **136:**21 **140:**8
**142:**2 **143:**13 **149:**13,15
**per** [3] **16:**17 **68:**24 **142:**14
**perfectly** [1] **11:**21
**perhaps** [7] **17:**16 **76:**7
**100:**13 **109:**10 **142:**20 **143:**
3
**period** [5] **19:**15 **98:**10 **121:**
22 **145:**16 **146:**9
**periods** [1] **109:**17
**permissible** [4] **31:**15 **57:**
15 **58:**17 **145:**5
**permit** [3] **13:**24 **52:**10 **148:**
25
**permits** [2] **73:**9 **106:**11
**permitted** [2] **107:**19 **124:**
10
**persistently** [2] **102:**2 **135:**
4
**person** [35] **16:**11,12,16 **28:**
4 **33:**1,3 **34:**5,9,10,23 **39:**
19,21 **41:**10 **93:**4,6 **98:**5,6,
7 **104:**2,19 **105:**1,2 **106:**9,
13 **122:**20 **125:**16 **133:**3,4,
12 **142:**5,10,11,15 **143:**18,
21
**person's** [3] **29:**13 **81:**13
**146:**12
**personally** [1] **113:**6
**personam** [2] **76:**9 **77:**10
**personnel** [1] **39:**13
**persons** [2] **113:**4,5
**perspective** [1] **146:**18
**persuade** [2] **21:**12 **150:**18
**Petitioners** [25] **1:**4 **2:**4,
10 **3:**8 **74:**3,6,8,24 **75:**3 **78:**
23 **79:**3,11 **82:**25 **87:**6 **101:**
24 **125:**3,11 **128:**6 **130:**25

**132:**24 **135:**6 **138:**23 **145:**
8 **147:**4
**Petitioners'** [1] **75:**4
**pick** [5] **10:**23 **58:**22 **94:**5,7
**97:**15
**piece** [4] **56:**9,11 **88:**15,15
**pin** [1] **92:**16
**place** [15] **15:**8 **18:**13 **26:**13
**27:**1,17 **40:**9 **55:**12 **63:**1
**64:**13 **84:**6 **105:**8 **128:**23
**129:**17 **131:**5 **132:**19
**placed** [1] **94:**16
**places** [1] **131:**10
**plainly** [2] **5:**5 **69:**2
**plaintiff** [7] **66:**21 **67:**8,15
**68:**4,8 **69:**8,14
**plaintiffs** [1] **11:**5
**play** [3] **94:**6 **134:**6 **135:**14
**please** [3] **3:**10 **73:**22
**pocketbook** [1] **16:**20
**point** [44] **8:**2 **14:**10 **18:**11
**40:**13 **41:**15,19 **46:**18 **47:**
24 **54:**3,10 **56:**23 **57:**24 **58:**
23 **64:**3 **65:**3 **66:**17 **75:**1
**79:**20,22 **81:**18 **84:**11 **85:**
14,22 **107:**21 **108:**11 **113:**
18 **115:**8 **116:**24 **122:**22
**124:**13 **130:**16 **131:**3,5
**132:**22 **134:**11,12 **137:**14
**138:**14 **139:**13 **140:**20 **141:**
25 **148:**2 **149:**16 **150:**13
**pointed** [5] **15:**14 **58:**25 **98:**
25 **109:**1 **140:**2 **146:**2
**pointing** [1] **144:**20
**points** [13] **78:**13 **85:**8 **88:**9
**90:**1,24 **92:**18 **98:**16 **106:**2,
17 **112:**6 **113:**13 **144:**1,21
**policies** [10] **7:**3 **67:**4,7 **70:**
12 **71:**2,14,18 **89:**18 **92:**16
**150:**24
**policy** [20] **3:**21 **4:**5 **69:**25
**73:**1,1 **83:**22 **88:**15,16,25
**89:**11,16,24 **90:**17,18,22
**94:**9 **103:**7 **106:**15 **149:**11
**150:**9
**political** [3] **50:**18 **53:**20
**137:**8
**pool** [1] **95:**18
**Poor** [1] **9:**21
**population** [1] **86:**13
**portion** [1] **64:**15
**position** [15] **7:**15 **9:**19 **13:**
18 **20:**21 **35:**17 **50:**11 **51:**
10 **53:**3,12 **56:**2 **72:**6 **79:**
24 **119:**2 **150:**21 **151:**1
**posits** [1] **25:**8
**possess** [1] **24:**13
**possibilities** [1] **92:**11
**possibility** [2] **99:**6 **146:**18
**possible** [16] **5:**14 **9:**13 **10:**
15 **21:**5 **33:**8 **59:**3 **62:**6 **64:**
3 **65:**15 **75:**23 **96:**23 **98:**13,
14 **99:**14,21 **100:**8
**possibly** [3] **20:**25 **28:**5

**127:**17
**postulated** [1] **126:**14
**posture** [1] **147:**17
**potential** [2] **76:**25 **100:**8
**potentially** [1] **71:**16
**power** [13] **27:**9 **31:**24 **51:**
17 **67:**3 **90:**19,20 **98:**18
**113:**3 **115:**18,19 **123:**21
**129:**23 **143:**25
**powerful** [1] **87:**10
**powerless** [2] **52:**3 **58:**11
**powers** [8] **9:**17 **51:**21,25
**136:**12,13 **149:**4,5,5
**practical** [4] **22:**9 **23:**6,11,
21
**practically** [1] **118:**10
**practice** [10] **35:**25 **42:**22
**55:**1 **75:**10,13 **108:**10 **114:**
23,23 **120:**13 **139:**12
**pre-APA** [1] **75:**13
**precedent** [5] **14:**10 **50:**17
**52:**24 **97:**20 **128:**18
**precedents** [5] **8:**17 **10:**17
**11:**12 **12:**17 **73:**25
**precise** [1] **56:**18
**precisely** [4] **23:**10 **46:**21
**128:**20 **147:**21
**preclude** [3] **6:**4,6 **60:**13
**precluded** [4] **52:**13 **109:**
12,15 **110:**6
**precludes** [2] **5:**18 **63:**8
**preclusion** [1] **62:**14
**predicates** [1] **21:**19
**preexisted** [3] **37:**8 **58:**13,
17
**PRELOGAR** [117] **1:**19 **2:**3,
9 **3:**6,7,9 **5:**10,19 **6:**5 **7:**5,
12,17 **8:**10,24 **9:**2,24 **10:**13
**11:**6,20 **12:**1,8,16 **13:**11
**14:**1,9,20 **15:**20 **17:**5,8,21
**18:**3,7,19 **19:**3 **21:**10,22
**22:**7,19,23 **24:**4,8,21 **25:**5,
15,24 **26:**4,10,19,23 **27:**2,5,
12,16,23 **28:**1,11,14 **29:**17
**31:**4,20 **32:**10 **33:**7 **34:**2,6,
11 **36:**1,10,16 **37:**13,20,22
**38:**5,12 **39:**1 **40:**6 **41:**2,5,
11,15,25 **42:**4,6 **43:**8 **44:**18
**45:**5,20 **47:**5 **48:**3,14 **49:**
21 **50:**16 **51:**16 **52:**17,21
**53:**14 **56:**13 **58:**2,5 **59:**17
**60:**15 **61:**19 **62:**6,24 **64:**
9,20 **65:**2,24 **68:**5 **69:**13
**71:**6 **72:**5,20 **73:**7 **147:**2,4,
5
**premise** [2] **34:**22 **52:**5
**premised** [2] **72:**9 **108:**22
**prerogative** [1] **91:**16
**present** [2] **16:**6 **98:**11
**presented** [4] **120:**6,7,20
**140:**15
**presents** [2] **15:**4 **135:**1
**preserves** [1] **73:**11
**President** [6] **24:**12 **50:**22

53:22 136:25,25 137:1
**President's** [1] 136:11
**presidential** [1] 4:13
**press** [3] 52:5 54:2 79:21
**pressing** [1] 9:11
**pressure** [2] 79:7,9
**presumably** [2] 84:22 85:3
**pretrial** [1] 30:5
**pretty** [11] 54:17,24 55:17,
20 56:7,12 57:7 119:11
128:17,19 143:10
**prevail** [3] 101:4,12 134:7
**prevailed** [1] 73:25
**prevent** [6] 9:9 46:18 53:
20 71:13 98:25 123:6
**prevented** [1] 147:18
**preventing** [2] 6:22 64:5
**prevents** [3] 6:11 71:12
106:4
**previous** [6] 74:22 104:21
114:22,23 124:2 140:17
**previously** [3] 63:21 114:
14 144:3
**primarily** [1] 119:15
**principle** [9] 3:24 7:6 9:8
11:9 14:8,12,16 46:7 98:1
**principles** [9] 4:12 13:7 23:
20,25,25 42:17 43:12 46:9
98:8
**prior** [9] 39:7,22 43:7 70:15
128:12 139:2,12 143:21
146:11
**priorities** [14] 3:17 4:22 16:
3,8 18:12 29:8 39:17 40:2,
4 87:25 93:4 99:2 123:7
147:12
**prioritizing** [1] 16:10
**priority** [3] 23:17 124:9
132:9
**prison** [2] 104:25 105:9
**private** [4] 11:23 12:5 13:
19 108:23
**probable** [3] 100:1 143:2,9
**probably** [3] 97:20 98:2
118:5
**probatory** [1] 60:7
**problem** [17] 17:12 21:5
29:6 30:17 51:5 60:16 66:
16 81:21 98:9,9 99:18 121:
15 122:25 125:12 137:15
144:17 146:15
**problematic** [1] 61:5
**problems** [2] 54:12 79:25
**procedural** [1] 91:20
**procedure** [4] 73:2 112:8
115:15 139:3
**procedures** [7] 67:8,10,20,
23 70:1,21 115:11
**proceed** [5] 11:22 12:24
23:12 27:11,16
**proceeding** [14] 6:19 26:
15 27:1,19 33:4 47:14 82:
19 111:25 112:1,4,10,14
116:19 145:18

proceedings [23] 26:8,9
29:24 31:7 32:22,25 33:12,
25 34:9 40:13 41:3,17 43:
25 103:20 127:12,20 128:
13,22 129:25 131:4 141:9
146:22,23
**proceeds** [2] 6:14 110:19
**process** [4] 26:12 41:19
100:9 146:4
**produce** [1] 46:4
**Professor** [1] 109:4
**program** [1] 138:2
**programmatic** [2] 6:17 46:
20
**programs** [2] 10:24 137:15
**progression** [1] 116:17
**prohibit** [1] 78:20
**prohibited** [2] 41:16 77:12
**prohibiting** [1] 44:20 70:8
**prohibitions** [1] 92:3
**prohibitory** [1] 76:10
**prohibits** [2] 5:2 118:9
**promptly** [1] 143:11
**promulgated** [1] 123:12
**proper** [3] 38:9 49:10 69:
20
**properly** [4] 21:13 69:6,11
139:14
**proposal** [1] 55:15
**proposition** [1] 28:23
**proprietary** [1] 11:22 12:
20 117:19
**prosecute** [1] 24:25 30:8,
16 32:6 54:8 75:6 98:7 99:
7,10,11 100:12,21 130:22
142:24 143:8
**prosecution** [2] 30:11 143:
12
**prosecutor** [1] 30:7
**prosecutorial** [16] 26:7 30:
23 32:5 54:6 74:25 82:18
97:23 98:17,18,24 100:7,
10,18 101:17 128:3 130:21
**prospect** [2] 16:5 17:16
**prosse** [1] 143:4
**protect** [1] 4:23
**protection** [1] 31:17
**protest** [1] 7:18
**protesting** [2] 8:11 68:8
**prototypical** [1] 107:7
**prove** [1] 87:16
**proved** [1] 73:23
**proves** [1] 87:21
**provide** [2] 37:8 116:9
**provided** [6] 66:21 115:14,
20 116:22 121:21 149:19
**provides** [6] 111:19 112:8
113:15,18 117:1 139:7
**provision** [20] 5:8 27:5 28:
5,15 31:6 32:18 36:18 44:
2,4,8 46:13,18 65:21 70:15,
18 71:5 79:14 96:24 100:4
122:6
**provisions** [22] 4:9 5:4 6:

13,23 25:18 36:25 37:24
40:20 43:6,10,18 45:9 52:
14 70:7 71:11,20 72:10,12,
14 73:14 116:16 148:11
**public** [6] 3:15 20:9 39:11
55:24 148:19 151:13
**purpose** [2] 31:2 45:22
**purposes** [10] 5:9 11:4 12:
5 31:17 48:17 63:5 79:1,
22 105:5 131:25
**purse** [1] 51:17
**pursuant** [3] 30:23 86:15
149:4
**pursue** [3] 98:19,20 147:14
**pursued** [1] 47:11
**push** [2] 54:17 55:20
**put** [20] 26:8 27:21 34:18
76:12 86:5 104:9,10,18
105:8 108:10 110:15 111:
1 113:2,2 125:16,25 126:
10 132:6 134:19 150:23
**puts** [3] 14:17 150:24 151:
1
**putting** [3] 19:18 111:13
129:14 130:3,6

# Q

**qualify** [1] 148:15
**quasi-sovereign** [3] 11:
11 12:9,25
**question** [49] 15:5 19:24
21:19 29:5,20 33:24 34:4,
4,7,12 38:18 44:25 52:6
56:4 58:23 61:7 62:11 63:
7 64:8 85:22 86:10,20 87:
3,8 90:8 97:16,21 100:14
101:3 104:21,22 105:7
107:25 109:3 114:9 118:
14 120:20 124:2 128:10
129:21 130:2,17 132:18
137:8,14,17,24 138:9 140:
14
**questioning** [2] 95:5 107:
25
**questions** [14] 5:6 14:22
35:13 38:20 42:8 50:7 59:
19 62:13 75:16 97:10 116:
19 117:15 120:6 134:4
**quick** [1] 139:19
**quickly** [1] 137:16
**quite** [5] 29:1 43:3 77:3,3
117:17
**quote** [1] 78:1

# R

**R.S** [3] 7:1 14:12 97:19
**radical** [2] 35:18 54:24
**Raines** [1] 51:23
**raise** [2] 65:12 136:14
**raised** [6] 66:9 108:1 109:9
134:5 136:9,10
**raises** [3] 15:5 109:3 137:
14
**ramifications** [1] 23:6

