# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

|  |  |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| *Plaintiffs*, | |
| *v.* | |
| UNITED STATES OF AMERICA, *et al.*, | Case No. 1:18-cv-00068 |
| *Defendants*, | |
| KARLA PEREZ, *et al.*;<br>STATE OF NEW JERSEY, | |
| *Defendants-Intervenors*. | |

**MEMORANDUM OF LAW OF AMICI CURIAE THE STATES OF CALIFORNIA, NEW YORK, ARIZONA, COLORADO, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, WASHINGTON, AND WISCONSIN, AND THE DISTRICT OF COLUMBIA, IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................ ii

Introduction and Interest of the Amici States .............................................................. 1

Argument .................................................................................................................. 2

   I.   If this Court concludes that DACA is unlawful, it has equitable discretion to tailor an appropriate remedy ................................................................................... 3

   II.  Any remedy in this case must account for the significant reasonable reliance interests of DACA recipients and their States and communities ......................... 7

      A.  DACA creates substantial social and economic benefits on which amici States rely ................................................................................................ 7

          1.  DACA recipients are vital to amici States' communities, public universities, and economies ........................................................... 7

          2.  DACA enhances public safety and reduces the strain on social safety net programs ................................................................................. 10

          3.  Amici States have structured their laws and regulations in reliance on DACA and the benefits it confers .............................................. 11

      B.  Abrupt termination of DACA would disrupt and harm amici States ........................ 13

Conclusion .............................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aurelius Inv., LLC v. Puerto Rico,*
  915 F.3d 838 (1st Cir. 2019) ....................................................................6

*Buckley v. Valeo,*
  424 U.S. 1 (1976) .................................................................................5-6

*Cent. & S.W. Servs., Inc. v. EPA,*
  220 F.3d 683 (5th Cir. 2000) ...................................................................4

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020) .............................................................................5

*Doe v. Chao,*
  540 U.S. 614 (2004) .................................................................................3

*EEOC v. CBS, Inc.,*
  743 F.2d 969 (2d Cir. 1984) ....................................................................6

*Finnbin, LLC v. Consumer Prod. Safety Comm'n,*
  45 F.4th 127 (D.C. Cir. 2022) ..................................................................4

*Hecht Co. v. Bowles,*
  321 U.S. 321 (1944) .................................................................................3

*Matter of Vargas,*
  131 A.D.3d 4 (N.Y. App. Div. 2015) ......................................................12

*Moore v. Madigan,*
  702 F.3d 933 (7th Cir. 2012) ...................................................................6

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
  459 U.S. 813 (1982) .................................................................................6

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
  458 U.S. 50 (1982) ...................................................................................6

*Ruiz v. Estelle,*
  650 F.2d 555 (5th Cir. 1981) ...................................................................4

*Sw. Elec. Power Co. v. U.S. EPA,*
  920 F.3d 999 (5th Cir. 2019) ...................................................................4

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
 989 F.3d 368 (5th Cir. 2021) ................................................................4

*Texas v. United States*,
 50 F.4th 498 (5th Cir. 2022) ............................................................2, 4

*Weinberger v. Romero-Barcelo*,
 456 U.S. 305 (1982) ..........................................................................3

**Statutes**

6 U.S.C. § 202 ........................................................................................2

8 U.S.C. § 1103 ......................................................................................2

Cal. Educ. Code
 § 66021.7 ..........................................................................................12
 § 68130.5 ..........................................................................................12

20 Ill. Comp. Stat. Ann. 2105/2105-140 ..................................................12

105 Ill. Comp. Stat. Ann. 5/21B-15 .........................................................12

705 Ill. Comp. Stat. Ann. 205/2 ..............................................................12

Minn. Stat. Ann.
 § 135A.043 ........................................................................................12
 ch. 136A ............................................................................................12

N.Y. Educ. Law
 § 355 ................................................................................................12
 § 661 ................................................................................................12
 § 6206 ..............................................................................................12

**Administrative Sources**

Deferred Action for Childhood Arrivals Final Rule, 87 Fed. Reg. 53,152
 (Aug. 30, 2022) ...................................................................1, 8, 10, 15

**Miscellaneous Authorities**

Atheendar S. Venkataramani et al., *Health Consequences of the US Deferred Action
 for Childhood Arrivals (DACA) Immigration Programme: A Quasi-Experimental
 Study*, 2 Lancet Pub. Health 175 (2017), https://tinyurl.com/5dkmp8r3 ................................11

Comment Letter from Att'ys Gen. (Nov. 19, 2021), https://tinyurl.com/49hwhujm .......... 8-12, 14

