**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, ET AL.; | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 1:18-cv-00068 |
| | § | |
| UNITED STATES OF AMERICA, ET AL.; | § | |
| | § | |
| *Defendants,* | § | |
| | § | |
| *and* | § | |
| | § | |
| KARLA PEREZ, ET AL.; | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| *Defendants-Intervenors.* | § | |

**PLAINTIFFS' REPLY IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT AND
MEMORANDUM IN OPPOSITION TO ALL CROSS-
MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................ii

TABLE OF AUTHORITIES ...................................................................................................iii

INTRODUCTION ....................................................................................................................1

     I.     The Court should award declaratory, vacation, and permanent injunctive relief. ....................................................................................................................2

          A.  Declaratory relief is proper.............................................................................2

          B.  Vacatur is proper .............................................................................................2

          C.  Permanent injunctive relief is proper. ..........................................................9

          D.  All relief should be nationwide. ..................................................................14

          E.  No relief sought here is precluded by 8 U.S.C. § 1252(f)(1)....................16

          F.  The provisions of the Final Rule are not severable. .................................20

     II.    Plaintiffs have a cause of action. .......................................................................27

     III.   The Final Rule is unlawful.................................................................................27

          A.  The Final Rule is inconsistent with the INA for the same reasons as the DACA Memorandum.....................................................................................28

          B.  Private Intervenors' attempts to distinguish the Final Rule form the DACA Memorandum fail.........................................................................................28

     IV.   The Final Rule is unconstitutional. ..................................................................29

     V.    The Final Rule is arbitrary and capricious........................................................32

     VI.   Plaintiffs have standing to challenge the DACA program that continues in the Final Rule. ........................................................................................................33

          A.  The Final Rule continues the same DACA program and injures Plaintiffs in the same way....................................................................................................34

          B.  Texas additionally has standing based on costs of issuing driver's licenses.........40

CONCLUSION........................................................................................................................44

CERTIFICATE OF SERVICE .............................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alaska Airlines, Inc. v. Brock,*
    480 U.S. 678 (1987) ..................................................................................23

*Alli v. Decker,*
    650 F.3d 1007 (3d Cir. 2011) .................................................................18

*Almendarez-Torres v. United States,*
    523 U.S. 224 (1998) ..................................................................................17

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...........................................................................28, 29

*Arevalo v. Ashcroft,*
    344 F.3d 1 (1st Cir. 2003) .......................................................................18

*Ass'n of Priv. Colleges & Universities v. Duncan,*
    870 F. Supp. 2d 133 (D.D.C. 2012) ......................................................24

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
    140 S. Ct. 2335 (2020) .......................................................................23, 25

*Belmont Mun. Light Dep't v. FERC,*
    38 F.4th 173 (D.C. Cir. 2022) .................................................................21

*Biden v. Texas,*
    142 S. Ct. 2528 (2022) .......................................................................17, 39

*Brackeen v. Haaland,*
    994 F.3d 249 (5th Cir. 2021) (en banc) .................................................34

*California v. Arizona,*
    452 U.S. 431 (1981) ..................................................................................17

*Cargill v. Garland,*
    57 F.4th 447 (5th Cir. 2023) (en banc) ....................................................3

*Carlson v. Postal Regul. Comm'n,*
    938 F.3d 337 (D.C. Cir. 2019) ...............................................................21

*Carmona v. Toledo,*
    215 F.3d 124 (1st Cir. 2000) ...................................................................43

*Carr v. Alta Verde Indus., Inc.,*
   931 F.2d 1055 (5th Cir.1991)...............................................................................36

*Chamber of Com. of United States of Am. v. United States Dep't of Lab.,*
   885 F.3d 360 (5th Cir. 2018)...............................................................................24

*Christianson v. Colt Indus. Operating Corp.,*
   486 U.S. 800 (1988)...................................................................................... 38, 40

*Cmty. for Creative Non-Violence v. Turner,*
   893 F.2d 1387 (D.C. Cir. 1990).............................................................................23

*In re Core Comm'n, Inc.,*
   531 F.3d 849 (D.C. Cir. 2008) (Griffith, J., concurring)........................................7

*Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r,*
   187 F.2d 789 (3d Cir. 1951)...................................................................................4

*Czyzewski v. Jevic Holding Corp.,*
   580 U.S. 451 (2017)..............................................................................................42

*Dalton v. Specter,*
   511 U.S. 462 (1994)........................................................................................ 30, 31

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor,*
   45 F.4th 846 (5th Cir. 2022) ............................................................................3, 18

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
   140 S. Ct. 1891...........................................................................................*passim*

*Doe ex rel. Doe v. Dallas Indep. Sch. Dist.,*
   220 F.3d 380 (5th Cir. 2000).................................................................................41

*eBay Inc. v. MercExchange, LLC,*
   547 U.S. 388 (2006)..............................................................................................18

*EME Homer City Generation, L.P. v. E.P.A.,*
   795 F.3d 118 (D.C. Cir. 2015) (Kavanaugh, J.)......................................................7

*Feds for Med. Freedom v. Biden,*
   — F.4th —, No. 22-40043, 2023 WL 2609247 (5th Cir. Mar. 23, 2023) (en banc)................ 15, 37

*Fisher v. Univ. of Tex. At Austin,*
   758 F.3d 633 (5th Cir. 2014), *aff'd*, 579 U.S. 365 (2016) ....................................39

*Franciscan All., Inc. v. Becerra,*
   553 F. Supp. 3d 361 (N.D. Tex. 2021)...................................................................40

*Franciscan Alliance, Inc. v. Becerra,*
  47 F.4th 368 (5th Cir. 2022) ..................................................................3, 40

*Garland v. Aleman Gonzalez,*
  142 S. Ct. 2057 (2022) .................................................................................19

*Harmon v. Thornburgh,*
  878 F.2d 484 (D.C. Cir. 1989) ...............................................................3, 18

*Jennings v. Rodriguez,*
  138 S. Ct. 830 (2018) ...................................................................................17

*Judulang v. Holder,*
  565 U.S. 42 (2011) ................................................................................ 12, 32

*King v. Dogan,*
  31 F.3d 344 (5th Cir. 1994) (per curiam) ..................................................37

*Las Vegas Sands, LLC v. Nehme,*
  632 F.3d 526 (9th Cir. 2011) ......................................................................43

*Love v. Motiva Enters., LLC,*
  349 F. App'x 900 (5th Cir. 2009) ...............................................................41

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) .....................................................................................36

*Lujan v. National Wildlife Federation,*
  497 U.S. 871 (1990) ...................................................................................3, 4

*Make the Rd. N.Y. v. Pompeo,*
  475 F. Supp. 3d 232 (S.D.N.Y. 2020) ........................................................31

*Material Handling Techs., Inc. v. Southland Process Grp. LLC,*
  No. 16-cv-1297, 2020 WL 1042236 (W.D. La. Mar. 3, 2020) ...................44

*McGowan v. Maryland,*
  366 U.S. 420 (1961) .....................................................................................42

*MD/DC/DE Broadcasters Ass'n v. FCC,*
  236 F.3d 13 (D.C. Cir. 2001) ......................................................................24

*Medellin v. Texas,*
  552 U.S. 491 (2008) .....................................................................................12

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) .....................................................................................18

*Nat. Res. Def. Council v. EPA,*
    489 F.3d 1250 (D.C. Cir. 2007) (Randolph, J., concurring) ..........................................7, 24

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ................................................................................................................23

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
    145 F.3d 1399 (D.C. Cir. 1998) ..............................................................................................3

*New York SMSA Ltd. P'ship v. Town of Clarkstown,*
    603 F. Supp. 2d 715 (S.D.N.Y. 2009), *aff'd* 612 F.3d 97 (2d Cir. 2010) ...........................23

*O.A. v. Trump,*
    404 F. Supp. 3d 109 (D.D.C. 2019) ........................................................................................5

*Pisano v. Strach,*
    743 F.3d 927 (4th Cir. 2014) ................................................................................................44

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.,*
    No. 6:20-cv-00176, 2022 WL 17489170 (E.D. Tex. Dec. 7, 2022) (Barker, J.) ..................3

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ..............................................................................................................16

*Reno v. American Civil Liberties Union,*
    521 U.S. 844 (1997) ..............................................................................................................23

*Republic Nat. Bank of Miami v. United States,*
    506 U.S. 80 (1992) ................................................................................................................36

*Rodriguez v. Hayes,*
    591 F.3d 1105 (9th Cir. 2010) ..............................................................................................18

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
    140 S. Ct. 2183 (2020) ..........................................................................................................30

*Strag v. Bd. of Trustees, Craven Cmty. Coll.,*
    55 F.3d 943 (4th Cir. 1995) ..................................................................................................44

*Sw. Bell Tele. Co. v. City of El Paso,*
    346 F.3d 541 (5th Cir. 2003) ................................................................................................44

*Sw. Elec. Power Co. v. United States Env't Prot. Agency,*
    920 F.3d 999 (5th Cir. 2019) ................................................................................................33

*Telephone & Data Sys., Inc. v. FCC,*
    19 F.3d 42 (D.C. Cir. 1994) ..................................................................................................24

*Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n,*
 989 F.3d 368 (5th Cir. 2021)...............................................................................6

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.,*
 No. 6:22-cv-372, 2023 WL 1781801 (E.D. Tex. Feb. 6, 2023) (Kernodle, J.) ..................3

*Texas v. Biden,*
 — F. Supp. 3d —, No. 2:21-cv-067-Z, 2022 WL 17718634 (N.D. Tex. Dec. 15,
 2022) (Kacsmaryk, J.) ........................................................................14, 15, 40

*Texas v. Biden,*
 554 F. Supp. 3d 818 (N.D. Tex. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022)...................39

*Texas v. Biden (MPP),*
 20 F.4th 928 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022) ...............*passim*

*Texas v. United States,*
 40 F.4th 205 (5th Cir. 2022) ....................................................................15, 16, 34

*Texas v. United States,*
 549 F. Supp. 3d 572 (S.D. Tex. 2021) ..............................................................*passim*

*Texas v. United States,*
 86 F. Supp. 3d 591 (S.D. Tex. 2015) ...................................................................11

*Texas v. United States (DACA),*
 50 F.4th. 498 (5th Cir. 2022) ......................................................................*passim*

*Texas v. United States (DAPA),*
 809 F.3d 134 (5th Cir. 2015)........................................................................*passim*

*Thomas v. LTV Corp.,*
 39 F.3d 611 (5th Cir. 1994) ...........................................................................28

*United States v. Garcia,*
 604 F.3d 186 (5th Cir. 2010)...........................................................................34

*United States v. Norbert,*
 24 F.4th 1016 (5th Cir. 2022) .........................................................................34

*United States v. Texas,*
 579 U.S. 547 (2016) (per curiam) .....................................................................11

*Util. Air Regul. Grp. v. EPA,*
 573 U.S. 302 (2014).....................................................................................32

*Uzuegbunam v. Preczewski,*
 141 S. Ct. 792 (2021)..................................................................................42

*V.I. Tel. Corp. v. FCC,*
   444 F.3d 666 (D.C. Cir. 2006) ................................................................. 3

*Wages & White Lion Invs., LLC v. U.S. Food & Drug Admin.,*
   16 F.4th 1130 (5th Cir. 2021) ..........................................................6, 14

*Webb v. Davis,*
   940 F.3d 892 (5th Cir. 2019) ................................................................ 43

*Wise v. E.I. DuPont De Nemours & Co.,*
   58 F.3d 193 (5th Cir. 1995) .................................................................. 29

**Statutes**

5 U.S.C. § 706 ...........................................................................................4, 30

5 U.S.C. § 705 .................................................................................................. 4

5 U.S.C. § 706 .................................................................................................. 4

5 U.S.C. § 706(2) ............................................................................................. 4

5 U.S.C. § 706(2)(A) ....................................................................................... 4

6 U.S.C. § 202(5) ........................................................................................... 19

8 U.S.C. § 1103(a)(1) ..................................................................................... 19

8 U.S.C. §§ 1221–1232 ............................................................................ 16, 19

8 U.S.C. § 1225 .............................................................................................. 19

8 U.S.C. §§ 1226, 1227, and 1229a ............................................................. 18

8 U.S.C. § 1252(f)(1) ...............................................................................*passim*

8 U.S.C. § 1252(f) .......................................................................................... 17

8 U.S.C. § 1252(f)(1) ..................................................................................... 16

Tex. Transp. Code § 521.142(a) .................................................................. 41

**Other Authorities**

Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2722 (4th ed.) .......... 43, 44

Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2738 (4th ed.) ............... 43

Administrative Procedure Act, S. Doc. No. 79-248 (1946) ......................... 4

*Black's Law Dictionary* 550 (7th ed. 1999) ........................................................................17

*Black's Law Dictionary* 937 (11th ed. 2019) ......................................................................17

*Black's Law Dictionary* 1612 (3d ed. 1933)..........................................................................4

Federal Rule of Civil Procedure 56(f) .................................................................................44

Federal Rule of Civil Procedure 65(c) .................................................................................17

*Garner's Dictionary of Legal Usage* 295-96 (3d ed. 2011)................................................16

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012 (2018) .............................17

U.S. Const. art. II, § 3...........................................................................................................30

## INTRODUCTION

Plaintiffs the States of Texas, Alabama, Arkansas, Louisiana, Nebraska, South Carolina, West Virginia, Kansas, and Mississippi file this combined (1) reply in support of their motion for summary judgment, ECF No. 625-1, and (2) opposition to the cross-motions for summary judgment of the Federal Defendants, ECF No. 639 ("Fed. Br."); Defendant-Intervenor State of New Jersey, ECF No. 636 ("NJ Br."); and Defendant-Intervenors Elizabeth Diaz, et al. ("Private Intervenors"), ECF No. 642 ("Pvt. Intvn'rs' Br.").

