**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**DEFENDANT-INTERVENOR STATE OF NEW JERSEY'S REPLY IN**
**SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

INTRODUCTION ...............................................................................................................1

ARGUMENT

    I.   THE FINAL RULE IS LAWFUL ..............................................................................3

        A.  The Final Rule Is Not Arbitrary and Capricious.............................................3

        B.  The Final Rule is Substantively Valid ............................................................6

    II.  IN THE ALTERNATIVE, IF THIS COURT HOLDS THAT DACA IS
          UNLAWFUL, IT SHOULD ADOPT DEFENDANTS' PROPOSED
          REMEDIES..............................................................................................................8

        A.  The Court Should Retain Its Stay Pending Appeal.........................................8

        B.  Beyond The Stay, This Court Should Craft A Remedial Order To Respect
            The Profound Reliance Interests Engendered By DACA..............................10

        C.  Alternatively, The Court Should Remand To Allow DHS To Make The
            Complex Policy Choices Involved In Winding Down DACA ....................19

CONCLUSION..................................................................................................................20

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                          <u>Pages</u>

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
   166 F.3d 772 (5th Cir. 1999) ................................................................................................16

*Barber v. Bryant*,
   833 F.3d 510 (5th Cir. 2016) ................................................................................................9

*Collins v. Lew*,
   --- F. Supp. 3d ---, No. 4:16-cv-03113, 2022 WL 17170955
   (S.D. Tex. Nov. 21, 2022) ................................................................................................18

*Collins v. Yellen*,
   141 S. Ct. 1761 (2021) ................................................................................................18

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ................................................................................................5

*Department of Homeland Security v. Regents of the University of California*,
   140 S. Ct. 1891 (2020) ................................................................................. *passim*

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021) ................................................................................................6

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ................................................................................................3

*Judulang v. Holder*,
   565 U.S. 42 (2011) ................................................................................................5

*Luminant Generation Co., LLC v. EPA*,
   675 F.3d 917 (5th Cir. 2012) ................................................................................................ 3

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ................................................................................................12

*Texas v. Biden* (*MPP*),
   20 F.4th 928 (5th Cir. 2021) ................................................................................................14

*Texas v. United States,*
  328 F. Supp. 3d 662 (S.D. Tex. Aug. 31, 2018) ...................................................................10, 16

*Texas v. United States*,
  No. 18-0068, 2021 WL 3022434 (S.D. Tex. July 16, 2021) ...................................................9, 10

*Texas v. United States*,
  549 F. Supp. 3d 572 (S.D. Tex. 2021) .....................................................................................4, 9

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ...................................................................................................9, 20

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..........................................................................................................................12

<u>Statutes</u>

6 U.S.C. § 202 .....................................................................................................................................7

8 U.S.C. § 1103 ...................................................................................................................................7

26 U.S.C. § 4980H .............................................................................................................................6

<u>Regulations</u>

86 Fed. Reg. 53,736 ...........................................................................................................................7

87 Fed. Reg. 53,152 ................................................................................................................ *passim*

<u>Other Authorities</u>

Douglas Laycock & Richard Hasen,
  *Modern American Remedies* (5th Ed. 2018)...............................................................................16

## INTRODUCTION

This Court should grant summary judgment against Plaintiffs, and therefore deny them the belated and disruptive remedy they presently demand.

I.      The Final Rule is valid. Plaintiffs' new arbitrary-and-capricious challenge must fail because the Department of Homeland Security (DHS) properly evaluated the costs and benefits associated with Deferred Action for Childhood Arrivals (DACA)—including the reliance interests of DACA recipients, their families, their U.S. citizen children, employers, and state and local governments across the country. Plaintiffs at no point challenge DHS's overall assessment of costs and benefits. Instead, Plaintiffs focus their arbitrary-and-capricious claim on work authorization specifically, but even then, disavow a claim that DHS "did not adequately assess the costs and benefits of employment authorization for DACA recipients relating to American workers." Dkt. 673 at 32. Instead, their argument is that DHS could not *consider* benefits from work authorization at all because Congress did not itself authorize this population to work, but that just repackages their separate Immigration and Nationality Act (INA) claim; it is not an independent arbitrary-and-capricious theory. Regardless, even as an independent claim, it would fail: this Court and *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), both required DHS to consider precisely these concerns in evaluating next steps for DACA, including the disruption that would follow to DACA recipients, employers, and the economy from the policy's cessation. Separately, as to Plaintiffs' INA claim, although this Court already held otherwise, the Final Rule bolsters Defendants' view that DACA lies well within DHS's prosecutorial discretion and the long history of deferred action.

II.      The same reliance interests that this Court and *Regents* both recognized for current recipients, their families, their U.S. citizen children, employers, and state and local governments

across the country also require this Court to reject Plaintiffs' preferred remedy. As an initial matter, the Court should retain its stay pending appeal for current DACA recipients, consistent with prior rulings in this litigation. The Fifth Circuit's own order continuing the stay never contemplated that it could be upended on remand, and this Court itself granted a stay pending the end of the appellate proceedings—not simply the end of DHS's next rulemaking. And the stay makes sense: it protects reliance interests, avoids disruption, and ensures the status quo while the appeal proceeds, allowing for an orderly and non-emergent briefing process on appeal.

