**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |

**DEFENDANT-INTERVENORS' APPENDIX
IN SUPPORT OF THEIR REPLY BRIEF IN SUPPORT OF THEIR
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# VOLUME 1
# Exhibits A–B

Dated:  April 27, 2023

Respectfully Submitted,

**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND**

By:  /s/ Nina Perales
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone:  (210) 224-5476
Facsimile:  (210) 224-5382
Email:  nperales@maldef.org

**ROPES & GRAY LLP**
Douglas H. Hallward-Driemeier
2099 Pennsylvania Ave NW
Washington, DC  20006-6807
(202) 508-4600
(202) 508-4776 (direct dial)
Douglas.Hallward-Driemeier@ropesgray.com
(Admitted pro hac vice)

**GARCÍA & GARCÍA,
ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX  78502
Phone:  (956) 630-3889
Facsimile:  (956) 630-3899
Email:  cgarcia@garciagarcialaw.com

Attorneys for Defendant-Intervenors

| Exhibit | Description/Source | Vol. No. |
|---|---|---|
| A | March 4, 2019, letter from Todd Lawrence Disher to Jack Salmon | 1 |
| B | Oral argument transcript in *Texas v. United States*, No. 21-40680 (5th Cir., July 6, 2022) | 1 |

# Exhibit A



**KEN PAXTON**

ATTORNEY GENERAL OF TEXAS

March 4, 2019

Jack Salmon
Staff Attorney
MALDEF
110 Broadway, Suite 300
San Antonio, TX 78205

Re:     *Texas, et al. v. United States, et al.*, No. 1:18-cv-00068

Dear Mr. Salmon:

I write in response to your two letters dated February 1, 2019.

First, Plaintiff States' discovery requests do not require supplementation, as there are no genuine issues of material fact that require additional development before the Court can rule on Plaintiff States' claims as a matter of law.

The requests cited in your letter seek information regarding various categories of costs incurred by Plaintiff States as a result of the Deferred Action for Childhood Arrivals ("DACA") program. Because Plaintiff States are not seeking to recover monetary damages for the harms they have suffered from DACA, Plaintiff States must merely prove *some* injury to support their standing to bring this lawsuit. *See* ECF No. 319 at 50.

As explained in Plaintiff States' brief in support of their motion for summary judgment, the Court has already ruled that Plaintiff States have suffered injuries sufficient to establish their standing. *See* ECF No. 357 at 21-30. That ruling is based on legal principles and evidence that is properly in the record and before this Court. And much of Plaintiff States' evidence is corroborated by Defendant-Intervenors' own witnesses. *See, e.g.*, ECF No. 319 at 51 ("Finally, and perhaps most importantly for this topic, Defendant-Intervenors' own witness directly connected the dots for the Plaintiff States."). As such, there are no genuine issues as to any material facts regarding Plaintiff States' standing, so additional discovery on Plaintiff States' standing is not proportional to the needs of this case and outside the scope of discovery. *See* Fed. R. Civ. P. 26(b)(1).

Defendant-Intervenors have filed a motion pursuant to Federal Rule of Civil Procedure 56(d), claiming that additional discovery is needed before the Court can rule on Plaintiff States' motion for summary judgment. ECF No. 363. Plaintiff States will file a response in opposition to that motion setting forth why the requested

Jack Salmon
March 4, 2018
Page 2

additional discovery is not needed. The parties can discuss whether supplementing discovery responses is needed should the Court rule that additional discovery is required on Plaintiff States' standing.

Second, you also reference the Court's Order excluding certain declarations from the *Texas I* litigation. *See* ECF No. 318. Consistent with my representations to you in the past, Plaintiff States do not intend to rely on those declarations at this time.


Sincerely,

Todd Lawrence Disher
Trial Counsel for Civil Litigation
Office of the Attorney General of Texas


Attorney-in-Charge for Plaintiff States

# Exhibit B

No. 21-40680

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

State of Texas; State of Alabama; State of Arkansas;
State of Louisiana; State of Nebraska; State of South
Carolina; State of West Virginia; State of Kansas; State
of Mississippi,

Plaintiffs - Appellees,

versus

United States of America; Alejandro Mayorkas, Secretary,
U.S. Department of Homeland Security; Troy Miller, Acting
Commissioner, U.S. Customs and Border Protection;
Tae D. Johnson, Acting Director of U.S. Immigration and
Customs Enforcement; Ur M. Jaddou, Director of U.S.
Citizenship and Immigration Services,

Defendants - Appellants,

Elizabeth Diaz; Jose Magana-Salgado; Karina Ruiz De Diaz;
Jin Park; Denise Romero; Angel Silva; Moses Kamau Chege;
Hyo-Won Jeon; Blanca Gonzalez; Maria Rocha; Maria Diaz;
Elly Marisol Estrada; Darwin Velasquez; Oscar Alvarez;
Luis A. Rafael; Nanci J. Palacios Godinez; Jung Woo Kim;
Carlos Aguilar Gonzalez; State of New Jersey,

Intervenor Defendants - Appellants.

On Appeal from the United States District Court
for the Southern District of Texas, Brownsville Division

------------------------------------------------------------
WEDNESDAY, JULY 6, 2022

BEFORE PANEL:

CHIEF JUDGE PRISCILLA RICHMAN
JUDGE JAMES C. HO

JUDGE KURT D. ENGELHARDT
------------------------------------------------------------

```
 1   APPEARANCES:

 2   FOR THE UNITED STATES:

 3        UNITED STATES DEPARTMENT OF JUSTICE

 4             By: Brian Boynton

 5
     FOR DACA RECIPIENT APPELLANTS:
 6
          MEXICAN-AMERICAN LEGAL DEFENSE & EDUCATIONAL FUND
 7        110 Broadway Street
          San Antonio, Texas 78205
 8        (210) 224-5476

 9             By: Nina Perales

10
     FOR THE STATE OF NEW JERSEY:
11
          NEW JERSEY OFFICE OF ATTORNEY GENERAL
12
               By:  Jeremy Feigenbaum
13

14   FOR THE STATE OF TEXAS:

15        TEXAS OFFICE OF THE ATTORNEY GENERAL

16             By: Judd Edward Stone, II

17

18

19

20

21

22

23

24

25
```

3

1                               INDEX
                                                    Page
2
  ARGUMENT BY MR. BOYNTON                        4
3
  ARGUMENT BY MS. PERALES                       14
4
  ARGUMENT BY MR. FEIGENBAUM                    20
5
  ARGUMENT BY MR. STONE                         26
6
  ARGUMENT BY MR. BOYNTON                       34
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          CHIEF JUDGE RICHMAN:  The next case on our

2  docket is 21-40680, the State of Texas versus the United

3  States.

4          Mr. Boynton.

5          MR. BOYNTON:  Good morning, Your Honor, and

6  may it please the Court, Brian Boynton for the United

7  States.  I've reserved 4 minutes for rebuttal.

8          The 2012 DACA memorandum challenged in this

9  case is lawful in its entirety and should be upheld.

