**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:18-cv-00068 |
| UNITED STATES OF AMERICA, *et al.*, | |
| Defendants, | |
| *and* | |
| KARLA PEREZ, *et al.*, | |
| and | |
| NEW JERSEY, | |
| Defendant-Intervenors. | |

**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT [ECF NO. 639]**

# TABLE OF CONTENTS

I.      Plaintiffs Do Not Have Standing To Challenge The Final Rule ........................... 1

    A.      Plaintiffs Cannot Establish Standing Based On Supposed Social Services Costs ..................................................................................................... 2

    B.      Plaintiffs Cannot Assert *Parens Patriae* Standing ................................... 4

    C.      Plaintiffs' New Theory Of Driver's License Standing Should Be Rejected ............................................................................................................. 5

II.     The Final Rule Is Lawful In All Respects ........................................................ 10

    A.      The Final Rule Is Consistent With The INA ........................................... 10

    B.      Plaintiffs Articulate No Violation Of The Take Care Clause ................. 10

    C.      The Final Rule Is Not Arbitrary And Capricious ................................... 11

III.    If The Court Finds The Final Rule Unlawful, It Should Limit Any Relief .......... 14

    A.      The Court Lacks Jurisdiction To Enjoin Or Vacate The Final Rule ........ 14

    B.      The Final Rule Is Severable ................................................................. 15

    C.      DHS Is Best Positioned To Facilitate The Timing And Conditions Of Any Wind-Down If the Court Finds the Final Rule Unlawful ........................ 17

    D.      Plaintiffs Are Not Entitled to Nationwide Relief .............................................. 19

IV.     Plaintiffs Do Not Dispute that the Court Should Maintain the Present Stay ....... 19

# TABLE OF AUTHORITIES

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................................... 6

*BCCA Appeal Group v. E.P.A.*,
  355 F.3d 817 (5th Cir. 2003) ...................................................................... 12, 13

*California v. Texas*,
  141 S. Ct. 2104 (2021)................................................................................. 14, 19

*Center for Biological Diversity v. EPA*,
  937 F.3d 533 (5th Cir. 2019) ............................................................................. 5

*Central and South West Servs., Inc. v. EPA*,
  220 F.3d 683 (5th Cir. 2000)............................................................................ 18

*Chamber of Com. of United States of Am. v. United States Dep't of Lab.*,
  885 F.3d 360 (5th Cir. 2018)............................................................................ 17

*Crane v. Johnson*,
  783 F.3d 244 (5th Cir. 2015) ...................................................................2, 3, 19

*Dalton v. Specter*,
  511 U.S. 462 (1994)......................................................................................... 10

*DHS v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020)........................................................................16, 17, 18

*Garland v. Aleman Gonzalez*,
  142 S. Ct. 2057 (2022)................................................................................. 13, 14

*Hernandez v. Reno*,
  91 F.3d 776 (5th Cir. 1996) ............................................................................. 19

*Lewis v. Casey*,
  518 U.S. 343 (1996)......................................................................................... 18

*Louisiana ex rel. Landry v. Biden*,
  64 F.4th 674 (5th Cir. 2023)......................................................................... 2, 4

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923)........................................................................................... 4

*MD/DC/DE Broadcasters Ass'n v. F.C.C.*,
  236 F.3d 13 (D.C. Cir. 2001)...................................................................... 15, 16

*Nat. Res. Def. Council v. E.P.A.*,
   489 F.3d 1250 (D.C. Cir. 2007)................................................................. 16, 17

*O'Shea v. Littleton*,
   414 U.S. 488 (1974)..................................................................................... 9

*Pennsylvania* v. *New Jersey*,
   426 U.S. 660 (1976)..................................................................................... 7

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999)................................................................................... 14

*Southwestern Electric Power Company v. United States Environmental Protection Agency*,
   920 F.3d 999 (5th Cir. 2019)..................................................................... 12

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)..................................................................................... 3

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)..................................................................................... 4

*Texas Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n*,
   989 F.3d 368 (5th Cir. 2021)..................................................................... 18

*Texas Oil & Gas Ass'n v. EPA*,
   161 F.3d 923 (5th Cir. 1998)..................................................................... 12

*Texas v. Biden*,
   20 F.4th 928 (5th Cir. 2021), *rev'd*, 142 S. Ct. 2528 (2022).................... 3

*Texas v. United States* (*Texas I*),
   809 F.3d 134 (5th Cir. 2015)................................................................... 7, 8

*Texas v. United States*,
   40 F.4th 205 (5th Cir. 2022)....................................................................... 4

*Texas v. United States* (*Texas II*),
   50 F.4th 498 (5th Cir. 2022)............................................................... *passim*

## Federal Statutes

5 U.S.C § 703.................................................................................................. 14

6 U.S.C. § 202(5) ............................................................................................ 11

8 U.S.C. § 1103(a) .......................................................................................... 11

8 U.S.C. § 1229a ............................................................................................. 14

2

8 U.S.C. § 1252(f) .................................................................................................. 1, 13

8 U.S.C. § 1324a(h)(3) ................................................................................................ 11

8 U.S.C. §§ 1221-1232 ............................................................................................... 14


**State Statutes**

Tex. Transp. Code Ann. § 521.142 (West 2021) ....................................................... 7


**Federal Rules**

Fed. R. Civ. P. 56(d) .................................................................................................. 6


**Federal Regulations**

8 C.F.R. § 236.24(a) .................................................................................................. 15

