**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors, | § | |

**APPENDIX IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION TO FILE A
SUR-REPLY OF DEFENDANT-INTERVENORS ELIZABETH DIAZ, ET AL.**

# VOLUME 1
# Exhibits 1–8

Dated:  June 20, 2023

Respectfully Submitted,

**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND**

By:  /s/ Nina Perales
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone:  (210) 224-5476
Facsimile:  (210) 224-5382
Email:  nperales@maldef.org

**ROPES & GRAY LLP**
Douglas H. Hallward-Driemeier
2099 Pennsylvania Ave NW
Washington, DC  20006-6807
(202) 508-4600
(202) 508-4776 (direct dial)
Douglas.Hallward-Driemeier@ropesgray.com
(Admitted pro hac vice)

**GARCÍA & GARCÍA,
ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX  78502
Phone:  (956) 630-3889
Facsimile:  (956) 630-3899
Email:  cgarcia@garciagarcialaw.com

Attorneys for Defendant-Intervenors

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on the 20th day of June, 2023, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Nina Perales*
Nina Perales

| Exhibit | Description/Source | Vol. No. |
|---------|-------------------|----------|
| 1 | Transcript of the motion proceedings for this case held in this Court on December 22, 2020 | 1 |
| 2 | June 2018 email exchange between counsel for Plaintiffs, Defendants, and Defendant-Intervenors. | 1 |
| 3 | *Warrior Energy Servs. Corp. v. ATP Titan M/V*, 551 F. App'x 749 (5th Cir. 2014) | 1 |
| 4 | *Weems v. Hodnett*, No. 10-CV-1452,  2011 WL 2731263 (W.D. La. July 13, 2021) | 1 |
| 5 | *Civelli v. J.P. Morgan Chase Sec., LLC*, C.A. H-173739, 2023 WL 2825702 (S.D. Tex. Feb. 2, 2023) | 1 |
| 6 | Plaintiffs' Second Amended Responses to Defendant-Intervenors' Second Set of Discovery Requests, served on August 7, 2019 | 1 |
| 7 | *Winfrey v. San Jacinto Cnty.*, 481 F. App'x 969 (5th Cir. 2012) | 1 |
| 8 | *Wojcik v. Memorial Hermann Health Sys.*, C.A. No. H-17-3198, 2019 WL 4887265 (S.D. Tex. Oct. 3, 2019) | 1 |

# Exhibit 1

1       UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF TEXAS
2        BROWNSVILLE DIVISION

3 **********************************************************

4 STATE OF TEXAS, ET AL   1:18-CV-00068

5
 VS.        HOUSTON, TEXAS
6

7 UNITED STATES OF AMERICA, ET
 AL        DECEMBER 22, 2020
8

9 **********************************************************

10     TRANSCRIPT OF MOTION PROCEEDINGS
   HEARD BEFORE THE HONORABLE ANDREW S. HANEN
11     UNITED STATES DISTRICT JUDGE

12 **********************************************************

13 APPEARANCES:

14 FOR THE PLAINTIFFS:   MR. TODD LAWRENCE DISHER
          Office of the
15         Attorney General of Texas
          209 West 14th Street
16         8th Floor
          Austin, Texas 78701
17
          MR. ERIC ALAN HUDSON
18         Texas Attorney General
          300 West 15th Street
19         Austin, Texas 78711

20         MS. ELIZABETH MURRILL
          Office of the Attorney General
21         Louisiana Department of Justice
          1885 North 3rd Street
22         Baton Rouge, LA 70802

23

24
    Proceedings recorded by mechanical stenography,
25 transcript produced via computer.

```
 1   FOR THE INTERVENOR          MS. NINA PERALES
     DEFENDANTS                  MALDEF
 2   KARLA PEREZ, ET AL:         110 Broadway
                                 Suite 300
 3                               San Antonio, Texas 78205

 4                               DOUGLAS H. HALLWARD-DRIEMEIER
                                 Ropes & Gray LLP
 5                               2099 Pennsylvania Avenue, NW
                                 Washington, DC 20006-6807
 6

 7   FOR THE INTERVENOR          MR. JEREMY M. FEIGENBAUM
     STATE OF NEW JERSEY:        Office of the
 8                               New Jersey Attorney General
                                 RJ Hughes Justice Complex
 9                               25 Market Street
                                 Trenton, New Jersey 80625
10

11   FOR THE FEDERAL DEFENDANTS:  MR. JOHN COGHLAN
                                 U.S. Department of Justice
12                               PO Box 868
                                 Washington, DC 20044
13
                                 MR. DANIEL DAVID HU
14                               U.S. Attorney's Office
                                 1000 Louisiana
15                               Suite 2300
                                 Houston, Texas 77002
16

17   Official Court Reporter:    Lanie M. Smith, CSR, RMR, CRR
                                 Official Court Reporter
18                               United States District Court
                                 Southern District of Texas
19                               515 Rusk
                                 Room 8004
20                               Houston, Texas 77002

21

22

23

24

25
```

**P R O C E E D I N G S**

(Call to order of the court.)

THE COURT:  Thank you.  Be seated.

Good morning, Counsel.

We're here in the State of Texas versus United States, 18-cv-68.  Before we start, let me do a little housekeeping.

First of all, I appreciate the fact that our counsel from Washington and New Jersey came down here; and I know there was a motion to, one, let them appear by phone; and, two, to put off the hearing until early January.

We've had mixed results with phone, people trying to argue by phone and especially with the fact that we set up special lines so people could listen in.  We were having technology problems about letting some people argue but not everybody unmute and argue at the same time and maybe people that weren't lawyers arguing.  So that's why we couldn't do it by phone.

With regard to the hearing date, the general consensus, at least here in the Southern District -- and I don't know that anybody can really say what is what with regard to COVID -- is that the COVID situation will be worse after the holiday and it's better to do this before.

So we scheduled this to give enough distance away from Thanksgiving but before Christmas.  And so you can blame

1   me or COVID, whichever one you want to blame; but I appreciate

2   you being here.

3            As you can tell, we're trying to keep you as

4   socially distanced as possible.  When you're talking, if you

10:14AM  5   want to take off your mask, you're welcome to.  I have my mask

6   off, but I'm 6 feet away from everybody.  Plus these guys are

7   around me all the time anyway so if I have it, they have it.

8            We have covers on the microphones and we replace

9   those every time so make sure -- I'm going to have you speak

10:14AM  10  from your tables so, like, for instance, Ms. Perales, you're

11  going to want to make sure that microphone is facing you.

12           We don't have -- of course this is the courtroom

13  with the least technology.  We don't have -- you guys are just

14  going to have to speak loudly.

10:15AM  15           Anyway, I think we're all right there.  I'm

16  looking out in the audience.  We don't have many people here in

17  the audience, so I don't think we have to worry about social

18  distancing there.

19           Let me do, as I have in the past, some

10:15AM  20  preliminaries about really what we're here to talk about.  I

21  mean, we're here to talk about whether DACA was legally

22  created.  We're not talking about whether it's popular or

23  whether it's good policy or bad policy or, you know, whether

24  it's contrary to immigration policy as opposed to law.  We are

10:15AM  25  talking about whether it's contrary to law.

1          We're not talking about issues of border security

2     or any of the other popular themes that seem to pervade our

3     press and newspapers.  I mean, so let's stick to the facts

4     here.

10:16AM  5          As everyone here I think knows, to qualify for

6     DACA, you have to be in the country illegally.  There are a

7     number of -- six or seven different qualifications you have to

8     go through to be a DACA recipient.

9          But I mention that one because I don't want

10:16AM 10    anybody to walk away from this hearing thinking lawyers for

11    Texas or lawyers for the government or lawyers for the DACA

12    recipients or the lawyers for New Jersey are speaking in the

13    pejorative if they use the term "illegal alien" or "illegal

14    immigrant."

10:17AM 15          As you know, the Fifth Circuit has actually said

16    that's the term that ought to be used when we talk about this

17    because it describes someone from one country who is present in

18    another country without complying with that second country's

19    immigration laws.

10:17AM 20          And so while it may not sound or be politically

21    correct in today's parlance, popular parlance, it does apply

22    here in a certain context.  So I don't want anyone walking away

23    with the feeling that somebody on the other side is racist or

24    xenophobic or anti-immigrant just because they use the term

10:17AM 25    "illegal immigrant" or "illegal alien."

1          All right.  That having been said, let's turn to

2    the actual merits of why we're here today.  Procedurally we

3    have competing motions for summary judgment and I actually want

4    to start with the intervenors' motion first, the motion on

10:18AM 5    standing, unless there's some objection from any person, and

6    then circle back and take the State's motion for summary

7    judgment.

8          So who is going to take the lead on that?

9          MS. PERALES:  Your Honor, Douglas Hallward-Driemeier

10:18AM 10   will argue defendant-intervenors' motion for summary judgment;

11   however, a question for the Court whether and when the Court

12   might want to hear oral argument on the *Daubert* motion or the

13   motion to exclude testimony for the summary judgment phase?

14         THE COURT:  Why don't we do that first.  Are you going

10:19AM 15   to argue that, Ms. Perales?

16         MS. PERALES:  Yes, Your Honor.

17         THE COURT:  All right.  Why don't you lead off then.

18         MS. PERALES:  Thank you, Your Honor.

19         Before I start, I would like to introduce an

10:19AM 20   attorney who came with me from MALDEF today, Samantha Serna

21   Uribe; and also one of the DACA Intervenors is here with us

22   today.  Her name is Esther Jeon.

23         THE COURT:  All right.  Welcome to both of you.

24         MS. PERALES:  Thank you, Your Honor.

10:19AM 25         In our filing, which is Docket 390, the

defendant-intervenors DACA recipients request that the Court
not consider the testimony of two experts put forward by the
plaintiffs, Mr. Donald Deere and -- sorry.  Dr. Donald Deere
and Dr. Lloyd Potter.

When deciding motion for summary judgment, the
Court has the discretion to disregard an expert opinion that is
unreliable or irrelevant or both.  And the case here of course
is *Munoz versus Orr*.

And in *Munoz*, the Court excluded expert testimony
at the summary judgment stage because the methods were not in
accord with other experts and also that he made mistakes,
failed to consider other variables and made assumptions that
drove his conclusions.  We have very much the same situation
here as was presented in *Munoz*.

Dr. Deere is an economist.  He testifies
primarily in wage and hour cases and employment discrimination
cases.  He does not research or testify on the impact of
immigrants on the labor market.  He is not qualified to offer
the conclusions that he does.

But more importantly, his conclusions are
speculative.  He made assumptions about -- and this is with
respect to the interaction between the Affordable Care Act and
hiring of DACA recipients versus other authorized workers.

He only made assumptions, did no study of how
many businesses find themselves in this situation, how many

1    times any businesses have been faced with these equally

2    qualified candidates that are U.S. citizens and DACA that he

3    presented in his scenario.

4              He makes assumptions about how many hiring

10:21AM   5    managers know how the ACA penalty works, how many U.S. citizens

6    may or may not trigger the ACA penalty, when employers know --

7    at what point in the hiring process employers know somebody is

8    a DACA recipient.

9              He assumes further -- these are all assumptions

10:22AM  10    that he makes without any study at all -- that businesses would

11    favor a DACA recipient over a non-DACA recipient.  He assumes

12    no other variables would affect the hiring decision and all

13    other factors in the economy would remain constant.

14             Most importantly, Dr. Deere was unable to

10:22AM  15    document a single instance of this happening.  He didn't talk

16    to any employers.  He didn't create any actual fact that

17    supports his conclusions.

18             And we would also like to point the Court to

19    *Hathaway versus Bazany,* which similarly excluded an expert's

10:22AM  20    testimony for making so many assumptions that the conclusion

21    itself was not reliable.

22             In addition, the conclusions are irrelevant in

23    the sense that Dr. Deere isn't able to say that even if this

24    were to happen based on all of his assumptions, that there

10:23AM  25    would be any pressure on the labor market.  So qualifications,

the methodology and relevance are all present.

And similarly with the second expert, the demographer, Dr. Lloyd Potter, whose testimony is presented to argue that people will leave the state or leave the plaintiff states if they lose their DACA, Dr. Potter is not qualified to render opinions having to do with immigrant demography or the reasons why immigrants may stay or choose to leave the United States.

And he makes one central and incorrect assumption which dooms his analysis.  Dr. Potter conceded that he assumed that if somebody lost their work authorization, they would be unable to work in the United States; and that's not true.

When you lose your work authorization, you can still work in the United States.  You can work in a business that you own.  You can work in your family business that's owned by your family.  You can work as an independent contractor.  You can mow lawns for money.

And Dr. Potter conceded that he hadn't thought about any of those possibilities and ultimately he testified, quote, well, I hadn't really kind of thought the whole thing through, unquote.

His work further --

THE COURT:  Would working for your family be legal?

MS. PERALES:  If your family owns a restaurant, let's say, Your Honor, in the example that I gave and you're working

1    with your family members in the restaurant and you're not

2    work-authorized, yes, the work would be legal as long as you're

3    not --

4          THE COURT:  Would your family be breaking the law by

10:24AM  5    hiring you?

6          MS. PERALES:  If you're not an employee, no,

7    Your Honor.

8          THE COURT:  Okay.  I'm missing that.  You are making a

9    distinction between working and not an employee and I missed

10:25AM  10    that distinction.

11          MS. PERALES:  That's right, Your Honor, because not all

12    work is performed as an employee of the business.  If you're

13    self-employed or you're working with your family, not as an

14    employee but in a joint effort to run whatever enterprise is

10:25AM  15    being run, then your work is not unlawful and your parents are

16    not breaking the law by having you work with them.

17          THE COURT:  So if I owned a restaurant and my son is in

18    the country illegally and doesn't have work authorization, I

19    can still hire him to be a waiter in my restaurant?

10:25AM  20          MS. PERALES:  As long as he's not an employee, yes,

21    Your Honor.

22          THE COURT:  So if he's, what, an independent

23    contractor?

24          MS. PERALES:  He could be or he could just be helping

10:25AM  25    out and you could be supporting him.  As long as he's not an

1   employee, his work authorization or lack thereof doesn't come

2   into play.

3          THE COURT:  So if he was basically working for free,

4   just for the family good to help support the family and I

10:26AM  5   wasn't paying him a salary, then I, as the employer, would not

6   be illegal, breaking the law by hiring him?

7          MS. PERALES:  That's correct.

8          THE COURT:  Okay.  Go ahead.

9          MS. PERALES:  And so because Dr. Potter made this very

10:26AM 10  flawed assumption, he eventually conceded that he hadn't really

11  thought the whole issue through.

12          But in addition to that, his analysis is purely

13  based on speculation.  In his deposition, he agreed that he had

14  no studies or information, either his own information or

10:26AM 15  other's information, about DACA recipients' likelihood of

16  return if they lost DACA.

17          He relied on eight articles.  They don't support

18  his conclusion.  The articles that he relied on don't study

19  undocumented immigrants, did not study Texas, did not study

10:27AM 20  states with different work authorization verification schemes,

21  and did not analyze populations similar to DACA recipients.

22          Now, ultimately he expressed his opinion as the

23  idea that quote/unquote some people might return and when

24  pressed for a number, he testified somewhere between one and

10:27AM 25  everybody.  That testimony really reveals how speculative and

1    unsupported his analysis was.

2           Now, the Court said in its order on Docket 452

3    that the Court would treat the points raised in our motion as

4    objections to the expert testimony for the pending summary

10:27AM   5    judgment motion; and for that reason, we've reasserted the

6    motion in our response to the motion for summary judgment.

7           Now, the plaintiffs have responded in part going

8    to the weight and Mr. Disher will give his argument on that.

9    But the plaintiffs wrote in their response, which is at

10:28AM   10   Docket 411, quote, defendant-intervenors' arguments are better

11   resolved through cross-examination and contrary evidence than

12   in a motion such as this.

13          And we'll get to their response to summary

14   judgment a little bit later; but I wanted to point that out

10:28AM   15   because I think even the plaintiffs at this point have taken

16   the position that if there is competing evidence, even if the

17   Court doesn't completely exclude these experts, that a trial is

18   really the necessary forum to work out the weight or the

19   credibility of the experts.

10:28AM   20          Thank you.

21          THE COURT:  Mr. Disher, who wants to reply from your

22   side?

23          MR. DISHER:  Thank you, Your Honor.  Todd Disher for

24   the plaintiff states.

10:29AM   25          Just a brief introduction.  With me today is

1    Mr. Eric Hudson with our office as well as Elizabeth Murrill.

2    She is the solicitor general for the great State of Louisiana.

3                So just a couple of points in response to the

4    *Daubert* motion.  Of course, we filed a written reply which the

10:29AM   5    Court can review.

6                Obviously we're here on a motion for summary

7    judgment and as the Court weighs and considers our motion for

8    summary judgment, the Court can of course give the weight that

9    is due to the various expert testimony and expert declarations.

10:29AM  10    There's no need for the Court to resolve the motion to strike

11    at this point.  The Court will be presumed, in fact, to have

12    given it the weight that it's due.

13                Additionally the two conclusions from our experts

14    are, in fact, confirmed by many of the other witnesses in this

10:29AM  15    case as well as the plaintiffs' own expert.

16                First with Dr. Deere, the defendant-intervenors,

17    for example, have offered an opinion from Ike Brannon.  During

18    his deposition, Ike Brannon -- this is, again, all laid out in

19    our motion and various points in our pleadings -- Dr. Ike

10:30AM  20    Brannon confirmed what Dr. Deere said that for certain lawfully

21    present workers, be they citizens or other folks who are

22    lawfully present to work here, having the DACA recipients be

23    eligible to work, in fact, does increase competition for at

24    least certain segments of the population.

10:30AM  25                As far as Dr. Potter is concerned, this Court is

1   well aware of the survey from Dr. Wong -- again, an expert by

2   both the DACA Intervenors as well as the state of New Jersey --

3   who did a survey of DACA recipients and in his survey found

4   that a substantial portion of them were either highly likely or

10:30AM   5   somewhat likely to leave the country should DACA end.

6          I would also simply point out, as we have before,

7   that the defendant-intervenors have never once said should DACA

8   end all of the DACA recipients will stay in the country.  They

9   have never once said that.

10:30AM   10         And so Dr. Potter's declaration stands for the

11   very common sense principle that should DACA end and these

12   folks no longer be able to work here lawfully -- some of them

13   may be able to be supported by their family members, some of

14   them who are highly educated and qualified may not want to do

10:31AM   15   that -- so a certain percentage of them would likely leave the

16   country.

17         So, again, the Court can evaluate all of that

18   evidence for itself and give it the weight that it's due as the

19   Court has already done in ruling on our motion for preliminary

10:31AM   20   injunction citing to Dr. Deere's very basic proposition of

21   black-letter law that the ACA mandate does not apply to DACA

22   recipients as well as Dr. Potter's conclusion, which is of

23   course confirmed by the defendant-intervenors' own expert.

24         So we would just ask the Court to consider all of

10:31AM   25   that when it is ruling on the motion for summary judgment and

give it the weight that it's due.  There's no need to resolve

that issue on a motion to exclude the expert testimony.

THE COURT:  What do I do -- and, Mr. Disher, I'm asking

you; but I'm going to let Ms. Perales think about it and let

her respond to this too.

What do I do with the fact that, in theory at

least, if there's no DACA all the DACA recipients are removable

aliens and presumably should be removed if they're following

the INA -- if the government is following the INA?  I mean,

doesn't that prove Dr. Potter's theory?

MR. DISHER:  It does, Your Honor.  Again, we can't

quantify how many DHS is likely to remove at this point given

their limited resources; but, again, I think it is a very, you

know, indisputable idea that should DACA end, some percentage

of DACA recipients will leave the country whether it's

voluntarily or through some removable action.

THE COURT:  All right.  Thank you, Mr. Disher.

Ms. Perales, you want to weigh in on the question

I just asked?  So I mean, in theory to be a DACA recipient, you

either overstayed your visa or you came in the country

illegally.  And I think, at least when I looked at it last, it

was about 50/50 how people fell into those two categories.

I mean, either way, you would be removable; so

wouldn't the proof be in the pudding that if the government was

actually doing its job as that job is laid out in the INA,

1   those people would be removed, whether as Mr. Disher said,

2   voluntarily or involuntarily?

3         MS. PERALES:  Two answers for that, Your Honor, before

4   I get to the reply portion of what I wanted to say.  First of

10:33AM  5   all, and I hope I get a chance to talk about this a little bit

6   later in response to the motion for summary judgment, but DACA

7   recipients are removable even when they're DACA recipients.

8   Having DACA or having deferred action doesn't change the fact

9   that you are removable or that you are undocumented.

10:34AM  10        THE COURT:  But they have legal presence under DACA?

11        MS. PERALES:  Yes, and I hope to discuss that a little

12   bit later with Your Honor as well.  They have not legal

13   presence but lawful presence as that term has been coined.

14            So as to the second part of what I wanted to say,

10:34AM  15   DACA recipients have been here for a while.  They have been out

16   of status for a while.  If they were to lose DACA, the most

17   reasonable expectation is that they would continue in that

18   state of being present and lacking immigration status and

19   that's the state that they were in before they received DACA.

10:34AM  20            The fact that somebody is removable doesn't mean

21   that they are immediately placed in removal proceedings and I

22   think Mr. Disher acknowledged that to some degree.  And so it

23   does not support Dr. Potter's otherwise completely unsupported

24   speculation that people would leave -- perhaps one, perhaps

10:35AM  25   all.  He has no information and produced no information about

1    people leaving or their likelihood of leaving.

2            I would like to respond to plaintiffs' contention

3    which they have sort of made a theme in this litigation that

4    somehow the defendant-intervenors' experts testified in support

5    of plaintiffs' position.  There's plaintiffs' theme that

6    defendant-intervenors' experts have supported plaintiffs'

7    position.

8            And I want to point out that with respect to the

9    ACA and the competition and the DACA recipient purportedly

10   being hired instead of a U.S.-born worker, Dr. Perryman

11   expressed that he, quote, does not know one way or the other,

12   unquote, whether an employer has ever hired a DACA recipient

13   for a job that a U.S. citizen also applied for.

14           Dr. Brannon referenced statements regarding only

15   general economic principles rather than any actual empirical

16   evidence of DACA's effects on wages.

17           Dr. Perryman, who is often raised by the

18   plaintiffs, testified that he has no information that there are

19   DACA recipients competing for low-skill jobs with non-DACA

20   workers.

21           And then finally Dr. Ku, who is an expert on the

22   ACA, said that there has not been any overall decline in

23   employment for U.S.-born workers following implementation of

24   DACA and the ACA.

25           So there's just no support for what Dr. Deere is

saying, and there's also no support for what Dr. Potter is

saying.

Now, plaintiffs refer to Dr. Wong who is not our

expert.  So for the purpose of this, the defendant-intervenors

can't be collapsed into one entity.  In fact, our expert,

Dr. Perryman, has testified why the statement of Dr. Wong is

not reliable and should not be used to counteract the

statements of Dr. Potter.

And my colleague, Mr. Hallward-Driemeier, has

more on that with his portion of the argument.

So, Your Honor, these two expert reports don't

meet the standards for expert testimony.  They should be

excluded; and at the very least, they are part of a serious

dispute over material facts that would preclude summary

judgment on these questions.

THE COURT:  Mr. Feigenbaum, do you have a dog in this

fight?

MR. FEIGENBAUM:  Thank you, Your Honor.

New Jersey is deferring to the DACA intervenor

defendants and their counsel for discussing this motion.  We

agree with them and we agree that the evidence presented in

this will ultimately go to both Mr. Hallward Driemeier's motion

and the plaintiff state's motion.  We shouldn't be relying on

those experts.

THE COURT:  All right.  Mr. Coghlan, you or Mr. Hu want

1    to weigh in?

2          MR. COGHLAN:  Just briefly, Your Honor.

3                Your Honor, as defendants at the outset of this,

4    the federal defendants have pointed out they disagree that this

10:38AM  5    Court has *parens patriae* standing, but we also recognize the

6    Court has found that.

7                But on the standing issue, Your Honor, you know,

8    the federal defendants' view is that even if these experts are

9    excluded there, that would not change the Court's analysis as

10:38AM  10   previously ruled.  It's noted that it relied on Dr. Wong's

11   statements and finding that there was standing and so federal

12   defendants' view is that it would not necessarily change the

13   Court's analysis regardless of its --

14         THE COURT REPORTER:  Regardless of its?

10:39AM  15   MR. COGHLAN:  Regardless of its ultimate decision on

16   these experts.

17                But we also agree with counsel for Texas that the

18   Court can grant whatever weight it determines appropriate as to

19   each of their testimony.

10:39AM  20   THE COURT:  Okay.  All right.  Let's shift over then

21   and talk about standing.  Is it Hayward?  Hallward?

22         MR. HALLWARD-DRIEMEIER:  It's Hallward-Driemeier, a

23   mouthful if ever there was one.

24         THE COURT:  I'm missing an "I" on the "meier" part.  I

10:39AM  25   had a cheat sheet here and I was trying to read it.

1    MR. HALLWARD-DRIEMEIER:  It is hard enough when it is

2    spelled correctly.  It is even more difficult when not.

3            Well, I'm happy to be following Ms. Perales

4    because I'll certainly rely on much of what she said and

10:40AM  5    incorporate it into my own arguments.

6            I have three primary points.  The first is how

7    the standing issue differs from the Court's earlier decision in

8    the DAPA case, the Fifth Circuit's decision in the DAPA case.

9            The second is how the standing issue now differs

10:40AM 10    from the Court's decision on the preliminary injunction

11    decision.

12            And the third is how it differs from

13    *Massachusetts v. EPA*.  Those generally map on to the driver's

14    license cost, the DAPA decision.  The health care and schooling

10:40AM 15    costs, that's the PI.  And then the sort of *parens patriae*

16    issue or the special solicitude, that's the *Massachusetts*

17    decision.

18            Starting with driver's licenses, both this Court

19    and the Fifth Circuit specifically relied on the very concrete,

10:41AM 20    specific evidence that was provided in the DAPA litigation

21    about a direct cost to the State of Texas as a consequence of

22    DAPA and that was estimated in declarations to be between 130

23    and 170 --

24            Yes, Your Honor.

10:41AM 25            THE COURT:  (Addressing the court reporter.)  He's

1    saying "DAPA" with a D-A-P-A as opposed to "DACA."

2          THE COURT REPORTER:  Thank you.

3          MR. HALLWARD-DRIEMEIER:  Thank you, Your Honor, for

4    that clarification.  The record will be much better for it.

10:41AM   5          So in the Fifth Circuit's decision, the Court of

6    Appeals specifically said that it was only relying on that very

7    specific evidence of a very direct cost and that's at 809 F.3d

8    at Page 150.

9          Here by contrast, although it was initially pled

10:42AM  10    in the complaint, the plaintiffs have specifically disavowed

11    that they are making that argument relying on that evidence in

12    this case.  There was initially a document that was submitted

13    that included some of the declarations from the DAPA

14    litigation, but the Court granted our motion to exclude those

10:42AM  15    undisclosed witnesses and that was Docket 318.

16          And I'll note also that at Docket 105 at Page 3,

17    the plaintiffs specifically represented that they were, quote,

18    not relying on the Peters declaration in support of their PI.

19    So the specific cost that was relied on by the Court in that

10:42AM  20    litigation is not present here.

21          At the PI stage, the Court did rely on some

22    different types of expenses and those related to health care

23    and education.  Now, I'll note that in the DAPA litigation the

24    Court did not find those costs to be supportive of standing

10:43AM  25    because the Court noted that they were indirect damages and

1     moreover that they were not caused by DAPA and that's at 86

2     F.Supp.3d at 634.

3          THE COURT:  Of course DAPA hadn't been enacted at that

4     point.  It wasn't in existence.

5          MR. HALLWARD-DRIEMEIER:  That's true.  There was yet

6     another problem of speculation at that time.

7               But primarily the Court was relying on the fact

8     that those costs, health care and education, derived from the

9     presence of the individual rather than their lawful presence

10    and as a consequence there was both a causation and

11    redressability problem with relying on that and that's again at

12    Page 634 and 635.

13         THE COURT:  What do I do with -- and I'll ask the same

14    question I asked Ms. Perales and Mr. Disher a minute ago.  And

15    throughout the briefing, the intervenors' attack on the States'

16    evidence has been, well, you've got evidence of what illegal

17    immigrants may cause but you haven't split them out between

18    DACA and immigrants, other immigrants.

19              What do I do with the fact that Mr. Disher comes

20    back and says, well, if the -- under his take care claim, if

21    the federal government was doing what the INA told them to do,

22    there wouldn't be either one of them here and we would save all

23    of that money?

24         MR. HALLWARD-DRIEMEIER:  Well, Your Honor, with respect

25    to that claim, as we've noted in our papers, Congress only

1   appropriates enough resources for the government to remove a

2   very small fraction of the some 11 to 12 million undocumented

3   immigrants in the country in any given year.

4           And so it's not a failure to take care when

5   because of the appropriations that are available, the executive

6   by necessity has to prioritize among those --

7           THE COURT:  And let's say I agree with that argument.

8   I can tell you the judiciary wishes they would have

9   appropriated more money to us.  We would have better acoustics

10  in this courtroom.

11          But doesn't that play into them saying, okay,

12  that's fine and good.  They're not going to deport or remove

13  these people, but we still have to pay all the costs for them.

14          I mean, you can't have your cake and eat it too.

15  You can't say they're going to stay if DACA is removed and

16  there's not -- but there's not a cost involved in that.

17          MR. HALLWARD-DRIEMEIER:  Well, Your Honor, just to be

18  clear, my argument is that there's not a cost to their

19  presence.  Of course we believe that the overall benefits

20  outweigh the costs.

21          THE COURT:  No, I understand that.  That's very clear

22  from your briefs.

23          MR. HALLWARD-DRIEMEIER:  But with respect to costs,

24  we're not disagreeing that there are costs of presence,

25  although that has not been identified by any of their

1    witnesses.  They specifically disclaim tracking that or having

2    any idea of what that amount would be.  That was Smoot and

3    Lopez.  Smoot with respect to health care and Lopez with

4    respect to education specifically said they did not track DACA

5    recipients.  They did not have an idea what that number would

6    be.

7              But with respect --

8              THE COURT:  Well, it's impossible for them to do that,

9    isn't it?

10             MR. HALLWARD-DRIEMEIER:  Well, it would not be

11   impossible if they were to track who was a DACA recipient and

12   who was not.  They don't because --

13             THE COURT:  Well, they don't know who is and who isn't.

14             MR. HALLWARD-DRIEMEIER:  Well, Your Honor, they're the

15   party bringing the case.  They have the burden of demonstrating

16   their standing.  They are the ones that have to come forward

17   with that evidence and they have not.

18             But my point earlier that I was making was that

19   it was the same point that this Court made in the DAPA

20   litigation, that there was a failure of proof as to causation

21   and remedy because at most what the States had shown was that

22   there was a cost associated on average perhaps or

23   hypothetically with respect to some of presence and the

24   elimination of DAPA would not address those individuals'

25   presence in the state.

1          *Plyler versus Doe* says that the State has to

2     educate the student-age population whether they are here

3     lawfully or not.  So those students, if they are here, are

4     going to be educated whether DACA exists or is set aside and

10:48AM  5     so --

6               THE COURT:  But if they're not here?

7               MR. HALLWARD-DRIEMEIER:  Well, Your Honor, so that

8     goes -- there are several arguments that we would make with

9     respect to that.

10:48AM  10               You're right to say that the State -- that Texas

11     tries to fill the gap by suggesting that they would

12     self-remove.

13               THE COURT:  Or the government could remove them.

14               MR. HALLWARD-DRIEMEIER:  Well, Your Honor, of course

10:49AM  15     the idea that the government would remove, we've already noted

16     that the government's resources are only sufficient to remove a

17     very small percentage.  Your Honor --

18               THE COURT:  But I agree with that, but that doesn't

19     lessen the burden on the States, does it?

10:49AM  20               MR. HALLWARD-DRIEMEIER:  Well, it lessens --

21               THE COURT:  I mean, they still have to educate those

22     people because the Supreme Court has told them they have to do

23     it.

24               MR. HALLWARD-DRIEMEIER:  What it does, Your Honor, is

10:49AM  25     it breaks the chain of causation between their costs and the

1  existence of DACA and it breaks the argument that they have

2  with respect to --

3      THE COURT:  Why?  That I'm not following.  Why does

4  that --

10:49AM  5      MR. HALLWARD-DRIEMEIER:  Because DACA is not

6  responsible for their presence.  If the cost is a consequence

7  of the student's presence and DACA --

8      THE COURT:  Tell me how it's not responsible for their

9  presence because it gives them legal presence and so they're

10:49AM  10  not being removed, in theory at least, because they have DACA

11  status.

12      MR. HALLWARD-DRIEMEIER:  No, Your Honor.  And I go back

13  to the Court's own analysis in the DAPA litigation.  Absence of

14  DACA does not equate to the federal government removing those

10:50AM  15  individuals.  In fact, every piece of evidence would suggest

16  that they would not be removed.

17          Why?  Because, again, the federal government has

18  to prioritize and these individuals are the ones that would be

19  least prioritized and that's because they are in school,

10:50AM  20  they're just --

21      THE COURT:  No.  I agree with you on that.  But doesn't

22  that -- setting aside the standing, isn't the argument you just

23  made, doesn't that prove his take care claim?  I mean, you're

24  just arguing their take care claim for them.

10:50AM  25      MR. HALLWARD-DRIEMEIER:  No, Your Honor.  Again, I

think not.  And I go back to the fact that there is not enough
appropriated at Congress for the executive to remove all
persons who are not here lawfully or even a substantial number
of them.

10:51AM       THE COURT:  Is that the State's fault though?  You see,
the problem is that's all in the province and the federal
government is saying, States, you can't do this.  You can't
deport people.  You can't have your own immigration laws.  You
can't make presence in the state illegal.  I mean, all this has
10:51AM   been basically -- I'm using the word "preempted," but that's
probably an incorrect usage of the word.

But it's all been gobbled up by the federal
government because they've said, okay.  Immigration is a
federal -- you know, it's their deal.  They can run it.
10:51AM   States, you can't run it.

So when you say -- and this is not a rhetorical
question; this is a question.  When you say, okay.  We don't
have the money to do it even though their presence causes the
States damage, for a standing argument, doesn't that give them
10:51AM   damage?

MR. HALLWARD-DRIEMEIER:  Well, so, Your Honor, I would
like to separate two things out here and maybe I'll jump right
now because it seems most responsive to your question to the
*parens patriae* or special solicitude type of arguments that
10:52AM   they're making in reliance on *Massachusetts v. EPA*.

1          I think we all agree and I think it's evident in

2     Your Honor's PI opinion that *Massachusetts v. EPA*, first of all

3     is very unclear exactly what its holding is; and secondly I

4     would posit -- and I think I see some recognition of this in

10:52AM  5     Your Honor's opinion -- that that is the outer bounds.  The

6     majority of the Supreme Court now is not going to take it any

7     further.

8          And *Massachusetts v. EPA* does not support

9     standing by Texas --

10:52AM 10          THE COURT:  Haven't they taken it further with all

11     these cases against the Trump administration?

12          MR. HALLWARD-DRIEMEIER:  Your Honor, no.  There are

13     specific --

14          THE COURT:  I mean, I was hoping -- when I heard

10:52AM 15     Roberts was writing the *Regents* opinion, I was hoping it would

16     be on standing, but it wasn't.

17          MR. HALLWARD-DRIEMEIER:  Well, there's a difference

18     when a particular school has particular students in which it's

19     invested and those are going to be taken.  That's a very

10:53AM 20     different notion than the *parens patriae* standing.  That's a

21     direct harm -- the type that this Court identified in the DAPA

22     litigation, the Fifth Circuit did.  It's not *parens patriae*.

23          When you're talking about *parens patriae*, both in

24     *Massachusetts v. EPA*, the Court talked about it as a harm that

10:53AM 25     affects the State as a whole.  In that instance it was the

1    State's sovereign territory.  Literally its boundaries were

2    washing away, its coastline.

3          In the *Alfred Snapp* case, it refers to an injury

4    to the residents of the state in general.  But in here so if

10:53AM  5    you're talking about that, well, then you do have to look at

6    what is the harm to the State in general?

7          And the Supreme Court's decision in the *Regents*

8    case actually directly contradicts that.  In *Regents*, the Court

9    stresses the benefit of DACA to the State as a whole.  It notes

10:54AM 10   that the consequences of rescission would radiate out to

11   families including citizens, U.S. citizen children, to the

12   schools that these recipients attend; to the health care

13   providers --

14         THE COURT:  But isn't their argument just the flip side

10:54AM 15   of that?  Isn't their argument that that's the cost?  We have

16   the cost of that to the school; you know, to our general

17   population.

18         Go ahead.  I'm sorry.

19         MR. HALLWARD-DRIEMEIER:  Well, again, if we're talking

10:54AM 20   about the sort of state as a whole, what DACA -- what the

21   *Regents* decision talks about is that rescinding DAPA would

22   constitute a loss of 215 billion in economic activity, 60

23   billion in federal taxes, and one and a quarter billion in

24   state taxes.

10:55AM 25         So there's not an injury to the state as a whole

1    from DACA.  In fact, this is an instance of the State cutting

2    off its nose to spite its face in order to litigate a policy

3    difference with the federal government and that has never been

4    upheld as a basis for *parens patriae* standing.

5              So I think with respect to *parens patriae,* the

6    type of injury they assert is not the type that has ever been

7    recognized.  In fact, the Supreme Court's decision in *Regents*

8    suggests that there's a benefit to the State as a whole.  They

9    are trying in effect to assert an interest as between

10   individuals.

11             Even if you assume that there are some

12   individuals who lose out in the job to others, there are many,

13   many people in the state of Texas who benefit from it and

14   that's never been a situation where *parens patriae* standing has

15   been allowed.

16             But with respect to, again, going back to these

17   questions of the health care costs, the education costs and the

18   like, what the State is assuming, what its declarants have

19   assumed, is that the loss of work authorization means they

20   would depart the United States and that's what Dr. Potter

21   testified.

22             But there's no basis for that as Ms. Perales

23   discussed at length.  There was assumption upon assumption upon

24   assumption.  And specifically when Dr. Potter was asked how

25   many, you know, anywhere between two and all, he said to say

1    anymore, quote, would be speculation.  And that's at Page 878

2    of Document 225-5.  So there is no basis upon which to conclude

3    that people would depart.

4              But there's more that I would want to emphasize.

5    Two things more.  The first is that the *Regents* decision itself

6    further undermines any such assumption of causation and that's

7    because it stresses that there's a difference between the

8    benefits and forbearance of removal and so one can't assume

9    that there would be removal of individuals even if they lost

10   the work authorization.

11             And furthermore there's no reason to think that

12   those individuals, now that they know that, would self-remove.

13        THE COURT:  Why can't a witness or a Court for that

14   matter assume that the law will be complied with?

15        MR. HALLWARD-DRIEMEIER:  Well, Your Honor, we're

16   dealing with a population that is already present without

17   documentation and the question is whether they would

18   self-remove.

19        THE COURT:  Or not self-remove but be removed.

20        MR. HALLWARD-DRIEMEIER:  Well, Your Honor, we know from

21   history that the federal government does not have the resources

22   to remove all of the individuals and so they're not going to be

23   removed.  And this was precisely why the Court found there was

24   a lack of causation and redressability in DAPA.

25             And I want to point out one other thing and that

1    is even if one assumes that some people -- now, of course, they

2    rely on Professor Wong's survey for this.  Dr. Perryman or

3    Mr. Perryman had pointed out the flaws in the methodology in

4    terms of the way the survey was built.  We don't believe that

10:58AM  5    that is reliable and we certainly don't believe there's a basis

6    for summary judgment there because that would have to be put to

7    I think the witnesses' testimony and cross-examination but

8    certainly we have challenged that conclusion.

9             But even if one were to take that for granted, it

10:58AM  10    matters who would self-remove because Mr. Potter -- Dr. Potter

11    in his own deposition testimony acknowledged that families with

12    young children who are enrolled in school would be less likely

13    to remove themselves and so you're not going to see a

14    diminution in education expenses.

10:59AM  15             He said that the individuals who would be more

16    likely to self-remove might be college graduates.  Well, the

17    college graduates are not the ones who are relying on Texas's

18    emergency health care expenditures.

19             So there's a dissonance between who might, even

10:59AM  20    in speculating, self-remove and what the costs are that Texas

21    says it is incurring.  And so therefore this is both

22    contradicted.  It is contrary to what -- the premise of this is

23    contrary to what the Supreme Court said in *Regents* in terms of

24    equating loss of work authorization and departure or removal

11:00AM  25    from the United States.

1          And finally it assumes that the departures, even

2    if they were to happen, are evenly distributed whereas what we

3    know is that the ones who would stay are the ones who are more

4    likely causing any costs if there are any.

11:00AM  5          So I think for all of those reasons, Texas has at

6    the very least failed to carry its burden in its summary

7    judgment and we believe we have, in fact, carried our burden

8    for summary judgment on those issues.

9          THE COURT:  All right.  Mr. Feigenbaum, do you want to

11:00AM 10   weigh in on that?

11         MR. FEIGENBAUM:  Yes.  Thank you, Your Honor.

12         THE COURT:  I'm going to let you go and them go and you

13   can both beat up on Mr. Disher and then I'll let Mr. Disher go.

14         MR. FEIGENBAUM:  I think he can handle that.

11:01AM 15         So I just have three quick points understanding

16   that the counsel for DACA intervenors have covered the majority

17   of their motion just to respond to some of the questions that

18   Your Honor had about this issue.

19         So first on causation and redressability, again,

11:01AM 20   I think that Mr. Hallward-Driemeier hopefully identified that

21   the question is not about whether or not someone here has

22   lawful presence, but whether or not they're simply going to

23   remain in any of the plaintiff states.

24         And as a result, the question as a fact matter is

11:01AM 25   whether or not they're likely to still be there even if the

1  plaintiff states prevail and there is some sort of relief or

2  injunction entered against DACA.

3          And we think that the record is insufficient to

4  demonstrate that, certainly for them on summary judgment, in

11:01AM  5  favor of the DACA intervenors in the other direction because

6  they're not challenging the failure of Congress to appropriate

7  sufficient money in order to remove everyone.

8          Your Honor had, I think, some helpful questions

9  that got to, well, is there some sort of take care problem with

11:01AM  10  the fact that not everyone who is here without documentation

11  could ultimately be removed and as everyone agrees, it's just a

12  real fraction of that.

13          But of course the answer to that question,

14  whether there's a take care problem with the lack of

11:02AM  15  appropriation would be a resounding no, which is why plaintiff

16  states aren't bringing them here.

17          Congress all the time does not appropriate enough

18  money to enforce the law against all individuals who may be

19  violating it, whether that's in the immigration context,

11:02AM  20  whether that's in the drug context, whatever sort of law

21  enforcement context you want to pick.  It's never a take care

22  problem that Congress has not appropriated enough money to

23  fully remedy whatever perceived violations of the law or actual

24  violations of the law there may be.

11:02AM  25          But that's the hook that would tie to whether or

1    not someone is actually remaining in plaintiff states in

2    violation of the law is whether there's actually going to be

3    the enforcement apparatus and the funding to remove them.

4                So I think that helps to explain where there is a

11:02AM  5    break sufficient for the causation and redressability prong,

6    that's different between what DACA does and what the failure to

7    appropriate does and as a result why there may be standing on

8    these facts to go after the appropriations themselves and the

9    failure to appropriate enough money.  But again there's just no

11:03AM 10    constitutional or legal claim against that decision by

11    Congress.

12                The second point, and I think maybe New Jersey is

13    well situated to talk about this one, is that we think this

14    isn't at all like *Regents*.  I heard Your Honor ask, well, if

11:03AM 15    there was standing in a case like *Regents,* doesn't there sort

16    of have to be standing in a case like this?

17                But I think there's plenty of examples all the

18    time where you would have standing in one situation but not

19    standing in another.

11:03AM 20                So, for example, in the employment context if

21    someone is applying for a job and doesn't get it and they think

22    they were discriminated against in that process, they clearly

23    have standing in order to bring the Title VII claim about

24    whether or not they should have gotten the job.  Whether or not

11:03AM 25    they win will be a separate issue.

1          If someone else says, well, you hired Person X

2     and so I'm suing because you hired Person X, that's a very

3     different inquiry and you may not have standing to challenge

4     Person X's hiring if the defendant can show as a matter of fact

11:04AM   5     that actually you wouldn't have been hired anyway.

6          THE COURT:  Let me ask you a question because you raise

7     an interesting point.  Let's say you and I are in an accident

8     and I caused the accident and you sued me and my defense is you

9     weren't hurt, all right?  Is there a difference in the fact

11:04AM   10    that you have standing to sue me but maybe I win on causation

11    and damages?  So is there a difference between -- are you

12    really arguing causation or are you really arguing standing?

13         MR. FEIGENBAUM:  So I think that it depends.  I mean

14    obviously we think that causation is part of the broader

11:05AM   15    standing just like the injury prong.  So I think with that

16    hypothetical, you're positing someone that doesn't show any

17    injury whatsoever and we think of course that the DACA

18    intervenor counsel has walked through why there hasn't been a

19    substantiated injury at all.

11:05AM   20         My point is even if you think there might be an

21    injury, maybe you're pointing to the wrong thing; so maybe the

22    analogy to use the car example --

23         THE COURT:  That was probably a bad analogy really.

24         MR. FEIGENBAUM:  No.  I wanted to do that thing lawyers

11:05AM   25    do where they modify it in the way it helps them.

1            But ultimately I think the point here even if you

2     think there may be some tangible injury from a DACA recipient

3     remaining in the country and remaining in plaintiff states,

4     there need to be facts that show that that is linked to DACA

11:05AM   5     itself.

6            And given the lack of appropriations and given

7     what we all agree is true in this case as a matter of fact

8     which is that there cannot possibly be enough people that would

9     be removed to meet the entire population of undocumented

11:06AM   10    individuals -- adults or who arrived here as children -- that I

11    think that does become more of a causation and redressability

12    problem.  We're not really talking about DACA.  We're really

13    talking about the appropriations.

14           And then the third point that I wanted to make

11:06AM   15    just briefly is that whatever this Court ultimately concludes

16    about the standing motion itself -- and we'll get to this when

17    we talk about the remedy at the end of the last motion that

18    we're talking about -- but I do think it should also bear on

19    the remedy that this Court keeps in mind at the end of the day

11:06AM   20    is the substantiation of harm and the fact that we think there

21    hasn't been any showing of injury, let alone one caused by DACA

22    itself; but certainly that this case, I think, differs in kind

23    from the degree of harm that the states are trying to show,

24    both in the number of plaintiff states that are before

11:06AM   25    Your Honor but also in how many of them are trying to show harm

1    and the kind of harm they're trying to show.

2            So wherever this Court ultimately comes down on

3    the standing motion, we do believe the DACA intervenors' motion

4    should be granted.  We think it also will bear on the remedy as

11:07AM  5    well.

6            THE COURT:  Okay.

7            MR. FEIGENBAUM:  Thank you, Your Honor.

8            THE COURT:  Mr. Coghlan, anything from the federal

9    side?

11:07AM 10            MR. COGHLAN:  Very briefly, Your Honor.

11            As I suggested before, the federal defendants'

12    view is that the issues on standing that are before the Court

13    now are essentially the same as they were when we were in the

14    preliminary injunction phase, which the Court already addressed

11:07AM 15    and the ruling noted that there need not be a substantial

16    demonstration of injury, only some injury.

17            So, you know, the federal defendants' view is

18    that the facts have not materially changed in a way that would

19    affect the Court's prior analysis and we recognize that.

11:07AM 20            THE COURT:  Thank you.

21            All right.  Mr. Disher, do you want to defend

22    yourself?

23            MR. DISHER:  Thank you, Your Honor.

24            The defendant intervenors are essentially asking

11:07AM 25    this Court to judicially codify the one-way ratchet theory of

1    federal rights and benefits.

2              As the Court is well aware, states across the

3    country have sued repeatedly over attempted rescissions or

4    modifications to the DACA program.  No Court in the country has

11:08AM  5    ever denied states standing to sue over the rescission or

6    modification of DACA and yet they ask this Court to find that

7    these plaintiff states here do not have standing to challenge

8    the creation of the program.

9              In other words, the determination or modification

11:08AM  10   of that program can be challenged; but the creation of it,

11   according to them, cannot be challenged by a state.

12             And I would simply posit that that is not what is

13   required here and the plaintiff states absolutely have standing

14   to challenge the very thing that created their injury and their

11:08AM  15   harm.

16             As to the *Regents* opinion, all of the arguments I

17   heard about the *Regents* opinion may apply or might apply if

18   standing, as this Court is aware, was an accounting exercise,

19   but it is not.

11:08AM  20             So all we have to do under binding Fifth Circuit

21   precedent is prove some scintilla of injury and we certainly

22   have done that, not only with our evidence but the evidence

23   that the defendant-intervenors have introduced themselves.

24             Of course, Your Honor will recall the

11:09AM  25   cost-benefit analysis from Dr. Perryman, who in doing that had

to find not only the benefits but the costs and he estimated

the costs to Texas alone providing social services to DACA

recipients was over $250 million a year.

That cost-benefit analysis was used at the

preliminary injunction stage, and it continues to be used today

in the DACA intervenors' response to our motion for summary

judgment.

Regarding New Jersey's arguments, I would just

simply note that New Jersey in all of its written briefing in

the case has not challenged our standing to bring this claim.

They certainly challenge us on the merits, but they have not

ever alleged in their briefing that we lack standing because it

would be certainly an odd position for New Jersey to argue that

they have an interest in this case in order to intervene and

yet the plaintiff states don't have the sufficient interests to

support their standing to bring these claims in the first

place.

To this Court's point about the take care clause

claim, we agree with this Court that it proves the take care

clause claim, but it also proves the substantive and procedural

violations of DACA as well.

Yes, there are limited funds to remove certain

individuals; but what the federal government has done here is

say there is a class of individuals; we may or may not have

resources to remove them.  But instead what we are going to do

1    is grant them lawful presence to remain.

2              And I heard the counsel for DACA intervenors say

3    DACA is not responsible for their presence.  DACA, in fact, is

4    what grants them lawful presence; and so, of course, we have

11:10AM  5    standing to challenge that grant as being unlawful pursuant to

6    Congress's duly enacted statutes.

7              We as states do not have the power to enforce

8    immigration or remove anybody from our states so we have to

9    rely on the federal government to do that and the federal

11:11AM  10   government's actions are controlled by Congress and its duly

11   enacted immigration schemes.

12             And what the federal government or -- excuse me.

13   What the executive branch has done is basically rewrite those

14   congressional mandates and doing so does indeed support our

11:11AM  15   injury to bring this claim.

16             THE COURT:  Thank you, Mr. Disher.

17             MR. HALLWARD-DRIEMEIER:  May I respond?

18             THE COURT:  You may.

19             MR. HALLWARD-DRIEMEIER:  Thank you, Your Honor.

11:11AM  20             A few points.  Let me start with the one-way

21   ratchet.

22             The states in the instance of challenging the

23   rescission of DACA were able to show the kind of very direct

24   particularized costs to the state that Texas showed in the DAPA

11:12AM  25   litigation but does not have here.

1    Specifically if the DACA recipients lose their

2    work authorizations and lose the health care that they have

3    privately as a consequence of their employment and then have to

4    rely instead on emergency, that would be an additional cost to

11:12AM 5    the State.  That does not support the conclusion that Texas

6    would like the Court to draw because Texas's theory of --

7    THE COURT:  You're assuming when you say that that they

8    all have health care.

9    MR. HALLWARD-DRIEMEIER:  Well, Your Honor, what we are

11:12AM 10   talking about is the loss of work authorization.

11   THE COURT:  I know, but if they're not working.  DACA

12   doesn't require them to work.

13   MR. HALLWARD-DRIEMEIER:  No, but they showed a specific

14   number of people who were working and as a consequence had

11:12AM 15   private insurance and would lose that insurance, that was a

16   direct injury that they were able to demonstrate.

17   THE COURT:  Well, wouldn't the direct injury be if

18   they're not working?  Wouldn't they have to cover those

19   people's health care?

11:13AM 20   MR. HALLWARD-DRIEMEIER:  Again, this goes to the point

21   earlier, the difference between presence and lawful presence.

22   The health care costs of those who are not

23   working and relying on the emergency system is because those

24   individuals are present.  It does not have to do with whether

11:13AM 25   they are or not lawfully present.

1          In fact, being lawfully present, to the extent

2     that it has a consequence, some are able to obtain work

3     authorizations and employment reduces --

4          THE COURT:  But aren't you essentially saying that the

11:13AM 5     DACA recipients, if DACA goes away, are just going to violate

6     the law and stay?  I mean, that's your argument.

7          MR. HALLWARD-DRIEMEIER:  Your Honor, am I arguing that

8     they're going to stay?  Yes.

9          THE COURT:  Okay.

11:13AM 10          MR. HALLWARD-DRIEMEIER:  The evidence is that they have

11     stayed.  They have been here.  In fact, they have to have been

12     here since 2007.

13          THE COURT:  Right.

14          MR. HALLWARD-DRIEMEIER:  They were here for years

11:14AM 15     before DACA existed; and as a consequence, it is a fair

16     conclusion that they will stay.  And because they are present,

17     there may be costs associated with that, but they are not

18     attributable to DACA.  In fact, they will increase if DACA is

19     rescinded.  So the State is again -- the State is not

11:14AM 20     proclaiming to remedy and rectify costs.  It's going to

21     self-impose additional costs.

22          Counsel for the government suggested that we're

23     here at the same as the PI.  No.  At the preliminary injunction

24     stage, the Court said that it was accepting the States'

11:14AM 25     allegations with respect to our motion to dismiss and also

1  noted that it was, quote, not deciding the motion on the

2  merits.

3       Now Texas is asking you to decide the question on

4  the merits, and it doesn't have the evidence to support it.  It

11:15AM  5  suggests that -- Your Honor asked the question, I think, about

6  whether causation is sort of part of this jurisdictional

7  inquiry or part of the merits.

8       Here, the oddity of an APA claim is that

9  causation is not part of their ultimate merits claim.  It is

11:15AM  10  part of the standing inquiry.

11       So that's the point at which we have to decide

12  that issue and they have to come forward at the motion for

13  summary judgment stage with evidence to support it.

14       They didn't do so; but at the very least, our

11:15AM  15  experts and declarants contest the evidence and would preclude

16  summary judgment.

17       And then finally on the take care claim, the take

18  care clause claim is not an APA claim; so to the extent that

19  the Court believes that the APA cause of action special

11:15AM  20  solicitude under *Massachusetts,* et cetera, is the hook for

21  standing, that would not cover the take care clause claim.

22       THE COURT:  Wait.  Why?

23       MR. HALLWARD-DRIEMEIER:  Because it's not an APA claim.

24       THE COURT:  No.  I agree with that.

11:16AM  25       MR. HALLWARD-DRIEMEIER:  So in *Massachusetts v. EPA,*

1   the Supreme Court -- and, again, what I think is sort of the

2   outer edge of this notion of special solicitude and --

3            THE COURT:  You're singing my song.

4            MR. HALLWARD-DRIEMEIER:  Well, Your Honor, for

11:16AM  5   11 years --

6            THE COURT:  I wish there were more than just you.

7            MR. HALLWARD-DRIEMEIER:  -- sang that song repeatedly.

8   I wish they were singing it still.

9                 But the fact is that there the Court relied on

11:16AM  10   the fact that the Clean Air Act had specifically provided a

11   cause of action for the procedural harm.

12            THE COURT:  Right.

13            MR. HALLWARD-DRIEMEIER:  And to the extent that the

14   Court believes that the APA provides a claim of that nature

11:16AM  15   here, we don't think it does; but it certainly would not

16   support the take care clause claim which is a constitutional

17   claim which does not have to do with DACA.  It has to do, as

18   Your Honor has said, with the fact that these individuals are

19   here and not being removed.  So I think there's a disconnect.

11:17AM  20            THE COURT:  Why don't they have -- let's say they can't

21   prove an APA standing.  Don't they have take care standing?

22            MR. HALLWARD-DRIEMEIER:  They would have to show

23   Article III standing to bring a take care clause claim --

24            THE COURT:  Right.

11:17AM  25            MR. HALLWARD-DRIEMEIER:  -- and they have not because

1    they don't have a direct injury and we've never seen the sort

2    of novel theories that they have about special solicitude or

3    *parens patriae.*

4              Of course, there's Supreme Court precedent that

11:17AM   5    says *parens patriae* is not a basis for bringing a suit against

6    the United States.  Clearly -- it's certainly never been a

7    basis of a suit against the United States for a constitutional

8    claim.

9              THE COURT:  Well, the interpretation of that by the

11:17AM   10   Supreme Court has basically been you can't sue the

11   United States for something they're doing, but you can sue them

12   to make them comply with their own law.

13             MR. HALLWARD-DRIEMEIER:  Well, Your Honor, with respect

14   to a statutory -- specific statutory command.  But the idea

11:18AM   15   that the take care clause has that kind of specificity to give

16   a cause of action -- I've never heard of the idea that that was

17   just a generalized cause of action that the State can bring

18   whenever it thought that the federal government wasn't doing

19   its job.

11:18AM   20             THE COURT:  I mean, setting aside the Clean Air Act,

21   that's essentially what they did in *Massachusetts versus EPA.*

22             MR. HALLWARD-DRIEMEIER:  But they did not rely on that.

23   They relied on a specific cause of action that Congress had

24   created based upon the procedural harm that was critical to the

11:18AM   25   Court's analysis there.

1           And if I haven't said it before, I do want to

2      stress Mr. Perryman's supplemental declaration which stress

3      that this 250 million figure that has been thrown around there

4      was something that was assumed for purposes of analysis that

11:19AM  5      showed that even if you assumed costs, the benefits were

6      greater.  He specifically said he did not study to determine

7      whether there were any costs of DACA and that he was unaware of

8      any studies that had been done to do that.

9           And of course we know that when plaintiffs'

11:19AM 10      declarants were asked about this status claim, that they had

11      never done such a study either.

12           It is the burden of the plaintiffs as movants for

13      summary judgment to come forward with evidence to support their

14      theory of injury and they have not done so; but at the very

11:19AM 15      least, whatever evidence there is, it's contested and would

16      preclude summary judgment.

17           THE COURT:  All right.

18           MR. DISHER:  Your Honor, I forgot to make one point;

19      and I'll be real brief.  I promise.  And if he wants to

11:19AM 20      respond, I certainly won't object to that.

21           Just one brief point to make.  I would just

22      simply point the Court back to Footnote 45 of your preliminary

23      injunction order talking about the redressability analysis to

24      vindicate a procedural right.

11:20AM 25           Of course, the Fifth Circuit in *Texas I* said

1   Texas had satisfied the third standing requirement,

2   redressability, in joining DAPA based on the procedural APA

3   claim could prompt DHS to reconsider the program which is all a

4   plaintiff must show when asserting a procedural right.

5         When Your Honor rules on our motion for

6   preliminary injunction, DHS was subject to no less than two

7   preliminary injunctions as well as a final order from the DC

8   Court.  That is no longer the case today, especially since the

9   Court in the Eastern District of New York vacated the Wolf and

10  the Edlow memos.

11        As we have laid out, DACA is now back in full

12  effect as it was when it was first issued in 2012 via the memo;

13  therefore, the Fifth Circuit's statement here about addressing

14  its procedural APA claim absolutely applies to this case now

15  given the posture that it is in.

16        So I would direct the Court to Footnote 45 and

17  note that we are now in a different spot for the purposes of

18  that footnote than we are today.

19        MR. HALLWARD-DRIEMEIER:  With respect, Your Honor, in

20  the *Texas I* case, the APA case, the redressability was that if

21  there was no work authorization, that lawful presence was

22  rescinded, then they would not be eligible for the driver's

23  license.  That was a very direct, just setting it aside, we

24  eliminated that cost.

25        Here, in order to show redressability, they have

1    to go through the self-removal theory and that is where we

2    contest that they have provided any evidence, much less summary

3    judgment evidence.

4                 With respect to the government's position,

11:21AM   5    Your Honor last time suggested it was not going to be swayed by

6    what is or is not going on in other courts which may or may not

7    be temporal, although the Wolf and Edlow memos have been set

8    aside, the government has indicated that it may appeal that

9    or -- and of course that would be one way to resolve it.  The

11:22AM  10    other way would be simply to have somebody appointed with

11    authority to enter the same.

12                 What's clear from *Regents* --

13          THE COURT:  Okay.  Somebody at DHS you're talking

14    about?

11:22AM  15          MR. HALLWARD-DRIEMEIER:  Yes, somebody at DHS.

16                 What's clear from *Regents* is that that is a call

17    for the United States to make and for DHS to make and that that

18    is a decision that must be made with an eye toward the reliance

19    interests as well as noting the difference between any benefits

11:22AM  20    that might flow from simple forbearance, which is the presence

21    as opposed to the lawful presence.

22                 So *Regents* emphasizes that presence does not go

23    away even if DACA goes away.  *Regents* also stresses that more

24    is within the discretion of DHS.

11:23AM  25                 And I don't think that it's the proper response

1    to the Court's order in *Batalla Vidal* to direct the government

2    now to take some action when the government could simply cure

3    that problem by a proper appointment.

4            Thank you.

11:23AM 5    THE COURT:  All right, Mr. Disher.  Let's turn to the

6    merits.  That would be your motion.

7            MR. DISHER:  Thank you, Your Honor.

8            As this Court is aware, no president, Democrat or

9    Republican, can override Congress's duly enacted law and yet

11:23AM 10   that is exactly what the Obama administration did with the 2012

11   DACA memorandum.

12           What's worse, President Obama admitted as much

13   himself.  Before his administration created DACA, he said,

14   quote, there are enough laws on the books by Congress that are

11:23AM 15   very clear in terms of how we have to enforce our immigration

16   system that for me to simply through executive order ignore

17   those congressional mandates, that would not conform with my

18   appropriate role as president.

19           His administration issued the 2012 DACA

11:24AM 20   memorandum anyway and after his administration issued that

21   memo, he again went on record to say, "I just took an action to

22   change the laws."

23           Of course, President Obama was not authorized to

24   take that action, as the Fifth Circuit ruled when it held that

11:24AM 25   DAPA and expanded DACA were unlawful.  They were, quote, flatly

impermissible with the controlling statutory framework.

The Supreme Court in the *Regents* opinion has now affirmed this core tenant of this Court's prior ruling that DACA, quote, does not announce a passive nonenforcement policy. It created a program for conferring affirmative immigration relief.  That comes from the majority opinion in the *Regents* case.

Now, the context of that ruling is likewise critical for this Court's analysis.  The majority held that in ruling that DACA and the rescission of DACA is a reviewable action.  That ruling is dispositive for both the substantive and the procedural APA claims in front of this Court as well as the take care clause claim.

THE COURT:  Why is it dispositive of the substantive claim?

MR. DISHER:  Yes, Your Honor.

In so ruling, the Supreme Court has confirmed that DACA is not a mere grant of removal forbearance.  DACA went further than that.  DACA, as the Supreme Court has now ruled, did not just forebear from removal.  It granted affirmative lawful presence and the associated benefits to a class of 1.5 million people, both of which the lawful status, the lawful presence -- excuse me -- lawful presence as well as the associated benefits are contrary to Congress's immigration scheme.

1           Congress has said that some populations must and

2      some populations may be granted deferred action.  And neither

3      of those two populations are the eligible recipients for

4      deferred action through the DACA memorandum.

11:26AM  5           The Court could not -- excuse me.  Congress could

6      not have left such extreme power to the executive branch when

7      it has enacted and continues to refine and update its

8      congressional immigration scheme.

9           And, Your Honor, still to this day nobody in

11:26AM  10     front of Your Honor can come up with an answer to the most

11     basic question which is what is the limiting principle?

12           If the executive could grant lawful status --

13     excuse me -- lawful presence and the associated benefits to

14     these 1.5 million people, why can it not do the same for every

11:26AM  15     unlawfully present person in the United States?  That is not

16     within the executive's power and so, therefore, this grant of

17     deferred action surely must fail.

18           And that's to not even mention the use of advance

19     parole which DACA makes its recipients eligible for.

11:27AM  20           As we know now in discovery in this case, the

21     federal defendants estimate that 14,000 DACA recipients have

22     used DACA to adjust their status who otherwise could not have.

23           THE COURT:  Where is that in the record?

24           MR. DISHER:  Yes, Your Honor.  I believe it's Exhibit 3

11:27AM  25     to our motion.  Let me just pull it up so I make sure.  It's

1    actually Exhibit 2, which is at ECF 487-2.  It is a response

2    from the federal government to the DACA intervenors'

3    interrogatory.

4              They did the statistical sample that we had a

11:27AM 5    hearing about in the past and based on that statistical sample

6    of 500 individuals, they found that 484 of those individuals

7    could not have adjusted their status but for using advance

8    parole, which is made available to them only through the DACA

9    program.  Extrapolating that percentage out to the entire

11:28AM 10   population that has received DACA and adjusted their status

11   later, the federal government estimates that with a plus-minus

12   1.5 percent margin of error, between 13,908 and 14,358

13   requesters did this.

14             In other words, they were not eligible to adjust

11:28AM 15   their status, they got advance parole through DACA, and they

16   have since adjusted their status.  And of course as the Court

17   knows, adjusting their status is a step on the pathway to

18   citizenship.

19             So despite the assurances from the Obama

11:28AM 20   administration that DACA did not confer a pathway to

21   citizenship, we know that the evidence proves otherwise.  The

22   evidence shows that over 14,000 DACA recipients have now

23   adjusted their status who could not have without the DACA

24   program.  That is why DACA is a substantive violation of

11:29AM 25   Congress's duly enacted laws.

1        As to the procedural aspect and why the *Regents*

2   opinion confirms our claims here, in his opinion Justice Thomas

3   says that DACA fundamentally altered immigration laws.

4        Quote, DACA is thus what is commonly called a

11:29AM  5   substantive or legislative rule.

6        And of course those type of rules are subject to

7   notice and comment rulemaking under the APA.  Now, that was

8   Justice Thomas, joined by Justice Alito and Justice Gorsuch.

9   But Justice Thomas recognizes what we must.  The majority --

11:29AM 10   and, again, this is a quote from Justice Thomas's opinion.

11        "The majority tacitly acknowledges as much" --

12   again, that DACA is a substantive or legislative rule that

13   required notice and comment rulemaking -- "as it must.

14   Otherwise, the majority would have to accept that DACA was

11:30AM 15   nothing more than a policy of prosecutorial discretion which

16   would make its rescission unreviewable."

17        The Court did not find that.  The Court found

18   that DACA is reviewable; therefore, extending that logic out,

19   it was a substantive or legislative rule that required notice

11:30AM 20   and comment rulemaking subject to the APA and, of course, the

21   2012 memo that instituted DACA did not go through that.

22        Likewise, Your Honor, the defendant-intervenors'

23   pleadings in this case make that -- say that very point.  Their

24   arguments are replete with the benefits that they have received

11:30AM 25   from DACA.  Those benefits are what make DACA a substantive or

1    legislative rule.

2              And they also on the flip side argue what they

3    stand to lose should the program be set aside.  If DACA was

4    nothing more than some guidance, then they would have no

11:30AM 5    argument about what they're going to lose should DACA be set

6    aside.

7              And, again, Your Honor, their own experts have

8    admitted this point.  The defendant-intervenors have designated

9    an expert in immigration named Shoba Wadhia.  Professor Wadhia

11:31AM 10   is a professor at Penn State University Law School.  She

11   authored a report concerning, quote, the history and use of

12   prosecutorial discretion, including specifically deferred

13   action.

14              Professor Wadhia also wrote a book called

11:31AM 15   *Beyond Deportation* and in it she acknowledges what we've been

16   saying all alone.  Deferred action, quote, may officially walk

17   like a discretionary act; but to individuals who are granted

18   this remedy, it quacks like a substantive benefit.  That's on

19   Page 87 of her book and that just confirms again what we've

11:31AM 20   been saying all along and she comes to the same conclusion

21   which we have been alleging since the beginning of this case.

22              This is on Page 152.  Quote, DHS must publish

23   deferred action as a regulation in the *Federal Register*.

24              Skipping two sentences:  Deferred action is the

11:32AM 25   kind of program that should be subject to notice and comment

1    rulemaking under the Administrative Procedure Act.

2            That is what we have been saying since we filed

3    this lawsuit in May of 2018, and their own expert agrees with

4    us.  That is why this Court must set aside the DACA program as

11:32AM  5    not only a substantive violation of the APA, a violation of the

6    executive's responsibility to take care that the laws are

7    faithfully executed, but for the very common sense

8    prosecution -- position that a program of this magnitude must

9    at least go through notice and comment rulemaking pursuant to

11:32AM  10    the APA.

11            Now, Your Honor, one additional thing I will

12    mention to Your Honor is that never before have we been in

13    front of this Court with DACA being in full force and effect.

14    It is now.

11:33AM  15            Based on the ruling out of the Eastern District

16    of New York, for the first time since we have filed this

17    lawsuit, the federal defendants are now accepting new

18    applications of DACA as well as processing advance parole for

19    DACA recipients which again can lead to that pathway to

11:33AM  20    citizenship.

21            But the legal analysis from the preliminary

22    injunction posture to today remains as true as ever.  DACA is

23    unlawful and therefore under the APA, it must be set aside.

24            There has been some mention about remanding the

11:33AM  25    decision to the agency to reconsider it or to provide more

explanation.  Your Honor, there's nothing else for the agency
to explain.  DACA is unlawful.

THE COURT:  I wonder if I -- well, I'll take up
remedies later on.

MR. DISHER:  Okay.  They simply -- as a matter of law,
they cannot do what they did.  Therefore, the remedy here is
simple.  The Court must set aside DACA pursuant to the terms of
the APA and there is nothing for the agency to do at this point
related to the program that it instituted with the 2012 memo.
Therefore it is up to this Court, in reviewing that agency
action under the terms of the APA, to set aside that program.

THE COURT:  Okay.  Thank you, Mr. Disher.

Ms. Perales, you want to take the ball on this?

MS. PERALES:  Thank you, Your Honor.

THE COURT:  Uh-oh.  She took off her mask.  You're in
for it now.

MS. PERALES:  I promise I won't pick up my binder and
drop it though.

Since 2018, the plaintiffs have pushed for a
merits ruling and they've done so at every turn.  But at the
center of this case the facts are missing that the plaintiffs
need to prevail.

This case is like a doughnut.  It has a lot of
thick legal argument around the outside but the center is
empty.  Plaintiffs have again invited this Court now to reach

1    the merits of DACA; but on this summary judgment record, the

2    Court need not and should not accept that invitation.

3              I would like to start with some disputed facts,

4    the first one related to discretion and then move to additional

11:35AM  5    material facts that are in genuine dispute.

6         THE COURT:  Before we even get to discretion, because I

7    don't know that my -- I want you to talk about it but let me

8    ask you -- I mean, this is the elephant in the room question.

9              Didn't *Regents* hold that APA applies to DACA?  I

11:35AM  10   mean, the majority opinion says it applies to DACA.  Six judges

11   agreed with that.  And the dissent said it applied to DACA and

12   we ought to hold it illegal now.

13             So I have all nine judges of the Supreme Court

14   saying that APA applies to DACA, don't I?

11:36AM  15        MS. PERALES:  The majority found that the rescission

16   was reviewable under the APA.

17        THE COURT:  And that the President or Secretary of

18   Homeland Security, whomever did the withdrawal, didn't comply

19   with the APA; but it went further than that.  It described, you

11:36AM  20   know, the opinion as, you know, being a lot more than

21   prosecutorial discretion.  It said it was an award of benefits.

22        MS. PERALES:  Our reading of the *Regents* decision,

23   Your Honor, is actually helpful to our position which is that

24   the Court made clear that DACA is an exercise of prosecutorial

11:37AM  25   discretion to defer removal of a particular individual.

1    THE COURT:  Okay.

2    MS. PERALES:  Which is consistent with our position.

3    THE COURT:  And with an award of benefits because

4 that's what they reversed the Trump administration on by saying

11:37AM  5 that they didn't consider the benefits.

6    MS. PERALES:  Well, *Regents* pointedly and very clearly

7 states that a couple of the things that are at issue that are

8 referred to as benefits, and that's primarily work

9 authorizations, flows from other regulations.

11:37AM 10    So in our reading of *Regents*, there's this really

11 strong separation between the decision to defer removal and the

12 preexisting, long-existing regulations on work authorizations.

13    THE COURT:  Well, first of all, I mean, in *Texas I*, the

14 Fifth Circuit didn't buy that argument; but more importantly,

11:38AM 15 and I'm looking at the employment authorization in the record,

16 and it says:  "Since approval of the form I-821D" -- and that's

17 the DACA form -- "is a prerequisite and since the EAD" -- which

18 is Employment Authorization document "is based upon a grant of

19 DACA."  That's what it says.

11:38AM 20    MS. PERALES:  Yes, Your Honor.  But the work

21 authorization regulations that have existed for many, many

22 years before DACA provide that an individual with deferred

23 action -- not DACA, but deferred action because all of this

24 came along before DACA.

11:38AM 25    THE COURT:  Right.

1    MS. PERALES:  An individual with deferred action may be

2    able to secure work authorization.  So this benefit, as it's

3    termed, of work authorization is distinct from what the Court

4    in *Regents* identified as the centerpiece of DACA, which is

11:39AM  5    deferred action or deferred removal.

6    THE COURT:  Okay.  I agree with that.

7    MS. PERALES:  And the plaintiffs have had abundant

8    amount of time to challenge work authorization regulations and

9    they have chosen not to.  So that piece is not at issue here.

11:39AM  10   When you receive DACA and you have deferred

11   action, you have benefitted from an exercise of discretion that

12   is favorable to you.  The government has said, "We know that

13   you're here.  We have decided not to move to remove you at this

14   time."

11:39AM  15   That deferred action then, under these long

16   preexisting regulations, allows you to apply for work

17   authorization and further requires you to demonstrate financial

18   need; but that was never challenged in this case.

19   So this is part of one of the facts actually,

11:40AM  20   Your Honor, that I was going to touch on which is that this

21   idea of DACA bestowing eligibility for various types of

22   benefits -- whether they're federal, whether they're state or

23   local -- is to some extent part of plaintiffs' legal argument

24   but it's really a fact about what DACA is.  DACA itself does

11:40AM  25   not give work authorization.  It's the preexisting regulations

1    that are not challenged here that allow somebody to apply.

2         THE COURT:  But I mean that argument was rejected by

3    the Fifth Circuit in *Texas I*.  Am I not bound by the

4    Fifth Circuit?

11:40AM  5         MS. PERALES:  *Regents* explains that the Fifth Circuit

6    found that the benefits of work authorization and other things

7    were problematic or inconsistent with the INA, but did not

8    touch and did not talk about the core of deferred action --

9         THE COURT:  I'm sorry.  I didn't hear that.

11:41AM  10        MS. PERALES:  I'm sorry.  The *Regents* Court explained

11    that the Fifth Circuit focused on work authorization and other

12    so-called benefits, but that the Fifth Circuit analysis did not

13    touch what is at the core of DACA, which is the decision to

14    defer action or defer removal proceedings against an

11:41AM  15    individual.  That's what the *Regents* Court has told us about

16    the import or the weight of the Fifth Circuit decision.

17        THE COURT:  Well, that's because I didn't in *Texas I*

18    say that anyone had to be removed or that the government

19    couldn't practice prosecutorial discretion.

11:42AM  20        MS. PERALES:  Your Honor said it and then the

21    Fifth Circuit said it and then the Court in *Regents* explains to

22    us that to the extent that this Court is bound by DAPA or

23    *Texas I*, there is a separation between the consideration of

24    these benefits and the consideration of deferred action at its

11:42AM  25    core which is a deferred action.  It's hard to paraphrase it.

1     THE COURT:  I was trying to do this same -- but I cut

2  Mr. Disher off a minute ago, but let's go ahead and plunge into

3  it then because your argument brings this up.

4           Let's say hypothetically the Court finds they

11:42AM  5  have standing, the states have standing and that it violates

6  the APA because there was no notice of comment.  Y'all have to

7  concede there was no notice of comment.

8     MS. PERALES:  There was no notice of comment,

9  Your Honor.

11:43AM  10     THE COURT:  All right.  Is there a difference -- and

11  I'm going to use this term not in its technical sense but in a

12  general sense so you understand what I'm saying -- I mean, the

13  severability sense because I read *Regents* as kind of saying

14  that, that the discretion that leads the DACA recipients here

11:43AM  15  but may severable from the benefits.

16           Is that what you're saying?

17     MS. PERALES:  We're not arguing severability,

18  Your Honor.

19     THE COURT:  I know, but I didn't mean that in the

11:43AM  20  technical sense.

21     MS. PERALES:  But I understand the question.  And I

22  think it would be best -- most accurate to say that our

23  position is that to the extent that the plaintiffs challenge

24  the benefits, they didn't sue against the things that they're

11:44AM  25  really complaining about, which is they did not sue to

```
 1    invalidate the work authorization regulation which is
 2    (c)(14) -- 247(c)(14).  They did not sue to invalidate that.
 3    If that's the issue -- that is, the benefit of work
 4    authorization -- and then once you pay into the system, you may
 5    be able to --
 6              THE COURT:  Well, but if they knock out DACA, they
 7    knock out the right for these a million five people to work.
 8              MS. PERALES:  If they didn't have DACA, they would not
 9    have work authorization.  That's right.
10              THE COURT:  Right.
11              MS. PERALES:  But work authorization flows from
12    separate and free-standing regulations that plaintiffs did not
13    challenge; so to the extent that plaintiffs -- I apologize to
14    the court reporter -- to the extent that plaintiffs are
15    challenging the work authorization benefit, they should have
16    sued to invalidate the Regulation 247(c)(14).  They did not.
17              Same thing with advance parole.  Advance parole
18    is statutory.  It is for any undocumented individual.
19              So first of all, as a fact statement, DACA does
20    not confer eligibility for advance parole.  The statute is
21    clear.  It's 1152 -- I can get it for Your Honor.  1152 -- I
22    think it's -- I will find it for Your Honor -- on advance
23    parole.
24              It says:  Any individual -- I'm sorry.
25    8 USC 1182(d)(5)(A) says any undocumented person can apply for
```

advance parole; so, again, it's a fact issue.  DACA does not

provide eligibility for advance parole.

THE COURT:  Doesn't it apply eligibility for people who

have entered the country illegally?

11:45AM  MS. PERALES:  Say that again, Your Honor.

THE COURT:  As opposed to people who have overstayed

their visa, doesn't DACA allow for advance parole for those who

have entered the country illegally?

MS. PERALES:  DACA doesn't say anything about advance

11:46AM  parole.  The advance parole statute is open to any individual.

THE COURT:  So if I come in the country illegally and I

leave, I can come back in?  I don't have to wait ten years?

MS. PERALES:  If you entered without inspection,

Your Honor, and you were here out of status and you sought an

11:46AM  advance parole document as you are entitled to do under the

statute and you were granted it --

THE COURT:  Yeah; but if I am in the country illegally,

am I going to get that granted?

MS. PERALES:  Yes, you can.  The statute is plain on

11:46AM  its face that any individual can apply and receive an advance

parole document.  DACA doesn't say anything about advance

parole.  The advance parole statute doesn't say anything about

DACA.

THE COURT:  But all their -- I don't know what you call

11:47AM  them -- handbooks, worksheets, all the evidence says DACA

1    people get advance parole.

2           MS. PERALES:  Anybody can get advance parole.  DACA are

3    a subset of all people and anybody -- it is the case that

4    people apply for and receive advance parole routinely from the

11:47AM  5    United States government and plaintiffs haven't shown

6    otherwise.

7              They did talk about 484 DACA recipients who

8    adjusted status.  That is .69 percent of all DACA recipients as

9    estimated by the federal government.  This is not some wide

11:47AM 10    open door, this is not some component of DACA if only .69 of a

11    percent of DACA recipients are projected to have been able to

12    use it.

13           THE COURT:  And, Ms. Perales, Mr. Disher used the

14    figure of 1.5 million people.  Is that the figure you're kind

11:48AM 15    of working off of as well?

16           MS. PERALES:  No, Your Honor.  I brought because I was

17    moved by Your Honor's footnote in the preliminary injunction

18    opinion about --

19           THE COURT:  I shouldn't put so many footnotes.  I get

11:48AM 20    them quoted back to me by both sides.  I'm going to quit

21    writing footnotes.

22           MS. PERALES:  I have shared this with counsel.  I'm

23    just going to read it --

24           THE COURT:  Just give it to Charlotte.

11:48AM 25           MS. PERALES:  There you go.

                    These are the current numbers on the number of

2   individuals who are currently recipients of deferred action

3   under DACA.  It's about 645,000.

4                    Your Honor pointed out that there were various

11:48AM   5   numbers at the time and of course the expert reports are always

6   going to be snapshots of whenever they were written.  But

7   that's the number that we're talking about right now is

8   645,000.

9                    THE COURT:  And how many -- do we know how many people

11:49AM   10   got DACA status but let it expire?

11                    MS. PERALES:  We know that at the high point there were

12   821,000 people who all had DACA at the same time, but I don't

13   know and now of course we're down significantly, about

14   180,000 --

11:49AM   15                    THE COURT:  Do we know how many -- what the potential

16   DACA population is?  Now, that number should be dwindling, I

17   would think; but that's eligible for DACA but have not applied?

18                    MS. PERALES:  I do not know of that number, Your Honor.

19   I don't think that number is in the record.

11:49AM   20                    THE COURT:  Okay.  Because I think that's what

21   Mr. Disher's 1.5 included, people that had it, have it, or

22   could have it.

23                    MS. PERALES:  At a certain point in time --

24   Mr. Disher's estimate may have been drawn from a certain point

11:49AM   25   in time.  As Your Honor has noted, there are people who are

1    aging out --

2         THE COURT:  It's a moving target.

3         MS. PERALES:  There are people aging out at the top and

4    there's a point -- it's a fixed number.  It's a fixed number of

11:50AM   5    people who can be eligible.

6         And so, Your Honor, what DACA is is actually a

7    disputed fact in this case.  We assert that DACA is the

8    decision to defer removal proceedings against an individual.

9    It is discretionary.  It is prosecutorial discretion.  It is

11:50AM  10    one by one after an evaluation of each individual person's DACA

11    application.

12         The things of which plaintiffs complain, the

13    hooks on which plaintiffs hang their hats spring from other

14    sources of either regulation or statute, the advance parole

11:50AM  15    statute and the work authorization regulations.

16         So, Your Honor -- this is a very long way of

17    answering Your Honor's question.  There are different pieces of

18    this picture and according to *Regents* almost the entire

19    decision of the majority in *Regents* is about these

11:51AM  20    distinctions.

21         And so it is our contention that under *Regents*,

22    there are these two components.  The plaintiffs don't challenge

23    the prosecutorial discretion, the decision not to move against

24    somebody individually for removal proceedings.  What the

11:51AM  25    plaintiffs do challenge is given to us by statutes and

1    regulations that are not at issue here and so it's not

2    appropriate to grant summary judgment to them.

3         THE COURT:  You don't think they're challenging the

4    whole ball of wax?

11:51AM  5    MS. PERALES:  I don't think there is a ball of wax,

6    Your Honor.

7         THE COURT:  Okay.

8         MS. PERALES:  There are no balls of wax, but there are

9    separate components of what is referred to as DACA.  One of

11:51AM 10   them is forbearance.  Another one is, according to the

11   plaintiffs, work authorization and advance parole.  Those

12   things come from elsewhere and they should be challenged in

13   their own lawsuits.

14         The plaintiffs are perfectly able to sue to

11:52AM 15   overturn the work regulations for deferred action recipients,

16   claiming it's outside the statutory authority.  They're also

17   perfectly capable of suing for the grants of advance parole to

18   DACA recipients as opposed to any other person who is here

19   unlawfully.  That's what the advance parole statute is all

11:52AM 20   about.  If they want to sue about that, they can.

21         What they did sue over though is DACA and DACA is

22   prosecutorial discretion and they already said in their

23   findings that they're not challenging that.

24         And so I think that's really what I mean by the

11:52AM 25   doughnut here is that there's really nothing when you get

1    really close in.

2         I did want to say and this -- we point this out

3    in our papers; but the legal argument about forbearance, just

4    focusing on forbearance.  It's our position that their legal

11:53AM  5    argument is flawed because it collapses immigration status

6    which the INA is very careful to set out.

7         THE COURT:  What do you mean by "collapses"?

8         MS. PERALES:  It collapses two things.  On the one

9    hand, immigration status which is provided for in the INA; and

11:53AM  10   on the other hand, the conditions that an individual finds

11   themselves in when they have deferred action.

12        Now, a deferred action recipient is still

13   undocumented.  Deferred action is revocable at any time, not

14   just by --

11:53AM  15        THE COURT:  Apparently not.  If you're President Trump,

16   I don't think he would agree with you.

17        MS. PERALES:  Yes.  Well, rescission -- the dispute

18   there, rescission is a little bit different from revocability

19   with respect to the individual.

11:53AM  20        I asked my husband this morning over breakfast

21   whether the Court would recognize the term NTA and my husband

22   responded, of course he would.

23        And I wanted to point out that the issuance of an

24   NTA by a border person, by a border official, either in the

11:54AM  25   area or at the checkpoint, automatically revokes DACA and there

are no procedural rights to contest them.

So DACA is not immigration status.  It has been referred to as lawful presence, but lawful presence is not a term you will find in the INA.  You can search for the term "lawful presence," and it's not there.

It's a phrase that we use to describe a person that the government has taken note of and decided not to place into removal proceedings at that moment.

And so lawful presence is not immigration status; and for this reason, the exercise of discretion not to move against somebody in terms of removal is not the same thing as granting that person immigration status in a way that would be contrary to the INA.

So as to the substantive claim here, we would want to point out to the Court that there is a very strong distinction between what DACA recipients have in deferred action and what the INA talks about which is who has status, who can come, and who is removable.  Persons with deferred action always remain removable.  It is not inconsistent with the INA.

The last point that I would like to make is that when you remove all of these things, what's really left is a complaint by plaintiffs about the number of people who have received deferred action under DACA.

And this Court has expressed that concern as

1    well.  The Court in its preliminary injunction opinion said it

2    remains outside the authority of the agency to defer action for

3    this many people.

4         And you know, my friend, Mr. Disher, has talked

11:56AM   5    about, well, there's no sort of cap on the number; but I would

6    like to focus on the bottom of that number for a minute.

7         If individual grants of DACA are lawful as an

8    exercise of prosecutorial discretion, DACA cannot be outside

9    the scope of executive authority.  And this is true as we move

11:56AM   10   through the numbers.

11        THE COURT:  So that the federal government -- or not

12   the federal government -- the executive branch can just grant

13   deferred action to every illegal alien in the United States?

14        MS. PERALES:  Absolutely not.

11:56AM   15        THE COURT:  That's what you just said.  You just do it

16   one by one by one by one by one and pretty soon, you know --

17   again, we can argue over how many illegal aliens there are in

18   the United States, somewhere between 13 and 20 million.

19        MS. PERALES:  The answer is that they cannot,

11:56AM   20   Your Honor.

21        THE COURT:  Okay.  What's to stop that?  That was the

22   question I asked in the prior case and no one could give me an

23   answer to.  The Fifth Circuit asked that question.  Justice

24   Roberts asked that question and the solicitor general couldn't

11:57AM   25   give him an answer.  Basically the answer they gave to the

1    Supreme Court was, well, we would never do that.

2         MS. PERALES:  So the answer is no, because deferred

3    action, and particularly as guided by the DACA memorandum, only

4    applies to a limited number of people -- that finite group that

11:57AM  5    we were talking about plus all of the discretionary

6    considerations that go through those 150 pages of standard

7    operating procedure --

8         THE COURT:  No.  But what's to keep them from saying,

9    okay, now we're just going to adjust the criteria and we're

11:57AM  10   going to move it from June 15, 2012, to June 15, 2021 --

11        MS. PERALES:  Well, but that's --

12        THE COURT:  -- and everybody that now complies who

13   changes the date gets deferred adjudication?  I'm sorry.

14   Deferred action.  I switched gears on you.

11:58AM  15        MS. PERALES:  Those days are behind me, Your Honor.

16        THE COURT:  Yes.

17        MS. PERALES:  I would say that that is not 2012 DACA.

18   If the question is is 2012 DACA substantively lawful, the

19   answer is yes and the answer is that it cannot apply to an

11:58AM  20   infinite number of people, it's very discretionary and that

21   only people who fulfilled the criteria are ever going to

22   receive that favorable consideration.  There is no infinite

23   number on the top.

24             But I would like to focus on the bottom because I

11:58AM  25   think it also helps illuminate the issue before the Court.  You

know, if the question is whether DACA is legal as to the people who have received it, right, the answer is yes and plaintiffs have not shown otherwise.

11:58AM      The plaintiffs do not say that Karla Perez, who grew up in Pasadena, graduated from the University of Houston School of Law, who now represents immigrant women who are victims of violence in her work at a nonprofit, should not have received DACA.

11:59AM      They don't say that Esther Jeon, who is with us today, who also grew up in Houston and went to Harvard, where she graduated in 2019, should not have received deferred action after she underwent a careful and individualized review by the agency.

11:59AM      Or -- and this is my last example -- Maria Diaz, who is a nurse in Mission, Texas, who is working on the front line of the COVID pandemic in the Valley, where it's particularly severe as the Court knows.

11:59AM      The plaintiffs cannot identify any example where anybody who has received deferred action shouldn't have and this does go to the substantive lawfulness. We want to urge the Court not to just look at some hypothetical infinite number, but also to look at the individualized decisions that plaintiffs do not challenge as part of what makes DACA lawful.

      Thank you.

12:00PM      THE COURT:  Thank you, Ms. Perales.

1          New Jersey, do you want to weigh in?

2          MR. FEIGENBAUM:  Yes.  Thank you, Your Honor.

3          There's three topics that New Jersey would like

4     to cover today; and as I understand it, we're saving remedies

12:00PM  5     for later so I will just focus on the first two, which is the

6     timing of the summary judgment motion and then the merits of

7     the motion itself.

8          So obviously plaintiff states are pursuing a

9     motion for summary judgment and they've framed it as what I

12:00PM 10    think would be termed a straightforward challenge to a 2012

11    DACA memorandum.

12         But in our view, the reality right now is much

13    more complicated.  In our brief, we discussed the federal

14    government's choice to supersede this memo with the Wolf and

12:00PM 15    Edlow memos and our views on the choice that had on the case.

16    But admittedly since that time, the case has remained something

17    of a moving target.

18         For one, the *Regents* EDNY order had led to

19    significant uncertainty over what framework exactly federal

12:01PM 20    defendants are implementing; and I know you'll hear from them

21    in a moment.

22         Given as well I think the ongoing federal

23    transition, this Court can expect further changes to that

24    framework soon.  So as a result, we think the easiest approach

12:01PM 25    for this Court to take is not the mootness finding that we

1    focused on primarily in our briefs but to follow the steps that

2    federal courts typically and often take during federal

3    transitions which is briefly pause the case and seek a status

4    update as soon as the transition has been completed.

12:01PM  5            That's what this Court did with the DAPA

6    litigation in *Texas I* and that's also what the Courts have

7    repeatedly done in previous transitions.

8            And I want to give four reasons why I think the

9    disposition of this case in particular would materially benefit

12:01PM 10   from an opportunity to hear from federal defendants after the

11   inauguration.

12           First, it will allow federal defendants to

13   eliminate the current confusion over the precise policy or

14   framework that is being implemented.

12:01PM 15           Second, it will ensure the best possible record

16   for this Court to make fact-bound assessments over issues like

17   DHS officer discretion.

18           Third, it will eliminate any of the outstanding

19   issues regarding lack of adversity or even any questions

12:02PM 20   regarding lack of adversity.

21           And fourth, it will allow for the orderly process

22   that *Regents* envisioned.

23           Of course, if this Court disagrees and reaches

24   the merits of plaintiffs' motion, then New Jersey, like the

12:02PM 25   DACA intervenors, believes that plaintiffs are not entitled to

1    summary judgment given the facts disputes that remain.

2         And then of course we will save for later our

3    perspective on what remedies would be appropriate if the Court

4    disagrees with all of that.

12:02PM  5         I thought I might begin with our discussion about

6    why it makes no sense not even to do a formal stay order or

7    formal pause on the case but simply, as is often the case in

8    summary judgment, not to actually issue any final ruling until

9    after the transition is complete so that federal defendants

12:02PM  10   could weigh in with a status update this Court would order

11   almost immediately a week or two after the transition is

12   completed.

13        The first is that as a general matter this is a

14   perfectly normal course for ways that federal courts handle

12:03PM  15   cases where policies can be a bit of a moving target during

16   transition and I think it's fair to say given the changes that

17   have happened since even we briefed this case, this case has

18   certainly been a moving target.

19        This Court took a similar action, as I noted, in

12:03PM  20   the DAPA litigation in *Texas I*, where the parties moved to have

21   this Court essentially stay proceedings from November of 2015

22   to February of 2017 to allow a change in administration to come

23   in and perhaps take a different approach and weigh in

24   differently on the lawfulness of the framework before the

12:03PM  25   Court.  And as the Court is well aware, that's exactly what

ultimately happened in the DAPA litigation.

But I think there's another case from the Southern District that I think is particularly illustrative here and that's the *Veasey versus Abbott* case.  That's Docket 2:13-193.

That's a case that had been essentially ongoing for three and a half years by the time the transition took place and was in posttrial briefing and nevertheless the Court, in an opinion by one of your colleagues for the Southern District, nevertheless gave a continuance in 2017 to allow for the transition from one leadership of the Department of Justice to another DOJ leadership specifically on the basis that they may change the position the federal government was going to take.  That was the federal government challenging the Texas voter ID law.  And as part of that challenge, that would help illuminate the issues, even at post-trial briefing, in front of the Court.

The private plaintiffs in that case actually opposed but the Court nevertheless allowed a stay on that posture and as a result, it did materially change the issues before this Court.

This is not something unusual to this district by any means.  Plenty of circuit courts, including the DC Circuit in lots of environmental cases where changes in administration will change the legal and factual issues presented to the

1    Court, they repeatedly have granted stays from the

2    President Bush EPA to the President Obama EPA, from the Obama

3    EPA to the Trump EPA.  And we have plenty of examples.

4          THE COURT:  Let me ask you a question though.  How can

12:05PM   5    they change what happened eight years ago?

6          MR. FEIGENBAUM:  So I think because this case always

7    arrives on a posture of seeking injunctive relief rather than

8    damages, what really always matters to this Court is what sort

9    of remedy it's going to think about prospectively and whether

12:05PM  10    there are any violations in the implementation.

11         I think this Court's PI opinion was incredibly

12    helpful in illuminating that you don't just look at the words

13    on the page, but you also look at the implementation of the

14    frameworks on the ground.

12:05PM  15         And so how something might have been implemented

16    in 2013 says far less about the injunctive requests that are

17    pending before this Court than how it's being implemented in

18    2019 or 2020.

19         And I think that segues nicely into the four

12:05PM  20    reasons we have why this Court in particular would benefit from

21    following that normal course during the federal transition,

22    because, again, we think it isn't just about the 2012 memo.

23         The first reason that I gave is that we think

24    we're in a period of some confusion right now or moving target,

12:06PM  25    whichever phrase this Court or any of the parties want to use.

1   And we think that in particular there's some question about how

2   exactly the federal government wishes to implement DACA.

3          We spoke a lot about the Wolf and Edlow memos

4   which we believed addressed, in large part if not entirely, the

12:06PM   5   concerns about advance parole, the concerns about the lack of

6   use of discretion on the ground, and other concerns about the

7   types of various benefits that they went into some detail on

8   about in both the Wolf and Edlow memos.

9          Now, plaintiff states to Your Honor this morning

12:06PM   10   specifically said, "Well, now, because the Wolf and Edlow memos

11   are set aside, this is the first time in the history of the

12   case where the federal defendants are actually implementing

13   DACA fully against us," which I think is a sort of notable

14   comment.

12:06PM   15          And we actually don't think that's true because

16   there's a lot of opening questions we still have about how

17   federal defendants are implementing DACA and will be

18   implementing DACA in light of the *Batalla Vidal* order out of

19   EDNY.

12:07PM   20          Among other things, there's questions about

21   whether the federal defendants will appeal and there's

22   questions about whether the federal defendants are going to

23   repromulgate a new version, a similar version of the Wolf memo

24   by someone with due acting authority.

12:07PM   25          But even if they don't take those steps, there's

1    questions about how the *Batalla Vidal* order would be

2    implemented on the ground, even in the short-lived period until

3    a change in administration when issues around the authority for

4    this particular acting secretary all will by definition go

12:07PM  5    away.  So whatever we think of that order, it's clearly

6    short-lived in its context.

7            Among other things, we know that after *Regents*,

8    the federal defendants nevertheless held initial applications

9    and did not grant advance parole to DACA recipients and so it

12:07PM  10   is quite possible that applications are being accepted but not

11   finally adjudicated right now.

12           When it comes to initial DACA requests, it's

13   quite possible that advance parole is still not being granted

14   because, again, it is separate from the 2012 DACA memorandum

12:08PM  15   itself and applies to anyone who wishes to seek it even if in

16   this country.  Again, with nothing from the 2012 memorandum to

17   support their request.

18           So ultimately we have some serious questions that

19   hopefully federal defendants will be able to clear up for

12:08PM  20   Your Honor about how precisely the *Batalla Vidal* order and the

21   Wolf and Edlow memos all intersect and how they're being

22   implemented on the ground.  But the point is that all of that

23   confusion goes away in just a month.

24           It also helps that we will have federal

12:08PM  25   defendants that are going to be defending DACA in whatever

 1    precise memo the federal defendants have for implementing DACA.

 2              If that's the case, then any of the outstanding

 3    questions that ever existed in this case around lack of

 4    adversity also will necessarily go away.

 5              And I know that at the PI stage of this case,

 6    Your Honor made a number of findings regarding adversity, and I

 7    just have two responses to that.

 8              The first, and I'll get to this in just one

 9    moment, is that the lived experience of this case, including

10    now at the summary judgment posture, I think help illuminate

11    the problems that this case has had and that this record has

12    had and that any decision will have with the way federal

13    defendants have been defending this case.

14         THE COURT:  Wait, wait, wait.  Explain that.

15         MR. FEIGENBAUM:  Of course.  So we think that having --

16    the difference between, I think, willing warriors among federal

17    defendants and reluctant warriors is significant.  Your Honor,

18    I think, rightly noted that DACA intervenors in New Jersey have

19    come in to vigorously defend DACA; and we're happy to be here

20    doing it.

21              But there are certain things we simply cannot do

22    that federal defendants are best able to do which is

23    effectively present to this Court sufficient -- the complete

24    picture, let's say, of discretion which, again, we think is

25    part and parcel of the whole analysis in this case.  And this

1    Court recognized at the PI stage there was competing evidence

2    of discretion going in each direction.

3            You know, I read the PI opinion.  I don't think

4    this one is a footnote.  I think I'm just talking about the

12:10PM  5    text here.

6            THE COURT:  Thank God.

7            MR. FEIGENBAUM:  This Court in the PI opinion spoke

8    about how there was evidence going in either way and even made

9    comments saying there's a genuine dispute here.

12:10PM  10           So one would expect that between the PI and SJ,

11   that you have willing federal defendants who are standing up to

12   defend the lawfulness of DACA.  They would be eager to present

13   information to this Court about how exactly DACA is being

14   implemented on the ground, including whether or not any

12:10PM  15   discretion is used.

16           Instead -- and we'll talk about this, I

17   understand, when we discuss the merits portion of summary

18   judgment -- we have plenty of requests to federal defendants

19   regarding information about how exactly discretion is used.

12:10PM  20           So we asked, please tell us everyone who was

21   denied and then tell us if they were denied, was it because

22   this person didn't, you know, quote/unquote meet the criteria

23   or was it because it was someone who met the criteria but

24   nevertheless did not warrant the discretionary act of DACA from

12:11PM  25   DHS.

That's one of the questions I think Your Honor trained on in the PI stage, that it can be very difficult to figure out from denial rates alone or general evidence alone who exactly is being denied because this Court -- because DHS thinks they didn't meet the criteria or because DHS thinks they meet the criteria but shouldn't have their DACA request granted.

So one would imagine that the federal government would come forward with samples -- even if it's too burdensome to look at the entire population of requests ever -- samples, examples, a lot more information that could be provided.  And instead, interrogatory after interrogatory, they said -- this is at Pages 24 to 25 of the New Jersey records submission with our summary judgment opposition -- they said it's too burdensome based on the case needs to take steps like that, which doesn't suggest it's impossible by any means.  And they give hours estimates which certainly show it will take work but is by no means impossible but based on the case needs are choosing not to do it.

Well, a federal defendant that's committed to defending DACA and the framework and showing that discretion is inherent in the way DACA is implemented would think the cases supported taking on very different verdicts and taking on very different steps in order to show this Court exactly how DACA is being implemented.

1       And we do think, as this Court recognized at the

2   PI stage, discretion is an extraordinarily important part of

3   this case.  It always has been.  I think it always will be.

4       And having federal defendants who are now eager

12:12PM  5   to build a record on discretion when they alone --

6       THE COURT:  Didn't I in the preliminary injunction,

7   didn't I basically assume that discretion was being used and

8   still found that the states were likely to prevail?

9       MR. FEIGENBAUM:  So that will take me to the merits,

10   but I just want to say that even --

11       THE COURT:  We've already talked about the merits.

12   We're talking about the merits --

13       MR. FEIGENBAUM:  Of course, Your Honor.  The only thing

14   I wanted to say -- and I am perhaps throat-clearing up to

12:13PM  15   that -- is that even if Your Honor stands by that view and

16   says, yes, at summary judgment I realize there's too much

17   discretion here to be sure that that part of the procedural

18   analysis doesn't work, I'm still standing by the rest of the

19   procedural analysis -- even if that's the case, I think

12:13PM  20   everyone agrees that given a case of this sensitivity, having a

21   short pause of a couple of weeks so that this Court can have a

22   full record and clarity on discretion -- which of course has

23   always been a part of this case, will be a part of any appeal

24   no matter which party ends up prevailing in this case -- I

12:13PM  25   think will be really useful to make sure that the case is

1    really in the best possible posture in its decision and for its

2    review.

3          I'm not talking about a long pause, right?

4    Summary judgment opinions obviously often take longer than a

12:13PM  5    month anyway and so I think all of this helps show the benefits

6    that federal defendants can bring to the actual record,

7    whatever the precise final legal judgment this Court draws.

8          But turning to that legal judgment, if I think

9    that's one merit point that I can make, and I'm happy to

12:13PM  10   substantiate it, it's that we think discretion really is part

11   and parcel of the entire analysis in this case, that it isn't

12   really possible to say, well, I accept that there's a genuine

13   dispute about discretion and I'll even assume that there's a

14   lot of discretion being used -- and, again, we can talk about

12:14PM  15   that, the evidence I think that shows that.

16         If this Court is going to assume such significant

17   amount of discretion, then I actually think that infuses the

18   entire analysis on both parts of the procedural APA analysis as

19   well as getting into the substantive APA analysis.

12:14PM  20        This Court had a question about whether *Regents*

21   just kind of ends that conversation and so I thought I would

22   start there.

23         THE COURT:  I think that's what I would like to hear.

24         MR. FEIGENBAUM:  So I don't think that *Regents* can be

12:14PM  25   dispositive here for four different reasons.

1          The first is that *Regents*, of course, makes the

2     point that this issue is reviewable, but it's all the time the

3     case that documents can be judiciously reviewable and

4     nevertheless not have to go through notice and comments and

12:14PM   5     nevertheless not be unlawful, right?  To be reviewable, of

6     course, is not automatically by definition unlawful.

7          So I think the *Shalala* opinion from the

8     Fifth Circuit, which of course has been an opinion this Court

9     is intimately familiar with from the DAPA case, itself doesn't

12:15PM  10     make any sense if you assume that reviewability and the notice

11     and comment.

12          The premise of course of *Shalala* is that a

13     document is going to be reviewable but nevertheless provides

14     the prongs to figure out whether or not under the procedural

12:15PM  15     APA it itself was going to be unlawful because it didn't go

16     through notice and comment.

17          And I think I can give an example that might be

18     helpful for showing why this would be.

19          Imagine, for example -- and this is a little born

12:15PM  20     of 2020.  Imagine there's a memo that goes out that says

21     something just to the effect of:  In reviewing individualized

22     requests for deferred action -- nothing more.  Just someone

23     bringing it to you -- DHS should be solicitous or consider if

24     they're involved in the distribution of the vaccine.  That's

12:15PM  25     all that it says.  It doesn't say anyone is entitled to

anything.  It says that's a factor you should think about you might not have thought about in prior years.

That's obviously individual.  That's obviously an instance of total discretion, and it's just a request to consider a factor.

That said, it may be the case that someone has a legal challenge to that sort of memo, maybe they've identified a provision of the INA that says something to the effect of, you know, medical work isn't supposed to be relative.

Again, this is all obviously hypothetical.

So they have a legal challenge and the challenge would be reviewable to whether the memo is consistent with the INA, but that same memo does not necessarily have to go through notice and comment rulemaking because of the amount of discretion that would mean.

So I think that is sort of proof in the pudding that you can have an example where something is reviewable; but nevertheless, because of the amount of discretion that continues to exist under that particular memo, it doesn't have to go through notice and comment rulemaking.

So I think this Court finds itself in the same position it frankly did before *Regents* and that's not a huge surprise, I think, for two other aspects of *Regents*.

First, plaintiff states are obviously counting up what the justices have said in different opinions.  But I would

1    just note that the *Regents* majority included plenty of justices

2    who were obviously on one side of the equally divided court in

3    DAPA or on the other side.  It clearly had both.

4              So it's unlikely that the *Regents* majority was

12:17PM  5    meant to resolve the separate issue that was present in things

6    like DAPA, which involved notice and comment rulemaking.

7              Instead, if you look at *Regents* 1902, that's the

8    page cite, it specifically says that we understand these

9    benefits to come from separate regulations.

12:17PM  10             So I don't understand -- I take Mr. Disher's

11   point that there's language in *Regents* that talks about, you

12   know, affirmatively conferring benefits, the way DACA might be

13   appropriate, et cetera.

14             And there's certainly language for everyone in

12:17PM  15   *Regents* itself, but I think *Regents* was specifically staying

16   away from whether challenging the DACA memo itself would be the

17   way to get at what we view as the collateral benefits.

18             THE COURT:  Of course, that wasn't in front of the

19   Court in *Regents*.

12:18PM  20             MR. FEIGENBAUM:  I agree.  I agree it wasn't in front

21   of the Court in *Regents*, and that's why I think *Regents* isn't

22   dispositive of the question.  I think that's exactly right.

23             And so I think for all of those reasons, *Regents*

24   really can't be dispositive of the question and the Court is

12:18PM  25   left in the position it was before which is trying to figure

1    out on the record before it whether there's a procedural APA

2    problem and whether that's a substantive INA problem.

3              Now, as to the procedural APA problem, if I

4    could, I just wanted to highlight what I think are the five

12:18PM  5    best pieces of evidence of discretion and then I will

6    immediately move on to why we think the rights and benefits

7    prong alone, without considering discretion, isn't enough to

8    cross the procedural APA hurdle at summary judgment.

9              So the five best pieces of evidence that I think

12:18PM  10   really -- three of which weren't even before this Court at the

11   PI stage.  There's of course the internal DHS documents -- this

12   was at the PI stage -- where you have the Texas Service Center

13   in 2015 using what I term the neighbor test, essentially saying

14   you've got to figure out if this person would be someone you

12:19PM  15   would want as your neighbor.  That's Docket 215-1 at 405.

16             You also have internal testimony, this is the

17   Neufeld testimony that was before this Court at the PI stage,

18   Docket 6 at 279-96 where he specifically says DACA involves

19   discretion both in considering the factors and in deciding

12:19PM  20   whether someone merits discretion even once they've satisfied

21   the factors.

22             So we think those two pieces of evidence were

23   really helpful, but we think there's more now.

24             So we think the Wolf and Edlow memos, even if

12:19PM  25   they're set aside in *Batalla Vidal*, are incredibly illustrative

1    to the kind of discretion that DHS is using.

2    There's nothing in the *Batalla Vidal* order that

3    would prevent DHS from using greater discretion when they

4    review applications if that's what the leadership of DHS wants

12:19PM 5    them to be doing.

6    And so the Edlow memo in particular requires the

7    creation of new SOPs and new training materials that

8    specifically instruct all reviewing DHS agents on the amount of

9    discretion that they're supposed to use here.

12:20PM 10    So even if there was question before Wolf and

11    Edlow, there isn't question now.  And, again, this is an

12    injunctive relief case.  This is about whether the federal

13    defendants right here right now are violating the law and

14    therefore whether a federal court needs to step in.

12:20PM 15    So to a degree, that discretion is shot out after

16    Wolf and Edlow and there's nothing in the record to suggest

17    that they're lying or that the SOPs and new training materials

18    aren't being followed, then that's more evidence, I think,

19    still of discretion.

12:20PM 20    There's also the increase in the denial rates

21    that we've talked about back and forth in everything between

22    plaintiff states and the various intervenor defendants.

23    We have identified that for initial DACA

24    applications from 2018 -- I believe from September 2018 until

12:20PM 25    2020, we're now looking at something more like a 42 percent

1   denial rate.  There's some back and forth on the facts about

2   whether that's polluted by any individuals who simply weren't

3   eligible for DACA at all.

4           But, again, the sharp increase in the denial rate

12:20PM  5   based on the administration that has hostility to granting of

6   DACA requests, I think is really illustrative to the amount of

7   discretion that exists.

8           And then finally we also have on the record

9   federal defendants admitting, quote, anecdotally they are aware

12:21PM  10   of instances in which some individuals or at least two

11   individuals have received DACA -- or did not receive DACA that

12   otherwise were eligible for it.

13           Now, again, I'm not going to stake my hat on that

14   number itself even though it's just anecdotal, but I think

12:21PM  15   that's actually more proof of the adversity problem that we

16   have federal defendants who merely should be defending their

17   program specifically saying:  We're anecdotally aware, but

18   we're not going to run down more details, we're not going to

19   give you more information about how that worked, and we're not

12:21PM  20   going to be providing any samples to figure out how often

21   that's happening.  So there's a lot of evidence of discretion

22   here.

23           Now, I think Your Honor has said, okay.  I think

24   that there's discretion.  I'll accept that there's discretion.

12:21PM  25   Don't you lose anyway?

1          And I think that gets to the rights or benefits

2    prong.  And I think the basic principle here and the way to

3    think about this test is that this Court would have to find --

4    if it agrees with us on discretion or agrees there's genuine

12:22PM  5    material facts on discretion, that no amount of discretion, no

6    amount of discretion could show that this was a generalized

7    policy or even no amount of everything provided in this record

8    could show that that's --

9          THE COURT:  Why does that matter?

12:22PM 10          MR. FEIGENBAUM:  So the reason that that matters -- so

11    this Court in the PI opinion, I think, grapples with how these

12    prongs operate, whether in tandem or as two totally separate

13    prongs.

14          Obviously if they're two totally separate prongs

12:22PM 15    and both must be satisfied, then plaintiff states obviously

16    lose.

17          But this Court found that there are two factors

18    that come together in a single analysis.  Now, if that's right

19    and you've got two factors in the analysis, then sort of

12:22PM 20    necessarily the Court has to find that the other prong is so

21    strong that nothing on the discretion prong could overcome it,

22    no amount of discretion in that balancing analysis could be

23    enough to overcome what the rights or benefits prong shows.

24          And I don't think that could be quite right

12:23PM 25    because as I understood plaintiff states' position and even

1    aspects of the PI opinion, no one is saying that if an

2    individual totally separate from DACA requests deferred action

3    and receives deferred action in a truly one-off case, that that

4    alone would be the problem in and of itself --

12:23PM  5         THE COURT:  There's a third alternative though.

6         MR. FEIGENBAUM:  I'm sorry, Your Honor.  I didn't hear

7    that.

8         THE COURT:  There's a third alternative.  Instead of an

9    "and," it can be an "or."

12:23PM  10        MR. FEIGENBAUM:  Sure.  But I think my example would

11   work either way, and I can walk through.

12             So whether it's rights or benefits separate from

13   discretion still works on this one-off example.  So in the

14   one-off example, the person would have deferred action.  Let's

12:23PM  15   say -- I'll go back to my vaccine example.

16             Let's just say the inventor of the vaccine had

17   been here without documentation -- so, again, hypothetical --

18   and the federal defendants wish to defer an action for that

19   individual for the years while the vaccine is being distributed

12:23PM  20   because they would have concerns in that one-off case.

21             That would, based on the 1980s regulations that

22   have been in effect consistently since, mean that that person

23   would collaterally get work authorization.

24             The same rights would obtain, the same benefits

12:24PM  25   would obtain; but it's not at all clear to me that there's the

1    same legal problem by any means that this Court identified at

2    the PI stage.

3         THE COURT:  So all the talk that Justice Roberts made

4    in *Regents* about all the benefits that go along with DACA, I

12:24PM  5    mean, he was just wrong?

6         MR. FEIGENBAUM:  No, no, no, not at all.  And I know

7    better than to call the Chief Justice wrong, let alone in open

8    court.

9         I think I have two points on that.  The first is

12:24PM  10   our point is that essentially the wrong thing has always been

11   challenged here, so it's not that DACA leads to the collateral

12   effect.

13        So I think my one-off example is really obvious

14   there.  The challenge wouldn't be that this particular doctor

12:24PM  15   merited deferred action.  He would sue the federal defendants

16   and say, you violated some sort of notice and comment

17   requirement by not using notice and comment when you deferred

18   this person's -- when you granted this person deferred action.

19        Instead, you would say, sure, you granted him

20   deferred action.  You don't need to go through the notice and

21   comment.  That's a purely discretionary act.  You really used

22   your total discretion there.  That had collateral consequences.

23   The rights and benefits offend us and we're going to have to

24   challenge that regulation.

12:25PM  25        And Your Honor's point on severability, I think

1    is really illustrative and might help prove the point I'm

2    trying to make here.

3        THE COURT:  I don't know if it was my point or my

4    question.

12:25PM  5        MR. FEIGENBAUM:  I think it's fair.  The question, I

6    think, might serve a point I want to make is perhaps a fairer

7    way to say it.

8            So, you know, severability I think really

9    illustrates the problem here.  I think there's some thought

12:25PM 10   that what could happen or a possible remedy would be to defer

11   action but not to have any collateral consequences to come with

12   that, then that's not about the 2012 DACA memo itself at all.

13   And this, I think, *Regents* does stand for at Page 1902 of the

14   opinion.

12:26PM 15           The problem there would be with those preexisting

16   regulations which essentially set up an equation that said if

17   deferred action, then eligibility for work authorization if you

18   have economic necessity.

19           If that is always a problem for the person who

12:26PM 20   got the vaccine, the single individual who got it or DACA

21   recipients, then the problem is not the DACA memo and the

22   problem is not the one-off grant.  The problem would be with

23   the 1980s regulation, the one that set up this equation:  If

24   deferred action, then you would have work authorization

12:26PM 25   assuming economic necessity can be shown.

1           And, again, that could be challenged; and I don't

2      think *Regents* disposes of what has to be challenged.  That

3      could be challenged in a petition for rulemaking under

4      Section 553(c) and would not be part and parcel of the

12:27PM   5      challenge to DACA itself.

6           So we've always thought that a bit of the wrong

7      thing is being challenged here because the deferral of action

8      or the factors to consider in deferring action themselves do

9      not have to go through notice and comment rulemaking so long as

12:27PM  10      sufficiently high discretion is there.  Just as you don't need

11      notice and comment to defer the action of a single individual

12      who is receiving the vaccine and just as you don't need notice

13      and comment to say when you look at one-off applications,

14      please just consider the factor --

12:27PM  15           THE COURT:  What about the fact that Secretary

16      Napolitano's memo says:  For individuals who are granted

17      deferred action, the USCIS shall accept applications?  I mean,

18      that's part of the DACA memo.

19           MR. FEIGENBAUM:  So she's following the regulation in

12:27PM  20      that case.  I mean, she's just actually following the notice

21      and comment regulation.  I think it would be a real problem if

22      the DHS secretary in a memo is saying, you know, there's a

23      regulation on the books, but I don't particularly like it.  I

24      don't particularly want to follow it.

12:28PM  25           I think we would have questions about the

1    propriety of doing something like that.  She's not saying, I'm

2    creating some sort of new right from DACA itself that never

3    before existed.  Every deferred action -- and there are plenty

4    of deferred actions -- you know, family fairness.  This Court

12:28PM  5    is well aware of that history.  All of those examples tie to

6    the 1980s regulations and lead to the same equation that

7    Secretary Napolitano talked about in 2012.

8              And that's something that I think the Wolf and

9    Edlow memos are particularly instructive on.  You know, what

12:28PM  10   they say is we want to maximally use discretion and we want to

11   cut off advance parole.  We really don't think advance parole

12   is a live issue anymore in the way plaintiff states are talking

13   about because they make very, very clear you have to get a

14   one-off, meeting the statute, humanitarian reason, needing

12:28PM  15   life-saving treatment and a significant public benefit like law

16   enforcement reasons, national security reasons --

17        THE COURT:  Is there any viability to that memo

18   anymore?

19        MR. FEIGENBAUM:  So we think so.  So the Edlow memo

12:29PM  20   itself -- first of all, we think it could be viable if there's

21   an appeal, we think it could be viable if it's repromulgated.

22             And, again, we're just in a couple of weeks'

23   window right now with this authority problem, all of which is

24   clearly going to go away very soon.  That would get back to my,

12:29PM  25   you know, line of reasoning.

12:29PM

            1          But even on the merits, we think that those memos

            2     are instructive not for their formal, binding nature but

            3     because the Edlow memo itself says we haven't granted advance

            4     parole to a DACA recipient since 2017.  You don't need the memo

            5     by someone who is validly appointed to accept that DHS is

            6     identifying as a matter of fact that they know DACA does not

            7     immediately lead to advance parole.

            8          The Edlow memo itself said the 2012 memo did not

            9     give anyone rights to advance parole, did not change the

12:29PM    10     standards for advance parole.  So, you DHS officers, who are

           11     reviewing requests for advance parole, you need to look for the

           12     statutory rules.

           13          THE COURT:  But what you're arguing is that the states,

           14     assuming they have a valid complaint and assuming they have

12:30PM    15     statutes, never can challenge anything because it's not the

           16     DACA memo that's doing it.  It's how they're enforcing the DACA

           17     memo, how they're implementing it.

           18          So even though their handbook says you have to

           19     give these people, let them apply for advance parole or you

12:30PM    20     have to let them apply and even though it's the DACA -- grants

           21     of the DACA status that gives them the right to work or the

           22     right to get an EAD, you know, by challenging DACA, you're not

           23     challenging the right thing, you should be challenging all the

           24     regulations that implement it and why aren't they challenging

12:30PM    25     that?  That's the whole -- again, back to my ball of wax, I

1    think.

2    MR. FEIGENBAUM:  Well, I think Ms. Perales has, you

3    know, pushed back on the ball of wax.

4    But I think that very briefly the two main

5    responses to that, the first is we've always said from day one

6    we've never tried to hide the ball, that we think they're

7    challenging the wrong thing when it comes to work authorization

8    and this came up in the DAPA litigation as well.

9    THE COURT:  I know, and the Fifth Circuit rejected that

10   argument.

11   MR. FEIGENBAUM:  So the Fifth Circuit had a very

12   different set of concerns.  The Fifth Circuit did not have the

13   evidence of discretion before Your Honor.  So in that context

14   without that discretion the putative link to rights and

15   benefits alone were of sufficient concern, because the Fifth

16   Circuit perceived it as a class-wide grant of rights or

17   benefits, which our point is that's not what's before this

18   Court at summary judgment.  There are discretionary decisions

19   under DACA and those are collateral consequences.  That's a

20   very different scheme than a class-wide grant of rights or

21   benefits.

22   Then they have separate issues under the

23   substantive INA prong that don't apply to DACA involving direct

24   conflict of provisions for parents.  So there are aspects the

25   defendants want that really just don't ultimately control the

1    instant litigation.

2              So I think that that's parts of the point there.

3    But then the other point is the reason why it's always boiled

4    down to implementation is because plaintiff states themselves

12:32PM  5    asked this Court to ignore the language in the Napolitano memo

6    that talks about using discretion.  They think that's a lie and

7    they think *Texas I* substantiates that.

8              This Court found in the preliminary injunction

9    stage -- well, actually there is a lot of evidence that

12:32PM  10   suggests that was true.  So if we were just looking at the text

11   of the memo alone on discretion, it would be right there, that

12   finding of discretion would be proper; and the *Crane* case out

13   of Fifth Circuit basically made that point.

14             The plaintiff states are saying, well, in

12:32PM  15   implementation, it's not really and we're saying, well, then

16   you need to look at implementation as it develops over the

17   years.

18             And as it has developed over the years, it is

19   only more and more clear, including in this case, that there is

12:32PM  20   discretion in implementation and that discretion is great at

21   implementation and, therefore, this Court would have to find

22   that the rights or benefits of plaintiffs is so overwhelming,

23   that no amount of actual one-off calls for discretion would be

24   able to overcome it.

12:33PM  25             And we don't think that's the record or the case

1    law in front of this Court because we do think there's a lot of

2    discretion here that needs to get deferred into a merits ruling

3    to actually make those discretionary findings or have federal

4    defendants willing to present discretion to Your Honor, that I

12:33PM  5    think would really helpfully illuminate the issues and put a

6    finer point on the complete resolution of them because *Regents*

7    doesn't dispose of it and none of the other claims, I think,

8    do.  We really think discretion is the whole ball of wax still,

9    Your Honor.

12:33PM  10    THE COURT:  Okay.  Thank you.

11    MR. FEIGENBAUM:  Thank you, Your Honor.

12    THE COURT:  Here is what I'm going to do.  I'm going to

13    let Mr. Coghlan go and then let Mr. Disher respond and then

14    talk about remedies, but I want five minutes.  My Diet Coke is

12:33PM  15    running out.

16    MR. FEIGENBAUM:  Thank you, Your Honor.

17    (Court is in recess.)

18    THE COURT:  All right.  Be seated.

19    All right.  Mr. Coghlan, you or Mr. Hu want to

12:46PM  20    weigh in?

21    MR. COGHLAN:  Briefly, Your Honor.

22    Your Honor, the federal defendants and

23    specifically the Department of Homeland Security are still

24    considering the difficult questions on what the next steps

12:46PM  25    should be regarding DACA in light of the Supreme Court's

decision in *Regents*.

Your Honor, the Supreme Court did not opine on the legality of DACA in its opinion.  It recognized that DHS had the authority to rescind it if they wanted to.

What it did say was, and as Your Honor touched on, that DACA was more than a symbol of nonenforcement policy, that it's an inferred program for conferring affirmative immigration relief and that it at least allows access to a number of intended benefits including Medicare and Social Security.  And as Your Honor suggested, because of that, the Court found that it was appropriate for reviewing the APA.

So against that backdrop, Secretary Wolf in his July memo -- and of course we recognize that memo was vacated by the Court in the Eastern District of New York and defendants are currently complying and taking every effort to comply with that injunction.

But the policy concerns that were outlined in Secretary Wolf's memo were still ones that DHS is considering. And so what he said was whether to --

THE COURT REPORTER:  Would you repeat after "what he said was"?

THE COURT:  When you're looking down to read, you're lowering your voice.

MR. COGHLAN:  Understood, Your Honor.  My apologies for that.

1          He said, whether to retain the DACA policy

2     presents significant questions of law and legal policy and

3     presents serious policy concerns that may warrant its full

4     rescission.  But at the same time I've concluded that fully

12:48PM  5     rescinding the policy would be a significant administration

6     decision that warrants additional careful consideration.

7          And that is still what the department is doing as

8     of today, Your Honor.  And so, you know, while it's continuing

9     to consider these concerns or consider these difficult issues,

12:48PM 10     it does plan to continue to implement DACA.  As we stand here

11     today, that would be under the terms of the Napolitano memo and

12     in compliance with the Eastern District of New York's

13     injunction which vacated the Wolf memo.  What's left

14     controlling is only the Napolitano memo at this point.

12:49PM 15          The Napolitano memo has been in effect this whole

16     time and has been affecting, impacting what is DACA this whole

17     time; so that has not changed since 2012.

18          But what has changed is kind of these additional,

19     the Wolf and Edlow memos which impacted directly how the

12:49PM 20     Napolitano memo was to be implemented.  Those have been vacated

21     and so right now it is only the Napolitano memo that is being

22     enforced.  DHS still plans to implement DACA under those terms

23     for the foreseeable future.

24          THE COURT:  Based on the court order?

12:49PM 25          MR. COGHLAN:  I'm sorry, Your Honor?

1        THE COURT:  Based on the New York court order?

2        MR. COGHLAN:  Well, the New York court order vacated

3    the Wolf memo and basically took that out of existence.  So all

4    that is left is the 2012 memo for now that is looking into -- I

12:49PM  5    will say the acting solicitor general has not made a

6    determination on appeal in the Eastern District case yet and I

7    don't want to say anything that would limit his ability to do

8    that.

9        But I think either way, the 2012 Napolitano memo

12:50PM 10    is still in effect and the department continues to abide by

11    that for the foreseeable future.

12        So as I've suggested, Your Honor, we appreciate

13    that this Court has already ruled as a matter of law that DACA

14    is likely substantively unlawful because it violates the INA

12:50PM 15    and the federal defendants acknowledge that it is bound by the

16    Fifth Circuit's precedential ruling as the legality of DAPA and

17    the standard of DACA in the Texas ruling and will very likely

18    not depart from its own prior rulings finding that DACA is

19    manifestly contrary to the statutory scheme promulgated by

20    Congress and the INA.

21        We do have views on the potential remedies,

22    Your Honor, but I understand --

23        THE COURT:  In just a moment.  I'm going to let

24    Mr. Disher -- I'm going to untie his hands and he can hit back.

12:50PM 25        MR. DISHER:  Thank you, Your Honor.  Happy to do it.  I

1    just have a few brief things to say in no particular order.

2              First of all, in relation to advance parole and

3    the discussion about who is or who is not eligible for advance

4    parole, I will just point the Court to our reply brief filed on

12:51PM  5    November 20th, Docket Number 529, ECF Page 14, where we had

6    cited to the U.S. Customs and Border Patrol's website on which

7    it, in fact, says:  "Aliens in the United States are not

8    eligible for advance parole if they are...in the United States

9    illegally."

12:51PM  10             DACA of course has removed that provision for its

11   recipients meaning that they are now eligible for advance

12   parole which can lead to that pathway to citizenship.

13             I heard the lawyer for the defendant-intervenors

14   frame this case as such.  She said DACA has two components and

12:51PM  15   I think everybody agrees on the first component which is

16   forbearance from removal.

17             But then she went on to say, plaintiffs argue

18   that there is a second component to DACA, which is work

19   authorization and the benefits that go along with that lawful

12:52PM  20   presence.

21             Your Honor, it's not just the plaintiffs that

22   argue that; nine justices of the United States Supreme Court

23   have now agreed with the plaintiffs' position on that point.

24             In particular, Chief Justice Roberts says, in no

12:52PM  25   uncertain terms DACA is not simply a nonenforcement policy.  In

short, the DACA memorandum does not announce a passive
nonenforcement policy.  It created a program for conferring
affirmative immigration relief.  The creation of that program
and its rescission is an action that provides focus for
judicial review.  The benefits attendant to deferred action
provide further confirmation that DACA is more than simply a
nonenforcement policy.

          That is precisely what the plaintiffs are
challenging in this case.  It is not removal forbearance; it is
removal forbearance plus all of the attendant rights and
benefits granted to the DACA recipients through the executive
action.

          DHS and the federal defendants, of course, they
could have issued a different memo and Chief Justice Roberts
again acknowledges this.  They could have issued a memo that
simply said, we are going to forebear from removing this
particular class of individuals.  But that does not mean that
these individuals are considered lawfully present and eligible
for all of the attendant benefits that come along with that.

          And Chief Justice Roberts recognizes this in
Footnote 5, where he says lawful presence is a statutory
prerequisite for a receipt of certain benefits.  It is not the
same as forbearance nor does it flow inexorably from
forbearance.

          So DHS could have potentially said, we are simply

1   forbearing from removing this particular class of people.  That

2   would be a completely different case.

3               But what this Court has in front of it is a memo

4   that does more; and that's, in fact, acknowledged by DHS itself

12:54PM  5   or -- excuse me -- USCIS.  And this is Exhibit 4 to our motion

6   for summary judgment which is the frequently asked questions.

7               Question Number 1:  "What is deferred action?"

8               It goes on and then it says:  "An individual who

9   has received deferred action is authorized by DHS to be present

12:54PM  10  in the United States and is therefore considered by DHS to be

11  lawfully present during the period deferred action is in

12  effect."

13              They did not have to say that.  They could have

14  said, we are simply forbearing from removing this group of

12:54PM  15  people; but of course they went further as now all of the

16  members of the Supreme Court have recognized.

17              In that recognition, just to respond to this idea

18  of discretion and how DACA is being implemented, in the Supreme

19  Court's recognition of those aspects of the DACA program, the

12:55PM  20  Supreme Court never once talks about discretion or how DACA is

21  being implemented, meaning that this Court only needs to look

22  at what DACA did the day that it was enacted and the rights and

23  benefits that flow from that program.

24              So we contend certainly that the evidence shows

12:55PM  25  that the federal defendants continue not to exercise

1    discretion.  There was no discretion being exercised before the

2    2017 rescission attempt and what the evidence shows is that

3    even since that attempted rescission, the grant of renewal DACA

4    applications is over 99 percent.

12:55PM  5          Again, that's all in our briefing.  So there was

6    no discretion when they were originally granted DACA status and

7    now there continues to be no discretion being used for that

8    population that has already received DACA.

9          But even setting discretion aside, as this Court

12:56PM 10   has acknowledged in ruling on the preliminary injunction and as

11   the Supreme Court has made clear, we don't even need to talk

12   about discretion to get to the fact that DACA itself, the 2012

13   memo is unlawful, both substantively and procedurally.

14         And then finally, Your Honor, there simply is no

12:56PM 15   reason to exercise additional delay in this case.  We of course

16   filed our lawsuit in May of 2018.  President Obama overstepped

17   his authority when his administration issued the DACA

18   memorandum in 2012, and nothing now can change that.

19         This Court is being asked to rule on the 2012

12:56PM 20   memorandum that created the DACA program.  There is no

21   additional reason now to delay.  That program was unlawful at

22   its inception, and it continues to be unlawful today.

23         THE COURT:  Okay.  All right.  Let's switch gears and

24   talk about remedies.

12:57PM 25         And I want to -- I'm giving everybody what I'll

call blanket immunity for right now that obviously -- and I'm

reading from the states' proposed order that the plaintiffs'

motion for summary judgment is granted and the 2012 memorandum

that created the DACA program is set aside.  So I assume that's

12:57PM   Mr. Disher's preferred remedy.

I'm assuming your preferred remedy, the

defendant-intervenors, is that I grant your summary judgment

and say they don't have standing.

So I'm taking those two things as assumptions and

12:58PM   I'm -- I know it's kind of in a little bizarre way to ask but I

think it needs to be probed.  Let's assume for a minute -- I'm

going to start with the intervenors.  Let's assume that Texas

convinces me that it either violates the APA or the take care

clause hypothetically.  I know you're not conceding anything.

12:58PM   What remedy should I -- what is the remedy?

MR. FEIGENBAUM:  Thank you, Your Honor.  We appreciate

the chance to chat about the remedies.

So I want to talk both briefly about the

plaintiff states' proposal for the set aside and then also what

12:58PM   our proposal, which would be I think a remand without vacating

the memo in the interim which is I think most consistent with

the *Regents* opinion.

THE COURT:  A remand to the DHS?

MR. FEIGENBAUM:  To DHS, yes.

12:58PM   So first I just want to talk briefly about the

1    set aside request and maybe we'll get some clarity this

2    morning.  But as I understood it, they're essentially saying,

3    well, under the plain terms of the statute, if you find that

4    the 2012 DACA memorandum is the operative one in front of you

12:59PM  5    and it's unlawful, then you have to just set it aside.

6             And I don't totally -- if I'm following it

7    correctly, that essentially means that by that logic, there's

8    never any discretion.  Once you find summary judgment in a sort

9    of regulatory APA case, the relevant regulation or memo or

12:59PM  10   whatever is before you has to be just set aside or vacated.

11            That's obviously contrary to the way the case law

12   works and to this Court's own concerns about sort of nationwide

13   injunctions.  If you're just automatically vacating any sort of

14   policy, memo, regulation in front of you based on the plain

12:59PM  15   language of the APA, then in every case, you're just on a

16   nationwide basis enjoining the memo.

17            Maybe we'll get some clarity and I'm

18   misunderstanding the plaintiff states' position; but at least

19   if that's the position, then it's obviously a radical expansion

01:00PM  20   of the way that nationwide relief would work.

21        THE COURT:  Well, it's the way it's worked not only in

22   the DAPA case; but it's the way it's worked in every case since

23   then.  And the reason -- and I don't know this.  I've not

24   talked to the various judges that handled the challenge to the

01:00PM  25   DACA rescission.  But the reason they all did -- when they

1  issued an injunction, they made it nationwide is because -- and

2  I say "all."  I mean, most of them -- is because it's hard to

3  slice and dice immigration law.

4          You can't say, okay, we're going to have

01:00PM 5  immigration law for Texas be X and for New Mexico and Arizona

6  be Y.  And if you remember, in the preliminary injunction order

7  I issued, I actually talked about that and it's one of the

8  reasons I'm raising it today.

9          I mean, you know, if there's a way to slice and

01:01PM 10  dice it, I think any court would welcome anything that made

11  sense.  Number one, on the scale of it, should it be

12  nationwide?  There have been, as you know, there have been some

13  people that say you should rule just for your circuit or just

14  for, you know -- but that would ruin the uniformity of it.

01:01PM 15          But I do want to hear those suggestions.  But

16  also I'm asking with regard to slicing and dicing, not

17  necessarily the scale of it, but the order itself then.  By

18  "order," I mean Secretary Napolitano's memo.

19          MR. FEIGENBAUM:  So in that case I think it gets to,

01:01PM 20  you know, let's just assume we're figuring out slicing and

21  dicing, what would we do here.  And so I can lead off with ours

22  and we can talk about the slicing.

23          So in terms of what we would propose --

24          THE COURT:  Those are all technical terms.  They go

01:02PM 25  with "ball of wax," "slicing and dicing."

1          MR. FEIGENBAUM:  We're creating a whole new *Black's Law*

2     chapter today.

3          THE COURT:  That's right.  Bryan Garner would be

4     thrilled.

01:02PM   5          MR. FEIGENBAUM:  Exactly.  So I just want to say why we

6     think remand without vacatur is the appropriate thing to do

7     here -- remanding to DHS without vacating it in the meantime.

8               So the Fifth Circuit has walked through that as a

9     sort of ever-available option in APA cases, including cases

01:02PM   10    where plaintiff states or any sort of plaintiff is coming

11    forward and saying, please set it aside, there's always the

12    option to remand without vacating.

13              And the two factors that the Fifth Circuit has

14    identified, like the DC Circuit and like plenty of other

01:02PM   15    circuits have done, is that you would do that sort of remand

16    without vacating in the interim based on the disruption that

17    any court order might have and based on the flexibility the

18    agency would have on remand.

19              So I think of one case that's illustrative of

01:03PM   20    that point but there are really quite a lot for that

21    proposition.  So it's essential in *Southwest Services versus*

22    *EPA.*  That's 220 F.3d 683, which is a 2000 decision from the

23    Fifth Circuit.  It's just illustrative.  There are a lot of

24    examples.

01:03PM   25              And we think those factors here are

1    extraordinarily compelling for pointing to not vacating

2    immediately before the memos that are in front of the Court and

3    instead remanding to DHS.

4            So the first is disruption.  This Court is well

01:03PM  5    aware of the way the egg has been scrambled because this Court

6    put quite a lot of detail on it in its preliminary injunction

7    opinion.

8            And so I will just note on top of that opinion,

9    we of course entirely agree with this point.  We think there's

01:03PM 10    a lot of new evidence in summary judgment that continues to

11    show the way individual DACA recipients will have their lives

12    entirely disrupted and then the effects that that will have on

13    states like New Jersey, local governments within New Jersey,

14    universities in New Jersey, and the medical industry within

01:03PM 15    New Jersey.

16            We've included all sorts of evidence at summary

17    judgment about doctors; women who do registration at COVID

18    testing sites; individuals who do site visits for distressed

19    homes, part of our Child Protection Program, even when they

01:04PM 20    know there's a COVID-positive parent there.

21            So there's extensive examples of disruption that

22    I think any sort of immediate injunction would have.

23            The second question comes to flexibility.  As

24    this Court has noted, this is an unusual case.  This is a case

01:04PM 25    where we have a Supreme Court opinion about a rescission of a

1    memo that is being challenged in this case; so it's obviously

2    not every day.

3            And what the Supreme Court identified in *Regents*

4    is that even assuming DACA is unlawful -- which, again, we are

01:04PM  5    assuming for this exact conversation -- so assuming DACA is

6    unlawful, DHS has extraordinary flexibility in how it needs to

7    think about reliance interests, what that means on the ground.

8            The *Regents* opinion specifically says:  Deciding

9    how to best address a finding of illegality going forward can

01:05PM 10    involve important policy choices, especially if the finding

11    concerns a program with the breadth of DACA.  Those policy

12    choices are for DHS.

13            Now, I'm not saying this Court doesn't have any

14    role in the slicing and dicing.  Of course it does.  But this

01:05PM 15    Court's role is exactly what *Regents* identified in the

16    rescission context, as the backstop to review what actions are

17    arbitrary and capricious.

18            The answer, if this Court believes DACA is

19    unlawful, is to remand to the agency in the first instance to

01:05PM 20    make the policy calls that *Regents* has said it can make and

21    that this Court would be telling it to make.

22            And then if the plaintiff states are unhappy with

23    the way the policy calls are made or any other parties are

24    unhappy, there will be a challenge in front of Your Honor and

01:05PM 25    Your Honor, in an arbitrary and capricious framework, will have

1    the opportunity to review the consistency with the law based on

2    the actions that were taken on remand.

3           That would be the normal course.  It wouldn't be

4    in light of the *Regents* opinion for this Court to, I think,

01:06PM  5    step out on a limb and decide the precise remedy.

6           The Supreme Court could have done that too.  If

7    that was the answer to a finding of unlawfulness, then *Regents*

8    would have done more.  But *Regents* said, we accept

9    unlawfulness, now, DHS, do your work on policy questions.

01:06PM  10           Federal defendants say that's the process that's

11   already ongoing and we imagine would continue ongoing after any

12   decision by the Court and so any decision by this Court should

13   be followed by a remand.

14           THE COURT:  Okay.  Anybody else want to weigh in?

01:06PM  15   Ms. Perales?

16           MR. DISHER:  I certainly do.

17           THE COURT:  Why did I know that?

18           MR. DISHER:  Thank you, Your Honor.

19           So as for the remedy, I think what New Jersey and

01:06PM  20   to a lesser extent the DACA intervenors are asking for is quite

21   extraordinary.  They're asking for this Court to -- again, in

22   the hypothetical -- find that an agency action is unlawful

23   contrary to the statutory authority that that agency has and

24   then let that agency action stay on the books while they try to

01:07PM  25   fix it.  Now --

1      THE COURT:  Well, can't they go back and fix it?

2   Couldn't they go back and propose DACA and have notice and

3   comment and come on through?

4      MR. DISHER:  A couple of things on that.

01:07PM   5      THE COURT:  All right.

6      MR. DISHER:  The remedy that we're seeking here --

7   first, just to be crystal clear -- is not simply an absolute

8   set aside, the 2012 DACA memorandum is gone as of today.

9   That's not what we're seeking.

01:07PM   10      That is the first step of what this Court should

11   do, but we fully acknowledge that the Court has the equitable

12   power to stay the effect of that set-aside for a certain period

13   of time.

14      And let me give the Court an example in this

01:07PM   15   particular context.  The district court from the District of

16   Columbia did exactly this with the 2017 rescission memo.  On a

17   summary judgment final ruling posture, the district court said,

18   the 2017 rescission is unlawful.  I am, therefore, setting it

19   aside as is mandated by the APA; but I'm going to stay the

01:08PM   20   effect of my ruling for a certain number of days to allow the

21   federal defendants to try to redo it.

22      We are in no way seeking an injunction saying

23   that the federal defendants can never retry to do anything.

24   But all we're here to decide about today is the only agency

01:08PM   25   action that's in front of the Court which is the 2012 DACA

1    memorandum.  So we are not, again, seeking an injunction saying

2    the federal defendants are precluded from ever doing anything

3    in this field ever again.  If they do that -- or I should say

4    maybe when they do that, we can reevaluate that agency action

01:08PM  5    on its merits; consider litigation against that; or if it

6    complies with all of the APA and the constitutional framework,

7    then it's great.

8              But all we're saying here today is that the 2012

9    DACA memorandum exceeded their statutory authority.  So the APA

01:09PM  10   is clear on what happens -- on what remedy is required in the

11   first instance which is to set it aside.

12             It is not, in fact, an injunction.  This is

13   different than a challenge to a statute.  And there's a really

14   good law review article called *The Writ-of-Erasure Fallacy* that

01:09PM  15   goes into this, written by Jonathan Mitchell, talking about the

16   difference between an injunction against a statute and an APA

17   challenge against an agency's action.  When the Court is asked

18   to rule on a statute, it cannot erase the statute, it merely

19   enjoins the governmental actor from enforcing that statute.

01:09PM  20             The APA is different.  If there is an APA

21   challenge to an agency action, the Court actually is empowered

22   and I would argue required to set that action aside as if it

23   never existed.  Not only is that what happened in the DC court,

24   but the Supreme Court in fact affirmed that remedy in the

01:09PM  25   *Regents* opinion saying that the DC court did it right.  They

1    affirmed the complete vacatur of the 2017 DACA memorandum.

2              And so we know from that reasoning that what this

3    Court has to do in the first instance is to set aside the 2012

4    DACA memorandum.  But we are not arguing by any means that the

5    Court's hands are then bound at that point because the Court

6    clearly has the authority to stay the effect of that ruling for

7    a certain period of days.

8              And that is why we have suggested to the Court

9    various options in our briefing about how best to do this and

10   this -- one would be a complete set aside of the DACA

11   memorandum but stay the effect of that for two years.  That

12   would allow some appellate review of this Honor's ruling, it

13   would also allow those who have existing grants of DACA some

14   certainty about when those grants would potentially end, but it

15   wouldn't be today, it wouldn't be tomorrow.  It would be kind

16   of an orderly wind down of the program.

17             Another example would be to stay the effect of

18   this Court's ruling as it applies to folks who have an existing

19   grant of DACA through the program.  In other words, no new

20   grants, no new advance parole, no renewals; but everybody who

21   has a DACA grant for the next year or two years, however long

22   it may be, you can let that expire, you know, based on its own

23   terms.

24             So just to be clear, we are not saying that this

25   Court has to set aside DACA today and all grants of deferred

1   action pursuant to the program are thereby vacated.  But what

2   the Court has to do if it finds DACA unlawful, is to set aside

3   the agency action in the first instance and then craft whatever

4   remedy it may do on the back end.

01:11PM  5        There is simply no reason to leave the unlawful

6   program in place while the federal defendants do whatever it is

7   they're going to do if anything -- there's a chance that they

8   don't do anything -- and then we have no effective relief.

9        And then also whatever action they do take, the

01:12PM 10  history of this case has shown that that action is likely going

11  to be bound up in federal litigation and so the only way for

12  the plaintiffs to get an effective measure of relief in this

13  case is for the 2012 memo to be set aside in the first instance

14  and then we have proposed two different alternatives for the

01:12PM 15  Court to exercise its equitable powers to consider whatever

16  reliance interests there may be and help the process go through

17  appellate review and allow DACA recipients to prepare for the

18  ultimate set aside of the program.

19        THE COURT:  Mr. Coghlan, do you want to weigh in?

01:12PM 20        MR. COGHLAN:  Yes, Your Honor.

21        Your Honor, as I understand the hypothetical

22  Your Honor placed before us is what to do if the Court decides

23  that DACA is substantively unlawful, how to grant its remedies.

24        So as I understand that --

01:12PM 25        THE COURT:  We're waving good-bye to Louisiana.

1    MS. MURRILL:  Thank you.  It was nice being with you,

2    Judge.

3    MR. COGHLAN:  And the federal defendants' view,

4    Your Honor, is that you craft any remaining order in such a way

01:13PM  5    it still provides DHS with the opportunity to consider how to

6    conduct an orderly wind down of the program and consider the

7    reliance interests that were handed down by the Court in the

8    *Regents* decision.

9         If Your Honor intends to rule in this fashion, we

01:13PM  10    think the issues are complex enough that it would benefit from

11    additional limited, focused briefing purely on what that should

12    look like and how long it should take.

13         I think that it need not prevent the Court from

14    issuing a finding prior to that briefing, as the Court actually

01:13PM  15    did in EDNY, or issued its legal determination in that and

16    invited additional briefing from the parties on remedy.

17         You know, the issues here are complicated enough

18    and DHS is still working through them, as instructed by the

19    Court in *Regents*.

01:13PM  20         To that extent we think that whatever the Court

21    does, it should recognize that DHS will need some flexibility

22    and time to wind the program down if it is determined to be

23    unlawful.

24         And for more specifics, we think that the Court

01:14PM  25    would benefit from additional, again, limited, focused briefing

1    on this.

2         THE COURT:  All right.  Anyone else want to add

3    anything?

4         MR. FEIGENBAUM:  Your Honor, if I may, just two

01:14PM   5    clarifying points.

6              The first is, you know, I had said in my initial

7    comments on remedy that I wasn't sure how broad the position of

8    plaintiff states was in terms of when you would have to do set

9    asides of regulations.

01:14PM  10              I think the answer shows it actually is

11    extraordinarily sweeping if we're suggesting that you might be

12    required to do a full set aside of a regulation because

13    regulations are different from statutes.

14              There's plenty of instances of remand without

01:14PM  15    vacatur, in which circuit courts -- DC Circuit, Fifth Circuit,

16    and so on and so forth -- have remanded to agencies for further

17    proceedings even after making a finding of unlawfulness.

18              So the sort of idea that you would be required by

19    a finding of unlawfulness to issue some sort of set aside

01:15PM  20    instead of a remand without vacatur can't be right and would

21    also mean that *Regents* itself was wrong.

22              *Regents* itself accepted a finding of unlawfulness

23    and nevertheless said that DHS had important following steps to

24    take.

01:15PM  25              So, again, I think that that sort of sweeping

1    argument that you are bound to do some sort of set aside is

2    certainly inconsistent with *Regents* and circuit case law and

3    with Your Honor's own PI opinion where you talked in

4    considerable detail about preliminary injunction and the pros

01:15PM  5    and cons specifically in the context of setting aside the memo.

6          It wasn't a statute before Your Honor at the PI

7    stage, and so I think that that's an important point to

8    remember.

9          The only other thing I wanted to note is that

01:15PM  10   plaintiff states have identified a whole range of options for

11   Your Honor to consider, how long to stay some sort of ruling,

12   what way to do slicing and dicing, and so on and so forth.

13         We don't disagree that any and all of that would

14   be considered, we just think it needs to be considered by DHS

01:16PM  15   on remand because we think that's going to bring in all of

16   those questions about reliance that *Regents* all but begged,

17   urged DHS to do in the first instance.

18         We don't think that dispossesses plaintiff states

19   of any right to relief or any effective remedy.  It simply

01:16PM  20   suggests, as is normal and as *Regents* has asked for, that DHS

21   make the call in the first instance.

22         If it's taking too long, plaintiff states are

23   free to return to this Court for some sort of enforcement of

24   its prior remand to urge faster action from DHS.

01:16PM  25         And, of course, at the same time if DHS acts in

1  some way that plaintiff states believe is arbitrary and

2  capricious based on how they account for reliance interests,

3  then this Court is free to take action too.

4          So we're not suggesting that plaintiff states are

01:16PM  5  dispossessed of any opportunity or that this Court is prevented

6  effective relief or effective remedies.  We're just talking

7  about DHS having the opportunity in the first instance because

8  we think that's exactly what *Regents* suggested is supposed to

9  happen after a finding of unlawfulness.

01:16PM  10          THE COURT:  Well, if I do that, Mr. Feigenbaum, can't

11  DHS -- and this, again, is not rhetorical -- can't they just go

12  back and say, "Okay.  We like the Napolitano memo.  Let's put

13  it up for notice and comment"?

14          MR. FEIGENBAUM:  So Your Honor has a whole range of

01:17PM  15  options.  That's certainly an option that would be considered.

16  If Your Honor says, "This is unlawful because of a procedural

17  APA problem" and DHS upon remand wants to do notice and

18  comment, absolutely that's one of the options.

19          And so I do think that having a whole range of

01:17PM  20  options, but not vacating DACA in the meantime, is obviously

21  the best way to take into account reliance interests.

22          In Your Honor's example, a set aside of DACA

23  would, I think, create some chaos during the process of that

24  notice and comment rulemaking that you hypothesized because

01:17PM  25  individuals who remain removable but have associated collateral

1    benefits are going to be thrown into a real change of

2    circumstances while that proceeding is ongoing which is exactly

3    what remand without vacatur is meant to prevent and exactly

4    what *Regents* worked so hard to try to prevent in the way it

01:18PM  5    suggested that DHS go and make those policy calls about

6    reliance.

7              So I do think your hypothetical or your question

8    proves the point at the end of today that it makes sense not to

9    do an immediate set aside if one of the options on remand is

01:18PM 10    going to be the possibility for notice and comment rulemaking.

11    It would be much better to maintain the status quo, the status

12    quo that existed in part, as Your Honor noted, because of the

13    length of time it took for plaintiff states to bring this case.

14              And the number of individuals who are eligible

01:18PM 15    for DACA, who came forward and provided information to the

16    federal government in reliance on that, these are all reliance

17    interests that DHS needs to think about; that DHS, we

18    understand, is thinking about.

19              And this is an area where New Jersey and federal

01:18PM 20    defendants are in agreement.  This is an area they're thinking

21    about.

22         THE COURT:  Get that on the record.  They've actually

23    agreed on something.

24         MR. FEIGENBAUM:  It's possible.  Bold, highlighted,

01:18PM 25    et cetera.  So I do think we agree.

1          The last point is just that it's a long-standing

2    equitable principle, of course, that relief should not be

3    broader than is necessary to cure the harm.

4          The action this Court took in *Texas I* was when it

01:19PM  5    was facing 26 states where they were representing 50 percent of

6    the population and DAPA had not been implemented.

7          THE COURT:  Well, I think the last point that you hit

8    on is quite frankly the most important because DAPA had not

9    been implemented and the government took the position that if I

01:19PM 10    didn't enjoin them, they were going to implement it, like the

11    next week and it would create reliance issues once it was

12    implemented.  So this is a different situation completely.

13          MR. FEIGENBAUM:  You said it better than I did, so I

14    won't bear repeating it.

01:19PM 15          THE COURT:  All right.

16          MR. DISHER:  Your Honor, may I briefly respond?

17          THE COURT:  You may.  You can have the last word.

18          MR. DISHER:  Thank you.

19          On that last point about --

01:19PM 20          THE COURT:  Oh, if that were only true.  Go ahead,

21    Mr. Disher.

22          MR. DISHER:  That would be nice.  Maybe one day.

23          On that last point about reliance interest, one

24    thing to note on that is, of course, as we sit here today, DHS

01:20PM 25    and federal defendants are going to start and are, in fact,

1    starting to process initial DACA grants as well as the grants

2    of advance parole.

3            And as we pointed out in the reply, the eggs have

4    not been scrambled for those folks.  The reliance interests

01:20PM  5    that they may claim is vastly less.

6            And to the idea of reliance more generally, that

7    is -- we're cognizant of that, but that is why we have offered

8    the Court a couple of different options about how to do this

9    taking into account those reliance interests.

01:20PM  10            But I will still maintain that the right option

11    is to not allow the program to remain on the books if it is in

12    fact unlawful.  The instances in which there is remand without

13    vacatur, it normally arises in the context of an arbitrary or

14    capricious challenge.  In other words, the agency has not

01:21PM  15    explained its reasoning well enough and so the Court is going

16    to leave the action on the books but allow the agency to have

17    another crack at trying to explain their rationale.

18            In this case, Your Honor, there is no rationale

19    that DHS or the federal defendants can provide that makes DACA

01:21PM  20    lawful.  DACA is in excess of their statutory authority so it

21    is substantively unlawful and it was issued without notice and

22    comment rulemaking; so it is procedurally unlawful.

23            It's not as if we are complaining about the

24    reasoning and rationale that they gave in the first instance;

01:21PM  25    it's that they couldn't do this at all; and even if they could,

1    they did it the wrong way.

2            So there's no reason, if this Court finds that

3    DACA is unlawful, to let it remain on the books -- an unlawful

4    agency action on the books and yet remand it to the agency.

01:22PM   5            And any reliance interests that the New Jersey or

6    DACA intervenors bring up can be accounted for in that limited

7    stay of the effect of the Court's ruling as the DC Circuit

8    Court did.

9            And by the way, in the *Regents* case, of course,

01:22PM   10   that was an arbitrary and capricious challenge; but the Supreme

11   Court didn't remand it, didn't allow the decision to remain in

12   place to remand it to the agency to better explain their

13   reasoning.  The DC Court set the 2017 memo aside completely and

14   that is what the Supreme Court affirmed, even in the arbitrary

01:22PM   15   and capricious challenge, which is the proper context

16   potentially for remand with vacatur.

17           We are not in an arbitrary and capricious

18   challenge.  We are in a substantively and procedurally unlawful

19   context and therefore the proper remedy here in the first

01:22PM   20   instance is to set aside the program and then have the Court

21   use its powers of equity to enter some type of limited stay to

22   account for whatever reliance interests the Court deems

23   reasonable.

24           THE COURT:  Thank y'all.  I appreciate you coming here.

01:23PM   25           I apologize again for making some of you travel

1    in some cases great distances.  But as I said, it was the

2    measured judgment of the Southern District -- it's why we're

3    not starting jury trials on January 2nd, 3rd, 4th, we're

4    waiting until the 19th because we're worried about COVID and

01:23PM  5    the holidays.

6              And so I'm sorry to make y'all do that.  I

7    appreciate you coming.  Y'all stay safe, and have a good

8    holiday.

9              COURTROOM SECURITY OFFICER:  All rise.

10              (The proceedings were adjourned.)

11                        * * * *

1              REPORTER'S CERTIFICATE

2              I, Lanie M. Smith, CSR, RMR, CRR, Official
   Court Reporter, United States District Court, Southern District
3  of Texas, do hereby certify that the foregoing is a true and
   correct transcript, to the best of my ability and
4  understanding, from the record of the proceedings in the
   above-entitled and numbered matter.

5

6                              /s/ Lanie M. Smith_____
                               Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$250** [1] - 40:3

## /

**/s** [1] - 129:6

## 1

**1** [1] - 107:7
**1.5** [5] - 51:22, 52:14, 53:12, 65:14, 66:21
**1000** [1] - 2:14
**105** [1] - 21:16
**11** [2] - 23:2, 45:5
**110** [1] - 2:2
**1152** [2] - 63:21
**1182(d)(5)(A** [1] - 63:25
**12** [1] - 23:2
**13** [1] - 71:18
**13,908** [1] - 53:12
**130** [1] - 20:22
**14** [1] - 105:5
**14,000** [2] - 52:21, 53:22
**14,358** [1] - 53:12
**14th** [1] - 1:15
**15** [2] - 72:10
**150** [2] - 21:8, 72:6
**152** [1] - 55:22
**15th** [1] - 1:18
**170** [1] - 20:23
**18-cv-68** [1] - 3:6
**180,000** [1] - 66:14
**1885** [1] - 1:21
**1902** [2] - 88:7, 95:13
**1980s** [3] - 93:21, 95:23, 97:6
**19th** [1] - 128:4
**1:18-CV-00068** [1] - 1:4

## 2

**2** [1] - 53:1
**20** [1] - 71:18
**2000** [1] - 112:22
**20006-6807** [1] - 2:5
**20044** [1] - 2:12
**2007** [1] - 43:12
**2012** [26] - 48:12, 50:10, 50:19, 54:21, 57:9, 72:10, 72:17, 72:18, 74:10, 78:22, 80:14, 80:16, 95:12, 97:7, 98:8, 103:17, 104:4, 104:9, 108:12, 108:18, 108:19, 109:3, 110:4, 116:8, 116:25, 117:8, 118:3, 119:13
**2013** [1] - 78:16
**2015** [2] - 76:21, 89:13
**2017** [8] - 76:22, 77:10, 98:4, 108:2, 116:16, 116:18, 118:1, 127:13
**2018** [5] - 56:3, 57:19, 90:24, 108:16
**2019** [2] - 73:11, 78:18

**2020** [4] - 1:7, 78:18, 86:20, 90:25
**2021** [1] - 72:10
**209** [1] - 1:15
**2099** [1] - 2:5
**20th** [1] - 105:5
**215** [1] - 29:22
**215-1** [1] - 89:15
**22** [1] - 1:7
**220** [1] - 112:22
**225-5** [1] - 31:2
**2300** [1] - 2:15
**24** [1] - 83:13
**247(c)(14)** [2] - 63:2, 63:16
**25** [2] - 2:9, 83:13
**250** [1] - 47:3
**26** [1] - 125:5
**279-96** [1] - 89:18
**2:13-193** [1] - 77:5
**2nd** [1] - 128:3

## 3

**3** [2] - 21:16, 52:24
**300** [2] - 1:18, 2:2
**318** [1] - 21:15
**390** [1] - 6:25
**3rd** [2] - 1:21, 128:3

## 4

**4** [1] - 107:5
**405** [1] - 89:15
**411** [1] - 12:10
**42** [1] - 90:25
**45** [2] - 47:22, 48:16
**452** [1] - 12:2
**484** [2] - 53:6, 65:7
**487-2** [1] - 53:1
**4th** [1] - 128:3

## 5

**5** [1] - 106:21
**50** [1] - 125:5
**50/50** [1] - 15:22
**500** [1] - 53:6
**515** [1] - 2:19
**529** [1] - 105:5
**553(c** [1] - 96:4

## 6

**6** [2] - 4:6, 89:18
**60** [1] - 29:22
**634** [2] - 22:2, 22:12
**635** [1] - 22:12
**645,000** [2] - 66:3, 66:8
**683** [1] - 112:22
**69** [2] - 65:8, 65:10

## 7

**70802** [1] - 1:22
**77002** [2] - 2:15, 2:20
**78205** [1] - 2:3
**78701** [1] - 1:16
**78711** [1] - 1:19

## 8

**8** [1] - 63:25
**8004** [1] - 2:19
**80625** [1] - 2:9
**809** [1] - 21:7
**821,000** [1] - 66:12
**86** [1] - 22:1
**868** [1] - 2:12
**87** [1] - 55:19
**878** [1] - 31:1
**8th** [1] - 1:16

## 9

**99** [1] - 108:4

## A

**Abbott** [1] - 77:4
**abide** [1] - 104:10
**ability** [2] - 104:7, 129:3
**able** [13] - 8:23, 14:12, 14:13, 41:23, 42:16, 43:2, 60:2, 63:5, 65:11, 68:14, 80:19, 81:22, 100:24
**above-entitled** [1] - 129:4
**absence** [1] - 26:13
**absolute** [1] - 116:7
**absolutely** [4] - 39:13, 48:14, 71:14, 123:18
**abundant** [1] - 60:7
**ACA** [6] - 8:5, 8:6, 14:21, 17:9, 17:22, 17:24
**accept** [7] - 54:14, 58:2, 85:12, 91:24, 96:17, 96:5, 98:5, 115:8
**accepted** [2] - 80:10, 121:22
**accepting** [2] - 43:24, 56:17
**access** [1] - 102:8
**accident** [2] - 36:7, 36:8
**accord** [1] - 7:11
**according** [3] - 39:11, 67:18, 68:10
**account** [4] - 123:2, 123:21, 126:9, 127:22
**accounted** [1] - 127:6
**accounting** [1] - 39:18
**accurate** [1] - 62:22
**acknowledge** [2] - 104:15, 116:11
**acknowledged** [4] - 16:22, 32:11, 107:4, 108:10
**acknowledges** [1] - 54:11, 55:15, 106:15
**acoustics** [1] - 23:9

**Act** [4] - 7:22, 45:10, 46:20, 56:1

**act** [3] - 55:17, 82:24, 94:21

**acting** [3] - 79:24, 80:4, 104:5

**action** [82] - 15:16, 16:8, 44:19, 45:11, 46:16, 46:17, 46:23, 50:2, 50:21, 50:24, 51:11, 52:2, 52:4, 52:17, 55:13, 55:16, 55:23, 55:24, 57:11, 59:23, 60:1, 60:5, 60:11, 60:15, 61:8, 61:14, 61:24, 61:25, 66:2, 68:15, 69:11, 69:12, 69:13, 70:17, 70:19, 70:24, 71:2, 71:13, 72:3, 72:14, 73:11, 73:19, 76:19, 86:22, 93:2, 93:3, 93:14, 93:18, 94:15, 94:18, 94:20, 95:11, 95:17, 95:24, 96:7, 96:8, 96:11, 96:17, 97:3, 106:4, 106:5, 106:12, 107:7, 107:9, 107:11, 115:22, 115:24, 116:25, 117:4, 117:17, 117:21, 117:22, 119:1, 119:3, 119:9, 119:10, 122:24, 123:3, 125:4, 126:16, 127:4

**actions** [4] - 41:10, 97:4, 114:16, 115:2

**activity** [1] - 29:22

**actor** [1] - 117:19

**acts** [1] - 122:25

**actual** [6] - 6:2, 8:16, 17:15, 34:23, 85:6, 100:23

**add** [1] - 121:2

**addition** [2] - 8:22, 11:12

**additional** [11] - 42:4, 43:21, 56:11, 58:4, 103:6, 103:18, 108:15, 108:21, 120:11, 120:16, 120:25

**additionally** [1] - 13:13

**address** [2] - 24:24, 114:9

**addressed** [2] - 38:14, 79:4

**Addressing** [1] - 20:25

**addressing** [1] - 48:13

**adjourned** [1] - 128:10

**adjudicated** [1] - 80:11

**adjudication** [1] - 72:13

**adjust** [3] - 52:22, 53:14, 72:9

**adjusted** [5] - 53:7, 53:10, 53:16, 53:23, 65:8

**adjusting** [1] - 53:17

**administration** [28:11, 50:10, 50:13, 50:19, 50:20, 53:20, 59:4, 76:22, 77:24, 80:3, 91:5, 103:5, 108:17

**Administrative** [1] - 56:1

**admitted** [2] - 50:12, 55:8

**admittedly** [1] - 74:16

**admitting** [1] - 91:9

**adults** [1] - 37:10

**advance** [41] - 52:18, 53:7, 53:15, 56:18, 63:17, 63:20, 63:22, 64:1, 64:2, 64:7, 64:9, 64:10, 64:15, 64:20, 64:21, 64:22, 65:1, 65:2, 65:4, 67:14, 68:11, 68:17, 68:19, 79:5, 80:9, 80:13, 97:11, 98:3, 98:7, 98:9, 98:10, 98:11, 98:19, 105:2, 105:3, 105:8, 105:11, 118:20, 126:2

**adversity** [5] - 75:19, 75:20, 81:4, 81:6, 91:15

**affect** [2] - 8:12, 38:19

**affecting** [1] - 103:16

**affects** [1] - 28:25

**affirmatively** [1] - 88:12

**affirmed** [4] - 51:3, 117:24, 118:1, 127:14

**Affordable** [1] - 7:22

**age** [1] - 25:2

**agencies** [1] - 121:16

**agency** [20] - 56:25, 57:1, 57:8, 57:10, 71:2, 73:13, 112:18, 114:19, 115:22, 115:23, 115:24, 116:24, 117:4, 117:21, 119:3, 126:14, 126:16, 127:4, 127:12

**agency's** [1] - 117:17

**agents** [1] - 90:8

**aging** [2] - 67:1, 67:3

**ago** [3] - 22:14, 62:2, 78:5

**agree** [16] - 18:21, 19:17, 23:7, 25:18, 26:21, 28:1, 37:7, 40:19, 44:24, 60:6, 69:16, 88:20, 113:9, 124:25

**agreed** [4] - 11:13, 58:11, 105:23, 124:23

**agreement** [1] - 124:20

**agrees** [3] - 34:11, 56:3, 84:20, 92:4, 105:15

**ahead** [4] - 11:8, 29:18, 62:2, 125:20

**Air** [2] - 45:10, 46:20

**AL** [3] - 1:4, 1:7, 2:2

**ALAN** [1] - 1:17

**Alfred** [1] - 29:3

**alien** [3] - 5:13, 5:25, 71:13

**aliens** [3] - 15:8, 71:17, 105:7

**Alito** [1] - 54:8

**allegations** [1] - 43:25

**alleged** [1] - 40:12

**alleging** [1] - 55:21

**allow** [13] - 61:1, 64:7, 75:12, 75:21, 76:22, 77:11, 116:20, 118:12, 118:13, 119:17, 126:11, 126:16, 127:11

**allowed** [2] - 30:15, 77:19

**allows** [2] - 60:16, 102:8

**almost** [2] - 67:18, 76:11

**alone** [11] - 37:21, 40:2, 55:16, 83:3, 84:5, 89:7, 93:4, 94:7, 99:15, 100:11

**altered** [1] - 54:3

**alternative** [2] - 93:5, 93:8

**alternatives** [1] - 119:14

**AMERICA** [1] - 1:7

**amount** [12] - 24:2, 60:8, 85:17, 87:14, 87:18, 90:8, 91:6, 92:5, 92:6, 92:7, 92:22, 100:23

**analogy** [2] - 36:22, 36:23

**analysis** [25] - 9:10, 11:12, 12:1, 19:9, 19:13, 26:13, 38:19, 39:25, 40:4, 46:25, 47:4, 47:23, 51:9, 56:21, 61:12, 81:25, 84:18, 84:19, 85:11, 85:18, 85:19, 92:18, 92:19, 92:22

**analyze** [1] - 11:21

**ANDREW** [1] - 1:10

**anecdotal** [1] - 91:14

**anecdotally** [2] - 91:9, 91:17

**announce** [2] - 51:4, 106:1

**answer** [13] - 34:13, 52:10, 71:19, 71:23, 71:25, 72:2, 72:19, 73:2, 114:18, 115:7, 121:10

**answering** [1] - 67:17

**answers** [1] - 16:3

**anti** [1] - 5:24

**anti-immigrant** [1] - 5:24

**Antonio** [1] - 2:3

**anyway** [6] - 4:7, 4:15, 36:5, 50:20, 85:5, 91:25

**APA** [40] - 44:8, 44:18, 44:19, 44:23, 45:14, 45:21, 48:2, 48:14, 48:20, 51:12, 54:7, 54:20, 56:5, 56:10, 56:23, 57:8, 57:11, 58:9, 58:14, 58:16, 58:19, 62:6, 85:18, 85:19, 86:15, 89:1, 89:3, 89:8, 102:11, 109:13, 110:9, 110:15, 112:9, 116:19, 117:6, 117:9, 117:16, 117:20, 123:17

**apologies** [1] - 102:24

**apologize** [2] - 63:13, 127:25

**apparatus** [1] - 35:3

**appeal** [5] - 49:8, 79:21, 84:23, 97:21, 104:6

**Appeals** [1] - 21:6

**appear** [1] - 3:10

**APPEARANCES** [1] - 1:13

**appellate** [2] - 118:12, 119:17

**application** [1] - 67:11

**applications** [8] - 56:18, 80:8, 80:10, 90:4, 90:24, 96:13, 96:17, 108:4

**applied** [3] - 17:13, 58:11, 66:17

**applies** [7] - 48:14, 58:9, 58:10, 58:14, 72:4, 80:15, 118:18

**apply** [14] - 5:21, 14:21, 39:17, 60:16, 61:1, 63:25, 64:3, 64:20, 65:4, 72:19, 98:19, 98:20, 99:23

**applying** [1] - 35:21

**appointed** [2] - 49:10, 98:5

**appointment** [1] - 50:3

**appreciate** [6] - 3:8, 4:1, 104:12, 109:16, 127:24, 128:7

**approach** [2] - 74:24, 76:23

**appropriate** [11] - 19:18, 34:6, 34:17, 35:7, 35:9, 50:18, 68:2, 76:3, 88:13, 102:11, 112:6

**appropriated** [3] - 23:9, 27:2, 34:22

**appropriates** [1] - 23:1

**appropriation** [1] - 34:15

**appropriations** [4] - 23:5, 35:8, 37:6, 37:13

**approval** [1] - 59:16

**arbitrary** [7] - 114:17, 114:25, 123:1, 126:13, 127:10, 127:14, 127:17

**are...in** [1] - 105:8

**area** [3] - 69:25, 124:19, 124:20

**argue** [12] - 3:13, 3:15, 3:16, 6:10, 6:15, 9:4, 40:13, 55:2, 71:17, 105:17,

105:22, 117:22
  **arguing** [8] - 3:17, 26:24, 36:12, 43:7, 62:17, 98:13, 118:4
  **argument** [22] - 6:12, 12:8, 18:10, 21:11, 23:7, 23:18, 26:1, 26:22, 27:19, 29:14, 29:15, 43:6, 55:5, 57:24, 59:14, 60:23, 61:2, 62:3, 69:3, 69:5, 99:10, 122:1
  **arguments** [7] - 12:10, 20:5, 25:8, 27:24, 39:16, 40:8, 54:24
  **arises** [1] - 126:13
  **Arizona** [1] - 111:5
  **arrived** [1] - 37:10
  **arrives** [1] - 78:7
  **Article** [1] - 45:23
  **article** [1] - 117:14
  **articles** [2] - 11:17, 11:18
  **aside** [39] - 25:4, 26:22, 46:20, 48:23, 49:8, 55:3, 55:6, 56:4, 56:23, 57:7, 57:11, 79:11, 89:25, 108:9, 109:4, 109:19, 110:1, 110:5, 110:10, 112:11, 116:8, 116:12, 116:19, 117:11, 117:22, 118:3, 118:10, 118:25, 119:2, 119:13, 119:18, 121:12, 121:19, 122:1, 122:5, 123:22, 124:9, 127:13, 127:20
  **asides** [1] - 121:9
  **aspect** [1] - 54:1
  **aspects** [4] - 87:23, 93:1, 99:24, 107:19
  **assert** [3] - 30:6, 30:9, 67:7
  **asserting** [1] - 48:4
  **assessments** [1] - 75:16
  **associated** [6] - 24:22, 43:17, 51:21, 51:24, 52:13, 123:25
  **assume** [11] - 30:11, 31:8, 31:14, 84:7, 85:13, 85:16, 86:10, 109:4, 109:11, 109:12, 111:20
  **assumed** [4] - 9:10, 30:19, 47:4, 47:5
  **assumes** [4] - 8:9, 8:11, 32:1, 33:1
  **assuming** [9] - 30:18, 42:7, 95:25, 98:14, 109:6, 114:4, 114:5
  **assumption** [6] - 9:9, 11:10, 30:23, 30:24, 31:6
  **assumptions** [8] - 7:12, 7:21, 7:24, 8:4, 8:9, 8:20, 8:24, 109:9
  **assurances** [1] - 53:19
  **attack** [1] - 22:15
  **attempt** [1] - 108:2
  **attempted** [2] - 39:3, 108:3
  **attend** [1] - 29:12
  **attendant** [3] - 106:5, 106:10, 106:19
  **Attorney** [4] - 1:15, 1:18, 1:20, 2:8
  **attorney** [1] - 6:20
  **Attorney's** [1] - 2:14
  **attributable** [1] - 43:18
  **audience** [2] - 4:16, 4:17
  **Austin** [2] - 1:16, 1:19
  **authored** [1] - 55:11
  **authority** [13] - 49:11, 68:16, 71:2, 71:9, 79:24, 80:3, 97:23, 102:4, 108:17,

115:23, 117:9, 118:6, 126:20
  **Authorization** [1] - 59:18
  **authorization** [31] - 9:11, 9:13, 10:18, 11:1, 11:20, 30:19, 31:10, 32:24, 42:10, 48:21, 59:15, 59:21, 60:2, 60:3, 60:8, 60:17, 60:25, 61:6, 61:11, 63:1, 63:4, 63:9, 63:11, 63:15, 67:15, 68:11, 93:23, 95:17, 95:24, 99:7, 105:19
  **authorizations** [4] - 42:2, 43:3, 59:9, 59:12
  **authorized** [4] - 7:23, 10:2, 50:23, 107:9
  **automatically** [3] - 69:25, 86:6, 110:13
  **available** [3] - 23:5, 53:8, 112:9
  **Avenue** [1] - 2:5
  **average** [1] - 24:22
  **award** [2] - 58:21, 59:3
  **aware** [9] - 14:1, 39:2, 39:18, 50:8, 76:25, 91:9, 91:17, 97:5, 113:5

## B

  **backdrop** [1] - 102:12
  **backstop** [1] - 114:16
  **bad** [2] - 4:23, 36:23
  **balancing** [1] - 92:22
  **ball** [8] - 57:13, 68:4, 68:5, 98:25, 99:3, 99:6, 101:8, 111:25
  **balls** [1] - 68:8
  **based** [19] - 8:24, 11:13, 46:24, 48:2, 53:5, 56:15, 59:18, 83:15, 83:18, 91:5, 93:21, 103:24, 104:1, 110:14, 112:16, 112:17, 115:1, 118:22, 123:2
  **basic** [3] - 14:20, 52:11, 92:2
  **basis** [8] - 30:4, 30:22, 31:2, 32:5, 46:5, 46:7, 77:12, 110:16
  **Batalla** [6] - 50:1, 79:18, 80:1, 80:20, 89:25, 90:2
  **Baton** [1] - 1:22
  **Bazany** [1] - 8:19
  **bear** [3] - 37:18, 38:4, 125:14
  **beat** [1] - 33:13
  **become** [1] - 37:11
  **BEFORE** [1] - 1:10
  **begged** [1] - 122:16
  **begin** [1] - 76:5
  **beginning** [1] - 55:21
  **behind** [1] - 72:15
  **believes** [4] - 44:19, 45:14, 75:25, 114:18
  **benefit** [14] - 29:9, 30:8, 30:13, 39:25, 40:4, 55:18, 60:2, 63:3, 63:15, 75:9, 78:20, 97:15, 120:10, 120:25
  **benefits** [45] - 23:19, 31:8, 39:1, 40:1, 47:5, 49:19, 51:21, 51:24, 52:13, 54:24, 54:25, 58:21, 59:3, 59:5, 59:8, 60:22, 61:6, 61:12, 61:24, 62:15, 62:24, 79:7, 85:5, 88:9, 88:12, 88:17, 89:6, 92:1, 92:23, 93:12, 93:24, 94:4, 94:23, 99:15, 99:17, 99:21, 100:22, 102:9, 105:19,

106:5, 106:11, 106:19, 106:22, 107:23, 124:1
  **benefitted** [1] - 60:11
  **best** [10] - 62:22, 75:15, 81:22, 85:1, 89:5, 89:9, 114:9, 118:9, 123:21, 129:3
  **bestowing** [1] - 60:21
  **better** [8] - 3:23, 12:10, 21:4, 23:9, 94:7, 124:11, 125:13, 127:12
  **between** [23] - 7:22, 10:9, 11:24, 20:22, 22:17, 25:25, 30:9, 30:25, 31:7, 32:19, 35:6, 36:11, 42:21, 49:19, 53:12, 59:11, 61:23, 70:16, 71:18, 81:16, 82:10, 90:21, 117:16
  **Beyond** [1] - 55:15
  **billion** [3] - 29:22, 29:23
  **binder** [1] - 57:17
  **binding** [2] - 39:20, 98:2
  **bit** [6] - 12:14, 16:5, 16:12, 69:18, 76:15, 96:6
  **bizarre** [1] - 109:10
  **black** [1] - 14:21
  **Black's** [1] - 112:1
  **black-letter** [1] - 14:21
  **blame** [2] - 3:25, 4:1
  **blanket** [1] - 109:1
  **boiled** [1] - 100:3
  **bold** [1] - 124:24
  **book** [2] - 55:14, 55:19
  **books** [7] - 50:14, 96:23, 115:24, 126:11, 126:16, 127:3, 127:4
  **Border** [1] - 105:6
  **border** [3] - 5:1, 69:24
  **born** [1] - 86:19
  **bottom** [2] - 71:6, 72:24
  **bound** [7] - 61:3, 61:22, 75:16, 104:15, 118:5, 119:11, 122:1
  **boundaries** [1] - 29:1
  **bounds** [1] - 28:5
  **Box** [1] - 2:12
  **branch** [3] - 41:13, 52:6, 71:12
  **Brannon** [4] - 13:17, 13:18, 13:20, 17:14
  **breadth** [1] - 114:11
  **break** [1] - 35:5
  **breakfast** [1] - 69:20
  **breaking** [3] - 10:4, 10:16, 11:6
  **breaks** [2] - 25:25, 26:1
  **brief** [6] - 12:25, 47:19, 47:21, 74:13, 105:1, 105:4
  **briefed** [1] - 76:17
  **briefing** [9] - 22:15, 40:9, 40:12, 77:8, 77:16, 108:5, 118:9, 120:11, 120:14, 120:16, 120:25
  **briefly** [9] - 19:2, 37:15, 38:10, 75:3, 99:4, 101:21, 109:18, 109:25, 125:16
  **briefs** [2] - 23:22, 75:1
  **bring** [10] - 35:23, 40:10, 40:16, 41:15, 45:23, 46:17, 85:6, 122:15, 124:13, 127:6

**bringing** [4] - 24:15, 34:16, 46:5, 86:23
**brings** [1] - 62:3
**broad** [1] - 121:7
**broader** [2] - 36:14, 125:3
**Broadway** [1] - 2:2
**brought** [1] - 65:16
**BROWNSVILLE** [1] - 1:2
**Bryan** [1] - 112:3
**build** [1] - 84:5
**built** [1] - 32:4
**burden** [5] - 24:15, 25:19, 33:6, 33:7, 47:12
**burdensome** [2] - 83:9, 83:15
**Bush** [1] - 78:2
**business** [3] - 9:14, 9:15, 10:12
**businesses** [3] - 7:25, 8:1, 8:10
**buy** [1] - 59:14
**bye** [1] - 119:25

# C

**c)(14** [1] - 63:2
**cake** [1] - 23:14
**candidates** [1] - 8:2
**cannot** [9] - 37:8, 39:11, 57:6, 71:8, 71:19, 72:19, 73:18, 81:21, 117:18
**cap** [1] - 71:5
**capable** [1] - 68:17
**capricious** [7] - 114:17, 114:25, 123:2, 126:14, 127:10, 127:15, 127:17
**car** [1] - 36:22
**Care** [1] - 7:22
**care** [30] - 20:14, 21:22, 22:8, 22:20, 23:4, 24:3, 26:23, 26:24, 29:12, 30:17, 32:18, 34:9, 34:14, 34:21, 40:18, 40:19, 42:2, 42:8, 42:19, 42:22, 44:17, 44:18, 44:21, 45:16, 45:21, 45:23, 46:15, 51:13, 56:6, 109:13
**careful** [3] - 69:6, 73:12, 103:6
**carried** [1] - 33:7
**carry** [1] - 33:6
**case** [89] - 7:7, 13:15, 20:8, 21:12, 24:15, 29:3, 29:8, 35:15, 35:16, 37:7, 37:22, 40:10, 40:14, 48:8, 48:14, 48:20, 51:7, 52:20, 54:23, 55:21, 57:21, 57:23, 60:18, 65:3, 67:7, 71:22, 74:15, 74:16, 75:3, 75:9, 76:7, 76:17, 77:2, 77:4, 77:6, 77:18, 78:6, 79:12, 81:2, 81:3, 81:5, 81:9, 81:11, 81:13, 81:25, 83:15, 83:18, 84:3, 84:19, 84:20, 84:23, 84:24, 84:25, 85:11, 86:3, 86:9, 87:6, 90:12, 93:3, 93:20, 96:20, 100:12, 100:19, 100:25, 104:6, 105:14, 106:9, 107:2, 108:15, 110:9, 110:11, 110:15, 110:22, 111:19, 112:19, 113:24, 114:1, 119:10, 119:13, 122:2, 124:13, 126:18, 127:9
**cases** [9] - 7:16, 7:17, 28:11, 76:15, 77:24, 83:22, 112:9, 128:1
**categories** [1] - 15:22
**causation** [13] - 22:10, 24:20, 25:25,
31:6, 31:24, 33:19, 35:5, 36:10, 36:12, 36:14, 37:11, 44:6, 44:9
**caused** [3] - 22:1, 36:8, 37:21
**causes** [1] - 27:18
**causing** [1] - 33:4
**Center** [1] - 89:12
**center** [2] - 57:21, 57:24
**centerpiece** [1] - 60:4
**central** [1] - 9:9
**certain** [12] - 5:22, 13:20, 13:24, 14:15, 40:22, 66:23, 66:24, 81:21, 106:22, 116:12, 116:20, 118:7
**certainly** [18] - 20:4, 32:5, 32:8, 34:4, 37:22, 39:21, 40:11, 40:13, 45:15, 46:6, 47:20, 76:18, 83:17, 88:14, 107:24, 115:16, 122:2, 123:15
**certainty** [1] - 118:14
**CERTIFICATE** [1] - 129:1
**certify** [1] - 129:3
**cetera** [3] - 44:20, 88:13, 124:25
**chain** [1] - 25:25
**challenge** [29] - 36:3, 39:7, 39:14, 40:11, 41:5, 60:8, 62:23, 63:13, 67:22, 67:25, 73:23, 74:10, 77:15, 87:7, 87:11, 94:14, 94:24, 96:5, 98:15, 110:24, 114:24, 117:13, 117:17, 117:21, 126:14, 127:10, 127:15, 127:18
**challenged** [13] - 32:8, 39:10, 39:11, 40:10, 60:18, 61:1, 68:12, 94:11, 96:1, 96:2, 96:3, 96:7, 114:1
**challenging** [13] - 34:6, 41:22, 63:15, 68:3, 68:23, 77:14, 88:16, 98:22, 98:23, 98:24, 99:7, 106:9
**chance** [2] - 16:5, 109:17, 119:7
**change** [13] - 16:8, 19:9, 19:12, 50:22, 76:22, 77:13, 77:20, 77:25, 78:5, 80:3, 98:9, 108:18, 124:1
**changed** [3] - 38:18, 103:17, 103:18
**changes** [4] - 72:13, 74:23, 76:16, 77:24
**chaos** [1] - 123:23
**chapter** [1] - 112:2
**Charlotte** [1] - 65:24
**chat** [1] - 109:17
**cheat** [1] - 19:25
**checkpoint** [1] - 69:25
**Chief** [4] - 94:7, 105:24, 106:14, 106:20
**Child** [1] - 113:19
**children** [3] - 29:11, 32:12, 37:10
**choice** [2] - 74:14, 74:15
**choices** [2] - 114:10, 114:12
**choose** [1] - 9:7
**choosing** [1] - 83:19
**chosen** [1] - 60:9
**Christmas** [1] - 3:25
**circle** [1] - 6:6
**circuit** [4] - 77:23, 111:13, 121:15, 122:2
**Circuit** [29] - 5:15, 20:19, 28:22, 39:20,
47:25, 50:24, 59:14, 61:3, 61:4, 61:5, 61:11, 61:12, 61:16, 61:21, 71:23, 77:23, 86:8, 99:9, 99:11, 99:12, 99:16, 100:13, 112:8, 112:13, 112:14, 112:23, 121:15, 127:7
**Circuit's** [4] - 20:8, 21:5, 48:13, 104:16
**circuits** [1] - 112:15
**circumstances** [1] - 124:2
**cite** [1] - 88:8
**cited** [1] - 105:6
**citing** [1] - 14:20
**citizen** [2] - 17:13, 29:11
**citizens** [4] - 8:2, 8:5, 13:21, 29:11
**citizenship** [4] - 53:18, 53:21, 56:20, 105:12
**claim** [29] - 22:20, 22:25, 26:23, 26:24, 35:10, 35:23, 40:10, 40:19, 40:20, 41:15, 44:8, 44:9, 44:17, 44:18, 44:21, 44:23, 45:14, 45:16, 45:17, 45:23, 46:8, 47:10, 48:3, 48:14, 51:13, 51:15, 70:14, 126:5
**claiming** [1] - 68:16
**claims** [4] - 40:16, 51:12, 54:2, 101:7
**clarification** [1] - 21:4
**clarifying** [1] - 121:5
**clarity** [3] - 84:22, 110:1, 110:17
**class** [6] - 40:24, 51:22, 99:16, 99:20, 106:17, 107:1
**class-wide** [2] - 99:16, 99:20
**clause** [9] - 40:18, 40:20, 44:18, 44:21, 45:16, 45:23, 46:15, 51:13, 109:14
**Clean** [2] - 45:10, 46:20
**clear** [15] - 23:18, 23:21, 49:12, 49:16, 50:15, 58:24, 63:21, 80:19, 93:25, 97:13, 100:19, 108:11, 116:7, 117:10, 118:24
**clearing** [1] - 84:14
**clearly** [7] - 35:22, 46:6, 59:6, 80:5, 88:3, 97:24, 118:6
**close** [1] - 69:1
**coastline** [1] - 29:2
**codify** [1] - 38:25
**COGHLAN** [10] - 2:11, 19:2, 19:15, 38:10, 101:21, 102:24, 103:25, 104:2, 119:20, 120:3
**Coghlan** [5] - 18:25, 38:8, 101:13, 101:19, 119:19
**cognizant** [1] - 126:7
**coined** [1] - 16:13
**Coke** [1] - 101:14
**collapsed** [1] - 18:5
**collapses** [3] - 69:5, 69:7, 69:8
**collateral** [6] - 88:17, 94:11, 94:22, 95:11, 99:19, 123:25
**collaterally** [1] - 93:23
**colleague** [1] - 18:9
**colleagues** [1] - 77:9
**college** [2] - 32:16, 32:17
**Columbia** [1] - 116:16
**coming** [3] - 112:10, 127:24, 128:7

**command** [1] - 46:14
**comment** [27] - 54:7, 54:13, 54:20, 55:25, 56:9, 62:6, 62:7, 62:8, 79:14, 86:11, 86:16, 87:14, 87:20, 88:6, 94:16, 94:17, 94:21, 96:9, 96:11, 96:13, 96:21, 116:3, 123:13, 123:18, 123:24, 124:10, 126:22
**comments** [3] - 82:9, 86:4, 121:7
**committed** [1] - 83:20
**common** [2] - 14:11, 56:7
**commonly** [1] - 54:4
**compelling** [1] - 113:1
**competing** [4] - 6:3, 12:16, 17:19, 82:1
**competition** [2] - 13:23, 17:9
**complain** [1] - 67:12
**complaining** [2] - 62:25, 126:23
**complaint** [3] - 21:10, 70:23, 98:14
**complete** [5] - 76:9, 81:23, 101:6, 118:1, 118:10
**completed** [2] - 75:4, 76:12
**completely** [5] - 12:17, 16:23, 107:2, 125:12, 127:13
**complex** [1] - 120:10
**Complex** [1] - 2:8
**compliance** [1] - 103:12
**complicated** [2] - 74:13, 120:17
**complied** [1] - 31:14
**complies** [2] - 72:12, 117:6
**comply** [3] - 46:12, 58:18, 102:15
**complying** [2] - 5:18, 102:15
**component** [3] - 65:10, 105:15, 105:18
**components** [3] - 67:22, 68:9, 105:14
**computer** [1] - 1:25
**concede** [1] - 62:7
**conceded** [3] - 9:10, 9:18, 11:10
**conceding** [1] - 109:14
**concern** [2] - 70:25, 99:15
**concerned** [1] - 13:25
**concerning** [1] - 55:11
**concerns** [10] - 79:5, 79:6, 93:20, 99:12, 102:17, 103:3, 103:9, 110:12, 114:11
**conclude** [1] - 31:2
**concluded** [1] - 103:4
**concludes** [1] - 37:15
**conclusion** [7] - 8:20, 11:18, 14:22, 32:8, 42:5, 43:16, 55:20
**conclusions** [6] - 7:13, 7:19, 7:20, 8:17, 8:22, 13:13
**concrete** [1] - 20:19
**conditions** [1] - 69:10
**conduct** [1] - 120:6
**confer** [2] - 53:20, 63:20
**conferring** [4] - 51:5, 88:12, 102:7, 106:2
**confirmation** [1] - 106:6
**confirmed** [4] - 13:14, 13:20, 14:23, 51:17
**confirms** [2] - 54:2, 55:19

**conflict** [1] - 99:24
**conform** [1] - 50:17
**confusion** [3] - 75:13, 78:24, 80:23
**Congress** [12] - 22:25, 27:2, 34:6, 34:17, 34:22, 35:11, 41:10, 46:23, 50:14, 52:1, 52:5, 104:20
**Congress's** [4] - 41:6, 50:9, 51:24, 53:25
**congressional** [3] - 41:14, 50:17, 52:8
**cons** [1] - 122:5
**consensus** [1] - 3:20
**consequence** [7] - 20:21, 22:10, 26:6, 42:3, 42:14, 43:2, 43:15
**consequences** [4] - 29:10, 94:22, 95:11, 99:19
**consider** [15] - 7:2, 7:12, 14:24, 59:5, 86:23, 87:5, 96:8, 96:14, 103:9, 117:5, 119:15, 120:5, 120:6, 122:11
**considerable** [1] - 122:4
**consideration** [4] - 61:23, 61:24, 72:22, 103:6
**considerations** [1] - 72:6
**considered** [5] - 106:18, 107:10, 122:14, 123:15
**considering** [4] - 89:7, 89:19, 101:24, 102:18
**considers** [1] - 13:7
**consistency** [1] - 115:1
**consistent** [3] - 59:2, 87:12, 109:21
**consistently** [1] - 93:22
**constant** [1] - 8:13
**constitute** [1] - 29:22
**constitutional** [4] - 35:10, 45:16, 46:7, 117:6
**contend** [1] - 107:24
**contention** [2] - 17:2, 67:21
**contest** [3] - 44:15, 49:2, 70:1
**contested** [1] - 47:15
**context** [14] - 5:22, 34:19, 34:20, 34:21, 35:20, 51:8, 80:6, 99:13, 114:16, 116:15, 122:5, 126:13, 127:15, 127:19
**continuance** [1] - 77:10
**continue** [4] - 16:17, 103:10, 107:25, 115:11
**continues** [7] - 40:5, 52:7, 87:19, 104:10, 108:7, 108:22, 113:10
**continuing** [1] - 103:8
**contractor** [2] - 9:17, 10:23
**contradicted** [1] - 32:22
**contradicts** [1] - 29:8
**contrary** [10] - 4:24, 4:25, 12:11, 32:22, 32:23, 51:24, 70:13, 104:19, 110:11, 115:23
**contrast** [1] - 21:9
**control** [1] - 99:25
**controlled** [1] - 41:10
**controlling** [2] - 51:1, 103:14
**conversation** [2] - 85:21, 114:5
**convinces** [1] - 109:13

**core** [4] - 51:3, 61:8, 61:13, 61:25
**correct** [3] - 5:21, 11:7, 129:3
**correctly** [2] - 20:2, 110:7
**cost** [14] - 20:14, 20:21, 21:7, 21:19, 23:16, 23:18, 24:22, 26:6, 29:15, 29:16, 39:25, 40:4, 42:4, 48:24
**cost-benefit** [2] - 39:25, 40:4
**costs** [21] - 20:15, 21:24, 22:8, 23:13, 23:20, 23:23, 23:24, 25:25, 30:17, 32:20, 33:4, 40:1, 40:2, 41:24, 42:22, 43:17, 43:20, 43:21, 47:5, 47:7
**Counsel** [1] - 3:4
**counsel** [8] - 3:9, 18:20, 19:17, 33:16, 36:18, 41:2, 43:22, 65:22
**counteract** [1] - 18:7
**counting** [1] - 87:24
**country** [18] - 5:6, 5:17, 5:18, 10:18, 14:5, 14:8, 14:16, 15:15, 15:20, 23:3, 37:3, 39:3, 39:4, 64:4, 64:8, 64:11, 64:17, 80:16
**country's** [1] - 5:18
**couple** [6] - 13:3, 59:7, 84:21, 97:22, 116:4, 126:8
**course** [49] - 4:12, 7:7, 13:4, 13:8, 14:23, 22:3, 23:19, 25:14, 32:1, 34:13, 36:17, 39:24, 41:4, 46:4, 47:9, 47:25, 49:9, 50:23, 53:16, 54:6, 54:20, 66:5, 66:13, 69:22, 75:23, 76:2, 76:14, 78:21, 81:15, 84:13, 84:22, 86:1, 86:6, 86:8, 86:12, 88:18, 89:11, 102:13, 105:10, 106:13, 107:15, 108:15, 113:9, 114:14, 115:3, 122:25, 125:2, 125:24, 127:9
**Court** [208] - 2:17, 2:17, 2:18, 6:11, 7:1, 7:6, 7:9, 8:18, 12:2, 12:3, 12:17, 13:5, 13:7, 13:8, 13:10, 13:11, 13:25, 14:17, 14:19, 14:24, 19:5, 19:6, 19:18, 20:18, 21:5, 21:14, 21:19, 21:21, 21:24, 21:25, 22:7, 24:19, 25:22, 28:6, 28:21, 28:24, 29:8, 31:13, 31:23, 32:23, 37:15, 37:19, 38:2, 38:12, 38:14, 38:25, 39:2, 39:4, 39:6, 39:18, 40:19, 42:6, 43:24, 44:19, 45:1, 45:9, 45:14, 46:4, 46:10, 47:22, 48:8, 48:9, 48:16, 50:8, 51:2, 51:12, 51:17, 51:19, 52:5, 53:16, 54:17, 56:4, 56:13, 57:7, 57:10, 57:25, 58:2, 58:13, 58:24, 60:3, 61:10, 61:15, 61:21, 61:22, 62:4, 69:21, 70:15, 70:25, 71:1, 72:1, 72:25, 73:17, 73:21, 74:23, 74:25, 75:5, 75:16, 75:23, 76:3, 76:10, 76:19, 76:21, 76:25, 77:8, 77:17, 77:19, 77:21, 78:1, 78:8, 78:17, 78:20, 78:25, 81:23, 82:1, 82:7, 82:13, 83:4, 83:24, 84:1, 84:21, 85:7, 85:16, 85:20, 86:8, 87:21, 88:19, 88:21, 88:24, 89:10, 89:17, 92:3, 92:11, 92:17, 92:20, 94:1, 97:4, 99:18, 100:5, 100:8, 100:21, 101:1, 101:17, 102:2, 102:11, 102:14, 104:13, 105:4, 105:22, 107:3, 107:16, 107:20, 107:21, 108:9, 108:11, 108:19, 113:2, 113:4, 113:5, 113:24, 113:25, 114:3, 114:13,

114:18, 114:21, 115:4, 115:6, 115:12, 115:21, 116:10, 116:11, 116:14, 116:25, 117:17, 117:21, 117:24, 118:3, 118:5, 118:8, 118:25, 119:2, 119:15, 119:22, 120:7, 120:13, 120:14, 120:19, 120:20, 120:24, 122:23, 123:3, 123:5, 125:4, 126:8, 126:15, 127:2, 127:8, 127:11, 127:13, 127:14, 127:20, 127:22, 129:2, 129:6

**COURT** [155] - 1:1, 3:3, 6:14, 6:17, 6:23, 9:23, 10:4, 10:8, 10:17, 10:22, 11:3, 11:8, 12:21, 15:3, 15:17, 16:10, 18:16, 18:25, 19:14, 19:20, 19:24, 20:25, 21:2, 22:3, 22:13, 23:7, 23:21, 24:8, 24:13, 25:6, 25:13, 25:18, 25:21, 26:3, 26:8, 26:21, 27:5, 28:10, 28:14, 29:14, 31:13, 31:19, 33:9, 33:12, 36:6, 36:23, 38:6, 38:8, 38:20, 41:16, 41:18, 42:7, 42:11, 42:17, 43:4, 43:9, 43:13, 44:22, 44:24, 45:3, 45:6, 45:12, 45:20, 45:24, 46:9, 46:20, 47:17, 49:13, 50:5, 51:14, 52:23, 57:3, 57:12, 57:15, 58:6, 58:17, 59:1, 59:3, 59:13, 59:25, 60:6, 61:2, 61:9, 61:17, 62:1, 62:10, 62:19, 63:6, 63:10, 64:3, 64:6, 64:11, 64:17, 64:24, 65:13, 65:19, 65:24, 66:9, 66:15, 71:11, 71:15, 71:21, 72:8, 72:12, 72:16, 73:25, 78:4, 81:14, 82:6, 84:6, 84:11, 85:23, 88:18, 92:9, 93:5, 93:8, 94:3, 95:3, 96:15, 97:17, 98:13, 99:9, 101:10, 101:12, 101:18, 102:20, 102:22, 103:24, 104:1, 104:23, 108:23, 109:23, 110:21, 111:24, 112:3, 115:14, 115:17, 116:1, 116:5, 119:19, 119:25, 121:2, 123:10, 124:22, 125:7, 125:15, 125:17, 125:20, 127:24

**court** [15] - 3:2, 20:25, 63:14, 88:2, 90:14, 94:8, 103:24, 104:1, 104:2, 111:10, 112:17, 116:15, 116:17, 117:23, 117:25

**Court's** [21] - 19:9, 19:13, 20:7, 20:10, 26:13, 29:7, 30:7, 38:19, 40:18, 46:25, 50:1, 51:3, 51:9, 78:11, 101:25, 107:19, 110:12, 114:15, 118:5, 118:18, 127:7

**courtroom** [2] - 4:12, 23:10

**COURTROOM** [1] - 128:9

**courts** [5] - 49:6, 75:2, 76:14, 77:23, 121:15

**Courts** [1] - 75:6

**cover** [3] - 42:18, 44:21, 74:4

**covered** [1] - 33:16

**covers** [1] - 4:8

**COVID** [7] - 3:22, 4:1, 73:16, 113:17, 113:20, 128:4

**COVID-positive** [1] - 113:20

**crack** [1] - 126:17

**craft** [2] - 119:3, 120:4

**Crane** [1] - 100:12

**create** [3] - 8:16, 123:23, 125:11

**created** [8] - 4:22, 39:14, 46:24, 50:13, 51:5, 106:2, 108:20, 109:4

**creating** [2] - 97:2, 112:1

**creation** [4] - 39:8, 39:10, 90:7, 106:3

**credibility** [1] - 12:19

**criteria** [6] - 72:9, 72:21, 82:22, 82:23, 83:5, 83:6

**critical** [2] - 46:24, 51:9

**cross** [3] - 12:11, 32:7, 89:8

**cross-examination** [2] - 12:11, 32:7

**CRR** [2] - 2:17, 129:2

**crystal** [1] - 116:7

**CSR** [2] - 2:17, 129:2

**cure** [2] - 50:2, 125:3

**current** [2] - 66:1, 75:13

**Customs** [1] - 105:6

**cut** [2] - 62:1, 97:11

**cutting** [1] - 30:1

# D

**DACA** [284] - 4:21, 5:6, 5:8, 5:11, 6:21, 7:1, 7:23, 8:2, 8:8, 8:11, 9:5, 11:15, 11:16, 11:21, 13:22, 14:2, 14:3, 14:5, 14:7, 14:8, 14:11, 14:21, 15:7, 15:14, 15:15, 15:19, 16:6, 16:7, 16:8, 16:10, 16:15, 16:16, 16:19, 17:9, 17:12, 17:19, 17:24, 18:19, 21:1, 22:18, 23:15, 24:4, 24:11, 25:4, 26:1, 26:5, 26:7, 26:10, 26:14, 29:9, 29:20, 30:1, 33:16, 34:2, 34:5, 35:6, 36:17, 37:2, 37:4, 37:12, 37:21, 38:3, 39:4, 39:6, 40:2, 40:6, 40:21, 41:2, 41:3, 41:23, 42:1, 42:11, 43:5, 43:15, 43:18, 45:17, 47:7, 48:11, 49:23, 50:11, 50:13, 50:19, 50:25, 51:4, 51:10, 51:18, 51:19, 52:4, 52:19, 52:21, 52:22, 53:2, 53:8, 53:10, 53:15, 53:20, 53:22, 53:23, 53:24, 54:3, 54:4, 54:12, 54:14, 54:18, 54:21, 54:25, 55:3, 55:5, 56:4, 56:13, 56:18, 56:19, 56:22, 57:2, 57:7, 58:1, 58:9, 58:10, 58:11, 58:14, 58:24, 59:17, 59:19, 59:22, 59:23, 59:24, 60:4, 60:10, 60:21, 60:24, 61:13, 62:14, 63:6, 63:8, 63:19, 64:1, 64:7, 64:9, 64:21, 64:23, 64:25, 65:2, 65:7, 65:8, 65:10, 65:11, 66:3, 66:10, 66:12, 66:16, 66:17, 67:6, 67:7, 67:10, 68:9, 68:18, 68:21, 69:25, 70:2, 70:16, 70:24, 71:7, 71:8, 72:3, 72:17, 72:18, 73:1, 73:8, 73:23, 74:11, 75:25, 79:2, 79:13, 79:17, 79:18, 80:9, 80:12, 80:14, 80:25, 81:1, 81:18, 81:19, 82:12, 82:13, 82:24, 83:6, 83:21, 83:22, 83:24, 88:12, 88:16, 89:18, 90:23, 91:3, 91:6, 91:11, 93:2, 94:4, 94:11, 95:12, 95:20, 95:21, 96:5, 96:18, 97:2, 98:4, 98:6, 98:16, 98:20, 98:21, 98:22, 99:19, 99:23, 101:25, 102:3, 102:6, 103:1, 103:10, 103:16, 103:22, 104:13, 104:17, 104:18, 105:10, 105:14, 105:18, 105:25, 106:1,

106:6, 106:11, 107:18, 107:19, 107:20, 107:22, 108:3, 108:6, 108:8, 108:12, 108:17, 108:20, 109:4, 110:4, 110:25, 113:11, 114:4, 114:5, 114:11, 114:18, 115:20, 116:2, 116:8, 116:25, 117:9, 118:1, 118:4, 118:10, 118:13, 118:19, 118:21, 118:25, 119:2, 119:17, 119:23, 123:20, 123:22, 124:15, 126:1, 126:19, 126:20, 127:3, 127:6

**DACA's** [1] - 17:16

**damage** [2] - 27:19, 27:20

**damages** [3] - 21:25, 36:11, 78:8

**DANIEL** [1] - 2:13

**DAPA** [32] - 20:8, 20:14, 20:20, 20:22, 21:1, 21:13, 21:23, 22:1, 22:3, 24:19, 24:24, 26:13, 28:21, 29:21, 31:24, 41:24, 48:2, 50:25, 61:22, 75:5, 76:20, 77:1, 86:9, 88:3, 88:6, 99:8, 104:16, 110:22, 125:6, 125:8

**date** [2] - 3:19, 72:13

**Daubert** [2] - 6:12, 13:4

**DAVID** [1] - 2:13

**days** [3] - 72:15, 116:20, 118:7

**DC** [10] - 2:5, 2:12, 48:7, 77:23, 112:14, 117:23, 117:25, 121:15, 127:7, 127:13

**deal** [1] - 27:14

**dealing** [1] - 31:16

**DECEMBER** [1] - 1:7

**decide** [4] - 44:3, 44:11, 115:5, 116:24

**decided** [2] - 60:13, 70:7

**decides** [1] - 119:22

**deciding** [4] - 7:5, 44:1, 89:19, 114:8

**decision** [32] - 8:12, 19:15, 20:7, 20:8, 20:10, 20:11, 20:14, 20:17, 21:5, 29:7, 29:21, 30:7, 31:5, 35:10, 49:18, 56:25, 58:22, 59:11, 61:13, 61:16, 67:8, 67:19, 67:23, 81:12, 85:1, 102:1, 103:6, 112:22, 115:12, 120:8, 127:11

**decisions** [2] - 73:22, 99:18

**declarants** [3] - 30:18, 44:15, 47:10

**declaration** [3] - 14:10, 21:18, 47:2

**declarations** [3] - 13:9, 20:22, 21:13

**decline** [1] - 17:22

**deems** [1] - 127:22

**Deere** [3] - 7:3, 7:15, 8:14, 8:23, 13:16, 13:20, 17:25

**Deere's** [1] - 14:20

**defend** [3] - 38:21, 81:19, 82:12

**defendant** [17] - 6:10, 7:1, 12:10, 13:16, 14:7, 14:23, 17:4, 17:6, 18:4, 36:4, 38:24, 39:23, 54:22, 55:8, 83:20, 105:13, 109:7

**defendant-intervenors** [8] - 7:1, 13:16, 14:7, 18:4, 39:23, 55:8, 105:13, 109:7

**defendant-intervenors'** [6] - 6:10, 12:10, 14:23, 17:4, 17:6, 54:22

**defendants** [45] - 18:20, 19:3, 19:4, 52:21, 56:17, 74:20, 75:10, 75:12, 76:9,

79:12, 79:17, 79:21, 79:22, 80:8, 80:19,
80:25, 81:1, 81:13, 81:17, 81:22, 82:11,
82:18, 84:4, 85:6, 90:13, 90:22, 91:9,
91:16, 93:18, 94:15, 99:25, 101:4,
101:22, 102:14, 104:15, 106:13,
107:25, 115:10, 116:21, 116:23, 117:2,
119:6, 124:20, 125:25, 126:19
   **DEFENDANTS** [2] - 2:1, 2:11
   **defendants'** [5] - 19:8, 19:12, 38:11,
38:17, 120:3
   **defending** [4] - 80:25, 81:13, 83:21,
91:16
   **defense** [1] - 36:8
   **defer** [9] - 58:25, 59:11, 61:14, 67:8,
71:2, 93:18, 95:10, 96:11
   **deferral** [1] - 96:7
   **deferred** [50] - 16:8, 52:2, 52:4, 52:17,
55:12, 55:16, 55:23, 55:24, 59:22,
59:23, 60:1, 60:5, 60:10, 60:15, 61:8,
61:24, 61:25, 66:2, 68:15, 69:11, 69:12,
69:13, 70:16, 70:18, 70:24, 71:13, 72:2,
72:13, 73:11, 73:19, 86:22, 93:2, 93:3,
93:14, 94:15, 94:17, 94:18, 94:20,
95:17, 95:24, 96:17, 97:3, 97:4, 101:2,
106:5, 107:7, 107:9, 107:11, 118:25
   **Deferred** [1] - 72:14
   **deferring** [2] - 18:19, 96:8
   **definition** [2] - 80:4, 86:6
   **degree** [3] - 16:22, 37:23, 90:15
   **delay** [2] - 108:15, 108:21
   **Democrat** [1] - 50:8
   **demographer** [1] - 9:3
   **demography** [1] - 9:6
   **demonstrate** [3] - 34:4, 42:16, 60:17
   **demonstrating** [1] - 24:15
   **demonstration** [1] - 38:16
   **denial** [4] - 83:3, 90:20, 91:1, 91:4
   **denied** [4] - 39:5, 82:21, 83:4
   **depart** [3] - 30:20, 31:3, 104:18
   **department** [2] - 103:7, 104:10
   **Department** [4] - 1:21, 2:11, 77:11,
101:23
   **departure** [1] - 32:24
   **departures** [1] - 33:1
   **deport** [2] - 23:12, 27:8
   **Deportation** [1] - 55:15
   **deposition** [3] - 11:13, 13:18, 32:11
   **derived** [1] - 22:8
   **describe** [1] - 70:6
   **described** [1] - 58:19
   **describes** [1] - 5:17
   **designated** [1] - 55:8
   **despite** [1] - 53:19
   **detail** [3] - 79:7, 113:6, 122:4
   **details** [1] - 91:18
   **determination** [3] - 39:9, 104:6,
120:15
   **determine** [1] - 47:6
   **determined** [1] - 120:22
   **determines** [1] - 19:18

   **developed** [1] - 100:18
   **develops** [1] - 100:16
   **DHS** [53] - 15:12, 48:3, 48:6, 49:13,
49:15, 49:17, 49:24, 55:22, 75:17,
82:25, 83:4, 83:5, 86:23, 89:11, 90:1,
90:3, 90:4, 90:8, 96:22, 98:5, 98:10,
102:3, 102:18, 103:22, 106:13, 106:25,
107:4, 107:9, 107:10, 109:23, 109:24,
112:7, 113:3, 114:6, 114:12, 115:9,
120:5, 120:18, 120:21, 121:23, 122:14,
122:17, 122:20, 122:24, 122:25, 123:7,
123:11, 123:17, 124:5, 124:17, 125:24,
126:19
   **Diaz** [1] - 73:14
   **dice** [2] - 111:3, 111:10
   **dicing** [5] - 111:6, 111:21, 111:25,
114:14, 122:12
   **Diet** [1] - 101:14
   **difference** [10] - 28:17, 30:3, 31:7,
36:9, 36:11, 42:21, 49:19, 62:10, 81:16,
117:16
   **different** [24] - 5:7, 11:20, 21:22,
28:20, 35:6, 36:3, 48:17, 67:17, 69:18,
76:23, 83:23, 83:24, 85:25, 87:25,
99:12, 99:20, 106:14, 107:2, 117:13,
117:20, 119:14, 121:13, 125:12, 126:8
   **differently** [1] - 76:24
   **differs** [4] - 20:7, 20:9, 20:12, 37:22
   **difficult** [4] - 20:2, 83:2, 101:24, 103:9
   **diminution** [1] - 32:14
   **direct** [11] - 20:21, 21:7, 28:21, 41:23,
42:16, 42:17, 46:1, 48:16, 48:23, 50:1,
99:23
   **direction** [2] - 34:5, 82:2
   **directly** [2] - 29:8, 103:19
   **disagree** [2] - 19:4, 122:13
   **disagreeing** [1] - 23:24
   **disagrees** [2] - 75:23, 76:4
   **disavowed** [1] - 21:10
   **disclaim** [1] - 24:1
   **disconnect** [1] - 45:19
   **discovery** [1] - 52:20
   **discretion** [78] - 7:6, 49:24, 54:15,
55:12, 58:4, 58:6, 58:21, 58:25, 60:11,
61:19, 62:14, 67:9, 67:23, 68:22, 70:10,
71:8, 75:17, 79:6, 81:24, 82:2, 82:15,
82:19, 83:21, 84:2, 84:5, 84:7, 84:17,
84:22, 85:10, 85:13, 85:14, 85:17, 87:4,
87:15, 87:18, 89:5, 89:7, 89:19, 89:20,
90:1, 90:3, 90:9, 90:15, 90:19, 91:7,
91:21, 91:24, 92:4, 92:5, 92:6, 92:21,
92:22, 93:13, 94:22, 96:10, 97:10,
99:13, 99:14, 100:6, 100:11, 100:12,
100:20, 100:23, 101:2, 101:4, 101:8,
107:18, 107:20, 108:1, 108:6, 108:7,
108:9, 108:12, 110:8
   **discretionary** [8] - 55:17, 67:9, 72:5,
72:20, 82:24, 94:21, 99:18, 101:3
   **discriminated** [1] - 35:22
   **discrimination** [1] - 7:16

   **discuss** [2] - 16:11, 82:17
   **discussed** [2] - 30:23, 74:13
   **discussing** [1] - 18:20
   **discussion** [2] - 76:5, 105:3
   **DISHER** [17] - 1:14, 12:23, 15:11,
38:23, 47:18, 50:7, 51:16, 52:24, 57:5,
104:25, 115:16, 115:18, 116:4, 116:6,
125:16, 125:18, 125:22
   **Disher** [21] - 12:8, 12:21, 12:23, 15:3,
15:17, 16:1, 16:22, 22:14, 22:19, 33:13,
38:21, 41:16, 50:5, 57:12, 62:2, 65:13,
71:4, 101:13, 104:24, 125:21
   **Disher's** [4] - 66:21, 66:24, 88:10,
109:5
   **dismiss** [1] - 43:25
   **dispose** [1] - 101:7
   **disposes** [1] - 96:2
   **disposition** [1] - 75:9
   **dispositive** [5] - 51:11, 51:14, 85:25,
88:22, 88:24
   **dispossessed** [1] - 123:5
   **dispossesses** [1] - 122:18
   **dispute** [5] - 18:14, 58:5, 69:17, 82:9,
85:13
   **disputed** [2] - 58:3, 67:7
   **disputes** [1] - 76:1
   **disregard** [1] - 7:6
   **disrupted** [1] - 113:12
   **disruption** [3] - 112:16, 113:4, 113:21
   **dissent** [1] - 58:11
   **dissonance** [1] - 32:19
   **distance** [1] - 3:24
   **distanced** [1] - 4:4
   **distances** [1] - 128:1
   **distancing** [1] - 4:18
   **distinct** [1] - 60:3
   **distinction** [3] - 10:9, 10:10, 70:16
   **distinctions** [1] - 67:20
   **distressed** [1] - 113:18
   **distributed** [2] - 33:2, 93:19
   **distribution** [1] - 86:24
   **District** [14] - 2:18, 2:18, 3:20, 48:9,
56:15, 77:3, 77:10, 102:14, 103:12,
104:6, 116:15, 128:2, 129:2
   **DISTRICT** [3] - 1:1, 1:1, 1:11
   **district** [3] - 77:22, 116:15, 116:17
   **divided** [1] - 88:2
   **DIVISION** [1] - 1:2
   **Docket** [9] - 6:25, 12:2, 12:10, 21:15,
21:16, 77:5, 89:15, 89:18, 105:5
   **doctor** [1] - 94:14
   **doctors** [1] - 113:17
   **Document** [1] - 31:2
   **document** [6] - 8:15, 21:12, 59:18,
64:15, 64:21, 86:13
   **documentation** [1] - 31:17, 34:10,
93:17
   **documents** [2] - 86:3, 89:11
   **Doe** [1] - 25:1

**dog** [1] - 18:16
**DOJ** [1] - 77:12
**Donald** [2] - 7:3
**done** [12] - 14:19, 39:22, 40:23, 41:13, 47:8, 47:11, 47:14, 57:20, 75:7, 112:15, 115:6, 115:8
**dooms** [1] - 9:10
**door** [1] - 65:10
**doughnut** [2] - 57:23, 68:25
**Douglas** [1] - 6:9
**DOUGLAS** [1] - 2:4
**down** [10] - 3:9, 38:2, 66:13, 91:18, 100:4, 102:22, 118:16, 120:6, 120:7, 120:22
**Dr** [36] - 7:3, 7:4, 7:15, 8:14, 8:23, 9:3, 9:5, 9:10, 9:18, 11:9, 13:16, 13:19, 13:20, 13:25, 14:1, 14:10, 14:20, 14:22, 15:10, 16:23, 17:10, 17:14, 17:17, 17:21, 17:25, 18:1, 18:3, 18:6, 18:8, 19:10, 30:20, 30:24, 32:2, 32:10, 39:25
**draw** [1] - 42:6
**drawn** [1] - 66:24
**draws** [1] - 85:7
**DRIEMEIER** [42] - 2:4, 19:22, 20:1, 21:3, 22:5, 22:24, 23:17, 23:23, 24:10, 24:14, 25:7, 25:14, 25:20, 25:24, 26:5, 26:12, 26:25, 27:21, 28:12, 28:17, 29:19, 31:15, 31:20, 41:17, 41:19, 42:9, 42:13, 42:20, 43:7, 43:10, 43:14, 44:23, 44:25, 45:4, 45:7, 45:13, 45:22, 45:25, 46:13, 46:22, 48:19, 49:15
**Driemeier** [4] - 6:9, 18:9, 19:22, 33:20
**Driemeier's** [1] - 18:22
**driver's** [3] - 20:13, 20:18, 48:22
**drop** [1] - 57:18
**drove** [1] - 7:13
**drug** [1] - 34:20
**due** [5] - 13:9, 13:12, 14:18, 15:1, 79:24
**duly** [4] - 41:6, 41:10, 50:9, 53:25
**during** [6] - 13:17, 75:2, 76:15, 78:21, 107:11, 123:23
**dwindling** [1] - 66:16

## E

**EAD** [2] - 59:17, 98:22
**eager** [2] - 82:12, 84:4
**early** [1] - 3:11
**easiest** [1] - 74:24
**Eastern** [5] - 48:9, 56:15, 102:14, 103:12, 104:6
**eat** [1] - 23:14
**ECF** [2] - 53:1, 105:5
**economic** [4] - 17:15, 29:22, 95:18, 95:25
**economist** [1] - 7:15
**economy** [1] - 8:13
**edge** [1] - 45:2
**Edlow** [16] - 48:10, 49:7, 74:15, 79:3,

79:8, 79:10, 80:21, 89:24, 90:6, 90:11, 90:16, 97:9, 97:19, 98:3, 98:8, 103:19
**EDNY** [3] - 74:18, 79:19, 120:15
**educate** [2] - 25:2, 25:21
**educated** [2] - 14:14, 25:4
**education** [5] - 21:23, 22:8, 24:4, 30:17, 32:14
**effect** [16] - 30:9, 48:12, 56:13, 86:21, 87:8, 93:22, 94:12, 103:15, 104:10, 107:12, 116:12, 116:20, 118:6, 118:11, 118:17, 127:7
**effective** [5] - 119:8, 119:12, 122:19, 123:6
**effectively** [1] - 81:23
**effects** [2] - 17:16, 113:12
**effort** [2] - 10:14, 102:15
**egg** [1] - 113:5
**eggs** [1] - 126:3
**eight** [2] - 11:17, 78:5
**either** [12] - 11:14, 14:4, 15:20, 15:23, 22:22, 47:11, 67:14, 69:24, 82:8, 93:11, 104:9, 109:13
**elephant** [1] - 58:8
**eligibility** [5] - 60:21, 63:20, 64:2, 64:3, 95:17
**eligible** [14] - 13:23, 48:22, 52:3, 52:19, 53:14, 66:17, 67:5, 91:3, 91:12, 105:3, 105:8, 105:11, 106:18, 124:14
**eliminate** [2] - 75:13, 75:18
**eliminated** [1] - 48:24
**elimination** [1] - 24:24
**ELIZABETH** [1] - 1:20
**Elizabeth** [1] - 13:1
**elsewhere** [1] - 68:12
**emergency** [3] - 32:18, 42:4, 42:23
**emphasize** [1] - 31:4
**emphasizes** [1] - 49:22
**empirical** [1] - 17:15
**employed** [1] - 10:13
**employee** [6] - 10:6, 10:9, 10:12, 10:14, 10:20, 11:1
**employer** [2] - 11:5, 17:12
**employers** [3] - 8:6, 8:7, 8:16
**Employment** [1] - 59:18
**employment** [6] - 7:16, 17:23, 35:20, 42:3, 43:3, 59:15
**empowered** [1] - 117:21
**empty** [1] - 57:25
**enacted** [7] - 22:3, 41:6, 41:11, 50:9, 52:7, 53:25, 107:22
**end** [9] - 14:5, 14:8, 14:11, 15:14, 37:17, 37:19, 118:14, 119:4, 124:8
**ends** [2] - 84:24, 85:21
**enforce** [3] - 34:18, 41:7, 50:15
**enforced** [1] - 103:22
**enforcement** [4] - 34:21, 35:3, 97:16, 122:23
**enforcing** [2] - 98:16, 117:19
**enjoin** [1] - 125:10

**enjoining** [1] - 110:16
**enjoins** [1] - 117:19
**enrolled** [1] - 32:12
**ensure** [1] - 75:15
**enter** [2] - 49:11, 127:21
**entered** [4] - 34:2, 64:4, 64:8, 64:13
**enterprise** [1] - 10:14
**entire** [6] - 37:9, 53:9, 67:18, 83:10, 85:11, 85:18
**entirely** [3] - 79:4, 113:9, 113:12
**entitled** [4] - 64:15, 75:25, 86:25, 129:4
**entity** [1] - 18:5
**environmental** [1] - 77:24
**envisioned** [1] - 75:22
**EPA** [12] - 20:13, 27:25, 28:2, 28:8, 28:24, 44:25, 46:21, 78:2, 78:3, 112:22
**equally** [2] - 8:1, 88:2
**equate** [1] - 26:14
**equating** [1] - 32:24
**equation** [3] - 95:16, 95:23, 97:6
**equitable** [3] - 116:11, 119:15, 125:2
**equity** [1] - 127:21
**erase** [1] - 117:18
**Erasure** [1] - 117:14
**Eric** [1] - 13:1
**ERIC** [1] - 1:17
**error** [1] - 53:12
**especially** [3] - 3:13, 48:8, 114:10
**essential** [1] - 112:21
**essentially** [11] - 38:13, 38:24, 43:4, 46:21, 76:21, 77:6, 89:13, 94:10, 95:16, 110:2, 110:7
**Esther** [2] - 6:22, 73:9
**estimate** [2] - 52:21, 66:24
**estimated** [3] - 20:22, 40:1, 65:9
**estimates** [2] - 53:11, 83:17
**ET** [3] - 1:4, 1:7, 2:2
**et** [3] - 44:20, 88:13, 124:25
**evaluate** [1] - 14:17
**evaluation** [1] - 67:10
**evenly** [1] - 33:2
**eventually** [1] - 11:10
**ever-available** [1] - 112:9
**evidence** [40] - 12:11, 12:16, 14:18, 17:16, 18:21, 20:20, 21:7, 21:11, 22:16, 24:17, 26:15, 39:22, 43:10, 44:4, 44:13, 44:15, 47:13, 47:15, 49:2, 49:3, 53:21, 53:22, 64:25, 82:1, 82:8, 83:3, 85:15, 89:5, 89:9, 89:22, 90:18, 91:21, 99:13, 100:9, 107:24, 108:2, 113:10, 113:16
**evident** [1] - 28:1
**exact** [1] - 114:5
**exactly** [16] - 28:3, 50:10, 74:19, 76:25, 79:2, 82:13, 82:19, 83:4, 83:24, 88:22, 112:5, 114:15, 116:16, 123:8, 124:2, 124:3
**examination** [2] - 12:11, 32:7
**example** [17] - 9:25, 13:17, 35:20,

36:22, 73:14, 73:18, 86:17, 86:19,
87:17, 93:10, 93:13, 93:14, 93:15,
94:13, 116:14, 118:17, 123:22
  **examples** [6] - 35:17, 78:3, 83:11,
97:5, 112:24, 113:21
  **exceeded** [1] - 117:9
  **excess** [1] - 126:20
  **exclude** [4] - 6:13, 12:17, 15:2, 21:14
  **excluded** [4] - 7:9, 8:19, 18:13, 19:9
  **excuse** [5] - 41:12, 51:23, 52:5, 52:13,
107:5
  **executed** [1] - 56:7
  **executive** [9] - 23:5, 27:2, 41:13,
50:16, 52:6, 52:12, 71:9, 71:12, 106:11
  **executive's** [2] - 52:16, 56:6
  **exercise** [8] - 39:18, 58:24, 60:11,
70:10, 71:8, 107:25, 108:15, 119:15
  **exercised** [1] - 108:1
  **Exhibit** [3] - 52:24, 53:1, 107:5
  **exist** [1] - 87:19
  **existed** [6] - 43:15, 59:21, 81:3, 97:3,
117:23, 124:12
  **existence** [3] - 22:4, 26:1, 104:3
  **existing** [3] - 59:12, 118:13, 118:18
  **exists** [2] - 25:4, 91:7
  **expanded** [1] - 50:25
  **expansion** [1] - 110:19
  **expect** [2] - 74:23, 82:10
  **expectation** [1] - 16:17
  **expenditures** [1] - 32:18
  **expenses** [2] - 21:22, 32:14
  **experience** [1] - 81:9
  **expert** [18] - 7:6, 7:9, 9:2, 12:4, 13:9,
13:15, 14:1, 14:23, 15:2, 17:21, 18:4,
18:5, 18:11, 18:12, 55:9, 56:3, 66:5
  **expert's** [1] - 8:19
  **experts** [12] - 7:2, 7:11, 12:17, 12:19,
13:13, 17:4, 17:6, 18:24, 19:8, 19:16,
44:15, 55:7
  **expire** [2] - 66:10, 118:22
  **explain** [5] - 35:4, 57:2, 81:14, 126:17,
127:12
  **explained** [2] - 61:10, 126:15
  **explains** [2] - 61:5, 61:21
  **explanation** [1] - 57:1
  **expressed** [3] - 11:22, 17:11, 70:25
  **extending** [1] - 54:18
  **extensive** [1] - 113:21
  **extent** [10] - 43:1, 44:18, 45:13, 60:23,
61:22, 62:23, 63:13, 63:14, 115:20,
120:20
  **extraordinarily** [3] - 84:2, 113:1,
121:11
  **extraordinary** [2] - 114:6, 115:21
  **extrapolating** [1] - 53:9
  **extreme** [1] - 52:6
  **eye** [1] - 49:18

**F**

  **F.3d** [2] - 21:7, 112:22
  **F.Supp.3d** [1] - 22:2
  **face** [2] - 30:2, 64:20
  **faced** [1] - 8:1
  **facing** [2] - 4:11, 125:5
  **fact** [44] - 3:8, 3:13, 8:16, 13:11, 13:14,
13:23, 15:6, 16:8, 16:20, 18:5, 22:7,
22:19, 26:15, 27:1, 30:1, 30:7, 33:7,
33:24, 34:10, 36:4, 36:9, 37:7, 37:20,
41:3, 43:1, 43:11, 43:18, 45:9, 45:10,
45:18, 60:24, 63:19, 64:1, 67:7, 75:16,
96:15, 98:6, 105:7, 107:4, 108:12,
117:12, 117:24, 125:25, 126:12
  **fact-bound** [1] - 75:16
  **factor** [3] - 87:1, 87:5, 96:14
  **factors** [8] - 8:13, 89:19, 89:21, 92:17,
92:19, 96:8, 112:13, 112:25
  **facts** [12] - 5:3, 18:14, 35:8, 37:4,
38:18, 57:21, 58:3, 58:5, 60:19, 76:1,
91:1, 92:5
  **factual** [1] - 77:25
  **fail** [1] - 52:17
  **failed** [2] - 7:12, 33:6
  **failure** [5] - 23:4, 24:20, 34:6, 35:6,
35:9
  **fair** [3] - 43:15, 76:16, 95:5
  **fairer** [1] - 95:6
  **fairness** [1] - 97:4
  **faithfully** [1] - 56:7
  **Fallacy** [1] - 117:14
  **familiar** [1] - 86:9
  **families** [2] - 29:11, 32:11
  **family** [11] - 9:15, 9:16, 9:23, 9:24,
10:1, 10:4, 10:13, 11:4, 14:13, 97:4
  **far** [3] - 13:25, 78:16
  **fashion** [1] - 120:9
  **faster** [1] - 122:24
  **fault** [1] - 27:5
  **favor** [2] - 8:11, 34:5
  **favorable** [2] - 60:12, 72:22
  **February** [1] - 76:22
  **federal** [81] - 19:4, 19:8, 19:11, 22:21,
26:14, 26:17, 27:6, 27:12, 27:14, 29:23,
30:3, 31:21, 38:8, 38:11, 38:17, 39:1,
40:23, 41:9, 41:12, 46:18, 52:21, 53:2,
53:11, 56:17, 60:22, 65:9, 71:11, 71:12,
74:13, 74:19, 74:22, 75:2, 75:10, 75:12,
76:9, 76:14, 77:13, 77:14, 78:21, 79:2,
79:12, 79:17, 79:21, 79:22, 80:8, 80:19,
80:24, 81:1, 81:12, 81:16, 81:22, 82:11,
82:18, 83:8, 83:20, 84:4, 85:6, 90:12,
90:14, 91:9, 91:16, 93:18, 94:15, 101:3,
101:22, 104:15, 106:13, 107:25,
115:10, 116:21, 116:23, 117:2, 119:6,
119:11, 120:3, 124:16, 124:19, 125:25,
126:19
  **FEDERAL** [1] - 2:11
  **Federal** [1] - 55:23

  **feet** [1] - 4:6
  **Feigenbaum** [3] - 18:16, 33:9, 123:10
  **FEIGENBAUM** [35] - 2:7, 18:18, 33:11,
33:14, 36:13, 36:24, 38:7, 74:2, 78:6,
81:15, 82:7, 84:9, 84:13, 85:24, 88:20,
92:10, 93:6, 93:10, 94:6, 95:5, 96:19,
97:19, 99:2, 99:11, 101:11, 101:16,
109:16, 109:24, 111:19, 112:1, 112:5,
121:4, 123:14, 124:24, 125:13
  **fell** [2] - 41:20, 105:1
  **few** [2] - 41:20, 105:1
  **field** [1] - 117:3
  **Fifth** [29] - 5:15, 20:8, 20:19, 21:5,
28:22, 39:20, 47:25, 48:13, 50:24,
59:14, 61:3, 61:4, 61:5, 61:11, 61:12,
61:16, 61:21, 71:23, 86:8, 99:9, 99:11,
99:12, 99:15, 100:13, 104:16, 112:8,
112:13, 112:23, 121:15
  **fight** [1] - 18:17
  **figure** [8] - 47:3, 65:14, 83:3, 86:14,
88:25, 89:14, 91:20
  **figuring** [1] - 111:20
  **filed** [5] - 13:4, 56:2, 56:16, 105:4,
108:16
  **filing** [1] - 6:25
  **fill** [1] - 25:11
  **final** [4] - 48:7, 76:8, 85:7, 116:17
  **finally** [6] - 17:21, 33:1, 44:17, 80:11,
91:8, 108:14
  **financial** [1] - 60:17
  **findings** [3] - 68:23, 81:6, 101:3
  **fine** [1] - 23:12
  **finer** [1] - 101:6
  **finite** [1] - 72:4
  **first** [43] - 3:8, 6:4, 6:14, 13:16, 16:4,
20:6, 28:2, 31:5, 33:19, 40:16, 48:12,
56:16, 58:4, 59:13, 63:19, 74:5, 75:12,
76:13, 78:23, 79:11, 81:8, 86:1, 87:24,
94:9, 97:20, 99:5, 100:5, 105:15,
109:25, 113:4, 114:19, 116:7, 116:10,
117:11, 118:3, 119:3, 119:13, 121:6,
122:17, 122:21, 123:7, 126:24, 127:19
  **five** [4] - 63:7, 89:4, 89:9, 101:14
  **fix** [2] - 115:25, 116:1
  **fixed** [2] - 67:4
  **flatly** [1] - 50:25
  **flawed** [2] - 11:10, 69:5
  **flaws** [1] - 32:3
  **flexibility** [4] - 112:17, 113:23, 114:6,
120:21
  **flip** [2] - 29:14, 55:2
  **Floor** [1] - 1:16
  **flow** [3] - 49:20, 106:23, 107:23
  **flows** [2] - 59:9, 63:11
  **focus** [4] - 71:6, 72:24, 74:5, 106:4
  **focused** [4] - 61:11, 75:1, 120:11,
120:25
  **focusing** [1] - 69:4
  **folks** [4] - 13:21, 14:12, 118:18, 126:4
  **follow** [2] - 75:1, 96:24

**followed** [2] - 90:18, 115:13
**following** [10] - 15:8, 15:9, 17:23, 20:3, 26:3, 78:21, 96:19, 96:20, 110:6, 121:23
**Footnote** [3] - 47:22, 48:16, 106:21
**footnote** [3] - 48:18, 65:17, 82:4
**footnotes** [2] - 65:19, 65:21
**FOR** [4] - 1:14, 2:1, 2:7, 2:11
**forbearance** [11] - 31:8, 49:20, 51:18, 68:10, 69:3, 69:4, 105:16, 106:9, 106:10, 106:23, 106:24
**forbearing** [2] - 107:1, 107:14
**force** [1] - 56:13
**forebear** [2] - 51:20, 106:16
**foregoing** [1] - 129:3
**foreseeable** [2] - 103:23, 104:11
**forgot** [1] - 47:18
**form** [2] - 59:16, 59:17
**formal** [3] - 76:6, 76:7, 98:2
**forth** [4] - 90:21, 91:1, 121:16, 122:12
**forum** [1] - 12:18
**forward** [8] - 7:2, 24:16, 44:12, 47:13, 83:9, 112:11, 114:9, 124:15
**four** [3] - 75:8, 78:19, 85:25
**fourth** [1] - 75:21
**fraction** [2] - 23:2, 34:12
**frame** [1] - 105:14
**framed** [1] - 74:9
**framework** [8] - 51:1, 74:19, 74:24, 75:14, 76:24, 83:21, 114:25, 117:6
**frameworks** [1] - 78:14
**frankly** [2] - 87:22, 125:8
**free** [4] - 11:3, 63:12, 122:23, 123:3
**free-standing** [1] - 63:12
**frequently** [1] - 107:6
**friend** [1] - 71:4
**front** [14] - 51:12, 52:10, 56:13, 73:15, 77:17, 88:18, 88:20, 101:1, 107:3, 110:4, 110:14, 113:2, 114:24, 116:25
**fulfilled** [1] - 72:21
**full** [5] - 48:11, 56:13, 84:22, 103:3, 121:12
**fully** [4] - 34:23, 79:13, 103:4, 116:11
**fundamentally** [1] - 54:3
**funding** [1] - 35:3
**funds** [1] - 40:22
**furthermore** [1] - 31:11
**future** [2] - 103:23, 104:11

**G**

**gap** [1] - 25:11
**Garner** [1] - 112:3
**gears** [2] - 72:14, 108:23
**general** [11] - 3:19, 13:2, 17:15, 29:4, 29:6, 29:16, 62:12, 71:24, 76:13, 83:3, 104:5
**General** [4] - 1:15, 1:18, 1:20, 2:8
**generalized** [2] - 46:17, 92:6

**generally** [2] - 20:13, 126:6
**genuine** [4] - 58:5, 82:9, 85:12, 92:4
**given** [11] - 13:12, 15:12, 23:3, 37:6, 48:15, 67:25, 74:22, 76:1, 76:16, 84:20
**gobbled** [1] - 27:12
**God** [1] - 82:6
**good-bye** [1] - 119:25
**Gorsuch** [1] - 54:8
**government** [36] - 5:11, 15:9, 15:24, 22:21, 23:1, 25:13, 25:15, 26:14, 26:17, 27:7, 27:13, 30:3, 31:21, 40:23, 41:9, 41:12, 43:22, 46:18, 49:8, 50:1, 50:2, 53:2, 53:11, 60:12, 61:18, 65:5, 65:9, 70:7, 71:11, 71:12, 77:13, 77:14, 79:2, 83:8, 124:16, 125:9
**government's** [4] - 25:16, 41:10, 49:4, 74:14
**governmental** [1] - 117:19
**governments** [1] - 113:13
**graduated** [2] - 73:5, 73:11
**graduates** [2] - 32:16, 32:17
**grant** [18] - 19:18, 41:1, 41:5, 51:18, 52:12, 52:16, 59:18, 68:2, 71:12, 80:9, 95:22, 99:16, 99:20, 108:3, 109:7, 118:19, 118:21, 119:23
**granted** [18] - 21:14, 32:9, 38:4, 51:20, 52:2, 55:17, 64:16, 64:18, 78:1, 80:13, 83:7, 94:18, 94:19, 96:16, 98:3, 106:11, 108:6, 109:3
**granting** [2] - 70:12, 91:5
**grants** [10] - 41:4, 68:17, 71:7, 98:20, 118:13, 118:14, 118:20, 118:25, 126:1
**grapples** [1] - 92:11
**Gray** [1] - 2:4
**great** [4] - 13:2, 100:20, 117:7, 128:1
**greater** [2] - 47:6, 90:3
**grew** [2] - 73:5, 73:10
**ground** [6] - 78:14, 79:6, 80:2, 80:22, 82:14, 114:7
**group** [2] - 72:4, 107:14
**guidance** [1] - 55:4
**guided** [1] - 72:3
**guys** [2] - 4:6, 4:13

**H**

**half** [1] - 77:7
**Hallward** [6] - 6:9, 18:9, 18:22, 19:21, 19:22, 33:20
**HALLWARD** [42] - 2:4, 19:22, 20:1, 21:3, 22:5, 22:24, 23:17, 23:23, 24:10, 24:14, 25:7, 25:14, 25:20, 25:24, 26:5, 26:12, 26:25, 27:21, 28:12, 28:17, 29:19, 31:15, 31:20, 41:17, 41:19, 42:9, 42:13, 42:20, 43:7, 43:10, 43:14, 44:23, 44:25, 45:4, 45:7, 45:13, 45:22, 45:25, 46:13, 46:22, 48:19, 49:15
**Hallward-Driemeier** [4] - 6:9, 18:9, 19:22, 33:20
**HALLWARD-DRIEMEIER** [42] - 2:4,

19:22, 20:1, 21:3, 22:5, 22:24, 23:17, 23:23, 24:10, 24:14, 25:7, 25:14, 25:20, 25:24, 26:5, 26:12, 26:25, 27:21, 28:12, 28:17, 29:19, 31:15, 31:20, 41:17, 41:19, 42:9, 42:13, 42:20, 43:7, 43:10, 43:14, 44:23, 44:25, 45:4, 45:7, 45:13, 45:22, 45:25, 46:13, 46:22, 48:19, 49:15
**hand** [2] - 69:9, 69:10
**handbook** [1] - 98:18
**handbooks** [1] - 64:25
**handed** [1] - 120:7
**handle** [2] - 33:14, 76:14
**handled** [1] - 110:24
**hands** [2] - 104:24, 118:5
**HANEN** [1] - 1:10
**hang** [1] - 67:13
**happy** [4] - 20:3, 81:19, 85:9, 104:25
**hard** [4] - 20:1, 61:25, 111:2, 124:4
**harm** [11] - 28:21, 28:24, 29:6, 37:20, 37:23, 37:25, 38:1, 39:15, 45:11, 46:24, 125:3
**Harvard** [1] - 73:10
**hat** [1] - 91:13
**Hathaway** [1] - 8:19
**hats** [1] - 67:13
**Hayward** [1] - 19:21
**health** [11] - 20:14, 21:22, 22:8, 24:3, 29:12, 30:17, 32:18, 42:2, 42:8, 42:19, 42:22
**hear** [7] - 6:12, 61:9, 74:20, 75:10, 85:23, 93:6, 111:15
**HEARD** [1] - 1:10
**heard** [6] - 28:14, 35:14, 39:17, 41:2, 46:16, 105:13
**hearing** [4] - 3:11, 3:19, 5:10, 53:5
**held** [3] - 50:24, 51:9, 80:8
**help** [5] - 11:4, 77:16, 81:10, 95:1, 119:16
**helpful** [5] - 34:8, 58:23, 78:12, 86:18, 89:23
**helpfully** [1] - 101:5
**helping** [1] - 10:24
**helps** [5] - 35:4, 36:25, 72:25, 80:24, 85:5
**hereby** [1] - 129:3
**hide** [1] - 99:6
**high** [2] - 66:11, 96:10
**highlight** [1] - 89:4
**highlighted** [1] - 124:24
**highly** [2] - 14:4, 14:14
**himself** [1] - 50:13
**hire** [1] - 10:19
**hired** [5] - 17:10, 17:12, 36:1, 36:2, 36:5
**hiring** [7] - 7:23, 8:4, 8:7, 8:12, 10:5, 11:6, 36:4
**history** [5] - 31:21, 55:11, 79:11, 97:5, 119:10
**hit** [2] - 104:24, 125:7

**hold** [2] - 58:9, 58:12
**holding** [1] - 28:3
**holiday** [2] - 3:23, 128:8
**holidays** [1] - 128:5
**Homeland** [2] - 58:18, 101:23
**homes** [1] - 113:19
**Honor** [127] - 6:9, 6:16, 6:18, 6:24,
9:25, 10:7, 10:11, 10:21, 12:23, 15:11,
16:3, 16:12, 18:11, 18:18, 19:2, 19:3,
19:7, 20:24, 21:3, 22:24, 23:17, 24:14,
25:7, 25:14, 25:17, 25:24, 26:12, 26:25,
27:21, 28:12, 31:15, 31:20, 33:11,
33:18, 34:8, 35:14, 37:25, 38:7, 38:10,
38:23, 39:24, 41:19, 42:9, 43:7, 44:5,
45:4, 45:18, 46:13, 47:18, 48:5, 48:19,
49:5, 50:7, 51:16, 52:9, 52:10, 52:24,
54:22, 55:7, 56:11, 56:12, 57:1, 57:14,
58:23, 59:20, 60:20, 61:20, 62:9, 62:18,
63:21, 63:22, 64:5, 64:14, 65:16, 66:4,
66:18, 66:25, 67:6, 67:16, 68:6, 71:20,
72:15, 74:2, 79:9, 80:20, 81:6, 81:17,
83:1, 84:13, 84:15, 91:23, 93:6, 99:13,
101:4, 101:9, 101:11, 101:16, 101:21,
101:22, 102:2, 102:5, 102:10, 102:24,
103:8, 103:25, 104:12, 104:22, 104:25,
105:21, 108:14, 109:16, 114:24,
114:25, 115:18, 119:20, 119:21,
119:22, 120:4, 120:9, 121:4, 122:6,
122:11, 123:14, 123:16, 124:12,
125:16, 126:18
**Honor's** [8] - 28:2, 28:5, 65:17, 67:17,
94:25, 118:12, 122:3, 123:22
**HONORABLE** [1] - 1:10
**hook** [2] - 34:25, 44:20
**hooks** [1] - 67:13
**hope** [2] - 16:5, 16:11
**hopefully** [2] - 33:20, 80:19
**hoping** [2] - 28:14, 28:15
**hostility** [1] - 91:5
**hour** [1] - 7:16
**hours** [1] - 83:17
**housekeeping** [1] - 3:7
**HOUSTON** [1] - 1:5
**Houston** [4] - 2:15, 2:20, 73:5, 73:10
**Hu** [2] - 18:25, 101:19
**HU** [1] - 2:13
**Hudson** [1] - 13:1
**HUDSON** [1] - 1:17
**huge** [1] - 87:22
**Hughes** [1] - 2:8
**humanitarian** [1] - 97:14
**hurdle** [1] - 89:8
**hurt** [1] - 36:9
**husband** [2] - 69:20, 69:21
**hypothesized** [1] - 123:24
**hypothetical** [7] - 36:16, 73:21, 87:10,
93:17, 115:22, 119:21, 124:7
**hypothetically** [3] - 24:23, 62:4,
109:14

**I**

**I-821D** [1] - 59:16
**ID** [1] - 77:15
**idea** [11] - 11:23, 15:14, 24:2, 24:5,
25:15, 46:14, 46:16, 60:21, 107:17,
121:18, 126:6
**identified** [11] - 23:25, 28:21, 33:20,
60:4, 87:7, 90:23, 94:1, 112:14, 114:3,
114:15, 122:10
**identify** [1] - 73:18
**identifying** [1] - 98:6
**ignore** [2] - 50:16, 100:5
**Ill** [1] - 45:23
**illegal** [10] - 5:13, 5:25, 11:6, 22:16,
27:9, 58:12, 71:13, 71:17
**illegality** [1] - 114:9
**illegally** [8] - 5:6, 10:18, 15:21, 64:4,
64:8, 64:11, 64:17, 105:9
**illuminate** [4] - 72:25, 77:16, 81:10,
101:5
**illuminating** [1] - 78:12
**illustrates** [1] - 95:9
**illustrative** [6] - 77:3, 89:25, 91:6,
95:1, 112:19, 112:23
**imagine** [4] - 83:8, 86:19, 86:20,
115:11
**immediate** [2] - 113:22, 124:9
**immediately** [5] - 16:21, 76:11, 89:6,
98:7, 113:2
**immigrant** [5] - 5:14, 5:24, 5:25, 9:6,
73:6
**immigrants** [7] - 7:18, 9:7, 11:19,
22:17, 22:18, 23:3
**immigration** [23] - 4:24, 5:19, 16:18,
27:8, 27:13, 34:19, 41:8, 41:11, 50:15,
51:5, 51:24, 52:8, 54:3, 55:9, 69:5,
69:9, 70:2, 70:9, 70:12, 102:8, 106:3,
111:3, 111:5
**immunity** [1] - 109:1
**impact** [1] - 7:17
**impacted** [1] - 103:19
**impacting** [1] - 103:16
**impermissible** [1] - 51:1
**implement** [5] - 79:2, 98:24, 103:10,
103:22, 125:10
**implementation** [8] - 17:23, 78:10,
78:13, 100:4, 100:15, 100:16, 100:20,
100:21
**implemented** [14] - 75:14, 78:15,
78:17, 80:2, 80:22, 82:14, 83:22, 83:25,
103:20, 107:18, 107:21, 125:6, 125:9,
125:12
**implementing** [6] - 74:20, 79:12,
79:17, 79:18, 81:1, 98:17
**import** [1] - 61:16
**important** [5] - 84:2, 114:10, 121:23,
122:7, 125:8
**importantly** [3] - 7:20, 8:14, 59:14

**impose** [1] - 43:21
**impossible** [4] - 24:8, 24:11, 83:16,
83:18
**INA** [17] - 15:9, 15:25, 22:21, 61:7,
69:6, 69:9, 70:4, 70:13, 70:17, 70:20,
87:8, 87:13, 89:2, 99:23, 104:14,
104:20
**inauguration** [1] - 75:11
**inception** [1] - 108:22
**included** [4] - 21:13, 66:21, 88:1,
113:16
**including** [8] - 29:11, 55:12, 77:23,
81:9, 82:14, 100:19, 102:9, 112:9
**inconsistent** [3] - 61:7, 70:19, 122:2
**incorporate** [1] - 20:5
**incorrect** [2] - 9:9, 27:11
**increase** [4] - 13:23, 43:18, 90:20,
91:4
**incredibly** [2] - 78:11, 89:25
**incurring** [1] - 32:21
**indeed** [1] - 41:14
**independent** [2] - 9:16, 10:22
**indicated** [1] - 49:8
**indirect** [1] - 21:25
**indisputable** [1] - 15:14
**individual** [12] - 22:9, 58:25, 59:22,
60:1, 61:15, 63:18, 63:24, 64:10, 64:20,
67:8, 67:10, 69:10, 69:19, 71:7, 87:3,
93:2, 93:19, 95:20, 96:11, 107:8,
113:11
**individualized** [3] - 73:12, 73:22,
86:21
**individually** [1] - 67:24
**individuals** [27] - 26:15, 26:18, 30:10,
30:12, 31:9, 31:12, 31:22, 32:15, 34:18,
37:10, 40:23, 40:24, 42:24, 45:18, 53:6,
55:17, 66:2, 91:2, 91:10, 91:11, 96:16,
106:17, 106:18, 113:18, 123:25, 124:14
**individuals'** [1] - 24:24
**industry** [1] - 113:14
**inexorably** [1] - 106:23
**inferred** [1] - 102:7
**infinite** [3] - 72:20, 72:22, 73:21
**information** [11] - 11:14, 11:15, 16:25,
17:18, 82:13, 82:19, 83:11, 91:19,
124:15
**infuses** [1] - 85:17
**inherent** [1] - 83:22
**initial** [5] - 80:8, 80:12, 90:23, 121:6,
126:1
**injunction** [25] - 14:20, 20:10, 34:2,
38:14, 40:5, 43:23, 47:23, 48:6, 56:22,
65:17, 71:1, 84:6, 100:8, 102:16,
103:13, 108:10, 111:1, 111:6, 113:6,
113:22, 116:22, 117:1, 117:12, 117:16,
122:4
**injunctions** [2] - 48:7, 110:13
**injunctive** [3] - 78:7, 78:16, 90:12
**injury** [18] - 29:3, 29:25, 30:6, 36:15,
36:17, 36:19, 36:21, 37:2, 37:21, 38:16,

39:14, 39:21, 41:15, 42:16, 42:17, 46:1, 47:14

**inquiry** [3] - 36:3, 44:7, 44:10
**inspection** [1] - 64:13
**instance** [16] - 4:10, 8:15, 28:25, 30:1, 41:22, 87:4, 114:19, 117:11, 118:3, 119:3, 119:13, 122:17, 122:21, 123:7, 126:24, 127:20
**instances** [3] - 91:10, 121:14, 126:12
**instant** [1] - 100:1
**instead** [10] - 17:10, 40:25, 42:4, 82:16, 83:12, 88:7, 93:8, 94:19, 113:3, 121:20
**instituted** [2] - 54:21, 57:9
**instruct** [1] - 90:8
**instructed** [1] - 120:18
**instructive** [2] - 97:9, 98:2
**insufficient** [1] - 34:3
**insurance** [2] - 42:15
**intended** [1] - 102:9
**intends** [1] - 120:9
**interaction** [1] - 7:22
**interest** [3] - 30:9, 40:14, 125:23
**interesting** [1] - 36:7
**interests** [12] - 40:15, 49:19, 114:7, 119:16, 120:7, 123:2, 123:21, 124:17, 126:4, 126:9, 127:5, 127:22
**interim** [2] - 109:21, 112:16
**internal** [2] - 89:11, 89:16
**interpretation** [1] - 46:9
**interrogatory** [3] - 53:3, 83:12
**intersect** [1] - 80:21
**intervene** [1] - 40:14
**intervenor** [3] - 18:19, 36:18, 90:22
**INTERVENOR** [2] - 2:1, 2:7
**Intervenors** [2] - 6:21, 14:2
**intervenors** [17] - 7:1, 13:16, 14:7, 18:4, 33:16, 34:5, 38:24, 39:23, 41:2, 55:8, 75:25, 81:18, 105:13, 109:7, 109:12, 115:20, 127:6
**intervenors'** [11] - 6:4, 6:10, 12:10, 14:23, 17:4, 17:6, 22:15, 38:3, 40:6, 53:2, 54:22
**intimately** [1] - 86:9
**introduce** [1] - 6:19
**introduced** [1] - 39:23
**introduction** [1] - 12:25
**invalidate** [3] - 63:1, 63:2, 63:16
**inventor** [1] - 93:16
**invested** [1] - 28:19
**invitation** [1] - 58:2
**invited** [2] - 57:25, 120:16
**involuntarily** [1] - 16:2
**involve** [1] - 114:10
**involved** [3] - 23:16, 86:24, 88:6
**involves** [1] - 89:18
**involving** [1] - 99:23
**irrelevant** [2] - 7:7, 8:22
**issuance** [1] - 69:23

**issue** [20] - 11:11, 15:2, 19:7, 20:7, 20:9, 20:16, 33:18, 35:25, 44:12, 59:7, 60:9, 63:3, 64:1, 68:1, 72:25, 76:8, 86:2, 88:5, 97:12, 121:19
**issued** [10] - 48:12, 50:19, 50:20, 106:14, 106:15, 108:17, 111:1, 111:7, 120:15, 126:21
**issues** [15] - 5:1, 33:8, 38:12, 75:16, 75:19, 77:16, 77:20, 77:25, 80:3, 99:22, 101:5, 103:9, 120:10, 120:17, 125:11
**issuing** [1] - 120:14
**itself** [27] - 8:21, 14:18, 31:5, 37:5, 37:16, 37:22, 60:24, 74:7, 80:15, 86:9, 86:15, 87:21, 88:15, 88:16, 91:14, 93:4, 95:12, 96:5, 97:2, 97:20, 98:3, 98:8, 107:4, 108:12, 111:17, 121:21, 121:22

**J**

**January** [2] - 3:11, 128:3
**Jeon** [2] - 6:22, 73:9
**JEREMY** [1] - 2:7
**JERSEY** [1] - 2:7
**Jersey** [21] - 2:8, 2:9, 3:9, 5:12, 14:2, 18:19, 35:12, 40:9, 40:13, 74:1, 74:3, 75:24, 81:18, 83:13, 113:3, 113:14, 113:15, 115:19, 124:19, 127:5
**Jersey's** [1] - 40:8
**job** [7] - 15:25, 17:13, 30:12, 35:21, 35:24, 46:19
**jobs** [1] - 17:19
**JOHN** [1] - 2:11
**joined** [1] - 54:8
**joining** [1] - 48:2
**joint** [1] - 10:14
**Jonathan** [1] - 117:15
**JUDGE** [1] - 1:11
**Judge** [1] - 120:2
**judges** [3] - 58:10, 58:13, 110:24
**judgment** [47] - 6:3, 6:7, 6:10, 6:13, 7:5, 7:10, 12:5, 12:6, 12:14, 13:7, 13:8, 14:25, 16:6, 18:15, 32:6, 33:7, 33:8, 34:4, 40:7, 44:13, 44:16, 47:13, 47:16, 49:3, 58:1, 68:2, 74:6, 74:9, 76:1, 76:8, 81:10, 82:18, 83:14, 84:16, 85:4, 85:7, 85:8, 89:8, 99:18, 107:6, 109:3, 109:7, 110:8, 113:10, 113:17, 116:17, 128:2
**judicial** [1] - 106:5
**judicially** [1] - 38:25
**judiciary** [1] - 23:8
**judiciously** [1] - 86:3
**July** [1] - 102:13
**jump** [1] - 27:22
**June** [2] - 72:10
**jurisdictional** [1] - 44:6
**jury** [1] - 128:3
**Justice** [15] - 1:21, 2:8, 2:11, 54:2, 54:8, 54:9, 54:10, 77:12, 94:3, 94:7, 105:24, 106:14, 106:20
**justice** [1] - 71:23

**justices** [3] - 87:25, 88:1, 105:22

**K**

**Karla** [1] - 73:4
**KARLA** [1] - 2:2
**keep** [2] - 4:3, 72:8
**keeps** [1] - 37:19
**kind** [13] - 9:20, 37:22, 38:1, 41:23, 46:15, 55:25, 62:13, 65:14, 85:21, 90:1, 103:18, 109:10, 118:15
**knock** [2] - 63:6, 63:7
**knows** [3] - 5:5, 53:17, 73:17
**Ku** [1] - 17:21

**L**

**LA** [1] - 1:22
**labor** [2] - 7:18, 8:25
**lack** [9] - 11:1, 31:24, 34:14, 37:6, 40:12, 75:19, 75:20, 79:5, 81:3
**lacking** [1] - 16:18
**laid** [3] - 13:18, 15:25, 48:11
**language** [4] - 88:11, 88:14, 100:5, 110:15
**Lanie** [3] - 2:17, 129:2, 129:6
**large** [1] - 79:4
**last** [15] - 15:21, 37:17, 49:5, 70:21, 73:14, 125:1, 125:7, 125:17, 125:19, 125:23
**Law** [3] - 55:10, 73:6, 112:1
**law** [28] - 4:24, 4:25, 10:4, 10:16, 11:6, 14:21, 31:14, 34:18, 34:20, 34:23, 34:24, 35:2, 43:6, 46:12, 50:9, 57:5, 77:15, 90:13, 97:15, 101:1, 103:2, 104:13, 110:11, 111:3, 111:5, 115:1, 117:14, 122:2
**lawful** [24] - 16:13, 22:9, 33:22, 41:1, 41:4, 42:21, 48:21, 49:21, 51:21, 51:22, 51:23, 52:12, 52:13, 70:3, 70:5, 70:9, 71:7, 72:18, 73:23, 105:19, 106:21, 126:20
**lawfully** [9] - 13:20, 13:22, 14:12, 25:3, 27:3, 42:25, 43:1, 106:18, 107:11
**lawfulness** [1] - 73:20, 76:24, 82:12
**lawns** [1] - 9:17
**LAWRENCE** [1] - 1:14
**laws** [7] - 5:19, 27:8, 50:14, 50:22, 53:25, 54:3, 56:6
**lawsuit** [1] - 56:3, 56:17, 108:16
**lawsuits** [1] - 68:13
**lawyer** [1] - 105:13
**lawyers** [6] - 3:17, 5:10, 5:11, 5:12, 36:24
**lead** [7] - 6:8, 6:17, 56:19, 97:6, 98:7, 105:12, 111:21
**leadership** [3] - 77:11, 77:12, 90:4
**leads** [2] - 62:14, 94:11
**least** [15] - 3:20, 4:13, 13:24, 15:7, 15:21, 18:13, 26:10, 26:19, 33:6, 44:14,

47:15, 56:9, 91:10, 102:8, 110:18
**leave** [10] - 9:4, 9:7, 14:5, 14:15, 15:15, 16:24, 64:12, 119:5, 126:16
**leaving** [2] - 17:1
**led** [1] - 74:18
**left** [5] - 52:6, 70:22, 88:25, 103:13, 104:4
**legal** [20] - 9:23, 10:2, 16:10, 16:12, 26:9, 35:10, 56:21, 57:24, 60:23, 69:3, 69:4, 73:1, 77:25, 85:7, 85:8, 87:7, 87:11, 94:1, 103:2, 120:15
**legality** [2] - 102:3, 104:16
**legally** [1] - 4:21
**legislative** [4] - 54:5, 54:12, 54:19, 55:1
**length** [2] - 30:23, 124:13
**less** [5] - 32:12, 48:6, 49:2, 78:16, 126:5
**lessen** [1] - 25:19
**lessens** [1] - 25:20
**lesser** [1] - 115:20
**letter** [1] - 14:21
**letting** [1] - 3:15
**license** [2] - 20:14, 48:23
**licenses** [1] - 20:18
**lie** [1] - 100:6
**life** [1] - 97:15
**life-saving** [1] - 97:15
**light** [3] - 79:18, 101:25, 115:4
**likelihood** [2] - 11:15, 17:1
**likely** [12] - 14:4, 14:5, 14:15, 15:12, 32:12, 32:16, 33:4, 33:25, 84:8, 104:14, 104:17, 119:10
**likewise** [2] - 51:8, 54:22
**limb** [1] - 115:5
**limit** [1] - 104:7
**limited** [7] - 15:13, 40:22, 72:4, 120:11, 120:25, 127:6, 127:21
**limiting** [1] - 52:11
**line** [2] - 73:16, 97:25
**lines** [1] - 3:14
**link** [1] - 99:14
**linked** [1] - 37:4
**listen** [1] - 3:14
**literally** [1] - 29:1
**litigate** [1] - 30:2
**litigation** [16] - 17:3, 20:20, 21:14, 21:20, 21:23, 24:20, 26:13, 28:22, 41:25, 75:6, 76:20, 77:1, 99:8, 100:1, 117:5, 119:11
**live** [1] - 97:12
**lived** [3] - 80:2, 80:6, 81:9
**lives** [1] - 113:11
**Lloyd** [2] - 7:4, 9:3
**LLP** [1] - 2:4
**local** [2] - 60:23, 113:13
**logic** [2] - 54:18, 110:7
**long-existing** [1] - 59:12
**long-standing** [1] - 125:1

**look** [12] - 29:5, 73:21, 73:22, 78:12, 78:13, 83:10, 88:7, 96:13, 98:11, 100:16, 107:21, 120:12
**looked** [1] - 15:21
**looking** [6] - 4:16, 59:15, 90:25, 100:10, 102:22, 104:4
**Lopez** [1] - 24:3
**lose** [11] - 9:5, 9:13, 16:16, 30:12, 42:1, 42:2, 42:15, 55:3, 55:5, 91:25, 92:16
**loss** [4] - 29:22, 30:19, 32:24, 42:10
**lost** [3] - 9:11, 11:16, 31:9
**loudly** [1] - 4:14
**Louisiana** [4] - 1:21, 2:14, 13:2, 119:25
**low** [1] - 17:19
**low-skill** [1] - 17:19
**lowering** [1] - 102:23
**lying** [1] - 90:17

# M

**magnitude** [1] - 56:8
**main** [1] - 99:4
**maintain** [2] - 124:11, 126:10
**majority** [14] - 28:6, 33:16, 51:6, 51:9, 54:9, 54:11, 54:14, 58:10, 58:15, 67:19, 88:1, 88:4
**MALDEF** [2] - 2:1, 6:20
**managers** [1] - 8:5
**mandate** [1] - 14:21
**mandated** [1] - 116:19
**mandates** [2] - 41:14, 50:17
**manifestly** [1] - 104:19
**map** [1] - 20:13
**margin** [1] - 53:12
**Maria** [1] - 73:14
**Market** [1] - 2:9
**market** [2] - 7:18, 8:25
**mask** [3] - 4:5, 57:15
**Massachusetts** [9] - 20:13, 20:16, 27:25, 28:2, 28:8, 28:24, 44:20, 44:25, 46:21
**material** [3] - 18:14, 58:5, 92:5
**materially** [3] - 38:18, 75:9, 77:20
**materials** [2] - 90:7, 90:17
**matter** [11] - 31:14, 33:24, 36:4, 37:7, 57:5, 76:13, 84:24, 92:9, 98:6, 104:13, 129:4
**matters** [3] - 32:10, 78:8, 92:10
**maximally** [1] - 97:10
**mean** [32] - 4:21, 5:3, 15:9, 15:19, 15:23, 16:20, 23:14, 25:21, 26:23, 27:9, 28:14, 36:13, 43:6, 46:20, 58:8, 58:10, 59:13, 61:2, 62:12, 62:19, 68:24, 69:7, 87:15, 93:22, 94:5, 96:17, 96:20, 106:17, 111:2, 111:9, 111:18, 121:21
**meaning** [2] - 105:11, 107:21
**means** [8] - 30:19, 77:23, 83:16, 83:18, 94:1, 110:7, 114:7, 118:4

**meant** [2] - 88:5, 124:3
**meantime** [2] - 112:7, 123:20
**measure** [1] - 119:12
**measured** [1] - 128:2
**mechanical** [1] - 1:24
**medical** [2] - 87:9, 113:14
**Medicare** [1] - 102:9
**meet** [5] - 18:12, 37:9, 82:22, 83:5, 83:6
**meeting** [1] - 97:14
**meier** [1] - 19:24
**members** [3] - 10:1, 14:13, 107:16
**memo** [57] - 48:12, 50:21, 54:21, 57:9, 74:14, 78:22, 79:23, 81:1, 86:20, 87:7, 87:12, 87:13, 87:19, 88:16, 90:6, 95:12, 95:21, 96:16, 96:18, 96:22, 97:17, 97:19, 98:3, 98:4, 98:8, 98:16, 98:17, 100:5, 100:11, 102:13, 102:18, 103:11, 103:13, 103:14, 103:15, 103:20, 103:21, 104:3, 104:4, 104:9, 106:14, 106:15, 107:3, 108:13, 109:21, 110:9, 110:14, 110:16, 111:18, 114:1, 116:16, 119:13, 122:5, 123:12, 127:13
**memorandum** [18] - 50:11, 50:20, 52:4, 72:3, 74:11, 80:14, 80:16, 106:1, 108:18, 108:20, 109:3, 110:4, 116:8, 117:1, 117:9, 118:1, 118:4, 118:11
**memos** [12] - 48:10, 49:7, 74:15, 79:3, 79:8, 79:10, 80:21, 89:24, 97:9, 98:1, 103:19, 113:2
**mention** [4] - 5:9, 52:18, 56:12, 56:24
**mere** [1] - 51:18
**merely** [2] - 91:16, 117:18
**merit** [1] - 85:9
**merited** [1] - 94:15
**merits** [19] - 6:2, 40:11, 44:2, 44:4, 44:7, 44:9, 50:6, 57:20, 58:1, 74:6, 75:24, 82:17, 84:9, 84:11, 84:12, 89:20, 98:1, 101:2, 117:5
**met** [1] - 82:23
**methodology** [2] - 9:1, 32:3
**methods** [1] - 7:10
**Mexico** [1] - 111:5
**microphone** [1] - 4:11
**microphones** [1] - 4:8
**might** [16] - 6:12, 11:23, 32:16, 32:19, 36:20, 39:17, 49:20, 76:5, 78:15, 86:17, 87:2, 88:12, 95:1, 95:6, 112:17, 121:11
**million** [8] - 23:2, 40:3, 47:3, 51:22, 52:14, 63:7, 65:14, 71:18
**mind** [1] - 37:19
**minus** [1] - 53:11
**minute** [4] - 22:14, 62:2, 71:6, 109:11
**minutes** [1] - 101:14
**missed** [1] - 10:9
**missing** [3] - 10:8, 19:24, 57:21
**Mission** [1] - 73:15
**mistakes** [1] - 7:11
**misunderstanding** [1] - 110:18
**Mitchell** [1] - 117:15

**mixed** [1] - 3:12
**modification** [2] - 39:6, 39:9
**modifications** [1] - 39:4
**modify** [1] - 36:25
**moment** [4] - 70:8, 74:21, 81:9, 104:23
**money** [8] - 9:17, 22:23, 23:9, 27:18, 34:7, 34:18, 34:22, 35:9
**month** [2] - 80:23, 85:5
**mootness** [1] - 74:25
**moreover** [1] - 22:1
**morning** [4] - 3:4, 69:20, 79:9, 110:2
**most** [9] - 8:14, 16:16, 24:21, 27:23, 52:10, 62:22, 109:21, 111:2, 125:8
**motion** [44] - 3:10, 6:4, 6:6, 6:10, 6:12, 6:13, 7:5, 12:3, 12:5, 12:6, 12:12, 13:4, 13:6, 13:7, 13:10, 13:19, 14:19, 14:25, 15:2, 16:6, 18:20, 18:22, 18:23, 21:14, 33:17, 37:16, 37:17, 38:3, 40:6, 43:25, 44:1, 44:12, 48:5, 50:6, 52:25, 74:6, 74:7, 74:9, 75:24, 107:5, 109:3
**MOTION** [1] - 1:10
**motions** [1] - 6:3
**mouthful** [1] - 19:23
**movants** [1] - 47:12
**move** [7] - 58:4, 60:13, 67:23, 70:10, 71:9, 72:10, 89:6
**moved** [2] - 65:17, 76:20
**moving** [5] - 67:2, 74:17, 76:15, 76:18, 78:24
**mow** [1] - 9:17
**MR** [105] - 1:14, 1:17, 2:7, 2:11, 2:13, 12:23, 15:11, 18:18, 19:2, 19:15, 19:22, 20:1, 21:3, 22:5, 22:24, 23:17, 23:23, 24:10, 24:14, 25:7, 25:14, 25:20, 25:24, 26:5, 26:12, 26:25, 27:21, 28:12, 28:17, 29:19, 31:15, 31:20, 33:11, 33:14, 36:13, 36:24, 38:7, 38:10, 38:23, 41:17, 41:19, 42:9, 42:13, 42:20, 43:7, 43:10, 43:14, 44:23, 44:25, 45:4, 45:7, 45:13, 45:22, 45:25, 46:13, 46:22, 47:18, 48:19, 49:15, 50:7, 51:16, 52:24, 57:5, 74:2, 78:6, 81:15, 82:7, 84:9, 84:13, 85:24, 88:20, 92:10, 93:6, 93:10, 94:6, 95:5, 96:19, 97:19, 99:2, 99:11, 101:11, 101:16, 101:21, 102:24, 103:25, 104:2, 104:25, 109:16, 109:24, 111:19, 112:1, 112:5, 115:16, 115:18, 116:4, 116:6, 119:20, 120:3, 121:4, 123:14, 124:24, 125:13, 125:16, 125:18, 125:22
**MS** [55] - 1:20, 2:1, 6:9, 6:16, 6:18, 6:24, 9:24, 10:6, 10:11, 10:20, 10:24, 11:7, 11:9, 16:3, 16:11, 57:14, 57:17, 58:15, 58:22, 59:2, 59:6, 59:20, 60:1, 60:7, 61:5, 61:10, 61:20, 62:8, 62:17, 62:21, 63:8, 63:11, 64:5, 64:9, 64:13, 64:19, 65:2, 65:16, 65:22, 65:25, 66:11, 66:18, 66:23, 67:3, 68:5, 68:8, 69:8, 69:17, 71:14, 71:19, 72:2, 72:11, 72:15, 72:17, 120:1
**Munoz** [3] - 7:8, 7:9, 7:14

**MURRILL** [2] - 1:20, 120:1
**Murrill** [1] - 13:1
**must** [12] - 48:4, 49:18, 52:1, 52:17, 54:9, 54:13, 55:22, 56:4, 56:8, 56:23, 57:7, 92:15

### N

**name** [1] - 6:22
**named** [1] - 55:9
**Napolitano** [9] - 97:7, 100:5, 103:11, 103:14, 103:15, 103:20, 103:21, 104:9, 123:12
**Napolitano's** [2] - 96:16, 111:18
**national** [1] - 97:16
**nationwide** [5] - 110:12, 110:16, 110:20, 111:1, 111:12
**nature** [2] - 45:14, 98:2
**necessarily** [5] - 19:12, 81:4, 87:13, 92:20, 111:17
**necessary** [2] - 12:18, 125:3
**necessity** [3] - 23:6, 95:18, 95:25
**need** [13] - 13:10, 15:1, 37:4, 38:15, 57:22, 58:2, 60:18, 94:20, 96:10, 96:12, 98:4, 98:11, 100:16, 108:11, 120:13, 120:21
**needing** [1] - 97:14
**needs** [9] - 83:15, 83:18, 90:14, 101:2, 107:21, 109:11, 114:6, 122:14, 124:17
**neighbor** [2] - 89:13, 89:15
**Neufeld** [1] - 89:17
**never** [19] - 14:7, 14:9, 30:3, 30:14, 34:21, 46:1, 46:6, 46:16, 47:11, 56:12, 60:18, 72:1, 97:2, 98:15, 99:6, 107:20, 110:8, 116:23, 117:23
**nevertheless** [10] - 77:8, 77:10, 77:19, 80:8, 82:24, 86:4, 86:5, 86:13, 87:18, 121:23
**NEW** [1] - 2:7
**new** [10] - 56:17, 79:23, 90:7, 90:17, 97:2, 112:1, 113:10, 118:19, 118:20
**New** [29] - 2:8, 2:9, 3:9, 5:12, 14:2, 18:19, 35:12, 40:8, 40:9, 40:13, 48:9, 56:16, 74:1, 74:3, 75:24, 81:18, 83:13, 102:14, 103:12, 104:1, 104:2, 111:5, 113:13, 113:14, 113:15, 115:19, 124:19, 127:5
**newspapers** [1] - 5:3
**next** [3] - 101:24, 118:21, 125:11
**nice** [2] - 120:1, 125:22
**nicely** [1] - 74:5
**NINA** [1] - 2:1
**nine** [2] - 58:13, 105:22
**nobody** [1] - 52:9
**non** [2] - 8:11, 17:19
**non-DACA** [2] - 8:11, 17:19
**none** [1] - 101:7
**nonenforcement** [5] - 51:4, 102:6, 105:25, 106:2, 106:7
**nonprofit** [1] - 73:7

**normal** [4] - 76:14, 78:21, 115:3, 122:20
**normally** [1] - 126:13
**North** [1] - 1:21
**nose** [1] - 30:2
**notable** [1] - 79:13
**note** [9] - 21:16, 21:23, 40:9, 48:17, 70:7, 88:1, 113:8, 122:9, 125:24
**noted** [11] - 19:10, 21:25, 22:25, 25:15, 38:15, 44:1, 66:25, 76:19, 81:18, 113:24, 124:12
**notes** [1] - 29:9
**nothing** [11] - 54:15, 55:4, 57:1, 57:8, 68:25, 80:16, 86:22, 90:2, 90:16, 92:21, 108:18
**notice** [27] - 54:7, 54:13, 54:19, 55:25, 56:9, 62:6, 62:7, 62:8, 86:4, 86:10, 86:16, 87:14, 87:20, 88:6, 94:16, 94:17, 94:20, 96:9, 96:11, 96:12, 96:20, 116:2, 123:13, 123:17, 123:24, 124:10, 126:21
**noting** [1] - 49:19
**notion** [2] - 28:20, 45:2
**novel** [1] - 46:2
**November** [2] - 76:21, 105:5
**NTA** [2] - 69:21, 69:24
**Number** [2] - 105:5, 107:7
**number** [26] - 5:7, 11:24, 24:5, 27:3, 37:24, 42:14, 66:1, 66:7, 66:16, 66:18, 66:19, 67:4, 70:23, 71:5, 71:6, 72:4, 72:20, 72:23, 73:22, 81:6, 91:14, 102:9, 111:11, 116:20, 124:14
**numbered** [1] - 129:4
**numbers** [3] - 66:1, 66:5, 71:10
**nurse** [1] - 73:15
**NW** [1] - 2:5

### O

**Obama** [7] - 50:10, 50:12, 50:23, 53:19, 78:2, 108:16
**object** [1] - 47:20
**objection** [1] - 6:5
**objections** [1] - 12:4
**obtain** [3] - 43:2, 93:24, 93:25
**obvious** [1] - 94:13
**obviously** [16] - 13:6, 36:14, 74:8, 85:4, 87:3, 87:10, 87:24, 88:2, 92:14, 92:15, 109:1, 110:11, 110:19, 114:1, 123:20
**odd** [1] - 40:13
**oddity** [1] - 44:8
**OF** [5] - 1:1, 1:4, 1:7, 1:10, 2:7
**offend** [1] - 94:23
**offer** [1] - 7:18
**offered** [2] - 13:17, 126:7
**Office** [3] - 1:14, 2:7, 2:14
**office** [2] - 1:20, 13:1
**OFFICER** [1] - 128:9
**officer** [1] - 75:17
**officers** [1] - 98:10

**official** [1] - 69:24
**Official** [4] - 2:17, 2:17, 129:2, 129:6
**officially** [1] - 55:16
**often** [5] - 17:17, 75:2, 76:7, 85:4, 91:20
**once** [7] - 14:7, 14:9, 63:4, 89:20, 107:20, 110:8, 125:11
**one** [70] - 3:10, 4:1, 5:9, 5:17, 6:21, 9:9, 11:24, 16:24, 17:11, 18:5, 19:23, 22:22, 29:23, 31:8, 31:25, 32:1, 32:9, 35:13, 35:18, 37:21, 38:25, 41:20, 47:18, 47:21, 49:9, 56:11, 58:4, 60:19, 67:10, 68:9, 68:10, 69:8, 71:16, 71:22, 74:18, 77:9, 77:11, 81:8, 82:4, 82:10, 83:1, 83:8, 85:9, 88:2, 93:1, 93:3, 93:13, 93:14, 93:20, 94:13, 95:22, 95:23, 96:13, 97:14, 99:5, 100:23, 110:4, 111:7, 111:11, 112:19, 118:10, 123:18, 124:9, 125:22, 125:23
**one-off** [9] - 93:3, 93:13, 93:14, 93:20, 94:13, 95:22, 96:13, 97:14, 100:23
**one-way** [2] - 38:25, 41:20
**ones** [6] - 24:16, 26:18, 32:17, 33:3, 102:18
**ongoing** [5] - 74:22, 77:6, 115:11, 124:2
**open** [3] - 64:10, 65:10, 94:7
**opening** [1] - 79:16
**operate** [1] - 92:12
**operating** [1] - 72:7
**operative** [1] - 110:4
**opine** [1] - 102:2
**opinion** [35] - 7:6, 11:22, 13:17, 28:2, 28:5, 28:15, 39:16, 39:17, 51:2, 51:6, 54:2, 54:10, 58:10, 58:20, 65:18, 71:1, 77:9, 78:11, 82:3, 82:7, 86:7, 86:8, 92:11, 93:1, 95:14, 102:3, 109:22, 113:7, 113:8, 113:25, 114:8, 115:4, 117:25, 122:3
**opinions** [3] - 9:6, 85:4, 87:25
**opportunity** [5] - 75:10, 115:1, 120:5, 123:5, 123:7
**opposed** [6] - 4:24, 21:1, 49:21, 64:6, 68:18, 77:19
**opposition** [1] - 83:14
**option** [4] - 112:9, 112:12, 123:15, 126:10
**options** [7] - 118:9, 122:10, 123:15, 123:18, 123:20, 124:9, 126:8
**oral** [1] - 6:12
**order** [30] - 3:2, 12:2, 30:2, 34:7, 35:23, 40:14, 47:23, 48:7, 48:25, 50:1, 50:16, 74:18, 76:6, 76:10, 79:18, 80:1, 80:5, 80:20, 83:24, 90:2, 103:24, 104:1, 104:2, 105:1, 109:2, 111:6, 111:17, 111:18, 112:17, 120:4
**orderly** [3] - 75:21, 118:16, 120:6
**originally** [1] - 108:6
**Orr** [1] - 7:8
**otherwise** [7] - 16:23, 52:22, 53:21,

54:14, 65:6, 73:3, 91:12
**ought** [2] - 5:16, 58:12
**outer** [2] - 28:5, 45:2
**outlined** [1] - 102:17
**outset** [1] - 19:3
**outside** [4] - 57:24, 68:16, 71:2, 71:8
**outstanding** [2] - 75:18, 81:2
**outweigh** [1] - 23:20
**overall** [2] - 17:22, 23:19
**overcome** [3] - 92:21, 92:23, 100:24
**override** [1] - 50:9
**overstayed** [2] - 15:20, 64:6
**overstepped** [1] - 108:16
**overturn** [1] - 68:15
**overwhelming** [1] - 100:22
**own** [16] - 9:15, 11:14, 13:15, 14:23, 20:5, 26:13, 27:8, 32:11, 46:12, 55:7, 56:3, 68:13, 104:18, 110:12, 118:22, 122:3
**owned** [2] - 9:16, 10:17
**owns** [1] - 9:24

# P

**page** [2] - 78:13, 88:8
**Page** [8] - 21:8, 21:16, 22:12, 31:1, 55:19, 55:22, 95:13, 105:5
**pages** [1] - 72:6
**Pages** [1] - 83:13
**pandemic** [1] - 73:16
**papers** [2] - 22:25, 69:3
**paraphrase** [1] - 61:25
**parcel** [3] - 81:25, 85:11, 96:4
**parens** [11] - 19:5, 20:15, 27:24, 28:20, 28:22, 28:23, 30:4, 30:5, 30:14, 46:3, 46:5
**parent** [1] - 113:20
**parents** [2] - 10:15, 99:24
**parlance** [2] - 5:21
**parole** [41] - 52:19, 53:8, 53:15, 56:18, 63:17, 63:20, 63:23, 64:1, 64:2, 64:7, 64:10, 64:15, 64:21, 64:22, 65:1, 65:2, 65:4, 67:14, 68:11, 68:17, 68:19, 79:5, 80:9, 80:13, 97:11, 98:4, 98:7, 98:9, 98:10, 98:11, 98:19, 105:2, 105:4, 105:8, 105:12, 118:20, 126:2
**part** [24] - 12:7, 16:14, 18:13, 19:24, 36:14, 44:6, 44:7, 44:9, 44:10, 60:19, 60:23, 73:23, 77:15, 79:4, 81:25, 84:2, 84:17, 84:23, 85:10, 96:4, 96:18, 113:19, 124:12
**particular** [15] - 28:18, 58:25, 75:9, 78:20, 79:1, 80:4, 87:19, 90:6, 94:14, 105:1, 105:24, 106:17, 107:1, 116:15
**particularized** [1] - 41:24
**particularly** [6] - 72:3, 73:17, 77:3, 96:23, 96:24, 97:9
**parties** [4] - 76:20, 78:25, 114:23, 120:16
**parts** [2] - 85:18, 100:2

**party** [2] - 24:15, 84:24
**Pasadena** [1] - 73:5
**passive** [2] - 51:4, 106:1
**past** [2] - 4:19, 53:5
**pathway** [4] - 53:17, 53:20, 56:19, 105:12
**patriae** [11] - 19:5, 20:15, 27:24, 28:20, 28:22, 28:23, 30:4, 30:5, 30:14, 46:3, 46:5
**Patrol's** [1] - 105:6
**pause** [4] - 75:3, 76:7, 84:21, 85:3
**pay** [2] - 23:13, 63:4
**paying** [1] - 11:5
**pejorative** [1] - 5:13
**penalty** [2] - 8:5, 8:6
**pending** [2] - 12:4, 78:17
**Penn** [1] - 55:10
**Pennsylvania** [1] - 2:5
**people** [44] - 3:12, 3:14, 3:15, 3:16, 4:16, 9:4, 11:23, 15:22, 16:1, 16:24, 17:1, 23:13, 25:22, 27:8, 30:13, 31:3, 32:1, 37:8, 42:14, 51:22, 52:14, 63:7, 64:3, 64:6, 65:1, 65:3, 65:4, 65:14, 66:9, 66:12, 66:21, 66:25, 67:3, 67:5, 70:23, 71:3, 72:4, 72:20, 72:21, 73:1, 98:19, 107:1, 107:15, 111:13
**people's** [1] - 42:19
**Perales** [12] - 4:10, 6:15, 15:4, 15:18, 20:3, 22:14, 30:22, 57:13, 65:13, 73:25, 99:2, 115:15
**PERALES** [53] - 2:1, 6:9, 6:16, 6:18, 6:24, 9:24, 10:6, 10:11, 10:20, 10:24, 11:7, 11:9, 16:3, 16:11, 57:14, 57:17, 58:15, 58:22, 59:2, 59:6, 59:20, 60:1, 60:7, 61:5, 61:10, 61:20, 62:8, 62:17, 62:21, 63:8, 63:11, 64:5, 64:9, 64:13, 64:19, 65:2, 65:16, 65:22, 65:25, 66:11, 66:18, 66:23, 67:3, 68:5, 68:8, 69:8, 69:17, 71:14, 71:19, 72:2, 72:11, 72:15, 72:17
**perceived** [2] - 34:23, 99:16
**percent** [6] - 53:12, 65:8, 65:11, 90:25, 108:4, 125:5
**percentage** [4] - 14:15, 15:14, 25:17, 53:9
**Perez** [1] - 73:4
**PEREZ** [1] - 2:2
**perfectly** [3] - 68:14, 68:17, 76:14
**performed** [1] - 10:12
**perhaps** [6] - 16:24, 24:22, 76:23, 84:14, 95:6
**period** [5] - 78:24, 80:2, 107:11, 116:12, 118:7
**Perryman** [6] - 17:10, 17:17, 18:6, 32:2, 32:3, 39:25
**Perryman's** [1] - 47:2
**person** [13] - 6:5, 52:15, 63:25, 68:18, 69:24, 70:6, 70:12, 82:22, 89:14, 93:14, 93:22, 94:18, 95:19
**Person** [3] - 36:1, 36:2, 36:4

**person's** [2] - 67:10, 94:18
**persons** [2] - 27:3, 70:18
**perspective** [1] - 76:3
**pervade** [1] - 5:2
**Peters** [1] - 21:18
**petition** [1] - 96:3
**phase** [2] - 6:13, 38:14
**phone** [4] - 3:10, 3:12, 3:13, 3:18
**phrase** [2] - 70:6, 78:25
**PI** [21] - 20:15, 21:18, 21:21, 28:2, 43:23, 78:11, 81:5, 82:1, 82:3, 82:7, 82:10, 83:2, 84:2, 89:11, 89:12, 89:17, 92:11, 93:1, 94:2, 122:3, 122:6
**pick** [2] - 34:21, 57:17
**picture** [2] - 67:18, 81:24
**piece** [2] - 26:15, 60:9
**pieces** [4] - 67:17, 89:5, 89:9, 89:22
**place** [5] - 40:17, 70:7, 77:8, 119:6, 127:12
**placed** [2] - 16:21, 119:22
**plain** [3] - 64:19, 110:3, 110:14
**plaintiff** [34] - 9:4, 12:24, 18:23, 33:23, 34:1, 34:15, 35:1, 37:3, 37:24, 39:7, 39:13, 40:15, 48:4, 74:8, 79:9, 87:24, 90:22, 92:15, 92:25, 97:12, 100:4, 100:14, 109:19, 110:18, 112:10, 114:22, 121:8, 122:10, 122:18, 122:22, 123:1, 123:4, 124:13
**PLAINTIFFS** [1] - 1:14
**plaintiffs** [36] - 7:3, 12:7, 12:9, 12:15, 17:18, 18:3, 21:10, 21:17, 47:12, 57:19, 57:21, 57:25, 60:7, 62:23, 63:12, 63:13, 63:14, 65:5, 67:12, 67:13, 67:22, 67:25, 68:11, 68:14, 70:23, 73:2, 73:4, 73:18, 73:23, 75:25, 77:18, 100:22, 105:17, 105:21, 106:8, 119:12
**plaintiffs'** [10] - 13:15, 17:2, 17:5, 17:6, 47:9, 60:23, 75:24, 105:23, 109:2
**plan** [1] - 103:10
**plans** [1] - 103:22
**play** [2] - 11:2, 23:11
**pleadings** [2] - 13:19, 54:23
**pled** [1] - 21:9
**plenty** [8] - 35:17, 77:23, 78:3, 82:18, 88:1, 97:3, 112:14, 121:14
**plunge** [1] - 62:2
**plus** [4] - 4:6, 53:11, 72:5, 106:10
**plus-minus** [1] - 53:11
**Plyler** [1] - 25:1
**PO** [1] - 2:12
**point** [60] - 8:7, 8:18, 12:14, 12:15, 13:11, 14:6, 15:12, 17:8, 22:4, 24:18, 24:19, 31:25, 35:12, 36:7, 36:20, 37:1, 37:14, 40:18, 42:20, 44:11, 47:18, 47:21, 47:22, 54:23, 55:8, 57:8, 66:11, 66:23, 66:24, 67:4, 69:2, 69:23, 70:15, 70:21, 80:22, 85:9, 86:2, 88:11, 94:10, 94:25, 95:1, 95:3, 95:6, 99:17, 100:2, 100:3, 100:13, 101:6, 103:14, 105:4, 105:23, 112:20, 113:9, 118:5, 122:7,

124:8, 125:1, 125:7, 125:19, 125:23
**pointed** [4] - 19:4, 32:3, 66:4, 126:3
**pointedly** [1] - 59:6
**pointing** [2] - 36:21, 113:1
**points** [8] - 12:3, 13:3, 13:19, 20:6, 33:15, 41:20, 94:9, 121:5
**policies** [1] - 76:15
**policy** [24] - 4:23, 4:24, 30:2, 51:4, 54:15, 75:13, 92:7, 102:6, 102:17, 103:1, 103:2, 103:3, 103:5, 105:25, 106:2, 106:7, 110:14, 114:10, 114:11, 114:20, 114:23, 115:9, 124:5
**politically** [1] - 5:20
**polluted** [1] - 91:2
**popular** [3] - 4:22, 5:2, 5:21
**population** [10] - 13:24, 25:2, 29:17, 31:16, 37:9, 53:10, 66:16, 83:10, 108:8, 125:6
**populations** [4] - 11:21, 52:1, 52:2, 52:3
**portion** [4] - 14:4, 16:4, 18:10, 82:17
**posit** [2] - 28:4, 39:12
**positing** [1] - 36:16
**position** [19] - 12:16, 17:5, 17:7, 40:13, 49:4, 56:8, 58:23, 59:2, 62:23, 69:4, 77:13, 87:22, 88:25, 92:25, 105:23, 110:18, 110:19, 121:7, 125:9
**positive** [1] - 113:20
**possibilities** [1] - 9:19
**possibility** [1] - 124:10
**possible** [8] - 4:4, 75:15, 80:10, 80:13, 85:1, 85:12, 95:10, 124:24
**possibly** [1] - 37:8
**post** [1] - 77:16
**post-trial** [1] - 77:16
**posttrial** [1] - 77:8
**posture** [7] - 48:15, 56:22, 77:20, 78:7, 81:10, 85:1, 116:17
**potential** [2] - 66:15, 104:21
**potentially** [3] - 106:25, 118:14, 127:16
**Potter** [13] - 7:4, 9:3, 9:5, 9:10, 9:18, 11:9, 13:25, 18:1, 18:8, 30:20, 30:24, 32:10
**potter's** [1] - 14:10
**Potter's** [3] - 14:22, 15:10, 16:23
**power** [4] - 41:7, 52:6, 52:16, 116:12
**powers** [2] - 119:15, 127:21
**practice** [1] - 61:19
**precedent** [2] - 39:21, 46:4
**precedential** [1] - 104:16
**precise** [4] - 75:13, 81:1, 85:7, 115:5
**precisely** [3] - 31:23, 80:20, 106:8
**preclude** [3] - 18:14, 44:15, 47:16
**precluded** [1] - 117:2
**preempted** [1] - 27:10
**preexisting** [4] - 59:12, 60:16, 60:25, 95:15
**preferred** [2] - 109:5, 109:6

**preliminaries** [1] - 4:20
**preliminary** [17] - 14:19, 20:10, 38:14, 40:5, 43:23, 47:22, 48:6, 48:7, 56:21, 65:17, 71:1, 84:6, 100:8, 108:10, 111:6, 113:6, 122:4
**premise** [2] - 32:22, 86:12
**prepare** [1] - 119:17
**prerequisite** [2] - 59:17, 106:22
**presence** [35] - 16:10, 16:13, 22:9, 23:19, 23:24, 24:23, 24:25, 26:6, 26:7, 26:9, 27:9, 27:18, 33:22, 41:1, 41:3, 41:4, 42:21, 48:21, 49:20, 49:21, 49:22, 51:21, 51:23, 52:13, 70:3, 70:5, 70:9, 105:20, 106:21
**present** [19] - 5:17, 9:1, 13:21, 13:22, 16:18, 21:20, 31:16, 42:24, 42:25, 43:1, 43:16, 52:15, 81:23, 82:12, 88:5, 101:4, 106:18, 107:9, 107:11
**presented** [5] - 7:14, 8:3, 9:3, 18:21, 77:25
**presents** [2] - 103:2, 103:3
**president** [2] - 50:8, 50:18
**President** [7] - 50:12, 50:23, 58:17, 69:15, 78:2, 108:16
**press** [1] - 5:3
**pressed** [1] - 11:24
**pressure** [1] - 8:25
**presumably** [1] - 15:8
**presumed** [1] - 13:11
**pretty** [1] - 71:16
**prevail** [3] - 34:1, 57:22, 84:8
**prevailing** [1] - 84:24
**prevent** [4] - 90:3, 120:13, 124:3, 124:4
**prevented** [1] - 123:5
**previous** [1] - 75:7
**previously** [1] - 19:10
**primarily** [4] - 7:16, 22:7, 59:8, 75:1
**primary** [1] - 20:6
**principle** [4] - 14:11, 52:11, 92:2, 125:2
**principles** [1] - 17:15
**prioritize** [2] - 23:6, 26:18
**prioritized** [1] - 26:19
**private** [2] - 42:15, 77:18
**privately** [1] - 42:3
**probed** [1] - 109:11
**problem** [23] - 22:6, 22:11, 27:6, 34:9, 34:14, 34:22, 37:12, 50:3, 89:2, 89:3, 91:15, 93:4, 94:1, 95:9, 95:15, 95:19, 95:21, 95:22, 96:21, 97:23, 123:17
**problematic** [1] - 61:7
**problems** [2] - 3:15, 81:11
**procedural** [18] - 40:20, 45:11, 46:24, 47:24, 48:2, 48:4, 48:14, 51:12, 54:1, 70:1, 84:17, 84:19, 85:18, 86:14, 89:1, 89:3, 89:8, 123:16
**procedurally** [4] - 6:2, 108:13, 126:22, 127:18
**Procedure** [1] - 56:1

**procedure** [1] - 72:7
**proceeding** [1] - 124:2
**Proceedings** [1] - 1:24
**proceedings** [9] - 16:21, 61:14, 67:8, 67:24, 70:8, 76:21, 121:17, 128:10, 129:4
**PROCEEDINGS** [1] - 1:10
**process** [7] - 8:7, 35:22, 75:21, 115:10, 119:16, 123:23, 126:1
**processing** [1] - 56:18
**proclaiming** [1] - 43:20
**produced** [2] - 1:25, 16:25
**Professor** [2] - 32:2, 55:14
**professor** [2] - 55:9, 55:10
**Program** [1] - 113:19
**program** [32] - 39:4, 39:8, 39:10, 48:3, 51:5, 53:9, 53:24, 55:3, 55:25, 56:4, 56:8, 57:9, 57:11, 91:17, 102:7, 106:2, 106:3, 107:19, 107:23, 108:20, 108:21, 109:4, 114:11, 118:16, 118:19, 119:1, 119:6, 119:18, 120:6, 120:22, 126:11, 127:20
**projected** [1] - 65:11
**promise** [2] - 47:19, 57:17
**prompt** [1] - 48:3
**promulgated** [1] - 104:19
**prong** [8] - 35:5, 36:15, 89:7, 92:2, 92:20, 92:21, 92:23, 99:23
**prongs** [4] - 86:14, 92:12, 92:13, 92:14
**proof** [5] - 15:24, 24:20, 87:16, 91:15
**proper** [5] - 49:25, 50:3, 100:12, 127:15, 127:19
**proposal** [2] - 109:19, 109:20
**propose** [2] - 111:23, 116:2
**proposed** [2] - 109:2, 119:14
**proposition** [2] - 14:20, 112:21
**propriety** [1] - 97:1
**pros** [1] - 122:4
**prosecution** [1] - 56:8
**prosecutorial** [9] - 54:15, 55:12, 58:21, 58:24, 61:19, 67:9, 67:23, 68:22, 71:8
**prospectively** [1] - 78:9
**Protection** [1] - 113:19
**prove** [5] - 15:10, 26:23, 39:21, 45:21, 95:1
**proves** [4] - 40:19, 40:20, 53:21, 124:8
**provide** [5] - 56:25, 59:22, 64:2, 106:6, 126:19
**provided** [7] - 20:20, 45:10, 49:2, 69:9, 83:11, 92:7, 124:15
**providers** [1] - 29:13
**provides** [4] - 45:14, 86:13, 106:4, 120:5
**providing** [2] - 40:2, 91:20
**province** [1] - 27:6
**provision** [2] - 87:8, 105:10
**provisions** [1] - 99:24
**public** [1] - 97:15

**publish** [1] - 55:22
**pudding** [2] - 15:24, 87:16
**pull** [1] - 52:25
**purely** [3] - 11:12, 94:21, 120:11
**purportedly** [1] - 17:9
**purpose** [1] - 18:4
**purposes** [2] - 47:4, 48:17
**pursuant** [4] - 41:5, 56:9, 57:7, 119:1
**pursuing** [1] - 74:8
**pushed** [2] - 57:19, 99:3
**put** [7] - 3:11, 7:2, 32:6, 65:19, 101:5, 113:6, 123:12
**putative** [1] - 99:14

### Q

**quacks** [1] - 55:18
**qualifications** [2] - 5:7, 8:25
**qualified** [4] - 7:18, 8:2, 9:5, 14:14
**qualify** [1] - 5:5
**quantify** [1] - 15:12
**quarter** [1] - 29:23
**questions** [18] - 18:15, 30:17, 33:17, 34:8, 75:19, 79:16, 79:20, 79:22, 80:1, 80:18, 81:3, 83:1, 96:25, 101:24, 103:2, 107:6, 115:9, 122:16
**quick** [1] - 33:15
**quit** [1] - 65:20
**quite** [7] - 80:10, 80:13, 92:24, 112:20, 113:6, 115:20, 125:8
**quo** [2] - 124:11, 124:12
**quote** [15] - 9:20, 12:10, 17:11, 21:17, 31:1, 44:1, 50:14, 50:25, 51:4, 54:4, 54:10, 55:11, 55:16, 55:22, 91:9
**quote/unquote** [2] - 11:23, 82:22
**quoted** [1] - 65:20

### R

**racist** [1] - 5:23
**radiate** [1] - 29:10
**radical** [1] - 110:19
**raise** [1] - 36:6
**raised** [2] - 12:3, 17:17
**raising** [1] - 111:8
**range** [3] - 122:10, 123:14, 123:19
**ratchet** [2] - 38:25, 41:21
**rate** [2] - 91:1, 91:4
**rates** [2] - 83:3, 90:20
**rather** [3] - 17:15, 22:9, 78:7
**rationale** [3] - 126:17, 126:18, 126:24
**reach** [1] - 57:25
**reaches** [1] - 75:23
**read** [5] - 19:25, 62:13, 65:23, 82:3, 102:22
**reading** [3] - 58:22, 59:10, 109:2
**real** [4] - 34:12, 47:19, 96:21, 124:1
**reality** [1] - 74:12
**realize** [1] - 84:16
**really** [38] - 3:21, 4:20, 9:20, 11:10,

11:25, 12:18, 36:12, 36:23, 37:12, 59:10, 60:24, 62:25, 68:24, 68:25, 69:1, 70:22, 78:8, 84:25, 85:1, 85:10, 85:12, 88:24, 89:10, 89:23, 91:6, 94:13, 94:21, 95:1, 95:8, 97:11, 99:25, 100:15, 101:5, 101:8, 112:20, 117:13
**reason** [13] - 12:5, 31:11, 70:10, 78:23, 92:10, 97:14, 100:3, 108:15, 108:21, 110:23, 110:25, 119:5, 127:2
**reasonable** [2] - 16:17, 127:23
**reasoning** [5] - 97:25, 118:2, 126:15, 126:24, 127:13
**reasons** [9] - 9:7, 33:5, 75:8, 78:20, 85:25, 88:23, 97:16, 111:8
**reasserted** [1] - 12:5
**receipt** [1] - 106:22
**receive** [5] - 60:10, 64:20, 65:4, 72:22, 91:11
**received** [11] - 16:19, 53:10, 54:24, 70:24, 73:2, 73:8, 73:11, 73:19, 91:11, 107:9, 108:8
**receives** [1] - 93:3
**receiving** [1] - 96:12
**recess** [1] - 101:17
**recipient** [11] - 5:8, 8:8, 8:11, 15:19, 17:9, 17:12, 24:11, 37:2, 69:12, 98:4
**recipients** [38] - 5:12, 7:1, 7:23, 11:21, 13:22, 14:3, 14:8, 14:22, 15:7, 15:15, 16:7, 16:15, 17:19, 24:5, 29:12, 40:3, 42:1, 43:5, 52:3, 52:19, 52:21, 53:22, 56:19, 62:14, 65:7, 65:8, 65:11, 66:2, 68:15, 68:18, 70:16, 80:9, 95:21, 105:11, 106:11, 113:11, 119:17
**recipients'** [1] - 11:15
**recognition** [3] - 28:4, 107:17, 107:19
**recognize** [5] - 19:5, 38:19, 69:21, 102:13, 120:21
**recognized** [5] - 30:7, 82:1, 84:1, 102:3, 107:16
**recognizes** [2] - 54:9, 106:20
**reconsider** [2] - 48:3, 56:25
**record** [19] - 21:4, 34:3, 50:21, 52:23, 58:1, 59:15, 66:19, 75:15, 81:11, 84:5, 84:22, 85:6, 89:1, 90:16, 91:8, 92:7, 100:25, 124:22, 129:4
**recorded** [1] - 1:24
**records** [1] - 83:13
**rectify** [1] - 43:20
**redo** [1] - 116:21
**redressability** [9] - 22:11, 31:24, 33:19, 35:5, 37:11, 47:23, 48:2, 48:20, 48:25
**reduces** [1] - 43:3
**reevaluate** [1] - 117:4
**refer** [1] - 18:3
**referenced** [1] - 17:14
**referred** [3] - 59:8, 68:9, 70:3
**refers** [1] - 29:3
**refine** [1] - 52:7
**regard** [3] - 3:19, 3:21, 111:16

**regarding** [7] - 17:14, 40:8, 75:19, 75:20, 81:6, 82:19, 101:25
**regardless** [2] - 19:13, 19:15
**Regardless** [1] - 19:14
**Regents** [73] - 28:15, 29:7, 29:8, 29:21, 30:7, 31:5, 32:23, 35:14, 35:15, 39:16, 39:17, 49:12, 49:16, 49:22, 49:23, 51:2, 51:6, 54:1, 58:9, 58:22, 59:6, 59:10, 60:4, 61:5, 61:10, 61:15, 61:21, 62:13, 67:18, 67:19, 67:21, 74:18, 75:22, 80:7, 85:20, 85:24, 86:1, 87:22, 87:23, 88:1, 88:4, 88:7, 88:11, 88:15, 88:19, 88:21, 88:23, 94:4, 95:13, 96:2, 101:6, 102:1, 109:22, 114:3, 114:8, 114:15, 114:20, 115:4, 115:7, 115:8, 117:25, 120:8, 120:19, 121:21, 121:22, 122:2, 122:16, 122:20, 123:8, 124:4, 127:9
**Register** [1] - 55:23
**registration** [1] - 113:17
**regulation** [11] - 55:23, 63:1, 67:14, 94:24, 95:23, 96:19, 96:21, 96:23, 110:9, 110:14, 121:12
**Regulation** [1] - 63:16
**regulations** [17] - 59:9, 59:12, 59:21, 60:8, 60:16, 60:25, 63:12, 67:15, 68:1, 68:15, 88:9, 93:21, 95:16, 97:6, 98:24, 121:9, 121:13
**regulatory** [1] - 110:9
**rejected** [2] - 61:2, 99:9
**related** [3] - 21:22, 57:9, 58:4
**relation** [1] - 105:2
**relative** [1] - 87:9
**relevance** [1] - 9:1
**relevant** [1] - 110:9
**reliable** [3] - 8:21, 18:7, 32:5
**reliance** [18] - 27:25, 49:18, 114:7, 119:16, 120:7, 122:16, 123:2, 123:21, 124:6, 124:16, 125:11, 125:23, 126:4, 126:6, 126:9, 127:5, 127:22
**relied** [7] - 11:17, 11:18, 19:10, 20:19, 21:19, 45:9, 46:23
**relief** [12] - 34:1, 51:6, 78:7, 90:12, 102:8, 106:3, 110:20, 119:8, 119:12, 122:19, 123:6, 125:2
**reluctant** [1] - 81:17
**rely** [6] - 20:4, 21:21, 32:2, 41:9, 42:4, 46:22
**relying** [8] - 18:23, 21:6, 21:11, 21:18, 22:7, 22:11, 32:17, 42:23
**remain** [9] - 8:13, 33:23, 41:1, 70:19, 76:1, 123:25, 126:11, 127:3, 127:11
**remained** [1] - 74:16
**remaining** [4] - 35:1, 37:3, 120:4
**remains** [2] - 56:22, 71:2
**remand** [21] - 109:20, 109:23, 112:6, 112:12, 112:15, 112:18, 114:19, 115:2, 115:13, 121:14, 121:20, 122:15, 122:24, 123:17, 124:3, 124:9, 126:12, 127:4, 127:11, 127:12, 127:16

**remanded** [1] - 121:16
**remanding** [3] - 56:24, 112:7, 113:3
**remedies** [9] - 57:4, 74:4, 76:3, 101:14, 104:21, 108:24, 109:17, 119:23, 123:6
**remedy** [24] - 24:21, 34:23, 37:17, 37:19, 38:4, 43:20, 55:18, 57:6, 78:9, 95:10, 109:5, 109:6, 109:15, 115:5, 115:19, 116:6, 117:10, 117:24, 119:4, 120:16, 121:7, 122:19, 127:19
**remember** [2] - 111:6, 122:8
**removable** [9] - 15:7, 15:16, 15:23, 16:7, 16:9, 16:20, 70:18, 70:19, 123:25
**removal** [16] - 16:21, 31:8, 31:9, 32:24, 49:1, 51:18, 51:20, 58:25, 59:11, 60:5, 61:14, 67:8, 67:24, 70:8, 70:11, 105:16, 106:9, 106:10
**remove** [23] - 15:12, 23:1, 23:12, 25:12, 25:13, 25:15, 25:16, 27:2, 31:12, 31:18, 31:19, 31:22, 32:10, 32:13, 32:16, 32:20, 34:7, 35:3, 40:22, 40:25, 41:8, 60:13, 70:22
**removed** [12] - 15:8, 16:1, 23:15, 26:10, 26:16, 31:19, 31:23, 34:11, 37:9, 45:19, 61:18, 105:10
**removing** [4] - 26:14, 106:16, 107:1, 107:14
**render** [1] - 9:6
**renewal** [1] - 108:3
**renewals** [1] - 118:20
**repeat** [1] - 102:20
**repeatedly** [4] - 39:3, 45:7, 75:7, 78:1
**repeating** [1] - 125:14
**replace** [1] - 4:8
**replete** [1] - 54:24
**reply** [5] - 12:21, 13:4, 16:4, 105:4, 126:3
**report** [1] - 55:11
**REPORTER** [3] - 19:14, 21:2, 102:20
**Reporter** [4] - 2:17, 2:17, 129:2, 129:6
**reporter** [2] - 20:25, 63:14
**REPORTER'S** [1] - 129:1
**reports** [2] - 18:11, 66:5
**represented** [1] - 21:17
**representing** [1] - 125:5
**represents** [1] - 73:6
**repromulgate** [1] - 79:23
**repromulgated** [1] - 97:21
**Republican** [1] - 50:9
**request** [5] - 7:1, 80:17, 83:6, 87:4, 110:1
**requesters** [1] - 53:13
**requests** [8] - 78:16, 80:12, 82:18, 83:10, 86:22, 91:6, 93:2, 98:11
**require** [1] - 42:12
**required** [7] - 39:13, 54:13, 54:19, 117:10, 117:22, 121:12, 121:18
**requirement** [2] - 48:1, 94:17
**requires** [2] - 60:17, 90:6
**rescind** [1] - 102:4

**rescinded** [2] - 43:19, 48:22
**rescinding** [2] - 29:21, 103:5
**rescission** [17] - 29:10, 39:5, 41:23, 51:10, 54:16, 58:15, 69:17, 69:18, 103:4, 106:4, 108:2, 108:3, 110:25, 113:25, 114:16, 116:16, 116:18
**rescissions** [1] - 39:3
**research** [1] - 7:17
**residents** [1] - 29:4
**resolution** [1] - 101:6
**resolve** [4] - 13:10, 15:1, 49:9, 88:5
**resolved** [1] - 12:11
**resounding** [1] - 34:15
**resources** [5] - 15:13, 23:1, 25:16, 31:21, 40:25
**respect** [17] - 7:22, 17:8, 22:24, 23:23, 24:3, 24:4, 24:7, 24:23, 25:9, 26:2, 30:5, 30:16, 43:25, 46:13, 48:19, 49:4, 69:19
**respond** [8] - 15:5, 17:2, 33:17, 41:17, 47:20, 101:13, 107:17, 125:16
**responded** [2] - 12:7, 69:22
**response** [8] - 12:6, 12:9, 12:13, 13:3, 16:6, 40:6, 49:25, 53:1
**responses** [2] - 81:7, 99:5
**responsibility** [1] - 56:6
**responsible** [3] - 26:6, 26:8, 41:3
**responsive** [1] - 27:23
**rest** [1] - 84:18
**restaurant** [4] - 9:24, 10:1, 10:17, 10:19
**result** [4] - 33:24, 35:7, 74:24, 77:20
**results** [1] - 3:12
**retain** [1] - 103:1
**retry** [1] - 116:23
**return** [3] - 11:16, 11:23, 122:23
**reveals** [1] - 11:25
**reversed** [1] - 59:4
**review** [10] - 13:5, 73:12, 85:2, 90:4, 106:5, 114:16, 115:1, 117:14, 118:12, 119:17
**reviewability** [1] - 86:10
**reviewable** [9] - 51:10, 54:18, 58:16, 86:2, 86:3, 86:5, 86:13, 87:12, 87:17
**reviewing** [5] - 57:10, 86:21, 90:8, 98:11, 102:11
**revocability** [1] - 69:18
**revocable** [1] - 69:13
**revokes** [1] - 69:25
**rewrite** [1] - 41:13
**rhetorical** [2] - 27:16, 123:11
**rightly** [1] - 81:18
**rights** [15] - 39:1, 70:1, 89:6, 92:1, 92:23, 93:12, 93:24, 94:23, 98:9, 99:14, 99:16, 99:20, 100:22, 106:10, 107:22
**rise** [1] - 128:9
**RJ** [1] - 2:8
**RMR** [2] - 2:17, 129:2
**Roberts** [6] - 28:15, 71:24, 94:3,

105:24, 106:14, 106:20

**role** [3] - 50:18, 114:14, 114:15

**Room** [1] - 2:19

**room** [1] - 58:8

**Ropes** [1] - 2:4

**Rouge** [1] - 1:22

**routinely** [1] - 65:4

**ruin** [1] - 111:14

**rule** [8] - 54:5, 54:12, 54:19, 55:1, 108:19, 111:13, 117:18, 120:9

**ruled** [4] - 19:10, 50:24, 51:20, 104:13

**rulemaking** [13] - 54:7, 54:13, 54:20, 56:1, 56:9, 87:14, 87:20, 88:6, 96:3, 96:9, 123:24, 124:10, 126:22

**rules** [3] - 48:5, 54:6, 98:12

**ruling** [22] - 14:19, 14:25, 38:15, 51:3, 51:8, 51:10, 51:11, 51:17, 56:15, 57:20, 76:8, 101:2, 104:16, 104:17, 108:10, 116:17, 116:20, 118:6, 118:12, 118:18, 122:11, 127:7

**rulings** [1] - 104:18

**run** [5] - 10:14, 10:15, 27:14, 27:15, 91:18

**running** [1] - 101:15

**Rusk** [1] - 2:19

## S

**safe** [1] - 128:7

**salary** [1] - 11:5

**Samantha** [1] - 6:20

**sample** [2] - 53:4, 53:5

**samples** [3] - 83:9, 83:10, 91:20

**San** [1] - 2:3

**sang** [1] - 45:7

**satisfied** [3] - 48:1, 89:20, 92:15

**save** [2] - 22:22, 76:2

**saving** [2] - 74:4, 97:15

**scale** [2] - 111:11, 111:17

**scenario** [1] - 8:3

**scheduled** [1] - 3:24

**scheme** [4] - 51:25, 52:8, 99:20, 104:19

**schemes** [2] - 11:20, 41:11

**school** [4] - 26:19, 28:18, 29:16, 32:12

**School** [2] - 55:10, 73:6

**schooling** [1] - 20:14

**schools** [1] - 29:12

**scintilla** [1] - 39:21

**scope** [1] - 71:9

**scrambled** [2] - 113:5, 126:4

**search** [1] - 70:4

**seated** [2] - 3:3, 101:18

**second** [8] - 5:18, 9:2, 16:14, 20:9, 35:12, 75:15, 105:18, 113:23

**secondly** [1] - 28:3

**Secretary** [6] - 58:17, 96:15, 97:7, 102:12, 102:18, 111:18

**secretary** [2] - 80:4, 96:22

**Section** [1] - 96:4

**secure** [1] - 60:2

**Security** [3] - 58:18, 101:23, 102:10

**SECURITY** [1] - 128:9

**security** [2] - 5:1, 97:16

**see** [3] - 27:5, 28:4, 32:13

**seek** [2] - 75:3, 80:15

**seeking** [5] - 78:7, 116:6, 116:9, 116:22, 117:1

**seem** [1] - 5:2

**segments** [1] - 13:24

**segues** [1] - 78:19

**self** [10] - 10:13, 25:12, 31:12, 31:18, 31:19, 32:10, 32:16, 32:20, 43:21, 49:1

**self-employed** [1] - 10:13

**self-impose** [1] - 43:21

**self-removal** [1] - 49:1

**self-remove** [7] - 25:12, 31:12, 31:18, 31:19, 32:10, 32:16, 32:20

**sense** [11] - 8:23, 14:11, 56:7, 62:11, 62:12, 62:13, 62:20, 76:6, 86:10, 111:11, 124:8

**sensitivity** [1] - 84:20

**sentences** [1] - 55:24

**separate** [12] - 27:22, 35:25, 63:12, 68:9, 80:14, 88:5, 88:9, 92:12, 92:14, 93:2, 93:12, 99:22

**separation** [2] - 59:11, 61:23

**September** [1] - 90:24

**serious** [3] - 18:13, 80:18, 103:3

**Serna** [1] - 6:20

**serve** [1] - 95:6

**Service** [1] - 89:12

**services** [1] - 40:2

**Services** [1] - 112:21

**set** [39] - 3:13, 25:4, 49:7, 55:3, 55:5, 56:4, 56:23, 57:7, 57:11, 69:6, 79:11, 89:25, 95:16, 95:23, 99:12, 109:4, 109:19, 110:1, 110:5, 110:10, 112:11, 116:8, 116:12, 117:11, 117:22, 118:3, 118:10, 118:25, 119:2, 119:13, 119:18, 121:8, 121:12, 121:19, 122:1, 123:22, 124:9, 127:13, 127:20

**set-aside** [1] - 116:12

**setting** [6] - 26:22, 46:20, 48:23, 108:9, 116:18, 122:5

**seven** [1] - 5:7

**severability** [4] - 62:13, 62:17, 94:25, 95:8

**severable** [1] - 62:15

**several** [1] - 25:8

**severe** [1] - 73:17

**Shalala** [1] - 86:7, 86:12

**shall** [1] - 96:17

**shared** [1] - 65:22

**sharp** [1] - 91:4

**sheet** [1] - 19:25

**shift** [1] - 19:20

**Shoba** [1] - 55:9

**short** [4] - 80:2, 80:6, 84:21, 106:1

**short-lived** [2] - 80:2, 80:6

**shot** [1] - 90:15

**show** [16] - 36:4, 36:16, 37:4, 37:23, 37:25, 38:1, 41:23, 45:22, 48:4, 48:25, 83:17, 83:24, 85:5, 92:6, 92:8, 113:11

**showed** [3] - 41:24, 42:13, 47:5

**showing** [3] - 37:21, 83:21, 86:18

**shown** [5] - 24:21, 65:5, 73:3, 95:25, 119:10

**shows** [6] - 53:22, 85:15, 92:23, 107:24, 108:2, 121:10

**side** [7] - 5:23, 12:22, 29:14, 38:9, 55:2, 88:2, 88:3

**sides** [1] - 65:20

**significant** [6] - 74:19, 81:17, 85:16, 97:15, 103:2, 103:5

**significantly** [1] - 66:13

**similar** [3] - 11:21, 76:19, 79:23

**similarly** [2] - 8:19, 9:2

**simple** [2] - 49:20, 57:7

**simply** [21] - 14:6, 33:22, 39:12, 40:9, 47:22, 49:10, 50:2, 50:16, 57:5, 76:7, 81:21, 91:2, 105:25, 106:6, 106:16, 106:25, 107:14, 108:14, 116:7, 119:5, 122:19

**singing** [2] - 45:3, 45:8

**single** [4] - 8:15, 92:18, 95:20, 96:11

**sit** [1] - 125:24

**site** [1] - 113:18

**sites** [1] - 113:18

**situated** [1] - 35:13

**situation** [6] - 3:22, 7:13, 7:25, 30:14, 35:18, 125:12

**six** [2] - 5:7, 58:10

**SJ** [1] - 82:10

**skill** [1] - 17:19

**skipping** [1] - 55:24

**slice** [2] - 111:3, 111:9

**slicing** [6] - 111:16, 111:20, 111:22, 111:25, 114:14, 122:12

**small** [2] - 23:2, 25:17

**Smith** [3] - 2:17, 129:2, 129:6

**Smoot** [1] - 24:2

**smoot** [1] - 24:3

**Snapp** [1] - 29:3

**snapshots** [1] - 66:6

**so-called** [1] - 61:12

**Social** [1] - 102:9

**social** [2] - 4:17, 40:2

**socially** [1] - 4:4

**solicitor** [3] - 13:2, 71:24, 104:5

**solicitous** [1] - 86:23

**solicitude** [5] - 20:16, 27:24, 44:20, 45:2, 46:2

**someone** [13] - 5:17, 33:21, 35:1, 35:21, 36:1, 36:16, 79:24, 82:23, 86:22, 87:6, 89:14, 89:20, 98:5

**somewhat** [1] - 14:5

**somewhere** [2] - 11:24, 71:18
**son** [1] - 10:17
**song** [2] - 45:3, 45:7
**soon** [4] - 71:16, 74:24, 75:4, 97:24
**SOPs** [2] - 90:7, 90:17
**sorry** [9] - 7:3, 29:18, 61:9, 61:10, 63:24, 72:13, 93:6, 103:25, 128:6
**sort** [31] - 17:3, 20:15, 29:20, 34:1, 34:9, 34:20, 35:15, 44:6, 45:1, 46:1, 71:5, 78:8, 79:13, 87:7, 87:16, 92:19, 94:16, 97:2, 110:8, 110:12, 110:13, 112:9, 112:10, 112:15, 113:22, 121:18, 121:19, 121:25, 122:1, 122:11, 122:23
**sorts** [1] - 113:16
**sought** [1] - 64:14
**sound** [1] - 5:20
**sources** [1] - 67:14
**SOUTHERN** [1] - 1:1
**southern** [1] - 2:18
**Southern** [5] - 3:20, 77:3, 77:10, 128:2, 129:2
**Southwest** [1] - 112:21
**sovereign** [1] - 29:1
**speaking** [1] - 5:12
**special** [6] - 3:14, 20:16, 27:24, 44:19, 45:2, 46:2
**specific** [7] - 20:20, 21:7, 21:19, 28:13, 42:13, 46:14, 46:23
**specifically** [21] - 20:19, 21:6, 21:10, 21:17, 24:1, 24:4, 30:24, 42:1, 45:10, 47:6, 55:12, 77:12, 79:10, 88:8, 88:15, 89:18, 90:8, 91:17, 101:23, 114:8, 122:5
**specificity** [1] - 46:15
**specifics** [1] - 120:24
**speculating** [1] - 32:20
**speculation** [4] - 11:13, 16:24, 22:6, 31:1
**speculative** [2] - 7:21, 11:25
**spelled** [1] - 20:2
**spite** [1] - 30:2
**split** [1] - 22:17
**spot** [1] - 48:17
**spring** [1] - 67:13
**stage** [15] - 7:10, 21:21, 40:5, 43:24, 44:13, 81:5, 82:1, 83:2, 84:2, 89:11, 89:12, 89:17, 94:2, 100:9, 122:7
**stake** [1] - 91:13
**stand** [3] - 55:3, 95:13, 103:10
**standard** [2] - 72:6, 104:17
**standards** [2] - 18:12, 98:10
**standing** [50] - 6:5, 19:5, 19:7, 19:11, 19:21, 20:7, 20:9, 21:24, 24:16, 26:22, 27:19, 28:9, 28:16, 28:20, 30:4, 30:14, 35:7, 35:15, 35:16, 35:18, 35:19, 35:23, 36:3, 36:10, 36:12, 36:15, 37:16, 38:3, 38:12, 39:5, 39:7, 39:13, 39:18, 40:10, 40:12, 40:16, 41:5, 44:10, 44:21, 45:21, 45:23, 48:1, 62:5, 63:12, 82:11, 84:18, 109:8, 125:1

**stands** [2] - 14:10, 84:15
**start** [8] - 3:6, 6:4, 6:19, 41:20, 58:3, 85:22, 109:12, 125:25
**starting** [3] - 20:18, 126:1, 128:3
**state** [14] - 9:4, 14:2, 16:18, 16:19, 24:25, 27:9, 29:4, 29:20, 29:24, 29:25, 30:13, 39:11, 41:24, 60:22
**STATE** [2] - 1:4, 2:7
**State** [16] - 3:5, 13:2, 20:21, 25:1, 25:10, 28:25, 29:6, 29:9, 30:1, 30:8, 30:18, 42:5, 43:19, 46:17, 55:10
**State's** [3] - 6:6, 27:5, 29:1
**state's** [1] - 18:23
**statement** [3] - 18:6, 48:13, 63:19
**statements** [3] - 17:14, 18:8, 19:11
**States** [24] - 2:18, 3:6, 9:8, 9:12, 9:14, 24:21, 25:19, 27:7, 27:19, 30:20, 32:25, 46:6, 46:7, 46:11, 49:17, 52:15, 65:5, 71:13, 71:18, 105:7, 105:8, 105:22, 107:10, 129:2
**states** [42] - 9:5, 11:20, 12:24, 27:15, 33:23, 34:1, 34:16, 35:1, 37:3, 37:23, 37:24, 39:2, 39:5, 39:7, 39:13, 40:15, 41:7, 41:8, 41:22, 59:7, 62:5, 74:8, 79:9, 84:8, 87:24, 90:22, 92:15, 97:12, 98:13, 100:4, 100:14, 112:10, 113:13, 114:22, 121:8, 122:10, 122:18, 122:22, 123:1, 123:4, 124:13, 125:5
**STATES** [3] - 1:1, 1:7, 1:11
**States'** [2] - 22:15, 43:24
**states'** [4] - 92:25, 109:2, 109:19, 110:18
**statistical** [2] - 53:4, 53:5
**status** [28] - 16:16, 16:18, 26:11, 47:10, 51:22, 52:12, 52:22, 53:7, 53:10, 53:15, 53:16, 53:17, 53:23, 64:14, 65:8, 66:10, 69:5, 69:9, 70:2, 70:9, 70:12, 70:17, 75:3, 76:10, 98:21, 108:6, 124:11
**statute** [16] - 63:20, 64:10, 64:16, 64:19, 64:22, 67:14, 67:15, 68:19, 97:14, 110:3, 117:13, 117:16, 117:18, 117:19, 122:6
**statutes** [4] - 41:6, 67:25, 98:15, 121:13
**statutory** [11] - 46:14, 51:1, 63:18, 68:16, 98:12, 104:19, 106:21, 115:23, 117:9, 126:20
**stay** [20] - 9:7, 14:8, 23:15, 33:3, 43:6, 43:8, 43:16, 76:6, 76:21, 77:19, 115:24, 116:12, 116:19, 118:6, 118:11, 118:17, 122:11, 127:7, 127:21, 128:7
**stayed** [1] - 43:11
**staying** [1] - 88:15
**stays** [1] - 78:1
**stenography** [1] - 1:24
**step** [4] - 53:17, 90:14, 115:5, 116:10
**steps** [6] - 75:1, 79:25, 83:15, 83:24, 101:24, 121:23
**stick** [1] - 5:3

**still** [23] - 9:14, 10:19, 23:13, 25:21, 33:25, 45:8, 52:9, 69:12, 79:16, 80:13, 84:8, 84:18, 90:19, 93:13, 101:8, 101:23, 102:18, 103:7, 103:22, 104:10, 120:5, 120:18, 126:10
**stop** [1] - 71:21
**straightforward** [1] - 74:10
**Street** [4] - 1:15, 1:18, 1:21, 2:9
**stress** [2] - 47:2
**stresses** [3] - 29:9, 31:7, 49:23
**strike** [1] - 13:10
**strong** [3] - 59:11, 70:15, 92:21
**student** [1] - 25:2
**student's** [1] - 26:7
**student-age** [1] - 25:2
**students** [2] - 25:3, 28:18
**studies** [2] - 11:14, 47:8
**study** [7] - 7:24, 8:10, 11:18, 11:19, 47:6, 47:11
**subject** [4] - 48:6, 54:6, 54:20, 55:25
**submission** [1] - 83:13
**submitted** [1] - 21:12
**subset** [1] - 65:3
**substantial** [3] - 14:4, 27:3, 38:15
**substantiate** [1] - 85:10
**substantiated** [1] - 36:19
**substantiates** [1] - 100:7
**substantiation** [1] - 37:20
**substantive** [15] - 40:20, 51:11, 51:14, 53:24, 54:5, 54:12, 54:19, 54:25, 55:18, 56:5, 70:14, 73:20, 85:19, 89:2, 99:23
**substantively** [6] - 72:18, 104:14, 108:13, 119:23, 126:21, 127:18
**sue** [11] - 36:10, 39:5, 46:10, 46:11, 62:24, 62:25, 63:2, 68:14, 68:20, 68:21, 94:15
**sued** [3] - 36:8, 39:3, 63:16
**sufficient** [6] - 25:16, 34:7, 35:5, 40:15, 81:23, 99:15
**sufficiently** [1] - 96:10
**suggest** [3] - 26:15, 83:16, 90:16
**suggested** [8] - 38:11, 43:22, 49:5, 102:10, 104:12, 118:8, 123:8, 124:5
**suggesting** [3] - 25:11, 121:11, 123:4
**suggestions** [1] - 111:15
**suggests** [4] - 30:8, 44:5, 100:10, 122:20
**suing** [2] - 36:2, 68:17
**suit** [2] - 46:5, 46:7
**Suite** [2] - 2:2, 2:15
**summary** [44] - 6:3, 6:6, 6:10, 6:13, 7:5, 7:10, 12:4, 12:6, 12:13, 13:6, 13:8, 14:25, 16:6, 18:14, 32:6, 33:6, 33:8, 34:4, 40:6, 44:13, 44:16, 47:13, 47:16, 49:2, 58:1, 68:2, 74:6, 74:9, 76:1, 76:8, 81:10, 82:17, 83:14, 84:16, 85:4, 89:8, 99:18, 107:6, 109:3, 109:7, 110:8, 113:10, 113:16, 116:17
**supersede** [1] - 74:14
**supplemental** [1] - 47:2

**support** [16] - 11:4, 11:17, 16:23, 17:4, 17:25, 18:1, 21:18, 28:8, 40:16, 41:14, 42:5, 44:4, 44:13, 45:16, 47:13, 80:17
**supported** [3] - 14:13, 17:6, 83:23
**supporting** [1] - 10:25
**supportive** [1] - 21:24
**supports** [1] - 8:17
**supposed** [3] - 87:9, 90:9, 123:8
**Supreme** [26] - 25:22, 28:6, 29:7, 30:7, 32:23, 45:1, 46:4, 46:10, 51:2, 51:17, 51:19, 58:13, 72:1, 101:25, 102:2, 105:22, 107:16, 107:18, 107:20, 108:11, 113:25, 114:3, 115:6, 117:24, 127:10, 127:14
**surely** [1] - 52:17
**surprise** [1] - 87:23
**survey** [5] - 14:1, 14:3, 32:2, 32:4
**swayed** [1] - 49:5
**sweeping** [2] - 121:11, 121:25
**switch** [1] - 108:23
**switched** [1] - 72:14
**symbol** [1] - 102:6
**system** [3] - 42:23, 50:16, 63:4

**T**

**tables** [1] - 4:10
**tacitly** [1] - 54:11
**talks** [5] - 29:21, 70:17, 88:11, 100:6, 107:20
**tandem** [1] - 92:12
**tangible** [1] - 37:2
**target** [5] - 67:2, 74:17, 76:15, 76:18, 78:24
**taxes** [2] - 29:23, 29:24
**technical** [3] - 62:11, 62:20, 111:24
**technology** [2] - 3:15, 4:13
**temporal** [1] - 49:7
**ten** [1] - 64:12
**tenant** [1] - 51:3
**term** [9] - 5:13, 5:16, 5:24, 16:13, 62:11, 69:21, 70:4, 89:13
**termed** [2] - 60:3, 74:10
**terms** [14] - 32:4, 32:23, 50:15, 57:7, 57:11, 70:11, 103:11, 103:22, 105:25, 110:3, 111:23, 111:24, 118:23, 121:8
**territory** [1] - 29:1
**test** [2] - 89:13, 92:3
**testified** [6] - 9:19, 11:24, 17:4, 17:18, 18:6, 30:21
**testifies** [1] - 7:15
**testify** [1] - 7:17
**testimony** [15] - 6:13, 7:2, 7:9, 8:20, 9:3, 11:25, 12:4, 13:9, 15:2, 18:12, 19:19, 32:7, 32:11, 89:16, 89:17
**testing** [1] - 113:18
**TEXAS** [3] - 1:1, 1:4, 1:5
**Texas** [40] - 1:15, 1:16, 1:18, 1:19, 2:3, 2:15, 2:18, 2:20, 3:5, 5:11, 11:19, 19:17, 20:21, 25:10, 28:9, 30:13, 32:20,

33:5, 40:2, 41:24, 42:5, 44:3, 47:25, 48:1, 48:20, 59:13, 61:3, 61:17, 61:23, 73:15, 75:6, 76:20, 77:15, 89:12, 100:7, 104:17, 109:12, 111:5, 125:4, 129:3
**Texas's** [2] - 32:17, 42:6
**text** [2] - 82:5, 100:10
**Thanksgiving** [1] - 3:25
**THE** [159] - 1:10, 1:14, 2:1, 2:7, 2:11, 3:3, 6:14, 6:17, 6:23, 9:23, 10:4, 10:8, 10:17, 10:22, 11:3, 11:8, 12:21, 15:3, 15:17, 16:10, 18:16, 18:25, 19:14, 19:20, 19:24, 20:25, 21:2, 22:3, 22:13, 23:7, 23:21, 24:8, 24:13, 25:6, 25:13, 25:18, 25:21, 26:3, 26:8, 26:21, 27:5, 28:10, 28:14, 29:14, 31:13, 31:19, 33:9, 33:12, 36:6, 36:23, 38:6, 38:8, 38:20, 41:16, 41:18, 42:7, 42:11, 42:17, 43:4, 43:9, 43:13, 44:22, 44:24, 45:3, 45:6, 45:12, 45:20, 45:24, 46:9, 46:20, 47:17, 49:13, 50:5, 51:14, 52:23, 57:3, 57:12, 57:15, 58:6, 58:17, 59:1, 59:3, 59:13, 59:25, 60:6, 61:2, 61:9, 61:17, 62:1, 62:10, 62:19, 63:6, 63:10, 64:3, 64:6, 64:11, 64:17, 64:24, 65:13, 65:19, 65:24, 66:9, 66:15, 66:20, 67:2, 68:3, 68:7, 69:7, 69:15, 71:11, 71:15, 71:21, 72:8, 72:12, 72:16, 73:25, 78:4, 81:14, 82:6, 84:6, 84:11, 85:23, 88:18, 92:9, 93:5, 93:8, 94:3, 95:3, 96:15, 97:17, 98:13, 99:9, 101:10, 101:12, 101:18, 102:20, 102:22, 103:24, 104:1, 104:23, 108:23, 109:23, 110:21, 111:24, 112:3, 115:14, 115:17, 116:1, 116:5, 119:19, 119:25, 121:2, 123:10, 124:22, 125:7, 125:15, 125:17, 125:20, 127:24
**theme** [2] - 17:3, 17:5
**themes** [1] - 5:2
**themselves** [7] - 7:25, 32:13, 35:8, 39:23, 69:11, 96:8, 100:4
**theories** [1] - 46:2
**theory** [8] - 15:6, 15:10, 15:19, 26:10, 38:25, 42:6, 47:14, 49:1
**thereby** [1] - 119:1
**therefore** [12] - 32:21, 48:13, 52:16, 54:18, 56:23, 57:6, 57:10, 90:14, 100:21, 107:10, 116:18, 127:19
**thereof** [1] - 11:1
**they've** [6] - 27:13, 57:20, 74:9, 87:7, 89:20, 124:22
**thick** [1] - 57:24
**thinking** [3] - 5:10, 124:18, 124:20
**thinks** [2] - 83:5
**third** [6] - 20:12, 37:14, 48:1, 75:18, 93:5, 93:8
**Thomas** [3] - 54:2, 54:8, 54:9
**Thomas's** [1] - 54:10
**three** [5] - 20:6, 33:15, 74:3, 77:7, 89:10
**thrilled** [1] - 112:4
**throat** [1] - 84:14

**throat-clearing** [1] - 84:14
**throughout** [1] - 22:15
**thrown** [2] - 47:3, 124:1
**tie** [2] - 34:25, 97:5
**timing** [1] - 74:6
**Title** [1] - 35:23
**today** [22] - 6:2, 6:20, 6:22, 12:25, 40:5, 48:8, 48:18, 56:22, 73:10, 74:4, 103:8, 103:11, 108:22, 111:8, 112:2, 116:8, 116:24, 117:8, 118:15, 118:25, 124:8, 125:24
**today's** [1] - 5:21
**TODD** [1] - 1:14
**Todd** [1] - 12:23
**together** [1] - 92:18
**tomorrow** [1] - 118:15
**took** [8] - 50:21, 57:15, 76:19, 77:7, 104:3, 124:13, 125:4, 125:9
**top** [3] - 67:3, 72:23, 113:8
**topics** [1] - 74:3
**total** [2] - 87:4, 94:22
**totally** [4] - 92:12, 92:14, 93:2, 110:6
**touch** [3] - 60:20, 61:8, 61:13
**touched** [1] - 102:5
**toward** [1] - 49:18
**track** [2] - 24:4, 24:11
**tracking** [1] - 24:1
**trained** [1] - 83:2
**training** [2] - 90:7, 90:17
**TRANSCRIPT** [1] - 1:10
**transcript** [2] - 1:25, 129:3
**transition** [8] - 74:23, 75:4, 76:9, 76:11, 76:16, 77:7, 77:11, 78:21
**transitions** [2] - 75:3, 75:7
**travel** [1] - 127:25
**treat** [1] - 12:3
**treatment** [1] - 97:15
**Trenton** [1] - 2:9
**trial** [2] - 12:17, 77:16
**trials** [1] - 128:3
**tried** [1] - 99:6
**tries** [1] - 25:11
**trigger** [1] - 8:6
**true** [9] - 9:12, 22:5, 37:7, 56:22, 71:9, 79:15, 100:10, 125:20, 129:3
**truly** [1] - 93:3
**Trump** [4] - 28:11, 59:4, 69:15, 78:3
**try** [3] - 115:24, 116:21, 124:4
**trying** [11] - 3:12, 4:3, 19:25, 30:9, 37:23, 37:25, 38:1, 62:1, 88:25, 95:2, 126:17
**turn** [3] - 6:1, 50:5, 57:20
**turning** [1] - 85:8
**two** [33] - 3:11, 7:2, 13:13, 15:22, 16:3, 18:11, 27:22, 30:25, 31:5, 48:6, 52:3, 55:24, 67:22, 69:8, 74:5, 76:11, 81:7, 87:23, 89:22, 91:10, 92:12, 92:14, 92:17, 92:19, 94:9, 99:4, 105:14, 109:9, 112:13, 118:11, 118:21, 119:14, 121:4

**type** [6] - 27:24, 28:21, 30:6, 54:6, 127:21
**types** [3] - 21:22, 60:21, 79:7
**typically** [1] - 75:2

## U

**U.S** [7] - 2:11, 2:14, 8:2, 8:5, 17:13, 29:11, 105:6
**U.S.-born** [2] - 17:10, 17:23
**uh-oh** [1] - 57:15
**ultimate** [3] - 19:15, 44:9, 119:18
**ultimately** [10] - 9:19, 11:22, 18:22, 34:11, 37:1, 37:15, 38:2, 77:1, 80:18, 99:25
**unable** [2] - 8:14, 9:12
**unaware** [1] - 47:7
**uncertain** [1] - 105:25
**uncertainty** [1] - 74:19
**unclear** [1] - 28:3
**under** [22] - 16:10, 22:20, 39:20, 44:20, 54:7, 56:1, 56:23, 57:11, 58:16, 60:15, 64:15, 66:3, 67:21, 70:24, 86:14, 87:19, 96:3, 99:19, 99:22, 103:11, 103:22, 110:3
**undermines** [1] - 31:6
**understood** [3] - 92:25, 102:24, 110:2
**underwent** [1] - 73:12
**undisclosed** [1] - 21:15
**undocumented** [7] - 11:19, 16:9, 23:2, 37:9, 63:18, 63:25, 69:13
**unhappy** [2] - 114:22, 114:24
**uniformity** [1] - 111:14
**UNITED** [3] - 1:1, 1:7, 1:11
**United** [20] - 2:18, 3:5, 9:8, 9:12, 9:14, 30:20, 32:25, 46:6, 46:7, 46:11, 49:17, 52:15, 65:5, 71:13, 71:18, 105:7, 105:8, 105:22, 107:10, 129:2
**universities** [1] - 113:14
**University** [2] - 55:10, 73:5
**unlawful** [29] - 10:15, 41:5, 50:25, 56:23, 57:2, 86:5, 86:6, 86:15, 104:14, 108:13, 108:21, 108:22, 110:5, 114:4, 114:6, 114:19, 115:22, 116:18, 119:2, 119:5, 119:23, 120:23, 123:16, 126:12, 126:21, 126:22, 127:3, 127:18
**unlawfully** [2] - 52:15, 68:19
**unlawfulness** [6] - 115:7, 115:9, 121:17, 121:19, 121:22, 123:9
**unless** [1] - 6:5
**unlikely** [1] - 88:4
**unmute** [1] - 3:16
**unquote** [2] - 9:21, 17:12
**unreliable** [1] - 7:7
**unreviewable** [1] - 54:16
**unsupported** [2] - 12:1, 16:23
**untie** [1] - 104:24
**unusual** [2] - 77:22, 113:24
**up** [22] - 3:13, 27:12, 33:13, 52:10, 52:25, 57:3, 57:10, 57:17, 62:3, 73:5,

73:10, 80:19, 82:11, 84:14, 84:24, 87:24, 95:16, 95:23, 99:8, 119:11, 123:13, 127:6
**update** [3] - 52:7, 75:4, 76:10
**upheld** [1] - 30:4
**urge** [2] - 73:20, 122:24
**urged** [1] - 122:17
**Uribe** [1] - 6:21
**usage** [1] - 27:11
**USC** [1] - 63:25
**USCIS** [2] - 96:17, 107:5
**useful** [1] - 84:25

## V

**vacated** [7] - 48:9, 102:13, 103:13, 103:20, 104:2, 110:10, 119:1
**vacating** [7] - 109:20, 110:13, 112:7, 112:12, 112:16, 113:1, 123:20
**vacatur** [2] - 112:6, 118:1, 121:15, 121:20, 124:3, 126:13, 127:16
**vaccine** [6] - 86:24, 93:15, 93:16, 93:19, 95:20, 96:12
**valid** [1] - 98:14
**validly** [1] - 98:5
**Valley** [1] - 73:16
**variables** [2] - 7:12, 8:12
**various** [8] - 13:9, 13:19, 60:21, 66:4, 79:7, 90:22, 110:24, 118:9
**vastly** [1] - 126:5
**Veasey** [1] - 77:4
**verdicts** [1] - 83:23
**verification** [1] - 11:20
**version** [2] - 79:23
**versus** [8] - 3:5, 7:8, 7:23, 8:19, 25:1, 46:21, 77:4, 112:21
**via** [2] - 1:25, 48:12
**viability** [1] - 97:17
**viable** [2] - 97:20, 97:21
**victims** [1] - 73:7
**Vidal** [6] - 50:1, 79:18, 80:1, 80:20, 89:25, 90:2
**view** [8] - 19:8, 19:12, 38:12, 38:17, 74:12, 84:15, 88:17, 120:3
**views** [2] - 74:15, 104:21
**vigorously** [1] - 81:19
**VII** [1] - 35:23
**vindicate** [1] - 47:24
**violate** [1] - 43:5
**violated** [1] - 94:16
**violates** [2] - 62:5, 104:14, 109:13
**violating** [2] - 34:19, 90:13
**violation** [4] - 35:2, 53:24, 56:5
**violations** [4] - 34:23, 34:24, 40:21, 78:10
**violence** [1] - 73:7
**visa** [2] - 15:20, 64:7
**visits** [1] - 113:18
**voice** [1] - 102:23

## W

**voluntarily** [2] - 15:16, 16:2
**voter** [1] - 77:15
**VS** [1] - 1:5

## W

**Wadhia** [3] - 55:9, 55:14
**wage** [1] - 7:16
**wages** [1] - 17:16
**wait** [5] - 44:22, 64:12, 81:14
**waiter** [1] - 10:19
**waiting** [1] - 128:4
**walk** [3] - 5:10, 55:16, 93:11
**walked** [2] - 36:18, 112:8
**walking** [1] - 5:22
**wants** [4] - 12:21, 47:19, 90:4, 123:17
**warrant** [2] - 82:24, 103:3
**warrants** [1] - 103:6
**warriors** [2] - 81:16, 81:17
**washing** [1] - 29:2
**Washington** [3] - 2:5, 2:12, 3:9
**waving** [1] - 119:25
**wax** [7] - 68:4, 68:5, 68:8, 98:25, 99:3, 101:8, 111:25
**ways** [1] - 76:14
**website** [1] - 105:6
**week** [2] - 76:11, 125:11
**weeks** [1] - 84:21
**weeks'** [1] - 97:22
**weigh** [9] - 15:18, 19:1, 33:10, 74:1, 76:10, 76:23, 101:20, 115:14, 119:19
**weighs** [1] - 13:7
**weight** [8] - 12:8, 12:18, 13:8, 13:12, 14:18, 15:1, 19:18, 61:16
**welcome** [3] - 4:5, 6:23, 111:10
**West** [2] - 1:15, 1:18
**whatsoever** [1] - 36:17
**whereas** [1] - 33:2
**whichever** [2] - 4:1, 78:25
**whole** [17] - 9:20, 11:11, 28:25, 29:9, 29:20, 29:25, 30:8, 68:4, 81:25, 98:25, 101:8, 103:15, 103:16, 112:1, 122:10, 123:14, 123:19
**wide** [3] - 65:9, 99:16, 99:20
**willing** [3] - 81:16, 82:11, 101:4
**win** [2] - 35:25, 36:10
**wind** [3] - 118:16, 120:6, 120:22
**window** [1] - 97:23
**wish** [3] - 45:6, 45:8, 93:18
**wishes** [3] - 23:8, 79:2, 80:15
**withdrawal** [1] - 58:18
**witness** [1] - 31:13
**witnesses** [3] - 13:14, 21:15, 24:1
**witnesses'** [1] - 32:7
**Wolf** [16] - 48:9, 49:7, 74:14, 79:3, 79:8, 79:10, 79:23, 80:21, 89:24, 90:10, 90:16, 97:8, 102:12, 103:13, 103:19, 104:3
**Wolf's** [1] - 102:18

**women** [2] - 73:6, 113:17
**wonder** [1] - 57:3
**Wong** [3] - 14:1, 18:3, 18:6
**Wong's** [2] - 19:10, 32:2
**word** [3] - 27:10, 27:11, 125:17
**words** [5] - 39:9, 53:14, 78:12, 118:19, 126:14
**work-authorized** [1] - 10:2
**worker** [1] - 17:10
**workers** [4] - 7:23, 13:21, 17:20, 17:23
**works** [3] - 8:5, 93:13, 110:12
**worksheets** [1] - 64:25
**worried** [1] - 128:4
**worry** [1] - 4:17
**worse** [2] - 3:22, 50:12
**Writ** [1] - 117:14
**Writ-of-Erasure** [1] - 117:14
**writing** [2] - 28:15, 65:21
**written** [4] - 13:4, 40:9, 66:6, 117:15
**wrote** [2] - 12:9, 55:14

## X

**X's** [1] - 36:4
**xenophobic** [1] - 5:24

## Y

**y'all** [4] - 62:6, 127:24, 128:6, 128:7
**year** [3] - 23:3, 40:3, 118:21
**years** [12] - 43:14, 45:5, 59:22, 64:12, 77:7, 78:5, 87:2, 93:19, 100:17, 100:18, 118:11, 118:21
**York** [5] - 48:9, 56:16, 102:14, 104:1, 104:2
**York's** [1] - 103:12
**young** [1] - 32:12
**yourself** [1] - 38:22

# Exhibit 2

## Nina Perales

| | |
|---|---|
| **From:** | Disher, Todd <Todd.Disher@oag.texas.gov> |
| **Sent:** | Tuesday, June 26, 2018 7:20 PM |
| **To:** | Nina Perales; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter |
| **Cc:** | Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett; Peroyea, Trent; Moreno, Cristina; Bitter, Adam |
| **Subject:** | RE: Texas, et al. v. United States, et al. - Deposition of Joe Peters |

Nina,

It's come to my attention that Mr. Peters has retired from the Texas Department of Public Safety. He is not a party to the case and cannot be compelled to testify by notice alone. If you serve Mr. Peters with a subpoena, please provide the required notice to the parties under Rule 30 of the time and place for compliance. Plaintiff States will move to quash the subpoena because his requested testimony does not meet the good-cause standard governing this expedited discovery period. Mr. Peters is not on Plaintiff States' witness list, and unlike Defendant-Intervenors' apparent intention to rely on 30 late-disclosed witnesses, Plaintiff States will rely on the sworn testimony of only timely disclosed witnesses in support of their motion for a preliminary injunction.

Todd

Todd Lawrence Disher
Special Counsel for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov

-----Original Message-----
From: Nina Perales [mailto:nperales@MALDEF.org]
Sent: Tuesday, June 26, 2018 3:36 PM
To: Ernest Herrera <eherrera@MALDEF.org>; Disher, Todd <Todd.Disher@oag.texas.gov>; Robins, Jeffrey (CIV) <Jeffrey.Robins@usdoj.gov>; Rachel Wainer Apter <Rachel.Apter@njoag.gov>
Cc: Celina Moreno <cmoreno@MALDEF.org>; Kenneth Levine <Kenneth.Levine@law.njoag.gov>; Jeremy Hollander <Jeremy.Hollander@law.njoag.gov>; Biggs, Adam <Adam.Biggs@oag.texas.gov>; Starr, Brantley <Brantley.Starr@oag.texas.gov>; Alejandra Avila <Aavila@MALDEF.org>; Denise M. Hulett <Dhulett@MALDEF.org>; Peroyea, Trent <Trent.Peroyea@oag.texas.gov>; Moreno, Cristina <Cristina.Moreno@oag.texas.gov>; Bitter, Adam <Adam.Bitter@oag.texas.gov>
Subject: RE: Texas, et al. v. United States, et al. - Deposition of Joe Peters

Todd:

Please see the attached AMENDED notice of deposition of Joe Peters (change in location).  Thanks,

_____
From: Ernest Herrera
Sent: Tuesday, June 26, 2018 12:03 PM
To: Disher, Todd; Nina Perales; Robins, Jeffrey (CIV); Rachel Wainer Apter
Cc: Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett; Peroyea, Trent; Moreno, Cristina; Bitter, Adam

Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Todd:

Please see the attached notice of deposition of Joe Peters.


Ernest I. Herrera
Staff Attorney
MALDEF
110 Broadway, Suite 300
San Antonio, TX 78205
P: 210.224.5476 x. 208
F: 210.224.5382
www.maldef.org<https://urldefense.proofpoint.com/v2/url?u=http-3A__www.maldef.org_&d=DwIF-
g&c=Z_mC1sqOcfBCM1ZptXokOj7_ss37GsaAMzCZyvOxKN4&r=sJXj47LoI4xQ4zRIYXYPjtSABNiF6feJS5WOFi3VXKU&m=9
MX88sodENEGF_YccZ8jDaQgXNDtFRSMy5WekjU0Sjo&s=MP5fcCfPnmS6dupTZYO0imONdMHxpeSX9c0PXNOEP8E&e=>


From: Disher, Todd [mailto:Todd.Disher@oag.texas.gov]
Sent: Monday, June 25, 2018 9:38 PM
To: Nina Perales; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter
Cc: Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett;
Peroyea, Trent; Moreno, Cristina; Bitter, Adam
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Nina,

Mr. Peters' calculations related to the potential cost from the influx of new license holders under the DAPA program. As
I have already told you, Plaintiff States do not intend to rely on those calculations to support their motion for a
preliminary injunction against DACA. We have provided deposition dates for you for all of the witnesses on our witness
list and expert disclosures.

Also, your request overlooks your 30 untimely disclosed witnesses for whom you have failed to provide deposition
dates. You still have not explained why you need to rely on that testimony, why they were not on your witness list, or
why you did not provide dates for their depositions.

Todd

Todd Lawrence Disher
Special Counsel for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>

From: Nina Perales [mailto:nperales@MALDEF.org]
Sent: Monday, June 25, 2018 2:37 PM
To: Disher, Todd <Todd.Disher@oag.texas.gov>; Ernest Herrera <eherrera@MALDEF.org>; Robins, Jeffrey (CIV)
<Jeffrey.Robins@usdoj.gov>; Rachel Wainer Apter <Rachel.Apter@njoag.gov>

Cc: Celina Moreno <cmoreno@MALDEF.org>; Kenneth Levine <Kenneth.Levine@law.njoag.gov>; Jeremy Hollander <Jeremy.Hollander@law.njoag.gov>; Biggs, Adam <Adam.Biggs@oag.texas.gov>; Starr, Brantley <Brantley.Starr@oag.texas.gov>; Alejandra Avila <Aavila@MALDEF.org>; Denise M. Hulett <Dhulett@MALDEF.org>; Peroyea, Trent <Trent.Peroyea@oag.texas.gov>; Moreno, Cristina <Cristina.Moreno@oag.texas.gov>; Bitter, Adam <Adam.Bitter@oag.texas.gov>
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Dear Todd,

In light of Plaintiffs' position declining to withdraw declarations from non-disclosed witnesses that are included in your preliminary injunction submission, Defendant Intervenors would like to take the deposition of Mr. Joe Peters. We can take his deposition in Austin at your location of choice anytime Wed. through Friday this week that is not during the depositions of Dr. Deere or Dr. Potter. In other words, we are available at any time other than:

Wednesday - 1pm - 6pm
Thursday - 10am-3pm

Thank you very much,

Nina Perales
Vice President of Litigation
Mexican American Legal Defense
    and Educational Fund, Inc. (MALDEF)
110 Broadway, Suite 300
San Antonio, TX 78205
Ph (210) 224-5476 ext. 206
FAX (210 224-5382


From: Nina Perales
Sent: Friday, June 22, 2018 5:30 PM
To: 'Disher, Todd'; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter
Cc: Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett; Peroyea, Trent; Moreno, Cristina; Bitter, Adam
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

I understand and appreciate your communication on this -- and your willingness to find a solution -- even if we are ultimately unsuccessful.

Nina Perales
Vice President of Litigation
Mexican American Legal Defense
    and Educational Fund, Inc. (MALDEF)
110 Broadway, Suite 300
San Antonio, TX 78205
Ph (210) 224-5476 ext. 206
FAX (210 224-5382


From: Disher, Todd [mailto:Todd.Disher@oag.texas.gov]
Sent: Friday, June 22, 2018 5:27 PM
To: Nina Perales; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter

Cc: Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett; Peroyea, Trent; Moreno, Cristina; Bitter, Adam
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Thanks, Nina. We are not interested in trying to withdraw portions of an exhibit already on file with the Court, but we will make our intentions clear.

Todd

Todd Lawrence Disher
Special Counsel for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>

From: Nina Perales [mailto:nperales@MALDEF.org]
Sent: Friday, June 22, 2018 5:04 PM
To: Disher, Todd <Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>>; Ernest Herrera
<eherrera@MALDEF.org<mailto:eherrera@MALDEF.org>>; Robins, Jeffrey (CIV)
<Jeffrey.Robins@usdoj.gov<mailto:Jeffrey.Robins@usdoj.gov>>; Rachel Wainer Apter
<Rachel.Apter@njoag.gov<mailto:Rachel.Apter@njoag.gov>>
Cc: Celina Moreno <cmoreno@MALDEF.org<mailto:cmoreno@MALDEF.org>>; Kenneth Levine
<Kenneth.Levine@law.njoag.gov<mailto:Kenneth.Levine@law.njoag.gov>>; Jeremy Hollander
<Jeremy.Hollander@law.njoag.gov<mailto:Jeremy.Hollander@law.njoag.gov>>; Biggs, Adam
<Adam.Biggs@oag.texas.gov<mailto:Adam.Biggs@oag.texas.gov>>; Starr, Brantley
<Brantley.Starr@oag.texas.gov<mailto:Brantley.Starr@oag.texas.gov>>; Alejandra Avila
<Aavila@MALDEF.org<mailto:Aavila@MALDEF.org>>; Denise M. Hulett
<Dhulett@MALDEF.org<mailto:Dhulett@MALDEF.org>>; Peroyea, Trent
<Trent.Peroyea@oag.texas.gov<mailto:Trent.Peroyea@oag.texas.gov>>; Moreno, Cristina
<Cristina.Moreno@oag.texas.gov<mailto:Cristina.Moreno@oag.texas.gov>>; Bitter, Adam
<Adam.Bitter@oag.texas.gov<mailto:Adam.Bitter@oag.texas.gov>>
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Todd,

Although we can leave these materials in the record and pledge not to "rely" on them for the PI, they are still in the record and I don't think our intentions will be clear to the court.  My suggestion is that Plaintiffs withdraw the eleven non-witness declarations from wherever they appear in the record, and Defendant Intervenors will agree not to file with the court the non-witness declarations that you are concerned about.

Nina Perales
Vice President of Litigation
Mexican American Legal Defense
    and Educational Fund, Inc. (MALDEF)
110 Broadway, Suite 300
San Antonio, TX 78205
Ph (210) 224-5476 ext. 206
FAX (210 224-5382

From: Disher, Todd [mailto:Todd.Disher@oag.texas.gov]
Sent: Friday, June 22, 2018 4:53 PM
To: Nina Perales; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter
Cc: Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett;
Peroyea, Trent; Moreno, Cristina; Bitter, Adam
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Nina,

So do you agree that MALDEF will rely on sworn testimony only from timely disclosed witnesses if Plaintiff States agree
to the same?

Todd

Todd Lawrence Disher
Special Counsel for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>

From: Nina Perales [mailto:nperales@MALDEF.org]
Sent: Friday, June 22, 2018 2:51 PM
To: Disher, Todd <Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>>; Ernest Herrera
<eherrera@MALDEF.org<mailto:eherrera@MALDEF.org>>; Robins, Jeffrey (CIV)
<Jeffrey.Robins@usdoj.gov<mailto:Jeffrey.Robins@usdoj.gov>>; Rachel Wainer Apter
<Rachel.Apter@njoag.gov<mailto:Rachel.Apter@njoag.gov>>
Cc: Celina Moreno <cmoreno@MALDEF.org<mailto:cmoreno@MALDEF.org>>; Kenneth Levine
<Kenneth.Levine@law.njoag.gov<mailto:Kenneth.Levine@law.njoag.gov>>; Jeremy Hollander
<Jeremy.Hollander@law.njoag.gov<mailto:Jeremy.Hollander@law.njoag.gov>>; Biggs, Adam
<Adam.Biggs@oag.texas.gov<mailto:Adam.Biggs@oag.texas.gov>>; Starr, Brantley
<Brantley.Starr@oag.texas.gov<mailto:Brantley.Starr@oag.texas.gov>>; Alejandra Avila
<Aavila@MALDEF.org<mailto:Aavila@MALDEF.org>>; Denise M. Hulett
<Dhulett@MALDEF.org<mailto:Dhulett@MALDEF.org>>; Peroyea, Trent
<Trent.Peroyea@oag.texas.gov<mailto:Trent.Peroyea@oag.texas.gov>>; Moreno, Cristina
<Cristina.Moreno@oag.texas.gov<mailto:Cristina.Moreno@oag.texas.gov>>; Bitter, Adam
<Adam.Bitter@oag.texas.gov<mailto:Adam.Bitter@oag.texas.gov>>
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Todd,

If you file a motion, please note in your certificate of conference that Defendant Intervenors oppose the motion unless
Plaintiffs withdraw similar sworn testimony by non-disclosed witnesses that Plaintiffs filed with the court with their
Motion for Preliminary Injunction.

Nina Perales

Vice President of Litigation

Mexican American Legal Defense

 and Educational Fund, Inc. (MALDEF)

110 Broadway, Suite 300

San Antonio, TX 78205

Ph (210) 224-5476 ext. 206

FAX (210 224-5382

-----Original Message-----
From: Disher, Todd [mailto:Todd.Disher@oag.texas.gov]
Sent: Friday, June 22, 2018 2:44 PM
To: Nina Perales; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter
Cc: Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett; Peroyea, Trent; Moreno, Cristina; Bitter, Adam
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Nina,

The 11 declarations you reference below are included as part of another exhibit already on file with the Court. Once again, we do not intend to rely on those declarations in support of our motion for preliminary injunction. You have seen our initial briefing included with our motion and know that to be true. We will work with you to schedule depositions should that change.

In contrast, we still do not know why or how you intend to rely on the two dozen additional declarations on your exhibit list and why those witnesses were not included on your witness list. Even now, you still have not offered to withdraw those declarations as part of any agreement we may reach. Given the impending end of the discovery period that you requested, we do not have time to conduct additional negotiations based on your statement that you would consider withdrawing the untimely declarations. We will note your opposition in our motion.

Todd

Todd Lawrence Disher

Special Counsel for Civil Litigation

Office of the Attorney General of Texas

P.O. Box 12548 (MC 001)

Austin, TX 78711-2548

(512) 936-2266

Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>


-----Original Message-----

From: Nina Perales [mailto:nperales@MALDEF.org]

Sent: Friday, June 22, 2018 10:30 AM

To: Disher, Todd <Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>>; Ernest Herrera <eherrera@MALDEF.org<mailto:eherrera@MALDEF.org>>; Robins, Jeffrey (CIV) <Jeffrey.Robins@usdoj.gov<mailto:Jeffrey.Robins@usdoj.gov>>; Rachel Wainer Apter <Rachel.Apter@njoag.gov<mailto:Rachel.Apter@njoag.gov>>

Cc: Celina Moreno <cmoreno@MALDEF.org<mailto:cmoreno@MALDEF.org>>; Kenneth Levine <Kenneth.Levine@law.njoag.gov<mailto:Kenneth.Levine@law.njoag.gov>>; Jeremy Hollander <Jeremy.Hollander@law.njoag.gov<mailto:Jeremy.Hollander@law.njoag.gov>>; Biggs, Adam <Adam.Biggs@oag.texas.gov<mailto:Adam.Biggs@oag.texas.gov>>; Starr, Brantley <Brantley.Starr@oag.texas.gov<mailto:Brantley.Starr@oag.texas.gov>>; Alejandra Avila <Aavila@MALDEF.org<mailto:Aavila@MALDEF.org>>; Denise M. Hulett <Dhulett@MALDEF.org<mailto:Dhulett@MALDEF.org>>; Peroyea, Trent <Trent.Peroyea@oag.texas.gov<mailto:Trent.Peroyea@oag.texas.gov>>; Moreno, Cristina <Cristina.Moreno@oag.texas.gov<mailto:Cristina.Moreno@oag.texas.gov>>; Bitter, Adam <Adam.Bitter@oag.texas.gov<mailto:Adam.Bitter@oag.texas.gov>>

Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits


Todd,


Thank you for your email.  Are you willing to withdraw the sworn testimony of non-witnesses that you have placed in the record (the eleven listed below)?  If so, we would consider withdrawing the Def-Int declarations you identified as associated with non-disclosed witnesses.

Nina Perales

Vice President of Litigation

Mexican American Legal Defense

    and Educational Fund, Inc. (MALDEF)

110 Broadway, Suite 300

San Antonio, TX 78205

Ph (210) 224-5476 ext. 206

FAX (210 224-5382

-----Original Message-----

From: Disher, Todd [mailto:Todd.Disher@oag.texas.gov]

Sent: Friday, June 22, 2018 9:21 AM

To: Nina Perales; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter

Cc: Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett; Peroyea, Trent; Moreno, Cristina; Bitter, Adam

Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Nina,

We are not interested in a deal that does less than withdraw all of your declarations and deposition testimony from other cases. You have seen our arguments and know which declarations we used to support our motion for preliminary injunction. We still have not seen your fully briefed position, and you still have not explained why you need to rely on testimony from other witnesses in other cases.

Todd

Todd Lawrence Disher

Special Counsel for Civil Litigation

Office of the Attorney General of Texas

P.O. Box 12548 (MC 001)

Austin, TX 78711-2548

(512) 936-2266

Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>


-----Original Message-----

From: Nina Perales [mailto:nperales@MALDEF.org]

Sent: Thursday, June 21, 2018 6:36 PM

To: Disher, Todd <Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>>; Ernest Herrera <eherrera@MALDEF.org<mailto:eherrera@MALDEF.org>>; Robins, Jeffrey (CIV) <Jeffrey.Robins@usdoj.gov<mailto:Jeffrey.Robins@usdoj.gov>>; Rachel Wainer Apter <Rachel.Apter@njoag.gov<mailto:Rachel.Apter@njoag.gov>>

Cc: Celina Moreno <cmoreno@MALDEF.org<mailto:cmoreno@MALDEF.org>>; Kenneth Levine <Kenneth.Levine@law.njoag.gov<mailto:Kenneth.Levine@law.njoag.gov>>; Jeremy Hollander <Jeremy.Hollander@law.njoag.gov<mailto:Jeremy.Hollander@law.njoag.gov>>; Biggs, Adam <Adam.Biggs@oag.texas.gov<mailto:Adam.Biggs@oag.texas.gov>>; Starr, Brantley <Brantley.Starr@oag.texas.gov<mailto:Brantley.Starr@oag.texas.gov>>; Alejandra Avila <Aavila@MALDEF.org<mailto:Aavila@MALDEF.org>>; Denise M. Hulett <Dhulett@MALDEF.org<mailto:Dhulett@MALDEF.org>>; Peroyea, Trent <Trent.Peroyea@oag.texas.gov<mailto:Trent.Peroyea@oag.texas.gov>>; Moreno, Cristina <Cristina.Moreno@oag.texas.gov<mailto:Cristina.Moreno@oag.texas.gov>>; Bitter, Adam <Adam.Bitter@oag.texas.gov<mailto:Adam.Bitter@oag.texas.gov>>

Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits


Dear Todd,


We would oppose a motion to strike our exhibits without a similar withdrawal by Texas of the sworn testimony filed with your motion for preliminary injunction of the following non-disclosed witnesses:

1. Richard Allgeyer

2. Kevin D. Bailey

3. Lisa Dawn-Fisher

4. Karl Eschbach

5. Patrick A. Fernan

6. Jeffrey M. Gill

7. Joe Peters

8.  Sheri Pollock

9. Donald M. Snemis

10.  Finis Welch

11. David G. Baker


My suggestion is that we discuss the possibility of Defendant Intervenors withdrawing some of the exhibits that have caused you concern along with Texas withdrawing some of the exhibits that have caused us concern.  We are willing to have this discussion with you at your convenience.


Nina Perales

Vice President of Litigation

Mexican American Legal Defense

    and Educational Fund, Inc. (MALDEF)

110 Broadway, Suite 300

San Antonio, TX 78205

Ph (210) 224-5476 ext. 206

FAX (210 224-5382

-----Original Message-----

From: Disher, Todd [mailto:Todd.Disher@oag.texas.gov]

Sent: Wednesday, June 20, 2018 4:31 PM

To: Nina Perales; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter

Cc: Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett; Peroyea, Trent; Moreno, Cristina; Bitter, Adam

Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Nina,

As we have told you on the phone, at this time we are not planning on relying on any declarations in support of our motion for preliminary injunction other than those from the witnesses on our witness list and the experts we have disclosed. If that changes, we will let you know and make any additional witnesses available to be deposed.

It is still not clear why you intend to rely on two dozen declarations from other proceedings in other jurisdictions. It is also not clear why you did not include these witnesses on your witness list that the parties agreed to exchange on June 8 or on your expert disclosures due by court order on June 15. We are going to move to strike those declarations. Please let me know if you oppose that motion.

Todd

Todd Lawrence Disher

Special Counsel for Civil Litigation

Office of the Attorney General of Texas

P.O. Box 12548 (MC 001)

Austin, TX 78711-2548

(512) 936-2266

Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>

-----Original Message-----

From: Nina Perales [mailto:nperales@MALDEF.org]

Sent: Monday, June 18, 2018 1:15 PM

To: Disher, Todd <Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>>; Ernest Herrera
<eherrera@MALDEF.org<mailto:eherrera@MALDEF.org>>; Robins, Jeffrey (CIV)
<Jeffrey.Robins@usdoj.gov<mailto:Jeffrey.Robins@usdoj.gov>>; Rachel Wainer Apter
<Rachel.Apter@njoag.gov<mailto:Rachel.Apter@njoag.gov>>

Cc: Celina Moreno <cmoreno@MALDEF.org<mailto:cmoreno@MALDEF.org>>; Kenneth Levine
<Kenneth.Levine@law.njoag.gov<mailto:Kenneth.Levine@law.njoag.gov>>; Jeremy Hollander
<Jeremy.Hollander@law.njoag.gov<mailto:Jeremy.Hollander@law.njoag.gov>>; Biggs, Adam
<Adam.Biggs@oag.texas.gov<mailto:Adam.Biggs@oag.texas.gov>>; Starr, Brantley
<Brantley.Starr@oag.texas.gov<mailto:Brantley.Starr@oag.texas.gov>>; Alejandra Avila
<Aavila@MALDEF.org<mailto:Aavila@MALDEF.org>>; Denise M. Hulett
<Dhulett@MALDEF.org<mailto:Dhulett@MALDEF.org>>; Peroyea, Trent
<Trent.Peroyea@oag.texas.gov<mailto:Trent.Peroyea@oag.texas.gov>>; Moreno, Cristina
<Cristina.Moreno@oag.texas.gov<mailto:Cristina.Moreno@oag.texas.gov>>; Bitter, Adam
<Adam.Bitter@oag.texas.gov<mailto:Adam.Bitter@oag.texas.gov>>

Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Todd,

Thank you for writing to share your concern.  As I expressed in earlier phone calls, Defendant Intervenors share that same concern with a number of witnesses whose declarations Plaintiffs have filed with the court in support of their motion for preliminary injunction.

In total, Plaintiffs have filed with the court, but not disclosed as witnesses, the declarations of 11 individuals:

1. Richard Allgeyer

2. Kevin D. Bailey

3. Lisa Dawn-Fisher

4. Karl Eschbach

5. Patrick A. Fernan

6. Jeffrey M. Gill

7. Jose Peters

8.  Sheri Pollock

9. Donald M. Snemis

10.  Finis Welch

11. David G. Baker


I think it makes sense to discuss all of these declarations at the same time and try to figure out if we want to take these depositions or come to some other agreement.


Thank you very much,

_____

From: Disher, Todd [Todd.Disher@oag.texas.gov]

Sent: Sunday, June 17, 2018 11:59 AM

To: Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter

Cc: Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett; Peroyea, Trent; Moreno, Cristina; Bitter, Adam; Nina Perales

Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits


Nina,


I write with a concern regarding your exhibit list. With 14 days left in the discovery period, you have now included sworn statements from 25 new witnesses not on your witness list. The parties agreed to disclose by June 8 the identities of all witnesses from whom they were going to rely on sworn statements. These new witnesses provided sworn testimony in different proceedings in different jurisdictions. Please let me know why you intend to rely on this testimony and why these witnesses were not included on your witness list pursuant to our agreement.


Todd


Todd Lawrence Disher

13

Special Counsel for Civil Litigation

Office of the Attorney General of Texas

P.O. Box 12548 (MC 001)

Austin, TX 78711-2548

(512) 936-2266

Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov%3cmailto:Todd.Disher@oag.texas.gov>>


Todd Lawrence Disher

Special Counsel for Civil Litigation

Office of the Attorney General of Texas

P.O. Box 12548 (MC 001)

Austin, TX 78711-2548

(512) 936-2266

Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov%3cmailto:Todd.Disher@oag.texas.gov>>


From: Ernest Herrera [mailto:eherrera@MALDEF.org]

Sent: Saturday, June 16, 2018 12:23 AM

To: Disher, Todd <Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>>; Robins, Jeffrey (CIV) <Jeffrey.Robins@usdoj.gov<mailto:Jeffrey.Robins@usdoj.gov>>; Rachel Wainer Apter <Rachel.Apter@njoag.gov<mailto:Rachel.Apter@njoag.gov>>

Cc: Celina Moreno <cmoreno@MALDEF.org<mailto:cmoreno@MALDEF.org>>; Kenneth Levine <Kenneth.Levine@law.njoag.gov<mailto:Kenneth.Levine@law.njoag.gov>>; Jeremy Hollander <Jeremy.Hollander@law.njoag.gov<mailto:Jeremy.Hollander@law.njoag.gov>>; Biggs, Adam <Adam.Biggs@oag.texas.gov<mailto:Adam.Biggs@oag.texas.gov>>; Starr, Brantley <Brantley.Starr@oag.texas.gov<mailto:Brantley.Starr@oag.texas.gov>>; Alejandra Avila <Aavila@MALDEF.org<mailto:Aavila@MALDEF.org>>; Denise M. Hulett <Dhulett@MALDEF.org<mailto:Dhulett@MALDEF.org>>; Peroyea, Trent <Trent.Peroyea@oag.texas.gov<mailto:Trent.Peroyea@oag.texas.gov>>; Moreno, Cristina <Cristina.Moreno@oag.texas.gov<mailto:Cristina.Moreno@oag.texas.gov>>; Bitter, Adam

14

<Adam.Bitter@oag.texas.gov<mailto:Adam.Bitter@oag.texas.gov>>; Nina Perales
<nperales@MALDEF.org<mailto:nperales@MALDEF.org>>

Subject: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits


Dear counsel:


Please find Defendant Intervenors' exhibits at the following link: https://urldefense.proofpoint.com/v2/url?u=https-
3A__app.box.com_s_6tvlsrq2kbw5e4d9mqsznbngfzuzt1m8&d=DwIF-
g&c=Z_mC1sqOcfBCM1ZptXokOj7_ss37GsaAMzCZyvOxKN4&r=sJXj47LoI4xQ4zRIYXYPjtSABNiF6feJS5WOFi3VXKU&m=bjr
o5FDmagWI6oDuSQxfccpO05ZTfcoR61gDPK45Gno&s=6qw-
SJxO8kFkaLK3cp8aA4rC8KxIHllR0Jham1DvhXg&e=<https://urldefense.proofpoint.com/v2/url?u=https-
3A__app.box.com_s_6tvlsrq2kbw5e4d9mqsznbngfzuzt1m8&d=DwMFAg&c=Z_mC1sqOcfBCM1ZptXokOj7_ss37GsaAMz
CZyvOxKN4&r=sJXj47LoI4xQ4zRIYXYPjtSABNiF6feJS5WOFi3VXKU&m=OlZiW7dnvrGQ_QsXn_w2-
HrFvtnur5d62tba2viZSc4&s=cAkbEqwCNHKUvdtg2SEExcOrERmNj9JAE5DuMpt_Q5w&e<https://urldefense.proofpoint.c
om/v2/url?u=https-3A__app.box.com_s_6tvlsrq2kbw5e4d9mqsznbngfzuzt1m8&d=DwIF-
g&c=Z_mC1sqOcfBCM1ZptXokOj7_ss37GsaAMzCZyvOxKN4&r=sJXj47LoI4xQ4zRIYXYPjtSABNiF6feJS5WOFi3VXKU&m=bjr
o5FDmagWI6oDuSQxfccpO05ZTfcoR61gDPK45Gno&s=6qw-
SJxO8kFkaLK3cp8aA4rC8KxIHllR0Jham1DvhXg&e=%3chttps://urldefense.proofpoint.com/v2/url?u=https-
3A__app.box.com_s_6tvlsrq2kbw5e4d9mqsznbngfzuzt1m8&d=DwMFAg&c=Z_mC1sqOcfBCM1ZptXokOj7_ss37GsaAMz
CZyvOxKN4&r=sJXj47LoI4xQ4zRIYXYPjtSABNiF6feJS5WOFi3VXKU&m=OlZiW7dnvrGQ_QsXn_w2-
HrFvtnur5d62tba2viZSc4&s=cAkbEqwCNHKUvdtg2SEExcOrERmNj9JAE5DuMpt_Q5w&e>=>



Ernest I. Herrera

Staff Attorney

MALDEF

110 Broadway, Suite 300

San Antonio, TX 78205

P: 210.224.5476 x. 208

F: 210.224.5382

www.maldef.org<https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.maldef.org_&d=DwMFAg&c=Z_mC1sqOcfBCM1ZptXokOj7_ss37GsaAMzCZyvOxKN4&r=sJXj47LoI4xQ4zRIYXYP
jtSABNiF6feJS5WOFi3VXKU&m=OlZiW7dnvrGQ_QsXn_w2-
HrFvtnur5d62tba2viZSc4&s=5xeBav47PiZMjNup0lTg9CSucpsfhb6o0tgs_Ve4sig&e<https://urldefense.proofpoint.com/v2
/url?u=http-3A__www.maldef.org-253chttps-3A_urldefense.proofpoint.com_v2_url-3Fu-3Dhttp-2D3A-5F-
5Fwww.maldef.org-5F-26d-3DDwMFAg-26c-3DZ-5FmC1sqOcfBCM1ZptXokOj7-5Fss37GsaAMzCZyvOxKN4-26r-
3DsJXj47LoI4xQ4zRIYXYPjtSABNiF6feJS5WOFi3VXKU-26m-3DOlZiW7dnvrGQ-5FQsXn-5Fw2-2DHrFvtnur5d62tba2viZSc4-
26s-3D5xeBav47PiZMjNup0lTg9CSucpsfhb6o0tgs-5FVe4sig-
26e&d=DwMFAg&c=Z_mC1sqOcfBCM1ZptXokOj7_ss37GsaAMzCZyvOxKN4&r=sJXj47LoI4xQ4zRIYXYPjtSABNiF6feJS5WO

Fi3VXKU&m=167RZM2-lQjk1ToZrR0F3q6kgMzhzwbibFz2JCXgJ78&s=TGggjuHtckOnZBS8UQ5nUrkgadwE7-Jd1jQCnngm4AQ&e=>=>

# Exhibit 3

551 Fed.Appx. 749
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals, Fifth Circuit.

WARRIOR ENERGY SERVICES
CORPORATION; Fastorq, L.L.C.; Stabil
Drill Specialties, L.L.C.; Workstrings
International, L.L.C.; Superior Energy
Services, L.L.C., doing business as Superior
Completion Services, Plaintiffs–Appellants

v.

ATP TITAN M/V, its equipment,
appurtenances, furniture, etc.,
in rem; ATP Titan, L.L.C., in
personam, Defendants–Appellees.

No. 13–30587
|
Summary Calendar, No. 13–30587
|
Jan. 6, 2014.

**Synopsis**

**Background:** Tools and services supplier brought action against floating oil and gas production facility and its owners, seeking declaratory judgment that facility was a vessel and that supplier's maritime liens against the facility were valid. The United States District Court for the Eastern District of Louisiana, Sarah S. Vance, J., 941 F.Supp.2d 699, dismissed. Supplier appealed.

**Holdings:** The Court of Appeals held that:

the District Court did not abuse its discretion in denying supplier's motion to file a surreply, and

facility was not a vessel for purposes of the Maritime Lien Act.

Affirmed.

**Attorneys and Law Firms**

**\*750** Stewart F. Peck, Donald Lance Cardwell, Benjamin W. Kadden, David Boies Sharpe, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, New Orleans, LA, for Plaintiffs–Appellants.

Paul Joseph Goodwine, Emile Joseph Dreuil, III, Esq., Taylor Paul Mouledoux, Slattery, Marino & Roberts, P.L.C., New Orleans, LA, for Defendants–Appellees.

Appeal from the United States District Court for the Eastern District of Louisiana, USDC No. 2:12–CV–2297.

Before WIENER, OWEN, and HAYNES, Circuit Judges.

**Opinion**

PER CURIAM:[*]

Warrior Energy Services Corporation, Fastorq, L.L.C., Stabil Drill Specialties, L.L.C., Workstrings International, L.L.C., and Superior Energy Services, L.L.C., d/b/a Superior Completion Services (collectively, "Superior") appeal the order of the district court dismissing their claims against ATP Titan M/V (the "TITAN") and ATP Titan, L.L.C. ("ATP"). We AFFIRM.

I. Background

The TITAN is a floating oil and gas production facility moored on the Outer Continental Shelf, miles offshore of Louisiana. The TITAN is owned by ATP and is operated by ATP Oil & Gas. Superior contracted with ATP Oil & Gas to provide certain services and supplies to the TITAN to support its operations. After Superior performed under the contract, ATP Oil & Gas declared bankruptcy, and Superior was not paid.

Superior filed suit, asserting maritime liens and, in the alternative, state law privileges against the TITAN.[1] Superior **\*751** also sought declaratory relief against both the TITAN and ATP. ATP and the TITAN moved to dismiss, asserting that the district court lacked *in rem* admiralty jurisdiction over the TITAN and that Superior had failed to state a claim against

ATP. After jurisdictional discovery, the district court granted the motion and Superior appealed.[2]

## II. Standard of Review

We review a district court's dismissal for lack of subject matter jurisdiction *de novo*. *See Ballew v. Cont'l Airlines, Inc.,* 668 F.3d 777, 781 (5th Cir.2012). The burden of proof lies with the party asserting jurisdiction, who must prove "by a preponderance of the evidence that the court has jurisdiction based on the complaint and evidence." *Id.* A court can find a lack of subject matter jurisdiction based on "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir.2001).[3]

We review a district court's dismissal for failure to state a claim *de novo,* "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Sullivan v. Leor Energy, LLC,* 600 F.3d 542, 546 (5th Cir.2010). Dismissal is appropriate where the plaintiff fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and thus does not "raise a right to relief above the speculative level," *id.* at 555, 127 S.Ct. 1955. This standard is met where a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

## III. Discussion

Superior seeks to enforce a maritime lien against the TITAN pursuant to the Maritime Lien Act, 46 U.S.C. §§ 31301, *et seq.,* which states that "a person providing necessaries to a *vessel* ... has a maritime lien on the vessel [and] may bring a civil action *in rem* to enforce the lien." 46 U.S.C. § 31342(a) (emphasis added). Federal jurisdiction under the Maritime Lien Act therefore turns in this case on whether the TITAN is a "vessel." *See Lozman,* 133 S.Ct. at 745 ("A court's jurisdiction, *e.g.,* admiralty jurisdiction, may turn on application of the term 'vessel.' ").

A vessel is defined as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. **\*752** This includes "any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." *Stewart v. Dutra Constr. Co.,* 543 U.S. 481, 497, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005). The dispositive question is "whether the watercraft's use as a means of transportation on water is a practical possibility or merely a theoretical one." *Id.* at 496, 125 S.Ct. 1118 (internal quotation marks omitted).

We conclude that the district court did not err in concluding as a matter of law that the TITAN does not constitute a vessel based upon our prior precedent addressing similar structures. First, the TITAN is moored to the floor of the Outer Continental Shelf by twelve chain mooring lines connected to twelve anchor piles, each weighing 170 tons and each embedded over 200 feet into the seafloor, and by an oil and gas production infrastructure. *See Stewart,* 543 U.S. at 494, 125 S.Ct. 1118 ("[A] watercraft is not capable of being used for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement.") (internal quotations omitted); *see also Mendez v. Anadarko Petroleum Corp.,* 466 Fed.Appx. 316, 317 (5th Cir.2012) (unpublished) (concluding that similarly moored spar was not a vessel),[4] *cert. denied,* ––– U.S. ––––, 133 S.Ct. 979, 184 L.Ed.2d 760 (2013); *Fields v. Pool Offshore, Inc.,* 182 F.3d 353, 355 (5th Cir.1999) (same). Second, the TITAN has not been moved since it was constructed and installed at its current location in 2010. *See Lozman,* 133 S.Ct. at 741 (concluding that houseboat that had been moved only four times in seven years was not a vessel); *see also Mendez,* 466 Fed.Appx. at 317 (finding that spar that had been moored in one location for nine years was not a vessel). Third, the TITAN has no means of self-propulsion, apart from repositioning itself within a 200–foot range by manipulating its mooring lines. *See Fields,* 182 F.3d at 355, 359 (concluding that spar that had no means of self-propulsion, but could reposition itself within a 250–foot range by manipulating its mooring lines, had "extremely limited and purely incidental mobility" and was not a vessel). Fourth, moving the TITAN would require approximately twelve months of preparation, at least fifteen weeks for its execution, and would cost between $70 and $80 million. *See Mendez,* 466 Fed.Appx. at 319 (concluding that spar was not a vessel where relocating it would take nearly two months and would cost $42 million); *Moore v. Bis Salamis, Inc.,* 748

F.Supp.2d 598, 606 (E.D.Tex.2010) (same). In light of these characteristics, we agree with the district court that the TITAN is not practically capable of transportation on water and is therefore, as a matter of law, not a vessel.[5] *See Stewart,* 543 U.S. at 497, 125 S.Ct. 1118.

 **\*753** Finally, Superior sought a declaratory judgment that the TITAN is a vessel and that Superior has valid maritime liens against the TITAN. Because we conclude that the TITAN is not a vessel, Superior has failed to state a claim for declaratory relief.

AFFIRMED.

**All Citations**

551 Fed.Appx. 749, 2014 A.M.C. 2514

---

**Footnotes**

\*  Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

1  The only jurisdictional basis asserted for the state law claims was supplemental jurisdiction under 28 U.S.C. § 1367; Superior does not argue that the district court had original jurisdiction over the state law claims against the TITAN. With respect to its claims against ATP, Superior conceded in the district court that those claims relied upon TITAN's status as a vessel. Thus, if TITAN is not a vessel, Superior conceded that it does not have a claim against ATP. Before our court, it does not argue any basis for liability against TITAN or ATP that does not turn on the classification of the TITAN as a vessel or not.

2  Superior argues that the district court erred in denying its motion for leave to file a sur-reply because ATP and the TITAN raised new arguments in their reply addressing a recently decided case, *Lozman v. City of Riviera Beach, Florida,* ––– U.S. ––––, 133 S.Ct. 735, 184 L.Ed.2d 604 (2013). However, "[s]urreplies are heavily disfavored by courts." *Weems v. Hodnett,* No. 10–CV–1452, 2011 WL 2731263, at \*1 (W.D.La. July 13, 2011). The district court did not abuse its discretion in denying Superior leave to file a sur-reply, especially as Superior had previously addressed *Lozman* in its memorandum in opposition.

3  We reject Superior's invitation to assume hypothetical jurisdiction in order to reach the merits. *See Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

4  Superior contends that the district court erred in relying on the unpublished opinion in *Mendez.* While *Mendez* is not "controlling precedent," it "may be [cited as] persuasive authority." *Ballard v. Burton,* 444 F.3d 391, 401 n. 7 (5th Cir.2006). Given the factual similarities between this case and *Mendez,* we agree with the district court that *Mendez* is persuasive.

5  In *Lozman,* the Supreme Court articulated a standard to be applied in "borderline cases where 'capacity' to transport over water is in doubt." 133 S.Ct. at 745. This is not a "borderline case." Application of the *Lozman* "reasonable observer" test would nonetheless lead to the same result, as, for the reasons already enumerated, no reasonable observer, looking to the TITAN's physical characteristics and activities, would consider it designed to a practical degree for water transportation. *See id.* at 741.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 4

2011 WL 2731263
Only the Westlaw citation is currently available.
United States District Court,
W.D. Louisiana,
Shreveport Division.

Tanya McLain WEEMS

v.

James David HODNETT, et al.

No. 10–CV–1452.
|
July 13, 2011.

**Attorneys and Law Firms**

Fred H. Sutherland, Law Office of Fred H. Suttherland, Shreveport, LA, for Tanya McLain Weems.

Edwin H. Byrd, III, Nichole Marie Cox, Pettiette Armand et al, Brian D. Landry, Paul J. Carmouche, Weems Schimpf et al, Shreveport, LA, William L. Stroud, Patrick R. Jackson, Bossier City, LA, Terrel J. Broussard, Montgomery Barnett et al, Baton Rouge, LA, for James David Hodnett, et al.

**MEMORANDUM ORDER**

MARK L. HORNSBY, United States Magistrate Judge.

*1 Before the court is Plaintiff's Motion for Leave to File Surreply. Doc. 38. Surreplies are heavily disfavored by courts. *See, e.g., Sosna v. Bank of America,* 2011 WL 1060966 (D.Kan.2011); *Tate v. Mail Contractors,* 2011 WL 1380016 (W.D.N.C.2011); *Glass v. Lahood,* 2011 WL 1930669 (D.D.C.2011); *Sims v. Paramount Gold and Silver Corp.,* 2010 WL 5364783 (D.Ariz.2010); *El Chico Restaurants v. Carroll,* 2010 WL 2697293 (N.D.Tex.2010); *Aslani v. Sparrow Health Systems,* 2009 WL 3711602 (W.D.Mich.2009); *Crane v. Memorial Hospital,* 2009 WL 742567 (D.Utah 2009).

This court's experience, shared by others in reported decisions, is that surreplies often amount to little more than a strategic effort by the nonmovant to have the last word on a matter. *See, e.g., In re Enron,* 465 F.Supp.2d 687 (S.D.Tex.2006); *Lacher v. West,* 147 F.Supp.2d 538 (N.D.Tex.2001). The fourth brief usually just repeats

arguments from the memorandum in opposition and serves only to delay resolution of the underlying motion. Accordingly, it is proper to deny a motion for leave to file a surreply where the party fails to demonstrate exceptional or extraordinary circumstances warranting the relief sought. *Starr v. Cox,* 2008 WL 1914286 (D.N.H.2008); *Lacher,* 147 F.Supp.2d at 539–40. In other words, in seeking leave to file a surreply brief, a party must identify the new issues, theories, or arguments which the movant raised for the first time in its reply brief. *Harwood v. U.S.,* 2009 WL 2215080 (S.D.W.Va.2009).

That should not happen often, because it is improper for the movant to sandbag and raise wholly new issues in a reply memorandum. The scope of the reply should be limited to addressing the arguments raised by the memorandum in opposition. *Petty v. Portofino Council of Coowners, Inc.,* 702 F.Supp.2d 721, 729 n. 3 (S.D.Tex.2010). "[A]rguments raised for the first time in a Reply brief are waived." *Jones v. Cain,* 600 F.3d 527, 541 (5th Cir.2010), quoting *Iteld, Bernstein & Assocs., LLC v. Hanover Ins. Group,* 2009 WL 2496552, *4 (E.D.La.2009).

Plaintiff's motion for leave sets forth no justification for filing the surreply, other than to note that when he filed the surreply (which was improperly contained within another memorandum), the clerk issued a Notice of Deficiency. That does not articulate the type of exceptional or extraordinary circumstances, that happen perhaps only a few times in a lawyer's career, that most courts require to allow the filing of a surreply. Accordingly, Plaintiff's Motion to File Surreply (Doc. 38) is denied.

A surreply was virtually unheard of in this division for many years. Leave to file one was requested no more than a couple of times each year, and then usually in extraordinarily complex litigation. In the past two years or so, however, there has been an explosion of requests to file surreplies, usually in a most ordinary case and where there is no real need to file a fourth brief, only a desire except to have the last word. Some lawyers appear to believe that surreplies are common and almost expected, but that is certainly not the case. Local Rules 7.4 and 7.5 govern the briefing of motions, and they do not even provide for the filing of a reply brief. Accordingly, some judges do not allow a reply brief to be filed without leave of court, and requests for leave are frequently denied. Other judges, including the undersigned, provide in the Notice of Motion Setting that a movant may file a reply without leave of court. (The mounting requests to file surreplies may lead

to reconsideration of that policy.) No rule or notice employed in this division permits the filing of a surreply.

 **\*2**  The trend has reached the point that some "must have the last word" lawyers have even sought leave to file a *fifth* brief (the name for which has not yet been settled upon by the bar) to respond to a surreply. This must stop. The undersigned will no longer grant leave to file a surreply unless the requesting party points out the wholly new issues in the reply that demand a response or otherwise articulates exceptional or extraordinary circumstances.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2731263

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 5

Civelli v. J.P. Morgan Chase Securities, LLC, Slip Copy (2023)

2023 WL 2825702

2023 WL 2825702
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas.

Carlo Giuseppe CIVELLI, et al., Plaintiffs,

v.

J.P. MORGAN CHASE
SECURITIES, LLC, et al., Defendants.

Civil Action H-173739
|
Signed February 2, 2023

**Attorneys and Law Firms**

Richard Schwartz, Elizabeth Frances Eoff, Fred Wahrlich, Munsch Hardt Kopf & Harr, P.C., Houston, TX, Heather A. Kabele, Kane Russell Coleman Logan, PC, Houston, TX, Michael B. Martin, Martin Walton Law Firm, Friendswood, TX, Randall Wilson Miller, Munsch Hardt Kopf and Harr, Dallas, TX, for Plaintiff Carlo Giuseppe Civelli.

Richard Schwartz, Elizabeth Frances Eoff, Fred Wahrlich, Munsch Hardt Kopf & Harr PC, Houston, TX, Michael B. Martin, Martin Walton Law Firm, Friendswood, TX, Randall Wilson Miller, Munsch Hardt Kopf and Harr, Dallas, TX, for Plaintiff Aster Capital S. A. (LTD) Panama.

David H. Berg, Berg & Androphy, Houston, TX, Bronwyn M. James, Kaplan Rice LLP, New York, NY, Chris L. Sprengle, Berg & Associates, PC, New York, NY, Emily Burgess, Berg & Androphy, New York, NY, Jenny H. Kim, Lauren Michelle Goldman, Lindsey Ruff, Michael Matthew Fay, Boies Schiller Flexner LLP, New York, NY, for Defendants Phillip Emanuel Mulacek, Michelle Mulacek Vinson, Pierre Mulacek, Mauricette Mulacek, Ronald Mulacek.

Kyle Robert Watson, Winstead PC, The Woodlands, TX, for Defendants Dossey & Jones, PLLC, James Dossey.

Order on Motion to Compel, Motion for Leave

Lynn N. Hughes, United States District Judge

**\*1** The Mulacek Defendants have filed an emergency motion to compel compliance with the Court's computer forensic protocol. In opposing this motion, the Civelli

Plaintiffs have requested leave to file a sur-reply to the Mulacek Defendants' reply.

*1. Leave to File Sur-Reply*

While the Federal Rules of Civil Procedure and this Court's Local Rules do not expressly prohibit sur-replies, they are heavily disfavored.[1] Whether to allow a sur-reply is within the discretion of the district court, and is appropriate "only when the movant raises new legal theories or attempts to present new evidence at the reply stage,"[2] Leave is to be denied where the proposed sur-reply merely restates arguments in the movant's response and appears to be only a "strategic effort ... to have the last word on the matter."[3]

The Mulacek Defendants' reply did not raise new legal contentions. It was a continuation of the parties' dispute over the scope of the forensic protocol and addressed the arguments made in the Civelli Plaintiffs' response. In consideration of the present dispute, even if the reply raised some consideration that was not in the response, it cannot be said to fall outside the scope of the legal arguments at issue in the response. The sur reply is denied.

*2. Forensic Protocol*

The parties dispute whether the results of the forensic process, namely the results of a search of the unallocated space, would be delivered to both parties. While the Civelli Plaintiffs argue that nothing requires a review for privilege before they obtain access to the results, such an interpretation would contravene the text and purpose of the protocol.

The Civelli Plaintiffs have offered unconvincing support for their proposition that the parties agreed to give them information that may be privileged, before any review by the Mulacek Defendants. While perhaps the Mulacek Defendants may have been mistaken in having believed that the January Code Production would be undecipherable, such mistake is no reason to contravene the letter and spirit of the protocol, which explicitly affords relevant search results first to the Mulacek Defendants for a review of privilege.[4] The Civelli Plaintiffs would have the Court accept that the Mulacek Defendants knowingly consented to blanket access, even to privileged information. This argument is ambitious but without support, and is denied. The Civelli Plaintiffs must delete the January Code Production and permit the Mulacek Defendants to first conduct a proper review of the data.

2023 WL 2825702

### 3. Adequacy of the Privilege Assertion

The Federal Rules instruct that when a party withholds otherwise discoverable information on the basis of privilege, the party must expressly make the claim and describe the nature of the discovery in a manner that will enable other parties to assess the claim, including the basis for it.[5]

**\*2** As the Mulacek Defendants have pointed out, they informed the Civelli Plaintiffs that the privileged communication is one "between counsel and our clients that is providing legal advice."[6] This description, however, is too generic. Moving forward, after conducting a confidentiality review, the Mulacek Defendants may withhold confidential information but must sufficiently describe the nature of that information. At that time, the Civelli Plaintiffs, if still unsatisfied with the assertion of privilege, "may promptly present the information to the court under seal for a determination of the claim."[7]

### 4. Data Carving vs. Underlying Data

In rejecting the Civelli Plaintiffs' sur-reply, the Court will clarify and resolve a contention in the sur-reply, to which the Mulacek Defendants responded, because its resolution is necessary in this discovery dispute. The dispute concerns whether the Civelli Plaintiffs, privilege aside, may review the code from the allocated space on the basis that data carving is insufficient; they claim that they must examine the data itself, since data carving may not necessarily show a fragment of a different version or draft of the Letter of Wishes.

The Mulacek Defendants oppose this search on the basis that the protocol is limited to "reasonably accessible documents" and does not allow for the fragments of text in computer code. They also argue that review of the code "would add hundreds -

if not thousands – of hours to the Letter of Wishes discovery," and would confuse a jury.[8]

Without getting into whether the fragments are "reasonably accessible," the Court agrees that a raw review of the data itself would impose a disproportionate amount of discovery. The Civelli Plaintiffs accuse the Civelli Defendants of nefarious play, an allegation that is thus far wholly unsubstantiated. The Mulacek Defendants and the Court have indulged what may well be a wild goose chase, and the data carving affords the Civelli Plaintiffs ample opportunity to discover foul play. To drastically expand discovery on this issue and prolong what has already been an extremely lengthy litigation, at great cost to the parties, on the grounds that a review of the code itself might possibly uncover something that the data carving missed, is too much. In considering the Rule 26(b) (1) factors, the Court concludes that the Letter of Wishes discovery does not extend to the review of the computer code itself.

### 5. Conclusion

In sum, the Mulacek Defendants' motion to compel is granted, and the Civelli Plaintiffs' request for leave to file a sur-reply is denied. The Civelli Plaintiffs must delete the January Code Production and permit the Mulacek Defendants to first conduct a proper review of the data, at which time the Mulacek Defendants must adequately describe the nature of any privilege assertions so that the Civelli plaintiffs can assess the claim. The review of the discovery at issue extends only to the carved documents, and not to the computer code itself. (750) (760)

**All Citations**

Slip Copy, 2023 WL 2825702

---

Footnotes

1    *Warrior Energy Servs. Corp. v. ATP Titan M/V*, 551 F. App'x 749, 751 n.2 (5th Cir. 2014) (per curiam) (quoting *Weems v. Hodnett*, No. 10-CV-1452, 2011 WL 2731263, at \*1 (W.D. La. July 13, 2011)).

2    *Makhlou v. Tailored Brands, Inc.*, 2017 WL 10922311, at \*5 (S.D. Tex. Mar. 23, 2017) (collecting authority).

3    *Weems*, 2011 WL 2731263, at \*1.

4    *See* [Doc. 625–1]

5    Fed. R. Civ. P. 26(b) (5).

**Civelli v. J.P. Morgan Chase Securities, LLC, Slip Copy (2023)**

2023 WL 2825702

6       [Doc. 750-3] at 4.

7       Fed. R. Civ. P. 26(b)(5)(B).

8       [Doc. 762] at 3–4.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S.
Government Works.

---

Exhibit 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, ET AL.; | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| *vs.* | ) | Case No. 1:18-cv-00068 |
| | ) | |
| UNITED STATES OF AMERICA, ET AL.; | ) | |
| | ) | |
| *Defendants,* | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| KARLA PEREZ, ET AL.; | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| *Defendants-Intervenors.* | ) | |
| | ) | |

## PLAINTIFFS' SECOND AMENDED RESPONSES TO
## DEFENDANT-INTERVENORS' SECOND SET OF DISCOVERY REQUESTS

TO:   Defendant-Intervenors, by and through their attorneys of record, Nina Perales, Mexican American Legal Defense and Educational Fund, 110 Broadway, Suite 300, San Antonio, Texas 78205; Carlos Moctezuma García, García & García, Attorneys at Law P.L.L.C., P.O. Box 4545, McAllen, Texas 78502.

Plaintiff States serve these second amended responses to Defendant-Intervenors' second set of interrogatories and requests for production of documents pursuant to the Federal Rules of Civil Procedure.

August 7, 2019

STEVE MARSHALL
Attorney General of Alabama

LESLIE RUTLEDGE
Attorney General of Arkansas

JEFF LANDRY
Attorney General of Louisiana

DOUGLAS J. PETERSON
Attorney General of Nebraska

ALAN WILSON
Attorney General of South Carolina

PATRICK MORRISEY
Attorney General of West Virginia

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN BANGERT
Deputy Attorney General for Legal Counsel

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Attorney-in-Charge
Trial Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

ADAM ARTHUR BIGGS
Special Counsel for Civil Litigation

**COUNSEL FOR PLAINTIFF STATES**

## CERTIFICATE OF SERVICE

I certify that on August 7, 2019, I served a copy of this document by electronic mail to all counsel listed below:

Nina Perales
Mexican American Legal Defense and Educational Fund
110 Broadway
Suite 300
San Antonio, Texas 78205
nperales@maldef.org

Jeffrey S. Robins
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868
Washington, D.C. 20044
Jeffrey.Robins@usdoj.gov

Glenn Moramarco
Office of the Attorney General of New Jersey
25 Market Street, 8th Floor
Trenton, New Jersey 08625
Glenn.Moramarco@law.njoag.gov

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Trial Counsel for Civil Litigation
Office of the Attorney General of Texas

**COUNSEL FOR PLAINTIFF STATES**

**INTERROGATORY NO. 4:**

Identify all costs that Plaintiffs, by state and year, have incurred since June 2012 or expect to incur in the future, with respect to providing goods, support and/or services to DACA recipients living in Plaintiff states. With respect to each cost identify:

a.    the category of the cost;

b.    the amount of the cost;

c.    whether Plaintiff states have paid the cost;

d.    the anticipated amount of future costs;

e.    the complete factual basis for asserting and computing the above costs; and

f.    all information, documents or other evidentiary material on which such assertions and computations are based.

**RESPONSE:**

Plaintiff States have incurred costs to provide goods, support, and/or services to DACA recipients living in Plaintiff States. Plaintiff States incorporate into this response the discussion of their costs contained in their complaint, briefing on their motion for preliminary injunction, the briefing on their motion for summary judgment, and the exhibits attached thereto. For example, Texas has spent more than $375,000,000 over the past eleven years providing emergency Medicaid services to unlawfully present aliens, which encompasses DACA recipients. ECF No. 7 at 28; ECF No. 319 at 48. One of the Defendant-Intervenors' experts, Ray Perryman, opined that Texas incurs more than $250,000,000 in total direct costs from DACA recipients per year. ECF No. 219, Ex. 1 at 4. It is also virtually certain that at least some DACA recipients in Texas—totaling over 125,000 as of September 2017—utilize the emergency Medicaid services throughout the State. ECF No. 319 at 51; ECF No. 1, Ex. 2 at 2. A survey conducted by one of the Defendant-Intervenors' other experts shows that 43% of DACA recipients are not covered by employer-based, private health insurance, meaning this percentage of DACA recipients is likely reliant on emergency Medicaid and community-based uncompensated care. ECF No. 319 at 51; ECF No. 225, Ex. 3 at 121. Alabama and Arkansas are able to estimate DACA-specific emergency Medicaid expenditures, as detailed at STATES000261–64 and STATES000267–69. Additionally, Alabama incurs a cost to provide driver's licenses to DACA recipients. *See* STATES000255–56. Plaintiff States have already produced documents responsive to this interrogatory. *See* STATES0001–000254.

Beyond the evidence attached to their complaint, motion for preliminary injunction, motion for summary judgment, and referenced above, Plaintiff States do not keep the requested information in the manner in which it is sought and cannot compile the information without first being provided the names of and identifying information for DACA recipients. The declarations produced at STATES000255 to STATES000323 are incorporated into this response.

**INTERROGATORY NO. 5:**

Identify the number of DACA recipients living in Plaintiff states, by state and year, since June 2012. For each Plaintiff state, please identify:
   a.   the manner in which you determined the number of DACA recipients;
   b.   the manner in which you determined the individuals are DACA recipients;
   c.   the documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient;
   d.   the number of DACA recipients who attend public colleges or universities;
   e.   the number of DACA recipients who attend public K-12 schools;
   f.   the number of DACA recipients who are unaccompanied children (UAC);
   g.   the number of DACA recipients who have received health care not compensated by the patient or an insurer.

**RESPONSE:**

According to Douglas S. Massey, there are 814,000 people registered for DACA. ECF No. 225, Ex. 73 at 7. According to Ray Perryman, there were 693,850 persons across the country enrolled in DACA as of March 31, 2018. ECF No. 225, Ex. 74 at 6. A chart showing the number of DACA applications that originated in each State can be found at Exhibit 2 of Plaintiff States' Original Complaint. ECF No. 1, Ex. 2 at 2. Another can be found at Exhibit 2 of Plaintiff States' Motion for Summary Judgment. ECF No. 358-2. Yet another can be found at Exhibit 62-G of DACA Intervenors' Response to Plaintiff States' Motion for Summary Judgment. ECF No. 400-9 at 186–87.

Beyond the evidence attached to their complaint, motion for preliminary injunction, and motion for summary judgment, Plaintiff States do not keep the requested information in the manner in which it is sought and cannot compile the information without first being provided the names of and identifying information for DACA recipients. The relevant declarations related to education and health care produced at STATES000255 to STATES000323 are incorporated into this response.

**INTERROGATORY NO. 6:**

Identify the number of unaccompanied children (UAC)[1] living in Plaintiff states, by state and year, since June 2012. For each Plaintiff state, please identify:

a.   the total number of UAC;

b.   the total number of UAC who attend public K-12 schools;

c.   the total number of UAC who attend public colleges or universities;

d.   the amount of K-12 education costs each state incurs on UAC;

e.   the amount of higher education costs each state incurs on UAC;

f.   whether Plaintiff states have paid the cost;

g.   the anticipated amount of future costs;

h.   complete factual basis for asserting and computing the above costs; and

i.   all information, documents or other evidentiary material on which such assertions and computations are based.

**RESPONSE:**

Beyond the evidence attached to their complaint, motion for preliminary injunction, and motion for summary judgment, Plaintiff States do not keep the requested information in the manner in which it is sought and cannot compile the information without first being provided the names of and identifying information for UACs. The relevant declarations related to education produced at STATES000255 to STATES000323 are incorporated into this response.

---

[1] The term "unaccompanied children" can refer to the broader category of any children not in the physical custody of a parent or guardian. For purposes of their response, Plaintiffs assume that this interrogatory seeks information regarding "unaccompanied alien children."

**INTERROGATORY NO. 7:**

Identify Plaintiff states' expenditures, by state and year, to provide Emergency Medicaid Services to DACA recipients since June 2012. For each Plaintiff state, please identify:

   a.   the manner in which you determined the number of DACA recipients who receive Emergency Medicaid services;

   b.   the manner in which you determined the individuals are or were DACA recipients; and

   c.   all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient.

**RESPONSE:**

Plaintiffs incorporate into this response their complaint, the briefing on their motion for preliminary injunction, the briefing on their motion for summary judgment, and the exhibits attached to and cited in those documents, which identify costs that Plaintiffs have incurred in providing Emergency Medicaid services. Texas alone has spent more than $375,000,000 over the past eleven years providing Emergency Medicaid services to unlawfully present aliens, including DACA recipients. ECF No. 7 at 28; ECF No. 319 at 48. It is also virtually certain that at least some DACA recipients in Texas—totaling over 125,000 as of September 2017—utilize the emergency Medicaid services throughout the State. ECF No. 319 at 51; ECF No. 1, Ex. 2 at 2. In addition, a survey conducted by one of the Defendant-Intervenors' experts shows that 43% of DACA recipients are not covered by employer-based, private health insurance, meaning this percentage of DACA recipients are likely reliant on emergency Medicaid and community-based uncompensated care. ECF No. 319 at 51; ECF No. 225, Ex. 3 at 121. 2016 NHIS data indicates that DACA-type adults who are not working have a 19 percent probability of using emergency room care. ECF No. 319 at 51 (citing Declaration of Leighton Ku ¶ 50). Alabama and Arkansas are able to estimate DACA-specific emergency Medicaid expenditures, as detailed at STATES000261–64 and STATES000267–69.

Beyond the evidence attached to their complaint, motion for preliminary injunction, motion for summary judgment, and referenced above, Plaintiff States do not keep the requested information in the manner in which it is sought and cannot compile the information without first being provided the names of and identifying information for DACA recipients. The relevant declarations related to health care produced at STATES000255 to STATES000323 are incorporated into this response.

**INTERROGATORY NO. 8:**

Identify Plaintiff states' expenditures, by year, to provide benefits under the Texas Children's Health Insurance Program (CHIP) Perinatal Coverage program to DACA recipients since 2012 and identify:

      a.     the manner in which you determined the number of DACA recipients who receive benefits under the CHIP Perinatal Coverage program;

      b.     the manner in which you determined the individuals are or were DACA recipients; and

      c.     all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient.

**RESPONSE:**

     Plaintiffs incorporate into this response their complaint, the briefing on their motion for preliminary injunction, the briefing on their motion for summary judgment, and the exhibits attached to and cited in those documents, which identify costs that Plaintiffs have incurred in providing Texas Children's Health Insurance Program services to unlawfully present aliens, including DACA recipients.

     Other States do not provide benefits under the Texas Children's Health Insurance Program (CHIP) Perinatal Coverage program. Beyond the evidence attached to their complaint, motion for preliminary injunction, and motion for summary judgment, Texas does not keep the requested information in the manner in which it is sought and cannot compile the information without first being provided the names of and identifying information for DACA recipients. The declaration produced at STATES000312 to STATES000313 is incorporated into this response.

**INTERROGATORY NO. 9:**

Identify Plaintiff states' expenditures, by year, to provide benefits under Texas's Family Violence Program to DACA recipients since 2012 and identify:

    a.     the manner in which you determined the number of DACA recipients who receive benefits under Texas's Family Violence Program;

    b.     the manner in which you determined the individuals are or were DACA recipients; and

    c.     all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient.

**RESPONSE:**

    Plaintiffs incorporate into this response their complaint, the briefing on their motion for preliminary injunction, the briefing on their motion for summary judgment, and the exhibits attached to and cited in those documents, which identify costs that Plaintiffs have incurred in providing Texas Family Violence Program services to unlawfully present aliens, including DACA recipients.

    Other States do not provide benefits under the Texas Family Violence Program. Beyond the evidence attached to their complaint, motion for preliminary injunction, and motion for summary judgment, Texas does not keep the requested information in the manner in which it is sought and cannot compile the information without first being provided the names of and identifying information for DACA recipients. The declaration produced at STATES000312 to STATES000313 is incorporated into this response.

**INTERROGATORY NO. 10:**

Identify each and every incident in Plaintiff states, by state and year, in which you contend that a DACA recipient was involved in the commission of a crime since 2012. For each such incident, please identify:

    a.    the name of the DACA recipient;

    b.    all information, documents or other evidentiary material upon which you rely to support the conclusion that each such individual is a DACA recipient;

    c.    the crime which the DACA recipient was charged;

    d.    the court in which the DACA recipient was prosecuted;

    e.    whether the DACA recipient was convicted, and if so, of what crime or crimes; and

    f.    any information, documents or other evidentiary material related to the alleged crime, the identity of the victim or victims, and the conviction, if any.

**RESPONSE:**

Beyond the evidence attached to their complaint, motion for preliminary injunction, and motion for summary judgment, Plaintiff States do not keep the requested information in the manner in which it is sought and cannot compile the information without first being provided the names of and identifying information for DACA recipients. The relevant declarations related to law enforcement produced at STATES000255 to STATES000323 are incorporated into this response.

**INTERROGATORY NO. 11:**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and crime in any of the Plaintiff states, by state, or in any other part of the United States since June 2012. For any such study or report, please identify:

      a.    the date you requested it;
      b.    the date you obtained it;
      c.    the author(s);
      d.    the person or entity who commissioned it;
      e.    the person or entity who paid for or is responsible for paying for it; and

**RESPONSE:**

    Plaintiffs incorporate into this response their complaint, the briefing on their motion for preliminary injunction, the briefing on their motion for summary judgment, and the exhibits attached to and cited in those documents, which identify costs that Plaintiffs have incurred in providing law-enforcement services related to unlawfully present aliens, including DACA recipients.

    Beyond the evidence attached to their complaint, motion for preliminary injunction, and motion for summary judgment, Plaintiff States do not keep the requested information in the manner in which it is sought and cannot compile the information without first being provided the names of and identifying information for DACA recipients. The relevant declarations related to law enforcement produced at STATES000255 to STATES000323 are incorporated into this response.

11

**INTERROGATORY NO. 12:**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and the cost, benefit, and/or the quality of education to residents in Plaintiff states, by state, since June 2012. For any such study or report, please identify:

      a.      the date you requested it;

      b.      the date you obtained it;

      c.      the author(s);

      d.      the person or entity who commissioned it; and

      e.      the person or entity that paid for or is responsible for paying for it.

**RESPONSE:**

Plaintiff States incorporate into this response their complaint, the briefing on their motion for preliminary injunction, the briefing on their motion for summary judgment, and the exhibits attached to and cited in those documents, which identify costs that Plaintiffs have incurred in providing education to unlawfully present aliens, including DACA recipients. Plaintiffs also refer Defendant-Intervenors to their response to Interrogatory No. 4 identifying certain costs incurred by Texas in providing healthcare services to unlawfully present aliens.

Plaintiff States also note that the continued existence of DACA compels states like Texas to expend funds, including in education, that it would not otherwise be compelled to spend. For instance, many DACA recipients and several of the Defendant-Intervenors went to public school in Texas, each of which costs the State of Texas thousands of dollars per year. ECF No. 319 at 106–107.

Beyond the evidence attached to their complaint, motion for preliminary injunction, and motion for summary judgment, Plaintiff States do not keep the requested information in the manner in which it is sought and cannot compile the information without first being provided the names of and identifying information for DACA recipients. The relevant declarations related to education produced at STATES000255 to STATES000323 are incorporated into this response.

**INTERROGATORY NO. 12:**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and the cost, benefit, and/or the quality of healthcare services to residents in Plaintiff states, by state since June 2012. For any such study or report, please identify:

      a.     the date you requested it;

      b.     the date you obtained it;

      c.     the author(s);

      d.     the person or entity who commissioned it; and

      e.     the person or entity that paid for or is responsible for paying for it.

**RESPONSE:**

     Plaintiffs incorporate into this response their complaint, the briefing on their motion for preliminary injunction, the briefing on their motion for summary judgment, and the exhibits attached to and cited in those documents, which identify costs that Plaintiffs have incurred in providing healthcare services to unlawfully present aliens, including DACA recipients. Plaintiffs also refer Defendant-Intervenors to their response to Interrogatory No. 4 identifying certain costs incurred by Texas in providing healthcare services to unlawfully present aliens.

     Beyond the evidence attached to their complaint, motion for preliminary injunction, and motion for summary judgment, Plaintiff States do not keep the requested information in the manner in which it is sought and cannot compile the information without first being provided the names of and identifying information for DACA recipients. The relevant declarations related to health care produced at STATES000255 to STATES000323 are incorporated into this response.

**INTERROGATORY NO. 13:**

Identify each study or report that you prepared, obtained or requested on the correlation, if any, between DACA recipients and the cost, benefit, and/or the quality of law enforcement services to residents in Plaintiff states, by state, since June 2012. If so, for each study or report, please identify:
  a. the date you requested it;
  b. the date you obtained it;
  c. the author(s);
  d. the person or entity who commissioned it; and
  e. the person or entity that paid for or is responsible for paying for it.

**RESPONSE:**

Plaintiffs incorporate into this response their complaint, the briefing on their motion for preliminary injunction, the briefing on their motion for summary judgment, and the exhibits attached to and cited in those documents, which identify costs that Plaintiffs have incurred in providing law enforcement services to unlawfully present aliens, including DACA recipients.

Beyond the evidence attached to their complaint, motion for preliminary injunction, and motion for summary judgment, Plaintiff States do not keep the requested information in the manner in which it is sought and cannot compile the information without first being provided the names of and identifying information for DACA recipients. The relevant declarations related to law enforcement produced at STATES000255 to STATES000323 are incorporated into this response.

**INTERROGATORY NO. 14:**

For each interrogatory, identify each person answering the interrogatory, supplying any information relied upon in answering the interrogatory, or assisting in any manner with the preparation of answering the interrogatory.

**RESPONSE:**

The declarations produced at STATES000255 to STATES000323 identify the non-privileged response to this interrogatory.

**INTERROGATORY NO. 15:**

Identify each employer who hired a DACA recipient instead of a U.S. citizen because of the employer penalty pursuant to The Patient Protection and Affordable Care Act.

**RESPONSE:**

Plaintiffs incorporate into this response their complaint, the briefing on their motion for preliminary injunction, the briefing on their motion for summary judgment, and the exhibits attached to and cited in those documents. The implementation of DACA has injured the economic well-being of citizens of Texas, as these citizens are forced to compete in distorted labor markets making it more difficult for citizens to obtain a job. This is supported by the fact that DACA recipients receive work authorization under the program, adding 683,000 individuals nationwide and 112,000 individuals in Texas to the labor market. ECF No. 319 at 38; ECF No. 7, Ex. 11 at 92. DACA recipients also have a competitive advantage over non-DACA individuals being hired by employers with fifty or more employees, as the employers do not have to pay the cost of providing coverage to the DACA recipient, yet the employer has to do so for non-DACA employees. ECF No. 319 at 39. One of Defendant-Intervenor New Jersey's experts, Ike Brannon, bolstered this theory in saying that low-skilled DACA recipients "would increase competition with other people who are citizens who are also competing for low skilled jobs." ECF No. 319 at 39; ECF No. 289, Ex. 3 at 141.

The record in this case has also shown that some DACA recipients have been selected over other candidates for highly competitive positions. ECF No. 319 at 39. For instance, Defendant-Intervenor Esther Jeon was selected over other applicants for positions in Harvard University's Financial Aid Initiative and its Office of Equity, Diversity, and Inclusion. ECF No. 219, Ex. 19 at 5-6. Many businesses have indicated to the Court they would hire non-DACA employees if the program ended, as they would have to fill positions now occupied by DACA recipients. ECF No. 319 at 39; ECF No. 204, Ex. 1 at 18. In addition, New Jersey businesses informed the Court they would face an estimated $6.3 billion in costs to replace DACA recipients if they were to lose their DACA status. ECF No. 204, Ex.1 at 18. This market imbalance undoubtedly supports Plaintiff States' claim that an injury to the economic well-being of citizens and other lawfully present workers exists, and the economic well-being of the Plaintiff States' residents is a quasi-sovereign interest sufficient to support standing. ECF No. 319 at 40.

Beyond the evidence attached to their complaint, motion for preliminary injunction, and motion for summary judgment, Plaintiff States do not keep the requested information in the manner in which it is sought and cannot compile the information without first being provided the names of and identifying information for DACA recipients.

**REQUEST FOR PRODUCTION NO. 2:**

Please produce each document or other evidentiary material you identified in any of your responses to Defendant-Intervenors' Interrogatories Nos. 4-15.

**RESPONSE:**

Plaintiffs refer Defendant-Intervenors to the documents attached to and cited in the complaint, motion for preliminary injunction, motion for summary judgment, and the documents already produced to Defendant-Intervenors. The declarations produced at STATES000255 to STATES000323 are incorporated into this response.

Exhibit 7

481 Fed.Appx. 969

This case was not selected for
publication in West's Federal Reporter.

See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.

United States Court of Appeals, Fifth Circuit.

Richard WINFREY, Jr., Plaintiff–Appellant

v.

SAN JACINTO COUNTY; James Walters, San
Jacinto County Sheriff; Lacy Rogers, Former
San Jacinto County Sheriff; Lenard Johnson,
Former San Jacinto County Sheriff; Grover
Huff, Texas Ranger; Ronald Duff, Texas
Ranger; Fort Bend County; Milton Wright, Fort
Bend County Sheriff; Keith Pikett, Former Fort
Bend County Sheriff, Defendants–Appellees.

No. 11–20555
|
July 27, 2012.

**Synopsis**

**Background:** Arrestee who spent more than two years
in jail charged with capital murder before jury acquitted
him brought § 1983 civil rights action against county and
state law enforcement personnel alleging violation of due
process rights, failure of supervisors to supervise and train
investigators, failure to intervene and stop other personnel
from violating his rights, and conspiracy to violate his
constitutional rights. After limited discovery, county and law
enforcement personnel moved for summary judgment and
arrestee requested additional discovery. The United States
District Court for the Southern District of Texas, Lynn N.
Hughes, J., 2011 WL 2680771, granted summary judgment
for all defendants, and arrestee appealed.

**Holdings:** The Court of Appeals, Haynes, Circuit Judge, held
that:

individual liability § 1983 claims failed as to state rangers
and county sheriffs and deputy who were not objectively

unreasonable in seeking assistance from canine handler who
was ostensible expert in scent-related evidence and so were
entitled to qualified immunity;

official liability § 1983 claims failed as to county, sheriff, and
deputy in official capacities; but

fact issue existed as to whether handler used procedures to
cheat in scent line-up so as to preclude summary judgment on
basis of qualified immunity for handler on § 1983 claims; and

search and arrest affidavits contained material falsehood and
omitted irregularities casting doubt on jailhouse informant's
story and likely violated Fourth Amendment, and so arrestee
was entitled to additional discovery into mental state of sheriff
and deputy who executed affidavits with respect to whether
they were entitled to qualified immunity for those actions.

Affirmed in part, reversed in part, vacated, and remanded.

**Attorneys and Law Firms**

**\*971** Gayle M. Horn, Esq., Elizabeth Wang, Esq., Loevy &
Loevy, Chicago, IL, for Plaintiff–Appellant.

James Arthur Price, Jr., Olson & Olson, L.L.P., Houston,
TX, Shanna Elizabeth Molinare, Assistant Attorney General,
Demetri Anastasiadis, Assistant Attorney General, Office
of the Attorney General, Austin, TX, Randall Weaver
Morse, Assistant County Attorney, County Attorney's Office,
Richmond, TX, for Defendants–Appellees.

Appeal from the United States District Court for the Southern
District of Texas, USDC No. 4:10–CV–1896.

Before KING, HIGGINBOTHAM, and HAYNES, Circuit
Judges.

**Opinion**

HAYNES, Circuit Judge:[*]

Plaintiff–Appellant Richard Winfrey, Jr., appeals from the
district court's grant of summary judgment on qualified
immunity grounds in favor of Defendants–Appellees, a
number of state actors sued in their individual and official
capacities for alleged civil rights violations stemming from
a murder investigation of Winfrey and his family. For the
reasons that follow, we AFFIRM in part, REVERSE in part,

VACATE in part, and REMAND for proceedings consistent with this opinion.

## I. Facts and Procedural History

In August 2004, Murray Wayne Burr was found murdered in his San Jacinto County home. The crime scene was grisly. Officers followed a blood trail from the front room of the house, through the kitchen, and into a bedroom, where they found Burr's body. He had been stabbed over two dozen times and had suffered a number of other injuries, including a slit throat. There were no signs of forced entry.

 **\*972** Then–San Jacinto County Sheriff Lacy Rogers, and his deputy, Lenard Johnson, initially investigated. Rogers decided to call the Texas Rangers for assistance, and they assigned Ronald Duff and Grover Huff (the "Rangers") to the case. Huff brought in Keith Pikett, a canine handler and ostensible expert in scent-related evidence then working as a Fort Bend County deputy.

The investigation soon focused on the Winfrey family, who lived a few miles away. The Winfreys knew Burr. Winfrey and his sister, Megan, attended a school where Burr worked as a janitor. They sometimes visited Burr's home.

A few weeks after the murder, Pikett conducted a "scent line-up" using two of his bloodhounds and scent samples obtained from Winfrey and Megan. In the scent line-up, Pikett "scented" the bloodhounds on an item taken from the crime scene and then walked the dogs down a line of six cans, each containing a gauze "scent pad." According to Pikett, both dogs alerted to the can containing Winfrey's scent; Winfrey contends that Pikett cued his dogs.

The cans were then refreshed with another set of scent pads, including a scent pad obtained from Megan. The dogs alerted on the can containing Megan's scent. The scent pads were again replaced, this time introducing a scent pad from a suspect ultimately excluded by DNA evidence. The bloodhounds failed to alert during their final walkthroughs.

Pikett then conducted a "drop trailing" exercise. Starting at the crime scene, Huff scented the bloodhounds with what he believed was a scent sample taken from Winfrey. The dogs then followed the scent from Burr's house to the Winfrey residence. Huff later informed Pikett that he mistakenly had

scented the dogs with a sample taken from Christopher Hammond, Megan's boyfriend.

Hammond denied having ever been at the crime scene, and the bloodhounds had not alerted during the scent line-up to a sample taken from him. Huff, however, observed that Hammond had a cut on his face and discovered a stain on Hammond's shoe-strings that later tested positive for blood. The investigators were unable to obtain a DNA sample from the blood stain and continued investigating the Winfreys.

Sheriff Rogers later used the scent line-up and drop-trail results to obtain a search warrant for samples of Megan's hair. Rogers failed to disclose the use of Hammond's scent pad, stating instead that the drop-trail was conducted "using the scent pad from" Winfrey. Winfrey and Megan cooperated in the collection of DNA. Forensic evidence taken from the crime scene, including hairs and fingerprints, excluded the Winfreys. The investigation stalled.

Almost two years later, David Campbell, an inmate at the Montgomery County Jail, told a jailer that he had information about Burr's murder. At the time, Richard Winfrey, Sr. ("Senior"), was an inmate at the jail and shared the same "tank" as Campbell. It was not the first time Senior had been in prison; he had been released from custody shortly before Burr's death. Campbell apparently harbored some unspecified animosity towards Senior; Senior's sister later apologized to Campbell for Senior's having "treated [him] like crap."

Deputy Johnson first visited Campbell alone. According to Johnson's June 2006 Report, Campbell claimed that Senior had admitted to killing Burr by beating him and cutting open his neck, an accurate description of Burr's injuries. Senior also allegedly told Campbell that he had cut off Burr's penis and "placed it in Burr's mouth," but Burr had not been so mutilated. Senior also gave a motive for the **\*973** murder: that Burr had molested one of the Winfrey children. Senior allegedly "had his kids help him get into Burr's house," where they remained during the crime.

About a month later, Johnson visited Campbell again, accompanied by Rogers. Campbell's story changed on this visit. Although he maintained that Senior admitted to killing Burr, Campbell now claimed that Senior "had stabbed and shot" Burr. There is no evidence in the record suggesting that Burr sustained a gunshot wound. Instead of the Winfrey children, Campbell now fingered one of Senior's cousins as an accomplice. Senior also allegedly confessed to having stolen

two firearms, an "old .22 and ... a .3030 long gun," and a knife from Burr's house, which he had hidden in a nearby "hollow." Burr's brother-in-law later confirmed that Burr owned a .22 caliber "semi auto and a single shot 410 [gauge] shotgun." The weapons were never found.

Campbell's "jailhouse-snitch" evidence restarted the murder investigation. Rogers procured a search warrant for Senior's DNA using the 2004 scent results and Campbell's information. Rogers's affidavit omitted Campbell's inconsistencies and falsely related that the bloodhounds had drop-trailed from Burr's house to the Winfreys' "using the scent pads that [the dogs] had alerted to" in the scent line-up.[1] For the first time (at least from the available records), Rogers reported that Campbell said that Burr had been killed in the front room of his house, information that apparently had not been made public. Pikett later conducted another scent line-up, this time with scents taken from Senior. The bloodhounds alerted each time to Senior's scent pad. *See Winfrey v. State,* 323 S.W.3d 875, 881 (Tex.Crim.App.2010). Although the record appears to contain only a search warrant affidavit for Senior, Johnson obtained a search warrant to collect evidence from Winfrey on the same day.

Winfrey, Megan, and Senior were each charged with capital murder. Megan and Senior were convicted and received lengthy prison sentences. Pikett's dog-scent evidence and Campbell's statements played a large role in their trials. The jury in Senior's trial apparently convicted him based solely on the dog-scent evidence. *See id.* at 882 & n. 9 ("The jury submitted a note asking, 'Is it illegal to convict solely on the scent pad evidence?' "). The Texas Court of Criminal Appeals later held that insufficient evidence supported Senior's conviction and acquitted him. *Id.* at 885.

Winfrey went to trial in June 2009. The jury found him not guilty after only thirteen minutes of deliberation. He had spent over two years in jail. By then, Pikett and his methods had come into disrepute. He retired from the Fort Bend County Sheriff's Office in early 2010.

Winfrey subsequently filed the instant suit in federal court. He brought four § 1983 claims, alleging that (1) the Defendants violated his due process rights; (2) those Defendants serving in a supervisory capacity had failed to supervise and train the investigators; (3) at least one of the Defendants failed to intervene and stop the other Defendants from violating

his rights; and (4) the Defendants conspired to violate his constitutional rights.[2]

**\*974** Most Defendants answered, but the Rangers filed a motion to dismiss, which the district court stayed pending limited discovery. The district court ordered the production of documents from Winfrey's state court proceedings, as well as "information about dog-scent lineups that [had] been conducted in" San Jacinto County and about the Texas Department of Public Safety's ("DPS") "policies or manuals on dog-scent lineups." Given this limited discovery, the district court ordered the parties to file motions for summary judgment. The Defendants complied.[3] Winfrey responded and filed a Federal Rule of Civil Procedure 56(d) affidavit requesting additional discovery.

The district court granted summary judgment for the Defendants, reasoning primarily that Winfrey had "[a]t best" shown that "this is a case about a negligent investigation."[4] The district court did not explicitly rule on Winfrey's Rule 56(d) affidavit, considering the request for additional discovery to be a "dodge[ ]." It believed that "[a]dditional discovery [was] unnecessary [because] the essential facts of the[ ] events [were] known." Winfrey timely appealed.

## II. The District Court's Summary Judgment Ruling[5]

Generally speaking, Winfrey's case depends on establishing the following: (1) Pikett's methods were deficient and violated Winfrey's constitutional rights; (2) the Defendants knew it; (3) Pikett was brought into the investigation expressly to gin up false evidence against Winfrey; (4) Pikett cued the bloodhounds to alert on Winfrey's scent; and (5) the Defendants knowingly used false evidence and failed to prevent the violation of Winfrey's constitutional rights. Because Winfrey failed to show that most of the Defendants acted objectively unreasonably, the bulk of the district court's ruling stands. However, we conclude (1) that Winfrey introduced sufficient summary judgment evidence that Pikett cued his dogs such that summary judgment in Pikett's favor should be reversed, and (2) that Winfrey should have **\*975** been allowed to obtain additional discovery concerning Rogers and Johnson's alleged use of false evidence to secure search and arrest warrants.

### A. Qualified and Municipal Immunity Bar Most of Winfrey's Claims

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* ––– U.S. ––––, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' " *Id.* at 2083 (alterations in original) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). This "objective legal reasonableness" standard " 'ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful.' " *Pearson v. Callahan,* 555 U.S. 223, 244, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). Accordingly, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender,* ––– U.S. ––––, 132 S.Ct. 1235, 1244–45, 182 L.Ed.2d 47 (2012) (internal quotation marks and citations omitted).

 Most of Winfrey's § 1983 claims against those Defendants sued in their individual capacities fail because, even if he alleges violations of clearly-established constitutional rights, he lacks evidence showing that the Defendants were "on notice that their actions were unlawful." *Pearson,* 555 U.S. at 244, 129 S.Ct. 808. Winfrey assumes that it was objectively unreasonable to rely on evidence procured from Pikett's dog-scent line-ups and the drop-trail. To that end, he marshals evidence that disputes the reliability of Pikett's methods and the credibility of his credentials.

Pikett's fall from grace, however, does not show that the Rangers, Rogers, and Johnson were objectively unreasonable in seeking Pikett's assistance and then using the resulting information as part of their investigation, let alone that they actually knew that Pikett was a fraud at the time in question. Pikett enjoyed a solid reputation at the time of Burr's murder. The FBI occasionally turned to Pikett on a variety of matters,

and at least one Texas court had held that scent line-ups were a "legitimate field of expertise" and that Pikett's methods properly relied upon and utilized the principles involved in the field. *See Winston v. State,* 78 S.W.3d 522, 526–29 (Tex.App.–Houston [14th Dist.] 2002, pet. denied); *see also Robinson v. State,* No. 09–06–051, 2006 WL 3438076, at *4 (Tex.App.–Beaumont Nov. 29, 2006, no pet.) (unpublished) (following *Winston* in another case involving Pikett).

Indeed, the Texas Court of Criminal Appeals only recently addressed the probative value of Pikett's evidence. It held that such evidence is admissible, but that, "standing alone, it is insufficient to establish a person's guilt beyond a reasonable doubt." *Winfrey,* 323 S.W.3d at 885. Nothing in *Winfrey* suggests that Pikett's evidence is insufficient to establish probable cause.

 Although the expert affidavits proffered by Winfrey highlight numerous defects **\*976** in Pikett's work, they do not claim that such errors were so obvious that they would have been apparent to officers untrained in canine handling. Accordingly, even assuming that the investigators violated Winfrey's clearly-established constitutional rights, Winfrey presents no evidence suggesting that they knew or should have known that Pikett's involvement necessarily entailed such violations. Pikett's conduct alone therefore cannot establish that the Rangers, Rogers, and Johnson knowingly passed along Pikett's allegedly false evidence, consciously disregarded a duty to intervene, or willfully conspired to violate Winfrey's constitutional rights.[6]

 Winfrey's § 1983 claims against San Jacinto County and Rogers and Johnson in their official capacities fail for similar reasons.[7] These are municipal liability claims. *See, e.g., Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("Official-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' " (citation omitted)). Municipal liability requires proof of an "official policy," a "final" policymaker, and the policymaker's "knowledge" of, or "deliberate indifference" to, a risk of constitutional violations. *See, e.g., Burge v. St. Tammany Parish,* 336 F.3d 363, 369–73 (5th Cir.2003); *Piotrowski v. City of Houston,* 237 F.3d 567, 578–83 (5th Cir.2001); *see also Monell v. N.Y.C. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipal liability analysis turns on whether a plaintiff establishes that the relevant policymaker knew or should have known that the alleged policy created a high risk of constitutional violations; this "knowledge" requirement is

the "*sine qua non* of municipal liability under section 1983." *Burge,* 336 F.3d at 370.

Winfrey fails to introduce summary judgment evidence of any municipal liability element. He complains of San Jacinto County's *de facto* policies and practices of "pursu[ing] wrongful arrests and convictions through profoundly flawed investigations and fabricated evidence, including junk science evidence." The only potential policy Winfrey identifies that relates to Pikett is the use of dog-scent evidence. The district court ordered that San Jacinto County "produce its information about dog-scent lineups that have been conducted in the county." This evidence established that the Burr investigation was the first in San Jacinto County to use Pikett. Municipal liability may lie for a single constitutional violation, but claims premised on *de facto* policies and acts by municipal employees must establish deliberate indifference. *See City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123–27, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). That "generally requires that a plaintiff demonstrate 'at least a pattern of similar violations.' " *Burge,* 336 F.3d at 370 (citation omitted). Winfrey thus cannot show that a final policymaker, presumably Rogers, knew or should have known that constitutional violations **\*977** were the "obvious consequences" of Pikett's involvement. *Id.*

### B. Some of Winfrey's § 1983 Claims Survive

Winfrey, however, presented summary judgment evidence supporting his allegations that Pikett cued his dogs during the scent line-up and that Rogers and Johnson both omitted material information and provided false statements in their search and arrest warrant affidavits in an effort to "frame" him.

*1. Pikett and the Scent Line-ups.*—The district court reasoned that Winfrey provided only speculation to show that Pikett cued his dogs. The scent line-up, however, was videotaped. Although the video is not in the record on appeal, the parties referenced it below, and Winfrey provided the affidavit of Steven Nicely, a police canine expert who reviewed the film.

Nicely concludes that Pikett manufactured his results, finding that "[t]he line-up procedures used by Deputy Pikett support[ ] [the conclusion that] behaviors the dogs do exhibit are more likely to be induced by conscious actions

than unconscious actions." Nicely's conclusion rests on two general observations: First, he determined that Pikett's procedures "are more consistent with him using his ability to see inside the cans and identi[f]y which can contains the target pad than relying on his dogs to identify the can by odor." Second, he observed actions that "were consistent with attempting to induce a behavior," *i.e.,* cuing, specifically "jerk[ing]" on the dogs' leashes and strategically stopping as he paced down the row of cans. Nicely's affidavit comports with those of experts retained in other cases challenging Pikett's methods, which reason that Pikett cued his dogs by manipulating their leashes and by altering his footsteps during scent line-ups. In another case, one of those experts concluded that the dogs gave no visible signs of alerting to the target scent.

Winfrey therefore raised a sufficient issue of material fact. Pikett denies that he cued the dogs or otherwise used procedures that allowed him to "cheat." Winfrey provided summary judgment evidence that he did. At this juncture, the evidence and all reasonable inferences must be construed in the light most favorable to Winfrey; " '[t]he ultimate truth will be determined at trial....' " *Good v. Curtis,* 601 F.3d 393, 399 n. 1 (5th Cir.2010) (citation omitted). Winfrey alleged and presented evidence that Pikett made "knowing efforts to secure a false identification," and such actions violate clearly established constitutional rights. *Id.* at 398. To that extent, Pikett is not entitled to qualified immunity, and we reverse the summary judgment granted to him.

*2. Rogers and Johnson's Investigation.*—Winfrey also claims that Rogers and Johnson used false information to secure search and arrest warrants and failed to disclose exculpatory evidence. The district court acknowledged that Rogers's search affidavit to obtain DNA from Megan falsely stated that the drop-trail had used Winfrey's scent, but it concluded that the error was unintentional and that Winfrey suffered no constitutional injury because the evidence obtained bore no fruit. As to Winfrey's exculpatory-evidence argument, the district court focused on whether Winfrey could show that Rogers and Johnson knew of the infirmities underpinning Pikett's methods. The record, however, suggests that Rogers and Johnson may have acted recklessly in submitting warrant affidavits that contained false statements and material omissions that affected Winfrey's constitutional rights even without respect to the question of Pikett's methods.

**\*978** Even if there is a violation of a clearly-established constitutional right, a plaintiff must still prove the objective

unreasonableness of the complained-of act. Because the alleged predicate constitutional injury here concerns search and arrest warrant affidavits, we turn to Fourth Amendment principles.

The fact that a neutral magistrate issues a warrant is not dispositive of whether an officer's underlying actions were objectively reasonable. *See Messerschmidt,* 132 S.Ct. at 1245. Qualified immunity will not attach if a "reasonably well-trained officer in [the officer's] position would have known that his affidavit failed to establish probable cause." *Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Objective reasonableness in this context depends in part on the information available to the officer. *See Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Generally, when an officer is aware of material information casting doubt on, or directly contrary to, the information contained in a warrant affidavit, that fact may serve as evidence that "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Leon,* 468 U.S. 897, 922 n. 23, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Accordingly, the "deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based." *Leon,* 468 U.S. at 914, 104 S.Ct. 3405 (citing *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).

The record lacks search and arrest affidavits for Winfrey; the documents likely were destroyed in an effort to comply with an expunction order. The affidavits concerning Megan and Senior, however, suggest that Rogers and Johnson used the same affidavit language for all three Winfreys, and investigation reports indicate that warrants were obtained for Winfrey on the same day Johnson executed an arrest warrant affidavit for Megan. Notably, Rogers indicated that the drop-trail evidence and Campbell's "jailhouse snitching" established probable cause to obtain "a search warrant for the hairs of my *suspects.*" (emphasis added).

These documents contain a material falsehood. They reiterate that the drop-trail from the crime scene to the Winfrey house used Winfrey's scent. Huff, however, informed Pikett that he mistakenly used Hammond's scent, and Pikett included this information in his report prepared the day after the line-ups and drop-trail were conducted. Rogers and Johnson

executed the affidavits two years later, when no time exigency existed that would have explained the absence of accurate information.

The affidavits also omit irregularities in Campbell's story. According to Rogers and Johnson's contemporaneous reports: Campbell said that Senior shot and mutilated Burr—not true. Campbell first said Senior's kids assisted in the murder, then averred that it was one of Senior's cousins—a major inconsistency. Senior allegedly murdered Burr in retribution for molesting one of the Winfrey children—no corroboration of any such molestation appears in the record. Moreover, the allegedly stolen guns and knife were never found, and Burr's family reported that he previously owned a small-bore shotgun, not the .3030 caliber long rifle described by Campbell.

Johnson's arrest warrant also notably omits information concerning forensic evidence while including somewhat irrelevant facts. The affidavit recounts an altercation between Megan and a high school teacher that occurred over a year-and-a-half before the murder. Although Johnson included this questionable propensity **\*979** evidence, he failed to mention that several rounds of DNA testing on forensic evidence recovered from the crime scene had excluded Megan and that the drop-trail did not use Winfrey's scent. Assuming that the affidavits for Winfrey and Megan were substantially similar, the same exculpatory information would have been left out of the affidavit for Winfrey.

Although the "threshold for establishing [the objectively unreasonable] exception is a high one," *Messerschmidt,* 132 S.Ct. at 1245, the record suggests that Winfrey may meet that threshold at least for summary judgment purposes. In the light most favorable to Winfrey, the false statement and material omissions impugn Rogers and Johnson's "objective good faith" and suggest that their "transgressions" were not "minor." *Leon,* 468 U.S. at 908, 104 S.Ct. 3405.

The record indicates that Rogers and Johnson heavily relied on the false drop-trail representation and incomplete information regarding Campbell. In his search warrant affidavit for Senior's DNA, Rogers suggested that Campbell's story about Senior's confession and the drop-trail evidence implicating the "other two suspects" were the two primary reasons the officers had "enough 'P.C.' to get a search warrant." That same evidence featured prominently in Johnson's probable cause affidavit for Megan, which also omitted any reference to the consistently exculpatory DNA

evidence. It is a reasonable assumption that the same defects infected the warrant affidavits for Winfrey.

Yet, " '[w]hen the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a *truthful* showing.' " *Franks,* 438 U.S. at 164–65, 98 S.Ct. 2674 (citation omitted). "This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Id.* at 165, 98 S.Ct. 2674. Instead, the warrant requirement imposes an obligation to "set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Id.* That extends to providing facts concerning the reliability of the information and the credibility of its source and to avoiding "deliberately or reckless[ly] false statement[s]." *Id.* (describing the use of such statements in a warrant affidavit as "an unthinkable imposition upon [a magistrate's] authority").

The warrant affidavits here fail this standard. As presented to the magistrate, the affidavits' three primary pieces of evidence—the scent line-ups, drop-trail, and Campbell's story—all pointed to the Winfreys. Even if the false statement about Winfrey's scent stemmed from a cursory reading of Pikett's report, however, the use of a fact explicitly contrary to the report may reasonably be characterized as reckless here. In contrast to the typical "mistake" situation where an investigation's exigencies causes facts to be "garnered hastily," *id.,* Rogers and Johnson had several years to review the report's contents and other facts before executing the affidavits.

It was similarly problematic to omit all of the information casting doubt on Campbell's credibility and the DNA test results. Some of Campbell's inconsistencies were glaring, others minor. All undercut his reliability, and, like the DNA test results that challenged the conclusions drawn from Pikett's dog-scent evidence, none were presented to the magistrate who issued the warrants. The warrant affidavits therefore likely deprived the magistrate of the opportunity to independently weigh **\*980** whether Rogers and Johnson's evidence established probable cause.

Qualified immunity, however, provides "*immunity from suit* rather than a mere defense to liability." *Mitchell v.*

*Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).[8] The question, then, is when qualified immunity attaches for such § 1983 claims. *Franks* provides helpful guiding principles. *Cf. Malley,* 475 U.S. at 344, 106 S.Ct. 1092 (holding "that the same standard of objective reasonableness ... applied in the context of a suppression hearing ... defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest"). To show he is entitled to a *Franks* hearing, a criminal defendant challenging the veracity of a warrant affidavit must "make[ ] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause." *Franks,* 438 U.S. at 155–56, 98 S.Ct. 2674. That requires "allegations of deliberate falsehood or of reckless disregard for the truth, ... accompanied by an offer of proof. [The allegations] should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.... Allegations of negligence or innocent mistake are insufficient." *Id.* at 171, 98 S.Ct. 2674.

Applying these principles here, we conclude that Winfrey has made a sufficiently "substantial preliminary showing" to make qualified-immunity summary judgment for Rogers and Johnson inappropriate at this juncture. The district court should first have allowed Winfrey to conduct additional discovery to determine whether Rogers and Johnson executed affidavits with at least "a reckless disregard for the truth," *i.e.,* acted objectively unreasonable. As noted above, Rogers considered the false information crucial to getting "enough P.C.," and the omitted information concerning Campbell's reliability and the DNA test results materially challenged the information Johnson decided to include in his arrest warrant affidavit. It may be that these errors and omissions resulted from carelessness or run-of-the-mill negligence. *See, e.g., United States v. Astroff,* 578 F.2d 133, 136 (5th Cir.1978) (en banc) (holding that allegations of "negligent misrepresentation" are insufficient to render a warrant invalid or to show entitlement to a *Franks* hearing). Yet, for qualified immunity purposes, it is also possible that they occurred out of recklessness.

Because the issue of recklessness requires inquiry into the specifics of what Rogers and Johnson knew and why they completed the affidavits as they did,[9] the **\*981** district court should have allowed Winfrey additional discovery on his

false-evidence claim given his threshold showing of objective unreasonableness.[10] *Cf. Int'l Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1267 (5th Cir.1991) ("Because of the difficulties attendant to rebutting the professed state of mind of a party-opponent through summary judgment evidence, the district court should be generous in its allowance of discovery requests aimed at uncovering evidence of the moving party's state of mind."). We therefore vacate the district court's ruling as to Rogers and Johnson's alleged use of false evidence, and remand for additional discovery.

## C. Additional Summary Judgment Issues Concerning the Counties

Before addressing the district court's treatment of Winfrey's Rule 56(d) affidavit, we briefly discuss two summary judgment issues bearing on Fort Bend and San Jacinto Counties' municipal liability. Winfrey alleges that San Jacinto County maintained *de facto* policies and practices that permitted "wrongful convictions and arrests through profoundly flawed investigations and fabricated evidence, including junk science evidence." Because Rogers presumably was San Jacinto County's final policymaker for the Burr case, Winfrey need not have shown deliberate indifference to establish the County's culpability for Rogers's conduct in executing his warrant affidavits. *See Praprotnik,* 485 U.S. at 123–27, 108 S.Ct. 915. The patent unconstitutionality of presenting false information to or materially misleading a magistrate would allow a presumption that Rogers "was not only aware of the specific polic[ies], but was also aware that a constitutional violation most likely [would] occur." *Burge,* 336 F.3d at 370 (citation omitted).

Winfrey also brings a failure-to-train and supervise claim against San Jacinto County. This claim necessarily is premised on Johnson's actions and, thus, *respondeat superior.*[11] These types of municipal liability claims do require evidence of deliberate indifference. *See, e.g., Connick v. Thompson,* —— U.S. ——, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (noting, in rejecting a "single-incident" municipal liability claim, that "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights"). The district court, however, allowed discovery only of information concerning San Jacinto County's dog-scent line-

ups. That evidence did not specifically address the elements of a supervisory claim premised on the use of false evidence.

**\*982** Winfrey, however, has forfeited these points by failing to specifically make either argument on appeal. *See, e.g., Gen. Universal Sys. v. HAL, Inc.,* 500 F.3d 444, 454 (5th Cir.2007). Moreover, he frames the municipal liability issue as one that turns on San Jacinto County's knowledge of Pikett's "fraud" and the availability of discovery to that end. Because Winfrey cannot show that San Jacinto County knew or should have known that its employees would violate his rights by using Pikett for the first time, his municipal liability claims against San Jacinto County fail. We affirm the district court on this issue.

The district court also did not err in granting summary judgment on Winfrey's supervisory claims against Fort Bend County. Pikett notes that he was assigned by Fort Bend County to work on the Burr investigation in the regular scope of his employment. Accordingly, Fort Bend County could be liable under § 1983 if it knew or should have known that Pikett gamed the results of his dog-scent investigations or otherwise used procedures that created a high risk of constitutional violations.

Winfrey, however, fails to make the more basic showing of sufficiently identifying and describing the inadequacies of a Fort Bend County policy that permitted Pikett's alleged misconduct. Instead, he essentially reiterates his belief that Pikett's missteps were so obvious that Fort Bend County Sheriff Milton Wright could have avoided knowledge of the resulting constitutional violations only by maintaining a *de facto* policy of ignorance. As demonstrated by his inability to articulate how Wright—presumably the relevant final policymaker for this issue—was personally involved, *see supra* note 6, Winfrey therefore responded to summary judgment by doing little more than resting on conclusory, generic allegations in his complaint. *Cf. Spiller v. City of Tex. City, Police Dep't,* 130 F.3d 162, 167 (5th Cir.1997) (noting, in motion to dismiss context, the inadequacy of such tactics in satisfying the heightened pleading requirements of municipal liability claims). In light of this, the district court had no obligation to permit Winfrey additional discovery against Fort Bend County. *See Int'l Shortstop,* 939 F.2d at 1267. Thus, we affirm the district court as to Winfrey's supervisory claims.

## III. Winfrey's Rule 56(d) Affidavit and Additional Discovery Requests

"When a party is not given a full and fair opportunity to discover information essential to its opposition to summary judgment, the limitation on discovery is reversible error." *Access Telecom, Inc. v. MCI Telecomms. Corp.,* 197 F.3d 694, 720 (5th Cir.1999). Rule 56(d) allows nonmovants to identify and request discovery of such information "by affidavit or declaration." In response, "the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed.R.Civ.P. 56(d)(1)–(3).

Rule 56(d) "discovery motions are 'broadly favored and should be liberally granted' because the rule is designed to 'safeguard non-moving parties from summary judgment motions that they cannot adequately oppose.' " *Raby v. Livingston,* 600 F.3d 552, 561 (5th Cir.2010) (citation omitted). As a general matter, district courts should grant "a continuance for additional discovery if [the nonmovants]: (i) requested extended discovery prior to the court's ruling on summary judgment; (ii) placed the district court on notice that further discovery pertaining to the summary judgment motion was being sought; and (iii) demonstrated to the district court with reasonable specificity how the requested discovery pertained to the pending motion." **\*983** *Enplanar, Inc. v. Marsh,* 11 F.3d 1284, 1291 (5th Cir.1994) (citations omitted). "The nonmoving party must show how the additional discovery will defeat the summary judgment motion, that is, will create a genuine dispute as to a material fact, and 'may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts.' " *Int'l Shortstop,* 939 F.2d at 1267 (citations omitted). Rule 56(d) rulings lie within the district court's sound, but "not entirely unfettered," discretion. *Id.*

Winfrey identified fifteen additional areas of discovery that he contended were necessary to adequately respond to the Defendants' summary judgment motions. For most requests, the district court did not abuse its discretion in denying further discovery. As discussed above, the district court abused its discretion, however, by not allowing Winfrey to probe why Rogers and Johnson failed to disclose in their warrant affidavits that the drop-trail used Hammond's scent, that Campbell gave inconsistent statements—some

of which contradicted known facts—and that various DNA tests had excluded the Winfreys. Such evidence was relevant to establishing the objective reasonableness of Rogers and Johnson's actions. The record as developed at summary judgment inadequately spoke to that issue.

We also conclude that the district court abused its discretion by not ordering the production of a report concerning Pikett's drop-trail exercise from another case that, according to Nicely, was a "substantially different" version of the same report produced in this case. Nicely averred that the report was under a protective order and that he could discuss it only under court order. Given this potentially material discrepancy in a heavily relied-upon report and the specificity of Winfrey's request, the district court should have allowed Winfrey access to the document. In all other respects, we conclude that the district court did not abuse its discretion in its denial of the requested discovery.

## IV. Conclusion

Winfrey adduced sufficient evidence to survive qualified-immunity summary judgment on his due process claims against Pikett, and we reverse the summary judgment granted to him as to that count. The district court erred in not ordering additional discovery essential to Winfrey's showing Rogers and Johnson's potential recklessness in using false evidence and omitting material facts in their arrest and search warrant affidavits. It also abused its discretion in denying a handful of Winfrey's Rule 56(d) discovery requests as described above; accordingly, we vacate and remand the summary judgment as to those matters. The district court properly granted summary judgment for the Defendants as to all of Winfrey's other claims, and we affirm the summary judgment in all other respects. We note that the district court remains free to reassess the affirmed discovery determinations as it deems appropriate in light of further proceedings. Accordingly, we AFFIRM in part, REVERSE in part, VACATE in part, and REMAND for proceedings consistent with this opinion. Appellant's motion for reassignment in the district court is DENIED.

## All Citations

481 Fed.Appx. 969

Footnotes

\*  Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

1  The probable cause affidavit for Megan is almost identical to a search warrant affidavit used to collect Senior's DNA.

2  Winfrey also brought state-law claims for malicious prosecution, abuse of process, intentional infliction of emotional distress, and civil conspiracy. He does not reurge these claims on appeal.

3  The line between dismissal and summary judgment is somewhat unclear in the record. Some Defendants couched their motions in terms of both dismissal and summary judgment. The district court dismissed Winfrey's claims against the Rangers several months before its summary judgment ruling. The summary judgment order occasionally uses dismissal-like language, but it purports to grant summary judgment for all defendants.

   These ambiguities do not affect our review; we treat Winfrey's appeal as arising entirely from a grant of summary judgment. *See Enplanar, Inc. v. Marsh,* 11 F.3d 1284, 1293 (5th Cir.1994) ("Although the district court ... granted a dismissal as to [some parties], it also granted summary judgment as to *all* the defendants based on evidence not contained in the pleadings. Under these circumstances, the district court's *order* to dismiss the complaint as to [some parties] is disregarded, and we instead review the grant of summary judgment as to all defendants—including [the dismissed parties]." (citations omitted)).

4  The district court summarily dismissed James Walters because he was not Sheriff of San Jacinto County during the murder investigation. Winfrey does not challenge that ruling.

5  We review a grant of summary judgment *de novo,* construing the evidence in the light most favorable to the nonmoving party. *See, e.g., United Fire & Cas. Co. v. Hixson Bros.,* 453 F.3d 283, 284–85 (5th Cir.2006). "Unsubstantiated assertions, improbable inferences, and unsupported speculation," however, "are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir.2003). Summary judgment is appropriate if the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

6  The same reasoning applies to Fort Bend County Sheriff Milton Wright, who Winfrey sued in both his official and individual capacities. The individual-capacity suit against Wright also fails because nothing in the record shows that Wright had any direct, personal involvement in the Burr investigation. *See Thompson v. Steele,* 709 F.2d 381, 382 (5th Cir.1983). Because an official-capacity suit against a county officer is a suit against a municipality, that aspect of Winfrey's suit is subsumed in the municipal liability discussion below.

7  Winfrey does not clearly state official-capacity claims against the Rangers. To the extent that he does, the following analysis also disposes of those claims.

8  *Franks* crafted its remedy in light of the perceived inadequacy of extant "alternative sanctions" including "a civil suit," suggesting that § 1983 provides a post-investigation remedy for the knowing or reckless inclusion of false information, or exclusion of material exculpatory information, in warrant affidavits. 438 U.S. at 169, 98 S.Ct. 2674; *see also Daniel v. Ferguson,* 839 F.2d 1124, 1129 n. 12 (5th Cir.1988) ("The [*Franks* ] Court also concluded that alternative procedures, including civil suits, would not provide a sufficient remedy for untruthful affidavits."). Indeed, the Supreme Court has observed that sometimes such suits allow application of the exclusionary rule in a more efficient manner than suppression hearings. *See Malley,* 475 U.S. at 344, 106 S.Ct. 1092 ("[A] damages remedy for an arrest following an objectively unreasonable request for a warrant imposes a cost directly on the officer responsible for the unreasonable request, without the side effect of hampering a criminal prosecution.").

9  We recognize that the subjective motive of an officer executing a facially valid warrant generally is not an appropriate inquiry. *See, e.g., al–Kidd,* 131 S.Ct. at 2080–82. Winfrey, however, alleges that the affidavits were knowingly or recklessly false. Our inquiry, then, necessarily must consider what the officers knew and did in evaluating whether it was objectively reasonable for them to believe that their conduct was lawful. *Cf. Messerschmidt,* 132 S.Ct. at 1245 n. 2 (criticizing the dissent's reliance "on facts outside the affidavit" when there was "no contention ... that the affidavit was misleading in

omitting any of the facts on which the dissent relie[d]"); *Leon,* 468 U.S. at 922 n. 23, 104 S.Ct. 3405 (noting that courts may consider "all of the circumstances" bearing on the objective reasonableness inquiry).

10 Winfrey thus differs—at least on this issue—from the hypothetical § 1983 plaintiff with wide-ranging and conclusory allegations of officer misconduct against whom qualified immunity casts its protective shield.

11 "A plaintiff must show that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a 'moving force' in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy." *Valle v. City of Houston,* 613 F.3d 536, 544 (5th Cir.2010) (citations omitted).

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 8

Case 1:18-cv-00068   Document 702-2   Filed on 06/20/23 in TXSD   Page 217 of 222

Wojcik v. Memorial Hermann Health System, Not Reported in Fed. Supp. (2019)

2019 WL 4887265

2019 WL 4887265
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Irena WOJCIK, Plaintiff,

v.

MEMORIAL HERMANN
HEALTH SYSTEM, Defendant.

Civil Action No. H-17-3198
|
Signed 10/03/2019

**Attorneys and Law Firms**

Joshua Armstrong Verde, The Verde Law Firm PLLC, Houston, TX, for Plaintiff.

Kelley Riddle Edwards, Luke Christopher MacDowall, Littler Mendelson PC, Houston, TX, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Gray H. Miller, Senior United States District Judge

**\*1** Pending before the court is defendant Memorial Hermann Health System's ("Memorial Hermann") motion for summary judgment (Dkt. 36), plaintiff Irena Wojcik's response (Dkt. 41), and Memorial Hermann's reply (Dkt. 44).[1] Having considering the pleadings, the evidentiary record, and the applicable law, the court finds that Memorial Hermann's motion for summary judgment should be **GRANTED**.

**I. BACKGROUND**

This is an age discrimination and retaliation case brought pursuant to the federal Age Discrimination in Employment Act of 1967 ("ADEA"), and chapter 21 of the Texas Labor Code ("chapter 21"), popularly known as the Texas Commission on Human Rights Act ("TCHRA").[2] Wojcik was employed by Memorial Hermann as a physical therapy assistant from December 2009 until June 2017, when her position was eliminated as part of a reduction-in-force ("RIF"). Dkt. 36 at 4; Dkt. 41 ¶¶ 1, 5. Wojcik claims that this RIF was merely pretext and that she was actually terminated

as the result of age discrimination and retaliation for opposing that age discrimination.

From December 2009 to June 2015, Wojcik worked at Memorial Hermann's Beechnut Clinic. Dkt. 36 at 4; Dkt. 41 ¶ 2. In July 2015, Wojcik transferred to the Bellaire Clinic, where the alleged age discrimination occurred. Dkt. 36 at 4; Dkt. 41 ¶ 2. At the Bellaire Clinic, Wojcik worked under the supervision of Tamara "Nikki" Shelton, the Clinic Manager. Dkt. 36 at 9; Dkt. 41 ¶ 2. Shelton reported to Tim Couture, her Regional Director. Dkt. 36 at 4. Supervising the Bellaire Clinic was Shelton's first management job and Wojcik was her oldest employee. Dkt. 41 ¶ 3. During this time, Wojcik claims that she was "subjected to repeated acts of age discrimination" by Shelton. *Id.* For example, Wojcik claims that Shelton "would state that the 'dynamic of the clinic needs young people' " and "promoted youthful teambuilding events like a Christmas party featuring an American Ninja Warrior event." *Id.* Shelton once referred to Wojcik as a "grandma" when asking Wojcik to watch Shelton's son. Dkt. 41-7 at 727. And Shelton once told a patient of Wojcik's to get her green tea "because it's good for older people."[3] Dkt. 41-6 at 718. Wojcik claims these events made her feel like "an outcast," and in May 2017, Wojcik claims to have brought her concerns to Shelton's attention. *Id.*

**\*2** In Summer 2017, Tim Couture was informed that he needed to reduce the number of employees as part of a RIF. Dkt. 36 at 6; *see also* Dkt. 41 ¶ 4. Wojcik's position was one of the eight that he eliminated. Dkt. 36 at 7. Couture initially considered transferring Wojcik to another location —the Town & Country Clinic. Dkt. 36 at 7–8; *see also* Dkt. 41 ¶ 4. However, Couture ultimately decided against transferring Wojcik after discussing it with Greg Dodson, the Town & Country Clinic Manager, and concluding that it would be better to hire another physical therapist instead of another PTA in order to meet the clinic's requirements to see new patients within 48 hours. Dkt. 36 at 8. On June 26, 2017, Wojcik was formally notified that her position would be terminated effective July 7, 2017. Dkt. 36 at 8–9. On July 5, 2017, Wojcik submitted a complaint to Memorial Hermann's Compliance Helpline, "indicating that she believed Dr. Shelton was terminating her employment because of her age." Dkt. 36 at 9; *see also* Dkt. 41 ¶ 6. This lawsuit follows.

**II. STANDARD OF REVIEW**

Wojcik v. Memorial Hermann Health System, Not Reported in Fed. Supp. (2019)

2019 WL 4887265

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant." *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 377 (5th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "If [the movant's] burden is carried, then the nonmoving party must establish the existence of evidence creating an issue of fact that can be properly characterized as outcome-determinative." *Hanchey v. Energas Co.*, 925 F.2d 96, 97 (5th Cir. 1990) (citing *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986)). Evidence is viewed in the non-movant's favor. *Jackson*, 602 F.3d at 377 (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002)). However, "[l]egal conclusions and general allegations do not satisfy this burden." *Hanchey*, 925 F.2d at 97 (citing *Fontenot*, 780 F.2d at 1195–96).

## III. ANALYSIS

### A. Chapter 21

Memorial Hermann argues that this court lacks jurisdiction to hear Wojcik's chapter 21 claims because she failed to wait 180 days before filing suit. Dkt. 36 at 10–12. Memorial Hermann grounds its arguments in *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483 (Tex. 1991), *overruled by In re USAA*, 307 S.W.3d 299 (Tex. 2010). Wojcik counters that (1) chapter 21's exhaustion requirement is not jurisdictional, and (2) because the ADEA only requires a plaintiff to wait 60 days before filing suit—which Wojick did—and because chapter 21 is meant to "correlate state law with federal law," this court has jurisdiction to hear Wojcik's claims. Dkt. 41 at 9–10 (quoting *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 24 (Tex. 2000)). Both sides' arguments miss the mark.

Wojcik is correct that the requirement is not jurisdictional, although she identifies inapposite law in support of her argument. The relevant law is the Fifth Circuit's opinion in *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165 (5th Cir. 2014). In *Gorman*—and against the backdrop of the the Texas Supreme Court's opinion in *USAA*—the Fifth Circuit confronted the question of whether it had jurisdiction to hear plaintiff's chapter 21 claims where plaintiff failed to exhaust her administrative remedies through either receipt of a right to sue letter, or waiting 180 days without resolution by the

Texas Workforce Commission ("TWC"). *Gorman*, 753 F.3d at 169. The court found that:

> Although not explicit, *USAA* also overturned *Schroeder*'s holding that the TCHRA right to sue letter requirement is jurisdictional. Two reasons lead us to this conclusion. First, the TCHRA's exhaustion of remedies requirement is not expressly required by the statute but is inferred by the courts from the statute's structure. *See Schroeder*, 813 S.W.2d at 487. Consequently, the "clear legislative intent" that *USAA* held was necessary to render a provision jurisdictional is lacking. *USAA*, 307 S.W.3d at 306. If the TCHRA's exhaustion of remedies requirement is not jurisdictional, neither is the right to sue requirement, which is part of the exhaustion requirement.

**\*3** *Id.* at 169–70. Following *Gorman*'s logic, if the right to sue requirement is not jurisdictional, neither is the requirement to wait 180 days, which is also part of the exhaustion requirement. Accordingly, the court has jurisdiction to hear Wojcik's chapter 21 claims.

However, exhaustion is still a prerequisite to filing suit. *See e.g.*, *Gorman*, 753 F.3d at 170 (" 'the receipt of a right-to-sue letter is a condition precedent' ") (quoting *Pinkard v. Pullman–Standard*, 678 F.2d 1211, 1215 (5th Cir. 1982)). Wojcik tries to get around this requirement by noting that she was only required to wait 60 days to file suit under the ADEA, and that chapter 21 is " 'intended to correlate with federal law.' " Dkt. 41 at 10 (quoting *MD Anderson*, 28 S.W.3d at 24). But the ADEA is not the federal law with which chapter 21 was intended to correlate. "*USAA* emphasized the importance of harmonizing the interpretations of the TCHRA *and Title VII*." *Gorman*, 753 F.3d at 170 (emphasis added). Under Title VII, administrative exhaustion requires waiting 180 days. *See Stroy v. Gibson*, 896 F.3d 693, 698 (5th Cir. 2018) (noting that exhaustion is "a precondition to filing suit" and affirming dismissal of plaintiff's Title VII claim where he waited only 178 days, "two days shy of the statutorily-mandated 180 days"). Accordingly, administrative exhaustion under chapter 21 also requires waiting 180 days, which Wojcik indisputably did not do.[4]

Memorial Hermann has invoked failure to exhaust administrative remedies as an affirmative defense, and Wojcik "does not offer a waiver or estoppel argument to excuse [her] failure to exhaust." *Stroy*, 896 F.3d at 698. Accordingly, Memorial Herrman is entitled to summary judgment on Wojcik's chapter 21 claims.[5]

Case 1:18-cv-00068   Document 702-2   Filed on 06/20/23 in TXSD   Page 219 of 222

Wojcik v. Memorial Hermann Health System, Not Reported in Fed. Supp. (2019)

2019 WL 4887265

**B. Discrimination Claim**

The parties agree upon an incorrect standard for prima facie age discrimination in a reduction-in-force case. *See* Dkt. 36 at 12; Dkt. 41 ¶ 13. The correct standard is as follows:

> In a reduction-in-force case, a party makes out a prima facie case of age discrimination by showing "(1) that he is within the protected age group; (2) that he has been adversely affected by the employer's decision; (3) that he was qualified to assume another position at the time of the discharge; and (4) 'evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.' "

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 456 n.4 (5th Cir. 2019) (quoting *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996)). There is no dispute that Wojcik was within the protected age group, that she was adversely affected by the elimination of her position, and that she was qualified to assume another position had one been available. Dkt. 36 at 18. Because Memorial Hermann fails to discuss the fourth prong of the correct standard, and because " 'a plaintiff need only make a very minimal showing,' " the court will "assume *arguendo* that [Wojcik] has established a *prima facie* case." *Nichols*, 81 F.3d at 41 (quoting *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir. 1985)).

**\*4** Although a "*prima facie* case raises an inference of unlawful discrimination," that inference disappears where the employer articulates "a legitimate, non-discriminatory reason for the layoff, *i.e.*, the reduction in force." *Id.* (citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 992 (5th Cir. 1996) (en banc)). Here, Memorial Hermann has articulated such a reason. Dkt. 36 at 16. Thus, it falls to Wojcik "to demonstrate that the defendant's articulated rationale is merely a pretext for discrimination." *Nichols*, 81 F.3d at 41.

"Under the ADEA, the employee must 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' " *Squyres v. Heico Companies, L.L.C.*, 782 F.3d 224, 231 (5th Cir. 2015) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, L. Ed. 2d 105 (2000)). Pretext is established " 'either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.' " *Id.* (quoting *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010)). As evidence of pretext, Wojcik

points to comments made by Shelton. Dkt. 41 at 14. However, Shelton was not the person responsible for selecting Wojcik for the RIF—that person was Couture—and Wojcik points to no evidence to suggest otherwise. Wojcik also does not point to any evidence of animus on Couture's part. Instead, Wojcik claims that a "cat's paw" analysis should be applied because Couture was influenced by Shelton's discriminatory animus. Dkt. 41 ¶ 5 n.4; 14.

"To invoke the cat's paw analysis, [Wojcik] must submit evidence sufficient to establish two conditions: (1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker 'possessed leverage, or exerted influence, over the titular decisionmaker.' " *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000)). The court assumes, *arguendo*, that Shelton's statements constitute discriminatory animus. Even so, Wojcik's claim still fails because Wojcik cannot show that Shelton possessed leverage or exerted influence over Couture. In support of her cat's paw theory, Wojcik cites to a February 2016 email that Shelton[6] forwarded to Couture. Dkt. 41-3 at 508. The original email was from a Patient Access Rep who wrote that a certain patient[7] "wants to stay with you [Shelton], she felt uncomfortable with Irena [Wojcik]." *Id.* Shelton forwarded this email to Couture stating: "See below! This is a perfect patient for a PTA but we can't utilize her." *Id.* Wojcik also cites to a portion of Couture's deposition (Dkt. 41-3 at 428–29) and an October 2016 email (Dkt. 41-4 at 509), which show that Couture forwarded an announcement about a PTA opening at the Beechnut Clinic to Shelton, asking if Irena would want to be transferred there. Couture claims he forwarded this email because he "knew that Nikki [Shelton] was having difficulty with Irena [Wojcik]." Dkt. 41-2 at 428–29. These are the only portions of the record that Wojcik cites in support of her cat's paw theory, and they do not establish leverage or influence.

**\*5** Even if Shelton was motivated by discriminatory animus in forwarding the October 2016 email to Couture, the email itself originated not from Shelton, but from a neutral third party concerning a patient's own statement. More importantly, the email predates Couture's selection of Wojcik for the RIF by at least five months.[8] Most importantly, Wojcik offers no evidence to contradict Shelton and Couture's testimony that Shelton had no role in selecting Wojcik for the RIF. *See* Dkt. 41-3 at 183 (Shelton disclaiming involvement in the RIF decision); *id.* at 444 (Couture testifying that his RIF decision was based on "operational performance of the facility," "KPI metrics, [Wojcik's] performance," and "whether or not for any

Case 1:18-cv-00068   Document 702-2   Filed on 06/20/23 in TXSD   Page 220 of 222

Wojcik v. Memorial Hermann Health System, Not Reported in Fed. Supp. (2019)

2019 WL 4887265

– for any employee that we look at, if we pulled her out of the facility, could the other clinicians pick up the volume and not disrupt patient care"). Imputing discriminatory animus from Shelton to Couture requires Wojcik to show that Couture " 'acted as a rubber stamp, or the 'cat's paw,' for the subordinate employee's prejudice.' " *Laxton v. Gap Inc.*, 333 F.3d 572, 584 (5th Cir. 2003) (quoting *Russell*, 235 F.3d at 227). Wojcik has not carried this burden. Accordingly, Wojcik's cat's paw theory fails.[9]

Wojcik also questions the veracity of whether her position was actually eliminated (Dkt. 41 at 11), which if true, might indicate pretext for Wojcik's termination. As evidence that Wojcik's position was not actually eliminated, Wojcik points to the fact that Shelton emailed Couture three days after Wojcik's termination stating that the clinic was "slammed" and that Shelton had "asked [her] therapists to stretch themselves to get patients in since Irena's departure." Dkt. 41-3 at 492–93. Wojcik also points out that Shelton requested Zach, "a younger PTA to transfer to Wojcik's former work location." Dkt. 41 ¶ 14. The record does not establish that this PTA was in fact younger than Wojcik, but the court will assume, *arguendo*, that he was. Had Zach actually transferred to Shelton's clinic and assumed Wojcik's duties, the court might consider the RIF a pretext for Wojcik's termination. However, Wojcik concedes that "Zach ultimately did not transfer." *Id.* Wojcik also argues that her position was not really eliminated because her duties were "absorbed by existing younger[10] employees." *Id.* But Couture explicitly based his decision to eliminate Wojcik's position in part on the expectation that the other employees would absorb Wojcik's workload. Dkt. 41-3 at 444. That the clinic struggled in the wake of Wojcik's departure is at best evidence that Couture miscalculated the clinic's ability to absorb the work —it is not evidence that the entire RIF was a farce. In sum, Shelton's complaints about her clinic's workload following Wojcik's departure are insufficient to establish that Memorial Hermann's proffered explanation for terminating Wojcik, *i.e.*, the reduction-in-force, "is false or unworthy of credence." *Squyres*, 782 F.3d at 231.

### C. Retaliation Claim

To establish a prima facie case of retaliation under the ADEA, Wojcik must show "(1) that [s]he engaged in [an] activity protected by the ADEA; (2) that there was an adverse employment action; and (3) that there was a causal connection between the participation in the protected activity and the adverse employment decision." *Holt v. JTM Indus., Inc.*, 89 F.3d 1224, 1225–26 (5th Cir. 1996) (quoting *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir. 1992)). Memorial Hermann alleges that Wojcik fails to satisfy the first and third prongs of this test. Dkt. 36 at 19.

**\*6** As to the first prong, Wojcik asserts that she engaged in a protected activity on two occasions. The first was "in a May 2017 meeting with Shelton," and the second was "when she reported her concerns to Defendant's compliance office." Dkt. 41 ¶ 20(a); *see also* Dkt. 41 ¶¶ 3, 6. "With regard to the first element, a plaintiff has engaged in protected activity if [s]he has 'opposed any practice' forbidden by the ADEA." *Heggemeier v. Caldwell Cty., Tex.*, 826 F.3d 861, 869 (5th Cir. 2016) (quoting 29 U.S.C. § 623(d)). As to the May 2017 meeting, Wojcik points the court only to pages 757 and 767 of Appendix A to her response to substantiate that she engaged in a protected activity. Dkt. 41 ¶ 3. The first page merely shows Wojcik testifying to notes from the May 2017 meeting that state "I have talked with the doctor." Dkt. 41-7 at 757. Nowhere does it reflect what she talked to Shelton about. The second page that Wojcik points to reflects that she told Shelton she felt "isolated" and that it was "all conversation about all the situation is going on in the clinic," but admits that she "didn't say by age. I didn't use the word, no." Dkt. 41-8 at 767. "[A] vague complaint that does not reference a discriminatory practice does not constitute a protected activity." *Fuentes v. City of San Antonio Fire Dep't*, 240 F. Supp. 3d 634, 645 (W.D. Tex. 2017) (citing *Carter v. Target Corp.*, 541 Fed. App'x. 413, 418 (5th Cir. 2013)). Wojcik points this court to no evidence that would suggest her May 2017 meeting with Shelton constituted a protected activity.[11] Accordingly, the court finds that Wojcik's May 2017 meeting with Shelton was not a protected activity.

As for the second occasion, "Memorial Hermann does not contest that Wojcik engaged in 'protected activity' when she lodged her complaint through Memorial Hermann's Compliance Helpline on July 5, 2017, contending that she was being terminated because of her age." Dkt. 36 at 20. However, Memorial Hermann asserts that "this complaint cannot support her retaliation claim because it came after [Wojcik] was selected for the reduction-in-force." *Id.* Wojcik admits that this protected activity *followed* receipt of "word that her employment was being terminated." Dkt. 41 ¶ 6. An adverse action contemplated by an employer before learning of the protected activity "is no evidence whatever of causality." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (per curiam).

Wojcik v. Memorial Hermann Health System, Not Reported in Fed. Supp. (2019)

2019 WL 4887265

Accordingly, with regard to Wojcik's July 5, 2017 complaint, her retaliation claim fails for lack of causality.

Wojcik appears to also claim retaliation because she "was intentionally not hired into alternate positions within MHHS even though it is their policy to place qualified employees who are affected by a reduction in force." Dkt. 41 ¶ 20(b). Memorial Hermann offers myriad reasons as to why such a claim fails, including a failure to administratively exhaust and that such a claim is not recognized in the Fifth Circuit. Dkt. 36 at 14 n. 8; Dkt. 44 at 9. The court need not address these arguments because any claims that Wojcik could make would clearly fail for other reasons.

If Wojcik is claiming retaliation for the failure to transfer her to the Town and Country clinic, that claim would fail for the same reasons that her termination claim fails: because the decision to not transfer her was made "on or about June 13, 2017" (Dkt. 36 at 8), nearly a month before Wojcik's only protected activity. If Wojcik is claiming retaliation for

Memorial Hermann's failure to hire her into some other positions, she fails to identify those positions, state when she applied for them, identify who was responsible for hiring her into them, or provide any relevant details. Assuming such a claim could be made and that Wojcik had administratively exhausted that claim, with such deficient pleading, Wojcik would fail to state a claim, much less survive summary judgment. Accordingly, all of Wojcik's potential retaliation claims fail.

### IV. CONCLUSION

**\*7** For the reasons stated above, Memorial Hermann's motion for summary judgment is **GRANTED**.

### All Citations

Not Reported in Fed. Supp., 2019 WL 4887265

### Footnotes

1    Also pending is Wojcik's opposed motion to supplement her response (Dkt. 47), which the court construes as a motion for leave to file a surreply, and Memorial Hermann's response in opposition (Dkt. 49). "The Court finds that the Defendant did not raise new legal theories or attempt to present new evidence in the Reply that would necessitate a surreply by Plaintiff." *Smith v. Fluor Enters., Inc.*, No. 4:10-CV-03625, 2013 WL 571787, at \*4 (S.D. Tex. Feb. 12, 2013) (Ellison, J.). Nor does the "additional documentary evidence" that Wojcik seeks to add (Dkt. 47 ¶ 4) constitute "exceptional or extraordinary circumstances." *Weems v. Hodnett*, No. 10-CV-1452, 2011 WL 2731263, at \*1 (W.D. La. July 13, 2011). The "new evidence" that Wojcik "located" was created by her and her counsel more than a year before the instant motion was filed. Dkt. 47-2. Accordingly, Wojcik's motion (Dkt. 47) is denied.

2    The TCHRA nomenclature is disfavored by the Texas Supreme Court. *See Johnson v. Select Energy Servs., L.L.C.*, No. CIV.A. H-11-3486, 2013 WL 5425115, at \*1 n.1 (S.D. Tex. Sept. 24, 2013) (Harmon, J.). However, because "many courts still do" use chapter 21 and TCHRA interchangeably, this court will do so also to avoid confusion when discussing case law. *Id.*

3    Wojcik's brief quotes Shelton as saying "that 'old people like green tea.' " Dkt. 41 ¶ 3. However, the court notes that these exact words do not appear in the portion of the transcript that Wojcik cites for this "quote." Dkt. 41-6 at 718. The court has quoted the relevant portion above as it appears in the transcript.

4    Wojcik does not dispute that she filed this suit 83 days after filing her dual-filing her charge with the EEOC and TWC. Dkt. 36 at 11.

5    *See Dillon v. Rogers*, 596 F.3d 260, 272 (5th Cir. 2010) (noting that the Fifth Circuit has "frequently approved of using summary judgment to address exhaustion and other affirmative defenses not enumerated in Rule 12(b)").

6    The document reflects Shelton's maiden name: Hawkins. *See* Dkt. 36 at 4 n.4.

7    The patient's name is redacted.

8    Couture became aware of the RIF in April 2017. Dkt. 36 at 6. It is not clear from the parties' briefs when precisely between April 2017, when Couture was informed of the head count reduction, and July 2017, when Wojcik's termination became

**Wojcik v. Memorial Hermann Health System, Not Reported in Fed. Supp. (2019)**

2019 WL 4887265

effective, that Couture selected Wojick for the RIF. Accordingly, the time period between this email from Shelton and Wojcik's selection for the RIF could have been longer than five months, but is at least that much.

9      Wojcik claims that "both Shelton and Couture intentionally deleted work-related communications from their mobile devices." Dkt. 41 ¶ 5 n.4. Whether this is true is not an issue before the court. Moreover, Wojcik has not suggested that the court need to resolve this issue in order to decide the instant motion. *See id.* ("Even without this evidence, Wojcik proves a "Cat's Paw" theory, shown below.").

10     Because Wojcik was the oldest employee (Dkt. 41 ¶ 3), any employee who absorbed her duties would necessarily be younger.

11     " 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.' " *Jackson v. Cal-W. Packaging Corp.,* 602 F.3d 374, 379–80 (5th Cir. 2010) (quoting *Malacara v. Garber,* 353 F.3d 393, 405 (5th Cir. 2003)).

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.