# Exhibit 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES ET AL. *v.* TEXAS ET AL.

### CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 22–58.   Argued November 29, 2022—Decided June 23, 2023

In 2021, the Secretary of Homeland Security promulgated new immigration-enforcement guidelines (Guidelines for the Enforcement of Civil Immigration Law) that prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals or who have unlawfully entered the country only recently, for example. The States of Texas and Louisiana claim that the Guidelines contravene two federal statutes that they read to require the arrest of certain noncitizens upon their release from prison (8 U. S. C. §1226(c)) or entry of a final order of removal (§1231(a)(2)). The District Court found that the States would incur costs due to the Executive's failure to comply with those alleged statutory mandates, and that the States had standing to sue based on those costs. On the merits, the District Court found the Guidelines unlawful and vacated them. The Fifth Circuit declined to stay the District Court's judgment, and this Court granted certiorari before judgment.

*Held*: Texas and Louisiana lack Article III standing to challenge the Guidelines. Pp. 3–14.

 (a) Under Article III, a plaintiff must have standing to sue. This bedrock constitutional requirement has its roots in the separation of powers. So the threshold question here is whether the States have standing to maintain this suit. Based on this Court's precedents and longstanding historical practice, the answer is no.

 To establish standing, a plaintiff must show an injury in fact caused by the defendant and redressable by a court order. The District Court found that the States would incur additional costs due to the challenged arrest policy. And monetary costs are an injury. But this Court has stressed that the alleged injury must also "be legally and judicially cognizable." *Raines* v. *Byrd,* 521 U. S. 811, 819. That requires that

2                    UNITED STATES *v.* TEXAS

Syllabus

the dispute is "traditionally thought to be capable of resolution through the judicial process." *Ibid*. Here, the States cite no precedent, history, or tradition of federal courts entertaining lawsuits of this kind. On the contrary, this Court has previously ruled that a plaintiff lacks standing to bring such a suit "when he himself is neither prosecuted nor threatened with prosecution." See *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 619. The *Linda R. S.* Article III standing principle remains the law today, and the States have pointed to no case or historical practice holding otherwise. Pp. 3–6.

   (b) There are good reasons why federal courts have not traditionally entertained lawsuits of this kind. For one, when the Executive Branch elects *not* to arrest or prosecute, it does not exercise coercive power over an individual's liberty or property, and thus does not infringe upon interests that courts often are called upon to protect. Moreover, such lawsuits run up against the Executive's Article II authority to decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *TransUnion LLC* v. *Ramirez,* 594 U. S. ___, ___. The principle of Executive Branch enforcement discretion over arrests and prosecutions extends to the immigration context. Courts also generally lack meaningful standards for assessing the propriety of enforcement choices in this area, which are invariably affected by resource constraints and regularly changing public-safety and public-welfare needs. That is why this Court has recognized that federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions. Pp. 6–9.

   (c) This holding does not suggest that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions. First, the Court has adjudicated selective-prosecution claims under the Equal Protection Clause in which a plaintiff typically seeks to prevent his or her own prosecution. Second, the standing analysis might differ when Congress elevates *de facto* injuries to the status of legally cognizable injuries redressable by a federal court. Third, the standing calculus might change if the Executive Branch wholly abandoned its statutory responsibilities to make arrests or bring prosecutions. Fourth, a challenge to an Executive Branch policy that involves both arrest or prosecution priorities *and* the provision of legal benefits or legal status could lead to a different standing analysis. Fifth, policies governing the continued detention of noncitizens who have already been arrested arguably might raise a different standing question than arrest or prosecution policies. But this case presents none of those scenarios. Pp. 9–12.

   (d) The discrete standing question raised by this case rarely arises because federal statutes that purport to require the Executive Branch

Cite as:  599 U. S. ____ (2023)          3

Syllabus

to make arrests or bring prosecutions are rare.  This case is different from those in which the Federal Judiciary decides justiciable cases involving statutory requirements or prohibitions on the Executive, because it implicates the Executive Branch's enforcement discretion and raises the distinct question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions.  The Court's decision does not indicate any view on whether the Executive is complying with its statutory obligations.  Nor does the Court's narrow holding signal any change in the balance of powers between Congress and the Executive.  Pp. 12–14.

606 F. Supp. 3d 437, reversed.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, and JACKSON, JJ., joined.  GORSUCH, J., filed an opinion concurring in the judgment, in which THOMAS and BARRETT, JJ., joined.  BARRETT, J., filed an opinion concurring in the judgment, in which GORSUCH, J., joined.  ALITO, J., filed a dissenting opinion.

Cite as: 599 U. S. ____ (2023)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–58
_____

## UNITED STATES, ET AL., PETITIONERS *v.* TEXAS, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 23, 2023]

JUSTICE KAVANAUGH delivered the opinion of the Court.

In 2021, after President Biden took office, the Department of Homeland Security issued new Guidelines for immigration enforcement. The Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example. Texas and Louisiana sued the Department of Homeland Security. According to those States, the Department's new Guidelines violate federal statutes that purportedly require the Department to arrest *more* criminal noncitizens pending their removal.

The States essentially want the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more arrests. But this Court has long held "that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R. S.* v. *Richard D.*, 410 U. S. 614, 619 (1973). Consistent with that fundamental Article III principle, we conclude that the States lack Article III standing to bring this suit.

Opinion of the Court

I

 In 2021, Secretary of Homeland Security Mayorkas promulgated new "Guidelines for the Enforcement of Civil Immigration Law." The Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example.

 Texas and Louisiana sued the Department of Homeland Security, as well as other federal officials and agencies. According to those States, the Guidelines contravene two federal statutes that purportedly require the Department to arrest more criminal noncitizens pending their removal. First, the States contend that for certain noncitizens, such as those who are removable due to a state criminal conviction, §1226(c) of Title 8 says that the Department "shall" arrest those noncitizens and take them into custody when they are released from state prison. Second, §1231(a)(2), as the States see it, provides that the Department "shall" arrest and detain certain noncitizens for 90 days after entry of a final order of removal.

 In the States' view, the Department's failure to comply with those statutory mandates imposes costs on the States. The States assert, for example, that they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government.

 The U. S. District Court for the Southern District of Texas found that the States would incur costs as a result of the Department's Guidelines. Based on those costs, the District Court determined that the States have standing. On the merits, the District Court ruled that the Guidelines are unlawful, and vacated the Guidelines. 606 F. Supp. 3d 437, 502 (SD Tex. 2022); see 5 U. S. C. §706(2). The U. S. Court of Appeals for the Fifth Circuit declined to stay the District Court's judgment. 40 F. 4th 205 (2022). This Court granted certiorari before judgment. 597 U. S. ___ (2022).

Opinion of the Court

## II

Article III of the Constitution confines the federal judicial power to "Cases" and "Controversies."  Under Article III, a case or controversy can exist only if a plaintiff has standing to sue—a bedrock constitutional requirement that this Court has applied to all manner of important disputes.  See, *e.g., TransUnion LLC* v. *Ramirez*, 594 U. S. ___, ___ (2021) (slip op., at 7); *California* v. *Texas*, 593 U. S. ___, ___ (2021) (slip op., at 4); *Carney* v. *Adams*, 592 U. S. ___, ___–___ (2020) (slip op., at 4–5); *Hollingsworth* v. *Perry*, 570 U. S. 693, 704 (2013); *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 408 (2013); *Raines* v. *Byrd*, 521 U. S. 811, 818 (1997); *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 559–560 (1992); *Allen* v. *Wright*, 468 U. S. 737, 750 (1984); *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208, 215 (1974); *United States* v. *Richardson*, 418 U. S. 166, 171 (1974).

As this Court's precedents amply demonstrate, Article III standing is "not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787."  *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 476 (1982).  The principle of Article III standing is "built on a single basic idea—the idea of separation of powers."  *Allen*, 468 U. S., at 752.  Standing doctrine helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system.  By ensuring that a plaintiff has standing to sue, federal courts "prevent the judicial process from being used to usurp the powers of the political branches."  *Clapper*, 568 U. S., at 408.

4                  UNITED STATES *v.* TEXAS

Opinion of the Court

A

According to Texas and Louisiana, the arrest policy spelled out in the Department of Homeland Security's 2021 Guidelines does not comply with the statutory arrest mandates in §1226(c) and §1231(a)(2). The States want the Federal Judiciary to order the Department to alter its arrest policy so that the Department arrests *more* noncitizens.[1]

The threshold question is whether the States have standing under Article III to maintain this suit. The answer is no.

To establish standing, a plaintiff must show an injury in fact caused by the defendant and redressable by a court order. See *Lujan*, 504 U. S., at 560–561. The District Court found that the States would incur additional costs because the Federal Government is not arresting more noncitizens. Monetary costs are of course an injury. But this Court has "also stressed that the alleged injury must be legally and judicially cognizable." *Raines*, 521 U. S., at 819. That "requires, among other things," that the "dispute is traditionally thought to be capable of resolution through the judicial process"—in other words, that the asserted injury is traditionally redressable in federal court. *Ibid.* (internal quotation marks omitted); accord *Valley Forge*, 454 U. S., at 472. In adhering to that core principle, the Court has examined "history and tradition," among other things, as "a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Sprint Communications Co.* v. *APCC Services, Inc.*, 554 U. S. 269, 274 (2008); see *TransUnion LLC*, 594 U. S., at ___–___ (slip op., at 8–9).

———————

[1] The States may want the Department to arrest *all* of the noncitizens it is now arresting plus other noncitizens—or instead to arrest *some* of the noncitizens it is now arresting plus other noncitizens. Either way, the States seek a court order that would alter the Department's arrest policy so that the Department arrests more noncitizens.

Opinion of the Court

The States have not cited any precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions. On the contrary, this Court has previously ruled that a plaintiff lacks standing to bring such a suit.

The leading precedent is *Linda R. S.* v. *Richard D.*, 410 U. S. 614 (1973). The plaintiff in that case contested a State's policy of declining to prosecute certain child-support violations. This Court decided that the plaintiff lacked standing to challenge the State's policy, reasoning that in "American jurisprudence at least," a party "lacks a judicially cognizable interest in the prosecution . . . of another." *Id.,* at 619. The Court concluded that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Ibid.*

The Court's Article III holding in *Linda R. S.* applies to challenges to the Executive Branch's exercise of enforcement discretion over whether to arrest or prosecute. See *id.,* at 617, 619; *Castle Rock* v. *Gonzales*, 545 U. S. 748, 760–761, 767, n. 13 (2005); cf. *Sure-Tan, Inc.* v. *NLRB*, 467 U. S. 883, 897 (1984) (citing *Linda R. S.* principle in immigration context and stating that the petitioners there had "no judicially cognizable interest in procuring enforcement of the immigration laws" by the Executive Branch). And importantly, that Article III standing principle remains the law today; the States have pointed to no case or historical practice holding otherwise. A "telling indication of the severe constitutional problem" with the States' assertion of standing to bring this lawsuit "is the lack of historical precedent" supporting it. *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 505 (2010) (internal quotation marks omitted); see also *Raines*, 521 U. S., at 826 ("Not only do appellees lack support from precedent, but historical practice appears

to cut against them as well").

In short, this Court's precedents and longstanding historical practice establish that the States' suit here is not the kind redressable by a federal court.

## B

Several good reasons explain why, as *Linda R. S.* held, federal courts have not traditionally entertained lawsuits of this kind.

To begin with, when the Executive Branch elects *not* to arrest or prosecute, it does not exercise coercive power over an individual's liberty or property, and thus does not infringe upon interests that courts often are called upon to protect. See *Lujan*, 504 U. S., at 561–562. And for standing purposes, the absence of coercive power over the plaintiff makes a difference: When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed" to establish standing. *Id.,* at 562 (emphasis deleted).[2]

Moreover, lawsuits alleging that the Executive Branch has made an insufficient number of arrests or brought an insufficient number of prosecutions run up against the Executive's Article II authority to enforce federal law. Article II of the Constitution assigns the "executive Power" to the President and provides that the President "shall take Care that the Laws be faithfully executed." U. S. Const., Art. II, §1, cl. 1; §3. Under Article II, the Executive Branch possesses authority to decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *TransUnion LLC*, 594 U. S., at ___ (slip op., at 13); see *Lujan*, 504 U. S., at 576–578; *Allen*, 468

---

[2] By contrast, when "the plaintiff is himself an object of the action (or forgone action) at issue," "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U. S., at 561–562.

Opinion of the Court

U. S., at 760–761.   The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States.   See *United States* v. *Nixon*, 418 U. S. 683, 693 (1974) ("the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *Printz* v. *United States*, 521 U. S. 898, 922–923 (1997) (Brady Act provisions held unconstitutional because, among other things, they transferred power to execute federal law to state officials); *United States* v. *Armstrong*, 517 U. S. 456, 464 (1996) (decisions about enforcement of "the Nation's criminal laws" lie within the "special province of the Executive" (internal quotation marks omitted)); *Buckley* v. *Valeo*, 424 U. S. 1, 138 (1976) ("A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed'" (quoting U. S. Const., Art. II, §3)); see also *United States* v. *Cox*, 342 F. 2d 167, 171 (CA5 1965).

   That principle of enforcement discretion over arrests and prosecutions extends to the immigration context, where the Court has stressed that the Executive's enforcement discretion implicates not only "normal domestic law enforcement priorities" but also "foreign-policy objectives." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 490–491 (1999).   In line with those principles, this Court has declared that the Executive Branch also retains discretion over whether to remove a noncitizen from the United States.   *Arizona* v. *United States*, 567 U. S. 387, 396 (2012) ("Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all").

   In addition to the Article II problems raised by judicial review of the Executive Branch's arrest and prosecution policies, courts generally lack meaningful standards for assessing the propriety of enforcement choices in this area.   After all, the Executive Branch must prioritize its

Opinion of the Court

enforcement efforts.  See *Wayte* v. *United States*, 470 U. S.
598, 607–608 (1985).  That is because the Executive Branch
(i) invariably lacks the resources to arrest and prosecute
every violator of every law and (ii) must constantly react
and adjust to the ever-shifting public-safety and public-
welfare needs of the American people.

