# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, ET AL.; | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 1:18-cv-00068 |
| | § | |
| UNITED STATES OF AMERICA, ET AL.; | § | |
| | § | United States Courts |
| *Defendants,* | § | Southern District of Texas |
| | § | FILED |
| *and* | § | |
| | § | *July 17, 2023* |
| KARLA PEREZ, ET AL.; | § | |
| | § | Nathan Ochsner, Clerk of Court |
| STATE OF NEW JERSEY, | § | |
| | § | |
| *Defendant-Intervenors.* | § | |

## PLAINTIFF STATES' RESPONSE TO NOTICES OF SUPPLEMENTAL AUTHORITY

## TABLE OF CONTENTS

Table of Contents ......................................................................................................... ii

Table of Authorities .................................................................................................... iii

I.   *Enforcement Priorities* should not affect this Court's determination of the States' standing to challenge DACA. .......................................................................................................1

    A.    The rule articulated in *Enforcement Priorities* does not apply to this case. .....................1

    B.    Texas has demonstrated direct injuries that are legally cognizable because DACA constitutes affirmative immigration relief and eligibility for benefits. ....................................3

    C.    Even were the general rule in *Enforcement Priorities* to apply to this case, two exceptions would grant the States standing to challenge DACA. ...........................................................7

II.   *Brackeen* should not affect this Court's determination of the States' standing to challenge DACA. ......................................................................................................13

TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agostini v. Felton,*
521 U.S. 203 (1997) ........................................................................................... 11

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) ........................................................................................... 13

*Biden v. Nebraska,*
No. 22-506, 2023 WL 4277210 (June 30, 2023) ................................................ 6, 7

*Cochran v. SEC,*
20 F.4th 194 (5th Cir. 2021), *aff'd and remanded sub nom. Axon Enter., Inc. v. FTC,* 142 S. Ct. 890 (2023) ............................................................................... 11

*Dep't of Commerce v. New York,*
139 S. Ct. 2551 (2019) .......................................................................................... 6

*Dep't of Homeland Security v. Regents of the Univ. of Cal.,*
140 S. Ct. 1891 (2020) ..................................................................................... 6, 10

*Georgia v. Pennsylvania R. Co.,*
324 U.S. 439 (1945) ........................................................................................... 14

*Haaland v. Brackeen,*
143 S. Ct. 1609 (2023) ................................................................................. *passim*

*Heckler v. Chaney,*
470 U.S. 821 (1985) ...................................................................................... 5, 8, 9

*Linda R.S. v. Richard D.,*
410 U.S. 614 (1973) ........................................................................................... 10

*Massachusetts v. EPA,*
549 U.S. 497 (2007) ...................................................................................... 11, 14

*Massachusetts v. Mellon,*
262 U.S. 47 (1923) ........................................................................................ 13, 14

iii

*Missouri v. Biden*,
  —F. Supp. 3d—, No. 3:22-CV-01213, 2023 WL 4335270 (W.D. La. July 4,
  2023) (Doughty, J.) ................................................................................................ 11

*Pet. for Writ of Cert., United States of America v. State of Texas*,
  2015 WL 7308179 (U.S.) .......................................................................................... 9

*Scenic Am., Inc. v. United States Dep't of Transportation*,
  836 F.3d 42 (D.C. Cir. 2016) .................................................................................. 12

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997) ....................................................................................................... 11

*Texas v. United States*,
  549 F. Supp. 3d 572 (S.D. Tex. 2021) (Hanen, J.) ........................................ *passim*

*Texas v. United States*,
  86 F. Supp. 3d 591 (S.D. Tex. 2015) (Hanen, J.) ................................................ 8, 9

*Texas v. United States (DACA)*,
  50 F.4th 498 (5th Cir. 2022) .............................................................................. *passim*

*Texas v. United States (DAPA)*,
  809 F.3d 134 (5th Cir. 2015) .............................................................................. *passim*

*United States v. Texas*,
  577 U.S. 1101 (2016) .................................................................................................. 9

*United States v. Texas (Enforcement Priorities)*,
  143 S. Ct. 1964 (2023) ....................................................................................... *passim*

## Statutes

8 U.S.C. § 1252(f)(1) .................................................................................... 12, 13

Federal Defendants and Private Intervenors argue that the Supreme Court's recent decision in *United States v. Texas (Enforcement Priorities)*, 143 S. Ct. 1964 (2023), undermines the States' standing. ECF Nos. 705-2, 706-1. Defendants give that ruling a broad interpretation, but the majority opinion repeatedly emphasizes how narrow it is and how it does not apply to cases like this one.

