## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
|     Plaintiffs, | |
| v. | Case No. 1:18-cv-00068 |
| UNITED STATES OF AMERICA, *et al.*, | |
|     Defendants, | |
| *and* | |
| KARLA PEREZ, *et al.*, | |
| and | |
| NEW JERSEY, | |
|     Defendant-Intervenors. | |

## FEDERAL DEFENDANTS' REPONSE TO PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

The Federal Defendants hereby respond to Plaintiffs' notice to this Court of the recent Supreme Court decision *Biden v. Nebraska*, 600 U.S. ___, 143 S. Ct. 2355 (2023).

In *Nebraska*, the Supreme Court reversed the Secretary of Education's loan forgiveness program on the grounds that the authority granted to the Secretary in the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act) did not extend to the power to reduce or erase the debt of millions of borrowers. The Court noted that 20 U.S.C. § 1098bb(a)(1) "authorizes the Secretary to 'waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the [Education Act]'" in certain circumstances, and

1

found that the Secretary's loan forgiveness program exceeded the "modest adjustments and additions" that the statue allowed. *Nebraska*, 143 S. Ct. at 2368-69 (alteration in original).

There is no comparable statutory or regulatory language here that specifies or constrains the Secretary of Homeland Security's authority to set criteria for a grant of deferred action. Plaintiffs do not point to any language in the INA that indicates Congress's intention to constrain the Secretary's authority to exercise prosecutorial discretion in the way that the Court found the HEROES Act constrains the Secretary of Education. Instead, "*many* provisions of [the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA)] are aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the theme of the legislation." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486 (1999) (Court's emphasis); *see id.* at 483-84 ("[A]t the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience.").[1]

Contrary to Plaintiffs' assertion, the Secretary of Homeland Security did not rewrite the INA in promulgating the DACA rule. Rather, that rule establishes a policy for when and how the Secretary will exercise his enforcement discretion under the INA—discretion recently affirmed in *United States v. Texas*, 143 S. Ct. 1964, 1971-72 (2023)—and exercises authority specifically

---

[1] Plaintiffs cite to case law that notes congressional intent in the Immigration Reform and Control Act of 1986 (IRCA), to reduce "the unauthorized employment" of undocumented noncitizens. Pls' Mot. 16 (citing *Texas v. United States*, 549 F. Supp. 3d 572, 610 (S.D. Tex. 2021) (quoting *Arizona v. United States*, 567 U.S. 387, 404 (2012)). But DACA does not conflict with that goal. *See* Fed. Defs' Mot. at 19-20 (citing Fed. Reg. at 53,286-53,287). Furthermore, the Congressional record Plaintiffs cite for the proposition that, in passing IIRIRA, Congress "reinforced" laws curtailing "extending benefits to unlawfully present aliens" is incorrect. Pls' Mot. 16 (citing 142 Cong. Rec. S11882 (daily ed. Sept. 30, 1996)). The record Plaintiffs cite instead reflects one senator's disappointment that several provisions in the House of Representatives' version of the bill limiting certain public benefits for *documented* noncitizens were removed in order to pass IIRIRA. *See* 142 Cong. Rec. S11881-82.

granted to the Secretary in the INA to establish categories of immigrants who may apply for employment authorization, *see* 8 U.S.C. § 1324a(h)(3), and who will be deemed "lawfully present" for the purpose of certain federal public benefits, *see* 8 U.S.C. § 1611(b)(2). Plaintiffs thus err in asserting that the DACA policy is not in the Secretary's "purview." ECF 709-2 at 4. The Secretary rightfully exercises the authority duly granted to him by Congress.

Plaintiffs likewise err in relying on the Supreme Court's observation in *Nebraska* that "[p]rior to the COVID–19 pandemic, 'modifications' issued under the [HEROES] Act implemented only minor changes, most of which were procedural." *Nebraska*, 143 S. Ct. at 2369. As defendants have previously explained, DACA is consistent with prior exercises of the Secretary of Homeland Security's enforcement discretion. "DHS and its predecessors have implemented more than twenty policies granting deferred action or related temporary, discretionary reprieves from removal since the 1950s, including the Family Fairness policy under which an estimated 1.5 million people could apply." *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) (*Texas II*), Brief For Federal Appellants 4 (citation omitted).

