IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

|  |  |
|---|---|
| STATE OF TEXAS, *et al.*, | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 1:18-CV-68 |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| Defendants, | ) |
| *and* | ) |
| KARLA PEREZ, *et al.*, | ) |
| Defendant-Intervenors, | ) |

**RESPONSE OF DEFENDANT-INTERVENORS ELIZABETH DIAZ, ET AL.
TO PLAINTIFF STATES' NOTICE OF SUPPLEMENTAL AUTHORITY**

In their Notice of Supplemental Authority (Dkt. 712), Plaintiffs misinterpret the Supreme Court's recent decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), as supporting their positions in this case. None of the facts or circumstances that motivated the Court's decision in *Nebraska* is present here. ***First***, with respect to standing, *Nebraska* involved a loan-forgiveness program that all parties had "concede[d]" directly harmed a state instrumentality, *id.* at 2366; unlike the state plaintiffs in *Nebraska*, Texas (the only Plaintiff that has even attempted to show standing) can point to *no* evidence properly in the summary judgment record demonstrating that DACA has directly injured the state or its instrumentalities. ***Second***, with respect to statute at issue, unlike the HEROES Act at issue in *Nebraska*, which the Supreme Court believed gave the Secretary of Education only "modest" authority to "waive or modify" certain provisions related to student loans, *id.* at

1

2368–69, the Immigration and Nationality Act ("INA") affords the Secretary of the Department of Homeland Security("DHS") broad discretion to "administ[er] and enforce[] . . . all [ ] laws relating to [ ] immigration and naturalization," 8 U.S.C. § 1103(a)(1), and to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5). **Third**, with respect to the administrative act at issue, unlike the loan-forgiveness program in *Nebraska*, which the Supreme Court held affected 43 million individuals, *see id.* at 2362, at an estimated cost to taxpayers of "between $469 billion and $519 billion," *id.* at 2373 (cleaned up), DACA is entirely consistent with previous exercises of removal-forbearance discretion, affects a relatively small population, and generates significant net taxpayer *benefits*.

Because of those factual differences, *Nebraska* does not support Plaintiffs' positions here. To the contrary, the differences between this case and *Nebraska* only underscore why Plaintiffs lack standing and why, if this Court does reach the merits, Defendant-Intervenors should still prevail.

**I.    *NEBRASKA* DOES NOT SUPPORT PLAINTIFFS' STANDING.**

Plaintiffs conspicuously say nothing at all about *Nebraska*'s standing analysis in their own Notice of Supplemental Authority. Instead, Plaintiffs confine their discussion to their Response to Defendants' and Defendant-Intervenors' Notices of Supplemental Authority (Dkt. 713), where they misguidedly attempt to use *Nebraska* to distinguish *United States v. Texas (Enforcement Priorities)*, 143 S. Ct. 1964 (2023), and *Haaland v. Brackeen*, 143 S. Ct. 1609 (2023).[1] The reason Plaintiffs address *Nebraska*'s standing analysis only indirectly

---

[1] Plaintiffs' attempts to use *Nebraska* to distinguish *Enforcement Priorities* and *Brackeen* fail. Plaintiffs argue, for example, that because this case "does not involve any attempt to compel the arrest or prosecution of anyone, [ ] *Enforcement Priorities* does not undermine standing here." Dkt. 713 at 4. Yet Plaintiffs fail to explain why their attempt to distinguish *Enforcement Priorities* does not doom their argument that their supposed injuries would be redressed by DACA's

2

is clear: it does not support their case. In *Nebraska*, the government conceded, and all nine Justices agreed, that MOHELA suffered an injury sufficient to confer standing. *See Nebraska*, 143 S. Ct. at 2366; *id.* at 2386 (Kagan, J., dissenting). The standing question on which the Court divided was merely whether MOHELA's conceded injury gave *Missouri* standing to sue. *See id.* at 2365. The Court held that it did, not because Missouri was entitled to special solicitude or could sue as *parens patriae*, but instead because Missouri had "suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Id.* at 2365.

