United States District Court
Southern District of Texas

**ENTERED**

September 13, 2023

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| *v.* | § | Civil Action No. 1:18-CV-00068 |
| | § | |
| THE UNITED STATES OF AMERICA, *et al.*, | § | |
| Defendants, | § | |
| | § | |
| *and* | § | |
| | § | |
| KARLA PEREZ, *et al.*; | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| Defendant-Intervenors. | § | |

## MEMORANDUM AND ORDER

Before the Court is the Motion for Summary Judgment filed by the Plaintiff States.[1] (Doc. No. 625-1). Defendant-Intervenor New Jersey filed a combined response and cross-motion for Summary Judgment, as did the individual Defendant-Intervenors.[2] (Doc. Nos. 636, 641). The primary Defendant is the United States of America, and the following individuals with some supervisory role over the Deferred Action for Childhood Arrivals ("DACA") program have also been named: Alejandro Mayorkas, Troy A. Miller, Tae D. Johnson, Ur M. Jaddou, and Raul L. Ortiz (the "Federal Defendants"). Collectively, the Federal Defendants have filed a combined cross-motion for summary judgment and response in opposition to the Plaintiff States' motion. (Doc. No. 639). The parties have filed various responses, replies, and sur-replies. Additionally,

---

[1] The Plaintiff States are comprised of Texas, Alabama, Arkansas, Kansas, Louisiana, Mississippi, Nebraska, South Carolina, and West Virginia.

[2] The Defendant-Intervenors are 22 individual DACA recipients plus the State of New Jersey. The Court will refer to them collectively as "Defendant-Intervenors" unless there is a need for them to be referred to separately. When that occurs, the Court will denote the DACA recipients as the "individual Defendant-Intervenors" and the state as "New Jersey."

this Court has allowed multiple entities to participate as *amici curiae*. At the request of the parties, the Court held oral argument and various parties have, to a limited extent, filed additional post-argument authorities.

The focus of all parties is on the recently adopted DACA "Final Rule" promulgated by the Department of Homeland Security ("DHS"). This rule was promulgated following a notice and comment period as prescribed by the Administrative Procedure Act ("APA"). 5 U.S.C. § 500 *et seq*. The Final Rule was to become effective on October 31, 2022.[3] Before that date arrived, however, the United States Court of Appeals for the Fifth Circuit affirmed this Court's opinion and order enjoining DACA. *Texas v. United States*, 549 F.Supp.3d 572 (S.D. Tex. 2021), *aff'd Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) (hereinafter, "*Texas II*"). As discussed below, that affirmance had one exception—the legality of the "new" Final Rule. The Fifth Circuit, lacking the complete administrative record, remanded the consideration of the Final Rule to this Court. Following the remand, the parties agreed prior to the effective date that the Final Rule would be subject to this Court's earlier injunction of the DACA program pending a ruling by this Court.[4] Thus, the Final Rule has never been implemented.

In its opinion, the Fifth Circuit requested this Court rule expeditiously. *Texas II*, 50 F.4th at 512. Nevertheless, since the parties agreed to subject the Final Rule to the terms of the existing injunction, the need for immediate action was somewhat alleviated. Moreover, given the subject matter's importance, the Court allowed the parties to create their own briefing schedule to enable them to fully address the Final Rule. They agreed upon a schedule, fully briefed the issues in accordance with that schedule, and presented the case to the Court at oral argument. Prior to the

---

[3] 87 Fed. Reg. 53,152 (Aug. 30, 2022) (to be codified at 8 C.F.R. pts. 106, 236, and 274a).

[4] (Doc. No. 603).

hearing, the Court reviewed the administrative record in detail.[5] Thus, the issues are now ripe for resolution.

The Plaintiff States' attack on the Final Rule falls into two categories. The Plaintiff States argue that the Final Rule: (1) substantively violates the APA; and (2) violates the Take Care Clause of the United States Constitution. 5 U.S.C. § 500 *et seq.*; U.S. CONST. art. II, § 3.[6] Not surprisingly, the Defendants and the Defendant-Intervenors disagree.

## I.      Legal Standard

As contemplated by the parties, the issues concerning the Final Rule have been raised via competing motions for summary judgment. Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the Court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding

---

[5] The administrative record submitted to the Court is approximately 7,600 pages in length. *See* (Doc. Nos. 607–611).

[6] The Court, while using initial caps for ease of readability, acknowledges as it has before that "Take Care Clause" more often appears in print as "take Care Clause," which uses a lowercase initial letter in the word "take." This latter approach has been adopted by many scholars and authors because that is how it appears in most copies of the Constitution.

3

a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

## II.    Background

In 2012, after years of waiting for Congress to pass an act granting lawful status for individuals illegally brought to the United States as children, the Secretary of the Department of Homeland Security, Janet Napolitano, issued a three-page memorandum (the "2012 DACA Memorandum") that announced the creation of the Deferred Action for Childhood Arrivals ("DACA") program.[7] Among other provisions, the 2012 DACA Memorandum directed that the removal of certain aliens who entered the United States unlawfully as children should be deferred and that these immigrants should receive certain benefits.

Briefly, the 2012 DACA Memorandum directed immigration enforcement officers not to remove "certain young people who were brought to this country as children" who met specific delineated criteria. For those who qualify, DACA allows them to remain in the country indefinitely through a renewable two-year period of "deferred action."[8] An illegal alien[9] is eligible for DACA

---

[7] (Doc. No. 487, Ex. 1, Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012)).

[8] In at least one place in the Code of Federal Regulations, "deferred action" is characterized as "an act of administrative convenience to the government which gives some cases lower priority." 8 C.F.R § 274a.1(c)(14); *see also Reno v. AAADC*, 525 U.S. 471, 483–84 (1999) (describing deferred action as the Executive abandoning the deportation endeavor "for humanitarian reasons or simply for its own convenience").

[9] The Court understands that some may find the phrase "illegal alien" offensive; however, to be eligible for DACA under either the 2012 DACA Memorandum or the Final Rule, one must be an alien who is in the United States illegally, or "not in a lawful immigration status." AR2022_100264, 87 Fed. Reg. 53,221, (Doc. No. 607-1 at 286). Indeed, the DHS in its discussion acknowledges that it uses the term "alien" because it is a legal term of art defined by the Immigration and Nationalization Act. AR2022_100295, 87 Fed. Reg. 53,252, (Doc. No. 607-1 at 317). Additionally, the Court uses this term because it is used in official government documents as quoted by the Supreme Court in its seminal pronouncement pertaining to this area of law. *See Arizona v. United States*, 567 U.S. 387, 397 (2012). Moreover, "alien" and "immigrant" are defined statutory terms. *See* 8 U.S.C. §§ 1101(a)(3), (15). Furthermore, the Fifth Circuit explained why "illegal alien" is a preferable (and not pejorative) term in a case like this:

4

if he or she:

- came to the United States under the age of sixteen;

- has continuously resided in the United States for at least five years preceding [June 15, 2012] and is present in the United States on [June 15, 2012];

- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and

- is not above the age of thirty.

The 2012 DACA Memorandum made up to 1.9 million otherwise removable aliens eligible for the program.[10] The DACA program started with approximately 152,431 applications in 2012.

---

The usual and preferable term in [American English] is *illegal alien*. The other forms have arisen as needless euphemisms, and should be avoided as near-gobbledygook. The problem with *undocumented* is that it is intended to mean, by those who use it in this phrase, 'not having the requisite documents to enter or stay in the country legally.' But the word strongly suggests 'unaccounted for' to those unfamiliar with this quasi-legal jargon, and it may therefore obscure the meaning.

More than one writer has argued in favor of *undocumented alien* . . . [to] avoid[] the implication that one's unauthorized presence in the United States is a crime . . . . Moreover, it is wrong to equate illegality with criminality, since many illegal acts are not criminal. *Illegal alien* is not an opprobrious epithet: it describes one present in a country in violation of the immigration laws (hence 'illegal').

*Texas v. United States*, 809 F.3d 134, 148 n.14 (5th Cir. 2015) (quoting Bryan A. Garner, Garner's Dictionary of Legal Usage 912 (Oxford 3d ed. 2011)); *see also* Matthew Salzwedel, *The Lawyer's Struggle to Write*, 16 Scribes Journal of Legal Writing 69, 76 (2015) ("[I]llegal alien has going for it both history and well-documented, generally accepted use.").

[10] No one knows the exact number of DACA-eligible individuals. Estimates provided to the Court differ. According to evidence provided by the Defendant-Intervenors, this number could be as high as 1.9 million. (Doc. No. 225-4, Ex. 125 at 514, R. Gonzales et al., *Taking Giant Leaps Forward: Experiences of a Range of DACA Beneficiaries at the 5-Year Mark*, Ctr. for Am. Progress (June 22, 2017)) (describing DACA as "a policy that temporarily defers deportations . . . for up to an estimated 1.9 million eligible unauthorized young adults"). Other estimates are more conservative. (*See e.g.*, Doc. No. 225-3, Ex. 74 at 148, Decl. of M. Ray Perryman) (estimating "1.3 million people nationwide are eligible to apply for DACA. . . ."); J. Passel & M. Lopez, *Up to 1.7 Million Unauthorized Immigrant Youth May Benefit From New Deportation Rules*, Pew Research Center (Aug. 14, 2012). Rather than relying on extrinsic sources, arguments of counsel, or government statistics that frequently change, the Court will use a midrange number of approximately 1.5 million eligible individuals when needed.

DHS then approved 370,521 applicants in 2013, and 158,397 in 2014.[11] As of 2018, 814,000 individuals had applied for and received "lawful presence" through DACA.[12] The United States Citizenship and Immigration Services ("USCIS") reported that there were 634,650 active DACA participants as of December 31, 2020.[13]

In turn, having deferred action makes DACA recipients eligible for various benefits. For example, aliens are generally not eligible for any "[f]ederal public benefit," 8 U.S.C. § 1611(a), but aliens who are "lawfully present in the United States," are eligible to apply for Social Security and Medicare, *id.* §§ 1611 (b)(2), (3). A pre-existing regulation defining "lawfully present in the United States" includes "aliens currently in deferred action status."[14] 8 C.F.R. § 1.3(a)(4)(vi).

