**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**



| | | |
|---|---|---|
| STATE OF TEXAS, ET AL.; | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 1:18-cv-68 |
| | § | |
| UNITED STATES OF AMERICA, ET AL.; | § | |
| | § | |
| *Defendants,* | § | |
| | § | |
| *and* | § | |
| | § | |
| KARLA PEREZ, ET AL.; | § | |
| | § | |
| STATE OF NEW JERSEY, | § | |
| | § | |
| *Defendant-Intervenors.* | § | |

**Plaintiff States' Supplemental Brief**

<strong>TABLE OF CONTENTS</strong>

Table of Contents ................................................................................................................ ii

Table of Authorities ............................................................................................................ iii

Statement of the Nature and Stage of the Proceeding .................................................... 1

Introduction ........................................................................................................................ 2

Statement of the Issues to be Ruled upon by the Court ................................................. 3

Procedural History .............................................................................................................. 3

Summary of the Argument ................................................................................................. 5

Argument .............................................................................................................................. 7

   I.   The existing injunctive relief should be amended to provide Texas effective relief. .......... 7

      A.  The injunction should preclude work authorization and lawful presence that encourages DACA recipients to be present in Texas. ................................................................. 7

      B.  An injunction can be tailored to DACA recipients working or residing in Texas. .......... 9

   II.  Plaintiff States other than Texas should be granted declaratory relief on the Final Rule's benefits provisions. ....................................................................... 11

      A.  Relief under the Declaratory Judgment Act was pled and briefed in this Court, though unaddressed here and by the 2025 Fifth Circuit ruling. ............................ 12

      B.  The Court must separately consider and address Plaintiff States' distinct declaratory judgment claims. .................................................................... 13

      C.  The Court should exercise its broad discretion to afford the other Plaintiff States declaratory relief. ................................................................... 15

   III.  The Final Rule's forbearance provisions are independently unlawful. ........................ 22

      A.  Both this Court and the Fifth Circuit ruled the forbearance provisions unlawful, and nothing in subsequent rulings undermines that result. .......................... 22

      B.  The forbearance provisions are also unlawful under the Take Care Clause. ............... 29

      C.  A declaratory judgment that the forbearance provisions are unlawful is not unnecessarily duplicative of vacatur. ........................................... 35

   IV.  The Final Rule should be universally vacated ............................................ 36

      A.  The forbearance provisions should be universally vacated as substantively unlawful. ...37

      B.  The benefits provisions should be universally vacated. .................................. 41

   V.  This Court should lift its stay of relief for current DACA recipients and order a winding down of the program. ................................................................ 50

Conclusion ........................................................................................................................ 53

ii

TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aetna Cas. & Sur. Co. v. Quarles*,
  92 F.2d 321 (4th Cir. 1937) ........................................................................................ 17

*Agora Syndicate, Inc. v. Robinson Janitorial Specialists, Inc.*,
  149 F.3d 371 (5th Cir. 1998) ...................................................................................... 21

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
  522 U.S. 359 (1998) ................................................................................................... 42

*Am. Sec. Ass'n, Citadel Sec. LLC v. U.S. Sec. & Exch. Comm'n*,
  147 F.4th 1264 (11th Cir. 2025) ................................................................................ 39

*Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.*,
  64 F.4th 1354 (D.C. Cir. 2023) ............................................................................ 18, 21

*Arizona v. United States*,
  567 U.S. 387 (2012) ........................................................................................ 30, 33, 44

*Baker v. Carr*,
  369 U.S. 186 (1962) ................................................................................................... 13

*Baldwin Metals Co., Inc. v. Donovan*,
  642 F.2d 768 (5th Cir. 1981) ...................................................................................... 14

*Berger v. Xerox Corp. Ret. Income Guarantee Plan*,
  338 F.3d 755 (7th Cir. 2003) ...................................................................................... 18

*Board of Governors, FRS v. Dimension Financial Corp.*,
  474 U.S. 361 (1986) ................................................................................................... 39

*Braidwood Mgmt., Inc. v. Becerra*,
  104 F.4th 930 (5th Cir. 2024), *cert. granted sub nom. Xavier Becerra, Sec'y of
  Health & Human Services v. Braidwood Mgmt., Inc.*, 145 S. Ct. 1038 (2025) ................. 39, 40

*Brito v. Garland*,
  22 F.4th 240 (1st Cir. 2021) .................................................................................. 13, 14

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ................................................................................................... 11

*Caliste v. Cantrell,*
  937 F.3d 525 (5th Cir. 2019) ................................................................18

*Career Colleges & Sch. of Tex. v. United States Dep't of Educ.,*
  98 F.4th 220 (5th Cir. 2024) ...............................................................41

*Chamber of Commerce of the U.S. v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) .............................................................31

*Chamber of Commerce of United States v. Nat'l Labor Relations Bd.,*
  723 F. Supp. 3d 498 (E.D. Tex. 2024) ...........................................14, 19

*Chamber of Commerce of United States v. SEC,*
  88 F.4th 1115 (5th Cir. 2023) ..............................................................39

*Commercial Union Ins. Co. v. Walbrook Ins. Co.,*
  41 F.3d 764 (1st Cir. 1994) ..................................................................19

*Cont'l Cas. Co. v. Indian Head Indus., Inc.,*
  941 F.3d 828 (6th Cir. 2019) ...............................................................19

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.,*
  603 U.S. 799 (2024) .......................................................................37, 38

*Cornerstone Credit Union League v. Consumer Fin. Prot. Bureau,*
  —F.Supp.3d—, 2025 WL 1920148 (E.D. Tex. July 11, 2025)........................24, 40

*Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r,*
  187 F.2d 789 (3d Cir. 1951) ................................................................38

*In re Crocker,*
  941 F.3d 206 (5th Cir. 2019) ...............................................................19

*Demore v. Kim,*
  538 U.S. 510 (2003)............................................................................44

*DHS. v. Regents of the Univ. of California,*
  591 U.S. 1 (2020)........................................................................ *passim*

*Driftless Area Land Conservancy v. Valcq,*
  16 F.4th 508 (7th Cir. 2021) ...............................................................40

*Edward B. Marks Music Corp. v. Charles K. Harris Music Publ'g,*
  255 F.2d 518 (2d Cir. 1958) ................................................................21

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.,*
  824 F.3d 507 (5th Cir. 2016) ...............................................................17

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ........................................................................... 42

*Fisher v. Univ. of Tex. at Austin*,
    758 F.3d 633 (5th Cir. 2014), *aff'd*, 579 U.S. 365 (2016) ....................... 29

*Fort Bend Cnty. v. United States Army Corps of Engineers*,
    59 F.4th 180 (5th Cir. 2023) .............................................................. 38

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ........................................................................... 31

*Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*,
    155 F.3d 17 (2d Cir. 1998) ................................................................. 20

*Frye v. Anadarko Petroleum Corp.*,
    953 F.3d 285 (5th Cir. 2019) .............................................................. 15

*Gant v. Grand Lodge of Texas*,
    12 F.3d 998 (10th Cir. 1993) .............................................................. 20

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) ........................................................................... 18

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ........................................................................... 27

*Heimann v. Nat'l Elevator Indus. Pension Fund*,
    187 F.3d 493 (5th Cir. 1999), *overruled on other grounds* by *Arana v. Ochsner
    Health Plan*, 338 F.3d 433 (5th Cir. 2003) ........................................... 19

*Hollis v. Itawamba Cnty. Loans*,
    657 F.2d 746 (5th Cir. 1981) .............................................................. 16

*Hosein v. Gonzales*,
    452 F.3d 401 (5th Cir. 2006) .............................................................. 15

*INS v. Natl. Ctr. for Immigrants' Rights*,
    502 U.S. 183 (1991) ........................................................................... 42

*Judulang v. Holder*,
    565 U.S. 42 (2011) ............................................................................. 43

*Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.*,
    575 F.2d 530 (5th Cir. 1978) .............................................................. 19

*Kendall v. United States ex rel. Stokes*,
　　37 U.S. 524 (1838) ....................................................................................30

*Kentucky v. United States Envtl. Prot. Agency*,
　　123 F.4th 447 (6th Cir. 2024) ...................................................................39

*Kunkel v. Cont'l Cas. Co.*,
　　866 F.2d 1269 (10th Cir. 1989)...................................................................21

*La Union Del Pueblo Entero v. Abbott*,
　　—F.4th—, No. 24-50826, 2025 WL 2489464 (5th Cir. Aug. 29, 2025) ...............................29

*Lewis v. Knutson*,
　　699 F.2d 230 (5th Cir. 1983) ......................................................................13

*Make the Rd. N.Y. v. Pompeo*,
　　475 F. Supp. 3d 232 (S.D.N.Y. 2020) .........................................................32

*MD/DC/DE Broadcasters Ass'n v. FCC*,
　　253 F.3d 732 (D.C. Cir. 2001)....................................................................49

*MD/DC/DE Broads. Ass'n v. FCC*,
　　236 F.3d 13 (D.C. Cir. 2001).....................................................................49

*Missouri v. Trump*,
　　128 F.4th 979 (8th Cir. 2025)....................................................................39

*Monsanto Co. v. Geertson Seed Farms*,
　　561 U.S. 139 (2010) ................................................................................. 40

*Morrow v. Harwell*,
　　768 F.2d 619 (5th Cir. 1985)......................................................................13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
　　463 U.S. 29 (1983).............................................................................42, 44

*Nat. Res. Def. Council v. EPA*,
　　489 F.3d 1250 (D.C. Cir. 2007) .................................................................50

*Nat'l Ass'n for Gun Rights, Inc. v. Garland*,
　　741 F. Supp. 3d 568 (N.D. Tex. 2024).......................................................41

*Nat'l Broad. Co. v. United States (NBC)*,
　　44 F. Supp. 688 (S.D.N.Y. 1942), *rev'd* 316 U.S. 447 (1942) .................38

*Newball v. Offshore Logistics Intern.*,
　　803 F.2d 821 (5th Cir. 1986) .......................................................................2

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ...................................................................................................38

*Odeco Oil & Gas Co., Drilling Div. v. Bonnette*,
    4 F.3d 401 (5th Cir. 1993) ......................................................................................16

*Orix Credit All., Inc. v. Wolfe*,
    212 F.3d 891 (5th Cir. 2000) ..................................................................................15

*Pet. for Writ of Cert., United States of America v. State of Texas*,
    2015 WL 7308179 (U.S.) ........................................................................................35

*Phillips v. Collin Cmty. Coll. Dist.*,
    701 F. Supp. 3d 525 (E.D. Tex. 2023).....................................................................16

*Pontchartrain Partners, L.L.C. v. Tierra de Los Lagos, L.L.C.*,
    48 F.4th 603 (5th Cir. 2022) ..................................................................................19

*Pratt v. Harris Cnty., Tex.*,
    822 F.3d 174 (5th Cir. 2016) ....................................................................................2

*Robinson v. Hunt Cnty., Tex.*,
    921 F.3d 440 (5th Cir. 2019) ........................................................................... 14, 15

*Sec. & Exch. Comm'n v. Chenery Corp.*,
    318 U.S. 80 (1943) ..................................................................................................38

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020).......................................................................................... 30, 31

*Skyworks, Ltd. v. Centers for Disease Control & Prevention*,
    542 F. Supp. 3d 719 (N.D. Ohio 2021)...................................................................35

*Steffel v. Thompson*,
    415 U.S. 452 (1974) ................................................................................................14

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ............................................................................42, 46

*Tennessee v. Cardona*,
    762 F. Supp. 3d 615 (E.D. Ky. 2025) .....................................................................35

*Tex. Corn Producers v. United States Envtl. Prot. Agency*,
    141 F.4th 687 (5th Cir. 2025) ................................................................................39

*Tex. Med. Ass'n v. United States Dep't of Health & Human Services*,
    138 F.4th 961 (5th Cir. 2025) ................................................................................37

*Texas v. Biden* (*MPP*),
20 F.4th 928 (5th Cir. 2021), *rev'd on other grounds*, 597 U.S. 785 (2022) ............ 29, 32, 33, 45

*Texas v. Cardona*,
743 F. Supp. 3d 824 (N.D. Tex. 2024) ...................................................................35

*Texas v. Centers for Medicare and Medicaid Services*,
No. 6:23-cv-161, 2025 WL 2724375 (E.D. Tex. Sept. 24, 2025)............................ 40

*Texas v. DHS*,
756 F. Supp. 3d 310 (E.D. Tex. 2024).......................................................... 20, 35, 41

*Texas v. EEOC*,
633 F. Supp. 3d 824 (N.D. Tex. 2022) ...................................................................15

*Texas v. United States*,
328 F. Supp. 3d 662 (S.D. Tex. 2018).................................................................16, 44

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) (per curiam) ..............................................................43

*Texas v. United States* (*DACA 5th Cir. 2022*),
50 F.4th 498 (5th Cir. 2022) .................................................................... *passim*

*Texas v. United States* (*DACA 5th Cir. 2025*),
126 F.4th 392 (5th Cir. 2025) .................................................................. *passim*

*Texas v. United States* (*DACA SDTX 2021*),
549 F. Supp. 3d 572 (S.D. Tex. 2021) ..................................................... *passim*

*Texas v. United States* (*DACA SDTX 2023*),
691 F. Supp. 3d 763 (S.D. Tex. 2023) ..................................................... *passim*

*Texas v. United States* (*DAPA 5th Cir.*),
809 F.3d 134 (5th Cir. 2015) ....................................................................28, 43

*Texas v. United States* (*DAPA SDTX*),
86 F. Supp. 3d 591 (S.D. Tex. 2015) ......................................................................4, 34

*Texas v. United States Dep't of Transp.*,
726 F. Supp. 3d 695 (N.D. Tex. 2024).....................................................................41

*Travelers Ins. Co. v. Louisiana Farm Bureau Fed'n, Inc.*,
996 F.2d 774 (5th Cir. 1993)............................................................................... 15, 21

*Trump v. CASA*,
606 U.S. 831 (2025) ..............................................................................................7, 40

*Ulstein Mar., Ltd. v. United States,*
    833 F.2d 1052 (1st Cir. 1987) ............................................................................. 13

*Union de Empleados de Muelles de Puerto Rico, Inc. v. Int'l Longshoremen's Ass'n,*
    884 F.3d 48 (1st Cir. 2018) ...........................................................................18, 20

*United Aeronautical Corp. v. United States Air Force,*
    80 F.4th 1017 (9th Cir. 2023) ....................................................................... 13, 14

*United States v. Balt. & Ohio R.R. Co.,*
    293 U.S. 454 (1935) ............................................................................................ 37

*United States v. Teel,*
    691 F.3d 578 (5th Cir. 2012) ............................................................................ 1, 2

*United States v. Texas,*
    577 U.S. 1101 (2016) ................................................................................... 34, 35

*United States v. Texas,*
    579 U.S. 547 (2016) .............................................................................................2

*United States v. Texas (Immigration Priorities),*
    599 U.S. 670 (2023) .................................................................... 27, 28, 34, 35

*United Teacher Associates Ins. Co. v. Union Labor Life Ins. Co.,*
    414 F.3d 558 (5th Cir. 2005) ............................................................................. 18

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS,*
    985 F.3d 472 (5th Cir. 2021) ............................................................................. 42

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ........................................................................................... 33

*Wells v. Johnson,*
    150 F.4th 289 (4th Cir. 2025) .......................................................................13, 17

*Whitman v. American Trucking Assns., Inc.,*
    531 U.S. 457 (2001) ........................................................................................... 39

*Williams v. Seidenbach,*
    958 F.3d 341 (5th Cir. 2020) ...............................................................................2

*Wilton v. Seven Falls Co.,*
    41 F.3d 934 (5th Cir. 1994), *aff'd*, 515 U.S. 277 (1995) ........................................ 16

*Zwickler v. Koota,*
    389 U.S. 241 (1967) ........................................................................................... 14

**Statutes**

5 U.S.C. § 703 .................................................................................................... 35

5 U.S.C. § 706 ............................................................................................... 31, 40

5 U.S.C. § 706(1) ............................................................................................... 38

5 U.S.C. § 706(2)(A) ..................................................................................... 37, 42

8 U.S.C. §§ 1182(a)(6)(A)(i) .............................................................................. 10

8 U.S.C. § 1182(a)(9)(B)(i) ............................................................................... 10

8 U.S.C. § 1305 ................................................................................................... 10

26 U.S.C. § 4980h .............................................................................................. 45

28 U.S.C. § 2201 ..................................................................................... 15, 20, 35

28 U.S.C. § 2201(a) ........................................................................................ 15, 16

**Other Authorities**

8 C.F.R. pts. 106, 236, and 274a ...................................................................... 1, 2

8 C.F.R. § 106.2(a)(38) ......................................................................................... 3

8 C.F.R. §§ 236.21(c)(2), 274a.12(c)(14) & (33) ................................................. 3

8 C.F.R. § 236.24 ............................................................................................. 3, 47

8 C.F.R. § 263.21(c)(3)–(4) .................................................................................. 3

8 C.F.R. § 265.1 ................................................................................................ 9, 10

8 C.F.R. § 274a.12(c)(33) ..................................................................................... 9

BLACK'S LAW DICTIONARY 1537 (4th ed. 1951) .............................................. 37

Samuel L. Bray, *The Myth of the Mild Declaratory Judgment*, 63 Duke L.J. 1091,
    1121 (2014) ................................................................................................. 17

U.S. Const. art. II, § 3 .................................................................................. 30, 35

### STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

On September 13, 2023, this Court issued a Memorandum and Order granting Plaintiff States' (Texas, Alabama, Arkansas, Kansas, Louisiana, Mississippi, Nebraska, South Carolina, and West Virginia) Motion for Summary Judgment, supplementing the injunction and vacatur order already in place to include the Final Rule for the Deferred Action for Childhood Arrivals (DACA) program. *Texas v. United States* (*DACA SDTX 2023*), 691 F. Supp. 3d 763, 796 (S.D. Tex. 2023) (invalidating 8 C.F.R. pts. 106, 236, and 274a). That same day, the Court issued a Supplemental Order of Injunction, expressly noting that it "retains jurisdiction of this matter for purposes of construction, modification, and/or enforcement of the terms of the original and this Supplemental Injunction" and that "[a] Final Judgment has not been entered in this case, so all matters not being addressed by an appellate court are still pending in this Court and subject to its jurisdiction." *Texas v. United States*, No. 1:18-CV-68, 2023 WL 5950808 (S.D. Tex. Sept. 13, 2023) (ECF No. 729).