**rare** [1] 54:4
**rates** [1] 85:12
**rather** [5] 49:25 64:25 75:4
82:6 101:18
**re** [1] 52:1
**re-implement** [1] 76:22
**reach** [2] 20:19 67:11
**reached** [2] 18:14 36:8
**react** [1] 81:9
**read** [12] 25:10 34:13 60:1,
12 67:25 78:1 100:16 116:
15 127:17 131:19 144:15,
25
**reading** [12] 4:19 25:13 31:
3 61:1 66:22 77:18 97:22
103:17 129:16 131:7 132:
2,11
**realize** [1] 55:18
**really** [24] 9:13 19:10 23:7
24:2,18,23 29:18 32:13 34:
24 36:20 55:12 56:4 70:25
71:4 73:6 84:8 95:8 104:7
109:2 111:23 129:15 130:
5 132:10 141:5
**realm** [3] 14:13 28:20 30:9
**reapprehended** [1] 94:20
**reason** [18] 6:7 11:11,12
12:10 16:12 22:8 31:10,24
48:20 53:18,25 63:22 83:
10 95:7 109:11 119:3 141:
23,25
**reasonably** [2] 18:8 148:2
**reasons** [7] 23:8 74:19 76:
1 96:18 100:6 101:23 120:
14
**REBUTTAL** [3] 2:8 147:2,
3
**recall** [2] 9:25 45:1
**received** [2] 74:2 77:4
**recent** [1] 55:14
**recidivism** [4] 84:16 85:12
86:9,9,14 94:23
**recognition** [2] 14:25 43:
11
**recognize** [4] 11:13 14:2
19:5 56:25
**recognized** [18] 10:17 14:
16 23:9 26:6 27:10 57:11,
17 71:11 73:24 74:13 83:
23 108:9 113:14 114:24
115:1,3 139:2 151:4
**recognizing** [2] 9:10 13:4
**recollection** [1] 47:1
**record** [8] 15:24 19:9 39:7
87:20 94:15 95:17 124:8
135:12
**redressability** [4] 5:9 79:
23 82:24 135:10
**reducing** [2] 16:9 82:8
**refer** [1] 103:19
**referred** [1] 42:21
**referring** [1] 104:4
**reflects** [2] 12:18,23
**reflexively** [2] 36:5,23

**refrain** [3] 6:12 78:5 81:15
**refused** [1] 108:15
**regarding** [4] 85:11 86:12
127:14 135:4
**regardless** [1] 84:12
**regards** [1] 76:8
**Regents** [1] 84:4
**regulate** [1] 149:15
**regulated** [2] 12:22 92:4
**regulating** [1] 16:1
**regulation** [8] 10:6,18 17:
10 49:2 68:9 69:16 72:25
108:23
**regulations** [4] 70:11,17
71:2 119:8
**rejected** [2] 7:21 119:4
**relate** [1] 115:6
**related** [2] 15:13 31:23
**relates** [2] 8:17 32:11
**relation** [1] 83:15
**relationship** [2] 83:7,13
**relative** [1] 126:5
**release** [10] 31:15,16 34:1
35:10 40:16 41:16 53:23
96:23 106:18 131:2
**released** [7] 33:16 86:15
94:20 105:1,10 129:5,9
141:21 142:13
**releases** [2] 84:13 85:14
**releasing** [1] 133:7
**relevant** [1] 51:4
**relief** [35] 5:3 6:9 7:25 45:7
46:20 58:16 60:18,24 62:
10 63:17 69:21 72:1 73:4,
5,8,9,12 76:2,5 77:13 78:
25 79:17 82:9 108:14 112:
2,3,23 116:22 117:2 118:9,
10,12,24 149:25 151:2
**relinquished** [1] 149:1
**relinquishment** [1] 149:6
**rely** [4] 39:13 147:13,19
151:7
**remained** [1] 19:25
**remedial** [13] 38:6 45:2,3
59:7,13 62:15 64:2 111:7
112:3 113:10 140:4,10
150:6
**remedies** [27] 4:24 6:3 20:
19 36:24 37:7,8 45:10 49:
5,13 50:4 58:12,13 60:22
61:25 73:13 75:21 79:12,
16 81:10 111:10,20 112:16,
20,21,23,25 138:15
**remedy** [36] 4:25 5:1,14 35:
14 49:9,15,24 54:11 57:15,
23 58:17 59:2 61:2 62:19
63:12 64:5 66:20,22 67:15
68:2 69:20 74:2 75:9 76:
13 82:3 107:24 108:2,8
115:23 116:10 117:13 138:
16 139:6,8 147:15 150:22
**remember** [1] 54:23
**remiss** [1] 120:10
**removable** [2] 3:12 33:11

Official - Subject to Final Review

**removal** [66] 7:4 26:8,12,
  15 27:1,11,17,20,22 29:22,
  24 30:21 31:2,7 32:22,24
  33:3,4,12,25 34:9 40:8,12
  41:3,17 42:11,15 43:25 70:
  19 72:4 82:19 94:18 98:22
  103:2,9,20 122:14 123:2,
  15 124:15 127:12,14,19,19,
  20,23,24 128:13,21 129:11,
  25 130:23,23,24 131:12
  132:6 133:20 141:4,9 142:
  4 145:18 146:6,7,13,22,23
**removals** [3] 20:2,4,6
**remove** [44] 4:8 9:13 10:8
  26:18 30:24 32:7,16 41:1,
  9,14,23 42:10,14 75:3 96:5,
  7 102:9,17,25 103:23 104:
  1 121:7 122:11,17,18,20
  123:16,19,20,24,25 124:15,
  22 125:3,8 126:12,25 127:
  5 128:7 130:9 141:17 142:
  10,15 143:17
**removed** [9] 26:3 32:2 93:
  6 94:17,19 96:1 104:6 146:
  1,17
**removes** [1] 79:12
**removing** [3] 83:11 103:13
  125:19
**rendering** [1] 63:5
**renewal** [1] 97:9
**Reno** [2] 26:5 42:11
**repeated** [1] 57:6
**repeatedly** [4] 4:10 26:6
  101:24 124:18
**reply** [1] 119:20
**report** [1] 118:4
**Reporter** [1] 118:5
**require** [10] 6:11 43:23 61:
  23 72:11 78:3,8,19 86:2
  125:3 141:7
**required** [11] 27:21 47:9
  67:23 68:20 72:15 78:4,10
  81:23 84:21 119:23 129:1
**requirement** [2] 103:16
  131:20
**requirements** [1] 68:24
**requires** [3] 31:8 35:1 151:
  4
**requiring** [2] 10:20 44:2
**reserve** [1] 118:18
**reserved** [1] 118:13
**residents** [1] 10:9
**resolution** [1] 136:13
**resolve** [2] 150:2 151:10
**resolved** [1] 122:24
**resolves** [1] 150:25
**resort** [1] 53:5
**resource** [3] 21:13 74:25
  134:4
**resources** [18] 3:14 16:11
  34:19 64:24 65:18 97:6,14
  98:4,4 101:6,21 104:24
  105:8,15 126:23 132:14
  135:8 148:17

**respect** [24] 10:19 12:8,21
  20:2 29:19 30:19,21 39:18
  43:14,20,44 44:7 49:25 51:19
  61:4,25 65:10 66:1 71:14
  84:21 86:22 90:17 100:17
  131:14 149:15
**respectfully** [4] 54:17 88:8
  94:12 133:11
**respecting** [1] 113:7
**respond** [4] 74:3,24 75:18
  82:11
**responded** [1] 95:5
**Respondents** [5] 1:7,23 2:
  7 4:16 73:20
**Respondents'** [1] 4:19
**response** [4] 48:2 53:1 62:
  12 87:1
**responses** [1] 87:2
**responsibility** [3] 21:3 22:
  4 53:17
**responsive** [1] 90:7
**rest** [1] 130:17
**restrain** [6] 45:13,24,25 70:
  6 76:3 79:2
**restrained** [1] 101:17
**restraining** [1] 76:5
**restrains** [1] 118:1
**restrict** [1] 24:15
**restricted** [1] 107:18
**restriction** [1] 9:13
**restrictive** [1] 96:23
**result** [9] 39:14 65:15 67:
  12 68:1,24 69:3,7 83:22
  95:8
**retains** [2] 42:13 43:12
**reverse** [2] 3:19 151:15
**review** [36] 25:37:24 48:
  24 49:18 52:14 53:4 55:15
  110:10,12,14,18,19 111:6,
  12 113:16 115:21 119:15,
  16
**reviewable** [2] 93:16 116:
  20
**reviewing** [2] 108:11 116:
  3
**reviews** [1] 48:8
**revoke** [2] 108:16 115:2
**rewrite** [2] 54:25 74:4
**rid** [1] 81:21
**rights** [4] 12:22 47:11 48:
  17 147:14
**rise** [1] 93:9
**risk** [2] 84:25 85:20
**risks** [2] 85:13 88:3
**ROBERTS** [47] 3:3 6:25 7:
  10,14 8:7,19,25 20:16 21:
  17 22:1,17,20 35:12 36:9,
  12 37:12,15,21 38:3,11,14
  40:22 42:20 44:11 50:6 58:
  20 66:4 73:16 93:20,23 95:
  1,21 96:19 108:24 107:12
  108:25 109:6 117:4,7,14
  120:16 127:7 133:25 139:
  17 140:23 146:25 151:16

**Rock** [3] 23:14 97:25 130:3
**rooted** [1] 97:24
**Ruben** [1] 94:15
**rule** [18] 11:18 12:7,11 13:8,
  16 48:21 49:25 57:22 67:
  16 68:3,25 77:10 78:18 92:
  19 108:17 112:7 134:20
  140:21
**rule's** [1] 55:11
**rules** [12] 12:1 12:3 75:14
  91:9,10,13,14 94:6 97:2
  113:8,10 115:20
**ruling** [2] 3:18 58:1
**rulings** [6] 37:18 140:1,4,
  10,16,17
**run** [6] 75:4,6 103:1 115:16
  148:20 150:14
**running** [2] 40:16 145:23
**runs** [3] 6:24 96:3 103:4

**S**

**safety** [2] 3:15 148:19
**sake** [1] 29:2
**same** [24] 5:8 6:21 11:23
  12:2,20 19:21 23:8 42:16
  46:13 47:7 51:22,25 60:20
  62:22 71:16 79:8,22 98:9
  110:10 111:4 112:9 116:8
  139:13 149:13
**sat** [1] 54:18
**satisfies** [1] 80:15
**save** [1] 86:24
**saying** [36] 18:24 24:15 28:
  7 33:2 41:19,22 53:22 55:
  13 56:10 60:12 63:10 67:
  21 68:15 79:4,11 89:7 91:
  8,9,12 92:24,24 97:3 102:8,
  11,14 106:5,10,14 122:9
  125:25 126:21 127:11,13
  132:9 141:4 146:10
**says** [45] 24:1 25:10 29:11
  30:6,13 31:11 39:1,19,20
  41:12 45:11 50:9 53:7 54:
  25 59:5 60:6 63:24 69:2,
  10 70:5 81:13 86:23 89:19
  96:6 101:8 105:20 106:21
  107:12 116:11 118:6 121:
  24 122:19 123:1 124:11,21
  125:18 128:20 129:3,4
  130:11 134:7 135:23 141:
  5 145:8,24
**Scalia's** [2] 14:3 42:12
**scheme** [1] 61:11
**scholars** [2] 59:11 108:4
**scholarship** [3] 59:5 108:
  7 119:23
**scope** [6] 23:17 44:19 49:
  17 65:20 110:18 111:12
**score** [1] 77:23
**scramble** [1] 22:12
**search** [1] 39:14
**second** [8] 46:6 78:22 84:
  19 132:23 133:21 136:8
  142:19 144:7

**secondly** [1] 120:24
**Secretary** [3] 4:21 31:16
  137:5
**Section** [22] 5:2 6:2 25:25
  36:6 37:10 39:2 40:15 48:
  19 49:4,16 57:19 59:23 63:
  23 74:20 75:11 107:18,20
  110:18 111:12 116:1 132:
  20 141:6
**sections** [1] 88:20
**security** [5] 3:15,16 4:23
  148:19,20
**see** [10] 19:9 20:22 25:9,13
  29:6 42:16 53:18 105:9
  118:2 126:9
**seeing** [1] 30:17
**seek** [9] 12:24 28:3 32:15
  75:21 138:2,3 146:5,12
  151:2
**seeking** [7] 7:8 11:10,21
  72:10 104:5 106:18 135:
  19
**seem** [3] 98:8 111:9 119:10
**seemed** [1] 16:2
**seems** [15] 7:15 21:17 36:
  22 43:2 45:23 66:11 68:1
  70:8 77:25 92:25 116:15
  128:17 131:7 143:23 146:
  7
**seen** [2] 54:24 76:15
**self-executing** [1] 78:14
**self-inflicted** [1] 84:9
**sense** [5] 68:2 70:11 79:2
  83:14 91:16
**senseless** [1] 148:20
**sentence** [6] 39:8 111:20,
  21 132:23 133:21 142:12
**sentences** [1] 138:16
**separate** [5] 5:12 17:25 57:
  17 84:18,18,19 107:20
**separately** [1] 50:4
**separation** [3] 8:18 9:16
  51:25
**serious** [3] 39:7 84:15 148:
  13
**served** [1] 142:11
**service** [1] 39:11
**services** [1] 84:15
**serving** [1] 119:7
**set** [32] 4:22 29:8 39:5,17
  40:2,3 47:25 48:4,7 49:3
  54:14 55:9,10 57:24 60:4,
  9,12 65:6 67:22 69:10 75:
  12 92:10 110:24 111:12
  114:13 115:4 116:6 123:
  21 138:10,24 139:15 148:7
**set-aside** [2] 63:3 138:12
**sets** [1] 49:4
**setting** [5] 48:11,21 63:4
  67:25 99:1
**seven** [2] 16:17,18
**several** [1] 76:1
**sex** [1] 148:14
**shall** [67] 4:10,11 20:20,21

**21** [8] 8,8,15,20,20 22:16,21,
  22,24,25 24:1,2,2,3,16,16
  25:8,8,11,11,23 28:8,8 29:
  10 31:11,12 32:19 34:12
  38:22,22,25 39:19,21 42:9
  43:15 44:6,7 45:11 54:8,8
  63:24 64:17 96:14,14,15,
  19,19,21,21 129:14,15,16
  130:6,8,9,10,11,11 131:18
  134:25 147:25 148:6,15
**shalls** [4] 22:15 28:15 52:
  11,12
**share** [2] 65:25 149:13
**shares** [1] 6:20
**sharing** [1] 65:7
**Shepard** [1] 35:6
**shouldn't** [4] 21:7 89:5 91:
  1 92:1
**show** [11] 11:14 15:16 16:
  23 17:6 83:4 87:18,19 88:
  14 89:20 91:11 93:7
**showed** [3] 93:12,15,17
**showing** [3] 83:7 89:25
  124:4
**shown** [2] 88:4 138:11
**shows** [3] 19:23 88:12 92:
  20
**shut** [2] 62:8 137:16 138:1
**shutting** [1] 53:5
**side** [11] 19:18 45:17 48:7
  49:3 63:5 77:2 89:10 95:5
  109:1 118:25 133:13
**side's** [1] 47:24
**sides** [1] 23:7
**significant** [1] 131:25
**Silberman** [1] 54:18
**similar** [4] 15:14 118:10
  130:2 144:23
**simply** [8] 37:7 61:12 82:3
  97:5 115:17 124:21 125:
  22 126:4
**since** [2] 57:7 139:15
**single** [5] 29:15 89:16 133:
  15 149:11 150:19
**Sisters** [2] 9:21 57:7
**sit** [1] 104:24
**sits** [1] 111:10
**sitting** [2] 47:17 54:23
**situation** [9] 15:12 21:21
  54:9 89:22 107:8 126:3
  129:1 142:7 151:6
**situations** [1] 42:17
**Sixth** [2] 111:15 150:17
**skeptical** [1] 150:20
**skepticism** [1] 92:20
**skipped** [1] 116:24
**slip** [2] 108:3 118:3
**slippage** [1] 126:3
**small** [3] 75:6 129:22 130:
  16
**sneak** [2] 49:14 124:14
**social** [1] 84:15
**solely** [2] 29:12 39:22
**Solicitor** [8] 1:19,22 90:14