Cybersecurity & Infrastructure Sec. Agency, U.S. Dep't of Homeland Sec.,
    *Identifying Critical Infrastructure During COVID-19*, https://tinyurl.com/46dhvtv4 .............8

Democrats of the Comm. on Small Bus., *Economic Impact of DACA: Spotlight on
    Small Business* (2018), https://tinyurl.com/2p96wrst ............................................................10

Ike Brannon & Logan Albright, *The Economic and Fiscal Impact of Repealing
    DACA*, Cato Inst.: Cato at Liberty (Jan. 18, 2017), https://tinyurl.com/2au7a3cj ..................13

Ike Brannon & M. Kevin McGee, *The Costs of Closing DACA Initial Enrollments*,
    Regulation, Winter 2020-2021, https://tinyurl.com/536rzmrr ..................................................13

Jennifer Tolbert et al., *Key Facts About the Uninsured Population,* Kaiser Fam. Found.
    (Dec. 19, 2022), https://tinyurl.com/2wyb7c6m ....................................................................11

Jens Hainmueller et al., *Protecting Unauthorized Immigrant Mothers Improves Their
    Children's Mental Health*, 357 Science 1041 (2017), https://tinyurl.com/3uvz3mvt .............11

Jose Magaña-Salgado & Tom K. Wong, Immigrant Legal Res. Ctr., *Draining the Trust
    Funds: Ending DACA and the Consequences to Social Security and Medicare*
    (2017), https://tinyurl.com/423f9ddc .....................................................................................14

Nicole Prchal Svajlenka & Trinh Q. Truong, *The Demographic and Economic
    Impacts of DACA Recipients: Fall 2021 Edition*, Ctr. for Am. Progress
    (Nov. 24, 2021), https://tinyurl.com/5n9awyzf .........................................................8, 10, 14

Office of Health Ins. Programs, N.Y. Dep't of Health, GIS 13 MA/011, Children's
    Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for
    Certain Qualified and PRUCOL Aliens (May 7, 2013), https://tinyurl.com/4hemznr9..........12

Press Release, N.Y. State Educ. Dep't, *Board of Regents Permanently Adopts
    Regulations to Allow DACA Recipients to Apply for Teacher Certification and
    Professional Licenses* (May 17, 2016), https://tinyurl.com/y5dnw9sx ...................................12

Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in
    Administrative Law*, 53 Duke L.J. 291 (2003)..........................................................................3

Stefano Comino et al., *Silence of the Innocents: Undocumented Immigrants'
    Underreporting of Crime and Their Victimization*, 39 J. Pol'y
    Analysis & Mgmt. 1214 (2020), https://tinyurl.com/3xx4325j ...............................................15

Tom K. Wong et al., *2021 Survey of DACA Recipients Underscores the
    Importance of a Pathway to Citizenship*, Ctr. for Am. Progress
    (Feb. 3, 2022), https://tinyurl.com/3crd9h4a ..............................................................7, 11, 14

Tom K. Wong et al., *Amid Changes to the DACA Program and COVID-19,
    DACA Recipients Are Fired Up and Civically Engaged*, United We Dream
    (updated Mar. 16, 2022), https://tinyurl.com/j3wt9pfj .........................................................15

U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Sec., *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals Requests by Intake and Case Status, by Fiscal Year Aug. 15, 2012-Sept. 30, 2022*, https://tinyurl.com/26jj3t4w.........................................................................................................7

## INTRODUCTION AND INTEREST OF THE AMICI STATES

The States of California, New York, Arizona, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Washington, and Wisconsin, and the District of Columbia, respectfully file this brief in opposition to plaintiffs' motion for summary judgment and in support of defendants' cross-motions for summary judgment in this lawsuit challenging the lawfulness of the Deferred Action for Childhood Arrivals (DACA) Final Rule, 87 Fed. Reg. 53,152 (Aug. 30, 2022) (to be codified at 8 C.F.R. pts. 106, 236, 274a).  Amici States have a substantial interest in DACA.  Over 60 percent of all DACA recipients (359,000 individuals) live in amici States, where they are valued members of the community and vital members of the workforce who contribute to the tax base.

Since the federal government first issued guidance in 2012 for granting deferred action on a case-by-case basis to qualifying individuals, amici States have come to rely on DACA.  We have hired and trained hundreds of DACA recipients.  And we depend on the hundreds of thousands of DACA grantees who contribute to our States in varied and valuable ways, including as first responders, healthcare workers, and teachers.  In addition, by enabling grantees to work lawfully and to access other benefits that stem from the grant of deferred action, DACA has increased our tax receipts and reduced the strain on our social safety net programs.