The Federal Defendants "agree that the Final Rule is substantively the same policy as the DACA Memorandum" and "do not seek to relitigate before this Court any matter currently foreclosed by the Fifth Circuit's prior decision on this case" including "standing and the lawfulness of the policies now embodied in the Final Rule." Fed. Br. at 1–2. They only make arguments on those issues to preserve them for appeal. *Id.* at 2. In fact, they "recognize that Fifth Circuit precedent and this Court's prior rulings regarding the DACA Memorandum likely require this Court to hold the substantively equivalent Final Rule is inconsistent with the INA," Fed. Br. at 3, and "acknowledge [that] the Fifth Circuit's ruling that 'Texas has demonstrated standing' to challenge the DACA Memorandum applies equally to Texas's standing to challenge the Final Rule and is, therefore, binding at this juncture." Fed. Br. at 9 (quoting *Texas v. United States (DACA)*, 50 F.4th. 498, 520 (5th Cir. 2022)).

New Jersey does not make such explicit concessions, but their arguments as to the merits nonetheless relitigate the issues already decided by this Court and the Fifth Circuit. Perhaps seeing the writing on the wall, however, New Jersey primarily focuses on the question of the remedy sought in this case.

The Private Intervenors take an altogether different path. They argue that none of the evidence in the record in this case can be used to support Plaintiffs' standing; that this Court's and the Fifth Circuit's prior determinations in this case are inapplicable; and that the Final Rule is materially different

from the DACA Memorandum because the former supposedly provides much greater discretion in evaluating DACA applications. They also find it important that the current DACA recipients are aging and thus must have different (and lesser) effects on Plaintiffs' injuries.

As most of the issues are shared in common, Plaintiffs incorporate the briefing in their motion for summary judgment, ECF No. 625-1, and all the evidence in the record in this case, especially the Appendix to their motion for summary judgment, ECF No. 626.

### I.   The Court should award declaratory, vacation, and permanent injunctive relief.

In their motion for summary judgment, Plaintiffs set forth why they are entitled to a declaratory judgment, vacatur, and permanent injunction against the Final Rule. ECF No. 625-1 at 36– 41. Plaintiffs incorporate all those arguments in this opposition to Defendants' cross-motions for summary judgment.

### A.   Declaratory relief is proper.

No Defendants argue against the propriety of this Court issuing declaratory relief if it finds the Final Rule unlawful. Plaintiffs' argument in favor are thus uncontested. ECF No. 625-1 at 39–40.

### B.   Vacatur is proper.

Federal Defendants argue that vacatur is not a legitimate remedy at all, Fed. Br. at 23–25, and that—even if it were—it is precluded in this case by a specific statutory provision. Fed. Br. at 22–23; *see also* Pvt. Intvn'rs' Br. at 42–43 (Private Intervenors making same argument as to the latter point). New Jersey also argues that vacatur is not appropriate on equitable grounds. NJ Br. at 41–43. Defendants are wrong on all counts.

### 1.   The remedy of vacatur is authorized by the APA.

Federal Defendants make the radical claim that vacatur is not a legitimate remedy under the Administrative Procedure Act ("APA"). Fed. Br. at 23–25. But the Fifth Circuit just recently affirmed

this Court's remedy, finding it "was well within its discretion to order vacatur" of the DACA Memorandum. *DACA*, 50 F.4th at 530. The availability of this remedy is thus the law of the case.

"[V]acatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc). Indeed, "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022); *see also R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, No. 6:20-cv-00176, 2022 WL 17489170, at *21 (E.D. Tex. Dec. 7, 2022) (Barker, J.) (rejecting same argument Federal Defendants make here); *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, No. 6:22-cv-372, 2023 WL 1781801, at *13 (E.D. Tex. Feb. 6, 2023) (Kernodle, J.) (same).

Federal Defendants contend that section 706(2) is merely a rule of decision and does not authorize vacatur. Fed. Br. at 24. But "'[s]et aside' usually means 'vacate.'" *V.I. Tel. Corp. v. FCC*, 444 F.3d 666, 671 (D.C. Cir. 2006). If accepted, Federal Defendants' interpretation would upend decades of APA decisions. For more than 30 years, vacatur has been "the ordinary result" when the D.C. Circuit "determines that agency regulations are unlawful." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). In the Fifth Circuit, vacatur is the "default rule." *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022). And the Supreme Court has affirmed lower court decisions vacating administrative action. *See, e.g., Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1901 & 1916 n.7 (2020).

Federal Defendants' argument also clashes with *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). *See generally Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (discussing *Lujan* during its analysis of the scope of relief to be awarded). *Lujan*'s five-Justice majority observed that an "entire" agency program is "affected" by a successful "challenge[] under the APA." *Lujan*, 497 U.S. at 890 n.2. Similarly, *Lujan*'s four-Justice dissent explained that when a "plaintiff prevails" in APA litigation, "the result is that the rule is invalidated, not simply that the court forbids

its application to a particular individual." *Id.* at 913 (Blackmun, J., dissenting). Against this authority, however, Federal Defendants cite no case adopting their interpretation

Even if it weren't precluded by binding precedent, Federal Defendants' arguments fail even writing on a blank slate. The APA provides that a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts have long relied on the "set aside" authority to vacate unlawful agency actions.

A court "set[s] aside agency action" by vacating it. 5 U.S.C. § 706(2). When Congress adopted the APA, "set aside" meant "to cancel, annul, or revoke." *Black's Law Dictionary* 1612 (3d ed. 1933). The APA "reflected a consensus that judicial review of agency action should be modeled on appellate review of trial court judgments." Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253, 258 (2017). Just five years after the APA's enactment, the Third Circuit explained that section 706(2) "affirmatively provides for vacation of agency action." *Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*, 187 F.2d 789, 790 (3d Cir. 1951).

This interpretation harmonizes the "set aside" authority with the rest of the APA. After all, it would be illogical for the APA to allow a court to "postpone the effective date of an agency action" during litigation, 5 U.S.C. § 705, but be powerless to terminate that action if the court concludes the action is "unlawful," *id.* § 706(2). Likewise, section 706(1) suggests that section 706(2) authorizes vacatur. The former allows courts to "compel" agency action while the latter authorizes the inverse. 5 U.S.C. § 706.[1]

---

[1] Relatedly, Federal Defendants provide an incomplete picture of the APA's legislative history. Fed. Br. at 24. The committee report they cite also paraphrases section 706 as involving the "review and *invalidation* of agency action." Administrative Procedure Act, S. Doc. No. 79-248, at 40 (1946) (emphasis added).

Federal Defendants suggest that if the Final Rule is vacated, vacatur should apply only to the parties. Fed. Br. at 24–25. This atextual argument raises unanswerable questions. "[H]ow could this Court vacate the Rule with respect to the … plaintiffs in this case without vacating the Rule writ large? What would it mean to 'vacate' a rule as to some but not other members of the public?" *O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019). Thus, the Court should reject Federal Defendants' arguments: vacatur is authorized by the APA and it nullifies the agency action rather than precludes its application to any particular parties.

### 2. The Final Rule should be vacated.

Defendants not only argue that vacatur is impermissible, but also that it is improper here. In general, the propriety of vacatur is based on two factors: "(1) the seriousness of the deficiencies of the action, that is, how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur." *DACA*, 50 F.4th at 529 (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)).

Defendants argue that vacatur is improper because (1) DHS is better suited to determining the consequences of its own illegality, and (2) DACA has invoked significant reliance interests. *See* Fed. Br. at 26–28; NJ Br. at 28–43; Pvt. Intvn'rs' Br. at 47–50; *see also* ECF No. 656 ("Br. of Amici Curiae California, *et al.*") at 2–15. But the Final Rule has serious deficiencies as it perpetuates the same unlawful action that this Court previously held as unlawful. Further, the Plaintiffs' reasonably tailored remedy will not cause disruptive consequences because their requested two-year transition period mirrors DACA's renewal period and is consistent with this Court's caveats that none of the relief currently applicable to the Final Rule "requires DHS or the Department of Justice to take any immigration, deportation, or criminal action against any DACA recipient, applicant, or any other individual that [they] would not otherwise take." ECF No. 603 at 1–2; *see also* ECF No. 576 at (same clarification in permanent injunction issued against enforcement of DACA Memorandum).

### a.  DHS will not be able to justify its decision on remand.

Regarding the first factor, Defendants ask this Court to remand the remedial decision to DHS because it is supposedly in the best position to decide its own fate with regards to DACA and the Final Rule. *See* Fed. Br. at 26–27; NJ Br. at 41–43; Pvt. Intvn'rs' Br. at 49–50; *see also* Br. of Amici Curiae California, *et al.* at 4–6. That is not the case.

To begin, the Plaintiffs are not asking this Court to judge the rightness or wrongness of immigration *policy*. Instead, the Plaintiffs are asking this Court to uphold immigration *law*. Thus, while Federal Defendants assert that "the complexities involved in [this] policy" put DHS in the "best position[] to exercise the 'full scope of [its] discretion[]' … in considering how to effectuate any wind-down," Fed. Br. at 27, Plaintiffs are not asking this Court to determine what policy is "right"— they are asking that this Court determine whether the Final Rule is lawful. *See Wages & White Lion Invs., LLC v. U.S. Food & Drug Admin.,* 16 F.4th 1130, 1143 (5th Cir. 2021) ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends.") (citation omitted).

Even if this Court did remand to DHS, it would be impossible for the agency to fix the legal deficiencies of the Final Rule. Remand to an agency "is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) (citing *Central and South West Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000)).

Here, DHS will not be able to make such a substantiation because there is no possibility that it could correct the fundamental errors of DACA continued by the Final Rule. When the Fifth Circuit considered the first factor in the propriety of vacatur framework described above, it concluded that there was "no possibility that DHS could obviate the[] conflicts on remand" because DACA had "severe" deficiencies and "fundamental substantive defects" that "contradict[ed] significant portions of the INA." *DACA*, 50 F.4th at 529. And just like in *DACA*, the Final Rule commits the same legal

wrongs, continues the same severe substantive defects, and contradicts the same significant portions of the INA. As such, it should suffer the same legal fate.

But now, the Defendants want this Court to endorse such blatant agency indifference by allowing DHS to continue the same unlawful action through remedial sidestepping. "[R]emand without vacatur creates a risk that an agency may drag its feet and keep in place an unlawful agency rule. *EME Homer City Generation, L.P. v. E.P.A.*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.). Remanding without vacatur would "invite[] agency indifference." *In re Core Comm'n, Inc.*, 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) (urging courts "to consider the alternatives to the open-ended remand without vacatur"); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such.").