Beyond the stay, any equitable remedy must accommodate the same extraordinary reliance interests. Importantly, Plaintiffs *concede* that vacatur should be "tempered with" a more tailored judicial remedy that ensures DACA does not have to end overnight. *See* Dkt. 673 at 9 (admitting vacatur can be "tempered with" an order to reduce "disruptive consequences"). Although Plaintiffs claim the right way to address reliance is a single, categorical rule that DACA renewals must all terminate within two years, such a swift and bright-line rule would be massively disruptive, and *Regents* recognizes the remedy may need to be far more tailored. Instead, this Court either should remand the matter to DHS to provide the agency with an opportunity to address these reliance interests and consider the next steps, or—optimally—should craft a judicial remedial order that accounts for reliance interests by allowing DHS to maintain the status quo of granting renewals for current recipients to remain and work. Plaintiffs baldly assert that this Court should reject this remedy because the reliance interests are not reasonable; that Plaintiffs did not delay in taking six years to file suit; and that they are harmed even though they cannot show DACA recipients would not otherwise have been eligible for deferred action or other relief. But the law and record refute each argument. Any summary judgment order must reject Plaintiffs' remedial demands.

## ARGUMENT

## I.        THE FINAL RULE IS LAWFUL.

### A.        The Final Rule Is Not Arbitrary And Capricious.

This Court should grant Defendants' cross-motion because Plaintiffs have not established that the Final Rule is arbitrary and capricious. As an initial matter, Plaintiffs avowedly do not even attempt the "holistic review" that the APA requires of a challenge to the reasonableness of a cost-benefit analysis. *Luminant Generation Co., LLC v. EPA*, 675 F.3d 917, 926-27 (5th Cir. 2012). To the contrary, Plaintiffs expressly refuse to account for the Final Rule's myriad benefits redounding to DACA recipients, their families and communities, state and local governments, employers for whom recipients work, and educational institutions where they study—benefits that New Jersey has amply set forth in prior briefing. *See* Dkt. 636 at 12-17. And strikingly, even as to the one isolated portion of the Final Rule's cost-benefit analysis that they do challenge—the labor market impacts of granting work authorization to DACA recipients—Plaintiffs abandon any challenge to DHS's actual cost-benefit analysis. Instead, Plaintiffs *concede* that they "do not claim that [DHS] did not adequately assess the costs and benefits of employment authorization for DACA recipients relating to American workers." Dkt. 673 at 32. Because Plaintiffs have failed to show that the costs they allege outweigh the extraordinary benefits of the Final Rule—including, notably, the "central goal" of the Final Rule to respect reliance interests, 87 Fed. Reg. 53,183—Plaintiffs' supplemental claim fails, especially under the deferential standard that applies. *See Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021) (observing that "cost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency").

Plaintiffs do not seriously contest any of this. Instead, they erroneously contend that DHS acted in an arbitrary-and-capricious manner merely by conducting a cost-benefit analysis relating

to work authorization in the first place, pressing only their theory that "Congress already made that determination" when it prohibited unauthorized immigrant labor. Dkt. 673 at 32. But that is not a true or independent arbitrary-and-capricious theory; it is simply a repackaging of Plaintiffs' *other* claim that the INA categorically forecloses all employment authorization for DACA recipients— even those who worked in this country for over a decade. And were this somehow an independent theory, it could not withstand scrutiny. The sheer act of considering the costs and benefits of allowing DACA recipients to continue working is not arbitrary and capricious when the Supreme Court and this Court have both *required* as much. Indeed, this Court previously instructed DHS to assess a range of "issues that might be considered in a reformulation of DACA," including any "benefits bestowed by the DACA recipients on this country and the communities where they reside" and "effects of DACA on the unemployed or underemployed legal residents of the states." *Texas v. United States*, 549 F. Supp. 3d 572, 623-24 (S.D. Tex. 2021) (hereinafter *Texas II*).

An argument that DHS *could not* even assess the costs and benefits of work authorization, distinct from *how* it has evaluated them, is also inconsistent with the Supreme Court's mandates. *Regents* held the rescission of DACA to be arbitrary and capricious precisely because DHS failed to consider the benefits accruing to "employers who have invested time and money in training" recipients, as well as "the loss of $215 billion in economic activity and an associated $60 billion in federal tax revenue over the next ten years" that would result from "excluding DACA recipients from the lawful labor force," among other reliance interests engendered by DACA. 140 S. Ct. at 1914; *see id.* at 1913 (rejecting Secretary's position that "she did not need to" consider reliance interests and finding that no authority "automatically preclude[s] reliance interests"). Had DHS heeded Plaintiffs' demand and refused outright to consider the benefits of work authorization for DACA recipients in issuing the Final Rule, such action might have been deemed arbitrary and

capricious for failure to consider this patently relevant factor. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2570 (2019) (agencies must consider relevant factors, weigh risks and benefits, and articulate a satisfactory explanation). Since Plaintiffs have now explained that their arbitrary-and-capricious theory is trained exclusively on whether DHS can assess costs and benefits of continued employment for DACA recipients in the first place, their added claim must fail.