10  This Court should reverse the district court's grant of

11  summary judgment for the plaintiff states and vacate the

12  injunction against DACA.

13          I'd like to start first with standing.  The

14  plaintiffs have failed to meet their burden of

15  establishing Article III standing.  This case is very

16  similar to the Crane v Johnson case decided by this

17  Court, where the Court found that Mississippi had failed

18  to meet its burden to establish standing.  Mississippi,

19  like the plaintiffs here, was resting on an assertion

20  that DACA caused the state to spend more for social

21  services generally.  But Mississippi had not put in any

22  evidence showing that DACA specifically caused the state

23  to increase its expenditures.  This Court found standing

24  to be purely speculative in that case and rejected

25  Mississippi's challenge.

5

1          Importantly, Mississippi, like the plaintiffs

2  in this case, had not relied on expenditures due to the

3  issuance of driver's licenses, the basis for standing in

4  this Court's 2015 DAPA decision.

5          This case is also very similar to the recent

6  decisions by the Sixth Circuit in the immigration

7  priorities cases.  There have been two recent decisions

8  by the Sixth Circuit, both by Judge Sutton, the second

9  one issued just yesterday.  This is a case where the

10  plaintiff states have challenged a DHS memo setting

11  immigration enforcement priorities.  The states there,

12  like the states here, contend that the guidance about how

13  to remove people from the United States causes the states

14  to spend more money on social services.  The Sixth

15  Circuit concluded that the plaintiffs' basis for standing

16  was entirely speculative.

17          It's important that in this case the

18  plaintiffs --

19          JUDGE ENGELHARDT:  You think your best case on

20  standing is Crane v Johnson?

21          MR. BOYNTON:  Yes, Your Honor.

22          JUDGE ENGELHARDT:  The 2015 case?

23          MR. BOYNTON:  Yes, Your Honor.  The Sixth

24  Circuit decisions are also quite helpful.

25          JUDGE ENGELHARDT:  So, I'm looking at your

1  brief; you don't really talk about that case.

2          MR. BOYNTON:  Crane v Johnson, I believe we

3  cited.  We don't focus on it.  That's part of the reason

4  I wanted to --

5          JUDGE ENGELHARDT:  You don't mention it

6  anywhere in your standing discussion.

7          MR. BOYNTON:  The argument we've made, Your

8  Honor --

9          JUDGE ENGELHARDT:  I'm not saying it's waived.

10  I'm just kind of surprised that your lead case isn't even

11  in your brief.

12          MR. BOYNTON:  Your Honor, the argument we made

13  in our brief is very similar to the argument accepted in

14  Crane v Johnson.  I take your point that we didn't focus

15  as much on it, but the argument we made was that the

16  plaintiffs had failed to put forward evidence documenting

17  their expenses.

18          The approach the plaintiffs took here is very

19  different from what they did in the DAPA case.  There,

20  this Court relied on driver's license expenditures.  That

21  was important, because under Texas law, Texas issued

22  driver's licenses to people who are granted deferred

23  action.  That's not the case with respect to the

24  expenditures that the plaintiffs are pointing to here.

25  They're pointing to emergency medical care expenses --

```
 1              JUDGE ENGELHARDT:  I'll agree with you that
 2   it's interesting that the state doesn't make that
 3   argument here.  It would have been easy to just -- for us
 4   to just follow our previous ruling in the DAPA case.  I'm
 5   sure we'll ask the State of Texas that question when
 6   they're up here.
 7              But do you doubt that there's a similar injury
 8   in this case?  Wouldn't you have the same driver's
 9   license problems with the DACA population as we do with
10   the DAPA population?
11              MR. BOYNTON:  So, we don't have any evidence
12   in the --
13              JUDGE ENGELHARDT:  Or, in other words, is your
14   argument just purely a forfeiture argument, or do you
15   think it's actually factually different?
16              MR. BOYNTON:  There's the forfeiture argument
17   and -- I don't know factually whether the argument would
18   be the same or not.  It would depend on, you know,
19   expenses incurred by the states here.  But the bottom
20   line for us is that the states haven't raised this issue
21   and have forfeited it.
22              Because of the way the plaintiffs have
23   attempted to show standing, they necessarily have to show
24   that DACA causes more people to be in the United States
25   and that if DACA were rescinded these people would
```

1   voluntarily leave the United States.  That's the only way

2   they get to a decrease in expenditures.  And they've not

3   made that showing, they've not put in any --

4            JUDGE ENGELHARDT:  But you all had.  That's

5   the Wong [ph] survey.  They didn't need to have the

6   evidence because -- I'm not saying the United States.  I

7   think it was New Jersey.

8            MR. BOYNTON:  The intervenors.

9            JUDGE ENGELHARDT:  Right.

10           MR. BOYNTON:  Correct.

11           JUDGE ENGELHARDT:  They don't need to present

12   evidence when you guys present it for them.

13           MR. BOYNTON:  So, the intervenors also

14   presented evidence that the Wong survey is not

15   dispositive on this point, that it called for people to

16   speculate and there were methodological flaws.

17           At the end of the day, interestingly --

18           JUDGE ENGELHARDT:  Well, wait a minute.  It's

19   causing the beneficiaries to speculate on their own

20   behavior if DACA were to be repealed.  That's the whole

21   question that you're proposing.  I mean, you literally

22   said nobody would leave, and the survey says some

23   20 percent of the people would leave.  Why is that not

24   directly responsive?

25           MR. BOYNTON:  Because even there, it's

1  speculative about what people would do.  This was a

2  survey conducted five years ago that asked people to

3  hypothesize what would happen, and so it's necessarily

4  speculative.