8 C.F.R. § 274a.12(c)(14) .......................................................................................... 12

8 CFR 236.24 ............................................................................................................. 15

87 Fed. Reg. 53,152 ............................................................................................. *passim*


**Other Authorities**

88 Fed. Reg. 25,313 ................................................................................................... 13

## INTRODUCTION

Federal Defendants acknowledge but maintain their disagreement with the Fifth Circuit's prior ruling in this case, preserving all previously raised arguments, including those regarding Plaintiffs' lack of standing or a cause of action, the lawfulness of the DACA policies now embodied in the Final Rule, and the limitations imposed by 8 U.S.C. § 1252(f) on the availability of certain remedies. Under the proper view of those arguments, Defendants are entitled to summary judgment, and Plaintiffs' belated and improper attempt to bolster their claim to standing does not change that result.

Even under the Fifth Circuit's opinion, however, this Court should grant summary judgment to Defendants regarding Plaintiffs' new claim that the Final Rule is arbitrary and capricious because (as Plaintiffs appear to acknowledge, Pls' Reply 32) that argument merely repackages their contrary-to-law claim without raising a distinct claim. This Court also should limit any relief it orders in light of both the Final Rule's explicit severability provision and the Supreme Court's observations regarding DHS's flexibility in winding down any portion of the Rule deemed unlawful. And finally, as contemplated by the Fifth Circuit—and as Plaintiffs apparently concede—this Court should leave in place a stay with respect to existing DACA recipients of any relief ordered while the parties seek further review.

## I.      Plaintiffs Do Not Have Standing To Challenge The Final Rule

As explained in their cross-motion for summary judgment, Federal Defendants acknowledge that the Fifth Circuit's prior ruling with respect to standing—that Texas had standing to challenge the DACA Memorandum based on Medicaid and education costs that the State purportedly incurs because of DACA, *Texas v. United States* (*Texas II*), 50 F.4th 498, 517-20 (5th Cir. 2022)—also applies to Texas's standing to challenge the Final Rule and is, therefore, binding on this Court. *See* Fed. Defs' Mot. 9. The Federal Defendants preserve all their prior arguments

regarding that issue and highlight several points in reply to Plaintiffs. Separately, Plaintiffs now assert for the first time in this litigation—nearly five years after they filed their original complaint—a new theory of standing based on Texas's supposed costs of providing driver's licenses to DACA recipients. Plaintiffs forfeited this argument by not raising it earlier, however, and the Court should reject Plaintiffs' attempt to assert a new basis for standing at this juncture.[1]

### A.    Plaintiffs Cannot Establish Standing Based On Supposed Social Services Costs

As Federal Defendants have explained, Plaintiffs failed to meet their burden at summary judgment to establish that DACA increases Texas's expenditures on emergency Medicaid or public education—services that Texas must provide to every qualifying resident, regardless of whether they have been granted deferred action. Contrary to Plaintiffs' assertion (Pls' Reply 35), Federal Defendants do not argue that Texas's evidence of injury "needs to be tied specifically to particular DACA recipients." Federal Defendants have never argued that Plaintiffs must identify particular individuals who would leave the country and stop utilizing Texas's state-sponsored services absent DACA. Rather, they argue that Plaintiffs must establish that Texas suffers injury due to the grant of deferred action to *some*—indeed, *any*—individuals under the DACA policy. *See Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (state plaintiffs challenging DACA are "required to demonstrate that the state will incur costs *because of the DACA program*" (emphasis added)). Any injury caused (in Plaintiffs' words) by "illegal aliens as a whole," Pls' Reply 35, would be insufficient to establish standing because such injury would not be traceable to the DACA Memorandum or the Final Rule. *See Louisiana ex rel. Landry v. Biden*, 64 F.4th 674 (5th Cir. 2023) (finding no State standing where "Plaintiffs point to financial harm related to their oil

---

[1] As Plaintiffs do not raise any new arguments concerning whether they have a cause of action under the APA, *see* Pls' Reply 27, Federal Defendants do not address that issue in this reply, while continuing to preserve those arguments for further review.

and gas leasing projects but fail to allege any specific lease or project that was rejected due to the Interim Estimates.") (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009)). Nor would any cost imposed by DACA recipients be traceable to the DACA Memorandum or Final Rule unless plaintiffs are able to demonstrate Texas would not have incurred that cost absent the memorandum or rule. Plaintiffs cannot satisfy the traceability element of standing by pointing to healthcare and education costs that Texas is required to provide to any undocumented immigrant, because Texas is required to incur those costs even absent the DACA Memorandum or Final Rule. *See* ECF. No. 569 at 4-5; U.S. Br. 14-18, *Texas II*; U.S. Reply Br. 2-4, *Texas II*.