This case illustrates the point.  As the District Court
found, the Executive Branch does not possess the resources
necessary to arrest or remove all of the noncitizens covered
by §1226(c) and §1231(a)(2).  That reality is not an
anomaly—it is a constant.  For the last 27 years since
§1226(c) and §1231(a)(2) were enacted in their current
form, all five Presidential administrations have determined
that resource constraints necessitated prioritization in
making immigration arrests.

In light of inevitable resource constraints and regularly
changing public-safety and public-welfare needs, the
Executive Branch must balance many factors when
devising arrest and prosecution policies.  That complicated
balancing process in turn leaves courts without meaningful
standards for assessing those policies.  Cf. *Heckler* v.
*Chaney*, 470 U. S. 821, 830–832 (1985); *Lincoln* v. *Vigil*, 508
U. S. 182, 190–192 (1993).  Therefore, in both Article III
cases and Administrative Procedure Act cases, this Court
has consistently recognized that federal courts are
generally not the proper forum for resolving claims that the
Executive Branch should make more arrests or bring more
prosecutions.  See *Linda R. S.*, 410 U. S., at 619; cf. *Heckler*,
470 U. S., at 831 (recognizing the "general unsuitability for
judicial review of agency decisions to refuse enforcement");
*ICC* v. *Locomotive Engineers*, 482 U. S. 270, 283 (1987) ("it
is entirely clear that the refusal to prosecute cannot be the
subject of judicial review").[3]

_____

[3] Also, the plaintiffs here are States, and federal courts must remain
mindful of bedrock Article III constraints in cases brought by States

Opinion of the Court

All of those considerations help explain why federal courts have not traditionally entertained lawsuits of this kind.  By concluding that Texas and Louisiana lack standing here, we abide by and reinforce the proper role of the Federal Judiciary under Article III.  The States' novel standing argument, if accepted, would entail expansive judicial direction of the Department's arrest policies.  If the Court green-lighted this suit, we could anticipate complaints in future years about alleged Executive Branch under-enforcement of any similarly worded laws—whether they be drug laws, gun laws, obstruction of justice laws, or the like.  We decline to start the Federal Judiciary down that uncharted path.   Our constitutional system of separation of powers "contemplates a more restricted role for Article III courts." *Raines*, 521 U. S., at 828.

C

In holding that Texas and Louisiana lack standing, we do not suggest that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions.

*First*, the Court has adjudicated selective-prosecution claims under the Equal Protection Clause.  In those cases, however, a party typically seeks to prevent his or her own prosecution, not to mandate additional prosecutions

———

against an executive agency or officer.  To be sure, States sometimes have standing to sue the United States or an executive agency or officer.  See, *e.g., New York* v. *United States*, 505 U. S. 144 (1992).  But in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending.  And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated.  See *Massachusetts* v. *Laird*, 400 U. S. 886 (1970); *Florida* v. *Mellon*, 273 U. S. 12, 16–18 (1927); cf. *Lujan*, 504 U. S., at 561–562.  In short, none of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit.

against other possible defendants.  See, *e.g., Wayte*, 470
U. S., at 604; *Armstrong*, 517 U. S., at 459, 463.

*Second*, as the Solicitor General points out, the standing
analysis might differ when Congress elevates *de facto*
injuries to the status of legally cognizable injuries
redressable by a federal court.  See Brief for Petitioners 20,
n. 3; cf. *TransUnion LLC*, 594 U. S., at ___–___ (slip op., at
10–11); *Federal Election Comm'n* v. *Akins*, 524 U. S. 11, 20
(1998); *Raines*, 521 U. S., at 820, n. 3; *Lujan*, 504 U. S., at
578; *Linda R. S.*, 410 U. S., at 617, n. 3.  For example,
Congress might (i) specifically authorize suits against the
Executive Branch by a defined set of plaintiffs who have
suffered concrete harms from executive under-enforcement
and (ii) specifically authorize the Judiciary to enter
appropriate orders requiring additional arrests or
prosecutions by the Executive Branch.

Here, however, the relevant statutes do not supply such
specific authorization.  The statutes, even under the States'
own reading, simply say that the Department "shall" arrest
certain noncitizens.  Given the "deep-rooted nature of law-
enforcement discretion," a purported statutory arrest
mandate, without more, does not entitle any particular
plaintiff to enforce that mandate in federal court.  *Castle
Rock*, 545 U. S., at 761, 764–765, 767, n. 13; cf. *Heckler*, 470
U. S., at 835.  For an arrest mandate to be enforceable in
federal court, we would need at least a "stronger indication"
from Congress that judicial review of enforcement
discretion is appropriate—for example, specific
authorization for particular plaintiffs to sue and for federal
courts to order more arrests or prosecutions by the
Executive.  *Castle Rock*, 545 U. S., at 761.  We do not take
a position on whether such a statute would suffice for
Article III purposes; our only point is that no such statute
is present in this case.[4]

––––––––––

[4]As the Solicitor General noted, those kinds of statutes, by infringing

Opinion of the Court

*Third*, the standing calculus might change if the Executive Branch wholly abandoned its statutory responsibilities to make arrests or bring prosecutions. Under the Administrative Procedure Act, a plaintiff arguably could obtain review of agency non-enforcement if an agency "has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *Heckler*, 470 U. S., at 833, n. 4 (internal quotation marks omitted); see *id.,* at 839 (Brennan, J., concurring); cf. 5 U. S. C. §706(1). So too, an extreme case of non-enforcement arguably could exceed the bounds of enforcement discretion and support Article III standing. But the States have not advanced a *Heckler*-style "abdication" argument in this case or argued that the Executive has entirely ceased enforcing the relevant statutes. Therefore, we do not analyze the standing ramifications of such a hypothetical scenario.

*Fourth*, a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. That is because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion. Cf. *Department of Homeland Security* v. *Regents of Univ. of Cal.*, 591 U. S. ___, ___–___ (2020) (slip op., at 11–12) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); *Texas* v. *United States*, 809 F. 3d 134, 154 (CA5 2015) (*Linda R. S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits"), aff'd by an equally divided Court, 579 U. S. 547 (2016). Again, we need

_____

on the Executive's enforcement discretion, could also raise Article II issues. See Tr. of Oral Arg. 24–25.

not resolve the Article III consequences of such a policy.

*Fifth*, policies governing the continued detention of noncitizens who have already been arrested arguably might raise a different standing question than arrest or prosecution policies. Cf. *Biden* v. *Texas*, 597 U. S. ___ (2022). But this case does not concern a detention policy, so we do not address the issue here.[5]

### D

The discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare—not surprisingly, given the Executive's Article II authority to enforce federal law and the deeply rooted history of enforcement discretion in American law. Indeed, the States cite no similarly worded federal laws. This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit.

To be clear, our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action. Moreover, the Federal Judiciary of course routinely and appropriately decides justiciable cases involving statutory requirements or prohibitions on the Executive.

---

[5] This case concerns only arrest and prosecution policies, and we therefore address only that issue. As to detention, the Solicitor General has represented that the Department's Guidelines do not affect continued detention of noncitizens already in federal custody. See Brief for Petitioners 24; Tr. of Oral Arg. 40 (Solicitor General: "the Guidelines govern only decisions about apprehension and removal, whether to charge a non-citizen in the first place. . . . the Guidelines don't have anything to do with continued detention"); Guidelines Memorandum, App. 111 ("This memorandum provides guidance for the apprehension and removal of noncitizens"); *id.,* at 113 ("We will prioritize for apprehension and removal noncitizens who are a threat to our national security, public safety, and border security").

Opinion of the Court

See, *e.g., American Hospital Assn.* v. *Becerra*, 596 U. S. ___, ___–___ (2022) (slip op., at 9–14); *Weyerhaeuser Co.* v. *United States Fish and Wildlife Serv.*, 586 U. S. ___, ___–___ (2018) (slip op., at 8–15); *Zivotofsky* v. *Clinton*, 566 U. S. 189, 196–201 (2012); *Hamdan* v. *Rumsfeld*, 548 U. S. 557, 592–595, 613–615, 635 (2006); *id.,* at 636–646 (Kennedy, J., concurring); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 637–638, 640 (1952) (Jackson, J., concurring).

This case is categorically different, however, because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law. And this case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests. Under this Court's Article III precedents and the historical practice, the answer is no.[6]

It bears emphasis that the question of whether the federal courts have jurisdiction under Article III is distinct from the question of whether the Executive Branch is complying with the relevant statutes—here, §1226(c) and §1231(a)(2). In other words, the question of reviewability is different from the question of legality. We take no position on whether the Executive Branch here is complying with its legal obligations under §1226(c) and §1231(a)(2). We hold

———————

[6]As part of their argument for standing, the States also point to *Massachusetts* v. *EPA*, 549 U. S. 497 (2007). Putting aside any disagreements that some may have with *Massachusetts* v. *EPA*, that decision does not control this case. The issue there involved a challenge to the denial of a statutorily authorized petition for rulemaking, not a challenge to an exercise of the Executive's enforcement discretion. *Id.,* at 520, 526; see also *id.,* at 527 (noting that there are "key differences between a denial of a petition for rulemaking and an agency's decision not to initiate an enforcement action" and that "an agency's refusal to initiate enforcement proceedings is not ordinarily subject to judicial review").

Opinion of the Court

only that the federal courts are not the proper forum to resolve this dispute.

On that point, even though the federal courts lack Article III jurisdiction over this suit, other forums remain open for examining the Executive Branch's arrest policies. For example, Congress possesses an array of tools to analyze and influence those policies—oversight, appropriations, the legislative process, and Senate confirmations, to name a few. Cf. *Raines*, 521 U. S., at 829; *Lincoln*, 508 U. S., at 193. And through elections, American voters can both influence Executive Branch policies and hold elected officials to account for enforcement decisions. In any event, those are political checks for the political process. We do not opine on whether any such actions are appropriate in this instance.

The Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo. See *Linda R. S.*, 410 U. S., at 619. The Court's decision does not alter the balance of powers between Congress and the Executive, or change the Federal Judiciary's traditional role in separation of powers cases.

*          *          *

In sum, the States have brought an extraordinarily unusual lawsuit. They want a federal court to order the Executive Branch to alter its arrest policies so as to make more arrests. Federal courts have not traditionally entertained that kind of lawsuit; indeed, the States cite no precedent for a lawsuit like this. The States lack Article III standing because this Court's precedents and the "historical experience" preclude the States' "attempt to litigate this dispute at this time and in this form." *Raines*, 521 U. S., at 829. And because the States lack Article III standing, the District Court did not have jurisdiction. We reverse the judgment of the District Court.

*It is so ordered.*

Cite as:  599 U. S. ____ (2023)          1

GORSUCH, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–58

_____

## UNITED STATES, ET AL., PETITIONERS *v.* TEXAS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 23, 2023]

JUSTICE GORSUCH, with whom JUSTICE THOMAS and JUSTICE BARRETT join, concurring in the judgment.

The Court holds that Texas and Louisiana lack Article III standing to challenge the Department of Homeland Security's Guidelines for the Enforcement of Civil Immigration Law. I agree. But respectfully, I diagnose the jurisdictional defect differently. The problem here is redressability.

## I

Article III vests federal courts with the power to decide "Cases" and "Controversies." Standing doctrine honors the limitations inherent in this assignment by ensuring judges attend to actual harms rather than abstract grievances. "If individuals and groups could invoke the authority of a federal court to forbid what they dislike for no more reason than they dislike it, we would risk exceeding the judiciary's limited constitutional mandate and infringing on powers committed to other branches of government." *American Legion* v. *American Humanist Assn.*, 588 U. S. ___, ___ (2019) (GORSUCH, J., concurring in judgment) (slip op., at 3).

To establish standing to sue in federal court, a plaintiff must show that it has suffered a concrete and particularized injury, one that is both traceable to the defendant and redressable by a court order. See *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992). If a plaintiff fails

2                UNITED STATES *v.* TEXAS

GORSUCH, J., concurring in judgment

at any step, the court cannot reach the merits of the dispute. See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 102–104 (1998). This is true whether the plaintiff is a private person or a State. After all, standing doctrine derives from Article III, and nothing in that provision suggests a State may have standing when a similarly situated private party does not. See *Massachusetts* v. *EPA*, 549 U. S. 497, 536–538 (2007) (ROBERTS, C. J., dissenting).

The Court holds that Texas and Louisiana lack standing to challenge the Guidelines because "a party lacks a judicially cognizable interest in the prosecution . . . of another." *Ante*, at 5 (internal quotation marks omitted). To be sure, the district court found that the Guidelines have led to an increase in the number of aliens with criminal convictions and final orders of removal who are released into the States. 606 F. Supp. 3d 437, 459–463, 467 (SD Tex. 2022). The district court also found that, thanks to this development, the States have spent, and continue to spend, more money on law enforcement, incarceration, and social services. *Id.,* at 463–465, 467. Still, the Court insists, "[s]everal good reasons explain why" these harms are insufficient to afford the States standing to challenge the Guidelines. *Ante*, at 6.

I confess to having questions about each of the reasons the Court offers. Start with its observation that the States have not pointed to any "historical practice" of courts ordering the Executive Branch to change its arrest or prosecution policies. *Ante*, at 5, 6. The Court is right, of course, that "history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *TransUnion LLC* v. *Ramirez*, 594 U. S. ___, ___ (2021) (slip op., at 8) (internal quotation marks omitted). But, again, the district court found that the Guidelines impose "significant costs" on the States. 606 F. Supp. 3d, at 495. The Court today does not set aside this finding as clearly erroneous. Nor does anyone dispute that even one dollar's worth of harm is traditionally enough to "qualify as

concrete injur[y] under Article III." *TransUnion*, 594 U. S.,
at ___ (slip op., at 9); see also *Uzuegbunam* v. *Preczewski*,
592 U. S. ___, ___ (2021) (slip op., at 11). Indeed, this Court
has allowed other States to challenge other Executive
Branch policies that indirectly caused them monetary
harms. See, *e.g., Department of Commerce* v. *New York*, 588
U. S. ___, ___–___ (2019) (slip op., at 9–10). So why are
these States now forbidden from doing the same?