Defendants also point to on *Haaland v. Brackeen*, 143 S. Ct. 1609 (2023) as precluding the States' standing to challenge DACA. *See* ECF Nos. 703-1, 704-1. That ruling has no relevance to this case.

## I. *Enforcement Priorities* should not affect this Court's determination of the States' standing to challenge DACA.

### A. The rule articulated in *Enforcement Priorities* does not apply to this case.

*Enforcement Priorities* addressed Texas's and Louisiana's challenge to the Department of Homeland Security's guidelines, which stated that DHS would not arrest certain criminal aliens whom Congress provided "shall" be arrested. 2023 WL 4139000, at *2. "The [challenged] Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example," over the categories of criminal aliens that Congress mandated be arrested. *Id*. The Court characterized the case as "[t]he States essentially want[ing] the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id*. The Supreme Court held that Article III standing was lacking because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id*. (quoting *Linda R.S. v. Richard D*., 410 U.S. 614, 619 (1973)).

This holding was based *solely* on the rule that a party typically lacks standing to compel the arrest and prosecution of another. *See id.* The majority emphasized the narrowness of this holding, noting that "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare…. This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at *8.

The Court held that "our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action." *Id.* It held that "[t]his case is categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* It noted that "this case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." *Id.*

The Court emphasized that "[t]he Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo." *Id.* at *9 (citing *Linda R.S.*, 410 U.S. at 619). It described the States' standing argument as a "novel" one that "if accepted, would entail expansive judicial direction of the Department's arrest policies." *Id.* at *6. And it described the case as an "extraordinarily unusual lawsuit" because the States "want[ed] a federal court to order the Executive Branch to alter its arrest policies so as to make more arrests." *Id.* at *9. "This case concerns *only* arrest and prosecution policies, and we therefore address *only* that issue" *Id.* at *8

2

n.5 (emphases added); *see also id.* at \*21 (Alito, J., dissenting) (recognizing that "[t]he Court ... holds only that, with some small and equivocal limitations that I will discuss, no party may challenge the Executive's 'arrest and prosecution policies.'").

### B. Texas has demonstrated direct injuries that are legally cognizable because DACA constitutes affirmative immigration relief and eligibility for benefits.

The Court noted, "To establish standing, a plaintiff must show an injury in fact caused by the defendant and redressable[1] by a court order." *Id.* at \*4 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. at 560–561 (1992)). The Court did not dispute that Texas and Louisiana suffered injuries; rather, "[t]he District Court found that the States would incur additional costs because the Federal Government is not arresting more noncitizens. Monetary costs are of course an injury." *Id.*

But the *Enforcement Priorities C*ourt found that the States' acknowledged monetary injuries nevertheless did not give them standing because "the alleged injury must be legally and judicially cognizable," which "requires, among other things, that the dispute is traditionally thought to be capable of resolution through the judicial process—in other words, that the asserted injury is traditionally redressable in federal court." *Id.* (cleaned up). "The States have not cited any precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions. On the contrary, this Court has previously ruled that a plaintiff lacks standing to bring such a suit." *Id.*

---

[1] The *Enforcement Priorities* majority addressed only whether there was a judicially cognizable injury in fact, not whether the traceability and redressability prongs were satisfied. *See Enforcement Priorities,* 2023 WL 4139000, at \*4–5; *id.* at \*25 (Alito, J. dissenting). That decision therefore has no effect on those two prongs of the standing analysis, leaving the previous holdings of this Court and the Fifth Circuit the law of the case.