Plaintiffs' reference to *W. Virginia v. Env't Prot. Agency*, a case it has not previously raised in any briefing, is similarly misplaced. *W. Virginia* is a major questions doctrine case that has no bearing on the claims here.[2] *See* 142 S. Ct. 2587, 2610 (2022) ("EPA 'claim[ed] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority.'"); *see id*. at 2612 ("This view of EPA's authority was not only unprecedented; it also effected a 'fundamental revision of the statute, changing it from [one sort

---

[2] Plaintiffs assert once, without support, in their motion for summary judgment that "[t]he INA's general grants of authority to DHS 'cannot reasonably be construed as assigning "decisions of vast economic and political significance" to an agency' and therefore fail under the major-questions doctrine." Pls' Mot. 20 (citing *Texas II*, 50 F.4th at 527).

of] scheme of . . . regulation' into an entirely different kind.") (alteration in original). As noted, the authority exercised in the DACA rule is not new, but rather has been exercised more than 20 times over the past seven decades. Furthermore, to the extent that DACA has financial effects on Texas's economy, the Final Rule belies any claim that such effects are significant—and certainly they do not constitute "question[s] of deep economic and political significance" to amount to a major questions case. *Nebraska*, 143 S. Ct. at 2375 (quotation marks omitted) (citing *King v. Burwell*, 576 U.S. 473, 485 (2015) ("The tax credits are among the Act's key reforms, involving billions of dollars in spending each year and affecting the price of health insurance for millions of people.")); *see id.* at 2372-73 (finding that the estimated $430 billion in student loan forgiveness was "ten times the 'economic impact' that we found significant in concluding that an eviction moratorium implemented by the Centers for Disease Control and Prevention triggered analysis under the major questions doctrine.") (citing *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021)). Rather, "DHS estimated that compared to the pre-2012 baseline, DACA caused workers to join the Texas workforce in numbers representing only 0.4223% of the total workforce," and "currently make up no more than 0.69% of Texas's workforce." Defs' Mot. 11. And, "DHS estimates that Texas could receive only approximately 2,922 additional workers in the first year of the Final Rule, representing 'about 0.0208% of the overall Texas labor force.'" *Id.* (citing 87 Fed. Reg. at 53,286 ("The potential impacts to the other States would be lower.")); *see also id.* at 12 ("[T]he effect of DACA on overall wages would likely be very small and would be unable to be detected in these data.") (citing 87 Fed. Reg. at 53,154). Texas's alleged expenditures on emergency medical care and education for DACA recipients, to the extent they are established at all, are similarly low. *See id.*

Nor are the downstream positive effects of DACA, including the billions of dollars that

DACA recipients pay in taxes and contribute to their communities, *see* Fed. Defs' Mot 31-32, properly considered when determining whether the Final Rule is subject to the major questions doctrine. There is no precedent for applying the major questions doctrine on the basis of such secondary effects, which are, in any event, steps removed from the Secretary's interpretation of the INA provisions that support the Final Rule. Such downstream effects do not implicate "Congress's control of the purse," nor do they constitute "the Government [] providing monetary benefits [nor] imposing obligations." *Nebraska*, 143 S. Ct. at 2375. As DHS explained in the DACA final rule, "[w]hile DHS expects that this rule would carry significant benefits and would result in significant tax transfers, this rule is not akin to the rule in *West Virginia*[:] . . . the costs imposed by this rule are borne by DACA recipients themselves." 87 Fed. Reg. at 53,186.