---

termination. *See, e.g.*, *Enforcement Priorities*, 143 S. Ct. at 1978 (Gorsuch, J., concurring) (rejecting Texas's redressability argument because a "judicial decree rendering [an executive action] a nullity does nothing to change the fact that federal officials possess the same underlying prosecutorial discretion"). Plaintiffs' attempt to invoke *Nebraska* to distinguish direct and indirect costs by focusing on whether an agency acts or fails to act, *see* Dkt. 713 at 4–7, is likewise a distinction without a difference: as Defendant-Intervenors have explained, Texas's supposed (but still unproven) social services costs are not a result of any executive *action*, but instead merely the result of DACA recipients' presence. *See, e.g.*, Dkt. 400-2, Ex. 7 ¶ 14 (explaining Texas's supposed social services costs: "it's not because [DACA recipients] have DACA, it's because they are here"); *see also* Dkt. 673 at 34 (Plaintiffs conceding that they are "required to provide [social] services regardless of legal status"). Plaintiffs also contend that "the Supreme Court has explicitly approved [the abdication] basis for standing," Dkt. 713 at 10, even though the Court said only that an "extreme case of non-enforcement *arguably* could . . . support Article III standing" and "*might* change" the "standing calculus." 143 S. Ct. at 1973–74 (emphasis added); *see also id.* at 1978 (Gorsuch, J., concurring) (merely questioning whether a properly pleaded Take Care Clause claim is an "abdication argument," not concluding that it is). Plaintiffs likewise assert that special solicitude and *parens patriae* are still alive and well because *Enforcement Priorities* and *Brackeen* did not explicitly preclude them. *See* Dkt. 713 at 11–12, 13–16. But, as Defendant-Intervenors have explained, *see* Dkt. 642 at 23–26, 29–30, neither doctrine has "*direct application*" here, Dkt. 713 at 11 (cleaned up)—and in any event, *Enforcement Priorities* and *Brackeen* at the very least suggest that "lower courts should just leave [special solicitude and *parens patriae*] on the shelf" in future cases. *Enforcement Priorities*, 143 S. Ct. at 1977 (Gorsuch, J., concurring). Finally, Plaintiffs rely on *Texas DAPA*'s standing holding related to driver's license costs, *see* Dkt. 713 at 10–11, despite the fact that Plaintiffs repeatedly waived their reliance on driver's license evidence, Plaintiffs provided Defendants and Defendant-Intervenors no opportunity to test the new drivers license cost allegations, and Plaintiffs are no longer entitled to special solicitude. *See* Dkt. 705-2 at 4–5.

3

Texas has identified no such injury here. In fact, Texas's desperate attempt to analogize MOHELA's injuries in *Nebraska* to supposed driver's license costs that Texas repeatedly, explicitly, and consistently waived long ago, *see* Dkt. 713 at 7, only underscores the fundamental flaws in Texas's standing argument: Texas can identify no evidence properly in the summary judgment record demonstrating that it spent even a single cent on DACA recipients. *See* Dkt. 642 at 19–22. And even if Texas's driver's license costs could ever conceivably fill that gap—which is entirely speculative, because Defendant-Intervenors have not had the opportunity to test Texas's inconsistent and apparently contradictory statements, *compare* Dkt. 302 at 72:1–6 ("with DACA, the DACA recipients largely already have their driver's licenses, and they pay a $24 fee to renew their licenses"), *with* Dkt. 674-1 (declaration containing no mention of renewal fee)—Texas's driver's license costs are not properly before the Court. *See* Dkt. 680 at 9–10 (collecting authority). Plaintiffs' attempt to zoom past any consideration of *Nebraska*'s teachings on standing in favor of discussing the merits, *see* Dkt. 712, should fail because the record developed over the past 5 years in this case is deficient to establish Plaintiffs' standing. *Nebraska* is therefore perfectly consistent with Defendant-Intervenors' position that Plaintiffs' standing theories are fundamentally flawed, warranting the grant of Defendant-Intervenors' motion for summary judgment.

## II.  *NEBRASKA*'S NARROW READING OF THE HEROES ACT DOES NOT APPLY TO THE INA.

Plaintiffs assert that the Court's analysis in *Nebraska* "supports Plaintiffs['] argument that DACA and the Final Rule impermissibly rewrote congressional statutes," and that DACA is not in DHS's "wheelhouse." Dkt. 712 at 2. Unlike the Education Act at issue in *Nebraska*, however, Congress's delegation of authority to the Secretary of DHS is not modest. Rather, in the INA, Congress broadly charged DHS with "administ[ering] and enforc[ing] . . . all [ ] laws relating to [ ] immigration and naturalization," 8 U.S.C.

§ 1103(a)(1), and to "[e]stablishing national immigration enforcement policies and priorities," 6 U.S.C. § 202(5). Congress furthered that broad delegation of authority to DHS by empowering the Secretary to "authorize[]" classes of immigrants to be employed by promulgating separate regulations, 8 U.S.C. § 1324a(h)(3), and to determine whether immigrants are "lawfully present" in the United States for purposes of "any benefit payable under title II of the Social Security Act," 8 U.S.C. § 1611(b)(2). Considering the expansive language in the INA, the Supreme Court has already held that a "principal feature of the removal system is the broad discretion exercised by immigration officials," *Arizona v. United States*, 567 U.S. 387, 396 (2012), and that "DHS has considerable flexibility in carrying out its responsibility." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020). Thus, *Nebraska*'s analysis of a separate statute containing different language does not move the needle in Plaintiffs' favor here.

### III. DACA DOES NOT VIOLATE *NEBRASKA*'S ARTICULATION OF THE MAJOR QUESTIONS DOCTRINE.

Plaintiffs devote the majority of their Notice of Supplemental Authority to the Supreme Court's analysis of the major questions doctrine. *See* Dkt. 712 at 2–4. Despite spilling considerable ink on the Court's conclusion that the Department of Education overreached, Plaintiffs ignore the considerable daylight between the administrative action at issue in *Nebraska* and DHS's Final Rule, which renders *Nebraska*'s analysis of the major questions doctrine inapposite.