Additionally, deferred action status makes recipients eligible to apply for work authorization pursuant to a pre-existing regulation, *see* 8 C.F.R. § 274a.12(c)(14), and the 2012 DACA Memorandum instructs USCIS to consider DACA applicants for work authorization. DACA took the further step of *requiring* its recipients to apply for work authorization.[15] Once a recipient has work authorization, he or she is eligible for a Social Security number, along with its attendant benefits.[16] 20 C.F.R. §§ 422.104(a)(2), 422.105(a); 8 C.F.R. § 1.3(a)(4)(vi). Further, an

---

[11] (Doc. No. 224-2 at 450, USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by FY, Quarter, Intake, Biometrics and Case Status FY 2012-2017 (March 31, 2018)).

[12] (Doc. No. 225-3, Ex. 73 ¶ 16, Decl. of Dr. D. Massey).

[13] AR2022_600011, (Doc. No. 611-3 at 11, USCIS, *Deferred Action for Childhood Arrivals (DACA) Recipients: Characteristics and Trends*).

[14] DACA recipients must still meet the normal criteria to qualify for these benefits. Without lawful presence, however, even an alien who met those criteria would still be ineligible for the benefits. *See Texas v. United States*, 809 F.3d 134, 148–49 (5th Cir. 2015). In addition to Social Security and Medicare benefits, DACA recipients also can become eligible for benefits under the Railroad Retirement Act of 1974 and the Railroad Unemployment Insurance Act. 8 U.S.C. § 1611(b)(4).

[15] (Doc. No. 9, Ex. 20, USCIS, *DACA Toolkit: Resources for Community Partners*).

[16] Among these benefits are earned income tax credits, which require a Social Security number, *see* 26 U.S.C. §§ 32(c)(1)(E), (m); *Texas v. United States*, 809 F.3d 134, 149 (5th Cir. 2015); and perhaps even the stimulus payments under the American Rescue Plan Act of 2021. *See* Kelly Anne Smith, *Third Stimulus Check: Do Non-U.S. Citizens Qualify?*, Forbes, Mar. 12, 2021. The Department of Health and Human Services has recently proposed a rule change to make DACA recipients eligible for Medicaid and Affordable Care Act coverage. Clarifying Eligibility for a

award of DACA status makes the recipients eligible for certain state benefits, such as Texas's

state-subsidized work-study program. *See* Tex. Educ. Code § 56.075(a)(1); 19 Tex. Admin. Code

§ 21.24(d)(5).

Despite these benefits, the 2012 DACA Memorandum specifically concluded: "This

memorandum confers no substantive right, immigration status or pathway to citizenship. Only the

Congress, acting through its legislative authority, can confer these rights."[17]

In 2014, the DHS attempted to create a sister program, Deferred Action for Parents of

Americans and Lawful Permanent Residents ("DAPA"), and at the same time attempted to expand

the DACA program ("Expanded DACA"). The total population of illegal aliens with lawful

presence due to DACA, Expanded DACA, and DAPA could have been 5.8 million[18] (or over 50%

of the then-estimated 11.3 million illegal aliens in the country).[19] Twenty-six states, including the

---

Qualified Health Plan Through an Exchange, 88 Fed. Reg. 25,313 (proposed Apr. 26, 2023) (to be codified at 42 C.F.R. pts. 435, 457, and 600, and 45 C.F.R. pts. 152 and 155). The following is an inexhaustive list of the federal benefits that DACA status enables DACA recipients to seek access to: (1) various learning and service opportunities such as AmeriCorps VISTA Program, various youth outdoor programs, American Job Centers program, Job Corps, and YouthBuild; (2) various financial programs including FHA financing and HUD counseling agencies; (3) financial/consumer benefits such as tax credits, CFPB Resources, and CFPB Immigrant Initiative; (4) various healthcare programs such as access to Health Resources & Services Administration Health Centers, Emergency Medicaid, public health programs, pregnancy and breast feeding support, maternal mental health support, nutrition assistance (WIC), and many more federal programs and opportunities. According to a recent White House Fact Sheet, there are many more benefits that DACA provides. Fact Sheet, The White House, *President Biden Announces Plan to Expand Health Coverage to DACA Recipients* (Apr. 13, 2023), https://whitehouse.gov/briefing-room/statements-releases/2023/04/13/fact-sheet-fact-sheet-president-biden-announces-plan-to-expand-health-coverage-to-daca-recipients/.

[17] (Doc. No. 487, Ex. 1 at 4).

[18] *United States v. Texas*, 809 F.3d 134, 148 (5th Cir. 2015).

[19] Some parties, experts, and governmental units rely on an estimate that there are 11.3 million illegal aliens in the United States. That number seems to have originated with a study done by the Pew Research Center that estimated the illegal alien population as of March 2013. (*See* Doc. No. 225-2, Ex. 52, J. Passel et al., *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled*, Pew Research Center (Sept. 3, 2014)). This study is now a decade old, and it is arguable whether the number is accurate. A more recent study by Yale University and the Massachusetts Institute of Technology pegs the number at closer to 22 million. M. Fazel-Zarandi et al., *The Number of Undocumented Immigrants in the United States: Estimates Based on Demographic Modeling with Data From 1990 to 2016*, PLOS One (Sept. 21, 2018). Given the nature of individuals being in the country illegally, no person, entity, or governmental unit can really know the number of illegal aliens living in the United States.

Plaintiff States, sued to enjoin the implementation of DAPA and Expanded DACA, which this

Court preliminarily enjoined in 2015. *Texas v. United States*, 86 F.Supp.3d 591 (S.D. Tex. 2015).

That injunction was affirmed by the Fifth Circuit Court of Appeals, *Texas v. United States*, 809

F.3d 134 (5th Cir. 2015), and then by a split vote in the Supreme Court of the United States. *United*

*States v. Texas*, 136 S. Ct. 2271 (2016). This litigation will be referred to as *Texas I*.

Upon remand, the parties in *Texas I* asked this Court to postpone entering a scheduling

order that would have governed the proceedings to a final conclusion on the merits. Throughout

this time, the 2012 DACA Memorandum remained in force. Ultimately, the parties all agreed to

dismiss the case:

> On June 15, 2017, the U.S. Department of Homeland Security released a
> memorandum entitled *Rescission of November 20, 2014 Memorandum Providing*
> *for Deferred Action for Parents of Americans and Lawful Permanent Residents*
> *("DAPA")*. On September 5, 2017, the Department released a memorandum
> entitled *Rescission of the June 15, 2012 Memorandum Entitled "Exercising*
> *Prosecutorial Discretion with Respect to Individuals Who Came to the United*
> *States as Children."* Given these memoranda rescinding the DAPA program and
> phasing out the DACA and Expanded DACA programs, Plaintiffs file this
> stipulation of voluntary dismissal. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii) (allowing
> plaintiffs to dismiss an action, without court order, by filing a stipulation of
> dismissal by all parties who have appeared).[20]

This stipulation of dismissal was signed by the attorneys for the plaintiffs (a group that

included all of the Plaintiff States in this case), the United States and the federal government

defendants, and the putative DAPA recipients who had intervened. As is evident from its text, the

stipulation was partly based upon the Government "phasing out the DACA . . . program[]." All

parties agreed to the stipulation, otherwise such a dismissal would have required court action.

---

[20] (Doc. No. 473, 1:14-CV-00254, *Texas I*).

**A.    Rescission of DACA and *Regents***

After *Texas I*, the Government attempted to phase out DACA, as it represented to the Plaintiff States it would, but other courts around the nation were asked to enjoin or vacate the attempt to end the program. These lawsuits included: *Batalla Vidal v. Trump*, 279 F.Supp.3d 401 (E.D.N.Y. 2018); *NAACP v. Trump*, 298 F.Supp.3d 209 (D.D.C. 2018); *Regents of Univ. of Cal. v. United States Dep't of Homeland Sec.*, 279 F.Supp.3d 1011 (N.D. Cal. 2018); and *Casa de Md. v. United States*, 284 F.Supp.3d 758 (D. Md. 2018). The courts in the first three cases entered injunctions against the attempted DACA rescission. These cases were eventually appealed to and heard together by the Supreme Court in the case styled: *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) (hereinafter, "*Regents*").

Meanwhile, in May 2018, the Plaintiff States filed the current case challenging the lawfulness of DACA as it was enacted through the 2012 DACA Memorandum. The Plaintiff States now seek the same result they thought they achieved with the stipulation of dismissal in *Texas I*—that is, the cessation of DACA. While finding that they would likely succeed on the merits, this Court denied the Plaintiff States' request for a preliminary injunction.[21] Over the objections of the Plaintiff States, the Court stayed the resolution of this case pending the ruling in *Regents* because it was important to have the benefit of the Supreme Court's analysis before proceeding, particularly as that decision could have mooted this case.

The *Regents* opinion dealt with DACA's attempted recission. In 2017, the Attorney General concluded that DACA was unlawful and sent a letter to then-Acting DHS Secretary Elaine Duke to that effect. *Regents*, 140 S. Ct. at 1903. Relying upon that letter, Duke issued a memorandum rescinding the DACA program. *Id.* Various stakeholders sued to enjoin the

---

[21] (Doc. No. 319).

rescission. *Id.* The Chief Justice succinctly set out the exact questions the *Regents* Court needed to address: "The issues raised here are (1) whether the APA claims are reviewable, (2) if so, whether the rescission was arbitrary and capricious in violation of the APA, and (3) whether the plaintiffs have stated an equal protection claim." *Id.* at 1905.

In *Regents*, the Supreme Court found the Government's decision to rescind DACA was judicially reviewable. There is a general presumption of reviewability that can be rebutted by a showing that the action is committed to "agency discretion by law." 5 U.S.C. § 701(a)(2). An argument in *Regents*, in *Texas I*, and at the preliminary injunction stage in this litigation was that DACA was an agency decision not to institute enforcement proceedings and, as such, neither its creation nor rescission was reviewable.

The Supreme Court disagreed with this argument and recognized that "DACA is not simply a non-enforcement policy." *Regents*, 140 S. Ct. at 1906. Instead, the 2012 DACA Memorandum created standardized proceedings by which USCIS solicits and reviews applications from eligible aliens. *Id.* The proceedings are effectively "adjudications," and the result of the adjudications is an affirmative act of approval. *Id.* The Supreme Court concluded that the 2012 DACA Memorandum therefore "created a program for conferring affirmative immigration relief. The creation of that program—and its rescission—is an action that provides a focus for judicial review." *Id.* (cleaned up).