On appeal, the injunction was affirmed in part and modified in part by the Fifth Circuit, and the matter was "remanded for further proceedings as the district court may find appropriate." *Texas v. United States (DACA 5th Cir. 2025)*, 126 F.4th 392, 422 (5th Cir. 2025). Notably, the Fifth Circuit chose to "impose no restriction on the matters that the district court, in its wisdom, may address on remand," and "express[ed] no view on what decisions it should make." *Id.* Accordingly, on July 22, 2025, this Court granted leave for the parties to file additional briefing on five enumerated issues and any other pertinent points they wished the Court to consider or address. ECF No. 760 at 1–2.[1] In so doing, this Court correctly recognized "the wide discretion [the Fifth Circuit] has given this Court and the parties on remand." *Id.* at 1.

It is well established that "the district court on remand . . . abstains from reexamining an issue of fact or law that has already been decided on appeal." *United States v. Teel*, 691 F.3d 578, 582-83 (5th Cir. 2012). Observing this "mandate rule compels compliance on remand with the

---

[1] References to pagination for documents filed on this Court's electronic docket are to the stamped page numbers in the header of those filings.

dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *Id.* at 583. However, "a district court on remand is free to pass upon any issue which was not expressly or impliedly disposed of on appeal." *Newball v. Offshore Logistics Intern.*, 803 F.2d 821, 826 (5th Cir. 1986). Here, as acknowledged in this Court's earlier Supplemental Order of Injunction, every issue the Court has not previously resolved remains pending. *Cf. Williams v. Seidenbach*, 958 F.3d 341, 348 (5th Cir. 2020) (stating that "any order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time.") (quoting Fed. R. Civ. P. 54).

Much of the work suggested in the pages that follow can be accomplished by modifying this Court's previous remedial orders. And to the extent the Court finds it appropriate and necessary, Plaintiff States request the Court deem this submission a motion for summary judgment on any issues it does not believe are amenable to such modification. Summary judgment is appropriate where, as here, "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Pratt v. Harris Cnty., Tex.*, 822 F.3d 174, 180 (5th Cir. 2016) (cleaned up) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

### INTRODUCTION

Established by memorandum in 2012, the DACA program deferred action from removal and provided other benefits like lawful presence and work authorization to certain aliens who arrived in the United States as children. The creation of Deferred Action for Parents of Americans (DAPA)—which included an expansion of DACA—followed two years later, eventually falling to a universal injunction affirmed by an evenly divided Supreme Court. *United States v. Texas*, 579 U.S. 547 (2016). Rescission of DACA was later attempted and rejected as arbitrary and capricious. *DHS. v. Regents of the Univ. of California*, 591 U.S. 1 (2020). The 2012 DACA Memorandum was replaced by the Final Rule subject to the current proceedings here. 87 Fed. Reg. 53,152 (Aug. 30, 2022) (codified at 8 C.F.R. pts. 106, 236, and 274a). Along the way, this case has gone up to the

Fifth Circuit and back down to this Court—twice. Plaintiff States now seek to highlight the several issues still pending before this Court and suggest their proper resolution. In addition to crafting a revised injunction to afford Texas effective relief, this Court should decide the propriety of declaratory relief for the remaining Plaintiff States, determine whether the "forbearance provisions"—8 C.F.R. § 106.2(a)(38); § 236.21(a),(b),(c)(1),(d); § 236.22; § 236.23; § 236.24; and § 236.25—are unlawful independent of their severability from the "lawful presence provisions," 8 C.F.R. § 263.21(c)(3)–(4), and "work authorization provisions," 8 C.F.R. §§ 236.21(c)(2), 274a.12(c)(14) & (33) (collectively, the "benefits provisions"), and universally vacate the Final Rule in toto. Following resolution of these remaining issues, the now thirteen-year-old DACA program should be wound down.

### STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

Plaintiff States request that the Court address the following issues: (1) how to tailor the Court's previous injunction to limit injunctive relief in accordance with the Fifth Circuit's instructions; (2) whether the Court should grant declaratory relief on the Final Rule's benefits provisions to all Plaintiff States; (3) whether the Final Rule's forbearance provisions are unlawful independent of the Rule's benefits provisions; (4) if so, whether the Court should vacate the entirety of the Final Rule universally; and finally (5) whether the Court should lift its stay of relief for current DACA recipients and begin to wind down the DACA program.

### PROCEDURAL HISTORY

This litigation began in May 2018 when Plaintiff States sued Federal Defendants to challenge their authority to promulgate and implement the DACA Memorandum. *See* ECF No. 1, Original Complaint.[2] Since that initial filing, this case has proceeded along a tortuous path and has yet to reach final judgment.

---

[2] Of course, the litigation in a broader sense began in 2014. Plaintiffs and other States filed a lawsuit in this Court because DHS promulgated the DAPA program and "expand[ed] DACA eligibility by removing the age cap, shifting the date-of-entry requirement from 2007 to 2010, and extending the deferred action and work authorization period to three years." *Regents*, 591 U.S. at 10–11. On February 16, 2015, this Court issued a nationwide preliminary injunction against DAPA

On July 16, 2021, this Court adjudicated Plaintiff States' challenge to the DACA Memorandum and, finding the DACA program procedurally and substantively unlawful, vacated the Memorandum and enjoined Federal Defendants from administering the program nationwide. *Texas v. United States* (*DACA SDTX 2021*), 549 F. Supp. 3d 572, 624 (S.D. Tex. 2021). The Court simultaneously entered a partial stay of its order to permit pre-existing DACA recipients to continue enjoying DACA status and its attendant benefits. *Id.* On appeal, the Fifth Circuit affirmed this Court's decision and supplemented this Court's stay with its own, identical stay "pending a further order of this court or the Supreme Court." *Texas v. United States* (*DACA 5th Cir. 2022*), 50 F.4th 498, 531–32 (5th Cir. 2022).

During the pendency of that first appeal, DHS issued a notice of proposed rulemaking that announced a DACA rule with the stated purpose to "preserve and fortify DHS's DACA policy." AR2022_100001, Deferred Action for Childhood Arrivals, 86 Fed. Reg. 53,736, 53,773 (proposed Sept. 28, 2021). DHS then promulgated the Final Rule on August 30, 2022—after the Fifth Circuit had heard oral argument. DHS asked the Fifth Circuit to review the merits of the Final Rule on the basis that no material differences distinguished it from the 2012 DACA Memorandum. *DACA 5th Cir. 2022*, 50 F.4th at 511–12.

The Fifth Circuit, however, declined to do so and instead remanded to allow this Court "to determine if there are material differences between the Final Rule and the 2012 DACA Memorandum, and, if so, whether the already established rulings concerning the 2012 DACA Memorandum apply to the Final Rule." *DACA SDTX 2023*, 691 F. Supp. 3d at 778. This Court found that "there are no material differences between the Final Rule and the 2012 DACA Memorandum," *id.* at 782, and the Court subsequently expanded its previous injunction to cover the Rule. *Texas*, 2023 WL 595080, at *1. As part of its ruling, the Court also concluded that the Rule's forbearance provisions were not severable from its benefits provisions and did not reach the independent legality of the forbearance provisions. *Id.* at 795.

---

and Expanded DACA. *Texas v. United States* (*DAPA SDTX*), 86 F. Supp. 3d 591 (S.D. Tex. 2015) (Hanen, J.).

Defendants took a second appeal, and on January 17, 2025, the Fifth Circuit affirmed this Court's ruling that "the Final Rule substantively violates the INA" *DACA 5th Cir. 2025*, 126 F.4th at 417. However, the Fifth Circuit panel took several steps to limit the scope of relief. First, it ordered that injunctive relief be restricted to Texas. *Id*. at 422. Further, the panel "require[d] such relief to heed DACA's severability provision," *id*., after finding that this Court "erred when it vacated the entire Rule instead of severing the Rule's forbearance provisions from the work authorization provisions." *Id*. at 419. The panel remanded with instructions for this Court to modify its injunction but otherwise "impose[d] no restriction on the matters that the district court, in its wisdom, may address on remand, and [] express[ed] no view on what decisions it should make." *Id*. at 422. Thus, on remand, while this Court must modify its injunction so that it only applies to the benefits provisions and only protects Texas, it has jurisdiction to consider every other matter pertinent to the Plaintiff States' challenge to the Final Rule.

Finally, the Fifth Circuit "preserve[d] the stay to existing recipients," *id*., that it had instated in 2022 after hearing Defendants' first appeal. *DACA 5th Cir. 2022*, 50 F.4th at 531. Much like this Court's reasoning for its own stay, the Fifth Circuit granted its stay in recognition of "the immense reliance interests that DACA has created." *DACA 5th Cir. 2025*, 126 F.4th at 422. Additionally, the panel's stay decision noted "the uncertainty of final disposition," signaling its anticipation of this Court's final judgment. *Id*. On July 22, 2025, this Court invited the parties to submit supplemental briefing. Among other topics, the Court proposed the parties "raise any additional points they find pertinent" for the Court to address, citing the open-ended language of the Fifth Circuit's remand. ECF No. 760 at 2.

## SUMMARY OF THE ARGUMENT

The entire Final Rule is unlawful. The Fifth Circuit has not cabined this Court's jurisdiction to entering relief against the Final Rule's benefits provisions. The Court can therefore consider Plaintiff States' thus-far unadjudicated challenge to the Final Rule's forbearance

provisions. Because the forbearance provisions violate the INA, the U.S. Constitution, and binding precedent, the Court should declare them unlawful and vacate them.

Moreover, a careful severability analysis shows that the benefits provisions cannot be severed from forbearance once the latter is found unlawful. Although an independent forbearance policy can continue without DACA benefits, the reverse would be incoherent. DACA's benefits provisions are premised on forbearance from removal; therefore, a finding that forbearance is independently unlawful entails that the entire Final Rule is unlawful. Because the entire Final Rule falls with forbearance, if the Court rules the forbearance provisions unlawful, it should enter declaratory and vacation relief against the entire Final Rule. As vacatur is inherently non-party-specific, the Court should vacate the Final Rule universally.

Additionally, the Court should modify its previous order in three respects. First, the Court should tailor its injunction to award effective relief to Texas by recalibrating its injunction order to address illegal aliens who live or work in Texas. Second, because the Fifth Circuit's remand instructions to limit remedies to Texas only address injunctive and vacation relief, the Court has full discretion to grant declaratory relief to all Plaintiff States. Plaintiff States properly requested relief under the Declaratory Judgment Act in their pleadings and summary-judgment briefing, and nothing prevents the Court from declaring the benefits provisions unlawful. Third, the Court should lift its partial stay of the Final Rule and order a wind down of the program.

Plaintiff States' Supplemental Brief addresses the scope of injunctive relief in Part I. Next, Part II argues for the propriety of declaratory relief against the Rule's benefits provisions. Part III takes up the merits issue regarding forbearance and Part IV shows that any vacatur of the Final Rule must be universal and nationwide. Finally, Part V argues for lifting the stay and ordering a wind down of DACA. Plaintiff States include a proposed order to aid the Court's decision of appropriate relief. *See* Proposed Order (attached as Exhibit A). Plaintiff States' proposal includes language that would limit the injunction's scope to Texas. *Id.* at ¶¶ 1-15.

ARGUMENT

**I.    The existing injunctive relief should be amended to provide Texas effective relief.**

Following remand, this Court sought the parties' input on applying the Fifth Circuit's directive to confine injunctive relief to Texas alone, and on whether the Supreme Court's ruling in *Trump v. CASA*, 606 U.S. 831 (2025) alters that path. *See* ECF No. 760 at 2. Nothing in *CASA* curtails the remedies at this Court's disposal beyond the Fifth Circuit's own limitation of any injunctive relief to Texas. The Court should grant Texas effective relief by revising its injunction to remedy pocketbook injuries arising from the use of social services by DACA recipients residing or working in Texas. Plaintiff States' proposed injunction is tailored to effectively end DACA's unlawful work authorization and lawful presence benefits in Texas. Such a cure demands no bold innovation from DHS, which can readily adapt preexisting practices to this end.

**A.    The injunction should preclude work authorization and lawful presence that encourages DACA recipients to be present in Texas.**

On remand, this Court is tasked with implementing the Fifth Circuit's instructions to narrow injunctive relief to Texas. *DACA 5th Cir. 2025*, 126 F.4th at 420–21, 422. The injuries caused by the Final Rule's benefits provisions are "fully redressable by a geographically limited injunction," *id.* at 421, only so long as that injunctive relief covers all DACA recipients who either reside or work in Texas. To that end, Texas has proposed language to modify the Court's injunction to ensure Federal Defendants do not grant work authorization or lawful presence benefits to such recipients. *See* Exhibit A, ¶¶ 1–15.

The Fifth Circuit observed that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *DACA 5th Cir. 2025*, 126 F.4th at 421 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Having already severed the forbearance provisions, it then balanced Texas's injuries against the Final Rule's purported benefits to other States, finding that "the injury that Texas asserts—health, education, and other social service related expenses for the DACA population—can be redressed by a more limited

7

injunction that does not trigger the costs that New Jersey and the other *amici* [S]tates aver they would incur if the nationwide injunction were upheld." *Id.* at 421.

Injuries to the other States aside, by now it has been well established that DACA's benefits provisions injure Texas by imposing social services costs. *DACA 5th Cir. 2022*, 50 F.4th at 517 (holding that Texas demonstrated an injury in fact because "DACA inflicts pocketbook injuries on the State in the form of healthcare, education, and social services costs"). That injury results from DACA recipients living and working in Texas. *DACA 5th Cir. 2025*, 126 F.4th at 411 n.22 ("By conferring lawful presence, DACA makes recipients eligible for a variety of state and federal benefits, and both parties' experts agree that the costs borne by Texas result at least in part from the presence of DACA recipients."). Thus, the scope of a Texas-specific injunction must extend to fully remedying such injuries, including by incentivizing some recipients to relocate out of state. *DACA 5th Cir. 2022*, 50 F.4th at 520 (finding "evidence that if DACA were no longer in effect, at least some recipients would leave, and their departure would reduce the State's Medicaid, social services and education costs for those individuals and their families who depart with them"); *DACA SDTX 2021*, 549 F. Supp. 3d at 594 ("If DACA recipients leave, Texas would no longer be obligated to pay for those costs associated with DACA recipients' entitlement to social services.").