Heritage Reporting Corporation

Official - Subject to Final Review

92:1 95:4 109:1 140:2 144:
21
solicitude [3] 12:15,16,23
solve [1] 79:25
somebody [4] 30:8 41:1
104:17 122:11
somehow [1] 77:15
someone [23] 26:8 27:19
29:23 30:24 32:1 33:10,25
50:1 65:16 76:15 98:20
105:9 113:19 114:2 121:7
122:17 123:17 132:16 141:
17 142:24 143:1,8 146:17
someone's [3] 26:14 81:
10 131:24
sometimes [8] 15:2 37:1
38:1,4 48:4,6 108:15,15
somewhat [2] 57:1 87:3
soon [1] 141:22
sorry [11] 22:18 68:13 87:
13 100:25 101:3 109:20,24,
25 110:4 117 145:21
sort [16] 21:9 30:5 31:23 70:
3 86:6 91:15 92:19 94:10
99:8 109:8 113:15,17 116:
16 117:13 134:20 142:6
sorts [1] 77:19
SOTOMAYOR [82] 14:6
15:9,21 25:20,22,25 26:5,
14,21,24 27:4,7,15,18,24
28:6,13 32:12 33:23 40:23,
24 41:4,7,12,18 42:2,5,7,
19 44:10 87:13,16 88:13,
18 100:23,25 102:4,5,13,
21 103:2,3,6,21,25 104:7,
13,23 105:6,14,17,25 106:
8,20 107:2,6,10,14 120:17,
18,22,23 121:10,17,23 122:
7,15 123:1,4,14 124:2,6,12,
19 125:5,14,24 126:7,16,
20 127:4 141:2
Sotomayor's [1] 86:20
sought [4] 5:15 101:24
108:14 138:7
sounded [1] 35:17
sounds [1] 142:25
soup [1] 100:8
southern [2] 90:6 91:4
sovereign [6] 11:10 12:9,
25 13:4,5 91:16
sovereignty [3] 149:2,6,13
space [2] 9:14 10:17
speaking [4] 90:25 108:12
109:11 130:15
special [4] 11:18 12:7,12,
14,16,23 13:16 36:25 37:
24 61:11 91:8 92:20
specific [12] 14:17 18:13
60:5 61:21 80:5 86:14 88:
19 94:15 101:23 104:6
110:12,14
specifically [18] 5:1 14:11
31:14 47:24 52:13 61:17
63:23 72:23 83:9 85:15 94:

16 101:20 108:13 114:3,8
118:13 123:13 131:9
specifies [2] 112:10 130:
18
specify [1] 80:17
speculation [1] 93:11
speculative [4] 92:11 94:
10,13,24
spelling [1] 70:16
spend [5] 89:15 103:11
104:24 107:23 126:22
spending [6] 3:23 9:23 16:
1 123:19 149:9,18
spin [1] 80:21
stab [1] 21:11
stage [1] 17:23
stages [2] 26:11 42:14
standard [5] 18:22 55:1 74:
2 111:5 116:11
standing [51] 3:20 5:9,13 7:
1,2,18,23 8:5,12,12 9:11,
20 10:1,6 11:18,19 12:12,
15 13:16 14:4,22 15:12 16:
20,22 20:18 44:17 50:8,13
68:16 69:8 73:23 74:6,17
75:20 79:23 83:4 84:2 87:
11,17 88:10 89:2 90:5,14
97:15,16 113:8 137:19
148:23 149:19 150:5,7
stands [2] 97:19 147:16
staple [1] 36:15
stare [6] 47:22 109:12,15,
22 110:6 120:2
start [3] 56:24 128:11 143:
12
started [1] 57:4
starts [1] 146:4
state [33] 5:15 7:2,7,22 8:
11,12 9:11 10:5,24 11:19
12:12,15 13:16 15:11 35:2
50:12 59:25 64:19 65:13
66:2 77:20 88:3 89:19 91:
18 98:1 108:24 136:11,21,
23 142:12 148:25 150:7,10
state's [5] 7:18 28:1 30:18
83:22 89:13
statement [2] 124:21 127:
2
statements [1] 30:20
STATES [71] 1:1,3,15 3:5,
20,21 4:2,3,5 6:6 7:25 8:5
9:11,20,20 10:4,11,19
11:9,13,18,21 12:7,7,18,24
13:12,17,17 15:24 17:12
18:10 19:14 51:5,15 58:1
65:8,25 73:23 74:8,14 75:
2 77:6,11,14 85:4 86:2 87:
23 89:23 90:3,21 92:15,20
104:15 108:17 118:4 120:
8 124:8 126:4,13 129:2
130:20 146:1 149:1,9,12,
16,16 150:8,18
states' [6] 28:22 74:6 90:5
99:16 119:1 146:11

status [1] 65:5
statute [57] 6:8,18 21:15,
24 23:13 25:7,10,11,16 29:
25 34:8 35:2 38:8,23 43:
14 45:4,23,24 46:17 48:10,
11,15,16 49:1 50:3 60:25
61:2,12 64:5,16,25 67:25
69:2,10,20 70:9,13,22,24
71:18 72:15,22 105:20
107:21 110:12 115:22 117:
22 122:9 131:11 132:18
133:8 134:24 141:5 142:
14 143:20 144:15 148:22
statute's [4] 35:5 37:9 145:
19,24
statutes [9] 30:6,13 48:9
54:7 61:22 65:13 97:22
110:10,14
statutory [18] 4:22 15:1,6
23:1 36:25 37:24 46:4,6
53:17 59:20 61:11,13 63:
15 69:24 71:15,20 72:10
73:14
stay [2] 7:23,24
step [3] 55:7 114:10 149:23
steps [3] 53:6,13,15
still [9] 22:3,18,20 46:25 54:
12 69:18 97:14 145:7 147:
11
stipulated [1] 145:14
stipulating [1] 145:20
STONE [144] 1:22 2:6 73:
18,19,21 75:17,24 78:12
80:4,8,11,16,23 81:1,7,25
82:3,21 83:5 84:1 85:8,20
86:4 87:2,14 88:8,17 89:3
90:1,9,24 91:6,12 92:17
93:15 94:12 95:14,23 96:
17 98:12 99:13,19 100:5
101:13 102:11,18 103:1,4,
14,23 104:3,11,20 105:3,
11,15,23 106:2,16 107:1,9,
13,15 108:5 109:5,10,20,
23 110:1,5 111:17 112:5,
12,17,21 113:12 114:1,5,
13,17,22 115:12 116:7,23
117:1,6,9,24 118:22 120:5,
22 121:8,11,19 122:3,12,
22 123:3,8 124:1,7,17,23
125:9,20 126:2,13,18 127:
1,6,10,13,22 128:15,24
129:19 130:14 131:15 132:
12,21 133:11,18,23 134:10,
16 135:1,18 136:2,6,16,19,
24 137:7,22 138:6,20 140:
12 141:10,15,20 142:18
144:1 145:1 146:15
stop [3] 44:22 89:25 92:16
stops [1] 94:8
straightforward [1] 87:4
strange [1] 79:13
strengths [1] 100:14
strictly [1] 109:11
strikes [2] 77:21 91:24

strive [2] 101:9,10
strong [2] 43:4 117:12
stronger [1] 32:21
strongest [2] 99:14,21
strongly [4] 8:4,8 54:17 55:
20
structural [1] 51:25
structure [6] 3:25 8:18 9:
16 11:15 13:6 116:8
students [1] 10:9
stymied [1] 151:6
subchapter [1] 70:7
subject [9] 34:23 60:14 65:
16 76:24 84:7 85:10 103:
19 145:12 148:10
submission [1] 55:19
submitted [3] 82:25 151:
17,19
subsection [2] 42:9 46:7
95:20
subsections [1] 46:12
subsequent [2] 110:10
119:2
subsequently [1] 110:9
subset [4] 75:6 129:22,22
131:2
substance [1] 57:25
substantiate [1] 17:22
substantive [1] 116:11
success [2] 8:1 137:20
successful [3] 66:21 67:
14 137:19
succinct [1] 38:20
sudden [1] 35:22
sue [5] 4:2 13:12 53:24 134:
11 148:25
suffer [2] 76:20 91:2
suffering [2] 84:5 113:19
suffers [1] 84:11
sufficient [4] 12:4,6 74:10
83:24
suggest [8] 4:16 13:2 19:
13 59:25 69:16 70:3 96:21
120:4
suggested [1] 118:7
suggesting [4] 9:3 17:14
68:7 73:4
suggests [3] 58:10 118:25
119:1
suing [1] 13:4
suit [2] 6:14,18
suits [2] 89:23 150:12
Summers [1] 57:5
superfluity [1] 46:5
superfluous [1] 46:1
supervise [1] 85:6
supervision [2] 76:19 81:
14
support [2] 19:19 80:9
supported [2] 83:6 135:12
Suppose [2] 16:15 142:16
supposed [3] 90:18,19
119:22
suppress [1] 16:3

SUPREME [3] 1:1,14 118:
4
Sure-Tan [1] 14:11
surely [1] 91:15
surge [2] 87:21,22
surprised [1] 117:18
surprising [2] 91:1 96:11
surrender [2] 91:18,22
Sutton [3] 15:13 57:16 93:
3
swallow [1] 113:1
swallowing [1] 111:9
sweeping [3] 3:18 49:8,16
symmetry [1] 66:19
synonymous [1] 115:4
synonyms [2] 115:2,5
system [10] 64:18 65:23 72:
3 90:21 92:13 96:2 105:5
129:7 143:6 148:21
systems [1] 65:25

T

table [2] 45:10 150:14
talks [4] 64:16 70:24 97:25
111:24
task [1] 21:13
Tatel [1] 54:19
tax [1] 89:14
taxing [4] 3:23 16:1 149:9,
18
teeth [1] 92:21
tells [3] 29:11 110:21,22
temporary [1] 76:5
tender [1] 39:10
term [11] 4:10 6:11 7:13 45:
1 46:2,8 48:19 71:8 81:5
101:10 115:21
terms [11] 6:22 63:3 76:3
85:23 87:25 95:25 99:24
105:13 115:1 129:4 143:
24
testimony [1] 86:11
TEXAS [27] 1:6,22 3:5 7:11
16:6 55:25 77:4,19 80:15
83:15 84:11 85:3,13 86:1,
5,12 87:24 88:3,21 90:6,9
91:1,4,17,19 94:4 106:9
Texas's [7] 42:24 46:15 79:
25 81:18 83:19 85:2,24
text [18] 36:17 37:4 38:10
45:22 48:6 49:11 50:3 54:
15 55:9 56:17 59:25 66:17
74:1 99:15 124:11 145:19,
24 146:24
textual [2] 117:12 139:10
Thanks [1] 140:22
themselves [1] 71:3
then-existing [1] 108:10
theoretically [1] 100:3
theories [3] 8:12 9:10 12:
18
theory [12] 3:23 15:19 47:4
69:15 72:13 90:5 99:16
102:6 106:11 108:22 136:

Official - Subject to Final Review

15,23

**there'd** [1] 112:25

**There's** [2] 12:7 26:25 35: 4 46:6 53:18,25 54:1 64: 15 66:19 67:14 70:5 79:1 87:21 88:9,25 90:16 92:18 97:17 100:1 104:14 116: 16 118:6 121:15 129:1 132:22 135:5 143:20

**thereby** [1] 10:10

**therefore** [4] 29:22 30:4 33:17 81:22

**They'll** [3] 58:12 89:14,15

**they've** [2] 102:2 129:10 143:16

**thinking** [2] 140:19 142:6

**thinkingly** [1] 109:18

**thinks** [3] 48:10 93:17 112: 13

**third** [1] 7:9

**THOMAS** [6] 5:7,17 6:3 38: 15 75:17,24

**though** [8] 33:20 35:7 36: 19 44:25 67:21 70:8 90:3 101:21

**thoughtful** [1] 110:7

**thoughtfully** [1] 109:18

**thoughts** [1] 44:15

**Thousands** [1] 37:21

**thread** [1] 127:10

**threats** [3] 3:15 84:16 148: 18

**three** [10] 55:2,21 119:8,13, 13,18 123:9 124:9 125:11 144:1

**threshold** [1] 44:22

**throughout** [3] 28:16 53: 19 58:8

**throwing** [1] 8:23

**thrown** [1] 9:4

**thrust** [1] 117:25

**tie** [1] 101:3

**tied** [1] 62:15

**tight** [1] 96:23

**Title** [2] 20:10,11

**today** [5] 51:3 98:11 109:9 122:2 125:18

**together** [3] 98:2 111:19 134:19

**tolerable** [1] 144:4

**took** [4] 14:11 19:15 79:24 118:17

**tool** [2] 123:11,11

**tools** [3] 50:23 51:1,13

**top** [1] 46:14

**toss** [1] 55:21

**totality** [2] 121:24 122:19

**totality-of-the-circumst ances** [1] 29:14

**totally** [2] 34:15 143:23

**touch** [1] 42:8

**toughened** [1] 51:8

**Town** [1] 23:14

**tracking** [1] 35:5

**tracks** [2] 92:16 94:9

**tradition** [4] 4:2 97:18,22 149:20

**traditional** [7] 37:9 58:13 60:24 74:17 76:4 113:10, 22

**trafficking** [1] 94:21

**training** [1] 124:11

**transformed** [1] 4:4

**transgress** [2] 25:2,7

**transition** [1] 97:2

**transposed** [1] 36:24

**treat** [8] 22:15 30:2 61:8 82: 5,6 88:10 121:14 129:23

**treating** [1] 52:11

**treats** [1] 74:20

**trees** [1] 145:3

**trial** [8] 73:24 80:6 85:11 86:11 87:8 93:16 94:5,7

**tries** [1] 47:2

**troubling** [2] 141:24 142:1

**true** [4] 32:20 68:22 114:5, 8

**truly** [4] 23:15 45:4 49:8 147:25

**trumps** [2] 27:8,9

**try** [5] 22:11 65:6,20 85:6 135:25

**trying** [12] 18:4,11 21:11 56:22 60:16 61:21,24 65: 12 96:13 124:14 134:6 144:13

**Tuesday** [1] 1:11

**turn** [1] 109:18

**turning** [1] 22:8

**twist** [1] 91:13

**two** [32] 5:12 9:21 17:25 19: 11 23:7 43:6 52:8 76:4 78: 13 79:14 85:8 87:2 88:9, 20 90:1,24 92:18 96:18 97: 3,8 98:2,8 100:5 101:23 102:1 104:12 106:2,17 112:5 113:13 121:9 142: 18