Amici States submit this brief to emphasize the profound reliance interests DACA has engendered.  As this Court previously recognized, the reliance interests at stake have "not diminished, and may, in fact, have increased over time."  Mem. & Order at 76-77, ECF No. 575. That is even more true now, when DACA has continued for over a decade.  And that fundamental point should inform this Court's consideration of both the merits of plaintiffs' claims and any remedy the Court ultimately orders in this case.

## ARGUMENT

Amici States firmly believe that DACA is a lawful exercise of Executive Branch authority, and that the Final Rule does not violate the Administrative Procedure Act (APA).  Although the Fifth Circuit recently concluded that the 2012 DACA Memorandum was substantively and procedurally invalid, *see Texas v. United States*, 50 F.4th 498, 524, 528 (5th Cir. 2022), amici States respectfully maintain that DACA is a lawful exercise of the Executive Branch's authority to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to "administ[er] and enforce[]" laws relating to immigration and naturalization, 8 U.S.C. § 1103(a)(1).  *See* Br. of Fed. Defs. at 15-19, ECF No. 639; Br. of Def.-Intervenor State of N.J. at 24-28, ECF No. 636; Br. of Def.-Intervenors Elizabeth Diaz et al. ("DACA Recipients") at 35-40, ECF No. 642.  And in promulgating the DACA Final Rule, the Department of Homeland Security (DHS) not only acted lawfully, but also properly considered the costs and benefits of continuing the policy—including the significant reliance interests at stake.

This brief, however, will not cover that ground.  Instead, recognizing that this Court and the Fifth Circuit have already reached certain conclusions regarding the legality of DACA, amici States focus on the reasonable reliance interests that amici States and DACA recipients have in the policy.  This Court should ensure that any remedy it orders takes appropriate account of those reliance interests, and minimizes the serious harm that terminating DACA would cause to all who have relied on the policy in structuring their affairs over the past decade:  hundreds of thousands of individuals who know no home other than this country, as well as their families, communities, employers, and the States in which they reside.

I.    IF THIS COURT CONCLUDES THAT **DACA** IS UNLAWFUL, IT HAS EQUITABLE
      DISCRETION TO TAILOR AN APPROPRIATE REMEDY

Texas and its co-plaintiff States (hereafter Texas) ask this Court to vacate the Final Rule and "permanently and universally enjoin[]" its implementation. Mot. for Summ. J. (Mot.) at 5, ECF No. 625-1. As Texas recognizes, this request seeks a form of "equitable relief." *Id.*; *see also Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004). This Court should therefore exercise "the traditional function of equity," which is to "arrive at a 'nice adjustment and reconciliation' between the [parties'] competing claims." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). "In such cases, the court 'balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction.'" *Id.* Equitable remedies are distinguished by their "[f]lexibility rather than rigidity," which affords the judiciary the power to "mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Courts have been especially careful to account for the potential adverse effects of invalidating long-established laws, programs, or policies with substantial nationwide impact. *See* Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 Duke L.J. 291, 323 (2003). As New Jersey explains (Br. at 33-41), in light of the particular circumstances of this case and the extraordinary nature of the reliance interests at stake, these principles counsel strongly against awarding any injunctive relief that would affect existing DACA recipients. If the Court were to determine that some form of injunctive relief is warranted, however, these principles should at a minimum guide any remedy in several respects.

*First*, any remedy the Court orders with respect to existing DACA recipients should be stayed pending final resolution of this litigation, including throughout the appellate process. Texas agrees that relief should be tailored to "avoid unnecessary disruption while appellate review takes place" (Mot. at 5), and this Court previously tailored its order enjoining the 2012 DACA

3

Memorandum to allow existing DACA recipients to maintain their status pending appeal (Order of Permanent Inj. at 3-4, ECF No. 576).  A stay pending appeal is likewise appropriate here because there is, at a minimum, "a serious legal question" regarding whether DACA is lawful, and "the balance of the equities weighs heavily in favor" of maintaining the status quo. *See Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981); *see also Texas*, 50 F.4th at 531.

*Second*, if this Court identifies any defect in the Final Rule, the Court should consider whether to remand the matter to DHS without vacating the Final Rule, in full or in part.  Federal courts have discretion to order remand without vacatur, even where they conclude that an agency action violates the APA.  *See, e.g.*, *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389-90 (5th Cir. 2021); *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692, 702 (5th Cir. 2000).  Courts have employed that approach where vacatur would be "disruptive" and there is "at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so."  *Cent. & S.W. Servs.*, 220 F.3d at 692 (quotation and alteration marks omitted).  In addition, where "one aspect of a rule" violates the APA while other aspects do not, federal courts generally order "partial vacatur" of only the offending portion of the agency's action, while leaving the lawful portions in place.  *Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 136 (D.C. Cir. 2022); *see Sw. Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (vacating "unlawful . . . portions" of agency rule).  Given the multifaceted nature of the DACA policy, the significant reliance interests of existing DACA recipients, and the widespread disruption that any vacatur order would entail, the Court should consider whether remand without vacatur would be appropriate in this case, particularly with respect to existing DACA recipients.