DHS has had opportunities to solve this problem within the bounds of law. It failed when it tried to terminate the DACA program during the Trump Administration. And when the Biden Administration had the chance, and adopted the Final Rule, it doubled down on the same substantive legal flaws as the DACA Memorandum. Accordingly, this Court should vacate the Final Rule entirely and not give DHS any more chances to further drag out this unlawful program—the beneficiaries of this program use any further delay to argue that their "reliance interests have only grown stronger over time." Pvt. Intvn'rs' Br. at 48.

### b.  Vacatur will not cause disruptive consequences.

Turning to the second vacatur factor, Defendants argue that the termination of DACA and the Final Rule would cause substantial disruptive consequences because of the reliance interests at stake. *See* NJ Br. at 29–43; Fed. Br. at 21–32; Pvt. Intvn'rs' Br. at 49–50; *see also* Br. of Amici Curiae California, *et al.* at 6–15. Defendants also contend that Plaintiffs' proposed two-year transition period

for current DACA recipients has "no justification," NJ Br. at 41, and is an "arbitrary timeframe" that "cannot be squared with *Regents*," Fed. Br. at 27.

Addressing the disruptiveness of DACA, the Fifth Circuit concluded that this Court was "well within its discretion to order vacatur." *DACA*, 50 F.4th at 530 (citing *Am. Bankers Ass'n v. Nat'l Credit Union Ass'n*, 934 F.3d 649, 673 (D.C. Cir. 2019)). The Fifth Circuit based this conclusion on the fact that this Court considered the reliance interests, crafted a remedy tailored to them and the legal wrong, and exhibited sufficient restraint in ordering its remedy. *See id.*

Here, Plaintiffs are simply asking that the same remedy upheld by the Fifth Circuit apply to the Final Rule. The one difference is that the previous vacatur was stayed for existing recipients "pending the outcome of a rulemaking proceeding" that would likely solve the procedural problems and could have conceivably solved the substantive problems of the DACA Memorandum. *Id.* The rationale for that prudent stay no longer applies when that rulemaking proceeding led to a substantively identical agency action.

And contrary to Defendants' arguments, Plaintiffs did not invent the two-year transition period; this period is based on the Final Rule itself, which provides a two-year period for deferred action. AR2022_100284, 87 Fed. Reg. 53,241. After all, "DHS believes that 2 years is an appropriate frequency for review and decision on whether to continue to favorably exercise discretion in the form of deferred action." *Id.* And while "DHS recognizes and appreciates that biennial renewal requests may cause uncertainty for DACA recipients," that did not stop it from continuing to adopt the two-year renewal provision in the Final Rule. *Id.* DACA recipients are not entitled to rely on any status that extends beyond that provided in the Final Rule itself (and has existed with those limits since the beginning of the DACA program). The Final Rule recognizes that "the DACA policy as codified in this rule … is not a permanent solution for affected persons." AR2022_100226, 87 Fed. Reg. at

53,183. New Jersey's proposal to permanently allow renewals of current DACA recipients, NJ Br. at 38, asks more from this Court than the Final Rule itself grants.

Moreover, Plaintiffs tailored their requested relief so that current DACA recipients have *at least* two years (and potentially up to four years) to find alternative means and file renewals within this two-year period. *See* ECF No. 625-1 at 5 (asking that "Defendants should be prevented from approving … after two years from the date of judgment, any DACA renewal applications."). Contrast this with the Trump Administration's attempt at winding down renewals under DACA, which "would entertain applications for two-year renewals from [only those] DACA recipients whose benefits were set to expire within six months." *Regents*, 140 S. Ct. at 1903. Therefore, like this Court's order in *DACA*, vacatur in this case—when tempered with a generous winding-down period based on the program's own renewal periods—does not cause disruptive consequences and accounts for the legitimate (but modest) reliance interests of current DACA recipients reflected in the Final Rule that continues the same policies as the DACA Memorandum.

### C.  Permanent injunctive relief is proper.

Here, Plaintiffs' proposed remedy satisfies the demands of equity. Defendants argue against Plaintiffs' requested relief because of a purportedly unjustifiable delay by Plaintiffs and the resulting reliance interests of current DACA recipients. *See* NJ Br. at 33–41; Fed. Br. at 21–32; Pvt. Intvn'rs' Br. at 44–50; *see also* Br. of Amici Curiae California, *et al.* at 3–15. But while Defendants preach equity, they perpetuate illegality. They do so by placing undue weight on an alleged six-year delay that fits uncomfortably with Plaintiffs' prompt challenge to the Final Rule. They also exaggerate the strength of accumulated reliance interests while ignoring the public's interest in agencies complying with the law.

**1.  Defendants erroneously rely on a six-year delay before DACA was challenged.**

Defendants assert that the Plaintiffs' remedy merits restraint because of an alleged six-year delay in challenging the agency action at issue. *See* NJ Br. at 34–35, 38–39; Pvt. Intvn'rs' Br. at 47–48. But Plaintiffs expeditiously challenged the Final Rule, as demanded by the Fifth Circuit's remand order. The Final Rule was promulgated on August 30, 2022 and went into effect on October 31, 2022. AR2022_100195, 87 Fed. Reg. 53,152. Within a few short months, Plaintiffs filed a supplemental complaint challenging this unlawful agency action. *See* ECF No. 623. This timeframe does not demonstrate an "inexcusable delay" of six years. NJ Br. at 38. Nor does this delay give "rise to legitimate reliance interest on the part of DACA recipients" or show that "Plaintiffs waited six years to seek relief." Pvt. Intvn'rs' Br. at 47–48.

Plaintiffs, recognize, however, that the Final Rule is a continuation of the DACA Memorandum,[2] and any reliance interests from the latter should be considered. But this Court should still enjoin the Final Rule because litigation was not the only legitimate tool available to challenge the DACA Memorandum.

Recall that the DACA Memorandum was issued on June 15, 2012. Exhibit 1 (App.002). President Obama was facing reelection in a few months, and his opponent promised to end DACA.[3] There was a serious prospect that the legal controversy over the program would be resolved by a

---

[2] Strangely, Private Intervenors rely on the delay in challenging the DACA Memorandum as supporting their reliance interests today, even while they maintain that the Final Rule is an entirely new program from the DACA Memorandum. Pvt. Intvn'rs' Br. at 18–19. If so, how can they have reliance interests in this new program?

[3] *See* Julia Preston, *A Romney Stance Causes Turmoil for Young Immigrants*, N.Y. Times (Oct. 20, 2012), at https://www.nytimes.com/2012/10/21/us/politics/romneys-stance-on-obama-reprieves-panics-young-immigrants.html.

change in administration. And after President Obama's reelection, there was a prospect that Congress would resolve the issue: the House of Representatives voted to defund DACA on June 5, 2013.[4]

Then, when the Obama Administration on November 20, 2014 moved to expand DACA along with the DAPA program, Plaintiffs filed suit in this Court within two weeks. Plaintiffs and other States filed a lawsuit in this Court because DHS "expand[ed] DACA eligibility by removing the age cap, shifting the date-of-entry requirement from 2007 to 2010, and extending the deferred action and work authorization period to three years." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1902 (2020). On February 16, 2015, this Court issued a nationwide preliminary injunction against DAPA and Expanded DACA. *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015). And after the Fifth Circuit upheld this Court's preliminary injunction in Plaintiffs' favor on November 9, 2015, *see Texas v. United States (DAPA)*, 809 F.3d 134, 146 (5th Cir. 2015), the Supreme Court affirmed by an equally divided vote on June 23, 2016, *see United States v. Texas*, 579 U.S. 547 (2016) (per curiam).

Then, on top of litigating Expanded DACA and DAPA, Plaintiffs attentively requested in June of 2017 that the newly inaugurated Trump Administration rescind and phase out DACA because of its illegality. *See* Exhibit 11 (App.322–24). A few months later, DHS issued a memorandum rescinding the DACA Memorandum. *See* Exhibit 10 (App.318–20). But because many individuals and third parties challenged the recission as unlawful in 2017 and 2018, Plaintiffs were involved in defending the validity of DACA's recission. *See Regents*, 140 S. Ct. at 1902.

Thus, it was only after years of litigating issues concerning DAPA and Expanded DACA that Plaintiffs affirmatively challenged the DACA memorandum in May 2018. *See* ECF No. 1. This procedural history means that Plaintiffs' actions did not evidence "their own strategic decision to

---

[4] *See* Lisa Mascaro, *GOP rejects Dream Act-like deportation deferrals*, L.A. Times (June 6, 2013), at https://www.latimes.com/politics/la-xpm-2013-jun-06-la-pn-gop-rejects-deportation-deferrals-20130606-story.html.

delay" its challenge to DACA, *see* NJ Br. at 38, and did not make the reliance interests "stronger." Pvt. Intvn'rs' Br. at 48. Rather, the Plaintiffs' actions demonstrate their assiduous efforts in challenging the DACA memorandum and the issues surrounding it with every tool available.

The resolution of the legal issues in the DAPA litigation would have led reasonable DACA recipients to discount their reliance on the DACA program because "attempts to distinguish DACA and DAPA are unavailing." *DACA*, 50 F.4th at 527. It was prudent for Plaintiffs to have the legal issues in the DAPA and Enhanced DACA litigation resolved—and seek to have the DACA program terminated by legislative or executive action—before moving on to the DACA Memorandum itself.

Regardless, any delay does not impact the propriety of an injunction in this case. After all, this Court still issued an order enjoining the Defendants from granting any new DACA requests in spite of any alleged delay, *see Texas v. United States*, 549 F. Supp. 3d 572, 624 (S.D. Tex. 2021), and the Fifth Circuit still affirmed such an order, *see DACA*, 50 F.4th at 508. After all "[a]rbitrary agency action becomes no less so by simple dint of repetition," *Judulang v. Holder*, 565 U.S. 42, 61 (2011), "longstanding capriciousness receives no special exemption from the APA," *id.*, and "[p]ast practice does not, by itself, create power." *Medellin v. Texas*, 552 U.S. 491 (2008) (quoting *Dames & Moore v. Regan,* 453 U.S. 654, 686 (1981)).

Accordingly, any delays do not prevent this Court from ordering the appropriate equitable relief of an injunction.

### 2.  Plaintiffs' requested injunctive relief accounts for the public interest, as well as the reliance interests of current DACA recipients.

In addition to Defendants' delay arguments, they argue that the reliance interests of DACA recipients mean that the Plaintiffs' proposed interest does not comport with equity principles or serve the public interest. *See* NJ Br. at 33–41; Fed. Br. at 21–32; Pvt. Intvn'rs' Br. at 44–50; *see also* Br. of Amici Curiae California, *et al.* at 3–15. But this argument is incomplete and incorrect.

Indeed, while Defendants engage in an exhaustive discussion of the reliance interests of *current* DACA recipients, fails to even recognize that *future* DACA recipients do not have any reliance interests in the Final Rule because their DACA applications would not have been granted pursuant to this Court's previous injunction order. *See* ECF No. 576 at 3–4. This Court even removed any reliance interests that prospective DACA recipients may have when it previously ordered DHS to "post a public notice … to be displayed prominently on its website and on the websites of all other relevant agencies, that a United States District Court has found the DACA program to be illegal." *Id.* at 5.

Of course, Plaintiffs understand that current DACA recipients have *some* reliance interests. But those reliance interests are weak—especially when any DACA recipient's approval can be revoked at the whim of USCIS. *See* AR2022_100342, 87 Fed. Reg. 53,299 ("USCIS may terminate a grant … at any time in its discretion."). And any reliance interests that States supporting DACA may have, *see, e.g.,* NJ Br. at 32–33; Br. of Amici Curiae California, *et al.* at 7–15, can be no stronger than that of the DACA recipients themselves.

In addition, the Final Rule acknowledges that *Regents* recognized that the DACA Memorandum's "statement that it 'conferred no substantive rights'" and "its limitation to two-year grants"—features continuing in the Final Rule—were "surely pertinent in considering the strength of any reliance interests." AR2022_100208—09, 87 Fed. Reg. at 531645—166 (quoting *Regents*, 140 S. Ct. at 1913). In the Final Rule, "DHS recognizes, as the [*Regents*] Court did, that the expressly limited and discretionary nature of the deferred action conferred upon individuals under the DACA policy (who are not guaranteed a grant or renewal of DACA, whose DACA may be terminated in USCIS' discretion, and who have no right to remain in the United States) is relevant to the assessment of reliance interests." AR2022_100209, 87 Fed Reg. at 53,166. Indeed, the Fifth Circuit—after this Court's grant of summary judgment—described the DACA recipients' reliance interests as "*weak*" due

to these features. *Texas v. Biden (MPP)*, 20 F.4th 928, 990 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022).