Even were this Court's instructions and *Regents* not dispositive, Plaintiffs cite no law that specifically forecloses such analysis by DHS. *See* Dkt. 625-1 at 24. Instead, it is common sense that DHS would consider such benefits when determining whether to focus enforcement resources on deporting DACA recipients or other types of removable noncitizens, like dangerous criminals and those who pose threats to national security. *See* Dkt. 636 at 11, 18. On that front, the sole authority Plaintiffs cite on this score in their opposition brief—*Judulang v. Holder*, 565 U.S. 42, 61 (2011)—undercuts their position. *Judulang* held that the Board of Immigration Appeals' decision to limit the scope of discretionary relief available to deportable noncitizens was arbitrary and capricious exactly because the Board's decision did not "relate[] to an alien's fitness to remain in the country," and was therefore not even "loosely" tied to "the purposes of the immigration laws." 565 U.S. at 61. In contrast, assessing the contributions DACA recipients make to this country, to their communities, to their employers, and to the economy is entirely appropriate when DHS is determining if DACA recipients should be a priority for removal or forbearance.

Plaintiffs get no further with their only remaining substantive challenge to the Final Rule's reasonableness—the claim that DHS did not account for the Affordable Care Act (ACA) minimum essential coverage requirements, which they contend will make DACA recipients cheaper to hire. *See* Dkt. 673 at 32-33. Initially, this point has no relevance in light of Plaintiffs' explicit concession that they "do not claim that [DHS] did not adequately assess the costs and benefits of employment

authorization for DACA recipients relating to American workers." *Id.* at 32. Further, this argument is a red herring, because the record shows the relief Plaintiffs seek—termination of DACA—would not make recipients more costly to employ; to the contrary, stripped of work authorization, DACA recipients would be an easily exploitable low-wage labor pool. *See* Dkt. 636 at 22 n.3; Dkt. 639 at 21. But most fundamentally, the premise of the argument is flawed. Because DACA recipients are ineligible for insurance subsidies, Plaintiffs argue employing them will be more attractive because it is less likely to lead to any penalties under the ACA, which are imposed on large employers for failing to offer health insurance that meets minimum coverage requirements *only if* "at least one full time employee" obtains such a subsidy. 26 U.S.C. § 4980H(a). But this would only be true in the extremely unlikely event that *every single one* of a large employer's employees was a DACA recipient (or otherwise ineligible for subsidies), because the ACA penalty applies equally to large employers as long as "at least one" of their employees obtains an insurance subsidy. *See* 26 U.S.C. § 4980H(a)(2), 4980H(c)(1), 4980H(c)(4)(A). Plaintiffs present no evidence to this Court, let alone evidence in the administrative record, that such situation has arisen or likely will. Failing to discuss such speculation, especially when not laid out in the record, does not render DACA invalid.

In sum, Plaintiffs fail to meaningfully challenge DHS's accounting of costs and benefits in the Final Rule, which is both "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). They have no answer to the critical role reliance played in DHS's careful analysis of the agency record. And their asserted errors fall short. As an independent claim, Plaintiffs' arbitrary-and-capricious theory immediately collapses.

### B.     The Final Rule Is Substantively Valid.

The administrative record sets forth in detail how the Final Rule falls well within DHS's authority to promulgate deferred action policies. Plaintiffs fail to contend with this evidence and

instead rehash their prior view that the Final Rule contradicts the INA's provisions concerning (1) eligibility for removal, (2) lawful presence, (3) work authorization, and (4) limitations on advance parole. Dkt. 673 at 28. In doing so, Plaintiffs ignore the evidence—highlighted in New Jersey's prior briefing, *see* Dkt. 636 at 24-28—that directly undermines each of these claims. At the very least to preserve the appellate issue, New Jersey highlights those errors.

*First*, Plaintiffs fail to address the evidence showing that DACA is consistent with—not contrary to—the INA's scheme for removal. Dkt. 636 at 25. The Final Rule explains that DHS's authority to promulgate DACA lies in the agency's "power to exercise enforcement discretion, which is inherent in the delegation of authority over enforcement of the INA." 87 Fed. Reg. 53,186 (citing 6 U.S.C. § 202(3), (5); 8 U.S.C. § 1103(a)(1), (3)). Plaintiffs do not engage either with this text or with the DHS findings and agency record confirming that DACA is consistent with decades of established historical practice—practice of which Congress would have been well aware when it ratified the relevant policies by statute. *See* 87 Fed. Reg. 53,186; 86 Fed. Reg. 53,746-47.

*Second*, Plaintiffs neglect to respond to the Final Rule's statement that DACA "does not confer lawful immigration status, affirmative authorization to remain in the United States, or a defense to removal." 87 Fed. Reg. 53,211; Dkt. 636 at 27. Rather than subvert statutory provisions governing lawful presence, as Plaintiffs claim, the Final Rule "codifies the definition of deferred action as a temporary forbearance from removal that does not confer any right or entitlement to remain in or reenter the United States." 87 Fed. Reg. 53,258; Dkt. 636 at 27.