5          JUDGE ENGELHARDT:  What are the experts on the

6  other side doing but speculating?

7          MR. BOYNTON:  The experts --

8          JUDGE ENGELHARDT:  In other words, the experts

9  speculate as to what other people do.  The survey, I

10  suppose, speculates on what the survey recipients

11  themselves do.  If we're going to rely on anything,

12  wouldn't we rely on the people themselves?

13          MR. BOYNTON:  The district judge looked at the

14  evidence on both sides, Your Honor, both the survey, as

15  well as the evidence put in by the intervenors on the

16  other side, and the district court concluded that there

17  was a dispute of fact as to whether DACA recipients would

18  in fact leave the country.  The court then went on to

19  grant summary judgment --

20          JUDGE ENGELHARDT:  So, in your view, how would

21  the state satisfy this?  If it's too speculative for the

22  beneficiaries themselves to say that they would leave,

23  then I assume, (indiscernible) even more speculative for

24  an expert to say what some other person would.  It seems

25  like you're saying there's just no way for there ever to

1  be standing in a case like this for a state.

2          MR. BOYNTON:  It's very difficult for a state

3  to try and establish standing in this way.  And this is a

4  point that Judge Sutton makes in the Sixth Circuit

5  decision, about how inherently a question like this,

6  calls for speculation.

7          But even if the states could --

8          JUDGE ENGELHARDT:  What's more speculative,

9  the theory of standing and causation here, or the theory

10 of causation in Massachusetts v EPA?

11         MR. BOYNTON:  So, I think this one is more

12 speculative, Your Honor, than that one.  Because there's

13 just no way to know -- you're talking about a population

14 here that -- DACA recipients -- with deep ties to this

15 country.  They've been continuously residing in the

16 country since 2007 and are enmeshed in their communities.

17 And so, the prospect that they would just voluntarily

18 leave the country is quite speculative.

19               Even if it weren't, and even if the Court

20 were to conclude, and the district court were to have

21 concluded that some DACA recipients would leave, the

22 court failed to take into account another aspect of the

23 health care expenditure issue.  The court didn't take

24 into account the fact that DACA causes recipients to have

25 private insurance at greater rates than they would

 1  otherwise.  And having private insurance offsets the same

 2  health care costs that the state pointed to.

 3          JUDGE ENGELHARDT:  So, what's your theory then

 4  as to why, despite those, you know, reasonable points

 5  that you're making, 22.3 percent of this 3,000 or so

 6  population of survey recipients nevertheless said that

 7  they were likely or very likely to leave in the event or

 8  repeal?

 9          MR. BOYNTON:  It's hard to know, Your Honor.

10  The intervenors put in evidence that the way the

11  questions were structured led people to be predisposed to

12  answering that way.  But it's very -- at the end of the

13  day, it's almost impossible to know what would happen.

14          JUDGE ENGELHARDT:  Okay.  I mean, I'm

15  familiar, you know, when you have political polling and

16  push polls and how you order questions can affect the

17  response rate when we're talking about questions about

18  political beliefs and whatnot.  This is a question about,

19  literally, your entire life, right.  As you say, you

20  know, these people who are accustomed to living here,

21  this is a pretty profound question for them to get wrong.

22  I think that's basically your theory, that they answered

23  this question about their own lives incorrectly.

24          MR. BOYNTON:  I don't know that it's saying

25  that they got it wrong.  The question necessarily calls

12

1  for speculation, hypothetization [sic] about what someone

2  would do, and for that reason we believe it's too

3  speculative.

4          I'd like to pivot, if I could, to the merits,

5  and I'd like to -- I'd like to jump to the substantive

6  APA claims.

7          The Supreme Court, in Regents, made very clear

8  that when you're evaluating DACA, it is important to look

9  at the component parts of DACA.  The premise of the

10  court's decision in Regents was that DHS failed to

11  consider that it could have moved forward with a program

12  of forbearance only, that there was not a legal

13  impediment to a program of forbearance.  We think that's

14  very well established, that the forbearance --

15          JUDGE HO:  You're using the term

16  "forbearance," but this isn't a case that's entirely

17  about forbearance.  This isn't a prosecutorial discretion

18  case.  There are certain -- in fact, we just made

19  reference to it, you were talking about the medical

20  insurance -- certain rights that come with employment and

21  whatnot that are in addition to a simple forbearance

22  decision.  Isn't that correct?  It makes a different.

23          MR. BOYNTON:  That is correct, Your Honor,

24  this is not a case entirely about forbearance, but it is

25  partially, and in large measure, about forbearance.  And

1   I plan to talk about the different components of DACA,

2   but I think it's helpful, in considering the lawfulness

3   of DACA, to think about the lawfulness of each component

4   part.  And so, I'd like to start with forbearance and

5   then turn quickly, if I could, to other aspects.

6          The forbearance aspect of DACA is simply a

7   form of prioritization.  DHS has limited resources.  It's

8   unable to remove 11 million people in the country.  It

9   has to decide who it's going to target first.  It has

10  some priorities that say these people are high

11  priorities.  Deferred action is a way of saying other

12  groups of people are very low priorities.

13         It's well-established that agencies can

14  exercise this kind of discretion in the face of limited

15  resources.  And the statute specifically gives the

16  DHS Secretary authority to establish immigration

17  enforcement priorities.  That's Section 2025 of

18  Title 8.  And then, the Supreme Court's decision in

19  Regents also makes this quite clear.

20         More broadly, the Supreme Court has recognized

21  that deferred action is an authority that DHS has

22  exercised for many years.  The 1999 decision in Reno v

23  American Arab Anti-Discrimination Committee, notes that

24  DHS had -- this was 23 years ago.  At that point, DHS had

25  been engaged in deferred action for quite a long period

 1  of time.

 2          Additionally, there are numerous statutes

 3  within the INA that make reference to deferred action,

 4  including the Real ID Act, which necessarily recognizes

 5  that deferred action is a form of action DHS can engage

 6  in because it says that states can issue driver's

 7  licenses to people who have deferred action.

 8          So, with that, let me pivot to work

 9  authorization, which is a critical aspect of DACA.

10          Work authorization is authorized expressly by

11  regulation and by statute.  In 1981, INS promulgated a

12  regulation.  It's now 8 CFR 274a.12(c)(14), that says

13  that deferred action recipients generally, not DACA

14  specifically, deferred action recipients can seek and

15  obtain work authorization.