Plaintiffs, notably, do not even attempt to distinguish *Crane v. Johnson*, in which the Fifth Circuit held that Mississippi failed to establish an injury-in-fact from DACA where it relied on a report showing state costs associated with undocumented immigrants in general, explaining that it is not enough to show "that *illegal immigration*," generally, was "costing the state money." 783 F.3d at 252; *see* Fed. Defs' Mot. 13. Plaintiffs instead cite (Pls' Reply Br. 35) *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021) (*MPP), rev'd,* 142 S. Ct. 2528 (2022), which establishes only that standing can be supported by "large-scale statistics and figures, rather than highly specific individualized documents" in appropriate cases. *Id.* at 971; *see id.* (noting that "[t]his case is worlds apart" from *Crane*). But the statistics and figures must still relate to harm flowing from the challenged action; and they must still be sufficient to establish each of the three elements of standing—injury in fact, traceability, and redressability. *Louisiana*, 64 F.4th 674. Plaintiffs' statistics—even if they establish that Texas incurs some costs to provide services to undocumented immigrants generally or to DACA recipients in particular—are insufficient to establish traceability or redressability because they do not demonstrate that Texas incurs those costs because of DACA or would incur fewer costs if the Final Rule were held unlawful. *See Crane*, 783 F.3d at 252 (noting

3

that "the reallocation of DHS's assets" could "result[] in the removal of immigrants that impose a greater financial burden on the state," which would have a "net effect" of "a reduction in the fiscal burden on the state"). Plaintiffs' conjecture that some DACA recipients would leave absent the policy—and thus that Texas's healthcare and education costs would decrease absent the Final Rule—is insufficient to establish those elements of standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (injuries that are "hypothetical" or "conjectural" cannot establish standing); *see also Louisiana*, 64 F.4th 674 (finding no State standing where "Plaintiffs continue to rely on hypothetical harms").

### B.    Plaintiffs Cannot Assert *Parens Patriae* Standing

Federal Defendants have explained that a State does not have standing as *parens patriae* to bring an action against the Federal Government. Fed. Defs' Mot. 9 (citing ECF No. 569 at 3-4); *see Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923). Plaintiffs assert (Pls' Reply 34 n.9) that the Fifth Circuit "approved State standing against the federal government . . . on a *parens patriae* theory" in denying a motion for a stay pending appeal in a different case, see *Texas v. United States*, 40 F.4th 205 (5th Cir. 2022) (per curiam). To the contrary, the court found standing in that case based on expenditures by Texas itself, such as "the costs of providing public education and state-sponsored healthcare to aliens who would otherwise have been removed." *Id.* at 216-17. The Fifth Circuit did not find standing based on Texas's assertion of the interests of its citizens, and the case was thus not a *parens patriae* case. Although the Fifth Circuit referred to the *parens patriae* doctrine in that case, *see Texas*, 40 F.4th at 216, that single, unexplained reference cannot be characterized as a holding. And the Fifth Circuit did not address the *parens patriae* theory of standing in its prior DACA decision. See *Texas II*, 50 F.4th at 513-520.

Federal Defendants' motion further explained that research and data described in the Final Rule make clear that Plaintiffs' concerns for their citizens' interests are entirely unfounded. *See*,

*e.g.*, Fed. Defs' Mot. 11-12 & n.4 (showing that DACA recipients currently make up no more than 0.69% of Texas's labor force and that any effect of DACA on overall wages would be undetectable) (citing 87 Fed. Reg. at 53,154). Plaintiffs' failure to respond to these arguments or the data in the Final Rule is telling. The Fifth Circuit remanded this case specifically for the Court to determine whether "there are material differences in [the Final Rule's] record and the record before the district court regarding the 2012 DACA Memorandum." *Texas II*, 50 F.4th at 512 ("A district court is in the best position to review the administrative record in the rulemaking proceeding and determine whether our holdings as to the 2012 DACA Memorandum fully resolve issues concerning the Final Rule."). Federal Defendants have shown that the record now contains substantive evidence refuting Plaintiffs' allegations of labor market and wage disruptions, and this Court should reconsider its holding regarding *parens patriae* standing.

### C. Plaintiffs' New Theory Of Driver's License Standing Should Be Rejected

1. Plaintiffs assert, for the first time, a new theory of standing based on Texas's purported costs of issuing driver's licenses. *See* Pls' Reply 40-44. Plaintiffs long ago forfeited this argument, however, by failing to include it in their complaint, amended complaint, supplemental complaint, or any earlier briefing. "Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived." *Center for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019). The Fifth Circuit has declined to consider an argument alleging new injuries as a basis for standing for the first time in a reply brief. *See id.* This Court should do the same. Plaintiffs' failure to raise the issue earlier prevented Defendants from conducting discovery into the issue, and Plaintiffs should not be permitted to submit new evidence in support of that theory now.

Plaintiffs contend that the cost of providing driver's licenses is "subsumed under the category of 'social services . . . costs'" alleged in the supplemental complaint. Pls' Reply 43 (alteration in original). The grant of a license permitting a private party to do something (here, to

drive) is not a social service provided by the state, however. In any event, a reference in the supplemental complaint would not excuse Plaintiffs' failure to raise the driver's license theory in their amended complaint—at which point Defendants could have taken discovery on the theory—or in their earlier briefing. Likewise, Plaintiffs' assertion (Pls' Reply 43) that they are raising the new theory only "to counter the arguments against standing in [Defendants'] cross-motions for summary judgment" should be rejected, given that Defendants have been contesting Plaintiffs' standing in this litigation for years.[2]

At the very least, the Court should not address the driver's license theory until Defendants have had an opportunity to take discovery on the issue. *See* Fed. R. Civ. P. 56(d); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986) (summary judgment should "be refused where the nonmoving party has not had the opportunity to discovery information that is essential to his opposition"). To be clear, Federal Defendants do not suggest that the Court should delay proceedings to grant such discovery. Rather, if it does not hold that Plaintiffs forfeited this argument, the Court should decline to address it at this juncture and afford Defendants an opportunity for discovery on this new theory if the Fifth Circuit's holding that Plaintiffs have standing based on their assertion of healthcare and education costs is reversed. Indeed, Plaintiffs themselves appear to acknowledge the propriety of deferring consideration of this issue, arguing that the Court should not permit discovery under Rule 56(d) because they can establish standing based on other alleged injuries, Pls' Reply 44 n.15, an argument that would support only deferral of the issue, not a ruling finding standing on this basis without giving Defendants an opportunity to take discovery.