Next, the Court contends that, "when the Executive
Branch elects *not* to arrest or prosecute, it does not exercise
coercive power over an individual's liberty or property."
*Ante*, at 6. Here again, in principle, I agree. But if an ex-
ercise of coercive power matters so much to the Article III
standing inquiry, how to explain decisions like *Massachu-
setts* v. *EPA*? There the Court held that Massachusetts had
standing to challenge the federal government's decision not
to regulate greenhouse gas emissions from new motor vehi-
cles. See 549 U. S., at 516–526. And what could be less
coercive than a decision not to regulate? In *Massachusetts*
v. *EPA*, the Court chose to overlook this difficulty in part
because it thought the State's claim of standing deserved
"special solicitude." *Id.,* at 520. I have doubts about that
move. Before *Massachusetts* v. *EPA*, the notion that States
enjoy relaxed standing rules "ha[d] no basis in our jurispru-
dence." *Id.,* at 536 (ROBERTS, C. J., dissenting). Nor has
"special solicitude" played a meaningful role in this Court's
decisions in the years since. Even so, it's hard not to wonder
why the Court says nothing about "special solicitude" in
this case. And it's hard not to think, too, that lower courts
should just leave that idea on the shelf in future ones.

Finally, the Court points to the fact that Article II vests
in the President considerable enforcement discretion. *Ante*,
at 6–8. So much so that "courts generally lack meaningful
standards for assessing the propriety of [the Executive
Branch's] enforcement choices." *Ante*, at 7. But almost as

soon as the Court announces this general rule, it adds a ca-
veat, stressing that "[t]his case concerns only arrest and
prosecution policies." *Ante,* at 12, n. 5. It's a curious quali-
fication. Article II does not have an Arrest and Prosecution
Clause. It endows the President with the "executive
Power," §1, cl. 1, and charges him with "tak[ing] Care" that
federal laws are "faithfully executed," §3. These provisions
give the President a measure of discretion over the enforce-
ment of *all* federal laws, not just those that can lead to ar-
rest and prosecution. So if the Court means what it says
about Article II, can it mean what it says about the narrow-
ness of its holding? There's another curious qualification in
the Court's opinion too. "[T]he standing calculus might
change," we are told, "if the Executive Branch wholly aban-
doned its statutory responsibilities to make arrests or bring
prosecutions." *Ante*, at 11. But the Court declines to say
more than that because "the States have not advanced"
such an argument. *Ibid.* Is that true, though? The States
have pleaded a claim under the Take Care Clause. App.
106. Is that not an abdication argument? Did they fail to
plead it properly? Or is the Court simply ignoring it?

## II

As I see it, the jurisdictional problem the States face in
this case isn't the lack of a "judicially cognizable" interest
or injury. *Ante,* at 5 (internal quotation marks omitted).
The States proved that the Guidelines increase the number
of aliens with criminal convictions and final orders of re-
moval released into the States. They also proved that, as a
result, they spend more money on everything from law en-
forcement to healthcare. The problem the States face con-
cerns something else altogether—a lack of redressability.

To establish redressability, a plaintiff must show from
the outset of its suit that its injuries are capable of being
remedied "'by a favorable decision.'" *Lujan*, 504 U. S., at
561; see also *id.,* at 570, n. 5 (plurality opinion). Ordinarily,

GORSUCH, J., concurring in judgment

to remedy harms like those the States demonstrated in this suit, they would seek an injunction.  The injunction would direct federal officials to detain aliens consistent with what the States say the immigration laws demand.  But even assuming an injunction like that would redress the States' injuries, that form of relief is not available to them.

It is not available because of 8 U. S. C. §1252(f)(1).  There, Congress provided that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" certain immigration laws, including the very laws the States seek to have enforced in this case.  If there were any doubt about how to construe this command, we resolved it in *Garland* v. *Aleman Gonzalez*, 596 U. S. ___ (2022).  In that case, we held that §1252(f)(1) "prohibits lower courts from . . . order[ing] federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.,* at ___ (slip op., at 5).  Put simply, the remedy that would ordinarily have the best chance of redressing the States' harms is a forbidden one in this case.

The district court thought it could sidestep §1252(f)(1).  Instead of issuing an injunction, it purported to "vacate" the Guidelines pursuant to §706(2) of the Administrative Procedure Act (APA), 5 U. S. C. §706(2).  606 F. Supp. 3d, at 498–501, and n. 71.  Vacatur, as the district court understood it, is a distinct form of relief that operates directly on agency action, depriving it of legal force or effect.  See *id.,* at 499–500.  And vacatur, the district court reasoned, does not offend §1252(f)(1), because it does not entail an order directing any federal official to do anything.  See *id.,* at 501, n. 71.  The States embrace this line of argument before us.  Brief for Respondents 43–47; Tr. of Oral Arg. 75–82.

It's a clever workaround, but it doesn't succeed.  Start with perhaps the simplest reason.  Assume for the moment the district court was right that §1252(f)(1) does not bar vacatur orders and that §706(2) authorizes courts to issue

them. Even so, a vacatur order still does nothing to redress the States' injuries. The Guidelines merely advise federal officials about how to exercise their prosecutorial discretion when it comes to deciding which aliens to prioritize for arrest and removal. A judicial decree rendering the Guidelines a nullity does nothing to change the fact that federal officials possess the same underlying prosecutorial discretion. Nor does such a decree require federal officials to change how they exercise that discretion in the Guidelines' absence. It's a point even the States have acknowledged. Tr. of Oral Arg. 82–83; see also *id.,* at 75–77, 125.

Faced with that difficulty, the States offer this reply. As a practical matter, they say, we can expect federal officials to alter their arrest and prosecution priorities in light of a judicial opinion reasoning that the Guidelines are unlawful. See *id.,* at 80, 82–83. But this doesn't work either. Whatever a court may say in an opinion does no more to compel federal officials to change how they exercise their prosecutorial discretion than an order vacating the Guidelines. Nor do we measure redressability by asking whether a court's legal reasoning may inspire or shame others into acting differently. We measure redressability by asking whether a court's judgment will remedy the plaintiff's harms. As this Court recently put it: "It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability." *Haaland* v. *Brackeen*, 599 U. S. ___, ___ (2023) (slip op., at 32). If the rule were otherwise, and courts could "simply assume that everyone . . . will honor the legal rationales that underlie their decrees, then redressability [would] *always* exist." *Franklin* v. *Massachusetts*, 505 U. S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in judgment).

Perhaps sensing they have run into yet another roadblock, the States try one last way around it. Fleetingly, they direct us to the parenthetical in §1252(f)(1): "(other than the Supreme Court)." That language, they say, allows

GORSUCH, J., concurring in judgment

this Court to invoke the All Writs Act, 28 U. S. C. §1651, to fashion its own injunction. And the possibility that this Court might award them relief, the States suggest, makes their injuries redressable after all. See Brief for Respondents 47; cf. *post,* at 12 (ALITO, J., dissenting).

It's an argument that yields more questions than answers. The parenthetical the States cite is a "curious" provision, one that "does not appear to have an analogue elsewhere in the United States Code." *Biden* v. *Texas*, 597 U. S. ___, ___ (2022) (BARRETT, J., dissenting) (slip op., at 4). Even assuming it permits this Court to award an injunction when a case comes to us on review, it does not obviously solve the States' redressability problem. Normally, after all, a plaintiff must establish redressability from the outset of the suit. See *Lujan*, 504 U. S., at 561; see also *id.,* at 570, n. 5 (plurality opinion). Not only that, a plaintiff must show a favorable decision is "'likely'" to provide effectual relief. *Id.,* at 561. When the States filed this suit, however, the possibility that it might find its way to this Court was speculative at best. See *id.*, at 570, n. 5 (plurality opinion) (rejecting an argument that redressability could depend on "the fortuity that [a] case has made its way to *this* Court").

Nor is that the only complication. Ordinarily, to win an injunction from any court, a party must satisfy several factors. See *eBay Inc.* v. *MercExchange, L. L. C.*, 547 U. S. 388, 391 (2006). The States relegate any mention of these factors to a short, formulaic paragraph tacked onto the end of their brief. See Brief for Respondents 48. Worse, the only injunction they seek is one barring "implementation and enforcement" of the Guidelines—essentially an injunction imitating a vacatur order. *Id.*, at 47. And as we have seen, an order like that would leave officials with their prosecutorial discretion intact. See *supra,* at 6. So, even if this Court were to take the unusual step of issuing and superintending its own injunction, giving the States the very order they seek is hardly sure to redress the injuries they assert.

### III

Beyond these redressability problems may lie still another.  Recall the essential premise on which the district court proceeded—that the APA empowers courts to vacate agency action.  The federal government vigorously disputes this premise, arguing that the law does not contemplate this form of relief.  The reasons the government offers are plenty and serious enough to warrant careful consideration.

### A

Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff.  If the court's remedial order affects nonparties, it does so only incidentally.  See, *e.g., Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 931 (1975) ("[N]either declaratory nor injunctive relief can directly interfere with the enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs."); *Alemite Mfg. Corp.* v. *Staff*, 42 F. 2d 832 (CA2 1930) (L. Hand, J.) ("[A] court of equity . . . cannot lawfully enjoin the world at large."); see also *Trump* v. *Hawaii*, 585 U. S. ___, ___ (2018) (Thomas, J., concurring) (slip op., at 6).  This tracks the founding-era understanding that courts "render a judgment or decree upon the rights of the litigant[s]." *Rhode Island* v. *Massachusetts*, 12 Pet. 657, 718 (1838).  It also ensures that federal courts respect the limits of their Article III authority to decide cases and controversies and avoid trenching on the power of the elected branches to shape legal rights and duties more broadly.  After all, the "judicial Power" is the power to "decide cases for parties, not questions for everyone."  S. Bray, Multiple Chancellors:  Reforming the National Injunction, 131 Harv. L. Rev. 417, 421 (2017).

Despite these foundational principles, in recent years a number of lower courts have asserted the authority to issue

GORSUCH, J., concurring in judgment

decrees that purport to define the rights and duties of some-
times millions of people who are not parties before them.
Three years ago, I reflected on the rise of the "universal in-
junctio[n]" and raised questions about its consistency with
the separation of powers and our precedents.  *Department
of Homeland Security* v. *New York*, 589 U. S. ___, ___ (2020)
(opinion concurring in grant of stay) (slip op., at 3).  I ob-
served, too, that "the routine issuance of universal injunc-
tions" has proven "unworkable, sowing chaos for litigants,
the government, courts, and all those affected by these
[sometimes] conflicting" decrees.  *Ibid.*

Matters have not improved with time.  Universal injunc-
tions continue to intrude on powers reserved for the elected
branches.  They continue to deprive other lower courts of
the chance to weigh in on important questions before this
Court has to decide them.  They continue to encourage par-
ties to engage in forum shopping and circumvent rules gov-
erning class-wide relief.  Recent events have highlighted
another problem too.  Sometimes, the government may ef-
fectively submit to a universal decree running against it in
order to avoid "the usual and important requirement, under
the [APA], that a regulation originally promulgated using
notice and comment . . . may only be repealed through no-
tice and comment."  *Arizona* v. *City and County of San
Francisco*, 596 U. S. ___, ___ (2022) (ROBERTS, C. J., concur-
ring) (slip op., at 2).  It is a strategy that amounts to little
more than "'rulemaking-by-collective-acquiescence.'"  *Ibid.*;
see also *Danco Laboratories, LLC* v. *Alliance for Hippo-
cratic Medicine*, 598 U. S. ___, ___ (2023) (ALITO, J., dissent-
ing from grant of application for stays) (slip op., at 3); *Ari-
zona* v. *Mayorkas*, 598 U. S. ___, ___–___ (2023) (statement
of GORSUCH, J.) (slip op., at 1–4).

Today's case presents a variation on the theme.  The dis-
trict court ordered "wholesale vacatur" of the Guidelines,
rendering them inoperable with respect to any person any-
where.  606 F. Supp. 3d, at 499, 502.  As authority for its

course, the district court cited §706(2) of the APA. That provision does not say anything about "vacating" agency action ("wholesale" or otherwise). Instead, it authorizes a reviewing court to "set aside" agency action. Still, from those two words alone, the district court thought the power to nullify the Guidelines with respect to anyone anywhere surely follows. See 606 F. Supp. 3d, at 498–500.

Color me skeptical. If the Congress that unanimously passed the APA in 1946 meant to overthrow the "bedrock practice of case-by-case judgments with respect to the parties in each case" and vest courts with a "new and far-reaching" remedial power, it surely chose an obscure way to do it. *Arizona* v. *Biden*, 40 F. 4th 375, 396 (CA6 2022) (Sutton, C. J., concurring). At the very least, it is worth a closer look.

                                B

Begin with the words "set aside" in isolation. If they might suggest to some a power to "vacate" agency action in the sense of rendering it null and void, just as naturally they might mean something else altogether. They might simply describe what a court usually does when it finds a federal or state statute unconstitutional, or a state law preempted by a federal one. Routinely, a court will disregard offensive provisions like these and proceed to decide the parties' dispute without respect to them. In *Dennis* v. *United States*, 341 U. S. 494 (1951), for example, Justice Frankfurter observed that "[w]e are to set aside the judgment of those whose duty it is to legislate only if" the Constitution requires it. *Id.*, at 525 (concurring opinion). Justice Frankfurter hardly meant to suggest the Court had the power to erase statutes from the books. See *id.*, at 525–526. Instead, he used the phrase to mean that a court should disregard—refuse to apply—an unconstitutional law. It is a usage that was common at the time of the APA's adoption and that remains so today. See Webster's New International Dictionary 2291 (2d ed. 1954) (defining "set aside" as

Cite as: 599 U. S. ____ (2023)          11

GORSUCH, J., concurring in judgment

"to put to one side; discard; dismiss" and "to reject from consideration; overrule"); Webster's New World College Dictionary 1329 (5th ed. 2016) (defining "set aside" as "to set apart" and "to discard; dismiss; reject").