3

This case, by contrast, does not involve any attempt to compel the arrest or prosecution of anyone, so *Enforcement Priorities* does not undermine standing here. Plaintiff States here do "not ask for an injunction ordering DHS to take any sort of enforcement action against" DACA-eligible aliens. ECF No. 673 at 20. And nothing in the current injunction "requires DHS or the Department of Justice to take any immigration, deportation, or criminal action against any DACA recipient, applicant, or any other individual that [they] would not otherwise take." ECF No. 603 at 1–2; *see also* ECF No. 576 at 4–5 (same clarification in permanent injunction issued against enforcement of DACA Memorandum).

The *Enforcement Priorities* majority cautioned that, while States sometimes have standing to sue the United States or an executive agency or officer," 2023 WL 4139000, at *6 n.3, "federal policies frequently generate indirect effects on state revenues or state spending and when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated," *id.* (cleaned up; citations omitted).

The *Enforcement Priorities* Court recognized that the States had asserted an injury due to monetary costs, *id.* at 4, given their evidence that "the Department's failure to comply with those statutory mandates imposes costs on the States" including "that they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at *3. But those injuries were not "judicially cognizable" because they were indirect costs arising from the Federal Government's failure to arrest certain criminal aliens. *Id.* at *4; *see also id.* at *24 (Alito, J., dissenting) (describing States' injuries as increased criminal justice, education, and healthcare costs due to criminal aliens "who were released" and "not detained" by federal immigration authorities); *id.* (States' concrete

4

injuries were from "the cost of criminal supervision of aliens who should have been held in DHS custody").

Federal Defendants maintain that, because some of the same sort of evidence of costs is used in this case, there is no judicially cognizable injury in fact here either. *See* ECF No. 706-1 at 4. But those injuries were not judicially cognizable in *Enforcement Priorities* because those costs were incurred solely because of the lack of arrest by the Federal Government. 2023 WL 4139000, at *4. That is also why the Court describes those costs as "indirect"—they were not based on anything the agency did, but what it failed to do. *Id.* at *6 n.3.

Here, the Plaintiff States' injuries are not based on a mere failure to arrest particular DACA-eligible aliens—instead, a grant of deferred action is not mere non-enforcement but constitutes "affirmative immigration relief":

> DACA is not simply a non-enforcement policy. For starters, the DACA Memorandum did not merely "refus[e] to institute proceedings" against a particular entity or even a particular class. [*Heckler v. Chaney*, 470 U.S. 821, 832 (1985)]. Instead, it directed USCIS to "establish a clear and efficient process" for identifying individuals who met the enumerated criteria. App. to Pet. for Cert. 100a. Based on this directive, USCIS solicited applications from eligible aliens, instituted a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance. These proceedings are effectively "adjudicat[ions]." *Id.*, at 117a. And the result of these adjudications—DHS's decision to "grant deferred action," Brief for Petitioners 45—is an "affirmative act of approval," the very opposite of a "refus[al] to act," *Chaney*, 470 U.S. at 831–832. In short, the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief. The creation of that program—and its rescission—is an "action [that] provides a focus for judicial review." *Id.*, at 832.

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020) (citations truncated).[2]

This is why this Court and the Fifth Circuit have described Plaintiff States' injuries in this litigation as *direct*—rather than "indirect"—costs. *See* Texas v. United States (*DACA*), 50 F.4th 498, 517 (5th Cir. 2022) ("Texas asserts standing based on direct injury. It claims that DACA inflicts pocketbook injuries on the State in the form of healthcare, education, and social services costs."); *id.* at 520 ("Accordingly, Texas has demonstrated standing based on its direct injury."); *Texas v. United States*, 549 F. Supp. 3d 572, 589 (S.D. Tex. 2021) (Hanen, J.) ("DACA recipients' presence also represents direct costs in the areas of healthcare, education, and social services.").[3]

The Supreme Court's recent decision in *Biden v. Nebraska*, No. 22-506, 2023 WL 4277210 (June 30, 2023)[4] reinforces that the costs to the States in this case are direct rather than indirect.