Plaintiffs further contend that *Nebraska* supports their reliance on bills that Congress has failed to pass after the INA was enacted in 1952 and substantively amended in 1986, 1990, and 1996. But "[t]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 840 (1988) (citation and alteration omitted). Significantly, the legislative proposals that Plaintiffs reference would have been far more dramatic in effect than DACA: They proposed granting lawful immigration status, while DACA simply identifies guidelines for case-by-case, temporary forbearance from removal and grants no immigration status. *E.g.*, DREAM Act, S. 1291, 107th Cong. (2001). As DHS explained in the DACA final rule, "Congress does not legislate by failing to legislate." 87 Fed. Reg. 53,187. Congress's inaction on legislation impacting the DACA population, therefore, has no bearing on the legality of the DACA final rule or the extent of the Secretary's authority to exercise prosecutorial discretion. *See id.*

Plaintiffs also assert, in their response to the defendants' notices of supplemental authority,

that the Supreme Court's decision in *Nebraska* supports their argument that the costs they allege Texas has incurred "are direct rather than indirect." ECF No. 709-1 at 6. As Federal Defendants explained in their notice of supplemental authority [ECF No. 704-1], the standing analysis in *Nebraska* is not analogous to the standing claims here. The Supreme Court found that the State of Missouri had established that the Education Secretary's student loan forgiveness policy would eliminate the student loans of millions of borrowers, causing the Missouri Higher Education Loan Authority (MOHELA), a state instrumentality, a direct loss of approximately $44 million in revenue from existing customers that MOHELA "otherwise would have earned under its contract with the Department of Education." *See Nebraska*, 143 S. Ct. at 2366.

Plaintiffs here based their asserted injury on allegations that DACA causes increased social services expenditures on all undocumented noncitizens living in Texas—a claim that requires a chain of assumptions about the actions of third parties. *See* Order at 29 ("Texas's over 110,000 DACA recipients in all probability make up some of those expenses [for emergency Medicaid services]."). Even if established, the state's expenditures would be an indirect consequence of individuals choosing to remain in the United States because of DACA and then utilizing emergency medical care or public education at the state's expense. *See id.* (quoting a deponent who "assume[d] there would be some people in the DACA population who are likely to have some type of care that is reimbursed in some way by the state"). Plaintiffs' alleged harms are not at all like the direct loss of revenue in *Nebraska*, but instead are nearly identical to the alleged harms rejected by the Supreme Court in the recent *Enforcement Priorities* decision. *See* ECF No. 706-1 ("[I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending. And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become

more attenuated.") (quoting *United States v. Texas*, 599 U.S. ___, No. 22-58, 2023 WL 4139000, *6 n.3 (U.S. June 23, 2023)).

Nor does Plaintiffs' waived, last-minute claim of harm from the issuance of driver's licenses to noncitizens with DACA align with the direct harm to MOHELA of a loss of customer fees under a government contract. *See Nebraska*, 143 S. Ct. at 2366. Here, Texas claims that, because DACA recipients are considered lawfully present, and Texas law confers eligibility to lawfully present individuals to apply for a driver's license, those DACA recipients who apply for a driver's license cause the state to expend $0.30 to perform an immigration status check. *See* ECF No. 681, Defs' Reply at 8. Thus, Texas is not claiming a loss of existing revenues as a direct result of DACA. It is seeking to avoid an alleged expenditure that arises incidental to a secondary aspect of DACA policy that exists only because of Texas law—and occurs only when a DACA recipient applies for a driver's license in Texas. Plaintiffs' belated claims of indirect harm are thus entirely distinct from the harm established in *Nebraska*, and the Court should find that *Nebraska* offers no further support for Plaintiffs here.

For the reasons stated herein, as well as Federal Defendants' summary judgment briefing and first and second notices of supplemental authority, the Court should deny Plaintiffs' motion for summary judgment for lack of standing and grant Federal Defendants' motion for summary judgment.

Dated: July 31, 2023                                    Respectfully submitted,

BRIAN M. BOYNTON                          */s/ James J. Walker*
Principal Deputy Assistant Attorney General    JAMES J. WALKER
Civil Division                                         Senior Litigation Counsel
                                                       U.S. Department of Justice
WILLIAM C. PEACHEY                        Civil Division
Director, Office of Immigration Litigation    Office of Immigration Litigation
District Court Section                          District Court Section

7

JEFFREY S. ROBINS
Attorney-in-Charge
Deputy Director

P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 532-4468
Fax: (202) 305-7000
Email: james.walker3@usdoj.gov

*Attorneys for Federal Defendants*