To start, DACA is considerably smaller than the loan forgiveness program at issue in *Nebraska*. Whereas the loan forgiveness program would have affected as many as 43 *million* borrowers, *see id.* at 1, just over 825,000 individuals have ever received DACA, *see* Dkt. 607-1 at AR2022-100196, and there were only 578,680 DACA recipients as of March 31, 2023. *See* Exhibit A, U.S. Citizenship and Immigration Services, *Count of Active DACA*

*Recipients By Month of Current DACA Expiration As of March 31, 2023*, https://www.uscis.gov/sites/default/files/document/data/Active_DACA_Recipients_March_FY23_qtr2.pdf (last accessed Aug. 8, 2023). Of note, whereas the loan forgiveness program would have *cost* taxpayers approximately $500 billion, *see* 143 S. Ct. at 2373, DHS estimated that DACA generates approximately $20 billion in discounted annualized net *benefits*, *see* Dkt. 607-1 at AR2022_100335. Thus, the Court's concern in *Nebraska* about the "staggering" size and scope of the administration's action, 143 S. Ct. at 1373, does not apply equally here.

Nor does the Court's discussion of the "unprecedented impact of the Secretary's loan forgiveness program." *Id.* at 2374. Whereas the Department of Education's "past practice" under the HEROES Act was "inconsistent" with the loan modification program, *id.* at 2372 ("past waivers and modifications issued under the Act have been extremely modest and narrow in scope"), DHS's past practice under the INA is entirely *consistent* with the Final Rule. The district court opinion in *Regents*, for example, recited a litany of historical examples from the last half-century where the federal government has granted discretionary relief from removal to both individuals and various classes of non-U.S. citizens through deferred action. *See, e.g.*, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1019–22 (N.D. Cal. 2018), *aff'd*, 908 F.3d 476 (9th Cir. 2018), *rev'd in part, vacated in part*, 140 S. Ct. 1891 (2020) (describing programs since 1975). And, most notably, DACA is entirely consistent with the Family Fairness Program—a broad exercise of discretion subsequently endorsed by Congress in the Immigration Act of 1990—which extended deferred action and employment authorization on a non-country specific basis to approximately 1.5 million people who lacked immigration status. *See* Dkt. 642 at 4, 36–37 (collecting citations).

Finally, the Supreme Court has already suggested that DACA does not violate the major questions doctrine. In *Regents*, the Court emphasized that, especially because of its "breadth," DACA "involve[s] important policy choices." 140 S. Ct. at 1910. "Those policy choices," the Court held, "*are for DHS*." *Id.* (emphasis added). Particularly against that backdrop, the Court's context-specific major questions doctrine analysis in *Nebraska* does not support Plaintiffs' arguments on the merits here. *Nebraska*, 143 S. Ct. at 2379 (Barrett, J., concurring) ("context is also relevant to interpreting the scope of a delegation").[2]

\* \* \*

Accordingly, despite Plaintiffs' arguments in their Notice of Supplemental Authority to the contrary, *Nebraska* does not change the conclusion that Plaintiffs have failed to establish standing and their claims fail on the merits.

---

[2] Plaintiffs also argue that *Nebraska*'s discussion of former Speaker Pelosi's comments and Congress's failure to pass student debt relief parallel former President Obama's statements and Congress's inaction in this case. *See* Dkt. 712 at 3–4. But that discussion, in the context of the Court's analysis of the major questions doctrine, *see* 143 S. Ct. at 2374, was "not necessary to" the Court's holding, *id.* at 2376 (Barrett, J., concurring)—and its effect on the HEROES Act's meaning "should give a textualist pause." *Id.* In any event, Plaintiffs' focus on President Obama's speculation about the legality of an "executive *order*," *Texas v. United States*, 549 F. Supp. 3d 572, 605 n.39 (2021) (emphasis added) (cited in Dkt. 712 at 4), is irrelevant with regard to the Final Rule. And this Court has already recognized that Congress has failed to pass the DREAM Act "because it was always joined with something else that one side or the other found objectionable." Dkt. 565 at 6:22–7:1; *see also Texas v. United States*, 328 F. Supp. 3d 662, 674 (2018) (noting that Congress has failed to pass the DREAM Act "for whatever reason"). As evidenced by Congress's endorsement of the Family Fairness Program, Congress has historically endorsed DHS's exercise of enforcement discretion in cases affecting large numbers of individuals; it is the particularities of the political process around the DREAM Act, and not its endorsement of DHS's discretion, that explain Congress's inaction.

Dated: August 8, 2023                                Respectfully Submitted,

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**

By:  /s/ *Nina Perales*
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone: (210) 224-5476
Facsimile: (210) 224-5382
Email: nperales@maldef.org

**ROPES & GRAY LLP**
Douglas H. Hallward-Driemeier
2099 Pennsylvania Ave NW
Washington, DC 20006-6807
(202) 508-4600
(202) 508-4776 (direct dial)
Douglas.Hallward-Driemeier@ropesgray.com
(Admitted pro hac vice)

**GARCÍA & GARCÍA, ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

Attorneys for Defendant-Intervenors