Having determined that the rescission of DACA was subject to judicial review, the Supreme Court found that "judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Id.* at 1907 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). It continued on to explain: "Considering only contemporaneous explanations for agency action also instills confidence that the reasons given are not simply convenient litigating

position[s]." *Id.* at 1909 (quotations omitted). Additionally, the *Regents* Court emphasized that procedural compliance, in the context of rescission, "promote[s] agency accountability, by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority." *Id.* (citations and quotations omitted). It also noted that the APA procedural requirement of notice and comment, a pivotal issue in the instant case, was not before it. *Id.* at 1903 n.1.

Central to the *Regents* decision was whether DACA was subject to the requirements of the APA and whether the rescission of DACA, under the circumstances presented, was arbitrary and capricious. The Court held that the APA did apply and that, in light of the Attorney General's reliance on the *Texas I* litigation that did not question DHS's authority to forbear removal, the Acting Secretary's explanation for rescinding all of DACA (benefits *and forbearance*) was arbitrary and capricious under the APA. *Id.* at 1912–13. Additionally, the Acting Secretary's failure to consider the significant reliance interests that DACA had engendered was another independent reason that the rescission was arbitrary and capricious. *Id.* at 1913–14. Thus, the 2017 attempt to rescind DACA was thwarted.

Once the Supreme Court ruled, this Court gave the parties in this case adequate time to update their motions and briefs to include any relevant analysis of the *Regents* opinion. The Court then held a hearing and allowed the parties to present their competing positions and the Court proceeded to rule.

## B.    DACA After *Regents*

After the *Regents* decision, DHS issued a series of letters and memoranda that attempted to limit the DACA program ("New DACA"). New DACA spurred more litigation that was addressed in *Batalla Vidal v. Wolf*, 16-CV-4756, 2020 WL 7121849 (E.D.N.Y. Dec. 4, 2020).

There, the district court held that New DACA was unlawful because it found then-Acting Secretary of Homeland Security, Chad Wolf, was without authority to serve as Acting Secretary of DHS. *Id.* at, \*1. As a result, the district court vacated the memoranda and found DACA was governed by the same terms as it was in 2012, before any attempted rescission. The *Batalla Vidal* plaintiffs, in a motion to modify, asked the court to "clear up the ambiguity" created by that court's December 2020 order and this Court's July 2021 injunction. *Batalla Vidal v. Mayorkas*, 618 F.Supp.3d 119, 122 (E.D.N.Y. Aug. 3, 2022). The plaintiffs sought clarification on "what the government can and cannot do" in light of this Court's 2021 injunction. *Id.* at 120. The court denied their motion, stating the relief sought "sweeps well beyond the purpose of [the] prior injunction." *Id.* In the wake of the Final Rule promulgated by DHS in 2022, as seen below, New DACA has little bearing on the present litigation.

## C.    Final Rule DACA

In July 2021, this Court ruled that the 2012 DACA Memorandum was unlawful on both procedural and substantive grounds and issued an injunction prohibiting DHS from processing new DACA applications.[22] It also remanded, pursuant to the Federal Defendants' request, certain matters back to the DHS for further consideration. Simultaneously, the Federal Defendants appealed this Court's rulings on the merits to the Fifth Circuit.[23] While the appeal was pending, a proposed DACA rule was put through notice and comment and a final rule was promulgated by DHS.[24] On appeal, the Plaintiff States argued that the Final Rule was materially the same as the 2012 DACA Memorandum and asked the Fifth Circuit to enjoin it as well. The Fifth Circuit

---

[22] (Doc. Nos. 575, 576). It also entered an order vacating the DACA program but stayed this order during the pendency of the appeal.

[23] (Doc. No. 581).

[24] 87 Fed. Reg. 53,152 (Aug. 30, 2022) (to be codified at 8 C.F.R. pts. 106, 236, and 274a).

affirmed this Court's ruling as to the 2012 DACA Memorandum but remanded the Final Rule to this Court for consideration. *Texas II*, 50 F.4th at 512. Importantly, the Fifth Circuit held that: (1) Texas had standing under Article III; (2) the 2012 DACA Memorandum's adoption without notice and comment violated the procedural requirements of the APA; and (3) the program contravened the Immigration and Nationality Act ("INA"); and thus, it failed to comply with substantive requirements of the APA. *Id.* The Fifth Circuit has directed this Court to determine whether the Final Rule suffers from the same fatal deficiencies as the 2012 DACA Memorandum. As noted above, the parties entered into an agreed injunction, or standstill agreement, whereby the Final Rule would not become effective until this Court rules on the remanded issues.

This Court is now tasked with reviewing the Final Rule in light of its administrative record,[25] the applicable briefs of the parties, and the arguments related thereto. The Court will address the limited nature of the remand issued by the Fifth Circuit first. It will then discuss standing, as this argument has been raised again by all Defendants; and then it will proceed to analyze the substantive issues presented by the remand. Finally, it will address the possible application of the Final Rule's severability clause.

## III.    Limited Remand

The competing motions for summary judgment before the Court encompass an array of issues surrounding the legality of the Final Rule. It is important to note, however, the Fifth Circuit's instructions on remand. The Fifth Circuit remanded the Final Rule back to this Court for consideration with a more complete record than the one that existed at the appellate level. That remand was not a general remand of the entire case, but was instead a very specific, limited remand.

---

[25] (Doc. Nos. 607–611)

We cannot determine **whether there are material differences in that record and the record before the district court regarding the 2012 DACA Memorandum.** The DACA Memorandum remains in effect until October 31, 2022. To the extent our determinations about questions of law in the present appeal would also apply to the Final Rule, those issues of law should be resolved sooner rather than later to move this case forward as expeditiously as possible. A district court is in the best position to review the administrative record in the rulemaking proceeding and **determine whether our holdings as to the 2012 DACA Memorandum fully resolve issues concerning the Final Rule.**

\* \* \*

…we remand to the district court for further proceedings that the parties may pursue regarding the Final Rule.

*Texas II*, 50 F.4th at 512 (emphases added).

The Fifth Circuit specifically mandated this Court to determine if there are material differences between the Final Rule and the 2012 DACA Memorandum, and, if so, whether the already established rulings concerning the 2012 DACA Memorandum apply to the Final Rule. While this limited remand does not prohibit the Court from proceeding on the currently filed motions, it clearly does not permit the parties to relitigate previously established issues. The Court need not reconsider those issues as if on a motion for rehearing; nor does it need to rule on issues originally bypassed, such as the Plaintiff States' Take Care Clause allegations.

**A.      Standing**

Despite the Fifth Circuit's instructions, the Federal Defendants and the Defendant-Intervenors are attempting to relitigate a different set of issues than the one remanded to the Court, perhaps because it is abundantly clear from the administrative record that the Final Rule is merely a more formal enactment of the 2012 DACA Memorandum and thus subject to the same deficiencies. For example, the Defendant-Intervenors and the Federal Defendants have asked this Court to reconsider whether the Plaintiff States (and, specifically, Texas, the lead Plaintiff) have standing.

This Court has addressed the topic of standing in great detail and has found that standing exists, and that finding has been affirmed by the Fifth Circuit.[26] Thus, unless ultimately set aside by the Fifth Circuit *en banc* or by the Supreme Court, the Plaintiff States have established standing. Accordingly, the topic of standing is not before this Court. Nevertheless, if called upon to revisit the standing issue, this Court would again find it exists, especially in light of recent developments.

The first development is DHS's admission in the administrative record that DACA "could result in some indirect fiscal effects on State and local governments, the size and even the direction of the effects is dependent on many factors...."[27] The Plaintiff States have argued that those costs would be alleviated, or at least diminished, if DACA were eliminated because some DACA recipients would leave the country, and they have provided some evidence to this effect.[28] There are portions of the administrative record that also support this contention.[29] Further, the admission by DHS that the Plaintiff States will bear some costs resulting from the Final Rule also helps confirm standing for the Plaintiff States.

The other developments emanate from a recent opinion by the Supreme Court. *United States v. Texas*, 143 S. Ct. 1964 (2023). In that case, the Supreme Court found that standing for a state to question immigration enforcement guidelines did not exist. Critically important to this case, the opinion then shifted to explain when a state has standing and can challenge certain DHS

---

[26] *Texas v. United States*, 328 F.Supp.3d 662, 690–705 (S.D. Tex. Aug. 31, 2018); *Texas II*, 549 F.Supp.3d at 584–96; *Texas II*, 50 F.4th at 513–20.

[27] AR2022_100216, 87 Fed. Reg. 53,173, (Doc. No. 607-1 at 238).

[28] (Doc. No. 625-1 at 42); (Doc. No. 626-2 at 367, Ex. 31); (*Id.* at 371–72, Ex. 32).

[29] In the record DHS also acknowledges some, albeit not many, DACA recipients would leave the country if the program were rescinded. AR2022_100208, 87 Fed. Reg. 53,165, (Doc. No. 607-1 at 230). Thus, it impliedly concedes that rescinding DACA would alleviate some costs to states for whatever percentage of DACA recipients actually leave or are deported. In fact, one part of the record suggests that some DACA recipients have already left the United States due to the legal wrangling that has occurred over the past few years. AR2022_501536, (Doc. No. 611-1 at 546, Monsy Alvarado, *As Supreme Court considers end to DACA, some Dreamers are already leaving U.S. behind*, NorthJersey.com (May 7, 2020)).

decisions. It directly addressed DACA and DACA-related cases as exceptions to the no standing rule:

> In holding that Texas and Louisiana lack standing, we do not suggest that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions.
>
> *   *   *
>
> …**a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis.** That is because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion. […] (**benefits such as work authorization and Medicare eligibility accompanied by nonenforcement meant that the policy was "more than simply a non-enforcement policy"**); *Texas v. United States*, 809 F. 3d 134, 154 (CA5 2015) (*Linda R. S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits"), aff'd by an equally divided Court, 579 U. S. 547 (2016).

*Id.* at *7–8 (emphases added).