Any remedy focused solely on injuries stemming from DACA recipients who reside in Texas would not provide the State with complete relief. The requirement to provide certain public benefits to DACA recipients who traverse the State's borders also imposes a pocketbook injury on Texas. *See, e.g.*, *DACA 5th Cir. 2022*, 50 F.4th at 517 (recognizing that "[f]ederal law requires the State to provide emergency Medicaid to noncitizens"). And that injury occurs regardless of whether DACA beneficiaries reside in Texas or in a neighboring State and commute for work into Texas. Accordingly, this Court's injunction should remedy the harm caused by DACA recipient residents and commuters alike.

**B.  An injunction can be tailored to DACA recipients working or residing in Texas.**

An injunction that suspends the benefits provisions in Texas is administrable. DHS already tracks the current addresses of all DACA recipients and demands the same information from new applicants. *See* 8 C.F.R. § 265.1; *see also* AR2022_100150. And it issues work-authorization documents ("EADs") under a single, uniform form—the I-766 issued under category 33 (the "I-766 (c)(33)")—for those claiming DACA status. *See* 8 C.F.R. § 274a.12(c)(33); AR2022_100343. Using this data, DHS can filter for Texas residents. And to ensure all DACA recipients employed in Texas fall within the scope of relief, the Court need only direct DHS to notify employers that such DACA-specific EADs cannot be relied upon for work authorization purposes in Texas.

Texas's proposed injunction implements this through nine concrete provisions. Federal Defendants must: (1) halt the grant of lawful presence to Texas residents pursuant to the Final Rule, *see* Exhibit A, ¶ 1–2; (2) cease issuing I-766(c)(33) or replacement documents to those same residents, *id.* at ¶¶ 3; (3) refuse to accept I-766(c)(33) documents as valid work authorization from employers for any current or prospective employee residing in Texas or performing work there, *id.* at ¶ 4; (4) publish an online notice announcing the injunction and invalidity of I-766 (c)(33) for Texas employment, *id.* at ¶¶ 5–6; (5) append a similar warning to Form I-765 itself, *id.* at ¶ 7; (6) imprint every newly issued I-766 (c)(33) with a disclaimer of its ineffectiveness in Texas, *id.* at ¶ 8; (7) deny work authorization for any E-Verify case relying solely on an I-766(c)(33) where Texas residency or employment is involved, *id.* at ¶¶ 9–10; and (8) continue collecting residential data from all DACA recipients and applicants, *id.* at ¶¶ 11–12; and (9) enjoin Federal Defendants from granting eligibility for advance parole or federal benefits based on purported lawful presence on the basis of any DACA status possessed during any period residing in Texas, *id.* at ¶¶ 13–15.

These measures effectively end DACA's unlawful work authorization and benefits in Texas without interfering with other States. By keying relief to recipients' places of residence and employment, the injunction ensures that beneficiaries who decamp from Texas and abandon Texas-based jobs escape its reach entirely. This targeted approach supplies a potent incentive for DACA holders and aspirants to continue receiving benefits in other States by relocating from

Texas. Such a voluntary exodus is the very redress contemplated by both this Court and the Fifth Circuit. *DACA 5th Cir. 2022*, 50 F.4th at 520; *DACA SDTX 2021*, 549 F. Supp. 3d at 594.

An effective injunction should also prohibit Federal Defendants from granting advance parole on the basis of DACA status. As the Court has recognized, "[t]his has been a troubling aspect of DACA since its inception," that allows illegal aliens to circumvent statutory bars to adjustment of status. *DACA SDTX 2023*, 691 F. Supp. 3d at 785. The INA forbids aliens who were not lawfully admitted into the country from obtaining legal presence by adjusting their status. *See* 8 U.S.C. §§ 1182(a)(6)(A)(i). This "inadmissibility bar" is supplemented by a separate restriction on status adjustment that requires any alien who has entered unlawfully to remain outside the United States for either three or ten years before they can apply to adjust their status. 8 U.S.C. § 1182(a)(9)(B)(i); *see also DACA SDTX 2023*, 691 F. Supp. 3d at 785 n.54 (explaining the "inadmissibility" and "unlawful presence" bars). However, because advance parole permits reentry, DACA recipients who leave and return via that process reset their admission into the country, avoiding compliance with the inadmissibility or unlawful presence bars. This unlawful backdoor to lawful status should be firmly shut.

Texas's proposed remedy is workable because it demands nothing novel from DHS, whose practices can be readily adapted to implement the proposed injunction. DHS already routinely logs DACA applicants' residences, *see* AR2022_100150, and mandates that recipients "report each change of address and new address within 10 days of such change," 8 C.F.R. § 265.1; 8 U.S.C. § 1305; *see also* DHS Policy Manual Excerpt[3] ("All aliens in the United States [except A and G visa holders and visa waiver visitors] have a legal requirement to report a change of address to USCIS within 10 days of moving"). DHS's change of address forms specify that only physical addresses suffice to satisfy this requirement. U.S. Dep't of Homeland Sec., Form AR-11.[4] EAD applications yield the same residence data. *See* AR2022_100390, 100426.

---

[3] https://www.uscis.gov/policy-manual/volume-1-part-a-chapter-10.
[4] https://www.uscis.gov/sites/default/files/document/forms/ar-11.pdf; *see also* AR-11, Alien's Change of Address Card, https://www.uscis.gov/ar-11.

Similarly, directing DHS to withhold E-Verify verifications for Texas-based recipients merely repurposes an existing platform, as does ordering DHS to publish notices on its websites. Indeed, DHS has already been ordered to post online notices without causing significant disruption. *See Texas v. United States*, No. 1:18-CV-00068, 2021 WL 3022434, at *2 (S.D. Tex. July 16, 2021) (ECF No. 576) (ordering DHS "to post a public notice . . . to be displayed prominently on its website and on the websites of all other relevant agencies, that a United States District Court has found the DACA program to be illegal and that . . . the Government is prohibited from granting such applicants"). A similar notice informing the public of this Texas-specific injunction would be no more burdensome than those required in the past. Adding disclaimers to EADs does no more than require Federal Defendants to publicize the effects of this Court's order on documents they design and create. And enjoining grants of advance parole based on DACA status does no more than require DHS to apply the same criteria to recipients it does to others without such status.

By hewing to DHS's established procedures, Texas's proposal is "no more burdensome to the defendant than necessary to provide complete relief." *Califano*, 442 U.S. at 702. Texas's proposed injunction minimizes burdens on DHS and respects other States' equities while securing the relief Texas is due, thus striking the careful balance envisioned by the Fifth Circuit.

## II. Plaintiff States other than Texas should be granted declaratory relief on the Final Rule's benefits provisions.

Although Plaintiff States duly pled and briefed claims under the Declaratory Judgment Act, neither this Court nor the Fifth Circuit has had occasion to address this distinct basis for relief. Declaratory relief stands apart from injunctive remedies and requires independent judicial consideration. Application of the DACA program within the other Plaintiff States remains an actual controversy within this Court's jurisdiction. And by supplying legal certainty and dispelling ambiguity, a declaratory judgment would provide the most judicially economical means for resolving that controversy.

**A. Relief under the Declaratory Judgment Act was pled and briefed in this Court, though unaddressed here and by the 2025 Fifth Circuit ruling.**

Plaintiff States' live pleadings repeatedly invoke the Declaratory Judgment Act. *See* First Amended Compl., ECF No. 104 at ¶¶ 12, 19, 338; Supp. Compl., ECF No. 623 at ¶¶ 14, 42, 149, 153. Each filing expressly prays for declaratory relief. ECF No. 104 at 73; ECF No. 623 at 42. Plaintiff States continued to pursue that relief in their Motion for Summary Judgment, averring that "[t]he Court should declare that the Final Rule is substantively unlawful, arbitrary and capricious, and unconstitutional." ECF No. 625-1 at 47–48. And again, in their combined reply in support and response to Defendants' own summary judgment briefs, Plaintiff States observed that "[n]o Defendants argue against the propriety of this Court issuing declaratory relief if it finds the Final Rule unlawful." ECF No. 673 at 11. Pursuit of a declaratory judgment was important at the outset of this litigation and has remained so throughout.

On September 13, 2023, this Court granted injunctive relief and ordered vacatur while never addressing Plaintiff States' request for declaratory relief. *DACA SDTX 2023*, 691 F. Supp. 3d at 796; *Texas*, 2023 WL 5950808, at *1. Given the broad scope of relief granted, the Court perhaps viewed declaratory relief as unnecessarily duplicative. However, that reasoning no longer stands with regard to the other Plaintiff States in the wake of the Fifth Circuit's decision to "limit injunctive relief, including the effectiveness of the vacatur of the Final Rule, to Texas." *DACA 5th Cir. 2025*, 126 F.4th at 422.

The Fifth Circuit's limitation of injunctive relief to Texas does not preclude granting other remedies to the remaining States. That court's decision did not affect a "*de facto* change in the standing doctrine." ECF No. 760 at 2. Indeed, the Fifth Circuit expressly reaffirmed that "[o]nly one plaintiff needs standing for the suit to proceed." *DACA 5th Cir. 2025*, 126 F.4th at 405 (citing *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)). That determination echoed its previous decision on standing in this case. *See DACA 5th Cir. 2022*, 50 F.4th at 514 ("The presence of one party with standing is sufficient to authorize our review.").

Properly understood, the Fifth Circuit addressed only "the court's jurisdictional power to hear the case" in its treatment of standing. *Lewis v. Knutson*, 699 F.2d 230, 236 (5th Cir. 1983). Rather than directing dismissal of any party to this litigation, it instead exercised jurisdiction over each and every Plaintiff State. Having assured itself of the "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination," *Baker v. Carr*, 369 U.S. 186, 204 (1962), the Fifth Circuit went on to decide the merits and then—pursuant to a *separate* inquiry—address the scope of the only remedies that were then before the court, *DACA 5th Cir. 2025*, 126 F.4th at 420–21. But that determination on the distinctly harsher remedy of an injunction cannot control the availability of declaratory relief.

### B. The Court must separately consider and address Plaintiff States' distinct declaratory judgment claims.

As the Fourth Circuit recently explained, the fundamental reason "why declaratory judgments exist" is "to give plaintiffs facing future injuries a remedial option other than injunctions." *Wells v. Johnson*, 150 F.4th 289, 300 (4th Cir. 2025) (Richardson, J.) (citing Samuel L. Bray, *The Myth of the Mild Declaratory Judgment*, 63 Duke L.J. 1091, 1143 (2014)). Indeed, declaratory relief "differs legally and materially" from injunctive relief. *Brito v. Garland*, 22 F.4th 240, 251 (1st Cir. 2021). "An injunction is a coercive order by a court directing a party to do or refrain from doing something," while "[a] declaratory judgment states the existing legal rights in a controversy, but does not, in itself, coerce any party or enjoin any future action." *Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1055 (1st Cir. 1987); *see also Wells*, 150 F.4th at 300 (contrasting "an injunction, which requires the defendant to take or forbear from some action," with a declaratory judgment, which "'does not issue a command to the parties and does not threaten an instantaneous sanction.'" (quoting Samuel L. Bray, *The Myth of the Mild Declaratory Judgment*, 63 Duke L.J. 1091, 1120 (2014))). Thus, "the passive remedy of a declaratory judgment is far less intrusive into [governmental] functions than injunctive relief that affirmatively commands specific future behavior under the threat of the court's contempt powers." *Morrow v. Harwell*, 768 F.2d 619, 627 (5th Cir. 1985); *see also United Aeronautical Corp. v. United States Air*

13

*Force*, 80 F.4th 1017, 1031 (9th Cir. 2023) ("The primary difference is that declaratory relief 'is a much milder form' of relief because it is not backed by the power of contempt."(quoting *Steffel v. Thompson*, 415 U.S. 452, 471 (1974))).

The absence of contempt powers is "of special note in cases in which the government is a party," *Brito*, 22 F.4th at 251, since "in suits against government officials and departments, [courts] generally assume that they will comply with declaratory judgments," *United Aeronautical Corp.*, 80 F.4th at 1031; *see also Chamber of Commerce of United States v. Nat'l Labor Relations Bd.*, 723 F. Supp. 3d 498, 519 (E.D. Tex. 2024) (Barker, J.) ("It is anticipated that defendants would respect the declaratory judgment, so the court chooses not to issue an injunction at this time.") (cleaned up).

Given these important differences, a request for declaratory relief "must be considered independently of any request for injunctive relief against the enforcement of that statute." *Zwickler v. Koota*, 389 U.S. 241, 254 (1967). As the Supreme Court has explained, "engrafting upon the Declaratory Judgment Act a requirement that all of the traditional equitable prerequisites to the issuance of an injunction be satisfied before the issuance of a declaratory judgment is considered would defy Congress' intent to make declaratory relief available in cases where an injunction would be inappropriate." *Steffel*, 415 U.S. at 471. For example, "a failure to demonstrate irreparable injury" is "a traditional prerequisite to injunctive relief" that has "no equivalent in the law of declaratory judgments." *Id.* 471–72; *see also Baldwin Metals Co., Inc. v. Donovan*, 642 F.2d 768, 775 n.17 (5th Cir. 1981) (observing that "irreparable injury need not be shown in order to justify declaratory relief"). Accordingly, "[a] party may pursue both injunctive and declaratory relief, and '[a] court may grant declaratory relief even though it chooses not to issue an injunction or mandamus.'" *Robinson v. Hunt Cnty., Tex.*, 921 F.3d 440, 450 (5th Cir. 2019) (quoting *Powell v. McCormack*, 395 U.S. 486, 499 (1969)); *see also Brito*, 22 F.4th at 251 (observing that declaratory relief is often "available in situations where an injunction is unavailable or inappropriate"). A court's determination that a plaintiff's "declaratory judgment claims are redundant of [its] claims

for injunctive relief" constitutes an abuse of discretion where "this conclusion is inconsistent with the purposes of the Declaratory Judgment Act." *Robinson*, 921 F.3d at 450.

## C. The Court should exercise its broad discretion to afford the other Plaintiff States declaratory relief.

A three-step inquiry governs the availability of declaratory relief. A court must determine "(1) whether an 'actual controversy' exists between the parties in the case; (2) whether it has authority to grant declaratory relief; and (3) whether to exercise its broad discretion to decide or dismiss a declaratory judgment action." *Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 294 (5th Cir. 2019) (cleaned up). Here, the second step is not at issue since there is no pending state-court proceeding between the parties. *Travelers Ins. Co. v. Louisiana Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 776 (5th Cir. 1993) (setting forth three factors considered in addressing this second element of the test); *see also Texas v. EEOC*, 633 F. Supp. 3d 824, 846 (N.D. Tex. 2022) (Kacsmaryk, J.) (dispensing with the second element by noting that "nothing before the Court indicates there is a pending state-court proceeding between the parties whose existence divests the Court of its authority to grant declaratory relief"). The Court thus needs to address only the first and third steps of the required inquiry, beginning with the existence of an "actual controversy."

### 1. This case presents an actual controversy within the Court's jurisdiction.

The "actual controversy" inquiry addresses merely "whether the declaratory action is justiciable." *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000). This requirement is directly derived from the text of the Declaratory Judgment Act itself:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). In the Fifth Circuit, it is well established that "[t]he statute's requirement of a 'case of actual controversy' refers to an Article III case or controversy." *Frye*, 953 F.3d at 294; *see also Hosein v. Gonzales*, 452 F.3d 401, 403 (5th Cir. 2006) ("This circuit interprets the § 2201 'case of actual controversy' requirement to be coterminous with Article III's 'case or controversy'

requirement."). Previous decisions in the instant litigation from both this Court and the Fifth Circuit conclusively demonstrate this to be "a case of actual controversy" within the Court's jurisdiction.