**two-year** [1] 98:10

**types** [1] 59:19

**typically** [4] 88:10 98:17 113:17 137:1

---

## U

**U.S.C** [1] 110:11

**ultimately** [3] 7:21,24 146: 6

**unacceptably** [2] 85:12,17

**unattended** [1] 87:22

**unaware** [1] 126:18

**unbridled** [1] 145:9

**uncertain** [1] 23:17

**unchanged** [1] 20:1

**unconstitutional** [6] 24:3, 11,20 25:12,14,17

**under** [7] 7:1 8:5,23 9:4 10:24 11:13 13:5 15:15 20: 9,11 22:14 24:13 27:3,21

**28:5 34:25 35:25 36:6,24 37:**10,18 43:4,5 49:5 50: 17 57:15,18 60:19,25,25 63:2,23 66:25 67:9,20 71: 11,14 72:14 73:5,13 75:11, 23 76:18 79:6 81:14,14,18 88:20 89:1 95:19 96:1,2 97:12 99:18 102:9 104:11 106:1,11,12,13,14,18 111: 5 113:4 128:8 130:19 131: 1,18 132:24 136:23 139:14 143:6 145:10,13 148:7,15 150:6

**undermined** [1] 83:1

**underneath** [1] 115:14

**understand** [6] 10:13 12: 17 28:22 53:11 63:8,13,14 66:18 67:24 72:7 102:6 121:1,3 127:16 133:18 138:13

**understanding** [1] 118:16

**understands** [1] 131:23

**understood** [6] 17:24 28: 25 31:5 43:23 44:6 55:11 117:20 124:1 129:17 132: 15

**underused** [2] 102:2 135: 4

**undocumented** [1] 107: 12

**union** [2] 91:18,19

**unite** [1] 56:1

**UNITED** [31] 1:1,3,15 3:4 4: 2 9:19 51:5,14 77:5,11,14 90:5 98:3 108:17 118:4 119:1 120:8 126:3,13 129: 2 130:20 146:1,11

**universal** [4] 4:25 46:22 57:14 150:22

**universe** [1] 108:7

**unlawful** [8] 63:4 74:19 75: 14 79:6 110:23 111:11 139:5 145:7

**unlawfully** [1] 82:4

**unmanageable** [1] 34:15

**unnoticed** [1] 108:3

**unpack** [1] 24:18

**unprecedented** [4] 49:8, 24 56:3 61:2

**unquestionably** [2] 117: 10 139:7

**unreasonably** [1] 139:8

**unthinkingly** [1] 109:17

**until** [7] 96:4 100:19 127: 14 128:2 142:17 145:17 146:13

**unusual** [3] 54:4,5,9

**unyielding** [2] 4:8 28:19

**up** [14] 5:23 10:24 22:5 55: 5,17 58:22 61:7 65:6 97: 15 101:3 123:10 137:9 139:3,12

**upheld** [1] 37:18

**uses** [6] 32:18 46:8,11 48:8,

**19** 132:19

**using** [2] 110:10 135:7

**usual** [5] 91:9,10,13,14 101: 10

---

## V

**vacate** [5] 35:23 48:5,15 49:1 75:13

**vacating** [3] 3:18 37:18 78: 7 110:25 115:24 119:8

**vacatur** [46] 4:25 5:5 6:6, 20 35:17 36:5 37:1 44:20 46:22 57:14,18 58:23 59:2, 12 60:2,13 61:10 62:19,25 66:9 74:2 75:8,22,22,25 76:2,12 77:1,9 78:13,14,25 79:25 81:3 108:2,8 114:9 115:23 118:24 135:19 139: 5,14,20 140:18 147:9,16

**vacatur/declaratory** [1] 79:17

**valid** [6] 67:4,6,11 68:23 115:17 143:24

**validity** [1] 72:2

**varied** [1] 65:13

**variety** [1] 96:20

**various** [3] 25:18 39:11 61: 20

**velocity** [1] 95:25

**venue** [2] 111:25 116:18

**versions** [1] 150:6

**versus** [17] 3:5 12:13 13: 23 14:15 15:15 42:12 51: 24 57:5,16 74:11 83:25 91: 17,21 92:22 93:6 99:1 108: 17

**vet** [1] 151:8

**vice** [1] 88:21

**view** [13] 12:6 36:3 42:24 71:25 75:25 78:6,9 80:19 89:1 127:22 128:12 137: 25 142:10

**views** [2] 71:19 78:4

**vindicate** [2] 11:10 91:21

**violate** [2] 24:16 74:8

**violated** [2] 98:7 100:2

**violates** [1] 99:11

**violation** [3] 23:12 107:4 136:12

**voice** [1] 146:18

**void** [5] 48:15 67:22 68:3 69:5 78:19

**voided** [1] 147:18

**voluntary** [1] 83:14

**voters** [1] 50:23

---

## W

**wanted** [2] 51:7 64:14

**war** [3] 136:11,13,22

**warranted** [1] 53:15

**Washington** [2] 1:10,20

**watch** [1] 105:8

**way** [27] 5:21 8:9 22:6 25:1 31:4 36:21 47:7 62:6 66:

**22** 72:12,16 76:14 79:13 80:14 81:6,9 83:23 89:1 95:24 98:22 127:3 128:4 129:20 130:22 144:18,19 148:20

**ways** [3] 5:12 65:14 101:17

**week** [1] 16:17

**weight** [1] 140:1

**welcome** [3] 5:6 22:25 75: 16

**whatever** [4] 37:17 106:13 123:22 130:5

**whatnot** [1] 142:9

**whatsoever** [4] 78:20,21 79:16 87:7

**Whereupon** [1] 151:18

**whether** [55] 9:25 14:23 15: 5 18:8,23 20:25 21:1 24: 20 26:2,12 27:14,20 30:16 35:4,4 40:8 41:6,22,23 45: 2,4 60:25 61:21 62:13 64: 11,20 72:9 75:20 81:9 84: 12 85:11,16 88:11 96:4 100:11,20 102:12 110:21 118:18 119:24 121:1 132: 12 128:1 140:13 142:9,24 143:8,17 145:25 146:16

**who's** [6] 32:18 44:3 68:4 76:17 98:7 114:3

**whole** [8] 35:24 46:17 56:8 81:18 86:24 110:20 113:1 139:4

**whom** [1] 29:15

**whomever** [2] 69:7 148:9

**will** [17] 15:2,24 16:25 17:1 40:14 80:1,13,19 81:9,21 85:4 88:3 90:13,14 93:5,5, 5,6 97:6 101:4,5,9,15 134: 6 142:24 146:18 149:16

**Williams** [1] 54:19

**win** [2] 135:22 150:15

**withdraw** [1] 104:10

**withheld** [1] 139:9

**within** [6] 72:17 74:9 94:4 120:6 123:21 140:14

**without** [8] 32:4,6 40:16 80:2,12,16,18 111:3

**witness** [1] 31:17

**wondered** [2] 18:23 42:25

**word** [6] 4:11 13:15 32:19 45:24 114:12 132:3

**words** [12] 24:1,11 31:24 77:5 83:18 111:11 112:9 113:11 114:21 116:9 127: 20 128:12

**work** [6] 18:12 45:24 79:18 95:24,24 108:18

**world** [4] 89:18 113:24 117: 12 135:6

**worried** [1] 143:14

**worth** [6] 89:8,19,25 91:11 149:22 150:3

**Wow** [1] 36:9

**writ** [1] **37**:2
**writing** [1] **79**:13
**writs** [1] **60**:7
**written** [3] **73**:1,2 **134**:25
**Wynn** [1] **15**:15

## Y

**year** [5] **19**:13 **20**:5,6 **37**:17
**142**:8
**years** [11] **4**:1,13 **9**:21 **54**:
22,23 **55**:4 **97**:3,8 **119**:7
**120**:13 **138**:19

## Z

**Zadvydas** [2] **106**:3 **107**:2
**zenith** [2] **90**:18,20
**zero** [1] **87**:6
**Zivotofsky** [1] **137**:11

Exhibit 5

**Federal Register Comment on NPRM 86 FR 53736**
**Deferred Action for Childhood Arrivals**

**Ike Brannon, Ph.D.**
**Visiting Fellow**
**Jack Kemp Foundation**

**Kevin McGee, Ph.D.**
**Professor Emeritus**
**University of Wisconsin Oshkosh**

**6 November 2021**

We wish to register our support for the NPRM that would extend the protection afforded by the Deferred Action for Childhood Arrivals rule first published by DHS in 2012 and remanded by the U.S. District Court of the Southern District of Texas.

In October 2021 the Department of Homeland Security issued a notice of proposed rulemaking that would essentially codify President Barack Obama's 2012 executive order which allowed the children of immigrants who arrived in the country illegally to obtain legal status, permitting them to work and attend school.

The original order proved to be highly contentious. President Trump moved to repeal the order in 2018, and opponents filed a lawsuit to stop the repeal. The Supreme Court ruled that the repeal itself was invalid, but indicated that it could be possible for an Administration to legally repeal it in the future. The Trump Administration then attempted to do so but these efforts ended in January 2021.

In July of 2021 Texas Federal District Court Judge Andrew Hanen ruled that DACA must stop taking new entrants, in recognition of a 2018 lawsuit filed by the Attorneys General of Texas and several other states on the basis that the 2012 rule costs them irreparable harm because of the additional costs of providing this cohort health care, education, and law enforcement protection.

It is unclear whether the 2021 rulemaking, if completed, would survive if the 2018 lawsuit is upheld by the Supreme Court, but our research disputes the lawsuit's contention that DACA imposes costs on state or local governments or their residents.

Over the last 4 ½ years we have published a series of research papers analyzing the economic impact of DACA on the U.S. economy. Our body of work finds that its implementation served to increase the education, employment, and wages of DACA recipients while also boosting tax revenue and output. What's more, we not only find no evidence that DACA hurts low-wage American-citizen workers, our analysis suggests that it boosts the wages and employment of this population.

Opponents of DACA have argued that the rule in its current form hurts American-born workers by reducing their employment opportunities. This argument is wrong on two counts. First, it is based on the faulty premise that if DACA were ended, the population of young undocumented immigrants would leave the U.S.  Since nearly all DACA-eligibles have spent most of their lives in the U.S., and many do not even speak the language of their native country, voluntary self-deportation is extremely unlikely. Equally unlikely is the prospect that they would--or could--all be deported to their countries of origin.

The United States is currently facing a worker shortage, and demographic trends suggest that this will likely worsen over the  coming decade. The worker shortage is particularly severe in nursing, teaching, software development, physical and occupational therapy, as well as many similar occupations that require either a college degree or at least some modicum of post-secondary education. Terminating DACA would exacerbate these shortages even if it did not result in massive deportations.

The data also suggest that DACA recipients--and foreign-born legal residents of the U.S. in general--are more amenable to relocating in order to pursue economic opportunities in another community.  Given that geographic mobility for native born Americans has declined since the 1950s, having a cohort with the ability and inclination to locate where jobs are plentiful helps to slow down the increasing geographic stratification of jobs and career opportunities that has occurred in the 21st century.

Another problem with the argument that DACA hurts American-born workers--or taxpayers--is that it completely ignores DACA's impact on educational incentives. An undocumented worker has relatively little incentive to pursue an education: If the only jobs open to that person consist of being a roofer, a prep cook, a waiter, or a home aide, even a high school degree provides little to no advantages. In contrast, granting this cohort legal status opens up thousands of job possibilities. DACA, both by requiring a high school degree (or equivalent) to qualify and by dramatically increasing the usefulness of and access to a post-secondary education, has incentivized millions of young immigrants to expand their jobs skills and increase their productivity.

In our most recent 2021 study we estimate that DACA has increased the high school graduation rate among the potentially DACA-eligible population by about 10.7%, and increased the rates of post-secondary enrollment and college graduation in this cohort by 86%. The current DACA population of roughly 1.3 million young people, ranging in age from 14 to 39, all are either currently enrolled in school or have high school degrees, and a substantial fraction -- around one fourth -- have college degrees. Since 2012, DACA has allowed hundreds of thousands of potential prep cooks to become doctors and nurses, teachers and accountants, machinists and welders, EMTs and firefighters, business owners and chemical engineers.

As a result, DACA has had two substantial impacts on the lives of low-wage American-citizen workers. First, it has reduced the number of immigrant job competitors that they face. A DACA recipient with a nursing degree -- filling a job slot in an occupation with chronic worker shortages -- is no longer competing for an opening as a home health aide. A DACA recipient trained as a machinist -- also filling a job slot with chronic worker shortages -- is no longer driving an Uber. Thus, DACA has reduced the supply of unskilled workers, boosting the employment prospects of those who remain in this category--and their wages as well.

Secondly, DACA has increased the demand for low-wage workers. A DACA recipient employed as a teacher is more likely to dine at a local restaurant that employs lower-wage cooks and waiters. A DACA recipient who is an engineer is more likely to employ a home health aide to look after an aging parent. Economic research strongly supports the view that high-skill and low-skill jobs are complements, not substitutes: having more high-wage workers in a region increases the work opportunities for that region's low-skill workers.

To fully appreciate the impact of DACA it helps to consider what would happen if DACA were to be ended. If we assume that this entire cohort would be deported *en masse* we submit that the economies of Texas and the other states that filed the lawsuit would be worse off: Total economic output would be lower, worker shortages in a vast array of high-wage occupations would increase, demand for the services provided by low-wage workers would decline, and tax revenue would be lower.

If the alternative is that the DACA beneficiaries remain in the U.S. and simply seek employment in the cash economy then the states are also worse off: The wages of low-income workers would fall, employment in skilled positions would decline, and tax revenues would also fall--while the government would still be providing essentially the same services to its population of legal and illegal workers that it does presently. But in this scenario, DACA recipients are contributing far fewer tax dollars to pay for it.

Ending DACA would provide no benefits whatsoever to low-wage American-citizen workers. That should not be surprising; after all, eliminating DACA would, in effect, throw away the large amount of human capital that DACA recipients have amassed over the last decade.

Finally, we would like to suggest that the benefits of DACA should be extended to those who have arrived in the U.S. as children between 2007 and 2017. Providing these young people with the same opportunity to make themselves more productive would contribute both to our nation's economic output and our government's fiscal balances, through the increased tax revenues that greater productivity would generate.

# Exhibit 6

2022 WL 17170955
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Patrick J. COLLINS, et al., Plaintiffs,

v.