*Third*, if this Court were to conclude that some portion of the Final Rule must be vacated, the Court should stay that vacatur to allow the Secretary of Homeland Security to devise a plan for

the DACA policy in light of the Court's opinion.  As the Supreme Court has emphasized, even if DACA were found to be unlawful in certain respects, "deciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding concerns a program with the breadth of DACA."  *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1910 (2020).  And "[t]hose policy choices are for DHS" to make in the first instance.  *Id.*  Thus, for example, even when the former Acting Secretary of Homeland Security attempted to terminate DACA in 2017 on the asserted basis that it was unlawful (among other reasons), she exercised discretion in devising a "wind-down" of the program that entailed "two-year renewals for those DACA recipients whose benefits were set to expire within six months."  *Id.* at 1914.  The Supreme Court later explained that she also "should have considered whether she had similar flexibility in addressing any reliance interests of DACA recipients"—including, among other things, "a broader renewal period based on the need for DACA recipients to reorder their affairs."  *Id.*  Indeed, even Texas recognizes "the interests of current DACA recipients in an orderly winding down of the program."  Mot. at 5.  Consistent with the Supreme Court's guidance, the details of any such wind-down should be devised by DHS in the first instance, giving due consideration to reliance interests of existing DACA recipients, and their families, communities, and States.

*Fourth*, the Court should stay any remedy to allow Congress an opportunity to formulate a legislative response.  There is ample precedent for this approach in cases where an immediate judicial remedy would have threatened widespread disruption to long-established practices.  For example, in *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court held that the process for selecting commissioners of the Federal Election Commission violated the Appointments Clause, but stayed its judgment for 30 days to give Congress "an opportunity to reconstitute the

Commission" without interrupting enforcement of campaign finance law.  *Id.* at 143.  Similarly, in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), the Court held that Congress could not vest non-Article III judges with jurisdiction over all chapter 11 bankruptcy proceedings.  *Id.* at 87.  But the decision applied only prospectively, to avoid causing "substantial injustice and hardship" to litigants who had reasonably relied on the bankruptcy courts, and the Court stayed its judgment for a total of approximately six months to "afford Congress an opportunity to reconstitute the bankruptcy courts" in a constitutionally permissible way.  *Id.* at 88; *see N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 459 U.S. 813, 813 (1982) (extending initial three-month stay).[1]  The same approach is warranted here:  Any remedy that would affect existing DACA recipients should be temporarily stayed to allow Congress a reasonable time to act.

In sum, even if this Court were to find the Final Rule unlawful, the Court has significant discretion to tailor any remedy in light of the particular circumstances of this case, including the reliance interests of DACA recipients and their States and communities.  As we discuss below, those reliance interests are profound.

---

[1] *See also Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 862-63 (1st Cir. 2019) (staying mandate for 90 days to allow the President and Senate to remedy defective appointments to oversight board or "reconstitute the Board in accordance with the Appointments Clause," and clarifying that the ruling did not "eliminate any otherwise valid actions of the Board prior to the issuance of our mandate in this case"), *rev'd on other grounds sub nom. Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649 (2020); *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (staying mandate for 180 days to allow Illinois legislature to craft new legislation after holding that the State's law regulating the carrying of firearms in public violated the Second Amendment); *EEOC v. CBS, Inc.*, 743 F.2d 969, 975-76 (2d Cir. 1984) (staying mandate for approximately four months to afford Congress an opportunity to "take appropriate measures" to remedy the invalid transfer of powers to the EEOC).

## II.   ANY REMEDY IN THIS CASE MUST ACCOUNT FOR THE SIGNIFICANT REASONABLE RELIANCE INTERESTS OF DACA RECIPIENTS AND THEIR STATES AND COMMUNITIES

### A.   DACA creates substantial social and economic benefits on which amici States rely

Since 2012, DACA has provided protection from removal and access to work authorization to over 825,000 individuals, including more than 514,000 current and former residents of amici States.[2]  DACA recipients have grown up in this country, enrolled in degree programs, embarked on careers, purchased homes, and started their own families, all in reliance on the policy.  The benefits of DACA extend far beyond the lives of DACA recipients and their families:  DACA recipients bolster the tax bases and economies of the amici States, work in our essential industries, and enrich the student bodies and faculties of our public universities.  Amici States thus have a vital interest in preserving this longstanding policy or, at the very least, minimizing the harms that would flow from the policy's termination.