Nonetheless, in light of the reliance interests that do exist, the Plaintiffs have crafted their proposed injunction and remedy to account for such interests by including a two-year transition period that matches the renewal structure of the Final Rule and the previous injunction orders of this Court. Indeed, this Court has previously recognized that, despite the purported reliance interests of current DACA recipients, an injunction is appropriate against the Federal Defendants because "[t]he public interest is aways served by the cessation of a program that was created in violation of law and whose existence violates the law." ECF No. 576 at 2 (citing *Trump v. Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring)). There is a "public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. Biden*, — F. Supp. 3d —, No. 2:21-cv-067-Z, 2022 WL 17718634, at *17 (N.D. Tex. Dec. 15, 2022) (Kacsmaryk, J.) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). This remains true "even in pursuit of desirable ends." *Wages & White Lion Invs.*, 16 F.4th at 1143 (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021)). Furthering that public interest is precisely what Plaintiffs seek here.

Therefore, while current DACA recipients do have reliance interests, those interests are not strong enough to overcome the tailored relief that Plaintiffs request; that this Court has previously granted; and that the Fifth Circuit previously upheld. Accordingly, this Court should grant Plaintiffs their requested relief.

### D.  All relief should be nationwide.

Federal Defendants argue that any injunctive relief should be limited to the State of Texas, because no other Plaintiff "even attempted to establish a harm because of DACA." Fed. Br. at 29.

But relief applying to Texas alone would not provide even Texas any relief, because "there is a substantial likelihood that a geographically-limited injunction would be ineffective because [DACA] beneficiaries would be free to move among states." *DAPA*, 809 F.3d at 188; *see also Biden*, 2022 WL 17718634, at \*18 ("'[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective,' as aliens would simply enter the United States through a non-party State.") (brackets in original, quoting *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th Cir. 2022)). "In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas*, 40 F.4th at 229 n.18.

That this incidentally benefits the other Plaintiff States (and other States as well) is not unusual. While "'as a general rule, American courts of equity did not provide relief beyond the parties to the case[,]' [a]s with all general rules, of course, this one was subject to exceptions—the most important of which was that an injunction *could* benefit non-parties as long as 'that benefit was merely incidental.'" *Feds for Med. Freedom v. Biden*, — F.4th —, No. 22-40043, 2023 WL 2609247, at \*16 (5th Cir. Mar. 23, 2023) (en banc) (quoting *Trump*, 138 S. Ct. at 2427 (Thomas, J., concurring)).

Finally, Federal Defendants make the extraordinary suggestion that an injunction could be tailored to pop in and out of existence as to particular DACA recipients when they cross into or out of the State of Texas. Fed. Br. at 30. It is difficult to imagine a more damaging remedy to the constitutional requirement of a uniform immigration system.

Because "[t]he Constitution requires 'an *uniform* Rule of Naturalization,'" *DAPA*, 809 F.3d at 187 (quoting U.S. Const. art. I, § 8, cl. 4) (emphasis in original), "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*,'" *id.* at 187–88 (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384) (emphasis in original), "and the Supreme Court has described immigration policy as 'a comprehensive and *unified* system,'" *id.* at 188 (quoting *Arizona v. United States*, 567 U.S. 387, 401

(2012)), meaning that "[p]artial implementation of [DACA] would "detract[ ] from the 'integrated scheme of regulation' created by Congress," *id.*(quoting *Arizona*, 567 U.S. at 401). This Court would not be acting within the confines of equity if its remedy undercut constitutional and statutory requirements of national uniformity in this area.

### E.  No relief sought here is precluded by 8 U.S.C. § 1252(f)(1).

In the teeth of Fifth Circuit precedent, Federal Defendants and the Private Intervenors maintain that 8 U.S.C. § 1252(f)(1) bars both vacatur and the injunctive relief sought here.[5] Fed. Br. at 22–23; Pvt. Intvn'rs' Br. at 42–44.

#### 1.  Vacatur is not barred by Section 1252(f)(1).

Section 1252(f)(1)'s "[l]imit on injunctive relief" provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" sections 1221–1232 of Title 8. 8 U.S.C. § 1252(f)(1). "By its plain terms, and even by its title," section 1252(f)(1) "is nothing more or less than a limit on injunctive relief." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999).

The Fifth Circuit has repeatedly held that vacatur is not precluded by Section 1252(f)(1) *See DACA*, 50 F.4th at 528 ("As an initial matter, § 1252(f)(1) does not apply to vacatur."); *Texas*, 40 F.4th at 219 (rejecting DHS argument that "vacatur 'prohibits' DHS from implementing the [challenged agency action] and *de facto* 'enjoin[s] or restrain[s]' the agency's enforcement decisions," and was therefore barred by Section 1252(f)(1)).

This provision further confines itself to injunctions through its reference to remedies that "enjoin or restrain." 8 U.S.C. § 1252(f)(1). As "common doublets in legal writing" "restrain and enjoin" are often used as "coupled synonyms." *Garner's Dictionary of Legal Usage* 295-96 (3d ed. 2011).

---

[5] No Defendant claims that declaratory relief is barred by this provision.

Indeed, dictionaries contemporaneous to the passage of section 1252(f)(1) defined "enjoin" as "restrain by injunction." *Black's Law Dictionary* 550 (7th ed. 1999). "Enjoin" and "restrain," independently and as a doublet, refer to injunctive relief. Indeed, the Supreme Court has entered injunctions against parties in its original-jurisdiction docket by holding that they are "enjoined and restrained." *E.g., California v. Arizona*, 452 U.S. 431, 432 (1981).

Of course, at times, "enjoin" and "restrain" refer to injunctions and restraining orders as distinct from one another. For example, Federal Rule of Civil Procedure 65(c) describes the subject of a "preliminary injunction" or "temporary restraining order" as a party "enjoined or restrained." Whether treated as synonyms or references to two types of injunctive relief, "enjoin or restrain" as used in section 1252(f)(1) specifies injunctive relief.  Subsection 1252(f)'s title, "Limit on injunctive relief," confirms this interpretation. 8 U.S.C. § 1252(f). "[T]he heading of a section" is a "tool available for the resolution of a doubt about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (cleaned up). Here, section 1252(f)'s "title—'Limit on injunctive relief'—makes clear the narrowness of [the statute's] scope." *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022). It "prohibits … injunctive relief." *Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018).

Contrary to Federal Defendants' contention, vacatur is not "[m]uch like an injunction." Fed. Br. at 23. "[A]n injunction is a judicial process or mandate operating *in personam* by which, upon certain established principles of equity, a party is required to do or refrain from doing a particular thing." *Black's Law Dictionary* 937 (11th ed. 2019) (quoting 1 Howard C. Joyce, *A Treatise on the Law Relating to Injunctions* § 1, at 2-3 (1909)). Vacatur does not operate *in personam*, and it does not involve coercion as Federal Defendants assert. Fed. Br. at 23.

Instead, vacatur operates against a challenged action, is self-executing, and is accomplished through the court's order. It operates "in the same way that an appellate court formally revokes an erroneous trial-court judgment." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933,

1012 (2018). Nor does vacatur "compel[] officials" to do or "refrain" from anything. Fed. Br. at 23.

(quoting *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022)) (cleaned up). Like the revocation

of a court order, judicial annulment of administrative action may alter a party's conduct, but it does

not order anyone to do anything. Vacatur thus does not "involve coercion." Fed. Br. at 23. The two

remedies differ in additional ways. "An injunction is a[n] … extraordinary remedy," *Monsanto*, 561 U.S.

at 165, while vacatur is "the ordinary result," *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir.

1989). Injunctions "should not be granted as a matter of course," *Monsanto Co. v. Geertson Seed Farms*,

561 U.S. 139, 165 (2010), but vacatur is the "default," *Data Mktg. P'ship, LP*, 45 F.4th at 859.

Injunctions require showing "an irreparable injury," and both "the public interest" and "the balance

of hardships between the plaintiff and defendant" must favor injunctive relief. *eBay Inc. v. MercExchange,*

*LLC*, 547 U.S. 388, 391 (2006). Vacatur's "less drastic remedy," *Monsanto*, 561 U.S. at 165, requires

none of those showings.

Defendants also maintain that the term "restrain" in Section 1252(f)(1) sweeps beyond

injunctive relief. Fed. Br. at 23. But the word "'restrain' in Section 1252(f) is best read to refer to

temporary injunctive relief." *Rodriguez v. Hayes*, 591 F.3d 1105, 1119 (9th Cir. 2010); *Alli v. Decker*, 650

F.3d 1007, 1013 (3d Cir. 2011) ("'[R]estrain' refers to one or more forms of temporary injunctive relief,

such as a temporary restraining order or preliminary injunction"); *Arevalo v. Ashcroft,* 344 F.3d 1, 7 (1st

Cir. 2003) ("The most sensible way to give operative effect to both words in this statutory scheme is

to treat the word 'enjoin' as referring to permanent injunctions and the word 'restrain' as referring to

temporary injunctive relief....").

### 2.   The injunction sought in this case is not barred by Section 1252(f)(1).

Federal Defendants also believe that injunctive relief cannot bar the enforcement or

application of the Final Rule because Plaintiffs "invoke 8 U.S.C. §§ 1226, 1227, and 1229a and argue

that DACA prohibits 'immigration officials from enforcing these parts of the INA.'" Fed. Br. at 23

(citing Plaintiffs' Motion for Summary Judgment at 13–15); *see also* Pvt. Intvn'rs' Br. at 43–44 (Private Intervenors making the same argument, adding 8 U.S.C. § 1225 to the list).

The first problem with this argument is that both this Court and the Fifth Circuit cited those same provisions for the same reasons Plaintiffs have here—and the injunction was not therefore barred by Section 1252(f)(1). *See Texas*, 549 F. Supp. 3d at 607–08, 610; *DACA*, 50 F.4th at 525 & nn.195–97.

Defendants are confused as to what Section 1252(f)(1) forbids. It does not preclude injunctive relief whenever any provision within 8 U.S.C. §§ 1221–1232 is *relevant*; it forbids any injunctions that "order federal officials to take or refrain from taking actions to enforce, implement, or otherwise carry out" authority granted under those sections. *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022).

This Court's current injunction already applies to the Final Rule, *see* ECF No. 603, which certainly complicates Defendant' arguments on this point. Nothing in the current injunction "requires DHS or the Department of Justice to take any immigration, deportation, or criminal action against any DACA recipient, applicant, or any other individual that [they] would not otherwise take." ECF No. 603 at 1–2; *see also* ECF No. 576 at (same clarification in permanent injunction issued against enforcement of DACA Memorandum).

This is why the injunction does not violate Section 1252(f)(1)—it in no way requires Federal Defendants to *take* any action pursuant to those statutory provisions. And an injunction against the Final Rule would also not force DHS to "*refrain* from taking" actions to implement any part of 8 U.S.C. §§ 1221–1232 because the DACA program's purported sources of authority are outside those provisions. *See* Fed. Br. at 2 ("DACA is an exercise of DHS's statutory authority to '[e]stablish[] national immigration enforcement policies and priorities,' 6 U.S.C. § 202(5), and to otherwise 'administ[er] and enforc[e]' the immigration laws, 8 U.S.C. § 1103(a)(1), by deferring the removal of certain undocumented noncitizens.") (alterations in original). Plaintiffs seek nothing more than the

same type of relief here—they do not ask for relief that requires the enforcement of the immigration laws against any particular individual.