*Third*, Plaintiffs do not grapple with the fact that prior deferred action recipients, separate from DACA, have been eligible to request work authorization for nearly half a century. Dkt. 636 at 26 (citing historical regulations). And they do not respond to the DHS record evidence showing Congress was aware of this practice—and despite amending the underlying statutes in the decades

since, left that authority in place. As a result, the codification of DACA-related employment authorization does not represent a substantive change in longstanding DHS policy. *Id.*

*Finally*, having made much of DACA recipients' eligibility for advance parole, Plaintiffs fail to respond to the portions of the Final Rule that directly address their concerns. *See* Dkt. 636 at 27-28. While explaining how advance parole may help certain recipients apply for adjustment of status, the Final Rule clarifies that this flows from other statutes, not DACA itself. 87 Fed. Reg. 53,250. The Final Rule thus makes clear that DHS's practice of granting advance parole conforms to relevant statutes, and that the agency is making no special allowances for DACA recipients. 87 Fed. Reg. 53,251. That responds directly to this Court's prior concerns.

## II.       IN THE ALTERNATIVE, IF THIS COURT HOLDS THAT DACA IS UNLAWFUL, IT SHOULD ADOPT DEFENDANTS' PROPOSED REMEDIES.

### A.       The Court Should Retain Its Stay Pending Appeal.

Should this Court find the Final Rule unlawful and issue a remedy vacating or enjoining it, this Court should preserve the partial stay pending appeal currently in effect. Plaintiffs' brief does not articulate an entirely clear position on this issue. *See* Dkt. 673 at 8. Plaintiffs explain they "are simply asking that the same remedy upheld by the Fifth Circuit apply to the Final Rule," which of course included a stay pending appeal—in which case there is no dispute between the parties on the question of a stay. *Id.* And while Plaintiffs appear to be quibbling in their brief only with one of the rationales previously given for that stay—that is, Plaintiffs say the stay should no longer be pending the outcome of a now-completed DHS rulemaking process—they otherwise accept the stay's validity. *See id.* If that is their position, then all agree the stay pending appeal is proper.

That said, to the extent they oppose a stay pending appeal altogether on the basis that the prior DHS rulemaking process since concluded and culminated in this Final Rule, that argument would misunderstand the Fifth Circuit's order; this Court's prior order; and the important reasons

for a stay pending appeal. First, that argument would ignore the language of the Fifth Circuit's order. While the Fifth Circuit remanded for this Court to consider this challenge to the Final Rule, it also held that DHS would be permitted to continue renewing DACA for any current recipients of deferred action "pending a further order of [the Fifth Circuit] or the Supreme Court." *Texas v. United States*, 50 F.4th 498, 532 (5th Cir. 2022) (hereinafter *Texas II*). In other words, the Fifth Circuit did not provide any leeway for the stay to be upended on remand—likely due to the vast disruption it would cause. *See infra* at 13.

Second, this Court's prior order makes plain the vitality of the stay. This Court could have granted its partial stay pending only DHS's rulemaking, but it did not, instead sensibly granting a stay pending "appellate review." *Texas v. United States*, No. 18-0068, 2021 WL 3022434, at *2 (S.D. Tex. July 16, 2021) (hereinafter *Texas II*); *see also Texas II*, 549 F. Supp. 3d at 624. And for good reason: if this Court ends DACA without a stay pending appeal, it will cause massive economic and social repercussions for people who relied on DACA for years—including losing their current ability to make a living and provide for 250,000 U.S. citizen children, even as the appeal proceeds. *See Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016) ("the maintenance of the status quo is an important consideration in granting a stay"). DACA recipients would be left in limbo while the final outcome remains uncertain during the pendency of an inevitable appeal.

Finally, to the extent they oppose this partial stay, Plaintiffs altogether fail to address the myriad ways in which recipients, employers, and state and local governments who rely on DACA, would suffer from its cessation, particularly while an appeal is pending. Dkt. 636 at 31-32. These considerations animated this Court when it granted the stay, and continue to apply today. *See Texas II*, 2021 WL 3022434, at *2-3 (discussing "the significant reliance interests that DACA has engendered since its inception"); *id.* at *2 (noting "[h]undreds of thousands of individual DACA

recipients, along with their employers, states, and loved ones" today rely on DACA); *Texas v. United States*, 328 F. Supp. 3d 662, 741 (S.D. Tex. Aug. 31, 2018) (hereinafter *Texas II*) (explaining that "states, cities, and employers … could lose residents whom they consider to be valuable members of their communities or employees who are integral to various schools, municipalities, and industries"). "Given those interests," this Court recognized, "it is not equitable for a government program that has engendered such significant reliance to terminate suddenly," and "equity will not be served by a complete and immediate cessation of DACA" while the case remains ongoing. *Texas II*, 2021 WL 3022434, at *2. That all remains true today.