16          The light blocks my red light here, Your

17  Honor, so I see that the red light has gone off.  I'm

18  happy to continue to finish this question or to sit down.

19          CHIEF JUDGE RICHMAN:  Well, I gather you have

20  quite a list there.  You've saved some time for rebuttal.

21          MR. BOYNTON:  Okay.

22          CHIEF JUDGE RICHMAN:  We have others to

23  present arguments on your side.

24          MR. BOYNTON:  Okay.  Thank you, Your Honor.

25          MS. PERALES:  May it please the Court, Nina

15

1  Perales for DACA recipient appellants.  I will use my

2  time to discuss standing and make two main points.

3          First, the district court committed reversible

4  error when it entered summary judgment in favor of

5  plaintiffs after concluding that the facts related to

6  standing were in dispute.

7          Second, Texas 1, the DAPA case, does not

8  control the outcome here because the evidence of injury

9  in fact and causation offered by Texas is qualitatively

10  different here and does not rise to the level of that in

11  Texas 1, the DAPA, or parents' case.

12          In its summary judgment opinion, the district

13  court found that defendant intervenors' contrary evidence

14  related to plaintiff's standing created a factual

15  dispute.  For this reason, this Court should reverse and

16  remand for the district court to determine its

17  jurisdiction.  This would be after a trial.  The district

18  court observed that the contrary evidence creates --

19          CHIEF JUDGE RICHMAN:  That's what I have a

20  question about.  You say you can't determine standing

21  until after a trial?  I thought there were cases that say

22  if you -- it's colorable, basically, you proceed with the

23  lawsuit and that standing -- you don't wait till the very

24  end, based on ultimate fact issues, to decide if there's

25  standing.

16

1          MS. PERALES:  So, Your Honor, a couple of

2   answers to that.  Lujan tells us that the burden to show

3   standing gets more difficult, right.  This is not a

4   preliminary injunction case.  This is actually cross

5   motions for summary judgment.  The district court

6   improperly relied on cases in which the plaintiffs were

7   fending off, or were the non-movants, in summary

8   judgment.  And so, the plaintiffs' burden, then they are

9   the non-movants, is to place these issues in the realm of

10   disputed facts.

11          But here, the court entered summary judgment

12   against us, recognizing that we had placed the facts in

13   dispute.  The only way that plaintiffs properly get

14   summary judgment in their favor on standing at this stage

15   is if we do not put the facts in dispute.  But the

16   court's own words say that we have disputed facts.  At

17   ROA.25195, the court says we created a fact issue when

18   the evidence is viewed in favor of the defendant

19   intervenors who were the non-movants for the purpose of

20   this motion.

21          The court also ruled in its denial of our

22   Daubert motion, which was the same day that the court

23   issued its summary judgment decision in 2021, the court

24   said when denying our Daubert motion, that cross-

25   examination is the appropriate means to probe experts'

1   evidence and that our criticisms go to the weight of the

2   expert testimony.  That's --

3           JUDGE HO:  Perhaps you're going to get to it,

4   but didn't the court find standing on a few different

5   grounds, not simply the disputed grounds that you're

6   referencing?

7           MS. PERALES:  No, Your Honor, it did not.  The

8   court found that the disputed standing facts were those

9   that were -- that we contend are material.  That is,

10  injury in fact, whether DACA recipients affect or injure

11  Texas by distorting the labor market; that was one

12  disputed fact found by the court.

13          The other one is traceability, causation, and

14  redressability, whether DACA recipients would leave the

15  country if they lost their DACA.  These were facts that

16  the court itself found to be in dispute.  And the Daubert

17  language that it used is at ROA 25159.  It was error for

18  the district court to rely on the disputed facts to deny

19  our motion for summary judgment, but then grant the

20  plaintiffs' motion for summary judgment.  If there are

21  disputed facts, then the court may have properly denied

22  our motion for summary judgment, although we contend it

23  did not.

24          But the step further, to grant the plaintiffs'

25  motion for summary judgment on standing was error here.

1  Judge Ho wrote, two weeks ago in Garza-Flores v Mayorkas,

2  the physical present citizenship case, that at the

3  summary judgment stage the court is obliged not to weigh

4  conflicting evidence, assess the credibility of

5  affidavits, or attempt to reconcile the conflicting

6  evidence.  After the court recognized that these standing

7  facts were in dispute it could not then go further and

8  weigh the conflicting evidence.  Which is, either what

9  the court did, improperly, was make these determinations

10 on its own; or in the alternative, the court was using

11 the wrong standard, and it was using the preliminary

12 injunction standard, where you just have to sort of get

13 these facts out there with some evidence.  But you don't

14 have to show that there's no genuine issue of material

15 fact, which is the situation that we have here.

16         With respect to labor market distortion --

17         JUDGE ENGELHARDT:  One difference, of course,

18 about this case, is you've got the Massachusetts v EPA

19 framework, right?  That's very different from an

20 individualized plaintiff.

21         MS. PERALES:  It certainly is, Your Honor.

22 And if you're referring to special solicitude, special

23 solicitude adds to the list of the types of injuries that

24 a state could show, right.  That's a way to get standing,

25 is to show, for example, that --

1          JUDGE ENGELHARDT:  And not just that, but then

2  a dramatically reduced traceability and redressability

3  analysis that individuals would have to prove.

4          MS. PERALES:  Even if it is reduced, Your

5  Honor, there still has to be injury in fact.

6  Massachusetts pointed to the erosion of its beaches.

7  Here, the fact whether there was injury of fact was the

8  disputed fact.  Right?  The allegation was labor market

9  distortion as a result of DACA recipients in Texas, who

10  are less than one-third of 1 percent of the Texas

11  population, getting work authorization and becoming

12  employed.  But the district court itself found that there

13  was a fact dispute whether there was labor market

14  distortion.  The district court concluded only that there

15  was the existence of a larger eligible workforce, but

16  that didn't mean that there was any injury to Texas.

17          And just to quote Judge Sutton from Arizona v

18  Biden, the district court did not connect the dots

19  between the larger workforce and any injury to the

20  workers.  We are six years in to DACA at the time that

21  the summary judgment motions were filed, and because of

22  that, it was incumbent on Texas to get that fact into

23  dispute by showing, either an affect on the workforce at

24  large, or an affect on any employer or any employee.  And

25  it did not.  There was no evidence of that.