---

[2] Plaintiffs also contend (Pls' Reply 43-44) that the Court should not reject their affidavit concerning driver's license costs as unrelated to the pleadings. But this argument does not address Plaintiffs' forfeiture of the theory.

2. In any event, Plaintiffs' eleventh-hour addition of a standing argument based on the cost to issue driver's licenses to DACA recipients is meritless. Supreme Court precedent establishes that Texas does not suffer Article III injury as a result of any increased costs it might incur to provide subsidized driver's licenses to those who receive deferred action as a result of the Final Rule.[3] Texas has voluntarily chosen to subsidize those driver's licenses, and it could eliminate that subsidy at any time.

The Supreme Court has rejected a State's effort to claim standing on such a self-generated basis. In *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) (per curiam), the Court held that a State that chooses to extend a tax credit on the basis of another sovereign's actions does not thereby gain standing to challenge the other sovereign's policies by claiming that they have the incidental consequence of costing the complaining State money. Specifically, the Court concluded that Pennsylvania lacked standing to challenge a New Jersey tax that triggered a tax credit under Pennsylvania law and thereby reduced Pennsylvania's tax revenue. *Id.* at 662-664. The Court explained that "[n]o State can be heard to complain about damage inflicted by its own hand," and noted that "nothing prevents Pennsylvania from withdrawing [the] credit." *Id.* at 664.

*Pennsylvania* controls. Like the plaintiff State in *Pennsylvania*, Texas has created the only causal link between the challenged federal action (the Final Rule) and its alleged injury (expenditure on a particular subsidy). Neither the Final Rule nor any federal law required Texas to subsidize driver's licenses. Indeed, it was Texas's own decision to issue licenses on the basis of "authorize[d]" presence, a Tex. Transp. Code Ann. § 521.142 (West 2021). And Texas has exercised its independence in this area by defining "authorize[d]" presence with a list of categories

---

[3] To the extent this argument is foreclosed by the Fifth Circuit's decision in *Texas v. United States* (*Texas I*), 809 F.3d 134, 156-60 (5th Cir. 2015), the Federal Defendants are preserving it for further review.

of aliens that has no equivalent in federal law. *See* Tex. Dep't of Pub. Safety, *Verifying Lawful Presence* 2-7 (July 2013), available at https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifyinglawful presence.pdf. And Texas readily acknowledges that it is free to "chang[e] its statutes" if it does not wish to provide subsidized licenses to DACA recipients. *See* Pls' Reply 42 (citation omitted). For that reason, any expenditures Texas makes on subsidized driver's licenses are a classic example of a self-generated injury that does not suffice for Article III standing.

Furthermore, Plaintiffs' new declaration is insufficient to establish injury to the State from the issuance of any number of new driver's licenses. Plaintiffs assert Texas subsidizes provision of licenses, but provides no data to back up that assertion. According to the Gipson declaration, the State of Texas generally pays $0.30 per customer to verify the individual's lawful presence status when issuing a new or renewal driver's license, and in some small number of cases may pay as much as $1.08 per customer. *See* Gipson Decl. ¶¶ 6, 7. But Plaintiffs do not acknowledge that the State of Texas first collects $33 from a driver's license applicant for each new or renewed license application. *See* https://www.dps.texas.gov/section/driver-license/driver-license-fees (accessed April 9, 2023). There can be no doubt that this fee that Texas collects to issue a driver's license is an "offsetting benefit[] that [is] of the same type and arise[s] from the same transaction as the cost" to Texas to verify the applicant's lawful presence status. *See Texas I*, 809 F.3d at 155. Plaintiffs offer no explanation to support their math or the notion that Texas is subsidizing driver's licenses, and so establish no injury here.

Plaintiffs' assertion that "[e]ach additional customer seeking a limited term driver license or personal identification certificate imposes a cost on" Texas, Gipson Decl. ¶ 8, depends on the assumption that the State will need to lease more office space, hire additional employees, and

purchase additional technology for each additional applicant, *see id.* (identifying biennial cost for "[a]dditional [e]mployees, [l]eases, [f]acilities and [t]echnology"). But Plaintiffs' assertion that Texas will incur these additional overhead costs is not credible in light of the relatively small number of DACA recipients that could be expected to apply for driver's licenses going forward. The Final Rule projects that in the first year, there would be approximately 3,746 new DACA recipients living in Texas. *See* 87 Fed. Reg. at 53,274 (projecting active DACA population); *id.* at 53,286 (16 percent of DACA recipients reside in Texas).[4] Even if each of these new DACA recipients applied for a driver's license, that would amount to approximately one new driver's license applicant per Texas driver's license office every three weeks (or 17 new applicants per office per year). *See* https://www.dps.texas.gov/apps/Viewer/Document/Vue/WAITTIMES (showing 232 driver's license offices in Texas as of April 26, 2023). Where only 80% of DACA recipients reported obtaining a driver's license for the first time after obtaining DACA, the numbers are even less impressive—13 new applicants per year or just one per month, per office. *See* AR2022_502637, Results from Tom K. Wong, et al., 2019 National DACA Study at 8. The assertion that Texas would need to lease new space or hire new employees is simply incredible. And Plaintiffs' prediction (Gipson Decl. ¶ 8) that the Final Rule will increase driver's license applications by 10,000 to 200,000 per year is unfounded. Plaintiffs make no claim that an increase of approximately 3,800 driver's license applicants over the course of a year would require an expansion of the state's existing infrastructure.