There are many reasons to think §706(2) uses "set aside" to mean "disregard" rather than "vacate." For one thing, at the time of the APA's adoption, conventional wisdom regarded agency rules as "quasi-legislative" in nature. See *Humphrey's Executor* v. *United States*, 295 U. S. 602, 624, 628 (1935); see also D. Currie & F. Goodman, Judicial Review of Federal Administrative Action: Quest for the Optimum Forum, 75 Colum. L. Rev. 1, 40 (1975). And federal courts have never enjoyed the power to "vacate" legislation. Instead, they possess "little more than the negative power to disregard an unconstitutional enactment." *Massachusetts* v. *Mellon*, 262 U. S. 447, 488 (1923). Reading "set aside" to mean "disregard" ensures parallel judicial treatment of statutes and rules.

For another thing, the term "set aside" appears in §706 of the APA. That section is titled "Scope of review," a title it has borne since the law's enactment in 1946. 60 Stat. 243. And ordinarily, when we think about the scope of a court's review, we do not think about the remedies the court may authorize after reaching its judgment on the merits. Instead, we think about the court's decisional process leading up to that judgment. Understanding "set aside" as a command to disregard an unlawful rule in the decisional process fits perfectly within this design. Understanding the phrase as authorizing a remedy does not.

What follows in §706 appears to confirm the point. The statute begins by providing that, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of an agency action." Exactly as

GORSUCH, J., concurring in judgment

expected, we find an instruction about the decisional process—one requiring the court to apply "de novo review on questions of law" as it considers the parties' arguments in the course of reaching its judgment. *Kisor* v. *Wilkie*, 588 U. S. ___, ___ (2019) (GORSUCH, J., concurring in judgment) (slip op., at 15) (internal quotation marks omitted). Nothing here speaks to remedies.

The remaining statutory language is more of the same. Section 706 goes on to instruct that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary," "capricious," "contrary to constitutional right," "in excess of" statutory authority, or "unsupported by substantial evidence." §706(2). Looking at the provision as a whole, rather than focusing on two words in isolation, we see further evidence that it governs a court's scope of review or decisional process. The statute tells judges to resolve the cases that come to them without regard to deficient agency action, findings, or conclusions—an instruction entirely consistent with the usual "negative power" of courts "to disregard" that which is unlawful. *Mellon*, 262 U. S., at 488.

Other details are telling too. Consider the latter part of §706(2)'s directive to "set aside agency action, findings, and conclusions." The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U. S. C. §551(13). A court can disregard any of those things. But what would it even mean to say a court must render null and void an agency's failure to act? Notice, too, the language about "findings." Often, judges disregard factual findings unsupported by record evidence and resolve the case at hand without respect to them. See Fed. Rule Civ. Proc. 52(a)(6) ("Findings of fact . . . must not be set aside unless clearly erroneous."). None of that means we may pretend to rewrite history and scrub any trace of faulty findings from the record.

GORSUCH, J., concurring in judgment

Consider as well the larger statutory context.  Section 702 restricts judicial review to "person[s]" who have "suffer[ed] legal wrong because of agency action, or [been] adversely affected or aggrieved by agency action."  The provision also instructs that "any mandatory or injunctive decree shall specify the Federal officer or officers . . . personally responsible for compliance."  Here, it seems, Congress nodded to traditional standing rules and remedial principles.  Yet under the district court's reading, we must suppose Congress proceeded just a few paragraphs later to plow right through those rules and empower a single judge to award a novel form of relief affecting parties and nonparties alike.

Then there is §703.  That is where the APA most clearly discusses remedies.  Section 703 authorizes aggrieved persons to bring "any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus."  Conspicuously missing from the list is vacatur.  And what exactly would a "form of legal action" seeking vacatur look like anyway?  Would it be a creature called a "writ of vacatur"?  Nobody knows (or bothers to tell us).  Nor is it apparent why Congress would have listed most remedies in §703 only to bury another (and arguably the most powerful one) in a later section addressed to the scope of review.  Cf. J. Harrison, Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies, 37 Yale J. Reg. Bull. 37, 37, 45–46 (2020).

The district court's reading of "set aside" invites still other anomalies.  Section 706(2) governs all proceedings under the APA.  Any interpretation of "set aside" therefore must make sense in the context of an enforcement proceeding, an action for a declaratory judgment, a suit for an injunction, or habeas.  See §703.  This poses a problem for the district court's interpretation, for no one thinks a court adjudicating a declaratory action or a habeas petition "vacates" agency action along the way.  See Brief for United

14                 UNITED STATES *v.* TEXAS

States 41–42; Harrison, 37 Yale J. Reg. Bull., at 46.  The anomaly dissipates, however, if we read §706(2) as instructing courts about when they must disregard agency action in the process of deciding a case.

Imagine what else it would mean if §706(2) really did authorize vacatur.  Ordinary joinder and class-action procedures would become essentially irrelevant in administrative litigation.  Why bother jumping through those hoops when a single plaintiff can secure a remedy that rules the world?  See Bray, 131 Harv. L. Rev., at 464–465.  Surely, too, it is odd that leading scholars who wrote extensively about the APA after its adoption apparently never noticed this supposed remedy.  See J. Harrison, Vacatur of Rules Under the Administrative Procedure Act, 40 Yale J. Reg. Bull. 119, 127–128 (2023) (discussing scholarship of Professors Kenneth Culp Davis and Louis Jaffe); see also Department of Justice, Attorney General's Manual on the Administrative Procedure Act 108 (1947) (offering the Executive Branch's view that §706 simply "restates the present law as to the scope of judicial review").  These are not people who would have missed such a major development in their field.

C

As always, there are arguments on the other side of the ledger, and the States tee up several.  They first reply that §706(2) must allow vacatur of agency action because the APA models judicial review of agency action on appellate review of judgments, and appellate courts sometimes vacate judgments.  Brief for Respondents 40.  But just because "Congress may sometimes refer to collateral judicial review of executive action as 'an appeal' . . . does not make it an 'appeal' akin to that taken from the district court to the court of appeals."  *Garland* v. *Ming Dai*, 593 U. S. ___, ___ (2021) (slip op., at 9).  Nor does any of that tell us in which respects the APA models judicial review of agency action on appellate review of lower court judgments.  According to one

scholar, the "salient" similarities between appellate review and judicial review of agency action concern the standards of review—in both types of proceedings, a reviewing court engages in a more rigorous review of legal questions and a more deferential review of factual findings.  T. Merrill, Article III, Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law, 111 Colum. L. Rev. 939, 940–941 (2011).  None of that has to do with remedies; once again, it concerns a court's scope of review or decisional process.

The States next invoke §706(1) and §705.  The former provides that courts shall "compel agency action unlawfully withheld or unreasonably delayed."  The latter says courts "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  The States insist that "[i]t would be illogical" for the APA to authorize these remedies but not vacatur.  Brief for Respondents 40.  Is it so clear, though, that §706(1) and §705 authorize remedies?  Section 706(1) does seem to contemplate a remedy.  But it's one §703 mentions—mandatory injunctions.  So §706(1) might not authorize a remedy as much as confirm the availability of a traditional remedy to address agency *in*action.  The same could be said about §705; it might just confirm courts' authority to issue traditional equitable relief pending judicial review.  Cf. *Sampson* v. *Murray*, 415 U. S. 61, 69, n. 15 (1974) (explaining that §705 was "primarily intended to reflect existing law").

The States also direct us to scholarship that in turn purports to identify a few instances of federal courts "setting aside" agency action in the years leading up to the APA.  See Brief for Respondents 41; see also Brief for State of Florida as *Amicus Curiae* 17.  It is not obvious, however, that these few cases stand for so much.  In two of them, this Court *upheld* the agency action in question and thus had no occasion to opine on appropriate relief.  See *Houston* v.

GORSUCH, J., concurring in judgment

*St. Louis Independent Packing Co.*, 249 U. S. 479, 486–487 (1919); *The Assigned Car Cases*, 274 U. S. 564, 584 (1927). In a third case, the plaintiff sought "to enjoin enforcement of" an order of the Federal Communications Commission. *Columbia Broadcasting System, Inc.* v. *United States*, 316 U. S. 407, 408 (1942). That is a claim for traditional equitable relief, and indeed, the Court held that the complaint "state[d] a cause of action in equity" and remanded for further proceedings. *Id.,* at 425. A fourth case, involving an order of the Interstate Commerce Commission, seems of a piece. There, a district court held the Commission's order invalid and "restrain[ed] . . . enforcement" of it. *Baltimore & Ohio R. Co.* v. *United States*, 5 F. Supp. 929, 936 (ND Ohio 1933). This Court affirmed. See *United States* v. *Baltimore & Ohio R. Co.*, 293 U. S. 454 (1935). True, this Court described the case as an "appeal from [a] decree . . . setting aside" the Commission's order. *Id.,* at 455. But the fact that the lower court had only restrained enforcement of the order goes to show that "set aside" did not then (and does not now) necessarily translate to "vacate."

At the end of the day, the States fall back on other lower court decisions. "For more than 30 years," they say, "vacatur has been the ordinary result when the D. C. Circuit determines that agency regulations are unlawful." Brief for Respondents 42 (internal quotation marks omitted). Doubtless, to the extent those decisions are carefully reasoned, they merit respectful consideration. But, equally, they do not bind us. Cf. *post,* at 14, n. 7 (ALITO, J., dissenting) (observing that this Court has only ever "assumed" that the APA authorizes vacatur).

In raising questions about the district court's claim that §706(2) authorizes vacatur of agency action, I do not pretend that the matter is open and shut. Thoughtful arguments and scholarship exist on both sides of the debate. Nor do I mean to equate vacatur of agency action with universal injunctions. Despite some similarities, courts can at

least arguably trace their authority to order vacatur to language in a statute and practice in some lower courts. But the questions here are serious ones. And given the volume of litigation under the APA, this Court will have to address them sooner or later. Until then, we would greatly benefit from the considered views of our lower court colleagues.

### D

Suppose my doubts about vacatur are unfounded. Suppose the APA really does authorize both traditional forms of equitable relief (in §703) and a more expansive equitable power to vacate agency action (in §706). Even if that were true, a district court should "think twice—and perhaps twice again—before granting" such sweeping relief. *Arizona* v. *Biden*, 40 F. 4th, at 396 (Sutton, C. J., concurring).

After all, this Court has long instructed that equitable relief "must be limited to the inadequacy that produced [the] injury in fact." *Gill* v. *Whitford*, 585 U. S. ___, ___ (2018) (slip op., at 14) (internal quotation marks omitted). Any remedy a judge authorizes must not be "more burdensome [to the defendant] than necessary to redress the complaining parties." *Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979). And faithful application of those principles suggests that an extraordinary remedy like vacatur would demand truly extraordinary circumstances to justify it. Cf. S. Bray & P. Miller, Getting Into Equity, 97 N. D. L. Rev. 1763, 1797 (2022) ("[I]n equity it all connects—the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be.").

The temptations a single district judge may face when invited to vacate agency rules are obvious. Often, plaintiffs argue that everyone deserves to benefit from their effort to litigate the case and the court's effort to decide it. Judges may think efficiency and uniformity favor the broadest possible relief. But there are serious countervailing considerations. As with universal injunctions, vacatur can stymie

GORSUCH, J., concurring in judgment

the orderly review of important questions, lead to forum
shopping, render meaningless rules about joinder and class
actions, and facilitate efforts to evade the APA's normal
rulemaking processes. Vacatur can also sweep up nonpar-
ties who may not wish to receive the benefit of the court's
decision. Exactly that happened here. Dozens of States,
counties, and cities tell us they did not seek and do not want
the "benefit" of the district court's vacatur order in this
case. See Brief for New York et al. as *Amici Curiae* 1–2;
Brief for 21 Cities, Counties, and Local Government Organ-
izations as *Amici Curiae* 2–3.

More importantly still, universal relief, whether by way
of injunction or vacatur, strains our separation of powers.
It exaggerates the role of the Judiciary in our constitutional
order, allowing individual judges to act more like a legisla-
ture by decreeing the rights and duties of people nation-
wide. This Court has warned that "[f]ew exercises of the
judicial power are more likely to undermine public confi-
dence in the neutrality and integrity of the Judiciary than
one which casts [courts] in the role of a Council of Revision,
conferring on [themselves] the power to invalidate laws at
the behest of anyone who disagrees with them." *Arizona
Christian School Tuition Organization* v. *Winn*, 563 U. S.
125, 145–146 (2011). At a minimum, then, district courts
must carefully consider all these things before doling out
universal relief. And courts of appeals must do their part,
too, asking whether party-specific relief can adequately pro-
tect the plaintiff's interests. If so, an appellate court should
not hesitate to hold that broader relief is an abuse of discre-
tion. Cf. *Kentucky* v. *Biden*, 57 F. 4th 545, 556–557 (CA6
2023) (Larsen, J.).