---

[2] Note that this "affirmative immigration relief" includes the grant of deferred action—categorical forbearance from removal—all by itself, with eligibility for benefits only providing "*further* confirmation that DACA is more than simply a non-enforcement policy." *Regents*, 140 S. Ct. at 1906 (emphasis added). Thus, Federal Defendants' argument that the forbearance policy should be severed from any relief, ECF No. 706-1 at 7, is wrong—Plaintiff States' costs from the forbearance aspect of DACA do constitute judicially cognizable injury and are *direct* costs.

[3] Regardless, *Enforcement Priorities* did not overrule *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), which upheld indirect injury as a basis for States' standing to challenge federal agency action, *see id.* at 2565 ("diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources" were sufficient to give States and municipalities standing to sue over the proposed inclusion of a citizenship question on the 2020 census); *see also Enforcement Priorities*, 2023 WL 4139000, at *10 (Gorsuch, J., concurring in the judgment) (noting "this Court has allowed other States to challenge other Executive Branch policies that indirectly caused them monetary harms.") (citing *Dep't of Commerce*, 139 S. Ct. at 2565–66).

[4] Plaintiff States have contemporaneously filed a notice of supplemental authority for this case.

That case upheld the State of Missouri's standing to challenge the Biden Administration's student loan forgiveness program. Missouri had "created MOHELA as a nonprofit government corporation to participate in the student loan market," *id*. at *6, and it interacted with the federal government to service student loans and received administrative fees for these services. *Id*. The loss of those fees was "an injury in fact directly traceable to the" loan forgiveness program, *id*., as it "will cut MOHELA's revenues, impairing its efforts to aid Missouri college students. This acknowledged harm to MOHELA in the performance of its public function is necessarily a *direct injury* to Missouri itself." *Id*. at *7 (emphasis added).

This is most closely analogous to the driver's license costs imposed on the State of Texas by DACA. Texas interacts with the federal government through the REAL ID Act, *see DAPA*, 809 F.3d at 155 n.58, and ties eligibility for subsidized licenses to lawful presence—including deferred action and work authorization. *See* ECF No. 673 at 40–43. Just as the financial harm to MOHELA was "directly traceable" to the challenged agency action in *Nebraska*, 2023 WL 4277210, at *6, the financial injuries imposed on Texas by DACA are direct rather than indirect.

### C. Even were the general rule in *Enforcement Priorities* to apply to this case, two exceptions would grant the States standing to challenge DACA.

The Court took pains to note that it was "not suggest[ing] that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." *Enforcement Priorities*, 2023 WL 4139000, at *7. Although the *Enforcement Priorities* rule does not apply to this challenge to DACA because the States do not seek judicial relief ordering the Federal Defendants to arrest DACA-eligible aliens, two exceptions articulated by the Court would apply if it did and further support the States' standing.

7

1. **The States have standing because DACA constitutes an abdication of Federal Defendants' statutory responsibilities.**

The *Enforcement Priorities* majority noted that "a plaintiff arguably could obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Id.* (citing *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)). "So too, an extreme case of non-enforcement arguably could exceed the bounds of enforcement discretion and support Article III standing." *Id.* "But the States have not advanced a *Heckler*-style 'abdication' argument in this case or argued that the Executive has entirely ceased enforcing the relevant statutes," so the Court did not analyze this potential basis for standing. *Id.*

DACA is just such an extreme example that constitutes abdication of the Federal Defendants' statutory responsibilities to enforce the laws regarding removal, lawful presence, and work authorization against a category of illegal aliens not created by Congress. This Court had previously found that the Plaintiff States had standing to challenge DAPA—which is functionally identical to DACA in its legal infirmities[5]—based on this abdication theory. *See Texas v. United States*, 86 F. Supp. 3d 591, 636–41 (S.D. Tex. 2015) (Hanen, J.); *id.* at 641 ("The States claim that, unlike the FDA's action at issue in *Heckler,* the DAPA program is a total abdication and surrender