This "non-prosecution" vs. "non-prosecution with benefits" difference is a key distinction that both this Court and the Fifth Circuit made in *Texas I* and *Texas II*. In fact, in both cases, this Court emphasized that no part of its orders should be read as interfering with the enforcement, non-enforcement, or prosecutorial decisions that are an inherent part of DHS's field of operations. Consequently, in light of this overt adoption of the *Texas I* opinion by the Supreme Court, there is no question that standing exists in this case.

The Supreme Court, in that same opinion, goes on to describe another reason that the Plaintiff States have standing here. In listing exceptions to the no-standing rule, it stated:

> [T]he standing calculus might change if the Executive Branch wholly abandoned its statutory responsibilities to make arrests or bring prosecutions. **Under the Administrative Procedure Act, a plaintiff arguably could obtain review of agency non-enforcement if an agency "has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities."** *Heckler*, 470 U.S. at 833, n. 4, 105 S.Ct. 1649 (internal quotation marks omitted); see *id.*, at 839, 105 S.Ct. 1649 (Brennan, J., concurring); cf. 5

U.S.C. § 706(1). **So too, an extreme case of non-enforcement arguably could exceed the bounds of enforcement discretion and support Article III standing.**

*Id.* at *7 (emphases added).

Texas and the other Plaintiff States have clearly raised that very issue in this case. They have repeatedly pleaded that DHS has abdicated or abandoned its enforcement duties and, by doing so, violated the Take Care Clause of the Constitution.[30] They have consistently urged this Court to address this issue and even raised it again after the remand. This Court has followed the general jurisprudential rule of constitutional avoidance in declining to address this contention. *Texas I* and *Texas II* were both resolved on issues related to the Administrative Procedure Act; however, the fact that this Court has declined to address the Take Care Clause issue does not mean that the Plaintiff States have not pleaded such a cause of action. Standing has never been determined solely by those issues upon which the Court ultimately rules. The Plaintiff States have clearly pleaded into this very exception to the "no standing" rule outlined by the Supreme Court.

The Defendants should be wary of wanting this Court to address standing *ab initio* because the standing of the Plaintiff States is about to be buttressed by the Executive Branch's pending action. The Executive Branch has recently proposed expanding the Affordable Care Act and Medicaid coverage to DACA recipients.[31]

This new rule proposed by the Department of Health and Human Services (HHS) adds a powerful weapon to the Plaintiff States' standing arsenal. As of year-end 2020, Texas had 104,570

---

[30] (Amended Complaint, Doc. No. 104 at 4–5, 67, ⁋⁋ 11, 14, 319); (Supplemental Complaint, Doc. No. 623 at 22–23, ⁋⁋ 86–87); (Plaintiffs' Motion for Summary Judgment, Doc. No. 625-1 at 28–29).

[31] The White House, *President Biden Announces Plan to Expand Health Coverage to DACA Recipients* (Apr. 13, 2023); Clarifying Eligibility for a Qualified Health Plan Through an Exchange, 88 Fed. Reg. 25,313 (proposed Apr. 26, 2023) (to be codified at 42 C.F.R. pts. 435, 457, and 600, and 45 C.F.R. pts. 152 and 155). Currently, DACA recipients are ineligible for these benefits. *See e.g.*, AR2022_400283, (Doc. No. 608-4 at 283).

DACA recipients—the second largest DACA population after California.[32] HHS Secretary Becerra has announced that 34% of the DACA population does not have insurance.[33] The new proposed rule would make DACA recipients "eligible to enroll in a Qualified Health Plan (QHP) through an Exchange; a Basic Health Program (BHP)... and for some State Medicaid and Children's Health Insurance Programs (CHIPs)."[34] The New York Times estimates this to cost $5,000 per year, per person covered.[35] The proposed rule estimates that the individual states will have to bear at least 50% of these costs.[36] Therefore, hypothetically, if adopted and applicable to Texas, the uninsured DACA recipients who reside in Texas (which number 35,554 based upon the Executive Branch's figures) would directly cost Texas an additional $88,885,000 annually. These costs will be clearly DACA-specific and will be directly attributable to the existence of DACA.[37] Thus, if that rule becomes effective, the Executive Branch's current actions would conclusively establish standing in favor of the Plaintiff States.

For all of the above reasons, in addition to those already discussed in prior opinions, had this Court been called upon to rule on standing, it would again find that standing exists.

---

[32] AR2022_600016, (Doc No. 611-3 at 16).

[33] 88 Fed. Reg. 25,315.

[34] 88 Fed. Reg. 25,313.

[35] Zolan Kanno-Yongs, *Biden Will Expand Health Care Access for DACA Immigrants*, N.Y. Times, April 13, 2023, https://www.nytimes.com/2023/04/13/us/politics/biden-health-care-daca-immigrants.html.

[36] 88 Fed. Reg. 25,323 ("[W]e elected to use the higher end estimate that the States would contribute 50 percent of the costs....").

[37] Additionally, Texas recently resurrected its argument that standing exists due to the costs incurred by the state in issuing driver's licenses to DACA recipients. (Doc. No. 673 at 49–52). This issue helped establish standing in *Texas I* and was specifically cited by the Fifth Circuit as one of the reasons that standing existed as to the attack on DAPA and Expanded DACA. *Texas I*, 809 F.3d at 156. The Defendant-Intervenors objected to Texas's reassertion of this claim at oral argument. Transcript of Oral Argument at 13:25–15:7; 50:6–51:11 (Jun. 1, 2023) (Doc. No. 699). Clearly, if this Court were to reconsider standing it would also have to consider this contention.

## IV.     The Final Rule

At the request of the Federal Defendants, when this Court entered the order of vacatur and injunction it also remanded certain issues back to the DHS so that it had the opportunity to take whatever remedial action with regard to the 2012 DACA Memorandum that it deemed appropriate. Beyond providing it with the opportunity, this Court did not specifically instruct the DHS as to what steps it should or should not take or what facets it could address.

While the rulings in *Regents* and *Texas I* might have seemingly provided some motivation and direction, the actions DHS took to institute notice and comment and then push through the Final Rule were, by its own statements, done in response to President Biden's memorandum issued January 20, 2021, titled "Preserving and Fortifying Deferred Action for Childhood Arrivals (DACA)."[38] In that memorandum, President Biden directed the Secretary of Homeland Security to "take all actions he deems appropriate [...] to preserve and fortify DACA."[39]

Shortly after the remand, DHS published a notice of proposed rulemaking that it hoped would "preserve and fortify DHS's DACA policy."[40] DHS published the proposed rule in the Federal Register on September 28, 2021. While DHS explicitly disagreed with this Court's ruling that the 2012 DACA Memorandum was required to comply with the procedural requirements of the APA, it did concede that by following the notice and comment formula prescribed by the statute through the enactment of the Final Rule, it was putting "DACA on a stronger legal footing."[41] With respect to the more substantive problems noted by this Court and the Fifth Circuit, however,

---

[38] AR2022_200346, 86 Fed. Reg. 7053, (Doc. No. 607-3 at 205).

[39] *Id.* at § 2.

[40] AR2022_100001, 86 Fed. Reg. 53,736, (Doc. No. 607-1 at 23).

[41] AR2022_100195, 87 Fed. Reg. 53,152, (Doc. No. 607-1 at 217); AR2022_100234, 87 Fed. Reg. 53,191, (Doc. No. 607-1 at 256) ("DHS agrees that undertaking notice and comment through the proposed rule puts DACA on stronger legal footing in light of the district court's decision in *Texas* and other pertinent litigation.").

DHS, while complying with the injunction, expressed its disagreement and purposefully made no attempt to have the Final Rule vary from the substantive aspects of the 2012 DACA Memorandum.[42]

> The final rule does not introduce new criteria for consideration, expand the population eligible for consideration, change standards of review, provide lawful immigration status, or alter the forbearance from removal or employment authorization structure that has been in place for a decade.[43]

Thus, the easy response to the assignment given to this Court on remand is: there are no material differences between the Final Rule and the 2012 DACA Memorandum, and while the record underlying the Final Rule certainly supports the argument that DACA has been beneficial for the DACA recipients and that the DACA recipients are, with certain exceptions, beneficial to the country, DHS did nothing to change or resolve the substantive problems found by this Court or the Fifth Circuit.[44] Indeed, much to their counsel's credit, the Federal Defendants candidly admit that the Final Rule suffers from the same problems as the 2012 DACA Memorandum and that it is contrary to the Fifth Circuit's opinion in *Texas II*.

> **Federal Defendants and Plaintiffs agree that the Final Rule is substantively the same policy as the DACA Memorandum.** *Texas II*, 50 F.4th at 512. **Federal Defendants do not seek to relitigate before this Court any matter currently foreclosed by the Fifth Circuit's prior decision in this case, but they incorporate by reference and preserve for further review all previously raised arguments regarding Plaintiffs' lack of standing and the lawfulness of the policies now embodied in the Final Rule.** Those arguments are outlined below, along with Federal Defendants' responses to new points raised by Plaintiffs; under the proper view of those matters, Defendants, not Plaintiffs, are entitled to summary judgment. Moreover, as reflected by Plaintiffs' own proposed remedy, this Court has equitable discretion in crafting relief for any legal violation it finds in this case. **Assuming this Court finds such a violation under the Fifth Circuit's prior**

---

[42] *See e.g.*, AR2022_100252, 87 Fed. Reg. 53,209, (Doc. No. 607-1 at 274) ("DHS has further considered the district and appellate court opinions concerning DHS's authority to deem DAPA or DACA recipients 'lawfully present' for certain purposes, and respectfully disagrees with those decisions for the reasons explained in the proposed rule.").

[43] AR2022_100222, 87 Fed. Reg. 53,179, (Doc. No. 607-1 at 244).

[44] Thus, the Final Rule is flawed for the same substantive reasons as the 2012 DACA Memorandum. *See Texas II*, 549 F.Supp.3d at 603–21; *Texas II*, 50 F.4th at 525–28.