The issue of Article III jurisdiction has repeatedly been resolved in favor of Plaintiff States. This Court found on at least three occasions that Plaintiff States established standing. *See DACA SDTX 2023*, 691 F. Supp. 3d at 778–81; *DACA SDTX 2021*, 549 F. Supp. 3d at 584–96; *Texas v. United States*, 328 F. Supp. 3d 662, 690–705 (S.D. Tex. 2018) ("*DACA SDTX 2018*"). The Fifth Circuit has done the same at least twice, including in its most recent remand to this Court. *See DACA 5th Cir. 2025*, 126 F.4th at 405–15; *DACA 5th Cir. 2022*, 50 F.4th at 513–20. Because a case or controversy unquestionably exists under Article III, "any" Plaintiff State may obtain a declaratory judgment regardless of its entitlement to an injunction or order of vacatur. *See* 28 U.S.C. § 2201(a) (courts "may declare the rights and other legal relations of *any interested party* seeking such declaration, whether or not further relief is or could be sought") (emphasis added)).

### 2.  A declaratory judgment would provide legal certainty and clarity while promoting judicial economy.

While Plaintiff States clearly qualify for declaratory relief, this Court nevertheless possesses "broad discretion to grant (or decline to grant) declaratory judgment." *Wilton v. Seven Falls Co.*, 41 F.3d 934, 935 (5th Cir. 1994), *aff'd*, 515 U.S. 277 (1995). That discretion is not limitless, however, as "the district courts may not decline [to issue declaratory relief] on the basis of whim." *Hollis v. Itawamba Cnty. Loans*, 657 F.2d 746, 750 (5th Cir. 1981). Nor may a court "dismiss a request for declaratory judgment for serving no purpose where the requested declaratory judgment is not unnecessarily duplicative of other claims in the same action." *Phillips v. Collin Cmty. Coll. Dist.*, 701 F. Supp. 3d 525, 542 (E.D. Tex. 2023) (Mazzant, J.). Further, any dismissal must be accompanied by "a written or oral explanation." *Odeco Oil & Gas Co., Drilling Div. v. Bonnette*, 4 F.3d 401, 404 (5th Cir. 1993). Within these confines, "the court may consider a variety of factors in determining whether to decide a declaratory judgment suit." *Id.*

In deciding whether to grant a declaratory judgment, courts principally consider whether such relief "will serve a useful purpose in clarifying and settling the legal relations in issue" and will "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 523 (5th Cir. 2016) (quoting *Concise Oil & Gas P'ship v. La. Intrastate Gas Corp.*, 986 F.2d 1463, 1471 (5th Cir. 1993)). Indeed, courts have construed the Declaratory Judgment Act to effectuate these purposes since the statute's passage. *See, e.g.*, *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937) (recognizing the statute's purpose "to afford a speedy and inexpensive method of adjudicating legal disputes without invoking the coercive remedies" and "to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships"). Declaratory relief here would undoubtedly serve these purposes.

This Court has already found the benefits provisions of DACA substantively unlawful. *DACA SDTX 2021*, 549 F. Supp. 3d at 621 (holding that "DACA violates the substantive provisions of the APA"); *see also DACA SDTX 2023*, 691 F. Supp. 3d at 796 (observing that the Final Rule failed "to cure any of the substantive problems noted by this Court and confirmed by the Fifth Circuit" and thus holding that it "suffers from the same legal impediments" as the DACA Memorandum). The Fifth Circuit has twice affirmed these determinations. *DACA 5th Cir. 2022*, 50 F.4th at 528 (holding that the DACA Memorandum was "manifestly contrary" to the INA); *DACA 5th Cir. 2025*, 126 F.4th at 417 (holding that "the Final Rule substantively violates" the Immigration and Nationality Act). Thus, the benefits provisions of DACA has *already* been declared unlawful. *See Wells*, 150 F.4th 289, 305 n.10 (recognizing that a court "necessarily declares that something did (or would) break the law" before it "grants an injunction"); *see also* Samuel L. Bray, *The Myth of the Mild Declaratory Judgment*, 63 Duke L.J. 1091, 1121 (2014) ("[O]ne could see every decision by a court, including every decision paired with an injunction, as containing something like an implicit declaratory judgment about how the law applies to specific

facts."). And as the time to seek further review in the Fifth Circuit or Supreme Court has expired, those determinations will never be reversed.

What remains in doubt, however, is the legal relations between the federal government and Plaintiff States other than Texas. A declaratory judgment would provide much needed clarity while giving federal officials "the first crack at reforming their practices to conform" to the law. *Caliste v. Cantrell*, 937 F.3d 525, 532 (5th Cir. 2019); *see also Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755, 763–64 (7th Cir. 2003) (Posner, J.) ("The hope that motivates casting a request for relief in declaratory terms is that if the declaration is granted, the parties will be able to negotiate the concrete relief necessary to make the plaintiffs whole without further judicial proceedings.").

A declaratory judgment would also provide Plaintiff States with an opportunity for additional future relief from the uncertainty and insecurity surrounding DACA administration within their borders. The principal mechanism by which such relief would be afforded is Section 2202 of the Declaratory Judgment Act, which states that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202. Indeed, "a declaratory judgment is normally a prelude to a request for other relief, whether injunctive or monetary." *Berger*, 338 F.3d at 763; *see also Union de Empleados de Muelles de Puerto Rico, Inc. v. Int'l Longshoremen's Ass'n*, 884 F.3d 48, 58 (1st Cir. 2018) (observing that "[a] declaratory judgment is often a means to an end rather than an end in and of itself"). Relief stems from the judgment's preclusive effect on the parties. *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023); *see also Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.*, 64 F.4th 1354, 1366 (D.C. Cir. 2023) (holding that declaratory relief is not "illusory" where it can "serve as the basis for issuance of a later injunction to give effect to the declaratory judgment and it may have res judicata effect in later actions").

None of this is a controversial or novel interpretation of the Declaratory Judgment Act. For its part, the Fifth Circuit has found it "clear" that "a party can file a motion for further relief" in order "to effectuate a prior declaratory judgment." *United Teacher Associates Ins. Co. v. Union*

*Labor Life Ins. Co.*, 414 F.3d 558, 571 (5th Cir. 2005). And "a court has the power, upon a subsequent petition, to grant coercive or further declaratory relief in connection with a final declaratory judgment theretofore entered." *Heimann v. Nat'l Elevator Indus. Pension Fund*, 187 F.3d 493, 510 (5th Cir. 1999), *overruled on other grounds* by *Arana v. Ochsner Health Plan*, 338 F.3d 433 (5th Cir. 2003); *see also Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.*, 575 F.2d 530, 537 (5th Cir. 1978) (holding that "the prevailing party may seek further relief in the form of damages or an injunction"). In some instances, the need for additional relief may arise from a defendant's failure to heed the declaratory judgment. *See In re Crocker*, 941 F.3d 206, 211 (5th Cir. 2019) ("A violation of the declaratory judgment will lead to its own remedies such as 'damages or an injunction.'"); *Chamber of Commerce of United States*, 723 F. Supp. 3d at 519 ("Plaintiffs or their members may, of course, seek an injunction should defendants threaten to depart from the declaratory judgment."). And such relief may be granted "well after the original judgment—as long as the motion is not barred by laches." *Cont'l Cas. Co. v. Indian Head Indus., Inc.*, 941 F.3d 828, 834 (6th Cir. 2019); *see also Commercial Union Ins. Co. v. Walbrook Ins. Co.*, 41 F.3d 764, 773 (1st Cir. 1994) (stating that Section 2202 "authoriz[es] a district court to grant additional relief consistent with the underlying declaration even though the right to the relief may arise long after the court has entered its declaratory judgment").

A declaratory judgment also promotes judicial efficiency by limiting the need for additional evidence from the other Plaintiff States at this juncture in the litigation.[5] *See Pontchartrain Partners, L.L.C. v. Tierra de Los Lagos, L.L.C.*, 48 F.4th 603, 605 (5th Cir. 2022) (recognizing that district courts must consider whether issuing declaratory relief "would serve the purpose of judicial economy"). To be sure, every Plaintiff State suffers ongoing and future injuries as a result of DACA. For example, this Court may take judicial notice that each Plaintiff State features active

---

[5] This Court has inquired as to whether "non-Texas Plaintiff-States even wish to demonstrate an injury." ECF No. 760 at 2. While Plaintiff States believe that a declaratory judgment provides a superior alternative to further delaying resolution by putting on additional evidence at this point, they would respectfully request the opportunity to demonstrate their ongoing and future injuries if this Court disagrees with that approach.

DACA recipients within its borders as of the second quarter of 2025. *See* Deferred Action for Childhood Arrivals (DACA) Quarterly Report (Fiscal Year 2025, Quarter 2).[6] The Final Rule also demonstrates DHS's acknowledgement of DACA's potential "fiscal effects on State and local governments" when it promulgated the Final Rule, AR2022_100331–AR2022_100332; 87 Fed. Reg. 53,288, relying specifically on a 2017 National Academies of Sciences, Engineering, and Medicine publication in the administrative record that itself recognized negative immigration-related fiscal effects on each Plaintiff State involved in this lawsuit, AR2022_502085–AR2022_502086. This is sufficient proof of injury "by an agency's own pronouncements." *Texas v. DHS*, 756 F. Supp. 3d 310, 341 (E.D. Tex. 2024) (Barker, J.) (citing *NRDC v. NHTSA*, 894 F.3d 95, 104–05 (2d Cir. 2018)); *id.* at 346, 349 (using statements in agency rule to find legal effect of immigration policy on State).

As the Fifth Circuit noted, narrowing the injunctive relief to only Texas will have the effect of "providing an incentive for DACA recipients to move to other [S]tates not subject to the injunction," *DACA 5th Cir. 2025*, 126 F.4th at 421 n.49. While this law-of-the-case determination will remedy Texas's injury, such relief will inherently exacerbate the other Plaintiff States' injuries absent a declaratory judgment. These injuries are more than enough for issuance of declaratory relief under Section 2201.

Should the need arise, any additional evidence of injury needed to support an injunction can be presented in a subsequent hearing under Section 2202. The Court's authority to provide further relief under that provision is broad. For example, it may grant additional relief "even if such relief was not requested in the complaint." *Union de Empleados de Muelles de Puerto Rico, Inc.*, 884 F.3d at 59. Indeed, Section 2202 "authorizes the court to grant relief that was not demanded or relief *that was not even proved* in the original declaratory judgment action." *Gant v. Grand Lodge of Texas*, 12 F.3d 998, 1003 (10th Cir. 1993) (quoting 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure*, § 2771, at 766–67 (2d ed. 1983)) (emphasis added); *see also Fred Ahlert Music*

---

[6]    https://www.uscis.gov/sites/default/files/document/data/daca_performancedata _fy2025_q2.xlsx.

*Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 25 (2d Cir. 1998) (recognizing a district court's authority to grant further relief regardless of whether it "ha[d] been demanded, or even proved, in the original action for declaratory relief") (quoting *Edward B. Marks Music Corp. v. Charles K. Harris Music Publ'g*, 255 F.2d 518, 522 (2d Cir. 1958)). Here, "[f]urther necessary and proper relief based upon factual disputes not yet resolved may be sought at a later time." *See Kunkel v. Cont'l Cas. Co.*, 866 F.2d 1269, 1274 (10th Cir. 1989); *see also Edward B. Marks Music Corp.*, 255 F.2d at 522 (holding that "any additional facts which might be necessary to support such relief can be proved on the hearing provided in the section or in an ancillary proceeding if that is necessary").

Finally, in this instance, a "declaratory judgment serves important functions in confirming the end of this protracted litigation." *Anatol Zukerman & Charles Krause Reporting, LLC*, 64 F.4th at 1366–67. In the past, the Fifth Circuit has expressly taken such factors into consideration. For example, in *Travelers Insurance* it noted that "the parties here have completed discovery and have resolved all material fact issues," with the sole remaining legal issue having "already been thoroughly briefed." *Travelers Ins. Co.*, 996 F.2d at 779. Because dismissal would result in "duplicating the work already done," and thus "resolution of this case would be significantly delayed," the Fifth Circuit reversed the district court's dismissal of the declaratory action and remanded for merits consideration. *Id.* Similarly, where a "case had been pending in federal court for over a year" and there were "no factual disputes between the parties and that they have fully briefed the merits," the Fifth Circuit noted the plaintiff would be "forced into the wasteful prospect of commencing the declaratory judgment process anew" following dismissal and thus found that "judicial economy strongly favors the court's completion of the task that was well under way." *Agora Syndicate, Inc. v. Robinson Janitorial Specialists, Inc.*, 149 F.3d 371, 373–74 (5th Cir. 1998). Here, the litigation has stretched out even longer and proceeded to an even more advanced stage. If judicial economy favored issuance in those circumstances, it certainly favors granting declaratory relief in the current case.

### III.    The Final Rule's forbearance provisions are independently unlawful.

The forbearance provisions in the Final Rule represent an executive overreach that contravenes the Immigration and Nationality Act's clear mandate for the removal of certain aliens by creating a classwide exemption from removal without congressional authorization. Rulings by this Court and the Fifth Circuit have deemed this aspect of the earlier DACA Memorandum unlawful, and subsequent decisions on this aspect of the Final Rule merely addressed severability without revisiting whether the forbearance is lawful on its own. Moreover, these provisions violate the Take Care Clause by suspending enforcement of immigration statutes on a programmatic basis rather than through case-by-case discretion, abdicating the Executive's duty to faithfully execute the immigration statutes. The Court should therefore declare the forbearance provisions of the Final Rule unlawful, vacate them under the APA, and issue declaratory relief to Texas and all other Plaintiff States to foreclose the potential for future evasions.

### A.    Both this Court and the Fifth Circuit ruled the forbearance provisions unlawful, and nothing in subsequent rulings undermines that result.

After the Fifth Circuit's latest decision in this case, counsel for the DACA recipient Private Intervenors publicly stated that "[t]he decision upheld the part of DACA that protects DACA recipients from deportation" and that ruling "decided that 'forbearance from removal' is lawful, and can be preserved as part of DACA."[7] The Fifth Circuit did no such thing. As with this Court's 2023 ruling, the Court of Appeals did not address the legality of the forbearance provisions[8] of the DACA program. Instead, both this Court and the Fifth Circuit only addressed whether the forbearance provisions were severable from the program's other provisions that were determined

---

[7]    https://www.maldef.org/2025/03/summary-and-practical-effects-of-the-fifth-circuit-decision-in-the-daca-case/.

[8] The various courts and the parties addressing DACA use "forbearance" and "deferred action" interchangeably. The Final Rule defines "deferred action" as a "temporary forbearance from removal." AR2022_100341, 87 Fed. Reg. 53,298; *see also id.* at AR2022_100198, 87 Fed. Reg. 53,155 ("*Deferred Action.* The proposed rule provided a definition of deferred action as a temporary forbearance from removal . . ."). "The defining feature of deferred action is the decision to defer removal (and to notify the affected alien of that decision)." *Regents*, 591 U.S. at 27.

to be unlawful—the work authorization and lawful presence portions of the Final Rule. *See DACA 5th Cir. 2025*, 126 F.4th at 419–20 (reversing this Court's determination that forbearance was not severable from lawful presence and work authorization provisions but—just as this Court did in the ruling under review—not addressing the independent illegality of the forbearance provisions); *DACA SDTX 2023*, 691 F. Supp. 3d at 789–94 (finding forbearance to be inseverable from the lawful presence and work authorization provisions).

Of course, the 2025 Fifth Circuit panel had no power to find the forbearance provisions lawful even if it had wanted. The rule of orderliness prevents one panel from overruling a previous panel. *See DACA 5th Cir. 2025*, 126 F.4th at 406 ("Under the rule of orderliness, we are bound to follow that holding [of the earlier 2022 panel] absent an intervening change in the law.") (citation omitted). The panel thus concluded that "[b]ecause the Final Rule is materially identical to the 2012 [DACA] Memorandum [examined by the 2022 panel], the Final Rule [also] substantively violates the INA" and "[t]he government's arguments to the contrary, as it readily acknowledges, are foreclosed." *Id.* at 417 (citing *DACA 5th Cir. 2022*, 50 F.4th at 526, where it states: "We agree with the district court's reasoning and its conclusions that the DACA Memorandum contravenes comprehensive statutory schemes for removal, allocation of lawful presence, and allocation of work authorization.").