Jacob J. LEW, et al., Defendants.

Civil Action No. 4:16-CV-03113
|
Signed November 21, 2022
|
Entered November 22, 2022

**Synopsis**

**Background:** Shareholders in Federal National Mortgage Association (Fannie Mae) and Federal Home Loan Mortgage Corporation (Freddie Mac) brought action against United States Department of Treasury and Federal Housing Finance Agency (FHFA), alleging that actions by FHFA, as companies' conservator under Housing and Economic Recovery Act (HERA), adversely affected value of their shares, seeking declaratory and injunctive relief invalidating transfer of shareholders' economic rights to Treasury and returning all dividend payments made to Treasury, and asserting claims that FHFA Director acted outside scope of statutory authority under HERA, and that FHFA was unconstitutionally structured in violation of separation of powers. The United States District Court for the Southern District of Texas, Nancy F. Atlas, J., 254 F.Supp.3d 841, dismissed shareholders' statutory claims and granted Government's motion for summary judgment on shareholders' claim alleging that FHFA was unconstitutionally structured. Shareholders appealed. The Court of Appeals, 896 F.3d 640, affirmed in part and reversed in part. Rehearing en banc was granted. The Court of Appeals, Willett, Circuit Judge, and Haynes, Circuit Judge, 938 F.3d 553, affirmed in part, reversed in part, and remanded. Certiorari was granted. The Supreme Court, Justice Alito, 141 S.Ct. 1761, affirmed in part, reversed in part, vacated in part, and remanded with directions for lower courts to resolve remaining issue of whether unconstitutional restriction on President's power to remove FHFA Director inflicted compensable harm to shareholders. On remand, shareholders filed amended complaint, and defendants moved to dismiss.

**Holdings:** The District Court, Keith P. Ellison, J., held that:

with respect to their removal restriction claims, shareholders failed to plausibly demonstrate compensable harm;

with respect to their removal restriction claims, even if shareholders had shown cognizable harm, they failed to plausibly demonstrate the District Court's ability to provide the requested relief; and

shareholders' Appropriations Clause claims, as new claims brought for the first time on remand, exceeded the scope of the mandate.

Motions granted; claims dismissed with prejudice.

See also 27 F.4th 1068.

**West Codenotes**

**Recognized as Unconstitutional**

12 U.S.C.A. § 4512(b)(2)

**Attorneys and Law Firms**

David Henry Thompson, Brian W. Barnes, Peter A. Patterson, Cooper & Kirk, PLLC, Washington, DC, Charles Randall Flores, Beck Redden LLP, Houston, TX, for Plaintiffs.

Deepthy Kishore, Thomas David Zimpleman, U.S. Department of Justice - Civil Division, Washington, DC, for Defendant Secretary Jacob J. Lew.

Deepthy Kishore, Thomas David Zimpleman, U.S. Department of Justice - Civil Division, Washington, DC, R. Charlie Merritt, U.S. Dept. of Justice, Richmond, VA, for Defendant Department of the Treasury.

Asim Varma, Howard N. Cayne, Pro Hac Vice, Robert J. Katerberg, Arnold & Porter LLP, Washington, DC, Thad T. Dameris, Arnold & Porter Kaye Scholer LLP, Houston, TX, for Defendant Federal Housing Finance Agency.

Thad T. Dameris, Arnold & Porter Kaye Scholer LLP, Houston, TX, for Defendant Melvin L. Watt.

Asim Varma, Howard N. Cayne, Robert J. Katerberg, Arnold and Porter et al., Washington, DC, Christopher Mohr Odell,

Collins v. Lew, --- F.Supp.3d ---- (2022)
2022 WL 17170955

Arnold & Porter Kaye Scholer LLP, Houston, TX, for Defendant Sandra L. Thompson.

R. Charlie Merritt, U.S. Dept. of Justice, Richmond, VA, for Defendant Janet L. Yellen.

Melvin L. Watt, Pro Se.

## MEMORANDUM AND ORDER

Keith P. Ellison, United States District Judge

*1   Shareholders of the Federal National Mortgage Association and the Federal Home Loan Mortgage Association (Fannie Mae and Freddie Mac, respectively) brought this case against the U.S. Department of the Treasury (Treasury) and the Federal Housing Finance Agency (FHFA). The Supreme Court (1) rejected Plaintiffs' claim that FHFA exceeded its statutory powers by amending its agreement with Treasury to agree to pay certain dividends; (2) held that FHFA's founding statute unconstitutionally restricted removal of FHFA's single director only for cause; and (3) held that actions taken by FHFA, when it was headed by a single director whom the president could remove only for cause, were not void. *Collins v. Yellen*, ––– U.S. ––––, 141 S. Ct. 1761, 210 L.Ed.2d 432 (2021).

The Supreme Court directed lower courts to resolve the remaining issue of whether the unconstitutional removal restriction inflicted compensable harm to shareholders. The Fifth Circuit remanded for a ruling in the first instance.

Now pending before the Court are Defendants' Motions to Dismiss (Docs. 83, 84) Plaintiffs' Amended Complaint (Doc. 80). The Court heard argument on these motions at a November 7, 2022 hearing. After considering the Motions and applicable law, the Court **GRANTS** Defendants' Motions to Dismiss and dismisses Plaintiffs' claims **WITH PREJUDICE.**

## I. BACKGROUND

### A. Factual Background

Fannie Mae and Freddie Mac are government-sponsored enterprises (GSEs) created to provide liquidity to the mortgage market. In the wake of the 2008 financial crisis and housing market collapse, the GSEs experienced overwhelming losses due to increased default rates on residential mortgages. In response, Congress passed the Housing and Economic Recovery Act (HERA) of 2008. Pub. L. No. 110-289, 122 Stat. 2654. HERA created FHFA as an independent federal agency to supervise and regulate the GSEs. 12 U.S.C. § 4501 et seq.

HERA provided for FHFA to be headed by a single director, nominated by the president and confirmed by the Senate, and removable during his five-year term only for cause. 12 U.S.C. § 4512(a), (b)(1), (b)(2). HERA authorized the FHFA director to regulate companies and to appoint FHFA to serve as the GSEs' conservator or receiver. 12 U.S.C. § 4617(a). The statute gave FHFA control over its own funding, granting it the power to collect assessments from the entities it regulates. 12 U.S.C. § 4516(a). Finally, HERA gave Treasury temporary authority to purchase securities from the GSEs. *See* 12 U.S.C. §§ 1455(1), 1719(g).

A transitional director placed the GSEs into conservatorship on September 6, 2008. In two identical Preferred Stock Purchase Agreements (PSPAs), Treasury agreed to provide up to $100 billion in funding to each company in exchange for 79.9% of common stock, 1 million shares of preferred stock with a liquidation preference of $1 billion, quarterly dividends, and a quarterly periodic commitment fee.

Defendants amended the agreement several times to provide additional funding. By 2012, the GSEs had drawn about $187 billion from Treasury's funding commitment. In response to the GSEs' continued challenges, a third amendment (the Third Amendment) was signed in August 2012. The Third Amendment imposed an agreement called a Net Worth Sweep, which required the GSEs to pay Treasury a quarterly dividend based on net profit rather than a set rate.

*2   In 2012, the GSEs started generating profits. For the first time since the beginning of the conservatorship, the GSEs paid more to Treasury than they received. The surplus did not reduce Treasury's liquidation preference or preferred stock holdings. Plaintiffs argue that "the large liquidation preference on Treasury's senior preferred stock, combined with the fact that Treasury's senior preferred stock has priority over all other stock issued by the GSEs, prevented all shareholders in the GSEs other than Treasury from ever receiving a return on their investments." *Id.* ¶ 58. However, the Third Amendment did not alter or amend these liquidation preference rights.

In 2013, President Obama appointed Melvin Watt to lead FHFA. *Id.* ¶¶ 43-45. Director Watt continued his directorship through the first two years of the Trump presidency, leaving him as the "last-remaining Obama-appointed regulator." *Id.* ¶ 46. Throughout his tenure, Director Watt maintained that FHFA should wait for Congress to enact legislation before ending the conservatorship. *Id.* ¶ 47. In December 2017, FHFA (under Director Watt) and Treasury negotiated another amendment to the PSPAs, under which Treasury agreed to permit the GSEs to retain internal capital. In exchange, Treasury received an equivalent increase in its liquidation preference for each GSE. (Doc. 83 at 10-11.)

Director Watt's term ended in January 2019. The Senate confirmed President Trump's nominee, Mark Calabria, in April 2019.

**B. Procedural History**

**1. Initial Litigation and Remand**

Three shareholders holding both common and preferred stock of the GSEs sued Treasury and FHFA alleging that (1) FHFA's Third Amendment exceeded its statutory powers under HERA and the Administrati; and (2) its actions were void because HERA unconstitutionally restricted removal of FHFA's single director only for cause. Judge Atlas dismissed Plaintiffs' claims. Plaintiffs appealed to the Fifth Circuit, then to the Supreme Court, which granted certiorari and issued its opinion in 2021.

In *Collins v. Yellen*, the Supreme Court (1) denied Plaintiffs' claim that FHFA exceeded its statutory powers by entering into an amendment of its agreement with Treasury that required the payment of dividends to the Treasury; (2) held that HERA unconstitutionally restricted removal of FHFA's single director only for cause; and (3) held that actions taken by FHFA, when it was headed by a single Director whom the president could remove only for cause, were not void. — U.S. ——, 141 S. Ct. 1761, 210 L.Ed.2d 432 (2021). The Supreme Court determined that (a) the Third Amendment was not constitutionally infirm at its inception; (b) the Senate-confirmed FHFA Directors who implemented the Third Amendment were properly appointed; and (c) the removal defect did not render "any of the actions taken by the FHFA in relation to the third amendment [ ] void." *Id.* at 1783-87.

The Supreme Court clarified that its holdings did "not necessarily mean ... that the shareholders have no entitlement to retrospective relief." *Id.* at 1788. "[T]he possibility that the unconstitutional restriction on a President's power to remove a Director of the FHFA could have [inflicted compensable harm] cannot be ruled out." *Id.* at 1789. The Court went on to sketch possible causes and consequences of such harm:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

> **\*3** In the present case, the situation is less clear-cut, but the shareholders nevertheless claim that the unconstitutional removal provision inflicted harm. Were it not for that provision, they suggest, the President might have replaced one of the confirmed Directors who supervised the implementation of the third amendment, or a confirmed Director might have altered his behavior in a way that would have benefited the shareholders.

> The federal parties dispute the possibility that the unconstitutional removal restriction caused any such harm. They argue that, irrespective of the President's power to remove the FHFA Director, he "retained the power to supervise the [Third] Amendment's adoption ... because FHFA's counterpart to the Amendment was Treasury—an executive department led by a Secretary subject to removal at will by the President." The parties' arguments should be resolved in the first instance by the lower courts.

*Id.* (internal citation omitted).

Three concurrences, reflecting the opinions of five justices, suggested that Plaintiffs would struggle to establish cognizable harm on remand. *See id.* at 1795 (Thomas, J., concurring) ("I seriously doubt that the shareholders can demonstrate that any relevant action by an FHFA Director violated the Constitution. And, absent an unlawful act, the shareholders are not entitled to a remedy."); *id.* at 1799 (Gorsuch, J., concurring in part) (labeling the remand a "speculative enterprise" that would "intrude on often-privileged executive deliberations"); *id.* at 1802 (Kagan, J., concurring in part) (stating remand proceedings "may be brief indeed" because the Fifth Circuit has already found that "the

Collins v. Lew, --- F.Supp.3d ---- (2022)

2022 WL 17170955

President, acting through the Secretary of the Treasury," had "oversight" of FHFA's actions).

The Fifth Circuit, sitting en banc, held oral arguments on the issue of retrospective relief earlier this year. The Court reiterated that the Third Amendment "bore no constitutional infirmity in its inception" and that the "constitutional removal defect ... did not render any of the actions taken by the FHFA in relation to the third amendment [ ] void," but declined to rule and remanded to the district court. *Collins v. Yellen*, 27 F.4th 1068 (5th Cir. 2022). Five judges dissented, stating the circuit should resolve this case based on its previous conclusion that "the President, acting through the Secretary of the Treasury, could have stopped [the Net Worth Sweep] but did not." *Id.* at 1072 (citing *Collins v. Mnuchin*, 938 F.3d 553, 594 (5th Cir. 2019) (en banc)).

**2. Amended Complaint**

Plaintiffs filed an Amended Complaint (Doc. 80) with this Court. The Complaint seeks relief under the APA and the Constitution. Plaintiffs allege that the Trump Administration would have ended the Third Amendment but for the unconstitutional constraints on presidential removal. Plaintiffs seek relief on six separate counts. These counts can broadly be split into two categories: (1) removal authority claims (Counts I, III, V, VI), and (2) Appropriations Clause claims (Counts II, IV).

With respect to the removal authority claims, Plaintiffs request various forms of relief. First, Plaintiffs ask the Court to declare that FHFA's structures violate the separation of powers doctrine and declare void the provisions of HERA that insulate FHFA's director from oversight. Second, Plaintiffs ask the court to enter an injunction restoring Plaintiffs to the position they would have been in if not for the removal restriction, including by directing Defendants to eliminate the liquidation preference and by providing credits to Plaintiffs. Finally, Plaintiffs ask the Court to enter an order setting aside agency action maintaining Treasury's liquidation preference or compelling agency action to liquidate the preference. With respect to the Appropriations Clause claims, Plaintiffs ask the Court to declare FHFA's structures violate the separation of powers doctrine and declare void the provisions of HERA that fund FHFA permanently by assessments on regulated entities; vacate and set aside the Third Amendment or the PSPAs in their entirety; and enjoin FHFA and Treasury from implementing action under the Third Amendment. Finally,

Plaintiffs ask for reasonable costs and any other relief the Court deems proper.

**II. SCOPE OF REVIEW**

**\*4** The Fifth Circuit's "mandate rule requires a district court on remand to effect our mandate and do nothing else." *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007) (internal quotations omitted). Following remand, district courts need not and do not ordinarily entertain claims "not within the scope of the remand." *Id.* at 453. The mandate rule bars not only "litigation of issues decided by the district court but foregone on appeal," but also issues "otherwise waived, for example because they were not raised in the district court" before the appeal. *United States v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004). However, exceptions to the rule exist where "(1) the evidence at a subsequent trial is substantially different; (2) there has been an intervening change of law by a controlling authority; (3) the earlier decision is clearly erroneous and would work a manifest injustice." *Ball v. LeBlanc*, 881 F.3d 346, 351 (5th Cir. 2018) (citing *United States v. McCrimmon*, 443 F.3d 454, 460 (5th Cir. 2006)).