### 1.   DACA recipients are vital to amici States' communities, public universities, and economies

In the last decade, DACA has enabled hundreds of thousands of immigrants to further their education and find better employment.  In a 2021 survey of current DACA recipients, nine out of ten individuals reported that they were employed or in school.[3]  In addition, 43.8 percent reported obtaining a higher-paying job after receiving DACA, and 43.3 percent reported finding employment with health insurance or other benefits.[4]  Because DACA encourages recipients to

---

[2] *See* U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Sec., *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals Requests by Intake and Case Status, by Fiscal Year Aug. 15, 2012–Sept. 30, 2022*, https://tinyurl.com/26jj3t4w.

[3] Tom K. Wong et al., *2021 Survey of DACA Recipients Underscores the Importance of a Pathway to Citizenship*, Ctr. for Am. Progress (Feb. 3, 2022), https://tinyurl.com/3crd9h4a.

[4] *Id.*

remain in school and pursue further education, the policy has also increased productivity amongst grantees and created more opportunities for high-skilled work. This has redounded to the benefit of amici States, particularly in the critical education and healthcare sectors: approximately 20,000 DACA recipients are employed as teachers in school districts across the country, and an estimated 34,000 DACA recipients serve as healthcare workers.[5]

Amici States have especially relied on the contributions of DACA recipients during the COVID-19 pandemic. An estimated 343,000 DACA grantees serve in industries deemed essential by DHS,[6] which includes not only healthcare and education, but also food and agriculture.[7] In light of the ongoing labor shortage in these industries, DACA recipients' participation in the workforce is crucial to our ability to cope with, and recover from, the pandemic.[8]

Moreover, amici States themselves have hired and trained hundreds of DACA recipients to fill critical public service positions. California, for instance, employs nearly 300 DACA recipients across its state agencies and departments because of their specialized skills and qualifications.[9]

---

[5] *See* Nicole Prchal Svajlenka & Trinh Q. Truong, *The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition*, Ctr. for Am. Progress (Nov. 24, 2021), https://tinyurl.com/5n9awyzf.

[6] *Id.*

[7] Cybersecurity & Infrastructure Sec. Agency, U.S. Dep't of Homeland Sec., *Identifying Critical Infrastructure During COVID-19*, https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19https://tinyurl.com/46dhvtv4.

[8] *See* Comment Letter from Att'ys Gen. 27-28 (Nov. 19, 2021),https://ag.ny.gov/sites/default/files/daca_nprm_multistate_comment_11.19.21_final.pdf https://tinyurl.com/49hwhujm; *see also* DACA Final Rule, 87 Fed. Reg. at 53,171 (acknowledging that, "if members of the DACA population stopped performing their work, labor shortages could be exacerbated").

[9] As of July 2020, California employed at least 288 DACA recipients across 26 agencies and departments, including the Department of Corrections and Rehabilitation, Department of Health Care Services, Department of Transportation, Department of Water Resources, and Department of Veterans Affairs. *See* Comment Letter from Att'ys Gen., *supra* n.8, at 12.

These workers are vital to furthering the State's priorities in public safety, public health, infrastructure, and veterans affairs.  Other amici States have also made significant investments in training DACA grantees to work in underserved communities.  Illinois, for example, offers interest-free tuition loans to DACA recipients enrolled in higher-degree programs who commit to serving four years in an underserved Illinois community following their graduation.[10]

DACA recipients are also integral members of amici States' institutions of higher learning. Thousands are currently enrolled in the States' public universities and colleges, including 1,700 DACA recipients in the University of California system alone.[11]  Amici States benefit not just from these grantees' tuition dollars, which are substantial,[12] but also from their unique experiences, which help further the States' important interest in fostering diverse and inclusive educational environments.  Because of DACA, amici States' public universities and colleges are able to employ grantees in a variety of roles, including as professors, teachers, teaching assistants, administrators, research assistants, and postdoctoral researchers.[13]  In our experience, these individuals have made significant contributions to the research expertise and exchange of ideas that are central to these institutions' academic missions.[14]

DACA recipients not only strengthen our communities, but also bolster our economies. Recipients and their households pay an estimated $6.2 billion in federal taxes and $3.3 billion in

---

[10] *Id.* at 18-19.

[11] *See id.* at 13-14 & n.64 (listing estimated enrollment numbers of DACA grantees in public universities and colleges in the States of New York, California, New Jersey, Connecticut, Massachusetts, Hawaii, Pennsylvania, Washington, Illinois, Nevada, and Minnesota).

[12] *See id.* at 15.

[13] *Id.* at 16 & n.75. For example, the California State University system estimates that it employs approximately 500 DACA grantees. *Id.* at 16-17.