Private Intervenors also argue that because the injunction sought here would apply not just to initial applications but also to renewals changes the Fifth Circuit's answer to this question. Pvt. Intvn'rs' Br. at 44. They misunderstand what the Fifth Circuit meant when it said that Section 1252(f)(1) did not "apply to the injunction in this case." *DACA*, 50 F.4th at 529. It was of course true that *one reason* it didn't apply was because the injunction was stayed altogether for existing DACA recipients, but the court noted that it also did not apply because this Court's "judgment does not require the removal of any DACA applicant. It bears repeating: the district court's judgment does not require DHS to remove anyone." *Id.* That same rationale would apply to the injunction sought here as to existing DACA recipients, which does not ask for an injunction ordering DHS to take any sort of enforcement action against them.

### F.  The provisions of the Final Rule are not severable.

Federal Defendants argue that lawful presence, work authorization, and the attendant benefit portions of the Final Rule should be severed from the remainder of the Rule, such as the forbearance portion. *See* Fed. Br. at 25–26. Their argument relies on the inclusion of a severability clause[6] and the

---

[6] The Final Rule contains the following severability clause:

Any provision of this subpart held to be invalid or unenforceable as applied to any person or circumstance shall be construed so as to continue to give the maximum effect to the provision permitted by law, including as applied to persons not similarly situated or to dissimilar circumstances, unless such holding is that the provision of this subpart is invalid and unenforceable in all circumstances, in which event the provision shall be severable from the remainder of this subpart and shall not affect the remainder thereof.

AR2022_100342, 87 Fed. Reg. 53,299–300; 8 C.F.R. § 236.24(a); *see also id.* § 236.24(b) (The provisions in § 236.21(c)(2) through (4) and § 274a.12(c)(14) and 274a.12(c)(33) are intended to be severable from one another…").

alleged distinction between forbearance and the other components of Final Rule. *See* Fed. Br. at 25–26. But the Federal Defendants' arguments are contradicted by the justifications for the Final Rule.

True, courts may "sever a rule by setting aside only the offending parts of the rule." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019) (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988)). But "whether an agency [action] is severable turns on the agency's intent." *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 187 (D.C. Cir. 2022) (citations omitted). In particular, courts must make two determinations to find a rule severable: (1) there must not be "substantial doubt that the agency would have adopted the same disposition regarding the unchallenged portion if the challenged portion were subtracted," *Belmont Mun. Light Dep't*, 38 F.4th at 187–88 (citations omitted), and (2) the remainder of the rule must "function sensibly without the stricken provision," *id.* at 188 (citations omitted).

Here, the Final Rule fails both elements. *First*, the agency sets forth substantial doubt that it would have adopted only the forbearance aspect and not the lawful presence, work authorization, and attendant benefits components. Indeed, while the Final Rule "provides for temporary forbearance from removal without requiring the conferral of other benefits," AR2022_100237, 87 Fed. Reg. 53,194 (alterations and internal quotations omitted), it also states (contradictorily) that "[s]uch a structure has certain benefits," *id.* And on top of these internal inconsistencies, any severability of the Final Rule would contravene its ultimate purpose in the first place, which is "that work authorization will enable [DACA recipients] to support themselves and their families, and to contribute to our economy, while they remain." AR2022_100198, 87 Fed. Reg. 53,155 (quoting Preserving and Fortifying Deferred Action for Childhood Arrivals, 86 Fed. Reg. 7053 (Jan. 20, 2021)).

Moreover, actions speak louder than words. Thus, even more illuminating than the textual contradictions are DHS's actions in considering different permutations of forbearance-only policies

and rejecting them all in the Proposed Rule, *see* AR2022_100075–76, 87 Fed. Reg. 53,810–811, and even in the Final Rule, *see* AR2022_100299, 87 Fed. Reg. 53,256.

In fact, DHS specifically "considered a range of regulatory alternatives to the proposed rule, including alternatives related to a policy of forbearance without employment authority or the benefits associated with so-called lawful presence." *See* AR2022_10075, 87 Fed. Reg. 53,810. As part of this consideration, DHS itself noted that "a policy of forbearance *without* work authorization" would impose a litany of problems on society. AR2022_10075, 87 Fed. Reg. 53,811 (emphasis added). Specifically, such a forbearance-only policy would, among other things, (1) "disrupt the reliance interests of hundreds of thoughts of people, as well as the families, employers, and communities that rely on them;" (2) "result in substantial economic harm;" (3) "potentially result in hundreds of thousands of prime-working-age people remaining in the United States while lacking authorization to work to support either themselves or their families;" and (4) even "produce a great deal of human suffering, including harms to dignitary interests[] associated with lost income and ability to self-support." *Id.*

Likewise, even with a regulatory alternative that included forbearance and work authorization but excluded lawful presence provisions, "DHS believe[d] that [such an] alternative approach also may be inferior to the proposal" because (1) it "would single out DACA recipients … for differential treatment," and (2) "States have keyed benefits eligibility to lawful presence." *Id.*

And in the Final Rule, a commenter said that "deferred action and work authorization are not separate." AR2022_100298, 87 Fed. Reg. 53,255. Tellingly, DHS did not disagree. *See* AR2022_100299, 87 Fed. Reg. 53,256. Rather, DHS "appreciate[d] the commenters' statements regarding regulatory alternatives" and "agree[d] that a policy of forbearance without work authorization—while still a policy that would carry substantial benefits—*would harm* the substantial

reliance interest of thousands of DACA recipients, their families, employers, and communities." *Id.* (emphasis added).

The internal inconsistency and DHS's actions demonstrate the insufficiency of a severability clause in the Final Rule to satisfy this first element. After all, while the presence of the severability clause in the Final Rule is an indication that the agency would have adopted the remaining portions if one or more were vacated,[7] "a severability clause is an aid merely; not an inexorable command." *Reno v. American Civil Liberties Union,* 521 U.S. 844, 884–885, n. 49 (1997) (internal quotation marks omitted). The "determination of severability will rarely turn on the presence or absence of [a severability clause]." *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990) (quoting *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968)); *see also New York SMSA Ltd. P'ship v. Town of Clarkstown*, 603 F. Supp. 2d 715, 734 (S.D.N.Y. 2009), *aff'd* 612 F.3d 97 (2d Cir. 2010) ("[T]he presence of [a severability] clause is not dispositive.") (internal quotation marks omitted).

In a well-known example, while both the majority opinion and Justice Ginsburg's separate opinion in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) indicated that the Court would adhere to a severability clause instructing that the Medicaid expansion be severed from the rest of the Act,[8] the majority opinion nevertheless proceeded to determine—as if it were a totally separate inquiry— "what Congress would have intended in light of the Court's constitutional holding." *Id.* at 586

---

[7] *See, e.g.*, *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2349 (2020) (explaining that the inclusion of a severability clause in a statute demonstrates "that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision"); *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987)).

[8] *See NFIB*, 567 U.S. at 585–86 ("We then follow Congress's explicit textual instruction to leave unaffected 'the remainder of the chapter, and the application of [the challenged] provision to other persons or circumstances.'"); *id.* at 2642 (Ginsburg, J., concurring in part, concurring in the judgment in part, and dissenting in part) ("In view of the Chief Justice's disposition, I agree with him that the Medicaid Act's severability clause determines the appropriate remedy.").

(quoting *United States v. Booker*, 543 U.S. 220, 246 (2005)). In doing so, the Court looked beyond the severability clause.

In line with this precedent, the Final Rule, as a "comprehensive regulatory package[,] is plainly not amenable to severance," *Chamber of Com. of United States of Am. v. United States Dep't of Lab.*, 885 F.3d 360, 388 (5th Cir. 2018), because its component parts are "intertwined," thereby " giv[ing] rise to a substantial doubt that a partial affirmance would comport with the [agency's] intent." *Telephone & Data Sys., Inc. v. FCC,* 19 F.3d 42, 50 (D.C. Cir. 1994); *see also Ass'n of Priv. Colleges & Universities v. Duncan*, 870 F. Supp. 2d 133, 154 (D.D.C. 2012) ("Because the Department has repeatedly emphasized the ways in which the debt repayment and debt-to-income tests were designed to work together, *see* Debt Measure Rule, 76 Fed. Reg. at 34,394–400, the tests are obviously 'intertwined'— and so the court cannot sever one from the others. The entire debt measure rule must therefore be vacated and remanded to the Department."). In fact, the work authorization is so intertwined with DACA that the Final Rule itself explained how "DACA recipients' ability to work lawfully while in the United States is an important component of DHS's broader initiative to preserve and fortify the DACA policy." AR2022_100238, 87 Fed. Reg. 53,195. DHS even went so far as to describe work authorization as "*necessary* and appropriate for the DACA population." AR2022_100234, 87 Fed. Reg. 53,191 (emphasis added). The Private Intervenors helpfully list many statements from the Notice of Proposed Rulemaking that point to the disastrous effects of a "policy of forbearance without work authorization." Pvt. Intvn'rs' Br. at 9 (quoting AR2022_100336, 87 Fed. Reg. 53293).

And as the D.C. Circuit has observed when invalidating a rule in its entirety, here "it is clear that severing all ... [of the invalid sections] would severely distort the [Agency's work] and produce a rule strikingly different from" the one DHS promulgated and has defended in court, making severance inappropriate. *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 23 (D.C. Cir. 2001); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007) (vacating two rules in their entirety

because, "[a]s a result of our decision today, neither of the two Rules survives remand in anything approaching recognizable form").

DHS understood that the inclusion of work authorization in the Final Rule was "an important component of the DACA with myriad positive impacts on recipients' families and communities." AR2022_100238, 87 Fed. Reg. 53,195. Specifically, work authorization under the Final Rule "enable[d] DACA recipients to exit the shadow economy of unauthorized employment, dramatically reducing the risk of exploitation by unscrupulous employers." *Id.* It also "addresse[d] practical concerns that could otherwise result from a decision solely to grant temporary forbearance from removal." *Id.* And DHS explained that, in general, "DACA facilitates the physical and mental well-being of recipients and their families by providing … access to employer-sponsored health insurance and stable income that allows recipients in turn to provide their families with food, shelter, clothing, and adequate medical care." AR2022_100208, 87 Fed. Reg. 53,165. Thus, without the inclusion of work authorization or lawful presence, the Final Rule would look strikingly different as those purported positive impacts would go away while the practical concerns would remain.

Further, unlike those situations that involve the presence of a severability clause, where the Court "zero[ed] in on the precise statutory text and … hew[ed] closely to the text of severability or nonseverability clauses," *Barr*, 140 S. Ct. at 2349, other portions of the Final Rule's text contradict the intent nominally suggested by the severability clause. Indeed, the Final Rule "reflects the conclusion that, while [DACA recipients] are in the United States, they should have access to a process that, operating on a case-by-case basis, may allow them to work to support themselves and their families, and to contribute to the economy in multiple ways." AR2022_100198, 87 Fed. Reg. 53,155. That is why the Final Rule "further incorporates here its points in the preamble to the [Notice of Proposed Rulemaking] at 86 FR 53756–53762 regarding DHS's view that employment authorization, advance parole, and lawful presence may be provided in conjunction with DACA's forbearance of removal."

AR2022_100237, 87 Fed. Reg. 53,194. And that is why the Final Rule explicitly "seeks to continue the benefits that have accrued to DACA recipients, their families, their communities, their States, and the Department itself that have been made possible by the policy." AR2022_100198, 87 Fed. Reg. 53,155. Therefore, there *is* substantial doubt as to whether the Final Rule would have actually been enacted as a forbearance-only policy.

*Second*, any remaining portion of the Final Rule would not "function sensibly without the stricken provision." The Final Rule said as much when it rejected all the alternative forbearance-only policies. *See* AR2022_100299, 87 Fed. Reg. 53,256. Specifically, in response to the comments on the proposed alternatives that attempted to sever the lawful presence or work authorization portions from the Final Rule, the Final Rule stated that "employment authorization is an important component of the DACA policy with myriad positive impacts on recipients' families and communities." AR2022_100238, 87 Fed. Reg. 53,195. Similarly, the Final Rule stated that "[m]aintaining DACA recipients' ability to work lawfully while in the United States is an important component of DHS's broader initiative to preserve and fortify the DACA policy." AR2022_100238, 87 Fed. Reg. 53,195. The Final Rule even indicated that work authorization was a necessary part of its policy when it stated that "[w]ork authorization enables DACA recipients lawfully to support themselves and their families instead of risking potential exploitation in the shadow economy." *Id.*

But the Final Rule's text and DHS's actions are not the only indications that the Final Rule is not severable. Indeed, the Supreme Court even acknowledged that the forbearance component is one and the same with the other portions when it stated that the policy underlying the Final Rule "does not announce a passive non-enforcement policy" but "create[s] a program for conferring affirmative immigration relief." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1906 (2020). According to the Court, "[t]he benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy" because it is "by virtue of receiving deferred

action[] [that] the 700,000 DACA recipients may request work authorization and are eligible for Social Security and Medicare." *Id.* Thus, based on the Final Rule's own pronouncements, the Final Rule would not function sensibly without the inclusion of the same parts that the Federal Defendants assert are severable.