This particular risk of harm is easily avoidable and entirely one-sided. If this Court lifts the stay pending appeal, there will be disruption for DACA recipients, their families, their U.S. citizen children, employers, and state and local governments across the Nation—needless prejudice and confusion if an appellate court later disagrees with any of this Court's decision. By contrast, if the Court preserves the stay, the only harm would be a delay in DACA's ultimate cessation for current recipients, which will not materially harm Plaintiffs' interests while the appeal proceeds, especially as Plaintiffs waited nearly six years to challenge the DACA policy in the first instance. And judicial economy concerns are likewise one-sided. A stay will allow this lawsuit to proceed in the orderly course, as it has done to date. In the absence of a stay, the parties will need to seek emergent relief from appellate courts, which is inconsistent with the careful and orderly resolution of claims that has happened to date in this case. This Court's stay remains entirely proper.

B.      **Beyond The Stay, This Court Should Craft A Remedial Order To Respect The Profound Reliance Interests Engendered by DACA.**

As New Jersey explained in its cross-motion, should this Court find DACA unlawful, this Court should craft an equitable remedy that protects the extraordinary reliance interests at stake— reliance interests this Court and the Supreme Court have repeatedly recognized. An equitable order

would most appropriately effectuate these reliance interests by allowing DHS to maintain the status quo of granting renewals that permit current DACA recipients to remain and work in this country, and would thereby avoid irreparably disrupting the lives they have built over the past decade. Such an order would not preclude DHS from lawfully modifying or even terminating the DACA policy, but it would preserve the status quo until the agency does so.[1] This Court should at least adopt this relief as to any DACA recipients who Plaintiffs fail to prove would otherwise never have received deferred action without DACA. *See* 87 Fed. Reg. 53,213-14 (noting individualized, discretionary nature of deferred action). This remedy protects the extraordinary interests of 600,000 individuals who relied on DACA for a decade to live openly, start families, obtain degrees and jobs, hire U.S. workers, and provide their personal identifying information to the U.S. government. *See* Dkt. 636 at 30-41. And it would reflect Plaintiffs' own delay in contributing to this status quo. *See id.*

Indeed, given the extraordinary consequences that would follow from vacating DACA, *even Plaintiffs agree* that vacatur can and must be "tempered with" a tailored judicial remedy that would ensure DACA does not have to end overnight. *See* Dkt. 673 at 9 (Plaintiffs conceding that vacatur can be "tempered with" an order to reduce "disruptive consequences"); *see* Dkt. 673 at 14 (admitting that "in light of the reliance interests that do exist," a court could adopt a "proposed injunction and remedy to account for such interests"). This concession is logical, as this Court has

---

[1] Plaintiffs misunderstand New Jersey to be "ask[ing] [for] more … than the Final Rule itself grants." Dkt. 673 at 9. New Jersey does not seek an order permitting new requests for forbearance or work authorization from those who are not currently recipients. As to current recipients, New Jersey seeks an order that maintains the status quo—allowing recipients to submit requests every two years to renew forbearance and work authorization, just as current recipients can today, unless DHS lawfully terminates DACA. In other words, should this Court enter an order maintaining the *opportunity* for existing recipients to renew DACA, it could explain, like the Final Rule does, that deferred action for any particular recipient can be rescinded by DHS—and that DHS could decide to modify or terminate DACA as a whole if it did so lawfully. *See* Dkt. 636 at 40 n.9.

equitable power to limit the scope of the ultimate order to which DHS is subject, particularly in this extraordinary case. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32-33 (2008) (discussing "discretion" in selecting remedies, and noting relief "does not follow from success on the merits as a matter of course"); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). New Jersey previously marshaled myriad examples of courts exercising discretion to refrain from enjoining the full scope of an unlawful action, especially where the remedy would result in significant disruption or where a challenger delayed inexcusably in seeking relief. *See* Dkt. 636 at 34-37. Plaintiffs do not even attempt to refute or distinguish any of those cases—and thus appear not to challenge the point.

As a result, the question for this Court is *which* remedy to select to "temper" the disruption that would otherwise follow. Plaintiffs believe it would suffice to vacate DACA and to separately order that DHS may continue to approve "renewal applications" for up to "two years from the date of judgment," Dkt. 625-1 at 5, meaning current DACA recipients would remain eligible for deferred action under DACA for two to four more years, depending on the date of their next renewal. *See* Dkt. 673 at 9. Both Federal Defendants and Private Defendant-Intervenors urge a remand to DHS to allow the agency to determine the proper timing and details of any wind-down of DACA in the first instance, with deferred action for current recipients remaining in place as the agency does so. *See* Dkt. 642 at 49-50 (arguing for remand to DHS even if DACA is vacated); Dkt. 639 at 26 (arguing for remand for "an orderly wind-down of any legally defective aspects of the Final Rule that this Court identifies"). Although New Jersey prefers the approach that Federal Defendants and Private Defendant-Intervenors offer over an arbitrary two-year bright line, *see* Dkt. 636 at 41-43; *infra* at 19-20, this Court can go further. In light of recipients' unprecedented and justified reliance on this policy, which Plaintiffs inexcusably delayed in challenging for nearly six

years, a careful equitable remedy would expressly allow current DACA recipients to remain eligible for continued, ongoing renewals so as to allow them to maintain forbearance and employment authorization.