1       I would like to say, just to use my last few

2   seconds, with respect to pocketbook injuries with respect

3   to health care costs and also social services education,

4   Texas provided no evidence that DACA increased the use of

5   state services.  The court did recognize, however, that

6   DACA recipients who had been here since 2007, if there

7   was any evidence that a DACA recipient had used an

8   education dollar or social service dollar, which there

9   was not in this case, that that would be because they had

10  been here anyway.  So, again, California v Texas, a

11  complete lack of traceability.

12       The last point that I'd like to make, with the

13  Court's indulgence, is that Dr. Perryman, who was our

14  expert, and which Texas says measured social service

15  costs, did not.  He testified he was not aware of any

16  costs to the state of Texas as a result of DACA, and that

17  he provided no evidence of such costs in his offset

18  analysis.  He simply did not testify to costs.

19       Thank you, Your Honor.

20       CHIEF JUDGE RICHMAN:  I do not want to

21  mispronounce your name, so I'm going to let you tell us.

22       MR. FEIGENBAUM:  It's Jeremy Feigenbaum, for

23  New Jersey.

24       May it please the Court, with my limited time

25  this morning I'd like to focus our attention on an

1  independent error by the district court, the vacatur of

2  the 2012 memorandum.

3          Texas chose not to file a pre-enforcement

4  lawsuit in this case, and to instead challenge DACA only

5  years after the policy issued.  That choice matters.  Now

6  that we're a full decade later, eliminating DACA would

7  cause extraordinary disruption for recipients, employers,

8  their citizen children, and states.  And on these extreme

9  facts, remand without vacatur was appropriate instead.

10          I'll begin with that disruption, which this

11 Court's cases, I think, teach, is a central component of

12 the vacatur inquiry.

13          So, the first point is the reliance interest.

14 Obviously, the Supreme Court, in Regents, went into some

15 detail about the reliance interests that have developed

16 based on DACA and its existence, for now ten years.  And

17 there are a number of examples in the record.

18          So, it's not just about the recipients, it's

19 also about the businesses that have employed DACA

20 recipients.  DACA recipients have valid employment

21 authorization documents that they present to the

22 businesses.  The businesses train them, hire them,

23 sometimes in hard to fill roles.  And having vacatur upon

24 a final judgment would work extraordinary hardship to

25 businesses, as well as the military, as well as public

1   employers like the State of New Jersey, who have been

2   counting on DACA recipients to serve as our doctors, to

3   serve in our armed forces, et cetera.

4          Those are the sorts of interests that Regents

5   identifies and that I think go to the heartland of the

6   disruption inquiry that's a core part of what this Court

7   has looked at repeatedly in cases like Texas Association

8   of Manufacturers, cases like Southwest Services, and so

9   on.

10          The stay that the district court issued does

11  not resolve the issue of whether vacatur would be

12  appropriate.  The stay that the district court issued

13  pending appeal simply potentially pushes off a deadline

14  in which that we'll have that sort of disruption.  So,

15  the moment there's a final judgment, if the vacatur were

16  to hold, the moment there's a final judgment we would

17  have an individual serving in the armed forces who's a

18  DACA recipient on a Monday who'd no longer be able to

19  serve there on a Tuesday.

20          That's the sort of disruption that a post

21  enforcement challenge like this can engender, and that's

22  the sort of challenge that I think the district court

23  nowhere grappled with in its order.  I think, to its

24  credit, the district court grappled with a number of

25  these reliance interests and equitable interests in

1  crafting its stay pending appeal.  But at no point, in

2  deciding on the remedy of vacatur and in deciding on the

3  remedy of nationwide injunction, did the district court

4  expressly, or from my perspective even implicitly,

5  consider these sorts of equitable considerations.  And I

6  think that that choice ultimately matters.

7         Because it's on the district court, in the

8  first instance, to consider these sorts of questions,

9  like the disruption that will be wrought, or the

10 appropriate scope of relief in the case.  And the

11 district court did none of that in this unusual, sort of

12 ten years later challenge that we're facing.

13        One of the questions that comes up, of course,

14 in remand without vacatur, is whether there are available

15 options to the agency on remand.  I think that the D.C.

16 circuit's opinion by then Judge Cavanaugh in EME Homer,

17 is the most instructive on this score.  In that case, the

18 D.C. circuit found that there were substantive violations

19 by the EPA about the emissions limits that it had imposed

20 on a number of states under the Clean Air Act.  And

21 despite making a finding about the substantive invalidity

22 of the limits, then Judge Cavanaugh's opinion, for the

23 Court, specifically said that remand without vacatur

24 would be appropriate anyway on the basis that there were

25 some options still available to the agency even if the

24

1  particular choice of what the agency had done was

2  unlawful.

3          And I think as the United States was beginning

4  to talk about, there are all range of options still

5  available to the United States in this case, including

6  many that Regents particularly identified.  Whether that

7  comes to forbearance, or as the proposed rule making

8  indicates, decoupling forbearance with aspects of work

9  authorization but still including work authorization, or

10 taking into account particular reliance interests at the

11 level of the agency, these are all options still

12 available to the agency on remand and vacatur would lead

13 to an extraordinary disruption, including to forbearance,

14 including to ongoing employment, including to reliance

15 interests, that only remand without vacatur, I think,

16 properly achieves.

17         And so, when the Supreme Court says in Regents

18 that, whatever the court's view of the merits, that's

19 just the beginning of the remedial inquiry, because

20 ultimately, it's for the agency to make the important

21 remaining policy choices.  I do think that that's the

22 sort of thing that justifies remand without vacatur.  And

23 it's not every day you see a Supreme Court opinion

24 acknowledging the very reliance interests that we're

25 talking about in this very case, but I think that that

7/6/2022

1    has real force and impact in this case.

2            The other point I would make, is if this

3    Court's not prepared to outright say that remand without

4    vacatur would be the appropriate remedy at the end of the

5    case, the Court should still vacate the remedial order

6    that was issued below and remand that.  There are a

7    number of different issues that have arisen on appeal

8    about the scope of that remedial order.  So, there has

9    been, I think, 28 (j) letters flying back and forth

10   between Texas and the United States about the scope of

11   Aleman Gonzalez and the recent decision in Biden v Texas.

12           And I don't think I can say it much better

13   than Justice Barrett did in her dissent, where she said,

14   in Biden, that a number of these questions are hard, and

15   as a court of review, not first view, these are the sorts

16   of issues you'd want the court that actually issues the

17   remedy to think about in the first instance.  And only

18   vacating the remedial order and remanding that to the

19   district court allows Judge Hanen, in the first instance,

20   to consider the import of Aleman and its application to

21   this case.