Plaintiffs also cannot rely on any alleged injury resulting from prior driver's license applications processed during Plaintiffs' delay in filing this suit, as any such past injury is not

---

[4] To be clear, this does not equate to new undocumented individuals arriving in Texas. DACA eligibility includes having been present in the United States since 2007. *Id.* at 53,155.

redressable in this litigation. *See O'Shea v. Littleton*, 414 U.S. 488, 495 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief.").[5] In any event, Plaintiffs have presented no actual data to show a spike in infrastructure costs to DPS over the past ten years to accommodate the DACA recipients already living in Texas. *See* ECF No. 626-3, Pl. Ex. 39 (App. 716). There is no reason to believe that a small fraction of that number of new DACA recipients or the renewal of licenses by existing DACA recipients would cause DPS to take on any additional infrastructure costs under the Final Rule. Plaintiffs' failure to show actual harm from an alleged ongoing injury coupled with their overstated prediction of future harm should be fatal to their claim.

## II.     The Final Rule Is Lawful In All Respects

### A.     The Final Rule Is Consistent With The INA

Federal Defendants respectfully maintain their disagreement with the Fifth Circuit's conclusion that the DACA Memorandum—which relied on the same statutory authority as the Final Rule—is inconsistent with the INA. *See Texas II*, 50 F.4th at 525-28. To the extent that Plaintiffs seek to newly support their INA claim by pointing to the intersection of the Final Rule and DHS's advance parole policies, *see* Pls' Reply 28, they fail to respond to Federal Defendants' argument—and the Final Rule's explanation—that advance parole is not a component of the Final Rule. *See* Fed. Defs' Mot. 17-18, 87 Fed. Reg. at 53,250.

### B.     Plaintiffs Articulate No Violation Of The Take Care Clause

Plaintiffs' Take Care Clause arguments fail because that Clause is addressed to the President and does not create a judicially enforceable interest or a basis for an APA suit. *See* Fed.

---

[5] Plaintiffs present no evidence that DACA recipients who already have driver's licenses will impose any cost on Texas, particularly considering that they will pay $33 to have those licenses renewed. *See* https://www.dps.texas.gov/section/driver-license/driver-license-fees (accessed April 9, 2023).

Defs' Mot. 18. Plaintiffs' constitutional argument would also collapse the "well established" "distinction between claims that an official exceeded his statutory authority, . . . and claims that he acted in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 474 (1994). As Plaintiffs make clear, their constitutional claim is based solely on their argument that the Final Rule is inconsistent with the INA. *See* Pls' Reply 31 (citing the court of appeals' statutory analysis at 50 F.4th at 524-528). Even were that statutory argument correct, that would not make the Executive Branch's actions premised on a contrary view of the relevant statutes a violation of the Take Care Clause.

Plaintiffs also misconstrue Federal Defendants' position. Pls' Reply 31-32. Federal Defendants have not argued that the Final Rule is an exercise of prosecutorial discretion exempt from the Take Care Clause; rather, they explain that exercises of such discretion are consistent with the responsibilities imposed by the Take Care Clause. *See* Fed. Defs' Mot. 18-19. The Secretary's exercise of his authority and duty to set immigration enforcement priorities through the Final Rule is a faithful implementation of the immigration statutes, *see* 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a), not a failure to execute the laws. And contrary to Plaintiffs' argument that the Rule cannot implicate prosecutorial discretion because it is insufficiently particularized, Pls' Reply 32, Plaintiffs elsewhere acknowledge that DACA is administered with discretion on a case-by-case basis. *Id*. at 13 ("any DACA recipient's approval can be revoked at the whim of USCIS").

## C.    The Final Rule Is Not Arbitrary And Capricious

Nor is the Final Rule arbitrary and capricious. As an initial matter, Plaintiffs seem to confirm that their argument on this score merely restates their argument that the Rule is inconsistent with the INA and does not raise a distinct arbitrary-and-capricious claim. Plaintiffs now assert that they "do not claim that [DHS] did not adequately assess the costs and benefits of

11

employment authorization for DACA recipients," but rather only that "Congress already made that determination." Pls' Reply 32.

Plaintiffs' claims regarding effects on the workforce are misplaced. They overlook that Congress specifically defined "unauthorized alien[s]"—*i.e.*, those barred from lawful employment within the United States—to exclude individuals either "lawfully admitted for permanent residence" or "authorized to be so employed by this chapter or by the Attorney General." 8 U.S.C. § 1324a(h)(3). That statute, and the regulation implementing it that permits those granted deferred action to seek work authorization, *see* 8 C.F.R. § 274a.12(c)(14), are legislatively authorized *solutions* to the problem of preventing employers from hiring undocumented immigrants over American workers and exploiting them to work for lower wages in substandard working conditions. *See* U.S. Immigration Policy and the National Interest: The Final Report and Recommendations of the Select Commission on Immigration and Refugee Policy With Supplemental Views by Commissioners ("Select Comm. Report") (Statement of Commissioner Elizabeth Holtzman) 344 (1981) (calling for enforcement against large employers "who truly were exploiting illegal aliens to displace American workers and drive down wages" through violation of labor standards "such as the minimum wage—and working conditions.").