*

In our system of government, federal courts play an im-
portant but limited role by resolving cases and controver-
sies. Standing doctrine honors this limitation at the front

GORSUCH, J., concurring in judgment

end of every lawsuit.  It preserves a forum for plaintiffs seeking relief for concrete and personal harms while filtering out those with generalized grievances that belong to a legislature to address.  Traditional remedial rules do similar work at the back end of a case.  They ensure successful plaintiffs obtain meaningful relief.  But they also restrain courts from altering rights and obligations more broadly in ways that would interfere with the power reserved to the people's elected representatives.  In this case, standing and remedies intersect.  The States lack standing because federal courts do not have authority to redress their injuries.  Section 1252(f)(1) denies the States any coercive relief.  A vacatur order under §706(2) supplies them no effectual relief.  And such an order itself may not even be legally permissible.  The States urge us to look past these problems, but I do not see how we might.  The Constitution affords federal courts considerable power, but it does not establish "government by lawsuit."  R. Jackson, The Struggle for Judicial Supremacy 286–287 (1941).

Cite as:  599 U. S. ____ (2023)                      1

Barrett, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–58

_____

## UNITED STATES, et al., PETITIONERS *v.*
## TEXAS, et al.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 23, 2023]

JUSTICE BARRETT, with whom JUSTICE GORSUCH joins,
concurring in the judgment.

I agree with the Court that the States lack standing to
challenge the Federal Government's Guidelines for the en-
forcement of immigration law.  But I reach that conclusion
for a different reason: The States failed to show that the
District Court could order effective relief.  JUSTICE
GORSUCH ably explains why that is so.  *Ante*, p. 1 (opinion
concurring in judgment).  And because redressability is an
essential element of Article III standing, the District Court
did not have jurisdiction.

The Court charts a different path.  In its view, this case
can be resolved based on what it calls the "fundamental Ar-
ticle III principle" that "'a citizen lacks standing to contest
the policies of the prosecuting authority when he himself is
neither prosecuted nor threatened with prosecution.'"
*Ante*, at 1 (quoting *Linda R. S.* v. *Richard D.*, 410 U. S. 614,
619 (1973)).  In other words, the Court says, the States have
not asserted a "'judicially cognizable interest'" in this case.
*Ante*, at 5.  Respectfully, I would not take this route.

I

To begin with, I am skeptical that *Linda R. S.* suffices to
resolve this dispute.  First, the Court reads that decision

too broadly.  Consider the facts.  The "mother of an illegitimate child" sued in federal court, "apparently seek[ing] an injunction running against the district attorney forbidding him from declining prosecution" of the child's father for failure to pay child support.  410 U. S., at 614–616.  She objected, on equal protection grounds, to the State's view that "fathers of illegitimate children" were not within the ambit of the relevant child-neglect statute.  *Id.*, at 616.

We agreed that the plaintiff "suffered an injury stemming from the failure of her child's father to contribute support payments."  *Id.*, at 618.  But if the plaintiff "were granted the requested relief, it would result only in the jailing of the child's father."  *Ibid.*  Needless to say, the prospect that prosecution would lead to child-support payments could, "at best, be termed only speculative."  *Ibid.*  For this reason, we held that the plaintiff lacked standing.  Only then, after resolving the standing question on redressability grounds, did we add that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."  *Id.*, at 619.  In short, we denied standing in *Linda R. S.* because it was speculative that the plaintiff's requested relief would redress her asserted injury, not because she failed to allege one.  See *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 79, n. 24 (1978).

Viewed properly, *Linda R. S.* simply represents a specific application of the general principle that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish" given the causation and redressability issues that may arise.  *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 562 (1992).  That is true for the States here.  I see little reason to seize on the case's bonus discussion of whether "a private citizen" has a "judicially cognizable interest in the prosecution or nonprosecution of another" to establish a broad rule of Article III standing.  *Linda R. S.*, 410 U. S., at 619.

BARRETT, J., concurring in judgment

Second, even granting the broad principle the Court takes from *Linda R. S.*, I doubt that it applies with full force in this case. Unlike the plaintiff in *Linda R. S.*, the States do not seek the prosecution of any particular individual— or even any particular class of individuals. See *ASARCO Inc.* v. *Kadish*, 490 U. S. 605, 624 (1989) ("[F]ederal standing 'often turns on the nature and source of the claim asserted'"). In fact, they *disclaim* any interest in the prosecution or nonprosecution of noncitizens. See Brief for Respondents 15; Tr. of Oral Arg. 124–125. They acknowledge that 8 U. S. C. §1226(c)(1)'s detention obligation "only applies until" the Government makes "a decision whether or not to prosecute." Tr. of Oral Arg. 100. And they readily concede that if the Government decides not to prosecute, any detention obligation imposed by §1226(c)(1) "immediately ends." *Ibid.* The States make similar concessions with respect to §1231(a)(2). They maintain, for example, that §1231(a)(2) applies "only where the United States has used its prosecutorial discretion to bring a notice to appear, to prosecute that all the way to a final . . . order of removal." *Id.*, at 130. But if the Government for any reason "choose[s] to discontinue proceedings," the alleged detention obligation does not attach. *Id.*, at 131.

The upshot is that the States do not dispute that the Government can prosecute whomever it wants. They seek, instead, the temporary detention of certain noncitizens during elective removal proceedings of uncertain duration. And the States' desire to remove the Guidelines' influence on the Government's admittedly broad discretion to enforce immigration law meaningfully differs from the *Linda R. S.* plaintiff's desire to channel prosecutorial discretion toward a particular target. Given all of this, I would not treat *Linda R. S.* as the "leading precedent" for resolving this case. *Ante*, at 5. In my view, the Court is striking new ground rather than applying settled principles.

Barrett, J., concurring in judgment

## II

In addition to its reliance on *Linda R. S.*, the Court offers several reasons why "federal courts have not traditionally entertained lawsuits of this kind." *Ante*, at 6. I am skeptical that these reasons are rooted in Article III standing doctrine.

Take, for example, the Court's discussion of *Castle Rock* v. *Gonzales*, 545 U. S. 748 (2005). *Ante*, at 10. There, we reasoned that given "[t]he deep-rooted nature of law-enforcement discretion," a "true mandate of police action would require some stronger indication" from the legislature than, for example, the bare use of the word "'shall'" in a statutory directive. *Castle Rock*, 545 U. S., at 761. The Court today concludes that "no such statute is present in this case." *Ante*, at 10. But *Castle Rock* is not a case about Article III standing. It addressed "whether an individual who has obtained a state-law restraining order has a constitutionally protected property interest" under the Fourteenth Amendment "in having the police enforce the restraining order when they have probable cause to believe it has been violated." 545 U. S., at 750–751. I see no reason to opine on *Castle Rock*'s application here, especially given that the parties (correctly) treat *Castle Rock* as relevant to the *merits* of their statutory claims rather than to the States' *standing* to bring them. See Brief for Petitioners 8; Brief for Respondents 30.

The Court also invokes "the Executive's Article II authority to enforce federal law." *Ante*, at 6. I question whether the President's duty to "take Care that the Laws be faithfully executed," Art. II, §3, is relevant to the standing analysis. While it is possible that Article II imposes justiciability limits on federal courts, it is not clear to me why any such limit should be expressed through Article III's definition of a cognizable injury. Moreover, the Court works the same magic on the Take Care Clause that it does on *Castle Rock*: It takes an issue that entered the case on the merits

BARRETT, J., concurring in judgment

and transforms it into one about standing. See *ante*, at 4 (opinion of GORSUCH, J.)

The Court leans, too, on principles set forth in *Heckler* v. *Chaney*, 470 U. S. 821 (1985). *Ante*, at 8, 11. But, again, *Heckler* was not about standing. It addressed a different question: "the extent to which a decision of an administrative agency to exercise its 'discretion' not to undertake certain enforcement actions is subject to judicial review under the Administrative Procedure Act." 470 U. S., at 823; see also 5 U. S. C. §701(a)(2) (the APA's judicial-review provisions do not apply "to the extent" that "agency action is committed to agency discretion by law"). *Heckler* held that "an agency's decision not to take enforcement action should be presumed immune from judicial review under" the APA. 470 U. S., at 832. But such a decision "is only presumptively unreviewable; the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.*, at 832–833. Whatever *Heckler*'s relevance to cases like this one, it does not establish a principle of Article III standing. And elevating it to the status of a constitutional rule would transform it from a case about statutory provisions (that Congress is free to amend) to one about a constitutional principle (that lies beyond Congress's domain). Although the Court notes that *Heckler* involved the APA, its conflation of *Heckler* with standing doctrine is likely to cause confusion. See *ante*, at 8 (analogizing "Article III cases" to "Administrative Procedure Act cases").

\*    \*    \*

The Court weaves together multiple doctrinal strands to create a rule that is not only novel, but also in tension with other decisions. See *ante,* at 2–4 (opinion of GORSUCH, J.). In my view, this case should be resolved on the familiar ground that it must be "'likely,' as opposed to merely 'speculative,'" that any injury "will be 'redressed by a favorable

6                         UNITED STATES *v.* TEXAS

decision.'"   *Lujan*, 504 U. S., at 561.   I respectfully concur only in the judgment.

Cite as: 599 U. S. ____ (2023)          1

# SUPREME COURT OF THE UNITED STATES

_____

No. 22–58

_____

## UNITED STATES, ET AL., PETITIONERS *v.* TEXAS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 23, 2023]

JUSTICE ALITO, dissenting.

The Court holds Texas lacks standing to challenge a federal policy that inflicts substantial harm on the State and its residents by releasing illegal aliens with criminal convictions for serious crimes. In order to reach this conclusion, the Court brushes aside a major precedent that directly controls the standing question, refuses to apply our established test for standing, disregards factual findings made by the District Court after a trial, and holds that the only limit on the power of a President to disobey a law like the important provision at issue is Congress's power to employ the weapons of inter-branch warfare—withholding funds, impeachment and removal, etc. I would not blaze this unfortunate trail. I would simply apply settled law, which leads ineluctably to the conclusion that Texas has standing.

This Court has long applied a three-part test to determine whether a plaintiff has standing to sue. Under that test, a plaintiff must plead and ultimately prove that it has been subjected to or imminently faces an injury that is: (1) "concrete and particularized," (2) "fairly traceable to the challenged action," and (3) "likely" to be "redressed by a favorable decision." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992) (internal quotation marks and alterations omitted). Under that familiar test, Texas clearly has

2                    UNITED STATES *v.* TEXAS

                       ALITO, J., dissenting

standing to bring this suit.[1]

   Nevertheless, the United States (the defendant in this case) has urged us to put this framework aside and adopt a striking new rule.  At argument, the Solicitor General was asked whether it is the position of the United States that the Constitution does not allow any party to challenge a President's decision not to enforce laws he does not like. What would happen, the Solicitor General was asked, if a President chose not to enforce the environmental laws or the labor laws?  Would the Constitution bar an injured party from bringing suit?  She responded:

> "*That's correct under this Court's precedent*, but the framers intended political checks in that circumstance. You know, if—if an administration did something that extreme and said we're just not going to enforce the law at all, then the President would be held to account by the voters, and Congress has tools at its disposal as well."  Tr. of Oral Arg. 50 (emphasis added).

   Thus, according to the United States, even if a party clearly meets our three-part test for Article III standing, the Constitution bars that party from challenging a President's decision not to enforce the law.  Congress may wield what the Solicitor General described as "political . . . tools"— which presumably means such things as withholding funds, refusing to confirm Presidential nominees, and impeachment and removal—but otherwise Congress and the American people must simply wait until the President's term in office expires.

   The Court—at least for now—does not fully embrace this

---

[1] In a case with multiple plaintiffs, Article III permits us to reach the merits if any plaintiff has standing.  *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.,* 547 U. S. 47, 52, n. 2 (2006).  Because Texas clearly meets our test for Article III standing, it is not necessary to consider whether the other plaintiff, the State of Louisiana, also satisfies that test.

ALITO, J., dissenting

radical theory and instead holds only that, with some small and equivocal limitations that I will discuss, no party may challenge the Executive's "arrest and prosecution policies." *Ante*, at 12, n. 5. But the Court provides no principled explanation for drawing the line at this point, and that raises the concern that the Court's only reason for framing its rule as it does is that no more is needed to dispose of *this* case. In future cases, Presidential power may be extended even further. That disturbing possibility is bolstered by the Court's refusal to reject the Government's broader argument.

As I will explain, nothing in our precedents even remotely supports this grossly inflated conception of "executive Power," U. S. Const., Art. II, §1, which seriously infringes the "legislative Powers" that the Constitution grants to Congress, Art. I, §1. At issue here is Congress's authority to control immigration, and "[t]his Court has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo* v. *Bell*, 430 U. S. 787, 792 (1977). In the exercise of that power, Congress passed and President Clinton signed a law that commands the detention and removal of aliens who have been convicted of certain particularly dangerous crimes. The Secretary of Homeland Security, however, has instructed his agents to disobey this legislative command and instead follow a different policy that is more to his liking. And the Court now says that no party injured by this policy is allowed to challenge it in court.

That holding not only violates the Constitution's allocation of authority among the three branches of the Federal Government; it also undermines federalism. This Court has held that the Federal Government's authority in the field of immigration severely restricts the ability of States to enact laws or follow practices that address harms resulting from illegal immigration. See *Arizona* v. *United States*,

4                    UNITED STATES *v.* TEXAS

                        ALITO, J., dissenting

567 U. S. 387, 401 (2012).  If States are also barred from
bringing suit even when they satisfy our established test for
Article III standing, they are powerless to defend their vital
interests.  If a President fails or refuses to enforce the im-
migration laws, the States must simply bear the conse-
quences.  That interpretation of executive authority and Ar-
ticle III's case or controversy requirement is deeply and
dangerously flawed.

                               I

    The Court's opinion omits much that is necessary to un-
derstand the significance of its decision, and I therefore
begin by summarizing the relevant statutory provisions,
the challenged Department of Homeland Security (DHS)
action, and the District Court's findings of fact regarding
the injury faced by the State of Texas as the result of what
DHS has done.