---

[5] *Texas v. United States (DACA)*, 50 F.4th 498, 527 (5th Cir. 2022) ("The defendants' attempts to distinguish DACA and DAPA are unavailing."); *id.* at 527 ("The relevant comparison is between DAPA and DACA."); *Texas v. United States*, 549 F. Supp. 3d 572, 621 (S.D. Tex. 2021) (Hanen, J.) ("Nothing in *Texas I* [*DAPA*] indicates that any of its reasoning should not equally apply to DACA."); *id.* at n618 ("the Court agrees with the Defendant-Intervenors' contention that the substantive APA analysis in *Texas I* focused almost exclusively on DAPA, but the Fifth Circuit's judgment was not so limited; it applied to Expanded DACA as well.").

of the Government's statutory responsibilities. They contend that the DAPA Directive basically concedes this point, and this Court agrees."). Indeed, this Court relied on APA reviewability under *Heckler v. Chaney, id.* at 641, to also find standing—the same analysis adopted by the *Enforcement Priorities* majority.

The *Enforcement Priorities* majority found that the States there had "not advanced a *Heckler*-style 'abdication' argument in this case or argued that the Executive has entirely ceased enforcing the relevant statutes." 2023 WL 4139000, at *7. But here, the DACA program "prevents immigration officials from enforcing these provisions of the INA," *Texas*, 549 F. Supp. 3d at 608, and Plaintiff States have thoroughly briefed an abdication claim under the Take Care Clause.[6] *See* ECF No. 625-1 at 20–21; ECF No. 673 at 29–32; *see also Enforcement Priorities*, 2023 WL 4139000, at *10 (Gorsuch, J., concurring in the judgment) (noting that a properly advanced Take Care Clause claim is "an abdication argument").

---

[6] In the DAPA litigation, the Supreme Court granted Federal Defendants' petition for certiorari that presented three questions for review:

1. Whether a State that voluntarily provides a subsidy to all aliens with deferred action has Article III standing and a justiciable cause of action under the Administrative Procedure Act (APA), 5 U.S.C. 500 *et seq.,* to challenge the Guidance because it will lead to more aliens having deferred action.
2. Whether the Guidance is arbitrary and capricious or otherwise not in accordance with law.
3. Whether the Guidance was subject to the APA's notice-and-comment procedures.

*Pet. for Writ of Cert., United States of America v. State of Texas*, 2015 WL 7308179 (U.S.). The Court then added one question on its own initiative: "Whether the Guidance violates the Take Care Clause of the Constitution, Art. II, § 3." *United States v. Texas*, 577 U.S. 1101 (2016) (Mem.). The *Enforcement Priorities* majority's approval of standing based on abdication continues the Supreme Court's interest in this area. Plaintiff States do not believe this Court is limited to relying on the abdication rationale only if it rules in their favor on the Take Care Clause claim, and the analysis would be similar either way.

Abdication standing was not addressed by the Fifth Circuit in the *DAPA* case, and this Court did not address it in the challenge to the DACA Memorandum. Now that the Supreme Court has explicitly approved this basis for standing, the Court should find standing for the States to challenge the Final Rule here on this additional ground.

**2. The States have standing because DACA is not a mere policy of nonenforcement because it provides affirmative immigration relief and eligibility for federal and State benefits.**

The *Enforcement Priorities* majority also noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. … because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." *Id*. at *8. The Court cited two cases challenging DACA as exemplars of this exception: *Dep't of Homeland Sec. v. Regents of Univ. of Cal.,* 140 S. Ct. 1891, 1906–07 (2020) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); and *Texas v. United States (DAPA)*, 809 F.3d 134, 154 (5th Cir. 2015) (*Linda R.S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits")).