> **decision in this case, it must therefore choose a remedy in light of the Supreme Court's observations regarding the scope of DHS's discretion in choosing the means of winding down the DACA program if it is determined to be unlawful, as well as the Fifth Circuit's previous decision to "preserve the stay as to existing [DACA] recipients."** *Texas II*, 50 F.4th at 531.[45]

This admission was no doubt compelled by countless statements to the same effect found throughout the administrative record. The Court recounts just a few: "The final rule codifies without material change the threshold criteria that have been in place for a decade…"[46] "This rule preserves and fortifies in regulation a policy that has been in place for 10 years. This rule does not establish a new program…."[47]

> As explained in the proposed rule and elsewhere in this rule, DHS seeks to retain the threshold criteria of the DACA policy as applied by USCIS since 2012 in part due to recognition of the significant reliance interests in the continued existence of the DACA policy of individuals who previously have received DACA grants, and those similarly situated who have not yet requested DACA, and their families, employers, schools, and communities.[48]

"Furthermore, DHS has determined that retaining the criteria as set forth in the Napolitano Memorandum defines the population of those who may request DACA to those who are likely to continue to be a low priority for removal under the Department's general enforcement priorities."[49]

> DHS agrees that it has legal authority to modify or remove these age caps through notice-and-comment rulemaking. However, as discussed elsewhere in the [Notice of Proposed Rulemaking] and this rule, DHS has determined as a matter of policy to focus this rulemaking on preserving and fortifying DACA by generally retaining the threshold criteria of the Napolitano Memorandum. Retaining the criteria fortifies the longstanding policy upon which the DACA population and their families, employers, school, and communities have relied for a decade.[50]

---

[45] (Doc. No. 639 at 6–7) (emphases added).

[46] AR2022_100333, 87 Fed. Reg. 53,290, (Doc. No. 607-1 at 355).

[47] AR2022_100221, 87 Fed. Reg. 53,178, (Doc. No. 607-1 at 243).

[48] AR2022_100271, 87 Fed. Reg. 53,228, (Doc. No. 607-1 at 293).

[49] AR2022_100273, 87 Fed. Reg. 53,230, (Doc. No. 607-1 at 295). The Federal Defendants and the record frequently refer to the 2012 DACA Memorandum as the "Napolitano Memorandum."

[50] AR2022_100277, 87 Fed. Reg. 53,234, (Doc. No. 607-1 at 299).

The Final Rule "is intended to preserve and fortify the existing DACA policy; it does not alter DACA eligibility criteria, grant lawful immigration status or citizenship for noncitizens or provide a means for entry into the United States. Therefore, DHS anticipates no change in U.S. population as a direct effect of this rule."[51]

The Court could quote example after example from the administrative record where the DHS has stressed that the Final Rule merely incorporates the 2012 DACA Memorandum and that it will interpret the Final Rule similarly, as it viewed that path as the best way to implement President Biden's directive. The Court cannot speculate as to whether that was the President's intention when he issued the directive. Nevertheless, it is clear that with little change (and no substantive changes), the Final Rule simply takes the 2012 DACA Memorandum and reincorporates it. The creation and adoption of the Final Rule took no steps to avoid any of the substantive pitfalls that have been pointed out by the Fifth Circuit and other courts—perhaps because DHS did not want to, or perhaps because it was not possible to do so and retain the DACA program as currently constituted.[52] Regardless, substantively, DACA remains the same. All of the

---

[51] AR2022_100300, 87 Fed. Reg. 53,257, (Doc. No. 607-1 at 322).

[52] The Court, while pointing out that DHS made no effort to correct the substantive faults found in the 2012 DACA Memorandum when it adopted it as the Final Rule, is not stating that there was no mention of these problems. For example, it has long been recognized that one of Congress's goals in its enactment of the immigration scheme is the protection of the American workers. AR2022_200215–16, 51 Fed. Reg. 39,386, (Doc. No. 607-3 at 504). One author in the record quotes a prominent immigration historian to the effect that it is difficult to "determine where immigration policy ends and labor policy begins" because the two are so closely interrelated. AR2022_501463, (Doc. No. 611-1 at 473). The record also quotes Senator Edward Kennedy urging Congress to enact stricter immigration laws and that those laws be enforced in order to protect native workers. "We must . . . intensify the enforcement of existing laws . . . . Vigorous and effective enforcement of these laws will reduce the incentive for employers to hire undocumented workers." AR2022_501468–69, (Doc. No. 611-1 at 478–79) (quoting Senator Kennedy when he was introducing the amendment that would become IRCA § 111(d) of the Immigration Reform and Control Act that provides funds to deter the employment of illegal aliens) (*see also id.* Senator Alan Simpson's comments). DHS admitted that in principle DACA recipients take jobs that could otherwise be filled by American citizens or other aliens legally in the country. DHS discounted this effect because it found the data "unquantifiable." AR2022_100210, 87 Fed. Reg. 53,167, (Doc. No. 607-1 at 232). In other places in the record, DHS claimed that since the number of DACA recipient

deficiencies noted before by this Court and the Fifth Circuit still exist and the Court adopts its earlier opinions in that regard.

This Court has noted many of these problems in its earlier opinion and incorporates its earlier analysis here.[53] Instead of repeating the entirety of its analysis, the Court will focus on two simple aspects which highlight DHS's intention for the Final Rule to follow in the footsteps of the 2012 DACA Memorandum. The following two examples (one old and one new) demonstrate some of the ongoing problems with the Final Rule.

First, as noted in earlier opinions, the topic of advance parole for DACA recipients is problematic. Advance parole allows an alien to leave the United States with the advance assurance that he or she will be allowed back into the United States upon return. This has been a troubling

---

employees is small and the length of employment is of limited duration, the overall effect on the American workforce is quite minimal. AR2022_200222–23, 52 Fed. Reg. 46,092–93, (Doc. No. 607-3 at 81–82).

These statements are incompatible with each other and with other portions of the record. First, while it claimed that DACA employment is of limited duration, in other portions of the record DHS assumed that the employment authorizations (I-765) will continue indefinitely. AR2022_300664, (Doc. No. 607-4 at 664). Moreover, DACA itself is over ten years old. That hardly qualifies as temporary. Second, DHS stated the data is unquantifiable, but that seems implausible as the nature of the jobs held by DACA recipients and the skillset involved in those jobs could easily be mined from the DACA recipients themselves. It seems somewhat questionable that the record contains the fact that DACA recipients pay $566.7 million in annual mortgage payments, yet DHS cannot obtain or analyze their employment data. AR2022_100003, 86 Fed. Reg. 53,738, (Doc. No. 607-1 at 25). Moreover, if the data is unquantifiable, how can DHS conclude the effect is minimal?

Finally, the record (and the briefing in the Court) is replete with examples and statistics about the economic impact and the financial contributions made by the DACA recipients and the benefits they receive primarily due to their ability to work. Again, depending on the nature of the employment, those benefits could have gone to workers who were either American citizens or other legally employable aliens.

Using the data found in the record, a reasonable estimate of one aspect of the financial impact can be made. DHS estimates that 78% of the DACA recipients work and they make an average of $67,769 annually. AR2022_100323, 87 Fed. Reg. 53,280, (Doc. No. 607-1 at 345). This means that at least 470,000 DACA recipients work, and that figure could rise to as many as 1,170,000 workers if all who are eligible apply. That translates into salaries of between $31,851,430,000 and $79,289,730,000 annually. Even by governmental expenditure standards, these figures rise well above what a reasonable person would consider to be "minimal."

[53] *See Texas II*, 549 F.Supp.3d at 603–22.

aspect of DACA since its inception.[54] The Final Rule leaves it just as it was under the 2012 DACA Memorandum. This privilege, as exercised by certain DACA recipients, has been the subject of great criticism as it supplies approximately 50% of the DACA population with a shortened pathway to citizenship. Absent DACA, as a general rule, illegal aliens are not eligible to apply for advance parole. DACA makes some of the recipients eligible. In addition to DHS's generous interpretation of the phrases "urgent humanitarian reasons" and "significant public benefit" for DACA recipients, the Final Rule's allocation of advance parole to some DACA recipients subverts statutory law in two other ways: (1) it allows certain individuals to adjust illegal status by curing the "inadmissibility bar," and (2) it lets recipients avoid the statutory "unlawful presence bars."[55]

Setting that pathway issue aside, advance parole by statute is supposed to be available only for "urgent humanitarian reasons" or those in furtherance of a "significant public benefit." 8 U.S.C. § 1182(d)(5). DHS has traditionally construed its authority to grant advance parole for "urgent humanitarian" reasons to be limited to urgent medical, family, and related needs, and its authority to grant advance parole for "significant public benefit" to be limited to those individuals aiding

---

[54] In summary, DACA allows its recipients to apply for advance parole—a status for which they would not otherwise be eligible. Advance parole allows aliens to leave the country and return lawfully without being denied reentry. DACA's use of advance parole violates Congress's immigration scheme in two ways. First, immigrants who have entered the country illegally (without inspection) cannot adjust their status because they were not admitted to the country legally. This category includes approximately one half of all DACA recipients. Through DACA, those who have illegally entered the country can avoid this inadmissibility bar because once they leave the United States and return via advance parole, they have now entered the country legally and can adjust their status. Over 14,000 DACA recipients have adjusted their status in this fashion. AR2022_100293, 87 Fed. Reg. 53,250, (Doc. No. 607-1 at 315). Second, DACA recipients who use advance parole can avoid the unlawful presence bar found in 8 U.S.C. § 1182(a)(9)(B)(i). That statute dictates that those who have entered this country illegally or remained in the country beyond their allotted time (a population that describes all of the DACA recipients) must remain out of the United States for either three years (for those in the country illegally for more than 180 days) or ten years (for those who have been in the country illegally for more than a year) before they are allowed to adjust their status. By definition, all of the DACA recipients would otherwise be subject to this ten-year bar. Nevertheless, by leaving the country and returning via advance parole, they avoid this waiting period. Therefore, DACA allows its recipients on advance parole to avoid complying with the laws as written by Congress.