Indeed, the earlier Fifth Circuit panel in 2022 had unmistakably held the forbearance provisions substantively unlawful. First, that panel explained the relief sought by Plaintiff States included that "aliens covered by that [DACA] Program . . . would be removable under the INA." *DACA 5th Cir. 2022*, 50 F.4th at 512. It then set forth the following:

> Throughout the Amended Complaint and briefing, the States contend that the special treatment afforded by the DACA Memorandum, not just the benefits conferred, have encouraged those eligible for DACA to remain in this country. A key component for obtaining relief, the States say, is that at least some DACA recipients would be motivated to leave the States if the DACA program is ended. Deferring removal for DACA recipients, that is, special treatment under the immigration laws governing removal, is an integral part of the causation of the States' injuries, according to their Amended Complaint and briefing. For example, the States assert in the Appellees' Brief in our court that "[t]he district court's

injunction redresses the States' injuries because many of those aliens would and will return to their countries of origin without DACA."

In sum, the States seek an end to the DACA program in its entirety at some point in the future. They seek to end both forbearance of removal and the conferral of benefits to existing DACA recipients as existing permits expire. The States make clear in their filings and briefing that once the DACA program has ended, former DACA recipients should be removable on the same basis as any other similarly situated illegal alien.

*Id.* at 513.

In addressing standing, the 2022 Fifth Circuit panel noted that "[t]hose presently subject to DACA would be removable if the DACA program were ended, providing incentives for some if not many to leave the United States, including Texas" so "Texas has established that rescinding DACA would redress its harm." *Id.* at 520. And on the merits, the 2022 panel "agree[d] with the district court's reasoning and its conclusions that the DACA Memorandum contravenes comprehensive statutory schemes for removal." *Id.* at 526. This Court's conclusions that were affirmed were that the forbearance provisions were substantively unlawful since "[a]n award of deferred action is not a subject for prosecutorial discretion" because "[w]hile Congress has allowed the Executive Branch to create regulations and to selectively grant deferred action in some specific instances, it has reserved for itself the broad authority to regulate immigration." *DACA SDTX 2021*, 549 F. Supp. 3d at 606 (cleaned up). The forbearance provisions were unlawful because "all DACA applicants and recipients fall into a category for removal regardless of their mode of entry" and the DACA program "prevents immigration officials from enforcing these provisions of the INA"—"[i]n other words, DACA prevents the removal of its recipients, despite Congress having dictated their eligibility for removal." *Id.* at 608. The forbearance provisions therefore violated "Congress's clear articulation of laws for removal." *Id.* at 614.

This is why the 2022 Fifth Circuit panel had no need to evaluate the severability of the aspects of the DACA Memorandum—as all aspects of the DACA program were substantively unlawful, a consideration of severability never entered the picture. *See Cornerstone Credit Union League v. Consumer Fin. Prot. Bureau*, —F.Supp.3d—, 2025 WL 1920148, at *13–14 (E.D. Tex.

July 11, 2025) (Jordan, J.) ("the Court need not engage in severability analysis when it has concluded that each of the Medical Debt Rule's substantive provisions is unlawful."). The entire 2012 DACA Memorandum was vacated and its implementation enjoined, even though "[t]he three-page memorandum that established DACA is devoted entirely to forbearance, save for one sentence directing USCIS to 'determine whether [DACA recipients] qualify for work authorization.'" *Regents*, 591 U.S. at 29 n.6. "[F]orbearance was not simply within the ambit of the [DACA] policy, it was the centerpiece of the policy: DACA, after all, stands for '*Deferred Action for Childhood Arrivals.*'" *Id.* at 30.

In the summary-judgment briefing in 2023, Plaintiff States repeatedly emphasized that the Court need not address severability because each of the three provisions of the Final Rule—forbearance, lawful presence, and work authorization—were independently unlawful. ECF No. 625-1 at 21–22 (discussing illegality of forbearance provisions of the Final Rule); ECF No. 673 at 36 (recognizing that "even if this Court finds that the Final Rule is severable, it should still vacate and enjoin it in its entirety because each provision is independently unlawful") (citing, *inter alia*, ECF No. 625-1 at 10–25,[9] and *DACA 5th Cir. 2022*, 50 F.4th at 521–31); ECF No. 673 at 37 (stating "the DACA program—whether in its original form of the DACA Memorandum or the substantively identical Final Rule—is contrary to the INA's provisions on eligibility for removal, lawful presence, work authorization, and limitations on advance parole") (cleaned up). Because it found the forbearance provisions inseverable from the other two provisions of the Final Rule it had already found unlawful, this Court had no need to address the legality of the forbearance provisions independently despite having done so in its earlier 2021 ruling on the DACA Memorandum.

At least three members of the Supreme Court agree. Although the majority opinion in *Regents* did not address whether a stand-alone forbearance policy would be substantively lawful, Justice Thomas's opinion (joined by Justices Alito and Gorsuch) concurring in the judgment in part and dissenting in part did. That opinion explained why the forbearance provisions are

---

[9] This cite is to the page numbers in the footer of the cited document.

independently contrary to law. "DACA in effect created a new exception to the statutory provisions governing removability and, in the process, conferred lawful presence on an entire class of aliens." *Regents*, 591 U.S. at 45–46. "DHS needed a grant of authority from Congress . . . to exempt the entire class of aliens covered by DACA from statutory removal procedures,"—but "Congress has not authorized DHS to reclassify an entire class of removable aliens as lawfully present or to categorically exempt aliens from statutory removal provisions." *Id.* at 46. "DACA is substantively unlawful" because "DHS has no implicit discretion to . . . grant relief from removal out of whole cloth." *Id.*

Further substantiating its conclusions that DACA forbearance is unlawful, the Thomas opinion noted that "Congress clearly knows how to provide for classwide deferred action when it wishes to do so"—indeed, "[o]n multiple occasions, Congress has used express language to make certain classes of individuals eligible for deferred action." *Id.* at 49. "Congress has failed to provide similar explicit provisions for DACA recipients, and the immigration laws contain no indication that DHS can, at will, create its own categorical policies for deferred action." *Id.* at 50. Further, "[o]ther provisions pertaining to relief from removal further demonstrate that DHS lacked the delegated authority to create DACA." *Id.* "Congress has provided for relief from removal in specific and complex ways" and "[t]his nuanced detail indicates that Congress has provided the full panoply of methods it thinks should be available for an alien to seek relief from removal, leaving no discretion to DHS to provide additional programmatic forms of relief." *Id.* at 50–51. "Read together, the detailed statutory provisions governing temporary and lawful permanent resident status, relief from removal, and classwide deferred-action programs lead ineluctably to the conclusion that DACA is inconsistent with the design and structure of the statute as a whole." *Id.* at 52 (cleaned up).

While "[i]t is uncontested that deferred action frequently occurs on a case-by-case basis, often justified on the grounds that the agency lacks resources to remove all removable aliens," a classwide deferred action for aliens not included by statute is unlawful, "[e]ven assuming that these ad hoc exercises of discretion are permissible," because "'[a]n agency confronting resource

constraints may change its own conduct, but it cannot change the law.'" *Id.* at 51 n.7 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014)). The DACA program "contravened statutory limits" when "[i]t created a new category of aliens who, as a class, became exempt from statutory removal procedures." *Id.* at 54.

Moreover, forbearance from removal does not equate to mere nonenforcement from which the Plaintiff States have no judicially cognizable injury, per *United States v. Texas (Immigration Priorities)*, 599 U.S. 670 (2023). The DACA program is unlike the guidance in *Immigration Priorities* that implemented enforcement discretion concerning which illegal aliens were prioritized for arrest and removal. Here, Texas's injuries are not based on a mere failure to arrest particular DACA-eligible aliens.[10] Instead, a grant of deferred action constitutes "affirmative immigration relief":

> DACA is not simply a non-enforcement policy. For starters, the DACA Memorandum did not merely "refus[e] to institute proceedings" against a particular entity or even a particular class. [*Heckler v. Chaney*, 470 U.S. 821, 832 (1985)]. Instead, it directed USCIS to "establish a clear and efficient process" for identifying individuals who met the enumerated criteria. Based on this directive, USCIS solicited applications from eligible aliens, instituted a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance. These proceedings are effectively "adjudicat[ions]." *Id.*, at 117a. And the result of these adjudications—DHS's decision to "grant deferred action"—is an "affirmative act of approval," the very opposite of a "refus[al] to act," *Chaney*, 470 U.S. at 831–832. In short, the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief. The creation of that program—and its rescission—is an "action [that] provides a focus for judicial review." *Id.*, at 832.

*Regents*, 591 U.S. at 18 (citations truncated).

---

[10] As the Fifth Circuit noted, this Court's "judgment does not require the removal of any DACA applicant. It bears repeating: the district court's judgment does not require DHS to remove anyone." *DACA 5th Cir. 2022*, 50 F.4th at 529; *see also DACA SDTX 2023*, 691 F. Supp. 3d at 796 ("To be clear, neither this order nor the accompanying supplemental injunction requires the DHS or the Department of Justice to take any immigration, deportation, or criminal action against any DACA recipient, applicant, or any other individual that would otherwise not be taken."); *Texas*, 2023 WL 595080, at *1 (same); *DACA SDTX*, 549 F. Supp. 3d at 624 (same with regard to original injunction). Even the Final Rule recognizes that "DACA recipients would be at very low priority for removal even absent DACA," AR2022_100340, 87 Fed. Reg. 53,297, and no relief against the forbearance provisions would change that.

DACA's "affirmative immigration relief" includes the grant of deferred action—categorical forbearance from removal—all by itself, with eligibility for benefits only providing "*further* confirmation that DACA is more than simply a non-enforcement policy." *Id.* (emphasis added); *see also DACA 5th Cir. 2022*, 50 F.4th at 523 ("The two-year forbearance grant is 'an affirmative act of approval.'") (quoting *Regents*, 591 U.S. at 18).

Further, the 2025 Fifth Circuit panel rejected the argument that *Immigration Priorities* had any effect on the challenge to DACA here:

> *Immigration Priorities* is [] an odd rock on which to build a theory that it worked a sufficiently fundamental change in standing doctrine to overcome our rule of orderliness [because] the Court explicitly noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. The Court then cited two cases as examples: *Regents* (noting that "benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was more than simply a non-enforcement policy") and *Texas I* [*DAPA 5th Cir.*] (noting that "*Linda R.S.* concerned only non-prosecution, which is distinct from both non-prosecution and the conferral of benefits"). . . .
>
> The upshot is that even if *Immigration Priorities* is "illuminating with respect to the case before the court," it can hardly be read to "unequivocally overrule prior precedent." The holdings in *Regents* and *Texas I* were explicitly preserved, combined with "the longstanding jurisprudential status quo" and "the Federal Judiciary's traditional role in separation of powers cases."

*DACA 5th Cir. 2025*, 126 F.4th at 409 (citations omitted).

"[I]n *Immigration Priorities*, the Court explicitly preserved Fifth Circuit precedent," *id.*, which would include the 2022 Fifth Circuit panel ruling upholding Texas' standing to challenge the DACA program, including the forbearance provisions that it found unlawful.

Even more clearly did the 2025 Fifth Circuit panel uphold courts' jurisdiction to entertain challenges to the legality of the forbearance provisions when it reached the merits of whether those portions were severable from the benefits provisions. If Plaintiff States lacked standing to challenge the forbearance provisions, the Fifth Circuit would not have had jurisdiction to reach that merits issue because "'plaintiffs must establish standing for each and every provision they challenge.'"

*La Union Del Pueblo Entero v. Abbott*, —F.4th—, No. 24-50826, 2025 WL 2489464, at *4 (5th Cir. Aug. 29, 2025) (Duncan, J., joined by Smith, J.) (quoting *In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019)).

The 2025 Fifth Circuit panel did not question this Court's power to reach the issue of whether the forbearance provisions unlawful because they were inseverable form the benefits provisions, and the panel reached the merits of that issue and reversed that determination without attempting to distinguish standing to challenge the forbearance provisions apart from the benefits provisions. As "the mandate rule, a corollary of the law of the case doctrine, compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or *impliedly* decided by the appellate court," *Fisher v. Univ. of Tex. at Austin*, 758 F.3d 633, 639–40 (5th Cir. 2014) (emphasis added), *aff'd*, 579 U.S. 365 (2016), this Court is bound by 2025 Fifth Circuit panel's implicit determination that standing existed to challenge the forbearance provisions.

While this Court did not have to reach the legality of the forbearance provisions in the Final Rule in the last round of litigation (because it found it inseverable from the unlawful benefits provisions), the Fifth Circuit's order that forbearance is severable means its legality must be addressed on its own merits now. But this is an easy task, as this Court stands as Ulysses at the mast, bound by the law-of-the-case determinations from its own prior rulings and those of the 2022 Fifth Circuit panel that forbearance from removal (*i.e.*, deferred action) in the DACA Memorandum were unlawful.

### B.  The forbearance provisions are also unlawful under the Take Care Clause.

Since our Founding, "both courts and the executive branch itself have recognized the president's inability to suspend or dispense with the law." *Texas v. Biden* (*MPP*), 20 F.4th 928, 981 (5th Cir. 2021), *rev'd on other grounds*, 597 U.S. 785 (2022). "The Framers agreed that the executive should have neither suspending nor dispensing powers." *Id.* at 980. The Supreme Court has held likewise: "[t]o contend that the obligation imposed on the President to see the laws

faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution, and entirely inadmissible." *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838). Any other conclusion would "vest[] in the President a dispensing power." *Id.*

Drawing from the DACA Memorandum, the Final Rule contravenes the Take Care Clause by brazenly ignoring relevant immigration statutes and sanctioning as lawful that which Congress has deemed unlawful. U.S. Const. art. II, § 3 ("[The president] shall take Care that the Laws be faithfully executed …"). Justice Scalia promptly identified the fundamental problem with such a policy, describing the DACA program in particular as involving "biennial requests for *dispensation*" from immigration statutes. *Arizona v. United States*, 567 U.S. 387, 435 (2012) (Scalia, J., concurring in part and dissenting in part) (emphasis added); *cf. Kendall*, 37 U.S. at 613 (condemning "a dispensing power").

Federal Defendants advanced the argument in earlier briefing that the Take Care Clause, being "addressed to the President," cannot form the basis of suit under the APA, which applies only to subordinate executive agencies. ECF No. 639 at 23; *see also* ECF No. 642 at 49 (Private Intervenors asserting that "courts that have assessed the Take Care Clause have held that it does not create a private right of action") (citing *Las Americas Immigr. Advoc. Ctr. v. Biden*, 571 F. Supp. 3d 1173, 1180 (D. Or. 2021)). But attempts to limit the Take Care Clause's application only to the President are illogical and unworkable, as the President's subordinate officials necessarily exercise his power in carrying out executive functions:

> Under our Constitution, the "executive Power"—all of it—is "vested in a President," who must "take Care that the Laws be faithfully executed." Art. II, § 1, cl. 1; *id.*, § 3. Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance.

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203–04 (2020). The President may not shirk his duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, by delegating power to subordinates. Because "it would be impossible for one man to perform all the great business of the State," *Seila Law*, 591 U.S. at 213 (quotations omitted), "the Constitution

assumes that lesser executive officers will assist the supreme Magistrate in discharging the duties of his trust," *id.* (quotations omitted). But "[t]hese lesser executive officers must remain accountable to the President, whose authority they wield." *Id.*; *see also Franklin v. Massachusetts*, 505 U.S. 788, 828–29 (1992) (Scalia, J., concurring in part and concurring in the judgment) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive . . .").

Contrary to Private Intervenors' understanding in the earlier summary-judgment briefing, ECF No. 642 at 49, Plaintiff States are not basing their Take Care Clause claim on an implied cause of action arising from that constitutional provision itself. Plaintiff States instead invoke and rely upon an explicit cause of action under the APA, which provides that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret *constitutional* and statutory provisions, and determine the meaning or applicability of the terms of an agency action," 5 U.S.C. § 706 (emphasis added), and requires that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be" "contrary to constitutional right, power, privilege, or immunity," *id.* at § 706(2)(B).