**III. DEFENDANTS' MOTIONS TO DISMISS**

**A. Removal Authority**

Defendants first seek to dismiss Plaintiffs' removal restriction claims, including Counts I, III, V, and VI of the Amended Complaint. The Supreme Court and Fifth Circuit provided clear instructions regarding this Court's scope of inquiry. The Supreme Court directed lower courts to determine whether "retrospective relief" is available based on "compensable harm" caused by Director Watt's "implementation of the third amendment." 141 S. Ct. at 1788-89; *see also Collins*, 27 F.4th at 1069 (directing the district court to determine whether "the unconstitutional restriction on a President's power to remove a Director of the FHFA could have [inflicted harm]"). Plaintiffs fail to plausibly demonstrate compensable harm or the Court's ability to provide the requested relief.

**1. Compensable Harm**

In *Community Financial Services Association of America v. Consumer Financial Protection Bureau*, the Fifth Circuit read the *Collins* directive to require a party challenging the agency action due to an unconstitutional removal scheme to establish

"a nexus between the desire to remove and the challenged actions taken by the insulated actor." 51 F.4th 616, 632 (5th Cir. 2022). "Without this showing, the Plaintiffs could put themselves in a better place than otherwise warranted." *Id.* Several other circuits have similarly required findings of specific agency action causing the alleged harm. *See Calcutt v. FDIC*, 37 F.4th 293, 315 (6th Cir. 2022) (citing *Collins* for the proposition that "a petitioner would have to establish that an unconstitutional removal protection specifically caused an agency action in order to be entitled to judicial invalidation of that action"); *Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022) (explaining that "[a] party challenging an agency's past actions must ... show how the unconstitutional removal provision actually harmed the party"); *Bhatti v. Fed. Housing Fin. Agency*, 15 F.4th 848, 854 (8th Cir. 2021) (identifying issue under *Collins* as whether unconstitutional removal restriction "caused compensable harm").

Plaintiffs allege that, had President Trump been able to nominate his preferred director in January 2017, FHFA and Treasury would have ended the conservatorship and liquidated Treasury's shares by the end of the Administration. While Plaintiffs' evidence may plausibly suggest that the Trump Administration hoped to end the conservatorship, Plaintiffs do not demonstrate that the Administration had a concrete plan in place, that this plan necessarily involved liquidating Treasury's preferred stock, or that the Administration would have completed these actions within four years.

First, Plaintiffs fail plausibly to allege that the administration had a concrete plan to end the conservatorship, or that that plan necessarily involved liquidating Treasury's preferred stocks. Plaintiffs provide a range of policy statements. The only official policy statement is a March 2019 directive from President Trump instructing FHFA and Treasury to develop proposals for "[e]nding the conservatorships". *See* Federal Housing Finance Reform, 84 Fed. Reg. 12,479, 12,479-80 (Mar. 27, 2019). (Doc. 80 ¶ 53(f).) The proposal does not specifically focus on reducing Treasury's priority stock holdings. It does, however, emphasize the importance of protecting Treasury's economic interests in the GSEs.

**\*5** Plaintiffs' other proffered policy documents demonstrate that the Administration lacked a clear path for ending the conservatorship at least through September 2019—half a year after Director Watt's term ended, and two-and-a-half years into President Trump's term in office. For instance, a 2018 Executive Office report outlined

proposals to end the conservatorship and "transition[ ] Fannie Mae and Freddie Mac to fully private entities." *See* Executive Office of the President of the United States, *Delivering Government Solutions in the 21st Century: Reform Plan and Reorganization Recommendations* 75 (June 21, 2018), https://bit.ly/3rKXAbl. (Doc. 80 ¶ 53(e).) Likewise, a September 2019 Treasury report states that GSEs "should be recapitalized" and taken out of conservatorship "as promptly as practicable," but only amongst a list of other policy options. *Housing Reform Plan: Pursuant to the Presidential Memorandum Issued March 27, 2019* 26-28 (Sept. 5, 2019), https://bit.ly/2Uyvzre. (Doc. 80 ¶ 53(h).)

Further, Plaintiffs offer statements by Director Calabria and Secretary Mnuchin and a November 2021 letter from former President Trump to Senator Paul. These sources do not specifically outline a plan for ending the conservatorship. (Docs. 80 ¶¶ 53(a)-(d), (g), 60(b), (c); 80-1.) President Trump's post hoc letter—written after the *Collins* decision was released—should not be given significant weight. At no point during Director Watt's tenure did President Trump criticize or attempt to remove Director Watt. (Doc. 85 at 12.) "Considering only contemporaneous explanations for agency action [ ] instills confidence that the reasons given are not simply convenient litigating position[s]. Permitting agencies to invoke belated justifications ... can upset the orderly functioning of the process of review." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, ––– U.S. ––––, 140 S. Ct. 1891, 1909, 207 L.Ed.2d 353 (2020); *see also Am. Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 925 (D.C. Cir. 2017) ("[A]fter-the-fact claims about agency intentions do not work when agency actions evince the opposite."); *Indep. Living Res. v. Or. Arena Corp.*, 982 F. Supp. 698, 737 (D. Or. 1997) (stating "agencies do not formulate policy ... through post-hoc affidavits from former agency officials, on behalf of a private litigant, expressing the affiant's personal view" on agency policy).

Second, Plaintiffs do not effectively plead that the Administration would have been able to take the GSEs out of the conservatorship within four years, even if they had a clear plan to do so. Plaintiffs point to no specific action by Director Watt to obstruct the policy goals of the Trump Administration. Nor do they clarify how a Trump-appointed director's actions might have differed from Director Watt's actions. Under both Directors Watt and Calabria, FHFA took similar steps to enable the GSEs to retain capital while simultaneously amending the PSPAs to *increase* Treasury's liquidation preferences. (Doc. 80 ¶¶ 80, 83; Doc. 83 at 10;

Doc. 85 at 12-13.) Plaintiffs contend that this increase would allow Treasury to receive more common stock if it chose to convert its senior partner shares. (Doc. 80 ¶ 85.) These steps may indicate a desire to move towards an end of the conservatorship—Plaintiffs themselves state that the GSEs were not in a condition in which FHFA could have responsibly released them from their conservatorship at the end of 2016, and that affirmative steps were needed to prepare the GSEs. (Doc. 80 ¶ 54.) However, the actions do not indicate by more than mere speculation that an administration with four years to effectuate its policy preferences would have successfully taken different actions faster or otherwise reversed course to sell or eliminate these stocks.

**2. Retrospective Relief**

As Plaintiffs have failed to plead that they were harmed by the removal restrictions, they are unable to make a claim for relief. *CFSA v. CFTC*, 51 F.4th 616, 632 (5th Cir. 2022) ("Without [a] showing [of actual harm], the Plaintiffs could put themselves in a better place than otherwise warranted."). However, even had Plaintiffs demonstrated cognizable harm, their claims for relief far surpass this Court's mandate for retrospective relief.

**\*6** *Collins* is, at its core, a separation-of-powers decision. *See Collins v. Yellen*, ––– U.S. ––––, 141 S. Ct. 1761, 1784, 210 L.Ed.2d 432 (2021) ("The removal power helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to ensure that these subordinates serve the people effectively and in accordance with the policies that the people presumably elected the President to promote."). "[T]he separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996). Plaintiffs ask for injunctive and declaratory relief eliminating the liquidation preferences. This would require the Court to exercise sweeping administrative duties based on the unachieved policy preference of a prior administration, impeding the current administration's own ability to effectuate its policy preferences through the appointment of a new FHFA director.

In summary, the Court concludes that Plaintiffs' evidence of harm is contradictory and largely non-cognizable. Further, Plaintiffs' claims for relief are incongruous with the Supreme Court's remand. For these reasons, the Court grants

Defendants' Motions to Dismiss with respect to Plaintiff's removal claims.

**B. Appropriations Clause Claims**

In Counts II and IV, Plaintiffs seek to vacate the Third Amendment based on the theory that FHFA's self-funding structure violates the Appropriations Clause[1] and, therefore, FHFA lacks constitutional authority to act. Plaintiffs first introduced these claims in their Amended Complaint.

Before considering the merits of Plaintiffs' argument, this Court must consider whether Plaintiffs properly bring their claims at this point in the litigation. The mandate rule bars the litigation of issues that were previously "waived ... because they were not raised in the district court." *United States v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004). This rule "operates to create efficiency, finality and obedience within the judicial system." *Litman v. Massachusetts Mut. Life Ins. Co.*, 825 F.2d 1506, 1511 (11th Cir. 1987).

Plaintiffs argue that the Appropriations Clause claims fall into an exception to the mandate rule due to "an intervening change of law by a controlling authority." (Doc. 86 at 24 (quoting *United States v. McCrimmon*, 443 F.3d 454, 460 (5th Cir. 2006)). Plaintiffs theorized that the Supreme Court's removal authority ruling makes FHFA's appropriations scheme more suspect. This argument fails. The mandate rule exception imagines an *intervening* change in authority. Here, the allegedly changed law came from the very decision that prescribed this Court's remand mandate.[2] Allowing parties to introduce new issues on remand because a higher court has decided the initial issue in that same decision would frustrate the very purpose of the mandate rule.

Plaintiffs first brought this case in 2016. The Supreme Court resolved the main issues and remanded for further proceedings on a narrow question. The time for raising new issues has passed. The Court finds that Plaintiffs' Appropriations Clause claims exceed the scope of its mandate. Having found cause to dismiss on procedural grounds, the Court does not reach the merits.

**IV. CONCLUSION**

**\*7** The Supreme Court provided Plaintiffs with an opportunity to allege that they were concretely harmed by the unconstitutional provisions restricting President Trump's

2022 WL 17170955

ability to appoint a new FHFA director in the first two years of his administration. Plaintiffs' Amended Complaint fails to plead that any harm was more than speculative. Their new Appropriations Clause claims exceed the scope of the remand. For these reasons, Defendants' Motions to Dismiss are **GRANTED,** and Plaintiffs' claims are **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2022 WL 17170955

Footnotes

1   "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law ...." U.S. Const. Art. I, § 9, Cl. 7.

2   The Court also notes that, "absent exceptional circumstances, the mandate ... forecloses relitigation of issues expressly or impliedly decided by the appellate court." *Fuhrman v. Dretke,* 442 F.3d 893, 897 (5th Cir. 2006) (internal quotations omitted). While the *Collins* Court did not consider an Appropriations Clause question, it found that the Third Amendment "bore no constitutional infirmity in its inception." *See Collins v. Yellen,* 27 F.4th 1068, 1069 (5th Cir. 2022). Plaintiffs' arguments would void all actions FHFA has taken since it began its work in 2008.

---

End of Document
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.,* | § | |
| | § | |
| Defendant-Intervenors. | § | |

## <u>DECLARATION OF KARLA QUETZALLI PEREZ RAMIREZ</u>

My name is Karla Quetzalli Perez Ramirez.  I am over the age of 18 and fully competent to make this declaration.

1.  I am 30 years old and I live in Houston, Texas.

2.  I grew up in Houston, Texas and graduated from Pasadena Memorial High School in Pasadena, Texas.

3.  I graduated magna cum laude from the University of Houston in 2015, where I received a Bachelor's degree in Business Administration in Marketing and a minor in Mexican American Studies.  I graduated from University of Houston Law Center in 2018 and was admitted to the Texas Bar that same year.

4.  I currently work as a Senior Staff Attorney at the Tahirih Justice Center, a private non-profit organization.  In my job I provide immigration representation to women and children fleeing gender-based violence.

5.      I was a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA) from 2012 to 2019.

6.      DACA provided me with the stability I needed to accomplish my personal and professional goals. In 2012 when DHS published the DACA memorandum, I was a college student with hopes of becoming a lawyer.  However, because I was undocumented, I was uncertain about whether I would be able to get an education, go to law school or practice law.

7.      DACA meant I could follow through on my dreams and complete my undergraduate and law school degrees and take the bar exam. With work authorization, I was able to work part-time and help pay my educational expenses.  DACA also enabled me to work in internships related to being an immigration lawyer, and ultimately to become a licensed attorney and work after law school. Without DACA, I would not have been able to be employed and pursue my career.

8.      In 2017, I married my high school sweetheart.  My husband and I have always had really big plans and my having DACA allowed us to save up money and to mature before we got married. DACA allowed me to finish school and not feel pressure to be married so that I would have immigration status. DACA kept me safe from removal as I became an adult.  DACA also took a lot of the burden off my husband from worrying about my ability to drive, to get a law license, to work and to get health insurance. DACA allowed us to focus on graduating from school, and allowed us to take our time and do things intentionally for our marriage.  In January 2021 we joyfully welcomed the birth of our son Diego.

9.     After I married and my husband submitted a family-based immigration petition for me, DACA allowed me to keep working, save for our family and continue to move forward in my life. We filed the immigration petition in September 2017 and I did not receive my green card until February 2019. Without DACA, I would have been in a standstill throughout this process.  Instead, during this time, DACA enabled me to complete law school, take the bar exam and begin my legal career.

10.    I became a citizen in the summer of 2022.  Today, I am a taxpayer and a homeowner, and I am employed and have a Roth Individual Retirement Account. DACA was the catalyst that allowed me to become more involved in my community, and to advocate for others. DACA affirmed my interest in becoming a public interest attorney. My work helping vulnerable populations would have been impossible without DACA.

11.    Having DACA allowed me to not have to rely on anyone else. It bolstered my sense of agency. As an attorney for women and children fleeing violence, agency is so important for relationship dynamics because an individual is especially vulnerable when having to depend on a significant other or a spouse. If your partner is abusive then that dependency can become a very dangerous situation. That wasn't the case for me, but if it had been, DACA would have allowed me to hold my own.

12.    If DACA were to end, I worry that DACA recipients in domestic violence situations will be left unprotected, without the ability to work and at a greater risk of violence.  I have several immigration clients with pending Violence Against Women Act (VAWA) self-petitions. They must wait for these self-petitions to be processed before they can live with independence.  Clients with DACA grants are

more quickly able to leave abusive relationships and access resources when compared to clients that do not have immigration status or protection from deportation. The process for a VAWA self-petition takes roughly three years plus a year and a half long process to adjust to lawful permanent status. For immigrants without DACA, the inability to support themselves acts as a substantial barrier to leaving violent relationships.

13. DACA gave me the ability to thrive and to start my life as a young adult, to continue my studies and start a professional career as an attorney. Even being able to decide when I wanted to become a parent would have been very different without the stability DACA allowed me.  My child and his future is more stable because I was able to start motherhood on the right foot.

14. As a mother now, I recognize more acutely just how many people rely on DACA, especially the children of DACA recipients. I worry how the end of DACA will not just harm DACA recipients. DACA has existed for over ten years and in that time people have been able to start their lives and start the families that they have wanted. Ending DACA will pull the rug out from under not only DACA recipients, but their families and their communities.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this ___1st___ day of March, 2023 in ___Houston, Texas___.

_____
Signature

_____
Karla Perez

Printed Name

5

Exhibit 8

2021 WL 3022433
Only the Westlaw citation is currently available.
United States District Court, S.D.
Texas, Brownsville Division.