[14] *See id.* at 13.

state and local taxes annually, including over $2.1 billion in state and local tax revenue to amici States.[15]  The spending power of DACA recipients—estimated at $25.3 billion annually—also contributes substantially to the overall economic health of amici States.[16]  DACA recipients own 68,000 homes and make $760 million in annual mortgage payments.[17]  And nearly eight percent of recipients ages 25 and older have started small businesses.[18]  These investments create jobs and new spending in local economies.[19]

### 2. DACA enhances public safety and reduces the strain on social safety net programs

In addition to creating significant economic and educational benefits, DACA improves the public safety and health of residents in amici States.  As amici's experiences demonstrate, public safety is best protected when all members of the community—regardless of immigration status— are encouraged to report crimes and to participate in policing efforts without fear of immigration consequences.[20]  Multiple studies have shown that, by deferring the possibility of immediate removal, DACA removes a significant obstacle to reporting crime.[21]

---

[15] *See* Svajlenka & Truong, *The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition, supra* n.5.

[16] *Id.*

[17] *Id.*

[18] Democrats of the Comm. on Small Bus., *Economic Impact of DACA: Spotlight on Small Business* 7 (2018), https://tinyurl.com/2p96wrst.

[19] *See* Comment Letter from Att'ys Gen., *supra* n.8, at 29-30; *see also* DACA Final Rule, 87 Fed. Reg. at 53,169-70 (considering economic contributions of DACA recipients and determining "on balance" that "various positive economic impacts of DACA outweigh the potential adverse impacts to the labor market").

[20] *See* Comment Letter from Att'ys Gen., *supra* n.8, at 17.

[21] *See id.* at 23; *see also* DACA Final Rule, 87 Fed. Reg. at 53,171 (recognizing that "reduction of fear among DACA recipients contributes to improved law enforcement and community relations, which improves public safety").

Amici States' experiences also confirm that DACA enhances public health outcomes and reduces healthcare costs to the States.[22]  As studies repeatedly have shown, DACA improves mental health not only among DACA recipients, but also their family members.[23]  In addition, an estimated 43 percent of DACA recipients have been able to obtain jobs that provide health insurance or other benefits.[24]  Without DACA, these individuals (and their dependents) would likely be forced to forgo needed healthcare, including preventative care, creating costly health problems in the long run.[25]  They would also likely rely on state-funded or state-administered healthcare (or both), increasing the strain on amici States' safety nets.[26]

### 3.  Amici States have structured their laws and regulations in reliance on DACA and the benefits it confers

In light of DACA recipients' many contributions to our States and the associated societal benefits, many amici States have adopted programs and laws to ensure that individuals eligible for deferred action can reach their full potential.  For example, amici States have invested in DACA recipients' higher education and professional development.  Many of the amici States, including Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Nevada, New Mexico,

---

[22] *See* Comment Letter from Att'ys Gen., *supra* n.8, at 18-21, 24-25.

[23] *See* Atheendar S. Venkataramani et al., *Health Consequences of the US Deferred Action for Childhood Arrivals (DACA) Immigration Programme: A Quasi-Experimental Study*, 2 Lancet Pub. Health 175, 178-79 (2017), https://www.thelancet.com/action/showPdf?pii=S2468-2667%2817%2930047-6https://tinyurl.com/5dkmp8r3; Jens Hainmueller et al., *Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health*, 357 Science 1041, 1043 (2017),
https://www.science.org/doi/abs/10.1126/science.aan5893https://tinyurl.com/3uvz3mvt.

[24] Tom K. Wong et al., *2021 Survey of DACA Recipients Underscores the Importance of a Pathway to Citizenship*, *supra* n.3.

[25] *Cf.* Jennifer Tolbert et al., *Key Facts About the Uninsured Population,* Kaiser Fam. Found. (Dec. 19, 2022), https://www.kff.org/uninsured/issue-brief/key-facts-about-the-uninsured-population/https://tinyurl.com/2wyb7c6m.

[26] *See* Comment Letter from Att'ys Gen., *supra* n.8, at 19-20.

Massachusetts, Minnesota, Oregon, and Washington, have extended in-state tuition benefits to DACA recipients who are state residents.[27]  Some, including New York, California, and Minnesota, have not only extended in-state tuition benefits but also allowed grantees to apply for state-administered student aid and scholarships.[28]  And several States have enacted laws and regulations to integrate DACA recipients into professional licensing schemes:  DACA recipients in Illinois may now apply for law licenses, and those in New York may obtain teaching certifications and other professional licenses, including for law and nursing.[29]

A number of amici States have also structured healthcare access programs in reliance on DACA.[30]  New York, for example, currently funds Medicaid coverage for low-income undocumented immigrants who have received deferred action; undocumented immigrants who are not DACA grantees may qualify only for Medicaid coverage for necessary emergency services.[31] If DACA were terminated or limited, New York would be compelled to seek a legislative change of its scheme: the State would either have to spend additional state funds to maintain the current

---

[27] *See id.* at 15.