Overall, it is doubtful that the Final Rule would have been adopted as a forbearance-only policy, and even if it was, it would not function sensibly. Accordingly, the Final Rule is not severable, and even if this Court finds that the Final Rule is severable, it should still vacate and enjoin it in its entirety because each provision is independently unlawful. *See infra* at Section III; ECF No. 625-1 at 10–25; *see also DACA*, 50 F.4th at 521–31; *DAPA*, 809 F.3d at 178–88.

## II.    Plaintiffs have a cause of action.

As "Federal Defendants also acknowledge that this Court is bound by the Fifth Circuit's determination that Plaintiffs have a right to sue under the APA," Fed. Br. at 13, and the other Defendants forfeit the issue by not raising it, this point is conceded, and Plaintiffs incorporate the briefing on this issue from their motion for summary judgment. ECF No. 625-1 at 35.

## III.    The Final Rule is unlawful.

"Federal Defendants also recognize that the court of appeals affirmed this Court's conclusion that the DACA Memorandum—which relied on the same statutory authority as the Final Rule—was inconsistent with the INA," but "continue to disagree" with this law-of-the-case determination to "preserve all previously made arguments to the contrary" for appeal. Fed. Br. at 15. But, in the end, Federal Defendants "recognize that Fifth Circuit precedent and this Court's prior rulings regarding the DACA Memorandum likely require this Court to hold that the substantively equivalent Final Rule is inconsistent with the INA." Fed. Br. at 3.

### A. The Final Rule is inconsistent with the INA for the same reasons as the DACA Memorandum.

Defendants try the same arguments previously rejected by this Court and the Fifth Circuit. As Plaintiffs explained in their motion for summary judgment, ECF No. 625-1, the DACA program—whether in its original form of the DACA Memorandum or the substantively identical Final Rule—is contrary to the INA's provisions on eligibility for removal, *id.* at 13–14; lawful presence, *id.* at 14–15; work authorization, *id.* at 15–16; and limitations on advance parole, *id.* at 16–20.

"Congress's clear articulation of laws for removal, lawful presence, and work authorization illustrates a manifest intent to reserve for itself the authority to determine the framework of the [N]ation's immigration system." *DACA*, 50 F.4th at 511 (quoting *Texas*, 549 F. Supp. 3d at 614). The Final Rule is contrary to law because it is "foreclosed by Congress's careful plan" and is "manifestly contrary to the statute." *Id.* at 524–28.

### B. Private Intervenors' attempts to distinguish the Final Rule form the DACA Memorandum fail.

To avoid what Federal Defendants predicted was a "certain" fate of the Final Rule in this Court, Supp. Br. for Fed. Appellants 11, *DACA*, No. 21-40680 (5th Cir.), 2022 WL 4080252, *11, Private Intervenors attempt to ascribe to the Final Rule a fundamentally different "emphasis on *individualized discretion*," Pvt. Intvn'rs' Br. at 32, which is an exercise of "broad prosecutorial discretion," *id.* at 33.

*First*, agency "rules" such as the Final Rule cannot be the exercise of prosecutorial discretion—that is limited to agency "orders"; that is, prosecutorial discretion is exercised only in "one-off agency enforcement decisions rather than to agency rulemakings." *MPP*, 20 F.4th at 984; *see infra* Section IV.

*Second*, any increase in enforcement discretion in the Final Rule is not a material fact sufficient to preclude summary judgment. A fact is material if it might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Thomas v. LTV Corp.*, 39 F.3d 611, 616 (5th Cir. 1994). A dispute about a material fact is genuine if the evidence is such that a

reasonable [finder of fact at trial] could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Wise v. E.I. DuPont De Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson.*, 477 U.S. at 248 (citing 10A C. Wright & Miller, Fed. Prac. and Proc. § 2725, pp. 93–95 (1983)).

Private Intervenors are fighting the last war: The amount of discretion exercised by DHS was certainly relevant to whether the DACA Memorandum was a substantive rule that was required to have been promulgated through notice-and-comment rulemaking. *See Texas*, 549 F. Supp. 3d at 600–02 (discussing issue of discretion in that context); *DACA*, 50 F.4th at 524 (same). Though not enough to save the DACA Memorandum against that procedural APA claim, the Fifth Circuit "assume[d] that agents [did] have discretion to reject applicants who meet the criteria [of the DACA Memorandum]." *DACA*, 50 F.4th at 524; *see also Texas*, 549 F. Supp. 3d at 601–02 (same). But the amount of discretion granted to agents simply has no bearing on the Final Rule's substantive compliance with the INA, the Constitution, or the requirements of reasoned decisionmaking under the APA, which are the only claims at issue here. It is therefore not a material fact sufficient to affect summary judgment. *See Texas*, 549 F. Supp. 3d at 602 (even for notice-and-comment claim, "the existence of some amount of discretion is not determinative"). Regardless, there is no basis for claiming that the Final Rule is any different from the DACA Memorandum regarding discretion in its application.

## IV.   The Final Rule is unconstitutional.

Federal Defendants argue that because the Take Care Clause is "addressed to the President," and the APA applies only to subordinate executive agencies, the Clause cannot form the basis of suit under that statute. Fed. Br. at 18; *see also* Pvt. Intvn'rs' Br. at 40 (Private Intervenors asserting that

"courts that have assessed the Take Care Clause have held that it does not create a private right of action") (citing *Las Americas Immigr. Advoc. Ctr. v. Biden*, 571 F. Supp. 3d 1173, 1180 (D. Or. 2021)).

But it is not possible for the Take Care Clause to apply only to the President and not to subordinate executive officials such as Federal Defendants, because the President's subordinates are necessarily exercising his power:

> Under our Constitution, the "executive Power"—all of it—is "vested in a President," who must "take Care that the Laws be faithfully executed." Art. II, § 1, cl. 1; *id.*, § 3. Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance.

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020). The President may not shirk his duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, through delegation of his power to subordinates. Because "it would be impossible for one man to perform all the great business of the State," *Seila Law*, 140 S. Ct. at 2197 (quotations omitted), "the Constitution assumes that lesser executive officers will assist the supreme Magistrate in discharging the duties of his trust," *id.* (quotations omitted). But "[t]hese lesser executive officers must remain accountable to the President, whose authority they wield." *Id.*

Contra Private Intervenors' understanding, Pvt. Intvn'rs' Br. at 40, Plaintiffs are not basing their Take Care Clause claim on an implied cause of action arising from that constitutional provision itself. Instead, they have an explicit cause of action under the APA, which provides that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret *constitutional* and statutory provisions, and determine the meaning or applicability of the terms of an agency action," 5 U.S.C. § 706 (emphasis added), and. a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be" "contrary to constitutional right, power, privilege, or immunity," *id.* at (2)(B).

Federal Defendants also cite *Dalton v. Specter*, 511 U.S. 462, 473 (1994) for the proposition that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional'

claims." Fed. Br. at 18. But while "[t]he *Dalton* Court made clear that not every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution, [it] by no means found that action in excess of statutory authority can *never* violate the Constitution or give rise to a constitutional claim." *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 258 (S.D.N.Y. 2020) (quoting *Sierra Club v. Trump*, 929 F.3d 670, 696 (9th Cir. 2019)) (cleaned up).

Plaintiffs' claim here is not "that the President simply did not fully comply with a congressionally prescribed process"—such as failure to undergo notice-and-comment rulemaking—but "that the President's actions affirmatively displaced a congressional mandate[.]" *Make the Rd.*, 475 F. Supp. 3d at 258; *see DACA*, 50 F.4th at 524–28 (DACA Memorandum is "foreclosed by Congress's careful plan" and is "manifestly contrary to the statute."); *id.* at 511 ("Congress's clear articulation of laws for removal, lawful presence, and work authorization illustrates a manifest intent to reserve for itself the authority to determine the framework of the [N]ation's immigration system.") (quoting *Texas*, 549 F. Supp. 3d at 614). The Final Rule therefore implicates "constitutional separation of powers concerns not present in *Dalton*" and should be "appropriately considered as [a] constitutional claim[] subject to judicial review." *Id.* at 258–59.

Defendants also argue that the Final Rule cannot violate the Take Care Clause because it is an exercise of prosecutorial discretion. Fed. Br. at 19; Pvt. Intvn'rs' Br. at 41; NJ Br. at 28 n.5. But the Final Rule is a "rule" under the APA, defined as "'the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency.'" *MPP*, 20 F.4th at 982–83 (quoting 5 U.S.C. § 551(4)). This is "in contrast with an 'order,'" which is defined as "'the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing.'" *Id.* at 983 (quoting 5 U.S.C. § 551(6)).

While individual enforcement actions—"orders"—are properly subject to prosecutorial discretion, attempts to use "rules" to exercise prosecutorial discretion to not enforce statutes are dispensations precluded by the Take Care Clause. *MPP*, 20 F.4th at 983–85. And while "the executive [is] free to leave the law unenforced in *particular* instances and at *particular moments* in time," that constitutional provision "explicitly forbade the executive from nullifying whole statutes by refusing to enforce them on a *generalized* and *prospective* basis." *Id.* at 983 (emphases in original). An agency is not permitted "to modify unambiguous requirements imposed by federal statute … [and] were [courts] to recognize [such] authority … [they] would deal a severe blow" to the Take Care Clause. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 326–27 (2014) (citing U.S. Const. Art. II, § 3).

## V.   The Final Rule is arbitrary and capricious.

Defendants misunderstand the nature of Plaintiffs' arbitrary-and-capricious claim. Plaintiffs do not claim that they did not adequately assess the costs and benefits of employment authorization for DACA recipients relating to American workers, Fed. Br. at 19–20, Pvt. Intvn'rs' Br. at 38–40, NJ Br. at 11–24—the claim is that Congress already made that determination, and the agency is not licensed to second-guess it based on economic studies. ECF No. 625-1 at 24; *Judulang*, 565 U.S. at 55 ("Because agency action must be based on non-arbitrary, relevant factors, the agency's approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system.") (cleaned up).

Furthermore, no Defendant rebuts the point that DHS failed to even consider whether the effects of the Affordable Care Act's minimal essential coverage requirements make DACA recipients cheaper to hire than American workers, ECF No. 625-1 at 23–25, despite this Court raising the issue before the promulgation of the Final Rule, *see Texas*, 549 F. Supp. 3d at 587. The Fifth Circuit has held that an agency action was "not the product of reasoned decisionmaking" when an agency failed to

address legal issues previously raised *in a complaint* in related litigation. *MPP*, 20 F.4th at 992–93 (cleaned up). Failing to address an important issue raised *in this Court's opinion* is at least as irrational.

Realizing this omission cannot be defended on the merits, Federal Defendants assert that Plaintiffs' failure to raise this issue during the rulemaking process means this argument is forfeited. Fed. Br. at 21. However, the Fifth Circuit has recently clarified the conflicting precedent in this area (rejecting the precedential value of the case cited by Federal Defendants on this point):

> EPA claims that petitioners have waived this deferral argument by failing to raise it during the notice-and-comment period. That argument is foreclosed by our precedent. *See Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 295 (5th Cir. 1998) ("EPA has failed to identify any provision in the CWA that suggests a party's failure to comment waives its right to seek judicial review.") (citing *City of Seabrook v. EPA*, 659 F.2d 1349, 1360 n.17 (5th Cir. 1981)). Our waiver precedents in this area are admittedly in conflict. *See BCCA Appeal Grp.*, 355 F.3d at 829 (acknowledging conflict); *Tex. Oil & Gas Ass'n*, 161 F.3d 923, 933 n.7 (finding waiver due to "failure to raise the objections during the notice and comment period."). We must follow the earlier precedent, however, which directly refutes the agency's waiver argument. When precedents conflict, "under our rule of orderliness, the earlier case controls." *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 497 (5th Cir. 2016).