The most crucial consideration in selecting among the parties' proposed equitable remedies is the profound disruption to 600,000 DACA recipients, their families, their U.S. citizen children, employers, and state and local governments from an order terminating the policy. Plaintiffs' mere assertion that "[v]acatur will not cause disruptive consequences" to these reliance interests, Dkt. 673 at 7, strains credulity and ignores the plain record evidence. For example, the Final Rule cites numerous studies detailing the estimated economic effects of terminating DACA, none of which Plaintiffs ever actually dispute. *See, e.g.*, 87 Fed. Reg. 53,169 (DHS noting 2019 economic study finding that "eliminating DACA would result in the DACA population losing about $120 billion in income, the Federal Government losing approximately $72 billion in tax revenue, and States and local governments losing about $15 billion in tax revenue over the 2020-2029 decade"). Nor do Plaintiffs refute that tens of thousands of current DACA recipients own businesses or serve as healthcare workers, Dkt. 636 at 31-32, nor the ramifications that terminating DACA would have on those recipients, their employees, patients, and communities. And their brief fails to mention, let alone grapple with, the 250,000-plus U.S. citizen children of DACA recipients whose families and lives stand to be upended if DACA ends. *See* 87 Fed. Reg. 53,154; Dkt. 636 at 13. Plaintiffs do not even acknowledge this record evidence because they cannot refute it.

Although Plaintiffs respond that no disruption will be caused because "their requested two-year transition period mirrors DACA's renewal period," Dkt. 673 at 5, this bald statement fails to withstand scrutiny. By attempting to equate their demand for a two-year wind-down with the Final Rule's two-year renewal period for individual DACA grants, Plaintiffs obfuscate the reality—the

13

potential en masse revocation of lawful presence and work authorization for hundreds of thousands of workers, businesses, parents, and students. That is why *Regents* itself contemplated that winding down DACA responsibly—even after a finding of illegality—could ultimately require more time than the 2012 policy's two-year renewal period. *See Regents*, 140 S. Ct. at 1914. Instead, *Regents* contemplated that DHS could have "considered a broader renewal period based on the need for DACA recipients to reorder their affairs" or "more accommodating termination dates for recipients caught in the middle of a time-bounded commitment," to address the disruption termination would cause. *Id.* In other words, while Plaintiffs effectively suggest that two years *must* be enough time to protect the U.S. citizen child who counts on a DACA recipient parent's income, that unsupported position is inconsistent with case law and common sense. And the same is true as to the interests of DACA recipients, employers, employees, universities, and state and local governments—none of which suddenly dissipate at the end of a two-year date.[2]

Plaintiffs' other argument, Dkt. 673 at 12—which directly attacks the reasonableness and strength of these reliance interests, *see* Dkt. 636 at 13-17, 30-41—fares no better. Plaintiffs primarily contend that "reasonable DACA recipients" would "discount their reliance" in response to Plaintiffs' prior successful challenge to the Deferred Action for Parents of Americans (DAPA) policy. Dkt. 673 at 12. But the DAPA litigation supports the opposite inference at least as

---

[2] Plaintiffs also suggest incorrectly that DACA recipients' reliance interests are weak because DHS made clear that individual deferred action could be revoked, but that is also foreclosed by *Regents*, which recognized that the reliance interests here are unusually powerful. *Compare* Dkt. 673 at 13, *with Regents*, 140 S. Ct. at 1914. And while Plaintiffs say the Fifth Circuit itself found, as a matter of law, that DACA recipients' reliance interests are "weak," *see* Dkt. 673 at 13-14 (citing *Texas v. Biden* (*MPP*), 20 F.4th 928, 990 (5th Cir. 2021), *rev'd*, 142 S. Ct. 2528 (2022)), that is not what *MPP* held. *MPP* said only that the *rule of law* adopted in *Regents* would require agencies to "assess the strength of reliance interests," even when they are "weak," to be consistent with administrative law principles. 20 F.4th at 990. But that is a far cry from stating—let alone holding, in a case that did not present the issue—that the current DACA recipients' interests are themselves weak.

effectively—that because Plaintiffs challenged DAPA immediately but never challenged DACA, including for several years thereafter, a reasonable DACA recipient might conclude they were unlikely ever to file such belated suit. As a result, recipients relied on the representations of the U.S. government that they would remain eligible for a renewable, two-year grant of forbearance and work authorization—so much so that they provided their personal information to the U.S. government, which oversees the apparatus that would otherwise remove them. *See* Dkt. 636 at 13-15, 30-33, 37-38 (citing examples of recipients' reliance); *Regents*, 140 S. Ct. at 1914 (explaining "DACA recipients have 'enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on [DACA]"). The 600,000 current DACA recipients surely did not form reliance interests on the basis of scrutinizing federal court dockets and reporters instead of announced federal policies—particularly where those judicial decisions were addressing a materially different policy from DACA, and were issued at a time when DACA remained subject to no challenge in any court at all.