22           And if this Court does take that step, then I

23   think there are two additional things it should ask the

24   court to do.  It should ask the court specifically to

25   consider the disruption that the district court never

1   considered, and it should require the court to make the

2   usual findings under the normal four-part test about

3   scope of remedy, particularly given Judge Sutton's recent

4   concurrence in Arizona v Biden, which really emphasizes

5   some of the questions a district court needs to think

6   about.

7           I see my time has expired.  Thank you, Your

8   Honor.

9           CHIEF JUDGE RICHMAN:  Mr. Stone.

10          MR. STONE:  Good morning, Chief Judge Richman,

11  and it may it please the Court.

12          In 2015, this Court held that DAPA and

13  extended DACA violated the APA.  DACA was the foundation

14  for those programs.  This Court should come to the same

15  result.

16          I've heard the panel discussing standing, the

17  summary judgment standard, and what's in the record that

18  sort of supports Texas' standing to begin with, so I'd

19  like to start there.

20          The relevant question here for summary

21  judgment is whether or not, first, there's sufficient

22  evidence in the record that Texas has met the

23  constitutional minimum of standing.  Which is to say,

24  that we've shown at least a dollar of expenditures that

25  would be remedied by the removal of DACA, and in fact

1  whether we've shown that some individual who receives

2  that sort of spending under DACA will leave the United

3  States.  Those are the two propositions, that if there

4  are in fact sufficient evidence in the record and there

5  is no evidence shown that either of those numbers are

6  zero, for which summary judgment on standing is

7  appropriate for the plaintiff states.  There's plenty of

8  evidence for each.

9         Speaking first about Texas' expenditures under

10 DACA, both sides admitted evidence totaling in the

11 hundreds of millions of dollars of costs that Texas

12 spends on health care alone.  So, to begin with, Monica

13 Smoot, one of Texas' experts, just looking at three

14 Medicaid programs, estimated approximately over

15 $100 million for each of five separate fiscal years.

16        Ray Perryman [ph], intervenors' expert,

17 identified $250 million of costs attributable to Texas'

18 expenditures on DACA recipients.  And to be very clear,

19 he specifically said that those costs were incurred in

20 part by the State of Texas because of DACA recipients.

21 That's in the record at page 14304 to 05.  So, when my

22 friend on the other side says that their expert never

23 attributed those costs to DACA recipients in specific,

24 that's simply flat wrong.

25        Additionally, talking about the evidence in

1    the record showing that some DACA recipients would leave

2    the state, some of the approximately 115,000, appears to

3    be the number the sides agree on, DACA recipients would

4    leave the state, there is, as Your Honors pointed out, a

5    survey conducted by an expert by the appellants

6    indicating that 22.3 percent of individuals who had DACA

7    describe themselves as likely or very likely to leave,

8    another 27.1 percent said they were neither likely, nor

9    unlikely.

10          There are 23 declarations by the intervenors

11   using materially similar language describing the effect

12   of DACA on their ability to live in the United States

13   where they all say that it is critical to their ability

14   to live and work in the United States.  An ordinary

15   person who describes something as critical to their

16   ability to live somewhere undoubtedly is saying something

17   like, but for this thing it would be very unlikely that I

18   can continue to go on.  If I said that my oral argument

19   preparation folder here was critical, you'd think I'd be

20   highly impaired without it.  So, 23 declarations to that

21   effect, again, submitted by appellants.

22          And then, of course, the Texas state

23   demographer observed, in his expert capacity, that it

24   would be reasonable for an individual -- it would be

25   reasonable for someone to conclude that at least some

1  DACA recipients, if DACA were enjoined or otherwise no

2  longer available, would leave the state.  There is

3  nothing in the record that suggests the number of DACA

4  recipients would be zero.  That is what would be a

5  genuine issue of material fact, because again, the

6  constitutional minimal quantum for standing here is a

7  dollar of spending that would be remedied by the

8  injunction of DACA.  There is no material fact here.

9         If the Court doesn't have any questions on

10 standing, I'm happy to move on to my merits argument.

11        JUDGE ENGELHARDT:  Why didn't the State of

12 Texas make the same argument that was embraced in the

13 DAPA precedent?

14        MR. STONE:  Candidly, Your Honor, I can't

15 speak as to the litigation strategy that the trial

16 lawyers chose regarding this below.  Of course, as a

17 factual matter -- and I'm not raising this to you now --

18 as a factual matter, undoubtedly the driver's license

19 expenditures still exist.  But these hundreds of millions

20 of dollars of costs which both sides' expert directly

21 attribute to DACA recipients, plainly are

22 constitutionally sufficient as well.

23        And to the extent there even were some sort of

24 causal question, this Court's decision in Texas DAPA

25 regarding special solicitude plainly suffices.  For the

1   same reasons in Texas DAPAs, the states had special

2   solicitude.  We have both a procedural right to challenge

3   the act in question, the same procedural right in fact,

4   an APA challenge; and a quasi-sovereign interest, namely,

5   the interests that Texas and the other states surrendered

6   to the union in being able to pass and enforce their own

7   immigration laws.

8           So, again, just comparing this as a benchmark

9   to Massachusetts v EPA, where the standing, sort of chain

10  and causation there approved of, was that if EPA

11  regulated carbon, individuals would buy lower emitting

12  cars, which would reduce domestic emissions, global

13  emissions, and then preserve Massachusetts' coastline.

14  The evidence in this record is far more concrete, the

15  chain is far shorter and far more robust.

16          So, turning forward to the merits arguments.

17  The merits arguments in this case are easy, precisely

18  because they're almost to the individual provision

19  controlled by Texas DAPA.  The federal government relies

20  on three statutory provisions that they say give the

21  secretary the unbounded authority to create what, in

22  Regents, the Supreme Court called an affirmative program

23  for affirmative immigration relief.  Not merely a

24  forbearance policy, but a program for affirmative relief.

25          They rely on three statutory citations, which

1  are the exact same citations and sections that this Court

2  enumerated and rejected in Texas DAPA.  Those no more

3  authorize the secretary to create a power -- to have the

4  power to create DACA, than DAPA.