Plaintiffs also argue that Federal Defendants failed to rebut their claim that DHS arbitrarily failed to consider whether the Affordable Care Act (ACA) incentivizes employers to hire DACA recipients over U.S. citizens. Pls' Reply 32-33. As Federal Defendants previously explained, Plaintiffs cannot now assert the agency acted arbitrarily in failing to address this concern that Plaintiffs did not raise in their comments during the rulemaking. *See* Fed. Defs' Mot. 21 (citing *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 n.7 (5th Cir. 1998)). Although the Fifth Circuit has indicated that such waiver does not apply in all instances, *see* Pls' Reply 33, it has held that

12

"*Texas Oil & Gas* [is] controlling" where, as here, an unraised comment does not surface "an obligation expressly imposed by" statute. *BCCA Appeal Group v. E.P.A.*, 355 F.3d 817, 829 n.10 (5th Cir. 2003) (where no statutory obligation, a challenger "needed to raise its objections during the administrative proceeding and provide EPA an opportunity to consider the issue before asserting, after the fact, that EPA was arbitrary for failing to do so"). The case Plaintiffs cite, *Southwestern Electric Power Company v. United States Environmental Protection Agency*, 920 F.3d 999, 1022 n.23 (5th Cir. 2019), did not overrule *BCCA Appeal Group*'s holding that the earlier precedent dispensing with a comment requirement is "distinguishable" in such circumstances. *See* 355 F.3d at 829 n.10.

In any event, as Federal Defendants explained (Fed. Defs' Mot. 21) Plaintiffs' late-raised, ACA-based claim fails on the merits because Plaintiffs are unable to point to any evidence in the administrative record suggesting that there is an actual problem of U.S. employers discriminating against U.S. citizens in favor of DACA recipients because of these groups' current disparate treatment under the ACA.[6] DHS did not err by failing to consider a nonexistent problem.

Finally, Plaintiffs do not dispute that their arbitrary-and-capricious argument applies only to the employment-authorization provisions of the Final Rule. *See* Pls' Reply 33. Their only rationale for seeking "vacatur of the entire [R]ule" on this basis is their view that "these provisions

---

[6] On April 13, 2023, the Biden Administration made an announcement that the Department of Health and Human Services "will shortly propose a rule amending the definition of 'lawful presence,' for purposes of Medicaid and Affordable Care Act coverage, to include DACA recipients." *See* Fact Sheet: President Biden Announces Plan to Expand Health Coverage to DACA Recipients, https://www.whitehouse.gov/briefing-room/statements-releases/2023/04/13/fact-sheet-fact-sheet-president-biden-announces-plan-to-expand-health-coverage-to-daca-recipients/, April 13, 2023. The proposed rule was published on April 26, 2023. *See* 88 Fed. Reg. 25,313 (Apr. 26, 2023), and will be subject to a public comment period and revisions before any final rule may be issued.

are not severable" from the remainder of the Rule, *id.*, a claim that cannot be reconciled with the Rule's plain language or basic severability principles, *see infra* Section III.B.

## III.    If The Court Finds The Final Rule Unlawful, It Should Limit Any Relief

### A.    The Court Lacks Jurisdiction To Enjoin Or Vacate The Final Rule

As explained in Federal Defendants' cross-motion, this Court lacks jurisdiction to enjoin or vacate the Final Rule. *See* 8 U.S.C. § 1252(f); *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022); *see also* Brief for United States, *United States v. Texas*, No. 22-58 (S. Ct) (argued Nov. 29, 2022). Federal Defendants respectfully disagree with the Fifth Circuit's contrary conclusion, *see Texas II*, 50 F.4th at 528-29, and reiterate their preservation of all arguments for further review, *see* Fed. Defs' Mot. 22-25. Section 1252(f)(1) provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221-1232]." This restriction applies to vacatur and injunctions alike, *see* Fed. Defs' Mot. 22-24, and it "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions," *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022).

Plaintiffs do not dispute that they invoke the specified statutory provisions. Pls' Reply 18-19. Instead, they assert that their requested relief would "not force DHS to '*refrain* from taking' actions to implement any part of 8 U.S.C. §§ 1221-1232 because the DACA program's purported sources of authority are outside those provisions." Pls' Reply 19. But that argument misses the point: Section 1252(f)(1) does not bar injunctions of sources of authority, it bars injunctions of actions taken (or not taken) under these laws. A grant of deferred action is an action taken to delay implementation of the removal statute, generally under 8 U.S.C. § 1229a, *see Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999), and Plaintiffs request relief that would enjoin DHS from granting deferred action through DACA. Section 1252(f)(1) forbids such relief.

Plaintiffs likewise have not shown that vacatur is available under the APA. *See* Fed. Defs'
Mot. 23-25. The APA's remedies provision, 5 U.S.C § 703, limits courts to traditional *party-
specific* remedies like injunctions and declaratory relief, not universal vacatur. *See* Fed. Defs' Mot.
24; *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) ("Remedies . . . ordinarily operate with
respect to specific parties.") (quotation marks omitted). Plaintiffs do not address section 703, and
their remaining arguments regarding section 706(2)—a provision that establishes a rule of
decision, not available remedies—are inapposite.