                               A

    The relevant statutory provisions have figured in several
prior decisions, and in those cases we have recounted how
they came to be enacted and have clearly described what
they require.  These provisions were part of the Illegal Im-
migration Reform and Immigration Responsibility Act of
1996 (IIRIRA), which was adopted "against a backdrop of
wholesale failure by the [Immigration and Naturalization
Service] to deal with increasing rates of criminal activity by
aliens."  *Demore* v. *Kim*, 538 U. S. 510, 518 (2003).[2]  Con-
gress concluded that a central cause of that failure was the
Attorney General's "broad discretion to conduct individual-
ized bond hearings and to release criminal aliens from cus-
tody during their removal proceedings."  *Id.*, at 519.  To
remedy this problem, Congress "*subtract[ed]* some of that

_____

    [2]The Immigration and Naturalization Service was merged into DHS
in 2003.

ALITO, J., dissenting

discretion when it comes to the arrest and release of criminal aliens." *Nielsen* v. *Preap*, 586 U. S. ___, ___ (2019) (slip op., at 15) (emphasis in original).

Two such limits are important here. First, 8 U. S. C. §1226(c) directs the Government to "take into custody any alien" inadmissible or deportable on certain criminal or terrorist grounds "when the alien is released" from criminal custody, including when such an alien is released on "parole, supervised release, or probation." Second, §1231(a) imposes a categorical detention mandate. Section 1231(a)(2) provides that the Government "shall detain [an] alien" "[d]uring the removal period," which often begins either when an "order of removal becomes administratively final" or when an "alien is released from detention or confinement" not arising from immigration process, §1231(a)(1)(B). This requirement is reinforced by the direction that "[u]nder no circumstance during the removal period shall the [Government] release an alien" found inadmissible or deportable under almost any of the grounds relevant under §1226(c). §1231(a)(2). And §1231(a)(1)(A) commands that the Government "shall remove the alien" within the removal period.

All of our recent decisions interpreting these provisions confirm that, for covered aliens, *shall* means *shall*; it does not mean "may." See *Johnson* v. *Guzman Chavez*, 594 U. S. ___, ___–___, and n. 2 (2021) (slip op., at 2–3, and n. 2); *Nielsen*, 586 U. S., at ___–___ (slip op., at 16–17). Until quite recently, that was the Government's understanding as well. See *Biden* v. *Texas*, 597 U. S. ___, ___–___ (2022) (slip op., at 8–9) (ALITO, J., dissenting).

Actions taken by Congress when IIRIRA was enacted underscore this conclusion. Because the provisions described above left the Executive with no discretion to refrain from arresting and detaining covered aliens, even during the time immediately after IIRIRA's enactment when the Executive was still "expand[ing] its capacities" to enforce the

6                    UNITED STATES *v.* TEXAS

ALITO, J., dissenting

new law, Congress passed "transition rules [that] delayed the onset of the Secretary's obligation to begin making arrests as soon as covered aliens were released from criminal custody." *Nielsen*, 586 U. S., at ___ (slip op., at 21). If the Executive had possessed the discretion to decline to enforce the new mandates in light of "resource constraints," see *ante*, at 8, those transition rules would have been entirely "superfluous." *Nielsen*, 586 U. S., at ___ (slip op., at 21).

Despite this clear text and background, the majority now claims that the President's "enforcement discretion" survived these mandates, *ante*, at 7, but there is no basis for that conclusion. Certainly it is not supported by the cases it cites. They either underscore the *general* rule that the Executive possesses enforcement discretion, see *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 490–491 (1999), or pair that general rule with the observation that the *States* cannot limit the Government's discretion in pursuing removal, see *Arizona*, 567 U. S., at 396, 409. Nothing in those decisions is inconsistent with Congress's power to displace executive discretion, and the fact that "five Presidential administrations" sometimes neglected the mandates is likewise irrelevant. See *ante*, at 8. As I have stressed before, the Executive cannot "acquire authority forbidden by law through a process akin to adverse possession," *Biden* v. *Texas*, 597 U. S., at ___ (dissenting opinion) (slip op., at 15), and that is true even if the adverse possession is bipartisan.

B

The events that gave rise to this case began on January 20, 2021, when the Acting Secretary of DHS issued a memorandum with "enforcement priorities" for the detention and removal of aliens found to be in this country illegally. This memorandum prioritized: (1) aliens "whose apprehension" implicated "national security," (2) aliens not present "before November 1, 2020," and (3) aliens due to be released

Alito, J., dissenting

from criminal confinement who had both been "convicted of an 'aggravated felony'" and were "determined to pose a threat to public safety." 606 F. Supp. 3d 437, 454 (SD Tex. 2022) (internal quotation marks omitted); see §1101(a)(43) (defining "aggravated felony"). This prioritization was inconsistent with the §1226(c) arrest mandate, which extends to all aliens convicted of any crime within a long list of statutory categories. 606 F. Supp. 3d, at 454–455.

In February, Immigrations and Customs Enforcement (ICE), an arm of DHS, issued a second memorandum that slightly modified the earlier priorities and stated that "'pre-approval'" would generally be required "for enforcement actions" against persons outside these priority groups. *Id.*, at 455–456. This memorandum was also inconsistent with the relevant statutes.

After some litigation regarding these two memoranda, a new DHS Secretary issued a Final Memorandum instructing that even aliens in priority groups need not necessarily be apprehended and removed. App. 113–115. Rather, the Final Memorandum directed DHS personnel to consider non-statutory "aggravating and mitigating factors" in deciding whether to detain an alien. *Id.*, at 114–115. It further stated that DHS "personnel should not rely on the fact of [a qualifying] conviction" when exercising "prosecutorial discretion." *Id.*, at 115. Thus, the Final Memorandum did not simply *permit* deviations from the statutory mandates; it flatly *contradicted* those mandates by stating that qualifying convictions were insufficient grounds for initiating arrest, detention, and removal.

### C

Texas and Louisiana challenged this Final Memorandum in federal court under the Administrative Procedure Act (APA). After a 2-day bench trial, the District Court found in favor of the States and made detailed findings of fact that bear on the issue of standing.

Alito, J., dissenting

Much of the District Court's analysis of that issue focused on the Final Memorandum's effect on the "detainer" system, 606 F. Supp. 3d, at 459–463, and it is therefore important to understand how that system works in relation to the relevant statutory provisions.  When an alien in state custody for a criminal offense is identified as falling within a category of aliens whose apprehension and detention is required by §§1226(a) and (c), the Government should lodge a "detainer" with the State so that the Government can take the alien into custody when he or she is released by the State.  Then, when an alien is about to be released, a cooperative State will notify DHS so that it can be ready to assume its obligation under §§1226(a) and (c) to take the alien into federal custody.  When that occurs, the State is spared the burdens it would have to bear if the alien, after release, had been placed under state law on probation, parole, or supervised release.  But if DHS rescinds a detainer before such an alien is released (or never lodges a detainer in the first place), those burdens fall on the State.

After reviewing the parties' evidence, the District Court found that in the first month after the substantive policy change brought about by the January 2021 DHS memorandum, ICE had rescinded 141 detainers in Texas.[3]  Ninety-five of the criminal aliens whose detainers were rescinded were then released on a form of state supervision.  Seventeen of them went on to violate their terms of supervision, and four committed new crimes.  *Id.*, at 459.

The court then examined what had taken place during just the time "since the Final Memorandum became effective" and found that "because of the Final Memorandum," "ICE ha[d] continued to rescind detainers placed on criminal aliens in [Texas's] custody," and the court identified 15

---

[3]This figure excludes instances where a detainer was withdrawn but then reissued, or where an alien previously subject to a withdrawn detainer was taken into federal custody.

ALITO, J., dissenting

specific cases in which this had occurred. *Id.*, at 460. Rejecting the Government's claim that these dropped detainers were necessary in light of "limited resources," the court found that "the Government . . . persistently underutilized existing detention facilities" during the relevant time and that the average daily detained population in April 2022 was less than 40% of the 3-year high in August 2019. *Id.*, at 453, 481, 488.

Based on these findings of fact and historical data, the District Court identified four categories of costs that Texas had suffered and would continue to bear as a result of the relevant DHS actions. First, the court calculated the dollars-and-cents cost that Texas had to bear in order to supervise criminal aliens who were released in violation of §§1226(a), (c). *Id.*, at 463. Second, it noted the costs associated with criminal recidivism. *Id.*, at 464. Third, it found that some juvenile offenders who "are not detained by ICE because of the Final Memorandum" will attend Texas public schools (and at least one juvenile due to be released will do so). *Ibid.* Fourth, it concluded that the hundreds of millions of dollars that Texas annually spends on healthcare for illegal aliens would increase when some criminal aliens not detained "because of the Final Memorandum" make use of those services. *Id.*, at 465.

Concluding that these costs established Texas's injury for standing purposes, the District Court went on to hold that the Final Memorandum was contrary to law and that Texas had therefore established a violation of the APA.[4] As I will explain, it is a common practice for courts in APA cases to set aside an improper final agency action, and that is what

─────────

[4] The District Court also concluded that the Final Memorandum was "arbitrary and capricious," and had not undergone "notice and comment," resulting in separate APA violations. 606 F. Supp. 3d, at 492, 495. Because the majority's standing analysis applies equally to any APA violation, I focus only on the contrary-to-law claim and express no opinion on these further claims.

the District Court did here.  It vacated the Final Memoran-
dum pending further action by DHS, *id.*, at 499, but it de-
clined to issue injunctive or declaratory relief, *id.*, at 501–
502.

The Government asked the Court of Appeals to stay the
District Court's order vacating the Final Memorandum, but
that court refused to do so and observed that the Govern-
ment had not "come close" to showing "'clear error'" in the
District Court's factual findings on the injuries that Texas
had already incurred and would continue to incur because
of the Final Memorandum.  40 F. 4th 205, 216–217 (CA5
2022).

## II

Before I address the Court's inexplicable break from our
ordinary standing analysis, I will first explain why Texas
easily met its burden to show a concrete, particularized in-
jury that is traceable to the Final Memorandum and re-
dressable by the courts.  *Lujan*, 504 U. S., at 560–561.

## A

*Injury in fact.*  The District Court's factual findings,
which must be accepted unless clearly erroneous, quanti-
fied the cost of criminal supervision of aliens who should
have been held in DHS custody and also identified other
burdens that Texas had borne and would continue to bear
going forward.  These findings sufficed to establish a con-
crete injury that was specific to Texas.  *TransUnion LLC* v.
*Ramirez*, 594 U. S. ___, ___ (2021) (slip op., at 9); see *ante*,
at 4 (conceding that such costs are "of course an injury").

*Traceability.*  The District Court found that each category
of cost would increase "*because of* the Final Memorandum,"
rather than decisions that DHS personnel would make ir-
respective of the directions that memorandum contains.
606 F. Supp. 3d, at 460, 464, 465 (emphasis added).

The majority does not hold—and in my judgment, could

ALITO, J., dissenting

not plausibly hold—that these findings are clearly erroneous.  Instead, it observes only that a "State's claim for standing can become more attenuated" when based on the "indirect effects" of federal policies "on state revenues or state spending."  *Ante*, at 9, n. 3.  But while it is certainly true that indirect injuries may be harder to prove, an indirect financial injury that *is* proved at trial supports standing.  And that is what happened here.  As JUSTICE GORSUCH notes, just a few years ago, we found in a very important case that a State had standing based in part on indirect financial injury.  *Ante*, at 3 (opinion concurring in judgment) (citing *Department of Commerce* v. *New York*, 588 U. S. ___, ___–___ (2019) (slip op., at 9–10)).  There is no justification for a conflicting holding here.

In any event, many of the costs in this case are not indirect.  When the Federal Government refuses or fails to comply with §§1226(a) and (c) as to criminal aliens, the *direct* result in many cases is that the State must continue its supervision.  As noted, the District Court made specific findings about the financial cost that Texas incurred as a result of DHS's failure to assume custody of aliens covered by §§1226(a) and (c).  And the costs that a State must bear when it is required to assume the supervision of criminal aliens who should be kept in federal custody are not only financial.  Criminal aliens whom DHS unlawfully refuses to detain may be placed on state probation, parole, or supervised release, and some will commit new crimes and end up in a state jail or prison.  Probation, parole, and corrections officers are engaged in dangerous work that can put their lives on the line.

*Redressability.*  A court order that forecloses reliance on the memorandum would likely redress the States' injuries.  If, as the District Court found, DHS personnel rescind detainers "because of" the Final Memorandum, then vacating that memorandum would likely lead to those detainers' remaining in place.

12                 UNITED STATES *v.* TEXAS

ALITO, J., dissenting

B

 While the majority does not contest redressability, JUSTICE GORSUCH's concurrence does, citing two reasons. But the first is contrary to precedent, and the second should not be addressed in this case.

 The first asserted reason is based on the inability of the lower courts to issue a broad injunction forbidding enforcement of the Final Memorandum. See §1252(f)(1).[5]  In this case, the District Court did not issue injunctive relief. Instead, it vacated the Final Memorandum, and JUSTICE GORSUCH argues that this relief did not redress Texas's injuries because it does not "require federal officials to change how they exercise [their prosecutorial] discretion in the [Final Memorandum's] Guidelines' absence." *Ante*, at 6. There are two serious problems with this argument.

 First, §1252(f)(1) bars injunctive relief by courts "*other than* the Supreme Court." (Emphasis added.)  As a result, redress in the form of an injunction *can* be awarded by this Court.  According to the Court's decision last Term in *Biden* v. *Texas*, our authority to grant such relief "le[ft] no doubt" as to our jurisdiction even if §1252(f)(1) precluded the lower courts from setting aside an administrative action under the APA.  597 U. S., at ___ (slip op., at 10).  We have not been asked to revisit this holding, see *id.*, at ___–___ (BARRETT, J., dissenting) (slip op., at 3–4), and I would not do so here.

 Second, even if *Biden* v. *Texas* could be distinguished and

——————

 [5] Section 1252(f)(1) reads in full:

 "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated."