This applies to this case. DACA makes its recipients eligible for various federal and state benefits. *See Texas*, 549 F. Supp. 3d at 578. And that the *Enforcement Priorities* majority cited the Fifth Circuit's *DAPA* case—which found standing solely based on the costs to Texas of providing subsidized driver's licenses, *DAPA*, 809 F.3d at 150 (States' "standing is plain, based on the driver's-license rationale, so we need not address the other possible grounds for standing")—as how States could show standing to challenge federal agency action relating to immigration. This

10

provides a roadmap for this Court to analyze standing in a way blessed by Justice Kavanaugh's analysis for the majority in *Enforcement Priorities*: the driver's license rationale.

### 3. The States remain entitled to special solicitude.

Defendants argue that *Enforcement Priorities* sub silentio overruled the "special solicitude" granted to States in the standing analysis under *Massachusetts v. EPA*, 549 U.S. 497 (2007).[7] ECF No. 706-1 at 2–3; ECF No. 705-2 at 3–4. This argument is plainly incorrect, as the *Enforcement Priorities* majority never used the phrase "special solicitude" or addressed it in its analysis. *See Missouri v. Biden*, —F. Supp. 3d—, No. 3:22-CV-01213, 2023 WL 4335270, at *64 (W.D. La. July 4, 2023) (Doughty, J.) (explaining continued viability of special solicitude doctrine post-*Enforcement Priorities*).

As Justice Gorsuch noted, "the Court says nothing about 'special solicitude' in this case." *Enforcement Priorities*, 2023 WL 4139000, at *10 (Gorsuch, J., concurring in the judgment). Both *Massachusetts v. EPA* and subsequent Fifth Circuit case law recognizing the doctrine of "special

---

[7] Lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it:

> "We reaffirm that '[i]f a precedent of this Court has *direct application* in a case, yet appears to rest on reasons rejected in some other line of decisions,' the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (emphasis added) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *see also* Bryan A. Garner et al., The Law of Judicial Precedent 302 (2016). Indeed, even if the tension between the two cases was so stark that we could confidently predict *Free Enterprise Fund*'s impending demise, we would still have to follow it—it is the Supreme Court's "prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).

*Cochran v. SEC*, 20 F.4th 194, 206 n.11 (5th Cir. 2021) (citations truncated), *aff'd and remanded sub nom. Axon Enter., Inc. v. FTC*, 142 S. Ct. 890 (2023)

solitude" remain good law. Indeed, *Enforcement Priorities* favorably cited the standing analysis in the Fifth Circuit's *DAPA* ruling, which found that Texas was entitled to special solicitude. 2023 WL 4139000, at *8 (citing *DAPA*, 809 F.3d at 151). In any event, the States easily demonstrated standing even without "special solicitude"—the doctrine just served to gild the lily. *See DACA*, 50 F.4th at 520 ("*Especially* with the benefit of special solicitude, Texas has established that rescinding DACA would redress its harm. … [and] has demonstrated standing based on its direct injury.") (emphasis added); *Texas*, 549 F. Supp. 3d at 592 ("*Moreover*, Texas's entitlement to special solicitude shores up any alleged weaknesses presented by attenuated causation and redressability arguments.") (emphasis added) (citing *Lujan*, 504 U.S. at 572 n.7).

### 4. Nothing in *Enforcement Priorities* raises questions about traceability or redressability in this case.

Justice Gorsuch, for himself and two other Justices, questioned the majority's holding on legally cognizable injury in fact, but would have ruled against Texas on redressability grounds.[8] He noted that 8 U.S.C. § 1252(f)(1) provides that "'no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of' certain immigration laws, including the very laws the States seek to have enforced in this case," *Enforcement Priorities* at *11 (Gorsuch, J., concurring in the judgment); that vacatur of the prioritization policy without injunctive relief would not redress Texas's injury, *id.*; and that the APA might not empower courts to vacate agency action, *id.* at *11–16 ("I do not pretend that the matter is open and shut.").

---

[8] "[C]ausation and redressability are closely related, and can be viewed as two facets of a single requirement." *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 54 (D.C. Cir. 2016).