[55] *See* (Doc. No. 219, Ex. 3, Lena Graber & Jose Magaña-Salgado, *DACA, Advance Parole, and Family Petitions*, Immigr. Legal Res. Ctr. (June 2016)).

law enforcement—such as a witness.[56] Despite these two narrowly crafted circumstances, the supporting documentation for the Final Rule states that DACA recipients, under the Final Rule, just like under the 2012 DACA Memorandum, do not have to fall within these two Congressionally limited exceptions to gain advance parole.[57] DHS admits in the record that it does not have the legal authority to broaden these two categories.[58] Nevertheless, according to the record, DACA recipients can receive advance parole for academic research, semesters abroad, interviews, overseas assignments, training, and meetings with clients. A field trip abroad or a meeting with a client in Bermuda hardly equate to an urgent humanitarian situation, nor do they provide any public benefit, significant or otherwise. It seems highly suspect that the DHS admitted it lacks the authority to expand the application of advance parole, but then turned around and expanded it anyway.[59]

At one point during the course of this litigation, the parties informed the Court that during the prior Administration, USCIS had somewhat restricted these categories. "USCIS had not granted advance parole based on the standards associated with DACA since September 5, 2017."[60] The Final Rule clearly has resurrected them.

> On June 15, 2012, the Secretary of Homeland Security issued a memorandum that outlines guidelines that should be used when considering whether to defer removal proceedings or the execution of removal orders. Known as DACA, this is a case-by-case exercise of prosecutorial discretion relating to individuals who were brought to the United States as children and meet certain threshold guidelines. The

---

[56] AR2022_400210, (Doc. No. 608-4 at 210).

[57] AR2022_100346, (Doc. No. 607-1 at 368).

[58] AR2022_100294, 87 Fed. Reg. 53,251, (Doc. No. 607-1 at 316).

[59] In the case of *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), the Biden Administration argued that it had the power to create what was, in effect, an entirely new student loan program because the HEROES Act authorized the Secretary to "waive or modify any statutory or regulatory provision" of title IV of the Education Act. *Id.* at 2358. The Supreme Court held that this limited authorization did not give the Secretary the power to rewrite the Act. *Id.* at 2368–76. Here, the Secretary of Homeland Security is essentially rewriting various immigration acts (including the one concerning advance parole) without even a hint of statutorily delegated power.

[60] (Doc. No. 504-2, Ex. 2 at 33 n.7).

instructions for Form I-131 and USCIS policy provides that USCIS will generally grant advance parole to DACA recipients traveling outside the United States for educational purposes, employment purposes, or humanitarian purposes;

(a) Educational purposes include but are not limited to semester abroad programs or academic research;
(b) Employment purposes include but are not limited to overseas assignments, interviews, conferences, training, or meetings with clients; or
(c) Humanitarian purposes include but are not limited to travel to obtain medical treatment, attend funeral services for a family member, or visit an ailing relative.[61]

Consequently, DHS, just as before, has decided not to comply with the requirements dictated by Congress—instead, it is just reinstating the same criteria derived from the 2012 DACA Memorandum and professes its intent to interpret the criteria the same.

As discussed, employment and educational opportunities are *not* part of the Congressionally limited categories eligible for advance parole. More importantly, DHS indicates that it will not limit advance parole to the two narrowly approved categories. Instead, it plans to use the same unjustifiable criteria and interpret the Final Rule the same way it did under the 2012 DACA Memorandum. Thus, there are no material changes to the Final Rule from the 2012 DACA Memorandum that the Fifth Circuit held to be illegal.

Second, DHS's position on the lack of temporal limits is a new problem the administrative record reveals. When the 2012 DACA Memorandum was issued, the President described it as a temporary measure.[62] Similarly, in the past, DHS has indicated that DACA was always intended as a short-term aid to its enforcement mission. DHS admits it "does not have the authority to provide a permanent solution absent action by Congress."[63] Perhaps that was once its intention because, as the Fifth Circuit noted in *Texas I* and *Texas II*, deferred action programs have always

---

[61] AR2022_100380–81, (Doc. No. 607-1 at 402–03).

[62] AR2022_401447, (Doc. No. 610-3 at 156) ("It's not a permanent fix. This is a temporary stopgap measure….").

[63] AR2022_100237, 87 Fed. Reg. 53,194, (Doc. No. 607-1 at 259).

been short term adjuncts to forthcoming Congressional action. The Fifth Circuit described this

relationship as deferred action being "interstitial to a statutory legalization scheme." *Texas I*, 809

F.3d at 185; *Texas II*, 50 F.4th at 572.

Despite these earlier announcements, DHS, in responding to comments concerning the

Final Rule, indicates a shifting position. It has no plans to ever terminate the program unless and

until Congress adopts DACA.

> [The DHS] reiterates the purpose of the rule **to preserve and fortify DACA, a policy that has been in place for 10 years**.

> Regarding a commenter's concern that DACA was intended to be a temporary policy, DHS notes that the Napolitano Memorandum **did not impose temporal limits to the policy or otherwise indicate a temporary intent**. To the extent that the policy was described as a temporary measure by President Barack Obama when he announced it in 2012, DHS notes that President Obama also stated that, "[i]n the absence of any immigration action from Congress to fix our broken immigration system, what we've tried to do is focus our immigration enforcement resources in the right places," and that DACA is a measure "that lets us focus our resources wisely while giving a degree of relief and hope to talented, driven, patriotic young people."[64]

This makes clear that DHS views the immigration system as instituted by Congress as

faulty, so it is instituting its own solution, regardless of the dictates of Congress. Moreover, it has

no intention that the program be temporary.[65] Indeed, as noted, DHS views DACA employment

authorizations to go on indefinitely. When explaining its methodology for I-765 employment

authorizations, it assumed "the DACA program will continue indefinitely."[66] Thus, to the extent

that anyone makes the argument that this deferred action program is merely a temporary bridge to

Congressional action, the current DHS position, as demonstrated in the record, dispels that notion.

---

[64] AR2022_100226, 87 Fed. Reg. 53,183, (Doc. No. 607-1 at 248) (emphases added).

[65] Temporary is defined as "lasting for a time only; existing or continuing for a limited (usually short) time; transitory." Black's Law Dictionary (10th ed. 1990).

[66] AR2022_300664, (Doc. No. 607-4 at 664).

DACA has now entered its second decade and DHS clearly intends to continue this Congressionally unauthorized program indefinitely. While this Court and others—including at least two Presidents and two DHS Secretaries—have suggested that only Congress has the authority to implement a permanent DACA-like program, DHS's current position seems to indicate a contrary intention. This is epitome of "the Executive seizing the power of the Legislature." *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023).

The foregoing are only two examples of DHS's intention to reinstitute, without any pretense of temporal limitations, the original 2012 DACA Memorandum through the Final Rule. The original problems that the Fifth Circuit and this Court pointed out in earlier opinions concerning the 2012 DACA Memorandum persist in the Final Rule. Suffice it to say, the record makes it clear that DHS intends to interpret and operate DACA for the unforeseeable future exactly as it has been run in the past because the Final Rule is, in all pertinent parts, exactly the same as the 2012 DACA Memorandum.

Consequently, the Final Rule substantively violates the APA and is unlawful for the same reasons as the 2012 DACA Memorandum. The Plaintiff States' Motion for Summary Judgment[67] in this respect is hereby granted, and the Cross-Motions for Summary Judgment filed by the Federal Defendants and the Defendant-Intervenors[68] are hereby denied.

## V.     Severability

Having held that the Final Rule merely reiterates the 2012 DACA Memorandum and therefore substantively violates the APA, the Court must determine whether any part of the rule is

---

[67] (Doc. No. 625-1).

[68] (Doc. Nos. 636, 639, and 641).

severable.[69] Despite the dearth of cases from this Circuit, it seems well-settled that the APA allows courts to set aside the offending parts of the rule while keeping the remaining parts of the rule intact. *See e.g., K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988). To utilize this tool, a court must first find the rule satisfies two conditions. First, the court must determine that "the agency would have adopted the same disposition regarding the unchallenged portion [of the regulation] if the challenged portion were subtracted." *Sierra Club v. FERC*, 867 F.3d 1357, 1366 (D.C. Cir. 2017). Second, the parts of the regulation that remain must "function sensibly without the stricken provision." *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019).[70] It is important to note that inclusion of an express severability clause is "an aid merely; not an inexorable command." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, n. 49 (1997) (citations omitted).

By the mere inclusion of a severability clause, one might conclude that the DHS contemplates that the Final Rule contains problematic sections, and that it desires severability. Indeed, parts of the administrative record express the agency's intent that the Court should sever any unlawful portions of the Final Rule.[71] In fact, the Federal Defendants generally request the Court "sever any aspect of the Rule it considers inconsistent with the statute, but leave in effect

---

[69] This issue was not previously addressed by this Court or the Fifth Circuit because the 2012 DACA Memorandum did not have a severability clause. In fact, the only substantive change from the 2012 DACA Memorandum found in the Final Rule is that the latter contains a severability clause. 8 C.F.R. § 236.24.

[70] Given the relatively small number of APA cases brought in the Fifth Circuit, the case law concerning severability of an APA rule is scant. That said, the parties seem to agree that the two-part analysis is the correct test to use when determining whether a regulation is severable. (*See* Doc. Nos. 681 at 20, 673 at 30).

[71] *See e.g.*, 8 C.F.R. § 236.24(a) (explaining that if any provision of Final Rule is held "invalid and unenforceable in all circumstances," it "shall be severable from the remainder of this subpart and shall not affect the remainder thereof."); *id.* § 236.24(b) ("The provisions in § 236.21(c)(2) through (4) and § 274a.12(c)(14) and 274a.12(c)(33) are intended to be severable from one another, from this subpart and any grant of forbearance from removal resulting from this subpart...."); 87 Fed. Reg. 53,248–49 (responding to comments and maintaining severability "is preferable"); *id.* at 53,256 (a policy of forbearance only "would carry substantial benefits").

the remaining parts, undisturbed by any remedial order."[72] The Plaintiff States, on the other hand, challenge whether severability is proper, arguing the Final Rule would "not function sensibly without the stricken provision."[73]

While the Court is perplexed as to why DHS feels that this Court should try to tailor the Final Rule when the agency made no attempt to do so, the Court will follow the established two-part test to determine whether, and to what extent, severability is proper. The most obvious approach to apply the severability clause would be to separate forbearance from the benefits. This approach was mentioned frequently by commenters in the record. None of the parties suggest a different approach—in fact, they have not argued for any severability approach.

### 1. Would DHS Have Adopted the Final Rule Without the Benefits Provisions?

As mentioned above, the Court must first ask whether "the agency would have adopted the same disposition regarding the unchallenged portion [of the regulation] if the challenged portion were subtracted." *Sierra Club*, 867 F.3d at 1366. In other words, the Court must determine whether DHS would have adopted DACA without the benefits provisions.