In the earlier briefing, Federal Defendants also relied on *Dalton v. Specter* for the proposition that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." ECF No. 639 at 23 (citing 511 U.S. 462, 473 (1994)). But "*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1331 (D.C. Cir. 1996). As this Court and the Fifth Circuit have held, the INA does not entrust to the executive any authority to decide whether the DACA population is removable. *See DACA SDTX 2021*, 549 F. Supp. 3d at 614 ("Congress's clear articulation of laws for removal . . . illustrates a manifest intent to reserve for itself the authority to determine the framework of the [N]ation's immigration system."); *DACA 5th Cir. 2022*, 50 F.4th at 526 (concluding that "the DACA Memorandum contravenes comprehensive statutory schemes for

removal, allocation of lawful presence, and allocation of work authorization"). And while "[t]he *Dalton* Court made clear that not every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution, [it] by no means found that action in excess of statutory authority can never violate the Constitution or give rise to a constitutional claim." *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 258 (S.D.N.Y. 2020) (citations and internal quotation marks omitted).

Plaintiff States' claim here is not "that the President simply did not fully comply with a congressionally prescribed process"—such as failure to undergo notice-and-comment rulemaking—but "that the President's actions affirmatively displaced a congressional mandate[.]" *Id.*; *see also DACA 5th Cir. 2022*, 50 F.4th at 524–28 (finding that the DACA Memorandum is "foreclosed by Congress's careful plan" and "manifestly contrary to the statute"); *id.* at 511 ("Congress's clear articulation of laws for removal, lawful presence, and work authorization illustrates a manifest intent to reserve for itself the authority to determine the framework of the [N]ation's immigration system.") (quoting *DACA SDTX 2021*, 549 F. Supp. 3d at 614). The Final Rule therefore implicates "constitutional separation of powers concerns not present in *Dalton*" and should be "appropriately considered as [a] constitutional claim[] subject to judicial review." *Make the Rd. N.Y.*, 475 F. Supp. 3d at 258–59.

Defendants have also argued that the Final Rule cannot violate the Take Care Clause because it is an exercise of prosecutorial discretion. ECF No. 639 at 24; ECF No. 642 at 50. But the Final Rule is a "rule" under the APA, defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." *MPP*, 20 F.4th at 982–83 (quoting 5 U.S.C. § 551(4)). This is "in contrast with an 'order,'" which is defined as "'the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing.'" *Id.* at 983 (quoting 5 U.S.C. § 551(6)).

Though individual enforcement actions—"orders"—fall within the ambit of prosecutorial discretion, attempts to use "rules" to evade statutory enforcement are instead dispensations prohibited by the Take Care Clause. *MPP*, 20 F.4th at 983–85. While "the executive [is] free to leave the law unenforced in *particular instances* and at *particular moments* in time," that constitutional provision "explicitly forbade the executive from nullifying whole statutes by refusing to enforce them on a *generalized and prospective* basis." *Id.* at 983 (emphases in original). An agency is not permitted "to modify unambiguous requirements imposed by federal statute [and,] . . . were [courts] to recognize [such] authority[,] . . . [they] would deal a severe blow" to the Take Care Clause. *Util. Air Regul. Grp*, 573 U.S. at 326–27 (citing U.S. Const. Art. II, § 3).

This Court has previously declined to review Plaintiff States' Take Care Clause claim because "there is still a dearth of precedent on the Take Care Clause," and "the Court has made a full disposition of this case without addressing the constitutional claim, [so] it need not address this issue." *DACA SDTX 2021*, 549 F. Supp. 3d at 622. But neither of those reasons for declining to reach the Take Care Clause claim remains.

First, after this Court expressed its reluctance to reach the constitutional claim, the Fifth Circuit published a unanimous opinion authored by Judge Oldham that thoroughly evaluated the Take Care Clause's requirements. *See MPP*, 20 F.4th at 978–88. Like the instant case, that opinion featured a claim of enforcement discretion in the immigration context, rendering it squarely on point for this challenge to DACA. *Id.*

Second, the Fifth Circuit's recent decision severing forbearance from the Final Rule's other provisions has reversed this Court's earlier "full disposition of this case without addressing the constitutional claim." *DACA SDTX 2021*, 549 F. Supp. 3d at 622. With DACA's core now left untouched, the constitutional claim must be addressed where it remains most relevant: the forbearance provisions that, by creating "biennial requests for dispensation" from immigration statutes, *Arizona*, 567 U.S. at 435 (Scalia, J., concurring in part and dissenting in part) (specifically describing DACA), defy "Congress's clear articulation of laws for removal," *DACA SDTX 2021*, 549 F. Supp. 3d at 614; *see also id.* at 608 (noting that "all DACA applicants and recipients fall into

a category for removal regardless of their mode of entry, [but] [t]he DACA Memorandum prevents immigration officials from enforcing these provisions of the INA[;] . . . [i]n other words, DACA prevents the removal of its recipients, despite Congress having dictated their eligibility for removal"); *DACA 5th Cir. 2022*, 50 F.4th at 526 ("We agree with the district court's reasoning and its conclusions that the DACA Memorandum contravenes comprehensive statutory schemes for removal[.]").

This Court has consistently described the Federal Defendants' DAPA and DACA programs as "a total abdication and surrender of the Government's statutory responsibilities." *DAPA SDTX*, 86 F. Supp. 3d at 641. The Supreme Court explained that where "the Executive has entirely ceased enforcing the relevant statutes," *Immigration Priorities,* 599 U.S. at 683, "a plaintiff arguably could obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities,'" *id.* at 682–83 (citing *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)). And a claim under the Take Care Clause properly raises an abdication argument. *Id.* at 689 (Gorsuch, J., concurring). While deferring judgment on Plaintiff States' claim under the Take Care Clause, this Court's most recent opinion acknowledged that "Plaintiff States have clearly raised that very issue in this case." *DACA SDTX* 2023, 691 F. Supp. 3d at 780. And the Supreme Court not long ago took the initiative to order the parties in the DAPA case to brief the question whether that policy "violate[d] the Take Care Clause of the Constitution." *United States v. Texas*, 577 U.S. 1101 (2016) (granting certiorari).[11] With the same question now ripe for decision, this Court should rule on the Plaintiff States' Take Care Clause claim.

---

[11] In the DAPA litigation, the Supreme Court granted Federal Defendants' petition for certiorari that presented three questions for review:

1. Whether a State that voluntarily provides a subsidy to all aliens with deferred action has Article III standing and a justiciable cause of action under the Administrative Procedure Act (APA), 5 U.S.C. 500 *et seq.,* to challenge the Guidance because it will lead to more aliens having deferred action.

2. Whether the Guidance is arbitrary and capricious or otherwise not in accordance with law.

**C. A declaratory judgment that the forbearance provisions are unlawful is not unnecessarily duplicative of vacatur.**

As explained *infra*, this Court should "set aside"—*i.e.*, vacate—the forbearance provisions under the APA. However, Plaintiff States note that "[a] declaratory judgment is not precluded by the availability of vacatur." *Texas v. DHS*, 756 F. Supp. 3d at 360 (Barker, J.). Indeed, the APA expressly contemplates declaratory relief. *See* 5 U.S.C. § 703. And the "rules [that] govern the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201" also confirm that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. Thus, courts commonly award both forms of relief. *See, e.g.*, *Tennessee v. Cardona*, 762 F. Supp. 3d 615, 628 (E.D. Ky. 2025) (Reeves, C.J.) (holding that "[v]acatur of the Final Rule effectively moots the plaintiffs' request for permanent injunctive relief" but that the "requested declaratory relief is substantially consistent with the Court's decision and will be granted"); *Texas v. Cardona*, 743 F. Supp. 3d 824, 894 (N.D. Tex. 2024) (O'Connor, J.) (issuing a declaratory judgment "[a]s a result" of Texas having successfully established an APA violation despite the court also issuing vacatur); *Skyworks, Ltd. v. Centers for Disease Control & Prevention*, 542 F. Supp. 3d 719, 736 (N.D. Ohio 2021) (holding "the Administrative Procedure Act does not preclude declaratory relief"). Given the long history of the Federal Defendants implementing measures similar to the Final Rule—including the DACA Memorandum and the DAPA program—declaratory relief in addition to vacatur is especially appropriate in this instance. *See Texas v. Cardona*, 743 F. Supp. 3d at 897 (finding relief in addition

---

3. Whether the Guidance was subject to the APA's notice-and-comment procedures.

*Pet. for Writ of Cert., United States of America v. State of Texas*, 2015 WL 7308179 (U.S.). The Court then added one question on its own initiative: "Whether the Guidance violates the Take Care Clause of the Constitution, Art. II, § 3." *United States v. Texas*, 577 U.S. 1101 (2016) (Mem.). The *Immigration Priorities* majority's approval of standing based on abdication continues the Supreme Court's interest in this area. Plaintiff States do not believe this Court is limited to relying on the abdication rationale only if it rules in their favor on the Take Care Clause claim, and the analysis would be similar either way.

to vacatur was necessary "[g]iven that the Department has enacted similar guidance in the past and may attempt to do so again as an end-run to the Court's relief").

## IV.    The Final Rule should be universally vacated.

Plaintiff States specifically pled that the Final Rule "should be vacated" and "set aside." ECF No. 623 at ¶¶ 14, 153. They averred that all provisions of the Final Rule violate the substantive requirements of the APA. *Id.* at ¶¶ 12, 73. Focusing on its work authorization provisions, Plaintiff States further alleged that the Final Rule was arbitrary and capricious. *Id.* at ¶¶ 88–99. Accordingly, they sought "[a]n order vacating the Final Rule as substantively unlawful and unconstitutional, and arbitrary and capricious under the APA." *Id.* at 42. Plaintiff States continued to press these claims in their motion for summary judgment, ECF No. 625-1 at 29–33, 44–45. This Court found the Final Rule substantively unlawful and universally vacated it but chose not to address the Plaintiff States' arbitrary-and-capricious claim. *DACA SDTX 2023*, 691 F. Supp. 3d at 796 ("The existing injunction and vacatur order are supplemented to include the Final Rule."); *see also id.* at 782 n.44 ("Thus, the Final Rule is flawed for the same substantive reasons as the 2012 DACA Memorandum.").

On appeal, the Fifth Circuit recognized that its own binding precedent foreclosed any argument "that the APA does not authorize vacatur of agency action" and agreed that "DACA's critical substantive failings" made remand without vacatur inappropriate. *DACA 5th Cir. 2025*, 126 F.4th at 418–19. However, that court then narrowed the scope of relief in two important ways. First, the 2025 Fifth Circuit panel "sever[ed] the Rule's forbearance provisions from the work authorization provisions and vacat[ed] only the latter." *Id.* at 419. Second, it limited the scope of a *different* remedy—the injunction—to Texas only. *Id.* at 420–21. Finally, in summarizing the narrowed relief to be afforded, the Fifth Circuit conflated vacatur with injunctive relief by "limit[ing] injunctive relief, including the effectiveness of the vacatur of the Final Rule, to Texas." *Id.* at 422. This passing reference to party-specific vacatur is insufficient to overrule the Fifth Circuit's longstanding precedent on universal vacatur, and in any event Plaintiff States expect any

controversy on this point to be resolved by the en banc Fifth Circuit soon. *See Tex. Med. Ass'n v. United States Dep't of Health & Human Services*, 138 F.4th 961, 963 (5th Cir. 2025) (granting en banc review to consider whether the district court erred in entering a universal vacatur); *see also Tex. Med. Ass'n v. United States Dep't of Health & Human Services*, No. 23-40605, ECF No. 212 (calendaring case for en banc argument for September 24, 2025). In the interim, the geographically limited vacatur apparently granted by the Fifth Circuit in this instance only implicates Plaintiff States' claim that the benefits provisions are substantively unlawful, leaving ample alternative bases for this Court to apply universal vacatur as required by Fifth Circuit precedent.

### A. The forbearance provisions should be universally vacated as substantively unlawful.

Nothing in the Fifth Circuit's decision forecloses this Court from universally vacating the forbearance provisions upon finding them independently unlawful. Indeed, the APA speaks to this result with unmistakable clarity: A reviewing court "shall . . . set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The text is plain and imperative: When a court determines that an administrative rule is unlawful, it must vacate the rule universally. *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 839 (2024) (Kavanaugh, J., concurring) (stating that "the ordinary meaning of 'set aside' in § 706(2) has long been understood to refer to the remedy of vacatur"). As set forth below, text, history, and judicial practice converge to clearly demonstrate that "set aside" means vacate—not optionally, not conditionally, but as the default cure for APA violations.

The APA's "set aside" language bore a settled meaning at the time of its enactment: to cancel, annul, or render void. BLACK'S LAW DICTIONARY 1537 (4th ed. 1951) (defining "set aside" to mean "to cancel, annul, or revoke"); BOUVIER'S LAW DICTIONARY 1103 (W. Baldwin ed. 1926) ("To annul; to make void; as, to set aside an award"). Nor did Congress invent the phrase from whole cloth; it borrowed from pre-APA statutes and judicial precedents, where "set aside" routinely authorized outright vacatur of agency decisions. *See, e.g.*, *United States v. Balt. & Ohio*

*R.R. Co.*, 293 U.S. 454, 463-64 (1935) (stating that the lower court's order "setting aside" railroad regulation "renders it void"); *Nat'l Broad. Co. v. United States (NBC)*, 44 F. Supp. 688, 690 (S.D.N.Y. 1942) (Hand, J.) (describing the actions at bar "to declare invalid and set aside certain regulations"), *rev'd* 316 U.S. 447 (1942). Following the APA's passage, courts immediately grasped this without hesitation, promptly vacating unlawful agency actions. *Cream Wipt Food Prods. Co. v. Fed. Sec. Adm'r*, 187 F.2d 789, 790 (3d Cir. 1951) (explaining that "the Administrative Procedure Act affirmatively provides for vacation of agency action"); *cf. Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (holding that an administrative "order may not stand if the agency has misconceived the law").

Statutory context fortifies this interpretation. Subsection 706(2) pairs with subsection 706(1), which directs courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). These provisions are complementary: one redresses inaction by mandating performance of clear duties, while the other targets the wrongful exercise of authority by nullifying improper actions. Thus, "compel" operates on officials to enforce action. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."); *Fort Bend Cnty. v. United States Army Corps of Engineers*, 59 F.4th 180, 197 (5th Cir. 2023) ("A court's authority to compel agency action is limited to instances where an agency ignored 'a specific, unequivocal command' in a federal statute or binding regulation." (quoting *Norton*, 542 U.S. at 63)).

Conversely, "set aside" acts directly on the decision itself—the relevant "agency action, findings, and conclusions"—depriving it of legal force. *Corner Post*, 603 U.S. at 838 (Kavanaugh, J., concurring) ("'Unlike judicial review of statutes, in which courts enter judgments and decrees only against litigants, the APA' and related statutory review provisions 'go further by empowering the judiciary to act directly against the challenged agency action.'" (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012 (2018))).