State of TEXAS, et al., Plaintiffs,

v.

The UNITED STATES of
America, et al., Defendants,

and

Karla Perez, et al.; State of New
Jersey, Defendant-Intervenors.

Civil Action No. 1:18-CV-00068
|
Signed 07/16/2021

**Attorneys and Law Firms**

William Thomas Thompson, Adam Arthur Biggs, Cristina
Maria Moreno, Eric Alan Hudson, Philip Trent Peroyea,
Ryan L. Bangert, Michael Christopher Toth, Office of the
Attorney General, Todd Lawrence Disher, Lehotsky Keller
LLP, Austin, TX, for Plaintiffs State of Texas, State of
Alabama, State of Arkansas, State of Louisiana, State of
Nebraska, State of South Carolina, State of West Virginia,
State of Kansas.

Adam Arthur Biggs, Cristina Maria Moreno, Philip Trent
Peroyea, Office of the Attorney General, Todd Lawrence
Disher, Lehotsky Keller LLP, Austin, TX, for Plaintiff
Governor Paul R. LePage.

William Thomas Thompson, Adam Arthur Biggs, Eric Alan
Hudson, Philip Trent Peroyea, Office of the Attorney General,
Todd Lawrence Disher, Lehotsky Keller LLP, Austin, TX, for
Plaintiff State of Mississippi.

Paul R. LePage, Pro Se.

Jeffrey S. Robins, Pro Hac Vice, U.S. Department of Justice
Office of Immigration Litigation, Aaron Steven Goldsmith,
Pro Hac Vice, US Dept. of Justice, James Joseph Walker,
U.S. Dept. of Justice, Civil Division, Washington, DC, Daniel
David Hu, Office of the US Attorneys Office, Houston,
TX, for Defendants United States of America, Kirstjen M.
Nielsen.

Jeffrey S. Robins, Pro Hac Vice, U.S. Department of Justice
Office of Immigration Litigation, Aaron Steven Goldsmith,
Pro Hac Vice, US Dept. of Justice, James Joseph Walker,
U.S. Dept. of Justice, Civil Division, Washington, DC, Daniel
David Hu, Office of the US Attorneys Office, Houston, TX,
John Coghlan, US Dept. of Justice, for Defendants Kevin K.
McAleenan, Thomas D. Homan, L. Francis Cissna.

Jeffrey S. Robins, Pro Hac Vice, U.S. Department of Justice
Office of Immigration Litigation, James Joseph Walker, U.S.
Dept. of Justice, Civil Division, Washington, DC, Daniel
David Hu, Office of the US Attorneys Office, Houston, TX,
John Coghlan, US Dept. of Justice, for Defendant Carla L.
Provost.

John Coghlan, US Dept. of Justice, for Defendants Houston
Hispanic Chamber of Commerce, Texas Association of
Business.

Nina Perales, Ernest I. Herrera, MALDEF, Ramon Andres
Soto, Pro Hac Vice, Mexican American Legal Defense &
Educational Fund, San Antonio, TX, Carlos Moctezuma
Garcia, Garcia & Garcia Attorneys at Law, McAllen, TX,
Denise Hulett, Mexican American Legal Defense & Educ.
Fund, Sacramento, CA, Douglas H. Hallward-Driemeier,
Pro Hac Vice, Ropes & Gray LLP, Washington, DC, for
Defendant-Intervenor Karla Perez.

Nina Perales, Ernest I. Herrera, MALDEF, Ramon Andres
Soto, Pro Hac Vice, Mexican American Legal Defense &
Educational Fund, San Antonio, TX, Carlos Moctezuma
Garcia, Garcia & Garcia Attorneys at Law, McAllen, TX,
Douglas H. Hallward-Driemeier, Pro Hac Vice, Ropes &
Gray LLP, Washington, DC, for Defendant-Intervenors Maria
Rocha, Jose Magana-Salgado, Nanci J. Palacios Godinez,
Elly Marisol Estrada, Karina Ruiz De Diaz, Carlos Aguilar
Gonzalez, Karla Lopez, Darwin Velasquez, Jin Park, Oscar
Alvarez, Nancy Adossi, Denise Romero, Angel Silva, Moses
Kamau Chege, Hyo-Won Jeon, Elizabeth Diaz, Maria Diaz,
Blanca Gonzalez.

Nina Perales, Ernest I. Herrera, MALDEF, San Antonio, TX,
Carlos Moctezuma Garcia, Garcia & Garcia Attorneys at
Law, McAllen, TX, Douglas H. Hallward-Driemeier, Pro Hac
Vice, Ropes & Gray LLP, Washington, DC, for Defendant-
Intervenors Luis A. Rafael, Pratishtha Khanna, Jung Woo
Kim.

Andrew J. Pincus, Pro Hac Vice, Mayer Brown LLP,
Washington, DC, Craig Dashiell, Pro Hac Vice, David Leit,

2021 WL 3022433

Pro Hac Vice, Gavin J. Rooney, Pro Hac Vice, Lowenstein Sandler LLP, Roseland, NJ, Lauren Goldman, Pro Hac Vice, Mayer Brown LLP, New York, NY, for Defendant-Intervenor Proposed Amici New Jersey Businesses.

Houston Hispanic Chamber of Commerce, Pro Se.

Texas Association of Business, Pro Se.

## **ORDER**

Andrew S. Hanen, United States District Judge

**\*1** Before the Court is Defendant-Intervenors'[1] Motion to Strike Plaintiffs' Experts (Doc. No. 390). Plaintiff States[2] have responded (Doc. No. 411), and Defendant-Intervenors have replied. (Doc. No. 415). After careful consideration, the Court hereby **DENIES** Defendant-Intervenors' Motion to Strike.

## **I. Legal Standard**

Under Rule 702, a qualified expert may testify on the basis of "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence," provided the testimony rests on "sufficient facts or data" and "reliable principles and methods," and "the witness has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). An expert may be qualified to testify based on his or her "knowledge, skill, experience, training, or education." *Id.* In short, expert testimony must be both "reliable and relevant." *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal quotations and citations omitted). The reliable prong mandates that the "expert opinion be grounded in the methods and procedures of science and be more than unsupported speculation or subjective belief." *Id.* (cleaned up). The relevance prong requires the proponent to demonstrate that the expert's "reasoning or methodology can be properly applied to the facts in issue." *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999).

A proponent of expert testimony must prove by a preponderance of the evidence that the testimony is reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The Supreme Court has clarified in *Daubert* and *Kumho Tire* that it is the gatekeeping role of district courts to

determine whether an expert's proffered testimony conforms with Rule 702. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). The Court is to "ensure the reliability and relevancy of expert testimony," *Kumho Tire*, 526 U.S. at 152, and is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.* at 157 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

## **II. Analysis**

Broadly speaking, Defendant-Intervenors argue that the expert opinions of Dr. Donald Deere and Dr. Lloyd Potter are unreliable because they are based on flawed assumptions and insufficient data, and are not the product of reliable principles and methodology. They also argue the expert reports are irrelevant. Defendant-Intervenors additionally assert that as a threshold matter, neither Dr. Deere nor Dr. Potter is qualified to offer an opinion about the subject matter at hand. (*See* Doc. No. 390 at 7-8).

### A. Relevancy

The Court finds that the opinions of Dr. Deere and Dr. Potter are relevant to the Court's standing analysis despite Defendant-Intervenors' argument that neither expert can "quantify the harm to Plaintiffs...." (Doc. No. 390 at 8). Defendant-Intervenors argue that Dr. Deere's testimony is not relevant to the injury element of standing because he was unable to offer exact *numerical* estimates regarding the harm. For standing purposes, however, while damage may be a requirement, the exact extent of the damages is not. The Article III injury requirement "is qualitative, not quantitative, in nature." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 357-58 (5th Cir. 1999)). In other words, a plaintiff must show only some, not substantial, injury —a standard Dr. Deere's opinion meets. *Id.*

**\*2** Similarly, Defendant-Intervenors' challenge to the relevancy of Dr. Potter's testimony concerns his failure to state with numerical accuracy how many DACA recipients might leave the country if DACA ends. While this testimony goes to the redressability, not the injury, prong of standing, the law compels the same result. Courts do not resolve factual disputes when determining standing, *Ass'n of Comty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 357 (5th Cir. 1999), and Dr. Potter's opinions raise a genuine dispute of fact in response

to Defendant-Intervenors' Motion for Summary Judgment. (Doc. No. 504). Thus, his testimony is clearly relevant to the standing inquiry.

As this Court has previously found, Article III standing does not necessarily hinge on the damage caused by any specific DACA recipient; instead, it can be based on the damage caused by the entire program. Any deficiency in quantitative analysis by the experts, therefore, does not render their opinions irrelevant to the standing analysis this Court must undertake.

B. Qualifications and Reliability

*1. Dr. Donald Deere*
In his report, Dr. Deere seeks to offer two main opinions, which broadly summarized are: (1) the interaction between the Affordable Care Act (ACA) and DACA results in more workplace competition, lower wages, and less hiring of United States citizens, and (2) immigration puts downward pressure on wages, which makes it more difficult for some United States citizens to find employment.

Dr. Deere is a labor economist with over 30 years of experience in the field. He holds a Ph.D. in economics from the Massachusetts Institute of Technology (MIT) and has taught labor economics, economic principles, and public finance at Texas A&M University, MIT, and the University of California Santa Barbara. He additionally has served as the Associate Director of the George Bush School of Government and Public Service. His research focuses on labor markets and public policy that affects wages and employment, and he has published in numerous peer-reviewed journals. (*See* Doc. No. 411, Ex. A). Despite this, Defendant-Intervenors argue that he is unqualified to offer an opinion about the effect of DACA recipients on the labor market in Texas. (Doc. No. 390 at 9). Given his education, training, and experience, all within the general field of economics, Dr. Deere is qualified to provide the limited opinions related to labor economics contained in his report. *See* Fed. R. Evid. 702; *see also Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), *superseded by statute on other grounds as noted in Mathis v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002) ("As long as some reasonable indication of qualification is adduced, the court may admit the evidence without abdicating its gate-keeping function."). Dr. Deere exceeds this standard by a wide margin.

Defendant-Intervenors argue that Dr. Deere "created a mountain of unsupported assumptions, and concluded from these assumptions that employers, applicants, the ACA, and DACA interact to cause U.S. citizens to suffer from a loss of employment as a result of DACA." (Doc. No. 390 at 13). They also argue that his testimony about downward pressure on wages is based upon unreliable assumptions. (Doc. No. 390 at 16).

In reality, these complaints would be described more accurately as Dr. Deere relied on facts and offered conclusions with which the individual Defendant-Interveners disagree. As the Fifth Circuit has noted: "There are areas of expertise, such as the 'social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies.' " *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (quoting *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1297 (8th Cir. 1997)). Dr. Deere studied data related to the DACA population, reviewed relevant literature, and applied both to the facts at hand using his "knowledge, skill, experience, training, or education" as well as basic concepts of labor economics. Fed. R. Evid. 702. These are the typical tools one in the field of labor economics would use.

**\*3** In addition, Defendant-Intervenors' argument that Dr. Deere failed to interview any human resource representatives or complete qualitative analysis to support his conclusions about the DACA population goes to the weight of the evidence. An attack on data relied upon (or not relied upon) by an expert generally goes to the credibility, not the admissibility, of testimony. *See Primrose Operating Co. v. Nat'l Am. Ins., Co.*, 382 F.3d 546, 562 (5th Cir. 2004) ("[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.") (citing *United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996)).

Further, experts from other parties (and even some amici curiae) have drawn the same conclusions as Dr. Deere, implicitly confirming his conclusions. For example, one of the Defendant-Intervenors' (New Jersey) own experts, Dr. Ike Brannon, agreed that DACA increases competition with legal residents also competing for low skilled jobs. (Doc. No. 289-3 at 141). Similarly, Meg Wiehe and Misha Hill, tax policy experts hired by New Jersey, confirmed that "the work authorizations and deferral from deportation provided by DACA allow recipients to better compete with legally present workers." (Doc. No. 400-1 at 73). As can be seen by a review of the entirety of the record, Dr. Deere's opinions are

not by any means outside the mainstream of labor economics thinking. Moreover, his opinions are supported by a wealth of common sense. Even Defendant-Intervenors' own experts agree with many of his conclusions. To the extent that the movants consider Dr. Deere's analysis and opinions to be flawed, the Supreme Court has held that "[v]igorous cross-examination" is the "appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The Court concludes Dr. Deere's expert opinions are admissible.

### 2. Dr. Lloyd Potter

In Dr. Potter's report, he opines that some DACA recipients may migrate back to their country of origin if they lose their permission to work in the United States. Dr. Potter is the Texas State Demographer. As the state demographer, he is responsible for producing and disseminating population estimates and projections for Texas. (*See* Doc. No. 410, Ex. B). He is also currently a professor in the Department of Demography at the University of Texas at San Antonio, where he serves as the director of the Institute for Demographic and Socioeconomic Research. (Doc. No. 411-2 at 3). He holds a Ph.D. in Demography and Sociology from The University of Texas at Austin, in addition to an M.P.H. in Epidemiology from Emory University and an M.S. in Education from University of Houston Clear Lake. (*See id.*). He has also been a post-doctoral fellow at the Centers for Disease Control and Prevention. Defendant-Intervenors argue that he is not qualified because he lacks the proper research specialization in immigrant populations or emigration patterns of undocumented immigrants to offer an opinion on DACA recipients' likelihood of return to their country of origin. (Doc. No. 390 at 18). Considering Dr. Potter's education, training, and experience—particularly as the Texas State Demographer—Dr. Potter is qualified to opine about the concepts within his field contained in his expert report. *See Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I L.L.C.*, 753 F. App'x 191, 195 (5th Cir. 2018) ("A lack of specialization should generally go to the weight of the evidence rather than its admissibility," and "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications.") (first quoting *United States v. Wen Chyu Liu*, 716 F.3d 159, 168–69 (5th Cir. 2013); then quoting *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991)).

**\*4** Defendant-Intervenors argue that Dr. Potter's conclusion that some DACA recipients will return to their country of origin when faced with the loss of work authorization is based upon "flawed assumptions that doomed his analysis

and render his conclusion untrue." (Doc. No. 390 at 18). Like economics, demography and sociology fall within the soft sciences that the Fifth Circuit has noted require diminished methodological precision. *See Simmons*, 470 F.3d at 1123. Nevertheless, in addition to his education, training, and experience, Dr. Potter relied upon peer-reviewed articles to support his conclusion, including one focusing on young immigrants to the United States, which confirmed that "immigrants with college degrees [which would include DACA recipients] were more likely to return to their country of origin than those without." (Doc. No. 411-2 at 5). *See* Reagan, P.B., Olsen, R.J., *You can go home again: Evidence from longitudinal data.* 37(3). Demography, 339. Aug. 2000; *see also* Van Hook J., Zhang W., *Who Stays? Who Goes? Selective Emigration Among the Foreign-Born.* 30(1). Population Rsch. Pol'y Rev., 1. Feb. 2011. Insofar as Defendant-Intervenors disagree with the facts or assumptions that are based upon Dr. Potter's training, education, research, or peer-reviewed publications and led to Dr. Potter's conclusions, these arguments go to the weight to be given to, rather than the admissibility of, the expert's testimony. *See Anascape, Ltd. v. Microsoft Corp.*, 9:06CV158, 2008 WL 7180757, at *2 (E.D. Tex. Apr. 28, 2008) (citing *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1221 (Fed. Cir. 2006)).