[28] *See* N.Y. Educ. Law §§ 355(2)(h)(10), 661(5)(a), 6206(7)(e); Cal. Educ. Code §§ 66021.7, 68130.5(a); Minn. Stat. Ann. § 135A.043; *id.* ch. 136A.

[29] *See* 705 Ill. Comp. Stat. Ann. 205/2(a), (b); 20 Ill. Comp. Stat. Ann. 2105/2105-140; 105 Ill. Comp. Stat. Ann. 5/21B-15(f); *Matter of Vargas*, 131 A.D.3d 4, 6, 12, 27-28 (N.Y. App. Div. 2015) (per curiam) (DACA grantee may satisfy standard for good character and general fitness necessary for admission to practice law in New York); Press Release, N.Y. State Educ. Dep't, *Board of Regents Permanently Adopts Regulations to Allow DACA Recipients to Apply for Teacher Certification and Professional Licenses* (May 17, 2016), https://tinyurl.com/y5dnw9sx.

[30] *See* Comment Letter from Att'ys Gen., *supra* n.8, at 20.

[31] *See* Office of Health Ins. Programs, N.Y. Dep't of Health, GIS 13 MA/011, Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens (May 7, 2013), https://www.health.ny.gov/health_care/medicaid/publications/docs/gis/13ma011.pdfhttps://tinyurl.com/4hemznr9.

level of Medicaid coverage or be forced to limit coverage for some or all of those formerly eligible for DACA to treatment of emergency conditions.[32]

### B.    Abrupt termination of DACA would disrupt and harm amici States

Sudden termination of a decade-old policy of deferred action would upend the programs and laws that many amici States have adopted in reliance on DACA, in addition to devastating the lives of hundreds of thousands of individuals and their families.  Amici States would be forced to quickly hire new employees to replace the DACA recipients we have already trained and hired (see *supra* at 8-9), and we would lose the benefit of the substantial investments we have made in the higher education of DACA grantees (see *supra* at 9). Additionally, many amici States would be forced to spend time and resources changing the many laws and regulations we have enacted over the last decade in reliance on the DACA policy—laws governing everything from financial aid and professional licensing to Medicaid coverage—and to do so expeditiously. See *supra* at 11-12.

Abruptly ending or limiting DACA would also inflict substantial economic harm on DACA grantees, their families, and their States.  It would cause recipients to sustain significant losses in income, with negative tax and other consequences for the States in which they reside.[33] A full rollback of DACA is projected to result in a loss of an estimated $280 billion in national economic

---

[32] *See* Comment Letter from Att'ys Gen., *supra* n.8, at 20-21.

[33] *See* Ike Brannon & M. Kevin McGee, *The Costs of Closing DACA Initial Enrollments*, Regulation, Winter 2020-2021, at 30, 32, https://tinyurl.com/536rzmrrhttps://www.cato.org/sites/cato.org/files/2020-12/cpr-v43n4-6.pdf (freeze on new DACA enrollments projected to result in a $26.1 billion loss in income for DACA-eligible individuals over next 20 years).

growth over the course of a decade.[34]  And it would also lead to an estimated loss of $33.1 billion in Social Security contributions and $7.7 billion in Medicare contributions—funds that are critical to ensuring the financial health of these national programs upon which residents of amici States rely.[35]

In addition, a sudden removal of DACA's protections would weaken amici States' social safety nets.  Absent work authorization, many DACA recipients and their dependents would lose access to their employer-sponsored health insurance, thus limiting their access to care and increasing their reliance on state-funded and state-administered health services.  The projected costs to amici States are substantial.  To illustrate:  it is estimated that New York and Illinois would have incurred an estimated $18.5 million and $20.2 million, respectively, in additional public health costs if the previous attempt to rescind DACA had not been reversed.[36]

Ending the deferred action component of DACA would also have grave consequences for our communities.  An estimated 1.3 million people across the country live in a household with a DACA recipient, including 300,000 U.S.-born children who have at least one recipient parent.[37] Termination of the policy would threaten the security of these families.[38]  And it would negatively

---

[34] Ike Brannon & Logan Albright, *The Economic and Fiscal Impact of Repealing DACA*, Cato Inst.: Cato at Liberty (Jan. 18, 2017), https://www.cato.org/blog/economic-fiscal-impact-repealing-dacahttps://tinyurl.com/2au7a3cj.

[35] Jose Magaña-Salgado & Tom K. Wong, Immigrant Legal Res. Ctr., *Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare* 1 (2017), http://tinyurl.com/423f9ddc.