*Sw. Elec. Power Co. v. United States Env't Prot. Agency*, 920 F.3d 999, 1022 n.23 (5th Cir. 2019). Plaintiffs were not required to raise this—or any—issue in the rulemaking process as a prerequisite to review by this Court.

Finally, Federal Defendants argue that because "Plaintiffs' arbitrary-and-capricious arguments are directed only at the employment-authorization provisions of the Final Rule," the Court should sever the remaining portions of the rule if it finds this claim meritorious. Fed. Br. at 21 n.7. However, these provisions are not severable, making vacatur of the entire rule necessary. *See supra* Section I.F.

## VI. Plaintiffs have standing to challenge the DACA program that continues in the Final Rule.

"Federal Defendants do not seek to relitigate before this Court any matter currently foreclosed by the Fifth Circuit's prior decision in this case," including "standing." Fed. Br. at 2. The Private Intervenors ask this Court to ignore all the evidence in the record relating to standing and deny any

relevance to the previous rulings on standing by this Court and the Fifth Circuit, and New Jersey does not address this issue.

### A. The Final Rule continues the same DACA program and injures Plaintiffs in the same way.

Federal Defendants concede that "the Fifth Circuit's ruling that 'Texas has demonstrated standing' to challenge the DACA Memorandum applies equally to Texas's standing to challenge the Final Rule and is, therefore, binding at this juncture." Fed. Br. at 9 (quoting *DACA*, 50 F.4th at 520, and citing it at 513–20). Plaintiffs incorporate from their motion for summary judgment their arguments in favor of standing. ECF No. 625-1 at 25–35. Specifically:

- Plaintiffs are entitled to special solicitude, which lessens their burden to establish causation, redressability, and immediacy. They meet this standard because they have a procedural right under the APA to challenge the Final Rule, which affects their quasi-sovereign interests in the economic well-being of their residents and in classifying aliens. *Id.* at 27–29;

- Plaintiffs have *parens patriae* standing to protect their quasi-sovereign interest in the economic well-being of their workforces; the Final Rule increases the supply of labor and allows certain illegal aliens to better compete with lawful workers. *Id.* at 29–32;[9]

- Plaintiffs have standing based on direct injury due to emergency Medicaid and public education costs. They are required to provide these services regardless of legal status, and the Final Rule makes it likely that at least some DACA recipients will remain in the country (and within Plaintiff States)—and use emergency Medicaid or public education services—who would leave if without lawful presence and work authorization. *Id.* at 32–35.

---

[9] Private Intervenors assert that "[t]he Fifth Circuit is itself undecided whether States can establish standing under" *parens patriae*. Pvt. Intvn'rs' Br. at 24 (citing *Brackeen v. Haaland*, 994 F.3d 249, 292 n. 13 (5th Cir. 2021) (en banc)). But the en banc court was "equally divided" in this portion of the opinion. *Id.* at 267. "Decisions by an equally divided en banc court are not binding precedent but only affirm the judgment by operation of law." *United States v. Garcia*, 604 F.3d 186, 190 n.2 (5th Cir. 2010); *see also United States v. Norbert*, 24 F.4th 1016 (5th Cir. 2022) (mem.).

Subsequent to the *Brackeen* opinion, the Fifth Circuit approved State standing against the federal government (in the immigration context, no less) on a *parens patriae* theory. *See Texas*, 40 F.4th at 216 ("Texas's injuries as a result of the Final Memo are difficult to deny, specifically its financial injury and harm as *parens patriae*.").

1. **Plaintiffs are not required to establish that they have incurred costs by a particular DACA recipient.**

Federal Defendants make the familiar argument—rejected repeatedly by the Fifth Circuit—that Plaintiffs' evidence of injury needs to be tied specifically to particular DACA recipients, rather than costs from illegal aliens as a whole. Fed. Br. at 10–13; *see also* Pvt. Intvn'rs' Br. at 19–22 (making same argument). This reasoning was perhaps best repudiated in the *MPP* case:

> The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. Tellingly, however, it offers no hint as to how Texas could make that showing—nor why we should require it to do so. Imagine Texas had produced copies of driver's license applications from paroled aliens. Would that have counted as evidence that Texas had, in the Government's words, "issued a single additional driver's license as a result" of MPP's termination? Of course not: There would always remain some possibility that *any given parolee* would have been paroled even under MPP.

*MPP*, 20 F.4th at 971. The same applies to DACA recipients—"there would always remain some possibility" that any given DACA recipient would be granted deferred action on an individual basis, so pointing to him to "prove" the program caused the harm doesn't work. This reasoning applies equally to healthcare[10] or public education[11] costs here. *See id.* at 973 ("Likewise, at least some MPP-termination-caused immigrants will certainly seek healthcare

---

[10] Private Intervenors' own evidence shows that some DACA recipients without employer-based insurance use emergency Medicaid and that between 43 percent and 45 percent of DACA recipients fall into this category. Declaration of Leighton Ku, ECF No. 400-1 at Exhibit 4 ¶¶ 43–44, 46–50. And he estimated that over 18 percent of uninsured DACA recipients in Texas use emergency Medicaid in a given year. *Id.* at ¶ 56.

[11] The Final Rule cites a study that DACA caused an increase of more than 49,000 high school graduates. AR2022_100207, 87 Fed. Reg. 53,164 & n.40; *see also* AR2022_500565 (study cited in Final Rule finding increase of 2.2 percent in illegal alien school attendance and 6 percent increase in high school graduation). Given the large number of DACA recipients in Texas, and that "the youngest of [DACA recipients] will be completing their high school education by June 2025," AR2022_500790; *see also* AR2022_100296, 87 Fed. Reg. 53,253 ("under threshold criteria in place since 20123 and as codified by this rule, a 15-year-old in 2025 would not meet threshold criteria, but an 18-year-old in 2025 would."), Private Intervenors' attacks on Texas's evidence of education costs are without foundation. Pvt. Intvn'rs' Br. at 21.

services from the State. The causal chain is easy to see."). Instead of exposing individual

DACA recipients, programs such as DACA can be challenged with impersonal numbers:

> MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing "conjectural" or "hypothetical" about that. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (quotation omitted); *cf. DAPA*, 809 F.3d at 161–62 ("The state must allege an injury that has already occurred or is certainly impending; it is easier to demonstrate that some DAPA beneficiaries would apply for licenses than it is to establish that a particular alien would." (quotation omitted)). To the contrary, given both MPP's effect of increasing the number of parolees and the fact that many of those parolees will apply for Texas licenses, it's impossible to imagine how the Government could terminate MPP *without* costing Texas any money. *See Clapper*, 568 U.S. at 409 ("[T]hreatened injury must be certainly impending to constitute injury in fact." (emphasis omitted))

*Id.* (citations truncated). Plaintiffs here trod this same path repeatedly approved in State-led challenges

to federal immigration policies.

### 2.   Plaintiffs' standing to challenge the DACA program is the law of the case.

Private Intervenors misunderstand the relationship between the operation of the DACA

program and the standing inquiry. They maintain that specific evidence of injury from the Final Rule—

as opposed to the DACA Memorandum—must be produced. Pvt. Intvn'rs' Br. at 18–19. This ignores

the fact that the DACA program that originated in the DACA Memorandum *continues* through the

Final Rule. That it is based on a distinct agency action does not affect the issue of standing, as "[s]tasis

is not a general prerequisite to the maintenance of jurisdiction. Jurisdiction over the person survives a

change in circumstances, as does jurisdiction over the subject matter." *Republic Nat. Bank of Miami v.*

*United States*, 506 U.S. 80, 88 (1992) (citations omitted).

"The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the*

*complaint is filed.*" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.4 (1992) (emphasis in original; citation

omitted); *Carr v. Alta Verde Indus., Inc.,* 931 F.2d 1055, 1061 (5th Cir.1991) ("As with all questions of

subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the

complaint, and subsequent events do not deprive the court of jurisdiction."). Generally, "[a]n amended complaint supersedes the original complaint and renders it of no legal effect." *King v. Dogan,* 31 F.3d 344, 346 (5th Cir. 1994) (per curiam). But in this case, Plaintiffs filed a Supplemental Complaint, ECF No. 623, which unlike an amended one, does not supersede the earlier operative pleading—in this case, the Amended Complaint from June 2018, ECF No. 104. That is still the live pleading, which is why this Court's current injunction—granted based on the claims of that Amended Complaint—is still active. Standing is therefore based on the facts as they existed when the Amended Complaint was filed.

Private Intervenors mistake the standing inquiry for that of mootness. And this case is not moot:

> [W]hen a government repeals the challenged action and replaces it with something substantially similar, the injury remains," and "the case is not mooted." *MPP*, 20 F.4th at 958. And the D.C. Circuit has explained that a case is not moot when the defendant has not "ceased the challenged conduct" but has instead "renewed the challenged conduct in a new form." *Am. Freedom Def. Initiative*, 901 F.3d at 362; *see also Glob. Tel*Link v. F.C.C.*, 866 F.3d 397, 413-14 (D.C. Cir. 2017).

*Feds for Med. Freedom*, 2023 WL 2609247, at *8.

Indeed, in a press release accompanying the Final Rule, DHS stated that "[t]he rule continues the DACA policy as announced in the 2012 [DACA] Memorandum," and explained that the Final Rule "defer[s] [DACA recipients'] removal" and:

- Maintains the existing threshold criteria for DACA;

- Retains the existing process for DACA requestors to seek work authorization; and

- Affirms the longstanding policy that DACA is not a form of lawful status but that DACA recipients, like other deferred action recipients, are considered 'lawfully present' for certain purposes.

Ex. 37 at 1–2 (App. 683–84).

Language in the Final Rule emphasizes that "[t]his rule preserves and fortifies a policy that has been in place for 10 years. The rule does not establish a new program." AR2022_100221, 87 Fed. Reg.

53,178. "The final rule does not introduce new criteria for consideration, expand the population eligible for consideration, change standards of review, provide lawful immigration status, or alter the forbearance from removal or employment authorization structure that has been in place for a decade." AR2022_100222, 87 Fed. Reg. 53,179. And "DHS does not believe the rule triggers NEPA obligations because it simply codifies existing policy toward a population already in the United States and thus does not alter the environmental status quo." AR2022_100340, 87 Fed. Reg. 53,297.

The Final Rule reiterated that DACA recipients under the DACA Memorandum would see no difference in the program: "DHS also clarifies that existing recipients [under the DACA Memorandum] need not request DACA anew under this new rule to retain their current DACA grants." AR2022_100200, 87 Fed. Reg. 53,157.

When estimating costs of the Final Rule compared to the "No Action Baseline, which represents a state of the world wherein the DACA policy would be expected to continue under the [2012] Napolitano Memorandum guidance," DHS found that the Final Rule, "[r]elative to this baseline, [had] no quantitative and monetized impacts." AR23022_100314, 87 Fed. Reg. 53,271. In other words, it is the same policy and has the same effects.

At the October 14, 2022, hearing before this Court, DHS indicated that, once the Final Rule would become effective October 31, "we will just continue operating just thew way that it has been" under the DACA Memorandum. Tr. 17:23–24.

There is also the fact that this Court's injunction *already* applies to the Final Rule:

> The parties have agreed that the injunction currently in place (Doc. No. 576) extends and applies to the Department of Homeland Security's ("DHS") final rule on DACA ("New DACA"), which is scheduled to become effective on October 31, 2022. 87 Fed. Reg. 53152 (Aug. 30, 2022). Therefore, the Court hereby extends that injunction to cover that program.

ECF No. 603. This Court has therefore already determined that it has Article III jurisdiction over the Final Rule and that implicit determination is the law of the case. *See Christianson v. Colt Indus. Operating*

38

*Corp.*, 486 U.S. 800, 817 (1988) ("the law of the case turns on whether a court previously 'decide[d] upon a rule of law'—which the Federal Circuit necessarily did—not on whether, or how well, it explained the decision.").