Moreover, Plaintiffs' contention further ignores the reality that the reliance interests DACA engendered are not the expectations of recipients alone. As New Jersey already detailed, recipients' families, employers, state and local governments, and countless others all relied on the existence of DACA, and these reliance interests continued to grow with the passage of time. *See, e.g.*, Dkt. 636 at 14-15 (detailing business and government reliance interests); Dkt. 636 at 19 (describing tax contributions and consumer spending); 87 Fed. Reg. 53,289 (noting "[s]ome States have relied on the existence of DACA in setting policies regarding eligibility for driver's licenses, in-state tuition, State-funded healthcare benefits, and professional licenses"); *Regents*, 140 S. Ct. at 1914 (noting impacts termination of DACA would have on "recipients' families, including their 200,000 U.S.-citizen children," "the schools where DACA recipients study and teach," and "the employers who

15

have invested time and money in training them"). For Plaintiffs' argument to hold water, Plaintiffs would have to posit that "reasonable" DACA recipients would quit their jobs, uproot their families, and sell their homes; that businesses across the country would alter their hiring practices; and that States would enact new laws and regulations—all in response to a judicial decision that left the existing DACA policy entirely unchallenged. And Plaintiffs' argument would logically have to mean that "reasonable" citizens employed by DACA recipient employers and business owners (who may not know the immigration status of their employers) should have been looking for new jobs after the DAPA decision. And it is not clear what, precisely, Plaintiffs think U.S. citizen children of DACA recipients should have been doing after that ruling.

Nor is the profound harm to reliance interests and real-world disruption the only problem this Court's remedy must account for: Plaintiffs' decision not to file suit for nearly six years weighs strongly against granting their requested remedy. *See Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 794 (5th Cir. 1999) ("It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted with unclean hands." (citation omitted)). In their opposition, Plaintiffs attempt to minimize the impact of a *six-year* delay in the development of reliance interests and in the disruption this case now presents. But in assessing their preliminary injunction application in 2018, this Court already rightly concluded that Plaintiffs' delay did bear on the relief that was proper, as "[a] delay in seeking an injunction has been viewed as a concession or an indication that the alleged harm does not rise to a level that merits an injunction[.]" *Texas II*, 328 F. Supp. 3d at 738. For good reason: "[t]he most obvious form of prejudice is detrimental reliance on the lack of any legal challenge to one's conduct." Douglas Laycock & Richard Hasen, *Modern American Remedies* 1010 (5th Ed. 2018). The same equitable principles continue to apply today, with even greater force now, over a decade after the initiation of DACA.

Because delay can bear so heavily on the proper remedy, Plaintiffs make a series of excuses for their strategic decision to defer bringing suit—but the asserted explanations cannot support or account for their dilatory conduct. First, Plaintiffs contend that they promptly challenged the 2022 Final Rule following remand from the Fifth Circuit, but that fact is irrelevant to their choice not to challenge for years the 2012 Memo, the basis for *current* DACA recipients' longstanding reliance. Dkt. 673 at 10. Second, Plaintiffs argue they were busy with other priorities during these six years. Dkt. 673 at 10-11. But that runs into at least three problems: this response in no way undermines the reliance interests that third parties formed on Plaintiffs' *conduct*, whatever Plaintiffs' *motivations* were for it; this response only emphasizes the relative *un*importance to Plaintiffs of this issue for years; and these States have resources to challenge a policy like DACA within six years, whatever other priorities they have. (Indeed, Plaintiffs have not identified a single other challenge by States seeking nationwide relief against a federal government policy that took so many years to file.) Third, Plaintiffs say that they believed a lawsuit would be unnecessary because: in 2012, DACA could end by President Obama losing reelection; in 2013, a House bill addressing some of the same issues might have become law; in 2014, Plaintiffs challenged DAPA (but not the core of DACA itself); and in 2017, Plaintiffs urged then-President Trump to end DACA. *See* Dkt. 673 at 10-11. But Plaintiffs have repeatedly challenged policies in this Court that a future President could terminate or that Congress could supersede—even immigration policies— yet did not do so here. At bottom, Plaintiffs could have challenged the 2012 Memo, but chose to wait six years, while hundreds of thousands of individuals submitted information to the U.S. government, and built lives and careers and families in reliance on a policy they conspicuously refused to challenge. Those unduly delayed actions have had a profound and lasting impact on the equities now before the Court.

17

Nor have Plaintiffs shown the kind of harm necessary to justify this en masse disruption in two years. As New Jersey explained, to justify the adoption of their remedy, Plaintiffs must show that DACA actually caused their claimed legal injury with respect to any particular recipient who was granted deferred action. *See* Dkt. 636 at 39-40; *Collins v. Yellen*, 141 S. Ct. 1761, 1775, 1788-89 (2021) (declining to enter inunction where plaintiffs failed to show "compensable harm" justifying their requested remedy—that is, where they could not show that the Director who approved agency action that the plaintiffs opposed would have been removed "but for" the challenged removal law); *Collins v. Lew*, --- F. Supp. 3d ---, No. 4:16-cv-03113, 2022 WL 17170955, at *4 (S.D. Tex. Nov. 21, 2022) (implementing this requirement and rejecting those plaintiffs' demand for relief). That is an especially important consideration here, where individuals were eligible for deferred action and work authorization from DHS before, and entirely apart from, the DACA framework—a fact Plaintiffs have never challenged. *See* Dkt. 636 at 39-40 (highlighting that Plaintiffs never argued DHS lacks authority to grant deferred action to individual applicants on individualized facts, but instead have challenged DACA as a policy for structuring those discretionary grants). That proves fatal to Plaintiffs' demand, because Plaintiffs *concede* that they cannot demonstrate DACA recipients would not have otherwise received deferred action or some other form of immigration relief, even absent DACA. *See* Dkt. 673 at 35 (acknowledging that "'there would always remain some possibility' that any given DACA recipient would be granted deferred action on an individual basis"). That concession means that Plaintiffs cannot show the kind of harm to justify their draconian proposal.