5          They then turn to a variety of acts of sort of

6  enforcement history or enforcement discretion.

7  Basically, past practice.  This Court, in Texas DAPA,

8  said explicitly, past practice does not create power in

9  the executive.

10         Then it turned to those past examples, special

11 including Family Fairness, upon which the federal

12 government relies so heavily, and says, well, these other

13 programs, including Family Fairness, they tended to be

14 for specific geographic areas, or in response to

15 disasters, were limited in some way like that.  And that

16 Family Fairness was at least interstitial to an already

17 existing -- to a statutory scheme for family

18 reunification visas.

19         This Court rejected the comparison of Family

20 Fairness to DAPA, because as of 2015, it had noticed that

21 Congress had rejected the Dream Act repeatedly.  Here we

22 are, seven years later; Congress has rejected the Dream

23 Act in every congress since that's been proposed.  To the

24 extent there's a comparison between the two programs

25 based on those criteria, DACA is a much easier case

1   because of the intervening rejections Congress has made

2   regarding something along the lines of the Dream Act or

3   some statutory basis for DACA.

4        And to turn just briefly, because it came up

5   towards the end, about the Section 1252(f)(1) question

6   presented in Biden v Texas.  This Court need not be

7   disturbed by that for at least two reasons.

8             First, I'll get to the merits.  The merits

9   reason is 1252(f)(1) only limits a court's power to issue

10  injunctive relief enjoining or restraining the operation

11  of Part 4 of subchapter 2.  Part 4 of the INA in

12  subchapter 2 are provisions related to removal,

13  deportation, things of this nature.  Texas and the

14  plaintiff states, in complaint paragraph 10, expressly

15  disclaim they're not seeking relief that requires the

16  executive to deport, remove, or otherwise take any sort

17  of offensive immigration action against a particular

18  individual.  The district court's permanent injunction

19  specifically noted that for clarity, that it was not

20  obligating the federal government to do that either.

21            Beyond that, beyond the fact that that's not,

22  what's sort of the gravamen of our challenges, or

23  challenges that nothing in the INA provides this

24  affirmative power, the things that we complain about are

25  the sort of obviation of the unlawful presence bar and

1   the giving of lawful presence.  That section occurs in

2   part 2.  The illegal granting of workplace -- of the

3   authorization to work, that's in Section 1324(a), that

4   occurs in part 8.  So, they're simply outside the scope

5   of 1252(f)(1) on its own terms.

6            And more fundamentally, the United States

7   appellants, at minimum, were on notice of the

8   potentiality for this issue, 1252(f)(1), when the court

9   in Aleman Gonzalez added that question presented in

10  August of 2021.  They did not raise it in their opening

11  brief before this Court, much less the district court,

12  even though they cited 1252(g), the very next provision.

13  They did not raise it in their reply brief in March of

14  this year.  And instead, they waited to raise it in a

15  28(j) letter filed after the close of business the Friday

16  before a holiday weekend before oral argument.

17           This Court doesn't address issues raised for

18  the first time in reply briefs, let alone in 28(j)

19  letters.  So, because the one thing we know from Biden v

20  Texas is that 1252(f)(1) is not a subject matter

21  jurisdictional provision, it can be waived, like anything

22  else, and the United States and other appellants have

23  simply waived -- forfeited it here.  And because of that

24  forfeiture, this Court simply doesn't need to address it,

25  let alone remand to the district court for first

34

1  application.

2           If there are no further questions, I'm happy

3  to cede the balance of my time, but I want to give you an

4  opportunity if there's anything I can say to be useful.

5           Thank you.

6           MR. BOYNTON:  Thank you, Your Honor.  Let me

7  resume where I was discussing before with work

8  authorization.

9           So, there's a 1981 regulation that expressly

10 authorizes deferred action recipients to seek work

11 authorization.  Five years later, Congress

12 comprehensively considered employment of undocumented

13 non-citizens in IRCA.  It prohibited employers, for the

14 first time, from hiring, knowingly hiring unauthorized

15 aliens.  Critically, IRCA defines what is an unauthorized

16 alien, and that's 1324a(h)(3).

17          And the definition there is very important

18 because it excludes from unauthorized aliens, LPRs, as

19 well as anyone granted work authorization, either by the

20 INA or by the attorney general, now the secretary.  By

21 carving out both authorization by the INA or the attorney

22 general, the statute makes very clear that there is an

23 authority, by the then attorney general, now secretary,

24 to grant work authorization even if there is not a

25 specific INA provision that grants work authorization.

1           A year after IRCA, INS considered a petition

2   for rule making, someone was asking them to repeal their

3   regulation on the grounds that the attorney general

4   didn't have authority to grant work authorization.  The

5   INS said Congress just confirmed in IRCA that the

6   attorney general has this authority.  That was in 1987.

7   Congress has not taken any steps to alter that

8   understanding in the intervening years.

9           And in fact, other provisions of the INA make

10  clear that the secretary has independent work

11  authorization authority because it says in limited

12  circumstances work authorization cannot be granted.

13  Someone who's released, who's been detained and is

14  released, 1226(a)(3) says that that person can't be given

15  work authorization by the secretary.  That would be

16  unnecessary if there weren't some residual authority.

17          JUDGE ENGELHARDT:  Before your time runs out,

18  I want to ask sort of a different question about the

19  debate about the substantive power to do DACA.

20          I don't think I saw anywhere, any reference to

21  the pardon power.

22          MR. BOYNTON:  Correct, Your Honor.

23          JUDGE ENGELHARDT:  I take it that's because

24  there's no argument here that the President could have

25  done any of these things pursuant to the pardon power.

1           MR. BOYNTON:  We've not relied on the pardon

2  power, Your Honor.

3           The other aspect of DACA that is discussed,

4  although it's not actually part of the 2012 memo, is

5  lawful presence.  There are certain statutes that say

6  that individuals who are lawfully present can obtain

7  benefits, like Social Security, they're allowed to pay in

8  and then receive Social Security.

9           The 2012 DACA memo says nothing about lawful

10 presence.  There's a statute that does, 1611(b)(2).