### B.       The Final Rule Is Severable

Any remedy this Court orders should account for the Final Rule's unambiguous
severability provision. Whether a regulation is severable "depends upon" (1) "the intent of the
agency," and (2) "whether the remainder of the regulation could function sensibly without the
stricken provision." *MD/DC/DE Broadcasters Ass'n v. F.C.C.*, 236 F.3d 13, 22 (D.C. Cir. 2001).
The Final Rule meets both prongs.

First, the Secretary expressly stated the Rule's operational directive and the agency's intent
that any unlawful portion of the Final Rule be severed from the remainder. The Rule states, "even
if a court were to hold that DHS lacked authority to grant discretionary work authorization to
DACA recipients, DHS maintains that the court should sever the work authorization provision
from the rest of the regulation, leaving DACA's forbearance component intact." 87 Fed. Reg.
53,201; *see also id.* at 53,208 ("DHS also maintains its views on severability, as provided in 8
CFR 236.24 and discussed elsewhere in this rule, in the event that any portion of the rule is declared
invalid, including one or both of these lawful presence provisions."). Plaintiffs' contrary efforts to
raise "substantial doubt" regarding the agency's intent, *cf.* Pls' Reply 21-22, contradict the Rule's
express severability clause and DHS's numerous statements reinforcing the agency's intent to
allow each aspect of the Rule to operate independently were a court to find another portion

unlawful. *See, e.g.*, 8 C.F.R. § 236.24(a) (explaining that if any provision of Final Rule is held "invalid and unenforceable in all circumstances," it "shall be severable from the remainder of this subpart and shall not affect the remainder thereof."); *id.* § 236.24(b) ("The provisions in § 236.21(c)(2) through (4) and § 274a.12(c)(14) and 274a.12(c)(33) are intended to be severable from one another, from this subpart and any grant of forbearance from removal resulting from this subpart."); 87 Fed. Reg. 53,248-49 (responding to comments and maintaining severability "is preferable"); *id.* at 53,256 (a policy of forbearance-only "would carry substantial benefits").[7]

Second, DACA would function sensibly without such benefits. As the Supreme Court recognized, "forbearance and benefits are legally distinct and can be decoupled." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (finding error in failure to consider "the option of retaining forbearance without benefits"). Indeed, the agency could "exclude DACA recipients" from those benefits but nonetheless maintain "the forbearance policy." *Id.* at 1911-12 nn.5, 6.

Plaintiffs are incorrect that deferred action and employment authorization are too intertwined for the Court to sever. Pls' Reply 24, 26. Deferred action and employment authorization are undisputedly distinct: The two processes are handled consecutively, and each is evaluated on unique criteria. D. App. 061, 87 Fed. Reg. 53,211 ("EADs for all deferred action recipients, including DACA recipients, are available based on a determination of economic need."). Equally unavailing is Plaintiffs' suggestion that the Final Rule is not severable because, in its unsevered form, it reflects both forbearance *and* benefits policies (rather than a "forbearance-only polic[y]." Pls' Reply 26. That argument would eviscerate the severability doctrine; it would preclude an agency from ever combining multiple actions in a single rule and specifying that one

---

[7] Plaintiffs posit "internal inconsistencies" in the Final Rule, but point to sentence fragments that do not appear together and instead respond to different comments posed in the rulemaking. Pls' Reply 21 (citing AR2022_100237, 87 Fed. Reg. 53,194).

may be severed from the other. Further, the cases Plaintiffs invoke involved rules where (unlike the Final Rule here) the remaining elements could no longer operate as intended, *see MD/DC/DE Broadcasters Ass'n*, 236 F.3d at 22; *Nat. Res. Def. Council v. E.P.A.*, 489 F.3d 1250, 1261 (D.C. Cir. 2007); or where the rules were so complex and interdependent that severability was all but impossible, *see Chamber of Com. of United States of Am. v. United States Dep't of Lab.*, 885 F.3d 360, 363, 389 (5th Cir. 2018).[8]

### C.   DHS Is Best Positioned To Facilitate The Timing And Conditions Of Any Wind-Down If the Court Finds the Final Rule Unlawful

In the event the Court finds the Final Rule unlawful, Plaintiffs propose a wind-down lasting "*at least* two years (and potentially up to four years)." Pls' Reply 9 (emphasis in original). Federal Defendants agree that a wind-down should not be shorter than this period, particularly given the significance of the reliance interests involved, the complexities of this case, and Plaintiffs' delay in filing suit. *See* Fed. Defs' Mot. 26-28. But rather than choosing a wind-down period itself, if this Court finds the Final Rule to be unlawful and vacates all or part of it, then it should remand to DHS to effectuate a considered implementation of that vacatur in the event the Court's ruling is affirmed on appeal and the stay pending appeal lifts. Any wind-down, moreover, should be initiated only after all avenues of further review are exhausted, the contours of any legal rule under which the agency must operate are no longer subject to change, and the stay pending appeal has lifted. *See id.*

Plaintiffs' request for a rigid termination period is inconsistent with the Supreme Court's decision in *Regents*. In the specific context of a potential DACA wind-down, the Court emphasized that "DHS has considerable flexibility in carrying out its responsibility" in "[m]aking th[e] difficult

---

[8] In two of Plaintiffs' cited cases, the defendants did not even seek to sever the challenged rules. *See Chamber of Com.*, 885 F.3d at 388; *Nat. Res. Def. Council*, 489 F.3d at 425.