ALITO, J., dissenting

no injunctive relief can be awarded by any court, setting aside the Final Memorandum satisfies the redressability requirement.  Our decision in *Franklin* v. *Massachusetts*, 505 U. S. 788 (1992), settles that question.  There, the Court held that a declaratory judgment regarding the lawfulness of Executive Branch action satisfied redressability because "it [was] substantially likely that the President and other executive . . . officials would abide by an authoritative interpretation" of the law "even though they would not be directly bound by such a determination." *Id.*, at 803 (opinion of O'Connor, J.).[6]  Here, we need not speculate about how DHS officers would respond to vacatur of the Final Memorandum because the District Court found that the DHS personnel responsible for detainers were rescinding them "because of" the Final Memorandum.  606 F. Supp. 3d, at 460. This point was effectively conceded by the Government's application for an emergency stay pending our decision in this case.  The Government argued that the Final Memorandum was needed to guide prosecutorial discretion, Application 38–39, and if the District Court's order were ineffectual, that would not be true.  For these reasons, the harm resulting from the Final Memorandum is redressed by setting aside the Final Memorandum.

As to the concurrence's second argument—that the APA's "set aside" language may not permit vacatur—the concurrence acknowledges that this would be a sea change in administrative law as currently practiced in the lower courts. *Ante*, at 16 (opinion of GORSUCH, J.); see, *e.g.*, *Data Marketing Partnership, LP* v. *United States Dept. of Labor*, 45

———————

[6]While only four of eight Justices finding standing in *Franklin* formally joined this explanation, see 505 U. S., at 824, n. 1 (Scalia, J., concurring in part and concurring in judgment), the Court subsequently ratified this reasoning.  See *Utah* v. *Evans*, 536 U. S. 452, 460, 463–464 (2002).

Alito, J., dissenting

F. 4th 846, 859 (CA5 2022) ("The default rule is that vacatur is the appropriate remedy" under the APA); *United Steel* v. *Mine Safety and Health Admin.*, 925 F. 3d 1279, 1287 (CADC 2019) ("The ordinary practice is to vacate unlawful agency action").[7] We did not grant review on this very consequential question, and I would not reach out to decide it in a case in which *Biden* v. *Texas* resolves the issue of redressability.

To be clear, I would be less troubled than I am today if JUSTICE GORSUCH's concurrence had commanded a majority. At least then, Congress would be free to amend §1252(f). But the majority reaches out and redefines our understanding of the *constitutional* limits on otherwise-available lawsuits. It is to this misunderstanding that I now turn.

### III

The majority adopts the remarkable rule that injuries from an executive decision not to arrest or prosecute, even in a civil case, are generally not "cognizable." *Ante*, at 4 (internal quotation marks omitted). Its reasoning has three failings. First, it fails to engage with contrary precedent that is squarely on point. Second, it lacks support in the cases on which it relies. Third, the exceptions (or possible exceptions) that it notes do nothing to allay concern about the majority's break from our established test for Article III standing. I address each of these problems in turn.

--------

[7] Our decision three years ago in *Department of Homeland Security* v. *Regents of Univ. of Cal.*, 591 U. S. ___ (2020), appears to have assumed that the APA authorizes this common practice. We held that the rescission of the Deferred Action for Childhood Arrivals program had to be "vacated" because DHS had violated the procedures required by the APA. *Id.*, at ___ (slip op., at 2). If the court in that case had lacked the authority to set aside the rule adopting the program, there would have been no need to examine the sufficiency of DHS's procedures.

ALITO, J., dissenting

### A

Prior to today's decision, it was established law that plaintiffs who suffer a traditional injury resulting from an agency "decision not to proceed" with an enforcement action have Article III standing. *Federal Election Comm'n* v. *Akins*, 524 U. S. 11, 19 (1998). The obvious parallel to the case before us is *Massachusetts* v. *EPA*, 549 U. S. 497 (2007), which has been called "the most important environmental law case ever decided by the Court." R. Lazarus, The Rule of Five: Making Climate History at the Supreme Court 1 (2020). In that prior case, Massachusetts challenged the Environmental Protection Agency's failure to use its civil enforcement powers to regulate greenhouse gas emissions that allegedly injured the Commonwealth. Massachusetts argued that it was harmed because the accumulation of greenhouse gases would lead to higher temperatures; higher temperatures would cause the oceans to rise; and rising sea levels would cause the Commonwealth to lose some of its dry land. The Court noted that Massachusetts had a "quasi-sovereign interes[t]" in avoiding the loss of territory and that our federalist system had stripped the Commonwealth of "certain sovereign prerogatives" that it could have otherwise employed to defend its interests. *Massachusetts*, 549 U. S., at 519–520. Proclaiming that Massachusetts' standing claim was entitled to "special solicitude," the Court held that the Commonwealth had standing. *Id.*, at 520.

The reasoning in that case applies with at least equal force in the case at hand. In *Massachusetts* v. *EPA*, the Court suggested that allowing Massachusetts to protect its sovereign interests through litigation compensated for its inability to protect those interests by the means that would have been available had it not entered the Union. In the present case, Texas's entry into the Union stripped it of the power that it undoubtedly enjoyed as a sovereign nation to

police its borders and regulate the entry of aliens. The Constitution and federal immigration laws have taken away most of that power, but the statutory provisions at issue in this case afford the State at least *some* protection—in particular by preventing the State and its residents from bearing the costs, financial and non-financial, inflicted by the release of certain dangerous criminal aliens. Our law on standing should not deprive the State of even that modest protection. We should not treat Texas less favorably than Massachusetts. And even if we do not view Texas's standing argument with any "special solicitude," we should at least refrain from treating it with special hostility by failing to apply our standard test for Article III standing.

Despite the clear parallel with this case and the States' heavy reliance on *Massachusetts* throughout their briefing, the majority can only spare a passing footnote for that important precedent. *Ante*, at 13, n. 6; see Brief for Respondents 11, 12, 14, 16–18, 23; see also Brief for Arizona and 17 Other States as *Amici Curiae* 7–12. It first declines to say *Massachusetts* was correctly decided and references the "disagreements that some may have" with that decision. *Ante*, at 13, n. 6. But it then concludes that *Massachusetts* "does not control" since the decision itself refers to "'key differences between a denial of a petition for rulemaking and an agency's decision not to initiate an enforcement action,'" with the latter "'not *ordinarily* subject to judicial review.'" *Ante*, at 13, n. 6 (quoting 549 U. S., at 527) (emphasis added).

The problem with this argument is that the portion of *Massachusetts* to which the footnote refers deals not with its key Article III holding, but with the scope of review that is "ordinarily" available under the statutory scheme. Importantly, *Massachusetts* frames its statement about declining enforcement as restating the rule of *Heckler* v. *Chaney*, 470 U. S. 821 (1985). See 549 U. S., at 527. And

ALITO, J., dissenting

as the Court acknowledges when it invokes *Heckler* directly, that decision is not about standing; it is about the interpretation of the statutory exception to APA review for actions "committed to agency discretion by law." 5 U. S. C. §701(a)(2); see 470 U. S., at 823; *ante*, at 11. And even in that context, *Heckler* expressly contemplates that any "presumption" of discretion to withhold enforcement can be rebutted by an express statutory limitation of discretion—which is exactly what we have here. 470 U. S., at 832–833.

So rather than answering questions about this case, the majority's footnote on *Massachusetts* raises more questions about *Massachusetts* itself—most importantly, has this monumental decision been quietly interred? Cf. *ante*, at 3 (GORSUCH, J., concurring in judgment).

*Massachusetts* v. *EPA* is not the only relevant precedent that the Court brushes aside. "[I]t is well established that [this Court] has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers* v. *Earth Island Institute*, 555 U. S. 488, 499 (2009). Yet in case after case, with that obligation in mind, we have not questioned the standing of States that brought suit under the APA to compel civil enforcement.

In *Little Sisters of the Poor Saints Peter and Paul Home* v. *Pennsylvania*, 591 U. S. ___ (2020), two States sued under the APA and sought to compel the Department of Health and Human Services to cease exercising regulatory enforcement discretion that exempted certain religious employers from compliance with a contraceptive-coverage mandate. *Id.*, at ___–___ (slip op., at 11–12). The issue of the States' standing was discussed at length in the decision below, see *Pennsylvania* v. *President United States*, 930 F. 3d 543, 561–565 (CA3 2019), and in this Court, no Justice suggested that the Constitution foreclosed standing simply because the States were complaining of "the Execu-

18                UNITED STATES *v.* TEXAS

ALITO, J., dissenting

tive Branch's . . . enforcement choices" regarding third par-
ties. *Ante*, at 7.

   Just last Term in *Biden* v. *Texas*, two States argued that
their spending on the issuance of driver's licenses and the
provision of healthcare for illegal immigrants sufficed to es-
tablish Article III standing and thus enabled them to sue to
compel enforcement of a detain-or-return mandate.  See
*Texas* v. *Biden*, 20 F. 4th 928, 970–971 (CA5 2021).  The
Court of Appeals held that the States had standing, *ibid.*,
and the majority in this Court, despite extended engage-
ment with other jurisdictional questions, never hinted that
Article III precluded the States' suit.  597 U. S., at ___–___
(slip op., at 8–12).

   If the new rule adopted by the Court in this case is sound,
these decisions and others like them were all just wasted
ink.  I understand that what we have called "'drive-by ju-
risdictional rulings'" are not precedents, see *Arbaugh* v.
*Y & H Corp.*, 546 U. S. 500, 511 (2006), but the Court
should not use a practice of selective silence to accept or re-
ject prominently presented standing arguments on incon-
sistent grounds.

B

   Examination of the precedents the majority invokes only
underscores the deficiencies in its analysis.[8]  The majority
says that the "leading precedent" supporting its holding is
*Linda R. S.* v. *Richard D.*, 410 U. S. 614 (1973).  *Ante*, at 5.
But as JUSTICE BARRETT notes, this Court has *already* de-
finitively explained that the suit to compel prosecution in
*Linda R. S.* was rejected "because of the unlikelihood that

───────────

   [8]The Court also appeals to "historical experience" and "longstanding
historical practice."  *Ante*, at 6, 14 (internal quotation marks omitted).  I
do not take this to be an argument independent from the case law cited,
since no history is discussed apart from those cases (all but one from after
1964).

the relief requested would redress appellant's claimed injury." *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 79, n. 24 (1978); see *ante*, at 2 (opinion concurring in judgment).

The Court notes in a quick parenthetical that the "*Linda R. S.* principle" was once "cit[ed] . . . in [the] immigration context" in *Sure-Tan, Inc.* v. *NLRB*, 467 U. S. 883, 897 (1984), *ante*, at 5. But *Sure-Tan*'s single "[c]f." cite to *Linda R. S.* provides the Court no help. 467 U. S., at 897. *Sure-Tan* only rejected (quite reasonably) any standalone "cognizable interest in procuring enforcement of the immigration laws" by a party who lacked any "*personal* interest." *Ibid.* (emphasis added). And it did so, not as part of a standing analysis, but as part of its explanation for rejecting two employers' attempt to assert that seeking to have employees deported as retaliation for union activity was "an aspect of their First Amendment right 'to petition the Government for a redress of grievances.'" *Id.*, at 896.

After these two inapposite precedents, the majority's authority gets even weaker. I agree with JUSTICE BARRETT that neither *Heckler*, nor *Castle Rock* v. *Gonzales*, 545 U. S. 748 (2005), has real relevance here. *Ante*, at 4–5. *Castle Rock* considered the "deep-rooted nature of law-enforcement discretion" as a tool for interpreting a statute, not as a constitutional standing rule. 545 U. S., at 761. And as explained above, *Heckler* is not about standing and only states a presumptive rule. The Court's remaining authorities are likewise consistent with the understanding that prosecution decisions are "*generally* committed to an agency's absolute discretion" unless the relevant law rebuts the "presumption." *Heckler*, 470 U. S., at 831 (emphasis added). For example, *TransUnion* states that it is only when "unharmed plaintiffs" are before the Court that Article III forecloses interference with the "discretion of the Executive Branch." 594 U. S., at ___ (slip op., at 13) (emphasis deleted).

20      UNITED STATES *v.* TEXAS

In sum, all of these authorities point, not to the majority's new rule, but to the same ordinary questions we ask in every case—whether the plaintiff has a concrete, traceable, and redressable injury.

C

Despite the majority's capacious understanding of executive discretion, today's opinion assures the reader that the decision "do[es] not suggest that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions," despite its otherwise broad language covering the "exercise of enforcement discretion over whether to arrest or prosecute." *Ante*, at 5, 9. The majority lists five categories of cases in which a court would—or at least might—have Article III jurisdiction to entertain a challenge to arrest or prosecution policies, but this list does nothing to allay concern about the Court's new path. The Court does not identify any characteristics that are shared by all these categories and that distinguish them from cases in which it would not find standing. In addition, the Court is unwilling to say that cases in four of these five categories are actually exempted from its general rule, and the one remaining category is exceedingly small. I will discuss these categories one by one.

*First*, the majority distinguishes "selective-prosecution" suits by a plaintiff "to prevent his or her own prosecution," *ante*, at 9. But such claims are ordinarily brought as defenses in ongoing prosecutions, as in the cases the Court cites, and are rarely brought in standalone actions where a plaintiff must prove standing. This category is therefore little more than a footnote to the Court's general rule.