All of this discussion in Justice Gorsuch's opinion is irrelevant because binding Fifth Circuit precedent holds that 8 U.S.C. § 1252(f)(1) does not apply to *this* case, *DACA*, 50 F.4th at 528–29—and the consequent availability of injunctive relief therefore makes Justice Gorsuch's concerns about redressability by vacatur alone inapplicable here. A three-justice concurrence would not be able to affect any aspect of this case anyway, including by somehow abrogating binding Fifth Circuit precedent that vacatur is an available remedy under the APA. *See* ECF No. 673 at 3 (quoting *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) and *Franciscan Alliance, Inc. v. Becerra*, 47 F4th 368, 374–75 (5th Cir. 2022)).

## II. *Brackeen* should not affect this Court's determination of the States' standing to challenge DACA.

Defendants' reliance on *Haaland v. Brackeen*, 143 S. Ct. 1609 (2023), is likewise misplaced. In *Brackeen*, the Supreme Court held that Texas lacked standing to challenge the placement provisions of the Indian Child Welfare Act, which give preference to Indian families in custody disputes involving Indian children. *Id.* at 1623. *Brackeen* held that Texas "cannot assert equal protection claims on behalf of its citizens [against the statute] because '[a] State does not have standing as *parens patriae* to bring an action against the Federal Government.'" *Id.* at 1640 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982)). Defendants claim that this statement forecloses *parens patriae* standing here. Not so.

In its brief discussion of *parens patriae* standing, *Brackeen* merely quoted footnote 16 of *Alfred L. Snapp*, which itself merely restated the so-called "*Mellon* bar." *See Brackeen*, 143 S. Ct at 1640; *Alfred L. Snapp*, 458 U.S. at 610 n.16 (quoting *Massachusetts v. Mellon*, 262 U.S. 47, 485–86 (1923)). Though both cases use admittedly broad language, neither *Brackeen* nor *Alfred L. Snapp*

13

expounds the scope of that "*Mellon* bar," and the Supreme Court has made clear elsewhere that *parens patriae* suits are allowed against the federal government outside the *Mellon* bar. *See Massachusetts v. EPA*, 549 U.S. at 520 n.17 (explaining the "critical difference" between *parens patriae* suits barred by *Mellon* and *parens patriae* suits against the federal government otherwise permitted).

Defendants imply that *Brackeen* categorically barred *parens patriae* when a State is suing the Federal Government. *See* ECF No. 703-1 at 2; ECF No. 704-1 at 2–4. But while the Court stated that a "State does not have standing as *parens patriae* to bring an action against the Federal Government," *Brackeen*, 143 S. Ct. at 1640, that was because *Brackeen* involved a constitutional challenge to an act of Congress that sought to prevent its enforcement, *see id.* at 1622–26—a type of constitutional challenge repeatedly barred by Supreme Court precedent. *See Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 447 (1945) (explaining the so-called *Mellon* bar). In this case, however, Plaintiffs (unlike the plaintiffs in *Brackeen*) are not suing the Federal Government to "'protect [their] citizens from the operation of federal statutes,' (which is what *Mellon* prohibits)" but "to assert [their] rights under federal law (which it has standing to do)." *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (quoting *Pennsylvania R. Co.*, 324 U.S. at 447). The Final Rule challenged here is not a federal statute, making *Brackeen*'s discussion of *parens patriae* is thus orthogonal to this case. *See Texas*, 549 F. Supp. 3d at 591 n.20 ("The *Mellon* bar applies to statutes. Throughout their argument, the Defendant-Intervenors attempt to gloss over the fact that the DACA Memorandum is *not* a federal statute."). This Court's explanation why the Plaintiff States have *parens patriae* standing to challenge DACA, *id.* at 591, is not contradicted by *Brackeen*.