Upon examination of the administrative record, it is clear that the DHS would not have adopted DACA without the benefits provisions. First, it expressly rejected that path when it adopted the Final Rule.[74] Second, the DHS does not need the Final Rule to exercise forbearance as to the DACA recipient population. The DHS has always had the right and the power to prosecute or forbear from prosecution any person illegally present in the country, even without an administrative rule or memorandum. Thus, forbearance with no benefits would be superfluous.[75]

---

[72] (Doc. Nos. 639 at 9, 681 at 20–22).

[73] (Doc. No. 673 at 35).

[74] *See e.g.*, AR2022_100237, 87 Fed. Reg. 53,194, (Doc. No. 607-1 at 259).

[75] It is important to note that neither this Court's nor the Fifth Circuit's orders impair that prosecutorial function. DHS has always had the right to exercise prosecution discretion on a case-by-case basis. Consequently, a rule that only

As noted, the record is replete with evidence showing that the DHS would not have adopted the Final Rule without the benefits provisions. For example, DHS argues employment authorization is an important component of the DACA policy with a myriad of positive impacts on recipients, families, and communities.[76] In response to comments about how DACA has increased educational opportunities for DACA recipients, DHS admitted that the purpose of formalizing its existing non-prosecutorial policy was to provide these benefits.[77] Thus, the award of deferred action status with its attendant benefits is the key feature.

In support of its decision to combine benefits with forbearance, DHS explained that a forbearance only policy would "disrupt the reliance of interests of hundreds of thousands of people, as well as the families, employers, and communities that rely on them [and]… would produce a great deal of human suffering, including harms to dignitary interests, associated with lost income and ability to self-support."[78] Later in the administrative record, DHS stated that a forbearance only policy would have substantially lowered the net benefit since it "would result in hundreds of thousands of prime-working-age people remaining in the United States while lacking authorization to work lawfully to support either themselves or their families."[79]

To suggest that this Court should now sever virtually every section or benefit that was considered essential by the Federal Defendants and the Defendant-Intervenors would be contrary

---

encompasses forbearance is a statement of the obvious and reiterates what DHS was already doing before the issuance of the 2012 DACA Memorandum. A forbearance only policy adds nothing to the equation and would leave the DACA recipients where they were in 2011.

[76] AR2022_100238, 87 Fed. Reg. 53,195, (Doc. No. 607-1 at 260).

[77] AR2022_100207, 87 Fed. Reg. 53,164, (Doc. No. 607-1 at 229) ("DHS acknowledges that by applying a more formal administrative framework to forbearance from enforcement with respect to DACA recipients, DHS has enabled a range of additional benefits to this population, including increased educational and professional opportunities that benefit DACA recipients and society at large.").

[78] AR2022_100299, 87 Fed. Reg. 53,256, (Doc. No. 607-1 at 321).

[79] AR2022_100336, 87 Fed. Reg. 53,293, (Doc. No. 607-1 at 358).

to the intentions of the former and to the interests of the latter. If this Court were to sever out the grant of deferred action and then, by necessity, the various components that accompany that status, that would mean those DACA recipients currently employed would lose, among other things, their employment eligibility—a result against which the Defendant-Intervenors have fought for years. Further, if the DACA recipients lost their employment status, the reliance interests that weigh heavily in their favor would shift in favor of the Plaintiff States.

Several commenters also weighed in on this issue, reinforcing the point that "deferred action and work authorization are not separate."[80] DHS agreed with those comments, and in response, explained that it "considered a forbearance-only alternative" and "agrees that a policy of forbearance without work authorization—while still a policy that would carry substantial benefits—would harm the substantial reliance interest of thousands of DACA recipients, their families, employers, and communities."[81] It did not explain the benefits that a forbearance only policy would bestow.

Despite many court decisions to the contrary, DHS maintains that DACA is merely an exercise of prosecutorial discretion. The DHS does not need the 2012 DACA Memorandum or the Final Rule to defer prosecution. This position is also undermined by the administrative record. The Department of Justice set out certain factors that fall under the doctrine of prosecutorial discretion and what does not.[82]

> It is important to recognize not only what prosecutorial discretion is, but also what it is not. The doctrine of prosecutorial discretion applies to law enforcement decisions whether, and to what extent, to exercise the coercive power of the Government over liberty or property, as authorized by law in cases when individuals have violated the law. **Prosecutorial discretion does not apply to affirmative acts of approval, or grants of benefits, under a statute or other**

---

[80] *See* AR2022_100298, 87 Fed. Reg. 53,255, (Doc. No. 607-1 at 320).

[81] AR2022_100299, 87 Fed. Reg. 53,256, (Doc. No. 607-1 at 321).

[82] AR2022_300063–75, (Doc. No. 607-4 at 63–75).

**applicable law that provides requirements for determining when the approval should be given.** For example, the INS has prosecutorial discretion not to place a removable alien in proceedings, but it does not have prosecutorial discretion to approve a naturalization application by an alien who is ineligible for that benefit under the INA.[83]

Perhaps aware of this advisory and other similar ones, various commenters suggested that DHS should "unbundle" its discretion to forego prosecution or deportation of the putative DACA recipients from the award of deferred action and the other benefits that DACA status brings. DHS made clear in its response to those comments that the effects of DACA would be greatly diminished if it opted to separate these aspects, and it refused to do so.

Additionally, it is well understood that "an agency's decision not to prosecute or enforce" is "generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Long before DACA was instituted, DHS had already categorized[84] the population of what would later become DACA recipients as low priority prosecutorial prospects.[85] In fact, at that time, to even go forward with a civil immigration enforcement or removal action for an individual in this category, a DHS officer had to get pre-approval.[86] Thus, there was, and is, no need for a formal

---

[83] AR2022_300065, (Doc. No. 607-4 at 65, Immigr. and Naturalization Serv., U.S. Dep't of Just., "Memorandum from Doris Meissner, Exercising Prosecutorial Discretion" (Nov. 17, 2000)) (emphasis added).

[84] AR2022_301637–642, (Doc. No. 608-3 at 47–52, U.S. Immigr. and Customs Enf't., DHS, "Memorandum from John Morton, Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens" (Jun. 17, 2011)).

[85] Indeed, concomitant with the issuance of the 2012 DACA Memorandum, President Obama emphasized that the future DACA recipients were the Dreamers who were already not targets of law enforcement.

> In the absence of any immigration action from Congress to fix our broken immigration system, what we've tried to do is focus our immigration enforcement resources in the right places. So we prioritized border security, putting more boots on the southern border than at any time in our history—today, there are fewer illegal crossings than at any time in the past 40 years. **We focused and used discretion about whom to prosecute, focusing on criminals who endanger our communities rather than students who are earning their education.** And today, deportation of criminals is up 80 percent. We've improved on that discretion carefully and thoughtfully. Well, today, we're improving it again.

AR2022_401446, (Doc. No. 610-3 at 155, White House Off. of the Press Sec'y, "Remarks by the President on Immigration" (June 15, 2012)) (emphasis added).

[86] AR2022_301648, (Doc. No. 608-3 at 58).

policy such as DACA, aside from awarding the recipients some level of formal status and the benefits that accompany that status.[87] This is reinforced by the fact that DHS has no formal program to enforce the law against those who let their DACA status lapse—further proof that the forbearance aspect is not the pivotal point of the program.[88]

An earlier legal memorandum from the Department of Justice stressed the same distinction. That advice seems as if it were written just for this situation.

> While a decision to grant nation-wide relief to a class of illegal aliens could be subject to legal challenges, it is unlikely that a court would reverse the Attorney General's decision not to prosecute this particular class of aliens. Generally, the courts have applied a limited review standards when reviewing the Attorney General's prosecutorial discretion (citing authority).[89]

This is the same distinction the Supreme Court just reinforced in *United States v. Texas*, 143 S. Ct. 1964 (2023).

Despite the advice of various commenters to the Final Rule, DHS purposefully did not decouple the decision not to prosecute from the award of benefits, and in its refusal, stressed that doing so would undermine the entire program. It is clear that DHS had the chance to and purposefully chose not to adopt an unbundled DACA program. It rejected that very suggestion on multiple occasions. The Final Rule fails the first severability factor. Therefore, severability is not proper. Having answered the first part of test in the negative, the Court does not need to further

---

[87] In oral argument in *Texas I*, this Court suggested a variation of this very thing: the issuance of a "non-prosecution" identification card. Such an approach would accomplish the alleged goal of saving CBP and ICE agents time and effort in the field while not violating the law. The Government rejected this suggestion.

[88] In fact, in its 2017 Answers to Frequently Asked Questions, DHS responded that if one lost their DACA status, it did not automatically mean a former DACA recipient had to leave the country. AR2022_400160, (Doc. No. 608-4 at 160). DHS replied that decision is "a separate issue." *Id.* Thus, while DACA provides the protection of "deferred action" status, that benefit (or lack thereof) is separate and apart from any eventual immigration enforcement decision.

[89] AR2022_300082, (Doc. No. 607-4 at 82, Immigr. and Naturalization Serv., U.S. Dep't of Just., Decision Memo 8715, "Memorandum from Office of General Counsel to Alan C. Nelson, Legal Considerations on the Treatment of Family Members Who Are Not Eligible for Legalization" (May 29, 1987)) (emphasis in original). This same memorandum quotes the Senate Judiciary Committee to the effect that one of the goals of the Immigration Reform and Control Act of 1986 (IRCA) is that immigrants will be required to "wait in line"—a goal DACA certainly undermines. AR2022_300081, (Doc. No. 607-4 at 81).

address severability. Nevertheless, the Court will discuss the second question for purposes of being thorough.

## 2. Would the Final Rule Function Sensibly Without the Benefits Provisions?

The second part of the severability analysis examines whether the regulation would "function sensibly" without the stricken provision(s). Again, the answer is no. As previously noted by the Supreme Court in *Regents* and as expressly discussed throughout the administrative record, DACA is primarily a benefits rule. 140 S. Ct. at 1906, 1913[90] ("the benefits attendant to deferred action provide further confirmation that DACA is more than simply a non-enforcement policy [....] the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief."). The Final Rule would not function sensibly as a forbearance only policy. A review of the administrative record (and even the many briefs to this Court) demonstrates the variety of benefits that DACA status has bestowed on the DACA recipients and in turn the benefits that DACA recipients have bestowed on the country. None of this would have been possible under a forbearance only program.