Precedent aligns seamlessly. For decades, courts have treated vacatur as the routine consequence of invalidating regulations. In the Fifth Circuit and beyond, vacatur is the "default" and "ordinary" remedy for a successful APA challenge. *Tex. Corn Producers v. United States Envtl. Prot. Agency*, 141 F.4th 687, 710 (5th Cir. 2025) ("The default rule is that vacatur is the appropriate remedy."); *see also Am. Sec. Ass'n, Citadel Sec. LLC v. U.S. Sec. & Exch. Comm'n*, 147 F.4th 1264, 1274 (11th Cir. 2025) ("Vacatur is the ordinary remedy for orders that violate the Administrative Procedure Act."); *Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025) ("Upon ultimate success in an Administrative Procedure Act challenge, the default remedy is to set aside or vacate the rule."). And the "rare" alternative to universal vacatur is not oxymoronic party-specific vacatur, but rather a remand without vacatur—a remedy which is wholly "inappropriate" where, as here, the challenged "agency action suffer[s] from one or more serious procedural or substantive deficiencies." *Chamber of Commerce of United States v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023); *see also Kentucky v. United States Envtl. Prot. Agency*, 123 F.4th 447, 473 (6th Cir. 2024) (observing that "courts treat vacatur as the default and remand without vacatur as the 'rare' remedy"). The Supreme Court has repeatedly upheld vacatur orders, acknowledging their universal reach without insisting on equitable tailoring or party-specific constraints. *See, e.g.*, *Regents*, 591 U.S. at 36, & n. 7; *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 486 (2001); *Board of Governors, FRS v. Dimension Financial Corp.*, 474 U.S. 361, 364–365 (1986). For example, the Court concluded in *Regents* that its "affirmance of the [] order vacating the recission makes it unnecessary to examine the propriety of the nationwide scope of the injunctions issued by the District Courts," 591 U.S. at 36 n.7, both recognizing the universal scope of vacatur (even specifically relating to DACA) and declining to require equitable considerations like party-specific tailoring.

Contrary to the 2025 Fifth Circuit panel's unconsidered aside, the APA forged a distinct path for judicial review of agency action that departs from traditional equity. *See Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024) ("[W]e do not read our precedent to require consideration of the various equities at stake before determining whether a party is entitled to vacatur."), *cert. granted sub nom. Xavier Becerra, Sec'y of Health & Human Services v. Braidwood*

*Mgmt., Inc.*, 145 S. Ct. 1038 (2025) and *cert. denied*, 145 S. Ct. 1053 (2025) and *rev'd on other grounds sub nom. Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427 (2025). Vacatur stands apart from injunctions, which bind *in personam* and command or restrain specific conduct prospectively. *Id.* at 951 ("[U]nlike an injunction, which operates *in personam*, vacatur operates on the status of agency action in the abstract."); *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021) (Sykes, C.J.) (explaining that "[a]n injunction operates on the enjoined officials" by preventing enforcement of "the challenged statute, regulation, or agency action in the future"). By contrast, vacatur renders a rule retroactively void without the court's exercise of coercive authority, thus offering less intrusive relief than an injunction. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (referring to vacatur a "less drastic remedy" than injunctive relief); *Driftless Area Land Conservancy*, 16 F.4th at 522 (explaining vacatur "retroactively undoes or expunges a past state action" and "unwinds the challenged agency action"). These fundamental differences imply what the Supreme Court recently made explicit: Limitations on a court's authority to issue universal injunctions pursuant to the Judiciary Act of 1789 are irrelevant to "the distinct question" of vacatur under the APA. *CASA*, 606 U.S. at 841 n.4, 847 n.10; *see also Braidwood*, 104 F.4th at 952 ("we do not understand vacatur to be a remedy familiar to courts sitting in equity, at least as this court currently conceptualizes it").

Finally, binding Fifth Circuit precedent forecloses party-specific vacatur. In *Braidwood*, the court stated unequivocally that "setting aside agency action under § 706 has nationwide effect, is not party-restricted, and affects persons in all judicial districts equally." *Braidwood*, 104 F.4th at 951 (internal quotation marks omitted). As a consequence, federal judges across Texas agree that "vacatur is universal in scope." *Purl v. United States Dep't of Health & Human Services*, —F. Supp. 3d—, No. 2:24-CV-228, 2025 WL 1708137, at *28 (N.D. Tex. June 18, 2025) (Kacsmaryk, J.); *see also, e.g.*, *Texas v. Centers for Medicare and Medicaid Services*, No. 6:23-cv-161, 2025 WL 2724375, at *12 (E.D. Tex. Sept. 24, 2025) (Kernodle, J.) (finding that Defendants' mere assertion "that any relief granted should be limited to Texas" "provides no reason to depart from the ordinary course" of universal vacatur, especially given that "[t]he Fifth Circuit has squarely rejected similar

40

arguments"); *Texas v. DHS*, 756 F. Supp. 3d at 359 (Barker, J.) (rejecting geographically limited vacatur because "[i]t is unclear exactly how that would work given the freedom to move between States in our Nation"); *Nat'l Ass'n for Gun Rights, Inc. v. Garland*, 741 F. Supp. 3d 568, 610 (N.D. Tex. 2024) (O'Connor, J.) ("By its very nature, a vacatur is universal in scope . . ."); *Texas v. United States Dep't of Transp.*, 726 F. Supp. 3d 695, 724 (N.D. Tex. 2024) (Hendrix, J.) ("[V]acatur is inherently universal." (quoting John Harrison, *Vacatur of Rules under the Administrative Procedure Act*, 40 Yale J. on Reg. Bull. 119, 120 (2023)). Victory in an APA challenge does not merely secure a personal exemption—the rule is invalidated outright. *Career Colleges & Sch. of Tex. v. United States Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)), *cert. granted in part sub nom. Dep't of Educ. v. Career Colleges & Sch. of Tex.*, 145 S. Ct. 1039 (2025).

### B. The benefits provisions should be universally vacated.

Universal vacatur need not be limited to the forbearance provisions. The Final Rule's work authorization provisions flatly contradict Congress's clear directive to protect American jobs from unlawful competition. Indeed, the provisions do not just miss the mark; they aim in the opposite direction, treating the employment of illegal aliens as a virtue while brushing aside the harm done to citizens with empty rhetoric rather than reasoned explanation. This folly is only compounded where DHS wholly ignores labor market distortions under Affordable Care Act, making DACA recipients artificially attractive to business interests in search of cheaper labor. Ultimately, DHS provides little more than a patchwork of post hoc excuses, all the while failing to grapple with relevant statutory exceptions or this Court's explicit warnings. Finally, if forbearance is invalidated—as it should be—any attempt to retain the newly isolated benefits provisions would render the entire framework unrecognizable. The remaining provisions cannot stand on their own—indeed, they were never intended to—and thus they too must be universally vacated.

###### 1.    The work authorization provisions are arbitrary and capricious.

The APA imposes a duty on courts to hold unlawful and set aside arbitrary and capricious agency actions. 5 U.S.C. § 706(2)(A). While a reviewing court must not "substitute" its "own policy for that of the agency" and must apply this standard deferentially, the agency action must still "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Courts "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quotation omitted). Arbitrary and capricious review "is not toothless." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself," not reasons developed *post hoc*. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Further, federal administrative agencies are required to engage in "reasoned decisionmaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quotation marks omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id*. The work authorization provisions of the Final Rule do not represent reasoned decisionmaking.

As the Supreme Court has recognized, "a primary purpose in restricting immigration is to preserve jobs for American workers." *INS v. Natl. Ctr. for Immigrants' Rights*, 502 U.S. 183, 194 (1991). The Final Rule instead repeatedly treats illegal aliens' participation in the U.S. workforce as a positive good. *See, e.g.*, AR2022_100207, 87 Fed. Reg. 53,164 ("DHS . . . agrees . . . that DACA has a positive impact on recipients' ability to pursue employment."); AR2022_100210, 87 Fed. Reg. 53,167 ("The net effect on employment of citizens is difficult to specify and might turn out to be positive. DHS believes that these investments that DACA recipients have made in their communities and in the country as a whole are substantial."); *id*. ("[T]he hiring of DACA workers might contribute to expansion in business activity and potentially in increased hiring of American workers."); AR2022_100213, 87 Fed. Reg. 53,170 ("DHS agrees members of the DACA

population carry substantial spending power, generate billions in tax revenue, and fill vital roles across a broad array of industries.").

It is well established that "because agency action must be based on non-arbitrary, relevant factors, the agency's approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (cleaned up). The Final Rule does not merely lack even a loose connection to Congress's purpose of preserving jobs for American workers: its reasoning is diametrically opposed to that purpose.

In earlier proceedings, this Court clearly articulated the importance of these concerns, explicitly recommending that the promised notice-and-comment process should consider "the effects of DACA on the unemployed or underemployed legal residents of the states." *DACA SDTX 2021*, 549 F. Supp. 3d at 623. But the Final Rule musters only scant lip service in response, offering a "dismissive analysis, which dots 'i's and crosses 't's without actually saying anything." *Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022) (per curiam). In its most recent ruling, this Court noted that the Final Rule reasoned that the data on the effects of the work authorization on American workers were both "unquantifiable" and "minimal"—"statements [that] are incompatible with each other and with other portions of the record." *DACA SDTX 2023*, 691 F. Supp. 3d at 784 n.52. Like the DAPA program that preceded it, the Final Rule "undermin[es] Congress's stated goal of closely guarding access to work authorization and preserving jobs for those lawfully in the country." *Texas v. United States* (*DAPA 5th Cir.*), 809 F.3d 134, 181 (5th Cir. 2015).

Nor is that the end of the Final Rule's impermissible rebalancing of the benefits and burdens established by Congress. It also demotes the interests of American workers in favor of businesses that wish to employee illegal aliens:

> DHS agrees that employers, including businesses and educational institutions, have relied upon the existence of the DACA policy over the course of 10 years and that restricting DACA to currently active recipients or ending the DACA policy altogether would harm the reliance interests identified by these commenters,

> including their reliance interests in the labor and spending contributions of DACA recipients. For those employers that hire DACA recipients with highly specialized skills and higher levels of education, if the DACA policy were to end, some of these employers could face challenges and higher costs in finding replacement labor for these highly specialized workers, assuming all else remains constant.

AR2022_100218, 87 Fed. Reg. 53,175. Privileging such interests in contravention of Congress's clear mandate only compounds the error, as a rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. And by granting DACA recipients benefits to which they are not entitled, the Final Rule places additional burdens on another group—legal immigrants—without congressional license. This again upsets the delicate balance sought by the people's elected representatives, for "as Congress [has] explained, '[a]liens who enter or remain in the United States in violation of our law are effectively taking immigration opportunities that might otherwise be extended to others.'" *Demore v. Kim*, 538 U.S. 510, 518 (2003) (quoting S. Rep. No. 104–249, p. 7 (1996)).

The Final Rule's support of the positive impact of illegal aliens participating in the workforce flatly contradicts Congress's "comprehensive framework for combating the employment of illegal aliens," which has "forcefully made combating the employment of illegal aliens central to the policy of immigration law." *Arizona*, 567 U.S. at 404 (cleaned up). This Court has twice examined the laws prohibiting employment of illegal aliens and the specific statutory exceptions to that general feature of immigration law. *See DACA SDTX 2021*, 549 F. Supp. 3d at 610–12; *DACA SDTX 2018*, 328 F. Supp. 3d at 716–18. Where Congress permits work authorization, it does so for limited categories of illegal aliens who—unlike DACA recipients— have been deemed non-removable for various reasons set forth by statute. *See DACA SDTX 2021*, 549 F. Supp. 3d at 610 & nn.48–49 (citing statutes setting forth various categories, including human-trafficking victims and asylum applicants). The Final Rule never addresses the existence of these specific, congressionally delineated categories, much less how DACA's work authorization can be squared with them—and this despite the Court's previous rulings on this issue in its treatment of the 2012 DACA Memorandum.

Defendants' early summary-judgment briefing fares no better, as they fundamentally misunderstand the issue by addressing only whether DHS adequately assessed the costs and benefits to American workers of granting work authorization to DACA recipients. ECF No. 639 at 24–25; ECF No. 642 at 47–49. Plaintiff States acknowledge the Final Rule's reliance on potential downstream effects to speculate that some American workers could be benefitted despite harms to those directly competing with DACA recipients. *See* AR2022_100210, 87 Fed. Reg. 53,167. The claim, however, is that Congress already balanced these interests and made its determination, and the agency is not licensed to second-guess it based on economic studies. ECF No. 625-1 at 24.

The Final Rule's interaction with the Affordable Care Act presents another obstacle Defendants have been unable to surmount. This Court has explained how the Affordable Care Act's minimum essential coverage requirement, 26 U.S.C. § 4980h, "exacerbates" the problem of "labor market distortion caused by DACA." *DACA SDTX 2021*, 549 F. Supp. 3d at 587. While "[a]n employer who offers coverage that does not provide minimum essential coverage will face a penalty if any of its employees purchases coverage on the insurance exchange and receives a premium subsidy," employers "may offer to DACA-recipient employees coverage that does not provide minimum essential coverage without risking a penalty." *Id.* The Final Rule never addresses how "[t]his facet of the ACA can make DACA recipients less costly to employ for some employers, thereby incentivizing employers to hire DACA recipients over similarly qualified legal Texas residents." *Id.*; *see also id.* at 612. Defendants' earlier briefing neglects this aspect of the claim as well, with no Defendant even attempting to rebut the point that DHS failed to consider whether the Affordable Care Act's minimal essential coverage requirements make DACA recipients cheaper to hire than American workers. ECF No. 625-1 at 23–25. The refusal to grapple with these issues is all the more surprising because they were raised by the Court before the Final Rule was promulgated. *See DACA SDTX 2021*, 549 F. Supp. 3d at 587. If an agency action "was not the product of reasoned decisionmaking" when an agency failed to address legal issues raised *in a complaint* in related litigation—as the Fifth Circuit has held, *see MPP*, 20 F.4th at 992–93— failure to address an important issue raised *in this Court's opinion* is at least as irrational.

Perhaps sensing the weakness of the Final Rule's reasoning in this area, the Federal Defendants' prior briefing resorted to arguing that Plaintiff States forfeited their challenge to the rule's arbitrary and capricious nature by failing to raise it during rulemaking. ECF No. 639 at 26. However, the Fifth Circuit has clarified the conflicting precedent in this area, foreclosing Defendants' argument and rejecting the precedential value of the case they cited in support:

> EPA claims that petitioners have waived this deferral argument by failing to raise it during the notice-and-comment period. That argument is foreclosed by our precedent. *See Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 295 (5th Cir. 1998) ("EPA has failed to identify any provision in the CWA that suggests a party's failure to comment waives its right to seek judicial review.") (citing *City of Seabrook v. EPA*, 659 F.2d 1349, 1360 n.17 (5th Cir. 1981)). Our waiver precedents in this area are admittedly in conflict. *See BCCA Appeal Grp.*, 355 F.3d at 829 (acknowledging conflict); *Tex. Oil & Gas Ass'n*, 161 F.3d 923, 933 n.7 (finding waiver due to "failure to raise the objections during the notice and comment period."). We must follow the earlier precedent, however, which directly refutes the agency's waiver argument. When precedents conflict, "under our rule of orderliness, the earlier case controls." *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 497 (5th Cir. 2016).

*Sw. Elec. Power Co.*, 920 F.3d at 1022 n.23. Plaintiff States were not required to raise this—or any—issue in the rulemaking process as a prerequisite for review by this Court.

Finally, Plaintiff States note previous controversy regarding severability in relation to their arbitrary-and-capricious claim. Federal Defendants' earlier briefing argued that because the "arbitrary-and-capricious arguments are directed only at the employment-authorization provisions of the Final Rule," the Court should sever the remaining portions of the rule if it finds this claim meritorious. ECF No. 639 at 26 n.7. In view of the Fifth Circuit's latest ruling on severability, Plaintiff States agree that if the Court finds this claim meritorious, the resulting universal vacatur may be limited to the work authorization provisions. However, as set forth *infra*, no such limitation is necessary in the event this Court determines that the forbearance provisions are independently unlawful and should be set aside as a result.

**2.   The benefits provisions are not severable from the forbearance provisions.**

The 2025 Fifth Circuit panel held the Final Rule's forbearance provisions severable from its unlawful benefits provisions. *DACA 5th Cir. 2025*, 126 F.4th at 419–20. Since it did not discuss whether the forbearance provisions were themselves unlawful, the panel had no occasion to address whether severability worked in the opposite direction—if the two benefits provisions (work authorization and lawful presence) were severable in the event that the forbearance provisions fell. That inquiry is now squarely before this Court.