Critically, just as Dr. Deere's conclusions were supported by opposing experts, Dr. Potter's conclusions about migratory patterns were also echoed by other experts in this case. For example, Defendant-Intervenor New Jersey's expert Dr. Tom Wong, an Associate Professor at the University of California, San Diego, is an expert in immigration politics and policy: he received a Ph.D. in political science, served as an advisor to the White House on immigration related issues, and has published several reports and peer-reviewed journal articles on DACA. (Doc. No. 487-26). He conducted a national survey of 3,063 DACA recipients in August 2017 and carefully described the methodology used and how it accounted for bias. The study confirmed that 22.3% of DACA recipients were "likely/very likely" to "leave the country if DACA ends." (Doc. No. 219-2 at 4).[3] Thus, Dr. Potter's conclusions are not anomalies and are in fact bolstered by empirical findings from New Jersey's own expert. *See* Fed. R. Evid. 702(b); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendments ("Rule 702 ... requires that expert testimony be based on sufficient underlying 'facts or data.' The term 'data' is intended to encompass the reliable opinions of other experts.").

2021 WL 3022433

Finally, Defendant-Intervenors want Dr. Potter's testimony stricken based on their belief that he should base his testimony on the fact that DACA recipients would remain in the United States in violation of the law if they lost their status. In essence, Defendant-Intervenors want Dr. Potter to assume that all DACA-eligible individuals would remain in the United States illegally. While some of Defendant-Intervenors' own experts may rely on certain data to support such a hypothesis, their reliance upon that data does not render Dr. Potter's conclusions, based on different assumptions, studies, or data, unreliable. Moreover, if Defendant-Intervenors want to probe how his conclusions might change based upon their assumptions, counsel may certainly incorporate such assumptions in a hypothetical question to Dr. Potter during cross-examination. *See Daubert*, 509 U.S. at 596. The Court finds that Dr. Potter's opinions are admissible.

### III. Conclusion

 **\*5** The Court hereby **DENIES** Defendant-Intervenors' Motion to Strike Plaintiffs' Experts. (Doc. 390).

### All Citations

Slip Copy, 2021 WL 3022433

### Footnotes

1   Defendant-Intervenors here are 22 individual DACA recipients, although New Jersey is also a Defendant-Intervenor in this case.

2   At the time of filing, Plaintiff States were comprised of Alabama, Arkansas, Kansas, Louisiana, Nebraska, South Carolina, Texas, and West Virginia.

3   In the same vein, Defendant-Intervenors' own evidence highlights that the factor most critical to DACA recipients staying in the United States is, of course, their DACA status. For example, the declaration of one DACA recipient, Jin Park, expressed that DACA status was the critical factor to her ability to remain in the United States: "I wish to remain in the U.S.... Receiving deferred action is critical to my ability to live, work, and study in the United States." (Doc. No. 504-2, Ex. 18 ¶ 8 Decl. of Jin Park). Several declarations from other DACA recipients express the same sentiment. (*See id.*, Ex. 20, Ex. 21 & Ex. 22).

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 9

2021 WL 3022434
Only the Westlaw citation is currently available.
United States District Court, S.D.
Texas, Brownsville Division.

State of TEXAS, et al., Plaintiffs,
v.
The UNITED STATES of
America, et al., Defendants,
and
Karla Perez, et al.; State of New
Jersey, Defendant-Intervenors.

Civil Action No. 1:18-CV-00068
|
Signed 07/16/2021

**Attorneys and Law Firms**

William Thomas Thompson, Adam Arthur Biggs, Cristina
Maria Moreno, Eric Alan Hudson, Philip Trent Peroyea,
Ryan L. Bangert, Michael Christopher Toth, Office of the
Attorney General, Todd Lawrence Disher, Lehotsky Keller
LLP, Austin, TX, for Plaintiffs State of Texas, State of
Alabama, State of Arkansas, State of Louisiana, State of
Nebraska, State of South Carolina, State of West Virginia,
State of Kansas.

Adam Arthur Biggs, Cristina Maria Moreno, Philip Trent
Peroyea, Office of the Attorney General, Todd Lawrence
Disher, Lehotsky Keller LLP, Austin, TX, for Plaintiff
Governor Paul R. LePage.

William Thomas Thompson, Adam Arthur Biggs, Eric Alan
Hudson, Philip Trent Peroyea, Office of the Attorney General,
Todd Lawrence Disher, Lehotsky Keller LLP, Austin, TX, for
Plaintiff State of Mississippi.

Paul R. LePage, Pro Se.

Jeffrey S. Robins, Pro Hac Vice, U.S. Department of Justice
Office of Immigration Litigation, Aaron Steven Goldsmith,
Pro Hac Vice, US Dept. of Justice, James Joseph Walker,
U.S. Dept. of Justice, Civil Division, Washington, DC, Daniel
David Hu, Office of the US Attorneys Office, Houston,
TX, for Defendants United States of America, Kirstjen M.
Nielsen.

Jeffrey S. Robins, Pro Hac Vice, U.S. Department of Justice
Office of Immigration Litigation, Aaron Steven Goldsmith,
Pro Hac Vice, US Dept. of Justice, James Joseph Walker,
U.S. Dept. of Justice, Civil Division, Washington, DC, Daniel
David Hu, Office of the US Attorneys Office, Houston, TX,
John Coghlan, US Dept. of Justice, for Defendants Kevin K.
McAleenan, Thomas D. Homan, L. Francis Cissna.

Jeffrey S. Robins, Pro Hac Vice, U.S. Department of Justice
Office of Immigration Litigation, James Joseph Walker, U.S.
Dept. of Justice, Civil Division, Washington, DC, Daniel
David Hu, Office of the US Attorneys Office, Houston, TX,
John Coghlan, US Dept. of Justice, for Defendant Carla L.
Provost.

John Coghlan, US Dept. of Justice, for Defendants Houston
Hispanic Chamber of Commerce, Texas Association of
Business.

Nina Perales, Ernest I. Herrera, MALDEF, Ramon Andres
Soto, Pro Hac Vice, Mexican American Legal Defense &
Educational Fund, San Antonio, TX, Carlos Moctezuma
Garcia, Garcia & Garcia Attorneys at Law, McAllen, TX,
Denise Hulett, Mexican American Legal Defense & Educ.
Fund, Sacramento, CA, Douglas H. Hallward-Driemeier,
Pro Hac Vice, Ropes & Gray LLP, Washington, DC, for
Defendant-Intervenor Karla Perez.

Nina Perales, Ernest I. Herrera, MALDEF, Ramon Andres
Soto, Pro Hac Vice, Mexican American Legal Defense &
Educational Fund, San Antonio, TX, Carlos Moctezuma
Garcia, Garcia & Garcia Attorneys at Law, McAllen, TX,
Douglas H. Hallward-Driemeier, Pro Hac Vice, Ropes &
Gray LLP, Washington, DC, for Defendant-Intervenors Maria
Rocha, Jose Magana-Salgado, Nanci J. Palacios Godinez,
Elly Marisol Estrada, Karina Ruiz De Diaz, Carlos Aguilar
Gonzalez, Karla Lopez, Darwin Velasquez, Jin Park, Oscar
Alvarez, Nancy Adossi, Denise Romero, Angel Silva, Moses
Kamau Chege, Hyo-Won Jeon, Elizabeth Diaz, Maria Diaz,
Blanca Gonzalez.

Nina Perales, Ernest I. Herrera, MALDEF, San Antonio, TX,
Carlos Moctezuma Garcia, Garcia & Garcia Attorneys at
Law, McAllen, TX, Douglas H. Hallward-Driemeier, Pro Hac
Vice, Ropes & Gray LLP, Washington, DC, for Defendant-
Intervenors Luis A. Rafael, Pratishtha Khanna, Jung Woo
Kim.

Andrew J. Pincus, Pro Hac Vice, Mayer Brown LLP,
Washington, DC, Craig Dashiell, Pro Hac Vice, David Leit,

Pro Hac Vice, Gavin J. Rooney, Pro Hac Vice, Lowenstein Sandler LLP, Roseland, NJ, Lauren Goldman, Pro Hac Vice, Mayer Brown LLP, New York, NY, for Defendant-Intervenor Proposed Amici New Jersey Businesses.

Houston Hispanic Chamber of Commerce, Pro Se.

Texas Association of Business, Pro Se.

## ORDER OF PERMANENT INJUNCTION

Andrew S. Hanen, United States District Judge

**\*1** The Court has found that at least one of the Plaintiff States has satisfied all the necessary requisites to maintain this lawsuit. The Court has further found, pursuant to its Memorandum and Order, that the Plaintiff States are entitled to summary judgment on the merits of their procedural and substantive Administrative Procedure Act (APA) claims and has granted same. Finally, the Plaintiff States have proven the required elements to obtain a permanent injunction.

The Plaintiff States have requested vacatur of the Deferred Action for Childhood Arrivals (DACA) program and a permanent injunction against its continued operation. A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*

The first three factors are discussed in detail in the Court's ruling on the opposing motions for summary judgment, and that discussion need not be repeated here. Therefore, the Court finds:

**Factor One.** As discussed in the section on standing in the memorandum and opinion, the Plaintiff States have demonstrated that they have suffered an irreparable injury.

**Factor Two.** The injury to the Plaintiff States is derived from the creation of and the continued operation of the DACA program. Only its cessation would alleviate that injury, and monetary damages are inadequate to do so.

**Factor Three.** In this factor, the Court considers only the hardships as between the plaintiff, Plaintiff States, and the defendant, the Government, the party being enjoined. Ceasing the DACA program would not impose a significant hardship on the Government. Conversely, the Plaintiff States have demonstrated the hardship that the continued operation of DACA has inflicted on them. Furthermore, the Government has no legitimate interest in the continuation of an illegally implemented program.

**Factor Four.** The public interest of the nation is always served by the cessation of a program that was created in violation of law and whose existence violates the law. *See Trump v. Hawaii.* 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring) (recognizing that there is a "public interest in having congressional enactments properly interpreted and applied"). Considering all four factors, the Court finds that an injunction is warranted and appropriate here.

Nevertheless, "[i]t goes without saying that an injunction is an equitable remedy." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982). The "essence of equity" is to "mould each decree to the necessities of the particular case." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61. Equity is distinguished by "[f]lexibility rather than rigidity" and the "qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs." *Id.*

**\*2** The most significant equitable interests to consider here are those of the DACA recipients. While these recipients are not themselves enjoined, the Court also finds that as part of its analysis of factors three and four above, the Court is entitled to take into consideration their interests as well. Hundreds of thousands of individual DACA recipients, along with their employers, states, and loved ones, have come to rely on the DACA program. These interests have been discussed in this Court's earlier opinion (Doc. No. 319), by the Supreme Court in *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1896 (2020), and in the many decisions by other courts that had to address the attempted rescission of DACA. That being the case, the Court sees no need to delineate them here. Given those interests, it is not equitable for a government program that has engendered such significant reliance to terminate suddenly. This consideration, along with the Government's assertion that it is ready and willing to try

to remedy the legal defects of the DACA program, indicates that equity will not be served by a complete and immediate cessation of DACA.

Accordingly, the Court hereby grants the request for permanent injunction and vacatur, subject to the following limitations and parameters:

The DACA Memorandum (June 15, 2012 Memorandum by Department of Homeland Security (DHS) Secretary Janet Napolitano) and the DACA program that it created are hereby vacated; the DACA Memorandum is remanded to DHS for further consideration, as requested. From this date forward, the United States of America, its departments, agencies, officers, agents, and employees are hereby enjoined from administering the DACA program and from reimplementing DACA without compliance with the APA.

With respect to new (those not already granted by the date of this order) DACA applications received by DHS, the order of vacatur and remand is effective immediately. DHS may continue to accept applications as it has been ordered to do by the court in *Batalla Vidal v. Wolf*, 16-CV-4756, 2020 WL 7121849 (E.D.N.Y. Dec. 4, 2020), but it may not grant these applications until a further order of this Court, the Fifth Circuit Court of Appeals, or the United States Supreme Court. Thus, DHS is hereby permanently enjoined from granting DACA status for any new applicants.

With respect to DACA recipients who obtained that status on or before the date of this injunction and DACA renewal applications for these existing recipients (regardless of when the renewal applications are submitted), the order of immediate vacatur and the permanent injunction (but not the order of remand) are temporarily stayed until a further order of this Court, the Fifth Circuit Court of Appeals, or the United States Supreme Court. *See Campaign for S. Equal. v. Bryant*, 773 F.3d 55, 57 (5th Cir. 2014) ("the authority to hold an order in abeyance pending review allows an appellate court to act responsibly when faced with serious legal questions that merit careful scrutiny and judicious review") (quotations omitted). In addition to appellate review, the stay also serves the purpose of allowing DHS time to perform the review it has represented to the Court that it plans to do.

Subject to any further order as described above, nothing in this injunction should be read as ordering DHS or any other governmental entity to cancel or otherwise terminate DACA status for any individual who currently is, as of this date, a DACA recipient in good standing. Further, nothing in this injunction requires DHS or the Department of Justice to take any immigration, deportation, or criminal action against any DACA recipient, applicant, or any other individual that either would not otherwise take.

DHS is directed to post a public notice, within 3 calendar days of this Injunction, to be displayed prominently on its website and on the websites of all other relevant agencies, that a United States District Court has found the DACA program to be illegal and that, though applicants may continue to submit applications, the Government is prohibited from granting such applications. The Government shall provide a copy of the notice to all counsel and post it to the docket within 3 calendars days of this Order.

**\*3** The Court finds this permanent injunction is reasonable and properly takes into account the reliance interests of the Plaintiff States on the duly enacted immigration laws of this country, the interests of the public in having the Government and its agencies and employees comply with the law, and the significant reliance interests that DACA has engendered since its inception. This Court retains jurisdiction of the matter for purposes of construction, modification, and enforcement of this Permanent Injunction. If the Government fails to take the appropriate steps to remedy the shortfalls in DACA within a reasonable time given the complexities inherent in such a process, the Court will reconsider its decision to stay portions of the relief that it has granted, if an appropriate motion is filed.

**All Citations**

Slip Copy, 2021 WL 3022434

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on the 2nd day of March, 2023, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Nina Perales*
Nina Perales