[36] *See* Comment Letter from Att'ys Gen., *supra* n.8, at 20.

[37] Svajlenka & Truong, *The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition*, *supra* n.5.

[38] *See* Tom K. Wong et al., *2021 Survey of DACA Recipients Underscores the Importance of a Pathway to Citizenship*, *supra* n.3 (reporting recipients' fears of deportation and family separation if DACA were to end).

affect community welfare and safety as well.  According to a 2020 survey of DACA recipients, without deferred action, recipients would be 30.6 percent less likely to report crimes committed against them, and nearly 50 percent less likely to report wage theft by employers.[39]  This statistic is a matter of particular concern given the heightened vulnerability to crime faced by immigrant communities.[40]

These considerations underscore the importance to amici States of preserving the benefits of DACA and minimizing the harms that would result from its termination.  If this Court concludes that the DACA Final Rule is unlawful, the Court in formulating a remedy must take into account the substantial reliance interests at stake—including those of amici States—which DHS appropriately considered in promulgating the Final Rule.[41]

## CONCLUSION

The Court should deny plaintiffs' motion for summary judgment and grant defendants' cross-motions for summary judgment.  If the Court grants plaintiffs' motion for summary judgment, it should order an appropriately tailored remedy, as discussed above.

---

[39] Tom K. Wong et al., *Amid Changes to the DACA Program and COVID-19, DACA Recipients Are Fired Up and Civically Engaged*, United We Dream (updated Mar. 16, 2022**Error! Hyperlink reference not valid.**), https://tinyurl.com/j3wt9pfj.

[40] *See, e.g.*, Stefano Comino et al., *Silence of the Innocents: Undocumented Immigrants' Underreporting of Crime and Their Victimization*, 39 J. Pol'y Analysis & Mgmt. 1214, 1216 (2020), https://onlinelibrary.wiley.com/doi/full/10.1002/pam.22221h ttps://tinyurl.com/3xx4325j.

[41] *See, e.g.*, DACA Final Rule, 87 Fed. Reg. at 53,174, 53,289 (discussing States' reliance interests).

Dated:      March 9, 2023

                                    Respectfully submitted,

LETITIA JAMES                        ROB BONTA
 *Attorney General of New York*       *Attorney General of California*
BARBARA D. UNDERWOOD                 MICHAEL J. MONGAN
 *Solicitor General*                  *Solicitor General*
ESTER MURDUKHAYEVA                   MICHAEL L. NEWMAN
 *Deputy Solicitor General*           *Senior Assistant Attorney General*
GRACE X. ZHOU                        JOSHUA PATASHNIK
 *Assistant Solicitor General*        *Deputy Solicitor General*
                                     JAMES F. ZAHRADKA II
28 Liberty Street                     *Supervising Deputy Attorney General*
New York, NY 10005
(212) 416-6160                       By:   /s/Joshua Patashnik
grace.zhou@ag.ny.gov                       JOSHUA PATASHNIK
                                           California Bar No. 295120
                                           Application pending for admission *pro hac vice*
                                           to the Southern District of Texas

                                           600 West Broadway, Suite 1800
                                           San Diego, CA  92101
                                           (619) 738-9628
                                           josh.patashnik@doj.ca.gov

                      *(Counsel listing continues on next page)*

                                    16

KRISTIN K. MAYES
*Attorney General*
*Arizona*

PHILIP J. WEISER
*Attorney General*
*Colorado*

WILLIAM TONG
*Attorney General*
*Connecticut*

KATHLEEN JENNINGS
*Attorney General*
*Delaware*

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*

ANNE E. LOPEZ
*Attorney General*
*Hawaii*

KWAME RAOUL
*Attorney General*
*Illinois*

AARON M. FREY
*Attorney General*
*Maine*

ANTHONY G. BROWN
*Attorney General*
*Maryland*

ANDREA JOY CAMPBELL
*Attorney General*
*Massachusetts*

DANA NESSEL
*Attorney General*
*Michigan*

KEITH ELLISON
*Attorney General*
*Minnesota*

AARON D. FORD
*Attorney General*
*Nevada*

RAÚL TORREZ
*Attorney General*
*New Mexico*

JOSHUA H. STEIN
*Attorney General*
*North Carolina*

ELLEN F. ROSENBLUM
*Attorney General*
*Oregon*

MICHELLE A. HENRY
*Acting Attorney General*
*Pennsylvania*

PETER F. NERONHA
*Attorney General*
*Rhode Island*

ROBERT W. FERGUSON
*Attorney General*
*Washington*

JOSHUA L. KAUL
*Attorney General*
*Wisconsin*