And "the mandate rule, a corollary of the law of the case doctrine, compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or *impliedly* decided by the appellate court." *Fisher v. Univ. of Tex. At Austin*, 758 F.3d 633, 639–40 (5th Cir. 2014), *aff'd*, 579 U.S. 365 (2016). By staying this Court's injunction "as to current DACA recipients pending further appeal" "pending a further order of [the Fifth Circuit] or the Supreme Court," *DACA*, 50 F.4th at 531, when that court knew that the Final Rule would become effective a mere three weeks later, the Fifth Circuit found the injunction applicable to the Final Rule and "impliedly" determined that it and this Court had Article III jurisdiction.

This Court is not in uncharted waters here. Courts facing similar circumstances have not hesitated to decline invitations to relitigate standing when a new agency action has the same effect as a previous one where standing was already established.

In the MPP litigation, Judge Kacsmaryk originally vacated a June 1, 2021 memorandum terminating the program, finding that Texas had standing to challenge the action. *Texas v. Biden*, 554 F. Supp. 3d 818 (N.D. Tex. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022). The Supreme Court held that a new agency action on October 29, 2021 terminating the program had replaced the June 1 memorandum and remanded to the trial court to consider the new action's legality. *Biden v. Texas*, 142 S. Ct. 2528, 2548 (2022). On remand, the trial court found standing to challenge the new termination based on its previous determinations and evidence in the record regarding the earlier termination decision:

> Plaintiffs have standing to challenge the October 29 Memoranda for the same reasons that they had standing to challenge the previous termination of MPP. Additionally, the Court's previous determinations on standing constitute the law of the case because the agency action at issue is identical to the previously challenged action.

*Biden*, 2022 WL 17718634, at *4 (citations omitted).

Similarly, Judge O'Connor had vacated an agency rule. While considering the appeal, the agency repealed the challenged rule and replaced it with another. *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 366 (N.D. Tex. 2021). The Fifth Circuit remanded to Judge O'Connor for further consideration, *id.* at 366–67, and the trial court considered the legality of a new agency action. After it determined that the new agency action had the same effect as the previous one,

> the Court decline[d] to relitigate HHS's standing arguments, as they fail for the same reasons as before. *See Texas v. EEOC*, 933 F.3d 433, 448 (5th Cir. 2019) ("courts look exclusively to the time of filing."); *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (The "law of the case" doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.").

*Franciscan All., Inc.*, 553 F. Supp. 3d at 375 n.12. The Fifth Circuit subsequently upheld the trial court's ruling, despite its obligation to determine its jurisdiction. *Franciscan Alliance, Inc.*, 47 F.4th 368.

As "[p]erpetual litigation of any issue—jurisdictional or nonjurisdictional—delays, and therefore threatens to deny, justice," *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 n.5 (1988), this Court should recognize that its prior standing determinations remain the law of the case.

**B.  Texas additionally has standing based on costs of issuing driver's licenses.**

Because the Final Rule is the same substantive policy as the DACA Memorandum that this Court and the Fifth Circuit have already found Plaintiffs to have standing to challenge, Plaintiffs were content to accelerate appellate review by relying on the same bases that they did earlier: *parens patriae* on behalf of their lawful workforces, and costs incurred to provide healthcare, public education, and social services. ECF 625-1 at 25–35. Healthcare and public education costs had earlier been supported (and continue to be here) by declarations by officials of Texas agencies, ECF No. 625-1 at 32–33, and

general costs of social services (of $250,000,000 to Texas) by Private Intervenors' own expert,[12] ECF No. 625-1 at 33.

Private Intervenors note that Plaintiffs did not, in their motion for summary judgment, "allege any injury due to driver's licenses costs." Pvt. Intvn'rs' Br. at 29.[13] This is true; as Private Intervenors continue to challenge these bases of standing, however, Plaintiffs submit additional evidence of one aspect of that $250,000,000 cost that DACA recipients impose on Texas's social services: subsidized driver's licenses.

The Fifth Circuit approved this basis for standing—"the driver's-license rationale"—when Texas challenged the legality of DAPA and Enhanced DACA. *See DAPA*, 809 F.3d at 150. Texas provides driver's licenses to aliens so long as their presence in the United States is authorized by the federal government. *See id.* at 155; Tex. Transp. Code § 521.142(a); Exhibit 41, Gipson Decl. App.722–23, ¶¶ 3–5. Such authorization can be based on either a grant of deferred action or a grant of employment authorization. Exhibit 41-A, Verifying Lawful Presence, App.730–31. The Final Rule—just like the DACA Memorandum—grants DACA recipients both statuses.

--------

[12] Defendants object to use of this admission by Dr. Perryman because he later attempted to change his testimony in a declaration. Fed. Br. at 11 n.3; Pvt. Intvn'rs' Br. at 20. But this Court and the Fifth Circuit both credited his original testimony despite this attempt, *Texas*, 549 F. Supp. 3d at 596; *DACA*, 50 F.4th at 518, presumably because of the "sham affidavit rule." *See Love v. Motiva Enters., LLC*, 349 F. App'x 900, 903, n.1 (5th Cir. 2009) ("the 'sham affidavit rule' provides that, to 'the extent [a] declaration attempts to 'tell the same story differently' from [prior] deposition testimony, it is properly not considered.") (quoting *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996)) (alterations in original). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (quoting *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).

[13] New Jersey raised the issue of "States hav[ing] relied on the existence of DACA in setting policies regarding eligibility for driver's licenses," NJ Br. at 14 (quoting 97 Fed. Reg. 53,289); NJ Br. at 24, and DACA recipients "buying cars," including "that a majority of DACA recipients reported having purchased their first car after receiving deferred action." NJ Br. at 19 (citing 87 Fed. Reg. 53,170).

Because "Texas subsidizes its licenses," it "would lose" money "on each one it issued to" an alien granted deferred action or employment authorization by the Final Rule. *DAPA*, 809 F.3d at 155. If the Final Rule allows around 100,000 illegal aliens in Texas to receive driver's licenses, it will cost Texas over $20,000,000. Exhibit 41, Gipson Decl. App.724–25 ¶ 8; *cf. DAPA*, 809 F.3d at 155 ("Even a modest estimate would put the loss at 'several million dollars.'").

Millions of dollars in harm—though certainly sufficient for standing—are not necessary. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) ($1 damages sufficient); *McGowan v. Maryland,* 366 U.S. 420, 430–431 (1961) (finding that appellants fined $5 plus costs had standing to assert an Establishment Clause challenge). Thus, even the small amounts of money that Texas pays for each search of the federal government's immigration-status-verification system qualify as an injury in fact. Exhibit 41, Gipson Decl. App.724 ¶¶ 6–7.

The Fifth Circuit observed that "driving is a practical necessity in most of" Texas. *DAPA*, 809 F.3d at 156. For that reason, the court explained, it was "hardly speculative" that individuals would apply for driver's licenses upon becoming eligible to do so.[14] *Id.* at 160. The Fifth Circuit has adopted this rationale in other immigration cases. *See MPP*, 20 F.4th at 968–69. Here, as in these cases, Texas is injured by the "Hobson's choice of spending millions of dollars to subsidize driver's licenses or changing its statutes." *DAPA*, 809 F.3d at 163; *MPP*, 20 F.4th at 972.

Notably, the driver's license rationale does not depend on what Private Intervenors term "Plaintiffs' 'self-deportation theory,'" Pvt. Intvn'rs' Br. at 27, that is, the principle of causation and redressability already endorsed by this Court and the Fifth Circuit, *see DACA*, 50 F.4th at 518

---

[14] Private Intervenors' own expert states that "[c]lose to 60 percent of our [DACA] respondents had obtained a driver's license." Declaration of Roberto G. Gonzales, ECF No. 400-2 at Exhibit 9 ¶ 20.

(affirming that some DACA recipients' departure from Texas in the absence of the program would reduce healthcare and educational expenditures). These costs exist just by nature of the DACA recipients being granted deferred action or employment authorization.

Defendants may object that driver's license costs were not specifically named in the supplemental complaint, ECF No. 623, as a basis for standing. But such costs are subsumed under the category of "social services … costs" alleged there. *Id.* at ¶ 135. Regardless, while "[s]ome early cases indicated that affidavits are admissible only to prove facts put in issue by the pleadings, [those] are inconsistent with the contemporary view of the function of the pleadings and the rejection of the theory-of-the-pleadings doctrine as well as of the former rules against variance[;] [t]herefore, an affidavit should be excluded only when its irrelevance is clear." Wright & Miller, 10B Fed. Prac. & Proc. Civ. § 2738 (4th ed.).

"Moreover, the court's power to reject an affidavit should be limited by the policy expressed in Rule 15 that the judge may exercise discretion to allow the pleadings to be amended to conform to the issues presented by the record, which means that the relevance of an affidavit should be tested on the basis of the issues presented on the motion." *Id.* And consideration of new evidence is not consistent with the mandate from the Fifth Circuit—the mandate rule expressly contemplates lower courts "consider[ing] new evidence." *Webb v. Davis*, 940 F.3d 892, 897 (5th Cir. 2019).

Although Texas's evidence for its driver's license costs is submitted to counter the arguments against standing in the cross-motions for summary judgment, this Court may consider it for Plaintiffs' own motion because "an affidavit submitted [regarding] another motion may be taken into account on a motion for summary judgment." Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2722 (4th ed.); *see also Carmona v. Toledo,* 215 F.3d 124, 132 n. 7 (1st Cir. 2000); *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 538 n.13 (9th Cir. 2011). This is because "[a]n affidavit of a party that is on file in the case

will be considered by the court regardless of the purpose for which it was prepared and filed." Wright

& Miller, 10A Fed. Prac. & Proc. Civ. § 2722 (4th ed.).[15]

## CONCLUSION

The Final Rule—as the latest manifestation of the DACA program—is substantively unlawful

for the same reasons as the DACA Memorandum. The Court should declare it unlawful and

unconstitutional, vacate it in its entirety, and permanently enjoin its implementation (with a prudent

transition for existing DACA recipients).

---

[15] Defendants may argue that they should be entitled to discovery on the basis of the submission of the evidence of driver's license costs. But no extension under Federal Rule of Civil Procedure 56(f) would be proper here because of the other bases in the record for Plaintiffs' standing already determined by this Court and the Fifth Circuit: "The denial of a Rule 56(f) motion for extension should be affirmed where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trustees, Craven Cmty. Coll.*, 55 F.3d 943, 953–54 (4th Cir. 1995).

The same would be true under Rule 56(d) for the same reason: "a court may deny a Rule 56(d) motion when the information sought would not by itself create a genuine issue of material fact sufficient for the nonmovant to survive summary judgment." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

And Rule 56(c) is satisfied as the Fifth Circuit has also held that it "merely requires the court to give the non-movant an adequate opportunity to respond prior to a ruling." *Sw. Bell Tele. Co. v. City of El Paso*, 346 F.3d 541, 545 (5th Cir. 2003) (quoting *Jackson v. Widnall*, 99 F.3d 710, 713 (5th Cir. 1996)). Defendants all have an opportunity to respond to this evidence in their upcoming replies in support of their cross-motions *See Material Handling Techs., Inc. v. Southland Process Grp. LLC*, No. 16-cv-1297, 2020 WL 1042236, at *8 n.6 (W.D. La. Mar. 3, 2020) (applying this rule on cross-motions for summary judgment).

Date: April 6, 2023

Respectfully submitted.

STEVE MARSHALL
Attorney General of Alabama

KEN PAXTON
Attorney General of Texas

TIM GRIFFIN
Attorney General of Arkansas

BRENT WEBSTER
First Assistant Attorney General

KRIS KOBACH
Attorney General of Kansas

LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas Bar No. 33695

JEFF LANDRY
Attorney General of Louisiana

LYNN FITCH
Attorney General of Mississippi

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Special Counsel
*Attorney-in-Charge*
Texas Bar No. 24105085
Southern District of Texas Bar No. 3369185

MICHAEL T. HILGERS
Attorney General of Nebraska

ALAN WILSON
Attorney General of South Carolina

Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-2714
Fax: (512) 457-4410
leif.olson@oag.texas.gov
ryan.walters@oag.texas.gov

PATRICK MORRISEY
Attorney General of West Virginia

*Counsel for Plaintiff States*

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF) on April 6, 2023.

*/s/ Ryan D. Walters*
RYAN D. WALTERS