This Court has long recognized the paramount importance of reliance interests in resolving DACA. Plaintiffs' two-year proposal flies in the face of those interests, is unjustified by their own delays, and cites no cognizable harm that justifies it.

18

**C.    Alternatively, The Court Should Remand To Allow DHS To Make The Complex Policy Choices Involved In Winding Down DACA.**

If this Court does not craft an equitable remedy to account for the extraordinary reliance interests at stake, it should instead remand to DHS so the agency can appropriately address those reliance interests and determine the contours of any wind-down. Plaintiffs argue that DHS's only proper role was to promulgate the Final Rule, and now asks this Court "not [to] give DHS any more chances to further drag out this unlawful program[.]" Dkt. 673 at 7. The Court should decline Plaintiffs' request not least because it would directly contravene the Supreme Court's holding in *Regents*. The Supreme Court recognized that—even after DHS had concluded under President Trump's administration that the DACA policy was unlawful—the agency retains "considerable flexibility" in addressing the "reliance interests of DACA recipients" and "administrative complexities" involved in the "wind-down" of DACA. *Regents*, 140 S. Ct. at 1914. Contrary to Plaintiffs' arguments that remand is impossible where the legality of a policy is at stake, the Supreme Court in *Regents* acknowledged that remand to the agency serves a distinct purpose even upon a finding of unlawfulness. *Id.* at 1910, 1914. The Court recognized that "deciding how best to address a finding of illegality moving forward can involve important policy choices," and that "[t]hose policy choices are for DHS." *Id.* at 1910. But Plaintiffs do not mention this discussion, or how it forecloses their current argument.

Rather than grappling with *Regents*, Plaintiffs instead argue that remand to the agency is impossible because DHS's only proper role was to attempt to remedy any substantive deficiencies this Court identified in the DACA policy. Dkt. 673 at 6-7. But Plaintiffs conflate two distinct types of remand, both of which are permissible and each of which serves a distinct function. Contrary to Plaintiffs' suggestion, New Jersey does not request a remand for purposes of further rulemaking in an attempt to craft a policy that this Court would deem lawful. Instead, New Jersey requests a

19

remand to DHS for purposes of making the difficult policy choices necessary to effectuate a wind-down of DACA, it having been declared unlawful and all appeals having been exhausted, while respecting all relevant reliance interests. This type of remand is something Plaintiffs do not address at all, but which is clearly contemplated by *Regents*, 140 S. Ct. at 1914, and by the Fifth Circuit's decision, *see Texas II*, 50 F.4th at 512 (observing that its remand to this Court "does not, of course, foreclose remanding to DHS upon review of the Final Rule in any future proceedings").

Finally, while Plaintiffs insist that the Final Rule's two-year renewal period for *individual* DACA requests makes their proposal for a blanket end date logical, the Court in *Regents* explicitly contemplated that winding down DACA on a *policy-wide* level could require more time. Dkt. 673 at 8; *see supra* at 14 (summarizing the discussion in *Regents* of how DHS could tailor a wind-down to accommodate the varied needs of DACA recipients). Although DHS was not required to adopt any of the suggestions made in *Regents*, the Court's opinion emphasized that setting the precise contours of a wind-down would demand consideration of the "serious reliance interests" at play. 140 S. Ct. at 1913. Plaintiffs' demand to end DACA renewals two years after the date of judgment, en masse, with no such considerations, provides no response to this, and altogether fails to acknowledge that DHS remains tasked with the "difficult decision" of weighing these interests even upon a finding of illegality, "especially when the finding concerns a program with the breadth of DACA." *Id.* at 1910, 1914.

## CONCLUSION

This Court should grant New Jersey's motion as to both the merits and remedy, and enter summary judgment against Plaintiffs.

Dated: April 27, 2023

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Mayur P. Saxena*
MAYUR P. SAXENA
Attorney-in-Charge
Assistant Attorney General
(admitted pro hac vice)
124 Halsey St., 5th Floor
Newark, New Jersey 07101
PO Box 45029-5029
Phone: (973) 877-1280
Fax: (973) 648-4887
Mayur.Saxena@law.njoag.gov

Jeremy Feigenbaum, Solicitor General
(admitted pro hac vice)
Shireen A. Farahani, Deputy Attorney General
Melissa Fich, Deputy Attorney General
Amanda I. Morejón, Deputy Attorney General
Samuel L. Rubinstein, Deputy Attorney General
*Attorneys for Defendant-Intervenor State of New Jersey*

21

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 27, 2023, I caused this document (and exhibits hereto) to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Mayur P. Saxena*
Mayur P. Saxena