11 There's a regulation that governs Social Security, that's

12 8 CFR 1.3.  But those have not been challenged by the

13 plaintiffs in this case.  They're challenging only the

14 memo that says nothing about lawful presence.  That's

15 different from the 2014 DAPA memo that did discuss lawful

16 presence.  Here, the memo --

17          JUDGE ENGELHARDT:  Does that contradict what

18 the Supreme Court said in Regents?  I mean, similar

19 memos, and -- well, actually, the same --

20          MR. BOYNTON:  Same memo.

21          JUDGE ENGELHARDT:  And it was described by the

22 Supreme Court as not just a forbearance policy, but an

23 affirmative immigration rewrite, essentially.

24          MR. BOYNTON:  The court certainly acknowledged

25 that there are benefits that flow from having deferred

1   action status.  But the point I'm making here, is that

2   the plaintiffs have not challenged these statutes and

3   regulations that say that deferred action recipients

4   generally are lawfully present.  Their only challenge is

5   to the DACA memo itself.  And so, there has to be

6   something about granting deferred action to DACA

7   specifically that they're challenging.

8           And they rely a lot on the DAPA decision from

9   this Court, but as this Court noted in that case, that

10  was a very different program than DACA.  It was orders of

11  magnitude bigger.  It covered 4.3 million people, whereas

12  DACA only covers, at most, the estimate is 1.5, and there

13  are currently only 600,000 --

14          JUDGE ENGELHARDT:  The memo expressly mentions

15  work authorization.

16          MR. BOYNTON:  Correct.  Work authorization is

17  mentioned in a sentence.  There's nothing about lawful

18  presence in the memo.

19          I'd like to turn very quickly, if I may, to

20  severability.  This is an issue that we raised in our

21  brief that the plaintiffs have never responded to.  If

22  this Court were to find that some aspects of DACA are

23  lawful and some are unlawful, it should sever the

24  unlawful portions and leave in place the lawful portions.

25  That's uncontested in this case.

1          And then finally, on 1252(f)(1), there are

2     just a couple of points to make.  In the Aleman Gonzalez

3     decision, which was very recently issued, the Supreme

4     Court changed its interpretation of 1252(f)(1).  It

5     clarified, at least, the interpretation.  And that's why

6     we didn't raise 1252(f)(1) until after Aleman Gonzalez,

7     and then after the Biden v Texas MPP decision that also

8     relied on 1252(f)(1).

9          So, we don't think there's a forfeiture issue

10    because there's intervening precedent.  If there were a

11    forfeiture issue, we think the court below, if the

12    district court is deciding this in the first instance --

13          JUDGE ENGELHARDT:  I'm not sure I understand

14    that forfeiture argument.  I mean, even when -- I'm

15    trying to think of how many cases we have, there are

16    literally hundreds, where parties know that a case is --

17    an argument, sorry, a claim or argument is foreclosed by

18    Supreme Court precedent.  They make it anyway,

19    specifically to preserve the argument in the event the

20    Supreme Court takes cert.  So, I don't understand that.

21          MR. BOYNTON:  So, I think that the district

22    court at least would have within its discretion to waive

23    any forfeiture, if there were a forfeiture concern here,

24    because of the intervening --

25          JUDGE ENGELHARDT:  Okay.  But that'd be a

1  little ticklish, for us to not find your argument

2  forfeited, when you just said earlier that the State of

3  Texas' argument about driver's license is forfeited.

4          MR. BOYNTON:  Well --

5          JUDGE ENGELHARDT:  I assume you agree, we have

6  to apply the same principles to both sides of the "v".

7          MR. BOYNTON:  So, there at least a couple of

8  difference, Your Honor.  One is, Texas isn't asserting

9  driver's license standing now, and hasn't put in any

10 evidence in the record.  That's an evidence-based

11 argument.  It was their burden at summary judgment to put

12 in the evidence.  They haven't done it.

13         Second, there's been no intervening change in

14 the law.  In fact, there was a 2015 decision they could

15 have relied on.

16         And then third, this is a jurisdictional

17 provision.  The Supreme Court made clear in the Biden v

18 Texas case that it didn't affect the district court's

19 jurisdiction to hear the entire case, and thus, didn't

20 affect the Supreme Court's jurisdiction.  But it is a

21 jurisdictional provision with respect to the remedy, and

22 the Supreme Court left open the question of whether it's

23 forfeitable.  That's Footnote 4 of the MPP decision,

24 leaves that open.  If that's an issue this Court is

25 interested in, and we think it is a jurisdictional issue,

40

 1  we would be happy to provide briefing on that specific

 2  question.

 3           If the Court has no further questions, I see

 4  I've exceeded my time, and I appreciate your patience

 5  very much.

 6           CHIEF JUDGE RICHMAN:   Thank you, counsel, we

 7  have your argument.

 8           (Whereupon the proceeding was concluded.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7/6/2022

41

1              CERTIFICATION PAGE FOR TAPE RECORDING

2        I, Cheryl McKinney, certify that the foregoing in

3   a correct transcription from the tape recording of the

4   proceedings in the above-entitled matter.

5        Please take note that I was not personally present

6   for said recording and, therefore, due to the quality

7   of the audiotape provided, inaudibles may have created

8   inaccuracies in the transcription of said recording.

9        I further certify that I am neither counsel for,

10  related to, not employed by any of the parties to the

11  action in which this hearing was taken, and further

12  that I am not financially or otherwise interested in

13  the outcome of the action.

14

15

16  _Cheryl McKinney_
    Cheryl McKinney

17  Integrity Legal Support Solutions
    Firm Registration No. 528

18  9901 Brodie Ln., Suite 160-400
    Austin, Texas 78748

19  512.320.8690
    www.integritylegal.support

20

21

22

23

24

25

42

```
1   STATE OF TEXAS      )

2   COUNTY OF TRAVIS )

3                        NOTARY PAGE

4        Before me, Brian Christopher, on this day

5   personally appeared Cheryl McKinney, known to me to be

6   the person whose name is subscribed to the foregoing

7   instrument and acknowledged to me that they executed

8   the same for the purpose and consideration therein

9   expressed.

10       Given under my hand and seal of office this 7th

11  day of November, 2022.

12

13

14       _____
         NOTARY PUBLIC IN AND FOR
15       THE STATE OF TEXAS
         COMMISSION EXPIRES: 01/05/2025
16

17

18

19

20

21

22

23

24

25
```

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on the 27th day of April, 2023, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

_/s/ Nina Perales_
Nina Perales