decision" in how to weigh "reliance interests," "policy concerns," and "other interests." *Regents*, 140 S. Ct. at 1914. And while Plaintiffs justify a four-year wind-down based on *individual* renewal periods under DACA, Pls' Reply 8, that argument overlooks the Supreme Court's admonition that DHS enjoys "considerable flexibility" in implementing a *program-wide* wind-down, *Regents*, 140 S. Ct. at 1914. That flexibility properly includes the Secretary's ability to "consider[] a broader renewal period based on the need for DACA recipients to reorder their affairs," and to adopt "more accommodating termination dates for recipients caught in the middle of a time-bounded commitment" in light of, *e.g.*, educational, military-related, or medical needs. *Id.* The Supreme Court likewise indicated that the Secretary could "instruct[] immigration officials to give salient weight to any reliance interests engendered by DACA when exercising individualized enforcement discretion." *Id.* As the Supreme Court explained, these weighty decisions are all matters of policy and discretion properly reserved for the agency. *See, e.g.*, *id.* at 1914-15 (holding that DHS "*was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns" (emphasis in original)); *Texas Ass'n of Mfrs. v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) ("Only in 'rare circumstances' is remand for agency reconsideration not the appropriate solution.") (citing *Central and South West Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000)).

Plaintiffs' delay in filing suit further underscores the impropriety of the rigid wind-down they propose. Plaintiffs acknowledge that they waited through two presidential elections before challenging the 2012 DACA memorandum in 2018. Pls' Reply 10-11. This delay—and the substantial reliance interests of DACA recipients and their communities that are at stake—weigh heavily in favor of allowing DHS to facilitate any wind-down rather than accommodating Plaintiffs' preferred timeline. Any wind-down, moreover, should begin only after all avenues of

further review have been exhausted, particularly given the Fifth Circuit's endorsement of this Court's prior stay order. *Texas II*, 50 F.4th at 531 (explaining that "a partial stay was appropriate").

### D.      Plaintiffs Are Not Entitled to Nationwide Relief

The Court should decline Plaintiffs' request for a nationwide remedy, particularly because only Texas has attempted to show harm. *See* Fed. Defs' Mot. 28-30; *Lewis v. Casey*, 518 U.S. 343, 360, 360 n.7 (1996) ("Courts have no power to presume and remediate harm that has not been established."). Plaintiffs respond that applying vacatur "only to the parties . . . raises unanswerable questions" as to how a policy can be vacated "as to some but not other members of the public," Pls' Reply 5, but Supreme Court and Fifth Circuit law provide for this exact remedy, *see, e.g.*, Fed Defs' Mot. 24, 28-29; *California*, 141 S. Ct. at 2115; *Hernandez v. Reno*, 91 F.3d 776, 781 & n.16 (5th Cir. 1996).[9] It is certainly not an "extraordinary suggestion" (Pls' Reply 15) that the Court tailor any relief to the harm established with a ruling that provides assurance that forbearance and work authorization do not apply in Texas.[10] The Court should limit any relief accordingly.

### IV.     Plaintiffs Do Not Dispute that the Court Should Maintain the Present Stay

Although Plaintiffs argue that a stay "pending the outcome of a rulemaking proceeding" is no longer warranted, Pls' Reply 8, they offer no argument in opposition to Defendants' request that the Court maintain a partial stay of any relief issued against the Final Rule pending the outcome of all further appellate and Supreme Court review, thus conceding the propriety of such a stay. This is for good reason: The Fifth Circuit already "preserve[d] the stay as to existing

---

[9] Mississippi, moreover, has not shown how it could obtain relief here following dismissal of its earlier—and materially identical—challenge to DACA. *See Crane*, 783 F.3d at 252 (holding that Mississippi lacked cognizable injury).

[10] The Supreme Court's requirement that any relief be limited to the harm established is further support that vacatur of the Final Rule is not a proper remedy. If the Court finds Texas has been injured by the Final Rule, it should enjoin the operation of the Final Rule in Texas.

recipients" in this litigation until further order of that court or the Supreme Court. *Texas II*, 50 F.4th at 531-32. And to the extent an additional stay is required, each factor plainly favors such relief pending all appeals. Fed. Defs' Mot. 30-32. The Court should grant Defendants' request that any remedial order be stayed to allow recipients to continue to renew DACA pending all available further review.

## CONCLUSION

For the reasons stated here and in Federal Defendants' prior briefing, the Court should deny Plaintiffs' motion for summary judgment, grant summary judgment for Federal Defendants, and uphold the Final Rule in its entirety. If the Court finds the Final Rule to be invalid in any respect, it should preserve any discrete aspect of the Final Rule not found unlawful, and remand to DHS for further consideration without vacating or enjoining the Final Rule. If the Court does craft injunctive relief of some variety, it should not limit DACA renewals to only two years post-judgment, and should grant no more relief than is warranted by the limited evidence of harm to the state of Texas. In any event, the Court should stay any remedial order to allow DACA recipients to continue to renew DACA pending all available further review.

Dated: April 27, 2023

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director, Office of Immigration Litigation
District Court Section

JEFFREY S. ROBINS
Attorney-in-Charge
Deputy Director

Respectfully submitted,

*/s/ James J. Walker*
JAMES J. WALKER
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 532-4468
Fax: (202) 305-7000
Email: james.walker3@usdoj.gov

*Attorneys for Federal Defendants*

20

**CERTIFICATE OF SERVICE**

I certify that on April 27, 2023, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ James J. Walker*
JAMES J. WALKER