*Second*, the majority grants that "the standing analysis *might* differ when Congress elevates *de facto* injuries to the status of legally cognizable injuries," and it hypothesizes a situation in which Congress "(i) specifically authorize[s]

ALITO, J., dissenting

suits against the Executive Branch by a defined set of plaintiffs who have suffered concrete harms from executive under-enforcement and (ii) specifically authorize[s] the Judiciary to enter appropriate orders requiring additional arrests or prosecutions by the Executive Branch." *Ante,* at 10 (emphasis added).  It is puzzling why the presence or absence of such a statute should control the question of standing under the Constitution.  We have said that the enactment of a statute may help us to determine in marginal cases whether an injury is sufficiently concrete and particularized to satisfy the first prong of our three-part standing test.  *Spokeo, Inc.* v. *Robins*, 578 U. S. 330, 341 (2016).  But once it is posited that a plaintiff has personally suffered a "*de facto*" injury, *i.e.*, an injury in fact, it is hard to see why the presence or absence of a statute authorizing suit has a bearing on the question whether the court has Article III jurisdiction as opposed to the question whether the plaintiff has a cause of action.  In the end, however, none of this may matter because the majority suggests that such a statute might be unconstitutional.  *Ante*, at 10, and n. 4.

*Third*, the majority tells us that the standing outcome "*might* change" if the Federal Government "*wholly* abandoned its statutory responsibilities," but that statement is both equivocal and vague.  *Ante*, at 11 (emphasis added).  Under what circumstances might the Court say that the Federal Government has "wholly abandoned" its enforcement duties?  Suppose the Federal Government announced that it would obey 80% of the immigration laws or 70% of the environmental laws.  Would the Court say that it had "wholly abandoned" enforcement of these bodies of law?  What would happen if the Final Memorandum in this case had directed DHS agents not to arrest anyone convicted of any covered crime other than murder?  DHS would still be enforcing the arrest mandate as to one of the many covered crimes.  Would this only-murder policy qualify as complete abandonment?  And why should the ability of a particular

ALITO, J., dissenting

party to seek legal redress for an injury turn on the number of others harmed by the challenged enforcement policy? Standing is assessed plaintiff by plaintiff. The majority has no answers, and in the end, it cannot even bring itself to commit to this complete-abandonment exception. It says only that "the standing calculus *might*" or "arguably *could*" change. *Ibid.* (emphasis added).

*Fourth*, the Court says that a plaintiff might have standing to challenge an "Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status . . . because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." *Ibid.* Exactly what this means is not easy to ascertain. One possibility is that the majority is talking about a complaint that asserts separate claims based on the grant or denial of benefits, the grant or denial of legal status, and harms resulting from non-enforcement of a statutory mandate. In that event, standing with respect to each claim would have to be analyzed separately. Another possibility is that the majority is referring to a claim asserting that non-enforcement of a statutory requirement requiring the arrest or prosecution of third parties resulted in the plaintiff's loss of benefits or legal status. Such a situation is not easy to imagine, and the majority cites no case that falls within this category. But if such a case were to arise, there is no reason why it should not be analyzed under our standard three-pronged test.

*Fifth*, and finally, the majority states that "policies governing the continued detention of noncitizens who have already been arrested *arguably might* raise a different standing question than arrest or prosecution policies." *Ante*, at 12 (emphasis added). The majority provides no explanation for this (noncommittal) distinction, and in any event, as the majority acknowledges, the States in this case challenged noncompliance with the §1231(a)(2) detention mandate in addition to the §1226(c) arrest requirement. *Ante*, at 2, 13.

Cite as: 599 U. S. ____ (2023)          23

ALITO, J., dissenting

The Court points to what it sees as a "represent[ation]" by the Solicitor General that the Final Memorandum does not affect "continued detention of noncitizens already in federal custody." *Ante*, at 12, n. 5. But as JUSTICE BARRETT notes, the Government argued that when it chooses not to remove someone under the Final Memorandum's guidance, its mandatory detention obligation ends—meaning it *is* asserting discretion over continued detention. *Ante*, at 3 (opinion concurring in judgment).

In any event, arrest policy cannot be divided from detention policy in this case. When a person is arrested, he or she is detained for at least some period of time, and under the detainer system involved here, "arrest" often simply means transferring an immigrant from state custody to federal custody. As best I can tell, the majority's distinction between arrest and detention is made solely to avoid the obvious inference that our decision last Term in *Biden* v. *Texas* should have dismissed the case for lack of standing, without analyzing "the Government's detention obligations." 597 U. S., at ___ (slip op., at 14).

In sum, with the exception of cases in the first (very small) category (civil cases involving selective-prosecution claims), the majority does not identify any category of cases that it would definitely except from its general rule. In addition, category two conflates the question of constitutional standing with the question whether the plaintiff has a cause of action; category three is hopelessly vague; category four is incomprehensible; and category five actually encompasses the case before us.

IV

The Court declares that its decision upholds "[o]ur constitutional system of separation of powers," *ante*, at 9, but as I said at the outset, the decision actually damages that system by improperly inflating the power of the Executive and cutting back the power of Congress and the authority of the

ALITO, J., dissenting

Judiciary.  And it renders States already laboring under the effects of massive illegal immigration even more helpless.

Our Constitution gives the President important powers, and the precise extent of some of them has long been the subject of contention, but it has been widely accepted that "the President's power reaches 'its lowest ebb' when he contravenes the express will of Congress, 'for what is at stake is the equilibrium established by our constitutional system.'" *Zivotofsky* v. *Kerry*, 576 U. S. 1, 61 (2015) (ROBERTS, C. J., dissenting) (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 637–638 (1952) (Jackson, J., concurring)).

That is the situation here.  To put the point simply, Congress enacted a law that requires the apprehension and detention of certain illegal aliens whose release, it thought, would endanger public safety.  The Secretary of DHS does not agree with that categorical requirement.  He prefers a more flexible policy.  And the Court's answer today is that the Executive's policy choice prevails unless Congress, by withholding funds, refusing to confirm Presidential nominees, threatening impeachment and removal, etc., can win a test of strength.  Relegating Congress to these disruptive measures radically alters the balance of power between Congress and the Executive, as well as the allocation of authority between the Congress that enacts a law and a later Congress that must go to war with the Executive if it wants that law to be enforced.[9]

---

[9] The majority suggests that any law that constrains an Executive's "enforcement discretion" is "highly unusual," and notes that the States cite no "similarly worded federal laws" that "*require* the Executive Branch to make arrests or bring prosecutions" in other, non-immigration contexts.  *Ante*, at 12.  But there is nothing peculiar about Congress's reserving its mandates for an area—immigration—where it both exercises particularly broad authority, *Fiallo* v. *Bell*, 430 U. S. 787, 792 (1977), and identifies a unique "wholesale failure" by the enforcement authority, *Demore* v. *Kim*, 538 U. S. 510, 518 (2003).

Cite as: 599 U. S. ____ (2023)          25

ALITO, J., dissenting

What the majority has done is to apply Oliver Wendell Holmes's bad-man theory of the law to the separation of powers.  Under Holmes's theory, as popularly understood, the law consists of those things that a bad man cannot get away with.[10]  Similarly, the majority's understanding of the "executive Power" seems to be that a President can disobey statutory commands unless Congress, by flexing its muscles, forces capitulation.  That is not the Constitution's conception of "the executive Power."  Art. II, §1.  The Constitution, instead, requires a President to "take Care that the Laws be *faithfully* executed."  §3 (emphasis added).

Neither the Solicitor General nor the majority has cited any support for the proposition that a President has the power to disobey statutes that require him to take enforcement actions, and there is strong historical evidence to the contrary.[11]  The majority's conception of Presidential authority smacks of the powers that English monarchs claimed prior to the "Glorious Revolution" of 1688, namely, the power to suspend the operation of existing statutes, and to grant dispensations from compliance with statutes.[12]  After James II was deposed, that changed.  The English Bill of Rights of 1689 emphatically rejected "the pretended Power of Suspending of Laws or the Execution of Laws by Rega[l] Authority without Consent of Parl[i]ament" and

——————

[10] See O. Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 459–460 (1897).

[11] See Z. Price, Enforcement Discretion and Executive Duty, 67 Vand. L. Rev. 671, 689–696 (2014); R. Delahunty & J. Yoo, Dream On: The Obama Administration's Nonenforcement of Immigration Laws, the DREAM Act, and the Take Care Clause, 91 Texas L. Rev. 781, 797–804 (2013) (Delahunty & Yoo, Dream On); see also E. Biber, Two Sides of the Same Coin: Judicial Review of Administrative Agency Action and Inaction, 26 Va. Env. L. J. 461, 472–474 (2008).

[12] See R. Reinstein, The Limits of Executive Power, 59 Am. U. L. Rev. 259, 277–281 (2009) (Reinstein, Limits).

ALITO, J., dissenting

"the pretended Power of Dispensing with Laws or the Execution of Laws by Rega[l] Authorit[y] as it ha[s] bee[n] assumed and exercised of late."[13]

By the time of the American Revolution, British monarchs had long abandoned the power to resist laws enacted by Parliament,[14] but the Declaration of Independence charged George III with exercising those powers with respect to colonial enactments. One of the leading charges against him was that he had "forbidden his Governors to pass Laws of immediate and pressing importance, unless suspended in their operation till his Assent should be obtained; and when so suspended, . . . ha[d] utterly neglected to attend to them."[15]

By 1787, six State Constitutions contained provisions prohibiting the suspension of laws,[16] and at the Constitutional Convention, a proposal to grant the President suspending authority was unanimously defeated.[17] Many

———————

[13] An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown (Bill of Rights), 1 W. & M., Sess. 2, c. 2 (1689).

[14] The last time a British monarch withheld assent to a bill enacted by Parliament was in 1708. 18 HL J. 506 (Mar. 11, 1708).

[15] Declaration of Independence ¶4; In 1774, Jefferson had addressed the subject of this charge, explaining that British monarchs "for several ages past" had "declined the exercise of this power in that part of [the] empire called Great Britain" but had resumed the practice in the American Colonies and had "rejected laws of the most salutary tendency," such as one forbidding the importation of slaves. T. Jefferson, A Summary View of the Rights of British America (1774), https://avalon.law.yale.edu/18th_century/jeffsumm.asp. See G. Wills, Inventing America: Jefferson's Declaration of Independence 69 (1978).

[16] See generally S. Calabresi, S. Agudo, & K. Dore, State Bills of Rights in 1787 and 1791: What Individual Rights Are Really Deeply Rooted in American History and Tradition? 85 S. Cal. L. Rev. 1451, 1534–1535 (2012) (reporting that six State Constitutions had such provisions in 1787, rising to eight by 1791).

[17] 1 The Records of the Federal Convention of 1787, pp. 103–104 (M. Farrand ed. 1966). See generally R. Beeman, Plain, Honest Men: The

Cite as:  599 U. S. ____ (2023)          27

ALITO, J., dissenting

scholars have concluded that the Take Care Clause was meant to repudiate that authority.[18]  See 1 Works of James Wilson 399, 440 (R. McCloskey ed. 1967) (describing Clause as providing that the President holds "authority, not to make, or alter, or dispense with the laws, but to execute and act the laws").

Early decisions are inconsistent with the understanding of Executive Power that appears to animate the majority. In 1806, Justice Patterson, while presiding over a criminal trial, rejected the argument that the President could authorize the defendant to violate the law.  *United States* v. *Smith*, 27 F. Cas. 1192, 1201 (No. 16,342) (CC NY 1806). He concluded:

> "The president of the United States cannot control the statute, nor dispense with its execution, and still less can he authorize a person to do what the law forbids.  If he could, it would render the execution of the laws dependent on his will and pleasure; which is a doctrine that has not been set up, and will not meet with any supporters in our government.  In this particular, the law is paramount."  *Id.*, at 1230.

In *Kendall* v. *United States ex rel. Stokes*, 12 Pet. 524 (1838), the full Court rejected the President's claim that he had the authority to disregard a statutory duty to pay certain sums to a government contractor: "To contend that the obligations imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is

——————

Making of the American Constitution 140 (2009) (describing debate over the executive veto).

[18]See, *e.g.*, Delahunty & Yoo, Dream On 803–804 (2013); Reinstein, Limits 281; S. Prakash, The Essential Meaning of Executive Power, 2003 U. Ill. L. Rev. 701, 726, n. 113 (2003); C. May, Presidential Defiance of "Unconstitutional" Laws: Reviving the Royal Prerogative 16 and n. 58 (1998); R. Reinstein, An Early View of Executive Powers and Privilege: The Trial of Smith and Ogden, 2 Hastings Const. L. Q. 309, 320–321, n. 50 (1975).

ALITO, J., dissenting

a novel construction of the constitution, and is entirely in-
admissible." *Id.*, at 613. This Court made the obvious con-
nection to the separation of powers: "vesting in the Presi-
dent a dispensing power" would result in "clothing the
President with a power entirely to control the legislation of
congress, and paralyze the administration of justice." *Ibid.*;
see also *Office of Personnel Management* v. *Richmond*, 496
U. S. 414, 435 (1990) (White, J., concurring) (citing *Kendall*
to explain that the "Executive Branch does not have the dis-
pensing power on its own" and "should not be granted such
a power by judicial authorization").

The original understanding of the scope of the Executive's
prosecutorial discretion was not briefed in this case, and I
am reluctant to express a firm position on the question. But
it is indisputable that we have been provided with no his-
torical support for the position taken by the Solicitor Gen-
eral or the majority.

\*     \*     \*

This sweeping Executive Power endorsed by today's deci-
sion may at first be warmly received by champions of a
strong Presidential power, but if Presidents can expand
their powers as far as they can manage in a test of strength
with Congress, presumably Congress can cut executive
power as much as it can manage by wielding the formidable
weapons at its disposal. That is not what the Constitution
envisions.

I end with one final observation. The majority suggests
that its decision rebuffs an effort to convince us to "'usurp'"
the authority of the other branches, but that is not true.
*Ante*, at 3. We exercise the power conferred by Article III of
the Constitution, and we must be vigilant not to exceed the
limits of our constitutional role. But when we have juris-
diction, we have a "virtually unflagging obligation" to exer-
cise that authority. *Colorado River Water Conservation
Dist.* v. *United States*, 424 U. S. 800, 817 (1976). Because

Cite as:  599 U. S. ____ (2023)                29

Alito, J., dissenting

the majority shuns that duty, I must respectfully dissent.