Defendants also maintain that *Brackeen* precludes standing here because it found a lack of standing because the asserted costs were imposed by provisions other than the one challenged there. *See* ECF Nos. 703-1 at 2 of 4; 704-1 at 4. But Plaintiffs' pocketbook injuries are fairly traceable to the Final Rule's continuation of DACA and are unlike the injuries discussed in *Brackeen*. For example, while the injuries alleged there "would continue to [be] incur[r]ed" even if the requested relief was granted, *Brackeen*, 143 S. Ct. at 1640–41, Plaintiffs here would have their pocketbook injuries reduced should the Final Rule be enjoined, vacated, and declared unlawful because the separate provisions do not provide benefits to DACA recipients—or impose costs on States attributable to DACA-eligible aliens—absent the Final Rule.[9] In fact, Plaintiffs have established that DACA directly costs Texas millions of dollars and that, upon DACA's termination, such costs would decrease. *See* ECF No. 625-1 at 32–35. As a result, *Brackeen*'s determination regarding the "fairly traceable" component of standing is inapplicable in this case.

---

[9] Federal Defendants assert that Texas's costs are "independent of DACA and will not be alleviated by a court order ending DACA" because DACA recipients that remain in the United States "would likely become dependent on State social services after losing access to employment and health insurance." ECF No. 704-1 at 4. But the Fifth Circuit has already rejected this argument:

> The Government cites estimates that if the DACA program were to be terminated, the State's healthcare costs would increase for aliens who remain in Texas, because they would lose their jobs and employer-based health insurance and would rely more on emergency Medicaid. That may be, but these estimates do not account for the cost savings—healthcare *and educational*—from others' departure. Texas would no longer be required to educate those who depart or the children who depart with them. In any event, this court held with regard to standing in the *DAPA* case that "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." In resolving standing, courts do not engage in such an "accounting exercise."

*DACA*, 50 F.4th at 518 (citations omitted).

15

Finally, the States' injuries remain redressable because *Brackeen*'s discussion of redressability is distinguishable and, in fact, irrelevant to this case. Specifically, the majority only discussed redressability as to the individual petitioners, not Texas, and the majority's basis for concluding that redressability was unmet was that the individual petitioners' requested relief would not "conclusively resolve[] 'the legal rights *of the parties*.'" *Brackeen*, 143 S. Ct. at 1638–39 (emphasis in original) (quoting *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 200 (2014)). *Brackeen* recognized that non-parties responsible for enforcing or implementing the challenge statute there "would not be bound by the judgment" should the Court grant the individual petitioners' their requested relief. *Id.* at 1639. But unlike *Brackeen*, Plaintiffs' relief sought in this case does apply to "the officials who matter." *Id.* Plaintiffs seek relief against the very parties responsible for the administration, enforcement, or implementation of the unconstitutional Final Rule, which makes DACA recipients eligible for lawful presence and federal and state benefits. *See* ECF No. 623 at 13–14. Therefore, *Brackeen*'s redressability discussion does not apply to this case.

Date: July 14, 2023

STEVE MARSHALL
Attorney General of Alabama

TIM GRIFFIN
Attorney General of Arkansas

KRIS KOBACH
Attorney General of Kansas

JEFF LANDRY
Attorney General of Louisiana

LYNN FITCH
Attorney General of Mississippi

MICHAEL T. HILGERS
Attorney General of Nebraska

ALAN WILSON
Attorney General of South Carolina

PATRICK MORRISEY
Attorney General of West Virginia

Respectfully submitted,

ANGELA COLMENERO
Provisional Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

LEIF A. OLSON
Chief, Special Litigation Division
Texas Bar No. 24032801
Southern District of Texas Bar No. 33695

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Deputy Chief, Special Litigation Division
*Attorney-in-Charge*
Texas Bar No. 24105085
Southern District of Texas Bar No. 3369185

Ethan Szumanski
Assistant Attorney General
Texas Bar No. 24123966
Southern District of Texas Bar No. 3836010

Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-2714
Fax: (512) 457-4410
leif.olson@oag.texas.gov
ryan.walters@oag.texas.gov
ethan.szumanski@oag.texas.gov

COUNSEL FOR PLAINTIFF STATES

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF) on July 14, 2023.

/s/ Ryan D. Walters
RYAN D. WALTERS