As discussed earlier, various commenters suggested unbundling the various components of the DACA program if for no other reason than to protect it from being vulnerable to legal challenges. DHS refused, taking the position that it was the judiciary's duty to do the sorting. This Court disagrees.

First, it is not the judiciary's duty or role to write or rewrite regulations or rules, especially those that substantively contravene existing legislation. This is especially true when the DHS knew about these deficiencies and purposefully chose to ignore them. Second, if the Court were to do as

---

[90] *Regents*, of course, dealt with the validity of the attempted rescission of the 2012 DACA Memorandum, but as discussed *supra*, the substance of the 2012 DACA Memorandum and the Final Rule are for all practical purposes identical.

some suggest, the remaining regulation, stripped of the benefits it directly or indirectly bestows, would become a nullity. As noted, DHS has always had the inherent power—on a case-by-case basis—to exercise prosecutorial discretion with or without a regulation. It was already doing this before 2012, so a forbearance only policy changes nothing. If this Court were to take away the deferred action status (and all the resulting benefits), the DACA recipients would be back where they were—in the country illegally, but not active targets of the DHS. As stated previously, the DHS does not even have a policy to pursue individuals who have lost or failed to renew their DACA status, much less those with DACA status. DHS does not need a rule to enable it to not prosecute someone. While there may be a difference of opinion as to whether prosecutorial discretion is actually being exercised in the DACA arena, neither this Court nor the Fifth Circuit has encroached on the Executive Branch's role in that regard and no formal regulation is needed for it to perform that function.

This Court has written at length on the reliance interests that DACA recipients have in the continuation of this program. It has also acknowledged the many benefits, both financial and otherwise, that DACA recipients bestow on their communities and this country.[91] More importantly, vast portions of the record underlying the Final Rule do the same. If this Court were to slice away all of the DACA associated benefits, it would completely gut the program.[92] Moreover, it would undermine much of the reasoning that exists behind this Court's earlier decision to stay the injunction. Those reliance interests would no longer be part and parcel of DACA, and, consequently, would not figure into this Court's analysis.[93] This Court does not see

---

[91] *See e.g.*, (Doc. No. 319 at 112–15).

[92] *See e.g.*, AR2022_100076, 86 Fed. Reg. 53,811, (Doc. No. 607-1 at 98).

[93] Many of the benefits are not directly bestowed by the Final Rule or even the Federal Government. They are an indirect result of the DHS awarding deferred action status, which in turn bestows legal presence. These associated

a meaningful way to apply the severability clause and leave the program with any functionality. Thus, it fails the second prong of the severability test.

Setting aside the legal conditions that must be satisfied for a court to utilize severability, such an exercise in this instance would undermine virtually every aspect of this program. Congressional action, not administrative rulemaking or judicial rewriting, is what is required to "fix" this program. Congress was the proper place for any such program to originate, and it is the proper branch of the government to remedy the current situation.

This was noted by President Obama and Secretary Napolitano in 2012. Prior to and even following the adoption of the 2012 DACA Memorandum, President Obama specifically noted that he did not have the power to institute a DACA-like program.[94] In the very memorandum establishing DACA, Secretary Napolitano admitted that only Congress can solve the problem of the so-called Dreamers.[95] President Biden and DHS Secretary Mayorkas have likewise acknowledged the same limitations.[96] This Court agrees that under our Constitution, only Congress

---

benefits may vary from state to state and there is no meaningful way for any court to make determinations as to these benefits based upon this record.

[94] "With respect to the notion that I can just suspend deportations through executive order, that's just not the case, because there are laws on the books that Congress has passed...." Univision town hall meeting, Mar. 28, 2011, https://www.youtube.com/watch?v=TfZ3kaKZoIw, (starting at the 1:07 mark). "My job is to execute laws that are passed, and Congress right now has not changed what I consider to be a broken immigration system....we've kind of stretched our administrative flexibility as much as we can." Google+ Hangout Interview, Feb. 14, 2013, https://www.youtube.com/watch?v=-gU09bWifFo, (starting at the 19:27 mark). *See also* AR2022_401447, (Doc. No. 610-3 at 156).

[95] "This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." (Doc. No. 487, Ex. 1, Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012)).

[96] "While Vice President Harris and I will continue fighting to pass legislation to protect Dreamers and create a path to citizenship, only Congress can provide permanent and lasting stability for these young people and their families. Congress must act to protect our Dreamers." Statement from President Joe Biden on the Anniversary of DACA, June 15, 2023, https://www.whitehouse.gov/briefing-room/statements-releases/2023/06/15/statement-from-president-joe-biden-on-the-anniversary-of-daca/. "We are taking action to preserve and fortify DACA. This is in keeping with the President's memorandum. It is an important step, but only the passage of legislation can give full protection and a path to citizenship to the Dreamers who know the U.S. as their home." Statement by Homeland Security Secretary Mayorkas on DACA, March 26, 2021, https://www.dhs.gov/news/2021/03/26/statement-homeland-security-secretary-mayorkas-daca.

can legislate and only Congress has the power to establish immigration laws. U.S. CONST. art. I, §
8.[97] This Court has consistently refused to legislate from the bench, and it will not take up DHS's
offer to do so here.

For the reasons discussed, the Final Rule does not meet either of the preconditions that
warrant an exercise of the severability clause. Therefore, severability is neither proper nor sensible
based upon on the current record.

## IV.    Conclusion

Litigation revolving around the legality of DACA, in one form or another, has existed for
nearly a decade. While sympathetic to the predicament of DACA recipients and their families, this
Court has expressed its concerns about the legality of the program for some time. The solution for
these deficiencies lies with the legislature, not the executive or judicial branches. Congress, for
any number of reasons, has decided not to pass DACA-like legislation. Defendant-Intervenors
argue that this program is supported by the vast majority of Americans[98] and that the failure to
enact it is inexcusable; but Congress's alleged failure to pass, or, stated differently, its decision not
to enact legislation, does not empower the Executive Branch to "legislate" on its own—especially
when that "legislation" is contrary to actual existing legislation. The Executive Branch cannot
usurp the power bestowed on Congress by the Constitution—even to fill a void.

---

[97] Congress itself understands it is the body that must either solve the DACA dilemma or decide that the law should
remain as written. Nancy Pelosi, the then-Speaker of the House of Representatives, has repeatedly indicated that she
wanted Congress to take up this issue—a clear indication that Congress understands the ball is in their court—not this
one. "Pelosi Statement on the 10th Anniversary of DACA", (Jun. 15, 2022), https://pelosi.house.gov/news/press-
releases/pelosi-statement-on-the-10th-anniversary-of-daca; Benjamin Wermund, Dems plan big push to protect
Dreamers, THE HOUSTON CHRONICLE, Nov. 16, 2022 ("House Speaker Nancy Pelosi and Majority Leader Steny
Hoyer both told House Democrats on Tuesday that taking a final shot at codifying the [DACA] program is a priority
in the lame duck session....").

[98] *See e.g.*, J. Krogstad, *Americans Broadly Support Legal Status for Immigrants Brought to the U.S. Illegally as
Children*, Pew Research Center (June 17, 2020) ("...74% of Americans favor a law that would provide permanent
legal status to immigrants who came to the U.S. illegally as children....").

DHS takes a somewhat skewed view of its power to act when Congress has not. It seems

to suggest that it has the power to do what Congress has rejected, despite having no legislative or

constitutional authority.

> When Congress does not act, it might be for a wide variety of reasons, including
> competing priorities and the sheer press of business…By declining to enact the
> DREAM Act, then, Congress has not rejected or otherwise spoken to the
> Secretary's authority to establish the DACA policy. It bears repeating that, though
> well aware of DHS's longstanding administrative practice, including the [2012
> DACA] Memorandum, Congress has not taken any action to override or prohibit
> the use of deferred action.[99]

There are three very troublesome aspects of this position. First, there are many actions

Congress has not taken—perhaps with very good reasons. Its inaction, whether justifiable or not,

does not give DHS *carte blanche* to take any action it wants. Second, DHS cites the 2012 DACA

Memorandum as authority for it to enact the Final Rule, but that Memorandum was illegally

enacted. Citing an illegally enacted policy as authority is hardly comforting. Third, the foregoing

quote implies that DHS takes the position that it is empowered to do whatever it wants and that it

is up to Congress to stop it. This kind of reasoning simply turns the Constitution upside down.

What this Court must do is continue to interpret the law and the Constitution as written,

and in this instance, to resolve the question posed to it by the Fifth Circuit. Here, the Final Rule

was purposefully designed to preserve the 2012 DACA Memorandum as written. DHS has merely

formalized the 2012 DACA Memorandum, a program the Fifth Circuit already found to be

wanting. It also intends for it to be interpreted just as it has been for the last decade. While the

Final Rule may have used somewhat different wording in a few places, the substantive portions

are materially the same as the 2012 DACA Memorandum. DHS purposefully based the Final Rule

on the 2012 DACA Memorandum due to the directive it received from the President. It made no

---

[99] AR2022_100019, 86 Fed. Reg. 53,754, (Doc. No. 607-1 at 41).

effort in the Final Rule to cure any of the substantive problems noted by this Court and confirmed by the Fifth Circuit.

That being the case, the Court finds that the Final Rule, like the 2012 DACA Memorandum before it, is subject to this Court's (and the Fifth Circuit's) prior rulings. There are no material differences between the two programs. As such, the Final Rule suffers from the same legal impediments. The Plaintiff States' Motion for Summary Judgment[100] is granted. The Cross Motions for Summary Judgment[101] are denied. The existing injunction and vacatur order are supplemented to include the Final Rule. The remaining provisions of that injunction order remain intact. To be clear, neither this order nor the accompanying supplemental injunction requires the DHS or the Department of Justice to take any immigration, deportation, or criminal action against any DACA recipient, applicant, or any other individual that would otherwise not be taken.

Signed this 13 day of September, 2023.

Andrew S. Hanen
United States District Judge

---

[100] (Doc. No. 625-1).

[101] (Doc. Nos. 636, 639, and 641).