The Fifth Circuit panel recognized the proper test for severability of an agency rule: "Whether the offending portion[s] of a regulation [are] severable depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision[s]." *Id.* at 419 (emphasis in original) (quoting *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001)). Given that its explicit severability clause applies to each of the three major portions of the Final Rule, there is no question of the agency's intent under the first inquiry:

> (a) Any provision of this subpart [which includes forbearance, work authorization, and lawful presence] held to be invalid or unenforceable as applied to any person or circumstance shall be construed so as to continue to give the maximum effect to the provision permitted by law, including as applied to persons not similarly situated or to dissimilar circumstances, unless such holding is that the provision of this subpart is invalid and unenforceable in all circumstances, in which event the provision shall be severable from the remainder of this subpart and shall not affect the remainder thereof.
>
> (b) The provisions in § 236.21(c)(2) through (4) [for work authorization and lawful presence] and § 274a.12(c)(14) and 274a.12(c)(33) [relating to work authorization] are intended to be severable from one another, from this subpart and any grant of forbearance from removal resulting from this subpart, and from any provision referenced in those paragraphs, including such referenced provision's application to persons with deferred action generally.

8 C.F.R. § 236.24; *see also DACA 5th Cir. 2025*, 126 F.4th at 419–20 (relying on text of severability provisions to find the requisite intent of the agency). However, the test for severability independently requires a finding that the surviving provisions "could function sensibly without the stricken provision[s]." *DACA 5th Cir. 2025*, 126 F.4th at 419 (quoting *MD/DC/DE Broads. Ass'n*,

236 F.3d at 22). Applying this second requirement, the 2025 Fifth Circuit panel found that forbearance could function sensibly without the benefits provisions. *Id.* at 420. But the same analysis does not hold for the reverse situation.

While forbearance is "the heart of DACA," the Supreme Court recognized that "forbearance and benefits are legally distinct and can be decoupled." *Id.* (quoting *Regents*, 591 U.S. at 28, 30). And "[l]awful presence 'is not the same as forbearance nor does it flow inexorably from forbearance.'" *Id.* (quoting *Regents*, 591 U.S. at 26 n.5). A policy of forbearing removal of certain illegal aliens could logically function even if those aliens were not granted access to benefits through lawful presence or work authorization. But a policy granting illegal aliens benefits and allowing them to work in the United States where those same aliens are removable and therefore prohibited from being in the country at all would be completely nonsensical.

The absurdity of such a scenario is tacitly evidenced by the Final Rule itself, which often discusses the desired severability of various provisions in relation to each other but never once addresses the possibility of the benefits provisions surviving the invalidity of forbearance (the latter of which is described as "the core of the policy," AR2022_100230, 87 Fed. Reg. 53,187). Indeed, every example entertained by the agency in the Final Rule presupposes the survival of forbearance. *See* AR2022_100244, 87 Fed. Reg. 53,201 (discussing survival of forbearance if work authorization was found invalid); AR2022_100249, 87 Fed. Reg. 53,206 (explaining why work authorization automatically terminates when DACA status is terminated without having to await "when removal proceedings are instituted"); AR2022_100251, 87 Fed. Reg. 53,208 (explaining agency view that "[i]n particular," if a court were to find the lawful presence provisions to be unlawful, it intends that forbearance and work authorization survive); AR2022_100291–92, 87 Fed. Reg. 53,248–49 (stating agency intent to continue forbearance and work authorization even if lawful presence provisions were found invalid, and "[s]imilarly, although there are significant benefits to providing work authorization alongside forbearance, forbearance remains workable and desirable without work authorization, and DHS would have adopted the forbearance portion of the policy even if it did not believe that the work authorization portion of the rule were legally authorized");

AR2022_100299, 87 Fed. Reg. 53,256 ("DHS considered a forbearance-only alternative, as well as other request and fee structures. Upon careful consideration of comments received, DHS agrees that a policy of forbearance without work authorization—while still a policy that would carry substantial benefits—would harm the substantial reliance interest of thousands of DACA recipients, their families, employers, and communities."); AR2022_100336, 87 Fed. Reg. 53,293 (under discussion heading of "Reliance Interests and Other Regulatory Effects," "DHS has considered a range of regulatory alternatives to the final rule, including alternatives related to a policy of forbearance from removal without employment authorization or the benefits associated with so-called lawful presence" and examining alternatives that all include the continued existence of forbearance); AR2022_100337, 87 Fed. Reg. 53,294 (discussing how "DHS has carefully considered" "[a] possible alternative to the policy in the final rule [that] would include (1) forbearance and (2) work authorization, but exclude (3) 'lawful presence' and the resulting elimination of one ground of ineligibility for the associated benefits" and "DHS also has carefully considered comments related to DHS's authority to confer work authorization and whether the Department should codify a forbearance-only alternative in this rule").

Not only would the Rule not "function sensibly" were the benefits provisions to survive the removal of the forbearance provisions, but an additional problem with such severance presents itself under the APA. Agency action must be "based on a consideration of the relevant factors." *Regents*, 591 U.S. at 16 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Nothing in the Final Rule indicates that the agency ever considered a policy that excluded forbearance but granted lawful presence and work authorization. And if severing a provision would make the surviving policy arbitrary and capricious, courts are not permitted to sever. *See MD/DC/DE Broadcasters Ass'n v. FCC*, 253 F.3d 732, 734–36 (D.C. Cir. 2001) (rejecting severance where retention of a provision "would leave in force a rule that . . . would be arbitrary and capricious"). "[I]t is clear that severing all . . . [of the invalid sections] would severely distort the [Agency's work] and produce a rule strikingly different from" the one DHS promulgated and has defended in court, making severance inappropriate. *MD/DC/DE Broadcasters Ass'n*, 236 F.3d at

23; *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007) (vacating two rules in their entirety because, "[a]s a result of our decision today, neither of the two Rules survives remand in anything approaching recognizable form").

## V.    This Court should lift its stay of relief for current DACA recipients and order a winding down of the program.

This Court first stayed its order of vacatur and permanent injunction on July 16, 2021. *DACA SDTX 2021*, 549 F. Supp. 3d at 624; *Texas*, 2021 WL 3022434, at *2. Two years later, the Court supplemented the existing injunction and vacatur order to extend to the Final Rule while keeping the remaining provisions of that order intact. *DACA SDTX 2023*, 691 F. Supp. 3d at 796. As with its 2021 decisions, the Court "stay[ed] the effective date of the vacatur order as to all DACA recipients who received their initial DACA status prior to July 16, 2021." *Texas*, 2023 WL 5950808, at *1. Along the way, the Court remained ever mindful of the potential reliance interests of those who had benefited from the program prior to the Court's initial determination of its unlawfulness. *See, e.g.*, *DACA SDTX 2023*, 691 F. Supp. 3d at 793 ("This Court has written at length on the reliance interests that DACA recipients have in the continuation of this program.").

In addition, the Final Rule acknowledges that *Regents* recognized that the 2012 DACA Memorandum's "statement that it 'conferred no substantive rights'" and "its limitation to two-year grants"—features continuing in the Final Rule—were "surely pertinent in considering the strength of any reliance interests." AR2022_100208—09, 87 Fed. Reg. at 53,145—166 (quoting *Regents*, 591 U.S. at 31). In the Final Rule, "DHS recognizes, as the [*Regents*] Court did, that the expressly limited and discretionary nature of the deferred action conferred upon individuals under the DACA policy (who are not guaranteed a grant or renewal of DACA, whose DACA may be terminated in USCIS' discretion, and who have no right to remain in the United States) is relevant to the assessment of reliance interests." AR2022_100209, 87 Fed Reg. at 53,166. Indeed, the Fifth Circuit—after this Court's 2021 grant of summary judgment—described the DACA recipients' reliance interests as "weak" due to these features. *MPP*, 20 F.4th at 990.

These stays of the relief represented a sensible precaution at the time of issuance, given the possibility that higher courts might indulge a different view. Such stays were not an endorsement of the program's validity but a temporary shield against disruption during the appellate process. As it turns out, the Fifth Circuit affirmed this Court's 2021 judgment, upholding its injunction and vacatur of the 2012 DACA Memorandum. *DACA 5th Cir. 2022*, 50 F.4th at 528–32. And in reviewing this Court's 2023 decision, the Fifth Circuit again affirmed that "the Final Rule substantively violates" immigration law. *DACA 5th Cir. 2025*, 126 F.4th at 417; *see also id.* at 421 n.47 ("DACA's contravention of federal law is reason to hold DACA unlawful."). In neither instance was further review by petition for certiorari sought. Having now been on notice of the program's unlawfulness for over four years by judgments not subject to further appellate review—and having enjoyed its benefits in the intervening period—these recipients cannot plausibly claim ignorance of the program's infirmity.

Reliance interests, while worthy of consideration in the equitable calculus of judicial remedies, are not talismans against the enforcement of the law. Indeed, reliance interests presuppose good-faith dependence on a lawful regime. But as the passage of time erodes the legitimate foundations for such dependence, so too must the stays yield to finality. DACA recipients have known for years—through unambiguous judicial decrees—that their status derives from executive overreach, not statutory authority. They have had ample time to adjust their affairs, to seek alternative paths, or to petition Congress for legislative relief. What remains is mere inertia masquerading as reliance. A nation professing fealty to the rule of law cannot countenance the unending extension of benefits that Congress has not authorized, no matter how deeply ingrained they have become. Further prolonging these stays would allow the executive to achieve through judicial forbearance what it could not through lawful means. Having served their purpose, this Court should now take the decisive step toward their dissolution.[12]

---

[12] Plaintiff States note that the Fifth Circuit's separate stay of relief with respect to existing DACA recipients ensures the Court lifting its own stay will not prejudice Federal Defendants or

In exercising its discretion, this Court may, but need not, provide a brief wind-down period—90 or 180 days, perhaps—to further mitigate any hardship said to result. Such a grace period would afford DACA recipients and their advocates the opportunity to appeal directly to Congress for the legislative fix that has always been their proper recourse. After all, it was Congress that enacted the immigration framework DACA purported to rely upon, and it is Congress alone that is authorized to amend that framework should it deem such action wise and just. Ultimately, neither the executive nor the judiciary can substitute its judgment on such policy-laden determinations for that of the people's elected representatives.

In the alternative, should reliance interests remain at the forefront of this Court's consideration, it may choose to adopt Plaintiff States' milder proposal for an orderly winding down of the DACA program. *See* ECF No. 625-1 at 13; ECF No. 673 at 16-18. Under that framework, Federal Defendants would be restrained from approving renewal applications for existing DACA recipients starting two years from the date the Court issues judgment. Plaintiffs did not invent the two-year transition period; this period is based on the Final Rule itself, which provides a two-year period for deferred action. AR2022_100284, 87 Fed. Reg. 53,241. After all, "DHS believes that 2 years is an appropriate frequency for review and decision on whether to continue to favorably exercise discretion in the form of deferred action." *Id.* And while "DHS recognizes and appreciates that biennial renewal requests may cause uncertainty for DACA recipients," that did not stop it from continuing to adopt the two-year renewal provision in the Final Rule. *Id.* DACA recipients are not entitled to rely on any status that extends beyond that provided in the Final Rule itself (and has existed with those limits since the beginning of the DACA program). The Final Rule recognizes that "the DACA policy as codified in this rule . . . is not a permanent solution for affected persons." AR2022_100226, 87 Fed. Reg. at 53,183. Such an option would afford recipients ample time to arrange departure from the country or obtain lawful status.

---

Defendant-Intervenors. *See Texas*, 2023 WL 5950808, at *1 (issuing its own stay of the effective date of the vacatur order in addition to the Fifth Circuit's 2022 stay).

CONCLUSION

President Obama himself, in 2011, acknowledged the limits of executive power with regard to the "Dreamers." His subsequent issuance of the 2012 DACA Memorandum marked a regrettable retreat from that initial candor, inviting the very litigation that has consumed seven years and multiple trips to and from the Fifth Circuit. The resulting decisions from this Court and the Fifth Circuit have affirmed the wisdom of the Framers' tripartite allocation of authority. Sympathy for DACA recipients, understandable though it may be, is no substitute for statutory text or constitutional command. Like all who reside within our borders, they must abide by the rule of law. Accordingly, this Court should enter such orders as it deems appropriate in its discretion to terminate these unlawful benefits provided to DACA recipients, bringing this chapter to a close and restoring the proper balance of powers.

Dated: September 29, 2025

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**RYAN G. KERCHER**
Chief, Special Litigation Division

**BRENT WEBSTER**
First Assistant Attorney General

**DAVID BRYANT**
Senior Special Counsel
*Attorney-in-Charge*
Texas Bar No. 03281500
Southern Dist. No. 808332

**RALPH MOLINA**
Deputy First Assistant Attorney General

*/s/ Ryan D. Walters*
**RYAN D. WALTERS**
Deputy Attorney General for Legal Strategy
Texas Bar No. 24105085
Southern Dist. No. 3369185

**MUNERA AL-FUHAID**
Special Counsel
Texas Bar No. 24094501
Southern Dist. No. 3379673

**J. AARON BARNES**
Special Counsel
Texas Bar No. 24099014
Southern Dist. No. 3697248

**KYLE S. TEBO**
Special Counsel
Texas Bar No. 24137691
Southern Dist. No. 3893370

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Telephone: (512) 936-2714
Fax: (512) 457-4410
ryan.walters@oag.texas.gov
david.bryant@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
aaron.barnes@oag.texas.gov
kyle.tebo@oag.texas.gov

*Counsel for Plaintiff State of Texas*

TIM GRIFFIN
Attorney General of Arkansas

*/s/ Autumn Hamit Patterson*
AUTUMN HAMIT PATTERSON
Solicitor General
AR Bar Number 2025095
TX Bar Number 24092947

OFFICE OF THE ARKANSAS ATTORNEY
GENERAL
101 W. Capitol Avenue
Little Rock, AR 72201
Telephone: (501) 682-2007
autumn.patterson@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*


STEVE MARSHALL
Attorney General of Alabama

*/s/ Robert M. Overing*
ROBERT M. OVERING
Deputy Solicitor General

OFFICE OF THE ALABAMA ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36130
AL/8736M14Q
Telephone: (334) 353-8931
robert.overing@alabamaag.gov

*Counsel for Plaintiff State of Alabama*


KRIS W. KOBACH
Attorney General of Kansas

*/s/ James Rodriguez*
JAMES RODRIGUEZ (KS Bar #29172)
OFFICE OF KANSAS ATTORNEY GENERAL
KRIS W. KOBACH
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephoneeophone: (785) 368-8197
jay.rodriguez@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

ELIZABETH B. MURRILL
Attorney General of Louisiana

*/s J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA*
Solicitor General
ZACHARY FAIRCLOTH*
Principal Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL OF
LOUISIANA
1885 N. 3rd St.
Baton Rouge, LA 70802
Telephone: (225) 421-4088
aguinagaj@ag.louisiana.gov
fairclothz@ag.louisiana.gov

*\*PHV Application forthcoming*

*Counsel for Plaintiff State of Louisiana*


LYNN FITCH
Attorney General of Mississippi

*/s/ Justin L. Matheny*
JUSTIN L. MATHENY
Deputy Solicitor General

OFFICE OF THE MISSISSIPPI ATTORNEY
GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Fax: (601) 359-2003
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*


MICHAEL T. HILGERS
Attorney General of Nebraska

*/s/ Cody S. Barnett*
CODY S. BARNETT
Solicitor General
NEBRASKA DEPARTMENT OF JUSTICE
Telephone: (531) 350-4932
cody.barnett@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

ALAN WILSON
Attorney General of South Carolina

*/s/ James Emory Smith, Jr.*
**JAMES EMORY SMITH, JR.**
General Counsel
OFFICE OF THE SOUTH CAROLINA ATTORNEY
GENERAL
P.O. Box 11549
Columbia, SC 29211
Telephone: 803-734-3680
Fax: 803-734-3677
esmith@scag.gov

*Counsel for Plaintiff State of South Carolina*

JOHN B. MCCUSKEY
Attorney General of West Virginia

*/s/ Michael R. Williams*
**MICHAEL R. WILLIAMS**
Solicitor General
OFFICE OF THE ATTORNEY GENERAL OF WEST
VIRGINIA
State Capitol Complex
Building 1, Room E-26
1900 Kanawha Blvd. E
Charleston, WV 25301
Telephone: (304) 558-2021
michael.r.williams@wvago.gov

*Counsel for Plaintiff State of West Virginia*

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF) on September 29, 2025.

*/s/ Ryan D. Walters*
RYAN D. WALTERS